# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) **FOR PUBLICATION** |
| | ) |
| CELSIUS NETWORK LLC, *et al.*, | ) Chapter 11 |
| | ) Case No. 22-10964 (MG) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

## MEMORANDUM OPINION REGARDING WHICH DEBTOR ENTITIES HAVE LIABILITY FOR CUSTOMER CLAIMS UNDER THE TERMS OF USE

*A P E A R A N C E S :*

MILBANK LLP
*Attorneys for Community First Partners, LLC, Celsius SPV Investors, LP, and Celsius New SPV Investors, LP*
55 Hudson Yards
New York, NY 10001
By:    Dennis F. Dunne, Esq.
       Nelly Almeida, Esq.
       Andrew M. Leblanc, Esq.
       Melanie Westover Yanez, Esq.

JONES DAY
*Attorneys to CDP Investissements Inc.*
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
By:    Joshua M. Mester, Esq.

KIRKLAND & ELLIS LLP
*Attorneys for the Debtor*
601 Lexington Avenue
New York, NY 10022
By:    Joshua A. Sussberg, Esq.
       Patrick J. Nash, Jr., Esq.
       Ross M. Kwasteniet, Esq.
       Christopher S. Koenig, Esq.
       Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Creditor Committee*
1221 Avenue of the Americas
New York, New York 10020
By:     Michael Andolina, Esq.
        Aaron Colodny, Esq.
        Kimberly A. Halvin, Esq.
        Samuel P. Hershey, Esq.
        Gregory F. Pesce, Esq.
        David M. Turetsky, Esq.
        Keith H. Wofford, Esq.

SELENDY GAY ELSBERG PLLC
*Proposed Co-Counsel for the Creditor Committee*
1290 Avenue of the Americas
New York, New York 10104
By:     Jennifer M. Selendy, Esq.
        Faith E. Gay, Esq.
        Claire O'Brien, Esq

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Do Customers (as defined below) have claims against the debtors and all of their

affiliates or only against Celsius Network, LLC ("LLC") under the terms of use?  This is a

difficult gating question.  Careless drafting of the terms of use leaves the answer unclear.  On

one side, the Debtors (the eleven entities that filed chapter 11 petitions in this Court) and the

Official Committee of Unsecured Creditors (the "Committee") urge the Court to find that

Customers have claims against each of the Debtors and each of their non-debtor affiliates

(together, the Debtors and their non-Debtor affiliates, the "Company").  On the other side,

Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and

CDP Investissements Inc.  (collectively, the "Series B Preferred Holders") urge the Court to find

that Customers only have claims against LLC.  The Series B Preferred Holders are not parties to

the terms of use.  However, because they made significant investments in Celsius Network

Limited ("CNL"), the top-level parent company, and their investment contracts did not prohibit

2

CNL and its affiliates (other than LLC) from incurring customer liability, the only way the Series

B Preferred Holders can limit their exposure to customer contract claims is to argue for a

construction of the terms of use (a contract to which they are not a party) that limits Customers'

contract liability claims to LLC. LLC is hopelessly insolvent. The net equity value of CNL, to

the extent any exists in the global enterprise, arises from Debtor and non-Debtor entities other

than LLC whose net equity value will flow up to CNL. Because unsecured Customers recover

ahead of equity holders under the absolute priority rule, the Series B Preferred Holders have

some chance of recovery if Customers hold claims only against LLC and not against CNL or

other Debtor and non-Debtor affiliates.[1]

Both interpretations have undesirable practical consequences. A ruling that Customers

have contract claims against all debtors and affiliates could expose non-Debtor affiliates to

customer liability because the terms of use do not distinguish between Debtor and non-Debtor

affiliates. On the other hand, a ruling that Customers have claims solely against LLC could

deprive the Customers of whatever value would flow up to CNL from Debtor and non-Debtor

affiliates.

Notwithstanding the difficult consequences on both sides, the law provides the Court

with a clear process for interpreting contracts. First, the Court is to determine whether the

contract is ambiguous. Next, if the Court determines the contract is ambiguous, the Court can

look to extrinsic evidence to determine the parties' intent and, by extension, the proper

interpretation of the contract. If, and only if, the extrinsic evidence does not provide the answer

---

[1] Not addressed in this Opinion are two arguments that could reduce or eliminate entirely any recovery for the Series B Preferred Equity holders, even if they prevail on the terms of use contract interpretation issue, and thereby increase recoveries for LLC's Customers. The Debtors and the Committee contend that CNL is obligated on an intercompany claim to LLC of approximately $3.5 billion. The Committee also contends that substantive consolidation of all assets and liabilities of the global enterprise is appropriate in these cases, unlocking value that would not otherwise be available to Customer claims. Therefore, this decision could have little or no effect on the pool of assets available to satisfy Customer claims. Those will be issues for another day.

can the Court invoke the tiebreaker rule of *contra proferentem*: that the contract be construed against the drafter.  In setting the briefing schedule for this matter, the Court required the parties to provide the Court with any extrinsic evidence they believe supports their respective interpretations of the terms of use.  Therefore, the Court concludes that the record is complete.

As explained below, the Court concludes based on the record that the contract is ambiguous.  Considering the extrinsic evidence, the Court finds, based on a preponderance of the evidence, that the parties to the terms of use intended that only LLC, and not any other Debtor or non-Debtor affiliates, are liable to Customers *on contract claims* under the terms of use.  Because extrinsic evidence answers the question of the proper interpretation, the Court need not, and cannot, invoke the doctrine of *contra proferentem*.

Importantly, the Court finds and concludes that the terms of use do not limit Customers (or the Committee) from asserting non-contract claims against CNL, or against other Debtor or non-Debtor affiliates, such as claims for fraud, negligent misrepresentation, or other statutory or common law claims.[2]

In short, while the Series B Preferred Holders prevail here, they may very well end up recovering nothing.  Nevertheless, the Court appreciates that this decision may deprive Customers of the full value of the Company.  But the Court's obligation is to interpret the contract and evidence before it, and the evidence commands the Court to accept the Series B Preferred Holders' argument that only LLC is liable to Customers on contract claims.

---

[2]   While not providing admissible evidence, the Court takes note of the voluminous reports of the Examiner which describe in great detail alleged misconduct by certain Celsius executives targeted specifically at Celsius Customers.  (*See, e.g.,* Final Report of Shoba Pillay, Examiner (the "Examiner's Report" or the "Report," ECF Doc. # 1956) at 7).

# I.    BACKGROUND

### A.    The Issue and Briefing

The Court is asked to resolve "the issue [the "Issue"] of 'which Debtors are liable to the
account holders ("Customers") under the global contract (the "Terms of Use") between Celsius
Network LLC and its account holders . . . ."[3]  *See Order (I) Setting a Briefing Schedule and (II)
Granting Related Relief* (the "Scheduling Order," ECF Doc. # 1747, ¶ 3).  At a hearing on
December 8, 2022, the Court described the Issue as a "gating issue [that] should be decided
sooner rather than later."[4]

Three parties (the "Parties") filed briefs regarding the Issue: (1) the Series B Preferred
Holders (the "Series B Brief," ECF Doc. # 1795); (2) the Debtors (the "Debtor Brief," ECF Doc.
# 1799); and (3) the Committee (the "the Committee Brief," ECF Doc. # 1797).  The Series B
Preferred Holders also filed the declaration of Melanie Westover Yanez (the "Yanez Decl.," ECF
Doc. # 1796), which attached exhibits.  The Committee filed the declaration of Aaron Colodny
(the "Colodny Declaration," ECF Doc. # 1798), which attached exhibits.  The Parties also
stipulated to certain facts (the "Fact Stipulation," ECF Doc. # 1955).

The Parties also filed response briefs:  The Series B Preferred holders filed a response
(the "Series B Response," ECF Doc. # 1960) and a supplemental declaration of Melanie
Westover Yanez (the "Supplemental Yanez Decl.," ECF Doc. # 1961).  The Committee filed a
response (the "Committee Response," ECF Doc. # 1965), as did the Debtors (the "Debtor
Response," ECF Doc. # 1962.)

---

[3]    Unless otherwise noted references to Terms of Use refer to Terms of Use Version 8.  All the Debtors' terms
of use, including Version 8, are attached to the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius
Network LLC, Providing Terms of Use Dating Back to February 2018* (the "TOU Decl," ECF Doc. # 393).

