WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
One Bowling Green
New York, New York 10004
Telephone: (212) 510–0500
By:  Shara Cornell, Esq.
      Mark Bruh Esq.
      Brian Masumoto, Esq.
      Trial Attorneys

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                        :
In re                                                   :   Chapter 11
                                                        :
                                                        :
                                                        :   Case No. 22-10964 (MG)
CELSIUS NETWORK LLC, *et al.*,[1]                       :
                                                        :   Jointly Administered
                                                        :
                                        Debtors.        x
------------------------------------------------------- 

## OBJECTION OF THE UNITED STATES TRUSTEE
## TO MOTION OF DEBTORS FOR ENTRY OF ORDER APPROVING
## DEBTORS' KEY EMPLOYEE INCENTIVE PLAN

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 USA LLC (9450); GK8 Ltd. (1209); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

i

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ............................................................................... iii

**PRELIMINARY STATEMENT** ........................................................................ 1

**BACKGROUND** ............................................................................................... 4

    *A.*   *General Background* ................................................................................. 4

    *B.*   *Mining* ...................................................................................................... 6

    *C.*   *The KERP Motion* ................................................................................. 8

    *D.*   *The KEIP Motion* ................................................................................. 10

**OBJECTION** ..................................................................................................... 12

    A.   **The Statutory Framework** ................................................................. 12

    B.   **The Proposed KEIP Is a Disguised Retention Program That Fails to Meet the Requirements of Section 503(c)(1) of the Bankruptcy Code** ............................................... 15

    C.   **The KEIP Motion Does Not Provide a Basis for Concluding that the KEIP Performance Metrics Are Rigorous and Incentivizing** ....................................................... 18

**CONCLUSION** ................................................................................................. 21

## TABLE OF AUTHORITIES

*Statutes*

11 U.S.C. § 503(c) …………………………………………………………… *Passim*

11 U.S.C. § 503(b) …………………………………………………………. 12, 15

11 U.S.C. § 704 ……………………………………………………………….. 21

11 U.S.C. § 1106 …………………………………………………………… 21


*Cases*

*Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98. 101 (2d Cir. 1960) ………. 12

*Clarkson Co., Ltd. v. Shaheen*, 660 F.2d 506 (2d Cir. 1981) …………………………. 21

*Econ. Dev. Growth Enter. Corp. v. McDermott,* 478 B.R. 123 (N.D.N.Y. 2012) ……. 21

*Hughes v. BCI Int'l Holdings*, 452 F. Supp. 2d 290 (S.D.N.Y 2006) ………………… 21

*In re AMR Corp.*, 497 B.R. 690 (Bankr. S.D.N.Y. 2013) …………………………….. 13

*In re Borders Grp., Inc.*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011) ……………………... 14

*In re Brooklyn Hosp. Ctr.*, 341 B.R. 405 (Bankr. E.D.N.Y. 2006) …………………… 15

*In re Dana Corp.,* 351 B.R. 96 (Bankr. S.D.N.Y. 2006) …………………………….... 14, 15

*In re Georgetown Steel Co.*, 306 B.R. 549 (Bankr. D. S.C. 2004) …………………… 15, 16

*In re Global Crossing Ltd.*, 295 B.R. 726 (Bankr. S.D.N.Y. 2003) ………………….. 21

*In re Hawker Beechcraft, Inc.,* 479 B.R. 308 (Bankr. S.D.N.Y. 2012) ………………. 14, 15

*In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) …………….... 12, 13

*In re Mesa Air Grp., Inc.,* Case No. 10-10018 (MG), 2010 WL 3810899 (Bankr. S.D.N.Y. Sept. 24, 2010) ………………………………………………………………... 14, 15

*In re Residential Capital LLC,* 478 B.R. 154 (Bankr. S.D.N.Y. 2012) ………………. 14, 15

iii

*In re Velo Holdings Inc.*, 472 B.R. 201, 209-10 (Bankr. S.D.N.Y. 2012) ……………    14

*Orion Pictures Corp.,* 21 F.3d 24, 28  (2d Cir. 1994) ………………………………    18

*Robbins v. Delafield (In re Williams)*, 2017 Bankr. LEXIS 4183 (Bankr. E.D.Va.
Dec. 8, 2017) …………………………………………………………………………..    18

*RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 202 (S.D.N.Y. 2009) ………..    21

*STN Enterprises., Inc.*, 779 F.2d 901, 904 (2d Cir. 1985) ……………………………    21

*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98 (2d Cir. 1960) ..    12

### Secondary Sources

4 *Collier on Bankruptcy* ¶ 503.18 (16th ed. 2022) ……………………………………    13

"Google Parent Alphabet to Cut 12,000 Jobs"
https://www.nytimes.com/2023/01/20/business/google-alphabet-layoffs.html .............    17

TO:    **THE HONORABLE MARTIN GLENN,**
       **CHIEF UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), hereby submits his objection (the "Objection") the Debtors' Motion (the "KEIP Motion") for Entry of an Order Approving Debtors' Key Employee Incentive Plan (the "KEIP") (ECF Doc. No. 2336).  In support thereof, the United States Trustee respectfully states:

