# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | Adv. Proc. No. _____ |
| RHODIUM ENTERPRISES, INC., | |
| Plaintiff, | |
| v. | **ADVERSARY COMPLAINT** |
| CELSIUS MINING LLC, previously known as Celsius Core LLC, | |
| Defendant. | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network, Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey (07030).

Plaintiff Rhodium Enterprises, Inc. brings this adversary proceeding for declaratory judgment against Defendant Celsius Mining LLC[2] and alleges as follows:

## NATURE OF THIS ACTION

**A.    Overview**

1.    Rhodium seeks a declaration of its rights and obligations under a Simple Agreement for Future Equity ("SAFE") between Rhodium and Celsius dated June 2, 2021. The SAFE is attached as Exhibit A.

2.    Under the SAFE, Celsius paid $50 million (the "Purchase Amount") to Rhodium in exchange for the right to receive certain consideration upon the occurrence of specific triggering events. Ex. A at Preamble. The triggering events are (a) an "Equity Financing or Listing Event," (b) a "Liquidity Event," and (c) a "Dissolution Event." Ex. A § 1. The SAFE also contains a "Valuation Cap" of $3 billion and a "Discount Rate" of 85%. *Id.* at Preamble.

3.    On July 13, 2022, Celsius and its corporate relatives filed a Chapter 11 bankruptcy petition.

4.    On September 29, 2022, Rhodium entered into an Agreement and Plan of Merger with non-party SilverSun Technologies, Inc. Rhodium and SilverSun have since amended the agreement. The merger agreement and its relevant amendments (the "Merger Agreement") are attached as Exhibit B.

5.    The merger is a two-step transaction between Rhodium and two new SilverSun subsidiaries ("Merger Sub I" and "Merger Sub II"). In the first step, Rhodium will merge with a Merger Sub I, with Rhodium existing as the surviving company. Ex. B. § 1.01(a). In the second

---

[2] Celsius Mining LLC was previously called Celsius Core LLC. *See* Final Report of Shoba Pillay, ECF No. 1956, at 355, 355 n.1394.

step, Rhodium will merge with Merger Sub II, with Merger Sub II existing as the surviving

company. *Id.* § 1.01(b). Merger Sub II will then be a direct, wholly owned subsidiary of SilverSun.

*Id.* § 1.04.

6.    Under the merger, Rhodium's shareholders will receive shares of SilverSun

common stock representing approximately 96.8% of the voting power of the business. Ex. B

§ 2.01(a), *as amended* in Amendment to Merger Agreement. The merger values Rhodium at about

$650 million (the "Rhodium Valuation"). *Id.* Rhodium's shareholders and SAFE holders will

receive shares of SilverSun stock based on that $650 million valuation. *Id.*

7.    The parties disagree about how the merger should be treated under the SAFE in

three ways: (1) whether the merger is a Listing Event or a Liquidity Event[3]; (2) whether the

consideration owed to Celsius if the merger is a Liquidity Event is $50 million in cash or $50

million in SilverSun stock; and (3) whether Celsius has a right under the SAFE to challenge the

Rhodium Valuation as too high, or instead has the same right as Rhodium's existing shareholders

to receive a number of shares of SilverSun stock calculated based on the Rhodium Valuation.

8.    Celsius, through its Special Litigation Counsel, has threatened to sue Rhodium over

the treatment of the SAFE in the merger, but has not done so. If the merger does not close by June

30, 2023, it is subject to termination. *See* Ex. B § 7.02, *as amended* in Third Amendment to Merger

Agreement (either party may terminate Merger Agreement if merger not consummated by

Termination Date). SilverSun must still obtain the approval of its stockholders. Ex. B at Recitals,

§ 6.01(a). And with an ongoing dispute over what percentage of the resulting entity Celsius is

entitled to, other shareholders cannot determine what their stake will be. There is accordingly a

present and actual controversy in urgent need of this Court's prompt resolution.

---

[3] Or, in the alternative, a Dissolution Event or no event at all.

