**Hearing Date: May 17, 2023 at 10:00am (prevailing Eastern Time)**
**Objection Deadline: May 10, 2023 at 4:00pm (prevailing Eastern Time)**

Daniel A. Frishberg
Immanuel J. Herrmann
*Pro Se Customer-Appellants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

# NOTICE OF HEARING ON CUSTOMER-APPELLANTS' MOTION FOR A STAY PENDING APPEAL OF THE ORDER REGARDING WHICH DEBTOR ENTITIES HAVE LIABILITY FOR CUSTOMER CONTRACT CLAIMS UNDER THE TERMS OF USE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007

**PLEASE TAKE NOTICE** that a hearing on *Customer-Appellants' Motion for a Stay Pending Appeal of the Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use Pursuant to Federal Rule of Bankruptcy Procedure 8007* will be held on May 17, 2022 at 10:00am (prevailing Eastern Time) (the "Hearing").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. Electronic appearances (eCourtAppearances) need to be made by 4:00 p.m. (prevailing Eastern Time), the business day before the hearing (i.e., on May 16, 2023).

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m. (prevailing Eastern Time) on May 17, 2022, must connect to the Hearing beginning at 9:00 a.m. (prevailing Eastern Time) on May 17, 2022. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing. Parties that type in only their first name, a nickname or initials will not be admitted into the Hearing. When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room," in the order in which you seek to connect. Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (iii) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (iv) be served so as to be actually received by May 10, 2023, at 4:00 p.m. (prevailing Eastern Time), by (a) via electronic mail at immanuelherrmann@gmail.com, (b) to the entities on the Master Service List available on the case website of the above-captioned debtors at https://cases.stretto.com/celsius, and (c) to any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by Daniel A. Frishberg and Immanuel J. Herrmann.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Motion and other pleadings

filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in

accordance with the procedures and fees set forth therein.


Respectfully submitted,


/s/ Daniel A. Frishberg                                  /s/ Immanuel Herrmann
Daniel A. Frishberg                                      Immanuel Herrmann
*Pro Se*                                                 *Pro Se*
April 26, 2023                                           April 26, 2023

**Hearing Date: May 17, 2023 at 10:00am (prevailing Eastern Time)**
**Objection Deadline: May 10, 2023 at 4:00pm  (prevailing Eastern Time)**

Daniel A. Frishberg
Immanuel J. Herrmann
*Pro Se Customer-Appellants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.,*[2] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

# CUSTOMER-APPELLANTS' MOTION FOR A STAY PENDING APPEAL OF THE ORDER REGARDING WHICH DEBTOR ENTITIES HAVE LIABILITY FOR CUSTOMER CONTRACT CLAIMS UNDER THE TERMS OF USE PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 8007

Daniel A. Frishberg and Immanuel J. Herrmann–Celsius Network LLC, *et. al.,* customers

(the "Customer-Appellants")–hereby submit this Motion (this "Motion") for a Stay Pending

Appeal of the *Order Regarding Which Debtor Entities Have Liability for Customer Contract*

*Claims Under the Terms of Use* (D.R. 2265) (the "Customer Claims Decision"), currently on

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

appeal as Case No. 23-cv-03144 (S.D.N.Y. 2023) [rel. 23-cv-02882 (S.D.N.Y. 2023)] pursuant to Federal Rule of Bankruptcy Procedure 8007. In support of the Motion, we respectfully state as follows:

## BACKGROUND

It is no understatement to say that the outcome of the issue of which entities customers have claims against will *profoundly* impact the outcome <u>and</u> the litigation schedule of the remainder of these cases. No **customers** have expressed a desire to litigate matters of substantive consolidation between Celsius Network Ltd. and Celsius Network LLC as proposed in the Debtors' plan. In fact, all but the Preferred Shareholders and the insiders like Alex Mashinsky would likely consent to it. Nor has there been an interest among **customers** regarding the amount of the inter-company claims. Nor constructive fraudulent transfer claims. Yet, those are the issues–in addition to a customer non-contract claims litigation–which are now before the Court as a result of this ruling.

The appeal of the *Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use*–along with these four other litigations–have now become gating issues to our emergence from Chapter 11. And, while the Preferred Series B Holders would love nothing more than to equitably moot our appeal through a Chapter 11 Plan or settlement[3], we respectfully request that this Court not allow that to happen. The Preferred are determined to move forward with other litigations that are more likely to benefit **them** (or, at

---

[3] In the case of *In re Willian Harry Fryar*, 2017 WL 1489822 (Bankr. E.D. Tenn. Apr. 25, 2017), the Bankruptcy Court analyzed a proposed post-*Jevic* settlement under the standards of Bankruptcy Rule 9019. Citing the **Second Circuit's** decision in *Iridium*, 478 F.3d 452 (2d Cir. 2007), the Bankruptcy Court in *Fryar* noted that "whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019."

least,not leave them with zero). To them, it is all a game–a game to allow their well-heeled clients to extract as much money as possible from retail and unaccredited investors–investors who did not have access to Celsius management, or armies of professionals for due diligence, like the Preferred Series B had.

