## Exhibit A

**Class Proof of Claim**

Name of Debtor & Case Number:

- [✓] All Debtors (Account Holder Claim)
- [ ] Celsius Network, LLC (Case No. 22-10964)
- [ ] Celsius Network Inc. (Case No. 22-10965)
- [ ] Celsius Network Limited (Case No. 22-10966)
- [ ] Celsius KeyFi LLC (Case No. 22-10967)

- [ ] Celsius Mining LLC (Case No. 22-10968)
- [ ] Celsius Lending Networks, LLC (Case No. 22-10969)
- [ ] Celsius Lending LLC (Case No. 22-10970)
- [ ] Celsius US Holding LLC (Case No. 22-10971)

**United States Bankruptcy Court for the Southern District of New York**

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov on behalf of themselves and others similarly situated

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

- [✓] No
- [ ] Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

White & Case LLP, as Counsel to the Official Committee of Unsecured Creditors

Name

555 S. Flower St., Ste. 2700

Number        Street

Los Angeles        CA        90071

City        State        ZIP Code

Contact phone    (213) 620-7706

Contact email    aaron.colodny@whitecase.com

Where should payments to the creditor be sent? (if different)

Name _____

Number        Street _____

City        State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

- [✓] No
- [ ] Yes. Claim number on court claims registry (if known) _____    Filed on _____

**5. Do you know if anyone else has filed a proof of claim for this claim?**

- [✓] No
- [ ] Yes. Who made the earlier filing? _____

**Part 2:**     **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**

A. To the extent you assert a claim that is denominated in US Dollars, list the value of the claim in US Dollars as of the date the case was filed (July 13, 2022): $ <u>See Annex A.</u>

B. With regard to coins transferred to the Debtors, **list the number of each type of asset held in each type of account as of the date the case was filed (July 13, 2022).** <u>See Annex A.</u>

| Coin | Earn | Withheld | Custody | Collateral on Loan Receivable |
|------|------|----------|---------|-------------------------------|
| 1inch Network (1INCH) | | | | |
| 3pool Curve (3CRV) | | | | |
| AAVE (AAVE) | | | | |
| Arable Protocol (ACRE) | | | | |
| Cardano (ADA) | | | | |
| Alchemix (ALCX) | | | | |
| MyNeighborAlice (ALICE) | | | | |
| Alchemix USD (alUSD) | | | | |
| Ampleforth (AMPL) | | | | |
| Anchor Protocol (ANC) | | | | |
| Angle (ANGLE) | | | | |
| Ankr (ANKR) | | | | |
| Star Atlas (ATLAS) | | | | |
| AnnchorUST (aUST) | | | | |
| Avalanche (AVAX) | | | | |
| Badger DAO (BADGER) | | | | |
| Balancer (BAL) | | | | |
| Basic Attention Token (BAT) | | | | |
| bBADGER (bBADGER) | | | | |
| Bitcoin Cash (BCH) | | | | |
| bDIGG (bDIGG) | | | | |
| Beacon ETH (BETH) | | | | |
| Lido Bonded LUNA (BLUNA) | | | | |
| BNB (BNB) | | | | |
| Bancor (BNT) | | | | |
| Boba Network (BOBA) | | | | |
| BarnBridge (BOND) | | | | |
| Bone ShibaSwap (BONE) | | | | |
| SpookySwap (BOO) | | | | |
| BoringDAO (BOR) | | | | |
| BoringDAO (BORING) | | | | |
| Bitcoin SV (BSV) | | | | |
| Bozkurt Token (BT) | | | | |
| Bitcoin (BTC) | | | | |
| Bitcoin Gold (BTG) | | | | |
| Binance USD (BUSD) | | | | |
| Celsius (CEL) | | | | |
| CreaEther (CETH) | | | | |
| Compound (COMP) | | | | |
| Cream Finance (CREAM) | | | | |
| Curve Dao Token (CRV) | | | | |
| Convex Finance (CVX) | | | | |
| Convex CRV (CVXCRV) | | | | |

| | | | | |
|---|---|---|---|---|
| cxADA (cxADA) | | | | |
| cxBTC (cxBTC) | | | | |
| cxDOGE (cxDOGE) | | | | |
| cxETH (cxETH) | | | | |
| Dash (DASH) | | | | |
| DePay (DEPAY) | | | | |
| DIGG (DIGG) | | | | |
| Dogecoin (DOGE) | | | | |
| Polkadot (DOT) | | | | |
| DQUICK (DQUICK) | | | | |
| Eos (EOS) | | | | |
| Ellipsis (EPS) | | | | |
| Ethereum Classic (ETC) | | | | |
| Ethereum (ETH) | | | | |
| STASIS EURO (EURS) | | | | |
| Harvest Finance (FARM) | | | | |
| Fei USD (FEI) | | | | |
| StaFi (FIS) | | | | |
| Falcon Project (FNT) | | | | |
| Frax (FRAX) | | | | |
| Fantom (FTM) | | | | |
| FTX Token (FTT) | | | | |
| Gemini Dollar (GUSD) | | | | |
| H2O DAO (H2O) | | | | |
| Hermez Network (HEZ) | | | | |
| ICHI (ICHI) | | | | |
| JOE (JOE) | | | | |
| Kin (KIN) | | | | |
| Kyber Network (KNC) | | | | |
| Lido DAO (LDO) | | | | |
| ChainLink (LINK) | | | | |
| Livepeer (LPT) | | | | |
| Liquity (LQTY) | | | | |
| Loopring (LRC) | | | | |
| Litecoin (LTC) | | | | |
| Terra Luna (LUNA) | | | | |
| Liquity USD (LUSD) | | | | |
| LUSD Curve (LUSD Curve) | | | | |
| Decentraland (MANA) | | | | |
| Polygon (MATIC) | | | | |
| Multi-Collateral DAI (MCDAI) | | | | |
| MegaElfLand (MELT) | | | | |
| Mimatic (MIMATIC) | | | | |
| Maker (MKR) | | | | |
| Maple (MPL) | | | | |
| Marinade Staked SOL (MSOL) | | | | |
| Notional Finance (NOTE) | | | | |
| NXM (NXM) | | | | |
| OMG Network (OMG) | | | | |
| ownix (ONX) | | | | |
| Orbs (ORBS) | | | | |
| Origin Dollar (OUSD) | | | | |
| PAX (PAX) | | | | |
| PAX Gold (PAXG) | | | | |
| Pickle Finance (PICKLE) | | | | |
| pNetwork (PNT) | | | | |
| Star Atlas DAO (POLIS) | | | | |
| BENQI (QI) | | | | |
| Qredo (QRDO) | | | | |

| | | | |
|---|---|---|---|
| QuickSwap (QUICK) | | | |
| Rai Reflex Index (RAI) | | | |
| Raydium (RAY) | | | |
| Ren (REN) | | | |
| THORChain (RUNE) | | | |
| BENQI Liquid Staked AVAX (SAVAX) | | | |
| Saga (SGA) | | | |
| Songbird (SGB) | | | |
| Sogur (SGR) | | | |
| Synthetix (SNX) | | | |
| Solana (SOL) | | | |
| SparkLab (SPARK) | | | |
| Serum (SRM) | | | |
| Stable/cash (Stable/cash) | | | |
| Lido Staked ETH (STETH) | | | |
| Lido Staked LUNA (STLUNA) | | | |
| sUSD (sUSD) | | | |
| SushiSwap (SUSHI) | | | |
| TrueAUD (TAUD) | | | |
| tBTC (TBTC) | | | |
| TrueCAD (TCAD) | | | |
| TrueGBP (TGBP) | | | |
| TrueHKD (THKD) | | | |
| TrueFi (TRU) | | | |
| TrueUSD (TUSD) | | | |
| UMA (UMA) | | | |
| Uniswap (UNI) | | | |
| US Dollar (USD) | | | |
| USD Coin (USDC) | | | |
| Tether (USDT) | | | |
| USDT ERC20 (USDT ERC20) | | | |
| Unslashed Finance (USF) | | | |
| Ultra Salescloud (UST) | | | |
| Bancor Governance Token (vBNT) | | | |
| Vesper (VSP) | | | |
| Wrapped Bitcoin (WBTC) | | | |
| Wrapped DLG (WDGLD) | | | |
| WETH (WETH) | | | |
| Wrapped Fantom (WFTM) | | | |
| Wrapped Matic (WMATIC) | | | |
| XAUT (XAUT) | | | |
| eCash (XEC) | | | |
| Stellar Lumens (XLM) | | | |
| Ripple (XRP) | | | |
| Tezos (XTZ) | | | |
| yearn.finance (YFI) | | | |
| YF Link (YFL) | | | |
| YUSD Stablecoin (YUSD) | | | |
| yveCRV-DAO (yveCRV-DAO) | | | |
| Zcash (ZEC) | | | |
| 0x (ZRX) | | | |
| ZUSD (ZUSD) | | | |
| Other: | | | |

**Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges  required by Bankruptcy Rule 3001(c)(2)(A).  <u>See Annex A.</u>

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. |
| | | Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). |
| | | Limit disclosing information that is entitled to privacy, such as health care information. |
| | | See Annex A. |

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property:  See Annex A. _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\*  Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/28/23

*/s/ Aaron Colodny*

Signature

**Print the name of the person who is completing and signing this claim:**

Name    Aaron                                        Colodny
        First name          Middle name              Last name

Title    Partner

Company    White & Case LLP
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    555 S. Flower St., Ste. 2700
           Number        Street

           Los Angeles                    CA 90071
           City                           State    ZIP Code

Contact phone    (213) 620-7700        Email    aaron.colodny@whitecase.com

## <u>ANNEX A</u>

**Addendum to Class Proof of Claim**

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email: david.turetsky@whitecase.com
       sam.hershey@whitecase.com
       jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email: kwofford@whitecase.com

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email: mandolina@whitecase.com
       gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

## ADDENDUM TO CLASS PROOF OF CLAIM

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the

chapter 11 cases (these "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

possession (collectively the "**Debtors**"), pursuant to this Court's *Order Granting the Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert Non-Contract Claims on Behalf of Account Holders* [D.I. 2496] (the "**Class Claim Order**"), hereby submits on behalf of Thomas DiFiore, Rebecca Gallagher and Ignat Tuganov, in their individual and representative capacities as more fully set forth below (the "**Class Representatives**"), this addendum to the proof of claim (the "**Class Claim**")[2] against Celsius Network Limited ("**CNL**" and, together with its affiliates and subsidiaries, "**Celsius**") on behalf of themselves and all similarly situated individuals, as defined below in ¶ 20, based upon knowledge, information and belief.  The Class Representatives allege as follows:

## NATURE OF ACTION

1.      CNL was founded in 2017 by Alexander Mashinsky and S. Daniel Leon.  At the time of its founding, CNL was funded through an initial coin offering ("**ICO**") of the CEL token issued by CNL.  The initial business plan for Celsius was described in a whitepaper that CNL used to solicit capital to fund its operations through the ICO (the "**White Paper**").  The White Paper states that CNL "is a part and acting on behalf of the Celsius group, all as outlined in [CNL's] White Paper and the terms that govern the sale."

2.      CNL pitched a bold promise: financial freedom through cryptocurrency, and the ability for retail investors to "unbank" themselves.  Mr. Mashinsky, the controlling equity owner, director and CEO of CNL, claimed that banks were greedy and only looked out for their shareholders.  CNL, on the other hand, promised to prioritize and protect its "community."  CNL

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [D.I. 2358].

urged customers to acquire digital assets and transfer those digital assets to CNL, who would then lend the assets against collateral and share the revenues from that lending with its customers.

3.      CNL boasted that it provided higher returns and safer investments than traditional banks.  It specifically advertised to customers that, unlike banks, it passed a majority of its revenue—which it ***repeatedly*** identified as 80% of gross revenue—to CNL account holders through interest payments.  It also ***repeatedly*** assured customers that it was safer than a bank because, unlike banks, CNL was not leveraged, did not issue uncollateralized loans and did not engage in directional trading.  Instead, CNL ***repeatedly*** claimed that it only invested in safe, market-neutral and well-collateralized investments with reputable and well-capitalized counterparties.  Each of these messages pervaded CNL's marketing.

4.      Mr. Mashinsky was the public face of Celsius.  He hosted weekly videos on YouTube called "Ask Mashinsky Anything" ("**AMAs**"), during which he answered customers' questions live, often while wearing Celsius marketing merchandise.  Many of these videos were broadcast live from Mr. Mashinsky's New York residences.  Upon information and belief, others were broadcast live from Celsius's New Jersey office.  During the videos, Mr. Mashinsky, his co-hosts and his guests (who were frequently CNL employees) relentlessly promoted Celsius.  They ***repeated*** CNL's pitch and encouraged customers to "unbank" themselves.  When customers asked if the promises and returns were too good to be true (which they were), CNL, through Mr. Mashinsky, assured customers that they were not.

5.      The business that CNL actually operated was not the business that it repeatedly told the public it was running.  From its inception, CNL misrepresented and failed to disclose the true nature of its investments, material risks that it was taking, regulatory investigations of (and actions against) CNL and the staggering losses it accumulated.  CNL also engaged in coordinated

deceptive behavior to convince customers to transfer their digital assets to, and keep their digital

assets on, the Celsius platform.

6.      CNL's misstatements started at the beginning, when Mr. Mashinsky told customers

that Celsius's USD$50 million ICO was fully funded.  It was not.  From that day forward, CNL,

Mr. Mashinsky and their representatives defrauded customers by convincing them to transfer their

coins to and keep their coins with Celsius, based on statements that CNL knew were false and

misleading.  These misrepresentations were pervasive, repeated and specific.  To take just a few

egregious examples:

        a.  CNL told customers that the interest rates it paid were tied to its revenues
           and used that fact to differentiate Celsius from traditional banks.  This was
           false.  In fact, when asked by regulators whether CNL's interest rates were
           tied to revenues, CNL admitted that they were not.

        b.  CNL told customers that it was not engaging in risky uncollateralized
           lending or directional trading.  This was false.  In fact, CNL had an
           unsecured loan portfolio as early as 2019 as well as a swing trading desk,
           which is directional by nature.

        c.  CNL repeatedly told customers that it was compliant with all laws and
           regulations and that regulators had given it a clean bill of health.  This was
           false.  In fact, CNL was aware that many agencies in both the United
           Kingdom and United States were investigating Celsius.  And when the
           Financial Conduct Authority for the United Kingdom (the "**FCA**") told
           CNL that it was running an unlicensed business, rather than complying or
           notifying its customers, it moved its business out of the United Kingdom to
           an insolvent entity in the United States, separated its customers from their
           assets, and misleadingly told them that "all Celsius services for all existing
           customers remain unchanged."[3]

7.      CNL and Mr. Mashinsky were aware that these statements were false when they

were made.  Mr. Mashinsky was intimately involved in every aspect of Celsius's business.  Mr.

Mashinsky oversaw and directed Celsius's investments and had the final say on the interest rates

---

[3]    Celsius, *Celsius Community Update* (June 23, 2021), https://celsiusnetwork.medium.com/celsius-community-
update-june-23-2021-a28fca899091 (last visited Apr. 26, 2023).

it set for each coin.  Mr. Mashinsky was also repeatedly informed and reminded that what he was telling the public was false.  The compliance, legal, regulatory, marketing and finance teams at Celsius tried to coach Mr. Mashinsky on what not to say, but ultimately resigned themselves to watching as, week after week, he continued to lie to unsuspecting customers.

8.      In the spring of 2021, CNL's risk management team suggested that the AMAs be taped, rather than broadcast live, so that any misstatements could be edited out.  Mr. Mashinsky refused.  Mr. Mashinsky emphasized the effectiveness of live AMAs, arguing that "[t]he essence of our LIVE AMA is that we do not work [off] of transcripts."  CNL then began a concerted effort to cover up the false statements made by Mr. Mashinsky and CNL's other employees.  The "censorship process," as CNL's Head of Regulation, Yarden Noy, called it, was designed and carried out by CNL's employees.  A team would watch Mr. Mashinsky's AMAs as they were broadcast live and compile a list of the misrepresentations Mr. Mashinsky made on behalf of CNL. These lists would then be sent to the media team, who would edit the videos to remove the identified misrepresentations and repost the edited videos online.  The AMAs were broadcast each Friday.  Sometimes the videos were edited that day.  Other times, they were not updated until the next week.    But CNL never publicly flagged, retracted or corrected any of these misrepresentations.  Nor did it tell its customers that Mr. Mashinsky's statements were false.  To the contrary, each week Mr. Mashinsky would sign on to a new AMA and make further misrepresentations to encourage customers to transfer coins to, or keep coins on, the Celsius platform.

