Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF HEARING ON**
**DEBTORS' MOTION SEEKING ENTRY OF AN ORDER**
**(I) SUBSTANTIVELY CONSOLIDATING THE ESTATES OF CELSIUS NETWORK**
**LIMITED AND CELSIUS NETWORK LLC AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that an evidentiary hearing regarding the *Debtors' Motion Seeking Entry of an Order (I) Substantively Consolidating the Estates of Celsius Network Limited and Celsius Network LLC and (II) Granting Related Relief* (the "Motion") will be held the week of **July 24, 2023** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that additional information regarding the format of the Hearing and procedures for accessing the Hearing will be provided once a final date and format have been established.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the *Order Setting Schedule Regarding (I) Estimation of Certain Intercompany Contract Claims Between Celsius Network LLC and Celsius Network Limited, (II) Substantive Consolidation of Celsius Network LLC and Celsius Network Limited, and (III) Constructive Fraudulent Transfer Claim* [Docket No. 2522] (the "Scheduling Order"), opening briefs regarding the Motion and the other issues set forth in the Scheduling Order may be no longer than forty (40) pages. Opening briefs must be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief,* [Docket No. 2560] (the "Case Management Order") by **June 30, 2023, at 11:59 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order) and available on the case website of the Debtors at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Motion. Service in accordance with the Case Management Order shall include emailing a copy of any response or objection, excluding briefs, to the relief requested in the Motion to Debtors' counsel, Kirkland & Ellis LLP, at CelsiusRx@kirkland.com.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York　　　　　　　　　/s/ Joshua A. Sussberg
Dated: May 1, 2023

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:　　　(212) 446-4800
Facsimile:　　　(212) 446-4900
Email:　　　　　joshua.sussberg@kirkland.com

　- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:　　　(312) 862-2000
Facsimile:　　　(312) 862-2200
Email:　　　　　patrick.nash@kirkland.com
　　　　　　　　ross.kwasteniet@kirkland.com
　　　　　　　　chris.koenig@kirkland.com
　　　　　　　　dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION SEEKING ENTRY OF AN ORDER**
**(I) SUBSTANTIVELY CONSOLIDATING THE ESTATES OF CELSIUS NETWORK**
**LIMITED AND CELSIUS NETWORK LLC AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state the following in support of this motion (this "Motion"):

**Preliminary Statement**[2]

1.      As in many startup companies, record keeping and internal systems were sorely

lacking for much of Celsius' history.  While Celsius started to take steps to professionalize its

---

1       The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8
USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors'
service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

2       Terms capitalized but not defined in this Preliminary Statement shall have the meanings ascribed to such terms
elsewhere in this Motion.

operations prior to the bankruptcy filing, many glaring deficiencies remain. In addition to the challenges Celsius faced as a fast-growing startup, the rapidly changing landscape of cryptocurrency regulation resulted, on more than one occasion, in hasty business decisions by Celsius that, with the benefit of hindsight, undoubtedly could have been implemented better. The 2021 migration of Celsius' customer-facing business from UK-based Celsius Network Limited ("CNL") to US-based Celsius Network LLC ("LLC") is perhaps the starkest example. Facing regulatory pressure to withdraw its operations in the United Kingdom, Celsius rushed to effectuate a transatlantic migration of its customer-facing business. Within weeks of the decision to migrate the business, LLC was officially Celsius' new headquarters.

2.      The migration resulted in intercompany chaos. Formal documentation of the CNL-LLC intercompany relationship was not completed for several months, and even when it was, it remained ambiguous what transactions the agreements effectuated.[3] The associated books and records offer little clarity because Celsius routinely failed to record intercompany coin transfers—the Debtors and their advisors estimate that *thousands* of entries are missing from the Debtors' records. The Debtors have been working to reconcile these records for months but have not yet reached a final conclusion (and it may well be the case that a true, full accounting on a transaction-by-transaction basis will never be possible).

---

[3]     For example, the Asset Transfer Agreement undoubtedly transferred all customer liabilities. *See* Asset Transfer Agreement, Ex. 1 (transferring "[a]ll of Transferor's obligations related to or resulting from the Consenting Users' use of the Celsius App"). Despite being called an "asset" transfer agreement, however, the Asset Transfer Agreement appears to have transferred only certain rights to customer-related assets owned by CNL. *Compare* Asset Transfer Agreement, Ex. 1 ("All of Transferor's rights related to or resulting from the balances of the Consenting Users, including . . . all cryptographic assets loaned by the Consenting Users to Transferor prior to the Effective Date.") *with* Terms of Use Version 6 (published in connection with the migration) (providing that account holders transfer all rights *and title*) (emphasis added). Similarly, the Intercompany Loan Agreement does not specify the amount of the loan or (even categorically) a description of the loaned assets. *See* Intercompany Loan Agreement, Ex. 1 ("*[To be added]*") (emphasis in original).

