**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
       sam.hershey@whitecase.com
       jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
       gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

### MOTION BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER SUBSTANTIVELY CONSOLIDATING THE ESTATES OF CELSIUS NETWORK LIMITED AND CELSIUS NETWORK LLC, AND JOINDER IN THE DEBTORS' MOTION SEEKING THE SAME RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively the "**Debtors**") hereby files this motion (this "**Motion and Joinder**"), pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), for an order substantively consolidating the estates of Celsius Network Limited ("**CNL**") and Celsius Network LLC ("**LLC**"), and hereby joins in, and incorporates by reference, the Debtors' motion seeking the same relief [Dkt. No. 2563] (the "**Debtors' Motion**") to the extent not inconsistent with the arguments set forth in this Motion and Joinder or other pleadings filed by the Committee.  In support of this Motion and Joinder, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      CNL and LLC are—and always have been—functionally the same entity.  This is true in both the eyes of creditors, who transferred their assets to, or kept their assets with, the Debtors based on the Debtors' representations (and misrepresentation) about the consolidated performance of "Celsius" as a whole, and in the eyes of Celsius itself, which never distinguished between LLC and CNL in its operations, in its books and records, or in its public statements.  Substantive consolidation exists precisely for situations like this.

2.      From July 22 to August 23, 2021, CNL purported to migrate the customer-facing business on the Celsius platform from CNL to LLC, a newly-created shell company incorporated in Delaware (the "**Migration**").  In actuality, the Migration was a sham.  While CNL transferred billions of dollars' worth of liabilities to LLC, CNL retained nearly ***all*** of the assets associated with those obligations, which it then used to deploy in supposedly money-making investments, despite warnings from the Financial Conduct Authority (the "**FCA**"), a UK regulatory authority, that CNL was to cease all retail operations in the U.K.  All told, Celsius engaged in a series of

transactions that purported to separate Celsius's assets from its liabilities, and left LLC, in the words of this Court, "hopelessly insolvent."[2]

3.      Apart from this legal maneuvering, Celsius behaved as if the Migration had not happened.  Celsius, through its founder Alexander Mashinsky, repeatedly assured retail customers that the Migration had no impact on the operation of Celsius.  Indeed, Mr. Mashinsky touted the assets and financial performance of Celsius as a whole—that is, of both LLC and CNL (and, indeed, of other Celsius entities)—and assured customers that deposits on the Celsius platform would reap outsized returns based on the assets and financial performance of "Celsius."  Thus, for retail customers, a deposit with LLC was the same as a deposit with CNL (and with Celsius as a whole).

4.      Internally, Celsius also behaved as if the Migration had not happened.  The agreements purporting to effectuate the Migration were replete with self-dealing, and the documentation of those agreements was shoddy at best, and non-existent at worst.  After its creation, LLC was used as a piggybank for CNL; assets of LLC were transferred or "loaned" to CNL and coins nominally deposited to LLC were held in CNL wallets.  Celsius never had appropriate corporate governance, and no formalities were observed between the two supposedly separate entities.  From Celsius's perspective, CNL and LLC were simply part of the Celsius group of companies within which no distinction was made.  The entities were hopelessly entangled.  For

---

[2] In accordance with the *Order Setting Schedule Regarding (I) Estimation Of Certain Intercompany Contract Claims Between Celsius Network Llc And Celsius Network Limited, (Ii) Substantive Consolidation Of Celsius Network Llc And Celsius Network Limited, And (Iii) Constructive Fraudulent Transfer Claim* [Dkt. No. 2522] (the "**Scheduling Order**"), the Committee is also filing a complaint for fraudulent transfer concurrently with this Motion and Joinder.

instance, coin deployment specialists would take coins from wallets for various purposes without regard to the legal entity that owned the wallet or the obligation the coin was used to satisfy.

5.        In short, as set forth in the Debtors' Motion and herein,[3] substantive consolidation is warranted under governing law, and is necessary to produce an equitable outcome consistent with the expectations of creditors and the manner in which the affairs of LLC and CNL were conducted.

## LEGAL STANDARD

6.        "The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." *Union Sav. Bank v. Augie/Restivo Baking Co.* (*In re Augie/Restivo Baking Co.*) 860 F. 2d 515, 518 (2d Cir. 1988).  The goal of the analysis is to ultimately determine "whether equitable treatment will result from substantive consolidation," *id.*, "without any undue prejudice to any particular group." *In re Food Fair, Inc.*, 10 B.R. 123, 127 (Bankr. S.D.N.Y. 1981).

7.        Courts have identified numerous factors that may be considered in determining whether entities should be consolidated, "including whether the entities share costs or obligations; fail to observe corporate formalities; or, in the case of a subsidiary and parent, fail to act independently." *Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 552 (S.D.N.Y. 2008).  Other factors considered include: failure to distinguish between the properties of each entity, shifting of assets between the entities without observing formalities, the subsidiary having grossly inadequate capital, the parent owning all or a

---

[3] To avoid burdening the Court with duplicative briefing, the Committee joins in and adopts the factual background and arguments set forth by the Debtors in the Debtors' Motion, to the extent not inconsistent with the Motion & Joinder, as well as any other motions filed by the Committee, including its class proof of claim [Dkt. No. 2556] and complaint for fraudulent transfer filed concurrently herewith. The Committee files this Motion & Joinder to highlight certain additional grounds for substantive consolidation from the Committee's perspective. The Motion & Joinder, as well as the Debtors' Motion, are filed prior to any discovery by the Committee, in accordance with the Scheduling Order. Accordingly, the Committee reserves the right to amend, supplement or modify the allegations and arguments in the Motion & Joinder.

majority of the capital stock of the subsidiaries, the parent and the subsidiaries having common directors and officers, the directors of the subsidiary not acting independently in the interest of the subsidiary, and others. *In re Drexel Burnham Lambert Group, Inc*., 138 B.R. 723, 764-65 (Bankr. S.D.N.Y. 1992). "[A] decision to substantively consolidate affiliated debtors need not be supported by the presence of all such factors." *In re WorldCom, Inc*., No. 02-13533(AJG), 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003). As shown below, a substantial number of these factors are satisfied here.

8.      Under the "*Augie/Restivo* test" or "*Augie/Restivo* prongs," the Second Circuit synthesized these factors, which it identified as "merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled [that] consolidation will benefit all creditors." *In re Augie/Restivo Baking Co*., 860 F.2d at 518 (internal citations and quotation marks omitted).

9.      This test is "in the disjunctive and the presence of either [prong] may justify . . . substantive consolidation." *Official Comm. Of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006).

10.      The first *Augie/Restivo* prong is "applied from the creditors' perspective." *In re 599 Consumer Elecs., Inc*., 195 B.R. 244, 249 (S.D.N.Y. 1996). "The inquiry is whether creditors treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers, viewed the [debtors] as one enterprise." *Id.* (emphasis in original). As the Second Circuit stated in *Augie/Restivo*, the importance of this prong derives from courts' concern for the reasonable expectations of creditors:

> [C]reditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of

that loan. Such lenders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Such expectations create significant equities.

*In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518-19.

11.     Notably, the expectations of equityholders are not relevant to the creditor reliance prong because such equityholders are not creditors. *See, e.g., Eastgroup Props. v. Southern Motel*, 935 F.2d 245, 250 (11th Cir. 1991) (indicating that a relevant factor supporting consolidation was that "absent substantive consolidation, the majority of the creditors will receive only a small portion of their claims, while the equity interest holders may receive a substantial distribution….").

12.     In sum, "substantive consolidation may be authorized whenever it will benefit the debtors' estates without betraying legitimate expectations of the debtors and their respective creditors." *In re Murray Indus., Inc.*, 119 B.R. 820, 829 (Bankr. M.D. Fla. 1990).

## ARGUMENT

## I.     CELSIUS PROMOTED ITSELF AS A CONSOLIDATED ENTITY

13.     Account holders treated Celsius as a single entity and were encouraged to do so by the Debtors. From its inception to its chapter 11 filings (when it ceased accepting new deposits), Celsius always pitched itself to customers and creditors as a single, unified company that offered integrated services despite the technical creation of separate entities, including the Delaware-incorporated LLC. No distinction between Celsius entities generally (much less CNL and LLC specifically) was made to creditors, who were led to believe (and thus legitimately expected) that they were dealing with one consolidated "Celsius" entity.[4]

---

[4] In its March 9, 2023 Order, this Court specifically observed that the "Terms of Use" agreement between Celsius and its account holders, which supposedly set up LLC as the customer-facing entity, was carelessly drafted and ambiguous. *See Memorandum Opinion Regarding which Debtor Entities have Liability for Customer Claims Under the Terms of Use* at 10-11 [Dkt. No. 2205] (the "**Customer Claims**

14.     For example, in order to entice people to give Celsius their cryptocurrency, Celsius marketed itself to users as a "one stop shop" for all crypto needs.[5]  Celsius differentiated itself from its competitors by permitting users to access a multitude of integrated services on its platform including earn, custody, swap, loans, and more.  Celsius also applauded its diverse method of generating yield including institutional lending, crypto trading strategies, and Bitcoin mining operations, without regard to which Celsius entity nominally conducted which activity.

15.     Celsius's sales pitch started from the very top.  Mr. Mashinsky was the spokesperson and face of Celsius from its inception.  He was a director of CNL and Celsius Network Inc.  He served as the Chief Executive Officer of both CNL and LLC from both of their inception until September 27, 2022 (as well as positions at other Celsius entities).  Upon information and belief, Mr. Mashinsky served on the Executive Committee and the Assets and Liabilities Committee of CNL until the end of his tenure at Celsius, the Risk Committee of CNL from its inception on December 20, 2020 through August 2021, and other Celsius committees from time to time.  It also does not appear that LLC held any separate board meetings or had any separate committees.

16.     Celsius became well known for its "Ask Mashinsky Anything" (AMA) segments, where Mr. Mashinsky would host a live webcast with Celsius's community to promote Celsius, answer questions, share news and updates about the Company, and encourage users to give Celsius

---

Opinion").  Moreover, those Terms of Use included not only LLC as a contracting party but also each of LLC's affiliates, including CNL.  *Id.* at 19. Although the Court held, based upon extrinsic evidence, that customers have contract claims against only LLC under a limitation of liability provision that the Court found to be ambiguous, that ruling is under appeal and, in any event, the Court recognized that this provision did not foreclose non-contract claims against CNL.  *Id.* at 37-28. Moreover, the Court further stated that the issue of substantive consolidation was not being decided in the Customer Claims Opinion.  *Id.* at 3 n.1.

[5] Cision PR Newswire, *Celsius confirms over $10B in digital assets*, (Mar. 10, 2021) (quoting Alex Mashinsky: "Celsius is a one-stop-shop for crypto yield income and low-cost margin loans"), https://www.prnewswire.com/news-releases/celsius-confirms-over-10b-in-digital-assets-301244864.html.

more cryptocurrency (or leave their cryptocurrency with Celsius). During these AMAs, which were linked to on the Celsius website and viewed by tens of thousands of people, Mr. Mashinsky discussed the growth of Celsius and how user assets were being used to diversify and grow Celsius as a whole, without distinguishing among corporate entities.

17.    To make customers feel safe in transferring their coins, Mr. Mashinsky referred to Celsius as a whole (not to LLC particularly) and assured customers that in the event of any financial default, customers would be made whole from _**all**_ of Celsius's assets, what he described as "legs of the stool":

> Also, it's important to understand that, for Celsius to be able to raise this amount of money, tells you that your funds are safe. ***Because let's say that something bad happens. We first have to return all your funds.  And now there's 400 million dollars extra on top of the 2 billion that we have in CEL token and you know mining business and a lot of other things that we own, we have a lot of assets, another 400 million in cash, and all of that comes only after we return the assets to the community, if something bad happens***. So compare that to other people you give your coins to… can they show me their balance sheet?[6]

18.    At all times when Mr. Mashinsky referred to Celsius's total assets, he shared consolidated asset totals from Celsius as a whole (not LLC particularly). For example:

> The 100th largest bank had 15 billion in assets. I think it was bank of Hawaii, and with 15 billion in assets – so uh with – with us adding 300 million a week, on top of the 17 or 18 billion we already have, and us paying 20 times more in interest, or 30 times more in interest, than the average bank, when are we going to become one of the largest banks -- or the banks that or – or one of the largest institutions paying interest or the one paying the most interest in the United States?[7]

> We're probably something like 28 billion in assets… No one is even close.[8]

---

[6] Celsius Network, *Celsius AMA - Ask Mashinsky Anything – October 15th 2021*, YouTube (Oct. 15, 2021), at 33:25, https://www.youtube.com/live/N7oBe22Mvoc?feature=share.

[7] Celsius Network, *Celsius AMA - Ask Mashinsky Anything – Friday 13th of August 2021 California loans Part 2*, YouTube (Aug. 13, 2021), at 35:52, https://www.youtube.com/live/V7pEW7qFdP8?feature=share.

[8] Celsius Network, *Celsius AMA - Ask Mashinsky Anything – October 15th 2021*, YouTube (Oct. 15, 2021), at 35:49, https://www.youtube.com/live/N7oBe22Mvoc?feature=share.

19.     In addition, Mr. Mashinsky regularly spoke about the Celsius mining operations and its investment in mining.  In so doing, Mr. Mashinsky never mentioned that mining operations were conducted by a separate corporate entity, much less one distinct from LLC, the entity where users ostensibly transferred their coins.  In fact, he repeatedly said the opposite, representing to account holders that the Debtors' mining operation was available to support account holder claims.[9]  When Celsius invested nearly $500 million into its mining operations, Mr. Mashinsky shared the "big news" on his AMA explaining that:

> We felt we didn't have enough investment in mining business to be able to grow to 10 or 100 million users uh and you know we contract out relying on exchanges relying on institutions on mining on defi on lending to the community right retail lending.  ***Those are the main legs of our stool and uh once in a while we would make different investments in those different legs to really beef up the leg each leg to make sure that the stool can carry additional weight as we're getting heavier and heavier.  And this is part of like our competitive advantage is that we have diversified sources of yield*** and this include what we're building with Celsius X is a whole other arm of the company to diversify our yield keep the rates as high as possible….[10]

20.     Mr. Mashinsky summarized the situation as "everything Celsius does, one way or the other, actually translates into you having more coins."[11]

21.     In short, Celsius never advised customers that investing with LLC could lead to separate and distinct repercussions from investing with CNL, or that customers' access to their

---

[9] *See* Celsius Network, uploaded Feb. 7, 2022, What Does Investment in Bitcoin Mining Mean for Celsius? [video] (available at https://www.youtube.com/watch?v=ymHIfpxXv04) (explaining the rationale behind Celsius's increased investment in mining and stating "for us to have sustainable ways to pay yield, we need also sustainable ways to earn yield."); Celsius Network, uploaded June 28, 2021, Celsius mining Bitcoin helps the company and the community [video] (available at https://www.youtube.com/watch?app=desktop&v=nQ352qf1fzI) (explaining that the mining business benefitted the community and stating that "it is another source of yield for us," and "it is a factory that makes Bitcoin, we pay most of our interest in Bitcoin . . . it's just one-to-one exposure reduction for us.")

[10] Celsius Network, *Celsius AMA - Ask Mashinsky Anything – 26th November 2021*, YouTube (Nov. 26, 2021), at 4:22, https://www.youtube.com/live/NLBqTgAffQ4?feature=share.

[11] Celsius Network, *Celsius AMA - Ask Mashinsky Anything – 20th August 2021*, YouTube (Aug. 20, 2021), at 26:16, https://www.youtube.com/live/ayqyEggf_xE?feature=share.

assets or ability to recover from Celsius might in any way be limited or otherwise affected because they invested with LLC rather than CNL.  To the contrary, in regular, routine, and repeated communications to customers, Celsius marketed itself as an integrated entity, and creditors always understood that investing their assets with LLC was the functional equivalent of investing their assets with CNL; there was no distinction at all.  In fact, in a June 23, 2021 Celsius Community Update, Celsius announced the Migration to customers and assured that "all Celsius services for all existing customers remain unchanged."[12]

22.    Finally, as noted above, the expectations of the Series B Preferred Holders are not relevant to the creditor reliance prong because the Series B Preferred Holders are not creditors. *See Eastgroup Props. v. Southern Motel*, 935 F.2d 245, 250 (11th Cir. 1991) (indicating that a relevant factor supporting consolidation was that "absent substantive consolidation, the majority of the creditors will receive only a small portion of their claims, while the equity interest holders may receive a substantial distribution….").

23.    In sum, creditors thought of Celsius as one entity, becuase that is what they were sold, over and over again.  *See In re Augie/Restivo Baking Co.*, 860 F. 2d at 518 (first prong for substantive consolidation is "whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit").

## II.    Celsius Never Considered CNL and LLC to Be Separate Entities, and the Affairs of Both Entities Are Hopelessly Entangled

24.    The fact that Celsius marketed CNL and LLC to customers as a consolidated entity is no surprise, given that Celsius itself never considered CNL or LLC as separate entities, nor did it employ any distinction between the two – or any other Celsius entity – in its decision-making

---

[12] Celsius Network, *Celsius Community Update — June 23, 2021*, Medium (June 23, 2021),
https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091.

processes and deliberations.  Additionally, the affairs, books and records of CNL and LLC are, and always have been, hopelessly entangled.  A few of the most glaring examples are set forth below, though the Committee expects that discovery will uncover many more:

25.    **No Accounting for Intercompany Loans.**  In theory, as LLC satisfied customer obligations over time, LLC's intercompany receivable and CNL's intercompany payable should have been reduced.  As a practical matter, however, to the Debtors did not tie customer redemptions to assets transferred to LLC to settle those obligations, and thus the receivables and payables were not adjusted.  In fact it is not even clear which entities' assets were used to satisfy customer obligations, as Celsius appears to not have had any process to identify which entity's assets were used to satisfy its obligations to customers.  As a result, LLC's records reflect a multi-billion dollar asset in the form of an intercompany receivable from CNL[13], which the Debtors have said does not accurately reflect the status of that account receivable and would take "a time and cost intensive full forensic accounting exercise that would likely require the engagement of a forensic accounting firm to manually reconstruct every intercompany transaction at a significant cost to the Debtors' estates."[14]

26.    **No Accounting for Deployment of Assets.**  Accounting entries were not made reflecting the hundreds if not thousands of individual transactions involving the deployment or unwinding of deployments of Celsius assets.  Instead, month-end adjustments to equity were made reflecting the overall changes in the value of assets deployed by CNL.  Accounting for crypto asset

---

[13] *See, e.g.*, *Final Report of Shoba Pillay, Examiner* [Dkt. No. 1956] (the "**Examiner Report**") at 368.

[14] *Declaration of Robert Campagna, Managing Director of A&M in Support of Debtors' Statement with Respect to Intercompany Claims Held by Debtor Celsius Network LLC Against its Debtor Affiliates*, [Dkt. No. 2092, Ex. A] ¶ 10.

transactions in this manner did not allow for an accurate accounting of the intercompany receivables and payables booked with respect to the migrated customer assets and liabilities.[15]

27.    **Coins Deposited in LLC Were Held In CNL Wallets**.  Most coins, including coins deposited to LLC, were held in wallets owned by CNL, not in wallets controlled by LLC.[16] Thus, a deposit by a customer into LLC would immediately be transferred to CNL.[17]

28.    **CNL Continued to Deploy Coins that Were Deposited**.  Furthermore, despite Celsius advising customers in a convoluted and ambiguous manner that their engagement following the Migration would be with LLC, CNL (and not LLC) continued to manage and deploy these coins to generate yield after the migration.[18] *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Dkt No. 393], Ex. K.  Indeed, one purpose of the conflicted, delayed, incomplete, and, in one case, unexecuted documents governing the Migration was to accomplish this result so that returns could be generated for Celsius.  Thus, LLC's business with account holders was integrated with and tied to the business of Celsius generally, including CNL—among other things, that business could not work unless the deployments effectuated by CNL generated sufficient returns

---

[15] *See, e.g.*, Examiner Report at 368-69.

[16] *See, e.g.*, Examiner Report, Appendices 18 (Freeze Reports), 23 (Waterfall Reports); *see also* Examiner Report at 370-72; October 13, 2022 Section 341(a) Meeting Tr. [Dkt. No. 1798, Ex. 6] at 65:18-21 (Q: "Mr. Colodny: Okay, where did the liquid crypto 19 that's currently held in Fireblocks by Celsius Network LTD come from?"  A: (Mr. Ferraro) "It's predominantly customer coins.").

[17] Indeed, it is not clear (and it will be explored through discovery) whether customers actually deposited coins into wallets controlled by LLC, or rather wallets controlled by CNL.  It is also not clear if there was any distinction in the receipt and control over coins loaned to Celsius Lending through the borrow program, further highlighting the failure to respect corporate formalities.

[18] Celsius further required certain customers to acknowledge Terms of Use via a pop-up that advised customers that "the services will be provided to me by [LLC], and that [CNL] shall transfer to [LLC] my data, account balance, and its rights and obligations to me."  *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin*, Exhibits A-7 and A-9.

to pay rewards to customer **and** CNL actually passed the requisite amounts on to LLC.  Further

underscoring the interconnectedness of the customer-facing business with that of Celsius generally

is that assets deposited by customers were used to buy assets nominally owned by entities other

than LLC.  Moreover, significant amounts of customer coins deployed by CNL were used to prop

up the price of CEL token issued by CNL "acting on behalf of the Celsius group . . . ."[19]

29.    **Complete Absence of Corporate Controls**.  Celsius lacked any formal corporate

governance structure, including any corporate controls or ability to track assets and liabilities.  For

example, as one Celsius internal document memorialized, Celsius relied on an "[a]bsolutely

pathetic systems of record – We do not do a good job of knowing anything about how our assets

are actually performing. Our systems of record are horrible, and cause the team to operate in a

manner . . . [that] can cause us to take on excessive risk."[20]   It is also not clear whether Celsius

had any consistent policies regarding how records were kept—if they were kept at all.

30.    **No or Insufficient Documentation**.  Celsius's lack of distinction between CNL

and LLC is further demonstrated by the woefully deficient documentation of the Migration and

the establishment of LLC, which reflects a general disregard of corporate form or corporate

separateness.  For example, even though the Migration purportedly concluded by August 2021,

the intercompany arrangement between CNL and LLC was not formally documented until more

than four months later.[21]   In the interim, CNL continued to deploy billions of dollars of crypto

assets associated with the business it had supposedly "migrated" to LLC.  Moreover, the fact that

---

[19] Whitepaper, Celsius, https://celsius.network/static/celsius-whitepaper.pdf (last visited January 29, 2023), at 35.

[20] Celsius, Internal Company Document, CEL_EXAM-00088466 (March 5, 2021); *see also* Examiner Report at 194-95.

[21] *See e.g.,* Asset Transfer Agreement, CEL_EXAM-00051261 (entered into on December 29, 2021, but backdated to an effective date of August 19, 2021); Novation Agreement, CEL_EXAM-00028836 (effective date of August 19, 2021); *see also* Examiner Report at 365-366.

Celsius backdated these agreements calls into question whether the relevant transactions were properly recorded when they were made, particularly given the absence of contemporaneous schedules of these transactions.[22]

31.    **Lack of Arms-Length Dealings**.    The agreements between CNL and LLC that effectuated the Migration were not arms-length agreements.    For example, the signatory for these agreements on behalf of LLC was Daniel Leon, who was a co-founder of Celsius and occupied several positions at CNL, including being a board member and officer.    The agreements also lacked critical elements, like a set interest rate.    Moreover, an Intercompany Loan Agreement between CNL and LLC, which is undated but states an effective date of August 19, 2021, refers to assets to be loaned by LLC to CNL, which are purportedly listed on Schedule A.[23]    Schedule A, however, is blank.    Similarly, a Novation Agreement between the two parties provided that CNL would "execute a separate agreement with [LLC] to contemplate the terms and conditions of this obligation including the arm's length fee paid from [CNL] to [LLC]."[24]    But such a separate agreement was never executed, such fee was never calculated, and such fee was never paid. Further, the Novation Agreement is undated and does not appear to have even been executed.

32.    **Inadequate Capitalization**.    Additionally, as noted above, LLC was never adequately capitalized as a result of the Migration.    In fact, LLC received *no* capitalization at all, given that CNL transferred *over $10 billion* of obligations to LLC without transferring *any* assets, and the agreements governing those transfers did not include any date for repayment to LLC, timeline for interest payments to LLC, or interest rate to be paid to LLC (nor was interest ever

---

[22] Nor is it clear whether Celsius consistently booked internal and external liabilities in coin- or dollar-denominated terms.

[23] Intercompany Operation and Loan Agreement (the "**Intercompany Loan Agreement**"), CEL-UCC-00000059 (effective date of August 19, 2021).

[24] Novation Agreement, CEL_EXAM-00028836 (effective date of August 19, 2021).

paid).  As this Court has already found, LLC was "hopelessly insolvent" as a result of the

Migration.  *See Mem. Op. Regarding Which Debtor Entities Have Liability for Customer Claims*

*Under the Terms of Use* [D.I. 2205], *In re Celsius Network LLC,* Case No. 22-10964, at 3 (Mar. 9,

2023).

33.    In sum, there is *zero* distinction in CNL's and LLC's accounting, a complete failure

to observe corporate formalities, and a complete failure of CNL and LLC to act independently of

each other.  In such circumstances, substantive consolidation is appropriate.[25]  *Windels Marx Lane*

*& Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.)*, 392 B.R. 541, 552 (S.D.N.Y.

2008) (noting factors that may be considered in determining whether entities should be

consolidated, "including whether the entities share costs or obligations; fail to observe corporate

formalities; or, in the case of a subsidiary and parent, fail to act independently"); *In re Augie/Restivo*

*Baking Co.*, 860 F.2d at 518 (substantive consolidation looks to "whether the affairs of the debtors

are so entangled consolidation will benefit all creditors").

### III.    EQUITY DEMANDS SUBSTANTIVE CONSOLIDATION

34.    Finally, the Committee notes that "[t]he sole purpose of substantive consolidation

is to ensure the equitable treatment of all creditors." *In re Augie/Restivo Baking Co.*, 860 F. 2d

515, 518 (2d Cir. 1988).

35.    Here, substantive consolidation achieves the only equitable result: equal treatment

of creditors.  Absent consolidation, creditors of LLC will be severely prejudiced as they will only

have claims against an entity with massive liabilities without the corresponding assets.  In stark

---

[25] In light of the obvious and hopeless entanglement of the Debtors' affairs, including in particular those of
CNL and LLC, combined with the fact that CNL and LLC were always pitched as a combined "Celsius"
entity to all creditors, the remedy of estimation is both impractical and only a partial solution.  Creditors
should not be forced to rely on incomplete and non-existent corporate documents in order to win an
estimation battle, when the facts as set forth herein already more than justify the remedy of substantive
consolidation.

contrast, creditors (and, indeed, equity holders) of CNL would receive a windfall, recovering from an entity that is free of liabilities while engorged with assets that belong to LLC. Substantive consolidation is therefore essential to avoid harm to LLC creditors who had no knowledge of or reason to expect that LLC's assets would be transferred to CNL with nothing received in exchange—and in fact had every reason to expect the opposite.

36. Making matters worse, the unexpected windfall for creditors and equity holders of CNL, and the unexpected prejudice to creditors of LLC (*i.e.*, Celsius's account holders), that would occur absent substantive consolidation would be purely the result of Celsius's internal, and likely fraudulent, machinations. Indeed, the entire rationale for the Migration was to avoid regulatory scrutiny in the UK by supposedly transferring Celsius's deployment activities to the United States, which Celsius never intended to occur and did not actually occur. Celsius should not be permitted to prejudice the creditors of LLC in furtherance of this fraudulent scheme, particularly when LLC faced significant regulatory issues in the United States.

37. In proposing substantive consolidation, the Committee seeks nothing more than a return to the *status quo* of equality among creditors in light of the manner in which Celsius marketed itself and conducted its affairs. Treating CNL and LLC creditors equally would validate creditors' long-held and reasonable expectations. In these circumstances, the interests of equity demand substantive consolidation. *See Eastgroup Props. v. Southern Motel*, 935 F.2d 245, 250 (11th Cir. 1991) (relevant factor supporting consolidation was that "absent substantive consolidation, the majority of the creditors will receive only a small portion of their claims, while the equity interest holders may receive a substantial distribution…."); *In re Permian Producers Drilling*, 263 B.R. 510, 519 (W.D. Tex. 2000) ("[I]n the absence of consolidation, not only would the unsecured creditors – many of whom did not know that [two debtors] were not distinct entities

– receive less, [the shareholder of one] would receive a substantial distribution on his claim, which is based on his equity investment in [one of the debtors]. Courts have recognized that this type of distribution is the type of harm that should be remedied by substantive consolidation."); *In re Murray Indus., Inc*., 119 B.R. 820 (M.D. Fla. 1990) ("[T]he harm which may result from substantive consolidation is the harm visited on [the equity holder] . . . While equity security holders are parties in interest, it is a generally accepted proposition that the equitable sharing for the purpose of the Bankruptcy Code means an equitable sharing among creditors, not stockholders. In the overall scheme of things, the interest of [the equity holder], as noted earlier, is of the lowest rank in the context of a Chapter 11. Thus, in the last analysis, the equity clearly favors the entire creditors' constituency over the interest of the equity security interest holders.").

## **CONCLUSION**

38.    For the foregoing reasons, the Committee joins in the Debtors' Motion as set forth herein and respectfully moves that the Court enter an order substantially in the form attached to the Debtors' Motion as Exhibit A, substantively consolidating the estates of CNL and LLC.

Dated:  May 1, 2023
         New York, NY

*/s/ Joshua D. Weedman*        .

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
david.turetsky@whitecase.com
sam.hershey@whitecase.com
jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
mandolina@whitecase.com
gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
aaron.colodny@whitecase.com

*Counsel to the Official Committee of*
*Unsecured Creditors*