Immanuel J. Herrmann
Daniel A. Frishberg
*Pro Se Customer-Appellants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

# REPLY IN SUPPORT OF CUSTOMER-APPELLANTS' MOTION FOR A STAY PENDING APPEAL OF THE ORDER REGARDING WHICH DEBTOR ENTITIES HAVE LIABILITY FOR CUSTOMER CONTRACT CLAIMS UNDER THE TERMS OF USE PURSUANT TO FRBP 8007 AND MOTION FOR INDICATIVE VACATUR PURSUANT TO FRBP 8008

Immanuel J. Herrmann and Daniel A. Frishberg ("**We**," the "**Movants,**" and the "**Creditor-Appellants**") hereby file this Reply in Support of our *Motion for a Stay Pending Appeal of the Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use Pursuant to FRBP 8007* and also add a *Motion for Indicative Vacatur Pursuant to FRBP 8008,* based on newly-available information from May 15, 2023 (together, the "**Reply and Motion for Indicative Vacatur**"). In support of our Reply and Motion, we respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## **INTRODUCTION**

As we demonstrate in this filing, based upon newly discovered information regarding lack of actual notice to parties to the Celsius Terms of Use, the Court should issue an indicative ruling stating that the the *Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use*, D.R. 2205 (the "**Customer Contract Claims Opinion,**" "**the Opinion**") and the *Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use*, D.R. 2265 (the "**Customer Contract Claims Order,**" "**the Order**") ***should be vacated*** due to lack of service of process of the *Order (i) Setting a Briefing Schedule and (ii) Granting Related Relief*, D.R. 1747 (the "**Customer Contract Claims Scheduling Order**").

The Customer Contract Claims Scheduling Order paragraph 9 expressly required that "upon entry of this Order, the Debtors shall promptly serve this Order upon all parties in interest, which may be via e-mail to account holders." **That never happened, which is why we respectfully request that the Opinion and Order be vacated.** See *In re Navillus Tile, Inc.*, 634 B.R. 847 (Bankr. S.D.N.Y. 2021) (vacating discharge and plan injunction as to creditor who did not receive proper notice of bar date order and allowing late proof of claim) See also *In re Coudert Bros. LLP*, 562 B.R. 549 (S.D.N.Y. 2016) (holding that former partners did not receive adequate notice of bar date order and that their claims were not discharged by confirmation of plan).

Furthermore, we demonstrate why the Court should grant a stay until the District Court can consider this Court's indicative order to vacate, or, in the alternative, until the appeal is heard if, for some reason, the opinion and order are not vacated.

## <u>THE CUSTOMER CONTRACT CLAIMS OPINION AND ORDER SHOULD BE VACATED–AND THE COURT SHOULD ORDER A STAY UNTIL THE DISTRICT COURT APPROVES THE INDICATIVE ORDER OR, IN THE ALTERNATIVE, HEARS THE APPEAL</u>

The Customer Contract Claims Scheduling Order paragraph 9 expressly required that "upon entry of this Order, the Debtors ***shall*** promptly serve this Order upon all parties in interest, which may be via e-mail to account holders." (Emphasis added.) However, as noted, such an e-mail was never sent to account holders.

Furthermore, the *Amended Final Order (i) Establishing Certain Notice, Case Management, and Administrative Procedures and (ii) Granting Related Relief* (D.R. 1181) ("**<u>The Amended Case Management Procedures</u>**"), paragraph 9, expressly required that service be provided to "***Affected Entities.***" "All entities with a particularized interest in the subject matter of a specific Court Filing, including the entity filing the Request for Relief, are 'Affected Entities' and shall be served with all Bankruptcy Court Filings." This is consistent with Paragraph 9 of the Order.

The December 21 Affidavit of Service[2] does not show service to account holders beyond the Core/2002 list. The March 31 supplemental Affidavit of Service[3] does not show service to account holders beyond the Core/2002 list.

On May 15, we sent the Debtors the letter in Exhibit A. The Debtors replied and told us that "the affidavits of service speak for themselves, and the Debtors are not aware of any service outside of what is referenced in the affidavits of service," and followed up stating that "there is one other affidavit, but it does not change the substantive answer to the question." In addition, we did not receive service of this order ourselves. (See our declarations in Exhibits B and C.)

Such a sweeping order, directing customers regarding which Debtor entities they may and may not file claims again, must be served upon parties in interest, ***as this Court recognized and ordered*** in paragraph 9 of the Customer Contract Claims Scheduling Order and the Amended Case Management Procedures.

The notice and due process failures here materially prejudiced customers, including ourselves. In this case, all customer-parties to the Terms of Use, excepting those on the Core/2002 Service list (which appellants are not) are like the appellants in *In re Motors Liquidation Co.* (2016), where the Second Circuit reversed or remanded most of the Bankruptcy Court's decision that enjoined claims against New GM based on defects in Old GM's vehicles when the Second Circuit found that some claimants did not receive proper notice of the sale

---

[2] *Affidavit of Service,* D.R. 1777. See:
https://cases.stretto.com/public/x191/11749/PLEADINGS/1174912222280000000022.pdf

[3] Supplemental Affidavit of Service, D.R. 2352. See:
https://cases.stretto.com/public/x191/11749/PLEADINGS/1174903312380000000075.pdf

motion and had suffered harm or prejudice as a result, and found that their due process rights were violated and that their claims were not extinguished by the sale.

Cleanly vacating the relevant Order and the Opinion and rolling these issues into the rest of the ongoing litigation with the Preferred Series B Holders will support customers, and it will support expeditiously getting us out of Chapter 11.

As customers who were **materially** *and* **directly** prejudiced, we have standing to ask for this Opinion and Order to be vacated, and we are. We timely appealed, we expressly preserved this issue on appeal, and now, we have shown that we were materially prejudiced vis à vis the Preferred Series B Holders. See, *Appellants Amended Statement of Issues to Be Presented and Designation of Items to be Included in the Record on Appeal*, D.R. 2550, question 6 and footnote 5.[4]

---

[4] Question 6 on appeal states: In *Mullane v. Central Hanover Bank & Trust Corporation*, 339 U.S. 306, 313 (1950), the Supreme Court found that "Many controversies have raged about the cryptic and abstract words of the Due Process Clause, but there can be no doubt that at a minimum they require that deprivation...of property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." This matter was litigated between the UCC and Debtors on one side and the Preferred Series B Holders Series B on the other. Given that customer interests may not have been adequately represented and there was a lack of actual notice that this decision could impact customer claims for a substantial percentage of the estate's assets, were customers denied reasonable notice and opportunity to present their objections in violation of due process?

Footnote 5 states: Notably, not a single Celsius customer, represented or *pro se*, individual or *ad hoc* group, briefed this matter. The parties to the briefing were the UCC (our co-appellant), the Debtors, and the Preferred Series B Holders Series B. The order on appeal was drafted by the UCC, the Debtors, and Preferred Series B holders, and proposed to Chief Judge Glenn for his signature after the Opinion came out. As customers did not have adequate notice that their rights were impacted and the ability to interpose objections, this matter should be remanded for a rehearing with customer participation, in our view. "The fundamental requisite of due process of law is the opportunity to be heard and present objections." *Grannis v. Ordean* 234 U.S. 385, 394 (1914). The result of lack of customer participation was a sparse evidentiary record (as Chief Judge Glenn noted and expressed frustration with in this decision) and should dictate a remand in the interests of justice to give retail customers with pertinent information about the contract an opportunity to participate to avoid the draconian consequence here of channeling significant contract claims held by customers to an entity that, as Chief Judge Glenn notes, is "hopelessly insolvent."

Vacating the Opinion and Order is the *only* way to remedy the material prejudice we had in this matter, and grant us a "fair fight." It will *also* serve judicial economy, as the issue of which entities customers have claims against can now be briefed alongside the other customer litigation already taking place, and the same discovery from those matters will be useful for the matter on appeal. And it will ensure customer rights are protected from irreparable harm, including an otherwise uncertain impact on voting rights on a reorganization plan for Celsius Network Limited and its affiliates for us and other customers.[5]

We respectfully ask that, in light of the new information that has come to light, the Court issue an indicative order informing the District Court that it would recommend vacating the Opinion and Order.

In addition, Customer-Appellants request a stay of the Opinion and the Order. The Customer Contract Claims Scheduling Order[6], which was not served upon customers (except

---

[5] We reserve all rights with respect to a potential future scheduling order around Customer Contract Claims, including the right to meet and confer on a new scheduling order, the right to brief any and all issues, and the right to raise extrinsic evidence that does not uniformly apply to all customers–in other words, the same type of evidence the Preferred Series B Holders entered in support of their side. The first step is to vacate.

[6] Paragraph six of the scheduling order states that: "***The Court's findings of fact, conclusions of law, rulings and orders regarding the Briefed Legal Issue shall be binding on all account holders and other parties in interest <u>for all purposes</u>***, including in connection with confirmation of a chapter 11 plan, in these cases, ***regardless of whether*** any such party participated in the Briefed Legal Issue process. In the event that the Court concludes that the account holders do not have claims against every Debtor based on the Terms of Use (the "Court Ruling"): (i) the Debtors shall amend their Schedules to remove account holder claims scheduled against any and all Debtors found not to be liable to account holders pursuant to the Court Ruling, within five (5) business days of such ruling; (ii) the Debtors shall provide notice of any such amendment to all affected creditors within five (5) business days of the filing of such amendment; and (iii) the Debtors (or any successor to the Debtors pursuant to a chapter 11 plan) shall, prior to any deadline for filing objections to claims set by the Court pursuant to a chapter 11 plan or otherwise, seek to disallow and expunge from the claims register all proofs of claim filed by account holders against those Debtors that the Court Ruling determines not to be liable to such account holders, to the extent such proofs of claim are inconsistent with the Court Ruling." (Emphasis added.)

those few in the attached affidavits), binds non-participating customers who had no say or notice of this Motion to the decision "for all purposes," including plan confirmation. The lack of service of the Customer Contract Claims Scheduling Order **requires** a stay, because the lack of service prevented customers from briefing this matter in the first instance and we were ***entirely*** unrepresented.

If the Court will immediately issue a ruling that supports vacating the Opinion and Order, a stay may not be required. However, if the Court disagrees, or suggests that we file in the District Court, we respectfully request that the Court issue a stay maintaining the pre-decision *status quo* during our process of filing to vacate the order–and during the appeals process in the alternative–which will allow us to avoid seeking emergency relief in the District Court. Additionally, we propose that the Bar Date remain tolled during the stay period, which we hope will be brief if our request to vacate is granted.

We contend that this newly-discovered evidence makes it ***extremely likely*** that we will prevail when we file to vacate–or else on appeal. Conversely, not granting a stay and potentially re-opening the bar date post-appeal would be wasteful and potentially administratively catastrophic if (or more likely ***when***) the order is reversed. Not granting a stay will likely cause us to file for an Emergency Order to Vacate in the District Court, because of the cost, uncertainty, and inefficiency of briefing the appeal versus the quick certainty of vacating the orders; on the other hand, if this Court issues a stay, we can seek to complete the process of vacating these orders, one way or another, on somewhat expedited (but not emergency) basis, or perhaps even

normal time.[7]

Even if these orders and the decision are not vacated due to lack of service, these new service and due process issues mean that we have an exceptional chance of prevailing on appeal and maintaining the pre-decision status quo is safer than risking successive bar date changes.

To clarify, we are **not** requesting a stay of separate litigation moved forward by the Debtors or the UCC in light of the Customer Claims decision (i.e. constructive fraudulent transfer, substantive consolidation, customer class claims, etc.)

We clarify our original filing to state that we believe that a stay until the District Court can rule on the appeal is best (in the event our request to vacate is not granted.) However, a stay through late July or mid-August is still beneficial, and we would support it, reserving the right to ask the District Court for additional relief if the stay expires at a later date.

As one example of how sweeping this ruling is, it states unequivocally that "Customers may assert contract claims arising under the Terms of Use against only LLC and not against any other entity." Rule 3001(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim." Thus, any party objecting to the claim has the burden of introducing evidence sufficient to rebut the presumption

---

[7] We will likely ask the District Court to rule sooner than later, so that appellants and appellees do not have to waste substantial resources preparing briefs if the decision will be vacated due to lack of service. A stay will allow more breathing room if we are asked to pursue this in the District Court and the Court declines to hear, or indicatively rule, on our request.

of validity. *See generally* Collier on Bankruptcy ¶ 3001.09[2] (16th ed. 2019). See also *In re P.R.T.C., Inc., 177 F.3d 774* (9th Cir. 1999) (illustrating the principle that, once a creditor has filed a proof of claim under Rule 3001, the burden shifts to the debtor or any other objecting party to present evidence sufficient to overcome the claim's prima facie validity.) By ordering customers to only file claims against certain entities under the Terms of Use, the Court would effectively reverse this burden and deprive customers of their right to assert their claims against the proper parties. This would violate the *prima facie* validity rule and undermine the fairness of the bankruptcy process.

No briefs or joinders were submitted by customers, *pro se* or represented. Had briefs been submitted, the December 28 deadline was 9 days from entry of the Customer Contract Claims Scheduling Order order on December 19; too short for meaningful participation. Had joinders been submitted, they would have been restricted to "additional arguments or claims that uniformly apply to account holders" (See Customer Claims Scheduling Order, p. 3) The Preferred Series B Holders partly succeeded by introducing evidence that was viewed by *a mere* 55% of customers (such arguments were only admissible via a full brief); customers were prejudiced if they only had a meaningful opportunity to file a joinder (which was still on too tight a timeline to be realistic.)

Even if, by some chance, the arguments or claims from the customers were wholly **uniform** (a concept that is unclear when considering arguments and claims based on extrinsic evidence), such uniformity wouldn't address individual customers' timely-filed claims based on

their signed contracts, including but not limited to the Terms of Use.

Even if the order is not vacated due to lack of service, which it should be, we assert that all parties bound by the Terms of Use (which the Preferred Series B are not parties to) have potential claims against all involved entities and that this decision will be reversed on the Merits, even with the thin record that materially prejudiced us. And even if the District Court determines from the evidence that *some* customer-parties to the Terms of Use do not have contract claims against every entity, it does not imply that ***no customer-parties*** to the Terms of Use can assert claims against all entities or entities other than LLC. Therefore, ***some modifications*** to the Opinion and Order are almost certain. This is because each customer's contractual relationship with Celsius might differ. For instance, one customer may have encountered a specific pop-up, while another did not. One customer might have signed a Loan Agreement that altered their contractual relationship with Celsius, whereas another might not have. One customer may have invoked account closure under the Terms of Use, whereas another might not have.  The principle that contractual obligations and rights can vary from one party to another, even under the same general contract, is well-established in contract law. See *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). In this case, the Supreme Court ruled that a contract is ordinarily a personal obligation, and each party can have different rights and obligations. See also, in *Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820 (2nd Cir. 1990), where the Second Circuit Court of Appeals held that the rights and obligations under a contract can differ for each party based on their individual circumstances.

With everything that has come to light, this decision has a ***very*** substantial likelihood of being vacated before the appeal even begins, or else vacated post-appeal and remanded for retrial. We were already confident that there was ample cause for a stay before the service issues were confirmed. Even failing that, the order has a ***significant*** chance of being reversed on the merits, even based upon the existing record. We believe the totality of the probabilities is now overwhelmingly in our favor. We believe that a scenario where customer contract claims against all entities under the Terms of Use will ultimately prevail, circumventing the complexity of determining which customers can assert contract claims against various entities under the different contracts signed. But if that does not happen on a general basis, we will still seek to carve out properly-filed claims, and reduce this order to a presumption for non-claims-filers who do not produce their own evidence and other relief. In other words, while a generally-applicable ***rebuttable presumption*** could be determined by a group process, ***such presumption should remain rebuttable*** until the final bar date passes and the last claim is filed, afterwhich, properly plead claims should override a generally-applicable order if customers do not have claims against all entities. And, the Court should not use a higher standard for the rebuttable presumption than "preponderance of the evidence." In other words, if a customer submits their own evidence in their claim, such evidence should be admissible under normal standards for a claim.

In the leadup to the hearing on Customer Contract Claims, customers were unable to conduct meaningful discovery in the case, including 2004 examinations to gather and enter our own evidence when we requested to do so. For example, the Court declined a customer's discovery request on November 2, 2022, making the **general** statement that "permitting

private-party discovery at this time under Rule 2004 would duplicate efforts, wasting estate resources."[8] In doing so, the Court sent a *crystal clear* message that private-party discovery from customers was not to be permitted until the Examiner's report was complete. The Examiner's report resulted largely in hearsay, but hearsay that is useful to getting documents in the record. However, after the production of the Examiner's Report, requests from Mr. Herrmann to Kirkland to produce specific documents from the Examiner's report went unanswered. It was not until March 31, 2023 when there were actual documents that could *potentially* be entered into evidence via the Examiner's report with hyperlinked attachments. Yet, until that time, the Court continued, full steam ahead, with litigation on key questions that cried out for customer discovery *before* briefing even began.

We have inquiries to make into whether the Preferred Series B Holders had successfully conducted exploratory, general, pre-scheduling-order discovery and had more time to–based upon that discovery–to come up with their legal arguments for their opening brief, time which materially prejudiced creditors who were unable to obtain discovery.[9]

---

[8] See *Memorandum Opinion and Order Denying Victor de las Heras' Motion for an Order Pursuant to Bankruptcy Rule 2004 Compelling the Production of Documents*. Would this Court have allowed non-2004 discovery by customers, particularly *pro se* customers, and compelled the Debtors to comply, in December of 2022 between Christmas and New Year's, in time for customers to write a brief? The answer is no. The Debtors were able to ignore discovery customer requests with impunity at that time with the Court's support, but perhaps **were** cooperating with discovery from the Preferred Series B Holders with regards to the Briefed Legal Issue in the lead-up to the Briefing, and maybe even for months beforehand. If the Preferred Series B Holders were able to conduct informal discovery and build their case, while Customers were barred from doing discovery, then Customers were prejudiced and had no meaningful opportunity to conduct discovery on this matter, particularly given the December 30, 2022 deadline for interrogatories and requests for admission.

[9] We have not yet inquired what discovery the Preferred Series B Holders were able to do before they filed their briefs, but we reserve the right to investigate if the amount of discovery afforded to the Preferred Series B Holders versus the amount of discovery afforded to Customers, prejudiced Customers and put them at a disadvantage in briefing this matter. Doing general discovery before briefing a matter is, of course, necessary and important to formulate one's initial position and legal strategy, and there are reasons that bankruptcies allow for 2004 Examinations and other "fishing expeditions." The Preferred Series B Holders, earlier in the case, sought to file a document under seal because the Debtors considered it confidential. Their request was denied. The document was supposed to be evidence in support of them forming an official committee; the document the Preferred Series B Holders sought to

The Court made the right call in ordering this to be served to all customers (although this did not happen due to the failure of service), but erred in not allowing meaningful customer discovery on this and other matters, and in setting a briefing schedule that was too compressed.

We have a **strong likelihood** of vacatur–or, alternatively, success on the merits of our appeal–as we argue here and will fully argue in our appellate brief, if the Customer Claims Decision is not vacated before briefs are due. We need not show a greater than 50% chance of success for a stay, though we believe we have a *far greater* than 50% chance, but merely a reasonable likelihood of success. We have already done so in our initial filing and raise **significant, and newly discovered** additional arguments here.

As noted earlier in this filing, Celsius Customers (parties to the Terms of Use) all had a **particularized interest** in the outcome of this Motion. This issue goes beyond the court's procedures. Class action law has been clear that an entire class–or defined group, which is less than the whole group of creditors in a bankruptcy, but more than one party–can all share a particularized interest.[10] No representative or member of the group with the particularized interest briefed the matter, and only a negligible number of those with  particularized interest were even served (save a couple of creditors who filed notices of appearance and were on the Core/2002 list.) No *pro se* creditors participated. No *represented* creditors participated. Nor was anyone appointed to *represent* the Customer class, or parties to the Terms of Use, by this or any

---

enter was presumably not made available to customers at the same time it was made available to the Preferred Series B Holders, or it would have not have been under seal to begin with.

[10] Including in a bankruptcy context. See *In re Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), where the Second Circuit Court of Appeals held that a certain class of ignition switch plaintiffs, which was not all plaintiffs, had a **particularized interest** in suing the debtor's successor, because the debtor's bankruptcy sale order did not extinguish their claims.

court. We support the Class Claims Process. The Court needed to give the UCC *standing* to

represent customers in that process, however, and doing so was a big deal. No such standing was

conferred to the UCC in the Customer Claims matter. The UCC only had standing to speak in

their general capacity for all unsecured creditors in this matter, not for parties to the Terms of

Use *as such*. The hearing literally took place without any directly-impacted parties involved. The

lack of any customer appearance is further evidence of the impact of the lack of notice and

service. This violated due process for customers and prejudiced customers (as noted in question

6 of our designation and in general case law on the matter.)


In addition, parties to the Terms of Use were required to be served on constitutional due

process grounds and other precedents, not just based on this Court's rules only. See *Mullane v.

Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). Here, with no customers and no

court-approved class representative, there was nobody *actually representing* customers, the

parties to the Terms of Use, present. So, there was no one there to "safeguard the interests of all,"

in the most basic Constitutional or due process sense. Just three different parties (none of which

were customers, or represented customers) taking different sides and arguing different legal

arguments.


Notice was also lacking in other ways. Customers who signed the Terms of Use (and

potentially other contracts with the Debtors) should have been warned **LIKELY IN ALL CAPS

BOLD LETTERS** by the Debtors that they must submit their individual contract claims for

consideration as part of this Motion, because this Motion could be used to moot, enjoin, estop, or

otherwise bar their individual contract claims against non-LLC entities, where such claims

implicate the Terms of Use. This is *not* theoretical; we can see these types of warnings in other filings, for example, the class claims motion had **ALL CAPS, BOLD, RED** text up top.[11] This order did not. We can also see that the Order directs customers ***not to make*** certain claims. It does not leave wiggle room. This means that December 28, 2022, the initial brief deadline for the Briefed Legal Issue was, it turns out, a preclusive "pre-bar" bar date for customer contract claims, one that may have mattered more than the actual Bar Date for many customers. But customers did not know about it because they were **never served**.

The Court has recognized that 44% of account holders were never shown the pop-up screens that it used as extrinsic evidence in formulating its Opinion and Order, **much less required to accept them**. This Court relied upon evidence that a substantial percentage of customers never saw–but the Scheduling Order stated that joinders should reference only "arguments of claims that ***uniformly apply"*** to account holders. Limiting joinders to joinders is not a problem ***as such.*** Yet the Preferred Series B Holders prevailed using arguments that expressly ***did not*** uniformly apply to customers. Is it any wonder that no customer did that between Christmas and New Years' when creditors weren't even served and didn't even see the scheduling order?

So, hypothetically, even if Customer-Appellants had been served with the scheduling order (which we were not), and even had we decided based upon such service to submit a joinder under the scheduling order (because nine days to complete a brief would have been impossible),

---

[11] See: *Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders*, D.R. 2399
https://cases.stretto.com/public/x191/11749/PLEADINGS/1174904112380000000045.pdf

the scheduling order actually did not allow for joinder-filers to make arguments that didn't "uniformly apply" to customers, such as our own individual interactions with the Debtors, contracts we signed with the Debtors such as Mr. Herrmann's loan agreement, Mr. Frishberg's situation in which the contract with Celsius either is completely null and void (after the material breach in contract after which he voided it) or only exists in the form of the survival terms in section 35, AMAs that **we** listened to but other customers **may not** have listened to that serve as extrinsic evidence for a subset of customers, etc.

The Motion has had similar consequences as a Bar Date–if not ***more severe*** consequences with respect to Customer claims–yet, it lacked notice for those with a ***particularized interest*** as is required by this Court's own rules. Few claims had been filed when the Motion was heard. Now, nearly 30,000 claims have been filed. Paragraph 9 of the Customer Contract Claims Scheduling Order, served as something of an early "Bar Date" for Customer Contract Claims under the Terms of Use–but without the proper procedural protections of a Bar Date, including attendant service requirements for a bar date such as U.S. mail service, and a minimum of 21 days notice.[12]

The Preferred Series B Holders make an entirely circular argument in their reply when they state that "*Jevic* is inapposite here where customers do not have any approved legal right to recover from CNL ***based on the Customer Claims Decision***." But the fact that this decision was incorrectly decided, in our view, is the whole reason we seek to ***stay*** the decision until there ***is*** such a ruling on appeal. The reason Customers don't have an approved legal right to recover from CNL only is because this Court's erred in its Customer Claims decision, which was only

---

[12] There were, in fact, only 9 days notice between when *Order Setting a Briefing Schedule* was entered on December 19, and the December 28 deadline for briefs on the Briefed Legal Issue, and the Motion was not served to Customer parties to the Terms of Use.

because there was no customer participation, in part due to lack of service, in part due to a lack

of evidence in the record, and it part by erring in admitting evidence into the record that applied

to only a subset of customers. That is why we appealed it.

The Preferred Series B Holders claim that "the Customer-Appellants will not be

irreparably injured absent a stay." The opposite is true. The decision does cause us *irreparable*

harm. Celsius customers may lose their right to vote on a reorganization plan for CNL and other

entities, because the decision, which is highly likely to be vacated or otherwise reversed, could

bar customers from voting their contract claims at all entities. Even if customers can

(hypothetically) appeal after a plan confirmation, a plan based on this decision could equitably

moot the appeal and cause customers irreparable harm that cannot be remedied by money

damages or by adjusting the Preferred Series B Holders's recovery later. See *In re Charter*

*Commc'ns, Inc.*, 691 F.3d 476, 483-84 (2d Cir. 2012), where the court recognized that **voting**

**rights are an essential part of the bankruptcy process** and that depriving creditors and

shareholders of their right to vote on a plan **impairs their ability to protect their interests**. The

court also noted that voting rights are not compensable by monetary damages.

The Preferred Series B Holders note that the Debtors' only *proposed* plan so far does not

provide any recovery to the Series B Preferred Holders, despite the Customer Claims Decision.

However, this does not preclude the Debtors, the UCC, or other parties from proposing a

non-consensual settlement under Rule 9019, or modifying their plan, to give the Preferred Series

B Holders some recovery, or some votes on the reorganization plan. Without vacatur, or, in the

alternative, a stay, the Court may approve such plans, or issue rulings based on this decision that

affect other matters, and it may be very difficult to undo the effects later if the decision is overturned due to the principle of equitable mootness. See *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007), where the Second Circuit held that a bankruptcy court should approve a settlement under Rule 9019 only if it is fair and equitable and ***noting that the absolute priority rule applies to pre-plan settlements***. See also *In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007), where the bankruptcy court ***rejected a settlement under Rule 9019 that violated the absolute priority rule*** which gave junior creditors an interest in the reorganized debtor without paying senior creditors in full.

The Preferred Series B Holders's assertion that "all parties in these Chapter 11 cases will be harmed if a stay is allowed that prevents the parties from negotiating or moving forward with a confirmable plan based on the law of the case" overlooks the complexity of the situation. First off, customers didn't receive notice or participate in this decision, and the law of the case is based upon a briefing that included no customer participation cannot and must not remain law of the case. More broadly, the appropriate question is: "Which plan, involving which parties at which entities?" As established in *In re Johns-Manville Corp.*, 801 F.2d 60 (2d Cir. 1986), all creditors must be treated equitably in a bankruptcy proceeding and have a right to vote on the reorganization plan. Customers face **irreparable** harm if we are denied the right to vote on our contract claims at every Celsius entity listed at the top of the Terms of Use. *In re DBSD North America, Inc.*, 634 F.3d 79 (2d Cir. 2011), underscores the significance of allowing creditors to vote on a reorganization plan. Any plan that doesn't permit us a contract-based recovery at each entity mentioned in the Terms of Use potentially causes irreparable harm (unless or until some other litigation restores the pre-order *status quo*.) The Preferred Series B Holders's claim that a

stay would harm all parties is, therefore, woefully inaccurate. The rights of all creditors in a bankruptcy proceeding **must** be considered, as emphasized in *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007). A stay may not harm creditors if it offers an opportunity for more equitable treatment of creditors at each separate entity. If Customers do have claims against each separate entity, but the Preferred Series B Holders do not (and they are lower priority than Customers under the absolute priority rule), then a stay does the opposite of harming creditors. A stay will not rob the Preferred Series B Holders of their right to vote, should they prevail. However, the absence of a stay will deprive us, the Customer-Appellants (and all other customers), of our right to vote at all entities. Therefore, the balance of harms tips towards Customers and away from the Preferred Series B Holders.

Potential violations of the absolute priority rule are of significant concern to us. While our original motion referenced the case of *Czyzewski v. Jevic Holding Corp.* with respect to the absolute priority rule, another pivotal case is *In re DBSD North America, Inc.*, 634 F.3d 79 (2d Cir. 2011). In this case, a company undergoing Chapter 11 bankruptcy proposed a reorganization plan. A group of secured creditors objected, arguing that the plan violated the Bankruptcy Code by unfairly discriminating against them. Both the U.S. Bankruptcy Court for the Southern District of New York and the U.S. District Court affirmed the plan. However, the Second Circuit Court of Appeals reversed these decisions, citing that the plan was neither fair nor equitable, thereby failing to meet confirmation standards. The court emphasized that the Bankruptcy Code's requirement for a reorganization plan to be "fair and equitable" includes adherence to the "absolute priority rule." This rule mandates that senior creditors be fully paid before junior creditors receive any payment. If the Customer Claims Decision is overturned, this Court risks

confirming a plan that does **not** uphold the absolute priority rule. Should we oppose such a plan, we will seek to stay, and appeal, the whole Chapter 11 plan. It is more prudent to issue a stay now and resolve this issue than to later have a Chapter 11 plan deemed unconfirmable on appeal, or be partly stayed with respect to certain issues, which would cause severe harm to all creditors and the estate, and constitute significant value destruction.

Partial substantive consolidation that does not include customer claims against every entity listed at the top of the Terms of Use, or constructive fraudulent transfer, customer class claims, or another mechanism to allow for *some* customer voting in *some* other way on the reorganization of *some* other Debtor entities which is not identical to voting in a scenario where customers had contract claims against all entities. Voting on the plan is both uncertain at this time and does not substitute for fully vindicating our rights if the decision is overturned. In addition, neither we, nor the Court, can know for sure how the other litigation will go.

The harm we will face, should a plan be confirmed based on this order, is irreparable and very severe if the Preferred Series B Holders get any significant recovery where none is due. And the damage will not be compensable by money alone. In terms of financial damages, it is highly likely that the Preferred Series B Holders will recover at 100% the expense of Earn customers. There is also a risk that certain creditors, such as the Borrowers, may secure binding settlements that remain unaltered regardless of the Preferred Series B Holders's recovery. Customers may be unable to consensually settle with other creditor constituencies until this matter is resolved. For that reason, and many other reasons, vacating, and/or a stay, will lead to less litigation and a more streamlined exit from Chapter 11. Finally, as we noted in our original

filing, public interest does strongly support a stay, and we outlined why.

## CONCLUSION

The Court should issue an indicative ruling stating that the Opinion and Order be ***vacated*** due to lack of service of process. In the alternative, a stay of the Opinion and Order should be granted until the District Court either vacates the Opinion and Order or hears our appeal in full. The Court should also grant other relief as necessary and proper.

## CLERICAL CORRECTION

In our original filing, we cited Mr. Herrmann's *Omnibus Objection and Reservation of Rights to the Debtors' Proposed Scheduling Order and the Debtors' Amended Motion for the Entry of an Order (i) Establishing Ownership of Assets in the Debtors' Earn Program, (ii) Permitting the Sale of Stablecoin in the Ordinary Course and (iii) Granting Relief,* which contains the paper *Procedural Due Process Requirements in Bankruptcy Cases*, starting on p. 16. We incorrectly stated the docket number for that filing. The correct docket number is 1417.

## REQUEST FOR PROCEDURAL RELIEF

We request a waiver of certain procedural requirements because we are *pro se,*[13] including the requirement to file a proposed order. We request that the Court consider all arguments raised in this filing due to surprise and newly discovered evidence. We do not object to the Court allowing for parties to file supplemental responses after this argument is orally argued. However, we request that the court consider, and rule on this filing, expeditiously.

---

[13] We also request all other *pro se* relief.

## **RESERVATION OF RIGHTS**

We incorporate by reference our previous reservations of rights and reserve all of our

rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify,

or supplement this filing, to file for relief in the District Court or any other Court as appropriate,

and to raise additional arguments regarding the requested relief at the hearing on May 17.


Respectfully submitted,


*/s/ Daniel A. Frishberg*
Daniel A. Frishberg
*Pro Se*
May 16, 2023

*/s/ Immanuel Herrmann*
Immanuel Herrmann
*Pro Se*
May 16, 2023

IMMANUEL HERRMANN & DANIEL A. FRISHBERG, *PRO SE* CREDITORS

## EXHIBIT A

May 15, 2023

To: Celsius Network, LLC, *et al.*
Cc: Celsius Committee of Unsecured Creditors

We are writing to formally request that the Debtors confirm whether or not the *Order (i) Setting a Briefing Schedule and (ii) Granting Related Relief* (ECF Docket No. 1747) was served upon all "account holders," pursuant to paragraph 9 of the *Order (i) Setting a Briefing Schedule and (ii) Granting Related Relief* (ECF Docket No. 1747), which stated that "upon entry of this Order, the Debtors shall promptly serve this Order upon all parties in interest, which may be via e-mail to account holders" and the Amended Final Order (i) *Establishing Certain Notice, Case Management, and Administrative Procedures and (ii) Granting Related Relief* (ECF Docket No. 1181).

If service was not provided to all "account holders" as required by the *Order (i) Setting a Briefing Schedule and (ii) Granting Related Relief* (ECF Docket No. 1747), paragraph 9, we believe that this can be a way to vacate the order, end this appeal quickly, and roll it into the other ongoing litigation that is taking place–including substantive consolidation, constructive fraudulent transfer, and customer class claims–without the need to file briefs, brief alternative theories, or a large amount of litigation. On the other hand, if it was served, we request that the Debtors conduct an expeditious investigation, and file declarations confirming that it was **fully** served in accordance with D.R. 1747 and 1181, since neither of us were able to locate the records of service of this order on the docket.

Please reply back **as soon as you can**. We will be filing our reply to the preferred tomorrow morning, and we need to hear back by 9:30 AM EST tomorrow (Tuesday, May 16th, 2023) to include your response in our filing. If we do not hear back by tomorrow, we will be requesting at the May 17 hearing that Judge Glenn order you to respond.

If you would have *any* questions or clarifications, or would like to speak by phone, we are available today and tomorrow.

–Immanuel J. Herrmann and Daniel A. Frishberg, *pro se*

## EXHIBIT B: DECLARATION OF IMMANUEL J. HERRMANN

I, Immanuel J. Herrmann, pursuant to 28 U.S.C. § 1746, hereby declare to the best of my knowledge, information, and belief that I did not receive a copy of the *Order (i) Setting a Briefing Schedule and (ii) Granting Related Relief* (D.R. 1747) from the Debtors.

*/s/ Immanuel Herrmann*
Immanuel Herrmann
*Pro Se*
May 16, 2023

## EXHIBIT C: DECLARATION OF DANIEL A. FRISHBERG

I, Daniel A. Frishberg, pursuant to 28 U.S.C. § 1746, hereby declare to the best of my knowledge, information, and belief that I did not receive a copy of the *Order (i) Setting a Briefing Schedule and (ii) Granting Related Relief* (D.R. 1747) from the Debtors.

*/s/ Daniel A. Frishberg*
Daniel A. Frishberg
*Pro Se*
May 16, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2023, a true and correct copy of the *Reply In Support of Creditor-Appellants' Motion for a Stay Pending Appeal of the Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use Pursuant to FRBP 8007 and Motion for Indicative Vacatur Pursuant to FRBP 8008* was filed with the Clerk of the United States Bankruptcy Court in the Southern District of New York and served upon Chambers, the parties to the appeal, and the Core/2002 service list.[14]

*/s/ Immanuel Herrmann*
Immanuel Herrmann
Pro Se
May 16, 2023

---

[14] Core/2002 Service List available at https://cases.stretto.com/celsius/ on May 15, 2023