## **Exhibit B**

### **Class Certification Motion**

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
      sam.hershey@whitecase.com
      jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
      gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) CERTIFY THE CLASS OF ACCOUNT HOLDERS ASSERTING NON-CONTRACT CLAIMS AGAINST THE DEBTORS, (II) APPOINT THOMAS DIFIORE, REBECCA GALLAGHER, AND IGNAT TUGANOV AS THE CLASS REPRESENTATIVES, AND (III) APPOINT WHITE & CASE LLP AS CLASS COUNSEL, IN EACH CASE PURSUANT TO BANKRUPTCY RULE 7023**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 2

PROCEDURAL BACKGROUND............................................................................... 6

STATEMENT OF FACTS .......................................................................................... 7

    I.      CNL Flooded the Market with Misrepresentations and Omissions........... 8

    II.     CNL Lied to Account Holders from the Beginning................................. 12

          A.      CNL Told the Public It Passed Most of Its Revenue
                 to Customers Through Weekly Rewards; It Did Not.................. 13

          B.      Celsius Promised It Did Not Issue Uncollateralized Loans;
                 It Issued Billions in Unsecured Loans, Including to Parties
                 with Questionable Credit Profiles ................................................. 16

          C.      Contrary to CNL's Pervasive Messaging, CNL Undertook
                 Risky Directional Trading Strategies ........................................... 20

          D.      CNL Failed to Disclose that Regulators Forced It to Leave
                 the United Kingdom or the Consequences of that Decision ........ 22

          E.      Celsius Hid that It Was Under Investigation by Regulatory
                 Agencies........................................................................................ 25

    III.    Celsius Orchestrated a Cover-Up........................................................... 27

    IV.    Celsius Recklessly Lost Customer Funds ............................................... 30

    V.     The Class Representatives ....................................................................... 32

ARGUMENT .............................................................................................................. 33

    I.      The Proposed Class Satisfies all Rule 23(a) Requirements .................... 35

          A.      The Proposed Class is Ascertainable ........................................... 35

          B.      The Proposed Class Satisfies the Numerosity Requirement........ 35

          C.      The Proposed Class Satisfies the Commonality Requirement..... 36

          D.      The Class Representatives' Claims Are Typical ......................... 38

          E.      The Class Representatives and Proposed Class Counsel
                 will Adequately Represent the Class ............................................ 41

          F.      The Proposed Class Counsel will Adequately Represent
                 the Class ........................................................................................ 42

    II.     The Proposed Class Satisfies the Requirements of Rule 23(b)(3)........... 43

A.     Common Questions of Law or Fact Predominate over
Individual Claims ........................................................................ 44

B.     A Class Action Is Superior to Other Available Methods for
Fairly and Efficiently Adjudicating the Controversy ................... 56

CONCLUSION ............................................................................................. 59

# TABLE OF AUTHORITIES

## CASES

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2021) .............................................................36, 46, 53

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).........................................................................................44

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
568 U.S. 455 (2013)...................................................................................35, 44

*Basso v. NYU*,
363 F. Supp. 3d 413 (S.D.N.Y. 2019)........................................................ passim

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010)............................................................................39

*Cohen v. JP Morgan Chase & Co.*,
498 F.3d 111 (2d Cir. 2007)............................................................................46

*Dandong v. Pinnacle Performance Ltd.*,
2013 WL 5658790 (S.D.N.Y. Oct. 17, 2013) ...................................... passim

*Ebin v. Kangadis Food, Inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) ......................................................................35

*Elias v. Ungars Food Prods., Inc.*,
252 F.R.D. 233 (D.N.J. 2008)..........................................................................48

*Espinoza v. 953 Assocs., LLC*,
280 F.R.D. 113 (S.D.N.Y. 2011) ......................................................................34

*Famular v. Whirlpool Corp.*,
2019 WL 1254882 (S.D.N.Y. Mar. 19, 2019) .................................................52

*Green v. Wolf Corp.*,
406 F.2d 291 (2d Cir. 1968)............................................................................34

*Hasemann v. Gerber Prods. Co.*,
331 F.R.D. 239 (E.D.N.Y. 2019) ................................................................40, 46

*Howard Marine and Dredging Co Ltd v A Ogden & Sons (Excavations) Ltd*
[1978] QB 574 ................................................................................................55

*In re Aphria, Inc. Sec. Litig.*,
342 F.R.D. 199 (S.D.N.Y. 2022) ......................................................................34

*In re BGI, Inc.*,
    465 B.R. 365 (Bankr. S.D.N.Y. 2012) ........................................................................36, 49, 57

*In re Facebook, Inc.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ..................................................................................34, 42

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ................................................................................................41

*In re Glob. Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................................................39

*In re GSE Bonds Antitrust Litig.*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019)..........................................................................36, 41

*In re Homaidan*,
    2023 WL 2922576 (E.D.N.Y. Apr. 11, 2023) ...........................................................39, 42, 56

*In re Mercedes-Benz Tele Aid Contract Litig.*,
    257 F.R.D. 46 (D.N.J. 2009) ..............................................................................................48

*In re MF Global, Inc.*,
    512 B.R. 757 (S.D.N.Y. Bankr. 2014) ...................................................................... passim

*In re Partsearch Techs., Inc.*,
    453 B.R. 84 (Bankr. S.D.N.Y. 2011) ........................................................................ passim

*In re Petrobras Sec. Litig.*,
    862 F.3d 250 (2d Cir. 2017)..........................................................................................34, 35

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)................................................................................................44

*Johnson v. Nextel Commc'ns*,
    780 F.3d 128 (2d Cir. 2015)................................................................................................44

*Kalish v. Karp & Kalamotousakis, LLP*,
    246 F.R.D. 461 (S.D.N.Y. 2007) ..................................................................................34, 42

*Kleeberg v. Eber*,
    331 F.R.D. 302 (S.D.N.Y. 2019) .......................................................................................49

*Koch v. Acker, Merrall & Condit Co.*,
    967 N.E.2d 675 (N.Y. 2012)..............................................................................................46

*Makaeff v. Trump Univ., LLC*,
    2014 WL 688164 (S.D. Cal. Feb. 21, 2014) .....................................................................46

*Orlander v. Staples, Inc.*,
  802 F.3d 289 (2d Cir. 2015)....................................................................................45

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
  647 N.E.2d 741 (N.Y. 1995)...................................................................................46

*Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
  579 F. Supp. 3d 327 (N.D.N.Y. 2022)...............................................................35, 41

*Rodriguez v. It's Just Lunch, Int'l*,
  300 F.R.D. 125 (S.D.N.Y. 2014)........................................................................40, 50

*Royscot Trust Ltd v Rogerson*
  [1991] 2 QB 297....................................................................................................55

*Springwell Nav. Corp. v JPMorgan Chase Bank*
  *(formerly Chase Manhattan Bank) and others*
  [2010] EWCA Civ 1221.........................................................................................55

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*,
  374 F.3d 158 (2d Cir. 2004)...................................................................................53

*UFCW Local 1776 v. Eli Lilly & Co.*,
  620 F.3d 121 (2d Cir. 2010)...................................................................................44

*Union Ink Co. v. AT&T Corp.*,
  801 A.2d 361 (N.J. 2002).......................................................................................48

*Vargas v. Howard*,
  324 F.R.D. 319 (S.D.N.Y. 2018)............................................................................35

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...............................................................................................36

*Zivkovic v. Laura Christy LLC*,
  329 F.R.D. 61 (S.D.N.Y. 2018)..............................................................................41

## STATUTES AND OTHER AUTHORITY

Fed. R. Civ. P. 23(a) .................................................................................... passim

Fed. R. Civ. P. 23(b) .................................................................................... passim

Fed. R. Civ. P. 23(g) .................................................................................... passim

Fed. R. Bankr. P. 7023 ...................................................................................6, 33

Misrepresentation Act 1967 § 2 ....................................................................54, 55

N.J. Stat. § 56:8-2 ......................................................................................................48

N.Y. Gen. Bus. L. § 349 (2023) .............................................................................45, 46

N.Y. Gen. Bus. L. § 350 (2023) .............................................................................45, 46

### OTHER AUTHORITIES

Adam Hayes, *What Financial Ratios Are Used to Measure Risk?*,
   INVESTOPEDIA (Feb. 16, 2022), available at
   https://www.investopedia.com/ask/answers/062215/what-are-financial-risk-ratios-and-how-
   are-they-used-measure-
   risk.asp#:~:text=The%20most%20common%20ratios%20used,debt%2Dto%2Dequity%20rat
   io .........................................................................................................................19

J.B. Maverick, *What Is the Best Measure of a Company's Financial Health?*,
   INVESTOPEDIA (May 12, 2022), available at
   https://www.investopedia.com/ask/answers/062215/what-are-financial-risk-ratios-and-how-
   are-they-used-measure-
   risk.asp#:~:text=The%20most%20common%20ratios%20used,debt%2Dto%2Dequity%20rat
   io .........................................................................................................................19

7AA Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND
   PROCEDURE § 1779 (3d ed. 2005) ...........................................................................56

5 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 23.25 (3d ed. 2006) ................................41

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases (the "**Chapter 11 Cases**") of the above-captioned debtors and debtors in possession (collectively the "**Debtors**") submits this motion (the "**Motion**") on behalf of Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov, in their individual and representative capacities (collectively, the "**Class Representatives**"), pursuant to the *Order Granting the Motion of the Official Committee of Unsecured Creditors' (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert Non-Contract Claims on Behalf of Account Holders* [D.I. 2496] (the "**Class Claim Order**"). This Motion seeks to (i) certify the class (such proposed class, the "**Class**") of all Celsius account holders as of the Petition Date who were harmed as a result of the Debtors' (1) violation of the New York Deceptive Practices Act, New York False Advertising Act, and New Jersey Consumer Fraud Act, (2) fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and unjust enrichment under New York common law, (3) breach of the implied duty of good faith and fair dealing, (4) fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment under English common law, and (5) violation of section 2 of the Misrepresentation Act 1967 under English law; (ii) appoint Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives; and (iii) appoint White & Case LLP ("**White & Case**") as Class counsel.

In support of this Motion, the Committee relies upon and incorporates by reference the *Declaration of Thomas DiFiore in Support of the Motion* (the "**DiFiore Declaration**"), the *Declaration of Rebecca Gallagher in Support of the Motion* (the "**Gallagher Declaration**"), the *Declaration of Ignat Tuganov in Support of the Motion* (the "**Tuganov Declaration**"), and the *Declaration of Andrea Amulic in Support of the Motion* (the "**Amulic Declaration**"), each filed

contemporaneously herewith.  The Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Here is what all Celsius account holders were told was true: Celsius offered higher rewards than any bank and is safer than any bank.  Those high rewards were possible because Celsius passed 80% of its revenue to its customers (and not its shareholders).  Celsius did not make risky uncollateralized loans or take directional bets on cryptocurrency to generate those high rewards.    Rather, Celsius implemented best-in-class risk management and issued only collateralized loans to well-capitalized institutions.  Celsius had been deemed regulatory-compliant in all jurisdictions in which it operates.

2.        As we now know, those statements were all lies.  Customers, however, reasonably believed these statements because Celsius repeated them over and over on its website, at trade conferences, in online videos, and throughout its other marketing materials.  It conveyed them in its slogan: "Unbank Yourself."

3.        Yet, as Celsius Network Limited ("**CNL**") admitted in internal emails, confidential communications with regulators, and even the First Day Declaration, that was not how Celsius actually operated.  CNL systematically misled its customers and hid the true nature and risk of its business to convince customers to transfer cryptocurrency to, and keep it on, the Celsius platform.  Celsius also failed to inform its account holders of significant risks, staggering losses, and increased regulatory scrutiny regarding its business—including regulatory directives to remove misleading comments from its website and other promotional materials.    CNL's misrepresentations and omissions went to the core of how its business operated and were fundamental to, and pervaded, its sales pitch to customers throughout the life of the business.  The misrepresentations were widely disseminated, repeated, and consistent.

4.      The Class Claim[2] focuses on five categories of material misrepresentations and omissions that CNL made (or did not make) to the Class members: (1) whether Celsius passed a substantial percentage of its revenue to customers through weekly rewards, (2) whether Celsius issued unsecured loans, including to non-traditional finance institutions, and the extent of Celsius's collateral coverage, (3) whether Celsius engaged in risky directional trading, (4) why CNL moved its customer-facing business from the United Kingdom to the United States and the effect of that move on account holders, and (5) the extent of the regulatory investigations, orders, and other directives faced by Celsius.    Not only did CNL consistently make these material misrepresentations and omissions (and subsequently fail to correct them), beginning in 2021, it ***internally acknowledged them*** and engaged in a corporate "censorship process" to attempt to cover up the lies it told to the public.

5.      Celsius also acted recklessly with the digital assets that the Class members had entrusted to it by using them to repurchase its own digital currency in ways that were not disclosed, failing to accurately track its positions and investments, and undertaking risky investments without performing diligence or implementing proper safeguards.  Celsius thereby breached the implied covenant of good faith and fair dealing in the Terms of Use it entered into with all account holders. Because any and all Terms of Use were  procured by fraud, any limitation of liability therein is not effective.

6.      CNL's misrepresentations and omissions induced the Class members to transfer digital assets to, and refrain from withdrawing digital assets from, the Celsius platform.  The Class members have suffered similar injuries resulting from similar conduct that give rise to similar

---

[2]      As such term is defined below.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Class Claim.

statutory and common law claims.  As a result of CNL's unlawful conduct, each account holder is now a general unsecured creditor of Celsius and stands to have his or her claim treated under any plan approved by this Court.

7.      The proposed Class Representatives reflect the proposed Class members' range of experiences.  Tom DiFiore comes from the United States, was an early customer of Celsius who regularly watched Celsius's AMAs and now serves as co-chair of the Committee.  Rebecca Gallagher is a British citizen and a permanent resident of the United States.  Ms. Gallagher invested her life savings with Celsius based on CNL's (through its founder, CEO, and director, Alex Mashinsky) misrepresentations, has been an active *pro se* creditor in these cases, and was selected by the Debtors as a bellwether claimant in their previous claim objections.  Ignat Tuganov is a European citizen who runs a blockchain security firm and invested in Celsius because of CNL's representations regarding regulatory compliance and operations, among others.  All three proposed Class Representatives—like the other members of the proposed Class—transferred substantial assets to Celsius based on CNL's lies and omissions.  Their funds were put at risk and lost through Celsius's, and particularly CNL's, reckless conduct.  They now seek to represent their fellow account holders in pursuit of appropriate compensation for the unlawful conduct that caused losses common to all members of the Class.

8.      The proposed Class here—all account holders as of the Petition Date—satisfies each of the Rule 23(a) requirements and should be certified.  *First*, the Class is ascertainable and so numerous (approximately 600,000 members according to the Debtors' books and records), that joinder is impractical.  *Second*, the claims of the Class Representatives and Class members share common issues of law and fact, including their status as account holders, their receipt of widespread, consistent, and repeated misinformation and material omissions from CNL, Celsius,

and Mr. Mashinsky, violations of statutory laws regarding deceptive business practices and false advertising, and damages from having their assets trapped as a result of these Chapter 11 Cases. *Third,* the claims of the Class Representatives are typical of the Class and the Class Representatives have no interests adverse to the interests of other Class members. *Fourth*, the Class Representatives will adequately represent the class. Each has been active in these Chapter 11 Cases and has sought to bring claims against each Debtor on behalf of all account holders. *Finally*, proposed counsel, White & Case LLP, will also adequately represent the Class because it has done significant work investigating and identifying the claims asserted in the Class Claim and has substantial experience litigating class actions and class claim issues.

9.     The Class is further certifiable under Rule 23(b)(3) because common questions of law and issues of fact predominate over individual ones. Additionally, certifying the Class is more likely to result in a fair and efficient process for returning value to account holders than would requiring each individual Class member to file a proof of claim.[3]

10.     The Committee, therefore, respectfully requests that the Court certify the Class, appoint Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and appoint White & Case as Class counsel.

## JURISDICTION AND VENUE

11.     The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012. The Committee confirms its consent to the Court entering a

---

[3]     The Court, in considering the Class Claim Motion (defined below), has already identified certain "equitable considerations" that weigh in favor of the Class Claim process as more likely to support the "fundamental tent of bankruptcy, which is a fair and equitable distribution of assets to creditors. *See* Transcript of Omnibus Hearing, April 18, 2023 ("**Hr'g Tr.**") at 84:15–86:21.

final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgment in connection herewith consistent with Article III of the United States Constitution.

12.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.    The bases for the relief requested herein are sections 105(a), 1103(c), and 1109(b) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 23 of the Federal Rules of Civil Procedure (the "**Rules**"), and Rule 7023 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## RELIEF REQUESTED

14.    Pursuant to the Class Claim Order, the Committee seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Order**"), (I) certifying the Class under Rule 23, made applicable to this proceeding by Bankruptcy Rule 7023, (II) appointing Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) appointing White & Case LLP as Class counsel.

## PROCEDURAL BACKGROUND

15.    On April 10, 2023, the Committee filed its *Motion (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* [D.I. 2399] (the "**Class Claim Motion**"). The Series B Preferred Holders objected to the Class Claim Motion [D.I. 2467], and the Committee replied [D.I. 2475]. On April 18, 2023, the Court held a hearing on the Class Claim Motion. At the hearing, the Court granted the Class Claim Motion and issued the Class Claim Order.

16.    On April 28, 2023, and in accordance with the Class Claim Order, the Committee filed a proof of claim [D.I. 2566] against CNL and its Debtor affiliates and subsidiaries for

damages arising out of non-contractual claims, including: (1) violation of the New York Deceptive Practices Act, (2) violation of the New York False Advertising Act, (3) violation of the New Jersey Consumer Fraud Act, (4) fraudulent misrepresentation, (5) negligent misrepresentation, (6) fraudulent concealment (7) unjust enrichment,[4] (8) breach of the implied duty of good faith and fair dealing, and (9) violation of Section 2 of the Misrepresentation Act 1967 under English law (the "**Class Claim**").

## STATEMENT OF FACTS

17.    CNL's fundamental promise was that, unlike a bank, Celsius would serve the interests of its "community"— its customers and account holders—rather than its equity holders and insiders.  That was never the case.  That promise was just one of the many consistent and pervasive misstatements and omissions by which CNL misled account holders to trust Celsius with their cryptocurrency.

18.    CNL claimed that Celsius provided higher returns and safer investments than traditional banks.  CNL specifically and repeatedly advertised that, unlike banks, Celsius passed 80% of its gross revenue to account holders.  CNL also specifically and repeatedly advertised that Celsius was safer than a bank because, unlike banks, it was not leveraged, did not issue unsecured loans, and did not engage in risky directional trading.  CNL repeatedly promised the Class members that Celsius had no regulatory issues.  Each of these statements was false, widely and repeatedly disseminated, and made to induce customers to transfer assets to Celsius.  Customers believed those statements and transferred their assets to Celsius based on those statements,

---

[4]    Counts IV – VII in the Class Claim (for fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and unjust enrichment, respectively) are brought under New York common law.  As stated in the Class Claim, Counts IV – VII were also pleaded in the alternative, as violations of English common law for fraudulent misrepresentation, negligent misstatement, and a claim for restitution to reverse the unjust enrichment of CNL at the expense of the Class members.

unaware that, at all relevant times, Celsius, and particularly CNL, acted recklessly with the digital assets customers entrusted to it.

## I.    CNL Flooded the Market with Misrepresentations and Omissions

19.    From its founding to the Petition Date, CNL consistently misrepresented and failed to disclose facts that would be material to any reasonable person's decision to transfer cryptocurrency to Celsius.  Those misrepresentations touched every aspect of its business, including: its initial capital raise, how it determined the interest rates it paid account holders, its loan portfolio and leverage, its trading strategy, and its interactions with regulators.  CNL regularly broadcast these misrepresentations to the public through multiple channels, including the Celsius website and YouTube page, as well as interviews, magazine articles, news stories, tweets, and blog posts.  As intended, CNL's misrepresentations and omissions reached hundreds of thousands of people who relied on them in deciding to transfer over USD$4 billion in cryptocurrency to Celsius.

20.    For instance, CNL's Chief Executive Officer, director, and controlling equity owner, Alex Mashinsky, often gave interviews with third-party media outlets, including CNBC, Real Vision Finance, and iHeart Radio, and cryptocurrency media outlets such as The Business of Blockchain, Coin Central, and White Crypto.[5]  These interviews were available to the public.  CNL also posted some of these interviews on the Celsius website and YouTube page.[6]

---

[5]    CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr. 13, 2022), https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s; "The Exchange" (@CNBCTheExchange), Twitter    (July    21,    2021,    1:59    PM),    at    [2:02], https://twitter.com/CNBCTheExchange/status/1417907168678920192; Real Vision Finance, *Everything You Need to Know About Yield in Crypto* (Jan. 7, 2022), https://www.youtube.com/watch?v=-paNUHyLWlk; Just Get Started with Brian Ondrako, *Alex Mashinsky on Why People Should be Unbanking Themselves*, iHeart Radio (Feb.    10,    2022),    https://www.iheart.com/podcast/269-just-get-started-podcast-61217509/episode/211-alex-mashinsky-on-why-people-92736422/ (last visited May 15, 2023); Celsius Network, *Alex Mashinsky, Celsius CEO, interview at NASDAQ*, YouTube (Mar. 7, 2019), https://www.youtube.com/watch?v=8cIdPpA-pyk; Steven Buchko, *Celsius Network CEO Alex Mashinsky Is Moving from VoIP to* MoIP, Coin Central (Jul. 17, 2022), https://coincentral.com/alex-mashinsky-voip-to-moip-2/; White Crypto, *Celsius network (CEL) $26B TVL Interview with CEO Alex Mashinsky WebSummit. Bitcoin*, YouTube (Nov. 26, 2021), https://www.youtube.com/watch?v=LkZ8XJ-2n1c.

[6]    Celsius Network, *Alex Mashinsky, Celsius CEO, interview at NASDAQ*, YouTube (Mar. 7, 2019), at [3:26],

21.    Mr. Mashinsky also spoke at widely attended cryptocurrency events, including the

World BlockChain Forum,[7] Bitcoin Miami, and BlockShow, an international blockchain affiliated

with the publication Cointelegraph.[8]  Thousands of people attended these events, at which Mr.

Mashinsky would appear on panels and schedule meet-ups to promote Celsius.

22.    And, of course, CNL broadcast its misrepresentations through promotional and

marketing materials.  The Celsius website and official media channels repeated CNL's fraudulent

statements and misrepresentations.  CNL's majority equity owner, director, and CEO, Mr.

Mashinsky, also repeated them on his own Twitter page.[9]  Official Celsius blog posts, which

purported to provide customers with explanations and detailed information about Celsius's

programs and services, also parroted these lies.[10]  So did Celsius's responses to frequently asked

questions and articles posted on its website's "Help Center."[11]  And Mr. Mashinsky's weekly "Ask

Mashinsky Anything" live YouTube broadcasts ("**AMAs**"), which were central to Celsius's

marketing and posted on Celsius's website and YouTube page, consistently misled and failed to

inform customers of material risks and staggering losses, week after week.  In the summer of 2021,

---

https://www.youtube.com/watch?v=8cIdPpA-pyk.

[7]    Events, *Alex Mashinsky – Crossing the Chasm – The Next 100 Million Crypto Users,* YouTube (Jun. 24, 2018), https://www.youtube.com/watch?v=m5W7vNUfguM.

[8]    BlockShow, *Alex Mashinsky. Power vs. People: The War of Decentralization. BlockShow Americas 2018*, YouTube (Oct. 2, 2018), https://www.youtube.com/watch?v=HTENY4DlIqc.

[9]    @CelsiusNetwork,    Twitter    (Apr.    27,    2021,    6:41    PM), https://twitter.com/celsiusnetwork/status/1387175053062672388; Amulic Decl., Ex. 29. Mr. Mashinsky's Twitter account is now private.

[10]    Celsius, *What We Do & How We Do It*, Medium (Aug. 19, 2020), https://blog.celsius.network/what-we-do-how-we-do-it-9a82124f7159.

[11]    Celsius Network, FAQ | How does the insurance work for Lenders?, YouTube (Mar. 3, 2018), at [0:15], https://www.youtube.com/watch?v=VtuXPgyU6us; Celsius, *How do you earn the interest to pay your customers? Is    this    a    ponzi    scheme?*    (Aug.    11,    2021), https://web.archive.org/web/20200811102256/https://support.celsius.network/hc/en-us/articles/360001978817-How-do-you-earn-the-interest-to-pay-your-customers-Is-this-a-ponzi-scheme- (last visited May 15, 2023).  This post has subsequently been removed online.  *See also* Celsius, *How Does Celsius Network make money?* (Sept. 22,    2020),    https://web.archive.org/web/20200922005337/https://support.celsius.network/hc/en-us/articles/360001706797-How-does-Celsius-Network-make-money- (last visited May 15, 2023).

the Financial Conduct Authority of the United Kingdom (the "**FCA**") recognized the problem, noting that ████████████████████████████████████████████ ████████████████████████████████████████ Amulic Decl., Ex. 1 at CEL-UCC-00068311 (emphasis added).

23.    CNL last published audited financials for the year ending 2020 in the United Kingdom (and only then, one year after the end of FY2020).[12]  Apart from those outdated financials, the Class members had few (if any) sources of information (other than CNL) to verify its claims.  Even one of the Class Representatives, who is a blockchain specialist, could not verify CNL's statements.  Tuganov Decl. ¶¶ 5, 9.

24.    CNL took advantage of the fact that it was the sole source of information about Celsius's business practices and financial situation.  For example, on March 14, 2020, after a dramatic drop in the price of Bitcoin, Mr. Mashinsky emailed members of his events and communications teams, stating: ██████████████████████████████ ██████████████████    ██████████████████████ Amulic Decl., Ex. 2 (emphasis added), at CEL-UCC-01647139.

25.    CNL consistently reiterated that, if customers thought that what it was pitching was too good to be true, it wasn't.[13]  Mr. Mashinsky put himself forward as evidence of Celsius's success and *bona fides*—claiming that customers need look no further than him, and the fact that he was Celsius's largest customer, for verification.[14]  The Class Representatives found Mr.

---

[12]    *Celsius Network Limited, Annual Report and Financial Statements for the Year Ended February 29, 2020* (Feb. 29, 2021), attached to the Amulic Declaration as Exhibit 71.

[13]    Celsius Network, *Is Celsius too good to be true? Just give it a try – CEL Bites*, YouTube (Oct. 16, 2021), https://www.youtube.com/watch?v=mKm_eF4ruW8; *see also* Amulic Decl., Exs. 3–4.

[14]    Celsius Network, *Celsius AMA – Ask Mashinsky Anything – Friday November 20,* YouTube (Nov. 20, 2020), at [54:16], https://www.youtube.com/watch?v=ZBPT_p9IlCw ("I'm here to convince you that what Celsius is doing is in your best interest . . . including me with my wallet[]."); Celsius Network, *Celsius AMA - Ask Mashinsky Anything - Friday, November 6,* YouTube (Nov. 6, 2020), at [32:25],

Mashinsky very compelling.  *E.g.*, DiFiore Decl. ¶ 5; Gallagher Decl. ¶ 11.  Unlike other cryptocurrency executives, he made himself available to answer customers' questions.  That availability and openness was integral to their decisions to invest with Celsius.  DiFiore Decl. ¶ 6; Gallagher Decl. ¶ 11; Tuganov Decl. ¶ 8.  The fact that Mr. Mashinsky repeatedly, publicly, and specifically assured customers that Celsius only engaged in safe investments and was regulatory-compliant led each of the Class Representatives, like other Class members, to believe that Mr. Mashinsky's statements were credible and convinced them that Celsius was a safe and reliable crypto platform on which to invest.  *E.g.*, DiFiore Decl. ¶¶ 8–14; Gallagher Decl. ¶¶ 11, 13–16; Tuganov Decl. ¶¶ 8–15.

26.    Mr. Mashinsky was, however, not telling the truth.  In fact, prior to the Petition Date, Celsius hired a third-party risk management and investigation firm to review Mr. Mashinsky's media statements and assess the damage that had been caused by CNL's CEO.  Amulic Decl., Exs. 5–7.  CNL was aware that much of what Mr. Mashinsky repeatedly told customers to encourage them to transfer their assets to Celsius was not true.

27.    The Class Representatives, however, were not.  They consumed and relied on CNL's and Mr. Mashinsky's public misrepresentations and omissions, and transferred their coins to Celsius, as did all Class members.  DiFiore Decl. ¶ 6 (stating that Mr. DiFiore watched "almost every" AMA live, watched replays or read summaries posted on Twitter, and consumed materials on the CNL website); Gallagher Decl. ¶¶11, 13 (stating that Ms. Gallagher watched nearly every AMA live or, if she could not watch live, within a day and also watched interviews of Mr. Mashinsky); Tuganov Decl. ¶ 7 (stating that Mr. Tuganov primarily relied on CNL's press releases,

---

https://www.youtube.com/watch?v=apWkwq8uscU ("Right so, again I'm calling on anyone to come and say Celsius charged me a fee, or Celsius gave me a loan without at least 200 percent collateral right.  Come forward. I'll give you a thousand dollars prize, anyone.").

its website, and the content CNL published on the Internet for information about Celsius, as well as certain summaries of AMAs). Because many of Celsius's transactions were recorded on an internal ledger, it was not possible to audit its financial condition and business operations using the blockchain. *See, e.g.*, Tuganov Decl. ¶ 9.

## II.  CNL Lied to Account Holders from the Beginning

28.      CNL lied to its existing and potential customers from day one. CNL (and Celsius) was founded in 2017 by Mr. Mashinsky and S. Daniel Leon and was initially funded through an initial coin offering ("**ICO**") of CEL issued by CNL.[15] The ICO was not fully funded—it raised only USD\$32 million of its targeted USD\$50 million. Amulic Decl., Ex. 8 at CEL-UCC-00022924. Instead of telling the truth about its capital raise, CNL lied and consistently said that it had raised the full USD\$50 million.[16]

29.      The shortfall was due, in primary part, to Mr. Mashinsky's refusal to purchase USD\$18 million of CEL tokens that he had committed to buy as part of the ICO. Amulic Decl., Ex. 9. The CNL board obscured the failure of the ICO from the public by segregating USD\$18 million of unsold CEL tokens in a separate wallet. Amulic Decl., Ex. 10; Ex. 11. CNL kept that failure a secret from the Class members because it knew that, if it admitted that it had only raised a little more than half of what it had represented to customers, they would move their assets elsewhere. *See* Amulic Decl., Ex. 12 at CEL-UCC-00182002 (███████████████████

████████████████████████████████████████████████████████

███████); Ex. 13 at CEL-UCC-00277650 ████████████████████

---

[15]    White Paper, *Celsius Network*, https://celsius.network/static/celsius-whitepaper.pdf (last visited May 15, 2023).

[16]    Events, *Alex Mashinsky – Crossing the Chasm – The Next 100 Million Crypto Users,* YouTube (Jun. 24, 2018), at [1:41], https://www.youtube.com/watch?v=m5W7vNUfguM; Steven Buchko, *Celsius Network CEO Alex Mashinsky Is Moving from VoIP to* MoIP, Coin Central (Jul. 17, 2022), https://coincentral.com/alex-mashinsky-voip-to-moip-2/; BlockShow, *Alex Mashinsky. Power vs. People: The War of Decentralization. BlockShow Americas 2018*, YouTube (Oct. 2, 2018), at [16:19], https://www.youtube.com/watch?v=HTENY4DlIqc.

██████████████████████████████████████████████████████████████

████████████████████

30.      This foundational lie was the beginning of a pattern.  From that point forward, CNL consistently misrepresented Celsius's financial condition and the risk of its investments to convince the Class members to give Celsius more of their money to lose.  The truth behind those lies—that Celsius *did not*  calculate rewards based on its revenue, that Celsius *did* issue unsecured loans (including to poorly-rated counterparties) and place risky directional bets on highly volatile cryptocurrency, that the FCA pushed CNL out of the United Kingdom, and that regulators were investigating Celsius—was only revealed after the commencement of these Chapter 11 Cases. DiFiore Decl. ¶¶ 9–13; Gallagher Decl. ¶¶ 14–17; Tuganov Decl. ¶¶ 10–14.

A.      **CNL Told the Public It Passed Most of Its Revenue to Customers Through Weekly Rewards; It Did Not**

31.      The fundamental tenet of CNL's business, as communicated in its White Paper, on its website, through blog posts, on Twitter, and by Mr. Mashinsky, was that Celsius would "pass most of [its] earnings back to the community."[17]  CNL often referenced that Celsius would specifically pass 80% of its gross revenue to customers.  CNL's promise that Celsius's rates were set as percentages of revenue was key to the company's sales pitch.  Mr. Mashinsky and other CNL employees repeated this promise on AMAs and in interviews from as early as March 2019 through as late as April 2022, and it was underscored by CNL in its official blog posts and on its website.

32.      For instance, on March 7, 2019, in New York, Mr. Mashinsky promised, in an interview at NASDAQ, that "Celsius network enables you to deposit your coins, enables you to

---

[17]      White Paper, *Celsius Network*, at 5, https://celsius.network/static/celsius-whitepaper.pdf (last visited May 15, 2023).

lend them to someone else, and you get to keep 80%."[18]  This promise was echoed in a Medium

blog post originally published by CNL on its official website on April 24, 2019, which has since

been removed from the Internet.[19]  In that post, CNL stated: "The Celsius business model is

structured to do the exact opposite of what banks do – by giving 80% of total revenue back to our

community each week in the form of earned interest . . . . We're taking the exact same 80% profit

margin that banks have kept for themselves for centuries and returning it to our community of

depositors."[20]  CNL's website on August 28, 2019 echoed that same promise: "We are committed

to sharing up to 80% of our income with users."[21]

33.    CNL and Mr. Mashinsky repeated this promise at all times relevant to the Class

Claim, including on: (i) AMAs on December 19, 2019; April 10, 2020; May 15, 2020; December

18, 2020; November 12, 2021;[22] and March 11, 2022;[23] (ii) a Celsius Fireside Finance Video on

March 20, 2020;[24] and (iii) an interview with RealVision (which was posted on the Celsius

---

[18]  Celsius Network, *Alex Mashinsky, Celsius CEO, interview at NASDAQ,* YouTube (Mar. 7, 2019), at [3:26], https://www.youtube.com/watch?v=8cIdPpA-pyk.

[19]  *Celsius Network Interest Rates, Explained*, Medium (April 24, 2019), https://web.archive.org/web/20210216082029/https://celsiusnetwork.medium.com/celsius-network-interest-rates-explained-a336a52e163d.  This and other since-deleted posts are archived on the Internet Archive's Way Back Machine, which is a 501(c)(3) non-profit that builds a digital library of Internet sites.

[20]  *Celsius Network Interest Rates, Explained*, Medium (April 24, 2019), https://web.archive.org/web/20210216082029/https://celsiusnetwork.medium.com/celsius-network-interest-rates-explained-a336a52e163d.

[21]  *The 1% Had Their Turn,* Celsius Network, https://web.archive.org/web/20190828062049/https://celsius.network/earn-interest-on-your-crypto/ (last visited May 15, 2023).

[22]  Celsius Network, *AMA with Celsius Network CEO Alex Mashinsky,* YouTube (Dec. 19, 2019), at [49:52, 53:12], https://www.youtube.com/watch?v=eI62VDzt_ww&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=50; Celsius Network, *AMA with Celsius Network and Saga!,* YouTube (Apr. 10, 2020), at [46:25], https://www.youtube.com/watch?v=HAuoIsYA9EQ; Celsius Network, *Ask Mashinsky Anything – Friday, May 15,* YouTube (May 15, 2020), at [30:48], https://www.youtube.com/watch?v=am5CXWgj-Vk; Celsius Network, *Celsius AMA December 18th,* YouTube (Dec. 18, 2020), at [47:53] https://www.youtube.com/watch?v=8s3_X3VOq4k; Celsius Network, *Celsius AMA November 12th 2021,* YouTube (Nov. 12, 2021), at [33:12], https://www.youtube.com/watch?v=bTrByn1DAFo.

[23]  This statement was removed from the AMA during the censorship process, which is described in Statement of Facts Section III.  Amulic Decl., Ex. 14.

[24]  Celsius Network, *Fireside Finance with Alex Mashinsky,* YouTube (Mar. 20, 2020), at [31:18],

website) on December 6, 2020.[25]  CNL's promotional materials consistently repeated it, including on: (i) CNL's pitch to attract investors to purchase its Series A Preferred Shares,[26] (ii) Medium blog posts dated August 19, 2020; January 22, 2021; and March 7, 2021;[27] (iii) the official Celsius Twitter page on April 27, 2021;[28] (iv) Celsius's website,[29] including on the main page and posts in the website's "Help Center";[30] and (v) official press releases, including on August 24, 2020.[31]

34.    CNL has since admitted that Celsius did not calculate rewards based on revenue. Until July 2021, Celsius did not have a formal method or policy by which it calculated or set reward rates.  Amulic Decl., Ex. 16 at CEL_EXAM-00057817 ███████████████████ ███████████████████████████ Ex. 17.  Rates were instead set on an ad hoc basis, with Mr. Mashinsky having the final say on what interest rates CNL set for each coin.  *See, e.g.*, Amulic

---

https://www.youtube.com/watch?v=4_a9QWuXMF0&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=47.

[25]  *Celsius Network: Regulations & Yield on Crypto Assets,* RealVision (Dec. 7, 2020), at [19:57], https://www.realvision.com/shows/cryptoverse/videos/celsius-network-regulations-yield-on-crypto-assets-2QXo?tab=details.

[26]  *Celsius Network – Crypto Interest & Lending Platform with $6.2B In loans, $630M in Assets & 106k+ Active Wallets,* BnkToTheFuture, https://app.bnktothefuture.com/pitches/celsius-network (last visited May 15, 2023).

[27]  Celsius, *What We Do & How We Do It*, Medium (Aug. 19, 2020), https://blog.celsius.network/what-we-do-how-we-do-it-9a82124f7159; Celsius Network, *What are stablecoins? How to earn more on your dollars with Celsius*, Medium,        https://web.archive.org/web/20210118043446/https://celsiusnetwork.medium.com/what-are-stablecoins-how-to-earn-more-on-your-dollars-with-celsius-42b4d9c9630a;  Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike,* Medium (Mar. 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd.

[28]  @CelsiusNetwork,        Twitter        (Apr.        27,        2021,        6:41        PM), https://twitter.com/celsiusnetwork/status/1387175053062672388.

[29]  Amulic Decl., Ex. 1 (detailing fraudulent promotional materials); Ex. 15.

[30]  Celsius, *How do you earn the interest to pay your customers? Is this a ponzi scheme?* (Aug. 11, 2021), https://web.archive.org/web/20200811102256/https://support.celsius.network/hc/en-us/articles/360001978817-How-do-you-earn-the-interest-to-pay-your-customers-Is-this-a-ponzi-scheme- (last visited May 15, 2023).  This post has subsequently been removed online.  *See also* Celsius, *How Does Celsius Network make money?* (Sept. 22,        2020),        https://web.archive.org/web/20200922005337/https://support.celsius.network/hc/en-us/articles/360001706797-How-does-Celsius-Network-make-money- (last visited May 15, 2023).

[31]  Celsius, *Celsius Network now offers 6.2% APY on your first 5 Bitcoins*, PR Newswire, (Aug. 24, 2020), https://www.prnewswire.com/news-releases/celsius-network-now-offers-6-2-apy-on-your-first-5-bitcoins-301117223.html (last visited May 15, 2023).

15

Decl., Exs. 18–19.  And, when the FCA notified CNL that, by passing a portion of its revenue to customers, it was operating an unlicensed collective investment scheme (Amulic Decl., Exs. 1, 20), CNL quickly told the truth to the FCA (but not to customers) and admitted that Celsius's reward rates were not connected to revenue (Amulic Decl., Ex. 21).  In response to that admission, the FCA demanded that CNL take down misleading promotional content from its website and other media.  Amulic Decl., Ex. 1 at CEL-UCC-00068311 ███████████████████

████████████████████████████████████████████

████████████████ (emphasis added).  It also "strongly suggest[ed]" that CNL withdraw its application to operate as a cryptocurrency business in the United Kingdom.  Amulic Decl., Ex. 20 at CEL_EXAM-00107377.  CNL then skipped town and purported to move its customer-facing business to the United States, as discussed in Section II.D below.  It did not correct the record with its account holders.

35.    The promise that Celsius calculated rewards based on gross revenue and would share most of its earnings with account holders was central to the Class members' investment decisions.  *E.g.*, DiFiore Decl. ¶ 9; Gallagher Decl. ¶ 14; Tuganov Decl. ¶ 10.  Class Representatives believed that the movement in interest rates was a result of changes to Celsius's revenue and reinforced their belief that what Celsius was telling them was true.  DiFiore Decl. ¶ 9.

### B.    Celsius Promised It Did Not Issue Uncollateralized Loans; It Issued Billions in Unsecured Loans, Including to Parties with Questionable Credit Profiles

36.    CNL and Mr. Mashinsky repeatedly told customers that Celsius did not issue unsecured loans and that it only transacted with "Wall Street" institutions that were well-capitalized.  Those statements were never true.  Based on internal Celsius documents and CNL's own statements to regulators, it is clear that, when CNL and Mr. Mashinsky made those statements, Celsius had billions of dollars of outstanding unsecured loans and had never issued loans to

traditional Wall Street institutions.

37.    Like CNL's other misrepresentations, this false narrative started at the beginning. On March 3, 2018, the FAQ page on the Celsius YouTube channel represented: "100% of our loans, are asset backed."[32]  It continued in 2019, including on videos dated November 25, 2019; November 26, 2019; and December 10, 2019;[33]  and in the next year, including on videos recorded on March 13, 2020; April 3, 2020; April 14, 2020; April 17, 2020; May 15, 2020; May 18, 2020; May 19, 2020; and July 17, 2020.[34]  Mr. Mashinsky again repeated that Celsius did not make unsecured loans on (i) a keynote speech and AMA on September 11, 2020;[35]  (ii) an AMA on November 6, 2020;[36]  and (iii) a video titled "Why Celsius makes all loans collateralised" on November 9, 2020.[37]

---

[32]    Celsius Network, *FAQ | How does the insurance work for Lenders?*, YouTube (Mar. 3, 2018), at [0:15], https://www.youtube.com/watch?v=VtuXPgyU6us.

[33]    Lark Davis, *Putting Wall Street on Notice! Crypto is Coming! Alex Mashinsky Celsius Network*, YouTube (Nov. 26, 2019), at [10:17], https://www.youtube.com/watch?v=O0vZR-v0Kpo; *see also* Celsius Network, *Celsius Network AMA - Ask Mashinsky Anything!*, YouTube (Nov. 26, 2019), at [33:06], https://www.youtube.com/watch?v=H1n5g7uJyvQ ("[W]e only work with 150 of [800 hedge funds] the top 150. I can tell you there are other lenders in the market who lend with no collateral or lend to anybody.  Good.  Good for them.  **We will never do that**.") (emphasis added); Celsius Network, *December 10, 2019 AMA with Nuke Goldstein*, YouTube (Dec. 10, 2019), at [14:10], https://www.youtube.com/watch?v=gxf2XgPKdzI.

[34]    Celsius Network, *Crypto Market Commentary with Alex Mashinsky*, YouTube (Mar. 13, 2020), at [7:02], https://www.youtube.com/watch?v=MZlL_IrgV3E&list=PLLjzjU2vvKVMNgmFM2oV79WQ0iSqf_5oV&index=47; Celsius Network, *Fireside Finance with Alex Mashinsky*, YouTube (Apr. 3, 2020), at [16:22], https://www.youtube.com/watch?v=OsXvAsYZmvA; Celsius Network, *Revealing the NEW WORLD of Crypto Lending*, YouTube (Apr. 14, 2020), at [14:53], https://www.youtube.com/watch?v=QqWl9Qbh5to; Celsius Network, *Ask Mashinsky Anything - Friday, April 17 2020*, YouTube (Apr. 17, 2020), at [21:35], https://www.youtube.com/watch?v=zC1jIOwdhK0; Celsius Network, *Ask Mashinsky Anything - Friday, May 15*, YouTube (May 15, 2020), at [14:08], https://www.youtube.com/watch?v=am5CXWgj-Vk; Celsius Network, *Coronavirus and Market Crash won't stop DeFi Interview with Alex Mashinsky*, YouTube (May 19, 2020), at [12:44], https://www.youtube.com/watch?v=6kWqRsRXAt8.  Celsius Network, *Crypto for the Masses Celsius Network w The Godfather of VOIP Alex Mashinsky - Crypto Arnie*, YouTube (May 19, 2020), at [18:39], https://www.youtube.com/watch?v=vmqMPL51v_4; Celsius Network, *Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon*, YouTube (July 17, 2020), at [53:18], https://www.youtube.com/watch?v=csFrn4XtwL0; Amulic Decl., Ex. 5.

[35]    Celsius Network, *CHAINLINK Keynote & AMA Alex Mashinsky (Smart Contract Summit 2020)*, YouTube (Sept. 11, 2020), at [42:11], https://www.youtube.com/watch?v=DWd2AE-ge694; Amulic Decl., Ex. 5.

[36]    Celsius Network, *Celsius AMA - Ask Mashinsky Anything - Friday, November 6*, YouTube (Nov. 6, 2020), at [32:25], https://www.youtube.com/watch?v=apWkwq8uscU; Amulic Decl., Ex. 6.

[37]    Celsius Network, *Why Celsius makes all loans collateralized*, YouTube (Nov. 9, 2020), at [1:20],

38.    CNL and Mr. Mashinsky knew these statements were false.  Based on CNL's books
and records, including materials prepared for the Risk Committee and delivered to Mr. Mashinsky,
Celsius had numerous outstanding unsecured loans at the times these misrepresentations were
made.  For instance: as of December 2019, 72% of Celsius's aggregate institutional loans
outstanding were unsecured; Celsius's loan portfolio was uncollateralized by 24% in March 2020,
13% in April 2020, and 17% in May 2020; Celsius had USD$200,000,000 of outstanding
unsecured loans in July 2020; and between 19% and 23% of CNL's outstanding aggregate
institutional loans were unsecured from September 2020 through November 2020.  Amulic Decl.,
Ex. 22.  Risk Committee materials show that a majority of CNL's portfolio as of December 2021
was unsecured or partially collateralized.  Amulic Decl., Ex. 23.  In an August 19, 2021 letter to
the New Jersey Office of the Attorney General, CNL admitted that 30% of Celsius's institutional
lending book, or the equivalent of USD$747,948,734, was unsecured.  Amulic Decl., Ex. 24.

39.    CNL also lied about making loans to "vetted financial institutions," including on a
May 14, 2021 AMA, a January 7, 2022 Real Vision Finance interview, a March 11, 2022 AMA,
and an April 13, 2022 CNBC International interview.[38]  In fact, as of July 30, 2021, Celsius had
uncollateralized and undercollateralized loans outstanding with numerous non-traditional financial
institutions, including Genesis Global Capital, LLC, Alameda Research Ltd., and Three Arrows
Capital Ltd., each of which is currently in a chapter 11 or liquidation proceeding.  Amulic Decl.,

---

https://www.youtube.com/watch?v=NgA5t2RUcWI; Amulic Decl., Ex. 6.

[38]    Celsius Network, *Crypto Volatility and Elon Musk - Celsius AMA May 14th 2021*, YouTube (May 14, 2021),
https://www.youtube.com/watch?v=4r4jnEgeWl8; Real Vision Finance, *Everything You Need to Know About
Yield in Crypto* (Jan. 7, 2022), at [18:50], https://www.youtube.com/watch?v=-paNUHyLWlk; Celsius Network,
*Celsius AMA March 11th 2022*, YouTube (Mar. 11, 2022), https://www.youtube.com/watch?v=JCMuY2FbKJQ;
CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr.
13, 2022), at [1:43], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s; Amulic Decl., Ex. 7.  Several of
these statements were removed from AMAs during the censorship process, which is described in Statement of
Facts Section III, or flagged by Prescient in their independent review.  Amulic Decl., Exs. 14, 25.

Ex. 26.  According to a Risk Committee presentation, Celsius had over USD\$1 billion of loan exposure (USD\$763 million under fully unsecured loans) to non-traditional institutions, including Alameda Research LLC (partially secured), Equities First Holdings (unsecured), and Galaxy Digital (unsecured) as of May 10, 2022.  Amulic Decl., Ex. 27. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ (Amulic Decl., Ex. 28 at CEL-UCC-00015911).

40.     The financial health of a company is often measured with reference to its leverage ratio and credit-worthiness.[39]  It therefore makes perfect sense that retail investors would consider the quality of Celsius's investments (and Celsius's repeated representations regarding the risk of its investments and that it was not leveraged) in making decisions regarding where to invest their funds, as did the Class members.  For instance, Mr. DiFiore was focused on CNL's and Mr. Mashinsky's repeated public statements that all customer obligations were secure and that a run on the bank could never happen because Celsius was fully collateralized.  DiFiore Decl. ¶ 10.  Ms. Gallagher relied on Mr, Mashinsky's repeated statements that there was "no risk to customer funds" because there were "no uncollateralized loans."  Gallagher Decl. ¶ 15.  Mr. Tuganov found it significant that Celsius was "completely collateralized" and he relied on CNL's representations about its safe investment strategy in choosing to transfer his cryptocurrency to Celsius.  Tuganov

---

[39]  *E.g.*, Adam Hayes, *What Financial Ratios Are Used to Measure Risk?*, INVESTOPEDIA (Feb. 15, 2022), available at    https://www.investopedia.com/ask/answers/062215/what-are-financial-risk-ratios-and-how-are-they-used-measure-risk.asp#:~:text=The%20most%20common%20ratios%20used,debt%2Dto%2Dequity%20ratio    (last visited May 15, 2023); J.B. Maverick, *What Is the Best Measure of a Company's Financial Health?*, INVESTOPEDIA (Feb. 15, 2022), available at https://www.investopedia.com/articles/investing/061916/what-best-measure-companys-financial-health.asp#:~:text=A%20company's%20bottom%20line%20profit,health%20and%20long%2Dterm%20viability (last visited May 15, 2023).

Decl. ¶ 7.

**C.    Contrary to CNL's Pervasive Messaging, CNL Undertook Risky Directional Trading Strategies**

41.    CNL also misrepresented the risk of Celsius's cryptocurrency trading strategies. For instance, on November 25, 2019, Mr. Mashinsky stated in an interview, "our job is just, we don't take direction risk, bets, we don't bet against Bitcoin or for Bitcoin prices going down or prices going up."[40]  Additionally, on September 29, 2020, Mr. Mashinsky tweeted that "Celsius does not trade or take long or short positions with customer coins."  Amulic Decl., Ex. 29.  In an April 13, 2022 CNBC interview from Paris, in response to allegations that Celsius pursued risky trading strategies, Mr. Mashinsky again told the public that "Celsius is a delta neutral strategy [and] doesn't bet on the market going up and down."[41]  And in a May 27, 2022 AMA, Zachary Wildes, Celsius's Corporate and VIP Account Manager, stated that "the type of business that we do is not taking, you know, these directional bets and we allow HODLers to continue to renew week after week."[42]

42.    But CNL and Mr. Mashinsky knew these statements were false.  Celsius had a swing trading desk which is, by definition, not market-neutral, as it attempts to profit from predicting market movement, and had been engaged in swing trading as early as September 2020.  Amulic Decl., Ex. 30.  In a letter to Washington's Department of Financial Institutions dated August 31, 2021, Celsius described its ████████████████████████████████████ ███████████████████████ and disclosed that, as of August 22, 2021, the equivalent of

---

[40]    Lark Davis, *Putting Wall Street on Notice! Crypto is Coming! Alex Mashinsky Celsius Network,* YouTube (Nov. 25, 2019), at [20:30], https://www.youtube.com/watch?v=O0vZR-v0Kpo.

[41]    CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube (Apr. 13, 2022), at [2:50], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=148s.

[42]    Celsius    Network,    *Celsius    AMA    May    27    2022,*    YouTube    (May    27,    2022), https://www.youtube.com/watch?v=MFboVGyOX2I.  This statement was removed from the AMA during the censorship process, which is described in Statement of Facts Section III.  Amulic Decl., Ex. 14.

USD$1.1 billion of assets was being used to support swing trading, market making, and cash and carry practices. Amulic Decl., Ex. 31 at CEL-UCC-00023278. The same message was sent to the Pennsylvania Securities Examiner, the Oklahoma Department of Securities, and the Massachusetts Securities Division. Amulic Decl., Exs. 32–34. Based on internal communications and Risk Committee materials, Celsius and Mr. Mashinsky knew about Celsius's risky trading strategy. Amulic Decl., Ex. 35 at CELSIUS_NETWORK_02718490 ███████████████

████████ ████ ████ ████ ████ ████ ████ ████ ██ ████

████████████████ ████████████████████████████████████

████████████████████ (emphasis added); Ex. 36. Mr. Mashinsky even testified in the First Day Declaration that CNL engaged in swing trading, among other types of exchange deployments.[43]

43.    CNL's representations that Celsius would not take risks with the Class members' coins and its failure to disclose how those coins were actually kept and deployed was critical to the Class members' decisions to trust Celsius with their cryptocurrency. *E.g.*, DiFiore Decl. ¶ 7 (stating that Mr. DiFiore chose to invest with Celsius rather than Crypto.com or BlockFi because he believed its investment practices were safe); Gallagher Decl. ¶ 11 (stating that Ms. Gallagher invested bulk of her crypto with Celsius because she felt she could trust Mr. Mashinsky); Tuganov Decl. ¶ 7 (stating that Mr. Tuganov chose to invest with Celsius because he was persuaded by CNL's public statements that it was safe, regulatory compliant, and competitive). Had the Class members known that Celsius was recklessly putting their funds at risk, they would not have transferred their assets to Celsius, or would have withdrawn them. *E.g.*, DiFiore Decl. ¶ 14;

---

[43]    *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, In Support of Chapter 11 Petitions And First Day Motions* (the "**First Day Decl.**"), Ex. H [D.I. 23] (Jul. 14, 2022) ¶ 81.

Gallagher Decl. ¶ 22; Tuganov Decl. ¶ 15.

**D.    CNL Failed to Disclose that Regulators Forced It to Leave the United
Kingdom or the Consequences of that Decision**

44.    On June 23, 2021, CNL announced on a Medium blog post that it would be

migrating its customer-facing business from CNL to LLC.[44]  CNL mentioned that it was moving

due to "regulatory uncertainty," but assured account holders that "nothing was changing."[45]  That,

of course, was false—as this Court has found, the Class members' rights changed significantly.[46]

45.    As described in Statement of Facts Sections I and II.B above, the FCA had accused

CNL of operating an unlicensed collective investment scheme by passing a percentage of its

revenue to customers.  The FCA threatened potential criminal penalties and "strongly suggest[ed]"

that CNL withdraw its application to operate as a cryptocurrency company in the United Kingdom.

Amulic Decl., Ex. 20 at CEL-UCC-00208957.  In subsequent letters, the FCA detailed many

misrepresentations made on CNL's website and in its promotional materials regarding its revenue-

sharing model, which the FCA said customers were likely to have relied on, as evidence that CNL

was operating a collective investment scheme. Amulic Decl., Ex. 1.  CNL admitted to the FCA

that its reward rates were in no way related to its revenue.  Amulic Decl. Ex. 21.  The FCA

demanded that Celsius remove the fraudulent promotional material that misrepresented its business

from its website and stop providing services to customers in the United Kingdom.  Amulic Decl.,

Ex. 1.

46.    CNL did not tell its customers that it did was under criminal investigation.  In fact,

---

[44]  Celsius, *Celsius Community Update – June 23, 2021*, Medium (Jun. 23, 2021),
https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091.

[45]  Celsius, *Celsius Community Update – June 23, 2021*, Medium (Jun. 23, 2021),
https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091.

[46]  The Court determined that customers only have contract claims against LLC in its *Order Regarding Which Debtor
Entities Have Liability for Customer Contract Claims Under the Terms of Use* [D.I. 2265], which the Committee
has appealed.  *See Notice of Appeal* [D.I. 2356].

after receiving that letter, it repeatedly said the regulators had no issues with its business. *See infra* ¶¶ 51–53. Nor did CNL tell its customers that, contrary to its sales pitch, Celsius was not actually calculating rewards based on revenue. *See supra* ¶¶ 31–34. Rather, Mr. Mashinsky and other Celsius employees kept repeating CNL's false sales pitch and told customers that it was electing to leave the United Kingdom because it liked the U.S. market.[47]

47.     After these Chapter 11 Cases were filed, Class members learned (for the first time) that Celsius did not pay a substantial portion of its revenue to its customers and that CNL had only transferred its obligations to customers, not the assets or investments associated with those obligations, to LLC. Amulic Decl., Ex. 37 at CEL_EXAM-00028830 (e-mail from a CNL officer to an Ernst & Young advisor admitting: ███████████████████████████ ██████████████. As this Court has found, following the migration, the Class members had contract claims against an insolvent entity. The Class members had no reason to know that their relationships with Celsius had changed dramatically. To the contrary, CNL told them that "all Celsius services for all existing customers remain unchanged."[48]

48.     As part of the migration, Celsius amended its Terms of Use, which were presented to customers in a pop-up window when they logged into the Celsius app.[49] The pop-up window told customers that the "legal entity" had changed to LLC.[50] It did not inform customers that their relationship would now be with an insolvent subsidiary and their assets (and the proceeds thereof)

---

[47]    Celsius Network, *New Rewards Explorer Showcase! – Celsius AMA June 25th 2021*, YouTube (Jun. 25, 2021), at [7:16], https://www.youtube.com/watch?v=DdYrYPvY5OU.

[48]    Celsius, *Celsius Community Update – June 23, 2021*, Medium (Jun. 23, 2021), https://celsiusnetwork.medium.com/celsius-community-update-june-23-2021-a28fca899091.

[49]    *Declaration of Oren Blonstein, Head of Innovation and Chief Compliance Officer of the Debtors, in Support of the Debtors' Motion Regarding Ownership of Earn Assets and the Sale of Stablecoin* (the "**Blonstein Declaration**"), Ex. A-7 [D.I. 1327].

[50]    Blonstein Decl., Ex. A-7 [D.I. 1327].

would be available to Celsius's equity holders before its account holders. Instead, it told all account holders that they were required to accept the new Terms of Use to access their accounts and that their "data, account balances, and rights and obligations," would be transferred to LLC, which suggested that everything was being moved to the United States.

49.    While Mr. DiFiore and Ms. Gallagher do not recall accepting the Terms of Use (DiFiore Decl. ¶ 12; Gallagher Decl. ¶ 17), Mr. Tuganov recalls being required to accept the revised Terms of Use via an in-app pop-up, which did not disclose the reasons for the migration or the fact that CNL was only transferring account holder obligations, not assets, to LLC. Tuganov Decl. ¶ 14.

50.    The Class members could not have known that the migration was driven by the FCA's investigation or CNL's operation of an unregulated business, because that material fact was never disclosed by CNL or Celsius. Each Class Representative only learned that was the case after the Petition Date. DiFiore Decl. ¶ 12; Gallagher Decl. ¶ 17; Tuganov Decl. ¶ 14. Nor did the Class members know that coins deposited with CNL had not actually been transferred to LLC, rendering LLC insolvent from its formation and stranding the assets they had transferred to Celsius at CNL. DiFiore Decl. ¶ 12; Gallagher Decl. ¶ 17; Tuganov Decl. ¶ 14. Customers were **_required_** to accept the revised Terms of Use to keep earning interest or avoid margin calls,[51] meaning that all Class members who were CNL customers at the time relied on these material misrepresentations and omissions in determining to accept the new Terms of Use and not withdrawing their assets from the platform. Had the Class members known the truth about CNL's "migration," they would have withdrawn their funds from the Celsius platform (to the extent they were able). _E.g._, DiFiore Decl. ¶ 13; Gallagher Decl. ¶ 17; Tuganov Decl. ¶ 14.

---

[51]    Blonstein Decl., Ex. B-4–B-5 [D.I. 1327].

**E.** **Celsius Hid that It Was Under Investigation by Regulatory Agencies**

51.    CNL and Mr. Mashinsky often responded to questions regarding Celsius's business practices and financial health by repeatedly and consistently referring to Celsius's purported regulatory compliance.[52]  For instance, during a December 3, 2021 interview with KITCO News, Mr. Mashinsky stated that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . . ."[53]  During a March 11, 2022 AMA, he stated that Celsius had not been "do[ing] the things that get you in trouble" and had been complying with regulations "since day one."[54]  And, during the April 13, 2022 CNBC interview, when asked about regulatory compliance, Mr. Mashinsky stated: "We are following all the rules A to Z.  Seven days a week."[55]  He doubled down on this statement in an April 15, 2022 AMA, during which he said: "There's not—no legal issues at least with the services that Celsius provides . . . ."[56]

52.    But CNL and Mr. Mashinsky knew that, at least as early as May of 2021, state and federal regulators in the United States and the United Kingdom were investigating Celsius for potentially offering and selling securities in violation of securities laws and other regulations.[57]

---

[52]  Celsius Network, *AMA with Celsius Network CEO Alex Mashinsky*, YouTube (Dec. 19, 2019), at [58:36] [1:01:02], https://www.youtube.com/watch?v=el62VDzt_ww; On the Chain LIVE, *Celsius Network with Alex Mashinsky – On the Chain*, YouTube (July 19, 2020), at [8:04], https://www.youtube.com/watch?v=h5yzyx9Z6uk; Amulic Decl., Ex. 7.

[53]  Kitco NEWS, *This is when Bitcoin will hit $140k according to Alex Mashinsky, CEO of Celsius*, YouTube (Dec. 3, 2021), at [7:10], https://www.youtube.com/watch?v=DJPogJVkQUE.

[54]  Celsius Network, *Celsius AMA March 11th 2022*, YouTube (Mar. 11, 2022), at [16:35], https://www.youtube.com/watch?v=JCMuY2FbKJQ.

[55]  CNBC International TV, *Celsius CEO on best practices for retail investing in cryptocurrencies*, YouTube  (Apr. 13, 2022), at [6:41], https://www.youtube.com/watch?v=m1Zqx618Tvg&t=7s.

[56]  This statement was removed from the AMA during the censorship process, which is described in Statement of Factions Section III.  Amulic Decl., Ex. 38.

[57]  (Amulic Decl., Ex. 39 (letter from New Jersey Bureau of Securities), Ex. 40 (letter from the Securities and Exchange Commission (the "**SEC**")); *Texas State Securities Board v. Celsius Network, Inc. et al*, SOAH Docket No.   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   (Tex.   St.   Sec.   Bd.   Sept.   17,   2021)   (Notice   of   Hearing), https://www.ssb.texas.gov/sites/default/files/2021-09/20210917_FINAL_Celsius_NOH_js_signed.pdf; *In the*

Nevertheless, CNL and Mr. Mashinsky kept telling customers that the company had no regulatory issues.

53.    On September 17, 2021, the New Jersey Bureau of Securities ordered Celsius to cease and desist from offering its Earn product in the United States to non-accredited investors, effective November 1, 2021.[58]  After that order was entered, Mr. Mashinsky publicly denied it. On November 25, 2021, two months after the New Jersey Order had been entered, Mr. Noy, Head of Regulation at Celsius, emailed Mr. Mashinsky, asking him to avoid stating that CNL had not received the New Jersey Order because ████████████████████████████████████████ ████████████    Amulic Decl., Ex. 41 at CEL-UCC-02010066.

54.    Although certain of the regulatory orders were published, many orders and investigations were not, because CNL never disclosed them.  The Class members had no way to assess Celsius's regulatory issues or compliance.  Instead, the Class members relied on CNL's assurances that there were no problems or legal issues.  DiFiore Decl. ¶ 12; Gallagher Decl. ¶ 16; Tuganov Decl. ¶ 13.  Mr. Tuganov, for instance, found CNL's public statements that it was regulatory-compliant across multiple jurisdictions and was registered multinationally to be "fundamental" to his decision to transfer cryptocurrency to Celsius.  Tuganov Decl. ¶ 13.  Had CNL not concealed the truth and the Class Representatives known the extent of the regulatory issues and investigations that Celsius was facing, the Class Representatives would not have invested with Celsius or would have removed their assets from the platform (to the extent they were able).  DiFiore Decl. ¶ 14; Gallagher Decl. ¶ 16; Tuganov Decl. ¶ 14.

---

*Matter of Celsius Network, LLC*, Admin. Ord. SC-2021-0012 (Al. Sec. Comm'n Sept. 16, 2021), https://asc.alabama.gov/Orders/2021/SC-2021-0012.pdf; *Dep't of Fin. Inst. v. Celsius Network LLC*, No 2021-AH-00024 (Ky. Fin. Inst. Sept. 21, 2021), https://kfi.ky.gov/Documents/Celsius%20Network%20LLC%202021AH00024.pdf.

[58]    *Summary Cease and Desist Order by the State of New Jersey Bureau of Securities in the Matter of Celsius Network, LLC*, Celsius Cease and Desist 9.17.21.pdf (nj.gov), (Sept. 27, 2021) (last visited May 15, 2023).

### III.    Celsius Orchestrated a Cover-Up

55.    CNL and Celsius knew that Mr. Mashinsky's and other employees' "material misrepresentations" were public and "problematic." Amulic Decl., Ex. 42 at CEL-UCC-02011601, Ex. 43 at CELSIUSNETWORK_00081305. But CNL never corrected those misrepresentations. Rather, it orchestrated a corporate cover-up.

56.    First, other CNL employees attempted to coach Mr. Mashinsky to tell the truth. For instance, on June 11, 2021, Mr. Cohen-Pavon, CNL's Chief Revenue Officer, emailed Mr. Mashinsky and other senior officials, requesting that Celsius's marketing materials be revised because statements regarding 80% profit sharing, "███████████████████████████████ ████████████████████████████████████████ Amulic Decl., Ex. 42 at CEL-UCC-02011601. ██████████████████████████████████████████

████████████████████ *Id.* On November 8, 2021, Mr. Noy asked Mr. Mashinsky to avoid discussing ███████████████████████████████████████████████

██ ██ ██ ███ ████ █ █████                   Amulic    Decl.,    Ex.    44    at CELSIUSNETWORK_03212283.

57.    Then, around March 2021, CNL hired a new risk team led by Mr. Sunada-Wong as CNL's Chief Risk Officer. After noticing inaccuracies in the April 30, 2021 AMA, Mr. Sunada-Wong recommended that AMAs be taped rather than broadcast live so that they could be edited to remove false or misleading statements before the AMAs were broadcast to the public ███████

████████ Amulic Decl., Ex. 45 at CEL-UCC-00209093 (emphasis added). Mr. Mashinsky resisted and directed the Celsius team to continue to broadcast the videos live and ████████████ ████████████████████ *Id.* Mr. Mashinsky, however, did not stop telling the public his familiar false sales pitch.

58.    Beginning in early May 2021, Celsius executives from its risk, regulatory,

compliance, and legal teams established what Mr. Noy later referred to as a "censorship process"
to "remove unfortunate statements." Amulic Decl., Ex. 46 at CEL-UCC-01704147, Ex. 25 at
00208957. A group of Celsius executives watched the AMAs live every week, along with Class
members and prospective customers, and noted the false or materially misleading statements made
by Mr. Mashinsky, his co-hosts, or his guests. Amulic Decl., Exs. 25, 47. Each AMA video was
immediately posted, unedited, to YouTube following the broadcast. Amulic Decl., Ex. 45. The
censorship team would then send its list of misrepresentations to the media team, which edited the
video, removed the live recording from YouTube, and reposted the censored version. Amulic
Decl., Exs. 47–48. The whitewashed versions were sometimes posted days later, after the
weekend. Amulic Decl., Exs. 25, 48. Viewers who tuned in live or watched the posted AMAs
within a few days, like Mr. DiFiore and Ms. Gallagher, therefore only heard the misleading
statements. DiFiore Decl. ¶ 6; Gallagher Decl. ¶ 13. Notably, neither CNL nor Celsius took any
steps to alert these customers to the misleading statements they had heard, much less correct them.

59.    Misleading statements were thus systematically removed from the AMAs and,
occasionally, "███████████████████████████," but never actually corrected. Amulic Decl.,
Ex. 25 at CEL-UCC-00208957. An email from Mr. Noy to Mr. Cohen-Pavon dated April 20,
2022, sharing a compilation by the Celsius legal team of false statements made by Mr. Mashinsky
in certain AMAs and interviews, illustrates not only Celsius's awareness that Mr. Mashinsky was
misrepresenting Celsius's business to customers, but also the scale of the cover-up operation.
Amulic Decl., Ex. 49. The after-the-fact censorship process was well-engrained at Celsius by June
2, 2022—as Mr. Sunada-Wong stated in an email to Mr. Noy: "████████████████████
████████████████████████████████████████████████████████████████████."
Amulic Decl., Ex. 46 at CEL-UCC-01704147. That well-oiled machine, however, never corrected

or otherwise publicized that any particular CNL statements were false or even that any changes to the broadcast had been made.  Nor could Celsius remove these statements from live broadcasts or appearances by Mr. Mashinsky and other Celsius employees.  Celsius instead just attempted to cover up the lies that it could after the fact.

60.    Senior Celsius officials also reviewed public statements made through third parties. On July 26, 2021, Mr. Sunada-Wong asked the media team to truncate an interview of Mr. Mashinsky on CNBC[59] because █████████████████████████████████ ████████  Amulic Decl., Ex. 50 at CELSIUSNETWORK_03212250.  Mr. Sunada-Wong also asked Mr. Mashinsky to delete a tweet in which he posted a link to the interview.  *Id.*  On November 29, 2021, Mr. Noy emailed Mr. Mashinsky and the Celsius operations team regarding an advance draft of an article[60] featuring Mr. Mashinsky that they had received, saying ████████████ ████████████████████████  ███████████████████████████████ ██████████████████████████████████████ ████████████  Amulic Decl., Ex. 51 at CELSIUSNETWORK_03212272.

61.    CNL knew that it was lying to, and concealing material information from, customers.  It knew that, if regulators or legal authorities learned that it had been lying to customers, it would face severe sanctions.  That risk was not remote, as CNL was under active investigation by numerous international, federal, and state regulators for years.  But CNL also knew that if it told customers the truth, they would withdraw their assets from the platform. Moreover, new customers would not be incentivized to join.  So, instead of telling the truth, it

---

[59]    @CNBCTheExchange,              Twitter              (July          21,          2021,          1:59pm),
https://twitter.com/CNBCTheExchange/status/1417907168678920192.

[60]    Jacob Goldberg,  *Saver's Paradise: Alex Mashinsky*,  CEO Magazine,  Dec.  29,  2021,
https://www.theceomagazine.com/executive-interviews/finance-banking/alex-mashinsky/.

developed various systems to cover its tracks with regulators, while continuing to trick customers.

## IV.    Celsius Recklessly Lost Customer Funds

62.    Throughout its history, Celsius acted recklessly with customer funds.  CNL and Celsius lacked meaningful risk management systems and made investment decisions in an ad hoc manner, transferring hundreds of millions of dollars' worth of cryptocurrency to counterparties with little to no diligence.  Amulic Decl., Exs. 52–55.  Celsius employees acknowledged the insufficiency of the company's risk management systems and its inability to track the assets it held in correspondence dated December 23, 2020.  Amulic Decl., Ex. 56 at CELSIUSNETWORK_00574939 ███████████████████████████████████████████ ████████████████████.  By the spring of 2021, Celsius had over USD\$10 billion of crypto assets.[61]  To the extent CNL or Celsius attempted to track its billions of dollars of assets, investments or positions across the firm, it did so largely using manually updated spreadsheets.  Amulic Decl., Ex. 57.  And, despite its employees' repeated statements that they could not accurately assess its positions, it did not adequately fix the problem.  Amulic Decl., Ex. 36, Ex. 58, Ex. 59, and Ex. 60 at CEL-UCC-00076625 (describing the freeze report as ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████).

63.    CNL spent millions of dollars of customer assets to purchase CEL token on public markets to "support" the price of that token, to the benefit of CNL's executives, insiders, and their associated businesses and relatives, who held the majority of CEL token.  Amulic Decl., Exs. 61– 69.  Those purchases, among other things, led Celsius to develop a short position in Bitcoin, which

---

[61]    Celsius, *Celsius confirms over \$10B in digital assets*, PR Newswire, (Mar. 10, 2021), https://www.prnewswire.com/news-releases/celsius-confirms-over-10b-in-digital-assets-301244864.html    (last visited May 15, 2023).

caused it to incur hundreds of millions of dollars of losses as the price of the commodity rose in 2021. Amulic Decl., Exs. 70, 36.

64.    CNL invested its customers' funds in speculative investments, including by sending billions of dollars to KeyFi, Inc., an entity that Mr. Mashinsky and Mr. Goldstein partially owned (Amulic Decl., Exs. 54–55), and sending hundreds of millions of dollars in Bitcoin to Equities First Holdings without receiving its financials (Amulic Decl., Exs. 52–53). CNL also failed to implement proper oversight mechanisms. Amulic Decl., Exs. 70, 36. These transactions, and many other "poor asset deployment decisions,"[62] resulted in CNL and the Debtors losing billions of dollars of cryptocurrency transferred to them by the Class members.

65.    CNL also failed to properly monitor its trading positions. And, when it realized that its traders had inappropriately bet the market and were experiencing severe losses, it failed to take appropriate action. Amulic Decl., Exs. 70, 36. To the contrary, Mr. Mashinsky bet the market and ordered traders to sell hundreds of millions of dollars more of cryptocurrency. *Id.* The resulting losses were staggering. *Id.*

66.    The promises that Celsius would safeguard account holders' assets, which pervaded CNL's marketing, were far from the reality of what actually occurred at the company. Nor were Celsius's actual business practices consistent with the Class members' reasonable expectations of what they were signing up for when they entered into the Terms of Use and transferred cryptocurrency to Celsius. As a result of CNL's reckless conduct, the Class members have been prevented from accessing their crypto assets for approximately the last ten months,[63] and stand to lose a substantial portion of the assets they transferred. Had they known that CNL and Celsius

---

[62]    First Day Decl. ¶ 10.

[63]    First Day Decl. ¶ 14 (describing Celsius's pause on all crypto asset withdrawals).

would recklessly handle their funds, customers would not have transferred their assets to Celsius.
*See, e.g.*, DiFiore Decl. ¶ 14; Gallagher Decl. ¶ 22; Tuganov Decl. ¶ 15.

## V.    **The Class Representatives**

67.    The proposed Class Representatives are Thomas DiFiore, Rebecca Gallagher, and
Ignat Tuganov.  Each is—and at all times relevant to the Class Claim, has been—a retail investor
and a Celsius account holder.  DiFiore Decl. ¶ 3; Gallagher Decl. ¶ 2; Tuganov Decl. ¶ 2.  Mr.
DiFiore first invested with Celsius in March of 2020.  DiFiore Decl. ¶ 6.  Ms. Gallagher first
invested with Celsius on April 30 and May 1 of 2021.  Gallagher Decl. ¶ 12. Mr. Tuganov first
invested with Celsius in February of 2020.  Tuganov Decl. ¶ 6.

68.    Each of the proposed Class Representatives based his or her decision to transfer
digital assets to CNL on statements that CNL made publicly and across multiple media channels,
including, among others, third-party news sources, AMAs, the Celsius website, Celsius's and Mr.
Mashinsky's Twitter pages, and YouTube.  DiFiore Decl. ¶ 6; Gallagher Decl. ¶¶ 10, 13, 18;
Tuganov Decl. ¶ 7.  None of the proposed Class Representatives would have invested with Celsius
had the truth about Celsius's operations, investment strategy, and regulatory issues—which CNL
worked so hard to omit and conceal—been known to them.  DiFiore Decl. ¶ 14; Gallagher Decl.
¶ 22; Tuganov Decl. ¶ 15.  Each of the proposed Class Representatives has suffered damages as a
result of his or her reliance on these statements.  DiFiore Decl. ¶ 16; Gallagher Decl. ¶ 23; Tuganov
Decl. ¶ 16.

69.    Prior to reading the Examiner's Final Report,[64] none of the proposed Class
Representatives knew that Celsius did not pass 80% of revenues back to its customers, issued
unsecured loans, or engaged in swing trading or directional trading.  DiFiore Decl. ¶ 9–11;

---

[64]    *Final Report of Shoba Pillay, Examiner* [D.I. 1956].

Gallagher Decl. ¶¶ 14–15; Tuganov Decl. ¶ 10–12.  Prior to the commencement of these Chapter 11 Cases, none of the proposed Class Representatives knew that the FCA had accused CNL of operating an unlicensed investment scheme, the extent to which regulators were investigating Celsius, the questionable counterparties with which Celsius invested, or the deficit in Celsius's balance sheet.  DiFiore Decl. ¶ 12; Gallagher Decl. ¶ 16–17; Tuganov Decl. ¶ 13.  Had the Class Representatives known the truth about any of the foregoing, none of them would have invested digital assets with CNL in the first place, or would have withdrawn such digital assets had they already been invested.  DiFiore Decl. ¶ 14; Gallagher Decl. ¶ 22; Tuganov Decl. ¶ 15.

70.    Since learning the truth, each of the proposed Class Representatives has had an interest in achieving maximum recoveries for all Celsius account holders.  DiFiore Decl. ¶ 2; Gallagher Decl. ¶ 6; Tuganov Decl. ¶ 3.

## ARGUMENT

71.    Class certification in bankruptcy is allowed under Bankruptcy Rule 7023, which incorporates the requirements of Rule 23 for class certification.  *See* Fed. R. Bankr. P. 7023.  A class should be certified if all four requirements of Rule 23(a) and at least one of the three prongs of Rule 23(b) are satisfied.    *In re MF Global, Inc.*, 512 B.R. 757, 765, 767 (S.D.N.Y. Bankr. 2014).

72.    Under Rule 23(a), four prerequisites must be met for a suit to proceed as a class action: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(1)–(4).  With respect to the fourth requirement (the adequacy of representation), Rule 23(g) incorporates formally one prong of the Rule 23(a)(4) analysis and requires the court to consider the following factors in appointing

class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A); *e.g.*, *Kalish v. Karp & Kalamotousakis, LLP*, 246 F.R.D. 461, 463 (S.D.N.Y. 2007). The Second Circuit also recognizes an "implied requirement of ascertainability," which requires a class to be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 205 (S.D.N.Y. 2022) (citing *In re Petrobras Sec. Litig.*, 862 F. 3d 250, 260 (2d Cir. 2017)). Certification under Rule 23(b)(3) is appropriate if "questions of law or fact common to class members predominate over questions affecting only individual members" and class resolution will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

73.     "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification." *Espinoza v. 953 Assocs., LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011); *see also Basso v. NYU*, 363 F. Supp. 3d 413, 420 (S.D.N.Y. 2019) (noting that "district judges in the Second Circuit are to construe Rule 23 liberally, resolving close calls in favor of class certification"); *In re Facebook, Inc.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015) ("[I]f there is an error to be made, let it be in favor and not against the maintenance of the class action . . . .") (citing *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d. Cir. 1968)). While a court may resolve disputed factual issues necessary to determine that the requirements of Rule 23 have been met, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013).

74.    Here, the Class readily meets each of the Rule 23(a) factors (numerosity, commonality, typicality, adequacy, and ascertainability) and each of the Rule 23(b)(3) factors (predominance and superiority) and, under Rule 23(g), proposed class counsel White & Case will adequately represent the Class.

## I.    The Proposed Class Satisfies all Rule 23(a) Requirements

### A.    The Proposed Class is Ascertainable

75.    Ascertainability simply asks whether the Court can objectively determine who is in the class.  A class is ascertainable when it can be "defined using objective criteria that establish a membership with definite boundaries."  *Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 579 F. Supp. 3d 327, 336 (N.D.N.Y. 2022) (citing *In re Petrobras Sec. Litig.*, 862 F.3d at 269).  The ascertainability requirement is "not demanding," *Ebin v. Kangadis Food, Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) (citation omitted), and will only preclude certification "if a proposed class definition is indeterminate in some fundamental way."  *Vargas v. Howard*, 324 F.R.D. 319, 330 (S.D.N.Y. 2018) (citation omitted).

76.    Here, there is no ambiguity about the makeup of the Class.  A person is a member of the Class if he or she was a Celsius account holder as of the Petition Date.  Class membership can be easily and objectively determined from the Debtors' books and records, including as reflected in the Debtors' *Schedules and Statements of Financial Affairs* (the "**SOFAs and Schedules**") [D.I. 2311].

### B.    The Proposed Class Satisfies the Numerosity Requirement

77.    Rule 23(a)'s numerosity prong requires the class to be so large that joinder of all members would be impracticable.  Fed. R. Civ. P. 23(a)(1).  Numerosity is "presumed" in the Second Circuit "when the class has at least 40 members." *In re MF Glob. Inc.*, 512 B.R. at 765

n.6.  Class action plaintiffs do not have to "specify the exact size of the class" or prove that joinder is "impossible" to satisfy the numerosity prerequisite.  *In re BGI, Inc.*, 465 B.R. 365, 375 (Bankr. S.D.N.Y. 2012); *In re Partsearch Techs., Inc.*, 453 B.R. 84, 93 (Bankr. S.D.N.Y. 2011).

78.     Here, the Class is estimated to comprise more than 600,000 Celsius account holders in various U.S. states and other countries.[65]  The Court has already found that the logistical issues make joinder impractical, including that only a small minority of Class members have counsel and a significant portion of Class members are not familiar with the American legal system.  Hr'g Tr. (Apr. 18, 2023) at 85:23 – 86:6.

### C.     The Proposed Class Satisfies the Commonality Requirement

79.     Rule 23(a)(2) requires that class members' claims share common questions of fact and law.  Fed. R. Civ. P. 23(a)(2); *In re Partsearch Techs.*, 453 B.R. at 94.  "Even a single common question" will suffice.  *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 398 (E.D.N.Y. 2021). The commonality requirement is satisfied if the question of law or fact is "capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 700 (S.D.N.Y. 2019) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is not the raising of common questions—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation")).

80.     The focus of the commonality question of fact or law is often the defendant's conduct: "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."  *In re GSE Bonds Antitrust Litig.*,

---

[65]     *SOFAs and Schedules*; *Memorandum Opinion and Order Regarding Ownership of Earn Account* Assets, D.I. 1822 (Jan. 4, 2023) at 5; First Day Decl. ¶¶ 1, 38.

414 F. Supp. 3d at 700 (finding that commonality was met because the plaintiffs alleged the same economic injury stemming from the same antitrust violation by the same defendants) (citation omitted); *see also In re MF Glob., Inc.*, 512 B.R. at 766 (class can be certified if plaintiffs "demonstrate that the class members have suffered the same injury"); *In re Partsearch Techs.*, 453 B.R. at 94–95 (noting that courts have found commonality where "each member had different degrees of injury or even where defenses might exist only as to particular individuals") (citation omitted).

81.   For instance, in *Basso*, former students of Tisch Asia—a performing arts graduate school—alleged that NYU induced students to enroll at Tisch Asia by representing that Tisch Asia would offer an education experience equal to NYU's renowned Tisch School of the Arts in New York.  363 F. Supp. 3d at 418.  In reality, except for the tuition, Tisch Asia never lived up to the standards of Tisch New York or provided Tisch Asia students with the same education, professional training, and equipment as Tisch New York students received.  *Id.*  The court found that the commonality requirement had been satisfied as to fraud and negligent misrepresentation claims (among others) because the plaintiffs alleged that NYU failed to disclose the truth about Tisch Asia with an intent to induce enrollment, such that "the question posed by that element [of the negligent misrepresentation claim] stands to be answered class-wide with a single yes or no." *Id.* at 422.

82.   Here, as in *Basso*, the causes of action brought by the Class Representatives arise out of the same set of facts concerning a pattern of systemic, deceptive, and fraudulent misconduct and gross negligence by CNL and Mr. Mashinsky.  As the Examiner put it, "[t]he business model Celsius advertised and sold to its customers was not the business that Celsius actually operated."[66]

---

[66]   *Final Report of Shoba Pillay*, Examiner [Docket No. 1956] at 3.

As detailed above, CNL's misstatements and omissions regarding its financial health, risk strategy, and regulatory compliance pervaded its sales pitch and the description of its business that it marketed to customers. *See supra* ¶¶ 51–53; DiFiore Decl. ¶¶ 5–16; Gallagher Decl. ¶¶ 10–18, 21–23; Tuganov Decl. ¶¶ 7–16. Now, as a result of Celsius's actual risk profile and finances, Celsius is in bankruptcy and each of the Class members has suffered the same injury—loss of access to the cryptocurrency they transferred to Celsius and the likelihood that some of that cryptocurrency will never be recovered. *See* DiFiore Decl. ¶ 16; Gallagher Decl. ¶ 23; Tuganov Decl. ¶ 16.

83.     These common facts raise common legal questions, including but not limited to:

- Whether Celsius engaged in consumer-oriented conduct, including advertising, that (i) is materially misleading, (ii) consumers were likely to have been exposed to, and (iii) has the capacity to mislead the average consumer, and whether Class members suffered injury or ascertainable loss as a result of such deceptive acts or practices?

- Whether Celsius's messaging was misleading or false, particularly regarding (1) whether Celsius passed any percentage of its revenue to customers through weekly rewards, (2) whether Celsius issued uncollateralized loans, including to non-traditional finance institutions, (3) whether Celsius engaged in directional trading, (4) why CNL was forced to move its customer-facing business away from the United Kingdom, and (5) the extent of regulatory issues faced by Celsius?

- Whether Celsius knew its messaging was misleading or false?

- Whether Celsius's misrepresentations and omissions influenced Class members' decisions to transfer their assets to, and keep their assets on, the Celsius platform?

- Whether Celsius's reckless conduct with customer assets was objectively unreasonable and prevented the Class members from receiving the full benefit of their relationships with Celsius?

These common questions are fundamental to this litigation and "stand to be answered class-wide," with a single yes. *Basso*, 363 F. Supp. 3d at 422.

### D.     The Class Representatives' Claims Are Typical

84.     Rule 23(a)(3) requires that the claims of the class representative be "typical" of the

claims of the class. Fed. R. Civ. P. 23(a)(3). The typicality requirement is satisfied when "each

class member's claim arises from the same course of events, and each class member makes similar

arguments to prove the defendant's liability." *In re MF Glob. Inc.*, 512 B.R. at 765 n.6 (citations

omitted); *In re Partsearch Techs.*, 453 B.R. at 95 (citations omitted). Though typicality is its own

requirement, "the commonality and typicality requirements often 'tend to merge into one another,

so that similar considerations animate analysis of both.'" *In re Homaidan*, 2023 WL 2922576,

*26 (E.D.N.Y. Apr. 11, 2023) (quoting *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010)).

Typicality does not require that class representatives suffer identical injuries to class members.

Rather, it ensures that class representatives "have the incentive to prove all the elements of the

cause of action which would be presented by the individual members of the class were they

initiating individualized actions." *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 452

(S.D.N.Y. 2004) (citations omitted). Minor differences do not defeat typicality. *E.g.*, *In re

Homaidan*, 2023 WL 2922576, at *44–45 (finding that the class representatives established

typicality where their claims challenged efforts to collect on nation-wide loans and uniform

policies and procedures, even if the details of the class members' individual loans differed). What

matters is that "the same facts and legal argument[s]" would be used to establish liability because

the class members had been "subjected to the same course of events." *In re BGI, Inc.*, 465 B.R. at

375–76.

85.    Where a class representative's claims—like all other proposed class members'

claims—are based on common misrepresentations made to the entire class, the typicality

requirement will be satisfied. *See Basso*, 363 F. Supp. 3d at 423 ("Plaintiffs are typical of the

Proposed Class because their putative injuries arise from the manner in which NYU allegedly

misrepresented Tisch Asia—through statements and omissions—to the student body as a whole");

*Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 136–37 (S.D.N.Y. 2014) (finding typicality where the class representatives' fraud claims based on defendants' misrepresentations during match-making intake interviews "mirror[ed]" those of the class members); *Dandong v. Pinnacle Performance Ltd.*, 2013 WL 5658790, *5–6 (S.D.N.Y. Oct. 17, 2013) (finding typicality because the class representatives, like all class members, were subject to the same misrepresentations in offering documents); *see also Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 269–70 (E.D.N.Y. 2019) (finding typicality where all consumers paid a price premium as a result of false labeling and marketing, which constituted the "same course of events").

86.    Here, the Class Representatives' claims typify those of the Class because the entire Class was subject to the same pervasive misleading statements about CNL's business.    The promotional material CNL and Mr. Mashinsky put out to customers, whether through Celsius's website, AMAs, tweets, blog posts, or otherwise, consistently delivered the same misrepresentations and omissions. *See supra* ¶¶ 19–22, 31–33, 36–37, 39, 41, 51–53.  CNL made misleading consumer-facing statements to all Class members—these statements were broadcast widely and were consistent across all platforms and at all relevant times. *Id.*  Mr. DiFiore, Ms. Gallagher, and Mr. Tuganov, like all other Class members, chose to transfer their assets to Celsius because they had consumed at least some portion of CNL's advertisements, statements, and omissions.    DiFiore Decl. ¶ 6; Gallagher Decl. ¶ 11; Tuganov Decl. ¶ 7.    Each of the Class Representatives, like all Class members, was misled by CNL's misrepresentations, omissions, and deceptive practices to transfer digital assets to Celsius or maintain digital assets on Celsius's platform.  DiFiore Decl. ¶ 14; Gallagher Decl. ¶¶ 10–11, 8, 21; Tuganov Decl. ¶ 15.  None of them knew the actual risk or nature of Celsius's business because CNL covered up the nature of its true operations.  DiFiore Decl. ¶¶ 9–14; Gallagher Decl. ¶¶ 10–22; Tuganov Decl. ¶¶ 10–14.  Like all

individual Class members, the Class Representatives were harmed by CNL's reckless handling of those digital assets, and now stand to lose a significant portion of those digital assets as a result of CNL's actions.  DiFiore Decl. ¶ 16; Gallagher Decl. ¶ 23; Tuganov Decl. ¶ 16.

87.    Were Class members to prosecute their claims individually, they would support such claims with the same facts with respect to Celsius's actual operations and would make the same legal arguments with respect to its omissions, misrepresentations, and misleading marketing and reckless conduct as those alleged by the Class Representatives in the Class Claim.

### E.    The Class Representatives and Proposed Class Counsel will Adequately Represent the Class

88.    Rule 23(a)(4) requires a finding that the "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy inquiry relates to "whether (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 692 (citations omitted).  The inquiry in the first prong is focused on uncovering "conflicts of interest between named parties and the class they seek to represent."  *Raymond*, 579 F. Supp. 3d at 339 (internal quotation omitted); *see also In re Partsearch Techs.*, 543 B.R. at 95 (finding a class representative adequate because, among other reasons, they "diligently prosecuted" the adversary proceeding and did not hold an adverse interest to the class).  Only a "fundamental" conflict between class representatives and class members that is not "speculative or hypothetical" is sufficient to support a finding that the class members will not adequately represent the class.  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *Zivkovic v. Laura Christy LLC*, 329 F.R.D. 61, 72 (S.D.N.Y. 2018) (same); 5 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 23.25[2][b][ii], at 23-116 (3d ed. 2006).

89.    Here, Mr. DiFiore, Ms. Gallagher, and Mr. Tuganov will fairly and adequately

protect the interest of the class. None of them has interests that are adverse to the class and each
has every incentive to diligently prosecute the Class Claim. Mr. DiFiore is a co-chair of the
Committee and has been working diligently with the other Committee members and their advisors
toward a solution that would maximize recovery to all unsecured creditors, including all account
holders. DiFiore Decl. ¶ 2. Similarly, Ms. Gallagher and Mr. Tuganov have been advocating for
maximum returns to Earn customers throughout these Chapter 11 Cases. Gallagher Decl. ¶ 6;
Tuganov Decl. ¶ 3. The Class Claim similarly seeks to maximize recoveries to all Class members
(*i.e.*, all account holders as of the Petition Date), such that the interests of the Class Representatives
are squarely aligned with those of the Class.

### F.    The Proposed Class Counsel will Adequately Represent the Class

90.    Courts consider the factors required by Rule 23(g) in considering adequacy of
counsel, as also required by the second prong of Rule 23(a)(4). *E.g.*, *Kalish*, 246 F.R.D. at 463
(noting that, while the "2003 Amendments to Rule 23 changed the framework somewhat, shifting
the court's examination of the adequacy of counsel to coincide with its new duty to appoint class
counsel under Rule 23(g) … the court's analysis remains largely the same"). Rule 23(g) requires
a court to consider "(i) the work counsel has done in identifying or investigating potential claims
in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the
types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the
resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Class
counsel is adequate when they have experience with class actions, have devoted substantial time
to the matter, and are well-versed in the relevant areas of law. *In re Facebook, Inc.*, 312 F.R.D. at
345 (granting motion to certify class and appoint class counsel where counsel was "highly
qualified" and had "prosecuted this action vigorously" making them "more than sufficiently
qualified and experienced to conduct this litigation"); *In re Homaidan*, 2023 WL 2922576, at *46

(finding that class counsel is adequate when it "has the knowledge, skills, resources, and commitment to pursue this case vigorously" and has "been involved in substantial motion practice and discovery in this case").

91.    White & Case meets each of the Rule 23(g) factors and will adequately represent the Class.  White & Case has been involved in every aspect of these Chapter 11 Cases, in its role as Committee counsel.  White & Case has done significant work investigating and identifying account holder claims against the Debtors, in the context of the Class Claim and other matters in these Chapter 11 Cases (for example, disputes regarding cryptocurrency ownership and estate claims against directors and officers).  White & Case has substantial experience with, and is well-versed in, the law regarding class actions,[67] other complex litigation,[68] chapter 11,[69] and cryptocurrency.[70]  Moreover, White & Case has dedicated and will continue to dedicate significant resources to representing the Class.

## II.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3)

92.    Rule 23(b)(3) requires that: (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and

---

[67]    *See, e.g.*, *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018); *In re January 21 Short Squeeze Trading Litig.*, 2021 WL 1258399 (S.D. Fla. April 1, 2021); *In re Takata Airbag Products Liability Litig.*, No. 15-MD-2599 (S.D. Fla. Feb. 5, 2015).

[68]    *See, e.g.*, *Cigna Corp. v. Anthem, Inc.*, 251 A.3d 1015 (Del. 2021).

[69]    *See, e.g.*, *In re ION Geophysical Corp.*, Case No. 22-30987 (Bankr. S.D. Tex. 2022); *In re Seadrill Ltd.*, Case No. 21-30427 (Bankr. S.D. Tex. 2021); *In re Strike, L.L.C.*, Case No. 21-90054 (Bankr. S.D. Tex. 2021); *In re Hertz*, Case No. 20-11247 (Bankr. D. Del. 2020); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (Bankr. S.D.N.Y. 2020); *In re Garrett Motion Inc.*, Case No. 20-12212 (Bankr. S.D.N.Y. 2020).

[70]    *See, e.g.*, *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (Bankr. S.D.N.Y 2023); Douglas Landy, James Kong & Stephen Hogan-Mitchell, *Blockchain & Cryptocurrency Laws and Regulations 2023: The regulation of stablecoins in the United States*, GLOB. LEGAL INSIGHTS (2023), available at https://www.globallegalinsights.com/practice-areas/blockchain-laws-and-regulations/08-the-regulation-of-stablecoins-in-the-united-states (last visited May 15, 2023); Douglas Landy, Glen R. Cuccinello & Leel Sinai, *A New "Operation Choke Point"? The Quickly Changing Rules on Crypto Activities for Member Banks* (Feb. 14, 2023), available at https://www.whitecase.com/insight-alert/new-operation-choke-point-quickly-changing-rules-crypto-activities-member-banks (last visited May 15, 2023).

(2) proceeding by class action "is superior to other available methods for the fair and efficient adjudication of the controversy." *Amgen Inc.*, 568 U.S. at 460. Here, the proposed Class satisfies both prongs.

### A.    <u>Common Questions of Law or Fact Predominate over Individual Claims</u>

93.    The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and is "driven by a concern for efficient adjudication," namely "whether certification will 'reduce the range of issues in dispute and promote judicial economy,'" *Basso*, 363 F. Supp. 3d at 424 (quoting *Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 138 (2d Cir. 2015)). Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *In re Partsearch Techs.*, 453 B.R. at 96 (citation omitted). It is not necessary for each element of the claims to be susceptible to common proof, but rather for "common questions [to] predominate over any questions affecting only individual class members." *Dandong*, 2013 WL 5658790, at *8 (citing *Amgen*, 568 U.S. at 491) (internal quotation marks and alterations omitted). The standard is satisfied if the questions that can be resolved by class-wide proof "are more substantial than the issues subject only to individualized proof." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013) (citing *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)) (certifying class where common questions regarding fraud could be resolved through generalized proof).

94.    Each of the causes of action brought on behalf of the Class members raises common questions of fact and issues of law that can be resolved through generalized proof. Here, class-wide resolution predominates over any individual determination because the most "substantial

issues" asserted in any individual claims would be substantially identical to those asserted in the Class Claim.    Even if there is some individual variation as to which of CNL's myriad misrepresentations and omissions an individual customer relied upon in making his or her decision to invest or maintain his or her account with Celsius, at bottom, each cause of action raised by the Class Claim asks the Court to resolve the same questions: whether at all relevant times, CNL's misrepresentations and omissions were (i) sufficiently uniform (that is, consistently false) with respect to key information relevant to Class members' investment decisions, and (ii) contrary to Celsius's actual business practices.    Moreover, each customer was affected by Celsius's many material omissions discussed above.    There can be no real question that Class-wide resolution of these fundamental questions will promote efficiency and judicial economy.    Certification of the Class Claim will allow this Court to rule on the same issues and fact patterns once.    Each cause of action in the Class Claim is discussed in turn below.

**1.    Common Questions Predominate with Respect to the Class Claims for Violations of the NYGBL**

95.    N.Y. General Business Law ("**NYGBL**") section 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are [ ] unlawful."  N.Y. Gen. Bus. L. § 349(a) (2023).  NYGBL section 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is [ ] unlawful."  N.Y. Gen Bus. L. § 350 (2023).  To assert a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quotation and citation omitted).

96.    "The New York Court of Appeals has adopted an objective definition of

'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Id.* (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)).   Neither NYBGL section 349 nor section 350 contains a reliance requirement, nor does either require proof that a consumer actually relied on the materially misleading consumer-oriented conduct.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995) ("[NYGBL § 349(a)] does not require proof of justifiable reliance."); *Koch v Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 676 (N.Y. 2012) ("Justifiable reliance by the plaintiff is not an element of [a] statutory claim" under NYGBL § 350.).

97.    Courts in this and other circuits have found that the predominance requirement is met for class claims under section 349 or section 350 where class representatives provide evidence that business practices were deceptive or misleading under the reasonable consumer standard, that it was likely a reasonable consumer could have been exposed to the misrepresentations, and that class members suffered a loss as a result of the misrepresentations.  *See, e.g.*, *Allegra*, 341 F.R.D. at 405–08, 417–26 (finding predominance because, given the breadth of the defendants' multi-channel deceptive advertising campaign, it was likely that reasonable consumers were exposed to misleading statements); *Hasemann*, 331 F.R.D. at 264–67 (finding predominance when plaintiffs provided evidence that exposure to misrepresentations was "sufficiently uniform to conclude that it likely a reasonable consumer could have been misled and encouraged to purchase [the product]"); *Makaeff v. Trump Univ., LLC*, 2014 WL 688164, at *12–14 (S.D. Cal. Feb. 21, 2014) (finding that plaintiffs met the predominance requirement when they provided evidence that the defendants' advertising efforts were "uniform, highly orchestrated, concentrated and focused on [their] intended audience" such that it was likely that reasonable consumers were exposed to the

misrepresentations).

98.    Here, the Class Representatives have provided a wealth of evidence that CNL and

Mr. Mashinsky made the same misrepresentations and omissions regarding every aspect of CNL's

business from its inception to the Petition Date, including with respect to its initial capital raise,

its revenue sharing practices, its loan portfolio and leverage, its trading strategy, and its

relationships with regulators. *See supra* ¶¶ 19–22, 31–33, 36–37, 39, 41, 51–53. The Class

Representatives have also provided ample evidence that Celsius's (and particularly CNL's)

representations were wrong and misleading and a reasonable consumer could have been exposed

to the misrepresentations. *Id.* CNL disseminated its false narrative widely, across multiple media

channels, and repeated it consistently and constantly. *Id.* All of its lies were in the public domain.

*Id.* The Class Representatives have further provided substantial evidence that each of them were,

in fact, exposed to the same repeated and consistent misrepresentations and omissions. DiFiore

Decl. ¶¶ 5–12; Gallagher Decl. ¶¶ 10–11, 13–16, 19, 21; Tuganov Decl. ¶¶ 7–8, 10–14. They have

also provided substantial evidence that the Class Representatives all suffered common damages as

a result of these Chapter 11 Cases.

### 2.    Common Questions Predominate with Respect to the Class Claim for Violation of the NJCFA

99.    The New Jersey Consumer Fraud Act ("**NJCFA**") prohibits unconscionable,

deceptive, fraudulent or false commercial practices in connection with the sale or advertisement

of merchandise. N.J. Stat. § 56:8-2.[71] Deceptive practices are actionable even if nobody "has in

---

[71] "The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." N.J. Stat. § 56:8-2.

fact been misled, deceived or damaged" by the practices. *Id.* Plaintiffs are required to show only

that the "advertisement *has the capacity* to mislead the average consumer," *Union Ink Co. v. AT&T

Corp.*, 801 A.2d 361, 379 (N.J. 2002) (emphasis added), and that plaintiffs suffered an

"ascertainable loss"—that is, that they received less than what was promised, *In re Mercedes-Benz

Tele Aid Contract Litig.*, 257 F.R.D. 46, 73 (D.N.J. 2009) ("Plaintiffs must demonstrate

"(1) unlawful conduct on the part of [Defendant], (2) an ascertainable loss on the part of Plaintiffs

and (3) a causal relationship between the unlawful conduct and the ascertainable loss").

100.    Courts find the predominance requirement is satisfied for class claims under the

NJCFA where plaintiffs establish a causal nexus between defendants' alleged misrepresentations

and the injuries that plaintiffs suffered. *Elias v. Ungars Food Prods., Inc.*, 252 F.R.D. 233, 238–

39 (D.N.J. 2008) (affirming magistrate judge's finding of predominance for class claim under the

NJCFA where plaintiffs proved that statements on packaging were misrepresentations and that

they suffered harm as a result thereof); *In re Mercedes-Benz*, 257 F.R.D. at 73–75 (finding

predominance for class claim under the NJCFA claim where plaintiffs proved that defendant

misrepresented the lifespan of the Tele Aid systems, plaintiffs subscribed to the system before

learning it would be discontinued early, and plaintiffs suffered an ascertainable loss as a result).

101.    Here, the Class Representatives have provided evidence that CNL's pattern of

consistently and publicly making misrepresentations and omissions was unlawful and had the

"capacity to mislead" customers.  As detailed in Statement of Facts Section II, CNL repeatedly

and persistently misrepresented and omitted material information about its business and other

issues that were fundamental to customers' decisions to transfer their cryptocurrency to Celsius.

*See supra* ¶¶ 19–54.  Those misrepresentations were likely to mislead reasonable customers

because CNL held itself out as trustworthy and acting in account holders' best interests, and

ensured that it was the only source of information that customers had access to. *See supra* ¶¶ 23–24. CNL's misrepresentations and omissions did, in fact, influence the Class Representatives to transfer their assets to CNL. DiFiore Decl. ¶ 14; Gallagher Decl. ¶ 22; Tuganov Decl. ¶ 15. Because of CNL's unlawful conduct, the Class Representatives, along with the other Class members, suffered an ascertainable loss: the amount of cryptocurrency they transferred to Celsius. DiFiore Decl. ¶ 16; Gallagher Decl. ¶ 23; Tuganov Decl. ¶ 16.

### 3. Common Questions Predominate with Respect to the Class Claims Sounding in Fraud (Fraudulent Misrepresentation, Negligent Misrepresentation and Fraudulent Concealment)[72]

102.    To assert a claim of fraudulent misrepresentation under New York law, a party must show (1) a material, false misrepresentation; (2) made with knowledge of its falsity; and (3) intent to defraud upon which; (4) the plaintiff reasonably relies; (5) causing the plaintiff damages. *Basso*, 363 F. Supp. 3d at 420. "The elements of fraudulent concealment are under New York law are (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *Kleeberg v. Eber*, 331 F.R.D. 302, 319 (S.D.N.Y. 2019) (quotation and citation omitted). The elements of negligent misrepresentation under New York Law are (1) a duty, arising from a special relationship, to give correct information; (2) a false representation by the defendant that the defendant [knew or] should have known was incorrect; (3) that the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) that the plaintiff intended to rely and act upon it; and (5) that the plaintiff did reasonably rely on it

---

[72]    As stated in Count IV (Fraudulent Misrepresentation) of the Class Claim, the facts and evidence relevant to the common law fraudulent misrepresentation cause of action also constitute common law misrepresentation under English law. Class Claim ¶¶ 167-68. As stated in Count V (Negligent Misrepresentation) of the Class Claim, the facts and evidence relevant to the common law negligent misrepresentation cause of action also constitute common law negligent misrepresentation under English law. Class Claim ¶¶ 178-79.

to his or her detriment.  *Basso*, 363 F. Supp. 3d at 420.

103.    Claims sounding in fraud that are based on uniform misrepresentations and material omissions, like those raised by the Class Claim, are "appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof."  *Rodriguez*, 300 F.R.D. at 138–39 (certifying class based on fraud claim for oral misrepresentations); *Basso*, 363 F. Supp. 3d at 425 (certifying class based on negligent misrepresentation, fraud, and unjust enrichment claims); *Dandong*, 2013 WL 5658790, at *8–11 (certifying class based on fraud and fraudulent inducement claims).  "Certification may be appropriate as long as plaintiffs can prove reliance 'through common evidence (that is, through legitimate inferences based on the nature of the alleged misrepresentations at issue).'"  *Rodriguez*, 300 F.R.D. at 139 (quoting *In re US Foodservice Inc. Pricing Litig.*, 729 F.3d at 120).

104.    Plaintiffs may prove reliance "through circumstantial evidence that plaintiffs would not have purchased a product but for defendant's uniform misrepresentations about that product."  *Rodriguez*, 300 F.R.D. at 139; *accord Dandong*, 2013 WL 5658790 at *9.  In *Rodriguez*, for example, plaintiffs alleged that defendant, who operated a matchmaking service, fraudulently induced them to sign up for the service by falsely representing to each class member during their intake interviews that the match-maker had at least two matches for them in mind.  300 F.R.D. at 130–31.  Plaintiffs demonstrated that defendants instructed sales representatives not to deviate from this point and to make the payment request immediately after making that representation.  *Id.* at 139.    Each of the class representatives provided evidence that they relied on this misrepresentation and signed up for the service as a result.  *Id.* at 140.   The court therefore found that the oral misrepresentations made during the individual interviews were made "in a materially uniform fashion" and that defendant's misrepresentation that it had multiple matches for potential

customers was "essential to enticing consumers to sign up" and "so fundamental" that "it is reasonable to infer not only that defendants intended for their representations to induce plaintiffs' reliance but that plaintiffs in fact relied on those representations in becoming [defendants'] customers." *Id.* at 139–40. The court further concluded that the materiality of defendants' misrepresentations and the class's reliance thereon can be "demonstrated on a classwide basis through generalized proof." *Id.* at 141.

105.    Similarly, in *Dandong*, plaintiffs alleged that the defendants fraudulently induced them to purchase a series of notes through offering documents that misrepresented "the true nature of the financial arrangement:" namely that plaintiffs thought they were investing in low-risk assets through the purchase of certain credit-linked notes but were actually buying into high-risk synthetic collateralized-debt obligations that defendants themselves had issued, and then shorted. 2013 WL 5858790 at *2. There, the court found that the plaintiffs proved class-wide reliance through common, circumstantial evidence because "the alleged misrepresentations and omissions here were so fundamental to the value of the Notes that it is hard to imagine a reasonable investor purchasing them if the Offering Documents had revealed their true nature." *Id.* at *10. The court further found that "Defendants' misrepresentations and omissions [do not] have to have been the only considerations that the plaintiffs relied on in deciding to purchase the Notes." *Id.* at *11. The class representatives also provided evidence that they did rely on the Defendants' misrepresentations and omissions. *Id.* at *6. The court therefore concluded that common questions of law and fact predominated over individual issues of reliance. *Id.* at *11.

106.    Here, the Class Representatives' common-law fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment claims are likewise based on "uniform misrepresentations." As in *Rodriguez* and *Dandong*, it is reasonable to infer that CNL intended

for its representations to induce the Class members' reliance, and that the Class members did so
rely in deciding to transfer digital assets to Celsius.  As detailed in Sections II.A – II.E of the
Statement of Facts, CNL's misrepresentations and omissions related to essential facts about the
underlying operation, risk, and health of its business.  Those facts are fundamental considerations
that any reasonable person would consider when making an investment decision.  Each of the Class
Representatives, like other Class members, relied on these misrepresentations and omissions when
deciding to transfer their assets to, and keep them on, the Celsius platform.  *E.g.*, DiFiore Decl. ¶
14; Gallagher Decl. ¶ 22; Tuganov Decl. ¶ 15.  And, as in *Rodriguez*, CNL went to great lengths
to push its consistently false narrative, by blanketing the media landscape with its uniform and
consistent misrepresentations and omissions, posting them on the CNL website, blog, Twitter, and
YouTube page, even though it knew they were untrue.  *See supra* ¶¶ 19–22, 31–33, 36–37, 39, 41,
51–53.  Moreover, CNL made efforts to cover up the misrepresentations and CNL's actual conduct
with customer assets—without taking any steps to correct them or otherwise publicize past
falsehoods to consumers—because it understood that Class members had signed up to the platform
and were staying there because of CNL's lies.  *See supra* ¶¶ 55–61.

### 4.    Common Questions Predominate with Respect to the Unjust Enrichment Claims

107.    To assert a claim of unjust enrichment a party must show (1) the enrichment of the
defendant (2) at the plaintiff's expense, and that (3) the circumstances of such enrichment are such
that equity and good conscience require the defendant to make restitution.  *Basso*, 363 F. Supp. 3d
at 421.  "Class certification of unjust enrichment claims is appropriate when [] the crux of
plaintiffs' claims is that defendant unjustly retained the benefits of its sale of [] products to
consumers after it failed to disclose material facts about the defective nature of those products."
*Allegra*, 341 F.R.D. at 460 (quoting *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *10

(S.D.N.Y. Mar. 19, 2019)).  In *Allegra*, the court found unjust enrichment claims suitable for class treatment for the same reasons that the statutory claims are suitable for class treatment.  *Id.* at 461. The *Allegra* court agreed with plaintiffs that common questions predominated for their unjust enrichment claim because "[p]laintiffs' proof as to LensCrafters' deceptive practices and the resulting price premium [plaintiffs paid for the product] will rise or fall together for all class members." *Id.* at 425–26, 461.

108.    As in *Basso* and *Allegra*, and as discussed in paragraphs 100–104, above, the Class Representatives' unjust enrichment claims will rise and fall based on class-wide proof, as will the claims sounding in fraud.  Similarly, the benefit conferred to the Debtors (receiving Class members' transferred assets) can be proved class-wide through the Debtors' books and records. And, as discussed in paragraphs 93–104 above, CNL's deceptive conduct, which makes the retention of that benefit unjust, is also susceptible to class-wide proof.

### 5.    Common Questions Predominate in the Claim for Breach Of The Implied Covenant Of Good Faith And Fair Dealing

109.    The implied covenant of good faith and fair dealing is implied in all contracts and is violated if either party "do[es] anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dandong*, 2013 WL 5658790, at *12 (citing *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 169 (2d Cir. 2004)).  Proving a breach of the implied covenant of good faith and fair dealing requires a showing that one party prevented the other from receiving the full benefit of the parties' agreement.  *Id.* at *12.  A class may be certified and common issues found to predominate under a claim for breach of the implied covenant of good faith and fair dealing when such a claim can be demonstrated by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct.  *Id.* (collecting cases certifying a class based on the defendants' misconduct).

110.    Here, the Class Representatives have provided ample, class-wide evidence of Celsius's (and CNL's in particular) and Mr. Mashinsky's objectively unreasonable conduct. *See supra* ¶¶ 41-42, 62-65. As detailed above, although obligations were transferred to LLC, at all times, CNL deployed the vast majority of cryptocurrency transferred by account holders. *See supra* ¶¶ 46-48. CNL breached its implied promise to invest the Class members' assets responsibly by acting recklessly with those assets, including by making speculative investments with them that lost millions of dollars, using them to purchase CEL token on public markets to "support" the price of that token, and making risky directional trades that resulted in losses of millions of dollars of Bitcoin. *See supra* ¶¶ 41-42, 62-65. As a result, class members have been locked out of their accounts for over ten months. *See supra* ¶ 66. Common questions regarding whether CNL's conduct breached their implied duty to the Class members therefore predominate.

### 6.    Common Questions Predominate with Respect to the Class Claim for Violation of English Law, Section 2 of the Misrepresentation Act 1967

111.    Section 2(1) of the Misrepresentation Act 1967 provides that:

> where a person has entered into a contract after a misrepresentation has been made to him by another party thereto and as a result thereof he has suffered loss, then, if the person making the misrepresentation would be liable to damages in respect thereof had the misrepresentation been made fraudulently, that person shall be so liable notwithstanding that the misrepresentation was not made fraudulently, unless he proves that he had reasonable ground to believe and did believe up to the time the contract was made the facts represented were true.

Misrepresentation Act 1967, c. 7 § 2(1) (Eng.).

112.    A negligent misrepresentation under section 2(1) of the Misrepresentation Act 1967 is a statement made by one contracting party to another without reasonable grounds for believing its truth, such that the other party enters into the contract and, as a result, suffers loss. *Id.* The party does not have to prove that the misrepresentation at issue was fraudulent in order to recover under the Misrepresentation Act 1967. *Id.*

113.    The test for negligent misrepresentation is objective.  Once the party who received

the representation proves that the statement was false, the burden of proof shifts to the

misrepresenting party to establish that it reasonably believed in the truth of the misrepresentation,

up to the time the contract was made.  *Id.*  The court also takes into consideration the relative

sophistication of the contracting parties when assessing whether the party who received the

representation relied upon the statement when entering into the contract. *See Springwell

Navigation Corp v JPMorgan Chase Bank (formerly Chase Manhattan Bank) and others* [2010]

EWCA Civ 1221.  English courts have found a violation of section 2(1) of the Misrepresentation

Act 1967 when a contractual relationship exists between parties, one party states facts which it

cannot prove that it has reasonable grounds to believe, and the other party suffers a loss as a result

of its reliance on those statements.  *Royscot Trust Ltd v Rogerson* [1991] 2 QB 297 (the measure

for damages under s2(1) Misrepresentation Act 1967 is the measure for fraudulent

misrepresentation); *Howard Marine and Dredging Co Ltd v A Ogden & Sons (Excavations)

Ltd* [1978] QB 574 (the Misrepresentation Act imposes an absolute obligation not to state facts

which the representing party cannot prove he had reasonable grounds to believe).

114.    Here, the Class Representatives have provided ample evidence that CNL and Mr.

Mashinsky made the same false statements repeatedly to them and to the Class members that

(i) CNL returned 80% of its revenue to customers as weekly rewards; (ii) CNL did not make

uncollateralized loans; (iii) CNL was compliant with all applicable regulations; and (iv) CNL did

not engage in risky directional trading strategies. *See supra* ¶¶ 19–54. The Class Representatives

have also provided significant evidence that CNL and Mr. Mashinsky did not have reasonable

grounds to believe the statements were true—in fact, CNL and Mr.  Mashinsky knew that these

statements were false when they made them and throughout the contractual relationship between

the Class Representatives and Class Members and CNL. *See supra* ¶¶ 19–66. And, the Class

Representatives have demonstrated that they and the Class members relied on these false

statements when they entered into the Terms of Use. *See supra ¶¶* 55, 66; DiFiore Decl. ¶¶ 6, 14;

Gallagher Decl. ¶¶ 11–12, 22–23; Tuganov Decl. ¶¶ 7, 15. Finally, the Class Representatives and

Class members suffered losses on the basis of these misrepresentations on a class-wide basis. *See*

*supra ¶¶* 68–69; DiFiore Decl. ¶ 16; Gallagher Decl. ¶ 23; Tuganov Decl. ¶ 16. Common questions

regarding CNL and Mr. Mashinsky's conduct therefore predominate in the Class Representatives'

claim under the Misrepresentation Act 1967.

> ### B.    A Class Action Is Superior to Other Available Methods for Fairly and Efficiently Adjudicating the Controversy

115.    A class action is superior under Rule 23(b)(3) if it is more likely to achieve its

particular objectives in comparison to any other available procedure. 7AA Charles Alan Wright,

Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1779 (3d ed. 2005);

*see also In re Homaidan*, 2023 WL 2922576, at *53 (finding that a class action was superior

where there were thousands of plaintiffs who presented substantial and significant common

questions of law); *In re MF Global, Inc.*, 512 B.R. at 765 (finding that a class action was superior

where class certification would "result in the most expeditious administration of the estate"). Rule

23(b)(3) requires consideration of four factors: (A) the class members' interests in individually

controlling the prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum;

and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(2)(A)-(D). Class

actions are superior when no Class member has an interest in individually prosecuting their case,

litigation of the claims has not begun in a different forum, common questions predominate over

individual ones, and individually adjudicating the claims would be impractical and take significant judicial resources. *In re BGI, Inc.*, 465 B.R. at 377.

116.    Here, each of these factors favors a finding that a class action is a superior method of adjudicating the Class Claim than the alternative—addressing thousands of individual class claims through the claim administration process.

117.    *First*, the Class members do not have an interest in individually controlling the prosecution of individual proofs of claim. Many of them are outside of the United States and/or would be representing themselves *pro se*. The high cost of litigation in an unfamiliar system, even in the claims administration context, would result in many Class members not bringing claims at all. *See, e.g.*, Hr'g Tr. (April 18, 2023) at 82:17–19 (MR. KOENIG: "I note that the Debtors have 600,000 account holders approximately. Only 23,000 claims were filed prior to the original bar date. That's about three percent."); 84:17–21. Instead, permitting the Class Representatives to prosecute the Class Claim would give those Class members a "fair fight" against the sophisticated and well-represented objecting parties. Hr'g Tr. (April 18, 2023) at 86:10–15. Moreover, the Class Claim seeks damages in the aggregate amount of the Class members' account balances as of the Petition Date.

118.    *Second*, although certain potential Class members have commenced four adversary proceedings in these Chapter 11 Cases concerning non-contract claims against CNL, the overall number of individuals involved—fewer than 40—is relatively small compared to the size of the potential Class (600,000 individuals) and nearly all of those individuals have expressed support for the Class Claim.[73]

---

[73]    Mr. Immanuel Hermann (*Hermann v. Celsius Network LLC et al*, Docket No. 1:23-ap-01025 (Bankr. S.D.N.Y. Mar. 21, 2023)) has expressed that he is "supportive of the UCC's collective process to enable customers to assert non-contract claims against Celsius Network Limited and other affiliates" [D.I. 2476]. Counsel for the thirty-three (33) other individual plaintiffs involved in the adversary proceeding *Ad Hoc Group of Borrowers v. Celsius*

119.    *Third*, there is no evidence that concentrating the claims in this forum would disfavor the Class members.  In granting the Class Claim Motion, this Court stated that "[d]enying the [Class Claim Motion] is likely to result in only the sophisticated and represent[ed] claimants submitting their claims prior to the amended bar date to the detriment of the great majority of creditors.  That outcome goes against the fundamental tenet of bankruptcy, which is a fair and equitable distribution of assets to creditors."  Hr'g Tr. (April 18, 2023) at 86:17–21.

120.    *Fourth*, there is no evidence that it would be difficult to manage the Class Claim. To the contrary, prosecuting the Class Claim is more efficient than the alternative, and the Debtors believe it is the best way to manage non-contract claims against CNL.  As Debtors' counsel stated, the Debtors "believe that [the Class Claim process] is going to be a much more efficient process than having to deal with 23,000 claims [a mere fraction of potential claims, which had been filed in advance of the Amended Bar Date,] on an individual basis.  The Committee can deal with claims that are common to all account holders.  That should aid the resolution process."  Hr'g Tr. (April 18, 2023) at 82:5–9, 82:17–19.  Accordingly, and for all the reasons above, prosecuting the Class Claim is superior to the alternative means of adjudicating the Class members' claims.

## **MOTION PRACTICE**

121.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief herein is predicated and a discussion of their application to this Motion. Accordingly, the Committee submits that this Motion satisfies Local Rule 9013-1(a).

---

*Network LLC,* Docket No. 1:23-ap-01007 (Bankr. S.D.N.Y. Feb. 7, 2023), has not responded to communication from White & Case, but had previously asked if customers with outstanding loans were included in the proposed class.  The other two adversary proceedings for non-contract claims involve just a handful of individual, potential class members.  The Debtors have moved to dismiss the complaint asserting non-contract claims in *Christopher Lee Shanks v. Celsius Network LLC, et al,* Docket No. 1:22-ap-01190 (Bankr. S.D.N.Y. Dec. 20, 2022) [Adv. Proc. D.I. 9] and intend to similarly move to dismiss the complaint in *Georgiou et al v. Celsius Network LLC et al,* Docket No. 1:23-ap-01016 (Bankr. S.D.N.Y. Feb. 28, 2023).  White & Case has not discussed with the plaintiffs in those actions whether they would support the Class Claim process.

## NOTICE

122.    The Committee will provide notice of this Class Certification Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Debtors; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission;; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Committee submits that, in light of the nature of the relief requested, no other or further notice need be given.

## RESERVATION OF RIGHTS

123.    The Committee reserves all of its rights to supplement or amend this Motion.

## CONCLUSION

124.    WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court enter the Order granting the relief requested herein and other relief as the Court deems appropriate under the circumstances.

[*Remainder of page intentionally left blank*]

Dated:    May 17, 2023          Respectfully submitted,
          New York, New York

                                /s/ *Aaron E. Colodny*
                                **WHITE & CASE LLP**
                                David M. Turetsky
                                Samuel P. Hershey
                                Joshua D. Weedman
                                1221 Avenue of the Americas
                                New York, New York 10020
                                Telephone: (212) 819-8200
                                Facsimile:  (212) 354-8113
                                Email:  david.turetsky@whitecase.com
                                        sam.hershey@whitecase.com
                                        jweedman@whitecase.com

                                – and –

                                **WHITE & CASE LLP**
                                Michael C. Andolina (admitted *pro hac vice*)
                                Gregory F. Pesce (admitted *pro hac vice*)
                                111 South Wacker Drive, Suite 5100
                                Chicago, Illinois 60606
                                Telephone: (312) 881-5400
                                Facsimile:  (312) 881-5450
                                Email:  mandolina@whitecase.com
                                        gregory.pesce@whitecase.com

                                – and –

                                **WHITE & CASE LLP**
                                Keith H. Wofford
                                Southeast Financial Center
                                200 South Biscayne Blvd., Suite 4900
                                Miami, Florida 33131
                                Telephone: (305) 371-2700
                                Facsimile:  (305) 358-5744
                                Email:  kwofford@whitecase.com

                                – and –

                                **WHITE & CASE LLP**
                                Aaron E. Colodny (admitted *pro hac vice*)
                                555 South Flower Street, Suite 2700
                                Los Angeles, California 90071
                                Telephone: (213) 620-7700
                                Facsimile:  (213) 452-2329
                                Email:  aaron.colodny@whitecase.com

                                *Counsel to the Official Committee of
                                Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| CELSIUS NETWORK LLC, *et al.*,[74] ) | Case No. 22-10964 (MG) |
| ) | |
| Debtors. ) | (Jointly Administered) |
| ) | |

### ORDER GRANTING THE MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) CERTIFY THE CLASS OF ACCOUNT HOLDERS ASSERTING NON-CONTRACT CLAIMS AGAINST THE DEBTORS, (II) APPOINT THOMAS DIFIORE, REBECCA GALLAGHER, AND IGNAT TUGANOV AS THE CLASS REPRESENTATIVES, AND (III) APPOINT WHITE & CASE LLP AS CLASS COUNSEL, IN EACH CASE PURSUANT TO BANKRUPTCY RULE 7023

Upon the motion [Docket No. [●]] (the "**Motion**")[75] of the Committee on behalf of Thomas

DiFiore, Rebecca Gallagher, and Ignat Tuganov, in their individual and representative capacities

(collectively, the "**Class Representatives**"), pursuant to sections 105(a), 1103(c), and 1109(b) of

title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 23 of the Federal Rules of Civil

Procedure (the "**Rules**"), and Rule 7023 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), for entry of an order (this "**Order**") (I) certifying the class (such proposed

class, the "**Class**") of all Celsius account holders as of the Petition Date who were harmed as a

result of the Debtors' (1) violation of the New York Deceptive Practices Act, New York False

Advertising Act, and New Jersey Consumer Fraud Act, (2) fraudulent misrepresentation, negligent

misrepresentation, fraudulent concealment, and unjust enrichment under New York common law,

(3) breach of the implied duty of good faith and fair dealing, (4) fraudulent misrepresentation,

---

[74]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 USA LLC (9450); GK8 Ltd. (1209); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[75]    Capitalized terms used and not otherwise defined herein have the meanings ascribed to such terms in the Motion.

negligent misrepresentation, and unjust enrichment under English common law, and (5) violation of section 2 of the Misrepresentation Act 1967 under English law (II) appointing Tom DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) appointing White & Case LLP ("**White & Case**") as Class counsel; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution and that this matter is a core matter pursuant to 28 U.S.C. § 157; and this Court having found that venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation thereon and good cause appearing therefor;

The Court finds that:

1.      The Class is ascertainable.

2.      The requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied as follows:

        a.      Pursuant to Rule 23(a)(1), the Court determines that the Class is so numerous that joinder of all members would be impracticable.

b.  Pursuant to Rule 23(a)(2), the Court determines that there are one or more
questions of law or fact common to the Class.

c.  Pursuant to Rule 23(a)(3), the Court determines that the Class
Representatives' claims are typical of the claims of the Class.

d.  Pursuant to Rule 23(a)(4), the Court determines that the Class
Representatives will fairly and adequately protect the interests of the Class.

e.  Pursuant to Rules 23(a)(4) and 23(g), White & Case will fairly and
adequately represent the Class.

f.  Pursuant to Rule 23(b)(3), with respect to Counts I through IX asserted in
the Class Claim, questions of law or fact common to the Class members
predominate over any questions affecting the individual Class members.

g.  Pursuant to Rule 23(b)(3), proceeding with the Class Claim is superior to
other available methods of resolving the Class members' claims against the
Debtors.

3.    Other good and sufficient cause exists for granting the relief requested in the
Motion.

THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Motion is granted as set forth in this Order.

2.    The Class is hereby certified, pursuant to Federal Rule of Civil Procedure 23 (which
is made applicable to this matter through Federal Rules of Bankruptcy Procedure 9014 and 7023,
and Federal Rule of Bankruptcy Procedure 7023, and the Class Claim may be maintained.

3.    Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov are hereby appointed as
Class Representatives.

4.      The law firm White & Case LLP is hereby appointed as Class counsel.

5.      The rights of all parties interest to object to the Class Claim, as well as any other relief sought in connection therewith, are preserved.

6.      Nothing in this Order shall preclude the Committee from seeking any other relief or asserting any other claim or cause of action.

7.      The Committee and each of the Class Representatives is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

8.      This Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____            _____
New York, New York                                               The Honorable Martin Glenn
                                                                              Chief United States Bankruptcy Judge