Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF SUCCESSFUL BIDDER AND BACKUP BIDDER

**PLEASE TAKE NOTICE** that on November 2, 2022, the United States Bankruptcy Court

for the Southern District of New York (the "Court") entered the *Order (I) Approving the Bidding*

*Procedures In Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling*

*Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof,*

*(IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Relief* [Docket No. 1272] (the "Order"), approving certain dates, deadlines, and procedures for the potential sale of substantially all of the Debtors' assets (the "Bidding Procedures").[2]

 **PLEASE TAKE FURTHER NOTICE** that on March 1, 2023, pursuant to and in accordance with paragraph 12 of the Order and Section VI of the Bidding Procedures, the Debtors, in consultation with the Committee, filed the *Notice of (I) Selection of Stalking Horse Bidder and (II) Amended Dates and Deadlines with Respect to Bidding Procedures for the Potential Sale of Substantially All of the Debtors' Assets* [Docket No. 2150] (the "Notice of Stalking Horse Bidder"), which designated NovaWulf Digital Management, LP ("NovaWulf") as the Stalking Horse Bidder, announced that the Debtors, the Committee, and NovaWulf executed a plan sponsor agreement, and extended the Final Bid Deadline to April 17, 2023.

 **PLEASE TAKE FURTHER NOTICE** that, following the Notice of Stalking Horse Bidder and prior to the Final Bid Deadline, the Debtors received two additional Qualified Bids from: (1) Fahrenheit, LLC, whose equity is owned, directly or indirectly, by Arrington Capital, U.S. Data Mining Group, Inc. (d/b/a U.S. Bitcoin Corp.), Proof Group Capital Management LLC, Steven Kokinos, and Ravi Kaza ("Fahrenheit"); and (2) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (the "BRIC").

 **PLEASE TAKE FURTHER NOTICE** that, on April 22, 2023, the Debtors filed the *Notice of Auction* [Docket No. 2519], which established April 25, 2023, at 2:00 p.m. (prevailing Eastern Time) as the date that the Auction would commence.

 **PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph G of the Order and Section XI of the Bidding Procedures, the Debtors, in consultation with the Committee,

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Order.

commenced the Auction on April 25, 2023, at 2:00 p.m. (prevailing Eastern Time). Prior to the Auction, Qualified Bidders were provided copies of the rules for the Auction (the "Auction Rules"). The Auction concluded on May 24, 2023. The proceedings were conducted in accordance with the Bidding Procedures and Auction Rules. Proceedings in the main room were recorded by a court reporter (the "Auction Transcript").

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section XII of the Bidding Procedures, the Debtors, in consultation with the Committee, at the conclusion of the Auction selected Fahrenheit as the Successful Bidder. The Debtors, the Committee, and the Successful Bidder agreed to a term sheet attached hereto as **Exhibit A** (such term sheet, the "Plan Term Sheet") the terms of which shall be effectuated through a plan sponsor agreement and the Debtors' chapter 11 plan of reorganization.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section XIII of the Bidding Procedures, the Debtors, in consultation with the Committee, at the conclusion of the Auction selected BRIC as the Backup Bidder. The Debtors, the Committee, and the Backup Bidder agreed to a term sheet attached hereto as **Exhibit B** (such term sheet, the "Backup Plan Administration Agreement Term Sheet"), subject to definitive documentation, and such terms effectuated through a backup plan sponsor agreement.

**PLEASE TAKE FURTHER NOTICE** that the transactions contemplated in the Successful Bid will be subject to approval by the United States Bankruptcy Court for the Southern District of New York, and the Debtors will provide separate notice of such hearing and applicable objection deadlines.

**PLEASE TAKE FURHTER NOTICE** that the Debtors will file the Auction Transcript on the docket as soon as reasonably practicable.

3

**PLEASE TAKE FURHTER NOTICE** that the Debtors and the Committee have agreed to further extend the deadline (under the Exclusivity Order) for the Debtors to file the disclosure statement until **June 30, 2023**, subject to further extension.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures, Order, Notice of Stalking Horse Bidder and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Bidding Procedures, Order, Notice of Stalking Horse Bidder, and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: May 25, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        patrick.nash@kirkland.com
        ross.kwasteniet@kirkland.com
        chris.koenig@kirkland.com
        dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Plan Term Sheet**

**CELSIUS NETWORK LLC, ET AL.**
**CHAPTER 11 PLAN TERM SHEET**

THIS CHAPTER 11 PLAN TERM SHEET (THE "<u>TERM SHEET</u>") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF THE PROPOSED CHAPTER 11 PLAN (THE "<u>PLAN</u>") OF THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED IN RE CELSIUS NETWORK LLC, ET AL., CASE NO. 22-10964 (MG) (THE "<u>DEBTORS</u>" AND, TOGETHER WITH THEIR NON-DEBTOR AFFILIATES, "<u>CELSIUS</u>"). THIS TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PLAN OR THAT WILL BE SET FORTH IN THE PLAN AND THE OTHER DEFINITIVE DOCUMENTS, WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS TERM SHEET AND THE PLAN SPONSOR AGREEMENT. THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS TERM SHEET CONTEMPLATES THAT THE DEBTORS, THE COMMITTEE, AND FAHRENHEIT, LLC SHALL ENTER INTO A PLAN SPONSOR AGREEMENT AND THAT THIS TERM SHEET SHALL BE BINDING TO THE EXTENT PROVIDED IN SUCH PLAN SPONSOR AGREEMENT.

Reference is hereby made to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates,* dated March 31, 2023 (the "**Current Proposed Plan**"), pursuant to which NovaWulf Digital Management, L.P. is proposed to serve as the plan sponsor. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Current Proposed Plan. As used herein, the term "Plan Sponsor" means Fahrenheit, LLC. All currency denominations herein are in U.S. Dollars.

| <u>TERM</u> | <u>FAHRENHEIT BID</u> |
|---|---|
| | **<u>GENERAL PROVISIONS</u>** |
| *Transaction Summary* | The restructuring transactions will adopt substantially the same structure as set forth in the Current Proposed Plan, subject to the modifications set forth herein and in the accompanying submissions. The restructuring transaction steps may require adjustment to ensure feasibility. |
| | Plan Sponsor: The "**Plan Sponsor**" as used herein means Fahrenheit, LLC, a Delaware limited liability company ("**Fahrenheit**"). The equity in Fahrenheit is owned, directly or indirectly, including through one or more affiliates or subsidiaries, by: |
| | <ul><li>Arrington Capital ("**Arrington**"),</li><li>U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("**US Bitcoin**"),</li><li>Proof Group Capital Management LLC ("**Proof Group**"),</li><li>Steven Kokinos, and</li><li>Ravi Kaza (together, the "**Fahrenheit Team**")</li></ul> |

The plan of reorganization memorializing the provisions of this Term Sheet (the "**Fahrenheit Plan**") shall generally adopt the treatment and provisions included in the Current Proposed Plan, with modifications to reflect this Term Sheet, which modifications shall be reasonably acceptable to Fahrenheit, the Debtors, and the Committee.

NewCo:  On the Effective Date, the NewCo Assets shall vest in NewCo.  The NewCo Assets shall consist of: (1) the DeFi Cryptocurrency Assets, (2) the Institutional Loan portfolio, (3) the PE & VC Investments, (4) Mining, and (5) $500 million in Liquid Cryptocurrency, which may be reduced to an amount not less than $450 million solely in the event that the Secondary Market Purchase occurs as described below, free and clear on the Effective Date subject to adjustment with the agreement of the Plan Sponsor to account for any potential settlement of Borrow Claims (the "**NewCo Liquid Cryptocurrency**").

Holders of General Earn Claims, Convenience Claims that elect to receive the treatment of General Earn Claims, Withhold Claims (after accounting for the treatment provided in the Withhold Settlement) and Borrow Claims (after accounting for the Set Off Treatment) will receive 100% of the equity interests in NewCo, subject to dilution by equity issued to the Plan Sponsor as Management Compensation, as set forth herein.

On the Effective Date, the common equity shall be distributed under the Plan in the form of shares of common stock in NewCo (the "**NewCo Equity**").  To the extent the Debtors, the Committee, and the Plan Sponsor determine that a tokenized distribution mechanism (*e.g.* Securitize) that complies with applicable regulations is feasible, such parties shall have the option to place the NewCo Equity with such tokenized distribution mechanism.  From and after the Effective Date, the Fahrenheit Team will actively advise with respect to the management of NewCo at the direction of the New Board for the benefit of holders of the NewCo Equity.  Peter Briger will consult and advise NewCo with respect to its loan portfolio.

Earn Treatment:  Each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the (1) the Liquid Cryptocurrency Distribution Amount, (2) Litigation Proceeds, and (3) NewCo Equity (subject to dilution by the Management Compensation).

Convenience Class:  The Fahrenheit Plan proposes the same treatment for Allowed Convenience Claims as set forth in the Current Proposed Plan.

Custody / Withhold Treatment:  The Fahrenheit Plan proposes to offer certain Account Holders whose claims are associated with the Custody and Withhold Programs the same ability to elect to receive program-specific treatment based on the Custody Settlements and Withhold Settlements reflected in the Current Proposed Plan, which settlements and proposed treatments are fully incorporated in this Term Sheet by reference.

Borrow Treatment:  The Fahrenheit Plan may include a settlement of Borrow

Claims on terms acceptable to the Debtors and the Committee; *provided*, that the economic terms on which Valon (as defined below) or another loan servicer would service any structured settlements with holders of Borrow Claims will be subject to the agreement of Valon (or another loan servicer), the Debtors, the Committee, and the Plan Sponsor; *provided* that, notwithstanding anything set forth herein, a minimum of $500 million (or not less than $450 million solely in the event that the Secondary Market Purchase occurs) in Liquid Cryptocurrency shall be transferred to NewCo free and clear on the Effective Date subject to adjustment with the agreement of the Plan Sponsor to account for any potential settlement of Borrow Claims.

Fahrenheit agrees that the plan of reorganization memorializing the provisions of this Term Sheet (the "**Fahrenheit Plan**") shall otherwise adopt the treatment and provisions included in the Current Proposed Plan, with modifications to reflect this Term Sheet which modifications shall be reasonably acceptable to Fahrenheit, the Debtors and the Committee.

Management/Plan Sponsor Compensation: In exchange for its services, the Plan Sponsor and management team of NewCo identified below as the NewCo Management Team shall receive the following compensation (collectively, the "**Management Compensation**"), each of which shall be memorialized in a management agreement (the "**Management Agreement**") or other appropriate employment contract to be negotiated and agreed to by the Debtors, the Committee, and the Plan Sponsor:

- Fixed Management Fee: $35 million per year (the "**Fixed Management Fee**"), which is inclusive of (1) a mining management fee of $15 million, (the "**Mining Management Fee**") and (2) compensation for the (a) CEO, (b) COO, (c) CFO, (d) CMO; (e) General Counsel, (f) Chief Accounting Officer, (g) Chief Risk Officer, (h) other C-suite executives or heads of staking and mining businesses (if any), and (i) any individuals filling roles traditionally satisfied by individuals with the foregoing titles, regardless of the ultimate title assigned to such individuals (the "**NewCo Management Team**")

- Incentive Stock Units: Five percent (5%) of NewCo Equity which shall vest ratably over 5 years annually, with such vesting to occur at the end of the applicable one year period.

- Stock Options:  At the election of the Debtors and Committee to be made as of or prior to the Effective Date, and in each case with the granting of such option to occur at the end of the applicable one year period, either:

  o  Options to purchase 5% of NewCo Equity, structured in 5 tranches of 5 year options of 1.0% with 1 tranche granted each year at the anniversary of the Effective Date, with the strike price for each year set at the trading price of the NewCo Equity as of the close of the market on the preceding business day, or

    ○    Options to purchase 5% of NewCo Equity, structured in 5 tranches of 5 year options of 1.0% with 1 tranche granted each year at the anniversary of the Effective Date, with each year's strike price set at the trailing 90-day average level of the CMC 200 Index including BTC or other index to be agreed in good faith by the Debtors, Fahrenheit, and the Committee on or prior to the Effective Date. The index level used to set the strike price of each year's option issuance is based on the cumulative change in the index from the Effective Date. The initial strike price shall be calculated using Effective Date NAV (calculated using the midpoint of the valuation in the Disclosure Statements) divided by outstanding shares at emergence ("**Plan Value**").

- All Management Compensation and any other amounts payable under the Management Agreement set forth above or in any applicable employment/service agreements shall be payable to Fahrenheit, the applicable employee of NewCo, or one or more entities designated by Fahrenheit to receive such payments.

<u>Plan Sponsor Contribution</u>: On the Effective Date, the Plan Sponsor shall purchase $50 million of NewCo Equity (the "**Plan Sponsor Shares**") through primary purchases from NewCo at Plan Value or secondary equity purchases at the Debtors' and Committee's election, in each case subject to a two-year lockup; <u>provided</u>, that from and after the date that is one year from the Effective Date and expiring at the conclusion of the second year of the two-year lockup (the "**Unlock Period**"), the Plan Sponsor may sell: (i) up to 30% of the Plan Sponsor Shares issued on the Effective Date if, at any point during the Unlock Period, the NewCo Equity is trading at 150% of NewCo's net asset value as of the Effective Date; and (ii) an additional up to 30% of the Plan Sponsor Shares issued on the Effective Date if, at any point during the Unlock Period, the NewCo Equity is trading at 200% of NewCo's net asset value as of the Effective Date; <u>provided</u>, that, for the avoidance of doubt, the Plan Sponsors may not sell more than 60% in the aggregate of the Plan Sponsor Shares issued on the Effective Date during the Unlock Period; <u>provided</u>, <u>further</u>, that if the Plan Sponsor Contribution results in the purchase of NewCo Equity through the secondary market, the NewCo Liquid Cryptocurrency Amount shall be reduced to $450 million. Any Secondary Market Purchase shall be subject to NewCo's investment policy to be approved by the New Board.

<u>Releases</u>: The Plan shall contain standard release and exculpation provisions applicable only to the same specific parties as identified in the Current Proposed Plan, or otherwise agreed to by the Debtors and the Committee (and timely disclosed in the Plan Supplement). For the avoidance of doubt, the Excluded Parties—including, without limitation, Alexander Mashinsky, Shlomi Daniel Leon, and all the other UCC Stipulation Defendants—shall be *excluded* from the release and exculpation provisions.

<u>Orderly Wind-Down Toggle</u>: The Plan will provide that the Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down

| | |
|---|---|
| | Procedures if, at any time prior to the confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; provided that the Debtors and Committee may move for an Orderly Wind Down at any time prior to confirmation of the Plan by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court.<br><br>Regulatory Cooperation:  The Debtors, the Committee, and Fahrenheit will coordinated and cooperate regarding obtaining all necessary regulatory approvals for the transactions and business lines contemplated by the Fahrenheit Plan. |
| *Additional Material Improvements Over Current Proposed Plan* | In addition to the terms set forth above, this Term Sheet contains certain other material improvements over the Current Proposed Plan, including:<br><br><ul><li>NewCo Officers/Management:  Subject to the approval of the New Board, (1) Steven Kokinos will serve as Chief Executive Officer of NewCo; and (2) Joel Block will serve as Chief Financial Officer of NewCo (together with any successors appointed by the New Board, the "**Executive Management Team**").<br><br>For the avoidance of doubt, the compensation to be paid to the Executive Management Team shall be deducted from the Management Compensation.</li><br><li>Industry Leading Expertise:  The Fahrenheit Team, led by the Executive Management Team, Michael Arrington, Ravi Kaza, Noah Jessop, and Asher Genoot will include industry leaders in operating PoS networks, venture/defi/token portfolio management, and monetization capabilities. Each member of the Fahrenheit Team shall actively participate in the management of NewCo, with the New Board approving a policy governing the involvement and commitment of each member of the Fahrenheit Team, including Ravi Kaza, Michael Arrington, and Noah Jessop.<br><br>A comprehensive business plan respecting NewCo was attached as **Exhibit A** to the Bid Letter submitted by the Fahrenheit on April 17, 2023.</li><br><li>Mining Consideration:  US Bitcoin will manage the Mining assets pursuant to one or more operating and services agreements to be entered into between US Bitcoin and NewCo, which agreements shall be terminable if it is determined by the New Board that U.S. Bitcoin cannot provide the services contemplated by this Term Sheet, including the inability to provide the intellectual property and software referenced in the bullet immediately below.<ul><li>US Bitcoin shall provide the Debtors the option to enter into a royalty-free license for the duration of the term of the</li></ul></li></ul> |

operating and services agreements, without sublicense rights, of intellectual property owned by US Bitcoin (or other rights to use the applicable software or proprietary technology) for (1) the miner management software referred to as the Operator, and (2) curtailment management software referred to as the Reactor. To the extent the New Board informs Fahrenheit that the Management Agreement will not be renewed under the terms of the Management Agreement, US Bitcoin and Fahrenheit shall use commercially reasonable efforts to transition all NewCo data and systems to commercially reasonable alternative product or assist NewCo in building and installing a fully-owned and operated alternative system.

o   US Bitcoin shall build and energize a 100 megawatt ("**MW**") of bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and US Bitcoin reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board. To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. The construction of medium voltage to plug ready infrastructure shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW (for a total of 400 MW). The capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the term of the Management Agreement, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.

o   US Bitcoin shall provide all site level employees (excluding security) for all existing Celsius self-mining facilities and any facilities developed by Celsius or NewCo for cost, but in any event subject to a cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; *provided,* that to the extent there are existing obligations of the Debtors with respect to existing Celsius self-

mining facilities that are not replaced by US Bitcoin the $2 million cap shall not apply to such obligations.

o   From the date hereof, but subject to the occurrence of the Effective Date, US Bitcoin shall use its commercially reasonable efforts to contribute the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to US Bitcoin identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that US Bitcoin is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.

o   To the extent that Fahrenheit is selected as the successful bid, US Bitcoin will provide the Debtors or NewCo, as applicable, with an option which can be exercised on or before the date that is six months from the date of this Term Sheet to purchase an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such site) identified to the Debtors and the Committee during the bid process for $575,000 per MW that is "plug ready," and support the immediate installation at miners at such site upon Bankruptcy Court approval of such purchase. To the extent that the Fahrenheit Plan is not confirmed or does not go effective, the Debtors or NewCo (as applicable) shall enter into a mining management agreement with US Bitcoin respecting such 50 MW site on terms acceptable to the parties.

o   To the extent that the Debtors or NewCo, as applicable, elect not to purchase the Alpha facility, US Bitcoin will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

o   US Bitcoin will offer up to 50 MW of immediately available containers and transformers currently owned by US Bitcoin, and other supplies to the Debtors or NewCo, as applicable, at the lower of its cost to obtain such items or market prices.

o   In the event that NewCo elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, US Bitcoin will offer NewCo a 3-month option to purchase the substation materials that US Bitcoin currently has on its balance sheet for cost.

o   US Bitcoin will offer 20,000 rack spaces to the Debtors or NewCo, as applicable, for a 5-year term, or a period to be

negotiated between the US Bitcoin, US Bitcoin's partner, the Debtors and the Committee.

o   US Bitcoin, in partnership with a strategic partner, will offer NewCo an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

o   US Bitcoin will contribute to NewCo a strategic partnership agreement with an ASIC manufacturer that will give NewCo the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at NewCo's option) on the terms set forth in the accompanying letter agreement.

o   US Bitcoin will contribute to NewCo one hundred million dollars ($100,000,000) in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by NewCo on the terms set forth in the accompanying letter agreement.

o   US Bitcoin will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and NewCo, including by seeking extension of expiration deadlines currently applicable to such credits.

o   US Bitcoin will provide the Debtors and NewCo with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee.

o   Between the execution of this Term Sheet and the Effective Date, US Bitcoin will provide the Debtors with the option to begin using the mining management and services set forth above subject to agreement between US Bitcoin, the Debtors, and the Committee respecting such services and associated costs, and subject to any required Bankruptcy Court approvals, if any.

o   Fahrenheit and U.S. Bitcoin shall indemnify NewCo with respect to any and all claims and damages related to the causes of action asserted in the lawsuit styled *Lancium LLC v. U.S. Data Mining Group, Inc. et al*. (W.D. Tex. Civ. A. No. 6:23-cv-00344).

- NewCo Equity / Liquidity Platform:  Holders of Allowed General Earn Claims will receive 100% of the NewCo Equity (subject to dilution on account of the Management Compensation as set forth herein) in the form of common stock. Fahrenheit will use commercially reasonable efforts, in conjunction with NewCo, to have the NewCo Equity listed on a stock exchange (*e.g.*, NASDAQ, Abu Dhabi Securities Exchange (ADX), NASDAQ Dubai) acceptable to the New Board as of, or as

soon as reasonably practicable following, the Effective Date.  To the extent that the NewCo Equity cannot be listed on an acceptable stock exchange within a reasonable period of time to be determined by the New Board, Fahrenheit will use commercially reasonable efforts, in conjunction with NewCo, to have the NewCo Equity traded in the over-the-counter (OTC) market or listed through a security token.

Fahrenheit agrees to use commercially reasonable efforts to raise capital for a rights offering or other funding mechanism for eligible third parties and creditors to purchase NewCo Equity in connection with the Plan.

- Proof Group Staking Consideration:    At the Debtors' and the Committee's option, Proof Group will (1) provide NewCo with a royalty-free, perpetual license, without sublicense rights, of intellectual property owned by Proof Group (or other rights to use the applicable software or proprietary technology) ("Proof Group IP") with respect to staking services, and (2) commitment to support staking in NewCo using the Proof Group IP at no cost to NewCo. The Proof Group, its principals (including Noah Jessop), and its managed entities and affiliates (including Proof Group LP) agree that, from the time of the determination that the Fahrenheit bid is the highest and best bid at the auction, none of them will engage in staking businesses (other than existing fund raises and investments) outside of NewCo, without the prior written consent of (i) prior to the effective date of the Fahrenheit Plan, the Debtors and the Committee and (ii) following the effective date of Fahrenheit Plan, the NewCo Board.

  Prior to the Effective Date, Proof Group will offer its staking services to the Debtors at pass through costs (subject to necessary Bankruptcy Court approvals, if any).

  In the event that NewCo licenses the Proof Group IP, on or after the Effective Date, Proof Group shall migrate its current staking customers to NewCo to the extent such customers agree to be transferred to NewCo and shall drop those customers that do not agree to be transferred to NewCo.

  In the event the Debtors and the Committee elect to toggle to the Orderly Wind Down or the Fahrenheit Plan is not otherwise confirmed and determined to be effective, any rights to the Proof Group IP and any Proof Group customers transferred to NewCo shall revert to Proof Group.

- Loan Services: At the option of the Debtors and the Committee after the Effective Date of the Fahrenheit Plan, NewCo's option, Valon Technologies, Inc. ("Valon") shall provide services and licenses to service and originate loans or structured settlements for NewCo at a price to be agreed by NewCo and Valon.  The Fahrenheit team will work with the New Board and Executive Management Team to

potentially introduce new lending products and services, only as permitted by applicable law. None of the Fahrenheit team shall participate or develop any cryptocurrency-related lending product outside of NewCo.

- Exclusivity and Disclosure: For as long as the Plan Sponsor or any member of the Executive Management Team is involved in the management of NewCo, then Fahrenheit, Proof Group, and Arrington Capital (together with the principals of Proof Group and Arrington Capital, the "**Fahrenheit Exclusivity Parties**") will each have a customary global allocation policy that includes NewCo; *provided* that the Debtors, the Committee, and the Plan Sponsor shall negotiate in good faith regarding the application of the following restrictions to the Plan Sponsor and Executive Management Team in the event that the Plan Sponsor or any member of the Executive Management Team is no longer involved in the management of NewCo:

  o NewCo shall have a right of first offer on (1) the creation of operating cryptocurrency businesses by the Fahrenheit Exclusivity Parties and (2) cryptocurrency-related investments (including acquisitions of ownership stakes in new operating cryptocurrency businesses or acquisitions of the material assets of operating cryptocurrency businesses) with a proposed investment in excess of $20 million that is proposed to be entered into by the Fahrenheit Exclusivity Parties or any of their respective managed funds or entities; provided that the Fahrenheit Exclusivity Parties shall be deemed to have satisfied this obligation to the extent that any investment opportunity in the preceding (1) or (2) was provided to NewCo, regardless of whether NewCo chooses to pursue the opportunity and regardless of whether NewCo reaches agreement with the potential counterparty.

  o Arrington Capital and Proof Group will share substantially all deal flow with NewCo and use commercially reasonable efforts to include NewCo in any deals of interest to NewCo.

  o Fahrenheit, Proof Group, and Arrington Capital will each have a customary global allocation policy that includes NewCo.

  o The Fahrenheit Exclusivity Parties will work in good faith with the New Board to create appropriate conflict and disclosure policies. For the avoidance of doubt, the Fahrenheit Exclusivity Parties, US Bitcoin, and Messrs. Kokinos and Kaza will disclose all financial conflicts that they may respectively have while advising and managing NewCo.

  o NewCo may, at its discretion, become investors in any member funds of the Fahrenheit Exclusivity Parties (fund General Partners to waive fund minimums as needed and able)

| | solely so that NewCo may receive customary investor disclosures, including quarterly portfolio detail, investor communications, and audited financials. |
|---|---|
| *Deposit* | The Plan Sponsor shall submit a $10,000,000 cash deposit (the "**Deposit**"), submitted by wire transfer of immediately available funds to an escrow account to be identified by the Debtors as soon as possible.  Such Deposit shall be received by the escrow account no later than three (3) business days after Fahrenheit is named the lead bidder at the auction.   The Deposit shall be: (i) subject to an escrow agreement acceptable to Fahrenheit; and (ii) placed into a U.S. Treasury money market fund, with proceeds payable to Fahrenheit. <br><br> To the extent that the Fahrenheit Plan is selected as the highest and/or best bid at the Auction and Fahrenheit is selected as the Successful Bidder, then the Deposit and all proceeds thereof shall be returned to Fahrenheit, paid to the Debtors, or applied against the Management Contribution, as the case may be, as set forth in the Plan Sponsor Agreement. <br><br> To the extent that the Fahrenheit Plan is not selected as the highest and/or best bid at the Auction or Fahrenheit is not selected as the Successful Bidder, or if the Plan Sponsor Agreement is not agreed to and executed as set forth herein, then the Deposit and all proceeds thereof shall be returned to Fahrenheit within two (2) business days of any such determination or the failure of the parties to timely execute the Plan Sponsor Agreement, as applicable. |
| *Liquid Cryptocurrency Distributions* | The Debtors, the Committee, and the Plan Sponsor shall mutually agree on the identity of any distribution agent(s) and the terms of any agreement(s) with such distribution agent(s). |
| *Key Assumptions* | This Term Sheet is predicated on the same assumptions as set forth in the Current Proposed Plan, including, without limitation, as it relates to: (i) the Earn Program; (ii) account balances reflected in the Debtors' records as "withheld" (iii) the Custody Program; (iv) the priority of Account Holder Claims; and (v) the value of the CEL Token. |
| *NewCo and Management Arrangements* | The Executive Management Team and the Plan Sponsor will manage NewCo at the direction of the New Board for the benefit of holders of the NewCo Equity in accordance with the terms of the Management Agreement and the New Organizational Documents.  NewCo will implement a policy regarding the provision of quarterly dividends to holders of the NewCo Equity, which dividends, if any, shall be paid in Cash at the discretion of the New Board in accordance with the New Organizational Documents and applicable law. <br><br> In exchange for its services, the Plan Sponsor and Executive Management Team will be paid the Management Fee (both of which, for the avoidance of doubt, |

11

| | |
|---|---|
| | shall be modified in accordance with the Management Agreement Term Sheet), as will be more fully described in the Management Agreement.<br><br>NewCo will be a public reporting company and will file financial statements on Forms 10-Q and 10-K as well as annual proxy statements.<br><br>The New Organizational Documents shall be included in the Plan Supplement and shall be consistent with the revised Management Agreement Term Sheet in all material respects.<br><br>NewCo shall have any and all necessary licenses, if any, to fulfill its obligations under the Plan (including any settlements entered in connection therewith) or, to the extent NewCo does not possess such licenses, NewCo shall use commercially reasonable efforts to make appropriate arrangements through a partnership with a third party to ensure that NewCo can meet its obligations under the Plan without disruption. |
| *Governance* | The New Board shall initially consist of seven members: (i) two of whom will be appointed by the Plan Sponsor; (ii) three of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange.<br><br>Members of the New Board (other than the designees of the Plan Sponsor) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member may be reelected at the end of their term; <u>provided</u> that, for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect two members of the New Board.<br><br>The Management Agreement shall be in form and substance consistent with this Term Sheet and acceptable to the Debtors, the Committee, and the Plan Sponsor. The Management Agreement's initial term will be five years, subject to two consecutive two-year renewals periods at the option of the New Board in its sole discretion; <u>provided</u> that the Management Agreement and each member of the NewCo Management Team shall be subject to termination for cause, as will be defined in the Management Agreement.  The Management Agreement shall provide that such extensions are at the same Fixed Management Fee, adjusted for inflation, with no additional equity issued to Fahrenheit or any executive whose compensation is included in the Fixed Management Fee.<br><br>Following the first five-year term (the "**Initial Term**"), the New Board shall provide notice no more than twelve (12) months but not less than six (6) months prior to the end of the Initial Term or any renewal term that it does not wish to renew the Management Agreement, wishes to exercise its renewal option, or wishes to renew the Management Agreement on different terms. To the extent the Management Agreement is terminated, NewCo shall have no further obligation to pay the Management Fee.  NewCo shall have the option for up to |

| | |
|---|---|
| | two renewal terms of two years each, on the same fee terms but excluding any equity fees or rights but adjusting the cash fee for inflation. |
| | The New Board shall adopt and approve: (i) the investment policy; (ii) the dividend policy; (iii) any policies regarding potential conflicts of interest (including with respect to Fahrenheit, NewCo, and their respective personnel and Affiliates); (iv) all major investment and operational decisions of NewCo (taking into account the recommendation of the CEO and CFO); and (v) a policy governing the involvement and commitment of each member of the Fahrenheit Team, including Ravi Kaza, Michael Arrington, and Noah Jessop.  To the extent the investment policy includes an allocation for new venture investments, such investments shall be less than 5% of the total investment policy, unless otherwise approved by the NewCo board.    The CEO, CFO, and C-Suite executives all serve at the pleasure of the New Board. |
| | The New Organizational Documents shall provide for the ability of 25% of the NewCo Equity holders to call, and for NewCo to convene in such case, a special meeting of shareholders to, with the approval of a majority of the NewCo Equity held by holders that (i) are in attendance (in person or by proxy) and (ii) vote for or against such proposal at such special meeting where a quorum exists in accordance with the New Organizational Documents, instruct the New Board to consider whether to terminate or reconsider the Management Agreement, the Plan Sponsor, or the Executive Team, or wind down NewCo, in each case, to the extent provided for in the Management Agreement. |
| *Releases and Exculpations* | The Plan shall include customary release, exculpation, and injunction provisions on the same terms and conditions as set forth in the Current Proposed Plan. |
| *Orderly Wind Down* | The Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down Procedures if, at any time prior to confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo, provided that the Debtors and Committee may move for an Orderly Wind Down at any time prior to confirmation of the Plan by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court. |
| | In the event of an Orderly Wind Down, (a) the Plan Administrator or any other Person or Entity identified by the Debtors and the Committee will wind down the Estates and (b) the Debtor's Cryptocurrency, Cash, and other assets will be distributed, in each case, in an orderly manner pursuant to the Plan and the Wind-Down Procedures. |
| | The Orderly Wind Down is anticipated to occur over a wind-down period to be set forth in the Wind-Down Procedures. |
| | Notwithstanding anything to the contrary in the Plan, this Term Sheet, or the Plan Sponsor Agreement, whether or not the Debtors implement the Orderly |

13

| | |
|---|---|
| | Wind Down, the Litigation Administrator shall be appointed on the date that the Effective Date occurs. |
| *Near-Term Liquidity* | The Debtors, the Committee, and the Plan Sponsor shall agree on mechanisms to ensure a liquid market for the NewCo Equity, which mechanisms shall be described in the Disclosure Statement and/or Plan Supplement. |
| *Conditions Precedent to Confirmation* | The Plan shall provide that Confirmation of the Plan (in addition to other reasonable and customary conditions, including as set forth in the Plan Sponsor Agreement) shall be subject to the occurrence of the following, unless waived in accordance with the Plan: <br><br> (i) The Bankruptcy Court shall have entered the Disclosure Statement Order; <br><br> (ii) the Management Agreement, the New Organizational Documents, the Valon Agreements, the distribution agent agreement(s), and the USBTC Agreements shall be agreed as required under the Plan Sponsor Agreement; <br><br> (iii) the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and <br><br> (iv) the Bankruptcy Court shall have entered the Confirmation Order. |
| *Conditions Precedent to Effective Date* | The Plan shall provide that the Effective Date of the Plan (in addition to other reasonable and customary conditions, including as set forth in the Plan Sponsor Agreement) shall be subject to the occurrence of the following, unless waived in accordance with the Plan: <br><br> (i) the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order); <br><br> (ii) NewCo shall have obtained all regulatory approvals included in <u>Schedule 1</u> to the Plan Sponsor Agreement, and any applicable waiting periods related thereto shall have expired or terminated early; <br><br> (iii) the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with this Plan Term Sheet in all material respects, and shall have been Filed in a manner consistent with this Plan Term Sheet; <br><br> (iv) the Debtors shall have transferred, liquidated, monetized, or sold Cryptocurrency in an amount equal to an amount determined by the Debtors, and consented to by the Committee, as reasonably necessary to pay in full, or reserve for payment in full of, all |

|  | Allowed Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims (the "**Senior Claims Amount**"); |
|  | (v) the Litigation Administrator Agreement shall have been executed and the Litigation Recovery Account shall have been established and funded with the Initial Litigation Funding Amount; |
|  | (vi) each Definitive Document (as defined in the Plan Sponsor Agreement) and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, if applicable, in form and substance consistent in all material respects with the Plan and the Plan Sponsor Agreement, and shall not have been modified in a manner inconsistent therewith; |
|  | (vii) the Professional Fee Escrow Account shall have been established and funded with Cash in accordance with the Plan; and |
|  | (viii) the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date. |
| *Tax Matters* | The Plan and the various transactions thereunder shall be structured in a tax-efficient and cost-effective manner to be agreed among the Debtors, the Committee, and Fahrenheit, each in their reasonable discretion. |
|  | Holders of Earn Claims who are projected to receive more than $100,000 in Liquid Cryptocurrency distributions may contact the Debtors to discuss potential individualized accommodations to the composition of their liquid recovery (including a discussion of the allocation of the associated administrative costs of such customized distributions), and the Debtors, in consultation with the Committee, shall use commercially reasonable efforts to accommodate those requests, in the aggregate, solely to the extent permitted by applicable regulatory requirements. |
| *Plan Sponsor Agreement* | To the extent that the Fahrenheit Plan is selected as the highest and/or best bid at the Auction and Fahrenheit is selected as the Successful Bidder, then Fahrenheit, the Debtors, and the Committee shall execute a Plan Sponsor Agreement in form and substance acceptable to each of the foregoing parties not later than five (5) business days following the conclusion of the Auction. The Plan Sponsor Agreement shall include a milestone of June 30, 2023 for the filing of a plan and disclosure statement (the "**Plan and DS Milestone**"). To the extent a plan and disclosure statement are not filed by the Plan and DS Milestone, the PSA shall terminate, the Debtors and Committee shall toggle to an orderly wind down, and the Debtors shall be entitled to keep the the Deposit; *provided*, that to the extent the Plan and DS Milestone is not achieved due to no fault of Fahrenheit, the Deposit shall be returned to Fahrenheit. The Plan Sponsor Agreement shall include provisions addressing, among other things, |

|  | milestones, return of the Deposit, termination events, and conditions precedent to the confirmation and occurrence of the Effective Date of the Fahrenheit Plan. Further, the Plan Support Agreement shall provide for the reimbursement of the fees and expenses of the Plan Sponsor up to $5 million.  The Debtors shall seek approval of the up to $5 million expense reimbursement as part of the motion to approve the Disclosure Statement, which request shall be supported by the Committee. |

## **Exhibit B**

**Backup Plan Administration Agreement Term Sheet**

## BACKUP PLAN ADMINISTRATION AGREEMENT TERM SHEET

This term sheet (the "Term Sheet") summarizes certain proposed terms and conditions of a Backup Plan Administration Agreement, which would be consummated pursuant to arrangements satisfactory to the BRIC and the Debtors, pursuant to consummation of a plan of reorganization in the Debtors' chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE.  NOTHING CONTAINED IN THIS BACKUP PLAN TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY.  THIS BACKUP PLAN TERM SHEET IS BINDING SOLELY TO THE EXTENT PROVIDED IN THE PLAN SPONSOR AGREEMENT.**

| BACKUP PLAN ADMINISTRATION AGREEMENT TERM SHEET | |
|---|---|
| **Overview** | The Backup Plan Administration Agreement will be entered into between the Backup Plan Administrator and the Debtors and will include the following terms.  Terms capitalized but not defined in this Terms Sheet will have the meanings ascribed to such terms in the Backup Plan Sponsor Agreement or Backup Plan, as applicable.  Except as otherwise required by the context of this Term Sheet, this Term Sheet contemplates that the Debtors have determined to terminate a NewCo Transaction with the Successful Bidder or other plan sponsor, as applicable, and instead implement the transactions contemplated by the Backup Plan Sponsor Agreement (including the Backup Transactions) through the Backup Plan. |
| | The Backup Plan Sponsor Agreement shall provide that the Debtors shall have the right to terminate the pre-Effective Date consultation services to be provided by the BRIC to the Debtors and the Committee upon 30-days' notice, and such termination shall terminate the BRIC's obligation to serve as the Backup Bidder (as defined in the Backup Plan Sponsor Agreement). |
| **Term** | After the Backup Plan Effective Date, the Backup Plan Administration Agreement's initial term will be five years from the Backup Plan Effective Date. |
| | Following the first five-year term (the "Initial Term"), the Oversight Committee shall decide whether to renew or terminate the Backup Plan Administration Agreement (each such renewal term, a "Renewal Term"). |
| | If the Backup Plan Administration Agreement is terminated, the Backup Plan Administrator Fees will cease to accrue as of the date of such termination.  Any Backup Plan Administrator Fees accrued prior to such |

| | |
|---|---|
| | termination date shall be payable by the Wind Down Estate to the Backup Plan Administrator upon such termination. |
| **Role of the Backup Plan Administrator; Services Performed** | Upon the Debtors' determination, in consultation with the Committee, to toggle to the Backup Plan, prior to the Backup Plan Effective Date, at the direction of the Special Committee and, in consultation with the Committee, the proposed Backup Plan Administrator shall develop the Data Science, Claims Reconciliation and Distribution Services Program.<br><br>After the Backup Plan Effective Date, the Backup Plan Administrator, at the direction of the Oversight Committee will adopt and implement the Data Science, Claims Reconciliation and Distribution Services Program, and approve and oversee the investment policy, dividend policy, any policies regarding conflicts of interest (including with respect to the Backup Plan Sponsor and the BRIC Exchange Partner, and their respective personnel and Affiliates), and all major investment and operational decisions of the Wind Down Estate. Subject always to the oversight, supervision, and approval of the Oversight Committee, the Backup Plan Administrator will perform the following services (the "Services"):<br><br>• manage the Wind Down Estate's day-to-day business and operations, including managing its liquidity and capital resources;<br><br>• evaluate, manage, negotiate and oversee the disposition of all or any part of the property or assets of the Wind Down Estate; and<br><br>• perform any other services for and on behalf of Wind Down Estate to the extent necessary or appropriate. |

| Fees Paid to Backup Plan Administrator | After the Backup Plan Effective Date the Backup Plan Administrator shall receive the following fees: |
|---|---|
| | • a $50 million administration fee, which will be payable in $10 million annual installments beginning on the Backup Plan Effective Date and ending on the fifth anniversary of the Backup Plan Effective Date, provided that, if the chapter 11 cases are closed before the fifth anniversary of the Backup Plan Effective Date, the remaining balance of the plan administration fee shall be immediately due and payable (the "Backup Plan Administration Fee"), plus |
| | • a percentage of any distributions (the "Distribution Fees"), to be paid as follows and within 10 days of the end of each applicable period: (i) a flat fee of $15 million for the initial distribution, which initial distribution shall be made before the six month anniversary of the Backup Plan Effective Date; (ii) 1.25% of any distributions made between the six month anniversary of the Backup Plan Effective Date and the one year anniversary of the Effective Date; (iii) 1.00% of any distributions made between the first and second anniversaries of the Backup Plan Effective Date; (iv) 0.75% of any distributions made between the second and third anniversaries of the Backup Plan Effective Date; (v) 0.50% of any distributions made between the third and fourth anniversaries of the Backup Plan Effective Date; (vi) 0.25% of any distributions made between the fourth and fifth anniversaries of the Backup Plan Effective Date; and (vii) 0.00% of any distributions made after the fifth anniversary of the Backup Plan Effective Date; plus |
| | • a "Value Creation Incentive Fee" equal to 10% of value recovered above the initial asset valuation and/or IP developed or developed with funding by the estate exclusive of price appreciation on liquid BTC/ETH at emergence.[1] |
| | • An "Efficiency Incentive Fee" equal to 20% of any savings achieved as compared to the annual budget for that year, provided that the Backup Plan Administrator has achieved the operational milestones established for that year. (Each year, the Backup Plan Administrator and the Oversight Committee shall establish operational milestones and annual budgets for operating expenses and any other pass through costs, including, without limitation, advisory and execution consultants, third-party distribution |

---

[1]    The BRIC, the Debtors, and the Committee shall determine the initial asset valuation prior to the Backup Plan Effective Date with any unresolved disputes to be resolved by the Oversight Committee. To the extent that there is an opportunity to develop and build new scaled businesses, the Backup Plan Administrator will work in good faith with the Oversight Committee on an appropriate incentive / equity package for those involved, to be approved by the Oversight Committee.

| | platform, and other costs.  Each year the Backup Plan Administrator shall earn a fee equal.). |
|---|---|
| **Fees Paid to Members of Oversight Committee** | Each member of the Oversight Committee shall be compensated (the "<u>Oversight Committee Fee</u>") on an annual basis in an amount to be agreed upon with the Debtors and the Committee, in consultation with the BRIC.  Such proposed compensation shall be disclosed in the Backup Plan Supplement at least 14 days prior to the Confirmation Hearing for the Backup Plan. |
| **Expenses** | The Wind Down Estate shall reimburse the Backup Plan Administrator and the Oversight Committee for all reasonable and documented expenses, including the reasonable and documented fees and expenses of outside service providers such as legal counsel, accountants and other professionals, advisors and consultants.  For the avoidance of doubt, expenses shall not be deducted from the Backup Plan Administration Fee, Distribution Fee, or the Incentive Fees. |
| **Indemnification** | The Wind Down Estate will indemnify reimburse, defend, and hold harmless the Backup Plan Administrator, the BRIC Exchange Partner, the BRIC Loan Servicing Partner, the BRIC Mining Partner, the members of the Oversight Committee, and their respective successors and permitted assigns, together with their respective employees, officers, members, managers, directors, agents and representatives (collectively the "<u>Indemnified Parties</u>"), from and against all losses (including lost profits), costs, damages, injuries, taxes, penalties, interests, expenses, obligations, claims and liabilities (joint or severable) of any kind or nature whatsoever (collectively "<u>Losses</u>") that are incurred by such Indemnified Parties in connection with, relating to or arising out of the performance of any Services hereunder; *provided, however*, that the Wind Down Estate will not be obligated to indemnify, reimburse, defend, or hold harmless an Indemnified Party for any losses incurred in connection with, relating to or arising out of gross negligence, willful misconduct or fraud of such Indemnified Party.<br><br>The Indemnified Parties will also be indemnified from all Losses due to the negligence of third-party brokers, collateral managers or other third-party agents of the Post-Effective Date Debtors, the Wind Down Estate, the Backup Plan Administrator, or the Oversight Committee. |

| | |
|---|---|
| **Exculpation** | The Backup Plan Administrator, the BRIC Exchange Partner, the BRIC Loan Servicing Partner, the BRIC Mining Partner and the members of the Oversight Committee (collectively, the "Exculpated Parties") will not be liable for, and the Wind Down Estate will not take, or permit to be taken, any action against the Exculpated Parties to hold the Exculpated Parties liable for, any error of judgment or mistake of law or for any loss suffered by the Post-Effective Date Debtors or the Wind Down Estate (including, without limitation, by reason of the purchase, sale or retention of any security) in connection with the performance of their duties under the Backup Plan Administration Agreement except for any error of judgement, mistake of law, or loss suffered resulting from gross negligence, willful misconduct or fraud committed by an Exculpated Party.<br><br>The Exculpated Parties will not be liable for any loss due to the negligence of third-party brokers, collateral managers or other third-party agents of the Post-Effective Date Debtors, the Wind Down Estate, the Backup Plan Administrator, or the Oversight Committee. |