Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF DEBTORS' ENTRY INTO PLAN SPONSOR AGREEMENT**

**PLEASE TAKE NOTICE** that on November 2, 2022, the United States Bankruptcy Court

for the Southern District of New York (the "Court") entered the *Order (I) Approving the Bidding*

*Procedures In Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling*

*Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof,*

*(IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Relief* [Docket No. 1272] (the "Order"), approving certain dates, deadlines, and procedures for the potential sale of substantially all of the Debtors' assets (the "Bidding Procedures").[2]

**PLEASE TAKE FURTHER NOTICE** that on March 1, 2023, pursuant to and in accordance with paragraph 12 of the Order and Section VI of the Bidding Procedures, the Debtors, in consultation with the Committee, filed the *Notice of (I) Selection of Stalking Horse Bidder and (II) Amended Dates and Deadlines with Respect to Bidding Procedures for the Potential Sale of Substantially All of the Debtors' Assets* [Docket No. 2150] (the "Notice of Stalking Horse Bidder"), which designated NovaWulf Digital Management, LP ("NovaWulf") as the Stalking Horse Bidder, announced that the Debtors, the Committee, and NovaWulf executed a plan sponsor agreement, and extended the Final Bid Deadline to April 17, 2023.

**PLEASE TAKE FURTHER NOTICE** that, following the Debtors filing of the Notice of Stalking Horse Bidder and prior to the Final Bid Deadline, the Debtors received two additional Qualified Bids from: (1) Fahrenheit, LLC, whose equity is owned, directly or indirectly, by Arrington Capital, U.S. Data Mining Group, Inc. (d/b/a U.S. Bitcoin Corp.), Proof Group Capital Management LLC, Steven Kokinos, and Ravi Kaza ("Fahrenheit"); and (2) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (the "BRIC").

**PLEASE TAKE FURTHER NOTICE** that on April 22, 2023, the Debtors filed the *Notice of Auction* [Docket No. 2519], which established April 25, 2023 (prevailing Eastern Time) as the date that the Auction would commence.

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Order or Bidding Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph G of the Order and Section XI of the Bidding Procedures, the Debtors, in consultation with the Committee, commenced the Auction on April 25, 2023, at 2:00 p.m. (prevailing Eastern Time).  Prior to the Auction, Qualified Bidders were provided copies of the rules for the Auction (the "Auction Rules").  The Auction concluded on May 24, 2023.  The proceedings were conducted in accordance with the Bidding Procedures and Auction Rules.  Proceedings in the main room of the Auction were recorded by a court reporter.

**PLEASE TAKE FURTHER NOTICE** that on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713] (the "Notice of Successful and Backup Bidder"), which announced that, pursuant to Sections XII and XIII of the Bidding Procedures, the Debtors, in consultation with the Committee, selected Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.

**PLEASE TAKE FURTHER NOTICE** that on June 2, 2023, the Debtors filed the *Notice of Filing of Transcript of Auction Proceedings* [Docket No. 2748], which includes the certified transcripts of the on the record Auction proceedings (the "Auction Transcript").

**PLEASE TAKE FURTHER NOTICE** that on June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into a Plan Sponsor Agreement, which sets forth terms of the restructuring transactions contemplated by the Successful Bid and the Plan Term Sheet, which is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Order, Bidding Procedures, the Notice of Successful and Backup Bidder, the Auction Transcripts, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

New York, New York
Dated: June 7, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Plan Sponsor Agreement**

*Execution Version*

THIS PLAN SPONSOR AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS PLAN SPONSOR AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.

## *PLAN SPONSOR AGREEMENT*

This PLAN SPONSOR AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, this "**Agreement**") is made and entered into as of June 5, 2023 (the "**Execution Date**"), by and among the following parties (each, a "**Party**" and collectively the "**Parties**"):

(i)     Celsius Network LLC, a company incorporated under the Laws of Delaware ("**Celsius**"), and each of its affiliated debtors and debtors in possession that have executed and delivered counterpart signature pages to this Agreement (collectively, the "**Debtors**");

(ii)    the official committee of unsecured creditors of the Debtors, appointed by the United States Trustee for Region 2 (the "**U.S. Trustee**") in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (as defined herein) on July 27, 2022 [Docket No. 241], as may be reconstituted from time to time (the "**Committee**"); and

(iii)   Fahrenheit, LLC (together with any successors thereto, the "**Plan Sponsor**").[1]

## *RECITALS*

**WHEREAS,** on July 13, 2022 (the "**Initial Petition Date**") and December 7, 2022 (the "**GK8 Petition Date**"), as applicable, each of the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on November 2, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**") authorizing the Debtors to solicit bids for the sale of some or substantially all of their assets;

---

[1] Biographies of the members of the Plan Sponsor are attached hereto as **Exhibit A**.

**WHEREAS**, on May 24, 2023, following a comprehensive marketing process, in accordance with the Bidding Procedures Order and in consultation with the Committee, the Debtors selected the Plan Sponsor as the Successful Bidder (as defined in the Bidding Procedures Order), in a manner consistent with the exercise of their fiduciary duties, and otherwise consistent with the Bidding Procedures Order;

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations regarding certain restructuring transactions (the "**Restructuring Transactions**") to be implemented through a chapter 11 plan of reorganization to be prepared and proposed by the Debtors in accordance with this Agreement (including all schedules and exhibits thereto, and as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms or to implement the Restructuring Transactions contemplated by this Agreement, the "**Plan**"), which Plan shall contain the terms and conditions set forth in, and be consistent in all respects with, the term sheet attached as **Exhibit B** hereto (such term sheet, including all exhibits thereto, the "**Plan Term Sheet**");

**WHEREAS**, the Parties have agreed to take certain actions in support of the Plan and the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan Term Sheet; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Account Holder**" means any single Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date.

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with <u>Section 15.02</u> (including the Plan Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Transaction.

"**Alternative Transaction**" means a sale (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code), disposition, new-money investment, restructuring, reorganization, merger, amalgamation, joint venture, partnership, acquisition, consolidation, dissolution, winding up, debt investment, equity investment, liquidation, tender offer, rights offering, recapitalization, plan of reorganization or liquidation, share exchange, business combination, or similar transaction, in each case involving any one or more Debtors or the debt, equity, or other interests in any one or more Debtors that is inconsistent with this Agreement and the Restructuring Transactions.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"**Bidding Procedures Order**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims or defenses pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes, and common law, including fraudulent transfer laws.

"**CEL Token**" means the Cryptocurrency Token native to the Debtors' platform defined by the smart contract code located at https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code.

"**Celsius**" has the meaning set forth in the preamble to this Agreement.

3

"**Celsius Account**" means any active account identified in the Debtors' books and records as having a balance as of the Petition Date.  For the avoidance of doubt, (i) each Account Holder's Celsius Accounts shall be aggregated such that each Account Holder's holdings are reflected in a single Celsius Account and (ii) the consolidation described in (i) shall not eliminate the designations associated with such assets based on the program the Account Holders participated in (*e.g.*, "Earn," "Custody," etc.).

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Committee**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Cryptocurrency**" means a fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a decentralized protocol, operating independently from a central bank.

"**Current Proposed Plan**" means the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2358] dated March 31, 2023.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means the documents listed in <u>Section 3.01</u>.

"**Deposit**" means a $10,000,000 cash deposit submitted by wire transfer or immediately available funds to the Escrow Account, as set forth in greater detail in the Plan Term Sheet.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or modified from time to time, to be approved pursuant to the Disclosure Statement Order.

"**Disclosure Statement Order**" means the order (and all exhibits thereto), entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).  The Disclosure Statement Order shall, among other things, include approval of the Fees set forth in Section 13.

"**Distribution Agent**" means the Entity or Entities selected by the Debtors, the Plan Sponsor, and the Committee to make or facilitate distributions contemplated under the Plan.

"**Distribution Agent Agreement**" means the agreement entered into by NewCo with the Distribution Agent for the provision of services to NewCo following the Effective Date, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Effective Date**" means the date on which (a) all conditions precedent to the occurrence of the consummation of the Plan have been satisfied or waived in accordance with the Plan (including receipt of all Regulatory Approvals and the expiration or early termination of any applicable waiting periods related thereto) and (b) the Plan is declared effective by the Debtors.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

"**Escrow Account**" means the separate escrow account established pursuant to the Escrow Agreement.

"**Escrow Agreement**" means an escrow agreement to be entered into by the Debtors, Plan Sponsor, and an escrow agent to be agreed upon by the Debtors and Plan Sponsor.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Express Representations**" has the meaning set forth in Section 10 of this Agreement.

"**Fees**" has the meaning set forth in Section 13 of this Agreement.

"**GK8 Debtors**" means Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC.

"**GK8 Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Governmental Authority**" means (i) any U.S. federal, state, county, civil, or local legislative, administrative, self-regulatory or regulatory authority, agency court, tribunal, or judicial or arbitral body or other governmental or quasi-governmental entity with competent jurisdiction or (ii) any supranational or non-U.S. authority of similar jurisdiction.

"**Initial Litigation Funding Amount**" has the meaning set forth in the Current Proposed Plan.

"**Initial Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted,

promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**Litigation Administrator**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Administrator Agreement(s)**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Oversight Committee**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Proceeds**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Recovery Account**" has the meaning set forth in the Current Proposed Plan.

"**Management Agreement**" means the agreement containing the terms and conditions under which the Plan Sponsor will manage the assets held by the NewCo, including, but not limited to, the terms of the Management Fee. The Management Agreement shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Management Contribution**" means the Plan Sponsor's Effective Date purchase of the NewCo Equity, either on the primary or secondary market, at the election of the Debtors and the Committee, for cash consideration of $50 million.

"**Management Fee**" means the management fee payable to the Plan Sponsor under the Management Agreement.

"**Milestones**" has the meaning set forth in Section 4 of this Agreement.

"**Mining**" has the meaning set forth in the Current Proposed Plan.

"**New Board**" means the board of directors or the board of managers, as applicable, of NewCo which shall be appointed as provided in the Plan Term Sheet. Unless otherwise agreed by the Parties, the identities of the members of the New Board shall be disclosed in the Plan Supplement.

"**NewCo**" means the Entity or Entities to be managed by the Plan Sponsor and the Executive Management Team (as such term is defined in the Plan Term Sheet) following the Effective Date which shall hold the NewCo Assets for the benefit of holders of NewCo Equity.

"**NewCo Assets**" has the meaning set forth in the Plan Term Sheet.

"**NewCo Equity**" means, collectively, the common equity of NewCo to be distributed in the form of shares of common stock pursuant to the Plan on and after the Effective Date.

"**New Organizational Documents**" means the documents providing for corporate governance of NewCo, and any subsidiaries thereof, including charters, bylaws, operating agreements, agreements providing indemnification, contribution, or reimbursement to any Person

or Entity, other organizational documents, and investment guidelines, as applicable, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Orderly Wind Down**" has the meaning set forth in the Plan Term Sheet.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the Initial Petition Date with respect to the Debtors other than the GK8 Debtors and the GK8 Petition Date with respect to the GK8 Debtors.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Administrator**" has the meaning set forth in the Current Proposed Plan.

"**Plan Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Plan Sponsor Advisors**" has the meaning set forth in Section 13 of this Agreement.

"**Plan Sponsor Counsel**" has the meaning set forth in Section 13 of this Agreement.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreement, schedules, and exhibits to the Plan, in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with its terms, this Agreement, the Bankruptcy Code, and Bankruptcy Rules, to be filed (unless otherwise expressly required under this Agreement to be filed by a different date) by the Debtors no later than fourteen (14) days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court, including the following, each as defined in this Agreement, the Plan, or Plan Term Sheet, as applicable:  (a) the Management Agreement; (b) the New Organizational Documents; (c) the identities of the members of the New Board; (d) the schedule of Rejected Executory Contracts and Unexpired Leases; (e) the schedule of proposed cure amounts; (f) the Transaction Steps Memorandum; (g) the Litigation Recovery Agreement; (h) the identity of the Litigation Administrator; (i) the identity and proposed compensation (if known) of the members of the Litigation Oversight Committee; (j) the Wind-Down Procedures (if applicable); (k) the Valon Agreements; (l) the Distribution Agent Agreements; (m) the US Bitcoin Agreements; and (n) the identities of Insiders and other individuals identified by the Committee who participated in the manipulation of the price of the CEL Token.  The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth therein in full; *provided* that in the event of a conflict between the Plan and the Plan Supplement, the Plan Supplement shall control.

"**Plan Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Post-Effective Date Debtor**" has the meaning set forth in the Current Proposed Plan.

"**Recovery Causes of Action**" has the meaning set forth in the Current Proposed Plan.

"**Regulatory Approvals**" means any consents, approvals, or permissions of Governmental Authorities, including, for the avoidance of doubt, the U.S. Securities and Exchange Commission, that are necessary to implement and consummate the Restructuring Transactions, which shall be set forth in greater detail on a schedule to be delivered by the Plan Sponsor to the Debtors and the Committee.

"**Related Party**" has the meaning set forth in the Current Proposed Plan.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Service Providers**" means US Bitcoin, Valon, and each other Entity that intends to provide services to NewCo following the Effective Date.

"**Solicitation Materials**" means the solicitation materials with respect to the Plan, including the court-approved Disclosure Statement, form of ballots, and any other solicitation materials, including the solicitation version of the Plan.

"**Solvent**" means, with respect to any Person or Entity, that such Person or Entity: (i) is able to pay its debts as they become due; (ii) owns property that has a fair value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (iii) has adequate capital to carry on its business.

"**Successful Bidder**" has the meaning set forth in the recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Termination Event**" means any event described in Sections 12.01, 12.02, or 12.03.

"**Token**" means a unit of Cryptocurrency.

"**US Bitcoin**" means US Bitcoin Corp or any Affiliate thereof.

"**US Bitcoin Agreements**" means the agreements entered into by NewCo with US Bitcoin respecting the operation and management of the Mining assets and business following the Effective Date, each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Valon**" means Valon Technologies, Inc. or any Affiliate thereof.

"**Valon Agreements**" means, if applicable, the agreements entered into by NewCo with Valon for the provision of services to NewCo following the Effective Date each of which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement.

"**Wind-Down Procedures**" has the meaning set forth in the Current Proposed Plan.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)   capitalized terms used but not defined herein shall have the meanings ascribed to them in the Current Proposed Plan, Plan, or Plan Term Sheet, as applicable;

(b)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(c)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)   whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation;"

(j)   the words "to the extent" shall mean "the degree by which" and not "if;"

(k)   all time periods before which, within which, or following which any act is to be done or step taken pursuant to this Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a);

(l)   the word "will" will be construed to have the same meaning and effect as the word "shall."  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive;

(m)   all references to "$" and "dollars" will be deemed to refer to United States currency unless otherwise specifically provided;

(n)     all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided;

(o)     any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived, in accordance herewith, if applicable; and

(p)     where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**Section 2.**     *Effectiveness of this Agreement*.   This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Debtors shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)     the Plan Sponsor shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(c)     counsel to the Committee shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties; and

(d)     execution and consummation of the Escrow Agreement.

**Section 3.**     *Definitive Documents*.

3.01.   The Definitive Documents are all documents reasonably necessary or desirable to implement or give effect to the Restructuring Transactions, including the following:  (A) the Plan (and any and all exhibits, annexes, and schedules thereto); (B) the Confirmation Order; (C) the Disclosure Statement and the other Solicitation Materials; (D) the Disclosure Statement Order; (E) the Plan Supplement (including, for the avoidance of doubt, the Management Agreement, the Valon Agreements (if applicable), the Distribution Agent Agreements, the US Bitcoin Agreements, and the New Organizational Documents); (F) documents or agreements relating to the NewCo Equity; (G) any and all other material documents, deeds, agreements, filings, notifications, letters, or instruments reasonably necessary or desirable to consummate the Restructuring Transactions, which shall exclude, for the avoidance of doubt, any affidavits, statements of financial affairs and schedules of assets and liabilities, monthly operating reports or other periodic reports, retention applications or fee applications, fee statements or other notices, declarations, or other documents filed by the Debtors or the Committee with respect thereto, and other similar ministerial documents filed with the Bankruptcy Court; and (H) any amendments, modifications or supplements to such documents.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions,

representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall be consistent with this Agreement and in form and substance reasonably acceptable to the Debtors, the Plan Sponsor, and the Committee; *provided* that the Plan (and any and all exhibits, annexes, and schedules thereto), the Confirmation Order, the Plan Supplement, and documents relating to the NewCo Equity shall be in form and substance acceptable to the Debtors, the Committee, and the Plan Sponsor; *provided, further*, that the documents and forms of documents, agreements, schedules, and exhibits to the Plan with respect to the Recovery Causes of Action, the Litigation Recovery Account, the Litigation Proceeds, the Litigation Administrator, and the Litigation Oversight Committee, including the Litigation Administrator Agreement, shall be in form and substance acceptable to the Committee in its sole and absolute discretion; *provided, further*, that the Initial Litigation Funding Amount shall be in form and substance acceptable to the Committee and the Debtors.

**Section 4.**    ***Milestones***.  The following milestones shall apply to this Agreement (collectively, the "**Milestones**"), which in each case may be waived or extended in writing by the Plan Sponsor (electronic mail among counsel is sufficient):

(a)    by no later than May 26, 2023, the Plan Sponsor shall have funded the Deposit to the Escrow Account;

(b)    by no later than June 23, 2023, the Debtors shall provide the Plan Sponsor with substantially final drafts of the Plan and Disclosure Statement;

(c)    by no later than June 30, 2023, the Debtors shall file the Plan, the Disclosure Statement, Solicitation Materials, and a motion seeking entry of the Disclosure Statement Order;

(d)    by no later than August 15, 2023, the Bankruptcy Court shall have entered the Disclosure Statement Order;

(e)    by no later than September 30, 2023, the Bankruptcy Court shall have entered the Confirmation Order;

(f)    by no later than October 31, 2023, the Effective Date of the Plan shall have occurred; and

(g)    prior to (and as a condition to the occurrence of) the Effective Date, the Debtors shall:  (i) identify and deliver to the Plan Sponsor a list of all assets anticipated to be transferred to NewCo, and an estimate of the book value of such assets, in each case as of the Effective Date of the Plan, and such list of assets and estimated book values shall be reasonably acceptable to the Plan Sponsor; and (ii) deliver to the Plan Sponsor historical audited financial statements and an unqualified audit opinion, in each case solely with respect to the Debtors' mining business for the fiscal year ended 2021, fiscal year ended 2022, and, only to the extent required by the U.S. Securities and Exchange Commission, the period from January 1, 2023 through a to-be-agreed-upon date prior to emergence, which audits shall be prepared by a nationally-recognized, PCAOB-registered audit firm.  Additionally, as a condition to the Effective Date, a PCAOB-registered audit firm shall be engaged to deliver an audit of the opening balance sheet of

NewCo.  The foregoing PCAOB-registered audit firm(s) shall be subject to the mutual consent of the Debtors and the Plan Sponsor, which consent shall not be unreasonably withheld.

**Section 5.**     *Commitments of the Plan Sponsor*.

    5.01.   General Commitments.

    (a)     During the Agreement Effective Period, the Plan Sponsor agrees to:

        (i)     support the Restructuring Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement, including voting and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, and voting, if applicable, in favor of the Plan and supporting and consenting to the releases and exculpation provisions in the Plan;

        (ii)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

        (iii)     use commercially reasonable efforts to oppose the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions; *provided*, that such commercially reasonable efforts shall not include filing formal objections or pleadings with the Bankruptcy Court;

        (iv)     use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from the Debtors' other stakeholders;

        (v)     use commercially reasonable efforts to obtain, or assist the Debtors in obtaining, as applicable, any and all required Regulatory Approvals and/or third-party approvals for the Restructuring Transactions; and

        (vi)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

    5.02.   Negative Commitments.  During the Agreement Effective Period, the Plan Sponsor shall not directly or indirectly:

    (a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in this Agreement or the Plan; or

(c)    file any motion or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 6.    *Commitments of the Debtors*.**

6.01.    <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 8</u>, during the Agreement Effective Period, the Debtors agree to:

(a)    support and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)    use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including, but not limited to, timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; (vi) modifying or terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or (vii) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(d)    use commercially reasonable efforts, and provide such assistance as may be reasonably required by the Plan Sponsor, to obtain any and all required Regulatory Approvals and/or third-party approvals for the Restructuring Transactions;

(e)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(g)     provide Plan Sponsor Counsel with Definitive Documents that the Debtors intend to file with the Bankruptcy Court at least three (3) Business Days in advance of the filing thereof where reasonably practicable, or if not reasonably practicable, as soon as reasonably practicable but in any event no less than twenty-four (24) hours in advance of filing thereof; and

(h)     inform Plan Sponsor Counsel as soon as reasonably practicable and in any event within two (2) Business Days after becoming aware of (i) receipt of any notice or other correspondence from a third party asserting its consent is required to implement the Restructuring Transactions and (ii) any determination by the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, that taking any action, or refraining from taking any action, with respect to the Restructuring Transactions would be inconsistent with applicable Law or its fiduciary obligations under applicable Law or, in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, in accordance with Section 8.

6.02.   Negative Commitments.  Subject in all cases to Section 8, during the Agreement Effective Period, each of the Debtors shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)     (i) fail to draft the Plan in a manner consistent with this Agreement, the Plan Term Sheet, and the Milestones contained herein in all material respects or (ii) modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     withdraw or revoke the Plan, as applicable, or publicly announce its intention not to pursue the Restructuring Transactions;

(e)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including in violation of the consent rights of any Party as to the form and substance of such motion, pleading, or Definitive Document) or the Plan; or

(f)     commence, support, or join any litigation or adversary proceeding against the Plan Sponsor other than in connection with (i) the interpretation or enforcement of the Debtors' rights under this Agreement, (ii) litigation regarding the rights of Earn, Custody, Withhold, and Borrow assets with respect to applicable account holders generally; (iii) the Bankruptcy Court's determination that Earn assets constitute property of the Debtors' estates and that Custody and certain Withhold assets are not property of the estate, (iv) whether customers have claims at every Celsius entity, and (v) the Claims reconciliation process.

**Section 7.**      *Commitments of the Committee*.

7.01.    <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 9</u>, during the Agreement Effective Period, the Committee agrees to:

(a)      support the Restructuring Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement, including supporting the Plan and consenting to the releases and exculpation provisions in the Plan;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps reasonably requested by the Debtors or the Plan Sponsor to address any such impediment;

(c)      use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; or (vi) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions; and

(d)      use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from the Debtors' other stakeholders, including by delivering to the Debtors at least five (5) Business Days prior to the hearing with respect to entry of the Disclosure Statement Order a draft of the proposed letter to be included in the Solicitation Materials expressing the Committee's support for the Plan and the Committee's recommendation that holders of unsecured claims against the Debtors vote to accept the Plan.

7.02.    <u>Negative Commitments</u>.  Subject in all cases to <u>Section 9</u>, during the Agreement Effective Period, the Committee shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)        file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan; or

(d)        commence, support, or join any litigation or adversary proceeding against the Plan Sponsor other than in connection with the (i) interpretation or enforcement of the Committee's rights under this Agreement, (ii) litigation with respect to the Debtors' Cryptocurrency obligations generally (*e.g.*, Earn, Custody, Borrow, and Withhold), (iii) litigation with respect to whether customers have claims at every Celsius entity and any alternative legal theories related to such litigation, and (iv) the Claims reconciliation process.

**Section 8.        *Additional Provisions Regarding Debtors' Commitments*.**

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel to the Debtors, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would, based on the advice of counsel to the Debtors, be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Debtor and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Debtor to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided*, that the Debtors shall provide notice to the Plan Sponsor within two (2) Business Days of any decision by the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to pursue an Alternative Restructuring Proposal.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.        *Additional Provisions Regarding Committee's Commitments*.**

9.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Committee, after consulting with counsel to the Committee, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to

the extent taking or failing to take such action, based on the advice of counsel to the Committee, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 9.01 shall not be deemed to constitute a breach of this Agreement.

9.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 9.01), the Committee and its investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Committee shall provide notice to the Plan Sponsor Counsel within two (2) Business Days of any decision by the Committee, after consulting with counsel, to pursue an Alternative Restructuring Proposal.

9.03.    Nothing in this Agreement shall:  (a) impair or waive the rights of the Committee to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent the Committee from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.    *Representations and Warranties of the Plan Sponsor*.**  The Plan Sponsor represents and warrants that, as of the date such Plan Sponsor executes and delivers this Agreement and as of the Effective Date:

(a)    it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; or (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) of the Securities Act );

(b)    any securities acquired by the Plan Sponsor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(c)    as of the Effective Date the Plan Sponsor will have sufficient funds in an aggregate amount necessary to consummate the Restructuring Transactions and to consummate all of the other transactions contemplated by this Agreement and the Management Agreement, including the payment of the Management Contribution;

(d)    the Plan Sponsor is, and immediately after giving effect to the Restructuring Transactions, the Plan Sponsor shall be, Solvent;

(e)    to its knowledge, no facts or circumstances, including in respect to any pending or threatened legal actions, exist that would reasonably be expected to materially impair or materially delay the ability of the Plan Sponsor or any of the Servicer Providers to consummate the Restructuring Transactions; Plan Sponsor and the Service Providers hold (or have contractual

relationships by which they have access to) all material licenses, franchises, permits, certificates, approvals, and authorizations from U.S. Governmental Authorities necessary for the Plan Sponsor and the Service Providers to consummate the Restructuring Transactions and to execute, deliver, and perform under the Management Agreement;

(f)    there are no actions or proceedings pending or, to the Plan Sponsor's knowledge, threatened against or affecting the Plan Sponsor or any of the Service Providers that would reasonably be expected to materially impair or materially delay the Plan Sponsor's or the Service Providers' performance under this Agreement or the Management Agreement or the consummation of the transactions contemplated by this Agreement, the Management Agreement, or the Restructuring Transactions;

(g)    other than as otherwise contemplated by this Agreement or the Management Agreement, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between Plan Sponsor or any of the Service Providers or any of their respective Affiliates or representatives, on the one hand, and any member of the management of any Debtor or its board of directors (or applicable governing body of any Affiliate of any Debtor), any holder of equity or debt securities of any Debtor, or any lender or creditor of any Debtor or any Affiliate of any Debtor, on the other hand, that would be reasonably likely to prevent, restrict, impede, or affect adversely the ability of the Plan Sponsor or the Service Providers to entertain, negotiate or participate in any such transactions in any material respect;

(h)    to its knowledge, no facts or circumstances, including in respect to any pending or threatened legal actions, exist that would reasonably be expected to materially impair or materially delay the ability of the Plan Sponsor or any of the Service Providers to consummate the Restructuring Transactions or provide the services to NewCo envisioned under the Plan Term Sheet;

(i)    as of the Effective Date, the Plan Sponsor will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof; and

(j)    notwithstanding anything contained in this Section 10 or any other provision of this Agreement to the contrary, the Plan Sponsor acknowledges and agrees that the representations and warranties expressly contained in Section 11 hereof (the "**Express Representations**") are the sole and exclusive representations, warranties, and statements of any kind made to the Plan Sponsor and on which the Plan Sponsor may rely in connection with the Restructuring Transactions. The Plan Sponsor acknowledges and agrees that all other representations, warranties, and statements of any kind or nature expressed or implied, whether in written, electronic or oral form are, in each case specifically disclaimed by the Debtors and that the Plan Sponsor has not relied, is not relying on, and will not rely on any such representations, warranties, or statements. The Plan Sponsor acknowledges that it has conducted to its full satisfaction an independent investigation and verification of the business including its financial condition, results of operations, assets, liabilities, properties, contracts, environmental compliance, employee matters, regulatory compliance, business risks, and prospects of the Debtors, and, in making its determination to proceed with the Restructuring Transactions, the Plan Sponsor has relied solely on the results of its own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, the

18

Debtors, any information presentation, any projections, any dataroom, or any information, statements, disclosures, documents, projections, forecasts or other material made available to the Plan Sponsor or any of its Affiliates or representatives in any dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Debtors or any of their Affiliates or representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that the Plan Sponsor has relied, is relying, and will rely only on the Express Representations).

**Section 11.**    *Mutual Representations and Warranties*.    Each of the Parties represents and warrants to each other Party that, as of the date such Party executes and delivers this Agreement and as of the Effective Date:

(a)    it is validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company, or other similar action;

(b)    this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code (including, for the avoidance of doubt, all Regulatory Approvals), no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)    the execution, delivery, and performance of such Party of this Agreement do not, and will not (i) violate (A) any provision of any Law or regulations applicable to it or (B) its articles of association, memorandum of association, charter, bylaws, or other governing documents or (ii) conflict with or constitute a breach of or default (without notice or lapse of time, or both) under, or give rise to a right of termination, modification, or cancellation of any obligation under any material contractual obligation to which it is a party, except in the case of clause (i)(A) and (ii)(Y) with respect to the Debtors, as would not reasonably be expected to have a material adverse effect on the Debtors, taken as a whole, and (Z) with respect to any other Party, as would not reasonably be expected to prevent or materially impair, alter, or delay the ability of such Party to consummate the transactions contemplated hereby and by the Management Agreement;

(e)    to its knowledge, no facts or circumstances, including with respect to any pending or threatened legal actions, exist that would be reasonably expected to impair or delay the ability of such Party to consummate the Restructuring Transactions; and

(f)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**      *Termination Events*.

12.01.   Plan Sponsor Termination Events.  This Agreement may be terminated with respect to the Plan Sponsor by the Plan Sponsor by the delivery to the Debtors and the Committee of a written notice in accordance with Section 15.11 upon the occurrence of the following events:

(a)      the breach in any material respect by a Debtor or the Committee of any of the applicable representations, warranties, or commitments set forth in this Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Plan Sponsor transmits a written notice in accordance with Section 15.11 detailing any such breach; *provided*, that that the Plan Sponsor may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Plan Sponsor's own actions in material breach of this Agreement;

(b)      the termination of this Agreement in accordance with its terms by the Committee;

(c)      the delivery of a notice by the Debtors in accordance with Section 8.02;

(d)      the failure to meet any Milestone set forth in Section 4 that has not been waived or extended in a manner consistent with this Agreement;

(e)      the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Plan Sponsor transmits a written notice in accordance with Section 15.11 detailing any such issuance; *provided* that this termination right may not be exercised by the Plan Sponsor if the Plan Sponsor sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Plan Sponsor;

(f)      any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Plan Sponsor, based upon the advice of Plan Sponsor Counsel, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(g)      the Bankruptcy Court grants relief that is (i) inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, in each case unless the Debtors have sought a stay of such relief within seven (7) days after the date that the Bankruptcy Court grants such relief and such order is stayed, reversed, or vacated within fourteen (14) days after the date that the Bankruptcy Court grants such relief;

(h)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed with regard to any material asset of the Debtors and such relief would materially delay or impede the implementation of the Restructuring Transactions;

(i)    the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(j)    the Bankruptcy Court enters an order denying confirmation of the Plan;

(k)    the Bankruptcy Court enters an order (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (other than the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby) or a trustee in one or more of the Chapter 11 Cases of the Debtors, (iii) terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization, or (iv) rejecting this Agreement; or

(l)    the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Plan Sponsor), (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of the Debtors, or (iii) rejecting this Agreement.

12.02.    <u>Debtor Termination Events</u>.  Any Debtor may terminate this Agreement as to all Parties upon prior written notice to the Plan Sponsor in accordance with <u>Section 15.11</u> upon the occurrence of any of the following events:

(a)    the breach in any material respect by the Plan Sponsor of any of the representations, warranties, or commitments of the Plan Sponsor set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consumption of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Debtors transmit a written notice in accordance with <u>Section 15.11</u> detailing any such breach; *provided*, that that the Debtors may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Debtors' own actions in material breach of this Agreement;

(b)    the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel to the Debtors, (i) that proceeding with any of the Restructuring Transactions or failing to terminate this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Debtors transmit a written notice in accordance with <u>Section 15.11</u> detailing any

such issuance; *provided* that this termination right may not be exercised by the Debtors if any Debtor sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by any Debtor;

(d)      any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Debtors, based upon the advice of counsel to the Debtors, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(e)      if all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and the Plan Sponsor fails to complete the actions to be taken by it on the Effective Date in accordance with this Agreement; or

(f)      the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03.  Committee Termination Events.  This Agreement may be terminated with respect to the Committee by the Committee by the delivery to the Debtors and the Plan Sponsor of a written notice in accordance with Section 15.11 upon the occurrence of the following events:

(a)      the breach in any material respect by the Debtors or Plan Sponsor of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Debtors transmit a written notice in accordance with Section 15.11 detailing any such breach; *provided*, that that the Committee may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Committee's own actions in material breach of this Agreement

(b)      the Committee determines, after consulting with counsel to the Committee, (i) that proceeding with any of the Restructuring Transactions or failing to terminate this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to support an Alternative Restructuring Proposal;

(c)      any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Committee, based upon the advice of counsel to the Committee, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(d)      the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Debtors transmit a written notice in accordance with Section 15.11 detailing any such issuance; *provided* that this termination right may not be exercised by the Committee if the Committee sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Committee;

(e)    if all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and the Plan Sponsor fails to complete the actions to be taken by it on the Effective Date in accordance with this Agreement;

(f)    the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(g)    the Bankruptcy Court enters an order denying confirmation of the Plan.

12.04.  <u>Mutual Termination</u>.  This Agreement, and the obligations of the Parties hereunder, may be terminated by mutual written agreement among each of the Parties.

12.05.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Effective Date.

12.06.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement except as otherwise expressly provided herein.  Nothing in this Agreement shall be construed as prohibiting a Party from contesting whether any such termination is valid or effective in accordance with this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Party, or the ability of any Party, to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against the Plan Sponsor, and (b) any right of the Plan Sponsor, or the ability of the Plan Sponsor, to protect and preserve its rights (including rights under this Agreement), remedies, and interests.  Unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and termination of this Agreement in accordance with its terms is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of a Termination Event shall result in the automatic termination of this Agreement with respect to each Party for which this Agreement would terminate if the Parties having the right to terminate this Agreement (the "**<u>Requisite Notice Parties</u>**") were permitted to provide notice of such occurrence in accordance with this Agreement, upon the date that is five (5) days following such occurrence, unless the Requisite Notice Parties waive such Termination Event in writing.  No purported termination of this Agreement shall be effective under this <u>Section 12.06</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Section 12.02(b)</u> or <u>12.02(f)</u>.  Nothing in this <u>Section 12.06</u> shall restrict any Debtor's right to terminate this Agreement in accordance with <u>Section 12.02(b)</u>.

**Section 13.**    *Expenses*.  The Debtors shall request and obtain the Bankruptcy Court's approval of the prompt payment and/or reimbursement of all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses of:  (i) the Plan Sponsor; (ii) Brown Rudnick LLP ("**<u>Plan Sponsor Counsel</u>**"); and (iii) any other accountants and other professionals, advisors and consultants retained by the Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld) (together with the Plan Sponsor

Counsel, the "**Plan Sponsor Advisors**"), in each case, in connection with the Auction, this Agreement, the formulation of the Plan, Disclosure Statement, and Plan Supplement, and the approval and implementation of the Restructuring Transactions (collectively, the "**Fees**") without any requirement of the Plan Sponsor or Plan Sponsor Advisors to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that the Plan Sponsor or Plan Sponsor Advisor, as applicable, will provide additional detail as reasonably requested by the Debtors and the Committee; *provided*, *further*, that the aggregate amount of Fees to be paid under this Section 13 shall not exceed $5,000,000 in the aggregate. The Debtors' payment of the Fees shall be approved pursuant to the Disclosure Statement Order. Following approval by the Bankruptcy Court of the Debtors paying up to $5,000,000 of Fees in the aggregate, and the receipt of an invoice that includes a description of the services provided by the Debtors and the Committee and the expiration of a seven (7) day period, the Debtors shall promptly reimburse the Fees on no more frequent than a monthly basis for so long as this Agreement has not been terminated. To the extent not previously paid, the Fees shall be payable by the Debtors as administrative expenses promptly upon the written request of the applicable Plan Sponsor Advisor (with accompanying invoice and description of the services provided and the expiration of a seven (7) day period) following the termination of this Agreement (x) by the Debtors pursuant to Sections 12.02(b), 12.02(c), 12.02(d), or 12.02(f) or (y) by the Plan Sponsor pursuant to Section 12.01; *provided* that the Fees shall not be payable in the event the Plan and Disclosure Statement are not filed by the Milestone set forth in Section 4(c), but only if the failure to file the Plan and Disclosure Statement is solely the result of the Plan Sponsor's action or inaction. To the extent that this Agreement is terminated pursuant to Sections 12.02(a) or 12.02(e), then any Fees paid by the Debtors pursuant to this Section 13 shall be promptly returned to, and/or clawed back by, the Debtors. The Committee shall support the Debtor's request for approval of the payment of the Fees set forth herein.

**Section 14.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)    This Agreement may be modified, amended, or supplemented in a writing signed by: (i) each Debtor; (ii) the Committee; and (iii) the Plan Sponsor. Any provision, condition, or other term of this Agreement may be waived only in a writing signed by the Party against which enforcement of such waiver is sought.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)    Notwithstanding anything to the contrary in this Section 14, the Milestones shall be subject to waiver and extension upon the written consent of each of the Parties (email being sufficient).

(e)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other

or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.    *Miscellaneous*.**

15.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to use commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary and not inconsistent with this Agreement, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04.  Publicity.  The Parties shall use commercially reasonable efforts to consult with each other regarding material press releases or public announcements concerning this Agreement or the transactions contemplated hereby.  For the avoidance of doubt, material public announcements do not include any routine statements made via social media.

15.05.  Complete Agreement.  This Agreement, together with the other documents expressly referred to herein, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.06.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the

Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or do not have jurisdiction over any Party hereto.

15.07.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.08.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery (including .pdf), each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.09.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.10.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity without the prior written consent of the other Parties.

15.11.  <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, if received prior to 5:00 PM (local time of the recipient) on a Business Day or otherwise on the next Business Day, (c) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the electronic mail address or street address, as applicable, set forth below, or at such other electronic mail address or street address as such Party may specify by written notice to the other Party.

(a)      if to the Debtors, to:

    Celsius Network LLC
    50 Harrison Street, Suite 209F
    Hoboken, New Jersey 07030
    Attention: Ron Deutsch
    E-mail address: ron.deutsch@celsius.network

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Patrick J. Nash, P.C.; Ross M. Kwasteniet, P.C.; Christopher S.
Koenig; Dan Latona; and Alison J. Wirtz
E-mail address: patrick.nash@kirkland.com; ross.kwasteniet@kirkland.com;
chris.koenig@kirkland.com; dan.latona@kirkland.com; and
alison.wirtz@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Joshua A. Sussberg, P.C.
E-mail address: joshua.sussberg@kirkland.com

(b)    if to the Plan Sponsor, to:

Fahrenheit, LLC
Attn: Steven Kokinos
207 South Street, 5th Floor
Boston, MA 02111
E-mail address: steve@kokinos.com

with copies to:

Brown Rudnick LLP
Seven Times Square
New York, NY 10036
Attention: Andrew M. Carty and Matthew E. Uretsky
E-mail address: acarty@brownrudnick.com and muretsky@brownrudnick.com

and

(c)    if to the Committee, to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attn: David M. Turetsky
E-mail address: david.turetsky@whitecase.com

and

White & Case LLP

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attention:  Gregory F. Pesce
E-mail address:  gregory.pesce@whitecase.com

and

White & Case LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:  Keith H. Wofford
E-mail address: kwofford@whitecase.com

and

White & Case LLP
555 Flower Street, #2700
Los Angeles, California 90071
Attention:  Aaron Colodny
E-mail address: aaron.colodny@whitecase.com

15.12. <u>Independent Due Diligence and Decision Making</u>.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

15.13. <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.14. <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.15. <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.16.  Deposit.  Notwithstanding anything to the contrary in this Agreement and subject to the terms of the Escrow Agreement, to the extent this Agreement is terminated by the Debtors or the Committee pursuant to their rights under Sections 12.02(a) or 12.02(e) or Sections 12.03(a) (but excluding any termination under Section 12.03(a) due to a Debtor breach of this Agreement) or 12.03(e), as applicable, the Debtors shall retain the Deposit together with all received investment income; *provided* that, to the extent this Agreement is terminated due to any other Termination Event, the Deposit and all received investment income shall be returned to the Plan Sponsor or the respective Funding Entities (as defined in the Escrow Agreement), as set forth in the Escrow Agreement.  To the extent the Effective Date occurs, the Deposit shall, at the Plan Sponsor's option, either (a) be paid to the Debtors, to be applied against the Management Contribution, or (b) returned to the respective Funding Entities, in which case the Plan Sponsor shall still be obligated to pay the entire Management Contribution.  Finally, the Debtors shall retain the Deposit together with all received investment income if the Plan and Disclosure Statement are not filed by the Milestone set forth in Section 4(c), but only if the failure to file the Plan and Disclosure Statement is solely the result of Fahrenheit's action or inaction.  For the avoidance of doubt, if the Milestone set forth in Section 4(c) is not met for any reason other than solely Fahrenheit's action or inaction, the Deposit shall be returned to the Plan Sponsor or the respective Funding Entities, as set forth in the Escrow Agreement.

15.17.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.18.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.19.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.20.  Survival.  Notwithstanding the termination of this Agreement in accordance with its terms, Sections Section 13 or 15.16 of this Agreement, the Escrow Agreement, and Confidentiality Agreements shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.21.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Debtors, the Plan Sponsor, or the Committee, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.22. <u>Pre-Effective Date Services</u>.   To the extent that the Debtors or Committee seek advice or services from the Plan Sponsor or any members thereof prior to the Effective Date, and the Plan Sponsor or its members provide any such advice or services, then the Plan Sponsor and any such members shall be released, exculpated, indemnified, and held harmless by the Debtors for any claim or liability that may arise in connection with such advice or services.   The Plan or any other Chapter 11 plan filed by the Debtors shall contain the foregoing release and exculpation provisions respecting the Plan Sponsor and its members (among other customary release and exculpation provisions).

[*Signature pages omitted*]

## EXHIBIT A

**Biographies of Members of Fahrenheit, LLC**



**Fahrenheit Holdings**



| US BITCOIN CORP | | | |
|---|---|---|---|
| **Headquarters** | Miami, FL | **Year founded** | 2020 |
| **Website** | https://www.usbitcoin.com/ | | |

**US Bitcoin Corp (USBTC)** is a leading industrial-scale operator of bitcoin mining sites, specializing in the design, construction, and management of data centers with access to low-cost and sustainable sources of energy. The company operates four sites across the United States with total capacity of more than 730 MW of electricity and generates revenue through self-mining, hosting, managed infrastructure operations, and equipment sales. USBTC announced an all-stock merger of equals with Hut 8 Mining Corp. on February 7, 2023, which is subject to customary closing conditions.

| arrington CAPITAL | | | |
|---|---|---|---|
| **Headquarters** | Seattle, WA | **Year founded** | 2018 |
| **Website** | https://www.arringtoncapital.com/ | | |

**Arrington Capital** is a digital asset management firm primarily focused on blockchain-based capital markets. The firm, founded in 2018 by TechCrunch and CrunchBase founder Michael Arrington and TechCrunch CEO Heather Harde, has invested in hundreds of startups around the world. Arrington Capital is a seasoned, international team composed of Silicon Valley veterans and operators with deep venture capital experience and crypto native roots. Arrington Capital's first fund was Arrington XRP Capital, and the firm has expanded to multiple funds over time.

| PROOF GROUP . | | | |
|---|---|---|---|
| **Headquarters** | Menlo Park, CA | **Year founded** | 2021 |
| **Website** | https://www.proofgroup.xyz/ | | |

**Proof Group** is a team of former crypto founders and venture investors backing the next generation of founders building disruptive financial technology. With a deep understanding of the financial technology sector and a proven track record of success, the firm is dedicated to founders building the future of finance. Proof Group specializes in supporting founders in aligned structures from day zero all the way through to the public markets.

**Fahrenheit Holdings**

## NEWCO CEO



**Steve Kokinos**
Founder and Managing Director, Sonic Boom Ventures

Steve is the founder of Sonic Boom Ventures, a crypto focused investment firm. Steve was formerly the founding CEO of Algorand, a Layer-1 staking-based blockchain where he was instrumental in scaling the ecosystem to a multi-billion-dollar market cap. Steve has raised over $1.5 billion for the companies he founded and/or led as CEO with investments from Fidelity, Battery Ventures, Bessemer Venture Partners, Union Square Ventures, Goldentree Asset Management, China Merchants Bank, and Pillar VC.

Steve has been a serial entrepreneur and investor for over 25 years, founding and operating companies ranging from internet infrastructure, cloud software, communications, and crypto. Steve previously founded Fuze, a cloud-based communications platform, which raised over $500 million and was acquired by 8x8, Inc. (NYSE: EGHT) in 2022. Prior to Fuze, Steve founded BladeLogic which went public in 2007 and was subsequently acquired by BMC Software in 2008 for $800 million. Steve founded and was CEO of WebYes, which was acquired by Breakaway Solutions, which went public in 2001.

Steve holds a Bachelor of Arts in economics from McGill University.

## NEWCO CFO



**Joel Block**
Chief Financial Officer, US Bitcoin Corp

Joel Block is the CFO of US Bitcoin. Joel was formerly CEO of Collegewise, one of the largest college counseling organizations in the US with 20 offices across 12 states, where he led significant revenue growth over 6 years and led the sale of a stake in the business to A-Star Education, a private equity backed global education group.

Joel has extensive expertise in PCAOB processes, including the oversight of S-1 and S-4 filings, along with completion of complex audits for multiple years. Joel has built and led finance and accounting teams, managed ongoing relationships with legal counsel and external auditors, and ensured regulatory compliance as managing director. He has also executed on finance, tax and audit transitions in extremely tight timeframes, including a comprehensive financial audit for the stub 2021 year and full 2022 year in under forty days despite challenges related to unwinding accounting errors made by predecessors.

Joel spent 9 years with Credit Suisse in interest rate derivatives within the fixed income division. He is a member of the Young Presidents Organization (YPO). Joel holds a Bachelor of Business Administration from the University of Michigan.

## MEMBERS OF FAHRENHEIT, LLC



**Michael Arrington**
Founder and Managing Director, Arrington Capital

Michael Arrington is the founder of Arrington Capital, a crypto-focused hedge fund created in 2018. Prior to Arrington Capital, Michael founded TechCrunch and later Crunchfund, where he was an early investor in Uber, Airtable, Pinterest, Cloudflare and many other companies. He was named to the Time 100 list of the world's most influential people, received a JD from Stanford University, and was previously an attorney with O'Melveny & Myers and Wilson Sonsini Goodrich & Rosati. He wrote a book, The Initial Public Offering: A Practical Guide for Investors, published by Bowne in 1998.



**Keli Callaghan**
Partner, Arrington Capital

Keli Callaghan is a partner at Arrington Capital, a crypto-focused hedge fund created in 2018. Keli was formerly CMO at Algorand, a leading Layer-1 blockchain, where she grew the ecosystem from inception to a thriving community. In addition to brand and growth, Keli spearheaded unique marketing partnerships and collaborations with entities such as the Drone Racing League, FIFA, World Chess, TD Garden, Motor Sport Group, eMerge Americas, Open Fortune, and collegiate athletics. Keli has held leadership roles at companies including Avid, Sprint, Zmags, and Rez1. She holds a bachelor's degree in communications and business ethics from Fairfield University and a Master of Business Administration from Boston College.



**Asher Genoot**
Co-founder and President, US Bitcoin Corp

Asher Genoot is the co-founder and President of US Bitcoin Corp. In less than two years, he has scaled the company from zero to 772 MW and increased the number of employees from four to 120+. Asher has raised $300M+ in equity and debt financing from NYDIG, Anchorage Digital, 25madison, Eric Schmidt of Google and Steel Perlot, Peter Thiel of Thiel Capital, Naval Ravikant of AngelList, Stanley O'Neal, former Chairman and CEO of Merrill Lynch, and Mayo Shattuck III, former Chairman and CEO of Deutsche Bank. Asher most recently led US Bitcoin Corp's bid, takeover, and turnaround of approximately 580 MW of distressed mining assets in the Chapter 11 bankruptcy proceeding of Compute North.

Prior to founding US Bitcoin Corp, Asher founded Curio, a Shanghai-based EdTech company. He is a member of Young Presidents Organization (YPO). He graduated from the University of Southern California summa cum laude with a Bachelor of Science in Business Administration at age 19.



**Noah Jessop**
Founder and Managing Director, Proof Group

Noah is the founder and managing director at Proof Group, a digital asset focused fund. Noah was formerly SVP at Core Scientific, a PM at Libra Association, and CEO at CommandIQ. He sold his mining optimization company to Core Scientific in 2019. Noah was an investor at Founder Collective where he was part of seed investments in Uber, The Trade Desk Inc, Coupang Inc and many others). He has deep experience across venture investing and the web3 space and has raised over $70M in capital to date as a founder or principal. He studied mathematics and computer science at MIT.



**Ravi Kaza**
Founder and Managing Director, Seasons Capital Management

Ravi has spent the last 25+ years consistently focused on disruptive technologies. Ravi started his career in Silicon Valley at a prominent investment banking group founded by Frank Quattrone, where he worked on numerous transactions involving companies such as Amazon, Apple, Northern Telecom, and Lam Research. Thereafter, Ravi entered the money management business as a Vice President at Pequot Capital Management, at the time one of the world's largest alternative asset managers with a focus on technology long/short investing. Ravi was then hired by Stanley Druckenmiller as a Managing Director at Duquesne Capital Management with investment responsibilities centered around long/short technology investing. In 2003, Ravi founded Seasons Capital Management, which he helped grow into a multi-billion-dollar, SEC-registered alternative investment manager that oversaw several technology-related long/short investment strategies. In 2010, Ravi shifted his focus to running primarily internal capital with a continued primary focus on disruptive technologies. Since 2015, Ravi has accumulated significant exposure to digital assets through liquid tokens, venture funds, hedge funds and more than 50 direct investments.

Ravi serves as a Strategic Advisor to Arrington Capital. He graduated from The Wharton School at the University of Pennsylvania with a BS in Finance summa cum laude at age 19.



**Bhavik Patel**
Chief Investment Officer and Partner, Arrington Capital

Bhavik Patel is Chief Investment Officer and partner at Arrington Capital, a crypto-focused hedge fund created in 2018. He was formerly Chief Product Officer and the Head of the Derivatives Business at BitMEX. He assisted the founding team at an early stage on design of the flagship product before onboarding full time in 2018. Previously he was the APAC Derivatives strategist at UBS, responsible for generating and publishing cross-asset tactical and systematic trade ideas. He was the APAC touchpoint for content driven dialogue with a wide variety of clients (volatility funds, long-short investors, tail funds). Prior to UBS in Hong Kong, Bhavik had a number of trading and risk management roles in London at a mix of European investment banks. He holds a Master in Mathematics from the University of Oxford.

## EXHIBIT B

**Plan Term Sheet**

`

**CELSIUS NETWORK LLC, ET AL.**
**CHAPTER 11 PLAN TERM SHEET**

THIS CHAPTER 11 PLAN TERM SHEET (THE "**TERM SHEET**") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF THE PROPOSED CHAPTER 11 PLAN (THE "**PLAN**") OF THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED IN RE CELSIUS NETWORK LLC, ET AL., CASE NO. 22-10964 (MG) (THE "**DEBTORS**" AND, TOGETHER WITH THEIR NON-DEBTOR AFFILIATES, "**CELSIUS**"). THIS TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PLAN OR THAT WILL BE SET FORTH IN THE PLAN AND THE OTHER DEFINITIVE DOCUMENTS, WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS TERM SHEET AND THE PLAN SPONSOR AGREEMENT. THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS TERM SHEET CONTEMPLATES THAT THE DEBTORS, THE COMMITTEE, AND FAHRENHEIT, LLC SHALL ENTER INTO A PLAN SPONSOR AGREEMENT AND THAT THIS TERM SHEET SHALL BE BINDING TO THE EXTENT PROVIDED IN SUCH PLAN SPONSOR AGREEMENT.

Reference is hereby made to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates,* dated March 31, 2023 (the "**Current Proposed Plan**"), pursuant to which NovaWulf Digital Management, L.P. is proposed to serve as the plan sponsor. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Current Proposed Plan. As used herein, the term "Plan Sponsor" means Fahrenheit, LLC. All currency denominations herein are in U.S. Dollars.

| **TERM** | **FAHRENHEIT BID** |
|---|---|
| **GENERAL PROVISIONS** | |
| *Transaction Summary* | The restructuring transactions will adopt substantially the same structure as set forth in the Current Proposed Plan, subject to the modifications set forth herein and in the accompanying submissions. The restructuring transaction steps may require adjustment to ensure feasibility.<br><br>Plan Sponsor: The "**Plan Sponsor**" as used herein means Fahrenheit, LLC, a Delaware limited liability company ("**Fahrenheit**"). The equity in Fahrenheit is owned, directly or indirectly, including through one or more affiliates or subsidiaries, by:<br><br>• Arrington Capital ("**Arrington**"),<br>• U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("**US Bitcoin**"),<br>• Proof Group Capital Management LLC ("**Proof Group**"),<br>• Steven Kokinos, and<br>• Ravi Kaza (together, the "**Fahrenheit Team**") |

The plan of reorganization memorializing the provisions of this Term Sheet (the "**Fahrenheit Plan**") shall generally adopt the treatment and provisions included in the Current Proposed Plan, with modifications to reflect this Term Sheet, which modifications shall be reasonably acceptable to Fahrenheit, the Debtors, and the Committee.

NewCo:  On the Effective Date, the NewCo Assets shall vest in NewCo.  The NewCo Assets shall consist of: (1) the DeFi Cryptocurrency Assets, (2) the Institutional Loan portfolio, (3) the PE & VC Investments, (4) Mining, and (5) $500 million in Liquid Cryptocurrency, which may be reduced to an amount not less than $450 million solely in the event that the Secondary Market Purchase occurs as described below, free and clear on the Effective Date subject to adjustment with the agreement of the Plan Sponsor to account for any potential settlement of Borrow Claims (the "**NewCo Liquid Cryptocurrency**").

Holders of General Earn Claims, Convenience Claims that elect to receive the treatment of General Earn Claims, Withhold Claims (after accounting for the treatment provided in the Withhold Settlement) and Borrow Claims (after accounting for the Set Off Treatment) will receive 100% of the equity interests in NewCo, subject to dilution by equity issued to the Plan Sponsor as Management Compensation, as set forth herein.

On the Effective Date, the common equity shall be distributed under the Plan in the form of shares of common stock in NewCo (the "**NewCo Equity**").  To the extent the Debtors, the Committee, and the Plan Sponsor determine that a tokenized distribution mechanism (*e.g.* Securitize) that complies with applicable regulations is feasible, such parties shall have the option to place the NewCo Equity with such tokenized distribution mechanism.  From and after the Effective Date, the Fahrenheit Team will actively advise with respect to the management of NewCo at the direction of the New Board for the benefit of holders of the NewCo Equity.  Peter Briger will consult and advise NewCo with respect to its loan portfolio.

Earn Treatment:  Each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the (1) the Liquid Cryptocurrency Distribution Amount, (2) Litigation Proceeds, and (3) NewCo Equity (subject to dilution by the Management Compensation).

Convenience Class:  The Fahrenheit Plan proposes the same treatment for Allowed Convenience Claims as set forth in the Current Proposed Plan.

Custody / Withhold Treatment:  The Fahrenheit Plan proposes to offer certain Account Holders whose claims are associated with the Custody and Withhold Programs the same ability to elect to receive program-specific treatment based on the Custody Settlements and Withhold Settlements reflected in the Current Proposed Plan, which settlements and proposed treatments are fully incorporated in this Term Sheet by reference.

Borrow Treatment:  The Fahrenheit Plan may include a settlement of Borrow Claims on terms acceptable to the Debtors and the Committee; *provided*, that

the economic terms on which Valon (as defined below) or another loan servicer would service any structured settlements with holders of Borrow Claims will be subject to the agreement of Valon (or another loan servicer), the Debtors, the Committee, and the Plan Sponsor; *provided* that, notwithstanding anything set forth herein, a minimum of $500 million (or not less than $450 million solely in the event that the Secondary Market Purchase occurs) in Liquid Cryptocurrency shall be transferred to NewCo free and clear on the Effective Date subject to adjustment with the agreement of the Plan Sponsor to account for any potential settlement of Borrow Claims.

Fahrenheit agrees that the plan of reorganization memorializing the provisions of this Term Sheet (the "**Fahrenheit Plan**") shall otherwise adopt the treatment and provisions included in the Current Proposed Plan, with modifications to reflect this Term Sheet which modifications shall be reasonably acceptable to Fahrenheit, the Debtors and the Committee.

Management/Plan Sponsor Compensation: In exchange for its services, the Plan Sponsor and management team of NewCo identified below as the NewCo Management Team shall receive the following compensation (collectively, the "**Management Compensation**"), each of which shall be memorialized in a management agreement (the "**Management Agreement**") or other appropriate employment contract to be negotiated and agreed to by the Debtors, the Committee, and the Plan Sponsor:

- Fixed Management Fee: $35 million per year (the "**Fixed Management Fee**"), which is inclusive of (1) a mining management fee of $15 million, (the "**Mining Management Fee**") and (2) compensation for the (a) CEO, (b) COO, (c) CFO, (d) CMO; (e) General Counsel, (f) Chief Accounting Officer, (g) Chief Risk Officer, (h) other C-suite executives or heads of staking and mining businesses (if any), and (i) any individuals filling roles traditionally satisfied by individuals with the foregoing titles, regardless of the ultimate title assigned to such individuals (the "**NewCo Management Team**")

- Incentive Stock Units: Five percent (5%) of NewCo Equity which shall vest ratably over 5 years annually, with such vesting to occur at the end of the applicable one year period.

- Stock Options:  At the election of the Debtors and Committee to be made as of or prior to the Effective Date, and in each case with the granting of such option to occur at the end of the applicable one year period, either:

    o Options to purchase 5% of NewCo Equity, structured in 5 tranches of 5 year options of 1.0% with 1 tranche granted each year at the anniversary of the Effective Date, with the strike price for each year set at the trading price of the NewCo Equity as of the close of the market on the preceding business day, or

    o Options to purchase 5% of NewCo Equity, structured in 5 tranches of 5 year options of 1.0% with 1 tranche granted each

year at the anniversary of the Effective Date, with each year's strike price set at the trailing 90-day average level of the CMC 200 Index including BTC or other index to be agreed in good faith by the Debtors, Fahrenheit, and the Committee on or prior to the Effective Date. The index level used to set the strike price of each year's option issuance is based on the cumulative change in the index from the Effective Date. The initial strike price shall be calculated using Effective Date NAV (calculated using the midpoint of the valuation in the Disclosure Statements) divided by outstanding shares at emergence ("**Plan Value**").

- All Management Compensation and any other amounts payable under the Management Agreement set forth above or in any applicable employment/service agreements shall be payable to Fahrenheit, the applicable employee of NewCo, or one or more entities designated by Fahrenheit to receive such payments.

Plan Sponsor Contribution: On the Effective Date, the Plan Sponsor shall purchase $50 million of NewCo Equity (the "**Plan Sponsor Shares**") through primary purchases from NewCo at Plan Value or secondary equity purchases at the Debtors' and Committee's election, in each case subject to a two-year lockup; provided, that from and after the date that is one year from the Effective Date and expiring at the conclusion of the second year of the two-year lockup (the "**Unlock Period**"), the Plan Sponsor may sell: (i) up to 30% of the Plan Sponsor Shares issued on the Effective Date if, at any point during the Unlock Period, the NewCo Equity is trading at 150% of NewCo's net asset value as of the Effective Date; and (ii) an additional up to 30% of the Plan Sponsor Shares issued on the Effective Date if, at any point during the Unlock Period, the NewCo Equity is trading at 200% of NewCo's net asset value as of the Effective Date; provided, that, for the avoidance of doubt, the Plan Sponsors may not sell more than 60% in the aggregate of the Plan Sponsor Shares issued on the Effective Date during the Unlock Period; provided, further, that if the Plan Sponsor Contribution results in the purchase of NewCo Equity through the secondary market, the NewCo Liquid Cryptocurrency Amount shall be reduced to $450 million. Any Secondary Market Purchase shall be subject to NewCo's investment policy to be approved by the New Board.

Releases: The Plan shall contain standard release and exculpation provisions applicable only to the same specific parties as identified in the Current Proposed Plan, or otherwise agreed to by the Debtors and the Committee (and timely disclosed in the Plan Supplement). For the avoidance of doubt, the Excluded Parties—including, without limitation, Alexander Mashinsky, Shlomi Daniel Leon, and all the other UCC Stipulation Defendants—shall be *excluded* from the release and exculpation provisions.

Orderly Wind-Down Toggle: The Plan will provide that the Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down Procedures if, at any time prior to the confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in

4

| | |
|---|---|
| | implementing NewCo; provided that the Debtors and Committee may move for an Orderly Wind Down at any time prior to confirmation of the Plan by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court.<br><br>Regulatory Cooperation:  The Debtors, the Committee, and Fahrenheit will coordinated and cooperate regarding obtaining all necessary regulatory approvals for the transactions and business lines contemplated by the Fahrenheit Plan. |
| *Additional Material Improvements Over Current Proposed Plan* | In addition to the terms set forth above, this Term Sheet contains certain other material improvements over the Current Proposed Plan, including:<br><br>• NewCo Officers/Management:  Subject to the approval of the New Board, (1) Steven Kokinos will serve as Chief Executive Officer of NewCo; and (2) Joel Block will serve as Chief Financial Officer of NewCo (together with any successors appointed by the New Board, the "**Executive Management Team**").<br><br>For the avoidance of doubt, the compensation to be paid to the Executive Management Team shall be deducted from the Management Compensation.<br><br>• Industry Leading Expertise:  The Fahrenheit Team, led by the Executive Management Team, Michael Arrington, Ravi Kaza, Noah Jessop, and Asher Genoot will include industry leaders in operating PoS networks, venture/defi/token portfolio management, and monetization capabilities.  Each member of the Fahrenheit Team shall actively participate in the management of NewCo, with the New Board approving a policy governing the involvement and commitment of each member of the Fahrenheit Team, including Ravi Kaza, Michael Arrington, and Noah Jessop.<br><br>A comprehensive business plan respecting NewCo was attached as **Exhibit A** to the Bid Letter submitted by the Fahrenheit on April 17, 2023.<br><br>• Mining Consideration:  US Bitcoin will manage the Mining assets pursuant to one or more operating and services agreements to be entered into between US Bitcoin and NewCo, which agreements shall be terminable if it is determined by the New Board that U.S. Bitcoin cannot provide the services contemplated by this Term Sheet, including the inability to provide the intellectual property and software referenced in the bullet immediately below.<br><br>    o  US Bitcoin shall provide the Debtors the option to enter into a royalty-free license for the duration of the term of the operating and services agreements, without sublicense rights, of intellectual property owned by US Bitcoin (or other rights to use the applicable software or proprietary technology) for |

(1) the miner management software referred to as the Operator, and (2) curtailment management software referred to as the Reactor. To the extent the New Board informs Fahrenheit that the Management Agreement will not be renewed under the terms of the Management Agreement, US Bitcoin and Fahrenheit shall use commercially reasonable efforts to transition all NewCo data and systems to commercially reasonable alternative product or assist NewCo in building and installing a fully-owned and operated alternative system.

o   US Bitcoin shall build and energize a 100 megawatt ("**MW**") of bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and US Bitcoin reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board. To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. The construction of medium voltage to plug ready infrastructure shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW (for a total of 400 MW). The capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the term of the Management Agreement, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.

o   US Bitcoin shall provide all site level employees (excluding security) for all existing Celsius self-mining facilities and any facilities developed by Celsius or NewCo for cost, but in any event subject to a cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; *provided,* that to the extent there are existing obligations of the Debtors with respect to existing Celsius self-mining facilities that are not replaced by US Bitcoin the $2 million cap shall not apply to such obligations.

o   From the date hereof, but subject to the occurrence of the

Effective Date, US Bitcoin shall use its commercially reasonable efforts to contribute the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to US Bitcoin identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that US Bitcoin is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.

o   To the extent that Fahrenheit is selected as the successful bid, US Bitcoin will provide the Debtors or NewCo, as applicable, with an option which can be exercised on or before the date that is six months from the date of this Term Sheet to purchase an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such site) identified to the Debtors and the Committee during the bid process for $575,000 per MW that is "plug ready," and support the immediate installation at miners at such site upon Bankruptcy Court approval of such purchase. To the extent that the Fahrenheit Plan is not confirmed or does not go effective, the Debtors or NewCo (as applicable) shall enter into a mining management agreement with US Bitcoin respecting such 50 MW site on terms acceptable to the parties.

o   To the extent that the Debtors or NewCo, as applicable, elect not to purchase the Alpha facility, US Bitcoin will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

o   US Bitcoin will offer up to 50 MW of immediately available containers and transformers currently owned by US Bitcoin, and other supplies to the Debtors or NewCo, as applicable, at the lower of its cost to obtain such items or market prices.

o   In the event that NewCo elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, US Bitcoin will offer NewCo a 3-month option to purchase the substation materials that US Bitcoin currently has on its balance sheet for cost.

o   US Bitcoin will offer 20,000 rack spaces to the Debtors or NewCo, as applicable, for a 5-year term, or a period to be negotiated between the US Bitcoin, US Bitcoin's partner, the Debtors and the Committee.

o   US Bitcoin, in partnership with a strategic partner, will offer NewCo an additional up to 15,000 rack spaces at various

facilities located in the U.S. on competitive market terms.

- US Bitcoin will contribute to NewCo a strategic partnership agreement with an ASIC manufacturer that will give NewCo the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at NewCo's option) on the terms set forth in the accompanying letter agreement.

- US Bitcoin will contribute to NewCo one hundred million dollars ($100,000,000) in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by NewCo on the terms set forth in the accompanying letter agreement.

- US Bitcoin will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and NewCo, including by seeking extension of expiration deadlines currently applicable to such credits.

- US Bitcoin will provide the Debtors and NewCo with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee.

- Between the execution of this Term Sheet and the Effective Date, US Bitcoin will provide the Debtors with the option to begin using the mining management and services set forth above subject to agreement between US Bitcoin, the Debtors, and the Committee respecting such services and associated costs, and subject to any required Bankruptcy Court approvals, if any.

- Fahrenheit and U.S. Bitcoin shall indemnify NewCo with respect to any and all claims and damages related to the causes of action asserted in the lawsuit styled *Lancium LLC v. U.S. Data Mining Group, Inc. et al*. (W.D. Tex. Civ. A. No. 6:23-cv-00344).

- <u>NewCo Equity / Liquidity Platform</u>: Holders of Allowed General Earn Claims will receive 100% of the NewCo Equity (subject to dilution on account of the Management Compensation as set forth herein) in the form of common stock. Fahrenheit will use commercially reasonable efforts, in conjunction with NewCo, to have the NewCo Equity listed on a stock exchange (*e.g.*, NASDAQ, Abu Dhabi Securities Exchange (ADX), NASDAQ Dubai) acceptable to the New Board as of, or as soon as reasonably practicable following, the Effective Date. To the extent that the NewCo Equity cannot be listed on an acceptable stock exchange within a reasonable period of time to be determined by the New Board, Fahrenheit will use commercially reasonable efforts, in conjunction with NewCo, to have the NewCo Equity traded in the

over-the-counter (OTC) market or listed through a security token.

Fahrenheit agrees to use commercially reasonable efforts to raise capital for a rights offering or other funding mechanism for eligible third parties and creditors to purchase NewCo Equity in connection with the Plan.

- Proof Group Staking Consideration:    At the Debtors' and the Committee's option, Proof Group will (1) provide NewCo with a royalty-free, perpetual license, without sublicense rights, of intellectual property owned by Proof Group (or other rights to use the applicable software or proprietary technology) ("Proof Group IP") with respect to staking services, and (2) commitment to support staking in NewCo using the Proof Group IP at no cost to NewCo.  Proof Group, its principals (including Noah Jessop), and its managed entities and affiliates (including Proof Group LP) agree that, from the time of the determination that the Fahrenheit bid is the highest and best bid at the auction, none of them will engage in staking businesses (other than existing fund raises and investments) outside of NewCo, without the prior written consent of (i) prior to the effective date of the Fahrenheit Plan, the Debtors and the Committee and (ii) following the effective date of Fahrenheit Plan, the NewCo Board.

  Prior to the Effective Date, Proof Group will offer its staking services to the Debtors at pass through costs (subject to necessary Bankruptcy Court approvals, if any).

  In the event that NewCo licenses the Proof Group IP, on or after the Effective Date, Proof Group shall migrate its current staking customers to NewCo to the extent such customers agree to be transferred to NewCo and shall drop those customers that do not agree to be transferred to NewCo.

  In the event the Debtors and the Committee elect to toggle to the Orderly Wind Down or the Fahrenheit Plan is not otherwise confirmed and determined to be effective, any rights to the Proof Group IP and any Proof Group customers transferred to NewCo shall revert to Proof Group.

- Loan Services: At the option of the Debtors and the Committee after the Effective Date of the Fahrenheit Plan, NewCo's option, Valon Technologies, Inc. ("**Valon**") shall provide services and licenses to service and originate loans or structured settlements for NewCo at a price to be agreed by NewCo and Valon.  The Fahrenheit team will work with the New Board and Executive Management Team to potentially introduce new lending products and services, only as permitted by applicable law.  None of the Fahrenheit team shall participate or develop any cryptocurrency-related lending product outside of NewCo.

- Exclusivity and Disclosure:  For as long as the Plan Sponsor or any

member of the Executive Management Team is involved in the management of NewCo, then Fahrenheit, Proof Group, and Arrington Capital (together with the principals of Proof Group and Arrington Capital, the "**Fahrenheit Exclusivity Parties**") will each have a customary global allocation policy that includes NewCo; *provided* that the Debtors, the Committee, and the Plan Sponsor shall negotiate in good faith regarding the application of the following restrictions to the Plan Sponsor and Executive Management Team in the event that the Plan Sponsor or any member of the Executive Management Team is no longer involved in the management of NewCo:

- o  NewCo shall have a right of first offer on (1) the creation of operating cryptocurrency businesses by the Fahrenheit Exclusivity Parties and (2) cryptocurrency-related investments (including acquisitions of ownership stakes in new operating cryptocurrency businesses or acquisitions of the material assets of operating cryptocurrency businesses) with a proposed investment in excess of $20 million that is proposed to be entered into by the Fahrenheit Exclusivity Parties or any of their respective managed funds or entities; <u>provided</u> that the Fahrenheit Exclusivity Parties shall be deemed to have satisfied this obligation to the extent that any investment opportunity in the preceding (1) or (2) was provided to NewCo, regardless of whether NewCo chooses to pursue the opportunity and regardless of whether NewCo reaches agreement with the potential counterparty.

- o  Arrington Capital and Proof Group will share substantially all deal flow with NewCo and use commercially reasonable efforts to include NewCo in any deals of interest to NewCo.

- o  Fahrenheit, Proof Group, and Arrington Capital will each have a customary global allocation policy that includes NewCo.

- o  The Fahrenheit Exclusivity Parties will work in good faith with the New Board to create appropriate conflict and disclosure policies. For the avoidance of doubt, the Fahrenheit Exclusivity Parties, US Bitcoin, and Messrs. Kokinos and Kaza will disclose all financial conflicts that they may respectively have while advising and managing NewCo.

- o  NewCo may, at its discretion, become investors in any member funds of the Fahrenheit Exclusivity Parties (fund General Partners to waive fund minimums as needed and able) solely so that NewCo may receive customary investor disclosures, including quarterly portfolio detail, investor communications, and audited financials.

| | |
|---|---|
| *Deposit* | The Plan Sponsor shall submit a $10,000,000 cash deposit (the "**Deposit**"), submitted by wire transfer of immediately available funds to an escrow account |

| | |
|---|---|
| | to be identified by the Debtors as soon as possible. Such Deposit shall be received by the escrow account no later than three (3) business days after Fahrenheit is named the lead bidder at the auction. The Deposit shall be: (i) subject to an escrow agreement acceptable to Fahrenheit; and (ii) placed into a U.S. Treasury money market fund, with proceeds payable to Fahrenheit.<br><br>To the extent that the Fahrenheit Plan is selected as the highest and/or best bid at the Auction and Fahrenheit is selected as the Successful Bidder, then the Deposit and all proceeds thereof shall be returned to Fahrenheit, paid to the Debtors, or applied against the Management Contribution, as the case may be, as set forth in the Plan Sponsor Agreement.<br><br>To the extent that the Fahrenheit Plan is not selected as the highest and/or best bid at the Auction or Fahrenheit is not selected as the Successful Bidder, or if the Plan Sponsor Agreement is not agreed to and executed as set forth herein, then the Deposit and all proceeds thereof shall be returned to Fahrenheit within two (2) business days of any such determination or the failure of the parties to timely execute the Plan Sponsor Agreement, as applicable. |
| *Liquid Cryptocurrency Distributions* | The Debtors, the Committee, and the Plan Sponsor shall mutually agree on the identity of any distribution agent(s) and the terms of any agreement(s) with such distribution agent(s). |
| *Key Assumptions* | This Term Sheet is predicated on the same assumptions as set forth in the Current Proposed Plan, including, without limitation, as it relates to: (i) the Earn Program; (ii) account balances reflected in the Debtors' records as "withheld" (iii) the Custody Program; (iv) the priority of Account Holder Claims; and (v) the value of the CEL Token. |
| *NewCo and Management Arrangements* | The Executive Management Team and the Plan Sponsor will manage NewCo at the direction of the New Board for the benefit of holders of the NewCo Equity in accordance with the terms of the Management Agreement and the New Organizational Documents. NewCo will implement a policy regarding the provision of quarterly dividends to holders of the NewCo Equity, which dividends, if any, shall be paid in Cash at the discretion of the New Board in accordance with the New Organizational Documents and applicable law.<br><br>In exchange for its services, the Plan Sponsor and Executive Management Team will be paid the Management Fee (both of which, for the avoidance of doubt, shall be modified in accordance with the Management Agreement Term Sheet), as will be more fully described in the Management Agreement.<br><br>NewCo will be a public reporting company and will file financial statements on Forms 10-Q and 10-K as well as annual proxy statements.<br><br>The New Organizational Documents shall be included in the Plan Supplement and shall be consistent with the revised Management Agreement Term Sheet in all material respects. |

| | |
|---|---|
| | NewCo shall have any and all necessary licenses, if any, to fulfill its obligations under the Plan (including any settlements entered in connection therewith) or, to the extent NewCo does not possess such licenses, NewCo shall use commercially reasonable efforts to make appropriate arrangements through a partnership with a third party to ensure that NewCo can meet its obligations under the Plan without disruption. |
| *Governance* | The New Board shall initially consist of seven members: (i) two of whom will be appointed by the Plan Sponsor; (ii) three of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange.

Members of the New Board (other than the designees of the Plan Sponsor) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member may be reelected at the end of their term; <u>provided</u> that, for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect two members of the New Board.

The Management Agreement shall be in form and substance consistent with this Term Sheet and acceptable to the Debtors, the Committee, and the Plan Sponsor. The Management Agreement's initial term will be five years, subject to two consecutive two-year renewals periods at the option of the New Board in its sole discretion; <u>provided</u> that the Management Agreement and each member of the NewCo Management Team shall be subject to termination for cause, as will be defined in the Management Agreement. The Management Agreement shall provide that such extensions are at the same Fixed Management Fee, adjusted for inflation, with no additional equity issued to Fahrenheit or any executive whose compensation is included in the Fixed Management Fee.

Following the first five-year term (the "**Initial Term**"), the New Board shall provide notice no more than twelve (12) months but not less than six (6) months prior to the end of the Initial Term or any renewal term that it does not wish to renew the Management Agreement, wishes to exercise its renewal option, or wishes to renew the Management Agreement on different terms. To the extent the Management Agreement is terminated, NewCo shall have no further obligation to pay the Management Fee. NewCo shall have the option for up to two renewal terms of two years each, on the same fee terms but excluding any equity fees or rights but adjusting the cash fee for inflation.

The New Board shall adopt and approve: (i) the investment policy; (ii) the dividend policy; (iii) any policies regarding potential conflicts of interest (including with respect to Fahrenheit, NewCo, and their respective personnel and Affiliates); (iv) all major investment and operational decisions of NewCo (taking into account the recommendation of the CEO and CFO); and (v) a policy governing the involvement and commitment of each member of the Fahrenheit Team, including Ravi Kaza, Michael Arrington, and Noah Jessop. To the extent |

| | the investment policy includes an allocation for new venture investments, such investments shall be less than 5% of the total investment policy, unless otherwise approved by the NewCo board.  The CEO, CFO, and C-Suite executives all serve at the pleasure of the New Board. |
|---|---|
| | The New Organizational Documents shall provide for the ability of 25% of the NewCo Equity holders to call, and for NewCo to convene in such case, a special meeting of shareholders to, with the approval of a majority of the NewCo Equity held by holders that (i) are in attendance (in person or by proxy) and (ii) vote for or against such proposal at such special meeting where a quorum exists in accordance with the New Organizational Documents, instruct the New Board to consider whether to terminate or reconsider the Management Agreement, the Plan Sponsor, or the Executive Team, or wind down NewCo, in each case, to the extent provided for in the Management Agreement. |
| *Releases and Exculpations* | The Plan shall include customary release, exculpation, and injunction provisions on the same terms and conditions as set forth in the Current Proposed Plan. |
| *Orderly Wind Down* | The Debtors will effectuate an Orderly Wind Down in accordance with the Wind-Down Procedures if, at any time prior to confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; provided that the Debtors and Committee may move for an Orderly Wind Down at any time prior to confirmation of the Plan by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court. |
| | In the event of an Orderly Wind Down, (a) the Plan Administrator or any other Person or Entity identified by the Debtors and the Committee will wind down the Estates and (b) the Debtors' Cryptocurrency, Cash, and other assets will be distributed, in each case, in an orderly manner pursuant to the Plan and the Wind-Down Procedures. |
| | The Orderly Wind Down is anticipated to occur over a wind-down period to be set forth in the Wind-Down Procedures. |
| | Notwithstanding anything to the contrary in the Plan, this Term Sheet, or the Plan Sponsor Agreement, whether or not the Debtors implement the Orderly Wind Down, the Litigation Administrator shall be appointed on the date that the Effective Date occurs. |
| *Near-Term Liquidity* | The Debtors, the Committee, and the Plan Sponsor shall agree on mechanisms to ensure a liquid market for the NewCo Equity, which mechanisms shall be described in the Disclosure Statement and/or Plan Supplement. |
| *Conditions Precedent to Confirmation* | The Plan shall provide that Confirmation of the Plan (in addition to other reasonable and customary conditions, including as set forth in the Plan Sponsor Agreement) shall be subject to the occurrence of the following, unless waived in accordance with the Plan: |

|  | (i) | The Bankruptcy Court shall have entered the Disclosure Statement Order; |
|  | (ii) | the Management Agreement, the New Organizational Documents, the Valon Agreements, the distribution agent agreement(s), and the USBTC Agreements shall be agreed as required under the Plan Sponsor Agreement; |
|  | (iii) | the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and |
|  | (iv) | the Bankruptcy Court shall have entered the Confirmation Order. |
| *Conditions Precedent to Effective Date* | | The Plan shall provide that the Effective Date of the Plan (in addition to other reasonable and customary conditions, including as set forth in the Plan Sponsor Agreement) shall be subject to the occurrence of the following, unless waived in accordance with the Plan: |
|  | (i) | the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order); |
|  | (ii) | NewCo shall have obtained all regulatory approvals included in <u>Schedule 1</u> to the Plan Sponsor Agreement, and any applicable waiting periods related thereto shall have expired or terminated early; |
|  | (iii) | the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with this Plan Term Sheet in all material respects, and shall have been Filed in a manner consistent with this Plan Term Sheet; |
|  | (iv) | the Debtors shall have transferred, liquidated, monetized, or sold Cryptocurrency in an amount equal to an amount determined by the Debtors, and consented to by the Committee, as reasonably necessary to pay in full, or reserve for payment in full of, all Allowed Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims (the "**Senior Claims Amount**"); |
|  | (v) | the Litigation Administrator Agreement shall have been executed and the Litigation Recovery Account shall have been established and funded with the Initial Litigation Funding Amount; |
|  | (vi) | each Definitive Document (as defined in the Plan Sponsor Agreement) and each other document contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, if applicable, in form and substance consistent in all material |

14

| | |
|---|---|
| | respects with the Plan and the Plan Sponsor Agreement, and shall not have been modified in a manner inconsistent therewith;<br><br>(vii)   the Professional Fee Escrow Account shall have been established and funded with Cash in accordance with the Plan; and<br><br>(viii)   the Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date. |
| *Tax Matters* | The Plan and the various transactions thereunder shall be structured in a tax-efficient and cost-effective manner to be agreed among the Debtors, the Committee, and Fahrenheit, each in their reasonable discretion.<br><br>Holders of Earn Claims who are projected to receive more than $100,000 in Liquid Cryptocurrency distributions may contact the Debtors to discuss potential individualized accommodations to the composition of their liquid recovery (including a discussion of the allocation of the associated administrative costs of such customized distributions), and the Debtors, in consultation with the Committee, shall use commercially reasonable efforts to accommodate those requests, in the aggregate, solely to the extent permitted by applicable regulatory requirements. |
| *Plan Sponsor Agreement* | To the extent that the Fahrenheit Plan is selected as the highest and/or best bid at the Auction and Fahrenheit is selected as the Successful Bidder, then Fahrenheit, the Debtors, and the Committee shall execute a Plan Sponsor Agreement in form and substance acceptable to each of the foregoing parties not later than five (5) business days following the conclusion of the Auction. The Plan Sponsor Agreement shall include a milestone of June 30, 2023 for the filing of a plan and disclosure statement (the "**Plan and DS Milestone**"). To the extent a plan and disclosure statement are not filed by the Plan and DS Milestone, the PSA shall terminate, the Debtors and Committee shall toggle to an orderly wind down, and the Debtors shall be entitled to keep the Deposit; *provided*, that to the extent the Plan and DS Milestone is not achieved due to no fault of Fahrenheit, the Deposit shall be returned to Fahrenheit. The Plan Sponsor Agreement shall include provisions addressing, among other things, milestones, return of the Deposit, termination events, and conditions precedent to the confirmation and occurrence of the Effective Date of the Fahrenheit Plan. Further, the Plan Support Agreement shall provide for the reimbursement of the fees and expenses of the Plan Sponsor up to $5 million. The Debtors shall seek approval of the up to $5 million expense reimbursement as part of the motion to approve the Disclosure Statement, which request shall be supported by the Committee. |