Hearing Date: **June 28, 2023, at 10:00 a.m. (prevailing Eastern Time)**
Objection Deadline: **June 21, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF DEBTORS' MOTION SEEKING**
**ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF**
**OSPREY BTC SHARES AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Sale of Osprey BTC Shares and (II) Granting Related Relief* (the "Motion") will be held on **June 28, 2023, at 10:00 a.m., prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge. The Hearing will be conducted in a hybrid fashion both in person and via Zoom for Government. Those

---

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

wishing to participate in the June Omnibus Hearing in person may appear before the Honorable

Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for

the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New

York, New York 10004-1408.  For those wishing to participate remotely, in accordance with

General Order M-543 dated March 20, 2020, the June Omnibus Hearing will be conducted

remotely using Zoom for Government.  Parties wishing to appear at or listen to the June Omnibus

Hearing, whether (a) an attorney or non-attorney, (b) appearing in person or remotely, or

(c) making a "live" or "listen only" appearance before the Court, need to make an electronic

appearance      (an "eCourtAppearance")      through      the      Court's      website      at

https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.  When making an eCourtAppearance,

parties must specify whether they will appear at the June Omnibus Hearing remotely or in person

and, and if appearing remotely, whether they are making a "live" or "listen only" appearance.

Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern**

**Time, the business day before the hearing (*i.e.*, on Tuesday, June 27, 2023)**.

PLEASE TAKE FURTHER NOTICE that due to the large number of expected

participants in the June Omnibus Hearing and the Court's security requirements for participating

in a Zoom for Government audio and video hearing, all persons seeking to attend the June Omnibus

Hearing remotely at 10:00 a.m., prevailing Eastern Time on June 28, 2023 must connect to the

June Omnibus Hearing beginning at 9:00 a.m., prevailing Eastern Time on June 28, 2023.  When

parties sign in to Zoom for Government and add their names, they must type in the first and last

name that will be used to identify them at the June Omnibus Hearing.  Parties that type in only

their first name, a nickname, or initials will not be admitted into the June Omnibus Hearing.  When

seeking to connect for either audio or video participation in a Zoom for Government Hearing, you

will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the June Omnibus Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the June Omnibus Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov; and (d) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief,* [Docket No. 2560] (the "Case Management Order") by **June 21, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius. You may also obtain copies of the motions and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

New York, New York
Dated: June 7, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com

   - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) |
|  | ) Case No. 22-10964 (MG) |
| Debtors. | ) |
|  | ) (Jointly Administered) |

**DEBTORS' MOTION SEEKING ENTRY**
**OF AN ORDER (I) AUTHORIZING THE SALE OF**
**OSPREY BTC SHARES AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state

the following in support of this motion (this "<u>Motion</u>"):

**<u>Preliminary Statement</u>**

1.        As part of their prepetition investment strategy, the Debtors purchased 2,932,321

shares issued by the Osprey Bitcoin Trust (the "<u>Osprey BTC Trust</u>," and such shares, the "<u>Osprey</u>

<u>BTC Shares</u>"), a trust that provides a simple and secure way to invest in Bitcoin through a

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8
USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors'
service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

brokerage account—in other words, so that one does not need to directly own Bitcoin to have investment exposure to Bitcoin. The Osprey BTC Trust holds Bitcoin, and each Osprey BTC Share represents a share of the ownership of the Bitcoin in the trust's possession. Osprey BTC Shares can be purchased by investors in-kind (with Bitcoin) or with fiat currency. The Debtors purchased the Osprey BTC Shares with Bitcoin at a time when the price per Bitcoin was significantly higher than it is today. Although Osprey BTC Shares are transferable and tradable over the counter, the secondary market for the shares is relatively illiquid. Moreover, the Debtors hold a significant position in the Osprey BTC Trust, which makes selling the Osprey BTC Shares on the secondary market more challenging, especially in light of the ongoing pressures on the cryptocurrency market and the value of Bitcoin.

2.      The Debtors received a proposal from a third party for the purchase of all of the Osprey BTC Shares in the Debtors' possession. Although the purchase price that has been proposed for the Osprey BTC Shares is discounted from the current price of Bitcoin, the sale provides the Debtors a means to monetize an otherwise illiquid asset at a fair price. The Debtors also believe that the Proposed Transaction (as defined herein) is preferable to any alternative, including attempting to sell the Osprey BTC Shares on the secondary market, or continuing to hold the Osprey BTC Shares. Simply holding the Osprey BTC Shares provides the Debtors no utility. And any sale on the secondary market would likely result in lower prices than the Proposed Transaction. The Debtors have discussed the Proposed Transaction with the Official Committee of Unsecured Creditors, which agrees that the Proposed Transaction is in the best interest of the Debtors' estates and creditors. Accordingly, in a sound exercise of their business judgment— because they believe that this is a value-maximizing transaction that will benefit their estates and creditors—the Debtors request the authority to proceed with the sale of their Osprey BTC Shares.

## **Relief Requested**

3.       The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), authorizing, but not directing, the Debtors to (i) sell the Osprey BTC

Shares to Anax Trading, LLC ("Anax") according to the terms of the Proposed Transaction, and

(ii) granting related relief.[2]

## **Jurisdiction and Venue**

4.       The United States Bankruptcy Court for the Southern District of New York

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court

entering a final order in connection with this Motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

5.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       The bases for the relief requested herein are sections 105(a) and 363 of title 11 of

the United States Code (the "Bankruptcy Code"), rules 2002, 6004, 9006, and 9007 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 6004-1 and 9006-1 of the

Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## **Background**

7.       The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are

one of the largest and most sophisticated cryptocurrency based finance platforms in the world and

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Ferraro
Declaration (as defined herein).

provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

8.      On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "Campagna Declaration").  The Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

9.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee"). On September 29, 2022, the Court entered an order directing the appointment of an examiner [Docket No. 920].  On April 4, 2023, the Court entered an order discharging the examiner [Docket No. 2364].

10.     In support of this Motion, the Debtors submit the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer*

*of the Debtors, in Support of the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Sale of Osprey BTC Shares and (II) Granting Related Relief* (the "Ferraro Declaration"), filed contemporaneously herewith.

### The Osprey BTC Shares

11.    In March 2021, Celsius Network Limited acquired 2,932,321 Osprey BTC Shares. Ferraro Decl. ¶¶ 4, 7.  The Osprey BTC Trust is a Delaware statutory trust that is managed by Osprey Funds, LLC (the "Osprey Funds"), and Osprey BTC Shares are transferable and tradable over the counter on the OTCQX market operated by OTC Markets, Inc.  *Id.* ¶¶ 4, 6.

12.    The Osprey BTC Trust, and others like it,[3] provide investors exposure to cryptocurrency in an indirect manner:  the trust holds Bitcoin, and each share of the trust represents a share of the ownership of those Bitcoin.  Investors themselves do not hold the cryptocurrency (and therefore do not have to manage related aspects such as accounts on cryptocurrency exchanges, keys, and wallets). Investors can purchase trust shares with Bitcoin, or with fiat currency through brokerage accounts, IRAs, and other similar accounts.  The value of the Osprey BTC Trust largely tracks the value of Bitcoin.  As of the date of the filing of this Motion, the Osprey BTC Trust has approximately $73 million worth of Bitcoin under management.[4]

13.    Although the price of the Osprey BTC Shares reflects changes in the price of Bitcoin, Osprey BTC Shares trade at an additional discount in the market that is independent of the direction of Bitcoin prices.  As of June 6, 2023, the Osprey BTC Shares traded at a price level that represents a discount of approximately forty percent below the market value of the Bitcoin assets held within the trust.  This discount has been sizable and persistent, ranging from thirty to

---

[3]    The Debtors also hold shares of the Osprey Polkadot Trust.

[4]    Osprey Funds, *Osprey Bitcoin Trust*, https://ospreyfunds.io/products/obtc/ (last visited June 1, 2023).

forty percent below net asset value in recent months.  Such discounts are common to similar cryptocurrency pass-through vehicles trading in the public markets, at least since the major fall-off in cryptocurrency prices.

14.    The Debtors purchased the Osprey BTC Shares for approximately 1,000 Bitcoin in two tranches, on March 2, 2021 and March 17, 2021, when the price of one Bitcoin was significantly higher than it is today.  *Id.* ¶ 7.  Specifically, the price per Bitcoin on the first fifty Bitcoin the Debtors used to make the purchase was $48,417.99, and the price per Bitcoin on the remaining 950 Bitcoin was $55,645.20, resulting in a blended price per Bitcoin of $55,283.84 and an aggregate price of approximately $55.3 million.  At the time of purchase of the first 146,552 Osprey BTC Shares on March 2, 2021, each Osprey BTC Share was valued at approximately $16.52; at the time of purchase of the remaining 2,785,769 Osprey BTC Shares on March 17, 2021, each Osprey BTC Share was valued at approximately $18.97.  As of March 17, 2021, the total estimated market value of the Debtors' Osprey BTC Shares was approximately $55.6 million.  As of June 7, 2023, each Osprey BTC Share was valued at $ 5.06, and the Debtors estimate that the Osprey BTC Shares in their possession have a current market value of approximately $15 million.  The Debtors hold approximately 36.65 percent of the total number of outstanding Osprey BTC Shares.

15.    Since the Debtors' purchase of the Osprey BTC Shares, the Debtors have not encumbered or assigned the Osprey BTC Shares, nor are the Debtors aware of any third party asserting an interest therein.  *Id.* ¶ 8.

16.    In April 2023, the Debtors received a proposal from Anax—a third party not affiliated with the Debtors—to purchase not less than all of the Osprey BTC Shares in the Debtors' possession, which terms were subsequently negotiated and are set forth in the term sheet attached

hereto as **Exhibit B** (the "Proposed Transaction"). Anax has proposed to purchase the Debtors' Osprey BTC Shares at the closing price of the shares as reported by Bloomberg (the "Closing Price") on a date to be determined, but as soon as reasonably practicable after the entry of the Order authorizing the Debtors to proceed with the Proposed Transaction, and in no event after July 10, 2023 (the "Purchase Date"). A condition to Anax's obligation to close the Proposed Transaction is that the Closing Price on the Purchase Date, divided by the net asset value of the Osprey BTC Trust on such date, does not exceed 67.84 percent of the net asset value of the Osprey BTC Trust (*i.e.*, the highest level reached during the sixty-day period immediately preceding the date of the Term Sheet), and a condition to the Debtors' obligation to close the Proposed Transaction is that the Closing Price on the Purchase Date, divided by the net asset value of the Osprey BTC Trust on such date, is not lower than 62.57 percent of the net asset value of the Osprey BTC Trust (*i.e.*, the lowest level reached during the sixty-day period immediately preceding the date of the Term Sheet), though either party may waive the condition in its favor. Based on the terms Anax proposed as of June 7, 2023, the Debtors anticipate that they will be able to sell the Osprey BTC Shares to Anax for approximately $ 16 million in cash consideration.

17.     The Proposed Transaction contains no financing or due diligence contingency. Between the filing of this Motion and the Hearing, the Debtors and Anax will negotiate and enter into conditional agreements to document the Proposed Transaction. Upon the Court's approval of the Proposed Transaction and satisfaction of other conditions to closing, the Debtors will execute the agreements and proceed with closing.

18.     If the Proposed Transaction is effectuated, the purchase price for the Osprey BTC Shares will be significantly discounted from the price the Debtors initially paid for them, largely

due to the significant decrease in price per Bitcoin.  Nonetheless, the Debtors believe that the Proposed Transaction is in the best interest of their estates and creditors for the following reasons.

19.    *First*, the Proposed Transaction provides the Debtors an opportunity to increase their cash on hand and improve their liquidity position.  *Id.* ¶ 12.  The Debtors require liquidity to finish these chapter 11 cases, and the Debtors believe that the proposed purchase price of $16 million is commensurate with today's market.  *Id.  Second*, absent the Proposed Transaction, the Debtors will likely continue to hold the Osprey BTC Shares for the foreseeable future because selling the Osprey BTC Shares on the secondary market would likely be more challenging and less profitable.  *Id.*  Although the Osprey BTC Shares are transferable and tradable over the counter, the market for Osprey BTC Shares is relatively illiquid, and there are generally a limited number of potentially interested purchasers for such shares.  *Id.*  The Debtors also believe that they hold a significant position of Osprey BTC Shares, which makes it even more difficult to sell them.[5]  *Id.* Accordingly, it would be challenging for the Debtors to sell their Osprey BTC Shares on the secondary market at a competitive price, and it is unlikely that the Debtors would be able to find purchasers for *all* of their Osprey BTC Shares.  *Id.  Finally*, the Debtors believe that selling the Osprey BTC Shares pursuant to the Proposed Transaction is preferable to the Osprey BTC Shares remaining in the Debtors' possession, where they provide them no utility.  *Id.*

### Basis for Relief

20.    Section 363(b)(1) of the Bankruptcy Code allows a debtor "after notice and a hearing may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit have granted a debtor's request to sell

---

[5]    Approximately 8 million Osprey BTC Shares are currently outstanding.  Osprey Funds, *supra* note 5.  As noted, the Debtors hold approximately 36.65 percent of that amount.

property outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy

Code upon a finding that the debtor demonstrates a "sound business purpose" for the transaction.

*See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071

(2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale, or lease

of property outside of the ordinary course of business).  The "business judgement rule" is not an

unduly strict standard; it merely requires showing that a decision to sell the property was based on

the debtor's sound business judgement.  *See In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir.

1992) (holding that a judicial approval of a section 363(b) sale was appropriate if good business

reason existed to proceed with such sale); *In re Ionosphere Clubs, Inc.¸*100 B.R. 670, 675

(Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good

business reason"); *In re Glob. Crossing Ltd.*, 295 B.R 726, 743 (Bankr. S.D.N.Y. 2003).

21.     The business judgement rule also shields a debtor's decision making from second

guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (noting a

"presumption of reasonableness attaches to a debtor's management decisions" and courts will

generally not entertain objections to a debtor's conduct after a reasonable basis is set forth);

*see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.

(In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgement

rule is a presumption that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company," and has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*,

488 A.2d 858, 872 (Del. 1985)) (internal quotation marks omitted).

22.     Furthermore, section 105 of the Bankruptcy Code provides, in relevant part, that

"[t]he court may issue any order, process, or judgement that is necessary or appropriate to carry

out the provisions of this title." 11 U.S.C. § 105(a); *see also In re Enron Corp.*, 335 B.R. 22 (S.D.N.Y. 2005) ("Section 105(a) provides the authority for the bankruptcy court to carry out the provisions of § 363(b)."); *In re Bethlehem Steel Corp.*, 2003 WL 21738964 at *6, 13 (S.D.N.Y. 2003) (same).

23.     Finally, Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property of the estate outside of the ordinary course of business by private sale. *See* Bankruptcy Rule 6004(f)(1). Private sales by debtors outside of the ordinary course are appropriate where the debtors demonstrate that the sale is permissible pursuant to section 363 of the Bankruptcy Code. *See, e.g.*, *In re Wellman, Inc.*, No. 08-10595 (SMB) (Bankr. S.D.N.Y. Oct. 6, 2008) (approving private sale of industrial complex); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (private real estate sale by debtor approved when purchase price was the same as independent appraisal); *In re Bakalis*, 220 B.R. 525, 531–32 (Bankr. E.D.N.Y. 1998) (trustee has ample authority to conduct a sale of estate property through private sale).

**I.    Selling the Osprey BTC Shares Is a Reasonable Exercise of Debtors' Sound Business Judgement and in the Best Interests of the Debtors' Estates.**

24.     Selling the Osprey BTC Shares represents a reasonable exercise of the Debtors' business judgement and should be approved pursuant to sections 105(a) and 363(b) of the Bankruptcy Code as well as Bankruptcy Rule 6004(f).

25.     The sale of the Osprey BTC Shares will generate significant liquidity to help fund the continued administration of these chapter 11 cases. Ferraro Decl. ¶ 12. Absent the sale of the Osprey BTC Shares pursuant to the Proposed Transaction, the Debtors will likely continue to hold the Osprey BTC Shares because there are limited potential other purchasers of the shares at this time. *Id.* To find other purchasers, the Debtors would likely have to expend significant time and resources marketing the Osprey BTC Shares. *Id.* In addition, the Proposed Transaction is

particularly beneficial because it will allow the Debtors to sell all of the Osprey BTC Shares in their possession at once rather than piecemeal. *Id.* Most importantly, if the Debtors do not proceed with the Proposed Transaction, they will be wasting an opportunity to generate millions of dollars for their estates at a time when liquidity is critical. *Id.*

26.    The Debtors must move quickly to execute the Proposed Transaction. *Id.* ¶ 10. Indeed, absent the Court's approval of this Motion, the Debtors' ability to effectuate the Proposed Transaction will be jeopardized. *Id.* Accordingly, the Court should authorize the Debtors to sell the Osprey BTC Shares.

## II.    The Proposed Transaction Should be Approved Free and Clear of Liens, Claims and Encumbrances

27.    To procure the highest offers, the Osprey BTC Shares should be sold free and clear of any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances to attach to the proceeds of the sale. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if any one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which property is to be sold is greater than the value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

28.    The Debtors are not aware of any party asserting a lien, claim, encumbrance or other interest against the Osprey BTC Shares, and therefore section 363(f) is satisfied.

## III.    The Proposed Transaction Has Been Negotiated in Good Faith and Without Collusion

29.    The Debtors request that the Court find that Anax is entitled to the benefits and

protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Osprey BTC Shares.  Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  *See* 11 U.S.C. § 363(m).

30.     Section 363(m) provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 3d Cir. 1986); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

31.     The Debtors and Anax have negotiated the Proposed Transaction without collusion, in good faith, and through extensive arm's-length negotiations.  Ferraro Decl. ¶13.  To that end, Anax and the Debtors have engaged separate counsel and other professional advisors to represent their respective interests in the negotiation of the Proposed Transaction.  *Id.*  To the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct that would cause or permit the Proposed Transaction to be set aside under section 363(m) of the Bankruptcy

Code. *Id.* And perhaps most significantly, as set forth above, the Debtors believe that the Proposed Transaction represents the highest offer—and the one that incurs the least amount of transaction cost and the most prompt infusion of liquidity into the estate. *Id.* ¶12.

32.     The Debtors thus submit that Anax is a "good faith purchaser" within the meaning of Bankruptcy Code section 363(m), and the Proposed Transaction constitutes a good-faith agreement on arm's-length terms entitled to the protections of section 363(m).

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

33.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that cause exists to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h).

## Motion Practice

34.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

35.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) the offices of the attorneys general in the states in which the Debtors operate; (f) the Securities and Exchange Commission; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

13

**No Prior Request**

36.    No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| New York, New York | */s/ Joshua A. Sussberg* |
| Dated: June 7, 2023 | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | Joshua A. Sussberg, P.C. |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:    (212) 446-4800 |
| | Facsimile:    (212) 446-4900 |
| | Email:    jsussberg@kirkland.com |
| | |
| | - and - |
| | |
| | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| | Christopher S. Koenig |
| | Dan Latona (admitted *pro hac vice*) |
| | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |
| | Email:    patrick.nash@kirkland.com |
| | ross.kwasteniet@kirkland.com |
| | chris.koenig@kirkland.com |
| | dan.latona@kirkland.com |
| | |
| | *Counsel to the Debtors and Debtors in Possession* |

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | )    Case No. 22-10964 (MG) |
| | ) |
|            Debtors. | )    (Jointly Administered) |
| | ) |
| | ) |

### ORDER (I) AUTHORIZING THE SALE
### OF OSPREY BTC SHARES AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), authorizing, but not requiring the Debtors to sell the Osprey BTC Shares to Anax, all as more fully set forth in the Motion; and upon the Ferraro Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate

---

[1.] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are : Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion.

under the circumstances and no other notice need be provided; and this Court having reviewed the

Motion and having heard the statements in support of the relief requested therein at a hearing

(the "Hearing") before this Court; and this Court having determined that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule

6004, the Debtors are authorized, but not directed, in their reasonable business judgement, to sell

the Osprey BTC Trust to Anax pursuant to the terms of the Proposed Transaction.

3.      The Debtors have demonstrated sufficient basis to enter into the Proposed

Transaction and sell the Osprey BTC Shares for the proposed purchase price, and such actions are

appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors,

their creditors, their estates and other parties in interest.  The Proposed Transaction is fair and

reasonable, and the proposed purchase price constitutes reasonably equivalent value, fair

consideration, and fair value for the Osprey BTC Shares under the Bankruptcy Code, the Uniform

Fraudulent Transfer Act, the Uniform Voidable Transactions Act, and other similar laws.

4.      The Proposed Transaction was negotiated, proposed, and entered into by the

Debtors and Anax without collusion, in good faith, and from arm's-length bargaining positions.

Neither the Debtors nor Anax has engaged in any conduct that would cause or permit the Proposed

Transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the

Bankruptcy Code.

5.      The Proposed Transaction is undertaken by Anax in good faith, as that term is used

in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification of the

authorization provided herein to consummate the Proposed Transaction shall not affect the validity of the transaction to Anax unless such authorization is duly stayed prior to its closing.  Anax is a buyer in good faith of the Osprey BTC Shares and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

6.      Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon the Proposed Transaction, the Osprey BTC Shares shall be transferred to Anax free and clear of any and all liens, claims and interests of any kind or nature whatsoever, including any such rights or claims based on any putative successor or transferee liability.

7.      The transfer of the Osprey BTC Shares to Anax shall constitute a legal, valid, and effective transfer of the Osprey BTC Shares at the closing of the Proposed Transaction and, on the date of such closing, shall vest Anax with all of the Debtors' rights, title and interests in the Osprey BTC Shares free and clear of all liens, claims and interests of any kind or nature whatsoever.

8.      Neither Anax nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither Anax nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates. The transfer of the Osprey BTC Shares to Anax does not and will not subject Anax to any liability whatsoever with respect to the Debtors or the operation of the Debtors' businesses on any theory of liability, including, without limitation, successor, fraudulent transfer or avoidance, or other applicable law, rule, or regulation, or other theory of liability whatsoever, whether legal, equitable, or otherwise.

9.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions

involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

10.    Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

11.    Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12.    To the extent the provisions of this Order are inconsistent with the Motion, the provisions of this Order shall control.

13.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

14.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

## **Exhibit B**

**Term Sheet**

CONFIDENTIAL

**ANAX TRADING, LLC**

_____

**CONFIDENTIAL SUMMARY OF TERMS
PURCHASE OF SHARES OF OBTC**

_____

**JUNE 7, 2023**

**THIS SUMMARY OF TERMS (THIS "*TERM SHEET*") SUMMARIZES THE PRINCIPAL TERMS OF A PROPOSED CASH PURCHASE DATE OF ALL OF THE UNITS OF OSPREY BITCOIN TRUST OWNED BY CELSIUS NETWORK LLC, AS DEBTOR IN POSSESSION. THIS TERM SHEET IS FOR DISCUSSION PURPOSES ONLY AND IS NON-BINDING; THERE IS NO OBLIGATION ON THE PART OF ANY NEGOTIATING PARTY UNLESS AND UNTIL DEFINITIVE AND BINDING DOCUMENTS ARE SIGNED BY SUCH PARTY. THIS TERM SHEET AND THE PROVISIONS HEREOF ARE PROPERTY OF ANAX TRADING, LLC, ARE CONFIDENTIAL, AND MAY NOT BE COPIED, DISSEMINATED OR DISCLOSED WITHOUT THE PRIOR WRITTEN CONSENT OF ANAX TRADING, LLC.**

| | |
|---|---|
| **Securities:** | Units of undivided beneficial interest issued by the Osprey Bitcoin Trust ("*OBTC*"), a Delaware Statutory Trust, which units are freely transferable and are currently trading over-the-counter on the OTCQX market operated by OTC Markets, Inc. OBTC is managed by Osprey Funds, LLC, a Delaware limited liability company as sponsor ("*Sponsor*"). |
| **Purchaser:** | Anax Trading, LLC or an affiliate thereof (as applicable, the "*Purchaser*"). |
| **Seller:** | Celsius Network Limited (or the applicable affiliate thereof which is the legal and beneficial owner of the Units (as defined below), "*Seller*"), a debtor in possession in a Chapter 11 bankruptcy. |
| **Proposed Purchase:** | All but not less than all of the outstanding units in OBTC owned by the Seller on the Purchase Date (as defined below) (the "*Units*"), believed to be 2,932,321 Units total. Seller currently values its Units, as implied from its schedules of assets and liabilities, at approximately $14.8 million. Purchaser proposes to purchase the Units for US dollars at the closing price of the Units as reported by Bloomberg on the Purchase Date ("*Closing Price*") so long as the conditions to closing, including the conditions identified as "Pricing Conditions" below, are satisfied. Settlement for the purchase shall occur on or before "T+2" i.e. two business days after the Purchase Date. |
| **Pricing Conditions** | On the Purchase Date, the following conditions must be met: |

    (a) the Closing Price on such date, divided by the net asset value of OBTC on such date, does not exceed 67.84% (which is the highest level reached during the 60-day period immediately preceding the date of this Term Sheet); and

(b) the Closing Price on such date, divided by the net asset value of OBTC on such date, is not lower than 62.57% (which is the lowest level reached during the 60-day period immediately preceding the date of this Term Sheet);

Alternatively, the transaction will be subject to such other Pricing Conditions as may be agreed to in writing (email being sufficient) between Purchaser and Seller (and with respect to the Seller, subject to the written consent of the Official Committee of Unsecured Creditors, email being sufficient).

**Purchase Terms:** The acquisition contemplated by this Term Sheet (the "***Transaction***") may close on any valid business day (subsequent to court approval) upon agreement by the parties (as the case may be, the "***Purchase Date***") but shall close no later than July 10, 2023. Purchaser's obligation to close shall be conditioned upon definitive documentation in a form acceptable to Purchaser in its sole discretion and upon bankruptcy court approval of the Transaction. For the avoidance of doubt, the Proposed Purchase contains no financing or due diligence contingencies. Good funds shall be wired from Purchaser to Seller within two business days following the Purchase Date in exchange for immediate transfer of Units to Purchaser by book-entry transfer.

**Definitive Documentation:** The parties will negotiate and enter into definitive agreements with customary terms and conditions for a transaction of this type, including representations, warranties, covenants and indemnities. Initial drafts of such Definitive Documentation will be prepared by counsel for Purchaser. Seller will be expected to execute a "big boy" letter in connection with the Transaction.