**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
          sam.hershey@whitecase.com


– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
          gregory.pesce@whitecase.com

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com


– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
### OMNIBUS OBJECTION TO MOTIONS FOR ENTRY OF AN ORDER TO DOLLARIZE
### NON-INSIDER CEL TOKEN CLAIMS AT THE PETITION DATE PRICE OF $0.81565

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 USA LLC (9450); GK8 Ltd. (1209); and GK8 UK Limited (0893).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned

debtors and debtors-in-possession (collectively, the "**Debtors**" and together with their non-Debtor

affiliates "**Celsius**") files this omnibus objection to (1) *Santos Caceres' Second Amended Motion*

*for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at The Petition Date Price*

*of $0.81565; If Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable*

*Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief* [Docket No.

2240] (the "**Caceres Motion**") and (2) *Sean StJohn's Motion for Entry of an Order (I) to Dollarize*

*Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; If Otherwise, (II) Request*

*the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the*

*Earn Group (III) Granting Related Relief* [Docket No. 2216] (the "**StJohn Motion**," and together,

the "**Motions**") and respectfully states as follows:

## Preliminary Statement

1.      CEL Token was described as the "backbone" of Celsius.  It was a speculative

investment.  Although the Debtors issued CEL Token, holders of CEL Token were not entitled to

any cash payment from the Debtors.  Instead, the value of CEL Token was inextricably tied to the

perceived success or failure of Debtors.  Now that the Debtors are in bankruptcy proceedings, CEL

Token is unlike any other token on the Debtors' balance sheet.  The Debtors cannot (and will not)

distribute CEL Token because it is a security and the Debtors cannot (and will not) comply with

the regulations required to distribute the token.  No potential Plan Sponsor, or any other potential

buyer that the Committee is aware of, made an offer to purchase the Debtors' CEL Token.[2]  Nor

does it appear that the movants themselves wish to receive CEL Token.  Rather, each seeks to

---

[2]    The only plan submitted that proposed to do anything with CEL Token was a presentation made by Mr. Mashinsky
before he was removed as the Chief Executive Officer of the Debtors.  The Debtors and Committee have
determined that any plan proposed by Mr. Mashinsky is not viable.

receive a claim for the CEL Token balances in their accounts in the amount of $0.81 per CEL Token—the token's trading price on the Petition Date.

2.    If allowed at the Petition Date trading price, claims on account of the Debtors' CEL Token liabilities would reduce the recovery of every creditor of the Debtors. That reduction would be significant. On the Petition Date, the alleged dollarized value of all claims for the return of CEL Token totaled approximately $229 million. That figure does not include potentially hundreds of millions (or more) of additional tort or statutory claims arising from the purchase or sale of CEL Token.

3.    The Bankruptcy Code squarely addresses this issue and requires that claims arising from the purchase or sale of a security of the Debtors be subordinated to claims of unsecured creditors. 11 U.S.C. § 510(b). Section 510(b) is not limited to shareholder claims, but rather applies to all securities of a debtor or its affiliates.[3] Although there is a significant debate about what types of digital assets are securities, here the Debtors admit that CEL Token is a security and have consistently treated it as such. The Second Circuit has found that section 510(b) should be broadly construed and applies to all claims with a causal connection to the purchase of a security of the Debtors, including contract claims.[4] The Second Circuit has also found that receiving a security as compensation for labor or other value constitutes a purchase.[5] Accordingly, claims on account of CEL Token are properly subordinated and should only receive a recovery after all unsecured claims are paid in full.

---

[3]    *In re Lehman Bros. Inc.*, 519 B.R. 434, 442 (S.D.N.Y. 2014).

[4]    *See Rombro v. Dufrayne* (*In re Med. Diversified, Inc.*), 461 F.3d 251, 255-59 (2d Cir. 2006); *Adler v. Lehman Bros. Holdings* (*In re Lehman Bros. Holdings*), 855 F.3d 459, 471 (2d Cir. 2017) (citing *In re Med. Diversified, Inc.*, 461 F.3d at 255-259).

[5]    *In re Lehman Bros. Holdings*, 855 F.3d 459, 475 (2d. Cir. 2017).

4.    Even if section 510(b) did not apply (it does), there is significant doubt that the trading price of CEL Token on the Petition Date was an accurate indication of its value. On June 12, 2022 (the date that Celsius paused withdrawals, or the "**Pause**"), approximately 95% of CEL Token was locked on the Debtors' platform. CEL Token continued to trade on other exchanges and protocols after the Pause and the trading price increased from between approximately $0.20 to $0.35 to $0.81 on the Petition Date. Apart from speculation and limited supply, there are few rational reasons why a token dependent on the value of a platform that had paused withdrawals for over a month would increase in value. At that time, the market was also unaware of material information regarding Celsius's business and misconduct that had occurred in connection with that business.

5.    The Committee sought information from FTX (one of the primary exchanges that listed CEL Token) with respect to suspicious trading activity and large short positions that are alleged to have affected the price of CEL Token prior to the Petition Date.[6] The FTX debtors produced information regarding the suspicious wallets shortly before this Opposition was filed. The Committee is evaluating that information and awaiting other information regarding the reported large short positions on CEL Token on the FTX exchange. If anything is clear, it is that determining the proper value of CEL Token on the Petition Date will likely be difficult.

6.    The movants disagree with the positions set forth above and argue that CEL Token is like every other coin and its holders should receive a claim against the Debtors equal to the Petition Date "market" price—$0.81—for each CEL Token the Debtors are obligated to return. Each Motion is in substance a premature objection to the proposed valuation of CEL Token at

---

[6]    Docket No. 2642 at Ex. 1. Shortly after the Pause Date, certain supporters of Celsius began to organize a short squeeze and encourage other individuals to purchase CEL Token on FTX and other exchanges.

$0.20 in the Plan.[7]  That proposed valuation reflects a settlement of the issues regarding the subordination and valuation of CEL Token.  The proposed settlement would provide CEL Token holders a reasonable recovery, but not the $0.81 advocated in the Motions.  The proposed settlement would also avoid the need for costly litigation that could result in creditors holding CEL Token obligations receiving nothing.

7.      Time is of the essence and to the extent the movants wish to proceed and determine whether claims on account of CEL Token should be subordinated under section 510(b), the Committee agrees that a decision prior to the solicitation of the Plan would be helpful.  Expert testimony, however, will likely be needed to determine the value of CEL Token on the Petition Date.  To the extent a valuation of CEL Token liabilities is necessary, that should occur in connection with confirmation of the Plan.  The Committee is also prepared to move forward with the $0.20 settlement set forth in the Plan and believes that figure represents a reasonable compromise of the issues set forth above that meets the applicable standard for approval of settlements under Bankruptcy Rule 9019.

8.      Finally, the movants and other creditors with CEL Token claims assert that they were defrauded by the Debtors' prepetition management.  As this Court is aware, the Committee believes that the Debtors' customers were defrauded.  This no doubt includes many CEL Token holders.  But that does not address the nature of the parties' entitlements nor how those entitlements are to be valued, prioritized, and treated under the Bankruptcy Code.  This Court has overseen some of the largest corporate frauds and collapses in modern history.  Similar arguments were made by parties asserting claims with respect to the debtors' securities in the Enron, Lehman, and

---

[7]      *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 2807] (the "**Plan**") at Art. IV, §B.2.  At this time, a disclosure statement hearing with respect to the Plan has not been set.

WorldCom cases.[8]  In an opinion that has been cited favorably by the Second Circuit, the *Enron* court acknowledged the difficult equitable questions raised by subordination, but noted that the Bankruptcy Code creates a hierarchical and class structured regime that, as a general principle, does not permit a claim to be elevated based on the needs of the claimant or equities favoring the claim.  It concluded that section 510(b) is not an equitable doctrine, but rather a mandatory provision that the Court must enforce.  Here, CEL Token holders chose to invest in a token whose value was tied to the continued operation of Celsius.  They knowingly accepted the risk that if Celsius failed, their investment would likely have no value.  The fact that Celsius failed spectacularly or that there was fraud associated with its failure (perpetrated by some of the largest holders of CEL Token) does not revive their claim.

### Factual Background

9.      In April 2018, Celsius filed a notice of an exempt offering of securities (Form D) with the Securities and Exchange Commission ("**SEC**") for the sale of CEL Token.  Colodny Decl., Ex. 1.  In summer 2018, Celsius sold 203 million CEL Tokens to the public for between $0.20 and $0.30 through an Initial Coin Offering ("**ICO**"), raising $32 million.[9]  The sale was promoted, in part, through a Whitepaper which described Celsius's proposed business model and the role of CEL Token in the business.[10]  The Whitepaper identified how the proceeds of the ICO would be used to fund Celsius's business, allocating specific amounts to specific expenses.  *Id.* at 14 (listing that $6,487,000 would be spent on "Operations + Management," $5,988,000 on "Research + Development," etc.).

---

[8]     *See, e.g., In re Enron Corp.*, 341 B.R. 141, 169 (Bankr. S.D.N.Y. 2006); *In re WorldCom, Inc.*, 329 B.R. 10, 17 (Bankr. S.D.N.Y. 2005); *In re Lehman Bros. Holdings*, 855 F.2d at 475.

[9]     Token, Celsius, Etherscan, https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code (last visited June 19, 2023).

[10]    *See* Whitepaper, Celsius Network, available at: https://celsius.network/static/celsius-whitepaper.pdf (last visited June 13, 2023); *see also*, *Final Report of Shoba Pillay, Examiner* [Docket No. 1956] at 13.

10.     As part of the ICO, CEL Tokens were granted to employees in three allotments. Two of the allotments would only be released to the employees when the price of CEL Token exceeded $1.50 and $3.00. *Id.* Celsius continued to provide CEL Token to employees as a form of compensation that would vest like restricted stock units ("**RSUs**") after the ICO. *See, e.g.,* Colodny Decl. Ex. 2 at -8849.

11.     Celsius also sold CEL Token through over-the-counter ("**OTC**") transactions. As part of those transactions, purchasers of CEL Token were required to execute subscription agreements. *See*, *e.g.*, Colodny Decl. Ex. 4. The subscription agreement applicable to foreign purchasers made clear that CEL Tokens were being sold pursuant to the Regulation S under the Securities Act. *Id.* at 3 (requiring the purchaser to agree that "the CEL Tokens may only be resold in accordance with the provisions of Regulation S.").[11]  The purchaser also had to acknowledge the CEL Tokens "[are] being offered and sold in reliance upon exemptions provided in the Securities Act and State Securities Laws for transactions not involving any public offering" and that "an investment in CEL Tokens is speculative and involves a risk of loss of the entire investment . . . the Company has not made and cannot make any representation or warranty as to the future operation or financial condition of the Company. . . ." Colodny Decl. Ex. 4 at 4.

12.     Celsius also provided eligible customers with the ability to earn interest or "rewards" in CEL Token on digital assets transferred to Earn accounts.[12]  Rewards in CEL Token were paid out at a higher rate than if the customers elected to receive rewards in kind, reflecting

---

[11]   Regulation S is a safe harbor from the registration requirements of the Securities Act for offshore offers and sales of securities.

[12]   *See*, *e.g.*, *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] at Ex. A-8 (General Terms of Use from April 15, 2022 to Present) at 538-39.

the increased risk associated with owning CEL Token as opposed to Bitcoin or other cryptocurrency.[13]

13.     CEL Token did not create any payment right against, or financial obligations of, Celsius.  Instead, the value of CEL Token was tied to the perceived value of Celsius, its continuing success, and its management's ability to convince more users to transfer cryptocurrency to the platform.  Celsius and Mr. Mashinsky regularly described customers' purchase of CEL Token as an investment in Celsius.  For example, in a January 12, 2021 Ask Mashinsky Anything ("**AMA**") segment, Mr. Mashinsky stated:

> Celsius community members, the ones who are earning in CEL, understand that they're earning twice as many CEL Tokens as they were when CEL Token was at eight dollars.  They're basically getting twice as many CEL for the same thing.  If you believe in the viability of the company, then you would know you're getting a 50% discount.  If you don't believe in it, then you probably don't want these CELs anyway.  If you're not sure about it, how about some of the world's best investors coughing up $750 million? . . . They bought into half of all the CEL Tokens out there.  What is the biggest asset that they bought into?  The biggest asset that Celsius [has] today is our Treasury, which is mostly CEL Token.[14]

Celsius also acknowledged that the value of CEL Token was dependent on its efforts to grow the number of users on the Celsius platform.  For instance, on March 8, 2018, Mr. Mashinsky described that Celsius was:

> [F]ocused on enabling the community, on creating a large community because everything we do is measured by the token.  The

---

[13]     *See*, *e.g.*, Examiner Report at 92 n.221 (Examiner Interview of Alex Mashinsky (Former Chief Executive Officer – Celsius, January 5, 2022) ("The token was a way to get more if you want to earn more."); Whitepaper, Celsius, https://celsius.network/static/celsius-whitepaper.pdf (last visited January 29, 2023), at 3 (indicating that "[i]n the future, the CEL token will have additional utilities including: . . . achieving seniority in the platform which will impact the interest rate gained[ ]")); Colodny Decl. Ex. 5 ("Get more bang for your buck with weekly interest rewards on your favorite cryptocurrencies! Chose to earn in-kind or set your settings to CEL to get up to 35% more rewards each week!").

[14]     Ozi_Crypto, *Celsius Network Twitter Spaces AMA 1-12-2021*, YouTube (Jan. 12, 2021), https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=28, at [1:43:33].

token price goes up, our entire compensation is the token.  So our
job is to do everything we can to increase the price of the token as
long as it's in the best interest of the community.[15]

14.    Celsius advertised that CEL Token was an indicator of the success of the Debtors.

For instance, in November 2019, Mr. Mashinsky stated, "[t]he yield on CEL is an indication of

profitability or how well Celsius is doing."[16]  Similarly, in July 2020, he explained:

Celsius has a very simple business model that says we will give the
most to the community, through that we will have the most deposits.
With those deposits we will earn the most interest.  And our 20%,
what we keep, will be worth more than those other guys because if
we have more coins we do more deployment, it's going to make the
company more valuable, if it's more valuable the token value will
increase, and so on.[17]

15.    In addition to publicly making such statements, Celsius's management internally

recognized that CEL was a "barometer of [Celsius's] performance."  Colodny Decl. Ex. 6.  As

acknowledged by one employee in internal messages, "if people want to know if Celsius is doing

well they look at CEL and not at anything else."  Colodny Decl. Ex. 7.

16.    Celsius demonstrated how the success of its business would drive increases to the

CEL Token's value through a "flywheel."[18]

---

[15]    *See* Celsius Network, *AMA with Alex Mashinsky, CEO of Celsius*, YouTube (Mar. 8, 2018),
https://www.youtube.com/watch?v=YQNdQXxPNQE, at [20:15].

[16]    Celsius Network, *Celsius Network AMA – Ask Mashinsky Anything!,* YouTube (Nov. 26, 2019),
https://www.youtube.com/watch?v=H1n5g7uJyvQ, at [44:40].

[17]    Celsius Network, *Celsius Network Team AMA – Thursday, July 2, 2020*, YouTube (July 2, 2020),
https://youtube.com/watch?v=Ym1EjbThjVk, at [38:35].

[18]    *See* Whitepaper, Celsius Network, at 34 available at: https://celsius.network/static/celsius-whitepaper.pdf  (last
visited June 13, 2023) (illustrating Celsius's purported self-sustaining flywheel).



The flywheel evolved over time, but the general concept was that customers would transfer digital assets to the Celsius platform.  Celsius would lend those coins to third parties to earn yield.  Celsius would use the return from its investments to buy CEL Token on the market.  Celsius would pay interest in CEL Token to electing holders, whose balances would increase.  Celsius would earn yield on the increased balances and pay its users more interest in CEL Token.  At all times, Celsius described that CEL Token's value was based on its ability to attract more users to its platform.[19]  As Mr. Mashinsky explained in an AMA, "more users means more deposits, more deposits means more loans, more loans means more interest for Celsius, more interest for Celsius means we are paying out more, meaning we have to buy more CEL Token. You know what happens when you keep going to market and buying CEL Token, right, prices go up. That is the flywheel of Celsius, we're doing that I think better than anyone else."[20]

---

[19]    *See* Celsius Network, *Alex Mashinsky AMA 6/14/2018,* YouTube (Jun. 14, 2018), https://www.youtube.com/watch?v=P89WfneySwE, at [9:00] ("Our wheels have started turning and the wheels that generate demand both generate income and generate demand for the CEL Token.  We want those wheels to spin faster and faster.  When we feel that the wheels are spinning fast enough to the point where organic demand for the token represents one of the biggest demand generators out there, we feel comfortable going on exchanges.")

[20]    Celsius Network, *Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon,* YouTube (July 17, 2020), https://www.youtube.com/watch?v=csFrn4XtwL0.

17.    Celsius and its management also took great efforts to make CEL Token more valuable.  Celsius listed CEL Token on several centralized and decentralized exchanges, including FTX, Uniswap, Liquid, and others.[21]  It then purchased CEL Token on certain of those exchanges, strategically timing and sizing its purchases and using resting buy orders to "support" the market price of the CEL Token.[22]  *See, e.g.,* Colodny Decl. Ex. 9 ("[W]e start to buy back CEL at the market and take care the price is visibly going up during the buyback.").  In an internal presentation from April 13, 2022, Celsius reported that it spent approximately $135 million repurchasing CEL Token annually.  Colodny Decl. Ex. 10 at -42823.  That figure was much higher for calendar year 2021.

18.    Celsius advertised that the amount of CEL Token it purchased was tied to the amount of CEL Token needed to pay customers who elected to earn interest in CEL Token each week.  That was not true.  Rather, Celsius's purchases were determined in an ad hoc manner and often exceeded the interest amount.  *See, e.g.* Colodny Decl. Ex. 11 ("Just to clarify between us three: The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that is just what we told the community.").  Beginning in October 2021, Celsius began burning CEL Token (*i.e.*, permanently removing tokens from circulation) to increase the value of the token.[23]  Finally, as the value of CEL Token began to

---

[21]    Celsius also engaged market makers to provide liquidity for CEL Tokens on exchanges.

[22]    *See* Celsius Network, *Celsius Network Team AMA – Thursday, July 2, 2020*, YouTube (Jul. 2, 2020), https://www.youtube.com/watch?v=Ym1EjbThjVk&t=2446s, at [35:25] ("We work with a lot of different coins that enable us to generate enough revenue to put that back into the market for CEL.  Because we have to go out to the market to buy CEL every week to pay it, we're using the revenues we're making from these loans to be able to convert that into CEL that we pay back to the community"); Colodny Decl. Ex. 8 (discussing purchasing CEL Token during weekly AMA broadcast to encourage retail investors to likewise purchase CEL).

[23]    Celsius Network, *Celsius AMA October 1st 2021*, YouTube (Oct. 1, 2021), https://www.youtube.com/watch?v=mUokZbnfFyE (announcing CEL burn strategy to the public).

decrease rapidly in early 2022, Mr. Mashinsky launched a campaign called "CEL Team Six," which was a dedicated effort by Celsius to increase the value of CEL Token.[24]

19.    In May 2022, Celsius stopped purchasing CEL Token.  The Committee believes that the last purchase by the Company was made on May 12, 2022.  Colodny Decl. Ex. 12.  From that day until the day the Pause was announced, the price of CEL Token dropped from approximately $0.99 to between approximately $0.20 to $0.35.

20.    Celsius and its directors, officers, and other employees, as well as their families, were the largest holders of CEL Token.

| CEL Tokens Owned By Certain Insiders[1] | 7/12/2022 |
|---|---|
| Alexander Mashinsky | 70,096,767 |
| Shlomi Daniel Leon | 15,934,635 |
| Hanoch "Nuke" Goldstein | 9,705,806 |
| Kristine Meehan Mashinsky | 2,117,023 |
| Jeremie Beaudry | 274,249 |
| Harumi Urata-Thompson | 315,487 |
| Johannes Treutler | 535,928 |
| **Total Insider CEL Balance** | **98,979,895** |
| **Treasury CEL Balance** | **284,568,835** |
| **Available CEL Supply[2]** | **692,753,441** |

Notes:

*1. Balances include related entities and collateral related loans.  Balances include (i) on platform holdings as disclosed in the Debtors' Schedules and Statements of Financial Affairs, and (ii) Defendants' known wallets.*
*2. The total supply of CEL was fixed at 700 million.  Celsius periodically destroyed or burned certain of those CEL token.  As of the last CEL burn transaction, dated June 10, 2022, approximately 693 million CEL tokens existed, per Etherscan.*

*See Declaration of Max Galka in Support of the Motion.*  CEL Token was a significant part of Celsius's balance sheet, which included the market value of the CEL Tokens held in its treasury. Its insiders' net worth grew as the price of CEL Token grew.  Those insiders regularly profited on

---

[24]    *See*  Celsius  Network,  *Celsius  AMA  January  28th  2022,*  YouTube  (Jan.  28,  2022), https://www.youtube.com/watch?v=erQn2wczFsk (introducing CEL Team Six and describing their efforts to raise the value of CEL).

the rising price of CEL Token, selling millions of dollars worth of CEL Token through Celsius's

OTC desk and on third party exchanges. *See, e.g.*, Colodny Decl. Ex. 13 (noting that over 90% of

all OTC CEL sellers in a given week were either Celsius insiders, family, and friends of insiders,

or the top 5 CEL holders); *see also* Colodny Decl. Ex. 14 ("I am still concerned about the CEL

Alex is selling every day . . 120k CEL yesterday . . 120k CEL the day before . . Alex is the biggest

seller by far and depressing the market"). Many of these sales violated Celsius's Token and

Security Trading Policy, which prohibited CEL Token sales exceeding $20,000 per day or $50,000

per week, and also prohibited any purchase or sale of CEL Token by an insider who knew material

nonpublic information. *See* Colodny Decl. Exs. 15, 16, 17.

21.     Celsius also timed certain purchases of CEL Token to maintain the potential

decreases in price cause by the sales by insiders, particularly Mr. Mashinsky. Colodny Decl. Ex.

18. For instance, on January 8, 2021, in response to a large sale by Mr. Mashinsky, Ms. Urata-

Thompson, the Debtors' then CFO, told Mr. Treutler, the employee in charge of directing CEL

Token purchases, that "because Alex already breached, let's 'breach it back' and support the

market. It is just disproportionate how we are performing out there." Colodny Decl. Ex. 16.

Insiders' sales were often purchased directly or indirectly by Celsius through its buybacks.[25]

22.     On the date of the Pause, 95% of the total supply of CEL Token was locked on the

Debtors platform. From June 12, 2022 (the date of the Pause) until July 13, 2022 (the Petition

Date), the price of CEL Token increased from between approximately $0.20 to $0.35 to $0.81.

---

[25] Even though certain Celsius executives attempted to sell token on decentralized exchanges such as Uniswap, the sales were ultimately purchased by Celsius. Automatic programs buy and sell tokens across different exchanges and other platform to earn an arbitrage. Those programs would buy the executives' orders on Uniswap and sell them to Celsius on Liquid, FTX, or other exchanges. The executives and employees of Celsius were aware of these programs and that their sales were ultimately being purchased by Celsius. Colodny Decl. Exs. 18, 19 (noting that 90% of Mr. Mashinsky's sale orders are purchased by "bots" and sold into Celsius's buy orders).

**Opposition**

I.    **Claims for the Return of CEL Token and Damages on Account of CEL Token Are Subordinated Under Section 510(b)**

23.    Section 510(b) of the Bankruptcy Code provides, in relevant part:

> [A] claim . . . for damages arising from the purchase or sale of . . . a security [of the debtor], . . .  shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security[.]

11 U.S.C. § 510(b).  For a claim to fall within section 510(b) it must (1) concern a security of the debtor, (2) have been acquired in a purchase, and (3) the claims for damages arises from that purchase.  *In re Lehman Bros. Holdings*, 855 F.3d at 465.  The Second Circuit has held that section 510(b) should be interpreted broadly.  *See. e.g.*, *Id.* at 478 (citing the "well-settled principle that [section 510(b)] is to be interpreted broadly").

A.    **Celsius Admits that CEL Token Is a Security.**

24.    Whether particular digital assets are securities is the subject of great debate and significant litigation.  For instance, on November 7, 2022, the District Court for New Hampshire held that LBC, a token distributed by LBRY, Inc., was a security.  *SEC v. LBRY, Inc.*, Case No. 21-cv-260-PB, 2022 U.S. Dist. LEXIS 202738, at *24 (D.N.H. Nov. 7, 2022).  The SEC and Ripple Labs, Inc. have been involved in a multi-year litigation regarding whether XRP is a security.  *See SEC v. Ripple Labs, Inc.*, (Case No. 20-CV-10832 (AT) (SN), S.D.N.Y. 2022).  The SEC has also recently brought suit against both Binance Holdings Ltd. and Coinbase, Inc. for the unlicensed offer and sale of tokens that the SEC asserts are securities.[26]  Coinbase has informally responded, in part, by acknowledging that certain digital assets are likely securities and detailing the rigorous

---

[26]    *See SEC v. Binance Holdings Ltd. et al.*, C.A. No. 1:23-cv-01599 (D.D.C. June 5, 2023) [Docket No. 1]; *SEC v. Coinbase, Inc. et al.*, 1:23-cv-04738-KPF (S.D.N.Y. June 6, 2023) [Docket No. 1].

analysis it performs to make sure that the tokens it lists are not securities.[27]  Finally, the SEC staff

has also taken the position that tokens are securities.  For example, at *Voyager*'s plan confirmation

hearing, the SEC staff argued that Voyager's token (VGX) may be a security.[28]

25.     In each of those actions, the SEC has asked the Court to apply the test established

by *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) ("**Howey**") to the facts of the specific asset.[29]

That exercise is often difficult, and many people believe that the *Howey* test does not provide an

appropriate or predictable framework for determining whether a digital asset is a security.

26.     Here, however, the determination of whether CEL Token is a security is not

difficult.  Celsius has admitted that CEL Token is a security.  For instance, on September 16, 2021,

Roni Cohen-Pavon, the Company's Chief Revenue Officer and executive in charge of regulatory

matters, and Rodney Sunada-Wong, the Company's Chief Risk Officer, discussed an internal

meeting where Mr. Mashinsky had shared confidential information with a large group of

employees.  In discussing whether they should restrict those employees from trading CEL Token,

Mr. Cohen-Pavon told Mr. Sunada-Wong "CEL is a security, 100% security."  *See* Colodny Decl.

Ex. 20.

27.     If there were any doubt, it was removed when Celsius started burning CEL Token.

As Mr. Cohen-Pavon informed the Celsius executive committee after the burn was announced on

one of Mr. Mashinsky's weekly broadcasts, "CEL is much more of a security in the US than before.

This burn requires us to be much more cautious on everything we do with the token.  From insider

---

[27]     Coinbase, *By the Numbers,* YouTube (June 6, 2023) https://www.youtube.com/watch?v=ox1KPM9Mi8U, at
[0:14] ("Percentage of assets we reject because they don't pass legal standards: 90[.]").

[28]     *See In re Voyager Digital Holdings, Inc.*, (Bankr. S.D.N.Y. 2023, Case No. 22-10943 (MEW)); *Objection of the
U.S. Securities and Exchange Commission to Final Approval of the Adequacy of the Debtors' Disclosure
Statement and Confirmation of the Chapter 11 Plan* [Docket No. 1047] at ¶ 4; March 2, 2023 *Voyager* Tr. 24:18–
25 (Mar. 2, 2023); March 3, 2023 *Voyager* Tr. 230:14–25 (Mar. 3, 2023).

[29]      *See SEC v. Coinbase, Inc.*, [Docket No. 1] ¶ 339; *SEC v. Binance Holdings Ltd.* [Docket No. 1] ¶ 37.

trading to investment advice.  We [have] always been careful, but now we need to be even more, and yes, even internally[.]"  *See*, *e.g.*, Colodny Decl. Ex. 21.  Celsius's internal presentations also acknowledged that CEL Token is a security.  *See*, *e.g.*, Colodny Decl. Ex. 22 ("$CEL still a security").

28.    Celsius also treated CEL Token as a security and purported to attempt to comply with securities laws.  For instance, it filed a notice of an exempt offering of securities (Form D) with the Securities and Exchange Commission ("**SEC**") for the sale of CEL Token in connection with its ICO.  Colodny Decl. Ex. 1.  Moreover, the Plan proposed by the Debtors seeks to subordinate Other CEL Token Claims under section 510(b), which as stated above, requires a determination that CEL Token is a security.  *See* Plan, Art. I, No. 201 (defining "Section 510(b) Claims" to include any Account Holder claim arising from the purchase or sale of CEL Token); *id.*, Art. II, B, 15 (providing Section 510(b) Claims will receive no distribution); *id.*, Art II, F.

29.    Celsius was (and is) correct.  Section 101(49) of the Bankruptcy Code contains a broad definition of "security."  11 U.S.C. § 101(49).  It lists fourteen specific examples of securities and a residual clause that covers any "other claim or interest commonly known as 'security.'"  *Id.*  The interests specifically enumerated in section 101(49) are not exhaustive or exclusive.  *In re Lehman Bros. Holdings*, 855 F.3d at 473.  Courts in the Second Circuit have defined "security" in terms of an interest tied to a firm's overall success.  *Id.* (collecting cases from this Court holding that convertible notes and unissued membership units in an LLC are securities for purposes of section 510(b)).

30.    Here, there is no doubt that the value of CEL Token was tied to the Debtors' success.  As described in Paragraph 15, above, the entire idea behind CEL Token was that the token would become more valuable as more people used Celsius and the value of the Company

grew.  Indeed, CEL Token holders believe that their purchases of CEL Token were instrumental in the growth of Celsius.  StJohn Mot. at 4-5.

31.    It also plainly meets each requirement of an "investment contract" under the test set forth in *Howey*.  Under *Howey*, an "investment contract" (a type of security) exists if there is (i) an investment of money (ii) in a common enterprise (iii) with a reasonable expectation of profits derived predominantly from the efforts of others.  328 U.S. at 298-99.  In applying *Howey*, "form should be disregarded for substance and the emphasis should be on the economic reality."  *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (internal quotations omitted).

32.    An investments of money exists when "the digital asset is purchased or otherwise acquired in exchange for value."  *Framework for "Investment Contract" Analysis of Digital Assets* (the "**SEC Framework**"), at 2.[30]  Here, Celsius sold the CEL Token through its ICO and its OTC desk.  It also provided CEL Token as compensation for transferring assets to Celsius's Earn program (and electing to earn interest in CEL Token) or working for Celsius.  Each one of those practices involved exchanging CEL Token for value—whether it be other cryptocurrency, labor, or fiat.

33.    A common enterprise exists if there is *either* horizontal or strict vertical commonality.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *see also*, *e.g.*, *In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) ("[C]ourts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*.").  Here, CEL Token holders invested in a common enterprise that satisfies both strict vertical commonality and horizontal commonality.

---

[30]    *SEC's Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), available at: https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

34.    "Horizontal commonality is established when investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. at 352 (citing *Revak*, 18 F.3d at 87).   A pro rata distribution of profits from the enterprise is not required to establish horizontal commonality.  *Id.* at 369 n.8.   Strict vertical commonality "requires that the fortunes of investors be tied to the fortunes of the promoter."  *Id.* at 369 (citing *Revak*, 18 F.3d at 88).

35.    Here, there is horizontal commonality.  The fortune of each individual who invested in CEL Token was tied to the fortunes of other investors (and the enterprise) as well as the success of the overall enterprise.  Mr. Mashinsky routinely describe the value of CEL Token as tied to Celsius's success.[31]  For instance, Mr. Mashinsky stated, "[t]he yield on CEL is an indication of profitability or how well Celsius is doing."[32]  Internal correspondence at the Company also makes clear that the Company believed that CEL should be correlated with user growth and AUM.  *See, e.g.,* Colodny Decl. Ex. 6 ("CEL is a barometer of our performance").[33]  Mr. Mashinsky also regularly discussed how the success of Celsius was correlated to and reflected in the price of CEL Token.  *See, e.g.,* Paragraph 14, *supra.*

36.    CEL Tokens are identical to one another.  When the price of CEL increased, all holders of CEL Tokens profited equally.  Moreover, Celsius pooled the funds received from the purchase of CEL Token and used them to fund the growth of its business.

---

[31]   When analyzing whether an instrument is a security courts "look at all of the representations made by the promoters in marketing the interests, not just at the legal agreements underlying the sale of the interest." *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014).

[32]   Celsius Network, *Celsius Network AMA – Ask Mashinsky Anything!,* YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at [44:40].

[33]   The proceeds from the ICO and OTC purchases were also pooled and presumably used to fund Celsius's operations.  *See SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) (finding that depositing funds in a single bank account was sufficient to establish pooling under horizontal commonality).

37.     Likewise, the fortunes of the investors who elected to purchase CEL Tokens also were tied to the fortunes of Celsius and its insiders—the issuers, promoters, and largest holders of CEL Token—satisfying strict vertical commonality.  *Revak*, 18 F.3d at 88.  At times, the CEL Token held in Celsius treasury was Celsius's largest asset.  And, Celsius and its insiders all profited handsomely on the increase in the value of CEL Token.  *See* Paragraph 20, *supra*.  This was made clear by Mr. Mashinsky who repeatedly noted his and Celsius economic alignment with CEL Token holders:

> The token price goes up, our entire compensation is the token.  So our job is to do everything we can to increase the price of the token as long as it's in the best interest of the community.[34]

38.     Finally, purchasers can reasonably expect profits from the efforts of others when a promoter or sponsor "provides essential managerial efforts that affect the success of the enterprise," and purchasers expect a return through "distribution or through other methods of realizing appreciation on the asset, such as selling at a gain in the secondary market."  SEC Framework at 2-3.

39.     Here, the Celsius team controlled the issuance and distribution of CEL Token and touted CEL Token as a proxy and means of sharing in the profitability of Celsius.  *See, e.g.* Paragraph 14, *supra*.  The entire idea behind CEL Token was that as more people join the Celsius community, and more users were on the platform, demand for CEL Token will increase and the token will increase in value.  The Celsius team took extensive efforts to increase the size of its user base and assets transferred to Celsius, by, among other things, relentlessly promoting its business and routinely misrepresenting that business and its account holders' risk exposure to lure more

---

[34]  *See* Celsius Network, *AMA with Alex Mashinsky, CEO of Celsius*, YouTube (Mar. 8, 2018), https://www.youtube.com/watch?v=YQNdQXxPNQE, at [20:15].

customers to the platform. *See generally*, Class Claim, [Docket No. 2670]. Each week Celsius would describe the efforts it was taking to grow its user base and increase the price of CEL Token. The Celsius team also regularly described features it was adding to Celsius or the CEL Token to make it more valuable. *See* Paragraph 18, *supra*.

40.    The Celsius team also took direct efforts to increase the value of CEL Token, including purchasing the token to "support" (or more appropriately "pump") its price and burning tokens to reduce the supply. *See, e.g.*, Colodny Decl. Ex. 23. Both buybacks and burning tokens have been identified by the SEC as clear indicators that an interest has an expectation of profit based on the efforts of others. *See* SEC Framework. Finally, the Celsius team took extensive efforts to have CEL Token listed on exchanges and engaged market makers to provide liquidity for the token.

41.    Although CEL Token did not represent an ownership interest in Celsius, it was very similar to an equity security. CEL Token has none of the factors commonly associated with a debt security.[35] CEL Token did not have a set maturity date or fixed interest rate. No security was provided by Celsius for holders' purchase of CEL Token. And, individuals that held CEL Token did not have a right to receive cash from the Debtors or a right to sell the CEL Token to the Debtors in exchange for cash. Indeed, individuals that currently hold CEL Token that is not on the Debtors' platform do not have a claim against the Debtors on account of that CEL Token.

---

[35]    Courts in this Circuit rely on the *Autostyle Plastics* factors to determine whether to recharacterize a debt as equity. *See e.g.*, *In re Live Primary, LLC*, 626 B.R. 171, 181 (Bankr. S.D.N.Y. 2021). The relevant factors under that analysis are: (a) the names given to the instruments, if any, evidencing indebtedness; (b) the presence or absence of a fixed maturity date and schedule of payments; (c) the presence or absence of a fixed rate of interest and interest payments; (d) the source of repayments; (e) the adequacy or inadequacy of capitalization; (f) the identity of interest between the creditor and the stockholder; (g) the security, if any, for the advances; (h) the corporation's ability to obtain financing from outside lending institutions; (i) the extent to which the advances were used to acquire capital assets; and (j) the presence or absence of a sinking fund to provide repayments. *See Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001).

42.    However, it is not necessary for the Court to determine whether CEL Token should be recharacterized as an equity security in order to determine whether claims arising from the purchase of CEL Token should be subordinated under section 510(b).[36]  The District Court for the Southern District of New York has held "[s]ection 510(b) is not limited to shareholder claims."  *In re Lehman Bros. Inc.*, 519 B.R. at 442.  There, the court found that claims arising out of a transaction concerning bonds issued by an affiliate of Lehman Brothers were subordinated under section 510(b).  *Id.* at 452.  Similarly, the Second Circuit has held that "security" as it is defined in section 510(b) includes *all* interests that are tied to a firm's overall success.  *In re Lehman Bros. Holdings*, 855 F.3d at 473.  There is no question CEL Token meets that standard.

**B.    Claimants Purchased CEL Tokens.**

43.    Individuals acquired CEL Tokens from the Debtors in four primary ways (1) purchasing CEL Tokens through the ICO, (2) purchasing CEL Tokens through the Debtors' OTC desk, (3) earning CEL Token as part of their compensation package, or (4) electing to earn CEL Token as rewards on cryptocurrency transferred to the Debtors as part of the Earn program. The first two clearly concern a purchase of CEL Token.

44.    Courts in the Second Circuit have similarly interpreted the term "purchase" in section 510(b) broadly and found that it includes circumstances where a claimant has received a security in exchange for value.  *Id.* at 474.  For instance, in *Lehman Brothers*, the Second Circuit analyzed whether RSUs earned by employees as part of their compensation package equated to the purchase of the security such that they were subordinated under section 510(b).  *In re Lehman*

---

[36]    The Committee expressly reserves all rights with respect to whether CEL Token should be recharacterized as equity.

*Bros. Holdings*, 855 F.3d at 475-77.  It found that the act of electing to receive RSUs in exchange for labor was a purchase.  *Id.* at 476.[37]

45.    The same reasoning would apply to claimants who elected to transfer their digital assets to Celsius in exchange for receiving interest in CEL Token instead of in-kind.  Those claimants voluntarily provided Celsius with their digital assets to invest and elected to receive interest at a higher rate in CEL Token than if they had chosen to receive rewards in-kind.  As part of that transaction they chose to exchange something of value (the use and ownership of their digital assets) for the right to receive an amount of CEL Token as interest.  Those claimants made an economic decision to accept CEL Token and the risk that Celsius would succeed, rather than an incremental amount of the transferred digital asset and risks associated with that specific digital asset.

### C.    Claims for the Return of CEL Token and Damages on Account of CEL Token Arise from the Purchase of CEL Tokens.

46.    The last question is whether claims for damages for breach of the Terms of Use, torts, or other statutory claims related to CEL Token arise from the purchase or sale of the token.  Courts uniformly interpret whether a claim "arises from" the purchase or sale of a security broadly.  *See. e.g.*, *In re Lehman Bros. Holdings*, 855 F.3d at 478 (citing the "well-settled principle that [section 510(b)] is to be interpreted broadly").  For a claim to arise from the purchase of a security, there only needs to be "some nexus or causal relationship between the claim and the [purchase] of a security."  *Enron*, 341 B.R. at 151.  The damage or illegality does not need to be connected to the purchase itself.  *In re Lehman Bros. Inc.*, 519 B.R. at 434-44 ("'[I]t is, in our view, more natural, as a textual matter, to read 'arising from' as requiring some nexus or causal relationship

---

[37]    Similarly, the *Enron* court found that employees purchased stock options within the meaning of section 510(b) when such employees "willingly accepted [the stock option] in return for their labor," even though they were "required to receive [the options] as a portion of their consideration."  *Enron*, 341 B.R. at 151.

between the claims and the purchase of the securities, but not limiting the nexus to the claims alleging illegality in the purchase itself.'") (quoting *Baroda Hill Invs., Inc. v. Telegroup, Inc.* (*In re Telegroup, Inc.*), 281 F.3d 133, 138 (3d Cir. 2002)).

47.     Here, section 510(b) applies to all claims asserted on account of liabilities related to CEL Token because such claims would not have arisen but for the claimants' agreement to purchase CEL Token, receive part of their compensation in CEL Token, or earn interest in CEL Token.   Indeed, courts have specifically found that breach of contract claims related to the applicable security are sufficiently related to the purchase of the security and subordinated under section 510(b).  *Enron*, 341 B.R. at 158 ("[T]he clear trend in the case law is to interpret section 510(b) broadly to include, for example, breach of contract claims."); *Queen v. Official Comm. of Unsecured Creditors* (*In re Response U.S.A., Inc.*), 288 B.R. 88, 94 (D.N.J. 2003) (concluding breach of contract claims must be subordinated where "they would not exist but for the [purchase of the security], despite the claimants attempt to characterize themselves as 'creditors who seek payment based on a contract.'").

48.     In *Enron*, this Court undertook a detailed analysis of the arguments that a more literal reading should be required in the context of whether employees' claims that the Enron debtors' fraud caused them to sustain damages when they retained and did not exercise options on account of the Debtors' fraud.  341 B.R. at 150-159.  The Court explicitly found that section 510(b) should be interpreted broadly and applied even if the claimant did not actually receive the stock. The Court also found that claims relating to fraud, including fraudulent inducement and retention claims, clearly fall within the scope of section 510(b).  The Second Circuit agrees that section 510(b) encompasses breach of contract and fraud claims, a holding that has also been followed by this Court on numerous occasions.  *See*, *e.g.*, *In re Lehman Bros. Holdings*, 855 F.3d at 471; *see*

*also*, *e.g.*¸ *In re MF Global Holdings, Ltd.*, Case No. 11-15059 (MG), 2014 Bankr. LEXIS 3333, at*14-15 (Bankr. S.D.N.Y. Aug. 6, 2014); *In re KIT Digital, Inc.*, 497 B.R. 170, 181 (Bankr. S.D.N.Y. 2013); *In re WorldCom, Inc.*, 329 B.R. at 17 ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of [s]ection 510(b)[.]").

49.    The broad reach of section 510(b) is consistent with its purpose—to ensure that those claimants that elected to take greater risk based on the success of the debtors are subordinated to other creditors. *Enron*, 341 B.R. at 164-166 ("[T]he issue of risk allocation is more integral to any policy analysis"). Here, the subordination of CEL Token claims fits squarely within that policy rationale. Claimants who elected to purchase or earn in CEL Token bet on the Debtors and their success. Creditors that transferred their coins and elected to receive interest in-kind bet on other projects or a belief in Bitcoin as a store of value, etc. Those creditors accepted counterparty risk that the Debtors would not be able to return their coins (as ultimately proved true). But, unlike CEL Token, the value of their coins would not increase solely based on the efforts and success of the Debtors.

50.    Finally, section 510(b) is not an equitable doctrine. This Court has been faced with some of the largest corporate collapses and frauds in history, including WorldCom, Enron, and Lehman Brothers. In each instance, security claimants made equitable arguments that they were harmed by the Debtors' fraud to an equal extent as other creditors. In each case, although the Courts acknowledged the difficult position of the defrauded securities claimants, the courts subordinated their claims. The *Enron* Court addressed this issue head on, and while it acknowledged the hardship suffered by the innocent employees, the Court noted that the

Bankruptcy Code creates a hierarchical and class-structured regime that, as a general principle, does not permit a claim to be elevated based on needs of the claimant or equities favoring the claim. *Enron*, 341 B.R. at 169. It concluded that section 510(b) is not an equitable doctrine, but rather a mandatory provision that the Court must enforce. *Id.* at 169.

**D.** **The Petition Date Trading Price Likely Does Not Reflect the Value of CEL Token.**

51.    Section 502(b) provides, in relevant part: "if [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition[.]" 11 U.S.C. § 502(b).

52.    The best indication of value is often said to be the price set by an efficient market. *See Iridium IP LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*)*,* 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007); *In re VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007). However, the market price is not an appropriate indication of value when it was manipulated prepetition or the marketplace did not have knowledge of material facts regarding the security such that the market price was not accurate. *See Mathias v. Jacobs*, 238 F. Supp. 2d 556, 576 (S.D.N.Y. 2002) ("It is settled that when the value of securities is artificially inflated by fraud and improprieties or other relevant facts of which the marketplace did not have reasonable knowledge, the public trading price . . . is not the measure of fair market value. Rather, the market price must be adjusted downward to account for the effects on it demonstrably caused by the irregularities or undisclosed material facts.") (internal citations omitted).

53.    Celsius strategically supported the price of CEL Token prior to the Petition Date. When it finally stopped purchasing CEL Token in mid-May 2022, the price plummeted. After the Pause Date, 95% of the available supply was locked on the Celsius platform. By that time, Celsius employees knew CEL Token was, at its core, worthless. *See* Colodny Decl. Ex. 24 (internal

message dated April 13, 2022: "We are using users USDC to pay for employees worthless CEL");
Colodny Decl. Ex. 25 (internal message dated April 13, 2022: "CEL Token's value "[s]hould be
0"); Colodny Decl. Ex. 26 (internal message dated May 12, 2022: "assume CEL is $0 because we
cannot liquidate our current CEL position").

54.    Starting around the Pause Date, supporters of the CEL Token noted large short
positions on FTX and sought to organize to purchase CEL Token to increase the price to "squeeze"
the short sellers.  On May 16, 2023, the Committee served FTX with a subpoena requesting
information regarding suspicious transactions and the short positions on the FTX exchange prior
to the Petition Date and patterns of transactions.  The FTX debtors have cooperated, thus far, and
produced information regarding the suspicious transactions, but not the short positions.  The
Committee hopes to receive information regarding the short positions shortly.

55.    Determining the proper value of CEL Token will be difficult.  The price was
affected by Celsius before the Pause and there was likely not an efficient market for the token from
the date of the Pause to the Petition Date.  Nor did the market know material facts regarding
Celsius's operations that have since been disclosed.  There are few rational explanations why a
token associated with a platform that had paused withdrawals increased in value other than that
most of the supply was locked on the Celsius platform and certain individuals were speculating on
the equivalent of a penny stock.

56.    The Debtors have determined that they cannot return CEL Token to users.  No party
has offered to purchase CEL Token from the Debtors.  And, other than Mr. Mashinsky, no one has
proposed a plan that includes CEL Token.[38]  Presumably, if people had known of the Debtors'

---

[38]    After this proposal was first presented to the Committee, it was disclosed that Mr. Mashinsky had withdrawn tens
of millions of dollars prior to the Petition Date, and he resigned from the Debtors.  Subsequently, investigations
by the independent Examiner and the Committee have uncovered significant misconduct by Mr. Mashinsky and
other former Celsius executives, including actions to manipulate the price of CEL Token.  *See Notice of Filing of*

efforts to affect the price of CEL Token prepetition, the Debtors' insolvency, or the fraud that the Debtors committed prior to the Petition Date, it is likely they would not have ascribed any value to CEL Token. In sum, there are strong arguments that CEL Token had no value on the Petition Date.

## II.    The Fiduciary Duty Accusations in the Motions Are Misplaced and Not Correct.

57.    Finally, Mr. Caceres and Mr. StJohn accuse the Committee of breaching its fiduciary duty by supporting the proposed valuation of CEL Token in a Plan that was filed after the claims bar date had passed. That argument confuses the allowance of a claim, which is governed, in part, by the bar date, and the treatment, which is governed by the Plan. To be clear, the filing of the Plan does not prejudice the rights of any creditor. All creditors will have an opportunity to address whether the proposed settlement of the value of CEL Token claims in the Plan meets the applicable standard under the Bankruptcy Code.

## Conclusion

58.    In short, there are strong arguments that claims for the return of CEL Token should be subordinated and not receive any recovery under the Plan. There are also arguments that on the Petition Date, as the token of a bankrupt entity that would likely not survive, CEL Token did not have any value.

59.    In light of these issues, the Debtors and the Committee have proposed that CEL Token be valued at $0.20 for account balance claims. Claims for damages arising from the

---

*Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349]. As referenced above, Mr. Mashinsky and other former Celsius executives were the largest holders of CEL Token, and strategically bought and sold their own CEL Tokens, while in possession of material nonpublic information that could affect the price of the CEL Token. Their purchases routinely violated the company's Token and Security Trading Policy. Additionally, certain Celsius insiders caused Celsius to buy back large quantities of CEL Token. On certain instances, those purchases were made specifically to counteract the effects of Mr. Mashinsky's sales on the price of CEL Token. *See* Colodny Decl. Ex. 16. Accordingly, it is the Committee's view that any plan proposed by Mr. Mashinsky would not have been confirmable.

purchase of sale of CEL that are not account balance claims would be subordinated and receive no recovery.

60.    The Committee is prepared for the Court to determine the applicability of section 510(b) in connection with the Motions.    If the Court determines such claims should be subordinated, the Plan will be revised to reflect the Court's determination.    Alternatively, if the movants wish to accept the proposed settlement, the Debtors and Committee will proceed as proposed in the Plan.    Any settlement must comply with Rule 9019, which provides that a Court may approve the settlement as long as it falls within the lowest point in a range of reasonableness.    *See Motorola, Inc. v. Off. Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007).[39]    For the reasons set forth above, the proposed settlement satisfies that standard.

WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that the Court deny the relief requested in the Motions, and grant such other and further relief as may be just and proper.

*[Remainder of page intentionally left blank]*

---

[39]    Courts in this circuit consider the following factors when presented with a 9019 settlement: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and  (7) "the extent to which the settlement is the product of arm's length bargaining."  *In re Iridium Operating LLC*, 478 F.3d at 462.

Dated:  June 21, 2023
New York, New York

Respectfully submitted,

*/s/ Aaron Colodny*
**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
        gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of*
*Unsecured Creditors*