# **EXHIBIT 4**
## **Redacted**

[REGULATION S]



**CEL TOKEN**

**SUBSCRIPTION AGREEMENT**

Ladies and Gentlemen:

The undersigned (the "Subscriber") understands that Celsius Network Limited, a limited liability company incorporated under the laws of England and Wales (the "Company"), is offering for sale to the Subscriber for a purchase price of USDC/T [ 60,000.00 ] (the "Purchase Price"), [ 12,245.00 ] CEL Tokens ("CEL Tokens"), having the functions described on the Company's Website (collectively with the aggregate amount of CEL Tokens offered to each other subscriber of the CEL Tokens, the "Offering").

The Subscriber acknowledges that it is not acting on the basis of any representations or warranties other than those set forth in this subscription agreement (this "Subscription Agreement") and the user Terms of Use set forth on the Company's Website as the same may be amended from time to time (the "Terms of Use") and understands that the Offering is being made without registration of the CEL Tokens under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities, "blue sky" or other similar laws of any foreign or domestic state ("State Securities Laws"), including without limitation, the jurisdiction in which the Subscriber resides.

The Subscriber agrees as follows:

1.      Subscription.  The Subscriber hereby tenders this subscription and applies for the purchase of the CEL Tokens for the Purchase Price.

2.      Payment for CEL Tokens.  Payment of the Purchase Price shall be made simultaneously with the execution and delivery of this Agreement by delivery to the Company by such payment method as directed or as may otherwise be acceptable to the Company.  If this subscription is not accepted or the Offering is terminated by the Company for any reason, all documents, together with the Purchase

1

{S2595484; 1}

Price (without interest), will be returned to the Subscriber. If this subscription is accepted by the Company, the Company will deliver a countersigned copy of this Agreement confirming the CEL Token purchased by the Subscriber has been issued to the Subscriber promptly upon such acceptance.

3. <u>Certain Acknowledgements and Agreements of Subscriber</u>.

(a) The Subscriber understands and acknowledges and agrees that: (i) the Company has the unconditional right, exercisable in its sole and absolute discretion, to accept or reject this Subscription Agreement in whole or in part, (ii) the subscription is subject to prior sale, withdrawal, modification, or cancellation of the Offering by the Company, (iii) the subscription shall not be valid unless and until accepted by the Company, (iv) this Subscription Agreement shall be deemed to be accepted by the Company only when it is signed by an authorized officer of the Company on behalf of the Company, (v) Subscriber's acceptance of the Terms of Use is a condition precedent to the acceptance of the subscription, and (vi) notwithstanding anything in this Subscription Agreement to the contrary, the Company shall have no obligation to issue CEL Tokens to the Subscriber if such issuance would constitute a violation of the Securities Act or any State Securities Laws or any other laws.

(b) The Subscriber further understands and acknowledges that that the CEL Tokens do not represent or confer any ownership right or stake, share, equity, ownership interest or equivalent rights, or any right to receive future revenue shares or voting rights in the Company or in any of its affiliates or any rights in the intellectual property of the Company or of any of its affiliates. Acquiring CEL Tokens shall not grant any right or influence over the Company's or any of its affiliates' organization and governance to Subscriber, other than rights relating to the potential future provision and receipt of services from the Company, subject to the limitations and conditions contained set forth in this Subscription Agreement and the Terms of Use.

4. <u>Representations and Warranties of Company</u>. In order to induce the Subscriber to tender this subscription, the Company hereby represents and warrants to the Subscriber as follows:

(a) <u>Organization, Good Standing, Company Power and Qualification</u>. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of England and Wales and has all requisite company power and authority to carry on its business as presently conducted.

(b) <u>Authorization</u>. All action on the part of the Company necessary for (i) the execution and delivery of this Subscription Agreement, (ii) the performance of all obligations of the Company under this Subscription Agreement, and (iii) the issuance and delivery of the CEL Tokens has been taken or will be taken prior to acceptance of this subscription. This Subscription Agreement, when executed and delivered by the Company, shall constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (x) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (y) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c) <u>Valid Issuance of CEL Tokens</u>. The CEL Tokens subject to this subscription, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Subscription Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Terms of Use, applicable federal and State Securities Laws and liens or encumbrances created by or imposed by a Subscriber.

{S2595484; 1}                                          - 2 -

(d) <u>No Other Representations or Warranties</u>. Except for the representations and warranties made by the Company in this Agreement (the "Company Representations"), neither the Company nor any other person makes any representation or warranty with respect to the Company or its business, operations, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Subscriber or its representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing, and Subscriber is relying solely on the Company Representations in its execution, delivery and performance of this Agreement. Each representation and warranty herein is deemed to be made on the date of this Subscription Agreement and to be true and correct only as of such date. Any cause of action arising from an alleged breach of such representations or warranties shall survive and be actionable only until the end of twelve (12) months from the date hereof, at which time any such cause of action will expire and be of no further effect unless a claim based on such cause had been properly brought forth by Subscriber by such date.

5. <u>Representations and Warranties of Subscriber</u>. In order to induce the Company to accept this subscription, the Subscriber hereby represents and warrants to the Company as follows:

(a) Subscriber:

(i) is not a U.S. person[1*] as that term is defined under Regulation S ("Regulation S") promulgated under the Securities Act;

(ii) is outside the United States* as of the date of the execution and delivery of this Subscription Agreement;

(iii) is acquiring the CEL Tokens for its own account (and/or for the account of other non-U.S. persons*, who are outside of the United States*) and not on behalf of any U.S. person, and the sale has not been prearranged with a person in the United States;

(iv) is not acquiring the CEL Tokens with the present intention of "distributing" the CEL Tokens on behalf of the Company or a "distributor"* as defined in Regulation S, or any of their affiliates, in the United States or to a U.S. person under Regulation S;

(v) acknowledges that, in addition to other restraints on transfer set forth in the Terms of Use: (x) the CEL Tokens may only be resold in accordance with the provisions of Regulation S and cannot be sold by it in the United States as part of a "distribution" (as such term is defined in the federal securities laws of the United States), and (y) cannot be sold by it to any U.S. person* until after one year and one day from the date that this Subscription Agreement has been accepted by the Company; and

(vi) agrees not to engage in any hedging transaction with regard to the CEL Tokens.

(b) SUBSCRIBER HAS RECEIVED, READ CAREFULLY AND UNDERSTANDS THIS SUBSCRIPTION AGREEMENT AND ALL EXHIBITS AND APPENDICES HERETO AND HAS HAD AN ADEQUATE OPPORTUNITY TO CONSULT SUBSCRIBER'S OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR SUBSCRIBER;

---

[1*] "U.S. person", "United States" and "distributor" defined in Appendix A hereto.

{S2595484; 1} - 2 -

(c) The Company has provided the Subscriber and his, her or its representative, if any, prior to the purchase of the CEL Tokens, with the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the financial data and business of the Company and to obtain any additional information related to the financial data and business of the Company, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory. The Subscriber is satisfied that he, she or it has received adequate information concerning all matters which he, she or it considers material to a decision to purchase the CEL Tokens;

(d) Subscriber understands and acknowledges that (i) Subscriber must bear the economic risk of an investment in the CEL Tokens for an indefinite period of time; (ii) the CEL Tokens have not been registered under the Securities Act or any State Securities Laws and is being offered and sold in reliance upon exemptions provided in the Securities Act and State Securities Laws for transactions not involving any public offering and, therefore, the CEL Tokens may not be resold or transferred unless it is subsequently registered under the Securities Act and applicable State Securities Laws or unless an exemption from such registration is available; and (iii) Subscriber is purchasing the CEL Tokens, and any purchase of the CEL Tokens will be, for investment purposes only for Subscriber's account and not with any view toward a distribution thereof;

(e) Subscriber is aware and acknowledges that: (i) an investment in the CEL Tokens is speculative and involves a risk of loss of the entire investment and no assurance can be given of any income from such investment; (ii) the Company has not made and cannot make any representation or warranty as to the future operations or financial condition of the Company; and (iii) there is no public market for, and there are substantial restrictions on the transferability of, the CEL Tokens and it may not be possible for Subscriber to liquidate the investment readily in case of an emergency;

(f) Subscriber has adequate means of providing for all current and foreseeable needs and personal contingencies and has no need for liquidity in this investment;

(g) Subscriber maintains a domicile or business at the address shown on the signature page of this Subscription Agreement, at which address Subscriber has subscribed for the CEL Tokens; and

(h) Subscriber has evaluated the risk of investing in the CEL Tokens, and has determined that the CEL Tokens are a suitable investment for Subscriber. Subscriber can bear the economic risk of the investment and can afford a complete loss of the investment. In evaluating the suitability of any investment in the CEL Tokens, Subscriber has not relied upon any representations or other information (whether oral or written) other than independent investigations made by Subscriber or Subscriber's representative(s); and

(i) Subscriber understands that the Company will rely on the accuracy and completeness of the information provided by Subscriber in this Agreement and the Terms of Use (the "Subscriber Representations"). Such information is accurate and complete.

(j) Subscriber acknowledges that a breach by it of the Subscriber Representations will cause irreparable harm to the Company and that the remedies at law for Subscriber's breach of the Subscriber Representations under this Agreement will be inadequate. Subscriber agrees, in the event of its breach of the Subscriber Representations, that the Company shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein: (i) to an injunction or injunctions restraining, preventing or curing any breach of the Subscriber Representations

and to enforce specifically the terms and provisions hereof and thereof, without the necessity of showing economic loss and without any bond or other security being required, and (ii) to such other penalties it deems reasonable including, but not limited to, cancelling Subscriber's membership on the Company platform and/or burning or destroying any CEL Tokens held by Subscriber.

6. <u>Survival and Indemnification</u>. All representations, warranties and covenants by Subscriber contained in this Subscription Agreement or any other documents executed and delivered in connection therewith, and including, without limitation, the indemnification contained in this <u>Section 6</u> shall survive (i) the acceptance of this Subscription Agreement by the Company, (ii) changes in the transactions, documents and instruments described herein, and (iii) the death, disability or dissolution of the Subscriber.  The Subscriber acknowledges the meaning and legal consequences of the representations, warranties and covenants in determining the Subscriber's qualification and suitability to acquire the CEL Tokens.  The Subscriber hereby agrees to indemnify, defend and hold harmless the Company, and its officers, directors, employees, agents and controlling persons, from and against any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and disbursements), judgments or amounts paid in settlement of actions arising out of or resulting from the untruth of any representation herein or the breach of any warranty, covenant or acknowledgment made herein by the Subscriber.

7. <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, confirmed e-mail or facsimile, or overnight air courier guaranteeing next day delivery:

(a) if to the Company, to it at the following address:

Celsius Network Limited
1 Bartholomew Lane
London, United Kingdom EC2N 2AX
Attn: Harumi Urata-Thompson
Email: OTC@celsius.network

(b) if to the Subscriber, to the address set forth on the signature page hereto, or at such other address as either party shall have specified by notice in writing to the other.

8. <u>Assignability</u>.  This Subscription Agreement is not assignable by the Subscriber, and may not be modified, waived or terminated except by an instrument in writing signed by the party against whom enforcement of such modifications, waiver or termination is sought.

9. <u>Entire Agreement</u>.  This Subscription Agreement and the Terms of Use constitute the entire agreement of the Subscriber and the Company relating to the matters contained herein, superseding all prior contracts or agreements, whether oral or written.

10. <u>Governing Law</u>.  This Subscription Agreement shall be governed and controlled as to the validity, enforcement, interpretation, construction and effect and in all other aspects by the substantive laws of the State of New York, without reference to conflicts of laws principles (except insofar as affected by the state securities or "blue sky" law of the jurisdiction in which the Offering has been made to Subscriber).

11. <u>Severability</u>.  If any provision of this Subscription Agreement or the application thereof to any circumstance shall be held invalid or unenforceable to any extent, the remainder of this Subscription Agreement and the application of such provision to other subscriptions or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

12. <u>Headings</u>.  The headings in this Subscription Agreement are inserted for convenience only and are not intended to describe, interpret, defined, or limit the scope, extent or intent of this Subscription Agreement or any provision hereof.

13. <u>Counterparts</u>.  This Subscription Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

14. <u>Amendment and Modification</u>.  This Subscription Agreement may be amended or modified, or any provision hereof may be waived, provided that such amendment or waiver is set forth in writing executed by the Company and the Subscriber.  No course of dealing between or among any persons having any interest in this Subscription Agreement will be deemed effective to modify, amend or discharge any part of this Subscription Agreement or any rights or obligations of any person under or by reason of this Subscription Agreement.

15. <u>Jurisdiction</u>.  The Subscriber hereby irrevocably consents, to the maximum extent permitted by law, that any legal action or proceeding against it by the Company, arising out of or in any manner relating to this Subscription Agreement shall be brought exclusively in either the state or federal courts located in New York, New York.  By its execution and delivery of this Subscription Agreement, the Subscriber expressly and irrevocably consents and submits to the personal jurisdiction and jurisdiction over their property of all of such courts in any such action or proceeding.  The Subscriber expressly and irrevocably waives its claims and defenses in any such action or proceeding in any of such courts based on any alleged lack of personal jurisdiction, improper venue or forum non conveniens or any similar basis to the maximum extent permitted by law.

16. <u>Binding Effect</u>.  This Subscription Agreement shall be binding upon the Subscriber and the heirs, personal representatives, successors and permitted assigns of Subscriber (provided that this Subscription Agreement and the rights and obligations of Subscriber hereunder are not transferable or assignable by Subscriber).

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned Subscriber has executed this Subscription Agreement as of the 13 day of Feb, 2021.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Subscriber's Full Legal Name

By: ▓▓▓▓▓▓▓▓▓▓
Signature of Subscriber
Name: ▓▓▓▓▓▓▓▓
Title: ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Address

Date of Execution by Subscriber
2/12/2021

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
City, Country

U.S. Social Security or Taxpayer I.D. No. (if Applicable)

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Telephone Number

Email Address

**Please Check Appropriate Category**:

_X_ Individual
___ Tenants in Common
___ Joint tenants with right of survivorship
___ As custodian, trustee or agent for:

___ Other (*e.g.*, corporation, Company, etc.)

AGREED TO AND ACCEPTED BY:

CELSIUS NETWORK LIMITED

By: _____[DocuSigned signature 821A611261A84B2...]_____

Its: _____CFO_____

OFFERED AMOUNT:

CEL Tokens      CEL     [ 12,245.00 ]

Total Purchase Price:   USDC/T [ 60,000.00 ]

**Please Initial Each Box Below**:

__X__ I am aware of the risks associated with buying CEL tokens and accept all of such risks.

__X__ I am aware that I am not allowed to sell CEL tokens to any U.S. person until after one year and one day from the date that this Subscription Agreement has been accepted by the Company.

{S2595484; 1}                  - 2 -

**APPENDIX A**

Pursuant to Rule 902(d), (k) and (l) of Regulation S, the terms "distributor," "U.S. person" and "United States" are defined as follows:

(a) <u>Distributor</u>. "Distributor" means any underwriter, dealer, or other person who participates pursuant to a contractual arrangement, in the distribution of the securities offered or sold in reliance on Regulation S.

(b) <u>U.S. Person</u>.

    (A) "U.S. person" means:

        (i) Any natural person resident in the United States;

        (ii) Any partnership or corporation organized or incorporated under the laws of the United States;

        (iii) An estate of which any executor or administrator is a U.S. person;

        (iv) Any trust of which any trustee is a U.S. person;

        (v) Any agency or branch of a foreign entity located in the United States;

        (vi) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; and

        (vii) Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the United States; and

        (viii) Any partnership or corporation if: (1) organized or incorporated under the laws of any foreign jurisdiction; and (2) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act of 1933, unless it is organized or incorporated and owned, by accredited investors (as defined in Rule 501(a)) who are not natural persons, estate or trusts.

    (B) Notwithstanding paragraph (k)(1) of Rule 902, any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States shall not be deemed a "U.S. person".

    (C) Notwithstanding paragraph (k)(1) of Rule 902, any estate of which any professional fiduciary acting as executor or administrator is a U.S. person shall not be deemed a U.S. person if:

        (i) An executor or administrator or the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estates; and

{S2595484; 1}

    (ii)  The estate is governed by foreign law.

 (D)  Notwithstanding paragraph (k)(1) of Rule 902, any trust of which any professional fiduciary acting as trustee is a U.S. person shall not be deemed a U.S. person if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person.

 (E)  Notwithstanding paragraph (k)(1) of Rule 902, an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country shall not be deemed a U.S. person.

 (F)  Notwithstanding paragraph (o)(1) of Rule 902, any agency or branch of a U.S. person located outside the United States shall not be deemed a "U.S. person" if:

    (i)  The agency or branch operates for valid business reasons; and

    (ii)  The agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located.

 (G)  The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, any other similar international organizations, their agencies, affiliates and pension plans shall not be deemed "U.S. persons".

(c)  <u>United States</u>.  "United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.