WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
One Bowling Green
New York, New York 10004
Telephone: (212) 510–0500
By:    Shara Cornell, Esq.
       Trial Attorney

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- x
                                                          :
In re                                                     :    Chapter 11
                                                          :
CELSIUS NETWORK LLC, et al.,[1]                           :    Case No. 22-10964 (MG)
                                                          :
                                                          :    Jointly Administered
                                                          :
                                           Debtors.       :
--------------------------------------------------------- x

**OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTORS' MOTION FOR
ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING CERTAIN FEES
AND EXPENSES FOR THE BACKUP PLAN SPONSOR
AND (II) GRANTING RELATED RELIEF**

**TO:    THE HONORABLE MARTIN GLENN,
        CHIEF UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 ("United States Trustee"),

hereby respectfully objects (the "Objection") to the Motion of Celsius Network LLC, et al. (the

"Debtors") for Entry of An Order Authorizing and Approving Certain Fees and Expenses for the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Backup Plan Sponsor (the "Motion"). In support thereof, the United States Trustee respectfully alleges as follows:

## INTRODUCTION

The extraordinary relief requested in the Motion must be denied. Debtors seek an order authorizing and approving substantial fees and expenses to the backup bidder at the Auction, BRIC (defined below). The payment of what is tantamount to break-up fees and expenses to a party that was merely a bidder at an auction – and not even the highest bidder – is not authorized by the Bankruptcy Code and certainly is not a reasonable expenditure of estate funds. There was no need to encourage bidders for an auction process that the Debtors touted as being "robust and active."[2] Whereas a stalking horse bidder may be compensated in order to induce it to be the initial bidder and thereby encourage other potential bidders, a backup bidder and a stalking horse bidder are not the same. To award these protections to BRIC, would open the floodgates for all losing bidders, or perhaps uninterested bidders, to seek compensation for performing diligence and participating in bankruptcy auctions.

BRIC's inappropriate fees include (1) an uncapped Expense Reimbursement, (2) a vague $500,000 monthly Consulting Fee for unknown work without retention of a professional firm by this Court, and (3) a Commitment Fee. The Consulting Fee does not have a definitive start and end date and is in addition to the Expense Reimbursement. While the Expense Reimbursement has no cap, the Motion fails to explain why such broad authority should be granted. In short, there is no reason why the Debtors' Motion should be granted.  Accordingly, the Motion must be denied.

---

[2] May 17, 2023 Hearing Transcript at 16:21.

**BACKGROUND**

1.      On July 13, 2022 (the "Petition Date"), Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC (collectively, the "Debtors") each commenced a voluntary case under Chapter 11 of the Bankruptcy Code. *See* Voluntary Petitions, SDNY Case No. 22-10964(MG), ECF Doc. No. 1. On July 19, 2022, the Court entered an Order directing that these cases be jointly administered. ECF Doc. No. 53. On December 7, 2022, the Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (the "GK8 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      An Official Committee of Unsecured Creditors was appointed on July 27, 2022. ECF Doc. No. 241.

3.      On September 22, 2022, First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Equity Holders") filed for a Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee (the "Equity Committee Motion"). ECF Doc. No. 880.

4.      On March 9, 2023, the Court issued the Memorandum Opinion Regarding which Debtor Entities have Liability for Customer Claims under the Terms of Use (the "Opinion"). ECF Doc. No. 2205.

5.      The Opinion concluded that customer (i.e. account holder) contract claims were limited to claims against only Celsius Network LLC ("LLC") and not against Celsius Network Limited ("CNL"), the top-level parent company (where the Series B Preferred Holders made significant investments), although the Court specifically noted that the Series B Preferred Holders'

investment contracts did not prohibit CNL and its affiliates (other than LLC) from incurring customer liability. *Id.*

6.      On September 29, 2022, the Debtors filed the Sale Motion seeking *inter alia* the authority to sell all or some of the Debtors' unidentified assets. ECF Dkt. No. 929.

7.      On March 1, 2023, the Debtors' filed its Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief (the "Bid Protection Motion"). ECF Doc. No. 2151. The Motion sought bid protections (the "Bid Protections") for the Plan Sponsor and stalking horse bidder, NovaWulf Digital Management, LP ("NovaWulf" or the "Stalking Horse Bidder").

8.      As a condition of the Stalking Horse Bidder's entry into the Plan Support Agreement, the Debtors sought to provide NovaWulf with the Bid Protections – a break-up fee of $5 million and an expense reimbursement of up to a maximum of $15 million (the "Stalking Horse Break-Up Fees").[3] Bid Protection Motion, p. 6, ¶ 7.

9.      The "Expense Reimbursement" under the Plans Sponsor Agreement provides "that the aggregate amount of Fees to be paid under this Section 13.01 shall not exceed $15,000,000 in the aggregate provided, further, that the foregoing shall in no way limit the ability of NewCo to reimburse the Fees under terms of the Management Agreement up to $15,000,000." Bid Protection Motion, p. 19- 20, ¶ 26.

10.     On March 13, 2023, the United States Trustee filed his Objection to the Bid Procedures Motion (the "UST Bid Protection Objection"). ECF Doc. No. 2218.

11.     On March 30, 2023, the Court entered the Order (the "Bid Protection Order") [ECF Doc. No. 2344] Granting the Debtors' Motion for Bid Protections as Modified. The Bid Protection

---

[3] The Expense Reimbursement was later lowered by agreement to $13 million.

4

Motion expressly carves out an Orderly Wind Down from the payment of the Break-Up Fee. An

Orderly Wind Down is defined as:" The orderly wind down of the Debtors' Estates by the Plan

Administrator pursuant to the Wind-Down Procedures." Bid Protection Motion at p. 106 of 150.

The Break-Up Fee is payable:

> In the event that the Plan Sponsor Agreement is (x) terminated by the Debtors
> pursuant to (i) Section 12.02(b**) (other than to pursue an Orderly Wind Down)**
> or (ii) pursuant to any other provision of Section 12.02 if, as of the Termination
> Date, the Debtors are in material breach of the Plan Sponsor Agreement or (y)
> terminated by the Plan Sponsor pursuant to Sections 12.01(a) (solely on account of
> a breach of the Plan Sponsor Agreement by the Debtors), 12.01(c) (**unless the
> Debtors provide notice of their intention to pursue an Orderly Wind Down),**
> or 12.01(d) (unless the Plan Sponsor unreasonably withholds consent to a waiver
> or extension of the Milestones) pursuant to the Bid Protections Order, in addition
> to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Plan Sponsor
> an amount equal to $5,000,000, which shall be an administrative expense of the
> Debtors (the "Break Up Fee") and shall be paid on the Termination Date; provided,
> that, notwithstanding the foregoing, in the event that Plan Sponsor Agreement is
> terminated (A) by the Debtors pursuant to Section 12.02(b) to pursue an Orderly
> Wind Down or (B) by the Plan Sponsor upon receiving notice from the Debtors of
> their intention to pursue an Orderly Wind Down, the Debtors shall remain obligated
> to pay the Plan Sponsor the Break-Up Fee **unless an Orderly Wind Down is
> actually consummated within six (6) months of the Termination Date;
> provided, that any sale or disposition of the Mining assets must be
> consummated within eighteen (18) months of the Termination Date**.

Bid Protection Motion at ¶ 26 (emphasis added). Specifically, the Stalking Horse Break-Up Fee is

not payable in (1) an orderly winddown is consummated within six months and that there is a sale

or disposition of the mining assets within 18 months of the termination date. The Debtors have not

provided a basis that the proposed fees under the Motion are outside the explicit carve out in the

Bid Protection Motion.

12.     Following the notice of Stalking Horse Bidder and prior to the final bid deadline,

the Debtors received two additional qualified bids from: (1) Fahrenheit, LLC ("Fahrenheit"),

whose equity is owned, directly or indirectly, by Arrington Capital, U.S. Data Mining Group, Inc.

(d/b/a U.S. Bitcoin Corp.), Proof Group Capital Management LLC, Steven Kokinos, and Ravi

Kaza; and (2) the Blockchain Recovery Investment Committee ("BRIC"), which includes Van Eck Absolute Return Advisers Corporation, Global X Digital, LLC, or an affiliate thereof including GXD Labs LLC, Plutus Lending LLC d/b/a Abra, and Gemini Trust Company, LLC. Notice of Auction, ECF Doc. No. 2519, p. 2 of 5.

13.    An auction was scheduled for April 25, 2023 at 2:00 p.m EST at the offices of the Debtors' counsel (the "Auction"). *Id.* at p. 3 of 5. The Auction was adjourned from time to time and ultimately concluded on May 24, 2023. ECF Doc. No. 2748 p. 3 of 256. The Auction was apparently conducted in accordance with the Bidding Procedures and Auction Rules. Proceedings in the main room of the Auction were recorded by a court reporter. *Id.*

14.    On May 25, 2023, the Debtors' filed the Notice of Successful Bidder and Backup Bidder [ECF Doc. No. 2713] (the "Notice of Successful and Backup Bidder"), which announced that, pursuant to Sections XII and XIII of the Bid Protections, the Debtors, in consultation with the Committee, selected Fahrenheit as the successful bidder and the BRIC as the backup bidder. *Id.*

15.    On June 7, 2023, the Debtors filed the Motion which requested entry of an order authorizing and approving certain fees and expenses to the backup plan sponsor, BRIC.

16.    The Motion *inter alia* requests authority to pay BRIC an Expense Reimbursement, Commitment Fee, and Consultation Services Fees (together, the "BRIC Fees") in addition to all other compensation awarded to BRIC. Other compensation to be paid to BRIC include a $50 million administration fee, a percentage of any distribution fees, a value creation incentive fee, and an efficiency incentive fee.

17.    Specifically, the Backup Plan Sponsor Agreement sets forth the following terms for the payment of the BRIC Fees:

- **Expense Reimbursement**. Pursuant to the Backup Plan Sponsor Agreement Order, the Debtors shall promptly pay or reimburse, as and when

required under the Backup Plan Sponsor Agreement or the Toggle Option within the NewCo Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses incurred through the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order of: (i) the Backup Plan Sponsor; (ii) Willkie Farr & Gallagher LLP, as counsel to the Backup Plan Sponsor ("Backup Plan Sponsor Counsel"); (iii) Hughes Hubbard & Reed LLP, as counsel to the BRIC Exchange Partner; (iv) McAfee & Taft, P.C., as counsel to the BRIC Mining Partner; (v) Clifford Chance US LLP, as counsel to VanEck; and (vi) any other accountants and other professionals, advisors and consultants retained by the Backup Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld) ( (iii)–(v), each a "BRIC Party Counsel," and collectively (i)–(vi), the "Backup Plan Sponsor Advisors"), in each case, in connection with the Bidding Process, the Auction, the Backup Plan Sponsor Agreement, or to implement the Backup Transactions (collectively, the "Expense Reimbursement"); provided that BRIC Party Counsel shall not be entitled to Expense Reimbursement for any services provided which are duplicative of the services provided by other Backup Plan Sponsor Advisors; provided further that review of the Backup Plan Sponsor Agreement by each BRIC Party Counsel shall not be considered duplicative. The Expense Reimbursement shall be payable by the Debtors as administrative expenses (1) pursuant to the Backup Plan Sponsor Agreement Order or (2) promptly upon the written request of the applicable Backup Plan Sponsor Advisor following the termination of the Backup Plan Sponsor Agreement (x) by the Debtors pursuant to Sections 12.02(b), 12.02(c), 12.02(d) (unless the Backup Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or Section 12.02(f) or (y) by the Backup Plan Sponsor or BRIC Exchange Partner pursuant to Section 12.01, in the event of either (1) or (2) without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; provided that Debtors shall promptly pay the Expense Reimbursement incurred prior to the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order; provided, further, that beginning immediately after entry of the Backup Plan Sponsor Agreement Order the Debtors shall pay a maximum Expense Reimbursement of $500,000 per month in the aggregate (the "Expense Reimbursement Monthly Cap"); provided, further, that in the event the Debtors make the Backup Plan Election and switch to the Toggle Option (as set forth in the NewCo Plan), the Expense Reimbursement Monthly Cap shall cease to apply thereafter; provided, further, that to the extent the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor or the BRIC Exchange Partner, the Backup Plan Sponsor shall promptly repay the Debtors the Expense Reimbursement paid to the Backup Plan Sponsor Advisors under this Section 13.01.

- **Commitment Fee**. Pursuant to the Backup Plan Sponsor Agreement Order, as and when required under the Backup Plan Sponsor Agreement or the Toggle Option within the NewCo Plan, in addition to any Fees owed pursuant to Sections 13.01 and 13.03, the Debtors shall pay the Backup Plan Sponsor an amount equal to $1,500,000, which shall be paid as an administrative expense of the Debtors (the "Commitment Fee") and shall be paid promptly upon the entry of the Backup Plan Sponsor Agreement Order; provided that in the event the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor, the Backup Plan Sponsor shall not be entitled to the Commitment Fee.

- **Consultation Services Fee**. Pursuant to the Backup Plan Sponsor Agreement Order, in addition to any Fees owed pursuant to Sections 13.01 and 13.02, the Debtors shall pay to an entity designated by the BRIC, in exchange for the Consultation Services, $500,000 per month, retroactive to May 1, 2023, after entry of the Backup Plan Sponsor Agreement Order, which shall be paid as an administrative expense pursuant to section 503 of the Bankruptcy Code (the "Consultation Services Fee"), on a date each month that is mutually agreed to by the Debtors and the BRIC; provided that, to the extent any Party terminates this Agreement or the Consultation Services, neither the BRIC nor any entity designated by the BRIC, shall be entitled to the Consultation Services Fee from that date forward.

*Id*. at ¶ 32.

18.    Specifically, the Motion also provides that the newly created wind down estate of the Debtors shall reimburse BRIC and the newly formed oversight committee for all reasonable and documented expenses, including the reasonable and documented fees and expenses of outside service providers such as legal counsel, accountants and other professionals, advisors, and consultants. No cap is provided. *Id*. at p. 22 of 86.

19.    The Consultation Services contemplated by the Motion include services:

To be provided to the Debtors by the members of the BRIC in order to assist the Debtors and the Successful Bidder (in a manner wholly consistent with Debtors' objectives to prepare for consummation of the NewCo Plan) and to minimize unnecessary delays to the Chapter 11 Cases in the event the Toggle Option is exercised, including, among other things and solely to the extent requested by the Debtors: (i) sharing analyses and guidance with respect to the more than 100

8

cryptocurrency assets owned by the Debtors; (ii) assisting the Debtors with the development of strategies to maximize the value of the Debtors' illiquid assets, including developing trading strategies for cryptocurrency assets; (iii) consulting with the Debtors on mining operations strategy and execution; (iv) advising the Debtors on the process for developing models and data science tools in preparation for distributions, including timing and reserves; and (v) consulting with the Debtors on distribution mechanics, including claim calculations, appropriate reserves, KYC/AML processes, tax complexities, and timing.

*Id*. at ¶ 30.

20.     The Motion further provides that "[i]n consideration for the BRIC's agreement to serve as the Backup Plan Sponsor, the substantial time, effort, and resources the BRIC has expended, and will continue to expend, regarding the Auction and Backup Transactions, and in exchange for the Consultation Services, the Debtors agreed to provide the BRIC the Fees." *Id*. at ¶ 31.

## ARGUMENT

### A.   There is no Basis for the Payment of the BRIC Fees to BRIC as a Back-Up Bidder

It is axiomatic that the paramount goal of any proposed auction process is to maximize the proceeds received by the estate. *See In re Cybergenics Corp*., 330 F.3d 548, 573 (3d Cir. 2003) (*en banc*); *In re Food Barn Stores, Inc*., 107 F.3d 558, 564-65 (8th Cir. 1997). Approval of reasonable bidding procedures is appropriate only in circumstances in which the procedures and fees are (a) necessary to preserve and benefit the estate, (b) reasonable, (c) in the best interests of these estates, and (d) designed in a fashion to promote, enhance and encourage bidding. *See In re Reliant Energy Channelview L*P, 594 F. 3d 200, 206 (3d Cir. 2010); *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999); *see also In re S.N.A. Nut Co*., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *In re America West Airlines, Inc*., 166 B.R. 908, 913 (Bankr. D. Ariz. 1994); *In re Integrated Resources, Inc*.,

147 B.R. 650, 663 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re Hupp Industries, Inc*., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992).

The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). To accomplish that goal, bankruptcy courts are necessarily given discretion and latitude in conducting a sale. *See id.*; *see also In re Wintz Co*., 219 F.3d 807, 812 (8th Cir. 2000) (stating that in structuring the sale of assets, bankruptcy courts "have ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets"). The burden is on the Debtors to prove the necessity of, and benefit to the estates from, the proposed break-up fee. In addition, although "the considerations that underlie the debtor's judgment may be relevant to the bankruptcy court's determination on a request for break-up fees and expenses," "the business judgment rule should not be applied as such in the bankruptcy context." *O'Brien*, 181 F.3d at 535.

The Debtors have failed to meet its burden demonstrating that BRIC is entitled to the BRIC Fees from the Debtor's estate for having submitted a losing bid at the Auction. The Debtors cite no legal authorities to support the payment of the BRIC Fees. By contrast, other courts have rejected the payment of break-up fees in bankruptcy auction sales, when there was no contractual right to the fee and "absent compelling circumstances which clearly indicate that payment of the fee would be in the interests of the estate." *In re S.N.A. Nut Company*, 186 B.R. 98, 105 (N.D. Ill. 1995); *O'Brien Environmental*, 181 F.3d 527 (affirming denial of break-up fee when the party seeking the fee had strong financial incentives to undertake the cost of submitting the bid, even in the absence of any promise of the fee, and when the results of the bidding do not prove what effect the break-up fee had on other bidders' behavior, thus there was no evidence that fee was actually

10

necessary to preserve the value of the estate.) As such, "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Id*. at 535. The Debtors have failed to make such a showing.

In *O'Brien*, the appellant, Capline Corporation ("Capline"), sought bankruptcy court approval of the break-up fee prior to participating in the bidding procedures and had conditioned its participation on such approval. The bankruptcy court refused to approve the break-up fee at that time and indicated that it would be willing to consider such a motion at the end of the bidding process. Notwithstanding the court's refusal to approve the fees, Capline participated in the bidding process, was beat out by NRG Energy, Inc., and later brought a motion again seeking payment of a break-up fee and expenses. The bankruptcy court refused to approve the payment of a break-up fee to Capline. *O'Brien*, 181 F.3d 527.

The Third Circuit affirmed the decisions of the bankruptcy court and the district court denying Calpine's request for the payment of a break- up fee, based on, among other things: (i) the fact that the debtor's assets sold for $52 million more than Calpine's original bid, which, in the court's view, suggested that "it was the prospect of purchasing O'Brien cheaply, rather than the prospect of break-up fees or expenses, that lured Calpine back into the bidding"; (ii) the lack of proof that Calpine's bid served as a catalyst to higher bids, merely because Calpine's bid was the first for the debtor's assets; and (iii) the fact that much of the information bidders required to evaluate the debtor's assets was compiled by the debtor at its own expense. *Id*.

The court further reasoned that Calpine's willingness to participate in the auction absent the court's approval in advance of a break-up fee undercuts the contention that a break-up fee was necessary to induce Calpine's participation. The court recognized that Calpine's decision to

participate in the bidding process may have been influenced by the bankruptcy court's reservation of its decision with respect to allowance of a break-up fee. However, the court held that the willingness to take that risk was enough to prove that a break-up fee was not necessary. *Id*.

The case at hand is virtually identical to that in *O'Brien*, except that here, unlike the bidder in *O'Brien*, the Debtors and BRIC never even sought pre-approval by the Bankruptcy Court of any break-up fee or expense reimbursement protection for BRIC prior to the Auction, an additional distinguishing fact that mitigates even further against granting the Debtors' request. At least in *O'Brien*, the bidder had an expectation that the Bankruptcy Court *might* ultimately approve some sort of break-up fee if it were not the successful bidder at the auction, whereas here BRIC had absolutely no such expectation going into the open auction. The Third Circuit's decision in *O'Brien* makes clear that a mere increase in the purchase price received at an auction (which in this case has not been demonstrated by BRIC) does not entitle a losing bidder to a break-up fee. Indeed, as in *O'Brien*, the dramatic increase in the purchase price received for the Debtors' assets here suggests that BRIC participated in the bidding process in hopes of obtaining the assets cheaply, not because it had an expectation of receiving a break-up fee.

In *Reliant Energy*, the stalking-horse bidder made its bid prior to Bankruptcy Court approval of any break-up fee or expense reimbursement, and its proposed sale agreement expressly recognized that the payments were not guaranteed, but instead were subject to court approval. *See Reliant Energy*, 594 F.3d at 206. The court observed that the bidders in a sale under § 363 of the Bankruptcy Code always takes a risk by investing the time, money, and energy necessary to prepare its bid, but stated:

> Nevertheless, while we understand that the first bidder may be motivated in part to submit its bid by the possibility that it will receive a break-up fee, it does not follow from that motivation that the bidder will withdraw its bid, pass up on the opportunity to acquire the asset to be sold, and nullify its work in preparing its bid

> if a court, when ordering that there be an auction of assets, declines to authorize a break-up fee to be paid to the initial bidder. Surely O'Brien makes that clear because even though Calpine had made its bid contingent on the award of a break-up fee, it competed at the auction after the Bankruptcy Court rejected the request for a break-up fee.

*Reliant Energy*, 594 F. 3d at 207. Similarly, here, there has been no factual showing that requested BRIC Fees were in any way used to induce BRIC to submit its bid.

There is no evidence in this case that BRIC would not have incurred the costs, absent the proposed BRIC Fees. BRIC was always aware that it did not have an exclusive right to a break-up fees or expense reimbursements. Indeed, the Bid Procedures Order authorized the payment of the Stalking Horse Break Up Fees, which consists of $5 million in break-up fees and $13 million as an expense reimbursement.

BRIC would have (and did) bid without any court authorization for BRIC's fees or reimbursements, the bid protections are therefore not a necessary expense of preserving the estate and are therefore impermissible under § 503(b) of the Bankruptcy Code. *Reliant Energy*, 594 F.3d at 206 ("[A] break-up fee is not 'necessary to preserve the value of the estate' when the bidder would have bid even without the break-up fee.") (citing *O'Brien*, 181 F.3d at 535). As in *Reliant Energy*, "there is no escape from the fact that [BRIC] did make its bid without the assurance of [Expense Reimbursement], and this fact destroys [the] argument that the fee was needed to induce it to bid." *Reliant Energy*, 594 F. 3d at 207.

Thus, its participation in the process demonstrates that it believed its investment in due diligent and closing costs was worth the risk. Indeed, under the Debtors' logic every runner-up bidder who participates in an auction and loses should be entitled to a break-up fee or expense reimbursements, a precedent that this Court clearly should not establish.

The Debtors have not established that the any of the proposed fees and/or expenses are or were actually necessary to preserve the value of the estate or actual, necessary costs or that it induced BRIC to submit their bid. The Court is not required to defer to the judgment of debtors-in-possession when analyzing the propriety of a break-up fee or expense reimbursement in a bankruptcy context. *See O'Brien*, 181 F.3d at 535. Break-up fees (or expense reimbursement) would be necessary, the Third Circuit observed, if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. However, in many instances a break-up fee is not necessary to induce bidding. *Id*. at 535. The *O'Brien* court noted that potential buyers will bid whether or not break-up fees are offered whenever they determine that the cost of acquiring the debtor, including the cost of making the bid, is less than the value the buyer can expect to gain from the acquisition. In such cases, the award of a break-up fee cannot be characterized as necessary to preserve the value of the estate. *See id*.

Similarly, when a debtor has multiple suitors, a break-up fee is not necessary to induce bidding. *O'Brien*, *supra*; *Reliant Energy*, *supra*. Here, bidding was already heavily underway when the BRIC bid came to fruition. Indeed, the Auction lasted over four weeks with several qualified bidders, only one of which - BRIC - is seeking additional monetary protections. *See* May 17, 2023 Hearing Transcript at 16:11-19:5 ("the auction is working as intended and participation has been robust and active"). Because the Debtors had multiple suitors anxious to bid on assets, including its Stalking Horse Bidder, they cannot genuinely characterize the BRIC Fees as actually necessary to induce bids or actually necessary to preserve the value of the estates. Under these circumstances, and the rationale of the Third Circuit in *O'Brien*, BRIC and the Debtors have failed to demonstrate

14

that awarding it a fees is necessary to preserve the value of the estate. Accordingly, the BRIC Fees should not be approved.

**B.  <u>The Requested BRIC Fees Are Undefined, Vague, and Exorbitant.</u>**

The BRIC Fees include (1) an uncapped Expense Reimbursement, (2) a vague $500,000 monthly Consulting Fee for unknown work without retention of a professional firm by this Court, and (3) the Commitment Fee.

The Consulting Fee does not have a definitive start and end date and is in addition to the Expense Reimbursement. Nor is there an engagement letter outlining what responsibilities or activities are included in the consulting fee attached to the Motion. Both the Debtors and the Committee already have sophisticated investment bankers and financial advisors that are intimately familiar with these cases, and it is questionable how much additional consulting work is necessary or beneficial to the Debtors' estates. Moreover, the proposed fee of $500,000 is almost double the Debtors' current investment banker's monthly set fees of $250,000.[4]

The Commitment Fee is in addition to all other fees and expenses payable to BRIC and is requested in the amount of $1,500,000 as an administrative expense of the Debtors. The Motion provides no basis for why BRIC is entitled to the Commitment Fee or how $1,500,000 was calculated.

The Motion also describes the creation of a new board/committee for the mining business. This board will be appointed by the Committee and by BRIC. However, there is no proposed input from the Preferred Equity Holders. While their dispute is ongoing, if successful, it may upend the

---

[4] The Debtors pay a "Monthly Advisory Fee" to Centerview Partners LLC of $250,000 which is payable until the effective date of a chapter 11 plan for the Debtors. Order Authorizing the Expanded Scope of Employment and Retention of Centerview Partners LLC as Investment Banker for the Debtors Effective as of July 13, 2023 and Granting Related Relief at ¶2(a).

BRIC transaction. The United States Trustee is concerned that the diligent and expensive work of all of the professionals involved in creating the BRIC bid may be hindered if the Preferred Equity Holders are not invited to the table earlier, in the event they are successful.

Moreover, while it is not immediately pertinent to the relief requested in the Motion, the BRIC transaction is seemingly identical to an orderly winddown and transfer of the mining business, an exact scenario that was carved out of the Bid Procedures Order. The Motion is silent as to whether the Stalking Horse Break Up Fee would still be payable under the proposed BRIC transaction.

## CONCLUSION

**WHEREFORE**, the United States Trustee respectfully requests this Court to deny the Motion as stated herein, and award such other relief as this Court deems appropriate under the circumstances.

Dated: New York, New York
       June 21, 2023

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Shara Cornell*
Shara Cornell, Esq.
Trial Attorney
One Bowling Green
New York, New York 10004
Tel. (212) 510-0500