# **EXHIBIT 2**
## **Redacted**

To: 

Date: March 25, 2020

## Employment Agreement

Dear ▮,

We are pleased to extend you this offer of employment in Celsius Network Ltd. (the "**Company**"). This letter sets forth the terms of your employment, which, if you accept by countersigning below, will govern your employment with the Company (the "**Employment Agreement**").

1. **Duties, Obligations and Consents**

    1.1    Commencing on March16th (the "**Commencement Date**") you shall be engaged in a fulltime position in the position of Chief Security and Information Officer, reporting directly to the CTO, Nuke Goldstein.

    The three months' period commencing from the Commencement Date shall be considered a probation period (the "**Probation Period**").

    1.2    You shall use your best endeavors to promote the interests of the Company. You shall devote all of your business and professional time, attention, energy, skill, learning and best efforts to the business and affairs of the Company. You shall use your best endeavors to protect the good name of the Company and shall not perform any act that may bring the Company into disrepute.

    1.3    In the event that you discover that you have, or might have at some point in the future, any direct or indirect personal interest in any of the Company's business, or a conflict of interest with your employment duties and functions, you shall immediately inform the Company upon such discovery.

    1.4    You shall not engage, directly or indirectly, in any business, professional or commercial occupation outside your employment with the Company, whether or not such occupation is rendered for any gain, without the prior written approval of the Company, and subject to the terms of such approval. The Company may cancel or change such approval at any time, in its sole and absolute discretion.

    1.5    You shall not, directly or indirectly, accept any commission, rebate, discount or gratuity in cash or in kind, from any third party which has or is likely to have a business relationship with the Company.

    1.6    You hereby represent that no provision of any law, regulation, agreement or other source prohibits you from entering into this Employment Agreement and fulfilling all its terms.

    1.7    You hereby undertake to comply with all Company policies, procedures and objectives, as in effect from time to time.

    1.8    You are aware of the need for frequent travel outside of Israel, for short or long periods, and hereby agree to perform such travel and stay inside and outside of Israel as may be necessary to fulfill your duties hereunder.

**SK**

1.9   You consent, of your own free will and although not required to do so under law, that the information in this Employment Agreement and any information concerning you gathered by the Company, will be held and managed by the Company or on its behalf, inter alia, on databases according to law, and that the Company shall be entitled to transfer such information to third parties, in Israel or abroad (including to countries which have a different level of data protection that that existing in Israel). The Company undertakes that the information will be used, and transferred for legitimate business purposes only. Without derogating from the generality of the above, such purposes may include human resources management and assessment of potential transactions, to the extent required while maintaining your right to privacy.

1.10  You agree that the Company may monitor your use of their Systems and copy, transfer and disclose all electronic communications and content transmitted by or stored in such Systems, in pursuit of the Company's legitimate business interests, all in accordance with the Company's policy as in force from time to time and subject to applicable law. For the purposes of this Section, the term "Systems" includes telephone, computers, computer system, internet server, electronic database and software, whether under your direct control or otherwise

1.11  You hereby undertake to keep the contents of this Employment Agreement confidential and not to disclose the existence or contents of this Employment Agreement to any third party without the prior written consent of the Company except for your immediate family members and your personal advisors who are subject to confidentiality obligations.

2.  **Salary and Benefits**

2.1   Your salary and benefits will be as detailed in **Appendix A** to this Employment Agreement, which forms an integral part hereof.

2.2   As you are employed hereunder in a management position, which requires a special degree of trust, the Hours of Work and Rest Law 1951, and any other law amending or replacing such law, does not apply to you or to your employment with the Company. You acknowledge that the consideration set for you hereunder nevertheless includes within it consideration that would otherwise have been due to you pursuant to such law.

3.  **Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Inventions Undertaking**

Upon the signing of this Employment Agreement, you will sign a Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Inventions Undertaking in the form attached hereto as **Appendix B**, which constitutes an integral part hereof. Your employment compensation has been calculated to include special consideration for your commitments under Appendix B.

4.  **Termination of Employment**

4.1   Your employment shall commence as of the Commencement Date and shall continue for an un-fixed term, unless terminated in accordance with the terms of this Employment Agreement.

4.2   Termination of this Employment Agreement shall be by either party giving prior notice according to law to the other party ("**Prior Notice**"). During the Prior Notice period you should attend work, continue to perform your position within the Company and train your successor, unless the Company instructs otherwise in writing.

4.3   Notwithstanding Section 4.2 above, the Company may, in its sole discretion:

3

- Terminate your employment without Prior Notice in whole or in part, by giving you notice together with payment in lieu of all or part of the Prior Notice, as the case may be, according to law. Your employment shall be deemed to have ceased on the date of the receipt of the notice from the Company; and/or

- Instruct you not to attend work during the Prior Notice period or any part of it. In such case, you will continue to receive your salary and other benefits to which you are entitled under this Employment Agreement, except for benefits dependent on actual work.

4.4 Notwithstanding the above, the Company shall be entitled to terminate this Employment Agreement forthwith, without prior notice or payment in lieu of notice, where any of the following apply: (i) you have committed a fundamental breach of this Employment Agreement, including any breach of your covenants in Appendix B or Sections 1 or 3 above; (ii) you have breached your fiduciary duty to the Company; and/or (iii) you have performed any act that entitles the Company legally to dismiss you without paying you severance pay, in whole or in part, in connection with such dismissal.

4.5 No later than the termination date of your actual employment with the Company, or at such other time as directed by the Company, you shall immediately return to the Company each and every asset (including documents and information) in your possession or control which belongs, or has been entrusted, to the Company.

Furthermore, upon termination of your actual employment, or at such other time as directed by the Company, you shall provide the Company with a list of all passwords, write-protect codes and similar access codes used in the context of your work.

5. **General**

5.1 All of the payments and benefits provided to you under this Employment Agreement are gross amounts and shall be subject to the withholding of all applicable taxes and deductions required by any applicable law.

5.2 This Employment Agreement may only be amended in writing and signed by the Company.

5.3 This Employment Agreement is personal, and the terms and conditions of your employment shall be solely as set forth herein. You shall not be entitled to any payment, right or benefit which is not expressly mentioned in this Employment Agreement, including, without limitation, any payments, rights or benefits of any current or future general or special collective labor agreements or arrangements or extension orders, any custom or practice, and/or any other agreements between the Company and its employees, unless required under law.

5.4 This Employment Agreement, after confirmed by you, shall contain the entire understanding between the Company and yourself with respect to your employment by the Company and all prior negotiations, agreements, offer letters, commitments and understandings (whether written or oral) not expressly contained herein shall be null and void in their entirety.

5.5 This Employment Agreement and your employment by the Company shall be governed by and construed in accordance with the laws of Israel.

5.6    A form regarding Notification of Employment Conditions pursuant to the Notice to the Employee and Job Candidate Law (Employment Conditions and Candidate Screening and Selection), 5762-2002 (the "**Notification**"), is attached hereto, as **Appendix C**. By signing below, you hereby acknowledge receipt of the Notification.

**PLEASE READ THIS EMPLOYMENT AGREEMENT CAREFULLY AND RETURN IT SIGNED TO THE COMPANY.**

Yours sincerely,

By: 
Name:  S. Daniel Leon
Title:   COO
Date:  March 29, 2020

**CONFIRMATION**

I hereby confirm that I have read the above Employment Agreement, I understand it and agree with its contents.

| Employee | Signature | 28.3.2020 |
|---|---|---|
| | | Date |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00990946
CEL-UCC-01288848

5

**Appendix A**

**Salary and Benefits**

1. **Salary**

    1.1   The Company shall pay you a gross monthly salary of NIS 35,000 (the "**Salary**"). The parties will re-negotiate the said salary in addition to the tokens detailed below post the next round of funding but no later than January 1st 2021.

    1.2   Without derogating from the above said in Section 2.2 of the Employment Agreement, it is hereby clarified that the Salary is calculated based on two separate components as follows:

    (a)   A gross monthly base salary of NIS [80% of the Salary] (the "**Base Salary**");

    (b)   A gross monthly global compensation for overtime hours of work in the amount of NIS 7000 [20% of the Salary] (the "**Global Overtime Compensation**"), which represents payment for 36.4 overtime hours. The Global Overtime Compensation has been determined based on the Company's knowledgeable estimation (according to the Company's experience with similar positions within the Company) of the average of overtime hours per month that your position requires.

    In the event that it is claimed or determined that the Work and Rest Law is applicable to your employment under this Employment Agreement despite the specific agreement between us, the Global Overtime Compensation represents any amounts payable under such law.

    All salary-based social benefits will be calculated based on the Salary (meaning not only the Base Salary but also based on the Global Overtime Compensation) except if detailed otherwise in this Employment Agreement.

    1.3   The Salary for each month shall be payable in arrears within nine (9) calendar days of the first day of the following calendar month.

2. **Tokens**

    2.1 On top of the Salary payable to you pursuant to this Employment Agreement, the Company shall grant you 300,000 CEL tokens (the "**Tokens**"). The Tokens shall vest over a period of 3 years commencing on the Commencement Date on a quarterly basis, subject to your continued engagement with the Company under this Employment Agreement. **You will be fully responsible to report and pay any and all tax related charges to any tax authority.**

    2.2 In the event of expiration or termination of this Employment Agreement for any and all reasons, all unvested Tokens as of the time of such expiration or termination shall expire immediately upon such expiration or termination, as applicable. In the event of expiration or termination of this Employment Agreement, any Token that is vested as of the time of such expiration or termination may be exercised within ninety (90) days following the expiration or termination date, as applicable. In the event that after expiration or termination of this Employment Agreement you do not exercise your vested Tokens within such ninety (90) days, such vested Tokens shall expire.

3. **Options**

6

3.1 Following the execution of this Agreement, and subject to the Employee's continued employment with the Company, the Company will recommend to the Board of Directors of the Company's Parent Company, Celsius Network, Inc. (the "**Board**" and "**Parent**") to grant the Employee [1500] options to purchase shares of common stock of Parent under the Company's option plan, as amended from time to time (the "**Plan**"), subject to the terms of the Plan at an exercise price and subject to the vesting schedule and expiration terms as shall be determined by the Board at the time of such grant (the "**Options**"). Should the Board resolve to grant options to the Employee, the Options shall be granted in accordance with and subject to the Plan and the terms and conditions set forth in the applicable option agreement. Any entitlement to equity compensation shall be further subject to the execution of any documents as required by Parent and the receipt of all approvals required under any applicable law. For the avoidance of doubt it is clarified that any tax liability in connection with the Options (including with respect to the grant, exercise, sale of the Options or the shares receivable upon their exercise) shall be borne solely by the Employee and that the Company and Parent shall be entitled to withhold tax as it deems required under applicable law. It is further clarified that nothing herein is intended to constitute a grant of Options or any other rights with respect to the share capital of Parent, and the only obligation of the Company hereunder is to make the recommendation referred to above.

4. **Vacation**

   4.1 You shall be entitled to the higher of (a) 16 working days' vacation; or (b) the statutory quota, in each calendar year.

   4.2 The accrual of vacations days shall be in accordance with the Company's policy, as in effect from time to time.

5. **Sick Leave**

   You shall be entitled to sick leave according to law. Notwithstanding the aforesaid, you will be entitled to your full Salary from the first day of your sick leave. You shall not be entitled to any compensation with respect to unused sick leave.

6. **Recuperation Pay**

   You shall be paid recuperation pay as required by law.

7. **Travel Expenses**

   The Company shall pay you travel expenses according to law.

8. **Severance Pay and Pension Arrangement**

   8.1 You shall be entitled to contributions to a pension arrangement of your choice (the "**Pension Arrangement**"), at the following monthly rates:

   (a) The Company shall contribute:

   (i) 8.33% of the Salary towards the severance pay component; and

   (j) 6.5% of the Salary towards the pension component. In the case you are insured in a

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00990948
CEL-UCC-01288850

mangers insurance policy or a provident fund (which is not a pension fund), the said rate shall include the rate of contributions towards the disability insurance (ביטוח אבדן כושר עבודה), ensuring loss of earning payment of 75% of the Salary but no less than 5% towards the pension component, all subject to the terms of the Extension Order regarding the Increase of Pension Contributions - 2016 (the "**Pension Order 2016**"). In accordance with the terms of the Pension Order 2016, if the said rate shall not be sufficient to insure you in disability insurance, the total rate of contributions shall increase up to 7.5% of the Salary.

(b) The Company shall also deduct 6% of the Salary to be paid on your account towards the Pension Arrangement.

8.2 It is hereby agreed that the settlement regulated in the General Order as amended (attached as **Appendix D**) published under section 14 of the Severance Pay Law 1963 applies. The Company's contributions to your Pension Arrangement will therefore constitute your entire entitlement to severance pay in respect of the paid Salary, in place of any severance pay to which you otherwise may have become entitled at law.

8.3 The Company waives all rights to have its payments refunded, unless your right to severance pay is denied by a judgment according to sections 16 or 17 of the Severance Pay Law or in the event that you withdraw monies from the pension arrangement in circumstances other than an Entitling Event, where an "Entitling Event" means death, disablement or retirement at the age of 60 or over.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00990949
CEL-UCC-01288851

## Appendix B

### Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Inventions Undertaking

I, **Shiran Kleidrman**, am employed by Celsius Network Ltd. ("**Company**") pursuant to an employment agreement to which this Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Inventions Undertaking ("**Undertaking**") is attached as Appendix B ("**Employment Agreement**").

I acknowledge that in the course of my employment with the Company I will become familiar with a range of Confidential Information (as defined below) and that my services are of particular and special value to the Company. In consequence, I undertake the following towards the Company and its affiliates, being persons or entities which control, are controlled by or are under common control with the Company now or in the future (individually and collectively referred to as the "**Group**").

1. **Confidential Information and Confidentiality**

    1.1 I am aware that I may have access to or be entrusted with information (regardless of the manner in which it is recorded or stored) relating to the business interests, methodology or affairs of the Group, or any person or entity with whom or which the Group deals or is otherwise connected and which, for the avoidance of doubt, includes the terms of the Employment Agreement, other than the terms of this Undertaking ("**Confidential Information**"). For the purposes of this agreement, Confidential Information includes but is not limited to:

    A. Technical information of the Company and/or the Group, its customers or other third parties that is in use, planned, or under development, such as manufacturing and/or research processes or strategies; computer product, process and/or devices; software product; and any other databases, methods, know-how, formulae, compositions, technological data, technological prototypes, processes, discoveries, machines, inventions, and similar items;

    B. Business information of the Company and/or the Group, its customers or other third parties that is in use, planned, or under development, such as information relating to the Group's employees (including information related to performance, skillsets, and compensation); actual and anticipated relationships between the Company and/or the Group and other companies; financial information; information relating to customer or vendor relationships; product pricing, customer lists, customer preferences, financial information, credit information; and similar items; and

    C. Information relating to future plans of the Company and/or the Group, its customers or other third parties that is in use, planned, or under development, such as marketing strategies; new product research; pending projects and proposals; proprietary production processes; research and development strategies; and similar items.

    1.2 During the term of the Employment Agreement and at all times thereafter I shall keep confidential, and shall not except in the proper performance of my employment duties use, disclose and/or make available, directly or indirectly, to any third party any Confidential Information without the prior written consent of the Company. The foregoing does not apply to information that I can provide evidence that is already in the public domain through no fault of my own, or to disclosures which are required by law or a valid court order, in which case I will notify the Company in writing immediately on becoming aware of such requirement or its likely occurrence, and the disclosure shall be limited to the extent expressly required.

    1.3 Without derogating from the generality of the foregoing, I confirm that:

    1.3.1    Except in the proper performance of my employment duties, I shall not copy, transmit, communicate, publish or make any commercial or other use whatsoever of any Confidential Information, without the prior written consent of the Board.

    1.3.2    I shall exercise the highest degree of care in safeguarding the Confidential Information against loss, theft or other inadvertent disclosure and in maintaining its confidentiality.

    1.3.3    Upon termination of my employment, or at the earlier request of my direct manager I shall deliver to the Company all Confidential Information and any and all copies thereof that have been furnished to me, prepared by me or came to my possession howsoever, and I shall not retain copies thereof in whatever form.

2. **Non-Competition and Non-Solicitation**

I hereby covenant that throughout the term of the Employment Agreement and for a period of twelve (12)] months thereafter:

1.1    I shall not, directly or indirectly, in any capacity whatsoever, whether independently or as a shareholder, employee, consultant, officer or in any managerial capacity, carry on, set up, own, manage, control or operate, be employed, engaged or interested in a business anywhere in the world, which competes with, or proposes to compete with the Group, including, without limitation, in any activity in the field of borrowing or lending of cryptocurrencies.

1.2    I shall not, whether directly or indirectly, in any way:

    1.2.1    canvass, solicit, or endeavour to entice from the Group, or otherwise have any business dealings with, any person or entity who or which at any time during my employment was or is:

        1.2.1.1    a supplier to, investor, customer, partner, joint venturer or licensor of the Group or other commercial contractor of whatever nature;

        1.2.1.2    in the habit of dealing with the Group;

        1.2.1.3    an employee, agent, officer, consultant, advisor or other independent contractor of or provider of services to the Group; or

        1.2.1.4    negotiating or discussing becoming any of the above.

    1.2.2    otherwise interfere with the relationship between any of the persons or entities listed in Section 2.2.1 and the Group (including by assisting another to interfere in such relationship).

1.3    I acknowledge that my obligations under this Section 2 are reasonable in light of my position and duties within the Company and the nature of the Group's business, the unique and valuable resources that the Company will invest in my training.

3. **Intellectual Property**

2.1    I shall promptly disclose to the Company all Intellectual Property which I have or which I may solely or jointly conceive, develop or reduce to practice or cause to be conceived, developed or

10

reduced to practice during the course of and/or in connection with my employment with the Company and/or which use Confidential Information or other Group property ("**Inventions**").

For the purposes of this Agreement, "**Intellectual Property**" shall include all intellectual property rights, whether or not patentable, including without limitation rights in algorithms, binary code, brands, business methods, business plans, computer programs, computer software, concepts, confidential information, content, databases, developments, firmware, composition of matter or materials, certification marks, collective marks, copyright, customer lists, data, designs (whether registered or unregistered), derivative works, discoveries, distributor lists, documents, domain names, file layouts, formulae, goodwill, ideas, improvements, industrial designs, information, innovations, inventions (including but not limited to Service Inventions as defined in Section 132 of the Patent Law-1967 (the "**Patent Law**")), integrated circuits, know-how, logos, look and feel, manufacturing information, mask works, materials, methods, moral rights, object code, original works of authorship, patents, patent applications, patent rights, including but not limited to any and all continuations, divisions, reissues, re-examinations or extensions, plans, processes, proprietary technology, reputation, research data, research results, research records, semiconductor chips, service marks, software, source code, specifications, statistical models, supplier lists, systems, techniques, technology, trade secrets, trademarks, trade dress, trade names, trade styles, technical information, utility models, and any rights analogous to the foregoing

2.2  I further confirm that all Inventions, and any and all rights, interests and title therein, shall be the exclusive property of the Company and I shall not be entitled to, and I hereby waive now and in the future, any claim to any right, moral rights, compensation or reward, including any right to royalties in Service Inventions in accordance with the Patent Law, that I may have in connection therewith. This clause, constitute an express waiver of any rights I may have under Section 134 of the Patent Law.

2.3  Without derogating from the Group's rights under this Undertaking or any law, I agree to assign and hereby automatically assign to the Company and/or its designee any and all rights, titles and interests in respect of any Inventions, to the extent that I may have such rights, on a worldwide basis, and I acknowledge now and in the future the Company's full and exclusive ownership in all such Inventions. I shall, at any time hereafter, execute all documents and take all steps necessary to effectuate the assignment to the Company and/or its designee or to assist them to obtain the exclusive and absolute right, title and interest in and to all Inventions, including by the registration of patents or trademarks, protection of trade secrets, copyright, or any other applicable legal protection, and to protect the same against infringement by any third party, including by assisting in any legal action requested by the Group with respect to the foregoing.

4. **No Conflicting Obligations**

I have not and will not, at any time during the term of the Employment Agreement, use or disclose Confidential Information in such manner that may breach any confidentiality or other obligation I owe to any former employer or other third party, without their prior written consent.

I warrant that I have the full right to assign the Inventions and the associated rights, titles and interests therein and that I have not made, and will not make, any agreement in conflict with this paragraph or Section 3 above.

5. **Notice to Offerors**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00990952
CEL-UCC-01288854

I agree that if, during my employment with the Company or the period of the restrictions set out in Section 2, I receive an offer of employment or engagement, I will provide a copy of this Undertaking to the offeror as soon as is reasonably practicable after receiving the offer and will inform the Company of the identity of the offeror.

6. **General**

   5.1  I acknowledge that any breach by me of my obligations pursuant to this Undertaking may cause substantial damage for which the Group shall hold me liable.

   5.2  The terms of this Undertaking shall be interpreted in such a way as to give them maximum enforceability at law. The unenforceability of any term (or part thereof) shall not affect the enforceability of any other part of this Undertaking.

   5.3  My undertakings hereunder are in addition to, and do not derogate from, any obligation to which I may be subject under applicable law or any Group policy or agreement.

   5.4  My undertakings hereunder will be applicable to me during the term of my employment with the Company and thereafter. Notwithstanding the aforesaid, the effect of my undertakings under Section 2 above shall be for the period specified in such Section.

   5.5  This Undertaking shall be governed by and construed in accordance with the laws of Israel.



_____           29.3.2020
Employee                           Date

Celsius Network Ltd. hereby agrees to and accepts the assignment of all rights in the Inventions.

_____           March 29, 2020
Celsius Network Ltd.               Date
By: S. Daniel Leon
Title: COO

*[Signature Page to Confidentiality, Non-Competition, Non-Solicitation, and Assignment of Inventions Undertaking]*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS            CELSIUSNETWORK_00990953
HIGHLY CONFIDENTIAL                                          CEL-UCC-01288855

## Appendix C

### Notification of Employment Conditions

1. Name of Employer: <u>Celsius Network Ltd.</u>
   Legal Entity: <u>Celsius Network Ltd</u>
   Registration No. (Corporation): 515817294
   Address: 54 Echad Haam St, Tel-Aviv, Israel

   Name of Employee: ▮
   I.D. No.: ▮
   Address: ▮

2. Employment Commencement Date: <u>March 16 2020</u>

   Period of Contract from - Unlimited as to period.

3. Main duties of the employee are: ▮

4. Name of direct superior of employee or title of direct superior of employee: <u>Nuke Goldstein</u>

5. The salary is paid on the basis of: <u>monthly salary</u>

6. The employee's salary is determined according to a rank of **N/A** and at level **N/A**

   If the employee's salary is not determined by a rank set by a collective agreement – the aggregate of all fixed payments paid to the employee as salary (gross) in accordance with the salary basis, is **35,000**

   The breakdown of the total amount of payments paid to the employee as work salary is as follows:

| Fixed payments | | Non – fixed payments | |
|---|---|---|---|
| Type of payment | Due date of payment[1] | Type of payment[2] | Due date of payment |
| Base Salary | Until the 9th of the following month | Recuperation payment | According to applicable law |
| Global Overtime Compensation | Until the 9th of the following month | | |
| Travel Expenses | Until the 9th of the following month | | |

7. The length of an ordinary working - day of the employee is **N/A** hours/ the length of an ordinary working week of the employee is **N/A** days. *The Employee is employed in a position involving a fiduciary relationship between him and the Company. Accordingly, the Hours of Work and Rest Law 1951 and any other law amending or replacing such law, does not apply to his employment with the Company.*

---

[1] If time of payment is variable, or it depends upon the fulfillment of a condition, it must be specified.

[2] Specify types of payments, for example: base salary, benefits received equal to salary or part of salary – food and non – alcoholic beverages for consumption in the workplace and accommodation not reimbursed as expenses; seniority increment; premiums and incentives, overtime; shifts increment, recuperation payment, and any other payments for work, whether regular or not.

8. The employee's weekly rest day is **N/A**; <u>*The Employee is employed in a position involving a fiduciary relationship between him and the Company. Accordingly, the Hours of Work and Rest Law 1951 and any other law amending or replacing such law, does not apply to his employment with the Company.*</u>

9. The employee is entitled to the following payments for social benefits:

| Type of payment | Name of institution and the plan to which payment is made | % of deduction on behalf of the employee | % of deduction on behalf of the employer | Date of first payment |
|---|---|---|---|---|
| Pension Arrangement | Per the employee's choice | 6% from the Salary | 6.5% for pension and loss of earning insurance subject to the Employment Agreement; 8.33% for severance | In accordance with the Employment Agreement |
|  |  |  |  |  |

10. If the employer, or the employers' organization of which the employer is a member, is/are a party to a collective agreement which sets out the employee's terms of employment – the name of the employees' organization, which is a party to the abovementioned collective agreement, is: **N/A** and its address is **N/A**

This statement is not an employment agreement, but a notification by the employer of the employee's main terms of employment; this statement shall not subtract from any of the rights to which the employee is entitled according to law, extension order, collective agreement or employment agreement.

Date: **March 29, 2020**         Signature of Employer: _[signature]_

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00990955
CEL-UCC-01288857

**Appendix D**
**General Order and Confirmation Regarding Payments of Employers to Pension Funds and Insurance Funds instead of Severance Pay**

**It should be noted that the specific contribution rates set out in this General Approval are subject to the terms of the Pension Order 2016, as detailed in the Employment Agreement.**

Pursuant to the power granted to me under section 14 of the Severance Pay Law 5723-1963 (**"Law"**) I hereby confirm that payments paid by an employer, commencing the date hereof, to an employee's comprehensive pension fund into a provident fund which is not an insurance fund, as defined in the Income Tax Regulations (Registration and Management Rules of a Provident Fund) 5724-1964 (**"Pension Fund"**), or to a Manager's Insurance Fund that includes the possibility of an allowance or a combination of payments to an Allowance Plan and to a plan which is not an Allowance Plan in an Insurance Fund (**"Insurance Fund"**), including payments which the employer paid by combination of payments to a Pension Fund and to an Insurance Fund whether there exists a possibility in the Insurance Fund to an allowance plan (**"Employer Payments"**), will replace the severance pay that the employee is entitled to for the salary and period of which the payments were paid (**"Exempt Wages"**) if the following conditions are satisfied:

(1) Employer Payments –

   (A) for Pension Funds are not less than 14.33 % of the Exempt Wages or 12% of the Exempt Wages, if the employer pays for his employee an additional payment on behalf of the severance pay completion for a providence fund or Insurance Fund at the rate of 2.33% of the Exempt Wages. If an employer does not pay the additional 2.33% on top of the 12%, then the payment will constitute only 72% of the Severance Pay.

   (B) to the Insurance Fund are not less than one of the following:

      (1) 13.33% of the Exempt Wages if the employer pays the employee additional payments to insure his monthly income in case of work disability, in a plan approved by the Supervisor of the Capital Market, Insurance and Savings in the Finance Ministry, at the lower of, a rate required to insure 75% of the Exempt Wages or 2.5% of the Exempt Wages (**"Disability Payment"**).

      (2) 11% of the Exempt Wages if the employer pays an additional Disability Payment and in this case the Employer Payments will constitute only 72% of the employee's severance pay; if, in addition to the abovementioned sum, the employer pays 2.33% of the Exempt Wages for the purpose of Severance Pay completion to providence fund or Insurance Funds, the Employer Payments will constitute 100% of the severance pay.

(2) A written agreement must be made between the employer and employee no later than 3 months after the commencement of the Employer Payments that include –

   (A) the agreement of the employee to the arrangement pursuant to this confirmation which details the Employer Payments and the name of the Pension Fund or Insurance Fund; this agreement must include a copy of this confirmation;

   (B) an advanced waiver of the employer for any right that he could have to have his payments refunded unless the employee's right to severance pay is denied by judgment according to sections 16 or 17 of the Law, or in case the employee withdrew monies from the Pension

        Fund or Insurance Fund not for an Entitling Event; for this matter, Entitling Event or purpose means death, disablement or retirement at the age of 60 or over.

(3)    This confirmation does not derogate from the employee's entitlement to severance pay according to the Law, Collective Agreement, Extension Order or personal employment agreement, for any salary above the Exempt Wages.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00990957
CEL-UCC-01288859