```
------------------------------------------------------------
In re:                                      )   Chapter 11
                                            )
CELSIUS NETWORK LLC, et al.,¹               )   Case No. 22-10964 (MG)
                                            )
                        Debtors.            )   (Jointly Administered)
                                            )
                                            )
------------------------------------------------------------
```

Sean StJohn

Pro Se Creditor

myjunkemailaddressforjunk@gmail.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

### SEAN STJOHN'S REPLY TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS OBJECTION TO MOTION FOR ENTRY OF AN ORDER TO DOLLARIZE <u>NON-INSIDER CEL TOKEN CLAIMS AT THE PETITION DATE PRICE OF $0.81565</u>

Sean StJohn (Pro Se Creditor) submits this reply (the "<u>Reply</u>") to the omnibus objection of the Unsecured Creditors Committee (UCC) to dollarize non-insider CEL token claims at the petition date price of $0.81, and in further support of my *Motion Seeking Entry of an Order to* **(***I***)** *To Dollarize Non-Insider CEL token Claims at Petition Date Price of $0.81565, if otherwise (II) I Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief.*

The Omnibus Objection to my Motion to Dollarize Non-Insider CEL Token Claims at Petition Date Prices should be overruled, and the relief requested in my motion should be granted. Contemporaneously herewith, I am submitting evidence that continues to add merit to my request as follows:

### Preliminary Statement

Your honor, below are the items I wish to submit as my opposition to the CelsiusUCC's defense to value CEL token at 20 cents for purposes of determining depositor claims in the Celsius bankruptcy. I first present my general arguments that I wish to verbalize in the June 28th hearing, and in Section D are my written specific counterarguments to the CelsiusUCC's most recent filed objections to the original motions filed by myself and Santos Caceras.

A) FIGURES USED IN THIS DOCUMENT

I wish to express the profound difficulty in acquiring accurate datapoints both due to general inaccessibility, and also the lack of resources available to me since being nearly bankrupted by the Celsius collapse. Below are some anecdotal datapoints I have garnered from the Internet and various submissions to the court, but cannot fully attest to their accuracy. All figures quoted in USD where $ is used.

1. Alleged CEL balance on platform at time of filing ($229 million, indicated in the CelsiusUCC complaint 22-10964-mg Doc 2840 Filed 06/21/23 on page 3)
2. Purported founders CEL combined balance on platform (99 million CEL, or $80 million at time of petition filing, indicated in the CelsiusUCC complaint 22-10964-mg Doc 2840 Filed 06/21/23 on page 12)
3. Non-founder on-platform CEL balance valued at 81 cents/CEL ($229m - $80m = $149 million)
4. Non-founder on-platform CEL balance valued at 20 cents/CEL ($149m x 20/81 = $36.8 million)
5. Amount CelsiusUCC is claiming is unrecoverable for non-founder CEL holders ($149m - 36.8m = $112.2m)
6. Legal fees to date ($144 million, anecdotal)
7. Production cost of the examiner's report ($20 million, anecdotal)

B) MAIN POINTS

1. The suggested value of CEL token at 20 cents is the attempt to dismiss years of organic market forces.

2. The many-years-long development of the Celsius crypto-rehypothecation technology and the associated community of depositors that are being sold to NewCo for multiple millions of dollars, was largely financed by CEL token sales. How can CEL reasonably be decreed nearly worthless and not salvageable in the recovery plan, at the whim of the CelsiusUCC?

3. I am not pursuing 81 cents CEL token recovery valuation for Celsius founders or insiders, only retail depositors, meaning the actual difference between CelsiusUCC's proposed 20 cents and bankruptcy law's assertion of 81 cents, sums to approximately $112 million, which is notably less than the $144 million in legal fees so far spent by the CelsiusUCC, of which they spent a considerable amount fighting for a 20 cent CEL valuation, such as spending $20 million on a 680+ page examiner's report.

C) PRIMARY ARGUMENTS

1. CelsiusUCC claims Celsius artificially inflated the market price of CEL token with its weekly CEL token purchases.

22-10964-mg    Doc 2867    Filed 06/26/23    Entered 06/26/23 12:57:59    Main Document
Pg 5 of 14

a. Those CEL purchases were the consolidated buy orders for depositors that chose to earn their interest in CEL token, not arbitrarily decided by Celsius, meaning all weekly CEL market purchases were organic.

2. CelsiusUCC claims Celsius was operating as a ponzi, thus exploiting customer deposits to wrongfully purchase CEL.

    a. The examiner's report suspiciously excludes any profit/loss data preceding the black swan events that pushed Celsius into insolvency (e.g. chart on pg 35 in examiner's report), thus Celsius presumably was profitable for the majority of its existence, using profits to purchase CEL tokens on depositors' behalf.

    b. Insolvency does not instantly and retroactively redefine a profitable business model as a Ponzi. Profits were still being generated on Celsius' deployed assets, despite the negative balance sheet that resulted from the recent market-wide black swan events.

3. CelsiusUCC claims CEL token short squeeze artificially inflated the price of CEL token.

    a. There's no evidence anywhere to suggest Alex or others employed by Celsius had promoted or participated in the short squeeze, in fact, Alex told employees not to participate.

    b. If CelsiusUCC claims off-platform unaffiliated manipulation is relevant, then they need to apply the same manipulation scrutiny to all coins hosted by the Celsius platform

4. CelsiusUCC claims CEL token is a security, thus worth nothing and holders should be subjugated.

a. Since Bitcoin's introduction in 2009, all crypto has been considered a commodity by nearly every country in the world.  The American SEC is attempting to redefine some cryptos to be securities for Americans, but until the Ripple case is resolved and the precedent set, the CelsiusUCC cannot unilaterally make that determination, nor expand the scope to non-American Celsius depositors.

b. Alex and Simon Dixon in a video (https://twitter.com/mawworn/status/1671755149197312000) both clearly delineated CEL from being an equity security, so virtually nobody bought CEL with the perception they were buying equity.

c. Even if CEL is considered as a security, there's still no justification for the CelsiusUCC to subjugate CEL token as if it were equity because CEL token does not represent any ownership in Celsius the company whatsoever.

d. As a precedent, the Voyager token VGX was considered a security in its recent bankruptcy case, and still it was awarded petition date market value.

e. CEL token is immutable, fungible, and without limits to potential value-adding applications outside of the Celsius ecosystem, even should the Celsius ecosystem not survive.  Despite the Celsius collapse, the CEL token remains a tradeable asset to this very day, with meaningful value.  These are not the hallmarks of an equity security that reflects part ownership of a company and hence inextricability from a company's success or failure.

f. How can CEL token suddenly be recategorized as an equity security and subsequently bear the negative aspects of bankruptcy, when it never had the

    option of enjoying the benefits granted to an equity security prior to the bankruptcy?

D) RESPONSE TO CELSIUSUCC OBJECTION (22-10964-mg Doc 2840 Filed 06/21/23) TO MY FILING (Sean StJohn's Motion for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; If Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief [Docket No. 2216])

1) In the UCC defense point 1, the statement "Instead, the value of CEL Token was inextricably tied to the perceived success or failure of Debtors." is incorrect. The value of CEL token was clearly tied to its utility and adoption, which conceivably and inevitably could extend beyond the scope of Celsius the company, even surviving the demise of Celsius. Unfortunately, the CelsiusUCC dictated that CEL could not play a role in whatever bankruptcy recovery plan may be instituted, thus unilaterally deciding that CEL was indeed dead, falsely mimicking the prophesied outcome had the value of CEL token truly been tied to the success of Celsius. There's no valid reason the CEL token could not have played a role in any conceivable recovery plan, particularly if the founders' CEL tokens were exempted from recovery.

2) In the UCC defense point 2, the statement "alleged dollarized value of all claims for the return of CEL Token totaled approximately $229 million" incorporates founder holdings. This figure would be dramatically reduced if founders' CEL tokens were not part of this calculation. It should also be noted that this amount would be a fair recovery value since many people paid multiple dollars for CEL tokens.

3) In the UCC defense point 3, the statement "here the Debtors admit that CEL Token is a security and have consistently treated it as such." is a misrepresentation of the truth. The consistent message has been that they treat it like a security, just in case, but they don't consider CEL to be a security, demonstrated in this video with Alex and Simon Dixon clearly dismissing the notion of CEL being a security:

https://twitter.com/mawworn/status/1671755149197312000.

4) In the UCC defense point 4, the statement "there are few rational reasons why a token dependent on the value of a platform that had paused withdrawals for over a month would increase in value" implies that the markets were somehow wrong because of their repeated assertion that CEL is inextricably tied to the success of Celsius. How is it that the CelsiusUCC knows best what the markets should be trading CEL for, and despite optimism by traders, that this effect is dismissed and interpreted rather as manipulation? Don't the markets decide the market price? Wouldn't this outcome also serve as evidence that CEL token value is indeed independent on the value of the Celsius platform?

5) In the UCC defense point 5, the statement "If anything is clear, it is that determining the proper value of CEL Token on the Petition Date will likely be difficult." Correct. Hence bankruptcy law's amelioration of this ubiquitous bankruptcy characteristic contention by simply assigning the market value at the time of petition filing. Is it necessary to set a new precedent here? Why continue to waste legal resources debating on a matter that was solved by bankruptcy law long ago?

6) In the UCC defense point 6, the statement "The proposed settlement would provide CEL Token holders a reasonable recovery, but not the $0.81 advocated in the Motions." I find nothing reasonable about anything less than 81 cents. The CelsiusUCC haven't even

presented criteria by which they calculated 20 cents to be reasonable, and this figure appears to be simply random if not needlessly punitive to innocent retail CEL holders.

7) In the UCC defense point 7, suffice it to say that the CelsiusUCC has been solely responsible for any and all time wasted and legal expenses incurred as a consequence of forcing myself and others to aggressively pursue the full value of CEL token that I believe CEL holders are legally entitled to, making their statement "Time is of the essence" quite ironic.

8) In the UCC defense point 8, the statement "Here, CEL Token holders chose to invest in a token whose value was tied to the continued operation of Celsius." This is another attempt to portray CEL purchasers as uneducated in the distinction between crypto and equities. Celsius' customers were aware that CEL tokens confer no rights or ownership to Celsius the company, further distinguished by Celsius' multiple widely-advertised rounds of Celsius' legitimate equity sales that had nothing to do with the CEL token. Furthermore, CEL holders know full well that other entities might employ and drive value into the CEL token, so the idea that CEL's value was solely dependent on Celsius fails to acknowledge the potential CEL had in the broader crypto ecosystem.

9) In the UCC defense point 12, the statement "Rewards in CEL Token were paid out at a higher rate than if the customers elected to receive rewards in kind, reflecting the increased risk associated with owning CEL Token as opposed to Bitcoin or other cryptocurrency." Higher rewards for earning in CEL were simply a marketing strategy, not related to risk whatsoever. There's no evidence I can find to support the narrative that risk compensation was the motivation behind higher CEL yields.

10) In the UCC defense point 13, the statement "Instead, the value of CEL Token was tied to the perceived value of Celsius, its continuing success, and its management's ability to convince more users to transfer cryptocurrency to the platform." Like any commodity that is in demand, there's no reason CEL token market price should not be able to exhibit benefits from the success of Celsius' utilization of CEL token, without CEL necessarily and suddenly becoming equity, no more than a company's gold assets could confer equity rights to gold holders.

11) In the UCC defense point 16, the statement "At all times, Celsius described that CEL Token's value was based on its ability to attract more users to its platform." Alex did not make this claim. Using the CelsiusUCC's own reference (#19), the actual claim made by Alex was "When we feel that the wheels are spinning fast enough to the point where organic demand for the token represents <u>one of</u> the biggest demand generators out there…", meaning Celsius will be but "one of" the driving forces behind the market price of CEL, which makes it obvious that other non-Celsius drivers of CEL market price can exist.

12) In the UCC defense point 17, the statement "strategically timing and sizing its purchases and using resting buy orders to "support" the market price of the CEL Token", is a mischaracterization of the regular CEL purchases made every week by Celsius. A buy-wall is a typical purchasing strategy that minimizes slippage losses, and cannot be construed as a form of market manipulation, otherwise virtually every large limit order of any coin/token/stock in history would be considered market manipulation. I don't believe it's illegal or even unethical to optimize the timing and nature of CEL purchases made on behalf of depositors choosing to earn in CEL. How else could those required

purchases be made responsibly? Moreover, this buying strategy actually minimized the price appreciation of CEL instead of artificially pushing it much higher, so I don't understand how this helps the UCC's argument that CEL is overvalued.

13) In the UCC defense point 20, the statement "Those insiders regularly profited on the rising price of CEL Token, selling millions of dollars worth of CEL Token through Celsius's OTC desk and on third party exchanges." Agreed, but this does nothing to prove market manipulation. The founders legally sold into the organically priced markets for CEL. The petition date price of CEL could have been much higher if they didn't, so again, I'm confused how the CelsiusUCC's point is relevant to claiming 81 cents for CEL token is overvalued.

E) CONCLUSION

Points from the CelsiusUCC defense that I have specifically rebutted above, or not rebutted, all fall under at least one of the following descriptions:

- hearsay, irrelevant or redundant,
- do not justify punishing CEL holders,
- repeat attempts to tie CEL value solely to Celsius' success,
- demonstrates the CelsiusUCC's lack of comprehension of the Celsius business model and common legal trading practices,
- are different spins on the argument that CEL token was an equity security and thus supposedly warrants subjugation

- are extended arguments that rely on the presumption that CEL is an equity security.  I volunteer that all their security arguments can be defeated by my non-security arguments in Section C-4 above.

None of the CelsiusUCC's arguments logically support reducing retail CEL holders' claims to 20 cents.  Over 56% of Celsius creditors hold CEL tokens on the platform.  (Exhibit A below)



For no justifiable reason, these depositors are being singled out and punished, despite also being victims of the same industry-wide collapse of the rehypothecation industry.  Therefore, without any evidence to support the conspiracy theory that Alex or others at Celsius somehow manipulated the price of CEL token, nor a reasonable grounds to consider the CEL token as

equity, I believe the 10s of thousands of CEL token holders are entitled to be treated equally by the same bankruptcy laws and metrics all other depositors and tokens are benefitting from. Your honor, I only ask for fair and equitable treatment for CEL holders.

For the foregoing reasons, as well as the reasons set forth in my motion to dollarize CEL Token Claims at Petition Date Price of $0.81, I request that the court (a) overrule the Objections of the UCC to my motion and (b) grant my motion to apply bankruptcy law in the treatment of Non-Insiders CEL Token Claims.

[*Remainder of the page intentionally left blank*]

Ottawa, Ontario.                                           */s/ Sean StJohn*

                                                           Pro Se Creditor

Dated: June 24, 2023.

_____