June 26, 2023
Re: White & Case Objection – Docket #2840
The Honorable Martin Glenn
Chief Judge
United States Bankruptcy Court
Southern District of New York

Dear Judge Glenn,

1. I am writing to express my concerns regarding the objection filed by the legal counsel representing the Celsius UCC in response to a Pro Se motion (docket #2240) submitted by Mr. Caceres, a creditor of Celsius. It is my understanding that Mr. Caceres is advocating for fair and equal treatment of the CEL token, specifically requesting that it receives the same pricing treatment as all other coins/tokens held by the creditors.

2. I strongly oppose the action taken by the Celsius UCC, through their legal counsel, to subordinate the CEL token claims, and I have the following reasons to support my stance:

    a. Aaron Colodny of White & Case has incorrectly combined criteria 3 and 4 of the Howey test in his objection, docket #2840, thereby misrepresenting the legal criteria applied.

    b. White & Case has not provided any supporting evidence in their objection to demonstrate that the Howey test has

been satisfied. Furthermore, the opinions expressed by White & Case cannot be considered equivalent to the positions of regulators who have not yet issued formal rulings.

c. Based on the screenshot from the Debtors' own website provided below(Exhibit A), it is evident that 56% of Celsius Creditors currently hold CEL tokens. Subordinating these tokens would have an adverse impact on the majority of creditors.

d. The Debtor has never officially or formally stated that the CEL token is a security.

e. The Debtor does describe CEL token like this on its website "Meet CEL. Think of it as a rewards program, with actual financial rewards like even higher earning rates and ridiculously low rates on loans." (Exhibit B) Its function is as a utility token as shown in Exhibit C.

f. The Examiner's Report does not assert that the CEL token was treated as a security.

g. Simon Dixon, a top 10 Celsius Creditor, explicitly states that the CEL token is not a security, he is also the CEO of 'BNK To The Future' a company that sold Celsius shares. Here he is explaining how

the CEL token is both not a security nor equity to all his investors.

https://youtu.be/k3PYLdlfFVo

h. Celsius Creditors currently hold numerous other tokens, and the Celsius UCC is not seeking to subordinate claims related to those tokens.

i. Despite the Securities and Exchange Commission (SEC) asserting that the VGX token is a security in their lawsuits against Binance and Coinbase, creditors holding VGX tokens from Voyager are not facing subordination.

j. Following the SEC's recent lawsuits against Binance and Coinbase, there are now only a total of 68 named tokens that the SEC officially considers securities, and the CEL token is not among them.

k. Even if regulators were to determine that the CEL token is a security, there is still no legal justification to subordinate creditors' claims. I argue that if the CEL token were to be subordinated, the same treatment should be applied to all coins, with the exception of Bitcoin, which regulators have explicitly stated is not a security.

3. Further to these points I would like to add how I personally used the CEL token as a user of the Celsius Platform and my conclusions;

4. Initial Relationship with Celsius Network: Upon establishing my association with Celsius Network, I deposited Bitcoin and Ethereum. I opted to receive my earnings in Celsius tokens to elevate my membership to the Platinum level, thereby accessing the utility benefits of the token, including enhanced interest rates.

5. No Requirement to Purchase Celsius Tokens: There was no obligation to purchase Celsius tokens to utilize its benefits. As the token's value exceeded $7, I adjusted my earnings to be received in kind, which was more profitable than receiving in Celsius tokens. As the token's value decreased, I switched back to receiving earnings in Celsius tokens.

6. Primary Value of Celsius Token: The primary value of the Celsius token was its associated benefits, not its market price. Upon reaching the Platinum level, I could leverage my Bitcoin and Ethereum holdings more effectively. The market price of the Celsius token was irrelevant to me. Once I secured the Platinum level permanently, I adjusted my earnings to be received in kind for my Bitcoin and Ethereum holdings, with the pause taking effect a few days later, on the

7. Profitability of Receiving Earnings in Kind: The profitability of receiving earnings in kind over Celsius tokens was due to the inverse relationship

between the token's price and the quantity earned. As the token's price increased, fewer tokens were earned, thereby extending the time required to reach the Platinum level. The objective was not to purchase Celsius tokens with fresh capital, but to leverage my existing holdings. Given my recent retirement and the consequent scarcity of new funds, the innovative model of Celsius Network enabled me to utilize the token at no additional cost, regardless of its value.

8. UCC's Role and SEC's Potential Decision: The UCC's role is not to act as a regulator or preempt the SEC's decision on the CEL token's status. Their proposed subordination lacks sufficient evidence and may be premature given the SEC's pending decision.

9. Equitable Subordination Principles: Equitable subordination should only occur to offset harm caused by inequitable conduct. Allegations alone are insufficient for subordination. Clear evidence of fraud, inequitable conduct, or other recognized grounds under bankruptcy law is required.

10.     Uncertainty of CEL Token's Security Status: The SEC's decision on whether the CEL token is a security remains speculative. Subordinating CEL token holders based on this uncertainty may be premature and inconsistent with bankruptcy principles.

11.     **Impact of Subordination on CEL Token Holders:** Subordinating 56% of creditors who hold CEL tokens by $0.61 per token could unfairly discriminate against them and may amount to impermissible, inequitable treatment. This subordination could significantly impact the fair distribution of assets to creditors under bankruptcy law.

12.     **CEL Token's Global Availability and Residual Value:** Even if the SEC classifies the CEL token as a security, it may still retain residual value due to its global availability and continued trading outside the U.S. The proposed subordination of $0.61 per token could potentially overstate the impacts of any SEC decision, given the token's international market presence.

13.     **UCC's Proposal and Bankruptcy Law:** The UCC's proposal appears more designed to shield other creditors from risks associated with the CEL token than to further the purposes of bankruptcy laws around fair and equitable distribution of assets.

14.     **Need for Clear Evidence:** With a vast majority of creditors potentially affected, there is a greater need for clear evidence of grounds warranting subordination under the Code. Allegations alone would likely not justify such a disproportionate impact.

15.     **Conclusion:** Absent firmer evidence of grounds warranting subordination under bankruptcy law, the proposal to subordinate CEL

token holders by $0.61 per token seems premature, overly harsh, and likely inconsistent with the Code's provisions. The UCC has not provided adequate compensation to the creditors affected by their decision, underscoring the need for a more balanced and evidence-based approach in addressing the concerns of all stakeholders.

Sincerely,



Michael Gonzalez
Celsius Creditor: #171633e7c3

[Rest of page intentionally left blank]

**Exhibit A**



**Exhibit B**



**Exhibit C**

| Reward Status | CEL Ratio | or CEL Balance | Bonus Rewards | Loan Interest Discount |
|---|---|---|---|---|
| NONE | 0%-5% | 0 CEL | 0% | 5% |
| BRONZE | 5%-10% | 1 CEL | 10% | 5% |
| SILVER | 10%-15% | 1,000 CEL | 15% | 10% |
| GOLD | 15%-25% | 10,000 CEL | 20% | 15% |
| PLATINUM | 25%-100% | 25,000 CEL | 30% | 25% |