| | |
|---|---|
| Joshua A. Sussberg, P.C. | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Christopher S. Koenig |
| 601 Lexington Avenue | Dan Latona (admitted *pro hac vice*) |
| New York, New York 10022 | **KIRKLAND & ELLIS LLP** |
| Telephone:    (212) 446-4800 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Facsimile:    (212) 446-4900 | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:    (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**REPLY IN SUPPORT OF**
**DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING CERTAIN FEES AND EXPENSES**
**FOR THE BACKUP PLAN SPONSOR, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this reply ("Reply") in support of the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2774] (the "Motion")[2] and in response to the *Objection of the United States*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Backup Plan Sponsor Agreement, or the Schreiber Definition (as defined herein), as applicable.

*Trustee to Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor and (II) Granting Related Relief* [Docket No. 2847] (the "Objection") filed by the United States Trustee for Region 2 (the "U.S. Trustee").[3] In support of the Motion and this Reply, the Debtors state the following.

**Preliminary Statement**

1. The Debtors have always remained cognizant of the risks inherent to pursuing any NewCo Bid. Having closely monitored the issues facing the cryptocurrency market and watching the *Voyager* plan process unfold, the Debtors and the Committee entered the Auction determined to secure a Backup Bid that would de-risk the pursuit of a NewCo Transaction. While the Backup Transactions contemplate more than a mere wind down (*e.g.*, they include a reorganization of the Debtors' mining business), the Debtors and the Committee believe the Backup Plan Sponsor Agreement allows the Debtors to maintain an appropriate degree of optionality as the Debtors work toward establishing NewCo so that the Debtors can quickly pivot to the Backup Transactions if needed. Securing the Backup Plan Sponsor avoids the delay (and associated cost) that would otherwise occur if the Debtors have to "go back to the drawing board" if the NewCo Transaction cannot be completed for any reason. Not only has the BRIC agreed to serve as the Backup Plan Sponsor, but the BRIC has also agreed to support the NewCo Transactions through the Consultation Services requested by the Debtors and the Committee.

2. As set forth in the Motion, the Backup Plan Sponsor Agreement establishes a floor for an Orderly Wind Down. The Backup Plan Sponsor Agreement includes a broad fiduciary out

---

[3] The United States Securities and Exchange Commission (the "SEC") also filed the *Statement Regarding Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2831] (the "SEC Statement"). The SEC Statements states that the SEC is not objecting to the Motion but, "in not objecting, the SEC is not opining as to the legality, under the federal securities laws, of the transactions outlined in the Motion, and reserves its rights to challenge transactions involving crypto assets." SEC Statement, at 1.

2

provision whereby the Debtors can consider alternative transactions. And, as more fully explained in the Schreiber Declaration,[4] the Backup Plan Sponsor Agreement has worked as intended: following the execution of the Backup Plan Sponsor Agreement and filing the Motion, a third party submitted a competing proposal for the Backup Transactions to the Debtors. *See* Schreiber Declaration ¶ 17.

3. Following the Debtors' receipt of the competing offer, the Debtors asked the BRIC to materially improve the terms of the Fees and Backup Plan Sponsor Agreement. The BRIC responded to the request with meaningful improvements to the terms of the Backup Plan Sponsor Agreement. *See id.* ¶ 17.

4. Specifically, the BRIC and the BRIC Exchange Partner have agreed to (a) reduce the Consultation Services Fee to $450,000 per month with the Consultation Services Fee payable retroactive to June 1, 2023 and (b) reduce the Expense Reimbursement Monthly Cap to $300,000 per month (to be measured over any rolling three-month period). *See id.* ¶ 21. In addition, the BRIC has indicated that the Expense Reimbursement for the BRIC and the BRIC Exchange Partner for amounts incurred through the date of this filing will not exceed $1.25 million. *See id.* ¶ 21.

5. The BRIC and the BRIC Exchange Partner also agreed to reduce certain fees payable after the Backup Plan Effective Date to the Backup Plan Administrator, which are payable only to the extent the Debtors pivot to the Backup Transactions and the Backup Transactions are consummated. The revised terms include (a) a reduction of the Distribution Fee for the initial distribution from $15 million to $12 million and (b) a reduction of the Backup Plan Sponsor

---

[4] "Schreiber Declaration" means the *Declaration of Samuel Schreiber, Senior Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief*, filed contemporaneously herewith.

3

Administration Fee from $50 million to $46 million. The Backup Plan Administration Fee was previously structured to be paid in equal annual installments over the five-year term. The Backup Plan Administration Fee will now have $10 million payments in years one through three and $8 million payments in years four and five.

6. As discussed in the Motion and the Backup Plan Sponsor Agreement, the BRIC agreed to serve as the Backup Plan Sponsor based upon the Debtors' assurance that appropriate preparations would be made prior to the Debtors exercising the Toggle Option and pivoting to the Backup Transactions. The required preparations included the BRIC commencing the Consultation Services at the request of the Debtors and the Committee, which include:

- preparing and sharing analyses and consulting on exchange strategies with respect to the numerous non-BTC and non-ETH cryptocurrency tokens and assets held by the Debtors in connection with the Debtors converting their altcoin holdings to BTC and ETH;

- developing strategies to maximize the value of the Debtors' illiquid assets;

- consulting with the Debtors on distribution mechanics and preparations; and

- consulting with the Debtors on the path to establish a standalone publicly traded mining company (the Backup Mining Transaction).

These Consultation Services benefit the Debtors' estates because such services preserve the Debtors' ability to quickly pivot to the Orderly Wind Down and maximize the value of the Debtors' assets under both the NewCo Plan and Backup Plan.[5] *See id.* ¶ 25. Through the Consultation Services, the BRIC is incurring and will continue to incur expenses in connection with their work as Backup Plan Sponsor. *See id.* ¶ 25. The Consultation Services will conserve significant time and resources of the Debtors and support the NewCo Transaction as well as the Backup Plan.

---

[5] "Orderly Wind Down" shall have the meaning ascribed to it in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "Amended Plan")

4

*See id.* ¶ 23. The Consultation Services also ensure that the BRIC is ready to step in as the plan sponsor if the Debtors have to pivot to the Backup Transactions, avoiding further delay and additional cost to the Debtors' estates.

7. The Objection, however, seeks to characterize the Debtors' payment of the Fees as a payment to an unsuccessful bidder that, if granted, will open the floodgates for other unsuccessful bidders to seek the payment of fees and expenses. *See* Objection at 2. This is factually inaccurate. Not only are the facts and circumstances of these chapter 11 cases unique and complex, the Fees requested in the Motion and consideration provided to the Backup Plan Sponsor (a) ensure the Debtors can quickly and seamlessly pivot to the Orderly Wind Down if in the best interest of the Debtors' estates and (b) support the Debtors' pursuit of the NewCo Transactions through the Consultation Services. With the BRIC's significant concessions in hand and with the full support of the Committee, the Debtors believe that it is an appropriate exercise of their business judgment to enter into the Backup Plan Sponsor Agreement (as modified) and lock in a viable path forward in case the NewCo Plan cannot be completed for any reason.

## Reply

**I.    The Payment of the Fees are a Sound Exercise of the Debtors' Business Judgement.**

8. The Objection cites case law from outside the Second Circuit for the proposition that the Fees are not justified. The Objection primarily relies on *Calpine Corp. v. O'Brien Env't Energy, Inc.*, where the Court of Appeals for the Third Circuit denied break-up fees to an unsuccessful bidder. *Calpine Corp. v. O'Brien Env't Energy, Inc., (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999). The Objection states that the facts at issue in *O'Brien* are "virtually identical" to the Motion and attempts to demonstrate why fees to the BRIC, as an unsuccessful bidder, are inappropriate. The Objection seemingly misunderstands the function of the Backup Transactions and Fees proposed to be paid under the Backup Plan Sponsor Agreement.

5

*See In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *9 (S.D.N.Y. 2003) ("*O'Brien* deals with the case of an unsuccessful bidder seeking payment of a fee from the estate after the bidding has concluded. *O'Brien* does not address whether, under § 363(b), a bankruptcy court can authorize a debtor in possession to enter into a reimbursement agreement with a potential buyer.").

9.  As an initial matter, the Backup Transactions are fundamentally different from the NewCo Transaction, in the event the Debtors elect to pivot to an Orderly Wind Down, the BRIC will seek to distribute all of the Debtors' Liquid Cryptocurrency (unlike NewCo, where approximately $450 million of Liquid Cryptocurrency will be retained to capitalize NewCo) and monetize the Debtors' illiquid assets (which would otherwise be transferred to NewCo). Furthermore, the Backup Transactions contemplate a publicly traded, pure-play, standalone mining business, a significant undertaking in and of itself. To be clear, the Fees are not compensation for the BRIC's participation in the Auction. The Fees are the necessary consideration to secure the BRIC's commitment to serve as the Backup Plan Sponsor, allow the Backup Transactions to be shopped, and to provide the Consultation Services to ensure that a quick pivot to the Orderly Wind Down can be achieved (if necessary)—an agreement that the Debtors, in consultation with the Committee, determined was in the best interests of the Debtors' estates. Importantly, the BRIC refused to enter into the Backup Plan Sponsor Agreement absent the Debtors agreeing to pay the Fees.

10. Additionally, the Objection provides no rationale as to why deference should not be given to the Debtors' business judgment. The business judgement rule shields a debtor's decisions from second guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (noting a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to a debtor's conduct after a

reasonable basis is set forth); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," and has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

11. Furthermore, while the Objection questions the quantum of the Fees, the Objection fails to show why the Fees are not the reasonable price of securing the BRIC as the Backup Plan Sponsor. *See* Objection at 15. The Objection implies that the BRIC would serve as the Backup Bidder absent the Fees (or the Backup Plan Sponsor Agreement) because the BRIC participated in the Auction. *See* Objection at 13. Absent the security of a committed backup plan sponsor, in the event the Debtors determine to pivot to an orderly wind down, they would likely be forced to pay a significant premium in the final hour, which would undoubtedly be detrimental to the Debtors and their estates. The Backup Plan Sponsor Agreement provides the Debtors with the requisite protection (and appropriate preparations) as they pursue the NewCo Transaction and progress toward emergence. The BRIC has agreed to serve as the Backup Bidder until December 31, 2023—a significant commitment given the shifting cryptocurrency market and regulatory landscape.

12. The Debtors, in consultation with the Committee, executed the Backup Plan Sponsor Agreement after hard-fought, arm's length negotiations with the BRIC. In light of the market volatility and regulatory uncertainty surrounding the cryptocurrency industry, preserving optionality is paramount. One only need to look at the recent events in *Voyager* to recognize the importance of having a "plan B." In *Voyager*, the debtors' asset purchase agreement with Binance

7

was terminated after the United States Department of Justice and the U.S. Trustee appealed confirmation. *See In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.) [Docket No. 1345]. Through the debtors' toggle option in the plan, the debtors were able to effectively toggle to an orderly wind down and preserve significant value for their creditors. *See id.* [Docket No. 1374] (projected recoveries under the Voyager debtors' liquidation procedures).

13. Accordingly, paying the Fees is a sound exercise of the Debtors' reasonable business judgment and should therefore be approved.

## II. The Consultation Services Fee Requested by the Debtors will Provide Significant Value to the Debtors Estates.

14. The Objection also takes issue with the Consultation Services Fee by arguing that it has no definitive start and end date, the Consultation Services are not outlined in an engagement letter, and the Consultation Services Fee is too high in light of the Debtors retention of their other restructuring advisors. Objection at 15. As described above, the Debtors seek authorization to pay the Consultation Services Fee beginning June 1, 2023, through the termination of the Backup Plan Sponsor Agreement, which has an outside date of December 31, 2023. The Consultation Services allow the Debtors to progress both the NewCo Transaction and Backup Transactions concurrently, providing the Debtors significant value by enabling the BRIC to step in (if necessary) without delay—but the BRIC is entitled to reasonable compensation for providing these services for many months as the Backup Plan Sponsor. Importantly, the Backup Plan Sponsor Agreement authorizes the Debtors to terminate the Consultation Services and cease paying the Consultation Services Fee upon written notice. Thus, the Debtors can terminate the Consultation Services to the extent those services no longer serve the Debtors' estates.

15. The Backup Plan Sponsor Agreement, the Motion, this Reply, and the Schreiber Declaration all describe the services the BRIC, in close consultation and coordination with the Debtors' advisors, will provide at the request of the Debtors and the Committee. As described, the Debtors have already requested certain consulting services from the BRIC—none of which are duplicative of the responsibilities of the Debtors' or the Committees' advisors, nor areas where these advisors have meaningful expertise. Moreover, the Consultation Services are a core component of the Backup Transactions and include services that will (a) assist the Debtors' pursuit of the NewCo Transaction and (b) allow the Debtors to maintain optionality to maximize the value of the Debtors' assets. The Debtors and the Committee believe the reduced Consultation Services Fee of $450,000 per month along with the Commitment Fee and Expense Reimbursement are reasonable in light of the scope of the services to be provided.

### III. The Debtors' Proposed Settlement with the Series B Preferred Equity Holders Renders the U.S. Trustee's Objection Moot.

16. The Objection argues that authorizing the Fees is inappropriate because the ongoing litigation with the Series B Preferred Equity Holders may upend the BRIC Transaction due to their lack of input in the future of the Debtors' mining business.[6] After the U.S. Trustee filed the Objection, the Debtors and the Committee filed a motion to approve a settlement with the Series B Preferred Equity Holders [Docket No. 2899] (the "Series B Settlement"). Pursuant to the Series B Settlement, the Series B Preferred Equity Holders have agreed to settle their claims and relinquish their request for a preferred equity committee. Thus, notwithstanding the lack of merit to this argument, the Series B Settlement has rendered this basis for the Objection moot.

---

[6] On May 17, 2023, certain holders of the preferred equity shares issued by Celsius Network Limited (the "Series B Preferred Equity Holders") sent a letter to the U.S. Trustee to renew their request for the appointment of an equity committee.

9

## **Conclusion**

17. Accordingly, for the reasons set forth herein, in the Motion and in the Schreiber Declaration, the Debtors request that the Court approve the payment of the Fees and overrule the Objection.

*[Remainder of page intentionally left blank]*

| | |
|---|---|
| New York, New York<br>Dated: June 27, 2023 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:   (212) 446-4800<br>Facsimile:    (212) 446-4900<br>Email:           joshua.sussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:   (312) 862-2000<br>Facsimile:    (312) 862-2200<br>Email:           patrick.nash@kirkland.com<br>                      ross.kwasteniet@kirkland.com<br>                      chris.koenig@kirkland.com<br>                      dan.latona@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |