Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF SAMUEL SCHREIBER, SENIOR**
**DIRECTOR OF ALVAREZ & MARSAL NORTH AMERICA, LLC, IN**
**SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING CERTAIN FEES AND EXPENSES**
**FOR THE BACKUP PLAN SPONSOR, AND (II) GRANTING RELATED RELIEF**

I, Samuel Schreiber, hereby declare under penalty of perjury that the following is true and

correct to the best of my knowledge, information, and belief:

1.      I am a Senior Director with Alvarez & Marsal North America, LLC (together with

its wholly-owned subsidiaries and independent contractors and also with employees of its

professional service provider affiliates, all of which are wholly-owned by its parent company and

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8
USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors'
service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the country. Celsius Network LLC ("LLC") along with certain of its subsidiaries and affiliates, are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"). A&M has been retained as the Debtors' financial advisor during these chapter 11 cases [Docket No. 842].

2. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have been informed of such matters by professionals of A&M. I am also familiar with the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2774] (the "Motion")[2] and the *Debtors' Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses of the Backup Plan Sponsor, and (II) Granting Related Relief* (the "Reply"), filed contemporaneously herewith.

3. I submit this declaration (this "Declaration") in support of the Motion and the Reply and to inform the Court and other parties in interest as to the factual background surrounding the Backup Bid and the Backup Plan Sponsor Agreement. Unless otherwise indicated, the statements set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the A&M team working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by

---

2   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion, the Backup Plan Sponsor Agreement, or Backup Plan Administration Agreement, as applicable.

A&M as a professional retained by the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

**Qualifications**

4.    Since 1983, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas.  A&M's debtor advisory services have encompassed a wide range of activities targeted at stabilizing and improving a company's financial position, including developing and validating forecasts and business plans; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

5.    I have worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information.  I am a senior member of the A&M team advising the Debtors.

6.    I have over 10 years of distressed company advisory experience.  As a restructuring advisor, I have substantial experience helping financially-distressed companies stabilize their financial condition, analyze their operations, and develop business plans to accomplish the necessary restructuring of their operations and finances.  I have advised clients in numerous major bankruptcy cases, including *In re Talen Energy Supply, LLC*, No. 22-90054 (MI); *In re Mallinckrodt plc*, No. 20-12522 (JTD); *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC); and *In re Energy Future Holdings Corp.*, No. 14-10979 (CS).  Prior to serving as a restructuring advisor, I advised clients on energy and power issues, including power plant valuations, market forecasts, and performance improvements.  I

received my bachelor's degree in engineering physics from Cornell University and my master's

degree in nuclear engineering from the University of Texas at Austin.

**The Marketing and Sale Process**

7.        Throughout the Debtors' chapter 11 cases, the Debtors' primary goal has been to

maximize the value of the Debtors' liquid and illiquid assets and return that value to creditors and

stakeholders.  To that end, the Debtors, in consultation with the Committee, ran an auction from

April 25, 2023 through May 25, 2023, which included three Qualified Bidders: NovaWulf Digital

Management, L.P. ("NovaWulf"), Fahrenheit, LLC ("Fahrenheit"), and the Blockchain Recovery

Investment Consortium (the "BRIC").

8.        Unlike Fahrenheit's and NovaWulf's "NewCo" proposals (the Fahrenheit Bid and

the NovaWulf Bid, each, a "NewCo Bid"), the BRIC Bid contemplated (a) a distribution of the

Debtors' liquid cryptocurrency, (b) monetization of the Debtors' illiquid assets, (c) the

establishment of a standalone, pure play, publicly traded mining company, and (d) an orderly wind

down of the chapter 11 estates ((a) through (d) collectively, the "BRIC Plan" or "Backup Plan").

The Debtors ultimately determined, in consultation with the Committee, to pursue a NewCo Bid

rather than selecting the BRIC Plan as the highest or best bid because of the potential upside

associated with the NewCo's cryptocurrency staking business and other potential business lines

outside of Bitcoin mining.

9.        In light of the fact that the Debtors, in consultation with the Committee, determined

that a NewCo Bid was higher and better than the Wind Down Bid, the Debtors, the Committee,

and the BRIC began discussions surrounding the BRIC's willingness to serve as a Backup Bidder.

On May 3, 2023, the Debtors announced that, subject to final documentation and Court approval, the Debtors and the Committee accepted the BRIC's proposal to serve as a Backup Bidder.[3]

10.    On May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713] (the "Notice of Successful Bidder and Backup Bidder"), pursuant to which the Debtors announced Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.  On June 7, 2023, the Debtors, the Committee, the BRIC, and the BRIC Exchange Partner, executed the Backup Plan Sponsor Agreement.  After thoroughly evaluating the BRIC's proposal, its team, and capabilities, the Debtors and the Committee concluded that entering into the Backup Plan Sponsor Agreement with the BRIC is in the best interests of the Debtors' estates and all stakeholders.

**The Selection of BRIC as Successful Backup Bidder**

11.    The Debtors, in consultation with the Committee, weighed a number of factors in entering the Backup Plan Sponsor Agreement.  Importantly, the Backup Plan contemplates a different structure than Fahrenheit's Successful Bid.  The Debtors and the Committee firmly believe that Fahrenheit's Successful Bid is the value maximizing path forward and are spending considerable time and effort to minimize the execution risk of the NewCo Transaction.  But the Debtors and the Committee are acutely aware that certain risks inherent to the NewCo Transaction cannot be effectively mitigated.  The Debtors' industry faces an evolving regulatory environment and daily market volatility.  It is for this exact reason that the Debtors' initial chapter 11 plan of reorganization filed with NovaWulf's Stalking Horse Bid contemplated an Orderly Wind Down[4]

---

[3]    See May 3, 2023 Auction Tr. 15:10–17:24.

[4]    As defined in the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates [Docket No. 2358].

in the event the Debtors determine that, consistent with their fiduciary duties, an Orderly Wind

Down is in the best interest of the Debtors' estates due to complications or delays in implementing

the NewCo Transaction.  In the face of regulatory uncertainty and market volatility, the Debtors

continue to believe that the best path forward requires maintaining a degree of optionality to pivot

to the Backup Plan if circumstances warrant.

12.     To that end, the Debtors believe that the BRIC Plan will derisk their pursuit of a

value maximizing NewCo Transaction by providing the Debtors a degree of optionality to pivot

to a Wind Down Bid if the circumstances warrant.  Although the Backup Plan Sponsor Agreement

contemplates more than a mere orderly wind down of the Debtors' estates (*i.e.*, the standalone,

pure play, publicly traded mining company), the Debtors, the Committee, and each of their

respective advisors believe the risk profile of the Backup Transactions are markedly different and

reduce the execution risk of pursuing the NewCo Transactions.  Moreover, notwithstanding the

Backup Plan Sponsor's service as the Backup Bidder, the Backup Plan Sponsor has agreed to

support the Debtors' efforts in establishing NewCo with the Successful Bidder through the

Consultation Services.  Notably, the BRIC's proposal provides value to the Debtors' estates that

other wind proposals may not be able to provide given the BRIC's ability to manage both an

Orderly Wind Down and a publicly traded mining company.

13.     The BRIC was not the "loser" of the Auction to whom the Debtors now seek to pay

for their loss.  Instead, the Debtors and the Committee selected the BRIC based on their merits to

support these cases to a value maximizing resolution in parallel with, and in support of, the NewCo

Transactions.

14.     Importantly, the Backup Plan Sponsor Agreement includes a broad "fiduciary out"

provision.  Although the Debtors and the Committee have entered into the Backup Plan Sponsor

Agreement and believe that the BRIC Transactions represent the best option presently available if the Debtors determine not to proceed with the NewCo Transaction, the Debtors and the Committee continue to have the ability to engage with other bidders and potential bidders with respect to alternative proposals.

15.    Throughout the Auction and over the course of the last several weeks, the Debtors, the Committee, and the BRIC have engaged in negotiations regarding the terms of the proposed Backup Plan Sponsor Agreement.  The BRIC expended time, efforts, and financial resources participating in the Auction, conducting due diligence of the Debtors' business, structuring the Backup Transactions, and negotiating the Backup Plan Sponsor Agreement.

16.    Based on my involvement in the restructuring of the Debtors' business, including the marketing and sale process, and in the negotiations conducted by the Debtors, the Committee, the BRIC, and each of their respective advisors, I believe that the Backup Plan Sponsor Agreement and the Backup Transactions provide a level of optionality to the Debtors and the Committee, which are warranted under the circumstances, and can be a continued source of leverage for the Debtors to solicit potentially higher and better Wind Down Proposals.

17.    The Debtors have already realized significant value by securing the BRIC as the Backup Plan Sponsor.  Following the execution of the Backup Plan Sponsor Agreement and after the Debtors filed the Motion, a third party submitted a competing proposal for the Backup Transactions to the Debtors  With the competing proposal in hand, the Debtors requested the BRIC to improve the terms of the Backup Plan Sponsor Agreement.  The BRIC responded to the Debtors' request with meaningful improvements to the Fees included in the Backup Plan Sponsor Agreement, as well as improvements to certain other fees that would be due to the Backup Plan Administrator in the event the Debtors elect to pursue the Backup Transactions. These improved

terms will serve as a floor as the Debtors consider and solicit alternative backup bids to ensure the

Debtors secure the value maximizing backup transaction.

18.     Even if no further savings are realized and no "higher and better" Orderly Wind

Down proposal is generated, the risk mitigation and time savings the BRIC are providing and

intend to continue to provide the Debtors is important to the successful resolution of these cases.

Indeed, I believe that in the event the Debtors elect to pursue an Orderly Wind Down, the absence

of the BRIC or an alternative backup plan sponsor may result in further delay to these cases and

the corresponding costs of those delays to the Debtors' estates and creditor recoveries.

**The Fees**

19.     As consideration for the BRIC serving as the Backup Plan Sponsor, the substantial

time, effort, and resources the BRIC has expended and will continue to expend, and in exchange

for certain consultation services, the Debtors, in consultation with the Committee, agreed to

provide the BRIC certain Fees (as described herein).  As further detailed below, the Fees consist

of (a) a $1.5 million commitment fee (the "Commitment Fee"), (b) the reimbursement of all

reasonable and documented fees and expenses incurred by the Backup Plan Sponsor, the BRIC

Exchange Partner, and certain affiliated parties in connection with the Auction and Backup

Transactions (the "Expense Reimbursement"), and (c) a $500,000 monthly fee for consultation

services (the "Consultation Services Fee") (each, as more fully described in the Motion and

Backup Plan Sponsor Agreement and collectively, the "Fees").  Specifically, the Backup Plan

Sponsor Agreement provides the Plan Sponsor with the following Fees (which the BRIC have

subsequently reduced, as is described in more detail below):

- **Expense Reimbursement**:  Pursuant to the Backup Plan Sponsor
  Agreement Order, the Debtors shall promptly pay or reimburse, as and when
  required under the Backup Plan Sponsor Agreement or the Toggle Option
  within the NewCo Plan, all reasonable and documented out-of-pocket fees

(including success fees, transaction fees, or similar fees) and expenses incurred through the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order of:  (i) the Backup Plan Sponsor; (ii) Willkie Farr & Gallagher LLP, as counsel to the Backup Plan Sponsor ("**Backup Plan Sponsor Counsel**"); (iii) Hughes Hubbard & Reed LLP, as counsel to the BRIC Exchange Partner; (iv) McAfee & Taft, P.C., as counsel to the BRIC Mining Partner; (v) Clifford Chance US LLP, as counsel to VanEck; and (vi) and any other accountants and other professionals, advisors and consultants retained by the Backup Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld) ( (iii)–(v), each a "**BRIC Party Counsel**," and collectively (i)–(vi), the  "**Backup Plan Sponsor Advisors**"), in each case, in connection with the Bidding Process, the Auction, the Backup Plan Sponsor Agreement, or to implement the Backup Transactions (collectively, the "**Expense Reimbursement**"); *provided* that BRIC Party Counsel shall not be entitled to Expense Reimbursement for any services provided which are duplicative of the services provided by other Backup Plan Sponsor Advisors; *provided further* that review of the Backup Plan Sponsor Agreement by each BRIC Party Counsel shall not be considered duplicative.  The Expense Reimbursement shall be payable by the Debtors as administrative expenses (1) pursuant to the Backup Plan Sponsor Agreement Order or (2) promptly upon the written request of the applicable Backup Plan Sponsor Advisor following the termination of the Backup Plan Sponsor Agreement (x) by the Debtors pursuant to Sections 12.02(b), 12.02(c), 12.02(d) (unless the Backup Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or Section 12.02(f) or (y) by the Backup Plan Sponsor or BRIC Exchange Partner pursuant to Section 12.01, in the event of either (1) or (2) without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that Debtors shall promptly pay the Expense Reimbursement incurred prior to the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order; *provided*, *further*, that beginning immediately after entry of the Backup Plan Sponsor Agreement Order the Debtors shall pay a maximum Expense Reimbursement of $500,000 per month in the aggregate (the "**Expense Reimbursement Monthly Cap**"); *provided*, *further*, that in the event the Debtors make the Backup Plan Election and switch to the Toggle Option (as set forth in the NewCo Plan), the Expense Reimbursement Monthly Cap shall cease to apply thereafter; *provided*, *further*, that to the extent the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor or the BRIC Exchange Partner, the Backup Plan Sponsor shall promptly repay the Debtors the Expense Reimbursement paid to the Backup Plan Sponsor Advisors under this Section 13.01.

- **Commitment Fee**: Pursuant to the Backup Plan Sponsor Agreement Order, as and when required under the Backup Plan Sponsor Agreement or the

Toggle Option within the NewCo Plan, in addition to any Fees owed pursuant to Sections 13.01 and 13.03, the Debtors shall pay the Backup Plan Sponsor an amount equal to $1,500,000, which shall be paid as an administrative expense of the Debtors (the "**Commitment Fee**") and shall be paid promptly upon the entry of the Backup Plan Sponsor Agreement Order; *provided* that in the event the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor, the Backup Plan Sponsor shall not be entitled to the Commitment Fee.

- **Consultation Services Fee**.    Pursuant to the Backup Plan Sponsor Agreement Order, in addition to any Fees owed pursuant to Sections 13.01 and 13.02, the Debtors shall pay to an entity designated by the BRIC, in exchange for the Consultation Services, $500,000 per month, retroactive to May 1, 2023, after entry of the Backup Plan Sponsor Agreement Order, which shall be paid as an administrative expense pursuant to section 503 of the Bankruptcy Code (the "**Consultation Services Fee**"), on a date each month that is mutually agreed to by the Debtors and the BRIC; *provided* that, to the extent any Party terminates this Agreement or the Consultation Services, neither the BRIC nor any entity designated by the BRIC, shall be entitled to the Consultation Services Fee from that date forward.

20.    Under the Backup Plan Sponsor Agreement and the Backup Plan Administration Agreement Term Sheet, the Debtors and the Committee reserve their rights to terminate the Consultation Services upon written notice, at which time the Debtors will no longer owe the BRIC additional amounts under the Consultation Services Fee and will no longer be required to pay the Expense Reimbursement.    In other words, the Debtors have full discretion to terminate the Consultation Services and related fees to the extent those services no longer serve the Debtors' estates.

21.    Since the Debtors filed the Motion, the BRIC and the BRIC Exchange Partner have agreed to reduce certain fees payable under the Backup Plan Sponsor Agreement.    Specifically, the BRIC agreed to (a) reduce the Consultation Services Fee to $450,000 per month (formerly $500,000 per month) with the Consultation Services Fee payable retroactive to June 1, 2023 (formerly May 1, 2023) and (b) reduce the Expense Reimbursement Monthly Cap to $300,000 to be measured over any rolling three-month period (formerly $500,000 per month in the aggregate).

In addition, the BRIC has estimated that the Expense Reimbursement for the BRIC and the BRIC Exchange Partner for amounts incurred through the date of this filing will not exceed $1.25 million.

22.     The BRIC also agreed to reduce certain fees payable after the Backup Plan Effective Date to the Backup Plan Administrator, which are payable only to the extent the Debtors pivot to the Backup Transactions and the Backup Transactions are consummated.  The revised terms include (a) a reduction of the Distribution Fee for the initial distribution from $15 million to $12 million and (b) a reduction of the Backup Plan Sponsor Administration Fee from $50 million to $46 million (years one through three will have $10 million annual payments; years four and five will have payments reduced from $10 million to $8 million).  The Backup Plan Administration Fee was previously structured to be paid in equal annual installments over the five-year term.

23.     I believe that the proposed Fees are appropriate under the circumstances given the complex and unique nature of the Debtors' business, these chapter 11 cases, and industry headwinds, among other things.  In this case, the Backup Plan Sponsor is not only committing to serve as the Backup Bidder, but it is also actively providing services and support for the NewCo Transactions through the Consultation Services.  Absent the Fees, I have been informed that the BRIC is unwilling to serve as a Backup Plan Sponsor.  In the event the Debtors elect to pursue an Orderly Wind Down, the absence of the BRIC or an alternative backup plan sponsor may result in a delay to the resolution of these cases; such delay may include additional estate costs in excess of the Fees which are contemplated to be paid to the BRIC.

24.     The Backup Plan Sponsor and its advisors have spent the past three months and numerous hours on legal fees and other expenses in formulating and negotiating the Backup Transactions. The BRIC dedicated significant time attending the Auction, working to improve the terms of their proposed bid, exchanging draft documentation, and conducting extensive diligence

on the Debtors' business, assets, and regulatory hurdles. Additionally, the BRIC has agreed to support the Debtors' pursuit of the NewCo Transactions while preserving the Debtors' optionality to quickly pivot to an Orderly Wind Down by providing the Consultation Services.

25.     It is my understanding that the BRIC agreed to serve as the Backup Plan Sponsor based upon the Debtors' assurances that appropriate preparations would be made prior to the Debtors pivoting to the Backup Transactions. These preparations include the BRIC commencing the Consultation Services at the request of the Debtors and the Committee, which may include: (a) sharing analyses and consulting on exchange strategies with respect to the numerous non-BTC and non-ETH cryptocurrency, crypto tokens, or other cryptocurrency assets owned by the Debtors in connection with the Debtors converting their altcoin holdings to BTC and ETH; (b) developing strategies to maximize the disposition of the Debtors' illiquid assets; (c) consulting with the Debtors on distribution mechanics and preparations; and (d) consulting with the Debtors on the path to establish a standalone, pure play, publicly traded mining company (the Backup Mining Transaction). By providing the Consultation Services, the BRIC is incurring and will continue to incur expenses in connection with their work as Backup Plan Sponsor. I believe that the Consultation Services requested by the Debtors and the Committee serve to benefit the Debtors' estates by reducing the risk of further case delays and preserving the Debtors' optionality by ensuring the Debtors can timely pivot to an Orderly Wind Down.

26.     Absent the Fees, it is my understanding that the Backup Plan Sponsor would be unwilling to perform under the Backup Plan Sponsor Agreement or serve as the Backup Bidder—an agreement the Debtors and the Committee have determined to be value maximizing for the Debtors' estates and their creditors.

27.     Based upon the foregoing, I believe that the Fees associated with the BRIC serving

as a Backup Bidder are a sound exercise of the Debtors' reasonable business judgment and should

therefore be approved.


[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated:  June 27, 2023

*/s/  Samuel Schreiber*

Name:    Samuel Schreiber
Title:      Senior Director of Alvarez & Marsal,
North America, LLC