**Hearing Date: July 18, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: July 14, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF HEARING ON DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**AND APPROVING CERTAIN FEES AND EXPENSES FOR THE**
**BACKUP PLAN SPONSOR, AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* (the "Motion") will be held on **July 18, 2023, at 10:00 a.m., prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will take place in a hybrid fashion both in person and via Zoom for Government.  Those wishing to participate in the Hearing in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408.  For those wishing to participate remotely, in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government.  Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.  When making an eCourtAppearance, parties must specify whether they are making a "live" or "listen only" appearance.  Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business day before the hearing (*i.e.*, on Monday, July 17, 2023)**.

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m., prevailing Eastern Time on July 18, 2023, must connect to the Hearing beginning at 9:00 a.m., prevailing Eastern Time on July 18, 2023.  When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing.  Parties that type in only their first name, a nickname or initials will not be admitted into the Hearing.  When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room," in the order in which you seek to connect.  Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their

eCourtAppearance.  Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 2560] (the "Case Management Order") by **July 14, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

PLEASE TAKE FURTHER NOTICE that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

PLEASE TAKE FURTHER NOTICE that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings

filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank*]

New York, New York
Dated:  July 8, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:            joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200
Email:            patrick.nash@kirkland.com
                     ross.kwasteniet@kirkland.com
                     chris.koenig@kirkland.com
                     dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING CERTAIN FEES AND EXPENSES
FOR THE BACKUP PLAN SPONSOR, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

the following in support of this motion (this "Motion"):

**Preliminary Statement**

1.     On June 7, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order
(I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and
(II) Granting Related Relief* [Docket No. 2774] (the "Original Motion"), setting forth the terms

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8
USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors'
service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

under which the BRIC agreed to serve as Backup Plan Sponsor and seeking authorization to pay certain Fees to the Backup Plan Sponsor.

2.     At the June 28, 2023 hearing, the Court denied the Original Motion without prejudice and raised concerns regarding the Consultation Services Fee.  Specifically, the Court indicated that the Consultation Services Fee could not be approved without the BRIC being retained by the Debtors' estates under section 327 of the Bankruptcy Code.[2]

3.     In response, the Debtors, the Committee and the BRIC worked to address the Court's concerns and ultimately agreed to eliminate the Consultation Services and Consultation Services Fee entirely from the Backup Plan Sponsor Agreement.

4.     As a result, pursuant to this Motion, the Debtors are only seeking approval to pay the BRIC (a) the $1.5 million commitment fee (the "Commitment Fee") and (b) the reimbursement of all reasonable and documented fees and expenses incurred by the Backup Plan Sponsor, the BRIC Exchange Partner, and certain affiliated parties in connection with the Auction and the Backup Transactions (the "Expense Reimbursement", and together with the Commitment Fee, the "Fees").  The Commitment Fee is the consideration for the BRIC to serve as the Backup Plan Sponsor through December 31, 2023.  The Expense Reimbursement is estimated not to exceed $1.5 million in the aggregate through July 19, 2023, and thereafter will be subject to the Expense Reimbursement Monthly Cap of $300,000 per month (to be measured over any rolling three-month period).  For the avoidance of doubt, if the Debtors exercise the Toggle Option and pivot to the Backup Transactions, the Expense Reimbursement Monthly Cap will no longer apply starting on

---

[2]     The Court entered the *Order Denying Without Prejudice Debtors' Motion to Pay Fees to the Backup Plan Sponsor* [Docket No. 2923] without prejudice.

the date the Debtors exercise the Toggle Option and the reasonable and documented expenses of

the Backup Plan Sponsor will be deemed administrative expenses of the Debtors' estates.[3]

6.      Through this Motion, the Debtors renew their request as to the Commitment Fee

and the Expense Reimbursement, and seek authority to pay the Fees immediately upon entry of

the Order.  The Debtors believe that payment of the Fees is necessary to maintain the BRIC as the

Backup Plan Sponsor through December 31, 2023, and is critical to ensuring a successful

conclusion to these chapter 11 cases, and therefore should be authorized as a sound exercise of the

Debtors' business judgment.

### Relief Requested

6.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), (a) authorizing and approving certain fees and expenses for the Backup

Plan Sponsor, and (b) granting related relief.[4]

### Jurisdiction and Venue

7.      The United States Bankruptcy Court for the Southern District of New York

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York, entered February 1, 2012.  The Debtors confirm their consent to the Court

entering a final order in connection with this Motion to the extent that it is later determined that

---

[3]     The Debtors, the Committee, and the BRIC have also agreed to a compensation structure under which the BRIC will be compensated if the Debtors exercise the Toggle Option, the Backup Plan is consummated, and the BRIC is appointed as the Backup Plan Administrator.  The Debtors are not seeking approval of the proposed compensation to the Backup Plan Administrator by this Motion.

[4]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Original Motion, the Backup Plan Sponsor Agreement or the Backup Plan Administration Agreement (each as modified), as applicable.

the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 9006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 9006-1 of the Local Bankruptcy Rules for the Southern District of New York.

### Background

10.    The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency-based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

11.    On July 13, 2022, certain of the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22].  The Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

12.    On December 7, 2022, the Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (the "GK8 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of the GK8 Debtors' chapter 11 cases is set forth in the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motion* [Docket No. 1629].

13.    The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53, 1648].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee").  On September 14, 2022, the Court entered an order directing the appointment of an examiner (the "Examiner") [Docket No. 820].  On September 29, 2022, the U.S. Trustee appointed the Examiner [Docket No. 920].  On April 5, 2023, the Court entered an order discharging the Examiner [Docket No. 2364].

**The Backup Plan Sponsor Agreement**

14.    At the Auction on May 3, 2023, the Debtors, in consultation with the Committee, announced the selection of the BRIC Plan as the Backup Bid on the terms and conditions memorialized in the Backup Plan Sponsor Agreement.

15.    On May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713] (the "Notice of Successful Bidder and Backup Bidder"), pursuant to which the Debtors announced Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.

16.     The BRIC comprises VanEck and GXD and is working with Gemini as the BRIC Exchange Partner.  VanEck is a U.S. registered investment advisor with 70 years' experience and $75 billion in assets under management firm-wide, including approximately $500 million in digital asset products globally.  VanEck has been engaged with U.S. regulators on various digital asset projects for more than six years and has a robust compliance program.

17.     GXD Labs is a digital asset and blockchain platform to build blockchain technology, operating and infrastructure businesses, partner with digital asset entrepreneurs and invest in early stage and liquid digital asset tokens.  GXD Labs was founded by the former executive management team of Global[X]Digital, a premier U.S.-based, environmentally conscious, industrial-scale Bitcoin mining and digital asset company.  The founders of GXD Labs have extensive experience managing complex wind downs, including the estates of Lehman Brothers, Toys "R" Us, Inc., Residential Capital, LLC, and MF Global Holdings Ltd.  In addition, the GXD Labs team has successfully built and operated asset management platforms dedicated to the analysis, acquisition, workout and liquidation of billions of dollars of litigation claims and loans (including hundreds of thousands of individual consumer loans and claims).  The team continues to have strategic relationships with Global[X]Digital.

18.     Gemini is a New York limited purpose trust company chartered under New York Banking Law ("NYBL") and supervised by the New York Department of Financial Services ("NYDFS").  Gemini operates as a full reserve exchange and custodian as required by the NYBL and the NYDFS under Gemini's trust charter.  In other words, all client funds at Gemini are held 1:1, are not administered without specific client authorization, and are segregated from Gemini's own funds in separate accounts.  Gemini does not offer futures or options trading and does not allow trading on margin.  Gemini also meets or exceeds the NYDFS's excess capital reserve requirements and compliance standards for all assets held at Gemini.

19.     The Debtors attached the term sheet agreed to by the Debtors, the Committee, and

the BRIC (the "Backup Plan Administration Agreement Term Sheet") outlining the BRIC's

services as the Backup Plan Administrator as Exhibit B to the Notice of Successful Bidder and

Backup Bidder.

20.     Following the conclusion of the Auction, the Debtors, the Committee, and the BRIC

continued to work on finalizing the terms by which the BRIC will serve as the Backup Plan

Sponsor.  On June 7, 2023, the Debtors, the Committee, the BRIC, and the BRIC Exchange

Partner, executed the Backup Plan Sponsor Agreement.

21.     A  summary  of  the  Backup  Plan  Sponsor  Agreement  and  Backup  Plan

Administration, as revised, are set forth below:[5]

| Material Terms of Backup Sponsor Agreement[6] | |
| --- | --- |
| Backup Plan Sponsor | The Blockchain Recovery Investment Consortium (together with any successors thereto, the "BRIC" or the "Backup Plan Sponsor"), which comprises Van Eck Absolute Return Advisers Corporation ("VanEck") and GXD Labs LLC ("GXD"). |
| BRIC Exchange Partner | Gemini Trust Company, LLC ("Gemini" or the "BRIC Exchange Partner"). |
| Backup Transactions (Recitals) | The Backup Transactions include: <br><br> (a)  a pure play, publicly traded mining business in which Celsius creditors will receive 100% of the equity interests with a potential management contract with Global[X]Digital (the "Backup Mining Transaction"); <br><br> (b)  a liquid cryptocurrency distribution to Celsius creditors on or as soon as practicable after the Backup Plan Effective Date; |

---

[5]    The summary of the Backup Plan Sponsor Agreement in this Motion is qualified in its entirety by reference to the provisions of the Backup Plan Sponsor Agreement.  To the extent there is any discrepancy between the summary contained in the Motion and the terms set forth in the Backup Plan Sponsor Agreement and the Backup Plan Administration Agreement Term Sheet, the terms of the Backup Plan Sponsor Agreement and the Backup Plan Administration Agreement Term Sheet shall govern.  The Backup Plan Sponsor Agreement and Backup Plan Administration Agreement Term Sheet (each as modified) are attached hereto as **Exhibit B** and **Exhibit C**, respectively.

[6]    Capitalized terms used but not otherwise defined in these summary charts shall have the meanings ascribed to them in the Backup Plan Sponsor Agreement or the Backup Plan Administration Agreement Term Sheet (each as modified), as applicable.

| | |
|---|---|
| | (c)    a timely monetization of the remaining assets of the Debtors' estates and subsequent liquid Cryptocurrency distributions to Celsius creditors; and |
| | (d)    an orderly wind down. |
| **Backup Plan Administrator (Backup Plan Sponsor Agreement §1.01)** | An Entity designated by the BRIC to manage the assets held by the Wind Down Estate in the event that the Debtors make the Backup Plan Election and consummate the Backup Plan Transactions pursuant to the Toggle Option |
| **Backup Plan Election (Backup Plan Sponsor Agreement §1.01)** | The determination by the Debtors, in consultation with the Committee, to terminate the NewCo Transaction with the Successful Bidder or other plan sponsor, as applicable, and instead implement the Backup Transactions through the Toggle Option to the NewCo Plan. |
| **Toggle Option (Backup Plan Sponsor Agreement §1.01)** | The Backup Transactions to the extent the Debtors determine, in consultation with the Committee, to terminate the NewCo Transaction with the Successful Bidder and pivot to the transactions contemplated by the Backup Plan Sponsor Agreement (including the Backup Transactions) through the NewCo Plan in the event the Debtors make the Backup Plan Election. |
| **Milestones (Backup Plan Sponsor Agreement §4)** | The following milestones shall apply to the Backup Plan Sponsor Agreement (collectively, the "Milestones"), which shall be subject to waiver and extension upon the written consent of each of the Parties (e-mail among counsel being sufficient): |
| | (a)    by no later than July 8, 2023, the Debtors shall file, the Backup Plan Sponsor Agreement Motion with the Backup Plan Sponsor Agreement attached as an exhibit thereto; and |
| | (b)    by no later than July 19, 2023, the Bankruptcy Court shall have entered the Backup Plan Sponsor Agreement Order. |
| **Backup Plan Sponsor Affirmative Commitments (Backup Plan Sponsor Agreement §5.01)** | During the Backup Plan Sponsor Agreement Effective Period, the Backup Plan Sponsor and BRIC Exchange Partner each agree: |
| | (a)    to the extent the Debtors make the Backup Plan Election, support the Backup Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate, or otherwise give effect to the Backup Transactions in accordance with the Backup Plan Sponsor Agreement, including voting and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Backup Transactions, and voting, if applicable, in favor of the NewCo Plan and supporting and consenting to the releases and exculpation provisions in the NewCo Plan; provided that the BRIC agrees to take the steps reasonably necessary and desirable to support, facilitate, implement, consummate, or otherwise give effect to the NewCo Transaction in accordance with the Backup Plan Sponsor Agreement; |
| | (b)    to the extent the Debtors make the Backup Plan Election, to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Backup |

| | | |
|---|---|---|
| | | Transactions contemplated in the Backup Plan Sponsor Agreement, take all steps reasonably necessary and desirable to address any such impediments; |
| | (c) | to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to oppose the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Backup Transactions; *provided* that such commercially reasonable efforts shall not include filing formal objections or pleadings with the Bankruptcy Court; |
| | (d) | to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Backup Transactions from the Debtors' other stakeholders; |
| | (e) | to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to obtain, or assist the Debtors in obtaining, as applicable, any and all required Regulatory Approvals and/or third-party approvals for the Backup Transactions; and |
| | (f) | to the extent the Debtors make the Backup Plan Election, negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with the Backup Plan Sponsor Agreement to which it is required to be a party. |
| **Backup Bid (Backup Plan Sponsor Agreement §5.03)** | | The Backup Plan Sponsor agrees to serve as the Backup Bidder through and including December 31, 2023 on the terms and conditions set forth in the Backup Plan Sponsor Agreement. Pursuant to the NewCo Plan, the Backup Plan Sponsor will designate an entity to serve as the Backup Plan Administrator for the Wind Down Estates in the event that the Debtors determine in an exercise of their fiduciary duties, in consultation with the Committee, to make the Backup Plan Election. Furthermore, subject to Section 12 of the Backup Plan Sponsor Agreement, the Backup Plan Sponsor and the BRIC Exchange Partner agree not to object to, directly or indirectly, the Debtors' decision to pursue the NewCo Transaction with the Successful Bidder. |
| **Termination (Backup Plan Sponsor Agreement §12)** | | Termination Generally: |
| | | The Debtors, the Committee, the Backup Plan Sponsor, and the BRIC Exchange Partner,[7] as applicable, shall have the ability to terminate the Backup Plan Sponsor Agreement upon the occurrence of one the following events, subject to certain exceptions as further detailed in Section 12 of the Backup Plan Sponsor Agreement: |
| | (a) | the breach in any material respect by a Party of any of the applicable representations, warranties, or commitments set forth in the Backup Plan Sponsor Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Backup Transactions in the event the Debtors make the Backup Plan Election and (ii) to the extent curable, remains uncured for ten |

---

[7]    The Backup Plan Sponsor and the BRIC Exchange Partners have separate termination rights as to their respective participation in the Backup Plan Sponsor Agreement.

days after the Party transmits a written notice in accordance with Section 15.11 of the Backup Plan Sponsor Agreement;

(b)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Backup Transactions and (ii) remains in effect for thirty Business Days after the Backup Plan Sponsor or BRIC Exchange Partner transmits a written notice in accordance with Section 15.11 detailing any such issuance; *provided* that this termination right may not be exercised by the Backup Plan Sponsor or BRIC Exchange Partner or any Affiliate if the Backup Plan Sponsor or BRIC Exchange Partner sought or requested such ruling or order in contravention of any obligation set out in the Backup Plan Sponsor Agreement or such ruling or order resulted from any breach of the Backup Plan Sponsor Agreement by the Backup Plan Sponsor, the BRIC Exchange Partner or any Affiliate;

(c)    any Governmental Authority that must grant a Regulatory Approval regarding the Backup Transactions has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Backup Plan Sponsor or the BRIC Exchange Partner, based upon the advice of counsel, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Backup Transactions;

(d)    the Bankruptcy Court enters an order denying confirmation of the NewCo Plan;

(e)    the Debtors and the Committee may terminate the Backup Plan Sponsor Agreement if the board of directors, board of managers, or such similar governing body of any Debtor determines or the Committee, respectively after consulting with counsel to the Committee, (i) that proceeding with the Backup Transactions or failing to terminate the Backup Plan Sponsor Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to support an Alternative Restructuring Proposal;

(f)    the Debtors and the Committee may terminate the Backup Plan Sponsor Agreement if all conditions precedent to the occurrence of the Backup Plan Effective Date have been satisfied or waived in accordance with the Backup Transactions and the Toggle Option and the Backup Plan Sponsor or BRIC Exchange Partner fails to complete the actions to be taken by it on the Backup Plan Effective Date in accordance with the Backup Plan Sponsor Agreement;

(g)    the Debtors and the Committee may terminate the Backup Plan Sponsor Agreement if, to the extent the BRIC Exchange Partner terminates the Backup Plan Sponsor Agreement with respect to its participation, the Backup Plan Sponsor fails to secure an alternative Backup Distribution Agent acceptable to the Debtors within thirty (30) days of the BRIC Exchange Partner's written notice to the Debtors and the Committee in accordance with Section 15.11; *provided* that, for the

avoidance of doubt, any alternative Backup Distribution Agent shall assume all of the obligations that the BRIC Exchange Partner would have had under the Backup Plan Sponsor Agreement if not for the BRIC Exchange Partner's termination;

(h)    only to the extent the Debtors make the Backup Plan Election and switch to the Toggle Option, the Debtors withdraw, revoke, or modify the Backup Plan Transactions, in whole or in part, in a manner that is not materially consistent with the Backup Plan Sponsor Agreement; or

(i)    the Debtors or the Committee may terminate the agreement by providing thirty days' notice of intent to terminate in accordance with Section 15.11 of the Backup Plan Sponsor Agreement if the Debtors, in consultation with the Committee, do not reasonably expect to make the Backup Plan Election.

Termination by the Backup Plan Sponsor and the BRIC Exchange Partner

In addition to the foregoing general rights to terminate, the Backup Plan Sponsor and the BRIC Exchange Partner may each jointly terminate their respective participant in the Plan Sponsor Agreement upon the occurrence of one of the following events, subject to certain exceptions as further detailed in Section 12.01 of the Backup Plan Sponsor Agreement:

(a)    the failure to meet any Milestone set forth in Section 4 of the Backup Plan Sponsor Agreement that has not been waived or extended in a manner consistent with the Backup Plan Sponsor Agreement;

(b)    the Bankruptcy Court grants relief that (i) is inconsistent with the Backup Plan Sponsor Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of the Backup Plan Sponsor Agreement, including by preventing the consummation of the Backup Transactions, in each case unless the Debtors have sought a stay of such relief within seven days after the date that the Bankruptcy Court grants such relief and such order is stayed, reversed, or vacated within fourteen days after the date that the Bankruptcy Court grants such relief;

(c)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed with regard to any material asset of the Debtors and such relief would materially delay or impede the implementation of the Backup Transactions;

(d)    the Debtors file a NewCo Plan or plan sponsor agreement with the Successful Bidder or another plan sponsor that is not consistent with or does not honor the terms of the Backup Plan Sponsor Agreement, it being understood that the Backup Plan Sponsor Agreement permits the Debtors to pursue the NewCo Plan prior to the Debtors making the Backup Plan Election;

(e)    the Debtors file another chapter 11 plan that is not the NewCo Plan or plan implementing the Backup Transactions without

the consent of the Backup Plan Sponsor and the BRIC Exchange Partner;

(f) the Bankruptcy Court enters an order (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (other than the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby) or a trustee in one or more of the Chapter 11 Cases of the Debtors, (iii) terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization, or (iv) rejecting the Backup Plan Sponsor Agreement;

(g) following entry of the Backup Plan Sponsor Agreement Order or the Backup Plan Sponsor Substantial Contribution Order, the Debtors fail to pay and reimburse all Fees in accordance with the Backup Plan Sponsor Agreement, the Backup Plan Administration Agreement, the Backup Plan Sponsor Agreement Order, and/or the Backup Plan Sponsor Substantial Contribution Order, as applicable; *provided* that any obligation due and owing under the Backup Plan Sponsor Agreement Order or the Backup Plan Sponsor Substantial Contribution Order shall be treated as allowed administrative expense claims against each of the Debtors;

(h) the Bankruptcy Court does not enter the Backup Plan Sponsor Agreement Order by July 19, 2023;

(i) the filing of a motion or application by any Debtors seeking an order (without prior written consent of the Backup Plan Sponsor and the BRIC Exchange Partner) rejecting this Agreement; or

(j) if the NewCo Plan Effective Date or the Backup Plan Effective Date has not occurred by December 31, 2023.

Termination by the Committee:

In addition to the foregoing general rights to terminate, the Committee shall have the ability to terminate the Plan Sponsor Agreement upon the occurrence of one the following events, subject to certain exceptions as further detailed in Section 12.03 of the Backup Plan Sponsor Agreement:

(a) the Debtors withdraw or revoke the Toggle Option within the NewCo Plan, pursue an Alternative Transaction not consented to by the Committee, or modify the Toggle Option within the NewCo Plan, in whole or in part, in a manner that is not consistent with the Backup Plan Sponsor Agreement in all material respects.

**Mutual Termination:** The Backup Plan Sponsor Agreement and the obligations of the Parties hereunder, may be terminated by mutual written agreement among each of the Parties.

**Automatic Termination:** The Backup Plan Sponsor Agreement shall terminate after the NewCo Plan Effective Date or Backup Plan Effective Date; provided that Section 5.04 and Section 5.05 of the Backup Plan Sponsor Agreement shall survive the termination of the Backup Plan

| | Sponsor Agreement for a period of one year following the Backup Plan Sponsor Agreement Effective Date. |
|---|---|
| **Expense Reimbursement and Commitment Fee (Backup Plan Sponsor Agreement §13)** | **Expense Reimbursement**:  Pursuant to the Backup Plan Sponsor Agreement Order, the Debtors shall promptly pay or reimburse, as and when required under the Backup Plan Sponsor Agreement or the Toggle Option within the NewCo Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses incurred through the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order of:  (i) the Backup Plan Sponsor; (ii) Willkie Farr & Gallagher LLP, as counsel to the Backup Plan Sponsor ("**Backup Plan Sponsor Counsel**"); (iii) Hughes Hubbard & Reed LLP, as counsel to the BRIC Exchange Partner; (iv) McAfee & Taft, P.C., as counsel to the BRIC Mining Partner; (v) Clifford Chance US LLP, as counsel to VanEck; and (vi) any other accountants and other professionals, advisors and consultants retained by the Backup Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld) ( (iii)–(v), each a "**BRIC Party Counsel**," and collectively (i)–(vi), the "**Backup Plan Sponsor Advisors**"), in each case, in connection with the Bidding Process, the Auction, the Backup Plan Sponsor Agreement, or to implement the Backup Transactions (collectively, the "**Expense Reimbursement**"); *provided* that BRIC Party Counsel shall not be entitled to Expense Reimbursement for any services provided which are duplicative of the services provided by other Backup Plan Sponsor Advisors; *provided further* that review of the Backup Plan Sponsor Agreement by each BRIC Party Counsel shall not be considered duplicative.  The Expense Reimbursement shall be payable by the Debtors as administrative expenses (1) pursuant to the Backup Plan Sponsor Agreement Order or (2) promptly upon the written request of the applicable Backup Plan Sponsor Advisor following the termination of the Backup Plan Sponsor Agreement (x) by the Debtors pursuant to Sections 12.02(b), 12.02(c), 12.02(d) (unless the Backup Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or Section 12.02(f) or (y) by the Backup Plan Sponsor or BRIC Exchange Partner pursuant to Section 12.01 in the event of either (1) or (2) without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that Debtors shall promptly pay the Expense Reimbursement incurred prior to the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order; *provided*, *further*, that beginning immediately after entry of the Backup Plan Sponsor Agreement Order the Debtors shall pay a maximum Expense Reimbursement of $300,000 per month in the aggregate (to be measured over any rolling three-month period)  (the "**Expense Reimbursement Monthly Cap**"); *provided*, *further*, that in the event the Debtors make the Backup Plan Election and switch to the Toggle Option (as set forth in the NewCo Plan), the Expense Reimbursement Cap shall cease to apply thereafter; *provided*, *further*, that to the extent the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor or the BRIC Exchange Partner, the Backup Plan Sponsor shall promptly repay the Debtors the Expense Reimbursement paid to the Backup Plan Sponsor Advisors under Section 13.01 of the Backup Plan Sponsor Agreement.<br><br>**Commitment Fee**:  Pursuant to the Backup Plan Sponsor Agreement Order, as and when required under the Backup Plan Sponsor Agreement or the Toggle Option within the NewCo Plan, in addition to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Backup Plan Sponsor an amount equal to $1,500,000, which shall be paid as an administrative |

|  | expense of the Debtors (the "Commitment Fee") and shall be paid promptly upon the entry of the Backup Plan Sponsor Agreement Order; provided that in the event the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor, the Backup Plan Sponsor shall not be entitled to the Commitment Fee. |
|---|---|

| **Material Terms of Backup Plan Administration Agreement Term Sheet[8]** | |
|---|---|
| **Role of the Backup Plan Administrator; Services Performed** | Upon the Debtors' determination, in consultation with the Committee, to terminate a NewCo Transaction with the Successful Bidder or other plan sponsor, as applicable, and switch to the Toggle Option contemplated by the Backup Plan Sponsor Agreement (including the Backup Transactions) through the NewCo Plan in the event the Debtors make the Backup Plan Election, prior to the Backup Plan Effective Date, at the direction of the Special Committee and, in consultation with the Committee, the proposed Backup Plan Administrator shall develop the Data Science, Claims Reconciliation and Distribution Services Program.

After the Backup Plan Effective Date, the Backup Plan Administrator, at the direction of the Oversight Committee will adopt and implement the Data Science, Claims Reconciliation and Distribution Services Program, and approve and oversee the investment policy, dividend policy, any policies regarding conflicts of interest (including with respect to the Backup Plan Sponsor and the BRIC Exchange Partner, and their respective personnel and Affiliates), and all major investment and operational decisions of the Wind Down Estate. Subject always to the oversight, supervision, and approval of the Oversight Committee, the Backup Plan Administrator will perform the following services (the "Services"):

- manage the Wind Down Estate's day-to-day business and operations, including managing its liquidity and capital resources;

- evaluate, manage, negotiate and oversee the disposition of all or any part of the property or assets of the Wind Down Estate; and

- perform any other services for and on behalf of Wind Down Estate to the extent necessary or appropriate. |
| **Fees Paid to Backup Plan Administrator** | After the Backup Plan Effective Date the Backup Plan Administrator shall receive the following fees:

- a $46 million administration fee, which will be payable as follows (i) $10 million annual installments beginning on the Backup Plan Effective Date and ending on the third anniversary of the Backup Plan Effective Date and (ii) $8 |

---

[8]    For the avoidance of doubt, the Motion does not seek the approval of any of the fees payable to the Backup Plan Administrator. The Backup Plan Administrator will only be entitled to the fees *only* to the extent the Debtors pivot to the Toggle Option and consummate the Backup Transactions.

| | |
|---|---|
| | million annual installments on the fourth and fifth anniversaries of the Backup Plan Effective Date and ending on the fifth anniversary of the Backup Plan Effective Date, provided that, if the chapter 11 cases are closed before the fifth anniversary of the Backup Plan Effective Date, the remaining balance of the plan administration fee shall be immediately due and payable  (the "<u>Backup Plan Administration Fee</u>"), plus |
| | • a percentage of any distributions (the "<u>Distribution Fees</u>"), to be paid as follows and within 10 days of the end of each applicable period:  (i) a flat fee of $12 million for the initial distribution, which initial distribution shall be made before the six month anniversary of the Backup Plan Effective Date; (ii) 1.25% of any distributions made between the six month anniversary of the Backup Plan Effective Date and the one year anniversary of the Effective Date; (iii) 1.00% of any distributions made between the first and second anniversaries of the Backup Plan Effective Date; (iv) 0.75% of any distributions made between the second and third anniversaries of the Backup Plan Effective Date; (v) 0.50% of any distributions made between the third and fourth anniversaries of the Backup Plan Effective Date; (vi) 0.25% of any distribu00tions made between the fourth and fifth anniversaries of the Backup Plan Effective Date; and (vii) 0.00% of any distributions made after the fifth anniversary of the Backup Plan Effective Date; |
| | • a "<u>Value Creation Incentive Fee</u>" equal to 10% of value recovered above the initial asset valuation and/or IP developed or developed with funding by the estate exclusive of price appreciation on liquid BTC/ETH at emergence; plus |
| | • an annual "<u>Discretionary Management Bonus</u>" equal to up to 100% of the annual installments of the Backup Plan Administration Fee between the second and fifth anniversaries of the Backup Plan Effective Date payable upon the majority vote of the Oversight Committee (for the avoidance of doubt, $10 million in years two and three and $8 million in years 4 and 5). |
| **Fees Paid to Members of Oversight Committee** | Each member of the Oversight Committee shall be compensated (the "<u>Oversight Committee Fee</u>") on an annual basis in an amount to be agreed upon with the Debtors and the Committee, in consultation with the BRIC.  Such proposed compensation shall be disclosed in the Backup Plan Supplement at least 14 days prior to the Confirmation Hearing for the Backup Plan. |
| **Expenses** | The Wind Down Estate shall reimburse the Backup Plan Administrator and the Oversight Committee for all reasonable and documented expenses, including the reasonable and documented fees and expenses of outside service providers such as legal counsel, accountants and other professionals, advisors and consultants.  For the avoidance of doubt, expenses shall not be deducted from the Backup Plan Administration Fee, Distribution Fee, or the Incentive Fees. |
| **Indemnification** | The Wind Down Estate will indemnify reimburse, defend, and hold harmless the Backup Plan Administrator, the BRIC Exchange Partner, |

| | |
|---|---|
| | the BRIC Mining Partner, the members of the Oversight Committee, and their respective successors and permitted assigns, together with their respective employees, officers, members, managers, directors, agents and representatives (collectively, the "Indemnified Parties"), from and against all losses (including lost profits), costs, damages, injuries, taxes, penalties, interests, expenses, obligations, claims and liabilities (joint or severable) of any kind or nature whatsoever (collectively, "Losses") that are incurred by such Indemnified Parties in connection with, relating to or arising out of the performance of any Services hereunder; provided, however, that the Wind Down Estate will not be obligated to indemnify, reimburse, defend, or hold harmless an Indemnified Party for any losses incurred in connection with, relating to or arising out of gross negligence, willful misconduct or fraud of such Indemnified Party.<br><br>The Indemnified Parties will also be indemnified from all Losses due to the negligence of third-party brokers, collateral managers or other third-party agents of the Post-Effective Date Debtors, the Wind Down Estate, the Backup Plan Administrator, or the Oversight Committee. |
| **Exculpation** | The Backup Plan Administrator, the BRIC Exchange Partner, the BRIC Mining Partner and the members of the Oversight Committee (collectively, the "Exculpated Parties") will not be liable for, and the Wind Down Estate will not take, or permit to be taken, any action against the Exculpated Parties to hold the Exculpated Parties liable for, any error of judgment or mistake of law or for any loss suffered by the Post-Effective Date Debtors or the Wind Down Estate (including, without limitation, by reason of the purchase, sale or retention of any security) in connection with the performance of their duties under the Backup Plan Administration Agreement except for any error of judgement, mistake of law, or loss suffered resulting from gross negligence, willful misconduct or fraud committed by an Exculpated Party.<br><br>The Exculpated Parties will not be liable for any loss due to the negligence of third-party brokers, collateral managers or other third-party agents of the Post-Effective Date Debtors, the Wind Down Estate, the Backup Plan Administrator, or the Oversight Committee. |

22.     The Backup Plan Sponsor Agreement contemplates Backup Transactions, which will only be consummated to the extent the Debtors, in consultation with the Committee, make the Backup Plan Election (as set forth in the Backup Plan Sponsor Agreement) and terminate the NewCo Transaction with the Successful Bidder to proceed with some or all of the Backup Transactions.  Importantly, and as demonstrated by the Debtors' receipt of a competing third-party proposal and the announcement of the Backup Proposal RFP Process,[9] to the extent a third party

---

[9]     Substantially contemporaneously herewith, the Debtors filed the *Notice of Deadline to Submit Backup Bids* (the "Notice"), which invites interested parties to submit alternative restructuring proposals for the Backup Transactions (such proposals, "Backup Transaction Proposals").  As set forth in the Notice, the Debtors are

(or multiple third parties) submits a competing bid that is superior to the Backup Plan, the Debtors have the flexibility to consider and, if appropriate, act upon such alternative proposal in an exercise of their fiduciary duties.

23.     Furthermore, under Section 8.03 of the Backup Plan Sponsor Agreement, the Debtors retain the right to consider and pursue any alternative wind down transactions that may be proposed.  In addition, pursuant to Sections 12.02(c) and 12.03(c) of the Backup Plan Sponsor Agreement, the Debtors and the Committee, respectively, each reserve the right to terminate the Backup Plan Sponsor Agreement if the Debtors or the Committee, as applicable, determine that pursuing an alternative transaction that is inconsistent with the Backup Plan Sponsor Agreement or consummation of the Backup Transactions is consistent with the Debtors' or Committee's fiduciary duties.  Put differently, the Debtors and the Committee retain their ability to consider and pursue alternative transactions with other potential plan sponsors if doing so would be a sound exercise of the Debtors' business judgment and consistent with their fiduciary duties.  Indeed, the Debtors' receipt of a competing offer and ability to request that the BRIC materially improve the terms of the Backup Plan Sponsor Agreement demonstrates the value of the Backup Plan Sponsor Agreement and the flexibility the Debtors and the Committee have to consider alternative proposals consistent with their fiduciary duties.

24.     The Debtors believe that the Backup Transactions and Backup Plan Sponsor Agreement provide the Debtors with a plan administrator that is best positioned to maximize the value of the Debtors' illiquid assets while still preserving the Debtors' flexibility to pursue a NewCo Transaction.

---

soliciting alternative Backup Transaction Proposals, with a bid deadline of July 31, 2023 (the "Backup Proposal RFP Process").

## The Commitment Fee and Expense Reimbursement

25.    In consideration for the BRIC's agreement to serve as the Backup Plan Sponsor, the substantial time, effort, and resources the BRIC has expended, and will continue to expend, regarding the Auction and Backup Transactions, the Debtors agreed to provide the BRIC the Fees. As further detailed below, the Fees consist of (a) the Commitment Fee and (b) the Expense Reimbursement.  As mentioned, the BRIC does not expect the Expense Reimbursement to exceed $1.5 million through July 19, 2023.    Furthermore, on a go-forward basis, the Expense Reimbursement will be subject to an Expense Reimbursement Monthly Cap of $300,000 in the aggregate per month (to be measured over any rolling three-month period).   In the event the Debtors exercise the Toggle Option and pivot to the Backup Transactions, the Expense Reimbursement Monthly Cap will no longer apply starting on the date the Debtors exercise the Toggle Option.

26.    The Fees are an integral part of the Backup Plan Sponsor Agreement and the BRIC's willingness to serve as the Backup Plan Sponsor.   The Debtors and the Committee determined to secure a Backup Bid to derisk their pursuit of a value-maximizing NewCo and secure a potential plan administrator.   The BRIC team has significant experience with the liquidation and disposition of complex bankruptcy estates and illiquid assets.  The BRIC has made clear that it is only willing to enter into the Backup Plan Sponsor Agreement and serve as the Backup Bidder in return for the Commitment Fee and the Expense Reimbursement.

27.    The Backup Plan Sponsor Agreement is the culmination of a lengthy, complex, and highly competitive Auction process and extensive negotiations.   The Backup Plan Sponsor Agreement ensures that, to the extent the Debtors cannot move forward with a NewCo Transaction, the Debtors will have a viable and value-maximizing path to bring a successful and timely conclusion to these chapter 11 cases.  Moreover, the Backup Plan Sponsor Agreement allows the

18

Debtors to solicit and consider competing Backup Plan Sponsor Proposals.  Accordingly, the Debtors request approval of the Commitment Fee and the Expense Reimbursement (each as modified).

## **Basis for Relief**

### I.     **The Relief Requested Is In the Best Interests of the Debtors' Estates and Their Creditors and Should Be Approved.**

28.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).  In this district, "[t]he standard used for judicial approval of the use of estate property outside of the ordinary course of business is [] the business judgment of the debtor." *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)).  The "business judgement rule" is not an unduly strict standard; it merely requires showing that a decisions was based on the debtor's sound business judgement.  *See In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason"); *Glob. Crossing Ltd.*, 295 B.R at 743 (Bankr. S.D.N.Y. 2003).  The business judgement rule also shields a debtor's decision making from second guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (noting a "presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to a debtor's conduct after a reasonable basis is set forth); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating "the business judgement rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the

company," and has continued applicability in bankruptcy) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)) (internal quotation marks omitted).  Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

29.    The Debtors conducted a robust marketing and sale process designed to identify the value-maximizing path forward.  The marketing process led the Debtors, in consultation with the Committee, to select the Fahrenheit Bid as the Successful Bid because it represents the best option presently available to maximize the value of the Debtors' assets (including their substantial illiquid assets) in an efficient and regulatorily compliant manner.  Nevertheless, the Debtors and the Committee both appreciate the need to prepare for the possibility of an Orderly Wind Down[10] and reorganization of the Debtors' mining business.  The BRIC submitted the only Bid at the Auction that provides the Debtors with optionality to pivot to that Orderly Wind Down while still successfully reorganizing the Debtors' mining business.  Moreover, the BRIC was the only Bidder willing to serve as a Backup Bidder.  While the Backup Plan Sponsor Agreement contemplates transactions beyond a mere wind down (such as the standalone mining reorganization), the Debtors believe the risks associated with the Backup Transactions are markedly different from the NewCo Transactions such that the Backup Plan Sponsor Agreement is in the best interest of the Debtors' estates and are worth pursuing.  The Debtors and the Committee believe that the Backup Plan Sponsor Agreement allows the Debtors to maintain an appropriate degree of optionality as the Debtors work to establish NewCo so that the Debtors can quickly pivot to the Backup Transactions if needed.  Moreover, the BRIC has agreed to serve as the Plan Administrator even if the Debtors cannot proceed with the Backup Mining Transaction.

---

[10]    As defined in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2358].

30.    In exercising their sound business judgment, the Debtors, with full support of the Committee, concluded that securing a Backup Plan Sponsor, entering the Backup Plan Sponsor Agreement with the BRIC, and payment of the Fees is in the best interests of their estates and all stakeholders. The BRIC would not agree to enter into the Backup Plan Sponsor Agreement absent the Commitment Fee and the Expense Reimbursement, and the Debtors' commitment to seek approval thereof.

31.    As such, based on the circumstances of these chapter 11 cases, the Fees under the Backup Plan Sponsor Agreement, are fair and reasonable.

## II.    Paying the Fees is a Sound Exercise of the Debtors' Business Judgment and Are Reasonable and Appropriate Under the Circumstances.

32.    Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as those proposed here using the "business judgment rule" standard, and, in particular, courts in this district have considered three questions when considering such incentives: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed *purchase* price?" *See Integrated Res.*, 147 B.R. at 657; *see also Genco Shipping & Trading Ltd*., 509 B.R. at 465; *Metaldyne Corp.*, 409 B.R. at 670. The answer to each of these questions in this instance is emphatically "no." Courts in this District have also routinely approved the payment of fees under the business judgement rule, in connection with backstop commitment agreements. *See, e.g.*, *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC) (Bankr. S.D.N.Y. Sept. 26, 2019) [Docket No. 350] (authorizing entry into a postpetition restructuring support agreement and payment by the debtors of all reasonable and documented fees and expenses incurred by certain restructuring support parties); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr.

21

S.D.N.Y. Jan. 15, 2019) [Docket No. 291] (same); *In re AOG Entm't, Inc.*, Case No. 16-11090 (SMB) (Bankr. S.D.N.Y. June 29, 2016) [Docket No. 184] (same); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (S.D.N.Y. May 12, 2020) [Docket No. 1806] (approving the Debtors' reimbursement of fees and expenses incurred by backstop parties in connection with Debtors' rights offering); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 6, 2017) [Docket No. 3283] (same).

33.    The Fees are the product of hard-fought, good faith, and arms'-length negotiations among the Debtors, the Committee, and the BRIC, and each party's respective advisors. The Debtors and the BRIC are wholly unrelated, sharing no officers, directors, shareholders, incorporators, employees or economic interests—other than as embodied in these transactions—in common. Additionally, the Backup Plan Sponsor is not an "insider" as that term is defined in the Bankruptcy Code. 11 U.S.C. § 101(31).

34.    The Fees, individually and collectively, were a material inducement for, and a condition of, the Backup Plan Sponsor's entry into the Backup Plan Sponsor Agreement. The Bidding Procedures expressly contemplate a Backup Bidder, and the BRIC was the only party willing to serve as a Backup Bidder at the Auction. As recognized by the Bidding Procedures, a Backup Bidder provides real value to the Debtors' estates by allowing the Debtors to capture the value of the Auction process, even in the event the Successful Bidder fails. Moreover, as evidenced by the Debtors' receipt and consideration of a competing proposal, the Backup Transactions do not prevent the Debtors from considering alternative proposals for the Orderly Wind Down or standalone reorganization of the Debtors' mining business, in which case the Backup Plan Sponsor Agreement establishes a floor for another plan administrator to bid against. Indeed, as described above, the Debtors intend to commence the Backup Proposal RFP Process to consider alternative Backup Transactions Proposals. At the same time, the Debtors believe it is a

sound exercise of their business judgment to compensate the BRIC for its commitment to serve as the Backup Bidder through December 31, 2023.  Having the BRIC locked in and fully committed establishes a floor for the Debtors to solicit and consider competing proposals.  Accordingly, authorizing and approving the Fees will enhance, rather than hamper, a successful emergence from chapter 11.

35.     The amounts of the Fees are fair and reasonable relative to the benefits that inure and will continue to inure to the Debtors and their stakeholders from the proposed transaction with the Backup Plan Sponsor.  As discussed above, the Commitment Fee is $1.5 million, and the Expense Reimbursement is limited to $1.5 million for the Expense Reimbursement incurred prior to the Court's entry of the Order and thereafter subject to the Expense Reimbursement Monthly Cap of $300,000 per month (to be measured over any rolling three-month period).

36.     Moreover, the Fees constitute the "actual and necessary costs and expenses of preserving the estate" entitled to administrative expense status and payment under sections 503(b) and 507(a)(2) of the Bankruptcy Code.  11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2).  Courts in this jurisdiction, including in these chapter 11 cases in connection with the Bid Protections Motion, have provided administrative priority status to bidding incentives and expense reimbursements in the event that the applicable bidder becomes entitled to them.  *See, e.g.*, *In re All Year Holdings Ltd.*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Apr. 19, 2022) (approving treatment of break-up fee and expense reimbursement as administrative expenses); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) (same); *In re KB US Holdings, Inc.*, No. 20-22962 (SHL) (Bankr. S.D.N.Y. Sep. 17, 2020) (same); *In re Fairway Group Holdings Corp.*,

No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) (same); *In re Hooper Holmes, Inc. (d/b/a Provant Health)*, No. 18-23303 (Bankr. S.D.N.Y. Sept. 20, 2018) (same).[11]

37.     Here, the Fees were a material inducement for, and a condition of, the BRIC's execution of the Backup Plan Sponsor Agreement and willingness to serve as the Backup Bidder. The BRIC was unwilling to serve as the Backup Plan Sponsor without assurance of payment of the Fees. Absent the Debtors' agreement to pay such amounts, the BRIC would not have been willing to execute the Backup Plan Sponsor Agreement, threatening the Debtors' ability to pivot to an Orderly Wind Down and reorganization of the Debtors' mining business in a manner consistent with their fiduciary duties. Not to mention, NovaWulf declined to serve as a Backup Bidder. The BRIC has indicated that, absent the prompt payment of the Fees, the BRIC is unwilling to serve as the Backup Plan Sponsor. Thus, the payment of the Fees are actual and necessary costs of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code. Accordingly, the Fees should be accorded administrative expense status.

38.     Based on the foregoing, the Fees represent a reasonable exercise of the Debtors' business judgment and should be approved.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

39.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a) and (ii) the 14-day stay under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons described above, the relief

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' counsel.

requested is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.

### Notice

40.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the United States Attorney's Office for the Southern District of New York; (d) the Internal Revenue Service; (e) the offices of the attorneys general in the states in which the Debtors operate; (f) the Securities and Exchange Commission; (g) the BRIC; (h) Fahrenheit; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter the Order granting the relief

requested herein and such other relief as the Court deems appropriate under the circumstances.

| | |
|---|---|
| New York, New York<br>Dated: July 8, 2023 | */s/ Joshua A. Sussberg* |

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:    (212) 446-4900
Email:            joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:    (312) 862-2200
Email:            patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com
                      chris.koenig@kirkland.com
                      dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) AUTHORIZING AND**
**APPROVING CERTAIN FEES AND EXPENSES FOR THE**
**BACKUP PLAN SPONSOR, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving certain fees and expenses for the Backup Plan Sponsor and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Fees are approved in their entirety, subject to the terms of the Backup Plan Sponsor Agreement and as modified by this Order.

3.      The Debtors are authorized to pay in cash or by wire transfer of immediately available funds in accordance with the terms of the Backup Plan Sponsor Agreement without further action or order by the Court:  (a) the Commitment Fee and (b) the Expense Reimbursement.

4.      Notwithstanding anything to the contrary in the Backup Plan Sponsor Agreement, the Expense Reimbursement shall not exceed $1,500,000 in the aggregate for the fees and expenses incurred through July 19, 2023.

5.      The Expense Reimbursement Monthly Cap shall be modified to $300,000 per month as measured over any rolling three-month period.  If the Debtors exercise the Toggle Option and pivot to the Backup Transactions, the reasonable and documented expenses of the Backup Plan Sponsor shall no longer be subject to the Expense Reimbursement Monthly Cap starting on the date the Debtors exercise the Toggle Option and shall be deemed administrative expenses of the Debtors' estates.

6.        The Fees, to the extent payable under the Backup Plan Sponsor Agreement and as authorized by this Order, shall constitute allowed administrative expense claims against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code.

7.        Notwithstanding anything to the contrary in the Backup Plan Sponsor Agreement, the BRIC shall not be required to provide the Consultation Services and shall not be entitled to the Consultation Services Fee.

8.        Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether cryptocurrency tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

9.        Except with respect to the Fees and any actions taken pursuant to such relief, the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant

to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

10.    Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

11.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated:    _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE