Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF AMENDED AND RESTATED BACKUP PLAN**
**SPONSOR AGREEMENT AND DEADLINE TO SUBMIT BACKUP BIDS**

**PLEASE TAKE NOTICE** that on November 2, 2022, the United States Bankruptcy Court

for the Southern District of New York (the "Court") entered the *Order (I) Approving the Bidding*

*Procedures In Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling*

*Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof,*

*(IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8
USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors'
service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Relief* [Docket No. 1272] (the "Order"), approving certain dates, deadlines, and procedures for the potential sale of substantially all of the Debtors' assets (the "Bidding Procedures").[2]

**PLEASE TAKE FURTHER NOTICE** that on March 1, 2023, pursuant to and in accordance with paragraph 12 of the Order and Section VI of the Bidding Procedures, the Debtors, in consultation with the Committee, filed the *Notice of (I) Selection of Stalking Horse Bidder and (II) Amended Dates and Deadlines with Respect to Bidding Procedures for the Potential Sale of Substantially All of the Debtors' Assets* [Docket No. 2150] (the "Notice of Stalking Horse Bidder"), which designated NovaWulf Digital Management, LP ("NovaWulf") as the Stalking Horse Bidder, announced that the Debtors, the Committee, and NovaWulf executed a plan sponsor agreement, and extended the Final Bid Deadline to April 17, 2023.

**PLEASE TAKE FURTHER NOTICE** that, following the Debtors filing of the Notice of Stalking Horse Bidder and prior to the Final Bid Deadline, the Debtors received two additional Qualified Bids from: (1) Fahrenheit, LLC, whose equity is owned, directly or indirectly, by Arrington Capital, U.S. Data Mining Group, Inc. (d/b/a U.S. Bitcoin Corp.), Proof Group Capital Management LLC, Steven Kokinos, and Ravi Kaza ("Fahrenheit"); and (2) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (the "BRIC").

**PLEASE TAKE FURTHER NOTICE** that on April 22, 2023, the Debtors filed the *Notice of Auction* [Docket No. 2519], which established April 25, 2023 as the date that the Auction would commence.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Order, Bidding Procedures, Plan Sponsor Agreement, Backup Plan Sponsor Motion, or Backup Plan Sponsor Agreement (each as defined herein), as applicable.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to paragraph G of the Order and Section XI of the Bidding Procedures, the Debtors, in consultation with the Committee, commenced the Auction on April 25, 2023, at 2:00 p.m. (prevailing Eastern Time).  Prior to the Auction, Qualified Bidders were provided copies of the rules for the Auction (the "<u>Auction Rules</u>").  The Auction concluded on May 24, 2023.

**PLEASE TAKE FURTHER NOTICE** that on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713] (the "<u>Notice of Successful and Backup Bidder</u>"), which announced that, pursuant to Sections XII and XIII of the Bidding Procedures, the Debtors, in consultation with the Committee, selected Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.

**PLEASE TAKE FURTHER NOTICE** that on June 2, 2023, the Debtors filed the *Notice of Filing of Transcript of Auction Proceedings* [Docket No. 2748], which includes the certified transcripts of the on the record Auction proceedings (the "<u>Auction Transcripts</u>").

**PLEASE TAKE FURTHER NOTICE** that on June 6, 2023, the Debtors filed the *Notice of Debtors' Entry Into Plan Sponsor Agreement* [Docket No. 2759] (the "<u>Notice of Plan Sponsor Agreement</u>"), which announced that the Debtors, the Committee, and Fahrenheit entered into a plan sponsor agreement to memorialize the terms of the Successful Bid, which is attached thereto as <u>Exhibit A</u> (the "<u>Plan Sponsor Agreement</u>").

**PLEASE TAKE FURTHER NOTICE** that on July 8, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2978] (the "<u>Backup Plan Sponsor Motion</u>").

**PLEASE TAKE FURTHER NOTICE** on July 10, 2023, the Debtors, the Committee, the

BRIC, and the BRIC Exchange Partner executed the amended and restated backup plan sponsor agreement (the "Backup Plan Sponsor Agreement"), which is attached hereto as **Exhibit A**. The amended and restated Backup Plan Administration Agreement Term Sheet (the "Backup Plan Administration Agreement Term Sheet") is attached to the Backup Plan Sponsor Agreement as Exhibit A.

PLEASE TAKE FURTHER NOTICE that, pursuant to the terms of the Plan Sponsor Agreement, Backup Plan Sponsor Agreement, and Section XVIII of the Bidding Procedures, the Debtors, in consultation with the Committee, and in a manner consistent with the exercise of their fiduciary duties, are authorized to consider Alternative Restructuring Proposals (as defined in the Backup Plan Sponsor Agreement). The Debtors, in consultation with the Committee, intend to solicit and consider alternative restructuring proposals for the Backup Transactions (the "Backup Transaction Proposals").

PLEASE TAKE FURTHER NOTICE that the Debtors, in consultation with the Committee, will consider Backup Transaction Proposals for comprehensive Backup Transactions, standalone Backup Mining Transactions, and/or the Orderly Wind Down. Interested parties are invited to participate in the Backup Transaction Proposal Process and to submit Backup Transaction Proposals for the Debtors' consideration, in consultation with the Committee, by **Monday, July 31, 2023 at 11:59 p.m. (prevailing Eastern Time)**. All Backup Transaction Proposals should be in the same format as the Backup Plan Sponsor Agreement. For additional information, interested parties are invited to contact: (a) the Debtors' counsel, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn.: Ross M Kwasteniet, P.C. (ross.kwasteniet@kirkland.com), Christopher S. Koenig (chris.koenig@kirkland.com), and Dan Latona (dan.latona@kirkland.com); (b) the Debtors' investment bank, Centerview Partners LLC,

31 West 52nd Street, New York, New York 10019, Attn.: Marc Puntus (mpuntus@centerview.com), Ryan Kielty (rkielty@centerview.com), and Bob Beasley (bbeasley@centerview.com); and (c) the Debtors' restructuring advisor, Alvarez & Marsal North America, LLC, 600 Madison Avenue, 8th Floor, New York, New York 10022 Attn.: Robert Campagna (rcampagna@alvarezandmarsal.com) and Sam Schreiber (samuel.schreiber@alvarezandmarsal.com).

**PLEASE TAKE FURTHER NOTICE** that copies of the Order, Bidding Procedures, the Notice of Successful and Backup Bidder, the Auction Transcripts, the Notice of Plan Sponsor Agreement, the Backup Plan Sponsor Motion, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/celsius. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: July 10, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Backup Plan Sponsor Agreement**

*Execution Version*

THIS AMENDED AND RESTATED BACKUP PLAN SPONSOR AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS BACKUP PLAN SPONSOR AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.

### *AMENDED AND RESTATED BACKUP PLAN SPONSOR AGREEMENT*

This AMENDED AND RESTATED BACKUP PLAN SPONSOR AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with <u>Section 15.02</u>, this "**Agreement**") is made and entered into as of July 10, 2023 (the "**Execution Date**"), by and among the following parties (each, a "**Party**" and collectively the "**Parties**"):

(i)    Celsius Network LLC, a company incorporated under the Laws of Delaware ("**Celsius**"), and each of its affiliated debtors and debtors in possession that have executed and delivered counterpart signature pages to this Agreement (collectively, the "**Debtors**");

(ii)    the official committee of unsecured creditors of the Debtors, appointed by the United States Trustee for Region 2 (the "**U.S. Trustee**") in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (as defined herein) on July 27, 2022 [Docket No. 241], as may be reconstituted from time to time (the "**Committee**");

(iii)    The Blockchain Recovery Investment Consortium (together with any successors thereto, the "**BRIC**" or the "**Backup Plan Sponsor**"), which comprises Van Eck Absolute Return Advisers Corporation ("**VanEck**") and GXD Labs LLC ("**GXD**"); and

(iv)    Gemini Trust Company, LLC ("**Gemini**" or the "**BRIC Exchange Partner**").

### *RECITALS*

**WHEREAS**, on July 13, 2022 (the "**Initial Petition Date**") and December 7, 2022 (the "**GK8 Petition Date**"), as applicable, each of the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on November 2, 2022, the Bankruptcy Court entered the *Order (I) Approving the Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates With Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and*

*(V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**") authorizing the Debtors to solicit bids for the sale of some or substantially all of their assets;

**WHEREAS**, on March 1, 2023, pursuant to the Bidding Procedures Order, the Debtors, in consultation with the Committee, filed the *Notice of (I) Selection of Stalking Horse Bidder and (II) Amended Dates and Deadlines with Respect to Bidding Procedures for the Potential Sale of Substantially All of the Debtors' Assets* [Docket No. 2150] (the "**Notice of Stalking Horse Bidder**"), which designated NovaWulf Digital Management, LP ("**NovaWulf**") as the stalking horse bidder, announced that the Debtors, the Committee, and NovaWulf entered into that certain plan sponsor agreement dated as of February 28, 2023 (the "**NovaWulf Plan Sponsor Agreement**"), and extended the final bid deadline to April 17, 2023 (the "**Final Bid Deadline**");

**WHEREAS**, on March 31, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2358], which embodied the terms of the NovaWulf Plan Sponsor Agreement;

**WHEREAS**, following the filing of the Notice of Stalking Horse Bidder and prior to the Final Bid Deadline, the Debtors received two additional Qualified Bids (as defined in the Bidding Procedures Order) from: (i) Fahrenheit, LLC, whose equity is owned, directly or indirectly, by Arrington Capital, U.S. Data Mining Group, Inc. (d/b/a U.S. Bitcoin Corp.), Proof Group Capital Management LLC, Steven Kokinos, and Ravi Kaza ("**Fahrenheit**"); and (ii) the BRIC;

**WHEREAS**, on April 22, 2023, pursuant to the Bidding Procedures Order, the Debtors, in consultation with the Committee, filed the *Notice of Auction* [Docket No. 2519] after determining, in their reasonable discretion, that an auction (the "**Auction**") would maximize the value of the Debtors' estates;

**WHEREAS**, on April 25, 2023, pursuant to the Bidding Procedures Order, the Debtors, in consultation with the Committee, commenced the Auction;

**WHEREAS**, the Parties have engaged in good faith, arm's length negotiations regarding the restructuring transactions contemplated herein (collectively, the "**Backup Transactions**"), including:

(a) a pure play, publicly traded mining business in which Celsius creditors will receive 100% of the Equity Interests with a potential management contract with GXD (the "**Backup Mining Transaction**");

(b) a liquid Cryptocurrency distribution to Celsius creditors on or as soon as practicable after the Backup Plan Effective Date (as defined herein);

(c) a timely monetization of the remaining assets of the Debtors' estates and subsequent liquid Cryptocurrency distributions to Celsius creditors; and

(d) an orderly wind down.

**WHEREAS**, on May 3, 2023, the Debtors announced on the Auction record that the Debtors and the Committee had selected the BRIC to serve as the Backup Plan Sponsor on the terms and conditions described on the record and reflected in this Agreement;

**WHEREAS**, the Auction concluded on May 24, 2023, and on May 25, 2023, the Debtors, in consultation with the Committee, filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which designated Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder (each as defined herein);

**WHEREAS**, the Debtors shall implement the Backup Transactions to the extent the Debtors determine, in consultation with the Committee, to terminate the NewCo Transaction (as defined herein) with the Successful Bidder or other plan sponsor, as applicable, and switch to the Toggle Option contemplated by this Agreement (including the Backup Transactions) through the NewCo Plan in the event the Debtors make the Backup Plan Election;

**WHEREAS,** the Toggle Option shall contain the terms and conditions set forth in, and be materially consistent in all respects with, this Agreement, including the term sheet attached hereto as **Exhibit A** (the "**Backup Plan Administration Agreement Term Sheet**"); *provided* that nothing in this Agreement is intended to limit the Debtors' ability to pursue the NewCo Transaction or an Alternative Transaction.  For the avoidance of doubt, the Parties agree that the Backup Transactions contemplated by this Agreement shall be embedded in the Toggle Option of the NewCo Plan and solicited in connection with the NewCo Plan and related Disclosure Statement; and

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**Account Holder**" means any single Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date.

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with <u>Section 15.02</u> (including the Backup Plan Administration Agreement Term Sheet).

"**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> of this Agreement have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Transaction.

"**Alternative Transaction**" means a sale (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code), disposition, new-money investment, restructuring, reorganization, merger, amalgamation, joint venture, partnership, acquisition, consolidation, dissolution, winding up, debt investment, equity investment, liquidation, tender offer, rights offering, recapitalization, plan of reorganization or liquidation, share exchange, business combination, or similar transaction, in each case involving any one or more Debtors or the debt, equity, or other interests in any one or more Debtors that is inconsistent with this Agreement or consummation of the Backup Transactions; *provided* that an Alternative Transaction shall not include any NewCo Transaction, including the transactions contemplated by the Successful Bid; *provided*, *further*, that no transaction may provide worse treatment for a class of claimants than the Toggle Option.

"**Auction**" has the meaning set forth in the recitals to this Agreement.

"**Backup Bidder**" has the meaning set forth in the Bidding Procedures Order, as modified by the terms and conditions of this Agreement.

"**Backup Distribution Agent**" means the party or parties that will distribute or facilitate distributions under the Backup Plan to the extent the Debtors make the Backup Bid Election and consummate the Backup Transactions, and which shall make all necessary and desirable preparations in connection with such obligations.

"**Backup Mining Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Backup Plan Administration Agreement**" means the agreement containing the terms and conditions under which the Backup Plan Administrator would manage the assets held by the Wind Down Estate in the event that the Debtors make the Backup Plan Election and consummate the Backup Plan Transactions pursuant to the Toggle Option, including the terms of the Backup Plan Administrator Fees, the Oversight Committee Fee and such other terms as further set forth in the Backup Plan Administration Agreement Term Sheet, attached hereto as **Exhibit A**. The Backup Plan Administration Agreement shall be filed as part of the Backup Plan Supplement.

"**Backup Plan Administration Agreement Term Sheet**" has the meaning set forth in the recitals to this Agreement and is attached hereto as **Exhibit A**.

"**Backup Plan Administrator**" means an Entity designated by the BRIC to manage the assets held by the Wind Down Estate in the event that the Debtors make the Backup Plan Election and consummate the Backup Plan Transactions pursuant to the Toggle Option.

"**Backup Plan Administrator Fees**" has the meaning set forth in the Backup Plan Administration Agreement Term Sheet.

"**Backup Plan Effective Date**" means the date on which (a) all conditions precedent to the occurrence of the consummation of the Toggle Option have been satisfied or waived in accordance with the Toggle Option (including receipt of all Regulatory Approvals and the expiration or early termination of any applicable waiting periods related thereto) and (b) the Toggle Option is declared effective by the Debtors.

"**Backup Plan Election**" means the determination by the Debtors, in consultation with the Committee, to terminate the NewCo Transaction with the Successful Bidder or other plan sponsor, as applicable, and instead implement the Backup Transactions through the Toggle Option to the NewCo Plan.

"**Backup Plan Sponsor**" has the meaning set forth in the preamble to this Agreement.

"**Backup Plan Sponsor Advisors**" has the meaning set forth in Section 13.01 of this Agreement.

"**Backup Plan Sponsor Agreement Motion**" means a motion to be filed by the Debtors, in form and substance reasonably acceptable to the BRIC, the BRIC Exchange Partner, and the Committee, seeking approval of the Backup Plan Sponsor Agreement Order.

"**Backup Plan Sponsor Agreement Order**" means an order of the Bankruptcy Court approving the payment of the Fees, including the Expense Reimbursement for expenses incurred prior to, and through and including, the Agreement Effective Date, and the Commitment Fee, as described further in Section 13 of this Agreement.

"**Backup Plan Sponsor Counsel**" has the meaning set forth in Section 13.01 of this Agreement.

"**Backup Plan Sponsor Substantial Contribution Order**" means an order of the Bankruptcy Court approving a motion to be filed by the Backup Plan Sponsor, in form and substance reasonably acceptable to the Debtors and the Committee, seeking approval of an allowed administrative expense claim in favor of the Backup Plan Sponsor for expenses incurred by the Backup Plan Sponsor Advisors in connection with this Agreement, participating in the Bidding Process, the Auction, and pursuing approval of the Backup Plan Sponsor Agreement Order pursuant to sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

"**Backup Plan Supplement**" means the compilation of documents and forms of documents, agreement, schedules, and exhibits to the NewCo Plan, in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with its terms, this Agreement, the Bankruptcy Code, and the Bankruptcy Rules, to be filed (unless otherwise expressly required under this Agreement to be filed by a different date) by the Debtors no later than fourteen days before the deadline set by the Disclosure Statement Order to object to the NewCo Plan or such later date as may be approved by the Bankruptcy Court if the Debtors make the Backup Plan Election after the Confirmation Date, including the following, each as defined in this Agreement or the NewCo Plan as applicable: (a) the Backup Plan Administration Agreement; (b) the identity of the Backup Plan Administrator; (c) the identities and proposed compensation of the members of the Oversight Committee; (d) the Mining NewCo Organizational Documents; (e) the identities of the members of the Mining NewCo Board; (f) the schedule of Rejected Executory

5

Contracts and Unexpired Leases; (g) the schedule of proposed cure amounts; (h) the Transaction Steps Memorandum; (i) the Litigation Administrator Agreement; (j) the identity of the Litigation Administrator; (k) the identity and proposed compensation (if known) of the members of the Litigation Administrator Oversight Committee; (l) the Wind-Down Procedures; (m) the identities of Insiders and other individuals identified by the Committee who participated in the manipulation of the price of the CEL Token; (n) the Employee Transition Plan; (o) the Plan Administrator Budget; (p) the Schedule of Retained Causes of Action; (q) the Schedule of Additional Recovery Causes of Action; (r) the Schedule of Equitably Subordinated Claims; and (s) the Schedule of Excluded Parties.  The Backup Plan Supplement shall be deemed incorporated into and part of the NewCo Plan as if set forth therein in full; *provided* that, in the event of a conflict between the NewCo Plan and the Backup Plan Supplement, the Backup Plan Supplement shall control.

"**Backup Plan Transaction**" means the Backup Transactions (as defined in the recitals to this Agreement) but excluding the Backup Mining Transactions.

"**Backup Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"**Bid**" has the meaning set forth in the Bidding Procedures Order.

"**Bidding Procedures Order**" has the meaning set forth in the recitals to this Agreement.

"**Bidding Process**" means the marketing and sale process implemented by the Debtors pursuant to the Bidding Procedures Order to solicit Bids for the Debtors' assets.

"**BRIC**" has the meaning set forth in the preamble to this Agreement.

"**BRIC Exchange Partner**" has the meaning set forth in the preamble to this Agreement.

"**BRIC Mining Partner**" means Global X Digital, LLC, or an Affiliate thereof.

"**BRIC Parties**" means the BRIC, the BRIC Exchange Partner, the BRIC Mining Partner, and each of their Affiliates, current and former directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns (including any other

attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing.

"**BRIC Party Counsel**" has the meaning set forth in <u>Section 13.01</u> of this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**CEL Token**" means the Cryptocurrency Token native to the Debtors' platform defined by the smart contract code located at https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code.

"**Celsius**" has the meaning set forth in the preamble to this Agreement.

"**Celsius Account**" means any active account identified in the Debtors' books and records as having a balance as of the Petition Date. For the avoidance of doubt, (i) each Account Holder's Celsius Accounts shall be aggregated such that each Account Holder's holdings are reflected in a single Celsius Account and (ii) the consolidation described in (i) shall not eliminate the designations associated with such assets based on the program the Account Holders participated in (*e.g.*, "Earn," "Custody," etc.).

"**Celsius Mining**" means Debtor Celsius Mining LLC and its non-Debtor subsidiary Celsius Mining IL Ltd.

"**Celsius Mining Assets**" means all real and personal, tangible and intangible property, assets and rights of any kind or nature whatsoever of Celsius Mining, whether now owned or hereafter acquired by Celsius Mining, including the Core Claims (as defined herein), all accounts receivable, security deposits and prepaid assets of Celsius Mining, all Bitcoin mining equipment and servers thereof, all Bitcoin or similar Tokens or instruments held or owned by Celsius Mining, all Equity Interests that Celsius Mining owns, directly or indirectly, in any subsidiary that owns or operates the bitcoin mining business commonly known as Celsius Mining, including, but not limited to, Celsius Mining IL Ltd. and all assets, contracts, and agreements, used by or useful to, the Debtors relating to the Bitcoin mining business other than those that the Debtors elect not to contribute to the Mining NewCo.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Commitment Fee**" has the meaning set forth in <u>Section 13.02</u> of this Agreement.

"**Committee**" has the meaning set forth in the preamble to this Agreement.

"**Confidential Information**" means all information, tangible or intangible, pertaining to the Debtors' business, including, without limitation, (i) trade secrets, know how, inventions,

proprietary information, intellectual property, software, data, research, marketing arrangements, competitive analyses, and customer vendor and other lists, (ii) information about products, services, pricing, policies, costs, profits, employee and customer information, (iii) information about business, marketing, and strategic plans, practices, and studies, (iv) forecasts, unpublished financial information, budgets and projections, in each case, which are not generally known to the public (other than through a breach of this agreement), (v) any material non-public information subject to a Confidentiality Agreement, and (vi) any information shared whether spoken, printed, electronic, or any other form or medium, by the Debtors, either intentionally or unintentionally, with the BRIC or the BRIC Exchange Partner that is not generally known to the public.  For the avoidance of doubt, any information shared with the BRIC or the BRIC Exchange Partner in connection with any potential restructuring transaction that is not generally known to the public is Confidential Information.

"**Confidentiality Agreement**" means an executed confidentiality agreement with the BRIC and the BRIC Exchange Partner, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information in connection with the NewCo Transaction, Auction, or Backup Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the NewCo Plan pursuant to section 1129 of the Bankruptcy Code.

"**Core Claims**" means the claims and causes of action set forth in the Proofs of Claims filed in the *In re Core Scientific, Inc.* bankruptcy proceedings, before Judge Jones in the U.S. Bankruptcy Court for the Southern District of Texas and jointly administered under Case No. 22-90341, including but not limited to: Claim Nos. 425, 428, 434, 436, 439, 469, 494, 495, 496, and 497.

"**Cryptocurrency**" means a fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a decentralized protocol, operating independently from a central bank.

"**Current Proposed Plan**" means the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2358] dated March 31, 2023.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means the documents listed in Section 3.01 of this Agreement.

"**Disclosure Statement**" means the related disclosure statement with respect to the NewCo Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or modified from time to time, to be approved pursuant to the Disclosure Statement Order.

"**Disclosure Statement Order**" means the order (and all exhibits thereto), entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the NewCo Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

"**Employee Transition Plan**" means the agreement entered into by the Debtors, and to the extent the Debtors make the Backup Plan Election, the Backup Plan Sponsor, the BRIC Exchange Partner, and the BRIC Mining Partner, containing the terms and conditions under which certain of the Debtors' employees will be available to (i) provide transition services to the Debtors, the Post-Effective Date Debtors, and/or Mining NewCo and its subsidiaries and (ii) at the option of the BRIC Mining Partner, become employees of Mining NewCo and/or its subsidiaries.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Expense Reimbursement**" has the meaning set forth in Section 13.01 of this Agreement.

"**Expense Reimbursement Monthly Cap**" has the meaning set forth in Section 13.01 of this Agreement.

"**Express Representations**" has the meaning set forth in Section 10 of this Agreement.

"**Fees**" means, collectively, the Expense Reimbursement and Commitment Fee, each having the meaning set forth in Section 13 of this Agreement.

"**Gemini**" has the meaning set forth in the preamble to this Agreement.

"**Gemini Affiliates**" means, with respect to Gemini, any corporation, limited liability company, limited partnership, or other organization or entity that directly or indirectly controls, is controlled by, or is under common control with Gemini, where "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the corporation, limited liability company, limited partnership or other organization or entity through ownership of voting securities, or membership interests.

"**GK8 Debtors**" means Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC.

"**GK8 Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Governmental Authority**" means (i) any U.S. federal, state, county, civil, or local legislative, administrative, self-regulatory or regulatory authority, agency court, tribunal, or judicial or arbitral body or other governmental or quasi-governmental entity with competent jurisdiction or (ii) any supranational or non-U.S. authority of similar jurisdiction.

"**GXD Affiliates**" means, with respect to GXD, any corporation, limited liability company, limited partnership, or other organization or entity that directly or indirectly controls, is controlled by, or is under common control with GXD, where "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the corporation, limited liability company, limited partnership or other organization or entity through ownership of voting securities, or membership interests.

"**Initial Litigation Funding Amount**" has the meaning set forth in the Current Proposed Plan.

"**Initial Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**Litigation Administrator**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Administrator Agreement(s)**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Oversight Committee**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Proceeds**" has the meaning set forth in the Current Proposed Plan.

"**Litigation Recovery Account**" has the meaning set forth in the Current Proposed Plan.

"**Milestones**" has the meaning set forth in Section 4 of this Agreement.

"**Mining NewCo**" means the to be up-listed publicly-traded Entity or Entities that will contain all of Celsius Mining and Celsius Mining Assets, which shall be managed by the BRIC Mining Partner for the benefit of holders of Mining NewCo Equity. For the avoidance of doubt, Mining NewCo will be established through the consummation of the Backup Mining Transactions pursuant to the Toggle Option.

"**NewCo Plan**" means a chapter 11 plan of reorganization to consummate the NewCo Transaction with the Successful Bidder and which shall include the Toggle Option.

"**NewCo Plan Effective Date**" means the date on which the Debtors declare a NewCo Plan effective.

"**NewCo Transaction**" means the transactions contemplated by the Successful Bid to create a new entity or entities that will operate and/or manage the Debtors' liquid and illiquid assets (including the mining business, retail, and institutional loan portfolios, staked Cryptocurrency, and other alternative investments), not including the Toggle Option.

"**NovaWulf**" has the meaning set forth in the recitals to this Agreement.

"**NovaWulf Plan Sponsor Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Oversight Committee**" means the seven member committee tasked with overseeing the Backup Plan Administrator's administration of the Wind Down Estate, five initial members of which shall be selected by the Committee, provided that the BRIC shall have consent rights over three of the Committee's selections, and two initial members of which shall be appointed by the BRIC, subject to the consent of the Committee, identified and disclosed in the Backup Plan Supplement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the Initial Petition Date with respect to the Debtors other than the GK8 Debtors and the GK8 Petition Date with respect to the GK8 Debtors.

"**Recovery Causes of Action**" has the meaning set forth in the Current Proposed Plan.

"**Regulatory Approvals**" means any consents, approvals, or permissions of Governmental Authorities, including, for the avoidance of doubt, the U.S. Securities and Exchange Commission, that are necessary to implement and consummate the Backup Transactions, which shall be set forth in greater detail on a schedule to be delivered by the Backup Plan Sponsor to the Debtors and the Committee.

"**Related Party**" means with respect to an Entity, each of, and in each case solely in its capacity as such, (i) such Entity's current and former Affiliates and (ii) such Entity's, and such Entity's current and former Affiliates', directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing. Notwithstanding anything to the contrary in the NewCo Plan, no Excluded Party shall constitute a Related Party in any capacity under the NewCo Plan.

"**Requisite Notice Parties**" has the meaning set forth in Section 12.06 of this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

11

"**Solicitation Materials**" means the solicitation materials with respect to the NewCo Plan, including the court-approved Disclosure Statement, form of ballots, and any other solicitation materials, including the solicitation version of the NewCo Plan.

"**Solvent**" means, with respect to any Person or Entity, that such Person or Entity: (i) is able to pay its debts as they become due; (ii) owns property that has a fair value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent liabilities); and (iii) has adequate capital to carry on its business.

"**Successful Bid**" has the meaning set forth in the Bidding Procedures Order.

"**Successful Bidder**" means Fahrenheit.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05 of this Agreement.

"**Termination Event**" means any event described in Sections 12.01, 12.02, or 12.03 of this Agreement.

"**Toggle Option**" means the Backup Transactions to the extent the Debtors determine, in consultation with the Committee, to terminate the NewCo Transaction (as defined herein) with the Successful Bidder and pivot to the transactions contemplated by this Agreement (including the Backup Transactions) through the NewCo Plan in the event the Debtors make the Backup Plan Election.

"**Token**" means a unit of Cryptocurrency.

"**VE Affiliates**" means, with respect to VanEck, any corporation, limited liability company, limited partnership, or other organization or entity that directly or indirectly controls, is controlled by, or is under common control with VanEck, where "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the corporation, limited liability company, limited partnership or other organization or entity through ownership of voting securities, or membership interests.

"**Wind Down Estate**" means the chapter 11 estates on and after the Backup Plan Effective Date.

1.02.    *Interpretation*.  For purposes of this Agreement:

(a)     capitalized terms used but not defined herein shall have the meanings ascribed to them in the Current Proposed Plan;

(b)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(c)     capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation";

(j)      the words "to the extent" shall mean "the degree by which" and not "if":

(k)      all time periods before which, within which, or following which any act is to be done or step taken pursuant to this Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a);

(l)      the word "will" will be construed to have the same meaning and effect as the word "shall."  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive;

(m)      all references to "$" and "dollars" will be deemed to refer to United States currency unless otherwise specifically provided;

(n)      all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided;

(o)      any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived, in accordance herewith, if applicable; and

(p)      where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**Section 2.** *Effectiveness of this Agreement.* This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Time, on the Agreement Effective Date:

(a)    each of the Debtors shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)    the BRIC and the BRIC Exchange Partner each shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties; and

(c)    counsel to the Committee shall have executed this Agreement and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties.

**Section 3.** *Definitive Documents*

3.01.    The Definitive Documents are all documents reasonably necessary or desirable to implement or give effect to the Backup Transactions, including the following: (A) the NewCo Plan (and any and all exhibits, annexes, and schedules thereto); (B) the Confirmation Order; (C) the Disclosure Statement and the other Solicitation Materials; (D) the Disclosure Statement Order; (E) the Backup Plan Sponsor Agreement Motion; (F) the Backup Plan Sponsor Agreement Order; (G) the Backup Plan Supplement (including, for the avoidance of doubt, the Backup Plan Administration Agreement); (H) any definitive documents related to the Backup Mining Transaction; (I) an agreement to engage the BRIC Exchange Partner to facilitate in-kind Cryptocurrency distributions to Account Holders, to the extent provided under the Toggle Option, (J) any and all other material documents, deeds, agreements, filings, notifications, letters, or instruments reasonably necessary or desirable to consummate the Backup Transactions, which shall exclude, for the avoidance of doubt, any affidavits, statements of financial affairs and schedules of assets and liabilities, monthly operating reports or other periodic reports, retention applications or fee applications, fee statements or other notices, declarations, or other documents filed by the Debtors or the Committee with respect thereto, and other similar ministerial documents filed with the Bankruptcy Court; and (K) any amendments, modifications or supplements to such documents.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Backup Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 14. Furthermore, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall be consistent with this Agreement and in form and substance reasonably acceptable to the Debtors, the Backup Plan Sponsor, the BRIC Exchange Partner and the Committee; *provided* that the Backup Plan Sponsor Agreement Motion and the Backup Plan Administration Agreement shall be in form and substance acceptable to the Debtors, the Committee, and the Backup Plan Sponsor; *provided*, *further*, that the documents and forms of documents, agreements, schedules, and exhibits to the NewCo Plan with respect to the Recovery Causes of Action, the Litigation Recovery Account, the

Litigation Proceeds, the Litigation Administrator, and the Litigation Oversight Committee, including the Litigation Administrator Agreement, shall be in form and substance acceptable to the Committee in its sole and absolute discretion; *provided*, *further*, that the Initial Litigation Funding Amount shall be in form and substance acceptable to the Committee and the Debtors.

**Section 4.**    *Milestones.*  The following milestones shall apply to this Agreement (collectively, the "**Milestones**"), which shall be subject to waiver and extension upon the written consent of each of the Parties (e-mail among counsel being sufficient):

(a)    by no later than July 8, 2023, the Debtors shall file, the Backup Plan Sponsor Agreement Motion with this Agreement attached as an exhibit thereto; and

(b)    by no later than July 19, 2023, the Bankruptcy Court shall have entered the Backup Plan Sponsor Agreement Order.

**Section 5.**    ***Commitments of the Backup Plan Sponsor and BRIC Exchange Partner***

5.01.    Affirmative Commitments

During the Agreement Effective Period, the Backup Plan Sponsor and BRIC Exchange Partner each agree to:

(i)    to the extent the Debtors make the Backup Plan Election, support the Backup Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate, or otherwise give effect to the Backup Transactions in accordance with this Agreement, including voting and exercising any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Backup Transactions, and voting, if applicable, in favor of the NewCo Plan and supporting and consenting to the releases and exculpation provisions in the NewCo Plan; *provided* that the BRIC agrees to take the steps reasonably necessary and desirable to support, facilitate, implement, consummate, or otherwise give effect to the NewCo Transaction in accordance with this Agreement;

(ii)    to the extent the Debtors make the Backup Plan Election, to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Backup Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediments;

(iii)    to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to oppose the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Backup Transactions; *provided* that such commercially reasonable efforts shall not include filing formal objections or pleadings with the Bankruptcy Court;

(iv)    to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Backup Transactions from the Debtors' other stakeholders;

(v)    to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to obtain, or assist the Debtors in obtaining, as applicable, any and all required Regulatory Approvals and/or third-party approvals for the Backup Transactions; and

(vi)    to the extent the Debtors make the Backup Plan Election, negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

5.02.    <u>Negative Commitments</u>.  During the Agreement Effective Period, the Backup Plan Sponsor and BRIC Exchange Partner shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with the Debtors' solicitation of votes in favor, implementation, or consummation of the NewCo Transaction;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of any restructuring transaction described in this Agreement or the NewCo Plan;

(c)    file any motion or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the NewCo Plan;

(d)    take any action that is intended to frustrate or impede approval, implementation, and/or consummation of (i) the NewCo Transaction, (ii) the NewCo Plan, or (iii) a plan sponsor agreement (including any and all exhibits, annexes, and schedules thereto) to be executed by the Debtors, the Committee, and the Successful Bidder; or

(e)    take any action that is intended to frustrate or impede the Debtors or the Committee from negotiating any Alternative Restructuring Proposal.

5.03.    <u>Backup Bid</u>.  The Backup Plan Sponsor agrees to serve as the Backup Bidder through and including December 31, 2023 on the terms and conditions set forth in this Agreement. Pursuant to the NewCo Plan, the Backup Plan Sponsor will designate an entity to serve as the Backup Plan Administrator for the Wind Down Estates in the event that the Debtors determine in an exercise of their fiduciary duties, in consultation with the Committee, to make the Backup Plan Election.  Furthermore, subject to <u>Section 12</u> of this Agreement, the Backup Plan Sponsor and the BRIC Exchange Partner agree not to object to, directly or indirectly, the Debtors' decision to pursue the NewCo Transaction with the Successful Bidder.

5.04.    <u>Non-Disparagement</u>.  For a period of one year from the date of this Agreement, the Backup Plan Sponsor and the BRIC Exchange Partner shall not, and shall each respectively cause their employees and agents to not, without the prior written consent of the Debtors and the Committee (until dissolved), whether directly or indirectly, (i) make any public statement, in connection with these Chapter 11 Cases, regarding the Debtors, the Debtors' professionals, the Debtors' current directors or employees, the Committee, the Committee's members, Committee's professionals, the NewCo Transaction, the Successful Bidder, or the Bidding Process; or (ii) knowingly encourage or induce others to make any public statement, in connection with these Chapter 11 Cases regarding the Debtors, the Debtors' professionals, the Debtors'

current directors or employees, the Committee, the Committee's members, the Committee's professionals, the NewCo Transaction, the Successful Bidder, or the Bidding Process; *provided* that the foregoing shall not prevent the BRIC Parties from (a) making any truthful statement to the extent required by Law or a Governmental Authority to disclose or make accessible such information, (b) exercising or enforcing any of its rights under this Agreement, or (c) filing any motion or pleading with the Bankruptcy Court or any other court (including any modifications or amendments thereof) to oppose an Alternative Transaction (unless the Backup Plan Sponsor agrees to serve as the Backup Bidder for any Alternative Transaction).  Notwithstanding the termination of this Agreement or the occurrence of any Termination Event under <u>Section 12</u> of this Agreement, the Backup Plan Sponsor's obligations under this <u>Section 5.04</u> of the Agreement shall survive the termination of this Agreement for a period of one year following the date of this Agreement; *provided*, *further*, that following the Effective Date of any plan or termination of this Agreement, the Debtors, the Committee, the Committee's members, the Committee's professionals, and successors to the Debtors shall have the right to enforce this <u>Section 5.04</u>.

5.05.   <u>Confidentiality</u>.  Except as may be required under applicable Law or legal process, the Backup Plan Sponsor and the BRIC Exchange Partner shall not, and shall each respectively cause their employees and agents to not, directly or indirectly, use or disclose to any Person or Entity any Confidential Information without the prior written consent of the Debtors and the Committee, including any information obtained or received in connection with the Auction, the Backup Plan Sponsor Agreement, any NewCo Transaction, the Backup Transactions, or otherwise. For the avoidance of doubt, notwithstanding termination of this Agreement or the occurrence of any Termination Event under <u>Section 12</u> of this Agreement, the Backup Plan Sponsor's obligations under this <u>Section 5.05</u> of the Agreement shall survive the termination of this Agreement for a period of one year following the Agreement Effective Date.

**Section 6.** *Commitments of the Debtors*.

6.01.   <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 8</u>, during the Agreement Effective Period, the Debtors agree to:

(a)     support and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the NewCo Transaction and/or the Backup Transactions in accordance with this Agreement; *provided* that, for the avoidance of doubt, nothing herein shall require the Debtors to make the Backup Plan Election (including consummation of the Backup Plan Transaction and/or Backup Mining Transaction) or limit the Debtors' ability to consummate the NewCo Transaction or an Alternative Transaction with the Successful Bidder or another plan sponsor;

(b)     to the extent the Debtors make the Backup Plan Election, provide and file an amended plan giving effect to the Backup Transactions in accordance with this Agreement, in form and substance acceptable to the Committee, the Backup Plan Sponsor, and the BRIC Exchange Partner;

(c)     draft and propose the NewCo Plan, and to the extent the Debtors make the Backup Plan Election, in such a manner that provides the Backup Plan Sponsor, the BRIC Exchange

Partner, and the BRIC Parties the benefits of any provision included in favor of the Successful Bidder, including the release and exculpation provisions of such NewCo Plan;

(d)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Backup Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e)    use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the NewCo Transaction and/or the Backup Transactions, including, but not limited to, timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; (vi) modifying or terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or (vii) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the NewCo Transaction and/or the Backup Transactions;

(f)    to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts, and provide such assistance as may be reasonably required by the Backup Plan Sponsor, to obtain any and all required Regulatory Approvals and/or third-party approvals for the Backup Transactions;

(g)    to the extent the Debtors make the Backup Plan Election, negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Backup Transactions as contemplated by this Agreement;

(h)    to the extent the Debtors make the Backup Plan Election, use commercially reasonable efforts to seek additional support for the Backup Transactions from their other material stakeholders to the extent reasonably prudent;

(i)    provide Backup Plan Sponsor Counsel with drafts of the Definitive Documents that the Debtors intend to file with the Bankruptcy Court as soon as reasonably practicable under the circumstances prior to their filing; *provided* that the Debtors shall provide the Backup Plan Sponsor Counsel with drafts of the Disclosure Statement and any motion seeking approval of the Disclosure Statement at least two Business Days before the filing of such documents with the Bankruptcy Court;

(j)      inform Backup Plan Sponsor Counsel as soon as reasonably practicable and in any event within two Business Days following (i) receipt of any notice or other correspondence from a third party asserting its consent is required to implement the Backup Transactions and (ii) any determination by the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, that taking any action, or refraining from taking any action, with respect to the Backup Transactions would be inconsistent with applicable Law or its fiduciary obligations under applicable Law or, in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, in accordance with Section 8;

(k)      use commercially reasonable efforts to seek timely entry of the Backup Plan Sponsor Agreement Order, via a motion in form and substance reasonably acceptable to the BRIC, the BRIC Exchange Partner, and the Committee, and, upon entry of the Backup Plan Sponsor Agreement Order, promptly pay and reimburse all Fees pursuant to this Agreement and the Backup Plan Sponsor Agreement Order;

(l)      to the extent the Debtors seek to enter into an Alternative Transaction after making the Backup Plan Election, determine whether to enter into an Alternative Transaction within 3 Business Days after such election; and

(m)      to the extent the Court does not enter the Backup Plan Sponsor Agreement Order, use commercially reasonable efforts to support entry of the Backup Plan Sponsor Substantial Contribution Order.

6.02.   Negative Commitments.  Subject in all cases to Section 8, during the Agreement Effective Period, each of the Debtors shall not directly or indirectly:

(a)      agree to any provision in the NewCo Plan or any other plan sponsor agreement related thereto that is inconsistent with or contrary to the terms and conditions of this Agreement, it being understood that this Agreement permits the Debtors to pursue the NewCo Transaction as contemplated in the NewCo Plan prior to the Debtors making the Backup Plan Election;

(b)      to the extent the Debtors make the Backup Plan Election, object to, delay, impede, or take any other action to interfere with confirmation of the Backup Plan Transactions or acceptance, implementation, or consummation of the Backup Plan Transactions;

(c)      in the event the Debtors make the Backup Plan Election, take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Backup Transactions described in this Agreement or the Toggle Option within the NewCo Plan; *provided* that, for the avoidance of doubt, the Debtors shall be permitted to pursue the NewCo Transaction with the Successful Bidder;

(d)      to the extent the Debtors make the Backup Plan Election, modify the Toggle Option within the NewCo Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(e)      to the extent the Debtors make the Backup Plan Election, withdraw or revoke the Toggle Option within the NewCo Plan, as applicable, or publicly announce its intention not to pursue the Backup Transactions;

(f)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including in violation of the consent rights of any Party as to the form and substance of such motion, pleading, or Definitive Document) or the Toggle Option within the NewCo Plan; or

(g)      commence, support, or join any litigation or adversary proceeding against the BRIC, the BRIC Exchange Partner, the GXD Affiliates, the Gemini Affiliates or the VE Affiliates, other than in connection with the interpretation or enforcement of the Debtors' rights under this Agreement.

**Section 7.      *Commitments of the Committee***

7.01.      <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 9</u>, during the Agreement Effective Period, the Committee agrees to:

(a)      support the NewCo Transaction and/or the Backup Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the NewCo Transaction and/or the Backup Transactions in accordance with this Agreement, including supporting the NewCo Plan and consenting to the releases and exculpation provisions in the NewCo Plan; *provided* that, for the avoidance of doubt, nothing herein shall limit the Committee's ability to consummate the NewCo Transaction or an Alternative Transaction with the Successful Bidder or another plan sponsor;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Backup Transactions contemplated herein, take all commercially reasonable steps reasonably requested by the Debtors or the Backup Plan Sponsor to address any such impediment;

(c)      use commercially reasonable efforts to support the NewCo Plan and the Toggle Option within the NewCo Plan proposed by the Debtors that provides the Backup Plan Sponsor, the BRIC Exchange Partner, and the BRIC Parties the benefits of any provision included in favor of the Successful Bidder, including the release and exculpation provisions of such NewCo Plan;

(d)      use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the NewCo Transaction and/or the Backup Transactions, including timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; or (vi) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would,

or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the NewCo Transaction and/or the Backup Transactions;

(e)    use commercially reasonable efforts to support entry of the Backup Plan Sponsor Agreement Order;

(f)    to the extent the Debtors make the Backup Plan Election, with the consent of the Committee, use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Backup Transactions from the Debtors' other stakeholders, including by delivering to the Debtors, at least five Business Days prior to the hearing with respect to entry of the Disclosure Statement Order, a draft of the proposed letter to be included in the Solicitation Materials expressing the Committee's support for the NewCo Plan and the Committee's recommendation that holders of unsecured claims against the Debtors vote to accept the NewCo Plan; and

(g)    to the extent the Court does not enter the Backup Plan Sponsor Agreement Order, use commercially reasonable efforts to support entry of the Backup Plan Sponsor Substantial Contribution Order.

7.02.    <u>Negative Commitments</u>.  Subject in all cases to <u>Section 9</u>, during the Agreement Effective Period, the Committee shall not directly or indirectly:

(a)    agree to any provision in the NewCo Plan or any plan sponsor agreement related thereto that is inconsistent with or contrary to the terms and conditions of this Agreement;

(b)    in the event the Debtors make the Backup Plan Election, with the consent of the Committee, object to, delay, impede, or take any other action to interfere with confirmation of the Toggle Option within the NewCo Plan or acceptance, implementation, or consummation of the Backup Transactions;

(c)    in the event the Debtors make the Backup Plan Election, with the consent of the Committee, take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Backup Transactions, the Toggle Option within the NewCo Plan, or other chapter 11 plan of reorganization filed by the Debtors;

(d)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof), solely relating to the NewCo Plan or the Toggle Option, that, in whole or in part, is not materially consistent with this Agreement, a NewCo Plan, or other chapter 11 plan of reorganization filed by the Debtors;

(e)    commence, support, or join any litigation or adversary proceeding, solely relating to the NewCo Plan or the Toggle Option, against the BRIC, the BRIC Exchange Partner, the GXD Affiliates, the Gemini Affiliates or the VE Affiliates, other than in connection with the interpretation or enforcement of the Committee's rights under this Agreement; or

(f)    object, directly or indirectly, or support in any way the objection of any Party or Entity to the entry of the Backup Plan Sponsor Agreement Order or payment of any amounts

payable to the Backup Plan Sponsor under the Backup Plan Sponsor Agreement Order in accordance with its terms.

**Section 8.**     *Additional Provisions Regarding Debtors' Commitments*

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel to the Debtors, to take any action or to refrain from taking any action with respect to any NewCo Transaction or the Backup Transactions, as applicable, to the extent taking or failing to take such action would, based on the advice of counsel to the Debtors, be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement; *provided*, *however*, that in the event such Debtor determines the Fees payable to the Backup Plan Sponsor as set forth in Section 13 of this Agreement are inconsistent with its fiduciary duties and ceases payment of such Fees as a result, the Backup Plan Sponsor and BRIC Exchange Partner shall no longer be obligated to perform under this Agreement.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Debtor and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights, but not the obligations, to take all actions necessary to consummate the NewCo Transaction or an Alternative Transaction.

8.03.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Debtor and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Debtor to any Entity or enter into confidentiality agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the NewCo Transaction, the Backup Transactions, or Alternative Restructuring Proposals; *provided* that the Debtors shall provide notice to the Backup Plan Sponsor within two Business Days of any decision by the Debtors or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to pursue an Alternative Restructuring Proposal.

8.04.    Nothing in this Agreement shall:  (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the NewCo Transaction, the Backup Transactions, or an Alternative Transaction; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**       ***Additional Provisions Regarding Committee's Commitments***

9.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Committee, after consulting with counsel to the Committee, to take any action or to refrain from taking any action with respect to any NewCo Transaction or the Backup Transactions to the extent taking or failing to take such action, based on the advice of counsel to the Committee, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this <u>Section 9.01</u> shall not be deemed to constitute a breach of this Agreement; *provided, however,* that in the event the Committee determines the Fees payable to the Backup Plan Sponsor as set forth in <u>Section 13</u> of this Agreement is inconsistent with its fiduciary duties and causes the Debtors to cease payment of such Fees as a result, the Backup Plan Sponsor and BRIC Exchange Partner are no longer obligated to perform under this Agreement.

9.02.    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 9.01</u>), the Committee and its respective members, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights, but not the obligations, to take all actions necessary to consummate the NewCo Transaction or an Alternative Transaction.

9.03.    Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 9.01</u>), the Committee and its respective members, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) enter into confidentiality agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the NewCo Transaction, the Backup Transactions, or Alternative Restructuring Proposals; *provided* that the Committee shall provide notice to the Backup Plan Sponsor Counsel within two Business Days of any decision by the Committee, after consulting with counsel, to pursue an Alternative Restructuring Proposal.

9.04.    Nothing in this Agreement shall:  (a) impair or waive the rights of the Committee to assert or raise any objection permitted under this Agreement in connection with the NewCo Transaction, the Backup Transactions, or an Alternative Transaction; or (b) prevent the Committee from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.**       ***Representations and Warranties of the Backup Plan Sponsor and BRIC Exchange Partner.***  Each member of the Backup Plan Sponsor and BRIC Exchange Partner represent and warrant that, as of the date such members of the Backup Plan Sponsor and BRIC Exchange Partner each execute and deliver this Agreement and as of the Backup Plan Effective Date:

(a)      Each member of the Backup Plan Sponsor and the BRIC Exchange Partner are, and immediately after giving effect to the Backup Transactions, shall each be, Solvent;

(b)      to its knowledge, no facts or circumstances, including in respect to any pending or threatened legal actions, exist that would reasonably be expected to materially impair or materially delay the ability of any member of the Backup Plan Sponsor or the BRIC Exchange Partner to consummate the Backup Transactions pursuant to the Toggle Option;

(c)      the Backup Plan Sponsor and the BRIC Exchange Partner each hold (or has contractual relationships by which it has access to) all material licenses, franchises, permits, certificates, approvals, and authorizations from U.S. Governmental Authorities necessary for the Backup Plan Sponsor to consummate the Backup Transactions (including the Backup Plan Transaction and Backup Mining Transaction) and to execute, deliver, and perform under the Backup Plan Administration Agreement;

(d)      there are no actions or proceedings pending or, to the knowledge of each member of Backup Plan Sponsor and BRIC Exchange Partner, threatened against or affecting the any member of the Backup Plan Sponsor or the BRIC Exchange Partner that would reasonably be expected to materially impair or materially delay the Backup Plan Sponsor's members' or the BRIC Exchange Partner's performance under this Agreement or the Backup Plan Administration Agreement or the consummation of the transactions contemplated by this Agreement, the Backup Plan Administration Agreement or the Backup Transactions;

(e)      other than as otherwise contemplated by this Agreement, there are no contracts, undertakings, commitments, agreements or obligations, whether written or oral, between any member of the Backup Plan Sponsor, the BRIC Exchange Partner or any of their Affiliates or representatives, on the one hand, and any member of the management of any Debtor or its board of directors (or applicable governing body of any Affiliate of any Debtor), any holder of equity or debt securities of any Debtor, or any lender or creditor of any Debtor or any Affiliate of any Debtor, on the other hand, that would be reasonably likely to prevent, restrict, impede, or affect adversely the ability of any Debtor or any of its Affiliates to entertain, negotiate or participate in any such transactions in any material respect;

(f)      as of the Backup Plan Effective Date, each member of the Backup Plan Sponsor and BRIC Exchange Partner will not be a "foreign person," as defined in section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof; and

(g)      notwithstanding anything contained in this Section 10 or any other provision of this Agreement to the contrary, each member of the Backup Plan Sponsor and the BRIC Exchange Partner acknowledge and agree that the representations and warranties expressly contained in Section 11 hereof (the "**Express Representations**") are the sole and exclusive representations, warranties, and statements of any kind made to such member of the Backup Plan Sponsor or BRIC Exchange Partner and on which such member of the Backup Plan Sponsor or BRIC Exchange Partner may rely in connection with the Backup Transactions.  The Backup Plan Sponsor and BRIC Exchange Partner each acknowledge and agree that all other representations, warranties, and statements of any kind or nature expressed or implied, whether in written, electronic or oral form are, in each case specifically disclaimed by the Debtors and the Committee and that the Backup

24

Plan Sponsor and the BRIC Exchange Partner have not relied, are not relying on, and will not rely on any such representations, warranties, or statements. The Backup Plan Sponsor and BRIC Exchange Partner have not relied on, are not relying on, and will not rely on, the Debtors, any information presentation, any projections, any dataroom, or any information, statements, disclosures, documents, projections, forecasts or other material made available to the Backup Plan Sponsor, the BRIC Exchange Partner or any of their Affiliates or representatives in any dataroom or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or the Debtors or any of their Affiliates or representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that the Backup Plan Sponsor and BRIC Exchange Partner have relied, are relying, and will rely only on the Express Representations).

**Section 11.** *Mutual Representations and Warranties.* Each of the Debtors, the Committee, members of the Backup Plan Sponsor, and the BRIC Exchange Partner represents and warrants to each other that, as of the date such Party executes and delivers this Agreement and as of the Backup Plan Effective Date:

(a)    it is validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company, or other similar action;

(b)    this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c)    except as expressly provided in this Agreement, the Toggle Option within the NewCo Plan, and the Bankruptcy Code (including, for the avoidance of doubt, all Regulatory Approvals), no consent or approval is required by any other Person or Entity in order for it to effectuate the Backup Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)    the execution, delivery, and performance of such Party of this Agreement do not, and will not (i) violate (A) any provision of any Law or regulations applicable to it or (B) its articles of association, memorandum of association, charter, bylaws, or other governing documents or (ii) conflict with or constitute a breach of or default (without notice or lapse of time, or both) under, or give rise to a right of termination, modification, or cancellation of any obligation under any material contractual obligation to which it is a party, except in the case of clause (i)(A) and (ii)(Y) with respect to the Debtors, as would not reasonably be expected to have a material adverse effect on the Debtors, taken as a whole, and (Z) with respect to any other Party, as would not reasonably be expected to prevent or materially impair, alter, or delay the ability of such Party to consummate the transactions contemplated hereby and by the Backup Plan Administration Agreement;

25

(e)    to its knowledge, no facts or circumstances, including with respect to any pending or threatened legal actions, exist that would be reasonably expected to impair or delay the ability of such Party to consummate the Backup Transactions or the Toggle Option within the NewCo Plan; and

(f)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**    *Termination Events*.

12.01.  BRIC Termination Events.  The Backup Plan Sponsor and the BRIC Exchange Partner may each terminate their respective participation in this Agreement by the delivery to the Debtors and the Committee of a written notice in accordance with Section 15.11 upon the occurrence of any of the following events:

(a)    the breach in any material respect by a Debtor or the Committee of any of the applicable representations, warranties, or commitments set forth in this Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Backup Transactions in the event the Debtors make the Backup Plan Election and (ii) to the extent curable, remains uncured for ten days after the Backup Plan Sponsor or BRIC Exchange Partner transmits a written notice in accordance with Section 15.11 detailing any such breach; *provided* that the Backup Plan Sponsor and/or the BRIC Exchange Partner may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Backup Plan Sponsor's, BRIC Exchange Partner's or any Affiliate's own actions in material breach of this Agreement;

(b)    the failure to meet any Milestone set forth in Section 4 that has not been waived or extended in a manner consistent with this Agreement;

(c)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Backup Transactions and (ii) remains in effect for thirty Business Days after the Backup Plan Sponsor or BRIC Exchange Partner transmits a written notice in accordance with Section 15.11 detailing any such issuance; *provided* that this termination right may not be exercised by the Backup Plan Sponsor or BRIC Exchange Partner or any Affiliate if the Backup Plan Sponsor or BRIC Exchange Partner sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Backup Plan Sponsor, the BRIC Exchange Partner or any Affiliate;

(d)    any Governmental Authority that must grant a Regulatory Approval regarding the Backup Transactions has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Backup Plan Sponsor or the BRIC Exchange Partner, based upon the advice of counsel, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Backup Transactions;

26

(e)    a legal or structural impediment arises that would prevent or impede the implementation or consummation of a material portion of the Backup Transactions, including, without limitation, notice from any Governmental Authority that any portion of the Backup Transactions would constitute a violation of applicable Law;

(f)    the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Backup Transactions, in each case unless the Debtors have sought a stay of such relief within seven days after the date that the Bankruptcy Court grants such relief and such order is stayed, reversed, or vacated within fourteen days after the date that the Bankruptcy Court grants such relief;

(g)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed with regard to any material asset of the Debtors and such relief would materially delay or impede the implementation of the Backup Transactions;

(h)    the Debtors file a NewCo Plan or plan sponsor agreement with the Successful Bidder or another plan sponsor that is not consistent with or does not honor the terms of this Agreement, it being understood that this Agreement permits the Debtors to pursue the NewCo Plan prior to the Debtors making the Backup Plan Election;

(i)    the Debtors file another chapter 11 plan that is not the NewCo Plan or plan implementing the Backup Transactions without the consent of the Backup Plan Sponsor and the BRIC Exchange Partner;

(j)    only to the extent the Debtors make the Backup Plan Election and switch to the Toggle Option, the Debtors withdraw, revoke, or modify the Backup Plan Transactions, in whole or in part, in a manner that is not materially consistent with this Agreement;

(k)    the Bankruptcy Court enters an order denying confirmation of the NewCo Plan (including the Toggle Option);

(l)    the Bankruptcy Court enters an order (i) converting one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code (other than the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby) or a trustee in one or more of the Chapter 11 Cases of the Debtors, (iii) terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization, or (iv) rejecting this Agreement;

(m)    following entry of the Backup Plan Sponsor Agreement Order or the Backup Plan Sponsor Substantial Contribution Order, the Debtors fail to pay and reimburse all Fees in accordance with this Agreement, the Backup Plan Administration Agreement, the Backup Plan Sponsor Agreement Order, and/or the Backup Plan Sponsor Substantial Contribution Order, as applicable; *provided* that any obligation due and owing under the Backup Plan Sponsor Agreement

Order or the Backup Plan Sponsor Substantial Contribution Order shall be treated as allowed administrative expense claims against each of the Debtors;

(n)    the Bankruptcy Court does not enter the Backup Plan Sponsor Agreement Order by July 19, 2023;

(o)    the filing of a motion or application by any Debtors seeking an order (without prior written consent of the Backup Plan Sponsor and the BRIC Exchange Partner) rejecting this Agreement; or

(p)    if the NewCo Plan Effective Date or the Backup Plan Effective Date has not occurred by December 31, 2023.

12.02.    <u>Debtor Termination Events</u>.  Any Debtor may terminate this Agreement as to all Parties upon prior written notice to the Backup Plan Sponsor and the BRIC Exchange Partner in accordance with <u>Section 15.11</u> to the Backup Plan Sponsor and BRIC Exchange Partner upon the occurrence of any of the following events:

(a)    the breach in any material respect by the Backup Plan Sponsor or BRIC Exchange Partner of any of the representations, warranties, or commitments of the Backup Plan Sponsor or BRIC Exchange Partner set forth in this Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the NewCo Transaction and/or the Backup Transactions, and (ii) to the extent curable, remains uncured for ten days after the Debtors transmit a written notice in accordance with <u>Section 15.11</u> detailing any such breach; *provided* that that the Debtors may not seek to terminate this Agreement pursuant to this <u>Section 12.02(a)</u> based upon a breach of this Agreement by any other Party arising primarily out of the Debtors' own actions in material breach of this Agreement;

(b)    to the extent the BRIC Exchange Partner terminates this Agreement with respect to its participation, the Backup Plan Sponsor fails to secure an alternative Backup Distribution Agent acceptable to the Debtors within thirty (30) days of the BRIC Exchange Partner's written notice to the Debtors and the Committee in accordance with <u>Section 15.11</u>; *provided* that, for the avoidance of doubt, any alternative Backup Distribution Agent shall assume all of the obligations that the BRIC Exchange Partner would have had under this Agreement if not for the BRIC Exchange Partner's termination;

(c)    the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel to the Debtors, (i) that proceeding with the Backup Transactions or failing to terminate this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to support an Alternative Restructuring Proposal;

(d)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Backup Transactions and (ii) remains in effect for thirty Business Days after the Debtors transmit a written notice in accordance with <u>Section 15.11</u> detailing any such issuance; *provided* that this termination right may not be exercised by the Debtors if any Debtor

28

sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by any Debtor;

(e)    any Governmental Authority that must grant a Regulatory Approval regarding the Backup Transactions has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Debtors, based upon the advice of counsel to the Debtors, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Backup Transactions or the Toggle Option within the NewCo Plan;

(f)    if all conditions precedent to the occurrence of the Backup Plan Effective Date have been satisfied or waived in accordance with the Backup Transactions and the Toggle Option and the Backup Plan Sponsor or BRIC Exchange Partner fails to complete the actions to be taken by it on the Backup Plan Effective Date in accordance with this Agreement;

(g)    the Debtors' providing thirty days' notice of intent to terminate in accordance with Section 15.11 of this Agreement if the Debtors, in consultation with the Committee, do not reasonably expect to make the Backup Plan Election; or

(h)    the Bankruptcy Court enters an order denying confirmation of the NewCo Plan (including the Toggle Option).

12.03.   Committee Termination Events.  The Committee may terminate this Agreement as to itself by delivering to the Debtors, the Backup Plan Sponsor, and the BRIC Exchange Partner of a written notice in accordance with Section 15.11 upon the occurrence of any of the following events:

(a)    the breach in any material respect by the Debtors, the Backup Plan Sponsor, or the BRIC Exchange Partner of any of the applicable representations, warranties, or commitments set forth in this Agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the NewCo Transaction, any Alternative Transaction, and/or the Backup Transactions and (ii) to the extent curable, remains uncured for ten days after the Committee transmits a written notice in accordance with Section 15.11 detailing any such breach; *provided* that that the Committee may not seek to terminate this Agreement based upon a breach of this Agreement pursuant to this Section 12.03(a) by any other Party arising primarily out of the Committee's own actions in material breach of this Agreement

(b)    to the extent the BRIC Exchange Partner terminates this Agreement with respect to its participation, the Backup Plan Sponsor fails to secure an alternative Backup Distribution Agent acceptable to the Committee within thirty (30) days of the BRIC Exchange Partner's written notice to the Debtors and the Committee in accordance with Section 15.11; *provided* that, for the avoidance of doubt, any alternative Backup Distribution Agent shall assume all of the obligations that the BRIC Exchange Partner would have had under this Agreement if not for the BRIC Exchange Partner's termination;

(c)    the Committee determines, after consulting with counsel to the Committee, (i) that proceeding with the Backup Transactions or failing to terminate this Agreement would be

inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to support an Alternative Restructuring Proposal;

(d)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Backup Transactions and (ii) remains in effect for thirty Business Days after the Debtors transmit a written notice in accordance with Section 15.11 detailing any such issuance; *provided* that this termination right may not be exercised by the Committee if the Committee sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Committee;

(e)    any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Committee, based upon the advice of counsel to the Committee, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Backup Transactions or the Toggle Option within the NewCo Plan;

(f)    if all conditions precedent to the occurrence of the Backup Plan Effective Date have been satisfied or waived in accordance with the Backup Transactions and the Toggle Option and the Backup Plan Sponsor or BRIC Exchange Partner fails to complete the actions to be taken by it on the Backup Plan Effective Date in accordance with this Agreement;

(g)    the Debtors withdraw or revoke the Toggle Option within the NewCo Plan, pursue an Alternative Transaction not consented to by the Committee, or modify the Toggle Option within the NewCo Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(h)    the Bankruptcy Court enters an order denying confirmation of the NewCo Plan (including the Toggle Option).

12.04.    Mutual Termination.  This Agreement, and the obligations of the Parties hereunder, may be terminated by mutual written agreement among each of the Parties.

12.05.    Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the NewCo Plan Effective Date or Backup Plan Effective Date; *provided* that Section 5.04 and Section 5.05 of this Agreement shall survive the termination of this Agreement for a period of one year following the Agreement Effective Date.

12.06.    Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, except as otherwise expressly provided herein.  Nothing in this Agreement shall be construed as prohibiting a Party from contesting whether any such termination is valid or effective in accordance with this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in

30

this Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair, or restrict (a) any right of any Party, or the ability of any Party, to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against the Backup Plan Sponsor or the BRIC Exchange Partner, and (b) any right of the Backup Plan Sponsor or the BRIC Exchange Partner, or the ability of the Backup Plan Sponsor or BRIC Exchange Partner, to protect and preserve its rights (including rights under this Agreement), remedies, and interests. Unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and termination of this Agreement in accordance with its terms is prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of a Termination Event shall result in the automatic termination of this Agreement with respect to each Party for which this Agreement would terminate if the Parties the having the right to terminate this Agreement (the "**Requisite Notice Parties**") were permitted to provide notice of such occurrence in accordance with this Agreement, upon the date that is five days following such occurrence, unless the Requisite Notice Parties waive such Termination Event in writing. No purported termination of this Agreement shall be effective under this <u>Section 12.06</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Sections 12.02(b)</u> or <u>12.02(g)</u>. Nothing in this <u>Section 12.06</u> shall restrict any Debtor's right to terminate this Agreement in accordance with <u>Section 12.02(b)</u> or the Committee's right to terminate this Agreement in accordance with <u>Section 12.03(b)</u>. For the avoidance of doubt, the occurrence of a Termination Date as to a Party shall in no event terminate the Backup Plan Sponsor's obligations under <u>Sections 5.04</u> and <u>5.05</u> of this Agreement.

**Section 13.    *Expense Reimbursement and Commitment Fee***

13.01.  <u>Expense Reimbursement</u>.  Pursuant to the Backup Plan Sponsor Agreement Order, the Debtors shall promptly pay or reimburse, as and when required under this Agreement or the Toggle Option within the NewCo Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses incurred through the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order of:  (i) the Backup Plan Sponsor; (ii) Willkie Farr & Gallagher LLP, as counsel to the Backup Plan Sponsor ("**Backup Plan Sponsor Counsel**"); (iii) Hughes Hubbard & Reed LLP, as counsel to the BRIC Exchange Partner; (iv) McAfee & Taft, P.C., as counsel to the BRIC Mining Partner; (v) Clifford Chance US LLP, as counsel to VanEck; and (vi) and any other accountants and other professionals, advisors and consultants retained by the Backup Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld) ( (iii)–(v), each a "**BRIC Party Counsel**," and collectively (i)–(vi), the "**Backup Plan Sponsor Advisors**"), in each case, in connection with the Bidding Process, the Auction, the Backup Plan Sponsor Agreement, or to implement the Backup Transactions (collectively, the "**Expense Reimbursement**"); *provided* that BRIC Party Counsel shall not be entitled to Expense Reimbursement for any services provided which are duplicative of the services provided by other Backup Plan Sponsor Advisors; *provided further* that review of this Agreement by each BRIC Party Counsel shall not be considered duplicative. The Expense Reimbursement shall be payable by the Debtors as administrative expenses (1) pursuant to the Backup Plan Sponsor Agreement Order or (2) promptly upon the written request of the applicable Backup Plan Sponsor Advisor following the termination of this Agreement (x) by the Debtors pursuant to <u>Sections 12.02(c)</u>, <u>12.02(d)</u>, <u>12.02(e)</u> (unless the Backup Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or <u>Section 12.02(g)</u> or (y) by the Backup Plan Sponsor or BRIC Exchange Partner pursuant to <u>Section 12.01</u>, in the

31

event of either (1) or (2) without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that Debtors shall promptly pay the Expense Reimbursement incurred prior to the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order; *provided*, *further*, that beginning immediately after entry of the Backup Plan Sponsor Agreement Order the Debtors shall pay a maximum Expense Reimbursement of $300,000 per month in the aggregate (to be measured over any rolling three-month period) (the "**Expense Reimbursement Monthly Cap**"); *provided*, *further*, that in the event the Debtors make the Backup Plan Election and switch to the Toggle Option (as set forth in the NewCo Plan), the Expense Reimbursement Monthly Cap shall cease to apply thereafter; *provided*, *further*, that to the extent this Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor or the BRIC Exchange Partner, the Backup Plan Sponsor shall promptly repay the Debtors the Expense Reimbursement paid to the Backup Plan Sponsor Advisors under this Section 13.01.

13.02.  Commitment Fee.  Pursuant to the Backup Plan Sponsor Agreement Order, as and when required under this Agreement or the Toggle Option within the NewCo Plan, in addition to any Fees owed pursuant to Sections 13.01, the Debtors shall pay the Backup Plan Sponsor an amount equal to $1,500,000, which shall be paid as an administrative expense of the Debtors (the "**Commitment Fee**") and shall be paid promptly upon the entry of the Backup Plan Sponsor Agreement Order; *provided* that in the event this Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor, the Backup Plan Sponsor shall not be entitled to the Commitment Fee.

**Section 14.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)    This Agreement may be modified, amended, or supplemented in a writing signed by: (i) each Debtor; (ii) the Committee; (iii) the Backup Plan Sponsor; and (iv) the BRIC Exchange Partner.  Any provision, condition, or other term of this Agreement may be waived only in a writing signed by the Party against which enforcement of such waiver is sought.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)    Notwithstanding anything to the contrary in this Section 14, the Milestones shall be subject to waiver and extension as set forth in Section 4.

(e)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right,

power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 15.    *Miscellaneous*

15.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to use commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary and not inconsistent with this Agreement, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Backup Transactions, as applicable.

15.04.  <u>Publicity</u>.  The Parties shall use commercially reasonable efforts to consult with each other regarding material press releases or public announcements concerning this Agreement or the transactions contemplated hereby.  For the avoidance of doubt, material public announcements do not include any routine statements made via social media.

15.05.  <u>Complete Agreement</u>.  This Agreement, together with the other documents expressly referred to herein, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

15.06.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or do not have jurisdiction over any Party hereto.

15.07.  TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.08.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery (including .pdf), each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.09.  Rules of Construction.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.10.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, except as set forth in Section 5.04, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity without the prior written consent of the other Parties.

15.11.  Notices.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by e-mail, if received prior to 5:00 PM (local time of the recipient) on a Business Day or otherwise on the next Business Day, (c) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the e-mail address or street address, as applicable, set forth below, or at such other e-mail address or street address as such Party may specify by written notice to the other Party.

> (a)    if to the Debtors, to:
>
> Celsius Network LLC
> 50 Harrison Street, Suite 209F
> Hoboken, New Jersey 07030
> Attention:  Ron Deutsch
> E-mail address:  ron.deutsch@celsius.network
>
> with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Patrick J. Nash, P.C.; Ross M. Kwasteniet, P.C.; Christopher S.
Koenig; Dan Latona; and Alison J. Wirtz
E-mail address:  patrick.nash@kirkland.com; ross.kwasteniet@kirkland.com;
chris.koenig@kirkland.com; dan.latona@kirkland.com; and
alison.wirtz@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Joshua A. Sussberg, P.C.
E-mail address:  joshua.sussberg@kirkland.com

(b)     if to the Backup Plan Sponsor, to:

GXD Labs LLC
7301 SW 57th Ct, Suite 515
Miami, FL 33143
Attention:  David Proman and R. Christian Wyatt
E-mail address: david@gxdlabs.io and christian@gxdlabs.io

Van Eck Absolute Return Advisers Corporation
666 Third Avenue, Floor 9
New York, NY 10017
Attention.:  Pranav Kanade
E-mail  address:  pkanade@vaneck.com;  mbabinsky@vaneck.com;
and legalnotices@vaneck.com

with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention:  Brian Lennon, Russell Leaf, and Jared Fertman
E-mail address:  blennon@willkie.com; rleaf@willkie.com; and
jfertman@willkie.com

and

(c)     if to the BRIC Exchange Partner, to:

Gemini Trust Company, LLC
315 Park Avenue South, 16th Floor
New York, NY 10010

Attention:  Marshall Beard
E-mail address: marshall.beard@gemini.com; legal@gemini.com

with copies to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
Attention:  Anson B. Frelinghuysen and Elizabeth A. Beitler
E-mail address:  anson.frelinghuysen@hugheshubbard.com; and
elizabeth.beitler@hugheshubbard.com

and

(d)    if to the Committee, to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention:  David M. Turetsky
E-mail address:  david.turetsky@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attention:  Gregory F. Pesce
E-mail address:  gregory.pesce@whitecase.com

and

White & Case LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:  Keith H. Wofford
E-mail address: kwofford@whitecase.com

and

White & Case LLP
555 Flower Street, #2700
Los Angeles, California 90071
Attention:  Aaron Colodny
E-mail address: aaron.colodny@whitecase.com

15.12.  <u>Independent Due Diligence and Decision Making</u>.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

15.13.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.14.  <u>Waiver</u>.  If the Backup Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.15.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.16.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.17.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.18.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.19.  <u>Survival</u>.  Notwithstanding the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Sections 5.04</u>, <u>5.05</u>, <u>13.01</u> and <u>13.02</u> and the Confidentiality Agreements shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.20.  <u>E-mail Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u> or <u>Section 14</u>, or otherwise, including a written approval by the Debtors, the Backup Plan Sponsor, the BRIC Exchange Partner, or the Committee, such written consent, acceptance, approval, or waiver shall

be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including e-mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

[*Signature Pages Omitted*]

## Exhibit A

**Backup Plan Administration Agreement Term Sheet**

## BACKUP PLAN ADMINISTRATION AGREEMENT TERM SHEET

This term sheet (the "Term Sheet") summarizes certain proposed terms and conditions of a Backup Plan Administration Agreement, which would be consummated pursuant to arrangements satisfactory to the BRIC and the Debtors, pursuant to consummation of a plan of reorganization in the Debtors' chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS BACKUP PLAN TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS BACKUP PLAN TERM SHEET IS BINDING SOLELY TO THE EXTENT PROVIDED IN THE PLAN SPONSOR AGREEMENT.**

| BACKUP PLAN ADMINISTRATION AGREEMENT TERM SHEET | |
|---|---|
| **Overview** | The Backup Plan Administration Agreement will be entered into between the Backup Plan Administrator and the Debtors and will include the following terms. Terms capitalized but not defined in this Term Sheet will have the meanings ascribed to such terms in the Backup Plan Sponsor Agreement or Backup Plan, as applicable. Except as otherwise required by the context of this Term Sheet, this Term Sheet contemplates that the Debtors have determined to terminate a NewCo Transaction with the Successful Bidder or other plan sponsor, as applicable, and instead implement the transactions contemplated by the Backup Plan Sponsor Agreement (including the Backup Transactions) through the Backup Plan.

The Backup Plan Sponsor Agreement shall provide that the Debtors shall have the right to terminate the pre-Effective Date consultation services to be provided by the BRIC to the Debtors and the Committee upon 30-days' notice, and such termination shall terminate the BRIC's obligation to serve as the Backup Bidder (as defined in the Backup Plan Sponsor Agreement). |
| **Term** | After the Backup Plan Effective Date, the Backup Plan Administration Agreement's initial term will be five years from the Backup Plan Effective Date.

Following the first five-year term (the "Initial Term"), the Oversight Committee shall decide whether to renew or terminate the Backup Plan Administration Agreement (each such renewal term, a "Renewal Term").

If the Backup Plan Administration Agreement is terminated, the Backup Plan Administrator Fees will cease to accrue as of the date of such termination. Any Backup Plan Administrator Fees accrued prior to such |

| | |
|---|---|
| | termination date shall be payable by the Wind Down Estate to the Backup Plan Administrator upon such termination. |
| **Role of the Backup Plan Administrator; Services Performed** | Upon the Debtors' determination, in consultation with the Committee, to toggle to the Backup Plan, prior to the Backup Plan Effective Date, at the direction of the Special Committee and, in consultation with the Committee, the proposed Backup Plan Administrator shall develop the Data Science, Claims Reconciliation and Distribution Services Program. |
| | After the Backup Plan Effective Date, the Backup Plan Administrator, at the direction of the Oversight Committee will adopt and implement the Data Science, Claims Reconciliation and Distribution Services Program, and approve and oversee the investment policy, dividend policy, any policies regarding conflicts of interest (including with respect to the Backup Plan Sponsor and the BRIC Exchange Partner, and their respective personnel and Affiliates), and all major investment and operational decisions of the Wind Down Estate. Subject always to the oversight, supervision, and approval of the Oversight Committee, the Backup Plan Administrator will perform the following services (the "Services"): |
| | <ul><li>manage the Wind Down Estate's day-to-day business and operations, including managing its liquidity and capital resources;</li><li>evaluate, manage, negotiate and oversee the disposition of all or any part of the property or assets of the Wind Down Estate; and</li><li>perform any other services for and on behalf of Wind Down Estate to the extent necessary or appropriate.</li></ul> |

| Fees Paid to Backup Plan Administrator | After the Backup Plan Effective Date the Backup Plan Administrator shall receive  the following fees: |
|---|---|
| | <ul><li>a $46 million administration fee, which will be payable as follows (i) $10 million annual installments beginning on the Backup Plan Effective Date and ending on the third anniversary of the Backup Plan Effective Date and (ii) $8 million annual installments on the fourth and fifth anniversaries of the Backup Plan Effective Date and ending on the fifth anniversary of the Backup Plan Effective Date, provided that, if the chapter 11 cases are closed before the fifth anniversary of the Backup Plan Effective Date, the remaining balance of the plan administration fee shall be immediately due and payable (the "Backup Plan Administration Fee"), plus</li></ul> (iii) a percentage of any distributions (the "Distribution Fees"), to be paid as follows and within 10 days of the end of each applicable period: (i) a flat fee of $12 million for the initial distribution, which initial distribution shall be made before the six month anniversary of the Backup Plan Effective Date; (ii) 1.25% of any distributions made between the six month anniversary of the Backup Plan Effective Date and the one year anniversary of the Effective Date; (iii) 1.00% of any distributions made between the first and second anniversaries of the Backup Plan Effective Date; (iv) 0.75% of any distributions made between the second and third anniversaries of the Backup Plan Effective Date; (v) 0.50% of any distributions made between the third and fourth anniversaries of the Backup Plan Effective Date; (vi) 0.25% of any distribu00tions made between the fourth and fifth anniversaries of the Backup Plan Effective Date; and (vii) 0.00% of any distributions made after the fifth anniversary of the Backup Plan Effective Date; plus <ul><li>a "Value Creation Incentive Fee" equal to 10% of value recovered above the initial asset valuation and/or IP developed or developed with funding by the estate exclusive of price appreciation on liquid BTC/ETH at emergence.[1]</li></ul> <ul><li>an annual "Discretionary Management Bonus" equal to up to 100% of the annual installments of the Backup Plan Administration Fee between the second and fifth anniversaries of the Backup Plan Effective Date payable</li></ul> |

---

[1]    The BRIC, the Debtors, and the Committee shall determine the initial asset valuation prior to the Backup Plan Effective Date with any unresolved disputes to be resolved by the Oversight Committee.  To the extent that there is an opportunity to develop and build new scaled businesses, the Backup Plan Administrator will work in good faith with the Oversight Committee on an appropriate incentive / equity package for those involved, to be approved by the Oversight Committee.

|  | upon the majority vote of the Oversight Committee (for the avoidance of doubt, $10 million in years two and three and $8 million in years 4 and 5). |
|---|---|
| **Fees Paid to Members of Oversight Committee** | Each member of the Oversight Committee shall be compensated (the "Oversight Committee Fee") on an annual basis in an amount to be agreed upon with the Debtors and the Committee, in consultation with the BRIC. Such proposed compensation shall be disclosed in the Backup Plan Supplement at least 14 days prior to the Confirmation Hearing for the Backup Plan. |
| **Expenses** | The Wind Down Estate shall reimburse the Backup Plan Administrator and the Oversight Committee for all reasonable and documented expenses, including the reasonable and documented fees and expenses of outside service providers such as legal counsel, accountants and other professionals, advisors and consultants.  For the avoidance of doubt, expenses shall not be deducted from the Backup Plan Administration Fee, Distribution Fee, or the Incentive Fees. |
| **Indemnification** | The Wind Down Estate will indemnify reimburse, defend, and hold harmless the Backup Plan Administrator, the BRIC Exchange Partner, the BRIC Mining Partner, the members of the Oversight Committee, and their respective successors and permitted assigns, together with their respective employees, officers, members, managers, directors, agents and representatives (collectively the "Indemnified Parties"), from and against all losses (including lost profits), costs, damages, injuries, taxes, penalties, interests, expenses, obligations, claims and liabilities (joint or severable) of any kind or nature whatsoever (collectively "Losses") that are incurred by such Indemnified Parties in connection with, relating to or arising out of the performance of any Services hereunder; *provided, however*, that the Wind Down Estate will not be obligated to indemnify, reimburse, defend, or hold harmless an Indemnified Party for any losses incurred in connection with, relating to or arising out of gross negligence, willful misconduct or fraud of such Indemnified Party.<br><br>The Indemnified Parties will also be indemnified from all Losses due to the negligence of third-party brokers, collateral managers or other third-party agents of the Post-Effective Date Debtors, the Wind Down Estate, the Backup Plan Administrator, or the Oversight Committee. |

| | |
|---|---|
| **Exculpation** | The Backup Plan Administrator, the BRIC Exchange Partner, the BRIC Mining Partner and the members of the Oversight Committee (collectively, the "Exculpated Parties") will not be liable for, and the Wind Down Estate will not take, or permit to be taken, any action against the Exculpated Parties to hold the Exculpated Parties liable for, any error of judgment or mistake of law or for any loss suffered by the Post-Effective Date Debtors or the Wind Down Estate (including, without limitation, by reason of the purchase, sale or retention of any security) in connection with the performance of their duties under the Backup Plan Administration Agreement except for any error of judgment, mistake of law, or loss suffered resulting from gross negligence, willful misconduct or fraud committed by an Exculpated Party. <br><br> The Exculpated Parties will not be liable for any loss due to the negligence of third-party brokers, collateral managers or other third-party agents of the Post-Effective Date Debtors, the Wind Down Estate, the Backup Plan Administrator, or the Oversight Committee. |