| | |
|---|---|
| Joshua A. Sussberg, P.C. | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Christopher S. Koenig |
| 601 Lexington Avenue | Dan Latona (admitted *pro hac vice*) |
| New York, New York 10022 | **KIRKLAND & ELLIS LLP** |
| Telephone:   (212) 446-4800 | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Facsimile:    (212) 446-4900 | 300 North LaSalle Street |
| | Chicago, Illinois 60654 |
| | Telephone:   (312) 862-2000 |
| | Facsimile:    (312) 862-2200 |

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF
CHRISTOPHER FERRARO, INTERIM
CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING
OFFICER, AND CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN
SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING CERTAIN FEES AND EXPENSES FOR
THE BACKUP PLAN SPONSOR, AND (II) GRANTING RELATED RELIEF**

I, Christopher Ferraro, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Celsius Network LLC ("Celsius," and together with the above-captioned

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

debtors and debtors-in-possession, the "Debtors"). I joined Celsius on March 21, 2022. I was appointed as Chief Financial Officer on July 11, 2022, and I was appointed as interim Chief Executive Officer and Chief Restructuring Officer by the Special Committee of Debtor Celsius Network Limited (the "Special Committee") on September 27, 2022 following the resignation of the Debtors' co-founder and former chief executive officer, Alex Mashinsky.

2. I am familiar with the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2978] (the "Backup Plan Sponsor Motion")[2] and the *Debtors' Motion to Schedule an Expedited Hearing and Shorten the Notice Period on the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2979] (the "Motion to Expedite"), and submit this declaration (this "Declaration") in support thereof.

3. In my capacity as the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and the ongoing restructuring efforts. Except as otherwise indicated, all facts in this Declaration are based upon (a) my personal knowledge of the Debtors' operations, (b) my discussions with other members of the Debtors' management team and advisors, and (c) my review of relevant documents and information concerning the Debtors' operations. I am over the age of eighteen and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Backup Plan Sponsor Motion, the Motion to Expedite, the Backup Plan Sponsor Agreement, or Backup Plan Administration Agreement Term Sheet (each as defined herein), as applicable.

2

**Qualifications**

4. I have approximately two decades of experience in financial planning and analysis activities, asset and liability management, and product control. Before my roles with Celsius, I was a Senior Managing Director at Cerberus Operations & Advisory Company ("Cerberus"), where I focused on improving the operating returns for two legacy portfolio positions. In this role, I advised the chief executive officer and leadership team on increasing profitability by changing and repricing business mix, restructuring costs, and optimizing the balance sheet.

5. Prior to Cerberus, I served in various roles at JPMorgan Chase & Co. from 2001 to 2018. I was the head of Financial Analysis and a Senior Leader, where I was responsible for all financial, planning, and analysis activities, developed analytical tools, and authored a patent application in forecasting. Before my role as head of Financial Analysis and a Senior Leader, I was the Treasurer of the Consumer Bank and the Retail Loan Pricing Manager.

6. I hold a Bachelor's degree in Economics, Finance, & Accounting from the University of Washington. I also passed the Washington state Uniform Certified Public Accountant Examination.

**The Selection of BRIC as the Backup Bidder**

7. On May 3, 2023, the Debtors announced the BRIC as the Backup Bidder on the record at the Auction.

8. On May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713] (the "Notice of Successful Bidder and Backup Bidder"), pursuant to which the Debtors announced Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.

9. On June 7, 2023, the Debtors, the Committee, the BRIC, and the BRIC Exchange Partner, executed the Backup Plan Sponsor Agreement. After thoroughly evaluating the BRIC's proposal, its team, and capabilities, the Debtors and the Committee concluded that entering into the Backup Plan Sponsor Agreement with the BRIC and the BRIC Exchange Partner is in the best interests of the Debtors' estates and all stakeholders.

10. The Debtors, in consultation with the Committee, weighed a number of factors in entering the Backup Plan Sponsor Agreement. Importantly, the Backup Plan contemplates a different structure than Fahrenheit's Successful Bid. The Debtors and the Committee firmly believe that Fahrenheit's Successful Bid is the value maximizing path forward and are spending considerable time and effort to minimize the execution risk of the NewCo Transaction. But the Debtors and the Committee are acutely aware that certain risks inherent to the NewCo Transaction cannot be effectively mitigated. The Debtors' industry faces an evolving regulatory environment and daily market volatility. It is for this exact reason that the Debtors' initial chapter 11 plan of reorganization filed with NovaWulf's Stalking Horse Bid contemplated an Orderly Wind Down[3] in the event the Debtors determine that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interest of the Debtors' estates due to complications or delays in implementing the NewCo Transaction. In the face of regulatory uncertainty and market volatility, the Debtors continue to believe that the best path forward requires maintaining a degree of optionality to pivot to the Backup Plan if circumstances warrant.

11. To that end, the Debtors believe that the BRIC Plan will derisk their pursuit of a value-maximizing NewCo Transaction by providing the Debtors a degree of optionality to pivot

---

[3] As defined in the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates [Docket No. 2358].

to the Backup Plan. Although the Backup Plan Sponsor Agreement contemplates more than a mere orderly wind down of the Debtors' estates (*i.e.*, the standalone pure play, publicly traded mining company), the Debtors, the Committee, and each of their respective advisors believe the risk profile of the Backup Transactions are markedly different and reduce the execution risk of pursuing the NewCo Transaction. Importantly, the Backup Plan Sponsor Agreement also includes a broad "fiduciary out" provision. Notably, the BRIC's proposal provides value to the Debtors' estates that other wind down proposals may not be able to provide given the BRIC's unique ability to manage both an Orderly Wind Down and a publicly traded mining company. Not to mention, the BRIC has agreed to serve as Plan Administrator in the event of an Orderly Wind Down even if the Debtors cannot proceed with the Backup Mining Transaction.

12. The Debtors and the Committee selected the BRIC based on the BRIC's ability and willingness to complete the Backup Transactions, if needed, and support these cases to a value maximizing resolution. Throughout the Auction and over the course of the last several weeks, the Debtors, the Committee, and the BRIC have engaged in negotiations regarding the terms of the proposed Backup Plan Sponsor Agreement. The BRIC expended time, efforts, and financial resources participating in the Auction, conducting due diligence of the Debtors' business, structuring the Backup Transactions, and negotiating the Backup Plan Sponsor Agreement.

13. Following the execution of the Backup Plan Sponsor Agreement and after the Debtors filed the Original Motion, a third party submitted a competing proposal for the Backup Transactions to the Debtors. The Debtors then turned to the BRIC and asked for the BRIC to materially improve the terms of the Fees and Backup Plan Sponsor Agreement. The BRIC responded to the Debtors' request with meaningful improvements to the terms of the Backup Plan Sponsor Agreement.

5

14. Although the Debtors and the Committee entered into the Backup Plan Sponsor Agreement and believe that the BRIC Transactions represent the best option presently available if the Debtors determine not to proceed with the NewCo Transaction, the Debtors and the Committee continue to have the ability to solicit and consider competing proposals for alternative restructuring transactions. The Debtors have announced the Backup RFP Process for third parties to submit competing proposals for the Backup Transactions prior to July 31, 2023.[4] Securing the BRIC as the Backup Plan Sponsor will provide a source of competitive tension in the Backup RFP Process and allow the Debtors to generate meaningful value for the Debtors' estates.

### The Fees

15. As consideration for the BRIC serving as the Backup Plan Sponsor, the substantial time, effort, and resources the BRIC has expended and will continue to expend, and in exchange for certain consultation services, the Debtors, in consultation with the Committee, agreed to provide the BRIC certain Fees (as described herein). As further detailed below, (a) a $1.5 million commitment fee (the "Commitment Fee") and (b) the reimbursement of all reasonable and documented fees and expenses incurred by the Backup Plan Sponsor, the BRIC Exchange Partner, and certain affiliated parties in connection with Auction and Backup Transactions (the "Expense Reimbursement") (each as more fully described in the Backup Plan Sponsor Motion and in the Backup Plan Sponsor Agreement and collectively, the "Fees"). Specifically, the Backup Plan Sponsor Agreement (as revised) provides the Backup Plan Sponsor with the following Fees:[5]

---

[4] The Debtors filed the *Notice of Amended and Restated Backup Plan Sponsor Agreement and Deadline to Submit Backup Bids* (the "Notice" and such process, the "Backup RFP Process"), substantially contemporaneously herewith. The amended and restated Backup Plan Sponsor Agreement (the "Backup Plan Sponsor agreement") is attached to the Notice as Exhibit A. The amended and restated Backup Plan Administration Agreement Term Sheet (the "Backup Plan Administration Agreement Term Sheet") is attached as Exhibit A to the Backup Plan Sponsor Agreement.

[5] The summary of the Backup Plan Sponsor Agreement in this Motion is qualified in its entirety by reference to the provisions of the Backup Plan Sponsor Agreement. To the extent there is any discrepancy between the

- **Expense Reimbursement**. Pursuant to the Backup Plan Sponsor Agreement Order, the Debtors shall promptly pay or reimburse, as and when required under the Backup Plan Sponsor Agreement or the Toggle Option within the NewCo Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses incurred through the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order of:  (i) the Backup Plan Sponsor; (ii) Willkie Farr & Gallagher LLP, as counsel to the Backup Plan Sponsor ("**Backup Plan Sponsor Counsel**"); (iii) Hughes Hubbard & Reed LLP, as counsel to the BRIC Exchange Partner; (iv) McAfee & Taft, P.C., as counsel to the BRIC Mining Partner; (v) Clifford Chance US LLP, as counsel to VanEck; and (vi) any other accountants and other professionals, advisors and consultants retained by the Backup Plan Sponsor with the prior written consent of the Debtors (which shall not be unreasonably withheld) ( (iii)–(v), each a "**BRIC Party Counsel**," and collectively (i)–(vi), the  "**Backup Plan Sponsor Advisors**"), in each case, in connection with the Bidding Process, the Auction, the Backup Plan Sponsor Agreement, or to implement the Backup Transactions (collectively, the "**Expense Reimbursement**"); *provided* that BRIC Party Counsel shall not be entitled to Expense Reimbursement for any services provided which are duplicative of the services provided by other Backup Plan Sponsor Advisors; *provided further* that review of the Backup Plan Sponsor Agreement by each BRIC Party Counsel shall not be considered duplicative.  The Expense Reimbursement shall be payable by the Debtors as administrative expenses (1) pursuant to the Backup Plan Sponsor Agreement Order or (2) promptly upon the written request of the applicable Backup Plan Sponsor Advisor following the termination of the Backup Plan Sponsor Agreement (x) by the Debtors pursuant to Sections 12.02(c), 12.02(d), 12.02(e) (unless the Backup Plan Sponsor unreasonably withholds consent to a waiver or extension of the Milestones), or Section 12.02(g) or (y) by the Backup Plan Sponsor or BRIC Exchange Partner pursuant to Section 12.01 in the event of either (1) or (2) without any requirement to (a) file retention or fee applications, (b) provide notice to any person other than the Debtors and the Committee, or (c) provide itemized time detail to the Debtors or any other Person; *provided* that Debtors shall promptly pay the Expense Reimbursement incurred prior to the Bankruptcy Court's entry of the Backup Plan Sponsor Agreement Order; *provided*, *further*, that beginning immediately after entry of the Backup Plan Sponsor Agreement Order the Debtors shall pay a maximum Expense Reimbursement of $300,000 per month in the aggregate (to be measured over any rolling three-month period) (the "**Expense Reimbursement Monthly Cap**"); *provided*, *further*, that in the event the Debtors make the Backup Plan Election and switch to the Toggle Option (as set forth in the NewCo Plan), the Expense Reimbursement Cap shall cease to apply thereafter; *provided*, *further*, that to the extent the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor or the BRIC Exchange Partner, the Backup Plan Sponsor shall promptly repay the Debtors the Expense Reimbursement paid to the Backup Plan Sponsor Advisors under this Section 13.01.

---

summary contained in this Declaration and the terms set forth in the Backup Plan Sponsor Agreement, the terms of the Backup Plan Sponsor Agreement shall govern.

- **Commitment Fee**. Pursuant to the Backup Plan Sponsor Agreement Order, as and when required under the Backup Plan Sponsor Agreement or the Toggle Option within the NewCo Plan, in addition to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Backup Plan Sponsor an amount equal to $1,500,000, which shall be paid as an administrative expense of the Debtors (the "**Commitment Fee**") and shall be paid promptly upon the entry of the Backup Plan Sponsor Agreement Order; *provided* that in the event the Backup Plan Sponsor Agreement is terminated pursuant to Section 12.02(a) or Section 12.03(a) due to a material breach of the Backup Plan Sponsor, the Backup Plan Sponsor shall not be entitled to the Commitment Fee.

16. Notably, pursuant to the revised terms of the Backup Plan Sponsor Agreement, the BRIC and the BRIC Exchange Partner have agreed to (a) completely eliminate the Consultation Services Fee and (b) limit the Expense Reimbursement to a maximum of $1.5 million in the aggregate for fees and expenses incurred prior to July 19, 2023.

17. The BRIC has also agreed to reduce certain fees payable after the Backup Plan Effective Date to the Backup Plan Administrator, which are payable only to the extent the Debtors pivot to the Backup Transactions and the Backup Transactions are consummated. The revised terms include (a) a reduction of the Distribution Fee from $15 million to $12 million and (b) a reduction of the Backup Plan Sponsor Administration Fee from $50 million to $46 million (years one through three will have $10 million annual payments; years four and five will have payments reduced from $10 million to $8 million).[6]

18. I believe that the prompt payment of the Fees is in the best interests of the Debtors and their estates and reasonable and appropriate under the circumstances given the complex and unique nature of the Debtors' business, these chapter 11 cases, and industry headwinds, among other things.

---

[6] The Backup Plan Administration Fee was previously structured to be paid in equal annual installments over the five-year term.

19. The Backup Plan Sponsor and its advisors have spent the past three months and has incurred considerable legal fees and other expenses in formulating and negotiating the Backup Transactions. The BRIC dedicated significant time attending the Auction, working to improve the terms of their proposed bid, exchanging draft documentation, and conducting extensive diligence on the Debtors' business, assets, and regulatory hurdles. I believe that the Fees are appropriate to compensate the Backup Plan Sponsor. The BRIC's ability to manage both an Orderly Wind Down and deep cryptocurrency industry expertise makes the BRIC uniquely qualified to serve as the Backup Plan Sponsor. Absent the Fees, I believe that the Debtors would be unable to maintain the BRIC as the Backup Plan Sponsor and adequately preserve the Debtors optionality to quickly pivot to an Orderly Wind Down without further costs and delay. Not to mention, the BRIC has made clear that prompt payment of the Fees are a necessary condition of the BRIC's willingness to serve as the Backup Plan Sponsor. The BRIC has agreed to extend the milestone by which the Court must enter the Order until July 19, 2023, but has declined to extend the milestone further.

20. Moreover, the prompt payment of the Fees is necessary to the Debtors' solicitation and consideration of alternative Backup Transaction Proposals. Through the payment of the Fees, the Debtors will be able to leverage the BRIC's Backup Transactions as a "stalking horse" proposal against which the Debtors can consider competing Backup Transaction Proposals ahead of the Debtors' chapter 11 plan confirmation hearing. In any event, the prompt payment of the Fees are necessary to preserve the appropriate degree of optionality. Failure to maintain a backup plan sponsor may lead to significant delays and impose costs on the estates in excess of the Fees contemplated to be paid to the BRIC in the event of an Orderly Wind Down.

21. Based upon the foregoing, I believe that the Fees associated with the BRIC serving as a Backup Bidder are a sound exercise of the Debtors' reasonable business judgment and should therefore be approved.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 10, 2023

/s/ Christopher Ferraro
Name:   Christopher Ferraro
Title:    Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Debtor Celsius Network LLC