Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9              Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11   Adv. Case No. 23-01010-mg

12   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13   CHRISTOPHER LEE SHANKS,

14                  Plaintiff,

15            v.

16   CELSIUS NETWORK LLC, ET AL.,

17                  Defendants.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   Adv. Case No. 23-01016-mg

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21   GEORGIOU, ET AL.,

22                  Plaintiff,

23            v.

24                  Defendants.

25   CELSIUS NETWORK LLC, ET AL.,

Page 2

```
 1   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 2   Adv. Case No. 23-01104-mg

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 4   OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

 5                    Plaintiff,

 6           v.

 7                    Defendants.

 8   CELSIUS NETWORK LLC, ET AL.,

 9   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10   Adv. Case No. 23-01107-mg

11   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

12   AD HOC GROUP OF BORROWERS,

13                    Plaintiff,

14           v.

15                    Defendants.

16   CELSIUS NETWORK LLC, ET AL.,

17   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

18

19                    United States Bankruptcy Court

20                    One Bowling Green

21                    New York, NY  10004

22

23                    June 28, 2023

24                    10:03 am

25
```

```
 1    B E F O R E :

 2    HON MARTIN GLENN

 3    U.S. BANKRUPTCY JUDGE

 4

 5    ECRO:   KAREN

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1    Hybrid Hearing RE: Motion to Approve Transfer of Property.

 2    Motion to Approve the Transfer of Property Pursuant to

 3    Bankruptcy Code Section 105 and Rule 9019 of the Federal

 4    Rules of Bankruptcy Procedure [Docket No. 2758, 2772, 2783].

 5

 6    Hybrid Hearing RE: Debtors' Motion for Entry of an Order (I)

 7    Authorizing Christopher Ferraro to Act as Foreign

 8    Representative and (II) Granting Related Relief [Docket No.

 9    2802, 2827].

10

11    Hybrid Hearing RE: Debtors' Third Motion for Entry of an

12    Order (I) Extending the Debtors' Exclusive Period to Solicit

13    Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of

14    the Bankruptcy Code and (II) Granting Related Relief [Docket

15    No. 2805, 2827, 2838, 2841].

16

17    Hybrid Hearing RE: Motion of Euclid Financial Institution

18    Underwriters, LLC, a Duly Authorized Agent of Certain

19    Underwriters at Lloyds of London and Republic Vanguard

20    Insurance Company for Relief from the Automatic Stay to the

21    Extent Applicable [Docket No. 2585, 2639, 2760, 2839, 2842,

22    2849, 2851, 2859, 2873].

23

24    Hybrid Hearing RE: Motion for Relief from Stay [Docket No.

25    2760, 2763, 2781, 2839, 2842, 2849, 2851, 2873, 2585, 2763].

Page 5

1

2     Hybrid Hearing RE: Motion for Entry of an Order (I) allowing

3     Non-Insider CEL Token Claim holders to join the Earn group

4     for equitable treatment and have access to the same

5     optionality of equity and liquid cryptocurrency at the

6     Petition Date Price of $0.81565; if Otherwise, (II) Request

7     the Debtors to Submit Evidence Supporting Inequitable

8     Treatment of Unsecured Creditors in the Earn Group (III)

9     Granting Related Relief [Docket No. 2169, 2208, 2215, 2240,

10    2241, 2260, 2329, 2583, 2840, 2844 to 2846, 2848].

11

12    Hybrid Hearing RE: Motion for Entry of an Order (I) to

13    Dollarize Non-Insider CEL Token Claims at the Petition Date

14    Price of $0.81565; if Otherwise, (II) Request the Debtors to

15    Submit Evidence Supporting Inequitable Treatment of

16    Unsecured Creditors in the Earn Group (III) Granting Related

17    Relief [Docket No. 2216, 2327, 2584, 2593, 2840].

18

19    Hybrid Hearing RE: First Interim Application for Interim

20    Professional Compensation of Delaware ADR, LLC for Fee

21    Examiner Sonchi, Other Professional Period from October 13,

22    2022 Through February 28, 2023, fee: $137,400.00, expenses:

23    $2046.28 [Docket No. 2622, 2624].

24

25    Hybrid Hearing RE: First Application for Interim

Page 6

1   Professional Compensation as Attorneys for Fee Examiner for

2   Godfrey & Kahn, S.C., Other Professional, Period from

3   October 13, 2022-February 28, 2023, fee: $637,735.00,

4   expenses: $7359.71 [Docket No. 2623, 2624].

5

6   Adversary proceeding: 23-01010-mg Christopher Lee Shanks v.

7   Celsius Network LLC, et al.

8   Hybrid Status Conference [Doc# 1, 3 to 8, 12, 13]

9

10   Adversary proceeding: 23-01016-mg Georgiou, et al. v.

11   Celsius Network LLC, et al.

12   Hybrid Pre-Trial Conference [Doc# 1 to 4, 6 to 8, 10]

13

14   Adversary proceeding: 23-01016-mg Georgiou, et al. v.

15   Celsius Network LLC, et al.

16   Hybrid Status Conference RE: Motion to the Dismiss Complaint

17   [Doc# 5, 6, 7, 9, 11 to 13]

18

19   Adversary proceeding: 23-01104-mg Official Committee of

20   Unsecured Creditors v. Celsius Network Limited

21   Hybrid Pre-Trial Conference [Doc# 1, 2, 5, 6]

22

23   Hybrid Hearing RE: Debtors' Motion for Entry of an Order (I)

24   Authorizing and Approving Certain Fees and Expenses for the

25   Backup Plan Sponsor, and (II) Granting Related Relief

Page 7

1    [Docket No. 2774, 2825, 2831, 2847].

2

3    Adversary proceeding: 23-01107 Ad Hoc Group of Borrowers v.

4    Celsius Network LLC, et al.

5    Status Conference [Doc# 1 to 4]

6

7    Hybrid Hearing Re:  Debtor's Motion Seeking Entry of an

8    Order (I) Authorizing the Sale of Osprey BTC Shares and (II)

9    Granting Related Relief.  (Doc ## 2775, 2776, 2825)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 8

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Debtor

 5        300 N La Salle Street

 6        Chicago, IL 60654

 7

 8   BY:  CHRIS KOENIG

 9        DAN LOTONA

10

11   Akin Gump Strauss Hauer Feld, LLP

12        Special Counsel to Celsius

13        One Bryant Park

14        New York, NY 10036

15

16   BY:  MITCH HURLEY

17

18   WHITE & CASE LLP

19        Official Committee of Unsecured Creditors

20        555 South Flower Street

21        Suite 2700

22        Los Angeles, CA 90071

23

24   BY:  AARON COLODNY

25
```

```
1    MCCARTER ENGLISH, LLP

2          Attorneys for Ad Hoc Group of Borrowers

3          245 Park Avenue

4          New York, NY 10167

5

6    BY:  DAVID ADLER

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9          Attorneys for the U.S. Trustee

10         201 Varick Street

11         New York, NY 10014

12

13   BY:  SHARA CORNELL

14

15   ALSO APPEARING:

16   CHRIS FERRARO

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right, good

3     morning.  Obviously, we're here on Celsius Network, LLC, 22-

4     10964.

5              MR. KOENIG:  Good morning, Your Honor.

6              THE COURT:  One of the few times we've been in the

7     Courtroom.

8              MR. KOENIG:  Good morning, Your Honor.

9              THE COURT:  Good morning, Mr. Koenig.

10             MR. KOENIG:  Chris Koenig, Kirkland & Ellis for

11    the Debtors.  It's great to be back in your Courtroom in

12    person again.  We're looking forward to being in your

13    Courtroom more regularly in the future.  We've been busy

14    since our last hearing before Your Honor via Zoom.  We

15    concluded the month-long auction.  We selected The Fairbank

16    Group as the Plan Sponsor.  We'll commence a NewCo that will

17    maximize the value of the Debtor's liquid and illiquid

18    assets to the benefit of the Creditors.  We filed an updated

19    Chapter 11 Plan with Fahrenheit a few weeks ago and late on

20    Monday night, we filed the initial version of the Disclosure

21    Statement.  As we discussed at the hearing a few months ago,

22    the Disclosure Statement includes a long Executive Summary

23    that is intended to be a plain English description of the

24    Plan for accountholders to help -- to help explain the

25    complicated Plan transactions.  That Executive Summary

Page 11

1    includes charts detailing recovery -- the recovery --

2              THE COURT:  Just slow down a little bit.

3              MR. KOENIG:  I'm sorry, Your Honor.  -- including

4    charts detailing the recoveries for the accountholders for

5    each of the Debtors' programs or custody, loans, reports --

6              THE COURT:  What's the estimated recovery for it?

7              MR. KOENIG:  Just shy of 70 percent, Your Honor.

8    Also, on Monday night, we announced a settlement between the

9    Debtors, the Committee and the Series B Holders.  The

10   litigation between the parties regarding the Series B

11   Holders' right to recover from the Debtor's estates has been

12   one of the most important and contested issues in these

13   cases, was it getting under confirmation.  The litigation

14   was incredibly expensive and threatened to delay these

15   Chapter 11 cases.  So, in exchange for a payment of $25

16   million from the GK8 sale proceeds, which had been held in a

17   separate reserve pursuant to a prior Court Order, we're

18   going to resolve all the disputes between the parties.

19   We're very pleased to be able to reach this consensual

20   resolution, which cuts off the associated professional fee

21   burner, which was very significant and allows us to work

22   towards obtaining approval of our Disclosure Statement and

23   move on to confirmation.

24              Of course, that settlement, not for today's

25   hearing, is set for July 18th.  We'll have plenty more to

Page 12

1    say on that topic then, we wanted to highlight it given the

2    importance of the dispute and I believe Your Honor was

3    reserving a few days of your calendar in late July which you

4    can now have back as the litigation schedule is on hold

5    pending approval of the settlement in mid-July.

6              THE COURT:  Let me ask, what impact, if any,

7    assuming the settlement is approved, will that have on the

8    Class Certification Motion and also issues of substantive

9    consolidation?

10             MR. KOENIG:  Yes, Your Honor.  So, the settlement

11   contemplates the substantive consolidation and/or when a

12   company claim would be allowed pursuant to the settlement.

13   The settlement resolves that dispute between the Series B

14   Holders, the Debtors and the Committee.  The Class

15   Certification Motion is going to proceed in parallel.  The

16   Series B Holders have agreed not to object to that Class

17   Certification Motion.  But we think that there may,

18   nonetheless, be benefits to the estate and to the Claims

19   Resolution process by allowing that to proceed.

20             THE COURT:  Just amplify the -- with respect to

21   substantive consolidation.  I think, obviously, the earned

22   accountholders have been most concerned about, have

23   obviously the decision that I had entered.  What, if any,

24   impact will this settlement have on the earned

25   accountholders' ability to reach assets in the parent?

Page 13

1           MR. KOENIG:   They will be able to recover, in

2     full, from the parent under the Chapter 11 Plan.   Under the

3     Chapter 11 Plan, we had already contemplated that all of the

4     Debtor's assets, regardless of which box they were at, would

5     be distributed to accountholders in one way or another,

6     either through substantive consolidation or the allowance of

7     an intercompany claim.   This settlement allows that proposal

8     from the Debtors to proceed in the Chapter 11 Plan subject

9     to the $25 million settlement payment being made in the

10    Series B.

11          THE COURT:   Okay.   Are there -- what's the amount

12    of separate claims directly against the parent

13    (indiscernible)?   There was apart from that -- obviously,

14    the earned accountholders' claims are direct -- were

15    directly against LLC.   What are the separate claims that

16    have been asserted against the parent?

17          MR. KOENIG:   Sure, Your Honor.   I don't have that

18    number in front of me.   Certainly, the vast majority of the

19    claims are accountholder claims.   There are certain loans

20    that were made from C&L specifically, so the creditor body

21    is not identical.   That being said, given the size of the

22    accountholder claims, we don't believe that the difference

23    is significant.

24          THE COURT:   All right.   So, essentially, if the

25    settlement is approved, is that -- will that moot the issue

Page 14

1    of substantive consolidation and having to -- we'll have a

2    contested evidentiary hearing with respect to substantive

3    consolidation.

4              MR. KOENIG:  Your Honor, the Settlement Order that

5    we proposed and attached in the 9019 Motion will provide for

6    substantive consolidation of those two estates and so, after

7    the Settlement Order is entered, that will be granted.

8              THE COURT:  Okay.

9              MR. KOENIG:  And anybody who opposes that relief

10   should object to the Motion, the Settlement Motion.

11             THE COURT:  Okay.

12             MR. KOENIG:  The point being, Your Honor, that

13   these cases have been going on for just under a year now.

14   From the Debtor's perspective, we've reached the endgame of

15   these cases.  We selected the Fahrenheit Group as the Plan

16   Sponsor, and we've secured a backup option that provides us

17   with optionality in case we need to pivot for any reason.

18   We filed a Plan and Disclosure Statement.  We intend to

19   promptly seek approval of the Disclosure Statement and if

20   approved, solicit the Plan and seek confirmation.  We're

21   headed for the exit so that we can promptly return liquid

22   cryptocurrency to accountholders and create the NewCo will

23   be owned by accountholders.  If I could just spend one

24   moment on scheduling.  I know at the prior hearing, Your

25   Honor indicated that you wanted to read the Disclosure

Page 15

1    Statement before giving us a hearing.  I don't know if

2    you've had a chance to look at it, at all.

3            THE COURT:  I haven't.

4            MR. KOENIG:  But just wanted to check in on

5    scheduling what the best way to proceed was.

6            THE COURT:  When would you like to have a -- put

7    it this way, I do want to read the Disclosure.  I have not

8    read the Disclosure.  I've been rather busy.  Let's put it

9    that way.  I do want to read the Disclosure Statement.  I'm

10   certainly anxious to move this along as quickly as possible.

11   Does the Debtor and the Committee -- have you consulted

12   about a proposed date for a Disclosure Statement hearing?

13           MR. KOENIG:  Your Honor, we're prepared to proceed

14   as promptly as possible.  Obviously, we need 35 days' notice

15   of the hearing for 28 days' notice for the objection

16   deadline  and then 7 days' notice of the hearing.  We have a

17   Motion that we could file in short order.  I think we were

18   seeking a date in early to mid-August, depending on what

19   works with your calendar.  We will work backwards from

20   there.

21           THE COURT:  I think we'll make it work.  I will

22   endeavor to review the Disclosure Statement this weekend.

23           MR. KOENIG:  Okay.  Very good.  So, we'll go ahead

24   and prepare the Motion and then, would you like us to get a

25   hearing date from Chambers before filing it?

```
1              THE COURT:  Yes, I would.

2              MR. KOENIG:  Very good.  Thank you.  I know we

3    have a very long agenda --

4              THE COURT:  I think Deanna can give you a number

5    of suggested alternative dates, but I think we should be

6    able to move it along.

7              MR. KOENIG:  Great.  We will -- we will coordinate

8    with her and thank you.

9              THE COURT:  Thank you.

10             MR. KOENIG:  I know we have a long agenda this

11   morning.  So, unless you have any questions for me, I would

12   propose to turn it over to Mr. Ferraro for a brief updating

13   of business.

14             THE COURT:  That's fine.  Thank you.

15             MR. KOENIG:  Great.  We filed a few slides last

16   night at Docket #2918 and Deanna, if you could, my

17   colleague, Nima Khosrabi is going to share the slides if you

18   can make him the co-presenter.

19             CLERK:  Could you spell the last name please?

20             MR. KOENIG:  K-H-O-S-R-A-B-I.  I think his hand is

21   raised on the Zoom.

22             CLERK:  Yes, all right.  He is a co-host.  He can

23   present.

24             MR. KOENIG:  Wonderful.  Good morning, Mr.

25   Ferraro.
```

Page 17

1           MR. FERRARO:  Hello?

2           MR. KOENIG:  Good morning, Mr. Ferraro.  Could you

3    please tell the Court about the current status of the

4    withdrawal process?

5           MR. FERRARO:  Yeah.  Hey, thanks, Chris and good

6    morning, Your Honor.  The company has continued with process

7    withdrawals for (indiscernible).  To date, we've completed

8    32 million of pure custody withdrawals for transfer of the

9    preference threshold, totaling 80 percent of the distributed

10   (indiscernible), with approximately 8 million

11   (indiscernible) to be withdrawn.  (indiscernible) remaining

12   assets in the custody account that are not part of the pure

13   custody tranche.  Users (indiscernible) custody settlement

14   before they get the approval of that line.  They will

15   receive 72.5 percent of their assets that will remain in the

16   custody accounts in two payments of 36.25 percent, less

17   (indiscernible) fees, (indiscernible) to withdraw the first

18   36.25 percent.  Overall, more than 50 percent of the

19   eligible users opted into the settlement and we began

20   processing these withdrawals (indiscernible), 39 million

21   withdrawals or 83 percent of the eligible value.

22          Sorry, give me one second.  I had an incoming call

23   that messed up my screen.  Sorry about that.  On April 20th,

24   the Court approved a settlement among Celsius, the Withhold

25   Ad Hoc Group and the UCC that provided participating members

Page 18

1    of the Withhold Ad Hoc Group of any kind of distribution of

2    50 of their eligible withhold claim.  With the remaining 85

3    percent of the value of (indiscernible) claim, it be

4    converted to an early claim and treated as such under the

5    Plan.  To date, the company has processed withdrawals

6    representing 89 percent of the eligible withhold value with

7    Withhold Ad Hoc Group.

8              Finally, on May 25th, the company began to process

9    the line to users who deposited on the petition date to

10   withdraw those assets.  As of June 25th, the company has

11   processed withdrawals for over 70 percent of the eligible

12   value.  In summary, the company would process withdrawals of

13   over $72 million in value across 50+ clients for tens of

14   thousands of accountholders across a wide range of

15   jurisdictions and (indiscernible).  Now turning to the next

16   slide.

17             MR. KOENIG:  Mr. Ferraro, can you please provide

18   an update on the company's mining operations?

19             MR. FERRARO:  Yeah, since April, we deployed

20   11,000 additional machines, representing an increase of 20

21   percent.  We ended May with 64,000 (indiscernible) adjusted

22   EBIDTA of 1.5 million, relatively (indiscernible) month over

23   month.  As a quick reminder, EBIDTA for this business is

24   effectively the pre-tax income --

25             THE COURT:  If you could slow down a little and

Page 19

1    just repeat that.  You were breaking up a little bit.  So,

2    just try and repeat what you just said, slowly.

3           MR. FERRARO:  Yeah, I'm sorry, Your Honor.  I'll

4    start with the (indiscernible) on this slide.  Since April,

5    we have declared 11,000 of these new machines representing

6    an increase of 20 percent.  We ended May with 64,000 rigs

7    deployed.  In May, we had an adjusted EBITDA of 1.5 million,

8    relative (indiscernible) month.  As a quick reminder, EBIDTA

9    for this business is effectively the pre-tax income

10   (indiscernible) to add back depreciation (indiscernible)

11   revenue was 10.2 million in May, (indiscernible).  The

12   uptime or the percentage of time our machines are hashing

13   decreases 61 percent in May and 70 percent (indiscernible).

14   The reduction in uptime resulted from a scheduled

15   maintenance outage at the heart of (indiscernible).  That

16   outage occurred from mid-May to early June.  The power

17   (indiscernible) mid-June.

18          Moving to the next, which notes the longer term

19   (indiscernible).  On the bottom left draft, we see the

20   64,000 (indiscernible) end of May and since the course of

21   (indiscernible) contract rejection in early-January, our

22   rigs deployed have increased steadily each month from 20,000

23   to 64,000 as of the other day, which is an increase of 128

24   percent since the rejection.  Now moving to the next slide.

25          MR. KOENIG:  And Mr. Ferraro, can you provide a

Page 20

1    quick update on the company's current financial position?

2         MR. FERRARO:  Yeah.  As a quick reminder, we

3    started the case with 138 million in cash.  We got 137

4    million on hand as of (indiscernible), which is a decrease

5    (indiscernible).  That's all I have for you, Your Honor.

6         THE COURT:  Thank you.

7         MR. KOENIG:  Thank you, Your Honor.  I'll turn the

8    lectern over to the Debtor's Special Counsel.

9         THE COURT:  Thank you.

10        MR. HURLEY:  Good morning, Your Honor.  Mitch

11   Hurley with Akin Gump Strauss Hauer Feld --

12        THE COURT:  Good morning, Mr. Hurley.

13        MR. HURLEY:  -- Special Counsel to Celsius.  Good

14   morning.  Your Honor, I'm here today on the uncontested

15   Motion of Celsius to approve the transfer of property

16   pursuant to Bankruptcy Code Sections 105 and Rule 9019 of

17   the Federal Rules of Bankruptcy Procedure.  Our Motion was

18   filed on June 6, 2023.  An Amended Notice of Motion was

19   filed on June 7, 2023, reflecting the Court's updated,

20   hybrid -- in-person and procedures for hearings.  As you may

21   recall, on December 6th of last year, Your Honor entered a

22   9019 Order approving a Stipulation to settle and discontinue

23   the adversary proceeding between Celsius and Prime Trust.

24   That was adversary Proceeding #22-01140, which has since

25   been closed.  That Stipulation represented a significant

Page 21

1    achievement in the Chapter 11 cases providing Celsius with

2    virtually all the relief that it sought it its adversary

3    proceeding with Prime Trust, including a return of coins

4    that are worth around $23 million in recent prices.  As

5    required under the Stipulation and the 9019 Approval Order,

6    Prime Trust transferred the property subject to the

7    Stipulation to Celsius on December 13, 2022.

8            Since that time and in accordance with the terms

9    of the Stipulation and Order, Celsius has stored that

10   property and fully segregated designated Celsius wallets,

11   and for over six months now, has not accessed, transferred,

12   distributed or otherwise used the subject property.  The

13   Stipulation contemplates that further Order of this Court is

14   needed before Celsius may transfer or use the subject

15   property.  As the state property of the currently segregated

16   assets, Celsius submits it should be available to Celsius in

17   the ordinary course, including in connection with reaching

18   corporate finance activities and Confirmed Plan of

19   Reorganization.  Accordingly, Celsius filed the Motion to

20   Transfer seeking an Order authorizing it to transfer the

21   subject property from the segregated designated Celsius

22   wallets to Celsius Network deposit vaults and the Celsius

23   Network, LLC U.S. workspace, and from there, to access,

24   transfer and use the subject property in the ordinary course

25   as it does with all other assets held in those accounts and

Page 22

1    consistent with the sound exercise of Celsius business

2    judgment.

3              As reflected in the Certificate of Service we

4    filed on June 8, 2023, Celsius provided notice of the Motion

5    to Transfer to all relevant parties, including the standard

6    service list as set forth in the Court's Case Management

7    Order, as well as all potentially impacted Celsius users who

8    received notice via electronic mail to their last known

9    email address.  The deadline to object to the Motion to

10   Transfer was June 21, 2023, and as reflected in the

11   Certificate of No Objection filed on June 26, 2023, we are

12   not aware of any objections having been filed.  Since no

13   objection had been filed, we submit that the relief

14   requested in this Motion is warranted, we ask that Your

15   Honor grant the Motion to Transfer the Assets.

16             THE COURT:  Thank you.  Mr. Colodny, does the

17   Committee have -- you didn't file a response so --

18             MR. COLODNY:  No, we do not, Your Honor and we've

19   spoken to Mr. Hurley in debrief.

20             THE COURT:  All right.  Does anybody else wish to

21   be heard?  Motion is granted.

22             MR. HURLEY:  Thank you, Your Honor.

23             THE COURT:  Thank you very much.

24             MR. LOTONA:  Good morning, Your Honor.  For the

25   record, Dan Lotona, Kirkland & Ellis, on behalf of the

Page 23

1    Celsius Debtors.  The next item on the agenda is the

2    Debtor's Motion to Appoint Christopher Ferraro as Foreign

3    Representative in the High Court of Justice in the U.K.

4    pursuant to the Cross-Border Insolvency Regulations.  Your

5    Honor, subsequent to the entry of the Order, the Debtors

6    will seek to recognize the Chapter 11 cases in the U.K. as

7    foreign main proceedings given that the center of main

8    interest is in the United States.  Your Honor, this relief

9    is necessary to protect the Debtor's assets in the U.K.

10   Absent protection of those assets and the protection of the

11   Automatic Stay and various Orders concerning the ownership

12   of cryptocurrency, certain customers may seek self-help

13   remedies in the U.K. which conclude up to winding up this

14   Celsius Network, Ltd. entity in the U.K.  This, of course,

15   would result in inequitable outcomes --

16           THE COURT:  Has any action or proceeding been

17   commenced against the English parent?

18           MR. LOTONA:  Yes, Your Honor.  There was a small

19   claims court proceeding where the accountholder was awarded

20   a judgment.  That is currently in the process of being

21   appealed.  What we're concerned about is, if that judgment

22   is affirmed on appeal, similar customers will seek similar

23   self-help remedies in the U.K.  Again, Your Honor, this

24   relief is necessary to ensure equitable treatment for all

25   accountholders across the world.  Your Honor, the Debtors

Page 24

1    received no objections.  It had been coordinating with the

2    Creditor's Committee on this relief.

3              THE COURT:  Motion is granted.

4              MR. LOTONA:  Thank you, Your Honor.  The next item

5    on the agenda is the Debtor's Motion to sell their shares in

6    the Osprey Bitcoin Trust.  Your Honor, the Osprey Bitcoin

7    Trust is a trust where the shares trade over the counter and

8    allows individuals and other institutions to obtain indirect

9    access to bitcoin without all the intended risks of bitcoin

10   such as holding private keys and storing cryptocurrency in

11   their wallets on the (indiscernible).  Your Honor, the

12   Debtors hold approximately 35 percent of the outstanding

13   shares of the Osprey Bitcoin Trust.  These shares were

14   purchased in March of 2021 in two tranches for 1,000

15   bitcoin.  At the time, the blended rate of bitcoin was

16   approximately $55,000 and the shared price of purchase

17   ranged between $16 and $19.  Your Honor, this is a highly

18   illiquid asset, the daily average trade value is only

19   approximately 16,000 shares per day.  As a result, it would

20   take the Debtors a significant portion of time to either

21   unwind their position, which would be at a significant

22   discount given the large holdings or it would take a

23   significant amount of time to acquire enough shares to earn

24   a majority voting interest where they could seek to elect to

25   dissolve the trust, which again, it's not clear on the face

Page 25

```
 1    of the documents that that's even an option.  Even if it

 2    were, it could result in protracted litigation that would

 3    tie up those shares for a protected period of time.

 4              Your Honor, the Debtors received a third-party

 5    proposal to purchase the shares at the closing price as

 6    reflected on Bloomberg on the closing date, which would

 7    happen no later than July 10th.  Your Honor, that would

 8    result in approximately $15-20 million coming into the

 9    estates at the current price which is $7 as of today.  The

10    net asset value is currently $10.18, which represents

11    approximately a 30 percent discount.  And that's where the

12    Osprey Bitcoin Trust shares have traded historically between

13    30-40 percent discount (indiscernible).  Your Honor, the

14    benefits of this transaction will increase liquidity at a

15    time where the Debtors are on the precipice of confirming

16    these Chapter 11 cases.  It sells an otherwise illiquid

17    asset that would instead remain on the Debtor's balance

18    sheet and is a sound exercise of the business judgment.  The

19    Debtors received no objections to this and the UCC supports

20    the relief requested.

21              THE COURT:  Mr. Colodny?

22              MR. COLODNY:  Good morning, Your Honor.  Aaron

23    Colodny for the Official Committee of Unsecured Creditors.

24    I agree with Mr. Lotona, it's a large illiquid position and

25    we believe that this maximizes value.  We've consulted with
```

Page 26

1    our investment bankers familiar with the securities and they

2    believe this is a good transaction, so we're okay moving

3    forward.

4              THE COURT:  All right.  Does anybody else wish to

5    be heard?  It's granted.

6              MR. LOTONA:  Thank you, Your Honor.  At this time,

7    I will cede the lectern to my partner, Mr. Koenig.

8              THE COURT:  Thank you.

9              MR. KOENIG:  Again, for the record, Chris Koenig

10   for the Celsius Debtors.  Your Honor, next is exclusivity.

11   I'll be brief in my opening remarks given my comments at the

12   start of the hearing.  We've now concluded the auction,

13   chosen a Plan Sponsor, filed a Plan and Disclosure

14   Statement, we've worked to build consensus for the Plan, and

15   we will continue to do so.  We've worked closely with the

16   Committee to develop the Plan and Disclosure Statement,

17   which are both supported by the Committee.  We've reached

18   settlements with Custody, Withhold and now the Series B

19   Preferred Holders.  We're pleased to announce that we have a

20   mediation session scheduled with Judge Wiles on July 17th.

21   That mediation session will include the Committee, the Loan

22   Ad Hoc Group, the Earned Ad Hoc Group and (indiscernible) to

23   try to build additional consensus for the Plan.  But we need

24   additional time to seek approval of the Disclosure Statement

25   and if approved, solicit the Plan and seek confirmation.

Page 27

1    So, we've sought a 90-day extension of the solicitation

2    exclusive period, which would take us through September

3    30th, which is our target date for confirmation and also the

4    milestone in the Plan Sponsor Agreement.  That's simply how

5    much time we will need.  We only received one objection to

6    exclusivity from Mr. Adler on behalf of the Loan Ad Hoc

7    Group.  The Debtors and the Committee had worked with Mr.

8    Adler for many weeks before the auction to try to reach an

9    agreement.

10              THE COURT:  I thought you had a settlement?

11              MR. KOENIG:  Ultimately, we're unable to take that

12   settlement and turn it into definitive documents,

13   unfortunately.  But as I mentioned, we've agreed to

14   mediation with Mr. Adler in mid-July and hope to be able to

15   reach a compromise that works for all parties.  But as per

16   his objection to exclusivity, his objection is essentially a

17   confirmation objection and even he is not arguing that

18   exclusivity should be terminated, instead, he's arguing that

19   it should be limited to 60days.  Again, Your Honor, we've

20   asked for 90 days because we believe that that's how much

21   time it will need to solicit -- that we will need to solicit

22   and confirm the Plan.  We don't think it makes sense to have

23   to obtain another exclusivity extension midway through

24   soliciting votes.  And we believe an extension is clearly

25   warranted here in light of all the progress that we've made

Page 28

1    and it's notable that we only received one objection to

2    exclusivity in light of how contested prior exclusivity

3    hearings have been.

4            In short, we believe that cause has been

5    demonstrated as required under the factors in this district.

6    These cases are undoubtedly large and complex.  We have made

7    good faith progress toward reorganization by filing a Plan

8    of Disclosure Statement and reaching various settlements.

9    We need more time to obtain approval of the Disclosure

10   Statement and the Plan.  We're paying our bills on time and

11   we're working to build additional consensus at mediation

12   session in mid-July.  Accordingly, we believe a 90-day

13   extension is appropriate.  We'd respectfully request that

14   the Court provide us with the time to finish what we

15   started.

16           THE COURT:  All right.  Mr. Adler?

17           MR. ADLER:  Good morning, Your Honor.  David Adler

18   from McCarter English on behalf of the Ad Hoc Group of

19   Borrowers.  It's a pleasure to be back in your Courtroom.

20   My first time in three years.  We filed an Objection last

21   Wednesday and we basically raised two issues that I think go

22   to exclusivity, not -- the Debtors characterize it as a Plan

23   objection, but we said essentially that the lack of

24   communication in this case basically dropped off to nothing

25   from April 23rd until June 13th and that the Borrowers --

1    the Ad Hoc Group of Borrowers received nothing from the

2    Debtor in terms of where we were, if the original proposal

3    had fallen apart, what the alternatives are.  And on June

4    13th we received a call, and we were told that we had to

5    rush to mediation and my response, Your Honor, was, we

6    should have done this.  You obviously knew that the deal

7    wasn't going to go forward, you should have done this back

8    in April when the auction started or early May.  So, the

9    first issue is the lack of communication between the Debtor

10   and the Ad Hoc Group.  The second issue is the lack of

11   progress.  I mean obviously, last time that we were here for

12   the second exclusivity extension, there was a Power Point

13   put up by the Debtors showing that there was a settlement

14   with the Ad Hoc Group of Borrowers.  That fell apart and now

15   we've got all the way backwards and we have to go to a

16   mediation and basically start from Square One with Judge

17   Wiles.  The Ad Hoc Group of Earned Creditors are going to be

18   there as well, which shows that not too much consensus has

19   been reached with them.  And that really was our concern in

20   objecting to exclusivity.

21           We do recognize, Your Honor, that this is a

22   complex case and there are a lot of moving parts.  But from

23   the Ad Hoc perspective, I'm going to fall back on the point

24   that these mediations or discussions could have started in

25   May or in June, not rush, rush, rush, you know, we have to

Page 30

1    get into mediation when I get a phone call on June 13th.

2    And for that reason, we think that there should be a shorter

3    time period for exclusivity of 60 days so that we can come

4    back here and revisit where we are at that point.  And

5    unless Your Honor has any questions --

6              THE COURT:  I don't.

7              MR. ADLER:  Thank you, Your Honor.

8              THE COURT:  Does anybody else want to be heard?

9    Mr. Colodny?

10             MR. COLODNY:  Your Honor, Aaron Colodny for the

11   Official Committee of Unsecured Creditors.  We support the

12   Debtor's Motion for Exclusivity.  I think the level of

13   collaboration between the Debtors and the Committee has been

14   unprecedented in these cases.  That was shown in the

15   auction, which was truly unique, and the Debtors took the

16   Committee's comments, we consulted with them, and we were

17   ultimately picking the management team that was going to

18   lead a new company.  Mr. Adler is entirely correct.  Prior

19   to the auction, we had extended discussions with a group of

20   borrowers around a construct bid extended the loans.  The

21   issue became we were not able to get to an agreement.  The

22   agreement that was on the table had a significant amount of

23   risk that the estates were not comfortable moving forward

24   with and we didn't have the support of the Borrowers and it

25   seemed that the support of the Earned Group was against that

Page 31

1    sort of settlement.  So, at the auction, we turned our focus

2    to maximizing value for the estate.  After the auction

3    concluded, we are entirely focused on reaching an agreement

4    with the borrowers.

5         I think consensus here is extremely important and

6    prior to filing the Plan, we made a proposal to the

7    Borrowers that had a framework.  I've spoken with Mr. Adler

8    since then and believe that we are committed to work

9    together to find something that works, and we've posed

10   mediation so that the Earned Group and the Borrower Group

11   can be in the same room to discuss the treatment together.

12   I think everyone with the Disclosure Statement, as Your

13   Honor will see this weekend, sees that there is a very

14   delicate balance here.  If you take liquid cryptocurrency

15   and give it one group, it comes out of the other groups too.

16   And I am sure that the Earned Creditors are not happy with

17   the amount of liquid cryptocurrency they are receiving, same

18   as though the Borrowers are.  Any discussion has to be based

19   on the legal entitlements of the groups as they exist today,

20   which is why I believe that bringing everybody together

21   through mediation with Judge Wiles will help to level set

22   the playing field and come to an agreed solution.  At the

23   same time, I don't want to wait until July 17th.  As Mr.

24   Adler said, we should start discussions if we can come to a

25   framework that works for both parties before then and go to

Page 32

1    that mediation with that framework in hand, I think it will

2    be much more productive and we're committed to making that

3    happen.

4              THE COURT:  Thank you.  Does anybody else wish to

5    be heard?  Okay.

6              MS. CORNELL:  Good morning, Your Honor.  This is

7    Shara Cornell with the Office of the United States Trustee.

8    The United States Trustee did not file an Objection to the

9    Extension of Exclusivity in this instance.  I've spoken both

10   with counsel for the Debtors and counsel for the committee

11   with respect to the relief in motion.  The United States

12   Trustee understands the need for an extension; however, for

13   a limited extension, less than 90 days would be our

14   preference.  Thank you, Your Honor.

15             THE COURT:  All right.  Anybody else wish to be

16   heard?  All right.  The Objections to extending exclusivity

17   are overruled.  The Motion to Extend for 90 days is granted.

18   Let me just comment.  I was certainly -- I thought, from

19   what had been discussed at prior hearings, that there had

20   been a successful resolution with the Borrowers.  Obviously,

21   that fell apart.  I don't want to get into what the reasons

22   or whatever, there's no deal.  I think it's really very

23   important that a consensual resolution of the issues be

24   reached.  I think that confirmation -- if the Borrowers

25   object to confirmation, I think it will complicate

Page 33

1   considerably the issues that the Court is faced with.  So,

2   I'm quite pleased that Judge Wiles has agreed to be the

3   mediator.  I haven't talked to him, and I will not talk to

4   him about the mediation.  He, obviously, is very

5   knowledgeable about crypto and I think even without regard

6   to that, he's an excellent choice as a mediator.  So, I

7   appreciate his willingness to do this.  He has a very busy

8   calendar and schedule, as well.  So, please put all your

9   efforts into trying to reach a consensual agreement with the

10  Borrowers.  I think it's an important set of issues.

11          But with respect to exclusivity, I really do view

12  the objection as really, as Plan issues, not as really as to

13  exclusivity.  I think that the case is -- it's taken time to

14  get here, but compared to a lot of cases, it's actually been

15  a relatively brief time compared to many large, complicated

16  cases.  So, let's keep it moving forward.  Your Motion is

17  granted.

18          MR. KOENIG:  Thank you, Your Honor.  We intend to

19  do so.  Up next is the Motion to Pay Certain Fees to a

20  Backup Plan Sponsor.  Your Honor, from the beginning of the

21  auction process, the Debtors have been focused on

22  maintaining optionality.  The cryptocurrency industry is

23  fast-moving and has been subject to regulatory scrutiny, and

24  we want to make sure, of course, that we're fully

25  regulatorily compliant in whatever transaction we propose.

Page 34

1    So, we have been focused on making sure that we have an

2    executable backup plan in case the Fahrenheit NewCo

3    transaction cannot be completed for any reason.  These cases

4    are too expensive and have gone on for too long to have us

5    have to go all the way back to the drawing board if we have

6    to pivot to another transaction.  We need to get out of

7    bankruptcy promptly.

8            For that reason, the Plan we have filed

9    contemplates two transaction structures, the Fahrenheit

10   NewCo deal, which we believe is the best way to maximize the

11   value of Celsius' liquid and illiquid assets for the benefit

12   of our Creditors, and it also includes a pivot to an orderly

13   wind down as a backup if this NewCo transaction cannot be

14   completed for some reason.  That way we don't have to start

15   from scratch and file a new Plan and Disclosure Statement.

16   We could quickly pivot to a wind down and promptly conclude

17   these cases without having to start over.  Of course, we

18   don't presently see any reason why the NewCo Plan could not

19   be completed.  We've been in close contact with the

20   regulators, we've answered their questions, but we need to

21   have optionality just in case.  We're very cognizant of what

22   happened in Voyager, and it turned out to be very helpful

23   that Voyager had backup wind down built into their Plan

24   given what happened with finance.  It allowed them to

25   quickly pivot an exit.  This optionality comes with a price,

Page 35

1    of course.

2           The Debtors and the Committee have selected The

3    Brick as the backup Plan Sponsor.  The Brick would take

4    Celsius' mining business public and liquidate Celsius' other

5    assets for the benefit of Celsius' Creditors.  We've entered

6    into a Plan Sponsor Agreement that obligates The Brick to

7    serve as this backup bidder through the end of the year.

8    But in order to be an effective backup, we need to be

9    closely coordinated with them.  We need to make sure that

10   The Brick is ready to take over as Plan Sponsor and promptly

11   make distributions if we need to pivot late in the process.

12   So, that requires us to closely consult with The Brick on a

13   host of different issues relating to the Backup Plan, from

14   strategies on how to best convert the Debtor's all coin

15   portfolio to bitcoin in need for distribution, how to best

16   maximize the value the Debtor's illiquid assets, make sure

17   that The Brick is ready to make distributions of liquid

18   cryptocurrency to creditors and make sure that The Brick is

19   ready to take the mining business public.  In short, The

20   Brick needs to be running alongside the Fahrenheit

21   transaction in parallel so that they can step in if need be.

22           And of course, there's a cost to that work by The

23   Brick, which the Debtors believe, in their business

24   judgment, is a cost worth paying in order to secure a backup

25   that preserves its optionality and prevents us from having

Page 36

1    to further extend the cases if the Fahrenheit transaction

2    cannot be completed.  So, we've agreed to pay a backup

3    commitment fee, pay certain expenses and pay consulting fees

4    for ongoing consultation between the Debtors and The Brick

5    to ensure that The Brick can be an effective backup option.

6    We've structured these backup fees in a way that ensures

7    that the Debtor's estates receive maximum value from The

8    Brick, including a monthly fee that is earned out in

9    exchange for Brick's ongoing consultation with us.  And The

10   Brick has a lot to offer the estate in that regard.  One of

11   the members is (indiscernible) Absolute Return Advisors, who

12   is uniquely qualified to help the Debtors decide how to best

13   convert their cryptocurrency into bitcoin (indiscernible) to

14   maximize the value of our (indiscernible) portfolio.  And

15   Brick is partnered with Gemini's Distribution Agent, which

16   is helpful as we finalize our plans for the Distribution

17   Agent under any Plan.

18           But we believe that the fees are imminently

19   reasonable in light of the potential cost of delay and the

20   value of securing this backup.  The cost of these cases is

21   around $20 million a month and having a backup transaction

22   will likely save at least a month off the timeline if we had

23   to pivot.  And The Brick reduced their fees since the filing

24   of the Motion.  They reduced the Consultation Services Fee

25   by $50,000 a month and they waived that fee, in its

Page 37

1    entirety, for May.  They also clarified that their expense

2    reimbursement through today's date will not exceed $1.25

3    million in the aggregate.  They also agreed to reduce their

4    ongoing go-forward expense reimbursement to $300,000 per

5    month down from $500,000 per month.  And they also agreed to

6    reduce their fees under the backup proposal itself by a

7    total of $7 million if we actually have to pivot to them.

8                  Finally, as we disclosed in the Reply we filed

9    yesterday, we received another bid for a wind down.  Our

10   Backup Plan Sponsor Agreement, of course, includes a broad

11   fiduciary out if we identify a better offer that is more

12   value maximizing than The Brick.  But we believe it is

13   important to lock in the Backup Proposal so that we have it

14   in hand and can move towards the Disclosure Statement

15   Hearing and Confirmation confidently that we have a backup

16   if, for whatever reason, we need it.  Again, as with

17   exclusivity, we think it's notable that we only received one

18   objection from the U.S. Trustee.  None of the Debtor's

19   economic stakeholders objected to the Motion.  I'll respond

20   in more detail after Ms. Cornell speaks, but we address her

21   objection in the Reply that we filed yesterday.  This is not

22   the case of the Debtors paying an unsuccessful bidder as

23   compensation for participating in the auction.  Rather,

24   these fees are for the work that they are doing to serve as

25   a backup transaction which is very valuable to the Debtor's

Page 38

1    estates.  The fees are appropriate to compensate The Brick

2    for their commitment to serve as a backup for a six-month

3    period of time and all the work that they need to do in

4    order to ensure that they are an effective and available

5    backup option for the Debtors.  With that, unless Your Honor

6    has questions for me at the outset, I'll turn the

7    evidentiary portion of the motion.

8              THE COURT:  So, I do have questions.  So, you

9    filed the Motion without a Declaration.  My Chambers have

10   been calling for weeks asking for a Declaration in support.

11   We were told that the Motion references a Declaration by

12   Christopher Ferraro.  There is no Declaration by Christopher

13   Ferraro.  There's this late-filed Declaration by Mr.

14   Schreiber from Alvarez and Marsal.  So, I haven't had

15   sufficient time to really focus on this because you were so

16   late in filing anything in support and explain it.  So, why

17   don't you have to file a Motion to obtain Brick as a

18   consultant?  I mean, you -- that's what you ordinarily --

19   you hire consultants, you've done this before in the case

20   and it requires a Motion.  You haven't done that.  I don't

21   understand -- there are lots of fees built into this, as

22   well.  I don't understand all the pieces of it.  What's the

23   aggregate amount of compensation that Brick is going to

24   receive and how much for each of the categories of

25   compensation they're going to receive?  You've basically

1    dropped this on us without sufficient evidentiary support.

2              MR. KOENIG:  Your Honor, on the evidentiary

3    support, we apologize for being so late.

4              THE COURT:  No, don't apologize.  You know, you

5    think apologies are going to get you a decision today?

6              MR. KOENIG:  No, look, Your Honor, we understand

7    you take the --

8              THE COURT:  Answer first about the requirement

9    that you have a consultant retained, the retention approved

10   by the Court?

11             MR. KOENIG:  So, The Brick is working on their

12   own.  They are the backup bidder, they are working for their

13   own account.

14             THE COURT:  You're -- you've said they're going to

15   be a consultant to the Debtor for the purposes of this

16   backup bid, okay.  You've said they're a consultant, to you,

17   you know, to the Debtor.  You have to get them retained.

18   They have to file -- it's going to require to show they have

19   no conflicts.  You know, I'm exasperated because I

20   understand what you're trying to accomplish but follow the

21   rules.

22             MR. KOENIG:  Your Honor, we don't believe that

23   they're professional within the meaning of the Section 327

24   and 328.

25             THE COURT:  Really?

Page 40

1              MR. KOENIG:  They are the backup bidder who would

2    provide us -- they would --

3              THE COURT:  Well then, they're not entitled to any

4    consulting fees then, right?  Because they're a backup

5    bidder.  They're not a consultant, they're a backup bidder.

6              MR. KOENIG:  Sure.  So, what we did -- what we

7    tried to do, Your Honor.  We could have structured the fees

8    as a one-time backup commitment fee or something of that

9    nature and avoided that issue.  What we tried to do is

10   structure this in a way that the estate's got the maximum

11   bang for the buck by ensuring that they work with us as the

12   process goes along, to ensure that they're actually ready to

13   -- so that we can pivot to them any time, if needed.

14             THE COURT:  Let's assume that the successful bid,

15   they're executed.  What's the aggregate compensation that

16   Brick you expect will be entitled to under what you're

17   asking for?

18             MR. KOENIG:  It depends on what --

19             THE COURT:  Put everything together, how much?

20   What's the range?

21             MR. KOENIG:  It depends on when we exit from

22   bankruptcy, but it's a $1.5 million commitment fee, plus

23   their expense reimbursement which, as we disclosed in the

24   Reply, the expect to be about $1.25 million so I'm up to

25   $2.75 million and then they have a $450,000 monthly fee

Page 41

1    through whenever we emerge.

2              THE COURT:  What are they doing for the $450,000 a

3    month?

4              MR. KOENIG:  We're talking to them about

5    converting the Debtor's (indiscernible) portfolio and

6    bitcoin (indiscernible) and utilizing the benefit of

7    (indiscernible) as a proprietary trading platform and a deep

8    knowledge in the space.  We're consulting with them about

9    how they would distribute liquid cryptocurrency under their

10   Plan and making sure that they're ready to stand up the

11   mining business.  All of this is something that any bidder

12   needs to do.  The difference is, Fahrenheit is the winning

13   bidder, and they expect to succeed.  So, that's sweat equity

14   that is reasonable to expect them to do on their own.  The

15   Brick is the backup bid and for them to be running

16   alongside, they don't have any expectation that they're

17   going to be the transacting counterparty at the end of the

18   day.  They have to be ready if we call them on any given day

19   and say, "We need to pivot", we can't be starting from

20   scratch.  That's the whole point of having a backup bidder.

21             THE COURT:  But what are they going to do for

22   $450,000 a month?

23             MR. KOENIG:  Your Honor, I went through the

24   consulting services that we think are necessary and

25   appropriate to make sure that we -- that they're ready to go

Page 42

1    if we need to call on them.

2              THE COURT:  Let me hear from Mr. Colodny, do you

3    want to address it and then I'll give Ms. Cornell a chance.

4              MR. COLODNY:  Your Honor, Aaron Colodny for the

5    Official Committee of Unsecured Creditors.  I -- it's the

6    Debtor's Motion and to the extent that you require them to

7    follow and retain a professional.  We defer --

8              THE COURT:  Don't you think that -- you don't

9    believe that this -- that they require retention as a

10   professional?

11             MR. COLODNY:  As a --

12             THE COURT:  For a consultant fee of $450,000 a

13   month?  They don't have to be retained?

14             MR. COLODNY:  Your Honor --

15             THE COURT:  What's the position of the Committee

16   on that issue?  And then explain it.

17             MR. COLODNY:  Your Honor, I think it is

18   appropriate for all professionals in this case to be

19   conflict-free, to file a professional retention application

20   or not.  If it's the Debtor's position that they are not

21   being professional within the meaning of 327(e) --

22             THE COURT:  And you believe that's correct?  The

23   Committee supports compensating them as a consultant for

24   $450,000 a month, without retention, without approval,

25   without establishing they're conflict-free, the Committee

Page 43

1    believes that the Debtor should be able to pay these fees

2    and have them as a consultant without having them retained -

3    -

4                MR. COLODNY:  The way that I look at the economic

5    benefit of this, to the extents that we need to pivot and we

6    need to pivot quickly, I think that being able to move on a

7    couple days' notice saves $20 million in this case, which to

8    me, when I looked at --

9                THE COURT:  So, let the move quickly and seek to

10   be retained.

11               MR. COLODNY:  If that is what Your Honor decides,

12   that is perfectly --

13               THE COURT:  But I want to know what -- tell me, do

14   you in your professional judgment, believe that as a

15   consultant to the Debtor, they're not required to be

16   retained?

17               MR. COLODNY:  Your Honor, as a professional for

18   the Debtor, I think they have to meet the requirements of

19   all other professionals.

20               THE COURT:  Thank you.  Ms. Cornell?

21               MS. CORNELL:  Thank you, Your Honor.  Again, this

22   is Shara Cornell at the Office of the United States Trustee

23   and thank you again for allowing me to appear virtually

24   today.  I appreciate it.  The motion (indiscernible) to pay

25   a backup bidder a variety of fees, including, as discussed

Page 44

1    earlier, an expense reimbursement commitment fees and

2    consultant fees.

3            There's no support for these biddings either in

4    case law or the Bankruptcy Code.  Instead, the Debtors rely

5    solely on their business judgment, a statement that has been

6    rejected for evaluating a punitive backup -- backup bidder

7    fees.  See (indiscernible) Environmental Energy, Inc.,

8    (indiscernible) F3D 527 (indiscernible) 1989; and

9    (indiscernible) Energy Channel, LLP, (indiscernible) F3d

10   200.  That's at (indiscernible) 2010.

11           Specifically, the considerations that underlie the

12   Debtors' judgment may be relevant with the Bankruptcy

13   Court's determination on a request for breakup fees and

14   expenses but the business -- the business judgment rule

15   should not be applied as such in the bankruptcy context.

16   O'Brien 181 F3d 535.

17           The burden is on the Debtors to prove the

18   necessity of and the benefit to the estates from the

19   proposed fees.  The Debtors have failed to meet this burden

20   in demonstrating that Brick is entitled to the fees because

21   the Debtors' (indiscernible) in having submitted a losing

22   bid at the auction.  The Debtors' (indiscernible) no legal

23   authorities to support the payment of the fees.  The bidder

24   was never even marketed as a second sale, never even tested

25   with the market.  It's great that they got another bid, but

Page 45

1    when they filed the motion they didn't say they were

2    accepting further -- further offers just for a wind-down.

3            So, to the auction associated with that, backup

4    bidders do not get opportunity costs.  The Brick plan itself

5    is an orderly wind-down to exchange assets and a

6    reorganizing of the mining assets, which could also be

7    accomplished in a Chapter 7, where mining is sold and the

8    remaining (indiscernible) --

9            THE COURT:  I don't -- I don't agree with that,

10   Ms. Cornell.

11           MR. COLODNY:  The -- okay.  But it calls into

12   question as to the propriety of these views.  And, again,

13   with the consultation fees, as Your Honor pointed out

14   earlier, how does the Debtor hire a potential purchaser as a

15   consultant?  They haven't addressed the potential conflict

16   issues at all.  How can they consult on a deal that they are

17   involved in?  How are they not (indiscernible)?

18           And if the Debtor truly needs their services, for

19   whichever Brick entity is providing the services, should be

20   engaged as a retained professional by the estate, not in an

21   (indiscernible) consultation agreement.  However, I'm still

22   not convinced that the professionals that are currently

23   retained cannot perform the proposed consultation services

24   and keep the Brick bid on the same playing field as

25   Fahrenheit or any other options.

Page 46

1           We have competent investment bankers, financial

2     analysts on both the Debtors and the committee.  There are

3     block (indiscernible) analysis.  There are a lot of

4     professionals already working in this case.  The risk of

5     duplication of efforts is serious and there is no mechanism

6     for review because Brick is not going to be retained as a

7     professional pursuant to the motion.

8           Moreover, under the Fahrenheit deal, the buyer

9     also has to convert all claims to BTC and E.  So, whether

10    the buyer has to maximize the value of the liquid assets

11    there as well, it appears as though the functions under the

12    Brick consulting agreement will be duplicative even if we go

13    forward with the Fahrenheit approach.  How much do these

14    services really cost?  How many hours are you going to need

15    to be expanded?  Who will determine if the fees are

16    appropriate?  These are just a couple of the, you know,

17    overarching questions that we really need to discuss.

18          Your Honor, I also wanted to address a case

19    citation by the Debtors in their reply brief, if I may.  The

20    Debtors cite to In Re Bethlehem Steel Corp 2003 Westlaw

21    21738964 (S.D.N.Y. 2003).  While it's true that the case

22    does evaluate the payment of fees under 363(b) it

23    (indiscernible) reviewing whether a debtor can reimburse a

24    creditor's professional fees.  There, the debtors were

25    seeking to pick counsel for the union because their efforts

Page 47

1      in negotiating were integral to formulating a workable plan.

2              Here, Brick is not a creditor.  Brick is not

3      similarly situated to the USWA and Bethlehem.  Brick is a

4      bidder in an auction.  And, moreover, this really isn't a

5      reimbursement motion either like Bethlehem.  The motion

6      includes so much more:  Commitment fees, consultation fees

7      and expense reimbursements.  How a commitment or

8      consultation fee fits into Bethlehem, well, I really don't

9      see it myself.

10             And Judge Stein in evaluating a 503 substantial

11     contribution claim in In Re SNY Enterprises, LLC,

12     (indiscernible) 452, Bankruptcy E.D.N.Y 2012, found that a

13     would-be purchaser consistently acted to further its own

14     economic interest and not to advance an entire bankruptcy

15     process.  And at most, Conferred asserted only incidental

16     benefits on the estate.

17             Brick is clearly acting to further its own

18     economic interest here and not to advance this bankruptcy

19     estate.  And any benefit is incidental and therefore does

20     not rise to the level of substantial contribution.  I'm

21     happy to answer any other questions Your Honor may have

22     regarding our -- our objection today.

23             THE COURT: Mr. Koenig?  Well, before I -- anybody

24     else want to be heard before Mr. Koenig comes back to the

25     microphone?  Go ahead.

1            MR. KOENIG:  Thank you, Your Honor, again, Chris

2    Koenig.  So, look, again, the fees are to make sure that

3    they are ready to step in.  They are not being hired as a

4    consultant to the Debtors.  We need to work with them --

5            THE COURT:  That sounds like you -- exactly the

6    opposite of what you told me before.

7            MR. KOENIG:  I said -- I said that we were

8    speaking with them, we were consulting with them.  That

9    doesn't make them a consultant.

10           THE COURT:  You know, we don't have a transcript

11   that can be read back, but how many times you said the word

12   consultant?

13           MR. KOENIG:  It doesn't make them a consultant of

14   the Debtors' fund.

15           THE COURT:  Who are they consulting for then?

16           MR. KOENIG:  We -- we are working with them to

17   ensure that they are ready to step in as the backup bidder.

18           THE COURT:  Go ahead.

19           MR. KOENIG:  Your Honor, look, we will -- we think

20   it's very important to have a backup bidder.  We think that

21   there's an awful lot of value --

22           THE COURT:  That I agree with.

23           MR. KOENIG:  We think that there's an awful lot of

24   value, and that comes with a cost.

25           THE COURT:  That I agree with.  I agree it's

Page 49

1    important, and I understand, you know, Mr. Schreiber's

2    declaration I think pointed out that the Fahrenheit

3    proposal, which is the selected bid, is really for a

4    different construct.  And I think -- I think Voyager, among

5    others, has shown the importance of being able to pivot

6    quickly to another alternative structure that can be

7    included.  Okay.

8            I don't -- contrary to what Ms. Cornell has said,

9    I do believe that Brick is entitled to be compensated.

10   Okay, the question is how much and for what?  I'm -- the

11   monthly consultation fee of 400,000 -- $450,000, they're

12   going to have to be retained as a professional in this case

13   in order to be entitled -- and you're going to have to show

14   that that's a reasonable fee for it.  We've got lots of fees

15   built into this proposal.  It's truly not clear to me what's

16   the aggregate amount of compensation that they would be

17   entitled to if the Debtor winds up going forward, if

18   Fahrenheit is the successful -- and it's confirmed and --

19   and, you know, when it goes effective, I don't know -- how

20   much will Brick be entitled in the aggregate to have

21   received by then?  I don't know.  Okay, I have real

22   questions about it.

23           You've built in so many different fees and

24   reimbursements and everything else.  That's unacceptable to

25   me at this point with not sufficient disclosure or

Page 50

1    information.  I don't agree -- the point I don't agree with

2    -- I agree with Ms. Cornell that if they're going to be a

3    consultant, they need to be retained.  You retain

4    professionals.  Mr. Colodny was choking on whether he was

5    going to answer my question as to whether they had to be

6    conflict-free, retain this as a professional.  I understand

7    the committee is supporting this Brick proposal, okay, but

8    you're going to have to go back to the drawing board.

9              To be clear, I'm not opposed to approving an

10   arrangement where Brick is compensated.  I need to

11   understand what they're doing for it and whether those are

12   reasonable amounts.  And if it involves a consultation fee,

13   they're going to have to be retained.

14             MR. KOENIG:  Understood, Your Honor.  So, let us

15   go back to the drawing board with the Brick and the

16   committee and come back with a revised proposal.

17             THE COURT:  So, this motion is denied without

18   prejudice.

19             MR. KOENIG:  Understood.

20             THE COURT:  Okay?

21             MR. KOENIG:  Thank you, Your Honor.

22             THE COURT:  All right.

23             MR. KOENIG:  I'll turn over the lectern.  I think

24   we're in the insurance automatic stay portion of the agenda.

25             THE COURT:  Yes, okay.

Page 51

```
1              MR. KOENIG:  Thank you.

2              MR. WINDELS:  Good morning, Your Honor.  Kevin

3    Windels from Kaufman Dolowich & Voluck on behalf of Euclid

4    Financial Providers, LLC.  Your Honor, this is a motion for

5    relief from the automatic stay to allow underwriters to

6    advance and pay defense costs of certain insureds who have

7    made claims under a direct (indiscernible) liability policy

8    issued to Celsius.  Your Honor, the motion has been opposed

9    but --

10             THE COURT:  Well, not really opposed.

11             MR. WINDELS:  Well, kind of -- yes, Your Honor.

12   Well, it was opposed by one -- one other secured creditor,

13   Your Honor, and partially opposed by the bidder and

14   committee of unsecured creditors.

15             THE COURT:  Let me kind of cut through it, okay?

16   depending on what conditions are included in it, I believe

17   the law supports granting the motion, okay.  When I say the

18   conditions with reporting requirements, etc., I just went

19   through this in SVB Financial Group.  I'd written on D&O

20   issues before, so I think I understand the issues.  But --

21   so, to the extent that I have a pro se creditor opposing the

22   relief in full, I reject that position, okay?  The question

23   is what -- what are the appropriate conditions that are --

24   or requirements, reporting requirements that should be built

25   into the order?
```

1           MR. WINDELS:  Your Honor, we did not oppose the

2    partial objections by the Debtor and committee of unsecured

3    creditors on the reporting function.  We have submitted a

4    proposed revised order to the Court with our reply on

5    Monday, which essentially indicated we would report to them

6    in the same format that we would report to the U.S. Trustee.

7    What we do have an issue with are two other conditions that

8    they're seeking to implement, one of which is the

9    implementation of a pro rata distribution under the policy,

10   which is not provided for under the policy terms nor is it

11   provided for any case that we know of ever seen, which

12   literally would alter on an extra contractual basis the

13   terms of the policy.  So, we are certainly strongly opposed

14   to the suggestion.

15           THE COURT:  What's the aggregate amount of

16   insurance available from all levels of the tower?

17           MR. WINDELS:  Your Honor, I believe that was set

18   forth on Page 5 of the Debtors' opposition and essentially

19   Sides A, B and C in a total limit of 7.5 and -- from what

20   they say, Your Honor, there's a total policy limit of $30

21   million.

22           THE COURT:  Okay.

23           MR. WINDELS:  And, again, Your Honor --

24           THE COURT:  Regrettably, that gets eaten through

25   pretty quickly.

1          MR. WINDELS:  I'm sorry, Your Honor?

2          THE COURT:  I said, regrettably, that will

3    potentially get eaten through pretty quickly.

4          MR. WINDELS:  I can't --

5          THE COURT:  It sounds like a lot of money, I know,

6    but --

7          MR. WINDELS:  Yeah, I can't forecast the future

8    but I can understand Your Honor's point.  Okay, but, Your

9    Honor, simply what they're suggesting is not something that

10   we can ever agree to or could countenance.  Simply put, the

11   policy does not provide for pro rata distribution.

12         THE COURT:  So, one of the provisions that I've

13   been urged to include is a requirement that the individual

14   insureds consent to the jurisdiction of this court.

15         MR. WINDELS:  I'm sorry, I missed you again.

16         THE COURT:  One of the conditions that has been

17   urged upon me is a requirement that the individual insureds

18   consent to the jurisdiction of this court.

19         MR. WINDELS:  Your Honor, the objections filed

20   suggest that the Court should implement a condition of the

21   order which says that the Court should require the

22   individual to subject themselves to jurisdiction of this

23   Court for all purposes.  I don't believe that that is

24   something that -- that should be included in the order.  It

25   certainly is not something that's in the insurance policy,

Page 54

1    for that matter.  But I don't see the basis -- the legal

2    basis for such a condition being implemented.

3              THE COURT:  Okay.  You have, I take it, no

4    objection to the reporting requirements that they --

5              MR. WINDELS:  We do not, Your Honor.

6    (indiscernible) put into our proposed revised order.

7              THE COURT:  You are opposed to the request for pro

8    rate allocation scheme for the reasons you said?

9              MR. WINDELS:  We are firmly opposed to that, Your

10   Honor.

11             THE COURT:  Okay, all right, thank you.

12             MR. WINDELS:  Thank you.

13             THE COURT:  All right, who else wants to be heard?

14             MS. JONES:  Good morning, Your Honor.  Elizabeth

15   Jones of Kirkland & Ellis on behalf of the Debtors.  Your

16   Honor, as you correctly stated, we're not opposed with the

17   respect to lifting -- lifting the automatic stay or

18   addressing whether or not the proceeds are property of the

19   estate.  We do think, based on the previous rulings in this

20   court and in others with respect to balancing the harms,

21   that it would be appropriate to put in two additional

22   protections on top of the reporting.  One with respect to

23   jurisdiction.  Our main concern here is that we have certain

24   parties seeking to invoke the jurisdiction of the Court with

25   respect to their rights under the contract but not with

Page 55

1    respect to any potential obligations in the future.  We --

2            THE COURT:  What do you mean, with respect to any

3    obligations in the future?  I -- I have no problem, and I

4    don't think the insurers have a problem, about requiring

5    just that the Court retains jurisdiction with respect to all

6    issues concerning the insurance.  Any of the individuals who

7    receive policy proceeds are going to be subject to the

8    jurisdiction to the Court with respect to the insurance

9    issues.  But how do you justify a hook that they submit to

10   jurisdiction that the bankruptcy -- I mean, if I have

11   jurisdiction, I have jurisdiction.  If I don't, I -- you

12   know, this seems to me to be an improper condition you want

13   to impose.

14           MS. JONES:  We understand, Your Honor, and our

15   main concern is what you outlined with respect to the

16   policy.  I think our concern was if we start carving things

17   back, we might run into a -- to a gray area.

18           THE COURT:  Well, give me an example of what you -

19   - let's assume that I agreed with the Debtors' proposal on

20   submission to jurisdiction.  What -- what would the result

21   be with respect to -- what jurisdiction would this Court

22   have with respect to any -- for claims against anyone who

23   would receive policy persons?

24           MS. JONES:  So, I think the circumstance that

25   we're concerned about here is for the Court to -- I know

Page 56

1    that this has come up -- and some of these issues we saw a

2    lot with MF Global and some issues with respect to whether

3    the Court has personal jurisdiction to either -- for the

4    extent, let's say they're -- the advanced payment provision

5    comes into play.  There is a claw-back.  And if either

6    Euclid or any of the other underwriters or the Debtors are

7    seeking to enforce that claw-back, and the individual

8    insureds that have received the funds argue that the Court

9    doesn't have the authority to issue the order requirements

10   of payback --

11          THE COURT:  But that would be -- but if the order

12   included a requirement that anyone receiving proceeds submit

13   to the jurisdiction of the Court with respect to anything

14   related to insurance, the proceeds that they have received -

15   - I don't have a particular problem about that.

16          What I'm reacting to is if the Debtor, or the

17   committee, or if there's a trust post-confirmation brings an

18   action against officers and directors who received insurance

19   proceeds, the claim -- it doesn't relate to the insurance

20   proceeds they received; it relates to alleged misconduct

21   that they may have -- the Court either does -- you know,

22   absent the insurance, the Court either does or doesn't have

23   jurisdiction over them.  I mean, I'm just -- I'm trying to

24   understand how far you're trying to extend what they're --

25   what somebody would have to consent to.

1          MS. JONES:  Yes, we understand, Your Honor.  Our

2     goal is, with respect to the policy, if our language and

3     proposals aren't precise on that, we're happy to narrow it

4     and make it clear that we think the conditions should be

5     limited to respect -- with respect to receiving proceeds

6     from the policy.

7          THE COURT:  Okay.

8          MS. JONES:  With respect, Your Honor, to the pro

9     rata point, our -- our concern here is -- we know these

10    insurance internal matters come up frequently in a lot of

11    cases.  Here, we're a year in.  There have been a number of

12    claim submitted.  Our understanding is that at this time, no

13    approvals have been made so we're really at the very

14    beginning of potentially how to distribute this policy.

15         One -- one point we wanted to clear -- clarify,

16    there are -- there is about 30 million on the tower.  Ten

17    million is just for the independent directors, and then an

18    additional about 13.75 million of the remaining 20 or so is

19    for prior to the petition date.  So, 6.25 million is for

20    acts after the petition date.  So, that's how it sort of

21    breaks down.

22         And at this point, where we believe that the

23    universe of claims are essentially known and we think that

24    they are going to exceed the 1.5 million, all that we're

25    asking, if that's clear after they've reviewed the claims

Page 58

1    submitted to date, made their decisions on approval, that

2    allocation is done fairly.  While it's true that that's not

3    a requirement in the contract, there is no requirement in

4    the contract whatsoever on how to allocate (indiscernible)

5    among parties.

6            THE COURT:  I don't -- I'm trying to understand

7    where I would derive the power to impose allocation

8    requirements that don't appear in the policy.  Either the

9    individuals who are protected by the insurance are entitled

10   to policy proceeds or they're not.  And I understand what

11   you might be trying to accomplish.

12           So, I know -- look, I read in the blogs that

13   Mashinski is still in the New York Attorney General suit.  I

14   read yesterday in the ABI news that there's been an

15   amendment in the class securities class action bringing

16   someone else in as -- for (indiscernible) sales.  I don't

17   know what the status of non-bankruptcy court litigation -- I

18   don't know how many of the officers and directors have been

19   named as defendants in any of them.  But I'm -- I don't --

20   where do I derive the authority to impose any pro rata

21   requirements?  If the proceeds -- if the policy proceeds are

22   there to protect the covered individuals, how do I decide

23   no, I'm sorry, you're only going to get this much of it?

24           MS. JONES:  Yes.  And it's something we've thought

25   about as well, Your Honor.  And I think a couple of points

Page 59

1    with respect to both looking at 362 and 105 of the

2    Bankruptcy Code -- one with evaluating the (indiscernible)

3    factors of whether cause exists to lift the stay, there is a

4    factor of balancing the harms.  And while it is not as clear

5    as the Court can fashion, sort of maybe in a pro rata

6    allocation --

7              THE COURT:  How do you square it with either my MF

8    Global decision or the more recent SVB Financial Group

9    decision?  I've written on insurance in other cases as well.

10             MS. JONES:  Yeah, so we do think that this falls

11   in line with sort of a reporting requirement to the extent

12   that it is not -- we don't want to tell the insureds who

13   they can and can't approve.  That's exactly to your point.

14   Our goal here is not to say that there should be certain

15   insureds that are entitled to receive the benefits of the

16   policy that aren't going to get it.  Our goal here was

17   something along those lines of there is a limited amount of

18   resources to go around.  Unlike SVB and MF Global, we don't

19   have hundreds of millions of dollars in tower proceeds.  We

20   have a very limited amount here.  At this point, a year into

21   the case, where, again, compared to SVB, we're very early

22   and there is a lot of speculation.  We know that there have

23   been a lot of claims been submitted.  The underwriters

24   believe it's going to exceed the limits.  And so where we

25   have a much more clear insight into the universe of claims,

Page 60

1    when they are making the decisions of who to approve, with

2    that decision also comes their ability to make a decision on

3    how much, and in what amount, and who is going to get it.

4    We understand that --

5              THE COURT:  I don't -- what I don't understand is

6    where I get the -- where the authority for me -- once, as a

7    legal matter, proceeds go to the individual insureds, what,

8    as a legal matter, where do I get the authority to say so

9    much -- only so much to this person and so much to that

10   person?  I don't know where that would come from.

11             MS. JONES:  Right.  And I know Section 105 is

12   broad and it's used as a catch all.  But our point here with

13   doing it with respect to Side A is there -- and we've all

14   reserved the issues with respect to A, B and C -- but our

15   hope and our goal was to put in a process in place at the

16   start of starting to eat into the insurance tower so that if

17   we get to the points where we have to come back and we have

18   to argue the issue of whether we think BNC should be -- and

19   whether cause there exists to lift the stay, that we already

20   have a process in place.  That we're not changing our

21   position or we're not altering that and getting into the

22   issues of has this been thoughtful and fair and -- we

23   understand that it's a little bit of a trickier point but we

24   do think, based on the information we have and what we know,

25   that we have a responsibility to at least advocate for an

Page 61

1    equitable distribution of those proceeds.  And in

2    bankruptcy, where there a lot of equitable remedies

3    fashioned that may not exist outside of bankruptcy, we tried

4    with the information we had to propose that solution.  That

5    didn't encroach on the insurers' rights and ability to

6    determine who even should be approved for proceeds.

7              THE COURT:  Okay, thank you.

8              MS. JONES:  Thank you.

9              THE COURT:  All right, who else wants to be heard?

10             MR. COLODNY:  Your Honor, Aaron Colodny on behalf

11   of the official committee of unsecured creditors.  With

12   respect to the amount of insurance that you asked about,

13   there's not a lot here.  $30 million, as was described, 10

14   is for the special committee, 6.5 is for acts after the

15   petition date.  And so, really, at the end of the day,

16   you're looking at about $13-14 million.

17             THE COURT:  That doesn't go very far.

18             MR. COLODNY:  It does not go very far.  With

19   respect to the jurisdictional question, Your Honor, if you

20   are comfortable limiting it to the insurance policy that's

21   fine with us.  The point that we had was --

22             THE COURT:  Do I have authority to impose a

23   condition that in order to get insurance proceeds, they have

24   to generally submit to the jurisdiction of the Bankruptcy

25   Court for everything?  I don't think so.

Page 62

1          MR. COLODNY:  I -- I believe a 362 gives you a

2    broad ability to condition relief from the automatic stay.

3    And to the extent someone comes to the Court asking for

4    relief from the automatic stay, and here we have a former

5    director asking for your relief and saying it was a limited

6    appearance for a sole purpose, I think if you are hearing

7    for that purpose, it is perfectly acceptable for this Court

8    to say that in the event something were to happen in the

9    future and I -- not -- yeah, everything has to be proven.

10   That is abundantly clear.

11          It is perfectly fine to say we are -- okay, to the

12   extent they're seeking relief from the Court, you have the

13   ability to get that back if the contract provides, they are

14   entitled to that.

15          THE COURT:  Well, if the issue is whether I should

16   have jurisdiction to rule on any claw-back claims if they

17   received insurance proceeds, I'm not going to rule from the

18   bench but, in theory, I don't have a problem with that.

19   It's linked to the insurance and the payments they've

20   received by virtue of the stay being lifted and their

21   receiving insurance proceeds.

22          If, for example, it was a determined -- in a non-

23   Bankruptcy Court litigation, there was a determination that

24   a particular insured acted in bad faith and was not entitled

25   to receive policy proceeds, for example, where it's clawing

Page 63

```
1    back insurance proceeds that have only been received because

2    I lifted the stay for them to do it, I understand the basis

3    for that.  What I don't -- where I'm -- again, I'm not

4    ruling -- where I have a problem is if you're trying -- if

5    the collective group is trying to use this motion to impose

6    a condition, that individuals insureds who receive any

7    insurance proceeds submit to the jurisdiction of the

8    Bankruptcy Court to determine any issues regarding that

9    person's conduct -- that I have a problem with.

10            MR. COLODNY:  So, I completely agree, Your Honor.

11   All we're receiving is with respect to the insurance

12   proceeds here.  I will note that to the extent someone has

13   filed a proof of claim or filed a motion for relief --

14            THE COURT:  That can be a different issue.  You

15   know, you submit equitable jurisdiction of the Bankruptcy

16   Court when you submit a proof of claim.

17            MR. COLODNY:  Correct, Your Honor.  And then with

18   respect to your question of Ms. Jones about what authority

19   do you have to order this pro rata distribution, I think our

20   point with respect to the pro rata distribution is --

21   there's a pending motion before Your Honor asking the estate

22   to pay some of the costs of cooperating witnesses.  I think

23   that that puts the estate property squarely in play with

24   respect to this insurance policy.  To the extent that all of

25   the insurance is eaten up by one or two directors, and then
```

Page 64

1    the estate has to pay for the cost of others, I think that

2    we should have some sort of sharing.  Again, I think 362

3    gives you very broad discretion to condition the stay.  And

4    to the extent that Your Honor is comfortable with some

5    apportion mechanism, which -- which takes into account the

6    potential the estate will have to pay for some of these

7    costs --

8              THE COURT:  So, the Court's -- I still haven't

9    approved the -- the motion to compen -- reimburse employees

10   in connection with their cooperation.  It might well be I'm

11   left, again, not ruling.  I only -- haven't thought this

12   through clearly.  It might well be that if an employee

13   receives reimbursement from the Debtor for its cooperation,

14   and if the conditions on that were good faith -- etc., good

15   faith by them, it may be that their receipt of the money

16   from the Debtor will require them to submit to the

17   jurisdiction of the Bankruptcy Court.

18             MR. COLODNY:  I believe that's a condition to the

19   agreement.

20             THE COURT:  Okay.  All right. Well, what I would -

21   - again, I'm taking this under submission.  I think -- let's

22   put the pro rata issue aside because I do have a real

23   problem about that.  But with respect to submission to

24   jurisdiction by virtue or receiving insurance proceeds, I'd

25   like to see, hopefully, the Debtor and the committee can

Page 65

1   work together and propose some language.  And I'm going to

2   hear from anybody else yet as to what specifically is being

3   proposed on that.  Okay.

4           MR. COLODNY:  Okay, thank you, Your Honor.

5           THE COURT:  All right, thank you, Mr. Colodny.

6   Who else wants to be heard?  Do any of the insureds or the

7   representatives, do they wish to be heard on this?  I mean,

8   they're the ones who are most affected by whatever I rule

9   here.

10          MR. VANTOL:  Thank you, Your Honor, and good

11   morning.  Peter Vantol from Hogan Lovells representing Mr.

12   Leon and Ms. Landis.  I'd like to be heard on the pro rata

13   allocation point because I think Your Honor has hit on it.

14   Section 105's been around for a long time.  It's the first

15   thing I heard as a junior lawyer from the Bankruptcy Court.

16   We could not find a single case where that was invoked to

17   impose the kind of pro rata allocation that's being sought

18   here.

19          I think the insureds have shown that it's a first

20   come, first serve basis.  We have no problem with reporting

21   requirements, Your Honor.  With respect to personal

22   jurisdiction, again, I think you hit the nail on the head.

23   Mr. Leon has filed a proof of claim.  He's here seeking

24   proceeds.  Our objection was the fact that they had said

25   earlier submit to jurisdiction for all purposes.

1          So, Your Honor, for example, brought up the UCC

2     adversary proceeding.  That is to be determined.  I'm not

3     saying we will assert a personal jurisdiction defense, but

4     it would seem to raise constitutional objections to have

5     someone forcibly waive a defense.

6          So, with that, Your Honor, I would urge you with

7     that one condition.  We have no problem with reporting, and

8     I urge you to grant the motion.

9          THE COURT:  So, when I was a practicing lawyer, I

10    did a lot of securities litigation defense, often officers

11    and directors, and was keenly aware of the issues that would

12    arise with respect to the insurance.  My experience back

13    then was where the aggregate would look at the tower, the

14    proceeds were limited and rapidly being chewed up.  I found

15    that the insurers tried to coordinate the efforts of counsel

16    to avoid duplication, to try and, to the extent possible,

17    limit one insured getting all the money and leaving

18    everybody high and dry without it.  That obviously is for

19    the counsel for those who expect to be drawing on policy

20    proceeds, and the insurer to try and work out an acceptable

21    arrangement.  I think reporting -- at least make everybody

22    keenly aware of what's happening.  But I'd walk at -- unless

23    someone points to specific authority for me to be able to

24    impose pro rata requirements, I don't see where I have the

25    authority to do that.

1            MR. VANTOL:  Thank you, Your Honor.  And on that

2       allocation point, it's my experience, too, that generally

3       there is some rough justice done where the parties get

4       together and we're certainly happy to do that, and we drop

5       that reference in our reply brief.  So, working out I think

6       is the best way to make sure there is no run on the

7       insureds' proceeds.

8            THE COURT:  Okay.

9            MR. VANTOL:  Thank you, Your Honor, I appreciate

10      it.

11           THE COURT:  All right.  Let me just suggest this:

12      You ought to consult with Mr. Colodny and Mr. Koenig with

13      respect to language, with respect to submission to

14      jurisdiction.  Obviously, if your client filed a proof of

15      claim, that raises a set of issues.  So, to the extent

16      there's jurisdiction, there's jurisdiction.  I just want to

17      be careful how I cabin what the effect of a consent to

18      jurisdiction.  I do think it's appropriate that anything

19      with respect to insurance, that they receive insurance

20      proceeds.  And is that a claw-back?  Well, I do think that's

21      appropriate.  But why don't you consult with Mr. Koenig and

22      Mr. Colodny about the proposed language?

23           MR. VANTOL:  Will do, Your Honor.  Thank you very

24      much.

25           THE COURT:  Thank you very much.  All right, who

1    else wants to be heard?  Any of the other insureds wish to

2    be heard?  Okay, let me hear from the insurer's counsel

3    again.

4            MR. WINDELS:  Your Honor, just briefly.  Kevin

5    Windels for underwriters.  We would just reiterate on the

6    pro rata issue that we really do not believe that the Court

7    should countenance what they're suggesting because it would

8    just create a huge, huge problem with this case.  It's not

9    the policy.  On top of everything else, it would exacerbate

10   issues between insurance with excess insurers and probably

11   most likely (indiscernible) coverage litigation which would

12   create more chaos and havoc for the Court.

13           THE COURT:  I just -- I don't have the authority

14   to require it, but I urge -- I mean, there's not a lot of

15   money that's available with a separate pot for the

16   independent directors.  So, that's not...  It is what it is.

17   I have no problem about that.  But the money that's

18   available otherwise is quite limited.  I mean, it just --

19   and I would hope that the insurer would try to assure a fair

20   allocation, cooperation, avoid -- you know, I used to have

21   insurers' counsel saying, this was an unnecessary

22   duplication, can't you all -- sure, there are some issues

23   that are separate for each individual, but there are some

24   that are very common and we're just not going to pay for

25   everybody to do the same work.  I'm just urging that that

1    happen because there's just not that much to go around.

2            MR. WINDELS:  Understood, Your Honor, thank you.

3            THE COURT:  Okay, all right.  So, I'm going to

4    take it under submission and I do want to see -- I would

5    hope that you would all try and work out language for a

6    proposed retention of jurisdiction and submit it as soon as

7    possible, and I won't let this linger very long.  Okay?

8    Thank you very much.

9            MR. WINDELS:  Thank you, Your Honor.

10           MR. VANTOL:  Your Honor, we don't have any further

11   business for the Court.  May we be excused?

12           THE COURT:  You can.  I just want to be sure,

13   before you seek to be excused, the agenda had a separate

14   Item 8, Leon and Landis Motion for Relief From Stay.  It

15   seems to me exactly the same issue.

16           MR. VANTOL:  It is, Your Honor, exactly the same

17   issue.  Thank you so much.

18           THE COURT:  Thank you very much.  You're excused.

19   All right, let's deal with Number 9, Caceres motion for

20   valuation of sell token.

21           MR. COLODNY:  Your Honor, that was a pro se motion

22   filed by Mr. Caceres.

23           THE COURT:  Yes.  Mr. Caceres, go ahead.

24           MR. CACERES:  Thank you, Your Honor. Santos

25   Caceres, pro se creditor.  I am before the Court today to

Page 70

1    ask Debtors and the UCC to treat this (indiscernible) the

2    same as all the 50 assets in this case.  It's my

3    understanding that bankruptcy law states that all assets

4    must be (indiscernible) -- 81 cents on the day of the

5    petition.  On the (indiscernible) sheet, (indiscernible) the

6    Debtors, the UCC who's supposed to be representing me and

7    all other creditors, (indiscernible) and holders, demanded

8    at 20 cent valuation for all (indiscernible) without sharing

9    any justification requirements.  Neither the bidder nor the

10   Debtors have (indiscernible) to reduce the price from 81

11   cents with any of us.

12          This proposal hurts me directly as a non-insider

13   (indiscernible) holder.  This is a 75 percent reduction on

14   my (indiscernible) open claim and the claims of

15   approximately 37,000 (indiscernible).  There's no apparent

16   rationale for the (indiscernible) treatment of

17   (indiscernible).  I request this court to intervene to make

18   sure the sell token claims are treated fairly and equitably,

19   as any other (indiscernible) creditor in the other group.

20          I'm happy to file any evidence with the Court

21   which clearly demonstrate that (indiscernible) not

22   manipulated by Celsius and no customer funds were used to

23   prop up the sell token as reported by the examiner.  The

24   examiner did not access any company records regarding sell

25   token, stated on Page 97 of her report.  Unfortunately, the

Page 71

1    examiner mischaracterized $600 million customer-requested

2    OTC by orders as purchases of sell token using customer

3    assets.  All such transactions are recorded in emails from

4    (indiscernible) OTC (indiscernible) network inbox and an

5    Excel Spreadsheet (indiscernible) UCC, also which are held

6    with the Debtor and upon information and belief have also

7    been shared with the UTC.

8            We ask that the Debtor share all information

9    relevant to sell token with the court and the UCC finishes

10   the work analyzing and verifying all transactions that had

11   been sent to them (indiscernible) justify sell token

12   valuation of 81 cents.  This includes the information that

13   UCC has already stated that they received information from

14   FTX regarding the short positions against sell token.

15           If Your Honor would like, a group of sell holders

16   have already done the analysis and we'd be happy to send it

17   -- submit the evidence with the Court.  The analysis will be

18   accompanied by multiple affidavits from OTC desk users

19   representing a number of transactions with the OTC desk.  A

20   number of such large sell token holders were contacted

21   recently by the Debtors (indiscernible) UCC.  We're

22   surprised to see the latest filing from the Debtors that

23   they have reached a settlement with the sell token holders.

24   This group of sell token holders representing more than 20

25   million sell tokens from non-insiders has avoided forming a

Page 72

1    group and hiring counsel in hopes that we can resolve this

2    outcome.  All of their attempts to communicate with the UCC

3    have been rejected.

4          In conclusion, Your Honor, I'm asking for a ruling

5    on fair and equal treatment of sell token violation for all

6    (indiscernible) accounts sell token holders.  If you would

7    like, Your Honor, I can provide one example that shows that

8    no manipulation took place and no customer funds were used

9    without express written permission.  Thank you.

10         THE COURT:  Mr. Caceres, you addressed briefly the

11   examiner's report which is -- it is hearsay and not

12   competent evidence for this purpose.  But the examiner I

13   think briefly concluded that there was manipulation with

14   respect to the price of the sell token.  I referenced

15   earlier in the hearing today just a report I read yesterday

16   that was a securities lawsuit -- I think, is it New Jersey,

17   Mr. Colodny?

18         MR. COLODNY:  Correct.

19         THE COURT:  In New Jersey, where the complaint was

20   being amended to add an additional defendant with

21   allegations about so-called wash sales.  So, whether -- I'm

22   not making any determination today whether the price of sell

23   tokens was manipulated or not, but the fact that it may have

24   appeared to have a market price of 81 cents on the petition

25   date is rebuttable.  That doesn't establish that that was

Page 73

```
1    the price -- that's the value.  It doesn't establish that

2    it's the value for purposes of any plan or confirmation to

3    the plan.

4           The -- you know, in the committee's response, they

5    also raise the argument that the sell token was a security

6    and, therefore, any claims with respect to the sell token

7    would be subordinated under Section 510 of the Bankruptcy

8    Code.  You haven't had a chance to respond to that.  It's a

9    very sophisticated issue and I would be very reluctant to

10   rule on it with pro se parties on one side and sophisticated

11   counsel on the other side.  So, I'm not prepared to rule on

12   the issue that the committee raised in its response to your

13   motion.

14          It does seem to me the issues you raise, Mr.

15   Caceres, are very important to you and many others.  I don't

16   doubt that and will have to be resolved.  I think it's

17   premature for the Court to have to do that now.  It will

18   either be a plan confirmation issue or it may arise in terms

19   of the claims allowance process.  You file a proof of claim,

20   the Debtor, if it disagrees, or the committee, they can file

21   a claim objection and it can be resolved in that context.

22          One of the thing that I'm -- so, I don't know

23   whether you're prepared -- again, I'm really not -- I'm not

24   going to decide at this stage.  I think that the Court

25   received quite a few.  I think at last count, it was sort of
```

Page 74

1    17 letters supporting your position, and the number may have

2    grown since we last checked on it.  It was just over a two

3    to three hour period on Monday, there were 17 letters

4    supporting your position.  So, I know this is a very

5    strongly held view of a large number of pro se creditors who

6    have sell tokens.  And you're entitled to a fair hearing and

7    determination by the Court.  So, I know just looking at the

8    appearance list for today's hearing, and I don't expect

9    necessarily to have any of these parties state their

10   position today, but at least two lawyers have appeared for

11   the New Jersey Bureau of Securities today -- were on the

12   list at least.  One from the Texas Attorney General's

13   Office, from the Texas State Securities Board.  Two lawyers

14   from the SEC were on the appearance list for today.

15          I'm not ordering but would certainly like to

16   receive any briefs that any of the securities regulators

17   would submit with respect to whether their view as to

18   whether the sell tokens are securities or not.  I think the

19   issues are complicated.  Again, I'm not prepared to rule on

20   it with only the committee.  I think the Debtor supported

21   the committee in this, but I think that people like

22   yourself, Mr. Caceres, are entitled to have this issue fully

23   aired.

24          So, I think that it's -- for today, it's premature

25   and so I'm denying the motion that you've made.  But I want

Page 75

1   to make clear to you and the others who have raised this

2   issue, this is an important issue.  I'm not -- it's not

3   going to be evaded.  The Court is going to have to decide it

4   either in the context of plan confirmation or the claims

5   allowance process.  You know, let me stop with that.  I

6   don't know, Mr. Caceres, if you want to say something else,

7   please go ahead.

8           MR. CACERES:  Thank you, Your Honor.  Would it be

9   -- would it be fair to say that the United States Trustee

10  would need to get involved in probably creating a class -- a

11  (indiscernible) class here?  I know we're late in the case

12  and I know --

13          THE COURT:  No.  Stop.  I'm not saying that at

14  all.  We're going to have -- assuming that a disclosure

15  statement is approved, there'll be plan confirmation.  There

16  can be objections to it and it is important, in my view,

17  that those who are seeking to recovery 81 cents on the sell

18  token be adequately represented in this issue.  You're going

19  to have to address the issue that the committee and the

20  Debtor have raised that sale tokens are securities and

21  subject to Section 510 of the Bankruptcy Code.  Any claim

22  for that will be subordinated.  It's important issues.

23  Sophisticated issues.

24          I think from the Court's standpoint, I think I

25  would hope it isn't going to be right now, because I'm

1    denying the motion without prejudice, I think it's premature

2    -- I hope there will be adequate briefing on the issue of

3    whether the sell tokens were securities.  This issue of when

4    -- what crypto, whether it's securities or not may depend on

5    the nature of the specific crypto asset that we're talking

6    about.  So, let me stop there.

7              Ms. Cordry, are you seeking to be heard?  I saw

8    your name flash across my screen.

9              MS. CORDRY:  I'm sorry, Your Honor, I'm not sure

10   why it flashed up but no, I'm not.

11             THE COURT:  Okay, okay.

12             MS. CORDRY:  (indiscernible) that you're raising

13   there but I'm not --

14             THE COURT:  I would be happy to hear from you on

15   this issue, Ms. Cordry.

16             MS. CORDRY:  I would agree (indiscernible)

17   regulators that may have a thought on it but we're not

18   seeking (indiscernible) at this point.

19             THE COURT:  Okay.  But, Ms. Cordry, let me just

20   say I hope you will talk with your client base and with the

21   other counsel representing state securities regulators to

22   discuss this issue and whether the regulators are -- want to

23   take a position on this issue.  It's an important issue and

24   I just -- I may have commented on this before, I used this

25   phrase, I want it to be a fair fight.  I don't think it

Page 77

1     should be just a group of pro se creditors who feel very

2     strongly about it but don't have counsel at this point.

3              MR. COLODNY:  Your Honor --

4              THE COURT:  Mr. Colodny, go ahead.

5              MR. COLODNY:  Yeah.  So, Your Honor, I completely

6     agree with you and I want to be clear that we weren't filing

7     our objection to try to sandbag anybody to have it heard on

8     seven days' notice.

9              These pro se -- two pro se objections have been

10    pending for two to three months --

11             THE COURT:  Well, there were at least 17 letters

12    in a two-hour period on Monday this week supporting their

13    position so...

14             MR. COLODNY:  Correct.  But my point is not that

15    people don't feel strongly about this, people have written

16    abdicating their position.  My point is that the committee

17    did not intend to move forward today without a full record

18    before Your Honor.  What we did was we filed an objection to

19    make our position clear and I think that some of the pro se

20    creditors raised that this was dropped at the eleventh hour.

21    I disagree with that.

22             We had a call where we spoke with Mr. Santos and

23    many other pro se creditors.  It was some time ago and they

24    were adamant about 81 cents when we talked to them about the

25    subordination issue.  It was in our second exclusivity

1    brief.  It's in the plan.  And what we wanted to do was lay

2    out the arguments so that everybody --

3            THE COURT:  I'm not faulting you for raising the

4    argument, Mr. Colodny.

5            MR. COLODNY:  I know.

6            THE COURT:  I really am not.

7            MR. COLODNY:  I have drawn a lot of personal ink

8    for this so I want to make it clear that I agree with your

9    fair fight comment.

10           THE COURT:  I'm not faulting it.  It needs to be a

11   fair fight.

12           MR. COLODNY:  Correct.  I agree.  Thank you, Your

13   Honor.

14           THE COURT:  So, look, as I say, I'm denying you

15   the motion without prejudice because I think it's premature,

16   but that doesn't mean that in the middle of a confirmation

17   hearing we're going to have however many days are going to

18   be taken up with this issue of whether the sell token is a

19   security, whether it's going to be subordinated and what the

20   value is.  What I would hope would happen is that the

21   committee, the Debtors -- Debtors and other counsel with an

22   interest or pro ses who are interested in this would try and

23   work out whether it's immediately prior to the start of the

24   confirmation -- in the confirmation hearing.  This is

25   important.  This is separate -- it really is a separate

Page 79

1   issue that can be dealt with.

2          If it's left to the claims allowance process, that

3   raises potential issues.  People knowing really what are

4   they going to get, what's their recovery going to be.  Okay,

5   so please confer and see if you can come up with an

6   acceptable proposal for timing and how to deal with this.

7          And, Ms. Cordry, I hope you and your

8   constituencies will --

9          MS. CORDRY:  Look, Your Honor, just let me say

10  official for the record, Karen Cordry from the National

11  Association of Attorneys General, so you have it there.

12  And, yes, I will pass this question and this issue back to

13  my group -- and if they're going to take a position on the

14  securities issue.

15          THE COURT:  And the SEC may want to take a

16  position on it too.  They haven't taken a position on

17  anything in this case yet but they have filed some recent

18  actions against Coinbase and Binance, so a slightly

19  different issue.  Not slightly.  A different issue.  But

20  okay.

21          MR. COLODNY:  Thank you, Your Honor.

22          THE COURT:  All right.

23          MR. LOTONA:  Your Honor, if I may be briefly

24  heard on this topic?

25          THE COURT:  Go ahead.

1              MR. LOTONA:  Dan Lotona, Kirkland & Ellis on

2     behalf of Celsius Debtors.  We realize that this has been a

3     very divisive issue in these Chapter 11 cases.  Your Honor

4     mentioned the support for 81 cents.  There are equally

5     passionate arguments on the other side of that that --

6              THE COURT:  I don't doubt it at all.  I'm not

7     suggesting that -- I have no idea what the value of the sell

8     token was and the position is.

9              MR. LOTONA:  Right.  Exactly.  And what the

10    Debtors and the committee were trying to do was strike a

11    balance in between those two positions to avoid a protracted

12    and costly confirmation fight, which it looks like we may be

13    headed for.  And the Debtors will be prepared to carry their

14    burden, whichever position we take in the plan

15    reorganization.  And we do agree with Your Honor that we

16    want it to be a fair fight.

17             So, we and the committee will seek build

18    consensus, which has been very important for us in these

19    Chapter 11 cases and will continue to do that.  So, thank

20    you.

21             MR. ABREU:  Your Honor, this is Artur Abreu.

22    Could I just give you some --

23             THE COURT:  Yes.

24             MR. ABREU:  About (indiscernible) trading of

25    course on cryptocurrencies in every single asset today

Page 81

1    because of the lack of regulation.  And a very important

2    aspect that I have to mention to you is that FTX, the FTX

3    International Exchange, currently in Chapter 11, had massive

4    short positions which is demonstrably proven and it's

5    public.  Just to give you some perspective, on June 11, they

6    were paying an interest for you to open a position on the

7    wrong side.  So, there was -- there were so many people

8    thinking that the price was going down.  That for you to

9    take an opposite position, they were paying you 1,144

10   percent.

11         Additionally, on June 17h, they were paying 3,500

12   percent, and this keeps through the entire process.

13   Additional, this is on the derivative markets, also on the

14   spot market they were paying an interest for you to short

15   the token to 3,000 -- 2,600 percent.

16         I just want to highlight that the pressure to

17   downside on the price of sell was completely out of this

18   world and according to watching that data from the FTX

19   exchange, they did not -- they did not hold the short

20   positions of the token that they are saying.  So, they

21   basically were selling tokens that there was no proven that

22   these tokens ever existed on the blockchain.

23         There was enormous volumes in the overall 500

24   million (indiscernible) markets to bring the price of this

25   token down.  So, I -- I think it's domestically proven on

Page 82

1    the blockchain and on the exchanges that there was massive

2    short positions to the down side.  And eventually the price

3    actually -- there is a position that there is no

4    (indiscernible) that represented the tokens that FTX was

5    telling that they were selling. This would be called what

6    you might say a naked short position to the tune of 50

7    million tokens.

8            I think on the examiner's report and I think the

9    UCC also mentions that over 95 percent of the token was

10   dropped on the platform.  So, there is not much tokens to be

11   even sold.  This is like the issue that I think the judge in

12   the coming procedures should raise -- what is the size of

13   the downside pressure that was being applied to this token

14   and if this was (indiscernible) realize this.  Again, just

15   to (indiscernible) FTX is in Chapter 11.  There aren't much

16   of the assets that they told they had.  And they had

17   previous proceedings against the manipulation as well.

18           So, I did put a letter -- I think Docket 2882 in

19   support of Mr. Santos' motion to highlight some debt

20   (indiscernible) and it's demonstrably proven.  Also to

21   highlight that, according to the examiner's report, I think

22   Raj Bolger, the current chief financial officers, met with

23   the FTX exchange and the FTX exchange also has a trading

24   branch which is called Alameda, so Alameda traded against

25   their users.  They took market positions.  And it's

Page 83

1    suspicious (indiscernible) that a few others (indiscernible)

2    after this meeting position on the short spot of sell token

3    is open, which has no assets backing on the blockchain.

4    These are things that should be followed by the UCC and

5    questioned about -- for the FTX (indiscernible) I think the

6    UCC has put some questions but it's very, very important to

7    mention the derivative markets.  That's where most of the

8    pressure to the downside came because there was no spot sale

9    on the market.  And I just wanted to say this.

10              THE COURT:  Thank you, Mr. Abreu.

11              MR. ABREU:  Thank you.

12              THE COURT:  Let me just ask Mr. Lotona because --

13   so, or actually ask -- well, I don't know whether Mr.

14   Caladny or Mr. Lotona -- if I understand the position of the

15   committee, if the sell tokens are securities, the result

16   under Section 510(b) is that the claims of the holders of

17   the sell token would be subordinated to the unsecured

18   creditors in the case.  Is that your position?

19              MR. LOTONA:  Correct, Your Honor.

20              THE COURT:  All right.  And under almost any

21   imaginable scenario, unsecured creditors are not going to be

22   repaid in full and, therefore, holders of sell tokens, if

23   their claims are subordinated, would receive nothing.  Is

24   that correct?

25              MR. LOTONA:  Correct.

Page 84

1              THE COURT:  So, I see two separate -- well,

2     potentially two separate issues.  First is either sell token

3     securities.  Because if they are, the holders' claims would

4     be whatever the value of the sell token -- whether it's 20

5     cents or 81 cents would be subordinated and they'd recover

6     nothing.  If there's a consensual plan that proposes to

7     resolve the disputes as to whether sell tokens are

8     securities or not and it's resolved consensually and the

9     Court has asked to approve a settlement, that approved

10    recovery by sell token holders, whether it's 20 cents, 50

11    cents, I'm not -- whatever that amount is, it would obviate

12    the need for determination by this court or an appellate

13    court as to whether or not the sell token is a security.  Is

14    that a fair assessment?  Mr. Colodny?

15              MR. COLODNY:  I think that may be a fair

16    assessment with respect to the claims on the platform.

17    There's the separate issue of claims for fraud related to

18    the cell token.  All right, so there's -- when I think about

19    it, there are claims for the return of cell token, based off

20    of balances and accounts.  As the examiner's report showed,

21    there is also a potential and alleged fraud related to the

22    price of cell token.  And so, individuals who purchase cell

23    token, on the OTC market, may make claims that they were

24    defrauded and bought at a higher price and have damages

25    against (indiscernible).

Page 85

1          THE COURT:  But your position would be 510b, that

2     the claim arising from the purchase or sale of a security

3     for damages arising from the purchase or sale, would include

4     fraud damages and your -- I take it, am I'm correct that

5     your argument would be that even the fraud claim in

6     connection with the cell token would be a claim that's

7     subordinated under 510b?  Is that --

8          MR. COLODNY:  Correct.  But the -- the current

9     proposal under the plan is that compounds get 20 cents.

10          THE COURT:  Correct.

11          MR. COLODNY:  Not that fraud claims are 510b

12     claims.  So, it may be that even if we're able to reach a

13     settlement with respect to the claims related to account

14     balances, the Court may need to determine 510b, with respect

15     to a potential larger universe of claims connected to the

16     fraud, in connection with the purchase of cells.

17          THE COURT:  Okay.  It's complicated.

18          MR. COLODNY:  It's complicated.  And -- and

19     luckily the Second Circuit's still (indiscernible) disallow,

20     I think we said this in our objection.  We have Second

21     Circuit precedent from the Leeman Brother's case.  I think

22     there is two different Second Circuit opinions on the

23     purchase of sale security, which covers 510b, but the issue

24     of whether cell token is a security is a unique issue, which

25     has not been determined by anyone.

1            THE COURT:  Right.  All right.  But I -- I --

2   would you agree, subject to the approval of the Court on any

3   settlement that was reached, as part of a plan, the Debtor

4   with committee support, could consensually agree to settle

5   those issues and the settlement would have to be approved as

6   part of the plan?

7            MR. COLODNY:  Correct.

8            MR. CACERES:  Your Honor, may I say something?

9            THE COURT:  Mr. Caceres, go ahead.  Please, go

10  ahead.

11            MR. CACERES:  Did you say to me?

12            THE COURT:  Yes.

13            MR. CACERES:  Yes, I've been a Committee member

14  since 2019.  It's my understanding that the state regulators

15  of New Jersey have filed a ceased and desist order to

16  Celsius.  It's also my understanding that if we're going to

17  decide cell token being a security, we also need to look at

18  all of the (indiscernible) accounts with other tokens and we

19  can conclude as well that those earn accounts issued by

20  Celsius represent also securities.  So, if we're thinking

21  about subordinating cell token holder claims, we are

22  stepping into a danger zone here where we can

23  (indiscernible) and generating Celsius issued claims as

24  accounts, I'm sorry.

25            THE COURT:  Are you -- are you ready -- do you

Page 87

1    have an owned account as well?

2              MR. CACERES:  Yes, sir.  Yes.  Yes, Your Honor.

3              THE COURT:  I think we've gone as far with this as

4    we can today.  These are difficult issues  --

5              MR. IOVINE:  Your Honor, can I say one thing,

6    please?

7              THE COURT:  Go ahead Mr. IOVINE.

8              MR. IOVINE:  Okay.  The Debtor's counsel, Kirkland

9    and Owens, almost a representative wager.  VGX was

10   determined to be -- or while the STC says is a security.

11   But they still paid out petition date prices.  So, what's

12   the difference here?

13             THE COURT:  These issues are all premature for

14   today, we've got lots of time to think about that much time.

15             MR. IOVINE:  Well, then I request that the estate

16   --

17             THE COURT:  No, I'm sorry -- no -- no.

18             MR. IOVINE:  -- counsel --

19             THE COURT:  No -- no.  Stop.  You have not filed a

20   motion.  I'm denying, without prejudice, the motions that

21   were pending before me with respect to valuation of the cell

22   tokens.  It will be dealt with in the future, I've heard

23   enough.  Let's move on.

24             MR. IOVINE:  Thank you, Your Honor.

25             MR. LOTONA:  Your Honor, I'll turn them up and

Page 88

1   (indiscernible) in order to appease him.

2           THE COURT:  Okay.  Is the fee examiner, fee

3   application and the fee examiner counsel fee application,

4   who's going to argue on that?

5           MR. SANTICHI:  Good -- good morning, Your Honor,

6   this is Chris Santichi.  Ms. Stadler is on as well, I

7   believe she's going to make the presentation to the Court.

8           THE COURT:  That's fine.

9           MS. STADLER:  Yes, I am, thank you, Judge.  As

10  Your Honor knows, we've completed our first round.  Oh,

11  Katherine Stadler of Godfrey and Kahn, on behalf of the Fee

12  Examiner. As you know, we completed our reporting on the

13  first interim fee cycle back in April, with an order entered

14  for the consensual award of fees.  We have two pending

15  applications for the first interim fee period that are

16  deferred to the July 18th hearing and then we have a large

17  group of second interim fee applications, plus those two

18  deferred applications, schedule to go forward with

19  recommendations to the Court in connection with the July

20  18th fee hearing.

21          The process has gone smoothly.  The professionals

22  have all been cooperative, our fee applications have been

23  accurate, but we are continuing to be engaged on behalf of

24  the fee examiner, and to complete our work through February,

25  which was mostly -- most of the work on the first interim

1    fee period reporting.  So, if you have questions about any

2    of that, I'm happy to answer.  Otherwise, the fee

3    applications will speak for themselves.

4            THE COURT:  I -- I do have some questions about

5    the examiner's application.  So, the examiner's application

6    seeks allowance of $137,400.00 in compensation, and

7    $2,046.28 in expense reimbursement.  When I look at Exhibit

8    A to the examiner's application, it shows invoice numbers,

9    invoice period, total fees, shows a hold back.  The total

10   fees that it shows, so October 22 through February 23, as

11   $59,100.00.

12           So, I'm trying to understand what is it in the

13   application that I can look at that -- that backs up to the

14   $130 -- you know, that comes -- that down to the $137,400?

15   I'm just looking for the support for the -- in the

16   application for the numbering.

17           MS. STADLER:  So, you're talking about the fee

18   examiner's application, not the checkbook?

19           THE COURT:  Yes, I'm talking about the fee -- fee

20   examiner's application.

21           MS. STADLER:  Yes.  Okay.  So, the fee examiner

22   fee application incorporates the four -- I'm sorry, five

23   monthly fee statements filed on most of their summary sheet.

24   The fee examiner was paid 80 percent of fees, and 100

25   percent of expenses on those five applications.  So, the

1    exhibit is an effort to delineate what portion has been held

2    back and what portion has been paid pursuant to the order.

3              THE COURT:  But that exhibit --

4              MS. STADLER:  Your (indiscernible) --

5              THE COURT:  -- that exhibit --

6              MS. STADLER:  (Indiscernible) --

7              THE COURT:  -- shows the holdback --

8              MS. STADLER:  (Indiscernible) --

9              THE COURT:  -- that Exhibit A shows the hold back

10   as $11,820.00.

11             MS. STADLER:  Right.

12             THE COURT:  I'm trying to understand -- I just

13   want, you know --

14             MR. SANTICHI:  I think it -- I'll have to act --

15             THE COURT:  Go ahead, Mr. Santichi.

16             MR. SANTICHI:  I think it's -- frankly, Your

17   Honor, I think it's a mistake and we'll have to circle back

18   on that, because my memory of those five months is

19   consistent with the amount that's in that Exhibit A and I'm

20   having trouble looking at it here on my computer, please

21   excuse me.  Oh, for goodness sake, I just had it.  And I --

22   it's interesting that you mentioned that, because I was

23   prepping for when you got -- I looked at the number in the

24   application and thought well, I'm doing better than I

25   thought, because that's not what I thought (indiscernible)

Page 91

1   what I had billed, so I think we may just have a mistake

2   there.

3          THE COURT:  Okay.  Just -- look, check it over,

4   submit it.  There were no objections that -- that were

5   filed.  I don't think it's going to be necessary to have

6   another hearing.  I just want to make sure that I understand

7   exactly what you're asking for --

8          MR. SANTICHI:  Yes.

9          THE COURT:  -- and what the support for it is.

10  Okay?

11         MR. SANTICHI:  Yes, because if it is correct -- if

12  this is the correct number, we will provide you what

13  representation as to the backup for that.

14         THE COURT:  That's fine.  That's fine.  Okay.

15         MR. SANTICHI:  I apologize for the mistake.

16         THE COURT:  Thank you.

17         MS. STADLER:  As do I, Judge.

18         THE COURT:  Okay.

19         MS. STADLER:  We'll get to the bottom of it.

20         THE COURT:  Okay.  All right, with respect to Ms.

21  Stadler, your firms, fees, you're seeking $637,735.00 in

22  compensation, that's a blended hourly rate of $578.15.

23  Blended hourly rate for all timekeepers of $590.50.  I

24  didn't have any questions about your application.  Does this

25  -- anybody else want to be heard with respect to this?

1    Okay.  So, yours is approved, and again, with Mr. Santichi,

2    I just need to understand and see the appropriate support

3    for it and I'm sure I'll be able to enter an order on it

4    without having another hearing.  Okay?

5              MS. STADLER:  Yes, thank you very much, Judge.

6              THE COURT:  Okay.  Thank you very much.  Thank you

7    Mr. Santichi.

8              MR. SANTICHI:  Thank you, Your Honor.

9              THE COURT:  Mr. Colodny.

10             MR. COLODNY:  Your Honor, we have our co-counsel

11   (indiscernible) let me get over here for the cell motion,

12   may they be excused?

13             THE COURT:  Yes, absolutely.

14             MR. COLODNY:  Thank you.

15             THE COURT:  All right.  We're up to the status

16   conferences. First is for Shanks v Celsius Adversary

17   Proceeding 23-01010.

18             MR. D'D'ANTONIO:  Good morning, Your Honor, Joe

19   D'ANTONIO, Kirkland and Ellis on behalf of the Debtor's.

20   We're here on three status conferences.

21             THE COURT:  Right.  So, we have Shanks, Giorgio,

22   which is adversary proceeding 23-01016, and --

23             MR. D'ANTONIO:  The Ad Hoc --

24             THE COURT:  Ad Hoc Group of Borrowers v Celsius

25   Network, adversary proceeding 23-01007.

Page 93

1             MR. D'ANTONIO:  That's correct, Your Honor.

2             THE COURT:  Don't tell me your (indiscernible)

3     tell me your name again?

4             MR. D'ANTONIO:  Joe D'Antonio, Kirkland and Ellis.

5             THE COURT:  Thank you.

6             MR. D'ANTONIO:  And as Your Honor's aware in the

7     Shanks and Giorgio adversary proceedings, the Debtor's

8     supply all dispositive motions to dismiss that at this

9     point, are fully briefed and the Debtor's believe are ready

10    for resolution and in the Ad Hoc Borrower's group, let me

11    discuss a little bit about the negotiations.  The Borrowers

12    filed a complaint in early February.  The Debtors have never

13    been served with a summons or complaint, nonetheless the

14    Debtors have engaged counsel to the Borrowers in

15    negotiations.  We got to the auction and following the

16    auction and as discussed earlier --

17            THE COURT:  I thought it was done.

18            MR. D'ANTONIO:  We'd -- I'll let my other counsel

19    discuss -- I was not involved in the negotiations

20    themselves.  But we do have a mediation date set with Judge

21    Wiles for next month.  And that will be alone with the

22    counsel for the Committee, as well as the Ad Hoc Group of

23    Current Account Holders.

24            THE COURT:  Okay.  Well let's talk about Shanks

25    and Giorgio then.

1        MR. D'ANTONIO:  Yes.  And we understand that Your

2   Honor, wished to hear these in connection, given the overlap

3   of the --

4        THE COURT:  Go ahead.

5        MR. D'ANTONIO:  -- loan in terms of the use

6   issues.  It's the Debtor's position, based on their motions

7   to dismiss, and I understand, Your Honor, doesn't want to

8   hear merits arguments today, but it's our understanding and

9   belief, based on those motions to dismiss that the Court

10  could rule on those and resolve these complaints, without

11  reference or interpretation to the underlying loan terms of

12  use.  We believe that we've made arguments clear with

13  respect to the law of the case in interim order and our

14  belief that both those cases fall under the gambit of that

15  order.  With that in mind, we're happy to take questions

16  from Your Honor, or hear any other issues you may have or

17  thoughts with respect to the most efficient way to resolve

18  these.

19       THE COURT:  Sure.  Mr. Shanks, I see you on

20  screen, go ahead.

21       MR. SHANKS:  Yes, sir, I'm -- really trying to

22  claim is the -- the deposits that -- the excess deposits

23  back into my account.  When Celsius froze everything, I had

24  and liquidated my loan, I had no access to either withdraw

25  or have an opportunity from any access bitcoin, unless

Page 95

1   whenever we tried to come back.

2            THE COURT:  Do you agree that the motion to

3   dismiss is fully briefed, is there anything else that -- I

4   mean, I'll schedule arguments.  This is -- I'm not hearing

5   argument today.  I'm not going to decide it without giving

6   you an opportunity to address the issues during argument.

7   But do you -- do you agree that it's fully briefed?

8            MR. SHANKS:  Yes, Your Honor.

9            THE COURT:  Okay.  Are the arguments in Shanks and

10  Giorgio the same?

11           MR. D'ANTONIO:  They overlap with the law of the

12  case issue would be the same in both, Your Honor.

13           THE COURT:  All right.

14           MR. D'ANTONIO:  I believe they're also overlapping

15  claims in each -- in each complaint that would, you know,

16  certain the argument would be similar.

17           THE COURT:  Mr. Shanks, where -- where do you

18  reside?  I'm just trying to understand.  I don't know

19  whether there's a time change or whether you're in the East

20  Coast, or somewhere else.  I'm just trying to figure out

21  with regards to time -- time to be scheduling a time of

22  argument.

23           MR. SHANKS:  No, that's fine, sir, in Colorado.

24           THE COURT:  Okay.  All right.  We -- we have a

25  hearing in Celsius scheduled for July 18th. What I'd like to

1    do is schedule the time for argument on Shanks and Giorgio

2    for the afternoon.  I have something else at 2:00.  But

3    schedule it for 3:00 on Tuesday, July 18th, and Mr. Giorgio

4    you can -- since you're in Colorado, I'll permit you to

5    appear by zoom, you don't have to appear in person.  Are you

6    able to do it then?

7              MR. D'ANTONIO:  Looking at Mr. Shanks --

8              THE COURT:  I'm sorry, Mr. Shanks, are you able to

9    do it at 3:00 on July 18th? So, it'll be 1:00 your time.

10             MR. SHANKS:  July 18th, 1:00, yes sir.

11             THE COURT:  Okay.  That's when we'll set it for.

12             MR. D'ANTONIO:  Thank you very much, Your Honor.

13             THE COURT:  Okay?

14             MR. SHANKS:  Thank you.

15             THE COURT:  All right, thank you very much.

16             MR. SHANKS:  Thank you, Your Honor.

17             THE COURT:  And you know, I will -- I've seen

18   these papers already, but I will have reviewed the papers

19   completely -- both sides papers before the hearing, but I

20   want to give you an opportunity to say anything else that

21   you want to say, okay?

22             MR. SHANKS:  Thank -- thank you, Your Honor, I

23   have nothing else further to say.

24             THE COURT:  okay.  All right.  Thank you, very

25   much.  Let me just make myself a note.  Okay.  So, let's

Page 97

1    deal with Giorgio.

2            MR. D'ANTONIO:  Yes --

3            THE COURT:  And it is -- is Mr. or Ms. Giorgio, I

4    don't know.

5            MR. D'ANTONIO:  It's three plaintiffs represented

6    by; I believe his counsel was on zoom.

7            THE COURT:  All right.  Is the counsel for --

8            MR. ZAREH:  Yes, Your Honor, good morning -- or

9    good afternoon, Your Honor, my name is Omid Zareh, Weinberg

10   Zareh Malkin and Price.  We represent the Giorgio parties.

11           THE COURT:  Okay.  And is your -- this motion

12   fully briefed?

13           MR. ZAREH:  Yes, Your Honor.

14           THE COURT:  Okay.  So, I won't -- are you

15   available for argument on the same time I've just said, 3

16   p.m., July 18th?  I'll hear Shanks first and you immediately

17   following it?

18           MR. ZAREH:  Yes, Your Honor, we are available for

19   3 p.m. on July 18th.  My -- we're a New York firm, does Your

20   Honor, want us to be in person or will this be virtual?

21           THE COURT:  I would prefer that it be in person.

22   Look, I've just -- this is a general comment.  I'm trying to

23   move more and more of our hearings to in person or hybrid,

24   as we're doing today.  And so, since Mr. Shanks is in

25   Colorado, I'm perfectly fine, per se to have the hearing

1    remote.  Since you're in New York, let's plan on doing it in

2    the courtroom.  Okay?

3              MR. ZAREH:  Absolutely, Your Honor, we look

4    forward to it.

5              THE COURT:  Okay.  All right.  So, now let's deal

6    with the Ad Hoc Group of Borrowers.  Mr. Adler.

7              MR. ADLER:  Good morning, or good afternoon, Your

8    Honor, it's David Adler, from Carter English on behalf of

9    the Ad Hoc Group of Borrowers.  I'd like to say first, that

10   with respect to Mr. Shanks' adversary proceeding, that is

11   adversary proceeding 23-1010 and it was filed, I believe on

12   February 22nd.  It is a duplicate copy of the Ad Hoc Group

13   of Borrower's complaint which is 23-1007.  So, it was filed

14   afterwards, about two weeks, if I recall correctly.  I think

15   that's -- as -- as noted by counsel, that this motion, the

16   complaint has not been scheduled.  It's not been set with it

17   yet.  We would ask for that. But we would also ask for the

18   opportunity to have all of these matters considered together

19   because there's so much overlap.  Especially, I mean,

20   Shanks' is verbatim from the Ad Hoc Group of Borrowers.

21   Giorgio is a little bit different, but it involves the same

22   issues of interpretation with respect to lending terms of

23   use.  So, that's our position.  You know, we have --

24             THE COURT:  Well, let me ask you this.  But go

25   ahead and finish.  I'm sorry, I cut you off.

1          MR. ADLER:   No.

2          THE COURT:  Have you spoken with Shanks and

3     Giorgio?  Well, it was Giorgio, has counsel.

4          MR. ADLER:  I believe I spoke with one pro se

5     party, it may have been Mr. Shanks over the complaint.  I'm

6     not 100 percent certain, but I recall that that individual

7     lived in Florida who had issues that were nearly -- that

8     were overlapping with the Borrower's complaint.  But it was

9     not anything substantive, Your Honor.

10         THE COURT:  Let -- let me ask, because I agree --

11    just that the issues are the same, I'd like to resolve them

12    at the same time.  And you've been active throughout this

13    case and what I would ask you to do is communicate with Mr.

14    Zareh, counsel for Giorgio -- Giorgio, et al, and with Mr.

15    Shanks; and see if you can consensually work out an

16    agreement to defer the argument.  You know, it raises a

17    special -- obviously you're about to embark on mediation.

18    And the outcome in mediation I think will hopefully resolve

19    the issues for all.  I'm, you know, I've got two fully

20    briefed motions in front of me.  I don't want to deny them a

21    day in court.  See if you can communicate with them and see

22    if you can work out an agreement with them for those -- for

23    those all to be heard together.  I don't know whether Mr.

24    Zareh -- is he included in the mediation?

25         MR. ADLER:  He is not, Your Honor, no.  He's not a

Page 100

1     member of the Ad Hoc to --

2              THE COURT:  Okay.

3              MR. ADLER:  -- the best of my knowledge.

4              THE COURT:  Well, let's see what you can work out,

5     and I'll decide it -- it may be that I'll hear argument and

6     not decide it.  You know, I've not been resolving things at

7     the hearing, I usually been taking things under submission,

8     on most things.  So, I'm -- I'm -- all the issues, if

9     (indiscernible) the issues are the same, they ought to be

10    decided together.  I don't want to disadvantage the Ad Hoc

11    Group by deciding in one adversary proceeding, and

12    particularly if it's a pro se, or even with counsel

13    representing them.

14             MR. ADLER:  Okay.  It has to be a fair fight, Your

15    Honor.

16             THE COURT:  It has to be a fair fight.

17             MR. ADLER:  What I would say is maybe in that

18    regard, we should set a schedule with respect to the Ad Hoc

19    complaint, so that we can -- so that we can have everything,

20    you know --

21             THE COURT:  Well, why don't you work with Debtor's

22    counsel, I agree with that.  Try and see if we can iron out

23    a schedule so that Mr. Shanks and Mr. Zareh, on behalf of

24    the Giorgio plaintiffs, don't think they're just being put

25    off indefinitely.  So, there's a concrete schedule.  I think

Page 101

1    they'd be more likely to agree, I think and -- and they may

2    well be quite agreeable if they think that collectively you

3    have a strong position than might be asserted separately.

4              MR. ADLER:  Understood, Your Honor.

5              THE COURT:  Okay.  I appreciate that.

6              MR. ADLER:  Thank you.

7              THE COURT:  Okay.  Thank you very much.  I think

8    that leaves us with one last status conference.  The

9    Committee v --

10             MR. ZAREH:  Your Honor, forgive me, Your Honor,

11   this is Omid Zareh, forgive me.

12             THE COURT:  Yes.

13             MR. ZAREH:  I'm just trying to put a button on

14   this.  So, we're on for -- we're on for July 18th at 3 p.m.

15   --

16             THE COURT:  Unless I change it.

17             MR. ZAREH:  Thank you, Your Honor.

18             THE COURT:  Okay.

19             MR. HERMANN:  Your Honor, if I may, excuse me, I'm

20   so sorry, but this is Immanuel Hermann.

21             THE COURT:  No, Mr. Hermann.  Mr. Hermann, stop.

22   Stop.

23             MR. HERMANN:  Okay, it's just there's common

24   issues here, but you can (indiscernible) --

25             THE COURT:  Stop.  I have two adversary -- I have

Page 102

```
 1    three adversary proceedings in front of me.  That's what I'm

 2    dealing with at the moment.  Okay.  Mr. Zareh, talk with Mr.

 3    Adler.  Mr. Shanks should talk with Mr. Adler. We'll see

 4    whether we can agree -- whether there can be an agreement on

 5    a common schedule. I think, Mr. Zareh, I don't want to

 6    decide these issues piecemeal, I think collectively you'd

 7    have a stronger position than separately.  So, let's do

 8    that.  Mr. Koenig, with respect to the Committee v Celsius

 9    Network Limited --

10             MR. KOENIG:  Thank you, Your Honor, again, Chris

11    Koenig, for from Kirkland for -- for Celsius.  So, this is

12    the fraudulent transfer complaint that relates back to the

13    919 motion that I mentioned at the top of the hearing.  Mr.

14    Colodny reminded me, we have briefing in that -- in those

15    disputes that we should stay -- I mean, in light of the

16    settlement, all parties have agree to stay that litigation,

17    we just wanted that point to be clear.  I don't think there

18    would be anything else that we need to decide.  I think this

19    status conference can be continued.  I think that this --

20    this matter will be mooted by the settlement of the case.

21             THE COURT:  Well, let me suggest this.  With

22    respect to this adversary, file a stipulation adjourning the

23    dates sine die, just so the record's clear.

24             MR. KOENIG:  Wonderful.

25             THE COURT:  If I have to bring it back, but that
```

Page 103

1    way it just doesn't fall off the radar screen completely.

2          MR. KOENIG:  Wonderful.  All right, thank you so

3    much.  And just quickly, it's not on the agenda, we'd filed

4    the stipulation with the Committee about conversion of the

5    Debtor's all coins in the bit coin (indiscernible) -- we

6    submitted an amended form on stipulation earlier this week

7    that related to (indiscernible) from the SEC.  We received

8    no objection.  We'll just go ahead and submit that to

9    chambers.

10          THE COURT:  Okay.  Just submit it to chambers.

11          MR. KOENIG:  Thank you, Your Honor.

12          THE COURT:  Mr. Hermann, if you want to be heard,

13   I'll listen to you, briefly.

14          MR. HERMANN:  Okay, Your Honor, thank you.

15   Immanuel Hermann, pro se creditor.

16          THE COURT:  I like your shirt -- I like your

17   shirt, Mr. Hermann.

18          MR. HERMANN:  Thank you, I'm sorry, it's not more

19   formal today, Your Honor.  But I'm glad you like it.  So, I

20   just wanted to quickly note that similar to Mr. Adler's

21   comments, and that actually, you know, I have an adversary

22   proceeding that would have been up today, but I consented to

23   adjourning it.  But this issue of law of the case is common

24   to basically all adversary proceedings that are before you.

25   And I would hope that the parties can come to some mutual

Page 104

1    agreement to brief this issue, along with the Ad Hoc Group

2    of Borrowers, then also my adversary complaints has overlap

3    issues with the Ad Hoc Group of Borrowers, and with these

4    other two complainants and that a lot of these complaints

5    copied elements of existing adversary proceedings, including

6    ones filed by Ad Hoc, the other one's filed by myself.  So,

7    I would hope that, basically, we can come to some way to

8    brief.  I don't consider the matter fully briefed.  It's an

9    interrogatory order for one thing, and I don't think that's

10   been briefed.  Here an order that is, you know law of the

11   case.  I'll have to put more into that, but what I would

12   propose is, you know, we -- yeah, come to some kind of

13   mutual agreement about briefing it and deal with it in one

14   efficient proceeding that deals with it with respect to all

15   of the adversary proceedings.

16            THE COURT:  So, I'm here to resolve disputes.  If

17   you can agree on a schedule, you'll submit it and if it's

18   acceptable to me, I'll approve it.  Okay?  Let me put it

19   that way.  I also --

20            MR. HERMANN:  I (indiscernible) --

21            THE COURT:  I -- I certainly much prefer parties

22   to consensually agree on a schedule and I think that's

23   largely happened in all the matters you've been involved in,

24   so far, Mr. Hermann, which I appreciate.  Okay.

25            MR. HERMANN:  Thank you, Your Honor.

Page 105

1           THE COURT:  Okay.  All right, Mr. Koenig, do you

2   have anything else for today?

3           MR. KOENIG:  No, thank you, Your Honor.

4           THE COURT:  Okay.  Thank you very much.  It's nice

5   to see people in the courtroom.

6           MR. KOENIG:  Thank you.

7           THE COURT:  Okay, we're adjourned.

8           (Whereupon these proceedings were concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1                          I N D E X

2

3    RULING                              PAGE        LINE

4

5    Motion to Transfer the Assets, GRANTED  22          21

6    Motion to Appoint Christopher Ferraro

7    as Foreign Representative, GRANTED      24          3

8    Motion to Extend for 90 days, GRANTED   32          17

9    Motion Put Forth by Santos Caceres,

10   DENIED                                  74          24

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 107

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 3, 2023

[& - 2760]                                                                                    Page 1

| & | 11,820.00. | 2 | 2216    5:17 |
|---|---|---|---|
| **&**   6:2 8:3,18 | 90:10 | **2**   6:21 | **2240**   5:9 |
| 10:10 22:25 | **1121**   4:13 | **2,046.28**   89:7 | **2241**   5:10 |
| 51:3 54:15 | **11501**   107:23 | **2,600**   81:15 | **2260**   5:10 |
| 80:1 | **12**   6:8 | **2.75**   40:25 | **22nd**   98:12 |
| **0** | **12151**   107:7 | **20**   18:20 19:6 | **23**   21:4 89:10 |
| **0.81565**   5:6,14 | **128**   19:23 | 36:21 43:7 | **23-01007**   92:25 |
| **1** | **13**   5:21 6:3,8 | 57:18 70:8 | **23-01010**   1:11 |
| **1**   6:8,12,21 7:5 | 6:17 21:7 | 71:24 84:4,10 | 6:6 92:17 |
| **1,000**   24:14 | **13-14**   61:16 | 85:9 | **23-01016**   1:19 |
| **1,144**   81:9 | **13.75**   57:18 | **20,000**   19:22 | 6:10,14 92:22 |
| **1.25**   37:2 40:24 | **130**   89:14 | **200**   44:10 | **23-01104**   2:2 |
| **1.5**   18:22 19:7 | **137**   20:3 | **2003**   46:20,21 | 6:19 |
| 40:22 57:24 | **137,400**   89:14 | **201**   9:10 | **23-01107**   2:10 |
| **10**   6:12 61:13 | **137,400.00** | **2010**   44:10 | 7:3 |
| **10.18**   25:10 | 5:22 89:6 | **2012**   47:12 | **23-1007**   98:13 |
| **10.2**   19:11 | **138**   20:3 | **2019**   86:14 | **23-1010**   98:11 |
| **100**   89:24 99:6 | **13th**   28:25 | **2021**   24:14 | **2327**   5:17 |
| **10004**   2:21 | 29:4 30:1 | **2022**   5:22 6:3 | **2329**   5:10 |
| **10014**   9:11 | **15-20**   25:8 | 21:7 | **23rd**   28:25 |
| **10036**   8:14 | **16**   24:17 | **2023**   2:23 5:22 | **24**   106:7,10 |
| **10167**   9:4 | **16,000**   24:19 | 6:3 20:18,19 | **245**   9:3 |
| **105**   4:3 20:16 | **17**   74:1,3 77:11 | 22:4,10,11 | **25**   11:15 13:9 |
| 59:1 60:11 | 106:8 | 107:25 | **2583**   5:10 |
| **105's**   65:14 | **17h**   81:11 | **2046.28**   5:23 | **2584**   5:17 |
| **10964**   10:4 | **17th**   26:20 | **20th**   17:23 | **2585**   4:21,25 |
| **10:03**   2:24 | 31:23 | **21**   22:10 106:5 | **2593**   5:17 |
| **10th**   25:7 | **181**   44:16 | **2169**   5:9 | **25th**   18:8,10 |
| **11**   4:13 6:17 | **18th**   11:25 | **21738964** | **26**   22:11 |
| 10:19 11:15 | 88:16,20 95:25 | 46:21 | **2622**   5:23 |
| 13:2,3,8 21:1 | 96:3,9,10 | **22**   10:3 89:10 | **2623**   6:4 |
| 23:6 25:16 | 97:16,19 | 106:5 | **2624**   5:23 6:4 |
| 80:3,19 81:3,5 | 101:14 | **22-01140**   20:24 | **2639**   4:21 |
| 82:15 | **19**   24:17 | **22-10964**   1:3 | **2700**   8:21 |
| **11,000**   18:20 | **1989**   44:8 | **2208**   5:9 | **2758**   4:4 |
| 19:5 | **1:00**   96:9,10 | **2215**   5:9 | **2760**   4:21,25 |

| | | | |
|---|---|---|---|
| **2763** 4:25,25 | **30** 25:11 52:20 | **510** 73:7 75:21 | **72.5** 17:15 |
| **2772** 4:4 | 57:16 61:13 | 83:16 | **7359.71** 6:4 |
| **2774** 7:1 | **30-40** 25:13 | **510b** 85:1,7,11 | **74** 106:10 |
| **2775** 7:9 | **300** 8:5 107:22 | 85:14,23 | **75** 70:13 |
| **2776** 7:9 | **300,000** 37:4 | **527** 44:8 | **8** |
| **2781** 4:25 | **30th** 27:3 | **535** 44:16 | **8** 6:8,12 17:10 |
| **2783** 4:4 | **32** 17:8 106:8 | **55,000** 24:16 | 22:4 69:14 |
| **28** 2:23 5:22 | **327** 39:23 | **555** 8:20 | **80** 17:9 89:24 |
| 6:3 15:15 | 42:21 | **578.15.** 91:22 | **81** 70:4,10 |
| **2802** 4:9 | **328** 39:24 | **59,100.00.** | 71:12 72:24 |
| **2805** 4:15 | **330** 107:21 | 89:11 | 75:17 77:24 |
| **2825** 7:1,9 | **35** 15:14 24:12 | **590.50.** 91:23 | 80:4 84:5 |
| **2827** 4:9,15 | **36.25** 17:16,18 | **6** | **83** 17:21 |
| **2831** 7:1 | **362** 59:1 62:1 | **6** 6:12,17,21 | **85** 18:2 |
| **2838** 4:15 | 64:2 | 20:18 | **89** 18:6 |
| **2839** 4:21,25 | **363** 46:22 | **6.25** 57:19 | **9** |
| **2840** 5:10,17 | **37,000** 70:15 | **6.5** 61:14 | **9** 6:17 69:19 |
| **2841** 4:15 | **39** 17:20 | **60** 30:3 | **90** 27:1,20 |
| **2842** 4:21,25 | **3:00** 96:3,9 | **600** 71:1 | 28:12 32:13,17 |
| **2844** 5:10 | **4** | **60654** 8:6 | 106:8 |
| **2846** 5:10 | **4** 6:12 7:5 | **60days** 27:19 | **90071** 8:22 |
| **2847** 7:1 | **400,000** 49:11 | **61** 19:13 | **9019** 4:3 14:5 |
| **2848** 5:10 | **450,000** 40:25 | **637,735.00** 6:3 | 20:16,22 21:5 |
| **2849** 4:22,25 | 41:2,22 42:12 | 91:21 | **919** 102:13 |
| **2851** 4:22,25 | 42:24 49:11 | **64,000** 18:21 | **95** 82:9 |
| **2859** 4:22 | **452** 47:12 | 19:6,20,23 | **97** 70:25 |
| **2873** 4:22,25 | **5** | **6th** 20:21 | **a** |
| **2882** 82:18 | **5** 6:17,21 52:18 | **7** | **aaron** 8:24 |
| **2918** 16:16 | **50** 17:18 18:2 | **7** 6:17 15:16 | 25:22 30:10 |
| **2:00** 96:2 | 18:13 70:2 | 20:19 25:9 | 42:4 61:10 |
| **3** | 82:6 84:10 | 37:7 45:7 | **abdicating** |
| **3** 6:8 97:15,19 | **50,000** 36:25 | **7.5** 52:19 | 77:16 |
| 101:14 106:7 | **500** 81:23 | **70** 11:7 18:11 | **abi** 58:14 |
| 107:25 | **500,000** 37:5 | 19:13 | **ability** 12:25 |
| **3,000** 81:15 | **503** 47:10 | **72** 18:13 | 60:2 61:5 62:2 |
| **3,500** 81:11 | | | 62:13 |

[able - aggregate]                                                    Page 3

**able** 11:19 13:1
  16:6 27:14
  30:21 43:1,6
  49:5 66:23
  85:12 92:3
  96:6,8
**abreu** 80:21,21
  80:24 83:10,11
**absent** 23:10
  56:22
**absolute** 36:11
**absolutely**
  92:13 98:3
**abundantly**
  62:10
**acceptable**
  62:7 66:20
  79:6 104:18
**acceptances**
  4:13
**accepting** 45:2
**access** 5:4
  21:23 24:9
  70:24 94:24,25
**accessed** 21:11
**accompanied**
  71:18
**accomplish**
  39:20 58:11
**accomplished**
  45:7
**accordance**
  21:8
**account** 17:12
  39:13 64:5
  85:13 87:1
  93:23 94:23

**accountholder**
  13:19,22 23:19
**accountholders**
  10:24 11:4
  12:22,25 13:5
  13:14 14:22,23
  18:14 23:25
**accounts** 17:16
  21:25 72:6
  84:20 86:18,19
  86:24
**accurate** 88:23
  107:4
**achievement**
  21:1
**acquire** 24:23
**act** 4:7 90:14
**acted** 47:13
  62:24
**acting** 47:17
**action** 23:16
  56:18 58:15
**actions** 79:18
**active** 99:12
**activities** 21:18
**acts** 57:20
  61:14
**actually** 33:14
  37:7 40:12
  82:3 83:13
  103:21
**ad** 2:12 7:3 9:2
  17:25 18:1,7
  26:22,22 27:6
  28:18 29:1,10
  29:14,17,23
  92:23,24 93:10

93:22 98:6,9
98:12,20 100:1
100:10,18
104:1,3,6
**adamant** 77:24
**add** 19:10
  72:20
**additional**
  18:20 26:23,24
  28:11 54:21
  57:18 72:20
  81:13
**additionally**
  81:11
**address** 22:9
  37:20 42:3
  46:18 75:19
  95:6
**addressed**
  45:15 72:10
**addressing**
  54:18
**adequate** 76:2
**adequately**
  75:18
**adjourned**
  105:7
**adjourning**
  102:22 103:23
**adjusted** 18:21
  19:7
**adler** 9:6 27:6
  27:8,14 28:16
  28:17,17 30:7
  30:18 31:7,24
  98:6,7,8 99:1,4
  99:25 100:3,14

100:17 101:4,6
  102:3,3
**adler's** 103:20
**adr** 5:20
**adv** 1:11,19 2:2
  2:10
**advance** 47:14
  47:18 51:6
**advanced** 56:4
**adversary** 6:6
  6:10,14,19 7:3
  20:23,24 21:2
  66:2 92:16,22
  92:25 93:7
  98:10,11
  100:11 101:25
  102:1,22
  103:21,24
  104:2,5,15
**advisors** 36:11
**advocate** 60:25
**affected** 65:8
**affidavits**
  71:18
**affirmed** 23:22
**afternoon** 96:2
  97:9 98:7
**agenda** 16:3,10
  23:1 24:5
  50:24 69:13
  103:3
**agent** 4:18
  36:15,17
**aggregate** 37:3
  38:23 40:15
  49:16,20 52:15
  66:13

[ago - approach]                                                              Page 4

**ago**  10:19,21
  77:23
**agree**  25:24
  45:9 48:22,25
  48:25 50:1,1,2
  53:10 63:10
  76:16 77:6
  78:8,12 80:15
  86:2,4 95:2,7
  99:10 100:22
  101:1 102:4,16
  104:17,22
**agreeable**
  101:2
**agreed**  12:16
  27:13 31:22
  33:2 36:2 37:3
  37:5 55:19
**agreement**
  27:4,9 30:21
  30:22 31:3
  33:9 35:6
  37:10 45:21
  46:12 64:19
  99:16,22 102:4
  104:1,13
**ahead**  15:23
  47:25 48:18
  69:23 75:7
  77:4 79:25
  86:9,10 87:7
  90:15 94:4,20
  98:25 103:8
**aired**  74:23
**akin**  8:11
  20:11

**al**  1:16,21,25
  2:8,16 6:7,10
  6:11,14,15 7:4
  99:14
**alameda**  82:24
  82:24
**allegations**
  72:21
**alleged**  56:20
  84:21
**allocate**  58:4
**allocation**  54:8
  58:2,7 59:6
  65:13,17 67:2
  68:20
**allow**  51:5
**allowance**  13:6
  73:19 75:5
  79:2 89:6
**allowed**  12:12
  34:24
**allowing**  5:2
  12:19 43:23
**allows**  11:21
  13:7 24:8
**alongside**
  35:20 41:16
**alter**  52:12
**altering**  60:21
**alternative**
  16:5 49:6
**alternatives**
  29:3
**alvarez**  38:14
**amended**  20:18
  72:20 103:6

**amendment**
  58:15
**amount**  13:11
  24:23 30:22
  31:17 38:23
  49:16 52:15
  59:17,20 60:3
  61:12 84:11
  90:19
**amounts**  50:12
**amplify**  12:20
**analysis**  46:3
  71:16,17
**analysts**  46:2
**analyzing**
  71:10
**angeles**  8:22
**announce**
  26:19
**announced**
  11:8
**answer**  39:8
  47:21 50:5
  89:2
**answered**
  34:20
**anxious**  15:10
**anybody**  14:9
  22:20 26:4
  30:8 32:4,15
  47:23 65:2
  77:7 91:25
**apart**  13:13
  29:3,14 32:21
**apologies**  39:5
**apologize**  39:3
  39:4 91:15

**apparent**
  70:15
**appeal**  23:22
**appealed**  23:21
**appear**  43:23
  58:8 96:5,5
**appearance**
  62:6 74:8,14
**appeared**
  72:24 74:10
**appearing**  9:15
**appears**  46:11
**appease**  88:1
**appellate**
  84:12
**applicable**
  4:21
**application**
  5:19,25 42:19
  88:3,3 89:5,5,8
  89:13,16,18,20
  89:22 90:24
  91:24
**applications**
  88:15,17,18,22
  89:3,25
**applied**  44:15
  82:13
**appoint**  23:2
  106:6
**apportion**  64:5
**appreciate**
  33:7 43:24
  67:9 101:5
  104:24
**approach**
  46:13

[appropriate - back]                                                    Page 5

**appropriate**
  28:13 38:1
  41:25 42:18
  46:16 51:23
  54:21 67:18,21
  92:2
**approval**  11:22
  12:5 14:19
  17:14 21:5
  26:24 28:9
  42:24 58:1
  86:2
**approvals**
  57:13
**approve**  4:1,2
  20:15 59:13
  60:1 84:9
  104:18
**approved**  12:7
  13:25 14:20
  17:24 26:25
  39:9 61:6 64:9
  75:15 84:9
  86:5 92:1
**approving**
  6:24 20:22
  50:9
**approximately**
  17:10 24:12,16
  24:19 25:8,11
  70:15
**april**  17:23
  18:19 19:4
  28:25 29:8
  88:13
**area**  55:17

**argue**  56:8
  60:18 88:4
**arguing**  27:17
  27:18
**argument**  73:5
  78:4 85:5 95:5
  95:6,16,22
  96:1 97:15
  99:16 100:5
**arguments**
  78:2 80:5 94:8
  94:12 95:4,9
**arising**  85:2,3
**arrangement**
  50:10 66:21
**artur**  80:21
**aside**  64:22
**asked**  27:20
  61:12 84:9
**asking**  38:10
  40:17 57:25
  62:3,5 63:21
  72:4 91:7
**aspect**  81:2
**assert**  66:3
**asserted**  13:16
  47:15 101:3
**assessment**
  84:14,16
**asset**  24:18
  25:10,17 76:5
  80:25
**assets**  10:18
  12:25 13:4
  17:12,15 18:10
  21:16,25 22:15
  23:9,10 34:11

  35:5,16 45:5,6
  46:10 70:2,3
  71:3 82:16
  83:3 106:5
**associated**
  11:20 45:3
**association**
  79:11
**assume**  40:14
  55:19
**assuming**  12:7
  75:14
**assure**  68:19
**attached**  14:5
**attempts**  72:2
**attorney**  58:13
  74:12
**attorneys**  6:1
  8:4 9:2,9 79:11
**auction**  10:15
  26:12 27:8
  29:8 30:15,19
  31:1,2 33:21
  37:23 44:22
  45:3 47:4
  93:15,16
**august**  15:18
**authorities**
  44:23
**authority**  56:9
  58:20 60:6,8
  61:22 63:18
  66:23,25 68:13
**authorized**
  4:18
**authorizing**
  4:7 6:24 7:8

  21:20
**automatic**  4:20
  23:11 50:24
  51:5 54:17
  62:2,4
**available**  21:16
  38:4 52:16
  68:15,18 97:15
  97:18
**avenue**  9:3
**average**  24:18
**avoid**  66:16
  68:20 80:11
**avoided**  40:9
  71:25
**award**  88:14
**awarded**  23:19
**aware**  22:12
  66:11,22 93:6
**awful**  48:21,23

---
                  **b**
---

**b**  3:1 11:9,10
  12:13,16 13:10
  16:20 26:18
  46:22 52:19
  60:14 83:16
**back**  10:11
  12:4 19:10
  28:19 29:7,23
  30:4 34:5
  47:24 48:11
  50:8,15,16
  55:17 56:5,7
  60:17 62:13,16
  63:1 66:12
  67:20 79:12
  88:13 89:9

[back - borrowers]

Page 6

90:2,9,17
94:23 95:1
102:12,25
**backing** 83:3
**backs** 89:13
**backup** 6:25
14:16 33:20
34:2,13,23
35:3,7,8,13,24
36:2,5,6,20,21
37:6,10,13,15
37:25 38:2,5
39:12,16 40:1
40:4,5,8 41:15
41:20 43:25
44:6,6 45:3
48:17,20 91:13
**backwards**
15:19 29:15
**bad** 62:24
**balance** 25:17
31:14 80:11
**balances** 84:20
85:14
**balancing**
54:20 59:4
**bang** 40:11
**bankers** 26:1
46:1
**bankruptcy**
1:1 2:19 3:3
4:3,4,14 20:16
20:17 34:7
40:22 44:4,12
44:15 47:12,14
47:18 55:10
58:17 59:2

61:2,3,24
62:23 63:8,15
64:17 65:15
70:3 73:7
75:21
**base** 76:20
**based** 31:18
54:19 60:24
84:19 94:6,9
**basically** 28:21
28:24 29:16
38:25 81:21
103:24 104:7
**basis** 52:12
54:1,2 63:2
65:20
**began** 17:19
18:8
**beginning**
33:20 57:14
**behalf** 22:25
27:6 28:18
51:3 54:15
61:10 80:2
88:11,23 92:19
98:8 100:23
**belief** 71:6 94:9
94:14
**believe** 12:2
13:22 25:25
26:2 27:20,24
28:4,12 31:8
31:20 34:10
35:23 36:18
37:12 39:22
42:9,22 43:14
49:9 51:16

52:17 53:23
57:22 59:24
62:1 64:18
68:6 88:7 93:9
94:12 95:14
97:6 98:11
99:4
**believes** 43:1
**bench** 62:18
**benefit** 10:18
34:11 35:5
41:6 43:5
44:18 47:19
**benefits** 12:18
25:14 47:16
59:15
**best** 15:5 34:10
35:14,15 36:12
67:6 100:3
**bethlehem**
46:20 47:3,5,8
**better** 37:11
90:24
**bid** 30:20 37:9
39:16 40:14
41:15 44:22,25
45:24 49:3
**bidder** 35:7
37:22 39:12
40:1,5,5 41:11
41:13,20 43:25
44:6,23 47:4
48:17,20 51:13
70:9
**bidders** 45:4
**biddings** 44:3

**billed** 91:1
**bills** 28:10
**binance** 79:18
**bit** 11:2 19:1
60:23 93:11
98:21 103:5
**bitcoin** 24:6,6
24:9,9,13,15
24:15 25:12
35:15 36:13
41:6 94:25
**blended** 24:15
91:22,23
**block** 46:3
**blockchain**
81:22 82:1
83:3
**blogs** 58:12
**bloomberg**
25:6
**bnc** 60:18
**board** 34:5
50:8,15 74:13
**body** 13:20
**bolger** 82:22
**border** 23:4
**borrower**
31:10
**borrower's**
93:10 98:13
99:8
**borrowers**
2:12 7:3 9:2
28:19,25 29:1
29:14 30:20,24
31:4,7,18
32:20,24 33:10

92:24 93:11,14
98:6,9,20
104:2,3
**bottom** 19:19
91:19
**bought** 84:24
**bowling** 2:20
**box** 13:4
**branch** 82:24
**breaking** 19:1
**breaks** 57:21
**breakup** 44:13
**brick** 35:3,3,6
35:10,12,17,18
35:20,23 36:4
36:5,8,10,15
36:23 37:12
38:1,17,23
39:11 40:16
41:15 44:20
45:4,19,24
46:6,12 47:2,2
47:3,17 49:9
49:20 50:7,10
50:15
**brick's** 36:9
**brief** 16:12
26:11 33:15
46:19 67:5
78:1 104:1,8
**briefed** 93:9
95:3,7 97:12
99:20 104:8,10
**briefing** 76:2
102:14 104:13
**briefly** 68:4
72:10,13 79:23

103:13
**briefs** 74:16
**bring** 81:24
102:25
**bringing** 31:20
58:15
**brings** 56:17
**broad** 37:10
60:12 62:2
64:3
**brother's**
85:21
**brought** 66:1
**bryant** 8:13
**btc** 7:8 46:9
**buck** 40:11
**build** 26:14,23
28:11 80:17
**built** 34:23
38:21 49:15,23
51:24
**burden** 44:17
44:19 80:14
**bureau** 74:11
**burner** 11:21
**business** 16:13
18:23 19:9
22:1 25:18
35:4,19,23
41:11 44:5,14
44:14 69:11
**busy** 10:13
15:8 33:7
**button** 101:13
**buyer** 46:8,10

**c**

**c** 8:1 10:1
52:19 60:14
107:1,1
**c&l** 13:20
**ca** 8:22
**cabin** 67:17
**caceres** 69:19
69:22,23,24,25
72:10 73:15
74:22 75:6,8
86:8,9,11,13
87:2 106:9
**caladny** 83:14
**calendar** 12:3
15:19 33:8
**call** 17:22 29:4
30:1 41:18
42:1 77:22
**called** 72:21
82:5,24
**calling** 38:10
**calls** 45:11
**careful** 67:17
**carry** 80:13
**carter** 98:8
**carving** 55:16
**case** 1:3,11,19
2:2,10 8:18
14:17 20:3
22:6 28:24
29:22 33:13
34:2,21 37:22
38:19 42:18
43:7 44:4 46:4
46:18,21 49:12
52:11 59:21

65:16 68:8
70:2 75:11
79:17 83:18
85:21 94:13
95:12 99:13
102:20 103:23
104:11
**cases** 11:13,15
14:13,15 21:1
23:6 25:16
28:6 30:14
33:14,16 34:2
34:17 36:1,20
57:11 59:9
80:3,19 94:14
**cash** 20:3
**catch** 60:12
**categories**
38:24
**cause** 28:4 59:3
60:19
**ceased** 86:15
**cede** 26:7
**cel** 5:3,13
**cell** 84:18,19
84:22,22 85:6
85:24 86:17,21
87:21 92:11
**cells** 85:16
**celsius** 1:7,16
1:25 2:8,16 6:7
6:11,15,20 7:4
8:12 10:3
17:24 20:13,15
20:23 21:1,7,9
21:10,14,16,16
21:19,21,22,22

22:1,4,7 23:1
23:14 26:10
34:11 35:4,4,5
51:8 70:22
80:2 86:16,20
86:23 92:16,24
94:23 95:25
102:8,11
**cent**  70:8
**center**  23:7
**cents**  70:4,11
71:12 72:24
75:17 77:24
80:4 84:5,5,10
84:11 85:9
**certain**  4:18
6:24 13:19
23:12 33:19
36:3 51:6
54:23 59:14
95:16 99:6
**certainly**  13:18
15:10 32:18
52:13 53:25
67:4 74:15
104:21
**certificate**  22:3
22:11
**certification**
12:8,15,17
**certified**  107:3
**chambers**
15:25 38:9
103:9,10
**chance**  15:2
42:3 73:8

**change**  95:19
101:16
**changing**
60:20
**channel**  44:9
**chaos**  68:12
**chapter**  4:13
10:19 11:15
13:2,3,8 21:1
23:6 25:16
45:7 80:3,19
81:3 82:15
**characterize**
28:22
**charts**  11:1,4
**check**  15:4
91:3
**checkbook**
89:18
**checked**  74:2
**chewed**  66:14
**chicago**  8:6
**chief**  82:22
**choice**  33:6
**choking**  50:4
**chosen**  26:13
**chris**  8:8 9:16
10:10 17:5
26:9 48:1 88:6
102:10
**christopher**
1:13 4:7 6:6
23:2 38:12,12
106:6
**circle**  90:17
**circuit**  85:21
85:22

**circuit's**  85:19
**circumstance**
55:24
**citation**  46:19
**cite**  46:20
**claim**  5:3 12:12
13:7 18:2,3,4
47:11 56:19
57:12 63:13,16
65:23 67:15
70:14 73:19,21
75:21 85:2,5,6
94:22
**claims**  5:13
12:18 13:12,14
13:15,19,19,22
23:19 46:9
51:7 55:22
57:23,25 59:23
59:25 62:16
70:14,18 73:6
73:19 75:4
79:2 83:16,23
84:3,16,17,19
84:23 85:11,12
85:13,15 86:21
86:23 95:15
**clarified**  37:1
**clarify**  57:15
**class**  12:8,14
12:16 58:15,15
75:10,11
**claw**  56:5,7
62:16 67:20
**clawing**  62:25
**clear**  24:25
49:15 50:9

57:4,15,25
59:4,25 62:10
75:1 77:6,19
78:8 94:12
102:17,23
**clearly**  27:24
47:17 64:12
70:21
**clerk**  16:19,22
**client**  67:14
76:20
**clients**  18:13
**close**  34:19
**closed**  20:25
**closely**  26:15
35:9,12
**closing**  25:5,6
**coast**  95:20
**code**  4:3,14
20:16 44:4
59:2 73:8
75:21
**cognizant**
34:21
**coin**  35:14
103:5
**coinbase**  79:18
**coins**  21:3
103:5
**collaboration**
30:13
**colleague**
16:17
**collective**  63:5
**collectively**
101:2 102:6

colodny 8:24
22:16,18 25:21
25:22,23 30:9
30:10,10 42:2
42:4,4,11,14
42:17 43:4,11
43:17 45:11
50:4 61:10,10
61:18 62:1
63:10,17 64:18
65:4,5 67:12
67:22 69:21
72:17,18 77:3
77:4,5,14 78:4
78:5,7,12
79:21 84:14,15
85:8,11,18
86:7 92:9,10
92:14 102:14
colorado 95:23
96:4 97:25
come 30:3
31:22,24 50:16
56:1 57:10
60:10,17 65:20
79:5 95:1
103:25 104:7
104:12
comes 31:15
34:25 47:24
48:24 56:5
60:2 62:3
89:14
comfortable
30:23 61:20
64:4

coming 25:8
82:12
commence
10:16
commenced
23:17
comment
32:18 78:9
97:22
commented
76:24
comments
26:11 30:16
103:21
commitment
36:3 38:2 40:8
40:22 44:1
47:6,7
committed
31:8 32:2
committee 2:4
6:19 8:19 11:9
12:14 15:11
22:17 24:2
25:23 26:16,17
26:21 27:7
30:11,13 32:10
35:2 42:5,15
42:23,25 46:2
50:7,16 51:14
52:2 56:17
61:11,14 64:25
73:12,20 74:20
74:21 75:19
77:16 78:21
80:10,17 83:15
86:4,13 93:22

101:9 102:8
103:4
committee's
30:16 73:4
common 68:24
101:23 102:5
103:23
communicate
72:2 99:13,21
communicati...
28:24 29:9
company 4:20
12:12 17:6
18:5,8,10,12
30:18 70:24
company's
18:18 20:1
compared
33:14,15 59:21
compen 64:9
compensate
38:1
compensated
49:9 50:10
compensating
42:23
compensation
5:20 6:1 37:23
38:23,25 40:15
49:16 89:6
91:22
competent
46:1 72:12
complainants
104:4
complaint 6:16
72:19 93:12,13

95:15 98:13,16
99:5,8 100:19
102:12
complaints
94:10 104:2,4
complete 88:24
completed 17:7
34:3,14,19
36:2 88:10,12
completely
63:10 77:5
81:17 96:19
103:1
complex 28:6
29:22
compliant
33:25
complicate
32:25
complicated
10:25 33:15
74:19 85:17,18
compounds
85:9
compromise
27:15
computer
90:20
concern 29:19
54:23 55:15,16
57:9
concerned
12:22 23:21
55:25
concerning
23:11 55:6

conclude 23:13
34:16 86:19
concluded
10:15 26:12
31:3 72:13
105:8
conclusion
72:4
concrete
100:25
condition
53:20 54:2
55:12 61:23
62:2 63:6 64:3
64:18 66:7
conditions
51:16,18,23
52:7 53:16
57:4 64:14
conduct 63:9
confer 79:5
conference 6:8
6:12,16,21 7:5
101:8 102:19
conferences
92:16,20
conferred
47:15
confidently
37:15
confirm 27:22
confirmation
11:13,23 14:20
26:25 27:3,17
32:24,25 37:15
56:17 73:2,18
75:4,15 78:16

78:24,24 80:12
confirmed
21:18 49:18
confirming
25:15
conflict 42:19
42:25 45:15
50:6
conflicts 39:19
connected
85:15
connection
21:17 64:10
85:6,16 88:19
94:2
consensual
11:19 32:23
33:9 84:6
88:14
consensually
84:8 86:4
99:15 104:22
consensus
26:14,23 28:11
29:18 31:5
80:18
consent 53:14
53:18 56:25
67:17
consented
103:22
consider 104:8
considerably
33:1
considerations
44:11

considered
98:18
consistent 22:1
90:19
consistently
47:13
consolidation
12:9,11,21
13:6 14:1,3,6
constituencies
79:8
constitutional
66:4
construct
30:20 49:4
consult 35:12
45:16 67:12,21
consultant
38:18 39:9,15
39:16 40:5
42:12,23 43:2
43:15 44:2
45:15 48:4,9
48:12,13 50:3
consultants
38:19
consultation
36:4,9,24
45:13,21,23
47:6,8 49:11
50:12
consulted
15:11 25:25
30:16
consulting
36:3 40:4 41:8
41:24 46:12

48:8,15
contact 34:19
contacted
71:20
contemplated
13:3
contemplates
12:11 21:13
34:9
contested
11:12 14:2
28:2
context 44:15
73:21 75:4
continue 26:15
80:19
continued 17:6
102:19
continuing
88:23
contract 19:21
54:25 58:3,4
62:13
contractual
52:12
contrary 49:8
contribution
47:11,20
conversion
103:4
convert 35:14
36:13 46:9
converted 18:4
converting
41:5
convinced
45:22

**cooperating**
63:22
**cooperation**
64:10,13 68:20
**cooperative**
88:22
**coordinate**
16:7 66:15
**coordinated**
35:9
**coordinating**
24:1
**copied** 104:5
**copy** 98:12
**cordry** 76:7,9
76:12,15,16,19
79:7,9,10
**cornell** 9:13
32:6,7 37:20
42:3 43:20,21
43:22 45:10
49:8 50:2
**corp** 46:20
**corporate**
21:18
**correct** 30:18
42:22 63:17
72:18 77:14
78:12 83:19,24
83:25 85:4,8
85:10 86:7
91:11,12 93:1
**correctly** 54:16
98:14
**cost** 35:22,24
36:19,20 46:14
48:24 64:1

**costly** 80:12
**costs** 45:4 51:6
63:22 64:7
**counsel** 8:12
20:8,13 32:10
32:10 46:25
66:15,19 68:2
68:21 72:1
73:11 76:21
77:2 78:21
87:8,18 88:3
92:10 93:14,18
93:22 97:6,7
98:15 99:3,14
100:12,22
**count** 73:25
**countenance**
53:10 68:7
**counter** 24:7
**counterparty**
41:17
**country** 107:21
**couple** 43:7
46:16 58:25
**course** 11:24
19:20 21:17,24
23:14 33:24
34:17 35:1,22
37:10 80:25
**court** 1:1 2:19
10:2,6,9 11:2,6
11:17 12:6,20
13:11,24 14:8
14:11 15:3,6
15:21 16:1,4,9
16:14 17:3,24
18:25 20:6,9

20:12 21:13
22:16,20,23
23:3,16,19
24:3 25:21
26:4,8 27:10
28:14,16 30:6
30:8 32:4,15
33:1 38:8 39:4
39:8,10,14,25
40:3,14,19
41:2,21 42:2,8
42:12,15,22
43:9,13,20
45:9 47:23
48:5,10,15,18
48:22,25 50:17
50:20,22,25
51:10,15 52:4
52:15,22,24
53:2,5,12,14
53:16,18,20,21
53:23 54:3,7
54:11,13,20,24
55:2,5,8,18,21
55:25 56:3,8
56:11,13,21,22
57:7 58:6,17
59:5,7 60:5
61:7,9,17,22
61:25 62:3,7
62:12,15,23
63:8,14,16
64:8,17,20
65:5,15 66:9
67:8,11,25
68:6,12,13
69:3,11,12,18

69:23,25 70:17
70:20 71:9,17
72:10,19 73:17
73:24 74:7
75:3,13 76:11
76:14,19 77:4
77:11 78:3,6
78:10,14 79:15
79:22,25 80:6
80:23 83:10,12
83:20 84:1,9
84:12,13 85:1
85:10,14,17
86:1,2,9,12,25
87:3,7,13,17
87:19 88:2,7,8
88:19 89:4,19
90:3,5,7,9,12
90:15 91:3,9
91:14,16,18,20
92:6,9,13,15
92:21,24 93:2
93:5,17,24
94:4,9,19 95:2
95:9,13,17,24
96:8,11,13,15
96:17,24 97:3
97:7,11,14,21
98:5,24 99:2
99:10,21 100:2
100:4,16,21
101:5,7,12,16
101:18,21,25
102:21,25
103:10,12,16
104:16,21
105:1,4,7

court's 20:19
22:6 44:13
64:8 75:24
courtroom
10:7,11,13
28:19 98:2
105:5
coverage 68:11
covered 58:22
covers 85:23
create 14:22
68:8,12
creating 75:10
creditor 13:20
47:2 51:12,21
69:25 70:19
103:15
creditor's 24:2
46:24
creditors 2:4
5:8,16 6:20
8:19 10:18
25:23 29:17
30:11 31:16
34:12 35:5,18
42:5 51:14
52:3 61:11
70:7 74:5 77:1
77:20,23 83:18
83:21
cross 23:4
crypto 33:5
76:4,5
cryptocurren...
80:25
cryptocurrency
5:5 14:22

23:12 24:10
31:14,17 33:22
35:18 36:13
41:9
current 17:3
20:1 25:9
82:22 85:8
93:23
currently
21:15 23:20
25:10 45:22
81:3
custody 11:5
17:8,12,13,13
17:16 26:18
customer
70:22 71:1,2
72:8
customers
23:12,22
cut 51:15 98:25
cuts 11:20
cycle 88:13

d

d 10:1 106:1
d&o 51:19
d'antonio
92:19,23 93:1
93:4,4,6,18
94:1,5 95:11
95:14 96:7,12
97:2,5
d'd'antonio
92:18
daily 24:18
damages 84:24
85:3,4

dan 8:9 22:25
80:1
danger 86:22
data 81:18
date 5:6,13
15:12,18,25
17:7 18:5,9
25:6 27:3 37:2
57:19,20 58:1
61:15 72:25
87:11 93:20
107:25
dates 16:5
102:23
david 9:6
28:17 98:8
day 19:23
24:19 27:1
28:12 41:18,18
61:15 70:4
99:21
days 12:3
15:14,15,16
27:20 30:3
32:13,17 43:7
77:8 78:17
106:8
deadline 15:16
22:9
deal 29:6 32:22
34:10 45:16
46:8 69:19
79:6 97:1 98:5
104:13
dealing 102:2
deals 104:14

dealt 79:1
87:22
deanna 16:4,16
debrief 22:19
debt 82:19
debtor 1:9 8:4
15:11 29:2,9
39:15,17 43:1
43:15,18 45:14
45:18 46:23
49:17 52:2
56:16 64:13,16
64:25 71:6,8
73:20 74:20
75:20 86:3
debtor's 7:7
10:17 11:11
13:4 14:14
20:8 23:2,9
24:5 25:17
30:12 35:14,16
36:7 37:18,25
41:5 42:6,20
87:8 92:19
93:7,9 94:6
100:21 103:5
debtors 4:6,11
4:12 5:7,14
6:23 10:11
11:5,9 12:14
13:8 23:1,5,25
24:12,20 25:4
25:15,19 26:10
27:7 28:22
29:13 30:13,15
32:10 33:21
35:2,23 36:4

36:12 37:22
38:5 44:4,12
44:17,19,21,22
46:2,19,20,24
48:4,14 52:18
54:15 55:19
56:6 70:1,6,10
71:21,22 78:21
78:21 80:2,10
80:13 93:12,14
**december**
20:21 21:7
**decide** 36:12
58:22 73:24
75:3 86:17
95:5 100:5,6
102:6,18
**decided** 100:10
**decides** 43:11
**deciding**
100:11
**decision** 12:23
39:5 59:8,9
60:2,2
**decisions** 58:1
60:1
**declaration**
38:9,10,11,12
38:13 49:2
**declared** 19:5
**decrease** 20:4
**decreases**
19:13
**deep** 41:7
**defendant**
72:20

**defendants**
1:17,24 2:7,15
58:19
**defense** 51:6
66:3,5,10
**defer** 42:7
99:16
**deferred** 88:16
88:18
**definitive**
27:12
**defrauded**
84:24
**delaware** 5:20
**delay** 11:14
36:19
**delicate** 31:14
**delineate** 90:1
**demanded**
70:7
**demonstrably**
81:4 82:20
**demonstrate**
70:21
**demonstrated**
28:5
**demonstrating**
44:20
**denied** 50:17
106:10
**deny** 99:20
**denying** 74:25
76:1 78:14
87:20
**department**
9:8

**depend** 76:4
**depending**
15:18 51:16
**depends** 40:18
40:21
**deployed** 18:19
19:7,22
**deposit** 21:22
**deposited** 18:9
**deposits** 94:22
94:22
**depreciation**
19:10
**derivative**
81:13 83:7
**derive** 58:7,20
**described**
61:13
**description**
10:23
**designated**
21:10,21
**desist** 86:15
**desk** 71:18,19
**detail** 37:20
**detailing** 11:1
11:4
**determination**
44:13 62:23
72:22 74:7
84:12
**determine**
46:15 61:6
63:8 85:14
**determined**
62:22 66:2
85:25 87:10

**develop** 26:16
**die** 102:23
**difference**
13:22 41:12
87:12
**different** 35:13
49:4,23 63:14
79:19,19 85:22
98:21
**difficult** 87:4
**direct** 13:14
51:7
**directly** 13:12
13:15 70:12
**director** 62:5
**directors** 56:18
57:17 58:18
63:25 66:11
68:16
**disadvantage**
100:10
**disagree** 77:21
**disagrees**
73:20
**disallow** 85:19
**disclosed** 37:8
40:23
**disclosure**
10:20,22 11:22
14:18,19,25
15:7,8,9,12,22
26:13,16,24
28:8,9 31:12
34:15 37:14
49:25 75:14
**discontinue**
20:22

Page 14

**discount** 24:22
25:11,13
**discretion** 64:3
**discuss** 31:11
46:17 76:22
93:11,19
**discussed**
10:21 32:19
43:25 93:16
**discussion**
31:18
**discussions**
29:24 30:19
31:24
**dismiss** 6:16
93:8 94:7,9
95:3
**dispositive**
93:8
**dispute** 12:2,13
**disputes** 11:18
84:7 102:15
104:16
**dissolve** 24:25
**distribute** 41:9
57:14
**distributed**
13:5 17:9
21:12
**distribution**
18:1 35:15
36:15,16 52:9
53:11 61:1
63:19,20
**distributions**
35:11,17

**district** 1:2
28:5
**divisive** 80:3
**doc** 6:8,12,17
6:21 7:5,9
**docket** 4:4,8,14
4:21,24 5:9,17
5:23 6:4 7:1
16:16 82:18
**documents**
25:1 27:12
**doing** 37:24
41:2 50:11
60:13 90:24
97:24 98:1
**dollarize** 5:13
**dollars** 59:19
**dolowich** 51:3
**domestically**
81:25
**doubt** 73:16
80:6
**downside**
81:17 82:13
83:8
**draft** 19:19
**drawing** 34:5
50:8,15 66:19
**drawn** 78:7
**drop** 67:4
**dropped** 28:24
39:1 77:20
82:10
**dry** 66:18
**duly** 4:18
**duplicate**
98:12

**duplication**
46:5 66:16
68:22
**duplicative**
46:12

**e**

**e** 3:1,1 8:1,1
10:1,1 42:21
46:9 106:1
107:1
**e.d.n.y** 47:12
**earlier** 44:1
45:14 65:25
72:15 93:16
103:6
**early** 15:18
18:4 19:16,21
29:8 59:21
93:12
**earn** 5:3,8,16
24:23 86:19
**earned** 12:21
12:24 13:14
26:22 29:17
30:25 31:10,16
36:8
**east** 95:19
**eat** 60:16
**eaten** 52:24
53:3 63:25
**ebidta** 18:22
18:23 19:8
**ebitda** 19:7
**economic**
37:19 43:4
47:14,18

**ecro** 3:5
**effect** 67:17
**effective** 35:8
36:5 38:4
49:19
**effectively**
18:24 19:9
**efficient** 94:17
104:14
**effort** 90:1
**efforts** 33:9
46:5,25 66:15
**either** 13:6
24:20 44:3
47:5 56:3,5,21
56:22 58:8
59:7 73:18
75:4 84:2
94:24
**elect** 24:24
**electronic** 22:8
**elements** 104:5
**eleventh** 77:20
**eligible** 17:19
17:21 18:2,6
18:11
**elizabeth** 54:14
**ellis** 8:3 10:10
22:25 54:15
80:1 92:19
93:4
**email** 22:9
**emails** 71:3
**embark** 99:17
**emerge** 41:1
**employee**
64:12

employees  64:9
encroach  61:5
endeavor
   15:22
ended  18:21
   19:6
endgame  14:14
energy  44:7,9
enforce  56:7
engaged  45:20
   88:23 93:14
english  9:1
   10:23 23:17
   28:18 98:8
enormous
   81:23
ensure  23:24
   36:5 38:4
   40:12 48:17
ensures  36:6
ensuring  40:11
enter  92:3
entered  12:23
   14:7 20:21
   35:5 88:13
enterprises
   47:11
entire  47:14
   81:12
entirely  30:18
   31:3
entirety  37:1
entitled  40:3
   40:16 44:20
   49:9,13,17,20
   58:9 59:15
   62:14,24 74:6

74:22
entitlements
   31:19
entity  23:14
   45:19
entry  4:6,11
   5:2,12 6:23 7:7
   23:5
environmental
   44:7
equal  72:5
equally  80:4
equitable  5:4
   23:24 61:1,2
   63:15
equitably
   70:18
equity  5:5
   41:13
especially
   98:19
essentially
   13:24 27:16
   28:23 52:5,18
   57:23
establish  72:25
   73:1
establishing
   42:25
estate  12:18
   31:2 36:10
   45:20 47:16,19
   54:19 63:21,23
   64:1,6 87:15
estate's  40:10
estates  11:11
   14:6 25:9

30:23 36:7
   38:1 44:18
estimated  11:6
et  1:16,21,25
   2:8,16 6:7,10
   6:11,14,15 7:4
   99:14
euclid  4:17
   51:3 56:6
evaded  75:3
evaluate  46:22
evaluating
   44:6 47:10
   59:2
event  62:8
eventually
   82:2
everybody
   31:20 66:18,21
   68:25 78:2
evidence  5:7
   5:15 70:20
   71:17 72:12
evidentiary
   14:2 38:7 39:1
   39:2
exacerbate
   68:9
exactly  48:5
   59:13 69:15,16
   80:9 91:7
examiner  5:21
   6:1 70:23,24
   71:1 72:12
   88:2,3,12,24
   89:21,24

examiner's
   72:11 82:8,21
   84:20 89:5,5,8
   89:18,20
example  55:18
   62:22,25 66:1
   72:7
exasperated
   39:19
exceed  37:2
   57:24 59:24
excel  71:5
excellent  33:6
excess  68:10
   94:22
exchange
   11:15 36:9
   45:5 81:3,19
   82:23,23
exchanges  82:1
exclusive  4:12
   27:2
exclusivity
   26:10 27:6,16
   27:18,23 28:2
   28:2,22 29:12
   29:20 30:3,12
   32:9,16 33:11
   33:13 37:17
   77:25
excuse  90:21
   101:19
excused  69:11
   69:13,18 92:12
executable
   34:2

executed  40:15

executive
  10:22,25

exercise  22:1
  25:18

exhibit  89:7
  90:1,3,5,9,19

exist  31:19
  61:3

existed  81:22

existing  104:5

exists  59:3
  60:19

exit  14:21
  34:25 40:21

expanded
  46:15

expect  40:16
  40:24 41:13,14
  66:19 74:8

expectation
  41:16

expense  37:1,4
  40:23 44:1
  47:7 89:7

expenses  5:22
  6:4,24 36:3
  44:14 89:25

expensive
  11:14 34:4

experience
  66:12 67:2

explain  10:24
  38:16 42:16

express  72:9

extend  32:17
  36:1 56:24

106:8

extended  30:19
  30:20

extending  4:12
  32:16

extension  27:1
  27:23,24 28:13
  29:12 32:9,12
  32:13

extent  4:21
  42:6 51:21
  56:4 59:11
  62:3,12 63:12
  63:24 64:4
  66:16 67:15

extents  43:5

extra  52:12

extremely  31:5

**f**

f  3:1 107:1

f3d  44:8,9,16

face  24:25

faced  33:1

fact  65:24
  72:23

factor  59:4

factors  28:5
  59:3

fahrenheit
  10:19 14:15
  34:2,9 35:20
  36:1 41:12
  45:25 46:8,13
  49:2,18

failed  44:19

fair  60:22
  68:19 72:5

74:6 75:9
76:25 78:9,11
80:16 84:14,15
100:14,16

fairbank  10:15

fairly  58:2
  70:18

faith  28:7
  62:24 64:14,15

fall  29:23
  94:14 103:1

fallen  29:3

falls  59:10

familiar  26:1

far  56:24 61:17
  61:18 87:3
  104:24

fashion  59:5

fashioned  61:3

fast  33:23

faulting  78:3
  78:10

february  5:22
  6:3 88:24
  89:10 93:12
  98:12

federal  4:3
  20:17

fee  5:20,22 6:1
  6:3 11:20 36:3
  36:8,24,25
  40:8,22,25
  42:12 47:8
  49:11,14 50:12
  88:2,2,3,3,11
  88:13,15,17,20
  88:22,24 89:1

89:2,17,19,19
89:21,22,23,24

feel  77:1,15

fees  6:24 17:17
  33:19 36:3,6
  36:18,23 37:6
  37:24 38:1,21
  40:4,7 43:1,25
  44:1,2,7,13,19
  44:20,23 45:13
  46:15,22,24
  47:6,6 48:2
  49:14,23 88:14
  89:9,10,24
  91:21

feld  8:11 20:11

fell  29:14 32:21

ferraro  4:7
  9:16 16:12,25
  17:1,2,5 18:17
  18:19 19:3,25
  20:2 23:2
  38:12,13 106:2

fiduciary
  37:11

field  31:22
  45:24

fight  76:25
  78:9,11 80:12
  80:16 100:14
  100:16

figure  95:20

file  15:17 22:17
  32:8 34:15
  38:17 39:18
  42:19 70:20
  73:19,20

[file - giorgio]                                                                                      Page 17

102:22
**filed**  10:18,20
   14:18 16:15
   20:18,19 21:19
   22:4,11,12,13
   26:13 28:20
   34:8 37:8,21
   38:9,13 45:1
   53:19 63:13,13
   65:23 67:14
   69:22 77:18
   79:17 86:15
   87:19 89:23
   91:5 93:12
   98:11,13 103:3
   104:6,6
**filing**  15:25
   28:7 31:6
   36:23 38:16
   71:22 77:6
**finalize**  36:16
**finally**  18:8
   37:8
**finance**  21:18
   34:24
**financial**  4:17
   20:1 46:1 51:4
   51:19 59:8
   82:22
**find**  31:9 65:16
**fine**  16:14
   61:21 62:11
   88:8 91:14,14
   95:23 97:25
**finish**  28:14
   98:25

**finishes**  71:9
**firm**  97:19
**firmly**  54:9
**firms**  91:21
**first**  5:19,25
   17:17 28:20
   29:9 39:8
   65:14,19,20
   84:2 88:10,13
   88:15,25 92:16
   97:16 98:9
**fits**  47:8
**five**  89:22,25
   90:18
**flash**  76:8
**flashed**  76:10
**florida**  99:7
**flower**  8:20
**focus**  31:1
   38:15
**focused**  31:3
   33:21 34:1
**follow**  39:20
   42:7
**followed**  83:4
**following**
   93:15 97:17
**forcibly**  66:5
**forecast**  53:7
**foregoing**
   107:3
**foreign**  4:7
   23:2,7 106:7
**forgive**  101:10
   101:11
**form**  103:6

**formal**  103:19
**format**  52:6
**former**  62:4
**forming**  71:25
**formulating**
   47:1
**forth**  22:6
   52:18 106:9
**forward**  10:12
   26:3 29:7
   30:23 33:16
   37:4 46:13
   49:17 77:17
   88:18 98:4
**found**  47:12
   66:14
**four**  89:22
**framework**
   31:7,25 32:1
**frankly**  90:16
**fraud**  84:17,21
   85:4,5,11,16
**fraudulent**
   102:12
**free**  42:19,25
   50:6
**frequently**
   57:10
**front**  13:18
   99:20 102:1
**froze**  94:23
**ftx**  71:14 81:2
   81:2,18 82:4
   82:15,23,23
   83:5
**full**  13:2 51:22
   77:17 83:22

**fully**  21:10
   33:24 74:22
   93:9 95:3,7
   97:12 99:19
   104:8
**function**  52:3
**functions**
   46:11
**fund**  48:14
**funds**  56:8
   70:22 72:8
**further**  21:13
   36:1 45:2,2
   47:13,17 69:10
   96:23
**future**  10:13
   53:7 55:1,3
   62:9 87:22

---

**g**

**g**  10:1
**gambit**  94:14
**gemini's**  36:15
**general**  58:13
   79:11 97:22
**general's**  74:12
**generally**
   61:24 67:2
**generating**
   86:23
**georgiou**  1:21
   6:10,14
**getting**  11:13
   60:21 66:17
**giorgio**  92:21
   93:7,25 95:10
   96:1,3 97:1,3
   97:10 98:21

99:3,3,14,14
100:24
**give** 16:4 17:22
  31:15 42:3
  55:18 80:22
  81:5 96:20
**given** 12:1
  13:21 23:7
  24:22 26:11
  34:24 41:18
  94:2
**gives** 62:1 64:3
**giving** 15:1
  95:5
**gk8** 11:16
**glad** 103:19
**glenn** 3:2
**global** 56:2
  59:8,18
**go** 15:23 28:21
  29:7,15 31:25
  34:5 37:4
  41:25 46:12
  47:25 48:18
  50:8,15 59:18
  60:7 61:17,18
  69:1,23 75:7
  77:4 79:25
  86:9,9 87:7
  88:18 90:15
  94:4,20 98:24
  103:8
**goal** 57:2 59:14
  59:16 60:15
**godfrey** 6:2
  88:11

**goes** 40:12
  49:19
**going** 11:18
  12:15 14:13
  16:17 29:7,17
  29:23 30:17
  38:23,25 39:5
  39:14,18 41:17
  41:21 46:6,14
  49:12,13,17
  50:2,5,8,13
  55:7 57:24
  58:23 59:16,24
  60:3 62:17
  65:1 68:24
  69:3 73:24
  75:3,3,14,18
  75:25 78:17,17
  78:19 79:4,4
  79:13 81:8
  83:21 86:16
  88:4,7 91:5
  95:5
**good** 10:2,5,8,9
  15:23 16:2,24
  17:2,5 20:10
  20:12,13 22:24
  25:22 26:2
  28:7,17 32:6
  51:2 54:14
  64:14,14 65:10
  88:5,5 92:18
  97:8,9 98:7,7
**goodness** 90:21
**grant** 22:15
  66:8

**granted** 14:7
  22:21 24:3
  26:5 32:17
  33:17 106:5,7
  106:8
**granting** 4:8
  4:14 5:9,16
  6:25 7:9 51:17
**gray** 55:17
**great** 10:11
  16:7,15 44:25
**green** 2:20
**group** 2:12 5:3
  5:8,16 7:3 9:2
  10:16 14:15
  17:25 18:1,7
  26:22,22 27:7
  28:18 29:1,10
  29:14,17 30:19
  30:25 31:10,10
  31:15 51:19
  59:8 63:5
  70:19 71:15,24
  72:1 77:1
  79:13 88:17
  92:24 93:10,22
  98:6,9,12,20
  100:11 104:1,3
**groups** 31:15
  31:19
**grown** 74:2
**gump** 8:11
  20:11

**h**

**h** 16:20
**hand** 16:20
  20:4 32:1

37:14
**happen** 25:7
  32:3 62:8 69:1
  78:20
**happened**
  34:22,24
  104:23
**happening**
  66:22
**happy** 31:16
  47:21 57:3
  67:4 70:20
  71:16 76:14
  89:2 94:15
**harms** 54:20
  59:4
**hashing** 19:12
**hauer** 8:11
  20:11
**havoc** 68:12
**head** 65:22
**headed** 14:21
  80:13
**hear** 42:2 65:2
  68:2 76:14
  94:2,8,16
  97:16 100:5
**heard** 22:21
  26:5 30:8 32:5
  32:16 47:24
  54:13 61:9
  65:6,7,12,15
  68:1,2 76:7
  77:7 79:24
  87:22 91:25
  99:23 103:12

hearing 4:1,6
4:11,17,24 5:2
5:12,19,25
6:23 7:7 10:14
10:21 11:25
14:2,24 15:1
15:12,15,16,25
26:12 37:15
62:6 72:15
74:6,8 78:17
78:24 88:16,20
91:6 92:4 95:4
95:25 96:19
97:25 100:7
102:13
hearings 20:20
28:3 32:19
97:23
hearsay 72:11
heart 19:15
held 11:16
21:25 71:5
74:5 90:1
hello 17:1
help 10:24,24
23:12,23 31:21
36:12
helpful 34:22
36:16
hermann
101:19,20,21
101:21,23
103:12,14,15
103:17,18
104:20,24,25
hey 17:5

high 23:3
66:18
higher 84:24
highlight 12:1
81:16 82:19,21
highly 24:17
hire 38:19
45:14
hired 48:3
hiring 72:1
historically
25:12
hit 65:13,22
hoc 2:12 7:3
9:2 17:25 18:1
18:7 26:22,22
27:6 28:18
29:1,10,14,17
29:23 92:23,24
93:10,22 98:6
98:9,12,20
100:1,10,18
104:1,3,6
hogan 65:11
hold 12:4
24:12 81:19
89:9 90:9
holdback 90:7
holder 70:13
86:21
holders 5:3
11:9,11 12:14
12:16 26:19
70:7 71:15,20
71:23,24 72:6
83:16,22 84:3
84:10 93:23

holding 24:10
holdings 24:22
hon 3:2
honor 10:5,8
10:14 11:3,7
12:2,10 13:17
14:4,12,25
15:13 17:6
19:3 20:5,7,10
20:14,21 22:15
22:18,22,24
23:5,8,18,23
23:25 24:4,6
24:11,17 25:4
25:7,13,22
26:6,10 27:19
28:17 29:5,21
30:5,7,10
31:13 32:6,14
33:18,20 38:5
39:2,6,22 40:7
41:23 42:4,14
42:17 43:11,17
43:21 45:13
46:18 47:21
48:1,19 50:14
50:21 51:2,4,8
51:11,13 52:1
52:17,20,23
53:1,9,19 54:5
54:10,14,16
55:14 57:1,8
58:25 61:10,19
63:10,17,21
64:4 65:4,10
65:13,21 66:1
66:6 67:1,9,23

68:4 69:2,9,10
69:16,21,24
71:15 72:4,7
75:8 76:9 77:3
77:5,18 78:13
79:9,21,23
80:3,15,21
83:19 86:8
87:2,5,24,25
88:5,10 90:17
92:8,10,18
93:1 94:2,7,16
95:8,12 96:12
96:16,22 97:8
97:9,13,18,20
98:3,8 99:9,25
100:15 101:4
101:10,10,17
101:19 102:10
103:11,14,19
104:25 105:3
honor's 53:8
93:6
hook 55:9
hope 27:14
60:15 68:19
69:5 75:25
76:2,20 78:20
79:7 103:25
104:7
hopefully
64:25 99:18
hopes 72:1
host 16:22
35:13
hour 74:3
77:12,20

[hourly - initial]                                                          Page 20

hourly  91:22
    91:23
hours  46:14
huge  68:8,8
hundreds
    59:19
hurley  8:16
    20:10,11,12,13
    22:19,22
hurts  70:12
hybrid  4:1,6
    4:11,17,24 5:2
    5:12,19,25 6:8
    6:12,16,21,23
    7:7 20:20
    97:23
hyde  7:25
    107:3,8

            i

idea  80:7
identical  13:21
identify  37:11
ii  4:8,14 5:6,14
    6:25 7:8
iii  5:8,16
il  8:6
illiquid  10:17
    24:18 25:16,24
    34:11 35:16
imaginable
    83:21
immanuel
    101:20 103:15
immediately
    78:23 97:16
imminently
    36:18

impact  12:6,24
impacted  22:7
implement
    52:8 53:20
implementati...
    52:9
implemented
    54:2
importance
    12:2 49:5
important
    11:12 31:5
    32:23 33:10
    37:13 48:20
    49:1 73:15
    75:2,16,22
    76:23 78:25
    80:18 81:1
    83:6
impose  55:13
    58:7,20 61:22
    63:5 65:17
    66:24
improper
    55:12
inbox  71:4
incidental
    47:15,19
include  26:21
    53:13 85:3
included  49:7
    51:16 53:24
    56:12 99:24
includes  10:22
    11:1 34:12
    37:10 47:6
    71:12

including  11:3
    21:3,17 22:5
    36:8 43:25
    104:5
income  18:24
    19:9
incoming
    17:22
incorporates
    89:22
increase  18:20
    19:6,23 25:14
increased
    19:22
incredibly
    11:14
indefinitely
    100:25
independent
    57:17 68:16
indicated
    14:25 52:5
indirect  24:8
indiscernible
    13:13 17:7,10
    17:11,11,13,17
    17:17,20 18:3
    18:15,21,22
    19:4,8,10,10
    19:11,13,15,17
    19:19,20,21
    20:4,5 24:11
    25:13 26:22
    36:11,13,14
    41:5,6,7 43:24
    44:7,8,8,9,9,10
    44:21,22 45:8

45:17,21 46:3
    46:23 47:12
    51:7 54:6 58:4
    58:16 59:2
    68:11 70:1,4,5
    70:5,7,8,10,13
    70:14,15,16,17
    70:19,21 71:4
    71:4,5,11,21
    72:6 75:11
    76:12,16,18
    80:24 81:24
    82:4,14,15,20
    83:1,1,5 84:25
    85:19 86:18,23
    88:1 90:4,6,8
    90:25 92:11
    93:2 100:9
    101:24 103:5,7
    104:20
individual
    53:13,17,22
    56:7 60:7
    68:23 99:6
individuals
    24:8 55:6 58:9
    58:22 63:6
    84:22
industry  33:22
inequitable  5:7
    5:15 23:15
information
    50:1 60:24
    61:4 71:6,8,12
    71:13
initial  10:20

ink 78:7
insider 5:3,13
　70:12
insiders 71:25
insight 59:25
insolvency
　23:4
instance 32:9
institution
　4:17
institutions
　24:8
insurance 4:20
　50:24 52:16
　53:25 55:6,8
　56:14,18,19,22
　57:10 58:9
　59:9 60:16
　61:12,20,23
　62:17,19,21
　63:1,7,11,24
　63:25 64:24
　66:12 67:19,19
　68:10
insured 62:24
　66:17
insureds 51:6
　53:14,17 56:8
　59:12,15 60:7
　63:6 65:6,19
　67:7 68:1
insurer 66:20
　68:19
insurer's 68:2
insurers 55:4
　61:5 66:15
　68:10,21

integral 47:1
intend 14:18
　33:18 77:17
intended 10:23
　24:9
intercompany
　13:7
interest 23:8
　24:24 47:14,18
　78:22 81:6,14
interested
　78:22
interesting
　90:22
interim 5:19
　5:19,25 88:13
　88:15,17,25
　94:13
internal 57:10
international
　81:3
interpretation
　94:11 98:22
interrogatory
　104:9
intervene
　70:17
investment
　26:1 46:1
invoice 89:8,9
invoke 54:24
invoked 65:16
involved 45:17
　75:10 93:19
　104:23
involves 50:12
　98:21

iovine 87:5,7,8
　87:15,18,24
iron 100:22
issue 13:25
　29:9,10 30:21
　40:9 42:16
　52:7 56:9
　60:18 62:15
　63:14 64:22
　68:6 69:15,17
　73:9,12,18
　74:22 75:2,2
　75:18,19 76:2
　76:3,15,22,23
　76:23 77:25
　78:18 79:1,12
　79:14,19,19
　80:3 82:11
　84:17 85:23,24
　95:12 103:23
　104:1
issued 51:8
　86:19,23
issues 11:12
　12:8 28:21
　32:23 33:1,10
　33:12 35:13
　45:16 51:20,20
　55:6,9 56:1,2
　60:14,22 63:8
　66:11 67:15
　68:10,22 73:14
　74:19 75:22,23
　79:3 84:2 86:5
　87:4,13 94:6
　94:16 95:6
　98:22 99:7,11

99:19 100:8,9
　101:24 102:6
　104:3
it'll 96:9
item 23:1 24:4
　69:14

**j**

january 19:21
jersey 72:16,19
　74:11 86:15
joe 92:18 93:4
join 5:3
jones 54:14,15
　55:14,24 57:1
　57:8 58:24
　59:10 60:11
　61:8 63:18
judge 3:3
　26:20 29:16
　31:21 33:2
　47:10 82:11
　88:9 91:17
　92:5 93:20
judgment 22:2
　23:20,21 25:18
　35:24 43:14
　44:5,12,14
july 11:25 12:3
　12:5 25:7
　26:20 27:14
　28:12 31:23
　88:16,19 95:25
　96:3,9,10
　97:16,19
　101:14 107:25
june 2:23
　18:10 19:16,17

20:18,19 22:4
22:10,11 28:25
29:3,25 30:1
81:5,11
**junior** 65:15
**jurisdiction**
53:14,18,22
54:23,24 55:5
55:8,10,11,11
55:20,21 56:3
56:13,23 61:24
62:16 63:7,15
64:17,24 65:22
65:25 66:3
67:14,16,16,18
69:6
**jurisdictional**
61:19
**jurisdictions**
18:15
**justice** 9:8 23:3
67:3
**justification**
70:9
**justify** 55:9
71:11

**k**

**k** 16:20
**kahn** 6:2 88:11
**karen** 3:5
79:10
**katherine**
88:11
**kaufman** 51:3
**keenly** 66:11
66:22

**keep** 33:16
45:24
**keeps** 81:12
**kevin** 51:2 68:4
**keys** 24:10
**khosrabi** 16:17
**kind** 18:1
51:11,15 65:17
104:12
**kirkland** 8:3
10:10 22:25
54:15 80:1
87:8 92:19
93:4 102:11
**knew** 29:6
**know** 14:24
15:1 16:2,10
29:25 39:4,17
39:19 43:13
46:16 48:10
49:1,19,19,21
52:11 53:5
55:12,25 56:21
57:9 58:12,17
58:18 59:22
60:10,11,24
63:15 68:20
73:4,22 74:4,7
75:5,6,11,12
78:5 83:13
88:12 89:14
90:13 95:15,18
96:17 97:4
98:23 99:16,19
99:23 100:6,20
103:21 104:10
104:12

**knowing** 79:3
**knowledge**
41:8 100:3
**knowledgeable**
33:5
**known** 22:8
57:23
**knows** 88:10
**koenig** 8:8 10:5
10:8,9,10,10
11:3,7 12:10
13:1,17 14:4,9
14:12 15:4,13
15:23 16:2,7
16:10,15,20,24
17:2 18:17
19:25 20:7
26:7,9,9 27:11
33:18 39:2,6
39:11,22 40:1
40:6,18,21
41:4,23 47:23
47:24 48:1,2,7
48:13,16,19,23
50:14,19,21,23
51:1 67:12,21
102:8,10,11,24
103:2,11 105:1
105:3,6

**l**

**la** 8:5
**lack** 28:23 29:9
29:10 81:1
**landis** 65:12
69:14
**language** 57:2
65:1 67:13,22

**knowing** 69:5
**large** 24:22
25:24 28:6
33:15 71:20
74:5 88:16
**largely** 104:23
**larger** 85:15
**late** 10:19 12:3
35:11 38:13,16
39:3 75:11
**latest** 71:22
**law** 44:4 51:17
70:3 94:13
95:11 103:23
104:10
**lawsuit** 72:16
**lawyer** 65:15
66:9
**lawyers** 74:10
74:13
**lay** 78:1
**lead** 30:18
**leaves** 101:8
**leaving** 66:17
**lectern** 20:8
26:7 50:23
**ledanski** 7:25
107:3,8
**lee** 1:13 6:6
**leeman** 85:21
**left** 19:19
64:11 79:2
**legal** 31:19
44:22 54:1
60:7,8 107:20
**lending** 98:22

leon 65:12,23
  69:14
letter 82:18
letters 74:1,3
  77:11
level 30:12
  31:21 47:20
levels 52:16
liability 51:7
lift 59:3 60:19
lifted 62:20
  63:2
lifting 54:17,17
light 27:25
  28:2 36:19
  102:15
likely 36:22
  68:11 101:1
limit 52:19,20
  66:17
limited 6:20
  27:19 32:13
  57:5 59:17,20
  62:5 66:14
  68:18 102:9
limiting 61:20
limits 59:24
line 17:14 18:9
  59:11 106:3
lines 59:17
linger 69:7
linked 62:19
liquid 5:5
  10:17 14:21
  31:14,17 34:11
  35:17 41:9
  46:10

liquidate 35:4
liquidated
  94:24
liquidity 25:14
list 22:6 74:8
  74:12,14
listen 103:13
literally 52:12
litigation 11:10
  11:13 12:4
  25:2 58:17
  62:23 66:10
  68:11 102:16
little 11:2
  18:25 19:1
  60:23 93:11
  98:21
lived 99:7
llc 1:7,16,25
  2:8,16 4:18
  5:20 6:7,11,15
  7:4 10:3 13:15
  21:23 47:11
  51:4
lloyds 4:19
llp 8:3,11,18
  9:1 44:9
loan 26:21 27:6
  94:5,11,24
loans 11:5
  13:19 30:20
lock 37:13
london 4:19
long 10:15,22
  16:3,10 34:4
  65:14 69:7

longer 19:18
look 15:2 39:6
  43:4 48:2,19
  58:12 66:13
  78:14 79:9
  86:17 89:7,13
  91:3 97:22
  98:3
looked 43:8
  90:23
looking 10:12
  59:1 61:16
  74:7 89:15
  90:20 96:7
looks 80:12
los 8:22
losing 44:21
lot 29:22 33:14
  36:10 46:3
  48:21,23 53:5
  56:2 57:10
  59:22,23 61:2
  61:13 66:10
  68:14 78:7
  104:4
lotona 8:9
  22:24,25 23:18
  24:4 25:24
  26:6 79:23
  80:1,1,9 83:12
  83:14,19,25
  87:25
lots 38:21
  49:14 87:14
lovells 65:11
luckily 85:19

m

machines
  18:20 19:5,12
made 13:9,20
  27:25 28:6
  31:6 51:7
  57:13 58:1
  74:25 94:12
mail 22:8
main 23:7,7
  54:23 55:15
maintaining
  33:22
maintenance
  19:15
majority 13:18
  24:24
make 15:21
  16:18 33:24
  35:9,11,16,17
  35:18 41:25
  48:2,9,13 57:4
  60:2 66:21
  67:6 70:17
  75:1 77:19
  78:8 84:23
  88:7 91:6
  96:25
makes 27:22
making 32:2
  34:1 41:10
  60:1 72:22
malkin 97:10
management
  22:6 30:17
manipulated
  70:22 72:23

manipulation
  72:8,13 82:17
march  24:14
market  44:25
  72:24 81:14
  82:25 83:9
  84:23
marketed
  44:24
markets  81:13
  81:24 83:7
marsal  38:14
martin  3:2
mashinski
  58:13
massive  81:3
  82:1
matter  1:5
  54:1 60:7,8
  102:20 104:8
matters  57:10
  98:18 104:23
maximize
  10:17 34:10
  35:16 36:14
  46:10
maximizes
  25:25
maximizing
  31:2 37:12
maximum  36:7
  40:10
mccarter  9:1
  28:18
mean  29:11
  38:18 55:2,10
  56:23 65:7

68:14,18 78:16
  95:4 98:19
  102:15
meaning  39:23
  42:21
mechanism
  46:5 64:5
mediation
  26:20,21 27:14
  28:11 29:5,16
  30:1 31:10,21
  32:1 33:4
  93:20 99:17,18
  99:24
mediations
  29:24
mediator  33:3
  33:6
meet  43:18
  44:19
meeting  83:2
member  86:13
  100:1
members
  17:25 36:11
memory  90:18
mention  81:2
  83:7
mentioned
  27:13 80:4
  90:22 102:13
mentions  82:9
merits  94:8
messed  17:23
met  82:22
mf  56:2 59:7
  59:18

mg  1:3,11,19
  2:2,10 6:6,10
  6:14,19
microphone
  47:25
mid  12:5 15:18
  19:16,17 27:14
  28:12
middle  78:16
midway  27:23
milestone  27:4
million  11:16
  13:9 17:8,10
  17:20 18:13,22
  19:7,11 20:3,4
  21:4 25:8
  36:21 37:3,7
  40:22,24,25
  43:7 52:21
  57:16,17,18,19
  57:24 61:13,16
  71:1,25 81:24
  82:7
millions  59:19
mind  94:15
mineola  107:23
mining  18:18
  35:4,19 41:11
  45:6,7
mischaracter...
  71:1
misconduct
  56:20
missed  53:15
mistake  90:17
  91:1,15

mitch  8:16
  20:10
moment  14:24
  102:2
monday  10:20
  11:8 52:5 74:3
  77:12
money  53:5
  64:15 66:17
  68:15,17
month  10:15
  18:22,23 19:2
  19:22 36:21,22
  36:25 37:5,5
  38:2 41:3,22
  42:13,24 93:21
monthly  36:8
  40:25 49:11
  89:23
months  10:21
  21:11 77:10
  90:18
moot  13:25
mooted  102:20
morning  10:3
  10:5,8,9 16:11
  16:24 17:2,6
  20:10,12,14
  22:24 25:22
  28:17 32:6
  51:2 54:14
  65:11 88:5
  92:18 97:8
  98:7
motion  4:1,2,6
  4:11,17,24 5:2
  5:12 6:16,23

7:7 12:8,15,17
14:5,10,10
15:17,24 20:15
20:17,18 21:19
22:4,9,14,15
22:21 23:2
24:3,5 30:12
32:11,17 33:16
33:19 36:24
37:19 38:7,9
38:11,17,20
42:6 43:24
45:1 46:7 47:5
47:5 50:17
51:4,8,17 63:5
63:13,21 64:9
66:8 69:14,19
69:21 73:13
74:25 76:1
78:15 82:19
87:20 92:11
95:2 97:11
98:15 102:13
106:5,6,8,9
**motions** 87:20
93:8 94:6,9
99:20
**move** 11:23
15:10 16:6
37:14 43:6,9
77:17 87:23
97:23
**moving** 19:18
19:24 26:2
29:22 30:23
33:16,23

**multiple** 71:18
**mutual** 103:25
104:13

**n**

**n** 8:1,5 10:1
106:1 107:1
**nail** 65:22
**naked** 82:6
**name** 16:19
76:8 93:3 97:9
**named** 58:19
**narrow** 57:3
**national** 79:10
**nature** 40:9
76:5
**nearly** 99:7
**necessarily**
74:9
**necessary** 23:9
23:24 41:24
91:5
**necessity** 44:18
**need** 14:17
15:14 26:23
27:5,21,21
28:9 32:12
34:6,20 35:8,9
35:11,15,21
37:16 38:3
41:19 42:1
43:5,6 46:14
46:17 48:4
50:3,10 75:10
84:12 85:14
86:17 92:2
102:18

**needed** 21:14
40:13
**needs** 35:20
41:12 45:18
78:10
**negotiating**
47:1
**negotiations**
93:11,15,19
**neither** 70:9
**net** 25:10
**network** 1:7,16
1:25 2:8,16 6:7
6:11,15,20 7:4
10:3 21:22,23
23:14 71:4
92:25 102:9
**never** 44:24,24
93:12
**new** 1:2 2:21
8:14 9:4,11
19:5 30:18
34:15 58:13
72:16,19 74:11
86:15 97:19
98:1
**newco** 10:16
14:22 34:2,10
34:13,18
**news** 58:14
**nice** 105:4
**night** 10:20
11:8 16:16
**nima** 16:17
**non** 5:3,13
58:17 62:22
70:12 71:25

**notable** 28:1
37:17
**note** 63:12
96:25 103:20
**noted** 98:15
**notes** 19:18
**notice** 15:14,15
15:16 20:18
22:4,8 43:7
77:8
**number** 13:18
16:4 57:11
69:19 71:19,20
74:1,5 90:23
91:12
**numbering**
89:16
**numbers** 89:8
**ny** 2:21 8:14
9:4,11 107:23

**o**

**o** 3:1 10:1
16:20 107:1
**o'brien** 44:16
**object** 12:16
14:10 22:9
32:25
**objected** 37:19
**objecting**
29:20
**objection**
15:15 22:11,13
27:5,16,16,17
28:1,20,23
32:8 33:12
37:18,21 47:22
54:4 65:24

73:21 77:7,18
85:20 103:8
**objections**
22:12 24:1
25:19 32:16
52:2 53:19
66:4 75:16
77:9 91:4
**obligates** 35:6
**obligations**
55:1,3
**obtain** 24:8
27:23 28:9
38:17
**obtaining**
11:22
**obviate** 84:11
**obviously** 10:3
12:21,23 13:13
15:14 29:6,11
32:20 33:4
66:18 67:14
99:17
**occurred** 19:16
**october** 5:21
6:3 89:10
**offer** 36:10
37:11
**offers** 45:2
**office** 32:7
43:22 74:13
**officers** 56:18
58:18 66:10
82:22
**official** 2:4
6:19 8:19
25:23 30:11

42:5 61:11
79:10
**oh** 88:10 90:21
**okay** 13:11
14:8,11 15:23
26:2 32:5
39:16 45:11
49:7,10,21
50:7,20,25
51:15,17,22
52:22 53:8
54:3,11 57:7
61:7 62:11
64:20 65:3,4
67:8 68:2 69:3
69:7 76:11,11
76:19 79:4,20
85:17 87:8
88:2 89:21
91:3,10,14,18
91:20 92:1,4,6
93:24 95:9,24
96:11,13,21,24
96:25 97:11,14
98:2,5 100:2
100:14 101:5,7
101:18,23
102:2 103:10
103:14 104:18
104:24 105:1,4
105:7
**old** 107:21
**omid** 97:9
101:11
**once** 60:6
**one's** 104:6

**ones** 65:8
104:6
**ongoing** 36:4,9
37:4
**open** 70:14
81:6 83:3
**opening** 26:11
**operations**
18:18
**opinions** 85:22
**opportunity**
45:4 94:25
95:6 96:20
98:18
**oppose** 52:1
**opposed** 50:9
51:8,10,12,13
52:13 54:7,9
54:16
**opposes** 14:9
**opposing** 51:21
**opposite** 48:6
81:9
**opposition**
52:18
**opted** 17:19
**option** 14:16
25:1 36:5 38:5
**optionality** 5:5
14:17 33:22
34:21,25 35:25
**options** 45:25
**order** 4:6,12
5:2,12 6:23 7:8
11:17 14:4,7
15:17 20:22
21:5,9,13,20

22:7 23:5 35:8
35:24 38:4
49:13 51:25
52:4 53:21,24
54:6 56:9,11
61:23 63:19
86:15 88:1,13
90:2 92:3
94:13,15 104:9
104:10
**ordering** 74:15
**orderly** 34:12
45:5
**orders** 23:11
71:2
**ordinarily**
38:18
**ordinary** 21:17
21:24
**original** 29:2
**osprey** 7:8 24:6
24:6,13 25:12
**otc** 71:2,4,18
71:19 84:23
**ought** 67:12
100:9
**outage** 19:15
19:16
**outcome** 72:2
99:18
**outcomes**
23:15
**outlined** 55:15
**outset** 38:6
**outside** 61:3
**outstanding**
24:12

overall  17:18
  81:23
overarching
  46:17
overlap  94:2
  95:11 98:19
  104:2
overlapping
  95:14 99:8
overruled
  32:17
owens  87:9
own  39:12,13
  41:14 47:13,17
owned  14:23
  87:1
ownership
  23:11

**p**

p  8:1,1 10:1
p.m.  97:16,19
  101:14
page  52:18
  70:25 106:3
paid  87:11
  89:24 90:2
papers  96:18
  96:18,19
parallel  12:15
  35:21
parent  12:25
  13:2,12,16
  23:17
park  8:13 9:3
part  17:12 86:3
  86:6

partial  52:2
partially  51:13
participating
  17:25 37:23
particular
  56:15 62:24
particularly
  100:12
parties  11:10
  11:18 22:5
  27:15 31:25
  54:24 58:5
  67:3 73:10
  74:9 97:10
  102:16 103:25
  104:21
partner  26:7
partnered
  36:15
parts  29:22
party  25:4 99:5
pass  79:12
passionate
  80:5
pay  33:19 36:2
  36:3,3 43:1,24
  51:6 63:22
  64:1,6 68:24
payback  56:10
paying  28:10
  35:24 37:22
  81:6,9,11,14
payment  11:15
  13:9 44:23
  46:22 56:4
payments
  17:16 62:19

pending  12:5
  63:21 77:10
  87:21 88:14
people  74:21
  77:15,15 79:3
  81:7 105:5
percent  11:7
  17:9,15,16,18
  17:18,21 18:3
  18:6,11,21
  19:6,13,13,24
  24:12 25:11,13
  70:13 81:10,12
  81:15 82:9
  89:24,25 99:6
percentage
  19:12
perfectly  43:12
  62:7,11 97:25
perform  45:23
period  4:12
  5:21 6:2 25:3
  27:2 30:3 38:3
  74:3 77:12
  88:15 89:1,9
permission
  72:9
permit  96:4
person  10:12
  20:20 60:9,10
  96:5 97:20,21
  97:23
person's  63:9
personal  56:3
  65:21 66:3
  78:7

persons  55:23
perspective
  14:14 29:23
  81:5
peter  65:11
petition  5:6,13
  18:9 57:19,20
  61:15 70:5
  72:24 87:11
phone  30:1
phrase  76:25
pick  46:25
picking  30:17
piecemeal
  102:6
pieces  38:22
pivot  14:17
  34:6,12,16,25
  35:11 36:23
  37:7 40:13
  41:19 43:5,6
  49:5
place  60:15,20
  72:8
plain  10:23
plaintiff  1:14
  1:22 2:5,13
plaintiffs  97:5
  100:24
plan  4:13 6:25
  10:16,19,24,25
  13:2,3,8 14:15
  14:18,20 18:5
  21:18 26:13,13
  26:14,16,23,25
  27:4,22 28:7
  28:10,22 31:6

33:12,20 34:2
34:8,15,18,23
35:3,6,10,13
36:17 37:10
41:10 45:4
47:1 73:2,3,18
75:4,15 78:1
80:14 84:6
85:9 86:3,6
98:1
**plans**  36:16
**platform**  41:7
  82:10 84:16
**play**  56:5 63:23
**playing**  31:22
  45:24
**please**  10:2
  16:19 17:3
  18:17 33:8
  75:7 79:5 86:9
  87:6 90:20
**pleased**  11:19
  26:19 33:2
**pleasure**  28:19
**plenty**  11:25
**plus**  40:22
  88:17
**point**  14:12
  29:12,23 30:4
  41:20 49:25
  50:1 53:8 57:9
  57:15,22 59:13
  59:20 60:12,23
  61:21 63:20
  65:13 67:2
  76:18 77:2,14
  77:16 93:9

102:17
**pointed**  45:13
  49:2
**points**  58:25
  60:17 66:23
**policy**  51:7
  52:9,10,13,20
  53:11,25 55:7
  55:16,23 57:2
  57:6,14 58:8
  58:10,21 59:16
  61:20 62:25
  63:24 66:19
  68:9
**portfolio**  35:15
  36:14 41:5
**portion**  24:20
  38:7 50:24
  90:1,2
**posed**  31:9
**position**  20:1
  24:21 25:24
  42:15,20 51:22
  60:21 74:1,4
  74:10 76:23
  77:13,16,19
  79:13,16,16
  80:8,14 81:6,9
  82:3,6 83:2,14
  83:18 85:1
  94:6 98:23
  101:3 102:7
**positions**  71:14
  80:11 81:4,20
  82:2,25
**possible**  15:10
  15:14 66:16

69:7
**post**  56:17
**pot**  68:15
**potential**  36:19
  45:14,15 55:1
  64:6 79:3
  84:21 85:15
**potentially**
  22:7 53:3
  57:14 84:2
**power**  19:16
  29:12 58:7
**practicing**  66:9
**pre**  6:12,21
  18:24 19:9
**precedent**
  85:21
**precipice**  25:15
**precise**  57:3
**prefer**  97:21
  104:21
**preference**
  17:9 32:14
**preferred**
  26:19
**prejudice**
  50:18 76:1
  78:15 87:20
**premature**
  73:17 74:24
  76:1 78:15
  87:13
**prepare**  15:24
**prepared**
  15:13 73:11,23
  74:19 80:13

**prepping**
  90:23
**present**  16:23
**presentation**
  88:7
**presenter**
  16:18
**presently**
  34:18
**preserves**
  35:25
**pressure**  81:16
  82:13 83:8
**pretty**  52:25
  53:3
**prevents**  35:25
**previous**  54:19
  82:17
**price**  5:6,14
  24:16 25:5,9
  34:25 70:10
  72:14,22,24
  73:1 81:8,17
  81:24 82:2
  84:22,24 97:10
**prices**  21:4
  87:11
**prime**  20:23
  21:3,6
**prior**  11:17
  14:24 28:2
  30:18 31:6
  32:19 57:19
  78:23
**private**  24:10
**pro**  51:21 52:9
  53:11 54:7

57:8 58:20
59:5 63:19,20
64:22 65:12,17
66:24 68:6
69:21,25 73:10
74:5 77:1,9,9
77:19,23 78:22
99:4 100:12
103:15
**probably**
68:10 75:10
**problem** 55:3,4
56:15 62:18
63:4,9 64:23
65:20 66:7
68:8,17
**procedure** 4:4
20:17
**procedures**
20:20 82:12
**proceed** 12:15
12:19 13:8
15:5,13
**proceeding** 6:6
6:10,14,19 7:3
20:23,24 21:3
23:16,19 66:2
92:17,22,25
98:10,11
100:11 103:22
104:14
**proceedings**
23:7 82:17
93:7 102:1
103:24 104:5
104:15 105:8
107:4

**proceeds** 11:16
54:18 55:7
56:12,14,19,20
57:5 58:10,21
58:21 59:19
60:7 61:1,6,23
62:17,21,25
63:1,7,12
64:24 65:24
66:14,20 67:7
67:20
**process** 12:19
17:4,6 18:8,12
23:20 33:21
35:11 40:12
47:15 60:15,20
73:19 75:5
79:2 81:12
88:21
**processed** 18:5
18:11
**processing**
17:20
**productive**
32:2
**professional**
5:20,21 6:1,2
11:20 39:23
42:7,10,19,21
43:14,17 45:20
46:7,24 49:12
50:6
**professionals**
42:18 43:19
45:22 46:4
50:4 88:21

**programs** 11:5
**progress** 27:25
28:7 29:11
**promptly**
14:19,21 15:14
34:7,16 35:10
**proof** 63:13,16
65:23 67:14
73:19
**prop** 70:23
**property** 4:1,2
20:15 21:6,10
21:12,15,15,21
21:24 54:18
63:23
**proposal** 13:7
25:5 29:2 31:6
37:6,13 49:3
49:15 50:7,16
55:19 70:12
79:6 85:9
**proposals** 57:3
**propose** 16:12
33:25 61:4
65:1 104:12
**proposed** 14:5
15:12 44:19
45:23 52:4
54:6 65:3
67:22 69:6
**proposes** 84:6
**proprietary**
41:7
**propriety**
45:12
**protect** 23:9
58:22

**protected** 25:3
58:9
**protection**
23:10,10
**protections**
54:22
**protracted**
25:2 80:11
**prove** 44:17
**proven** 62:9
81:4,21,25
82:20
**provide** 14:5
18:17 19:25
28:14 40:2
53:11 72:7
91:12
**provided** 17:25
22:4 52:10,11
**providers** 51:4
**provides** 14:16
62:13
**providing** 21:1
45:19
**provision** 56:4
**provisions**
53:12
**public** 35:4,19
81:5
**punitive** 44:6
**purchase**
24:16 25:5
84:22 85:2,3
85:16,23
**purchased**
24:14

**purchaser**
45:14 47:13
**purchases** 71:2
**pure** 17:8,12
**purpose** 62:6,7
72:12
**purposes** 39:15
53:23 65:25
73:2
**pursuant** 4:2
4:13 11:17
12:12 20:16
23:4 46:7 90:2
**put** 15:6,8
29:13 33:8
40:19 53:10
54:6,21 60:15
64:22 82:18
83:6 100:24
101:13 104:11
104:18 106:9
**puts** 63:23

**q**

**qualified** 36:12
**question** 45:12
49:10 50:5
51:22 61:19
63:18 79:12
**questioned**
83:5
**questions**
16:11 30:5
34:20 38:6,8
46:17 47:21
49:22 83:6
89:1,4 91:24
94:15

**quick** 18:23
19:8 20:1,2
**quickly** 15:10
34:16,25 43:6
43:9 49:6
52:25 53:3
103:3,20
**quite** 33:2
68:18 73:25
101:2

**r**

**r** 3:1 8:1 10:1
16:20 107:1
**radar** 103:1
**raise** 66:4 73:5
73:14 82:12
**raised** 16:21
28:21 73:12
75:1,20 77:20
**raises** 67:15
79:3 99:16
**raising** 76:12
78:3
**raj** 82:22
**range** 18:14
40:20
**ranged** 24:17
**rapidly** 66:14
**rata** 52:9 53:11
57:9 58:20
59:5 63:19,20
64:22 65:12,17
66:24 68:6
**rate** 24:15 54:8
91:22,23
**rather** 15:8
37:23

**rationale** 70:16
**reach** 11:19
12:25 27:8,15
33:9 85:12
**reached** 14:14
26:17 29:19
32:24 71:23
86:3
**reaching** 21:17
28:8 31:3
**reacting** 56:16
**read** 14:25
15:7,8,9 48:11
58:12,14 72:15
**ready** 35:10,17
35:19 40:12
41:10,18,25
48:3,17 86:25
93:9
**real** 49:21
64:22
**realize** 80:2
82:14
**really** 29:19
32:22 33:11,12
33:12 38:15
39:25 46:14,17
47:4,8 49:3
51:10 57:13
61:15 68:6
73:23 78:6,25
79:3 94:21
**reason** 14:17
30:2 34:3,8,14
34:18 37:16
**reasonable**
36:19 41:14

49:14 50:12
**reasons** 32:21
54:8
**rebuttable**
72:25
**recall** 20:21
98:14 99:6
**receipt** 64:15
**receive** 17:15
36:7 38:24,25
55:7,23 59:15
62:25 63:6
67:19 74:16
83:23
**received** 22:8
24:1 25:4,19
27:5 28:1 29:1
29:4 37:9,17
49:21 56:8,14
56:18,20 62:17
62:20 63:1
71:13 73:25
103:7
**receives** 64:13
**receiving** 31:17
56:12 57:5
62:21 63:11
64:24
**recent** 21:4
59:8 79:17
**recently** 71:21
**recognize** 23:6
29:21
**recommenda...**
88:19
**record** 22:25
26:9 77:17

79:10 107:4

**record's**
102:23

**recorded** 71:3

**records** 70:24

**recover** 11:11
13:1 84:5

**recoveries** 11:4

**recovery** 11:1
11:1,6 75:17
79:4 84:10

**reduce** 37:3,6
70:10

**reduced** 36:23
36:24

**reduction**
19:14 70:13

**reference** 67:5
94:11

**referenced**
72:14

**references**
38:11

**reflected** 22:3
22:10 25:6

**reflecting**
20:19

**regard** 33:5
36:10 100:18

**regarding**
11:10 47:22
63:8 70:24
71:14

**regardless** 13:4

**regards** 95:21

**regrettably**
52:24 53:2

**regularly**
10:13

**regulation**
81:1

**regulations**
23:4

**regulatorily**
33:25

**regulators**
34:20 74:16
76:17,21,22
86:14

**regulatory**
33:23

**reimburse**
46:23 64:9

**reimbursement**
37:2,4 40:23
44:1 47:5
64:13 89:7

**reimburseme...**
47:7 49:24

**reiterate** 68:5

**reject** 51:22

**rejected** 44:6
72:3

**rejection** 19:21
19:24

**relate** 56:19

**related** 4:8,14
5:9,16 6:25 7:9
56:14 84:17,21
85:13 103:7

**relates** 56:20
102:12

**relating** 35:13

**relative** 19:8

**relatively**
18:22 33:15

**relevant** 22:5
44:12 71:9

**relief** 4:8,14,20
4:24 5:9,17
6:25 7:9 14:9
21:2 22:13
23:8,24 24:2
25:20 32:11
51:5,22 62:2,4
62:5,12 63:13
69:14

**reluctant** 73:9

**rely** 44:4

**remain** 17:15
25:17

**remaining**
17:11 18:2
45:8 57:18

**remarks** 26:11

**remedies** 23:13
23:23 61:2

**reminded**
102:14

**reminder**
18:23 19:8
20:2

**remote** 98:1

**reorganization**
21:19 28:7
80:15

**reorganizing**
45:6

**repaid** 83:22

**repeat** 19:1,2

**reply** 37:8,21
40:24 46:19
52:4 67:5

**report** 52:5,6
70:25 72:11,15
82:8,21 84:20

**reported** 70:23

**reporting**
51:18,24 52:3
54:4,22 59:11
65:20 66:7,21
88:12 89:1

**reports** 11:5

**represent**
86:20 97:10

**representation**
91:13

**representative**
4:8 23:3 87:9
106:7

**representatives**
65:7

**represented**
20:25 75:18
82:4 97:5

**representing**
18:6,20 19:5
65:11 70:6
71:19,24 76:21
100:13

**represents**
25:10

**republic** 4:19

**request** 5:6,14
28:13 44:13
54:7 70:17

87:15

**requested**
22:14 25:20
71:1

**require** 39:18
42:6,9 53:21
64:16 68:14

**required** 21:5
28:5 43:15

**requirement**
39:8 53:13,17
56:12 58:3,3
59:11

**requirements**
43:18 51:18,24
51:24 54:4
56:9 58:8,21
65:21 66:24
70:9

**requires** 35:12
38:20

**requiring** 55:4

**reserve** 11:17

**reserved** 60:14

**reserving** 12:3

**reside** 95:18

**resolution**
11:20 12:19
32:20,23 93:10

**resolve** 11:18
72:1 84:7
94:10,17 99:11
99:18 104:16

**resolved** 73:16
73:21 84:8

**resolves** 12:13

**resolving**
100:6

**resources**
59:18

**respect** 12:20
14:2 32:11
33:11 54:17,20
54:22,25 55:1
55:2,5,8,15,21
55:22 56:2,13
57:2,5,5,8 59:1
60:13,14 61:12
61:19 63:11,18
63:20,24 64:23
65:21 66:12
67:13,13,19
72:14 73:6
74:17 84:16
85:13,14 87:21
91:20,25 94:13
94:17 98:10,22
100:18 102:8
102:22 104:14

**respectfully**
28:13

**respond** 37:19
73:8

**response** 22:17
29:5 73:4,12

**responsibility**
60:25

**result** 23:15
24:19 25:2,8
55:20 83:15

**resulted** 19:14

**retain** 42:7
50:3,6

**retained** 39:9
39:17 42:13
43:2,10,16
45:20,23 46:6
49:12 50:3,13

**retains** 55:5

**retention** 39:9
42:9,19,24
69:6

**return** 14:21
21:3 36:11
84:19

**revenue** 19:11

**review** 15:22
46:6

**reviewed** 57:25
96:18

**reviewing**
46:23

**revised** 50:16
52:4 54:6

**revisit** 30:4

**right** 10:2
11:11 13:24
16:22 22:20
26:4 28:16
32:15,16 40:4
50:22 54:11,13
60:11 61:9
64:20 65:5
67:11,25 69:3
69:19 75:25
79:22 80:9
83:20 84:18
86:1,1 90:11
91:20 92:15,21
95:13,24 96:15

96:24 97:7
98:5 103:2
105:1

**rights** 54:25
61:5

**rigs** 19:6,22

**rise** 47:20

**risk** 30:23 46:4

**risks** 24:9

**road** 107:21

**room** 31:11

**rough** 67:3

**round** 88:10

**rule** 4:3 20:16
44:14 62:16,17
65:8 73:10,11
74:19 94:10

**rules** 4:4 20:17
39:21

**ruling** 63:4
64:11 72:4
106:3

**rulings** 54:19

**run** 55:17 67:6

**running** 35:20
41:15

**rush** 29:5,25
29:25,25

**s**

**s** 8:1 10:1
16:20

**s.c.** 6:2

**s.d.n.y.** 46:21

**sake** 90:21

**sale** 7:8 11:16
44:24 75:20
83:8 85:2,3,23

sales 58:16
72:21
salle 8:5
sandbag 77:7
santichi 88:5,6
90:14,15,16
91:8,11,15
92:1,7,8
santos 69:24
77:22 82:19
106:9
save 36:22
saves 43:7
saw 56:1 76:7
saying 62:5
66:3 68:21
75:13 81:20
says 53:21
87:10
scenario 83:21
schedule 12:4
33:8 88:18
95:4 96:1,3
100:18,23,25
102:5 104:17
104:22
scheduled
19:14 26:20
95:25 98:16
scheduling
14:24 15:5
95:21
scheme 54:8
schreiber
38:14
schreiber's
49:1

scratch 34:15
41:20
screen 17:23
76:8 94:20
103:1
scrutiny 33:23
se 51:21 69:21
69:25 73:10
74:5 77:1,9,9
77:19,23 97:25
99:4 100:12
103:15
seated 10:2
sec 74:14 79:15
103:7
second 17:22
29:10,12 44:24
77:25 85:19,20
85:22 88:17
section 4:3,13
39:23 60:11
65:14 73:7
75:21 83:16
sections 20:16
secure 35:24
secured 14:16
51:12
securing 36:20
securities 26:1
58:15 66:10
72:16 74:11,13
74:16,18 75:20
76:3,4,21
79:14 83:15
84:3,8 86:20
security 73:5
78:19 84:13

85:2,23,24
86:17 87:10
see 19:19 31:13
34:18 44:7
47:9 54:1
64:25 66:24
69:4 71:22
79:5 84:1 92:2
94:19 99:15,21
99:21 100:4,22
102:3 105:5
seek 14:19,20
23:6,12,22
24:24 26:24,25
43:9 69:13
80:17
seeking 7:7
15:18 21:20
46:25 52:8
54:24 56:7
62:12 65:23
75:17 76:7,18
91:21
seeks 89:6
seem 66:4
73:14
seemed 30:25
seems 55:12
69:15
seen 52:11
96:17
sees 31:13
segregated
21:10,15,21
selected 10:15
14:15 35:2
49:3

self 23:12,23
sell 24:5 69:20
70:18,23,24
71:2,9,11,14
71:15,20,23,24
71:25 72:5,6
72:14,22 73:2,7
73:6 74:6,18
75:17 76:3
78:18 80:7
81:17 83:2,15
83:17,22 84:2
84:4,7,10,13
selling 81:21
82:5
sells 25:16
send 71:16
sense 27:22
sent 71:11
separate 11:17
13:12,15 68:15
68:23 69:13
78:25,25 84:1
84:2,17
separately
101:3 102:7
september
27:2
series 11:9,10
12:13,16 13:10
26:18
serious 46:5
serve 35:7
37:24 38:2
65:20
served 93:13

service 22:3,6
services 36:24
41:24 45:18,19
45:23 46:14
ses 78:22
session 26:20
26:21 28:12
set 11:25 22:6
31:21 33:10
52:17 67:15
93:20 96:11
98:16 100:18
settle 20:22
86:4
settlement 11:8
11:24 12:5,7
12:10,12,13,24
13:7,9,25 14:4
14:7,10 17:13
17:19,24 27:10
27:12 29:13
31:1 71:23
84:9 85:13
86:3,5 102:16
102:20
settlements
26:18 28:8
seven 77:8
shanks 1:13
6:6 92:16,21
93:7,24 94:19
94:21 95:8,9
95:17,23 96:1
96:7,8,10,14
96:16,22 97:16
97:24 98:10,20
99:2,5,15

100:23 102:3
shara 9:13
32:7 43:22
share 16:17
71:8
shared 24:16
71:7
shares 7:8 24:5
24:7,13,13,19
24:23 25:3,5
25:12
sharing 64:2
70:8
sheet 25:18
70:5 89:23
shirt 103:16,17
short 15:17
28:4 35:19
71:14 81:4,14
81:19 82:2,6
83:2
shorter 30:2
show 39:18
49:13
showed 84:20
showing 29:13
shown 30:14
49:5 65:19
shows 29:18
72:7 89:8,9,10
90:7,9
shy 11:7
side 60:13
73:10,11 80:5
81:7 82:2
sides 52:19
96:19

signature
107:7
significant
11:21 13:23
20:25 24:20,21
24:23 30:22
similar 23:22
23:22 95:16
103:20
similarly 47:3
simply 27:4
53:9,10
sine 102:23
single 65:16
80:25
sir 87:2 94:21
95:23 96:10
situated 47:3
six 21:11 38:2
size 13:21
82:12
slide 18:16
19:4,24
slides 16:15,17
slightly 79:18
79:19
slow 11:2
18:25
slowly 19:2
small 23:18
smoothly
88:21
sny 47:11
sold 45:7 82:11
sole 62:6
solely 44:5

solicit 4:12
14:20 26:25
27:21,21
solicitation
27:1
soliciting 27:24
solution 31:22
61:4
solutions
107:20
somebody
56:25
sonchi 5:21
sonya 7:25
107:3,8
soon 69:6
sophisticated
73:9,10 75:23
sorry 11:3
17:22,23 19:3
53:1,15 58:23
76:9 86:24
87:17 89:22
96:8 98:25
101:20 103:18
sort 31:1 57:20
59:5,11 64:2
73:25
sought 21:2
27:1 65:17
sound 22:1
25:18
sounds 48:5
53:5
south 8:20
southern 1:2

[space - subordination]                                          Page 35

space  41:8
speak  89:3
speaking  48:8
speaks  37:20
special  8:12
  20:8,13 61:14
  99:17
specific  66:23
  76:5
specifically
  13:20 44:11
  65:2
speculation
  59:22
spell  16:19
spend  14:23
spoke  77:22
  99:4
spoken  22:19
  31:7 32:9 99:2
sponsor  6:25
  10:16 14:16
  26:13 27:4
  33:20 35:3,6
  35:10 37:10
spot  81:14 83:2
  83:8
spreadsheet
  71:5
square  29:16
  59:7
squarely  63:23
stadler  88:6,9
  88:11 89:17,21
  90:4,6,8,11
  91:17,19,21
  92:5

stage  73:24
stakeholders
  37:19
stand  41:10
standard  22:5
standpoint
  75:24
start  19:4
  26:12 29:16
  31:24 34:14,17
  55:16 60:16
  78:23
started  20:3
  28:15 29:8,24
starting  41:19
  60:16
state  21:15
  74:9,13 76:21
  86:14
stated  54:16
  70:25 71:13
statement
  10:21,22 11:22
  14:18,19 15:1
  15:9,12,22
  26:14,16,24
  28:8,10 31:12
  34:15 37:14
  44:5 75:15
statements
  89:23
states  1:1 2:19
  9:8 23:8 32:7,8
  32:11 43:22
  70:3 75:9
status  6:8,16
  7:5 17:3 58:17

92:15,20 101:8
  102:19
stay  4:20,24
  23:11 50:24
  51:5 54:17
  59:3 60:19
  62:2,4,20 63:2
  64:3 69:14
  102:15,16
stc  87:10
steadily  19:22
steel  46:20
stein  47:10
step  35:21 48:3
  48:17
stepping  86:22
stipulation
  20:22,25 21:5
  21:7,9,13
  102:22 103:4,6
stop  75:5,13
  76:6 87:19
  101:21,22,25
stored  21:9
storing  24:10
strategies
  35:14
strauss  8:11
  20:11
street  8:5,20
  9:10
strike  80:10
strong  101:3
stronger  102:7
strongly  52:13
  74:5 77:2,15

structure
  40:10 49:6
structured
  36:6 40:7
structures  34:9
subject  13:8
  21:6,12,14,21
  21:24 33:23
  53:22 55:7
  75:21 86:2
submission
  55:20 64:21,23
  67:13 69:4
  100:7
submit  5:7,15
  22:13 55:9
  56:12 61:24
  63:7,15,16
  64:16 65:25
  69:6 71:17
  74:17 91:4
  103:8,10
  104:17
submits  21:16
submitted
  44:21 52:3
  57:12 58:1
  59:23 103:6
subordinated
  73:7 75:22
  78:19 83:17,23
  84:5 85:7
subordinating
  86:21
subordination
  77:25

subsequent
23:5
substantial
47:10,20
substantive
12:8,11,21
13:6 14:1,2,6
99:9
succeed 41:13
successful
32:20 40:14
49:18
sufficient
38:15 39:1
49:25
suggest 53:20
67:11 102:21
suggested 16:5
suggesting
53:9 68:7 80:7
suggestion
52:14
suit 58:13
suite 8:21
107:22
summary
10:22,25 18:12
89:23
summons
93:13
supply 93:8
support 30:11
30:24,25 38:10
38:16 39:1,3
44:3,23 80:4
82:19 86:4
89:15 91:9

92:2
supported
26:17 74:20
supporting 5:7
5:15 50:7 74:1
74:4 77:12
supports 25:19
42:23 51:17
supposed 70:6
sure 13:17
31:16 33:24
34:1 35:9,16
35:18 40:6
41:10,25 48:2
67:6 68:22
69:12 70:18
76:9 91:6 92:3
94:19
surprised
71:22
suspicious 83:1
svb 51:19 59:8
59:18,21
sweat 41:13

t

t 107:1,1
table 30:22
take 24:20,22
27:2,11 31:14
35:3,10,19
39:7 54:3 69:4
76:23 79:13,15
80:14 81:9
85:4 94:15
taken 33:13
78:18 79:16

takes 64:5
talk 33:3 76:20
93:24 102:2,3
talked 33:3
77:24
talking 41:4
76:5 89:17,19
target 27:3
tax 18:24 19:9
team 30:17
tell 17:3 43:13
59:12 93:2,3
telling 82:5
ten 57:16
tens 18:13
term 19:18
terminated
27:18
terms 21:8
29:2 52:10,13
73:18 94:5,11
98:22
tested 44:24
texas 74:12,13
thank 16:2,8,9
16:14 20:6,7,9
22:16,22,23
24:4 26:6,8
30:7 32:4,14
33:18 43:20,21
43:23 48:1
50:21 51:1
54:11,12 61:7
61:8 65:4,5,10
67:1,9,23,25
69:2,8,9,17,18
69:24 72:9

75:8 78:12
79:21 80:19
83:10,11 87:24
88:9 91:16
92:5,6,6,8,14
93:5 96:12,14
96:15,16,22,22
96:24 101:6,7
101:17 102:10
103:2,11,14,18
104:25 105:3,4
105:6
thanks 17:5
theory 62:18
thing 65:15
73:22 87:5
104:9
things 55:16
83:4 100:6,7,8
think 12:17,21
15:17,21 16:4
16:5,20 27:22
28:21 30:2,12
31:5,12 32:1
32:22,24,25
33:5,10,13
37:17 39:5
41:24 42:8,17
43:6,18 48:19
48:20,23 49:2
49:4,4 50:23
51:20 54:19
55:4,16,24
57:4,23 58:25
59:10 60:18,24
61:25 62:6
63:19,22 64:1

64:2,21 65:13
65:19,22 66:21
67:5,18,20
72:13,16 73:16
73:24,25 74:18
74:20,21,24
75:24,24 76:1
76:25 77:19
78:15 81:25
82:8,8,11,18
82:21 83:5
84:15,18 85:20
85:21 87:3,14
90:14,16,17
91:1,5 98:14
99:18 100:24
100:25 101:1,2
101:7 102:5,6
102:17,18,19
104:9,22
**thinking**  81:8
86:20
**third**  4:11 25:4
**thought**  27:10
32:18 58:24
64:11 76:17
90:24,25,25
93:17
**thoughtful**
60:22
**thoughts**  94:17
**thousands**
18:14
**threatened**
11:14
**three**  28:20
74:3 77:10

92:20 97:5
102:1
**threshold**  17:9
**tie**  25:3
**time**  19:12
21:8 24:15,20
24:23 25:3,15
26:6,24 27:5
27:21 28:9,10
28:14,20 29:11
30:3 31:23
33:13,15 38:3
38:15 40:8,13
57:12 65:14
77:23 87:14,14
95:19,21,21,21
96:1,9 97:15
99:12
**timekeepers**
91:23
**timeline**  36:22
**times**  10:6
48:11
**timing**  79:6
**today**  20:14
25:9 31:19
39:5 43:24
47:22 69:25
72:15,22 74:10
74:11,14,24
77:17 80:25
87:4,14 94:8
95:5 97:24
103:19,22
105:2
**today's**  11:24
37:2 74:8

**together**  31:9
31:11,20 40:19
65:1 67:4
98:18 99:23
100:10
**token**  5:3,13
69:20 70:18,23
70:25 71:2,9
71:11,14,20,23
71:24 72:5,6
72:14 73:5,6
75:18 78:18
80:8 81:15,20
81:25 82:9,13
83:2,17 84:2,4
84:10,13,18,19
84:22,23 85:6
85:24 86:17,21
**tokens**  71:25
72:23 74:6,18
75:20 76:3
81:21,22 82:4
82:7,10 83:15
83:22 84:7
86:18 87:22
**told**  29:4 38:11
48:6 82:16
**took**  30:15
72:8 82:25
**top**  54:22 68:9
102:13
**topic**  12:1
79:24
**total**  37:7
52:19,20 89:9
89:9

**totaling**  17:9
**toward**  28:7
**towards**  11:22
37:14
**tower**  52:16
57:16 59:19
60:16 66:13
**trade**  24:7,18
**traded**  25:12
82:24
**trading**  41:7
80:24 82:23
**tranche**  17:13
**tranches**  24:14
**transacting**
41:17
**transaction**
25:14 26:2
33:25 34:3,6,9
34:13 35:21
36:1,21 37:25
**transactions**
10:25 71:3,10
71:19
**transcribed**
7:25
**transcript**
48:10 107:4
**transfer**  4:1,2
17:8 20:15
21:14,20,20,24
22:5,10,15
102:12 106:5
**transferred**
21:6,11
**treat**  70:1

treated   18:4
  70:18
treatment   5:4
  5:8,15 23:24
  31:11 70:16
  72:5
trial   6:12,21
trickier   60:23
tried   40:7,9
  61:3 66:15
  95:1
trouble   90:20
true   46:21 58:2
  107:4
truly   30:15
  45:18 49:15
trust   20:23
  21:3,6 24:6,7,7
  24:13,25 25:12
  56:17
trustee   9:9
  32:7,8,12
  37:18 43:22
  52:6 75:9
try   19:2 26:23
  27:8 66:16,20
  68:19 69:5
  77:7 78:22
  100:22
trying   33:9
  39:20 56:23,24
  58:6,11 63:4,5
  80:10 89:12
  90:12 94:21
  95:18,20 97:22
  101:13

tuesday   96:3
tune   82:6
turn   16:12
  20:7 27:12
  38:6 50:23
  87:25
turned   31:1
  34:22
turning   18:15
two   14:6 17:16
  24:14 28:21
  34:9 52:7
  54:21 63:25
  74:2,10,13
  77:9,10,12
  80:11 84:1,2
  85:22 88:14,17
  98:14 99:19
  101:25 104:4

**u**

u.k.   23:3,6,9,13
  23:14,23
u.s.   3:3 9:9
  21:23 37:18
  52:6
ucc   17:25
  25:19 66:1
  70:1,6 71:5,9
  71:13,21 72:2
  82:9 83:4,6
ultimately
  27:11 30:17
unable   27:11
unacceptable
  49:24
uncontested
  20:14

under   11:13
  13:2,2 14:13
  18:4 21:5 28:5
  36:17 37:6
  40:16 41:9
  46:8,11,22
  51:7 52:9,10
  54:25 64:21
  69:4 73:7
  83:16,20 85:7
  85:9 94:14
  100:7
underlie   44:11
underlying
  94:11
understand
  38:21,22 39:6
  39:20 49:1
  50:6,11 51:20
  53:8 55:14
  56:24 57:1
  58:6,10 60:4,5
  60:23 63:2
  83:14 89:12
  90:12 91:6
  92:2 94:1,7
  95:18
understanding
  57:12 70:3
  86:14,16 94:8
understands
  32:12
understood
  50:14,19 69:2
  101:4
underwriters
  4:18,19 51:5

56:6 59:23
  68:5
undoubtedly
  28:6
unfortunately
  27:13 70:25
union   46:25
unique   30:15
  85:24
uniquely   36:12
united   1:1 2:19
  9:8 23:8 32:7,8
  32:11 43:22
  75:9
universe   57:23
  59:25 85:15
unnecessary
  68:21
unprecedented
  30:14
unsecured   2:4
  5:8,16 6:20
  8:19 25:23
  30:11 42:5
  51:14 52:2
  61:11 83:17,21
unsuccessful
  37:22
unwind   24:21
update   18:18
  20:1
updated   10:18
  20:19
updating   16:12
uptime   19:12
  19:14

**urge**  66:6,8
  68:14
**urged**  53:13,17
**urging**  68:25
**use**  21:14,24
  63:5 94:5,12
  98:23
**used**  21:12
  60:12 68:20
  70:22 72:8
  76:24
**users**  17:13,19
  18:9 22:7
  71:18 82:25
**using**  71:2
**usually**  100:7
**uswa**  47:3
**utc**  71:7
**utilizing**  41:6

**v**

**v**  1:15,23 2:6
  2:14 6:6,10,14
  6:20 7:3 92:16
  92:24 101:9
  102:8
**valuable**  37:25
**valuation**
  69:20 70:8
  71:12 87:21
**value**  10:17
  17:21 18:3,6
  18:12,13 24:18
  25:10,25 31:2
  34:11 35:16
  36:7,14,20
  37:12 46:10
  48:21,24 73:1

73:2 78:20
  80:7 84:4
**vanguard**  4:19
**vantol**  65:10
  65:11 67:1,9
  67:23 69:10,16
**varick**  9:10
**variety**  43:25
**various**  23:11
  28:8
**vast**  13:18
**vaults**  21:22
**verbatim**  98:20
**verifying**  71:10
**veritext**  107:20
**version**  10:20
**vgx**  87:9
**view**  33:11
  74:5,17 75:16
**views**  45:12
**violation**  72:5
**virtual**  97:20
**virtually**  21:2
  43:23
**virtue**  62:20
  64:24
**voluck**  51:3
**volumes**  81:23
**votes**  27:24
**voting**  24:24
**voyager**  34:22
  34:23 49:4

**w**

**wager**  87:9
**wait**  31:23
**waive**  66:5

**waived**  36:25
**walk**  66:22
**wallets**  21:10
  21:22 24:11
**want**  15:7,9
  30:8 31:23
  32:21 33:24
  42:3 43:13
  47:24 55:12
  59:12 67:16
  69:4,12 74:25
  75:6 76:22,25
  77:6 78:8
  79:15 80:16
  81:16 90:13
  91:6,25 94:7
  96:20,21 97:20
  99:20 100:10
  102:5 103:12
**wanted**  12:1
  14:25 15:4
  46:18 57:15
  78:1 83:9
  102:17 103:20
**wants**  54:13
  61:9 65:6 68:1
**warranted**
  22:14 27:25
**wash**  72:21
**watching**
  81:18
**way**  13:5 15:5
  15:7,9 29:15
  34:5,10,14
  36:6 40:10
  43:4 67:6
  94:17 103:1

104:7,19
**we've**  10:6,13
  14:14,16 17:7
  22:18 25:25
  26:12,14,15,17
  27:1,13,19,25
  29:15 31:9
  34:19,20 35:5
  36:2,6 49:14
  58:24 60:13
  87:3,14 88:10
  94:12
**wednesday**
  28:21
**week**  77:12
  103:6
**weekend**  15:22
  31:13
**weeks**  10:19
  27:8 38:10
  98:14
**weinberg**  97:9
**went**  41:23
  51:18
**westlaw**  46:20
**whatsoever**
  58:4
**whichever**
  45:19 80:14
**white**  8:18
**wide**  18:14
**wiles**  26:20
  29:17 31:21
  33:2 93:21
**willingness**
  33:7

**wind** 34:13,16
    34:23 37:9
    45:2,5
**windels** 51:2,3
    51:11 52:1,17
    52:23 53:1,4,7
    53:15,19 54:5
    54:9,12 68:4,5
    69:2,9
**winding** 23:13
**winds** 49:17
**winning** 41:12
**wish** 22:20
    26:4 32:4,15
    65:7 68:1
**wished** 94:2
**withdraw**
    17:17 18:10
    94:24
**withdrawal**
    17:4
**withdrawals**
    17:7,8,20,21
    18:5,11,12
**withdrawn**
    17:11
**withhold** 17:24
    18:1,2,6,7
    26:18
**witnesses**
    63:22
**wonderful**
    16:24 102:24
    103:2
**word** 48:11
**work** 11:21
    15:19,21 31:8

35:22 37:24
38:3 40:11
48:4 65:1
66:20 68:25
69:5 71:10
78:23 88:24,25
99:15,22 100:4
100:21
**workable** 47:1
**worked** 26:14
    26:15 27:7
**working** 28:11
    39:11,12 46:4
    48:16 67:5
**works** 15:19
    27:15 31:9,25
**workspace**
    21:23
**world** 23:25
    81:18
**worth** 21:4
    35:24
**written** 51:19
    59:9 72:9
    77:15
**wrong** 81:7

**x**

**x** 1:4,10,12,18
    1:20 2:1,3,9,11
    2:17 106:1

**y**

**yeah** 17:5
    18:19 19:3
    20:2 53:7
    59:10 62:9
    77:5 104:12

**year** 14:13
    20:21 35:7
    57:11 59:20
**years** 28:20
**yesterday** 37:9
    37:21 58:14
    72:15
**york** 1:2 2:21
    8:14 9:4,11
    58:13 97:19
    98:1

**z**

**zareh** 97:8,9
    97:10,13,18
    98:3 99:14,24
    100:23 101:10
    101:11,13,17
    102:2,5
**zone** 86:22
**zoom** 10:14
    16:21 96:5
    97:6