Hearing Date:  August 10, 2023, at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline:  August 3, 2023, at 4:00 p.m. (prevailing Eastern Time)

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF HEARING ON JOINT MOTION**
**FOR ENTRY OF AN ORDER (I) APPROVING THE SETTLEMENT**
**BY AND AMONG THE DEBTORS AND THE COMMITTEE WITH RESPECT TO**
**THE COMMITTEE'S CLASS CLAIM AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that hearing on the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* (the "Motion") will be held on **August 10, 2023, at 10:00 a.m., prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will take place in a hybrid

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

fashion both in person and via Zoom for Government. Those wishing to participate in the Hearing in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. For those wishing to participate remotely, in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted remotely using Zoom for Government. Parties wishing to appear at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. When making an eCourtAppearance, parties must specify whether they are making a "live" or "listen only" appearance. Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business day before the hearing (*i.e.*, on Wednesday, August 9, 2023)**.

PLEASE TAKE FURTHER NOTICE that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m., prevailing Eastern Time on August 10, 2023, must connect to the Hearing beginning at 9:00 a.m., prevailing Eastern Time on August 10, 2023. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing. Parties that type in only their first name, a nickname, or initials will not be admitted into the Hearing. When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their

2

eCourtAppearance.  Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 2560] (the "Case Management Order") by **August 3, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

PLEASE TAKE FURTHER NOTICE that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

PLEASE TAKE FURTHER NOTICE that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings

filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in

accordance with the procedures and fees set forth therein.


[*Remainder of page intentionally left blank*]

New York, New York
Dated: July 20, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:           joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:           patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING THE SETTLEMENT BY AND AMONG**
**THE DEBTORS AND THE COMMITTEE WITH RESPECT TO**
**THE COMMITTEE'S CLASS CLAIM AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and,

together with their non-debtor affiliates, "Celsius") and the Official Committee of Unsecured

Creditors (the "Committee," and together with the Debtors, the "Parties") appointed in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") respectfully state the following in

support of this joint motion (this "Motion"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

### Preliminary Statement[2]

1.      Throughout these Chapter 11 Cases, the Debtors' principal goal has been to maximize the value of their assets and to distribute that value to their creditors as promptly as possible.  Following an extensive marketing and competitive sale and auction process, the Debtors and the Committee selected Fahrenheit as the sponsor of their Plan. The Debtors are seeking approval of the related disclosure statement (the "Disclosure Statement") on August 10.  The Debtors hope to confirm the Plan in October and commence distributions to creditors before the end of the calendar year.

2.      This goal is well within the Debtors' grasp, particularly due to the recent settlement reached among the Debtors, the Committee, the Earn Ad Hoc Group, the Borrower Ad Hoc Group, and certain *pro se* creditors, which includes the settlement described in this Motion.  Following three days of mediation with Judge Michael E. Wiles, Bankruptcy Judge for the Southern District of New York Bankruptcy Court, and as set forth in more detail in the signed settlement term sheet attached hereto as **Exhibit B**, the Earn Ad Hoc Group, the Borrower Ad Hoc Group and certain *pro se* creditors have agreed to support an amended Plan that will provide Holders of Retail Borrower Deposit Claims with (a) the option to repay the their principal balance of their loan (*i.e.*, the Retail Borrower Advance Obligations) in exchange for an equivalent amount of cryptocurrency (which could lead to tax benefits for such Holders as compared to the Setoff Treatment) and (b) priority in electing a preference to exchange the NewCo Equity for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency Weighted Distribution

---

[2]    Capitalized terms used but not yet defined in this Motion shall have the meanings ascribed to them later in the Motion.  Terms used but not defined in this Motion shall have the meanings ascribed to them in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, and supplemented from time to time, the "Plan").

Election) made by such Holders under the Plan.  In addition, each of the Earn Ad Hoc Group and the Borrower Ad Hoc Group will have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee.  This settlement, including the increased claim amounts described below, fully resolves all issues between the mediation parties relating to the Plan, will lead to the withdrawal of the adversary proceedings filed by the mediation parties, and will pave the way towards confirmation of the Plan in October and distributions to account holders by the end of this year.

3.    One significant hurdle to making distributions by the end of the year is reconciling the more than 30,000 claims totaling over $78.2 billion that have been filed against the Debtors. Many of the Proofs of Claim filed by Account Holders sought damages for fraud, misrepresentation, and similar non-contractual causes of action.  Unless and until those claims are resolved, the Debtors would have to "hold back" distributions to creditors that could otherwise be paid out under the Plan.  If the Settlement is approved, it will provide each Account Holder that does not opt out of the Settlement with a 5% increase of their Account Holder Claims (other than Custody Claims) as a settlement of alleged damages incurred on account of the prepetition misconduct of the Debtors' former management team and resolve the Class Claim and other Account Holder claims.[3]

4.    Resolving the more than $70 billion of non-contract claims outside of the Settlement would be extraordinarily time-consuming and expensive.  The resolution process would significantly harm creditors through delayed distributions and ultimately lower distributions as a

---

[3]    Although the proposed percentage increase is uniform for Earn Claims and Retail Borrower Deposit Claims, because the increased percentage is applied to the entire Retail Borrower Deposit Claim, it will result in Holders of Retail Borrower Deposit Claims receiving a proportionally higher recovery on the unsecured portion of their Claim compared to Earn Claims (*i.e.*, the Retail Borrower Post-Set Off Claim).

result of increased administrative expenses incurred in connection with adjudicating such claims. Although many parties have made credible allegations of fraud and misrepresentation against the Debtors' former management team relating to the Debtors' prepetition business, obtaining a judgment for fraud or similar causes of action is a high bar and would require the expenditure of substantial time and expense. Also, it is highly unlikely that any one Account Holder could establish fraud or other non-contractual damages that would be unique to them, and not common with other Account Holders. Moreover, any Account Holder seeking to prove a non-contractual claim will have to demonstrate that they have valid damages above and beyond the loss of the cryptocurrency in their Celsius Account. A fully litigated resolution of all of the non-contractual claims that have been asserted against the Debtors would be a long and costly endeavor that would significantly delay distributions and may not ultimately lead to any change in recoveries.

5.      On April 28, 2023, and May 17, 2023, the Committee filed the Class Claim and the Class Certification Motion, respectively, on behalf of all Account Holders, alleging a variety of non-contractual claims on behalf of a proposed class of Account Holders. These non-contractual claims made allegations of fraud, misrepresentation, and similar causes of action against the Debtors' former management team regarding their prepetition business operations. The Class Claim was brought given that all Account Holders were harmed by the actions of the Debtors' prepetition management team and to ensure that all Account Holders were compensated for that harm. If allowed, the Class Claim will provide Account Holders with non-contractual claims against each of the Debtors.

6.      The Debtors' position throughout these Chapter 11 Cases has been that Account Holders' claims should be limited to the amount of the cryptocurrency in their Celsius Accounts, and that there should be no further damages for non-contractual claims. The Debtors engaged in

arm's-length, good faith discussions with the Committee, however, regarding a resolution of the issues raised in the Class Claim and the Class Certification Motion, and the Parties agreed to settle those issues through the Debtors' agreement to increase Account Holder Claims (other than Custody Claims) by 5% on account of these non-contractual causes of action.  This settlement will also significantly streamline the claims reconciliation process and allow the Debtors to promptly commence distributions to Account Holders under the Plan on the Effective Date.

7.      Importantly, any Account Holder can opt out of the Settlement and retain their rights to pursue their individual Proofs of Claim against the Debtors.  Any eligible Account Holder who does ***not*** opt out of the Settlement will receive a claim in the amount of 105% of their scheduled claim, which will supersede and extinguish any related Proofs of Claim filed by such Account Holder.  ***To be clear, any Account Holder who does not timely opt out of the Settlement will not have any right to pursue any filed Proof of Claim against the Debtors, which will be expunged by the Settlement***.  But any Account Holder who opts out will not receive the increased claim amount, will not receive a distribution from the Debtors until their applicable Proofs of Claim are fully and finally resolved by the Bankruptcy Court—which likely will be months— perhaps years—after the Effective Date, and will have to litigate and prove, or otherwise resolve their proofs of claim against the Debtors after the Effective Date.

8.      The Settlement of the Class Claim and the Class Certification Motion will provide Account Holders with a 5% increase to their claims (other than with respect to any Custody Claims) on account of non-contractual claims, will allow distributions to be made promptly after the Effective Date to any Account Holder that does not opt out of the Settlement, and will resolve costly and time-consuming litigation.  For these reasons and as further set forth below, the Settlement should be approved.

## Relief Requested

9.      The Parties seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Settlement Order"), approving the settlement of the Committee's Class Certification Motion and resolving the allegations in the Class Claim as set forth in this Motion (the "Settlement")[4] by and among the Parties.

## Jurisdiction and Venue

10.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012.  The Parties confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.      The bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9019-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New York (the "Local Bankruptcy Rules").

---

[4]    The Parties will file a settlement agreement (the "Settlement Agreement") on the docket prior to the deadline to object to this Motion, which will include the proposed opt-out procedure for all Account Holders (the Debtors intend to include the option to opt out of the Settlement as an election in the Ballot).

**Background**

I.    **The Claims Bar Date and the Claims Reconciliation Process.**

13.    The initial claims bar date in these Chapter 11 Cases occurred on February 9, 2023.
*See* [Docket No. 1846].  Prior to the occurrence of that date, over 24,000 non-governmental proofs
of claim, asserting over $78.2 billion in unsecured claims, were filed.  *See* Disclosure Statement
at 134.  In addition, Governmental Units filed 81 proofs of claim totaling approximately $77 billion
by the Governmental Bar Date.  *Id.*  Following entry of the Class Claim Order (as defined below),
the Debtors agreed to reopen the Bar Date and suspend the deadline for Account Holders to file
Proofs of Claim pending the resolution of the Class Certification Motion (as defined below) or
further order of the Court.  *See* Class Claim Order.

14.    After the issuance of the Court's *Memorandum Opinion and Order Regarding
Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling"), on January 4, 2023,
many Account Holders filed Proofs of Claim alleging, among other things, claims for fraud, breach
of contract, constructive trust, and other damages against the Debtors.  The Debtors believe that
these claims are not "individual" claims and that allowing any such claims would only reduce
recoveries for all other Account Holders.  Moreover, the Debtors do not believe that Account
Holders suffered any additional damages on behalf of these claims greater than the amount of the
cryptocurrency in Account Holders' Celsius Accounts.  To ensure equal recoveries for all Account
Holders that transferred their digital assets in the Debtors' Earn Program, the Debtors began
objecting to proofs of claim that seek additional individual claims (beyond claims on account of
cryptocurrency balances) on procedural and equitable grounds.

15.    The Debtors commenced their claims reconciliation and objection process by
objecting to three bellwether claims on February 19 and 20, 2023:  (a) *Debtors' Objection to Proof
of Claim No. 24604 of Immanuel Herrmann* [Docket No. 2105]; (b) *Debtors' Objection to Proof*

of Claim No. 23959 of Rebecca Gallagher [Docket No. 106]; and (c) *Debtors' Objection to Proof of Claim No. 24480 of Daniel A. Frishberg* [Docket No. 2107]. In all three objections, the Debtors reiterated their arguments that Account Holders are not entitled to any damages claims in excess of the amounts in their Celsius Accounts. As of the date of this Motion, prosecution of the bellwether objections was paused in connection with the Class Claim and the Class Certification Motion.

16.    As of July 11, 2023, approximately 30,046 Proofs of Claim have been filed in these Chapter 11 Cases. Of the approximately 30,046 filed Proofs of Claim, approximately 29,732 have not been resolved by final order and remain subject to the Debtors' claims reconciliation process. Until these Claims are reconciled, each is a Disputed Claim under the Plan and Holders of these Claims will not receive a distribution until they are resolved. *See generally* Plan, Art. VII. Under the Plan, the Debtors are required to establish one or more reserve accounts with funds for Disputed Claims so that once a resolution is reached with respect to a Disputed Claim, the Holder of such Claim may receive a distribution. *Id.* Art. VII.G. If there are significant Disputed Claims at the Effective Date, material distributions will need to be "held back" pending resolution of all Disputed Claims. Based on the total number of unreconciled Proofs of Claim, the Debtors anticipate that, unless this Motion and the Settlement is approved (which would resolve all Claims (other than Custody Claims) of Account Holders who do not opt out of the Settlement), the claims reconciliation process will take many months and significantly delay distributions to all creditors.

17.    At the hearing on July 18, 2023, upon the Committee's request, the Court agreed to establish August 2, 2023, as the final Bar Date in these Chapter 11 Cases. *See In re Celsius LLC*, July 18, 2023 Hr'g Tr. 68:1–3.[5]

---

[5]    A copy of the transcript is attached hereto as **Exhibit C**.

II.    **The Class Claim.**

18.    On March 3, 2023, the Court issued its *Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205] (the "Customer Claims Opinion") and held that "only [Celsius Network LLC], and not any other Debtor or non-Debtor affiliates, are liable to Customers *on contract claims* under the terms of use." Customer Claims Op. at 4 (emphasis in original). The Court further found that "the terms of use do not limit Customers (or the Committee) from asserting non-contract claims against CNL, or against other Debtor or non-Debtor affiliates, such as claims for fraud, negligent misrepresentation, or other statutory or common law claims." *Id.* The Court took note of the report submitted by the independent examiner in these Chapter 11 Cases which, while it is not admissible evidence, "describe[d] in great detail alleged misconduct by certain Celsius executives targeted specifically at Celsius customers." *Id.* at 4 n.3. Indeed, the Final Examiner's Report [Docket No. 1956] found that "[t]he business model Celsius advertised and sold to its customers was not the business that Celsius actually operated." Final Examiner's Report at 3.

19.    On April 10, 2023, the Committee filed the *Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* [Docket No. 2399] (the "Class Claim Motion") seeking authority to file a class claim or other collective action on behalf of all Account Holders and assert fraud, misrepresentation, and other statutory claims against each Debtor entity to solve the "unprecedented collective action problem" of "hundreds of thousands" of the Debtors' creditors asserting individual non-contract claims against the Debtors. Class Claim Motion ¶¶ 5, 6.

20.    On April 18, 2023, the Court entered an order granting the Class Claim Motion [Docket No. 2496] (the "Class Claim Order"). Community First Partners, LLC, Celsius SPV

Investors, LP, Celsius New SPV Investors, LP (collectively, the "Community First Holders") and

CDP Investissements Inc. (together with the Community First Holders, the "Initial Consenting

Series B Preferred Holders") appealed entry of the Class Claim Order, but agreed to dismiss the

appeal without prejudice on June 14, 2023, as reflected in the *Joint Stipulation of Voluntary

Dismissal*, which the District Court for the Southern District of New York entered on June 15,

2023. *See* [Docket No. 2817].

### III.    The Class Certification Motion.

21.    On April 28, 2023, in accordance with the Class Claim Order, the Committee filed

a class proof of claim (Claim No. 29046) (the "Class Claim") on behalf of Thomas DiFiore, Ignat

Tuganov, and Rebecca Gallagher, in their individual capacities and as proposed class

representatives, against Debtor Celsius Network Limited ("CNL") and CNL's Debtor affiliates.

The Class Claim asserts damages against the Debtors in an amount not less than $5,217,524,781.00

in U.S. Dollars arising out of non-contractual claims, including:  (a) violation of the New York

Deceptive Practices Act; (b) violation of the New York False Advertising Act; (c) violation of the

New Jersey Consumer Fraud Act; (d) fraudulent misrepresentation; (e) negligent

misrepresentation; (f) fraudulent concealment; (g) unjust enrichment;[6] (h) breach of the implied

duty of good faith and fair dealing; and (i) violation of Section 2 of the Misrepresentation Act 1967

under English law.

22.    On May 17, 2023, the Committee filed the *Motion of the Official Committee of

Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims*

---

[6]    Counts IV – VII in the Class Claim (for fraudulent misrepresentation, negligent misrepresentation, fraudulent
concealment, and unjust enrichment, respectively) are brought under New York common law. As stated in the
Class Claim, Counts IV – VII were also pleaded in the alternative, as violations of English common law for
fraudulent misrepresentation, negligent misstatement, and a claim for restitution to reverse the unjust enrichment
of CNL at the expense of the Class members.

*Against the Debtors, (II) Appoint Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2670] (the "Class Certification Motion"). Pursuant to the Class Certification Motion, the Committee sought entry of an order (i) certifying the proposed class of all account holders (the "Class"), (ii) appointing Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the class representatives (collectively, the "Class Representatives"), and (iii) appointing White & Case LLP ("White & Case") as Class counsel. Class Certification Mot. ¶ 14. As further set forth in the Class Certification Motion, the Committee argues that the Class satisfies the requirements of Bankruptcy Rule 7023, which incorporates Federal Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules") for class certification. *See generally id.* ¶¶ 71–120.

23. On June 12, 2023, the Court entered the *Order Establishing Schedule for Litigation of the Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, In Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2795] (the "Class Certification Scheduling Order"). Pursuant to the Class Certification Scheduling Order, a litigation schedule was set for the months of June, July, August, and September with a hearing on the Class Certification Motion scheduled for the week of September 25, 2023. *See* Class Certification Scheduling Order ¶ 1.

24. On June 27, 2023, the Parties and the Initial Consenting Series B Preferred Holders filed the *Joint Motion for Entry of an Order (I) Approving the Settlement by and among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting*

11

*Related Relief* [Docket No. 2899] (the "Series B Settlement Motion") seeking approval of a settlement that would, among other things, resolve the Initial Consenting Series B Preferred Holders' objections to the Class Certification Motion and alleviate the need for the litigation scheduled in the Class Certification Scheduling Order. *See* Series B Settlement Mot. ¶ 28. An order approving the Series B Settlement Motion was entered on July 20, 2023. *Order (I) Approving the Settlement By and Among the Debtors, the Committee, and the Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 3058].

**IV.    Recent Regulatory Developments and Proofs of Claim.**

25.    On July 13, 2023, the Federal Trade Commission (the "FTC"), Commodity Futures Trading Commission (the "CFTC"), and the Securities and Exchange Commission (the "SEC") each filed complaints against Celsius, certain of the Debtors, Alexander Mashinsky, the Debtors' former Chief Executive Officer, and certain other members of the Debtors' prepetition management team.

26.    Also on July 13, 2023, the United States District Court for the Southern District of New York unsealed an indictment of Mr. Mashinsky and Roni Cohen-Pavon, the Debtors' Chief Revenue Officer, alleging that the defendants committed securities fraud, commodities fraud, wire fraud, conspiracy to manipulate the price of the CEL token, market manipulation of the CEL token, and wire fraud, and conducted a fraudulent scheme to manipulate the price of the CEL token.

27.    At the hearing on July 18, 2023, counsel for the Debtors explained that the Debtors reached consensual agreements with the FTC, CFTC, and SEC resulting in a full and final resolution of the allegations brought by such agencies against the Debtors. These agreements include ongoing cooperation by the Debtors and requirements that the Debtors continue to follow

applicable laws and regulations postpetition.[7]  These agreements do ***not*** include material claims

by the regulators against the Debtors—while the agreement with the FTC includes a suspended

judgment in the amount of $4.7 billion, such suspended judgment is not expected to ripen into an

allowed claim against the Debtors.  *See* July 18, 2023 Hr'g Tr. 27:18–31:13.

### The Settlement

28.    Following good-faith and arm's-length negotiations, including negotiations with

the Ad Hoc Group of Borrowers, the Ad Hoc Group of Earn Holders, Mr. Tuganov, and certain

*pro se* parties, the Parties reached an agreement resolving the disputes between the Parties,

including disputes with respect to the Class Claim and the Class Certification Motion on the terms

set forth in this Motion.  The Settlement is supported by the Borrower Ad Hoc Group, the Earn Ad

Hoc Group, Mr. Tuganov, and certain other *pro se* parties, including Mr. Immanuel Herrmann and

Mr. Daniel Frishberg, two of the initial bellwether plaintiffs, and Mr. Cameron Crews.

29.    The Settlement resolves the disputes between the Debtors and the Committee with

respect to the Class Claim and the Class Certification Motion.  Pursuant to the Settlement, the

Debtors shall:  (a) agree to certification of the Class as requested in the Class Certification Motion;

(b) provide all Account Holder Claims (other than Custody Claims) of Holders that do not opt out

of the Settlement with a 5% increase[8]  from such Account Holders' scheduled claim (for a total of

105% of the scheduled Claim amount) measured in U.S. Dollars as of the Petition Date

(the "Settlement Claim"); and (c) provide for a mechanism for those Account Holders who do not

wish to participate in the Settlement to opt out and pursue their own claims for damages against

---

[7]    The Debtors will file these agreements on the docket of these chapter 11 cases when they are made public.

[8]    For the avoidance of doubt, the 5% increase shall apply to the entire amount of a Retail Borrower Deposit
       Claim.

the Debtors.[9] In exchange, the Committee agrees that this Settlement resolves the relief requested in the Class Claim, with respect to Account Holders that do not opt out of this Settlement, and the Class Certification Motion.

30.    For all Account Holders that do not opt out of the Settlement, the Settlement will expunge any pending claims (other than Custody Claims) held by such Account Holders other than the Settlement Claims.

31.    All Account Holders will have the opportunity to opt out of the Settlement. Those Account Holders who elect to opt out of the Settlement will (1) not receive the Settlement Claim, and will hold a Disputed Claim, (2) not receive a distribution under the Plan until such Disputed Claim is resolved, and (3) upon the filing of an objection to their Claim, the applicable Account Holder will be required to establish the validity of the Disputed Claim against the Debtors (including the underlying causes of action and the amount of such claims).

32.    The key terms of the Settlement are as follows:

| **SETTLEMENT TERMS**[10] |
|---|

| **Settlement Summary** | In full and final satisfaction of the Class Claim and resolution of the Class Certification Motion, all Holders of Account Holder Claims, other than with respect to any such Holder's Custody Claims (if any), that do not opt out of the Settlement pursuant to the procedures set forth below, shall receive, instead of any scheduled claim and/or filed Proof of Claim, a Claim equal to 105% of the scheduled amount of such Claim in the same type of Account Holder Claim (*e.g.*, a scheduled General Earn Claim for $10,000 shall receive a scheduled General Earn Claim in an amount of $10,500 or a Retail Borrower Deposit Claim for $10,000 shall receive a Retail Borrower Deposit Claim for $10,500) (any such claim, a "<u>Settlement Claim</u>") against each Debtor entity. |

---

[9]    The amount of any Account Holders' Claim based on CEL Token will be valued using the price currently proposed in the Plan.

[10]    The following summary of the Settlement is provided for illustrative purpose only and is qualified in its entirety by the Settlement Agreement. In the event of any inconsistency between this summary, this Motion, and the subsequently filed Settlement Agreement, the Settlement Agreement will control in all respects. Further, neither this summary nor Motion shall be used to construe or interpret the terms of the Settlement Agreement or intent of the Parties thereto.

| | Upon the expiration of the Opt-Out Period (as defined below), any claims and/or causes of action set forth in a Proof of Claim and/or the Class Claim held by any Account Holder that does not opt-out of the Settlement shall be expunged and superseded by such Holder's Settlement Claim (other than Custody Claims). For the avoidance of doubt, Holders of Account Holder Claims that do not opt out of the Settlement shall (a) no longer be entitled to the amounts set forth on any filed Proof of Claim, (b) no longer be entitled to prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim, and (c) be limited to receiving a recovery from the Debtors with respect to a Settlement Claim pursuant to the treatment provided in the Plan. |
| | Each applicable scheduled claim or filed Proof of Claim relating to any Account Holder (other than Custody Claims) who does not timely opt out of the Settlement shall be deemed amended consistent with the foregoing upon entry of the Settlement Order; *provided* that all Account Holders shall only be entitled to vote in the amount of their pre-Settlement scheduled claims as further explained in the Disclosure Statement Motion;[11] *provided further* that Excluded Parties are not eligible for the Settlement and will not receive the benefit of the Settlement (*i.e.*, a Settlement Account Holder Claim) even if any such Excluded Party does not opt out of the Settlement. |
| | Any Settlement Claims (other than Claims based on CEL Token) shall not be subject to subordination pursuant to section 510(b) of the Bankruptcy Code. |
| | For the avoidance of doubt, the Debtors shall have until the Effective Date of the Plan to object to any Settlement Claim based on the Debtors' books and records. |
| **Calculation of certain Account Holder Claims** | All Account Holder Claims, except for any such claims associated with CEL Token and any Custody Claims, shall be calculated by converting the value of the Claim into Cash as of the Petition Date using the conversion rates provided in the Cryptocurrency Conversion Table [Docket No. 1420]. CEL Token shall be valued as provided in Article IV.B.2 of the Plan. |
| **Excluded Claims** | The Settlement shall not apply to non-Account Holder Claims, Custody Claims,[12] or Claims of Excluded Parties. For the avoidance of any doubt, the Settlement applies to any other damage or other non-contract claims asserted by Account Holders. |

---

[11]   The "Disclosure Statement Motion" means the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 2970].

[12]   Holders of Custody Claims are eligible to participate in the Custody Settlement pursuant to the Plan, which would result in a release of the same claims contemplated by the Settlement. In addition, Holders of Custody Claims are receiving distributions "in-kind" and are not subject to the same distribution "hold back" concerns as other Account Holders. For these reasons, Holders of Custody Claims are not eligible for the Settlement with respect to the Custody Claims.

| | |
|---|---|
| **Participation Process** | As a part of the Solicitation Package, the Debtors will provide all eligible Account Holders with a Notice of Claims Settlement, which shall be attached to the Settlement Agreement and approved pursuant to the Settlement Order. The Notice of Claims Settlement will explain the terms of the Settlement, the process of opting-out, and the consequences of not opting out of the Settlement.[13]<br><br>Any Holder of an Account Holder Claim that does not vote on the Plan or does not affirmatively opt-out of the Settlement prior to the conclusion of the time period to vote on the Plan (the "Opt-Out Period") will be bound by the terms of the Settlement upon the expiration of the Opt-Out Period. Proofs of Claim filed by Holders of Account Holder Claims (other than Custody Claims) that do not opt out of the Settlement shall be expunged from the Claims Register and shall be of no further force and effect.<br><br>Holders of Account Holder Claims that opt-out of the Settlement shall have their Account Holder Claims (other than Custody Claims) treated as Disputed Claims under the Plan and shall not receive a distribution on the Effective Date. Rather, such Holders shall receive a distribution (if any) on the date any such Holder's Disputed Claim is resolved in the claims reconciliation process. The distribution that any such Holder that elects to opt-out of the Settlement ultimately may receive will depend on the outcome of such claims reconciliation process and/or litigation.<br><br>Holders of Account Holder Claims may vote in favor of the Plan and opt-out of this Settlement; *provided* that Holders of Account Holder Claims that vote in favor of the Plan are still bound by the releases set forth in the Plan and will only retain their rights with respect to their Proof of Claim. For the avoidance of doubt, the Debtors reserve all rights to object to and dispute the amounts set for the in any filed Proofs of Claim and the allegations set forth in the Class Claim with respect to any Account Holder that commences litigation against the Debtors related to such Holder's Proof of Claim and/or any allegations in the Class Claim. |
| **Revised Plan and Disclosure Statement** | As soon as reasonably practicable after the filing of this Motion and prior to the deadline to object to the Disclosure Statement, the Debtors shall file a revised plan of reorganization reflecting the terms of the Settlement.<br><br>Each Account Holder shall be entitled to vote the scheduled amount of their claim as authorized by the Court in the Disclosure Statement Order (as defined in the Disclosure Statement Motion). For the avoidance of doubt, nothing in the Settlement, the Class Certification Motion, or the Class Claim shall affect voting on the Plan or provide the Committee with a right to vote on the Plan. Committee members shall retain all rights to vote Claims held in their individual capacity and opt out of this Settlement in such capacity. |
| **Resolution of Class Claim and Class Certification Motion** | Under the Settlement, the Debtors agree to granting the certification of the Class, to the extent applicable and necessary. The Allowance of the Settlement Claims shall constitute a full and final resolution of the Class Claim on behalf of all Account Holders that do not opt out of the Settlement. For the avoidance of doubt, |

---

[13]    The Debtors will file a proposed form of Notice of Claims Settlement on the docket prior to the deadline to object to this Motion and prior to the deadline to object to the Disclosure Statement.

| | upon entry of the Settlement Order, the Committee shall not prosecute the Class Claim on behalf of any or all Account Holders. |
|---|---|

33.     The Debtors have determined, in the exercise of their business judgment, that entry into the Settlement is in the best interest of their estates and all stakeholders as it avoids the delay and costs of potentially protracted litigation related to the Class Claim and the claims reconciliation process.  The Settlement was negotiated at arm's length and in good faith among the Debtors and the Committee and their respective advisors, and provides clarity and certainty to the Debtors' stakeholders with respect to the Class Claim and their anticipated distributions under the Plan.

## Basis for Relief

### I.    The Settlement Should Be Approved Pursuant to Bankruptcy Rule 9019(a).

34.     The Settlement represents a favorable resolution of Account Holder Claims, allows any Account Holder to opt out of the Settlement, and reflects the Debtors' sound business judgment.  Bankruptcy Rule 9019(a) provides that "after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  The Settlement is subject to approval by the Court under Bankruptcy Rule 9019(a).

35.     A settlement under Bankruptcy Rule 9019 need not result in the best possible outcome for the debtors, but must not "fall below the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 595 (Bankr. S.D.N.Y. 1991).   In determining the range of reasonableness, the bankruptcy court need not decide issues of law and fact raised by the settlement.  *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).  In other words, the court does not need to conduct a "mini-trial" of the underlying facts and merits; it needs only to evaluate those facts that are necessary to allow it to assess the settlement and to make an independent judgment about the settlement.  *See In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y.

2009) ("The standard does not require that the settlement be the best the debtor could have obtained nor does it require the court to conduct a mini-trial of the questions of law and fact.").

36.     Rather, the court must be "apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640-41 (Bankr. S.D.N.Y. 2012) (Glenn, J.).  In conducting this assessment, "a court may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *Id.* at 641.

37.     Ultimately, the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim."); *Drexel Burnham*, 134 B.R. at 505; *see also Abeles v. Infotechnology (In re Infotechnology)*, 1995 U.S. App. LEXIS 39883, at *4–5 (2d Cir. Nov. 9, 1995) (noting that in determining whether to approve a debtor's motion to settle a controversy, a court does not substitute its judgment for that of the debtor).

38.     A court should exercise its discretion in favor of a settlement wherever possible, as settlements are generally favored in bankruptcy. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged."); *see also In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) ("The decision to grant or deny a settlement or compromise lies squarely within the discretion of the bankruptcy court [and such] discretion should be exercised in light of the general public policy favoring settlements.") (citing *Nellis v. Shugrue* 165 B.R. at 121); *In re Michael Milken & Assocs. Secs. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (noting the paramount

public policy for settlements)).[14]   Notably, "[s]ettlements and compromises are favored in

bankruptcy as they minimize costly litigation and further parties' interests in expediting the

administration of the bankruptcy estate." *In re LATAM Airlines Group S.A.*, 2022 WL 272167, at

*12 (Bankr. S.D.N.Y. Jan. 28, 2022) (quoting *In re MF Global Inc.*, 2012 WL 3242533, at *5

(Bankr. S.D.N.Y. Aug. 10, 2012) (Glenn, J.)).

39.     In determining whether to approve a settlement as fair and equitable and in the best

interests of the debtor's estate under Bankruptcy Rule 9019, courts in the Second Circuit consider

what is often referred to as the "*Iridium*" factors:   (a) the balance between the litigation's

possibility of success and the settlement's future benefits; (b) the likelihood of complex and

protracted litigation, with its attendant expense, inconveniences, and delay; (c) the paramount

interest of the creditors; (d) whether other parties in interest affirmatively support the proposed

settlement; (e) the nature and breadth of releases to be obtained by officers and directors;

(f) whether the competency and experience of counsel support the settlement; and (g) the extent to

which the settlement is the product of arm's-length bargaining.  *See In re Iridium Operating LLC*,

478 F.3d 452, 462 (2d Cir. 2007); *see also Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292

(2d Cir. 1992); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 428 (S.D.N.Y. 1993), *aff'd*, 17 F.3d

600 (2d Cir. 1994).

40.     The Settlement described in this Motion represents a fair and equitable compromise

that is in the best interests of the Debtors' estates, falls well within the range of reasonableness,

and satisfies each of the *Iridium* factors.

---

[14]    Further, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that
is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."   Authorizing the Debtors to
proceed with the Settlement falls squarely within the spirit of Bankruptcy Rule 9019 as well as the Bankruptcy
Code's predilection for compromise.  Thus, to the extent necessary, section 105(a) relief is appropriate in this
instance and would best harmonize the settlement processes contemplated by the Bankruptcy Code.

**A. The Settlement Avoids the Costs and Risks Associated with Litigating the Class Claim and the Class Certification Motion.**

41.    The Settlement satisfies the *first* and *second* *Iridium* factors, as the Settlement will resolve the Class Certification Motion without the need for costly and protracted litigation. Certification of the Class, as contemplated by the Settlement, finally resolves a series of issues that were scheduled to be litigated over a fourth-month period, culminating in a full evidentiary hearing.  Avoiding such litigation, including the voluminous discovery and expert testimony associated therewith, will save the Estates significant resources.  In addition, not requiring hundreds of thousands of Holders to file and prove individual non-contract proofs of claim and the Estates to defend against such claims will save the Estates expenses and resources associated with administering such a large volume of claims and ensure an equitable and efficient distribution of the Debtors' assets.

42.    Avoiding costly, protracted litigation that would consume significant estate resources at this critical juncture is in the best interests of the Debtors' estates.  The Debtors have been in chapter 11 for over a year and are seeking approval of the Disclosure Statement and nearing confirmation and consummation of their Plan.  Moreover, by seeking approval of the Settlement prior to commencement of the solicitation process and using the solicitation process to provide Account Holders with the opportunity to opt out, the Debtors will save additional costs and further streamline the confirmation and distribution process.  Approval and consummation of the Settlement would avoid these costs for the benefit of all parties in interest.

B.    **The Settlement Is in the Best Interests of the Debtors' Estates and Is Supported by the Borrower Ad Hoc Group and the Earn Ad Hoc Group.**

43.    As for the ***third*** and ***fourth*** *Iridium* factors, the resolution of the Class Claim and the Class Certification Motion is in the best interests of the Debtors' creditors and is supported by two key stakeholder groups, in addition to the Parties.

44.    The Settlement resolves one of the most significant issues in these Chapter 11 Cases (the relative rights of creditors to the Debtors' assets) and further builds consensus among stakeholders.  The cost savings associated with the Settlement are astronomical, as the Settlement not only resolves the Class Claim and Class Certification Motion, but significantly streamlines the claims reconciliation process.  As a result, the Debtors will be able to distribute greater amounts of recoveries to more creditors on a faster timeline.  All of this results in both costs and time saved.  Resolving this key issue at a reasonable cost, and at this critical juncture in these Chapter 11 Cases, is invaluable to the Debtors' estates.  The Settlement also provides for an equitable distribution of the Debtors' Estates and is the product of hard-fought negotiations as part of a mediation overseen by Judge Wiles.

C.    **The Releases in the Settlement Are Customary and a Crucial Part of the Settlement.**

45.    The releases granted pursuant to the Settlement are mutual, narrow in scope, essential to the Settlement, and are similar in nature to other settlements of the same nature in other Chapter 11 Cases.  Importantly, ***all*** eligible Account Holders will have an opportunity to opt out

21

of the Settlement and preserve their rights to prosecute their Proofs of Claims against the Debtors, should they choose to do so.

> ### D.    Each Party to the Settlement Is Represented by Competent and Experienced Counsel and the Settlement Is the Result of Extensive Negotiations Between the Parties

46.    As for the last two *Iridium* factors listed above, all Parties to the Settlement are represented by competent and experienced counsel and various financial advisors, and the Settlement is the result of good faith, arm's-length negotiations between the Parties.  Throughout settlement discussions, the Parties worked in good faith and without collusion towards a consensual resolution of all disputed issues.  In addition, Account Holders will have an opportunity to review and understand the Settlement in connection with the solicitation process and may elect to opt out of the Settlement.

47.    The Settlement reflects the best possible consensual resolution of the Class Claim and the Class Certification Motion.  The alternative to a consensual resolution is a potentially worse outcome for the Debtors than a settlement on the terms embodied in the Settlement.  The Debtors are confident that the Parties have reached the best possible terms and that negotiations can conclude so that the Debtors can focus on achieving approval of the Disclosure Statement, confirmation of the Plan, and emerging from bankruptcy.

48.    In sum, the Debtors have determined, in an exercise of their sound business judgment, that the Settlement is fair, equitable, and eminently reasonable.  Moreover, the timely resolution of this dispute is in the best interests of the Debtors' estates and creditors.  The Debtors therefore submit that the Settlement falls well above the lowest point in the range of reasonableness.  Accordingly, the Debtors respectfully request that the Court approve the Settlement, including the Parties' entry into the Settlement Agreement pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019.

## **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

49.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

50.    Except as explicitly set forth in this Motion and the Settlement Agreement (once approved by the Court and implemented in accordance with its terms), nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Except as explicitly set forth in this Motion and the Settlement Agreement (once approved by the Court and implemented in accordance with its terms), if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

51.    This Motion includes citations to the applicable rules and statutory authorities upon

which the relief requested herein is predicated and a discussion of their application to this Motion.

Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

52.    The Debtors will provide notice of this Motion to the following parties or their

respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) Account Holders;

(d) the United States Attorney's Office for the Southern District of New York; (e) the Internal

Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate;

(g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant

to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested,

no other or further notice need be given.

## No Prior Request

53.    No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Parties respectfully request that the Court enter the Settlement Order,

granting the relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

New York, New York
Dated:  July 20, 2023

_/s/ Aaron E. Colodny_
**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Keith H. Wofford
1221 Avenue of the Americas
New York, New York 10020
Telephone:      (212) 819-8200
Facsimile:       (212) 354-8113
Email:  david.turetsky@whitecase.com
         sam.hershey@whitecase.com
         kwofford@whitecase.com

-and-

**WHITE & CASE LLP**
Michael C. Andolina (admitted _pro hac vice_)
Gregory F. Pesce (admitted _pro hac vice_)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60654
Telephone:      (312) 881-5400
Facsimile:       (312) 881-5450
Email:         mandolina@whitecase.com
               gregory.pesce@whitecase.com

-and-

**WHITE & CASE LLP**
Aaron E. Colodny (admitted _pro hac vice_)
555 South Flower Street, Suite 2700
Los Angeles, California 90012
Telephone:      (213) 620-7700
Facsimile:       (213) 452-2329
Email:  aaron.colodny@whitecase.com

_Co-Counsel to the Official Committee of_
_Unsecured Creditors_

_/s/ Joshua A. Sussberg_
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:         jsussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

_____

## ORDER (I) APPROVING THE SETTLEMENT
## BY AND AMONG THE DEBTORS AND THE COMMITTEE WITH RESPECT
## TO THE COMMITTEE CLASS CLAIM AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") and the Committee (collectively, the "Parties") for entry of an order (this "Order"), pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 9019 (a) approving the settlement ("Settlement"), as described in the Motion, by and among the Parties, and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.  The Settlement was negotiated in good faith and the Settlement Agreement attached hereto as **Exhibit 1** is approved in its entirety.

2.      In the event of any inconsistency between the Motion or this Order and the Settlement Agreement, the Order shall control.

3.      All objections, including without limitation, made by any party to the Settlement, that have not been withdrawn, waived, settled, or specifically addressed in this Order and all reservations of rights included in any such objections, are hereby overruled on the merits. Accordingly, the entry into the Settlement by the Parties is authorized and ratified, and the Parties are directed to perform all of the terms of the Settlement.

4.      The Notice of Class Claims Settlement attached hereto as **Exhibit 2** is approved and may be included in the Solicitation Package.  The mechanism by which to opt-out of the Settlement in the Ballot is approved.

5.      Pursuant to Bankruptcy Rule 9019, the Parties are authorized to enter into and perform the Settlement as embodied in the Settlement Agreement, and perform, execute, and deliver all documents, and take all actions necessary, to immediately continue and fully implement

the Settlement in accordance with the terms, conditions, and agreements set forth or provided for in the Settlement Agreement.

6.      In furtherance of this Order, the Settlement Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the Parties thereto in a writing signed by such Parties, and in accordance with the terms thereof, without further order of the Court, provided such modification, amendment, or supplement is not material.

7.      The failure to mention any provision of the Settlement in this Order shall not impair its efficacy, it being the intent and effect of this Order that the Settlement and the compromises and agreements contained therein are approved in all respects and all relief contemplated by the Settlement is hereby granted.

8.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

9.      The notice requirements under Bankruptcy Rule 6004(a) are hereby waived.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

12.     This Order shall bind the Parties, their estates and any successors or assigns, including without limitation any trustee, liquidating trustee, litigation administrator, or other estate representative.

13.     This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

Exhibit 1

Settlement Agreement

<u>Exhibit 2</u>

Notice of Claims Settlement

## **Exhibit B**

**Settlement Term Sheet By and Among the Debtors, the Committee, the Earn Ad Hoc Group, the Borrow Ad Hoc Group, and Certain *Pro Se* Creditors**

*In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG)

## PLAN TREATMENT TERM SHEET REGARDING CLAIMS AND OBLIGATIONS OF RETAIL BORROWERS AND GENERAL EARN CLAIMS

This term sheet (the "**Term Sheet**") is presented in connection with the mediation of the treatment of Retail Borrow Deposit Claims and General Earn Claims in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (the "**Plan**") proposed by Celsius Network LLC and its affiliated debtors (the "**Debtors**") in the jointly-administered cases styled *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (the "**Chapter 11 Cases**").[1]

This term sheet contains certain material terms and conditions concerning a framework for a proposed settlement and treatment of the claims and obligations of individual account holders (the "**Retail Borrowers**") with outstanding obligations (each, a "**Retail Advance Obligation**") with respect to advances made by the Debtors in connection with the Debtors' Borrow program as of July 13, 2022 (the "**Petition Date**") and individual account holders with outstanding obligations in connection with the Debtors' Earn program as of July 13, 2022.

This Term Sheet is being provided for negotiation purposes only and does not address all terms, conditions, or other provisions that would be required in connection with the Plan, which terms shall be set forth in the Plan, which is subject to further negotiation between the parties. This term sheet is not an offer and is subject to definitive documentation in all respects.

**THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE CONFIRMATION OF THE PROPOSED PLAN (AND THEN ONLY AS PROVIDED THEREIN), AS APPLICABLE, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

| TERMS |
|---|
| ***Plan Treatment of Non-Contract Claims Associated with the Earn and Borrow Accounts*** | The Debtors and the Committee shall enter into a settlement agreement resolving the Committee Class Claim and Class Certification Motion (the "Class Claim Settlement"), which shall Allow a Claim for each Account Holder who does not opt out of the Class Claim Settlement against each Debtor entity on account of their contract claims and non-contract claims as follows:<br><br>All holders of Account Holder Claims other than Custody Claims shall receive, in lieu of any scheduled claim or a proof of claim, 105% of the scheduled amount of such Claim as the same type of Account Holder Claim |

---

[1] Where context requires, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

| | |
|---|---|
| | (*e.g.*, a General Earn Claim for $10,000 shall receive a General Earn Claim in an amount of $10,500 or a Retail Borrower Deposit Claim for $10,000 shall receive a Retail Borrower Deposit Claim for $10,500) (the "Settlement Claim"). |
| | Each Account Holder shall receive notice and an opportunity to opt out of the Class Claim Settlement. |
| | Any applicable scheduled claim or filed claim relating to any Account Holder who does not opt out of the Class Claim Settlement shall be deemed amended consistent with the foregoing. |
| | For the avoidance of doubt, no Account Holder may receive value under the Plan that exceeds the amount of their Settlement Claim. |
| | The Class Claim Settlement (other than Claims based on CEL Token) will resolve any argument that any damage claim on account of the Earn or Borrow program is subject to subordination pursuant to section 510(b) of the Bankruptcy Code. |
| | The Earn Ad Hoc Group, Borrower Ad Hoc Group, Mr. Tuganov, Mr. Hermann, Mr. Crews, and Mr. Frishberg shall support the Class Claim Settlement. |
| ***Calculation of Retail Deposit Claims and General Earn Claims*** | All Retail Deposit Claims and General Earn Claims, except for any such claims associated with CEL Token, shall be calculated by converting the value of the Claim into Cash as of the Petition Date using the conversion rates provided in the Cryptocurrency Conversion Table [Dkt. No. 1420]. CEL Token shall be valued as provided in Article IV.B.2. |
| ***Treatment of Retail Deposit Claim*** | The Plan will be amended to provide Holders of Retail Borrower Deposit Claims the following treatment in full and final satisfaction of such Retail Borrower Deposit Claims, including, without limitation, dismissal with prejudice of the adversary proceeding brought by the Ad Hoc Group of Borrowers and participating *pro se* account holders: |
| | o **Optional Repayment of Retail Advance Obligation**: |
| | A Retail Borrower must elect on its ballot whether it intends to repay its Retail Advance Obligation. To the extent a Retail Borrower makes such election and repays its Retail Advance Obligation on the terms set forth below, the Debtors shall pay an amount of BTC or ETH (at the Retail Borrower's election) equivalent to the Retail Advance Obligation repaid with such amount of BTC or ETH valued as of Noon ET on such date based on prices on a cryptocurrency exchange agreed upon by the Debtors and the Ad Hoc Group of Borrowers. |
| | The Debtors shall email a notice of the projected Effective Date to all Retail Borrowers at least thirty (30) calendar days prior to such Effective Date and provide each such Retail Borrower with instructions on how to repay the applicable Retail Advance Obligation. |

If a Retail Borrower elects to repay its Retail Advance Obligation, it must do so no later than five (5) calendar days prior to the projected Effective Date.

To the extent a Retail Borrower elects to repay its Retail Advance Obligation, but does not repay such obligation no later than five (5) calendar days prior to the projected Effective Date, the applicable Retail Borrower's Retail Advance Obligation shall be set off against the Retail Borrower Deposit Claim.  The difference between the Retail Borrower Deposit Claim and the Retail Advance Obligation, is referred to herein as the "**Retail Borrower Excess Claim.**"

o   **Treatment**:  On the Effective Date, a Retail Borrower shall receive:

  **A.**  Either:

    1.  If the Retail Borrower repays its Retail Advance Obligation, an amount of BTC or ETH (at the Retail Borrower's election) equal to the Repayment Amount; *or*

    2.  If the Retail Borrower elects to not repay or fails to repay its Retail Advance Obligation, such Retail Advance Obligation shall be set off against the Retail Borrower Deposit Claim (*i.e.* the Retail Borrower Deposit Claim shall be reduced by the amount of the Retail Advance Obligation); *plus*

  **B.**  On account of the Retail Borrower Excess Claim, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, in an amount such that the Retail Borrower receives its pro rata amount of the Unsecured Claim Distribution Consideration (*i.e.* (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of NewCo Common Stock (subject to dilution by the Management Equity Compensation); *provided,* that any election to Liquid Cryptocurrency Weighed Distribution Election shall be given priority over all other such elections.

  **C.**  In exchange for the agreements herein, the parties acknowledge that any obligation of the Borrowers to pay any amount on account of interest owed to the Debtors on account of the applicable Retail Advance Obligation for the duration of these Chapter 11 Cases is waived.

  **D.**  All recoveries on account of a Retail Borrower Deposit Claim shall be capped at 100% of such Claim.

3

| | |
|---|---|
| ***General Earn Claim Treatment*** | The Plan will be amended to provide Holders of General Earn Claims the following treatment in full and final satisfaction of such General Earn Claims:<br><br>**Treatment**:  Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its pro rata share of the Unsecured Claim Distribution. |
| ***Substantive Consolidation*** | The Plan shall be amended to provide for the substantive consolidation of Celsius Network LLC, Celsius Network Limited, Celsius Lending LLC, and Celsius Networks Lending LLC. |
| ***Outstanding Adversary Proceedings*** | Following the execution of the Restructuring Support Agreements described below, the parties shall stay all deadlines related to the adversary proceedings filed by the Ad Hoc Group of Borrowers, Mr. Tuganov, Mr. Herrmann, and Mr. Frishberg; and Mr. Frishberg and Mr. Hermann's appeal of the Customer Claims Opinion and Order (the "<u>Outstanding Litigation</u>").    Upon the occurrence of the Effective Date, the Outstanding Litigation shall be dismissed with prejudice. |
| ***Restructuring Support Agreements*** | The Ad Hoc Group of Borrowers, Ad Hoc Group of Earn Holders, Mr. Tuganov, Mr. Herrmann, Mr. Frishberg and Mr. Crews shall execute a Restructuring Support Agreement to support the Plan (as amended in accordance with this term sheet) and not take any actions inconsistent with such support.    The parties recognize that any Restructuring Support Agreement executed by an ad hoc group does not bind any individual members in such group other than the signatories. |
| ***Tax Matters*** | The parties agree to use commercially reasonable efforts to structure the transaction in a tax efficient manner for Earn and Borrow creditors. |
| ***Plan Supplement*** | The Debtors shall provide the Ad Hoc Group of Earn Holders, Mr. Tuganov, and Ad Hoc Group of Borrowers with copies of the governance documents for NewCo prior to the filing of the Plan Supplement. |
| ***Definitions*** | "*Distribution Valuation Table*" means the conversion table the Debtors shall use to calculate the amount of any Cryptocurrency a Holder of an Allowed Claim (other than Custody Claims) shall receive under the Plan, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the anticipated Effective Date.<br><br>"*Liquid Cryptocurrency Distribution Amount*" means the amount of Liquid Cryptocurrency to be distributed as part of the Unsecured Claim Distribution Consideration, which shall be an amount equal to the total value of Liquid Cryptocurrency held by the Debtors on the Effective Date less, without duplication:   (a) distributions to (or reserves for) Holders of Allowed Convenience Class Claims, Allowed Custody Claims, and Allowed Withhold Claims; (b) the NewCo Capitalization Amount; (c) amounts liquidated to fund the Professional Fee Escrow Account; (d) the Initial Litigation Funding |

Amount; (e) Cash needed at emergence (pre-transaction items); and (f) Cryptocurrency in an amount equal to the Senior Claims Amount. The Committee, in consultation with the Debtors, shall have the discretion to adjust the Liquid Cryptocurrency Distribution Amount downward based upon the amount of aggregate Unsecured Claim Distribution Mix Elections, the status and funding of the Litigation Recovery Account, or any other factors affecting the evaluation or liquidity of the assets anticipated to be transferred to NewCo and/or its subsidiaries on the Effective Date of the Plan.

"*Litigation Proceeds*" means the proceeds of the Recovery Causes of Action.

"*Liquid Cryptocurrency*" means the types of Cryptocurrency to be distributed to Holders of Claims pursuant to this Plan, which may include: (a) BTC and (b) ETH.

"*NewCo Equity*" means shares of common stock in NewCo to be distributed on the Effective Date in accordance with the terms hereof, representing each such Holder's common equity interest in NewCo.

"*Recovery Causes of Action*" means, to the extent not expressly released pursuant to the terms of the Plan or the Confirmation Order, any (a) Causes of Action that the Debtors or their Estates may have that are based on or related to actions taken by, or omissions of, any Excluded Party or any other Person or Entity that is not a Released Party in connection with the management or affairs of the Debtors prior to or after the filing of the Chapter 11 Cases and (b) Avoidance Actions. For the avoidance of doubt, the Recovery Causes of Action shall include (x) those Causes of Action identified in (i) the complaint attached as Exhibit 2 to the UCC Claims Stipulation Motion and Roni Cohen-Pavon and (ii) the Schedule of Additional Recovery Causes of Action, (y) the Contributed Claims, and (z) any additional Causes of Action determined to be included by the Court and described in the Confirmation Order.

"*Retail Advance Obligation*" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

"*Retail Borrower Deposit Claim*" means a Retail Borrower's Claim against the Debtors on account of the Cryptocurrency such Retail Borrower transferred in connection with its Retail Advance Obligation(s).

"*Retail Borrower Post-Set Off Claim*" means the amount of the Retail Borrower Deposit Claim remaining after the set off or repayment of the Retail Advance Obligation as set forth in this term sheet.

"*Unsecured Claim Distribution Consideration*" means (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of the NewCo Equity (subject to dilution by the Management Equity Compensation).

| | |
|---|---|
| *Expense Reimbursement* | The Plan shall be amended to provide for the payment of expense reimbursement for reasonable and documented expenses and legal fees incurred by the Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, the participating *pro se* claimants in their individual capacities, and Ignat Tuganov, under Section 503(b)(3)(D) of the Bankruptcy Code as consideration, in part, for the settlement of the relevant adversary proceedings and the appeal as provided herein, participation in the mediation, their role as class representative, and other contributions to the case as applicable. |
| *Governance* | The Ad Hoc Group of Earn Account Holders and the Ad Hoc Group of Borrowers shall each appoint one member of the Litigation Oversight Committee and Avoidance Action Subcommittee, which shall be subject to the consent of the Committee. |
| *Reservation of Rights* | The Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, the participating *pro se* claimants in their individual capacities, and Ignat Tuganov shall be consulted prior to the execution of the Plan wind-down "toggle."<br><br>The class representatives in the class action, the Earn Ad Hoc Group, and Borrower Ad Hoc Group (including their members and Related Parties) shall be added as Released Parties and Exculpated Parties under the Plan. |

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Celsius Network LLC and its Affiliated Debtors**

By: Christopher Ferraro

**The Official Committee of Unsecured Creditors**

By: Thomas DiFiore

**Ad Hoc Group of Borrowers**

By: Veton Vejseli

**Ad Hoc Group Earn Group**

By: Joyce Kuhns Esq.

**Ignat Tuganov**

By: Jeffrey Sabin, Esq.

7

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Cameron Crews**

By: Cameron Crews

**Daniel Frishberg**

By: Daniel Frishberg

IMMANUEL HERRMANN

**Exhibit C**

*In re Celsius Network LLC*, **July 18, 2023 Hearing Transcript**



Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    Adv. Case No. 23-01007-mg

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK LLC,

9

10           Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   AD HOC GROUP OF BORROWERS,

13           Plaintiffs,

14       v.

15   CELSIUS NETWORK, LLC, et al.,

16           Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 23-01016-mg

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   GEORGIOU, et al.,

21           Plaintiffs,

22       v.

23   CELSIUS NETWORK, LLC, et al.,

24           Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

1   Adv. Case No. 23-01190-mg

2   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3   SHANKS,

4            Plaintiffs,

5        v.

6   CELSIUS NETWORK, LLC, et al.,

7            Defendants.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   Adv. Case No. 23-01010-mg

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11  SHANKS,

12           Plaintiffs,

13       v.

14  CELSIUS NETWORK, LLC, et al.,

15           Defendants.

16  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17               United States Bankruptcy Court

18               One Bowling Green

19               New York, NY   10004

20

21               July 18, 2023

22               10:01 AM

23

24

25

**Page 3**

1  B E F O R E :

2  HON MARTIN GLENN

3  U.S. BANKRUPTCY JUDGE

4

5  ECRO:   F. FERGUSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   HEARING re Second Interim Fee Application of M3 Advisory

2   Partners, LP for Compensation for Services Rendered and

3   Reimbursement of Expenses as Financial Advisor to the

4   Official Committee of Unsecured Creditors for the period of

5   November 1, 2022 through February 28, 2023 (Doc #2459, 2980)

6

7   HEARING re Second Application for Interim Professional

8   Compensation for Ernst & Young LLP, Other Professional,

9   period:  11/1/2022 to 2/28/2023, fee:  $417,855.00,

10  expenses:  $0.00 (Doc #2455, 2980)

11

12  HEARING re First Interim Fee Application of Gornitzky & Co.

13  for Compensation for Services Rendered and Reimbursement of

14  Expenses as Israeli Counsel to the Official Committee of

15  Unsecured Creditors for the period of November 2, 2022

16  through February 28, 2023 (Doc #2514, 2980)

17

18  HEARING re Second Interim Fee Application of Huron

19  Consulting Services LLC as Financial Advisor to Examiner for

20  the Period from November 1, 2022 through and including

21  February 28, 2023 for Huron Consulting Services LLC, Other

22  Professional, period:  11/1/2022 to 2/28/2023, Fee:

23  $3,386,594.00, expenses:  $0.00 (Doc #2465, 2980)

24

25

Page 5

1   HEARING re Second Interim Application of Elementus Inc. for

2   Compensation for Services Rendered and Reimbursement of

3   Expenses as Blockchain Forensics Advisor to the Official

4   Committee of Unsecured Creditors of Celsius Network, LLC, et

5   al., for the period from November 1, 2022 through February

6   28, 2023 filed by Elementus Inc. (Doc #2464, 2980)

7

8   HEARING re Second Application for Interim Professional

9   Compensation of White & Case LLP for Compensation for

10   Services Rendered and Reimbursement of Expenses as Counsel

11   to the Official Committee of Unsecured Creditors from

12   November 1, 2022 through February 28, 2023 (Doc #2457, 2980)

13

14   HEARING re Second Application for Interim Professional

15   Compensation for Centerview Partners LLC, Other

16   Professional, period:  11/1/2022 to 2/28/2023, Fee:

17   $2,000,000.00, expenses:  $2,195.04 (Doc 2466, 2980)

18

19   HEARING re First Application for Interim Professional

20   Compensation for Ernst & Young LLP, Other Professional,

21   period: 7/13/2022 to 10/31/2022, fee:$778,680.00, expenses:

22   $0.00. (Doc# 2170, 2980, 3020)

23

24

25

Page 6

1    HEARING re Second Interim Application of Shoba Pillay,

2    Examiner and Jenner & Block LLP for Compensation for

3    Professional Services Rendered and Reimbursement of Expenses

4    Incurred as Attorneys for Examiner for the Period of

5    November 1, 2022 Through March 31, 2023 for Jenner & Block

6    LLP, Special Counsel, period: 11/1/2022 to 3/31/2023,

7    fee:$9,534,819.50, expenses: $66,595.09. (Doc #2463, 2980)

8

9    HEARING re First Interim Application of A.M. Saccullo Legal,

10    LLC Compensation for Services and Reimbursement of Expenses

11    Incurred as Special Counsel to the Debtors for the Period

12    from December 1, 2022 Through February 28, 2023 for A.M.

13    Saccullo Legal, LLC, period: 12/1/2022 to 2/28/2023,

14    fee:$63,845.00, expenses: $0.00. (Doc # 2462, 2980)

15

16    HEARING re First Application for Interim Professional

17    Compensation of Selendy Gay Elsberg PLLC for Services

18    Rendered and Reimbursement of Expenses as Co-Counsel to the

19    Official Committee of Unsecured Creditors for the Period of

20    January 8, 2023, through February 28, 2023. (Doc# 2452,

21    2980)

22

23

24

25

Page 7

1    HEARING re Second Interim Fee Application of Perella

2    Weinberg Partners LP for Compensation for Services Rendered

3    and Reimbursement of Expenses as Investment Banker to the

4    Official Committee of Unsecured Creditors of Celsius

5    Network, LLC, et al., for the period of November 1, 2022

6    through February 28, 2023 for Perella Weinberg Partners LP,

7    Other Professional, period: 11/1/2022 to 2/28/2023,

8    fee:$400,000, expenses: $76,270.73.·(Doc# 2456, 2980)

9

10   HEARING re Second Interim Fee Application of Akin Gump

11   Strauss Hauer & Feld LLP as Special Litigation Counsel to

12   the Debtors and Debtors in Possession for Allowance of

13   Compensation for Services Rendered and Reimbursement of

14   Expenses for the Period November 1, 2022 through and

15   Including February 28,

                           2023 for Akin Gump Strauss Hauer &

16   Feld LLP, Special Counsel, period: 11/1/2022 to 2/28/2023,

17   fee:$4,884,132.60, expenses: $61,571.97. (Doc# 2446, 2980)

18

19   Hybrid Hearing RE: Second Application for Interim

20   Professional Compensation for Alvarez & Marsal North

21   America, LLC, Other Professional, period: 11/1/2022 to

22   2/28/2023, fee:$7,194,758.50, expenses: $17,746.65. (Doc

23   #2437, 2980)

24

25

Page 8

1    HEARING re Status Conference Using Zoom for Government RE:

2    Regarding Bar Date and Class Certification Motion (Doc##

3    3032, 1846,2670,2899,2795)

4

5    HEARING re Adversary proceeding: 23-01010-mg Ad Hoc Group of

6    Borrowers v. Celsius Network LLC et al

7    Status Conference. (Doc #6)

8

9    HEARING re Adversary proceeding: 23-01010-mg Georgiou et al

10   v. Celsius Network LLC et al

11   Hybrid Status Conference RE: Motion to Dismiss. (Doc## 1 to

12   4, 6 to 8, 10, 16)

13

14   HEARING re Adversary proceeding: 23-01010-mg Shanks v.

15   Celsius Network LLC, ET AL et al

16   Hybrid Status Conference RE: Debtor's Motion to Dismiss the

17   Second Amended Complaint. (Doc## 17 to 22, 27 to 32)

18

19   HEARING re  Adversary proceeding: 23-01010-mg Shanks v.

20   Celsius Network LLC, ET AL et al

21   Status Conference.

22

23

24

25

Page 9

1    HEARING re Adversary proceeding: 23-01010-mg Shanks v.

2    Celsius Network LLC et al

3    Hybrid Conference RE: Motion to Dismiss. (Doc## 1, 3 to 8,

4    12, 13, 15)

5

6    HEARING re Joint Motion for Entry of an Order (I) Approving

7    the Settlement by and Among the Debtors, the Committee, and

8    the Initial Consenting Series B Preferred Holders and (II)

9    Granting Related Relief. (Doc## 2899,2967,2998,3002,3013)

10

11   HEARING re Debtors Motion for Entry of an Order (I)

12   Authorizing and Approving Certain Fees and Expenses for the

13   Backup Plan Sponsor, and (m Granting Related Relief. (Doc##

14   2978, 2979, 2982 to 2984)

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4         Attorneys for the Debtor

5         300 N La Salle Street

6         Chicago, IL 60654

7

8    BY:  CHRISTOPHER KOENIG

9         LUKE SPANGLER

10        MORGAN WILLIS

11        ROSS M. KWASTENIET

12

13   KIRKLAND & ELLIS LLP

14        Attorneys for the Debtor

15        601 Lexington Avenue

16        New York, NY 10022

17

18   BY:  ELIZABETH JONES

19        TANZILA ZOMO

20        GEORGIA CHARLOTTE MEADOW

21

22

23

24

25
```

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Attorneys for the U.S. Trustee

4         201 Varick Street

5         New York, NY 10014

6

7    BY:  SHARA CORNELL

8         MARK BRUH

9         BRIAN S. MASUMOTO

10

11   MILBANK LLP

12        Attorneys for Community First Investors Group of the

13        Series B Preferred Holders

14        55 Hudson Yards

15        New York, NY 10001

16

17   BY:  NELLY ALMEIDA

18        DENNIS F. DUNNE

19        ANDREW M. LEBLANC

20        MELANIE WESTOVER YANEZ

21        ALAINA HEINE

22

23

24

25

Page 12

 1

 2     JONES DAY

 3          Attorneys for CDP Investments, Inc.

 4          250 Vesey Street

 5          New York, NY 10018

 6

 7     BY:  TODD R. GEREMIA

 8          BENJAMIN RESENBLUM

 9

10     VENABLE, LLP

11          Attorneys for Ignat Tuganov

12          151 West 42nd Street, 49th Floor

13          New York, NY 10036

14

15     BY:  ARIE PELED

16

17     SELENDY GAY ELSBERG PLLC

18          Attorneys The Official Committee of Unsecured Creditors

19          1290 Avenue of the Americas

20          New York, NY 10104

21

22     BY:  TEMIDAYO AGANGA-WILLIAMS

23          CLAIRE O'BRIEN

24          KAYLA CHEN

25

Page 13

```
 1

 2    OFFIT KURMAN

 3         Attorneys for Ad Hoc Group of Earn Account Holders

 4         300 East Lombard Street, Suite 2010

 5         Baltimore, MD 21202

 6

 7    BY:  JOYCE A. KUHNS

 8         JASON A. NAGI

 9         BRETT A. PERRY

10

11    WHITE & CASE LLP

12         Attorneys for Official Committee of Unsecured Creditors

13         555 South Flower Street, Suite 2700

14         Los Angeles, CA 90071

15

16    BY:  AARON COLODNY

17         SAMUEL P. HERSHEY

18         GREGORY F. PESCE

19

20    WHITE & CASE LLP

21         Attorneys for Official Committee of Unsecured Creditors

22         200 South Biscayne Boulevard, Suite 4900

23         Miami, FL 33131

24

25    BY:  MIRA HAQQANI
```

1

2     WHITE & CASE LLP

3          Attorneys for Official Committee of Unsecured Creditors

4          1221 Avenue of the Americas

5          New York, NY 10020

6

7     BY:  DAVID TURETSKY

8          KEITH WOFFORD

9          THOMAS DIFIORE

10         SCOTT DUFFY

11         KEITH NOYES

12         MARK ROBINSON

13         ANDREW YOON

14

15    WHITE & CASE LLP

16         Attorneys for Official Committee of Unsecured Creditors

17         111 Wacker Drive, Suite 5100

18         Chicago, IL 60606

19

20    BY:  ANDREW RUDOLPH

21

22

23

24

25

Page 15

1

2    TEXAS OFFICE OF ATTORNEY GENERAL

3          Attorneys for Texas SSB, DOB

4          PO Box 12548

5          Austin, TX 78711-2548

6

7    BY:  LAYLA MILLIGAN

8

9    TEXAS OFFICE OF THE ATTORNEY GENERAL

10          Attorneys for TX State Sec. Board TX Dept. of Banking

11          300 W 15th Street

12          Austin, TX 78701

13

14    BY:  ABIGAIL RYAN

15

16    WISCONSIN DEPARTMENT OF JUSTICE

17          Attorneys for Wisconsin Department of Financial

18          Institutions

19          17 West Main

20          P.O. Box 7857

21          Madison, WI 53597

22

23    BY:  MICHAEL D. MORRIS

24

25

Page 16

1

2    MCELROY DEUTSCH MULVANEY CARPENTER LLP

3         Attorneys for The New Jersey Bureau of Securities

4         225 Liberty Street, 36th Floor

5         New York, NY 100281

6

7    BY:  NICOLE A. LEONARD

8         JEFFREY BERNSTEIN

9

10   ATLAS GROVE PARTNERS

11        Attorneys for Atlas Grove Partners

12        7301 SW 57th Court, Suite 515

13        Miami, FL 33143

14

15   BY:  DAN KAPLAN

16

17   AKIN GUMP STRAUSS HAUER FELD LLP

18        Attorneys as Special Litigation Counsel to Debtors

19        One Bryant Park

20        New York, NY 10036

21

22   BY:  MITCHELL HURLEY

23        DEAN CHAPMAN

24        KAILA ZAHARIS

25

Page 17

1

2    KRAMER LEVIN NAFTALIS FRANKEL LLP

3         Attorneys for Tether International Limited

4         1177 Avenue of the Americas

5         New York, NY 10036

6

7    BY:  GABRIEL EISENBERGER

8

9    LAW OFFICE OF SUSAN ADLER

10        Attorneys for Andersen, Hoffman, JR Investment Trust,

11        Objectants

12        630 Third Avenue

13        New York, NY 10017

14

15   BY:  SUSAN ADLER

16

17   HUGHES HUBBARD REED LLP

18        Attorneys for Gemini Trust Company

19        One Battery Park Plaza

20        New York, NY 10004

21

22   BY:  ELIZABETH A. BEITLER

23

24

25

Page 18

1

2    GODFREY KAHN SC

3         Attorneys for Fee Examiner Christopher Sontchi

4         One East Main Street, Suite 500

5         P.O. Box 2719

6         Madison, WI 53701

7

8    BY:  KATHERINE STADLER

9

10   WEINBERG ZAREH MALKIN PRICE LLP

11        Attorneys for the Plaintiffs

12        45 Rockefeller Plaza, 20th Floor

13        New York, NY 10111

14

15   BY:  ADRIENNE WOODS

16

17   PAUL WEISS RIFKIND WHARTON GARRISON LLP

18        Attorneys for NovaWulf Digital Management, LP

19        1285 Avenue of the Americas

20        New York, NY 10022

21

22   BY:  KEN ZIMAN

23        MITCHELL MENGDEN

24

25

1

2    WEIL GOTSHAL MANGES LLP

3         Attorneys for Interested Party

4         767 Fifth Avenue

5         New York, NY 10153

6

7    BY:  PAUL FABSIK

8

9    CHEROKEE DEBT ACQUISITION LLC

10        Attorneys for Cherokee Debt Acquisition

11        1384 Broadway, Suite 906

12        New York, NY 10018

13

14   BY:  LISA FAUCHER

15

16   DLA PIPER LLP (US)

17        Attorneys for Interested Creditor

18        200 South Biscayne Boulevard, Suite 2500

19        Miami, FL 33131

20

21   BY:  CRAIG V. RASILE

22

23

24

25

1

2   PRYOR CASHMAN LLP

3        Attorneys for Thomas Difiore

4        7 Times Square

5        New York, NY 10036

6

7   BY:  MATTHEW W. SILVERMAN

8

9   ALSO PRESENT:

10   ZACHARY ZABIB

11   KEN EHRLER

12   ROBERT M. KAUFMANN

13   RAKESH PATEL

14   PETER J. SPROFERA

15   PAUL D. STORVICK

16   BRIAN STOUT

17   VINCE SULLIVAN

18   KEYAN TAJI

19   MAUDE H. TIPTON

20   JOVANNI TORRES

21   RYAN VOLLENHALS

22   CHRISTOPHER D. WALTON

23   CAROLINE WARREN

24   TAK YEUNG

25   DON SMITH

Page 21

1    ALEX SHLIVKO

2    NICHOLAS SABATINO

3    PRIYA SAIHGAL

4    CAROLINE SALLS

5    SHIKHAR SAXENA

6    CALLAN SEARCY

7    DAVID SENES

8    NIKOLAS SEVERSON

9    JONATHAN RODRIGUEZ

10   AISLINN KEELY

11   TRAVIS KEENEY

12   GREGORY KIESER

13   TOMAS KOSTER

14   RIKI KOULY

15   JOSEPH LALIA

16   JEAN-PHILIPPE LATRIELLE

17   SEAN LEE

18   JASON LU

19   SERBAN LUPU

20   JOHN LY

21   BECKY MADSEN

22   MARY O'BRIEN

23   RICHARD OSWALD

24   SHANE C. OWENS

25   DONALD L. POYNTER

Page 22

1   MASON PALISSERY

2   JEFF PATTON

3   PETER PATZAK

4   CATHERINE PHUNG

5   AMELIA POLLARD

6   MACIEJ PORCZEK

7   LALANA PUNDISTO

8   TIMOTHY REILLY

9   KEVIN M. MANUS

10  SARAH BETH MARONPOT

11  CAROL MAUNDER

12  KEVIN MCCARTHY

13  KRAIG JAKOBSEN

14  ALI JAMSHID FAR

15  STIG JELLESTAD

16  GREG KACZKOWSKI

17  DARIUS GHEORGHE

18  TAYLOR HARRISON

19  JON HATCHER

20  MARIA HELIOTI

21  BRADLEY GIARDIELLO

22  UDAY GORREPATI

23  TAMMY L. GROVER

24  CAMERON GUTHRIE

25  THOMAS BRAZIEL

Page 23

1   STEVE CHURCH

2   DAVID J. DALHART

3   JASLEIGH GEARY

4   JEREMY HILL

5   KHAI PHAM

6   JACK SCHICKLER

7   JAMA BERG

8   ARTUR ABREU

9   NEGISA BALLUKU

10  BRIAN BARNES

11  JASON D. BEAIRD

12  SOMA BISWAS

13  KYLE BRAY

14  PAUL BREUDER

15  NURALDEEN BRIFKANI

16  SHIRLEY T. CARROLL

17  RICKIE CHANG

18  ROBERT CHRISTIANSEN

19  GEOFFREY CIRKEL

20  CHRISTOPHER COCO

21  LUC COHEN

22  MIA COOPER

23  KAREN CORDRY

24  STEFFAN DAVIES

25  ZARYN A. DENTZEL

Page 24

1    DREW DUFFY

2    JOHN P. DZARAN

3    SIMON ELIMELECH

4    BEN EADES

5    JANELL ECKHARDT

6    CHRISTOPHER LEE SHANKS

7    DAVID BARSE

8    ANNE YEILDING

9    SID PAN

10   CHRIS PAGNANELLI

11   JESSE LUND

12   CHRISTOPHER LACKEY

13   JOSEPH LEHRFELD

14   DEVERICK J. MCINTYRE

15   JOSEMAR A. MARQUES BARBOSA

16   ERIK MENDELSON

17   CHASE MARSH

18   RYAN PHAN

19   REGINA OSBORNE

20   DANIEL FRISHBERG

21   KULPREET KHANUJA

22   MEVIN JOSHI

23   JANKE JANKOVIC

24   LUCAS J. HOLCOMB

25   JOHN HODSON

Page 25

1    KAITLYN HITTELMAN

2    IMMANUEL HERRMANN

3    JOSEPH G. HENDRICKSON

4    JARED HANNAN

5    SANDALI HANDAGAMA

6    JESSE HALL

7    REBECCA GALLAGHER

8    DANIL A. FRISHBERG

9    DEBORAH FRANKEL

10   FLORENCE FLANNIGAN

11   ALEXANDER FERNANDEZ

12   DAVID FAHEY

13   JAMES ENGEL

14   GRZEGORZ DYMON

15   SHARON DOW

16   TRISTAN DIAZ

17   CAMERON CREWS

18   CARL J. COTE

19   SANTOS CACERES

20   JOHAN BRONGE

21   OCTAVE J. BOURGEOIS

22   ED G. BIRCH

23   CHRIS BECIN

24   BJORN ANDERSEN

25   RICHARD PHILLIPS

Page 26

1    JOHN P. REDING

2    MICHAEL ROSELLA

3    KYLE SATTERFIELD

4    DAVID SCHNEIDER

5    NOAH M. SCHOTTENSTEIN

6    WILLIAM D. SCHROEDER

7    COURTNEY BURKS STEADMAN

8    NIKHIL SURI

9    LUCY L. THOMSON

10   VICTOR UBIERNA DE LAS HERAS

11   EZRA VAZQUEZ-D'AMICO

12   TONY VEJSELI

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2              THE COURT:  Please be seated.  Just give me a

3      moment.

4              MR. KOENIG:  Good morning, Your Honor, Chris

5      Koenig --

6              THE COURT:  Just give me a moment.  Okay, Mr.

7      Koenig.

8              MR. KOENIG:  Good morning, Your Honor.  Chris

9      Koenig, Kirkland & Ellis, for the Celsius Debtors.  Your

10     Honor, I know that there was quite a bit of news outside of

11     these Chapter 11 cases --

12             THE COURT:  Oh, really?

13             MR. KOENIG:  -- last week probably of interest to

14     the parties and likely to Your Honor as well, so with your

15     indulgence, I'd like to cover a few of those topics before

16     we get into the amended agenda that we filed last night.

17             THE COURT:  Sure.

18             MR. KOENIG:  So first, Mr. Mashinsky was indicted

19     last week by the Department of Justice, charged with

20     securities fraud, commodities fraud, and wire fraud.  The

21     SEC, CFTC, and FTC also charged Mr. Mashinsky in separate

22     civil complaints.  Each of those regulatory agencies

23     announced consensual agreements with Celsius as corporate

24     defendants.  Of course, Mr. Mashinsky has not had any role

25     with the Debtors since last fall when the Special Committee

Page 28

1    instructed Mr. Mashinsky that he could either resign or he

2    would be terminated and elected to resign.

3            One of the principal directives from the Special

4    Committee throughout these cases is to fully comply with all

5    investigations.  That's exactly what we did here.  We fully

6    cooperated with the investigations by the government in

7    Celsius' business model and historical practices.  We turned

8    over thousands of documents, provided interviews, and

9    assisted in their investigations, and as a result were

10   pleased to be able to reach resolutions with the DOJ, SEC,

11   FTC, and CFTC, which we think will help us with our Chapter

12   11 plan and exit from bankruptcy.

13           Of course, given the allegations that have been

14   made, it was totally possible that the regulators could have

15   come into the case, tried to seize the company's assets, or

16   levy huge fines or penalties that would have diluted or even

17   eliminated recoveries for account holders.  But that's not

18   what happened here.

19           Celsius worked cooperatively with these agencies

20   and made clear our view that the account holders are the

21   victims of the crimes here and that we have a process well

22   under way to compensate the victims through these Chapter 11

23   cases.  As a result, the agreements that we've reached do

24   not include claims, fines, or penalties that are likely to

25   dilute the claims pool.  Specifically, we've agreed to enter

1    into consent orders with the SEC and the CFTC and we've

2    entered into a stipulated order with the FTC.  These orders

3    fully resolve the litigation against the Celsius --

4              THE COURT:  Let me ask you, all right.  Have those

5    orders been final -- has the agreement with the SEC been

6    finalized?

7              MR. KOENIG:  I believe it's been entered.  I don't

8    know whether it's been --

9              THE COURT:  Because I -- you know, I've got the

10   indictment.  I got the SEC complaint.  I got the CFTC

11   complain.  I don't think I found the FTC.

12             MR. KOENIG:  The consent orders have been signed

13   by the company.  I don't know, as a procedural matter,

14   whether the applicable Court has answered them or approved

15   them, but they've been signed by the company.

16             THE COURT:  Okay.

17             MR. KOENIG:  And agreed to by the company.

18             THE COURT:  As soon as they -- are they publicly

19   filed in any of the dockets?

20             MR. KOENIG:  I don't believe that they're publicly

21   filed.

22             THE COURT:  Because I didn't find them.

23             MR. KOENIG:  I don't believe that they're publicly

24   filed yet, Your Honor.

25             THE COURT:  And here -- well, go ahead and finish,

Page 30

1    then I'll ask my questions.

2            MR. KOENIG:  No problem, Your Honor.  So none of

3    these agreement are expected to have any material effect in

4    these Chapter 11 cases.  Distributions to creditors, our

5    timeline for the Newco's business model.

6            THE COURT:  Well, I think they require amending

7    the disclosure statement.

8            MR. KOENIG:  We totally agree, of course, Your

9    Honor, that that's going to need to be fully disclosed, and

10   to be clear, the agreement with the FTC includes a $4.7

11   billion suspended judgment.  We've seen a lot of confusion

12   in social media about what that means.  Does that increase

13   customer recoveries?  Does that dilute customer recoveries?

14           THE COURT:  Shouldn't affect --

15           MR. KOENIG:  The word suspended is very important.

16           THE COURT:  I understand.  That I understand.

17           MR. KOENIG:  We just want to make sure all the

18   parties understand.  It's suspended and we don't believe

19   that it will ever be unsuspended.  The only way in which the

20   suspended judgment could spring into existence against the

21   Debtors is if these Chapter 11 cases are dismissed without

22   being fully administered in accordance with the rules of the

23   Bankruptcy Code.  Of course, we don't expect -- that's

24   exactly what we're doing here is complying with the

25   Bankruptcy Code.

Page 31

```
 1              So we don't expect that that suspended judgment

 2      will have any effect on cases -- on these cases or

 3      distributions to creditors or the like.  And again, these

 4      agreements with the regulators relate to the historical

 5      business practices of Celsius, which of course Celsius has

 6      not been engaged in certainly since the petition date in

 7      which the Newco under the plan will not be continuing those

 8      business practices, either.

 9              These agreements that we've entered into with the

10      regulators require Celsius to follow the law and not engage

11      in a variety of illegal activity relating to its historical

12      business model.  So I'll pause there and whatever questions

13      Your Honor has.

14              THE COURT:  Well, so it was a week chock filled

15      with developments, not only in Celsius, but the Court also

16      notes the Ripple decision in the District Court, which of

17      course is not binding on this Court, but I guess one

18      question I have is why -- in particular I'm interested in

19      whatever the resolution is between the company and the SEC.

20              The SEC complaint alleges both that the cell token

21      is a security and it also alleges that the Earn accounts

22      were securities under Howey test.  And so at the last

23      hearing, one of the issues that was discussed was a pro se

24      creditor's motion to value the CEL token.  The Committee and

25      the Debtor joined it, an objection that the CEL token was a
```

Page 32

1   security in that 510(b) of the Bankruptcy Code would require

2   subordination of the claim.  I put off that issue.  I

3   thought it was, still think it was premature but has -- in

4   its settlement with the SEC, has the Debtor agreed that the

5   Earn accounts were unregistered securities?

6           MR. KOENIG:  Your Honor, we stipulated to certain

7   facts.  We didn't agree that -- I don't believe that we

8   agreed -- the legal conclusion --

9           THE COURT:  What facts did you stipulate to with

10  respect to the Earn accounts?

11          MR. KOENIG:  I think that there are facts that

12  could reasonably lead a fact finder to determine that CEL

13  token and Earn were securities.

14          THE COURT:  Will -- are you able to say at this

15  point, will the Debtor contest in connection with

16  confirmation that the Earn program was an unregistered

17  security?

18          MR. KOENIG:  I think, Your Honor, I recognize I'm

19  going to adopt the question a little bit --

20          THE COURT:  That's okay.  It's all news for --

21          MR. KOENIG:  Right.  But for purposes of the plan,

22  what matters is not whether it is an unregistered security,

23  but whether it's a security subject to -- whether the claims

24  associated with Earn account are subject to subordination

25  pursuant to Section 510(b), and we don't believe that the

Page 33

1   Earn accounts are subject to subordination pursuant to

2   Section 510(b).

3              THE COURT:  And what about with respect to CEL

4   tokens?

5              MR. KOENIG:  I think that -- we've proposed a

6   settlement of those issues and to allow the CEL token at 20

7   cents in settlement of those issues, that it could be 81

8   cents if it isn't a security subject to subordination under

9   510(b), or it could be zero.  We've proposed a middle ground

10  and we've been engaged in discussions with -- along with the

11  Committee with the CEL token holders to see if we can reach

12  a more consensual resolution of that issue.  That's how we

13  propose to deal with it under the plan, is under the 9019

14  settlement standard.

15             THE COURT:  And I think I even commented at the

16  last hearing that certainly this issue -- I asked a series

17  of questions if the CEL token is a security and if five --

18  therefore subordinated under 510(b).  It might entitle the

19  holders to zero.  What the plan construct was to pay at 20

20  cents.  I guess that was the initial offering price.

21             MR. KOENIG:  That's right.

22             THE COURT:  And I guess we'll see.  I don't know

23  how the disclosure statement is dealing with this issue.  If

24  it's -- you know, if it's not a -- subject to subordination

25  under -- if the Court had to decide the issue and it was not

Page 34

1    subject to subordination under 510(b), there would then be a

2    valuation issue.  And I guess that the Committee, perhaps

3    the Debtors' argument would be that the 80 cents price at

4    the petition date was a result of market manipulation.

5             MR. KOENIG:  As set forth in the examiner's

6    report.

7             THE COURT:  And the examiner's report included a

8    chart which it took right from the Debtor which showed the

9    insider transactions and the market movement in that period

10   leading up to the 80 cents (indiscernible) in the last few

11   days.  So I'm just -- I didn't go back.  What's in -- what's

12   the disclosure statement say about this issue?

13            MR. KOENIG:  It lays out the arguments, pro and

14   con, on this whether CEO should be 81, whether CEL should be

15   zero, the fact that we've -- that we're proposing to settle

16   it at 20 cents.

17            THE COURT:  But does it discuss the 510(b)

18   subordination issue?

19            MR. KOENIG:  I think it's going to be amended to

20   discuss it a little bit more, Your Honor.

21            THE COURT:  Okay.  All right.  And what if any

22   effect do you believe the Ripple decision has -- and again,

23   it's not binding on this Court.  I've read it.  What if any

24   impact do you believe it has or may have on the proposed

25   plan or confirmation in this case?

1          MR. KOENIG:  Your Honor, obviously, it's fresh

2     news for all of us -- I'll put a disclaimer at the front of

3     it -- but we don't think it has any effect outside of

4     potentially the CEL token issue, does this ruling affect the

5     way that the Court would look at the CEL token subordination

6     issue under Section 510 of the -- 510(b) of the Bankruptcy

7     Code.  It's a complicated decision of the District Court's

8     decision.

9          THE COURT:  It is.

10          MR. KOENIG:  XRP is --

11          THE COURT:  Got a lot of commentary on it now and

12     --

13          MR. KOENIG:  And it a security for certain sales

14     but not a security for other transactions.

15          THE COURT:  That was a lot to me, but --

16          MR. KOENIG:  And so I think it would be -- I don't

17     know if Your Honor would adopt that or not --

18          THE COURT:  I have no idea.

19          MR. KOENIG:  -- at confirmation.  We're not there.

20     I think that that --

21          THE COURT:  I'm just more interested in whether,

22     is this likely to be an issue that the Court is going to

23     have to decide?

24          MR. KOENIG:  I think the CEL token subordination

25     issue is the only area where I think it would come up.  The

Page 36

1    Newco is not engaged in any securities offerings, is not

2    engaged in any of Celsius' historic business practices.

3    Their new business plan is going to involve Bitcoin mining

4    and staking of Ethereum and other cryptocurrencies.  So I

5    don't think it's going to affect the go-forward plan.  It

6    may be relevant to the subordination issue under 510(b) for

7    CEL token and perhaps the Earn accounts if somebody makes

8    that argument, which we don't believe is a viable argument,

9    but certainly everybody has their litigation position.

10            But the last thing I wanted to cover is in the

11   indictment from the DOJ, Mr. Roni Cohen-Pavon, the Debtors'

12   chief revenue officer, was indicted.  We learned about that

13   indictment at the same time everybody else did, when the

14   indictment was unsealed and distributed to the world.  Upon

15   learning about the indictment, the Special Committee

16   immediately met, immediately authorized the termination of

17   Mr. Cohen-Pavon.

18            That termination process remains ongoing because

19   under Israeli law, there has to be a hearing in Israel

20   before he can be formally terminated.  That said, he is on

21   administrative leave.  All of his access to the company's

22   systems, data, email, his internal authority were all

23   immediately cut off by the Special Committee.  And even

24   prior to this process, Mr. Cohen-Pavon did not have

25   significant authority with respect to the Debtors' day-to-

1    day operations.

2            He had historical information that was useful for

3    internal investigations, but he was not a day-to-day

4    critical officer of the company, but again, to be clear, he

5    has no ongoing authority with the company and he is expected

6    to be terminated in short order.

7            THE COURT:  Okay.  Obviously, the company has been

8    in active dialogue with the federal regulators and the DOJ.

9    That leaves the potential issues with the state regulators.

10   For quite some time, I've been urging the Debtor, I guess

11   the Committee as well, to be in dialogue with the state

12   regulators.  I think that -- I think you all want to avoid

13   any unnecessary surprises once either disclosure statement

14   comes on for hearing or confirmation hearing, you know.

15           I -- it was the federal regulators in Voyager, but

16   it -- we all know what effect that seemed to have on it.

17   So, I mean, obviously the Debtor has been in dialogue with

18   all of the federal regulators.  I'm interested in seeing

19   what the settlements actually look like when that's

20   released.  Let me end with that.

21           MR. KOENIG:  Okay.  Your Honor, earlier in

22   colloquy, you seemed to almost be suggesting once the

23   agreements become public, would you like to file those on

24   the docket so that everybody has ready access?

25           THE COURT:  I think so, so that everybody can see

1    it and I guess your claims agent will put it on their

2    website as well --

3              MR. KOENIG:  Yes.

4              THE COURT:  -- and provide everybody with easy

5    access to it.

6              MR. KOENIG:  Wonderful.  And on the -- on your

7    last point about the state regulators, we're in constant

8    dialogue with them, too.  We've urged them in the same way

9    that we urged the federal regulators, the account holders

10   are the victims here.  It doesn't make sense for the

11   government to come in and levy huge fines.

12             Of course, they have their rights and, you know,

13   they haven't agreed to anything, but we're -- I would say

14   that the Debtors are cautiously optimistic that given the

15   way that the federal regulators, we were able to reach

16   agreement with them, we're hopeful that that will pave the

17   way for similar agreements with the state regulators.

18   That's all that I have.  I don't know if you wanted to hear

19   from Mr. Colodny before turning to the agenda.

20             THE COURT:  Well, I do.  Let me just ask this.

21   When do you expect to have an amended disclosure statement?

22             MR. KOENIG:  As early as later this week, Your

23   Honor.

24             THE COURT:  Okay.  So I mean, I -- my chambers, I

25   guess, the Committee was in touch with my courtroom deputy,

Page 39

1    Deanna Anderson and maybe you were as well, about dates for

2    -- possible dates for confirmation hearing.  And so you're

3    going to need 28 days' notice for objections and a hearing

4    on disclosure statement and you also need 28 days' notice,

5    for objections and hearing on confirmation.  So that's

6    obviously after a disclosure statement and ballot are

7    approved for mailing.

8            So I don't know how all this will fit into the

9    bigger picture.  I was asked about a potential two-week

10   block for a confirmation hearing.  Assuming that disclosure

11   statement is approved and it goes out for balloting, I was

12   asked about a couple -- I was asked for a two-week time

13   period.  That's a little complicated.  So I'll give you all

14   some potential dates.  Okay, first dates I was -- make sure

15   I got this right.

16           Okay.  So it may not be possible or be more

17   difficult to have two consecutive weeks.  All right.

18   Potential dates are October 2 through 6.  On Monday, October

19   2, we would need to start at 2 p.m.  Starting in September,

20   I teach on Monday morning from 9:10 until 11 a.m. at

21   Columbia.  So we can't have a hearing on Monday morning.  We

22   can start at two o'clock.  So October 2 through 6; 16

23   through 20.  Sixteenth is Monday.  Again it's -- have to be

24   a two o'clock start time.  Twenty-three -- 23rd through the

25   27th.  That is two consecutive weeks.  I don't expect a

Page 40

1    response now.

2              MR. KOENIG:  All right, Your Honor --

3              THE COURT:  Just bear with me one more.  I've got

4    one more question.  So on the -- I gave you those dates,

5    16th or 20th, 23rd to 27th.  The 26th, as of now at least,

6    we would have to start at one o'clock.  I have hearing in

7    the morning, a final pretrial conference in what promises to

8    be a long trial.  Possible that would move, but -- so those

9    would give you a sense of the dates and you can all confer

10   about it.  I don't expect answers now.

11             MR. KOENIG:  We'll coordinate with chambers, and

12   of course, we hope that the confirmation hearing is less

13   than two weeks.  We just -- we know the Voyager confirmation

14   hearing was two weeks and if past is prologue, we want to be

15   ready.

16             THE COURT:  So other than this issue about

17   Mondays, we'll start at 9 a.m. and I'm amenable to going

18   late.  It's not necessarily the preferred action, but I've -

19   - I mean, I've had hearings going into the evening, night.

20   It's not -- again, not preferred.  Usually, if I start at

21   nine, I usually like to stop by 5:30 unless a witness is

22   being examined and then I'll go until they're finished,

23   typically, if they can be finished within a reasonable time.

24   That'll give you an idea of the time limit.  I just have

25   this issue about Monday starting in September.

1          MR. KOENIG:  No worries.  We will figure it out.

2     We'll coordinate with the other parties and --

3          THE COURT:  Okay.

4          MR. KOENIG:  I assume we will take the first dates

5     you have available.  We want to be out of bankruptcy as fast

6     as we can.

7          THE COURT:  Right.  Okay.

8          MR. KOENIG:  All right, I'll cede the lectern to

9     Mr. Colodny.

10          THE COURT:  Thank you.  Mr. Colodny?

11          MR. COLODNY:  good morning, Your Honor.  Aaron

12     Colodny from White& Case on behalf of the Official Committee

13     of Unsecured Creditors.  You know, each of the government

14     actions that were filed against Mr. Mashinsky and the

15     Debtors echo what both the examiner found and the Committee

16     brought in its class complaint.  We believe that the

17     cooperation of the Debtors which was specifically called out

18     by the district attorney was key to getting the outcome that

19     we have here, which is justice being served and the

20     government's commitment to using this process to return

21     funds to account holders.

22          I don't think it's any surprise that that is

23     critical to us and our mantra in this case has been more

24     recoveries to creditors quickly.  We believe the account

25     holders are the victims here and we think that all of these

Page 42

1    actions are large steps forward to making that happen.  I

2    could repeat a lot of what Mr. Koenig said, but if Your

3    Honor has any questions about how the Committee views this

4    or the Ripple decision, happy to answer anything.

5         THE COURT:  No, I -- look, I mean, I've read

6    Ripple and I've read half a dozen commentaries about it.

7    Again, it's not a binding precedent on this Court.  And I --

8         MR. COLODNY:  What I'll say about that, Your

9    Honor, is I think we all know that Ripple won't likely be

10   the last word.  But we don't intend to wait for the last

11   word.  I think that I agree --

12        THE COURT:  Well to the extent -- let me just

13   interrupt.  You know, to the extent that issues are

14   consensually resolved in a plan, then you know, it's not --

15   I don't think it's necessary for the Court to resolve the

16   issues.  The key, I think, is coming to a consensual

17   agreement to the fullest extent possible.

18        MR. COLODNY:  And we are working our hardest to

19   get there.  As you said before, consensual resolution in

20   bankruptcy avoids putting money and spending money on

21   litigation and gets money back to customers quicker, which

22   are our two main goals here and I think you'll hear a little

23   more about that today.

24        THE COURT:  I -- just for full disclosure, I was -

25   - I spoke at the ABI Northeast program in Newport, Rhode

Page 43

1    Island on Friday and Saturday on a panel on crypto.  Shoba

2    Pillay was -- the examiner from this case was on the panel

3    as well.  She put up the chart of alleged market

4    manipulation, the chart that's in her examiner's report that

5    came, as she said, on -- she and I didn't discuss the

6    merits.  Okay.  I want to make clear.

7           And I didn't opine on any of the issues that would

8    have to -- obviously, there was broad interest last week and

9    a lot of late night reading of things that just came out

10   before the conference.  But she put that chart up on the

11   PowerPoint screen of the price movements of the CEL token.

12   But again, I didn't address those issues, but she and I were

13   on the panel together with some other people.  Okay.

14           MR. KOENIG:  Your Honor, for the record again,

15   it's Chris Koenig.  Turning to the agenda this morning.  The

16   first item up on the agenda is the revised motion to pay the

17   fees of the BRIC as a backup plan sponsor.  I know we got

18   into this at length at the last hearing, so I won't repeat

19   myself too much.

20           The last hearing, Your Honor indicated that the

21   BRIC could not provide consultant services to the Debtors

22   and the Debtors could not pay --

23           THE COURT:  Well, they'd have to seek retention

24   and I think there were roadblocks to retention.

25           MR. KOENIG:  I was just going to say, without

Page 44

1    being retained as a professional, pursuant to Section 327

2    and we agree they probably would have had some issues with

3    conflicts.  So the parties heard you loud and clear.  We

4    went back to the table.  We revised the documents to remove

5    the consulting services and to remove the consulting fees.

6    And so we're here seeking approval of the backup commitment

7    fee of $1.5 million and expense reimbursement.  The expense

8    reimbursement will be paid through the date of this order.

9    That amount is not expected to exceed 1.5 million.

10            THE COURT:  So there were some replies that --

11   late replies that was filed that deal with what the fees

12   were being paid for.

13            MR. KOENIG:  I think that that was the last

14   hearing perhaps, Your Honor.  We haven't had that -- we

15   didn't file for the BRIC.  That's on the Series B CEL, Your

16   Honor.

17            THE COURT:  Okay.  I'm sorry.  That is the Series

18   B.

19            MR. KOENIG:  So we are proceeding on --

20            THE COURT:  Yes.

21            MR. KOENIG:  -- an uncontested basis, I believe,

22   this morning.  The objection deadline passed last Friday.

23   No objections were filed.  We're not aware of any informal

24   objections.

25            THE COURT:  I'm going to turn to Ms. Cornell, see

1   what the position of the U.S. Trustee is.  I noted that

2   there were no further objections that were filed.  Ms.

3   Cornell?

4           MS. CORNELL:  Thank you, Your Honor.  Shara

5   Cornell (indiscernible) for the United States Trustee.

6   Again, thank you for allowing me to appear virtually this

7   morning.  I appreciate it.

8           Your Honor, we filed our original objection at

9   Docket (indiscernible).  These are extremely unusual

10  circumstances proposed by the Debtors and the Committees

11  here.  The amended motion is slightly more palatable but

12  it's still a lot of money.  The reviews are an unnecessary

13  expense of the bankruptcy estate, especially when we have

14  the stalking horse fees that are already quite high.

15          Specifically, we have questions about why BRIC

16  should receive an expense reimbursement.  Diligence was

17  performed in advance of the deal and that's a slippery slope

18  for more fees in future cases or even this case.  What if

19  there's a backup bid to the backup bidder after the auction

20  is reopened?  The line has been drawn and the question is

21  why should further parties be compensated?  Thank you, Your

22  Honor.

23          THE COURT:  I guess my question is, it's all very

24  interesting.  Why didn't you put it in -- on paper?  That is

25  a question to you.

Page 46

1          MS. CORNELL:  It is very interesting, Your Honor,

2     but it's a lot of money in this case and it's just one more

3     party that's being paid.

4          THE COURT:  Let me be pointed.  Are you objecting

5     to it?

6          MS. CORNELL:  Yes, Your Honor.  Our --

7          THE COURT:  Why didn't you file a further --

8          MS. CORNELL:  -- objection still stands at Docket

9     --

10         THE COURT:  Why didn't you file a further document

11    saying you were objecting, if that's what you're doing?

12    There was an objection deadline of July 14th and no

13    responses by anyone were filed.

14         MS. CORNELL:  I understand that, Your Honor.  Our

15    position was that we filed our objection in 2847 and that it

16    was not overruled and that it still stands.

17         THE COURT:  It was sustained with respect to the

18    consulting fees.  They went back to the drawing board.  But

19    -- okay.  Your verbal objection is untimely and overruled.

20    I'm happy to be able to approve the backup plan for the

21    sponsor.  I commented at the time of the last hearing,

22    contrary to the position taken by the U.S. Trustee in the

23    circumstances of this case, in my view, the necessity of

24    moving forward toward confirmation as rapidly as reasonably

25    possible, that it was -- it is important to have the backup

1   bidder plan and it does seem to me, that they are performing

2   important services in support of the fee that they would be

3   entitled to.  It is no doubt rich and in -- I want to make

4   clear that in other circumstances, I would be very reluctant

5   to approve it.  I think the examples of what happened in

6   Voyager show the importance of having this backup bid with a

7   somewhat alternative plan structure in the event that, you

8   know, the sponsor proposal winds up failing or being unable

9   to close.  So it is approved.

10          MR. KOENIG:  Thank you, Your Honor.  We'll submit

11  the order to chambers.

12          THE COURT:  (indiscernible).  Go ahead.

13          MR. KOENIG:  Thank you, Your Honor.  Up next is

14  the proposed settlement motion with the Series B.  The

15  dispute with the Series B holders over their entitlement to

16  recover from the Debtors' estates is perhaps the most

17  protracted and contested issue in these cases.  It started

18  it when the Series B holders sought appointment of an equity

19  committee early in the case.

20          It's resulted in one fully litigated trial and

21  opinion that has been appealed and it spawned a variety of

22  other litigation that sought -- that had the potential to

23  delay these cases, delay confirmation, and delay emergency.

24  Court's decisions to date had already generated two appeals

25  and future decisions were likely to also be appealed.  And

Page 48

1    these disputes would have created enormous cost for the

2    estates.  If this litigation ran to its conclusion -- we had

3    dozens of depositions scheduled, many days of trial

4    scheduled.

5           Even if the Debtors won the litigation, their

6    stakeholders would have nonetheless lost by bearing the cost

7    of litigating these complex issues as well as the likely

8    delay to confirmation and emergence.  And although the

9    Debtors were confident in their litigation position, there

10   was nonetheless some risk that the Series B could win and if

11   they won, they likely would have been entitled to recover up

12   to $600 million from the Debtors' estates.

13          So we engaged in settlement negotiations and we

14   reached a deal.  By the settlement motion, Debtors seek to

15   implement the Series B settlement between the company, the

16   Committee, and the initial consenting Series B holders.  It

17   fully resolves the litigation between the parties and allows

18   the Debtors to proceed towards confirmation without needing

19   to litigate these key issues.

20          The settlement provides for $25 million in cash.

21   That $25 million is going to be funded out of the prior sale

22   of the GK8 platform which had been segregated pending the

23   resolution of this dispute and will involve the release of

24   all claims between the initial consenting Series B parties

25   on the one hand and the Debtors and the Committee on the

Page 49

1    other hand.

2          The way we're going to implement the settlement is

3    through a substantive consolidation of CNL and LLC.  The

4    Debtors filed a motion to substantively consolidate those

5    entities on May 1st and the Committee also filed a motion to

6    substantively consolidate those entities.  That objection

7    deadline passed and no party's objected to it there or in

8    the settlement motion here that implements that relief.

9          The only objections that we received to the

10   settlement motion were from Mr. Herrmann and Mr. Frishberg.

11   Probably saw in our reply that we filed yesterday, we were

12   able to resolve that dispute with language in a revised

13   proposed order.  The only remaining dispute -- the only

14   remaining objection, I should say, is from one of the other

15   Series B holders who did not sign the settlement, appears to

16   object to the allocation of the $25 million, but they did

17   not participate in this litigation.  They were not

18   litigating against the company.

19         From the company's perspective, the settlement

20   makes sense as cost saved and we believe that the cost that

21   would have been incurred would have been tremendous here and

22   may have even exceeded the $25 million settlement.  But from

23   our perspective, we were paying $25 million to resolve the

24   dispute.  The allocation was not so much our issue.  The

25   Series B holders proposed an allocation.  We asked them, did

Page 50

1   your fees actually exceed $24 million and they represented

2   that it did.   Probably saw in their reply yesterday.

3              THE COURT:   That was what I mistakenly referred to

4   earlier.

5              MR. KOENIG:   No problem, Your Honor.   But what I

6   would argue is, the objecting party is not bound by the

7   settlement.   It wasn't offered to them.   Any Series B holder

8   that wanted to sign the settlement, receive their share of

9   the proceeds, and grant releases, is free to do so.   The

10  objecting party can retain whatever rights they have.   They

11  have not sued the Debtors.

12             The substantive consolidation would go forward and

13  they have whatever rights they have under the Chapter 11

14  plan or otherwise.   But we submit that the settlement is in

15  the eminent business judgment of the company; avoids costly,

16  protracted, and risky litigation; and should be approved.

17  We filed a declaration of Mr. Ferraro in support of the

18  settlement motion in Docket No. 2967.   I'm happy to move

19  that into evidence at this time.

20             THE COURT:   All right.   Are there any objections

21  to the Court admitting in evidence the Ferraro declaration,

22  ECF 2967?   All right, it's admitted into evidence.

23             (ECF 2967 entered into evidence)

24             MR. KOENIG:   Your Honor, that concludes my opening

25  presentation.   I don't know if the Committee or the Series B

1    wish to be heard before we turn it over.

2              THE COURT:  I do want to hear from the Committee.

3              MR. KOENIG:  Thank you, Your Honor.

4              MR. AGANGA-WILLIAMS:  Temidayo Aganga-Williams,

5    Your Honor, from Selendy Gay Elsberg.  Your Honor, the

6    Committee joins with all the reasons that Mr. Koenig just

7    advanced, part of the settlement agreement with the Series

8    B.  From the Committee's standpoint, the settlement terms

9    are straightforward and the agreement satisfies the

10   threshold for reasonableness under Rule 9019.  The agreement

11   settles all litigation between the Debtors and the Committee

12   and the Series B preferred holders and seeks the substantive

13   consolidation of the CNL and LLC estates in exchange for a

14   $25 million cash payment and the release of all claims.

15             I won't rehash all the terms that Debtors' counsel

16   just did, Your Honor, but I will note that as Your Honor

17   knows, our firms role in this bankruptcy was to represent

18   the Committee in certain matters that were adverse to the

19   Series B preferred holders.  And this included investigating

20   potential claims against preferred equity holders.  When the

21   parties reached this agreement, the settlement agreement,

22   our firm had been investigating those claims for months.

23             Now, while Your Honor will expect, the specifics

24   of our investigation are privileged we'll give Your Honor a

25   general sense of the work that we did, which included

Page 52

1    investigating and reviewing publicly available information

2    and the substance of Court filings like the examiner's

3    report, and also the voluminous documentary record produced

4    over the course of this bankruptcy.

5         We have begun depositions in connection with the

6    sub con litigation and we also notified the Series B

7    preferred holders that we would promptly pursue additional

8    document and deposition discovery under Rule 2004.  Of

9    course, our investigation was still ongoing when the

10   settlement was reached, but we advised the Committee members

11   that based on the facts and circumstances as they were known

12   to us at the time and the relevant law pertaining to

13   potential claims subject to the releases, our investigation

14   process and findings to date and the value of the settlement

15   agreement, customers supported the acceptance of an

16   agreement here.

17        Ultimately, we took those findings to the

18   Committee and provided our advice and the Committee voted to

19   accept the settlement agreement.  We believe the benefit of

20   the settlement is significant and satisfies the threshold

21   for reasonableness, and we respectfully request that the

22   Court so-order the proposed order, approving settlement and

23   consolidating the CNL and LLC estates.

24        THE COURT:  So let me ask you this, because in

25   particular for the Earn account holders, the impact of

Page 53

```
 1    substantive consolidation in light of the Court's earlier

 2    decision which I recognized was appealed, that the Earn

 3    account holders' only contract claims were against LLC;

 4    could you just briefly discuss the actual impact on Earn

 5    account holders by the provision of this agreement which

 6    essentially -- which does provide for substantive

 7    consolidation of CNL and LLC?

 8            MR. AGANGA-WILLIAMS:  Yes, Your Honor.  Well, a

 9    negotiated term of the order of approving the settlement

10    would be that it resolves all pending litigation.  So with

11    the -- with regard to appeals from the Court's order

12    regarding the contract claims --

13            THE COURT:  No, I understand that.  The appeals

14    are resolved.  But I think maybe Mr. Colodny wants to

15    address this, if he could.  What I would just like, you

16    know, sort of a plain English explanation of the impact on

17    LLC creditor claims as a result of the substantive

18    consolidation during the bankruptcy law at issue.  Go ahead,

19    Mr. Colodny.

20            MR. COLODNY:  Happy to, Your Honor.  So as you

21    know, the Debtors' assets are held at different legal

22    entities.  There's a substantial amount of liquid

23    cryptocurrency investments and other assets that are held at

24    CNL.  Under Your Honor's ruling, the Earn claimants only had

25    contract claims against LLC.  We filed our class claim
```

Page 54

1    asserting other claims which has not been adjudicated yet

2    and I think we're going to get to that in a status

3    conference after this matter is adjudicated.

4            But what the substantive consolidation will do is

5    merge the two estates so that Earn claimants will have

6    claims against the assets and be entitled to recover from

7    the Debtors' estates at CNL, which holds the substantial --

8    I don't know if substantial majority, but holds the majority

9    of the Debtors' assets.

10           So the settlement not only resolves claims against

11   the Series B litigation and litigation before this Court,

12   but it provides current account holders with access to all

13   of the assets held by CNL.

14           THE COURT:  So for example, which entity owns

15   mining directly or indirectly?  That's up through CNL?

16           MR. COLODNY:  Correct.  Mining --

17           THE COURT:  And so to the extent there's value in

18   CNL, the Earn account -- excuse me.  To the extent that

19   there's value in mining, the Earn account holders benefit

20   from, as a result of the substantive consolidation even

21   though mining was held not by LLC, but by CNL, correct?

22           MR. COLODNY:  Entirely correct, Your Honor.

23   Mining is a subsidiary of CNL.  To the extent there are

24   direct claims against mining, those claims will recover

25   first.  There's no funded debt or substantial funded debt

Page 55

1    claims against mining, so there is equity value which we

2    believe will flow up to CNL.  The substantive consolidation

3    of CNL and LLC will result in Earn account holders having --

4    and general unsecured creditors of either entities having

5    claims of the equity value of mining.

6            THE COURT:  Okay, thank you.  Thank you very much.

7    All right.  Preferred holders want to be heard?  Mr.

8    Leblanc, do you want to be heard?

9            MR. LEBLANC:  Good morning, Your Honor.  Andrew

10   Leblanc of Milbank on behalf of Community First Partners,

11   one of the Series B investors, and Mr. Metzger is here in

12   the courtroom with me.  He represents, of course, CDP

13   Investissements, another of the most -- more significant

14   holders and Mr. Dunn is actually on the TV screen here with

15   us, joining by video.

16           Your Honor, we obviously support the Court's

17   approval of the settlement.  I will echo the comments of Mr.

18   Koenig.  This was among the most intense litigations I've

19   ever been a part of in about 25 years of practice.  It was

20   very hard fought.  There were an enormous number of

21   significant issues.  I think we were, at the day we settled,

22   we had 17 depositions coming up in the next three days.

23   Obviously, the amount that would have been expended by the

24   Debtor parties would have been astronomical as it would have

25   been by my clients.  And so we reached the resolution.  We

1   think it's appropriate and we'd urge the court to approve

2   it.

3            With respect to the one objection, and if Your

4   Honor wants to hear it from me after they lodge their

5   objection, I agree completely with Mr. Koenig.  We've

6   represented to the Court and I don't think anybody disputes

7   and I -- in fairness, I don't think anyone could dispute

8   that the quantum of fees exceeds what has been allocated to

9   pay for those fees.  What we didn't want -- we obviously

10  litigated this at our own expense despite our efforts to get

11  an equity committee for a period of over a year.

12           And we were trying to get a fair allocation to

13  make sure that our fees were reimbursed to the greatest

14  extent possible, but we did want to make an offer to other

15  people which are free to choose to accept or not.  And this

16  holder apparently chose not to accept it.  That means

17  they're not bound by it.  They want to pick up the baton and

18  continue the litigation in light of the litigation schedule

19  and the findings that Your Honor would enter if Your Honor

20  enters the order.  That's their choice.  We wish them the

21  best of luck if they were to do that.  But that's their

22  choice.

23           THE COURT:  What was the -- what is the face

24  amount of the Series B preferred?

25           MR. LEBLANC:  In total, Your Honor --

Page 57

1          THE COURT:  Yes.

2          MR. LEBLANC:  -- it's about $690 million.  Our

3   clients hold approximately 600 million of it.

4          THE COURT:  Okay.  Anything else you want to add?

5          MR. LEBLANC:  I don't, Your Honor.  I urge the

6   Court to approve the settlement.

7          THE COURT:  Okay.  Thank you very much.

8          MR. LEBLANC:  Thank you, Your Honor.

9          THE COURT:  Anybody else want to speak in favor of

10   the settlement?  All right, let me hear from the -- limited

11   objections, but let me from counsel for the limited

12   objectors, if they want to be heard.

13          MS. ADLER:  Yes, Susan Adler on behalf of Anderson

14   Investment, JR Investment Trust, and David Hoffman.  Thank

15   you for allowing me to appear telephonically.  I hope the

16   sound is okay.  (indiscernible) the parties in reaching the

17   settlement, understand that it was (indiscernible) that the

18   litigation expenses were going (indiscernible) higher.

19          My -- the reason this is a limited objection is

20   that there's simply not enough information in that agreement

21   for my clients to determine whether it works for them and

22   you know, (indiscernible) since the first -- you know, since

23   I first filed the objection (indiscernible) you know, my

24   clients (indiscernible) that's an issue.  But again, this

25   agreement (indiscernible) require them to give up certain

Page 58

1   litigation rights and to take certain stances in the future

2   and right now, this is the -- you know, this is the best

3   time to get these questions answered for us.

4            You know, it's more financially feasible for them

5   to get these questions answered, answered now.  So that is

6   the source of our limited objection.  We still don't know

7   how the (indiscernible) were allocated or any analysis.  So

8   -- but I do, you know, I do applaud the efforts of the

9   parties and I realize  they're done -- that this has been

10  very hard fought out.

11           THE COURT:  All right, thank you very much.  Does

12  anybody else wish to be heard in opposition?  Please come

13  up.  Mr. Herrmann.

14           MR. HERRMANN:  Immanuel Herrmann, pro se creditor.

15           THE COURT:  Nice to see you in the courtroom, Mr.

16  Herrmann.

17           MR. HERRMANN:  Yes, nice to see you, Your Honor.

18  So one, our objection, we were able to fully resolve it.  So

19  I'm glad that that that was the case.  First off, I just

20  wanted to say, you know, this is a long fought battle.  I'm

21  glad to see it come to an end.  I just wanted to say a few

22  things.  One, customers may have direct claims against, I

23  think in particular, WestCap and CEBQ.  They made certain

24  claims.  I think customers relied on that, you know, some

25  customers relied on it in keeping their assets on the

Page 59

1    platform.  You know, we believe those claims are preserved.

2          This settlement with our changes also preserves

3    GK8 claims, or at least maybe it did already, but you know,

4    we'll note that GK8 made false claims of insurance which

5    actually were marketed on the website and were included in

6    one of the complaints and may have been the FTC complaint.

7          And then finally, I just wanted to say on the

8    appeal, we're still waiting for a full substantive

9    consolidation and a disclosure of what are the non-filing

10   entities.  So there's still -- this would consolidate the

11   parent company, but there's still a mining company that sits

12   above the substantively consolidated entities.

13          THE COURT:  I saw you filed an emergency motion

14   for a stay in the District Court, a stay of the Court's

15   opinion on which entities your claims reside against.  Has

16   the District Court ruled on that yet?

17          MR. HERRMANN:  No, Your Honor, they have not yet

18   ruled on that.

19          THE COURT:  Okay.

20          MR. HERRMANN:  I believe that that's resolved in

21   the changes that were made --

22          THE COURT:  All right.

23          MR. HERRMANN:  -- to the order.

24          THE COURT:  And you'll advise the District Court

25   of that?

1           MR. HERRMANN:  And -- yes, Your Honor.  And also

2      if we're able to resolve the substantive consolidation

3      issues, then I do believe that ultimately would end the

4      appeal, if we could deal with the other entities that

5      haven't been substantively consolidated.

6           THE COURT:  Okay.  Thank you, Mr. Herrmann.

7           MR. HERRMANN:  Thank you.

8           THE COURT:  Anybody else?  Mr. Fishberg.  Nice to

9      see you in the courtroom as well.

10          MR. FRISHBERG:  Good morning, Your Honor.  Danial

11     Frishberg, pro se.  My notes were kind of taken in security,

12     so I'll have to work on this --

13          THE COURT:  Just speak clearly and --

14          MR. FRISHBERG:  Sorry.  My notes were taken at

15     security so --

16          THE COURT:  Your notes were taken?

17          MR. FRISHBERG:  They're on my phone.

18          THE COURT:  You can't bring a -- only lawyers can

19     bring phones.

20          MR. FRISHBERG:  We were able to bring it to

21     mediation yesterday, so I assumed I could bring it.

22          What Mr. Herrmann said about how there's a mining

23     entity that's not consolidated, I'm not sure if that's fully

24     accurate, but I am -- but my understanding of the corporate

25     structure is that there's -- I believe it's Celsius Lending

Page 61

1   LLC which holds in excess of a billion dollars in assets

2   which sits directly underneath the parent company which

3   would not be consolidated in these -- in the settlement.

4          THE COURT:  Well, any value of any subsidiaries

5   held directly by CNL flows up to CNL and by virtue -- it's

6   the same thing with mining, thereby any value that flows up

7   to CNL is now -- would now be available to LLC's creditors.

8          MR. FRISHBERG:  It's not under CNL, I believe.

9   There's one under CNL and there's two lending entities, one

10  under CNL and one directly under the Delaware parent

11  company.  It's on the flow chart going through CNL just

12  directly into the parent company.  Under the current

13  proposed plan, I believe Earn holders would be last to get -

14  - have claims against it, since it would have to go into the

15  other entities after all claims are fully satisfied.

16         At least that is my understanding of it.  It is a

17  fairly complex structure.  Yeah, and as Mr. Herrmann said it

18  was the FTC company that (indiscernible) the GK8 claims.

19  Thank you, Your Honor.

20         THE COURT:  Okay.  Anybody else want to be heard?

21  Mr. Koenig, do you have any response?

22         MR. KOENIG:  Again, Chris Koenig.  Thank you, Your

23  Honor.  Mr. Herrmann agreed, the settlement does not include

24  any nonconsensual releases of any direct claims.  To be

25  clear, it releases any claims that the company, the Debtors

1    have against the initial consenting Series B holders as well

2    as any derivative claims that creditors may seek to bring on

3    the Debtors' behalf.  But of course, there's no

4    nonconsensual releases and if there are direct claims there

5    are direct claims.

6         I repeat what I would say to Ms. Adler's client

7    that the settlement, they retain whatever rights they have.

8    It was an open offer to them that they apparently did not

9    accept and we believe that the settlement is reasonable and

10   should be approved pursuant to Bankruptcy Rule 9019.

11        THE COURT:  All right.  So the Court is going to

12   grant the motion, overrules the limited objections.  I

13   intend to issue an opinion or order within next day or two

14   that deals with -- just so, no suspense, but the motion is

15   granted.

16        MR. KOENIG:  Thank you, Your Honor.  I believe

17   we're now going to have a status conference on the bar date

18   and related issues that sort of stem out of the Series B

19   settlement, that was under the Series B heading.  Mr.

20   Colodny filed that last night.  I'll cede the lectern.

21        THE COURT:  Mr. Colodny.

22        MR. COLODNY:  Thank you, Your Honor.  Aaron

23   Colodny on behalf of the Official Committee of Unsecured

24   Creditors.  Your Honor asked about an amended disclosure

25   statement.  I hope Mr. Koenig did not over promise by later

1    this week, but --

2              MR. KOENIG:  I said as early as later this week.

3              MR. COLODNY:  True.

4              THE COURT:  What's your prediction, Mr. Colodny?

5              MR. COLODNY:  Mid next week.  Your Honor, we --

6              THE COURT:  Have a nice weekend.

7              MR. COLODNY:  They always are.  We -- I want to

8    start again with the government complaints.  I think they

9    echo what we brought in our class claim and what the

10   examiner found.  They show that Mr. Mashinsky and Celsius'

11   prepetition management actions had real effects on account

12   holders and they devastated a lot of people.  As of the

13   initial bar date, 23 -- about 23,000 account holders filed

14   proof of claim totaling over $70 billion.

15             The Committee also brought a class proof of claim

16   asserting fraud, misrepresentation, and other non-contract

17   claims on behalf of all account holders.  And per this

18   Court's order approving the filing of that class proof of

19   claim, the bar date is currently over.

20             We need to close the bar gate before we solicit a

21   plan and we wanted to use this opportunity to inform

22   everyone, the Debtors and the Committee have discussed and

23   we intend to file a notice with Your Honor's approval, as is

24   required by that order, to set it for August 2nd.  So with

25   Your Honor's approval, we can file a notice of proposed

Page 64

1    order setting the bar for August 2nd, if that's okay with

2    Your Honor.

3              THE COURT:  So tell me, what if anything has --

4    will happen with respect to the class claim?

5              MR. COLODNY:  Getting to that, Your Honor.  So

6    we've got 23,000 claims asserting $70 billion.  Resolving

7    all of those is going to take an incredible amount of time

8    if we were to go claim by claim.  On the same hand, account

9    holders having to prove fraud and specific damages is going

10   to take a significant amount of effort.  And I think we saw

11   when the bellwether trials were attempted scheduling, that

12   that is going to be difficult, time consuming, and

13   expensive, both for the account holders and for the estate,

14   and that is money out of the account holders' pockets in

15   twofold.

16              The potential harm to account holders, though, is

17   much greater than that because to the extent we are not able

18   to resolve those claims, the Debtors are going to hold --

19   have to hold back proceeds on the effective date because

20   they can't distribute all of the funds that they have and if

21   someone else comes back later and Your Honor finds they have

22   a valid claim, not receive anything because the funds have

23   been distributed.

24              So what that means in practical reality is if we

25   don't resolve the claims prior to the effective date, the

Page 65

1  disclosure statement recoveries will in fact be

2  significantly less in terms of an initial distribution.

3  There's still a good faith attempt to estimate the actual

4  distributions to creditors.

5        So we have been talking with the Debtors and

6  working to find a way to address this.  We are nearing the

7  terms of a settlement and what that settlement would provide

8  is that the Debtors would agree to certify the class and for

9  the allowance of a class claim on behalf of all account

10  holders, which would provide for an incremental recovery to

11  account holders to account for damages as a result of the

12  Debtors' noncontract claims.

13        Any account holder who wishes to opt out and

14  pursue their own litigation is free to do so, and we will

15  provide a disclosure which will be approved by this Court

16  which will allow -- if approved by this Court will allow an

17  opt-out of that settlement.  If they opt out of the

18  settlement though, they won't receive the additional

19  damages.  They will be left to the claim process to resolve

20  their claims and they will likely have to prove those claims

21  in order to receive a distribution from the Debtors' estate

22  because they will have a disputed claim under the plan until

23  that time.

24        We believe that the resolution of these non-

25  contract claims through this proposed settlement will allow

Page 66

1    the Debtors to hold back less on account of disputed claims

2    and distribute more value to account holders, more funds to

3    account holders faster.  That's been our mantra for a long

4    time.

5            I want to make a couple of things clear.  We're --

6    there will have to be certain exceptions from this.  We're

7    not trying to resolve claims where people dispute what

8    amounts are in what accounts and we're working with the

9    Debtors and the class claimants to find out what those

10   exceptions are going to be.  It also will not affect voting

11   on the plan in any way.

12           We're not seeking to impose a large claim that the

13   Committee will vote.  I've seen that.  In no way.  We filed

14   a -- the Debtors filed a disclosure statement motion by

15   which every account holder will vote the amount of their

16   scheduled claims.  We don't intend to effect that.  This

17   will be a democratic process.  We're going to need numbers

18   of votes and that's what we intend to do here.

19           So I think, more to come, but I wanted to preview

20   with Your Honor and everyone that's listening --

21           THE COURT:  Give me some sense of the anticipated

22   schedule of this.  I think -- look.  It's a huge creditor

23   body, spread around the world.  And I mean, I'm not --

24   haven't been asked to rule.  I'm not ruling on anything at

25   this point.  It would be unfortunate if this affected the

Page 67

1   disclosure statement, plan confirmation process.  You know,

2   it actually brings to mind a very vivid experience I have as

3   a practicing lawyer in the Drexel -- Milken, Drexel Burnham

4   litigation where there was a global class action which

5   actually was, the construct was part of a settlement plan

6   and there was an opt-out procedure and Judge Milton Pollack

7   was the judge who presided.

8          Judge Pollack called the opt-outs into Court and I

9   was -- I represented one of the main defendants in the cases

10  and was there for these and he would listen and he would say

11  fine.  When are you going to be ready to go to trial?  I

12  wouldn't do quite what he did.  He would say, we'll start

13  the trial next Tuesday.  But you know, I mean, people

14  reserve the right to opt out, but they need to understand

15  what the potential ramifications of that are.  That -- I'm

16  not -- you know, I will hear and judge whatever it is that

17  comes before me and will fairly judge it.

18          I just, I only tell this story because at the end

19  of the day, all the opt-outs with through their opt-outs

20  because the settlement actually was a pretty rich settlement

21  and, you know, I think they all became convinced this was

22  the best avenue for a fast recovery.  But the consequences

23  for those who opt out, they're catching a tiger by the tail

24  at that point.  So -- but we'll -- let's see where this

25  goes.

1          Thank you for -- so what is -- with respect to

2     respect to the issue you raised about the amended bar date,

3     August 2, that's satisfactory to me.

4          MR. COLODNY:  Thank you, Your Honor.  And then

5     with respect to the proposed settlement, I'll step into Mr.

6     Koenig's shoes and say I'm hopeful we can get it on by the

7     end of the week.  And our intention is not to slow down

8     disclosure statement hearing, confirmation.  We want to keep

9     moving to get out of bankruptcy as quick as possible.

10          THE COURT:  Okay.  All right, thank you, Mr.

11    Colodny.

12          MR. COLODNY:  Thank you.

13          THE COURT:  Anybody else want to be heard?

14          MR. SABIN:  It's good to be back, Your Honor.

15    Jeff Sabin from Venable on behalf of Ignat Tuganov who is

16    one of the three lead representatives referred to in terms

17    of the class action proof of plan.  I rise to make clear

18    very concisely that we've had these discussions with Mr.

19    Colodny.  You know, our -- I can only give superlatives in

20    terms of the work and time that he's put and his colleagues

21    have put into this.  We support exactly what he has

22    otherwise conveyed to you.  Timing is very important to us.

23          We are also engaged as you know in a mediation

24    currently or concurrently with his hearing, continuing

25    shortly thereafter.  And I do believe that the process

1   outlined and contemplated by Mr. Colodny is the right one

2   for this case.  I also want to point out that the class

3   proof of claim has been filed against all Debtors, okay, not

4   just a particular Debtor who may or may not be substantively

5   consolidated.

6          I also wish to point out that as you, I think,

7   have heard one of the issues that is still unresolved and we

8   hope to be resolved in connection with the mediation and the

9   plan process is whether additional Debtors may be

10  substantively consolidated, some or all of them.  And

11  indeed, we've raised that issue in our separate adversary

12  proceeding, which we also hope soon is resolved by part of

13  mediation (indiscernible).  And for all of those reasons, I

14  just wanted not update informationally, Your Honor, in terms

15  of where at least one of the class representatives is.

16  Thank you.

17         THE COURT:  Thank you, Mr. Sabin.  Mr. Colodny, go

18  ahead.  I'm sorry --

19         MR. KOENIG:  No problem, Your Honor, Chris Koenig.

20  Just very briefly, want to echo what Mr. Colodny said.

21  We've been struggling with the claims process, how to deal

22  with them fairly, equitably, and at the same time we want to

23  get distributions to customers as soon as possible and for

24  23,000 claims, that could drag on for years.  So what we've

25  -- what we have an agreement in principle with the Committee

Page 70

1    on is, this is a process that will offer account holders an

2    additional claim on account of fraud, misrepresentation, and

3    the like.  It is an open offer.  They can take it or not.

4    If they believe that they can achieve a higher recovery,

5    than what's in the offer, they're free to opt out.  But from

6    our perspective, fraud is a heightened pleading standard.

7    It's very difficult for individuals to prove.  And although

8    it's in the examiner's report, actually proving it is

9    difficult, time consuming, costly.  You might have to hire a

10   lawyer.  So we think that this is an equitable and speedy

11   way to give common sense to the account holders that want it

12   and if they want to opt out, they are certainly free to do

13   so.

14             THE COURT:  Thank you very much.

15             MR. KOENIG:  Thank you.  I believe next up on the

16   agenda is -- we're at fee application --

17             THE COURT:  Yes.

18             MR. KOENIG:  So I'll cede the lectern to Mr.

19   Sontchi.

20             MAN:  Your Honor --

21             THE COURT:  You're excused.

22             MR. HANCOCK:  Good morning, Your Honor.  Mark

23   Hancock of Godfrey & Kahn on behalf of the fee examiner.

24   Chris Sontchi is also with me here today.  Your Honor, on

25   July 7th, we filed the fee examiner summary report with

1    recommendations for 16 fee applications for approval,

2    subject to various consensual reductions.  Happy to answer

3    any questions you have for me or for Judge Sontchi -- Chris

4    Sontchi regarding that summary report.

5          THE COURT:  Mr. Sontchi, do you want to be heard?

6          MR. SONTCHI:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. SONTCHI:  Chris Sontchi, the Court appointed

9    fee examiner.  Yeah, just very briefly, I would like to

10    applaud the work of the firms to adapt themselves to the

11    sort of rules we laid down at the beginning and we dealt

12    with in connection with the first interim fee applications

13    and we saw a lot of changing in billing behavior which is

14    normal by the parties and that resulted in a much smoother

15    process to resolve the claims that are -- the claims that

16    were brought by the professionals.

17          I'm here specifically in case you had any

18    questions in connection with the Voyager issue that we did

19    address.

20          THE COURT:  Yeah, why don't you just -- so that,

21    just very briefly describe what the Voyager issue is so that

22    that anybody who is on Zoom --

23          MR. SONTCHI:  Sure.

24          THE COURT:  -- in the courtroom will understand.

25          MR. SONTCHI:  So the Voyager issue is that

Page 72

```
 1    Kirkland & Ellis is lead counsel to Voyager, which is a

 2    separate crypto case.  They are also the counsel to Celsius.

 3    Voyager had a bar date for the filing of proofs of claim and

 4    Celsius did not file proof of claim prior to the bar date.

 5          Additionally, because of that relationship and

 6    other relationships, the Debtor hired conflicts counsel

 7    which was Akin Gump.  After -- actually, I believe it was

 8    Mr. Fishberg who brought it to everyone's attention after it

 9    was brought to the attention of the estate that the bar date

10    had been missed.

11          Kirkland and Akin both got very busy to file a

12    motion in the Voyager case seeking to allow the filing of a

13    late proof of claim.  Ultimately, that was denied by Judge

14    Wiles who noted that among other things that it could not

15    constitute excusable neglect when the same law firm

16    represented Celsius and Voyager and that law firm did not

17    file timely proof of claim.

18          That litigation continues.  Akin Gump has taken

19    over complete control of that litigation and is negotiating

20    with a series of conflict counsel at Voyager.  It's been

21    very difficult to get someone to talk to at Voyager.  I

22    think they're on their fourth law firm that they're dealing

23    with to try to resolve that on a consensual basis.  That's

24    the current status.  I wasn't asked -- that's your job --

25    whether there was any substantive issue to deal with.  I was
```

Page 73

1    -- I viewed my role in looking at the fees that were sought

2    in connection with the filing of the late proof of claim

3    whether they met the reasonableness standard, and we had --

4    I had and my attorneys had meetings with Kirkland and Akin

5    on these issues and we're not talking about a ton of money

6    that was spent.  Between the two law firms, it gets well

7    into the six figures.  And both firms agreed to lower their

8    recovery by -- and in connection with Kirkland by a

9    substantial cut, which was -- we made a request, they agreed

10   to it.  And as a result, the fees that are being approved or

11   seeking to be approved today constitute a discount to the

12   estate of some of the costs associated with pursuing the

13   late filed proof of claim in front of Judge Wiles.

14           THE COURT:  Is it fair to say, though, that

15   approval -- if I approve the fees as revised, it does not

16   release any claims arising from the circumstances that you

17   described?

18           MR. SONTCHI:  Correct.  Yes, absolutely, Your

19   Honor.  This isn't some sort of release.  If there are

20   malpractice claims or any other kind of claims against

21   Kirkland or Akin in connection with this issue, those are

22   obviously fully preserved either on behalf of the -- well,

23   on behalf of the estate or if there are any other

24   individualized claims, which I have no idea if there are.

25           THE COURT:  All right.

Page 74

1           MR. SONTCHI:  If I could also -- oh, I'm sorry.

2           THE COURT:  No, please go ahead.  I also wanted to

3   discuss Ms. Pillay's work.  So we took a very long look and

4   had many conversations with her in connection with the fee

5   application of Jenner, which was about $10 million.  In the

6   context of at least early on when this was being discussed,

7   way back last fall, numbers of in the, you know, $2 million

8   cap, something like that was talk -- were talked about.  We

9   wanted to make sure we understood what occurred here.

10          And I have -- first of all, I also spent a lot of

11  time talking to professionals in our world who are involved

12  in this case, as well as the professionals in this case

13  about their belief about the merits of the reports that the

14  examiner provided and whether they were worth $10 million.

15  And I could tell you universally, throughout the universe of

16  that we live in, everyone said they were absolutely worth

17  the amount that was spent.  So we had some concerns.

18          It was a full court press, but she was given a

19  very short period of time.  She was required to do two

20  reports, not one report.  And I've read a lot of reports in

21  my career.  You've read a lot of reports.  It's just a

22  phenomenal piece of work.  So at the end of the day, we --

23  they did agree to some changes, some minor -- well, not

24  minor.  Some significant changes in connection with

25  staffing, using higher billed rates when it could have been

Page 75

1    lower billed rates.  Sort of typical stuff.

2              We took no deduction or asked for no deduction in

3    connection with sort of overstaffing or anything along those

4    lines.  Given the unique circumstances of this, this is --

5    this parrots what you said earlier, the unique circumstances

6    of this case, the timeframe, the complexity, the amount of

7    work that had to be done.  I felt it was an appropriate

8    amount to approve.

9              THE COURT:  All right.  I'll just make a brief

10   comment about the expense of the examiner.  I think that the

11   two reports were extraordinary.  That's the first

12   observation I would make.  And this is not the -- I've never

13   been a giant fan of examiners.  I've had examiners in two

14   very large cases and they were expensive.  Just referring to

15   this case in particular, I think that the examiner has

16   delivered value for what the cost was.  I will never know.

17             I think state and federal regulators, DOJ would

18   have been much, much more active throughout in the absence

19   of an examiner.  I'm not questioning the Committee's ability

20   to conduct an investigation.  I don't think they could have

21   delivered the reports, given the constituency, the reports

22   that were delivered by the examiner.  So actually, I view

23   this as an example where yes, an examiner is expensive but I

24   think Ms. Pillay and her colleagues add credibility.

25             You know, the scope originally had been negotiated

1 between the Committee, the U.S. Trustee, and the Debtor.  I

2 think it was important, people may disagree, I was very

3 interested in the comments and recommendations from pro se

4 creditors who I think know a lot more about crypto than I

5 do.  And I think I commented at the time, I thought they

6 raised some very good issues and the examiner's scope, the

7 scope of the investigation was expanded.

8    I think that it -- I've read examiners reports

9 before.  I think these two reports done in very, very

10 compressed timeframe were fairly extraordinary.  I

11 appreciate the scrutiny that you and your counsel took in

12 reviewing the fee applications as well.  So I just want to

13 make that comment about the examiner report.

14    I do -- and either, I don't know whether you or

15 your counsel want to address the issue about the deferral of

16 the Latham & Watkins fee application.

17    MR. SONTCHI:  I'd be happy to address that, Your

18 Honor.  Latham & Watkins is regulatory, special regulatory

19 counsel to Celsius.  And indeed, they were involved in the

20 early discussions with the government entities.  We have an

21 ongoing dialogue with them and indeed we have a meeting -- I

22 have a meeting scheduled with them next Monday here in New

23 York face to face to discuss these issues.  With regard to

24 two issues, one are just technical issues.  Their time

25 records are difficult for us to understand.

1           And second, more substantive issues.  Kirkland

2     took over for them, for all intents and purposes, in

3     February.  And so the issues with Latham are pretty isolated

4     to the November to February -- excuse me, beginning of the

5     case to February sort of timeframe.  Kirkland is really

6     taking by far the laboring oar with the regulatory issues

7     now.

8           So, rather than prematurely -- well, there are two

9     things.  One, we just need more information and need an

10    under -- better understanding of what happened, why Kirkland

11    took over, et cetera.  And then also we just need some help

12    with, from them frankly on the quality of their time

13    records.  So it's an ongoing dialogue and rather than

14    getting into any kind of dispute when hopefully there won't

15    be a dispute, we're just continuing so we can continue to

16    have these discussions.

17          And as I said, we have a meeting next week here in

18    New York on these issues.

19          THE COURT:  Thank you very much.

20          MR. SONTCHI:  You're welcome.

21          THE COURT:  All right.  So --

22          MR. SONTCHI:  May I be excused?

23          THE COURT:  Yeah, you are.

24          MR. SONTCHI:  Thank you.

25          THE COURT:  Actually, you might want hold on --

1              MR. SONTCHI:  Okay.  All right.

2              THE COURT:  -- another minute.

3              MR. SONTCHI:  Guess I should wait to see if the

4      motion's approved.

5              MR. HANCOCK:  Yes, Your Honor.  Anything further?

6              THE COURT:  No.  What I was going to say is, I've

7      commented in many cases before that reviewing fee

8      applications is the least enjoyable part of my job but I

9      take the responsibility very seriously.  And I think I've

10     also commented, I haven't been a giant fan of fee examiners,

11     but this case has sort of maybe turned my view around about

12     it.  So what I have before me today are 18 professional fee

13     applications for the period from November 1, 2022 through

14     February 28, 2023, the second interim period.

15             And the fee examiner filed his second report.

16     It's at ECF 2975, which recommends the Court approve 16 of

17     the applications with certain stipulated reductions and

18     defer consideration of two applications.  Those are the

19     Latham applications.  And I reviewed -- I really have

20     reviewed them clearly and my clerks and interns have spent a

21     lot of time on this.

22             I think the fee examiner's report and

23     recommendation is exceedingly well done and I do not -- I

24     think this may be one of the few times in a big case I can

25     say this.  I don't have any issues that I want to raise.

1    I'm satisfied with the fee examiner's report, the reductions

2    which they got applicants to agree to.  I think they were

3    all appropriate, in my view.  And so believe it or not, the

4    report and recommendations are adopted in full.  The fee

5    applications are approved, fees and expenses approved as set

6    forth in the fee examiner's report.

7             You know, in Exhibit A, report Exhibit A shows 16

8    of those applications and for both fees and expenses and

9    Exhibit B are the two Latham applications that are being

10   deferred.  So with that, that's why I thought I'd have you

11   stay for a minute because I didn't -- it really is

12   unnecessary to go through each of the applications.  So, I

13   appreciate all the work that went in, Mr. Sontchi, and your

14   counsel as well.

15             MR. HANCOCK:  Thank you, Your Honor.  Appreciate

16   it.

17             THE COURT:  Anything else that -- you know, I have

18   -- this is jam packed day and I have -- I know we have some

19   status conferences set, so let's try and very quickly, Mr.

20   Koenig, you go through them because actually I have -- I'm

21   already 15 minutes behind for the next hearing, so --

22             MR. KOENIG:  Your Honor, Chris Koenig.  I think I

23   can be very brief.  So at the last hearing, you directed us

24   to meet and confer with the adversary plaintiffs to try to

25   come up with a schedule.  We're very close on a schedule.

Page 80

1     The schedule would end with one joint hearing but all of the

2     other parties have agreed, we will have one joint hearing.

3     We're just working through some scheduling issues because

4     August, September, travel, holidays, all of those sorts of

5     things, but we expect to have a consensual proposed

6     scheduling order, I think later this week.

7                 THE COURT:  Okay, thank you.  Does anybody want to

8     be heard on that?

9                 MR. ADLER:  Good morning, Your Honor.  David Adler

10    from McCarter & English on behalf of the Ad Hoc Borrower

11    Group.  Just want to say that I've spoken to Mr. Shanks,

12    both Mr. Shanks, Christopher and Fred, as well as counsel

13    for the Georgiou matter.  They have agreed for consolidated

14    hearing.

15                 I got a number of emails yesterday from Kirkland

16    regarding scheduling, which generally seemed okay to me and

17    we're looking essentially, the trigger point would be filing

18    a motion to dismiss on the ad hoc complaint and we're

19    looking at a hearing in early September.  And I just wanted

20    to make sure that that was acceptable to Your Honor.  I

21    think it would be the September omnibus date.

22                 THE COURT:  Okay.  In principle it is.  I can't

23    tell you -- I've tried to make sure I don't have conflicting

24    calendars with omnibus dates, but I have, unfortunately, on

25    a couple of them I had.  I don't know that -- I'm not

Page 81

1    suggesting there is one on this one.  I don't know.

2              MR. ADLER:  I just wanted to advise.

3              THE COURT:  Trying to do this is as orderly and as

4    quickly as possible.  Any settlement prospects?

5              MR. ADLER:  We're continuing, Your Honor.  As soon

6    as we get done here, we're going back to see Judge Wiles.  A

7    lot of parties there yesterday, a lot of discussion, and

8    hopefully we will have something positive to report the next

9    hearing.

10             THE COURT:  That would be -- that really would

11   please me if you were able to resolve this.  Okay.

12             MR. ADLER:  Thank you, Your Honor.

13             THE COURT:  Thank you very much.  Mr. Koenig,

14   anything else I need to hear?

15             MR. KOENIG:  Nothing further.  Thank you, Your

16   Honor.

17             THE COURT:  All right.

18             MR. AGANGA-WILLIAMS:  Judge, if we may be excused.

19             THE COURT:  Just identify your name, okay.

20             MR. AGANGA-WILLIAMS:  Temidayo Williams.

21             THE COURT:  Everybody can be excused.  We're

22   adjourned.

23             MR. AGANGA-WILLIAMS:  Thank you.

24             THE COURT:  Okay.  Because I'm already about 17

25   minutes late.

Page 82

1              (Whereupon these proceedings were concluded at

2      11:17 AM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 83

1                          **I N D E X**

2

3                             RULINGS

4                                              Page        Line

5    Backup bidder plan, approved              46          20

6

7    Series B settlement, approved             62          12

8

9    Fee applications, approved                79          5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 84

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 19, 2023

| **&** | | | |
| --- | --- | --- | --- |

**&**   4:8,12 5:9,20
6:2,5 7:11,15
7:20 10:3,13
13:11,20 14:2
14:15 27:9
70:23 72:1
76:16,18 80:10

**0**

**0.00**   4:10,23
**0.00.**   5:22 6:14

**1**

**1**   4:5,20 5:5,12
6:5,12 7:5,14
8:11 9:3 78:13
**1.5**   44:7,9
**10**   8:12 74:5,14
**10/31/2022**
5:21
**10001**   11:15
**10004**   2:19
17:20
**10014**   11:5
**10017**   17:13
**10018**   12:5
19:12
**10020**   14:5
**10022**   10:16
18:20
**100281**   16:5
**10036**   12:13
16:20 17:5
20:5
**10104**   12:20
**10111**   18:13

**10153**   19:5
**10:01**   2:22
**11**   27:11 28:12
28:22 30:4,21
39:20 50:13
**11/1/2022**   4:9
4:22 5:16 6:6
7:7,16,21
**111**   14:17
**11501**   84:23
**1177**   17:4
**11:17**   82:2
**12**   9:4 83:7
**12/1/2022**   6:13
**12151**   84:7
**1221**   14:4
**12548**   15:4
**1285**   18:19
**1290**   12:19
**13**   9:4
**1384**   19:11
**14th**   46:12
**15**   9:4 79:21
**151**   12:12
**15th**   15:11
**16**   8:12 39:22
71:1 78:16
79:7
**16th**   40:5
**17**   8:17 15:19
55:22 81:24
**17,746.65.**   7:22
**18**   2:21 78:12
**1846,2670,2...**
8:3
**19**   84:25

**1st**   49:5

**2**

**2**   4:15 39:18,19
39:19,22 68:3
74:7
**2,000,000.00**
5:17
**2,195.04**   5:17
**2/28/2023**   4:9
4:22 5:16 6:13
7:7,16,22
**20**   33:6,19
34:16 39:23
83:5
**200**   13:22
19:18
**2004**   52:8
**201**   11:4
**2010**   13:4
**2022**   4:5,15,20
5:5,12 6:5,12
7:5,14 78:13
**2023**   2:21 4:5
4:16,21 5:6,12
6:5,12,20,20
7:6,15 78:14
84:25
**20th**   18:12
40:5
**21202**   13:5
**2170**   5:22
**22**   8:17
**22-10964**   1:3
**225**   16:4
**23**   63:13
**23,000**   63:13
64:6 69:24

**23-01007**   1:4
**23-01010**   2:9
8:5,9,14,19 9:1
**23-01016**   1:18
**23-01190**   2:1
**23rd**   39:24
40:5
**24**   50:1
**2437**   7:23
**2446**   7:17
**2452**   6:20
**2455**   4:10
**2456**   7:8
**2457**   5:12
**2459**   4:5
**2462**   6:14
**2463**   6:7
**2464**   5:6
**2465**   4:23
**2466**   5:17
**25**   48:20,21
49:16,22,23
51:14 55:19
**250**   12:4
**2500**   19:18
**2514**   4:16
**26th**   40:5
**27**   8:17
**2700**   13:13
**2719**   18:5
**27th**   39:25
40:5
**28**   4:5,16,21
5:6,12 6:12,20
7:6,15 39:3,4
78:14

**2847**  46:15
**2899,2967,2...**
   9:9
**2967**  50:18,22
   50:23
**2975**  78:16
**2978**  9:14
**2979**  9:14
**2980**  4:5,10,16
   4:23 5:6,12,17
   5:22 6:7,14,21
   7:8,17,23
**2982**  9:14
**2984**  9:14
**2nd**  63:24 64:1

**3**

**3**  9:3
**3,386,594.00**
   4:23
**3/31/2023**  6:6
**300**  10:5 13:4
   15:11 84:22
**3020**  5:22
**3032**  8:3
**31**  6:5
**32**  8:17
**327**  44:1
**330**  84:21
**33131**  13:23
   19:19
**33143**  16:13
**36th**  16:4

**4**

**4**  8:12
**4,884,132.60**
   7:17

**4.7**  30:10
**400,000**  7:8
**417,855.00**  4:9
**42nd**  12:12
**45**  18:12
**46**  83:5
**4900**  13:22
**49th**  12:12

**5**

**5**  83:9
**500**  18:4
**510**  32:1,25
   33:2,9,18 34:1
   34:17 35:6,6
   36:6
**5100**  14:17
**515**  16:12
**53597**  15:21
**53701**  18:6
**55**  11:14
**555**  13:13
**57th**  16:12
**5:30**  40:21

**6**

**6**  8:7,12 39:18
   39:22
**600**  48:12 57:3
**601**  10:15
**60606**  14:18
**60654**  10:6
**61,571.97.**  7:17
**62**  83:7
**63,845.00**  6:14
**630**  17:12
**66,595.09.**  6:7

**690**  57:2

**7**

**7**  20:4
**7,194,758.50**
   7:22
**7/13/2022**  5:21
**70**  63:14 64:6
**7301**  16:12
**76,270.73.**  7:8
**767**  19:4
**778,680.00**
   5:21
**7857**  15:20
**78701**  15:12
**78711-2548**
   15:5
**79**  83:9
**7th**  70:25

**8**

**8**  6:20 8:12 9:3
**80**  34:3,10
**81**  33:7 34:14

**9**

**9**  40:17
**9,534,819.50**
   6:7
**90071**  13:14
**9019**  33:13
   51:10 62:10
**906**  19:11
**9:10**  39:20

**a**

**a.m.**  6:9,12
   39:20 40:17
**aaron**  13:16
   41:11 62:22

**abi**  42:25
**abigail**  15:14
**ability**  75:19
**able**  28:10
   32:14 38:15
   46:20 49:12
   58:18 60:2,20
   64:17 81:11
**above**  59:12
**abreu**  23:8
**absence**  75:18
**absolutely**
   73:18 74:16
**accept**  52:19
   56:15,16 62:9
**acceptable**
   80:20
**acceptance**
   52:15
**access**  36:21
   37:24 38:5
   54:12
**accordance**
   30:22
**account**  13:3
   28:17,20 32:24
   38:9 41:21,24
   52:25 53:3,5
   54:12,18,19
   55:3 63:11,13
   63:17 64:8,13
   64:14,16 65:9
   65:11,11,13
   66:1,2,3,15
   70:1,2,11
**accounts**  31:21
   32:5,10 33:1

36:7 66:8
**accurate** 60:24
84:4
**achieve** 70:4
**acquisition**
19:9,10
**action** 40:18
67:4 68:17
**actions** 41:14
42:1 63:11
**active** 37:8
75:18
**activity** 31:11
**actual** 53:4
65:3
**actually** 37:19
50:1 55:14
59:5 67:2,5,20
70:8 72:7
75:22 77:25
79:20
**ad** 1:12 8:5
13:3 80:10,18
**adapt** 71:10
**add** 57:4 75:24
**additional** 52:7
65:18 69:9
70:2
**additionally**
72:5
**address** 43:12
53:15 65:6
71:19 76:15,17
**adjourned**
81:22
**adjudicated**
54:1,3

**adler** 17:9,15
57:13,13 80:9
80:9 81:2,5,12
**adler's** 62:6
**administered**
30:22
**administrative**
36:21
**admitted** 50:22
**admitting**
50:21
**adopt** 32:19
35:17
**adopted** 79:4
**adrienne** 18:15
**adv** 1:4,18 2:1
2:9
**advance** 45:17
**advanced** 51:7
**adversary** 8:5
8:9,14,19 9:1
69:11 79:24
**adverse** 51:18
**advice** 52:18
**advise** 59:24
81:2
**advised** 52:10
**advisor** 4:3,19
5:3
**advisory** 4:1
**affect** 30:14
35:4 36:5
66:10
**affected** 66:25
**aganga** 12:22
51:4,4 53:8
81:18,20,23

**agencies** 27:22
28:19
**agenda** 27:16
38:19 43:15,16
70:16
**agent** 38:1
**agree** 30:8 32:7
42:11 44:2
56:5 65:8
74:23 79:2
**agreed** 28:25
29:17 32:4,8
38:13 61:23
73:7,9 80:2,13
**agreement**
29:5 30:3,10
38:16 42:17
51:7,9,10,21
51:21 52:15,16
52:19 53:5
57:20,25 69:25
**agreements**
27:23 28:23
31:4,9 37:23
38:17
**ahead** 29:25
47:12 53:18
69:18 74:2
**aislinn** 21:10
**akin** 7:10,15
16:17 72:7,11
72:18 73:4,21
**al** 1:15,20,23
2:6,14 5:5 7:5
8:6,9,10,15,15
8:20,20 9:2

**alaina** 11:21
**alex** 21:1
**alexander**
25:11
**ali** 22:14
**allegations**
28:13
**alleged** 43:3
**alleges** 31:20
31:21
**allocated** 56:8
58:7
**allocation**
49:16,24,25
56:12
**allow** 33:6
65:16,16,25
72:12
**allowance** 7:12
65:9
**allowing** 45:6
57:15
**allows** 48:17
**almeida** 11:17
**alternative**
47:7
**alvarez** 7:20
**amelia** 22:5
**amenable**
40:17
**amended** 8:17
27:16 34:19
38:21 45:11
62:24 68:2
**amending** 30:6
**america** 7:21

americas 12:19
14:4 17:4
18:19
amount 44:9
53:22 55:23
56:24 64:7,10
66:15 74:17
75:6,8
amounts 66:8
analysis 58:7
andersen
17:10 25:24
anderson 39:1
57:13
andrew 11:19
14:13,20 55:9
angeles 13:14
anne 24:8
announced
27:23
answer 42:4
71:2
answered
29:14 58:3,5,5
answers 40:10
anticipated
66:21
anybody 56:6
57:9 58:12
60:8 61:20
68:13 71:22
80:7
apparently
56:16 62:8
appeal 59:8
60:4

appealed 47:21
47:25 53:2
appeals 47:24
53:11,13
appear 45:6
57:15
appears 49:15
applaud 58:8
71:10
applicable
29:14
applicants
79:2
application 4:1
4:7,12,18 5:1,8
5:14,19 6:1,9
6:16 7:1,10,19
70:16 74:5
76:16
applications
71:1,12 76:12
78:8,13,17,18
78:19 79:5,8,9
79:12 83:9
appointed 71:8
appointment
47:18
appreciate
45:7 76:11
79:13,15
appropriate
56:1 75:7 79:3
approval 44:6
55:17 63:23,25
71:1 73:15
approve 46:20
47:5 56:1 57:6

73:15 75:8
78:16
approved
29:14 39:7,11
47:9 50:16
62:10 65:15,16
73:10,11 78:4
79:5,5 83:5,7,9
approving 9:6
9:12 52:22
53:9 63:18
approximately
57:3
area 35:25
argue 50:6
argument 34:3
36:8,8
arguments
34:13
arie 12:15
arising 73:16
artur 23:8
asked 33:16
39:9,12,12
49:25 62:24
66:24 72:24
75:2
asserting 54:1
63:16 64:6
assets 28:15
53:21,23 54:6
54:9,13 58:25
61:1
assisted 28:9
associated
32:24 73:12

assume 41:4
assumed 60:21
assuming
39:10
astronomical
55:24
atlas 16:10,11
attempt 65:3
attempted
64:11
attention 72:8
72:9
attorney 15:2,9
41:18
attorneys 6:4
10:4,14 11:3
11:12 12:3,11
12:18 13:3,12
13:21 14:3,16
15:3,10,17
16:3,11,18
17:3,10,18
18:3,11,18
19:3,10,17
20:3 73:4
auction 45:19
august 63:24
64:1 68:3 80:4
austin 15:5,12
authority
36:22,25 37:5
authorized
36:16
authorizing
9:12
available 41:5
52:1 61:7

[avenue - brett]

| | | | |
|---|---|---|---|
| **avenue** 10:15 12:19 14:4 17:4,12 18:19 19:4 67:22 | **baltimore** 13:5 **banker** 7:3 **banking** 15:10 **bankruptcy** 1:1 2:17 3:3 | 80:10 **behavior** 71:13 **beitler** 17:22 **belief** 74:13 **believe** 29:7,20 | **billion** 30:11 61:1 63:14 64:6 **binding** 31:17 34:23 42:7 |
| **avoid** 37:12 **avoids** 42:20 50:15 **aware** 44:23 | 28:12 30:23,25 32:1 35:6 41:5 42:20 45:13 51:17 52:4 | 29:23 30:18 32:7,25 34:22 34:24 36:8 41:16,24 44:21 | **birch** 25:22 **biscayne** 13:22 19:18 **biswas** 23:12 |
| **b** | 53:18 62:10 68:9 | 49:20 52:19 55:2 59:1,20 | **bit** 27:10 32:19 34:20 |
| **b** 3:1 9:8 11:13 32:1,25 33:2,9 33:18 34:1,17 | **bar** 8:2 62:17 63:13,19,20 64:1 68:2 72:3 | 60:3,25 61:8 61:13 62:9,16 65:24 68:25 | **bitcoin** 36:3 **bjorn** 25:24 **block** 6:2,5 |
| 35:6 36:6 44:15,18 47:14 47:15,18 48:10 | 72:4,9 **barbosa** 24:15 **barnes** 23:10 | 70:4,15 72:7 79:3 **bellwether** | 39:10 **blockchain** 5:3 **board** 15:10 |
| 48:15,16,24 49:15,25 50:7 50:25 51:8,12 | **barse** 24:7 **based** 52:11 **basis** 44:21 | 64:11 **ben** 24:4 **benefit** 52:19 | 46:18 **body** 66:23 **borrower** |
| 51:19 52:6 54:11 55:11 56:24 62:1,18 | 72:23 **baton** 56:17 **battery** 17:19 | 54:19 **benjamin** 12:8 **berg** 23:7 | 80:10 **borrowers** 1:12 8:6 |
| 62:19 79:9 83:7 **back** 34:11 | **battle** 58:20 **beaird** 23:11 **bear** 40:3 | **bernstein** 16:8 **best** 56:21 58:2 67:22 | **boulevard** 13:22 19:18 **bound** 50:6 |
| 42:21 44:4 46:18 64:19,21 66:1 68:14 | **bearing** 48:6 **becin** 25:23 **becky** 21:21 | **beth** 22:10 **better** 77:10 **bid** 45:19 47:6 | 56:17 **bourgeois** 25:21 **bowling** 2:18 |
| 74:7 81:6 **backup** 9:13 43:17 44:6 | **beginning** 71:11 77:4 **begun** 52:5 | **bidder** 45:19 47:1 83:5 **big** 78:24 | **box** 15:4,20 18:5 **bradley** 22:21 |
| 45:19,19 46:20 46:25 47:6 83:5 | **behalf** 41:12 55:10 57:13 62:3,23 63:17 | **bigger** 39:9 **billed** 74:25 75:1 | **bray** 23:13 **braziel** 22:25 **brett** 13:9 |
| **ballot** 39:6 **balloting** 39:11 **balluku** 23:9 | 65:9 68:15 70:23 73:22,23 | **billing** 71:13 | |

breuder 23:14
brian 11:9
  20:16 23:10
bric 43:17,21
  44:15 45:15
brief 75:9
  79:23
briefly 53:4
  69:20 71:9,21
brifkani 23:15
bring 60:18,19
  60:20,21 62:2
brings 67:2
broad 43:8
broadway
  19:11
bronge 25:20
brought 41:16
  63:9,15 71:16
  72:8,9
bruh 11:8
bryant 16:19
bureau 16:3
burks 26:7
burnham 67:3
business 28:7
  30:5 31:5,8,12
  36:2,3 50:15
busy 72:11

c

c 10:1 21:24
  27:1 84:1,1
ca 13:14
caceres 25:19
calendars
  80:24

callan 21:6
called 41:17
  67:8
cameron 22:24
  25:17
cap 74:8
career 74:21
carl 25:18
carol 22:11
caroline 20:23
  21:4
carpenter 16:2
carroll 23:16
case 1:3,4,18
  2:1,9 5:9 13:11
  13:20 14:2,15
  28:15 34:25
  41:12,23 43:2
  45:18 46:2,23
  47:19 58:19
  69:2 71:17
  72:2,12 74:12
  74:12 75:6,15
  77:5 78:11,24
cases 27:11
  28:4,23 30:4
  30:21 31:2,2
  45:18 47:17,23
  67:9 75:14
  78:7
cash 48:20
  51:14
cashman 20:2
catching 67:23
catherine 22:4
cautiously
  38:14

cdp 12:3 55:12
cebq 58:23
cede 41:8
  62:20 70:18
cel 31:24,25
  32:12 33:3,6
  33:11,17 34:14
  35:4,5,24 36:7
  43:11 44:15
cell 31:20
celsius 1:8,15
  1:23 2:6,14 5:4
  7:4 8:6,10,15
  8:20 9:2 27:9
  27:23 28:7,19
  29:3 31:5,5,10
  31:15 36:2
  60:25 63:10
  72:2,4,16
  76:19
centerview
  5:15
cents 33:7,8,20
  34:3,10,16
ceo 34:14
certain 9:12
  32:6 35:13
  51:18 57:25
  58:1,23 66:6
  78:17
certainly 31:6
  33:16 36:9
  70:12
certification
  8:2
certified 84:3

certify 65:8
cetera 77:11
cftc 27:21
  28:11 29:1,10
chambers
  38:24 40:11
  47:11
chang 23:17
changes 59:2
  59:21 74:23,24
changing
  71:13
chapman
  16:23
chapter 27:11
  28:11,22 30:4
  30:21 50:13
charged 27:19
  27:21
charlotte 10:20
chart 34:8 43:3
  43:4,10 61:11
chase 24:17
chen 12:24
cherokee 19:9
  19:10
chicago 10:6
  14:18
chief 36:12
chock 31:14
choice 56:20
  56:22
choose 56:15
chose 56:16
chris 24:10
  25:23 27:4,8
  43:15 61:22

69:19 70:24
71:3,8 79:22
**christiansen**
23:18
**christopher**
10:8 18:3
20:22 23:20
24:6,12 80:12
**church** 23:1
**circumstances**
45:10 46:23
47:4 52:11
73:16 75:4,5
**cirkel** 23:19
**civil** 27:22
**claim** 32:2
53:25 63:9,14
63:15,19 64:4
64:8,8,22 65:9
65:19,22 66:12
69:3 70:2 72:3
72:4,13,17
73:2,13
**claimants**
53:24 54:5
66:9
**claims** 28:24
28:25 32:23
38:1 48:24
51:14,20,22
52:13 53:3,12
53:17,25 54:1
54:6,10,24,24
55:1,5 58:22
58:24 59:1,3,4
59:15 61:14,15
61:18,24,25

62:2,4,5 63:17
64:6,18,25
65:12,20,20,25
66:1,7,16
69:21,24 71:15
71:15 73:16,20
73:20,24
**claire** 12:23
**class** 8:2 41:16
53:25 63:9,15
63:18 64:4
65:8,9 66:9
67:4 68:17
69:2,15
**clear** 28:20
30:10 37:4
43:6 44:3 47:4
61:25 66:5
68:17
**clearly** 60:13
78:20
**clerks** 78:20
**client** 62:6
**clients** 55:25
57:3,21,24
**close** 47:9
63:20 79:25
**cnl** 49:3 51:13
52:23 53:7,24
54:7,13,15,18
54:21,23 55:2
55:3 61:5,5,7,8
61:9,10,11
**coco** 23:20
**code** 30:23,25
32:1 35:7

**cohen** 23:21
36:11,17,24
**colleagues**
68:20 75:24
**colloquy** 37:22
**colodny** 13:16
38:19 41:9,10
41:11,12 42:8
42:18 53:14,19
53:20 54:16,22
62:20,21,22,23
63:3,4,5,7 64:5
68:4,11,12,19
69:1,17,20
**columbia**
39:21
**come** 28:15
35:25 38:11
58:12,21 66:19
79:25
**comes** 37:14
64:21 67:17
**coming** 42:16
55:22
**comment**
75:10 76:13
**commentaries**
42:6
**commentary**
35:11
**commented**
33:15 46:21
76:5 78:7,10
**comments**
55:17 76:3
**commitment**
41:20 44:6

**committee** 4:4
4:14 5:4,11
6:19 7:4 9:7
12:18 13:12,21
14:3,16 27:25
28:4 31:24
33:11 34:2
36:15,23 37:11
38:25 41:12,15
42:3 47:19
48:16,25 49:5
50:25 51:2,6
51:11,18 52:10
52:18,18 56:11
62:23 63:15,22
66:13 69:25
76:1
**committee's**
51:8 75:19
**committees**
45:10
**commodities**
27:20
**common** 70:11
**community**
11:12 55:10
**company** 17:18
29:13,15,17
31:19 37:4,5,7
48:15 49:18
50:15 59:11,11
61:2,11,12,18
61:25
**company's**
28:15 36:21
49:19

**compensate**
28:22
**compensated**
45:21
**compensation**
4:2,8,13 5:2,9
5:9,15,20 6:2
6:10,17 7:2,13
7:20
**complain**
29:11
**complaint** 8:17
29:10 31:20
41:16 59:6
80:18
**complaints**
27:22 59:6
63:8
**complete** 72:19
**completely**
56:5
**complex** 48:7
61:17
**complexity**
75:6
**complicated**
35:7 39:13
**comply** 28:4
**complying**
30:24
**compressed**
76:10
**con** 34:14 52:6
**concerns** 74:17
**concisely** 68:18
**concluded** 82:1

**concludes**
50:24
**conclusion**
32:8 48:2
**concurrently**
68:24
**conduct** 75:20
**confer** 40:9
79:24
**conference** 8:1
8:7,11,16,21
9:3 40:7 43:10
54:3 62:17
**conferences**
79:19
**confident** 48:9
**confirmation**
32:16 34:25
35:19 37:14
39:2,5,10
40:12,13 46:24
47:23 48:8,18
67:1 68:8
**conflict** 72:20
**conflicting**
80:23
**conflicts** 44:3
72:6
**confusion**
30:11
**connection**
32:15 52:5
69:8 71:12,18
73:2,8,21 74:4
74:24 75:3
**consecutive**
39:17,25

**consensual**
27:23 33:12
42:16,19 71:2
72:23 80:5
**consensually**
42:14
**consent** 29:1
29:12
**consenting** 9:8
48:16,24 62:1
**consequences**
67:22
**consideration**
78:18
**consolidate**
49:4,6 59:10
**consolidated**
59:12 60:5,23
61:3 69:5,10
80:13
**consolidating**
52:23
**consolidation**
49:3 50:12
51:13 53:1,7
53:18 54:4,20
55:2 59:9 60:2
**constant** 38:7
**constituency**
75:21
**constitute**
72:15 73:11
**construct**
33:19 67:5
**consultant**
43:21

**consulting**
4:19,21 44:5,5
46:18
**consuming**
64:12 70:9
**contemplated**
69:1
**contest** 32:15
**contested**
47:17
**context** 74:6
**continue** 56:18
77:15
**continues**
72:18
**continuing**
31:7 68:24
77:15 81:5
**contract** 53:3
53:12,25 63:16
65:25
**contrary** 46:22
**control** 72:19
**conversations**
74:4
**conveyed**
68:22
**convinced**
67:21
**cooper** 23:22
**cooperated**
28:6
**cooperation**
41:17
**cooperatively**
28:19

**coordinate**
  40:11 41:2
**cordry** 23:23
**cornell** 11:7
  44:25 45:3,4,5
  46:1,6,8,14
**corporate**
  27:23 60:24
**correct** 54:16
  54:21,22 73:18
**cost** 48:1,6
  49:20,20 75:16
**costly** 50:15
  70:9
**costs** 73:12
**cote** 25:18
**counsel** 4:14
  5:10 6:6,11,18
  7:11,16 16:18
  51:15 57:11
  72:1,2,6,20
  76:11,15,19
  79:14 80:12
**country** 84:21
**couple** 39:12
  66:5 80:25
**course** 27:24
  28:13 30:8,23
  31:5,17 38:12
  40:12 52:4,9
  55:12 62:3
**court** 1:1 2:17
  16:12 27:2,6
  27:12,17 29:4
  29:9,14,16,18
  29:22,25 30:6
  30:14,16 31:14

31:15,16,17
32:9,14,20
33:3,15,22,25
34:7,17,21,23
35:5,9,11,15
35:18,21,22
37:7,25 38:4
38:20,24 40:3
40:16 41:3,7
41:10 42:5,7
42:12,15,24
43:23 44:10,17
44:20,25 45:23
46:4,7,10,17
47:12 50:3,20
50:21 51:2
52:2,22,24
53:13 54:11,14
54:17 55:6
56:1,6,23 57:1
57:4,6,7,9
58:11,15 59:13
59:14,16,19,22
59:24,24 60:6
60:8,13,16,18
61:4,20 62:11
62:11,21 63:4
63:6 64:3
65:15,16 66:21
67:8 68:10,13
69:17 70:14,17
70:21 71:5,7,8
71:20,24 73:14
73:25 74:2,18
75:9 77:19,21
77:23,25 78:2
78:6,16 79:17

80:7,22 81:3
81:10,13,17,19
81:21,24
**court's** 35:7
  47:24 53:1,11
  55:16 59:14
  63:18
**courtney** 26:7
**courtroom**
  38:25 55:12
  58:15 60:9
  71:24
**cover** 27:15
  36:10
**craig** 19:21
**created** 48:1
**credibility**
  75:24
**creditor** 19:17
  53:17 58:14
  66:22
**creditor's**
  31:24
**creditors** 4:4
  4:15 5:4,11
  6:19 7:4 12:18
  13:12,21 14:3
  14:16 30:4
  31:3 41:13,24
  55:4 61:7 62:2
  62:24 65:4
  76:4
**crews** 25:17
**crimes** 28:21
**critical** 37:4
  41:23

**crypto** 43:1
  72:2 76:4
**cryptocurren...**
  36:4
**cryptocurrency**
  53:23
**current** 54:12
  61:12 72:24
**currently**
  63:19 68:24
**customer**
  30:13,13
**customers**
  42:21 52:15
  58:22,24,25
  69:23
**cut** 36:23 73:9

                **d**

**d** 15:23 20:15
  20:22 23:11
  26:6 27:1 83:1
**d'amico** 26:11
**dalhart** 23:2
**damages** 64:9
  65:11,19
**dan** 16:15
**danial** 60:10
**daniel** 24:20
**danil** 25:8
**darius** 22:17
**data** 36:22
**date** 8:2 31:6
  34:4 44:8
  47:24 52:14
  62:17 63:13,19
  64:19,25 68:2
  72:3,4,9 80:21

84:25
**dates** 39:1,2,14
39:14,18 40:4
40:9 41:4
80:24
**david** 14:7
21:7 23:2 24:7
25:12 26:4
57:14 80:9
**davies** 23:24
**day** 12:2 36:25
37:1,3,3 55:21
62:13 67:19
74:22 79:18
**days** 34:11
39:3,4 48:3
55:22
**de** 26:10
**deadline** 44:22
46:12 49:7
**deal** 33:13
44:11 45:17
48:14 60:4
69:21 72:25
**dealing** 33:23
72:22
**deals** 62:14
**dealt** 71:11
**dean** 16:23
**deanna** 39:1
**deborah** 25:9
**debt** 19:9,10
54:25,25
**debtor** 1:10
10:4,14 31:25
32:4,15 34:8
37:10,17 55:24

**debtor's** 8:16
**debtors** 6:11
7:12,12 9:7,11
16:18 27:9,25
30:21 34:3
36:11,25 38:14
41:15,17 43:21
43:22 45:10
47:16 48:5,9
48:12,14,18,25
49:4 50:11
51:11,15 53:21
54:7,9 61:25
62:3 63:22
64:18 65:5,8
65:12,21 66:1
66:9,14 69:3,9
**december** 6:12
**decide** 33:25
35:23
**decision** 31:16
34:22 35:7,8
42:4 53:2
**decisions** 47:24
47:25
**declaration**
50:17,21
**deduction** 75:2
75:2
**defendants**
1:16,24 2:7,15
27:24 67:9
**defer** 78:18
**deferral** 76:15
**deferred** 79:10

**delaware**
61:10
**delay** 47:23,23
47:23 48:8
**delivered**
75:16,21,22
**democratic**
66:17
**denied** 72:13
**dennis** 11:18
**dentzel** 23:25
**department**
11:2 15:16,17
27:19
**deposition**
52:8
**depositions**
48:3 52:5
55:22
**dept** 15:10
**deputy** 38:25
**derivative** 62:2
**describe** 71:21
**described**
73:17
**despite** 56:10
**determine**
32:12 57:21
**deutsch** 16:2
**devastated**
63:12
**developments**
31:15
**deverick** 24:14
**dialogue** 37:8
37:11,17 38:8
76:21 77:13

**diaz** 25:16
**different** 53:21
**difficult** 39:17
64:12 70:7,9
72:21 76:25
**difiore** 14:9
20:3
**digital** 18:18
**diligence** 45:16
**dilute** 28:25
30:13
**diluted** 28:16
**direct** 54:24
58:22 61:24
62:4,5
**directed** 79:23
**directives** 28:3
**directly** 54:15
61:2,5,10,12
**disagree** 76:2
**disclaimer**
35:2
**disclosed** 30:9
**disclosure** 30:7
33:23 34:12
37:13 38:21
39:4,6,10
42:24 59:9
62:24 65:1,15
66:14 67:1
68:8
**discount** 73:11
**discovery** 52:8
**discuss** 34:17
34:20 43:5
53:4 74:3
76:23

[discussed - english]                                                        Page 11

**discussed**
31:23 63:22
74:6
**discussion** 81:7
**discussions**
33:10 68:18
76:20 77:16
**dismiss** 8:11,16
9:3 80:18
**dismissed**
30:21
**dispute** 47:15
48:23 49:12,13
49:24 56:7
66:7 77:14,15
**disputed** 65:22
66:1
**disputes** 48:1
56:6
**distribute**
64:20 66:2
**distributed**
36:14 64:23
**distribution**
65:2,21
**distributions**
30:4 31:3 65:4
69:23
**district** 1:2
31:16 35:7
41:18 59:14,16
59:24
**dla** 19:16
**dob** 15:3
**doc** 4:5,10,16
4:23 5:6,12,17
5:22 6:7,14,20

7:8,17,22 8:2,7
8:11,17 9:3,9
9:13
**docket** 37:24
45:9 46:8
50:18
**dockets** 29:19
**document**
46:10 52:8
**documentary**
52:3
**documents**
28:8 44:4
**doing** 30:24
46:11
**doj** 28:10
36:11 37:8
75:17
**dollars** 61:1
**don** 20:25
**donald** 21:25
**doubt** 47:3
**dow** 25:15
**dozen** 42:6
**dozens** 48:3
**drag** 69:24
**drawing** 46:18
**drawn** 45:20
**drew** 24:1
**drexel** 67:3,3
**drive** 14:17
**duffy** 14:10
24:1
**dunn** 55:14
**dunne** 11:18
**dymon** 25:14

**dzaran** 24:2

**e**

**e** 3:1,1 10:1,1
27:1,1 83:1
84:1
**eades** 24:4
**earlier** 37:21
50:4 53:1 75:5
**early** 38:22
47:19 63:2
74:6 76:20
80:19
**earn** 13:3
31:21 32:5,10
32:13,16,24
33:1 36:7
52:25 53:2,4
53:24 54:5,18
54:19 55:3
61:13
**east** 13:4 18:4
**easy** 38:4
**ecf** 50:22,23
78:16
**echo** 41:15
55:17 63:9
69:20
**eckhardt** 24:5
**ecro** 3:5
**ed** 25:22
**effect** 30:3 31:2
34:22 35:3
37:16 66:16
**effective** 64:19
64:25
**effects** 63:11

**effort** 64:10
**efforts** 56:10
58:8
**ehrler** 20:11
**eisenberger**
17:7
**either** 28:1
31:8 37:13
55:4 73:22
76:14
**elected** 28:2
**elementus** 5:1
5:6
**elimelech** 24:3
**eliminated**
28:17
**elizabeth** 10:18
17:22
**ellis** 10:3,13
27:9 72:1
**elsberg** 6:17
12:17 51:5
**email** 36:22
**emails** 80:15
**emergence**
48:8
**emergency**
47:23 59:13
**eminent** 50:15
**engage** 31:10
**engaged** 31:6
33:10 36:1,2
48:13 68:23
**engel** 25:13
**english** 53:16
80:10

enjoyable 78:8
enormous 48:1
  55:20
enter 28:25
  56:19
entered 29:2,7
  31:9 50:23
enters 56:20
entirely 54:22
entities 49:5,6
  53:22 55:4
  59:10,12,15
  60:4 61:9,15
  76:20
entitle 33:18
entitled 47:3
  48:11 54:6
entitlement
  47:15
entity 54:14
  60:23
entry 9:6,11
equitable
  70:10
equitably
  69:22
equity 47:18
  51:20 55:1,5
  56:11
erik 24:16
ernst 4:8 5:20
especially
  45:13
essentially
  53:6 80:17
estate 45:13
  64:13 65:21

72:9 73:12,23
estates 47:16
  48:2,12 51:13
  52:23 54:5,7
estimate 65:3
et 1:15,20,23
  2:6,14 5:4 7:5
  8:6,9,10,15,15
  8:20,20 9:2
  77:11
ethereum 36:4
evening 40:19
event 47:7
everybody
  36:9,13 37:24
  37:25 38:4
  81:21
everyone's
  72:8
evidence 50:19
  50:21,22,23
exactly 28:5
  30:24 68:21
examined
  40:22
examiner 4:19
  6:2,4 18:3
  41:15 43:2
  63:10 70:23,25
  71:9 74:14
  75:10,15,19,22
  75:23 76:13
  78:15
examiner's
  34:5,7 43:4
  52:2 70:8 76:6
  78:22 79:1,6

examiners
  75:13,13 76:8
  78:10
example 54:14
  75:23
examples 47:5
exceed 44:9
  50:1
exceeded 49:22
exceedingly
  78:23
exceeds 56:8
exceptions
  66:6,10
excess 61:1
exchange
  51:13
excusable
  72:15
excuse 54:18
  77:4
excused 70:21
  77:22 81:18,21
exhibit 79:7,7
  79:9
existence 30:20
exit 28:12
expanded 76:7
expect 30:23
  31:1 38:21
  39:25 40:10
  51:23 80:5
expected 30:3
  37:5 44:9
expended
  55:23

expense 44:7,7
  45:13,16 56:10
  75:10
expenses 4:3
  4:10,14,23 5:3
  5:10,17,21 6:3
  6:7,10,14,18
  7:3,8,14,17,22
  9:12 57:18
  79:5,8
expensive
  64:13 75:14,23
experience
  67:2
explanation
  53:16
extent 42:12,13
  42:17 54:17,18
  54:23 56:14
  64:17
extraordinary
  75:11 76:10
extremely 45:9
ezra 26:11

**f**

f 3:1,5 11:18
  13:18 84:1
fabsik 19:7
face 56:23
  76:23,23
fact 32:12
  34:15 65:1
facts 32:7,9,11
  52:11
fahey 25:12
failing 47:8

fair  56:12
  73:14
fairly  61:17
  67:17 69:22
  76:10
fairness  56:7
faith  65:3
fall  27:25 74:7
false  59:4
fan  75:13
  78:10
far  22:14 77:6
fast  41:5 67:22
faster  66:3
faucher  19:14
favor  57:9
feasible  58:4
february  4:5
  4:16,21 5:5,12
  6:12,20 7:6,15
  77:3,4,5 78:14
federal  37:8,15
  37:18 38:9,15
  75:17
fee  4:1,9,12,18
  4:22 5:16,21
  6:7,14 7:1,8,10
  7:17,22 18:3
  44:7 47:2
  70:16,23,25
  71:1,9,12 74:4
  76:12,16 78:7
  78:10,12,15,22
  79:1,4,6 83:9
fees  9:12 43:17
  44:5,11 45:14
  45:18 46:18

50:1 56:8,9,13
  73:1,10,15
  79:5,8
feld  7:11,16
  16:17
felt  75:7
ferguson  3:5
fernandez
  25:11
ferraro  50:17
  50:21
fifth  19:4
figure  41:1
figures  73:7
file  37:23 44:15
  46:7,10 63:23
  63:25 72:4,11
  72:17
filed  5:6 27:16
  29:19,21,24
  41:14 44:11,23
  45:2,8 46:13
  46:15 49:4,5
  49:11 50:17
  53:25 57:23
  59:13 62:20
  63:13 66:13,14
  69:3 70:25
  73:13 78:15
filing  59:9
  63:18 72:3,12
  73:2 80:17
filings  52:2
filled  31:14
final  29:5 40:7
finalized  29:6

finally  59:7
financial  4:3
  4:19 15:17
financially
  58:4
find  29:22 65:6
  66:9
finder  32:12
findings  52:14
  52:17 56:19
finds  64:21
fine  67:11
fines  28:16,24
  38:11
finish  29:25
finished  40:22
  40:23
firm  51:22
  72:15,16,22
firms  51:17
  71:10 73:6,7
first  4:12 5:19
  6:9,16 11:12
  27:18 39:14
  41:4 43:16
  54:25 55:10
  57:22,23 58:19
  71:12 74:10
  75:11
fishberg  60:8
  72:8
fit  39:8
five  33:17
fl  13:23 16:13
  19:19
flannigan
  25:10

floor  12:12
  16:4 18:12
florence  25:10
flow  55:2
  61:11
flower  13:13
flows  61:5,6
follow  31:10
foregoing  84:3
forensics  5:3
formally  36:20
forth  34:5 79:6
forward  36:5
  42:1 46:24
  50:12
fought  55:20
  58:10,20
found  29:11
  41:15 63:10
fourth  72:22
frankel  17:2
  25:9
frankly  77:12
fraud  27:20,20
  27:20 63:16
  64:9 70:2,6
fred  80:12
free  50:9 56:15
  65:14 70:5,12
fresh  35:1
friday  43:1
  44:22
frishberg
  24:20 25:8
  49:10 60:10,11
  60:14,17,20
  61:8

**front** 35:2
73:13
**ftc** 27:21 28:11
29:2,11 30:10
59:6 61:18
**full** 42:24 59:8
74:18 79:4
**fullest** 42:17
**fully** 28:4,5
29:3 30:9,22
47:20 48:17
58:18 60:23
61:15 73:22
**funded** 48:21
54:25,25
**funds** 41:21
64:20,22 66:2
**further** 45:2,21
46:7,10 78:5
81:15
**future** 45:18
47:25 58:1

**g**

**g** 25:3,22 27:1
**gabriel** 17:7
**gallagher** 25:7
**garrison** 18:17
**gate** 63:20
**gay** 6:17 12:17
51:5
**geary** 23:3
**gemini** 17:18
**general** 15:2,9
51:25 55:4
**generally**
80:16

**generated**
47:24
**geoffrey** 23:19
**georgia** 10:20
**georgiou** 1:20
8:9 80:13
**geremia** 12:7
**getting** 41:18
64:5 77:14
**gheorghe**
22:17
**giant** 75:13
78:10
**giardiello**
22:21
**give** 27:2,6
39:13 40:9,24
51:24 57:25
66:21 68:19
70:11
**given** 28:13
38:14 74:18
75:4,21
**gk8** 48:22 59:3
59:4 61:18
**glad** 58:19,21
**glenn** 3:2
**global** 67:4
**go** 29:25 34:11
36:5 40:22
47:12 50:12
53:18 61:14
64:8 67:11
69:17 74:2
79:12,20
**goals** 42:22

**godfrey** 18:2
70:23
**goes** 39:11
67:25
**going** 30:9
32:19 34:19
35:22 36:3,5
39:3 40:17,19
43:25 44:25
48:21 49:2
54:2 57:18
61:11 62:11,17
64:7,9,12,18
66:10,17 67:11
78:6 81:6
**good** 27:4,8
41:11 55:9
60:10 65:3
68:14 70:22
71:6,7 76:6
80:9
**gornitzky** 4:12
**gorrepati**
22:22
**gotshal** 19:2
**government**
8:1 28:6 38:11
41:13 63:8
76:20
**government's**
41:20
**grant** 50:9
62:12
**granted** 62:15
**granting** 9:9
9:13

**greater** 64:17
**greatest** 56:13
**green** 2:18
**greg** 22:16
**gregory** 13:18
21:12
**ground** 33:9
**group** 1:12 8:5
11:12 13:3
80:11
**grove** 16:10,11
**grover** 22:23
**grzegorz** 25:14
**guess** 31:17
33:20,22 34:2
37:10 38:1,25
45:23 78:3
**gump** 7:10,15
16:17 72:7,18
**guthrie** 22:24

**h**

**h** 20:19
**half** 42:6
**hall** 25:6
**hancock** 70:22
70:23 78:5
79:15
**hand** 48:25
49:1 64:8
**handagama**
25:5
**hannan** 25:4
**happen** 42:1
64:4
**happened**
28:18 47:5
77:10

**happy** 42:4
  46:20 50:18
  53:20 71:2
  76:17
**haqqani** 13:25
**hard** 55:20
  58:10
**hardest** 42:18
**harm** 64:16
**harrison** 22:18
**hatcher** 22:19
**hauer** 7:11,15
  16:17
**heading** 62:19
**hear** 38:18
  42:22 51:2
  56:4 57:10
  67:16 81:14
**heard** 44:3
  51:1 55:7,8
  57:12 58:12
  61:20 68:13
  69:7 71:5 80:8
**hearing** 4:1,7
  4:12,18 5:1,8
  5:14,19 6:1,9
  6:16 7:1,10,19
  8:1,5,9,14,19
  9:1,6,11 31:23
  33:16 36:19
  37:14,14 39:2
  39:3,5,10,21
  40:6,12,14
  43:18,20 44:14
  46:21 68:8,24
  79:21,23 80:1
  80:2,14,19

81:9
**hearings** 40:19
**heightened**
  70:6
**heine** 11:21
**held** 53:21,23
  54:13,21 61:5
**helioti** 22:20
**help** 28:11
  77:11
**hendrickson**
  25:3
**heras** 26:10
**herrmann** 25:2
  49:10 58:13,14
  58:14,16,17
  59:17,20,23
  60:1,6,7,22
  61:17,23
**hershey** 13:17
**high** 45:14
**higher** 57:18
  70:4 74:25
**hill** 23:4
**hire** 70:9
**hired** 72:6
**historic** 36:2
**historical** 28:7
  31:4,11 37:2
**hittelman** 25:1
**hoc** 1:12 8:5
  13:3 80:10,18
**hodson** 24:25
**hoffman** 17:10
  57:14
**holcomb** 24:24

**hold** 57:3
  64:18,19 66:1
  77:25
**holder** 50:7
  56:16 65:13
  66:15
**holders** 9:8
  11:13 13:3
  28:17,20 33:11
  33:19 38:9
  41:21,25 47:15
  47:18 48:16
  49:15,25 51:12
  51:19,20 52:7
  52:25 53:3,5
  54:12,19 55:3
  55:7,14 61:13
  62:1 63:12,13
  63:17 64:9,13
  64:14,16 65:10
  65:11 66:2,3
  70:1,11
**holds** 54:7,8
  61:1
**holidays** 80:4
**hon** 3:2
**honor** 27:4,8
  27:10,14 29:24
  30:2,9 31:13
  32:6,18 34:20
  35:1,17 37:21
  38:23 40:2
  41:11 42:3,9
  43:14,20 44:14
  44:16 45:4,8
  45:22 46:1,6
  46:14 47:10,13

50:5,24 51:3,5
  51:5,16,16,23
  51:24 53:8,20
  54:22 55:9,16
  56:4,19,19,25
  57:5,8 58:17
  59:17 60:1,10
  61:19,23 62:16
  62:22,24 63:5
  64:2,5,21
  66:20 68:4,14
  69:14,19 70:20
  70:22,24 71:6
  73:19 76:18
  78:5 79:15,22
  80:9,20 81:5
  81:12,16
**honor's** 53:24
  63:23,25
**hope** 40:12
  57:15 62:25
  69:8,12
**hopeful** 38:16
  68:6
**hopefully**
  77:14 81:8
**horse** 45:14
**howey** 31:22
**hubbard** 17:17
**hudson** 11:14
**huge** 28:16
  38:11 66:22
**hughes** 17:17
**hurley** 16:22
**huron** 4:18,21
**hybrid** 7:19
  8:11,16 9:3

hyde  9:25 84:3 84:8

**i**

idea  35:18 40:24 73:24
identify  81:19
ignat  12:11 68:15
ii  9:8
il  10:6 14:18
illegal  31:11
immanuel  25:2 58:14
immediately  36:16,16,23
impact  34:24 52:25 53:4,16
implement  48:15 49:2
implements  49:8
importance  47:6
important  30:15 46:25 47:2 68:22 76:2
impose  66:12
include  28:24 61:23
included  34:7 51:19,25 59:5
includes  30:10
including  4:20 7:15
increase  30:12

incredible  64:7
incremental  65:10
incurred  6:4 6:11 49:21
indicated  43:20
indicted  27:18 36:12
indictment  29:10 36:11,13 36:14,15
indirectly  54:15
indiscernible  34:10 45:5,9 47:12 57:16,17 57:18,22,23,24 57:25 58:7 61:18 69:13
individualized  73:24
individuals  70:7
indulgence  27:15
inform  63:21
informal  44:23
information  37:2 52:1 57:20 77:9
informationa...  69:14
initial  9:8 33:20 48:16,24 62:1 63:13 65:2

insider  34:9
institutions  15:18
instructed  28:1
insurance  59:4
intend  42:10 62:13 63:23 66:16,18
intense  55:18
intention  68:7
intents  77:2
interest  27:13 43:8
interested  19:3 19:17 31:18 35:21 37:18 76:3
interesting  45:24 46:1
interim  4:1,7 4:12,18 5:1,8 5:14,19 6:1,9 6:16 7:1,10,19 71:12 78:14
internal  36:22 37:3
international  17:3
interns  78:20
interrupt  42:13
interviews  28:8
investigating  51:19,22 52:1
investigation  51:24 52:9,13

75:20 76:7
investigations  28:5,6,9 37:3
investisseme...  55:13
investment  7:3 17:10 57:14,14
investments  12:3 53:23
investors  11:12 55:11
involve  36:3 48:23
involved  74:11 76:19
island  43:1
isolated  77:3
israel  36:19
israeli  4:14 36:19
issue  32:2 33:12,16,23,25 34:2,12,18 35:4,6,22,25 36:6 40:16,25 47:17 49:24 53:18 57:24 62:13 68:2 69:11 71:18,21 71:25 72:25 73:21 76:15
issues  31:23 33:6,7 37:9 42:13,16 43:7 43:12 44:2 48:7,19 55:21 60:3 62:18

69:7 73:5 76:6
76:23,24,24
77:1,3,6,18
78:25 80:3
**item** 43:16

**j**

**j** 20:14 23:2
24:14,24 25:18
25:21
**jack** 23:6
**jakobsen** 22:13
**jam** 79:18
**jama** 23:7
**james** 25:13
**jamshid** 22:14
**janell** 24:5
**janke** 24:23
**jankovic** 24:23
**january** 6:20
**jared** 25:4
**jasleigh** 23:3
**jason** 13:8
21:18 23:11
**jean** 21:16
**jeff** 22:2 68:15
**jeffrey** 16:8
**jellestad** 22:15
**jenner** 6:2,5
74:5
**jeremy** 23:4
**jersey** 16:3
**jesse** 24:11
25:6
**job** 72:24 78:8
**johan** 25:20
**john** 21:20
24:2,25 26:1

**joined** 31:25
**joining** 55:15
**joins** 51:6
**joint** 9:6 80:1,2
**jon** 22:19
**jonathan** 21:9
**jones** 10:18
12:2
**josemar** 24:15
**joseph** 21:15
24:13 25:3
**joshi** 24:22
**jovanni** 20:20
**joyce** 13:7
**jr** 17:10 57:14
**judge** 3:3 67:6
67:7,8,16,17
71:3 72:13
73:13 81:6,18
**judgment**
30:11,20 31:1
50:15
**july** 2:21 46:12
70:25 84:25
**justice** 11:2
15:16 27:19
41:19

**k**

**kaczkowski**
22:16
**kahn** 18:2
70:23
**kaila** 16:24
**kaitlyn** 25:1
**kaplan** 16:15
**karen** 23:23

**katherine** 18:8
**kaufmann**
20:12
**kayla** 12:24
**keely** 21:10
**keeney** 21:11
**keep** 68:8
**keeping** 58:25
**keith** 14:8,11
**ken** 18:22
20:11
**kevin** 22:9,12
**key** 41:18
42:16 48:19
**keyan** 20:18
**khai** 23:5
**khanuja** 24:21
**kieser** 21:12
**kind** 60:11
73:20 77:14
**kirkland** 10:3
10:13 27:9
72:1,11 73:4,8
73:21 77:1,5
77:10 80:15
**know** 27:10
29:8,9,13
33:22,24 35:17
37:14,16 38:12
38:18 39:8
40:13 41:13
42:9,13,14
43:17 47:8
50:25 53:16,21
54:8 57:22,22
57:23 58:2,4,6
58:8,20,24

59:1,3 67:1,13
67:16,21 68:19
68:23 74:7
75:16,25 76:4
76:14 79:7,17
79:18 80:25
81:1
**known** 52:11
**knows** 51:17
**koenig** 10:8
27:4,5,7,8,9,13
27:18 29:7,12
29:17,20,23
30:2,8,15,17
32:6,11,18,21
33:5,21 34:5
34:13,19 35:1
35:10,13,16,19
35:24 37:21
38:3,6,22 40:2
40:11 41:1,4,8
42:2 43:14,15
43:25 44:13,19
44:21 47:10,13
50:5,24 51:3,6
55:18 56:5
61:21,22,22
62:16,25 63:2
69:19,19 70:15
70:18 79:20,22
79:22 81:13,15
**koenig's** 68:6
**koster** 21:13
**kouly** 21:14
**kraig** 22:13
**kramer** 17:2

kuhns 13:7
kulpreet 24:21
kurman 13:2
kwasteniet
  10:11
kyle 23:13 26:3

**l**

l 21:25 22:23
  26:9
la 10:5
laboring 77:6
lackey 24:12
laid 71:11
lalana 22:7
lalia 21:15
language 49:12
large 42:1
  66:12 75:14
las 26:10
late 40:18 43:9
  44:11 72:13
  73:2,13 81:25
latham 76:16
  76:18 77:3
  78:19 79:9
latrielle 21:16
law 17:9 31:10
  36:19 52:12
  53:18 72:15,16
  72:22 73:6
lawyer 67:3
  70:10
lawyers 60:18
layla 15:7
lays 34:13
lead 32:12
  68:16 72:1

leading 34:10
learned 36:12
learning 36:15
leave 36:21
leaves 37:9
leblanc 11:19
  55:8,9,10
  56:25 57:2,5,8
lectern 41:8
  62:20 70:18
ledanski 9:25
  84:3,8
lee 21:17 24:6
left 65:19
legal 6:9,13
  32:8 53:21
  84:20
lehrfeld 24:13
lending 60:25
  61:9
length 43:18
leonard 16:7
levin 17:2
levy 28:16
  38:11
lexington
  10:15
liberty 16:4
light 53:1
  56:18
likely 27:14
  28:24 35:22
  42:9 47:25
  48:7,11 65:20
limit 40:24
limited 17:3
  57:10,11,19

58:6 62:12
line 45:20 83:4
lines 75:4
liquid 53:22
lisa 19:14
listen 67:10
listening 66:20
litigate 48:19
litigated 47:20
  56:10
litigating 48:7
  49:18
litigation 7:11
  16:18 29:3
  36:9 42:21
  47:22 48:2,5,9
  48:17 49:17
  50:16 51:11
  52:6 53:10
  54:11,11 56:18
  56:18 57:18
  58:1 65:14
  67:4 72:18,19
litigations
  55:18
little 32:19
  34:20 39:13
  42:22
live 74:16
llc 1:8,15,23
  2:6,14 4:19,21
  5:4,15 6:10,13
  7:5,21 8:6,10
  8:15,20 9:2
  19:9 49:3
  51:13 52:23
  53:3,7,17,25

54:21 55:3
  61:1
llc's 61:7
llp 4:8 5:9,20
  6:2,6 7:11,16
  10:3,13 11:11
  12:10 13:11,20
  14:2,15 16:2
  16:17 17:2,17
  18:10,17 19:2
  19:16 20:2
lodge 56:4
lombard 13:4
long 40:8 58:20
  66:3 74:3
look 35:5 37:19
  42:5 66:22
  74:3
looking 73:1
  80:17,19
los 13:14
lost 48:6
lot 30:11 35:11
  35:15 42:2
  43:9 45:12
  46:2 63:12
  71:13 74:10,20
  74:21 76:4
  78:21 81:7,7
loud 44:3
lower 73:7
  75:1
lp 4:2 7:2,6
  18:18
lu 21:18
luc 23:21

lucas 24:24
luck 56:21
lucy 26:9
luke 10:9
lund 24:11
lupu 21:19
ly 21:20

**m**

m 9:13 10:11
  11:19 20:12
  22:9 26:5
m3 4:1
maciej 22:6
made 28:14,20
  58:23 59:4,21
  73:9
madison 15:21
  18:6
madsen 21:21
mailing 39:7
main 15:19
  18:4 42:22
  67:9
majority 54:8
  54:8
make 30:17
  38:10 39:14
  43:6 47:3
  56:13,14 66:5
  68:17 74:9
  75:9,12 76:13
  80:20,23
makes 36:7
  49:20
making 42:1
malkin 18:10

malpractice
  73:20
man 70:20
management
  18:18 63:11
manges 19:2
manipulation
  34:4 43:4
mantra 41:23
  66:3
manus 22:9
march 6:5
maria 22:20
mark 11:8
  14:12 70:22
market 34:4,9
  43:3
marketed 59:5
maronpot
  22:10
marques 24:15
marsal 7:20
marsh 24:17
martin 3:2
mary 21:22
mashinsky
  27:18,21,24
  28:1 41:14
  63:10
mason 22:1
masumoto
  11:9
material 30:3
matter 1:6
  29:13 54:3
  80:13

matters 32:22
  51:18
matthew 20:7
maude 20:19
maunder 22:11
mccarter 80:10
mccarthy
  22:12
mcelroy 16:2
mcintyre 24:14
md 13:5
meadow 10:20
mean 37:17
  38:24 40:19
  42:5 66:23
  67:13
means 30:12
  56:16 64:24
media 30:12
mediation
  60:21 68:23
  69:8,13
meet 79:24
meeting 76:21
  76:22 77:17
meetings 73:4
melanie 11:20
members
  52:10
mendelson
  24:16
mengden 18:23
merge 54:5
merits 43:6
  74:13
met 36:16 73:3

metzger 55:11
mevin 24:22
mg 1:3,4,18 2:1
  2:9 8:5,9,14,19
  9:1
mia 23:22
miami 13:23
  16:13 19:19
michael 15:23
  26:2
mid 63:5
middle 33:9
milbank 11:11
  55:10
milken 67:3
milligan 15:7
million 44:7,9
  48:12,20,21
  49:16,22,23
  50:1 51:14
  57:2,3 74:5,7
  74:14
milton 67:6
mind 67:2
mineola 84:23
mining 36:3
  54:15,16,19,21
  54:23,24 55:1
  55:5 59:11
  60:22 61:6
minor 74:23,24
minute 78:2
  79:11
minutes 79:21
  81:25
mira 13:25

misrepresent...
63:16 70:2
missed 72:10
mistakenly
50:3
mitchell 16:22
18:23
model 28:7
30:5 31:12
moment 27:3,6
monday 39:18
39:20,21,23
40:25 76:22
mondays 40:17
money 42:20
42:20,21 45:12
46:2 64:14
73:5
months 51:22
morgan 10:10
morning 27:4
27:8 39:20,21
40:7 41:11
43:15 44:22
45:7 55:9
60:10 70:22
71:6,7 80:9
morris 15:23
motion 8:2,11
8:16 9:3,6,11
31:24 43:16
45:11 47:14
48:14 49:4,5,8
49:10 50:18
59:13 62:12,14
66:14 72:12
80:18

motion's 78:4
move 40:8
50:18
movement
34:9
movements
43:11
moving 46:24
68:9
mulvaney 16:2

**n**

n 10:1,5 27:1
83:1 84:1
naftalis 17:2
nagi 13:8
name 81:19
nearing 65:6
necessarily
40:18
necessary
42:15
necessity 46:23
need 30:9 39:3
39:4,19 63:20
66:17 67:14
77:9,9,11
81:14
needing 48:18
negisa 23:9
neglect 72:15
negotiated
53:9 75:25
negotiating
72:19
negotiations
48:13

nelly 11:17
network 1:8,15
1:23 2:6,14 5:4
7:5 8:6,10,15
8:20 9:2
never 75:12,16
new 1:2 2:19
10:16 11:5,15
12:5,13,20
14:5 16:3,5,20
17:5,13,20
18:13,20 19:5
19:12 20:5
36:3 76:22
77:18
newco 31:7
36:1
newco's 30:5
newport 42:25
news 27:10
32:20 35:2
nice 58:15,17
60:8 63:6
nicholas 21:2
nicole 16:7
night 27:16
40:19 43:9
62:20
nikhil 26:8
nikolas 21:8
nine 40:21
noah 26:5
non 59:9 63:16
65:24
nonconsensual
61:24 62:4

noncontract
65:12
normal 71:14
north 7:20
northeast
42:25
note 51:16 59:4
noted 45:1
72:14
notes 31:16
60:11,14,16
notice 39:3,4
63:23,25
notified 52:6
novawulf
18:18
november 4:5
4:15,20 5:5,12
6:5 7:5,14 77:4
78:13
noyes 14:11
number 55:20
80:15
numbers 66:17
74:7
nuraldeen
23:15
ny 2:19 10:16
11:5,15 12:5
12:13,20 14:5
16:5,20 17:5
17:13,20 18:13
18:20 19:5,12
20:5 84:23

| **o** | offer 56:14 | open 62:8 70:3 | outside 27:10 |
|---|---|---|---|
| **o** 3:1 27:1 84:1 | 62:8 70:1,3,5 | opening 50:24 | 35:3 |
| **o'brien** 12:23 | offered 50:7 | operations | overruled |
| 21:22 | offering 33:20 | 37:1 | 46:16,19 |
| **o'clock** 39:22 | offerings 36:1 | opine 43:7 | overrules |
| 39:24 40:6 | office 15:2,9 | opinion 47:21 | 62:12 |
| **oar** 77:6 | 17:9 | 59:15 62:13 | overstaffing |
| **object** 49:16 | officer 36:12 | opportunity | 75:3 |
| **objectants** | 37:4 | 63:21 | owens 21:24 |
| 17:11 | official 4:4,14 | opposition | own 56:10 |
| **objected** 49:7 | 5:3,11 6:19 7:4 | 58:12 | 65:14 |
| **objecting** 46:4 | 12:18 13:12,21 | opt 65:13,17 | owns 54:14 |
| 46:11 50:6,10 | 14:3,16 41:12 | 65:17 67:6,8 | **p** |
| **objection** | 62:23 | 67:14,19,19,23 | **p** 10:1,1 13:17 |
| 31:25 44:22 | offit 13:2 | 70:5,12 | 24:2 26:1 27:1 |
| 45:8 46:8,12 | oh 27:12 74:1 | optimistic | p.m. 39:19 |
| 46:15,19 49:6 | okay 27:6 | 38:14 | p.o. 15:20 18:5 |
| 49:14 56:3,5 | 29:16 32:20 | order 9:6,11 | packed 79:18 |
| 57:19,23 58:6 | 34:21 37:7,21 | 29:2 37:6 44:8 | page 83:4 |
| 58:18 | 38:24 39:14,16 | 47:11 49:13 | pagnanelli |
| **objections** 39:3 | 41:3,7 43:6,13 | 52:22,22 53:9 | 24:10 |
| 39:5 44:23,24 | 44:17 46:19 | 53:11 56:20 | paid 44:8,12 |
| 45:2 49:9 | 55:6 57:4,7,16 | 59:23 62:13 | 46:3 |
| 50:20 57:11 | 59:19 60:6 | 63:18,24 64:1 | palatable |
| 62:12 | 61:20 64:1 | 65:21 80:6 | 45:11 |
| **objectors** | 68:10 69:3 | orderly 81:3 | palissery 22:1 |
| 57:12 | 78:1 80:7,16 | orders 29:1,2,5 | pan 24:9 |
| **observation** | 80:22 81:11,19 | 29:12 | panel 43:1,2,13 |
| 75:12 | 81:24 | original 45:8 | paper 45:24 |
| **obviously** 35:1 | old 84:21 | originally | parent 59:11 |
| 37:7,17 39:6 | omnibus 80:21 | 75:25 | 61:2,10,12 |
| 43:8 55:16,23 | 80:24 | osborne 24:19 | park 16:19 |
| 56:9 73:22 | once 37:13,22 | oswald 21:23 | 17:19 |
| **occurred** 74:9 | ongoing 36:18 | outcome 41:18 | parrots 75:5 |
| **octave** 25:21 | 37:5 52:9 | outlined 69:1 | part 51:7 55:19 |
| **october** 39:18 | 76:21 77:13 | outs 67:8,19,19 | 67:5 69:12 |
| 39:18,22 | | | 78:8 |

participate
49:17
particular
31:18 52:25
58:23 69:4
75:15
parties 27:14
30:18 41:2
44:3 45:21
48:17,24 51:21
55:24 57:16
58:9 71:14
80:2 81:7
partners 4:2
5:15 7:2,6
16:10,11 55:10
party 19:3 46:3
50:6,10
party's 49:7
passed 44:22
49:7
past 40:14
patel 20:13
patton 22:2
patzak 22:3
paul 18:17
19:7 20:15
23:14
pause 31:12
pave 38:16
pavon 36:11,17
36:24
pay 33:19
43:16,22 56:9
paying 49:23
payment 51:14

peled 12:15
penalties 28:16
28:24
pending 48:22
53:10
people 43:13
56:15 63:12
66:7 67:13
76:2
perella 7:1,6
performed
45:17
performing
47:1
period 4:4,9,15
4:20,22 5:5,16
5:21 6:4,6,11
6:13,19 7:5,7
7:14,16,21
34:9 39:13
56:11 74:19
78:13,14
perry 13:9
perspective
49:19,23 70:6
pertaining
52:12
pesce 13:18
peter 20:14
22:3
petition 31:6
34:4
pham 23:5
phan 24:18
phenomenal
74:22

philippe 21:16
phillips 25:25
phone 60:17
phones 60:19
phung 22:4
pick 56:17
picture 39:9
piece 74:22
pillay 6:1 43:2
75:24
pillay's 74:3
piper 19:16
plain 53:16
plaintiffs 1:13
1:21 2:4,12
18:11 79:24
plan 9:13
28:12 31:7
32:21 33:13,19
34:25 36:3,5
42:14 43:17
46:20 47:1,7
50:14 61:13
63:21 65:22
66:11 67:1,5
68:17 69:9
83:5
platform 48:22
59:1
plaza 17:19
18:12
pleading 70:6
please 27:2
58:12 74:2
81:11
pleased 28:10

pllc 6:17 12:17
po 15:4
pockets 64:14
point 32:15
38:7 66:25
67:24 69:2,6
80:17
pointed 46:4
pollack 67:6,8
pollard 22:5
pool 28:25
porczek 22:6
position 36:9
45:1 46:15,22
48:9
positive 81:8
possession
7:12
possible 28:14
39:2,16 40:8
42:17 46:25
56:14 68:9
69:23 81:4
potential 37:9
39:9,14,18
47:22 51:20
52:13 64:16
67:15
potentially
35:4
powerpoint
43:11
poynter 21:25
practical 64:24
practice 55:19
practices 28:7
31:5,8 36:2

practicing 67:3
precedent 42:7
prediction
  63:4
preferred 9:8
  11:13 40:18,20
  51:12,19,20
  52:7 55:7
  56:24
premature
  32:3
prematurely
  77:8
prepetition
  63:11
present 20:9
presentation
  50:25
preserved 59:1
  73:22
preserves 59:2
presided 67:7
press 74:18
pretrial 40:7
pretty 67:20
  77:3
preview 66:19
price 18:10
  33:20 34:3
  43:11
principal 28:3
principle 69:25
  80:22
prior 36:24
  48:21 64:25
  72:4

privileged
  51:24
priya 21:3
pro 31:23
  34:13 58:14
  60:11 76:3
probably
  27:13 44:2
  49:11 50:2
problem 30:2
  50:5 69:19
procedural
  29:13
procedure 67:6
proceed 48:18
proceeding 8:5
  8:9,14,19 9:1
  44:19 69:12
proceedings
  82:1 84:4
proceeds 50:9
  64:19
process 28:21
  36:18,24 41:20
  52:14 65:19
  66:17 67:1
  68:25 69:9,21
  70:1 71:15
produced 52:3
professional
  4:7,8,22 5:8,14
  5:16,19,20 6:3
  6:16 7:7,20,21
  44:1 78:12
professionals
  71:16 74:11,12

program 32:16
  42:25
prologue 40:14
promise 62:25
promises 40:7
promptly 52:7
proof 63:14,15
  63:18 68:17
  69:3 72:4,13
  72:17 73:2,13
proofs 72:3
proposal 47:8
propose 33:13
proposed 33:5
  33:9 34:24
  45:10 47:14
  49:13,25 52:22
  61:13 63:25
  65:25 68:5
  80:5
proposing
  34:15
prospects 81:4
protracted
  47:17 50:16
prove 64:9
  65:20 70:7
provide 38:4
  43:21 53:6
  65:7,10,15
provided 28:8
  52:18 74:14
provides 48:20
  54:12
proving 70:8
provision 53:5

pryor 20:2
public 37:23
publicly 29:18
  29:20,23 52:1
pundisto 22:7
purposes 32:21
  77:2
pursuant
  32:25 33:1
  44:1 62:10
pursue 52:7
  65:14
pursuing 73:12
put 32:2 35:2
  38:1 43:3,10
  45:24 68:20,21
putting 42:20

## q

quality 77:12
quantum 56:8
question 31:18
  32:19 40:4
  45:20,23,25
questioning
  75:19
questions 30:1
  31:12 33:17
  42:3 45:15
  58:3,5 71:3,18
quick 68:9
quicker 42:21
quickly 41:24
  79:19 81:4
quite 27:10
  37:10 45:14
  67:12

| r | | | |
|---|---|---|---|
| **r** 3:1 10:1 12:7 27:1 84:1 | **reasonableness** 51:10 52:21 73:3 | 79:1 | **release** 48:23 51:14 73:16,19 |
| **raise** 78:25 | **reasonably** 32:12 46:24 | **reed** 17:17 | **released** 37:20 |
| **raised** 68:2 69:11 76:6 | **reasons** 51:6 69:13 | **referred** 50:3 68:16 | **releases** 50:9 52:13 61:24,25 62:4 |
| **rakesh** 20:13 | **rebecca** 25:7 | **referring** 75:14 | **relevant** 36:6 52:12 |
| **ramifications** 67:15 | **receive** 45:16 50:8 64:22 65:18,21 | **regard** 53:11 76:23 | **relied** 58:24,25 |
| **ran** 48:2 | **received** 49:9 | **regarding** 8:2 53:12 71:4 80:16 | **relief** 9:9,13 49:8 |
| **rapidly** 46:24 | **recognize** 32:18 | **regina** 24:19 | **reluctant** 47:4 |
| **rasile** 19:21 | **recognized** 53:2 | **regulators** 28:14 31:4,10 37:8,9,12,15 37:18 38:7,9 38:15,17 75:17 | **remaining** 49:13,14 |
| **rates** 74:25 75:1 | **recommenda...** 78:23 | | **remains** 36:18 |
| **rather** 77:8,13 | **recommenda...** 71:1 76:3 79:4 | **regulatory** 27:22 76:18,18 77:6 | **remove** 44:4,5 |
| **reach** 28:10 33:11 38:15 | **recommends** 78:16 | **rehash** 51:15 | **rendered** 4:2 4:13 5:2,10 6:3 6:18 7:2,13 |
| **reached** 28:23 48:14 51:21 52:10 55:25 | **record** 43:14 52:3 84:4 | **reilly** 22:8 | **reopened** 45:20 |
| **reaching** 57:16 | **records** 76:25 77:13 | **reimbursed** 56:13 | **repeat** 42:2 43:18 62:6 |
| **read** 34:23 42:5,6 74:20 74:21 76:8 | **recover** 47:16 48:11 54:6,24 | **reimbursement** 4:3,13 5:2,10 6:3,10,18 7:3 7:13 44:7,8 45:16 | **replies** 44:10 44:11 |
| **reading** 43:9 | **recoveries** 28:17 30:13,13 41:24 65:1 | | **reply** 49:11 50:2 |
| **ready** 37:24 40:15 67:11 | **recovery** 65:10 67:22 70:4 73:8 | **relate** 31:4 | **report** 34:6,7 43:4 52:3 70:8 70:25 71:4 74:20 76:13 78:15,22 79:1 79:4,6,7 81:8 |
| **real** 63:11 | | **related** 9:9,13 62:18 | |
| **reality** 64:24 | **reding** 26:1 | **relating** 31:11 | |
| **realize** 58:9 | **reductions** 71:2 78:17 | **relationship** 72:5 | **reports** 74:13 74:20,20,21 75:11,21,21 76:8,9 |
| **really** 27:12 77:5 78:19 79:11 81:10 | | **relationships** 72:6 | |
| **reason** 57:19 | | | |
| **reasonable** 40:23 62:9 | | | |

represent 51:17
representatives 68:16 69:15
represented 50:1 56:6 67:9 72:16
represents 55:12
request 52:21 73:9
require 30:6 31:10 32:1 57:25
required 63:24 74:19
resenblum 12:8
reserve 67:14
reside 59:15
resign 28:1,2
resolution 31:19 33:12 42:19 48:23 55:25 65:24
resolutions 28:10
resolve 29:3 42:15 49:12,23 58:18 60:2 64:18,25 65:19 66:7 71:15 72:23 81:11
resolved 42:14 53:14 59:20 69:8,12

resolves 48:17 53:10 54:10
resolving 64:6
respect 32:10 33:3 36:25 46:17 56:3 64:4 68:1,2,5
respectfully 52:21
response 40:1 61:21
responses 46:13
responsibility 78:9
result 28:9,23 34:4 53:17 54:20 55:3 65:11 73:10
resulted 47:20 71:14
retain 50:10 62:7
retained 44:1
retention 43:23,24
return 41:20
revenue 36:12
reviewed 78:19 78:20
reviewing 52:1 76:12 78:7
reviews 45:12
revised 43:16 44:4 49:12 73:15

rhode 42:25
rich 47:3 67:20
richard 21:23 25:25
rickie 23:17
rifkind 18:17
right 29:4 32:21 33:21 34:8,21 39:15 39:17 40:2 41:7,8 50:20 50:22 55:7 57:10 58:2,11 59:22 62:11 67:14 68:10 69:1 73:25 75:9 77:21 78:1 81:17
rights 38:12 50:10,13 58:1 62:7
riki 21:14
ripple 31:16 34:22 42:4,6,9
rise 68:17
risk 48:10
risky 50:16
road 84:21
roadblocks 43:24
robert 20:12 23:18
robinson 14:12
rockefeller 18:12
rodriguez 21:9

role 27:24 51:17 73:1
roni 36:11
rosella 26:2
ross 10:11
rudolph 14:20
rule 51:10 52:8 62:10 66:24
ruled 59:16,18
rules 30:22 71:11
ruling 35:4 53:24 66:24
rulings 83:3
ryan 15:14 20:21 24:18

**s**

s 10:1 11:9 27:1
sabatino 21:2
sabin 68:14,15 69:17
saccullo 6:9,13
saihgal 21:3
sale 48:21
sales 35:13
salle 10:5
salls 21:4
samuel 13:17
sandali 25:5
santos 25:19
sarah 22:10
satisfactory 68:3
satisfied 61:15 79:1

satisfies 51:9
52:20
satterfield 26:3
saturday 43:1
saved 49:20
saw 49:11 50:2
59:13 64:10
71:13
saxena 21:5
saying 46:11
sc 18:2
schedule 56:18
66:22 79:25,25
80:1
scheduled 48:3
48:4 66:16
76:22
scheduling
64:11 80:3,6
80:16
schickler 23:6
schneider 26:4
schottenstein
26:5
schroeder 26:6
scope 75:25
76:6,7
scott 14:10
screen 43:11
55:14
scrutiny 76:11
se 31:23 58:14
60:11 76:3
sean 21:17
searcy 21:6
seated 27:2

sec 15:10 27:21
28:10 29:1,5
29:10 31:19,20
32:4
second 4:1,7
4:18 5:1,8,14
6:1 7:1,10,19
8:17 77:1
78:14,15
section 32:25
33:2 35:6 44:1
securities 16:3
27:20 31:22
32:5,13 36:1
security 31:21
32:1,17,22,23
33:8,17 35:13
35:14 60:11,15
see 33:11,22
37:25 44:25
58:15,17,21
60:9 67:24
78:3 81:6
seeing 37:18
seek 43:23
48:14 62:2
seeking 44:6
66:12 72:12
73:11
seeks 51:12
seem 47:1
seemed 37:16
37:22 80:16
seen 30:11
66:13
segregated
48:22

seize 28:15
selendy 6:17
12:17 51:5
senes 21:7
sense 38:10
40:9 49:20
51:25 66:21
70:11
separate 27:21
69:11 72:2
september
39:19 40:25
80:4,19,21
serban 21:19
series 9:8
11:13 33:16
44:15,17 47:14
47:15,18 48:10
48:15,16,24
49:15,25 50:7
50:25 51:7,12
51:19 52:6
54:11 55:11
56:24 62:1,18
62:19 72:20
83:7
seriously 78:9
served 41:19
services 4:2,13
4:19,21 5:2,10
6:3,10,17 7:2
7:13 43:21
44:5 47:2
set 34:5 63:24
79:5,19
setting 64:1

settle 34:15
settled 55:21
settlement 9:7
32:4 33:6,7,14
47:14 48:13,14
48:15,20 49:2
49:8,10,15,19
49:22 50:7,8
50:14,18 51:7
51:8,21 52:10
52:14,19,20,22
53:9 54:10
55:17 57:6,10
57:17 59:2
61:3,23 62:7,9
62:19 65:7,7
65:17,18,25
67:5,20,20
68:5 81:4 83:7
settlements
37:19
settles 51:11
severson 21:8
shane 21:24
shanks 2:3,11
8:14,19 9:1
24:6 80:11,12
shara 11:7
45:4
share 50:8
sharon 25:15
shikhar 21:5
shirley 23:16
shlivko 21:1
shoba 6:1 43:1
shoes 68:6

| | | | |
|---|---|---|---|
| **short** 37:6 74:19 | **somebody** 36:7 | **specific** 64:9 | **starting** 39:19 40:25 |
| **shortly** 68:25 | **somewhat** 47:7 | **specifically** | **state** 15:10 |
| **show** 47:6 63:10 | **sontchi** 18:3 70:19,24 71:3 71:4,5,6,8,8,23 71:25 73:18 74:1 76:17 77:20,22,24 78:1,3 79:13 | 28:25 41:17 45:15 71:17 | 37:9,11 38:7 38:17 75:17 |
| **showed** 34:8 | | **specifics** 51:23 | **statement** 30:7 |
| **shows** 79:7 | | **speedy** 70:10 | 33:23 34:12 |
| **sid** 24:9 | | **spending** 42:20 | 37:13 38:21 |
| **sign** 49:15 50:8 | | **spent** 73:6 74:10,17 78:20 | 39:4,6,11 |
| **signature** 84:7 | | | 62:25 65:1 |
| **signed** 29:12 29:15 | **sonya** 9:25 84:3,8 | **spoke** 42:25 | 66:14 67:1 68:8 |
| **significant** 36:25 52:20 55:13,21 64:10 74:24 | **soon** 29:18 69:12,23 81:5 | **spoken** 80:11 | **states** 1:1 2:17 11:2 45:5 |
| | | **sponsor** 9:13 43:17 46:21 47:8 | |
| | **sorry** 44:17 60:14 69:18 74:1 | | **status** 8:1,7,11 8:16,21 54:2 62:17 72:24 79:19 |
| | | **spread** 66:23 | |
| **significantly** 65:2 | | **spring** 30:20 | |
| **silverman** 20:7 | **sort** 53:16 62:18 71:11 73:19 75:1,3 77:5 78:11 | **sprofera** 20:14 | **stay** 59:14,14 79:11 |
| **similar** 38:17 | | **square** 20:4 | |
| **simon** 24:3 | | **ssb** 15:3 | **steadman** 26:7 |
| **simply** 57:20 | **sorts** 80:4 | **stadler** 18:8 | **steffan** 23:24 |
| **sits** 59:11 61:2 | **sought** 47:18 47:22 73:1 | **staffing** 74:25 | **stem** 62:18 |
| **six** 73:7 | | **stakeholders** 48:6 | **step** 68:5 |
| **sixteenth** 39:23 | **sound** 57:16 | **staking** 36:4 | **steps** 42:1 |
| **slightly** 45:11 | **source** 58:6 | **stalking** 45:14 | **steve** 23:1 |
| **slippery** 45:17 | **south** 13:13,22 19:18 | **stances** 58:1 | **stig** 22:15 |
| **slope** 45:17 | | **standard** 33:14 70:6 73:3 | **stipulate** 32:9 |
| **slow** 68:7 | **southern** 1:2 | | **stipulated** 29:2 32:6 78:17 |
| **smith** 20:25 | **spangler** 10:9 | **standpoint** 51:8 | |
| **smoother** 71:14 | **spawned** 47:21 | | **stop** 40:21 |
| | **speak** 57:9 60:13 | **stands** 46:8,16 | **storvick** 20:15 |
| **social** 30:12 | | **start** 39:19,22 39:24 40:6,17 40:20 63:8 67:12 | **story** 67:18 |
| **solicit** 63:20 | **special** 6:6,11 7:11,16 16:18 27:25 28:3 36:15,23 76:18 | | **stout** 20:16 |
| **solutions** 84:20 | | | **straightforw...** 51:9 |
| **soma** 23:12 | | **started** 47:17 | |

**strauss** 7:11,15
16:17
**street** 10:5
11:4 12:4,12
13:4,13 15:11
16:4 18:4
**structure** 47:7
60:25 61:17
**struggling**
69:21
**stuff** 75:1
**sub** 52:6
**subject** 32:23
32:24 33:1,8
33:24 34:1
52:13 71:2
**submit** 47:10
50:14
**subordinated**
33:18
**subordination**
32:2,24 33:1,8
33:24 34:1,18
35:5,24 36:6
**subsidiaries**
61:4
**subsidiary**
54:23
**substance** 52:2
**substantial**
53:22 54:7,8
54:25 73:9
**substantive**
49:3 50:12
51:12 53:1,6
53:17 54:4,20
55:2 59:8 60:2

72:25 77:1
**substantively**
49:4,6 59:12
60:5 69:4,10
**sued** 50:11
**suggesting**
37:22 81:1
**suite** 13:4,13
13:22 14:17
16:12 18:4
19:11,18 84:22
**sullivan** 20:17
**summary**
70:25 71:4
**superlatives**
68:19
**support** 47:2
50:17 55:16
68:21
**supported**
52:15
**sure** 27:17
30:17 39:14
56:13 60:23
71:23 74:9
80:20,23
**suri** 26:8
**surprise** 41:22
**surprises**
37:13
**susan** 17:9,15
57:13
**suspended**
30:11,15,18,20
31:1
**suspense** 62:14

**sustained**
46:17
**sw** 16:12
**systems** 36:22

**t**

**t** 23:16 84:1,1
**table** 44:4
**tail** 67:23
**taji** 20:18
**tak** 20:24
**take** 41:4 58:1
64:7,10 70:3
78:9
**taken** 46:22
60:11,14,16
72:18
**talk** 72:21 74:8
**talked** 74:8
**talking** 65:5
73:5 74:11
**tammy** 22:23
**tanzila** 10:19
**taylor** 22:18
**teach** 39:20
**technical** 76:24
**telephonically**
57:15
**tell** 64:3 67:18
74:15 80:23
**temidayo**
12:22 51:4
81:20
**term** 53:9
**terminated**
28:2 36:20
37:6

**termination**
36:16,18
**terms** 51:8,15
65:2,7 68:16
68:20 69:14
**test** 31:22
**tether** 17:3
**texas** 15:2,3,9
**thank** 41:10
45:4,6,21
47:10,13 51:3
55:6,6 57:7,8
57:14 58:11
60:6,7 61:19
61:22 62:16,22
68:1,4,10,12
69:16,17 70:14
70:15 77:19,24
79:15 80:7
81:12,13,15,23
**thing** 36:10
61:6
**things** 43:9
58:22 66:5
72:14 77:9
80:5
**think** 28:11
29:11 30:6
32:3,11,18
33:5,15 34:19
35:3,16,20,24
35:25 36:5
37:12,12,25
41:22,25 42:9
42:11,15,16,22
43:24 44:13
47:5 53:14

54:2 55:21
56:1,6,7 58:23
58:24 63:8
64:10 66:19,22
67:21 69:6
70:10 72:22
75:10,15,17,20
75:24 76:2,4,5
76:8,9 78:9,22
78:24 79:2,22
80:6,21
**third** 17:12
**thomas** 14:9
20:3 22:25
**thomson** 26:9
**thought** 32:3
76:5 79:10
**thousands** 28:8
**three** 39:24
55:22 68:16
**threshold**
51:10 52:20
**tiger** 67:23
**time** 36:13
37:10 39:12,24
40:23,24 46:21
50:19 52:12
58:3 64:7,12
65:23 66:4
68:20 69:22
70:9 74:11,19
76:5,24 77:12
78:21
**timeframe**
75:6 76:10
77:5

**timeline** 30:5
**timely** 72:17
**times** 20:4
78:24
**timing** 68:22
**timothy** 22:8
**tipton** 20:19
**today** 42:23
70:24 73:11
78:12
**todd** 12:7
**together** 43:13
**token** 31:20,24
31:25 32:13
33:6,11,17
35:4,5,24 36:7
43:11
**tokens** 33:4
**tomas** 21:13
**ton** 73:5
**tony** 26:12
**took** 34:8
52:17 74:3
75:2 76:11
77:2,11
**topics** 27:15
**torres** 20:20
**total** 56:25
**totaling** 63:14
**totally** 28:14
30:8
**touch** 38:25
**toward** 46:24
**towards** 48:18
**transactions**
34:9 35:14

**transcribed**
9:25
**transcript** 84:4
**travel** 80:4
**travis** 21:11
**tremendous**
49:21
**trial** 40:8 47:20
48:3 67:11,13
**trials** 64:11
**tried** 28:15
80:23
**trigger** 80:17
**tristan** 25:16
**true** 63:3 84:4
**trust** 17:10,18
57:14
**trustee** 11:3
45:1,5 46:22
76:1
**try** 72:23 79:19
79:24
**trying** 56:12
66:7 81:3
**tuesday** 67:13
**tuganov** 12:11
68:15
**turetsky** 14:7
**turn** 44:25
51:1
**turned** 28:7
78:11
**turning** 38:19
43:15
**tv** 55:14
**twenty** 39:24

**two** 39:9,12,17
39:22,24,25
40:13,14 42:22
47:24 54:5
61:9 62:13
73:6 74:19
75:11,13 76:9
76:24 77:8
78:18 79:9
**twofold** 64:15
**tx** 15:5,10,10
15:12
**typical** 75:1
**typically** 40:23

**u**

**u.s.** 3:3 11:3
45:1 46:22
76:1
**ubierna** 26:10
**uday** 22:22
**ultimately**
52:17 60:3
72:13
**unable** 47:8
**uncontested**
44:21
**under** 28:22
31:7,22 33:8
33:13,13,18,25
34:1 35:6 36:6
36:19 50:13
51:10 52:8
53:24 61:8,9
61:10,10,12
62:19 65:22
77:10

underneath
61:2
understand
30:16,16,18
46:14 53:13
57:17 67:14
71:24 76:25
understanding
60:24 61:16
77:10
understood
74:9
unfortunate
66:25
unfortunately
80:24
unique 75:4,5
united 1:1 2:17
11:2 45:5
universally
74:15
universe 74:15
unnecessary
37:13 45:12
79:12
unregistered
32:5,16,22
unresolved
69:7
unsealed 36:14
unsecured 4:4
4:15 5:4,11
6:19 7:4 12:18
13:12,21 14:3
14:16 41:13
55:4 62:23

unsuspended
30:19
untimely 46:19
unusual 45:9
update 69:14
urge 56:1 57:5
urged 38:8,9
urging 37:10
use 63:21
useful 37:2
using 8:1 41:20
74:25
usually 40:20
40:21

**v**

v 1:14,22 2:5
2:13 8:6,10,14
8:19 9:1 19:21
valid 64:22
valuation 34:2
value 31:24
52:14 54:17,19
55:1,5 61:4,6
66:2 75:16
varick 11:4
variety 31:11
47:21
various 71:2
vazquez 26:11
vejseli 26:12
venable 12:10
68:15
verbal 46:19
veritext 84:20
vesey 12:4
viable 36:8

victims 28:21
28:22 38:10
41:25
victor 26:10
video 55:15
view 28:20
46:23 75:22
78:11 79:3
viewed 73:1
views 42:3
vince 20:17
virtually 45:6
virtue 61:5
vivid 67:2
vollenhals
20:21
voluminous
52:3
vote 66:13,15
voted 52:18
votes 66:18
voting 66:10
voyager 37:15
40:13 47:6
71:18,21,25
72:1,3,12,16
72:20,21

**w**

w 15:11 20:7
wacker 14:17
wait 42:10
78:3
waiting 59:8
walton 20:22
want 30:17
37:12 40:14
41:5 43:6 47:3

51:2 55:7,8
56:9,14,17
57:4,9,12
61:20 63:7
66:5 68:8,13
69:2,20,22
70:11,12 71:5
76:12,15 77:25
78:25 80:7,11
wanted 36:10
38:18 50:8
58:20,21 59:2
63:21 66:19
69:14 74:2,9
80:19 81:2
wants 53:14
56:4
warren 20:23
watkins 76:16
76:18
way 28:22
30:19 35:5
38:8,15,17
49:2 65:6
66:11,13 70:11
74:7
we've 28:23,25
29:1 30:11
31:9 33:5,9,10
34:15 38:8
56:5 64:6
68:18 69:11,21
69:24
website 38:2
59:5
week 27:13,19
31:14 38:22

39:9,12 43:8
63:1,2,5 68:7
77:17 80:6
**weekend**  63:6
**weeks**  39:17,25
40:13,14
**weil**  19:2
**weinberg**  7:2,6
18:10
**weiss**  18:17
**welcome**  77:20
**went**  44:4
46:18 79:13
**west**  12:12
15:19
**westcap**  58:23
**westover**  11:20
**wharton**  18:17
**white**  5:9 13:11
13:20 14:2,15
**white&**  41:12
**wi**  15:21 18:6
**wiles**  72:14
73:13 81:6
**william**  26:6
**williams**  12:22
51:4,4 53:8
81:18,20,20,23
**willis**  10:10
**win**  48:10
**winds**  47:8
**wire**  27:20
**wisconsin**
15:16,17
**wish**  51:1
56:20 58:12
69:6

**wishes**  65:13
**witness**  40:21
**wofford**  14:8
**won**  48:5,11
**wonderful**
38:6
**woods**  18:15
**word**  30:15
42:10,11
**work**  51:25
60:12 68:20
71:10 74:3,22
75:7 79:13
**worked**  28:19
**working**  42:18
65:6 66:8 80:3
**works**  57:21
**world**  36:14
66:23 74:11
**worries**  41:1
**worth**  74:14,16

**x**

**x**  1:5,11,17,19
1:25 2:2,8,10
2:16 83:1
**xrp**  35:10

**y**

**yanez**  11:20
**yards**  11:14
**yeah**  61:17
71:9,20 77:23
**year**  56:11
**years**  55:19
69:24
**yeilding**  24:8

**yesterday**
49:11 50:2
60:21 80:15
81:7
**yeung**  20:24
**yoon**  14:13
**york**  1:2 2:19
10:16 11:5,15
12:5,13,20
14:5 16:5,20
17:5,13,20
18:13,20 19:5
19:12 20:5
76:23 77:18
**young**  4:8 5:20

**z**

**zabib**  20:10
**zachary**  20:10
**zaharis**  16:24
**zareh**  18:10
**zaryn**  23:25
**zero**  33:9,19
34:15
**ziman**  18:22
**zomo**  10:19
**zoom**  8:1 71:22