LAW OFFICE OF EDUARDO GLAS PC
Eduardo Glas
500 E. 83rd Street, # 9H
New York, New York 10028
Tel: (917)864-1461
eglas@glasattorneys.com
Attorneys for Creditor Greg Kieser

## UNITED STATES BANKRUPTCY COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORKS LLC et al<br><br>          Debtors | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |

Greg Kieser, a creditor of the Debtors with active retail loans and liquidated retail loans,

through his attorneys, Law Office of Eduardo Glas PC, hereby objects to the Disclosure

Statement filed by the Debtors.  In support of his objections, Mr. Kieser states as follows:

I.      <u>The Plan is Unconfirmable as a matter of law because the Earn Account Claims
        should be subordinated pursuant to Section 510(b) of the Bankruptcy Code</u>

1.    The Plan proposes to treat the claims of the Earn Account Holders as receiving

distributions on parity with other unsecured creditors.  This is in error because the Earn Account

Claims should be subordinated pursuant to Section 510(b) of the Bankruptcy Code.

2.    Section 510(b) of the Bankruptcy Code provides in pertinent part:

> a claim arising from rescission of a purchase or sale of a security
> of the debtor or of an affiliate of the debtor, for damages arising
> from the purchase or sale of such a security, or for reimbursement
> or contribution allowed under section 502 on account of such a

1

> claim, shall be subordinated to all claims or interests that are senior
> to or equal the claim or interest represented by such security,
> except that if such security is common stock, such claim has the
> same priority as common stock…

11 U.S.C. § 510 (b).

3.  The purpose of this provision is to prevent investors, who essentially assumed the risk of the entity's business failure by investing in securities, from turning their investment into general unsecured claims against the debtor's estate.  See, e.g., In re Lehman Bros. Holdings, 513 B.R. 624, 629 (Bankr. S.D.N.Y. 2014) (discussing rationale of Section 510(b)).  Regardless of the type of claim that is being asserted (e.g., fraud or breach of contract), "precedent requires subordination of claims by security holders that seek to recover … for the loss in value of a security issued by the debtor or an affiliate."  In re Lehman Bros., Inc. 519 B.R. 434, 448 (S.D.N.Y. 2014) (affirming bankruptcy court decision subordinating claim based on bonds of an affiliate of the debtor to claims of general unsecured creditors).

4.  Section 101(49) of the Code defines securities broadly, including "investment contract or certificate of interest or participation in a profit-sharing agreement or in an oil, gas, or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement." See 11 U.S.C. § 101 (49)(xii).

5.  On or about July 13, 2023, the Securities and Exchange Commission filed a complaint against Celsius Networks Ltd. and its former CEO and founder Alexander "Alex" Mashinsky, alleging fraudulent conduct in the solicitation of investments of unregistered securities, among other things.  More specifically as it pertains to the Earn Accounts, the SEC alleged:  "… Celsius offered an Earn Interest Program whereby investors tendered their crypto assets to Celsius in

exchange for interest payments.  Defendants promised investors in the Earn Interest Program

returns as high as 17%.  Defendants never filed a registration statement for their offers and sales

of the Earn Interest Program, however, and no exception from registration was available."   See

SEC v. Celsius Network Ltd and Alexander "Alex" Mashinsky, Docket No. 23-cv-06005

(S.D.N.Y.) [ECF # 1, Complaint (the "SEC Complaint") at ¶ 3].  As the SEC Complaint notes,

the Securities and Exchange Act defines "security" broadly, including "investment contracts

[which] … are instruments through which a person invests money in a common enterprise and

reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of

others. In this case, Celsius offered and sold CEL and the Earn Interest Program as securities."

SEC Complaint at ¶ 25.  Under the Earn Interest Program, Celsius pooled the assets received

from investors and deployed them into revenue-generating activities, paying return to investors

on a pro rata basis on their investment.  SEC Complaint at ¶ 64.  "Celsius specifically invited

investors to expect that any profits earned would come from Celsius efforts, stating on its

website: 'The Celsius finance team generates returns for our community by lending out our

communities' digital assets to institutional and retail borrowers.  We aim to return up to 80% of

the revenues made from lending out our community's assets back to our community on a weekly

basis.  Due to the rate of returns we can achieve in the lending market change nearly every day

[sic], we adjust the rates that our community earns on their digital assets on a weekly basis."

SEC Complaint at ¶ 73.

6.    Significantly, the Debtor entered into a Consent decree with the SEC pursuant to which,

among other things, the Debtor admitted to the allegations in the SEC Complaint, and was barred

from taking "any action or make or permit to be made any public statement denying directly or

indirectly, any allegation in the complaint or creating the impression that the complaint is

without factual basis..."  See Consent of Defendant Celsius Network Limited, Docket No. 23-cv-06005 (SDNY ECF # 6-1).  Virtually the same facts were acknowledged by Celsius Network LLC in a non-prosecution agreement signed in a criminal case with the U.S. Attorney's Office that is annexed to the consent decree with the SEC.  Id.

7.    As noted in the Interim Examiner Report [Doc. No. 1411], numerous jurisdictions have found that the Earn Program was an investment contract that constituted a security.  See Interim Report at pp. 29-31.  For example, the Cease and Desist Order issued by the State of Kentucky provided:

> [Celsius] is offering securities in the form of investment contracts … [t]hese investment contracts allow passive investors to earn profit in the form of interest on the assets deposited with [Celsius], and qualify as securities under the Act … The [Earn Rewards Program] amounts to an investment contract because they are "an investment of money in a common enterprise with profits to come solely from the efforts of others."  See S.E.C. v. W.J. Howey Co., 328 U.S. 293, 301 (1946).

See, Kentucky Cease and Desist Order, at ¶¶ 18, 20.[1]

8.    In short, the Debtors cannot dispute that the Earn Accounts are securities for purposes of the Bankruptcy Code.  The Earn Account Claims were acquired when investors placed their cryptocurrencies into the Earn Rewards Program.  Thus, their securities were acquired in a "purchase."  In re Lehman Bros. Holdings, 855 F.3d 459, 474 (2d Cir. 2017) ("purchase" includes circumstances where a claimant received a security in exchange for value).  Equally important, the Earn Account Claims arose from the purchase of the security since there only needs to be "some nexus or causal relationship between the claim and the [purchase] of the

---

[1] A copy of the KY Order can be found at Celsius Network LLC 2021AH00024.pdf (ky.gov).

security." In re Enron Corp., 341 B.R. 141, 151 (Bankr. S.D.N.Y. 2006).   As such, these claims

should be subordinated under Section 510(b) because the Earn Account Claimants took the risk

that their investments could be wiped out just like any investor who invests in a hedge fund or

some other type of investment pool. Indeed, Earn Program investors were warned of such risk:

"…by engaging with Celsius you acknowledge that there is a risk that Celsius may become

unable to repay its obligations to its creditors, *in which case your digital assets may be lost, in*

*whole or in part*." See General Risk Disclosures, Risks Related to Using the Earn Service

(emphasis added), p. 1114 (ECF Doc. # 393);  see also In re Lehman Bros., Inc, 519 B.R. at 448

("The fact that the value of the [bonds] declined while [Claren Road] held them … should not

enable [Claren Road] to eviscerate the absolute priority rule, and shift to creditors the investment

risk assumed by the [bond] holders.  In short, subordination of Claren Road's claim pursuant to

section 510(b) is justified because it prevents Claren Road from converting its investment loss

into a creditor's claim.").  Therefore, these claims are being impermissibly treated as other

general unsecured claims under the Debtor's proposed plan.  This improper classification of the

Earn Account Holders' claims, a direct violation of the absolute priority rule, makes the

proposed plan unconfirmable as a matter of law.  In re American Capital Equipment, LLC, 688

F.3d 145 (3d Cir. 2012) (patent unconfirmable plan can be rejected at disclosure hearing).


    II.     The Disclosure Statement and the Plan Failed to Treat Liquidated Loans as a Class.

    9.   The proposed Plan and the Disclosure Statement includes specific discussion about the

Retail Borrower Claims, but absolutely none about the retail loans that were wrongfully

terminated by the Debtor during the so-called Pause.  This set of claimants is not classified under

any of the enumerated classes under the proposed Disclosure Statement and Plan, a fatal flaw in

these documents.  See, In re Agrokor d.d., 591 B.R. 163, 185 (Bankr. S.D.N.Y. 2018) (a

bankruptcy case must resolve the claims of *all* creditors).

10.   To the extent the liquidated retail borrowers' claims are supposed to be included among

the Earn Account Claims, this is an impermissible classification. In general, the default

provisions of these loans provided that Celsius was required to return the excess collateral after a

liquidation to the borrower's "Celsius Account." See, e.g., Loan Terms of Use [ECF # 393 at p.

914 ("Within ten (10) of your full repayment of the Principal Amount and all outstanding

obligations, Celsius shall release all remaining Collateral to your Celsius Account."). To the

extent "Celsius Account" meant "Earn Account," such accounts were illegal as unregistered

securities.  See Point I above in this objection. Thus, this set of creditors should not be included

in the same class as the General Earn Claims.  As it stands, the Disclosure Statement should be

rejected for not dealing with this set of claimants at all, and the Plan should be deemed

unconfirmable for discriminating impermissibly against them.[2]

11. Similarly, among the liquidated borrowers, there was a subset, which included Mr.

Kieser, whose loan terms provided only for the liquidation of a limited portion of the collateral to

meet the required LTV, whereas the Debtors ended liquidating 100% of the collateral and

terminating the loans.  These liquidated borrowers have claims for wrongful liquidation of their

collateral under the terms of their loan agreements and Article 9 of the Uniform Commercial

Code.[3] None of these claims are classified or even acknowledged under the proposed disclosure

statement and plan.

---

[2] The liquidated borrowers' claims cannot be considered to be part of the general unsecured
claims either because the latter specifically excludes them.  See Plan, Art. III B 9 ("For the
avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims").
[3] In fact, as it applies to Mr. Kieser, the liquidation of his loans under the applicable Terms of
Use required the Debtors to liquidate his collateral only to the extent required to bring the LTV

III.    The Disclosure Statement and the Plan Fails to Treat the Active Retail Loans as
        Executory Agreements

12.    The proposed Disclosure Statement and Plan fails to classify the Retail Loan

Agreements as executory contracts that need to be assumed or rejected.  The Debtors seek to

gain the benefits of these contracts (i.e., the repayment of the loans) without having to assume

the burdens (i.e., cure and return of the Collateral).  As of the Petition Date, the Retail Loan

Agreements were contracts with obligations unperformed by the respective parties such that the

failure to perform them would constitute a material breach excusing the performance of the non-

breaching party. See In re Avianca, S.A., 618 B.R. 684, 696 (Bankr. S.D.N.Y. 2020).  Here, the

Borrowers have an obligation under their Retail Loan Agreement to post additional collateral in

the event of a margin call.  The failure to satisfy a margin call would trigger the liquidation of the

collateral and termination of the agreement.  See Gen. DataComm Indus., Inc. v. Arcara (In re

Gen. DataComm Indus., Inc.), 407 F.3d 616, 625 (3d Cir. 2005) (When parties to a contract

define a breach of one party's obligations as a terminable breach, such obligations are material

obligations).  Correspondingly, Celsius retains the obligation under the agreements to return the

collateral upon repayment of the loans.  Further evidence that the lending agreements are

executory contracts is reflected by the proposed Plan's assumption of institutional loans as

---

down to 65 percent. Instead, the Debtors liquidated **all** his collateral and terminated his loan.  Mr.
Kieser suffered great losses in the form of loss of his coins and the large tax bill that resulted
from the liquidation.  To add to the injury, the Debtors did not treat all Borrowers in the same
position as Mr. Kieser the same way.  In an arbitrary manner noted by the Examiner in this case,
some of loans with margin calls were terminated and all the collateral was liquidated while
others similarly situated were not.  See Examiner's Report at p. 326 (Section on Customer Retail
Loan Liquidations).  Also noted in the Examiner's Report was the Hobson choice that many
borrowers faced of being unable to "move crypto assets within the platform or were unwilling to
deposit crypto assets into a platform that had paused withdrawals.  These liquidations occurred
despite Celsius's promises that it would work with customers to meet margin calls and that
liquidation will be a last resort." Id.

executory contracts, given the nearly identical nature of the obligations of the retail and institutional borrowers under their respective agreements.  See proposed Plan, Art. V.D ('[n]otwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtor shall be deemed to have assumed…"); also, Disclosure Statement at p. 89 ("All Institutional Loans, and any agreements … relating to such Institutional Loans are Executory Contracts that the Debtor will assume and assign to Newco under the Plan.").

13. Should the Debtors fail to assume the Retail Loans, and should there be a confirmation of the Plan, the Retail loans would be deemed rejected.  A rejection of a contract is deemed a prepetition breach, and as the breaching party the Debtors would be unable to effect a setoff against the outstanding amounts owed under the loan.  In re Pure Performance Golf, LLC, 2017 Bankr LEXIS 3295 (Bankr. M.D.Fla. 2017) (a rejection is a breach by the debtor occurring immediately prior to the petition date and, upon rejection, the debtor is divested of all rights under the agreement).   Given the legal consequences that result from the assumption or rejection of the Retail Loan Agreements, the failure to classify as executory contracts in the Disclosure Statement is a material omission.

14. Indeed, the Debtors seek to obtain full payment from the Retail Borrowers on the Retail Loan Obligations by calling in these loans.  The proposed Plan and Disclosure Statement do not discuss how this is to occur in accordance with the terms of these loans.  While in general any of the parties to these agreements could terminate the loan, the Terms of Use require thirty-day advanced notice to do so.  Neither the proposed Plan nor the Disclosure Statement indicate whether the Debtors will follow this procedure, which appears to be the only way to terminate the loans before their term expires.  This further cements the notion that the Retail Loan

Obligations are executory contracts that need to be assumed or rejected.  Without an assumption

of these agreements, the Debtors cannot exercise their right to termination or to trigger the setoff

contemplated under the proposed Plan.  <u>Pure Performance Golf</u>, <u>supra</u>.

IV.    <u>Reservation of Rights</u>

15. Mr. Kieser expressly reserves the right to supplement these objections at the hearing to

consider approval of the Disclosure Statement, and to assert these or any other objections in

connection with any hearing to consider confirmation of the Plan.

V.    <u>Conclusion</u>

16. For the foregoing reasons, Mr. Kieser respectfully requests that the Court direct the

Debtors to modify the Disclosure Statement to address the objections contained herein, and grant

such other and further relief as is just and proper.


Dated:  New York, New York
August 4, 2023

<u>/s/Eduardo J. Glas</u>
Eduardo Glas, Esq.
Law Office of Eduardo Glas PC
500 E. 83rd Street, # 9H
New York, New York 10028

Counsel for Greg Kieser
