**OFFIT KURMAN, P.A.**
Jason A. Nagi
590 Madison Avenue, 6th Floor
New York, NY 10022
Phone: 212-545-1900

**OFFIT KURMAN, P.A.**
Joyce A. Kuhns (*pro hac vice*)
1954 Greenspring Dr., Suite 605
Timonium, MD 21093
Phone: 410.209.6400

*Counsel to Ad Hoc Group of Earn Account Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC,[1] et al.,<br><br>                 Debtors. | Chapter 11<br><br>Case No.  22-10964 (MG)<br>Jointly Administered |

### RESERVATION OF RIGHTS AND COMMENTS OF AD HOC GROUP OF EARN ACCOUNT HOLDERS TO REVISED DISCLOSURE STATEMENT TO JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

The Ad Hoc Group of Earn Account Holders  (the "**Ad Hoc Earn Group**"), by and

through its counsel, Offit Kurman, PA, files this Reservation of Rights and Comments of Ad Hoc

Group of Earn Account Holders to Revised Disclosure Statement to Joint Chapter 11 Plan of

Reorganization of Celsius Network LLC and its Debtor Affiliates (the "**Reservation of Rights**")

and, in support, states as follows:

### BACKGROUND

1.    Significant events have continued to unfold potentially impacting Earn Account

Holder recoveries after the filing of the revised disclosure statement [ECF 3117] (the "**Revised**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450) and are collectively referred to herein as "**Debtors**."

**Disclosure Statement**") warranting the filing of this Reservation of Rights to preserve and protect the rights of Earn claimants under any Plan, as amended or modified.

2.      The Ad Hoc Earn Group was formed in the late spring of 2023 to give voice to the distinct issues confronting the 600,000 plus Earn account holders in the above referenced bankruptcy cases (collectively, the "**Celsius Case**").  The Celsius Case has highlighted how the bankruptcy and cryptocurrency worlds do not always dovetail and are not easily reconciled. Nonetheless, despite differing positions on whose account holder deposited cryptocurrency ("**crypto**") constituted estate property, and how and when claims would be calculated (whether dollarized or through return of liquid crypto), the Ad Hoc Earn Group's approach has been to achieve, to the extent possible in the bankruptcy context, parity and fair and equitable treatment among crypto account holders with respect to their claims.

3.      With this objective in mind, at the invitation of the Debtors and Official Unsecured Creditors' Committee (the "**UCC**"), representatives of the Ad Hoc Earn Group and other Earn representatives attended a three-day mediation in New York from July 17 – 19, 2023, before the Honorable Michael E. Wiles to mediate the treatment of Earn claimants versus Borrower claimants under a chapter 11 plan.

4.      Prior to the mediation: (a) the Debtor Celsius Network LLC and certain Debtor affiliates had already filed a joint plan of reorganization on March 31, 2020 [ECF No. 2358] (the "**Plan**"); (b) an auction had already been conducted and Fahrenheit LLC ("**Fahrenheit**") had been selected by the Debtors and UCC as Plan sponsor; (c) a disclosure statement had already been filed in connection with the Plan on June 27, 2023 (the "**Initial Disclosure Statement**" ) [ECF No. 2902]; and (d) a hearing had been set for approval of the Initial Disclosure Statement on August 10, 2023. At the conclusion of the mediation, a term sheet was signed by the

attendees, subject to execution of definitive documents. The term sheet did not address all Plan issues of concern to the attendees but the basics of plan treatment of Earn versus Borrower account holders. The executed term sheet was filed with the Court on July 20, 2023.  [ECF No. 3064, Exhibit B thereto].

5.      Over a two-day period from July 25, 2023, the Ad Hoc Earn Group held a forum to gauge the concerns of the larger Earn claimant constituents to Earn claimant treatment.  On July 29, 2023, a Revised Disclosure Statement was filed by the Debtors  [ECF No. 3117] to update the Initial Disclosure Statement. As of the filing of the Revised Disclosure Statement and this Reservation of Rights, no definitive document has yet been executed by either the Ad Hoc Earn Group or Ad Hoc Borrower Group in connection with the mediation.

## **LEGAL STANDARD**

6.      The proponent of a plan has the affirmative duty to provide creditors with "adequate information… to make an informed judgment about the plan." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., et al.*, 337 F. 3d 314, 321 (3rd Cir. 2003). Section 1125 of the Bankruptcy Code defines "adequate information" as "information of a kind and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interest of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The determination of whether a disclosure statement has adequate information is made on a case-by-case basis and is largely within the discretion of the bankruptcy court. *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F. 2d 694, 696 (4th Cir. 1989). *See In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567 (Bankr.

N.D. Ga. 1984) (for elements courts commonly considered to determine whether a disclosure

statement contains adequate information).

## RESERVATION OF RIGHTS AND CONCERNS

7.       At 380 pages, the Revised Disclosure Statement is quite lengthy. The Ad Hoc

Earn Group acknowledges that the Revised Disclosure Statement is a sincere attempt to break

down difficult concepts and complex treatments for the benefit of an extremely large creditor

body of varying degrees of sophistication and engagement in this case. That said, Earn claimants

have been actively participating and monitoring this case at apparently unprecedented levels, and

have communicated to the Ad Hoc Earn Group that the Revised Disclosure Statement does not

contain sufficient information to make an informed decision on the Plan.

8.       Without going into the complexities of the various elections that may be made

under the Plan, Earn recoveries will derive from three sources: a) return of a certain amount of

liquid crypto; b); equity in NewCo, a crypto mining company whose stock will trade on

NASDAQ, if all goes well; and c) litigation recoveries through a Litigation Oversight Committee

("**LOC**") to be run by [a] Litigation Administrator(s).  The Ad Hoc Earn Group takes seriously

its role in acting as a conduit and voice for a much larger constituency.  Earn customers, both

members of the Ad Hoc Earn Group, and in the larger Earn creditor community, continue to

voice major concerns about inadequate disclosures and a lack of transparency in the Revised

Disclosure Statement. The ability to receive adequate disclosures, and understand the proposed

plan, will have a significant impact on creditors' decisions to vote to accept or reject the Plan.

## A.       Tax Consequences

9.       While the Debtors have added a provision that they will work to minimize tax

consequences, the reality Earn claimants face under the NewCo scenario is that they are not

4

getting back the crypto they deposited with Debtors, but a combination of either Bitcoin or Ether

and stock.  Because Earn claimants will not be receiving exactly what was deposited, there is a

distinct possibility that Earn claimants who receive stock can have negative tax consequences as

claimants are not receiving a "like exchange" under the Internal Revenue Code.  Thus, through

no fault of their own, some Earn claimants now face unanticipated tax burdens as a result of the

nature of Plan distributions under the NewCo scenario.  The Revised Disclosure Statement does

not address the relative tax consequences between the NewCo scenario and the orderly wind-

down scenario. Furthermore, it is noteworthy that there is no clarity in the Plan on who is getting

the benefit of the crypto appreciation from the petition date, and what happens if crypto

continues to appreciate above its current levels between now and the Plan effective date.

**B.**    **Governance Issues**

10.    <u>NewCo Board Seats</u>.  Indisputably, the future equity holders of NewCo are

largely Earn claimants. Nonetheless, there is no commitment to provide Earn Claimants with

seats on the NewCo board of directors, nor is there any explanation as to why Earn claimants are

not guaranteed their proportionate share of seats on the 7-seat NewCo board.  Fahrenheit has

already secured two seats on the board, whereas, the Ad Hoc Earn Group has been excluded

from the selection process by Debtor entities who have no future business continuation, let alone

as equity holders of NewCo.   In contrast to the Debtors, Earn claimants are the primary

recipients of stock with the largest vested interest in NewCo. Having been victimized once, Earn

representatives are entitled to a role in the selection of management and the initial board because

a significant portion of their recovery is predicated on a successful launch of NewCo. This defect

must be corrected by giving the Ad Hoc Earn Group the right to designate no fewer than three of

the remaining five board seats.

11.    <u>Litigation Oversight Committee Seats</u>:  Likewise, Earn recoveries depend on the successful recovery of litigation controlled by the LOC and its yet-to-be-named Litigation Administrator(s). Once again, the primary recipients of these recoveries have been inexplicably locked out of a guaranteed seat on the LOC and the selection of the Litigation Administrators. The Ad Hoc Earn Group should be guaranteed at least one seat on the LOC, without providing the UCC approval rights. Otherwise, there is a risk that there will be no agreement, and the Ad Hoc Earn Group will be deprived of a seat.

**C.    NewCo Valuation**

12.    There is a conspicuous lack of detail on the methodology and calculation of the illiquid asset and mining company component parts of the NewCo valuation.  (*See* Revised Disclosure Statement, chart at p. 12 and Exhibits C, D and E.)  By way of examples, there is:  (i) no accompanying explanation why administrative costs are double under the wind-down as opposed to under the NewCo scenarios; (ii) no basis given for the discount attributed to Mining Co. in wind-down; and (iii) no shared cash flow forecast/projections and no updated business plan from Fahrenheit, the Plan sponsor. In addition, there is a $250 million discrepancy between the Gross Liquid Cryptocurrency under an "Orderly Wind Down" on page 12 of the Revised Disclosure Statement and the "Orderly Wind Down Distribution Waterfall" on page 6 of Exhibit C.  The waterfall on page 6 of Exhibit C begins with $2.404 billion in liquid crypto assets (row [B]) while the "Orderly Wind Down" on page 12 of the Revised Disclosure Statement begins with $2.657 billion in liquid crypto.  These discrepancies imply that there are either different assumptions or approaches in these two analyses, which need to be clarified.

13.    Further, the valuation of NewCo equity does not appear to reflect any liquidity risk.  NewCo will be a new company without a trading history and with a fresh business

operation.  To safeguard against liquidity risks, Earn claimants have expressed the need for a conservative valuation of NewCo equity and the implementation of a modified "Dutch auction," which aims to mitigate potential challenges related to liquidity and provide a more orderly and transparent mechanism for determining the value of NewCo equity.

14.    The NewCo valuation has significant impact on both stock values and tax consequences for Earn claimants.  Given the significant role NewCo plays in any ultimate recovery for Earn claimants, the information provided is neither adequate, consistent, nor sufficient in detail to enable Earn claimants to make informed decisions to vote to accept or reject the Plan.  The Ad Hoc Earn Group believes the Revised Disclosure Statement must be further amended to remedy these deficiencies.

15.    It is also noteworthy that the July 31, 2023, deadline for submitting alternative wind-down bids passed after the filing of the Revised Disclosure Statement. Upon information and belief, at least two alternative bids were submitted.  No supplemental disclosures have yet been made as to whether and to what extent the bids significantly improve recoveries under the orderly wind-down scenario. This deficiency should also be cured.

**D.    The Wind-Down Toggle**

16.    The stark reality is that Earn claimants must vote to accept or reject a reorganization plan with a toggle to a wind-down with no meaningful input into the ultimate choice. Presently the choice to toggle to wind-down resides solely with the Debtors and UCC, with a "consultation right" given to the Ad Hoc Earn Group. In light of the paucity of information regarding NewCo and reluctance thus far by the Debtors or UCC to give the most affected party guaranteed board seats or any input into the management and selection process, the Ad Hoc Earn Group believes that the only fair recourse is to give the Ad Hoc Earn Group the

right to decide along with the Debtors and UCC whether the toggle to wind-down should be

exercised.

17.     The Ad Hoc Earn Group also believes there should be a commitment articulated

in the Revised Disclosure Statement that the Debtors will commit to an open and competitive

process for alternative orderly wind-down sponsors.

## E.    Recovery Waterfall and Held-Back Crypto

18.     The Amended Disclosure Statement does not attribute any set value to recoveries

from litigation by the LOC. It also does not clarify who owns any crypto that is held back

on the plan effective date, and who benefits from the appreciation of such crypto.  The

distribution waterfall should be clarified to make it clear any excess recoveries or

distributions will, in all cases, be distributed *pro rata* to general unsecured creditors.

## F.    Releases and Excluded Parties

19.     The list of persons to be designated "Excluded Parties" from the Plan release and

exculpation provisions remains a mystery to the most affected constituents—the Earn

claimants—until the Plan Supplement is filed. This places tremendous and inappropriate pressure

on a self-funded group to evaluate the panoply of critical Plan documents including the list that

will impact future litigation targets and recoveries in the days before confirmation. That list

should be shared. In fact, since the Ad Hoc Earn Group and counsel are under Non-Disclosure

Agreements and protective orders with the Debtors and UCC, there can be no reasonable

explanation to refuse to share the list as developed. Moreover, there are certain carve-outs from

the releases that may be appropriate and are not disclosed.

## G.    Emergence Incentive Plan ("EIP")

8

20.     It is difficult to evaluate the appropriateness of an additional $2.6 million in bonuses without the benefit of the Transition Services Agreement to be filed as a Plan Supplement. Based on statements made in the Revised Disclosure Statement, it appears that a  number of the purportedly "eligible" employees may be providing transition services not part of their current responsibilities or skill sets, such as assuring sufficient levels of liquid crypto for distribution. While the Ad Hoc Earn Group does not oppose the concept of an EIP to ensure sufficient employees to perform transition tasks, given the extremely high run of administrative expenses in the Celsius Case,  more detail and a connection between the tasks being performed and the reward metric is appropriate before the Earn claimants bear the brunt of yet another multi-million dollar expense.

**H.      FTX ($2 Billion Claim)**

21.     The Revised Disclosure Statement appears to list all of the proofs of claims filed against FTX. However, the size of the $2 billion claim alone warrants more detail as to its nature other than that it is contingent, unliquidated and unsecured. It is also unclear who will be prosecuting this claim on behalf of the claimants. In fact, Debtors are seeking to defer filing a list of litigation "Causes of Actions" until submission of a confirmation order.

## CONCLUSION

22.     As it is highly likely the Revised Disclosure Statement will be further amended and events will continue to unfold impacting Earn claimants, the Ad Hoc Earn Group fully reserves all of its rights to supplement this filing and to raise additional concerns regarding further amendments to the Revised Disclosure Statement, any Plan Supplements, and in connection with confirmation of any Plan, as further amended or modified.

Dated: New York, New York
        August 3, 2023

**OFFIT KURMAN, P.A.**

By:    */s/ Jason A. Nagi*
Jason A. Nagi
590 Madison Avenue, 6th Floor
New York, NY 10022
Phone: 212-545-1900
jason.nagi@offitkurman.com
       -and-
Joyce A. Kuhns
(Admitted *pro hac vice*)
1954 Greenspring Dr., Suite 605
Timonium, MD 21093
Phone: 410-209-6463
joyce.kuhns@offitkurman.com

*Counsel to the Ad Hoc Group of Earn*
*Account Holders*

4877-4525-6820