WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
U.S. Department of Justice
Office of the United States Trustee
One Bowling Green
New York, New York 10004
Telephone: (212) 510–0500
By:     Shara Cornell, Esq.
        Trial Attorney

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                                        :
In re                                                   :    Chapter 11
                                                        :
CELSIUS NETWORK LLC, *et al.*,[1]                       :    Case No. 22-10964 (MG)
                                                        :
                                                        :    Jointly Administered
                                                        :
                                          Debtors.      :
------------------------------------------------------- x


# OBJECTION OF THE UNITED STATES TRUSTEE TO DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK, LLC AND ITS DEBTOR AFFILIATES

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## Table of Contents

Table of Contents ........................................................................................................... i

Table of Authorities ...................................................................................................... ii

I. PRELIMINARY STATEMENT ................................................................................. 1

II. BACKGROUND ......................................................................................................... 5

   A.  General Background ............................................................................................. 5

   B.  The KEIP Motion .............................................................................................. 6

   C.  Exclusivity ......................................................................................................... 6

   D.  The Plan and Disclosure Statement ................................................................... 8

III. OBJECTION ........................................................................................................... 16

   A.  Legal Standards ................................................................................................. 16

   B.  The Debtors Must Provide Adequate Information Establishing that the Proposed Releases and Exculpation Meet the Standard Required by the Second Circuit ...................................... 18

      1. The Disclosure Statement Fails to Establish Why Releases Are Appropriate in These Cases…………………………………………………………………………………18

      2. The Plan Manufactures Consent for Third-Party Releases Based on Failure to Act Instead of Affirmative, Informed, and Knowing Consent. .............................. 19

      3. The Disclosure Statement Should Not be Approved Because the Exculpation Provision is Overly Broad. ........................................................................................ 23

      4. The Disclosure Statement Contains an Impermissible Punishment for Certain Plan Rejectors. ............................................................................................................ 26

      5. The  Debtor Should Explain How the Management Incentive Plan Satisfies the Requirements Set Forth in Section 503(c) of the Bankruptcy Code ................................... 28

      6. The Distribution Mechanics are Confusing and Require Additional Information. .......... 29

IV. RESERVATION OF RIGHTS ............................................................................... 30

V. CONCLUSION ......................................................................................................... 31

**Table of Authorities**

*Statutory Authority*

11 U.S.C. § 503 ……………………………………………………….............    *Passim*

11 U.S.C. § 1125 ………………………………………………………...........    *Passim*

11 U.S.C. § 1125(a)(1) ………………………………………………………....    16

11 U.S.C. § 1125(b) ………………………………………………………........    16

11 U.S.C. § 1125(e) ………………………………………………………........    23

11 U.S.C. § 1129(a)(1) ………………………………………………………....    28

11 U.S.C. § 1129(a)(2) ………………………………………………………....    17

11 U.S.C. § 1129(a)(3) ………………………………………………………....    27

H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977) ………………………….    16

N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1) ………………………..    26


*Case Authority*

*Century Glove, Inc. v. First American Bank*, 860 F.2d 94 (3d Cir. 1988) …………..    17

*Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) …………………………….    27

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) …………………………………………….    18, 19, 22

*In re Adelphia Commc'ns Corp.*, 352 B.R. 592 (Bankr. S.D.N.Y. 2006) …………….    16, 17

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ………........    27

*In re Aegean Marine Petroleum Network, Inc.* 599 B.R. 717 (Bankr. S.D.N.Y. 2019)    23, 24

*In re Allegheny Int'l, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990)……………………    26

*In re Beyond.com*, 289 Bankr. 138 (Bankr. N.D. CA. 2003) ............................ 18

*In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015) ..................... 3, 19

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) .............................. 27

*In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) .......... 17

*In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ................... 19

*In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999) ..................... 17

*In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) ................................ 22

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y. 1992) ..................................................................................... 27

*In re Duratech Indus.*, 241 B.R. 291 (Bankr. E.D.N.Y. 1999) ........................... 17

*In re Emerge Energy Services, LP*, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019).. 21

*In re Ferretti*, 128 B.R. 16 (Bankr. D.N.H. 1991)........................................ 17

*In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993) .................................... 17

*In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ................................ 22

*In re Mallinckrodt PLC*, 639 B.R. 837 (Bank. D. Del. 2022) ........................... 25

*In re MCorp Fin., Inc.*, 137 B.R. 219 (Bankr. S.D. Tex. 1992) ......................... 26

*In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R.685 (Bankr. S.D.N.Y. 2010) .. 22

*In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. January 8, 2016) ..... 27

*In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987) ........................ 17

*In re Motors Liquidation Co.*, 477 B.R. 198 (Bankr. S.D.N.Y. 2011).................... 19

*In re Purdue Pharma, L.P.,* 2023 WL 3700458 (2d Cir. May 30, 2023) ............... 2, 19, 20

*In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021) ............. 21

*In re PWS Holding Corp.*, 228 F.3d 224 (3d. Cir. 2000) ................................ 17, 25

iii

*In re Quiqley Co.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007) …………………………….    16

*In re Residential Capital, LLC,* 478 B.R. 154 (Bankr. S.D.N.Y. 2012) ………………    28

*In re Voyager Holdings*, *Inc.*, No. 23 CIV. 02171 (JHR), 2023 WL 2731737
(S.D.N.Y. Apr. 1, 2023)……………………………………………………………….    23

*In re Washington Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ……………………..    24, 25

*John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*,
987 F. 2d 154 (3d Cir. 1993) …………………………………………………………..    17

*Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46 (S.D.N.Y. 1999) ………………………….    16

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*,
25 F.3d 1132 (2d Cir. 1994) …………………………………………………………..    16

*Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*,
848 F.2d 414 (3d Cir. 1988) …………………………………………………………..    16

*Patterson v. Mahwah Bergen*, 636 B.R. 641 (E.D. Va. 2022) ………………………..    21

*PWS Holding Corp.,* 228 F.3d 224 (3d Cir. 2000) …………………………………...    17, 25

*Roni LLC v. Arfa*, 74 A.D.3d 442 (2010) ……………………………………………..    24

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co*., 81 F.3d 355 (3d Cir. 1996)    17

*In re SunEdison*, 576 B.R. 453 (S.D.N.Y. Bankr. 2017) ………………...............    18

*Stern v. Marshall*, 564 U.S. 462 (2011) ………………………………………………    22

*William K. Harrington, United States Trustee, Region 2, v. Purdue Pharma L.P., et
al.*, Case No. 23A_, filed in July 2023 ………………………………………………..    20, 22

iv

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                                  :

In re                                 :   Chapter 11
                                    :

   CELSIUS NETWORK LLC, *et al.*,[1]   :   Case No. 22-10964 (MG)
                                    :

                                    :   Jointly Administered
                           Debtors.   :

---------------------------------------------------- x

**MEMORANDUM IN SUPPORT OF OBJECTION OF THE UNITED STATES
TRUSTEE TO DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF CELSIUS NETWORK, LLC AND ITS DEBTOR AFFILIATES**

**TO:**    **THE HONORABLE MARTIN GLENN,**
         **CHIEF UNITED STATES BANKRUPTCY JUDGE:**

     William K. Harrington, the United States Trustee for Region 2 ("United States Trustee"),

objects (the "Objection") to the Disclosure Statement (the "Disclosure Statement") for the Joint

Chapter 11 Plan of Reorganization (the "Plan") of Celsius Network, LLC and its Debtor Affiliates

(collectively, the "Debtors"). ECF Dkt. No. 2902. In support thereof, the United States Trustee

respectfully submits as follows:

## I.    PRELIMINARY STATEMENT

     The Disclosure Statement should not be approved because it fails to provide creditors with

sufficient information to allow them to make an informed choice as to whether to approve or reject

the Plan.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

First, the Plan contains inappropriate, nonconsensual, non-debtor, third-party releases, yet the Disclosure Statement does not contain adequate information explaining to interested creditors (i) exactly what releases are being imposed upon *each* class of creditor, (ii) the legal basis for the Debtors' belief that it is likely that the Plan will be confirmed with these provisions, (iii) the justification for the third-party releases in the Plan, (iv) whether the proposed releases are essential to confirm the Plan, and (v) what substantial contribution the numerous non-debtors receiving releases are making. Without further clarification, the releases do not comport with Second Circuit law or the Bankruptcy Code, and the Debtors should provide more information to explain why they do.

The nonconsensual, non-debtor third-party release in the Plan exemplifies the abuse that concerned the Second Circuit in *In re Purdue Pharma, L.P.,* 2023 WL 3700458, *68 (2d Cir. May 30, 2023), fails to satisfy the factors justifying such release, and is unsupported by the rigorous factual disclosures and evidentiary burden required by the *Purdue Pharma* decision. Because the third-party releases are not based on knowing and informed consent, the Disclosure Statement cannot be approved.

The Plan deems that any creditor consents to the third-party releases that either (i) abstains from voting or (ii) votes to reject the Plan but neglects to affirmatively opt-out of the releases. Moreover, a claimant cannot vote in favor of the Plan and also opt-out of the releases. As written, and considering the proposed ballot that includes the opt-out box on a separate page, proving knowing and informed consent for third-party releases will be problematic at best. Affirmative consent through an opt-in form is the clearest and most transparent way to prove affirmative

consent for third-party releases, and the Disclosure Statement should explain why the Plan provides instead for an opt-out procedure.

If, in fact, the Debtors seek to impose releases upon holders of non-voting claims or interests, the Plan must make that clear and provide a way for the affected parties to affirmatively demonstrate knowing and informed consent to such releases. As Judge Wiles discussed in *Chassix*,[2] creditors whose rights do not simply pass through the bankruptcy process are not unimpaired. Furthermore, the Disclosure Statement fails to explain why impaired classes that are entitled to vote must still affirmatively opt out of releases even when deemed to reject the Plan.

Second, the Plan provides for an overly broad and impermissible Exculpation Provision (defined below). The Exculpation extends to non-Debtor parties that are not in existence, is not temporally limited to *only* acts or omissions *during* the pendency of the Debtors' chapter 11 cases, and there is no carve out for malpractice for professionals. Moreover, there is no opt out mechanism for the Exculpation Provision. Instead, the Exculpation Provision diminishes the impact of the release opt out, by including all of the defined "Released Parties" as also being exculpated.

Third, the Disclosure Statement should explain why claimants should be coerced to vote for the plan to avoid having an avoidance action filed against them. If holders of General Custody Claims (as defined by the Disclosure Statement) vote for the plan, Debtors will waive avoidance actions against them. This is a play on an impermissible and coercive death trap designed to force General Custody Claim holders into acquiescing to their impaired treatment under the plan in exchange for a waiver of the *possibility* of an avoidance action being filed. Debtors provide no

---

[2]        *In re Chassix Holdings, Inc.,* 533 B.R. 64 (Bankr. S.D.N.Y. 2015) (Wiles, J.).

meaningful information about the avoidance actions, the procedures, or the likelihood of the Debtors bringing such avoidance actions.

Fourth, the Disclosure Statement disguises its Key Employee Incentive Program ("KEIP") as an allegedly new Emergence Incentive Program ("EIP"). There is no explanation of how it satisfies the requirements of 11 U.S.C. § 503(c) or how the EIP will replace the still pending and contested KEIP.[3] Debtors must prove the Plan comports with section 503. And if the pending KEIP is to be withdrawn, the Disclosure Statement should say so.

Finally, the Disclosure Statement provides confusing and conflicting information regarding distribution to claimants using a third-party platform—Paypal or an undisclosed affiliate. The Debtors should explain why their own platform cannot be used for distributions and why certain claimholders will receive fiat currency as opposed to cryptocurrency. Moreover, the Debtors impose an arbitrary 90-day window for claimants to receive distributions directly from the Debtors' own platform but fail to explain why. No information is provided as to Paypal or its undisclosed affiliates' relationship with the Debtors or how Paypal (or its undisclosed affiliates) were selected as a distribution agent.

Until adequate information is provided in these important areas, the Disclosure Statement should not be approved.

---

[3] The United States Trustee incorporates his Objection to the Debtors' Motion for Entry of an order Approving Debtors' Key Employee Incentive Plan ("KEIP Objection") [ECF Dkt. No. 2430] and expressly reserves his right to supplement, amend, or further object to EIP should the Debtors subsequently amend the Disclosure Statement or Plan.

## II.    **BACKGROUND**

A.  General Background

1.      On July 13, 2022 ("Petition Date"), certain of the Debtors filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code.  ECF Dkt. No. 1.

2.      On December 7, 2022, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b). ECF Dkt. No. 53, 1648.

5.       On July 27, 2022, the United States Trustee appointed an official committee of unsecured creditors (the "Committee"). ECF Dkt. No. 241.

6.      On September 14, 2022, the Court entered an order directing the appointment of an examiner (the "Examiner"). ECF Dkt. No. 820. On September 29, 2022, the United States Trustee appointed the Examiner. ECF Dkt. No. 920. On April 5, 2023, the Court entered an order discharging the Examiner. ECF Dkt. No. 2364.

7.      On October 25, 2022, the United States Trustee appointed Lucy L. Thomson as Consumer Privacy Ombudsman (the "Consumer Privacy Ombudsman"). ECF Dkt. No. 1190. On October 27, 2022, the Court entered the Order approving the appointment of the Consumer Privacy Ombudsman. ECF Dkt. No. 1208.

8.      On January 27, 2023, the Privacy Ombudsman filed her Ombudsman Report for the period of July 13, 2022 through January 27, 2023. ECF Dkt. No. 1948.

B.   The KEIP Motion

9.      On March 28, 2023, the Debtors filed their Motion for Entry of an Order Approving the Debtors Key Employee Incentive ("KEIP") Program (the "KEIP Motion"). ECF Dkt. No. 2336. Concurrently with the KEIP Motion, the Debtors filed the Declaration off Allison Hoeinghaus in Support of the KEIP Motion. ECF Dkt. No. 2337.

10.      On April 14, 2023, the United States Trustee filed his Objection to the KEIP Motion (the "UST KEIP Objection"). ECF Dkt. No. 2430. The UST KEIP Objection argued, *inter alia*, that the Debtors failed to meet the requirements under 11 U.S.C. § 503(b). The United States Trustee incorporates the UST KEIP Objection to the extent applicable.

11.      On May 16, 2023, the Debtors filed their Reply in Support of the KEIP Motion. ECF Dkt. No. 2653.

12.      The hearing on the KEIP Motion has been adjourned from time to time, and most recently was adjourned without a future date. *See* Notice of Adjournment Regarding the KEIP Motion, ECF Dkt. No. 3093.

C.   Exclusivity

13.      On November 9, 2022, the Debtors filed the Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to section 1121 of the Bankruptcy Code and (II) Granting Related Relief [ECF Dkt. No. 1317] (the "First Exclusivity Motion"), which was approved pursuant to the Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances

Thereof Pursuant to section 1121 of the Bankruptcy Code and (II) Granting Related Relief [ECF Dkt. No. 1645] (the "First Exclusivity Order"). The First Exclusivity Order extended the Debtors' exclusive right to file a chapter 11 plan by ninety-seven days and the Solicitation Exclusivity Period by thirty-seven days, through and including February 15, 2023.

14.     On January 25, 2023, the Debtors filed the Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief [ECF Dkt. No. 1940] (the "Second Exclusivity Motion"), which was approved pursuant to the Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief [ECF Dkt. No. 2203] (the "Second Exclusivity Order"). The Second Exclusivity Order extended the Filing Exclusivity Period by twenty-three days through and including March 31, 2023, and the Solicitation Exclusivity Period by 114 days through and including June 30, 2023.

15.     On June 14, 2023, the Debtors filed the Debtors' Third Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief [ECF Dkt. No. 2805] (the "Third Exclusivity Motion), which was approved pursuant to the Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief [ECF Dkt. No. 2935] (the "Third Exclusivity Order"). The Third Exclusivity Order extended the Solicitation Exclusivity Period by 91 days through and including September 29, 2023.

D. The Plan and Disclosure Statement

16.     On March 31, 2023, the Debtors filed their Joint Chapter 11 Plan of Reorganization. ECF Dkt. No. 2358.

17.     On June 15, 2023, the Debtors filed their Amended Plan/Revised Joint Chapter 11 Plan of Reorganization. ECF Dkt. No. 2807.

18.     On June 27, 2023, the Debtors filed the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization. ECF Dkt. No. 2902.

19.     On July 8, 2023, the Debtors filed a Notice of Hearing to Consider Approval of Disclosure Statement for the Joint Chapter 11 Plan of Reorganization. ECF Dkt. No. 2977.

20.     On July 29, 2023, the Debtors filed the Revised Disclosure Statement (the "Disclosure Statement"). ECF Dkt. No. 3117. Concurrently filed with the Disclosure Statement, the Debtors filed the Second Amended Plan of Reorganization (the "Plan") [ECF Dkt. No. 3116] and Plan Supplement (the "Plan Supplement") [ECF Dkt. No. 3115].

21.     The Plan and Disclosure Statement provide for third-party releases:

> Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the

Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action

released pursuant to the Third-Party Release. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

Plan, Art. VIII.E., pg. 79-80 of 183.

22. Release Parties are defined by the Disclosure Statement and Plan as:

"Released Parties" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members, (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the Class Claim Representatives; (m) the Initial Series B Preferred Holders; (n) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders; (o) Christopher Ferraro; (p) the BRIC Parties; (q) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (r) any Releasing Party. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; provided, further, that, notwithstanding anything to the contrary in this Plan or the Plan Supplement, Account Holder Avoidance Actions against Released Parties shall not be released unless released pursuant to the Account Holder Avoidance Action Settlement; provided, further, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.

*Id*., Art. I.A., ¶ 200, pg. 26 of 183; Disclosure Statement, ¶ LL, pg. 74 of 781. The "Released Parties" include "(c) the Post-Effective Debtors, (d) the Plan Administrator . . .(f) any Litigation Administrator(s)," all of whom are not yet in existence nor is there any discussion regarding what consideration is to be provided in exchange for these releases.

23. The Releasing Parties means:

"Releasing Parties" means, collectively: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan **and who do not affirmatively opt out of the releases provided by the Plan**; (c) all Holders of Claims or Interests that

vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan **and who do not affirmatively opt out of the releases provided by the Plan**; (e) all Holders of Claims who abstain from voting on the Plan **and who do not affirmatively opt out of the releases provided by the Plan**; (f) all Holders of Claims who vote to reject the Plan **and who do not affirmatively opt out of the releases provided by the Plan**; and (g) each Related Party of each Entity in clause (a) through clause (f).

*Id*. at ¶ 201, pg. 26 of 183 (emphasis added).

24.       " 'Third-Party Release' means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.D of the Plan." *Id*., Art. I.A., ¶ 240, pg. 29 of 183.

25.       Third-Party Releases are further described as:

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released **and discharged** each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down (if applicable), or any

restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) **given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan**; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

*Id*., Art. VIII.D., pg. 79-80 of 18 (emphasis added). There is no explanation as what "discharged"

means in this context or why it is included in a section for third-party releases. Moreover, while

the provision states that these releases were "given in exchange for the good and valuable

consideration provided by the Released Parties, including the Released Parties' contributions to

facilitating the restructuring and implementing the Plan," no information or evidence is provided as to what consideration was exchanged.

26. The Disclosure Statement and Plan provides, in part,

"Exculpated Parties" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; **(c) the Post-Effective Date Debtors; (d) the Plan Administrator;** (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; **(h) NewCo and its directors and officers; (i)** the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, **investment bankers, consultants, representatives, and other professionals**; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and **(o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.**

*Id.*, Art. I.A., ¶ 109, pg. 18 of 183. Subsection (o) specifically states that all Released Parties are to be exculpated. Additionally, this provision also provides that post-effective date created entities will be exculpated: "(c) the Post-Effective Date Debtors, (d) the Plan Administrator . . . (f) any Litigation Administrator (s) . . . (h) NewCo and its directors and officers…"

27. The documents further provide that,

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is **released** and exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the **formulation, preparation, dissemination, negotiation, entry into, termination of, or filing of**, as applicable, the Chapter 11 Cases, the Plan Sponsor Agreement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction (if applicable), the Orderly Wind Down (if applicable), or any restructuring transaction, contract, instrument, release, **or other agreement or**

**document created or entered into before or during the Chapter 11 Cases in connection with the Chapter 11 Cases** (including the trading and sales of Cryptocurrencies and Tokens in connection with the Chapter 11 Cases), the Plan Sponsor Agreement, the PSA Definitive Documents, the Plan, the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down (if applicable), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock) pursuant to the Plan, or the distribution of property, Cryptocurrency, or Tokens under the Plan (including the NewCo Assets) or any other related agreement or upon any other related act or omission, transaction, agreement, event, **or other occurrence taking place on or before the Effective Date** (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, actual fraud, willful misconduct, or gross negligence, but in all respects such Entities **shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not exculpate (a) any obligations arising on or after the Effective Date** of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party.

*Id*., Art. VIII.E., pg. 80-81 of 183 (the "<u>Exculpation Provision</u>") (emphasis added). Specifically, this provision affirmatively states that each "Exculpated Party is hereby **released** . . ." *Id*. at 80 (emphasis added). Moreover, each of the Exculpated Parties are exculpated for any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the

formulation, preparation, dissemination, negotiation, entry into, termination of, or filing of

. . . " *Id*. (emphasis added). This provision also provides that there is no temporal scope for

exculpation for the preparation of documents, "**other agreement or document created or entered**

**into before or during the Chapter 11 Cases in connection with the Chapter 11 Cases** . . . " *Id*.

(emphasis added). There is also no legal malpractice carveout: "in all respects such Entities **shall**

**be entitled to reasonably rely upon the advice of counsel with respect to their duties and**

**responsibilities pursuant to the Plan**." *Id*. (emphasis added).

28.     The Plan and Disclosure Statement further provide for certain EIP Awards. *See Id*.,

Article V, § J, ¶ 2, pg. 60-63 of 183; Disclosure Statement, Article II, § AAA, pg. 100-103 of 781;

Article IV, 130-133 of 781. There is no mention in either the Plan or Disclosure Statement about

the KEIP Motion or its status nor is there any discussion of 11 U.S.C. § 503(b) and how the relevant

requirements are met by the proposed EIP Awards.

29.     The Plan and Disclosure Statement provides further that:

> Until the Deactivation Date (i.e., 90 days after the Effective Date), all
> distributions to Custody Claim Holders, Withhold Claim Holders, and PayPal
> Crypto-Restricted Account Holders shall be made by the Debtors or the Post-
> Effective Date Debtors, as applicable, or another Distribution Agent identified by
> the Debtors. Distributions to all other Account Holders shall be made by PayPal.

> After the Deactivation Date, distributions to Custody Claim Holders,
> Withhold Claim Holders, and PayPal Crypto-Restricted Account Holders shall be
> made by PayPal. PayPal is subject to Cryptocurrency trading regulatory limitations
> in the PayPal Restricted Jurisdictions. In such jurisdictions, PayPal may not be able
> to distribute Cryptocurrency to Account Holders, or the Cryptocurrency distributed
> may be subject to secondary transfer restrictions. Accordingly, any distributions
> made by PayPal to PayPal Crypto-Restricted Account Holders may be processed in
> fiat in PayPal's discretion. For the avoidance of doubt, to the extent reasonably
> practicable, Custody Claim Holders, Withhold Claim Holders, and PayPal Crypto-
> Restricted Account Holders will be offered the option to receive distributions in
> Liquid Cryptocurrency from PayPal following the Deactivation Date. Any such
> distributions shall be valued in accordance with the Deactivation Date Conversion

Table. In no circumstances will PayPal make distributions in Cryptocurrency other than Liquid Cryptocurrency.

*Id*. at Art. IV. D4, pg. 49-50 of 183.

## III.     OBJECTION

### A. Legal Standards

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable a such a hypothetical reasonable investor . . . to make an informed judgment about the plan. . . .

11 U.S.C. § 1125(a)(1); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

Section 1125(b) of the Bankruptcy Code requires the Bankruptcy Court to find that the disclosure statement contains "adequate information" before a debtor is allowed to solicit its plan of reorganization or plan of liquidation to its creditors. 11 U.S.C. § 1125(b). The disclosure statement requirement of section 1125 is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d

Cir. 1988)). "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with Debtors over the plan. *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir. 1988).

Section 1125 of the Bankruptcy Code is biased towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors. *Adelphia*, 352 B.R. at 596 (*citing Century Glove,* 860 F.2d at 100). Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement as long as the additional information is accurate and its inclusion is not misleading. *Adelphia*, 352 B.R. at 596. The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), aff'd, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

Moreover, section 1129(a)(2) conditions confirmation of a plan upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000). Therefore, a disclosure statement should not be approved if the plan it describes is unconfirmable on its face, because approving the disclosure statement and proceeding to a confirmation hearing would be a fruitless exercise. *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999); *In re H.K.*

*Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (3d Cir. 1993). Furthermore, a disclosure statement should not be approved if the plan attempts to rewrite the Bankruptcy Code. *See In re Beyond.com*, 289 Bankr. 138 (Bankr. N.D. CA. 2003).

**B.  The Debtors Must Provide Adequate Information Establishing that the Proposed Releases and Exculpation Meet the Standard Required by the Second Circuit**

1.  The Disclosure Statement Fails to Establish Why Releases Are Appropriate in These Cases.

The Plan, if confirmed, will provide a myriad of third parties with broad releases. The third-party releases in the Plan are material terms and should be addressed fully in the Disclosure Statement so that interested creditors can determine (i) exactly what releases will be imposed upon them and (ii) the likelihood of the Debtors' success in confirming a Plan with such broad third-party releases. Unfortunately, other than vague assurances that the Debtors believe the releases contained in the Plan are reasonable and fair, the Disclosure Statement fails to explain in a clear and succinct manner what releases are being imposed on creditors and what support is found in the Bankruptcy Code and Circuit precedent for those broad third-party releases.

The Disclosure Statement should explain why the third-party releases in the Plan are rare and unique circumstances under the facts of this case and likely to be approved by the Court. Specifically, assuming the Debtors persuade the Court that it has subject matter jurisdiction to compel impaired creditors to provide non-consensual third-party releases, the imposition of third-party releases is proper only in rare and unique circumstances. *In re SunEdison*, 576 B.R. 453, 461-62 (S.D.N.Y. Bankr. 2017) (*citing Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141 (2d Cir. 2005) ("*Metromedia*")). In

*Metromedia*, the Second Circuit articulated at least two reasons for its reluctance to approve these releases:

> First, the only explicit authorization in the Code for non-debtor releases is 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified conditions are satisfied, including the creation of a trust to satisfy future claims, [and] …Second, a non-debtor release is a device that lends itself to abuse. By it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect it may operate as a bankruptcy discharge without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity.

*Id*. at 142. *See also In re DBSD N. Am., Inc*., 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (footnotes omitted); *In re Motors Liquidation Co*., 477 B.R. 198, 220 (Bankr. S.D.N.Y. 2011) ("Although (since the Code is silent on the matter) third-party releases aren't 'inconsistent with the applicable provisions of this title,' the Second Circuit has ruled that they're permissible only in rare cases, with appropriate consent or under circumstances that can be regarded as unique, some of which the Circuit listed. But where those circumstances haven't been shown, third-party releases can't be found to be appropriate").

2. The Plan Manufactures Consent for Third-Party Releases Based on Failure to Act Instead of Affirmative, Informed, and Knowing Consent.

The nonconsensual, non-debtor, third-party releases in the Plan require denial of confirmation and therefore the Disclosure Statement cannot be approved because it does not pass muster under Second Circuit precedent. A release of claims held by non-debtors against other non-debtors is "a dramatic measure to be used cautiously" and "is only proper in rare cases." *Metromedia*, 416 F.3d at 142-43 (internal citation omitted). "The plain admonition of the Second Circuit Court of Appeals is that third-party releases are frequently a subject of abuse and that they are appropriate only in narrow and unusual circumstances." *Chassix Holdings*, 533 B.R. at 78 (citing *Metromedia*, 461 F 3d. at 143).

According to *Purdue Pharma*[4], given the potential for abuse, third-party releases must be imposed against a backdrop of equity, and courts should exercise particular care when evaluating a non-debtor release. *Purdue Pharma.*, 2023 WL 3700458, at *79. In evaluating releases, courts must consider the following seven factors to determine if a non-consensual non-debtor release is appropriate:

> First, is there an identity of interest between the debtor and the released third parties?
>
> Second, are the claims against the debtor and non-debtor factually and legally intertwined?
>
> Third, is the scope of the release appropriate?
>
> Fourth, is the release essential to the reorganization?
>
> Fifth, has the non-debtor contributed substantial assets to the reorganization?
>
> Sixth, did the impacted creditors overwhelmingly vote in support of the plan? And
>
> Seventh, does the plan provide fair payment of enjoined claims?

*Id.* at **78 & 79.

The Second Circuit requires "consideration of each factor" but also cautions that "there may even be cases in which all factors are present, but the inclusion of third-party releases in a plan of reorganization should not be approved." *Id*. at * 79. The Court also required the bankruptcy court to "support each of these factors with specific and detailed findings." *Id.* The third-party release here fails to satisfy the seven-factor test.

Here, the Plan attempts to deem consent to the proposed third-party releases for "unimpaired" classes who will not have an opportunity to vote or utilize the "opt-out" form. The

---

[4]      There is a pending Application for Stay of the Mandate of the United States Court of Appeals for the Second Circuit Pending the Filing and Disposition of a Petition for a Writ of Certiorari before the Supreme Court of the United States of America in the case of *William K. Harrington, United States Trustee, Region 2, v. Purdue Pharma L.P., et al.*, Case No. 23A__, filed in July 2023.

Plan further attempts to produce consent by deeming all parties entitled to vote who fail to vote as consenting to the third-party releases. There are many reasons that creditors do not act, and because creditors have no duty to vote on a plan, return a ballot, or object to a plan it does not like, the failure to do so cannot have legal consequences for the inactive creditor with respect to the releases. *See, generally, In re Emerge Energy Services, LP*, 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) (applying contract principles, the bankruptcy court determined that failure to return a ballot could not be deemed consent to the release); *In Patterson v. Mahwah Bergen*, 636, B.R. 641, 688 (E.D. Va. 2022) (District Court held that neither contract law nor class action law supported debtors' argument that failure to vote or to opt out could be deemed consent to a release and that construing either as consent violates due process as well.) The "[f]ailure to opt out, without more, cannot form the basis of consent to the release of a claim. Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Patterson v. Mahwah Bergen*, 636, B.R. at 688. Absent genuine consent, courts have no statutory authority to approve releases between non-debtors. *In re Purdue Pharma, L.P.*, 2021 WL 5979108 (S.D.N.Y. Dec. 16, 2021), rev'd and rem'd by *In Re Purdue Pharma L.P.*, 69 F.4th 45, 63 (2d Cir. 2023).

The Disclosure Statement states that if a creditor fails to check the opt out box or abstains from voting and fails to even tender a ballot, the creditor will be "deemed" to have consented and will be bound by the Releases by default. This Court should not rule that any creditor has affirmatively consented to the proposed third-party releases when the creditor never expressly agreed.

Additionally, the *Purdue Pharma* factors are not met here, despite the Second Circuit's requirement that the factors be considered. *Purdue Pharma, L.P.*, 2021 WL 5979108, at *79. First, the Debtors have not shown that any of the numerous proposed released third parties have made essential contributions to the Plan. As the Second Circuit held, "if the only reason for the inclusion of a release is the non-debtor's financial contribution to a restructuring plan, then the release is not essential to the bankruptcy." *Purdue Pharma* at *81. Second, there has been no proof that any of the proposed released parties have or will contribute substantial assets to the reorganization. In *Purdue Pharma*, the Second Circuit noted that the funds contributed to the plan were one of the largest contributions in bankruptcy anywhere.[5] *Id*. Here, the Disclosure Statement fails to identify what each released party is contributing to even make such an assessment. The Disclosure Statement should adequately explain the contributions and consideration the proposed released parties are making to the Plan and the reorganization.

Even if, however, the third-party release could satisfy the *Purdue* factors, approval of the release is a non-core proceeding under *Stern v. Marshall*, 564, U.S. 462 (2011), *Perdue Pharam.* at *68 (2d Cir. May 30, 2023), and the bankruptcy court therefore lacks constitutional authority to finally approve the release.[6] Accordingly, the bankruptcy court's decision, should it approve the

---

[5] The United States Trustee takes the position that whether the contributions were the largest in a case are not relevant to the analysis. Moreover, the arguments made and positions taken by the United States Trustee in this pleading are not an indication or waiver of his positions on relevant issues in other or future cases, particularly given the pending outcome of *William K. Harrington, United States Trustee, Region 2, v. Purdue Pharma L.P., et al.*, Case No. 23A\_, filed in July 2023.

[6] There is no information contained in the Disclosure Statement setting forth a basis for the Debtors' apparent belief that this Court has subject matter jurisdiction to impose the third-party releases. Whether this Court has subject matter to bestow such broad releases is a material issue and an issue that should be addressed by the Debtors in the Disclosure Statement so that interested creditors can determine (i) exactly what release are being imposed and on which creditors and (ii) the likelihood of Debtors' success of confirming a plan with such broad releases. *See In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008), vacated & remanded on other grounds, 557 U.S. 137 (2009), aff'g in part & rev'g in part, 600 F.3d 135 (2d Cir. 2010) and *Deutsche Bank AG v. Metromedia*, 416 F.

third-party release, would only constitute findings of fact and conclusions of law for the district court's *de novo* review before the Plan could be confirmed.

3. The Disclosure Statement Should Not be Approved Because the Exculpation Provision is Overly Broad.

The Exculpation Provision is overly broad and beyond the scope of 11 U.S.C. § 1125(e).[7] *See, e.g.*, Plan, Art. I.A., ¶ 109, pg. 18 of 183. Importantly, the Plan saddles holders of claims or interests with the burden of opting out of the release provisions. However, the exculpation provision is even more hostile to these parties, as they are given no opportunity to opt out of the Exculpation Provision. The exculpation provision should be limited (and is not here), as courts in the district bar only "claims against the exculpated parties based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court." *In re Aegean Marine Petroleum Network, Inc.* 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). Accordingly, the Debtors should revise their exculpation provision so that it is consistent with 11 U.S.C. § 1125; otherwise, the United States Trustee objects to the exculpation provision as set out below.

First, the Exculpation Provision not only covers specific transactions approved by the Court, but also appears to include the virtually any action during these Chapter 11 cases. Section 1125(e) is the only section of the Bankruptcy Code that provides for exculpation. *See* 11 U.S.C. § 1125(e) (limiting liability in connection with certain good faith solicitation and plan participation

---

3d at 141; *accord In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010); *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010).

[7]       The arguments made and positions taken by the United States Trustee in this pleading are not an indication or waiver of his positions on relevant issues in other or future cases, particularly given the pending outcome of the appeal in *In re Voyager Holdings, Inc.*, No. 23 CIV. 02171 (JHR), 2023 WL 2731737 (S.D.N.Y. Apr. 1, 2023).

efforts). There is no Bankruptcy Code provision that supports exculpating all these parties in a manner as broadly as this Plan. Plan, Art. VIII.E., pg. 80-81 of 183.

Second, the Exculpation Provision is inappropriate because the list of exculpated parties is overly broad. The list of exculpated parties includes many persons who cannot be classified as fiduciaries to the estate. A proper exculpation is a protection of court-supervised fiduciaries. *Aegean Marine*, 599 B.R. at 721. "The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers." *In re Washington Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011). Exculpation provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions." *Aegean*, 599 B.R. at 721. "If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should not be subject to claims that effectively seek to undermine or second-guess this Court's determinations." *Id*.

Here, the Exculpated Parties include not only the Debtor and the Committee and each of their members, but also various officers, directors, accountants, investment bankers, consultants, representatives, creditors, other professionals, and post-effective date entities. Second Revised Plan, Art. I.A., ¶ 109, pg. 18 of 183. *Roni LLC v. Arfa*, 74 A.D.3d 442, 444 (2010), aff'd, 18 N.Y.3d 846 (2011) ("a conventional business relationship between parties dealing at arm's length does not give rise to fiduciary duties."). In fact, the range of Exculpated Parties is so broad that it likely includes parties who performed no duties essential, necessary, or at all, related to the Plan. Accordingly, the Disclosure Statement fails to provide adequate information as to why the

exculpation clauses are not limited to the fiduciaries in the case. *See Wash. Mut.*, 442 B.R. at 350-351 (limiting exculpation clause to estate fiduciaries).

Third, the Exculpation Provision is not limited to acts or omissions during the case, but instead extends to prepetition activity that cannot be exculpated. *See Id.* at 350 (exculpations cover "actions in the bankruptcy case") (citing *PWS Holding.,* 228 F.3d at 246). The temporal scope has no end date and therefore could be interpreted to provide prospective exculpation that extends past the Effective Date, especially as it covers entities that will not exist until after the Effective Date, such as the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator(s), etc. Exculpation clauses should not extend past the effective date of a plan, to avoid exculpating actions that have not yet occurred and are yet unknown. *See In re Mallinckrodt PLC*, 639 B.R. 837, 883 (Bank. D. Del. 2022) (exculpation "only extends to conduct that occurs between the Petition Date and the effective date"). In addition, post-effective date entities cannot receive prospective immunity by exculpation, just as they cannot receive prospective immunity through a release. *See Wash. Mut.*, 442 B.R. at 348 ("The Liquidating Trust and its Trustee have not done anything yet for which they need a release. They will not even come into existence until the Plan is confirmed."). The Plan should not grant prospective releases to entities that do not yet exist on account of future conduct and claim that have yet to arise. While the "Exculpated Parties" provision of the Plan states that an "Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date," the Exculpation Provision does not contain the same temporal scope. To rectify this inconsistency in the Exculpation Provision, all post-effective date entities should be stricken from the list of Released Parties and should not be covered by the Plan's Exculpation Provision.

Fourth, the exculpation provision also includes a "release" as well as an exculpation, of various non-debtor parties. Because that release is binding on all holders of claims and equity interests, regardless of how they vote on the Plan or whether they opt out of giving third-party release (if they are permitted to do so), such release constitutes an impermissible non-consensual third-party release.

Fifth, in addition to excepting bad faith, actual fraud, willful misconduct, or gross negligence, the exculpation provision should carve out claims for legal malpractice, release of which is prohibited under section of the New York Rules of Professional Conduct, *i.e.*, N.Y. Comp. Codes R. & Res. Tit. 22 § 1200.8 Rule 1.8(h)(1).

Finally, United States Trustee also objects to the extent exculpation shields exculpated parties who rely upon the advice of counsel. Although reliance may be raised as an affirmative defense, it should not be an absolute bar against liability. The exculpated parties should have a claim against their legal advisors for improper or mistaken advice, and the exculpation should not protect such advice.

4. <u>The Disclosure Statement Contains an Impermissible Punishment for Certain Plan Rejectors.</u>

The Debtors cite no authority that authorizes them to "trap" claimants into accepting a plan to avoid possible litigation with the Debtors. Indeed, the Bankruptcy Code does not allow a debtor to discriminate against, or in this case, punish creditors solely because of how they vote. *See In re MCorp Fin., Inc.*, 137 B.R. 219, 236 (Bankr. S.D. Tex. 1992); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 304 (Bankr. W.D. Pa. 1990). The few death trap provisions that have been judicially condoned

arose out of circumstances far removed from these cases (and the facts here).[8] Specifically, a few cases reflect that death traps may be employed to encourage stakeholders to vote as a class to accept a plan in exchange for a nominal "tip" when they are not otherwise entitled to any recovery under the Bankruptcy Code. But such cases are restricted to the extreme circumstances where senior creditors effectively agree to dilute their own recoveries in favor of a junior class in exchange for a consensual confirmation. *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007) ("[T]he Bankruptcy Code doesn't require that any distribution be made to the holders of Equity Interests of ACC. The Plan gives equity holders more than their legal entitlement.") (emphasis in original), aff'd, 544 F.3d 420 (2d Cir. 2008); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 717 (Bankr. S.D.N.Y. 1992) ("we have no conceptual problem with senior interests offering to junior interests an inducement to consent to the Plan"), aff'd, 140 B.R. 347 (S.D.N.Y. 1992). In both *Drexel* and *Adelphia*, the courts condoned the use of a voting incentive to obtain a junior class's accepting vote in order to achieve consensus on a plan.[9]

The voting trap that the Debtors seek to employ bears no semblance to the relevant facts in these limited authorities and cannot be approved. *Adelphia* and *Drexel* are distinguishable because they involved either a liquidating debtor or a sale of all of the debtors' assets and consequently, the only form of recovery available to the junior stakeholders were either warrants or proceeds

---

[8]     Death traps are unacceptable and violate section 1129(a)(3)'s requirement that a plan be filed in good faith. *See In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. January 8, 2016), Hr'g Tr. 67:3, 69:4 (denying the Debtors' attempt to utilize the deathtrap, specifically stating that it was "ridiculous" and "unacceptable."). A plan cannot be confirmed unless it is proposed in good faith. 11 U.S.C. § 1129(a)(3); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246 (3d Cir. 2004) ("Courts and commentators have recognized the good faith requirement provides an additional check on a debtor's intentional impairment of claims").

[9]     Debtors cannot avoid the Bankruptcy Code's priority scheme. *See generally, Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) (holding that a bankruptcy court may not approve a structure dismissal that provides for distributions that do not follow the Bankruptcy Code's priority scheme).

from a litigation trust. Here, the General Custody Claimants, would be entitled to share in distributions regardless of how they cast their vote, but if they vote in favor of the Plan, they would avoid the *possibility* of an avoidance action. No information is provided to these claimants what is the possibility of an avoidance action against each claimant, what liability may be, or even what exactly an avoidance action is. In many circumstances there may be appropriate defenses to avoidance actions, although none are identified in the Disclosure Statement. Without additional information, the Disclosure Statement runs the risk of coercing claimants to accept to avoid something that may have limited, if any, negative implications for each claimant.

5. The Debtor Should Explain How the Management Incentive Plan Satisfies the Requirements Set Forth in Section 503(c) of the Bankruptcy Code

The ability of a debtor to implement a key employee incentive plan is governed by section 503(c) of the Bankruptcy Code. *In re Residential Capital, LLC*, 478 B.R. 154, 169 (Bankr. S.D.N.Y. 2012). Debtors have not sought approval of the Emergence Incentive Plan apart from the Plan. The Disclosure Statement, however, does not explain why this provision is likely to be approved by the Court when that it is an insider retention plan governed by section 503(c). Section 503(c) of the Bankruptcy Code explicitly prohibits the *allowance* or payment of certain transfers to insiders unless certain condition are met. *See* 11 U.S.C § 503(c). Section 503(c) of the Code applies whether a transfer to an insider is proposed under a plan of reorganization or by assumption of an employment agreement under a plan. The general prohibition of section 503(c) is clear and without qualification: "there shall neither be allowed, nor paid," certain transfers. 11 U.S.C. § 503(c). Moreover, section 1129(a)(1) provides that the Plan must comply with the applicable provisions of the Bankruptcy Code. This includes section 503(c).

Notably, the EIP replaces the pending and contested KEIP. Information regarding the Debtors' rationale that there is a basis for including a Management Incentive Plan as a Plan provision—as opposed to pursuing the Debtors' already filed KEIP Motion– should be provided in the Disclosure Statement. Additional evidence is needed regarding the proposed metrics, how they were determined, and how they meet the strict standards set by section 503.

6. <u>The Distribution Mechanics are Confusing and Require Additional Information.</u>

The Plan contemplates distributions both on the Celsius platform, for what appears to be a limited time of only 90 days, but then after that utilizing PayPal[10] (or an undisclosed affiliate) for all distributions. Upon use of PayPal (or an undisclosed affiliate), fiat or cash will be paid at the discretion of PayPal (or an undisclosed affiliate) for certain jurisdictions. *See* Plan, Art. IV. D4, pg. 49-50 of 183. In other words, certain account holders, *i.e.*, a PayPal Crypto-Restricted Account Holder (as defined by the Plan) where cryptocurrency deposits are not supported by PayPal (or an undisclosed affiliate), will receive cash rather than "liquid cryptocurrency"[11] at the discretion of PayPal (or an undisclosed affiliate). As set forth in the Disclosure Statement, this "dollarizing" of cryptocurrency will trigger a taxable event for those account holders. But neither the Disclosure Statement nor the Plan identify which jurisdictions may result in the discretionary "dollarizing" by PayPal (or an undisclosed affiliate)— which means creditors being asked to vote on the Plan do not know if they are receiving cryptocurrency or are being cashed out and incurring additional tax liabilities—at the discretion of PayPal (or an undisclosed affiliate). Moreover, the relevant

---

[10]     The Debtors neither disclosed the distribution mechanics nor Paypal's involvement in the case until July 29, 2023.

[11]     "Liquid Cryptocurrency" as defined by the Plan "means the types of Cryptocurrency to be distributed to Holders of Claims pursuant to this Plan, which may include: (a) BTC and (b) ETH." Plan, Art I, pg. 20 of 183.

timing for use of the Celsius Platform vs PayPal distribution is confusing—there appears to be only a 90-day window to use the Debtors' own distribution platform—but can claimants control if they are paid during that 90-day period, or is that discretionary by the Debtors? Because some claimants may be more impacted by the switch to PayPal (or an undisclosed affiliate) distributions, it is important for PayPal-impacted claimants to know how to (if they can) accelerate their payments during those first 90 days when the Celsius platform is open. Claimants should be clearly informed of how they will be paid, when they will be paid, and in what format they will be paid. It is also unclear what, if any, relationship Celsius or the proposed Newco have with PayPal (or its undisclosed affiliate) and if there is any reason to believe an alternative platform would be better suited for this distribution. This information is critical to deciding whether to accept or reject the Plan and should be included in the Disclosure Statement, especially, since the Celsius platform is capable of making distributions.

Further, the Plan also proposes to transfer certain personal identifying information to PayPal (or an undisclosed affiliate), which, upon information and belief, includes, among other things, social security numbers, licenses numbers (possibly photos as well), and passport information. It is unclear how or why this information needs to be collected again or how it will be protected by the Debtors or a newco. The Disclosure Statement should describe what efforts have or will be taken to protect this information as well as any information obtained from the Privacy Ombudsman.

## IV.    <u>RESERVATION OF RIGHTS</u>

The United States Trustee reserves his rights to supplement this Objection and object at the hearing on the Disclosure Statement to other deficiencies and/or amendments, including

supplemental disclosures and documents. The United States Trustee further reserves his rights to objection to confirmation of the Plan or any amendments or supplements thereto.

## V.    CONCLUSION

**WHEREFORE,** the United States Trustee respectfully requests the United States Trustee's Objection be sustained and grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 4, 2023

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Shara Cornell*

Shara Cornell, Esq.
Trial Attorney
One Bowling Green
New York, New York 10004
Tel. (212) 510-0500