[4]    December 8, 2022 H'rg Tr. 37:19–20.

The Court held a hearing on the Issue on February 6, 2023. None of the parties called any witnesses to testify at the hearing.

## B.    The Parties' Positions

The heart of the Issue is as follows: the Debtors and Committee contend that the Terms of Use unambiguously provide that Customers have claims against all Debtor entities, while the Series B Preferred Holders contend that the Terms of Use unequivocally provide that only LLC is liable to Customers.

The Terms of Use form a contract between account holders and "Celsius." "Celsius" is defined in section 1 of the Terms of Use as "Celsius Network LLC and its Affiliates." "Affiliate" is defined as:

> an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise.

Terms of Use §§ 1–2.

Accordingly, the Debtors contend that the Terms of Use provide that Customers have claims against all Debtor and non-Debtor entities, since all Debtor and non-Debtor entities are Affiliates, as defined in the Terms of Use. (Debtor Brief ¶ 6.) The Committee agrees with the Debtors' position. (*See* Committee Brief ¶ 1.)

The Series B Preferred Holders, on the other hand, point to the language in the Terms of Use which indicates that "***in no event shall [the Customer] have any recourse***, whether by setoff or otherwise, with respect to our obligations, ***to or against any assets of any person or entity*** other than Celsius, ***including*** . . . ***any*** member, shareholder, ***Affiliate***, investor, employee, officer, director, agent, or advisor of Celsius." (*See* Series B Brief ¶ 2; Terms of Use § 25 (emphasis added).) Because "Affiliate[s]" are carved out of liability, the Series B Preferred

6

Holders argue that this language must be interpreted to mean that Customers only have recourse against LLC. (Series B Brief ¶ 28.) Specifically, they argue that "Celsius" in this sentence must be read to mean LLC, and not "LLC and its Affiliates," to effectuate the meaning of the clause. (*Id.*)

While all Parties claim that the contract is unambiguously in their favor, they further contend that extrinsic evidence supports their respective positions should the Court conclude it is proper to consider such evidence.[5] The Debtors and the Committee also argue that to the extent there is any ambiguity in the contract, it must be construed in favor of Customers and against the drafter.[6] Finally, all Parties agree that Terms of Use Version 8 govern the determination of the Issue.[7]

### C.    Factual Background

### 1.    The Terms of Use and the Migration to LLC

Prepetition, Customers accessed the Debtors' cryptocurrency services through its web interface or mobile application (together, the "Platform").[8] There were eight iterations of the Terms of Use from February 1, 2018 to the Petition Date.[9] Customers' use of the Platform was "expressly conditioned on consent to being bound by" the Terms of Use.[10] Upon creating an

---

[5]    *See* Series B Brief ¶ 32; Debtor Response ¶ 6; Committee Brief ¶ 5.

[6]    Committee Brief ¶ 23; Debtor Response ¶ 46.

[7]    Fact Stipulation ¶ 11.

[8]    TOU Decl. ¶ 3.

[9]    *See id.* ¶¶ 4–13.

[10]    *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Ferraro Decl.," ECF Doc. # 1326) ¶ 23.

7

account, Customers were required to view, agree to, and digitally execute the then-current version of the Terms of Use as a prerequisite to accessing the Platform.[11]

From February 1, 2018 through July 21, 2021, versions 1 through 5 of the Terms of Use governed the Customers' use of the Platform. In each of those versions, the Customers' only contract counterparty was CNL, a United Kingdom-based entity.[12] Versions 1 through 5 expressly provided that: (i) the Debtors could unilaterally update the Terms of Use; (ii) any such subsequent version would "supersede" or "prevail" over all prior versions; (iii) the Customers' continued use of the Platform constituted acceptance of the superseding Terms of Use; and (iv) if a Customer did not agree with a change to the Terms of Use, they could close their account before the effective date of the change, which would be their sole remedy.[13] No party disputes that under versions 1 through 5, only CNL, and no other affiliate, was liable to Customers under the terms of use.[14]

On January 10, 2020, the financial services regulator of the United Kingdom ("UK"), the Financial Conduct Authority (the "FCA"), began requiring certain cryptocurrency firms to register with the FCA by January 2021.[15] In December 2020, cryptocurrency firms that had

---

[11]     *Id.* ¶ 22.

[12]     See TOU Decl., Exhibits A-1 at 1, A-2–A-5 § 1 (stating, in substance, that CNL was providing the Terms of Use that apply to the Customers).

[13]     *See, e.g., id.*, Exhibits A-1 at 4, A-2 § 31, A-3–A-5 § 32 (noting that the Company reserves the right to change the Terms and Condition).

[14]     See February 6, 2023 H'rg Tr. 73:16–25 (Debtors' counsel agrees with the Court that prior to Version 6 of the terms of use only CNL, and not any other affiliate, was liable to customers); *id.* at 48:6–8 (Series B Preferred Holders' counsel notes that "while it's not a stipulated fact, I don't know that it is disputed under every prior iteration of the terms of use, affiliates were not in fact liable"); Committee Brief ¶ 6 ("Until August 2021, account holders contracted solely with CNL").

[15]     *See* The Money Laundering and Terrorist Financing (Amendment) Regulations 2019 (UK), https://www.legislation.gov.uk/uksi/2019/1511/made; FCA Press Release, *FCA becomes AML and CTF supervisor of UK cryptoasset activities* (January 10, 2020), https://www.fca.org.uk/news/news-stories/fca-becomes-aml-and-ctf-supervisor-uk-cryptoasset-activities.

applied for registration, including CNL, were granted temporary registration through July 9,

2021, to continue trading pending full authorization.[16]  On June 23, 2021, however, CNL

announced that, due to the "increased regulatory uncertainty" in the UK, CNL was "migrating

[its] main business activity and headquarters from the [UK] to the United States and where

applicable, to several other jurisdictions" and withdrawing from the FCA registration process in

the UK.[17]

One month later, on July 22, 2021, the Debtors adopted Terms of Use Version 6,

changing what the Debtors refer to as the "customer-facing entity," from CNL to "Celsius

Networks LLC and its Affiliates."[18]  As explained by the Debtors, "[t]he Terms of Use Version 6

were implemented in response to, among other things, significant changes that were made as a

result of a change of the legal entity where the majority of Debtors' cryptocurrencies were

held—moving those cryptocurrencies from being held by [CNL] in the [UK] to being held by . . .

[LLC] in the United States."[19]

On August 3, 2021, version 7 of the Terms of Use became effective.[20]  The latest Terms

of Use, version 8, became effective just prior to the launch of the Debtor's custody program, on

---

[16]     See FCA Press Release, *FCA establishes Temporary Registration Regime for cryptoasset businesses*
(December 16, 2020), https://www.fca.org.uk/news/press-releases/fca-establishes-temporary-registration-regime-
cryptoasset-businesses; see also @Mashinsky, TWITTER (Jan. 12, 2021 6:52PM),
https://twitter.com/mashinsky/status/1349142305689767936?s=46&t=3JF7_2d0lA0Tse6p1UER-g ("Good to be on
the FCA provisional list.").

[17]     *See Celsius Community Update* — June 23, 2021, CELSIUS, https://celsiusnetwork.medium.com/celsius-
community-update-june-23-2021-a28fca899091; TOU Decl. ¶ 11 (describing the transfer as "moving those
cryptocurrencies from being held by [CNL] in the [UK] to being held by [LLC] in the United States").

[18]     TOU Decl., Ex. A-6 § 1.

[19]     TOU Decl. ¶ 11.

[20]     *Id.* ¶ 12.

April 14, 2022.[21]  While the Terms of Use have been updated periodically to reflect the growth

of the Company and the cryptocurrency industry more broadly, many features of the Terms of

Use have remained consistent.  Notably, version 7 and version 8 of the Terms of Use both define

"Celsius" as "Celsius Network LLC and its Affiliates.[22]

### 2. Communication To Customers Regarding the Migration

Customers were informed of the significant changes effected by Terms of Use Version 6

in several ways.  Customers were advised via email that (i) their engagement from then on would

be with LLC rather than with CNL and (ii) the relationship would be governed by New York,

rather than UK, law.[23]  The email instructed Customers to "carefully read and make sure" they

understood the new contractual arrangements, including the fact that their "engagement will be

with [LLC.]"[24]  The email further informed Customers that if they did not accept the superseding

Terms of Use by August 5, 2021, they would lose access to the Platform and, if they did not

consent to the superseding Terms of Use by August 19, 2021, they would no longer be eligible to

earn rewards.[25]  The email further instructed Customers who did not agree to the superseding

Terms of Use that they could "withdraw [their] funds and close [their] account."[26]

The Debtors also announced Terms of Use Version 6 via pop-up communications on both

the web browser and mobile application that required Customers to accept Terms of Use Version

---

[21]     *Id.* ¶ 13.

[22]     TOU Decl., Exhibit A-7, § 1; id., Exhibit A-8, § 1.

[23]     *See* TOU Decl., Exhibit K (example email to Customers).

[24]     *Id.*

[25]     *Id.*

[26]     *Id.*

6 on the Platform.[27]  These pop-up communications similarly informed Customers of the significant changes to the Terms of Use, including the "[c]hange of legal entity [to LLC], a Delaware Company," and included links to the superseding version of the Terms of Use.[28] Customers were required to click a check-box to (i) "acknowledge that under the new [Terms of Use], the services will be provided to me by [LLC], and that [CNL] shall transfer to [LLC] my data, account balance, and its rights and obligations to me," and (ii) "Agree" to accept the superseding Terms of Use.[29]

If an existing Customer failed to accept the superseding Terms of Use by August 5, 2022, the Customer's account was suspended and such Customer was prevented from using the Platform.[30]  These Customers could view their account dashboards, but could not conduct any transactions.[31]  Customers were notified of the account suspensions via (i) e-mail; (ii) push notification; and (iii) on-Platform pop-ups on the web browser and the mobile application, and, again, were reminded repeatedly throughout August 2021 to accept the superseding Terms of Use to regain access.[32]  Finally, on August 19, 2021, the accounts of Customers who had not accepted the superseding Terms of Use stopped earning rewards.[33]

---

[27]     *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Blonstein Decl." or "Blonstein Declaration," ECF Doc. # 1327) ¶ 18.

[28]     *Id.*, Exhibits A-7 and A-9.

[29]     *Id.*

[30]     *Id.*, Exhibit A-2.

[31]     *Supplemental Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "Supp. Blonstein Decl.," ECF Doc. # 1584) ¶ 11.

[32]     Blonstein Decl. ¶ 17.

[33]     *Id.* ¶ 19.

3.      Customer Acceptance of Terms of Use

55% of the Customers listed on the Debtors' Schedules (as defined below) accepted a version of the Terms of Use earlier than version 6 and would therefore have seen and been required to affirmatively accept these pop-up notifications advising of the change from CNL to LLC when they logged into their accounts around July 22, 2021.[34]  The remaining 44% of the scheduled Customers opened their accounts after Terms of Use Version 6.[35]

4.      The Series B Investment

On October 12, 2021, after Celsius issued Terms of Use Version 6, Celsius announced a $400,000,000 million investment led by WestCap Group LLC ("WestCap"), a growth equity firm with billions under management, and Caisse de dépôt et placement du Québec ("CDPQ"), one of Canada's largest pension funds and certain of their affiliates.[36]  The investment, which was reported to have subsequently increased to more than $750 million, was structured as a preferred equity investment (the "Series B Preferred Shares") in CNL.[37]

As of July 29, 2022, CDPQ held approximately 7,328 Series B Preferred Shares in CNL.[38]  As of August 12, 2022, Community First Partners, LLC, Celsius SPV Investors, LP, and

---

[34]      *See. id* ¶ 14.

[35]      *Id*.  There is no record located for which version of the terms of use 1% of Customers first accepted.  *Id.*

[36]      Celsius Network Announces an Investment Led by WestCap and CDPQ at a Valuation More than US $3 Billion, Cision: PR Newswire (Oct. 12, 2021), https://www.prnewswire.com/news-releases/celsius-network-announces-an-investment-led-by-westcap-and-cdpq-at-a-valuation-more-than-us-3-billion-301397834.html (last accessed Dec. 26, 2022)

[37]      See Celsius Network Series B Expands to $750M, CoinDesk (Nov. 24, 2021), https://www.coindesk.com/business/2021/11/25/celsius-network-series-b-expands-to-750m-at-325b-valuation/ (last accessed on Dec. 22, 2022).

[38]      *See Declaration of Status as a Substantial Shareholder* (ECF Doc. # 336).

Celsius New SPV Investors, LP held approximately 14,125, 7,328, and 722 Series B Preferred Shares in CNL, respectively.[39]

In connection with their fundraising efforts CNL and its advisors made presentations to potential investors that included financial information about Celsius Mining LLC ("Mining"), a wholly-owned subsidiary of CNL, and did not report Customer liabilities.[40] In connection with a contemplated IPO for the mining business, CNL and its advisors prepared materials that described Mining as a "standalone entity" with operations that were "segregated into a new company formed in 2020."[41]

5.  Schedules of Assets and Liabilities

On October 5, 2022, the Debtors filed their Schedules of Assets and Liabilities (collectively, the "Schedules").[42] Mr. Ferraro, the Debtors' acting Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, declared under penalty of perjury that he had a reasonable belief that the information in the Schedules was true and correct. (*See generally* LLC Schedules; CNL Schedules; Non-LLC Schedules.) While the Schedules listed

---

[39]    *See Declaration of Status as a Substantial Shareholder* (ECF Doc. # 444).

[40]    *See* Mining Executive Summary, Fall 2021 Presentation, attached as Exhibit D to the Yanez Declaration; Mining Transaction & Business Update Presentation, dated January 2022, attached as Exhibit E to the Yanez Declaration.

[41]    *See* Yanez Decl., Exhibit I (Mining S-1) at 1; *see also*, *Celsius Network Announces Confidential Submission of Draft Registration Statement by Bitcoin mining subsidiary*, Celsius Mining LLC, PR NEWSWIRE (May 16, 2022), https://www.prnewswire.com/news-releases/celsius-network-announces-confidential-submission-of-draft-- registration-statement-by-bitcoin-mining-subsidiary-celsius-mining-llc-301547547.html [https://web.archive.org/web/20230120133021/https://www.prnewswire.com/news-releases/celsius-network-announces-confidential-submission-of-draft-registration-statement-by-bitcoin-mining-subsidiary-celsius-mining-llc-301547547.html].

[42]    The Schedules include the (i) Schedules for LLC (the "LLC Schedules," ECF Doc. # 974); (ii) Schedules for CNL, Case No. 22-10966 (the "CNL Schedules," ECF Doc. # 7); and (iii) Schedules for Celsius US Holding LLC, Case No. 22-10971 (ECF Doc. # 5), Celsius Networks Lending LLC, Case No. 22-10969 (ECF Doc. # 5), Celsius Network Inc., Case No. 22-10965 (ECF Doc. # 6), Mining, Case No. 22-10968 (ECF Doc. # 5), Celsius Lending LLC, Case No. 22-10970 (ECF Doc. # 5), and Celsius KeyFi LLC, Case No. 22-10967 (ECF Doc. # 5) (collectively with the CNL Schedules, the "Non-LLC Schedules").

Customer claims against every Debtor, the "Global Notes and Overview of Methodology" (the "Global Notes"),[43] attached to the Schedules, included a disclaimer indicating that an officer of the Debtors could not declare under penalty of perjury a reasonable belief as to the accuracy of scheduling Customer liabilities against each Debtor.[44] The Global Notes state "it is not the intent of the Debtors to create any presumption that account holders have claims against each Debtor entity, as that issue is disputed by certain holders of the Series B Preferred Shares issued by Celsius Network Limited."[45]

### D. The Intercompany Claim

Following the hearing on the Issue, the Court entered an order (ECF Doc. # 2017) directing the Debtors to file information on the estimated value of the claims held by LLC against CNL (the "Intercompany Claim"). On February 16, 2023, the Debtors filed a statement (the "Intercompany Statement," ECF Doc. # 2092), which noted that valuation of the Intercompany Claim is difficult because of the "enormous volume of historical intercompany transactions and severe deficiencies in intercompany record keeping." (Intercompany Statement ¶ 4.). The Debtors aver that to understand the complete universe of intercompany claims would require "forensic analysis and would be costly and timing consuming, if it were even possible given the recordkeeping deficiencies." (*Id.* ¶ 12.) While the Debtors' Schedules, based on the Debtors' books and records as of the Petition Date, reflect an approximately $9.1 billion intercompany claim held by LLC against CNL based on the initial value of the Intercompany

---

[43] "Global Notes" means the *Global Notes and Statement of Limitations, Methodology and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs* (ECF Doc. # 974), as applicable to each Debtor.

[44] *See, e.g.*, CNL Schedules, Official Form 202 ("Declaration Under Penalty of Perjury for Non-Individual Debtors").

[45] Global Notes at 3.

Claim, such claim does not account for the shortfalls in record keeping that make this accounting difficult. (*Id.* ¶ 10.) Nevertheless, using the information and analysis the Debtors did perform, they aver that the Intercompany Claim is "best reflected at the pro forma amount of $3.5 billion." (*Id.* ¶ 12.)

### E. Discovery Conducted Regarding the Issue

Before entering the Scheduling Order, the Court told the Parties on that record that "I want as part of the filings the . . . extrinsic evidence that each of you would rely on in the event that the Court concludes that the contract terms are ambiguous and it can't be resolved solely from the contract terms."[46] While the Scheduling Order provided a schedule for discovery, including document requests, interrogatories, and depositions, it appears that relatively little discovery regarding the Issue took place. (Scheduling Order ¶ 4.) The Committee notes that the Series B Preferred Holders (along with the Debtors and Committee) did not seek any depositions. (Committee Response ¶ 2.) They also argue that the Series B Preferred Holders, by producing only one document that they had not previously publicly filed, are effectively trying to rely on extrinsic evidence while preventing their adversaries from developing evidence that might undermine their position. (*Id.*) For example, the Committee contends that the Series B Preferred Holders refused to produce any communications with the Debtor to identify members of the Series B Preferred Holders with knowledge of Debtors' intent and declined to depose the Debtors to ascertain the same. (*Id.*) The Series B Preferred Holders make the same accusation of the Debtors. They argue that the Debtors have not produced a single document consistent with their argument that the Debtors intended all Debtor entities to have liability to Customers. (Series B Response ¶ 26.)

---

[46]   Dec. 8, 2022 Hr'g Tr. at 38:5-9.

None of the parties sought any Court intervention, despite the Court's expedited procedures for dealing with discovery disputes. Consequently, the Court considers the record closed, and the Court's decision is based on the record before it.

## II.    <u>LEGAL STANDARD</u>

This is the second time the Court has been asked to interpret the Terms of Use. The first time resulted in a written decision. *See In re Celsius Network, LLC,* 647 B.R. 631 (Bankr. S.D.N.Y. 2023) (appeal pending). While the contract interpretation issue addressed in that opinion was different than the one presented here, the same contract interpretation principles apply.

The Terms of Use is a contract governed by New York law.[47] In New York, it is well settled that courts interpret contracts based on plain meaning of the terms of the contract. When a contract's terms are unambiguous, courts apply them as written.[48] In addition, "[a] contract should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases. . . . Courts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Consedine v. Portville Cent. Sch. Dist.*, 907 N.E.2d 684, 689 (2009) (internal citations omitted). Finally, where a contract's terms are unambiguous, extrinsic and parol evidence should not be considered and such evidence cannot be used to create an ambiguity in an

---

[47]     *See* Terms of Use § 33 (providing that the Terms of Use is "governed exclusively by the laws of the state of New York"). The Terms of Use have been governed by the laws of the state of New York since version 6.

[48]     *In re Condado Plaza Acquisition LLC*, 620 B.R. 820, 831 (Bankr. S.D.N.Y. 2020) (finding that under New York Law, contracts are interpreted and enforced in accordance with their plain meaning and their clear and unambiguous terms); *see also, e.g., In re Enron Corp.*, 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("When an act provides that it shall be known and referred to by a designated name, the name cannot be made the means of overriding the plain meaning of its other provisions").

otherwise clear agreement. *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990)

(quoting *Intercontinental Plan., Ltd. v Daystrom, Inc.*, 24 N.Y.2d 372, 379 (1969)) ("It is well

settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written

agreement which is complete and clear and unambiguous upon its face.'").

"The question of whether a written contract is ambiguous is a question of law for the

court." *Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 59 (2d Cir. 2017) (quoting *JA

Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009)). The fact that the "parties present

alternative interpretations" does not alone make the contract ambiguous. *Neopharm Ltd. v.

Wyeth–Ayerst Int'l LLC*, 170 F. Supp. 3d 612, 615 (S.D.N.Y. 2016). Conversely, "[a] contract is

ambiguous if the provisions in controversy are reasonably or fairly susceptible of different

interpretations or may have two or more different meanings." *New York City Off-Track Betting

Corp. v. Safe Factory Outlet, Inc.*, 28 A.D.3d 175, 177 (1st Dep't 2006) (internal quotation

marks and citation omitted).

On the other hand, when a court finds a contract to be ambiguous, "extrinsic evidence

may properly be considered in the search for the contracting parties' intent." *Seiden Assocs. v.

ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir. 1992); *see also Faulkner v. Nat'l Geographic

Soc'y.*, 452 F. Supp. 2d 369, 375, 377–79 (S.D.N.Y. 2006) (finding the contract ambiguous and

analyzing different types of evidence to ascertain intent). "The cardinal principle for the

construction and interpretation . . . [of] all contracts—is that the intentions of the parties should

control." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties*, LLC, 467 F.3d 107, 125 (2d Cir.

2006) (citing *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir.1986)). Under

New York law, courts determine intent by looking at "the objective manifestations of the intent

of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977).

The *contra proferentem* principle, that a contract is construed against the drafter, is to be applied only (i) where more than one reasonable interpretation exists, and (ii) as a last resort, after all other guides to interpretation have been exhausted. *See Electra v. 59 Murray Enters.*, 987 F.3d 233, 245 (2d Cir. 2021) ("[The] generally accepted purpose [of *contra proferentem* is] as an interpretive tiebreaker of last resort."), *cert. denied*, 142 S. Ct. 563 (2021); *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1050 (2d Cir. 1989) ("Finally, if, after all of the other guides to interpretation have been exhausted and the court concludes that there remain two reasonable interpretations of the contract, with each party knowing or having reason to know of the other party's understanding of the term, the court should as a policy matter, assuming . . . the parties have indeed attempted to enter into a contract, choose the interpretation that is adverse to the party that drafted the contract.").

## III.   DISCUSSION

For the reasons detailed below the Court finds that the contract is ambiguous and thus looks to extrinsic evidence to determine the proper meaning of the contract. Based on the extrinsic evidence admitted during the February 6, 2023 hearing, the Court finds that the Series B Preferred Holders have established by a preponderance of the evidence that the Terms of Use provide that Customers only have contract claims against LLC, and not against any other Debtor or non-Debtor affiliate. However, the Terms of Use do not limit the liability of Debtor affiliates for non-contract claims, such as fraud, negligent misrepresentation, or, perhaps, federal or state statutory claims.

18

A. **The Contract Is Ambiguous**

The text of the provision at issue, which is entitled "Limitation of Liability; Legal Fees

and Costs for Lawsuits" is as follows:

> in no event shall you [(the Customer)] have any recourse, whether by setoff
> or otherwise, with respect to our obligations, to or against any assets of any
> person or entity other than Celsius, including, without limitation, any
> member, shareholder, ***Affiliate***, investor, employee, officer director, agent
> or advisor of Celsius.

TOU Decl., Exhibit A-8, § 25 (emphasis added).

The Parties do not dispute that the introduction to the Terms of Use defines "Celsius" as

"Celsius Network LLC and its Affiliates."[49]  The Parties do dispute, however, how this fact

affects the interpretation of Section 25 of the Terms of Use.  The Court finds that Section 25 of

the Terms of Use could reasonably be interpreted to mean that affiliates other than LLC are

carved out from liability, *or* that only affiliates of affiliates of LLC are carved out from liability.

Both interpretations, discussed in turn below, equally strain the bounds of reasonableness,

leaving the Court unsure which interpretation is correct and thus requiring the Court to consider

extrinsic evidence.

1. The Debtor' and Committee's Interpretation

The Debtors' and Committee's proposed interpretation relies heavily on the fact that the

introduction to the Terms of Use defines Celsius as including "LLC and its Affiliates."  They

argue that "Affiliates . . . of Celsius" that are carved out from liability in Section 25 of the Terms

of Use cannot be Celsius's direct affiliates, since the Terms of Use repeatedly refer to "Celsius,"

as the entities that owe obligations to account holders.  (Debtor Brief ¶ 22.)  In short, they

contend that it would make no sense for the Terms of Use to provide in multiple places that

---

[49]     Series B Brief ¶ 3; Debtor Brief ¶ 20; Committee Brief ¶ 10.

"Celsius and its Affiliates" were liable and then exclude them from liability using one word buried 129 words into a 160-word clause in Section 25.

The Terms of Use provide that "capitalized terms have the meaning assigned to them in these terms, unless context requires otherwise." (Terms of Use § 2.) Thus, absent specific circumstances counseling otherwise, all references to "Celsius" should be read to mean "LLC and its Affiliates."

Reading the term "Celsius" in Section 25 in line with the defined term in the text, "Affiliate . . . of Celsius," would read "Affiliates of LLC and its Affiliates." The Debtors argue that the "Affiliates of LLC and its Affiliates" that are excluded from liability under Section 25 are those Affiliates of LLC's Affiliates—i.e., Affiliates of LLC that are outside the Company's capital structure. (Debtor Brief ¶ 27.) For example, the Debtors note that if an affiliate of CNL, such as Debtor Celsius Mining LLC, owned or controlled a different entity through a joint venture or contractual agreement, such entity would not necessarily be an "Affiliate" of LLC. (*Id.*)

In support of this interpretation, the Committee correctly points out that to the extent the Company wanted to refer to a specific entity, such as LLC, it knew how to do so. For example, the Terms of Use also refer specifically to Celsius EU UAB regarding services provided by that specific entity.[50] Accordingly, the Committee makes a colorable argument that since Celsius knew how to designate specific entities, but never referred to LLC on its own, that every place in the Terms of Use that it used the defined term Celsius, it intended to impose obligations to account holders on each Debtor entity, not just LLC. *Quadrant Structured Prod. Co. v. Vertin*,

---

[50]     Terms of Use § 1 (referring to particular services to be provided by Celsius EU UAB with respect to Binance Coin (BNB), Ripple (XRP), Tether Gold (XAUT), and WDGLD).

16 N.E.3d 1165, 1172 (N.Y. 2014) ("[I]f parties to a contract omit terms—particularly, terms
that are readily found in other, similar contracts—the inescapable conclusion is that the parties
intended the omission.").

    While this argument would allow the Court to read Section 25 in harmony, using the
defined terms of the Terms of Use, it has multiple weaknesses.  First, the Debtors' argument only
works if the Court reads the language in Section 25, "Affiliate . . . of Celsius," to exclude from
liability Affiliates of LLC's Affiliates, but not LLC's Affiliates, since LLC's Affiliates are the
very Debtor entities that the Debtors are trying to argue are liable to Customers.  But the Debtors
are asking the Court to read all references to Celsius as "LLC and Affiliates."  The resulting
clause is dizzying.  It would follow that the Court should read "Affiliate . . . of Celsius" as
"Affiliate . . . of Celsius LLC and its Affiliates."  This language would seem to include both
Affiliates of LLC's Affiliates and Affiliates of LLC.  The Series B Preferred Holders summarize
it well when they note that "the Debtors ask the Court to read Affiliate in the carveout as
referring to only half of the composite defined term, the Affiliates of LLC, but not LLC itself."
(Series B Response ¶ 5.)  The Series B Preferred Holders reasonably argue that this is "not how
every other group listed in the carveout, such as employees, directors, or officers is meant to be
read."  (*Id.*)

    Second, the Series B Preferred Holders also reasonably argue that the Debtors'
interpretation of "Affiliate of Celsius" as referring to an affiliate of an affiliate in Section 25
cannot be reconciled with certain other uses of "Affiliate of Celsius" throughout the Terms of
Use.  (*Id.* ¶ 13.)  For example, they note that Section 4(E) of the Terms of Use provides that "you
may apply to borrow certain Fiat currencies . . . from an Affiliate of Celsius."  (*Id.* ¶ 13, n.23
(quoting TOU Decl., Exhibit A-5–A-6).)  The Series B Preferred Holders thus contend that if

21

"Affiliate of Celsius" referred to an affiliate of an affiliate, there could be no borrow program,
because at the time of drafting there were no affiliates of affiliates in existence. (*Id.* ¶ 13.) The
Series B Preferred Holders provide several other examples of places in which Celsius is used in
the same clause as Affiliates, which they argue casts doubt on "Celsius" meaning "Celsius and
its Affiliates." (See *id.* ¶ 9 (listing examples).) The Series B Preferred Holders argue that using
the Debtors' reading of the Terms of Use, the reference to "and/or its Affiliates" would be
superfluous if the term Celsius already included Celsius and its Affiliates. (*Id.*) While the
existence of "Celsius" and "Affiliates" in the same clause does present ambiguity, it does not
mean that the Court should *carte blanche* replace the definition of "Celsius" in every clause
where "Affiliates" also appear. Nevertheless, these instances make it challenging for the Court
to determine what "Celsius" means in different places throughout the Terms of Use, and,
particularly, in Section 25.

Finally, the Series B Preferred Holders correctly point out that if Celsius wanted the term
"Affiliates" in Section 25 to refer only to entities outside the company's corporate structure, they
could have simply added that language to the clause rather than using the defined term Affiliate.
(Series B Response ¶ 17.) Moreover, based on the broad definition of an affiliate as "an entity
that owns or controls, is owned or controlled by, or is or [*sic*] under common control or
ownership with a party . . . ," it is unclear if there could ever be an affiliate of an LLC affiliate
that is not also an Affiliate of LLC.[51] In response, the Committee points out that it is not
uncommon for parties to contract regarding entities that do not exist at the time of drafting, such
as a will that bequeaths assets to an unborn heir. (Committee Response ¶ 13.) Nevertheless, the
Debtors' failure, either in their briefs or at the hearing, to articulate how such an affiliate could

---

[51] Terms of Use § 2.

exist is problematic.  In sum, while the Debtors' and Committee's argument has some appeal, it also has major weaknesses.

### 2.    The Series B Preferred Holder's Interpretation

Notwithstanding that Celsius is defined as "Celsius and its Affiliates," the Series B Preferred Shareholders contend that the Court should read the term "Celsius" to refer only to "LLC" in Section 25 of the Terms of Use.  (Series B Response ¶ 1 (arguing that "where the Terms of Use makes a distinction between Affiliate(s) and Celsius . . . context requires Celsius to be read as just LLC").)  As with the Debtor and Committee's interpretation, the Series B Preferred Holder's interpretation has some appeal, but also significant weaknesses.

The Series B Preferred Holders make three primary arguments why the Court must read the term "Celsius" in Section 25 of the Terms of Use as referring only to LLC.  First, they argue that the "plain meaning" of Section 25 supports this interpretation.  (*Id.* ¶ 7.)  Second, they argue that if Celsius is not read as "LLC" in Section 25, the operative provision would have no meaning.  (*Id.* ¶ 12; 18.)  Third, they argue that under principles of contract interpretation, where there is an inconsistency between a specific provision and a general provision of the contract the specific must control; thus, they contend that the specific definition of Celsius in Section 25 must trump the general definition in the introduction.  (*Id.* ¶ 21.)

As to the first argument, under New York law, when interpreting a contract, "words and phrases are given their plain meaning." *Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal quotation marks and citation omitted).  The Series B Preferred Holders argue that even if the Court reads Celsius to mean "Celsius and its Affiliates," the plain meaning of Section 25 provides that Customers have no recourse because the sentence would read (LLC + Affiliates – Affiliates = LLC) leaving only LLC remaining with liability to Customers.  (Series B

Response ¶ 1.)  This argument has some intuitive appeal, but what the Series B Preferred Holders leave out is that the carve out does not just mention an Affiliate but an "Affiliate . . . of **Celsius.**" (Terms of Use § 25 (emphasis added).)  The correct equation leads to similarly dizzying results as the Debtors' interpretation of the clause.  If one plugs in "Celsius and Affiliates" for every mention of "Celsius," the equation would read (LLC + Affiliates – (**Affiliates of LLC and its Affiliates**)).  Thus, the plain language does not carve out all but LLC from liability, but rather carves out only "Affiliates of LLC and its Affiliates," arguably leaving LLC and Affiliates as liable to Customers.  Moreover, though the Series B Preferred Holders accuse the Debtors of only reading Affiliate in the carveout as referring to only half of the composite defined term, the Affiliates of LLC, but not LLC itself, they do essentially the same thing by not including the "of Celsius" language in their equation.  Thus, neither party has convincingly argued that the plain language supports their interpretation.

Next, the Series B Preferred Holders argue that reading the term "Celsius" to mean "Celsius and its Affiliates" renders Section 25 meaningless and that "Celsius" in this clause must be read to only refer to LLC.  (Series B Brief ¶ 27.)  This argument fares better than the plain meaning argument but is still flawed.  The Series B Preferred Holders argue that if "Celsius" in Section 25 is interpreted to mean "Celsius and Affiliates," such that all affiliates have liability, the carve-out of "Affiliate" would be rendered meaningless—violating the canon of contract interpretation which holds that each word must be given meaning.  (*Id.* (citing *See Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 648-49 (S.D.N.Y. 2012)) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (internal quotation marks and citations omitted).)  While the Series B Preferred Holders are correct that

the carveout should have meaning, the problem here is that reading "Celsius and Affiliates" out of the definition of "Celsius" in order to give meaning to the carve-out has the effect of rendering the Debtors' explicitly defined term "Celsius" as meaningless. In short, the Court would have to pick between nullifying the definition of "Celsius" or the definition of "Affiliate," and neither party has identified guidance within the four corners of the text for how the Court should make this decision.

Finally, the Series B Preferred Holders argue that "if there [i]s an inconsistency between a specific provision and a general provision of a contract . . . , the[] specific provision controls." *DBT GmbH v. J.L. Mining. Co.*, 544 F. Supp. 2d 364, 377–78 (S.D.N.Y. 2008) (internal citation omitted); *see also U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 99 (2d Cir. 2013) (noting that a "specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision") (internal quotation and citation omitted). Here, the Series B Preferred Holders contend that because Section 25 specifically deals with limitation of liability and carves out affiliates, while the definition of "Celsius" is a general clause, "Celsius" must be read to mean only "LLC" in Section 25 to give effect to this more specific provision.

However, the case law the Series B Preferred Holders cite does not support application of this maxim under these circumstances. For example, in the *Sears* decision, the district court found that notwithstanding the broad definition of "Liability" and a provision that the Debtor agreed to assume all "Liability," the Court had to read a more specific section that listed "Excluded Liabilities" as qualifying the Debtors' agreement to assume all liabilities. *In re Sears Holdings Corp.*, No. 21 CIV. 5437 (NSR), 2022 WL 4482375, at *5 (S.D.N.Y. Sept. 27, 2022). In *Sears*, there was a broad definition of a concept ("Liability"), and then another clause that

25

carved out a definition for a specific portion of that concept ("Excluded Liability"), which
counseled the Court to read "Liability" differently depending on context. (*See id*.) Here, in
contrast, there are definitions of Celsius and Affiliate in the definition section, but nowhere is
there a definition of those terms that is further broken down. For example, there is no reference
to "Non-Customer Facing Affiliates" or another subset of Affiliates that would alert the Court to
the need to potentially read the words Celsius or Affiliates in Section 25 differently than the
definition section counsels.

In sum, the Court finds that both sides' interpretations equally strain the plain language of
the contract. Because the interpretation of Section 25 can fairly be read as carving out only
affiliates of affiliates from liability, or as carving out all but LLC from liability, the contract is
ambiguous and the Court must turn to extrinsic evidence. *See Seiden Assocs. v. ANC Holdings,
Inc.*, 959 F.2d 425, 429 (2d Cir. 1992) (noting that when a contract is ambiguous "extrinsic
evidence may properly be considered in the search for the contracting parties' intent.")

### B. Extrinsic Evidence Supports the Series B Preferred Holders' Interpretation

While the Series B Preferred Holders put forth voluminous evidence to support their
interpretation, the Debtors and Committee put forth very little extrinsic evidence in support of
their position. The Debtors instead dedicate most of their briefing to refuting the Series' B
Preferred Holders' evidence, rather than presenting their own. As explained below, based on the
evidence in the record, the Court finds by a preponderance of evidence that the intention of the
parties was for only LLC and not any other Debtor or non-Debtor affiliate to be liable to
Customers under the Terms of Use.

    1.    <u>Discovery Limitations</u>

All Parties complain in their briefs that the other side did not produce sufficient discovery to show intent.  (*See supra* § 1.E.)  The Court directed the Parties to develop an evidentiary record before the hearing.[52]  No party contacted the Court about discovery disputes.  The Court will consider the evidence in the record without reference to the various allegations of discovery slights.

    2.    <u>Series B Preferred Holders Extrinsic Evidence</u>

The extrinsic evidence that the Series B Preferred Holders rely on largely falls into four categories: (1) evidence surrounding the substitution of LLC for CNL as the customer-facing entity; (2) reports and presentations listing customer liabilities at LLC, (3) the Debtors' statements in these Chapter 11 Cases; and (4) customer conduct.

    *a.  Migration from CNL to LLC*

The most probative evidence the Series B Preferred Holders put forth is the evidence of the transition from CNL to LLC in connection with the promulgation of Terms of Use Version 6. The Court finds that this evidence shows the objective intent to transfer customer liability from CNL to LLC.  The Court finds, and no party disputed, that before the implementation of Terms of Use Version 6, only CNL, and no other Debtor or non-Debtor affiliate, was liable to Customers under the terms of use.[53]  Because only CNL was liable before Version 6, the evidence of an intent to substitute the previously liable party, CNL, for a new party, LLC, is a strong indication of an intent that only LLC would be liable to Customers.  The Court finds that

---

[52]    Dec. 8, 2022 Hr'g Tr. at 38:5-9.

[53]    *See* TOU Decl., Exhibits A-1 at 1, A-2–A-5 § 1 (stating, in substance, that CNL was providing the Terms of Use that apply to the Customers);

(1) the Debtors historically had only *one* entity liable to Customers, and (2) one entity (LLC) was substituted for the other (CNL) in the Terms of Use Version 6. This is strong evidence of the intent to make only the substituted entity (LLC) liable for customer contract claims.

The Series B Preferred Holders provide ample evidence that the Debtors manifested an objective intent through communications to Customers that LLC and not CNL would be liable to Customers going forward. *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399 (1977) (noting that Courts look to objective manifestations, such as a party's words or deeds to determine intent). Evidence in the record shows that Customers were told repeatedly of this change from CNL to LLC, and Customers were specifically required to accept the change through a pop-up screens accompanying their acceptance of Terms of Use Version 6:

- Customers' relationship will now be with LLC, *not CNL*, and subject to the governing laws of New York (not UK);
- under the new T[erms of Use], the services will be provided to [Customers] by . . . LLC"; and
- CNL "shall transfer to . . . LLC [Customers'] data, account balance, and [CNL's] rights *and obligations* to [the Customer]."[54]

Thus, Customers, who prior to Version Six of the Terms of Use, had only contracted with CNL, were now being told that their engagement was with LLC.

The Committee and Debtors attempts to poke holes in this evidence with three arguments. All fail. First, the Committee argues that pop-ups omitted from the Series B Preferred Holders' opening brief, which require Customers to confirm they have read and agreed to the new Terms of Use" in their entirety, weaken the Series B Preferred Holders' argument. (Committee Response ¶ 18–19 (citing Blonstein Decl., Ex. A).) The Committee argues that rather than altering the Terms of Use, these pop-ups confirm that the Terms of Use control the

---

[54] *See* TOU Decl., Exhibit K (emphasis added).

party's agreement, since parties were directed to read the entire terms of use. (Committee

Response ¶ 19.) The Committee further argues that given the fact that these pop-ups were only

shown to the 44% of Customers that signed up after Terms of Use Version 6, the pop-ups cannot

have altered the conditions of the Terms of Use. (*Id.* ¶ 20.) But this argument entirely misses

the point. While it is true that the pop-ups are extrinsic evidence that do not change the terms of

the contract, given that the contract is ambiguous, the Court is permitted to look at all evidence

probative of intent to interpret Section 25.[55] Further, the fact that 44% of Customers did not see

these pop-ups is immaterial. Those Customers, who joined after the release of Terms of Use

Version 6, would never have had an engagement with CNL,[56] which, as noted above, was

removed from the terms of use upon the release of Terms of Use Version 6. Thus, the fact that

the Debtors did not communicate to Customers that CNL, an entity these Customers had never

had a relationship with, was no longer liable to them, is not evidence that CNL is still liable to

Customers.

Second, the Committee argues that if the Debtors intended to substitute LLC for CNL,

Customers would have needed to explicitly release LLC from liability. Not so. The Committee

cites caselaw for the proposition that New York law requires an explicit statement of release in

order to release a party from liability. (See Committee Response ¶ 16 (citing *Elbit Sys. v. Credit

Suisse Grp.*, 842 F. Supp. 2d 733, 739 (S.D.N.Y. 2012) ("A release will not be given effect

unless it contains an 'explicit, unequivocal statement of a present promise to release [a party]

from liability.'")).) In other words, the Committee argues that, even if the Court accepted the

---

[55]   *Freedberg v. Landman*, 930 F. Supp. 851, 855 (E.D.N.Y. 1996) ("Where the meaning of a word or phrase
is ambiguous, a court may look beyond the 'four corners' of the agreement and 'examine the record as a whole in an
attempt to interpret the agreement so as to effectuate the intent of the parties.'" (quoting *Bank of New York v. Amoco
Oil Co.*, 35 F.3d 643, 661 (2d Cir. 1994)), *aff'd*, 112 F.3d 503 (2d Cir. 1996).

[56]   See TOU Decl., Exhibits A-6–A-7 § 1; Terms of Use § 1.

Series B Preferred Holders' interpretation of the text, as a legal matter, the Terms of Use do not provide a proper release of CNL. But the Committee ignores the fact that under New York law it is "well settled that where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.,* 100 A.D.2d 865, 967 (1985) (internal quotation and citation omitted).[57] To be clear, an express waiver, discharge, or release of claims is not necessary to extinguish claims upon novation; in general, when there is an express superseding agreement, no claims may be made on the prior agreement unless the claims are expressly or impliedly reserved. *Berkshire Bank v. Pioneer Bank*, Nos. 901358-20, 901359-20, slip op. at *18 (N.Y. Sup. Ct. July 1, 2021). The Committee does not provide any analysis of novation, or otherwise refute the fact that a novation acts as a proper release under New York law. (*See* Committee Response ¶ 16.)

Here, each version of the Terms of Use, including version 5, which immediately preceded the migration to LLC, provides that the Terms of Use may be changed and the updated version will "supersede all prior versions." Further, as discussed herein, in connection with the migration, Customers were explicitly informed that (i) their counterparty was changing from CNL to LLC, (ii) the governing law changed, and (iii) CNL would no longer have any obligations to Customers. Using extrinsic evidence, the Court finds that under Terms of Use Version 6 only LLC is liable. Terms of Use Version 6 acted as novation releasing LLC from liability. To be clear, the issue of a novation does not bear on the interpretation of the text,

---

[57] *See also Revonate Mfg., LLC v. Acer Am. Corp.*, 12-CV-6017-KBF, 2013 WL 342922, at *5 (S.D.N.Y. Jan. 18, 2013) (granting a motion to dismiss a claim related to a prior contract that had been extinguished by superseding contract); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 879 (N.D. Cal. 2018), *aff'd*, 816 F. App'x 68 (9th Cir. 2020) (finding novation applied to superseding online terms of service).

which the Court comes to by way of extrinsic evidence, but the doctrine disposes of the Committee's legal argument that CNL was not properly released from liability.

Finally, the Debtors argue that the fact that the Debtors communicated to Customers that LLC would be the customer facing entity does not constitute evidence that LLC would be liable. (Debtor Response ¶ 24.)  This argument would be more persuasive if prior to Terms of Use Version 6, all Debtor affiliates, and not just CNL had been liable.  But, as noted repeatedly, only CNL was liable prior to Version 6.  Thus, absent evidence to the contrary, which, as noted below, the Debtors have not produced, the fact that the Debtors communicated to Customers that LLC was the new Customer facing entity and substituted LLC for CNL in the Terms of Use, is strong evidence of an intent to transfer liability to CNL.

### b. *Reports and Presentations*

The Series B Preferred Holders next point to certain annual reports and presentations distributed to potential investors which do not report any Customer liability to Mining.  (Series B Brief ¶ 37).[58]  The Court finds this evidence to be far less probative.  These reports were not shared with the contract counterparty, the Customers, and extrinsic evidence of one party's one party's undisclosed, subjective understanding of a contract does not provide support for a particular contract interpretation, particularly where, as here the contract is one of adhesion.  *See Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1315 (D.N.J. 1990) (stating that "the subjective intent of a person drafting a contract is not, by any means, determinative as to the meaning of the contract especially where, as here, the contract is one of adhesion. This principle is so well-settled it does not require further citation of authority").  While these

---

[58]     The documents the Series B Preferred Holders refer to are Mining Executive Summary, Fall 2021 Presentation, attached as Exhibit D to the Yanez Declaration and Mining Transaction & Business Update Presentation, dated January 2022, attached as Exhibit E to the Yanez Declaration.

documents provide evidence that the Debtors may have had a subjective belief that Mining was not liable to Customers, which they did not share with Customers, this evidence does not provide strong support of an objective intent that can be used to construe the meaning of the contract.[59]

### c. The Debtors Statements in These Chapter 11 Cases

The thrust of the Series B Preferred Holders' argument with regard to statements in these Chapter 11 cases is that the Debtors have at various times filed documents showing only LLC as liable to Customers or made statements emphasizing that LLC is the main customer facing entity. (Series B Brief ¶¶ 41–49.) While saying that a customer entity is "customer facing" is not the same thing as saying that that entity is the only one with liability to Customers, the documents filed provide some evidence that the Debtors did not believe CNL was liable to Customers.

For example, the Schedules list the Terms of Use as the basis for scheduling Customers' claims at every Debtor. Yet, the Schedules themselves contradict this.[60] Significantly, only LLC (and no other Debtor) lists versions 6 through 8 of the Terms of Use as executory contracts to which it is party.[61] Notably, Schedule G of the CNL Schedules lists the pre-migration versions of the Terms of Use (i.e., versions 1 through 5) as CNL's executory contracts; the CNL Schedules do not list any of the post-Migration versions of the Terms of Use, including version

---

[59] Unmanifested subjective intent, 28 N.Y. PRAC., CONTRACT LAW § 9:35 ("The general rule is that in the absence of any evidence that a party's views were either discussed with the other party or considered by both parties during the process leading up to the execution of the agreement, the words in the contract must be given the meaning that the parties would reasonably be expected to perceive as opposed to what one party intended them to mean.").

[60] Global Notes at 3 ("The [Terms of Use] are between each [Custom]er, on the one hand, and [LLC] and its "Affiliates," on the other hand . . . This may mean that [Customer]s have claims against every Debtor and non-Debtor entity in the Debtors' corporate structure.").

[61] LLC Schedules, Schedule G, at 12.

8.[62]  These portions of the Schedules are therefore consistent with LLC being the only Debtor bound by the post-migration versions of the Terms of Use (i.e., versions 6 through 8) and therefore liable to Customers.  In response, the Debtors argue that the Global Notes provide that they reserve the right to amend Schedule G and that where it would have been duplicative, they have only listed a liability once.  (Debtor Response ¶ 33.)  But even if the Debtors had the right to amend, the Schedules reflect an objective understanding at one time that CNL was not liable on Terms of Use Version 6, and later versions.  Further, even if the Debtors were avoiding duplication by not listing CNL as liable on all versions, the fact that they began to list only LLC and, not CNL, starting with Terms of Use Version 6, provides objective evidence that there was a change in the liable entity at that point.

Another example is the Series B Preferred Holders' argument that the Asset Purchase Agreement (the "GK8 APA"), dated as December 2, 2022, for the sale of the assets of Debtor affiliate GK8 Ltd. does not list "liabilities to Customers on account of the Terms of Use" in a "list of specifically "Excluded Liabilities," notwithstanding the fact that the Debtors claim that all affiliates, including GK8, are liable to Customers.  (Series B Brief ¶ 48.)  The Debtors counter that because of the way defined terms work, Customer liabilities are in fact excluded.  They contend that Excluded Liabilities' is defined as "any Liabilities . . . that are not Assumed Liabilities.  (GK8 APA § 1.4.)  "Excluded Liabilities" are all those not explicitly assumed, thus the list of "Assumed Liabilities" does not include Customer claims, therefore account holder claims are "Excluded Liabilities."  While Customer Liabilities were likely excluded from the Sale, if GK8 had billions of dollars of liabilities to Customers that were being excluded, it would seem odd for the Company not to take extra pains to emphasize that those liabilities were

---

[62]    See CNL Schedules, Schedule G, at 227–228.

33

excluded. Accordingly, this document provides some, but not overwhelming, objective evidence that the Debtors believed only LLC and not other Debtor entities, such as GK8, were liable to Customers.

### d. Customer Conduct

Because the Customers, and not the Series B Preferred Holders, are the counterparties to the Terms of Use, their conduct would be probative to determining the parties' objective understanding of the contract.[63] But the Court does not find the evidence presented particularly persuasive. The Series B Preferred Holders contend that because (1) 94% of Customers filed proofs of claims against only LLC, and (2) the majority of pre-petition lawsuits brought against the company sue only LLC, that the Customers had objectively manifested their understanding that they only had claims as to LLC. (Series B Response ¶ 51.) As to the proof of claims, the Debtors point out there are many reasons why account holders may have filed one claim against only one entity, including for the most likely reason: Celsius Network is the first specific debtor box to check on the claim form and an account holder does not understand that it must file multiple claims against multiple entities to best protect its interests. (Debtor Response ¶ 39.) The fact that account holders may not be versed in the nuances of bankruptcy proceedings is not a basis for imputing intent onto those same account holders. The fact that Customers have largely sued LLC, is slightly more compelling, because it may show that with the help of a lawyer, Customers came to the belief that only LLC was liable. But because only a fraction of Customers has filed lawsuits, it is hard to extrapolate from a few lawsuits, the objective

---

[63]     Under New York law, Courts determine intent by looking at "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999, 1001 (1977).

understanding of all Customers.  In sum, the Court infers little from Customer conduct about the parties' intent with regard to Section 25.

>           3.    The Debtors' Extrinsic Evidence

Out of fifty pages of total briefing on the Issue, the Debtors dedicate only two pages to the extrinsic evidence they claim demonstrates that account holders have recourse against every Debtor entity.  Their main piece of evidence is that before the transfer of accounts from CNL to LLC, "Celsius" was defined as "Celsius Network Limited"[64] ; but after the transfer and corresponding revision of the Terms of Use, at the time of the Series B Preferred Holders investment, "Celsius" was (and still is) defined as "Celsius Network LLC and its Affiliates."  The Debtors thus argue that reviewing the evolution between each version of the Terms of Use illustrates that the Company made the effort to not simply transfer the Terms of Use from CNL to LLC; rather, the Company intentionally included Celsius Network and its Affiliates.  This argument would be more convincing if there was a single additional piece of evidence showing an intent expand liability to affiliates.  According to the Debtors, they created billions of dollars of liabilities against all affiliates of LLC the moment Terms of Use Version 6 was adopted.  But there is not a single document—financial statement, board minutes, internal email, or any other writing—that the Debtors have produced that is consistent with that view.  The Court finds the reason for that is simple: no one intended to create those liabilities at the time, and no one believed they did.

The limited evidence the Debtors do put forth does not allow the Court to find that the Company's objective intent was to expose its affiliates to billions of dollars of liability.  The Debtors argue that the Company organizational chart demonstrates that affiliates other than LLC

---

[64]      Version 5 of the Terms of Use § 1.

provide services to Customers.  (Debtor Response ¶ 42.)  But the Court fails to see how that fact

is evidence of an intent to make those affiliates liable for Customer contract claims.[65]  Just

because an entity provides services to a party, does not mean it is necessarily directly liable.  Nor

does the Annual Report and Financial Statements for the period ended December 31, 2020 (the

"Report")[66] which provides that the "Group's[67] business model relies on attracting users to

utilize the Group's services" convince the Court otherwise.[68]  The fact that the Company wanted

to attract users to the "Group's" services does not lead the Court to find that the Company

intended for all affiliates to be *liable* to Customers.  Unlike the Series B Preferred Holders who

provide extrinsic evidence of the parties' intent based on the Terms of Use, the Debtors only

provide evidence of general statements that do not bear directly on the interpretation of the

Terms of Use.

In sum, while certain pieces of the Series B Preferred Holders' evidence are more

persuasive than others, the Series B Preferred Holders have put forth probative, objective

evidence that allows the Court to find by a preponderance of the evidence that the Debtors

intended only LLC to be liable under the Terms of Use.  The Debtors do not successfully refute

this evidence or provide any persuasive extrinsic evidence in support of their alternative

interpretation.  Accordingly, the Court reads Section 25 of the Terms of Use, and the Terms of

Use as a whole, as excluding all but LLC from customer contract liability.  Specifically, the

---

[65]     To be sure, to the extent that Affiliates engaged with Customers, they may be exposed to liability on a variety of theories, including breach of contract and tort.

[66]     Nyman Libson Paul LLP, Celsius Network Limited Annual Report and Financial Statements for the Period Ended 31 December 2020, dated October 8, 2021.

[67]     "Group" is defined as "Celsius Network Limited and the group now headed by it."

[68]     Report at 1.

Court reads the term "Celsius" in Section 25 of the Terms of Use as referring only to LLC, and not Affiliates, such that Affiliates are excluded from contract liability.

Given that extrinsic evidence answers the question of the proper interpretation, the Court will not apply the *contra proferentem* principle, that a contract is construed against the drafter. *See Electra v. 59 Murray Enters.*, 987 F.3d 233, 245 (2d Cir. 2021) ("[The] generally accepted purpose [of *contra proferentem* is] as an interpretive tiebreaker of last resort."), *cert. denied*, 211 L. Ed.2d 352, 142 S. Ct. 563 (2021).

### C. The Terms of Use Do Not Limit Non-Contract Claims

As even the Series B Preferred Holders concede, the Court finds and concludes that the Terms of Use do not limit non-contract claims, such as claims for fraud, negligent misrepresentation, or federal or state statutory claims, against CNL or any other Debtor affiliate.[69] As the Series B Preferred Holders' noted at the hearing, the only Issue before the Court is "which entities are claims assertable under the terms of use"[70] as a matter of contract law, and not which Debtor or non-Debtor entities may have liability for torts or other wrongdoing.

The Terms of Use contain no language purporting to limit liability of CNL or other Debtor or non-Debtor affiliates on any other theory of liability.[71] But even if there was such language, it would be unenforceable. For example, in New York, "public policy . . . forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by "grossly negligent conduct." *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs*., Ltd., 81 N.Y.2d

---

[69] *See* February 6, 2023 H'rg Tr. 26:7–17 (Series B Preferred Holders counsel agrees with the Court that Section 25 could not limit liability for fraud against CNL).

[70] *Id.* at 28:10–11.

[71] Terms of Use § 25 (noting that Customers have no recourse "with respect to our obligations [to Customers] . . . against . . .any . . . Affiliate," but not limiting tort claims or other claims).

821, 824(1993); *Sear-Brown Grp. v. Jay Builders*, Inc., 244 A.D.2d 966, 967 (1997) (stating that "likewise, a party may not rely upon a limitation of liability clause to insulate itself from damages caused by gross negligence"). No matter how unqualified its terms, a contract cannot exonerate a party from liability when a party acts "willfully or grossly." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983) (noting that damage-limitation provisions are ineffective where "the defendants' conduct . . . 'smacks of intentional wrongdoing' and amount[s] to egregious intentional misbehavior . . . or, when, as in gross negligence, it betokens a reckless indifference to the rights of other"); *see also Air China, Ltd. v. Kopf*, 473 F. App'x 45, 49 (2d Cir. 2012) (summary order) (finding no error in the district court's nullification of the limitations on damages provisions because the defendants' conduct "smacks of intentional wrongdoing").

Accordingly, for avoidance of doubt, while the Court finds that the Terms of Use limit contract claims to only LLC, Customers rights to assert non-contract claims are expressly reserved.

## IV. <u>CONCLUSION</u>

For the reasons discussed above, the Court finds that Customers only have contract claims under the Terms of Use against LLC. Within seven (7) days from the date of this Opinion, counsel for the Debtors, the Committee and the Series B Preferred Holders shall confer and submit a proposed order consistent with the terms of this Opinion.

Dated:    March 9, 2023
        New York, New York

                        *Martin Glenn*
                        MARTIN GLENN
           Chief United States Bankruptcy Judge