## PRELIMINARY STATEMENT

In the KEIP Motion, Debtors request authority to provide ten insiders (the "KEIP Participants") up to $2.86 million in bonuses  ( the "Bonuses").[2] While the Debtors have styled the KEIP as an incentive plan, the KEIP appears to be a disguised retention plan. The tasks listed by the Debtors as a basis for Bonuses, require little more than the KEIP Participants do their jobs while the chapter 11 cases are pending and await either confirmation of the Plan currently proposed by the Debtors – for which the Debtors have already lined up a stalking horse purchaser and have proposed confirmation dates in less than three months-time – or, if that Plan fails, wait for the Debtors to complete an orderly wind-down.  Further, the other proposed incentive benchmark, the requirement that a certain number of mining rigs be online and hashing by a date certain, is a benchmark which the Debtors already have met on more than one occasion during the cases. Even more egregious – many of the tasks identified by the Debtors are verbatim the same tasks identified as the basis for the KERP Bonuses, which were approved back in December 2022.[3] Accordingly,

---

[2] The substance of the KEIP Motion suggests that bonuses in the aggregate are $4.29 million. *See, e.g.*, KEIP Motion at ¶ 30 ("If approved, the KEIP would provide aggregate (for all KEIP Participants) threshold and target opportunities of approximately $1.43 million and $2.86 million, ***respectively***, to be earned for performance") (emphasis added). However, the Debtors represented to the United States Trustee that the total cap for all awards is $2.86 million as the $1.43 million is subsumed by the larger dollar amount if all of the metrics are met.

[3] Compare Amended KERP Motion ¶ 3 with KEIP Motion ¶ 33 (*see e.g.,* "receiving and reviewing nearly 300 diligence requests from the Committee, over 100 diligence requests from the U.S. Trustee, and producing over 100,000

the KEIP will function primarily as a pay-to-stay retention plan and section 503(c)(1) is directly applicable, not section 503(c)(3).

The Debtors primary argument in justifying these generous and far-reaching Bonuses is the KEIP Participants need to be retained through confirmation as their services will be needed by the purchaser acquiring the Debtors' assets in the Plan. However, nothing in the Bid Protections Motion or Plan requires retention of the Debtors' workforce or specifically the KEIP Participants. Indeed, Debtors' justification supports the conclusion that the KEIP is nothing more than a pay-to-stay retention plan. Moreover, as described more fully below, the proposed purchase price for substantially all of the Debtors' assets is approximately $45 million, making the Bonuses almost 6.5% of the purchase price (assuming the $2.86 million cap). As a result, merely maintaining its workforce does not justify the KERP.

Additionally, as noted above, what the Debtors have defined as "benchmarks" are merely layups that are solely in the discretion of the KEIP Participants. For example, in order for three of the employees, including Chief Executive Officer Christopher Ferraro, to receive their KEIP Bonuses, the Debtors must have 70,000 mining rigs hashing by June 30, 2023 to receive the full KEIP Bonuses. However, how many rigs are hashing is entirely dependent on the discretion of these executives. As previously testified to by Ferraro, the rigs are turned on and off based on market conditions, which requires evaluating the costs of bitcoin on a given date compared to the

---

documents . . . responding to over fifty requests from the Examiner and participating in numerous telephone and Zoom conferences with the Examiner . . . . engaging in discussions and interviews with the Committee surrounding security policies and developed security protocols, which culminated in the security stipulation . . .").

price of operating costs, like electricity.[4] The Mining Executives[5] now have an incentive to turn on more rigs even if it is at a loss to the Debtors simply to receive their KEIP Bonuses, as there is no requirement that rigs are profitable in the KEIP, it simply requires that such rigs be online and hashing. This is nonsensical.

Furthermore, the KEIP Motion fails to establish that the KEIP Performance Metrics are rigorous and incentivizing because of the absence of historical data regarding the various performance metrics. Evaluating whether the performance metrics are rigorous and incentivizing is hampered by the KEIP Motion's failure to disclose historical data on the prepetition bonus plans, the annual salary and bonus awards of the KEIP Participants, the EBITDA, and cash flow – all of which are absent from the proposed metrics. While the KEIP Motion does identify that previously the KEIP Participants received part of their salary in CEL tokens, the KEIP Motion fails to describe what salary increases have been implemented over the past nine months of these bankruptcy cases to compensate for that loss and instead suggests that these KEIP bonuses are solely being used to compensate for prior CEL awards. This is critical, as the Debtors' main business – its crypto currency platform – has not been in operation during the life of these bankruptcy cases.

The KEIP Motion is quite emphatic as to the need for the bonus payments to insiders in light of departures of a large portion of the Debtors' workforce. However, the Debtors do not distinguish how many of those departures were part of the Debtors' own reduction in its workforce.

---

[4] *See* August 19, 2022 341 Meeting Transcript at 55:8-12 ("Right now we have plugged in and hashing about 49,000 rigs, some of which are not up all day. The energy cost at some of these hosting sites is expensive and we curtail during periods of the day in which we wouldn't be marginally profitable."); and 57:22-25 ("Rigs that are idle because we turned them off because the costs are too high or idle during the peak parts of the day. We have a very small amount of rigs in storage"); *see also* October 13, 2022 341 Meeting Transcript at 32:1-20; November 21, 2022 Transcript of Christopher Ferraro at 167:8-169:18. Excerpts are attached hereto as **Exhibits A**, **B**, **C**, and **D**, respectively.

[5] As defined by the KEIP Motion.

3

Given the retentive characteristics of the KEIP, Section 503(c)(1) applies and requires, *inter alia,* that the KEIP recipients must have a *bona fide* job offer in order to be permissible. The KEIP Motion provides no evidence of job offers to any of the KEIP Participants.

The KEIP Motion's focus on alleged prepetition assets (the KEIP Motion claims $4.4 billion) as a guide for why these executives should be paid more is inapposite. First, the Debtors have not had anywhere near those assets postpetition. Second, the Debtors are not operating and have not been operating for almost an entire year (the Pause[6] was June 12, 2022). The Debtors have not provided any cases where a debtor has substantially less assets postpetition and has not been operating for an entire year where bonuses in excess of $2.86 million were appropriate or justified. As the Debtors continue to point out, these "cases are of first impression." *See* KEIP Motion at ¶ 1. Looking at cases in different industries, with different portfolios, and different functionality does not work here. Instead, what the Debtors have failed to state in their KEIP Motion, is that in no other crypto case has a KEIP been sought.[7]

For all these and additional reasons, as fully detailed below, the United States Trustee respectfully objects to the KEIP Motion.

## BACKGROUND

### A. General Background

1.      On July 13, 2022 (the "Petition Date"), Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC (collectively, the "Debtors") each

---

[6] As defined below.

[7] *See generally*, *In re FTX Trading Ltd., et al.*, Case No. 22-11068-JTD (Bankr. D.De.); *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943-MEW (Bankr. S.D.N.Y.) *In re Cred In., et al.*, Case No. 20-12836-JTD (Bankr. D.De), *In re Genesis Global Holdco, LLC*, Case No. 23-10063-SHL (Bankr. S.D.N.Y.); *In re Core Scientific, Inc., et al.*, Case No. 22-90341-DRJ (Bankr. S.D.Tx.).

commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *See* Voluntary Petitions, SDNY Case No. 22-10964, ECF Doc. No. 1. On July 19, 2022, the Court entered an Order directing that these cases be jointly administered. ECF Doc. No. 53. An Official Committee of Unsecured Creditors was appointed on July 27, 2022. ECF Doc. No. 241.

2.      On June 12, 2022, the Debtors paused all withdrawals, swaps, and transforms on its platform (the "Pause"). *See* Declaration of Alex Mashinsky Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions and First Day Motions (ECF Doc. No. 23) (the "Mashinsky Decl.") at ¶ 14.

3.      On September 22, 2022, First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Equity") filed for a Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee. ECF Doc. No. 880.

4.      On March 9, 2023 the Court entered its Memorandum Opinion Regarding Which Debtor Entities have Liability for Customer Claims under the Terms of Use (the "Equity Opinion"). ECF Doc. No. 2205. The Equity Opinion held *inter alia* that only Celsius Network LLC ("LLC"), and not any other Debtor or non-Debtor affiliates, are liable to customers on contract claims[8] under the terms of use. Equity Opinion at p. 4.

5.      On March 31, 2023, the Committee filed its Notice of Appeal of the Equity Opinion and corresponding order. ECF Doc. No. 2356.

---

[8] The Opinion distinguishes contract claims from other claims such as claims for fraud or misrepresentation. *Id*. at p. 4 ("Importantly, the Court finds and concludes that the terms of use do not limit Customers (or the Committee) from asserting non-contract claims against CNL, or against other Debtor or non-Debtor affiliates, such as claims for fraud, negligent misrepresentation, or other statutory or common law claims.").

6.      On March 1, 2023, the Debtors filed their motion seeking approval of certain bid protections (the "<u>Bid Protections Motion</u>"). ECF Doc. No. 2151.

7.      The Bid Protections Motion provided *inter alia* that NovaWulf would act as the stalking horse bidder under the terms of the Sponsor Agreement[9] executed between the Debtors and Novawulf. *Id.*

8.      On March 30, 2023, the Court entered the Order Granting the Debtors' Motion for Bid Protections as Modified. ECF Doc. No. 2344.

9.      On March 31, 2023, the Debtors filed their Joint Chapter 11 Plan of Reorganization (the "<u>Plan</u>"). ECF Doc. No. 2358. Filed with the Plan was Debtors' Statement Regarding the Plan Process (the "<u>Plan Statement</u>"). ECF Doc. No. 2359.

10.     The Plan Statement requires the Disclosure Statement to be filed by April 12, 2023 with a Disclosure Statement Hearing scheduled for May 17, 2023. Plan Statement at ¶ 5, 8.

### B. Mining

11.      As of the Petition Date, the Debtors' mining operations ("<u>Mining</u>") consisted of 80,850 owned rigs with 43,632 in operation. Also as of the Petition Date, the Debtors' investment plan included operation of approximately 120,000 rigs by end of 2022. Mashinsky Decl. at ¶ 67. The Mashinsky Decl. further stated that as of the Petition Date, Mining generated approximately 14.2 Bitcoins per day, while generating a total of 3,114 Bitcoin during 2021. *Id.* For 2022, the Debtors projected to generate 10,118 Bitcoin. For 2023, the Debtors anticipated having at least 110,000 rigs online generating a total of 15,000 Bitcoin. *Id.*

---

[9] As defined by the Bid Protections Motion.

12.     On August 14, 2022, the Debtors filed their initial Budget and Coin Report (the "August Report"). ECF Doc. No. 447. The August Report stated there were approximately 58,000 rigs deployed, although no mention is made for online hashing. *Id*.

13.     On September 14, 2022, the Debtors filed their second Budget and Coin Report (the "September Report"). ECF Doc. No. 811. The September Report makes no mention of the Debtors' rigs.

14.     On October 18, 2022, the Debtors filed their third Budget and Coin Report (the "October Report"). ECF Doc. No. 1111. The October Report stated that the Debtors had approximately 67,000 rigs deployed and approximately 60,000 online and hashing for September 2022. *Id*.

15.     On December 12, 2022, the Debtors filed their fourth Budget and Coin Report (the "December Report"). ECF Doc. No. 1676. The December Report stated that the Debtors had approximately 74,000 rigs deployed and approximately 48,000 online and hashing for October 2022. *Id*.

16.     On January 22, 2023, the Debtors filed their fifth Budget and Coin Report (the "January Report"). ECF Doc. No. 1905. The January Report stated that the Debtors had approximately 51,000 rigs online and hashing for November 2022 and approximately 65,000 rigs online and hashing for December 2022.

17.     On February 22, 2023, the Debtors filed their sixth Budget and Coin Report (the "February Report"). ECF Doc. No. 2122. The February Report stated that the Debtors had approximately 81,000 rigs deployed and approximately 28,000 online and hashing for January 2023.

18.    On April 3, 2023, the Debtors filed their seventh Budget and Coin Report (the "April Report"). ECF Doc. No. 2361. The April Report stated that the Debtors had approximately 72,000 rigs deployed with approximately 45,000 online and hashing for February 2023. *Id.*

19.    On December 21, 2022 (the "Core Petition Date"), Core Scientific ("Core") filed its own chapter 11 petition for relief in the Bankruptcy Court for the Southern District of Texas. *See* Bankr. Case No. 22-90341 (S.D.TX). As of the Core Petition Date, the Debtors had approximately 37,000 mining rigs in Core's possession.[10] *See* Bankr. Case No. 22-90341 (S.D.TX), ECF Doc. No. 265 at ¶ 9.

### C. The KERP Motion

20.    On October 11, 2022, the Debtors filed their Motion for Entry of an Order Approving Debtors' Key Employee Retention Plan (the "KERP"). ECF Doc. No. 1021. The KERP was accompanied by the declaration of Josephine Gartrell (the "Gartrell Declaration") [ECF Doc. No. 1023] and the declaration of Christopher Ferraro (the "Ferraro Declaration") [ECF Doc. No. 1022].

21.    According to the KERP, "certain employees have not been paid their agreed-upon compensation during these chapter 11 cases. The Debtors previously compensated certain of their employees with their proprietary cryptocurrency ("CEL") token in addition to cash compensation. This practice is currently suspended, and as such, eligible employees have been missing this portion of their compensation since the first quarter of 2022." KERP at ¶ 13.

22.    On October 27, 2022, the United States Trustee filed an objection to the KERP. ECF Doc. No. 1207.

---

[10] The KEIP Motion does not make clear if the 37,000 rigs allegedly in Core's possession are the rigs the Mining Executives intend to put online and hash to meet the Mining Metrics.

23.     On November 2, 2022, the Court entered the Order Denying Debtors' KERP (the "Denial Order"). ECF Doc. No. 1268.

24.     As a result of the Denial Order, November 22, 2022, the Debtors filed their Amended Motion for Entry of an Order Approving Debtors' Key Employee Retention Plan (the "Amended KERP") [ECF Doc. No. 1426], along with the Supplemental Declarations of Josephine Gartrell [ECF Doc. No. 1428] and Christopher Ferraro [ECF Doc. No. 1425].

25.     On December 2, 2022, the United States Trustee filed an objection to the Amended KERP. ECF Doc. No. 1551.

26.     On December 13, 2022, the Court entered the Order Approving the Amended KERP (the "KERP Order") which, *inter alia*, required the Debtors to further investigate the proposed KERP participants who withdrew cryptocurrency within 90 days of the Petition Date. ECF Doc. No. 1683.

27.     Pursuant to the KERP Order, the Debtors performed an investigation (the "KERP Investigation") which "included a review of the relevant transaction history and an interview with each of the relevant Participants. Additional investigation was completed for certain Participants, which included an interview with the Participant's manager, a request for, and analysis of, documentary evidence, and/or additional correspondence with the Participants." *Id*. at ¶ 3.

28.     As a result of the Debtors KERP Investigation, the Debtors decided to reinclude twelve Participants in the KERP, three of whom will be reincluded following the satisfaction of certain conditions, which include, as relevant, returning withdrawn funds to the Platform and authorizing the Debtors to reverse transfers made into Custody. None of these twelve Participants were found to have withdrawn cryptocurrency from the Platform or transferred cryptocurrency

from another program into Custody on the basis of inside information. Seven Participants were not reincluded in the KERP. *Id*. at ¶ 4.

### D. The KEIP Motion

29.     On March 28, 2023, the Debtors filed the KEIP Motion. ECF Doc. No. 2336. The KEIP Motion was accompanied by the declaration of Allison Hoeinghaus (the "Hoeinghaus Declaration").  ECF Doc. No. 2337.

30.     As described by the Debtors, the primary purpose of the KEIP Motion is to provide incentive awards to ten executives (the "KEIP Participants").  KEIP Motion at ¶ 4, 19.

31.     The KEIP Participants include: (a) Christopher Ferraro, Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer; (b) Guillermo Bodnar, Chief Technology Officer; (c) Oren Blonstein, Chief Product Officer; (d) Ron Deutsch, General Counsel; (e) Trunshedda Ramos, Chief Human Resources Officer; (f) Roni Pavon Cohen, Chief Revenue Officer; (g) Adrian Alisie, Chief Compliance Officer; (h) Jenny Fan, Chief Financial Officer of Mining; (i) Dave Albert, Chief Administrative Officer of Mining; and (j) Quinn Lawlor, Chief Strategy Officer of Mining (Quinn Lawlor, together with Jenny Fan and Dave Albert, the "Mining Executives"). *Id.* at ¶ 19. Due to the scope of their authority, the KEIP Participants are considered "insiders" within the meaning of section 101(31) of the Bankruptcy Code. *Id.* at ¶ 19.

32.     The KEIP is the product of negotiations involving the Debtors, its outside advisors, including their restructuring advisor Alvarez & Marsal North America ("A&M") and external legal counsel Kirkland & Ellis, which was ultimately approved by the special committee of the Board of Directors of Debtor Celsius Network Limited. *Id.* at ¶ 5.

33.     The KEIP Motion alleges that the KEIP Participants are responsible for: "(a) ensuring the safety and security of assets on the Celsius platform; (b) overseeing the processing of

customer withdrawals from the custody and withhold accounts; (c) steering the Debtors' sale and marketing process; and (d) supervising all human resources, payroll matters, monthly financial reporting, and bankruptcy reporting." *Id*. at ¶ 13.

34.     Since the Petition Date, the Debtors allegedly have lost approximately 570 employees. There is no distinction made as to how many employees left voluntarily or were part of the Debtors' significant efforts to reduce its workforce. *Id*. at ¶ 1.

35.     Under the KEIP, awards are payable only upon the Debtors' achievement of certain targets, namely, (i) the confirmation of a chapter 11 plan pursuant to the proposed Sponsor Agreement with Novawulf ("Transaction") or (ii) confirmation of a plan of liquidation pursuant to an orderly wind-down ("Orderly Wind-Down"). *Id*. at ¶ 32.

36.     The KEIP would provide aggregate threshold and target opportunities of approximately $1.43 million and $2.86 million, respectively, to be earned for performance through (a) confirmation of a chapter 11 plan pursuant to a Transaction, or (b) confirmation of a plan of liquidation pursuant to an Orderly Wind-Down. *Id*. at ¶ 30.

37.     The KEIP Motion identifies the following as metrics for the KEIP awards: (i) target performance requires confirmation of a chapter 11 plan pursuant to a Transaction by September 30, 2023; and (ii) threshold performance requires confirmation of a plan pursuant to a Transaction after September 30, 2023, or confirmation of a plan of liquidation pursuant to an Orderly Wind-Down by December 31, 2023.

38.     For the Mining Executives, such metrics shall be weighted at 25% of each Participant's KEIP award. For Christopher Ferraro, such metrics are weighted at 75% of his KEIP award. For all other KEIP Participants, such metrics are weighed at 100% of their KEIP award.

11

39.    For the Mining Executives and Christopher Ferraro, (i) target performance requires that the Debtors have 70,000 mining rigs hashing by June 30, 2023, and (ii) threshold performance requires the Debtors have a minimum of 60,000 mining rigs hashing by June 30, 2023. For the Mining Executives, such metrics are weighted at 75% of each Participant's KEIP award. For Christopher Ferraro, such metrics are weighted at 25% of his KEIP award. *Id*. at ¶ 29.

40.    The KEIP does not state if a similar investigation to the KERP Investigation was performed or the cost of such an Investigation on the bankruptcy estates. *See generally* KEIP Motion.

## **OBJECTION**

### A.    **The Statutory Framework**

Section 503 governs the allowance of administrative expenses "for actual, necessary costs and expenses of preserving a debtor's bankruptcy estate."  11 U.S.C. § 503(b)(1)(A).  The two general overriding policies of Section 503 of the Bankruptcy Code are: (i) to preserve the value of the estate for the benefit of its creditors and (ii) to prevent the unjust enrichment of the insiders of the estate at the expense of its creditors. *In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) (citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1960)) (additional citations omitted).

Section 503(c)(1) of the Bankruptcy Code prohibits any transfer:

> made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtors' business, absent a finding by the court based on evidence in the record that

> (A)    the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

> (B)    the services provided by the person are essential to the survival of the business; and

12

(C)     either –

    (i)     the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

    (ii)     if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

11 U.S.C. § 503(c)(1).

Congress added Section 503(c) as one of the BAPCPA amendments in 2005, to curtail payments of retention incentives to insiders. *See Journal Register*, 407 B.R. at 535. In particular, Congress imposed significant limits on the payments of retention and incentive bonuses and severance to insiders and on the payments of retention bonuses granted to non-insiders without factual and circumstantial justification. *Id.* The intent of section 503(c) is to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." 4 *Collier on Bankruptcy* ¶ 503.18 (16th ed. 2022); *In re AMR Corp.*, 497 B.R. 690, 696 (Bankr. S.D.N.Y. 2013) (the language of Section 503(c) is prohibitive; if payments to insiders do not comply with the applicable 503(c) provisions, they "shall neither be allowed, nor paid"); *accord In re Residential Capital LLC,* 478 B.R. 154 (Bankr. S.D.N.Y. 2012) ("*Rescap.*").

Section 503(c) establishes specific evidentiary standards that must be met before a bankruptcy court may authorize payments to an insider for the purpose of inducing such person to

remain with a debtor's business or payments made on account of severance. *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*"); 11 U.S.C. § 503(c)(1). By enacting the BAPCPA, Congress put into place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid. *In re Mesa Air Grp., Inc.*, Case No. 10-10018 (MG), 2010 WL 3810899, *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (citations omitted). The proponent of a bonus plan has the burden of showing that the plan is not a retention plan governed by section 503(c)(1). *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).

Where section 503(c)(1) applies, the transfer cannot be justified solely on the debtor's business judgment. *See In re Borders Grp., Inc.*, 453 B.R. 459, 470-71 (Bankr. S.D.N.Y. 2011); *Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).

Further, a debtor's label of a plan as incentivizing to avoid the strictures of section 503(c)(1) must be viewed with skepticism; rather, the circumstances under which the proposal is made and the structure of the compensation package control. *In re Velo Holdings Inc.*, 472 B.R. 201, 209-10 (Bankr. S.D.N.Y. 2012) ("Attempts to characterize what are essentially prohibited retention programs as incentive programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1)") (internal quotation marks and citations omitted); *see also Rescap*, 478 B.R. at 161 (noting that an incentive plan "should incentivize employees for their post-petition efforts, not compensate them for the work they did before the bankruptcy filing."); *Hawker Beechcraft*, 479 B.R. at 313 ("The concern in the type of motion presented ... is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding 'facts and circumstances' standard in ... § 503(c)(3).");

14

*Dana I,* 351 B.R. at 102 n. 3 ("If it walks like a duck (KERP) and quacks like a duck (KERP), it's a duck (KERP).").

Finally, not only must bonus plans comply with section 503(c) but, as administrative expenses they must also be "actual, necessary costs and expenses of preserving the estate," as required by section 503(b).

**B.    The Proposed KEIP Is a Disguised Retention Program That Fails to Meet the Requirements of Section 503(c)(1) of the Bankruptcy Code**

Because the KEIP is primarily a retention plan for insiders, it is governed by section 503(c)(1), not section 503(c)(3). Section 503(c)(1) establishes specific and challenging standards that a debtor must satisfy before a bankruptcy court may authorize bonus payments to an insider to induce the insider to remain with a debtor's business. *Dana I*, 351 B.R. at 100; 11 U.S.C. § 503(c)(1).  The Debtors have the burden to prove these facts and must show that the proposed KEIP awards comply with Section 503(c)(1).  *See Dana I*, 351 B.R. at 100; *Mesa Air Grp.*, 2010 WL 3810899, at *2.

Retention plans usually are intended "to encourage certain crucial employees to remain with the company through a critical, transitional time period when the exact future of the company is unclear and when those employees would be most likely to search for other employment." *In re Brooklyn Hosp. Ctr.*, 341 B.R. 405, 413 (Bankr. E.D.N.Y. 2006), quoting *In re Georgetown Steel Co.*, 306 B.R. 549, 556 (Bankr. D. S.C. 2004). Here, the KEIP is primarily retentive and does not satisfy section 503(c)(1). As noted above, the KEIP Motion argues that obtaining approval of the KEIP is essential as the Debtors have lost over 570 employees since the Petition Date. KEIP Motion at ¶ 1. However, no mention is made as to how many (if any) executives have left since the Petition Date. Nor does the KEIP Motion state how many of those 570 employees left as a

result of significant company layoffs.[11] The Debtors are not operating, so the reduction in workforce is expected. If the reduction is actually tied to other job opportunities, the Debtors should provide evidence of those opportunities and offers.

Moreover, no information is provided as to whether any KEIP Participant (or any employee at the Debtors) has received a "bona fide job offer . . . at the same or greater rate of compensation." Section 503(c)(1) requires that each insider have a *bona fide* job offer at the same or greater compensation, the services provided by the insider are essential to the survival of the business, and the proposed retention payments are either less than ten times the mean of similar payments made to non-management employees during the calendar year or less than 25 percent of the amount of any similar payments made in the prior year. 11 U.S.C. § 503(c)(1)(A)-(C). Indeed, since the Petition Date, many of the Debtors' contemporaries have suffered similar financial distress, and in some cases, filed their own bankruptcies.[12] Technology companies are also seeing a similar strain on resources.[13] The KEIP Motion does not adequately explain what opportunities would even be available, let alone have been offered to the KEIP Participants.

The KEIP Motion also fails to provide historical salary and bonus data for the KEIP Participants. In fact, while the KEIP Motion takes pains to explain that "[the Debtors] historically

---

[11] *See, e.g.*, November 21, 2022 Transcript of Christopher Ferraro at 110:21-22 ("We've gone from 920 employees to about 167 employees as of, really, last week."). Excerpt attached hereto as **Exhibit E**.

[12] *See generally*, *In re BlockFi, Inc.*, Case No. 22-10361-MBK (Bankr. D.N.J.); *In re FTX Trading Ltd., et al.*, Case No. 22-11068-JTD (Bankr. D.De.); *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943-MEW (Bankr. S.D.N.Y.); *In re Genesis Global Holdco, LLC*, Case No. 23-10063-SHL (Bankr. S.D.N.Y.); *In re Core Scientific, Inc., et al.*, Case No. 22-90341-DRJ (Bankr. S.D.Tx.).

[13] *See, e.g.*, "Google Parent Alphabet to Cut 12,000 Jobs" found at https://www.nytimes.com/2023/01/20/business/google-alphabet-layoffs.html ("Google joins a list of technology companies that have laid off workers after concluding they overextended under the belief that the pandemic-fueled boom represented a new normal. Amazon, Meta, Microsoft, Salesforce and Twitter are among others that have announced thousands of job cuts.").

provided a significant portion of employees' compensation through equity awards and awards of

CEL Tokens; both of these elements of compensation have declined significantly in value (if not

become completely worthless) due to the chapter 11 cases," the KEIP Motion does not state the

value of compensation each KEIP Participant either received historically or would have been

entitled to absent the bankruptcy filing. KEIP Motion at ¶ 2. There is also no information stating

whether or not any of these executives liquidated, sold, or otherwise took advantage of the CEL

token either pre-Pause or pre-petition. No investigation similar to the KERP Investigation has been

performed by the Debtors either. Moreover – any investigation for the KEIP Participants must be

for at least a year – since the Debtors admit they are all insiders. All of this information is probative.

There is no way to determine if the current KEIP awards incorporate the amount of the historical

equity or CEL awards into the current KEIP cash awards, which would further suggest that the

KEIP awards are primarily retentive in nature.

Furthermore, there is no information that would allow a determination that the KEIP

Participants would not fail the test limiting insider payouts to ten times the average non-insider

bonus payout pursuant to Section 503(c)(1)(C)(i).

To the extent that the Debtors may be willing to provide additional information to the Court

or to the Committee but not to the public in general, the United States Trustee takes the position

that such information is not protected pursuant to Section 107(b)(1) as "confidential commercial

information." *See Robbins v. Delafield (In re Williams)*, 2017 Bankr. LEXIS 4183 at *8 (Bankr.

E.D.Va. Dec. 8. 2017)(the court specified that relief pursuant to Section 107(b)(1) was available

for "confidential commercial information") citing to 11 U.S.C. § 107(b); *Orion Pictures Corp.,* 21

F.3d 24, 28  (2d Cir. 1994).  The Debtors have not met the heavy evidentiary burden establishing

that the damage that might ensue from the disclosure of this relevant information outweighs the

17

general policy of transparency on which the public bankruptcy process depends. Therefore, the Court should require the disclosure of the historical compensation information and bonus metrics regarding the KEIP Participants.

**C.     The KEIP Motion Does Not Provide a Basis for Concluding that the KEIP Performance Metrics Are Rigorous and Incentivizing**

The KEIP Awards are tied to two potential restructuring transactions, either (1) confirmation of a plan pursuant to the newco transaction with NovaWulf (or a superior alternative) or (2) an orderly wind-down.

Given the status and trajectory of these bankruptcy cases, it is hard to view the metrics as anything other than backwards looking lay-ups, particularly when the chapter 11 Plan has already been filed and the Debtors have scheduled a hearing on the approval of the disclosure statement for May 17, 2023. Debtors' Statement Regarding Plan Process at ¶ 8.  Moreover, the KEIP Awards are tied to confirmation, not to whether the plan actually goes effective or is substantially consummated. In these cases that distinction is particularly important, as it is still unknown whether, even if a plan is confirmed, if the Debtors or a newco (as applicable) would be capable (or when) of obtaining all necessary licensures for operation.[14] To date, no timelines have been provided for an operating and legal company. Accordingly, tying any metric to confirmation in this instance is meaningless. It appears that the KEIP has been designed to maximize the likelihood that the Debtors will be obligated to pay the bonuses to the KEIP Participants if the Court approves the KEIP.

The Mining Executives and Ferraro are each subjected to further metrics (the "Mining Metrics") for receipt of their proposed bonuses. There is no way to consider the Mining Metrics

---

[14] It is also notable that no metric is tied to filing for or receipt of proper licenses for either the Debtors or for a newco.

as anything other than a layup. As shown by the budget and coin reports, the Debtors at various times have deployed and hashed rigs at or above the Mining Metric requirements. The decisions to deploy and hash is at the discretion of the Mining Executives and Ferraro. During these bankruptcy cases, the Debtors have had at least 60,0000 rigs hashing in both September 2022 (October Report) and December 2022 (December Report).  Since the Debtors contracts with Core Scientific were terminated,[15] the Debtors have had less rigs hashing – *i.e.*, approximately 28,000 online and hashing for January 2023 and approximately 45,000 online and hashing for February 2023. *See* February Report and April Report. But, what the Debtors fail to quantify is the valuation for the savings from either lower electricity costs or other hosting fees. Simply put, the Mining Executives should not be incentivized to put additional rigs online or hashing solely to reach the Mining Metrics if new deployment, hashing, electricity, or hosting costs do not maintain a level of profitability – to wit none is mentioned in the KEIP Motion. Importantly, there is no check on the Mining Executives just turning the rigs online and hashing briefly in order to meet the Mining Metric for their Bonuses. At minimum, the Mining Metrics should require the rigs be online and hashing for a minimum time frame and netting a certain level of coins. Moreover, if the price of BTC drops, the benefits of having more rigs online and hashing are reduced. No formula for considering these variables is part of the Mining Metrics. Further, it may become more profitable to continue selling its rigs. The Mining Metrics disincentivize an ad hoc liquidation approach in favor of putting more rigs online and hashing solely for the Mining Executives to receive their bonuses. And since this decision is solely in their discretion, it is a meaningless metric. Accordingly, because the Mining Executives have sole discretion regarding the rigs and there is

---

[15] *See* Notice of Filing of Rejection Motion by Core Scientific, Inc. And Debtors' Preliminary Objection Thereto ECF Doc. No. 1807; *See also* Order Authorizing Rejection of Executory Contracts with Celsius Mining, Case No. 22-90341 (Bankr. S.D.Tx.) ECF Doc. No. 232.

no relationship between having the rigs online and hashing and profitability, it is an inappropriate metric.

Furthermore, the Bid Protections Motion and the Plan do not explain how the alleged efforts of the Mining Executives to get more rigs online and hashing will add value to the proposed NovaWulf transaction. If the NovaWulf transaction will take place either way, then the Mining Metrics are just a superficial metric to provide the Mining Executives an opportunity at their own discretion to cash out.

In sum, the Debtors have provided no information or evidence to explain how the KEIP targets – confirming a plan, consummating a wind-down, or increasing mining capabilities present rigorous or appropriate goals for the KEIP Participants rather than mere lay-ups.

It appears that the principal purpose of the KEIP is simply to ensure that the Debtors' insiders remain with the Debtors through confirmation and fulfill the very fiduciary duties that they are already required to fulfill under the Bankruptcy Code.  The Debtors imply that the KEIP Participants would not perform the necessary work adequately absent the proposed bonuses. Insiders should not be paid bonuses to "incentivize" them to live up to their fiduciary duties to the estate. "Under New York law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors." *Hughes v. BCI Int'l Holdings*, 452 F. Supp. 2d 290, 308 (S.D.N.Y 2006)(citation omitted); *Clarkson Co., Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir. 1981) (holding that courts properly consider the officers and directors of an insolvent corporation as trustees of the property for the benefit of the corporations creditors (quotation omitted)); *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 202 (S.D.N.Y. 2009) (under the "trust fund doctrine," directors and officers of a fully insolvent corporation owe a fiduciary duty to hold remaining corporate assets in trust for the benefit of its creditors (citations

omitted)). *Econ. Dev. Growth Enter. Corp. v. McDermott,* 478 B.R. 123, 128 (N.D.N.Y. 2012).

*See also In re Global Crossing Ltd.*, 295 B.R. 726, 745 n. 61 (Bankr. S.D.N.Y. 2003) quoting *STN*

*Enterprises., Inc.*, 779 F.2d 901, 904 (2d Cir. 1985) ("although in most states directors of a *solvent*

corporation do not owe a fiduciary duty to creditors, quite the reverse is true when the corporation

becomes insolvent.") (emphasis in original). The KEIP Participants have existing obligations to

perform the services for which they are already being well paid.  *See* 11 U.S.C. §§ 704 and 1106.

In any event, there is no evidence that the KEIP Participants would not perform the work necessary

to propose and confirm a plan or to close any asset sales irrespective of the proposed bonuses.

## CONCLUSION

**WHEREFORE,** the United States Trustee respectfully requests that the Court sustain the

foregoing Objection and grant such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        April 14, 2023

                                Respectfully submitted,

                                WILLIAM K. HARRINGTON
                                UNITED STATES TRUSTEE, Region 2

                                By: */s/ Shara Cornell*
                                Shara Cornell
                                Trial Attorney
                                One Bowling Green
                                New York, New York 10004
                                Tel. (212) 510-0500