**B.     The Merger Is A Liquidity Event, Not A Listing Event.**

9.     The merger is not a Listing Event. The SAFE defines Listing Event to mean "either (i) an Initial Public Offering, (ii) a SPAC Event, or (iii) a Direct Listing." Ex. A § 2. The merger is not an initial public offering, does not involve a special purpose acquisition vehicle, and it will not result in a direct listing of Rhodium common stock on any exchange. *See id.* Therefore, the merger is not a Listing Event.

10.     The merger is a Liquidity Event. The SAFE defines a Liquidity Event as a "Change of Control other than a Listing Event." Ex. A § 2. A Change of Control includes "any reorganization, merger or consolidation of the Company" except for transactions in which Rhodium shareholders retain "at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity." *Id.* In the merger, Rhodium shareholders will receive no voting securities of the "surviving or resulting entity," which is Merger Sub II. Instead, Merger Sub II will be a wholly owned subsidiary of SilverSun. Ex. B at Recitals, §§ 1.01, 4.07(b). Therefore, the merger is a Liquidity Event.

11.     A Change of Control also includes "a sale, lease or other disposition of all or substantially all of the assets of [Rhodium]." Ex. A § 2. The merger will dispose of all Rhodium assets. Ex. B. § 1. *See generally id.* at Article II. Therefore, the merger is also a Liquidity Event on this independent basis.

12.     In the alternative, the merger is a Dissolution Event. A Dissolution Event includes "any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary." Ex. A § 2. Rhodium will not survive the merger with Merger Sub II, meaning there will be "a liquidation, dissolution or winding up of the Company." Therefore, if the merger is not a Liquidity Event, it is a Dissolution Event.

13.    In the alternative, the merger does not meet the definition of any triggering event and is thus no event at all. In that case, Celsius would receive no shares in anything upon the closing of the merger and will continue to hold its rights under the SAFE until one of the three triggering events occurs.

## C.    The Consideration Owed Is Merger "Proceeds" (SilverSun Stock), Not Cash.

14.    The SAFE provides that upon a Liquidity Event, Celsius will receive "a portion of Proceeds, due and payable to [Celsius] immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to . . . the Purchase Amount (the 'Cash-Out Amount')." Ex. A § 1(b). Proceeds are "cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event . . . ." Ex. A § 2.

15.    The Proceeds from the merger are shares of SilverSun stock. Ex. B at Recitals and § 2.01, *as amended* in Amendment to Merger Agreement. Therefore, Celsius is entitled to receive shares of SilverSun stock equal to the $50 million Purchase Amount—i.e., $50 million worth of SilverSun stock.

## D.    Under The SAFE, Celsius Has No Right To Challenge The Rhodium Valuation.

16.    When Celsius (or any other SAFE holder) receives Proceeds from a Liquidity Event, it receives the same consideration, in the same form, as Rhodium's existing shareholders. Ex. A § 2. Here, Rhodium's existing shareholders will receive shares of SilverSun stock based on the Rhodium Valuation. Celsius is accordingly entitled to the same thing.

17.    If Rhodium were valued for less, Celsius would receive a larger percentage of the company. For example, Celsius's $50 million stake would amount to 25% of the company if Rhodium were valued at $200 million. At the $650 million Rhodium Valuation, Celsius will own

approximately 7.7% of the company. Celsius would therefore prefer a lower valuation of Rhodium to apply to the conversion of its SAFE.

18.    The plain terms of the SAFE establish that Celsius has no right to a different valuation of Rhodium. First, the term "Proceeds" is defined to give SAFE holders the same consideration that Rhodium's existing shareholders receive from a Liquidity Event; here, SilverSun stock based on the Rhodium Valuation. Second, the SAFE's Valuation Cap imposes a maximum valuation of Rhodium of $3 billion. Ex. A at Preamble, § 2. The Valuation Cap protects Celsius against dilution by ensuring that it receives at least a certain percentage interest in Rhodium upon conversion. The SAFE contains no other protections against dilution. It also contains no independent appraisal rights.

19.    Rhodium and Celsius entered into a side letter in connection with the SAFE, also on June 2, 2021 (the "Side Letter"). The Side Letter grants various additional rights to Celsius, including "Information Rights" and "Certain Approval Rights." These rights do not include rights to information about the valuation of Rhodium in a Liquidity Event (or Dissolution Event), or any appraisal rights. The Side Letter is attached as Exhibit C.

20.    The $650 million valuation of Rhodium in connection with the merger is well below the $3 billion Valuation Cap in the SAFE. Therefore, Celsius has no rights under the SAFE or the Side Letter to challenge that valuation as too high.

21.    For these reasons, Rhodium seeks a declaration of the event (if any) that has been triggered and the proper calculation of shares in SilverSun (if any) that Celsius is to receive.

## PARTIES

22.    Plaintiff Rhodium Enterprises, Inc. is a Delaware corporation with its principal place of business in Texas. The SAFE refers to Rhodium as the "Company." Ex. A at Preamble.

23.    Defendant Celsius Mining LLC is a Delaware limited liability corporation. The SAFE refers to Celsius as the "Investor." Ex. A at Preamble.

24.    Non-party SilverSun Technologies, Inc. is a Delaware corporation with its principal place of business in New Jersey.

## JURISDICTION

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of the U.S. District Court for the Southern District of New York referring all matters arising under title 11 to the Bankruptcy Judges of this district.

26.    There is an actual controversy between the parties for purposes of 28 U.S.C. § 2201(a) and Bankruptcy Rules 7001(2) and (9). Celsius has repeatedly threatened to institute litigation over its rights under the SAFE in connection with the merger that is intended to close by June 30, 2023. There is accordingly a significant live controversy between the parties, and Rhodium seeks a declaration regarding the extent of Celsius's interest under the SAFE, pursuant to Bankruptcy Rules 7001(2) and (9).

27.    This adversary proceeding constitutes a "non-core" proceeding that is related to *In re Celsius Network, LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.). It is a state-law contract dispute between Celsius and Rhodium (a non-party to the bankruptcy), which does not fall within any of the core proceedings enumerated in 28 U.S.C. § 157(b)(2). Absent its relation to Celsius's bankruptcy, there would be no federal subject matter jurisdiction.

28.    Rhodium consents to the entry of final orders and judgments by the Bankruptcy Court in this adversary proceeding.

29.    Venue is proper in this district because this adversary proceeding is related to a case in this district commenced under the Bankruptcy Code.

## FACTUAL ALLEGATIONS

**A.    Rhodium And Celsius Enter Into The SAFE.**

30.    On or about June 2, 2021, Rhodium and Celsius entered into the SAFE. *See generally* Ex. A.

31.    Celsius paid $50 million to Rhodium under the SAFE. Ex. A at Preamble. That $50 million is defined as the "Purchase Price." *Id.*

32.    In exchange for the Purchase Price, Celsius received "the right to certain shares of the Company's Capital Stock, subject to terms described below." Ex. A at Preamble. The "Company" is Rhodium Enterprises, Inc. *Id.* "Capital Stock" means "the capital stock of the Company." *Id.* § 2.

33.    The SAFE contains a "Valuation Cap" of $3 billion. Ex. A at Preamble.

34.    The SAFE contains a "Discount Rate" of 85%. Ex. A at Preamble.

**I.    The SAFE Defines The Triggering Events**

35.    The SAFE will convert (*e.g.*, into a right to receive stock) only upon the occurrence of specified triggering events. The triggering events are (a) an "Equity Financing or Listing Event," (b) a "Liquidity Event," and (c) a "Dissolution Event." Ex. A § 1.[4]

36.    A "'**Listing Event**' means either (i) an Initial Public Offering, (ii) a SPAC Event, or (iii) a Direct Listing." Ex. A § 2. The SAFE defines each embedded term as follows:

    a.    "'**Initial Public Offering**' means the closing of the Company's first firm commitment underwritten offering of Common Stock pursuant to a registration statement filed under the Securities Act." Ex. A § 2. "'Common Stock' means the Class A Common Stock of the Company, par value $0.0001 per share." *Id.*

---

[4] Neither party contends that the anticipated merger between Plaintiff and SilverSun is an "Equity Financing."

b.     "'**SPAC Event**' means the direct or indirect acquisition of the Company by a special purpose acquisition company (a "**SPAC**") that (x) results in the capital stock of the Company being listed on a U.S. Securities Exchange and (y) constitutes such SPAC's 'initial business combination' (as such term is used in such SPAC's constituent documents)." Ex. A § 2.

c.     "'**Direct Listing**' means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services." Ex. A § 2.

37.     A "'**Liquidity Event**' means a Change of Control other than a Listing Event." Ex.

A § 2. "Change of Control" is defined to mean:

(i) a transaction or series of related transactions in which any 'person' or 'group' (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) becomes the 'beneficial owner' (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or other such surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

*Id.*

38.     A "'**Dissolution Event**' means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary." *Id.*

## II.    The SAFE Specifies The Consideration For Each Triggering Event

39.    The SAFE describes the consideration payable to Celsius in connection with a Listing Event as follows: "If there is . . . a Listing Event before the termination of the Safe . . . immediately prior to the consummation of such Listing Event, this Safe will automatically convert into . . . the number of shares of Common Stock of the Company equal to the Purchase Amount divided by the applicable Conversion Price ( . . . the '**Conversion Shares**')." Ex. A § 1.[5]

40.    "'**Conversion Price**' means the either: (1) the Safe Price or (2) the Discount Price, whichever calculation results in a greater number of Conversion Shares." Ex. A § 2. [6]

41.    "'**Discount Price**' means the price per share of the Capital stock . . . upon the closing of the Listing Event . . . multiplied by the Discount Rate." The "Discount Rate" is 85%.

42.    The SAFE describes the consideration payable to Celsius in connection with a Liquidity Event as follows:

> If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below), to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the '**Cash-Out Amount**'), or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the '**Conversion Amount**'). If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to

---

[5] The parties agree that Equity Financing is inapplicable.

[6] The parties agree that using the Discount Price results in a greater number of Conversion Shares.

satisfy any requirement or limitation generally applicable to the Company's
securityholders, or under any applicable laws.

Ex. A § 1.[7]

43.    "'**Proceeds**' means cash and other assets (including without limitation stock
consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable,
and legally available for distribution." Ex. A § 2

44.    The consideration payable in connection with a Liquidity Event thus may take the
form of "stock consideration" if the proceeds from the Liquidity Event are stock consideration.

45.    If Rhodium's shareholders receive a choice about the form and amount of Proceeds
they will receive in connection with a Liquidity Event, then Celsius is entitled to the "same choice."
Ex. A § 2. Celsius otherwise has no input into the form and amount of Proceeds it will receive in
connection with a Liquidity Event.

46.    The SAFE describes the consideration payable to Celsius in connection with a
Dissolution Event as follows: "If there is a Dissolution Event before the termination of this Safe,
the Investor will automatically be entitled . . . to receive a portion of Proceeds equal to the Cash-
Out Amount, due and payable to the Investor immediately prior to the consummation of the
Dissolution Event." Ex. A § 1.

47.    Once again, "'**Proceeds**' means cash and other assets (including without limitation
stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as
applicable, and legally available for distribution." Ex. A § 2

---

[7] The parties agree that the Cash-Out Amount is greater than the Conversion Amount.
Therefore, we omit further discussion of the Conversion Amount.

48.    The consideration payable in connection with a Dissolution Event thus may take the form of "stock consideration" if the proceeds from the Dissolution Event are stock consideration.

### III.    Miscellaneous Aspects Of The SAFE

49.    Rhodium and Celsius are both sophisticated parties, and both were represented by sophisticated counsel in connection with the SAFE transaction. Celsius was represented by the law firm Akin Gump Strauss Hauer & Feld LLP.

50.    In the SAFE, Celsius made specific representations about its sophistication:

a.    "The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount." Ex. A § 5(b).

b.    "The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time." Ex. A § 5(b).

51.    The SAFE contains a Delaware choice-of-law provision: "All rights and obligations hereunder will be governed by the laws of the State of the State [sic] of Delaware, without regard to the conflicts of law provisions of such jurisdiction." Ex. A § 5(f).[8]

### B.    Rhodium And Celsius Enter Into The Side Letter.

52.    On or about June 2, 2021, Rhodium and Celsius entered into the Side Letter in connection with the SAFE. *See generally* Ex. C.

---

[8] The SAFE has two "Section 5"s. The reference here is to the second Section 5 ("Miscellaneous").

53.    The Side Letter specifies that it "is entered into in connection with the investment by Celsius in Rhodium pursuant to the Safe." Ex. C at p. 1.

54.    The Side Letter confers additional rights on Celsius, including the right to invest up to $100 million more in Rhodium on the same terms as in the SAFE (Ex. C ¶ 2), the right to receive certain mandatory distributions (*id.* ¶ 3), the right to receive certain unaudited and audited financial statements (*id.* ¶ 4), and various rights to participate in Rhodium's other business dealings (*id.* ¶¶ 8, 9, 10). It further commits Rhodium to maintaining a "Leverage Ratio" (of debt to EBITDA) of 3:1 or less. *Id.* ¶ 7.

55.    The Side Letter also gives Celsius "Certain Approval Rights," as follows:

> The prior written consent of Celsius will be required with respect to any of the following matters: (a) a change in domicile or tax status of Rhodium; (b) any transaction between Rhodium, on the one hand, and any affiliate, stockholder, manager, director, office or employee of Rhodium or any affiliate of Rhodium, on the other hand, in each case except for (i) transactions by and among Rhodium and/or wholly owned subsidiaries of Rhodium, and (ii) transactions on fair and reasonable terms no less favorable to Rhodium than would be obtainable in a comparable arm's length transaction with a [sic] unaffiliated third party; (c) commencement of a voluntary bankruptcy by Rhodium, or Rhodium's consent to the appointment of a receiver, liquidator, assignee, custodian, or trustee for the purposes of winding up the affairs of Rhodium, and (d) any amendment of the organizational documents of Rhodium that is adverse to holders of Rhodium's Class A Common Stock. Celsius shall respond within 48 hours to any written request (including via e-mail) for consent pursuant to this Section 6 and, if Celsius fails to respond within 48 hours, Celsius shall be deemed to have consented to the matter described in such request.

Ex. C ¶ 6.

56.    The Side Letter does not give Celsius any appraisal rights with respect to the valuation of Rhodium in a triggering event under the SAFE.

57.    Thus, although Celsius bargained for and received substantial additional rights in connection with the SAFE, including "Information Rights" (Ex. C ¶ 4) and "Certain Approval

Rights" (*id.* ¶ 6), Celsius did not receive information rights or approval rights with respect to the valuation of Rhodium in a Liquidity Event (or Dissolution Event).

**C.    Rhodium Enters Into A Merger Agreement With SilverSun.**

58.    On or about September 29, 2022, Rhodium entered into an Agreement and Plan of Merger with SilverSun. The same day, SilverSun announced the merger by publicly filing a Form 8-K. SilverSun later filed an amended Form 8-K. The parties have since amended their initial merger agreement.

59.    The merger is an arms-length transaction between unaffiliated third parties. Rhodium and SilverSun are currently unaffiliated. They share no directors, officers, or employees. Rhodium has no current ownership interest in SilverSun, nor do its directors or officers.

**I.    The Mechanics Of The Merger**

60.    Rhodium's merger with SilverSun will proceed in two steps. First, Rhodium will merge with a new SilverSun subsidiary called Merger Sub I, with Rhodium existing as the surviving company. Ex. B § 1.01(a). Then, Rhodium will merge with another new SilverSun subsidiary called Merger Sub II, with Merger Sub II existing as the surviving company. *Id.* § 1.01(b). Merger Sub II will then be a direct, wholly owned subsidiary of SilverSun. *Id.* § 1.04.

61.    Rhodium will not exist after the merger. Ex. B § 1.01. Nor will Rhodium common stock exist after the merger. *Id.* § 1.04. *See generally id.* at Article II.

**II.    The Consideration To Rhodium Under The Merger**

62.    Under the merger, Rhodium's shareholders will receive shares of SilverSun common stock representing approximately 96.8% of the voting power of the enterprise. Ex. B § 2.01(a), *as amended* in Amendment to Merger Agreement. Current SilverSun shareholders will retain approximately 3.2% of the voting power. *Id*.

63.     Rhodium and SilverSun have agreed that for all purposes of the merger, the pro forma net equity value of SilverSun after the merger is $671,875,175 (the "Pro Forma Valuation"). *Id.* Rhodium and SilverSun have further agreed that based on the Pro Forma Valuation, the value of the consideration to be received by current Rhodium shareholders is $650,375,153 (the "Rhodium Valuation."). *Id.*

### III.     The Merger's Treatment Of The SAFE

64.     The Merger Agreement discloses how the SAFE (and other SAFEs issued by Rhodium) will be treated in connection with the merger. *See* Ex. B § 2.05 ("Treatment of Company SAFEs").

65.     The Merger Agreement describes the consideration under the SAFE as follows:

> Pursuant to each of the simple agreements for future equity entered into by and between the Company and party thereto that are outstanding immediately prior to the First Effective Time (each a "***Company SAFE***" and collectively the "***Company SAFEs***"), each holder of a Company SAFE (each a "***Company SAFE Holder***" and collectively the "***Company SAFE Holders***") shall, at the Closing of the Mergers, receive an aggregate number of validly issued, fully paid and nonassessable shares of Parent Class A Common Stock equal to the Purchase Amount (as defined below) divided by the price per share implied by the Rhodium Valuation as illustrated in Section 2.05(c), rounded up to the nearest whole number of shares of Parent Class A Common Stock (in the aggregate, the "***Company SAFE Merger Consideration***"). Following the issuance of the Company SAFE Merger Consideration, each Company SAFE shall terminate in accordance with its terms, and the Company SAFE Holder shall cease to have any rights with respect to such Company SAFE.

Ex. B § 2.05(a).

66.     In short, "each holder of a Company SAFE" (including Celsius) will receive a number of "shares of [SilverSun] Class A Common Stock" equal to the Purchase Amount (for Celsius, $50 million) divided by the price per share implied by the Rhodium Valuation (where the Rhodium Valuation is about $650 million).

67.    The Merger Agreement explains that the merger itself is a "Liquidity Event" under the SAFE:

> Pursuant to the terms of the Company SAFEs, the Mergers are considered a Liquidity Event (as defined in the Company SAFE). Under a Liquidity Event, no discount is applied in the calculation of the amount of Proceeds (as defined in the Company SAFE) due and payable to each Company SAFE Holder. Accordingly, immediately prior to the First Effective Time, the amount of Proceeds that each Company SAFE Holder is entitled to receive under the terms of the Company SAFE will be equal to the value paid for such Company SAFE on its date of execution (the "***Purchase Amount***"). The Company will use the Rhodium Valuation to determine the amount of Proceeds to be issued to each Company SAFE Holder at Closing.

Ex. B § 2.05(b).

68.    The Merger Agreement goes on to provide two illustrative examples of how the consideration will be calculated under the SAFEs. Ex. B § 2.05(c).

### IV.    The Status Of The Merger

69.    The directors of SilverSun and Rhodium's board of directors have unanimously approved the Merger Agreement. Ex. B at Recitals, §§ 3.04, 4.04.

70.    SilverSun must still obtain the approval of its stockholders at a special meeting. Either party may terminate the Merger Agreement if the merger is not consummated on or before the June 30, 2023 Termination Date. Ex. B § 7.02(a), *as amended* in Third Amendment to Merger Agreement.

### D.    Celsius Files For Bankruptcy.

71.    Meanwhile, on or about July 13, 2022, Celsius and its affiliates filed for Chapter 11 bankruptcy in the Southern District of New York. *In re Celsius Network, LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.).

72.    Rhodium has not previously been involved in this bankruptcy litigation.

**E.     Celsius Asserts That Its Treatment In The Merger Violates The SAFE.**

73.     After SilverSun announced the merger, Rhodium began to receive correspondence from Special Litigation Counsel to Celsius in the bankruptcy proceeding. The parties engaged in extensive correspondence and discussions over a period of six months.

74.     Through Special Litigation Counsel, Celsius has asserted that the treatment of Celsius contemplated in the Merger Agreement is not consistent with Celsius's rights under the SAFE.

75.     Specifically, Celsius asserts that the merger between Rhodium and SilverSun is a Listing Event because it will result in Rhodium's current shareholders owning shares of a company that is listed on a national securities exchange. Celsius asserts that as a result:

      a.     Celsius is entitled to a discount on the valuation used to calculate the shares owed to it; and

      b.     The Rhodium Valuation is the wrong reference for determining what is owed to Celsius.

76.     Celsius also asserts that the merger is not a Liquidity Event because it will result in Rhodium's current shareholders continuing to own a majority of the voting securities of the entity resulting from the transaction. Alternatively, if it is a Liquidity Event, in Celsius's view:

      a.     Celsius is entitled to receive $50 million in cash;

      b.     Rhodium must provide information concerning the actual value of the post-merger company, or how Rhodium and SilverSun arrived at the Rhodium Valuation; and

      c.     The Rhodium Valuation is arbitrary and inflated.

77.     Rhodium responded at length and in detail to Celsius's assertions.

78.     Rhodium explained that the merger is not a Listing Event because: (1) it is not an Initial Public Offering (a "public offering of Company Common Stock"); (2) it is not a SPAC Event because there is no SPAC involved, and because it will not result in "the capital stock of the Company being listed on a U.S. securities exchange"; and (3) it is not a Direct Listing because Rhodium is not listing its own "Common Stock . . . on a national securities exchange by means of an effective registration statement on Form S-1 . . . ." *See* Ex. A § 2.

79.     With respect to the "Direct Listing," Rhodium further explained that the fact that Rhodium's shareholders will own publicly listed stock (i.e., SilverSun stock) does not suffice. Rather, the SAFE defines a "Direct Listing" as Rhodium's initial listing of Rhodium's own common stock. *See* Ex. A § 2. Rhodium is not listing its own common stock.

80.     Rhodium also explained that the merger is a Liquidity Event because Rhodium's current shareholders will not own any shares in the entity resulting from the merger (Merger Sub II). Instead, Merger Sub II will be a wholly-owned subsidiary of SilverSun. Ex. B § 1.04. Therefore, the exception for transactions in which Rhodium's shareholders retain their majority voting interest in the "surviving or resulting entity" does not apply. *See* Ex. A § 2 (defining "Liquidity Event" and "Change of Control").

81.     In addition, the merger is a Liquidity Event for the independent reason that it disposes "of all or substantially all of the assets of the Company." Ex. A § 2 (defining "Liquidity Event" and "Change of Control"); Ex. B § 1. *See generally id.* at Article II.

82.     Rhodium further explained to Celsius that in a Liquidity Event:

      a.      Celsius is not entitled to cash but rather to a portion of the Proceeds, which are expressly defined to include stock consideration (Ex. A § 2);

b.      By receiving Proceeds in the form of stock consideration based on the Rhodium Valuation, Celsius will receive exactly the same thing that Rhodium's existing shareholders receive from the Liquidity Event; no one received any choice in the form or amount of the Proceeds (*cf.* Ex. A. § 1)*;*

c.      Celsius has no information rights beyond those bargained for in the Side Letter (Ex. C at ¶ 4); and

d.      Celsius has no appraisal rights and no protections against dilution under the SAFE except for the Valuation Cap of $3 billion (Ex. A at Preamble).

83.     Despite Rhodium's extensive efforts to resolve the dispute, the parties have reached an impasse.

## COUNT I

## (DECLARATORY JUDGMENT)

84.     Rhodium repeats the allegations set forth above as if fully set forth herein.

85.     The merger is not a Listing Event under the SAFE for the following reasons:

a.      It is not an Initial Public Offering;

b.      It is not a SPAC Event; and

c.      It is not a Direct Listing.

86.     The merger is a Liquidity Event under the SAFE, either because:

a.      It is a merger, and it is not a series of related transactions in which Rhodium's shareholders retain a majority of the total voting power of the surviving entity; or

b.      It is a disposition of all or substantially all the assets of Rhodium.

87.    In the alternative, the merger is a Dissolution Event under the SAFE because it is a "liquidation, dissolution or winding up of the Company ([that is not] a Liquidity Event), whether voluntary or involuntary."

88.    In the alternative, the merger is not an event at all under the SAFE because it does not meet the definition of any triggering event.

89.    Celsius is not entitled to the Discount Price. Nor is Celsius owed $50 million in cash in connection with the merger. Rather, the consideration owed to Celsius is $50 million in Proceeds from the merger, meaning $50 million in SilverSun stock at the Rhodium Valuation. Alternatively, if the merger is not a triggering event, nothing is owed to Celsius.

90.    The Rhodium Valuation is less than the $3 billion Valuation Cap in the SAFE. Celsius has no right to additional information about the actual value of the post-merger company, or how Rhodium and SilverSun arrived at the Rhodium Valuation. Celsius has no appraisal rights and no other right to challenge the valuation.

91.    Rhodium has complied with, and is in compliance with, all its obligations under the SAFE and has not breached, and is not in breach of, the SAFE. In the Merger Agreement, Rhodium has set forth its intention to treat Celsius consistently with the SAFE.

92.    Celsius has claimed that it is entitled to different treatment under the SAFE in connection with the merger, including but not limited to the Discount Price, cash payment, and information and appraisal rights. Rhodium is entitled to a judgment declaring that Celsius is not entitled to such different treatment.

**WHEREFORE**, Rhodium respectfully requests that the Court enter an order as follows:

A.    Declaring that Rhodium's merger with SilverSun is a Liquidity Event under the SAFE and not a Listing Event, that the consideration that will be payable to Celsius upon the

merger is $50 million in SilverSun common stock based on Rhodium Valuation, and that Celsius has no right to additional information about the merger valuation of Rhodium, no appraisal right under the SAFE, and no other right to challenge the Rhodium Valuation as too high;

B.      In the alternative, declaring that Rhodium's merger with SilverSun is a Dissolution Event under the SAFE, that the consideration that will be payable to Celsius upon the merger is $50 million in SilverSun common stock based on Rhodium Valuation, and that Celsius has no right to additional information about the merger valuation of Rhodium, no appraisal right under the SAFE, and no other right to challenge the Rhodium Valuation as too high;

C.      In the alternative, declaring that Rhodium's merger with SilverSun does not constitute a triggering event under any of the definitions in the SAFE and that Celsius is entitled to nothing in connection with the merger, including no right to additional information about the merger valuation of Rhodium, no appraisal right under the SAFE, and no other right to challenge the Rhodium Valuation as too high; and

D.      Awarding such other and further relief as this Court deems just and proper.

Dated the 21st day of April, 2023                    Respectfully submitted,

**THOMPSON HINE LLP**

/s/ Renee Zaytsev
Renee Zaytsev, Esq.
335 Madison Avenue, 12th Floor
New York, New York 10017-4611
Telephone:  212-908-3981
Facsimile:  212-344-6101
Renee.Zaytsev@thompsonhine.com

**STRIS & MAHER LLP**

Peter K. Stris (NYSBA # 3975141)
Dana Berkowitz (NYSBA #5155270)
Victor O'Connell (*pro hac vice application forthcoming*)
John Stokes (*pro hac vice application forthcoming*)
pstris@stris.com
dberkowitz@stris.com
voconnell@stris.com
jstokes@stris.com
777 S Figueroa Street, Suite 3850
Los Angeles, California 90017
Phone: (213) 995-6800
Fax: (213) 261-0299

Attorneys for Plaintiff Rhodium Enterprises, Inc.