The premise behind our appeal is simple: The Hedge Fund Masters of the Universe (also known as the Preferred Series B) want to get all of the gains <u>when they make a good bet</u>. ***But*** when they <u>make a bad bet</u>, they want bailouts and bonuses. In other words: capitalism for me, but not for thee. Since the government[4] won't bail out the Preferred Series B investors like they did with Silicon Valley bank, ***retail customers of Celsius*** will have to do. The Preferred Series B will stop at nothing to (continue to) ***<u>twist</u>*** the contracts, ***<u>pervert</u>*** the rule of law, and enter ***<u>their extrinsic evidence</u>***–evidence that ostensibly gets at the meaning of a contract that ***<u>they were not even a party to</u>*** while conveniently ***<u>keeping relevant customer evidence out.</u>***

The bottom line? A reasonable stay pending appeal–one that wouldn't unreasonably prolong these cases but would stay the order's implementation and encourage the District Court and Bankruptcy Court to collaborate to expedite this appeal so that it is not equitably mooted–would protect the due process rights of Customers in these cases. It would help level the playing field, even just a little bit, between billionaire hedge fund managers and defrauded retail investors. A stay of implementation of this order would be ***extremely beneficial*** to Customers, ensuring that the appeal is heard before plan confirmation while merely maintaining the ***status quo*** for the Preferred Series B. A stay would simply prevent a settlement or the consummation of

---

[4] Though if they have not already tried, the Series B Holders should do what Silicon Valley Bank customers recently did, and ask the government, instead of defrauded Celsius Customers, for a bailout.

a plan that would–but not for this order–violate the Supreme Court ruling *Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973 (2017) which held that the absolute priority rule **would prevent the Preferred Series B shareholders getting a dime in any non-consensual settlement or Chapter 11 Plan.**[5]

A stay that encourages (and allows) for an expeditious resolution of this appeal–but still ensures ***that it is timely heard***–would allow the sale process, plan process, and thus the case to proceed efficiently with regards to other matters related to the plan, and would materially advance these chapter 11 cases–because it will allow us to avoid the distraction of a premature settlement with the preferred, move on with the rest of a plan, and leave this issue for final resolution (such as a nuisance settlement or a zero recovery) at the very end of plan confirmation, ***only after*** the appropriate–timely, and hopefully, expedited–appellate review. Appellate review is a critical and fundamental part of due process. Just as the Preferred Series B have made no secret of stating due process is *critically important*[6] for ***their*** clients, due process is even more important for retail, *pro se*, unrepresented, underrepresented, and non accredited Customers in a *contract of adhesion*.

---

[5] As this Court stated in its *Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use*, "Because unsecured **Customers recover ahead of equity holders under the absolute priority rule**, the Series B Preferred Holders have some chance of recovery if Customers hold claims ***only*** against LLC and not against CNL or other Debtor and non-Debtor affiliates." (emphasis added).

[6] See *Series B Holders' Statement Regarding Proposed Litigation Schedule* (D.R. 2510), where the Preferred mention "due process" four times and ask to litigate through the end of September. Due process for their well-heeled clients–but seemingly not for Celsius customers–as the Preferred Series B support ***protracted*** litigation that prioritizes due process for their clients at every turn, no matter how much it costs, while pushing for ***summary*** litigation for customers at every turn, no matter how much such summary litigation violates customers' due process rights. Their responses around the Customer Claims process were especially laughable. See *Series B Preferred Holders' Objection to the Motion of the Official Committee of Unsecured Creditors (i) For Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (ii) To Appoint a Third-Party Fiduciary to Assets a Class Claim on Behalf of Account Holders* (D.R. 2467) in particular, their proposal that Bellwether Claims, defended by *pro se* claimants, "could serve as an efficient resolution of any fraud claims."

Furthermore, Customer-Movants do not, and will not, agree to *any* settlement with the Preferred Series B without our express consent, and it's a good bet that any proposed settlement in these Cases will be non-consensual[7]; therefore, a stay is necessary to protect the Customer-Appellants' due process rights and a plan that would be permissible under *Jevic*, as well as avoid a finding of equitable mootness down the road that would end the appeal before it is heard. Although the Customer-Appellants do not believe that the doctrine of equitable mootness should exist, it is alive and well in the Second Circuit, thereby requiring us to protect our rights now to avoid a finding of equitable mootness later.

Customer-Appellants (along with other customers) have an *immediate* need for this stay of the Customer Claims Decision and are suffering irreparable harm each day that this decision remains in force and a plan continues hurtling forward toward confirmation (from legal fees and additional months of litigation that reduce our recovery[8]). While the Preferred Series B holders cry out for "due process" on all of ***their*** matters, no matter how costly (or harmful) to the estate, it is critical that our appeal, which raises ***both*** contract and due process issues for customers, move forward briskly and in tandem with their other litigation that the Preferred Series B are engaged in.

Undoubtedly, the Preferred Series B will continue pushing to slow down and moot this appeal as other matters hurtle on, all to uphold this ruling's the draconian consequence of

---

[7] In other words, if we do not consent to the settlement, and should this decision be overturned on Appeal, we believe it would be impermissible for this Court to approve any settlement with the Preferred under *Jevic*. Of course, we are not guaranteed the decision will be overturned on appeal, but we do think we have a good chance of success. This Court has noted the record was thin. In any case, denying us our appellate rights via equitable mootness and plan consummation causes us irreparable harm.
[8] By over $600,000 a day without even accounting for the hefty professional fees.

channeling significant contract claims held by customers to an entity that, as this Court notes, is "hopelessly insolvent." Furthermore, they will use upcoming litigation to attempt to extract the ***largest possible amount*** from the retail investors who the Preferred Series B helped fund (and frankly, their doing so may have ***enabled*** the Debtors to further defraud customers for longer and worsened Customer recoveries, not to mention, their aggressive litigation also hurts Customer recoveries as well[9].)

Forcing the Customer-Appellants to be bound by any non-consensual settlement with the Preferred Series B that would (if the decision is reversed) violate *Jevic,* ***before*** we can complete our due process right of appellate review, would cause Customer-Appellants irreparable harm. Equitable mootness must not be allowed to prevent the appropriate appellate review that, we believe, will likely show that the Preferred are owed no recovery.

We note that this Court also noted, when the Earn Decision was appealed, that appealing customers should understand the "capital structure" of Celsius, perhaps implying that the Earn Decision was to our benefit *in conjunction* with a hypothetical future Customer Claims decision that would go the other way. Earn Customers are now left with the lowest-priority unsecured claims against an ***unfavorable*** capital structure that does *not* match what the Debtors, the UCC, or others implied would likely exist for us going into this failed "one-two" punch, the danger of

---

[9] We reserve all rights with respect to the Series B Holders. Mr. Herrmann and Mr. Frishberg, along with many other customers, relied on the announced investment of the Series B holders as a key factor in not withdrawing our funds from Celsius. We relied on the fact that hedge funds with 100's of billions of dollars under management did due diligence and had support from top law firms; this served as evidence that Celsius was safe and legitimate. Now, the Series B Holders are adding insult to injury by coming after retail customers' deposits. Perhaps they will even try to get releases and exculpations in a final Chapter 11 plan for their clients, using customer money to pay for their legal fees to get them. We would not be surprised, since they seem to not even know what shame is, let alone have any.

*irreparable* harm for **Customers** is heightened, and is, in fact, at its highest point in these cases so far. This appeal gives Customers a way forward, if only it is heard.

## LEGAL STANDARD

In *General Motors*, the Bankruptcy Court for the Southern District of New York stated "the Circuit and more recent cases have engaged in a balancing process with respect to the four factors, as opposed to adopting a rigid rule." (See *In re Gen. Motors Corp.*, 409 B.R. at 30.) We believe a balancing teast is the correct approach, versus the preliminary injunction test, and we ask that the Court use a balancing test if it determines that not all prongs are met under the preliminary injunction standard. That said, we believe the preliminary injunction standard is met **with flying colors.**

Under Second Circuit law for preliminary injunctions, "[f]or a preliminary injunction to issue, the movant must establish (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 183-84 (2d Cir. 2019) (internal quotation marks omitted); accord *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35-38 (2d Cir. 2010); *Mohamed v. Reno,* 309 F.3d 95, 101 (2d Cir. 2002); *ACC Bondholder Grp. v. Adelphia Comm. Corp.* (*In re Adelphia Comm. Corp.*), 361 B.R. 337, 346-47 (S.D.N.Y. 2007).

To determine whether a stay pending appeal is appropriate in the Second Circuit, a court considers: whether the movant is likely to succeed on the merits on appeal; whether the movant will suffer irreparable injury if the stay is denied; whether issuance of the stay will ***substantially*** injure the other parties interested in the proceeding; and where the public interest lies. *Nken v. Holder,* 556 U.S. 418, 426 (2009). (Emphasis added)

We go through the *Niken* factors here:

## Argument

### I.    A Stay Is Needed to Avoid Irreparable Harm to the Customer-Appellants (and Other Customers.)

It is **critical** for a stay pending appeal to be granted *both* to prevent value destruction for customers *and* to prevent the appeal from becoming equitably moot as part of a settlement, a plan, or plan consummation. For equitable mootness to happen here, the Court need only to confirm a Chapter 11 Plan that gives any recovery to the Preferred Series B, or, approve a settlement under Rule 9019 or similar that would allow a recovery for the Preferred Series B. Both of these would be permissible under this decision absent a stay (but would *not* be permissible if this decision is stayed pending appeal, due to the absolute priority rule.) That is where the stay comes in.

The possibility of mootness here, *in itself*, may be enough to constitute irreparable harm. While courts are split as to whether the irreparable injury prong ***alone*** may be satisfied by a

showing that the appeal would be moot absent a stay, it is a contributing factor, and several

courts in the Second Circuit have recognized that the loss of the right to appeal ***alone*** *is* enough

and that it is a "quintessential form of prejudice." See *In re Country Squire Assocs. of Carle*

*Place*, 203 B.R. 182, 183 (2nd Cir. BAP 1996) (concluding the irreparable injury prong was

satisfied because there was "a very strong likelihood that any appeal would be moot" without the

stay); see also *Daly v. Germain* (*In re Norwich Historic Pres. Tr., LLC)*, No. 3:05CV12 (MRK),

2005 WL 977067, at *3 (*D. Conn*. Apr. 21, 2005) (assuming appellant "has satisfied the

irreparable harm prong of the four-part test because of the concern that the lack of a stay will

moot his appeal.")


Even if this Court disagrees that mootness alone is enough, there are four ***additional***

factors that **heavily** weigh in favor of granting a stay to avoid irreparable harm:


1. The appeal is a central gating issue in the resolution of these cases, just like substantive

consolidation, intercompany claims, constructive fraudulent transfer matters, and customer fraud

non-contract claims. Giving it the same weight as those matters gives it the importance it

deserves. A failure to hear the appeal at all, but to get rulings on substantive consolidation and

intercompany claims and constructive fraudulent transfer in a vacuum, will likely result in

irreparable harm to the Customer-Appellants' prejudice, if such rulings result in any

non-consensual value transfer to the Preferred Series B and no Article III Court is able to rule on

the Customer Claims issue and whether such value transfer is permissible under *Jevic*. This is

why we will move to expedite this appeal –but it is also why a stay pending appeal will help

move these cases forward.

2. A stay will prevent the Preferred Series B from doing an end-run around *Jevic* through a decision that *could* later be overturned on appeal, if only appellate review had happened faster. A distribution to the Preferred–where none is due–could wrongly deprive customers of due process *and* their Fifth Amendment rights, at significant harm to the customers, through a binding non-voluntary settlement with the Preferred Series B shareholders or the substantial consummation of a plan. Any plan that violates the absolute priority rule–which states that the Preferred should receive zero if the Court's Customer Claims decision is overturned–would cause Customer-Appellants irreparable harm. Therefore, any plan confirmed until the appeal is heard is *likely* to cause Creditor-Appellants irreparable harm.

3. A stay will allow the District Court to answer our due process and constitutional questions on appeal and, hopefully, remand to this Court for additional action–such as a rehearing with additional evidence in the record. Depriving customers of such due process and denying us our constitutional rights, including our Fifth Amendment right to not be deprived of property without due process of law–which includes appellate review by an Article III court–would be, in itself, irreparable harm. Constitutional violations are routinely recognized as triggering irreparable harm unless they are promptly remedied. One such remedy here is a stay pending appeal that would merely preserve the *status quo*. See, e.g., *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of constitutional "freedoms, for even minimal periods of time, **<u>unquestionably constitutes irreparable injury</u>**"). (Emphasis added.) A failure to hear the due

process aspects of our appeal is "unquestionably" its own form of irreparable harm, separate and apart from the risk of equitable mootness.

4. A stay is needed to preserve the right for appellate review of whether there was proper notice and a hearing that involved meaningful participation ***for <u>Customers, the ones whose claims were being adjudicated,</u>*** and that Customers **<u>actually understood what was happening</u>**. Here, the adjudication was lost for Customers (the non-participants in this matter) without Customer participation in any form on a thin record. Notably, at the time, Earn Customers, the largest group of Customers, had no legal representation in this matter; nor did even a single Customer with counsel participate; nor did any *pro se* Customers participate. Given the significant Customer and *pro se* participation in these cases on other matters, it is beyond clear to us that Customers **<u>simply did not understand the stakes and may have been lacking adequate notice</u>**.

The bottom line is that, "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Id.* (second alteration in original) (quoting Joint *Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)), and although "the particulars of the adjudication may vary based on the circumstances involved" (see, e.g., *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976)), we contend that these due process requirements were not met here. Our questions include the lack of meaningful notice ***to Customers generally*** (not just notice on the docket), including Customers who follow these cases less closely and the need for a process that

includes, minimally, some **Customer** (as distinct from merely **creditor/estate fiduciary**)

participation in the controversy.

Here, due to a lack of meaningful notice, such as contacting customers via email and

postal mail about the pendency of this hearing and its high stakes for customer claims, all

Customers, including Customer-Appellants, suffered prejudice to our detriment. This decision

has as much import as, potentially, which party wins an action or how a Chapter 11 plan is voted

upon. Given the stakes, we contend notice was inadequate here, and that a lack of participation

by non-noticed participants–and their lack of presence in this matter due to such lack of

notice–prejudiced us. In Mr. Herrmann's *Omnibus Objection and Reservation of Rights to the*

*Debtors' Proposed Scheduling Order and the Debtors Amended Motion for Entry of an Order (i)*

*Establishing Ownership of Assets in the Debtors' Earn Program, (ii) Permitting the Sale of*

*Stablecoin in the Ordinary Course, and (iii Granting Related Relief* (D.R. 1276) earlier in these

cases, Movant Immanuel Herrmann submitted to the Court an article entitled "Procedural Due

Process Requirements in Bankruptcy Cases." Although this was on another matter, it is possible

that no adequate notice, in the sense outlined in past Second Circuit decisions on due process in

bankruptcy was given with respect to the Customer Claims Motions, given their import for

Customers and Customer claims.

In *Mullane v. Central Hanover Bank & Trust Co., 3*39 U.S. 306 (1950), the Supreme

Court found that the presentation of an argument by one among many with a shared interest (in

this case, the shared interest would be the interest of **Customers**) could protect the interests of all.

Here, however, there was *no* Customer or Customer fiduciary present (who did not have at least *some* broader mandate, such as being an estate fiduciary, or a fiduciary for all *creditors* as distinct from *customers*) at the hearing to our prejudice, and inadequate notice to bring any customers into the controversy. The Preferred Series B, in contrast, were fully represented in this controversy–by a large and powerful law firm (actually, *two* law firms)–representing only Preferred Series B shareholders.

Given that there was a lack of adequate notice that this decision could impact Customer claims for a substantial percentage of the estate's assets in a process where Customers may not have had dedicated representation, the Customer-Appellants deserve appellate review of the question of whether **Customers** were denied ***reasonable notice and opportunity*** to present their objections.[10]

## II.    No Party Will Suffer "Substantial" Harm If A Stay Is Issued.

The Series B Preferred Holders could lose their ~$750 million investment in its entirety and not suffer any <u>significant</u>[11] harm (compared to the apocalyptic harm customers will suffer if

---

[10] Notably, ***not a single Celsius customer***, or customer fiduciary, represented or *pro se,* individual or *ad hoc* group, briefed this matter. The parties to the briefing were the UCC (our co-appellant), the Debtors, and the Preferred Series B. As customers did not have adequate notice that their rights were impacted and the ability to interpose objections, it is our view that customers suffered irreparable harm to our prejudice and that this matter should be remanded for a rehearing with customer participation. "The fundamental requisite of due process of law is the opportunity to be heard and present objections." *Grannis v. Ordean* 234 U.S. 385, 394 (1914). The result of lack of customer participation was a sparse evidentiary record (as this Court commented on in its decision) should dictate a remand in the interests of justice to give retail customers with pertinent information about the contract an opportunity to participate to avoid the draconian consequence here of channeling significant contract claims held by customers to an entity that, as this Court notes, is "hopelessly insolvent."

[11] As of this point, the Preferred **Equity** Holders don't have access to their investment (which is hopelessly out of the money, as the Company is literally bankrupt). However they have a greater capacity to hire well-respected lawyers while most retail customers are not in such a privileged position.

their claims are channeled exclusively to a "hopelessly insolvent" entity based on the thin record before this Court in the Customer Claims decision). For example, Rebecca Gallagher, a retiree, and Courtney Burks Steadman, a disabled single mother. Both have their **entire life savings** in the platform, and both would be ***irreparably damaged if the Preferred prevail here***.

It is not an understatement to say that *hundreds* and, potentially, ***thousands*** of Customers could **literally lose their homes (as well as their life savings) and be made homeless if this decision is not overturned**, if Customers only have claims against Celsius Network LLC, and if the Preferred Series B succeed in minimizing the inter-company loan and the Preferred further whittle away customer claims as part of substantive consolidation and constructive fraudulent transfer litigation. Fraud and non-contract claims are no clear substitute, and it remains uncertain the extent to which customers will be ultimately protected through fraud claims. Customers need a voice in any litigation on Customer issues, just like the Preferred Series B have a voice on Preferred Series B issues. The Preferred Series B can easily afford to wait until the District Court rules while the *status quo* is maintained, and, in the meantime, can litigate matters of substantive consolidation and inter company claims as much as they see fit.[12]

Many customers invested their life savings–and some people even invested their retirement funds–in Celsius. The Preferred Holders invested a fraction of 1% of their Assets Under Management in Celsius. The Preferred Holders also had an opportunity to look at Celsius's books and records, unlike customers, and had sophisticated lawyers and sophisticated

---

[12] At an enormous cost to Customers.

professionals to (presumably) do due diligence. Many customers relied on this due diligence in

deciding to keep their coins on the platform.[13] These same luxuries were not afforded to retail

Customers who stand to lose nearly *everything*, to pay taxes on it as if it were their personal

property (and some of whom, including Rebbecca Gallaher and Courtney Burks Steadman, are

unable to ever earn it back).

The Preferred Holders can easily afford to wait months, years and even decades, and not

having this money would not affect them in any meaningful way. With a stay, their rights remain

protected; we simply have the *status quo* and, if their case is strong, they will prevail on appeal.

Many Customers, on the other hand, are having *serious* financial difficulties during this <u>long and

drawn out</u> bankruptcy (which the Preferred are attempting to *expand and extend*, as they have

filed proposed schedules stretching well over two months past what the Debtors and UCC

proposed that this Court wisely overruled), and the financial difficulties are only compounding.

But mooting this appeal and paying the Preferred to go away is no answer. That's caving into

blackmail.

Celsius has issued 1099s to customers as if they own 100% of the coins, even though this

Court has ruled otherwise[14]; such Customers recently had to pay taxes on the *purported* earnings

that they were *purportedly* paid (but are unable to access/withdraw) since all of their assets are

locked up in Celsius. The same cannot be said (and is not true) for the Preferred Series B, who

---

[13] Including the Customer-Appellants, Daniel A. Frishberg and Immanuel Herrmann; other customers
have told us they relied on this as well.
[14] We continue to reserve all rights to argue that some, or all, Earn deposits are not property of the
Debtors' estate under Section 541 of the Bankruptcy Code.

are not paying taxes on such *phantom* capital gains. While the non-movants may admittedly

suffer *some small* harm from this stay, such as **not being able to force a settlement down**

**non-consenting customers' throats in violation of the absolute priority rule** (should the stay

cause their ruling to be overturned down the road), the prejudice to them comes *only* from

**offering due process to the Customer-Appellants**–a very reasonable trade-off. Such harm is

negligible compared to the harm that will be suffered by the customers, including the

Customer-Appellants, if a stay is not granted, and they are forced to share a (potentially

substantial) percentage of the estate with the Preferred Series B.

### III.    The Customer-Appellants Have a High Chance Of Success On Appeal

The Second Circuit requires that the movant show "substantial possibility, although less

than a likelihood, of success on appeal."[15] Substantial possibility may be defined as somewhere

in between "possible and probable,"[16] landing in the realm of plausibility. It is, in fact, quite

likely that the Movants (who are co-appellants with the Celsius Unsecured Creditors

Committee[17]) will win this appeal. The Movants have a high chance of success for various

reasons:

1.    The participation of the UCC and Customers together in this appeal with different

      questions and records, all of which have merit, show that there are multiple grounds on

---

[15] *Hirschfeld v. Bd. of Elections in New York*, 984 F.2d 35, 39 (2d Cir. 1993) (internal quotation marks omitted) (quoting *Dubose v. Pierce*, 761 F.2d 913, 920 (2d Cir. 1985).
[16] *In re Brown*, No. 18-10617 (JLG), 2020 WL 3264057, at *7–8 (Bankr. S.D.N.Y. June 10, 2020) (internal quotation marks omitted) (quoting *In re Sabine Oil*, 548 B.R. at 683–84) (finding it was not *plausible* that the debtor's ex-wife, claiming her share of marital assets in a chapter 7 bankruptcy action, could demonstrate on appeal that she relied on the debtor's fraudulent disclosures in settling her divorce).
[17] (The "UCC").

which this decision could be overturned.

2. There was a thin record that this Court noted in its own order. This Court noted that the decision was only "based on the record before it."[18] The District Court may rule differently on the same record. Or, this Court may rule differently with a full record and customer participation on remand and rehearing with Customer participation, should the District Court remand. That gives us two possible bites at the apple.

3. The additional arguments of the Customer-Appellants–above and beyond the UCC arguments–further increase the chances of success on appeal, because we allege that customers were not fully represented in this matter, but that we **can** be fully represented on remand and reargument in the interests of justice.

4. There are questions about whether **Customers** were adequately represented in this matter, to the extent it was supposed to be an adversarial process between Customers and the Preferred Series B, given that no Customers–or pure Customer fiduciaries–participated. In the recent case of *Jin v. Shanghai Original, Inc. et al,* the Second Circuit Court of Appeals upheld the removal of class counsel where the attorney wasn't serious about taking the case to trial. Here, the case was conducted on too narrow a record, and we argue it was not with Customers' interests *solely and exclusively* in mind.

---

[18] *Memorandum Opinion Regarding Which Entities Have Liability for Claims Under the Terms of Use* (D.R. 2205 p. 16 " the Court considers the record closed, and the Court's decision is based on the record before it." Notably, "the parties" referenced in the decision arguing the side of customers were the Debtors and the UCC only, there was no pure customer fiduciary or customer, participating.

The UCC has also raised excellent contract questions on appeal which are incorporated in full into our appeal (with some slight modifications); the contract questions are complex and deserve a second look given how dense and "sloppy" these contracts are, as this Court noted. These questions, too, argue for a stay.

### IV.    Public Interest Favors a Stay

The public interest favors a stay pending appeal in this case for the following reasons:

1.  Supreme Court precedent (*Jevic)* could potentially be upended by a settlement or plan that violates the absolute priority rule. The Supreme Court did not release the *Jevic* decision only for it to be violated, then equitably mooted by Bankruptcy Courts using narrow rulings, on thin records, that make an end run around it. There is a public interest in upholding vertical *stare decisis.* Particularly with newer decisions that would overturn existing practice in the District and in the Second Circuit, extra deference should be given to the Supreme Court to grant timely appellate review, develop the case law in this district that comports with *Jevic,* and ensures that parties are not trying to make an *end run* around it by getting narrow rulings, then rushing to confirm a plan that violates the spirit, if not the letter, of the decision.

2.  There are due process concerns and adequacy of representation concerns about the trial that took place and recent case law in this Circuit (see *Jianmin Jin)* that upholds Courts'

decisions to, in certain circumstances, ensure adequate representation for a class before moving forward, going as far as to decertify class representation on the eve of a trial. Granting a stay here for a second look by an Article III Court is "small potatoes" compared to that.

3. The preferred equity holders are adequately represented by Milbank and Jones Day; even in the absence of a statutory committee (which they asked for and failed to get), they can afford the minimal (to them) burden of a stay. Movants did not have the means or capacity to ask for a statutory committee and are "on our own" to litigate matters *pro se* or else pay for attorneys to help us do so out-of-pocket.

4. A failure to hear the due process aspects of our appeal is "unquestionably" its own form of irreparable harm–and the public interest lies in upholding constitutional rights and due process.

5. The estate is already being forced to fund *extremely* costly litigation–on substantive consolidation, intercompany claims, and constructive fraudulent transfer–being driven *exclusively* by a Preferred Series B committee determined to ***divert*** money from customers, even though it is ***still*** unlikely the preferred equity holders will get any recovery (barring a settlement to end the bleeding); as the Court noted in its order, they may well end up "recovering nothing" on the merits.

6. There is a public policy interest in finality of litigation. The finality of litigation was *not* served by this Decision. Instead, it created four new controversies. The appeal will also not add meaningful time to these cases if it is timely heard. Therefore, its implementation should be stayed and the appeal should be heard. If the decision is reversed timely, there will be *less, not more*, litigation. There have been talks about aggressive creditors in these cases, but the Preferred Series B have certainly taken things to a *whole* different level. Rather than resulting in *finality* of litigation, the Customer Claims Decision has actually led to *four* new sets of litigation *plus* this appeal: Customer Class Claims litigation, Substantive Consolidation Litigation, Constructive Fraudulent Transfer, and Inter Company Claims litigation (without clearly ending Bellwether Claims litigation, but rather, postponing it). Given the consequences, to say the Preferred "punched above their weight" in these cases with regards to their impact would be a dramatic understatement. This Court has noted that the Preferred may well get nothing, and they are far, far, far, out of the money–and yet…. And yet … they have caused the estates (and thereby retail customers) to bear millions–or now, likely, **tens of millions**–in legal fees, and months longer in Chapter 11 to our detriment. Public policy favors a stay, which will encourage *timely* hearing of the appeal, which will end other litigation if the appeal is heard and the decision is overturned (by effectively mooting it).

7. There is a fine line between aggressively defending one's position and abuse. The amount of litigation pushed forward by the Preferred to force a settlement is profoundly unfair and unjust to creditors. Fortunately, this Court recently curtailed the Preferred's proposed

scheduling order that would have litigated into September, ostensibly, in the name of

"due process." But, at some point, this litigation has got to end. A stay would mean that

overly aggressive and expensive litigation for a cash settlement should, at a minimum, be

subject to timely appellate review and that due process on this decision is upheld.

Curtailing efforts to exhaust Customers and box them out of crucial litigation when they

most need to be active and protect their rights is in line with public policy. See, *inter alia*,

*Mandarin Touch I*, 347 F.Supp.2d at 864, where the District Court noted that a large

volume of lawsuits might indicate an intent to harass defendants into agreeing to cash

settlements. In this case, a bankruptcy, which consists of multiple mini "cases and

controversies," the Preferred Series B have manufactured a "large number of suits" (i.e.

mini-controversies, or Motions within these cases)–each one of them ostensibly to

determine a core, gating legal question, though in reality in search of a cash settlement on

the backs of retail Customers, where none is likely due or owed to them and where such

settlement, should the appeal succeed on the merits, would violate *Jevic*.[19]


8. As this Court noted in its decision denying the Preferred Series B an official committee

earlier in these cases, there is a vast power, wealth, and quality of representation

differential here, raising issues of inadequate representation in these matters in particular.

As this Court opined, "The Requesting Equity Holders are not *pro se* litigants who would

otherwise be incapable of advancing their interests, they are sophisticated financial

---

[19] See *Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* (D.R. 2205) "while the Series B Preferred Holders prevail here, they may very well end up recovering nothing."

institutions who are already represented by highly competent counsel. See *Spansion*, 421
B.R. at 163-64 (denying a motion to appoint an equity committee because the equity
security holders were 'well organized, well represented by counsel, and adequate to the
task of representing its interests without 'official' status')."[20] On the other hand, there
were no Customers involved in this litigation at all (*pro se* or represented).

## **Conclusion**

This Court should grant a stay pending appeal of the *Order Regarding Which Debtor
Entities Have Liability for Customer Contract Claims Under the Terms of Use* until such time as
it is heard in the District Court. In the alternative, the Court should pause the Order's
implementation through a confirmation and litigation-related deadline which we can discuss at
the hearing or submit in a supplemental filing. Ordering a stay until whenever the Court
estimates that the plan will truly be ready for confirmation and where there will be time for a
speedy hearing of the appeal on the merits will not slow down confirmation, and could give the
Customer-Appellants, the District Court, and the UCC, a timeline to aim for to ensure this appeal
is heard, and avoid equitable mootness.

Notably, September is the timeline the Preferred Series B Shareholders had asked to have
to litigate their matters to receive *due process*[21]; it is logical, and we do think that it is logistically

---

[20] See D.R. 1168, *Memorandum Opinion and Order Denying Motion for the Appointment of an Official
Preferred Equity Committee*
[21] See *Series B Holders' Statement Regarding Proposed Litigation Schedule* (D.R. 2510) where the
Preferred Series B propose a schedule that would go into September, to protect their clients' "due
process" rights. Fortunately, this Court overruled their proposal.

sound, to give the District Court until then, at the very latest, to decide this appeal and to deal

with any rehearing on remand (as one possible outcome) before final Plan Confirmation. We

need a schedule that allows the District Court to hear ***and decide and/or remand*** the appeal in

time for this matter to be resolved before Plan Confirmation–so that we can adjust the final

Chapter 11 Plan to ensure that recoveries go 100% to Customers should this decision be

overturned–as we believe they should.

In summary, for the reasons set forth herein, the Customer-Appellants respectfully

petition the Court to enter an Order staying implementation of this order on appeal, and other

relief as the Court deems just and proper.

## **Reservation of Rights**

The Customer-Appellants reserve all rights to supplement, amend, or re-file this Motion.

Respectfully submitted,

*/s/ Daniel A. Frishberg*
Daniel A. Frishberg
*Pro Se*
April 26, 2023

*/s/ Immanuel Herrmann*
Immanuel Herrmann
*Pro Se*
April 26, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on Wednesday, April 26, 2023, I filed a true and correct copy of the *Customer-Appellants' Motion for a Stay Pending Appeal of the Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use Pursuant to Federal Rule of Bankruptcy Procedure 8007* with the Clerk of the United States Bankruptcy Court in the Southern District of New York.

I hereby further certify that on Wednesday, April 26, 2023, I served a true and correct copy of the *Customer-Appellants' Motion for a Stay Pending Appeal of the Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use Pursuant to Federal Rule of Bankruptcy Procedure 8007* upon noticed appellants, noticed appellees, and the Core/2002 service list by electronic mail in accordance with the SDNY Bankruptcy Court's *Amended Final Order (I) Establishing Certain Notice, Case Management, And Administrative Procedures, And (II) Granting Related Relief* (ECF Docket No. 1181).

Respectfully submitted,

*/s/ Daniel A. Frishberg*
Daniel A. Frishberg
*Pro Se*
Dated: April 26, 2023
Hillsborough County, Florida