9.      In the summer of 2021, CNL's lies began to catch up to it.  In the United Kingdom, the FCA accused CNL of operating an unlicensed investment scheme.  It specifically cited CNL's advertising materials, and Mr. Mashinsky's public statements that CNL passed a percentage of its

revenue to customers, in support of that accusation.  CNL, Mr. Mashinsky and CNL's Chief

Revenue Officer, Roni Cohen-Pavon, assured the FCA that the interest rates Celsius charged were

in no way tied to its revenue—the exact opposite of what it was telling its customers.  In response,

the FCA demanded that CNL remove certain promotional material from its website and that CNL

stop offering investments to customers in the United Kingdom without prior FCA approval.  It

also strongly suggested that CNL withdraw its pending application with the FCA for approval to

conduct cryptocurrency activities as a business in the United Kingdom.

10.     In response, CNL fled the United Kingdom, seeking to offload its regulatory issues

onto Celsius Network, LLC ("**LLC**"), a newly-created Delaware entity that was insolvent from

the start.  CNL did not tell its customers why it was leaving the United Kingdom.  Nor did it tell

them that its rates were not tied to its revenue.  Rather, in a June 23, 2021 blog posted on

Medium.com ("**Medium**"), CNL made a vague reference to "regulatory uncertainty," all the while

assuring customers that nothing was changing.[4]  That was false: customers' relationship with

Celsius changed significantly, and to their detriment.  In particular, while CNL purported to

transfer all customer obligations to LLC, it did not transfer the assets that customers had transferred

to CNL, or the assets and investments that customer funds had been used to purchase.  As a result

of sloppily and ambiguously drafted language in the amended Terms of Use that accompanied the

"migration," which could be read to suggest the opposite, customers now only had contract claims

against LLC.[5]  CNL also did not tell its customers that, at the time of the migration, many state

and federal regulators in the United States were investigating whether Celsius was operating an

---

[4]   *Id.*

[5]   The Court determined that customers only had contract claims against LLC in its *Order Regarding Which Debtor
      Entities Have Liability for Customer Contract Claims Under the Terms of Use* [D.I. 2265], which the Committee
      has appealed.  *See Notice of Appeal* [D.I. 2356].

unlicensed investment company or selling unregistered securities.

11.    CNL's misstatements and omissions continued after the purported migration of the customer-facing business from CNL to LLC.  Celsius did not differentiate between CNL and LLC. Neither did Mr. Mashinsky, who was the CEO of both entities.

12.    From the beginning, Mr. Mashinsky and CNL promised customers that they had customers' best interests at heart.  They did not.  In an effort to procure new customers and convince existing customers to keep their assets on its platform, CNL repeatedly lied about the financial health of the company, the risks associated with customers transferring assets to Celsius, its regulatory issues and, most fundamentally, the business it was actually running.  These lies pervaded all of CNL's marketing and communications—they were repeated on AMAs, at trade conferences, during news broadcasts, on official blog posts and Twitter accounts, and through other media.  And, as Celsius's financial condition worsened over the years, CNL and Mr. Mashinsky assured customers repeatedly that everything was fine, thus inducing them to keep their assets with Celsius and causing them to incur even further losses.

13.    This widespread and continuous fraudulent conduct has left hundreds of thousands of account holders without access to the crypto assets they transferred to CNL to safeguard and manage.  As a result, all of these account holders have suffered significant damages.  The Class Representatives therefore bring this Class Claim in an amount not less than USD$5,217,542,781, equaling the outstanding obligations of all account holders that transferred coins to Celsius as part of the Earn, Borrow[6] or Custody programs, or have balances associated with balances in "Withhold Accounts," as of the Petition Date, in addition to damages in an amount to be determined at trial.

---

[6]    Claims held by account holders in the Borrow program may be subject to rights of setoff with respect to those account holders' retail loan obligations.

## JURISDICTION

14.     This Class Claim is filed in accordance with the Class Claim Order, pursuant to Rule 9014(c), applying Rule 2023, of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

15.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Federal subject matter jurisdiction also exists under 28 U.S.C. § 1332(a), based on complete diversity of citizenship of the parties and because the amount in controversy, exclusive of interests and costs, exceeds USD$75,000, and under 28 U.S.C. § 1331.

16.     This Court has personal jurisdiction over all of the Debtors pursuant to Bankruptcy Rule 7004.  All of the Debtors have maintained minimum contacts with the United States in connection with the claims asserted herein.

17.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this Class Claim arises under and in connection with cases commenced under the Bankruptcy Code.

## PARTIES

18.     The Committee, comprising seven Celsius account holders—Thomas DiFiore, Scott Duffy on behalf of ICB Solutions, Keith Noyes on behalf of Covario AG, Caroline Warren, Mark Robinson, Andrew Yoon and Christopher Coco—is authorized to and hereby does file this Class Claim pursuant to the Class Claim Order entered on April 18, 2023 at D.I. 2496.

19.     The Class Representatives are Thomas DiFiore, Rebecca Gallagher and Ignat Tuganov.

20.     The Class Representatives bring this action on behalf of all Celsius customers and

8

account holders who were harmed by CNL's (1) violation of the New York Deceptive Practices Act, New York False Advertising Act and New Jersey Consumer Fraud Act, (2) fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment and unjust enrichment under New York common law, (3) breach of the implied duty of good faith and fair dealing, (4) fraudulent misrepresentation, negligent misrepresentation and unjust enrichment under English common law and (5) violation of Section 2 of the Misrepresentation Act 1967 under English law (such putative class, the "**Class**").

21.    Thomas DiFiore is and was at all times relevant herein an individual and an account holder at Celsius.  At the time he became a Celsius account holder, Mr. DiFiore was a resident of New Jersey and, after June 15, 2022, a resident of Puerto Rico.

22.    Rebecca Gallagher is and was at all times relevant herein an individual and an account holder at Celsius.  At the time she became a Celsius account holder, Ms. Gallagher was a resident of Tennessee.  As of April 11, 2022, Ms. Gallagher is a resident of California.  Ms. Gallagher was one of the bellwether claimants selected by the Debtors in their initial claims objections in these Chapter 11 Cases.

23.    Ignat Tuganov is and was at all times relevant herein an individual and an account holder at Celsius.  At the time he became a Celsius account holder, Mr. Tuganov was a resident of Russia.  As of October 2021, he is a resident of Cyprus.

24.    CNL is a Debtor in these Chapter 11 Cases with its service address at 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

25.    Debtor CNL is and was at all times relevant herein a private limited company incorporated under the laws of England & Wales, with offices in the United Kingdom and Las

Vegas, Nevada.[7]

26.     Upon information and belief, at all times relevant herein, Celsius had one or more office locations in the State of New Jersey and, from time to time, in the State of New York.

27.     Upon information and belief, at all times relevant herein, CNL conducted business in or directed its business at the State of New York and the State of New Jersey.

28.     Upon information and belief, at all times relevant herein, certain employees of CNL worked from offices or locations in State of New York and/or the State of New Jersey.

## STATEMENT OF FACTS

### I.     The Celsius Sales Pitch

29.     From its inception, CNL held itself out to be "safer than a bank" and insisted that its values and interests were aligned with "the community."  Its fundamental pitch was that, while banks could pay higher interest rates, they were greedy and kept their profits for their shareholders and executives.  CNL, on the other hand, had its customers' best interests at heart and passed *80% of its revenue* to those customers through weekly interest payments.

30.     Mr. Mashinsky was the spokesperson and face of Celsius from its inception.  He was a director of CNL and Celsius Network Inc., and served as the Chief Executive Officer of CNL and LLC until September 27, 2022.  Upon information and belief, Mr. Mashinsky served on the Executive Committee and the Assets and Liabilities Committee of CNL until the end of his tenure at Celsius, the Risk Committee of CNL from its inception on December 20, 2020 through August 2021, and other Celsius committees from time to time.  Mr. Mashinsky regularly attended, participated in and received materials from each Celsius committee, even if he was not at the time

---

[7]     *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions And First Day Motions* Ex. H [D.I. 23] (the "**Mashinsky Decl.**").

a sitting member thereof.  At all times relevant to this Class Claim, Mr. Mashinsky controlled the

Debtors through his controlling equity stake in Celsius Network Inc., which is a majority owner

of CNL, which wholly owns Celsius US Holding LLC, which is in turn the sole owner of LLC.

31.     Mr. Mashinsky and Mr. Leon, the co-founder, director and former Chief Operating

Officer and Chief Strategy Officer of CNL, advertised that "Banking is Broken" and that CNL's

product would be for "[t]he 99% not the 1%."[8]  CNL promised customers that it only undertook

safe investments with reputable counterparties—CNL consistently reiterated that, if customers

thought that what Celsius was pitching was too good to be true, it wasn't.[9]  CNL told customers

that banks could do the same thing, but were keeping their profits for themselves and their

shareholders.[10]

32.     At the time of its founding, CNL sought to raise capital to launch its business

through the ICO of the CEL token, to be issued by CNL.  A successful ICO was a key barometer

of success at a time when many cryptocurrency projects were trying to get off of the ground.  Mr.

Mashinsky, on behalf of CNL, told several media outlets that the ICO of the CEL token was fully

funded.  For instance, at the World Blockchain Forum held in New York from June 11-13, 2018,

Mr. Mashinsky stated: "Celsius completed a fifty two million dollar ICO two months ago. We did

that in less than 14 days and . . . we did it very differently than everybody else . . . ."  This statement

was captured in a video titled "Alex Mashinsky-Crossing the Chasm – The next 100 Million

---

[8]     White Paper, *Celsius Network*, at 4-5, https://celsius.network/static/celsius-whitepaper.pdf (last visited Apr. 27, 2023).

[9]     Celsius Network, *Is Celsius too good to be true? Just give it a try – CEL Bites*, YouTube (Oct. 16, 2021), https://www.youtube.com/watch?v=mKm_eF4ruW8.

[10]    CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr. 13, 2022), at [0:01], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s ("So crypto allows you to earn yield, take loans, but unlike the banks that do that and keep all the profit for themselves, in the crypto world, we give most of the profits, most of the yield, back to the community. So, Celsius, as an example, paid the community over one billion dollars in yield, and this is the kind of yield that you cannot get from banks.").

Crypto Users" and posted by Keynote on June 24, 2018.[11]  During a July 25, 2018 Coin Central

Interview, Mr. Mashinsky repeated this claim, stating, "[i]t's funny because our ICO raised over

$50 million."[12]  And on October 2, 2018, in a YouTube video titled "Alex Mashinsky, Power vs.

People: The War of Decentralization," Mr. Mashinsky, while wearing a Celsius t-shirt, stated,

"[w]e did a $52 million ICO four months ago."[13]

33.    Each of these statements was false.  In fact, the ICO raised only USD$32 million,[14]

as Mr. Mashinsky.  Mr. Mashinsky agreed to contribute the USD$18 million shortfall himself but

quickly reneged on that promise.  Worse still, Mr. Mashinsky then purported to use those

unpurchased CEL tokens as collateral for a personal loan.  The CNL board obscured the fact that

the ICO had not been fully funded by segregating the CEL tokens that Mr. Mashinsky refused to

purchase and, two years later, resolved to move the tokens to CNL's treasury.[15]  CNL's employees

knew that the ICO had not been fully funded and worried about the negative reaction from the

community. On March 1, 2019 several Celsius employees, including Hanoch Goldstein, CNL's

Chief Technology Officer and co-founder, and Mr. Leon, discussed how to publicly address the

partially-subscribed ICO over Slack.  In that Slack channel, Aaron Patchen, a Celsius Community

Manager, expressed concern that "[t]he public believes that the ICO was fully funded and all

tokens purchased. If they find out now that the[y] were unsold they will be upset[.]"  In a Slack

---

[11]  Events, *Alex Mashinsky – Crossing the Chasm – The Next 100 Million Crypto Users,* YouTube (Jun. 24, 2018), at [1:41], https://www.youtube.com/watch?v=m5W7vNUfguM.

[12]  Steven Buchko, *Celsius Network CEO Alex Mashinsky Is Moving from VoIP to MoIP,* Coin Central (Jul. 17, 2022), https://coincentral.com/alex-mashinsky-voip-to-moip-2/.

[13]  This statement was made in Las Vegas.  BlockShow, *Alex Mashinsky. Power vs. People: The War of Decentralization. BlockShow Americas 2018,* YouTube (Oct. 2, 2018), at [16:19], https://www.youtube.com/watch?v=HTENY4DlIqc.

[14]  *See Final Report of Shoba Pillay, Examiner* [D.I. 1956], at 85; Token, Celsius, Etherscan, https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code (last visited January 29, 2023).

[15]  *E.g.*, *id.* at 82, 85-86.

message between Harumi Urata-Thompson, Chief Financial Officer and Chief Investment Officer of Celsius, and Johannes Treutler, head of CeFi Trading at Celsius, two years after the ICO, Ms. Urata-Thompson asked Mr. Treutler whether the community would care that 117 million CEL tokens were coming back into the treasury, and Mr. Treutler said: "Yes, they would absolutely care." Mr. Treutler said: "But ou[r] 117M from old ICO stake into the Treasury would change the whole structure of how the ICO was designed—the community would be very angry." Without the initial misrepresentation that the ICO was fully funded, Celsius may have never existed.

34.     From then on, CNL continuously and pervasively misrepresented its business to the investing public. Mr. Mashinsky publicly and repeatedly held himself and CNL out as acting in the best interests of its customers. CNL's motto was that it would pay 80% of its gross revenue to customers. Mr. Mashinsky made this promise as early as March 7, 2019, in an interview with NASDAQ in New York.[16] This was false. On September 29, 2020, he tweeted: "stick to @CelsiusNetwork and get your extra coins as we always act in your best interest."[17] He emphasized repeatedly that, as the largest Celsius account holder and CEL token holder, he was in it with the customers. He claimed that anyone looking for evidence of Celsius's success and *bona fides* therefore need look no further than him.[18] During an AMA on November 6, 2020, again wearing a Celsius t-shirt, Mr. Mashinsky challenged customers to prove that anyone had uncollateralized loans with Celsius, and backed that challenge up with a thousand dollars, per

---

[16]    Celsius Network, *Alex Mashinsky, Celsius CEO, interview at NASDAQ,* YouTube (Mar. 7, 2019), at [3:26], https://www.youtube.com/watch?v=8cIdPpA-pyk ("So Celsius network enables you to deposit your coins, enables you to lend them to someone else, and you get to keep 80%.").

[17]    @Mashinsky, Twitter (Sept. 29, 2020), https://twitter.com/search?q=(from%3AMashinsky)%20since%3A2020-7-1%20until%3A2020-10-1&amp;src=typed_query&amp;f=live. Mr. Mashinsky's Twitter account is now private.

[18]    Of course that was not true when, prior to the Pause date, Mr. Mashinsky, Mr. Leon and other insiders withdrew their assets from Celsius while hiding its dire situation from account holders (and in certain circumstances, preventing account holders, including Mr. Tuganov, from withdrawing their assets).

person, of his own money.[19]  And, during a November 20, 2020 AMA in New York, he said: "I'm here to convince you that what Celsius is doing is in your best interest . . . including me with my wallet[ ]."[20]

35.    Mr. Mashinsky hosted weekly AMAs, during which he answered live questions from the audience.[21]  Many of the AMAs were recorded from Mr. Mashinsky's residences in New York, and others were recorded from the Celsius office in New Jersey.  The online descriptions of the AMAs invited viewers to "[j]oin the revolution, join Celsius and unbank yourself!" and contained links to Celsius's website and to download the Celsius app.[22]  The AMAs could be accessed from links on the Celsius website.[23]  From 2018 through at least 2020, the online descriptions of the AMAs repeated Mr. Mashinsky's promise "to act in the best interest" of CNL's customers.[24]  Mr. Mashinsky also preached Celsius's trustworthiness and transparency.  For instance, on July 19, 2020, in New York, when addressing questions about CNL's transparency with regulators, Mr. Mashinsky said: "when you go to the community and say hey trust me to earn

---

[19]    Celsius Network, *Celsius AMA - Ask Mashinsky Anything - Friday, November 6,* YouTube (Nov. 6, 2020), at [32:25], https://www.youtube.com/watch?v=apWkwq8uscU. ("Right so, again I'm calling on anyone to come and say Celsius charged me a fee, or Celsius gave me a loan without at least 200 percent collateral right.  Come forward.  I'll give you a thousand dollars prize, anyone.").

[20]    Celsius Network, *Celsius AMA – Ask Mashinsky Anything – Friday November 20,* YouTube (Nov. 20, 2020), at [54:16], https://www.youtube.com/watch?v=ZBPT_p9IlCw.

[21]    The AMAs were also recorded and posted to the Celsius website by the middle of 2021.

[22]    *See, e.g.,* Celsius Network, *AMA with Celsius Network CEO Alex Mashinsky,* YouTube (Dec. 19, 2019), https://www.youtube.com/watch?v=el62VDzt_ww&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=49; Celsius Network, *Celsius Network Team AMA – Thursday, July 2, 2020,* YouTube (Jul. 2, 2020), https://www.youtube.com/watch?v=Ym1EjbThjVk&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=44; Celsius Network, *Celsius AMA – Ask Mashinsky Anything – Friday, November 20,* YouTube (Nov. 20, 2020), https://www.youtube.com/watch?v=ZBPT_p9IlCw.

[23]    *See, e.g.,* *Celsius in the world,* Celsius, https://celsius.network/media  (last visited Apr. 26, 2023).

[24]    *See, e.g.,* Celsius Network, *Celsius Network Team AMA – Thursday, July 2, 2020,* YouTube (July 2, 2020), https://www.youtube.com/watch?v=Ym1EjbThjVk&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=44; Celsius Network, *AMA with Alex Mashinsky, CEO of Celsius,* YouTube (Mar. 8, 2018), https://www.youtube.com/watch?v=YQNdQXxPNQE&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=54.

this income for you and they see that you're transparent your offices are listed and you're on YouTube every week and you're talking to the community you're not hiding, uh then [the regulators] can trust you right, because they know that you're doing everything the right way."[25]

36.    But Mr. Mashinsky was never telling the truth.  Throughout the AMAs and in other public materials and statements, CNL and Mr. Mashinsky failed to disclose material facts that each had knowledge of, and repeatedly lied to customers and the public about the risk profile of Celsius's investments and Celsius's financial condition.  Facts that would be material to any reasonable person's investment decision were omitted from, or misstated, in public disclosures.  CNL used those misrepresentations, misstatements and omissions to encourage customers or potential customers to invest more cryptocurrency with Celsius—all the while hiding the truth of Celsius's financial position, risk strategy and regulatory issues.

37.    This Class Claim primarily focuses on four categories of fundamental misstatements and omissions that pervaded Celsius's marketing and communications.  To be clear, CNL and Mr. Mashinsky made far more misrepresentations than the ones detailed herein.  For instance, in the White Paper and over the following years, customers were promised an insurance product that was never delivered.[26]  But the misleading statements and omissions outlined in this Class Claim were fundamental to Celsius's business model and pervaded Celsius's sales pitch to customers throughout the life of the business.  These pervasive and continuous misrepresentations and omissions were intended to and did induce new customers to transfer their assets to Celsius's platform and existing customers to keep their assets on Celsius's platform.

---

[25]    On The Chain LIVE, *Celsius Network with Alex Mashinsky – On The Chain,* YouTube (Jul. 19, 2020), at [8:42], https://www.youtube.com/watch?v=h5yzyx9Z6uk.

[26]    White Paper, *Celsius Network*, at 9, https://celsius.network/static/celsius-whitepaper.pdf (last visited Apr. 27, 2023).

## II.    CNL Claimed to Pass a Percentage of its Revenue to Customers through Weekly Rewards

38.    The fundamental tenet of CNL's business, as communicated in its White Paper, on its website, through blog posts, on Twitter, and by its public face, Mr. Mashinsky, was that it would "pass most of [its] earnings back to the community."[27]  CNL used this promise to lure customers to its platform (or keep them there) and even modified interest rates to create the impression that it was honoring that promise.[28]  Mr. Mashinsky and other CNL employees repeated this promise on AMAs and in interviews from as early as March 2019 through as late as April 2022.  This promise was underscored by CNL in its official blog posts on Medium and the information it provided to customers on its website.

39.    As early as March 7, 2019, in New York, Mr. Mashinsky promised, in an interview with NASDAQ, that "Celsius network enables you to deposit your coins, enables you to lend them to someone else, and you get to keep 80%."[29]  This promise was echoed in a Medium blog post originally published on April 24, 2019, which CNL has since deleted from the Internet.[30]  In that post, CNL stated: "The Celsius business model is structured to do the exact opposite of what banks do – by giving 80% of total revenue back to our community each week in the form of earned interest . . . .  We're taking the exact same 80% profit margin that banks have kept for themselves for centuries and returning it to our community of depositors."[31]  CNL's website on August 28,

---

[27]    *Id.* at 5.

[28]    *E.g.*, *Final Report of Shoba Pillay, Examiner* [D.I. 1956], at 249-50.

[29]    Celsius Network, *Alex Mashinsky, Celsius CEO, interview at NASDAQ,* YouTube (Mar. 7, 2019), at [3:26], https://www.youtube.com/watch?v=8cIdPpA-pyk.

[30]    *Celsius  Network  Interest  Rates,  Explained*,  Medium  (April  24,  2019), https://web.archive.org/web/20210216082029/https://celsiusnetwork.medium.com/celsius-network-interest-rates-explained-a336a52e163d.  This and other since-deleted posts are archived on the Internet Archive's Way Back Machine, which is a 501(c)(3) non-profit that builds a digital library of Internet sites.

[31]    *Id.*

2019 further stated: "The 1% had their turn.  At Celsius Network, we're driven by the mission to do what is best for our community.  That means offering the highest earning potential to everyone, equally.  We are committed to sharing up to 80% of our income with users."[32]

    40.    CNL and Mr. Mashinsky repeated this promise for years.  For instance, Mr. Mashinsky donned his Celsius t-shirt, and he and his colleagues stated on seven separate AMAs:

- **December 19, 2019 AMA**: "So what Celsius has done is really put this whole model on its head by returning eighty or ninety percent to our depositors.  No one has ever done that before. No one has ever done that in seven hundred years of banking giving so much back to the depositors right . . . Celsius gives you eighty to ninety percent [of] the revenues we collect.  Revenue, not net profit." (Mr. Mashinsky, New York);[33]

- **March 20, 2020, Celsius Fireside Finance Video**: "[W]e [are] finding more and more ways to earn more and more yield for customers, and again, no one can compete with this model.  No one who pays less than 80% to their community can compete with the Celsius model.  If you want to beat us, you're going to have to pay more than 80 percent." (Mr. Mashinsky, New York);[34]

- **April 10, 2020 AMA**: "And again 80%, we're the only guys that take 80% of what we earn and give it to the community as Bitcoin, Ethereum, or CEL tokens." (Mr. Mashinsky, New York);[35]

- **May 15, 2020 AMA**: "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day." (Mr. Mashinsky, New York);[36]

- **December 18, 2020 AMA**: "Right, so if you continue to earn interest, then Celsius would be basically a scam or something.  We couldn't sit there and explain how we make money.  Celsius makes money, we don't charge you any fees, we pay your

---

[32] *The 1% Had Their Turn,* Celsius Network, https://web.archive.org/web/20190828062049/https://celsius.network/earn-interest-on-your-crypto/ (last visited Apr. 27, 2023).

[33] Celsius Network, *AMA with Celsius Network CEO Alex Mashinsky,* YouTube (Dec. 19, 2019), at [49:52, 53:12], https://www.youtube.com/watch?v=el62VDzt_ww&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50.

[34] Celsius Network, *Fireside Finance with Alex Mashinsky,* YouTube (Mar. 20, 2020), at [31:18], https://www.youtube.com/watch?v=4_a9QWuXMF0&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=47.

[35] Celsius Network, *AMA with Celsius Network and Saga!,* YouTube (Apr. 10, 2020), at [46:25], https://www.youtube.com/watch?v=HAuoIsYA9EQ.

[36] Celsius Network, *Ask Mashinsky Anything – Friday, May 15,* YouTube (May 15, 2020), at [30:48], https://www.youtube.com/watch?v=am5CXWgj-Vk.

withdrawal fees, and we are doing everything because we do make money when you take a loan. How do we make money? We've got your collateral effectively for free, you've got the loan. We've got the collateral and we make income off that collateral. So we can't make income and pay you at the same time, right? So that's why it's one or the other. We basically don't make any money when you just deposit with us and we pay you that 80%, right? Because the cost of running Celsius is more than 20% of our income, all of the revenues, right? So the rest of the money comes from us using your collateral and re-hypothecating the collateral." (Mr. Mashinsky, New York);[37]

- **November 12, 2021 AMA**: "[Celsius pays] at least 80%" of revenue earned from borrowing back to users." (Christina Sciotto, Celsius business development employee, Illinois);[38] and

- **March 11, 2022 AMA**: "[T]he rate that we published is what we earned the week before, right, for that pool based on how full or empty the deployment bucket is, so, and again, we change those rates weekly." (Mr. Mashinsky, Texas).[39]

CNL's misrepresentations extended beyond the AMAs, as well:

- **August 19, 2020 Medium blog post**: "Celsius returns up to 80% of what we earn (and that's before we deduct any expenses), and that enables us to offer a very high reward rate on the assets we support." (Ms. Urata-Thompson);[40]

- **December 6, 2020 RealVision Interview (posted on the Celsius website)**: "We are structured almost like a hedge fund, even though we're not. But we are like a 80-20 LP-GP relationship, meaning our users are LP's. They lend us their coins. We deploy the coins. We earn yield, and we give 80% of it back to the depositors." (Mr. Mashinsky, New York);[41]

- **January 22, 2021 (since-deleted) blog post**: "[W]e make money by deploying the coins transferred to Celsius and return up to 80% of our revenue to the community before we take out any for expenses . . . . Our 'bread and butter business is crypto lending.'" (Ms. Urata-Thompson);[42]

---

[37]  Celsius Network, *Celsius AMA December 18th*, YouTube (Dec. 18, 2020), at [47:53] https://www.youtube.com/watch?v=8s3_X3VOq4k.

[38]  Celsius Network, *Celsius AMA November 12th 2021*, YouTube (Nov. 12, 2021), at [33:12], https://www.youtube.com/watch?v=bTrByn1DAFo.

[39]  This statement was removed from the AMA during the censorship process, which is described in Section VII hereof.

[40]  Celsius, *What We Do & How We Do It*, Medium (Aug. 19, 2020), https://blog.celsius.network/what-we-do-how-we-do-it-9a82124f7159.

[41]  *Celsius Network: Regulations & Yield on Crypto Assets,* RealVision (Dec. 7, 2020), at [19:57], https://www.realvision.com/shows/cryptoverse/videos/celsius-network-regulations-yield-on-crypto-assets-2QXo?tab=details.

[42]  Celsius Network, *What are stablecoins? How to earn more on your dollars with Celsius*, Medium, https://web.archive.org/web/20210118043446/https://celsiusnetwork.medium.com/what-are-stablecoins-how-

- **<u>March 7, 2021 Medium blog post</u>**: "Celsius lends funds to institutions and returns up to 80% of earnings to users." (Mr. Mashinsky);[43]

- **<u>April 27, 2021 Tweet</u>**: "How is it possible that we offer up to 7% APY on crypto, asks @CNBC. The answer is simple: we give 80% of our revenue back to the community. #UnbankYourself." (@CelsiusNetwork);[44]

41.    The promise to give 80% of its revenue to customers was prominently featured on CNL's website and in its promotional materials. Its website stated that "[g]iving back is fundamental to how Celsius works. Up to 80% of our revenue is paid back to the community as weekly rewards on crypto."[45] Additionally, under a heading titled, "How do you earn the rewards to pay your customers? Is this a Ponzi scheme?", the website stated that Celsius was not a Ponzi scheme, that it earned rewards through issuing over-collateralized loans to hedge funds, institutional traders and exchanges, and that its aim was "to return 80% of the revenues made from lending out [its] community's assets back to [its] community on a weekly basis."[46] CNL issued a press release via PR Newswire on August 24, 2020 which again described the company's "customer-centric business model in which 80% of the company's revenues go directly back to its community of crypto holders."[47] These misstatements continued through 2022—a description of

---

to-earn-more-on-your-dollars-with-celsius-42b4d9c9630a.

[43]    Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike,* Medium (Mar. 7, 2021),    https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd.

[44]    @CelsiusNetwork,    Twitter    (Apr.    27,    2021,    6:41    PM), https://twitter.com/celsiusnetwork/status/1387175053062672388.

[45]    This statement was removed from the website around August 1, 2021.

[46]    Celsius, *How do you earn the interest to pay your customers? Is this a ponzi scheme?* (Aug. 11, 2021), https://web.archive.org/web/20200811102256/https://support.celsius.network/hc/en-us/articles/360001978817-How-do-you-earn-the-interest-to-pay-your-customers-Is-this-a-ponzi-scheme- (last visited Apr. 26, 2023). This post has subsequently been removed online. *See also* Celsius, *How Does Celsius Network make money?* (Sept. 22,    2020),    https://web.archive.org/web/20200922005337/https://support.celsius.network/hc/en-us/articles/360001706797-How-does-Celsius-Network-make-money- (last visited Apr. 26, 2023) ("We aim to return 80% of the revenues made from lending out our community's assets back to our community on a weekly basis.").

[47]    Celsius, *Celsius Network now offers 6.2% APY on your first 5 Bitcoins*, PR Newswire, (Aug. 24, 2020), https://www.prnewswire.com/news-releases/celsius-network-now-offers-6-2-apy-on-your-first-5-bitcoins-

a February 10, 2022 iHeart Radio podcast episode with Mr. Mashinsky highlighted that the Celsius wallets "charge no fees yet pay 80% of interest income revenues back to the depositors and the underserved global population."[48]

42.    By CNL's own admission, however, these promises were false.  CNL did not calculate rewards based on revenue.  Until July 2021, Celsius did not have a formal method or policy by which it calculated or set reward rates.  In fact, as Celsius employees expressed, "[t]here [was] no evidence that has ever supported the rates [Celsius] pay[s]."  Rates were instead set on an ad hoc basis, with Mr. Mashinsky having the final say on what interest rates CNL set for each coin—even after July 2021.

43.    On June 9, 2021, the FCA wrote CNL an email stating: "After reviewing the 'earn reward' interest generating business model promising 80% of returns back to its customers, our lawyers have raised serious concerns that the firm is operating a collective investment scheme." Mr. Mashinsky, Mr. Leon, Mr. Cohen-Pavon and Mr. Noy were included on the email chain.  The FCA reiterated this accusation in a June 18, 2021 letter to CNL, which stated that CNL's arrangements "suggest that Celsius is operating a Collective Investment Scheme," and that it may be in violation of the General Prohibition (which is a criminal offense).  In the letter, the FCA noted that the statements on CNL's website and in its promotional materials "repeatedly make a link between the sums generated through its lending activities and the returns to consumers."  The FCA pointed out that "[t]here is a substantial amount of promotional material on the Website that is *likely to have been seen and relied upon by prospective customers*."  Accordingly, the FCA

---

301117223.html (last visited Apr. 26, 2023).

[48]    Just Get Started with Brian Ondrako, *Alex Mashinsky on Why People Should be Unbanking Themselves*, iHeart Radio (Feb. 10, 2022), https://www.iheart.com/podcast/269-just-get-started-podcast-61217509/episode/211-alex-mashinsky-on-why-people-92736422/ (last visited Apr. 26, 2023).

demanded that CNL cease investment activity in the United Kingdom absent prior FCA approval. In its response to that letter, dated July 2, 2021, CNL asserted that rewards paid to customers "do not represent a share in the income or capital appreciation derived from Celsius'[s] use of such cryptoassets," and are rather paid weekly according to a fixed reward schedule. The letter went on to explain how rewards were calculated, emphasized that rewards were in no way linked to Celsius's revenue and confirmed that customers did not receive 80% of revenue as rewards. Even after that admission, Celsius did not inform its customers that its rewards were not connected to its revenue.

44.     A section of the letter titled "Next [S]teps" explained that, rather than going forward with its application to register as a cryptoasset business in the United Kingdom, CNL would migrate its business from to an entity outside of the United Kingdom.

## III.    Celsius Issued Billions of Dollars of Uncollateralized Loans to Parties with Questionable Credit Profiles

45.     CNL and Mr. Mashinsky repeatedly told customers that Celsius did not issue uncollateralized loans and that it only transacted with "Wall Street" institutions that were well-capitalized. Those statements were never true. Based on internal Celsius documents and CNL's own statements to regulators, it is clear that, when CNL and Mr. Mashinsky made those statements, Celsius had billions of dollars of outstanding unsecured loans and had never issued loans to traditional Wall Street institutions.

46.     Like CNL's other misrepresentations, this false narrative started at the beginning. On March 3, 2018, the FAQ page on the Celsius YouTube channel represented: "100% of our loans, are asset backed."[49]   Back in his Celsius t-shirt, Mr. Mashinsky made similarly false

---

[49]    Celsius Network, *FAQ | How does the insurance work for Lenders?*, YouTube (Mar. 3, 2018), at [0:15], https://www.youtube.com/watch?v=VtuXPgyU6us.

statements in some of his early AMAs:

- **November 25, 2019 "Putting Wall Street on Notice! Crypto is Coming!" Video**: "[W]e lend out against collateral." (Mr. Mashinsky);[50]

- **November 26, 2019 AMA**: "[W]e only work with 150 of [800 hedge funds] the top 150. I can tell you there are other lenders in the market who lend with no collateral or lend to anybody. Good. Good for them. *We will never do that*." (Mr. Mashinsky);[51]

- **December 10, 2019 AMA**: "And one of the things we do we don't leverage we don't do all these, these manipulations that banks do. We are fully collateralized with whatever we do. And I can tell you that the financial team is very, very busy always making sure that we don't leverage we don't do any trickery." (Mr. Goldstein).[52]

But that was not true: in December 2019, 72% of Celsius's aggregate institutional loans outstanding were unsecured.

     47.    CNL's misrepresentations continued in the next year.

- **March 13, 2020 "Crypto Market Commentary with Alex Mashinsky" Video**: "We stick with the highest quality, we don't do non-collateralized loans, we always have collateral." (Mr. Mashinsky, New York);[53]

- **April 3, 2020 "Fireside Finance with Alex Mashinsky" Video**: "Celsius does asset-backed lending." (Mr. Mashinsky, New York);[54]

- **April 14, 2020 "Revealing the New World of Crypto Lending" Video**: "For us, I mean, we are – they are crazy guys out there that lend with no collateral. We don't do that, so, we have very tight controls." (Mr. Mashinsky, New York);[55]

---

[50]  Lark Davis, *Putting Wall Street on Notice! Crypto is Coming! Alex Mashinsky Celsius Network*, YouTube (Nov. 26, 2019), at [10:17], https://www.youtube.com/watch?v=O0vZR-v0Kpo.

[51]  Celsius Network, *Celsius Network AMA - Ask Mashinsky Anything!*, YouTube (Nov. 26, 2019), at [33:06], https://www.youtube.com/watch?v=H1n5g7uJyvQ (emphasis added).

[52]  Celsius Network, *December 10, 2019 AMA with Nuke Goldstein*, YouTube (Dec. 10, 2019), at [14:10], https://www.youtube.com/watch?v=gxf2XgPKdzI.

[53]  Celsius Network, *Crypto Market Commentary with Alex Mashinsky*, YouTube (Mar. 13, 2020), at [7:02], https://www.youtube.com/watch?v=MZlL_IrgV3E&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=47.

[54]  Celsius Network, *Fireside Finance with Alex Mashinsky*, YouTube (Apr. 3, 2020), at [16:22], https://www.youtube.com/watch?v=OsXvAsYZmvA.

[55]  Celsius Network, *Revealing the NEW WORLD of Crypto Lending*, YouTube (Apr. 14, 2020), at [14:53],

- **April 17, 2020 AMA**: "So, we only do asset backed lending. I know some of our competitors lend coins with no collateral, we don't do that right." (Mr. Mashinsky);[56]

- **May 15, 2020 AMA**: "I can tell you that our competitors are lending coins unsecured, meaning they not take any collateral. Right, we don't do anything like that we always require collateral we always have something that we hold to make sure that the institution on the other side we don't mean are just relying on their goodwill. We have an asset that they want to come back and claim. So we get our coins back -- or your coins back, actually" (Mr. Mashinsky, New York);[57]

- **May 18, 2020 "Coronavirus and Market Crash won't stop DeFi Interview with Alex Mashinsky" Video**: "Celsius basically has zero leverage at any time. We don't use leverage at all, right. We collect coins and assets from 80,000 retail users and we only lend them to institutions, and we always have collateral from the institutions, there's no leverage in the system. So, we expand the network this way, meaning we don't create any leverage in the system, you don't want to create leverage and copy what Wall Street does." (Mr. Mashinsky, New York);[58] and

- **May 19, 2020 "Crypto for the Masses, Celsius Network with the Godfather of VOIP Alex Mashinsky – Crypto Arnie" Video**: "So we are only doing asset backed lending unlike the banks, and the credit card companies, and all the other guys who lend you money." (Mr. Mashinsky, filmed from Celsius Office).[59]

Each of these statements was false. During that time period, Celsius had outstanding unsecured

loans in the following percentages: 24% in March 2020, 13% in April 2020 and 17% in May 2020.

- **July 17, 2020 AMA**: "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf." (Mr. Mashinsky)[60]

Again, this was false. In July 2020, Celsius had approximately USD$200,000,000 in unsecured

---

https://www.youtube.com/watch?v=QqWl9Qbh5to.

[56] Celsius Network, *Ask Mashinsky Anything - Friday, April 17 2020*, YouTube (Apr. 17, 2020) at [21:35], https://www.youtube.com/watch?v=zC1jIOwdhK0.

[57] Celsius Network, *Ask Mashinsky Anything - Friday, May 15*, YouTube (May 15, 2020), at [14:08], https://www.youtube.com/watch?v=am5CXWgj-Vk.

[58] Celsius Network, *Coronavirus and Market Crash won't stop DeFi Interview with Alex Mashinsky*, YouTube (May 19, 2020), at [12:44], https://www.youtube.com/watch?v=6kWqRsRXAt8.

[59] Celsius Network, *Crypto for the Masses Celsius Network w The Godfather of VOIP Alex Mashinsky - Crypto Arnie*, YouTube (May 19, 2020), at [18:39], https://www.youtube.com/watch?v=vmqMPL51v_4.

[60] Celsius Network, *Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon*, YouTube (July 17, 2020), at [53:18], https://www.youtube.com/watch?v=csFrn4XtwL0.

loans, according to materials presented to the Risk Committee on November 14, 2021 which summarized Celsius's loan portfolio history.

- **September 11, 2020 Summit Keynote Speech & AMA**: "We don't believe in fractional reserve or taking loans with fractional collaterals. All of our loans are effectively over-collateralized or they are given to institutions that have billion dollar balance sheets." (Mr. Mashinsky);[61]

- **November 6, 2020 AMA**: "We do not do all kinds of unsecured lending like a lot of people are talking about or saying Celsius does unsecured. We do not do unsecured lending." (Mr. Mashinsky);[62]

- **November 6, 2020 AMA**: "[W]e are not lending out on leverage, we are over collateralized." (Zachary Wildes, corporate and VIP account manager at CNL);[63] and

- **November 9, 2020 "Why Celsius makes all loans collateralised" Video**: "I'm asking you right now, anyone who received an uncollateralized loan from Celsius go on twitter, give us the loan number that you got, and I will give you a thousand dollars just to prove that Celsius does not do non collateralized loans." (Mr. Mashinsky).[64]

From September 2020 through November 2020, however, between 19% and 23% of Celsius's outstanding aggregate institutional loans were unsecured.

48.    CNL and Mr. Mashinsky carried on this false and fraudulent narrative in 2021.

- **May 14, 2021 AMA**: The loans Celsius makes to "vetted financial institutions . . . are collateralized" as the institutions "give Celsius assets or dollars to hold on to[.]" (Mr. Mashinsky, New York).[65]

But, as of July 30, 2021, Celsius had uncollateralized and undercollateralized loans outstanding

---

[61]   Celsius Network, *CHAINLINK Keynote & AMA Alex Mashinsky (Smart Contract Summit 2020)*, YouTube (Sept. 11, 2020), at [42:11], https://www.youtube.com/watch?v=DWd2AE-g694.

[62]   Celsius Network, *Celsius AMA - Ask Mashinsky Anything - Friday, November 6*, YouTube (Nov. 6, 2020), at [32:25], https://www.youtube.com/watch?v=apWkwq8uscU.

[63]   *Id.* at [34:02].

[64]   Celsius Network, *Why Celsius makes all loans collateralized*, YouTube (Nov. 9, 2020), at [1:20], https://www.youtube.com/watch?v=NgA5t2RUcWI.

[65]   Celsius Network, *Crypto Volatility and Elon Musk - Celsius AMA May 14th 2021*, YouTube (May 14, 2021), https://www.youtube.com/watch?v=4r4jnEgeWl8. This statement was removed from the AMA during the censorship process, which is described in Section VII hereof.

with numerous non-traditional financial institutions, including Genesis Global Capital, LLC, Alameda Research Ltd. and Three Arrows Capital Ltd., each of which is currently in a chapter 11 or liquidation proceeding.  In an August 19, 2021 letter to the New Jersey Office of the Attorney General that was sent on behalf of CNL, CNL admitted that 30% of Celsius's institutional lending book, or the equivalent of USD$747,948,734, was uncollateralized.  In that same letter, CNL explained that two counterparties to uncollateralized loans "failed to pay it back" and that CNL "accounts for the disputed amounts on its books as 'bad debt.'"

- **November 19, 2021 AMA**: "Obviously [Celsius] only [does] asset-backed lending, so we're holding a lot of collateral so it's a big incentive for people to pay back their loans.  But in general, [Celsius] basically [has] no bad debt."  (Mr. Mashinsky, Nevada).[66]

49.    CNL also misrepresented to the public that retail borrowers and institutional borrowers were subject to different collateralization requirements.   In CNL's letter to the Pennsylvania Department of Banking and Securities dated September 17, 2021, CNL admitted that it "may choose to agree to provide uncollateralized loans where the borrower can provide sufficient financial stability."  One month later, in an October 29, 2021 AMA filmed in New York, Mr. Mashinsky said: "We don't treat businesses or individuals differently.  Both can access the same loans.  We only do asset back lending meaning you have to give us an asset like crypto."[67]  A presentation made for the Risk Committee in December 2021, however, shows that the majority of Celsius's loan portfolio was unsecured or partially collateralized at that time.

50.    In 2022, CNL and Mr. Mashinsky continued to reiterate these misrepresentations.

- **January 7, 2022 Real Vision Finance Interview**: "So, Celsius, is, uh, lending, uh,

---

[66]    Celsius Network, *Celsius AMA November 19th 2021*, YouTube (Nov. 19, 2021), at [55:19], https://www.youtube.com/watch?v=PUGeuPbQ4Qo.

[67]    Celsius Network, *Celsius AMA October 29th 2021*, YouTube (Oct. 29, 2021), at [1:20:39], https://www.youtube.com/watch?v=3yAfI082wJo.

basically most of our loans are fully collateralized.  Some of them are partially collateralized.  It really depends on the size of the counterparty . . . And we have, uh, tier 1 institutions with billions of dollars on their balance sheet borrowing from us." (Mr. Mashinsky);[68] and

- **March 11, 2022 AMA**: "So we are squeezing the lots of the largest guys on Wall Street." (Mr. Mashinsky, Texas);[69]

- **April 13, 2022 CNBC International Interview**: "[W]e do not offer any non-collateralized loans." (Mr. Mashinsky, Paris).[70]

But according to May 12, 2022 Risk Committee presentation materials, Celsius had over USD$1 billion of loan exposure (USD$763 million of which was under fully uncollateralized loans) to non-traditional institutions, such as Alameda Research LLC (partially collateralized), Equities First Holdings (uncollateralized) and Galaxy Digital (uncollateralized) as of May 10, 2022.  Many of Celsius's institutional counterparties had internal credit ratings ranging from "BBB" to "C", which meant that Celsius categorized the institutional parties' capacity to repay debt as ranging from "adequate capacity to repay debt" to "default on debt is likely."

## IV.    CNL Undertook Risky Directional Trading Strategies

51.    CNL also misrepresented the risk of Celsius's trading strategies.  For instance, on September 29, 2020, Mr. Mashinsky tweeted that "Celsius does not trade or take long or short positions with customer coins."   But this was false.  Celsius had a swing trading desk which is, by definition, not market-neutral, as it attempts to profit from predicting market movement. Celsius had been engaged in swing trading as early as September 2020.  For example, in a letter to Washington's Department of Financial Institutions dated September 17, 2021, Celsius described

---

[68]   Real Vision Finance, *Everything You Need to Know About Yield in Crypto* (Jan. 7, 2022), at [18:50], https://www.youtube.com/watch?v=-paNUHyLWlk.

[69]   Celsius    Network,    *Celsius    AMA    March    11th    2022*,    YouTube    (Mar.    11,    2022), https://www.youtube.com/watch?v=JCMuY2FbKJQ. This statement was removed from the AMA during the censorship process, which is described in Section VII hereof.

[70]   CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr. 13, 2022), at [1:43], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s.

its "Opportunistic Single Side Trading ("Swing Trading")" strategy as "not market neutral," and disclosed that, as of August 22, 2021, the equivalent of USD$1.1 billion of assets was being used to support swing trading, market making and cash and carry practices.  The same message was sent to the Pennsylvania Securities Examiner, the Oklahoma Department of Securities and the Massachusetts Securities Division.

52.      A February 2, 2022 email describing Celsius's trading strategy states from Adrian Alisie, Head of Internal Audit, to Vanessa Joasaint, a Celsius Audit Department Representative, states that "*[d]irectional trading was a widespread practice before September 2021 and was known and accepted by senior management*, including risk.  It was presented and discussed in ExCo, ALCO, and R[isk] C[ommittee] and there is extensive supporting evidence."  This email also describes the directional trading accounts and losses associated therewith, and emphasizes the lack of adequate governance over trading (noting, among other things, "senior management intervention under stress").  These concerns were reiterated in a February 16, 2022 presentation to the Risk Committee, which was directly sent to Mr. Mashinsky on that same date.  Mr. Mashinsky has also subsequently admitted that Celsius operated a swing trading strategy, including in his sworn testimony submitted to the Bankruptcy Court.[71]

53.      Celsius also failed to establish risk limits for its Centralized Finance ("**CeFi**") traders until sometime on or about December 2021.  When those risk limits were finally imposed, they were neither monitored nor enforced, as Celsius's risk and finance teams had no way to tell the positions of each strategy or whether the traders were within their limits.  An investigation in

---

[71]    Mashinsky Decl. ¶¶ 78, 81 ("Swing Trading. Similar to Market Making, this strategy involved Celsius holding both long and short futures positions, but with an imbalance between the amount of long and short options Celsius held. This allowed Celsius to benefit from its experience being an active participant in the futures market. Since this trading activity was not market neutral, Celsius had set narrow risk limits on such activity which were also accompanied by strict stop-loss mechanisms.").

January 2022 found that the traders were intentionally placing only one side of a transaction (*i.e.*, taking either a long or short position) and not properly hedging their trades by placing a second derivative, and that the CeFi trading desk was over its limits.

54.     Mr. Mashinsky also directed Celsius to take large directional bets.  For instance, in January 2022, the price of Bitcoin dropped significantly.  At the bottom of the market, Mr. Mashinsky directed traders to sell hundreds of millions of dollars of Bitcoin, betting the price would continue to plummet.  It did not, and Celsius incurred massive losses as a result.  Celsius suffered additional losses on directional trades around this time, and Mr. Mashinsky berated his team on January 23, 2022 for not "liv[ing] in crypto time" and not "put[ting] the positions first and then do[ing] the research and analysis to see if we need to amend them."  Rodney Sunada-Wong, CNL's Chief Risk Officer, in a subsequent email to other members of the risk and finance teams, stated: "[A]lthough Alex's mantra is that the firm is not to do proprietary trading[,] what Alex has instructed the team to do the past 8 days and his continued requests for 'trading around the hedges' are proprietary trading."

55.     Notwithstanding the truth that CNL placed directional bets and, as a result, incurred losses, in the April 13, 2022 CNBC interview from Paris, in response to allegations that Celsius pursued risky trading strategies, Mr. Mashinsky again told the public that "Celsius is a delta neutral strategy [and] doesn't bet on the market going up and down."[72]  And in a May 27, 2022 AMA, Mr. Wildes stated that "the type of business that we do is not taking, you know, these directional bets and we allow HODLers to continue to renew week after week."[73]

---

[72]   CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr. 13, 2022), at [2:50], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=148s.

[73]   This statement was removed from the AMA during the censorship process, which is described in Section VII hereof.

## V.   CNL Failed to Disclose that it Was Forced to Leave the United Kingdom

56.    On June 23, 2021, CNL announced on a Medium blog post that it would be migrating its customer-facing business from CNL to LLC.[74]   While the blog post made a vague reference to "regulatory uncertainty," it assured customers that nothing would change.[75]   When customers accessed the Celsius app to access their accounts, they were presented with new Terms of Use.[76]   The text in the pop-up window that they saw stated that Celsius had updated its Terms of Use to change the "legal entity" to LLC, to change the governing law to New York law and to introduce a binding arbitration clause.[77]   The pop-up window did not state that the changes were driven by a regulatory investigation.[78]

57.    CNL did not tell its community why it was leaving the United Kingdom.   As described in Section II above, the FCA had accused Celsius of operating an unlicensed collective investment scheme.   As a result, the FCA threatened potential criminal penalties and "strongly suggest[ed]" that CNL withdraw its application to operate as a cryptocurrency company in the United Kingdom.[79]   The FCA informed CNL that, if it did not withdraw that application, the FCA would recommend that the decision-making body (the Regulatory Decisions Committee) refuse the application.

58.    In several subsequent letters, the FCA detailed numerous representations made on

---

[74]   Celsius, *Celsius Community Update – June 23, 2021*, Medium (Jun. 23, 2021), https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091.

[75]   *Id.*

[76]   *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "**Blonstein Declaration**"), at Ex. A-7 [D.I. 1327].

[77]   *Id.*

[78]   *Id.*

[79]   The 5th Money Laundering Directive Application ("**5MLD**") is an application that must be approved by the FCA in order for a company to carry out cryptocurrency activities in the United Kingdom.

CNL's website and in its promotional materials regarding its profit-sharing model, which it said customers were likely to have relied on, as evidence that CNL may have been operating a collective investment scheme. The FCA demanded that Celsius remove fraudulent promotional material from its website and stop offering investments to customers in the United Kingdom without prior FCA approval.

59. While CNL continued to dispute that it was operating an illegal collective investment scheme and reiterated that its profits were not connected to its revenues, it fled the United Kingdom and purported to migrate its customer-facing business to LLC. But CNL only transferred its customer obligations, not the assets or investments associated with those obligations, to LLC. In an email from Lior Koren, Global Tax Director at CNL, to Matthew Stevens at Ernst & Young (who advised on the migration), CNL stated: "the assets were not transferred, only liabilities were assumed by LLC." At the end of the day, CNL customers were unknowingly left to look to an insolvent entity to satisfy their obligations.

60. While it hid the reasons for the migration from customers, CNL knew and acknowledged those reasons in internal agreements. The intercompany asset transfer agreement and novation agreement that CNL and LLC signed with respect to the migration included representations acknowledging "certain regulatory limitations" with respect to CNL's business and describing that CNL had given customers the "ability" to transfer assets to LLC. These agreements further stated that the transferred assets were "the subject of regulatory limitations and requirements," and that the transferred assets only related to customers who consented to such transfers. While CNL clearly thought it was important to include these explanations in its formal agreements, it did not consider it important to share them with customers.

61. To the contrary, the emails and in-app communications that customers received

informing them of the migration did not explain the reason for the move, or any details about it.[80]
The Terms of Use that customers were required to accept to keep using Celsius's services post-migration did not disclose the regulatory issues.  The June 23, 2021 Medium blog post further assured customers that, despite the "regulatory uncertainty," nothing was changing.[81] That, of course, was not true.

62.     Customers had no reason to know that the move was driven by the FCA accusing Celsius of operating an illegal business, nor that regulators in the United States had similarly raised issues, and therefore could not have been expected to know that similar scrutiny would befall Celsius in the United States.  Nor did customers know that coins had not actually been transferred to LLC, rendering it insolvent from its formation.  Had customers known the truth about LLC, they would have withdrawn their funds from the Celsius platform.

## VI.    Celsius Did Not Disclose Significant Regulatory Issues

63.     CNL repeatedly and consistently depicted Celsius as completely regulatory-compliant.  For instance, during a December 19, 2019 AMA, Mr. Mashinsky stated: "we are fully compliant, everything we do is compliant . . . we will not do anything that is not 100% compliant."[82]  Moreover, in July of 2020, Mr. Mashinsky told customers: "There's no way we're doing this bypassing all the rules like FINCEN and the SEC."[83]  Mr. Mashinsky's statements about regulatory compliance troubled some of Celsius's employees.  On November 7, 2020, Ms. Urata-

---

[80]    Blonstein Declaration, at Ex. A-3 [D.I. 1327].

[81]    Celsius, *Celsius Community Update – June 23, 2021*, Medium (Jun. 23, 2021), https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091.

[82]    Celsius Network, *AMA with Celsius Network CEO Alex Mashinsky*, YouTube (Dec. 19, 2019), at [58:36] [1:01:02], https://www.youtube.com/watch?v=el62VDzt_ww.

[83]    On the Chain LIVE, *Celsius Network with Alex Mashinsky – On the Chain*, YouTube (July 19, 2020), at [8:04], https://www.youtube.com/watch?v=h5yzyx9Z6uk.

Thompson messaged Mr. Treutler: "I just don't know what goes through Alex['s] mind when he talks about things that go against regulatory things . . . . But talking about something that is not compliant we could get sanctioned.  I just sometimes feel like throwing up."

64.    On May 14, 2021, the Texas State Securities Board notified Celsius that it may have offered securities in Texas in violation of Texas securities law and issued a notice of hearing on September 17, 2021.[84]  Also on May 14, 2021, the New Jersey Bureau of Securities sent CNL a letter stating that CNL "may be offering and selling securities to and from New Jersey."  But on July 21, 2021, notwithstanding his knowledge of these investigations, Mr. Mashinsky appeared on CNBC's show "The Exchange" and stated that "we also work closely with regulators all over the world . . . we are fully compliant.  We do everything that we need to do to stay compliant in all the jurisdictions we operate."[85]

65.    The SEC sent CNL a letter on July 23, 2021 announcing that it was investigating whether CNL had violated the federal securities laws.  The Alabama Securities Commission issued an order to show cause on September 16, 2021.[86]  And a cease and desist order was entered against Celsius in Kentucky on September 23, 2021 (the "**Kentucky Order**").[87]  Following entry of the Kentucky Order, Mr. Leon emailed all Celsius employees, acknowledging that "recently a number of state regulators started looking into and taking action against some crypto companies, Celsius included."  Mr. Leon went on to say that Celsius was "[a]s always . . . cooperating fully and

---

[84]    *Texas State Securities Board v. Celsius Network, Inc. et al*, SOAH Docket No. 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 (Tex. St. Sec. Bd. Sept. 17, 2021) (Notice of Hearing), https://www.ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_signed.pdf.

[85]    "The Exchange" (@CNBCTheExchange), Twitter (July 21, 2021, 1:59 PM), at [2:02], https://twitter.com/CNBCTheExchange/status/1417907168678920192.

[86]    *In the Matter of Celsius Network, LLC*, Admin. Ord. SC-2021-0012 (Al. Sec. Comm'n Sept. 16, 2021), https://asc.alabama.gov/Orders/2021/SC-2021-0012.pdf.

[87]    *Dep't of Fin. Inst. v. Celsius Network LLC*, No 2021-AH-00024 (Ky. Fin. Inst. Sept. 21, 2021), https://kfi.ky.gov/Documents/Celsius%20Network%20LLC%202021AH00024.pdf.   On November 3, 2021, CNL represented to the SEC that it was complying with the Kentucky order.

transparently with all regulators, providing them with all the information they request as we continue to comply with the law and protect our community's assets."

66.    On September 17, 2021, the New Jersey Bureau of Securities found that Celsius was offering unregistered securities in violation of New Jersey law and ordered Celsius to cease and desist from offering Earn accounts to unaccredited investors in the United States (the "**New Jersey Order**").[88] But Mr. Mashinsky publicly denied that the New Jersey Order had been issued. On November 25, 2021, two months after the New Jersey Order had been entered, Mr. Noy emailed Mr. Mashinsky, asking him to avoid stating that CNL had not received the New Jersey Order because "[t]he fact is that we did and that is publicly available information."

67.    Celsius did not take the necessary steps to properly address these regulatory issues. Its compliance officer resigned shortly after the New Jersey Order was entered, and Celsius never hired anyone to replace him.  Although Oren Blonstein was subsequently appointed the Chief Compliance Officer of Celsius Network Limited and Celsius Network LLC, he only focused on compliance with anti-money laundering and bank secrecy laws, rather than securities law and other regulatory compliance.

68.    While Mr. Mashinsky acknowledged that he understood that Celsius was under regulatory investigation and the importance of regulatory compliance, as well as the fact that he had made false statements in prior AMAs with respect thereto, he carried on lying to customers. On November 8, 2021, Mr. Mashinsky emailed Mr. Noy, Mr. Blonstein, Mr. Cohen-Pavon and Mr. Sunada-Wong, claiming to "understand" the misrepresentations he had made on a recent AMA regarding sharing revenues with customers, which Mr. Noy described as a "major issue for

---

[88]    State of New Jersey Bureau of Securities, *Summary Cease and Desist Order in the Matter of Celsius Network, LLC* (Sept. 16, 2021), https://www.nj.gov/oag/newsreleases21/Celsius-Order-9.17.21.pdf.

regulators which we are strongly fighting to disclaim."   And, although Mr. Mashinsky sent an

email to Mr. Cohen-Pavon on November 26, 2021 stating that he understood Celsius was "in [the]

midst of negotiating with regulators," he went on to say, during a public interview broadcast from

Lisbon, Portugal —while wearing a Celsius t-shirt—that same day, "[w]e have followed

regulations since day one.  We did KYC AML FinCen SEC everything.  We followed all the rules

as needed and we will continue to do that."[89]  During a December 3, 2021 interview with KITCO

News in Florida, Mr. Mashinsky misrepresented that "states and other regulators have looked into

Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . . ."[90]

69.    On February 2, 2022, Mr. Mashinsky acknowledged that "[t]he whole point about

regulation is consumer protection," and yet continued to lie publicly about Celsius's regulatory

compliance in the months leading up to these Chapter 11 Cases.  During a March 11, 2022 AMA

broadcast from Texas, he stated that Celsius had not been "do[ing] the things that get you in

trouble" and had been complying with regulations "since day one."[91]  And, during the April 13,

2022 CNBC interview in Paris, when asked about regulatory compliance, Mr. Mashinsky stated:

"We are following all the rules A to Z.  Seven days a week."[92]  He doubled down on this statement

in an April 15, 2022 AMA, during which he said: "There's not—no legal issues at least with the

services that Celsius provides or so."[93]  But Celsius launched its Custody Program and limited its

---

[89]   White Crypto, *Celsius network (CEL) $26B TVL Interview with CEO Alex Mashinsky WebSummit. Bitcoin*, YouTube (Nov. 26, 2021), at [12:30], https://www.youtube.com/watch?v=LkZ8XJ-2n1c.

[90]   Kitco NEWS, *This is when Bitcoin will hit $140k according to Alex Mashinsky, CEO of Celsius*, YouTube (Dec. 3, 2021), at [7:10], https://www.youtube.com/watch?v=DJPogJVkQUE.

[91]   Celsius Network, *Celsius AMA March 11th 2022*, YouTube (Mar. 11, 2022), at [16:35], https://www.youtube.com/watch?v=JCMuY2FbKJQ.

[92]   CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr. 13, 2022), at [6:41], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s.

[93]   This statement was removed from the AMA during the censorship process, which is described in Section VII hereof.

Earn Program to accredited investors, pursuant to the New Jersey Order, in the day between those statements.

## VII.    The Censorship Process

70.    Not only did Mr. Mashinsky make statements and fail to disclose certain information in a way that was materially misleading and deceptive customers, his pattern of misrepresenting and lying to the public was well-known within CNL.  For years, other CNL employees attempted to coach Mr. Mashinsky on what to say and not say to the public, so as not to mislead customers.  Members of the Celsius team expressed frustrations about not being able to stop Mr. Mashinsky from making misrepresentations.  For example, in a September 16, 2021 Slack exchange with Mr. Sunada-Wong, Mr. Cohen-Pavon said that Mr. Mashinsky "refuses to listen and insists on putting the company at risk, plus the individual risk on himself."  Their guidance to Mr. Mashinsky fell on deaf ears.

71.    Similarly, on November 7, 2020, Ms. Urata-Thompson and Mr. Treutler discussed Mr. Mashinsky's public misstatement regarding uncollateralized loans despite Ms. Urata-Thompson having "just told him that the number is increasing and overall ratio of collateral with institution is going down."  On June 11, 2021, Mr. Cohen-Pavon emailed Mr. Mashinsky, Mr. Leon, Ron Deutsch, General Counsel and Head of M&A,[94] Mr. Noy and Mr. Sunada-Wong, demanding that Celsius's marketing materials be revised, saying:

> These statements [regarding 80%] have recently created issues that we [do] not need to deal with, and were quoted by 4 regulators in discussions I'm having with them (not pleasant discussions), along with other problematic statement[s].  We need to find a way to ensure that ALL marketing materials and statements are going through me and/or Ron in the next few weeks. How can we do that?  BTW – the most significant regulator raised specific concerns about our social media channels.

---

[94]    *Final Report of Shoba Pillay, Examiner* [D.I. 1956] at 491.

On November 8, 2021, Mr. Noy, emailed Mr. Mashinsky stating: "Distributing profits to the community – That's a major issue for regulator[s] which we are strongly fighting to disclaim. Please avoid anything around that." Mr. Mashinsky responded that he understood. On November 25, 2021, Mr. Noy asked Mr. Mashinsky to "please stop saying" that Celsius only did asset-backed lending. At least as recently as May 25, 2022, Mr. Noy asked that Mr. Mashinsky be instructed to "avoid any connection between the yield/revenue Celsius generates on its deployment side and the yield paid to customers. No '80%,' no 'up to 80%.'"

72.     A new risk team led by Mr. Sunada-Wong, which included Brian Strauss for Credit Risk, Stevan Maglic for Liquidity Risk and Tat Chan for Market/Operational Risk, was brought in around March 2021, in part, to try to rein in Mr. Mashinsky and address CNL's risky investments.[95] On May 1, 2021, Mr. Sunada-Wong noted inaccuracies in the April 30, 2021 AMA regarding the risk of Celsius investments. He recommended that AMAs be taped rather than proceeding live so that they could be edited to remove false or misleading statements before the AMA was broadcast to the public "[t]o protect Celsius." Mr. Mashinsky resisted and directed the Celsius team to broadcast the videos to the public "ASAP and then make the changes [as] necessary."

73.     Beginning in early May 2021, Celsius executives from its risk, regulatory, compliance and legal teams established what Mr. Noy referred to as a "censorship process." In an email to Aslihan Denizkurdu, former Chief Operating Officer,[96] dated January 28, 2022, Mr. Sunada-Wong explained that the risk team "began marshaling a variety of people to track exactly what was being said in the AMA and remove unfortunate statements." The censorship process

---

[95]    *Id.* at 191.

[96]    *Id.* at 489.

went on for over a year, from May 2021 until around the date of the Pause: June 12, 2022.[97]  The

process involved a group of Celsius executives watching the AMAs live, along with current and

prospective customers, and making a list of false or materially misleading statements made by Mr.

Mashinsky, his co-hosts, or his guests.  Each AMA video was immediately posted, unedited, to

YouTube following the broadcast.  The censorship team would then send their list of

misrepresentations to the media team, which edited the video, removed the live recording from

YouTube and reposted the censored version.  The censored versions were sometimes posted after

the weekend.  The primary employees involved in the video-editing process were Tom McCarthy,

the Group Marketing Manager of, and Shaktideep Tailor, a Marketing Manager in the Creative

Video & Motion Graphics team at Celsius.  Each was an employee of CNL.

74.    Misleading statements, including related to the subject matters described in this

Class Claim, were systematically removed from the AMAs.  For instance, Mr. Sunada-Wong

called it "crucial" to delete a statement from the May 14, 2021 AMA that said that the loans Celsius

issued were collateralized because it was misleading, given that many of Celsius's institutional

loans were uncollateralized.  In fact, Mr. Sunada-Wong demanded that the media team "remove

the curated video explanation from EVERYPLACE on the internet."  Similarly, in an email to the

censorship team, Mr. Sunada-Wong requested that Mr. Mashinsky's statement during the October

29, 2021 AMA that Celsius did not treat business or individuals differently be removed because

"[w]e absolutely do treat institutional counterparties differently than we treat retail borrowers.

There are institutional loans which are not collateralized."  The censorship team removed several

statements made during the November 12, 2021 AMA, including Mr. Mashinsky's statement that

---

[97]    Prior to the Petition Date, Celsius hired a third party risk management and investigation firm to review Mr.
Mashinsky's media statements and assess the damage that had been caused.

"the beauty of the Celsius model is that the rate we publish is actually tied to the yield we create," Ms. Sciotto's statement that Celsius gave "at least 80%" back to the community.  On May 27, 2022, the censorship team requested that a statement made by Mr. Wildes claiming that Celsius did not take directional positions be removed because it was "untrue and misrepresents material risk factors associated with yield accounts."  The censorship process was well-engrained at Celsius by June 2, 2022—as Mr. Sunada-Wong stated in an email to Mr. Noy: "Well, we've been doing this weekly for about a year now, so we have a pretty good sense within our team for what must be removed."

75.    Notwithstanding the fact that senior executives and Celsius employees who were participants in the AMAs were included on emails noting these inaccuracies, upon information and belief, no one did anything to retract or correct the statements which had previously been made to the public.  Instead, they covered them up and tried to wish them away.

76.    Senior Celsius officials also reviewed public statements made through third parties. For instance, on July 21, 2021, Mr. Mashinsky was interviewed on CNBC's show, "the Exchange."[98]  On July 26, 2021, Mr. Sunada-Wong asked the media team to truncate that interview because "[t]owards the end, [Mr. Mashinsky] state[d] 'Celsius has no leverage.'"  Mr. Sunada-Wong also asked Mr. Mashinsky to delete a tweet in which he posted a link to the interview.  On November 29, 2021, Mr. Noy emailed Mr. Mashinsky and the Celsius operations team regarding an advance draft of an article featuring Mr. Mashinsky that they had received.  Mr. Noy said "[t]his article says everything we cannot say in 3 pages.  From 'returning profits to customers,' to 'deposits' and 'savers,' to all loans are fully collateralized.  It's going to be a challenge to get all

---

[98]    @CNBCTheExchange,    Twitter    (July    21,    2021,    1:59pm), https://twitter.com/CNBCTheExchange/status/1417907168678920192.

that edited out, but I trust your skills."

## VIII.    CNL Acted Recklessly With Customer Funds

77.    Throughout its history, CNL acted recklessly with customer funds.  For most of its existence, CNL lacked effective risk management systems and made investment decisions in an ad hoc manner, on occasion transferring hundreds of millions of dollars' worth of cryptocurrency to counterparties with little to no diligence.  By the spring of 2021, Celsius had over USD$10 billion of crypto assets.[99]  To the extent Celsius attempted to track its billions of dollars of assets, investments or positions across the firm, it did so using spreadsheets.  And, despite its employees' repeated statements that they could not accurately assess its positions, it did not adequately fix the problem.

78.    CNL spent millions of dollars of customer assets to purchase CEL token on public markets to "support" the price of that token, to the benefit of its executives, insiders and their associated businesses and relatives, who held the majority of CEL token.  Those purchases, among other things, led Celsius to develop a short position in Bitcoin, which caused it to incur hundreds of millions of dollars of losses as the price of the commodity rose in 2021.

79.    CNL invested its customers' funds in speculative investments, including sending billions of dollars to KeyFi, Inc., an entity that Mr. Mashinsky and Mr. Goldstein partially owned, and sending hundreds of millions of dollars in Bitcoin to Equities First Holdings without receiving financials from the Company.  It also failed to implement proper oversight mechanisms.  These transactions, and many other "poor asset deployment decisions," resulted in the Debtors losing billions of dollars.

---

[99]    Celsius, *Celsius confirms over $10B in digital assets*, PR Newswire, (Mar. 10, 2021), https://www.prnewswire.com/news-releases/celsius-confirms-over-10b-in-digital-assets-301244864.html    (last visited Apr. 28, 2023).

80.     CNL also failed to properly monitor its trading positions.  And, when it realized that its traders had inappropriately bet the market and were experiencing severe losses, it failed to take appropriate action.  To the contrary, Mr. Mashinsky bet the market and ordered traders to sell hundreds of millions of dollars more of cryptocurrency.  The resulting losses were staggering.

81.     The promises that pervaded CNL's marketing were far from the reality of what actually occurred at the company.  Nor were they consistent with account holders' reasonable expectations of what they were signing up for when they entered into the Terms of Use and transferred cryptocurrency to Celsius.  As a result of CNL's reckless conduct, account holders have been prevented from accessing their crypto assets for approximately the last ten months.[100]

## IX.    The Class Representatives

### A.    Thomas DiFiore

82.     Thomas DiFiore is a co-chair of the Committee.  Mr. DiFiore learned about Celsius through BNKtotheFuture during its Series A financing round.  Mr. DiFiore watched the pitch deck video that was posted on BNKtotheFuture in which Mr. Mashinsky described Celsius's business model, including that it only issued over-collateralized loans.  At that time, Mr. DiFiore held a significant amount of Bitcoin.

83.     After learning about Celsius, Mr. DiFiore began to research Celsius and Mr. Mashinsky, including by watching several of Celsius's AMAs.  Mr. DiFiore invested his Bitcoin with Celsius in March of 2020 and purchased CEL tokens in August 2020, in each case based on promises from Mr. Mashinsky that, as an accredited United States investor, he would be able to earn extra interest in CEL.

84.     Starting around his initial transfer of coins to CNL until about June 2021, Mr.

---

[100]    Mashinsky Decl. ¶ 14 (describing Celsius's pause on all crypto asset withdrawals).

DiFiore watched almost every AMA live, often with his co-worker at their auto dealership. To the extent he did not watch the AMAs live, Mr. DiFiore watched replays or summaries posted on Twitter.

85.    Mr. DiFiore remembers Mr. Mashinsky describing how Celsius only invested in over-collateralized loans and did not take directional risks. Mr. DiFiore found the safety of Celsius's business practice important when determining whether to transfer cryptocurrency to Celsius. He had looked into investing with Crypto.com (or its predecessor) and BlockFi, but picked Celsius because it allowed withdrawals at any time, the rates were more competitive and its investment practices were safe (or so he was told). He relied on the stated business model that Celsius would share 80% of its revenue with its customers and believed that Celsius would periodically change interest rates to make the 80% work. In fact, when Celsius lowered their rates, it gave Mr. DiFiore confidence that Celsius was actively adjusting rates to meet the 80%/20% ratio. He also relied on the 80% representation as justification for why Celsius was able to provide higher rates than other competitors. Mr. Mashinsky's comments that Celsius was able to pass that revenue along to customers and remain profitable was key to Mr. DiFiore's investment decision.

86.    Prior to reading the Examiner's Final Report,[101] Mr. DiFiore had no knowledge that Celsius did not pass 80% of revenues back to its customers, issued uncollateralized loans or engaged in swing trading or directional trading. Prior to the commencement of these Chapter 11 Cases, Mr. DiFiore did not know that the FCA had accused CNL of operating an unlicensed investment scheme. Mr. DiFiore also did not know about the extent to which regulators were investigating Celsius or the deficit in Celsius's balance sheet. Had Mr. DiFiore known the truth about the foregoing, he would not have invested his digital assets with Celsius in the first place, or

---

[101]    *Final Report of Shoba Pillay, Examiner* [D.I. 1956].

would have withdrawn such digital assets had they already been invested.

87.     Mr. DiFiore planned his life based on his loan and rewards earned with Celsius.  He referred many of his friends and family to Celsius, including his brother, mother-in-law, mother-in-law's sister, brother's friend, uncle, cousins, sales manager, general manager and other employees.  Mr. DiFiore believed Mr. Mashinsky and Celsius when they proclaimed that Celsius was safer than a bank and therefore entrusted his own finances, as well as those of his family and friends, with Celsius.  Now, along with all other Class members, he stands to lose much of what he invested as a result of Celsius's misrepresentations and omissions.

### B.     Rebecca Gallagher

88.     Rebecca Gallagher is a retired stewardess who used to work on private luxury yachts and determined to stay at home with her children following the death of their father.  She is a retail investor.  In October 2020, Ms. Gallagher sold her house and sought to invest the proceeds of that sale in cryptocurrency to fund her retirement.  She purchased her first BTC and ETH in January 2021.

89.     During January, February and March of 2021, Ms. Gallagher was investing in cryptocurrency and began to voraciously watch online videos about cryptocurrency.  During the course of her research, Ms. Gallagher heard about Celsius through several cryptocurrency influencers, including Ben Armstrong (who goes by the moniker "BitBoy Crypto").  After learning about Celsius, she went to the Celsius website and watched a video that Celsius had posted of an interview of Mr. Mashinsky on the Real Vision financial media and education platform.

90.     Ms. Gallagher was particularly persuaded by Mr. Mashinsky's statements in that interview that Celsius would share 80% of its revenue with Celsius customers.[102]   She was

---

[102]   Gallagher Addend. at 3.

reassured that Celsius was investing in a safe and regulatory-compliant manner.  For instance, in the RealVision Interview, Mr. Mashinsky assured customers that Celsius did not have "a single issue with a single regulator in a single country because we follow the all rules."[103]

91.    Ms. Gallagher was greatly influenced by the RealVision interview and, based on Mr. Mashinsky's comments in that interview, believed that it was safe to transfer the entirety of her retirement funds to Celsius.  She transferred $300,000 USDC to Celsius in two transactions, on April 30, and May 1, 2021.  She transferred 2.8 BTC (then worth approximately USD$164,000) later in May of 2021.

92.    Ms. Gallagher found Mr. Mashinsky very compelling.  In fact, Mr. Mashinsky's willingness to keep customers updated and make himself available for questions on a weekly basis was a key factor that drove Ms. Gallagher's decision to invest with Celsius.  Ms. Gallagher watched nearly every AMA during the time that she was an account holder.  She watched or listened to most of the AMAs live.  If she could not watch an AMA live, she would watch it shortly after it was posted, often on the same day that it had been broadcast.  Ms. Gallagher did not use Twitter prior to the commencement of these Chapter 11 Cases and relied on the AMAs for information on Celsius and her investments in Celsius.

93.    Ms. Gallagher was convinced by Mr. Mashinsky's repeated reassurances that there was no risk to Celsius customers' funds, that no borrower had ever defaulted on its loan from Celsius and that, if a borrower were to default, Celsius would simply liquidate the collateral.  For instance, during a March 12, 2021 AMA, Mr. Mashinsky stated that Celsius "didn't have any breaches, [Celsius] didn't have any losses, [Celsius] didn't have any counterparties who, you

---

[103]    Real Vision, *Celsius Network: Regulations & Yield on Crypto Assets*, realvision.com (Dec. 20, 2020), at 41:00, https://www.realvision.com/shows/cryptoverse/videos/celsius-network-regulations-yield-on-crypto-assets-2QXo?tab=details.

know, stole money from us, or didn't pay us, or defaulted."[104]  Ms. Gallagher was also reassured

by statements Mr. Mashinsky subsequently made in a December 3, 2021 interview with KITCO

News representing that regulators had confirmed that Celsius had "no problem."[105]

94.    Based on those representations, she continued to transfer additional digital assets

to Celsius.  On October 12, 2021, Ms. Gallagher transferred an additional 135 ETH (then worth

approximately USD$479,000) to Celsius.   In November 12, 2021, she transferred 12,204.91

Cardano (then worth approximately USD$25,064).  In January 16, 2022, Ms. Gallagher transferred

an additional Bitcoin to Celsius (then worth approximately USD$42,974).

95.    On April 8, 2022, Ms. Gallagher traveled to a Celsius meet up at Bitcoin Miami

and had the opportunity to meet Mr. Mashinsky in person.  There, she told Mr. Mashinsky that she

had entrusted her entire life's savings to Celsius, and he assured her that her funds were safe.

96.    On April 12, 2022, Ms. Gallagher received an email from Celsius that informed her

that Celsius was working with regulators and releasing the Custody product.  In that email, Celsius

informed Ms. Gallagher that, unless she was an accredited investor (which she was not), she would

no longer be able to transfer any digital assets to the Earn program after April 15, 2022.  Believing

this was her last opportunity to earn rewards on her digital assets, she transferred $20,000 USDC

to her Earn account on April 14, 2022.

97.    After that date, Ms. Gallagher continued to watch the AMAs.  She was aware of

the collapse of Terra Luna, but was reassured by Mr. Mashinsky's statements on Celsius's AMAs

that Celsius was not affected by the Terra Luna crisis.  Ms. Gallagher has never withdrawn any

---

[104]  Celsius Network, *Three New Exchanges and the Celsius Marketing Push! – Celsius AMA (March 12, 2021)*,
YouTube (Mar. 12, 2021), at [56:28], https://www.youtube.com/watch?v=3yGDcqsutsc.

[105]  Gallagher Addend. at 3; Kitco NEWS, *This is when Bitcoin will hit $140k according to Alex Mashinsky, CEO of
Celsius*, YouTube (Dec. 3, 2021), at 7:10,  https://www.youtube.com/watch?v=DJPogJVkQUE.

digital assets from the Celsius platform since becoming a Celsius account holder, including the yield she earned.

98.     Prior to reading the Examiner's Final Report, Ms. Gallagher had no knowledge that Celsius did not pass 80% of revenues back to its customers, issued uncollateralized loans or engaged in swing trading or directional trading.  Prior to the commencement of these Chapter 11 Cases, Ms. Gallagher did not know that the FCA had accused CNL of operating an unlicensed investment scheme.  Ms. Gallagher also did not know about the extent to which regulators were investigating Celsius or the deficit in Celsius's balance sheet.  Had Ms. Gallagher known the truth about the foregoing, she would not have invested her digital assets with Celsius in the first place, or would have withdrawn such digital assets had they already been invested.

99.     Ms. Gallagher suffered devastating losses due to the misrepresentations and omissions that Mr. Mashinsky and CNL made.[106]   Because of those misrepresentations and omissions, she put all of her savings and retirement fund into Celsius.[107]  She has been forced to live below the poverty level as a result of Celsius's bankruptcy proceedings and now often has to eat from food banks.[108]  The Celsius bankruptcy has affected her relationship with her husband. And, it has taken the inheritance from her late husband, which she intended to pass on to her three sons.  Like every other member of the Celsius community, Ms. Gallagher now finds herself with the possibility of recovering significantly less than she initially invested with Celsius.

---

[106]   Gallagher Addend. at 22.

[107]   *Id.*

[108]   *Id.*

C.    **Ignat Tuganov**

100.    Ignat Tuganov is the founder and CEO of Clain, a leading blockchain analytics company.  He is a resident of Cyprus and has been a Celsius Earn account holder since February 2020.

101.    Mr. Tuganov made an initial transfer to CNL in February 2020.  He continued to transfer digital assets to Celsius in 2020 and 2021.  From his work in blockchain, Mr. Tuganov was familiar with multiple platforms where he could deploy his crypto assets.  Mr. Tuganov chose Celsius because he was persuaded by CNL's public statements that it was safe, regulatory compliant and competitive.

102.    In particular, Mr. Tuganov was impressed by CNL's public statements that it was regulatory compliant across multiple jurisdictions, including the list of regulatory licenses featured on its website.  Mr. Tuganov also liked that CNL claimed to be registered multinationally, including in Delaware and with the FCA in the United Kingdom.  Mr. Tuganov has a background in compliance, and his belief that Celsius had a robust risk management framework and was complying with regulators was critical to his decision to invest.  Mr. Tuganov also found it notable that Celsius offered top-of-the-market interest rates to customers as compared to other cryptocurrency companies and generated the revenue to pay for those interest rates.

103.    Mr. Tuganov was further influenced by public statements that Celsius always had sufficient funds or collateral to meet its obligations and that it did not issue uncollateralized loans. Mr. Tuganov recalls Mr. Mashinsky and CNL explaining that a "run on the bank" could never happen at Celsius because, unlike a traditional bank, which holds funds totalling 20-30% of its obligations, Celsius held 100% of collateral at all times.  Mr. Tuganov was very focused on Mr. Mashinsky's and CNL's repeated public statements that all customer obligations were secure and that Celsius was completely collateralized, which he recalls repeatedly seeing or hearing in AMAs

and other interviews with Mr. Mashinsky, such as on the Digital Asset News YouTube channel, in 2020 and 2021. Mr. Tuganov further understood, based on CNL's public statements, that Celsius did not make risky investments, such as in NFTs. The fact that the founder of CNL made these declarations repeatedly, in public, gave Mr. Tuganov comfort that they were credible, and further convinced him that Celsius was a safe and reliable platform for his crypto assets. He was convinced by these misrepresentations and omissions to transfer digital assets to Celsius and to remain a Celsius customer.

104.    Mr. Tuganov also occasionally read summaries of the questions raised and answers provided during AMAs, where he saw many of the claims described above repeated. He primarily relied on Celsius press releases and other content Celsius and its representatives published on Celsius's website and elsewhere on the Internet for information about Celsius.

105.    Mr. Tuganov also performed his own research through the blockchain and attempted to confirm that Celsius was moving significant BTC and ETH to customers. Because many of Celsius's transaction were recorded on its own internal ledger, however, there was a significant amount of information that could not be ascertained from the blockchain, including Celsius's obligations and the nature of those obligations (especially its uncollateralized obligations). Mr. Tuganov therefore relied on CNL's public statements, as did other Class members.

106.    At the time of the purported migration in the summer of 2021, Mr. Tuganov specifically recalls being required to accept revised Terms of Use through an in-app pop-up screen. He read the pop-up and understood that the assets held at CNL corresponding to his account balance would be moved to LLC. Had Mr. Tuganov known that CNL was transferring his

obligations, but not all of the assets (or receivables) associated with those obligations, he would not have agreed to the new Terms of Use and would have withdrawn his assets.

107.    Mr. Tuganov became concerned after the Terra-Luna collapse in May 2022.  At that point, he checked Celsius's balances again, and began watching AMAs regularly.  He attempted to withdraw some assets prior to the date of the Pause; however, Celsius did not honor those withdrawal requests.

108.    Prior to reading the Examiner's Final Report, Mr. Tuganov had no knowledge that Celsius did not pass 80% of revenues back to its customers, issued uncollateralized loans or engaged in swing trading or directional trading.  Prior to the commencement of these Chapter 11 Cases, Mr. Tuganov did not know that the FCA had accused CNL of operating an unlicensed investment scheme.  Mr. Tuganov also did not know about the extent to which regulators were investigating Celsius or the deficit in Celsius's balance sheet.  Had Mr. Tuganov known the truth about the foregoing, he would not have invested his digital assets with Celsius in the first place, or would have withdrawn such digital assets had they already been invested.  Like all Class members, Mr. Tuganov now stands to lose a significant amount as a result of these Chapter 11 Cases that he would not have lost had he not transferred his cryptocurrency to CNL.

**X.    The Class Claim**

109.    This Class Claim asserts common claims against CNL and its Debtor and non-Debtor subsidiaries on behalf of all customers in the Earn, Borrow and Custody programs and with balances associated with "Withhold" accounts for CNL's (1) violation of the New York Deceptive Practices Act, New York False Advertising Act and New Jersey Consumer Fraud Act, (2) fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment and unjust enrichment under New York common law, (3) breach of the implied duty of good faith and fair dealing, (4) fraudulent misrepresentation, negligent misrepresentation and unjust enrichment

under English common law and (5) violation of Section 2 of the Misrepresentation Act 1967 under English law.

110.    The Class members are numerous—all account holders who have or had at any time accounts in the Earn, Borrow or Custody programs, or have or had balances associated with "Withhold" accounts are Class members unless they opt out.  The total number of Class members could therefore exceed 600,000.  The Class members live in various U.S. states and foreign jurisdictions, such that joinder of all parties would be impracticable if not impossible.

111.    The Class Claim is predicated on questions of law and facts that are common among Class members.  The underlying facts arise out of the same pattern of systemic deceptive and fraudulent misconduct and gross negligence by CNL and Mr. Mashinsky.  This pervasive conduct was foundational to Celsius's sales pitch and widely broadcast to all customers through AMAs, videos, interviews, Tweets and blog posts and on the Celsius app and website and other sources.  Any investor in Celsius was led to believe that Celsius was safer than a bank, passed its revenue back to customers and undertook safe investments.

112.    The Class members have suffered the same injury.  The misstatements and omissions made by CNL misled the Class members with respect to the financial health, loan portfolio, risk strategy and regulatory compliance of the company they were investing in, and which is now, as a result of its undisclosed leverage, risky trading practices, lack of regulatory compliance and reckless management, in bankruptcy.  Moreover, none of the Class members knew Celsius was under serious regulatory investigations or that it was systematically editing its public messaging to remove false and misleading statements.  The common facts raise common legal questions as to fraud, deceptive conduct, misrepresentation and concealment.  The Class members are similarly situated—each is a general unsecured creditor of Celsius and stands to have his or

49

her claim affected under any plan of reorganization that is approved by this Court.

113.    The Class Representatives have claims that are typical of other Class members.  As described in Section IX above, Mr. DiFiore, Ms. Gallagher and Mr. Tuganov are retail investors who, like many other Class members, invested significant amounts of cryptocurrency with Celsius and now stand to lose a significant amount of the value they invested.

114.    For instance, Mr. DiFiore planned his life around what he was misled to believe was a safe investment strategy with CNL.  Similarly, Ms. Gallagher transferred her life savings to CNL on the basis of statements made and truths concealed by Mr. Mashinsky and CNL in public. Mr. Tuganov was also so taken by Mr. Mashinsky's lies that he transferred significant funds to CNL.  Moreover, Mr. DiFiore and Mr. Tuganov are active in the crypto investment space, as are numerous other Class members.

115.    Each of Mr. DiFiore, Ms. Gallagher and Mr. Tuganov have been Celsius investors for years, in each case prior to the purported migration from CNL to LLC.  Mr. DiFiore, Ms. Gallagher and Mr. Tuganov have listened to and consumed the promotional material CNL and Mr. Mashinsky put out, whether through AMAs, tweets, blog posts, or otherwise.  Mr. DiFiore and Ms. Gallagher each watched almost every AMA live since becoming account holders.  Mr. Tuganov did not listen to many AMAs prior to May 2022 but got information about Celsius from Celsius press releases and other content Celsius and its representatives published, as did other Class members.

116.    Each of the Class Representatives, like all Class members, was misled by CNL's failure to disclose that it did not pass 80% of revenues back to its customers, that it issued uncollateralized loans, that it engaged in swing trading or directional trading, that it migrated its business from the United Kingdom as a result of regulatory scrutiny and that the entity to which

the business was migrated was highly insolvent.  They, like all Class members, also did not know the extent to which regulators were investigating CNL due to CNL's withholding of that information from customers.  They and the other Class members relied on this (mis)information in deciding to invest in Celsius, just like all Class members who transferred digital assets to Celsius based on CNL's and Mr. Mashinsky's misrepresentations and omissions with respect to the viability and risk profile of the business.  They were also each harmed by CNL's reckless conduct. Now, together with those other Class members, the Class Representatives stand to lose a significant portion of those digital assets as a result of CNL's actions.

117.    Mr. DiFiore, Ms. Gallagher and Mr. Tuganov will fairly and adequately protect the interest of the class.  Neither Mr. DiFiore, Ms. Gallagher nor Mr. Tuganov has interests that are adverse to the class.  Mr. DiFiore is a co-chair of the Committee in these Chapter 11 Cases and has been working diligently with the other Committee members and their advisors toward a solution that would maximize recovery to all creditors.  Similarly, Ms. Gallagher and Mr. Tuganov have been advocating for maximum returns to Earn customers throughout these Chapter 11 Cases. The Class Claim similarly seeks to maximize recoveries to all Class members, such that the interests of the Class Representatives are squarely aligned with those of the Class.

118.    The questions of law and issues of fact that are common to the Class predominate over any such questions of law or issues of fact that only affect individual Class members and resolving the Class members' non-contractual claims against CNL by adjudication of this Class Claim is superior to other available methods, namely, requiring each individual Class member to file a proof of claim.  A decision as to the questions of law raised by Class Claim can and should be achieved through generalized proof because, if Class members were required to file individual proofs of claim, they would rely on the same evidence and reasoning regarding CNL's myriad

public misrepresentations and omissions.  Moreover, requiring individual Class members to file proofs of claim would create the risk that an adjudication as to one such proof of claim would have preclusive effects on the others under the doctrine of *res judicata*.

119.    Managing hundreds of thousands of proofs of claim will be impractical and burdensome to the estates and this Court, whereas condensing all such proofs of claim into the Class Claim will save the estates and Court valuable time and resources.  Moreover, each of these proofs of claim will be substantially similar to the others, given that they are all predicated on the same facts and raise the same questions of law.

120.    The Class members do not have individual interests in controlling separate proofs of claim that are entirely predicated on the same pattern of conduct.  To the contrary, the Class members will benefit from the assertion of the Class Claim by counsel as they will not have to go through the exercise of replicating the allegations and factual assertions made in the Class Claim and defending their own proofs of claim.

121.    Upon information and belief, there has been no individual litigation regarding the non-contractual allegations in this Class Claim by or against any Class member other than claims that have been filed in these Chapter 11 Cases and litigation that has been stayed as result of these Chapter 11 Cases.  CNL is a Debtor and is protected from any post-petition causes of action that may be brought against it.

## COUNT I

### (Violation of New York Deceptive Practices Act (N.Y. Gen. Bus. Law § 349(a))

122.    The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

123.     New York General Business Law ("**GBL**") § 349 prohibits any business or person from engaging in deceptive business practices in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state.  GBL § 349(a).

124.     As consumers of CNL's services as described herein, the Class and the Class Representatives are "person[s]" within the meaning of GBL § 349.

125.     The Class Representatives are authorized to bring a private action for the conduct described herein under GBL § 349(h).

126.     At all times relevant herein, CNL conducted business in the State of New York or directed its business at the State of New York and is therefore subject to New York law for the incidents described in this Count I.

127.     CNL's actions alleged herein constitute unlawful, unfair, deceptive and fraudulent business practices in the State of New York.

128.     CNL's conduct constitutes acts, uses and/or employment by CNL and/or its agents or employees of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression and/or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of services, and with the subsequent performance of services and transactions, in violation of GBL § 349.

129.     At all times relevant herein, CNL offered and sold its services to a robust consumer base and did not tailor such offer or sale to a specific buyer.

130.     This Class Claim derives from a series of transactions spanning several years and CNL's pervasive pattern of conduct with respect thereto.

131.     The specific misrepresentations and omissions made by CNL to the Class members

as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above:

    a.  were factually incorrect;

    b.  were made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, in its and their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

    c.  were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such misrepresentations or omissions were made;

    d.  were never retracted or corrected by CNL and/or its senior-level executives and/or other employees;

    e.  presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

    f.  were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

    g.  were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

    h.  constituted materially misleading and, therefore, deceptive conduct in violation of GBL § 349.

132.    CNL systematically engaged in these deceptive, misleading and unlawful acts and practices to the detriment of the Class Representatives and the Class.

133.    Had the Class members known the truth about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

134.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from CNL's marketing materials and public statements.

135.    The Class Representatives and the Class members relied on CNL's misrepresentations when they transferred their assets to Celsius, and the Class members have been harmed by CNL's deceptive conduct in that they have suffered the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above. As a result of CNL's violation of GBL § 349, the Class members have suffered a loss in an amount to be determined at trial.

136.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT II

### (Violation of New York False Advertising Law (N.Y. Gen. Bus. Law § 350)

137.    The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

138.    GBL § 350-a(1) prohibits false advertising in the conduct of any business, trade or commerce, or in the furnishing of any service, in New York state.

139.    GBL § 350-A defines the term "false advertising" as advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.

140.    At all times relevant herein, CNL conducted business in the State of New York or directed its business at the State of New York and is therefore subject to New York law for the incidents described in this Count II.

141.    As alleged herein, CNL has engaged in material deceptive, misleading or false advertising that was directed at and affected consumers, including the Class members, who transferred digital assets to and/or did not withdraw digital assets from Celsius platform as a result of such deceptive, misleading or false advertising, in violation of GBL §§ 350 and 350-a.

142.    At all times relevant herein, CNL offered and sold its services to a robust consumer base and did not tailor such offer or sale to a specific buyer.

143.    This Class Claim derives from a series of transactions spanning several years and CNL's pervasive pattern of conduct with respect thereto.

144.    The specific misrepresentations and omissions made by CNL to the Class members as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above:

     a.  were factually incorrect;

     b.  were made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, in its and their official capacities, through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website, podcast interviews;

     c.  were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such misrepresentations or omissions were made;

     d.  were never retracted or corrected by CNL and/or its senior-level executives and/or other employees;

     e.  presented the kind of information that consumers regularly research,

investigate, diligence and rely upon when determining whether to purchase or use a product or service;

f.   were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

g.   were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

h.   constituted affirmative misrepresentation and omissions in connection with the marking, advertising, promotion and sale of the products and services offered by Celsius in violation of GBL § 350 and 350-a.

145.    Had the Class members known the truth about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

146.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from CNL's marketing materials and public statements.

147.    The Class members have been harmed by CNL's deceptive conduct in that they have suffered the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above. As a result of CNL's violation of GBL §§ 350 and 350-a, the Class members have suffered a loss in an amount to be determined at trial.

148.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT III

**(Violation of New Jersey Consumer Fraud Act (N.J. Stat. Ann. § 56:8-1, et seq.))**

149.    The Class Representatives repeat and reallege each and every allegation and factual

statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully

herein.

150.    The New Jersey Consumer Fraud Act (the "**NJCFA**") prohibits unconscionable

practices, misrepresentations and omissions, including:

> the act, use or employment by any person of any unconscionable commercial practice,
> deception, fraud, false pretense, false promise, misrepresentation, or the knowing
> concealment, suppression, or omission of any material fact with intent that others rely upon
> such concealment, suppression or omission, in connection with the sale or advertisement
> of any merchandise or real estate, or with the subsequent performance of such person as
> aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby.

N.J. Stat. Ann. 56:8-2.

151.    At all times relevant herein, Celsius had an office or offices in the State of New

Jersey.

152.    At all times relevant herein, CNL conducted business in the State of New Jersey or

directed its business at the State of New Jersey and is therefore subject to New Jersey law for the

incidents described in this Count III.

153.    CNL has engaged in unconscionable commercial practices under the NJCFA.

154.    The specific misrepresentations and omissions made by CNL to the Class members

as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage

ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the

reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of

customer funds, each as detailed with particularity in Sections I through VIII above:

> a.    were factually incorrect;

58

b.  were made in connection with the sale or advertisement of merchandise, being the Celsius services;

c.  were made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, in its and their official capacities, through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website, podcast interviews;

d.  were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such misrepresentations or omissions were made;

e.  were never retracted or corrected by CNL and/or its senior-level executives and/or other employees;

f.  were intended to and did induce the Class members to use the Celsius service by transferring digital assets to and/or not withdrawing digital assets from the Celsius platform; and

g.  constituted, in the aggregate, an unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation and/or the knowing, concealment, suppression and/or omission of material facts in connection with the sale and advertisement of the Celsius services, in violation of N.J. Stat. Ann. § 56:8-2.

155.   Had the Class members known the truth about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform.

156.   CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, willfully, knowingly and/or recklessly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from CNL's marketing materials and public statements.

157.   The Class members have been harmed by CNL's deceptive conduct in that they have suffered the quantifiable and measurable loss of the digital assets they transferred to the

Celsius platform, as described in Sections I through VIII above. As a result of CNL's violation of N.J. Stat. Ann. § 56:8-2, the Class members have suffered a loss in an amount to be determined at trial.

158. The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

**COUNT IV**

**(Common Law Fraudulent Misrepresentation)**

159. The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

160. The specific misrepresentations and omissions made by CNL to the Class members as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above:

    a.  were factually incorrect;

    b.  were made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, in its and their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

    c.  were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such statements were made;

    d.  were never retracted or corrected by CNL and/or its senior-level executives and other employees;

    e.  created a materially false impression with respect to Celsius's financial

        health, leverage, risk strategy, regulatory compliance, and business model;

f.    presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

g.    were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

h.    were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

i.    were reasonably and justifiably relied on by the Class members in deciding whether to transfer assets to and/or withdraw assets from the Celsius platform.

161.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, knew or should have known that the Class members would rely on the misrepresentations and/or omissions made by them because it and they insisted that Class members rely on CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, for accurate information.

162.    The Class members' reliance on CNL's representations about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance, or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, was both reasonable and justifiable because:

a.    the Class members, taken as a whole, are relatively unsophisticated retail investors;

b.    CNL, its senior-level executives, including its CEO, Mr. Mashinsky, and its other employees are sophisticated parties in the cryptocurrency industry relative to the Class members, taken as a whole;

c.    the misrepresentations and omissions were made by sophisticated parties with personal and specific knowledge about the subject matter relating thereto;

d.    CNL established and carried out a systematic censorship process, pursuant to which CNL and/or its senior-level executives, including its CEO, Mr.

Mashinsky and/or its other employees acknowledged its and their knowledge of the falsity of the misrepresentations and omissions, removed any evidence of such misrepresentations and omissions from the public record after the fact, and did not take any action to retract or correct the misrepresentations and omissions;

e.  the Class members watched AMAs and interviews with Mr. Mashinsky and other senior-level executives and other employees of CNL, read blog post and posts on the Celsius website, and read tweets by CNL and Mr. Mashinsky to learn information about Celsius; and

f.  the Class members had no reason to doubt the truthfulness of CNL's and/or its senior-level executives' and/or other employees' representations made in its and their official capacities.

163.   CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, willfully, knowingly and recklessly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from CNL's marketing materials and public statements.

164.   Had the Class members known the truth about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained such damages but for CNL's fraudulent conduct.

165.   As a direct and proximate result of relying on CNL's intentional misrepresentations and/or omissions, which induced the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, the Class members have suffered the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above, in an amount to be determined at trial.

166.   The Class Representatives and the Class accordingly seek all monetary and non-

monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

167.    The facts asserted in this Count IV also constitute common law fraudulent misrepresentation under English law, which is rooted in the tort of deceit and requires:

    a.  CNL making a false representation to the Class members;

    b.  CNL's knowledge that the representation is false, or recklessness as to whether it is true or false;

    c.  CNL's intention that the Class members act in reliance on the representation; and

    d.  the Class members acting in reliance on the representation and suffering loss as a result.

168.    As set out above, the specific misrepresentations and omissions made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, to the Class members as to:  (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above were, among other things:

    a.  factually incorrect;

    b.  known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such statements were made;

    c.  intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform; and

    d.  reasonably and justifiably relied upon by the Class members, causing them to suffer the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above, in an amount to be determined at trial.

# COUNT V

## (Common Law Negligent Misrepresentation)

169.     The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

170.     CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, owed the Class members a duty to impart complete and correct information because:

> a.  CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky possessed specialized knowledge and/or expertise with respect to cryptocurrency and Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance and management of customer funds, and the reasons for, and effects of, the migration, as described in Sections I through VIII above;
>
> b.  the relationship between CNL and the Class members was not at arms' length or between equals because CNL possessed specialized knowledge and expertise and the Class members had no bargaining power; and
>
> c.  CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, held themselves out as reliable, trustworthy experts with respect to such specialized knowledge and expertise, told Class members that they were protecting the Class members' interests, and insisted that the Class members rely on them for information.

171.     The specific misrepresentations and omissions made by CNL to the Class members as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above:

> a.  were factually incorrect;
>
> b.  were made by CNL and/or its senior-level executives and/or other

64

employees, including its CEO, Mr. Mashinsky, in its and their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

c.  were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such statements were made;

d.  were never retracted or corrected by CNL and/or its senior-level executives and other employees;

e.  created a materially false impression with respect to Celsius's financial health, leverage, risk strategy, regulatory compliance and business model;

f.  presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

g.  were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

h.  were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

i.  were reasonably and justifiably relied on by the Class members in deciding whether to transfer assets to and/or withdraw assets from the Celsius platform.

172.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, knew or should have known that the Class members would rely on the misrepresentations and/or omissions made by them because it and they insisted that Class members rely on CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, for accurate information.

173.    The Class members' reliance on CNL's representations about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, was both reasonable and justifiable because:

a.  the Class members, taken as a whole, are relatively unsophisticated retail

      investors;

b. CNL, its senior-level executives, including its CEO, Mr. Mashinsky, and its other employees are sophisticated parties in the cryptocurrency industry relative to the Class members, taken as a whole;

c. the misrepresentations and omissions were made by sophisticated parties with personal and specific knowledge about the subject matter relating thereto;

d. CNL established and carried out a systematic censorship process, pursuant to which CNL and/or its senior-level executives, including its CEO, Mr. Mashinsky and/or its other employees acknowledged its and their knowledge of the falsity of the misrepresentations and omissions, removed any evidence of such misrepresentations and omissions from the public record after the fact, and did not take any action to retract or correct the misrepresentations and omissions;

e. the Class members watched AMAs and interviews with Mr. Mashinsky and other senior-level executives and other employees of CNL, and read blog post, posts on the Celsius website, and tweets by CNL and Mr. Mashinsky to learn information about Celsius; and

f. the Class members had no reason to doubt the truthfulness of CNL's and/or its senior-level executives' and/or other employees' representations made in its and their official capacities.

174.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, willfully, knowingly, recklessly and/or negligently engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from CNL's marketing materials and public statements.

175.    Had the Class members known the truth about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained such damages but for CNL's negligently fraudulent conduct.

176.    As a direct and proximate result of relying on CNL's negligent misrepresentations and/or omissions, which induced the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, the Class members have suffered the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above, in an amount to be determined at trial.

177.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

178.    The facts asserted in this Count V also constitute common law negligent misstatement under English law, which requires:

    a.  the existence of a duty of care between CNL and the Class members;

    b.  a breach of that duty of care by CNL; and

    c.  the Class members suffering loss as a result of CNL's breach.

179.    CNL owed a duty of care to the Class members because it assumed responsibility for the provision of services to retail investors, including the Class members, as a cryptocurrency exchange.  As set out above, CNL owed the Class members a duty to impart complete and correct information because:

    a.  CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky possessed specialized knowledge and/or expertise with respect to cryptocurrency and Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or management of customer funds, or the reasons for, and effects of, the migration, each as described in Sections I through VIII above;

    b.  the relationship between CNL and the Class members was not at arms' length or between equals because CNL possessed specialized knowledge and expertise and the Class members had no bargaining power; and

    c.  CNL and/or its senior-level executives and/or other employees, including

its CEO, Mr. Mashinsky, held themselves out as reliable, trustworthy experts with respect to such specialized knowledge and expertise, told Class members that they were protecting the Class members' interests, and insisted that the Class members rely on them for information.

180.    The specific misrepresentations and omissions made by CNL to the Class members as to:  (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above, were factually incorrect and known to be false by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky.  CNL therefore breached its duty to the Class members to impart correct and complete information.

181.    As a result of reasonably and justifiably relying on CNL's negligent misstatements, which were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, the Class members have suffered the loss of the digital assets they transferred to the Celsius platform, in an amount to be determined at trial.

## **COUNT VI**

### **(Common Law Fraudulent Concealment)**

182.    The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

183.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, owed the Class members a duty to impart complete and correct information because:

    a.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky possessed specialized knowledge and/or expertise

with respect to cryptocurrency and Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance and management of customer funds, and the reasons for, and effects of, the migration, as described in Sections I through VIII above;

b.  the knowledge of these essential facts was not public and could not have been discovered through the exercise of ordinary intelligence as only CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, had access to and knew such essential facts;

c.  CNL knew that the Class members would not have elected to use Celsius's services had they known such essential facts;

d.  the relationship between CNL and the Class members was not at arms' length or between equals because CNL possessed specialized knowledge and expertise and the Class members had no bargaining power in the transaction; and

e.  CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, held themselves out as reliable, trustworthy experts with respect to such specialized knowledge and expertise, told Class members that they were protecting the Class members' interests, and insisted that the Class members rely on them for information.

184.  The specific misrepresentations and omissions made by CNL to the Class members as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above:

a.  were factually incorrect;

b.  were made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, in its and their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

c.  were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such statements were made;

d.  were never retracted or corrected by CNL and/or its senior-level executives and other employees;

e.  created a materially false impression with respect to the financial health, leverage, risk strategy, regulatory compliance and business model of Celsius;

f.  presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

g.  were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

h.  were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

i.  were reasonably and justifiably relied on by the Class members in deciding whether to transfer assets to and/or withdraw assets from the Celsius platform.

185.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, knew or should have known that the Class members would rely on the misrepresentations and/or omissions made by them because it and they insisted that Class members rely on CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, for accurate information.

186.    The Class members' reliance on CNL's representations about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (and effects of) the migration, each as detailed with particularity in Sections I through VIII above, was both reasonable and justifiable because:

a.  the Class members, taken as a whole, are relatively unsophisticated retail investors;

b.  CNL, its senior-level executives, including its CEO, Mr. Mashinsky, and its other employees are sophisticated parties in the cryptocurrency industry relative to the Class members, taken as a whole;

c.  the misrepresentations and omissions were made by sophisticated parties with personal and specific knowledge about the subject matter relating thereto;

d.  CNL established and carried out a systematic censorship process, pursuant to which CNL and/or its senior-level executives, including its CEO, Mr. Mashinsky and/or its other employees acknowledged its and their knowledge of the falsity of the misrepresentations and omissions, removed any evidence of such misrepresentations and omissions from the public record after the fact, and did not take any action to retract or correct the misrepresentations and omissions;

e.  the Class members watched AMAs and interviews with Mr. Mashinsky and other senior-level executives and other employees of CNL, and read blog post, posts on the Celsius website, and tweets by CNL and Mr. Mashinsky to learn information about Celsius; and

f.  the Class members had no reason to doubt the truthfulness of CNL's and/or its senior-level executives' and/or other employees' representations made in its and their official capacities.

187.    CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, willfully and knowingly engaged in the conduct alleged herein, including a coordinated effort to remove misstatements from CNL's marketing materials and public statements.

188.    Had the Class members known the truth about Celsius's calculation and payment of rewards, loan portfolio and leverage ratio, trading and risk strategies, regulatory compliance or reckless mismanagement of customer funds, or the reasons for (or effects of) the migration, each as detailed with particularity in Sections I through VIII above, they would not have transferred digital assets to or declined to withdraw digital assets from the Celsius platform, and therefore would not have sustained such damages but for CNL's negligently fraudulent conduct.

189.    As a direct and proximate result of relying on CNL's negligent misrepresentations and/or omissions, which induced the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, the Class members have suffered the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above, in an amount to be determined at trial.

190.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT VII

### (Common Law Unjust Enrichment)

191.    The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

192.    The Class Representatives further plead, in the alternative, a claim for unjust enrichment.

193.    The specific misrepresentations and omissions made by CNL to the Class members as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above:

  a. were factually incorrect;

  b. were made by CNL and/or its senior-level executives and/or other employees, including its CEO, Mr. Mashinsky, in its and their official capacities through, among other media, interviews, AMA broadcasts, tweets, blog posts, posts on the Celsius website and podcast interviews;

  c. were known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Mr. Mashinsky, at the time such statements were made;

  d. were never retracted or corrected by CNL and/or its senior-level executives and other employees;

  e. created a materially false impression with respect to Celsius's financial health, leverage, risk strategy, regulatory compliance and business model;

f. presented the kind of information that investors regularly research, investigate, diligence and rely upon when making investment decisions;

g. were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform;

h. were likely to mislead a reasonable consumer acting reasonably under the circumstances; and

i. were reasonably and justifiably relied on by the Class members in deciding whether to transfer assets to and/or withdraw assets from the Celsius platform.

194.    As a result of CNL's deceptive, fraudulent and misleading practices, as alleged herein, CNL was enriched, at the expense of the Class members, in the amounts of digital assets that the Class members transferred to the Celsius platform.

195.    Under the circumstances, it would be against equity and good conscience to permit CNL to retain the ill-gotten benefits that it received from the Class members in light of CNL's deceptive and fraudulent conduct.

196.    It would therefore be unjust or inequitable for CNL to retain the benefit of the cryptocurrency transferred to the Celsius platform by the Class members without restitution to the Class.

197.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

198.    The facts asserted in this Count VII also give rise to a claim for restitution under English law, to reverse the unjust enrichment of CNL at the expense of the Class members. Under English law, unjust enrichment requires:

a. CNL to have been enriched, or to have received a benefit;

b. Such enrichment to be unjust; and

    c.  Such enrichment to be at the expense of the Class members.

199.    As set out above, CNL was enriched, at the expense of the Class members, in the amounts of digital assets that the Class members transferred to the Celsius platform, as a direct result of CNL's deceptive, fraudulent and misleading practices.

200.    It would therefore also be unjust or inequitable under English law for CNL to retain the benefit of the cryptocurrency transferred to the Celsius platform by the Class members without restitution thereto.

## COUNT VIII

### (Breach of the Implied Duty of Good Faith and Fair Dealing)

201.    The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

202.    The Terms of Use Version 8 between LLC and its Affiliates, including CNL, and the Class members constitutes a valid, enforceable and binding contract.

203.    The Class members transferred digital assets to and did not withdraw digital assets from the Celsius platform in consideration for entering into the Terms of Use.

204.    In exchange for the Class members transferring digital assets to CNL or LLC, LLC and its Affiliates had an obligation to return a like kind digital asset to the Class members.

205.    The Class members are not in breach of the Terms of Use.

206.    CNL breached its duty of good faith and fair dealing under the Terms of Use through intentional and grossly negligent conduct which prevented the Class from receiving the benefits under the Terms of Use, by, among other things:

    a.  transferring its contractual obligations to account holders to LLC without transferring the corresponding assets;

    b.   not employing proper accounting and risk systems to monitor its investments and avoid massive losses;

    c.   using customer assets to purchase CEL token to artificially inflate its price; and

    d.   making grossly negligent and self-interested investment decisions.

207.    CNL's conduct was not consistent with the reasonable expectations of the Class under the Terms of Use.

208.    Section 25 of the Terms of Use contains a limitation of liability clause that is ambiguous. This Court has found that Section 25 limits Class members' contract claims to LLC only.

209.    The Class members' consent to the Terms of Use was procured through fraudulent or grossly negligent means, as detailed with particularity in Sections I through VIII above and, accordingly, the limitation of liability contained in the Terms of Use is void and of no force or effect.

210.    As a result of CNL's conduct, the Class members have suffered the loss of the digital assets they transferred to the Celsius platform, as described in Sections I through VIII above, in an amount to be determined at trial.

211.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.

## COUNT IX

(Violation of English Law, Section 2 of the Misrepresentation Act 1967)

212.    The Class Representatives repeat and reallege each and every allegation and factual statement in all prior paragraphs, each of which is incorporated by reference as if set forth fully herein.

213.    Section 2(1) of the Misrepresentation Act 1967 provides that:

"where a person has entered into a contract after a misrepresentation has been made to him by another party thereto and as a result thereof he has suffered loss, then, if the person making the misrepresentation would be liable to damages in respect thereof had the misrepresentation been made fraudulently, that person shall be so liable notwithstanding that the misrepresentation was not made fraudulently, unless he proves that he had reasonable ground to believe and did believe up to the time the contract was made the facts represented were true."

214.    As set out above, the specific misrepresentations and omissions made by CNL to the Class members as to: (i) Celsius's calculation and payment of rewards; (ii) Celsius's loan portfolio and leverage ratio; (iii) Celsius's trading and risk strategies; (iv) Celsius's regulatory compliance; (v) the reasons for, and the effects of, the migration; and (vi) Celsius's reckless mismanagement of customer funds, each as detailed with particularity in Sections I through VIII above, were, among other things:

a.    factually incorrect; and

b.    known to be false by CNL and/or its senior-level executives and other employees, including its CEO, Alexander Mashinsky, at the time such statements and/or omissions were made.

215.    CNL therefore had no reasonable grounds to believe, and did not believe, that its misrepresentations were true.

216.    As a result of reasonably and justifiably relying on CNL's negligent misrepresentations, which were intended to and did induce the Class members to transfer digital assets to and/or not withdraw digital assets from the Celsius platform, the Class members have suffered the loss of the digital assets they transferred to the Celsius platform, in an amount to be determined at trial.

217.    The Class Representatives and the Class accordingly seek all monetary and non-monetary relief allowed by law, including actual damages in an amount to be determined at trial, as well as any available equitable relief.