3.     Against this backdrop, the Debtors see two options:  (i) attempt a full reconciliation (or at least estimation) of the intercompany claims between CNL and LLC or (ii) substantively consolidate the estates of CNL and LLC on the basis that their books and records are too hopelessly intertwined to reconcile without destroying value.  The Debtors expect that a full reconciliation of the intercompany claims between CNL and LLC, if possible, would reflect a multi-billion-dollar liability owed from CNL to LLC.  That reconciliation and adjustment of the intercompany claim balance would be the most traditional resolution—especially for the Debtors to propose—but the practical reality is that such a reconciliation may, in fact, not be possible to accomplish.  Having already worked for months to determine the quantum of the intercompany balance between CNL and LLC, the Debtors believe that substantive consolidation is an appropriate remedy.

4.     Courts evaluating whether to substantively consolidate debtors' estates look to see if:  (i) any creditors relied on corporate separateness such that they would be prejudiced by a consolidation *or* (ii) the relevant debtors are so hopelessly intertwined that the cost of disentangling them would outweigh the benefits to all creditors of doing so.  The test is disjunctive, but each of the prongs is satisfied.

5.     With respect to the creditor expectation prong, the Debtors do not believe that the evidence will show that any stakeholder relied on CNL and LLC operating separately.  Reconstructing historical expectations is challenging—particularly with over 600,000 creditors— but the Debtors expect the evidence to show that:  (i) account holders had limited—if any— awareness and understanding of the Debtors' corporate and capital structure and were specifically told by Celsius that the migration would have no effect on them and (ii) that the Series B Preferred Holders were well informed of the Debtors' deficient recordkeeping practices and limited regard for corporate separateness prior to their $600 million investment in CNL, including through

diligence that was not available to other creditors. In any event, the Court need not fully explore all stakeholders' expectations because the circumstances underlying the creation of LLC and the intercompany relationship between LLC and CNL present a textbook case for substantive consolidation on "hopeless entanglement" grounds. Following months of reconciliation efforts, the Debtors' advisors concluded that:

> Th[e intercompany claim] reconciliation process has only been completed, and is likely only possible, at a very high level given the enormous volume of historical intercompany transactions and severe deficiencies in intercompany record keeping . . . . [A] comprehensive accounting of all intercompany transactions would require forensic analysis and be costly and time consuming, if it were even possible given the recordkeeping deficiencies . . . . [E]ven if such a reconciliation were theoretically possible, [] a complete accounting and unwinding would [not] add meaningful value to the estates considering the significant time investment and immense fees of a comprehensive forensic audit.[4]

6. Under these circumstances, a substantive consolidation of CNL and LLC is appropriate and would provide the fastest, fairest, and most final resolution to allow the Debtors to move forward toward confirmation and emergence.[5] For these reasons, and as more fully set forth herein, the Debtors request a substantive consolidation of CNL and LLC on the terms provided in the proposed order.

**Background**

7. The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest cryptocurrency based finance platforms in the world and provided financial services to institutional, corporate, and retail clients across more than 100 countries. Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred

---

[4] *Debtors' Statement with Respect to Intercompany Claims Held by Debtor Celsius Network LLC Against its Debtor Affiliates* ¶¶ 4, 12 [Docket No. 2092] (the "Intercompany Statement").

[5] Estimation could also be a viable and appropriate alternative.

crypto assets as collateral. Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

8.    On July 13, 2022 (the "Petition Date"), certain of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On December 7, 2022, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

9.    The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53, 1648]. On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee"). On September 14, 2022, the Court entered an order directing the appointment of an examiner (the "Examiner") [Docket No. 820]. On April 5, 2023, the Court entered an order discharging the Examiner [Docket No. 2364].

10.    On September 22, 2022, Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Series B Preferred Holders") filed the *Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 880] (the "Equity Committee Motion"), arguing that the Series B Preferred Holders may be entitled to a recovery

because they are structurally senior to account holders as to the residual value of certain assets owned by subsidiaries of CNL. *See Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* at 3 [Docket No. 2205] (the "Opinion") ("The net equity value of CNL . . . arises from Debtor and non-Debtor entities other than LLC whose net equity value will flow up to CNL. Because unsecured Customers recover ahead of equity holders under the absolute priority rule, the Series B Preferred Holders have some chance of recovery if Customers hold claims only against LLC and not against CNL or other Debtor and non-Debtor affiliates.") (summarizing the Series B Preferred Holders' position). On October 24, 2022, the Court denied the Equity Committee Motion without prejudice, finding that the Series B Preferred Holders had not met their burden to demonstrate a substantial likelihood of a recovery to equityholders, and that a cost-benefit analysis did not weigh in the favor of appointing an equity committee.[6]

11. On December 19, 2022, the Court entered the *Order (I) Setting a Briefing Schedule and (II) Granting Related Relief* [Docket No. 1747] (the "Initial Scheduling Order"). The Initial Scheduling Order provided for interested parties to brief the issue of "which Debtors are liable to account holders under the global contract (the "Terms of Use") between Celsius Network LLC and its account holders" (the "Contract Interpretation Issue"). Initial Scheduling Order ¶ 1. On February 6, 2023, the Court held an evidentiary hearing regarding the Contract Interpretation Issue. On February 9, 2023, following discussions held during the hearing, the Court entered an order requiring the Debtors to file information on the docket regarding the amount and nature of

---

[6] *Memorandum Opinion and Order Denying Motion for the Appointment of an Official Preferred Equity Committee* [Docket No. 1168] at 9.

any intercompany claim held by LLC against other Debtor entities.[7]  On February 16, 2023, the Debtors filed the Intercompany Statement in response to the Court's order.

12.     The Intercompany Statement explained that the reconciliation of the Debtors' prepetition intercompany claims is likely only possible "at a very high level given the enormous volume of historical intercompany transactions and severe deficiencies in intercompany record keeping" and that "the Debtors did not generally record prepetition intercompany transactions in their books and records contemporaneously with such transfers, and in many cases did not record intercompany transactions at all."  Intercompany Statement ¶ 4, 5.  Moreover, the Intercompany Statement reported that the Debtors accounted for the transfer of certain assets between CNL and LLC only on a cost basis, rather than recognizing the full value of such transfers.  Intercompany Statement ¶ 5.  In the Intercompany Statement, the Debtors estimated that CNL's and LLC's books are missing an aggregate of approximately 7,000 intercompany transfers pertaining to cryptocurrency assets between October 2021 and the Petition Date, excluding the transactions highlighted in the Intercompany Statement.  Intercompany Statement ¶ 10.  As of the filing of the Intercompany Statement, the Debtors and their financial advisors "believe[d] that the as-adjusted intercompany claim held by LLC against CNL [was] best reflected at the pro forma amount of $3.5 billion."  Intercompany Statement ¶ 12.

13.     On March 9, 2023, the Court issued the Opinion, finding that only LLC, not CNL or any other Debtor or non-Debtor affiliate, is contractually liable to customers under the Terms of Use.  In the Opinion, the Court observed that when LLC became the customer facing entity and assumed liability under the Terms of Use in August 2021, "customers were advised via email that [] their engagement from then on would be with LLC rather than with CNL" and received pop-up

---

[7]     *Order Requiring Debtors to File Information Regarding Intercompany Claims* [Docket No. 2017] at 1.

notifications, including one with a check-box that required creditors to acknowledge that they had read the new version of the Terms of Use and that "the services will be provided [to account holders] by Celsius Network LLC, and that Celsius Network Limited shall transfer to Celsius Network LLC [account holders'] data, account balance, and its rights and obligations [to account holders]."[8] To date, account holders representing 99.86 percent of Earn Program liabilities have accepted the August 2021 Terms of Use or a later version.[9] On March 17, 2023, the Court entered the *Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use* [Docket No. 2265] to implement the Opinion.

14. On March 31, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 2358] (the "Plan").[10] The Plan provides that equityholders will not receive any distributions, either on the basis of (i) the substantive consolidation of CNL and LLC or (ii) the allowance of significant intercompany claims between CNL and LLC.

15. On April 4, 2023, the Series B Preferred Holders filed the *Series B Preferred Holders' Motion for Entry of an Order Establishing Estimation Procedure for the Intercompany Claim Between Celsius Network LLC and Celsius Network Limited in Furtherance of Formulating*

---

[8] Opinion at 10–11 (citing the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 2018* , Ex. K [Docket No. 393] and the *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* ¶ 18, Exs. A-7, A-9 [Docket No. 1327] (the "Blonstein Declaration")).

[9] Blonstein Declaration ¶ 20. By headcount, 90.06% of account holders have accepted version 6 of the Terms of Use or a later version. The 9.81% of account holders (by headcount) that did not accept the newer Terms of Use represent just 0.14% of outstanding Earn Program liabilities.

Account holders who first accepted Terms of Use version 6 or later did not have a specific pop up calling out the contract counterparty, as these users only ever contracted with LLC.

[10] Terms capitalized but not defined herein shall have the meanings ascribed to such terms in the Plan.

*the Debtors' Plan of Reorganization* [Docket No. 2367] and the Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order (I) Establishing Procedures to Estimate the Intercompany Claim That Celsius Network, LLC Has Against Celsius Network Limited and (II) Granting Related Relief* [Docket No. 2369]. On April 24, 2023, the Court entered the *Order Setting Schedule Regarding (I) Estimation of Certain Intercompany Contract Claims Between Celsius Network LLC and Celsius Network Limited, (II) Substantive Consolidation of Celsius Network LLC and Celsius Network Limited, and (III) Constructive Fraudulent Transfer Claim* [Docket No. 2522] (the "Scheduling Order") establishing a schedule for briefing "(a) the estimation of the Intercompany Claim by LLC against CNL for allowance purpose, (b) the substantive consolidation of LLC and CNL, and (c) a constructive fraudulent transfer claim that may be brought on behalf of LLC's estate against CNL." Scheduling Order at 1–2.

## Relief Requested

16.     The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):    (a) substantively consolidating the estates of CNL and LLC (the "Consolidated Debtors") for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, all as further described in the Order and (b) granting related relief.

## Jurisdiction and Venue

17.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012. The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

18. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19. The statutory bases for the relief requested herein are sections 105, 1109(b) and section 1123(a)(5)(C) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), rules 7042 and 9014(c) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>").

## <u>Basis for Relief</u>

20. Substantive consolidation is a well-established judicial remedy arising out of sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code. *See, e.g.*, *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992) ("Courts have consistently found the authority for substantive consolidation in the bankruptcy court's general equitable powers as set forth in 11 U.S.C. § 105."); *In re Continental Vending Mach. Corp.*, 517 F.2d 997, 1000 (2d Cir. 1975) ("The power to consolidate is one arising out of equity, enabling a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation."); *In re Worldcom, Inc.*, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The Bankruptcy Code itself contemplates that substantive consolidation may be used to effectuate a plan of reorganization.") (citing 11 U.S.C. § 1123(a)(5)(C)).

21. In *In re Augie/Restivo*, the Second Circuit surveyed the then-existing standards on substantive consolidation and formulated a now widely cited test streamlining these cases into a two-pronged, disjunctive test that permits substantive consolidation where: (a) creditors dealt with the debtors "as a single economic unit" and "did not rely on the[] separate identity" of a debtor in

extending credit (the "creditor reliance" prong); or (b) the assets and financial structures of the various entities are so hopelessly entangled that "the time and expense necessary to unscramble [the debtors' affairs] is so substantial as to threaten the realization of any net assets for all creditors" (the "hopeless entanglement" prong). *In re Augie/Restivo Baking Co, Ltd.*, 860 F.2d 515, 518–19 (2d Cir. 1988). To determine whether entanglement is "hopeless," courts will engage in a balancing test, weighing the cost, expenses, and delay associated with disentanglement against the potential benefit to creditors. *WorldCom*, 2003 WL 23861928, at *36.

**A.     Substantive Consolidation is Warranted Under the Creditor Reliance Prong**.

22.     Under the circumstances, creditor reliance favors a substantive consolidation of CNL and LLC. The creditor reliance prong evaluates the way creditors interacted with the Debtors, rather than the reality of how the Debtors managed their business. *In re Republic Airways Holdings, Inc.*, 565 B.R. 710, 717 (Bankr. S.D.N.Y. 2017) ("The first prong, whether creditors relied on a separate existence of the debtors, is applied from the creditors' perspective.") (internal quotation marks and citation omitted). In particular, the reliance factor looks to honor the expectations of creditors who have relied on the Debtors' corporate structure, which typically equates to reliance on corporate separateness. *Augie/Restivo*, 860 F.2d at 518–19 ("[C]reditors who make loans on the basis of financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan. Such lenders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets."). Accordingly, courts look to the creditors' interactions with the debtors and the creditors' reliance in determining whether the creditor reliance prong supports a substantive consolidation. The expectations of the account holders are indisputably relevant to this analysis. The relevance of the expectations of the Series B Preferred

Holders is less clear, but, even if considered, should not prevent the proposed substantive consolidation of CNL and LLC.

(i)     <u>Account Holders' Expectations</u>.

23.     The Debtors' account holders (i) are predominately retail investors, (ii) each entered into a form version of the Terms of Use (and amendments) with the Debtors, and (iii) were generally not knowledgeable regarding the specifics of the Debtors' corporate structure. Of the account holders, approximately 55 percent originally entered into their contract with CNL, but account holders representing almost 100 percent (99.86 percent) of Earn Program liabilities have, at one time or another, entered a contract substituting LLC for CNL as the Celsius counterparty under the Terms of Use. Blonstein Declaration ¶ 12.

24.     The evidence will show, however, that both before and after the change to the Terms of Use, the Debtors continued to solicit account holder business and deposits based on the purported strength of the assets held by the entire group of Celsius companies, not solely those of LLC. Alex Mashinsky (who served as a representative of both CNL and LLC) told account holders that there was no consequence to this change. *See* Celsius Network, *New Rewards Explorer Showcase! – Celsius AMA June 25th 2021*, YouTube (June 25, 2021), https://www.youtube.com/watch?v=DdYrYPvY5OU (discussing the transition from the UK to the US; Z. Wildes: "I'd just say the big takeaway here is that all current users—there's no effect. So no matter where you are, if you're a current Celsius user, this is not going to affect you in any way." A. Mashinsky: "Right."). What the Series B Preferred Holders thought this change meant is irrelevant with respect to account holders' understanding. *See* Opinion at 31 ("These reports [that the Series B Preferred Holders relied on] were not shared with the [Terms of Use] counterparty, the Customers, and extrinsic evidence of [] one party's undisclosed, subjective understanding of a contract does not provide support for a particular contract interpretation,

16

particularly where, as here the contract is one of adhesion." (citing *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1315 (D.N.J. 1990))).  Mashinsky also represented to account holders that Celsius' assets that were not LLC's assets, including those of the Debtors' mining operation, were available to support account holder claims.  *See* Celsius Network, *What Does Investment in Bitcoin Mining Mean for Celsius?*, YouTube (Feb. 7, 2022), https://www.youtube.com/watch?v=ymHIfpxXv04 (explaining the rationale behind Celsius' increased investment in mining and stating "for us to have sustainable ways to pay yield, we need also sustainable ways to earn yield."); Celsius Network, *Celsius mining Bitcoin helps the company and the community*, YouTube (June 28, 2021), https://www.youtube.com/watch?app=desktop&v=nQ352qf1fzI (explaining that the mining business benefitted the community and stating that "it is another source of yield for us," and "it is a factory that makes Bitcoin, we pay most of our interest in Bitcoin . . . it's just one-to-one exposure reduction for us.")  Put differently, the account holders—who constitute nearly all of the Debtors' *creditors*—had no reason to rely on Celsius operating as multiple, separate units.

25.     This conclusion is consistent with the Court's Opinion.  In the Opinion, the Court looked to the account holders' conduct for insight into the "parties' objective understanding of the [Terms of Use]."  Opinion at 34.  During the February 6, 2023 trial, the Series B Preferred Holders argued that 94 percent of account holders filed claims against only LLC and the majority of prepetition lawsuits brought against Celsius were against only LLC, but the Court did not find these points persuasive.  Opinion at 34 ("[LLC] is the first specific debtor box to check on the claim form and an account holder does not understand that it must file multiple claims against multiple entities to best protect its interests" and that "[t]he fact that account holders may not be versed in the nuances of bankruptcy proceedings is not a basis for imputing intent onto those same

account holders.").  The court also largely disregarded the fact that most prepetition lawsuits had been filed against LLC because of the difficulty of extrapolating the intent of all account holders "from a few lawsuits" (which were, at least in some instances, filed with the assistance of counsel). Opinion at 34.

        (ii)        <u>Series B Preferred Holders' Expectations</u>.

26.     In contrast to the account holders, the Series B Preferred Holders (i) are sophisticated, (ii) are not creditors, but instead hold equity in CNL, (iii) were represented by counsel and other advisors in their transactions with the Debtors, (iv) conducted significant diligence and had access to the Debtors' management team as part of their decision to invest with the Debtors, and (v) had an opportunity to (and did) negotiate the relevant contracts with the Debtors.[11]

27.     Exactly what the Series B Preferred Holders knew (and when) remains to be discovered, but based on the fact that the Series B Preferred Holders are sophisticated, were represented by counsel and other advisors, conducted diligence, and negotiated multiple investment documents specific to their investments, their expectations can be better inferred from the agreements that they executed with the Debtors than can the account holders' expectations based on the Terms of Use.

---

[11] *See* Senior Secured Convertible Promissory Note Purchase Agreement, dated September 2, 2021, by and among Celsius Network Limited, Celsius Network Inc., and the Purchasers party thereto; Amended and Restated Senior Secured Convertible Promissory Note Purchase Agreement, dated October 8, 2021, by and among Celsius Network Limited, Celsius Network Inc., and the Purchasers party thereto (together, the "<u>Note Purchase Agreements</u>," and each, an "<u>Note Purchase Agreement</u>"); Amended and Restated Subscription and Shareholders' Agreement, dated December 3, 2021, by and between the Lead Investors, the Participating Investors, the Existing Shareholders, and the Company (the "<u>Subscription & Shareholders' Agreement</u>"); Lead Investor Agreement, dated December 3, 2021, by and between the Lead Investors, Celsius Network Inc., and the Company (the "<u>Lead Investor Agreement</u>" and together with the Note Purchase Agreements and the Subscription & Shareholders' Agreement, the "<u>Preferred Equityholder Contracts</u>"); *see also* Articles of Association of Celsius Network Limited, dated December 3, 2021 (as amended).

28.     The Series B Preferred Holders made secured loans (in the form of convertible secured notes) to CNL on September 2, 2021 and October 8, 2021 and converted their secured notes to preferred equity on December 3, 2021.  *See generally* Preferred Equityholder Contracts. The original Notes Purchase Agreements CNL executed with the Series B Preferred Holders contained several traditional creditor protections, including restrictions on the ability of CNL and its direct and indirect subsidiaries to incur additional debt.  *See* Note Purchase Agreements § 6. The documents governing the Series B Preferred Holders' *equity* investments, in contrast, only reflect protections typically afforded to equityholders, such as restrictions on issuing senior *shares*. Subscription & Shareholders' Agreement § 6.2.  These changes reflect a voluntary decision to give up rights as secured creditors under the Note Purchase Agreements in favor of the potential economic upside associated with an equity position.

29.     The Debtors expect that discovery will reveal that the Series B Preferred Holders were on notice of the recordkeeping deficiencies and other indicia of failures of corporate separateness that plagued the Debtors and proceeded with their investments anyway.  If that expectation reflects reality, the Debtors believe that the asymmetries in information, bargaining power, and experience, the Series B Preferred Holders' conscious decision to abandon a secured credit investment in favor of the upside (and risk) of an equity investment, and the fact that substantive consolidation is an equitable remedy all weigh in favor of a substantive consolidation under the creditor expectation prong.  In any event, the *Augie/Restivo* test is disjunctive.

**B.      Substantive Consolidation is Also Warranted Under the Hopeless Entanglement Prong.**

30.     The hopeless entanglement test alone supports substantive consolidation. Under the hopeless entanglement test, substantive consolidation may be ordered if a court determines that "the time and expense necessary even to attempt to unscramble [the debtor's

records] [is] so substantial as to threaten the realization of any net assets for all the creditors or where no accurate identification and allocation of assets is possible." *Augie/Restivo*, 860 F.3d at 519 (internal citation omitted); *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 766 n.10 (Bankr. S.D.N.Y. 1992) (approving substantive consolidation where, among other things, "in one adversary proceeding . . . discovery pertaining to one singular intercompany transaction took months to complete before it was up for adjudication"); *WorldCom*, 2003 WL 23861928, at *37 ("[Disentanglement] would take so long and be so costly such that creditors as a whole would be substantially harmed by the effort. Thus, disentangling the financial affairs of the debtors was a practical impossibility."). To determine whether entanglement is "hopeless," courts will engage in a balancing test, weighing the cost, expenses, and delay associated with disentanglement against the potential benefit to creditors. *WorldCom*, 2003 WL 23861928, at *36 ("When deciding whether to order substantive consolidation, the courts in [the Second Circuit] also use a balancing test to determine whether the relief achieves the best results for all creditors.").

31.     The Debtors' recordkeeping deficiencies—particularly with respect to intercompany transactions—are well documented in these cases. *See generally Final Report of Shoba Pillay, Examiner* [Docket No. 1956] (the "Examiner Report"); Intercompany Statement.[12] Contemporaneous internal communications reflect similar conclusions. In February 2021, Alex Mashinsky, a representative of both CNL and LLC, wrote, "We are 3 years old and we still don't have any way to reconcile what we owe our customers vs. what our borrowers owe us." Examiner Report at 193.

---

[12] The Debtors were unable to fulfill certain Examiner requests due to the unavailability of records. *See* Examiner Report at 44–45. Ultimately, the Examiner recreated financial statements for various entities from Celsius' accounting software files, which the Examiner found differed from the financial statements created by Celsius. Examiner Report at 44. As of the filing of this Motion, the Debtors still have not finalized audited financials for 2021.

32.     The accompanying legal documents also support substantively consolidating LLC and CNL.  To effectuate the migration, CNL and LLC entered an Asset Transfer Agreement, effective August 19, 2021 (providing for the transfer of certain assets and liabilities) (the "Asset Transfer Agreement") and an Intercompany Operation and Loan Agreement, effective August 19, 2021 (the "Intercompany Loan Agreement") to facilitate continued cryptocurrency deployment activities at CNL.  Although the migration of customer accounts from CNL to LLC ostensibly occurred in August 2021, the Asset Transfer Agreement and Intercompany Loan Agreement effectuating the transfers were not finalized until December 2021.  Examiner Report at 365. Further, rather than specifically describing the transferred assets, the Asset Transfer Agreement described the transfers categorically and references only a transfer of "rights":

> All of [CNL]'s obligations related to or resulting from the Consenting Users' use of the Celsius App, including any obligation of [CNL] to return collateral following repayment of a loan made to a Consenting User, all obligations to repay loans of cryptographic assets made by Consenting Users to [CNL] prior to the Effective Date and obligations to pay financing fees (known as "Rewards" on the Celsius App) to Consenting Users in respect of loans made by Consenting Users through the Celsius App.
>
> . . .
>
> All of [CNL]'s rights related to or resulting from the balances of the Consenting Users in the Celsius App, including the right to use any collateral used to secure loans to Consenting Users and all cryptographic assets loaned by the Consenting Users to [CNL] prior to the Effective Date.
>
> Asset Transfer Agreement, Ex. 1.

33.     The companion document, an Intercompany Loan Agreement documenting a loan framework under which LLC would loan certain assets to CNL for deployment, is incomplete:  it references, but does not attach, an exhibit describing the loaned assets.  *See* Intercompany Loan Agreement, Ex. 1 ("*[To be added]*") (emphasis in original).

34.     Both the Debtors' Intercompany Statement and the Examiner's Report describe in detail how these agreements were (and were not) accounted for on the Debtors books and records. *See generally* Intercompany Statement; Examiner Report at 364–376.   Following an in-depth review of the relevant financial records, the Examiner concluded that Celsius "generally viewed coins available for deployment on a consolidated basis."[13]   Similarly, the Debtors' advisors have concluded that it may be impossible to fully reconcile the intercompany claims between CNL and LLC.  *See* Intercompany Statement ¶ 7 ("Given the dearth of record-keeping, it may not be possible to fully reconstruct the Intercompany Claim.  If it were at all possible, it would be a time and cost intensive forensic accounting exercise that would likely require the engagement of a forensic accounting firm to manually reconstruct every intercompany transaction at a significant cost to the Debtors' estates.").   These conclusions illustrate a textbook case for substantive consolidation. Accordingly, although rare, substantive consolidation is an appropriate remedy with respect to CNL and LLC on "hopeless entanglement" grounds.

### C.     Additional Factors Support Substantive Consolidation

35.     In evaluating the need for substantive consolidation, courts have considered subfactors beyond the *Augie/Restivo* test.  These factors include the following:

a.     assumption by the parent of contractual obligations of its subsidiaries;

b.     the sharing of overhead, management, accounting, and other related expenses among the different corporate entities;

c.     the existence of intercompany guarantees on loans;

d.     failure to distinguish between property of each entity;

---

[13]   Examiner Report at 365–66.  Reports tracking liquidity of cryptocurrency assets do not include a field designating an entity; assets are deployed from wallets in vaults of CNL and were never moved to vaults in LLC's workspace. Examiner Report at 366.

e.      shifting of funds from one company to another without observing corporate formalities;

f.      parent paying salaries of employees of subsidiaries;

g.      the subsidiary having grossly inadequate capital;

h.      the degree of difficulty in segregating and ascertaining individual assets and liabilities;

i.      the presence of consolidated financial statements;

j.      the parent owning all or a majority of the capital stock of a subsidiary;

k.      the parent, its affiliates and the subsidiary having common directors or officers;

l.      the parent or its affiliates financing the subsidiary;

m.      the parent shifting people on and off the subsidiary's board of directors;

n.      the subsidiary having substantially no business except that with the parent or its affiliates or no assets except those conveyed to it by the parent or an affiliate;

o.      the parent referring to the subsidiary as a department or division;

p.      the directors of the subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent; and,

q.      the parent, its affiliates and the subsidiary acting from the same business location.

*Drexel*, 138 B.R. at 764.

36.      In reviewing the above factors, courts consider "the prejudice resulting from the proposed consolidation against the effect of preserving separate debtor entities." Drexel, 138 B.R. at 764–65 (citing *In re Donut Queen, Ltd.*, 41 B.R. 706, 709–710 (Bankr. E.D.N.Y. 1984)). Several of these additional factors support the Debtors' request for substantive consolidation of CNL and LLC:

- **Failure to distinguish between property of each entity; shifting of funds from one company to another without observing corporate formalities.** Alex Mashinsky stated that he "looked at asset deployments and liquidity as an 'overall'

23

issue for Celsius, not an entity-by-entity issue."[14]  Customer redemptions regarding migrated assets were not tracked, and the intercompany claim was not adjusted. Moreover, the Debtors estimate that CNL's and LLC's books are missing an aggregate of approximately 7,000 intercompany transfers pertaining to cryptocurrency assets.[15]

- **The parent owning all or a majority of the capital stock of a subsidiary.**  LLC is 100% owned by CNL through Celsius US Holding.[16]

- **The parent, its affiliates, and the subsidiary having common directors or officers; the parent shifting people on and off the subsidiary's board of directors.**  As of March 2022, Alexander Mashinsky and S. Daniel Leon were directors of both CNL and LLC.  Moreover, CNL and LLC had the same officers: Alex Mashinsky (Chief Executive Officer); S. Daniel Leon (Chief Strategy Officer); Rod Bolger (Chief Financial Officer); Roni Cohen Pavon (Chief Revenue Officer); Aslihan Denizkurdu (Chief Operating Officer); Ron Deutsch (General Counsel, Head of M&A and Secretary); Oren Blonstein (Chief Compliance Officer and Head of Innovations (also BSA Compliance Officer for LLC)); Tushar Nadkarni (Chief Growth & Product Officer); Trunshedda Ramos (Chief Human Resources Officer); Rodney Sunada-Wong (Chief Risk Officer); Guillermo Bodnar (Chief Technology Officer); Tal Bentov (VP of Lending); and Shiran Kleiderman (Chief Security Officer).[17]

- **The subsidiary having substantially no business except that with the parent or its affiliates or no assets except those conveyed to it by the parent or an affiliate.**  LLC was created to overtake CNL's customer-facing business operations in response to changes in the regulatory landscape in the United Kingdom.[18]

## Conclusion

37.     In recognition of the universal agreement that the expeditious resolution of the intercompany claim(s) between CNL and LLC is of the utmost importance, the Debtors request

---

[14]  Examiner Report at 366.

[15]  *See generally* Intercompany Statement.

[16]  Voluntary Petition of Celsius US Holding LLC; Voluntary Petition of Celsius Network LLC.

[17]  Written Resolutions of the Board of Directors of Celsius Network Limited, dated March 22, 2022; Action by Written Consent of the Board of Managers of Celsius Network LLC, dated March 30, 2022.

[18]  Examiner Report at 363–64, 366–67; July 18, 2022, Hr'g Tr. at 31:20–32:3 ("Up until August of 2021… [CNL] was the customer-facing party for the retail depositors . . . . In August of last year, [CNL] transferred the existing customer accounts down to . . . LLC.").

that the Court order a substantive consolidation of the estates of CNL and LLC on the terms provided in the Order. The Debtors understand that certain stakeholders may prefer an estimation of these claims. Estimation, however, necessarily provides an incomplete answer at a substantial cost, leaving open the door for future complication and litigation. Substantive consolidation, in contrast, is equally appropriate and would provide a final resolution, ending the uncertainty for all involved and cutting off administrative expenses from further depleting stakeholders' recoveries.

## Reservation of Rights

38.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

## Motion Practice

39.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

40.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; (h) the Series B Preferred Holders; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

41.     No prior request for the relief sought in this Motion has been made to this or any other court.


*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York
Dated: May 1, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                     ross.kwasteniet@kirkland.com
                     chris.koenig@kirkland.com
                     dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## ORDER (I) SUBSTANTIVELY CONSOLIDATING
## THE ESTATES OF CELSIUS NETWORK LIMITED
## AND CELSIUS NETWORK LLC AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) substantively consolidating the estates of Celsius Network Limited and Celsius Network LLC and (b) granting related relief, all as more fully set forth in the Motion; and upon the Campagna Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Plan, as applicable.

of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The Motion is granted on a final basis as set forth herein.

2.    The estates of Celsius Network Limited and Celsius Network LLC are hereby substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, and subject to the following sentence: (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.

3.    The substantive consolidation and deemed merger effected pursuant to the Plan shall not affect (other than for purposes of the Plan as set forth in this Order and the Plan) (x) the legal and organizational structure of the Consolidated Debtors, except as provided in the Transaction Steps Memorandum, including, for the avoidance of doubt, the legal existence of any Claim of one Consolidated Debtor against another Consolidated Debtor; (y) defenses to any

Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; provided that any Claim that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of the Consolidated Debtors; or (z) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts.

4.     Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

5.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

6.     Notice of the Motion satisfies the requirements of the Bankruptcy Code and Bankruptcy Rules.

7.      Notwithstanding anything in the Bankruptcy Code or Bankruptcy Rules, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023

_____
MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE