Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## SECOND NOTICE OF FILING OF REVISED
## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE** that on June 27, 2023, the above-captioned debtors and debtors

in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Joint Chapter 11*

*Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2902]

(the "Initial Disclosure Statement").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that on July 29, 2023, the Debtors filed a revised *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3117] (the "First Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a further revised *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates*, attached hereto as **Exhibit A** (the "Second Revised Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE THAT** a comparison between the First Revised Disclosure Statement and the Second Revised Disclosure Statement is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Initial Disclosure Statement, First Revised Disclosure Statement, Second Revised Disclosure Statement, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated:  August 9, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:              joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:              patrick.nash@kirkland.com
                        ross.kwasteniet@kirkland.com
                        chris.koenig@kirkland.com
                        dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Second Revised Disclosure Statement**

> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

The Debtors are providing the information in this Disclosure Statement to Holders of Claims in the Voting Classes for purposes of soliciting votes to accept or reject the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates*. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan (as defined herein), each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article VIII herein.

The Debtors urge Holders of Claims whose votes are being solicited to accept the Plan.

The Debtors urge each Holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. The Plan and other documents incorporated herein will govern for all purposes in the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference. Factual information contained in this Disclosure Statement has been provided by the Debtors' management team and is as of the date of this Disclosure Statement except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records and various assumptions regarding the Debtors' business. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business or their future results or operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof unless otherwise specifically noted, and there is no assurance that the statements contained herein will be correct at any time after such date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any part of this Disclosure Statement, including the exhibits and any forward-looking statements whether as a result of new information, future events, or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan and Plan Sponsor Agreement.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

This Disclosure Statement does not constitute and may not be construed as an admission of fact, liability, stipulation, or waiver. The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims and Interests who do not submit Ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby. The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied or waived. You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VIII entitled "Risk Factors," before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting votes for and Confirmation of the Plan and may not be relied on for any other purpose. This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws. The Securities and Exchange Commission or any similar federal, state, local, or foreign regulatory agency has not approved or disapproved this Disclosure Statement; nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code to the extent permitted under applicable law. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. If exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. The Debtors recommend that potential recipients of securities issued under the Plan consult their own counsel concerning their ability to freely trade such securities in compliance with the federal securities laws and any applicable "Blue Sky" laws. The Debtors make no representation concerning the ability of a person to dispose of such Securities.

**The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters to be forward-looking statements. Although the Debtors believe the expectations reflected in such forward-looking statements are based on reasonable assumptions, the Debtors can give no assurance that their expectations will be attained, and it is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties. Such factors include, but are not limited to, the following:**

- plans, objectives, expectations, and intentions;

- business and financial strategies, budgets, and projections;

- changes in political, economic, or market conditions generally and in the Cryptocurrency industry specifically;

- governmental regulation and taxation applicable to the Debtors, Post-Effective Date Debtors, or NewCo, including any changes thereto;

- possible restrictions on the ability of the Debtors, Post-Effective Date Debtors, or NewCo to operate;

- the unfavorable resolution of legal or regulatory proceedings;

- the regulatory licenses held by the Debtors, Post-Effective Date Debtors, or NewCo;

- risks associated with the chapter 11 process, including the Debtors' ability to develop, confirm, and consummate a plan under chapter 11;

- inability to maintain relationships with customers, employees, and other third parties as a result of the Chapter 11 Cases or other failure of such parties to comply with their contractual obligations; and

- failure to satisfy the Debtors', Post-Effective Date Debtors', or NewCo's short- or long-term liquidity needs, including their inability to generate sufficient cash flow from operations or to obtain adequate financing;

- the Debtors' or NewCo's technology and ability to adapt to rapid technological change;

- the outcome of pending and future litigation;

- exchange rate fluctuations and Cryptocurrency price fluctuations;

- risks in connection with dispositions of assets; and

- risk of information technology or data security breaches or other cyberattacks.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE NEWCO'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE PROJECTED, AND THE DEBTORS**

**UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- the Debtors' ability to confirm and consummate the Plan;

- the potential that the Debtors may need to pursue an alternative transaction if the plan is not confirmed;

- the potential adverse impact of the Chapter 11 Cases on the Debtors', Post-Effective Date Debtors', or NewCo's operations, management, and employees;

- the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases;

- general economic, business, and market conditions;

- Cryptocurrency fluctuations;

- interest rate fluctuations;

- price increases;

- exposure to litigation;

- a decline in the Debtors' or NewCo's market share due to competition;

- adverse tax changes;

- limited access to capital resources;

- the impact of a Cryptocurrency market downturn on the Debtors' or NewCo's business;

- changes in domestic and foreign laws and regulations;

- trade balance;

- natural disasters;

- geopolitical instability; and

- the effects of governmental regulation on the Debtors' or NewCo's business.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**
DATED August 9, 2023

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE FOLLOWING CLASSES AND ARE THEREFORE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 2 | Retail Borrower Deposit Claims |
| 4 | Convenience Claims |
| 5 | General Earn Claims |
| 6A | General Custody Claims |
| 7 | Withhold Claims |
| 8 | Unsecured Loan Claims |
| 9 | General Unsecured Claims |
| 10 | State Regulatory Claims |
| 14 | Series B Preferred Interests |

| DELIVERY OF BALLOTS |
|---|
| 1.     For your vote to be counted to accept or reject the Plan, your Ballot must be actually received by Stretto, Inc. ("Stretto" or the "Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on [September 20], 2023).[2] |
| 2.     Ballots may be returned by the following methods: |
| a)  For Holders of Claims in Class 2, Class 4, Class 5, Class 6A, and Class 7:  via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://case.stretto.com/Celsius/balloting. |
| b)  For Holders of Claims in Class 8, Class 9, Class 10, and Class 14:  (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at https://case.stretto.com/Celsius/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below: |
| Celsius Ballot Processing c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602 |
| If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Solicitation Agent by emailing celsiusinquiries@stretto.com and referencing "In re Celsius – Solicitation Inquiry" in the subject line, or by calling (855) 423-1530 (Toll-Free) or (949) 669-5873 (International). |

---

[2]     This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this date once the Voting Deadline is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..............................................................................................................................1

II.     PRELIMINARY STATEMENT ......................................................................................................1

     A.      These Chapter 11 Cases. ................................................................................................1
     B.      The Restructuring Transactions. ....................................................................................5
     C.      Summary of Treatment Under the NewCo Transaction. ...............................................13
     D.      Recommendation. .........................................................................................................24

III.    QUESTIONS AND ANSWERS ABOUT THIS DISCLOSURE STATEMENT AND PLAN..............25

     A.      What is chapter 11? ......................................................................................................25
     B.      Why are the Debtors sending me this Disclosure Statement? ........................................25
     C.      Am I entitled to vote on the Plan? .................................................................................25
     D.      How are Claims valued under the Plan?  How will the value of my Claim affect the
             amount of my distribution under the Plan? ....................................................................26
     E.      What will I receive from the Debtors if the Plan is consummated? ................................28
     F.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or
             Priority Tax Claim? ......................................................................................................36
     G.      Why do the Debtors believe that the Plan provides the greatest distribution possible to
             Holders of Claims? .......................................................................................................37
     H.      What is the "NewCo Transaction"? ..............................................................................38
     I.      What is the "Orderly Wind Down"? .............................................................................39
     J.      Can I vote if I have transferred my Claim to someone else? ..........................................40
     K.      Can I vote if I am the Holder of a Transferred Claim and if so, how? ............................41
     L.      What does it mean if I have a Convenience Claim? ........................................................41
     M.      What is the Convenience Claim Election and what are the consequences of making the
             Convenience Claim Election? .......................................................................................41
     N.      Are any regulatory approvals required to consummate the Plan? ...................................43
     O.      When will I receive my distribution under the Plan?  What is meant by "Confirmation,"
             "Effective Date," and "Consummation?" .......................................................................44
     P.      What happens to my recovery if the Plan is not confirmed or does not go effective? .....45
     Q.      If the Plan provides that I get a distribution, how will I receive my distribution? ..........45
     R.      How will undeliverable distributions and unclaimed property be treated under the Plan? ............49
     S.      How will I receive my recovery if the Orderly Wind Down, including the Backup Plan
             Sponsor Transaction, is consummated? .........................................................................50
     T.      What is NewCo Common Stock? ..................................................................................50
     U.      Can I trade or sell my NewCo Common Stock? .............................................................51
     V.      How much NewCo Common Stock will I receive under the Plan? .................................51
     W.      How can I elect to receive more NewCo Common Stock in lieu of Liquid
             Cryptocurrency?  Can I elect to receive a greater distribution of Liquid Cryptocurrency
             instead? ........................................................................................................................51
     X.      What happens to my NewCo Common Stock in an Orderly Wind Down? ......................55
     Y.      Are there risks to owning NewCo Common Stock upon emergence from Chapter 11? ...56
     Z.      How will Holders know what NewCo is doing after the Effective Date? ........................56
     AA.     What is a Plan Administrator?  Who will be the Plan Administrator? .............................56
     BB.     What are the roles of the Plan Administrator? ...............................................................57
     CC.     What is a Litigation Administrator?  What is the Litigation Oversight Committee?  Who
             will be the Litigation Administrator?  Who will be on the Litigation Oversight
             Committee? ...................................................................................................................57
     DD.     What are the roles of the Litigation Administrator and the Litigation Oversight
             Committee? ...................................................................................................................58

EE.    Will the Litigation Administrator(s) be paid?  If so, who will pay the Litigation
       Administrator(s)? ............................................................................................................59
FF.    How will I receive Litigation Proceeds?  What happens to the Cash left in the Litigation
       Recovery Account after the Litigation Administrator(s) have completed their duties? ................60
GG.    What are Contributed Claims? Should I contribute my Contributed Claims to the
       Litigation Administrator? ..............................................................................................60
HH.    What is the difference between a Plan Administrator and a Litigation Administrator? ................61
II.    How will the preservation of the Causes of Action affect my recovery under the Plan? ...............61
JJ.    Does the Plan subordinate any Claims?  What does it mean to subordinate Claims?
       Whose Claims are subordinated under the Plan and why? ...............................................62
KK.    Is there potential litigation related to the Plan? .............................................................65
LL.    Will there be releases and exculpation granted to parties in interest as part of the Plan?
       What are "releases" and "exculpation"? ......................................................................66
MM.    Are any specific individuals or entities specifically excluded from the Plan's release or
       exculpation provisions? ..............................................................................................73
NN.    Do I have to grant the releases under the Plan?  Can I opt out of the releases? .....................73
OO.    What is an injunction, and does the Plan contain any injunctions? ....................................74
PP.    What is the Account Holder Avoidance Action Settlement? ..............................................76
QQ.    Will I receive a distribution on the Effective Date if the Debtors have potential
       Avoidance Actions against me or otherwise dispute my Claim? ........................................82
RR.    How and when will potential Avoidance Actions and disputes with respect to Claims be
       resolved? .................................................................................................................83
SS.    What is the effect of the Plan on the Debtors' business? ...................................................83
TT.    What is the Custody Settlement, how does it work, and who is affected by it? ........................84
UU.    What is the Withhold Settlement, how does it work, and who is affected by it? .......................88
VV.    What is the Series B Settlement, how does it work, and who is affected by it? .........................91
WW.    What do I receive on behalf of my Retail Borrower Deposit Claim? ....................................92
XX.    How does the Plan classify Claims for damages arising from the alleged wrongful
       liquidation of loans issued under the Borrow program? ...................................................95
YY.    What is the CEL Token Settlement and what is the basis for the valuation of CEL
       Tokens? ...................................................................................................................96
ZZ.    What is "substantive consolidation" and what entities have been "substantively
       consolidated" pursuant to the Plan? ............................................................................97
AAA.   How are "Flare Tokens" treated under the Plan?  Will they be distributed to Holders of
       Earn or Custody Claims based on XRP transferred to the Debtors? ....................................99
BBB.   What are "EIP Awards" and who is eligible to receive one?  Why do the Debtors believe
       EIP Awards are necessary? .........................................................................................99
CCC.   What is an executory contract or unexpired lease, and what does it mean for the Debtors
       to "assume," "reject," or "assume and assign" such contracts, and why is this important? .........103
DDD.   Can and will the Debtors assume or reject any executory contracts? ..................................104
EEE.   What is the deadline to vote on the Plan? ....................................................................104
FFF.   What is the deadline to object to the Confirmation of the Plan? .......................................104
GGG.   How do I vote for or against the Plan? .......................................................................105
HHH.   If I vote to accept the Plan, am I voting only for the NewCo Transaction or am I voting
       for both the NewCo Transaction and the Orderly Wind Down?  Can I vote to accept the
       Plan only with respect to the NewCo Transaction?  Can I vote to accept the Plan only with
       respect to the Orderly Wind Down? .............................................................................106
III.   When is the Confirmation Hearing set to occur? ...........................................................106
JJJ.   What is the purpose of the Confirmation Hearing? .........................................................106
KKK.   I Filed a Proof of Claim.  How will that affect how much I will receive under the Plan
       and when that distribution will be made to me? .............................................................106
LLL.   What do the recent actions by the SEC, FTC, CFTC, and USAO mean and how do they
       affect my recovery?  How do the Debtors propose to treat the Claims of state regulators
       and how will this proposed treatment affect my recovery? ..............................................107
MMM.   What is the Class Claim Settlement, how does it work, and who is affected by it? ..................108
NNN.   What are the ADR Procedures and how do they work? ...................................................110

OOO.   How will the Debtors' books and records be preserved?................................................112
PPP.   Who do I contact if I have additional questions with respect to this Disclosure Statement
or the Plan? .......................................................................................................................113

**IV.   THE DEBTORS' PLAN OF REORGANIZATION. ...................................................................113**

A.   Means for Implementation of the Plan. ....................................................................114
B.   Corporate Action. .....................................................................................................132
C.   Cancellation of Notes, Instruments, Certificates, and Other Documents. ...............132
D.   Employee Obligations. .............................................................................................133
E.   Effectuating Documents; Further Transactions. .......................................................136
F.   Exemptions from Certain Taxes and Fees. ..............................................................137
G.   Preservation of Causes of Action. ...........................................................................137
H.   Election to Contribute Claims. ................................................................................138
I.   Contribution of Contributed Claims. .......................................................................138
J.   Retiree Benefits. ......................................................................................................139

**V.   THE DEBTORS' CORPORATE STRUCTURE, HISTORY, AND BUSINESS OVERVIEW.........139**

A.   The Debtors' Corporate Structure and History. .......................................................139
B.   The Debtors' Prepetition Capital Structure, Operations, and Revenue. ...................141
C.   Prepetition Regulatory Actions and Responses..........................................................150

**VI.   EVENTS LEADING TO THESE CHAPTER 11 CASES ........................................................153**

A.   Rapid Growth, Business Losses Suffered, and Business Transition. .........................153
B.   Turbulent Market Conditions. ..................................................................................154
C.   The "Cryptopocalypse."...........................................................................................154
D.   The Effect of the "Cryptopocalypse" on the Company's Recovering Balance Sheet. .................157
E.   The Pause. ................................................................................................................157
F.   Governance Initiatives. ............................................................................................158

**VII.   EVENTS OF THESE CHAPTER 11 CASES .......................................................................159**

A.   First Day and Second Day Motions and Relief. .......................................................159
B.   The Debtors' Motions to Protect Personally Identifiable Information.......................162
C.   Appointment of the Unsecured Creditors' Committee. ............................................164
D.   Schedules and Statements. .......................................................................................164
E.   341 Creditors' Meetings...........................................................................................165
F.   The Key Employee Retention Plan. .........................................................................166
G.   Appointment of the Examiner and Cooperation with the Examiner. ........................168
H.   Bar Date Motion. .....................................................................................................172
I.   The Request for Appointment of an Equity Committee............................................174
J.   The Special Committee Investigation. ......................................................................176
K.   Litigation Matters. ...................................................................................................185
L.   Resolution of Key Legal Issues. ..............................................................................207
M.   The Post-Petition Sale and Marketing Process.........................................................217
N.   Postpetition Disposition of Certain Property. ..........................................................234
O.   Employee Expense Reimbursement Motion. ............................................................236
P.   Insurance Motions. ..................................................................................................238
Q.   Agreements with Mawson Infrastructure Group Inc. and Its Affiliates. ...................239
R.   Navigating Developments in the Cryptocurrency Industry. ......................................241

**VIII.   RISK FACTORS .........................................................................................................249**

A.   Bankruptcy Law Considerations. .............................................................................249
B.   Risks Related to Recoveries Under the Plan. ...........................................................254
C.   Risks Related to the Debtors' and NewCo's Businesses...........................................261

|   | D. | Risks Related to NewCo's Digital Asset Mining and Staking. | 265 |
|   | E. | Disclosure Statement Disclaimer. | 277 |
|   | F. | Regulatory-Related Risk Factors. | 279 |

**IX.    SOLICITATION AND VOTING PROCEDURES** .............................................................. **285**

|   | A. | Holders of Claims and Interests Entitled to Vote on the Plan. | 286 |
|   | B. | Votes Required for Acceptance by a Class. | 286 |
|   | C. | Certain Factors to Be Considered Prior to Voting. | 287 |
|   | D. | Classes Not Entitled to Vote on the Plan. | 287 |
|   | E. | Solicitation Procedures. | 288 |
|   | F. | Voting on the Plan. | 290 |
|   | G. | Voting Tabulations. | 291 |
|   | H. | Ballots Not Counted. | 292 |

**X.    CONFIRMATION OF THE PLAN** ............................................................................... **292**

|   | A. | Confirmation Hearing. | 292 |
|   | B. | Requirements for Confirmation of the Plan. | 293 |
|   | C. | Best Interests of Creditors/Liquidation Analysis. | 293 |
|   | D. | Feasibility. | 294 |
|   | E. | Acceptance by Impaired Classes. | 294 |
|   | F. | Confirmation without Acceptance by All Impaired Classes. | 294 |

**XI.    CERTAIN SECURITIES LAW MATTERS** ..................................................................... **295**

**XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .............................. **297**

|   | A. | Introduction. | 297 |
|   | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 298 |
|   | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 300 |
|   | D. | Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Consideration Received Under the Plan. | 308 |
|   | E. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims. | 309 |
|   | F. | FATCA. | 311 |
|   | G. | Information Reporting and Back-Up Withholding. | 311 |

**XIII.    RECOMMENDATION OF THE DEBTORS** ..................................................................... **312**

**EXHIBITS**[3]

**EXHIBIT A**    Plan of Reorganization

**EXHIBIT B**    Liquidation Analysis

**EXHIBIT C**    Orderly Wind Down Analysis

**EXHIBIT D**    Mining Valuation Analysis

**EXHIBIT E**    Mining Financial Projections

**EXHIBIT F**    Fahrenheit Business Plan

**EXHIBIT G**    Navigating the Ballot—Retail Borrower Deposit Claims

**EXHIBIT H**    Navigating the Ballot—Convenience Claims

**EXHIBIT I**    Navigating the Ballot—General Earn Claims

**EXHIBIT J**    Navigating the Ballot—Custody Claims

**EXHIBIT K**    Navigating the Ballot—Withhold Claims

**EXHIBIT L**    Cryptocurrency Conversion Table

---

[3]    Each Exhibit is incorporated by reference herein.

## I.    INTRODUCTION

Celsius Network LLC ("Network LLC") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor Affiliates, the "Company" or "Celsius")[1] provide this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement") to creditors and other parties in interest to provide them with information regarding the Debtors' *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be supplemented or amended from time to time, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[2] This Disclosure Statement contains important information regarding the Debtors' history, assets, a summary of recoveries under and analysis of the Plan, the NewCo Transaction, an alternative Orderly Wind Down if the NewCo Transaction cannot be consummated, financial information, risk factors with respect to the Plan, tax information, and answers to certain questions that the Debtors and the Committee believe creditors will have regarding the Plan.

The Plan provides for an allocation of the entire value of the Debtors' Estates among their creditors and other stakeholders. This introduction is meant to provide a succinct summary of the Plan. The Plan includes many compromises that are meant to create the most equitable, efficient, and economical outcome for all creditors and stakeholders.

**AT THIS TIME, THE DEBTORS AND THE COMMITTEE BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS AND THE COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.    These Chapter 11 Cases.

Soon after its inception, Celsius grew to be one of the largest Cryptocurrency based finance platforms in the world, providing financial services to institutional, corporate, and retail clients across more than 100 countries. Unfortunately, Celsius' growth outpaced its ability to effectively manage its assets and keep up with increasing regulatory scrutiny. As a result, Celsius experienced a number of losses that, coupled with the 2022 "crypto winter," resulted in a short-term "run on the bank" that led to a liquidity crisis. On June 12, 2022, Celsius "paused" all withdrawals, swaps, and transfers of Tokens on the Celsius platform to prevent an unequal distribution of assets to its creditors (the "Pause"). Celsius ultimately had no choice but to file the Debtor entities for chapter 11 protection on July 13, 2022 (the "Petition Date").

Since the outset of these Chapter 11 Cases, the Debtors have been focused on three main issues with the goal of successfully emerging from bankruptcy: (i) understanding what went wrong historically so the Debtors can determine the appropriate path forward and put in place processes to address and prevent

---

[1]    Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor other than Celsius Network Limited ("CNL"), Network LLC, Celsius Lending LLC ("Lending LLC"), and Celsius Networks Lending LLC ("Networks Lending LLC"), for which the Debtors propose a substantive consolidation and joint Plan (for all purposes).

[2]    Except as otherwise provided herein, capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan. **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, Plan Supplement, and documents being summarized. The Plan governs in the event of any inconsistencies between it and the Disclosure Statement.**

those historical wrongs in the future; (ii) determining novel legal issues regarding the distribution of the Debtors' assets to creditors and reaching consensus wherever possible; and (iii) maximizing the value of their assets for the benefit of their creditors by, among other things, conducting several strategic asset sales and developing a new reorganized business that complies with all regulatory requirements.

### 1. Historical Analysis.

As described in more detail in Article V and Article VI of this Disclosure Statement, the Debtors' prepetition business lacked certain necessary financial and regulatory controls. This lack of control resulted in significant losses that ultimately caused the Debtors to file these Chapter 11 Cases.

Shortly after the Petition Date, the Debtors' Special Committee commenced an investigation into the Debtors' prepetition business operations, including reviewing, among other things, Celsius' policies and internal controls, public statements, and CEL Token transactions. As a result of these investigations, in September 2022, the Special Committee determined that Alex Mashinsky and Daniel Leon needed to be removed from their positions within the Company. Both Mr. Mashinsky and Mr. Leon voluntarily resigned shortly thereafter.

In addition, throughout these Chapter 11 Cases, the Special Committee has cooperated with third-party investigations into the Debtors, including by the Examiner and the Committee. Following the appointment of the Examiner, the Special Committee, the Debtors, and their employees cooperated with the Examiner's requests for interviews and documents. The Examiner issued a nearly 500-page final report on a variety of topics, including, among other things, Celsius' prepetition misrepresentations to its customers. The Special Committee also cooperated with the Committee's investigation into the Debtors and the actions of the Debtors' current and former directors, officers, and employees. The Committee's investigation resulted in the Filing of a complaint detailing claims against certain former insiders of Celsius and other related parties (the "Committee Insiders Complaint") and a class claim on behalf of all Account Holders asserting Causes of Action relating to prepetition misrepresentations by Celsius. The Debtors and the Special Committee agreed that any claims and Causes of Action set forth in the Committee Insiders Complaint will be contributed to the Litigation Recovery Account and that such litigation will be pursued and overseen by the Litigation Administrator. In so doing, the Debtors and the Special Committee have ensured that any value recovered in connection with the Committee Insiders Complaint will be for the benefit of the Debtors' creditors.

Finally, the Debtors have met frequently with various regulators and other governmental parties, including the United States Attorney's Office for the Southern District of New York ("USAO"), the Securities and Exchange Commission (the "SEC"), the United States Commodity Futures Trading Commission (the "CFTC"), the Federal Trade Commission (the "FTC"), and various state regulators. The Debtors also responded to extensive information requests from these regulators and numerous current and former employees have met with regulators and provided additional information. On July 13, 2023, the Debtors reached a consensual resolution of civil and criminal claims asserted by these government agencies based upon the Debtors' prepetition conduct. *See* [Docket No. 3016]. The Debtors agreed to the relief requested by the federal government, including injunctions prohibiting violations of securities, commodities, and other applicable laws and regulations, and a monetary judgment in the amount of $4.7 billion. Importantly, this monetary judgment is suspended, so that the Debtors can fully distribute their assets to their creditors under the Plan.

### 2. Legal Issues.

At the first day hearing in these Chapter 11 Cases, the Debtors identified key legal issues that must be resolved for the Debtors to successfully exit from bankruptcy, including, among others: (a) whether the Cryptocurrency in the Debtors' possession is property of the estate; (b) whether the Debtors can pursue

certain Avoidance Actions; (c) which Debtor entities customers have claims against; and (d) what rights retail and institutional borrowers have with respect to any amounts deposited on the Debtors' platform.

The Debtors have spent the last year resolving many of these legal issues before the Bankruptcy Court and through consensual resolutions with key stakeholders. The results are embodied in the Plan and described in this Disclosure Statement.

There have been numerous resolutions by the Bankruptcy Court of these key legal issues. First, in December 2022, the Debtors held two separate trials with respect to: (a) whether the assets held in Custody Accounts and Withhold Accounts are property of the Debtors' Estates, and, even if they are not, whether the Debtors can maintain possession of such assets pending resolution of any Avoidance Actions; and (b) whether the assets transferred on to the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' estates, and if so, whether the Debtors may sell stablecoins held in the Earn Program. With respect to the Custody and Withhold issues, the Bankruptcy Court found that the assets in the Custody Accounts were property of the Account Holders. The Bankruptcy Court did not determine who owned the assets associated with Withhold Accounts. Finally, the Bankruptcy Court found that, regardless of who owns the assets associated with the Custody Accounts and the Withhold Accounts, the Debtors could maintain possession of those assets pending resolution of any Avoidance Actions. After these rulings were issued, the Debtors entered into the Custody Settlement and the Withhold Settlement, which are embodied in the treatment provided to Holders of Custody Claims and Holders of Withhold Claims under the Plan. With respect to the Earn ownership issues, the Bankruptcy Court found that the assets transferred onto the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' Estates, and granted the Debtors the authority to sell stablecoins.

The Debtors and the Committee have also resolved many of the open legal issues through consensual settlements with the Debtors' creditors. Following a three-day mediation before the Honorable Judge Michael E. Wiles of the United States Bankruptcy Court for the Southern District of New York, the Debtors, the Committee, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, and certain individual creditors executed a term sheet reflecting the terms of an amended Plan that would resolve the treatment of the Earn creditors and Borrow creditors. Specifically, this mediated resolution provides Retail Borrowers with the option to repay the principal balance of their loans (*i.e.*, the Retail Borrower Advance Obligations) in exchange for an equivalent amount of Cryptocurrency, which could result in tax benefits for such Holders as compared to the Set Off Treatment described below. In addition, Retail Borrowers will have priority compared to other creditors when electing to exchange the NewCo Common Stock for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency Weighted Distribution Election) for their distributions under the Plan. Also, each of the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group will have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee. This settlement fully resolves all issues between the mediation parties relating to the Plan and will lead to the withdrawal of numerous adversary proceedings filed by the mediation parties.

The amended Plan reflects this mediated settlement. The revised treatment gives Holders of Retail Borrower Deposit Claims two options. They can repay the principal balance of their loan (or a portion of that principal balance) and receive an equivalent amount of Cryptocurrency in return and, if the loan was overcollateralized, have the remainder of their Retail Borrower Deposit Claim receive either the treatment provided to Holders of Convenience Claims or General Earn Claims, as further explained below. If the loan is not repaid, the Debtors will "set off" the amount of the loan owed by an Account Holder against the Claim of that borrower. In this scenario, the borrower's loan from Celsius will be forgiven and the borrower will not need to repay the loan. The Account Holder will then have a Claim for the difference between their Claim and the amount forgiven, which will receive either the treatment provided to Holders of Convenience Claims or General Earn Claims, as further explained below.

The Debtors and the Committee also consensually resolved the recovery of the Debtors' preferred equity holders. The Series B Holders argued that they were entitled to recover ahead of Account Holders on their approximately $690 million investment because Account Holders only had claims against Network LLC. The Debtors and the Committee argued that Account Holders had both contractual and noncontractual claims against all Debtor entities. The Bankruptcy Court ruled in favor of the Series B Holders and determined that customers could only assert contractual claims against Network LLC and not all Celsius entities. Importantly, however, the Bankruptcy Court noted that there may be non-contractual claims against other Celsius entities. The Debtors and the Committee then commenced a series of related litigations, including an estimation proceeding on the value of an intercompany claim held by Network LLC against CNL and motions to substantively consolidate Network LLC and CNL. The Committee also sought to avoid the Debtors' transfer of Account Holder obligations form the UK to the U.S. in 2021 due to allegations brought by the Financial Conduct Authority of the United Kingdom (the "UK FCA").

The Committee also Filed a class Claim on behalf of all Account Holders. Ultimately, the Debtors, the Committee, and the Series B Holders reached a global settlement of these issues and the Bankruptcy Court entered an order approving the settlement [Docket No. 3074]. The settlement provides for a $25 million Cash payment to the Series B Holders in exchange for a release of all claims between the participating Series B Holders and the Debtors and the Committee. The settlement avoids litigation, the costs of that litigation, and ensures that Account Holders will be able to recover the value of all of the Debtors' assets.

The Debtors and the Committee have now reached settlements with representatives for the Earn, Borrow, Custody, and Withhold programs and each of the ad hoc groups representing each program now supports the amended version of the Plan.

     *3.*   *Maximizing Returns to Creditors.*

The ultimate goal of these Chapter 11 Cases has always been to find a way to limit the harm to creditors and distribute as much value to creditors as possible. To that end, from day one, the Debtors have been committed to preserving the value of the Cryptocurrency on the Debtors' platform. In the early stages of these Chapter 11 Cases, the Debtors negotiated a security protocol with the Committee that has governed the Debtors' storage and use of Cryptocurrency during these Chapter 11 Cases.

In addition, as noted above, the Debtors have been involved in extensive discussions with regulators regarding distributions of Cryptocurrency and other digital assets to creditors in connection with consummation of the Plan. As a result of these discussions, the Debtors have decided to convert nearly all of their Cryptocurrency to BTC and ETH prior to the Effective Date so that distributions of Cryptocurrency are regulatorily compliant.

Finally, the Debtors have valuable illiquid assets that cannot be readily liquidated without losing material value to distribute to creditors, like the large mining operation that was in the process of being built by the Debtors prior to the Petition Date. The Debtors ran an extensive marketing and sale process to buy or manage their illiquid assets. The Debtors received three actionable Bids and held a competitive auction to sponsor the Plan. The Debtors and the Committee selected as plan sponsor Fahrenheit, LLC ("Fahrenheit," the "Fahrenheit Group," or the "Plan Sponsor"), a consortium of crypto-native operators consisting of US Bitcoin Corp., Arrington Capital, Proof Group Capital Management, Steven Kokinos, and Ravi Kaza, as the winning bidder. As described in more detail below, if the Plan is Confirmed and Consummated, a new compliant public Cryptocurrency company will be created that will be owned by creditors and managed by Fahrenheit.

The Debtors are ready to solicit the Plan, move forward with the implementation of the NewCo Transaction, and distribute Liquid Cryptocurrency and NewCo Common Stock to Account Holders.

### B.    The Restructuring Transactions.

In October 2022, the Debtors commenced a marketing and sale process for all of the Debtors' assets. The Debtors and their advisors contacted over 130 parties that they believed would be interested in a potential transaction. This marketing process resulted in six non-binding bids for their Retail Platform Assets (or portions thereof), three non-binding bids for their mining business, and other bids for individual assets.

On February 15, 2023, the Debtors announced that, in consultation with the Committee, they had reached an agreement in principle with NovaWulf for NovaWulf to sponsor the Debtors' reorganization. On March 1, 2023, NovaWulf was designated as the Stalking Horse Bidder and received certain Bid Protections while the Debtors and the Committee continued to engage in conversations with other bidders pending the Final Bid Deadline of April 17, 2023. On March 31, 2023, the Debtors filed a chapter 11 plan for the NovaWulf Transaction [Docket No. 2358].

Prior to the Final Bid Deadline, the Debtors and the Committee identified two additional Qualified Bidders—(a) the Fahrenheit Group; and (b) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (collectively, the "BRIC"). As a result, the Debtors and the Committee determined to hold an Auction to determine the highest and best bid. Starting on April 25, 2023, and ending on May 24, 2023, the Debtors conducted multiple rounds of bidding ending in the selection of Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder. The revised Plan incorporates both of these bids and provides the Debtors with the ability to toggle to the backup bid if Fahrenheit's NewCo proposal cannot be completed. No matter what transaction is ultimately pursued, the Debtors' creditors will receive significant value. The Plan contemplates that the Debtors will first pursue the NewCo Transaction (a reorganization) **and** that, if the NewCo Transaction cannot be pursued, the Debtors can pivot to the Orderly Wind Down (a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets).

Under either transaction, the Debtors will promptly distribute at least $2.03 billion of Cryptocurrency to their creditors, subject to the fluctuations in Cryptocurrency prices.

The NewCo Transaction sponsored by the Fahrenheit Group recognizes and seizes on the long-term promise and potential of Cryptocurrency, particularly with respect to the two primary consensus mechanisms for verifying Cryptocurrency transactions on the blockchain—mining and staking. The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations. NewCo will have no funded debt and will be equipped to capitalize on an industry that is poised for significant future growth. Moreover, the Fahrenheit Group intends to list NewCo Common Stock on NASDAQ, which is intended to maximize liquidity for creditors and better position NewCo to potentially access the capital markets in the future at the discretion of the NewCo board of directors, a majority of whom will be appointed by customers.

Upon emergence, NewCo will be managed by Fahrenheit, which is comprised of experienced crypto-native operators, each of whom have industry-leading experience in various facets of the Cryptocurrency space and are well positioned to lead NewCo for the benefit of the Debtors' creditors. Fahrenheit has committed to buy (with $50 million in Cash) a meaningful equity stake in NewCo, and Fahrenheit's management team will receive a portion of their compensation in NewCo Common Stock, thereby aligning the interests of the Fahrenheit Group and the holders of NewCo Common Stock (*i.e.*, the Debtors' creditors) and incentivizing Fahrenheit to grow NewCo for the benefit of NewCo's stakeholders.

Additional detail and information regarding the Fahrenheit Group and its vision and plan for NewCo (the "Fahrenheit Business Plan") is set forth in **Exhibit F** to this Disclosure Statement.

The Orderly Wind Down is an alternative to the NewCo Transaction and operates as a failsafe "Plan B" alternative if the NewCo Transaction cannot be completed for any reason. The Orderly Wind Down avoids a fire-sale liquidation that would result in significantly lower recoveries to creditors. This alternative is contemplated by the Plan because the Cryptocurrency landscape has proven to be dynamic and unpredictable. The Debtors and the Committee believe it is important for the Debtors to be able to pivot quickly to an alternative, without the need to restart the plan process and propose and solicit a new chapter 11 plan, and incur additional administrative expense, in the event the NewCo Transaction cannot be consummated for any reason.

     *1. The NewCo Transaction.*

The NewCo Transaction provides stakeholders with the opportunity to own NewCo and realize the potential upside value of a new Cryptocurrency company that will emerge from chapter 11 with a fresh start and will be ready to operate responsibly and transparently for the benefit of creditors. At its core, the NewCo Transaction provides for (a) the distribution of a significant amount of the Debtors' Liquid Cryptocurrency to creditors on or around the Effective Date of the Plan, and (b) the creation of NewCo — a new public-reporting, compliant entity, which will be owned by the Debtors' customers when the Debtors exit bankruptcy. NewCo will be predicated on transparency and governed by a board of directors, a majority of which will be appointed by the Debtors' creditors.

Fahrenheit will form NewCo prior to the Effective Date. On the Effective Date, NewCo will be vested with the NewCo Assets (including the mining business, institutional loan portfolio, and other alternative investments), which Fahrenheit will manage for the benefit of NewCo's stakeholders. As equity owners of NewCo, the value of Fahrenheit's efforts will ultimately be realized by the Debtors' Account Holders. For information regarding the Fahrenheit Group, the potential value of NewCo, and its plan and vision for NewCo, please see the Fahrenheit Business Plan attached as **Exhibit F** to this Disclosure Statement.

Fahrenheit intends to list the equity of NewCo on NASDAQ. An equity listing on a public exchange such as NASDAQ is intended to provide creditors with maximum flexibility to decide for themselves whether they want to (a) hold their shares in NewCo and remain investors in NewCo's long-term vision, or (b) sell their shares in NewCo and thereby immediately monetize their share of the Debtors' illiquid assets and the other assets held by NewCo.

As further described in the Fahrenheit Business Plan, NewCo will have two main operating business lines: Bitcoin mining and staking.

*Mining*. U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin") will run NewCo's mining operations. US Bitcoin is one of the largest and most successful Bitcoin mining operators in the country, and has included a variety of potential partnerships, options, and guarantees for NewCo's mining operations that provides a clear path to energize NewCo's entire existing fleet of miners, de-risk the build out of additional mining capacity, and grow or replenish NewCo's mining rigs in a cost-controlled and efficient manner.

*Staking*. Proof Group Capital Management ("Proof Group") will lead NewCo's staking efforts. Proof Group has substantial experience staking Cryptocurrency worth hundreds of millions of dollars for its own clients. Through the NewCo Transaction, Proof Group will contribute its staking intellectual property to NewCo and assist NewCo in developing and growing its staking infrastructure. NewCo will, therefore, be set up with a significant and sophisticated staking platform, which could be utilized to create more value for NewCo to the extent that any new, regulatorily-compliant staking opportunities develop.

NewCo will be seeded with up to $450 million of the Debtors' Cryptocurrency. Subject to the

direction of the NewCo board of directors, the Fahrenheit Group intends to utilize much of NewCo's balance sheet to invest in and grow the NewCo staking and mining businesses, and to develop and execute on the partnerships that Fahrenheit is bringing to NewCo. While the Debtors have significant mining operations today, Fahrenheit will optimize, improve, and grow the mining business. The Debtors and the Committee believe the investment in NewCo creates the opportunity to generate significant value for Celsius creditors.

As demonstrated by the charts below, the value generated by NewCo is expected to be significantly higher than liquidating the Debtors' assets and distributing that value to creditors. To the extent NewCo is successful in its new business development endeavors or if the Cryptocurrency markets continue to improve, NewCo offers additional upside, and the value of NewCo Common Stock could ultimately be multiples of the projections contained in this Disclosure Statement.

Under the NewCo Transaction, creditors will receive: (a) BTC and ETH; (b) NewCo Common Stock; and/or (c) Litigation Proceeds (collectively, the "Unsecured Claim Distribution Consideration"). The recoveries provided to creditors under the NewCo Transaction are significant:

- 85.6% for Holders of Retail Borrower Deposit Claims, which represents a midpoint recovery based on the average loan to value ("LTV") ratio of the total Retail Borrower Advance Obligations against the Retail Borrower Deposit Claims;[3]

- 70% for Holders of Convenience Claims;

- 67.0% for Holders of General Earn Claims;

- 72.5% of the Cryptocurrency transferred to the Debtors for Holders of General Custody Claims who accept the Custody Settlement; and

- 72.0% for Holders of Withhold Claims.[4]

---

[3]    The individual recovery for any Holder of a Retail Borrower Deposit Claim will vary based on the LTV associated with a Retail Borrower Deposit Claim.

[4]    Recoveries are for illustrative purposes only and may materially differ from the amount portrayed in the chart. Account Holder Claims shall be valued in U.S. Dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

| Type of Distribution[5] | | | | |
|---|---|---|---|---|
| | *Liquid Cryptocurrency* | *NewCo Common Stock* | *Litigation Proceeds* | *Other* |
| **Class 2 — Retail Borrower Deposit Claims[6]** | ✓ | ✓ | ✓ | Set Off Treatment or Retail Advance Obligation Repayment Election |
| **Class 4 — Convenience Claims** | ✓ | ✗ | ✗ | ✗ |
| **Class 5 — General Earn Claims** | ✓ | ✓ | ✓ | ✗ |
| **Class 6 — Custody Claims** | ✓ | ✗ | ✗ | Percentage of Cryptocurrency coins in Custody Account to be returned |
| **Class 7 — Withhold Claims** | ✓ | ✓ | ✓ | ✗ |
| **Class 8 — Unsecured Loan Claims** | ✓ | ✓ | ✓ | ✗ |
| **Class 9 — General Unsecured Claims** | ✓ | ✓ | ✓ | ✗ |

Distributions to creditors under the NewCo Transaction will occur quicker than in the Orderly Wind Down. If the Plan is confirmed in the fall of 2023 as currently contemplated, creditors will likely start receiving distributions before the end of 2023. The Debtors and the Committee also believe that NewCo Common Stock will provide greater liquidity and value to creditors who wish to sell their equity compared to liquidation trust interests, which historically trade for a fraction of the value of the assets that make up the liquidation trust.

Finally, Holders of Claims that vote to accept the Plan will have the option to elect to receive more NewCo Common Stock or more Liquid Cryptocurrency at a discount (the "Unsecured Claim Distribution Mix Election"). Account Holders will get to make that election when they vote on the Plan, which will not occur until after the Bankruptcy Court approves this Disclosure Statement. The Debtors' ability to honor such elections will depend on whether other creditors make the opposite election.

(a)    Liquid Cryptocurrency Distributions.

The NewCo Transaction provides creditors with meaningful recoveries in Cryptocurrency as soon as reasonably practicable. On or shortly after the Effective Date, the Debtors will distribute Liquid Cryptocurrency (BTC and/or ETH) to creditors entitled to receive Liquid Cryptocurrency under the Plan (as shown above). The Debtors believe that nearly all of their creditors will be eligible for this form of distribution.

The amount of Cryptocurrency that will be distributed to creditors (including administrative

---

[5]    For the avoidance of doubt, not all Classes of Claims are included in this table.

[6]    Holders of Retail Borrower Deposit Claims that receive the Convenience Claim treatment on behalf of their Retail Borrower Post-Set Off Claims will only receive Liquid Cryptocurrency.

creditors) shortly after the Effective Date is expected to be approximately $2.03 billion in the aggregate. The estimated recoveries for the various creditor Classes under the Plan from the Liquid Cryptocurrency Distribution Amount are shown in the tables below, however, those percentages are subject to change depending on the value of BTC and ETH on or around the Effective Date and the Unsecured Claim Election Distribution Mix, among other things.

Because of the cost of keeping the Debtors' platform open to process withdrawals, the Debtors believe that it is in the interest of the Debtors' Estates and creditors for the Debtors to use third-party Distribution Agents to make all distributions of Liquid Cryptocurrency and for the Celsius App to become inactive after a set period of time.  Among other things, the Debtors would have to continue employing and compensating numerous employees for an extended period of time to oversee and approve distributions through the Celsius platform.  Accordingly, the Debtors have been working to identify Distribution Agents who could make distributions of Liquid Cryptocurrency to the Debtors' creditors under the Plan in a regulatorily compliant way and to enter into agreements with such Distribution Agents setting forth the terms on which the Distribution Agents may distribute Liquid Cryptocurrency or, in certain circumstances discussed below, fiat currency (the "Distribution Agreements").  As of the date of the Filing of this Disclosure Statement, the Debtors have identified PayPal as a potential Distribution Agent for certain distributions of Liquid Cryptocurrency to individual (non-corporate) creditors (other than with respect to Custody and Withhold creditors) in the United States (other than Hawaii).

For all distributions of Cryptocurrency that are not or will not be made by PayPal (including distributions to international creditors, corporate creditors, and Custody and Withhold creditors), the Debtors continue to explore potential Distribution Agents.  If another Distribution Agent cannot be located to make those distributions, the Debtors will keep the Celsius platform open for ninety days after the Effective Date to make distributions to these creditors through the Celsius App (similar to how the Debtors have processed Court-approved withdrawals for certain Custody and Withhold users).  The Debtors would prefer to identify a Distribution Agent who can make these distributions to international and corporate creditors because it is expensive to keep the Debtors' platform open to process withdrawals.  Ninety days after the Effective Date, any applicable creditor who has not claimed their distribution of Cryptocurrency from the Debtors' platform will receive their distributions, if any, through PayPal or another Distribution Agent, and may receive fiat currency if a Distribution Agent does not have the requisite licenses to distribute Cryptocurrency to that creditor.

Upon the Deactivation Date, the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.  The Debtors chose a ninety-day period based on their experience enabling withdrawals of Cryptocurrency from the Celsius App for Custody and Withhold Account Holders pursuant to the Custody and Withhold Settlements.  Specifically, the vast majority of the value eligible to be withdrawn pursuant to the Custody and Withhold Settlements was withdrawn within ninety days.

On the Deactivation Date, the Celsius App will cease to exist and users will no longer be able to log-in to the Celsius App and/or access their Celsius Account.  Users are encouraged to download their transaction history for their personal records starting now to ensure that they have a copy of such history before the Celsius App ceases to exist.

The Debtors are also working to streamline distribution mechanics with respect to Persons and Entities that may not have opened an account with Celsius directly but earned rewards on their digital assets in accounts set up with other exchanges or from companies which were part of Celsius' partner programs as further explained herein.

The Debtors will provide additional information regarding Liquid Cryptocurrency distributions to

all applicable creditors, including Partners' customers, once the Debtors finalize agreements with the Distribution Agent(s).

(b)      NewCo Common Stock.

The Debtors, the Committee, and the Plan Sponsor also wanted to provide creditors with an opportunity to capitalize on what they believe is the undeniable long-term value proposition of Cryptocurrency and Bitcoin mining. The NewCo Transaction accomplishes this by providing certain creditors with a distribution in the form of NewCo Common Stock (as shown above)—in other words, certain creditors will receive an ownership interest in NewCo.

(c)      Litigation Proceeds.

In addition, the Plan ensures that certain Claims and Causes of Action with respect to the Debtors' prepetition operations will be preserved and monetized for the benefit of Holders of Claims entitled to Litigation Proceeds (as shown above). Through the establishment of a Litigation Recovery Account, which will be overseen and monitored by a Litigation Administrator and Litigation Oversight Committee (each of which will be appointed by the Committee), creditors entitled to the Litigation Proceeds may receive additional distributions over time depending on the results of the litigation to be pursued by the Litigation Administrator.

The Litigation Administrator(s) will work to undertake legal action against individuals such as certain former directors and officers of Celsius, including Alex Mashinsky and Shlomi Daniel Leon, in connection with their management of the Debtors prior to or after the Petition Date. The Litigation Administrator(s) will also work to collect the Goldstein Loan (the $4.2 million loan issued to Hanoch "Nuke" Goldstein), and the Leon Loan (the $4 million loan issued to Shlomi Daniel Leon). Finally, the Litigation Administrator(s) will pursue other Claims the Debtors have against third parties. The value of any litigation will ultimately be distributed for the benefit of Holders of Claims entitled to Litigation Proceeds under the Plan.

Importantly, the Litigation Proceeds have not been separately valued, given the uncertainty regarding the timing and outcome of the various litigations, *so any value of the Litigation Proceeds will be additive to the currently projected recoveries for Holders of Claims entitled to a share of the Litigation Proceeds*. The Litigation Administrator(s) will be provided with up to $50 million to pursue Claims and Causes of Action on behalf of creditors. To the extent it is not economical for the Litigation Administrator(s) to pursue any Claims or Causes of Action further, the Litigation Oversight Committee will distribute the Litigation Proceeds and any remaining funding to Holders of Claims entitled to Litigation Proceeds under the Plan.

2.      *The Orderly Wind Down.*

The Debtors are aware that there are risks to implementing the NewCo Transaction. Those potential risks are described in detail in this Disclosure Statement. The Debtors and the Committee believe that it is in the best interests of all stakeholders to prepare for a scenario where the NewCo Transaction cannot be completed. The Plan contemplates an option for the Debtors to "toggle" to the Orderly Wind Down at any time if they determine in good faith that, an Orderly Wind Down is in the best interests of the Debtors' Estates due to complications or delays in implementing the NewCo Transaction.

If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in the Backup Plan Sponsor Agreement that they have negotiated with the Backup Plan Sponsor, the BRIC — or on terms that provide a better recovery to the Debtors' creditors than the Backup Plan Sponsor Agreement, which terms may be with a different Backup Plan Sponsor than the BRIC.

The current Backup Plan Sponsor Transaction contemplates providing recoveries to creditors in the following ways: (a) 100 percent of the equity interests in a pure play, publicly traded mining business with a potential management contract with GXD Labs LLC; (b) a Liquid Cryptocurrency distribution on or as soon as practicable after the Effective Date; and (c) a timely monetization of the remaining assets of the Debtors' Estates and subsequent Liquid Cryptocurrency distributions to creditors from the proceeds thereof, likely through the creation of a liquidating trust.

Unlike the NewCo Transaction, the Orderly Wind Down is expected to take up to five years to complete and offers limited upside as compared to the equity in NewCo. Moreover, none of the partnership and other strategic opportunities contained in the NewCo Transaction, which are intended to position NewCo to grow its mining business responsibly and significantly, would be available under the Orderly Wind Down. The Orderly Wind Down, however, will provide creditors with better recoveries than a straightforward chapter 7 liquidation.

A comparison of the anticipated recoveries to creditors under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation is provided in the chart below:

|  |  | Recovery Under Plan | | |
| --- | --- | --- | --- | --- |
|  | Class | NewCo | Orderly Wind Down | Liquidation Analysis |
| Other Secured Claims | Class 1 | N/A | N/A | N/A |
| Retail Borrower Deposit Claims | Class 2 | 85.6% | 83.0% | 47.4% |
| Other Priority Claims | Class 3 | N/A | N/A | N/A |
| Convenience Claims | Class 4 | 70.0% | 70.0% | N/A |
| General Earn Claims | Class 5 | 67.0% | 61.2% | 47.4% |
| General Custody Claims[1] | Class 6A | 72.5% | 72.5% | 72.5% |
| Withdrawable Custody Claims[1] | Class 6B | 100.0% | 100.0% | 100.0% |
| Withhold Claims | Class 7 | 72.0% | 67.1% | 47.4% |
| Unsecured Loan Claims | Class 8 | 67.0% | 61.2% | 47.4% |
| General Unsecured Claims | Class 9 | 67.0% | 61.2% | 37.5% |
| State Regulatory Claims[2] | Class 10 | 0.0% | 0.0% | 0.0% |
| De Minimis Claims | Class 11 | 0.0% | 0.0% | 0.0% |
| Intercompany Claims | Class 12 | N/A | N/A | 47.3% |
| Intercompany Interests | Class 13 | N/A | N/A | N/A |
| Series B Preferred Interests | Class 14 | 0.1% | 0.1% | 0.1% |
| Other Interests | Class 15 | 0.0% | 0.0% | 0.0% |
| Section 510(b) Claims | Class 16 | N/A | N/A | N/A |
| Equitably Subordinated Claims | Class 17 | 0.0% | 0.0% | 0.0% |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*
*(2) The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators*

The chart on the next page provides a more granular comparison of the distribution of Liquid

Cryptocurrency under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation:

**Celsius Network Inc.**
**Recovery and Distribution Comparison**
*$ in millions*

| | | NewCo Plan | Orderly Wind Down | Liquidation (Mid-Point) |
|---|---|---|---|---|
| **Liquid Cryptocurrency** | | | | |
| Gross Liquid Cryptocurrency[1] | | $ 2,679 | $ 2,657 | $ 2,604 |
| Operating & Professional Expenses | | (55) | (91) | (75) |
| Plan Administration / Distribution Costs | | (20) | (72) | (84) |
| Litigation Trust[2] | | (50) | (50) | - |
| Mining Business Capitalization[3] | | - | (50) | - |
| Liquid Cryptocurrency Holdback for NewCo | | (450) | - | - |
| **Total Reductions to Liquid Cryptocurrency** | | $ (575) | $ (263) | $ (159) |
| **Net Liquid Cryptocurrency Assets** | | $ 2,104 | $ 2,394 | $ 2,444 |
| **Distribution to Claims** | | | | |
| Administrative Claims | | (70) | (85) | (85) |
| Convenience Claims | | (242) | (242) | - |
| General Custody Claims | | (158) | (158) | (158) |
| Withdrawable Custody Claims | | (48) | (48) | (48) |
| Withhold Claims (Eligible 15% Distribution) | | (2) | (2) | - |
| Liquid Cryptocurrency Available for Unsecured Claims[4][5] | a | $ 1,584 | $ 1,859 | $ 2,153 |
| NewCo Cryptocurrency | | 450 | - | - |
| Mining[6] | b | 515 | 424 | 88 |
| Illiquid Assets[1] | c | 283 | 306 | 184 |
| NewCo NAV / Wind Down Period Distributable Assets[7] | d | $ 1,248 | $ 729 | $ 272 |
| **Total Assets Available for Unsecured Claims** | e | $ 2,832 | $ 2,588 | $ 2,425 |
| **Total Unsecured Claims[4]** | f | $ 4,225 | $ 4,225 | $ 5,117 |
| Initial Liquid Cryptocurrency Distribution % | a / f | 37.5% | 44.0% | N/A |
| NewCo Common Stock Recovery % | d / f | 29.5% | N/A | N/A |
| Wind Down Period Mining Business Equity Recovery % | b / f | N/A | 10.0% | N/A |
| Wind Down Period Illiquid Asset Recovery % | c / f | N/A | 7.2% | N/A |
| Chapter 7 Liquidation Cash Recovery %[5] | e / f | N/A | N/A | 47.4% |
| **Total Recovery %** | e / f | 67.0% | 61.2% | 47.4% |

*(1) In the Orderly Wind Down, Liquid Cryptocurrency is reduced by approximately $22 million relative to the Liquid Cryptocurrency in NewCo. There is a corresponding increase in the value of illiquid assets in the Orderly Wind Down related to collateral held on behalf of institutional loan counterparties*
*(2) Funding amount is still under discussion. Amount not to exceed $50 million*
*(3) In NewCo, funds to capitalize the NewCo mining business are included in the Liquid Cryptocurrency Holdback for NewCo*
*(4) Unsecured Claims includes Retail Borrower Post-Set Off Claim, General Earn Claims, Unsecured Loan Claims, General Unsecured Claim and the remaining 85% of Withhold Claims, all of which are eligible for Unsecured Claim Distribution Consideration.*
*(5) Under Chapter 7 liquidation, no distributions will be made in Liquid Cryptocurrency. All Liquid Cryptocurrency, illiquid assets and mining assets will be liquidated and distributed in cash to creditors at the end of the Liquidation Period*
*(6) The midpoint valuation for mining under NewCo is estimated to be $565 million. For illustrative purposes the mining valuation has been reduced to reflect $50 million of mining capitalization that is included within NewCo Cryptocurrency for the sole purposes of this illustrative exhibit*
*(7) The non-mining assets in NewCo NAV reflect the net asset value of these assets at the projected Emergence Date and do not reflect any potential upside associated with NewCo's non-mining business lines. Additionally, NewCo NAV does not reflect potential future dilution related to the NewCo management agreement*

Finally, the chart below illustrates the timeline of distributions to Holders of unsecured Claims (*i.e.*, General Earn Claims, Unsecured Loan Claims, General Unsecured Claims, Retail Borrower Post-Set Off Claims, and 85% of Withhold Claims) under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation:



*(1) Unsecured Claims includes Retail Borrower Post-Set Off Claim, General Earn Claims, Unsecured Loan Claims, General Unsecured*
*Claims and the remaining 85% of Withhold Claims, all of which are eligible for Unsecured Claim Distribution Consideration. The*
*analysis assumes CEL Token Deposit Claims vote in favor of the Plan and receive the treatment associated with the program*
*in which they were deployed. Recovery percentages do not reflect any potential future increase in the value of assets*
*(2) Under Chapter 7 liquidation, no distributions will be made in Liquid Cryptocurrency. All Liquid Cryptocurrency, illiquid assets and*
*mining assets will be liquidated and distributed in cash to creditors at the end of the Liquidation Period*

Following the Debtors' announcement of the terms of the Backup Plan Sponsor Transaction, the Debtors received Bids for alternative backup transactions. As explained in Article VII.M.3(c) of this Disclosure Statement, the Debtors intend to continue to explore the viability of the alternative Bids in consultation with the Committee. To the extent the Debtors select an alternative backup transaction and pivot to the Orderly Wind Down, they will File additional disclosure on the docket.

The Debtors, the Committee, and the Plan Sponsor have worked to negotiate and formulate a Plan that provides Holders of Claims with the maximum recoveries, on the quickest timeline, and with the greatest amount of flexibility.

### C.    Summary of Treatment Under the NewCo Transaction.

As noted above, the NewCo Transaction is a transaction that will result in the distribution of both the Debtors' liquid and illiquid assets to creditors. Before voting on the Plan, however, it is important that you understand how your Claims are proposed to be treated under the Plan and your projected recoveries under the Plan. This is particularly true if you are an Account Holder as your Claims will be listed in U.S. Dollars (based on Cryptocurrency prices on the Petition Date) on your Ballot and not in the types or amount of Cryptocurrency associated with your Claims.

The below tables provide a simplified roadmap of this Disclosure Statement for Account Holders to understand the various recoveries contemplated by the Plan with respect to each Account Holder Claim. The tables are intended to be a guide to help you navigate this complex document, however, ***this Disclosure Statement and the Plan should be read in their entirety to provide a complete understanding of the transactions contemplated by the Plan***.

After the Bankruptcy Court approves the Disclosure Statement, you will receive a Ballot setting

forth the types and amount (in U.S. Dollars based on Cryptocurrency prices on the Petition Date) of your Claims. The Ballot will also explain to you the various elections and options on how to receive your distributions under the NewCo Transaction depending on which Class your Claims are in. Finally, the Ballot will provide you with instructions on how to vote your Claims to accept or reject the Plan and what releases are provided under the Plan, among other things. Other than with respect to any Custody Claims you may hold *you must vote all of your Claims to either accept or reject the Plan*.

*Class 2 — Retail Borrower Deposit Claims*. Account Holders that participated in the Debtors' Borrow Program will likely have a Retail Borrower Deposit Claim. If you have a Retail Borrower Deposit Claim, you may elect to repay your loan (by making the Retail Advance Obligation Repayment Election), or else you will receive the Set Off Treatment.

If you make the Retail Advance Obligation Repayment Election, you must repay all or a portion of the proceeds of the loan you took out under the Debtors' Borrow Program (defined in the Plan as the "Retail Advance Obligation"). If you repay all or a portion of your Retail Advance Obligation in accordance with the instructions provided by the Debtors,[7] and you make this repayment on or prior to five calendar days prior to the Effective Date of the Plan,[8] then you will receive an amount of BTC or ETH equal to the amount that you paid back. You can make an election as to whether to receive BTC or ETH. The remaining amount of your Retail Borrower Deposit Claim after the repayment is made (the "Retail Borrower Post-Set Off Claim")[9] will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable. In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, and will receive either a 67.0% recovery on account of your Retail Borrower Post-Set Off Claim if your Retail Borrower Post-Set Off Claim receives the General Earn Claim treatment, or a 70% recovery if your Retail Borrower Post-Set Off Claim receives the Convenience Class Claim treatment.

If you do not make the Retail Advance Obligation Repayment Election or you fail to repay your Retail Advance Obligation in accordance with the Debtors' instructions and by the specific deadline, then you will receive the Set Off Treatment. Under the Set Off Treatment, you will retain the proceeds of the Retail Advance Obligation and have your associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date. The remaining amount of your Retail Borrower Deposit Claim[10] after such set off is accounted for is your Retail Borrower Post-Set Off Claim, which will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable. In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, either a 67.0% recovery on account of your Retail Borrower Post-Set Off Claim if your Retail Borrower Post-Set Off Claim receives the General Earn Claim treatment or a 70% recovery if your Retail Borrower Post-Set Off Claim receives the Convenience Class Claim treatment, and *you will not have to repay your loan or owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of your Retail Borrower Deposit Claim (i.e., your loan is being forgiven)*.

If you receive the Unsecured Claim Distribution Consideration on account of your Retail Borrower

---

[7] The "Retail Advance Obligation Repayment Instructions" will be provided by the Debtors via email to all Retail Borrowers at least thirty calendar days prior to the anticipated Effective Date.

[8] This is defined in the Plan as the "Retail Advance Obligation Repayment Deadline."

[9] "Retail Borrower Post-Set Off Claim" means a Retail Borrower's remaining Claim after application of any Retail Advance Obligation Repayment Amounts transferred by such Retail Borrower by the Retail Advance Obligation Repayment Deadline and/or the application of the Set Off Treatment to such Retail Borrower's Retail Borrower Deposit Claim.

[10] Calculated in U.S. Dollars as of the Petition Date utilizing the conversion rates provided in the Cryptocurrency Conversion Table.

Post-Set Off Claim, you will receive a combination of (a) Liquid Cryptocurrency (BTC and ETH), (b) NewCo Common Stock, and (c) Litigation Proceeds. If you receive the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim (*i.e.*, if the total amount of your Account Holder Claims, including your Retail Borrower Post-Set Off Claim, is equal to or less than $5,000), you will receive only Liquid Cryptocurrency. Your Ballot will explain whether you will receive the Unsecured Claim Distribution Consideration or the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of Retail Borrower Deposit Claims, your related rights, and how to vote your Retail Borrower Deposit Claim to accept or reject the Plan.

| Class 2 — Retail Borrower Deposit Claims | | | |
|---|---|---|---|
| **Type of Distribution** | **Estimated NewCo Transaction Recovery Under the Plan**[11] | **Certain Key Provisions of this Disclosure Statement Relevant to Holders of Retail Borrower Deposit Claims** | **Navigating the Ballot** |
| Set Off Treatment or Retail Advance Obligation Repayment Election<br>- and -<br>If total Account Holder Claims is equal to or less than $5,000:<br>• Liquid Cryptocurrency<br>- or -<br>If total Account Holder Claims is greater than $5,000<br>• Liquid Cryptocurrency<br>• NewCo Common Stock<br>• Litigation Proceeds | 85.6% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.Q<br>• Article III.T<br>• Article III.V<br>• Article III.W<br>• Article III.X<br>• Article III.FF<br>• Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.WW<br>• Article III.XX<br>• Article III.MMM<br>• Article III.YY<br>• Article VIII<br>• Article IX<br>• Article XI<br>• Article XII | *See* **Exhibit G** |

---

[11]     In the NewCo Transaction, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 67.0% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment). Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

The below tables provide examples of illustrative recoveries that a Holder of a Retail Borrower Deposit Claim may receive on behalf of her Retail Borrower Deposit Claim in the event the NewCo Transaction is consummated.[12]

| Account Holder Claim 1 - $9,940.50 Retail Borrower Deposit Claim, $5,000 Retail Advance Obligation | | | |
|---|---|---|---|
| Coin | # of Coins | Petition Date Coin Price | USD ($) |
| *Retail Borrower Deposit Claim* | | | |
| BTC | 0.50 | 19,881.00 | $ 9,940.50 |
| *Set Off: Retail Advance Obligation* | | | |
| USDC / USD | 5,000.00 | $ 1.00 | $ 5,000.00 |
| **Retail Borrower Post-Set off Claim ($)** | | | **$ 4,940.50** |

| Recovery Scenario - Convenience Class | | | |
|---|---|---|---|
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.06 | $ 1,729.18 |
| ETH | 1,879.61 | 0.92 | 1,729.18 |
| Liquid Cryptocurrency | | | $ 3,458.35 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | **$ 3,458.35** |

| | |
|---|---|
| ***Recovery % on Retail Borrower Post-Set off Claim*** | **70.0%** |
| ***Recovery % on Retail Advance Obligation*** | **100.0%** |
| ***Total Recovery % on Retail Borrower Deposit Claim*** | **85.1%** |

| Account Holder Claim 2 - $16,322.56 Retail Borrower Deposit Claim, $5,000 Retail Advance Obligation | | | |
|---|---|---|---|
| Coin | # of Coins | Petition Date Coin Price | USD ($) |
| *Retail Borrower Deposit Claim* | | | |
| ETH | 15.00 | 1,088.17 | $ 16,322.56 |
| *Set Off: Retail Advance Obligation* | | | |
| USDC / USD | 5,000.00 | $ 1.00 | $ 5,000.00 |
| **Retail Borrower Post-Set off Claim ($)** | | | **$ 11,322.56** |

| Recovery Scenario (consistent with General Earn treatment) | | | |
|---|---|---|---|
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.08 | $ 2,121.68 |
| ETH | 1,879.61 | 1.13 | 2,121.68 |
| Liquid Cryptocurrency[1,2] | | | $ 4,243.36 |
| NewCo Common Stock[1,2] | N/A | N/A | 3,344.90 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | **$ 7,588.27** |

| | |
|---|---|
| ***Liquid Cryptocurrency Recovery %*** | **37.5%** |
| ***NewCo Common Stock Recovery %*** | **29.5%** |
| ***Recovery % on Retail Borrower Post-Set off Claim*** [3] | **67.0%** |
| ***Recovery % on Retail Advance Obligation*** | **100.0%** |
| ***Total Recovery % on Retail Borrower Deposit Claim*** | **77.1%** |

---

[12]    The tables include the following assumptions:  (1) the Holder only has a Retail Borrower Deposit Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

**Account Holder Claim 3 - $49,702.50 Retail Borrower Deposit Claim, $30,000 Retail Advance Obligation (Set Off Treatment)**

| Coin | # of Coins | Petition Date Coin Price | USD ($) |
|---|---|---|---|
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $ 49,702.50 |
| *Set Off:  Retail Advance Obligation* | | | |
| USDC / USD | 30,000.00 | $ 1.00 | $ 30,000.00 |
| **Retail Borrower Post-Set off Claim ($)** | | | $ 19,702.50 |

**Recovery Scenario (consistent with General Earn treatment)**

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| BTC | $ 27,323.96 | 0.14 | $ 3,691.96 |
| ETH | 1,879.61 | 1.96 | 3,691.96 |
| Liquid Cryptocurrency[1,2] | | | $ 7,383.92 |
| NewCo Common Stock[1,2] | N/A | N/A | 5,820.50 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | $ 13,204.42 |
| *Liquid Cryptocurrency Recovery %* | | | 37.5% |
| *NewCo Common Stock Recovery %* | | | 29.5% |
| *Recovery % on Retail Borrower Post-Set off Claim [1]* | | | 67.0% |
| *Recovery % on Retail Advance Obligation* | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | 86.9% |

**Account Holder Claim 3 - $49,702.50 Retail Borrower Deposit Claim, $30,000 Retail Advance Obligation (Retail Advance Obligation Repayment Election)**

| Coin | # of Coins | Petition Date Coin Price | USD ($) |
|---|---|---|---|
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $ 49,702.50 |
| *Retail Advance Obligation Borrower Repayment* | | | |
| USDC / USD | (30,000.00) | $ 1.00 | $ (30,000.00) |
| **Retail Borrower Post-Set off Claim ($)** | | | $ 19,702.50 |

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| **Retail Advance Obligation Return to Borrower** | | | |
| BTC | $ 27,323.96 | 1.10 | $ 30,000.00 |
| **Retail Borrower Post-Set Off Claim Recovery** | | | |
| BTC | $ 27,323.96 | 0.14 | $ 3,691.96 |
| ETH | 1,879.61 | 1.96 | 3,691.96 |
| Liquid Cryptocurrency[1,2] | | | $ 7,383.92 |
| NewCo Common Stock[1,2] | N/A | N/A | 5,820.50 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | $ 13,204.42 |
| *Liquid Cryptocurrency Recovery %* | | | 37.5% |
| *NewCo Common Stock Recovery %* | | | 29.5% |
| *Recovery % on Retail Borrower Post-Set off Claim [1]* | | | 67.0% |
| *Recovery % on Retail Advance Obligation* | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | 86.9% |

*Class 4 — Convenience Claims*.  If you have a Convenience Claim, that means the total amount of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) is greater than $10 but less than or equal to $5,000.  Holders of Convenience Claims will only receive a recovery in the form of Liquid Cryptocurrency.  Your Ballot will explain whether you have a Convenience Claim or separate Account Holder Claims.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of Convenience Claims, your related rights, and how to vote your Convenience Claim to accept or reject the Plan.

| Class 4 — Convenience Claims | | | |
|---|---|---|---|
| **Type of Distribution** | **Estimated NewCo Transaction Recovery Under the Plan** | **Certain Key Provisions of this Disclosure Statement Relevant to Holders of Convenience Claims** | **Navigating the Ballot** |
| Liquid Cryptocurrency | 70% | <ul><li>Article III.C</li><li>Article III.D</li><li>Article III.E</li><li>Article III.L</li><li>Article III.M</li><li>Article III.O</li><li>Article III.Q</li><li>Article III.LL</li><li>Article III.NN</li><li>Article III.OO</li><li>Article III.PP</li><li>Article III.QQ</li><li>Article III.MMM</li><li>Article VIII</li><li>Article IX</li><li>Article XII</li></ul> | *See* **Exhibit H** |

The below tables provide examples of illustrative recoveries that a Holder of a Convenience Claim may receive on behalf of her Convenience Claim in the event the NewCo Transaction is consummated, including if such Holder is the Holder of a General Earn Claim and makes the Convenience Claim Election on her Ballot because she wishes to receive a smaller recovery entirely in Liquid Cryptocurrency instead of the Unsecured Claim Distribution (*see* Account Holder Claim 2).[13]

---

[13] The tables include the following assumptions: (1) the Holder does not have any Custody Claims; and (2) Liquid Cryptocurrency values are as of May 31, 2023.

| Account Holder Claim 1 - $5,000 | | | |
| --- | --- | --- | --- |
| Coin | Petition Date Coin Price | # of Coins | USD ($) |
| BTC | $ 19,881.00 | 0.19 | $ 3,813.89 |
| ETH | 1,088.17 | 0.50 | 544.09 |
| USDC | 1.00 | 150.00 | 150.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| Total Initial Claim ($) | | $ | 5,000.00 |
| *Forfeited Claim* | | | - |
| Total Adjusted Claim ($) | | $ | 5,000.00 |

| Account Holder Claim 2 - $7,500 (opt-in, forfeit portion of claim) | | | |
| --- | --- | --- | --- |
| Coin | Petition Date Coin Price | # of Coins | USD ($) |
| BTC | $ 19,881.00 | 0.29 | $ 5,813.89 |
| ETH | 1,088.17 | 0.50 | 544.09 |
| USDC | 1.00 | 650.00 | 650.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| Total Initial Claim ($) | | $ | 7,500.00 |
| *Forfeited Claim* | | | (2,500.00) |
| Total Adjusted Claim ($) | | $ | 5,000.00 |

| Recovery Scenario | | | |
| --- | --- | --- | --- |
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.06 | $ 1,750.00 |
| ETH | 1,879.61 | 0.93 | 1,750.00 |
| Total Value Recovered ($) | | $ | 3,500.00 |
| *Recovery %* | | | *70.0%* |

| Recovery Scenario | | | |
| --- | --- | --- | --- |
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.06 | $ 1,750.00 |
| ETH | 1,879.61 | 0.93 | 1,750.00 |
| Total Value Recovered ($) | | $ | 3,500.00 |
| *Recovery %* | | | *70.0%* |

*Class 5 — General Earn Claims*.  Account Holders that participated in the Debtors' Earn Program will likely have a General Earn Claim.  If you have a General Earn Claim, you will receive the Unsecured Claim Distribution Consideration, which means you will receive a combination of (a) Liquid Cryptocurrency (BTC and ETH), (b) NewCo Common Stock, and (c) Litigation Proceeds.  Your Ballot will explain whether you have a General Earn Claim or whether the total amount of your Account Holder Claims means you have a Convenience Claim.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of General Earn Claims, your related rights (including various elections available to you), and how to vote your General Earn Claim to accept or reject the Plan.

| Class 5 — General Earn Claims | | | |
| --- | --- | --- | --- |
| Type of Distribution | Estimated NewCo Transaction Recovery Under the Plan | Certain Key Provisions of this Disclosure Statement Relevant to Holders of General Earn Claims | Navigating the Ballot |
| • Liquid Cryptocurrency<br>• NewCo Common Stock<br>• Litigation Proceeds | 67.0% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.Q<br>• Article III.T<br>• Article III.V<br>• Article III.W<br>• Article III.X<br>• Article III.FF<br>• Article III.LL<br>• Article III.NN | *See* **Exhibit I** |

|  |  | • Article III.OO |  |
|  |  | • Article III.PP |  |
|  |  | • Article III.QQ |  |
|  |  | • Article III.YY |  |
|  |  | • Article III.MMM |  |
|  |  | • Article VIII |  |
|  |  | • Article IX |  |
|  |  | • Article XI |  |
|  |  | • Article XII |  |

The below table provides an example of an illustrative recovery that a Holder of a General Earn Claim may receive on behalf of her General Earn Claim in the event the NewCo Transaction is consummated. [14]

| Account Holder Claim 1 - $9,682.60 | | | |
| --- | --- | --- | --- |
| Coin | Petition Date Coin Price | # of Coins | USD ($) |
| BTC | $ 19,881.00 | 0.40 | $ 7,952.40 |
| ETH | 1,088.17 | 1.00 | 1,088.17 |
| USDC | 1.00 | 150.00 | 150.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| **Total Claim ($)** | | | $ **9,682.60** |

| Recovery Scenario | | | |
| --- | --- | --- | --- |
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.07 | $ 1,814.38 |
| ETH | 1,879.61 | 0.97 | 1,814.38 |
| Liquid Cryptocurrency[(1,2)] | | | $ 3,628.75 |
| NewCo Common Stock[(1,2)] | N/A | N/A | 2,860.42 |
| **Total Value Recovered ($)** | | | $ **6,489.18** |
| ***Liquid Cryptocurrency Recovery %*** | | | *37.5%* |
| ***NewCo Common Stock Recovery %*** | | | *29.5%* |
| ***Total Recovery %*** [(3)] | | | *67.0%* |

*Scenario 2: If total Claim is less than $5,000, see Class 4 - Convenience Recovery Scenarios*

**Class 6A — General Custody Claims**. Account Holders that participated in the Debtors' Custody Program will likely have a General Custody Claim. If you are the Holder of a General Custody Claim, you

---

[14] The table includes the following assumptions: (1) the Holder only has a General Earn Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

have the opportunity, through your Ballot, to participate in the Custody Settlement. You can participate in the Custody Settlement by voting your General Custody Claim to accept the Plan. If you do that, then you will receive Treatment A under the Plan, which essentially provides you with the same recovery as the Settling Custody Account Holders, as further explained herein. Pursuant to Treatment A, on or shortly after the Effective Date, you will receive (a) a distribution of Cryptocurrency equal to 72.5% of the amount of your Allowed General Custody Claim in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions.

If you are the Holder of a General Custody Claim and you vote your Claim to reject the Plan or you do not vote your Claim, then you will not receive the Custody Settlement. You will receive Treatment B under the Plan. Pursuant to Treatment B, on or shortly after the Effective Date, Holders of General Custody Claims will have an amount corresponding to each Holder's Allowed General Custody Claim transferred to a segregated wallet held by the Post-Effective Date Debtors. The amount held in that segregated wallet will be subject to all Avoidance Actions and other claims by the Debtors' Estate with respect to such Allowed General Custody Claim. The Litigation Administrator will have 180 days following the Effective Date to bring any Avoidance Action or other claim against you, with respect to the amount of your General Custody Claim. You will not receive a distribution of *any* amounts on the Effective Date in this scenario.

Unlike with other Claims, you do *not* have to vote your General Custody Claim in the same way you vote any other Claims you may have. For example, you may vote to reject the Plan with respect to your General Custody Claim but vote to accept the Plan with respect to all other Claims you have.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of General Custody Claims, your related rights (including various elections available to you), and how to vote your General Custody Claim to accept or reject the Plan.

| Class 6A — General Custody Claims | | | |
|---|---|---|---|
| **Type of Distribution** | **Estimated NewCo Transaction Recovery Under the Plan**[15] | **Certain Key Provisions of this Disclosure Statement Relevant to Holders of General Custody Claims** | **Navigating the Ballot** |
| Cryptocurrency (in-kind) | 72.5% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.O<br>• Article III.Q<br>• Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.TT<br>• Article VIII<br>• Article IX<br>• Article XII | *See* **Exhibit J** |

The below table provides an example of an illustrative recovery that a Holder of a General Custody

---

[15]    Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, *not* a percentage of the value of their General Custody Claims as of the Petition Date.

Claim may receive on behalf of her General Custody Claim in the event the NewCo Transaction is consummated and where she voted to accept the Plan.[16]

| Account Holder Claim | | | |
|---|---|---|---|
| Coin | Petition Date Coin Price | # of Coins | USD ($) |
| BTC | N/A | 0.10 | N/A |
| ETH | N/A | 0.50 | N/A |
| USDC | N/A | 150.00 | N/A |
| DOT | N/A | 37.00 | N/A |
| ZRX | N/A | 925.00 | N/A |
| Total Claim ($) | | In Kind[(1)] | |

| Recovery Scenario |
|---|
| **Treatment A:** |
| Holders who elect Treatment A will receive a distribution of Cryptocurrency equal to 72.5% of their coins in kind, and a full and final release of all Causes of Action, including Avoidance Actions. |
| *Recovery %*                                                           72.5% |
| Holders with Withdrawal Preference Exposure under $100,000 shall receive 100% recovery under this treatment. |
| *Recovery %*                                                          100.0% |
| **Treatment B:** |
| Holders who elect Treatment B will transfer the Cryptocurrency assets associated with their claim to a segregated wallet held by the Post-Effective Date Debtors. Provided no Avoidance Actions and other claims are brought and no settlement is reached within 180 days (or an extended period), such assets shall be released to the Holder. |
| *Recovery %*                                                           TBD |

**Class 7 — Withhold Claims.**  Account Holders with a "Withhold Account" will likely have a Withhold Claim or a Convenience Claim.  Your Ballot will explain whether you have a Withhold Claim or whether the total amount of your Account Holder Claims means you have a Convenience Claim.

If you are the Holder of a Withhold Claim, you have the opportunity, through your Ballot, to participate in the Withhold Settlement.  If you vote your Withhold Claim to accept the Plan, and if Class 7 votes to accept the Plan, which means more than two-thirds of the amount of Withhold Claims and more than one-half of the number of Holders of Withhold Claims that vote on the Plan vote to accept the Plan, then you and everyone else in Class 7 (regardless of how they voted) will receive Treatment A under the Plan, which is the same treatment as the Withhold Settlement.  The Withhold Settlement provides for the right to withdraw an in-kind distribution equal to fifteen (15) percent of the value, as of the Petition Date, of your Withhold Distribution Claims, calculated in accordance with the Conversion Procedure, *plus* the treatment of your remaining eighty-five (85) percent of your Withhold Distribution Claim as a General Earn Claim.

If, however, Class 7 does not vote to accept the Plan, then even if you voted your Class 7 Claim to

---

[16]    The table includes the following assumptions:  (1) the Holder only has a General Custody Claim and no other Claims; and (2) recovery percentage reflects a percentage of the Cryptocurrency held in such Holder's Custody Account and *not* a percentage of the total value of the General Custody Claim as of the Petition Date.

accept the Plan you will not receive Treatment A, or the Withhold Settlement, under the Plan. Instead, you and everyone else in Class 7 (regardless of how they voted) will receive Treatment B under the Plan, which means your Claim will receive the same treatment as a General Earn Claim.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of Withhold Claims, your related rights (including various elections available to you), and how to vote your Withhold Claim to accept or reject the Plan.

| Class 7 — Withhold Claims | | | |
|---|---|---|---|
| **Type of Distribution** | **Estimated NewCo Transaction Recovery Under the Plan**[17] | **Certain Key Provisions of this Disclosure Statement Relevant to Holders of Withhold Claims** | **Navigating the Ballot** |
| • Liquid Cryptocurrency<br>• NewCo Common Stock<br>• Litigation Proceeds | 72.0% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.Q<br>• Article III.T<br>• Article III.V<br>• Article III.W<br>• Article III.X<br>• Article III.FF<br>• Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.UU<br>• Article III.MMM<br>• Article VIII<br>• Article IX<br>• Article XI<br>• Article XII | *See* **Exhibit K** |

The below tables provide examples of illustrative recoveries that a Holder of a Withhold Claim may receive on behalf of her Withhold Claim in the event the NewCo Transaction is consummated and either (a) Class 7 voted to accept the Plan or (b) Class 7 voted to reject the Plan. [18]

---

[17] This estimated recovery assumes that Class 7 votes to accept the Plan. If Class 7 votes to reject the Plan, but the Plan is confirmed, then the estimated recovery is 67.0% (*i.e.*, the same as General Earn Claims).

[18] The tables include the following assumptions: (1) the Holder only has a Withhold Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

**Account Holder Claim 1: Treatment A\***

| Coin | Petition Date Coin Price | # of Coins | USD ($) |
|------|---|---|---|
| BTC | $ 19,881.00 | 0.40 | $ 7,952.40 |
| ETH | 1,088.17 | 1.00 | 1,088.17 |
| USDC | 1.00 | 150.00 | 150.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| **Total Claim ($)** | | | **$ 9,682.60** |

**Account Holder Claim 1: Treatment B\*\***

| Coin | Petition Date Coin Price | # of Coins | USD ($) |
|------|---|---|---|
| BTC | $ 19,881.00 | 0.40 | $ 7,952.40 |
| ETH | 1,088.17 | 1.00 | 1,088.17 |
| USDC | 1.00 | 150.00 | 150.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| **Total Claim ($)** | | | **$ 9,682.60** |

**Recovery Scenario**

*Scenario 1:*

| Recovery Type | Petition Date Coin Price | 15% of Claim | Recovery Value ($) |
|------|---|---|---|
| BTC | $ 19,881.00 | 0.04 | $ 726.19 |
| ETH | 1,088.17 | 0.67 | 726.19 |
| 15% Liquid Cryptocurrency Settlement Recovery | | | 1,452.39 |
| Remaining 85% of Claim | | | $ 8,230.21 |
| BTC | 27,323.96 | 0.06 | 1,542.22 |
| ETH | 1,879.61 | 0.82 | 1,542.22 |
| Liquid Cryptocurrency[1,2] | | | $ 3,084.44 |
| NewCo Common Stock[1,2] | N/A | N/A | 2,431.36 |
| **Total Value Recovered ($)** | | | **$ 6,968.19** |
| ***Liquid Crypto Recovery %*** | | | ***46.9%*** |
| ***NewCo Common Stock Recovery %*** | | | ***25.1%*** |
| ***Total Recovery %*** [3] | | | ***72.0%*** |

*Scenario 2: If Remaining Claim after Conversion is less than $5,000, see Class 4 - Convenience Recovery Scenarios*

**Recovery Scenario**

*Scenario 1:*

| Recovery Type | Petition Date Coin Price | # of Coins Recovered | Recovery Value ($) |
|------|---|---|---|
| BTC | $ 19,881.00 | 0.09 | $ 1,814.38 |
| ETH | 1,088.17 | 1.67 | 1,814.38 |
| Liquid Cryptocurrency[1,2] | | | $ 3,628.75 |
| NewCo Common Stock[1,2] | N/A | N/A | 2,860.42 |
| **Total Value Recovered ($)** | | | **$ 6,489.18** |
| ***Liquid Cryptocurrency Recovery %*** | | | ***37.5%*** |
| ***NewCo Common Stock Recovery %*** | | | ***29.5%*** |
| ***Total Recovery %*** [3] | | | ***67.0%*** |

*Scenario 2: If total Claim is less than $5,000, see Class 4 - Convenience Recovery Scenarios*

### D.    Recommendation.

The Debtors strongly believe that the Plan is in the best interests of the Debtors' Estates and maximizes stakeholder recoveries in the Chapter 11 Cases.   In particular, the NewCo Transaction with Fahrenheit provides meaningful Liquid Cryptocurrency distributions to the majority of creditors and valuable ownership in a go-forward enterprise through NewCo Common Stock. ***The Debtors strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their Ballots no later than [September 20], 2023, at [4]:00 p.m., prevailing Eastern Time (the "Voting Deadline")***. Stretto must receive Ballots from voting creditors and in accordance with the Solicitation Procedures (as defined herein) on or before the Voting Deadline.  If the Plan receives the requisite acceptances, the Debtors will seek confirmation of the Plan at a hearing (the "Confirmation Hearing") before the Bankruptcy Court on **[October 2], 2023, at [2]:00 [p].m., prevailing Eastern Time.**[19]

---

[19]    These dates are subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Voting Deadline and Confirmation Hearing is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

### III.    QUESTIONS AND ANSWERS ABOUT THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions and other provisions prescribed in the Bankruptcy Code.  The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date that the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until the chapter 11 plan is consummated.

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as the bankruptcy court may order.  Subject to certain limited exceptions, a bankruptcy court order confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class, such as Holders of Claims under the Plan, to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.

This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Whether you may vote on the Plan depends on what type of Claim or Interest you hold.  The Classes of Claims and Interests created by the Plan, and their respective voting status, are set forth below.  The definitions in the Plan describe what Claims are included in each Class.

Please note that, for purposes of voting on the Plan, Holders of Account Holder Claims are entitled to vote only such Account Holder Claims that (a) were scheduled by the Debtors (in the amounts set forth in the Schedules (as defined herein)) and not in the amounts set forth in any Filed Proofs of Claim related to such Account Holder Claims, or (b) if not scheduled by the Debtors, are based on  Filed Proofs of Claim (solely to the extent such Proofs of Claim are not disputed) in the amounts set forth in such Filed Proofs of Claim.  If you are the Holder of an Account Holder Claim described in clause (a) of the preceding sentence and would like your vote to be based on your Filed Proof of Claim and the amounts or categorizations reflected therein, you must File a motion under Bankruptcy Rule 3018(a) asking the Bankruptcy Court to temporarily allow the Claim or Interest in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

For the avoidance of doubt, Holders of Claims other than Account Holder Claims shall be entitled to vote such Claims in the Filed amount unless the Debtors have Filed an objection to such Claim.[20]  If an

---

[20]    The majority of these Claims are General Unsecured Claims that were either not scheduled by the Debtors or the Filed Proof of Claim includes supporting documents that differ from the amounts scheduled by the Debtors.

objection to such Claim has been filed, then such Holder will only be able to vote on such Claim in the amount of $1.00. If any Holders of Claims subject to an objection would like their votes to be based on the amounts set forth in the Filed Proofs of Claims and the amounts or categorizations reflected therein, they must File a motion under Bankruptcy Rule 3018(a) asking the Bankruptcy Court to temporarily allow the Claim or Interest in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Retail Borrower Deposit Claims | Impaired | Entitled to Vote |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | General Earn Claims | Impaired | Entitled to Vote |
| 6A | General Custody Claims | Impaired | Entitled to Vote |
| 6B | Withdrawable Custody Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Withhold Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Loan Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | State Regulatory Claims | Impaired | Entitled to Vote |
| 11 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 13 | Intercompany Interests | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 14 | Series B Preferred Interests | Impaired | Entitled to Vote |
| 15 | Other Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 16 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 17 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.    How are Claims valued under the Plan?  How will the value of my Claim affect the amount of my distribution under the Plan?**

Because many of the Claims are denominated in Cryptocurrency, the section below describes how the Debtors will value and make distributions on such Claims.

### General Earn Claims, Withhold Claims, and Convenience Claims

Under the Plan, all Claims relating to Cryptocurrency (other than CEL Token Deposit Claims) associated with the Earn Program and Withhold Accounts[21]—Class 4 Convenience Claims, Class 5 General Earn Claims, and Class 7 Withhold Claims—are valued based on the dollar value of the applicable Cryptocurrency that comprises such Claims on the Petition Date based on the Cryptocurrency Conversion Table.[22]

Because (i) distributions to Classes 4, 5, and 7 are a percentage of the applicable Claim, (ii) some or all of the amount being distributed in Liquid Cryptocurrency, and (iii) the value of the Cryptocurrency to be distributed will change over time, it is necessary to determine a date by which the value of the Cryptocurrency distributed to those Holders will be determined. Those values will be included in the Distribution Valuation Table. The intention is to File that table as close to the Effective Date as possible (approximately 15 days prior to the Effective Date) so that the Distributions actually provided to Holders on the Effective Date reflect current Cryptocurrency prices and the Debtors, or the Distribution Agent, are able to administer the distributions.[23]

| Account Holder Claim 3 - $36,203.57 | | | |
|---|---|---|---|
| **Coin** | **Petition Date Coin Price** | **# of Coins** | **USD ($)** |
| BTC | $ 19,881.00 | 1.00 | $ 19,881.00 |
| ETH | 1,088.17 | 15.00 | 16,322.56 |
| **Total Claim ($)** | | | **$ 36,203.57** |

| Recovery Scenario | | | |
|---|---|---|---|
| **Recovery Type** | **5/31 Coin Price** | **# of Coins Recovered** | **Recovery Value ($)** |
| BTC | $ 27,323.96 | 0.25 | $ 6,784.01 |
| ETH | 1,879.61 | 3.61 | 6,784.01 |
| Liquid Cryptocurrency[(1,2)] | | | $ 13,568.03 |
| NewCo Common Stock[(1,2)] | N/A | N/A | 10,695.23 |
| **Total Value Recovered ($)** | | | **$ 24,263.26** |
| *Liquid Cryptocurrency Recovery %* | | | *37.5%* |
| *NewCo Common Stock Recovery %* | | | *29.5%* |
| *Total Recovery %* [(3)] | | | *67.0%* |

---

[21]    For the avoidance of doubt, this does not include any Withhold Claims previously paid pursuant to the Withhold Settlement.

[22]    The Cryptocurrency Conversion Table is Filed at [Docket No. 1420] and attached to this Disclosure Statement as **Exhibit L**.

[23]    The examples provided herein are based on the price of Cryptocurrency on May 31, 2023. For the avoidance of doubt, this date will not be used in the Distribution Valuation Table.

### Custody Claims

The percentage recovery provided to Holders of Custody Claims is based on the percentage of Cryptocurrency owed by the Debtors to Holders of Custody Claims. In other words, if a Holder of a General Custody Claim accepts the Custody Settlement, on the Effective Date she will receive 72.5% of the amount of Cryptocurrency coins in her Custody Account instead of the dollar value of such coins on the Petition Date, as with other Account Holder Claims. The difference between the treatment of General Custody Claims and Claims associated with the Borrow Program, Earn Program, and Withhold Accounts is because the Bankruptcy Court has found that Cryptocurrency held in Custody Accounts is property of the applicable Account Holder.

### Retail Borrower Deposit Claims

Under the Set Off Treatment, the amount of a Holder's Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligation outstanding on the Petition Date. The remaining amount of the Retail Borrower Deposit Claim—the Retail Borrower Post-Set Off Claim—will be determined based on the value of the applicable Cryptocurrency (other than CEL Token) on the Petition Date based on the Cryptocurrency Conversion Table.

If you make the Retail Advance Obligation Repayment Election and repay all or a portion of the proceeds of the loan you took out under the Debtors' Borrow Program by the Retail Advance Obligation Repayment Deadline and in accordance with the Retail Advance Obligation Repayment Instructions, you will receive an amount of BTC or ETH equal to the amount that you paid back (you can choose whether to receive BTC or ETH). For example, if you took out a loan for $15,000 (this would be your Retail Advance Obligation), and you repaid $10,000 of that loan in Cash, you would receive $10,000 worth of BTC or ETH (depending on which you elect), valued as of noon prevailing Eastern Time on the date of repayment based on prices on a Cryptocurrency exchange agreed upon by the Debtors and the Ad Hoc Group of Borrowers.

The remaining amount, or the Retail Borrower Post-Set Off Claim, will (as under the Set Off Treatment) be based on the value of the applicable Cryptocurrency (other than CEL Token) on the Petition Date based on the Cryptocurrency Conversion Table.

### E.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the currently anticipated recoveries to Holders of Claims and Interests under the Plan. Any estimates of the potential recoveries for the Claims and Interests in a particular Class in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan. The amount of such distributions is also based on the total amount of Claims Allowed in the applicable Class, which is based on factors that are not within the Debtors' control, including future litigation regarding, among other things, the amount and allowances of claims against the Debtors. The Debtors have assumed the scheduled amount of Account Holder Claims for purposes of calculating the estimated recovery percentages in the table below.

The amount of projected recoveries in each of the scenarios are estimates that are based on valuations performed by the Debtors' valuation expert and analysis performed by the Debtors' financial advisors and investment bankers. As part of those analyses, the Debtors and their professionals were required to make a number of assumptions with respect to future events and the value of assets. Those assumptions are described in more detail in **Exhibit D** (the "Mining Valuation Analysis") and **Exhibit E** (the "Mining Financial Projections"). Amounts in the far-right column in the table below under the heading "Estimated Recovery Under Chapter 7" are based on certain assumptions set forth in greater detail in the

liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis"). Such recoveries are for comparison only and are only applicable in the event of a chapter 7 liquidation, which will not occur if the Plan is confirmed and becomes effective.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, CHANGES IN CRYPTOCURRENCY PRICES,[24] ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES, CLAIMS ASSERTED BY GOVERNMENT ENTITIES, INCLUDING TAXING AUTHORITIES, AND THE RESOLUTION OF DISPUTED CLAIMS. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, YOU SHOULD READ THE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES[25] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Class No. | Type of Claim | Treatment | Projected Total Amount of Claims ($ in millions)[26] | Estimated NewCo Transaction Recovery Under Plan | Projected Orderly Wind Down Recovery Under the Plan | Estimated Recovery Under Chapter 7 Liquidation |
| Classified Claims and Interests of the Debtors | | | | | | |
| Class 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor(s) as agreed to by the Debtors and the Committee, either: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of such Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | N/A | N/A | N/A |
| Class 2 | Retail Borrower Deposit Claims[27] | Each Holder of an Allowed Retail Borrower Deposit Claim shall receive: | $732 | 85.6% | 83.0% | 47.4% |

---

[24]    The projected recoveries in this Disclosure Statement are based on the value of Cryptocurrency on May 31, 2023.

[25]    **The projected recoveries in this Disclosure Statement are subject to material change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.** For purposes of estimating class recoveries, the Class Claim (as defined herein) Filed by the Committee and described in detail in Article VII.K.4 of this Disclosure Statement, is not taken into account.

[26]    The projected total amount of Claims is subject to material change based upon the Debtors' claim reconciliation process, among other things. Claim amounts may vary slightly in the Liquidation Analysis due to treatment of certain classes.

[27]    In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 67.0% recovery on their Retail Borrower Post-Set

(i) Repayment Election: If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

*or*

Set Off Treatment: If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

*plus*

(ii) On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup

---

Off Deposit Claims (if such Claims receive the General Earn Claim treatment). Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

| Class | Claim Type | Treatment | | | | |
|---|---|---|---|---|---|---|
| | | MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. | | | | |
| Class 3 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee. | N/A | N/A | N/A | N/A |
| Class 4 | Convenience Claims | Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim. | $346 | 70% | 70% | N/A |
| Class 5 | General Earn Claims | Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (i.e., Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. | $3,754 | 67.0% | 61.2% | 47.4% |
| Class 6A | General Custody Claims[28] | For Holders of Allowed General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order: Each such Holder of an Allowed General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in this | $218 | 72.5% | 72.5% | 72.5% |

---

[28] Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, *not* a percentage of the value of their General Custody Claims as of the Petition Date.

Disclosure Statement, one of two treatments:

**Treatment A:** (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim *provided* that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure under $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3. of the Plan.

**Treatment B**: The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim. The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing. To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim. Any such Allowed General Custody Claim will be subject to the ADR Procedures.

For Custody Settlement Participants: Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; *provided* that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; *provided, further*, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure under $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan. | | | | |
| **Class 6B** | **Withdrawable Custody Claims** | Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order. | $48 | 100% | 100% | 100% |
| **Class 7** | **Withhold Claims**[29] | Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:<br><br>**Treatment A**: If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in this Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).<br><br>**Treatment B**: If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).<br><br>In the event that the Debtors pursue the Orderly Wind Down, the above | $13 | 72.0% | 67.1% | 47.4% |

---

[29]    The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.<br><br>For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement. | | | | |
| Class 8 | **Unsecured Loan Claims** | Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).<br><br>In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. | $88 | 67.0% | 61.2% | 47.4% |
| Class 9 | **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in this Disclosure Statement.<br><br>In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) the Litigation Proceeds, and (d) the Illiquid Recovery Rights. | $50 | 67.0% | 61.2% | 37.6% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Class 10 | State Regulatory Claims[30] | Each Holder of an Allowed State Regulatory Claim shall have its Claim subordinated to all Account Holder Claims and General Unsecured Claims. On the Effective Date, all State Regulatory Claims shall be cancelled, released, and extinguished and will be of no further force or effect, regardless of whether Holders of State Regulatory Claims receive a distribution. | N/A | [0%] | [0%] | [0%] |
| Class 11 | De Minimis Claims | All De Minimis Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | $0 | 0% | 0% | 0% |
| Class 12 | Intercompany Claims | Each Allowed Intercompany Claim shall, at the option of the applicable Debtor(s) with the consent of the Committee be: (i) Reinstated; or (ii) set off, settled, distributed, addressed, converted to equity, contributed, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum. | N/A | N/A | N/A | 47.3% |
| Class 13 | Intercompany Interests | Each Intercompany Interest shall, at the option of the applicable Debtor(s) with the consent of the Committee, be: (i) Reinstated; or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum. | N/A | N/A | N/A | N/A |
| Class 14 | Series B Preferred Interests | Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to any order approving the Series B Settlement Order. | $686 | 0.1% | 0.1% | 0.1% |
| Class 15 | Other Interests | Holders of Other Interests shall not receive any distribution on account of such Other Interests, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. | N/A | 0% | 0% | 0% |

---

[30]    The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators. *See* Article III.LLL and Article VII.J.1 for more information about the proposed treatment of State Regulatory Claims.

| Class 16 | Section 510(b) Claims[31] | Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. | N/A | N/A | N/A | N/A |
|---|---|---|---|---|---|---|
| Class 17 | Equitably Subordinated Claims | Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court. | [TBD] | 0% | 0% | 0% |

**As detailed further herein and in the Liquidation Analysis, in a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims, Unsecured Loan Claims, and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan.** In the event of a chapter 7 liquidation, the Bankruptcy Court would appoint a chapter 7 trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets. The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims, Unsecured Loan Claims, or General Unsecured Claims. Given the novelty and complexity of the Debtors' business and the potential that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal Cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of Cryptocurrency by the Liquidating Trustee would likely result in Account Holders, Holders of Unsecured Loan Claims, and Holders of General Unsecured Claims receiving significantly reduced recoveries. Moreover, in a liquidation, the Debtors' mining business would likely be sold for far less than if it was reorganized as contemplated by the Plan. Finally, all distributions in a chapter 7 liquidation would be made in Cash.

F.    **What will I receive from the Debtors if I hold an Allowed Administrative Claim or Priority Tax Claim?**

Allowed Administrative Claims and Priority Tax Claims are not classified in Article III of the Plan because the Bankruptcy Code generally requires that such Claims be paid in full on the Effective Date. The treatment of Allowed Administrative Claims and Priority Tax Claims is summarized in the table below.

---

[31]    For the avoidance of doubt, the Debtors do not believe that any "Side C" insurance coverage under the Debtors' directors' and officers' liability insurance policy will be available as a distribution to any parties on account of any securities-related litigation, including the federal securities class action lawsuit styled as *Goines v. Celsius Network LLC, et al.*, No. 2:22-cv-04560-KM-ESK (D.N.J. 2022) because the coverage under the policies is extremely limited. When certain parties in interest Filed motions requesting the lifting of the automatic stay for purposes of accessing the Debtors' directors' and officers' liability policies, the Debtors explained in their objection thereto and during the hearing thereon that coverage under the policies was limited and could be exhausted relatively quickly. *See* Article VII.P for a detailed discussion of the D&O insurance policies. *See also* June 28, 2023 Hr'g Tr. 61:18–24 ("We have a very limited amount [of insurance proceeds available] here.").

| Claim | Summary of Treatment | Plan Section | Estimated Recovery |
|---|---|---|---|
| **Administrative Claims** | Each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such allowance or as soon as reasonably practicable thereafter, but in any event no later than ninety days after the date on which an order allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. | Article II, Section A | 100% |
| **Priority Tax Claims** | Each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | Article II, Section C | 100% |

**G.    Why do the Debtors believe that the Plan provides the greatest distribution possible to Holders of Claims?**

The Debtors believe that the Plan, which provides the Debtors with two comprehensive and orderly paths for emergence from these Chapter 11 Cases, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan. The Plan provides for a larger distribution to all Holders of Claims than would otherwise result from any other available alternative, including a chapter 7 liquidation, as illustrated in the Liquidation Analysis set forth in **Exhibit B** attached hereto.

If the Plan is effectuated through the NewCo Transaction, the Plan will provide Account Holders with a distribution of Liquid Cryptocurrency on the Effective Date as well as the opportunity to enjoy significant potential value growth through the ongoing management of the NewCo Assets by NewCo. If the Plan is effectuated through the Orderly Wind Down, the Debtors will be wound down through an orderly process that is expected to yield higher sale prices on the Debtors' assets than a typical chapter 7 liquidation, as illustrated in the Liquidation Analysis set forth in **Exhibit B** attached hereto. The Orderly Wind Down, however, does not provide for the same opportunity to enjoy the upside in the equity of NewCo and its development of regulatorily compliant operating businesses.

H.      **What is the "NewCo Transaction"?**

The Plan provides for the implementation and consummation of the NewCo Transaction.  Under the NewCo Transaction, a new entity — NewCo — will be formed and, on the Effective Date, the Debtors will transfer to NewCo the NewCo Assets, consisting of:   (a) the DeFi Cryptocurrency Assets; (b) the Institutional Loan portfolio; (c) PE & VC Investments; (d) Mining; and (e) the NewCo Capitalization Amount.  The equity in NewCo (*i.e.*, the NewCo Common Stock) will be distributed to certain Holders of Allowed Claims as set forth under the Plan.  "NewCo" is a general placeholder term that represents the new business.  The Debtors, the Committee, and the Plan Sponsor are currently evaluating a final name for the new, reorganized company.

Under the NewCo Transaction, NewCo will be managed by the Plan Sponsor (*i.e.*, Fahrenheit) for the benefit of all of NewCo's equity holders.  Fahrenheit is a coalition of crypto-native operators comprised of US Bitcoin Corp, Arrington Capital, Proof Group Capital Management, Steven Kokinos, and Ravi Kaza. Information respecting the background and experience of the Fahrenheit members is attached to this Disclosure Statement as **Exhibit F**.

Prior to or on the Effective Date, the Plan Sponsor and NewCo will enter into the Management Agreement respecting the Plan Sponsor's management of NewCo from and after the Effective Date. Further, NewCo and US Bitcoin will enter into the US Bitcoin Agreements respecting the management of the Mining assets from and after the Effective Date.  An overview of the Plan Sponsor's intended strategy respecting NewCo, including core business lines, illustrative projections, risk management structure, and liquidity approach, is attached to this Disclosure Statement as **Exhibit F**.

There are certain key elements of the NewCo Transaction that will add value to NewCo and be provided to creditors in the form of NewCo Common Equity, as explained below and in **Exhibit F**.

| Bid Item | Potential Impact / Benefit to MiningCo | Included in Mining Business Plan Projections |
|---|---|---|
| Construction of a 100 MW mining facility within one year of the Effective Date | Enhances MiningCo's vertical integration strategy in the near-term | Included |
| Construction cap of $395K / MW | Better control of the cost to build new sites, especially as the Company pursues its vertical integration strategy | Included |
| Contribute leasehold and development rights to an additional 240 MW site | Provides the opportunity to fully integrate MiningCo's entire fleet to proprietary sites over time | Not included |
| 8,500 rack spaces at US Bitcoin's Alpha facility | Rigs are expected to be deployed in the near term at the Alpha site, which historically has had favorable power costs | Included |
| $100MM in coupons from a leading ASIC manufacturer | Reduces capital expenditures for future new and replacement rig purchases | Included |
| Potential strategic partnership with an ASIC manufacturer | Provides the opportunity to scale up to 180,000 rigs with the opportunity to own 90,000 and take advantage of proprietary capacity in the pipeline | Not included |

These elements will build on the current value of Celsius Mining.  For example, during the 3-month period May, June and July 2023, the Company generated an average of 363 gross BTC per month, or an average daily production of 12 BTC per day.  As of July 31, 2023, the Company had over 79,000 rigs deployed, of which 22% are deployed at the Company's Proprietary Sites.

Moreover, the Company's adjusted gross margin has averaged roughly 27% across April, May, and June 2023.  The Company has taken several steps to improve the adjusted gross margin.  First, Celsius Mining has a fixed power price hedge for a portion of its Proprietary Sites, which allows it to participate in ERCOT's energy management programs and take advantage of power price volatility. Second, Celsius Mining has entered into new hosting agreements with improved economics, deploying 52,000 rigs this calendar year. This includes locations with historically lower or more stable power prices, the ability to share in energy management revenue and curtailment rights.  Third, the Company has installed software on its rigs that help improve the overall efficiency the miners.  This software is particularly important during the hotter summer months, especially in Texas, as rigs can continue to operate, albeit at a lower uptime. The NewCo Transaction intends to build on this value as shown above.

The management of NewCo will be overseen by the New Board of NewCo, which will initially consist of seven members:  (i) two of whom will be appointed by the Plan Sponsor; (ii) three of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose the identity and affiliations of any Person proposed to serve on the New Board in the Plan Supplement.

In connection with the NewCo Transaction, on or prior to the Effective Date, the Plan Sponsor will purchase $50 million of NewCo Common Stock pursuant to the Plan Sponsor Contribution Agreement. Such equity shall be purchased, at the determination of the Debtors and the Committee, through either a primary purchase of NewCo Common Stock or through the Secondary Market Purchase.

## I.    What is the "Orderly Wind Down"?

The Plan permits the Debtors and the Committee to implement an "Orderly Wind Down."  If, at any time prior to or after the Confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction, the Debtors will request approval from the Bankruptcy Court to pivot to an Orderly Wind Down.  An Orderly Wind Down would provide for the liquidation of the majority of the Debtors' assets and development of the Backup MiningCo as opposed to a restructuring of the Debtors through the NewCo Transaction.  Both the NewCo Transaction and the Orderly Wind Down are a part of the Plan.  In other words, if you vote to accept the Plan, you are voting to authorize the Debtors both to pursue the NewCo Transaction in the first instance **and** to pivot to the Orderly Wind Down if the Debtors, the Committee, and their respective advisors, in good faith and in an exercise of their fiduciary duties, elect to pursue the Orderly Wind Down.

At a high level, in the Orderly Wind Down: (1) the Debtors will seek to distribute Liquid Cryptocurrency in a manner designed to minimize the cost of such distribution to creditors; (2) the Debtors' illiquid assets will be liquidated and proceeds will be returned to creditors; and (3) the Debtors will pursue the Backup MiningCo, a pure play, publicly traded mining business in which creditors will receive 100%

of the equity interests.  The Debtors estimate that the Orderly Wind Down could take approximately five years to complete.

If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in the Backup Plan Sponsor Agreement that they have negotiated with the Backup Plan Sponsor, the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (collectively, the "BRIC")—or on terms that provide a better recovery to the Debtors' creditors than the Backup Plan Sponsor Agreement, which terms may be with a different Backup Plan Sponsor than the BRIC.  The BRIC was chosen as the Backup Plan Sponsor pursuant to the Auction held by the Debtors, which is explained in greater detail in Article VII.M.3 of the Disclosure Statement.  The Debtors may select a different Backup Plan Sponsor if a different party provides terms superior to those offered by BRIC.

If Holders of Claims and Interests approve the Plan and the Debtors pivot to the Orderly Wind Down, the Debtors will begin to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process.  As a result, Holders of Claims will receive the recovery of the initial liquid distribution under the Plan faster than if the Debtors had to recommence the solicitation process on a standalone liquidating plan.  The Debtors believe that resoliciting the Plan would result in significant costs for the Estates.  In the Orderly Wind Down scenario, the Debtors will still be required to administer claims and litigate certain disputes with respect to claimants' respective rights in certain property.  Moreover, it is likely that the value of the Debtors' illiquid assets would be impaired to some extent in such scenario, when compared with the assumed value of such assets in the New Co Transaction.  Please refer to the "Summary of Expected Recoveries" chart in Article III.E of this Disclosure Statement for a comparison of the recovery under the NewCo Transaction and the Orderly Wind Down.

Should the Debtors, the Committee, and their respective advisors decide to toggle to the Orderly Wind Down, the Debtors will (i) provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (ii) consult with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Immanuel Herrmann ("Mr. Herrmann"), Daniel Frishberg ("Mr. Frishberg"), Cameron Crews ("Mr. Crews"), and Ignat Tuganov ("Mr. Tuganov") regarding the decision to toggle, (iii) will File a "Wind-Down Motion" that explains the reasons for electing to pursue the Orderly Wind Down and includes the Wind-Down Procedures, and (iv) may File an amended Plan conformed to include the changes described in the summary table in Article IV.A.4 of this Disclosure Statement.  Parties in interest will have at least ten (10) days to object to the Wind-Down Motion.  In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.

The table in Article IV.A.4 of this Disclosure Statement and Article IV.E.1 of the Plan summarizes the changes that would be made in an amended Plan if the Debtors and the Committee elect to toggle from the NewCo Transaction to the Orderly Wind Down.

**J.      Can I vote if I have transferred my Claim to someone else?**

If you transfer all your Claim to a third party by [July 24], 2023 (the Voting Record Date),[32] you may *not* vote the portion of the Transferred Claim.  As explained in the question and answer immediately following this answer, any Holders of Transferred Claims are entitled to vote, but each portion of the Claim (if more than one portion) must vote collectively to accept or reject the Plan.  If Ballots are received that do not vote each portion of the Claim identically, the Ballots will not be counted.

---

[32]    This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Voting Record Date is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

**K.    Can I vote if I am the Holder of a Transferred Claim and if so, how?**

If you are the Holder of a Transferred Claim and you have fulfilled the requirements of Bankruptcy Rule 3001(e) and the transfer is reflected on the Claims Register by [July 24], 2023 (the Voting Record Date)[33] you may vote the Transferred Claim. The Claims Register can be accessed through the "Search Claims" button at cases.stretto.com/celsius.

If Ballots are received that do not vote each portion of the Claim identically, the Ballots will not be counted. If you are entitled to vote a Transferred Claim or a portion of a Claim, you will receive a Ballot.

**L.    What does it mean if I have a Convenience Claim?**

If you have a Convenience Claim, that means the total amount of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) is greater than $10 but less than or equal to $5,000. As set forth in the Plan, Holders of Convenience Claims will receive Liquid Cryptocurrency in an amount equal to the greater of (a) the percentage recovery for General Earn Claims set forth in the final version of this Disclosure Statement and (b) 70% recovery on account of such Convenience Claims.

For example, if you have an Earn Claim valued at $2,000 and a Withhold Claim valued at $1,000, instead of having two claims—one in Class 5 (General Earn Claim) and one in Class 7 (Withhold Claim)—and receiving two different types of treatment, you will have one in Class 4 (Convenience Claim) and will receive one form of treatment on behalf of the aggregate amount of both of your Claims. As a result, your vote will be counted as a Class 4 Convenience Claim in the amount of $3,000 and you will receive Liquid Cryptocurrency with a value equal to no less than 70% of the $3,000 Convenience Claim (*i.e.*, Liquid Cryptocurrency worth at least $2,100).

As further explained herein, Holders of Account Holder Claims may be eligible to opt-in to the Convenience Class by making the Convenience Claim Election. The Convenience Claim Election is explained in the question immediately following this answer.

**M.    What is the Convenience Claim Election and what are the consequences of making the Convenience Claim Election?**

The Convenience Claim Election, which is made on the Ballot when voting on the Plan, is an option available to Account Holders whose Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) total greater than $5,000 to irrevocably elect to have their Claims reduced to $5,000 and treated as Convenience Claims.[34] If you are an Account Holder of such Claims, you ***must vote to accept the Plan*** to make the Convenience Claim Election.

***Holders of Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) Greater than $5,000***[35]

---

[33]    This date is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Record Date is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

[34]    Please review Item 5 on your Ballot to make the Convenience Claim Election.

[35]    Please review Item 1 on your Ballot to see what type of Claim you have.

If you are an Account Holder whose Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) exceed the Convenience Claim Threshold,[36] the Convenience Claim Election allows you to *opt in* to receiving the Convenience Class treatment instead of receiving the applicable treatment available to each of your Claims.  By opting in to the Convenience Class treatment, the aggregate amount of your Account Holder Claims (excluding Custody Claims and pre-Set Off Treatment Retail Borrower Deposit Claims) will be reduced to $5,000.

For example, assume you have an Earn Claim in the amount of $4,000 and a Withhold Claim in the amount of $3,000 as of the Petition Date.[37]  Your Ballot will indicate that you have a Class 5 General Earn Claim in the amount of $4,000 and a Class 7 Withhold Claim in the amount of $3,000.  If you vote to accept the Plan, you will have the option to elect how you would like to receive a distribution.  *Regardless of what option you select, your vote will be counted as a vote to accept the Plan in Class 5 in the amount of $4,000 and a vote to accept the Plan in Class 7 in the amount of $3,000*.

*Option 1*.  You decide you would like to receive the Convenience Claim treatment.  To receive the Convenience Claim treatment, you make the Convenience Claim Election on your Ballot.[38]  The total amount of your Class 5 and Class 7 Claims is reduced from $7,000 to $5,000 (you cannot opt in to the Convenience Class treatment for one Claim and receive the class recovery for your other Claim).  If either a NewCo Transaction or an Orderly Wind Down is consummated, on the Effective Date, you will receive the greater of (a) the percentage recovery for General Earn Claims set forth in the final version of this Disclosure Statement and (b) 70% recovery on account of such $5,000 Convenience Claim in the form of Liquid Cryptocurrency.   In other words, you will receive not less than $3,500 in the form of Liquid Cryptocurrency.

*Option 2*.  You decide you would not like to receive the Convenience Claim treatment.  Rather, you would like to receive the General Earn Claim treatment with respect to your $4,000 Earn Claim and the Withhold Claim treatment with respect to your $3,000 Withhold Claim.  To receive the original treatment offered on behalf of your Class 5 and Class 7 Claims, you do not make the Convenience Claim Election on your Ballot, but may have the opportunity to make other elections.[39]  The amount and form of your recoveries will vary, as further explained below.

*Recovery Outcome A (Option 2 Only)*.  If either a NewCo Transaction or an Orderly Wind Down is consummated and Class 7 (Withhold Claims) votes to accept the Plan, you will receive the following:

| Withhold Claim ($3,000) | Remainder of Withhold Claim ($2,550)[40] | General Earn Claim ($4,000)[41] | Total |
|---|---|---|---|
|  |  |  |  |

---

[36]    Please review Item 1 on your Ballot to see what type of Claim you have.

[37]    For purposes of this example, you do not hold any other Claims.

[38]    Please review Item 5 on your Ballot to make the Convenience Claim Election.

[39]    Please review Item 6 on your Ballot to make further elections.

[40]    Assumes a 67.0% recovery for General Earn Claims.  Pursuant to the Plan, the remainder of Class 7 Withhold Claims receive the General Earn Claim treatment.

[41]    Assumes a 67.0% recovery for General Earn Claims.  For the purposes of this example, you do not make any Unsecured Claim Distribution Mix Elections.

| | | | | |
|---|---|---|---|---|
| Liquid Cryptocurrency | $450 | $956 | $1,499 | $2,905 |
| NewCo Common Stock [42] or Backup MiningCo Common Stock / Illiquid Recovery Rights [43] | N/A | $753 | $1,182 | $1,935 |
| Litigation Proceeds | N/A | The right to receive a share of the Litigation Proceeds. | | |

*Distribution Amount*    **$4,840**

***Recovery Outcome B (Option 2 Only).*** If either a NewCo Transaction or an Orderly Wind Down is consummated and Class 7 (Withhold Claims) votes to reject the Plan, you will receive the following:

| | *Withhold Claim ($3,000)* [44] | *General Earn Claim ($4,000)* [45] | *Total* |
|---|---|---|---|
| Liquid Cryptocurrency | $1,124 | $1,499 | $2,634 |
| NewCo Common Stock [46] or Backup MiningCo Common Stock / Illiquid Recovery Rights [47] | $886 | $1,182 | $2,068 |
| Litigation Proceeds | The right to receive a share of the Litigation Proceeds. | | |

*Distribution Amount*    **$4,691**

### N.    Are any regulatory approvals required to consummate the Plan? [48]

Yes, there are a number of regulatory approvals required to consummate the Plan, including:

---

[42]    Assumes the NewCo Transaction is consummated.

[43]    Assumes the Orderly Wind Down is consummated.

[44]    Assumes a 67.0% recovery for General Earn Claims. Pursuant to the Plan, the remainder of Class 7 Withhold Claims receive the General Earn Claim treatment.

[45]    Assumes a 67.0% recovery for General Earn Claims. For the purposes of this example, you do not make any Unsecured Claim Distribution Mix Elections.

[46]    Assumes the NewCo Transaction is consummated.

[47]    Assumes the Orderly Wind Down is consummated.

[48]    "Regulatory approvals" means any consents, approvals, or permissions of Governmental Authorities, including, for the avoidance of doubt, the SEC, that are necessary to implement and consummate the Restructuring Transactions, which shall be set forth in greater detail on a schedule to be delivered by the Plan Sponsor to the Debtors and the Committee.

- obtaining pre-clearance from the SEC confirming the financial statement presentation for the registration statement on Form 10 (the "Registration Statement") pursuant to the Securities and Exchange Act of 1934 (as amended) (the "Exchange Act") to be filed by NewCo;

- obtaining no-action relief or other reasonably acceptable assurances from the SEC with respect to NewCo's status as an investment company under the provisions of the Investment Company Act of 1940, or any rules or regulations promulgated thereunder; and

- obtaining temporary licensure from the State of New York to distribute and stake ETH.

Please see Article XI of this Disclosure Statement for a description of "Certain Securities Law Matters" related to approval of the Plan.

**O.      When will I receive my distribution under the Plan?   What is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan by entering the Confirmation Order.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After the Bankruptcy Court confirms the Plan, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Unless otherwise provided under the Plan, distributions to Holders of Allowed Claims and Interests will only be made starting on the date the Plan becomes effective—*i.e.*, the "Effective Date" or "Consummation"—or as soon as reasonably practicable thereafter, as specified in the Plan.  A "Notice of Effective Date" will be Filed on the Bankruptcy Court docket notifying all parties when the conditions precedent to the Effective Date have been satisfied.  *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion of the conditions that need to be satisfied or waived before the Effective Date and Consummation of the Plan.

The following distributions will be made on or shortly after the Effective Date, depending on the treatment of each Class:  (a) Liquid Cryptocurrency; (b) NewCo Common Stock (in the event the NewCo Transaction is consummated); (c) Cash; and (d) collateral securing Allowed Other Secured Claims.  Depending on the amount and types of elections Holders of Claims make in each Class, all as further explained herein, it may take several months for these distributions to be made.

In both the NewCo Transaction and the Orderly Wind Down, including the Backup Plan Sponsor Transaction, distributions of Litigation Proceeds from the Litigation Recovery Account will be made periodically as determined by the Litigation Administrator(s) and the Litigation Oversight Committee.  In the event of an Orderly Wind Down, Holders of General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims will receive Backup MiningCo Common Stock and Illiquid Recovery Rights instead of NewCo Common Stock.  Holders of such Claims will receive Backup MiningCo Common Stock and Illiquid Recovery Rights in the same percentage of any such Claim that was to be paid in NewCo Common Stock, which will provide Holders with equity in Backup MiningCo and preserve such Holders' rights to recoveries on the Debtors' illiquid assets.

In no event will Holders of Allowed Claims or Interests be entitled to interest, dividends, or accruals on the distributions provided for in the Plan regardless of whether such distribution is delivered on or after the Effective Date.  In addition, no distributions will be made to any Holder of Allowed Claims in an

---

"Governmental Authority" means (i) any U.S. federal, state, county, civil, or local legislative, administrative, self-regulatory or regulatory authority, agency court, tribunal, or judicial or arbitral body or other governmental or quasi-governmental entity with competent jurisdiction or (ii) any supranational or non-U.S. authority of similar jurisdiction.

aggregate amount less than or equal to $10. The Debtors shall not be required to make any distributions on account of Claims where the associated Withdrawal Fees would exceed the value of the distribution.

Distributions will only be made to Persons or Entities who are Holders of Allowed Claims on the Distribution Record Date, or such other date used to determine which Holders of Allowed Claims will be eligible to receive distributions under the Plan. Holders of Allowed Claims on the Distribution Record Date will receive distributions on the Effective Date (or as soon as possible thereafter), or in the time period otherwise described in the Plan. The Distribution Record Date is expected to be the date on which the Bankruptcy Court enters the Confirmation Order, or such other date as is announced by the Debtors or set forth in an Order of the Bankruptcy Court.

If a Claim is transferred twenty or fewer days before the Distribution Record Date, distributions will be made to the transferee of such Claim (*i.e.*, the Person or Entity to whom the Claim is transferred) only to the extent practicable, and in any event, only if the relevant Claim transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Debtors will have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

In addition, to be eligible to receive a distribution, Account Holders will have to complete the KYC process, provide required tax documents to the Debtors, sign up for an account with the Distribution Agent, and otherwise comply with the directions provided by the Debtors to receive a distribution.

Finally, the Distribution Agent may be unable to make distributions to certain parties for legal or other reasons, including to Holders of Claims that live in prohibited jurisdictions, as further explained in Article VIII of this Disclosure Statement, entitled "Risk Factors." In certain circumstances, these legal or other reasons may prevent the Distribution Agent from making any distributions, and in other circumstances, the Distribution Agent may only be able to make such distributions in Cash.

**P.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

There is no assurance that the Debtors will be able to reorganize their businesses if the Plan is not confirmed or does not go effective. It is likely that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan, including pursuant to a liquidation under chapter 7 of the Bankruptcy Code. A more detailed description of the consequences of an extended chapter 11 case or of a liquidation scenario is described in Article X.C of this Disclosure Statement entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit B**.

**Q.      If the Plan provides that I get a distribution, how will I receive my distribution?**

The initial distribution of Liquid Cryptocurrency will be distributed by the Distribution Agent, which will likely be the Post-Effective Date Debtors, PayPal, or another third-party provider, as applicable and depending on where you live, via the Celsius platform (or other platform) to an external wallet address on or shortly after the Effective Date. The NewCo Common Stock will be distributed by NewCo on or shortly after the Effective Date. As previously stated, however, you will be required to complete or fulfill certain registration requirements and compliance with certain AML/KYC policies and provide certain tax documents to the Debtors to receive a distribution. Distributions of the Pro Rata shares of the Litigation Recovery Account will be distributed periodically. The Litigation Administrator and the Litigation Oversight Committee will determine the frequency and timing of distributions.

Because of the cost of keeping the Debtors' platform open to process withdrawals, the Debtors believe that it is in the interest of the Debtors' Estates and creditors for the Debtors to use third-party

Distribution Agents to make all distributions of Liquid Cryptocurrency and for the Celsius App to become inactive after a set period of time. Among other things, the Debtors would have to continue employing and compensating numerous employees for an extended period of time to oversee and approve distributions through the Celsius platform. Accordingly, the Debtors have been working to identify Distribution Agents who could make distributions of Liquid Cryptocurrency to the Debtors' creditors under the Plan in a regulatorily compliant way and to enter into agreements with such Distribution Agents setting forth the terms on which the Distribution Agents may distribute Liquid Cryptocurrency or, in certain circumstances discussed below, fiat currency (the "Distribution Agreements"). As of the date of the Filing of this Disclosure Statement, the Debtors have identified PayPal as a potential Distribution Agent for certain distributions of Liquid Cryptocurrency to individual (non-corporate) creditors (other than with respect to Custody and Withhold creditors) in the United States (other than Hawaii).

For all distributions of Cryptocurrency that are not or will not be made by PayPal (including distributions to international creditors, corporate creditors, and Custody and Withhold creditors), the Debtors continue to explore potential Distribution Agents. If another Distribution Agent cannot be located to make those distributions, the Debtors will keep the Celsius platform open for ninety days after the Effective Date to make distributions to these creditors through the Celsius App (similar to how the Debtors have processed Court-approved withdrawals for certain Custody and Withhold users). The Debtors would prefer to identify a Distribution Agent who can make these distributions to international and corporate creditors because it is expensive to keep the Debtors' platform open to process withdrawals. Ninety days after the Effective Date, any applicable creditor who has not claimed their distribution of Cryptocurrency from the Debtors' platform will receive their distributions, if any, through PayPal or another Distribution Agent, and may receive fiat currency if a Distribution Agent does not have the requisite licenses to distribute Cryptocurrency to that creditor.

Upon the Deactivation Date, the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors. The Debtors chose a ninety-day period based on their experience enabling withdrawals of Cryptocurrency from the Celsius App for Custody and Withhold Account Holders pursuant to the Custody and Withhold Settlements. Specifically, the vast majority of the value eligible to be withdrawn pursuant to the Custody and Withhold Settlements was withdrawn within ninety days.

On the Deactivation Date, the Celsius App will cease to exist and users will no longer be able to log-in to the Celsius App and/or access their Celsius Account. Users are encouraged to download their transaction history for their personal records starting now to ensure that they have a copy of such history before the Celsius App ceases to exist.

The Debtors are also working to streamline distribution mechanics with respect to Persons and Entities that may not have opened an account with Celsius directly but earned rewards on their digital assets in accounts set up with other exchanges or from companies which were part of Celsius' partner programs (the "Partners"). Such Partners generally fall into two categories, "Segmented Partners" and "Omnibus Partners" (and the users thereof, "Segmented Partner Users" and "Omnibus Partner Users," respectively). The Debtors had eight Segmented Partners: Bitfinex; Blockbasis; Monarch; Paxful; B21; BitWala; Digifox; and Outlet (of which B21, BitWala, Digifox, Outlet are no longer operational). The Debtors have twelve Omnibus Partners: AmonInstitutional; BTTF; Public Mint; Anubi Digital; Mode; Line-Bitfront; Line-Bitmax; Liquid; KingdomTrust; Celsius Institutional; Civic; and Fabrx (of which Liquid, KingdomTrust, Celsius Institutional, Civi, and Fabrx are no longer operational).

Segmented Partner Users did not open accounts on the Celsius platform but instead accessed Celsius products through their accounts with, for example, BitWala. The Debtors, however, have existing Celsius accounts set up for each of those users on the Company's backend operations, and the Debtors

generally have contact information for these users (name, email, and other information necessary to operate Celsius user accounts). Further, these Segmented Partner Users accepted the Terms of Use. While these users were previously unable to access the Celsius App directly, the Debtors are able to activate these Celsius Accounts for distribution purposes. Accordingly, the Debtors currently plan to make distributions to Segmented Partner Users in the same way as for customers who opened accounts with Celsius directly. Segmented Partner Users are encouraged to reach out to the Debtors through Stretto to ensure that the Debtors have accurate contact information on file.

With respect to Omnibus Partner Users, the Company does not have any individual accounts for Omnibus Partner Users set up on the Company's backend operations. Instead, the Company only had an account for the Omnibus Partners themselves, who then further managed the provision of Celsius products to their users. Omnibus Partner Users only interacted with the Omnibus Partner and had no contact with the Company, did not accept the Terms of Use, and were unable to access the Celsius App directly. The Company also does not have any contact information for these users and only has an obligation to make distributions to the Omnibus Partners. Accordingly, the Company will make distributions to the Omnibus Partners and the Omnibus Partners are responsible for making any relevant distributions to Omnibus Partner Users. Omnibus Partner Users are encouraged to reach out to the Debtors through Stretto to ensure that the Debtors have accurate contact information on file.

The Debtors will provide additional information regarding Liquid Cryptocurrency distributions to all applicable creditors once the Debtors finalize agreements with the Distribution Agent(s).

The table below summarizes how distributions are expected to be made based on account and creditor type:

| Account and/or Claim Type | User Location (Based on KYC and Location) | Distribution Agent for Days 1–90 | Distribution Agent Starting on Day 91 |
|---|---|---|---|
| Custody Account (individual)<br><br>Withhold Account (individual) | United States, excluding Hawaii | Company (all Custody assets) or another Distribution Agent (BTC/ETH)<br><br>*Custody Account Holders can withdraw starting on the Confirmation Date. | PayPal (BTC/ETH) or another Distribution Agent (Cash or BTC/ETH) |
| Custody Account (corporate)<br><br>Withhold Account (corporate) | United States | Company (all Custody assets) or another Distribution Agent (BTC/ETH)<br><br>*Custody Account Holders can withdraw starting on the Confirmation Date. | Another Distribution Agent (Cash or BTC/ETH) |
| Earn Account (individual) | United States, excluding Hawaii | PayPal (BTC/ETH) | PayPal (BTC/ETH) or [another Distribution Agent (Cash or BTC/ETH)] |

| | | | |
|---|---|---|---|
| Retail Borrower Deposit Claim (individual)[49]<br><br>Convenience Claims (individual)<br><br>Unsecured Loan Claims (individual) | | | |
| Earn Account (corporate)<br><br>Convenience Claims (corporate)<br><br>Unsecured Loan Claims (corporate) | United States, excluding Hawaii | Company (BTC/ETH) or another Distribution Agent (BTC/ETH) | Another Distribution Agent (Cash or BTC/ETH) |
| Earn Account (individual and corporate)<br><br>Retail Borrower Deposit Claim (individual and corporate)<br><br>Convenience Claims (individual and corporate)<br><br>Custody Account (individual)<br><br>Withhold Account (individual)<br><br>Unsecured Loan Claims | Hawaii | PayPal (Cash, for individuals only) or another Distribution Agent (BTC/ETH), but unlikely to find a Distribution Agent to distribute in BTC/ETH | Same as Days 1–90 |
| Earn Account (individual and corporate)<br><br>Retail Borrower Deposit Claim (individual and corporate)<br><br>Convenience Claims (individual and corporate)<br><br>Unsecured Loan Claims | International | Company (BTC/ETH) or another Distribution Agent (BTC/ETH) | Another Distribution Agent (Cash or BTC/ETH) |

Finally, the Debtors and any applicable Distribution Agent will comply with applicable privacy and data laws in making distributions to Account Holders and other creditors. One method that the Debtors

---

[49] This does not account for Cryptocurrency that you will receive when you make the Retail Advance Obligation Repayment Election and repay your Retail Advance Obligation in accordance with the Retail Advance Obligation Repayment Instructions and by the Retail Advance Obligation Repayment Deadline.

are exploring is "hashing." "Hashing" is a series of mathematical operations (collectively a "hashing algorithm") that transforms a string of characters (like an e-mail address or name) into a meaningless sequence of characters (the "hash"). Importantly, the resulting hash has two properties that are critical: (1) the "hash" is meaningless to anyone who might view the hash, such that there is no known method to reverse the hash and discover the string of characters from which the hash was created; and (2) if you start with the exact same string of characters, and apply the same hashing algorithm, you will always get the same resulting hash.

For example, the Holders of Claims may register with a Distribution Agent in connection with distributions as explained above and will be required by applicable laws and regulations to provide to the Distribution Agent certain personal information to verify such Holder's identity, such as an e-mail address. Celsius will also have that same information about Account Holders in its own file. If hashing is employed, the Distribution Agent and Celsius would each use the agreed upon hashing algorithm to create a unique hash from such customer information, ***without Celsius or the Distribution Agent ever sharing the underlying customer information***. If the resulting hashes match, Celsius and the Distribution Agent will know that the person that registered with the Distribution Agent is the same as the person for whom Celsius has an associated approved claim, and Celsius can thereafter instruct the Distribution Agent to make a distribution to such person on account of the approved claim. At no time, however, would any private customer information be exchanged, other than the sequence of characters comprising the hash. If the hash is disclosed, it would be meaningless to anyone who might see it because the hash algorithm cannot be reversed.

### R.    How will undeliverable distributions and unclaimed property be treated under the Plan?

In the event that the NewCo Transaction is consummated, any distribution under the Plan that is unclaimed or otherwise remains undeliverable for a period of one year after the first attempt to deliver shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and shall automatically and irrevocably revert to NewCo, in the case of NewCo Common Stock, or the Litigation Recovery Account, to the extent it is Liquid Cryptocurrency, and shall be distributed Pro Rata to Holders entitled to receive Litigation Proceeds under the Plan (*i.e.*, General Earn Claims, Unsecured Loan Claims, Retail Borrower Deposit Claims, and General Unsecured Claims).

Any unclaimed property under the Series B Settlement will be redistributed in accordance with Section 4 of the Series B Settlement Agreement.

In the event that the Debtors decide to toggle to the Orderly Wind Down, any unclaimed distributions or unclaimed property shall be (a) distributed to Holders of Illiquid Recovery Rights, (b) utilized to fund Wind-Down Expenses, or (c), if no Wind-Down Expenses remain, contributed to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code.

Once a distribution is determined to be unclaimed property as set forth above and in the Plan, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

Accordingly, Holders of Claims should timely respond to NewCo's or the Post-Effective Date Debtors' communications and attempts to complete Distributions, including by completing required KYC processes, to avoid forfeiting Distributions to which they are entitled.

Finally, the Distribution Agent may be unable to make distributions to certain parties for legal or other reasons, including to Holders of Claims that live in prohibited jurisdictions, as further explained in Article VIII of this Disclosure Statement, entitled "Risk Factors."  In certain circumstances, these legal or other reasons may prevent the Distribution Agent from making any distributions, and in other circumstances, the Distribution Agent may only be able to make such distributions in Cash.

**S.  How will I receive my recovery if the Orderly Wind Down, including the Backup Plan Sponsor Transaction, is consummated?**

In the event of an Orderly Wind Down, whether pursuant to the Backup Plan Sponsor Transaction or otherwise, the Plan Administrator will administer the Post-Effective Date Debtors' estates in accordance with the Plan Administrator Agreement and the Wind-Down Procedures, including with respect to distributions.

For distributions of Cryptocurrency, the Plan Administrator may consider making distributions through Account Holders' existing Celsius Accounts subject to certain AML/KYC requirements and the provision of applicable tax documents.  For further distributions, including Litigation Proceeds, the Litigation Administrator will determine the most effective means of distributing the Litigation Proceeds.

The Debtors will provide detailed instructions to all claimants of the steps they must take to receive their distributions in the event of an Orderly Wind Down.

**T.  What is NewCo Common Stock?**

NewCo Common Stock is the common stock of NewCo to be issued by NewCo and distributed on the Effective Date to certain Holders of Claims, including Holders of General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims.  Holders of Retail Borrower Deposit Claims may also receive NewCo Common Stock on behalf of any portion of their Retail Borrower Deposit Claims that receives the Unsecured Claim Distribution Consideration.  Pursuant to the Plan, 100 percent of the NewCo Common Stock representing all of NewCo's common equity will be distributed to eligible Holders of Claims as part of their recoveries under the Plan (subject to dilution by the Management Equity Compensation and the Employee and NewCo Board Equity Compensation provided and any stock purchased by the Plan Sponsor for cash through a primary purchase).

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act, and, except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  The issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) is being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.  Such NewCo Common Stock will be considered "restricted securities."

Due to the number of Holders that will receive Newco Common Stock under the Plan, NewCo will file a Registration Statement pursuant to the Exchange Act.  After the Registration Statement is effective, NewCo intends to provide Holders of NewCo Common Stock financial disclosures and transparency on an ongoing basis through the filing of all periodic reports and disclosures (*e.g.*, Form 10-Ks and 10-Qs), as required by the Exchange Act and the rules and regulations of the SEC promulgated thereunder.

Please see Article XI of this Disclosure Statement for a description of "Certain Securities Law Matters" for more information.

**U.    Can I trade or sell my NewCo Common Stock?**

On or shortly after the Effective Date, the NewCo Common Stock will be issued to Holders of Retail Borrower Deposit Claims, General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims,[50] subject to certain applicable federal and state securities laws and AML/KYC compliance, as required by NewCo and its partners.  Such NewCo Common Stock will be freely tradeable.  Prior to the Effective Date, NewCo intends to file a Registration Statement with respect to the NewCo Common Stock and for such Registration Statement to be effective.  Fahrenheit intends for the NewCo Common Stock to trade on NASDAQ at or as soon as reasonably practicable after the Effective Date.

In the event of an Orderly Wind Down, Backup MiningCo Common Stock and Illiquid Recovery Rights will be issued instead of NewCo Common Stock.

Please see Article XI of this Disclosure Statement for a description of "Certain Securities Law Matters" for more information.

**V.    How much NewCo Common Stock will I receive under the Plan?**

If the NewCo Transaction is consummated, Holders of Retail Borrower Deposit Claims, General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims,[51] will each be entitled to such Holder's Pro Rata share of NewCo Common Stock (in addition to such Holder's Liquid Cryptocurrency Distribution Amount and Litigation Proceeds, as applicable), regardless of whether such Holder voted to accept the Plan, voted to reject the Plan, or abstained from voting on the Plan.

The default treatment under the Plan is that each Holder that receives the Unsecured Claim Distribution Consideration on behalf of such Holder's Claim, or portion of Claim, will receive a share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) NewCo Common Stock based on its Pro Rata portion of all Claims entitled to receive such consideration.  But, as further explained in the question and answer immediately following this answer, certain Holders of Claims are eligible to elect to request receive a greater amount of NewCo Common Stock than their Liquid Cryptocurrency Distribution Amount and vice versa, as discussed in more detail below.

**W.    How can I elect to receive more NewCo Common Stock in lieu of Liquid Cryptocurrency?  Can I elect to receive a greater distribution of Liquid Cryptocurrency instead?**

Holders of General Earn Claims (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) that vote to accept the Plan may indicate a preference on their Ballots to receive a greater share of NewCo Common Stock instead of some or all of their Pro Rata share of the Liquid Cryptocurrency Distribution Amount.  This is referred to in the Plan and in the Ballot as the "NewCo Common Stock Weighted Distribution Election."[52]  Similarly, such Holders may indicate a preference on their Ballot to receive a greater share of the Liquid Cryptocurrency Distribution Amount instead of some or all of their Pro Rata share of NewCo Common Stock.  This is referred to in the Plan and

---

[50]    Holders of Retail Borrower Deposit Claims will receive NewCo Common Stock to the extent their Retail Borrower Post-Set Off Deposit Claims receive the Unsecured Claim Distribution Consideration.

[51]    Holders of Retail Borrower Deposit Claims will receive NewCo Common Stock to the extent their Retail Borrower Post-Set Off Deposit Claims receive the Unsecured Claim Distribution Consideration.

[52]    Please review <u>Item 6</u> on your Ballot to make the NewCo Common Stock Weighted Distribution Election.

in the Ballot as the "Liquid Cryptocurrency Weighted Distribution Election."[53]

To be clear, you are only eligible to make the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election if you (a) are a Holder of any Claim that will receive the Unsecured Claim Distribution Consideration *and* (b) you vote to accept the Plan. You are not eligible to make any of these elections if you vote to reject the Plan.[54] Moreover, any Unsecured Claim Distribution Mix Election that you make will apply to ***all of your Claims that will receive the Unsecured Claim Distribution Consideration***.[55]

In addition, any NewCo Common Stock Weighted Distribution Elections and Liquid Cryptocurrency Weighted Distribution Elections will ***only be honored if a NewCo Transaction is consummated***. These elections will not be honored if an Orderly Wind Down is consummated. For the elections to be honored in a NewCo Transaction, each of the NewCo Common Stock Weighted Distribution Election and the Liquid Cryptocurrency Weighted Distribution Election will have to be selected by a sufficient number of Holders. In other words, if every Holder makes the NewCo Common Stock Weighted Distribution Election, the Debtors will be unable to honor those elections and will default to Pro Rata distributions. Further, the recovery you ultimately receive will also depend on the aggregate number of Holders who do or do not make the NewCo Common Stock Weighted Distribution Elections and Liquid Cryptocurrency Weighted Distribution Elections. The Debtors may also be unable to honor elections for administrative reasons. For the avoidance of doubt, there is no guarantee that a Holders' Unsecured Claim Distribution Mix Election will be honored.

Further, by making an Unsecured Claim Distribution Mix Election ***you are agreeing that up to all of your Liquid Cryptocurrency may be converted to NewCo Common Stock or that up to all of NewCo Common Stock may be converted to Liquid Cryptocurrency***, as applicable.

Finally, any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim will be given priority over the Liquid Cryptocurrency Weighted Distribution Elections made by other eligible Holders of Claims.

For example, assume you are the Holder of a General Earn Claim[56] in an amount of $10,000 as of the Petition Date. You vote to accept the Plan. On your Ballot, you can either (a) choose not to make an election, (b) make the NewCo Common Stock Weighted Distribution Election, or (c) make the Liquid Cryptocurrency Weighted Distribution Election.[57]

If you choose not to make an election, then on or shortly after the Effective Date, you will receive a distribution in the amount of 67.0% of the value of your General Earn Claim, for a total consideration of $6,702, through the following distributions:

---

[53]    Please review Item 6 on your Ballot to make the Liquid Cryptocurrency Weighted Distribution Election.

[54]    For the avoidance of doubt, if you have a Custody Claim and you vote your Custody Claim to reject the Plan, you are still entitled to make elections with respect to any Claim that will receive the Unsecured Claim Distribution Consideration that you voted to accept the Plan.

[55]    Please review Item 6 on your Ballot to make the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election.

[56]    For purposes of this example, you do not hold any other Claims.

[57]    Please review Item 6 on your Ballot to make the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election.

- $3,748 in Liquid Cryptocurrency;

- $2,954 worth of NewCo Common Stock; and

- the right to receive a share of the Litigation Proceeds.

If you choose to make either the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election, then the type and amount of your distribution will change as further explained below.

### *NewCo Common Stock Weighted Distribution Election*

Pursuant to the NewCo Common Stock Weighted Distribution Election, eligible Holders may make an election on their Ballots to receive a greater share of NewCo Common Stock instead of all or a portion of their Liquid Cryptocurrency Distribution Amount.  Any Holder that makes such election, and to the extent such election is honored, will receive incremental NewCo Common Stock at a 30% premium to the Liquid Cryptocurrency Distribution Amount such Holder forfeits.  Although the ultimate amount of Liquid Cryptocurrency that is forfeited will be based on the aggregate Unsecured Claim Distribution Mix Election, by making this election on the Ballot, such Holder is ***agreeing*** that her ***total*** Liquid Cryptocurrency Distribution Amount may be forfeited in exchange for more NewCo Common Stock.  ***Please consider this carefully before making the NewCo Common Stock Weighted Distribution Election on your Ballot.***[58]

Using the example above that you are the Holder of a General Earn Claim[59] in an amount of $10,000 as of the Petition Date, assume you make the NewCo Common Stock Weighted Distribution Election on your Ballot because you would rather receive more NewCo Common Stock than Liquid Cryptocurrency on the Effective Date.  As a result of that election, and after taking into account the Unsecured Claim Distribution Mix Election for all Holders, the Debtors determine that your NewCo Common Stock Weighted Distribution Election will result in your Liquid Cryptocurrency Distribution Amount being reduced by 50% in exchange for a greater distribution of NewCo Common Stock.[60]  Thus, instead of receiving $3,748 in Liquid Cryptocurrency, you will receive the following:

- $1,874 in Liquid Cryptocurrency (instead of the $3,748 in Liquid Cryptocurrency noted above); and

- $2,436[61] worth of NewCo Common Stock (in addition to the $2,954 worth of NewCo Common Stock noted above).

As a result, instead of receiving $2,954 in value in the form of NewCo Common Stock, you will receive $5,390 in value in the form of NewCo Common Stock.  The incremental $2,436 in value of your NewCo Common Stock is a result of the $1,874 of Liquid Cryptocurrency that you forfeited multiplied by a 30% premium.

Now, because you made the NewCo Common Stock Weighted Distribution Election, on or shortly

---

[58]    Please review Item 6 on your Ballot to make the NewCo Common Stock Weighted Distribution Election.

[59]    For purposes of this example, you do not hold any other Claims.

[60]    This 50% reduction is for illustrative purposes only and is not based on any specific assumption with respect to all Unsecured Claim Distribution Mix Elections.

[61]    This amount is calculated as follows:  (a) $3,748*50% = $1,874; and (b) $1,874*130% = $2,436.

after the Effective Date, you will receive a total consideration of $7,624, in the following ways:

- $1,874 in Liquid Cryptocurrency;

- $5,390 worth of NewCo Common Stock; and

- the right to receive a share of the Litigation Proceeds.

In other words, the amount of your recovery increases slightly and is no longer split in the Pro Rata amounts offered to Holders of General Earn Claims under the Plan.

### Liquid Cryptocurrency Weighted Distribution Election

Conversely, pursuant to the Liquid Cryptocurrency Weighted Distribution Election, eligible Holders may make an election on their Ballots to receive a greater distribution of Liquid Cryptocurrency instead of all or a portion of their NewCo Common Stock. Any Holder that makes such election, and to the extent such election is honored, will receive Liquid Cryptocurrency at a 30% discount to the amount of NewCo Common Stock such Holder forfeits. Although the ultimate amount of NewCo Common Stock that is forfeited will be based on the aggregate Unsecured Claim Distribution Mix Election, by making this election the Ballot, such Holder is *agreeing* that *all* of her NewCo Common Stock may be forfeited in exchange for Liquid Cryptocurrency. *Please consider this carefully before making the Liquid Cryptocurrency Weighted Distribution Election on your Ballot*.[62]

Please also note that any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim will be given priority over the Liquid Cryptocurrency Weighted Distribution Elections made by other eligible Holders of Claims.

Using the example above that you are the Holder of a General Earn Claim[63] in an amount of $10,000 as of the Petition Date, assume you make the Liquid Cryptocurrency Weighted Distribution Election on your Ballot because you would rather receive more Liquid Cryptocurrency than NewCo Common Stock on the Effective Date. As a result of that election, and after taking into account the Unsecured Claim Distribution Mix Election for all Holders, the Debtors determine that your Liquid Cryptocurrency Weighted Distribution Election will result in the value of the NewCo Common Stock you would have received being reduced by a total of 50% in exchange for a greater distribution of Liquid Cryptocurrency.[64] Thus, instead of receiving $2,954 worth of NewCo Common Stock, you will receive the following:

- $1,477 worth of NewCo Common Stock (instead of the $2,954 noted above); and

- $1,034[65] in Liquid Cryptocurrency (in addition to the $3,748 in Liquid Cryptocurrency noted above).

As a result, instead of receiving $3,748 in value in the form of Liquid Cryptocurrency, you will receive $4,782 in value in the form of Liquid Cryptocurrency. This increase of $1,034 in value of your Liquid Cryptocurrency is a result of the $1,477 of NewCo Common Stock that you forfeited multiplied by

---

[62]  Please review Item 6 on your Ballot to make the Liquid Cryptocurrency Weighted Distribution Election.

[63]  For purposes of this example, you do not hold any other Claims.

[64]  This 50% reduction is for illustrative purposes only and is not based on any specific assumption with respect to all Unsecured Claim Distribution Mix Elections.

[65]  This amount is calculated as follows:  (a) $2,954*50% = $1,477; and (b) $1,477*70% = $1,034.

a 30% discount.

Now, because you made the Liquid Cryptocurrency Weighted Distribution Election, on or shortly after the Effective Date, you will receive a total consideration of $6,259, in the following ways:

- $4,782 in Liquid Cryptocurrency;

- $1,477 worth of NewCo Common Stock; and

- the right to receive a share of the Litigation Proceeds.

A side-by-side comparison of the three different treatment outcomes for a Holder of a General Earn Claim[66] in the amount of $10,000 based on a 67.0% recovery is shown below:

| | *No Election (Default)* | *NewCo Common Stock Weighted Distribution Election*[67] | *Liquid Cryptocurrency Weighted Distribution Election*[68] |
|---|---|---|---|
| Liquid Cryptocurrency | $3,748 | $1,874 | $4,782 |
| NewCo Common Stock | $2,954 | $5,390 | $1,477 |
| Litigation Proceeds | The right to receive a share of the Litigation Proceeds | | |
| *Total Recovery:* | *$6,702* | *$7,264* | *$6,259* |
| *% of Recovery Change:* | *N/A* | *Increase of ~8%* | *Decrease of ~7%* |

### Unsecured Claim Distribution Mix Elections

The Debtors' ability to accommodate Holders' specified preferences will ultimately depend on what elections all Holders make on their Ballots. The Debtors will use reasonable efforts to redistribute the consideration provided to Holders to satisfy the aggregate Unsecured Claim Distribution Mix but cannot guarantee that Holders will receive what they requested.

## X.    What happens to my NewCo Common Stock in an Orderly Wind Down?

In an Orderly Wind Down, no NewCo Common Stock will be distributed to any Holders of Claims. Rather, in an Orderly Wind Down, Holders of Claims on account of which the Holder will receive the Unsecured Claim Distribution Consideration will receive a combination of Backup MiningCo Common

---

[66]    For purposes of this example, the Holder does not have any other Claims.

[67]    Assumes that your Liquid Cryptocurrency Distribution Amount is reduced by 50% in exchange for a greater distribution of NewCo Common Stock.

[68]    Assumes the value of the NewCo Common Stock you would have received is reduced by a total of 50% in exchange for a greater distribution of Liquid Cryptocurrency.

Stock and Illiquid Recovery Rights instead of NewCo Common Stock.  As a result, such Holders will receive their Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

"Backup MiningCo Common Stock" is the new common stock of Backup MiningCo.

"Illiquid Recovery Rights" are Claims that will remain outstanding after the Effective Date in the case of Orderly Wind Down for purposes of preserving such Holders' rights to recoveries on the Debtors' illiquid assets.

**Y.      Are there risks to owning NewCo Common Stock upon emergence from Chapter 11?**

Yes, see Article VIII of this Disclosure Statement, entitled "Risk Factors," for a further discussion of the risks associated with owning NewCo Common Stock.

Among other things, the ownership percentage represented by the NewCo Common Stock will be subject to dilution from securities that may be issued post-emergence, including the issuance of NewCo Common Equity to the Manager pursuant to the Management Equity Compensation and the issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than the Secondary Market Purchase).

Moreover, as discussed further herein and in the Plan, the success of NewCo is not guaranteed. NewCo's performance could affect the value of the NewCo Common Stock, and/or NewCo's capacity to issue and/or pay any dividends.  NewCo's business model is subject to a variety of risks including (a) the market forces and volatility common to the Cryptocurrency markets, (b) NewCo's capacity to maintain necessary regulatory licenses and approvals, and (c) the risks involved in the mining and staking businesses. In the event that NewCo does not achieve its projected financial results or the value of certain NewCo assets are assessed to be materially different than the financial valuations herein, the value of NewCo Common Stock could be negatively affected and/or NewCo may lack sufficient liquidity to operate as planned after it is established on the Effective Date.

Finally, there is also a risk that Fahrenheit may not succeed in listing NewCo Common Stock on NASDAQ or another public exchange, as it currently intends to do.

**Z.      How will Holders know what NewCo is doing after the Effective Date?**

NewCo will provide holders of NewCo Common Stock financial disclosures and transparency on an ongoing basis through the filing of all periodic reports and disclosures (*e.g.*, Form 10-Ks and 10-Qs), as required by the Exchange Act and the rules and regulations of the SEC promulgated thereunder.

Holders of NewCo Common Stock will also be entitled to receive certain information and/or vote on certain matters pursuant to the New Organizational Documents.

**AA.     What is a Plan Administrator?  Who will be the Plan Administrator?**

A "Plan Administrator" is a Person or Entity that will be appointed in either a NewCo Transaction or the Orderly Wind Down, whether pursuant to the Backup Plan Sponsor Transaction or otherwise, to act in a fiduciary capacity to administer the Post-Effective Date Debtors' estates.  The Plan Administrator will be selected by the Debtors, in consultation with the Committee, and will be identified in the Plan Supplement.

The Plan Administrator's appointment will be approved when the Plan is confirmed by the Bankruptcy Court entering the Confirmation Order. The Plan Administrator's duties will officially begin as of the Effective Date.

### BB.    What are the roles of the Plan Administrator?

The Plan Administrator's roles will be identified in the Plan Administrator Agreement, which will be included in the Plan Supplement, and will include a range of administrative duties such as:

- administering the Special Committee D&O Liability Insurance Policies;

- implementing the Orderly Wind Down, as applicable, and making (or arranging for the Distribution Agent to make) the distributions contemplated by the Plan;

- marshalling, marketing for sale, and winding down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated and to the extent not duplicative of the Litigation Administrator's responsibilities);

- recovering and compelling turnover of the Debtors' property in connection with the Plan, as long as this is not duplicative of the Litigation Administrator's work;

- managing the Plan Administrator Budget or Wind-Down Budget, as applicable, and paying the Wind-Down Expenses, if any;

- abandoning property or assets belonging to the Post-Effective Date Debtors that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective;

- preparing and Filing post-Effective Date operating reports;

- filing any necessary tax returns in the exercise of the Plan Administrator's fiduciary obligations;

- hiring the professionals necessary to help the Plan Administrator fulfil its fiduciary duties; and

- taking such actions as are necessary and reasonable to carry out the purposes of the Plan or Wind-Down Procedures, as applicable, including winding down the Debtors' business affairs.

The Plan Administrator will also take all necessary steps to dissolve the Post-Effective Date Debtors at the necessary and appropriate time.

### CC.    What is a Litigation Administrator?  What is the Litigation Oversight Committee? Who will be the Litigation Administrator?  Who will be on the Litigation Oversight Committee?

A "Litigation Administrator" is a Person or Entity that will be appointed to prosecute (*i.e.*, file lawsuits), settle, or otherwise resolve all remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to this Plan), the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans. One or more Litigation Administrator(s) will be appointed and such administrator(s)' duties

will commence on the Effective Date.  The Litigation Administrator(s) will be selected by the Committee, and the appointment will be approved by the Bankruptcy Court as part of the Bankruptcy Court's confirmation, or approval, of the Plan.  The identity of the Litigation Administrator(s) will be disclosed in the Plan Supplement, and, if there are multiple Litigation Administrators, the Plan Supplement will disclose the responsibilities for each Litigation Administrator.  For example, the Committee may identify (x) a Litigation Administrator to manage Account Holder Avoidance Actions for the benefit of Holders of Claims entitled to Litigation Proceeds as set forth in the Plan and (y) a Litigation Administrator to manage all Recovery Causes of Action, other than Account Holder Avoidance Actions, for the benefit of Holders of Claims entitled to Litigation Proceeds as set forth in the Plan.  The Plan Supplement will also contain the Litigation Administrator Agreement(s), which will set forth the duties and powers of the Litigation Administrator(s) in greater detail.

The Litigation Administrator will act in a fiduciary capacity for all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account.  That means that the Litigation Administrator will prosecute, settle, collect, or otherwise resolve the Claims and Causes of Action for which it is responsible in a manner that is consistent with the best interests of all Holders of Claims entitled to receive Litigation Proceeds.  Recoveries on account of those Claims and Causes of Action will be made Pro Rata to Holders of Claims entitled to receive Litigation Proceeds.

No individual Holder of a Claim shall be able to direct the actions of the Litigation Administrator(s).  The Litigation Administrator(s) will report to, and act at the direction of, the "Litigation Oversight Committee," which will oversee the work of the Litigation Administrator(s).  The Litigation Oversight Committee will have seven members, which will be identified in the Plan Supplement.  Two of the members of the Litigation Oversight Committee will be selected by the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group, each subject to the consent of the Committee.  The remaining members of the Litigation Oversight Committee shall be determined by the Committee through an open interview process.[69]  At least two members of the Litigation Trust Oversight Committee will not be Committee members.

The Litigation Oversight Committee will also contain a three member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders.  At least two members of the subcommittee shall not be current members of the Committee.  In addition, two members of the subcommittee will be selected by the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group, subject to the consent of the Committee, and which will be the same members that the Earn Ad Hoc Group and Retail Borrower Ad Hoc Group appoint to the Litigation Oversight Committee.  The Avoidance Action subcommittee shall confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety days prior to the Petition Date.

### DD.    What are the roles of the Litigation Administrator and the Litigation Oversight Committee?

As explained above, the Litigation Administrator(s)'s primary role will be to undertake legal action to recover assets and property belonging to the Debtors' estates that can then be distributed back to Holders of Claims entitled to Litigation Proceeds under the Plan.  The Litigation Oversight Committee will guide, manage, and review the work of the Litigation Administrator.

---

[69]    Applications for a position on the Litigation Oversight Committee were open until July 7, 2023.

Responsibilities of the Litigation Administrator(s) shall be as identified in the Litigation Administrator Agreement(s) and shall include, but are not limited to:

- filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted;

- filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court;

- exercising the Debtors' rights with respect to (a) the Goldstein Loan, (b) the Leon Loan, and (c) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party;

- managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan;

- retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and

- taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement.

For example, the Litigation Administrator(s) will undertake legal action against individuals such as Alex Mashinsky ("Mr. Mashinsky"), Shlomi Daniel Leon ("Mr. Leon"), and others, in connection with the management or affairs of the Debtors prior to or after the Petition Date.  The Litigation Administrator(s) will also work to collect the Goldstein Loan (the $4.2 million loan issued by one or more of the Debtors to Hanoch "Nuke" Goldstein), the Leon Loan (the $4 million loan issued by one or more of the Debtors to Mr. Leon), and any other CEL Insider Loans, the value of which will ultimately be distributed for the benefit of Holders of Claims entitled to Litigation Proceeds under the Plan.

### EE.    Will the Litigation Administrator(s) be paid?  If so, who will pay the Litigation Administrator(s)?

The Litigation Administrator(s) will be paid by the Litigation Recovery Account.  The Litigation Recovery Account will be a segregated account established by the Post-Effective Date Debtors on the Effective Date and funded with the Initial Litigation Funding Amount.[70]  The Litigation Recovery Account will be controlled by the Litigation Administrator(s), and the funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator(s) (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action, all in accordance with the terms of the Litigation Administrator Agreement(s).

The terms of the Litigation Administrator(s)'s compensation will be disclosed in the Plan Supplement.

---

[70]    "Initial Litigation Funding Amount" means Cash in an amount of up to $50,000,000, which amount shall be agreed upon by the Debtors and the Committee.

**FF.     How will I receive Litigation Proceeds?  What happens to the Cash left in the Litigation Recovery Account after the Litigation Administrator(s) have completed their duties?**

Holders of Claims entitled to receive Litigation Proceeds under the Plan will receive periodic distributions on account of recoveries from the Recovery Causes of Action from the Litigation Recovery Account.  The frequency and timing of distributions from or in respect of the Litigation Recovery Account shall be determined by the Litigation Administrator(s) and the Litigation Oversight Committee in accordance with the Litigation Administrator Agreement(s).  The parties are discussing the most efficient means to make distributions to Holders of Claims entitled to Litigation Proceeds under the Plan.

To the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account will be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds under the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrators' reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii)(a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court.

**GG.     What are Contributed Claims?  Should I contribute my Contributed Claims to the Litigation Administrator?**

Contributed Claims are any causes of action that Holders of Claims or Interests may have against persons or entities other than the Debtors whose prepetition acts or omission harmed such Holders in their capacity as creditors of the Debtors.  These Contributed Claims include, but are not limited to, any causes of action arising out of:  (a) the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Celsius' platform; (b) the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; or (c) any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date.  For instance, a Contributed Claim may include an Account Holder's claim directly against Mr. Mashinsky alleging that Mr. Mashinsky made various public misrepresentations that fraudulently induced the Account Holder to transfer their digital assets to the Celsius platform.  Contributed Claims do not, however, include (i) any derivative claims of the Debtors (*e.g.*, a claim where the principal harm was against the Debtors or another Person, which indirectly harmed the Contributed Claimant), (ii) any direct claims against the Released Parties, or (iii) any claims that cannot be assigned under applicable law.

Any Holder of a Claim or Interest can elect through their Ballot to contribute such Holder's Contributed Claims to the applicable Post-Effective Date Debtor(s) in order for the Litigation Administrator to prosecute such Causes of Action for the benefit of Holders of Claims entitled to receive Litigation Proceeds under the Plan.

By contributing a potential Contributed Claim, a Contributing Claimant (the person who contributed such Contributed Claim) is expressly forfeiting their right to receive any recovery on account of such Contributed Claim separate from their entitlement (if any) to receive a Pro Rata share of the Litigation Proceeds.  The proceeds of any recovery on account of a Contributed Claim will go entirely to the Litigation Recovery Account and Contributing Claimants will only be entitled to any Litigation Proceeds they are entitled to in connection with their Allowed Claims.

The Debtors and the Committee believe that most Contributing Claimants will likely benefit from contributing their Contributed Claims due to the time and cost likely required to resolve such Causes of Action.  At the same time, however, the Debtors recognize that certain potential Contributing Claimants may benefit from retaining their claims.  For example, a potential Contributing Claimant who is not entitled

to Litigation Proceeds as a form of distribution under the Plan cannot benefit from contributing a claim. Similarly, the Litigation Administrator(s) have no obligation or duties to the Contributing Claimants independent of their entitlement to a share of the Litigation Proceeds, and the Litigation Administrator(s) may determine that pursuing a Contributed Claim does not serve the best interests of the Holders of Claims entitled to the Litigation Proceeds under the Plan as a whole. Put another way, the singular objective of the Litigation Administrator(s) is to maximize the total Litigation Proceeds and not to pursue every potential cause of action.

The Debtors and the Committee believe that the Litigation Administrator(s) are uniquely qualified to resolve the Contributed Claims in a manner that maximizes the Litigation Proceeds because the Litigation Administrator(s) have:  (a) visibility into a large number of Claims; (b) the oversight and input to be provided by the Litigation Oversight Committee; and (c) access to the Litigation Recovery Account. While the Debtors believe that Contributed Claims will serve to benefit the Debtors' stakeholders in the aggregate, including the Contributing Claimants, the Debtors cannot make a recommendation as to whether it is the best interest of a particular Contributing Claimant to contribute a particular Claim. The Debtors recommend that potential Contributing Claimants consult their own counsel concerning their ability to resolve (and the potential benefits of not contributing) their potential Contributed Claims.

Any election to contribute Contributed Claims to the Litigation Administrator is irrevocable. That means that once individual Holders agree to contribute their Contributed Claims, they may not rescind that election.  To complete the contribution of Contributed Claims to the Litigation Administrator, each Contributing Claimant will execute appropriate documentation reasonably requested by the Post-Effective Date Debtors or the Litigation Administrator(s).  Finally, any Contributing Claimant that contributes their Contributed Claims will not be able to direct the actions of the Litigation Administrator with respect to such Contributed Claims.

### HH.    What is the difference between a Plan Administrator and a Litigation Administrator?

The Plan Administrator will be tasked with handling administrative duties related to the Post-Effective Date Debtors' Estates.  Examples of such tasks include filing any necessary tax returns or making distributions to Holders of Claims (in the event of the Orderly Wind Down).

In contrast, the Litigation Administrator will be tasked with taking legal actions such as resolving disputed claims and filing lawsuits to recover property for the Debtors' estates, which can then be distributed to Holders of Claims entitled to Litigation Proceeds under the Plan.  The Litigation Administrator and the Litigation Oversight Committee will determine the frequency and timing of distributions of the Litigation Recovery Account.

The Plan Administrator Agreement and the Litigation Administrator Agreement will identify the roles and duties of each Person or Entity acting as a Plan Administrator or Litigation Administrator and ensure that they are not duplicative.

### II.    How will the preservation of the Causes of Action affect my recovery under the Plan?

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.  *See* Article IV.M of the Plan. Recoveries on account of such Causes of Action may be distributed to Holders of Claims entitled to receive Litigation Proceeds under the Plan.

Each Post-Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue any and all Causes of Action, whether arising before or after

the Petition Date. The Schedule of Retained Causes of Action, which will be included in the Plan Supplement, will identify certain of these Causes of Action.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court**.

**JJ.    Does the Plan subordinate any Claims? What does it mean to subordinate Claims? Whose Claims are subordinated under the Plan and why?**

*1.    Does the Plan subordinate any Claims and what does it mean to subordinate Claims?*

Yes, the Plan subordinates Claims in Class 16 (Section 510(b) Claims) and Class 17 (Equitably Subordinated Claims) (collectively, the "Subordinated Claims"). To subordinate a claim means to rank it below other claims of the same or lower priority. The "subordinated" claim only receives a recovery or distribution under a plan after all claims and interests ranked above it are paid in full. Put another way, a claim that would otherwise be senior or equal to other claims can be demoted, under certain circumstances, to a more junior priority level. Pursuant to the terms of the Plan, the Subordinated Claims will only be paid if Claims in Classes 1–15 are paid in full. In other words, Claims in Classes 16 and 17 are placed at a lower priority than Claims in Classes 1–15.

Claims in Class 16 are subordinated pursuant to section 510(b) of the Bankruptcy Code. Section 510(b) of the Bankruptcy Code requires the subordination of any claim that (a) arises from the cancellation of a purchase or sale of a "security" in a debtor or a debtor's affiliate, (b) seeks damages arising from the purchase or sale of such a security, or (c) seeks reimbursement or contribution on account of a claim otherwise allowed under the Bankruptcy Code. The purpose of section 510(b) is to prevent claims arising on account of equity securities of the Debtors from being treated the same as creditor claims.

Here, the Section 510(b) Claims include, among others, Claims arising out of or relating to (a) CEL Tokens (other than CEL Token Deposit Claims), including damages arising from the purchase or sale of CEL Token, certain damages for reimbursement or contribution on account of such a Claim, and Claims arising from the cancellation of a contract for the purchase or sale of CEL Token, and (b) the purchase or sale of preferred shares in CNL or other equity interests in any Debtor.

For example, a Claim for damages allegedly incurred through the purchase of CEL Token at a price fraudulently inflated by the Debtors would be a Section 510(b) Claim and will receive no distribution under the Plan (notwithstanding any recovery on account of a related CEL Token Deposit Claim). Similarly, while Holders of the Series B Preferred Interests in the Debtors shall receive treatment as Class 14 (Series

B Preferred Interests), any Claims asserted in connection with the purchase or sale of the Series B Preferred Interests will be subordinated as Section 510(b) Claims.

In addition to subordination pursuant to section 510(b), claims may be subordinated pursuant to section 510(c) of the Bankruptcy Code. Section 510(c) allows for subordination of other types of claims pursuant to a principle known as "equitable subordination." Section 510(c) of the Bankruptcy Code provides that bankruptcy courts may, under principles of equitable subordination, subordinate all or part of an allowed claim to all or part of another claim or all or part of an allowed interest to all or part of another allowed interest. Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met: (a) the claimant engaged in some type of inequitable conduct; (b) the misconduct resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (c) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) (*citing Benjamin v. Diamon (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir. 1977)).

## 2. Whose Claims are equitably subordinated under the Plan and why?

Here, the Debtors seek to equitably subordinate the Holders of Claims identified as having engaged in inequitable conduct that harmed the Debtors' creditors. These Class 17 Equitably Subordinated Claims include: those Claims identified on the Schedule of Equitably Subordinated Claims, which will be Filed in the Plan Supplement on or about the time the final Disclosure Statement is Filed (subject to revision prior to the Confirmation Hearing) and will include the Claims of Persons or Entities who (i) participated in, or had direct knowledge of, the prepetition manipulation of the price of the CEL Token, or (ii) engaged in other misconduct, including fraud, willful misconduct, or other wrongful or inequitable conduct.

Currently, the Debtors intend to equitably subordinate the Claims of Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Harumi Urata-Thompson ("Ms. Urata-Thompson"), Johannes Treutler ("Mr. Treutler"), Roni Cohen-Pavon ("Mr. Cohen-Pavon"), and certain of their affiliated Entities, including AM Ventures Holding, Inc., Koala1 LLC, Koala2 LLC, Koala3 LLC (Entities affiliated with Mr. Mashinsky), Alchemy Capital Partners LP (an Entity affiliated with Mr. Leon), Bits of Sunshine LLC and Four Thirteen LLC (Entities affiliated with Mr. Goldstein), and any mediate or intermediate transferee of any of the foregoing.

These Persons and Entities are defined in the Plan as the Equitably Subordinated Parties. The Debtors, in consultation with the Committee, determined that it was appropriate to equitably subordinate the Claims of these individuals and their related Entities because of their fraud, recklessness, gross mismanagement, irrational indifference, and self-interested conduct, as revealed in the investigations conducted by the Examiner, the Special Committee, and the Committee, the criminal and civil complaints filed by the federal government against some of these individuals, and New York state's complaint against Mr. Mashinsky.

The Equitably Subordinated Parties were among the defendants identified in the draft complaint prepared by the Committee[71] whose conduct was detailed in the Committee's Class Claim,[72] both of which are incorporated in this section in their entirety. The Committee's draft complaint (the "Committee Insiders Complaint") asserts claims for breach of fiduciary duties, avoidance of actual and constructive fraudulent

---

[71] *Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2054].

[72] *Notice of Filing of Class Proof of Claim by the Official Committee of Unsecured Creditors on Behalf of the Class Representatives Asserting Non-Contract Claims on Behalf of Themselves and Other Similarly Situated Account Holders* [Docket No. 2556] (the "Class Claim").

transfers, and avoidance of preferential transfers arising from, among other things, the prepetition mismanagement of Celsius and self-interested conduct, as carried out by these and other defendants (all such defendants, the "UCC Claims Stipulation Defendants").[73] The Committee Insiders Complaint alleges that these individuals, among other things:  (a) made negligent, reckless, and sometimes self-interested investments that caused Celsius to lose more than $1 billion in a single year; (b) caused Celsius to use customer money to increase the token's price, while selling the Defendants' own holdings of CEL Token for personal gain; (c) engaged in a pattern of misrepresenting Celsius' business and financial condition to the public to convince additional retail investors to transfer their assets to Celsius, systematically obscuring certain (but not all) of those misstatements, and failing to correct those misrepresentations; (d) received loans or withdrew assets from Celsius shortly after they were informed that Celsius was massively insolvent and would likely not survive; and (e) breached their fiduciary duties by engaging in self-interested transactions, including the Debtors' acquisition of KeyFi and purchase of CEL Tokens, and gross mismanagement.[74]  The Committee Insiders Complaint also seeks the disallowance of the UCC Claims Stipulation Defendants' Claims against the Debtors, pending the return of any avoidable transfers to the Debtors' estates.[75]  The Committee Insiders Complaint will be prosecuted by the Litigation Administrator on behalf of the Debtors' Estates once a plan is confirmed in these Chapter 11 Cases (or earlier if agreed by the Debtors and the Committee or ordered by the Court), and any value recovered in connection with the Committee Insiders Complaint will be returned to the Debtors' creditors in the form of Litigation Proceeds.  More information about the Committee Insiders Complaint is set forth in in Article VII.K.3 of this Disclosure Statement.

The Committee Insiders Complaint and the Committee's Class Claim set forth in detail the Equitably Subordinated Parties' prepetition misconduct.  Similarly, the Final Examiner Report describes in detail certain of the Equitably Subordinated Parties' involvement in the prepetition manipulation of the price of CEL Token.  Specifically, the Examiner found that Celsius purchased CEL Token to artificially inflate of the price of CEL Token resulting in, among other things, the corresponding overstatement of Celsius' balance sheet.  The Examiner also found that Mr. Mashinsky, Ms. Urata-Thompson, Mr. Treutler, and Mr. Cohen-Pavon were all directly involved in the purchase of CEL Token.  Mr. Mashinsky, Mr. Leon and Mr. Goldstein all likely sold CEL Token with knowledge of the Debtors' purchases of CEL Token and often in violation of the Debtors' policies regarding those sales.  Certain of the Equitably Subordinated Parties also caused the Debtors to sell customer deposits of other digital assets to fund the purchase of CEL Token and payment of customer rewards in CEL Token.  A more detailed summary of the findings of the Final Examiner Report is set forth in Article VII.G.2 of this Disclosure Statement.

Since the publication of the Final Examiner Report and the Filing of the Committee Insiders Complaint, several of the individuals whose Claims are proposed to equitably subordinated have also been criminally indicted by the USAO on behalf of the Department of Justice or are the subjects of civil complaints filed by the SEC, CFTC, and FTC in the District Court.  As discussed in greater detail in Article III.LLL and Article VII.J.1(a) of this Disclosure Statement, Mr. Mashinsky and Mr. Cohen-Pavon face criminal charges recently unsealed by the USAO.  The indictment charges Mr. Mashinsky and Mr. Cohen-Pavon with securities fraud, commodities fraud, and wire fraud, asserting that Mr. Mashinsky defrauded and misled customers with respect to Celsius' profitability and how it invested the Cryptocurrency customers transferred to Celsius.  The indictment further charges Mr. Mashinsky and Mr. Cohen-Pavon

---

[73]    *Id.* ¶¶ 45–505 (Counts I–XXXII).

[74]    *Id.* ¶ 3.

[75]    *Id.* ¶¶ 506–09 (Count XXXIII).

with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token.

Finally, with respect to Mr. Mashinsky, a recent court ruling against him also demonstrates his inequitable misconduct warranting equitable subordination of his Claims. The New York State Attorney General (the "NYAG") commenced an action against Mr. Mashinsky asserting that he violated New York state laws and carried out a scheme to defraud investors, by inducing them, through false and misleading statements, to deposit their Cryptocurrency on the Celsius platform.[76] Mr. Mashinsky filed a motion to dismiss the complaint, which the NYAG opposed. On August 4, 2023, the Supreme Court of the State of New York (the "New York State Court") issued a ruling denying Mr. Mashinsky's motion to dismiss.[77] In denying Mr. Mashinsky's motion to dismiss, the New York State Court found that the state's complaint contained sufficient details regarding Mr. Mashinsky's alleged misstatements to target new and existing Celsius investors.[78] Further, the New York State Court found that New York's complaint plausibly alleges fraudulent or misleading practices by Mr. Mashinsky through his promotional efforts,[79] misstatements concerning regulatory approval and compliance,[80] and misrepresentations about Celsius' deployment strategies.[81] As a result of this ruling, New York's case against Mr. Mashinsky will continue.

The inequitable misconduct of Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Treutler, and the other Equitably Subordinated Parties caused severe harm caused to the Debtors' other creditors (e.g., the Account Holders). Accordingly, the Debtors believe that the equitable subordination of their Claims is warranted.

### KK.    Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well. *See* Article VIII.C.1 of this Disclosure Statement entitled "NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases" for further discussion on this issue.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determinates that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan" for further discussion on "cramdown" under the Bankruptcy Code.

---

[76]    The case is styled *New York  v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. 2023).

[77]    Decision and Order on Motion to Dismiss, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. Aug. 4, 2023) (the "Mashinsky Ruling").

[78]    Mashinsky Ruling at 13.

[79]    Id.

[80]    *Id.* at 17.

[81]    *Id.*

**LL.** **Will there be releases and exculpation granted to parties in interest as part of the Plan? What are "releases" and "exculpation"?**

Yes, both releases and exculpations will be granted to parties in interest as part of the Plan. The descriptions of the Plan's releases and exculpations are summaries only and, to the extent of any conflict between such summaries and the Plan, the Plan shall control. You are advised to read the Plan in its entirety.

*Releases*

A release is when Party A (the releasing party) "releases" Party B (the released party) from some claims or causes of action (the released claim) in exchange for some form of consideration from Party B. Sometimes, as is the case in some releases under the Plan, Party A releases Party B in exchange for Party B releasing Party A. Such releases are called "mutual releases." Releases are common features of settlements and chapter 11 plans because they provide finality.

There are three different kinds of releases pertaining to Account Holders under the Plan. Please note the following explanations of the releases are summaries only. Parties are encouraged to read the releases as set forth in Article VIII of the Plan and/or the applicable settlement agreement, and as reproduced below, to understand the full scope of the releases.

1. *Releases under the Custody Settlement, Withhold Settlement, Series B Settlement, and Class Claim Settlement.*

The Custody Settlement, the Withhold Settlement, and the Class Claim Settlement each provide specific releases by and among the Debtors, the Committee, and the respective Account Holders who participate in the respective settlement. The Series B Settlement provides certain Holders of Series B Preferred Interests with certain releases.

With respect to the Custody Settlement, releases are provided in two different ways. First, Holders of Allowed General Custody Claims that are Custody Settlement Participants, in connection with their participation in the Custody Settlement, previously agreed not to pursue any litigation, such as seeking relief from the automatic stay, against the Debtors. Likewise, the Debtors previously released all Avoidance Actions they may have against Custody Settlement Participants. On the Plan Effective Date, the Debtors and the Custody Settlement Participants will mutually release all Causes of Action, including Avoidance Actions and setoff rights, related to the Cryptocurrency that such Holders transferred to the Custody Program. These mutual releases apply *only* to the assets such Holders transferred to the Custody Program. Claims and Causes of Action related to such Holders' assets that are not in the Custody Program will *not* be released pursuant to the Custody Settlement. Second, Holders of Allowed General Custody Claims (Class 6A) that elect Treatment A under the Plan are also agreeing to a mutual release with the Debtors of all Causes of Action, including Avoidance Actions and setoff rights, related to assets such Holders transferred to the Custody Program.

With respect to the Withhold Settlement, Holders of Allowed Withhold Claims that participated in the Withhold Settlement were released by the Debtors from all Avoidance Actions that the Debtors may have had against them, solely with respect to such Holders' Withhold Account assets. At the same time, Holders of Allowed Withhold Claims who participated in the Withhold Settlement agreed not to pursue any litigation against the Debtors, including seeking relief from the automatic stay, and the conversion of 85% of such members' Withhold Claim to an Earn Claim under the Withhold Settlement. Holders of Allowed Withhold Claims that participated in the Withhold Settlement no longer have Allowed Withhold Claims. Current Holders of Allowed Withhold Claims may agree to a mutual release with the Debtors as further explained herein.

With respect to the Class Claim Settlement, Account Holders who participate in the Class Claim Settlement will (i) no longer be entitled to seek recovery of the amounts set forth on the Proof of Claim they Filed, if any, which Proof of Claim will be superseded, expunged, and extinguished; (ii) no longer be entitled to prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim; and (iii) no longer be entitled to receive any other recovery from the Debtors in addition to that provided pursuant to the Class Claim Settlement.

With respect to the Series B Settlement, the Initial Consenting Series B Preferred Holders and their Related Parties are now Released Parties and Releasing Parties under the Plan.

2. *Account Holder Avoidance Action Release.*

The Plan provides that the Debtors will release certain Account Holders that vote to accept the Plan from Avoidance Actions if the Withdrawal Preference Exposure of such Account Holders is below $100,000, as further explained below. This is called the "Account Holder Avoidance Action Release" and is granted in connection with the "Account Holder Avoidance Action Settlement," which is further explained in Article IV.B.3 of the Plan. The amount of each Account Holder's Withdrawal Preference Exposure will be set forth in each Account Holder's Ballot.[82]

If the total value of the assets that an Account Holder transferred from the Earn Program or the Borrow Program to either the Custody Program or entirely off the platform during the 90 days before July 13, 2022 (*i.e.*, between April 14, 2022, and July 13, 2022) is less than $100,000, valued at the time of such transfers, and such an Account Holder (1) votes all Claims to accept the Plan and (2) does not elect to opt out of the releases on the Ballot,[83] the Debtors will release all Avoidance Actions against such Account Holder.

If the total value of the assets an Account Holder transferred from the Earn Program or the Borrow Program off the platform during the 90 days before July 13, 2022 (*i.e.*, between April 14, 2022, and July 13, 2022) is equal to or exceeds $100,000, valued at the time of such transfers, and such an Account Holder (1) votes all Claims to accept the Plan, (2) does not elect to opt out of the releases on the Ballot,[84] and (3) pays the Debtors or the Litigation Administrator 27.5% of the amount such Account Holder withdrew during the 90 day time period described above no later than 14 days prior to the anticipated Effective Date of the Plan, the Debtors will release all Avoidance Actions against such an Account Holder.

For example, if an Account Holder withdrew $150,000 off the Debtors' platform, valued at the time of such transfers, between April 14, 2022, and July 13, 2022, and such an Account Holder (1) votes all Claims to accept the Plan, (2) does not elect to opt out of the releases on the Ballot,[85] and (3) pays the Debtors or the Litigation Administrator $41,250 (27.5% of $150,000) in Cash, BTC, or ETH no later than 14 days prior to the anticipated Effective Date of the Plan, then the Debtors will release all Avoidance Actions against such Account Holder.

The Plan will not release the Debtors' Avoidance Actions against: (1) certain Insiders, including Mr. Mashinsky, Mr. Leon, and certain current and former directors, officers, and employees of the Debtors, regardless of the amount of such Avoidance Actions; (2) Custody Account Holders who (a) transferred

---

[82]    Please review <u>Item 1</u> and <u>Item 12</u> on your Ballot to see your Withdrawal Preference Exposure.

[83]    Please review <u>Item 10</u> on your Ballot to determine whether to opt out of the Third-Party Release.

[84]    Please review <u>Item 10</u> on your Ballot to determine whether to opt out of the Third-Party Release.

[85]    Please review <u>Item 10</u> on your Ballot to determine whether to opt out of the Third-Party Release.

more than $100,000.00 from the Earn Program or the Borrow Program to the Custody Program during the 90 days before July 13, 2022 (*i.e.*, between April 14, 2022, and July 13, 2022), (b) do not participate in the Custody Settlement, and (c) do not vote to accept the Plan; or (3) Avoidance Actions against entities that are not Account Holders.

### 3. Debtor Release and Third-Party Release.

The Plan also proposes certain releases by the Debtors and the Holders of Claims and Interests, as outlined below.

As defined in the Plan, ***Released Parties*** means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (n) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (o) Christopher Ferraro; (p) the BRIC Parties; (q) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (r) any Releasing Party. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided*, *further*, that, notwithstanding anything to the contrary in this Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided*, *further*, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.

As defined in the Plan, ***Releasing Parties*** means, collectively: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).

The Debtor Release under the Plan provides, in sum, that the Debtor will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, ***with several important exceptions***. For example, the Debtors are not proposing to release (a) any Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

The Third-Party Release under the Plan provides, in sum, that the Releasing Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not affirmatively opt out of the

Plan's release provisions,  will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, ***with several important exceptions***.  For example, the Releasing Parties will not release the Released Parties from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

Article VIII.C–D of the Plan contains the release provisions, as set forth below.

### 3.  *Debtor Release Provision.*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Post-Effective Date Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise that the Debtors, their Estates, or the Post-Effective Date Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in-or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other**

occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Post-Effective Date Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

4.    *Third-Party Release Provision.*

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement) equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,

**including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement, or (d) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.**

### *Exculpation*

The Plan also provides for exculpation of certain parties.  Exculpation provisions shield parties from liability regarding a certain act or event.  In chapter 11 cases, exculpation provisions are included in chapter 11 plans to provide certain parties with protection from liability for conduct during, and claims relating to, the chapter 11 cases.  Unlike releases, which release parties from a broad range of pre-confirmation and prepetition conduct, exculpation is limited to the time period of the chapter 11 cases.  The parties that are usually exculpated are the debtors' professionals, debtors' employees, estate fiduciaries, such as official committees, and others directly involved in the chapter 11 cases who participated in administering such cases.  Like releases, exculpation clauses are common features in chapter 11 plans because they help encourage active participation in the chapter 11 process by various parties in interest.

The Plan proposes that the Exculpated Parties are granted immunity from liability for actions between the Petition Date and the Effective Date arising in relation to the Chapter 11 Cases except for actions or omissions that are the result of bad faith, actual fraud, willful misconduct, or gross negligence. Furthermore, the Exculpated Parties are not exculpated from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky and Mr. Leon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

As defined in the Plan, "***Exculpated Parties***" means, collectively:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants,

representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties.  Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.

An excerpt of the exculpation provision found in Article VIII.E of the Plan is set forth below.

5. *Exculpation Provision.*

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the formulation, preparation, dissemination, negotiation, entry into, termination of, or filing of, as applicable, the Chapter 11 Cases, the Plan Sponsor Agreement, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Chapter 11 Cases (including the trading and sales of Cryptocurrencies and Tokens in connection with the Chapter 11 Cases), the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan, the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or the Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property, Cryptocurrency, or Tokens under the Plan (including the NewCo Assets) or any other related agreement or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released hereunder, including pursuant to the Account Holder Avoidance Action Settlement.**

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such**

**distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party.**

### MM.   Are any specific individuals or entities specifically excluded from the Plan's release or exculpation provisions?

Yes, certain Excluded Parties will not receive the benefit of the Plan's releases or exculpation provisions, and all claims against such parties are fully preserved.  These Excluded Parties include:

- Mr. Mashinsky;

- Mr. Leon;

- Mr. Cohen-Pavon;

- The other defendants named in the draft complaint Filed by the Committee (*see* [Docket Nos. 2054, 2349]), including Mr. Goldstein, Ms. Urata-Thompson, Mr. Beaudry, Mr. Treutler, Ms. Mashinsky, Ms. Landes, AM Ventures Holding, Inc., Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and any mediate or intermediate transferees of these parties;

- Any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party on the Schedule of Released and Exculpated Parties or by name in the defined term "Released Party;"

- Any party on the Schedule of Excluded Parties, which will be Filed with the Plan Supplement in advance of the Confirmation Hearing; and

- With respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified as a Released Party on the Schedule of Released and Exculpated Parties or by name in the defined term "Released Party."

Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity.

### NN.    Do I have to grant the releases under the Plan?  Can I opt out of the releases?

You cannot opt out of the releases under the Plan with respect to any Claims you vote to accept the Plan.  By voting to accept the Plan, you are consenting to the releases.  *If you vote to accept the Plan, you cannot opt out of the releases*.

You can opt out of the releases if you are (a) a Holder of a Claim that is presumed to accept the Plan and you affirmatively opt out of the releases provided by the Plan, (b) a Holder of a Claim and you do not vote on the Plan, but you affirmatively opt out of the releases provided by the Plan, or (c) a Holder of a Claim who votes to reject the Plan and you affirmatively opt out of the releases provided by the Plan.

If you are a Holder of a Claim entitled to vote on the Plan and you (a) do not vote on the Plan or (b) vote to reject the Plan, you may affirmatively opt out of the Third-Party Release by following the

instructions on your Ballot.  **To opt out of the Third-Party Release, please follow the instructions on your Ballot**.

If you are a Holder of a Claim that is presumed to accept the Plan, you will receive a Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot.  The Non-Voting Status Notice will include (a) the mechanism for opting out of the Third-Party Release, (b) a disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan, (c) notice of the deadline to object to the confirmation of the Plan, and (d) notice of the hearing for the confirmation of the Plan, among other information.  **To opt out of the Third-Party Release, please follow the instructions on the Non-Voting Status Notice**.

If you are the Holder of a Claim or Interest that is deemed to reject the Plan, the releases will not apply to you unless you *opt into* the releases.  You will receive a Non-Voting Status Notice for Holders Deemed to Reject in lieu of a Ballot, which will include (a) the mechanism for opting into the Third-Party Release, (b) a disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan, (c) notice of the deadline to object to the confirmation of the Plan, and (d) notice of the hearing for the confirmation of the Plan, among other information.  **To opt into the Third-Party Release, please follow the instructions on the Non-Voting Status Notice**.

In addition, the Ballot contains the following information regarding your rights and responsibilities with respect to the Third-Party Release.  Please review the language carefully in making your decision.

THE PLAN CONTAINS MUTUAL THIRD-PARTY RELEASES.  ALL PARTIES THAT GRANT A RELEASE TO THE RELEASING PARTIES ARE ALSO RELEASED PARTIES.  IF YOU DO NOT WISH TO GRANT (AND RECEIVE) THIS MUTUAL THIRD-PARTY RELEASE, YOU MUST (I) VOTE TO REJECT THE PLAN OR ABSTAIN FROM VOTING ON THE PLAN AND (II) OPT OUT OF THE THIRD-PARTY RELEASES.  IF YOU DO NOT OPT OUT OF THE THIRD-PARTY RELEASES, THIS FAILURE TO ACT WILL BE CONSTRUED BY THE DEBTORS AS CONSENT TO THE THIRD-PARTY RELEASES. THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO DEEM YOUR FAILURE TO OPT OUT AS CONSENT TO THE THIRD-PARTY RELEASES, INCLUDING CONSENT TO THE BANKRUPTCY COURT'S AUTHORITY TO GRANT THE THIRD-PARTY RELEASES.

**OO.    What is an injunction, and does the Plan contain any injunctions?**

An injunction is typically a court order that requires a person to do or to stop doing something.  The Plan contains an injunction provision.  *See* Article VIII.F of the Plan.

When a debtor files for bankruptcy, the "automatic stay" goes into effect and prohibits the debtor's creditors from trying to collect any debts the debtor owed to the creditors before the date of the bankruptcy filing.  Once a debtor's plan of reorganization is approved and confirmed by the Bankruptcy Court, however, the automatic stay terminates.  At that time, the Bankruptcy Code's "discharge" provision goes into effect, and the debtor is discharged from having to pay any debts that arose prior to the petition date of the bankruptcy case other than on the terms set forth in the approved plan (*i.e.* a permanent discharge injunction).  In other words, the debtor only has to pay back the amount of its prepetition debt that is required in the plan and all other prepetition debt is discharged.  This helps fulfill the Bankruptcy Code's purpose of providing debtors with a "fresh start."

The injunction provision in the Plan protects the Debtors from further litigation over the "discharge" of the Debtors' prepetition debt that is not paid pursuant to the Plan.  Here, upon the Effective Date of the Plan, the Debtors' creditors are enjoined from acting to collect discharged debts, interfering with the implementation of the Plan, or taking similar actions.  If creditors violate the discharge injunction

by, for example, sending the Debtors collection letters related to prepetition debt or calling the Debtors to try to collect such a debt, the Bankruptcy Court has the authority to punish such creditors for violating the discharge provided in the Plan.

The bankruptcy injunction is authorized by section 524(a) of the Bankruptcy Code. Section 524(a) provides, in relevant part, that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."

In this case, the Plan's injunction provision states that any person or entity that holds a Claim or Interest that has been released, discharged, or that is subject to exculpation is permanently prohibited after the Effective Date from taking any actions to recover or collect any debt or property on account of such a Claim or Interest. Therefore, if an Account Holder receives a distribution on account of his General Earn Claim after the Plan is confirmed, the Account Holder cannot sue the Debtors or the Post-Effective Date Debtors to try to recover more from them on account of that same General Earn Claim. For example, once the Debtors pay a Holder of a Convenience Claim 70% of the amount of such Convenience Claim as provided under the terms of the Plan, then the remaining 30% is discharged. The Holder of the Convenience Claim is "enjoined" from seeking to collect the remaining 30% from the Debtors. Further, Confirmation of the Plan prohibits anyone from undertaking any "Cause of Action," as defined in the Plan, that is released or exculpated pursuant to the Plan. Finally, Confirmation of the Plan prohibits Holders of Claims and Interests from interfering with the implementation of the Plan. For the avoidance of doubt, the injunction will apply in the NewCo Transaction or the Orderly Wind Down.

Article VIII.F of the Plan contains the injunction provision, as set forth below:

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including the Causes of Action released or exculpated in this Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.**

**No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to <u>Article VIII.C</u>, <u>Article VIII.D</u>, or <u>Article VIII.E</u> of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.**

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.**

### PP.    What is the Account Holder Avoidance Action Settlement?

The Account Holder Avoidance Action Settlement is a compromise between the Debtors and Account Holders that, if approved under the Plan, will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The Account Holder Avoidance Action Settlement is a settlement of all Avoidance Actions against qualifying Account Holders, as explained below, in exchange for mutual releases. The Debtors submit that their entry into the Account Holder Avoidance Action Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

Pursuant to section 547 of the Bankruptcy Code, the Debtors can pursue Avoidance Actions against Account Holders for certain withdrawals Account Holders made from the Debtors' platform within 90 days of the Petition Date, which are referred to as "preferences." An Avoidance Action would be pursued by filing a lawsuit against the Account Holder requesting the return of the withdrawals identified as preferences. As defined under the Plan, an Account Holder's Withdrawal Preference Exposure is (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (*i.e.*, between April 14, 2022, and July 13, 2022), valued as of the time of such withdrawals, *minus* (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in this period, valued as of the time of such deposits. For example, an Account Holder who withdrew Cryptocurrency with an aggregate value of $120,000 from her Celsius Account on April 19, 2022, would have a Withdrawal Preference Exposure of $120,000. An Account Holder who made that same withdrawal but then deposited, on May 5, 2022, Cryptocurrency with an aggregate value of $50,000, would have a Withdrawal Preference Exposure of $70,000.

> *1. What kinds of transactions count as "withdrawals" and "deposits" for purposes of calculating the Withdrawal Preference Exposure?*

The table below summarizes the types of transactions considered in determining an Account Holder's Withdrawal Preference Exposure (*i.e.*, what transactions are counted as transfers on to the platform versus what transactions are counted as transfers off the platform):

| Transaction Type | Transaction Description | Preference Treatment |
|---|---|---|
| Deposit | Incoming transfer of assets into an Account Holder's Celsius Account that results in an increase in the account balance of coin that was deposited. | Decreases an Account Holder's Withdrawal Preference Exposure if Deposited to Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if Deposited to Custody. |
| Withdrawal | Asset withdrawals are reductions to an Account Holder's balance. | Increases an Account Holder's Withdrawal Preference Exposure if Withdrawn from Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if Withdrawn from Custody. |
| Inbound Transfer | CelPay was a crypto-remittance product where Account Holders were able to initiate crypto-asset transfers to other Celsius Account Holders. Instead of initiating a transfer to a crypto wallet address, a link was generated and shared with the proposed receiver.  This represents the inbound side of the transaction. | Decreases an Account Holder's Withdrawal Preference Exposure if received in Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if received in Custody. |
| Outbound Transfer | See above.  This represents the outbound side of the transaction. | Increases an Account Holder's Withdrawal Preference Exposure if sent from Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if sent from Custody. |
| Internal Account Transfer | Movement of funds between Celsius Earn, Custody or Withhold account types. | Increases Account Holder's Withdrawal Preference Exposure if the Transfers are made from Earn or Withheld to Custody.<br><br>Decreases Account Holder's Withdrawal Preference Exposure if the Transfers are made from Custody to Earn or Withheld. |
| Swap In | Represents the funds received in a swap transaction (*e.g.* if you buy 1 BTC with 30,000 USDC, you will see a swap in transaction for + 1 BTC). | Increases Account Holder's Withdrawal Preference Exposure if Swapped into Custody.<br><br>Does not change Account Holder's Withdrawal Preference Exposure if Swapped into Earn or Withheld. |

| | | |
|---|---|---|
| | | [NOTE: Netted out with Swap Outs, overall.] |
| Swap Out | Represents the funds paid in a swap transaction (*e.g.* if you buy 1 BTC with 30,000 USDC, you will see a swap out transaction for -30,000 USDC). | Decreases Account Holder's Withdrawal Preference Exposure if Swapped Out from Custody.<br><br>Does not change Account Holder's Withdrawal Preference Exposure if Swapped Out from Earn or Withheld.<br><br>[NOTE: Netted out with Swap Ins, overall.] |
| Loan Principal Payment | Represents the amounts funded for the loan and the amounts paid by the Account Holder to repay loan principal. | Incoming Loan Principal Payment (Payment from Celsius to Account Holder):<br><br>• Increases Account Holder's Withdrawal Preference Exposure if Incoming Loan Principal Payment is made to Custody or made in USD.<br><br>• Does not change Account Holder's Withdrawal Preference Exposure if Incoming Loan Principal Payment is made to Earn or Withheld.<br><br>Outgoing Loan Principal Payment (Payment from Account Holder to Celsius):<br><br>• Decreases Account Holder's Withdrawal Preference Exposure if Outgoing Loan Principal Payment is made from Custody or made in USD (i.e., USD payments from outside of the platform).<br><br>• Does not change Account Holder's Withdrawal Preference Exposure if Outgoing Loan Principal Payment is made from Earn or Withheld. |

| Loan Interest Payment | Represents payments made to satisfy loan interest. | Decreases Account Holder's Withdrawal Preference Exposure if Loan Interest Payment is made from Custody or made in USD (i.e., USD payments from outside of the platform). Does not change Account Holder's Withdrawal Preference Exposure if Loan Interest Payment is made from Earn or Withheld. |
|---|---|---|
| Loan Principal Liquidation | Represents the amount of collateral sold to pay off the borrowed principal (e.g. if a loan for $20K USD is liquidated, and the price of BTC is $16K then this field will equal -1.25 (BTC); number should be a negative)). This transaction reduces the overall Account Holder account balance (of the token held in collateral) by the amount of the token that was liquidated. | Decreases Account Holder's Withdrawal Preference Exposure if Loan Principal Liquidation is made from Custody. Does not change Account Holder's Withdrawal Preference Exposure if Loan Principal Liquidation is made from Earn or Withheld. |
| Loan Interest Liquidation | The final interest charged on the liquidation of a loan. | Decreases Account Holder's Withdrawal Preference Exposure if Loan Interest Liquidation is made from Custody. Does not change Account Holder's Withdrawal Preference Exposure if Loan Interest Liquidation is made from Earn or Withhold. |
| Collateral | Coin pledged as security for repayment of a loan in the event of a borrower's default. Will include any initial collateral posted as security, as well as any additional collateral provided in response to margin calls. Collateral transaction line items do not represent actual coin movement. These line items reflect system designations that separately identify pledged coin from non-pledged coin in a given account. | Incoming Collateral (From Celsius to Account Holder): • Increases Account Holder's Withdrawal Preference Exposure if Incoming Collateral is returned to Custody. • Does not change Account Holder's Withdrawal Preference Exposure if Incoming Collateral is returned to Earn or Withhold. Outgoing Collateral (From Account Holder to Celsius): • Decreases Account Holder's Withdrawal Preference Exposure if Outgoing Collateral is made |

| | | | | from Custody. <br><br> • Does not change Account Holder's Withdrawal Preference Exposure if Outgoing Collateral is made from Earn or Withhold. |
|---|---|---|---|

.

The following are examples of how Withdrawal Preference Exposure is calculated according to the above considerations.

**Account Holder with Withdrawal Preference Exposure of $85,000**:

| Transaction Date | Transaction | Transaction Type | Withdrawal Amount | Deposit Amount |
|---|---|---|---|---|
| May 2, 2022 | Transfer $10,000 of cryptocurrency from Custody Account to Earn Account. | Internal Account Transfer | -- | --*<br><br>*Does not constitute a Deposit because it occurs prior to the first Withdrawal in the 90-day window. |
| May 4, 2022 | Transfer from user's Earn Account into Custody Account of $145,000 worth of Cryptocurrency | Internal Account Transfer | $145,000*<br><br>*This constitutes the first withdrawal made in the ninety-day period before the Petition Date. | -- |
| May 7, 2022 | Use 30,000 USDC from Custody Account to purchase $30,000 in BTC | Swap Out | -- | $30,000 |
| May 7, 2022 | Receive $30,000 in BTC in Custody in exchange for preceding Swap Out of 30,000 USDC. | Swap In | $30,000 | -- |
| May 25, 2022 | Use CelPay to send $45,000 worth of BTC from Custody Account to another user. | Outbound Transfer | --*<br><br>*Does not constitute a Withdrawal because it originates from Custody. | -- |
| June 1, 2022 | Wired $100,000 to Celsius to repay loan principal | Loan Principal Payment | -- | $100,000 |

| June 1, 2022 | Wire $15,000 to Celsius make loan interest payment. | Loan Interest Payment | -- | $15,000 |
|---|---|---|---|---|
| June 1, 2022 | $400,000 of BTC Collateral returned to Earn Account | Collateral | -- | -- |
| June 10, 2022 | Withdraw $55,000 worth of ETH from Earn to external wallet. | Withdrawal | $55,000 | |
| | | *Total:* | *$230,000* | *$145,000* |

The Withdrawal Preference Exposure is determined by calculating the total withdrawals made from the platform based on the eligible transactions ($230,000 in this example), and subtracting the total deposits made onto the platform based on the eligible transactions ($145,000 in this example), which yields a Withdrawal Preference Exposure of $85,000.

### 2. How does the Account Holder Avoidance Action Settlement work?

Pursuant to the terms of the Account Holder Avoidance Action Settlement, the Debtors have agreed to release any potential preference claims, which are defined as Avoidance Actions, against certain Account Holders, subject to certain conditions as further explained herein. The Account Holder Avoidance Action Settlement is not available to (a) the Excluded Parties or (b) ADR-Ineligible Potential Defendants.

Under the terms of the Account Holder Avoidance Action Settlement, the Debtors agree to release claims against qualifying Account Holders (this is known as the "***Account Holder Avoidance Action Release***") in exchange for which the Account Holders will also agree to certain terms:

- **For Account Holders with a Withdrawal Preference Exposure under $100,000**: such Account Holder must (i) vote ***all Claims*** to accept the Plan; and (ii) agree to release all claims against the Released Parties (*i.e.*, not opt out of the releases).

- **For Account Holders with a Withdrawal Preference Exposure equal to or above $100,000**: such Account Holder must (i) vote ***all Claims*** to accept the Plan; (ii) agree to release all claims against the Released Parties; and (iii) provide the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the expected Effective Date of the Plan.

Eligible Account Holders who enter into the Account Holder Avoidance Action Settlement will otherwise be entitled to their full distribution under the Plan (*e.g.*, 100% of their Earn or Custody Claim minus any payments made pursuant to the Account Holder Avoidance Action Settlement). The amount of each Account Holder's Withdrawal Preference Exposure, if any, will be noted on such Holder's Ballot.

For example, an eligible Account Holder with a $70,000 Withdrawal Preference Exposure would receive the Account Holder Avoidance Action Release in return for (a) voting ***all Claims*** to accept the Plan, and (b) releasing all claims against the Released Parties.

In comparison, an Account Holder with a $120,000 Withdrawal Preference Exposure, however, would only receive the Account Holder Avoidance Action Release if such Account Holder (a) voted ***all Claims*** to accept the Plan, (b) released all claims against the Released Parties, and (c) made a payment in

Cash, Bitcoin, or ETH no later than 14 days prior to anticipated Effective Date of the Plan equal to 27.5% ($33,000) of their total Withdrawal Preference Exposure.    Account Holders who settle would otherwise receive treatment of their Claims under the Plan consistent with their Claims (*e.g.*, they would be entitled to 100% of any distributions on account of their Earn Claims).    Notwithstanding the foregoing, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

The Account Holder Avoidance Action Settlement is reasonable because it avoids complex and expensive litigation with eligible Account Holders who elect to participate and expedites distributions to such eligible Account Holders.    Certain Account Holders have asserted they hold defenses to Avoidance Actions, including (a) the securities safe harbor in section 546(e) of the Bankruptcy Code, which provides that preferential transfers involving margin payments or settlement payments in connection with securities contracts may not be clawed back, and (b) the ordinary course defense in section 547(c)(2) of the Bankruptcy Code, which provides that preferential transfers may not be avoided if they are made in the ordinary course of business.    While the Bankruptcy Court has not adjudicated these defenses in these Chapter 11 Cases and in the context of the Account Holder Avoidance Actions, it is possible that Account Holders may prevail on these defenses and defeat Avoidance Actions asserted against them.    On the other hand, it is also possible that those defenses and safe harbors will be found not to apply.    The Account Holder Avoidance Action Settlement is a fair resolution of these issues and participation is entirely voluntary. Accordingly, the Debtors and the Committee seek approval of the Account Holder Avoidance Action Settlement through the Plan.

> **QQ.    Will I receive a distribution on the Effective Date if the Debtors have potential Avoidance Actions against me or otherwise dispute my Claim?**

No.  If a Claim (or a portion thereof) is Disputed, if the Holder of a Claim is subject to an Avoidance Action (including Eligible Account Holders who do not participate in the Account Holder Avoidance Action Settlement), or if the Claim is held by any of the UCC Claims Stipulation Defendants, no payment or distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or such Avoidance Action is settled or otherwise resolved. ***This is true even if such Holder voted to accept the Plan or voted to reject the Plan and did not opt out of the releases***.  The only exception is if the Holder of the Claim participates in the Account Holder Avoidance Action Settlement and receives the Account Holder Avoidance Action Settlement Release.

After the Effective Date, the Litigation Administrator will have the authority to file, withdraw, or litigate to judgement objections to Claims, and settle or compromise any Disputed Claim.  If a Disputed Claim ultimately becomes an Allowed Claim or an Avoidance Action against the applicable Holder is settled or otherwise resolved, distributions will be made to the Holder of such Allowed Claim in accordance with their entitlements under the Plan to the extent possible.[86]  The Distribution Agent will make any distribution as soon as reasonably practicable after resolution by the Bankruptcy Court.

For example, Holders of General Custody Claims **who elect Treatment B** will not receive any Cryptocurrency on the Effective Date.  Instead, the Cryptocurrency will be transferred to a segregated wallet held by the Post-Effective Date Debtors and the Litigation Administrator(s) will have 180 days to bring any Avoidance Action or other claim against such Holders, although this time period may be extended by the Bankruptcy Court following notice and a hearing.  To the extent the Litigation Administrator does not bring

---

[86]    The Litigation Administrator may need to make distributions to Holders of these Claims in Cash or Liquid Cryptocurrency only depending on the timing of such distributions.

an Avoidance Action or other claim against Holders of General Custody Claims who elect Treatment B, and no settlement is reached in that time, the Cryptocurrency will then be released to the Holder.

**RR.    How and when will potential Avoidance Actions and disputes with respect to Claims be resolved?**

Disputed Claims and potential or outstanding Avoidance Actions that are not settled or otherwise released prior to the Effective Date are expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date.  The Litigation Administrator will prosecute, settle, or otherwise resolve any of the Recovery Causes of Action, including Avoidance Actions, and Contributed Claims.

The Avoidance Action subcommittee will confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the 90 days prior to the Petition Date.

Additional information on the procedures for resolving Disputed Claims and other Causes of Action will be set forth by the Debtors in the alternative dispute resolution procedures related to the determination of claims against the Estates, which will be included in the Plan Supplement.  Such alternative dispute resolution procedures will allow the Litigation Administrator(s) and Account Holders to submit evidence and arguments to a neutral third-party for resolution in an efficient manner, with the goal of reducing the expenses and time that would otherwise be associated with litigation in the court system.

**SS.    What is the effect of the Plan on the Debtors' business?**

Following Confirmation, the Plan will be consummated on the Effective Date, which is the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan and (b) the Plan is declared effective by the Debtors.

On or after the Effective Date, except as otherwise set forth in the Plan, NewCo and each Post-Effective Date Debtor may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  In addition, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

Prior to the Effective Date and as more fully set forth in the Plan or the Plan Supplement (including the Transaction Steps Memorandum), the Debtors will take actions necessary to effectuate the NewCo Transaction.  On the Effective Date (a) the DeFi Cryptocurrency Assets, (b) the Institutional Loan portfolio, (c) PE & VC Investments, (d) Mining, and (e) the NewCo Capitalization Amount (the "NewCo Assets") will vest in NewCo.  The Post-Effective Date Debtors will retain all other property in each of the Debtors' Estates, all Causes of Action, including the Recovery Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Post-Effective Date Debtor, in each case free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations on account of Secured Claims that are Reinstated pursuant to the Plan, as applicable).  Additionally, after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

In both the NewCo Transaction and the Orderly Wind Down, one or more of the Debtors shall continue in existence after the Effective Date, each as a Post-Effective Date Debtor, for purposes of

(1) preserving the Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds under the Plan, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors after the Effective Date and after consummation of the NewCo Transaction, (3) performing their obligations under any transition services agreement entered into by and between the Post-Effective Date Debtors and NewCo and/or its subsidiaries, (4) resolving any Disputed Claims, (5) paying Allowed Claims for which there is not a Distribution Agent other than the Post-Effective Date Debtors, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtors or the Litigation Administrator(s) to file motions or substitutions of parties or counsel in each such matter.

**TT.    What is the Custody Settlement, how does it work, and who is affected by it?**

This section describes the details of the Custody Settlement and how it may affect you. For a comprehensive background discussion regarding the resolution of issues surrounding assets in the Custody Program (such assets, "Custody Assets" and such accounts, the "Custody Accounts") and the negotiation and development of the Custody Settlement, please refer to Article VII.L.2 of this Disclosure Statement entitled "Custody/Withhold Briefing."

In sum, the Custody Settlement is a compromise between the Debtors and Holders of Custody Claims that, if approved under the Plan, will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. As further explained in the Custody Settlement Motion, the Debtors' entry into the Custody Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

*1.    To whom is the Custody Settlement being offered?*

Between March 21, 2023, and April 24, 2023, the Custody Settlement was offered to all Account Holders with Custody Accounts other than "insiders" as defined in section 101(31) of the Bankruptcy Code. This included all Account Holders with Custody Accounts who also had an outstanding obligation owed to the Debtors through the Debtors' Borrow Program.

Under the Plan, the Custody Settlement is offered to any Holder of a General Custody Claim other than Excluded Parties.

In other words, under the Plan, the Custody Settlement is available to Account Holders with Custody Accounts (the "Custody Account Holders") who are not otherwise authorized to fully withdraw the substantial majority of their Custody Assets from Celsius' platform pursuant to the Custody Withdrawal Order and the Custody Withdrawal Notice previously entered by the Bankruptcy Court (and as defined and discussed in Article VII.L.2 of this Disclosure Statement entitled "Custody/Withhold Briefing").

*2.    How do I participate in the Custody Settlement?*

If you returned an Election Form (as defined in the Custody Settlement Motion) between March 21, 2023, and April 24, 2023, then you have already elected to participate in the Custody Settlement. Your General Custody Claim will automatically be counted as a vote to accept the Plan pursuant to the terms of the Custody Settlement. If your Withdrawal Preference Exposure is under $100,000, you ***must*** vote your

General Custody Claim (and all other Claims) to accept the Plan to receive a 100% recovery on your General Custody Claim and receive the Account Holder Avoidance Action Release.

If you are the Holder of a General Custody Claim under the Plan, and you did not return an Election Form between March 21, 2023, and April 24, 2023, you **must vote to accept** the Plan to participate in the Custody Settlement.

> 3.  *What do I receive if I opted into the Custody Settlement during the Custody Settlement Election Period?*

Each Custody Account Holder who opted into the Custody Settlement during the Custody Settlement Election Period (each, a "<u>Settling Custody Account Holder</u>") received the right to withdraw *two* in-kind distributions of 36.25% of such Custody Account Holder's Custody Distribution Claim[87] in the Cryptocurrency associated with such Custody Distribution Claim, for a total recovery of 72.5% (the "<u>Custody Settlement Payments</u>").  Settling Custody Account Holders were eligible to withdraw the first Custody Settlement Payment as soon as reasonably practicable after the (i) entry of the Custody Settlement Order and (ii) the expiration of the Custody Settlement Election Period, and will be able to withdraw the second Custody Settlement Payment upon the earliest of the Custody Distribution Dates.[88]  If the Debtors' confirm the Plan on the currently proposed timeline, Settling Custody Account Holders will be eligible to withdraw the second Custody Settlement Payment on or shortly after the Effective Date.

Settling Custody Account Holders also received a release from the Debtors with respect to all Causes of Action, including Avoidance Actions (*e.g.*, preference claims), that the Debtors' estates may assert against such Settling Custody Account Holder on account of such holder's Custody Distribution Claim.

If you opted in to the Custody Settlement during the Custody Settlement Election Period, please review the Custody Settlement Order and related exhibits to fully understand your rights and obligations. *See* Docket No. 2291.

> 4.  *If I am a Settling Custody Account Holder, can I abstain from voting my General Custody Claim on the Plan or vote my General Custody Claim to reject the Plan?*

No.  If you are a Settling Custody Account Holder, you are deemed to accept the Plan.  Any Settling Custody Account Holder who attempts to votes her General Custody Claim to reject the Plan or does not vote her General Custody Claim will nonetheless be deemed to have voted her General Custody Claim to accept the Plan.

To be clear, however, if you are a Settling Custody Account Holder and you **do not affirmatively** vote to accept the Plan, your vote will still be deemed a vote to accept the Plan, but you will not be eligible

---

[87]  A "<u>Custody Distribution Claim</u>" means the balance of the Custody Account of a Custody Account Holder (such balance, the "<u>Custody Account Balance</u>") minus (a) any Withdrawable Custody Assets and (b) any further amounts for which such Custody Account Holder is alleged to be obligated or indebted to the Debtors, except on account of (1) Avoidance Actions or (2) an obligation with respect to an outstanding retail loan to the extent such loan obligation is supported by an allowed Borrow Claim (as defined in the Plan) in an amount that results in a loan to value ratio of equal to or less than 80% on the date of the entry of the Order (it is expected that no such claims exist).  With respect to (b)(2), the Debtors shall be authorized to subtract from the Custody Account Balance any amounts necessary to make any such outstanding retail loan's loan to value ratio equal 80%, which shall be calculated as of the date such Custody Account Holder's Custody Distribution Claim is calculated.

[88]  The "<u>Custody Distribution Dates</u>" are: (i) the Effective Date of the Plan, (ii) the occurrence of a Rejection Event, (iii) June 11, 2023 if the Debtors do not File a chapter 11 plan by such date, and (iv) December 31, 2023.  A "<u>Rejection Event</u>" means the date the Debtors' chapter 11 cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

for a 100% recovery if your Withdrawal Preference Exposure is under $100,000, or otherwise be eligible for the Account Holder Avoidance Action Release.

5. *Can I still receive the Custody Settlement even if I did not opt into it during the Custody Settlement Election Period?*

Yes. If you are the Holder of a General Custody Claim, and you did not participate in the Custody Settlement during the Custody Settlement Election Period because you either (a) did not timely return an Election Form and/or (b) you were not eligible to participate in the Custody Settlement during the Custody Settlement Election Period, you may now receive the Custody Settlement by voting your Class 6A General Custody Claim Custody to accept the Plan.

6. *What do I receive if I am the Holder of a Class 6A General Custody Claim and I vote my Class 6A General Custody Claim to accept the Plan?*

You will receive Treatment A under the Plan, which essentially provides you with the same recovery as the Settling Custody Account Holders. Pursuant to Treatment A, on or shortly after the Effective Date, Holders of General Custody Claims will receive (a) a distribution of Cryptocurrency equal to 72.5% of the amount of their Allowed General Custody Claim in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions.

In addition, if you vote all of your Claims to accept the Plan, and you transferred assets totaling under $100,000 in the aggregate from the Earn Program to the Custody Program, or off the platform entirely, you will receive all (100%) of your General Custody Claim and the Account Holder Avoidance Action Release.

If you vote all of your Claims to accept the Plan and you do not qualify for the Account Holder Avoidance Action Release, you will still receive a release under the Plan with respect to all Causes of Action other than Avoidance Action.

7. *What do I receive if I am the Holder of a Class 6A General Custody Claim and I vote my Class 6A General Custody Claim to reject the Plan or I do not vote my Class 6A General Custody Claim at all?*

If you are the Holder of a Class 6A General Custody Claim and you vote your Class 6A General Custody Claim to reject the Plan or you do not vote your Class 6A General Custody Claim, then you will receive Treatment B under the Plan.

Under Treatment B, on or shortly after the Effective Date, Holders of General Custody Claims will have an amount corresponding to each Holder's Allowed General Custody Claim transferred to a segregated wallet held by the Post-Effective Date Debtors. The amount held in that segregated wallet will be subject to all Avoidance Actions and other claims by the Debtors' Estate with respect to such Allowed General Custody Claim. The Litigation Administrator will have 180 days following the Effective Date to bring any Avoidance Action or other claim against such Account Holders, with respect to the amount of such Account Holder's General Custody Claim. For the avoidance of doubt, the Account Holder Avoidance Action Releases provided by the Plan to Account Holders who withdrew assets from the Debtors' platform does not apply to Holders of General Custody Claims that receive Treatment B, and the Litigation Administrator will have the right to bring any Avoidance Action against any such Holder with respect to her General Custody Claim, regardless of the amount.

If, after 180 days (or such longer period as approved in an order from the Bankruptcy Court), the Litigation Administrator does not bring an action against, or enter a settlement agreement with, any Holder

of a General Custody Claim that received Treatment B, then such Holder shall be entitled to receive the entire amount of her General Custody Claim.[89]

If you do not vote your Class 6A Claim to accept the Plan, either because you voted to reject and/or did not vote, you will not be eligible for the Account Holder Avoidance Action Release. You may receive other releases under the Plan if you vote your other Claims to accept the Plan as further explained herein.

> 8. *How does the way I vote my Class 6A General Custody Claim affect my rights with respect to my other Claims?*

The way Holders of Class 6A General Custody Claims vote on the Plan may affect to their other rights under the Plan, including with respect to how they must vote their other Claims and the releases they receive under the Plan. The following summaries explain how votes of Holders of Class 6A General Custody Claim will interact with their other rights under the Plan.

*Holder of Class 6A General Custody Claim votes to accept the Plan.* The Holder may (a) vote her other Claims to accept the Plan, (b) vote her other Claims to reject the Plan, or (c) not vote her other Claims. If she (i) votes her other Claims to accept the Plan, and (ii) does not opt out of the releases in the Plan (if applicable),[90] then she is eligible to receive the Account Holder Avoidance Action Release if she qualifies for such release. She would also be considered a "Released Party" and a "Releasing Party" under the Plan with respect to *all* of her Claims.

| *Holder of Class 6A General Custody Claim votes to **accept** the Plan.* | | | |
|---|---|---|---|
| Votes all other Claims to Accept | Votes all other Claims to Reject / Does Not Vote all other Claims | Opts out of the Releases (if applicable) | Types of Releases Granted |
| Yes | No | No or N/A | Account Holder Avoidance Action Release (if qualifies)<br><br>"Released Party" and a "Releasing Party" with respect to *all* Claims |
| Yes | No | Yes | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to *all* Claims where opt out did not occur |
| No | Yes | Yes | No Account Holder Avoidance Action Release<br><br>Mutual releases *solely* with respect to Class 6A General Custody Claim |
| No | Yes | No | Account Holder Avoidance Action Release (if qualifies)<br><br>"Released Party" and a "Releasing Party" with respect to *all* Claims |

---

[89]    The Allowed Custody Claims of such Non-Settling Custody Account Holders will be subject to the ADR Procedures as defined in the Plan and provided for in the Plan Supplement.

[90]    Holders of Class 6B Withdrawable Custody Claims are unimpaired under the Plan (which means they will receive 100% recovery on their Class 6B Claim), and thus, are presumed to accept the Plan and not entitled to vote on the Plan. Holders of Class 6B Withdrawable Custody Claims are, however, entitled to opt out of the releases provided by the Plan with respect to such Holder's Class 6B Claim.

*Holder of Class 6A General Custody Claim votes to **reject** the Plan or **does not vote** on the Plan.* The Holder may (a) vote her other Claims to accept the Plan, (b) vote her other Claims to reject the Plan, or (c) not vote her other Claims. Regardless of how she votes her other Claims or whether she opts out of the releases in the Plan (if applicable) she is **not** eligible to receive the Account Holder Avoidance Action Release.

If she (i) votes her other Claims to accept the Plan, and (ii) does not opt out of the releases in the Plan (if applicable),[91] then she would be considered a "Released Party" and a "Releasing Party" under the Plan with respect to **all** of her Claims **except for her Class 6A General Custody Claim**.

| Holder of Class 6A General Custody Claim votes to **reject** the Plan or **does not vote** on the Plan. | | | |
|---|---|---|---|
| Votes all Claims to Accept | Votes all Claims to Reject / Does Not Vote all Claims | Opts out of the Releases (if applicable) | Types of Releases Granted |
| Yes | No | No or N/A | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to **all** Claims **except for Class 6A General Custody Claims** |
| Yes | No | Yes | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to **all** Claims where opt out did not occur **except for Class 6A General Custody Claims** |
| No | Yes | Yes | No Account Holder Avoidance Action Release<br><br>No other releases |
| No | Yes | No | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to **all** Claims **except for Class 6A General Custody Claims** |

### UU.    What is the Withhold Settlement, how does it work, and who is affected by it?

This section describes the details of the Withhold Settlement and how it may affect you. For a comprehensive background discussion regarding the resolution of issues surrounding assets in Withhold Accounts (such assets, "Withhold Assets") and the negotiation and development of the Withhold Settlement, please refer to Article VII.L.2 of this Disclosure Statement entitled "Custody/Withhold Briefing."

In sum, the Withhold Settlement is a compromise between the Debtors and Holders of Withhold Claims that, if approved under the Plan, will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. As further explained in the Withhold Settlement Motion, the Debtors' entry into the Withhold Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

---

[91]    Holders of Class 6B Withdrawable Custody Claims are unimpaired under the Plan (which means they will receive 100% recovery on their Class 6B Claim), and thus, are presumed to accept the Plan and not entitled to vote on the Plan. Holders of Class 6B Withdrawable Custody Claims are, however, entitled to opt out of the releases provided by the Plan with respect to such Holder's Class 6B Claim.

### 1.   To whom is the Withhold Settlement being offered?

The Withhold Settlement was previously offered only to the members of the Withhold Ad Hoc Group.

Under the Plan, the Withhold Settlement is offered to any Holder of a Withhold Claim,[92] other than any Excluded Parties, on the conditions set forth herein.

### 2.   How do I participate in the Withhold Settlement?

If you are a member of the Withhold Ad Hoc Group that signed the Withhold Settlement, then you have already elected to participate in the Withhold Settlement.  You no longer have a Withhold Claim.  The remaining amount of your previous Withhold Claim has been reclassified as an Earn Claim.

If you are the Holder of a Withhold Claim under the Plan, Class 7 **must vote to accept** the Plan for you to receive Treatment A under the Withhold Settlement, as further explained herein.  Thus, if you would like to participate in the Withhold Settlement, you are encouraged to ***vote to accept*** the Plan.

### 3.   What do I receive if I am a member of the Withhold Ad Hoc Group who signed the Settlement Agreement?

Members of the Withhold Ad Hoc Group who signed the Withhold Settlement Agreement will receive the right to withdraw an in-kind distribution equal to fifteen (15) percent of the value, as of the Petition Date, of such members' Withhold Distribution Claims,[93] calculated in accordance with the Conversion Procedure[94] (the "Withhold Settlement Payments"), ***plus*** the treatment of such members' remaining eighty-five (85) percent of Withhold Distribution Claim as a General Earn Claim under the Plan.

As part of the Withhold Settlement, the Debtors, the Committee, and the Withhold Ad Hoc Group each agreed to settle all Causes of Action held by (i) the Debtors against the Settling Withhold Account Holders, including any Avoidance Actions, and (ii) the Settling Withhold Account Holders against the Debtors, including seeking relief from the automatic stay, turnover, or the conversion of such Holder's Withhold Claim to a General Earn Claim pursuant to the Withhold Settlement.

### 4.   If I previously settled my Withhold Claim, can I abstain from voting my General

---

[92]   Please check your Ballot to confirm whether you have a Withhold Claim.  If the total amount of your Withhold Claim and your Earn Claim (if any) is greater than $10 but less than or equal to $5,000, you will have a Class 4 Convenience Claim and not a Withhold Claim.

[93]   A "Withhold Distribution Claim" means an Allowed Withhold Claim minus any Ineligible Withhold Assets. A "Withhold Claim" means a Claim, arising from an attempted transfer of Cryptocurrency in a jurisdiction in which the Debtors did not offer the Custody Program, which transfers were placed in Withhold Accounts, less any amounts withdrawn under the Custody Withdrawal Order, *i.e.*, a Claim on account of the Transferred Withhold Assets.

[94]   The "Conversion Procedure" means the following process by which the Withhold Settlement Payment is calculated based on Exhibit A attached to the *Notice of Filing of Cryptocurrency Conversion Rates* [Docket No. 1420] (the "Cryptocurrency Conversion Table"): (a) converting the value of the Withhold Distribution Claim into a U.S. Dollar amount according to the prices of any Cryptocurrency that makes up the Withhold Distribution Claim on the Petition Date as reflected in the Conversion Table, (b) calculating what the value of 15 percent of that U.S. Dollar amount equals, and (c) converting the value of 15 percent of that U.S. Dollar amount into Cryptocurrency based on the prices of such Cryptocurrency on April 20, 2023, the date the Withhold Settlement Order is entered.

*Earn Claim on the Plan or vote my General Earn Claim to reject the Plan?*

Yes.  If you previously settled your Withhold Claim and you now have a General Earn Claim, you may vote such Claim to reject the Plan or choose not to vote such Claim.

5. *Can I still receive the Withhold Settlement even if I did not sign the Withhold Settlement Agreement?*

Maybe.  If you are the Holder of a Withhold Claim, and you did not participate in the Withhold Settlement because you either (a) did not sign the Withhold Settlement Agreement and/or (b) you were not eligible to participate in the Withhold Settlement, you may vote your Class 7 Withhold Claim to accept the Plan.

If Class 7 votes to accept the Plan, which means more than two-thirds of the amount of Claims and more than one-half of the number of Holders of Claims that vote on the Plan vote to accept the Plan, then you and everyone else in Class 7 (regardless of how they voted) will receive Treatment A under the Plan, which is the same treatment as the Withhold Settlement.

If, however, Class 7 does not vote to accept the Plan, then even if you voted your Class 7 Claim to accept the Plan you will not receive Treatment A, or the Withhold Settlement, under the Plan.  Instead, you and everyone else in Class 7 (regardless of how they voted) will receive Treatment B under the Plan, which means your Claim will receive the same treatment as a General Earn Claim.

6. *What do I receive if I am the Holder of a Class 7 Withhold Claim and Class 7 votes to accept the Plan?*

You receive Treatment A under the Plan, which essentially provides you with the same amount of recovery as Holders that participated in the Withhold Settlement.  Pursuant to Treatment A, on or shortly after the Effective Date, all Holders of Withhold Claims will receive (a) a distribution of Cryptocurrency equal to 15% of the amount of their Withhold Distribution Claim in accordance with the Conversion Procedure, and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be provided the same treatment as a General Earn Claim.

You will receive this treatment even if you voted your Class 7 Claim to reject the Plan or did not vote your Class 7 Claim.  Importantly, however, if you (a) voted to reject the Plan or did not vote on the Plan and (b) affirmatively opted out of the releases in the Plan, *you will not be considered a "Released Party" and a "Releasing Party" with respect to your Class 7 Withhold Claim*.

7. *What do I receive if I am the Holder of a Class 7 Withhold Claim and Class 7 votes to reject the Plan?*

You receive Treatment B under the Plan.  Pursuant to Treatment B, your entire Withhold Claim will receive the same treatment as a General Earn Claim.

You will receive this treatment even if you voted your Class 7 Claim to accept the Plan.  Importantly, however, if you voted to accept the Plan, *you will still be considered a "Released Party" and a "Releasing Party" with respect to your Class 7 Withhold Claim*.

8. *How does the way I vote my Class 7 Withhold Claim affect my rights with respect to my other Claims?*

The way Holders of Class 7 Withhold Claims vote on the Plan affects their rights and treatment under the Plan with respect to their other Claims, including with respect to how they must vote their other

Claims and the releases provided under the Plan. The following summaries explain how the way a Holder of a Class 7 Withhold Claim votes may affect her rights under the Plan with respect to her other Claims and the releases granted under the Plan.

*Holder of Class 7 Withhold Claim votes to **accept** the Plan*. The Holder must vote all other Claims (other than any Custody Claims) to **accept** the Plan. The Holder is also ineligible to opt out of any releases except with respect to any Custody Claims and any attempt to opt out of the releases will not be effective. **This is true regardless of whether Class 7 votes to accept or reject the Plan**.

In addition, if Class 7 votes to accept the Plan, the Holder will receive General Earn Claim treatment with respect to 85% of such Holder's Allowed Withhold Distribution Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

If Class 7 votes to reject the Plan, the Holder will receive General Earn Claim treatment with respect to 100% of such Holder's Allowed Withhold Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

*Holder of Class 7 Withhold Claim votes to **reject** the Plan or **does not vote** on the Plan*. The Holder must vote all other Claims (other than any Custody Claims) to **reject** the Plan or must not vote any of its Claims. A Holder who (a) votes to reject the Plan or does not vote on the Plan and (b) affirmatively opt out of the releases in the Plan will not be considered a "Released Party" and a "Releasing Party" with respect to her Class 7 Withhold Claim. **This is true regardless of whether Class 7 votes to accept or reject the Plan**.

In addition, if Class 7 votes to accept the Plan, the Holder will receive General Earn Claim treatment with respect to 85% of such Holder's Allowed Withhold Distribution Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

If Class 7 votes to reject the Plan, however, the Holder will receive General Earn Claim treatment with respect to 100% of such Holder's Allowed Withhold Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

### VV. What is the Series B Settlement, how does it work, and who is affected by it?

This section describes the details of the Series B Settlement and how it may affect you. For a comprehensive background discussion regarding the negotiation and development of the Series B Settlement, please refer to Article VII.L.5 of this Disclosure Statement as well as the Series B Settlement Motion Filed on June 27, 2023 [Docket No. 2899].

In sum, the Series B Settlement is a compromise negotiated by the Debtors, the Committee, and Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Series B Holders" or, with respect to the Series B Settlement specifically, the "Initial Consenting Series B Preferred Holders") that provides a resolution of issues related to the Series B Preferred Interests, which are the approximately 33,821 shares of series B preferred stock issued by CNL. The Bankruptcy Court recently approved the Series B Settlement (such order, the "Series B Settlement Order") [Docket No. 3074], and the Series B Settlement will be effectuated pursuant to Bankruptcy Rule 9019. As further explained in the Series B Settlement Motion, the Debtors' entry into the Series B Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

*1.  To whom is the Series B Settlement being offered?*

The Series B Settlement was offered only to Holders of Series B Preferred Interests (even though it was negotiated by a smaller group of such Holders, the Series B Holders).  All Holders of Series B Preferred Interests were able to participate in the settlement up until the start of the July 18, 2023 hearing on the Series B Settlement Motion.

*2.  How do I participate in the Series B Settlement?*

Holders of Series B Preferred Interests were able to opt into the Series B Settlement by returning the signature page of the settlement agreement attached as <u>Exhibit 1</u> to the Series B Settlement Motion (the "<u>Series B Settlement Agreement</u>") to the Debtors, the Committee, and counsel to the Series B Holders before the July 18, 2023 hearing on the Series B Settlement Motion.  Holders of Series B Preferred Interests who opted into the Series B Settlement before the start of the hearing on the Series B Settlement Motion are deemed "Consenting Series B Holders."

*3.  What do I receive if I am a Consenting Series B Holder?  Must I do anything if I am a Consenting Series B Holder?*

The Series B Settlement provides for a $25 million Cash settlement (the "<u>Series B Settlement Consideration</u>") in exchange for a release of all claims between the Consenting Series B Holders on the one hand and the Debtors and the Committee on the other.  The Series B Settlement Consideration will be distributed as follows.

Within three days of entry of the Series B Settlement Order, the Series B Holders will receive $24 million of the Series B Settlement Consideration on account of the fees and expenses incurred by them in connection with their litigation and negotiation efforts in these Chapter 11 Cases.  Holders of Series B Preferred Interests who are Consenting Series B Holders as of July 24, 2023, which is the date the Series B Settlement Order was entered, will receive their Pro Rata share of the remaining $1 million of the Series B Settlement Consideration, also within three days of entry of the Series B Settlement Order.  All Consenting Series B Holders and certain related parties are deemed to be "Releasing Parties" and "Released Parties" under the Plan, meaning that they will provide the Debtors and the Committee, among others defined as "Released Parties," a release of all claims, and will receive a release of all claims from those parties in return.

Consenting Series B Holders must not directly or indirectly oppose, or support any party who opposes, any relief sought by the Debtors or the Committee in these Chapter 11 Cases that is not inconsistent with the Series B Settlement Agreement.  Consenting Series B Holders must vote for any plan that is not inconsistent with the Series B Settlement Agreement, and cannot directly or indirectly oppose such a plan.

*4.  Can I still receive the Series B Settlement even if I did not sign the Series B Settlement Agreement?*

Yes.  If you are a Holder of Series B Preferred Interests and you did not participate in the Series B Settlement because you did not sign the Series B Settlement, you will receive your Pro Rata share of the $1 million of the Series B Settlement Consideration (to be shared with the Consenting Series B Holders) on the Effective Date of the Plan.  ***However, you will not receive a release from the Releasing Parties, and you will not provide the Released Parties with a release.***

**WW.  What do I receive on behalf of my Retail Borrower Deposit Claim?**

Account Holders that participated in the Debtors' Borrow Program will likely have a Retail

Borrower Deposit Claim. If you have a Retail Borrower Deposit Claim, you can choose between two possible treatments of your Retail Borrower Deposit Claim: you may elect to make the Retail Advance Obligation Repayment Election or to receive the Set Off Treatment.

If you make the Retail Advance Obligation Repayment Election, you must repay all or a portion of the proceeds of the "loan" you took out under the Debtors' Borrow Program, or the Retail Advance Obligation. If you actually repay all or a portion of your Retail Advance Obligation in accordance with the Retail Advance Obligation Repayment Instructions, which will be provided by the Debtors via email to all Retail Borrowers at least thirty calendar days prior to the anticipated Effective Date, and you make this repayment by the Retail Advance Obligation Repayment Deadline, which is five calendar days prior to the Effective Date of the Plan, then you will receive an amount of BTC or ETH equal to the amount that you paid back. You can make an election as to whether to receive BTC or ETH. In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, and will receive either a 67.0% recovery on account of your Retail Borrower Post-Set Off Claim if your Retail Borrower Post-Set Off Claim receives the General Earn Claim treatment, or a 70% recovery if your Retail Borrower Post-Set Off Claim receives the Convenience Claim treatment. There may be tax benefits to making the Retail Advance Obligation Repayment Election, and you are advised to confer with your own tax counsel to evaluate whether to make the Retail Advance Obligation Repayment Election.

If you do not make the Retail Advance Obligation Repayment Election or you fail to repay your Retail Advance Obligation in accordance with the Debtors' instructions and by the deadline, then you will receive the Set Off Treatment. Under the Set Off Treatment, you will retain the proceeds of the Retail Advance Obligation and have your associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date. The remaining amount of your Retail Borrower Deposit Claim,[95] *i.e.*, your Retail Borrower Post-Set Off Claim, will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable. In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, will receive either a 67.0% or a 70% recovery on account of the Retail Borrower Post-Set Off Claim, and ***you will not have to repay your loan or owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of your Retail Borrower Deposit Claim (i.e., your loan is being forgiven)***.

If you receive the Unsecured Claim Distribution Consideration on account of your Retail Borrower Post-Set Off Claim, you will receive a combination of (a) Liquid Cryptocurrency (BTC and ETH), (b) NewCo Common Stock, and (c) Litigation Proceeds. If you receive the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim (*i.e.*, if the total amount of your Account Holder Claims, including your Retail Borrower Post-Set Off Claim, is equal to or less than $5,000), you will receive only Liquid Cryptocurrency. Your Ballot will explain whether you will receive the Unsecured Claim Distribution Consideration or the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim.

For example, if you have a Retail Borrower Deposit Claim valued at $49,702.50 and a Retail Advance obligation of $30,000, as a result of the Retail Advance Obligation Repayment Election, you would receive the following:

---

[95] Calculated in U.S. Dollars as of the Petition Date utilizing the conversion rates provided in the Cryptocurrency Conversion Table.

| Account Holder Claim 3 - $49,702.50 Retail Borrower Deposit Claim, $30,000 Retail Advance Obligation (Retail Advance Obligation Repayment Election) | | | |
|---|---|---|---|
| **Coin** | **# of Coins** | **Petition Date Coin Price** | **USD ($)** |
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $ 49,702.50 |
| | | | |
| *Retail Advance Obligation Borrower Repayment* | | | |
| USDC / USD | (30,000.00) | $ 1.00 | $ (30,000.00) |
| **Retail Borrower Post-Set off Claim ($)** | | | **$ 19,702.50** |

| **Recovery Type** | **5/31 Coin Price** | **# of Coins Recovered** | **Recovery Value ($)** |
|---|---|---|---|
| **Retail Advance Obligation Return to Borrower** | | | |
| BTC | $ 27,323.96 | 1.10 | $ 30,000.00 |
| | | | |
| **Retail Borrower Post-Set Off Claim Recovery** | | | |
| BTC | $ 27,323.96 | 0.14 | $ 3,707.53 |
| ETH | 1,879.61 | 1.97 | 3,707.53 |
| Liquid Cryptocurrency [1,2] | | | $ 7,415.06 |
| NewCo Common Stock [1,3] | N/A | N/A | 6,079.91 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | **$ 13,494.96** |
| **Liquid Cryptocurrency Recovery %** | | | **37.6%** |
| **NewCo Common Stock Recovery %** | | | **30.9%** |
| **Recovery % on Retail Borrower Post-Set off Claim** [4] | | | **68.5%** |
| **Recovery % on Retail Advance Obligation** | | | **100.0%** |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | **87.5%** |

If, on the other hand, you do not make the Retail Advance Obligation Repayment Election or you fail to repay your Retail Advance Obligation in accordance with the Debtors' instructions and by the deadline, you would receive the Set Off Treatment according to the following. [96]

---

[96]   The tables include the following assumptions:  (1) the Holder only has a Retail Borrower Deposit Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

| Account Holder Claim 3 - $49,702.50 Retail Borrower Deposit Claim, $30,000 Retail Advance Obligation (Set Off Treatment) | | | | |
|---|---|---|---|---|
| Coin | # of Coins | Petition Date Coin Price | | USD ($) |
| *Retail Borrower Deposit Claim* | | | | |
| BTC | 2.50 | 19,881.00 | $ | 49,702.50 |
| *Set Off:  Retail Advance Obligation* | | | | |
| USDC / USD | 30,000.00 | $  1.00 | $ | 30,000.00 |
| **Retail Borrower Post-Set off Claim ($)** | | | $ | **19,702.50** |

| Recovery Scenario (consistent with General Earn treatment) | | | | |
|---|---|---|---|---|
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | | Recovery Value ($) |
| BTC | $  27,323.96 | 0.14 | $ | 3,707.53 |
| ETH | 1,879.61 | 1.97 | | 3,707.53 |
| Liquid Cryptocurrency[1,2] | | | $ | 7,415.06 |
| NewCo Common Stock[1,2] | N/A | N/A | | 6,079.91 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | $ | **13,494.96** |
| *Liquid Cryptocurrency Recovery %* | | | | *37.6%* |
| *NewCo Common Stock Recovery %* | | | | *30.9%* |
| *Recovery % on Retail Borrower Post-Set off Claim [3]* | | | | *68.5%* |
| *Recovery % on Retail Advance Obligation* | | | | *100.0%* |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | | **87.5%** |

As further explained herein, Holders of Claims that receive the Unsecured Claim Distribution Consideration may make Unsecured Claim Distribution Mix Elections, which could alter the recovery shown above.

Please see Article XII of this Disclosure Statement for an explanation of "Certain U.S. Federal Income Tax Consequences of the Plan" with respect to the Set Off Treatment.

**XX.    How does the Plan classify Claims for damages arising from the alleged wrongful liquidation of loans issued under the Borrow program?**

Certain former and current participants in the Debtors' Borrow program have asserted that they hold Claims or Causes of Action against the Debtors related to the liquidation of certain of their Retail Deposit Advance Obligations during and around the Pause.

As a general matter, the Terms of Use applicable to the Borrow program permitted the Debtors to liquidate Borrow program loans once a loan reached a maximum loan-to-value ("LTV") threshold.  Upon liquidation, the Company reduced the Borrow account balance by the amount owed by the Account Holder with respect to the loan, charged a 2-3% liquidation fee as permitted under the Terms of Use, and then returned the remaining amount to the Account Holder's "Celsius Account," which was the program associated with the Account Holder's balance prior to being transferred to the Borrow program.  The Debtors have investigated these liquidations and believe the Debtors' actions complied with the Terms of Use and that Account Holders do not hold valid Claims for damages arising from the liquidation of their loans.

To the extent Account Holders assert Claims on account of the alleged improper liquidation of their Retail Borrower Deposit Claims, those Claims are contingent, unliquidated, and disputed Claims and the remaining assets returned to the Account Holder's "Celsius Account" after liquidation will be treated as (a) General Earn Claims or Convenience Class Claims under the Plan to the extent the applicable Account Holder has a General Earn Claim or Convenience Class Claim arising from the liquidation, (b) Custody Claims to the extent the assets were returned to the Account Holder's Custody Account, or (c) a General Unsecured Claim to the extent there is no Account Holder Claim associated with the liquidation.

Any such Claims (other than the Custody Claims) will be subject to the Class Claim Settlement described in Article **Error! Reference source not found.** of this Disclosure Statement. *If any Claimants want to pursue these Claims instead of receiving the 5% increase to their Scheduled Account Holder Claims under the Class Claim Settlement, they should opt out of the Class Claim Settlement by making the applicable election on their Ballot*.

### YY.    What is the CEL Token Settlement and what is the basis for the valuation of CEL Tokens?

The CEL Token Settlement is a settlement of disputes regarding the treatment and priority of all Claims and Causes of Action arising out of or related to the CEL Token.  If approved under the Plan, the settlement will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry into the CEL Token Settlement is an exercise of the Debtors' business judgment and represents a fair and equitable compromise of the issues described below that falls well within the range of reasonableness.

Under the Plan, Holders of CEL Token Deposit Claims will receive treatment otherwise consistent with the treatment of the program in which their CEL Tokens were deployed, such as General Earn Claim treatment.  The amount of treatment provided to Holders of CEL Token Deposit Claims will be based on a valuation of $0.25 per CEL Token.  For example, a Holder of a CEL Token Deposit Claim on account of 100,000 CEL Tokens transferred to the Earn Program would be entitled to treatment consistent with an Earn Claim valued at $20,000.

All other Claims with respect to CEL Tokens, including other Claims for damages relating to CEL Token and Claims of the Equitably Subordinated Parties, will be subordinated and will receive no distribution under the Plan.  The UCC Claims Stipulation Defendants include defendants who participated in, or had direct knowledge of, the manipulation of CEL Token prior to the Petition Date.

The Debtors, in consultation with the Committee, determined that a $0.25 valuation of the CEL Token is appropriate in light of strong arguments that CEL Token Deposit Claims should be subordinated and the true value of CEL Token on the Petition Date was likely not reflected by the market price of such tokens.  The valuation offered under the CEL Token Settlement is the same price at which CEL Token was offered through a private sale prior to the initial coin offering and is close to the price of CEL Token at the time of the Pause.  Moreover, the valuation reflects the difficulty of fairly valuing an asset that had its value manipulated and that will almost certainly have no go-forward value.  Further, CEL Tokens could be treated as securities, which would result in CEL Token Deposit Claims being subordinated and Holders receiving $0.00 on account of such Claims.  Finally, as stated above, the market price of CEL Token as of the Petition Date is likely not reflective of the true value of CEL Token due to extremely low trading volume between the Pause and the Petition Date and potential effects on the price.

Valuing the CEL Token at $0.25 per CEL Token is equitable to other Account Holders.  There are approximately $220 million of CEL Token Deposit Claims if such Claims are valued at $0.81—the Petition Date trading price.  Yet, CEL Token cannot be distributed or sold.  If CEL Token Deposit Claims are valued at the Petition Date price, the recoveries of other Account Holders will be severely limited—even though

those Account Holders did not assume the unique risks associated with the CEL Token, a highly speculative asset with a price closely linked to the value of the Celsius platform and dependent on its continued viability.

In reaching the terms of a settlement that would be in the best interest of all creditors, the Debtors also assessed the potential of returning CEL Token in-kind to Holders of CEL Token Deposit Claims. This approach, however, would neither be feasible nor equitable. Distribution would be impractical due to the significant regulatory hurdles and risks associated with the distribution of what is likely an unregistered security. Moreover, an in-kind distribution would not effectively return value to Holders of CEL Token Deposit Claims because the value of CEL Token is predicated on the continued operation of the Celsius platform, which will not continue after the Effective Date.

Accordingly, the Debtors, in consultation with the Committee, determined that valuing CEL Token at $0.25 per token represented an appropriate settlement of the issues set forth above.

Although the Debtors and the Committee support the CEL Token Settlement, certain Account Holders Filed motions in the Bankruptcy Court seeking an order valuing CEL Token at $0.81 per CEL Token (the "CEL Token Valuation Motions").[97] The Committee Filed an objection to the CEL Token Valuation Motions,[98] joined by the Debtors,[99] which asserted the points above in support of valuing CEL Token at $0.25 per CEL Token. The Court heard the CEL Token Valuation Motions on June 28, 2023 and dismissed both motions without prejudice but did not issue a ruling with respect to the valuation of CEL Token. If the CEL Token Settlement is not approved, the Court may determine the appropriate valuation of CEL Token at the Confirmation Hearing or in the claims resolution process, which may ultimately result in CEL Token being valued at $0.00 or $0.81, or the CEL Token Deposit Claims being subordinated, or such other treatment as may be ordered by the Bankruptcy Court. The Debtors and the Committee believe that the CEL Token Settlement provides a reasonable valuation of CEL Token, eliminates costly and uncertain litigation, and expedites distributions to Account Holders.

### ZZ.    What is "substantive consolidation" and what entities have been "substantively consolidated" pursuant to the Plan?

"Substantive consolidation" means that the separate legal status of two or more entities (in this case, CNL, Network LLC, Lending LLC, and Networks Lending LLC) is ignored and they are treated as one entity so that their assets are combined and creditors' recoveries can be based on those combined assets. Celsius Network Limited (or "CNL," as it is defined and used throughout this Disclosure Statement) and Celsius Network LLC (or "Network LLC," as it is defined and used throughout this Disclosure Statement) have already been "substantively consolidated" for the purposes of the Plan. The Plan also seeks to substantively consolidate Celsius Lending LLC (or "Lending LLC," as defined in this Disclosure

---

[97]    *See Santos Caceres' Motion for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; if Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief* [Docket No. 2169]; *Sean StJohn's Motion for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; if Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief* [Docket No. 2216].

[98]    *See The Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2840].

[99]    *See Debtors' Joinder in Support of the Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2846].

Statement) and Celsius Networks Lending LLC (or "Networks Lending LLC," as defined in this Disclosure Statement).[100]

The Debtors, in consultation with the Committee, believe that the substantive consolidation of CNL, Network LLC, Lending LLC, and Networks Lending LLC is an appropriate means of implementing a Plan that unlocks value and maximizes recoveries for the Account Holders.

As discussed in Article VII.L.3 of this Disclosure Statement, while the Bankruptcy Court held that Account Holders can only assert contractual Claims against Network LLC pursuant to the Terms of Use, the Bankruptcy Court expressly reserved the Account Holders' right to assert non-contractual Claims against the other Debtors, including non-customer facing entities such as CNL.[101] Following the Customer Claims Ruling, the Debtors established a Supplemental Bar Date for affected Claims, which allowed Account Holders to assert non-contractual Claims, including for fraud and misrepresentation, against CNL.[102]

The Debtors and the Committee asserted that substantive consolidation is appropriate because creditors dealt with the Debtors as a single economic unit and did not rely on the Debtors' corporate separateness, and because the Debtors' assets and records are so hopelessly entangled that it would be value destructive and unduly time intensive to unscramble their affairs. On the first point, the majority of stakeholders—most importantly, Account Holders—transacted with Celsius as an integrated corporate group and did not rely on CNL and Network LLC operating separately with distinct assets. To the contrary, the Debtors' management, including Mr. Mashinsky, represented to Account Holders that all of the Debtors' assets—not just the assets of Network LLC—would be available to creditors in the event of the Debtors' insolvency. On the second prong, the Debtors did not maintain detailed corporate records that are necessary to account for any separate liabilities or assets of CNL and Network LLC.[103]

Pursuant to the consolidation as set forth under the Plan, Account Holders will have claims against the assets of the Consolidated Debtors. CNL, Network LLC, Lending LLC, and Networks Lending LLC will be consolidated for purposes including voting, Confirmation, and Plan distributions, and subject to the following: (a) all assets and all liabilities of CNL, Network LLC, Lending LLC, and Networks Lending LLC as consolidated Debtors (the "Consolidated Debtors") shall be treated as though they were merged; (b) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (d) all Claims between any Consolidated Debtors shall be deemed cancelled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors. In other words, the assets and liabilities of CNL, Network LLC, Lending LLC, and Networks Lending LLC will be combined; any joint obligations that CNL, Network LLC, Lending LLC, and Networks Lending LLC have will be treated as one obligation and the Claims against such obligations will be treated as a single Claim; any debt that one Consolidated Debtor owes another will be canceled (because they would be considered one and the same entity under substantive

---

[100]    CNL and Network LLC were substantively consolidated pursuant to the Series B Settlement Order [Docket No. 3074].

[101]    Customer Claims Ruling (as defined herein) at 4, 38.

[102]    *See Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

[103]    *Id.*

consolidation so they would be unable to have Claims against each other); and any creditor Claim filed or scheduled against any one Consolidated Debtor will be treated as a Claim against all Consolidated Debtors.

### AAA. How are "Flare Tokens" treated under the Plan? Will they be distributed to Holders of Earn or Custody Claims based on XRP transferred to the Debtors?

Any Flare Tokens (as defined below) transferred to or held by the Debtors will be transferred to NewCo on the Effective Date. Holders of Claims will not receive any distributions of Flare Tokens under the Plan.

Pursuant to an agreement entered into between CNL and Flare Network Limited ("Flare" and the "Flare Agreement," respectively), the Debtors are entitled to receive from Flare certain newly minted tokens ("Flare Tokens"). Under the terms of the Flare Agreement, Celsius is entitled to receive a grant of 150 million Flare Tokens as consideration for agreeing to distribute approximately 209 million Flare Tokens to the Celsius Accounts of customers holding XRP tokens on December 12, 2020 (such customers, the "Eligible XRP Customers," and such date, the "Snapshot Date").

On January 24, 2023, the Bankruptcy Court entered the *Order Authorizing the Debtors to Credit Flare Tokens to Eligible Account Holders* [Docket No. 1931] (the "Flare Order"), which authorized the Debtors to credit Flare Tokens to the accounts of the Eligible XRP Customers. As of the date of Filing of this Disclosure Statement, however, and although the Debtors are in communication with Flare, Flare has not complied with the terms of the Flare Agreement, and the Debtors are therefore unable to credit Eligible XRP Customers' accounts with the portion of Flare Tokens they are eligible to receive. The Debtors are continuing to work with Flare on resolving this issue and agreeing on a distribution mechanism.

Pursuant to the Flare Order, the Debtors will credit the Flare Tokens to the Accounts of Eligible Customers in a manner consistent with the distribution scheme set forth under the Flare Agreement. All Flare Tokens credited to Eligible XRP Customers' Accounts will be treated as Earn Assets since the Custody Program did not exist on the Snapshot Date. As such, all Flare Tokens will be held as the exclusive property of the Debtors, and Eligible Customers will only be entitled to an amended Claim to the extent the amount of the Flare Tokens credited to their Account. The value of the Flare Tokens will be determined by the market price of Flare Tokens on the date that Flare transfers the Flare Tokens to the Debtors.

### BBB. What are "EIP Awards" and who is eligible to receive one? Why do the Debtors believe EIP Awards are necessary?

The Plan includes an "EIP," or "Emergence Incentive Plan," which will provide for the distribution of Cash awards, or "EIP Awards," to certain employees, the "EIP Participants," if the Plan is Confirmed and Consummated. The Debtors believe that an EIP is necessary to address the Debtors' ongoing issues with employee retention and ensure that the Plan, once Confirmed by the Bankruptcy Court, can be successfully implemented.

Since the Petition Date, the Debtors have lost hundreds of employees. Moreover, the Debtors' compensation of certain essential members of senior management and key employees is currently at or below market relative to their peers. Further, the Restructuring Transactions contemplated by the Plan are extraordinarily complex and will require the dedicated efforts of a highly skilled employee base. The Debtors believe that it is in the interest of all stakeholders that the employees who will be tasked with implementing the Plan remain motivated.

The EIP Participants are, collectively: (a) Christopher Ferraro, Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer; (b) Guillermo Bodnar, Chief Technology Officer; (c) Oren Blonstein, Chief Product Officer; (d) Ron Deutsch, General Counsel; (e) Trunshedda Ramos, Chief

Human Resources Officer; (f) Adrian Alisie, Chief Compliance Officer; (g) Jenny Fan, Chief Financial Officer of Mining; (h) Dave Albert, Chief Administrative Officer of Mining; and (i) Quinn Lawlor, Chief Strategy Officer of Mining.

The EIP Participants are essential to the successful Consummation of the NewCo Transaction and are responsible for (a) ensuring the safety and security of assets on the Debtors' platform, (b) overseeing the processing of customer withdrawals from the Custody and Withhold Accounts, (c) effectuating the distribution of Liquid Cryptocurrency to creditors in accordance with the Plan, (d) managing operations at Mining, and (e) supervising all human resources, payroll matters, and monthly financial reporting.

The EIP will provide EIP Participants the ability to earn EIP Awards based on their performance relative to certain metrics, as set forth below:

Platform Metrics: Oren Blonstein, Trunshedda Ramos, Guillermo Bodnar, Adrian Alisie, and Ron Deutsch are eligible to earn an EIP Award based on the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

  (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

  (b) threshold performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (30% of the EIP Award):

  (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

  (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup between the date set forth in the applicable agreement and within thirty days afterthe Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

  (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

  (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

  (a) target performance requires the Effective Date occur by December 31, 2023;

(b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

(c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024; and

<u>Mining Metrics</u>: Jenny Fan, Dave Albert, and Quinn Lawlor are eligible to earn an EIP Award based on the following metrics:

- East Stiles Site Metric (25% of EIP Award):

    (a) target performance requires that the East Stiles site is completed and operational by September 30, 2023; and

    (b) threshold performance requires that the East Stiles site is completed and operational between October 1, 2023 and November 30, 2023.

- Effective Date Metric (25% of EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (25% of EIP Award):[104]

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

- Midland Texas Gross Margin Metric (25% of EIP Award):

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 above 25%; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 between 20% and 25%.

---

[104] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

Chris Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

    (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

    (b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (20% of the EIP Award):

    (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

    (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

102

- Mining Rig Metric (10% of EIP Award): [105]

> (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

> (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

If an EIP Participant's employment is terminated by the Debtors without "cause," by the EIP Participant for "good reason," or upon death or disability of the EIP Participant, the EIP Participant will be entitled to 100 percent of the EIP Award that would otherwise have been earned based on the percentage of the performance period the EIP Participant was engaged by the Debtors. If an EIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for "cause"), any EIP Award will be forfeited. The maximum aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.

EIP Awards will be made on the Effective Date, and the KEIP Motion will be withdrawn with prejudice.

### CCC. What is an executory contract or unexpired lease, and what does it mean for the Debtors to "assume," "reject," or "assume and assign" such contracts, and why is this important?

An "executory contract" is a contract that has not been fully completed. In other words, the parties to the contract still owe obligations to one another. One example of an executory contract is an "unexpired lease," or a residential or business lease that has not ended yet because the landlord and the tenant owe each other obligations until the end of the lease term (*e.g.*, the tenant must pay the landlord rent every month, and the landlord must continue to provide for services such as heat, garbage pick up, etc.).

Companies in bankruptcy can "assume" executory contracts, meaning they have the ability to take on the contract and acknowledge that the contract is one to which it intends to remain party. By assuming a contract, companies in bankruptcy promise to continue fulfilling their obligations under the contract. They can also "reject" executory contracts, meaning that companies can decide that they do not wish to perform under the contract any longer. For example, if a company in bankruptcy determines that it has a burdensome office lease, the company could reject the lease and stop fulfilling its obligations under the contract. The company's landlord, however, would have an unsecured claim for the damages it suffers as a result of the company's rejection of the contract.

Finally, companies can also "assume and assign" executory contracts, meaning that they can opt to remain party to the contract and can then assign both the benefits and the obligations of the contract to a third party. For example, if a company in bankruptcy were to assume an office lease but did not want to remain a tenant of the office, they could assign that lease to another affiliate of the company, or to a third party seeking to move into that property. Each of these three tools—assumption, rejection, and assumption

---

[105] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

and assignment—are beneficial for companies in bankruptcy and fulfill the Bankruptcy Code's purpose of helping the debtor with a fresh start.

### DDD. Can and will the Debtors assume or reject any executory contracts?

The Debtors are party to numerous Executory Contracts and Unexpired Leases that may be assumed, rejected, or assumed and assigned.

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be considered rejected by the Debtors or Post Effective Date Debtors unless such Executory Contract and Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan. Entry of the Confirmation Order will be considered an order approving the rejections of Executory Contracts or Unexpired Leases. *See* Article V.A of the Plan.

With respect to (a), the Debtors will list executory contracts they plan to assume (or assume and assign) on the Schedule of Assumed Executory Contracts and Unexpired Leases, and they will list executory contracts they plan to reject on the Schedule of Rejected Executory Contracts and Unexpired Leases. Both the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases will be Filed as part of the Plan Supplement.

In addition, all Institutional Loans, and any agreements, documents, or instruments relating to such Institutional Loans are Executory Contracts that the Debtors will assume and assign to NewCo under the Plan if a NewCo Transaction is consummated. In the event of an Orderly Wind Down, all agreements related to Institutional Loans shall be treated as all other Executory Contracts as provided in Article V.A of the Plan. *See* Articles V.E–V.D. of the Plan

Creditors may hold Claims (*i.e.*, have a right to payment) arising from the Debtors' rejection of Executory Contracts or Unexpired Leases for the outstanding amount owed to the creditor under the contract. In that case, the creditor must file a Proof of Claim within thirty days of rejection with the Solicitation Agent. If a creditor fails to file a Proof of Claim, his or her Claim will forever be barred and the creditor will be unable to collect payment on it.

### EEE. What is the deadline to vote on the Plan?

As requested in the Disclosure Statement Motion [Docket No. 2970], the Voting Deadline is expected to be [September 20], 2023, at [4:00] p.m. prevailing Eastern Time. This date, however, is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Deadline is set by the Bankruptcy Court and prior to distribution of this Disclosure Statement.

### FFF. What is the deadline to object to the Confirmation of the Plan?

As requested in the Disclosure Statement Motion [Docket No. 2970], the Plan Objection Deadline is expected to be [September 20], 2023, at [4:00] p.m. prevailing Eastern Time. This date, however, is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this

paragraph once the Plan Objection Deadline is set by the Bankruptcy Court and prior to distribution of this Disclosure Statement.

**GGG. How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan. To be counted as votes to accept or reject the Plan, each Ballot must be properly completed, executed, and delivered in accordance with the instructions provided such that the Ballot is **actually received** by the Debtors' Solicitation Agent **on or before the Voting Deadline,** *i.e.* **[September 20], 2023, at [4:00] p.m., prevailing Eastern Time**.[106]

Holders must vote all of their Claims (other than their Custody Claims, if any) either to accept or reject the Plan and may not split any votes between Classes (other than with respect to a Custody Claim). Accordingly, a Ballot that partially rejects and partially accepts the Plan (other than with respect to a Custody Claim) will not be counted, including a Ballot that accepts the Plan with respect to one Class and rejects the Plan with respect to another Class.

For example, a Holder with a General Earn Claim and a Withhold Claim must vote both Claims to either accept the Plan or reject the Plan. In comparison, a Holder with a General Earn Claim and a General Custody Claim may vote each Claim differently—such Holder may vote to accept the Plan with respect to her General Earn Claim and may vote to reject the Plan with respect to her General Custody Claim.

Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes. *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures," and Article X of this Disclosure Statement for more information.[107]

---

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT AT: (855) 423-1530 (TOLL-FREE) OR +1 (949) 669-587 (INTERNATIONAL) OR EMAIL CELSIUSINQUIRIES@STRETTO.COM AND REFERENCE "IN RE CELSIUS - SOLICITATION INQUIRY" IN THE SUBJECT LINE.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL **NOT** BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.

---

[106] This date is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Deadline is set by the Bankruptcy Court and prior to the distribution of the final version of this Disclosure Statement.

[107] The Debtors have also Filed Solicitation and Voting Procedures as Exhibit 1 to the order attached as Exhibit A to the Disclosure Statement Motion [Docket No. 2970]. All exhibits to the Disclosure Statement Motion were also Filed separately at [Docket No. 2971]. Revised Exhibits are Filed concurrently with the Disclosure Statement on August 9, 2023.

**HHH. If I vote to accept the Plan, am I voting only for the NewCo Transaction or am I voting for both the NewCo Transaction and the Orderly Wind Down? Can I vote to accept the Plan only with respect to the NewCo Transaction? Can I vote to accept the Plan only with respect to the Orderly Wind Down?**

If you vote to accept the Plan, you are voting to accept *both* the NewCo Transaction and the Orderly Wind Down. To be clear, you cannot vote to accept *only* the NewCo Transaction or *only* the Orderly Wind Down.

The Plan incorporates both the NewCo Transaction and the Orderly Wind Down, and provides the Debtors the option to pursue either of these transactions. The Debtors' goal is to consummate the NewCo Transaction, which the Debtors believe is the most value-maximizing transaction for all stakeholders. If the NewCo Transaction cannot be completed due to complications or delays, however, the Plan gives the Debtors the option to pursue the Orderly Wind Down instead. As explained throughout this Disclosure Statement and in particular in Article III.I, the Orderly Wind Down is a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets. The Debtors may decide to pursue the Orderly Wind Down before or after the Confirmation of the Plan and in consultation with their advisors, the Committee, the Committee's advisors, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, Mr. Herrmann, Mr. Frishberg, Mr. Crews, and Mr. Tuganov. If the Debtors decide to toggle to the Orderly Wind Down, they will File a motion requesting authority to do so and including proposed Wind-Down Procedures, as well as an amended Plan.

As you consider whether to vote to accept the Plan, you should review and evaluate both the NewCo Transaction and the Orderly Wind Down and how they may affect you and your potential recoveries.

**III.    When is the Confirmation Hearing set to occur?**

In their revised proposed Disclosure Statement Motion order [Docket No. [●]], the Debtors requested that the Bankruptcy Court schedule the Confirmation Hearing on October 2, 2023, at 2:00 p.m. prevailing Eastern Time. This date, however, is subject to Bankruptcy Court approval. The Bankruptcy Court must approve the Disclosure Statement Motion for the date of the Confirmation Statement Hearing to be set. The Confirmation Hearing may be adjourned from time to time and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**JJJ.    What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is for the Debtors to seek approval of the Plan from the Bankruptcy Court. The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**KKK. I Filed a Proof of Claim. How will that affect how much I will receive under the Plan and when that distribution will be made to me?**

The Bankruptcy Code requires debtors to file a schedule of the company's assets, liabilities, expenses, obligations, and debts owed to creditors and other parties in interest. The debtor company's record of how much it owes a creditor is known as a "scheduled claim." Unless they are labeled as

106

"disputed," "contingent," or "unliquidated" on the debtor's schedules, scheduled claims are presumed to be accurate and valid, or "allowed." This means that creditors whose claims are scheduled can, under a plan of reorganization, receive a distribution on account of that scheduled claim. Any creditor whose claim is not scheduled or whose claim is scheduled as disputed, contingent, or unliquidated, or who disagrees with the scheduled claim, can file a proof of claim instead. That filed claim will replace and supersede any scheduled claim.

Filed proofs of claim, however, may not be accurate or valid. Instead, they have to be reviewed as part of the claims reconciliation process and reconciled against the debtor's records. If the debtor does not object to the filed proof of claim, the filed proof of claim will be deemed "allowed," or considered valid, and the creditor will be able to receive distributions under the plan. If the debtor disputes a filed proof of claim by filing an objection with the bankruptcy court, the bankruptcy court has to determine whether to "allow" or "disallow" the filed proof of claim. A debtor may object to a filed proof of claim on numerous grounds, including the following:

- the filed claim duplicates other claims;

- the claim was filed in the wrong case;

- the claim was not timely filed; and

- the claim amount is incorrect;

For the avoidance of doubt, only "allowed" claims can receive a distribution under a confirmed plan of reorganization.

Accordingly, Filed Claims will have to be reviewed as part of the Debtors' claim reconciliation process. The claims reconciliation process in these Chapter 11 Cases is already underway, but will likely take significant time to be completed given the volume of Claims that have been Filed. Further, as of the date of the Filing of this Disclosure Statement, the claims reconciliation process is not expected to be complete by the Effective Date of the Plan. This means that you will not be eligible to receive a distribution under the Plan until your Filed Claim is reconciled and "allowed." If your Filed Claim is ultimately "disallowed," you will not receive a distribution on that Filed Claim. However, if you are an Account Holder with a Filed Claim, and if you do not opt out of the Class Claim Settlement, you will receive the treatment provided under the Class Claim Settlement (described in Article III.MMM of this Disclosure Statement) even though your Filed Claim will be expunged.

**LLL.  What do the recent actions by the SEC, FTC, CFTC, and USAO mean and how do they affect my recovery?  How do the Debtors propose to treat the Claims of state regulators and how will this proposed treatment affect my recovery?**

From the outset of these Chapter 11 Cases, the Debtors have met frequently with various regulators and other governmental parties, including the USAO on behalf of the United States Department of Justice, the SEC, the CFTC, the FTC, and various state regulators, to address concerns related to the Debtors' prepetition conduct and their future operations. On July 13, 2023, the Debtors released a statement and press release [Docket No. 3016] explaining that they had entered into a non-prosecution agreement (the "NPA") with the USAO as well as consent orders with the SEC, CFTC, and FTC consensually resolving the agencies' civil claims against them.

On July 11, 2023, the USAO filed a criminal indictment against Mr. Mashinsky and Mr. Cohen-Pavon. The indictment charges Mr. Mashinsky with securities fraud, commodities fraud, and wire fraud, and asserts that Mr. Mashinsky defrauded and misled customers with respect to Celsius'

profitability and how it invested the Cryptocurrency customers transferred to Celsius. The indictment further charges Mr. Mashinsky and Mr. Cohen-Pavon with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token. Specifically, the USAO asserts that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices. Pursuant to the NPA, however, the USAO will not criminally prosecute the Debtors themselves for any involvement in this conduct.

The SEC, CFTC, and FTC also filed civil complaints alleging the following. The SEC alleges that CNL and Mr. Mashinsky committed fraud and violated federal securities law by failing to register the Earn Program as a securities offering, making false and misleading statements about the Earn Program and the CEL Token, and engaging in market manipulation of the CEL Token. The CFTC filed a civil complaint against Network LLC and Mr. Mashinsky and alleged that Network LLC's prepetition activities violated the Commodity Exchange Act and the regulations promulgated thereunder. The FTC alleges that certain of the Debtors and Mr. Mashinsky, Mr. Leon, and Mr. Goldstein (i) violated the Federal Trade Commission Act by making false or misleading representations in connection with the marketing of Celsius' products and services and misappropriating consumers' Cryptocurrency deposits, and (ii) violated the Gramm-Leach-Bliley Act by using false or fraudulent statements to obtain or attempt to obtain certain financial information of customers such as bank account numbers and Cryptocurrency wallet addresses.

Pursuant to the NPA and each settlement with the federal civil regulatory agencies, the Debtors are permanently restrained, enjoined, and prohibited from engaging in conduct that violates federal laws and regulations. The settlements also provide for a $4.7 billion monetary judgment against the Debtors. ***This monetary judgment, however, is suspended and the Debtors will not be required to pay a judgment or have any of their assets seized. Instead, the settlements allow the Debtors to proceed with making a full distribution of their assets to their creditors pursuant to the Plan.***

 As noted, while the Debtors have entered into an NPA with the USAO and settlements with the federal civil regulatory agencies, the indictment and/or civil complaints against Mr. Mashinsky, Mr. Leon, Mr. Goldstein, and Mr. Cohen-Pavon will proceed.

Since the Filing of the revised Disclosure Statement on July 29, 2023, the Debtors have also been engaging with state regulators regarding a potential settlement of their Claims against the Debtors. As of the date of the Filing of this Disclosure Statement, the Debtors proposed that the State entities that Filed Claims against the Debtors would effectively have their Claims subordinated to Account Holder Claims (by agreement of the parties or otherwise as ordered by the Court) such that any fine, penalty, or judgment resulting from States' Claims would be suspended and the Debtors could maximize the recoveries of Account Holders. The Debtors extended this proposal to the NAAG and the states of New Jersey, Texas, Vermont, and Tennessee on or around August 2, 2023 and indicated it would be applicable to all States. As of the date of the Filing of this Disclosure Statement, those parties are evaluating the proposal and remain in discussions with the Debtors, but no agreement has yet been reached.

More detailed summaries of the NPA with the USAO, each of the settlements with the federal civil regulatory agencies, and the proposed treatment of state Claims, are set forth in Article VII.J.1 of this Disclosure Statement.

**MMM. What is the Class Claim Settlement, how does it work, and who is affected by it?**

This section describes the details of the Class Claim Settlement and how it may affect you. For a comprehensive background discussion regarding the negotiation and development of the Class Claim Settlement, including the Class Claim Mediation, please refer to Articles VII.K.4 of this Disclosure Statement as well as the Class Claim Settlement Motion Filed on July 20, 2023 [Docket No. 3064].

The Class Claim Settlement is a compromise negotiated between the Debtors, the Committee, the Retail Borrower Ad Hoc Group, and the Earn Ad Hoc Group, with participation from certain individual creditors. The settlement provides a comprehensive resolution of the Class Claim as well as the more than 30,000 claims totaling over $78.2 billion that have been Filed against the Debtors that do not elect to opt out of the Class Claim Settlement, many by Account Holders for non-contractual Claims (*e.g.*, Claims based on alleged conduct such as fraud, misrepresentation, and similar actions).

Under the Class Claim Settlement, Account Holders who participate (by not opting out, as explained in greater detail below), will receive a 5% increase to their scheduled Claim on account of any non-contractual Claims. In exchange, participating Account Holders' Filed Proofs of Claim will be superseded, expunged, and extinguished. In other words, you cannot receive both a 5% increase to your scheduled Claim and retain your Filed Proof of Claim.

The Debtors' and the Committee's joint motion to approve the Class Claim Settlement is scheduled to be heard by the Bankruptcy Court on August 14, 2023. The Bankruptcy Court must approve the Class Claim Settlement before it can become effective. If approved, the Class Claim Settlement will be effectuated pursuant to Bankruptcy Rule 9019. As further explained in the Class Claim Settlement Motion, the Debtors' entry into the Class Claim Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

*1. To whom is the Class Claim Settlement being offered?*

The Class Claim Settlement is offered to all Account Holders with Account Holder Claims that are not Custody Claims. The Settlement is not being offered to Holders of non-Account Holder Claims or Custody Claims, and it is not being offered to Excluded Parties.

*2. How do I participate in the Class Claim Settlement?*

Participation in the Class Claim Settlement is automatic: Account Holders do **not** need to do anything to participate in the Class Claim Settlement. The Class Claim Settlement is an opt-out settlement, meaning only those Account Holders who **do not** wish to participate in the Class Claim Settlement will need to act. For the avoidance of doubt, Account Holders who wish to participate in the Class Claim Settlement need **not** file any Proof of Claim or make any election on their Ballots. *If you have an Account Holder Claim that is not a Custody Claim (e.g., a Retail Borrower Deposit Claim, a Convenience Class Claim, a General Earn Claim, or a Withhold Claim), and you do not timely opt out of the Class Claim Settlement before the Voting Deadline, you will be deemed a participant in the Class Claim Settlement regardless of whether you vote to accept the Plan, vote to reject the Plan, or do not vote on the Plan*.

*3. How do I opt out of the Class Claim Settlement?*

*Account Holders can opt out by checking the box to opt out on the Account Holder Ballot. The opt out process is described in detail in the Solicitation Package*. Account Holders who wish to opt out should follow the instructions that will be provided in the Solicitation Package that they will receive once the Bankruptcy Court approves the Disclosure Statement. As a part of the Solicitation Package, the Debtors will provide all eligible Account Holders with a Notice of Claims Settlement, which will explain the terms of the Settlement, the process of opting-out, and the consequences of not opting out of the Settlement.

*IF YOU WISH TO PURSUE A TIMELY FILED PROOF OF CLAIM AGAINST THE DEBTORS, YOU MUST OPT OUT OF THE CLASS CLAIM SETTLEMENT ON YOUR ACCOUNT HOLDER BALLOT*.

The deadline for opting out will be the conclusion of the time period in which Account Holders can vote to accept or reject the Plan, *i.e.*, the Voting Deadline.

### 4. What do I receive if I participate in the Class Claim Settlement?

By participating in (*i.e.*, not opting out of) the Class Claim Settlement, your Account Holder Claims as scheduled by the Debtors (other than your Custody Claim) will be increased by 5% and you will receive a corresponding increase in the recovery you receive, depending on the treatment of your specific Account Holder Claims under the Plan.  For example, by participating in the Class Claim Settlement, an Account Holder with a scheduled General Earn Claim of $10,000 will receive the same distribution under the Plan as an Account Holder with a scheduled General Earn Claim of $10,500 who does not participate in the Class Claim Settlement.

Account Holders who participate in the Class Claim Settlement will receive their distribution under the Plan on the Effective Date or as soon as practicable thereafter.  In addition, they will (i) no longer be entitled to the amounts set forth on the Proof of Claim they Filed, if any, which Proof of Claim will be superseded, expunged, and extinguished; (ii) no longer be entitled to prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim; and (iii) will no longer be entitled to receive any other recovery from the Debtors in addition to that provided pursuant to the Class Claim Settlement.

### 5. How will Account Holder Claims be calculated?

All Account Holder Claims, except for any such Claims associated with CEL Token and any Custody Claims, will be calculated by converting the value of the Claim into Cash as of the Petition Date using the conversion rates provided in the Cryptocurrency Conversion Table [Docket No. 1420].  CEL Token will be valued as provided in Article IV.B.2 of the Plan.

### 6. What do I receive if I opt out of the Class Claim Settlement?

Account Holders who timely opt out of the Class Claim Settlement will retain their rights to pursue their individual Proofs of Claim against the Debtors.  However, their Claims will be treated as Disputed Claims under the Plan and will not receive any distribution on the Effective Date.   In addition, Account Holders who opt out (i) will not receive the 5% increase in their Claim amounts, (ii) will not receive any distribution from the Debtors until their applicable Proofs of Claims are fully and finally resolved in the claims reconciliation process by the Litigation Administrator in the Bankruptcy Court, which likely will be months, or even possibly years, after the Effective Date, and (iii) will have to meet the high bar of proving their allegations and liquidating their damages.

**NNN.  What are the ADR Procedures and how do they work?**

The ADR Procedures establish a process that will be implemented post-Effective Date to promote the efficient resolution of certain disputed prepetition Claims against the Debtors' Estates, as well as claims held by the Debtors, including Avoidance Actions, against certain individuals and entities.  A copy of the ADR Procedures were Filed on the docket on July 28, 2023 [Docket No. 3115].[108]

---

[108]  Capitalized terms used but not otherwise defined in this "Question and Answer" shall have the meanings ascribed to them in the ADR Procedures.

*1.    Who may participate in the ADR Procedures?*

Any person or entity that has timely Filed a Proof of Claim may be selected by the Litigation Administrator to participate in the ADR process, provided that any "Excluded Claim" (as defined in the ADR Procedures),[109] shall not be eligible to participate. Although the ADR Procedures encourage voluntary participation by Third Parties, they do not compel parties that have not Filed a Proof of Claim or otherwise subjected themselves to the jurisdiction of the Bankruptcy Court to participate.

*2.    How will I receive notice if I am selected to participate in the ADR Procedures?*

The Litigation Administrator will initiate the ADR Procedures by serving upon each selected Participating Claimant, at the address listed on the Participating Claimant's most recently Filed Proof of Claim or amended Proof of Claim or, if no such address is available, the email address of such Participating Claimant, if applicable, as well as upon any counsel of record, notice of the ADR Procedures and their selection as a Participating Claimant, together with a copy of the ADR Procedures and a Valuation Form.

*3.    Can I opt out of the ADR Procedures?*

Yes.  If a Participating Claimant does not believe the ADR Procedures are reasonably likely to result in the resolution of its Claim, they may choose to opt out within twenty-one (21) days of service of the ADR Initiation Package.  The Litigation Administrator, however, may file a motion with the Bankruptcy Court seeking an order from the Bankruptcy Court requesting that such Participating Claimant adhere to the ADR Procedures.  For the avoidance of doubt, if within twenty-one (21) days of service of the ADR Initiation Package, a Participating Claimant serves a written request for exclusion from the ADR Procedures, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.

*4.    How long will the ADR Procedures take?*

The ADR Procedures consist of five sequential steps:  (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure.  While there is no guarantee, the Initial Assessment Procedure may take sixty (60) to seventy-five (75) days, subject to any written agreement to extend certain deadlines.  It may be much shorter if an agreement is reached without mediation.  All deadlines established by the ADR Procedures may be extended by written agreement of the Litigation Administrator and the applicable Participating Claimant.

*5.    Are all five steps of the ADR Procedures required?*

No.  The ADR Procedures are intended to facilitate an efficient exchange of information to reach a resolution that will be binding on the parties and to save estate resources.  To the extent the informal Settlement Offer Exchange process does not yield a result, and the parties wish to continue in the ADR process, the ADR Procedures provide a clear path to resolution vis-à-vis mediation, and optional binding

---

[109]    An "Excluded Claim" is defined in the ADR Procedures to mean "(a) claims for which the automatic stay under section 362 of the Bankruptcy Code was modified by prior order of the Bankruptcy Court to allow for litigation of the claim to proceed in another forum, (b) tax claims, (c) claims where there is a judgment entered or settlement already agreed to and signed by all applicable parties, including the Class Claim Settlement, (d) any declaratory judgment actions or any other actions regarding insurance coverage issues; (e) any Avoidance Action claims against ADR-Ineligible Potential Defendants; and (f) claims subject to a separate order of the Bankruptcy Court providing for arbitration or mediation.

arbitration which is most likely quicker and more cost effective than proceeding before the Bankruptcy Court.

### 6.   Do I need an attorney to participate in the ADR Procedures?

No, but you should consider seeking representation if you are selected to participate in the ADR Procedures.

### 7.   Will I have to pay anything to participate in the ADR Procedures?

If you are a Participating Claimant in the ADR process, and engage in the mediation process, each party shall be responsible for fifty percent (50%) of the costs for the mediator, provided that if there are more than two parties involved in the mediation, each party shall be liable for their equal share of the costs. The Committee is working with counsel to the Ad Hoc Group of Withhold Account Holders to determine a list of preapproved mediators with an eye towards experience and cost.

### 8.   What happens if I fail to comply with the ADR Procedures?

If a Participating Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the Litigation Administrator may go to the Bankruptcy Court and seek appropriate relief.  Everyone will be provided with a hearing.  This is not meant to be a way to default Claimants or otherwise deny them their day in court.

### 9.   What if I have an objection to the terms of the ADR Procedures?

To the extent any parties object to the terms of the ADR Procedures those objections may be raised at the Confirmation hearing, if not resolved before then.

**OOO. How will the Debtors' books and records be preserved?**

Once the Plan enters into force on the Effective Date, the Debtors' books and records will be transferred to the Post Effective Date Debtors, which shall preserve all books, records, electronically stored information, and other documents that are currently in the Debtors' possession.  The Post-Effective Date Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, and other documents without (i) providing advance notice to the SEC (c/o Therese A. Scheuer, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549, scheuert@sec.gov) and (ii) the permission of the Litigation Administrator(s) or authorization from the Bankruptcy Court.

The Debtors, the Post-Effective Date Debtors, and any transferee or custodian of the Debtors will preserve and maintain any documents associated with the federal securities class action litigation captioned *Goines v. Celsius Network, LLC, et. al.*, Case No. 2:22-CV-04560-KM-ESK (D.N.J. 2022) until the entry of a Final Order of judgment or settlement with respect to all defendants now or hereafter named in the Securities Litigation.  These documents will be preserved and maintained as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil procedure, and will not be destroyed, abandoned, transferred or otherwise rendered unavailable.  For the avoidance of doubt, the injunction set forth in Article VIII.F of the Plan shall not affect in any manner any rights of the lead plaintiff and the class in the Securities Litigation to seek and obtain Securities Litigation Documents through discovery in the Securities Litigation.

**PPP. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement of the Plan, please contact the Solicitation Agent via one of the following methods:

By electronic mail at:
celsiusinquiries@stretto.com with a reference to "In re Celsius – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 423-1530 (Toll-Free) or (949) 669-5873 (International)

You may also contact the Debtors at CelsiusCreditorQuestions@kirkland.com.

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/Celsius (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

## IV. THE DEBTORS' PLAN OF REORGANIZATION.

This section provides a summary of the structure and means for implementation of the Plan and the documents referred to therein and is qualified in its entirety by reference to the Plan. Such summaries do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

In general, the Plan is divided into several key sections, all of which may be reviewed in detail in the Plan attached hereto as **Exhibit A**.

| Article | Summary |
|---------|---------|
| I.A | This section contains the definitions of various capitalized terms that are used throughout the Plan. The defined terms are an essential part of the Plan. Creditors should cross-reference capitalized terms used in the Plan to the definitions provided in this section to understand what is being described throughout the Plan. |
| III.B | This section describes the treatment to be given to Holders of Claims against the Debtors and Interests in the Debtors. Claims and Interests are separated into different Classes and provided treatment based on their relative legal rights against the Debtors. Article III sets forth the distributions that the Debtors are proposing to provide to their various stakeholders, including account holders. <br><br>The projected recoveries to Holders of Claims and Interests under the Plan are set forth in Article III.E of this Disclosure Statement. |
| IV | This section describes various provisions for implementing the Plan, including the NewCo Transaction, the substantive consolidation of CNL, Network LLC, Lending LLC, and Networks Lending LLC, the creation of the Litigation Administrator and Litigation |

| | Oversight Committee, and the various settlements proposed to be implemented under the Plan.<br><br>Article IV of the Plan is restated below. |
|---|---|
| V | This section describes the process by which the Debtors may reject, assume, and assume and assign executory contracts and unexpired leases. |
| VI | This section has certain provisions regarding distributions to be made under the Plan.<br><br>A description of how Holders of Allowed Claims will receive distributions under the Plan, to the extent such Holders are entitled to receive any under the Plan, is set forth in Article III.Q of this Disclosure Statement. |
| VII | This section contains the procedures for the allowance of claims and resolving, among other things, Disputed Claims. |
| VIII | This section has certain release, exculpation, and injunction provisions.<br><br>These provisions of the Plan are restated in Article III.LL and Article III.OO of this Disclosure Statement. |
| IX | This section has certain conditions that must be satisfied before the Plan can become effective and distributions can be made.<br><br>An explanation of "Confirmation," "Effective Date," and "Consummation" is set forth in Article III.O of this Disclosure Statement. |

## A.    Means for Implementation of the Plan.

### 1.    Substantive Consolidation.

The substantive consolidation of the Initial Consolidated Debtors (*i.e.*, Celsius Network Limited and Celsius Network LLC) for purposes of their Plans has been approved as set forth in the Series B Settlement Order and this Plan.  The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate Celsius Lending LLC and Celsius Networks Lending LLC with the Initial Consolidated Debtors on the same terms, effective as of the Effective Date.

Except as otherwise provided therein, the Consolidated Debtors (*i.e.*, the Initial Consolidated Debtors plus Celsius Lending LLC and Celsius Networks Lending LLC) are substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, and subject to the following sentence:  (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.  The substantive consolidation and deemed

merger effected pursuant to the Plan shall not affect (other than for purposes of the Plan as set forth in Article IV.A.1 thereof) (x) the legal and organizational structure of the Consolidated Debtors, except as provided in the Transaction Steps Memorandum, including, for the avoidance of doubt, the legal existence of any Claim of one Consolidated Debtor against another Consolidated Debtor; (y) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; *provided* that any Claim that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of the Consolidated Debtors; or (z) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts.

2.    *Plan Settlement Provisions Regarding Claims and Interests.*

(a)    General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI thereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)    CEL Token Settlement.

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in Article IV.B.2 of the Plan and this Article IV.A.2.(b) of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

- All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17 of the Plan, as applicable.

In the event that the Bankruptcy Court does not approve the CEL Token Settlement, CEL Token Deposit Claims shall either be treated as Section 510(b) Claims or receive such other treatment as the Bankruptcy Court orders. For the avoidance of doubt, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims will be classified as Class 15 Section 510(b) Claims and treated as provided in Article III.B.16.

An explanation of the CEL Token Settlement is set forth in Article III.YY of this Disclosure Statement.

(c)    Account Holder Avoidance Action Settlement.

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in Article IV.B.3 of the Plan and in this Disclosure Statement, the Plan shall effectuate the Account Holder Avoidance Action Settlement.  Pursuant to the Account Holder Avoidance Action Settlement, the Debtor Release contained in Article VIII.C of the Plan shall also release Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure under $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan.

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure of more than $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan.

For the avoidance of doubt:  (a) all Avoidance Actions against ADR-Ineligible Potential Defendants and Excluded Parties are not included in the Account Holder Avoidance Action Settlement and expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims shall be released if such Account Holder with a *De Minimis* Claim otherwise complies with the requirements set forth above other than voting in favor of the Plan (as such Account Holders are not entitled to vote), and (c) as a result of the Account Holder Avoidance Action Release, any Custody Settlement Participant with Withdrawal Preference Exposure under $100,000 shall receive a 100% recovery on their Allowed General Custody Claim.

For the avoidance of doubt, the rights of Account Holders to receive a distribution under the Plan on account of their Claims are not released pursuant to the Account Holder Avoidance Action Settlement. Notwithstanding anything to the contrary in the Plan, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

Each Account Holder's Withdrawal Preference Exposure shall be set forth in the customized Ballot distributed to each Account Holder.

An explanation of the Account Holder Avoidance Action Settlement is set forth in Article III.PP of this Disclosure Statement.

(d)    Custody Settlement.

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Custody Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Custody Settlement as set forth in the Custody Settlement Order.

An explanation of the Custody Settlement is set forth in Article III.TT of this Disclosure Statement.

(e)    <u>Withhold Settlement.</u>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Withhold Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Withhold Settlement.

An explanation of the Withhold Settlement is set forth in Article III.UU of this Disclosure Statement.

(f)    <u>Series B Settlement.</u>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Series B Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Series B Settlement in accordance with the Series B Settlement Agreement.

An explanation of the Series B Settlement is set forth in Article III.VV of this Disclosure Statement.

(g)    <u>Retail Borrower Settlement.</u>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise of the adversary proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors described in this Disclosure Statement, the Plan shall effectuate the Retail Borrower Settlement.  Pursuant to the Retail Borrower Settlement, (a) Holders of Retail Borrower Deposit Claims have the option to repay their Retail Borrower Advance Obligations in exchange for an equivalent amount of Liquid Cryptocurrency, which the applicable Retail Borrower may specify to receive in either BTC or ETH, (b) any obligation of the Retail Borrowers to pay any interest on account of Retail Advance Obligations for the duration of these Chapter 11 Cases is waived, and (c) Liquid Cryptocurrency Weighted Distribution Elections on account of Retail Borrower Post-Set Off Claims shall be given priority over all other Liquid Cryptocurrency Weighted Distribution Elections.  The adversary proceedings brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors and the Pending Withdrawal Adversary Proceeding shall be dismissed with prejudice pursuant to the Confirmation Order upon the Effective Date.

To the extent the Retail Borrower Ad Hoc Group, the Debtors, or the Committee identify a source of third-party financing reasonably acceptable to the Debtors, the Debtors shall take commercially reasonable efforts to facilitate such party in refinancing applicable Retail Advance Obligations with the consideration provided to Retail Borrowers under the Plan.

An explanation of the Retail Borrower Settlement is set forth in Article II.A.2 and Article III.WW of this Disclosure Statement.

(h)    <u>Class Claim Settlement.</u>

As part of the general settlement described in **Error! Reference source not found.** Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise described in the Class Claim Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Class Claim Settlement.  Except as otherwise provided in the Order approving the Class Claim Settlement, under the Class Claim Settlement, if a Holder does not opt-out of the Class Claim Settlement, such Holder's Account Holder Claims, other than Custody Claims, shall receive, in lieu of any scheduled Claim or Filed Proof of Claim, an Allowed Claim in an amount that

is 105% of the scheduled amount of such Claim, in each case of the same Class as the originally scheduled Claim. Proofs of Claim filed by Class Claim Settlement Participants (*i.e.*, Holders of Account Holder Claims (other than Account Holders who only hold Custody Claims) that do not opt out of Class Claim Settlement) shall be expunged from the Claims Register and shall be of no further force and effect.

An explanation of the Class Claim Settlement is set forth in Article III.MMM and Article VII.K.4 of this Disclosure Statement.

> 3.  *Restructuring Transactions.*

The Plan may be effectuated through either the NewCo Transaction or, if applicable in accordance with Article IV.E of the Plan, the Orderly Wind Down. In the event that the Plan is effectuated through the NewCo Transaction, Article IV.D of the Plan shall govern and Article IV.E of the Plan shall be disregarded unless specifically provided therein. Conversely, in the event that the Plan is effectuated through the Orderly Wind Down, Article IV.E of the Plan shall govern, and Article IV.D of the Plan shall be disregarded unless specifically provided therein. All other subsections of Article IV of the Plan shall apply regardless of whether the Orderly Wind Down or the NewCo Transaction is effectuated.

On or before the Effective Date, the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable, shall take any action as may be necessary or appropriate to effect the NewCo Transaction or Orderly Wind Down, as applicable, including those steps set forth in the Transaction Steps Memorandum. The actions to implement the NewCo Transaction or Orderly Wind Down may include, in addition to those steps set forth in the Transaction Steps Memorandum: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and Filing, if applicable, of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (4) the issuance, transfer, or distribution of NewCo Common Stock; (5) to the extent applicable, the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of NewCo and/or its subsidiaries (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (6) all transactions necessary to provide for the transfer of some or all of the assets or Interests of any of the Debtors to NewCo and/or one or more of its subsidiaries, which transfer may be structured as a taxable transaction for United States federal income tax purposes; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents and take any other actions as the Debtors reasonably determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the NewCo Transaction or the Orderly Wind Down, as applicable.

(a)    <u>NewCo Restructuring Transactions.</u>

(i)    **Transfer of Assets to NewCo and Vesting of Assets in the Post-Effective Date Debtors.**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, pursuant to sections 363, 1123(a)(5), and 1141(c) of the Bankruptcy Code: (1) all NewCo Assets shall be transferred to and vest in NewCo and/or its subsidiaries free and clear of all Liens, Claims, interests, charges, or other encumbrances, and (2) all other property in each Debtor's Estate, all Causes of Action (including all Recovery Causes of Action) that are not released, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Post-Effective Date Debtor, free and clear of all Liens, Claims, Interests, charges, or other encumbrances. For the avoidance of doubt, (i) NewCo shall not assume, be deemed to have assumed, or be liable for any liabilities of any of the Debtors except as, and solely to the extent, expressly set forth herein; (ii) the NewCo Transactions are not, and shall not be deemed to be, a *de facto* merger of any of the Debtors and NewCo, or any Affiliates of the foregoing; (iii) NewCo is not, and shall not be deemed to be, a continuation of any of the Debtors, any Affiliates thereof, or any of their respective businesses or operations; and (iv) the NewCo Transactions have been entered into in good faith and not for any fraudulent purpose or to escape any liabilities of the Debtors. On and after the Effective Date, except as otherwise provided herein, NewCo and/or its subsidiaries and each Post-Effective Date Debtor (or the Plan Administrator or applicable Litigation Administrator) may operate its business in accordance with applicable Law and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(ii)    **Post-Effective Date Debtors.**

One or more of the Debtors shall continue in existence after the Effective Date, each as a Post-Effective Date Debtor, for purposes of (1) preserving the Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors after the Effective Date and after consummation of the NewCo Transaction, (3) performing their obligations under any transition services agreement entered into by and between the Post-Effective Date Debtors and NewCo and/or its subsidiaries, (4) resolving any Disputed Claims, (5) paying Allowed Claims for which there is not a Distribution Agent other than the Post-Effective Date Debtors, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtors or the Litigation Administrator(s) to file motions or substitutions of parties or counsel in each such matter.

Except as otherwise provided in the Plan or the Plan Supplement (including the Transaction Steps Memorandum), or any agreement, instrument, or other document incorporated therein, each Post-Effective Date Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date,

except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### (iii)    Sources of Consideration for Plan Distributions.

The Debtors and the Post-Effective Date Debtors, as applicable, shall fund distributions under the Plan with:  (1) Cash on hand as of the Effective Date, including from the Plan Sponsor Contribution and net proceeds from the sale of GK8; (2) Liquid Cryptocurrency (in the Liquid Cryptocurrency Distribution Amount); (3) NewCo Common Stock; and (4) Litigation Proceeds.

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

After the Effective Date, the Post-Effective Date Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable NewCo and/or its subsidiaries and the Post-Effective Date Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan.

### (iv)    Distribution Mechanics.

The Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.

Unless otherwise specified in the Plan Supplement, until the Deactivation Date, all distributions to Custody Claim Holders, Withhold Claim Holders, or Account Holders to whom no other Distribution Agent is eligible to make distributions shall be made by the Debtors or the Post-Effective Date Debtors, as applicable.  On the Deactivation Date, the Celsius platform will cease to exist and Account Holders will no longer be able to log-in to the Celsius platform and/or access their Celsius Account, including for purposes of distributions.

After the Deactivation Date, the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.  Such distributions may be in Liquid Cryptocurrency or fiat currency, but in no circumstances will any Distribution Agent make distributions in Cryptocurrency other than Liquid Cryptocurrency.  Any post-Deactivation Date distributions to Holders of Allowed Custody Claims or Withhold Claims that did not retrieve their Plan distributions from the Celsius platform by the Deactivation Date shall be valued in accordance with the Deactivation Date Cryptocurrency Conversion Table.

To be eligible to receive a distribution under this Plan, Account Holders must update the AML/KYC Compliance Information for their Celsius Account and may be required to register or complete

additional onboarding with a Distribution Agent, which may require providing any requested AML/KYC Compliance Information.

<div align="center">(v)    <strong>NewCo Common Stock.</strong></div>

On the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Transaction Steps Memorandum, NewCo shall issue the NewCo Common Stock. The Confirmation Order shall authorize the issuance of NewCo Common Stock in one or more issuances without the need for any further corporate action, and the Debtors or NewCo, as applicable, shall be authorized to take any action necessary or appropriate in furtherance thereof. On the Effective Date or as soon as reasonably practicable thereafter, the applicable Holders of Claims shall receive NewCo Common Stock in satisfaction of such Holders' Allowed Claims pursuant to Article III.B of the Plan. The Confirmation Order shall further authorize the New Board, in its sole discretion, to issue the Employee and Board Equity Compensation.

Entry of the Confirmation Order shall authorize the clearance and trading of the NewCo Common Stock, subject to resale restrictions applicable to "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, on or as practicable after the Effective Date, and NewCo shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such NewCo Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of NewCo in all respects, without the need for any further corporate action. The Debtors or Post-Effective Date Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.

All of the NewCo Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Further, except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution, all NewCo Common Stock will be issued in reliance upon section 1145 of the Bankruptcy Code. The issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.

The distribution and issuance of the NewCo Common Stock under the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance. Any Person's or Entity's acceptance of NewCo Common Stock shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Person or Entity will be bound thereby in all respects.

<div align="center">(vi)    <strong>Exemption from Registration Requirements.</strong></div>

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act. Except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution, the NewCo Common Stock will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.

Securities issued in reliance upon section 1145 of the Bankruptcy Code to an entity that is not an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely

tradable and transferable under U.S. federal securities laws by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of NewCo or the Post Effective Date Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, (iii) has not acquired such securities from an "affiliate" within one year of such transfer and (iv) is not an entity that is an "underwriter," as defined under section 1145(b) of the Bankruptcy Code.

The issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.  Such NewCo Common Stock will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws.  Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Debtors recommend that potential recipients of NewCo Common Stock consult their own counsel:  (i) with respect to the NewCo Common Stock issued under the Plan, concerning whether such potential recipients will constitute "underwriters" pursuant to section 1145(b) of the Bankruptcy Code at the time of the issuance of the NewCo Common Stock; and (ii) the ability of such potential recipients to freely trade NewCo Common Stock in compliance with the federal securities laws and any applicable Blue Sky laws, including certain Blue Sky state notice requirements that may continue to apply with respect to resales of the NewCo Common Stock.  The Debtors make no representation concerning the ability of a person to dispose of any NewCo Common Stock.

The Post-Effective Date Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including The Depository Trust Company and any transfer agent for the NewCo Common Stock) with respect to the treatment of the NewCo Common Stock to be issued under the Plan under applicable securities laws.  The Depository Trust Company and any transfer agent for the NewCo Common Stock shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock is exempt from registration and/or eligible for The Depository Trust Company book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, (i) any partner of NewCo or the Plan Sponsor, (ii) The Depository Trust Company, and (iii) any transfer agent for the NewCo Common Stock) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock is exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services.

A description of "Certain Securities Law Matters" is set forth in Article XI of this Disclosure Statement.

<div align="center">(vii)    <b>Directors and Officers.</b></div>

On the Effective Date, the terms of the current members of the CNL Board shall expire.  For the avoidance of any doubt, no current director of the Debtors will remain a director or have any control over NewCo, the Debtors, or the Post-Effective Date Debtors unless explicitly provided herein or in the Plan Supplement.  The New Board of NewCo will consist of those directors identified in the Plan Supplement. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose the identity and affiliations of any Person proposed to serve on the New Board in the Plan Supplement.  The New Board shall initially consist of seven members:  (i) two of whom will be appointed by the Plan Sponsor; (ii) three of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the

Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange.  For the avoidance of doubt, the composition of the New Board shall comply with any applicable listing standards and rules of any applicable exchanges on which the NewCo Common Stock is or will be listed.

Members of the New Board (other than the designees of the Plan Sponsor) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member may be reelected at the end of their term; *provided* that for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect two members of the New Board.

After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

The Post-Effective Date Debtors shall be governed by the Plan Administrator in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Post-Effective Date Debtors shall be deemed to be terminated and such individuals shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole director and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors as further described in the Plan Administrator Agreement.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

(viii)    **Income Tax Matters.**

For U.S. federal and applicable state and local income tax purposes the Debtors and Holders of Claims will treat and report the return of Liquid Cryptocurrency to Holders of Claims under the Plan, to the extent such amounts are of the same type of Cryptocurrency in which a Holder's Claim was denominated, as a non-taxable transaction to such Holder, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Code.

A description of "Certain U.S. Federal Income Tax Consequences of the Plan" is set forth in Article XII of this Disclosure Statement.

4.    *Orderly Wind Down.*

Subject to Bankruptcy Court approval, the Debtors will effectuate an Orderly Wind Down if, at any time prior to or after the confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction.  In the event the Debtors pursue an Orderly Wind Down, distributions under the Plan shall be funded from the Wind-Down Assets.

For more information on the Orderly Wind Down, please review Article III.I of this Disclosure Statement.

(a)    <u>Orderly Wind-Down Toggle.</u>

To toggle to an Orderly Wind Down, the Debtors (i) shall provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (ii) shall consult with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Mr. Herrmann, Mr. Frishberg, Mr. Crews, and Mr. Tuganov regarding the decision to toggle, (iii) shall inform the U.S. Trustee of their intent to file the Wind-Down Motion, (iv) shall File the Wind-Down Motion, which shall include the Wind-Down Procedures, and (v) may File an amended Plan conformed to include the changes described in the table below. Parties in interest shall have no fewer than ten (10) days to object to the Wind-Down Motion. In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.

| Orderly Wind-Down Plan Changes | |
| --- | --- |
| **Provision/Concept** | **Change** |
| NewCo | Concept eliminated, replaced in certain places with "Post-Effective Date Debtors" and "Plan Administrator," as further described herein and as applicable. Related concepts, such as "NewCo Capitalization Amount" will similarly be eliminated. |
| Plan Sponsor Contribution | Concept eliminated. Related concepts, such as "Management Compensation" (and its component concepts) will similarly be eliminated. |
| NewCo Common Stock | Concept eliminated, replaced with "Backup MiningCo Common Stock" and "Illiquid Recovery Rights," as applicable. |
| Unsecured Claim Distribution Mix Elections | Concept eliminated, all Holders of Claims to receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections. |
| Wind-Down Procedures | Concept to become operative. As provided herein, the Debtors shall File the Wind-Down Procedures within fourteen (14) days of the decision to implement an Orderly Wind Down, in connection with the Wind-Down Motion. Such procedures shall provide additional details regarding the Wind-Down Assets, the Wind-Down Budget, and any revisions to the Wind-Down Procedures and shall be subject to approval by the Bankruptcy Court in connection with Wind-Down Motion. Related concepts shall similarly become operative. |
| Backup Plan Sponsor & Backup Plan Sponsor Transaction | Concept becomes operative, subject to a market test of the fees contained in the Backup Plan Administrator Term Sheet; *provided* that (i) Liquid Cryptocurrency, (ii) Backup MiningCo Common Stock, (iii) Illiquid Recovery Rights, and (iv) Litigation Proceeds shall be distributed according to this Plan, as revised to reflect the toggle to the Orderly Wind Down. |
| Proof Group IP License | Concept eliminated. Related consideration, such as any Proof Group customers to be transferred to NewCo, shall revert to Proof Group. |

| Orderly Wind-Down Plan Changes | |
|---|---|
| **Provision/Concept** | **Change** |
| US Bitcoin Agreements | Concept eliminated, unless US Bitcoin is selected as the Mining manager in connection with the Orderly Wind Down. |
| Institutional Loan Agreements | Concept in Article V.D of the Plan eliminated. All agreements related to Institutional Loans shall be treated as all other Executory Contracts as provided in Article V.A of the Plan. |
| Article IV.D of the Plan (NewCo Restructuring Transactions) | Concept eliminated.  Article IV.E of the Plan (Orderly Wind Down) to become operative instead. |

In the event that the Debtors elect to toggle to the Orderly Wind Down, the Debtors shall appoint a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet.

The Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Orderly Wind Down pursuant to the Wind Down Procedures and the Plan (conformed as described above).

5.    *Plan Administrator.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, a Plan Administrator will be appointed to administer the Post-Effective Date Debtors' estates in accordance with the Plan Administrator Agreement.  For the avoidance of doubt, unless otherwise specified, Causes of Action shall remain with the Post-Effective Date Debtors and shall not be NewCo Assets.

The Plan Administrator shall be selected by the Debtors, in consultation with the Committee, and shall be identified in the Plan Supplement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

The Plan Administrator shall administer the distributions of the Orderly Wind Down, if applicable. Except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Wind Down Procedures, if applicable, on and after the Effective Date, the Post Effective Date Debtors may operate their businesses (to the extent permitted under applicable Law) and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than the Recovery Causes of Action) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtors in the Plan Administrator Agreement shall be terminated.

The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

(b)    Responsibilities of Plan Administrator.

125

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include:

- administering the Special Committee D&O Liability Insurance Policies;

- implementing the Orderly Wind Down, as applicable, and making (or arranging for a Distribution Agent to make) the distributions contemplated by the Plan;

- to the extent not duplicative with the responsibilities of any Litigation Administrator, marshalling, marketing for sale, and winding down of the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

- to the extent not duplicative with the responsibilities of any Litigation Administrator, recovering and compelling turnover of the Debtors' property in accordance with the Plan;

- managing the Plan Administrator Budget or Wind-Down Budget, as applicable, and paying the Wind-Down Expenses, if any;

- abandoning any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

- preparing and Filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

- filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

- retaining such professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and

- taking such actions as are necessary and reasonable to carry out the purposes of the Plan or Wind-Down Procedures, as applicable, including winding down the Debtors' business affairs.

(c)    Expenses of Plan Administrator.

All costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, on or after the Effective Date, or in any manner connected, incidental, or related thereto, shall be paid by the Post-Effective Date Debtors as they are incurred without the need for Bankruptcy Court approval. In the event of an Orderly Wind Down, the Wind-Down Expenses shall be paid from the Wind-Down Assets.

    (d)    <u>Fiduciary Duties of Plan Administrator.</u>

Pursuant to the Plan and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.  The Plan Administrator shall be appointed and act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or officers of the Debtors shall be terminated and such individuals shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former employee, manager, or officer, including pursuant to any transition services agreement entered into by the Post-Effective Date Debtors in connection with the Employee Transition Services Agreement.

    (e)    <u>Wind-Down.</u>

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Post Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby; (2) take any actions necessary to wind down the Post Effective Date Debtors' Estates; provided that the Post Effective Date Debtors shall not be dissolved until all Causes of Action included in the Schedule of Retained Causes of Action are prosecuted and the conditions precedent to such dissolution in Article IV.F.6 of the Plan are satisfied; and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, except as set forth herein, the Post Effective Date Debtors for all purposes (x) shall be deemed to have withdrawn their business operations from any state in which the Post Effective Date Debtors were previously conducting, or are registered or licensed to conduct, their business operations, (y) shall not be required to File any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The Filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

    (f)    <u>No Liability of the Post-Effective Date Debtors.</u>

On and after the Effective Date, the Post-Effective Date Debtors shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement.  All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

(g)    Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Effective Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Post Effective Date Debtors' Chapter 11 Cases, and the conclusion of all litigation being pursued by the Litigation Administrator(s), the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Post Effective Date Debtors is formed or any other jurisdiction. The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

For the avoidance of doubt, notwithstanding the Post-Effective Date Debtors' dissolution on or after the Effective Date, the Post-Effective Date Debtors shall be deemed to remain intact solely with respect to the preparation, Filing, review, and resolution of applications for Professional Fee Claims.

To the extent the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator(s), such Cash or other property shall be distributed Pro Rata to the Holders of NewCo Common Stock or Illiquid Recovery Rights, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; provided that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated.

6.    *Litigation Administrator, Litigation Oversight Committee, and Contributed Claims.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, one or more Litigation Administrators will be appointed to prosecute, settle, or otherwise resolve any remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to the Plan), the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the benefit of Holders of General Earn Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures. Notwithstanding anything to the contrary in the Plan or the Plan Supplement, the Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan shall remain with the Post-Effective Date Debtors, shall not be NewCo Assets, and shall be controlled by the applicable Litigation Administrator(s). For the avoidance of doubt, the Litigation Administrator shall also serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to all retained Causes of Action related to Disputed Claims or Disputed Interests.

(a)    Litigation Administrator(s).

The Litigation Administrator(s) shall be selected by the Committee, and shall be identified in the Plan Supplement. The appointment of the Litigation Administrator(s) shall be approved in the Confirmation Order, and the Litigation Administrator's duties shall commence as of the Effective Date.

The Litigation Administrator(s) shall prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to the Plan), the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans. The Litigation Administrator shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates related to Disputed Claims or Disputed Interests that are not released, waived, settled, compromised, or transferred pursuant to the Plan (including, for the avoidance of doubt, the Recovery Causes of Action and Claims objections). Notwithstanding anything to the contrary in the Plan, the Committee may elect to identify separate Litigation Administrators to manage Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder. Solely by way of example, the Committee may identify (x) a Litigation Administrator to manage Account Holder Avoidance Actions for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder and (y) a Litigation Administrator to manage all Recovery Causes of Action, other than Account Holder Avoidance Actions, for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder. The identity of any Litigation Administrator, including the Recovery Causes of Action that any such Litigation Administrator shall manage for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, shall be disclosed in the Plan Supplement.

In accordance with the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall serve in such capacity through the earlier of (a) the date on which all Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans are fully resolved in accordance with the applicable Litigation Administrator Agreement, and (b) the date on which such Litigation Administrator resigns, is terminated, or is otherwise unable to serve; *provided, however*, that, in the event that a Litigation Administrator resigns, is terminated, or is otherwise unable to serve prior to the full resolution of all Recovery Causes of Action and Contributed Claims, the Goldstein Loan, the Leon Loan, or any other CEL Insider Loans for which such Litigation Administrator is responsible, the Litigation Oversight Committee shall appoint a successor to replace such Litigation Administrator in accordance with the applicable Litigation Administrator Agreement. If the Litigation Oversight Committee does not appoint a successor within the time periods specified in the applicable Litigation Administrator Agreement (as may be extended by the Bankruptcy Court), then the Bankruptcy Court, upon the motion of any party in interest, may approve a successor to serve as the Litigation Administrator.

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Recovery Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, Filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided, further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

No action taken by the Debtors, the Committee, or the Litigation Administrator(s) shall be (or deemed to be) a waiver of any privilege or immunity of the Debtors, the Committee, or the Litigation

Administrator(s), including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

### 7. Responsibilities of Litigation Administrator.

Responsibilities of the Litigation Administrator(s) shall be as identified in the Litigation Administrator Agreement(s) and shall include, but are not limited to:

(a) filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted;

(b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court;

(c) exercising the Debtors' rights with respect to (a) the Goldstein Loan, (b) the Leon Loan, and (c) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party;

(d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by the Plan;

(e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and

(f) taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement;

in each case, for the benefit of the Holders of Claims entitled to Litigation Proceeds hereunder and, as applicable, in accordance with the ADR Procedures.

### 8. Rights Under D&O Liability Insurance Policies.

On the Effective Date, the Litigation Administrator(s) shall, to the extent provided in the UCC Claims Stipulation, succeed to the rights of the Debtors under certain of their D&O Liability Insurance Policies. For the avoidance of doubt, the Litigation Administrator(s) shall not succeed to the Debtors' rights with respect to the Special Committee D&O Liability Insurance Policies.

### 9. Litigation Recovery Account.

On or before the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall establish a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator(s). The funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action.

Holders of Claims entitled to Litigation Proceeds hereunder will receive periodic distributions on account of recoveries from the Recovery Causes of Action. The frequency and timing of distributions from or in respect of the Litigation Recovery Account shall be determined by the Litigation Administrator(s) and the Litigation Oversight Committee in accordance with the Litigation Administrator Agreement(s).

To the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account shall promptly be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii)(a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

10. *Litigation Oversight Committee.*

The Litigation Administrator(s) shall report to, and act at the direction of, the Litigation Oversight Committee, whose members shall be selected by the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, and the Committee, as set forth in the definition of Litigation Oversight Committee and identified in the Plan Supplement; *provided* that: (a) prior to selecting any such members, the Committee will solicit potential candidates to serve on the Litigation Oversight Committee from the Holders of Claims entitled to receive Litigation Proceeds hereunder through an open interview process; (b) the Litigation Oversight Committee shall include at least one member of the Committee (unless no member of the Committee wishes to join); (c) the Litigation Oversight Committee shall include at least two individuals that are not members of the Committee; and (d) the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Litigation Oversight Committee (subject to the consent of the Committee).

The Litigation Oversight Committee shall contain a three (3) member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders. At least two (2) members of the Avoidance Action subcommittee shall not be current members of the Committee. The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action subcommittee, subject to the consent of the Committee, which shall be the same members appointed to the Litigation Oversight Committee. The Avoidance Action subcommittee shall confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date.

The Litigation Oversight Committee (at the recommendation of the applicable Litigation Administrator) will determine the frequency and quantum of any distributions from the Litigation Recovery Account (including the distribution of the Initial Litigation Funding Amount if appropriate). The Litigation Oversight Committee, in consultation with the Litigation Administrator(s), shall be entitled to control the financing of any litigation, with the right to cause the Litigation Administrator(s) to pledge or transfer a portion of the Recovery Causes of Action, the Litigation Recovery Account, or any proceeds of the foregoing to facilitate such financing, and may obtain such financing from NewCo or third-party sources, in their respective business judgment.

*11. Fiduciary Duties of the Litigation Administrator.*

Pursuant to the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan.

### B.    Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including all steps necessary for the implementation of the NewCo Transaction or Orderly Wind Down (as applicable), and all other actions desirable or appropriate to promptly consummate the NewCo Transaction or Orderly Wind Down (as applicable), including those contemplated under the Transaction Steps Memorandum.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors.  The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non bankruptcy Law.

### C.    Cancellation of Notes, Instruments, Certificates, and Other Documents.

Upon the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan:  (1) the obligations of the Debtors and their Affiliates under any terms of use, certificate, Security, share, note, bond, indenture, purchase right, option, warrant, agreement, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are Reinstated pursuant to the Plan) shall be cancelled and surrendered, and neither the Post-Effective Date Debtors nor the Debtors' Affiliates shall have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or their Affiliates (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are specifically Reinstated pursuant to the Plan) shall be released; *provided*, for the avoidance of doubt, that nothing herein shall release any Excluded Party from any claim or obligation.

### D.    Employee Obligations.

#### 1.    *Employee Transition Services Agreement.*

The Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Employee Transition Services Agreement set forth in the Plan Supplement. The Employee Transition Services Agreement will provide that employees of NewCo are available to provide transition services to the Debtors, Post-Effective Debtors, and/or the Plan Administrator to effectuate the NewCo Transaction and to wind down the Debtors' Estates. Except as provided in the Employee Transition Services Agreement, employee contracts shall be treated in accordance with Article V of the Plan.

#### 2.    *EIP Awards.*

On the Effective Date, the EIP Awards shall be effective without any further action by the Debtors or Post-Effective Date Debtors, and the KEIP Motion shall be withdrawn with prejudice. The Emergence Incentive Plan provides EIP Participants the ability to earn EIP Awards based on their performance relative to the metrics described in Article IV.J.2 of the Plan. Unless otherwise noted below, target performance shall result in a 100% payout and threshold performance shall result in a 50% payout for each respective metric. For the avoidance of doubt, the Emergence Incentive Plan is a post-Effective Date compensation plan and EIP Awards, to the extent earned, shall be paid by the Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation. Any EIP Award shall be subject to clawback in the event that an EIP Participant is later found guilty of a crime in connection with their employment at Celsius.

Platform Metrics: Oren Blonstein, Trunshedda Ramos, Guillermo Bodnar, Adrian Alisie, and Ron Deutsch are eligible to earn an EIP Award based on the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

  (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

  (b) threshold performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (30% of the EIP Award):

  (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

  (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024; and

Mining Metrics: Jenny Fan, Dave Albert, and Quinn Lawlor are eligible to earn an EIP Award based on the following metrics:

- East Stiles Site Metric (25% of EIP Award):

    (a) target performance requires that the East Stiles site is completed and operational by September 30, 2023; and

    (b) threshold performance requires that the East Stiles site is completed and operational between October 1, 2023 and November 30, 2023.

- Effective Date Metric (25% of EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (25% of EIP Award):[110]

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

---

[110] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

(b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

- Midland Texas Gross Margin Metric (25% of EIP Award):

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 above 25%; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 between 20% and 25%.

Chris Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

    (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

    (b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (20% of the EIP Award):

    (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

    (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

  (a) target performance requires the Effective Date occur by December 31, 2023;

  (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

  (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (10% of EIP Award):[111]

  (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

  (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

If an EIP Participant's employment is terminated by the Debtors without "cause," by the EIP Participant for "good reason," or upon death or disability of the EIP Participant, the EIP Participant will be entitled to 100 percent of the EIP Award that would otherwise have been earned based on the percentage of the performance period the EIP Participant was engaged by the Debtors.  If an EIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for "cause"), any EIP Award will be forfeited.  The maximum aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.

### 3.  Emergence Retention Plan.

To the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Emergence Retention Plan set forth in the Plan Supplement. The Emergence Retention Plan will provide for the distribution of Cash retention awards to certain employees of the Debtors to motivate such employees to remain with the Post-Effective Date Debtors to effectuate distributions contemplated under the Plan.

### E.    Effectuating Documents; Further Transactions.

On and after the Effective Date, NewCo and/or its subsidiaries, the Plan Administrator, or the Post-Effective Date Debtors, as applicable, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

---

[111]    Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

### F.    Exemptions from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to NewCo and/or its subsidiaries or a Post Effective Date Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, the Post-Effective Date Debtors, or NewCo; (2) the NewCo Transaction or the Orderly Wind Down, as applicable; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### G.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, each Post Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action.  The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan; provided that, notwithstanding anything to the contrary in the Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.

The Litigation Administrator(s) may pursue the Recovery Causes of Action, and the Plan Administrator may pursue all other Causes of Action, as appropriate in accordance with the best interests of the Holders of Claims entitled to receive Litigation Proceeds (as to Recovery Causes of Action) or the Post-Effective Date Debtors (as to all other Causes of Action).  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it.  The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan.  Any such objection that is**

**not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. The Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.** If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, and the objecting party, such objection shall be resolved by the Bankruptcy Court. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors free and clear of any Claims, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Post-Effective Date Debtors, through their authorized agents or representatives, including the Plan Administrator and the Litigation Administrator(s), shall retain and may exclusively enforce any and all such Causes of Action. The Post-Effective Date Debtors, the Plan Administrator, and the Litigation Administrator(s), as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

H.    **Election to Contribute Claims.**

Because aggregating all Contributed Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its Ballot, to contribute its Contributed Claims to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds. By electing such option on its Ballot, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the appointment of the Litigation Administrator(s), it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Claims to the Post-Effective Date Debtor(s), and (ii) to have agreed to execute any documents reasonably requested by the Post-Effective Date Debtor(s) or the Litigation Administrator(s) to memorialize and effectuate such contribution.

I.    **Contribution of Contributed Claims.**

On the Effective Date, all Contributed Claims will be irrevocably contributed to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds and shall thereafter be Recovery Causes of Action for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Litigation Administrator Agreement(s), the Plan Supplement, or any other

document as any indication that the Litigation Administrator(s) will or will not pursue any and all available Contributed Claims against such Person. The Litigation Administrator(s) shall have, retain, reserve, and be entitled to assert all Contributed Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests and shall not include any claims that cannot be assigned under applicable law.

### J.      Retiree Benefits.

Notwithstanding anything herein to the contrary, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

For the avoidance of doubt, the Debtors do not believe that any such obligations exist.

## V.      THE DEBTORS' CORPORATE STRUCTURE, HISTORY, AND BUSINESS OVERVIEW

### A.      The Debtors' Corporate Structure and History.

#### 1.   Corporate Structure.

Celsius is comprised of twenty-three entities (eleven of which are Debtors). On July 13, 2022, eight Celsius entities each Filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Initial Debtors"). On December 7, 2022 (the "GK8 Petition Date"), three additional entities–GK8 Ltd., GK8 UK Limited, and GK8 USA LLC–each Filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (such Debtors, "GK8"). A simplified organizational chart is included below.

As set forth in the organizational chart, Debtor CNI directly owns 100 percent of the equity in Debtor Celsius Networks Lending LLC, and directly owns approximately 60 percent of the Ordinary B Shares in Debtor CNL, which directly or indirectly owns each of the other Debtor and non-Debtor entities. The remaining 40 percent of the equity in CNL is in the form of Class A Preferred Shares, Class A1 Preferred Shares, and Class B Preferred Shares, which are owned by institutional investors (including WestCap Group LLC ("WestCap"), Caisse de dépôt et placement du Québec ("CDPQ"), Tether International Ltd., and BNK to the Future) and certain individuals. The common stock and stock options of CNI are owned by Mr. Mashinsky and Mr. Leon, as well as certain other employees as part of an employee stock option plan.

In addition, CNL directly owns 100 percent of the equity of non-Debtor Celsius Network IL Ltd., which directly owns 100 percent of the equity of Debtor GK8 Ltd. Debtor GK8 Ltd. directly owns 100 percent of each of Debtor GK8 UK Limited and Debtor GK8 USA LLC.



*Organizational Structure*

2.  *History.*

On February 8, 2018, Mr. Mashinsky and Mr. Leon incorporated CNI in Delaware, the first of the business entities that today are generally known as Celsius.  On February 9, 2018, Mr. Mashinsky and Mr. Leon incorporated CNL as a United Kingdom private limited company.  CNL was the original entity through which Celsius operated its retail customer-facing business through the summer of 2021.  While CNL was formally headquartered in the United Kingdom, Mr. Mashinsky and many of Celsius' other executives led its operations from New Jersey in the United States.

Prior to the Petition Date, Celsius operated as one of the largest Cryptocurrency based finance platforms in the world, providing financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius initially offered two primary products:  its users could transfer digital assets to Celsius and (a) earn rewards on digital assets and/or (b) take loans based upon the deposit of those transferred digital assets, with a contractual right to the return of like kind assets upon repayment.

In June 2018, Celsius launched version 1.0 of its mobile app (the "Celsius App").  By August 2018, users had received their first rewards on the Celsius App.  At the end of 2018, users had transferred $50 million in digital assets to Celsius.  By the spring of 2019, Celsius exceeded $200 million in digital assets and $1.2 billion in loan originations.  As 2019 came to an end, Celsius' platform was available in over 100 countries.

Celsius continued its growth in 2020.  In a round of funding at the end of 2020, many individual investors invested in Celsius through a crowd-funded equity raise on the platform BNK to the Future.  By March 2021, Celsius had surpassed $10 billion in digital assets and 200 employees.  In May of that year, Celsius launched its new website app, which made its platform available on any device, not just through a mobile device.  In October 2021, the Company expanded its business by purchasing Debtor GK8 Ltd., an

Israeli company, for $115 million.  GK8 Ltd. was a blockchain security company offering financial institutions an end-to-end platform, or "vault," for managing blockchain-based assets on their own.  Celsius intended to integrate GK8 Ltd. into its platform to enhance Celsius' ability to provide consumers with custody services.  In December 2021, Celsius announced the first closing of its Series B equity funding for $600 million at an implied enterprise value of approximately $3 billion.

By May 2022, the Company had raised approximately $690 million from the Series B financing, primarily from WestCap and CDPQ, with all but $6 million of that amount funded.  By July 2022, Celsius had approximately 1.7 million registered users and approximately 300,000 active users with account balances of more than $100.  At that time, Celsius had approximately $6.6 billion in assets and was preparing to go forward with an initial public offering of Debtor Celsius Mining.

### B.    The Debtors' Prepetition Capital Structure, Operations, and Revenue.

#### 1.    The Debtors' Prepetition Capital Structure.

The Debtors do not have any long-term or funded debt.  Prior to the Petition Date, Celsius' business model was centered on deploying digital assets transferred by users to generate income for Celsius and its operations and growth, as described further herein.  In addition to its lending services and revenue generated by Celsius Mining, Celsius engaged in other asset deployment activities to generate returns.  For instance, Celsius deployed digital assets into automated market maker or lending protocols for a fee.  Celsius also borrowed U.S. Dollars as stablecoins from decentralized finance ("DeFi") protocols collateralized by digital assets.  These DeFi loans are governed by "smart contracts" that are self-executing on the blockchain and are typically overcollateralized.

On June 27, 2022, the Company had approximately $648 million in DeFi borrowing collateralized by approximately $1.61 billion in digital assets based on market values as of June 27, 2022.  These DeFi loans were held on four different DeFi protocols:  (i) Maker (MKR) ($225 million loan collateralized by $499 million in digital assets); (ii) AAVE ($263 million loan collateralized by $708 million in digital assets); (iii) Compound ($157 million loan collateralized by $409 million in digital assets); and (iv) Notional Finance ($3.2 million loan collateralized by $6.6 million in digital assets).  The Company had an additional $108 million loan collateralized by $403 million in digital assets on the FTX Cryptocurrency exchange.

By the Petition Date, the Company had unwound nearly all of its DeFi loans and the FTX loan, with only the Notional Finance loan remaining.  On December 21, 2022, the Debtors also took steps to unwind the Notional Finance loan.  Nearly all of the Initial Debtors' liabilities relate to user accounts and potential Claims by Account Holders, whereas the majority of GK8's liabilities relate to trade payables, employee-related payables, intercompany obligations, taxes, and potential Claims by Account Holders.  As of the Petition Date, the Initial Debtors had approximately $130 million in Cash on hand.  As of the Petition Date, GK8 also had approximately $1.6 million in Cash on hand.

#### 2.    The Debtors' Prepetition Operations.

Prior to the Petition Date, Celsius' primary operations consisted of:  (a) financial services through which retail and institutional users were able to (i) earn rewards on Cryptocurrency they transferred to Celsius, (ii) securely store and access Cryptocurrency, (iii) borrow fiat based upon Cryptocurrency transferred to Celsius; and (b) Bitcoin mining through Celsius Mining.  Additionally, customers were able to send and receive Cryptocurrency using Celsius' CelPay services and swap types of Cryptocurrency.  Finally, Celsius also engaged in other deployment activities such as DeFi protocols (as explained above), staking, lending Cryptocurrency to institutions, and exchange deployments.

141

    (a)    <u>Financial Services.</u>

    (i)    **Buy and Swap Services.**

Through the Celsius App, Celsius provided both institutional and retail users with the ability to purchase Cryptocurrency with fiat currency utilizing the services of select third party providers to conduct the transactions; notably, Celsius was not a counterparty to these transactions. In addition, Celsius offered users the ability to "swap" ("trade" or "convert") eligible Cryptocurrencies for other types of eligible Cryptocurrencies without paying a fee. This allowed users to efficiently exchange digital assets as the market changed. On the Pause, as described below, Celsius stopped offering its buy and swap services.

    (ii)    **Earn Services.**

Through the Company's Earn Program, users who transferred certain Cryptocurrencies to Celsius earned "rewards" or interest on their digital assets in the form of payment in-kind interest or distributions of "CEL Token," the Cryptocurrency Token native to the Debtors' platform. Celsius publicly advertised that users could earn up to 17 percent annual percentage yield ("<u>APY</u>") on certain digital assets. On average, users earned a 4.5–5 percent APY on assets transferred to Celsius under the Earn Program.

The Company's Terms of Use provided that, once users transferred their digital assets onto the Celsius platform, Celsius held all rights and title to such digital assets. As a result, after users transferred their digital assets to Celsius for use in the Earn Program, Celsius used those assets in its sole discretion, including by rehypothecating the assets (*e.g.*, using the assets as collateral to take out additional loans) to generate a yield for Celsius. Celsius then paid rewards to users based on the rates published on the Celsius App. The amount of rewards a user received depended on the type and amount of digital asset transferred to the Company's platform, with higher rewards or interest rates available for users that elected to receive rewards in CEL Tokens.

From August 2018 until April 2022, Celsius offered the Earn Program to all of its users, regardless of location and regardless of whether users were unaccredited or accredited investors under applicable United States law. Celsius received significant regulatory scrutiny related to the Earn Program, however, including from the UK FCA, the New Jersey Bureau of Securities (the "<u>New Jersey Bureau</u>"), the Department of Financial Institutions for the State of Kentucky (the "<u>Kentucky DFI</u>"), and other regulatory authorities in the United States, as discussed in greater detail in Article V.C of this Disclosure Statement. After receiving cease and desist orders from the New Jersey Bureau and the Kentucky DFI, Celsius restricted, as of April 15, 2022, the creation of new accounts in the Earn Program (the "<u>Earn Accounts</u>") to international-based users and U.S. accredited users. U.S. non-accredited users who had a balance in their Earn Accounts prior to April 15, 2022 were allowed to keep such balances in the Earn Program and continued to earn rewards thereon.

As of the Petition Date, over 600,000 Earn users had transferred digital assets to Celsius with a market value of approximately $4.4 billion as of July 13, 2022. On the Petition Date, Celsius stopped offering rewards on digital assets transferred to Celsius through the Earn Program.

    (iii)    **Custody Program.**

On April 15, 2022, Celsius launched the Custody Program for unaccredited users in the United States who could no longer open Earn Accounts due to the cease and desist orders from the New Jersey

Bureau and Kentucky DFI.[112]  Due to certain licensing requirements, however, Celsius did not provide the Custody Program to users in nine states.  Those nine states were Connecticut, Louisiana, Nebraska, Nevada, New York, North Carolina, Ohio, Vermont, and Washington.

The Custody Program allowed eligible users to transfer and store Cryptocurrency on the Celsius platform.  Celsius did not deploy Cryptocurrency held in the Custody Program and such Cryptocurrency did not earn rewards.  Instead, pursuant to the terms of use in effect as of April 14, 2022, which were the first terms of use to reference the Custody Program (the "General Terms of Use," and all such terms of use versions as amended, supplemented, and modified, the "Terms of Use"), title to digital assets held in the Custody Program "at all times remain[ed] with the [user]" and Celsius agreed "not [to] transfer, sell, loan or otherwise rehypothecate" digital assets in the Custody Program unless "specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law."[113]  Under the General Terms of Use, the Company is, however, entitled to set off any obligations owed by a user to the Company against the user's assets held in the Custody Program.[114]  As of the Petition Date, approximately 58,000 users were utilizing the Custody Program, with digital assets worth a market value of approximately $201.6 million as of July 13, 2022 held by Celsius.

<div style="text-align:center">(iv)      <strong>Withhold Accounts.</strong></div>

Upon commencement of the Debtors' Custody Program in April 2022, customers in the nine states where the Custody Program was unavailable attempted to participate in the Custody Program by either (a) transferring Cryptocurrency to Celsius and the Custody Program from external platforms, or (b) withdrawing Cryptocurrency from the Earn Program, which now required that Cryptocurrency pass through the Custody Program before going off the platform.  Because of the nature of the blockchain, the Debtors could not prohibit or stop these transfers from users who already had a Celsius wallet address.  Accordingly, the Debtors noted these transfers in accounts the Debtors called Withhold Accounts (the "Withhold Accounts").  These Withhold Accounts were also used to show balances of Cryptocurrency which was not supported on the Debtors' platform.  Notably, the General Terms of Use do not contain any provisions addressing the Debtors' and customers' rights and responsibilities related to the Withhold Accounts, and the Debtors did not have a specific wallet designated to hold Cryptocurrency in Withhold Accounts.

As of the Petition Date, approximately 6,000 users held Withhold Assets worth approximately $13.6 million (valued in U.S. Dollars as of the Petition Date).

<div style="text-align:center">(v)      <strong>Borrowing Services.</strong></div>

*Borrow*.  Celsius also provided loans denominated in U.S. Dollars or stablecoins to institutional and retail parties supported by digital assets transferred to the Celsius platform.  As with the Earn Program, Celsius rehypothecated digital assets transferred by borrowers to Celsius to support those loans.

*Borrow—Retail Lending*.  The Company's retail lending was generally conducted through Debtor Lending LLC.  Borrowers in certain domestic states and foreign jurisdictions in which Lending operated were able to choose from different loan products based upon loan-to-value ("LTV") ratios of transferred digital assets ranging from 25% to 70%, with applicable interest rates being higher for higher LTV loans.

---

[112]   *See infra*, Article V.C.3 for more information about the regulatory developments that spurred the creation of the Custody Program.

[113]   General Terms of Use § 4(b).

[114]   *Id.* § 9.

With market fluctuations, Lending was permitted to (a) issue margin calls requiring borrowers to lower the LTV by adding additional digital assets or repaying the loan and/or (b) liquidate digital assets when certain LTV ratios were met, close the loans, and return any excess digital assets to the borrowers' Celsius accounts (after satisfying liquidation fees and interest owed). The retail loans ranged widely in principal amount, including certain loans as small as $100 and as large as $14 million (in U.S. Dollars or stablecoins). As of the Petition Date, Lending had approximately 23,000 outstanding loans to retail borrowers in the aggregate amount of approximately $411 million backed by digital assets with a market value of approximately $765.5 million.

*Borrow—Institutional Lending*. Through CNL, the Company lent Cryptocurrency to institutional clients such as hedge funds and market-makers. Unlike retail lending, institutional loans were mainly in the form U.S. Dollars or stablecoins, and sometimes in Cryptocurrency. In addition, the terms and conditions of institutional loans were based on master loan agreements ("MLAs") and term sheets that set forth the detailed terms of any specific transaction. The Company provided institutional borrowers with either secured or unsecured loans. As of July 13, 2022, CNL had approximately twenty institutional borrowers with approximately $126 million of aggregate outstanding performing loans, and the Company held digital assets with a market value of approximately $77 million to support such loans. As of May 26, 2023, the Debtors had approximately fifteen institutional borrowers with approximately $133 million of aggregate outstanding obligations supported by approximately $23 million in digital assets.[115]

(vi)    **CelPay.**

Celsius also offered its users a feature known as "CelPay." Available through the Celsius App, CelPay allowed a Celsius user to "pay" another user by transferring the first user's right to receive the return of certain Cryptocurrencies from Celsius to the second user. The transfer of rights to receive Cryptocurrency using CelPay was not recorded on the blockchain, but rather in Celsius' books and records.

(vii)    **CEL Token.**

The CEL Token was a primary topic of the Examiner's investigation.[116] The description of the CEL Token is taken from the Examiner's investigation and cites to the relevant portions of the Examiner's reports for the descriptions included herein. For the avoidance of doubt, the Debtors' inclusion of such description is not intended to be and should not be construed as an admission that the Examiner's reports are evidence and/or conclusive on the topic of CEL Tokens or otherwise and are provided here solely for descriptive purposes.

(1)    The Initial Coin Offering.

CEL Tokens were primarily issued in connection with the Company's loyalty and rewards program (the "CEL Loyalty Program"). In March 2018, Celsius solicited capital through the public initial coin offering of CEL Tokens (the "ICO"). In connection with the ICO, Celsius advertised CEL Tokens as serving two main purposes: *first*, providing customers who held CEL Token discounted interest rates when applying for loans in fiat currency; and *second*, providing customers with CEL Tokens tiered benefits on the Celsius platform. Account Holders could elect to receive weekly rewards payments (or interest) in CEL Tokens. Interest in CEL Tokens was paid at a higher rate than if the Account Holder elected to receive

---

[115]    The *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818] ¶ 9. *See infra*, Article VII.N for a detailed description thereof.

[116]    *See* Interim Examiner Report at 18–19; Final Examiner Report at 76–120. *See also infra*, Article VII.G.

interest in the deposited Cryptocurrency (*i.e.*, in-kind).  In addition, Celsius provided CEL Tokens to employees as part of their compensation, and collateralized certain fiat and stablecoin margin loans to employees and Account Holders with CEL Tokens.

In connection with the ICO, CEL Token was priced at $0.20 in a private sale and $0.30 in the public ICO.[117]  Of the 700 million CEL Tokens minted, 203 million were sold in the ICO and the private sales and distributed to purchasers in April 2018, 50 million were placed in a smart contract, 325 million were held in Celsius' treasury account, 4.33 million that were returned from or not sold to purchasers were burned (permanently removed from circulation by transferring the unsold tokens to a wallet from which they cannot be recovered), and 117 million were set aside as agreed under an $18 million option agreement with AM Venture Holdings, Inc. ("AM Venture"), an entity owned by Mr. Mashinsky.[118]  AM Venture, however, never purchased the 117 million CEL Tokens as required by the option agreement.[119]

(2)    The Utility of the CEL Token.

Celsius used a flywheel diagram to demonstrate the benefits the CEL Token was purported to provide to Token holders and Celsius.



The flywheel evolved over time, but the general concept was that customers would deposit digital assets onto the Celsius platform.  Celsius would lend the coins to third parties to earn yield.  Celsius would use the return from its investments to buy CEL Tokens on the market.  Celsius would pay interest in CEL Tokens to electing holders, whose balances would increase.  Celsius would earn yield on the increased balances and pay its users additional interest in CEL Tokens.

(3)    Inflation of the Price of the CEL Token.

To support the market value of CEL Token and to satisfy the obligation to pay customer rewards in CEL Tokens, Celsius purchased CEL Tokens on the secondary market, publicly disclosing only a limited number of these purchases.  Celsius used BTC, ETH, and stablecoins to fund these purchases.  According to the Examiner's analysis, Celsius transferred at least 19.9 million CEL Tokens from secondary markets

---

[117]    Final Examiner Report at 84–85.

[118]    *Id.* at 85–86.

[119]    *Id.* at 86–87.

to its wallets in 2018, at least 113.2 million in 2019, and at least 106.9 million in 2020.[120]  In 2020, Celsius adopted several new strategies to further support the price of CEL Tokens: (a) buying back more than 50% of the CEL Tokens used to pay weekly customer rewards from the market; (b) placing "resting orders" to automatically purchase CEL Tokens if the price decreased to a specified point; and (c) using its over-the-counter trading desk to sell CEL Tokens for later repurchases.  Also in 2020, Mr. Mashinsky represented that Celsius had registered with the SEC and that CEL Token was a "registered" token, when in fact, Celsius had only filed a Form D with the SEC in April 2018 and in September 2020, which provided that Celsius' ICO and subsequent token sale were exempt from registration.

The price of the CEL Token correlated with Celsius' marketing, buybacks, and market-making efforts.  At the end of October 2019, CEL Token's price was $0.05, but by June 2021, CEL Token it was $8.01—its highest price.

According to the Examiner's analysis, the increasing price of CEL Tokens had three significant consequences for Celsius and its insiders.  ***First***, it significantly inflated Celsius' balance sheet.[121]  Celsius recorded CEL Tokens on its financial statements either as "Treasury CEL Tokens," consisting of the CEL Tokens Celsius minted at the time of the ICO but did not offer for sale, and "Non-Treasury CEL Tokens," consisting of the CEL Tokens Celsius bought in the secondary market.  Both Treasury and Non-Treasury CEL Tokens were added at mark-to-market value, such that the value of Treasury CEL Tokens recorded on Celsius books was $1.5 billion at the end of 2020, and $1.7 billion by the end of the second quarter of 2021.  As of June 4, 2021, CEL Tokens comprised $5.1 billion (or 29.6%) of Celsius' assets under management.  According to the Examiner's analysis, however, Celsius had few options for deploying CEL Tokens, and the market for CEL Tokens was created and then largely supported by Celsius itself.

***Second***, the increasing price of CEL Token benefited Celsius' insiders who held most of the CEL Tokens following the ICO.[122]  Between 2018 and the Petition Date, Mr. Mashinsky sold at least 25 million CEL Tokens, realizing at least $68.7 million on these sales.[123]  Mr. Leon sold at least 2.6 million CEL Tokens in return for at least $9.74 million.  Mr. Goldstein either directly sold or swapped at least 2.5 million CEL Tokens in return for at least $2.8 million.  Many of these sales were also in violation of a trading policy implemented by Celsius in July 2020, which restricted sales of CEL Tokens by executive officers and directors of Celsius.  The policy specifically prohibited, among other things, officers and directors from buying and selling CEL Tokens in an amount of more than $20,000 per day or $50,000 per week.

***Third***, Celsius did not earn sufficient yield on its crypto asset deployments to fully fund its buy orders.  As a result, it began using customer deposited BTC and ETH to fund its CEL Token purchases, taking assets from its general omnibus wallets (where all customer funds were accepted and commingled).[124]

In May 2022, in the face of increasing liquidity pressure, Celsius reined in its efforts to support the price of CEL Token.  On May 12, 2022, when Mr. Mashinsky directed the purchase of $5 million worth of CEL Tokens, Celsius only had $1.6 million of stablecoins needed to make the purchase.  From the end of that day to the date of the Pause, the price of CEL Token dropped from $0.98 to $0.28.  From 2018 through

---

[120]   Final Examiner Report at 91, 103.

[121]   *Id.* at 8–9.

[122]   *Id.*

[123]   *Id.*

[124]   *Id.*

the Petition Date, Celsius spent at least $558 million buying at least 223 million CEL Tokens on the market.[125]  In sum, Celsius bought more CEL Tokens (223 million in total) than were sold to the public in the ICO (203 million).

<div align="center">(4)    Increasing Liquidity Pressure.</div>

The steady fall in the CEL Token's price beginning in Summer 2021 presented a significant challenge for Celsius.[126]  Beginning in October 2021, Celsius began burning CEL Tokens worth 10% of the rewards it paid every week to reduce the supply and stabilize the price of CEL Tokens.[127]  In total, from October 1, 2021 through June 10, 2022, Celsius burned a total of 2.9 million CEL Tokens.[128]

<div align="center">(b)    Celsius Mining LLC.</div>

In addition to its financial and trading operations, the Company, through Celsius Mining, operated one of the largest crypto mining enterprises in the United States.  To expand Celsius Mining's operations, and thus generate a greater yield, effective as of November 1, 2020, and through 2021, CNL entered into an intercompany revolving loan facility with Celsius Mining for up to $750 million.  The loan was a long-term investment in Celsius Mining that the Company expected to generate significant yield.  As of the Petition Date, the outstanding loan balance owed to CNL was approximately $649 million.  As of the Petition Date, Celsius Mining owned 123,590 rigs, 44,085 of which were deployed, and had an investment plan to operate approximately 120,000 rigs by the end of 2022.   Celsius Mining generated a total of 3,128 Bitcoin during 2021.  Up to the Petition Date, Celsius Mining generated 5,773 Bitcoin.  As of June 27, 2023, Celsius Mining owned 122,585 rigs.  From the Petition Date through June 27, 2023, Celsius Mining generated approximately 4,300 Bitcoin.

<div align="center">(c)    Other Deployment Activities.</div>

<div align="center">(i)    **Staking.**</div>

To further generate yield, the Company also engaged in "staking."  Utilizing the Lido Finance DeFi protocol, Celsius "staked" its digital assets in ETH on the Ethereum 2.0 Beacon Chain—a network that has merged with the main Ethereum network and transitioned the blockchain from a Proof of Work (PoW) to a Proof of Stake (PoS) blockchain (the "Merge").  In exchange for staking its ETH on the Beacon Chain, Lido Finance provided Celsius with staked ETH.  The Company also engaged in direct staking of ETH as well as other Cryptocurrencies for yield-generating purposes, leveraging staking as a service provider.[129]

<div align="center">(ii)    **Exchange deployments.**</div>

In addition to DeFi protocols and staking, Celsius engaged in five different types of exchange

---

[125]    Final Examiner Report at 123.

[126]    *Id.* at 114.

[127]    *Id.* at 116.

[128]    *Id.* at 118.

[129]    Directly staked ETH became available to unstake and withdraw in April 2023, and withdrawals were available from the Lido staking protocol starting in May 2023.  Following April 2023, the Company redeemed its staked ETH for ETH on the LIDO platform and directly staked the withdrawn ETH with the staking service providers Blockdaemon and Figment.  As of the date of the Filing of this Disclosure Statement, the Company has 762,528 ETH directly staked or in pending staking activation status on the Ethereum network.

deployments: (i) Cash and Carry; (ii) Market Making; (iii) Swing Trading; (iv) Funding; and (v) Spot Trading. Celsius also maintained limited exchange deployments in certain futures as of the Petition Date. The Company's prepetition exchange deployments are described in further detail in the Final Examiner Report.[130]

<div align="center">(d)    The Company's Communications – AMA Videos.</div>

Every week starting in April 2020, Celsius live-streamed "AMA" sessions, short for "Ask Mashinsky Anything," to the Celsius community. In the AMAs, Mr. Mashinsky and his guests, including other Celsius employees and Cryptocurrency promoters, discussed Celsius' business and products, CEL Tokens, reward rates, what Cryptocurrency was supported on the Celsius platform, Celsius' financial health, and Celsius' growth. The AMAs were an integral part of Celsius' marketing efforts aimed at new and existing Account Holders. The AMAs were regularly viewed by tens of thousands of people. According to Account Holders, "the AMAs [were] very important to their perceived understanding of Celsius and their desire to deposit crypto assets with Celsius."[131]

Through the AMAs, Mr. Mashinsky made a series of representations to Account Holders regarding Celsius' business model and the risks associated with transferring Cryptocurrency to Celsius. These representations included:

- **Celsius was safer than other digital asset platforms**. In an April 30, 2021 AMA, Mr. Mashinsky stated, "[a] run on the bank cannot happen at Celsius because Celsius never lends more than what it has. We always have enough coins and enough collateral and so on to return *all the assets to all of our users*."[132] On October 1, 2021, Mr. Mashinsky told viewers that "[o]ur number one priority is keeping the funds that we're lending out safe and we would rather lend large scale to a counterparty than to risk earning a ridiculously high yield lending to a shady character."[133] And, on December 16, 2021, Mr. Mashinsky explained that "Celsius takes full responsibility if anything goes bad. [W]e take full responsibility; that's part of why we raised [] 750 million and now we have over two billion dollars on our balance sheet—again more than anybody else."[134]

- **Celsius deployed Account Holders' digital assets in safe, prudent, and low-risk investments**. In a March 13, 2020 AMA, Mr. Mashinsky stated that Celsius deployed digital assets only to institutions of the "highest quality," and did not "lend[] to risky institutions or risky hedge funds."[135] Similarly, on November 6, 2020, Mr. Mashinsky stated, "[w]e [Celsius] have zero bad loans, we have zero loans that don't pay their interest.

---

[130] *Id.* at 171, 215–23. For the avoidance of doubt, the Debtors do not agree with certain aspects of the Examiner's characterization of the Company's prepetition exchange deployments.

[131] *Id.* at 267.

[132] *Id.* at 245 (emphasis added).

[133] *Id.* at 243.

[134] *Id.* at 245–46.

[135] *Id.* at 243.

Celsius is very, very strict who we lend to, we only lend to the first tier institutions, first tier exchanges. We do not do unsecured lending."[136]

- **Celsius returned 80% of its revenues to Account Holders participating in the Earn Program**. In numerous AMAs, Mr. Mashinsky stated that Celsius returned 80% of the gross revenue it received from its investments to Account Holders.[137]

- **Account Holders retained ownership of the digital assets that they transferred to Celsius**. In a November 26, 2019 AMA, Mr. Mashinsky stated, "*[t]hese are your coins, not our coins*. Whatever you put in, if you put in one Bitcoin, you will be withdrawing one Bitcoin. It's always your Bitcoin. Always your Ether. Always your CEL Token."[138] Similarly, in a June 24, 2020 AMA, Mr. Mashinsky stated, "when you give us Bitcoin it is not like it is ours, right, it is yours. *Legally it is still your Bitcoin*, the only thing we do is when you lend us your Bitcoin, we lend them to people who pay us interest, when they return them it goes back to the wallet and it is still *yours* from that wallet."[139]

As explained by the Examiner, many of the representations Mr. Mashinsky made during the AMAs were "inaccurate and misleading."[140] In fact, the Examiner concluded, "Celsius conducted its business in a starkly different manner than how it marketed itself to its customers in every key respect."[141]

(e)    The Company's Records and Bookkeeping.

Celsius maintained its financial accounting records through "QuickBooks" accounting software. Because this software is not as well-equipped as other more sophisticated software to manage the records and books of a business as voluminous and complex as Celsius' business, Celsius' ability to track its financial positions (including deployment activities and profitability) or evaluate and manage risks was limited. In May 2021, Celsius started using the "Freeze Report," a Google spreadsheet intended to provide a snapshot of the Company's assets and liabilities at a given time, *i.e.*, the quantity and price of each Cryptocurrency, with values calculated on the respective date. The Company then used this information to develop its balance sheet calculations. Also in May 2021, Celsius began using the "Waterfall Report" to track its liquidity and deployment activities, including the metric that compared, on a coin-by-coin basis, the yield that Celsius generated by deploying a certain Cryptocurrency against the reward rates that it paid to customers in the Earn Program. Around the same time, Celsius also developed a third report, the "Liquidity Reserve/Modeled Liquidity Outflow" report, to monitor liquidity on a coin-by-coin basis under different stress scenarios, thereby seeking to ensure that Celsius would maintain a minimum level of liquidity for each type of coin supported on the platform. Celsius' policy was to maintain each type of Cryptocurrency supported on its platform such that it could access that token and move it off Celsius' platform (for example, due to customer withdrawals) if either the Company's one-day or the seven-day stress test model was triggered.

---

[136]    *Id.* at 245; *see also id.* at 243.

[137]    *Id.* at 248 n.962.

[138]    *Id.* at 251 (emphasis added).

[139]    *Id.* at 252 (emphasis added).

[140]    *Id.* at 256.

[141]    *Id.* at 5.

(f)        The Company as a Consolidated Enterprise.

Although Celsius is comprised of twenty-three entities (eleven of which are Debtors), the Examiner's investigation suggests that Celsius typically operated as a consolidated enterprise prior to the Petition Date.  For instance, the Examiner noted that, "Celsius' management does not appear to have considered any corporate distinction in their decision-making processes and deliberations when it came to coin deployment or liquidity."[142]  Rather, "Celsius generally viewed coins available for deployment on a consolidated basis."[143]  Similarly, when "analyzing Celsius' liquidity and financial condition, Celsius management rarely differentiated among different Celsius legal entities, instead evaluating its financial condition, liquidity needs, and risk on a consolidated basis."[144]  As one example, "Celsius' Waterfall Report tracked Celsius' liquidity and deployment activities, and included all of Celsius' assets by factoring in Celsius' investments, Celsius Mining, Custody, and DeFi, among others," aggregated across all Celsius entities.[145]  Finally, Account Holders have also asserted that Celsius "held themselves out to the world and conducted their businesses" as "one integrated enterprise" when transacting with Account Holders.[146]

### C.    Prepetition Regulatory Actions and Responses.

#### 1.   UK Regulatory Action.

Until the summer of 2021, Celsius operated its retail customer-facing business through CNL and all customer liabilities were recognized at CNL.  CNL was also the top operating company in the Celsius corporate structure and the direct or indirect owner of all other Celsius entities.

In June 2020, CNL registered, on a temporary basis, as a crypto asset business with the UK FCA.  Approximately one year later, on June 11, 2021, the UK FCA informed Celsius by letter that Celsius had to withdraw its pending regulatory application and stop conducting any retail operations in the UK because the UK FCA believed that CNL's business was an unregulated collective investment scheme under the UK's Financial Services and Markets Act, 2010.  Unregulated collective investment schemes cannot be marketed and promoted to the public.

#### 2.   The Migration.

In response to the regulatory action taken by the UK FCA, during the summer of 2021, Celsius migrated all customer liabilities from CNL to Network LLC, a Delaware limited liability company established on June 14, 2021 (the "Migration").

The Examiner described the Migration as follows:

> Prior to the summer of 2021, all customer liabilities were recognized at the [CNL] level, which was the top- tier operating company and the direct or indirect owner of all other Celsius businesses and investments.  As a result, [CNL] directly or

---

[142]    *Id.* at 365–66.

[143]    *Id.* at 366.

[144]    *Id.* at 208–09.

[145]    *Id.*

[146]    Tuganov Complaint (as defined herein) ¶ 4.

indirectly owned all of the equity in Celsius Mining, as well as all other investments within the Celsius corporate chain. . . .

From July 22 until August 23, 2021, [CNL] migrated all customer obligations arising from transactions on the Celsius App from [CNL] to the newly-formed [Network LLC]. That migration was eventually memorialized in an Asset Transfer Agreement between [CNL] and [Network LLC] dated December 29, 2021, with an effective date of August 19, 2021. Under that agreement, [Network LLC] accepted and assumed substantially all assets and liabilities related to transactions on the Celsius App. However, not all customer assets were moved from [CNL] to [Network LLC] as part of the migration. The assets associated with DeFi and staking strategies, as well as undeployed assets, were transferred to [Network LLC]. But [Network LLC] lent—or more accurately, permitted [CNL] to retain— billions of dollars of customer-related assets that were being deployed on exchanges or for institutional lending, so that [CNL] could continue to deploy them for [Network LLC's] benefit. Thereafter, [CNL] continued to engage in both existing and new deployment activities in these areas. . . . Even though the migration was concluded by August 2021, the intercompany arrangement between [CNL] and [Network LLC] was not formally documented until more than four months later. In the interim, [CNL] continue[d] to deploy billions of dollars of crypto assets associated with the migrated business.[147]

Celsius disclosed the Migration to existing Account Holders through notifications on the Celsius App and through emails. Those disclosures informed Account Holders that Celsius had modified its Terms of Use to, among other things, "change" the customer-facing "legal entity" to Network LLC and "change" the law "applicable" to the Terms of Use from UK law to New York law.[148] In addition, during a June 25, 2021 AMA, a Celsius representative stated that the Migration "is not going to affect [Account Holders] in any way."[149]

The Migration created intercompany claims owing from CNL in favor of Network LLC—the new customer-facing entity. First, to account for the customer-related liabilities, "Celsius booked an offsetting $10.3 billion intercompany receivable due to [Network LLC] from [CNL] that was recorded in the respective general ledgers of each company."[150] Second, to account for the deployed and undeployed assets, Celsius "booked" an approximately $3.3 billion receivable due to CNL from Network LLC and $7.8 billion to the equity of Network LLC, which corresponded to the appreciation in value of certain DeFi, staked, and undeployed assets remaining at CNL in excess of their cost basis.[151]

---

[147]    Final Examiner Report at 363–66. *See also Debtors' Motion Seeking Entry of an Order (I) Substantially Consolidating the Estates of Celsius Network Limited and Celsius Network LLC and (II) Granting Related Relief* [Docket No. 2563] ¶¶ 32–34.

[148]    *In re Celsius Network LLC*, 649 B.R. 87, 93 (Bankr. S.D.N.Y. 2023) (discussing disclosure of change to Terms of Use).

[149]    Celsius AMA, YouTube (June 25, 2021), available at https://www.youtube.com/watch?v=DdYrYPvY5OU at 5:50.

[150]    Final Examiner Report at 366; *see also Debtors' Statement with Respect to Intercompany Claims Held by Debtor Celsius Network LLC Against Its Debtor Affiliates* [Docket No. 2092].

[151]    *See Debtors' Statement with Respect to Intercompany Claims Held by Debtor Celsius Network LLC Against Its Debtor Affiliates* [Docket No. 2092] for a detailed evaluation of the intercompany claim between CNL and Network LLC and the Final Examiner Report at 363–369 for a detailed summary of the Migration.

Even though Celsius attempted to reflect the value of the Migration in its books and records, the Examiner explained that these figures are likely inaccurate:

> Because of the manner in which the migration was accounted for, in theory as [Network LLC] satisfied customer obligations over time, the [Network LLC] intercompany receivable and [CNL] intercompany payable should have been reduced.  As a practical matter, however, it was impossible to tie customer redemptions to migrated assets, and thus the receivables and payables were not adjusted.  As a result, [Network LLC's] records reflect a multi-billion dollar asset in the form of an intercompany receivable from [CNL], which does not accurately reflect the status of that account receivable.

> The continued deployment of crypto assets by [CNL] created further complications.  Accounting entries were not made reflecting the hundreds if not thousands of individual transactions involving the deployment or unwinding of deployments.  Instead, month-end adjustments to equity were made reflecting the overall changes in the value of assets deployed by [CNL].  Accounting for crypto asset transactions in this manner did not allow for an accurate accounting of the intercompany receivables and payables booked with respect to the migrated customer assets and liabilities.[152]

Accordingly, in these Chapter 11 Cases, the Bankruptcy Court has established a litigation schedule to estimate the appropriate value of the various intercompany claims arising from the Migration.[153] Simultaneously, the Bankruptcy Court will also consider whether the Migration should be disregarded on theories of fraudulent transfer and substantive consolidation, as set forth in Articles VII.K.5–6 of this Disclosure Statement.[154]

### 3.    U.S. Regulatory Action and the Custody Program.

Although the Migration did not start until the summer of 2021, the SEC and multiple state securities regulators in the U.S. had begun investigating Celsius' Earn Program around May 2021 to determine whether Celsius was offering an unregistered security in violation of state laws.  The SEC and regulators in New Jersey, Texas, Kentucky, Arkansas, Oklahoma, Pennsylvania, and Washington served Celsius with requests for documents or subpoenas, requests with which the Company complied in early summer 2021.  In September 2021, New Jersey and Kentucky issued cease-and-desist orders against Celsius' Earn Program.  Additional requests for documents and information by Alabama, Pennsylvania, the SEC, Massachusetts, and New York followed.  Actions by state regulators included the following:

- On September 16, 2019, the Washington Department of Financial Institutions and CNI entered into a consent order prohibiting CNI from holding itself out as a provider of money services to consumers in the state of Washington until such time as CNI obtained a license in accordance with the Uniform Money Services Act.

---

[152]    Final Examiner Report at 368–69.

[153]    *See Order Setting Schedule Regarding (I) Estimation of Certain Intercompany Contract Claims Between Celsius Network LLC and Celsius Network Limited, (II) Substantive Consolidation of Celsius Network LLC and Celsius Network Limited, and (III) Constructive Fraudulent Transfer Claim* [Docket No. 2522] (the "Estimation Scheduling Order").

[154]    Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the litigation related to the Migration.

- On September 16, 2021, the Alabama Securities Commission issued an order to show cause as to why the Alabama Securities Commission should not order Celsius to cease and desist from further offers or sales of securities in Alabama.

- On September 17, 2021, the New Jersey Bureau issued a cease-and-desist order against Network LLC, prohibiting it from (1) offering for sale any security to or from New Jersey without first registering the security or qualifying for an exemption, (2) accepting any additional assets into an existing Earn account, and (3) violating any securities law.

- On September 17, 2021, the Texas State Securities Board issued a Notice of Hearing scheduled for February 14, 2022, for the purpose of determining whether to issue a cease-and-desist order against Network LLC and Lending LLC.

- On September 23, 2021, the Kentucky DFI issued an Emergency Order to Cease and Desist against Network LLC, prohibiting it from (1) soliciting or selling any security in Kentucky unless that security is registered with the Department and (2) any and all activity which would violate the Securities Act of Kentucky.

- On August 8, 2022, the California Department of Financial Protection and Innovation issued a desist-and-refrain order against CNI, CNL, Celsius US Holding LLC, their subsidiaries, and Mr. Mashinsky, ordering them to refrain from further offers and sales of securities unless such sales are qualified under California law or an exemption applies, and to desist and refrain from offering securities in California by means in violation of section 24501 of the California Corporations Code.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Rapid Growth, Business Losses Suffered, and Business Transition.

Celsius is a company in a novel and developing industry that experienced rapid growth and popularity in 2020 and 2021.  During this period of rapid growth, the Company suffered a series of losses that impacted its ability to match its assets and liabilities.

In particular, certain asset deployment decisions were made in the midst of its unexpected asset growth that in hindsight proved problematic.  Although the Company took the necessary steps to "unwind" these deployments, unfortunately, the damage was done.

Celsius also suffered other anticipated losses.  For example, in June 2021, StakeHound, an Eth2 staking service provider, announced that it had misplaced the "keys" to over 38,000 ETH tokens, including 35,000 of the Company's Ether, due to an alleged error by StakeHound's third-party crypto custody provider Fireblocks.  StakeHound is currently engaged in legal proceedings with Fireblocks.

Moreover, to support its operations, from October 2019 to February 2021, the Company took out collateralized term loans from Equities First Holdings, LLC ("EFH").  In July 2021, when Celsius attempted to repay one of its loans, it was informed for the first time that EFH was unable to return the Company's collateral on a timely basis, resulting in Celsius having an approximately $509 million uncollateralized claim against EFH after it set off its own loan obligations to the lender.  Since September 2021, the lender has made some principal payments to the Company.  As of May 26, 2023, the aggregate principal owed to the Company stands at approximately $409 million, consisting of $308 million in USD and 3,765 BTC, the latter worth approximately $101 million.

Due to these losses, the Company began evaluating its business model and corporate policies with

the goal of right-sizing its balance sheet, reducing risk, and aligning the quantum of digital assets with digital asset liabilities.

### B.    Turbulent Market Conditions.

In the midst of Celsius' expansion and incurrence of significant losses from risky investments, the onset of the COVID-19 pandemic drove many investors to exit the market altogether. Following an initial crash, both the traditional and Cryptocurrency markets experienced a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve (the "Federal Reserve")) enacted relief programs and adopted accommodative monetary policy, including quantitative easing and asset purchasing programs designed to bridge the global economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and Cryptocurrency markets, and investment into new Cryptocurrency projects skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove equity markets sideways through the end of 2021. Strong selloffs in "risk-on" sectors of the economy, such as technology and early-stage equities, led to selloffs in the Cryptocurrency market as investors trimmed exposure. Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it appeared like markets were beginning to recover from the COVID-19 pandemic and that its lingering effects would be minimal. But discussions around a possible recession in 2022 began to materialize as inflation rose, along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

2022 was marked by historic levels of volatility in the traditional markets and Cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. Western countries imposed a series of financial, trade, and travel sanctions against Russia in an effort to weaken Russia's ability to pursue the war, which led to a rampant increase in commodity prices. This instability has only continued in 2023, with no end in sight to the Ukrainian War.

In the year leading up to the Petition Date, the Federal Reserve increasingly raised the federal funds rate and instituted a quantitative tightening of approximately $95 billion per month starting in Q3 of 2022. These actions signaled a "risk off" to the markets resulting in the sharpest drop in Bitcoin value in its thirteen-year history. In June 2022, market analysts officially labeled 2022 a "bear market."

### C.    The "Cryptopocalypse."

The widespread selloff in traditional markets was mirrored in the Cryptocurrency industry. All major Cryptocurrencies experienced significant declines in the first half of 2022; by June 2022, the crypto market had lost $2 trillion of its peak $3 trillion market capitalization achieved in November 2021. By mid-June of 2022, seventy-two of the top one hundred digital assets had dropped by over 90% from their all-time highs.



Several negative events in the crypto space, including the implosion of Terra LUNA ("<u>LUNC Token</u>") and its TerraUSD stablecoin ("<u>UST</u>"), exacerbated this "Cryptocurrency winter." The eventual implosion of Terra and the loss of over $50 billion in values of the LUNC Token and UST coins over a three-day period created a domino effect, creating immediate issues for many market participants, including Three Arrows Capital, Babel Finance, Vauld, BlockFi, Genesis Trading, Blockchain.com, Crypto.com, and Voyager Digital Holdings, Inc., among many others, leading to the eventual "cryptopocalyse." Many of these market participants had to halt operations, limit withdrawals, or take emergency bailout loans to survive.

### 4.    *The Terra Luna Collapse.*

Terra was an open-source blockchain protocol created by Terraform Labs that authorized blockchain developers to make custom blockchains and decentralized applications for a variety of uses. Terra issued its own native token, LUNC Token, a Cryptocurrency that was used to execute transactions on the Terra blockchain. In early April 2022, LUNC Token traded at approximately $114 and had a market capitalization of approximately $41 billion. By mid-May 2022, the market capitalization had dropped to approximately $500 million.

Terra's stablecoin, UST, historically traded at $1. As previously explained, stablecoins are usually pegged 1:1 with a tangible asset, such as gold or dollars. UST, however, was "pegged" to LUNC Token using "algorithmic pegging." By virtue of a smart contract, LUNC Tokens were used to "mint" new UST, which was supposed to maintain the UST price stable and LUNC Token deflationary. Thus, regardless of the market conditions, $1 of UST could always be redeemed for $1 of LUNC Token, and $1 of LUNC Token could always be redeemed for $1 of UST.

For example, if UST was trading at $1.50, a trader holding LUNC Token could "burn" the LUNC Token worth $1.00 by converting it into UST, immediately sell its UST, and pocket the $0.50 difference (and vice versa). As more holders would do the same to realize a profit, more LUNC Token would be "burned," making the remaining LUNC Token supply more valuable until UST and LUNC Token were back to a 1:1 ratio. This arbitrage trade was intended to keep the two tokens equally scarce and limit oversupply or undersupply of the two tokens. To incentivize traders to burn LUNC Token to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST) on Terra's Anchor protocol.

On May 7, 2022, $2 billion of UST was reported as unstaked (taken out of the Anchor protocol) and immediately sold. As a result of such a massive sale, UST's price dropped to $0.91. Traders moved quickly to burn LUNC Token and "arbitrage" the price of UST; however, only $100 million of UST could be burned for LUNC Token each day. Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

The Terra blockchain protocol was widely viewed as a project with significant promise—LUNC Token had attracted significant interest from institutional investors and retail investors alike. The LUNC Token collapse erased approximately $40 billion of value and contributed to further selloffs in the Cryptocurrency sector. Many projects and funds which relied on UST as a stablecoin saw their treasury wiped out. Many others who took out loans to invest in UST faced the reality that they could not repay those loans.

Unlike many of these Cryptocurrency platforms, Celsius avoided losing a significant amount of its assets in the LUNC Token collapse. When LUNC Token started to "de-peg," Celsius immediately withdrew all deployed UST and suffered a loss of approximately $30 million on all activity related to LUNC Token or UST. Celsius may have claims related to this event.

### 5. The "Domino Effect."

The collapse of LUNC Token had a significant effect on the Cryptocurrency industry. Many Cryptocurrency-focused hedge funds and other Cryptocurrency companies held LUNC Token and incurred losses on their position after they sold. Some participants were unable to sell their LUNC Tokens under staking agreements or other lock-up agreements, which can require up to twenty-two days to unstake or return loans—such participants were forced to incur up to a 99 percent loss on their investment if they were prohibited from selling their LUNC Tokens.

In early June 2022, it was reported that Three Arrows Capital ("3AC") may have incurred significant losses due to LUNC Token's collapse. On June 15, 2022, one of 3AC's founders stated that the fund incurred significant losses on account of its staked LUNC Token position and had hired legal and financial advisors to explore potential liquidity solutions. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

The collapse of 3AC directly impacted Celsius and other crypto companies such as Voyager Digital Holdings, Inc. Celsius had extended two loans totaling $75 million to 3AC. When 3AC failed to meet a margin call, Celsius liquidated the collateral that 3AC had pledged, and its claim against 3AC now totals $40.6 million.

### 6. The "depegging" of Staked Ether.

As a result of the LUNC Token collapse, and the need for 3AC to quickly liquidate its other assets to repay its own institutional loans, staked ETH started to "depeg" from its 1:1 ratio with ETH. In mid-May 2022, the staked ETH to ETH exchange ratio dropped slightly creating a 2–3 percent gap in prices. The gap widened in June to 5–6 percent. After the LUNC Token and UST losses, continued market downturn, and the widening "depegging" of staked ETH, many Celsius users sought to withdraw their ETH from Celsius' platform. To meet these demands, Celsius was forced to sell some of its own staked ETH, which further exacerbated market conditions.

D.        **The Effect of the "Cryptopocalypse" on the Company's Recovering Balance Sheet.**

During the initial stages of the "cryptopocalypse," the Company expected that, with sufficient time, it would level-set and stabilize its balance sheet.  Unfortunately, due to ever worsening market conditions, among other factors, the value of the CEL Token declined.

Moreover, as a part of its asset deployment decisions, a number of Celsius' assets were tied up in illiquid investments, including staked ETH and the CNL loan to Celsius Mining, that were intended to generate profit over time.  Celsius had also borrowed over $1 billion in stablecoin loans that were secured by BTC and ETH.  As the price of BTC and ETH declined, the Company was required to post additional coins as collateral to avoid liquidation.  The combination of the decline in crypto prices, uptick of user withdrawals from Celsius' platform, and the need to post additional collateral left Celsius struggling to deal with two competing demands on its liquid assets:  Celsius could either process user withdrawals or transfer additional collateral to DeFi protocols and its institutional lenders to support its already existing loans and avoid liquidation of its collateral and subsequent additional losses.

In May and June 2022, Celsius decided to forgo providing one of its lenders, Tether (issuer of the USDT stablecoin), additional collateral and agreed to an orderly liquidation of its loan.  During the market crash, Tether issued a margin call to Celsius with regard to an outstanding $841 million USDT loan.  The Company agreed to an orderly liquidation and settlement of its loan with Tether to preserve the remaining collateral in excess of the value of the loan.  This resulted in a loss of approximately $97 million.[155]

By mid-June 2022, the amount of the Company's liquid assets and the dollar value of all remaining assets had decreased so significantly that Celsius lost the ability to continue borrowing stablecoins.

E.        **The Pause.**

Starting in May 2022, Celsius began processing significant customer withdrawals—experiencing a net outflow of over $1.4 billion in assets between May 9, 2022 and May 24, 2022 alone.  This flurry of withdrawals resumed just before the Pause.  For example, between June 10, 2022 and June 13, 2022, more than 198 million USDC, 5,500 BTC, and 117,500 ETH were withdrawn from the platform.  On June 12, 2022, CNL had an emergency meeting of its board of directors (the "CNL Board").  At that meeting, the CNL Board unanimously determined that the best way to protect all users would be to pause withdrawals.  This step was not taken lightly as the CNL Board knew that the Pause would fuel speculation and damage the Company's reputation.  But the CNL Board was unanimous in its decision that a pause would protect users by maximizing recoveries for all users.  Later that night, the Company announced that it was pausing all account withdrawals and transfers due to extreme market conditions.  The decision to enact the Pause was intended to preserve all digital assets for distribution to customers on an equal basis and avoid irreparable damage to Celsius' business.

As of July 29, 2022, Celsius had approximately 14,578 BTC, 23,348 wBTC, 417,392 ETH, 410,517 staked ETH, and 278,751,125 USDC, among other Cryptocurrencies, stored on Fireblocks or

---

[155]   Since the commencement of the Chapter 11 Cases, the Committee has evaluated potential causes of action arising from the liquidation of the Tether loan.

staked or deployed via loans and on exchanges.[156]  As of May 26, 2023, Celsius had approximately 37,000 BTC, 448,000 ETH, 424,000 staked ETH, and 273,448,000 USDC, among other Cryptocurrencies.[157]

### F.    Governance Initiatives.

On or around June 19, 2022, CNL formed the Special Committee, which is currently comprised of disinterested directors Alan Carr and David Michael Barse, both appointed on or around June 30, 2022.[158] The charter for the Special Committee (the "Special Committee Charter") vested the Special Committee with the authority to consider, review, evaluate, and execute strategic and/or financial alternatives with respect to the Company and its subsidiaries to address their liabilities in light of prevailing industry conditions and the Company's liquidity demands and operational results (each, a "Possible Transaction," and collectively, the "Possible Transactions").  Specifically, the Special Committee Charter vested the Special Committee with the authority to, among other things:

- review and evaluate the terms and conditions and various methods to effect any Possible Transaction[159] and determine the advisability of any Possible Transaction or any proposals for any Possible Transaction and various methods to effect any such Possible Transaction or proposals therefor;

- negotiate the consideration, structure, form, terms and conditions of any Possible Transaction or any proposals for any Possible Transaction and the form, terms and conditions of any definitive agreements in connection therewith and review and comment upon any and all documents and other instruments used in connection with any Possible Transaction, including any and all materials to be filed with governmental and non-governmental persons and entities;

- determine (a) whether a Possible Transaction negotiated by the Special Committee is in the best interests of CNL and (b) whether the CNL Board should recommend such Possible Transaction to CNL's stockholders if the consent of the CNL's stockholders is required in connection therewith;

- approve a Possible Transaction and the execution and delivery of documents necessary or advisable in connection with a Possible Transaction;

- direct the officers, employees, legal counsel, financial and other advisors, consultants, agents and representatives of CNL to take such actions or refrain from taking such actions relating to any Possible Transaction as the Special Committee may direct from time to time;

---

[156]    Detailed reports of the Debtors' postpetition coin holdings can be found in the coin reports Filed by the Debtors [Docket Nos. 447, 811, 2122, 2361, and 2648].

[157]    Coin Report [Docket No. 2361].

[158]    There was a prior special committee appointed that was replaced around the same time the Company replaced its restructuring counsel.

[159]    "Possible Transaction" means one or more alternative debt or equity financings, or a sale, merger, consolidation, restructuring, reorganization, recapitalization, liquidation or other transaction or related financing or refinancing involving the Company and/or one or more of its subsidiaries, whether by Filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code or otherwise.

- take all actions of the CNL Board with respect to certain issues and items necessary to commence a chapter 11 case; and

- exercise any other power or authority that may be otherwise exercised by the CNL Board and that the Special Committee may determine is necessary or advisable in order to fulfill its duties and responsibilities in connection with the evaluation of any Possible Transaction and the execution of any Possible Transaction.

After the Petition Date, on August 2, 2022, CNL revised and updated the Special Committee Charter. Thereafter, the Special Committee was also vested with the authority to review and consider issues related to conflicts of interest and to investigate allegations of misconduct of the Company. Specifically, the Special Committee is vested with the authority to:

- review, evaluate, negotiate, approve, and authorize any other matter in which the Special Committee determines that there may be an actual or perceived conflict of interest between interested members of the CNL Board and the Company (a "<u>Conflicts Matter</u>"), and any related issues thereto;

- review and, if appropriate, investigate credible allegations of misconduct by the Company or its current or former employees, officers, or directors, including working with independent counsel as appropriate to assist in any such investigation;

- consider, authorize, and implement any recommendations, remediation, or disciplinary action in connection with such investigation and authorized under the Special Committee Charter;

- communicate with regulators and third parties as necessary in connection with any investigation authorized under the Special Committee Charter; and

- consider such other matters as may be requested by the CNL Board, or as the Special Committee may deem to be necessary and appropriate for the Special Committee to fulfill its duties and functions as are authorized under the Special Committee Charter, and make any recommendations to the CNL Board with respect thereto that the Special Committee deems appropriate.

## VII.    EVENTS OF THESE CHAPTER 11 CASES[160]

### A.    First Day and Second Day Motions and Relief.

On the Petition Date, the Initial Debtors[161] Filed several motions (the "<u>First Day Motions</u>") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. Following hearings on July 18, 2022 and August 16, 2022 (the "<u>Second Day Hearing</u>"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

- the **Order Retaining Stretto as Noticing Agent** authorizing the Debtors to retain Stretto

---

[160] As further explained here, pursuant to the *Order (I) Applying Certain Orders in Initial Debtors' Chapter 11 Cases To, GK8 LTD., GK8 USA LLC, and GK8 UK Limited and (II) Granting Related Relief* [Docket No. 1655] applying certain orders entered in the Initial Debtors' chapter 11 cases to GK8, effective as of the GK8 Petition Date, the events described here apply with equal force to GK8 except for in certain circumstances.

[161] As further explained herein, GK8 Filed voluntary petitions for chapter 11 relief on December 7, 2022.

as third-party claims and noticing agent [Docket No. 54];

- the **Creditor Matrix Order** authorizing the Debtors to (a) File a consolidated list of creditors (the "Creditor Matrix"), (b) File a consolidated list of the Debtors' fifty (50) largest unsecured creditors; and (c) redact certain personal identification information [Docket No. 55];

- the **Schedules and Statements Order** extending the deadline by which the Debtors' Schedules and Statements were to be Filed [Docket No. 57];[162]

- the **Automatic Stay Order** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code [Docket No. 60];

- the **Interim and Second Interim Cash Management Order** authorizing the Debtors to continue to operate their cash management system on terms agreed between the Debtors and the Committee [Docket Nos. 56 and 513];

- the **Interim and Final Wages Orders** authorizing the Debtors to continue paying prepetition wages and continue employee benefits programs [Docket Nos. 61 and 518];

- the **Interim and Final Critical Vendors Orders** authorizing the Debtors to honor certain payments to vendors incurred in the ordinary course of business before the Petition Date [Docket Nos. 80 and 520];

- the **Interim and Final Insurance Orders** authorizing the Debtors to honor existing insurance obligations [Docket Nos. 59 and 524];

- the **Interim and Final NOL Orders** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common stock of Celsius Network Inc. and CNL [Docket Nos. 58 and 525];

- the **Interim and Final Taxes Orders** authorizing the Debtors to pay certain taxes and fees that arose in the ordinary course of business before the Petition Date [Docket Nos. 62 and 526];

- the **Utilities Order** approving the Debtors' proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code and prohibiting utility providers from altering, refusing, or discontinuing services [Docket No. 527]; and

- the **Interim and Final Case Management Orders** approving and implementing certain notice, case management, and administrative procedures [Docket Nos. 63 and 528].[163]

In the weeks following the Second Day Hearing, the Bankruptcy Court also granted the following First Day Motions on interim and final bases:

---

[162]    *See infra*, Article VII.D for more information about the procedural history of the Schedules and Statements Order, including further extensions of the deadline by which the Debtors had to File their Schedules and Statements.

[163]    The Final Case Management Order was subsequently amended with respect to procedures for obtaining hearing dates for *pro se* filers and the extension of objection deadlines.  *See Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] ¶¶ 19, 27.

- the **Bidding Procedures Order** approving the Debtors' bidding procedures with respect to the sale of the equity interests in GK8 Ltd. or some or all of its assets [Docket No. 687]; and

- the **Third Interim and Final Cash Management Orders** authorizing the Debtors to continue to operate their cash management system on terms agreed between the Debtors and the Committee [Docket Nos. 699 and 1152].

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at: https://cases.stretto.com/celsius.

The Debtors also Filed several other motions subsequent to the Petition Date (the "Second Day Motions") to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

- the **Mined Bitcoin Order** authorizing the Debtors continue to sell their mined Bitcoin subject to certain requirements between the Debtors and the Committee [Docket No. 514];

- the **Contract Procedures Order** authorizing and approving procedures to reject or assume executory contracts and unexpired leases [Docket No. 517];

- the **Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 519];

- the **Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 521];

- the **De Minimis Assets Order** approving expedited procedures for the sale or abandonment of certain de minimis assets [Docket No. 692];

- the **Bidding Procedures Sealing Order** authorizing the Debtors to File under seal the names of certain confidential parties in interest related to the Debtors' potential sale of certain assets [Docket No. 697]; and

- the **Retention Orders** granting the Debtors' applications to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code.[164]

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals

---

[164] Latham & Watkins LLP as Special Counsel, effective as of the Petition Date [Docket No. 838]; Stretto as Administrative Advisor, effective as of the Petition Date [Docket No. 841]; Alvarez & Marsal North America, LLC as Financial Advisor, effective as of the Petition Date [Docket No. 842]; Akin Gump Strauss Hauer & Feld LLP as Special Litigation Counsel, effective as of the Petition Date [Docket No. 843]; Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession, effective as of the Petition Date [Docket No. 845]; Centerview Partners LLC as Investment Bankers, effective as of the Petition Date [Docket No. 846]; Ernst & Young LLP as tax compliance services and tax advisory services provider, effective as of the Petition Date [Docket No. 1766]; Fischer (FBC & Co.) as Special Counsel, effective as of December 7, 2022 [Docket No. 1906]; A.M. Saccullo Legal, LLC as Special Counsel, effective as of December 1, 2022 [Docket No. 2142]; Stout Risius Ross, LLC as the Debtors' valuation advisor, effective as of February 21, 2023 [Docket No. 2498]; Andersen LLP as UK tax services provider, effective as of February 28, 2023 [Docket No. 2755]; and Mark Andrews & Company, d/b/a KE Andrews, as property tax services provider, effective as of January 1, 2023 [Docket No. 2753].

retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

Given the unique nature of, and the number of professionals working in these cases, the U.S. Trustee, the Debtors, and the Committee agreed to the appointment of an independent fee examiner.[165] After a hearing on October 20, 2022, the Bankruptcy Court appointed Christopher Sontchi, the former Chief Judge of the United States Bankruptcy Court for the District of Delaware, as the fee examiner (the "Fee Examiner") to review and assess all interim and final applications for allowance of compensation and reimbursement of expenses Filed by retained professionals for compliance with (1) Bankruptcy Code sections 329, 330 and 331, as applicable, (2) Bankruptcy Rule 2016, (3) the Interim Compensation Order, and (4) and rule 2016-1 of the Local Bankruptcy Rules for the Southern District of New York and the applicable guidelines for compensation.[166]

### B.    The Debtors' Motions to Protect Personally Identifiable Information.

In addition to the First Day and Second Day Motions, the Debtors Filed a set of motions in the early days of these Chapter 11 Cases seeking enhanced protection of their stakeholders' personally identifiable information. In particular, the Debtors were aware of (i) the concerns of many customers, employees, and the Debtors' directors and officers that the public disclosure of their home addresses, email addresses, or names on the docket could potentially subject them and their families to identity theft, blackmail, harassment, stalking, and doxxing;[167] and (ii) the possibility of "customer poaching" by the Debtors' competitors using the home addresses, email addresses, and names of the Debtors' customers published on the docket. Accordingly, on August 3, 2022, the Debtors Filed the *Debtors' Ex Parte Motion Pursuant to Section 107 of the Bankruptcy Code Seeking Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information from the Creditor Matrix, Schedules and Statements, and Related Documents and (II) Granting Related Relief* [Docket No. 344] (the "Sealing Motion"). The Sealing Motion sought to maintain public access to Bankruptcy Court records while protecting over 600,000 individuals from having home addresses, email addresses, and names (where applicable) published without their consent on the internet in a format easy to "data-mine" and readily accessible from anywhere in the world at a keystroke. In the Sealing Motion, the Debtors sought to redact (a) the home addresses and email addresses of any citizens of the United States located in the United States, including the Debtors' employees, individual shareholders, and individual customers, and (b) the names, home addresses, and email addresses of any citizens of the United Kingdom or European Economic Area member countries and any individual whose citizenship is unknown. The Sealing Motion was joined by the Committee [Docket No. 399] and supported by the Ad Hoc Group of Withhold Account Holders [Docket No. 633] and the Ad Hoc Group of Custodial Account Holders [Docket No. 642] but objected to by the U.S. Trustee [Docket Nos. 600 and 607].

To further secure their individual customers' safety and limit the unnecessary risks of theft, on August 30, 2022, the Debtors Filed the *Debtors' Motion Pursuant to Section 107 of the Bankruptcy Code Seeking Entry of an Order (I) Authorizing the Debtors to (A) Redact Individual Names, and (B) Implement an Anonymized Identification Process, and (II) Granting Related Relief* [Docket No. 639]

---

[165]    *See* Oct. 20, 2022 Hr'g Tr. 108:1–109:20; *see also Notice of Presentment of Order Appointing Independent Fee Examiner and Establishing Related Procedures for the Review of Fee Applications of Retained Professionals* [Docket No. 1117].

[166]    *Order Appointing Independent Fee Examiner and Establishing Related Procedures for the Review of Fee Applications of Retained Professionals* [Docket No. 1151] ¶¶ 1–6.

[167]    Doxxing is a form of cyberbullying and is the term used for the harassment technique of finding and then posting a user's sensitive personal information, including addresses, phone numbers, and even social security numbers. *See Dox*, Merriam Webster, https://www.merriam-webster.com/dictionary/dox (last visited March 11, 2023).

(the "Anonymization Motion"), requesting that the Bankruptcy Court grant the additional relief of redacting individual customer names regardless of where such individual customers are located, in any instance when individual customer names would be disclosed in connection with customer account balances, including in the Schedules and Statements.[168]

The U.S. Trustee Filed an objection to the Sealing Motion [Docket No. 607], to which the Debtors Filed an omnibus reply [Docket No. 638].[169]  The Debtors subsequently Filed a supplemental reply in support of the Sealing Motion and the Anonymization Motion [Docket No. 782] (the "Redaction Reply"). The Redaction Reply emphasized that, although the Debtors sought to redact and anonymize certain information due to the undue risk of identity theft, safety, and security created by the particular circumstances of these Chapter 11 Cases, the Debtors would be able to balance the countervailing need for public access and transparency by providing unredacted documents to the Bankruptcy Court, U.S. Trustee, counsel to the Committee, and certain other parties in interest upon request.[170]  The Committee supported the Sealing Motion and the Anonymization Motion and Filed a joinder to the Sealing Motion and supplemental joinder to the Redaction Reply [Docket Nos. 399 and 785].

On September 28, 2022, the Bankruptcy Court entered the *Memorandum Opinion and Order on the Debtors' Sealing Motion* [Docket No. 910] (the "Sealing Opinion"), granting in part and denying in part the relief requested in the Sealing Motion and the Anonymization Motion.  Specifically, the Bankruptcy Court (a) authorized the Debtors to, among other things, redact the home addresses and email addresses of individual creditors,[171] (b) denied the request to redact the names of individuals and the request to redact the names, email addresses, and, to the extent requested, the physical addresses of business entities, and (c) denied the Anonymization Motion.[172]  The Bankruptcy Court found that, while customers' email and physical addresses, "in combination with their names, could make individual account holders more vulnerable to identify theft and render account holders' crypto assets more susceptible to criminal theft," "customer names alone, without their addresses and emails, would not unequivocally identify people."[173]

The Debtors have continued their efforts to protect personally identifiable information of all Account Holders where possible.  Throughout the course of these Chapter 11 Cases, there have been several phishing attempts targeting Account Holders, with suspected aims ranging from gaining remote access to Account Holders' computers and stealing financial assets and inducing payments of fraudulent "filing fees" and "tax fees," to obtaining personally identifiable information and account information from Account Holders.[174]  To date, the Debtors have Filed five notices to warn Account Holders and all parties in interests

---

[168]    Anonymization Motion ¶¶ 3–4.

[169]    In addition to replying in support of the Sealing Motion, the Debtors' reply also responded to the U.S. Trustee's *Omnibus Objection to the Debtors' Retention Applications* [Docket No. 601].

[170]    Redaction Reply ¶ 3.

[171]    Sealing Opinion at 4.

[172]    *Id.*

[173]    *Id.* at 25, 27.

[174]    *See, e.g.*, *Notice of Phishing Attempts* [Docket No. 1527] (informing parties in interest of phishing emails sent to certain of the Debtors' customers purporting to be from restructuring associates at Kirkland & Ellis LLP and requesting that customers submit their wallet addresses and other account information to receive claim distributions).

of these phishing attempts, and will continue to do so for the remainder of these Chapter 11 Cases.[175]

### C.    Appointment of the Unsecured Creditors' Committee.

On July 27, 2022, the U.S. Trustee Filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 241], appointing the following unsecured creditors to the Committee: Caroline G. Warren, Thomas DiFiore, Scott Duffy for ICB Solutions, Christopher Coco, Andrew Yoon, Mark Robinson, and Keith Noyes for Covario AG. The Committee also Filed applications to retain their professionals pursuant to sections 327 and 328 of the Bankruptcy Code, which the Bankruptcy Court granted.[176]

### D.    Schedules and Statements.

On October 5, 2022, the Debtors Filed their schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs (the "Schedules") [Docket Nos. 973 and 974].[177] As described further herein, the Debtors amended their Schedules on March 24, 2023.[178] Interested parties may review the Schedules free of charge at https://cases.stretto.com/Celsius.

On October 25, 2022, the Series B Holders, as beneficial holders, or investment advisors or managers of beneficial holders, of the Series B Preferred Interests, Filed the *Series B Preferred Holders' Motion Pursuant to Bankruptcy Rule 1009 for Entry of An Order Directing the Debtors to Amend Their Schedules* [Docket No. 1183] (the "Series B Motion to Amend the Schedules") requesting that the Bankruptcy Court direct the Debtors to amend the Debtors' Schedules E/F such that each Claim is denominated in U.S. Dollar amounts as of the Petition Date instead of *only* providing native Cryptocurrency coin counts."[179] The Debtors Filed the *Debtors' Objection to Series B Preferred Holders' Motion Pursuant to Bankruptcy Rule 1009 for Entry of an Order Directing the Debtors to Amend Their Schedules* [Docket No. 1304] (the "Debtors' Objection to the Series B Motion to Amend the Schedules") maintaining that the Filed Schedules comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and Official Bankruptcy Forms, and, to the extent they do not, the Bankruptcy Court should otherwise permit the Schedules to remain as Filed pursuant to Bankruptcy Rule 1007(b).[180]

---

[175]    *See* [Docket Nos. 1527, 1681, 1904, 1992, and 2082]. All notices of phishing attempts may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius/content/1804-phishing-attempts/.

[176]    White & Case LLP as Counsel, effective as of July 29, 2022 [Docket No. 829]; Perella Weinberg Partners LP as Investment Banker, effective as of August 2, 2022 [Docket No. 1096]; Elementus Inc. as Blockchain Forensics Advisor, effective as of August 1, 2022 [Docket No. 1097]; M3 Advisory Partners, LP as Financial Advisor, effective as of August 1, 2022 [Docket No. 1098]; Gornitzky & Co. as Israeli Counsel, effective as of November 2, 2022 [Docket No. 1760]; Selendy Gay Elsberg PLLC as Co-Counsel, effective as of January 8, 2023 [Docket No. 2251]; and Kroll Restructuring Administration LLC as Noticing and Information Agent, effective as of August 5, 2022 [Docket No. 827].

[177]    On October 14, 2022, the Debtors withdrew the Third SOFAs and Schedules Extension Motion [Docket No. 1064].

[178]    *See Notice of Filing of Amended Global Notes, Statement of Financial Affairs 3 and 4, and Schedule F* [Docket No. 2311] (the "Amended Schedules").

[179]    Series B Motion to Amend the Schedules ¶¶ 1–5.

[180]    *See generally* Debtors' Objection to the Series B Motion to Amend the Schedules.

Prior to the hearing on the Series B Motion to Amend the Schedules scheduled for November 14, 2022, and after discussions with the Debtors and Committee, the Series B Holders Filed the *Notice of Filing Revised Proposed Order Pursuant to Bankruptcy Rule 1009 Directing the Debtors to Amend Their Schedules* [Docket No. 1342] (the "Revised Proposed Order to Amend the Schedules"), which was agreed upon by the Debtors and the Committee.[181] The Revised Proposed Order provided that (a) the Debtors would File a Conversion Table that includes all listed Cryptocurrency on the Schedules as of the Petition Date, and (b) all parties' rights are reserved with respect to the issues of (i) whether Account Holder Claims, or distributions on account of such Claims, are required to be stated in U.S. Dollars or determined by reference to U.S. Dollars, and (ii) whether the U.S. Dollar amounts of Account Holder Claims is relevant in any future proceeding in these cases. Following the hearing, the Bankruptcy Court entered the order as requested [Docket No. 1387].

The issues reserved in the Revised Proposed Order to Amend the Schedules are interconnected with the Debtors' and Series B Holders' resolution of issues related to the Bar Date Motion and the Revised Proposed Bar Date Order (each as defined herein). Further, as discussed in Article VII.L.3 of this Disclosure Statement, the Debtors subsequently Filed a motion seeking the establishment of a briefing schedule to resolve certain closely related legal issues, specifically, whether all Debtors were liable to Account Holders under the Terms of Use [Docket No. 1338]. Following the Customer Claims Ruling (as defined herein), which held that only Network LLC could be held contractually liable for Account Holders' contract claims under the Terms of Use,[182] the Debtors began the process of amending their Schedules and Statements to reflect that (a) contract claims related to the Debtors' Earn Program, Custody Program, and Withhold Accounts are only against Network LLC and not any other Debtor entity, and (b) contract claims related to the Debtors' Borrow Program are only against Lending LLC. On March 24, 2023, the Debtors Filed these amendments to Schedule F, Statement of Financial Affairs 3 and 4, and the Global Notes. In connection with the Debtors' amended Schedules and Statements, the Debtors established April 28, 2023, as a Supplemental Bar Date for any affected claims.[183] As explained further in Article VII.H of this Disclosure Statement, however, the Supplemental Bar Date was stayed until entry of the *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors Establishing Account Holder Bar Date* [Docket No. 3066] (the "July Bar Date Stipulation"), which establishes August 2, 2023, at 5:00 p.m., prevailing Eastern time, as the Bar Date.

## E.    341 Creditors' Meetings.

On August 15, 2022, the U.S. Trustee Filed a notice setting the first meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for August 19, 2022, at 9:00 a.m., prevailing Eastern Time [Docket No. 459].[184] Because the Debtors Filed the Second SOFAs and Schedules Extension Motion requesting an extension of the deadline to File schedules and statements to September 12, 2022, the Debtors did not File their Schedules and Statements in advance of the first 341 Meeting. At the first 341 Meeting, the U.S. Trustee; the Committee; and customers questioned the Company's Chief Financial Officer, Chris Ferraro ("Mr. Ferraro"), over a period of several hours about a wide range of topics, including the Debtors' financial affairs, the details of the Debtors' mining operations, ongoing investigations into the Debtors, and other issues.

---

[181]    *See generally* Nov. 15, 2022 Hr'g Tr. [Docket No. 1386] at 18:10–25, 19:1, 5–25, 20:1–12.

[182]    Customer Claims Ruling (as defined herein) at 38.

[183]    *See Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

[184]    *See generally* Aug. 19, 2022 341 Meeting Tr.

Subsequent to the Debtors' Filing of the Schedules and Statements, the U.S. Trustee Filed a notice setting the second meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for October 13, 2022, at 9:30 a.m., prevailing Eastern Time [Docket No. 1004].[185]  As at the first 341 meeting, the U.S. Trustee, White & Case, and multiple customers questioned Mr. Ferraro over a period of several hours, primarily regarding the Schedules and Statements.

On January 13, 2023, the U.S. Trustee Filed a notice setting the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for GK8 for January 26, 2023, at 11:00 a.m., prevailing Eastern Time [Docket No. 1857].[186]   The U.S. Trustee and two retail customers briefly questioned Mr. Ferraro, as the Director and Chief Financial Officer of GK8 Ltd., Director of GK8 USA LLC, and Director of GK8 UK Limited, regarding the GK8 Sale.[187]

### F.    The Key Employee Retention Plan.

On October 11, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1021] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of the proposed KERP.  The proposed KERP provided for payment of Cash retention awards to sixty-two of the Debtors' non-insider employees (the "KERP Participants") who perform vital roles in cash and digital asset management, IT infrastructure and data management, digital security, accounting, legal, compliance, and other critical functions.[188]   The KERP was necessary to prevent employee attrition and avoid the further cost and time required in connection with replacing employees—indeed, between the Petition Date and the Filing of the KERP Motion, 99 of the Debtors' employees had resigned.[189]

The proposed KERP was supported by the Committee but objected to by the U.S. Trustee.[190]  The Committee underscored the Debtors' concerns that continued attrition of key employees could frustrate the Debtors' stability and prevent them from accomplishing the milestones necessary to emerge from chapter 11.[191]   The U.S. Trustee stated that the Filed KERP, which was redacted, did not provide enough information for the public to determine conclusively whether any of the KERP Participants were insiders.[192]

---

[185]    *See generally* Oct. 13, 2022 341 Meeting Tr.

[186]    *See generally* Jan. 26, 2023 341 Meeting Tr.

[187]    *See infra*, Article VII.M.1 for more information about the GK8 Sale.

[188]    *See generally* KERP Motion.

[189]    Simultaneously with the KERP Motion, the Debtors also Filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1020], seeking permission to redact and File under seal the KERP Participants' job titles, job descriptions, supervisors, hiring personnel, corresponding salaries, and proposed KERP awards.

[190]    *See The Official Committee of Unsecured Creditors' Statement With Respect to the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1187] (the "Committee Statement on the KERP"); *Objection of the United States Trustee to Motion of Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1207] (the "UST Objection to the KERP").

[191]    Committee Statement on KERP ¶ 3.

[192]    UST Objection to the KERP at 2.

After a hearing on November 1, 2022, the Bankruptcy Court denied, without prejudice, both the KERP Motion and the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1020] (the "KERP Sealing Motion").[193]   In doing so, the Bankruptcy Court found that the "proposed redactions [in the KERP Sealing Motion] essentially prevent anyone who does not see the unredacted motion from having any idea what the Debtors are asking the Court to approve" and that the Debtors "have not provided enough information for the Court to evaluate the relationship between the proposed KERP payments and the results sought to be achieved."[194]   To rectify these issues, the Bankruptcy Court directed the Debtors to "provide a public evidentiary record that establishes that each of the proposed KERP recipients is not an insider, and that each of the proposed recipients, *based on the job responsibilities that each recipient is expected to perform*, is expected to fulfill job responsibilities related to the restructuring process (either in a standalone plan or proposed going concern sale) beyond what they were expected to do before bankruptcy."[195]

On November 22, 2022, the Debtors Filed the *Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1426] (the "Amended KERP Motion") and the *Debtors' Amended Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1425] (the "Amended KERP Sealing Motion").  The U.S. Trustee again objected.[196]   *Pro se* creditor Victor Ubierna de las Heras also Filed an objection, asserting that any employees who withdrew Cryptocurrency from the Celsius platform in late May or early June based on inside information should not be a KERP Participant.[197]

The Debtors agreed to exclude any KERP Participant who withdrew Cryptocurrency from the Celsius platform or transferred Cryptocurrency from another service into the Custody Program within ninety (90) days before the Petition Date pending further analysis.[198]

The Bankruptcy Court granted both the Amended KERP Sealing Motion and the Amended KERP Motion during the hearing on December 5, 2022, explaining that the Bankruptcy Court was "satisfied that the participants are not insiders" and that the Debtors "have provided detailed information about the participants' duties, salary, and position within the reporting structure."[199]   Importantly, the KERP Order

---

[193]   *Order Denying Debtors' KERP Sealing Motion and Denying Without Prejudice Debtors' KERP Motion* [Docket No. 1268] (the "First KERP Order").

[194]   First KERP Order at 1–2.

[195]   First KERP Order at 3 (emphasis original).  The Bankruptcy Court also stated, "For both competitive reasons and physical risks potentially faced by its employees, the Court will permit the Debtors to redact the names of each proposed KERP recipient from the public record…The redacted public record must also include the current salary information in reasonably narrow dollar ranges (but not the exact salary amount for each employee) and the proposed KERP payments (again in reasonably narrow dollar ranges (but not the exact dollar amounts))."  *Id.* at 4.

[196]   *Objection of the United States Trustee to the Amended Motion of Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1551].

[197]   *Victor Ubierna de las Heras Objection to Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1544] ¶ 1.

[198]   *Id.* ¶ 3.

[199]   Dec. 5 Hr'g Tr. 191:16–19.  The Bankruptcy Court read its full opinion from the bench, *see id.* 186–198; *see also Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1683].

prevented the Debtors from making payments to any proposed KERP Participants who withdrew Cryptocurrency from the platform, or transferred Cryptocurrency from another program into the Custody Program within ninety (90) days before the Petition Date, pending further investigation and analysis.[200]

Pursuant to the KERP Order, the Debtors investigated proposed KERP Participants who withdrew Cryptocurrency from the platform, or transferred Cryptocurrency from another program into the Custody Program within ninety (90) days before the Petition Date, including a review of the relevant transaction history and interviews with each of the relevant KERP Participants.[201]  As a result of the investigations, the Debtors decided to reinclude twelve proposed KERP Participants in the KERP, three of whom will be reincluded following the satisfaction of certain conditions, which include, as relevant, returning withdrawn funds to the platform and authorizing the Debtors to reverse transfers made into the Custody Program, as set forth and authorized by the KERP Order.[202]

In addition, on March 29, 2023, the Debtors Filed the *Notice of Addition of New KERP Participants to the Key Employee Retention Plan* [Docket No. 2339], noting that twelve new KERP Participants were added to the KERP in accordance with the procedures established by the KERP Order, that counsel to the Committee and the U.S. Trustee were provided with the requisite notice and information, and that neither objected to the addition of these new KERP Participants.

### G.    Appointment of the Examiner and Cooperation with the Examiner.[203]

On August 18, 2022, United States Trustee Filed the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 546].  On September 14, 2022, the Bankruptcy Court entered an order [Docket No. 820] (the "Examiner Order") directing the appointment of an Examiner (the "Examiner").[204]  On September 29, 2022, the United States Trustee appointed Shoba Pillay, of Jenner & Block LLP, as Examiner [Docket No. 920] and the Bankruptcy Court entered the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923].

---

[200]    KERP Order ¶ 4.  If, following analysis and investigation, the Debtors determine that any excluded KERP Participant did not transact on the basis of inside information, the Debtors may, after providing notice to counsel to the Committee and the U.S. Trustee, propose their re-inclusion in the KERP.  *Id.*  The Debtors may also add a replacement participant(s) to the KERP upon the resignation or the termination for cause of any KERP Participant after providing the requisite notice and information about the replacement participant(s) to the counsel to the Committee and the U.S. Trustee.  *Id.* at ¶ 5.

[201]    *Declaration of Allison Lullo Regarding Investigation into Certain Proposed Participants in the Key Employee Retention Plan* [Docket No. 1892] (the "KERP Investigation Declaration") ¶ 3.

[202]    KERP Investigation Declaration ¶ 4; *see also Notice of Reinclusion of Participants in the Key Employee Retention Program* [Docket No. 1893].  Information about each reincluded KERP Participant's job description, division, supervisor's name and title, the hiring person, cash salary range, and award range was attached to the KERP Investigation Declaration as Exhibit A.

[203]    Capitalized terms used but not defined in this section have the meaning ascribed to such terms in the Interim Examiner Report and the Final Examiner Report.  The following summaries of the Interim Examiner Report and the Final Examiner Report are not intended to replace or fully summarize the content of the Reports.

[204]    Following extensive discussions with the U.S. Trustee and the Committee, the Debtors reached a resolution providing for the appointment of an examiner with a defined scope that would not duplicate the ongoing investigations already being conducted by the Committee and the Debtors' Special Committee, as explained in the *Debtors' Response and Limited Objection to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 757], *The Official Committee of Unsecured Creditors' Limited Objection and Reservation of Rights to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 758], and the *Notice of Filing of Agreed Proposed Order Granting Examiner Motion* [Docket No. 752].

In the Examiner Order, the Bankruptcy Court directed that the scope of the Examiner's investigation include:

- an examination of the Debtors' Cryptocurrency holdings, including a determination as to where the Debtors' Cryptocurrency holdings were stored prepetition, where they were being stored postpetition, and whether different types of accounts are commingled;

- an examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account;"

- an examination of the Debtors' procedures for paying sales taxes, use taxes, and value added taxes and the extent of the Debtors' compliance with any non-bankruptcy laws with respect thereto; and

- an examination of the status of the utility obligations of the Debtors' mining business.[205]

On November 1, 2022, the Bankruptcy Court entered the *Order Approving Examiner's Motion to Confirm Examination Scope or Alternatively for Expansion of the Scope of the Examination* [Docket No. 1260] (the "Examiner Scope Expansion Order"), clarifying that topic (i) of the Examiner's investigation also included "an examination of the Debtors' CEL [T]okens, including why and how other digital assets were converted into CEL [T]okens, and how these tokens were marketed, stored, and traded – including whether any of the Debtors' trading practices involving CEL [T]okens generally or determinations of CEL [T]okens awarded as part of the Earn Rewards program – impacted their value" and that topic (ii) included "an examination of the representations Debtors generally made in public representations to customers to attract them to their platform about their cryptocurrency holdings and account offerings."[206] The scope of the Examiner's investigation was further modified on November 14, 2022, when the Bankruptcy Court entered the *Stipulation and Agreed Order Modifying Scope of Examiner Order* [Docket No. 1343] (the "Examination Scope Modification Order") directing that the Examiner's scope "expand[] to include an investigation and report on whether the Debtors used new deposits being made by customers to make payments or otherwise meet obligations to existing customers at a time when the Debtors had no other sources (whether liquid or which could have been monetized) from which to make such payments or meet such obligations[.]"[207]

Throughout the Examiner's investigation, the Debtors and the Committee cooperated extensively with the Examiner to ensure she had the requisite information to complete her investigation. Over the course of the Examiner's investigation, the Debtors provided the Examiner with approximately 500 gigabytes of data and records, which included 231,000 documents, and made numerous current and former

---

[205]    Examiner Order ¶ 3.

[206]    Examination Scope Expansion Order ¶ 2–3.

[207]    Examination Scope Modification Order ¶ 1.

Celsius employees and customers available for interviews.[208]  On April 4, 2023, following the Examiner's motion requesting discharge,[209] the Bankruptcy Court discharged the Examiner.[210]

### 1. Interim Examiner Report.

The Examiner released the *Interim Report of Shoba Pillay, Examiner* [Docket No. 1411] (the "Interim Examiner Report") on November 19, 2022, and the *Final Report of Shoba Pillay, Examiner* [Docket No. 1956] (the "Final Examiner Report") on January 31, 2023.  The Examiner's overarching finding in the Interim Examiner Report was that the Custody Program was launched as a swift response to regulatory scrutiny and remained a work-in-process after its April 15, 2022 launch date.[211]  The Interim Examiner Report also described that Withhold Accounts were established to help the Company handle digital assets that Celsius could not accept or digital assets that were transferred by non-accredited U.S. Account Holders living in states where Celsius did not have the appropriate licenses to offer Custody Accounts.[212]  These Withhold Assets were not separated from other digital assets but were commingled with other digital assets on the Debtors' platform and deployed like other Celsius assets, including deposits in the Earn Program.[213]

Finally, the Interim Examiner Report detailed the status of Custody Assets, Withhold Assets, and related liabilities in the time immediately before and after the Pause.[214]  Shortly before and after the Pause, the delta between the Custody Program's liabilities to customers and the amount of digital assets in the Custody Wallets shifted significantly.[215]  Thus, the initial surplus of digital assets in Custody Wallets compared to the liabilities owed to Custody users deteriorated approaching the Pause and resulted in a material shortfall.[216]  Celsius also recorded increased Withhold Assets in the same time period.[217]  Shortly after the Pause, Custody and Withhold Account balances increased due to customer transfers, attempted withdrawals from the Earn Program that were halted in the Custody Program, and Celsius' system permitting some transfers from the Earn Program to the Custody Program post-Pause.[218]  Celsius continued to manually reconcile digital assets held in Custody and the Custody Wallets post-Pause, which resulted in a smaller deficit at the Petition Date.[219]

---

[208]    Final Examiner Report at 33–35.

[209]    *Examiner's Motion for Entry of an Order Discharging Examiner* [Docket No. 2284].

[210]    *Order Discharging Examiner* [Docket No. 2364].

[211]    Interim Examiner Report at 27–60.

[212]    *Id.* at 70.

[213]    *Id.* at 70–74.

[214]    *Id.* at 74–81.

[215]    *Id.* at 76–77.

[216]    *Id.* at 77.

[217]    *Id.* at 76.

[218]    *Id.* at 79.

[219]    *Id.* at 79–80.

2.    *Final Examiner Report.*

On January 31, 2023, the Examiner issued the Final Examiner Report.  The Examiner's main finding in the Final Examiner Report was that, pre-petition, Celsius was unable to successfully execute its business plan and therefore engaged in various risky investments in an attempt to grow and maintain its customer base.[220]  In particular, Celsius purchased CEL Token such that the price of CEL Token was artificially inflated and Celsius' balance sheet was correspondingly overstated, the Debtors' former executives benefitted by selling their holdings of CEL Token, and the Debtors sold customer deposits of other digital assets to fund customer rewards in CEL Token.[221]  This, coupled with a lack of sufficient internal controls, resulted in shortfalls of various types of digital assets.[222]  In addition, the Examiner determined that the rewards Celsius paid to customers were not based on Celsius' revenue, but Celsius nonetheless continued this practice to remain competitive in the market.[223]  Attempts to earn the unsustainable yield it paid to customers through strategic investments pushed the Debtors' management towards riskier deployments and investments such as increased unsecured lending.[224]  When it started experiencing significant losses, Celsius began the process of establishing a risk management policy, but was unable to fully do so before Filing for chapter 11.[225]  Further, customers were not aware of the challenges Celsius faced because of misstatements made by Mr. Mashinsky and other of Celsius' former executives regarding the state of the business and the level of risk of Celsius' investments.[226]

The Examiner also determined that Celsius did not have adequate procedures for ensuring appropriate tax was paid to various taxing authorities, particularly with respect to Celsius Mining and CNL.[227]  As a result, Celsius Mining likely has pre- and postpetition use tax liability and CNL may owe value-added taxes, although the Examiner noted that the Debtors' current tax professionals are attempting to resolve these outstanding issues.[228]  With respect to the mining business generally, the Examiner also reviewed the business' utility obligations and found that they are satisfied with two exceptions:  (i) one relating to an ongoing dispute with Core Scientific (as defined herein) as to the amount of the claims; and (ii) one relating to prepetition amounts that may nevertheless be satisfied by prepayment balances.[229]

Finally, the Examiner recounted the market collapse that exacerbated Celsius' existing problems and forced the Company to institute the Pause and then to File for chapter 11 protection.[230]  During this time of extreme industry volatility, Celsius faced increasing customer withdrawals that it ultimately could not

---

[220]    Final Examiner Report at 3.

[221]    *Id.* at 6–10.

[222]    *Id.* at 10–11.

[223]    *Id.* at 14.

[224]    *Id.* at 15–16.

[225]    *Id.* at 19.

[226]    *Id.* at 20–21.

[227]    *Id.* at 30–31.

[228]    *Id.* at 31–32, 33.

[229]    *Id.* at 377–78, 402.

[230]    *Id.* at 22–26.

satisfy, despite contrary public statements made to the community.[231]  In reviewing how Celsius satisfied withdrawal requests during this industry crisis, the Examiner determined that Celsius largely satisfied withdrawal requests from the commingled pool of assets already under management, although the Examiner identified two instances in which the commingled assets in the pool that funded withdrawals of a certain coin type consisted of new customer deposits of that coin type.[232]

The Final Examiner Report explained that Celsius' customer facing advertisements, messaging, and other representations masked how Celsius actually operated its businesses and subsequent missteps to curb the damage caused by poor investment decisions and other losses.[233]  Celsius' artificial manipulation of CEL Token, inability to manage risk or deploy investments appropriately, and personnel deficiencies within many segments of the Company created an unsustainable business model kept afloat by misleading customers about the health of the business.[234]  Industry headwinds led to a "run on the bank," exposing these internal fractures and compelling the Debtors to File for chapter 11 protection.[235]

### H.    Bar Date Motion.

On October 11, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [Docket No. 1019] (the "Bar Date Motion") seeking approval of an order (a) setting bar dates for creditors to submit proofs of Claims (the "Bar Dates, and "Proofs of Claim," respectively), (b) approving the procedures and proposed form for submitting Proofs of Claim, (c) approving the form and manner of service of the notice of the Bar Dates, including the form of publication notice and (d) granting related relief.  On November 16, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion, as amended by a revised proposed bar date order [Docket No. 1368] (the "Bar Date Order").

The Bar Date Order established the following dates and deadlines with respect to the Debtors: (a) January 3, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all persons and entities were required to submit Proofs of Claim based on prepetition Claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code (the "General Claims Bar Date"); (b) January 10, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all Governmental Units were required to file Proofs of Claim (the "Governmental Bar Date"); (c) solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, establishing the later of (i) the General Claims Bar Date and (ii) any date the Bankruptcy Court may fix in the applicable order authorizing such rejection and, if no such date is provided, thirty days from the date of entry of such order; and (d) in the event the Debtors amend or supplement their Schedules, supplemental bar dates (any such date, a "Supplemental Bar Date") which shall afford parties at least thirty-five days from the date on which such notice is given to submit a Proof of Claim.[236]

---

[231]    *Id.* at 25–26.

[232]    *Id.* at 29, 350–54.

[233]    *Id.* at 3–22.

[234]    *Id.* at 3–22, 30–33.

[235]    *Id.* at 22–26.

[236]    *Bar Date Order* ¶¶ 2–4.

Pursuant to the Bar Date Order, any party required to file a Proof of Claim under the Bar Date Order that failed to do so before the applicable Bar Date is forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors are forever discharged from any indebtedness or liability relating to such claim. *Such party will not be permitted to vote or accept or reject the Plan or receive any recovery under the Plan.*[237]

On January 10, 2023, the Bankruptcy Court entered an order extending the deadlines for submitting Proofs of Claim as to the Initial Debtors [Docket No. 1846] to February 9, 2023, at 5:00 p.m., prevailing Eastern Time.

On March 14, 2023, the Debtors established Supplemental Bar Dates for GK8.[238]  The Debtors established (a) April 18, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all persons and entities are required to file Proofs of Claim against GK8, and (b) June 5, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all governmental units are required to file Proofs of Claim against GK8.[239]

On October 14, 2022, the Debtors Filed the *Notice of Presentment and Opportunity for Hearing on Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Extend the Deadline for Filing a Nondischargeability Complaint* [Docket No. 1066], thereby agreeing to extend the Governmental Bar Date for the Federal Trade Commission (the "FTC") to March 31, 2023.[240]  The Debtors Filed two more stipulations further agreeing to extend the Governmental Bar Date for the FTC [Docket Nos. 2354, 2705, and 2976]; the Governmental Bar Date for the FTC is now August 14, 2023. Similarly, on December 23, 2022, the Debtors Filed the *Notice of Presentment and Opportunity for Hearing on Joint Stipulation and Agreed Order Extending the Bar Date for the Securities and Exchange Commission and the Debtors to Extend the Filing Deadline for Filing a Nondischargeability Complaint* [Docket No. 1095] thereby agreeing to extend the Governmental Bar Date for the SEC to March 31, 2023.[241] Pursuant to additional stipulations, the Governmental Bar Date for the SEC has been extended to August 14, 2023 [Docket Nos. 2346, 2710, and 3014].

The Debtors also extended the General Claims Bar Date following the Bankruptcy Court's resolution of the question of whether the General Terms of Use limit customer Claims to Network LLC only, and not any other Debtor or non-Debtor affiliate (as described in Article VII.L.3 of this Disclosure Statement).[242]  Accordingly, the Debtors established a Supplemental Bar Date requiring that any claims arising from the amendment of the Schedules and Statements be filed by April 28, 2023.[243]  The Debtors

---

[237]    *Id.* ¶ 6.

[238]    *Notice of Deadline Requiring Submission of Proofs of Claim Against the Gk8 Debtors on or Before April 18, 2023, and Related Procedures for Submitting Proofs of Claim in the Chapter 11 Cases of the GK8 Debtors* [Docket No. 2231].

[239]    *Id.*

[240]    The Bankruptcy Court entered the order on November 7, 2022 [Docket No. 1296].

[241]    The Bankruptcy Court entered the order on January 13, 2023 [Docket No. 1858].

[242]    Customer Claims Ruling at 28.

[243]    *Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

also informed Account Holders that they must file an additional Proof of Claim in the event that they wished to assert a non-contractual claim against an entity besides Celsius Network LLC.[244]

On April 18, 2023, however, the Bankruptcy Court approved the Committee's motion requesting authority to File a class action proof of claim or other representative action against CNL and other Debtor entities for non-contract claims—such as claims for alleged fraud, negligent misrepresentation, or other statutory or common law claims—on behalf of all account holders [Docket No. 2496]. That order provided that the Supplemental Bar Date would be stayed until the Court ruled on the certification of the putative class.[245]

On July 20, 2023, following mediation (and as discussed in further detail in Article III.MMM and Article VII.K.4 of this Disclosure Statement), the Debtors reached a settlement with the Committee, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and certain individual creditors regarding, among other issues, the certification of the putative class, and Filed a motion requesting that the Bankruptcy Court approve the Class Claim Settlement (as defined herein). Pursuant to the Class Claim Settlement, the Debtors agree to certification of the putative class, as requested by the Committee.

Thereafter, the Debtors and the Committee Filed, and the Bankruptcy Court approved and entered, the July Bar Date Stipulation, which establishes August 2, 2023, at 5:00 p.m., prevailing Eastern time, as the final deadline for submitting Proofs of Claim (the "Bar Date").

In light of the number of Proofs of Claim filed, on February 1, 2023, the Debtors Filed the *Debtors' Motion for an Order (I) Approving (A) Omnibus Claims Objection Procedures and Form of Notice, (B) Omnibus Substantive Claims Objections, and (C) Satisfaction Procedures and Form of Notice and (II) Modifying Bankruptcy Rule 3007(e)(6)* [Docket No. 1972] (the "Omnibus Claims Objection Motion"). Therein, the Debtors sought approval of procedures and form of notice to expedite and complete the Claims reconciliation process in a timely, efficient, and cost-effective manner. On February 16, 2023, the Bankruptcy Court granted the relief requested in the Omnibus Claims Objection Motion [Docket No. 2090].

The Debtors received 24,859 Proofs of Claim, totaling approximately $78.2 billion, timely filed by the General Claims Bar Date. In addition, the Debtors received 81 Proofs of Claim by Governmental Units totaling approximately $7.2 billion timely filed by the Governmental Bar Date. Additional Proofs of Claim were Filed until the Bar Date and, as of June 27, 2023, the Debtors received an additional 4,992 Proofs of Claim, totaling approximately $53 million. The Debtors received one Proof of Claim by a Governmental Unit totaling approximately $22,000.

## I.    The Request for Appointment of an Equity Committee.

On September 22, 2022, the Series B Holders Filed the *Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 880] (the "Equity Committee Motion") requesting that the Bankruptcy Court appoint an Equity Committee.[246] The Series B

---

[244]    *Id.*

[245]    *Order Granting the Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert Non-Contract Claims on Behalf of Account Holders* [Docket No. 2496].

[246]    Previously, on July 19, July 22, and July 28, 2022, counsel for the Series B Holders sent a letter to the U.S. Trustee requesting the appointment of an official committee of the holders of CNL's preferred equity securities (an "Equity Committee"). The Committee responded to the Series B Holders' letters on August 10, 2022. The Debtors also responded to the Series B Holders on the same day, and the Series B Holders replied to the Debtors' response on August 15, 2022. Upon reviewing

Holders argued that an Equity Committee was warranted given the number of unresolved key legal issues which could impact the recoveries of the preferred equity holders (the "Preferred Equity Holders") of CNL, and the divergent interests of the Preferred Equity Holders, on the one hand, and the Committee and Debtors, on the other hand.[247] A joinder to the Equity Committee Motion was Filed by Andersen Invest Luxembourg S.A. SPF, an 0.05% equity holder in CNL (together with the Series B Holders, the "Requesting Equity Holders").[248]

On October 13, 2022, the Debtors Filed an objection to the Equity Committee Motion.[249] Therein, the Debtors argued that the Requesting Equity Holders failed to satisfy their high burden of showing that an Equity Committee is necessary—with two key considerations being (a) whether equity holders are unable to represent themselves, and (b) whether there is a substantial likelihood that the equity holders would receive a meaningful distribution under a strict application of the absolute priority rule.[250] The Committee also Filed an objection to the Equity Committee Motion.[251]

On October 24, 2022, the Bankruptcy Court issued the *Memorandum Opinion and Order Denying Motion for the Appointment of an Official Preferred Equity Committee* [Docket No. 1166] (the "Equity Committee Memorandum Opinion") denying, without prejudice, the relief requested in the Equity Committee Motion for three primary reasons: (a) the equity holders were adequately represented and were not found to need additional representation; (b) the Series B Holders did not meet their burden of demonstrating a substantial likelihood of equity recovery; and (c) "other factors such as the balance of costs and benefits to the estate" did not weigh in favor of appointment.[252]

On May 17, 2023, the Series B Holders sent a letter to the U.S. Trustee to renew their request for the appointment of an Equity Committee (the "Equity Committee Letter"). The Equity Committee Letter sets forth a number of reasons why a renewed request and the appointment of an Equity Committee is appropriate, including: (a) the Customer Claims Order's impact on Account Holder Claims against CNL, (b) the Series B Holders' belief that the Debtors will not zealously defend CNL against the Committee's Class Claim against CNL, (c) the Debtors' stipulation with the Committee granting the Committee authority to prosecute fraudulent transfer claims on behalf of Network LLC against CNL, (d) the Committee joining the Debtors in seeking substantive consolidation of Network LLC and CNL, and (e) the fact that the Plan

---

these communications, the U.S. Trustee—which has the discretion to appoint an Equity Committee—did not make a determination on whether an Equity Committee should be appointed in these Chapter 11 Cases.

[247]    Equity Committee Motion ¶ 1.

[248]    *Joinder of Andersen Invest Luxembourg SA SPF to the Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 924].

[249]    *Debtors' Objection to Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 1045] (the "Objection to the Equity Committee Motion").

[250]    *Id.* ¶¶ 16–18.

[251]    *The Official Committee of Unsecured Creditors' Objection to the Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 1048] (the "Committee Objection to the Equity Committee Motion"). The Committee Objection to the Equity Committee Motion made arguments similar to those in the Debtors' Objection to the Equity Committee Motion and highlighted the various constituencies which represented the interests of the equity holders. *See generally id.* The Committee Objection to the Equity Committee also disputed the notion that customers' and equity holders' interests were "uniquely adverse." *Id.* ¶ 22.

[252]    Equity Committee Memorandum Opinion at 9.

provides no recovery to Preferred Equity Holders.[253]  The Series B Holders assert that an Equity Committee is appropriate because the Preferred Equity Holders lack meaningful representation and because CNL is not hopelessly insolvent.[254]

As of the date of the Filing of this Disclosure Statement, the Series B Settlement Order was entered, mooting the need for an Equity Committee.

**J.    The Special Committee Investigation.**

*1.    General Scope and Mandate.*

As noted elsewhere in this Disclosure Statement, as part of its work, the Special Committee is vested with the authority to, among other things:  (i) review and, if appropriate, investigate credible allegations of misconduct by the Company or its current or former employees, officers, or directors, including working with independent counsel as appropriate to assist in any such investigation, (ii) consider, authorize, and implement any recommendations, remediation, or disciplinary action in connection with any such investigation, and (iii) communicate with regulators and third parties as necessary in connection with any such investigation.  The Special Committee retained Kirkland & Ellis LLP ("Special Committee Counsel") to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, Special Committee Counsel has sought and received information related to, among other things:  (i) Company policies and internal controls; (ii) public statements related to the Company, including on social media and Ask Mashinsky Anything sessions; and (iii) CEL Token purchases and sales, including by executives and the Company.  Among other things, Celsius provided access to email, Slack communications, Google Drive documents, and, in certain cases, mobile phone messaging data, from numerous Company employees.  In addition to reviewing documents and information related to the aforementioned topics, Special Committee Counsel interviewed Celsius employees and attended interviews of Celsius employees conducted by the Examiner and the Committee.

The Special Committee, through Special Committee Counsel, has also interfaced with various regulators, including the USAO, SEC, CFTC, FTC, and various state regulators.  As a result, on July 13, 2023, the Debtors announced that they had reached settlements and/or a non-prosecution agreement with these federal regulatory agencies, as described in further detail below.  At the same time, these federal agencies announced indictments or filed charges against one or a combination of Mr. Mashinsky, Mr. Leon, Mr. Goldstein, and Mr. Cohen-Pavon.

Since the Filing of the revised Disclosure Statement on July 29, 2023, the Debtors have also been engaging with state regulators regarding a potential settlement of their Claims against the Debtors, as explained below.

(a)    The Debtors' Non-Prosecution Agreement with the USAO.

(i)    **The indictment of Mr. Mashinsky and Mr. Cohen-Pavon.**

On July 13, 2023, the USAO unsealed an indictment against Mr. Mashinsky and Mr. Cohen-Pavon and announced that it had entered into the NPA with the Debtors.  The USAO's indictment charges Mr. Mashinsky with securities fraud, commodities fraud, and wire fraud, asserting that Mr. Mashinsky

---

[253]    Equity Committee Letter at 2–3.

[254]    *Id.* at 3–4.

defrauded and misled customers with respect to Celsius' profitability and how it invested the Cryptocurrency customers transferred to Celsius. The indictment further charges Mr. Mashinsky and Mr. Cohen-Pavon with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token. Specifically, the USAO asserts that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices.

The indictment alleges that two schemes were orchestrated. In the first, Mr. Mashinsky falsely represented Celsius as a profitable company and safe financial investment. Specifically, the indictment alleges that Mr. Mashinsky misrepresented the nature of Celsius' profitability, its yield-generating activities, the long-term sustainability of high rewards rates offered to customers, the risks associated with using Celsius, the percentage of revenue Celsius returned to customers in the form of rewards, the collateralization of the Company's loans, institutional counterparty defaults, and Celsius' regulatory compliance.[255] The indictment further alleges that Mr. Mashinsky made false statements during the AMAs that he regularly hosted, and that these AMAs had to be edited by other employees after the fact, although no correction was issued in relation to any AMA. In reality, Mr. Mashinsky openly discussed Celsius' lack of profitability with other Company executives internally,[256] Celsius paid out more in rewards than it earned,[257] Celsius suffered large and undisclosed losses, including a shortfall of hundreds of millions of dollars' worth of BTC,[258] and though Mr. Mashinsky claimed that the Company's loans were fully or partially collateralized, uncollateralized loans actually made up a substantial and growing percentage of Celsius' institutional loan portfolio.[259]

In the second scheme, the indictment alleges that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token, causing the public to purchase CEL Token at inflated prices and then selling their own holdings of CEL Tokens at those prices for profit, and that Mr. Mashinsky made additional false statements with respect to this scheme. For instance, the indictment alleges, Mr. Mashinsky repeatedly stated publicly that Celsius had sold all of its CEL Token in its ICO and thereby raised a total of $50 million, when it had in fact only sold one-third of all available CEL Token and raised $32 million.[260] After the ICO, Mr. Mashinsky and Mr. Cohen-Pavon caused Celsius to purchase CEL Token, including by using customer deposits, which led to an increase in the price of CEL Token, at which point they sold their personal holdings of the token.[261] The indictment alleges that Mr. Mashinsky netted approximately $42 million and Mr. Cohen-Pavon approximately $3.6 million from the sale of their CEL Tokens.[262]

---

[255]    United States of America v. Alexander Mashinsky, et al., ¶ 15, 23 Cr. (S.D.N.Y. July 13, 2023).

[256]    *Id.* ¶ 25.

[257]    *Id.* ¶ 26.

[258]    *Id.* ¶ 30.

[259]    *Id.* ¶¶ 35–36.

[260]    *Id.* ¶ 5.

[261]    *Id.* ¶ 6.

[262]    *Id.* ¶ 8.

(ii)    **The NPA.**

On July 11, 2023, the Debtors entered into the NPA with the USAO.  Pursuant to the NPA, which only binds the USAO and no other federal, state, or local prosecuting or regulatory authority, the USAO will not criminally prosecute the Debtors for their involvement in the above schemes.  Specifically, the Debtors will not be criminally prosecuted with respect to the first scheme to defraud and mislead customers about Celsius' yield-generating activities and the degree of risk to which customers' transferred cryptocurrency was exposed as a result, and the Debtors will not be criminally prosecuted with respect to the second scheme to manipulate the price and volume of CEL Tokens.

*Acceptance of Responsibility*.    The Debtors accept and acknowledge as true, and the NPA incorporates, a statement of facts describing the two schemes discussed above and Mr. Mashinsky's and Celsius' role therein (the "Statement of Facts").  The Statement of Facts describes the Debtors' background, history, prepetition operations, and the services they offered.  The Statement of Facts further states that the two schemes discussed above were carried out under the supervision and at the direction of Mr. Mashinsky starting in or about 2018 up to and including in or about May 2022.  The Statement of Facts describes Mr. Mashinsky's conduct, stating that he made false and misleading statements about core aspects of Celsius' business in order to convince customers to transfer to or continue to hold Cryptocurrency on Celsius' platform.  The Statement of Facts further describes Mr. Mashinsky's and other executives' statements regarding Celsius and CEL Token in the media, on social media, and via the AMAs.  The Statement of Facts details how, beginning in 2020, Celsius employees repeatedly raised concerns about Mr. Mashinsky's statements on AMAs and that Mr. Mashinsky's misrepresentations on the AMAs were edited after the fact before the AMAs were posted online, but that no corrections were ever issued to the public.  Further, Mr. Mashinsky also made such misrepresentations in video and print publications, and no corrections of such misrepresentations were ever issued.  The Statement of Facts details Mr. Mashinsky's and Celsius' misrepresentations about how many CEL Tokens were sold in the ICO and how much money was really raised from the ICO, and explains how Mr. Mashinsky portrayed the CEL Token as an indicator of Celsius' success and profitability more broadly.  Despite Mr. Mashinsky's public statements, the Statement of Facts explains, Celsius earned a profit in only a few months, and experienced significant losses that were not shared publicly.  Celsius' financial situation was precarious in 2022 in the months leading up to the Pause.

*Continuing Obligation to Cooperate*.    The NPA provides that Celsius has a continuing obligation to cooperate with the USAO in any and all matters relating to the events described in the NPA and its Statement of Facts until all investigations and prosecutions arising out of these events are concluded.  The NPA also requires Celsius to cooperate fully with other United States law enforcement, regulatory authorities, and regulatory agencies with respect to the events described in the NPA and its Statement of Facts and any other conduct being investigated by the USAO.

*Restitution and Remedial Obligations*.    The NPA makes clear that the USAO will not impose a fine or seek a forfeiture of Celsius' assets because of the Debtors' efforts in their Chapter 11 Cases to maximize recoveries for customers.

*Additional Obligations*.    The NPA provides that the Debtors will be criminally prosecuted if they commit any crimes after entering into the NPA, if it is determined that the Debtors have given false, incomplete, or misleading testimony or information, or if they violate any part of the NPA.  If the Debtors are found to have done any of these things, all statements made by the Debtors to the USAO, the SEC, the CFTC, or other law enforcement, and any testimony given by any then current officer, agent, or employee of Celsius before a grand jury or other tribunal, before or after the signing of the NPA, and any leads procured from such statements, will be admissible as evidence in any criminal proceeding brought against Celsius.  Further, Celsius will not be able to assert that any such statements or leads generated by such statements should be suppressed according to Rule 410 of the Federal Rules of Evidence or any other such federal rule.

178

The NPA tolls the statute of limitations for any prosecution that is not already time-barred by July 11, 2023, and the Debtors waive all defenses based on the statute of limitations by entering into the NPA.

Finally, any successor entity must formally adopt and execute the NPA in order to receive its protections, no matter if the successor's interest arises through a merger or plan of organization. Similarly, any purchasers of all or substantially all of the Debtors' assets must enter into a written agreement and agree to a continuing obligation to cooperate in order to receive the protections of the NPA.

(b)    Settlements with Regulatory Agencies.

(i)    **The SEC Settlement.**

In addition to the criminal indictment by the USAO, several regulatory agencies filed civil complaints against one or a combination of Mr. Mashinsky, Mr. Leon, and Mr. Goldstein. The Debtors consensually resolved all such actions against the Debtors as corporate defendants.

On July 13, 2023, the SEC filed a complaint in the United States District Court for the Southern District of New York (the "District Court") against CNL and Mr. Mashinsky (the "SEC Complaint").[263] The SEC alleges that CNL and Mr. Mashinsky committed fraud and violated federal securities law by failing to register the Earn Program as a securities offering, making false and misleading statements about the Earn Program and the CEL Token, and engaging in market manipulation of the CEL Token.

Specifically, the SEC alleges that the CEL Token constituted a crypto asset security, and that the Earn Program also constituted a securities offering.[264] Further, it asserts that Celsius marketed and sold the Earn Program without filing a registration statement, even though no exemption from registration was available under the law.[265] The SEC also alleges that CNL and Mr. Mashinsky manipulated the market for the CEL Token by secretly repurchasing CEL Token in an effort to inflate the token's price at the expense of customers and to enrich CNL and Mr. Mashinsky.[266] Finally, the SEC alleges that CNL and Mr. Mashinsky perpetuated the fraudulent scheme to induce investors to purchase CEL Token and invest in the Earn Program through false and misleading statements about CNL's business model, the risks involved, the safety of customer assets and CNL's compliance with laws and regulations, the success of the ICO, the size of the Company's customer base, and the Company's profitability.[267]

Such conduct, the SEC alleges, violated Sections 5(a), 5(c), and 17(a) of the Securities Act; Sections 9(a)(2) and 10(b) of the Exchange Act; and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act.[268] Sections 5(a) and 5(c) of the Securities Act require issuers of securities to file a registration statement with the SEC that provides investors information about the securities offering, the issuer, and the risks involved in the offering. Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and

---

[263]    *See generally* Complaint, *SEC v. Celsius Network Limited*, 1:23-cv-6005 (PC) (S.D.N.Y., July 13, 2023) [SEC Docket No. 1].

[264]    SEC Complaint ¶ 3.

[265]    SEC Complaint ¶¶ 1, 3, Section I.B.

[266]    SEC Complaint ¶10, Section IV; *see also* Press Release, SEC, SEC Charges Celsius Network Limited and Founder Alex Mashinsky with Fraud and Unregistered Offer and Sale of Securities (July 13, 2023), https://www.sec.gov/news/press-release/2023-133 (the "SEC Press Release").

[267]    SEC Complaint ¶¶ 3–9, Section III; SEC Press Release.

[268]    SEC Complaint ¶ 14; SEC Press Release.

Rule 10b-5 thereunder provide for liability for the fraudulent sale of securities.  The SEC Complaint charges Mr. Mashinsky and CNL with four counts of fraud and one count of making unregistered offers and sales of securities.  The SEC Complaint requests that:

- the District Court find that Mr. Mashinsky and CNL committed the violations alleged in the SEC Complaint;

- Mr. Mashinsky and CNL be permanently prohibited from engaging in any further conduct that violates the Securities Act and the Exchange Act;

- Mr. Mashinsky be prohibited from ever again serving as an officer or director of any issuer of securities registered under the Exchange Act;

- Mr. Mashinsky be permanently prohibited from participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset securities, or engaging in activities for the purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by others; and

- Mr. Mashinsky be ordered to give up any profit gained from the conduct alleged by the SEC, pay prejudgment interest, and pay civil penalties.

Following a consensual resolution between the SEC and the Debtors, the SEC filed the *Plaintiff's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited*, requesting entry of a final judgment (the "SEC Final Judgment") that enjoins CNL from violating Sections 5 and 17(a) of the Securities Act and Sections 9(a) and 10(b) of the Exchange Act, namely from unlawfully selling securities as well as committing fraud and making false statements in connection with the sale of securities.[269] Pursuant to the settlement, however, the Debtors will not be required to pay a fine  or penalty, which will allow the Debtors to provide as large a recovery as possible to their creditors.  The SEC will continue pursuing its claims against Mr. Mashinsky.

(ii)    **The CFTC Settlement.**

On July 13, 2023, the CFTC filed a complaint in the District Court against Network LLC and Mr. Mashinsky in connection with Celsius' prepetition activities (the "CFTC Complaint" and "CFTC Defendants," respectively).[270]  The CFTC alleges, among other things, that Network LLC's prepetition activities violated the Commodity Exchange Act and the regulations promulgated thereunder (the "CFTC Regulations").[271]

Specifically, the CFTC alleges that the CFTC Defendants made false and misleading statements to "induce customers to deposit and not withdraw their digital asset commodities from the Celsius platform" and that Network LLC operated as an unregistered commodity pool operator in violation of the Commodity

---

[269]    *See Plaintiff's Motion for Entry of a Final Judgment Against Defendant Celsius Network Limited*, *SEC v. Celsius Network Limited*, 1:23-cv-6005 (PC) (July 13. 2023) [SEC Docket No. 6], ¶¶ 2-4; *Notice of Press Release* [Docket No. 3016].

[270]    *CFTC v. Celsius Network, LLC*, 1:23-cv-6008 (S.D.N.Y. July 13, 2023) [Docket No. 1] (the "CFTC Docket").

[271]    CFTC Complaint ¶ 12.  The CFTC Complaint alleges that Network LLC violated Sections 4k(2), 4m(l), 4o(1)(A)-(B) and 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6(k)(2), 6(m)(1), 6o(1)(A)-(B), and 9(1), and CFTC Regulations 4.21(a)(1) and 180.1(a)(1)-(3). 17 C.F.R. § § 4.21(a)(1), 180.1(a)(1)-(3).  *Id.*

Exchange Act.[272]  As described in the CFTC Complaint, the CFTC seeks injunctive and equitable relief as well as civil monetary penalties.

Substantially contemporaneously with the filing of the CFTC Complaint, the CFTC and Network LLC filed a proposed consent order of permanent injunction against Network LLC that represents a full and final settlement of any alleged violations by Network LLC under the Commodities Exchange Act or the CFTC Regulations without Network LLC admitting or denying the allegations raised in the CFTC Complaint.[273]

The District Court entered the *Consent Order of Permanent Injunction Against Defendant Celsius Network LLC* [CFTC Docket No. 11] (the "CFTC Consent Order") on July 17, 2023.  Pursuant to the CFTC Consent Order, Network LLC is permanently restrained, enjoined, and prohibited from directly or indirectly engaging in conduct that violates Sections 4k(2), 4m(1), 4o(1)(A)-(B), and 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and the CFTC Regulations.  Network LLC has also agreed to cooperate with the CFTC in the proceeding and any investigation, litigation, or proceeding relating to the CFTC Complaint.[274]  Mr. Mashinsky was not a party to the CFTC Consent Order, and the CFTC's action against him continues.  As with the NPA and the settlements with the SEC and FTC, the CFTC Consent Order resolves all claims against the Debtors without the imposition of any fine or seizure of assets so that the Debtors can maximize creditor returns.

### (iii)    The FTC Settlement.

On July 13, 2023, the FTC[275] filed a complaint in the District Court against Debtors Network LLC, Networks Lending LLC, Lending LLC, Celsius Mining, Celsius Network Inc., Celsius KeyFi LLC, and Celsius US Holding LLC (collectively the "FTC Debtor Defendants"), non-Debtors Celsius US LLC and Celsius Management Corp. (the "FTC Non-Debtor Defendants," and together with the FTC Debtor Defendants, the "FTC Corporate Defendants"), and Mr. Mashinsky, Mr. Leon, and Mr. Goldstein (together with the FTC Corporate Defendants, the "FTC Defendants"), seeking a permanent injunction, monetary relief, and other relief pursuant to the Federal Trade Commission Act, 15 U.S.C. §§ 53(b), 57b and the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6821 *et seq.*[276]

Specifically, the FTC Complaint alleges that the FTC Defendants (i) violated the Federal Trade Commission Act by making false or misleading representations in connection with the marketing of Celsius' products and services and misappropriating consumers' Cryptocurrency deposits, and (ii) violated

---

[272]    CFTC Complaint ¶¶ 3, 11.

[273]    *Consent Order of Permanent Injunction Against Defendant Celsius Network LLC* [CFTC Docket No. 5] ¶ 12.

[274]    CFTC Consent Order at 5.

[275]    Prior to July 13, 2023, the Debtors and the FTC had entered into, and the Bankruptcy Court approved, four stipulations to extend the deadline for the FTC to file a nondischargeability complaint, through and including August 14, 2023 [Docket Nos. 1296, 2485, 2705, 2976].

[276]    *Federal Trade Commission v. Celsius Network Inc. et al*, Case No. 1:23-cv-06009-DLC (S.D.N.Y July 13, 2023) (the "FTC Docket").  *See Complaint for Permanent Injunction, Monetary Relief, and Other Relief* [FTC Docket No. 1] (the "FTC Complaint").

the Gramm-Leach-Bliley Act by using false or fraudulent statements to obtain or attempt to obtain certain financial information of customers such as bank account numbers and Cryptocurrency wallet addresses.[277]

Simultaneously with the filing of the FTC Complaint, the FTC and the FTC Corporate Defendants filed a joint motion in the District Court representing that the parties had reached a settlement resolving the FTC Complaint with respect to the FTC Corporate Defendants and requesting that the District Court stay the FTC Complaint as to the FTC Corporate Defendants until the earlier of (i) 45 days from July 13, 2023 (*i.e.*, until August 28, 2023) or (ii) the Bankruptcy Court's approval of the stipulated order reflecting the settlement.[278]  If the Bankruptcy Court approves the FTC Stipulated Order, the FTC and FTC Corporate Defendants will also file a motion in the District Court for approval thereof.

The FTC Stipulated Order, attached as <u>Exhibit A</u> to the FTC Stay Motion, provides for the following.  First, the FTC Corporate Defendants are permanently prohibited from engaging in certain activities.  Specifically, they are restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing, of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary.  The FTC Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the Stipulated Order, are also permanently restrained and enjoined from, directly or indirectly and in connection with promoting or offering for sale any product or service, (i) making misrepresentations about the benefits of or material facts about the FTC Defendants' products and services, (ii) obtaining or attempting to obtain customer financial information by false, fictitious, or fraudulent representations, (iii) violating the Gramm-Leach-Bliley Act, and (iv) disclosing Nonpublic Personal Information[279] about a consumer without the consumer's Express Informed Consent.[280]

Second, the FTC Stipulated Order provides that judgment in the amount of $4.72 billion (the "<u>FTC Judgment</u>") is entered in favor of the FTC against FTC Corporate Defendants.  The FTC Stipulated Order provides, however, that the FTC Judgment is suspended as to the FTC Non-Debtor Defendants if certain reports and statements provided by the FTC Non-Debtor Defendants to the FTC are truthful, accurate, and complete and with regard to the FTC Debtor Defendants, the FTC Judgment is suspended so long as these Chapter 11 Cases are not closed, dismissed, or otherwise concluded without the Debtors' Estates being fully administered, including any distributions to creditors, in accordance with the Bankruptcy Code, as

---

[277]   FTC Complaint at ¶¶ 95–113.

[278]   *See generally Joint Motion for Stay as to Corporate Defendants* [FTC Docket No. 3] (the "<u>FTC Stay Motion</u>"), and the *Stipulated Order for Permanent Injunction, Monetary Judgment and Other Relief Against Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, and Celsius Management Corp* (the "<u>FTC Stipulated Order</u>").

[279]   "<u>Nonpublic Personal Information</u>" means "[a]ny information that Defendants obtain about a consumer in connection with providing a product or service to that consumer," or "[a]ny list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Nonpublic Personal Information that is not publicly available."  FTC Stipulated Order at 5.

[280]   "<u>Expressed Informed Consent</u>" means "an affirmative act communicating unambiguous assent made after receiving and in close proximity to a Clear and Conspicuous disclosure of all information material to the provision of consent."  Assent obtained through any practice or user interface that has the effect of subverting or impairing consumer autonomy, decision-making, or choice, including using text that is not easily legible or disclosing material terms behind a hyperlink, dropdown icon, tooltip, or other similar interface, does not constitute Express Informed Consent.  Acceptance of a general or broad terms of use or similar document that contains descriptions of agreement by the individual along with other, unrelated information, does not constitute Express Informed Consent.  "<u>Clear and Conscious</u>" has the meaning ascribed to it in the FTC Stipulated Order.

more fully set forth in the FTC Stipulated Order.[281]  In other words, the Debtors do not actually have to pay the FTC Judgment as long as they abide by the terms of the FTC Stipulated Order.

Third, the FTC Stipulated Order provides that the FTC Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the FTC Stipulated Order, are required to comply with certain obligations with respect to (i) customer information, (ii) cooperation with the FTC, (iii) acknowledgement of the FTC Stipulated Order, (iv) compliance reporting, (v) recordkeeping, and (vi) compliance monitoring, as more fully set forth in the FTC Stipulated Order.[282]

Importantly, the FTC Stipulated Order does ***not*** (i) restrain or enjoin the deposit, exchange, distribution, investment, or withdrawal of assets owned or held by the FTC Debtor Defendants and being administered in accordance with the Bankruptcy Code and orders of the Bankruptcy Court, (ii) create a contingent liability against the FTC Debtor Defendants, or (iii) preclude the full distribution of assets held by the FTC Debtor Defendants in these chapter 11 cases.[283]  In other words, as with the NPA and the settlements with the SEC and CFTC, the settlement with the FTC does not prevent the Debtors from returning as many assets as possible to creditors, because the FTC Judgment is suspended.

The Debtors, in the sound exercise of their business judgment, determined that the consensual resolution of the FTC Complaint with respect to the FTC Debtor Defendants via the FTC Stipulated Order reduces ongoing litigation and regulatory uncertainties, maximizes returns for all creditors, and is in the best interest of their Estates.

On July 26, 2023, the Debtors Filed the *Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Enter into Stipulated Order in the District Court* [Docket No. 3095], requesting the Bankruptcy Court's authorization for the Debtors to enter into the FTC Stipulated Order and take all necessary action to implement the settlement with the FTC.  On August 2, 2023, the Committee Filed a limited objection [Docket No. 3136], seeking to clarify that the FTC Judgment will not attach to the assets transferred to NewCo, and that the Debtors will not be required to reserve any funds for paying the FTC Judgement after the Effective Date.

(c)    The Proposed Settlement with State Regulators.

Pursuant to the Debtors' consent orders with the SEC, CFTC, and FTC consensually resolving the agencies' civil claims against them, the Debtors are not required to pay a fine, penalty, or judgment, and the government will not seize any of their assets.  Further, the federal agencies agreed to either have no Claim against the Debtors or to have their Claims against the Debtors subordinated to the Claims of Account Holders.  The Debtors' consensual resolutions with the federal agencies ensure that the Debtors will be able to distribute Estate assets to, and maximize the recoveries of, Account Holders.  The settlements also reduce the cost of ongoing litigation and regulatory uncertainties.

In addition to the Claims asserted by the federal agencies, several states Filed Claims against the Debtors totaling approximately $7.2 billion, including New Jersey, which Filed Claims against all eleven Debtors, with a Claim against each Debtor in the amount of approximately $6.9 billion.  New Jersey's

---

[281]    FTC Stipulated Order at 7, 8.

[282]    *Id.* at 9–14.

[283]    *Id.* at 6–7.

eleven Claims make up nearly all of the liquidated Claims Filed by state regulators (approximately $6.9 billion of the total of $7.2 billion), although there are a number of unliquidated Claims as well.

Following the announcement of the Debtors' entry into the NPA with the USAO and consent orders with the SEC, CFTC, and FTC, the Debtors commenced discussions with certain state regulators, including those represented by counsel for the National Association of Attorneys General (the "NAAG") and the states of New Jersey, Texas, Vermont, and Tennessee, regarding the treatment of the state regulators' Claims against the Debtors. The Debtors have proposed to enter into similar arrangements with state regulators to ensure that Account Holders will receive the maximum value possible from the Debtors' Estates and not have their Claims diluted by large Claims of state regulators. These state regulators include the states named above and other state entities that have scheduled and/or Filed Claims in these Chapter 11 Cases.

As with the federal agencies' Claims, as of the date of the Filing of this Disclosure Statement, the Debtors proposed that the states that Filed Claims against the Debtors would effectively have their Claims subordinated to Account Holder Claims (by agreement of the parties or otherwise as ordered by the Court) such that any fine, penalty, or judgment resulting from states' Claims would be suspended and the Debtors could maximize the recoveries of Account Holders. The Debtors extended this proposal to the NAAG and the states of New Jersey, Texas, Vermont, and Tennessee on or around August 2, 2023 and indicated it would be applicable to all States. As of the date of the Filing of this Disclosure Statement, those parties are evaluating the proposal and remain in discussions with the Debtors, but no agreement has been reached as yet.

If and when the Debtors and the state entities, or any portion thereof, reach an agreement, the Debtors will File a notice on the docket explaining the agreed-upon resolution.

### 2. Resignation of Alex Mashinsky and S. Daniel Leon.

Pursuant to its authority to remove and appoint any director of direct and indirect subsidiaries of CNL, on or around September 23, 2022, the Special Committee resolved that Mr. Mashinsky and Mr. Leon should be terminated from their positions with CNL and its subsidiary entities.[284] On September 27, 2022, Mr. Mashinsky voluntarily resigned as Chief Executive Officer of CNL and from all other positions at the Company except for his directorship on the CNL Board.[285] On September 30, 2022, Mr. Leon initiated the process of resigning as Chief Strategy Officer of CNL and from all other positions at the Company.[286]

---

[284] *Declaration of Alan Carr, Director of Celsius Network Limited, in Support of (I) the Debtors' Second Exclusivity Extension and (II) the Debtors' Objection to the Motion to Appoint a Chapter 11 Trustee* [Docket No. 2047] (the "Carr Declaration") ¶ 14.

[285] *Id. See also Statement of the Official Committee of Unsecured Creditors Regarding (I) the Resignation of Alexander Mashinsky and (II) Other Transition Matters* [Docket No. 903] ¶ 3 ("The Committee believes that today's announcement [of Mr. Mashinsky's resignation] is a positive step that will allow the Debtors, the Committee, and all other stakeholders to focus on moving these cases forward in a prompt and efficient manner.").

[286] Carr Declaration ¶ 14.

### K.    Litigation Matters.

#### 1.    Certain Non-Bankruptcy Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

(a)    Goines v. Celsius Network LLC, et al.

On July 13, 2022, a putative federal securities class action was filed against Network LLC, Lending LLC, Celsius KeyFi LLC, and certain of the Debtors' directors and officers in the United States District Court for the District of New Jersey (the "Securities Class Action" and such defendants, the "Securities Class Defendants").[287]  The Securities Class Action is brought on behalf of the class comprised of all persons, excluding any of the Securities Class Defendants, who were (a) Earn Program customers, (b) purchasers of CEL Token, or (c) borrowers through the Debtors' Borrow Program between February 9, 2018 and July 13, 2022.  The Securities Class Action asserts claims under the Securities Act, Exchange Act, and under theories of common law.

#### 2.    Core Scientific Litigation.

On September 28, 2022, the Debtors Filed the *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* [Docket No. 917] (the "Debtors' Motion to Compel Core Scientific") in response to what they believed were Core Scientific, Inc.'s ("Core Scientific")[288] willful violations of the automatic stay in connection with certain contractual obligations owed to the Debtors.[289]  On December 18, 2020, prior to the Petition Date, Core Scientific and Celsius Core LLC[290] entered into a Master Services Agreement to provide certain services in connection with Celsius' digital asset mining rigs, including services relating to colocation, hosting, monitoring, maintenance and repair, technical support, and heat and thermal management (the "Core MSA").[291]  In the Debtors' Motion to Compel Core Scientific, the Debtors allege

---

[287]    *Goines v. Celsius Network, LLC*, 2:22-cv-04560-KM-ESK (D.N.J. July 13, 2022).  An amended complaint was filed on June 19, 2023.

[288]    The specific entity that entered into agreements with Celsius Mining was "Core Scientific, Inc.," which subsequently changed its name to "Core Scientific Operating Company."  The lead debtor in the Core Scientific Bankruptcy (as defined herein) is a separate entity called "Core Scientific, Inc."  For simplicity, this section uses the term "Core Scientific" to refer to both the entity Celsius Mining entered into agreements with (Core Scientific Operating Company f/k/a Core Scientific, Inc.) and the lead debtor in the Core Scientific Bankruptcy (Core Scientific, Inc.).

[289]    *See generally* Debtors' Motion to Compel Core Scientific.

[290]    Celsius Core LLC was the predecessor entity of Celsius Mining.

[291]    *Declaration of Quinn Lawlor in Support of Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* [Docket No. 918] (the "Core Declaration") ¶ 1.  Under the Core MSA, Core Scientific and Core Celsius LLC executed a series of orders (the "Orders," and collectively with the Core MSA, the "Core Agreement"), including Order #10, which was

185

that Core Scientific willfully violated the automatic stay through continued failure to uphold its contractual obligations under the Core Agreement (as defined herein).[292]  Specifically, the Debtors allege that Core Scientific (a) refused to perform its contractual obligations due to Celsius Mining under the Core Agreement,[293] (b) threatened to terminate the Core Agreement until Celsius Mining paid its prepetition obligations,[294] and (c) started adding improper surcharges, called "power cost pass-throughs," to Mining's invoices following the Petition Date—charges which are a breach of the fixed price structure of the Core Agreement, and which constitute an illegitimate attempt to setoff Celsius' prepetition debts.[295]

On October 19, 2022, Core Scientific Filed *Core Scientific, Inc.'s Objection to Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* [Docket No. 1140] (the "Core Objection to Debtors' Motion to Compel Core Scientific"), countering that Core Scientific did not violate the automatic stay. Core Scientific argued that: (a) it was not in breach of the Core Agreement because (i) Core Scientific was permitted under the Core Agreement to pass the increased power costs through to Mining, (ii) Core Scientific was performing in satisfaction of its hosting obligations by deploying all of Mining's rigs without unjustifiable delay, and (iii) Core Scientific lacked additional hosting availability and therefore did not breach the "notification of hosting availability" requirement under the Core Agreement; (b) Core Scientific did not threaten to terminate the Core MSA; and (c) Core Scientific's postpetition conduct did not otherwise violate the automatic stay.[296]

On the same day, Core Scientific also Filed the *Motion of Core Scientific, Inc. (I) to Compel Immediate Payment of Administrative Expenses and (II) (A) For Relief from the Automatic Stay to Exercise Rights Under Master Services Agreement and Related Orders or (B) in the Alternative, to Compel Assumption or Rejection of Master Services Agreement and Related Orders* [Docket No. 1144] (the "Core Scientific Motion for Relief from Automatic Stay," and together with the Debtors' Motion to Compel Core Scientific, the "Core Scientific Motions").  Core Scientific argued that, pursuant to the Core Agreement, it is entitled to the payment of an administrative expense on account of the increased power costs charged by utility providers and passed through by Core Scientific to Mining and is entitled to the continued payment of such charges on a go-forward basis.[297]  Core Scientific also requested that the Bankruptcy Court lift the automatic stay so that it could exercise its rights under the Core Agreement, including its right to terminate.[298]

---

executed on September 27, 2021.  Core Scientific Motion to Compel ¶ 9.  Celsius Mining and Core Scientific Operating Company (the entity formerly known as Core Scientific Inc.) executed a second master service agreement in December 2021 (the "2021 MSA," and together with the Core MSA, the "Core MSAs"), under which one additional order (Order No. 1A) was executed (the Core Agreement, the 2021 MSA, the Orders, Order No. 1A, and any related agreements, the "Core Contracts").

[292]    *See generally* Debtors' Motion to Compel Core Scientific.

[293]    Core Scientifics's failures to uphold its contractual obligations include failing to provide Celsius Mining with the hosting capacity it is entitled to under the Core Agreement, timely deploy Celsius Mining's rigs, or notify Celsius Mining of additional hosting capacity. *Id.* ¶¶ 16–24.

[294]    Core Scientific threatened to not deploy new rigs until Celsius caught up on its payments. *Id.* ¶ 25.

[295]    *Id.* ¶ 2.  Under the terms of Order #10, Core Scientific was obligated to provide Celsius a specified power allocation under an agreed upon schedule and to provide such services at a fixed rate. *Id.* ¶¶ 9–14, 26–32.

[296]    *See generally* Core Objection to Debtors' Motion to Compel Core Scientific.

[297]    *See generally* Core Scientific Motion for Relief from the Automatic Stay.

[298]    *See generally id.*

Following the Filing of the Core Scientific Motions, Core Scientific and its debtor affiliates filed their own chapter 11 petitions in the Bankruptcy Court for the Southern District of Texas on December 21, 2022 (the "Core Scientific Bankruptcy").[299]  During the course of the Core Scientific Bankruptcy proceedings, Core Scientific filed the *Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining, LLC* [Core Scientific Docket No. 189] (the "Core Scientific Rejection Motion") seeking to reject the Core Contracts with Celsius Mining.  On January 2, 2023, the Debtors filed a preliminary objection to the Core Scientific Rejection Motion [Core Scientific Docket No. 211].[300]  The Debtors contended that the rejection was sought at an inappropriate time.[301]  The Debtors argued that the circumstances, a product of Core Scientific's own actions, did not warrant a hearing on two business days' notice, which failed to provide the Debtors adequate time to consult with its stakeholders or to negotiate an orderly transition of the Debtors' mining rigs held by Core Scientific.[302]

The Debtors further argued that rejection of the Core Contracts amounted to a technical violation of the automatic stay through Core Scientific's non-performance of its contractual obligations.[303]  On January 4, 2023, the Bankruptcy Court of the Southern District of Texas (the "Core Bankruptcy Court") approved the rejection of the Core Agreement and the process of transitioning the mining rigs back to the Debtors.[304]

Following Core Scientific's rejection of the Core Contracts, the Debtors have worked with Core Scientific to coordinate the transition and return of the Debtors' rigs.  As of the date of the Filing  of this Disclosure Statement [/June 27, 2023], the Debtors have received approximately 37,539 rigs from Core Scientific.  The Debtors or NewCo plan to put a combination of these rigs and other rigs into production in the near term.  The NewCo Transaction provides a path to put the entire existing fleet of rigs into production in the near-term following emergence.

On January 3, 2023, Core Scientific Filed an initial Proof of Claim against Celsius Mining for approximately $1.4 million.  On February 9, 2023, Core Scientific amended its Proof of Claim against Celsius Mining for approximately $3.9 million in connection with services provided under the Core Contracts, which include "hosting services for [rigs], prepayments for the hosting services, [and] building infrastructure."[305]

---

[299]   *In re Core Scientific, Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. 2022) (the "Core Scientific Docket").

[300]   *Celsius Mining LLC's Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* [Core Scientific Docket No. 211] (the "Objection to the Core Scientific Rejection Motion").

[301]   *Id.*

[302]   *Id.* ¶¶ 2, 6, 7.

[303]   *Id.* ¶¶ 3, 10.

[304]   *Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* [Core Scientific Docket No. 232]; *see also Notice of Entry of Order Rejecting Contracts with Celsius Mining LLC in Core Scientific, Inc. Chapter 11 Cases* [Docket No. 1820].

[305]   Claim No. 23022.  Core Scientific has a Scheduled Claim of approximately $1.1 million against Celsius Mining.  Scheduled Claim No. 2410085.

On April 14, 2023, Celsius Mining filed a Proof of Claim in the Core Scientific Bankruptcy for approximately $312.3 million and additional unliquidated amounts (the "Core Claim").[306] The Core Claim is comprised of five parts:

- Core Prepetition Breach Claim. A prepetition breach of contract claim on account of Core Scientific's breach of the Core Contracts (for an estimated amount of $111,998,000);

- Core Postpetition Breach Claim. A postpetition pre-rejection breach of contract claim on account of Core Scientific's breach of the Core Agreement (for an estimated amount of $1,497,000) (together with the Core Prepetition Breach Claim, the "Core Breach Claims");

- Core Administrative Claim. An administrative expense claim for the return of Celsius' postpetition pre-rejection prepayment of amounts invoiced under the Core Contracts in December 2022 for services to be provided in January 2023 (the "Core Prepayment") (for an estimated amount of $4,719,000);

- Core Rejection Claim. A claim for damages arising from Core Scientific's rejection of the Core Contracts (for an estimated amount of $194,104,000); and

- Claim for Damages to Celsius Mining Rigs. An unliquidated claim for damages to Celsius Mining's rig as a result of Core Scientific's breach of the Core Contracts arising from its failure to maintain and inspect Celsius Mining's rigs in its possession.[307]

On April 15, 2023, Celsius Mining filed *Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Granting Related Relief* [Core Docket No. 801] (the "Core Administrative Claim Motion"), requesting the prompt payment of the Core Administrative Claim. As noted, the Core Administrative Claim stems from a December 2022 invoice, which sought payment of amounts including the Core Prepayment of $4.7 million.[308] On December 22, 2022, the same day as the first day hearing in the Core Scientific Bankruptcy, at which counsel to Core Scientific indicated that they looked forward to engaging with Celsius Mining, Celsius Mining sent a wire transfer to pay the invoiced amounts, which included the full Core Prepayment.[309] Because Core Scientific only performed under the Core Contracts until January 3, 2023, Celsius Mining requested that the Core Administrative Claim be allowed in the amount of the Core Prepayment less any services received through January 3, 2023.[310] The Core

---

[306] *In re Core Scientific, Inc.* (Claim Nos. 425, 497) (claim number 497 amended claim number 425). According to Core Scientific, any claims asserted against Core Scientific Inc. by Celsius pursuant to contracts signed by Core Scientific Inc. and Celsius Mining prior to January 2022 "are more properly claims Core Scientific Operating Company" because the original Core Scientific Inc. entity changed its name to Core Scientific Operating Company in January 2022. *Debtors' Objection to Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. 503(B)(1)(A) and (II) Granting Related Relief* [Core Docket No. 861] (the "Core Administrative Claim Objection") fn. 2; *see also Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Core Docket No. 5] ¶ 31.

[307] *See generally* Core Claim.

[308] Core Administrative Claim Motion ¶ 7. The total invoiced amount was $5.8 million. The $4.7 million Core Prepayment was equal to the estimated cost of hosting services to be provided in January 2023

[309] *Id.* ¶ 9.

[310] *Id.* ¶ 12–13.

Administrative Claim Motion explained that treatment as an administrative expense was appropriate, for among other reasons, because (a) the Core Administrative Claim arose from a postpetition transaction with the Debtors, and (b) the Core Prepayment enhanced the ability of Core Scientific to function as a going concern."[311]  Moreover, Celsius Mining argued that prompt payment was justified under the circumstances due to the hardships delay would cause—Celsius Mining has "net cash outflows and limited cash on hand."[312]

On April 24, Core Scientific filed the *Debtors' Objection to Proof of Claim Nos. 425 and 497 Filed by Celsius Mining LLC* [Core Docket No. 819] (the "Core Claim Objection") requesting that the Core Bankruptcy Court disallow the Core Claim.  Core Scientific asserted that the Core Claim should be disallowed because:  (a) Celsius Mining is not entitled to any recovery on its Core Claim; (b) any amounts Celsius Mining may be entitled to are subject to the limitations of damages provisions under the Core Contracts;[313] and (c) any amounts Celsius Mining may be entitled to are less than the amount Celsius Mining owes Core Scientific under the Core Contracts.[314]

On May 5, 2023, Core Scientific filed an objection to the Core Administrative Claim Motion [Core Docket No. 861] (the "Core Administrative Claim Objection"), requesting the Core court deny the Core Administrative Claim Motion and, alternatively, direct the parties to mediation.[315]  Core Scientific argued that treatment of the Core Prepayment as an administrative expense was inappropriate for reasons including, among others, that the amounts paid in connection with the Core Prepayment should instead be applied to older outstanding amounts then due under the Core Contracts.[316]  Core Scientific also argued that, to the extent that the Core Administrative Claim was allowed, that immediate payment would be inappropriate.[317]  A hearing on the Core Administrative Claim Motion was originally scheduled for May 22, 2023 [Core Docket No. 907], but has since been adjourned pending mediation.

On May 30, 2023, Core Scientific filed *Debtors' Motion for Partial Summary Judgment With Respect to Proof of Claim Nos. 425 and 497 Filed by Celsius Mining LLC* [Core Docket No. 942] (the "Core Motion for Summary Judgment") requesting (a) that the Core Bankruptcy Court issue a judgment as a matter of law that limits Core Scientific's total aggregate liability on account of the Core Claim to $5.7 million (the "Core Claim Cap"), and (b) preclude Celsius Mining from asserting damages arising from lost profit or loss of revenues.[318]

---

[311]  *Id.* ¶ 15.

[312]  *Id.* ¶ 21.

[313]  In particular, the Core Claim Objection claims that the Core MSAs expressly preclude "recoverable damages to an aggregate of one month's fee payable pursuant to the applicable order.  Core Claim Objection ¶ 32.

[314]  Core Claim Objection ¶ 12.  Core Scientific argues that to the extent Celsius Mining would be entitled to recover, the Core Claim would be subject to defenses of set off and recoupment."  *Id.* ¶ 33.

[315]  *Debtors' Objection to Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative expense Claim Pursuant to 11 U.S.C. 503(B)(1)(A) and (II) Granting Related Relief* [Core Docket No. 861] ¶ 10.

[316]  *Id.* ¶ 44.  The outstanding amounts owed relate to the disputed pass through charges under the Core Agreement.  *Id.*

[317]  Core Scientific argued that immediate payment would be inappropriate due to (a) the prejudice it would pose to Core Scientific, (b) the lack of hardship Celsius would face, and (c) the harm it would cause to other creditors.  *Id.* ¶ 4–8.

[318]  Core Motion for Summary Judgment ¶ 2.

Specifically, Core Scientific argues that the unambiguous language of the Core MSAs supports the Core Bankruptcy Court limiting the Core Claim (if allowed) to the Core Claim Cap as a matter of law.  In support, Core Scientific points to language in the Core MSAs which it claims limits total aggregate liability to an "amount equal to one (1) months fee payable to [Core Scientific] pursuant to the applicable order."[319] Core Scientific also argues that the Core Breach Claims and Core Rejection Claim (total estimated amount of $307.6 million) should be disallowed as a matter of law because the Core MSAs prevent Celsius Mining from asserting damages for "lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of Celsius equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance or punitive damages."[320]

On June 16, 2023, Celsius Mining, the Committee, and Core Scientific filed the *Joint Stipulation and Agreed Order Appointing a Mediator and Governing Mediation Procedures* [Core Docket No. 968] (the "Core Mediation Stipulation"), requesting the appointment of the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas, to serve as mediator and facilitate the parties' consensual resolution of a number of interrelated issues and disputes (respectively, the "Core Mediator" and the "Core Mediation").[321]  The Core Mediation Stipulation also established a briefing schedule regarding Core's Motion for Summary Judgment.[322]

On June 21, 2023, Celsius Mining filed its objection to Core's Motion for Summary Judgment [Core Docket No. 984] requesting that the Core Motion for Summary Judgment be denied.  As set forth therein, Celsius Mining argues that summary judgment is inappropriate because questions of material fact exist as to whether Core Scientific engaged in bad faith conduct by knowingly and willfully misinterpreting the Core Agreements as a basis for passing through fixed hosting costs to Celsius Mining.[323]  Celsius Mining also asserts that summary judgment is premature because it has not yet had the opportunity to take discovery of all five components of the Core Claim and therefore cannot confirm whether issues of material facts exist.[324]  Lastly, with respect to the Core Administrative Claim, Celsius Mining argues that summary judgment is inappropriate because the Core Prepayment is not covered by the limitation of liability provision under the Core MSA as argued by Core Scientific.[325]

---

[319]  *Id.* ¶ 25 (citing Core MSAs § 5(d)).  Core Scientific claims that the one month's fee payable refers to the amount of the most recent month's invoice, which was approximately $5.7 million in December 2022.

[320]  *Id.*

[321]  Core Mediation Stipulation ¶¶ 1–2.  The mediation topics include the (i) Core Motions, (ii) the Core Objection to Debtors' Motion to Compel Scientific, (ii) the Core Scientific Rejection Motion, (iv) the Core Claim, (v) Core Scientific's Claim against Celsius Mining, (vi) the Core Administrative Claim Motion, (vii) the Core Claim Objection, (viii) the Core Administrative Claim Objection, and (xi) the Core Motion for Summary Judgment and related pleadings (collectively, the "Core Mediation Topics").  Core Mediation Stipulation, at 4.  Pursuant to the Core Mediation Stipulation, the parties authorized the Core Mediator to mediate any issues and disputes concerning the Core Mediation Topics.  *Id.* ¶ 2.

[322]  *Id.* ¶ 4.

[323]  Objection to Core's Motion for Summary Judgment ¶¶ 6, 8–14.

[324]  *Id.* ¶ 4.

[325]  *Id.* ¶¶ 15–17.  Celsius Mining argues that "it is absurd to suggest that the return of the prepayments should be subject to a provision addressing a limitation of liability intended to cap damages."  *Id.* ¶ 17.

As of the date of the Filing of this Disclosure Statement, the Core Mediation was cancelled as the result of constructive discussions between the parties, and the parties continue to negotiate a potential resolution of this dispute.

### 3.  *The Committee's Standing Stipulation and Proposed Complaint.*

Since its appointment, the Committee has actively investigated the Debtors and the actions of their current and former directors, officers, and employees.  As part of that investigation, the Committee reviewed tens of thousands of documents and, in cooperation with the Examiner, conducted more than 25 interviews with current and former employees of the Debtors.  The Committee also spoke with many victims that have been affected by the actions of the Debtors' former directors and officers.  The Committee's investigation uncovered significant claims and Causes of Action based on fraud, recklessness, gross mismanagement, and self-interested conduct by the Debtors' former directors and officers.

As explained in Article III.JJ of this Disclosure Statement, on February 14, 2023, the Committee Filed a motion seeking approval of a stipulation preserving the Causes of Action set forth in the Committee Insiders Complaint prepared by the Committee for prosecution by the Litigation Administrator on behalf of the Debtors' estates against the UCC Claims Stipulation Defendants.  The Committee Insiders Complaint asserts claims for breach of fiduciary duties, avoidance of actual and constructive fraudulent transfers, and avoidance of preferential transfers arising from the Debtors' prepetition mismanagement of Celsius.  The Committee Insiders Complaint also seeks the disallowance of claims of the defendants, pending their return of any avoidable transfers to the Debtors' estates.

On March 8, 2023, the Bankruptcy Court entered an order finding that the "pursuit of the claims and causes of action" set forth in the Committee Insiders Complaint "is in the best interest of the Debtors' estate and necessary to a fair and efficient resolution of these Chapter 11 Cases."[326]  The Bankruptcy Court further directed that the claims and Causes of Action set forth in the Committee Insiders Complaint be contributed to an adequately funded litigation trust pursuant to any plan of reorganization confirmed in these Chapter 11 Cases.[327]  Finally, the Bankruptcy Court ordered that no defendants named in the Committee Insiders Complaint (or any amended version of the Committee Insiders Complaint) should receive a release or exculpation under any plan.[328]

On March 30, 2023, the Committee Filed an amended version of the Committee Insiders Complaint, which adds additional counts asserted against certain defendants, asserts additional factual allegations, and makes certain miscellaneous corrections.[329]  Ultimately, after a plan is confirmed, the Litigation Administrator will File and prosecute the Committee Insiders Complaint.

### 4.  *The Committee's Class Claim.*

On April 10, 2023, the Committee Filed a motion requesting authority to prosecute on behalf of all Account Holders a class action proof of claim asserting non-contract claims—including claims for fraud and negligent misrepresentation, as well as other statutory and common law claims—against CNL and other

---

[326]  *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2201] ¶ 2.

[327]  *Id.* ¶¶ 3, 5.

[328]  *Id.* ¶ 8.

[329]  *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

Debtor entities.[330]  The Committee sought this authority as a result of the Bankruptcy Court's ruling, discussed in Article VII.L.3 below, that Account Holders may only assert contract claims for breach of the Terms of Use against Network LLC, but not CNL or any other affiliates.  The Committee argued that it would be infeasible and value destructive to require every Account Holder to File individualized non-contract claims when all Account Holders possess non-contract claims against CNL and its affiliates based upon the Debtors' prepetition conduct.[331]  While Account Holders Filed statements generally in support of a class Proof of Claim,[332] the Series B Holders and the U.S. Trustee objected.[333]  The Series B Holders and U.S. Trustee argued that the Committee was not an appropriate representative for the class of Account Holders,[334] and the Series B Holders argued that a class Proof of Claim would unduly delay the administration of the Chapter 11 Cases.[335]  On April 18, 2023, the Bankruptcy Court overruled the objections and entered an order authorizing the Committee to File a class Proof of Claim.[336]

On April 28, 2023, the Committee Filed Proof of Claim No. 29068 on the Debtors' claims register (the "Class Claim") in accordance with the Bankruptcy Court's order.[337]  The Committee Filed the Class Claim on behalf of claimants Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov in their individual and representative capacities (the "Class Representatives").[338]  The Class Representatives assert the Class Claim on behalf of all Celsius Account Holders who were harmed by CNL's (i) violations of the New York Deceptive Practices Act, New York False Advertising Act, and New Jersey Consumer Fraud Act; (ii) fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and unjust enrichment under New York common law; (iii) breach of the implied duty of good faith and fair dealing; (iv) fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment under English common law; and (v) violations of Section 2 of the Misrepresentation Act 1967 under English law.[339]  The Class Claim seeks damages "not less than USD $5,217,542,781, equaling the outstanding obligations of all [A]ccount [H]olders that transferred coins to Celsius as part of the Earn, Borrow or Custody programs, or

---

[330]  *Motion of the Official Committee of Unsecured Creditors (I) For Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* [Docket No. 2399].

[331]  *Id.* ¶¶ 1–7, 26–29, 33–35.

[332]  *Ignat Tuganov's Response to The Committee's Class Claim Motion* [Docket No. 2474]; *Immanuel Herrmann, Daniel Frishberg, and Rebecca Gallagher's Response to the Committee's Class Claim Motion* [Docket No. 2476].

[333]  *Series B Holders' Objection to the Committee's Class Claim Motion* [Docket No. 2467] (the "Series B Holders' Class Claim Objection"); *Statement of the United States Trustee in Response to the Committee's Class Claim Motion* [Docket No. 2484] (the "U.S. Trustee's Class Claim Objection").

[334]  Series B Holders' Class Claim Obj. ¶¶ 7–10, 23–38; U.S. Trustee's Class Claim Obj. at 2–3.

[335]  Series B Holders' Class Claim Obj. ¶¶ 11–22.

[336]  *Order Granting the Motion of the Official Committee of Unsecured Creditors (I) For Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* [Docket No. 2496].

[337]  *Notice of Filing of Class Proof of Claim by the Official Committee of Unsecured Creditors on Behalf of the Class Representatives Asserting Non-Contract Claims on Behalf of Themselves and Other Similarly Situated Account Holders* [Docket No. 2556].

[338]  *Id.*

[339]  *Id.* Ann. A ¶ 109.

have balances associated with balances in 'Withhold Accounts,' as of the Petition Date, in addition to damages in an amount to be determined at trial."[340]

On May 17, 2023, the Committee moved to certify the proposed class of Account Holders (the "Committee's Class Certification Motion").[341]  Pursuant to a scheduling order issued by the Bankruptcy Court, a hearing on the Committee's class certification motion will be held during the week of September 25, 2023.[342]  The Committee will also propose appropriate procedures to permit Account Holders to opt-out of the prosecution and settlement of the Class Claim.  Ultimately, if the class is certified and a plan confirmed, the Litigation Administrator will prosecute the Class Claim.

Starting on July 17, 2023, the Debtors, the Committee, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and certain individual Account Holders (including *pro se* Account Holders) entered into mediation with Judge Michael E. Wiles, Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York (the "Class Claim Mediation").[343]  Following three days of mediation, the parties reached a settlement regarding the resolution of the Class Claim and the treatment of Retail Borrower Deposit Claims under the Plan, among other matters (the "Class Claim Settlement").  On July 20, 2023, the mediation parties Filed the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064] (the "Class Claim Settlement Motion"), requesting that the Bankruptcy Court approve the Class Claim Settlement.  On August 3, 2023, the parties Filed the Class Claim Settlement agreement [Docket No. 3138].

The Class Claim Settlement is an opt-out settlement that binds all Account Holders unless and until they opt out before the Voting Deadline according to the instructions that will be provided in the Solicitation Package.  Account Holders who do not timely opt out of the Class Claim Settlement will have their Account Holder Claims (other than any Custody Claims) increased by 5% as a settlement for any alleged damages they incurred on account of the prepetition misconduct of the Debtors' former management team (such increased claim, the "Class Claim Settlement Claim").[344]  For the Account Holders who do not timely opt out of the Class Claim Settlement, (i) their Class Claim Settlement Claim will supersede and expunge any Proofs of Claims they Filed; (ii) they can no longer prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim; and (iii) their recovery from the Debtors will be limited to the recovery provided to the corresponding Class Claim Settlement Claim under the Plan.

Account Holders who timely opt out of the Class Claim Settlement according to the instructions provided in the Solicitation Package will have their Account Holder Claims (other than their Custody

---

[340]   *Id.* ¶ 13.

[341]   *Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas Difiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2670].

[342]   *Order Establishing Schedule for Litigation of the Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas Difiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2795].

[343]   Judge Wiles presided over the chapter 11 cases of the cryptocurrency exchange Voyager, *In re Voyager Digital Holdings, Inc.*, *et al.*, Case No. 22-10943 (Bankr. S.D.N.Y. Jul. 5, 2022).

[344]   For example, a scheduled General Earn Claim for $10,000 shall receive a scheduled General Earn Claim in an amount of $10,500 or a Retail Borrower Deposit Claim for $10,000 shall receive a Retail Borrower Deposit Claim for $10,500.

Claims) treated as Disputed Claims under the Plan. They will not receive a distribution on the Effective Date even if they vote to accept the Plan. Instead, they will only receive a distribution (if any) on the date their Disputed Claim is resolved in the claims reconciliation process. If they vote for the Plan, however, they will be bound by the releases set forth in the Plan and will only retain their rights with respect to their Proof of Claim.

If approved, the Class Claim Settlement will resolve the Class Claim and the Committee's Class Certification Motion, among other things. The Debtors will support the certification of the proposed class of Account Holders to the extent applicable and necessary, and the Allowance of the Class Claim Settlement Claims will constitute a full and final resolution of the Class Claim on behalf of all Account Holders that do not opt out of the Class Claim Settlement. Upon entry of the order by the Bankruptcy Court approving the Class Claim Settlement, the Committee shall not prosecute the Class Claim on behalf of any or all Account Holders.

The Class Claim Settlement will (i) increase Account Holders' recovery on account of their Account Holder Claims without requiring them to pass the high bar of obtaining a judgment and liquidating their damages with respect to their non-contract Claims, (ii) significantly reduce the time and costs the Debtors and the Committee would otherwise have to spend on litigating the Committee's Class Certification Motion and the Class Claim, (iii) streamline the claim reconciliation process for the more than 30,000 claims totaling over $78.2 billion that have been filed against the Debtors, (iv) allow the Debtors to promptly commence distribution to Account Holders under the Plan on the Effective Date, and (v) provide all Account Holders who wish to pursue non-contract claims on their own the flexibility to opt out.

As of the date of the Filing of this Disclosure Statement, the Class Claim Settlement Motion is pending before the Bankruptcy Court, with a hearing scheduled for August 10, 2023.

### 5. The Committee's Fraudulent Transfer Complaint.

On May 1, 2023, the Committee, as a representative of Network LLC's estate,[345] commenced an adversary proceeding and Filed a complaint against CNL [Adv. No. 23-01104, Docket No. 1] (the "Committee AP Complaint"). The Committee AP Complaint alleges that, facing adverse regulatory actions in the United Kingdom, CNL entered into a series of sham transactions via the Migration.[346] Those transactions, the Committee alleges, were designed to keep CNL's business running at the expense of its Account Holders who now may find themselves with no recourse against the entity that actually holds a material portion of the digital assets they transferred to Celsius.[347] Specifically, the Committee AP Complaint alleges that through a set of conflicted, undated, incomplete, and unobserved contractual agreements, CNL purported to transfer all of the assets and liabilities connected to its customer-facing business to Network LLC.[348] CNL, however, retained nearly all Account Holder assets so that it could continue to deploy them despite warnings from the UK FCA that CNL was to cease all retail operations in

---

[345]    *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Set Forth in the Scheduling Order* [Docket No. 2562] ¶ 2 ("The Debtors and any successor thereto hereby grant nonexclusive standing to the Committee to pursue and litigate constructive fraudulent transfer/conveyance and similar claims set forth in the Scheduling Order held by Celsius Network LLC against Celsius Network Limited").

[346]    Committee AP Complaint ¶ 1.

[347]    *Id.*

[348]    *Id.*

the United Kingdom.[349]  At the same time, CNL transferred billions of dollars' worth of liabilities to Network LLC without capitalizing Network LLC sufficiently to support those liabilities.[350]

The Committee AP Complaint seeks extensive relief, including but not limited to: (i) damages in an amount to be proven at trial; (ii) punitive damages in an amount to be proven at trial; (iii) a determination that each transfer of liabilities and obligations from CNL to Network LLC and each transfer of assets from Network LLC to CNL is avoidable as a fraudulent transfer; (iv) a determination that Network LLC may avoid the transfer of liabilities from CNL to Network LLC and, at its election, assert a claim against CNL for the total value of the transferred liabilities, or, alternatively, a declaration that Network LLC's customers may recover the value of their claims directly from CNL; and (v) a determination that Network LLC may recover, and CNL must turn over, for the benefit of Network LLC and its creditors, any digital assets transferred from Network LLC to CNL.[351]

As a result of the Series B Settlement, the fraudulent transfer litigation is presently stayed.[352]  Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the fraudulent transfer litigation.

### 6.  *Substantive Consolidation of Debtors CNL and Network LLC.*

On May 1, 2023, the Debtors and the Committee each Filed motions requesting that the Bankruptcy Court substantively consolidate the estates of Debtors CNL and Network LLC.  The Debtors asserted that substantive consolidation is appropriate under sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code when creditors dealt with a debtor group as a "single economic unit" and did not rely on debtors' corporate separateness, *or* when a debtor group's assets and records are so hopelessly entangled that it would be value destructive and unduly time intensive to "unscramble" their affairs.[353]  On the first prong, the Debtors asserted that all stakeholders—most importantly, Account Holders—transacted with Celsius as an integrated corporate group and did not rely on CNL and Network LLC operating separately with distinct assets.[354]  On the second prong, the Debtors argued that the affairs of CNL and Network LLC were hopelessly entangled because the Debtors did not maintain adequately detailed corporate records before or after the Migration.[355]  That lack of appropriate recordkeeping "may" make it "impossible" to distinguish any separate liabilities of CNL and Network LLC, or to determine the value of the intercompany claims owing from CNL to Network LLC.[356]  Accordingly, the Debtors requested that the Court substantively

---

[349]    *Id.*

[350]    *Id.*

[351]    *Id.* at 24.

[352]    Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors, the Initial Consenting Series B Preferred Holders, and the Debtors Regarding Litigation Stay [Docket No. 2960] (the "Phase II Litigation Stay Stipulation") ¶ 3.

[353]    *Debtors' Motion Seeking Entry of an Order (I) Substantively Consolidating the Estates of Celsius Network Limited and Celsius Network LLC and (II) Granting Related Relief* [Docket No. 2563] (the "Substantive Consolidation Motion") ¶ 20.

[354]    *Id.* ¶¶ 22–29.

[355]    *Id.* ¶¶ 30–34.

[356]    *Id.*

consolidate "the estates of CNL and [Network] LLC for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions."[357]

The Committee joined the Debtors' request.[358] The Committee agreed with the Debtors that substantive consolidation is appropriate because the Debtors' operations and books and records were hopelessly entangled.[359] The Committee also provided additional examples of how Celsius represented to Account Holders that they were transacting with the Celsius corporate group as a whole, and how all of the assets of Celsius (not just the assets of Network LLC) would be available to satisfy Account Holder claims.[360] For instance, the Committee highlighted instances where Mr. Mashinsky (in his dual capacities as CEO of CNL and Network LLC) told Account Holders that Celsius, on a consolidated basis, had billions of dollars of assets, including its mining business, that could be "return[ed] to the community if something bad happens."[361] As a result of this statement and many others like it, the Committee asserted that CNL and Network LLC should be substantively consolidated in accordance with the expectations of Account Holders and the Debtors' other creditors.[362]

As a result of the Series B Settlement, the substantive consolidation litigation is presently stayed.[363] Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the substantive consolidation litigation.

### 7. Certain Adversary Proceedings.

#### (b) Celsius Network Limited, et al. v. Prime Trust, LLC.

On August 23, 2022, CNL and Network LLC (together, the "Celsius Prime Trust Plaintiffs") Filed a complaint and initiated an adversary proceeding against Prime Trust LLC ("Prime Trust") alleging turnover and breach of contract arising out of Prime Trust's alleged failure to return Celsius' digital assets held by Prime Trust (the "Prime Trust Digital Assets") following the purported termination of Prime Trust and Celsius' contractual relationship.[364] The Celsius Prime Trust Plaintiffs and Prime Trust reached a settlement (the "Prime Trust Settlement") on October 19, 2022 pursuant to which Prime Trust agreed to return the Prime Trust Digital Assets to Celsius wallets and Celsius agreed that it would not use or access

---

[357] *Id.* ¶ 16.

[358] *Motion by the Official Committee of Unsecured Creditors for Entry of an Order Substantively Consolidating the Estates of Celsius Network Limited and Celsius Network LLC, and Joinder in the Debtors' Motion Seeking the Same Relief* [Docket No. 2565] (the "Committee's Substantive Consolidation Motion" and together with the Debtors' Substantive Consolidation Motion, the "Substantive Consolidation Motions").

[359] *Id.* ¶ 4.

[360] *Id.* ¶¶ 13–23.

[361] *Id.* ¶ 17.

[362] *Id.*

[363] Phase II Litigation Stay Stipulation ¶ 3.

[364] *Celsius Network Limited et al. v. Prime Trust LLC*, Case No. 22-10964, Adv. No. 22-01140 (MG) (Bankr. S.D.N.Y. Aug. 23, 2022).

the Prime Trust Digital Assets, among other agreements.[365]  The Bankruptcy Court approved the settlement on December 6, 2022.[366]  The Celsius Prime Trust Plaintiffs Filed a notice of voluntary dismissal dismissing all claims with prejudice on December 20, 2022.[367]  On January 4, 2023, the Bankruptcy Court entered an order terminating and closing this adversary proceeding.  Approximately six months after Prime Trust transferred the Prime Trust Digital Assets to segregated Celsius wallets, the Debtors Filed a motion requesting authority to transfer the Prime Trust Digital Assets from segregated wallets to a workspace where the Prime Trust Digital Assets will be commingled with other Celsius digital assets and available for the Debtors to use in the ordinary course of business.[368]  The Bankruptcy Court granted the motion on June 28, 2023 [Adv. No. 22-01140, Docket No. 2926].

As of the date of the Filing of this Disclosure Statement, this adversary proceeding is closed.

(c)      Celsius Network Limited, et al. v. Stone, *et al.*

Prior to the Petition Date, on July 7, 2022, KeyFi, Inc. Filed a complaint against CNL and Celsius KeyFi LLC in New York state court.[369]  On August 23, 2022, CNL and Celsius KeyFi LLC (together with CNL, the "Celsius KeyFi Plaintiffs") initiated an adversary proceeding against KeyFi, Inc. and the chief executive officer and founder of KeyFi, Inc., Jason Stone (together, the "KeyFi Defendants"), and Filed an amended complaint (the "KeyFi Amended Complaint") on October 13, 2022.[370]  The amended complaint alleged conversion, fraudulent misrepresentation, breach of fiduciary duty, and unjust enrichment, and demanded turnover, replevin, and accounting in connection with digital assets the KeyFi Defendants accessed through their business relationship with the Celsius KeyFi Plaintiffs to deploy Celsius assets in decentralized financing and staking investment strategies.[371]  In particular, the KeyFi Amended Complaint alleges that the KeyFi Defendants unlawfully transferred assets from Celsius wallets to the KeyFi Defendants' wallets, which the KeyFi Defendants went on to sell, exchange for other digital assets, and purchase interests in other companies.[372]

---

[365]    *Motion to Approve Settlement With Prime Trust, LLC Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Adv. No. 22-01140, Docket No. 13].

[366]    *Order Granting Motion to Approve Settlement With Prime Trust, LLC Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Adv. No. 22-01140, Docket No. 20].

[367]    *Plaintiffs' Notice of Voluntary Dismissal* [Adv. No. 22-01140, Docket No. 22].

[368]    *Motion to Approve the Transfer of Property Pursuant to Bankruptcy Code Section 105 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2758]; *Amended Notice of Motion to Approve the Transfer of Property Pursuant to Bankruptcy Code Section 105 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2772].

[369]    *KeyFi, Inc. v. Celsius Network Limited and Celsius KeyFi LLC*, Index No. 652367/2022 (N.Y. Sup. Ct. July 7, 2022).

[370]    *Celsius Network Limited et al. v. Stone, et al.*, Case No. 22 10964, Adv. No. 22-01139 (MG) (Bankr. S.D.N.Y. Aug. 23, 2022); *First Amended Complaint* [Adv. No. 22-01139, Docket No. 10].

[371]    KeyFi Amended Complaint ¶ 3.

[372]    *Id.*

The KeyFi Defendants Filed a motion to dismiss on October 27, 2022,[373] and two amended motions to dismiss on November 1 and November 4, 2022, respectively.[374]  The Bankruptcy Court denied the motions to dismiss on December 8, 2022.[375]  The KeyFi Defendants then Filed an answer denying the allegations and asserting seven affirmative defenses.[376]  The Celsius KeyFi Plaintiffs sought a preliminary injunction to prevent the KeyFi Defendants from accessing, transferring, or disposing of Celsius' digital assets in addition to requiring the KeyFi Defendants to identify the digital assets and provide Celsius the private keys to access the digital assets.[377]  On December 16, 2023, the Bankruptcy Court entered the *Joint Stipulation and Agreed Order Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc.* [Adv. No. 22-01139, Docket No. 52], which required the KeyFi Defendants to identify Celsius' wallets and provide the KeyFi Plaintiffs the means which with to access the wallets, and prevented the KeyFi Defendants from accessing Celsius' wallets or accessing, transferring, or disposing of certain of Celsius' digital assets.

Following an evidentiary hearing on the Motion for a Preliminary Injunction, the Bankruptcy Court issued a temporary restraining order enjoining the KeyFi Defendants from making any transfers or dispositions of the digital assets at issue until the preliminary injunction has been decided, but allowed the KeyFi Defendants to continue to deploy certain of the digital assets in decentralized finance activities.[378]  The Bankruptcy Court requested additional briefing, and the parties submitted post-trial briefs in mid-February.[379]  The parties Filed and the Bankruptcy Court signed a joint stipulation to stay all formal party discovery for sixty days and ordered additional diligence from the KeyFi Defendants.[380]  On March 15, 2023, Judge Glenn entered an order noting that the KeyFi Plaintiffs and the KeyFi Defendants consented to a jury trial.[381]  The Court held a status conference on March 15, 2023 regarding Mr. Stone's requests of the Debtors regarding his ability to manage the assets within the scope of the temporary restraining order. [382]  Following the status conference, the Court entered an amended temporary restraining order expanding the scope of property subject to the temporary restraining order.[383]  On April 29, 2023, the parties agreed to

---

[373]   *Motion to Dismiss the Complaint in the Adversary Proceeding* [Adv. No. 22-01139, Docket No. 17].

[374]   *Amended Motion to Dismiss the Complaint in the Adversary Proceeding* [Adv. No. 22-01139, Docket No. 18]; *Amended Motion to Dismiss the Complaint in the Adversary Proceeding* [Adv. No. 22-01139, Docket No. 19].

[375]   *Memorandum Opinion and Order Denying Defendants' Motion to Dismiss the First Amended Complaint* [Adv. No. 22-01139, Docket No. 47].

[376]   *Answer to First Amended Complaint and Seven Affirmative Defenses* [Adv. No. 22-01139, Docket No. 55].

[377]   *Motion of Plaintiffs for Preliminary Injunction Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure* [Adv. No. 22-01139, Docket No. 20] (the "Motion for a Preliminary Injunction").

[378]   *Temporary Restraining Order* [Adv. No. 22-01139, Docket No. 76].

[379]   *Defendants Jason Stone and KeyFi Inc.'s Post-Trial Memorandum in Opposition to Celsius's Motion for Preliminary Injunction* [Adv. No. 22-01139, Docket No. 78]; *Plaintiffs' Post-Trial Brief* [Adv. No. 22-01139, Docket No. 79].

[380]   *Joint Stipulation and Stay Order* [Adv. No. 22-01139, Docket No. 82].

[381]   *Joint Stipulation and Order Regarding Jury Trial* [Adv. No. 22-01139, Docket No. 85].

[382]   Mar. 15, 2023 Hr'g Tr. [Adv. No. 22-01139, Docket No. 88] (the "Mar. 15, 2023 Hr'g Tr.").

[383]   *Amended Temporary Restraining Order* [Adv. No. 22-01139, Docket No. 86].

stay certain deadlines (the "Stone Stay") until June 2, 2023.[384]  On June 2, 2023, the parties Filed the first joint stipulation to extend the Stone Stay through June 16, 2023,[385] which the Bankruptcy Court entered the same day.[386]  On June 16, 2023, the parties Filed the second joint stipulation to extend the Stone Stay through June 30, 2023 [Adv. No. 22-01139, Docket No. 92], which the Court entered on June 20, 2023 [Adv. No. 22-01139, Docket No. 93].  On June 29, 2023, the parties Filed the third stipulation to extend the Stone Stay through July 30, 2023  [Adv. No. 22-01139, Docket No. 95], which the Bankruptcy Court entered on June 30, 2023  [Adv. No. 22-01139, Docket No. 96].  On July 31, 2023, the parties Filed the fourth stipulation to extend the Stone Stay through September 5, 2023 [Adv. No. 22-01139, Docket No. 98], which the Bankruptcy Court entered on August 4, 2023 [Adv. No. 22-01139, Docket No. 99].

As of the date of the Filing of this Disclosure Statement, this adversary proceeding is still pending.

(d)    Frishberg v. Celsius Network LLC, et al.

On December 9, 2022, pro se creditor Daniel Frishberg ("Mr. Frishberg") Filed a complaint and initiated an adversary proceeding against the Debtors.[387]  Mr. Frishberg argued that because he requested that the Debtors close his Earn Account on July 5, 2022, before the Debtors Filed for chapter 11 protection, title to the Cryptocurrency in his Earn Account transferred to him.[388]  On March 9, 2023, Mr. Frishberg Filed a demand for jury trial [Adv. No. 22-01179, Docket No. 17] and an amended complaint [Adv. No. 22-01179, Docket No. 18].  On May 18, 2023, the parties Filed a joint stipulation agreeing to the further amendment of Mr. Frishberg's complaint and extending the Debtors' deadline to respond to June 20, 2023 [Adv. No. 22-01179, Docket No. 28], which the Bankruptcy Court entered on May 19, 2023 [Adv. No. 22-01179, Docket No. 30].  On June 16, 2023, the parties Filed an additional joint stipulation agreeing to the further amendment of Mr. Frishberg's complaint and extending the Debtors' deadline to respond to July 20, 2023 [Adv. No. 22-01179, Docket No. 34], which the Bankruptcy Court entered on June 20, 2023 [Adv. No. 22-01179, Docket No. 35].

On February 20, 2023, the Debtors Filed the Debtors' Objection to Proof of Claim No. 24480 of Daniel A. Frishberg [Docket No. 2107] (the "Objection to Frishberg's POC").  Therein, the Debtors explained that the Bankruptcy Court's Memorandum Opinion and Order Regarding Ownership of Earn Account Assets [Docket No. 1822] (the "Earn Ruling"), issued on January 4, 2023, is instructive on Mr. Frishberg's circumstances.  Specifically, the Debtors noted that the Earn Ruling provided that the "Debtors' Terms of Use presumptively constitute a binding contract governing the relationship between the Debtors and their Account Holders, and that according to the unambiguous language of the Terms of Use, the assets associated with the Earn Program are property of the Debtors' estates."[389]

---

[384]    Joint Stipulation Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc. Regarding an Extension of the Stay Period Pursuant to the Stay Order [Adv. No. 22-01139, Docket No. 87].

[385]    Joint Stipulation and Stay Order Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc. Regarding an Extension of the Stay Period Pursuant to the Stay Order [Adv. No. 22-01139, Docket No. 90].

[386]    Joint Stipulation and Stay Order Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc. Regarding an Extension of the Stay Period Pursuant to the Stay Order [Adv. No. 22-01139, Docket No. 87].

[387]    Frishberg v. Celsius Network LLC et al, Case No. 22-10964, Adv. No. 22-01179 (MG) (Bankr. S.D.N.Y.).

[388]    Complaint [Adv. No. 22-01179, Docket No. 1] (the "Frishberg Complaint").

[389]    Objection to Frishberg's POC ¶ 14.

At his own request, Mr. Frishberg participated in the Class Claim Mediation, which is discussed in greater detail in Article VII.K.4 of this Disclosure Statement.  As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, Mr. Frishberg agreed to execute a restructuring support agreement to support the Plan and not take any actions inconsistent with such support.  Accordingly, as of the date of the Filing of this Disclosure Statement, Mr. Frishberg and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[390]

(e)      Fred Shanks v. Celsius Network LLC, et al.

On December 20, 2022, Fred M. Shanks ("Mr. F. Shanks") Filed a complaint and initiated an adversary proceeding against the Debtors.[391]  On January 7, 2023, Mr. F. Shanks Filed an *Amended Complaint* [Adv. No. 22-01190, Docket No. 8] ("F. Shanks Amended Complaint").  Mr. F. Shanks alleges that the Debtors breached their contract with him when they initiated a margin call on his loan but did not allow him to resolve the same due to the Pause.[392]  Mr. F. Shanks seeks a ruling that the assets at issue are not property of the Debtors' estates, that he be compensated based on his allegations, that he be allowed to close his account after the Debtors unfreeze it and allow him to transfer all remaining coins to an external wallet, and that the Debtors pay all of his expenses associated with Filing his adversary proceeding.[393]

On February 22, 2023, the Debtors Filed the *Debtors' Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law* [Adv. No. 22-01190, Docket No. 17] (the "Debtors' Motion to Dismiss the F. Shanks Adversary Proceeding").  Therein, the Debtors asserted that the Earn Ruling barred Mr. F. Shanks from litigating his breach of contract claim through this adversary proceeding,[394] that Mr. F. Shanks did not demonstrate that the Debtors breached the Terms of Use, and that the F. Shanks Amended Complaint failed to plead sufficient facts upon which the requested relief can be granted.[395]  On February 23, 2023, Mr. F. Shanks Filed the *Notice of Objection on Debtors' Motion to Dismiss of Claim No. 22-01190 of Fred M. Shanks* [Adv. No. 22-01190, Docket No. 18] (the "F. Shanks Objection"), asserting, among other things, that the Terms of Use provided multiple avenues to resolve issues with his loans and that the Debtors breached the same by not letting him exercise these rights, that the Debtors put the plaintiff under duress of impossibility and economic duress, and that he suffered injuries by having his Cryptocurrency liquidated.[396]  The hearing on the Debtors' Motion to Dismiss the F. Shanks Adversary Proceeding was scheduled for June 28, 2023 [Adv. No. 22-01190, Docket No. 19].  On May 16, 2023, however, Mr. F. Shanks Filed a second amended complaint largely restating his arguments [Adv. No. 22-01190, Docket No. 21].  On June 2, 2023, the Bankruptcy Court entered a jointly Filed stipulation, which explained that the Debtors would File a renewed motion to dismiss the amended complaint and setting a briefing schedule with respect to the same [Adv. No. 22-01190, Docket No. 25].

On June 23, 2023, the Debtors Filed the *Notice of Hearing on Debtors' Motion to Dismiss the Second Amended Complaint and Incorporated Memorandum of Law* [Adv. No. 22-01190, Docket No. 27],

---

[390]   Class Claim Settlement Motion, Exhibit B, at 4.

[391]   *Shanks v. Celsius Network LLC, et al*, Case No. 22-10964, Adv. No. 22-01190 (MG) (Bankr. S.D.N.Y.).

[392]   F. Shanks Amended Complaint at 4–5.

[393]   *Id.* at 7.

[394]   Debtors' Motion to Dismiss the F. Shanks Adversary Proceeding ¶ 35.

[395]   *Id.* ¶ 57.

[396]   F. Shanks Objection at 2.

to which Mr. F. Shanks Filed an objection [Adv. No. 22-01190, Docket No. 30].  During the July 18, 2023 omnibus hearing, the Debtors announced that the parties were working to schedule a joint hearing schedule for numerous adversary proceedings, including Mr. F. Shanks' adversary proceeding.

As of the date of the Filing of this Disclosure Statement, such hearing schedule has not yet been established.

(f)    Christopher Lee Shanks v. Celsius Network LLC, *et al.*

On February 10, 2023, Christopher Lee Shanks ("Mr. C. Shanks") Filed a complaint and initiated an adversary proceeding against the Debtors.  On February 21, 2023, Mr. C. Shanks Filed an *Amended Complaint* [Adv. No. 23-01010, Docket No. 4] (the "C. Shanks Amended Complaint").  Mr. C. Shanks alleges that the Debtors initiated a margin call on his loan but did not allow him to withdraw funds or resolve the same due to the Pause.[397]  He seeks a ruling that the Cryptocurrency associated with his account was not property of the estate, that the Debtors should be compelled to provide an accounting and turn over the Cryptocurrency, that the Debtors' loan agreements with customers constituted consumer credit transactions, that the Debtors engaged in deceptive business practices and committed fraud, that the Debtors breached their contract, and that the Debtors have been unjustly enriched.[398]  On April 12, 2023, the Debtors Filed their *Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law* [Adv. No. 23-01010, Docket No. 9] (the "Debtors' Motion to Dismiss the C. Shanks Adversary Proceeding"), and a status conference thereon was held on June 28, 2023.[399]  During the July 18, 2023 omnibus hearing, the Debtors announced that the parties were working to schedule a joint hearing schedule for numerous adversary proceedings, including Mr. C. Shanks' adversary proceeding.

As of the date of the Filing of this Disclosure Statement, such hearing schedule has not yet been established.

(g)    Celsius Network Limited v. Fabric Ventures Group SARL.

On January 17, 2023, CNL Filed a complaint and initiated an adversary proceeding against Fabric Ventures Group SARL ("Fabric Ventures") [Adv. No. 23-01002, Docket No. 1] (the "Fabric Ventures Complaint").  The complaint alleges a breach of contract arising out of Fabric Ventures' alleged commitment to purchase CNL's Series B Preferred Interests with alleged damages of approximately $6 million.[400]  At the March 8, 2023 hearing, the Debtors updated the Bankruptcy Court that the defendant's time to respond had not run yet.[401]

As of the date of the Filing of this Disclosure Statement, Fabric Ventures has not formally responded to the Fabric Ventures Complaint.

---

[397]    C. Shanks Amended Complaint ¶¶ 14–15, 17.

[398]    *Id.* ¶ 4.

[399]    June 28, 2023 Hr'g Tr. 93:24–25, 94–96.

[400]    Fabric Ventures Complaint ¶¶ 1, 47–51.

[401]    Mar. 8, 2023 Hr'g Tr. 58:1–5.

(h)    Yanchuk v. GK8 Ltd/GK8 UK Limited/GK8 U.S.A. LLC

On January 18, 2023, Valeriya Yanchuk ("Yanchuk") Filed a complaint and initiated an adversary proceeding against GK8 [Docket No. 1882; Adv. No. 23-01003] (the "Yanchuk Complaint"). The Yanchuk Complaint, which has not yet been served on the GK8 Debtors, alleges that Yanchuk is entitled to recover her digital assets held on Celsius' platform.[402] The Debtors have attempted to engage with Yanchuk regarding her adversary proceeding and proof of claim, but as of the date of the Filing of this Disclosure Statement have been unsuccessful in doing so.[403]

(i)    Retail Borrower Ad Hoc Group v. Celsius Network LLC, et al.

On February 7, 2023, a group of Celsius customers who participated in the Borrow Program (the "Retail Borrower Ad Hoc Group," as it is defined in the Plan and used throughout this Disclosure Statement) Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01007, Docket No. 2001] (the "Borrow Complaint"). The Borrow Complaint requests declaratory judgments that the Retail Borrower Ad Hoc Group members' Cryptocurrency in the Borrow Program is not property of the estate (and that, to the extent the Debtors hold any interest in such Cryptocurrency, such interest is limited to the outstanding balance of the applicable loans), that loans in the Borrow Program are entitled to the protections of Section 363(o) of the Bankruptcy Code, that the loan agreements are not enforceable, and that the loans are void and unenforceable due to fraudulent inducement.[404] The Borrow Complaint further (i) requests a judgment requiring the Debtors to account for and turn over the Retail Borrower Ad Hoc Group members' Cryptocurrency,[405] and (ii) alleges causes of action for deceptive trade practices concerning misrepresentations of the circumstances of the Retail Borrower Ad Hoc Group members' Cryptocurrency on the platform, consumer fraud regarding misrepresentations of the Borrow Program, unlawful provision of money services, fraudulent misrepresentations, breach of contract of the loan agreements, and unjust enrichment.[406]

The Retail Borrower Ad Hoc Group participated in the Class Claim Mediation. As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, the Retail Borrower Ad Hoc Group agreed to execute a restructuring support agreement to support the Plan and not to take any actions inconsistent with such support, *provided* that a restructuring support agreement executed by a member of the Retail Borrower Ad Hoc Group does not bind other non-signatory members. Pursuant to the Class Claim Settlement, as of the date of the Filing of this Disclosure Statement, the Retail Borrower Ad Hoc Group and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[407]

(j)    Georgiou, et al. v. Celsius Network LLC, et al.

On February 28, 2023, Georges Georgiou, Philip Harris Stewart, and Gilbert Castillo (collectively, the "Georgiou Plaintiffs") Filed a complaint and initiated an adversary proceeding against the Debtors

---

[402]    *See generally* Yanchuk Complaint.

[403]    Mar. 8, 2023 Hr'g Tr. 58:20–25, 59:1–5.

[404]    Borrowers' Complaint ¶¶ 33–48, 90–106.

[405]    *Id.* ¶¶ 39–43.

[406]    *Id.* ¶¶ 49–89, 107–119.

[407]    Class Claim Settlement Motion, Exhibit B, at 4.

[Adv. No. 23-01016, Docket No. 1] (the "Georgiou Complaint").  The Georgiou Plaintiffs collectively (a) allege (i) that the Debtors knowingly altered their historical data to mislead the Georgiou Plaintiffs, (ii) claims for conversion when the Debtors did not return the assets to the Georgiou Plaintiffs, (iii) "failure of contract" claims related to the General Terms of Use, and (b) seek declaratory judgments that the Georgiou Plaintiffs' assets are not property of the estate.[408]  Georges Georgiou also asserts claims of "failure of contract" regarding the terms of use applicable to loan agreements in effect as of February 23, 2022 (the "Loan Terms of Use Version 9"), unjust enrichment, and declaratory judgments that his loan Cryptocurrency is not property of the estate and that a constructive trust for his Cryptocurrency has been established.[409]  On May 3, 2023, the Bankruptcy Court signed the joint stipulation agreed to by the parties setting a briefing schedule agreed to by the parties [Adv. No. 23-01016, Docket No. 6].  On May 17, 2023, the Debtors Filed the *Debtors' Motion to dismiss the Complaint and Incorporated Memorandum of Law* [Adv. No. 23-01016, Docket No. 9] (the "Debtors' Motion to Dismiss the Georgiou Complaint").  The Debtors argued therein that the Georgiou Plaintiffs' claims, which relate to Cryptocurrency in Earn Accounts, are resolved by the Bankruptcy Court's Earn Ruling and are more appropriate for the claims resolution process rather than an adversary proceeding.[410]  The Debtors also argued that the Georgiou Plaintiffs failed to plead facts sufficient to support their various causes of action for fraud, conversion, establishment of a constructive trust, and unjust enrichment, primarily because a valid, enforceable contract existed between the parties and precludes such claims.[411]  On June 14, 2023, the Georgiou Plaintiffs Filed the *Plaintiffs' Opposition to Defendants' Motion to Dismiss* [Adv. No. 23-01016, Docket No. 12] ("Georgiou Plaintiffs Opposition"), arguing that the Debtors had not met the burden to dismiss because the Georgiou Complaint had sufficiently pled facts regarding the Debtors' alleged conduct that was outside the parties' contractual relationship and because the facts in this adversary proceeding were distinct from the facts in other adversary proceedings in this case.[412]  The Debtors Filed the *Debtors' Reply in Support of Debtors' Motion to Dismiss the Complaint and Incorporated Memorandum of Law* [Adv. No. 23-01016, Docket No. 13] (the "Debtors' Reply in Support of Debtors' Motion to Dismiss the Georgiou Complaint") arguing that a motion to dismiss is appropriate as the Georgiou Plaintiffs' factual allegations do not support their conclusion that the Terms of Use were terminated.[413]  Further, Account Holders of Earn Accounts must submit their Claims through the claims resolution process.[414]  During the July 18, 2023 omnibus hearing, the Debtors announced that the parties were working to schedule a joint hearing schedule for numerous adversary proceedings, including the Georgiou Plaintiffs' adversary proceeding.

As of the date of the Filing of this Disclosure Statement, such hearing schedule has not yet been established.

(k)    Tuganov v. Celsius Network LLC, *et al.*

On March 20, 2023, Mr. Tuganov Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01024, Docket No. 1] (the "Tuganov Complaint").  Mr. Tuganov seeks

---

[408]    Georgiou Complaint ¶¶ 46–77.

[409]    *Id.* ¶¶ 78–104.

[410]    Debtors' Motion to Dismiss the Georgiou Complaint ¶¶ 2, 34.

[411]    *Id.* ¶ 3.

[412]    Georgiou Plaintiffs' Opposition ¶¶ 1–8.

[413]    Debtors' Reply in Support of Debtors' Motion to Dismiss the Georgiou Complaint ¶¶ 8, 14.

[414]    *Id.* ¶ 3.

declaratory judgments that prepetition the Debtors operated as a Ponzi scheme, the Debtors should be substantively consolidated in the chapter 11 cases, and that all contracts with the Debtors, including the Terms of Use, are null and void due to the Debtors' operation as a Ponzi scheme.[415] On April 21, 2023, Mr. Tuganov, the Committee, and the Debtors Filed the *Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors, the Debtors, and Ignat Tuganov with Respect to Certain Deadlines* [Adv. No. 23-01024, Docket No. 5], agreeing to hold in abeyance all responsive deadlines.  The Bankruptcy Court approved the joint stipulation on April 27, 2023 [Adv. No. 23-01024, Docket No. 6].

At his own request, Mr. Tuganov participated the Class Claim Mediation.  As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, Mr. Tuganov agreed to execute a restructuring support agreement to support the Plan and not take any actions inconsistent with such support.  Accordingly, as of the date of the Filing of this Disclosure Statement, Mr. Tuganov and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[416]

(l)    Herrmann v. Celsius Network LLC, *et al.*

On March 21, 2023, Mr. Herrmann Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01025, Docket No. 1] (the "Herrmann Complaint").  Mr. Herrmann seeks declaratory judgments that certain loan Cryptocurrency in the Borrow Program is not property of the estate, that a constructive trust existed, that the Terms of Use and the Loan Terms of Use Version 9 are not enforceable, and that the Terms of Use and Loan Terms of Use Version 9 are void and unenforceable due to fraudulent inducement and securities fraud.[417]  Mr. Herrmann also alleges claims of conversion of such loan Cryptocurrency, failure of contract regarding the Terms of Use, unjust enrichment, deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, and conversion of collateral into unregistered securities and securities fraud.[418]  On May 18, 2023, the parties Filed a joint stipulation agreeing to the further amendment of Mr. Herrmann's complaint and extending the Debtors' deadline to respond to June 20, 2023 [Adv. No. 23-01025, Docket No. 7], which the Bankruptcy Court subsequently entered [Adv. No. 23-01025, Docket No. 8].  On June 16, 2023, the parties Filed an additional joint stipulation agreeing to the further amendment of Mr. Herrmann's complaint and extending the Debtors' deadline to respond to July 20, 2023 [Adv. No. 23-01025, Docket No. 12], which the Bankruptcy Court entered on June 20, 2023 [Adv. No. 23-01025, Docket No. 13].

On February 19, 2023, the Debtors Filed the *Debtors' Objection to Proof of Claim No. 24604 of Immanuel Herrmann* [Docket No. 2105] (the "Objection to Herrmann's POC").  Therein, the Debtors explained that the Bankruptcy Court's decision with respect to the question of who owns assets in Earn Accounts, issued on January 4, 2023, is instructive to Mr. Herrmann's circumstances.

At his own request, Mr. Herrmann participated the Class Claim Mediation.  As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, Mr. Herrmann agreed to execute a restructuring support agreement to support the Plan and not take any actions inconsistent with such support.  Accordingly, as of the date of the Filing of this Disclosure Statement, Mr. Herrmann and the Debtors agreed

---

[415]    Tuganov Complaint ¶¶ 1, 90–112.

[416]    Class Claim Settlement Motion, Exhibit B, at 4.

[417]    Herrmann Complaint ¶¶ 155-161.

[418]    Herrmann Complaint pp. 14–25; Claims Six, Seven, Eight, Nine, Ten, and Twelve.

to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[419]

(m)     Rhodium Enterprises, Inc. v. Celsius Mining LLC.

On April 21, 2023, Rhodium Enterprises, Inc. ("Rhodium") Filed a complaint and initiated an adversary proceeding against Debtor Celsius Mining [Adv. No. 23-01101, Docket No. 1] (the "Rhodium Complaint"). Rhodium seeks a declaratory judgment regarding certain rights of Celsius Mining under a "Simple Agreement for Future Equity" ("SAFE")[420] between Celsius Mining and Rhodium in connection with Rhodium's pending merger with non-party SilverSun Technologies, Inc. ("SilverSun"). Specifically, under the SAFE, Celsius paid $50 million to Rhodium in exchange for certain consideration upon the occurrence of certain triggering events.[421] At issue is what kind of triggering event Rhodium's merger with SilverSun is; the consideration owed to Celsius depends on that categorization.[422] Because the merger may be terminated if not closed by June 30, 2023, Rhodium seeks a declaratory judgment that under the SAFE and the merger agreement, (1) Celsius Mining is only entitled to $50 million in SilverSun shares under the SAFE and not Cash,[423] and (2) Celsius Mining is not entitled to either challenge the $650 million valuation or receive additional information on how that valuation is calculated, among other things.[424]

Celsius Mining maintains that under the SAFE and Rhodium's merger agreement with SilverSun, (1) Celsius Mining is entitled to a discount on the valuation used to calculate the shares owed to it–and thus a larger number of shares in SilverSun, (2) Celsius Mining is entitled to receive $50 million in Cash rather than stocks in the post-merger entity, and (3) the $650 million valuation of Rhodium is inflated, and Rhodium and SilverSun should provide more information as to how they arrived at this figure.[425]

Following a conference held on May 2, 2023, the Bankruptcy Court entered the *Case Management and Scheduling Order* [Adv. No. 23-01101, Docket No. 23] setting deadlines with respect to briefing, disclosures, and discovery, and other guidelines, and the Debtors served discovery requests on Rhodium.[426] The parties subsequently entered into a *Confidentiality Agreement and Stipulated Protective Order* [Adv. No. 23-01101, Docket No. 24]. On May 18, 2023, however, Rhodium Filed a notice voluntarily dismissing its adversary proceeding without prejudice [Adv. No. 23-01101, Docket No. 25]. Subsequently, on May 22, the Debtors Filed their Ex Parte *Motion for Entry of an Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing the Examination of Rhodium Enterprises, Inc.* [Docket No. 2697] (the "Application for Rule 2004 Examination of Rhodium") requesting authority to proceed with a Rule 2004 examination and for approval of expedited procedures for resolving any disputes related to Rhodium's responses to discovery in connection with the Rule 2004

---

[419]    Class Claim Settlement Motion, Exhibit B, at 4.

[420]    A SAFE is a type of financing agreement that provides investors the right to receive shares or other consideration in the future from a company at an agreed-upon price.

[421]    Rhodium Complaint ¶ 2.

[422]    *Id.* ¶ 7.

[423]    Specifically, Rhodium argues that Celsius Mining should receive a number of shares equal to the price Celsius paid to purchase the SAFE ($50 million), divided by the price per share based on Rhodium's $650 million valuation. *Id.* ¶¶ 64–66.

[424]    *Id.* ¶¶ 89–90.

[425]    *Id.* ¶¶ 75–76.

[426]    Application for Rule 2004 Examination of Rhodium (as defined herein) ¶ 1.

examination. Therein, the Debtors stated that Rhodium had dismissed the adversary proceeding unilaterally, without consulting the Debtors, and that it did so to avoid responding to the Debtors' discovery requests.[427] The Bankruptcy Court entered the order granting the Application for Rule 2004 Examination of Rhodium the next day [Docket No. 2701].

After entry of the Rhodium Rule 2004 Order, the Debtors issued a subpoena seeking Rhodium's production of certain documents and records. Rhodium filed a response and objections to the Debtors' subpoena on June 2, 2023. Thereafter, on July 24, 2023, the Debtors and Rhodium Filed the *Stipulation and Agreed Order Between Debtors and Rhodium Enterprises, Inc. Regarding ESI Review and Production in Connection With Rule 2004 Examination* [Docket No. 3083] (the "Production Stipulation"), which sets forth an agreed upon document production process and schedule. The Production Stipulation was approved by the Bankruptcy Court the next day [Docket No. 3086].

(n)    Celsius Network Limited v. StakeHound SA.

On July 11, 2023, CNL Filed a complaint and initiated an adversary proceeding against StakeHound SA ("StakeHound") [Adv. No. 23-01138, Docket No. 1] (the "StakeHound Complaint"). The StakeHound Complaint alleges a violation of the automatic stay, turnover of estate property, and breach of contract arising out of StakeHound's alleged failure to return certain of Celsius' digital assets worth approximately $150 million, including ETH, MATIC, and DOT tokens, that were entrusted to StakeHound as part of Celsius' staking strategy.[428] StakeHound allegedly lost the keys associated with certain of Celsius' staked ETH and maintained that it was not required to return any of Celsius' staked ETH, whether lost or otherwise.[429] StakeHound then commenced arbitration in Switzerland to resolve the dispute, thereby, according to CNL, violating of the automatic stay.[430] Celsius then requested the return of Celsius' other staked digital assets pursuant to agreements between the parties, which has not occurred.[431] CNL issued a summons and a notice of pretrial conference, and as of the date of the Filing of this Disclosure Statement, such pretrial conference is scheduled for August 29, 2023.[432]

On July 19, 2023, CNL Filed the *Plaintiff Celsius Network Limited's Motion for An Order Authorizing Alternative Service on Defendant StakeHound SA Pursuant to Federal Rule of Civil Procedure 4(f)(3)* [Adv. No. 23-01138, Docket No. 9] (the "Alternative Service Motion"), requesting that CNL be allowed to serve the StakeHound Complaint on StakeHound via email instead of the Hague Convention, which could take up to six months and result in dissipation of the property at issue. On July 27, 2023, StakeHound Filed the *Defendant StakeHound, S.A.'s Objection to Plaintiff's Motion for an Order Authorizing Alternative Service Pursuant to Federal Rule of Civil Procedure 4(f)(3)* [Adv. No. 23-01138, Docket No. 13], arguing that CNL should not be allowed to circumvent the Hague Convention. At a hearing on August 2, 2023 on CNL's motion with respect to service of the StakeHound Complaint, the Bankruptcy Court listened to the parties' arguments but ultimately adjourned the hearing, directed the parties to engage in discussions as to a possible path forward, and directed the parties to return to the Bankruptcy Court on

---

[427]    *Id.* ¶ 5.

[428]    StakeHound Complaint ¶ 1–2, 4, 50–71.

[429]    *Id.* ¶ 5, 42-45.

[430]    *Id.* ¶ 6, 46–49, 51–59.

[431]    *Id.* ¶ 7, 66–71.

[432]    Summons and Notice of Pretrial Conference in an Adversary Proceeding [Adv. No. 23-01138, Docket No. 7].

August 7, 2023 for additional argument.[433]  On August 7, 2023, StakeHound Filed a letter [Adv. No. 23-01138, Docket No. 21] representing to the Bankruptcy Court that it had shared with CNL a proposed stipulation in which it agreed to accept service of process via email to its U.S. counsel and proposed a briefing schedule for its prospective motion to compel arbitration, among other things.  CNL Filed a reply letter [Adv. No. 23-01138, Docket No. 22] clarifying that it will consider the Alternative Service Motion moot if the StakeHound Complaint is deemed duly served, and that it is willing to continue to meet and confer with StakeHound over early motion practices.

As of the date of the Filing of this Disclosure Statement, the Bankruptcy Court has not ruled on the Alternative Service Motion.

**L.    Resolution of Key Legal Issues.**

At the outset of these Chapter 11 Cases, the Debtors identified certain key legal issues that would be critical to the outcome of the Chapter 11 Cases.[434]

One such issue was the question of whether the Cryptocurrency transferred to the Debtors' platform constituted property of the Debtors' estate, and whether the answer to this question was different for Cryptocurrency assets in the Earn Program, the Custody Program, or Withhold Accounts.[435]  In the course of the Chapter 11 Cases, the parties in interest also identified an interconnected issue, namely the question of which Debtor entities are liable to Account Holders under the Terms of Use between Network LLC and its Account Holders, and subsequently engaged in similarly extensive briefing and hearings on this issue. Finally, on April 24, 2023, the Bankruptcy Court entered an order setting a briefing and discovery schedule to estimate the amount of the intercompany claim owed to Network LLC by CNL [Docket No. 2522].

*1.    Cryptocurrency Held in the Earn Program and Sale of Stablecoin.*

On September 15, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 832] (the "Original Motion to Sell Stablecoin") seeking authority to sell stablecoins held by the Debtors to fund operating expenses, including the administration of these Chapter 11 Cases.   The Debtors asserted that the sale of stablecoins was consistent with prepetition practice, was an efficient way to generate liquidity to help fund the Debtors' operations, and was a reasonable exercise of the Debtors' business judgment.[436]  Following further analysis and review, and as a result of the Debtors receiving a significant number of formal and informal responses and objections, however, the Debtors recognized that any sale of stablecoins in the Earn Program required the Debtors to establish title to those stablecoins, which also required a determination as to who holds title to Cryptocurrency in the Debtors' Earn Program——the Debtors or Account Holders.[437]

---

[433]    Aug. 2, 2023 Hr'g. Tr. 45:23–25, 46:1–10.

[434]    *See First Day Hearing Presentation* [Docket No. 45].

[435]    *See id.*

[436]    Original Motion to Sell Stablecoin ¶ 11.

[437]    *See Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 1228] (the "Statement on the Original Stablecoin Motion") ¶ 1.  A list of the objections received by the Debtors is included in the Statement on the Original Stablecoin Motion.  *Id.* ¶ 1 n.3.

Accordingly, on November 11, 2022, the Debtors Filed an amended motion [Docket No. 1325] (the "Amended Earn/Stablecoin Motion") seeking entry of an order (i) establishing ownership of assets in the Earn Program, (ii) permitting the sale of stablecoins consistent with past practice and in the ordinary course of business, and (iii) granting related relief.  The Debtors argued that the question of whether Earn Assets constituted property of the Debtors' estate was a question of contract law that could be resolved by analysis of the Terms of Use, which all Celsius customers had to accept in order to use the Earn Program.[438] The Amended Earn/Stablecoin Motion did not seek a determination as to whether any Account Holders in the Earn Program held valid defenses to the purported contract between them and the Debtors under the Terms of Use, and reserved the rights of all parties with respect to the foregoing.[439]

Contemporaneously with the Filing of the Amended Earn/Stablecoin Motion, the Debtors Filed the *Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (the "Proposed Scheduling Order"), which established the following objectives: (a) a determination of ownership rights to assets transferred by Account Holders and designated to be part of the Earn Program based on the unambiguous plain language of each version of the Terms of Use; (b) a determination as to whether each applicable version of the Terms of Use forms a binding contract with users who transferred assets to the Debtors while such Terms of Use were in effect; (c) a determination as to whether subsequent amendments to the Terms of Use were binding on users who transferred their assets to the Debtors prior to the effectiveness of the subsequently amended Terms of Use; and (d) a determination as to whether the specific stablecoin sought to be sold is property of the Debtors' estates (if not covered by the previous three issues).[440]  The Proposed Scheduling Order also identified matters that were beyond the scope of the Amended Earn/Stablecoin Motion, including whether any Account Holder has a valid defense to the purported contract between Account Holders and the Debtors under the Terms of Use, and reserving all parties' rights with respect to the foregoing.

Pursuant to the Proposed Scheduling Order, the Debtors agreed to respond to certain written deposition questions Filed by the Committee, and agreed to make each Earn Declarant available for one day of oral deposition.[441]    In formulating the written deposition questions, the Committee consulted (a) the U.S. Trustee, (b) certain state regulators, including the Texas Attorney General, the Vermont Attorney General, and the National Association of Attorneys General, and (c) certain *pro se* creditors.[442]  The Debtors answered forty-five of the Earn Deposition Questions on November 18, 2022 [Docket No. 1306].  While only the Committee was entitled to submit written deposition questions, parties attending the oral depositions were entitled to ask questions, subject to a cumulative seven-hour time limit for each deposition.[443]  Mr. Ferraro was deposed by the Committee, the U.S. Trustee, state regulators, and

---

[438]    Amended Earn/Stablecoin Motion ¶ 14.

[439]    *Id.*  ¶ 16.  The Debtors submitted the declarations of Oren Blonstein ("Mr. Campagna"), Christopher Ferraro ("Mr. Ferraro"), and Robert Campagna ("Mr. Campagna") in support of the Amended Earn/Stablecoin Motion [Docket Nos. 1326–1328] (Mr. Campagna, Mr. Ferraro, and Mr. Blonstein, each an "Earn Declarant," and collectively, the "Earn Declarants").

[440]    Proposed Scheduling Order ¶ 3.

[441]    *Id.* ¶¶ 1, 6.

[442]    *See Official Committee of Unsecured Creditors' Written Deposition Questions for the Debtors in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1345] Exhibit A (the "Earn Deposition Questions") ¶ 6.

[443]    Proposed Scheduling Order ¶ 6.

*pro se* creditors on November 21, 2022.[444]  The other Earn Declarants were deposed by the Committee, U.S. Trustee, state regulators, and *pro se* creditors on November 22, 2022.[445]  At the request of *pro se creditor* Mr. Frishberg, Mr. Blonstein was made available for additional and limited oral questioning on December 2, 2022.[446]  The Proposed Scheduling Order was never entered by the Bankruptcy Court; however, the Debtors and other parties abided by the process outlined therein. Over thirty objections and letters, many from *pro se* creditors, were Filed with the Bankruptcy Court in response to the Amended Earn/Stablecoin Motion.[447]  The objections to the Amended Earn/Stablecoin Motion principally argued that Account Holders did not intend to transfer title over Cryptocurrency to the Debtors, the Terms of Use did not provide for the transfer of title to the Debtors, and that the Debtors had not proven their reasonable business judgment in attempting to sell stablecoins.

On December 5, 2022, the Bankruptcy Court held an in-person trial on the Amended Earn/Stablecoin Motion.[448]  The Debtors argued in support of the Amended Earn/Stablecoin Motion, and the Committee agreed with the Debtors that the Terms of Use unambiguously grant the Debtors ownership of the Earn Assets.[449]  Mr. Blonstein testified that over 90 percent of Account Holders, representing 99 percent of asset value, affirmatively accepted Terms of Use version 6 or later.[450]  The Bankruptcy Court acknowledged that the question of ownership was clear in "Version 6 forward."[451]  The U.S. Trustee, the Texas State Securities Board and Texas Department of Banking, the National Association of Attorneys General, the New Jersey Bureau of Securities, and numerous *pro se* creditors spoke in opposition to the Debtors' Amended Earn/Stablecoin Motion.[452]  On January 4, 2023, the Bankruptcy Court issued its *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling"), holding that the "Terms of Use formed a valid, enforceable contract between the

---

[444]  *Notice of Deposition of Christopher Ferraro in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1389].

[445]  *Notice of Deposition of Oren Blonstein in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1388]; *Official Committee of Unsecured Creditors' Notice of Deposition of Robert Campagna in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1418].

[446]  Mr. Frishberg sent a letter to the Bankruptcy Court requesting Mr. Blonstein be made available for additional questions due to insufficient time on November 22, 2022 [Docket No. 1534].  On December 1, 2022, the Debtors sent a letter to the Bankruptcy Court opposing the request for additional deposition of Mr. Blonstein [Docket No. 1540].  Mr. Blonstein was deposed by Mr. Frishberg on December 2, 2022.  *Daniel Frishberg's Notice of Deposition of Oren Blonstein* [Docket No. 1577].

[447]  *See Debtors' Reply in Support of Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course, and (III) Granting Related Relief and Response to Certain Objections Thereto* [Docket 1578] (the "Earn/Stablecoin Reply"), Exhibit A, which provides a summary chart of all objections Filed in response to the Amended Earn/Stablecoin Motion.

[448]  *See generally* Dec. 5, 2022 Hr'g Tr. [Docket No. 1656].

[449]  *Id.* at 116:6–9, 15–22; 122:7–124:15.

[450]  *Id.* at 103:3–7.

[451]  *Id.* at 105:13.

[452]  *See generally id.*

Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Account Holders to the Debtors," and authorizing the Debtors to sell stablecoins to provide liquidity for these Chapter 11 Cases.[453]

The Earn Ruling first addressed the threshold questions of contract formation and modification. First, the Bankruptcy Court found that the Terms of Use formed a valid contract between the Account Holders and the Debtors because the "Second Circuit is clear that clickwrap contracts such as the Terms of Use are valid and binding," thus providing a sufficient basis for the "mutual assent element of contract formation."[454]  Second, the Bankruptcy Court found that the Debtors successfully modified the Terms of Use:  "Notwithstanding the language in the Terms of Use permitting [unilateral] modification by the Debtors, the Debtors specifically required all Account Holders to affirmatively accept Terms Version 6."[455]  The Bankruptcy Court found that the steps taken by the Debtors, including the use of pop-ups and prominent hyperlinks to the updated Terms of Use, satisfied the standard for valid clickwrap agreements under New York.[456]  After finding that the Terms of Use formed a valid contract between Account Holders and the Debtors, the Bankruptcy Court determined that the contract unambiguously granted the Debtors ownership of the Earn Assets.  Additionally, the Bankruptcy Court found no basis in the Terms of Use to distinguish between the treatment of stablecoins and other Earn Assets.[457]

The Earn Ruling answered the gating question of whether the Terms of Use granted the Debtors' ownership of the Earn Assets.  The Bankruptcy Court, however, made clear that this determination was not the end of the matter— the Earn Ruling expressly reserved "creditors' rights with respect to various defense to and breach of contract claims," which are reserved for the claims resolution process.[458]  The Bankruptcy Court, in explaining its sequencing of these distinct questions, explained that, "as a prerequisite to those [creditor] claims, the Court first must establish that a contract was formed and must interpret the contract terms."[459]

Numerous *pro se* creditors have appealed the Earn Ruling.  On January 18, 2023, *pro se* creditors Daniel A. Frishberg, Georges Georgiou, Immanuel J. Hermann, Kulpreet Khanuja, Christopher J. Little, and Luke P. Nowak (the "Earn Appellants") Filed the *Notice of Appeal and Statement of Election and the Motion to Authorize Certain Procedural Relief, And If Needed, for Leave to Appeal* [Docket No. 1894, Earn Appeal Docket No. 1] (the "Earn Appeal") in the United States District Court for the Southern District of New York (the "District Court") seeking leave to appeal the Earn Ruling.[460]  The parties Filed various

---

[453]   Earn Ruling at 30.

[454]   *Id.* at 33.

[455]   *Id.* at 35.

[456]   *Id.* at 36.

[457]   *Id.* at 5, 30.

[458]   *Id* at 45.

[459]   *Id* at 44.

[460]   The case is *In re Celsius Network LLC*, 1:23-cv-00523-JPO (S.D.N.Y. January 20, 2023) (the "Earn Appeal Docket"). Separate appeals to the Earn Ruling were Filed by Kwok Mei Po and Courtney Burks Steadman.  *Notice of Appeal and Statement of Election* [Docket No. 1952] (the "Kwok Joinder"); *Notice of Appeal and Statement of Election* [Docket No. 1973] (the "Steadman Appeal").  Steadman's case is *In re Celsius Network, LLC*, 1:23-cv-01302-JPO (S.D.N.Y. February 15, 2023) (the "Steadman Appeal Docket").  On February 15, 2023, Steadman Filed her *Statement of Issues to Be Presented and Designation of Items to Be Included in the Record of Appeal* [Docket No. 2121] (the "Steadman Designation").  In response to the Steadman Designation, the Debtors Filed a motion to strike certain items from the record [Docket No. 2127]

motions concerning the issues on appeal and the record on appeal.[461]  On February 2, 2023, the Debtors filed the *Debtors' Response in Opposition to Appellants' Motion for Leave to Appeal* [Earn Appeal Docket No. 3], requesting that the District Court deny the Earn Appeal and Kwok Joinder on the basis that the Earn Ruling is interlocutory, and an interlocutory appeal would be value destructive.

On March 27, 2023, the District Court denied the Earn Appellants' motion for leave to appeal and dismissed the Earn Appeal, Steadman Appeal, and Khanuja Appeal on the basis that (a) the Earn Ruling is not a final order, and (b) the circumstances do not warrant an interlocutory appeal.[462]

### 2. Custody/Withhold Briefing.

On August 31, 2022, an ad hoc group of Celsius customers with digital assets in the Custody Program (the "Custody Ad Hoc Group") Filed a complaint and initiated an adversary proceeding against Celsius requesting a declaratory judgment that assets in Custody Accounts are not property of the Debtors' estates.[463]  On September 1, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "Motion to Return Assets").  In their Motion to Return Assets, the Debtors requested authority to allow withdrawals of Cryptocurrency that was only ever in Custody Accounts and Withhold Accounts as well as Cryptocurrency transfers made in the ninety days before the Petition Date from the Earn Program or Borrow Program to Custody Accounts or Withhold Accounts that were, in the aggregate, under the statutory cap of $7,575 set out in section 547(c)(9) of the Bankruptcy Code.[464]  The requested relief did not apply to current or former employees of Celsius or insiders, any affiliates of current or former employees or insiders, or to customers with an outstanding loan.[465]  On September 7, 2022, an ad hoc group of Celsius customers with

---

(the "Steadman Motion to Strike").  Steadman also filed a statement of relatedness to the Earn Appeal [Steadman Appeal Docket No. 2].  The Kwok Joinder was withdrawn on February 17, 2023.  *Notice to Withdraw Kwok Mei Po's Amended Notice of Appeal (court docket 1952)* [Docket No. 2096].

Separately, Kulpreet Khanuja appealed the *Order Denying Kulpreet Khanuja's Motion Seeking a Ruling That Personal Earn Assets Are Not Property of the Debtors' Estates* [Docket No. 1934] (the "Khanuja Order").  *Notice of Appeal and Statement of Election* [Docket No. 1974].  The case is *In re Celsius Network LLC*, 1:23-cv-1243-JHR (S.D.N.Y. February 13, 2023) (the "Khanuja Appeal").  On February 13, 2023, Kulpreet Khanuja Filed the *Appellants' Statement of Issues to Be Presented and Designation of Items to Be Included in the Record on Appeal* [Docket No. 2063] (the "Khanuja Designation").  On February 15, 2023, the Debtors filed the *Debtors' Response to Kulpreet Khanuja's Notice of Appeal* [Khanuja Appeal Docket No. 3].  The Debtors also Filed a motion to strike from the record certain items requested in the Khanuja Designation [Docket No. 2126] (the "Khanuja Motion to Strike").  The Earn Appellants sent a letter to Judge Oetken requesting that the Earn Appeal, Steadman Appeal, Khanuja Appeal, and Kwok Joinder be consolidated [Earn Appeal Docket No. 7].  On February 28, 2023, the District Court entered an order requiring the Debtors to respond to the Earn Appellants' letter and address the questions of whether the Khanuja Appeal should be consolidated with the other cases, and whether the Khanuja Order is a final appealable order [Earn Appeal Docket No. 9].  On March 3, 2023, the Debtors filed their reply [Earn Appeal Docket No. 10].  The Debtors agreed that consolidation of the Earn Appeal and Khanuja Appeal is appropriate but maintained that the Khanuja Order and Earn Order are not final appealable orders, and therefore, the District Court should deny the appellants' leave to appeal [Earn Appeal Docket No. 10].

[461]    *See generally* [Docket Nos. 1976, 2085, 2164, 2187, Earn Appeal Docket No. 5].

[462]    *See generally* [Docket No. 2323, Earn Appeal Docket No. 12].

[463]    *Ad Hoc Group of Custodial Account Holders v. Celsius Network LLC, et. al.*, Case No. 22-10964, Adv. No. 22-01142 (MG) (Bankr. S.D.N.Y. Aug. 31, 2022); *Complaint for Declaratory Judgment* [Adv. Pro. 22-10964, Docket No. 1].

[464]    Motion to Return Assets ¶¶ 4-5, 10.

[465]    *Id.* ¶ 6.

digital assets in Withhold Accounts (the "Withhold Ad Hoc Group" and together with the Debtors, the Custody Ad Hoc Group, and the Committee, the "Custody and Withhold Parties") Filed the *Ad Hoc Group of Withhold Account Holders' Motion for Relief from the Automatic Stay* [Docket No. 737] arguing that Cryptocurrency in Withhold Accounts is not property of the Debtors' estates and requesting that Cryptocurrency in Withhold Accounts be returned to members of the Withhold Ad Hoc Group.

The Bankruptcy Court ordered the Custody and Withhold Parties to "meet and confer" with regards to the overlapping issues raised in the pleadings. Following the meet and confer, the Custody and Withhold Parties Filed a briefing schedule in the *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Orders* [Docket No. 1044], consisting of two phases ("Phase I" and "Phase II").

Following a trial on Phase I issues on December 7, 2022, the Bankruptcy Court ruled from the bench that digital assets in the Custody Wallets and digital assets transferred to Celsius' platform that were not supported on the platform (the "Ineligible Withhold Assets") are not property of the Debtors' estates.[466] The Bankruptcy Court subsequently entered an order permitting the Debtors to release to customers (i) digital assets that were only ever in the Custody Program, (ii) transfers of digital assets to the Custody Program made in the ninety days before the Petition Date when such transfers were, in the aggregate, less than $7,575 at the time of the transfers, and (iii) Ineligible Withhold Assets in the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "Custody Withdrawal Order").

On January 19, 2023, the Bankruptcy Court entered an order directing the parties to meet and confer regarding the distribution of "assets that all Parties agree are Custody Assets, setting aside for later determination, on a coin-by-coin basis, any shortfall as to which a further determination by the Bankruptcy Court is necessary before such shortfall can be allocated."[467] On January 31, 2023, the Debtors Filed *Notice of Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 1958] (the "Custody Withdrawal Notice") detailing the eligibility requirements for withdrawal, identifying the Custody users eligible to withdraw, and explaining the process for withdrawal. The Custody Withdrawal Notice permitted eligible users to withdraw 94% of their assets eligible for withdrawal in light of the six percent shortfall between the aggregate liabilities of the Custody Program and the digital assets actually held in Custody Wallets (the "Shortfall Issue").[468] In mid-February 2023, the Debtors sent eligible users communications via email and the Celsius application informing them of their eligibility and the steps they were required to take in order to withdraw, including updating specific customer information related to Anti-Money Laundering (AML) and Know Your Customer (KYC) procedures. On February 28, 2023, the Debtors Filed the *Notice of Potential Increase to Amount of Distributable Custody Assets* [Docket No. 2149] alerting Account Holders that Custody users may receive a greater distribution than anticipated by the Custody Withdrawal Notice pursuant to the pending settlement agreement between the Debtors, the Committee, and the Custody Ad Hoc Group (the "Custody Settlement"), as further explained below. Withdrawals pursuant to the Custody Withdrawal Notice opened on March 2, 2023, as described in the *Notice of Withdrawals Opening for Eligible Custody Users* [Docket No. 2176], and were processed thereafter. On April 17, 2023, the Debtors Filed the *Notice of Revised Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 2491], informing all Custody users eligible for withdrawal that they were now entitled to

---

[466]   Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684].

[467]   *Order Directing Certain Parties to Confer Regarding Custody Assets Shortfall Issue* [Docket No. 1880].

[468]   Custody Withdrawal Notice ¶ 4.

withdraw the full 100% of their assets eligible for withdrawal. The Debtors have also informed Custody users eligible for withdrawal of changes in withdrawal fees.[469]

As of the date of the Filing of this Disclosure Statement, over 15,300, or approximately 39% of eligible users have withdrawn approximately 83% of the value available for withdrawal (approximately $72.7 million in U.S. Dollars as of the Petition Date) off the Debtors' platform pursuant to the Custody Withdrawal Order, the Custody Settlement, and other orders by the Bankruptcy Court authorizing withdrawals off of the platform.

(a)    The Custody Settlement.

After entry of the Custody Withdrawal Order, the disposition of Custody Assets that are subject to (i) Avoidance Actions by the Debtors and (ii) the Debtors' right to setoff in connection with outstanding retail loans (the "Non-Withdrawable Custody Assets") remained unresolved. Also unresolved was the Shortfall Issue and how it would affect the withdrawal process.

After the completion of Phase I, the Debtors, the Committee, and the Custody Ad Hoc Group began negotiating a possible settlement as an alternative to moving to Phase II. The negotiations led to a resolution, and thus, on February 28, 2023, the Debtors, the Custody Ad Hoc Group, and the Committee Filed the Custody Settlement Motion, wherein they requested the Bankruptcy Court's approval of a settlement that would dispose of the Non-Withdrawable Custody Assets, resolve the Shortfall Issue, and provide a clear path forward for all Custody Account Holders.

The terms of the Custody Settlement are discussed in greater detail in Article III.TT of this Disclosure Statement. At a high level, the settlement provides that Custody Account Holders who elect to participate in the settlement will receive 72.5% of the digital assets in their Custody Accounts and the settlement of all Causes of Action the Debtors hold against Custody Account Holders, solely with respect to such Holders' Custody Accounts, in exchange for granting title of the remaining 27.5% of the Custody Account Holder's digital assets to the Debtors.[470] The Custody Settlement also provides that Custody users already eligible to withdraw pursuant to the Custody Withdrawal Notice will be entitled to withdraw the full balance of their Custody Assets eligible for withdrawal.[471] Following a hearing on March 21, 2023, the Bankruptcy Court approved the settlement and entered the Custody Settlement Order.

(b)    The Withhold Settlement.

While the Custody Withdrawal Order provided that Ineligible Withhold Assets could be withdrawn from the platform, it did not provide for the withdrawal of Transferred Withhold Assets. While the Bankruptcy Court has yet to determine whether Transferred Withhold Assets are property of the Debtors' estates, on March 28, 2023, the Debtors, the Withhold Ad Hoc Group, and the Committee Filed the Withhold Settlement Motion, requesting the Bankruptcy Court's approval of a settlement that resolved all disputes with respect to the Transferred Withhold Assets, and provided a clear path forward for all Withhold Account Holders (the "Withhold Settlement"). Following a hearing on April 18, 2023, the Bankruptcy Court approved the settlement and entered the *Order (I) Approving the Settlement By and Among the*

---

[469]    *Notice of Increased Withdrawal Fees* [Docket No. 2600]; *Notice of Decreased Withdrawal Fees* [Docket No. 2686].

[470]    Custody Settlement Motion ¶ 1.

[471]    *Id.* ¶ 4.

Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief [Docket No. 2509] (the "Withhold Settlement Order").

The terms of the Withhold Settlement are discussed in greater detail in Article III.UU of this Disclosure Statement. At a high level, the settlement provides that Withhold Account Holders who are members of the Withhold Ad Hoc Group and opt into the Withhold Settlement pursuant to its terms will receive 15% of their Withhold Distribution Claim in kind and the remaining 85% will be converted to an Earn Claim. Withhold Account Holders who are not members of the Withhold Ad Hoc Group can also receive the benefits of the Withhold Settlement when they vote on the Plan. If the class of Withhold Claims votes to accept the Plan, all Withhold Account Holders will receive the terms set out in the Withhold Settlement; however, if the class of Withhold Claims votes to reject the Plan, the class of Withhold Claims will receive the same treatment as Earn Claims under the Plan.

### 3. Customer Claims Briefing.

On November 14, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Setting A Briefing Schedule and (II) Granting Related Relief* [Docket No. 1338] to determine which Debtor entities are liable to Account Holders under the Terms of Use (the "Customer Claims Issue").

The Debtors, the Series B Holders, and the Committee Filed briefs addressing the Customer Claims Issue.[472] The Debtors and the Committee argued, among other things, that the plain language of the Terms of Use, which define "Celsius" as "Celsius Network LLC and its Affiliates," meant that each of the Debtors should be considered an "Affiliate" pursuant to the Terms of Use and that each of the Debtors therefore have liability to Account Holders.[473] The Series B Holders countered that the indemnification and limitation of liability provision of the April 2022 Terms of Use restricts liability to LLC only.[474] The Series B Holders further argued that additional support for their position can be found in certain "extrinsic evidence" such as statements by the Debtors related to the migration of the customer-facing business from CNL to LLC, CNL's course of conduct following this migration, and postpetition statements and documents Filed in these Chapter 11 Cases.[475]

Following an evidentiary hearing, on March 9, 2023, the Bankruptcy Court issued the *Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205] (the "Customer Claims Ruling"). The Bankruptcy Court determined that

---

[472] *Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Docket No. 1795] ("Series B Holders' Brief on Account Holders' Claims"); *The Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors That Are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [Docket No. 1797] ("Committee Brief on Account Holders' Claims"); *Debtors' Opening Brief Regarding Account Holders' Claims Issues* [Docket No. 1799] ("Debtors' Brief on Account Holders' Claims"); *Series B Preferred Holders' Response Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use* [Docket No. 1960] ("Series B Holders' Response Brief on Account Holders' Claims"); *Debtors' Response Brief Regarding Account Holders' Claims Issues* [Docket No. 1962] ("Debtors' Response Brief on Account Holders' Claims"); *The Official Committee of Unsecured Creditors' Response Brief Regarding Debtors that are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [Docket No. 1965] ("Committee Response Brief on Account Holders' Claims").

[473] *Id.* ¶¶ 6, 7, 20; Committee Brief on Account Holders' Claims ¶¶ 1, 10, 17.

[474] Series B Holders' Brief on Account Holders' Claims ¶¶ 2, 25, 29.

[475] *Id.* ¶¶ 5, 33, 37, 41–49.

the General Terms of Use were ambiguous, requiring the Bankruptcy Court to review extrinsic evidence.[476] Review of the extrinsic evidence led the Bankruptcy Court to conclude that the General Terms of Use limit customer claims to LLC only, and do not permit account holders to assert contractual claims against any other Debtor or non-Debtor affiliate.[477]  The Bankruptcy Court clarified, however, that the General Terms of Use do not limit customers from asserting non-contract claims against CNL or other Debtors or non-Debtors.[478]  The Bankruptcy Court noted that its "decision could have little or no effect on the pool of assets available to satisfy [c]ustomer claims" depending on the resolution of two further issues not yet addressed:  namely, the Debtors' and Committee's argument that CNL is obligated on an intercompany claim to LLC of at least $3.5 billion and the Committee's argument that substantive consolidation of all assets and liabilities, which would increase the total amount of assets available for customer claims, is appropriate in these Chapter 11 Cases.[479]

On March 17, 2023, the Bankruptcy Court entered the *Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use* [Docket No. 2265] (the "Customer Claims Order").  The Bankruptcy Court reiterated its main findings that only LLC is liable for customer contract claims under the Terms of Use, that the Terms of Use do not limit liability of LLC, CNL, or any other affiliate of LLC for non-contract claims, and that nothing in the Customer Claims Ruling affects the rights of parties in interest to assert non-contract claims against any Debtor.[480]

On March 31, 2023, the Committee Filed its *Notice of Appeal* of the Customer Claims Order [Docket No. 2356].  On April 5, 2023, Mr. Herrmann and Mr. Frishberg also Filed a *Notice of Appeal* of the Customer Claims Order [Docket No. 2375].  On April 27, 2023, Mr. Herrmann and Mr. Frishberg also Filed a motion seeking a stay of the relief granted in the Customer Claims Order until the disposition of their appeal of the same [Docket No. 2545], which the Bankruptcy Court denied [Docket No. 2663].  Thereafter, on June 15, 2023, Mr. Herrmann and Mr. Frishberg Filed a motion to vacate the relief granted in the Customer Claims Order, arguing that the Debtors did not provide adequate service to creditors of the briefing schedule on the Customer Claims Issue [Docket No. 2811].  The Bankruptcy Court denied Mr. Herrmann's and Mr. Frishberg's motion on June 20, 2023 [Docket No. 2819], and Mr. Herrmann and Mr. Frishberg then Filed a *Notice of Appeal* [Docket No. 2823].  On July 26, 2023, the Committee and the Series B Holders Filed a joint stipulation voluntarily dismissing the Committee's appeal of the Customer Claims Order.  Mr. Herrmann's and Mr. Frishberg's appeals remain pending.

Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the appeals of the Customer Claims Order.

4.    *Estimation of the CNL-Network LLC Intercompany Claim.*

On February 9, 2023, the Bankruptcy Court entered an order requiring the Debtors to File on the docket information regarding the amount and type of any potential intercompany claims held by Network LLC against the other Debtors [Docket No. 2017].  The Debtors Filed the Intercompany Statement, which highlighted that, among other claims, Network LLC holds a valuable intercompany claim against CNL arising from the migration of customer-facing business from CNL to Network LLC, among other

---

[476]    Customer Claims Ruling at 4.

[477]    *Id.*

[478]    *Id.*

[479]    *Id.* n.1.

[480]    Customer Claims Order ¶¶ 1–2.

intercompany transactions (the "CNL-Network LLC Intercompany Claim").[481] While the Debtors initially scheduled the CNL-Network LLC Intercompany Claim in excess of $9.1 billion, as a result of certain adjustments made in an attempt to reconcile the Debtors' books and records, the Debtors disclosed its value to be approximately $3.5 billion.[482]   On April 4, 2023, the Committee and the Series B Holders each Filed motions to establish procedures to estimate the value of the CNL-Network LLC Intercompany Claim.  The Committee argued that it is appropriate to estimate the CNL-Network LLC Intercompany Claim because it is currently unliquidated (as demonstrated by the Debtors' different valuations of the CNL-Network LLC Intercompany Claim), and estimating the CNL-Network LLC Intercompany Claim would avoid undue delay in these Chapter 11 Cases and aid in confirmation of the Plan.[483]   The Series B Holders agreed that estimation was appropriate because of the uncertain value of the CNL-Network LLC Intercompany Claim and the requirements for the Debtors to confirm the Plan.[484]

Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the estimation litigation.

### 5.    The Series B Settlement.

Following written discovery and leading up to the commencement of the trial on the estimation of the CNL-Network LLC Intercompany Claim, the Series B Holders, the Debtors, and the Committee successfully reached a settlement agreement (the "Series B Settlement").  On June 27, 2023, the Debtors, the Series B Holders,[485] and the Committee Filed the *Joint Motion for Entry of an Order (I) Approving the Settlement By and Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899] (the "Series B Settlement Motion") requesting the Bankruptcy Court's approval of the Series B Settlement, which resolves all disputes between the Debtors, the Committee, and any Holders of Series B Preferred Interests who consent to the settlement before the start of the hearing on the Series B Settlement Motion (the "Consenting Series B Holders").  The Series B Settlement Motion was heard by the Bankruptcy Court on July 18, 2023, and the Bankruptcy Court entered the Series B Settlement Order on July 24, 2023 [Docket No. 3074].

At a high level, the Series B Settlement provides for the Series B Settlement Consideration, a $25 million fund to be paid to the Consenting Series B Holders, in exchange for a release of all claims between the Consenting Series B Holders on the one hand and the Debtors and the Committee on the other.  The Series B Settlement ends all ongoing litigation between the parties regarding substantive consolidation, the allowance of the CNL-Network LLC Intercompany Claim, and the Committee AP Complaint, and resolves the issue of how much Holders of Series B Preferred Interests can recover from the Debtors' Estates.

---

[481]    Intercompany Statement ¶ 12.

[482]    *Id.*

[483]    *Motion of the Official Committee of Unsecured Creditors For Entry of an Order (I) Establishing Procedures to Estimate the Intercompany Claim That Celsius Network, LLC Has Against Celsius Network Limited and (II) Granting Related Relief* [Docket No. 2369] (the "Committee Estimation Motion") ¶¶ 1–3.

[484]    *Series B Preferred Holders' Motion for Entry of an Order Establishing Estimation Procedure For the Intercompany Claim Between Celsius Network LLC and Celsius Network Limited in Furtherance of Formulating the Debtors' Plan of Reorganization* [Docket No. 2367] (the "Series B Holders Estimation Motion") ¶¶ 1–5.

[485]    As noted in Article III.VV of this Disclosure Statement, the term "Series B Holders" refers to certain Holders of Series B Preferred Interests who have been primarily involved in litigation throughout these Chapter 11 Cases and the negotiation of the Series B Settlement, but does not include *all* Holders of Series B Preferred Interests.

All Holders of Series B Preferred Interests were eligible to participate in the Settlement. Within three days of entry of the Series B Settlement Order (*i.e.*, by July 27, 2023), the Series B Holders received $24 million of the Series B Settlement Consideration on account of the fees and expenses incurred by them in connection with their litigation and negotiation efforts in these Chapter 11 Cases. The Consenting Series B Holders are "Releasing Parties" and "Released Parties" under the Plan. All other Holders of Series B Preferred Interests will receive their Pro Rata share of the remaining $1 million of the Series B Settlement Consideration on the Effective Date of the Plan.

The Series B Settlement Order also provided for the approval of the substantive consolidation of CNL and Network LLC. Approval of the substantive consolidation of CNL and Network LLC requires the withdrawal of the Committee AP Complaint and the Estimation Motions. As of the date of the Filing of this Disclosure Statement, [such withdrawal is pending].

**M.    The Post-Petition Sale and Marketing Process.**

Since the outset of these Chapter 11 Cases, the Debtors and the Committee have diligently worked to identify a sale and restructuring transaction that maximizes the value of their liquid and illiquid assets and businesses for the benefit of their stakeholders. To that end, they pursued both sales of individual assets of particular interest for the Cryptocurrency and tech markets and also conducted a whole-company sale process.

*1.    The GK8 Sale.*

The Debtors anticipated that, apart from a whole-company sale process, certain of the Debtors' assets associated with GK8, along with the GK8 founders and senior management team (the "GK8 Assets"), would be clear targets of interest for an asset sale. Accordingly, on July 25, 2022, the Debtors Filed a motion [Docket No. 188] requesting that the Bankruptcy Court approve the bidding procedures for the sale of the GK8 Assets (the "GK8 Bidding Procedures").

In close consultation with the Committee, the Debtors drafted the GK8 Bidding Procedures, which provided for substantial flexibility with respect to the structure of any transaction—*e.g.*, they allowed the Debtors to select a stalking horse bidder and provide bid protections if the Debtors believed, in an exercise of their business judgement, that doing so would maximize the value of the estate. On September 1, 2022, the Bankruptcy Court approved the GK8 Bidding Procedures [Docket No. 687] (the "GK8 Bidding Procedures Order").

In accordance with the GK8 Bidding Procedures and to maximize returns for stakeholders, the Debtors continued to engage with potential buyers during a time of Cryptocurrency market turmoil, including the chapter 11 filing of FTX Trading Ltd.[486] During the marketing process, the Debtors ultimately engaged with forty-four parties, including other companies in the Cryptocurrency ecosystem, scaled fintech companies, and traditional financial institutions. At least thirty parties executed non-disclosure agreements associated with the sale of the GK8 Assets, and approximately 15 parties who engaged in meaningful discussions with the Debtors and their advisors were able to obtain access to a virtual data room including diligence materials associated with a sale of the GK8 Assets. As negotiations intensified, the Debtors and their advisors received six bids for the GK8 Assets. After discussions with the Special Committee, the Debtors' advisors, and the Committee, four interested bidders moved to the second round, and after further discussion, negotiation, and diligence, one strategic bidder, Galaxy Digital Trading, LLC ("Galaxy"), sent

---

[486]    As part of the strategy to maximize returns from the sale of the GK8 Assets, the Debtors, in consultation with the Committee, extended the final bid deadline three times to November 2, 2022 [Docket Nos. 878, 956, and 1060], and extended the auction date, the cure objection deadline, the sale objection deadline, and the sale hearing six additional times to December 2, December 6, December 6, and December 8, 2022, respectively [Docket Nos. 1299, 1323, 1460, 1461, 1480, and 1522].

a revised bid and deposit at the final bid deadline implemented by the Bankruptcy Court.

On December 2, 2022, the Debtors executed an asset purchase agreement with Galaxy and announced that Galaxy was the Successful Bidder as defined by the GK8 Bidding Procedures [Docket No. 1549]. On the same date, the Debtors Filed a supplemental motion [Docket No. 1620] requesting that the Bankruptcy Court authorize the Debtors to enter into a definitive purchase agreement (the "GK8 APA," and the transaction provided therein, the "GK8 Sale") with Galaxy.[487] The GK8 APA provides $44.1 million of aggregate deal consideration equal to (a) the assumption of certain liabilities[488] and (b) a Cash payment of $44 million. The GK8 APA contemplates the purchase of all GK8 Assets free and clear of any liens or encumbrances, the assumption of liabilities associated with the GK8 Assets and all other liabilities of GK8's business, and the exclusion of customer-related liabilities that may potentially be asserted against GK8's business arising under the Terms of Use.

### 2. GK8 Chapter 11 Filing.

To facilitate the sale of the GK8 Assets free and clear of any liens or encumbrances, thus maximizing the likelihood of a successful sale, and as previously noted in Article VII.A of this Disclosure Statement, GK8 Filed petitions for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of GK8's chapter 11 cases is set forth in the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 1629].

The Bankruptcy Court held a hearing on December 8, 2022, both as the sale hearing for the GK8 Sale pursuant to the GK8 Bidding Procedures Order and as the first-day hearing for GK8. After the hearing, the Bankruptcy Court entered the *Order (I) Applying Certain Orders in Initial Debtors' Chapter 11 Cases To, GK8 LTD., GK8 USA LLC, and GK8 UK Limited and (II) Granting Related Relief* [Docket No. 1655] (the "GK8 Order"), applying certain orders previously entered in the Initial Debtors' Chapter 11 Cases to GK8, effective as of the GK8 Petition Date.[489]

On February 24, 2023, the Bankruptcy Court entered the *Supplemental Order (I) Applying Certain Orders in Initial Debtors' Chapter 11 Cases to GK8 LTD., GK8 USA LLC, AND GK8 UK Limited and (II) Granting Related Relief* [Docket No. 2138] (the "Supplemental GK8 Order"), applying certain retention orders previously entered in the Initial Debtors' Chapter 11 Cases to GK8.[490]

The Bankruptcy Court expressed concerns regarding the preservation of any avoidance claims that the Initial Debtors may have against directors and officers associated with GK8, and directed the Debtors and the Committee to File additional briefs on this issue.[491] On December 12, 2022, both the Debtors and the Committee Filed briefs clarifying that only Claims and Causes of Action held exclusively by GK8 would be transferred to Galaxy under the GK8 APA and that such Claims and Causes of Action were

---

[487] *See also* Notice of Filing of Asset Purchase Agreement [Docket No. 1586] (attaching the GK8 APA thereto as Exhibit A).

[488] *See* GK8 APA, Article I, section 1.3.

[489] A complete list of such orders is attached to the GK8 Order as Exhibit 1.

[490] A complete list of such retention orders is attached to the Supplemental GK8 Order as Exhibit 1.

[491] Dec. 8 Hr'g Tr. at 73:2–4 ("I was very concerned whether avoidance claims that the Celsius debtors have against anybody associated with GK8 are not going to disappear."); *Id.* at 79:23–82:25.

speculative and not valuable to the Debtors' estates.[492]  In addition, the Debtors Filed a revised sale order [Docket No. 1673] further clarifying that any Claims and Causes of Action, including avoidance claims under chapter 5 of the Bankruptcy Code, that belong to any Initial Debtor or any Affiliate of an Initial Debtor (other than a GK8 entity) would not be transferred to Galaxy pursuant to the GK8 Sale.

On December 13, 2022, the Bankruptcy Court entered an order approving the GK8 Sale [Docket No. 1686] (the "GK8 Sale Order") after finding that the Debtors conducted the GK8 Sale in accordance with the GK8 Bidding Procedures Order, that the consideration provided by Galaxy under the GK8 APA constituted the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the GK8 Sale, and that the consummation of the GK8 Sale under the GK8 APA was in the best interests of the Debtors, their respective creditors, Estates, and other parties in interest.[493]

On December 27, 2022, *pro se* creditor Mr. Frishberg Filed a motion [Docket No. 1794] requesting that the Bankruptcy Court reconsider the GK8 Sale Order, alleging without basis that the Debtors were concealing "substantial assets" in the form of insurance policies from Aon and USI and committing "bankruptcy fraud," notwithstanding the Debtors' repeated explanation to Mr. Frishberg that he misunderstood GK8's referral arrangements with both Aon and USI.  After the Debtors Filed their objection [Docket No. 1869], and the Bankruptcy Court held a hearing on the motion on January 24, 2023, the Bankruptcy Court entered an opinion [Docket No. 1941] denying the GK8 Reconsideration Motion.[494]

### 3.    The Whole-Company Sale Process.

Parallel to the GK8 sale process, the Debtors, in close consultation with the Committee and its advisors, also pursued a dual-track process of marketing the Debtors' entire retail platform and other assets and, separately, the mining business while simultaneously evaluating a potential standalone reorganization. As a result, the Debtors, with input from the Committee and its professionals, determined that the best way to maximize value for all stakeholders was to conduct a robust, transparent process to solicit proposals from potentially interested parties for the Debtors' assets, including but not limited to the Debtors' retail platform, the loan portfolio, their mining operations, and related technology and assets.

In September 2022, the Debtors, through their investment banker Centerview, began a marketing process designed to identify potential bidders for and maximize the value of all or substantially all of the Debtors' assets, properties, goodwill, and rights relating to their businesses.  The Debtors, in consultation with Centerview, developed a list of over 130 parties whom they believed would be interested in, and whom the Debtors reasonably believed would have the financial resources to consummate, a sale.  The parties who were contacted included strategic parties, private equity firms, other companies in the Cryptocurrency ecosystem, scaled fintech companies, and traditional financial institutions.

On September 29, 2022, to enable the Debtors and their advisors to move expeditiously to complete

---

[492]    *See Debtors' Statement in Support of Entry of the Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the GK8 Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1671] ¶¶ 5–11; *The Official Committee of Unsecured Creditors' Memorandum of Law with Respect to the Proposed Sale of the GK8 Assets* [Docket No. 1674] ¶¶ 8–11.

[493]    *See* GK8 Sale Order at 3–7 (explaining the reasons for approving the sale under the APA).

[494]    The Bankruptcy Court held that, "even when liberally construed, provide[d] no legal support for [the] requested relief and is entirely without merit for three reasons":  (i) lack of new evidence or "any of the other grounds for reconsideration of a judgment"; (ii) failure to show that the Debtors lacked a sound business justification for the GK8 Sale; and (iii) failure to demonstrate by clear and convincing evidence that the GK8 Sale Order was procured by fraud. *Memorandum Opinion and Order Denying Daniel A. Frishberg's Motion for Reconsideration of the GK8 Sale* [Docket No. 1941] at 7–10.

a thorough marketing process, receive, evaluate, and improve upon bids, identify one or more potential stalking horse bidders, and hold an auction, if necessary, to determine the highest or otherwise best bid, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 929] (the "Bidding Procedures Motion"). The Bidding Procedures Motion requested that the Bankruptcy Court authorize and approve the bidding procedures (which were developed in close consultation with the Committee and its advisors) set forth therein (the "Bidding Procedures"), establish certain milestones in connection with the marketing process, and authorize the Debtors to select one or more stalking horse bidder(s) that would be entitled to certain bid protections, among other relief. After a hearing on October 20, 2022, the Bankruptcy Court entered an opinion granting the Bidding Procedures Motion after finding that the revised Bidding Procedures "work to ensure a fair bidding process and to maximize the sale price of the property in the auction," and that the Debtors had articulated a sound business purpose for the sale and the sale timeline.[495] On November 11, 2022, the Bankruptcy Court entered an order approving the Bidding Procedures as set forth therein (the "Bidding Procedures Order").[496]

The Bidding Procedures Order contained provisions related to: (1) the submission of a non-binding indication of interest; (2) the eligibility to participate in bidding; (3) the requirements for the form of bids and accompanying documents; (4) the sharing of information with regulators about potential bidders; (5) the use of back-up bidders; (6) the selection, with approval of the Bankruptcy Court, of a stalking horse bidder with the corresponding stalking horse agreement and bid protections; (7) the procedures for the holding of a potential auction, including the bidding increment the Debtors plan to use at such auction; and (8) the criteria under which the Debtors will select the highest or otherwise best bid.[497] The Bidding Procedures Motion contemplated certain milestones in connection with the sale of the Debtors' "Retail Platform Assets" (defined in the Bidding Procedures Motion to include the assets, properties, goodwill, and rights comprising the Debtors' retail platform business, including any Cryptocurrency or digital assets held by the Debtors) and for the Debtors' "remaining assets" (including the mining assets and the Retail Platform Assets to the extent they are not sold at the November 28, 2022 sale hearing). The Debtors, in consultation with the Committee, extended the final bid deadline to April 17, 2023, at 5:00 p.m. (prevailing Eastern Time) (the "Final Bid Deadline").

In light of the heightened concerns over keeping certain personally identifiable information of the Debtors' customers private in these chapter 11 cases, the Bankruptcy Court also appointed a consumer privacy ombudsman (the "CPO") pursuant to sections 363(b)(1)(B) and 332(a) of the Bankruptcy Code in connection with its approval of the Bidding Procedures Motion.[498] On January 27, 2023, the CPO Filed the

---

[495]    *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures in Connection with the Sale of Substantially All the Debtors' Assets* [Docket No. 1167] at 17–25.

[496]    *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272].

[497]    *See generally* Bidding Procedures Motion.

[498]    *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures in Connection with the Sale of Substantially All the Debtors' Assets* [Docket No. 1167] at 24 ("[G]iven the significant amount of potential customer data that could be included in a sale, the Court finds that appointing a neutral Consumer Privacy Ombudsman early in the sale process will ensure that any sale adequately protects such customer data."); *see also Order Approving the Appointment of Consumer Privacy Ombudsman* [Docket No. 1208] (appointing Lucy L. Thomson as the CPO).

first report, providing a number of suggestions to the Debtors in connection with the potential sale of the Debtors' assets.[499]

In accordance with the Bidding Procedures and in consultation with Centerview, the Debtors contacted over 130 parties they believed may be interested in a transaction. As part of that process, the Debtors executed over forty confidentiality agreements with prospective bidders, and such parties were granted access to a virtual data room populated with diligence materials to facilitate their assessment of the Debtors' assets. Parties that expressed interest in a transaction were also given the opportunity to discuss the business with the Debtors' management team.

The Debtors' robust marketing process ultimately produced six non-binding bids for their Retail Platform Assets (or portions thereof), three non-binding bids for their mining business, and certain other bids for individual assets. Importantly, none of the bids for the Debtors' mining business were Cash bids above liquidation value—all were preliminary and non-binding, contingent on raising financing, and would have significantly diluted creditors' equity stake in the mining business.

(a)    The Stalking Horse Bid.

The Debtors and the Committee thoroughly analyzed and worked to improve each bid to identify the bid that provided the value-maximizing solution for the Debtors' liquid and illiquid assets. On February 15, 2023, the Debtors announced that, in consultation with the Committee, they had reached an agreement in principle with NovaWulf Digital Management, LP ("NovaWulf")[500] to sponsor a plan of reorganization for the Debtors (the "NovaWulf Transaction").[501]

In accordance with the Bidding Procedures, on March 1, 2023, the Debtors Filed a notice [Docket No. 2150] designating NovaWulf as the stalking horse bidder (the "Stalking Horse Bidder"), NovaWulf's bid as the stalking horse bid (the "Stalking Horse Bid"), and announcing that the Debtors, the Committee, and NovaWulf executed a plan sponsor agreement (the "NovaWulf Plan Sponsor Agreement"). The NovaWulf Plan Sponsor Agreement provided for, among other things, certain bid protections, including: (a) a break-up fee of $5 million (the "Break-Up Fee"); and (b) reimbursement of NovaWulf's reasonable and documented out-of-pocket fees and expenses, initially up to a maximum of $15 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections"), to compensate NovaWulf for the substantial time and resources it had spent, and expected to continue to spend, in negotiating and consummating the complex and novel NovaWulf Transaction, in each case payable upon certain termination events as set forth in the NovaWulf Plan Sponsor Agreement. Simultaneously therewith, the Debtors also Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2151] (the "Bid Protections Motion"), requesting that the Bankruptcy Court approve the Bid Protections and attaching the NovaWulf Plan Sponsor Agreement as an exhibit thereto. Importantly, the NovaWulf Plan Sponsor Agreement included a broad provision known as a "fiduciary out" that allowed the Debtors or the

---

[499]    *See, e.g.,* the CPO's *First Report to the Court* [Docket No. 1948] at 8, 40–41 (suggesting that the Bankruptcy Court only approve a sale transaction to a "qualified buyer" as that term has been defined in prior case law, such as when the purchaser is in the same line of business as the Debtors and agrees to comply with the Debtors current privacy policy); *id.* at 7, 26, 32 (suggesting that the Debtors limit the transfer of customer data active accounts and that the Bankruptcy Court use its discretion to decide what customer data should be transferred or sold).

[500]    NovaWulf is an SEC-registered investment advisor and NovaWulf's management team has decades of experience in finance, restructuring, and technology, having managed tens of billions of dollars in assets. Additional information on NovaWulf's co-founders and managing partners, Jason New and Michael Abbate, is attached as Exhibit A to the Bid Protections Statement (as defined below) [Docket No. 2326].

[501]    *See generally Debtors' Statement with Respect to the Status of the Debtors' Chapter 11 Plan Process* [Docket No. 2066].

Committee, consistent with their fiduciary duties, to terminate the NovaWulf Plan Sponsor Agreement to the extent the Debtors and/or the Committee identified an alternative proposal that the Debtors and/or the Committee believed is higher or otherwise better than the NovaWulf Transaction.

The Bid Protections Motion was supported by the Committee, which noted that the NovaWulf Transaction was not only "the highest and best proposal" on the table at the time, but also "the only feasible transaction other than a value-destructive liquidation," and that the approval of the Bid Protections would ensure NovaWulf's "ongoing participation" in Debtors' restructuring and set a floor for the Debtors' ongoing competitive auction process.[502]  The U.S. Trustee, the Series B Holders, the Ad Hoc Group of Borrowers, and two creditors, on the other hand, objected to the Bid Protection Motion.

The U.S. Trustee argued that the Debtors should have provided additional information in the Bid Protections Motion with respect to (1) any changes to the NovaWulf Transaction that were necessitated by the Customer Claims Ruling, (2) how the Break-Up Fee and the Expense Reimbursement were calculated, and (3) the treatment of the Convenience Class.[503]  The Series B Holders objected that the Bid Protections were excessive when compared solely to NovaWulf's $45 million cash contribution under the NovaWulf Plan Sponsor Agreement.[504]  The Ad Hoc Group of Borrowers also objected to the Bid Protections Motion on the ground that the NovaWulf Plan Sponsor Agreement lacked adequate safeguards to protect borrowers electing a specific treatment from certain future risks, in addition to raising certain regulatory concerns.[505]  In addition, Mr. Tuganov Filed a joinder to the objection by the U.S. Trustee, and argued that, in light of the Customer Claims Ruling, the Debtors should disclose whether and to what extent customers have alleged non-contract claims against all Debtor entities and the Bankruptcy Court should consider whether to allow creditors to amend their proofs of claims.[506]  Lastly, *pro se* creditor Víctor Ubierna de las Heras also Filed a joinder to the objections Filed by the U.S. Trustee and Mr. Tuganov, arguing that the Debtors should disclose treatment to customers in "unsupported jurisdictions inside the United States of America and to customers in [other] countries," and "how withdrawals amounts will be calculated."[507]  On March 22, 2023, the Debtors Filed a reply (the "Bid Protections Reply") in support of the Bid Protections Motion, responding to the objectors' arguments and disclosing that NovaWulf had agreed to reduce the cap of the Expense Reimbursement from $15 million to $13 million.[508]

---

[502]  *The Official Committee of Unsecured Creditors' Statement in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2302] ¶¶ 2, 3.

[503]  *Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2218] at 7–10.

[504]  *Limited Objection and Reservation of Rights in Connection with the Debtors' Motion for an Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor* [Docket No. 2229] ¶¶ 3, 4.

[505]  *Objection of the Ad Hoc Group of Borrowers to the Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2256] ¶¶ 3–6.

[506]  *Joinder and Supplement to Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2224] ¶¶ 6–9.

[507]  *Joinder and Supplement to Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Procections for the Proposed Plan Sponsor and (II) Granting Related Relief and Joinder to Joinder and Supplement Filed by Ignat Tuganov* [Docket No. 2236] ¶¶ 4–7.

[508]  *Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2297] ¶¶ 2, 7–9.

During the hearing on March 23, 2022, the Bankruptcy Court inquired as to whether NewCo and the NovaWulf Transaction would be regulatorily compliant.[509]  Accordingly, the Bankruptcy Court directed certain state and federal regulators to File statements with respect to the Bid Protections Motion by 12:00 p.m. (prevailing Eastern Time) on March 28, 2023.[510]  Three statements were Filed.  First, the SEC Filed a statement noting that it is not aware of any published SEC guidance that addresses "whether an expense reimbursement and/or breakup fee for a bidder are appropriate where the proposed transaction is contingent on obtaining regulatory approvals."[511]  The statement Filed by the New Jersey Bureau of Securities (the "Bureau") indicated that "the Debtors have shared documents listing various licenses already held by the proposed Figure entity partners," and that "other required licenses and approvals for the involved entities are in place or efforts are being made to obtain them."[512]  Further, the Bureau noted that it "appreciate[d] the efforts" by the Debtors, the Committee, and NovaWulf "to reach regulatory compliance," and that "the plan terms outlined thus far show that that there is a path towards regulatory compliance."[513]  The statement Filed by the National Association of Attorneys General and joined by the states of Alabama, Arkansas, California, District of Columbia, Hawaii, Maine, North Dakota, Oklahoma, Tennessee, Texas, Vermont, Washington, and Wisconsin indicated that these states were "not asking the Court to deny the [Bid Protections Motion]" given that they were "not currently aware of any specific issues in the general plan outline that the Debtors have provided in the [Bid Protections Motion] that would inherently preclude" the Debtors from proposing a plan and disclosure statement that are regulatorily compliant.[514]  In all three statements, the regulators reserved the right to raise any regulatory issues to the extent any such issues arose subsequently.[515]

Also on March 28, 2023 the Debtors Filed a statement (the "Bid Protections Statement") in support of the Bid Protections Motion, indicating that the Debtors and NovaWulf were willing to delay approval of $5 million of the proposed Expense Reimbursement until the Disclosure Statement is approved by the Bankruptcy Court.[516]  On March 30, 2023, the Bankruptcy Court entered an order approving the Bid Protections Motion, as modified by the accommodations set forth in the Bid Protections Reply and the Bid Protections Statement, including approval of a Break-Up Fee of $5 million and an Expense Reimbursement of up to $8 million, with approval of an additional $5 million Expense Reimbursement subject to further order of the Bankruptcy Court following the approval of the Disclosure Statement.[517]  The Bankruptcy Court was "satisfied" that the modified Bid Protections were proper "[s]ince the regulators did not identify any immediate threats to the [NovaWulf Plan Sponsor Agreement's] regulatory compliance, and since

---

[509]    See, e.g., Mar. 23 Hr'g Tr. 69:16–20 [Docket No. 2317].

[510]    Id. at 87:22–88:2.

[511]    Statement Regarding Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief [Docket No. 2322] (the "SEC Statement") at 3.

[512]    Statement of the New Jersey Bureau of Securities Regarding Regulatory Compliance and Reservation of Rights [Docket No. 2318] (the "New Jersey Statement") ¶ 3

[513]    Id.

[514]    Response of Undersigned States to Debtors' Motion for Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor [Docket No. 2325] (the "NAAG Statement") ¶ 6.

[515]    See SEC Statement at 3, New Jersey Statement ¶¶ 4–5; NAAG Statement ¶¶ 2, 5.

[516]    Debtors' Statement in Further Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief [Docket No. 2326] ¶ 4.

[517]    Order Granting the Debtors' Motion for Bid Protections as Modified [Docket No. 2344].

NovaWulf is willing to delay part of the Expense Reimbursement.[518]  The Bankruptcy Court found that the Debtors "satisfied the requirements for court approval of bid protections," and that the "proposed [Bid Protection] amounts are reasonable."[519]

<div align="center">

(b)        The Auction.

</div>

As noted above, while the Debtors selected NovaWulf as the Stalking Horse Bidder, the Final Bid Deadline was April 17, 2023, at 5:00 p.m. (prevailing Eastern Time) and the Debtors continued reviewing and evaluating additional bids that they received until that time.

Prior to the Final Bid Deadline, the Debtors received three additional bids, and after consultation with the Committee, determined that two of those were Qualified Bids (as defined in the Bidding Procedures).  The two additional Qualified Bids were from (a) Fahrenheit, LLC ("Fahrenheit"), the equity of which is owned, directly or indirectly, by Arrington Capital ("Arrington"), U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin"), Proof Group Capital Management LLC ("Proof Group"), Steven Kokinos, and Ravi Kaza, and (b) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (the "BRIC," and together with Fahrenheit and NovaWulf, the "Bidders," and each Bidder's bid, a "Bid").[520]  Fahrenheit's proposal reflected the "NewCo" transaction structure contemplated by the Stalking Horse Bid, including both (a) the distribution of a significant amount of the Debtors' Liquid Cryptocurrency to Account Holders, and (b) the establishment of a NewCo that would manage all of the NewCo Assets as part of single go-forward business (Fahrenheit's Bid and NovaWulf's Bid, each a "NewCo Bid").  The BRIC Bid contemplated (a) the establishment of a pure-play, publicly traded mining business in which the Debtors' creditors will receive 100% of equity interests (the "Backup MiningCo"), (b) a distribution of all of the Liquid Cryptocurrency on or as soon as practicable after the Effective Date, (c) the timely monetization of the Debtors' remaining assets and subsequent Liquid Cryptocurrency distributions to creditors, and (d) an orderly wind down of the Estates.[521]  The BRIC also expressed a willingness to provide certain consultation services to the Debtors, including developing distribution procedures and making distributions to creditors (the "BRIC Consultation Services").

Pursuant to paragraph G of the Bidding Procedures Order and Section XI of the Bidding Procedures, the Debtors, in consultation with the Committee, determined that conducting an Auction (as defined in the Bidding Procedures Order) would maximize the value of the Debtors' assets and subsequently invited the three Qualified Bidders to participate in the Auction.[522]  The Auction commenced on April 25, 2023 at the offices of Kirkland & Ellis LLP in New York, New York ("Kirkland New York").[523]  Interested

---

[518]  *Id.* at 4.

[519]  *Id.*

[520]  *Notice of Auction* [Docket No. 2519] at 2.

[521]  As part of the BRIC Bid, the BRIC also proposed working with Gemini Trust Company, LLC ("Gemini" or the "BRIC Exchange Partner").  All distributions contemplated under the BRIC Bid would be made through Gemini as the BRIC Exchange Partner.

[522]  *Id.*

[523]  *Id.* at 3.

<div align="center">224</div>

parties, including regulatory agencies and Account Holders who executed confidentiality agreements with the Debtors, were permitted to listen to the on-the-record proceedings via Zoom.[524]

At the beginning of the Auction, the Debtors announced that the BRIC Bid, which was for an orderly wind down, was the leading proposal due to several factors including, among others, (a) the quantum and structure of the management fees under the NewCo Bids, and (b) the amount of Liquid Cryptocurrency to be distributed to Account Holders under the NewCo Bids.[525]  The Debtors also informed the Bidders that the Debtors would not consider proposals for individual assets or components of the Plan, including, among others, any proposed settlement terms with the Retail Borrower Ad Hoc Group, Convenience Class treatment, or treatment of CEL Token Deposit Claims.[526]  The Debtors also summarized the key terms of the Fahrenheit Bid and the BRIC Bid.[527]  The Auction continued on the record later that evening, at which point the Debtors announced that NovaWulf had submitted a revised Bid.[528]  A representative from NovaWulf announced the terms of the revised Bid on the record.  The Auction was adjourned on April 25, 2023 at 8:04 p.m. (prevailing Eastern Time).[529]

The Auction continued on April 26, 2023 at 10:00 a.m. (prevailing Eastern Time).[530]  At approximately 11:30 a.m. (prevailing Eastern Time), the Debtors announced on the record that the Bidders were to assume that (a) the Retail Borrower Deposit Claim Settlement will not be part of the Debtors' chapter 11 plan of reorganization, and (b) that NewCo will be capitalized with approximately $450 million of Liquid Cryptocurrency.[531]  The Auction went off the record at 11:38 a.m. (prevailing Eastern Time).

The Auction was scheduled to continue on April 27, 2023 at 10:00 a.m. (prevailing Eastern Time) at Kirkland New York.[532]  At 12:47 p.m. (prevailing Eastern Time), the Debtors announced on the record that the Debtors, in consultation with the Committee, had determined that each NewCo Bid was higher and better than the BRIC Bid, and that the most recent NovaWulf Bid was the leading Bid.[533]  The Debtors also described revisions and clarifications to the Fahrenheit Bid and NovaWulf Bid on the record.[534]  The revised and leading NovaWulf proposal included a number of improvements over the Stalking Horse Bid, including (a) moving to a fixed management fee (inclusive of mining) of $40 million per year instead of a fixed management fee determined by assets under management,[535] (b) replacing the Stalking Horse Bid's

---

[524]    *Id.*

[525]    April 25, 2023 Auction Tr. 16:7–19:20.

[526]    *Id.* at 2:11–22.

[527]    *See generally id.*

[528]    *Id.* 52:21–25.

[529]    *Id.* at  61:6.

[530]    Notice of Adjournment of Auction [Docket No. 2538] at 3.

[531]    April 26, 2023 Auction Tr. 2:7–22.

[532]    Notice of Adjournment of Auction [Docket No. 2542] at 3.

[533]    April 27, 2023 Auction Tr. 4:20–23.

[534]    *Id.* at 5:20–6:23.

[535]    April 25, 2023 Auction Tr. 56:3-6 (not inclusive of the proposed incentive fee).

incentive fee structure with a grant of 5% restricted stock units and 5% stock options (both to vest ratably over a 5-year term),[536] (c) providing an additional one billion HASH Tokens, and (d) contributing Figure equity of $25 million.[537]  In announcing the latest NovaWulf Bid as the leading Bid, the Debtors also explained that the factors they considered when evaluating the Bids included, among others (a) aggregate management fees, including fixed fees and incentive fees, (b) the break-up fee and expense reimbursement pursuant to the Bid Protections Order, (c) any incremental consideration provided, (d) regulatory considerations, (e) execution risk, (f) strength of the management teams, and (g) the liquidity of NewCo equity.[538]  The Debtors and the Committee continued discussions with the BRIC to develop a backup bid (the "Backup Bid," and such Bidder, the "Backup Bidder") to the extent that a NewCo Bid could not be consummated.[539]  The Debtors informed Fahrenheit that they were "on the clock" to return with a revised Bid.[540]

　　　The Auction continued on April 28, 2023 at 10:00 a.m. (prevailing Eastern Time) at Kirkland New York.[541]  The Debtors announced on the record that they had received a revised Fahrenheit Bid that was determined to be higher and better than the previously leading NovaWulf Bid.[542]  The revised Fahrenheit Bid included a reduced management fee of $35 million per year ($5 million less than the then-leading NovaWulf Bid).[543]  Fahrenheit also agreed to increase the proposed management contribution to $50 million, which was to be used to purchase NewCo equity in either the primary or secondary market at the discretion of the Debtors and the Committee.[544]  The Fahrenheit Bid was read into the record by a member of the Fahrenheit team.[545]  The Debtors also announced that they had received a revised proposal from the BRIC, which the Debtors, in consultation with the Committee, did not determine to be higher or better than the previously leading NovaWulf Bid.[546]  The Debtors announced that they were continuing to discuss the terms of a Wind-Down Bid as a potential Backup Bid,[547] and that the Auction would be adjourned to a date and time to be announced.[548]  In the meantime, the Debtors, the Committee, and the Bidders worked to develop revised Bids.

---

[536]　*Id.* at 56:17–57:15.

[537]　April 27, 2023 Auction Tr at 55:13–56:1.  The Figure equity was based on a 2021 valuation.  The Debtors and the Committee's advisors spoke with Figure and its investors to conduct diligence on the value of the equity contribution.

[538]　*Id.* at 7:2–9:23.

[539]　*Id.* at 5:3–9.

[540]　*Id.* at 9:22.

[541]　*Notice of Adjournment of Auction* [Docket No. 2547].

[542]　April 28, 2023 Auction Tr. 4:17–22.

[543]　*Id.* at 5:7–20.

[544]　*Id.* at 5:21–6:6.

[545]　*Id.* at 5:2–6:14.

[546]　*Id.* at 9:21–25.

[547]　*Id.* at 10:2–6.

[548]　*Notice of Adjournment of Auction* [Docket No. 2554].

The Auction continued on May 3, 2023 at Kirkland New York.[549]  The Debtors announced on the record the receipt of a revised NovaWulf Bid, which the Debtors, in consultation with the Committee, determined was the highest and best Bid.[550]  The Debtors read the terms of the revised NovaWulf Bid into the record.[551]  The revised terms included, among other things, an additional contribution of $25 million of Figure equity, bringing the total Figure equity to $50 million, structured as ten-year penny warrants.[552]  At NewCo's option, Figure also agreed to commit all of its lending licenses, services, and capabilities, and migrate its crypto lending business to NewCo at an agreed upon amount not to exceed the lesser of 125% of Figure's cost of service and market rate for those services.[553]  Figure would not engage in crypto lending outside of NewCo and would work with NewCo to introduce products and services.  NovaWulf's revised Bid included a NewCo Capitalization Amount of $500 million through either a primary purchase or a Secondary Market Purchase, thereby increasing the amount of Liquid Cryptocurrency to be distributable to Account Holders under the Plan.  The Debtors also announced that the BRIC submitted revised documentation of its proposal and that the Debtors, in consultation with the Committee, accepted the BRIC Bid as the Backup Bid, the terms of which would be memorialized in a backup plan sponsor agreement.[554]  The Auction continued on May 4, 2023, and May 5, 2023, but did not go on the record either day.[555]  The Debtors continued to work with the Committee and the Bidders on their proposals.

Fahrenheit submitted a revised Bid, including a detailed legal term sheet, on May 9, 2023, and the Debtors announced on the record that the Fahrenheit Bid was the leading Bid.[556]  The Debtors reiterated the quantitative and qualitative factors considered, which included, among others:  (a) the ability of each Bidder's management team to create value for customers, including each management team's ability to build out Mining and develop new lines of business (*e.g.*, staking); (b) the quantum and structure of management fees and expenses; (c) the ability to become regulatorily compliant; and (d) the costs and time associated with emergence.[557]  Fahrenheit's latest Bid included a minimum NewCo Capitalization Amount of $450 million (with a maximum of $500 million) and an increase in management contribution to $50 million,[558] and significant additional commitments to Mining,[559] including:

- the buildout and energization of 100 megawatts ("<u>MW</u>") of new bitcoin mining facilities at capped constructions costs, which facilities will be energized within 12 months of the Effective Date

---

[549]  *Notice of Continuation of Auction* [Docket No. 2561].

[550]  May 3, 2023 Auction Tr. 14:2–4.

[551]  *Id.* at 4:21–12:22.

[552]  *Id.* at 5:10–25,

[553]  *Id.* at 6:6–19.

[554]  *Id.* at 14:14–18:1.

[555]  *See generally Notice of Adjournment of Auction* [Docket No. 2586]; *Notice of Adjournment of Auction* [Docket No. 2588]; *Notice of Adjournment of Auction* [Docket No. 2591].

[556]  May 9, 2023 Auction Tr. 6:11–16.

[557]  May 9, 2023 Auction Tr. 5:15–6:11.

[558]  *Id.* at 8–11.

[559]  *Id.* at 10:18–14:5.

(subject to funding approval by the NewCo Board);

- the option to purchase a fully permitted and as-is built 50 MW facility and support respecting the immediate installation of miners at such site;

- subject to certain terms and conditions, the contribution of certain leasehold and development rights respecting a 240 MW behind-the-meter site;

- the option to utilize up to 20,000 rack spaces at various facilities located in the U.S. on certain terms and conditions;

- assistance in maximizing the value of existing credits and coupons for the benefit of the Debtors and NewCo;

- the provision of site-level employees for all existing and developed mining facilities at certain capped costs; and

- access to intellectual property licenses for miner management and curtailment software, US Bitcoin's energy management team, and energy trading desks.

- The revised Fahrenheit bid also provided additional consideration respecting NewCo's staking platform, including:

- access to certain intellectual property, technology, or software owned by Proof Group ("Proof Group IP") with respect to staking services;

- a commitment to support staking in NewCo using the Proof Group IP at no cost to NewCo; and

- subject to certain conditions, the migration of Proof Group's existing staking business to NewCo.

Finally, the Fahrenheit bid contemplated that the NewCo equity would be distributed in the form of shares of common stock and that such equity would be listed on a traditional exchange (*e.g.*, NASDAQ) to provide maximum liquidity to NewCo's stakeholders.[560] The Auction was adjourned on May 9, 2023.

On May 14, 2023, NovaWulf submitted a revised Bid, which the Debtors, the Committee, and NovaWulf documented in a revised term sheet. The Debtors also received a "best and final" Bid from Fahrenheit on May 18, 2023, which was not considered in evaluating NovaWulf's latest Bid. The Debtors announced that the Auction would continue on May 19, 2023 at 2:00 p.m. (prevailing Eastern Time) via Zoom.[561] Around that time, the Debtors announced on the record that the revised NovaWulf Bid was the leading Bid and described its revised terms.[562] NovaWulf's revised Bid included a total annual management fee of $35 million—down from $40 million.[563] NovaWulf also (a) matched the $50 million management

---

[560] *Id.* 11:2–22.

[561] *Notice of Continuation of Auction* [Docket No. 2689].

[562] May 19, 2023 Auction Tr. 6:3–15:24.

[563] *Id.* at 4:14–22, 6:22–25.

contribution proposed by Fahrenheit,[564] (b) increased its contribution of Figure equity $100 million,[565] and (c) made significant revisions to its mining proposal, including (i) a commitment to manage the mining assets with the support of BeoWulf Energy and (ii) a commitment to build 100 MW of Bitcoin mining facilities within 12 months of emergence.[566]  The Debtors instructed both NovaWulf and Fahrenheit to submit "best and final" Bids by Monday, May 22, 2023, at 5:00 p.m. (prevailing Eastern Time).[567]  The Debtors announced that they would make a decision and conclude the Auction on May 24, 2023.[568]

On May 22, 2023, the Debtors received "best and final" Bids from NovaWulf and Fahrenheit.  The Debtors and the Committee met with NovaWulf and Fahrenheit to discuss the terms of their respective final Bids and visons for NewCo.[569]  The Debtors and the Committee considered both final Bids to be significant improvements over the Stalking Horse Bid.  Relative to the Stalking Horse Bid, both the final NovaWulf Bid and Fahrenheit Bid each included:   (a) a significantly reduced minimum NewCo Capitalization Amount; (b) a fixed management fees as opposed to a fee determined by assets under management; (c) an incentive fee composed of options with strike prices that will either be (i) based on a crypto-index, or (ii) the price of NewCo's stock at the close of the preceding year; and (d) significantly improved mining terms.

NovaWulf's "best and final" Bid included a total annual management fee of $30 million, which was a further reduction from its $35 million proposed management fee in the prior round.[570]  NovaWulf's Bid also revised its incentive fee—previously structured as 5% restricted stock units and 5% stock options—to 4% in restricted stock units and 6% stock options respectively.[571]  In addition, NovaWulf increased its contribution of Figure equity to $125 million.[572]

Fahrenheit's Bid did not revise the total annual management fee or incentive fee, which remained at $35 million and 5% of restricted stock units and 5% of stock options, respectively.[573]  Fahrenheit's revised "best and final" Bid included a number of additional Mining commitments above and beyond the significant Mining consideration contained in Fahrenheit's prior bid.[574]  These additional commitments included:

- the option to enter into a strategic partnership agreement with a leading ASIC manufacturer that would provide NewCo with the ability to scale up to 180,000 mining machines and ultimately own

---

[564]   *Id.* at 6:6–15.

[565]   *Id.* at 10:23–11:10.

[566]   *Id.* at 8:5–17.

[567]   *Id.* at 5:10–14.

[568]   *Id.* at 5:15–19.

[569]   May 24, 2023 Auction Tr. 4:7–10.

[570]   *Id.* at 6:4–11.

[571]   *Id.* at 6:6–14.

[572]   *Id.* at 6:15–20.

[573]   *Id.* at 7:6–8.

[574]   *Id.* at 7:8–8:25.

up to 90,000 new mining machines, subject to certain terms and conditions;

- one hundred million dollars ($100,000,000) in coupons from another leading ASIC manufacturer, which coupons would have no expiration and would be applicable to future machine purchases by NewCo, subject to certain terms and conditions;

- the option to utilize up to 43,500 rack spaces at various facilities located in the U.S.; and

- the option to purchase certain substation materials, containers, and transformers at no greater than cost.

Subsequently, on May 24, 2023 at 10:36 p.m. (prevailing Eastern Time), the Debtors announced on the record that, in consultation with the Committee, that the Debtors selected Fahrenheit as the Successful Bidder and winner of the Auction.[575] The Debtors then described the quantitative and qualitative factors that had been considered in reaching the Debtors' decision.[576] The Debtors further elaborated that, while they did not give any credit to Fahrenheit's or NovaWulf's proposed future business plans because they found both parties to have qualified management teams "capable of building valuable NewCo businesses to maximize the value of the Debtors' assets," the Committee (and its advisors) believed that the Fahrenheit management team would create more value for NewCo over time, and therefore the Committee in its assessment gave significant weight to that qualitative factor in making its determination.[577] The Debtors explained that, in coming to a decision, deference was given to the Committee's judgement on this significant factor due to the Committee's role as the fiduciary for the Account Holders, who will become the future equity owners of NewCo.[578] The Committee explained that even though fees were lower in the NovaWulf Bid, the "Committee chose the Bid that it thought provided the best opportunity to make creditors whole and hopefully more than whole over the long run."[579]

On May 25, 2023, the Debtors filed the *Notice of Successful and Backup Bidder* [Docket No. 2713] (the "Notice of Successful and Backup Bidders"), announcing the selection of Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder. The Notice of Successful and Backup Bidders included the Fahrenheit Plan Term Sheet and the BRIC Backup Plan Administration Agreement Term Sheet, to be effectuated through a plan sponsor agreement and backup plan sponsor agreement, respectively.[580] The Debtors, the Committee, Fahrenheit, and the BRIC spent the following days working on definitive documentation.

On June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into a plan sponsor agreement (the "Plan Sponsor Agreement"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid to establish the NewCo (the "NewCo Transaction").[581]

---

[575]   *Id.* at 4:11–13.

[576]   *Id.* at 4:14–20.

[577]   *Id.* at 4:21–5:8.

[578]   *Id.* at 5:9–13.

[579]   *Id.* at 12:1–4.

[580]   Notice of Successful and Backup Bidder at 3.

[581]   *Notice of Debtors' Entry into Plan Sponsor Agreement* [Docket No. 2759].

(c)      The Backup Bid.[582]

As contemplated by the Backup Bid, in the event the Debtors elect to terminate the NewCo Transaction and pivot to the Backup Plan Sponsor Transaction, an entity designated by the BRIC will manage the Wind Down Estate as the "Backup Plan Administrator."[583]   In exchange, the Backup Plan Administrator will be entitled to certain fees (the "Backup Plan Fees"), including:  (a) a $50 million administration fee, which shall be payable in $10 million annual installments (the "Backup Plan Administration Fee"),[584] (b) a percentage of any distributions made to creditors from the Wind Down Estates, (c) an incentive fee based on the value recovered by the Backup Plan Administrator in excess above the initial asset valuation (excluding price appreciation of liquid BTC/ETH upon emergence), and (d) an efficiency incentive fee based on annual cost savings generated.[585]

On June 7, 2023, the Debtors, the Committee, the BRIC, and the BRIC Exchange Partner executed a backup plan sponsor agreement (the "Backup Plan Sponsor Agreement").[586]   As set forth in the Backup Plan Sponsor Agreement, the BRIC has agreed to serve as the Backup Bidder through December 31, 2023. The BRIC has also committed to provide the BRIC Consultation Services to assist the Debtors and Fahrenheit in preparing for the consummation of the NewCo Transactions and minimize unnecessary delays to the Chapter 11 Cases in the event the Debtors pivot to the Backup Bid.

The BRIC Consultation Services will include, among other things and solely to the extent requested by the Debtors:  (a) sharing analyses and guidance with respect to the more than 100 Cryptocurrency assets owned by the Debtors; (b) assisting the Debtors with the development of strategies to maximize the value of the Debtors' illiquid assets, including developing trading strategies for Cryptocurrency assets; (c) consulting with the Debtors on mining operations strategy and execution; (d) advising the Debtors on the process for developing models and data science tools in preparation for distributions, including timing and reserves; and (e) consulting with the Debtors on distribution mechanics, including claim calculations, appropriate reserves, KYC/AML processes, tax complexities, and timing.[587]

The Backup Plan Sponsor Agreement also provides for the Debtors' prompt payment of certain fees and expenses to the BRIC (and certain affiliated parties) (the "BRIC Fees") to compensate the BRIC for serving as the Backup Bidder, the substantial time and resources expended by the BRIC and its affiliates in connection with the Auction and execution of the Backup Plan Sponsor Agreement, and for the BRIC Consultation Services.[588]   The BRIC Fees include (a) a commitment fee of $1.5 million; (b) the reimbursement of all reasonable and documented fees and expenses incurred by the BRIC, the BRIC Exchange Partner, and certain affiliated parties (collectively, the "BRIC Parties") in connection with the

---

[582]     The terms of the Backup Bid are subject to change prior to any approval by the Bankruptcy Court.

[583]     *See generally* Backup Plan Sponsor Agreement.

[584]     To the extent the Chapter 11 Cases are closed before the fifth anniversary of the Effective Date, the remaining balance of the $50 million will be paid immediately.

[585]     For the avoidance of doubt, the Backup Plan Administrator will only be entitled to the Backup Plan Fees to the extent the Debtors make the Backup Bid Election and the Backup Plan Transactions are consummated.

[586]     *Notice of Hearing on Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2774].

[587]     The Debtors are authorized to terminate the Consultation Services; however, in the event of termination, the BRIC shall no longer be obligated to serve as the Backup Bidder.

[588]     *Id.* at §13.

Auction and Backup Plan Sponsor Transaction; and (c) a $500,000 monthly fee for the Consultation Services retroactive to May 1, 2023. Absent the prompt payment of the BRIC Fees as administrative expenses, the BRIC and BRIC Exchange Partner have made clear that they will terminate the Backup Plan Sponsor Agreement.

Simultaneously with executing the Backup Plan Sponsor Agreement, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2774] (the "Backup Bid Fees Motion"), which included the Backup Plan Sponsor Agreement as an exhibit, requesting that the Bankruptcy Court approve the BRIC Fees. The Debtors believe that the BRIC Fees are a necessary inducement for the BRIC to serve as the Backup Bidder, which the Debtors and the Committee have determined is critical to maintaining a degree of optionality under the Plan.[589] The BRIC Consultation Services will provide meaningful value regardless of whether the Debtors pivot to the Backup Plan Sponsor Transaction.[590] Importantly, the Backup Plan Sponsor Agreement includes a "fiduciary out" that allows the Debtors or the Committee, consistent with their fiduciary duties, to terminate the Backup Plan Sponsor Agreement to consider alternative restructuring proposals which are inconsistent with the Backup Plan Sponsor Transaction (*i.e.*, not the NewCo Transaction).[591] Furthermore, in light of increased regulatory scrutiny and market volatility, the Debtors and the Committee believe it is in the best interest of the Debtors' estates to secure the BRIC Bid as the Backup Bid—the Backup Plan Sponsor Transaction have a meaningfully different risk profile than the NewCo Transaction and the BRIC has agreed to serve as the Backup Plan Administrator even if the Debtors are unable to proceed with establishing the Backup MiningCo.[592]

On June 21, 2023, the U.S. Trustee Filed the *Objection of the United States Trustee to Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor Agreement and (II) Granting Related Relief* [Docket No. 2847] (the "UST Backup Bid Fees Objection"), which argued that the Court should deny the BRIC Fees because the Debtors did not demonstrate that the BRIC Fees were necessary to preserve the value of the estate or were necessary to induce BRIC's participation in the auction.[593] The UST Backup Bid Fees Objection also asserted that the Debtors could not justify the BRIC Fees because the "Debtors had multiple suitors anxious to bid on assets."[594] In response to the UST Backup Bid Fees Objection and in support of the Backup Bid Fees Motion, the Debtors Filed the *Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2908] (the Backup Bid Fees Reply").[595]

---

[589]    Backup Bid Fees Motion ¶ 7.

[590]    *Id.* ¶ 9.

[591]    Backup Plan Sponsor Agreement at §§ 12.02(c), 12.03(c).

[592]    Backup Bid Fees Motion at ¶ 37.

[593]    UST Backup Bid Fees Objection at 14.

[594]    *Id.* The U.S. Trustee relies on the argument that the Court's approval of the BRIC Fees would create bad precedent that creates perverse bidding incentives: "To award these protections to BRIC, would open the floodgates for all losing bidders, or perhaps uninterested bidders, to seek compensation for performing diligence and participating in bankruptcy auctions." *Id.* at 2.

[595]    Contemporaneously with filing the Backup Bid Fees reply, the Debtors Filed the *Declaration of Samuel Schreiber, Senior Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2909].

As described in the Backup Bid Fees Reply, after the Debtors executed the Backup Plan Sponsor Agreement, a third-party submitted a competing proposal for the Backup Plan Sponsor Transaction.[596] Upon receiving this competing offer, the Debtors asked the BRIC to revise the terms of the BRIC Fees and Backup Plan Sponsor Agreement.[597] In response to the Debtors' request, the BRIC and the BRIC Exchange Partner agreed to materially improve the terms of the BRIC Fees and the Backup Plan Sponsor Agreement.[598] The revised BRIC Fees included (a) reducing the Consultation Services Fee to $450,000 per month with the Consultation Services Fee payable retroactive to June 1, 2023, and (b) reducing the Expense Reimbursement Monthly Cap to $300,000 per month (to be measured over any rolling three-month period).[599] The BRIC and the BRIC Exchange Partner also agreed to reduce the Backup Plan Fees, which would be payable to the Backup Plan Administrator solely to the extent the Debtors consummate the Backup Plan Sponsor Transaction. The revisions to the Backup Plan Fees included (a) reducing the Backup Plan Administration Fee from $50 million to $46 million, with the last two years of the five-year term reduced to $8 million each, and (b) reducing the initial distribution fee from $15 million to $12 million.[600] The Debtors maintained that payment of the BRIC Fees constitutes a sound exercise of the Debtors' business judgment that would ensure that the Debtors could quickly and seamlessly pivot to the Backup Plan Sponsor Transaction (if in the best interest of the Debtors' Estates).[601]

A hearing on the Backup Bid Motion was held on June 28, 2023, at which the Bankruptcy Court expressed concerns about the BRIC Fees and indicated that the Consultation Services Fee could not be approved without the Backup Plan Sponsor being retained by the Debtors' Estates under section 327 of the Bankruptcy Code.[602] After the hearing, the Bankruptcy Court denied the Backup Bid Motion without prejudice.[603]

To address the Bankruptcy Court's concerns with the BRIC Fees, the Debtors, the Committee, and the Backup Plan Sponsor decided to remove the Consultation Services Fee entirely from the Backup Plan Sponsor Agreement (*i.e.*, the BRIC Fees would only consist of the Commitment Fee and Expense Reimbursement). On July 8, 2023, the Debtors Filed the renewed Backup Bid Fee Motion on an emergency basis [Docket No. 2978] (the "Renewed Backup Bid Motion").[604]

---

[596]    Backup Bid Fees Reply ¶ 2.

[597]    *Id.* ¶ 3.

[598]    *Id.* ¶ 3.

[599]    *Id.* ¶ 4.

[600]    *Id.* ¶ 4. Under the proposed terms, the payment of the Backup Plan Administration Fee would be reduced to $8 million in years 4 and 5.

[601]    *Id.* ¶ 7.

[602]    June 28, 2023 Hr'g at 48:25–50:13.

[603]    *Order Denying Without Prejudice Debtors' Motion to Pay Fees to the Backup Plan Sponsor* [Docket No. 2923] (the "Initial Backup Bid Fee Order").

[604]    The Debtors filed a motion to hear the Renewed Backup Bid Motion on an expedited basis [Docket No. 2979], which the Bankruptcy Court granted on June 10, 2023 [Docket No. 2982]. In support of the Renewed Backup Bid Motion, the Debtors submitted the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2984].

On July 10, 2023, in connection with the Renewed Backup Bid Motion and in accordance with the Bidding Procedures, the Debtors Filed a notice [Docket No. 2983] announcing that the Debtors intend to solicit and consider alternative restructuring proposals for the Backup Plan Sponsor Transactions and that the Debtors, the Committee, the BRIC, and the BRIC Exchange Partner executed an amended and restated Backup Plan Sponsor Agreement.[605]  On July 20, 2023, the Bankruptcy Court entered an order approving the BRIC Fees [Docket No. 3057].

On or about July 31, 2023, the Debtors received two bids for alternative backup plan sponsor transactions.  As of the date of this Disclosure Statement, the Debtors continue to diligence each proposal and have not determined whether either alternative backup plan sponsor transaction is superior to the BRIC proposal. The Debtors will continue to diligence and negotiate with the BRIC and additional bidders with respect to the terms of the Backup Plan Sponsor Transaction, including with respect to reducing the fees payable by the Post-Effective Date Debtors under the Backup Plan Sponsor Transaction.  If the Debtors, the Committee, and interested parties agree to revised terms for the Backup Plan Sponsor Transaction, the Debtors will File a notice describing such revised terms prior to the Effective Date of the Plan.

**N.      Postpetition Disposition of Certain Property.**

In accordance with their business judgment as debtors in possession, and to maximize value to all stakeholders, the Debtors have sought authorization from the Bankruptcy Court to dispose of certain assets postpetition when doing so would benefit the estates.

On November 14, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Decentralized Finance Loans and (II) Granting Related Relief* [Docket No. 1360], requesting that the Bankruptcy Court authorize the repayment of an outstanding decentralized finance loan of approximately $3.26 million so that approximately $7.5 million of digital assets collateralizing the loan could be returned to the estates.  After a hearing on December 8, 2022, the Bankruptcy Court authorized the Debtors to repay the decentralized finance loan [Docket No. 1761] (the "DeFi Order").[606]  As of December 21, 2022, the Debtors deposited approximately $3.26 million to repay the loan and withdrew 446.9013 wBTC that collateralized the loan.

On January 3, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Postpetition Cryptocurrency Transfers to Account Holders and (II) Granting Related Relief* [Docket No. 1817], requesting that the Bankruptcy Court authorize the Debtors to return Cryptocurrency assets of approximately $1.3 million that were transferred to the Debtors' platform postpetition.  After a hearing on January 24, 2023, the Bankruptcy Court authorized the Debtors to return the postpetition transfers [Docket No. 1929].  After engaging with their advisors to establish an efficient return process, the Debtors filed a notice on the docket regarding the withdrawal procedures on May 17, 2023 [Docket No. 2667].  As of the date of the Filing of this Disclosure Statement, withdrawals are underway.

---

[605]   Interested parties are invited to submit competing restructuring proposals by Monday, July 31, 2023 at 11:59 p.m. (prevailing Eastern Time).

[606]   The DeFi Order provided that to the extent consistent with the Earn Ruling, the Debtors are authorized, but not directed, to swap or sell coins from the Debtors' general coin holdings (in the Earn Program) to generate sufficient USD Coin to repay the loan.  DeFi Order ¶ 3.  Upon repayment and the return of the digital assets collateralizing the loan, the Debtors are authorized, but not directed, to swap or sell such returned collateral to replenish the coins in the Earn Program that were swapped or sold to generate the USD Coin used to repay the loan and convert the remaining digital assets into cash in the form of United States Dollars.  *Id.* ¶ 4.

On January 3, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818], requesting that the Bankruptcy Court authorize the Debtors to exercise certain rights under their master lending agreements with institutional borrowers. Specifically, the Debtors requested authority to, among other things, (i) return Cryptocurrency assets serving as collateral on account of loans to institutional customers upon repayment of each loan and (ii) apply Cryptocurrency assets serving as collateral on account of institutional loans at the prevailing market price to the balance of such outstanding loans. After a hearing on January 24, 2023, the Bankruptcy Court authorized the Debtors, in consultation with the advisors to the Committee, to exercise their rights under each master lending agreement with respect to each corresponding outstanding institutional loan without further notice and hearing [Docket No. 1944].

On February 9, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Sale of Bitmain Coupons and (B) the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2022], requesting that the Bankruptcy Court authorize the Debtors to monetize their coupons and credits that discount the purchase of mining rigs at Bitmain Technologies Ltd. Specifically, the Debtors requested authority to (i) sell the coupons through a private sale process, and (ii) convert the credits into purchase orders for mining rigs and sell the Debtors' interest under such purchase order to a third party. In January 2023, the Debtors executed a contract to sell 2,490 mining rigs for approximately $1.2 million in Cash. From late January 2023 through May, the Debtors sold five coupons with approximately $30.8 million of face value for approximately $4.5 million in Cash.

Subsequently, the Bankruptcy Court approved the coupon sale [Docket No. 2086]. After the Debtors Filed two revised orders and a declaration[607] providing that (i) the Debtors will request that the contractual assignee transfer the full amount of the purchase price prior to the Debtors placing and executing the purchase orders, which the Debtors will hold in escrow and (ii) the proceeds from the credit conversion will be subject to the applicable provisions of the Final Cash Management Order [Docket No. 1152], the Bankruptcy Court approved the credit conversion [Docket No. 2139].

On June 7, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Sale of Osprey BTC Shares and (II) Granting Related Relief* [Docket No. 2775] (the "Osprey BTC Motion"), requesting that the Bankruptcy Court authorize the Debtors to sell approximately 2.9 million shares issued by the Osprey Bitcoin Trust (the "Osprey BTC Shares"). The Osprey Bitcoin Trust is a Delaware statutory trust managed by Osprey Funds, LLC that owns Bitcoin and largely tracks the price of Bitcoin, and each Osprey BTC Share represents a share of ownership of the Bitcoin the trust holds.[608] Osprey BTC Shares can be bought in-kind or with fiat currency and can be purchased through brokerage

---

[607] *Notice of Filing Revised Proposed Order (I) Authorizing (A) the Sale of Bitmain Coupons and (B) the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2069]; *Supplemental Declaration of Christopher Ferraro in Support of Entry of an Order (I) Authorizing the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2124]; *Notice of Filing Further Revised Proposed Order (I) Authorizing the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2125].

[608] *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Sale of Osprey BTC Shares and (II) Granting Related Relief* [Docket No. 2776] (the "Osprey BTC Declaration") ¶ 5.

accounts.[609]  They are also transferable and tradable over the counter, although the secondary market for Osprey BTC Shares is relatively illiquid.[610]

As part of their prepetition investment strategy, the Debtors bought the Osprey BTC Shares for 1,000 Bitcoin, representing an aggregate consideration of approximately $55.3 million.[611]  However, due to the significant decrease in the value of Bitcoin since the time of the Debtors' purchase of the Osprey BTC Shares, the value of each Osprey BTC Share has decreased from the March 2021 purchase price.[612]  As of June 7, 2023, each Osprey BTC Share was valued at $5.06, and the Debtors estimate that the Osprey BTC Shares in their possession, which represented approximately 36.65 percent of the total number of outstanding Osprey BTC Shares, have a current market value of approximately $15 million.[613]

In April 2023, the Debtors received a proposal from Anax Trading, LLC ("Anax"), a third party not affiliated with the Debtors, to purchase all Osprey BTC Shares in the Debtors' possession for approximately $16 million in Cash consideration.[614]  The Debtors believe, in a sound exercise of their reasonable business judgement, that the $16 million selling price is commensurate with the market and the transaction is in the best interests of their estates and creditors in light of the continued volatility of Bitcoin prices, the low trading volume of the shares, the Debtors' significant holdings, and the difficulty of finding purchasers on the secondary market.[615]  The Debtors received no objections to the Osprey BTC Motion. The Bankruptcy Court heard arguments on the Osprey BTC Motion on June 28, 2023 and entered the order authorizing the sale on the same day [Docket No. 2925].

As of the date of the Filing of this Disclosure Statement, the sale of the Osprey BTC Shares has closed and the Debtors have received approximately $19 million in Cash consideration.

### O.    Employee Expense Reimbursement Motion.

On February 28, 2023, the Debtors Filed *The Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter Into Witness Cooperation Agreements with Certain Current and Former Employees, (II) Authorizing Reimbursement of Past and Future Out-of-Pocket Expenses of Cooperating Witnesses, Including Attorney's Fees, and (III) Granting Related Relief* [Docket No. 2147] (the "Employee Expense Reimbursement Motion").  In the Employee Expense Reimbursement Motion, the Debtors sought approval to enter into cooperating witness agreements and reimburse the expenses of

---

[609]    *Id.*

[610]    *Id.* ¶ 6.

[611]    *Id.* ¶ 4.

[612]    *Id.* ¶¶ 6, 11.

[613]    *Id.* ¶ 7.

[614]    *Id.* ¶ 9.  The Debtors and Anax further agreed that a condition to Anax's obligation to close the sale is that the closing price on the purchase date, divided by the net asset value of the Osprey BTC Trust on such date, does not exceed 67.84 percent of the net asset value of the Osprey BTC Trust, and a condition to the Debtors' obligation to close the sale is that the closing price on the purchase date, divided by the net asset value of the Osprey BTC Trust on such date, is not lower than 62.57 percent of the net asset value of the Osprey BTC Trust.

[615]    *Id.* ¶ 12.

cooperating employees who have played a role in cooperating with numerous ongoing investigations into the Debtors' prepetition business practices.[616]

Mr. Tuganov, the Committee, and the U.S. Trustee Filed responses or objections in opposition to the motion.[617]  Mr. Tuganov requested that the Debtors make the transcripts of the employee interviews available to creditors who Filed timely proofs of claim in the Debtors' Chapter 11 Cases.[618]  The Committee argued that the proposed payments of employee expenses were not in the ordinary course of business of the Debtors and did not satisfy the business judgment rule;[619] employees seeking reimbursement already have a right to a prepetition claim against the Debtors for their litigation-related expenses, rendering the motion unnecessary;[620] and the Employee Expense Reimbursement Motion was premature because the proposed reimbursement payments may have to be clawed back in the event that a cooperating witness was found to be culpable for certain of the alleged litigation claims.[621]  The U.S. Trustee argued that the Debtors provided no factual basis to make employee expense reimbursements, that the cooperation of employees in investigations was part of their employment and could be compensated through the Key Employee Retention Program awards, and that the Debtors' counsel can adequately represent the interests of the Debtors in investigations such that cooperating employees do not need their own counsel.[622]

In advance of the May 17, 2023 hearing on the motion, the Debtors worked with the Committee to resolve the Committee's objections.  The Debtors also Filed a revised proposed order [Docket No. 2643], a declaration by Mr. Ferraro [Docket No. 2654], and a reply addressing Mr. Tuganov's and the U.S. Trustee's objection [Docket No. 2653] (the "Employee Expense Reimbursement Motion Reply").  In response to Mr. Tuganov's request for transcripts of employee interviews, the Debtors explained therein that providing all creditors with such access is not within the Debtors' control as the investigations are conducted by other parties, the investigations are confidential and ongoing, and the Debtors do not participate in many of the interviews.[623]  In response to the U.S. Trustee's objections, the Debtors explained that the U.S. Trustee misunderstood the purpose of the Employee Expense Reimbursement Motion, that Debtors' counsel cannot represent any employees in their individual capacity as part of any investigations into the Debtors due to conflict of interest concerns, and that the Employee Expense Reimbursement Motion does not call for any reimbursement of expenses related to investigations into employees themselves.[624]

---

[616]    Employee Expense Reimbursement Motion ¶¶ 2, 5.

[617]    [Docket No. 2223] (the "Tuganov Response to Employee Expense Motion"), [Docket No. 2227] (the "Committee Objection to Employee Expense Motion"), and [Docket No. 2230] (the "U.S. Trustee Objection to Employee Expense Motion") respectively.

[618]    Tuganov Response to Employee Expense Motion ¶¶ 4, 8.

[619]    Committee Objection to Employee Expense Motion ¶¶ 8, 23.

[620]    Id. ¶ 14.

[621]    Id.  ¶¶ 23, 25.

[622]    U.S. Trustee Objection to Employee Expense Motion at 4–5.

[623]    Employee Expense Reimbursement Motion Reply ¶ 2.

[624]    Id. ¶ 3.

As of the date of the Filing of this Disclosure Statement, the Bankruptcy Court has not yet ruled on the Employee Expense Reimbursement Motion.

### P.    Insurance Motions.

On May 3, 2023, Euclid Financial Institution Underwriters, LLC ("Euclid") Filed the *Motion of Euclid Financial Institution Underwriters, LLC, a Duly Authorized Agent of Certain Underwriters at Lloyds of London and Republic Vanguard Insurance for Relief from the Automatic Stay to the Extent Applicable* [Docket No. 2585] (the "Euclid D&O Motion") requesting the authority to advance or pay certain defense costs to individuals insured under a Directors & Officer's Liability and Corporate Securities Liability insurance policy (the "Policy") issued by underwriters at Lloyds of London and Republic Vanguard Insurance (the "Underwriters") to Celsius.[625]

The Euclid D&O Motion was Filed in connection with the Underwriters receiving a number of notices from insured individuals (including directors, officers, and employees) seeking payment of defense costs incurred in connection with ongoing investigations, lawsuits, and arbitration proceedings arising in connection with the events leading to the Debtors' chapter 11 cases.[626]   The Policy contains three types of coverage:  (a) coverage for losses incurred by Insured Individuals (to the extent such loss is not indemnified by Celsius) ("Side A Coverage"); (b) coverage for Celsius in the event Celsius indemnifies an Insured Individual for covered losses ("Side B Coverage"); and (c) coverage for Celsius resulting for claims directly made against Celsius ("Side C Coverage").[627]   The Policy has a total aggregate liability limit of $1.5 million, (inclusive of defense costs), and is subject to a $2.5 million retention per claim for claims under the Policy's Side B Coverage or Side C Coverage.[628]

The Euclid D&O Motion argues that to the extent the automatic stay is applicable, cause exists to grant relief from the stay and permit the advancement of defense costs because of the greater harms to be faced by the Individual Insureds and the Policy's priority of payment provision, which it alleges prioritizes individual directors and officers over Celsius' clams.[629]

On June 7, 2023, counsel for Mr. Leon and Ms. Landes Filed the *Motion of Shlomi Daniel Leon and Aliza Landes for Relief from the Automatic Stay, as Applicable, to Permit Payments Under D & O Insurance and Joinder in Insurer's Motion Seeking the Same Relief* [Docket No. 2760] joining the Euclid D&O Motion and seeking relief from the automatic stay (together with the Euclid D&O Motion, the "D&O Motions").

On June 21, 2023, the Debtors Filed the *Debtors' Limited Objection and Reservation of Rights Regarding Euclid Financial Institution Underwriters, LLC's Motion for Relief from the Automatic Stay* [Docket No. 2842] (the "Euclid Limited Objection") requesting that the Bankruptcy Court establish certain

---

[625]   Euclid Motion ¶ 1.  The individual insureds under the policy include current and former directors, officers, and employees of Celsius (the "Insured Individuals").

[626]   *Id.* ¶ 17.

[627]   *Id.* ¶ 7.

[628]   *See generally* Policy (V. Retentions).

[629]   Euclid D&O Motion ¶¶22–24.  The Euclid D&O Motion also references a number of cases where bankruptcy courts have found insurance proceeds to not be property of the estate and therefore not subject to the automatic stay.  Euclid D&O Motion ¶¶ 19–21 (discussing where a debtor's interest in a policy's proceeds are only "hypothetical or speculative" and "no longer protecting the estate's other assets from diminution.").

procedures as a condition of providing individuals insured coverage under Side A for defense costs.[630] Specifically, the Debtors requested that the Court impose (a) certain quarterly reporting requirements, (b) a pro rata coverage scheme to protect the interests of all individual insureds and avoid a "run on the bank," and (c) a requirement that all individuals receiving payments under the Policy consent to the Bankruptcy Court's jurisdiction.[631]    The Debtors believe that the proposed procedures are appropriate and necessary to balance the interests of the individuals seeking coverage while reducing the likelihood the policy is inequitably exhausted.[632]

On June 21, 2023, *pro se* creditor Víctor Ubierna de las Heras Filed an objection to the D&O Motions [Docket No. 2849] asserting, among other things, that the Policy's proceeds are property of the Estates and that the balance of harms weighs against providing individuals coverage because doing so would deplete the amount of proceeds which may become available to the Debtors' unsecured creditors.

The Bankruptcy Court held a hearing on the D&O motions on June 28, 2023, and entered an opinion on July 10, 2023.[633]    The Bankruptcy Court found that cause exists to lift the automatic stay and allow Euclid to advance or pay certain defense costs to individual insureds, but also called for the adoption of certain of the conditions requested by the Debtors and the Committee.[634]    The Bankruptcy Court declined to adopt the Debtors' request for a pro rata coverage scheme, however, explaining that neither the Debtors nor the Committee provided legal precedent for this type of condition on a lift stay motion.[635]

### Q.    Agreements with Mawson Infrastructure Group Inc. and Its Affiliates.

#### 1.    The Co-Location Agreement.

On February 23, 2022, Debtor Celsius Mining and Luna Squares LLC ("Luna") entered into a customer equipment co-location agreement (together with all supporting schedules and addenda, the "Co-Location Agreement"), pursuant to which Luna agreed to provide a hosting facility, electrical power, and internet access for the Debtors' mining rigs.

On July 20, 2023, Celsius sent Luna a notice of Celsius' intent not to renew the Co-Location Agreement on the existing terms.    Luna has repeatedly and consistently failed to fulfill its obligations since March 2022.    The Co-Location Agreement obligated Luna to deploy a certain number of rigs beginning in certain months of the contract.    It detailed the deployment month (*e.g.*, March), the approximate quantity of rigs to be deployed (*e.g.*, 2,000), and the term of the contract (*e.g.*, until August 23, 2023).    Celsius Mining was responsible for delivering rigs in advance of the deployment date to ensure Luna could satisfy

---

[630]    The Euclid Limited Objection was Filed as the Debtors, the Committee, and Euclid worked towards a consensual resolution to address the Debtors' and the Committee's concerns.    The Euclid Limited Objection expressly reserved the question of whether the Policy's proceeds are property of the Debtors' Estates, and the Debtors' rights under Side B and/or Side C of the Policy, the Debtors' other insurance policies.    Euclid Limited Objection ¶¶ 24–25.    The Committee also Filed a limited objection to the D&O Motions [Docket No. 2839] and raised the same concerns and requested the same procedures and conditions as the Debtors.

[631]    *Id.* ¶¶19–21.

[632]    Euclid Limited Objection ¶¶ 19–23.

[633]    *Memorandum Opinion Granting Motion for Relief from the Automatic Stay, to Allow Advancement and Payment of Insureds' Defense Costs Under D&O Policies* [Docket No. 2981] (the "D&O Ruling").

[634]    *Id.* at 17.

[635]    *Id.* at 23.

its obligations.  The first month of deployment was scheduled to be March 2022.  At the end of March, despite Celsius Mining having delivered over 4,000 rigs, Luna had not deployed any of those rigs.  By the end of April, Celsius Mining had delivered a total of 5,400 rigs, and Luna had deployed less than 1,000 rigs.  This pattern continued, and for nearly half of the term of the Co-Location Agreement, the deficit between deployed rigs and the number of rigs Celsius Mining delivered exceeded 10,000.  Luna also chose to deploy more than 5,000 of its own rigs earlier this year while approximately 10,000 of Celsius Mining's rigs were sitting idle at Luna's facility.  Luna argues that construction delays contributed in part to the delayed deployment of Celsius, notwithstanding Luna's installation of its own rigs, and the extended delays.

As part of the Co-Location Agreement, Celsius Mining paid deposits totaling over $15.3 million in the aggregate to Luna that are returnable to Celsius at the expiration of the Co-Location Agreement, the vast majority of which will be due and owing to Celsius upon conclusion of the Co-Location Agreement this month.  Luna asserts these deposits have been forfeited by Celsius.  Celsius disputes this assertion and is working to ensure the return of the over $15.3 million to the estates using all means legally available to them.

Celsius Mining also believes Luna has inappropriately failed to charge the actual power costs incurred, by not taking into account the revenue generated from re-selling power that was reserved for Celsius.

Celsius has reserved all rights with respect to these breaches, and others, under the Co-Location Agreement.

### 2.  The Cooperation Agreement.

On the same day the Co-Location Agreement was signed, Celsius Mining and Luna's parent company, Mawson Infrastructure Group Inc. ("Mawson") executed a Cooperation Agreement, which requires Mawson to offer any additional availability it has for hosting services or power capacity to Celsius Mining before offering the availability to any third parties.  On July 25, 2023, Mawson issued a press release inviting indications of interest for its hosting and co-location services and no offer has been made to Celsius Mining.  Celsius Mining is continuing to evaluate its options as a result of this announcement and reserves all its rights.

### 3.  The Promissory Note and Related Agreements.

At the same, time, Celsius Mining loaned Luna $20 million to purchase and install modular transformers and assist Luna with meeting its obligations under the Co-Location Agreement.  In exchange for the loan, Luna provided Celsius Mining with a promissory note (the "Promissory Note") secured by certain of Luna's assets.  In addition, Mawson and Cosmos Infrastructure LLC ("Cosmos"), an affiliate of Luna ("Cosmos," and together with Luna and Mawson, the "Mawson Entities"), executed a guaranty and security agreement guaranteeing Luna's obligations under the Promissory Note and granting Celsius Mining a security interest in the certain additional collateral.

As of the date of the Filing of this Disclosure Statement, $8 million plus interest in the aggregate is outstanding under the Promissory Note and will be due this month.

### 4.  Recent Developments.

Mawson Infrastructure's annual Form 10-K for the year ended December 31, 2022 (released on March 23, 2023) contained a "going concern" qualification to the independent auditors' opinion contained therein.

On July 25, 2023, the Debtors Filed the *Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas for Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares, and Cosmos Infrastructure LLC* [Docket No. 3088], and the Bankruptcy Court entered an order on July 26, 2023 authorizing the Debtors to take discovery of the Mawson Entities [Docket No. 3091]. The Debtors intend to take discovery of the Mawson Entities to evaluate the status of the liens securing the Promissory Note and other potential claims the Debtors may have against the Mawson Entities, including with respect to the Co-Location Agreement.

As of the date of the Filing of this Disclosure Statement, such discovery is still in process.

### R.    Navigating Developments in the Cryptocurrency Industry.

In addition to resolving the key legal issues above, the Debtors have navigated these Chapter 11 Cases through a period of great volatility in both the Cryptocurrency industry and traditional markets.

#### 1.    FTX Bankruptcy.

On November 11 and 14, 2022, FTX Trading Ltd. and 101 of its affiliates (collectively, "FTX") each Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[636]

As part of the Debtors' efforts to reduce exposure to third-party Cryptocurrency trading platforms during the weeks before the Petition Date, the Company reduced its exposure to FTX from approximately $3.6 billion in January of 2022, to approximately $437 million around the Pause, and further to approximately $354 million immediately before the Petition Date, in part by paying down and unwinding over-collateralized loans from FTX and in exchange for a return of the excess collateral.[637] The significant drop in the Company's exposure to FTX was primarily due to the Company's efforts to pay down loans it received from FTX in order to unlock and recover collateral.

During a hearing on November 15, 2022, the Debtors provided the Bankruptcy Court an update regarding their exposure to FTX: as of November 15, 2022, the Debtors' total exposure to FTX consisted of "four loans outstanding to Alameda [Research Ltd.] totaling around $12 million or [$]11 million of net exposure, including the collateral," and certain coins transferred to FTX Trading Ltd. or Quoine Pte. Ltd., "mostly unlocked SRM tokens with a value of approximately one million," for "a total net exposure of [$]12 million."[638] Notwithstanding the Debtors' limited exposure to FTX, the Debtors continue to monitor the developments of the FTX bankruptcy on an ongoing basis to assess any potential impact on the Debtors. In conjunction therewith, the Debtors expect to file a claim in the FTX bankruptcy by June 30, 2023, the general bar date in the case.

The Committee has also requested Bankruptcy Court authority to serve FTX with subpoenas *duces tecum* for purposes of evaluating the fair market value of CEL Token as of the Petition Date by analyzing certain trading on FTX's exchange [Docket No. 2541]. Following the Bankruptcy Court's order authorizing the same [Docket No. 2626], the Committee Filed a notice of these subpoenas on May 15, 2023 [Docket No. 2642].

---

[636]    *In re FTX Trading Ltd. et al.*, Case No. 22-11068 (Bankr. D. Del. Nov. 11, 2022).

[637]    Nov. 15, 2022 Hr'g Tr. 28:12–19.

[638]    *Id.* 27:25–28:6.

On June 29, 2023, the Debtors filed proofs of claim in the FTX bankruptcy. Debtor CNL asserted a secured claim against FTX debtor Alameda Research, Ltd., based upon a loan agreement previously executed between the parties, in the amount of $14,176,995.81, or 10,000,000 ADA tokens, 83,553 LTC tokens, 1,303,482 EOS tokens, and 3,125,000 MATIC tokens, whichever is greater in value, plus interest, taxes, and certain fees.[639] Separately, the Debtors asserted a contingent, unliquidated, general unsecured claim against FTX in an amount no less than $2 billion, plus interest, taxes, fees, costs, penalties, and any other sums as may be determined by a court of competent jurisdiction, or any other similarly situated hearing officer, administrator, arbitrator, mediator, or in a documented or court-approved settlement or compromise.[640] The Debtors expect that their claims against the FTX debtors will be subject to extensive litigation. Accordingly, because of such litigation risk and because FTX is in bankruptcy, any recovery on account of these claims is speculative.

### 2. Failure of Silicon Valley Bank and Signature Bank.

On Friday, March 10, 2023, the California Department of Financial Protection and Innovation closed Silicon Valley Bank and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver.[641] On Sunday, March 12, 2023, the New York State Department of Financial Services closed Signature Bank and appointed the FDIC as receiver.[642] Shortly thereafter, Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg issued the *Joint Statement by Treasury, Federal Reserve, and FDIC* (the "Banking Statement") describing the actions taken to fortify the banking system, including "fully protect[ing] all depositors" at Silicon Valley Bank and similarly making all depositors at Signature Bank whole.[643]

Pursuant to the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152] (the "Final Cash Management Order"), the Debtors maintained bank accounts for some of their fiat currency at Signature Bank. In light of the fluctuations in the banking system, on March 13, 2023 the Debtors Filed the *Debtors' Statement Regarding Their Cash Management System* [Docket No. 2219], noting the steps the Debtors had taken to confirm the Debtors' funds at Signature Bank were secured pursuant to the Banking Statement and anticipating the transfer of funds from Signature Bank to another authorized depository in compliance with *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").

---

[639] Claim Number 3752.

[640] The Debtors filed separate (but identical) proofs of claim against each FTX debtor entity, for a total of 100 proofs of claim. *See, e.g.*, Claim Number 3021.

[641] Press Release, FDIC, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California (March 10, 2023, last updated March 12, 2023), https://www.fdic.gov/news/press-releases/2023/pr23016.html.

[642] Press Release, FDIC, FDIC Establishes Signature Bridge Bank, N.A., as Successor to Signature Bank, New York, NY (March 12, 2023), https://www.fdic.gov/news/press-releases/2023/pr23018.html.

[643] Press Release, Department of the Treasury, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Joint Statement by Treasury, Federal Reserve, and FDIC (March 12, 2023), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.

As of the date of the Filing of the Disclosure Statement, the Debtors are diversifying where they hold their fiat currency in compliance with the Final Cash Management Order and the U.S. Trustee Guidelines, and in consultation with the Committee as contemplated by the Final Cash Management Order.

### 3.   EFH Default.

As noted in Article VI.A of this Disclosure Statement, Celsius had an approximately $509 million uncollateralized claim against EFH after it set off its own loan obligations to the lender prepetition, which balance was $409 million as of May 2023.   While EFH had made some payments to the Company since September 2021, EFH stopped making those payments in June 2023.   As of the date of the Filing of this Disclosure Statement, the Debtors are in contact with the lender and continue to discuss possible resolutions of the Company's claim.

### 4.   The SEC v. Ripple Labs, Inc. Decision.

On December 22, 2020, the SEC filed a complaint against Ripple Labs, Inc. ("Ripple"), Bradley Garlinghouse, and Christian A. Larsen (collectively, the "Ripple Defendants"), alleging that they engaged in the unlawful offer and sale of securities in violation of section 5 of the Securities Act.[644]   These allegations arose in connection with the Ripple Defendants' sale of XRP.[645]

The SEC's allegations against Ripple relate to three primary offerings or sales of XRP:  (a) Ripple's sale of XRP to institutional buyers (the "Institutional XRP Sales," and the "Institutional XRP Buyers," respectively);  [646] (b) Ripple's sale of XRP through market transactions on digital asset exchanges "programmatically" or through trading algorithms (the "Programmatic XRP Sales");[647] and (c) Ripple's distributions of XRP as a form of payment of services (e.g., employee compensation) (the "Other XRP Distributions," and together with the Institutional XRP Sales and Programmatic XRP Sales, the "XRP Offerings").[648]

---

[644]   See SEC v. Ripple Labs, Inc., 20-cv-10832 (AT) (S.D.N.Y. Dec. 22, 2020) [Docket No. 46] (the "Ripple Amended Complaint").

[645]   SEC v. Ripple Labs, Inc., 20-cv-10832 (AT) (S.D.N.Y. June 13, 2023) [Docket No. 874], at 2 (the "Ripple Opinion").  XRP Ledger is a blockchain developed in 2011 and early 2012 by Arthur Britto, Jed McCaleb, and David Schwartz that requires XRP to operate.  Id. at 3.  Ripple was founded by Britto, McCaleb, and Larsen in 2012 with the purpose of developing a "global payments network for international currency transfers."  Id. at 3.  XRP Ledger generated 100 billion XRP—20 billion XRP were distributed to the three founders with the remainder provided to Ripple.  Id. at 2–3.  While "[s]ome, not all, of Ripple's products and services rely on the XRP Ledger and XRP,"  Ripple and XRP have been closely connected since inception: Id. at 3.

[646]   Id. at 4.  The Institutional XRP Buyers included hedge funds, and on demand liquidity customers, pursuant to written contracts.  Id. at 4.  Per the SEC's allegations, the Institutional XRP Sales generated total proceeds of approximately $728.9 million.  Id.

[647]   Id. at 4.  The SEC estimated the programmatic sales to total approximately $757.6 million in the aggregate.  Id. at 4.  The SEC's allegations against Larsen and Garlinghouse relate to their sales of XRP in their individual capacities through market transactions (i.e., Programmatic XRP Sales) and aiding and abetting Ripple's sales as executives of Ripple.  Id. at 5.  Per the SEC's allegations, Larsen's and Garlinghouse' s sales resulted in over $450 million.  Id.

[648]   Id. at 4–5.  "The SEC alleges that Ripple recognized revenue of $609 million from its distributions of XRP to individuals and entities in exchange for services."  Id. at 5.

In connection with these activities, the SEC alleges that the Ripple Defendants "sold XRP as an [unregistered] 'investment contract'" in violation of Section 5 of the Securities Act.[649]  On July 13, 2023, the District Court for the Southern District of New York (the "Ripple Court") ruled on the parties' cross motions for summary judgment.  Specifically, the Ripple Court granted in part and denied in part both motions, accepting the SEC's position that the Institutional XRP Sales constituted an unregistered offer or sale of investment contracts but finding that the Programmatic XRP Sales and Other XRP Distributions were not offers or sales of investment contracts.[650]

In making its determination, the Ripple Court reviewed each set of transactions and conducted the fact-intensive analysis required by *SEC v. W.J. Howey Co.* (*i.e.*, the *Howey* test).[651]  In discussing *Howey*, the Ripple Court made an important distinction between the XRP Offerings and XRP:  "XRP, as a digital token is not in and of itself a 'contract, transaction[,] or scheme' that embodies the Howey requirements of an investment contract."[652]

However, the Ripple Court ultimately determined that the Institutional XRP Sales were investment contracts.  Those sales met all three prongs of the *Howey* test:  (a) the Institutional XRP Buyers paid Ripple money in exchange for XRP; (b) Ripple used the funds to finance operations and the "fortunes of the Institutional Buyers were tied to the success of the enterprise as well as to the success of other Institutional Buyers;" and (c) a reasonable investor in the position of the Institutional Buyers "would have purchased XRP with the expectation that they would derive profits from Ripple's efforts" for reasons including, among others, that Ripple's marketing efforts to the Institutional Buyers would have led a reasonable investor to believe that the proceeds would be used to "improve the market for XRP and develop uses for the XRP Ledger, thereby increasing the value of XRP."[653]

The Ripple Court found that the Programmatic XRP Sales and Other XRP Distributions did not amount to the unregistered offering or sale of investment contracts under *Howey*.  The Ripple Opinion explained that the Programmatic XRP Sales failed to satisfy the third *Howey* prong; there was no expectation of profit "derive[d] from Ripple's efforts" because the buyers purchased XRP through blind bid/ask transactions on digital asset exchanges and "could not have known if their payments of money went

---

[649]    *Id.* at 10.  The parties did not dispute that the Ripple Defendants did not file a registration statement, which would be required to the extent the offerings were investment contracts.  *Id.* at 11.

[650]    *See Id.* at 34.  The Ripple Opinion also denied the SEC's motion for summary judgment on claims against Larsen and Garlinghouse for aiding and abetting Ripple's violations of the Securities Act.  *Id.* at 31.

[651]    *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  "In *SEC v. W.J. Howey Co.*, the Supreme Court held that under the Securities Act, an investment contract is "a contract, transaction[,] or scheme whereby a person [(1)] invests his money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of the promoter or a third party."  *Id.* at 11.  The Ripple Opinion declined to adopt the "essential ingredients" test advocated for by the Ripple Defendants, which would impose additional requirements beyond *Howey*.  *Id.*

[652]    *Id.* at 15.

[653]    *Id.* at 16–21.  The Ripple Opinion notes that while it accepted the SEC's argument to the extent that it held Ripple's sale of XRP to the Institutional XRP Buyers amounted to the offer and sale of investment contracts, it rejected the premise that through the Institutional XRP Sales Ripple "sold investment contracts to the public and used the Intuitional Buyers as underwriters."  *Id.* at 22 n. 15.  The Ripple Opinion also rejected the defenses raised by the Ripple Defendants under the due process clause, including Ripple's "fair notice" argument.  *See id.* at 29.

to Ripple."[654] Finally, the Ripple Court found that the Other XRP Distributions did not meet the first prong of *Howey* because there was no investment of money.[655]

> 5.    *The SEC v. Terraform Labs Pte Ltd. and Do Hyeong Kwon Decision.*

On February 16, 2023, the SEC filed a complaint against Terraform Labs PTE Ltd. ("Terraform") and Do Hyeong Kwon ("Kwon" and together with Terraform, the "Terraform Defendants").[656]    The Terraform Complaint alleges that the Terraform Defendants:  (a) "orchestrated a multi-billion-dollar fraud involving the development, marketing, and sale" of LUNC Token, UST, wLUNA, mAssets, and MIR token (collectively, the "Terraform Tokens") in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, including rule 10b-5, 17 C.F.R. § 240.10-5, promulgated thereunder; and (b) offered and sold unregistered securities and security-based swaps with non-eligible participants in violation of Section 5 of the securities Act.[657]

The Terraform Complaint alleges that the Terraform Defendants solicited investors by touting, among other things, the Terraform Token's profit potential and secondary market liquidity, both of which would be the result of Terraform's unique ability to create, develop, and grow the Terraform ecosystem.[658] In connection with these activities, the SEC alleges that the Terraform Defendants, with full knowledge and intent, violated the registration requirements of the Securities Act through the (a) sale of LUNC Tokens to institutional buyers with no restrictions on resale and (b) through loans of LUNC Token for the purpose of promoting market liquidity.[659]    The SEC further alleges that the Terraform Defendants engaged in a fraudulent scheme by (a) deceiving and misleading investors into believing that the "Terraform blockchain

---

[654]    *Id.* at 23–24.  The Ripple Court does not reach the first or second prongs of *Howey* with respect to the Programmatic XRP Sales.  *Id.* at 25 fn.17.  The Ripple Opinion does not discuss the question of "whether secondary market sales of XRP constitute offers and sales of investment contracts because that question is not properly before the Court."  *Id.* at 23 fn. 16.

[655]    *Id.* at 26.  The Ripple Court did not reach whether the second or third *Howey* prongs were satisfied.  *Id.* at 27 n. 18.  In rejecting the Other XRP Distributions as Investment Contracts, the SEC's argument that the Other XRP Distributions were indirect public offerings was also rejected.  *See id.* at 26–27.

[656]    *See SEC v. Terraform Labs PTE Ltd.*, 23-cv-1346 (JSR) (S.D.N.Y. Feb. 16, 2023).  An amended complaint was filed on April 3, 2023 [Terraform Docket No. 25] (the "Terraform Complaint").  Kwon is the sole director, chief executive officer, and majority shareholder of Terraform.  *Id.*  The SEC Complaint alleges that Kwon as its chief executive officer and co-founder, is jointly and severally liable with Terraform for any securities law violations committed by Terraform.

[657]    *See SEC v. Terraform Labs PTE Ltd.*, 23-cv-1346 (JSR) (S.D.N.Y. July 31, 2023) (the "Terraform Opinion").  *See* Section V.I.C. for a discussion of UST and LUNC Token.  The wLUNA token allowed holders of LUNC Token, which were only available for use on the Terra blockchain, to use LUNC Token in transactions on other blockchains.  Terraform Opinion at 3.  The mAssets "functioned as "security-based swaps" (as opposed to tokens) whose value 'mirrored' the price of securities exchanged on stock exchange," thereby allowing investors to "gauge the risk of investing in that [underlying] security without 'the burdens of owning or transacting in real assets." *Id.*  MIR tokens were the governance token of the Mirror Protocol and entitled its holders to receive the value generated by the Mirror Protocol.  Terraform Complaint ¶ 38.

[658]    Terraform Complaint ¶ 39.  Terraform is alleged to have aggressively marketed and solicited to U.S. investors through social media posts, media interviews and quotes, investor meetings in New York and San Francisco, industry conferences, and arranging to have several of the Terraform Tokens listed on "several major crypto-trading platforms, including a prominent U.S.-based platform."  *Id.* ¶¶42–43.  Based on such allegations, the SEC has held that the Terraform Tokens are investment contracts or security-based swaps and therefore subject to the SEC's jurisdiction and the securities laws.

[659]    *Id.* ¶¶ 105–10. The SEC made similar allegations with respect to MIR tokens including that the Terraform Defendant's (a) sold and loaned MIR tokens with no restrictions on resale and (b) entered into "a listing agreement with at least one U.S. crypto asset trading platform."  *Id.* at 112–14.  The Terraform Complaint also alleges that "Terraform created, offered, sold, and effected transactions in mAssets through the Mirror Protocol to persons who were not eligible contract participants." *Id.* ¶ 116.

was being used to process and settle real world purchases by retail consumers in Korea and (b) misrepresenting that the UST's "peg was restored due to the success of UST's algorithm."[660]

On July 31, 2023, the District Court for the Southern District of New York before which the complaint was filed (the "Terraform Court") denied the Terraform Defendants' motion to dismiss finding that the SEC adequately alleged that (a) the Terraform Defendants engaged in in the unlawful offering of unregistered securities and (b) "used false and materially misleading statements to entice U.S. investors to purchase and hold on to defendants' products."[661]

As a threshold question the Terraform Court answered whether the Terraform Tokens were securities and therefore subject to the SEC's jurisdiction and the securities laws by applying the *Howey* test.[662]  While the Terraform Court acknowledged that standalone tokens might not securities when viewed independently of the investment protocols, the Terraform Court declined to "erect an artificial barrier between the tokens and the investment protocols which they are closely related."[663]  This point was most relevant to UST as the Terraform Court observed that stablecoin holders do not have a reasonable expectation of profit.[664]  The Terraform Court appears to view this isolated analysis as irrelevant because, unlike other stablecoins, (a) the vast majority of UST was deployed in the Anchor protocol and (b) UST could be converted to LUNC tokens.[665]

The Terraform Court then focused its analysis on the second and third prongs of the *Howey* test: (a) whether there is a common enterprise and (b) whether investors have a reasonable expectation of profit derived from the managerial efforts of the promoter or a third party.[666]

First, the Terraform Court found the SEC to have adequately alleged that purchasers invested in a common enterprise.[667]  For UST in the Anchor protocol, this requirement was satisfied because UST was "pooled together in the Anchor protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed . . . on a pro-rata basis."[668]  Similarly, investors

---

[660]    *Id.* ¶ 118.

[661]    Terraform Opinion at 1–2.

[662]    Prior to reaching the *Howey* analysis, the Terraform Court also addressed and rejected the Terraform Defendants' arguments that (a) the Terraform Court lacked personal jurisdiction, (b) that the SEC lacks jurisdiction under the "major questions doctrine," and (c) the action violates the Terraform Defendants' due process rights.  *See generally id.* at 11–28.

[663]    *Id.* at 31–32.  When considered in isolation [LUNC Token and UST] might not have been by themselves, investment contracts. Much as the orange groves in Howey would not be considered securities if they were sold apart from the cultivator's promise to share any profits, the term "security" also cannot be used to describe any crypto-assets that were not somehow intermingled with one of the investment "protocols," did not confer a "right to . . . purchase" another security, or were otherwise not tied to the growth of the Terraform blockchain ecosystem.  *Id.* at 33.

[664]    *Id.* at 33.

[665]    *Id.* at 34.  This appears to conflict with the Ripple Court's approach to applying *Howey* as discussed in the Terraform Opinion with respect to types of purchasers.

[666]    *Id.* at 35.  The parties did not dispute the first prong of the *Howey* test.  *Id.*

[667]    *Id.* at 35.

[668]    *Id.* at 36.  The Terraform Court explained that this was *horizontal* commonality.  The Terraform Court did not assess whether there may also be vertical commonality.  *Id.* at 36 n. 6.

in LUNC Token were found to have invested in a common enterprise because Terraform used the sale proceeds to develop the Terraform blockchain and represented that these improvements would increase" the value of LUNC Token.[669]  As a result of LUNC Token satisfying the second *Howey* prong, the Terraform Court also found wLUNA to meet the requirement because wLUNA tokens could be exchanged for LUNC Tokens.[670]  Similar to LUNC token, MIR tokens also satisfy the common enterprise requirement because the "proceeds from sales of the MIR tokens were 'pooled together' to improve the Mirror Protocol" and any "profits derived from the use of the Mirror Protocol" were to be distributed on a "pro-rata basis."[671]

The Terraform Court also found that investors in all Terraform Tokens had a reasonable expectation of profits.[672]  The Terraform Complaint alleges that the Terraform Defendants "repeatedly touted the profitability of the Anchor Protocol," encouraged UST purchasers to deposit into the Anchor protocol, and led purchasers to believe that these profits were the result of the Terraform Defendants' "unique combination of investing and engineering experience."[673]  Similarly, LUNC Token (and indirectly wLUNA) investors had a reasonable expectation of profit based on the SEC's allegations that the Terraform Defendants "coaxed investors to continue purchasing . . . by pointing out the possibility of future investment returns" and the Terraform Defendant's claims "that profits from the continued sale of LUNA coins would be fed back into further development of the Terraform ecosystem, which would, in turn, increase the value of the LUNA coins."[674]  Like LUNC Tokens, the MIR Tokens created a reasonable expectation of profit as a result of the Terraform Defendants' efforts to grow and develop the Mirror protocol.[675]

Of particular interest, the Terraform Court declined to draw a distinction based on the manner in which Terraform Tokens were sold.  The Terraform Court directly rejected the distinction the Ripple Court drew between Institutional XRP Buyers and Programmatic XRP Buyers in making a determination as to a purchaser's reasonable expectation of profit.[676]  The Terraform Opinion noted the SEC's allegations that the Terraform Defendants marketed to both retail and institutional investors and claimed that "sales from purchases of all crypto-assets—no matter where the coins were purchased—would be fed back into the Terraform blockchain."[677]

The Terraform Court next rejected the Terraform Defendants' argument that its offering and sale of LUNC Token and MIR tokens did not constitute unregistered public distributions of securities in

---

[669] *Id.* at 36–37.

[670] *Id.*  The common enterprise requirement was not directly addressed in connection with non-deposited UST, however, because UST was marketed in connection with the Anchor protocol and could be swapped for LUNC Token, it appears that the Terraform Court deemed the requirement to be satisfied.

[671] *Id.* at 37–38.  The Terraform Court noted the, the mAssets were "on their face intended to reflect the fortunes of the existing securities they mirrored." *Id.*

[672] *Id.* at 38.

[673] *Id.* at 39.

[674] *Id.*

[675] *Id.* at 39–40.  The Court said that a similar expectation of profits was also created for the mAssets.  *Id.* at 40.

[676] *Id.* at 40.  The Terraform Court notes that *Howey* makes no distinction between "a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts." *Id.* at 41.

[677] *Id.* at 42.

violation of Section 5 of the Securities Act.[678]  The Terraform Court accepted the SEC's position that the sale and loan of LUNC tokens "essentially amounted to large-scale unregistered public distributions of [LUNC Token]" because "liability for violations of Section 5 extends to those who have engaged in steps necessary to the distribution of [unregistered security issues."[679]  The Terraform Court observed that, as alleged, the Terraform Defendants' scheme "is the very disguised public distribution that Section 5 seeks to prohibit."[680]  The Terraform Opinion found that the Terraform Defendants failed to show that the distributions were exempt from the Securities Act.[681]  The Terraform Court reaches the same conclusion with respect to the MIR tokens.[682]

The Terraform Defendants also argued that the offering and sale of mAssets did not violate, as claimed by the SEC, Sections 5(e) and 5(l) of the Securities Act because mAssets are not security-based swaps as they "do not involve a payment from one party to their counterparty based on a change in value in an underlying security."[683]  The Terraform Court rejected this argument on the basis that while there is no counterparty after the mAsset is purchased, the original purchase involves a counterparty "and a transfer of financial risk based on a stock or security's future value."[684]  Moreover, notwithstanding the fact that the Terraform Defendants did "not *technically* sell the mAssets through the Mirror Protocol, which programmatically generated the tokens," they were allegedly "necessary participants" because they were "responsible for the Protocol's creation, upkeep, and promotion to the general public."[685]  The Terraform Opinion also found the SEC's fraud claims to survive the Terraform Defendant's motion to dismiss.[686]

The Terraform Opinion casts doubt on the Ripple Opinion and demonstrates the unsettled application of securities laws to Cryptocurrencies and the fact-intensive analysis required.  The Bankruptcy Court may find the Ripple Opinion and the Terraform Opinion relevant if the CEL Token settlement is not implemented and if the Bankruptcy Court is required to determine whether CEL Tokens are securities.  Neither the Ripple Opinion nor the Terraform Opinion are binding authority on the Bankruptcy Court.

### 6.  *New York v. Mashinsky*

On January 5, 2023, the NYAG commenced a civil action in New York State Court against Mr. Mashinsky alleging securities fraud, failure to register securities, and repeated and consistent fraud and illegality in violation of New York law.[687]  The complaint alleges that Mr. Mashinsky induced investors to

---

[678]    *Id.*  The Terraform Complaint only alleges facts in support of this claim for LUNC Token and MIR tokens, and not UST, wLUNA, or mAssets.

[679]    *Id.* at 43.

[680]    *Id.* 43–44.

[681]    *Id.* at 44.

[682]    *Id.* at 45.

[683]    *Id.*

[684]    *Id.* at 46.

[685]    *Id.* at 46–47.

[686]    *Id.* at 48–50.

[687]    Complaint, *New York  v.  Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. Jan.. 4, 2023)  ¶¶ 113-132 (the "Mashinsky Complaint").

deposit Cryptocurrency with Celsius through false and misleading statements, including that Mr. Mashinsky publicly touted the safety of the Celsius platform for customers' Cryptocurrency despite Celsius' high-risk investment strategy, and other misrepresentations.[688] The NYAG seeks relief barring Mr. Mashinsky from engaging in any business related to securities, including Cryptocurrency, holding an officer or director position in any company in New York, and requiring payment of damages, restitution, and disgorgement.[689] Mr. Mashinsky filed a motion to dismiss the complaint on May 2, 2023, arguing that the NYAG had failed to state a claim and had not sufficiently plead the factual circumstances giving rise to the claims, particularly that Earn Accounts and CEL tokens are not securities.[690] The NYAG opposed the motion.[691] The New York State Court denied Mr. Mashinsky's motion to dismiss on August 4, 2023.[692] As noted in Article III.JJ of this Disclosure Statement, in allowing the case to go forward, the New York State Court found that the Mashinsky Complaint sufficiently plead that the New York State Court found that New York's complaint plausibly alleges fraudulent or misleading practices by Mr. Mashinsky through his promotional efforts,[693] misstatements concerning regulatory approval and compliance,[694] and misrepresentations about Celsius' deployment strategies.[695]

## VIII.    RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors are not the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations.

It is impossible to predict with certainty the amount of remaining time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. The occurrence or non-occurrence of any or all of the following contingencies and any others could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

---

[688]    Mashinsky Complaint ¶ 1.

[689]    Mashinsky Complaint at 33.

[690]    Defendant's Memorandum of Law in Support of Motion to Dismiss Complaint, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. May 2, 2023).

[691]    Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss Complaint, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. June 6, 2023).

[692]    Mashinsky Ruling at 1.

[693]    Id.

[694]    *Id.* at 17.

[695]    *Id.*

       1.   *Parties In Interest May Object to The Plan's Classification of Claims and Interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes of Claims and Interests each encompass Claims or Interests that are substantially similar to the other Claims or Interests in the particular Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

       2.   *The Debtors May Not Be able to Execute Certain Required Agreements and New Organizational Documents on Acceptable Terms Before the Disclosure Statement Hearing.*

The Plan requires that certain key agreements must be entered into between the Debtors, NewCo, Fahrenheit, and third parties. Such agreements must be Filed as part of the Plan Supplement, and include, for instance, the Management Agreement, the New Organizational Documents, and the Litigation Administrator Agreement(s), among numerous others. Negotiating and entering into these agreements will require significant coordination between the Debtors, NewCo, Fahrenheit, and various third parties. These negotiations are expected to be complex, and there is no guarantee that the Debtors will be able to enter into these agreements on acceptable terms.

       3.   *The Debtors May Fail to Satisfy Vote Requirements.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan as promptly as practicable thereafter. However, if sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Claims as those proposed in the Plan.

       4.   *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, the Bankruptcy Court to find that (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (b) a liquidation or a need for further financial reorganization does not follow confirmation of such plan unless such liquidation or reorganization is contemplated in the plan, and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. And if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of a Claim or Interest might challenge the treatment of its Claims or Interests under the Plan or specific provisions in the Plan. If the Bankruptcy Court overrules these objections, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Bankruptcy Court does not confirm the Plan, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims and Interests against them would ultimately receive on account of such Allowed Claims and Interests.

There can be no guarantee that the Debtors will be able to secure Confirmation of the Plan and it is possible that the Bankruptcy Court will find that the current Plan structure violates the absolute priority rule, the applicable provisions of the Bankruptcy Code, or other provisions of the Bankruptcy Code.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests as well as any class junior to such non-accepting class than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

<p style="text-align:center">5. <em>Nonconsensual Confirmation.</em></p>

If any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. The pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation and delays in the Confirmation schedule. Notwithstanding such efforts, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan is fair and equitable or does not unfairly discriminate against a dissenting impaired class.

<p style="text-align:center">6. <em>The Conditions Precedent to Confirmation and to the Effective Date of the Plan May Not Occur.</em></p>

Article IX of the Plan contains the conditions precedent to Confirmation, or the conditions that must be satisfied before Confirmation can occur, and Article X of the Plan contains the conditions precedent to the Effective Date, or the conditions that must be satisfied before the Effective Date of the Plan can occur. Conditions precedent to Confirmation include: that the Bankruptcy Court shall have entered the Disclosure Statement Order (meaning that the Bankruptcy Court approves the Disclosure Statement) and the Confirmation Order (meaning that the Bankruptcy Court confirms and approves the Plan); that the Management Agreement, the New Organizational Documents, the Proof Group IP License (if any), the distribution agent agreement(s), and the US Bitcoin Agreements are agreed to as required under the Plan Sponsor Agreement; and that the Plan Supplement and related documents will have been Filed. If such conditions precedent are not waived or not met, Confirmation will not be able to occur.

Conditions precedent to the Effective Date include: that the final version of the Plan Supplement and related documents will have been executed and Filed; that the Litigation Administrator Agreement(s) shall have been executed; that the NewCo Assets shall have been transferred to NewCo as described in the Plan; that the Registration Statement shall have been Filed and become effective; and numerous others. If such conditions precedent are not waived or not met, the Effective Date will not take place and the Plan will not be in force.

<p style="text-align:center">7. <em>Continued Risk Upon Confirmation and Potential Appeal of Confirmation.</em></p>

Even if the Plan is consummated, there may be continued risks, including certain risks that are beyond the control of the Debtors, the Post-Effective Date Debtors, and NewCo, such as further deterioration or other changes in economic conditions, changes in the Cryptocurrency industry, potential

<p style="text-align:center">251</p>

revaluing of their assets due to chapter 11 proceedings, changes in demand for Cryptocurrency, and increase in expenses. *See* Article VIII.C of this Disclosure Statement entitled "Risks Related to the Debtors' and NewCo's Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Even if the Plan is confirmed, there is no guarantee that the NewCo Transaction or the Orderly Wind Down will be implemented, and the Debtors will continue to face uncertainty. Specifically, it is possible that the Plan's confirmation is appealed and its implementation subsequently paused until further litigation takes place.

### 8. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved.*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. Parties in interest may object to the release, injunction, and exculpation provisions in the Plan, and such provisions may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Plan may not be Confirmed.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions to the implementation of the transactions contemplated by the Plan. As a result, the releases and exculpation are inextricable components of the Plan. The Bankruptcy Court, however, may not agree and may not approve the releases and exculpation provisions. As noted above, in the *Voyager Digital Holdings, Inc.* chapter 11 case, the U.S. Department of Justice and the U.S. Trustee appealed the bankruptcy court's confirmation of the plan due to concerns associated with the exculpation clauses included in the confirmation order.[696] After the District Court issued a stay pending the appeal, Voyager and the U.S. Department of Justice agreed to allow the *Voyager* transaction to proceed, while preserving the stay pending appeal as to the exculpation provisions.[697]

### 9. *Filing of Competing Plans.*

At the outset of a chapter 11 case, the Bankruptcy Code provides debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. The Debtors had the exclusive right to propose the Plan in these Chapter 11 Cases through March 31, 2023.[698] On March 31, 2023, the Debtors Filed their *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor*

---

[696]  *See In re Voyager Digital Hold., Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. 2022) [Docket No. 1165]; *see also In re Voyager Digital Hold., Inc.*, Case No. 23-02171 (JHR) (S.D.N.Y. 2023).

[697]  *In re Voyager Digital Hold., Inc.*, Case No. 23-02171 (JHR) (S.D.N.Y. 2023) [Docket No. 71].

[698]  On November 9, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1317], seeking an extension of the exclusivity period to March 31, 2023. At the February 15, 2023 hearing, the Bankruptcy Court approved a bridge order, granting the Debtors an extension of exclusivity until the next hearing on March 8, 2023. At the March 8, 2023 hearing, the Bankruptcy Court approved the *Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1940], extending the Debtors' exclusivity period to March 31, 2023. *See* Mar. 8, 2023 Hr'g Tr. 34:23–25, 35:1–25.

*Affiliates* [Docket No. 2358].   Because the Debtors Filed the Plan by the March 31, 2023 exclusivity deadline, the Debtors had the exclusive right to solicit Ballots for the Plan through June 30, 2023.  Following the Auction, the Debtors Filed a revised Plan on June 15, 2023 [Docket No. 2807].  At the same time, the Debtors also Filed the *Debtors' Third Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 2805] (the "Third Exclusivity Motion"), which was heard by the Bankruptcy Court on June 28, 2023 and granted on June 29, 2023 [Docket No. 2935], therefore preserving the Debtors' right to solicit votes on the revised Plan.

> *10. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate such debtor's assets for distribution in accordance with the priorities set forth in the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the business in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts in connection with cessation of operations.

> *11. One Or More of the Chapter 11 Cases May Be Dismissed.*

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

> *12. Risk of Non-Occurrence of the Effective Date.*

Although the Debtors believe that the Effective Date will occur at least several weeks after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur.  The Effective Date will occur on the date that (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and (b) the Plan is declared effective by the Debtors.

> *13. The Debtors May Object to The Amount or Classification of a Claim or Interest.*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  Any Holder of a Claim or Interest where such Claim or Interest is subject to an objection cannot rely on the estimates in the Disclosure Statements.  As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

> *14. Contingencies Could Affect Allowed Claims Classes.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety

of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, including that the actual Allowed amounts of Claims equals the scheduled amount of those Claims. The actual Allowed amounts of Claims may significantly differ from the estimates and would affect the recovery estimates in this Disclosure Statement. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

15. *Estimated Recoveries May Change Due to Litigation Arising Out of the Claims Allowance and Reconciliation Process.*

Only Allowed Claims will receive distributions pursuant to the Plan. If the Holder of a Claim pursues litigation and seeks an Allowed Claim in excess of the Cryptocurrency balance of the Holder's account, the Holder will not receive any recovery until such dispute is fully and finally resolved. To account for such litigation and Holders who are asserting Allowed Claims for more value, the Debtors and the Post-Effective Date Debtors will need to reserve sufficient Cryptocurrency to account for Holders that are asserting Allowed Claims of greater value. Accordingly, the estimated distributions will likely occur over time as Claims are resolved and reserves can be distributed.

**B.    Risks Related to Recoveries Under the Plan.**

1. *If the Restructuring Transactions are Not Implemented, the Debtors Will Consider All Available Alternative Restructuring Proposals, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.*

If neither the NewCo Transaction nor the Orderly Wind Down are implemented, the Debtors will consider all other restructuring alternatives available, which may include the Filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors. For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

### 2. Risk of Termination of the Plan Sponsor Agreement.

The Plan Sponsor Agreement contains certain provisions that give the parties the ability to terminate the Plan Sponsor Agreement upon the occurrence of certain events. Termination of the Plan Sponsor Agreement would also mean that the Restructuring Transactions contemplated therein and memorialized by the Plan could not be consummated.

### 3. The Debtors Cannot Guarantee Recoveries or the Timing of such Recoveries.

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated if Allowed Claims are materially higher than estimated. In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing or amount of any recovery on an Allowed Claim. Further, to the extent a Holder of Allowed Claims is entitled to receive a Liquid Cryptocurrency Distribution, such Holder's failure to satisfy applicable registration and AML/KYC requirements could delay or prevent recoveries.

### 4. Substantive Consolidation May Not Be Granted.

The substantive consolidation of the Initial Consolidated Debtors (*i.e.*, CNL and Network LLC) for purposes of their Plans has been approved as set forth in the Series B Settlement Order and the Plan. The Plan also serves as a motion seeking, and entry of the Confirmation Order will constitute, the approval pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate Lending LLC and Networks Lending LLC with the Initial Consolidated Debtors on the same terms, effective as of the Effective Date. A detailed explanation of the reasons for and effects of this consolidation can be found in Articles III.ZZ and IV.A.1 of this Disclosure Statement.

If the consolidation of these Debtor entities is not approved under the Plan, the amount of assets available to satisfy Account Holders' Claims will be reduced.

### 5. The Debtors' Assets are Largely Based on, and Highly Correlated to, the Volatility of Cryptocurrency.

The volatility of the Cryptocurrency market may adversely affect the fair market value of the Debtors' assets, which could result in lower recoveries for Holders of Claims than the Debtors' current estimates.

### 6. The Debtors May "Toggle" to the Orderly Wind Down, which is Estimated to Result in Lower Recoveries.

Before or after the Plan is confirmed, the Debtors may determine that it is in the best interests of the Estates to "toggle," or pivot, from Consummation of the NewCo Transaction to the pursuit of the Orderly Wind Down. The Orderly Wind Down is an alternative to the NewCo Transaction. Recoveries under the Orderly Wind Down are estimated to be lower than the recoveries estimated under the NewCo Transaction. Further, the Orderly Wind Down does not include any go-forward business, thus terminating any potential for future upside. Please see Article III.I for additional discussion of the Orderly Wind Down.

### 7. The Orderly Wind Down May Take Longer and Cost More than Estimated, which

*May Decrease Recoveries.*

The Orderly Wind Down also presents risks for interested parties. The Orderly Wind Down is estimated to take up to five years to be completed. This is merely an estimate, however, and it is entirely possible that it could take longer to complete the organized liquidation contemplated by the Orderly Wind Down. In the event the Orderly Wind Down takes longer than estimated to be completed, the associated costs, such as professional fees, could also be higher than estimated. Accordingly, estimated recoveries pursuant to the Orderly Wind Down could also be lower than estimated.

### 8. *NewCo May Not Be Able to Achieve Projected Financial Results.*

NewCo may not be able to achieve its projected financial results. The Financial Projections set forth in this Disclosure Statement represent the best estimate of NewCo's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of NewCo's business model and operations and, in particular, the Cryptocurrency market in which the Debtors operate. Although the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized, particularly in the light of the volatile nature of Cryptocurrency. If NewCo does not achieve its projected financial results, the value of NewCo Common Stock may be negatively affected and NewCo may lack sufficient liquidity to operate as planned after it is established on the Effective Date, both of which would negatively impact the recoveries available to Holders of Claims. Moreover, the financial condition and results of NewCo's operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements, including because the Debtors' historical financial statements include only the mining business and not the other business of the Debtors.

NewCo's business model is subject to inherent risks. NewCo's financial results may be impacted by the broader market forces and volatility common to the Cryptocurrency market. Similarly, NewCo's financial projections rely on NewCo's capacity to maintain necessary regulatory licenses and approvals required to operate. There can be no guarantees that NewCo and any partners are able to maintain the required licenses or approvals, nor can there be assurances that the regulatory requirements imposed on NewCo will not change, particularly in a rapidly evolving Cryptocurrency industry. As discussed herein, the Debtors cannot make any assurances that national or state regulators will not promulgate rules, update policies, or take actions that could severely restrict or prohibit NewCo's ability to operate. Moreover, the Debtors cannot guarantee that NewCo's operations in mining, staking, and other Cryptocurrency business operations will be successful. Staking Cryptocurrency is inherently risky, and there is no guarantee that the mining or staking of Cryptocurrency will be a profitable enterprise for NewCo.

NewCo will likely also be required to adopt fresh start accounting, in which case its assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.

Lastly, there can be no assurances that NewCo's business plan will not change, perhaps materially, as a result of decisions that the New Board may make after fully evaluating the strategic direction of NewCo and its business plan. Any deviations from NewCo's business plan would necessarily cause a deviation in projected financial results.

### 9. *NewCo May Not Be Able to Accurately Report Its Financial Results.*

NewCo will establish internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in NewCo's financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable

assurance with respect to the preparation and fair presentation of financial statements.  If NewCo fails to maintain the adequacy of its internal controls, NewCo may be unable to provide financial information in a timely and reliable manner within the time periods required for NewCo's financial reporting under SEC rules and regulations to the extent applicable.  Any such difficulties or failure could materially adversely affect NewCo's business, results of operations, and financial condition.  Further, NewCo may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect its businesses, results of operations, and financial condition.

10. *The Value of Litigation Proceeds that the Litigation Administrator May Secure Is Uncertain, which May Affect the Value that Can Be Distributed to Holders of Claims Entitled to Receive Litigation Proceeds.*

The Plan foresees the establishment, on or before the Effective Date, of a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, to pursue the prosecution of the Recovery Causes of Action.  Pursuant to the Plan, Holders of Claims entitled to Litigation Proceeds will receive periodic distributions on account of recoveries from the Recovery Causes of Action.  There can be no guarantee, however, that the Litigation Recovery Account is adequately funded by the Initial Litigation Funding Amount.  There can also be no guarantee as to the success of the prosecution of the Recovery Causes of Action, and the value of Litigation Proceeds that can be distributed to Holders of Claims entitled to receive them.  No value has been ascribed to the Litigation Proceeds in this Disclosure Statement.

11. *The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims Against or Interests in the Debtors.*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

12. *Regulatory Approvals May Not Be Granted.*

Consummation of the Restructuring Transactions may depend on obtaining Regulatory Approvals.  Failure by any governmental authority, including the SEC, to grant a necessary or advisable Regulatory Approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

The Debtors are currently engaging with the applicable Governmental Units and regulatory bodies, many of whom, while reserving all rights, have expressed an openness to working with the Debtors towards achieving the Consummation of the NewCo Transaction.[699]  Due to the complex and rapidly evolving environment in which the Debtors operate, however, no assurances can be made as to whether the Debtors will receive all required U.S. federal and state regulatory approvals.  Cryptocurrency has developed quickly, and regulators have taken different approaches to regulating the industry.  The Debtors cannot assess with any certainty that the SEC or other regulators will not take actions that would prevent the Debtors from effectuating the Restructuring Transactions or otherwise prevent Plan Confirmation.  Moreover, in the wake

---

[699] *Response of Undersigned States to Debtors' Motion for Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor* [Docket No. 2325] ¶ 6 ("[T]he States are not currently aware of any specific issues in the general plan outline that the Debtors have provided in Docket Nos. 2066 and 2151 that would inherently preclude it from being able to propose a plan and disclosure statement that could comply with their applicable statutory and administrative requirements.").

of the FTX bankruptcy and a general "crypto winter" that has seen retail investors lose billions in value, the SEC has taken a more active approach to enforcement with respect to the Cryptocurrency industry.

For example, while the Debtors, like most industry participants, believe that ETH and stablecoins are commodities not subject to securities laws, as indicated by the CFTC,[700] the Debtors cannot be certain that certain regulators such as the SEC will not take a contrary view. At least one state regulator, the Attorney General of the State of New York, has taken the position that ETH and at least one stablecoin do not constitute commodities not subject to state "blue sky" securities laws, including the Martin Act in New York State.

This is a risk inherent to the Cryptocurrency industry, and one inherent to the Debtors' Plan. Although the Debtors believe that the Plan and Restructuring Transactions do not involve the types of business operations that have received the strongest scrutiny from the SEC (*e.g.*, services provided by Cryptocurrency exchanges), the Debtors cannot be certain that the SEC will not take actions that could prevent the confirmation of the Plan.

> ### 13. The Debtors and Post-Effective Date Debtors are Unable to Make Distributions to Holders of Claims in Locations Where Cryptocurrency, or Certain Types Thereof, Is Banned.

Certain countries have taken harsh regulatory action to curb the use of digital assets and have completely restricted the right to acquire, own, hold, sell, or use these digital assets or to exchange them for fiat currency. The Debtors and Post-Effective Date Debtors will be unable to make distributions pursuant to the Plan to Holders of Claims whose accounts reflect that they reside in such countries.

> ### 14. Certain Tax Implications of the Plan.

Holders of Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors and/or have an impact on creditors' personal tax obligations. The Debtors do not know your specific tax situation. If you have any questions about the discussion of taxes in this Disclosure Statement, you should consult a tax professional.

> ### 15. The Debtors' Substantial Ongoing Liquidity Needs May Affect Recoveries.

Although the Debtors' operations with respect to their core business model have been completely paused since the Petition Date, and although the Debtors' workforce has been significantly reduced as a result, the Debtors have nonetheless had to maintain significant operations to comply with the demands of the chapter 11 process and the negotiation of the contemplated Restructuring Transactions and Plan. Accordingly, depending on how long the Chapter 11 Cases are, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of the Chapter 11 Cases. The Debtors cannot guarantee that Cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the

---

[700]    *See, e.g.*, *CFTC v. Nishad Sing*, Case No. 23-CV-1684 (Case No. 23-02171) (S.D.N.Y. 2023) [Docket No. 1].

Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to raise liquidity in different ways, including by selling assets or seeking additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

16. *A Liquid Trading Market for the NewCo Common Stock May Not Develop and the Trading Price for the NewCo Common Stock May Be Depressed or Volatile Following the Effective Date.*

The liquidity of any market for shares of NewCo Common Stock will depend upon, among other things, the number of holders of shares of NewCo Common Stock, NewCo's financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the NewCo Common Stock that an active trading market for the NewCo Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell NewCo Common Stock may be substantially limited. If a trading market were to develop, future trading prices of the NewCo Common Stock may be volatile and will depend on many factors, including the following: (a) the Reorganized Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar securities. Further, certain shares of NewCo Common Stock may be subject to transfer restrictions. The liquidity of the NewCo Common Stock depends on whether it is listed on an exchange, trades through an ATS, or trades over-the-counter. The ability of NewCo to list NewCo Common Stock on an exchange is not certain.

17. *Certain Holders of NewCo Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities.*

Under the Plan, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act the offer, issuance, and distribution of the NewCo Common Stock issued under the Plan with the exception of the issuance and sale of the NewCo Common Stock in connection with to the Plan Sponsor Contribution. To the extent that securities issued pursuant to the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, with respect to such securities. Resales by holders of Claims or Interests (as applicable) who receive NewCo Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempt by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 of the Securities Act. Resale restrictions are discussed in more detail in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters."

To transfer or sell shares of NewCo, a Holder will likely have to open a brokerage account with an institution that can hold and transfer its shares. It may be difficult for Holders in certain foreign jurisdictions to open brokerage accounts.

> 18. *Securities Subject to Resale Restrictions Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They are Registered Under the Securities Act or an Exemption from Registration Applies.*

Under the Plan, the Debtors shall rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act the offer, issuance, and distribution of the NewCo Common Stock issued under the Plan with the exception of the issuance and sale of the NewCo Common Stock in connection with to the Plan Sponsor Contribution. Any securities issued in reliance on Section 4(a)(2) of the Securities Act, including in compliance with Rule 506 of Regulation D and/or Regulation S, will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law such as, under certain conditions, the resale provisions of Rule 144 or Regulation S of the Securities Act. Holders of such securities may not be entitled to have their securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act."

Holders of NewCo Common Stock who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters."

> 19. *The Bankruptcy Court May Not Approve the CEL Token Settlement, or May Determine That CEL Token Should Have a Different Valuation, in which Case Projected Recoveries May Change.*

As described in Article IV.B.2 of the Plan and Article III.YY of this Disclosure Statement, the Debtors have proposed the CEL Token Settlement as a settlement of all disputes regarding the treatment and priority of Claims arising from CEL Tokens in accounts on the Debtors' platform. Pursuant to the settlement, Holders of CEL Token Deposit Claims will receive treatment otherwise consistent with the treatment of the program in which their CEL Tokens were deployed, such as General Earn Claim treatment. However, pursuant to the settlement, CEL Tokens will be valued at $0.25 per CEL Token (*i.e.*, 1 CEL Token = $0.25 CEL Token Deposit Claim). This means that a Holder with 100,000 CEL Tokens in an Earn Account would have a CEL Token Deposit Claim of $25,000, which would receive the General Earn Claim treatment under the Plan. Article III.YY of this Disclosure Statement describes how the Debtors, in consultation with the Committee, determined that a valuation of $0.25 per CEL Token was appropriate.

The Bankruptcy Court must decide whether to approve the CEL Token Settlement, including the proposed CEL Token valuation of $0.25, as part of the Plan's Confirmation. If the Bankruptcy Court does not approve the CEL Token Settlement during Confirmation or determines that the proposed valuation of $0.25 is not appropriate, then the Bankruptcy Court will have to determine the appropriate value CEL Token should have for purposes of the Plan and distributions thereunder.

This determination may change the overall projected recoveries under the Plan. If the Bankruptcy Court determines that CEL Token should be valued higher than $0.25, then recoveries on account of CEL Token Deposit Claims will increase. Holders of CEL Token Deposit Claims will therefore receive higher recoveries than projected, which will correspondingly dilute the recoveries available to other Holders. If, on the other hand, the Bankruptcy Court determines that CEL Token should have a valuation less than

$0.25, then recoveries to Holders of CEL Token Deposit Claims will be less than projected and recoveries to other Holders will be higher than projected.

### C. Risks Related to the Debtors' and NewCo's Businesses.

#### 1. NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, NewCo and the Post-Effective Date Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that NewCo or the Post-Effective Date Debtors may become party to, nor the final resolution of such litigation.

#### 2. NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Ongoing Litigation Arising Out of a Patent Dispute Against the Plan Sponsor.

US Bitcoin is party to patent infringement litigation in the United States District Court for the Western District of Texas. Lancium LLC ("Lancium") filed a complaint for patent infringement against US Bitcoin and two of its subsidiaries on May 10, 2023.[701] Lancium alleges that certain of US Bitcoin's mining datacenters and operations infringe on Lancium's patents relating to optimizing electricity generation. US Bitcoin disputes the allegations raised by Lancium and is defending itself in the lawsuit.

US Bitcoin does not believe the lawsuit will have a material impact on its ability to effectuate the Restructuring Transactions or NewCo's business and operations, and has provided reassurance and protection, including indemnification and termination rights, to the Debtors and NewCo, as more fully set forth in the Fahrenheit Plan Term Sheet. Nonetheless, there is a risk that such litigation may adversely affect the Debtors' ability to effectuate the Restructuring Transactions and emerge from bankruptcy and/or NewCo's business and operations, and such effect may be material. Further, such litigation is costly and time-consuming, and could result in settlements or damages that could significantly affect the Debtors' and NewCo's financial results.

Should US Bitcoin be found to have infringed the patents at issue, US Bitcoin may have to materially change its mining operations at certain mining sites, which may have an adverse effect on NewCo's mining operations and business. Even if the parties settle this intellectual property dispute through licensing or similar arrangements, the costs associated with such arrangements may be substantial, could include ongoing royalties, and the necessary licenses might not be available to NewCo on terms they believe to be acceptable.

#### 3. The Continued Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Plan.

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees, and the Debtors have suffered significant attrition since the Petition Date. Because competition for experienced personnel can be significant and it is difficult to hire as a debtor in chapter 11, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to lead these Chapter 11 Cases to resolution by consummating the Plan. In addition, a

---

[701] *Lancium LLC vs. U.S. Data Mining Grp., Inc.*, No. 6:23-cv-00344 (W.D. Tex. May 10, 2023).

loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to fulfill responsibilities related to their Chapter 11 Cases and emerge successfully therefrom.

4.   *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' Filing of their Petitions or before Confirmation of the Plan (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

The Debtors are aware that certain Governmental Units, including the SEC, are of the opinion that certain claims by Governmental Units, including claims of the kind specified under sections 523(a)(2)(A) and 523(a)(2)(B) of the Bankruptcy Code, may be nondischargeable pursuant to section 1141(d)(6) of the Bankruptcy Code.  Further, a discharge under the Bankruptcy Code would not prevent the SEC or other governmental entities from bringing enforcement actions against NewCo or the Post-Effective Date Debtors.[702]

5.   *NewCo Will Operate in an Industry Subject to Various Regulatory and Technological Uncertainties.*

NewCo will operate Bitcoin mining and ETH staking operations.  As Bitcoin, other digital assets, and blockchain technologies evolve and become more widely available, the services and products associated with them may evolve.  Future regulations may require NewCo to change its business model to comply fully with federal and state laws regulating power generation, Bitcoin mining, or provision of Bitcoin mining and ETH staking, or provision of Bitcoin mining services to third parties.  To remain competitive with peers, NewCo may need to modify aspects of its business model from time to time.  The Debtors cannot offer any assurance that these or any other changes will be successful or will not result in harm to NewCo's business.  NewCo may not be able to manage its growth effectively, which could damage its reputation, limit its growth, and negatively affect its operating results.  Furthermore, the Debtors cannot provide any assurance that NewCo will successfully identify all emerging trends and growth opportunities in the market.  As a result, NewCo may not capture those opportunities. Such circumstances could have a material adverse effect on NewCo's business, prospects, or operations.

6.   *The Cost of Obtaining New and Replacement Miners and Parts Can Be Capital-Intensive, which Could Materially and Adversely Affect Newco's Business, Financial Condition, and Results of Operations.*

NewCo's mining and staking operations can be profitable only if the costs, inclusive of hardware and electricity costs, associated with mining digital assets is lower than the price of the digital assets mined at the time of sale.  Miners experience ordinary wear and tear from operation and may also face more significant malfunctions caused by factors which may be beyond NewCo's control.  Additionally, as technology evolves, the company may acquire newer models of miners to remain competitive in the market. For example, the miners and other equipment to be transferred to NewCo on the Effective Date will

---

[702]   *See Stipulation and Agreed Order Extending Time to Take Action, To the Extent Necessary, To Determine the Nondischargeability of a Debtor Owing To a Governmental Unit Pursuant to 11 U.S.C. §1141(d)(6)* [Docket No. 1095].

eventually degrade due to ordinary wear and tear from usage and may also be lost or damaged due to factors outside of NewCo's control. When this happens, these miners and equipment will need to be repaired or replaced. The process of upgrading mines and equipment requires substantial capital investment, and NewCo may face challenges in executing upgrades on a timely and cost-effective basis based on availability of new miners and the company's access to adequate capital. If NewCo is unable to obtain a sufficient unit volume of miners and equipment at scale, it may be unable to remain competitive in a highly competitive and evolving industry. If this happens, NewCo may not be able to mine digital assets as efficiently or at a comparable scale as competitors. As a result, NewCo's business, financial condition, and results of operations could suffer. This could, in turn, materially and adversely affect the trading price of NewCo Common Stock.

      7.   *The Price of New Miners May Be Linked to the Price of Bitcoin and Other Digital Assets, and the Cost of Obtaining New and Replacement Miners May Increase if the Price Of Bitcoin Rises, which Could Materially and Adversely Affect NewCo's Business, Financial Condition, and Results of Operations.*

There are reports indicating that miner manufacturers adjust miner prices based on the price of Bitcoin. As a result, NewCo's cost of obtaining new miners may be unpredictable and subject to volatility. NewCo's business, financial condition, and results of operations will be dependent on its ability to sell the Bitcoin it mines at a price greater than its cost to produce Bitcoin. As the cost of obtaining new miners increases, the cost of producing Bitcoin also increases. This would require a corresponding increase in the price of Bitcoin for NewCo to maintain profitability. NewCo may incur a significant upfront capital cost each time it acquires new miners, and the company may not realize the benefit of these capital expenditures. If this occurs, NewCo's business, financial condition, and results of operations could be materially and adversely affected should the future price of Bitcoin not be sufficiently high.

      8.   *NewCo May Be Unable to Purchase Miners at Scale or Face Delays or Difficulty in Obtaining New Miners at Scale, which Could Materially and Adversely Affect Its Business, Financial Condition, and Results Of Operations.*

There may be periods of shortage in new miners available for purchase and a delay in delivery schedules for new miner purchases. There is no assurance that miner manufacturers or any other equipment manufacturers will be able to keep pace with potential surges in demand for mining equipment. It is uncertain how manufacturers will respond to increased global demand and whether they fulfill purchase orders fully and in a timely manner. In the event that miner manufacturers or other suppliers are not able to keep pace with, or fail to satisfy, demand, NewCo may not be able to purchase miners or other equipment in sufficient quantities or on the delivery schedules required to meet its business needs. Additionally, should any suppliers default on purchase agreements with NewCo, the company may need to pursue recourse under international jurisdictions, which could be costly and time-consuming. Furthermore, there is no guarantee that NewCo would succeed in recovering any of deposits paid for such purchases (including advance deposits that may be required), which could materially and adversely affect its business, financial condition, and results of operations. Fahrenheit has obtained a commitment from a leading mining manufacturer for discounted rates on the purchase of new mining machines. That commitment may not be finalized, which could affect the performance of NewCo.

      9.   *If There Are Significant Changes to the Method of Validating Blockchain Transactions, such Changes Could Reduce Demand for NewCo's Miner Equipment.*

New digital asset transaction protocols are continuously being deployed, and existing and new protocols are in a state of constant change and development. While certain validation protocols currently employ a "proof of work" consensus algorithm, whereby transaction processors are required to expend

significant amounts of electrical and computing power to solve complex mathematical problems in order to validate transactions and create new blocks in a blockchain, there may be a shift towards adopting alternative validating protocols. These protocols may include a "proof of stake" algorithm or an algorithm based on a protocol other than proof of work, which may decrease the reliance on computing power as an advantage to validating blocks. NewCo's transaction processing operations will be designed to primarily support a proof of work consensus algorithm. Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate less competitive.

> 10. *Failure of Critical Systems of the Facilities Operated by NewCo Could Have a Material Adverse Effect on Its Business, Financial Condition, and Results of Operations.*

The critical systems of the facilities that will be operated by NewCo will be subject to failure. Any such failure, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, power supplies or network connectivity, power loss, equipment failure, human error and accidents, network connectivity downtime and fiber cuts, security breaches, animal incursions, water damage, extreme temperatures, public health emergencies, terrorism, fire, earthquake, hurricane, tornado, flood and other natural disasters, whether or not within the company's control, could result in damaged equipment, significant business disruption, and reduced revenue, including through the reduction in the amount of Bitcoin mined by the company, and, consequently, reduced profitability. The destruction or severe impairment of any of the facilities operated by NewCo could have a material and adverse impact on NewCo's business, operations, and financial condition.

> 11. *NewCo May Face Risks of Internet Disruptions, which Could Have an Adverse Effect on the Price of Bitcoin.*

A disruption of the Internet may affect the use of Bitcoin and subsequently the value of NewCo. Generally, Bitcoin is dependent on the Internet, and NewCo's business of mining and staking digital assets will be dependent on the Internet as well. A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and NewCo's ability to contribute computing power to pools that mine Bitcoin.

> 12. *NewCo's Financial Performance May Be Affected by Price Fluctuations in the Power Market, as well as Other Market Factors that are Beyond NewCo's Control.*

NewCo's revenues, cost of doing business, results of operations, and operating cash flows generally may be impacted by price fluctuations in the power market and other market factors beyond NewCo's control. Market prices for power, capacity, and other ancillary services are unpredictable and tend to fluctuate substantially. Unlike most other commodities, electric power can only be stored on a very limited basis and generally must be produced concurrently with its use. As a result, power prices are subject to significant volatility due to supply and demand imbalances, especially in the day-ahead and spot markets. Long- and short-term power prices may also fluctuate substantially due to other factors outside of NewCo's control, including:

- changes in generation capacity in NewCo's markets, including the addition of new supplies of power as a result of the development of new plants, expansion of existing plants, the continued operation of uneconomic power plants due to state subsidies, or additional transmission capacity;

- environmental regulations and legislation;

- electric supply disruptions, including plant outages and transmission disruptions;

- changes in power transmission infrastructure;

- fuel transportation capacity constraints or inefficiencies;

- changes in law, including judicial decisions;

- weather conditions, including extreme weather conditions and seasonal fluctuations, including the effects of climate change;

- changes in commodity prices and the supply of commodities, including but not limited to natural gas, coal and oil;

- changes in the demand for power or in patterns of power usage, including the potential development of demand-side management tools and practices, distributed generation, and more efficient end-use technologies;

- development of new fuels, new technologies and new forms of competition for the production of power;

- fuel price volatility;

- economic and political conditions;

- supply and demand for energy commodities;

- supply chain disruption of electrical components needed to transmit energy;

- availability of competitively priced alternative energy sources;

- ability to procure satisfactory levels of inventory; and

- changes in capacity prices and capacity markets.

Such factors and the associated fluctuations in power and prices could affect wholesale power generation profitability and cost of power for NewCo's Bitcoin mining and ETH staking activities.

> 13. *NewCo May Be Required to Obtain, and to Comply with, Government Permits and Approvals.*

NewCo may be required to obtain, and to comply with, numerous permits and licenses from federal, state and local governmental agencies. The process of obtaining and renewing necessary permits and licenses can be lengthy and complex and can sometimes result in the establishment of conditions that make the project or activity for which the permit or license was sought unprofitable or otherwise unattractive. In addition, such permits or licenses may be subject to denial, revocation or modification under various circumstances. Failure to obtain or comply with the conditions of permits or licenses, or failure to comply with applicable laws or regulations, may result in the delay or temporary suspension of NewCo's operations.

**D.    Risks Related to NewCo's Digital Asset Mining and Staking.**

> 1. *There are Risks Related to Technological Obsolescence, the Vulnerability of the Global Supply Chain to Bitcoin Hardware Disruption, and Difficulty in Obtaining*

*New Hardware which May Have a Negative Effect on NewCo's Business.*

NewCo's mining and staking operations may be successful and ultimately profitable only if the costs of mining Bitcoin or staking ETH, including hardware and electricity costs, associated with mining Bitcoin or staking ETH are lower than the price of a Bitcoin or an ETH, respectively. As NewCo's mining facility operates, its miners experience ordinary wear and tear and general hardware breakdown and may also face more significant malfunctions caused by a number of extraneous factors beyond NewCo's control. The physical degradation of NewCo's miners or staking nodes will require NewCo to, over time, replace those miners or staking nodes that are no longer functional. Additionally, as the technology evolves, NewCo may be required to acquire newer models of miners or servers to remain competitive in the market. Reports have been released which indicate that players in the mining equipment business adjust the prices of miners according to Bitcoin mining revenues, so the cost of new machines is unpredictable but could be extremely high. As a result, at times, NewCo may obtain miners and other hardware from third parties at premium prices, to the extent they are available. In order to keep pace with technological advances and competition from other mining companies, it will be necessary to purchase new miners, which will eventually need to be repaired or replaced along with other equipment from time to time to stay competitive. This upgrading process requires substantial capital investment, and NewCo may face challenges in doing so on a timely and cost-effective basis. Also, because NewCo expects to depreciate all new miners, NewCo's reported operating results will be negatively affected.

The global supply chain for Bitcoin miners particularly, and computer hardware generally, is presently constrained due to unprecedented demand coupled with a global semiconductor (including microchip) shortage and further amplified due to the COVID-19 pandemic, with a significant portion of available miners being acquired by companies with substantial resources. Semiconductors are utilized in various devices and products and are a crucial component of miners; supply chain constraints coupled with increasing demand has led to increased pricing and limited availability for semiconductors. Prices for both new and older models of miners have been on the rise and these supply constraints are expected to continue for the foreseeable future. China, a major supplier of Bitcoin miners, has seen a production slowdown as a result of COVID-19. Should similar outbreaks or other disruptions to the China-based global supply chain for Bitcoin hardware or microprocessors occur, NewCo may not be able to obtain adequate replacement parts for its existing miners or to obtain additional miners on a timely basis, if at all, or NewCo may only be able to acquire miners or servers at premium prices. Such events could have a material adverse effect on NewCo's ability to pursue its strategy, which could have a material adverse effect on its business and the value of its securities. Moreover, NewCo may experience unanticipated disruptions to operations or other difficulties with its supply chain due to volatility in regional markets where its miners or microprocessors are sourced, changes in the general macroeconomic outlook, political instability, expropriation or nationalization of property, civil strife, strikes, insurrections, acts of terrorism, acts of war or natural disasters.

    2.   *NewCo May Not Adequately Respond to Price Fluctuations and Rapidly Changing Technology, which May Negatively Affect Its Business.*

Competitive conditions within the digital assets industry require that NewCo use sophisticated technology in the operation of its business. The industry for blockchain technology is characterized by rapid technological changes, new product introductions, enhancements, and evolving industry standards. New technologies, techniques or products could emerge that might offer better performance than the software and other technologies that NewCo currently utilizes, and NewCo may have to manage transitions to these new technologies to remain competitive. NewCo may not be successful, generally or relative to its competitors in the digital assets industry, in timely implementing new technology into its systems, or doing so in a cost-effective manner. During the course of implementing any such new technology into its operations, NewCo may experience system interruptions and failures during such implementation.

Furthermore, there can be no assurances that NewCo will recognize, in a timely manner or at all, the benefits that it may expect as a result of its implementing new technology into its operations. As a result, NewCo's business and operations may suffer, and there may be adverse effects on the value of NewCo.

>    3. *The Bitcoin Reward for Successfully Uncovering a Block Will Halve Several Times in the Future and Bitcoin Value May Not Adjust to Compensate NewCo for the Reduction in the Rewards NewCo Receives From Its Mining Effort.*

Halving is a process incorporated into many proof-of-work consensus algorithms that reduces the coin reward paid to miners over time according to a pre-determined schedule. This reduction in reward spreads out the release of digital assets over a long period of time resulting in an even smaller number of coins being mined. At a predetermined block, the mining reward is cut in half, hence the term "halving." For Bitcoin, the reward was initially set at 50 Bitcoin currency rewards per block and this was cut in half to 25 on November 28, 2012 at block 210,000, then again to 12.5 on July 9, 2016 at block 420,000. The most recent halving for Bitcoin happened on May 11, 2020, at block 630,000 and the reward reduced to 6.25. The next halving appears likely to occur in 2024. This process will reoccur until the total amount of Bitcoin currency rewards issued reaches 21 million, which is presently expected to occur around 2140. While the Bitcoin price has had a history of price fluctuations around the halving of its rewards, there is no guarantee that the price change will be favorable or would compensate for the reduction in mining reward. If a corresponding and proportionate increase in the trading price of Bitcoin or a proportionate decrease in mining difficulty does not follow these anticipated halving events, the revenue that NewCo would earn from its Bitcoin mining operations would see a corresponding decrease, which would have a material adverse effect on its business and operations.

>    4. *NewCo's Future Success Will Depend Upon the Value of Bitcoin and Other Digital Assets; the Value of Bitcoin May Be Subject to Pricing Risk and Has Historically Been Subject to Wide Swings.*

NewCo's operating results will depend in part on the value of Bitcoin, as it is presently the only digital asset that NewCo intends to mine. Specifically, NewCo's revenues from its Bitcoin mining operations and ETH staking operations will be based principally on two factors: (1) the number of Bitcoin and ETH rewards, respectively, that NewCo successfully mines or stakes; and (2) the value of Bitcoin and ETH, respectively. In addition, NewCo's operating results will be directly impacted by changes in the value of Bitcoin and ETH, because under the value measurement model, both realized and unrealized changes will be reflected in NewCo's statement of operations. This means that NewCo's operating results will be subject to swings based upon increases or decreases in the value of Bitcoin or ETH. If other digital assets were to achieve acceptance at the expense of Bitcoin or ETH causing the value of Bitcoin or ETH to decline, or if Bitcoin were to switch its proof of work encryption to an algorithm for which NewCo's miners are not specialized, or the value of Bitcoin or ETH were to decline for other reasons, particularly if such decline were significant or over an extended period of time, NewCo's operating results would be adversely affected, and there could be a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on its business, prospects or operations, and harm investors. The market price of Bitcoin and ETH, which have historically been volatile and are each impacted by a variety of factors (including those discussed herein), are each determined primarily using data from various exchanges, over-the-counter markets and derivative platforms. Furthermore, such prices may be subject to factors such as those that impact commodities, more so than business activities, which could be subjected to additional influence from fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of Bitcoin or ETH, or NewCo's share price, inflating and making their market prices more volatile or creating "bubble" type risks for Bitcoin, ETH, and shares of NewCo Common Stock.

5.  *Demand for Bitcoin Is Driven, in part, by its Status as the Most Prominent and Secure Digital Asset. It is Possible that Digital Assets other than Bitcoin Could Have Features that make them more Desirable to a Material Portion of the Digital Asset User Base, Resulting in a Reduction in Demand for Bitcoin, which Could Have a Negative Effect on the Price of Bitcoin and Adversely Affect an Investment in NewCo.*

Bitcoin, as an asset, holds "first-to-market" advantages over other digital assets. This first-to-market advantage is driven in large part by having the largest user base and, more importantly, the largest mining power in use to secure its blockchain and transaction verification system. Having a large mining network results in greater user confidence regarding the security and long-term stability of a digital asset's network and its blockchain; as a result, the advantage of more users and miners makes a digital asset more secure, which makes it more attractive to new users and miners, resulting in a network effect that strengthens the first-to-market advantage. Despite the first-mover advantage of the Bitcoin network over other digital asset networks, it is possible that another digital asset could become materially popular due to either a perceived or exposed shortcoming of the Bitcoin network protocol that is not immediately addressed by the Bitcoin contributor community or a perceived advantage of an altcoin that includes features not incorporated into Bitcoin. If a digital asset obtains significant market share (either in market capitalization, mining power or use as a payment technology), this could reduce Bitcoin's market share as well as other digital assets that NewCo may become involved in and have a negative effect on the demand for, and price of, such digital assets and could adversely affect NewCo. It is possible that NewCo could mine alternative digital assets in the future, but NewCo may not have as much experience mining such assets, which may put NewCo at a competitive disadvantage.

6.  *Forks In a Digital Asset Network May Occur in the Future Which May Affect the Value of Bitcoin or ETH Held by NewCo.*

To the extent that a significant majority of users and miners on a digital asset network install software that changes the digital asset network or properties of a digital asset, including the irreversibility of transactions and limitations on the mining of new digital asset, the digital asset network would be subject to new protocols and software. However, if less than a significant majority of users and miners on the digital asset network consent to the proposed modification, and the modification is not compatible with the software prior to its modification, the consequence would be what is known as a "fork" of the network, with one prong running the pre-modified software and the other running the modified software. The effect of such a fork would be the existence of two versions of the digital asset running in parallel that lack interchangeability and necessitate an exchange-type transaction to convert currencies between the two forks. Additionally, it may be unclear following a fork which fork represents the original asset and which is the new asset. Different metrics adopted by industry participants to determine which is the original asset include: referring to the wishes of the core developers of a digital asset, blockchains with the greatest amount of hashing power contributed by miners or validators; or blockchains with the longest chain. The Ethereum network previously forked in 2016 as a consequence of a hack of a decentralized autonomous organization, and the Ethereum network may fork again, which could adversely affect NewCo's operations. A fork in the Bitcoin network could adversely affect an investment in NewCo securities or its ability to operate. NewCo may not be able to realize the economic benefit of a fork, either immediately or ever, which could adversely affect an investment in its securities. If NewCo holds Bitcoin or ETH at the time of a hard fork of either into two digital assets, industry standards would dictate that NewCo would be expected to hold an equivalent amount of the old and new assets following the fork. NewCo may not be able, or it may not be practical, however, to secure or realize the economic benefit of the new asset for various reasons. Additionally, laws, regulation or other factors may prevent NewCo from benefiting from the new asset even if there is a safe and practical way to custody and secure the new asset.

268

7. *If a Malicious Actor or Botnet Obtains Control in Excess of 50% of the Processing Power Active on Any Digital Asset Network, Including the Bitcoin Network or Ethereum Network, it Is Possible that Such Actor or Botnet Could Manipulate the Blockchain in a Manner that Adversely Affects the Value of NewCo.*

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on any digital asset network, including the Bitcoin network or Ethereum network, it may be able to alter the blockchain by constructing alternate blocks if it is able to solve for such blocks faster than the remainder of the miners on the blockchain can add valid blocks. In such alternate blocks, the malicious actor or botnet could control, exclude, or modify the ordering of transactions, though it could not generate new digital assets or transactions using such control. Using alternate blocks, the malicious actor could "double-spend" its own digital assets (*i.e.*, spend the same digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintains control. To the extent that such a malicious actor or botnet does not yield its majority control of the processing power, or the digital asset community does not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible. Such changes could adversely affect the value of NewCo.

8. *Digital Assets, Including those Maintained by or for NewCo, May Be Exposed to Cybersecurity Threats and Hacks.*

As with any computer code generally, flaws in digital asset cryptographic primitives such as hash functions, Merkle trees and digital signatures or similar cryptographic methods, and the implementations of any digital asset protocol software, including those used by Bitcoin, have been and may be vulnerable to exploitation by malicious actors. Several such errors and defects have been found in multiple Cryptocurrency networks, including Bitcoin, previously, including those that would have allowed attackers to shut down a Cryptocurrency network through denial of service, disable functionality for users and expose users' information, or take or create Cryptocurrency balances. NewCo's devices, as well as its miners, computer systems and those of third parties that it uses in its operations, may be vulnerable to cyber security risks, including cyber-attacks such as viruses and worms, phishing attacks, denial-of-service attacks, physical or electronic break-ins, employee theft or misuse, and similar disruptions from unauthorized tampering with NewCo miners and computer systems or those of third parties that NewCo uses in its operations. Such events could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin that NewCo mines or otherwise acquires or holds for its own account.

9. *If the Bitcoin Reward for Solving Blocks and Transaction Fees Is Not Sufficiently High, NewCo May Not Have an Adequate Incentive to Continue Mining and May Cease Mining Operations, which Would Likely Result in NewCo's Failure to Achieve Profitability.*

As the number of Bitcoins awarded for solving a block in a blockchain decreases, NewCo's ability to achieve profitability would become more remote. Decreased use and demand for Bitcoin rewards may adversely affect NewCo's incentive to expend processing power to solve blocks. If the award of Bitcoin rewards for solving blocks and transaction fees are not sufficiently high, NewCo may not have an adequate incentive to continue mining and may cease its mining operations. Miners ceasing operations would reduce the collective processing power on the network, which would adversely affect the confirmation process for transactions (*i.e.*, temporarily decreasing the speed at which blocks are added to a blockchain until the next scheduled adjustment in difficulty for block solutions) and make the Bitcoin network more vulnerable to a

malicious actor or botnet obtaining control in excess of 50% of the processing power active on a blockchain, potentially permitting such actor or botnet to manipulate a blockchain in a manner that adversely affects NewCo's activities. A reduction in confidence in the confirmation process or processing power of the network could result and be irreversible. Such events could have a material adverse effect on NewCo's ability to continue to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin it mines or otherwise acquires or holds for its own account.

*10. NewCo May Suffer Losses Due to Staking.*

Staking ETH may require ETH to be transferred into smart contracts or staking pools on the underlying Ethereum network not under NewCo's control. If NewCo's validator, any third-party service providers, or smart contracts fail to behave as expected, suffer cybersecurity attacks, experience security issues, or encounter other problems, ETH that NewCo has staked may be irretrievably lost. In addition, certain networks and staking pools dictate requirements for participation in the relevant decentralized governance activity, and may impose penalties, or "slashing," if the relevant activities are not performed correctly, such as if the staker, delegator, or baker acts maliciously on the network, "double signs" any transactions, or experience extended downtimes. If NewCo or any of its service providers are slashed by the underlying network or staking pool, the ETH that NewCo has staked may be confiscated, withdrawn, or burned by the network, resulting in losses. Furthermore, certain types of staking require the payment of transaction fees on the underlying network or staking pool and such fees can become significant as the amount and complexity of the transaction grows, depending on the degree of network congestion and the price of ETH, which could result in NewCo incurring significant costs. Any penalties or slashing events could cause NewCo to suffer financial losses and adversely impact its business.

*11. Transactional Fees May Decrease Demand for Bitcoin and Prevent Expansion that Could Adversely Affect the Value of NewCo.*

As the number of Bitcoin currency rewards awarded for solving a block in a blockchain decreases, the incentive for miners to continue to contribute to the Bitcoin network may transition from a set reward to transaction fees. To incentivize miners to continue to contribute to the Bitcoin network, the Bitcoin network may either formally or informally transition from a set reward to transaction fees earned upon solving a block. This transition could be accomplished by miners independently electing to record in the blocks they solve only those transactions that include payment of a transaction fee. If transaction fees paid for Bitcoin transactions become too high, the marketplace may be reluctant to accept Bitcoin as a means of payment and existing users may be motivated to switch from Bitcoin to another digital asset or to fiat currency. Either the requirement from miners of higher transaction fees in exchange for recording transactions in a blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for Bitcoin and prevent the expansion of the Bitcoin network to retail merchants and commercial businesses, resulting in a reduction in the price of Bitcoin that could adversely impact the value of NewCo. Decreased use and demand for Bitcoins that NewCo has accumulated may adversely affect their value and may adversely affect NewCo.

*12. To the Extent that the Profit Margins of Bitcoin Mining or ETH Staking Operations Are Not Sufficiently High, Operators of Bitcoin Mining or ETH Staking Operations Are More Likely to Immediately Sell Bitcoins or ETH Earned by Mining or Staking, as Applicable, in the Bitcoin and ETH Exchange Markets, Resulting in a Reduction in the Price of Bitcoin or ETH, as applicable, that Could Adversely Affect NewCo.*

Bitcoin network mining and Ethereum network staking operations have evolved from individual users mining with computer processors, graphics processing units and first-generation ASIC servers.

Currently, new processing power brought onto the Bitcoin and Ethereum networks is predominantly added by incorporated and unincorporated "professionalized" mining operations.  Professionalized mining and staking operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers.  As a result, professionalized mining operations are of a greater scale than prior Bitcoin network miners and Ethereum network stakers and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining and staking operations to more immediately sell Bitcoins and ETH earned from mining operations on a Bitcoin or ETH exchange market. The immediate selling of newly acquired Bitcoins and ETH increases the supply of Bitcoins or ETH on the Bitcoin or ETH exchange markets, as applicable, creating downward pressure on the price of Bitcoins or ETH, as applicable.  The extent to which the value of Bitcoin mined or ETH staked by a professionalized mining or staking operation, as applicable, exceeds the allocable capital and operating costs determines the profit margin of such operation.  A professionalized mining or staking operation may be more likely to sell a higher percentage of its newly acquired Bitcoin or ETH, as applicable, rapidly if it is operating at a low profit margin-and it may partially or completely cease operations if its profit margin is negative.  In a low profit margin environment, a higher percentage could be sold into the Bitcoin or ETH exchange markets more rapidly, thereby potentially reducing Bitcoin or ETH prices, as applicable.  Lower Bitcoin or ETH prices could result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a negative effect that may further reduce the price of Bitcoin or ETH, as applicable, until mining or staking operations with higher operating costs become unprofitable and remove mining power from the Bitcoin network or staking power from the Ethereum network.  The network effect of reduced profit margins resulting in greater sales of newly mined Bitcoin or staked ETH could result in a reduction in the price of Bitcoin or ETH, as applicable, that could adversely affect NewCo.

13. *To the Extent that any Miners Cease to Record Transactions in Solved Blocks, Transactions that Do Not Include the Payment of a Transaction Fee Will Not Be Recorded on the Bitcoin Blockchain Until a Block Is Solved by a Miner That Does Not Require the Payment of Transaction Fees. Any Widespread Delays in the Recording of Transactions Could Result in a Loss of Confidence in the Bitcoin Network, which Could Adversely Affect NewCo.*

To the extent that any miners cease to record transaction in solved blocks, such transactions will not be recorded on the blockchain.  Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (*e.g.*, a collective movement among miners or one or more mining pools forcing Bitcoin users to pay transaction fees as a substitute for or in addition to the award of new Bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the Bitcoin blockchain.  Any systemic delays in the recording and confirmation of transactions on its blockchain could result in greater exposure to double-spending transactions and a loss of confidence in the Bitcoin network, which could adversely affect NewCo.

14. *Because the Number of Bitcoins Awarded for Solving a Block in the Bitcoin Network Blockchain Continually Decreases, Miners Must Invest in Increasing Processing Power to Maintain Their Yield of Bitcoins, which Might Make Bitcoin Mining Uneconomical for NewCo.*

The award of new Bitcoin for solving blocks continually declines, so that Bitcoin miners must invest in increasing processing power to maintain or increase their yield of Bitcoin.  If the pricing of Bitcoin were to decline significantly, there can be no assurance that NewCo would be able to recover its investment in the computer hardware and processing power required to upgrade its mining operations. There can, moreover, be no assurance that NewCo will have the resources to upgrade its processing power to maintain

the continuing profitability of its mining operations. Also, the developers of the Bitcoin network or other programmers could propose amendments to the network's protocols and software that, if accepted, might require NewCo to modify and increase its investment in its Bitcoin mining operations to maintain profitability. There can be no assurance, however, that NewCo will be able to do so.

15. *The Open-Source Structure of the Digital Asset Network Protocol, Including Bitcoin and Ethereum, means that the Contributors to the Protocol Are Generally Not Directly Compensated for their Contributions in Maintaining and Developing the Protocol. A Failure to Properly Monitor and Upgrade the Protocol Could Damage the Applicable Network and the Value of NewCo.*

The Bitcoin and Ethereum networks each operate based on an open-source protocol maintained by contributors, largely on the Bitcoin Core project on GitHub in the case of Bitcoin, and the Ethereum Foundation in case of Ethereum. As an open-source project, Bitcoin is not represented by an official organization or authority and its software is available free of charge in accordance with the terms of open-source licenses such as the MIT License. As the Bitcoin network protocol is not commercially licensed and its use does not generate revenues for contributors, contributors are generally not compensated for maintaining and updating the Bitcoin network protocol. Although the MIT Media Lab's Digital Currency Initiative funds the current maintainer, Wladimir J. van der Laan, among others, this type of financial incentive is not typical. The lack of guaranteed financial incentive for contributors to maintain or develop the Bitcoin network and the lack of guaranteed resources to adequately address emerging issues with the Bitcoin network may reduce incentives to address the issues adequately or in a timely manner. Although the open-source Ethereum network protocol is funded and maintained in part by the Ethereum Foundation, a non-profit organization dedicated to supporting Ethereum, there can be no guarantee that such support will continue or be sufficient in the future. Alternatively, some developers may be funded by entities whose interests are at odds with other participants in the Ethereum network. To the extent that material issues arise with the Ethereum network protocol and the core developers and open-source contributors are unable to address the issues adequately or in a timely manner, the Ethereum network and the business of the NewCo may be adversely affected. Changes to a digital asset network which NewCo is mining or staking on may adversely affect NewCo's business, operations, and financial condition.

16. *Significant Bitcoin Network Contributors Could Propose Amendments to the Bitcoin Network's Protocols and Software that, if Accepted and Authorized by the Bitcoin Network, Could Adversely Affect NewCo.*

Significant Bitcoin network contributors could propose refinements or improvements to the Bitcoin network's source code through one or more software upgrades that alter the protocols and software that govern the Bitcoin network and the properties of Bitcoin, including the irreversibility of transactions and limitations on the mining of new Bitcoins. Proposals for upgrades and discussions relating thereto take place on online forums. For example, there is an ongoing debate regarding altering the Bitcoin blockchain by increasing the size of blocks to accommodate a larger volume of transactions. Although some proponents support an increase, other market participants oppose an increase to the block size as it may deter miners from confirming transactions and concentrate power into a smaller group of miners. Additionally, Bitcoin could change its mining algorithm in a fashion which could render NewCo's ASIC mining equipment obsolete. To the extent that a significant majority of the users and miners on the Bitcoin network install such software upgrade(s), the Bitcoin network would be subject to new protocols and software that may adversely affect NewCo's business, operations, and financial condition.

17. *Banks and Financial Institutions Vary in the Services they Provide to Businesses that Engage in Bitcoin- or ETH-Related Activities or that Accept Bitcoin or ETH*

272

*as Payment.*

Although a number of significant U.S. banks and investment institutions, such as Goldman Sachs, Citigroup, J. P. Morgan and BlackRock, allow customers to carry and invest in Bitcoin and other digital assets such as ETH, the acceptance and use by banks of digital assets, including Bitcoin and ETH, varies. A number of companies that provide Bitcoin, ETH, or other digital asset-related services, however, have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. This risk may be further exacerbated in the current environment in light of several high-profile bankruptcies in the digital assets industry, as well as recent bank failures, which have disrupted investor confidence in digital assets and led to a rapid escalation of oversight of the digital asset industry. For example, certain banks have implemented enhanced know-your-customer and anti-money laundering requirements in connection with potential digital asset customers. These enhanced requirements may make it more difficult for digital asset-related companies to find banking or financial services.

Additionally, a number of companies and individuals or businesses associated with digital assets may have had and may continue to have their existing banking services discontinued with financial institutions in response to government action, particularly in China, where regulatory response to digital assets has been to exclude their use for ordinary consumer transactions. In May 2021, the Chinese government called for a crackdown on Bitcoin and ETH mining, staking, and trading. In September 2021, Chinese regulators instituted the China Ban. However, in 2020, the Office of the Comptroller of the Currency of the U.S. Treasury Department announced that national banks and federal savings associations may provide digital asset custody services for customers. NewCo cannot accurately predict the level and scope of services that these institutions will offer to businesses engaging in Bitcoin or other digital asset related activities.

The usefulness of Bitcoin and ETH, the only digital assets that NewCo intends to mine or stake, as applicable, as a payment system and the public perception of Bitcoin or ETH could be damaged if banks or financial institutions were to close the accounts of businesses engaging in Bitcoin, ETH, and/or other digital asset-related activities. This could occur as a result of compliance risk, cost, government regulation or public pressure. The risk applies to securities firms, clearance and settlement firms, national stock and derivatives on commodities exchanges, the over-the-counter market, and the Depository Trust Company, which, if any of such entities adopts or implements similar policies, rules or regulations, could negatively affect its relationships with financial institutions and impede NewCo's ability to convert Bitcoin or ETH to fiat currencies. Such factors could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects or operations and harm stakeholders.

> 18. *NewCo May Not Be Able to Compete with other Companies, Some of Whom have Greater Resources and Experience.*

NewCo may not be able to compete successfully against present or future competitors. NewCo may not have the resources to compete with larger providers of similar services at this time. The digital asset industry has attracted various high-profile and well-established operators, some of which have substantially greater liquidity and financial resources than NewCo may have. Additionally, the number of Bitcoin, ETH, and other digital asset mining and staking companies has increased in recent years. With the limited resources that NewCo will have available, NewCo may experience great difficulties in expanding and improving its network of computers to remain competitive. Competition from existing and future competitors, particularly those that have access to competitively priced energy, including energy providers themselves, could result in NewCo's inability to secure acquisitions and partnerships that NewCo may need to expand its business in the future. This competition from other entities with greater resources, experience and reputations may result in NewCo's failure to maintain or expand its business, as NewCo may never be

able to successfully execute its business plan.  If NewCo is unable to expand and remain competitive, its business could be negatively affected which would have an adverse effect on the trading price of its common stock, which would harm NewCo's value.

### 19. *Acceptance and/or Widespread Use of Bitcoin, ETH, and Other Digital Assets Is Uncertain.*

Currently, there is a relatively limited use of any digital assets, with Bitcoin being the most utilized, in the retail and commercial marketplace, thus contributing to price volatility that could adversely affect an investment in NewCo Common Stock.  Banks and other established financial institutions may refuse to process funds for Bitcoin or ETH transactions, process wire transfers to or from digital assets exchanges, digital assets-related companies or service providers, or maintain accounts for persons or entities transacting in Bitcoin, ETH, or other digital assets. Conversely, a significant portion of Bitcoin and ETH demand is generated by investors seeking a long-term store of value or speculators seeking to profit from the short- or long-term holding of the asset.  Price volatility undermines the role of Bitcoin and ETH as mediums of exchange, as retailers are much less likely to accept it as a form of payment.  Market capitalization for Bitcoin and ETH as mediums of exchange and payment methods may always be low.  The relative lack of acceptance of Bitcoin and ETH in the retail and commercial marketplace, or a reduction of such use, limits the ability of end users to use Bitcoin and ETH to pay for goods and services.  Such lack of acceptance or decline in acceptances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of Bitcoin that NewCo mines or otherwise acquires or holds for its own account.

### 20. *The Decentralized Nature of Digital Asset Systems May Lead to Slow or Inadequate Responses to Crises, which May Negatively Affect NewCo's Business.*

The decentralized nature of the governance and administration of digital asset systems may lead to ineffective decision making that slows development or prevents a network from overcoming emergent obstacles.  Governance of many digital asset systems is by voluntary consensus and open competition with no clear leadership structure or authority.  To the extent lack of clarity in governance of the Bitcoin or ETH systems leads to ineffective decision making that slows development and growth of Bitcoin or ETH, or slows a response to a problem such as addressing a critical vulnerability in the cryptographic primitives or software implementation of Bitcoin or ETH, the value of NewCo's securities may be adversely affected.

### 21. *Digital Assets May Have Concentrated Ownership and Large Sales or Distributions by Holders of Such Digital Assets Could Have an Adverse Effect on the Market Price of Such Digital Asset.*

Historically, a limited number of Bitcoin and ETH wallets held a significant portion of the Bitcoins and ETH in circulation.  Moreover, it is possible that other persons or entities control multiple wallets that collectively hold a significant number of Bitcoins and ETH, even if they individually only hold a small amount, and it is possible that some of these wallets are controlled by the same person or entity.  Similar or more concentrated levels of ownership may exist for other digital assets as well.  As a result of this concentration of ownership, large sales or distributions by such holders could have an adverse effect on the market price of Bitcoin, ETH, and other digital assets.

### 22. *NewCo's Operations, Investment Strategies, and Profitability May Be Adversely Affected by Competition from other Methods of Investing in Bitcoin.*

NewCo will compete with other users and/or companies that are mining Bitcoin or staking ETH and other potential financial vehicles, including securities backed by or linked to Bitcoin or ETH through

entities similar to NewCo. Market and financial conditions, and other conditions beyond NewCo's control, may make it more attractive to invest in other financial vehicles, or to invest in Bitcoin or ETH directly, which could limit the market for its shares and reduce its liquidity. The emergence of other financial vehicles and exchange-traded funds have been scrutinized by regulators and such scrutiny and the negative impressions or conclusions resulting from such scrutiny could be applicable to NewCo and impact NewCo's ability to successfully pursue its strategy or operate at all, or to establish or maintain a public market for its securities. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on its business, prospects, or operations and potentially the value of any Bitcoin it mines or ETH it stakes, or Bitcoin or ETH it or otherwise acquires or holds for its own account, and harm investors.

> 23. *The Development and Acceptance of Competing Blockchain Platforms or Technologies May Cause Consumers to Use Alternative Distributed Ledgers or other Alternatives.*

The development and acceptance of competing blockchain platforms or technologies may cause consumers to use alternative distributed ledgers or an alternative to distributed ledgers altogether. NewCo's business utilizes presently existent digital ledgers and blockchains and NewCo could face difficulty adapting to emergent digital ledgers, blockchains, or alternatives thereto. This may adversely affect NewCo and its exposure to various blockchain technologies and prevent NewCo from realizing the anticipated profits from its investments. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin it mines or ETH it stakes, or Bitcoin or ETH it otherwise acquires or holds for its own account, and harm investors.

> 24. *The Loss or Destruction of Private Keys Required to Access any Digital Assets Held in Custody for NewCo's Own Account May Be Irreversible. If NewCo is Unable to Access its Private Keys or if NewCo Experiences a Hack or Other Data Loss Relating to its Ability to Access any Digital Assets, it Could Cause Regulatory Scrutiny, Reputational Harm, and other Losses.*

Digital assets are generally controllable only by the possessor of the unique private key relating to the digital wallet in which the digital assets are held. While blockchain protocols typically require public addresses to be published when used in a transaction, private keys must be safeguarded and kept private to prevent a third party from accessing the digital assets held in such a wallet. To the extent that any of the private keys relating to any of NewCo's hot wallet or cold storage containing digital assets held for its own account or for its customers is lost, destroyed, or otherwise compromised or unavailable, and no backup of the private key is accessible, NewCo will be unable to access the digital assets held in the related wallet. Further, NewCo cannot provide assurance that its wallet will not be hacked or compromised. Digital assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store NewCo's digital assets could adversely affect NewCo's ability to access or sell its digital assets and subject NewCo to significant financial losses. As such, any loss of private keys due to a hack, employee or service provider misconduct or error, or other compromise by third parties could result in significant losses and adversely affect its business.

> 25. *NewCo's Digital Assets May Be Subject to Loss, Damage, Theft, or Restriction on Access. Additionally, Incorrect or Fraudulent Digital Asset Transactions May Be Irreversible.*

There is a risk that part or all of NewCo's digital assets could be lost, stolen, or destroyed. Digital assets are stored in digital asset sites commonly referred to as "wallets" which may be accessed to exchange

a holder's digital assets. Access to NewCo's Bitcoin assets could also be restricted by cybercrime (such as a denial-of-service attack) against a service at which NewCo maintains a hosted wallet. Access to NewCo's digital currency assets could also be restricted by cybercrime (such as a denial-of-service attack) against a service at which NewCo maintains a hosted hot wallet. A hot wallet refers to any digital currency wallet that is connected to the Internet. Generally, hot wallets are easier to set up and access than wallets in cold storage, but they are also more susceptible to hackers and other technical vulnerabilities. Cold storage refers to any digital currency wallet that is not connected to the Internet. Cold storage is generally more secure but is not ideal for rapid or regular transactions. NewCo may hold a portion of its digital currencies in cold storage to reduce the risk of malfeasance, but this risk cannot be eliminated. NewCo's digital assets may be an appealing target to hackers or malware distributors seeking to destroy, damage, or steal such digital assets. Hackers or malicious actors may attempt to steal Bitcoins or ETH, such as by attacking the Bitcoin or ETH networks' source code, exchange miners, nodes, third-party platforms, storage locations or software, NewCo's general computer systems or networks, or by other means. NewCo may be unable to prevent loss, damage, or theft, whether caused intentionally, accidentally or by act of God. Access to its digital assets could also be restricted by natural events (such as an earthquake or flood) or human actions (such as a terrorist attack). Any of these events may adversely affect NewCo's operations and, consequently, an investment in NewCo. Further, it is possible that, through computer or human error, theft, or criminal action, NewCo's digital assets could be transferred in incorrect amounts or to unauthorized third parties or accounts. In general, Bitcoin and ETH transactions are irrevocable, and stolen or incorrectly transferred digital assets may be irretrievable, and NewCo may have extremely limited or no effective means of recovering such Bitcoins or ETH. As a result, any incorrectly executed or fraudulent Bitcoin or ETH transactions could adversely affect NewCo's business.

### 26. Digital Assets Held by NewCo Are Not Subject to FDIC or SIPC Protections.

NewCo will not hold its digital assets with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC") and, therefore, NewCo's digital assets will not be subject to the protections provided to depositors with FDIC or SIPC member institutions.

### 27. Intellectual Property Rights Claims May Adversely Affect the Operation of Some or All Digital Asset Networks.

Third parties have asserted and may assert intellectual property claims relating to the holding and transfer of digital assets and their source code. Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in some or all digital asset networks' long-term viability or the ability of end-users to hold and transfer digital assets may adversely affect NewCo. Additionally, a meritorious intellectual property claim could prevent NewCo and other end-users from accessing some or all digital asset networks or holding or transferring their digital assets. As a result, an intellectual property claim against NewCo or other large digital asset network participants could adversely affect NewCo.

### 28. There Is a Risk of Additional Bitcoin Mining or Staking Capacity from Competing Bitcoin Miners or ETH Stakers, which Would Decrease NewCo's Effective Market Share.

The barriers to entry for new Bitcoin miners and ETH stakers are relatively low, which can give rise to additional capacity from competing Bitcoin miners or ETH stakers. The Bitcoin protocol responds to increasing total hashrate by increasing the "difficulty" of Bitcoin mining. If this "difficulty" increases at a significantly higher rate, NewCo would need to increase its hashrate at the same rate to maintain market share and generate equivalent block rewards. A decrease in NewCo's effective network hashrate market share would result in a reduction in NewCo's share of block rewards and transaction fees, which could

materially adversely affect its financial performance and financial position. Staking rewards on ETH will increase or decrease depending on the number of validators and amount of ETH being staked on the network, which may vary over time. A reduction in the staking reward rate and other factors like network performance could materially adversely affect its financial performance and financial position.

> 29. *There Is a Lack of Liquid Markets in Digital Assets, and These Markets are Subject to Possible Manipulation.*

Digital assets that are represented and trade on a ledger-based platform may not necessarily benefit from viable trading markets. Stock exchanges have rules and regulations regarding marketplace conduct and monitor investors transacting on such platform for fraud and other improprieties. These conditions may not necessarily be replicated on a distributed ledger platform, depending on the platform's controls and other policies. The more relaxed a distributed ledger platform is about vetting issuers of digital assets or users that transact on the platform, the higher the potential risk for fraud or the manipulation of the ledger due to a control event. These factors may decrease liquidity or volume or may otherwise increase volatility of investment securities or other assets trading on a ledger-based system, which may adversely affect NewCo. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin it mines or ETH it stakes, or Bitcoin or ETH it otherwise acquires or holds for its own account, which could harm investors.

> 30. *The Digital Assets Exchanges on Which Bitcoin and ETH Trade are Relatively New and, in most cases, Largely Unregulated and May Therefore Be More Exposed to Fraud and Failure Compared to Established, Regulated Exchanges for other Assets. In the Event that Digital Assets Exchanges Representing a Substantial Portion of the Volume in Bitcoin or ETH Trading are Involved in Fraud or Experience Security Failures or Other Operational Issues, Such Digital Assets Exchanges' Failures May Result in a Reduction in the Price of Bitcoin and ETH and Can Adversely Affect NewCo.*

Digital assets exchanges on which the Bitcoins and ETH trade are new and, in most cases, largely unregulated. Furthermore, many digital assets exchanges (including several of the most prominent U.S. Dollar Denominated Bitcoin Exchanges) do not provide the public with significant information regarding their ownership structure, management teams, corporate practices, or regulatory compliance. As a result, the marketplace may lose confidence in, or may experience problems relating to, digital assets exchanges, including prominent exchanges handling a significant portion of the volume of Bitcoin and ETH trading. A lack of stability in the digital assets exchange market and the closure or temporary shutdown of Bitcoin exchanges due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in the Bitcoin and Ethereum networks and result in greater volatility in Bitcoin or ETH value. These potential consequences of a digital assets exchange's failure could adversely affect NewCo.

### E.    Disclosure Statement Disclaimer.

> 1. *The Financial Information Is Based on the Debtors' Books and Records.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2. *No Legal or Tax Advice Is Provided by this Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

3. *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, NewCo, the Post-Effective Date Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4. *Failure To Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that any particular litigation claims or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

5. *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7. *No Representations Outside this Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS'**

ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.

    F.    **Regulatory-Related Risk Factors.**

        1.    *The Debtors Are Subject to an Extensive and Wide-Ranging Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, Any Laws and Regulations Could Adversely Affect their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition.*

The Post-Effective Date Debtors and NewCo will be subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, Cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and Cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. The Debtors are exposed to risks with respect to their business and operations, environmental issues, and technology, among other things.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, Cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the Cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and evolving nature surrounding the regulation of the Cryptocurrency economy could require the Post-Effective Date Debtors and NewCo to exercise their judgment as to whether certain laws, rules, and regulations apply to NewCo, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Post-Effective Date Debtors and NewCo do not comply with such laws, rules, and regulations, they could be subject to significant fines, revocation of licenses, limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Post-Effective Date Debtors and/or NewCo from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

The Debtors have engaged with state and federal regulators throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by the Post-Effective Date Debtors and NewCo with all applicable state and federal law.  The federal and state regulators, however, may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of such determinations.  There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of certain state regulators to require certain approvals with respect to confirmation of the Plan.  The Debtors may be unable to consummate the Restructuring Transactions in the event they determine that NewCo will not be able to meet all necessary regulatory requirements.  Furthermore, the Debtors cannot guarantee that NewCo will be able to remain compliant with all Laws and/or maintain all applicable licenses following the Effective Date.

> 2. *If NewCo Were Deemed to be an Investment Company Under the Investment Company Act, Applicable Restrictions Could Make it Impractical or Impossible For NewCo to Continue its Business as Contemplated and Could Have A Material Adverse Effect on its Business, Financial Condition, and Results of Operations.*

The SEC and its staff have taken the position that certain digital assets fall within the definition of a "security" under the U.S. federal securities laws.  Although public statements by senior officials and the staff of the SEC indicate that the SEC does not intend to take the position that Bitcoin is a security (in its current form), such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court.  The classification of Bitcoin or ETH as a security by the SEC could result in NewCo being deemed to be an "investment company" under the U.S. Investment Company Act.  Classification as an investment company under the U.S. Investment Company Act requires registration with the SEC.  If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable.  Registration is time-consuming and restrictive and would require a restructuring of NewCo's operations, and NewCo would be materially constrained in the kind of business it could do as a registered investment company.  Further, NewCo would become subject to substantial regulation concerning management, operations, transactions with affiliated persons, and portfolio composition, and would need to file reports under the U.S. Investment Company Act regime.  NewCo registering and complying with relevant regulation would result in NewCo incurring substantial additional expenses and would have a materially adverse impact on NewCo's operations.

It is not intended for NewCo to be engaged in the business of investing, reinvesting, or trading in securities, and NewCo will not hold itself out as being engaged in those activities. Nevertheless, NewCo could determine that it has become an inadvertent investment company under the second definition above. An inadvertent investment company can avoid being classified as an investment company if it can rely on one of the exclusions or exemptions under the Investment Company Act. One such exemption, Rule 3(a)(2) under the Investment Company Act, allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which an issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis and (b) the date on which an issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis.  If NewCo becomes an inadvertent investment company in the future, NewCo may take actions to cause the investment securities held by it to be less than 40% of its total assets, which may include acquiring assets with the cash and Bitcoin on hand or liquidating investment securities or Bitcoin or seeking a no-action letter from the SEC if NewCo is unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner.  Liquidating investment securities or Bitcoin could result in losses.  As the Rule 3(a)(2) exemption is available to a company no more than once every three years, and assuming no other exclusion or exemption would be available to NewCo, NewCo would have to keep within the 40%

limit for at least three years after it relies on Rule 3(a)(2) and subsequently cease being an inadvertent investment company.  This could limit NewCo's ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on NewCo's earnings.

> 3.  *NewCo Will Be subject to a Highly Evolving Cryptocurrency Regulatory Landscape and any Adverse Changes to, or its Failure to Comply with, any Laws and Regulations Could Adversely Affect Its Business, Prospects, or Operations.*

Bitcoin, ETH, and other forms of digital assets have been the source of significant regulatory scrutiny in the United States and internationally.  Bitcoin, ETH, and other digital assets are viewed disparately across various regulatory and standards-setting organizations internationally, as well as in the United States at the federal and state levels.  For example, the FATF and the IRS consider a digital asset as currency or an asset or property.  Further, the IRS applies general tax principles that apply to property transactions to transactions involving virtual currency.  The CFTC classifies Bitcoin and ETH as commodities.  The SEC has also publicly stated that it considers Bitcoin to be a commodity, but that some digital assets should be categorized as securities. The SEC has not taken a position as to whether ETH is a commodity or a security.  How a digital asset is characterized by a regulator impacts the rules that apply to activities related to that digital asset.

As digital assets have grown in both popularity and market size, governments around the world have reacted differently.  Certain governments have deemed digital assets illegal or have severely curtailed the use of digital assets by prohibiting the acceptance of payment in Bitcoin, ETH, and other digital assets for consumer transactions and barring banking institutions from accepting deposits of digital assets.  Other nations, however, allow digital assets to be used and traded without significant restrictions.  In some jurisdictions, such as in the United States, digital assets are subject to regulatory requirements and considerations.  For example, the SEC and its staff have taken the position that certain cryptocurrencies fall within the definition of a "security" under the U.S. federal securities laws and have issued reports, orders, and statements that provide guidance on when a cryptocurrency may be a security for purposes of the U.S. federal securities laws.  The SEC generally does not provide advance guidance or confirmation on the status of any particular cryptocurrency as a security.  Public statements made by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin is a security (as currently offered and sold).  Such statements are not official policy statements by the SEC, however, and reflect only the speakers' views, which are not binding on the SEC or any other agency or court and cannot be generalized to any other digital asset.  As of the date of this prospectus, with the exception of certain centrally issued digital assets that have received "no-action" letters from the SEC staff, Bitcoin and ETH are the only cryptocurrencies that senior officials at the SEC have publicly stated are unlikely to be considered securities.  If laws and regulations evolve or the SEC changes its position with respect to whether Bitcoin is regarded as a type of security, NewCo may become subject to the Investment Company Act and other regulations surrounding securities.

There is also a risk that relevant authorities in any jurisdiction may impose more onerous regulation on or scrutiny of Bitcoin, ETH, and other digital assets, for example banning their use, regulating their operation, or otherwise changing the relevant regulatory treatment.  Such changes could involve significant compliance or other costs, or otherwise have a material adverse impact on NewCo's business model, operations, and financial performance.  If the use of Bitcoin, ETH, and other digital assets is made illegal in jurisdictions where Bitcoin, ETH, and other digital assets are currently traded, the available market for Bitcoin, ETH, and other digital assets may contract.  For example, on September 24, 2021, the People's Bank of China announced that all activities involving digital assets in mainland China are illegal, which corresponded with a significant decrease in the price of Bitcoin and ETH.  If another government with considerable economic power were to ban digital assets or related activities, this could have further adverse impact on the price of Bitcoin or ETH.

Digital asset trading platforms may also be subject to increased regulation, and there is a risk that increased compliance costs are passed through to users, including NewCo, as it exchanges Bitcoin earned through its mining activities and ETH earned in its staking activities.  There is a risk that a lack of stability in the digital assets exchange market and the closure or temporary shutdown of digital assets exchanges due to fraud, business failure, hackers, malware, or government-mandated restrictions may reduce confidence in the Bitcoin and ETH networks and result in greater volatility in or suppression of Bitcoin's or ETH's value and consequently have a material adverse impact on NewCo's operations and financial performance.  Note that although Bitcoin and ETH are not currently treated as securities by the SEC, the exchanges on which Bitcoin and ETH are traded typically provide trading services with respect to numerous other digital assets, some of which may be deemed to be securities by the SEC, and some of them are currently under investigation by the SEC and other regulators as well.  If any of these exchanges are shut down due to regulatory action or have their activities significantly curtailed or otherwise modified, it could become more difficult for NewCo and other holders of Bitcoin and ETH to monetize holdings.  This could also result in a decrease in the overall price of Bitcoin or ETH which could have a material adverse impact on NewCo's operations and financial performance.

The SEC has recently proposed regulations which would require investment advisers (including fund managers of many funds) to custody all digital assets they hold on behalf of clients with "qualified custodians."  Because the majority of digital assets exchanges are not "qualified custodians," and because these exchanges require users to prefund their trades (in effect requiring users to place digital assets in custody with them), it may be practically impossible for investment advisers to hold digital assets on behalf of their institutional clients or managed funds.  The exit of institutional investors and funds from the market for Bitcoin could have a material adverse effect on the price of Bitcoin and thus on NewCo's operations.

In the U.S., the Federal Reserve Board, U.S. Congress, certain U.S. federal agencies (*e.g.*, the CFTC, the SEC, the Financial Crimes Enforcement Network, and the Federal Bureau of Investigation), and state regulators have begun to examine the operations of the Bitcoin and ETH networks, Bitcoin and ETH users, and the digital asset exchange market, in light of the FTX and other bankruptcies, including the Debtors' bankruptcy.  Increasing regulation and regulatory scrutiny may result in new costs for NewCo and its management may have to devote increased time and attention to regulatory matters or change aspects of its business.  Increased regulation may also result in limitations on the use cases of Bitcoin.  In addition, regulatory developments may require NewCo to comply with certain regulatory regimes.  Furthermore, in the future, foreign governments may decide to subsidize or in some other way support certain large-scale Bitcoin mining projects, thus adding hashrate to the overall network.  Such circumstances could have a material adverse effect on the amount of Bitcoin that NewCo may be able to mine as well as the value of Bitcoin and, consequently, NewCo's business, prospects, financial condition, and operating results.

    4.    *The Digital Asset Economy is Novel and Has Little to no Access to Policymakers or Lobbying Organizations, which May Harm NewCo's Ability to Effectively React to Proposed Legislation and Regulation of Digital Assets or Digital Asset Platforms Adverse to Its Business.*

As digital assets have grown in both popularity and market size, various U.S. federal, state, and local and foreign governmental organizations, consumer agencies, and public advocacy groups have been examining the operations of digital asset networks, users, and platforms, with a focus on how digital assets can be used to launder the proceeds of illegal activities, fund criminal or terrorist enterprises, and the safety and soundness of platforms and other service providers that hold digital assets for users.  Many of these entities have called for heightened regulatory oversight and have issued consumer advisories describing the risks posed by digital assets to users and investors.  For instance, in July 2019, then-U.S. Treasury Secretary Steven Mnuchin stated that he had "very serious concerns" about digital assets.  In recent months, members of Congress have made inquiries into the regulation of digital assets, and Gary Gensler, Chair of the SEC,

has made public statements regarding increased regulatory oversight of digital assets. Outside the United States, several jurisdictions such as China and South Korea have banned so-called initial coin offerings, while Canada, Singapore, Hong Kong have opined that token offerings may constitute securities offerings subject to local securities regulations. In July 2019, the United Kingdom's FCA proposed rules to address harm to retail investors arising from the sale of derivatives and exchange-traded notes that reference certain types of digital assets, contending that they are "ill-suited" to retail investors due to extreme volatility, valuation challenges and association with financial crimes. In May 2021, the Chinese government called for a crackdown on Bitcoin mining and trading, and in September 2021, Chinese regulators instituted a blanket ban on all digital asset mining and transactions, including overseas digital asset exchange services taking place in China, effectively making all digital asset-related activities illegal in China (the "China Ban").

The digital asset economy is novel and has little to no access to policymakers and lobbying organizations in many jurisdictions. Competitors from other, more established industries, including traditional financial services, may have greater access to lobbyists or governmental officials, and regulators that are concerned about the potential for digital assets for illicit usage may affect statutory and regulatory changes with minimal or discounted inputs from the digital asset economy. As a result, new laws and regulations may be proposed and adopted in the United States and internationally, or existing laws and regulations may be interpreted in new ways that harm the digital asset economy or digital asset platforms, which could adversely affect NewCo's business.

5. *Bitcoin's, ETH's, and Other Digital Assets' Status as a "Security," a "Commodity" or a "Financial Instrument" in any Relevant Jurisdiction is subject to a High Degree of Uncertainty, and if NewCo Is Unable to Properly Characterize a Digital Asset, NewCo May Be Subject to Regulatory Scrutiny, Investigations, Fines, and Other Penalties, which May Adversely Affect NewCo's Business, Operating Results, and Financial Condition.*

The SEC and its staff have taken the position that certain digital assets fall within the definition of a "security" under the U.S. federal securities laws. The legal test for determining whether any given digital asset is a security is a highly complex, fact-driven analysis. The SEC has indicated that the determination of whether or not a digital asset is a security depends on the characteristics and use of that particular asset. The SEC generally does not provide advance guidance or confirmation on the status of any particular digital asset as a security. However, the SEC and its staff have taken positions that certain digital assets are "securities"—often in the context of enforcement actions—and, as of the Effective Date, NewCo will not hold any digital assets for which the SEC or its staff has taken such a position. Prior public statements by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin is a security (in its current form). Bitcoin is the only digital asset as to which senior officials at the SEC have publicly expressed such a view. The SEC has not taken a position on whether ETH is a security, and certain public statements by senior officials at the SEC indicate that the SEC may or may not take the position that ETH is a security. Moreover, such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court, cannot be generalized to any other digital asset, and may evolve. Similarly, although the SEC's Strategic Hub for Innovation and Financial Technology published a framework for analyzing whether any given digital asset is a security in April 2019, this framework is also not a rule, regulation, or statement of the SEC and is not binding on the SEC. With the exception of certain centrally issued digital assets that have received "no-action" letters from the SEC staff, Bitcoin and ETH are the only Cryptocurrencies that senior officials at the SEC have publicly stated are unlikely to be considered securities.

As of the Effective Date, NewCo will hold only Bitcoin and ETH, which have not been treated as a "security" by the SEC. To the extent that the SEC or a court determines that any digital assets that NewCo

holds, or chooses to hold in the future, are securities, however, that determination could prevent NewCo from continuing to hold or mine those digital assets. It could also result in regulatory enforcement penalties and financial losses. NewCo could be subject to judicial or administrative sanctions for failing to offer or sell the digital asset in compliance with securities registration requirements. Such an action could result in injunctions and cease and desist orders, as well as civil monetary penalties, fines, disgorgement, criminal liability, and reputational harm. Moreover, the networks on which such digital assets are used might be required to be regulated as securities intermediaries, and subject to applicable rules, which could effectively render the network impracticable for its existing purposes. Further, any determination that Bitcoin or ETH is a security could draw negative publicity and cause a decline in the general acceptance of digital assets. Also, it would make it more difficult for Bitcoin or ETH, as applicable, to be traded, cleared, and custodied as compared to other digital assets that are not considered to be securities. Lastly, any determination that a digital asset that NewCo holds, or chooses to hold in the future, is a "security" may require NewCo to register as an investment company under the Investment Company Act.

6. *It May Be Illegal Now, or in the Future, To Acquire, Own, Hold, Sell, or Use Bitcoin, ETH, or Other Digital Assets, Participate in Blockchains or Utilize Similar Digital Assets in One or More Countries, which Would Adversely Affect NewCo's Business Operations.*

Although digital assets currently are generally not regulated or are lightly regulated in most countries, countries such as China and Russia have taken harsh regulatory action to curb the use of digital assets and may continue to take regulatory action in the future that could severely restrict the right to acquire, own, hold, sell, or use these digital assets or to exchange them for fiat currency. In 2021, China instituted the China Ban. In other nations, including Russia, it is illegal to accept payment in Bitcoin, ETH, or other digital assets for consumer transactions, and banking institutions are barred from accepting deposits of Bitcoin or ETH. Such restrictions may adversely affect NewCo as the large-scale use of Bitcoin and ETH as means of exchange is presently confined to certain regions globally. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations, and potentially the value of any Bitcoin that NewCo mines or otherwise acquires or holds for its own account, ultimately harming investors.

7. *NewCo's Business May Be Subject to Substantial Environmental Legislation and Energy Regulation and May Be Adversely Affected by Legislative or Regulatory Changes, as well as Liability Under, or any Future Inability to Comply with, Existing or Future Energy Regulations or Requirements.*

NewCo's business operations are, and may become subject to, further U.S. federal, state, and local laws and regulations governing air and water quality, hazardous and solid waste disposal, and other environmental matters. Compliance with, or changes to, the requirements under these legal and regulatory regimes may cause NewCo to incur significant additional costs or adversely impact NewCo's ability to compete on favorable terms with competitors. Failure to comply with such requirements could result in the shutdown of a non-complying facility, the imposition of liens, fines, and/or civil or criminal liability, and/or costly litigation before the agencies and/or in state or federal court. The regulatory environment has undergone significant changes in the last several years due to state and federal policies affecting wholesale competition and the creation of incentives for the addition of large amounts of new renewable generation and, in some cases, transmission. These changes are ongoing, and NewCo will not be able to predict the future design of the power markets or the ultimate effect that the changing regulatory environment will have on NewCo's business. These changes and regulatory developments could adversely impact NewCo's operations, increase NewCo's environmental compliance costs, and potentially reduce the extent of NewCo's business, any of which could have a material adverse effect on NewCo's business, results of

operations, and financial condition.  If competitive restructuring of the electric power markets is reversed, discontinued, delayed, or materially altered, NewCo's business, financial condition, results of operations, and prospects could be negatively affected.

> 8. *NewCo Could Be Materially and Adversely Affected if Currently Proposed and/or New Regulations Related to Global Climate Change Are Implemented or if New Foreign, Federal or State Legislation or Regulations Are Adopted to Address Global Climate Change, or if NewCo Is Subject to Lawsuits for Alleged Damage to Persons or Property Resulting from Greenhouse Gas ("GHG") Emissions.*

There is attention and interest nationally and internationally about global climate change and how GHG emissions, such as $CO_2$, contribute to global climate change. A number of governments or governmental bodies have introduced or are contemplating legislative and regulatory changes in response to the increasing focus on climate change and its potential impact, including from governmental bodies, interest groups and stakeholders. Over the last several years, the U.S. Congress and state and federal authorities have considered and debated several proposals intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon or GHG emissions, incentives for the development of low-carbon technology, and federal renewable portfolio standards. Foreign jurisdictions have also adopted legislation relating to global climate change and GHG emissions, and the United States and other countries have enacted legislation, regulations, policies and programs to address global climate change and GHG emissions.  For example, the Paris Agreement became effective in November 2016, and signatories are required to submit their most recent emissions goals in the form of nationally determined contributions.

Given the significant amount of electrical power required to operate Bitcoin mining machines, as well as the environmental impact of mining for the rare earth metals used in the production of mining servers, the Bitcoin mining industry may become a target for future environmental and energy regulation. Legislation and increased regulation regarding climate change could impose significant costs on NewCo and its suppliers, including costs related to increased energy requirements, capital equipment, environmental monitoring and reporting, costs to purchase renewable energy credits or allowances and other costs to comply with such regulations. Specifically, imposition of a tax or other regulatory fee in a jurisdiction where NewCo operates or on electricity that NewCo purchases could result in substantially higher energy costs, and due to the significant amount of electrical power required to operate Bitcoin mining machines, could in turn put NewCo facilities at a competitive disadvantage. Any future climate change regulations could also negatively affect NewCo's ability to compete with companies situated in areas not subject to such limitations. Any of the foregoing could have a material adverse effect on NewCo's financial position, results of operations and cash flows.

Additionally, a number of federal court cases have been filed in recent years asserting damage claims related to GHG emissions, and the results in those proceedings could establish adverse precedent that might apply to companies (including NewCo) that produce GHG emissions. NewCo could be materially and adversely affected if new federal and/or state legislation or regulations are adopted to address global climate change or if NewCo is subject to lawsuits for alleged damage to persons or property resulting from GHG emissions.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the solicitation package (the "Solicitation Package"), about which more detail is provided below.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> **PLEASE REFER TO THE DISCLOSURE STATEMENT MOTION AND DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

### A.   Holders of Claims and Interests Entitled to Vote on the Plan.

The Bankruptcy Code does not require or permit all holders of claims against and/or interests in a debtor to vote on a chapter 11 plan. Only impaired creditors who are receiving a distribution under the plan are entitled to vote. According to section 1124 of the Bankruptcy Code, a creditor's claim is "impaired" if the creditor's legal, equitable, or contractual rights are altered by the plan of reorganization. For example, a creditor's claim is impaired if the plan provides that the creditor will receive a distribution that is less than the full value of the claim.

####    1.   The Voting Classes.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 2 | Retail Borrower Deposit Claims | Impaired |
| 4 | Convenience Claims | Impaired |
| 5 | General Earn Claims | Impaired |
| 6A | General Custody Claims | Impaired |
| 7 | Withhold Claims | Impaired |
| 8 | Unsecured Loan Claims | Impaired |
| 9 | General Unsecured Claims | Impaired |
| 10 | State Regulatory Claims | Impaired |
| 14 | Series B Preferred Interests | Impaired |

The table shown in Article III.C of this Disclosure Statement provides a full summary of the status and voting rights of each Holder of a Claim or Interest in a Class (absent an objection to the Holder's Claim or Interest) under the Plan. Holders in the Voting Classes are Impaired under the Plan and are receiving a distribution under the Plan, subject to certain applicable conditions. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan. *If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package.*

### B.   Votes Required for Acceptance by a Class.

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating

the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

For example, in a class of 100 creditors holding a total of $6 million in claims, and assuming every creditor votes on the plan, then for the class to accept the plan, at least 51 creditors need to vote to accept the plan and at least $4 million of claims need to vote to accept the plan. In other words, the class will be deemed to accept the plan if at least 51 creditors holding $4 million or more of the total amount in such class vote to accept the plan.

### C.    Certain Factors to Be Considered Prior to Voting.

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may affect recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article VIII of this Disclosure Statement.

### D.    Classes Not Entitled to Vote on the Plan.

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 1 | Other Secured Claims | Unimpaired |
| 3 | Other Priority Claims | Unimpaired |

| 6B | Withdrawable Custody Claims | Unimpaired |
| 11 | *De Minimis* Claims | Impaired |
| 12 | Intercompany Claims | Impaired/Unimpaired |
| 13 | Intercompany Interests | Impaired/Unimpaired |
| 15 | Other Interests | Impaired |
| 16 | Section 510(b) Claims | Impaired |
| 17 | Equitably Subordinated Claims | Impaired |

Holders of Claims in Classes 1, 3, and 6B are not entitled to vote because they are deemed to accept the Plan because such Claims are Unimpaired.  Holders of Claims in Classes 11, 15, 16, and 17 are not entitled to vote because they are Impaired and are therefore deemed to reject the Plan.  Finally, Holders of Claims in Classes 12 and 13 are not entitled to vote because they are either Impaired or Unimpaired and are either deemed to reject or accept.

### E.   Solicitation Procedures.

#### 1.   *Solicitation Agent.*

The Debtors have retained Stretto to act, among other things, as a Solicitation Agent in connection with solicitation of votes to accept or reject the Plan.  As the Solicitation Agent, Stretto will be responsible for distributing the Solicitation Package to Holders of Claims in the Voting Classes and for reviewing and tabulating the Ballots.

#### 2.   *Solicitation Package.*

The following materials constitute the Solicitation Package distributed to Holders of Claims and Interests in the Voting Classes:

- a copy of the Solicitation and Voting Procedures;

- the applicable form of Ballot (as described in greater detail below), together with detailed voting instructions and instructions on how to submit the Ballot;

- the cover letter, which describes the contents of the Solicitation Package and urges Holders of Claims in each of the Voting Classes to vote to accept the Plan;

- the Committee's letter recommending that Holders of Claims vote to accept the Plan;

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

### 3. *Form of Ballots.*

The Debtors have prepared [four] different types of Ballots.  Holders of Class 2 Retail Borrower Deposit Claims, Class 4 Convenience Claims, Class 5 General Earn Claims, Class 6A General Custody Claims, and Class 7 Withhold Claims (collectively, the "Account Holder Voting Classes") will receive the account holder ballot (the "Account Holder Ballot").  Holders of Class 8 Unsecured Loan Claims, Class 9 General Unsecured Claims Ballot, [Class 10 State Regulatory Claims,] and Class 14 Series B Preferred Interests will each receive separate Ballots (the "Class 8 Unsecured Loan Claims Ballot," "Class 9 General Unsecured Claims Ballot," "Class 10 State Regulatory Claims Ballot," and "Class 14 Series B Preferred Interests Ballot," respectively).  The Ballots (except for the Class 10 State Regulatory Claims Ballot) are attached as Exhibit 3A, Exhibit 3B, Exhibit 3C, and Exhibit 3D to the order of the Disclosure Statement Motion [Docket No. 2970], and were also Filed separately at [Docket No. 2971].  Revised forms of Ballots have been Filed on the docket concurrently herewith.

The Account Holder Ballot will be pre-populated with the amount of each Claim held by the Holder in each of the Account Holder Voting Classes as reflected on the Debtors' Schedules.  Account Holders may not vote a Claim amount inconsistent with the Schedules unless the Bankruptcy Court has entered an order approving such relief for that Holder after the Holder files a motion seeking such relief pursuant to Bankruptcy Rule 3018(a).  The Account Holder Ballot will also provide explanations of elections available to each Holder and will contain the net preference exposure of the Account Holder, which is relevant to whether such Account Holder is eligible to participate in the Account Holder Avoidance Action Settlement and whether distributions may be held back on account of potential Avoidance Actions against such Account Holder.  The Account Holder Ballot on the online voting portal will provide user-friendly prompts to ensure that any elections the Holder makes are consistent, thus preventing Holders from inadvertently submitting a defective Ballot and ensuring that votes to accept or reject the Plan from Holders in the Account Holder Voting Classes will be properly counted.

You should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If a Holder fills out the Ballot incorrectly, the Ballot will be defective and will not be counted.

### 4. *Distribution of Solicitation Package and Plan Supplement.*

The Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than [August 21], 2023 (the "Solicitation Deadline").[703]  The Debtors will make every reasonable effort to ensure that each Holder of a Claim or Interest entitled to vote will receive only one Solicitation Package.

The Solicitation Package will be distributed via email in electronic format to the Account Holder Voting Classes.  Holders of Claims in Account Holder Voting Classes will also receive a "push" notification to the Debtors' mobile application, which will link to the Account Holder Ballot on the Solicitation Agent's online voting portal.  The Solicitation Package will be distributed via email (to the extent the Debtors have such email addresses) or by first-class U.S. mail to Holders of Claims in Classes 8, 9, and 13.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by (a) calling (855) 423-1530 (toll free) or +1 (949) 669-5873 (international), (b) electronic mail at CelsiusInquiries@stretto.com (reference "In re: Celsius – Solicitation Inquiry" in the subject line), or

---

[703] This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Solicitation Deadline is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

(c) writing to Celsius Inquiries, c/o Stretto, Inc., 410 Exchange, Suite 100, Irvine, CA 92602. You may also download the exhibits and documents (as well as any pleadings filed with the Bankruptcy Court) for free on the Debtors' restructuring website at https://cases.stretto.com/celsius or from the Bankruptcy Court for a fee on PACER at https://ecf.nysb.uscourts.gov. Any party that receives the Solicitation Package in electronic format but would prefer paper format may contact the Solicitation Agent and request paper copies of the corresponding materials already provided in electronic format (to be provided at the Debtors' expense). Additionally, the Debtors shall electronically serve all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

No later than fourteen (14) days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court, the Debtors will File the Plan Supplement. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; *however*, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by: (a) calling the Solicitation Agent at the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/celsius, or (c) emailing the Solicitation Agent at CelsiusInquiries@Stretto.com.

F.      **Voting on the Plan.**

**The Voting Record Date is [July 24], 2023**.[704] The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

**The Voting Deadline is [September 20], 2023, at 4:00 p.m. (prevailing Eastern Time)**.[705] A ballot must be properly executed, completed, and delivered as directed in order to be counted towards acceptance or rejection of the Plan. The Solicitation Agent must **actually receive** the completed Ballot on or before the Voting Deadline. Ballots may be submitted to the Solicitation Agent via the Solicitation Agent's online voting portal at https://case.stretto.com/Celsius or via mail to:

<div align="center">

Celsius Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

</div>

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of

---

[704]   This date is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Record Date is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

[705]   This date is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Deadline is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Solicitation Agent.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 423-1530, INTERNATIONAL AT +1 (949) 669-5873, OR VIA ELECTRONIC MAIL TO CELSIUSINQUIRIES@STRETTO.COM.**

G. **Voting Tabulations.**

*1. Ballots Must Be Received by the Solicitation Agent by the Voting Deadline.*

A Ballot will be deemed delivered only when the Solicitation Agent ***actually receives*** the executed Ballot as instructed in the voting instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors. Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Solicitation Agent (the "Voting Report"). The Voting Report shall, among other things, provide the votes received to accept or reject the Plan, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each, an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

*2. Holders of Claims in More than One Voting Class Must Vote All Claims Together.*

Holders must vote all of their Claims either to accept or reject the Plan (except for any such Holder's General Custody Claim, if applicable), and may not split any votes between Classes. For the avoidance of doubt, a Holder must vote all of her Claims, except for her General Custody Claim (if applicable), either to accept the Plan *or* to reject the Plan. As an example, in the event that you are a Holder of a Class 2 Retail Borrower Deposit Claim and a Class 5 General Earn Claim, you must vote to accept the Plan with respect to both the Retail Borrower Deposit Claim and the General Earn Claim or to reject the Plan with respect to both the Retail Borrower Deposit Claim and the General Earn Claim. You cannot vote your Retail Borrower Deposit Claim to accept the Plan and vote your General Earn Claim to reject the Plan. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.

*3.   Elections Will Not Change in Which Class Your Vote Is Counted.*

Holders of Class 2 Retail Borrower Deposit Claims, Class 5 General Earn Claims, Class 7 Withhold Claims, Class 8 Unsecured Loan Claims, and Class 9 General Unsecured Claims have the option of making certain elections to change the treatment of their Claim, and therefore the distribution, that they will receive if the Plan is Confirmed.  Notwithstanding any elections a Holder may make, the Holder's vote will nonetheless be allocated to the Holder's original Class.

For example, Holders of Class 5 General Earn Claims and Class 7 Withhold Claims whose Claims are above the Convenience Claim Threshold of $5,000 can opt into the Convenience Class, in which case their Claims are reduced to $5,000 and they will receive a distribution of at least 70% of their $5,000 Convenience Class Claim.  Regardless of the election a Holder of a Class 5 General Earn Claim and Class 7 Withhold Claim makes, however, such Holder's votes will be counted as a Class 5 General Earn Claim and/or a Class 7 Withhold Claim.

Detailed information about the Convenience Claim Election can be found in Article III.M of this Disclosure Statement and in **Exhibit H** attached to this Disclosure Statement.

**H.    Ballots Not Counted.**

**A Ballot will not be counted if, among other things:**  (1) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (2) if it does not vote all of the Holder's Claims (except for such Holder's General Custody Claim, if applicable) either to accept the Plan *or* to reject the Plan; (3) it was transmitted by facsimile, email or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (4) an Entity that does not hold a Claim or Interest in a Voting Class casts the ballot in violation of the Solicitation Procedures; (5) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors instead of the Solicitation Agent; (6) it is cast for a Claim scheduled as wholly-unliquidated, -contingent, or -disputed and the claimant has not filed a superseding proof of claim; (7) it is unsigned or lacking an original signature (note that a ballot submitted via the Solicitation Agent's online balloting portal shall be deemed an original signature); (8) it is not marked to accept or reject the Plan or marked both to accept and reject the Plan; or (9) it is submitted via improper means, as described in the Solicitation Procedures.  **Please refer to the Disclosure Statement Order and Solicitation Package for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL-FREE AT (866) 423-1530 OR INTERNATIONAL AT +1 (949) 669-5873.**
>
> **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

**X.    CONFIRMATION OF THE PLAN**

**A.    Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of such plan.  **The Bankruptcy Court has not yet scheduled the Confirmation Hearing.**  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the

Confirmation Hearing or the Filing of a notice of such adjournment. Any objection to the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules and the Local Rules, (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any, (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (5) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that the parties entitled to notice **actually receive** such objection no later than the Plan Objection Deadline. **The Bankruptcy Court may not consider an objection unless an objection to the Plan is timely served and Filed.**

### B. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are the following: (1) all impaired classes of claims or interests must accept the plan or, if the impaired class rejects the plan, the plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired class; (2) the plan is feasible; and (3) the plan is in the "best interests" of holders of claims or interests. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 for plan confirmation.

### C. Best Interests of Creditors/Liquidation Analysis.

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find that a chapter 11 plan provides that in each impaired class each holder of a claim or an equity interest either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7. This requirement is often called the "best interest" test.

A plan is in the best interests of each impaired class when the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan. The Debtors believe that under the Plan all Holders of impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. Attached hereto as **Exhibit B** and incorporated herein by reference is the Liquidation Analysis that the Debtors prepared with the assistance of their advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in a substantially less value to Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the highly unique nature of the Debtors' assets, the time delay associated with the chapter 7 trustee's learning curve for these assets, and any upcoming lease expirations associated with the Debtors' properties. Recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs associated with the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' specialized assets, and these specific Chapter 11 Cases to complete the administration of the Estate. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Accordingly, the Debtors believe that a chapter 7 liquidation would not result in distributions as favorable as those under the Plan.

### D.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that neither liquidation nor the need for further financial restructuring of the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization) is likely to follow confirmation of a plan of reorganization.  The Debtors, with the assistance of their relevant advisors, have analyzed their ability to meet their respective obligations under the Plan to determine whether the Plan meets this feasibility requirement.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article VIII of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Mining Financial Projections are attached hereto as **Exhibit E** and incorporated by reference herein.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of Claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[706]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in a number of Allowed Claims in that class, counting only those Claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by Holders of at least two-thirds in amount of Allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such class.

### F.    Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired

---

[706]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. *No Unfair Discrimination.*

The "unfair discrimination" test applies to classes of Claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of Claims receive more than 100 percent of the amount of the Allowed Claims in the class. As to the dissenting class, the test sets different standards depending upon the type of Claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank, and in accordance with each class's legal rights. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    CERTAIN SECURITIES LAW MATTERS

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act, except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution and will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.

Securities issued in reliance upon section 1145 of the Bankruptcy Code to an entity that is not an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and

(a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable under U.S. federal securities laws by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of NewCo or the Post Effective Date Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, and (iii) is not an entity that is an "underwriter," as defined under section 1145(b) of the Bankruptcy Code.

Resales of NewCo Common Stock by entities deemed to be "underwriters" are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act. Under certain circumstances, holders of NewCo Common Stock who are deemed to be "underwriters" may be entitled to resell their NewCo Common Stock pursuant to the limited safe harbor resale provisions of rule 144 of the Securities Act ("Rule 144"). Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the applicable holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "controlling person") with respect to the NewCo Common Stock would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to NewCo Common Stock and, in turn, whether any person may freely resell NewCo Common Stock.

The issuance and sale of the NewCo Common Stock in connection with to the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder. Such NewCo Common Stock will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Debtors recommend that potential recipients of NewCo Common Stock consult their own counsel: (i) with respect to the NewCo Common Stock issued under the Plan, concerning whether such potential recipients will constitute "underwriters" pursuant to section 1145(b) of the Bankruptcy Code at the time of the issuance of the NewCo Common Stock; and (ii) the ability of such potential recipients to freely trade NewCo Common Stock in compliance with the federal securities laws and any applicable Blue Sky laws, including certain Blue Sky state notice requirements that may continue to apply with respect to resales of the NewCo Common Stock. The Debtors make no representation concerning the ability of a person to dispose of any NewCo Common Stock.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT AND STATE "BLUE SKY LAWS," INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL**

**RECIPIENTS OF PLAN TOKENS ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

## XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Post-Effective Date Debtors, and to Holders entitled to vote to accept or reject the Plan.  This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to Cryptocurrency in general, is subject to an unusually high level of uncertainty.  No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors, Holders, or Post-Effective Date Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances.  This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. Dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, non-income, or non-U.S. taxation is addressed.  Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC).  This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Post-Effective Date Debtors are, or will be, a party to will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC.  This preliminary overview does not discuss

differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Post-Effective Date Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Post-Effective Date Debtors engage in.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of Cryptocurrency deposits that customers made to the Debtors in connection with the Borrow Program and the Earn Program when customers made such deposits.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in such deposited Cryptocurrency.  On the other hand, the below discussion assumes that the Debtors did not obtain tax ownership of Cryptocurrency deposits that customers made to the Debtors in connection with the Custody Program.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors did not have the right to transfer, rehypothecate, or otherwise deal in such deposited Cryptocurrency.  If the Debtors were determined to not have tax ownership of Cryptocurrency received in connection with the Borrow Program or the Earn Program, or to have tax ownership of Cryptocurrency received in connection with the Custody Program, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The Plan may be effectuated through either the NewCo Transaction or the Orderly Wind Down.

In the case of the NewCo Transaction, the Debtors would, among other things, (x) make "in-kind" distributions of Liquid Cryptocurrency to certain Holders in partial satisfaction of certain Claims related to deposits (including, for the avoidance of doubt, Claims with respect to both the Borrow Program and Earn Program) of Cryptocurrency, and (y) sell in a taxable transaction some of its assets to NewCo or a subsidiary thereof in exchange for NewCo Common Stock (which NewCo Common Stock the Debtors would then transfer to certain Holders in partial satisfaction of certain Claims pursuant to the Plan) and an assumption of certain liabilities.  As a result and in connection therewith, the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets.  Amounts subject to the Liquid Cryptocurrency distribution referenced above will, from the Debtors' perspective, result in the recognition of income equal to the difference between the value of what Holders receive in exchange for their Claims (including any in-kind distribution) and the amount of their Claims (determined without regard to "dollarization" of such Claims).  Income generated in connection with the foregoing will be reduced by the amount of tax attributes (if any) and other deductions (including with respect to certain intercompany obligations among the Debtors) (if any) available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.

In the case of an Orderly Wind Down, the Debtors would, among other things, (x) make "in-kind" distributions of Liquid Cryptocurrency to certain Holders in partial satisfaction of certain Claims related to deposits of Cryptocurrency (with the same treatment to the Debtors as described immediately above), (y) potentially sell certain assets to third parties or otherwise monetize assets (resulting in gain or loss to the Debtors in an amount equal to the difference between the value of the consideration received by the Debtors and the Debtors' tax basis in such assets), and (z) potentially distribute Cash and/or property to Holders in satisfaction of Claims (resulting in income equal to the difference between the value of what Holders receive in exchange for their Claims (including any in-kind distribution) and the amount of their Claims (determined without regard to "dollarization" of such Claims).  As above, income will be reduced by the amount of tax attributes (if any) and other deductions (including with respect to certain intercompany obligations among the Debtors) (if any) available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.

Thus, the U.S. federal income tax consequences of the Restructuring Transactions to the Debtors will in large part be a function of (a) the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, (b) the difference between the value of what Holders receive in exchange for their Claims and the amount of their Claims, and (c) the Debtors' ability to demonstrate the existence of tax losses, including losses that may be generated as a result of the implementation of the Restructuring Transactions and historically incurred losses.  There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of Cryptocurrency to a business like that of the Debtors (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such Cryptocurrency) or the transferee's utilization of the transferred Cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale).  Accordingly, there is significant uncertainty with respect to the tax consequences of the Restructuring Transactions to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' Cryptocurrency.  Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Restructuring Transactions, potentially in a way that has a materially adverse impact on the Debtors.  The Debtors, together with their advisors, continue to study this issue.

Regardless of how the Debtors consummate the Plan, it will likely be necessary to transfer property from non-U.S. Debtors to U.S. Debtors.  Any such transfer may directly or indirectly create a material tax liability under non-U.S. tax law, which is not discussed here, and which the Debtors continue to evaluate.

Because the Plan is being structured as a taxable transaction or a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further with respect to the Debtors.

The Debtors continue to evaluate how "dollarization" of certain Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.

The Debtors currently cannot say that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

C.    **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to any U.S. Holder of such a Claim which U.S. Holder will or may receive an in-kind distribution of Liquid Cryptocurrency pursuant to the Plan (either upfront, or a delayed distribution as part of an Orderly Wind Down) which Cryptocurrency (x) the Debtors took U.S. federal income tax ownership of upon such Holder's transfer of such Cryptocurrency to the Debtors, and (y) is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date.

The tax treatment of such Holders under the Plan depends significantly on the tax treatment of their transfer of Cryptocurrency to the Debtors in the first instance. There is uncertainty with respect to whether deposits in which tax ownership of the Cryptocurrency transferred to the Debtors were taxable when they occurred, but the Debtors generally expect that most customers have taken the position that the act of depositing Cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of Cryptocurrency for a contractual right to the return of such Cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on case law that predates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, with respect to customers, there is also support for the position that the initial deposit of Cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited Cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" Cryptocurrency or Cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of Cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of the same kind of Cryptocurrency to customers, because the exchange of the contractual right to such Cryptocurrency for the underlying Cryptocurrency is itself not an exchange of property "differing materially either in kind or in extent." The Debtors emphasize that, like other aspects of Cryptocurrency taxation, this position is subject to significant uncertainty, including because of the existence of Proposed Treasury Regulation Section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities transferred, or otherwise defaults under the agreement. While this Proposed Treasury Regulation is inapplicable by its terms to Cryptocurrency,  it would very likely cause such a transaction to be taxable to a customer (or other Person that transferred Cryptocurrency to the Debtors in a transaction (such as a "loan" (for commercial purposes but not tax purposes) of Cryptocurrency) intended to be treated as non-taxable in the first instance) if it applied to Cryptocurrency.    Furthermore,  with  respect  to  a  Holder  that  receives  Cryptocurrency  and

non-Cryptocurrency in satisfaction of its Claim, if the foregoing argument would apply in the first place to a recovery that comprised solely Cryptocurrency, such argument would need to be supplemented by a general "bifurcation" approach that permitted Holders to take the position that Holders retained their Cryptocurrency positions in a tax-free manner, even if the receipt of other consideration constituted a taxable exchange. The Debtors emphasize that these positions are unclear.

For Holders whose claims are "dollarized,"[707] the ability to take the position that an in-kind distribution of Liquid Cryptocurrency is not taxable to Holders is subject to increased risk as a result of such "dollarization" of Claims. It may be the case that "dollarization" resulted, or will result, in a taxable event to Holders, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular Cryptocurrency was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the argument described above that supports tax-free treatment of an in-kind distribution could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying Cryptocurrency. However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to underlying entitlements to cause tax events, either because of dollarization in the first instance or to the extent of an in-kind distribution.

Notwithstanding the foregoing uncertainty, the following intended tax treatment is set forth in the Plan: "the Debtors and Holders of Claims will treat and report the return of Liquid Cryptocurrency to Holders of Claims under the Plan, to the extent such amounts are of the same type of Cryptocurrency in which a Holder's Claim was denominated, as a non-taxable transaction to such Holder, except to the extent otherwise required pursuant to a 'final determination' within the meaning of section 1313(a) of the Code." In other words, and very generally, the Plan provides that the Debtors and such Holders of Claims will treat the return of such Cryptocurrency as a non-taxable event from the Holders' perspective unless, among other things, a court requires otherwise. The Debtors are not guaranteeing or otherwise making any promises or giving any assurances as to whether such intended tax treatment will be upheld if challenged by any taxing authority.

The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of Cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty. Although there are instructive analogous authorities, there is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described throughout this discussion (including any intended tax treatment) may not be sustained. The concept of a non-taxable in-kind distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in-kind to a Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors. Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).

### 3. Class 2 Retail Borrower Deposit Claims.

In satisfaction of its Claim, each Holder of a Retail Borrower Deposit Claim shall receive one of the following treatments: (1) If the Retail Borrower, (i) makes the Retail Advance Obligation Repayment

---

[707]    In general, all Claims were "dollarized" as of the Petition Date.

Election and (ii) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Repayment Amount or (2) If the Retail Borrower (i) does not make the Retail Advance Obligation Repayment Election or (ii) fails to repay its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (1) above. Under the Set Off Treatment, such Holder's Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligations outstanding on the Petition Date, and the Retail Borrower will retain the proceeds of its Retail Advance Obligation and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date.

The Retail Borrower Post-Set Off Claim, if any, will receive either (i) in a NewCo Transaction, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its pro rata amount of the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable (provided that, for the avoidance of any doubt, any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections). or (ii) in an Orderly Wind Down, its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. In connection with the above treatment, any interest accrued in respect of a loan owed to the Debtors on and following the Petition Date will not need to be paid or subject to the Set Off Treatment (*i.e.*, it is not included in the definition of Retail Advance Obligation).

Under treatment (1), the repayment of Retail Advance Obligations would be a tax-free transaction to the Class 2 Holder because such repayment would not involve a disposition of Cryptocurrency. To the extent any Cryptocurrency that a U.S. Holder of a Class 2 Claim receives in satisfaction of its Claim under treatment (1) is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

If such tax-free treatment did not apply with respect to such consideration, and with respect to any consideration that a U.S. Holder of a Class 2 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder, with the consequences described below for a Class 4 Holder.

Under treatment (2) (the Set Off Treatment), the setoff would be a taxable transaction to the Class 2 Holder. The setoff could be treated as a disposition of the applicable portion of the Cryptocurrency that such Holder transferred in connection with such Retail Advance Obligation ("Deposit Claim Assets") by the Debtors on behalf of the Holder (following a deemed distribution of such Deposit Claim Assets to such Holder) and the application of the resultant proceeds to such Holder's Retail Advance Obligations. Under such treatment, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Retail Advance Obligations and its adjusted tax basis in the applicable portion of the Deposit Claim Assets. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Deposit Claim Assets constituted a capital asset in the hands of the U.S. Holder, and, potentially, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Under this treatment, there is some amount of uncertainty with respect to how a Holder with differing amounts of tax basis in its deposited Cryptocurrency would calculate taxable income or loss, because it is unclear what portion of the Holder's Cryptocurrency would be treated as having been sold by the Debtors on the Holder's

behalf.  One possibility is that a "blended" approach would be applied, another is that a Holder could specifically identify lots of Cryptocurrency that are treated as having been sold.

Another possible tax treatment is that the setoff could be treated as a taxable disposition of the applicable portion of such Holder's Retail Borrower Deposit Claim in satisfaction of the Holder's Retail Advance Obligations.  If such treatment applied, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Retail Advance Obligations and its adjusted tax basis in the applicable portion of the Retail Borrower Deposit Claim.  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

For the treatment of the Retail Borrower Post-Set Off Claim under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down), see the sections below discussing the tax consequences to General Earn Claims (for the consequences of receiving the Unsecured Claim Distribution Consideration pursuant to a NewCo Transaction or for the consequences of an Orderly Wind Down) or Convenience Claims (for the consequences of receiving the Convenience Class Distribution pursuant to a NewCo Transaction), as applicable.

As noted above, under the Plan, an obligor under a Retail Advance Obligation will not need to pay interest that otherwise would have accrued on and following the Petition Date.  The consequences of that are unclear.  It is possible that the treatment of postpetition interest under the Plan could cause an obligor to recognize cancellation of indebtedness income ("COD Income"), because such obligor is being relieved from the need to pay such interest or otherwise suffer any economic consequence as a result of such interest.  Alternatively, an obligor may be able to take the position that no COD Income should arise as a result of the treatment of such interest under the Plan.  Such a position could be supported by the application of the so-called "disputed claims doctrine," pursuant to which the cancellation or settlement of an obligation that is the subject of a bona fide dispute as to its existence or enforceability.  In light of the circumstances surrounding Retail Advance Obligations and postpetition interest in respect of such amounts, the Debtors acknowledge that an obligor may take the view that such interest never would have been owed under the relevant contract, even if the Debtors had not made the decision to not attempt to collect such interest (or subject such interest to the Set Off Treatment).   There may be other arguments that an obligor could assert to avoid recognizing COD Income as a result of interest under the Plan.  Obligors should consult their own tax advisors regarding the tax consequences of the treatment of postpetition interest under the Plan.

4.    *Class 4 Convenience Claims.*

In satisfaction of its Claim, each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

To the extent any such consideration that a U.S. Holder of a Class 4 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

If such tax-free treatment did not apply with respect to such consideration, or with respect to any consideration that a U.S. Holder of a Class 4 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder.  In such case, such U.S. Holder would recognize gain or loss

in an amount equal to the difference between the fair market value of such consideration received under the Plan and such U.S. Holder's adjusted tax basis in the Claim (this assumes that all of the consideration is received in a taxable fashion; see immediately below for a discussion of a bifurcated approach). The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in such consideration should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in such consideration should begin on the day after the Effective Date.

Where a Holder receives some consideration tax-free and other consideration that is taxable (*e.g.*, some but not all of the consideration that a U.S. Holder of a Class 4 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date), such U.S. Holder would recognize gain or loss in an amount equal to the difference between (x) the fair market value of such consideration received under the Plan in a taxable fashion, and (y) while subject to uncertainty, a proportionate portion of the tax basis in such Claim (possibly based on relative fair market values of the consideration received in a tax-free fashion and the consideration received in a taxable fashion, although other potential ways of calculating gain or loss may exist). The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in any consideration received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

For a very simplified numerical example of the abovementioned methodology (which, for the avoidance of doubt, may be one among others) for determining gain or loss where a Holder receives some consideration tax-free and other consideration that is taxable, assume the following: (a) such Holder has a basis in its Claim of $1,000; (b) such Claim corresponds entirely to Bitcoin that such Holder previously deposited with the Debtors; and (c) such Holder receives, in satisfaction of its Claim, Bitcoin worth $3,000 and Ethereum worth $2,000. Pursuant to the above methodology, the Holder would have gain equal to the difference between (x) $2,000 (the fair market value of the Ethereum), and (y) [$2,000 / ($3,000 + $2,000)] x $1,000, i.e., $1,600 of gain.

     5.   *Class 5 General Earn Claims.*

     (a)     <u>NewCo Transaction.</u>

In a NewCo Transaction, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall, in satisfaction of its Claim, receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

To the extent any such consideration constituting Liquid Cryptocurrency that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

If such tax-free treatment did not apply with respect to such consideration constituting Liquid Cryptocurrency, and with respect to any consideration (including, for the avoidance of doubt, NewCo Common Stock, the receipt of which will be taxable to a U.S. Holder) that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder, with the consequences described above for a Class 4 Holder.

It is generally expected that a Class 5 Holder should not be taxed on Litigation Proceeds until such Class 5 Holder actually receives such Litigation Proceeds (if at all) after the Effective Date.

(b)    Orderly Wind Down.

In an Orderly Wind Down, each Holder of an Allowed General Earn Claim shall in satisfaction of its Claim receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

To the extent any such consideration constituting the Liquid Cryptocurrency Distribution Amount that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

If such tax-free treatment did not apply with respect to such consideration constituting the Liquid Cryptocurrency Distribution Amount, or with respect to any consideration that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder, with the consequences described above for a Class 4 Holder.

It is generally expected that a Class 5 Holder should not be taxed on Litigation Proceeds or (if received after the Effective Date) Illiquid Recovery Rights until such Class 5 Holder actually receives such consideration (if at all) after the Effective Date, *provided* that if the consideration ultimately received in respect of the Illiquid Recovery Rights is Cryptocurrency that is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

6.    *Class 6A General Custody Claims.*

Each Holder of an Allowed Custody Claim shall in satisfaction of its Claim receive a distribution of Cryptocurrency, provided, the timing of such distribution and the amount of such distribution will depend on certain elections available to such Holders as described in the Plan. In particular, for a Holder that does not elect to participate in the Custody Settlement Motion and selects Treatment B on its Ballot, the Cryptocurrency associated with the applicable Allowed Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed Custody Claim, and the Litigation Administrator shall have a certain amount of time to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing.

The Debtors have taken the position that they never took ownership for U.S. federal income tax purposes of the Cryptocurrency that Holders of Custody Claims transferred to the Debtors in respect of such Custody Claims. As such, the Debtors believe that it is relatively clear that any such Cryptocurrency

that a Class 6 Holder receives in satisfaction of its Claim should be received by such Class 6 Holder in a tax-free manner so long as it is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, consistent with the intended tax treatment described above.

However, if any such Cryptocurrency is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then it is generally expected that the exchange will be taxable to the U.S. Holder to the extent of such different Cryptocurrency. There is significant uncertainty as to the characterization of the deemed transaction or transactions that would have to occur in order to explain (for tax purposes) how the U.S. Holder receives property other than the property that such U.S. Holder transferred to the Debtors (with the Debtors not initially taking tax ownership of such property), and any Holder in such position is urged to consult its own tax advisors with respect thereto. The Debtors intend to take the position that the appropriate characterization of such transaction is that the Debtors are treated as having exchanged the originally-deposited Cryptocurrency for the type of Cryptocurrency returned in respect of such Claim on the Holder's behalf, resulting in a taxable exchange for such Holder.

### 7. Class 7 Withhold Claims.

In satisfaction of its Claim, each Holder of an Allowed Withhold Claim[708] that is not an Excluded Party shall receive, as applicable: (1) if Class 7 votes to accept the Plan, (a) a distribution of Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure, and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock); or (2) if Class 7 does not vote to accept the Plan, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In an Orderly Wind Down, the above (1) and (2) shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

The U.S. federal income tax consequences to a Holder of an Allowed Withhold Claim of receiving consideration under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down) should be the same as for a Holder of an Allowed General Earn Claim.

### 8. Class 8 Unsecured Loan Claims.

In a NewCo Transaction, in satisfaction of its Claim, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In an Orderly Wind Down, in satisfaction of its Claim, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

---

[708] This discussion is only with respect to Holders of Class 7 Claims who initially participated in the Earn Program or Borrow Program (as opposed to other Holders of Class 7 Claims, if any). With respect to those other Holders of Class 7 Claims, it is generally expected that their treatment will be the same as a Holder of a Class 6A Claim to the extent any exist.

The exchange will be taxable to the U.S. Holder. The U.S. Holder will recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down) and such U.S. Holder's adjusted tax basis in the Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in any such property should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such property should begin on the day after the Effective Date.

### 9. Class 9 General Unsecured Claims.

In a NewCo Transaction, in satisfaction of its Claim, each Holder of an Allowed General Unsecured Claim shall receive Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock) sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in Article III.E of the Disclosure Statement.

In an Orderly Wind Down, in satisfaction of its Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

The treatment to each such Holder under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down) will be as described for Holders of Allowed Class 8 Claims.

### 10. Class 14 Series B Preferred Interests.

In satisfaction of its Claim, each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to the Series B Settlement Order.

Because a Holder of an Allowed Series B Preferred Interest will have no continuing interest in NewCo after the Effective Date, the exchange will be treated as a redemption for U.S. federal income tax purposes and will therefore be taxable to such Holder. Such Holder will recognize gain or loss in an amount equal to the difference between the fair market value of such Pro Rata share of the Series B Settlement Consideration and such U.S. Holder's adjusted tax basis in the Claim. In light of the terms of the Series B Settlement, which provides for a payment of approximately $25 million, of which $24 million is owed to counsel for Series B Holders, it is somewhat unclear whether Holders should be treated for U.S. federal income tax purposes as receiving as consideration under the Series B Settlement $25 million or $1 million. While not free from doubt, if a Holder was treated as receiving its Pro Rata share of $25 million (*i.e.*, the Cash settlement amount *gross* of fees), a Holder would potentially be able to reduce its Pro Rata share of such amount realized by its Pro Rata allocation of the fees incurred in connection with receiving such recovery or, potentially, claim a deduction in respect of the incurrence of such fees. Alternatively, while not free from doubt, if a Holder was treated as receiving its Pro Rata share of $1 million (*i.e.*, the Cash settlement amount *net* of fees), then such Holder would presumably not be entitled to also capitalize or deduct the associated legal fees. Holders of Allowed Series B Preferred Interests should consult their own tax advisors regarding the appropriate treatment of the Series B Settlement Consideration.

*11. Net Investment Income Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

*12. Limitations on Use of Capital Losses.*

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Consideration Received Under the Plan.**

*1. Cryptocurrency.*

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party Cryptocurrency exchange (if any) to which such Holder transfers any such Cryptocurrency, and (ii) the activities that such Holder and/or such third-party Cryptocurrency exchange (if applicable) pursue with respect to such Cryptocurrency. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Cryptocurrency (regardless of how the Restructuring Transactions are consummated).

*2. NewCo Common Stock.*

Any distributions made on account of the NewCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of NewCo as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its NewCo Common Stock. Any such distributions in excess of the U.S. Holder's basis in its NewCo Common Stock (determined on a share-by-share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

308

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of NewCo Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the NewCo Common Stock for more than one year, taking into account the holding period rules described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

E.    **Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder and the ownership and disposition of NewCo Common Stock, as applicable.

1.    *Gain Recognition.*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. ***The taxation of Cryptocurrency is extremely uncertain, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Cryptocurrency-related activities (including activities on exchanges such as the Debtors').***

2.    *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan.*

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party Cryptocurrency exchange (if any) to which such Holder transfers any such Cryptocurrency, and (ii) the activities that such Holder and/or such third-party Cryptocurrency exchange (if applicable) pursue with respect to such Cryptocurrency. Non-U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Cryptocurrency (regardless of how the Restructuring Transactions are consummated).

3. *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of NewCo Common Stock Received Under the Plan.*

    (a)    <u>Dividends on NewCo Common Stock.</u>

Any distributions made with respect to NewCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of NewCo's current or accumulated earnings and profits as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain).  Except as described below, such dividends paid with respect to NewCo Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to NewCo Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

    (b)    <u>Sale, Redemption, or Repurchase of NewCo Common Stock.</u>

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of stock unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such stock is or has been during a specified testing period a "U.S. real property holding corporation" under the Foreign Investment in Real Property Tax Act rules.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

F.      FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

G.      Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO**

**CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

## XIII.    RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated: August 9, 2023                    Celsius Network LLC
                                         on behalf of itself and all other Debtors

                                         _/s/ Christopher Ferraro_
                                         Name:  Christopher Ferraro
                                         Title:   Interim Chief Executive Officer, Chief Financial
                                                  Officer, and Chief Restructuring Officer
                                                  Celsius Network LLC

**<u>Exhibit A</u>**

**Plan of Reorganization**

[*Filed Separately*]

**<u>Exhibit B</u>**

**Liquidation Analysis**

## EXHIBIT B

## LIQUIDATION ANALYSIS

**INTRODUCTION**

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that each holder of a claim or interest in each impaired class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests test, the Debtors, with the assistance of their financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") and have taken the following steps:

i)    estimated the cash proceeds that a chapter 7 trustee (a "**Trustee**") would generate if each Debtor's chapter 11 case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated (the "**Liquidation Proceeds**");

ii)   determined the distribution that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme set forth in chapter 7 of the Bankruptcy Code (the "**Liquidation Distribution**"); and

iii)  compared each Holder's Liquidation Distribution to the distribution such Holder would receive under the Debtors' Plan if the Plan were confirmed and consummated.

This Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is, therefore, a hypothetical analysis based on certain assumptions discussed herein and in the Disclosure Statement. As such, asset values and claims discussed herein may differ materially from amounts referred to in the Plan and Disclosure Statement. This Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement to which this Liquidation Analysis is attached as <u>Exhibit B</u> or the Plan attached to the Disclosure Statement as <u>Exhibit A</u> thereto, as applicable.

All limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein.   The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants and was not prepared to comply with Generally Accepted Accounting Principles or SEC reporting requirements.

Based on this Liquidation Analysis, the Debtors, with the assistance of their advisors, believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.   The Debtors believe that this Liquidation Analysis and the conclusions set forth herein are fair and represent the Debtors' best judgment regarding the results of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THESE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7 LIQUIDATIONS, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH IN THIS LIQUIDATION ANALYSIS.

**BASIS OF PRESENTATION**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation commences on or about November 30, 2023 (the "**Liquidation Date**").   The pro forma values referenced herein are projected as of the Liquidation Date and utilize (i) a valuation of certain of the Debtors' assets prepared by Stout Risius Ross, LLC as of May 31, 2023 (the "**Valuation Report**"), (ii) input from the Debtors' management team and advisors, and (iii) projected results of operations and cash flows over the period from May 31, 2023 to the Liquidation Date (the "**Projection Period**").   The Liquidation Analysis was prepared on a legal entity basis for each Debtor and, for presentation purposes, summarized into a consolidated report.   As part of the Liquidation Analysis, the Debtors assume the Trustee would liquidate each of the Debtors and each of the wholly-owned non-filing subsidiaries of the Debtors.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on scheduled liabilities as of the Petition Date and certain Filed claims following the Petition Date and during the Projection Period.   The cessation of business in a liquidation is likely to trigger certain claims and funding requirements that would otherwise not exist under the Plan.   Such claims could include contract rejection damages claims, chapter 7 administrative expense claims, including wind down costs, trustee fees, and professional fees, among other claims.   Some of these claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from Liquidation Proceeds.   The Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM OR

INTEREST BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

The Liquidation Analysis assumes Celsius Network Limited, Celsius Network LLC, Celsius Networks Lending LLC, and Celsius Lending LLC (the "**Consolidated Debtors**") are substantively consolidated for purposes of the Plan, subject to the following: (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.

To the extent the consolidation of the Consolidated Debtors is not approved under the Plan, the Debtors, with the assistance of their advisors, still believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the Liquidation Proceeds prior to proceeds being made available for distribution to Holders of Allowed Claims. Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

The commencement of chapter 7 liquidation may trigger certain additional claims that would otherwise not exist under the Plan, such as contract rejection damage claims, that are not reflected herein. Additionally, the Liquidation Analysis does not estimate contingent, unliquidated claims, regulatory claims, or the Class Claim Filed by the Committee. Finally, the Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets. Such tax consequences could be material.

Proceeds available for distribution to Holders of Allowed Claims under the Liquidation Analysis are reduced by the Initial Litigation Funding Amount. The Liquidation Analysis does not include any recoveries from the Litigation Recovery Account, as any such recoveries, including their amounts and frequencies, are uncertain.

**LIQUIDATION PROCESS**

The Debtors' liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code. The Debtors have assumed that their liquidation would occur over a period of approximately six

months (the "**Liquidation Period**") during which time the Trustee would monetize substantially all the assets on the consolidated balance sheet and administer and wind down the Estates.[2]

As part of the Trustee's liquidation process, the initial step would be to develop a liquidation plan designed to generate proceeds from the sale of assets that the Trustee would then distribute to creditors. The Liquidation Analysis assumes all Liquid Cryptocurrency is sold. This liquidation process would have four major components:

    i) Cash proceeds from asset sales, including the sale of all Cryptocurrency, illiquid assets, and the mining assets ("**Gross Liquidation Proceeds**");

    ii) Costs to liquidate the business and administer the Estates under chapter 7 ("**Liquidation Adjustments**");

    iii) Redistribution of assets on account of intercompany claims and interests ("**Intercompany Redistributions**"); and

    iv) Remaining proceeds available for distribution to claimants ("**Net Liquidation Proceeds Available for Distribution**").

**i)  Gross Liquidation Proceeds**

The Gross Liquidation Proceeds reflect the estimated proceeds the Trustee would generate from a hypothetical chapter 7 liquidation. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries. This Liquidation Analysis assumes the Trustee will market the assets on an accelerated timeline and consummate the sale transactions within six months from the Liquidation Date. The Liquidation Analysis assumes the sale of all Cryptocurrency for Cash, including Liquid Cryptocurrency and other illiquid Cryptocurrency investments. Asset values in the liquidation process will likely be materially reduced due to, among other things, (i) the accelerated time frame in which the assets are marketed and sold, (ii) negative vendor and customer reaction, and (iii) the generally forced nature of the sale.

The Trustee would also seek to sell substantially all of the Debtors' mining assets on an expedited basis, consistent with section 704 of the Bankruptcy Code. It is unlikely that a Trustee would be able to sell the assets as a going-concern business, and the total proceeds from the sale of the mining assets may be materially lower than the value that would otherwise be realized under the Plan.

**ii)  Liquidation Adjustments**

Liquidation Adjustments reflect the costs the Trustee would incur to monetize the assets and wind down the Estates in chapter 7 and include the following:

---

[2]    Although the Liquidation Analysis assumes the liquidation process would occur over a period of six months, it is possible the disposition and recovery from certain assets could take shorter or longer to realize.

- Expenses necessary to efficiently and effectively monetize the assets (the "**Liquidation Costs**");

- Chapter 7 professional fees (lawyers, financial advisors, and investment bankers to support the sale and transition of assets over the Liquidation Period); and

- Chapter 7 Trustee fees.

### iii) Intercompany Redistributions

For purposes of determining the recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor affiliates and (ii) the Debtors' equity interests in non-Debtor affiliate subsidiaries, individual liquidation analyses were performed on each Debtor and non-Debtor affiliate on a standalone basis. When a Debtor has an intercompany receivable or interest in another Debtor, this serves to redistribute proceeds available for distribution amongst each Debtor entity.

### iv) Net Liquidation Proceeds Available for Distribution

The Net Liquidation Proceeds Available for Distribution reflect estimated amounts available to Holders of Claims and Interests after the Liquidation Adjustments are netted against the Gross Liquidation Proceeds. Under this analysis, the Liquidation Proceeds are distributed to Holders of Claims against, and Interests in, the Debtors in accordance with the Bankruptcy Code's priority scheme.

**CONCLUSION**

The Debtors have determined, as summarized in the table below, on the Effective Date, that the Plan, under both a NewCo Plan or a toggle to Orderly Wind Down, will provide all Holders of Allowed Claims and Interests with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code. [3]

| | | Recovery Under Plan | | |
| | Class | NewCo | Orderly Wind Down | Liquidation Analysis |
|---|---|---|---|---|
| Other Secured Claims | Class 1 | N/A | N/A | N/A |
| Retail Borrower Deposit Claims | Class 2 | 85.6% | 83.0% | 47.4% |
| Other Priority Claims | Class 3 | N/A | N/A | N/A |
| Convenience Claims | Class 4 | 70.0% | 70.0% | N/A |
| General Earn Claims | Class 5 | 67.0% | 61.2% | 47.4% |
| General Custody Claims[1] | Class 6A | 72.5% | 72.5% | 72.5% |
| Withdrawable Custody Claims[1] | Class 6B | 100.0% | 100.0% | 100.0% |
| Withhold Claims | Class 7 | 72.0% | 67.1% | 47.4% |
| Unsecured Loan Claims | Class 8 | 67.0% | 61.2% | 47.4% |
| General Unsecured Claims | Class 9 | 67.0% | 61.2% | 37.5% |
| State Regulatory Claims[2] | Class 10 | 0.0% | 0.0% | 0.0% |
| *De Minimis* Claims | Class 11 | 0.0% | 0.0% | 0.0% |
| Intercompany Claims | Class 12 | N/A | N/A | 47.3% |
| Intercompany Interests | Class 13 | N/A | N/A | N/A |
| Series B Preferred Interests | Class 14 | 0.1% | 0.1% | 0.1% |
| Other Interests | Class 15 | 0.0% | 0.0% | 0.0% |
| Section 510(b) Claims | Class 16 | N/A | N/A | N/A |
| Equitably Subordinated Claims | Class 17 | 0.0% | 0.0% | 0.0% |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*
*(2) The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators*

**The Liquidation Analysis should be reviewed with the accompanying "Specific Notes to the Liquidation Analysis" set forth on the following pages. The below tables reflect the consolidation of the standalone liquidation analyses for each Affiliate Debtor for illustrative purposes.**

---

[3] Recoveries shown in the table do not contemplate any Allowed Claims on account of contingent, unliquidated claims, regulatory claims, or the Class Claim brought by the Committee.

## Consolidated Debtor Liquidation Waterfall

| USD $ in Millions | Notes | Assets 5/31/2023 | Adj. | Pro Forma | Estimated Recovery - % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Liquidation Proceeds** | | | | | | | | | | |
| **Liquidated Balance Sheet** | | | | | | | | | | |
| Cash | [A] | $ 92 | $ (92) | $ - | - | - | - | $ - | $ - | $ - |
| Fireblocks | [B] | 1,031 | (120) | 911 | 94% | 97% | 100% | 855 | 883 | 909 |
| Institutional Loans receivable | [C] | 75 | - | 75 | 28% | 37% | 47% | 21 | 28 | 35 |
| DeFi/Staking Assets | [D] | 1,653 | (56) | 1,597 | 91% | 94% | 98% | 1,456 | 1,509 | 1,558 |
| Custody Holdings | [E] | 160 | 93 | 253 | 90% | 95% | 99% | 228 | 241 | 250 |
| Investments | [F] | 129 | - | 129 | 25% | 50% | 75% | 32 | 64 | 97 |
| Retail Advance Obligation | [G] | 410 | (410) | - | - | - | - | - | - | - |
| Mining Assets | [H] | 565 | - | 565 | 12% | 16% | 19% | 70 | 88 | 105 |
| **Gross Liquidation Assets** | | $ 4,114 | $ (585) | $ 3,529 | 75% | 80% | 84% | $ 2,662 | $ 2,812 | $ 2,953 |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | | | |
| Liquidation Costs | [I] | | | | | | | (50) | (50) | (50) |
| Chapter 7 Professional and Broker Fees | [J] | | | | | | | (25) | (25) | (25) |
| Chapter 7 Trustee Fees | [K] | | | | | | | (80) | (84) | (89) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | | | $ (155) | $ (159) | $ (164) |
| **Net Liquidation Assets** | | | | | | | | $ 2,507 | $ 2,653 | $ 2,790 |
| **Redistribution on Account of Intercompany Claims and Interests** | | | | | | | | | | |
| Redistribution on Account of Pre-Petition Intercompany Balances | [L] | | | | | - | | - | - | - |
| Redistribution on Account of Post-Petition Intercompany Balances | [M] | | | | | | | 0 | 0 | 0 |
| Redistribution on Account of Intercompany Interests | [N] | | | | | | | 54 | 58 | 62 |
| **Total Recovery on Account of Intercompany Claims and Interests** | | | | | | | | $ 54 | $ 58 | $ 62 |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | | | | $ 2,562 | $ 2,711 | $ 2,852 |

| Claims and Recoveries | | Total Estimated Claim Petition Date | Adj. | Claim | Total Recovery - % Low | Mid | High | Total Recovery - $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Administrative Claims** | | | | | | | | | | |
| Administrative Claims | | 85 | - | 85 | 100% | 100% | 100% | 85 | 85 | 85 |
| Priority Tax Claims | | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims** | [O] | $ 85 | $ - | $ 85 | 100% | 100% | 100% | $ 85 | $ 85 | $ 85 |
| **Remaining Distributable Value after Administrative Claims** | | | | | | | | $ 2,477 | $ 2,626 | $ 2,767 |
| **Settled Claims** | | | | | | | | | | |
| Withdrawable Custody Claims[1] | [P] | 48 | - | 48 | 100% | 100% | 100% | 48 | 48 | 48 |
| General Custody Claims[1] | [Q] | 218 | - | 218 | 73% | 73% | 73% | 158 | 158 | 158 |
| **Total Settled Claims** | | $ 266 | $ - | $ 266 | 77% | 77% | 77% | $ 206 | $ 206 | $ 206 |
| **Remaining Distributable Value after Settled Claims** | | | | | | | | $ 2,270 | $ 2,419 | $ 2,560 |
| **Unsecured Claims** | | | | | | | | | | |
| General Earn Claims | [R] | 4,082 | - | 4,082 | 44% | 47% | 50% | 1,815 | 1,934 | 2,047 |
| Withhold Claims | [S] | 13 | - | 13 | 44% | 47% | 50% | 6 | 6 | 7 |
| Unsecured Loan Claims | [T] | 88 | - | 88 | 44% | 47% | 50% | 39 | 41 | 44 |
| Retail Borrower Deposit Claims | [U] | 763 | - | 763 | 44% | 47% | 50% | 339 | 361 | 382 |
| General Unsecured Claims | [V] | 50 | - | 50 | 35% | 37% | 40% | 17 | 19 | 20 |
| Intercompany Claims | | 121 | - | 121 | 44% | 47% | 50% | 54 | 57 | 60 |
| **Total Unsecured Claims** | | $ 5,117 | $ - | $ 5,117 | 44% | 47.287% | 50% | $ 2,270 | $ 2,419 | $ 2,560 |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | $ - | $ - | $ - |
| Redistribution on Account of Intercompany Interests | | | | | | | | - | - | - |
| **Remaining Distributable Value after Intercompany Interests** | | | | | | | | $ - | $ - | $ - |
| **Total Claims / Total Recovery** | | $ 5,468 | $ - | $ 5,468 | 47% | 50% | 52% | $ 2,562 | $ 2,711 | $ 2,852 |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*

SPECIFIC NOTES TO THE LIQUIDATION ANALYSIS

*Gross Liquidation Proceeds from External Assets*

The below table summarizes the estimated recovery percentages for each of the Debtors' assets. Net Liquidation Proceeds Available for Distribution resulting from the sales of non-Debtor assets are recovered by the Debtors via settlement of intercompany receivables and/or equity distributions taking into account the priority of claims that reside at each non-Debtor.

| Note | Asset Type / Assumptions | Debtors' Projected Recovery (Mid) |
|---|---|---|
| A | Cash consists of all unrestricted Cash deposits in savings, operating, receipt, and disbursement accounts. The valuation date Cash balance has been adjusted pro forma to the Liquidation Date, including monetization of coins in Fireblocks for the estimated cash shortfall to fund these Chapter 11 Cases through the Liquidation Date. | 100% |
| B | Fireblocks includes Liquid Cryptocurrency coins and tokens held on in Fireblocks. Although these coins and tokens are generally liquid and available to trade, certain coins have more liquidity than others on exchanges or the open market. BTC, ETH, and stablecoins are estimated to recover 95% to 100%, while less liquid alt coins are estimated to recover 50% to 90%. The blended recovery for assets in Fireblocks is estimated to be 94% to 100%. | 97% |
| C | Institutional Loans receivable reflects the receivable for principal issued to Holders of Institutional Loans<br><br>**Active Counterparties:**<br>Loans with active counterparties are estimated to recover 30% to 50% of their fair market value.<br><br>**Default Counterparties:**<br>The analysis assumes minimal or no recovery on defaulted loans. | 37% |
| D | DeFi/Staking Assets consist of Cryptocurrency directly staked on respective networks, undeployed ETH held in DeFi workspaces, and Cryptocurrency staked through Stakehound or placed onto DeFi protocols. Direct staked ETH and undeployed ETH in DeFi workspaces are assumed to be liquid prior to the Liquidation Date, and thus estimated to recover 95% to 100% similar to Cryptocurrency in Fireblocks. Stakehound and assets in | 94% |

| Note | Asset Type / Assumptions | Debtors' Projected Recovery (Mid) |
|---|---|---|
| | DeFi protocols are assumed to not be immediately available in liquidation and are estimated to recover 30% to 50%. The aggregate recovery on total DeFi/Staking Assets is estimated to be 91% to 98%. | |
| E | Custody Holdings reflect Cryptocurrency deposited into Custody Wallets that are assumed to be available to liquidate on or shortly after the Liquidation Date. Certain users were granted the ability to withdraw their Custody balances in advance of the Effective Date; however, the Liquidation Analysis reflects the estimated full Custody Asset amount for illustrative purposes. Cryptocurrency held in Custody is assumed to receive the same recovery by coin type as Fireblocks assets resulting in an estimated recovery of 90% to 99%. | 95% |
| F | Investments reflects alternative investments made in blockchain platforms, mining platforms, convertible notes and equity investments. The fair market value of these investments was estimated in the Valuation Report. An adjustment to the fair value of the investments was applied in the Liquidation Analysis due to the expedited sale of these assets and the uncertainty of recoverability, resulting in an estimate recovery of 25% to 75% of the fair market value. | 50% |
| G | The Liquidation Analysis assumes borrowers are unlikely to repay their Retail Advance Obligations and would not be granted the set-off against Retail Borrower Deposit Claims that is currently contemplated in the Plan. The Liquidation Analysis estimates 0% recovery on Retail Advance Obligations. | 0% |
| H | Mining Assets include mining hardware and proprietary mining sites owned by the Debtors. Although a valuation analysis was performed to value these assets, certain components were valued as a going concern. The Liquidation Analysis assumes that these rigs and proprietary sites will be liquidated on a condensed timeline and estimates a recovery of 12% to 19% of the fair market value of the going concern business. | 16% |

### *Liquidation Adjustments*

I.   Wind-Down Costs

Consist of employee costs; sales, general and administrative ("**SG&A**") expenses, third-party distribution fees, network fees, and expense reimbursement for plan termination.  Employee costs include payroll taxes, employee benefits and retention bonuses that may be necessary to retain certain employees to effectuate the liquidation.  Third-party costs to distribute represent fees paid to a third-party to meet certain regulatory requirements for customers (including "Know Your Customer" activities), set up receiving wallets, and manage distributions.  Total wind-down costs are estimated to be $50 million.

J.   Chapter 7 Professional Fees

The chapter 7 professional fees include estimates for certain professionals that will provide assistance and services to the Trustee during the Liquidation Period.  The Liquidation Analysis assumes the Trustee will retain lawyers, financial advisors, and investment bankers to assist in the liquidation.  These advisors will assist in marketing the Debtors' assets, litigating claims and resolving tax litigation matters, and resolving other matters relating to the liquidation of the Debtors' Estates.  The advisors will also collect broker fees for the sale of certain alternative investments.  Total professional fees are estimated to be $25 million.

K.   Trustee Fees

Section 326(a) of the Bankruptcy Code provides that Trustee fees may not exceed 3% of distributable proceeds *in excess* of $1 million.  The Liquidation Analysis assumes the Trustee fees would be approximately 3% of Gross Liquidation Proceeds from external assets, which equals approximately $80 million to $89 million, in the low and high cases, respectively.

### *Recovery on Intercompany Receivables and Interests*

For purposes of determining the recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor affiliates and (ii) the Debtors' equity interests in non-Debtor affiliate subsidiaries, individual liquidation analyses were performed on each Debtor and non-Debtor affiliate on a standalone basis.  The recoverability of the Debtors' intercompany receivables and investments in subsidiaries was calculated prior to determining the Net Liquidation Proceeds Available for Distribution to the Debtors' Claimants.

L.   Prepetition Intercompany Receivables

Historically, the Debtors and their Debtor and non-Debtor affiliates created intercompany receivables and payables primarily driven by the transfer of Cryptocurrency denominated assets and liabilities between entities.  The Liquidation Analysis does not assume any recoverability of prepetition intercompany receivables owed to the Debtors from non-Debtor affiliates.

M.  Postpetition Intercompany Balances

Intercompany receivables between Debtor and non-Debtor entities that occurred from postpetition transactions receive superpriority administrative expense status, in accordance with the *Final*

*Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152].

N.  Intercompany Interests

The Debtors' investments in affiliates and subsidiaries include the Debtors' equity interests in Debtor and non-Debtor affiliates.  The recoverability of the investments in affiliates and subsidiaries owed to the Debtors is estimated to be approximately $54 million to $62 million resulting from the remaining distributable assets from subsidiaries that are not distributed to Claimants at those entities.

**_Net Liquidation Proceeds Available for Distribution_**

Based on the Liquidation Analysis, the Net Liquidation Proceeds Available for Distribution to the Debtors' Holders of Claims and Interests range from approximately $2.6 billion to $2.9 billion.

**_Claims_**

O.  Administrative Claims

For the purposes of this Liquidation Analysis, Administrative Claims consist of claims for costs and expenses of administration incurred during the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, claims for postpetition accounts payable, postpetition accrued taxes, accrued and unpaid fees and expenses as of the Liquidation Date of professionals other than Debtor Professionals and Committee Professionals.  The Liquidation Analysis estimates approximately $85 million in Chapter 11 Administrative Claims at the Liquidation Date.  The Liquidation Analysis estimates 100% recovery to Chapter 11 Administrative Claims.

P.  Withdrawable Custody Claims

Consists of all Pure Custody Claims and Eligible Transferred Custody Claims that are eligible for withdrawal under the Custody Settlement Order.  These Claims are estimated to receive 100% recovery through in-kind distribution under the Liquidation Analysis rather than a percentage of their coins dollarized as of the Petition Date.

Q.  General Custody Claims

Consist of Claims from customers with deposits in Custody Wallets that were not permitted to withdraw under the Custody Settlement Order.  These claims are estimated to receive 72.5% recovery through in-kind Cryptocurrency distributions under the Liquidation Analysis rather than a percentage of their coins dollarized as of the Petition Date.

R.  General Earn Claims

General Earn Claims consist of user Cryptocurrency deposit balances in the Earn Program.  Cryptocurrency balances are dollarized as of the Petition Date except for CEL Tokens which

receive a claim of $0.25.  Total General Earn Claims are estimated to be approximately $4.1 billion and recover 44% to 50% in liquidation.

S.  Withhold Claims

Under a chapter 7 liquidation, the Withhold Settlement will not occur, and Withhold Claims will receive treatment *pari passu* to unsecured claims and receive a Pro Rata share of the Unsecured Claim Distribution Consideration.  Withhold Claims will receive an approximate recovery of 44% to 50%.

T.  Unsecured Loan Claims

Unsecured Loan Claims arise from borrowings made by the Debtors with institutional counterparties.  These counterparties have filed claims totaling $88 million and are estimated to recover 44% to 50% in liquidation.

U.  Retail Borrower Deposit Claims

Retail Borrower Deposit Claims represent the full balance of the Cryptocurrency transferred by Retail Borrowers in connection with their Retail Advance Obligations,[4] dollarized as of the Petition Date. Retail Borrower Deposit Claims are estimated to be $763 million and recover 44% to 50% in the Liquidation Analysis.

V.  General Unsecured Claims

Claims without security interests and not otherwise entitled to administrative or priority treatment including, but not limited to, prepetition trade amounts not paid pursuant to relief granted pursuant to the First Day Motions, rejected and contemplated rejection of executory contracts.  The Liquidation Analysis assumes there would be 35% to 40% recovery for General Unsecured Claims.

---

[4]    "Retail Advance Obligation" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

**Exhibit C**

**Orderly Wind Down Analysis**

## EXHIBIT C

## ORDERLY WIND DOWN

### INTRODUCTION

The Debtors will effectuate an Orderly Wind Down if, at any time prior to or after Confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; *provided* that the Debtors and Committee may move for an Orderly Wind Down by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court.

In the event of an Orderly Wind Down, (a) the Backup Plan Sponsor, with the support of the Debtors and their advisors, will wind down the Estates and (b) the Debtors' Cryptocurrency, Cash, and other assets will be distributed, in each case, in an orderly manner.

Upon the Debtors' determination, in consultation with the Committee, the Backup Plan Sponsor will adopt and implement the services detailed in the Backup Plan Sponsor Agreement,[1] and approve and oversee the investment policy, any policies regarding conflicts of interest, and all major investment and operational decisions of the Estates.  In accordance with the Plan Administrator Agreement and the Wind-Down Procedures, the Backup Plan Sponsor will perform the following services:

- Manage the Estates' day-to-day business and operations, including managing their liquidity and capital resources;

- Evaluate, manage, negotiate, and oversee the disposition of all or any part of the property or assets of the Estates;

- Establish a pure play, publicly traded mining business in which the Debtors' creditors will receive 100% of the equity interests;

- Oversee and manage the timely distributions of Liquid Cryptocurrency and equity interests in the mining business pursuant to the Plan and the Confirmation Order in an expeditious but orderly manner that does not unduly prolong the duration of such distributions; and

- Perform any other services for and on behalf of the Estates to the extent necessary or appropriate.

All limitations and risk factors set forth in the Disclosure Statement are applicable to this Orderly Wind Down and are incorporated by reference herein.  The underlying financial information in the Orderly Wind Down was not compiled or examined by independent accountants and was not prepared to comply with Generally Accepted Accounting Principles or SEC reporting requirements.

---

[1]    If the Debtors decide to pivot to the Orderly Wind Down, they may do so on terms set forth in the Backup Plan Sponsor Agreement or on terms that provide a better recovery to the Debtors' creditors than the Backup Plan Sponsor Agreement.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR THE BACKUP PLAN SPONSOR'S ABILITY TO ACHIEVE FORECASTED RESULTS.  IN THE EVENT THE PLAN IS CONVERTED TO AN ORDERLY WIND DOWN, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH HEREIN.

### BASIS OF PRESENTATION

The Orderly Wind Down has been prepared assuming that the Debtors, the Committee, and their respective advisors determine to toggle to an Orderly Wind Down that commences on or about November 30, 2023 (the "**Wind Down Date**").  The pro forma values referenced herein are projected as of the Wind Down Date and utilize (i) a valuation of certain of the Debtors' assets prepared by Stout Risius Ross, LLC as of May 31, 2023, (the "**Valuation Report**"), (ii) input from the Debtors' management team and advisors, and (iii) projected results of operations and cash flows over the period from May 31, 2023 to the assumed Wind Down Date (the "**Projection Period**").

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE FINANCIAL RESULTS AND MUST BE CONSIDERED.  ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

As part of the Orderly Wind Down, administration of the Debtors' assets (the "Wind Down Estate") would be assumed by the Backup Plan Sponsor to manage the wind down of the Debtors' operations and make timely distributions in accordance with the Plan.  In preparing the Orderly Wind Down, the Debtors estimated Allowed Claims based on scheduled liabilities as of the Petition Date and certain Filed Claims.  The commencement of an Orderly Wind Down may trigger certain additional Claims that would otherwise not exist under the Plan, such as contract rejection damage claims, that are not reflected herein.  Additionally, the Orderly Wind Down does not estimate contingent, unliquidated claims, regulatory claims, or the Class Claim brought by the Committee.  Finally, the Orderly Wind Down does not include estimates for the tax consequences that may be triggered upon the wind down and sale of assets.  Such tax consequences could be material.

The Orderly Wind Down may also result in additional fees that would otherwise not exist under the Plan for wind down Plan administration.  Some of these Claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from the distributable assets of the Estate.  The Debtors' estimates of Allowed Claims set forth in the Orderly Wind Down should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

Administrative expense claims that arise in an Orderly Wind Down would be paid in full from the Orderly Wind Down proceeds, prior to proceeds being made available for distribution to Holders of Allowed Claims.  Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in the Orderly Wind Down are estimated in accordance with the absolute priority rule.

NOTHING CONTAINED IN THE ORDERLY WIND DOWN IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM OR INTEREST BY THE DEBTORS.  THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE ORDERLY WIND DOWN.  THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

Proceeds available for distribution to Holders of Allowed Claims under the Orderly Wind Down are reduced by the Initial Litigation Funding Amount.  The Orderly Wind Down does not include any recoveries from the Litigation Recovery Account, as any such recoveries, including their amounts and frequency, are uncertain.

### WIND DOWN PROCESS

The Orderly Wind Down would be conducted pursuant to the Wind-Down Procedures and the Plan.  The Debtors have assumed that the wind down would occur over a period of approximately five years (the "**Wind Down Period**") during which time the Backup Plan Sponsor would monetize, in a value-maximizing, orderly process, substantially all the Debtors' non-mining assets while managing the day-to-day operations required to do so.[2]  Additionally, the Backup Plan Sponsor would work to establish a pure play, publicly traded mining business in which the Holders of Allowed Claims would receive 100% of the equity interests.

As part of the Wind-Down Procedures, an asset sale process would be established to generate proceeds from the sale of assets that would then be distributed to creditors.  This wind down process would include three major components:

i)  **Proceeds:**  Liquid Cryptocurrency, proceeds from asset sales, and the equity in a pure play, publicly traded mining business (collectively, the "**Gross Wind Down Proceeds**"):

---

[2]    Although the Orderly Wind Down assumes the Wind Down Period would occur over a period of five years, it is possible the disposition and recovery from certain assets could take shorter or longer to realize.

ii) **Expenses:** fees and expenses to administer the wind down ("**Orderly Wind Down Expenses**"); and

iii) **Recoveries:** periodic distributions of Liquid Cryptocurrency and equity in the mining business to Claimants resulting from the Orderly Wind Down ("**Wind Down Recoveries**").

## i) Gross Wind Down Proceeds

The Gross Wind Down Proceeds reflect total Liquid Cryptocurrency, proceeds generated from the sale and collection of assets during the Wind Down Period, and equity in the publicly traded mining business. This Orderly Wind Down assumes assets are marketed in a value-maximizing manner over the Wind Down Period. The proceeds are expected to be greater than those that would be realized under a Chapter 7 liquidation due to, among other factors, (i) the longer time frame under which assets will be sold, (ii) the ability to operate the Wind Down Estate to earn yield/interest on certain assets, and (iii) the industry knowledge and network of the Backup Plan Sponsor to monetize assets at or near market values. Additionally, the Gross Wind Down Proceeds include the equity in a pure play, publicly traded mining business, which the Backup Plan Sponsor will seek to establish with the Debtors' mining assets.

## ii) Orderly Wind Down Expenses

The Orderly Wind Down Expenses reflect the fees incurred and paid to the Backup Plan Sponsor as defined in the Backup Plan Sponsor Agreement, professional fees, and operating expenses incurred by the Wind Down Estate over the Wind Down Period.

## iii) Wind Down Distributions

The Wind Down Distributions represent periodic distributions of assets made by the Backup Plan Sponsor to claimants pursuant to the Wind-Down Procedures and the Plan.

## CONCLUSION

The table below summarizes the projected recoveries to Holders of Allowed Claims under the Orderly Wind Down.[3]

| $ in millions | Class | Recovery % |
|---|---|---|
| Other Secured Claims | Class 1 | N/A |
| Retail Borrower Deposit Claims[1] | Class 2 | 83.0% |
| Other Priority Claims | Class 3 | N/A |
| Convenience Claims | Class 4 | 70.0% |
| General Earn Claims | Class 5 | 61.2% |
| General Custody Claims[2] | Class 6A | 72.5% |
| Withdrawable Custody Claims[2] | Class 6B | 100.0% |
| Withhold Claims | Class 7 | 67.1% |
| Unsecured Loan Claims | Class 8 | 61.2% |
| General Unsecured Claims | Class 9 | 61.2% |
| State Regulatory Claims[3] | Class 10 | 0.0% |
| De Minimis Claims | Class 11 | 0.0% |
| Intercompany Claims | Class 12 | N/A |
| Intercompany Interests | Class 13 | N/A |
| Series B Preferred Interests | Class 14 | 0.1% |
| Other Interests | Class 15 | 0.0% |
| Section 510(b) Claims | Class 16 | N/A |
| Equitably Subordinated Claims | Class 17 | 0.0% |

*(1) Holders of Retail Borrower Deposit Claims will receive a 100% recovery on the amount of their Claim equivalent to the Retail Advance Obligation; the Retail Borrower Post-Set off Claim will receive a recovery equivalent to the recovery of the General Earn class. The recovery percentage shown represents the average recovery of all Holders of Retail Borrower Deposit Claims, but individual Holders may have a higher or lower recovery based on their specific Retail Borrower Deposit Claim and Retail Advance Obligation*
*(2) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*
*(3) The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators*

---

[3]    Recoveries shown in the table do not contemplate any Allowed Claims on account of contingent, unliquidated claims, regulatory claims, or the Class Claim brought by the Committee.

### ORDERLY WIND DOWN DISTRIBUTION WATERFALL

$ in millions

**Gross Wind Down Proceeds**

| | Notes | Valuation Date | | Pro Forma Adjustments | | Emergence Pro Forma Value | |
|---|---|---|---|---|---|---|---|
| Cash | [A] | $ | 91.6 | $ | (91.6) | $ | - |
| Liquid Cryptocurrency | [B] | | 2,558.3 | | (154.1) | | 2,404.2 |
| Institutional Loans | [C] | | 74.5 | | - | | 74.5 |
| Illiquid DeFi and Staking Assets | [D] | | 103.9 | | (1.8) | | 102.0 |
| Custody Assets | [E] | | 159.8 | | 93.0 | | 252.8 |
| Investments | [F] | | 129.0 | | - | | 129.0 |
| Retail Loans | [G] | | 410.4 | | (410.4) | | - |
| **Cash Value Available for Distribution** | | $ | **3,527.5** | $ | **(564.9)** | $ | **2,962.6** |
| Going Concern Mining - Equity Recovery | [H] | | 565.0 | | (141.3) | | 423.8 |
| **Total Gross Distributable Assets** | | $ | **4,092.5** | $ | **(706.2)** | $ | **3,386.3** |

**Orderly Wind Down Expenses**

| | Notes | | Expenses | |
|---|---|---|---|---|
| Plan Administration Fee | [I] | $ | 46.0 | |
| Distribution Fees | [J] | | 12.0 | |
| Oversight Committee Fee | [K] | | 13.8 | |
| Mining Capitalization | [L] | | 50.0 | |
| Litigation Trust | [M] | | 50.0 | |
| Professional Fees | [N] | | 35.0 | |
| Operating Expenses | [O] | | 56.3 | |
| **Total Expenses** | | $ | **263.1** | |
| **Total Available for Distribution** | | $ | **3,123.2** | |

**Orderly Wind Down Distribution**

| | Notes | Estimated Claim Value ($) | Recovery (%) | Recovery ($) | |
|---|---|---|---|---|---|
| Administrative Claims | [P] | 85.0 | 100.0% | $ | 85.0 |
| Convenience Claims | [Q] | 345.9 | 70.0% | | 242.1 |
| General Custody Claims[1] | [R] | 218.2 | 72.5% | | 158.2 |
| Withdrawable Custody Claims[1] | [S] | 48.1 | 100.0% | | 48.1 |
| Withhold Claims (Eligible 15% Distribution)[2] | [T] | 2.0 | 100.0% | | 2.0 |
| Retail Borrower Deposit Claims | [U] | 732.4 | 83.0% | | 607.9 |
| Other Unsecured Claims[3] | [V] | 3,902.8 | 61.2% | | 2,390.2 |
| **Total Claims / Recoveries[4]** | | $ **5,334.5** | **66.2%** | $ | **3,533.6** |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*
*(2) Withhold Claims receive a blended recovery of 67.1% resulting from (1) a liquid crypto distribution of 15% of their claim and (2) the remaining 85% receiving Unsecured Claim Distribution Consideration*
*(3) Includes General Earn Claims, Unsecured Loan Claims, General Unsecured Claims and the remaining 85% of Withhold Claims*
*(4) Total Claims and Recoveries include $410.4 million of amounts set-off on account of Retail Advance Obligations*

### Specific Notes to the Orderly Wind Down

#### *Gross Wind Down Proceeds*

A. <u>Cash</u>:   Consists of all unrestricted Cash deposits in savings, operating, receipt, and disbursement accounts.  The valuation date Cash balance has been adjusted pro forma to the Wind Down Date, including monetization of coins in Fireblocks for the estimated Cash shortfall to fund these Chapter 11 cases through the Wind Down Date.

B. <u>Liquid Cryptocurrency</u>:  Includes Liquid Cryptocurrency coins and tokens held in Fireblocks, Cryptocurrency directly staked on respective networks, and undeployed ETH held in DeFi workspaces, which are assumed to be available to distribute, subject to any required reserves for disputed and unliquidated Claims, on or shortly after the Wind Down Date.

C. <u>Institutional Loans</u>: Consist of loans receivable balances with active and defaulted counterparties.  The institutional loans are assumed to carry forward within the Wind Down Estate and will be monetized through negotiations with counterparties.  The values shown include consideration of the relative risk of counterparty default and estimated probability of collectability of these loans.

D. <u>Illiquid Defi and Staking Assets</u>:  Consist of Cryptocurrency staked through StakeHound or placed onto DeFi protocols which will be monetized over the Wind Down Period.

E. <u>Custody Assets</u>:   Reflects Liquid Cryptocurrency deposited into Custody Wallets that is assumed to be available to distribute on or shortly after the Wind Down Date.  Certain users were granted the ability to withdraw their Custody balances in advance of the Effective Date.  The Orderly Wind Down analysis reflects the estimated full distribution and recovery amounts for illustrative purposes.

F. <u>Investments</u>:   Reflects alternative investments made in blockchain platforms, mining platforms, convertible notes, and equity investments.  These investments would be monetized at various periods throughout the Wind Down Period when most economically viable.

G. <u>Retail Loans</u>: Pursuant to the Plan, Retail Advance Obligations will be set off against Retail Borrower Deposit Claims.  As a result, the Orderly Wind Down assumes no Gross Wind Down Proceeds on account of Retail Advance Obligations.

H. <u>Mining Equity</u>: The Mining Equity Recovery value is based on the going-concern valuation of Mining included in the NewCo Transaction of a midpoint of $565 million, adjusted to account for the uncertainty that may result from the decision to proceed with the Orderly Wind Down.  If the Debtors move for an Orderly Wind Down, certain benefits to the mining business from Fahrenheit may no longer be available.  These items include, but are not limited to, (i) US Bitcoin's new site build construction cap of $395,000 per megawatt ("MW") and expertise in the building sites, (ii) $100 million of coupons from a leading ASIC manufacturer that can be applied to new rig purchases, (iii) proprietary software, site-level operational management (with annual $2 million expense caps per 100 MW), and a number of other qualitative factors the US Bitcoin team brings to managing and operating the Mining fleet and sites.  It is possible

that as a standalone business, the loss of economies of scale could negatively impact mining and higher fees may be incurred for similar services. An assumed 25% discount to the going-concern valuation has been applied to account for these factors. The Mining Equity Recovery value is inclusive of the $50 million contribution from the Estate to capitalize the mining business.

### *Orderly Wind Down Expenses*

I.   Plan Administration Fee:  $46 million due to the Backup Plan Sponsor.

J.   Distribution Fees:  Fees paid to the Backup Plan Sponsor for the distribution of assets over the Wind Down Period, as reflected in the Backup Plan Administrator Term Sheet.

K.   Oversight Committee Fee:  Fees paid to the members of the Wind Down Oversight Committee. This analysis assumes approximately $13.8 million paid over the Wind Down Period. The actual amounts would be set by the Debtors and the Committee in accordance with the Wind-Down Procedures.

L.   Mining Capitalization:  Contribution of $50 million from the Estate for the capitalization of the publicly traded mining business that the Backup Plan Sponsor will seek to establish. This contribution is included in the Mining Equity Recovery value.

M.   Litigation Trust:  The Orderly Wind Down assumes the Initial Litigation Funding Amount.

N.   Professional Fees:  Consists of professional fees for legal counsel, financial advisors, claims agents, and any other advisors engaged during the Wind Down Period.

O.   Operating Expenses:  Operating expenses incurred during the Wind Down Period, including but not limited to, employee payroll, valuation and audit fees, IT and compliance fees, insurance costs, and costs for management of the non-affiliate Debtors, exclusive of costs attributed to Mining.

### *Wind Down Distribution*

P.   Administrative Claims:  For the purposes of this Orderly Wind Down, Administrative Claims consist of Claims for costs and expenses of administration incurred during the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, Claims for postpetition accounts payable, postpetition accrued taxes, and accrued and unpaid fees and expenses as of the Wind Down Date of professionals other than Debtor professionals and Committee professionals. The Orderly Wind Down assumes approximately $85 million in Chapter 11 Administrative Claims at the Wind Down Date.

Q.   Convenience Class Claims:  The Orderly Wind Down proposes the same treatment for Allowed Convenience Claims as set forth in the NewCo Transaction. The Orderly Wind Down does

not consolidate creditor balances across multiple platforms when considering claims that fall into the Convenience Class.

R. <u>General Custody Claims</u>:  Consist of Claims from customers with deposits in Custody Wallets who were not permitted to withdraw their Cryptocurrency prior to the Effective Date or were permitted to but did not yet withdraw.  As detailed in the Custody Settlement Order, these Claims are priority to other *pari passu* unsecured Claims and receive a 72.5% recovery of their outstanding coin balances as of the Petition Date through in-kind Cryptocurrency distributions rather than a percentage of their coins dollarized as of the Petition Date.

S. <u>Withdrawable Custody Claims</u>:  Consist of Claims for customers with deposits in Custody Wallets that were permitted to withdraw their Cryptocurrency prior the Effective Date.  As detailed in the Custody Settlement Order, these Claims are priority to other *pari passu* unsecured Claims and receive 100% recovery through in-kind Cryptocurrency distributions.

T. <u>Withhold Claims (Eligible 15% Distribution)</u>:  Represents the Liquid Cryptocurrency distribution for 15% of the Allowed Withhold Distribution Claims, assuming the entire Class votes to accept the Plan.  The remaining 85% of Allowed Withhold Claims will be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration.  Withhold Claims will receive a blended recovery of these distributions.

U. <u>Retail Borrower Deposit Claims</u>: Holders of Retail Borrower Deposit Claims will receive a 100% recovery on the amount of their Claim equivalent to the Retail Advance Obligation; the Retail Borrower Post-Set off Claim will receive a recovery equivalent to the recovery of the General Earn class.

V. <u>Other Unsecured Claims</u>:

Unsecured Claims consist of the following:

o <u>General Earn Claims</u>:  General Earn Claims consist of user Cryptocurrency deposit balances in the Earn Program.

o <u>Withhold Claims (Remaining 85%)</u>: The remaining 85% of Allowed Withhold Claims.

o <u>Unsecured Loan Claims</u>:  Claims arising from borrowings made by the Debtors with institutional counterparties.

o <u>Other General Unsecured Claims</u>:  Claims without security interests and not otherwise entitled to administrative or priority treatment including, but not limited to, prepetition trade amounts not paid pursuant to relief granted pursuant to the First Day Motions, rejected and contemplated to be rejected executory contracts.

**<u>Exhibit D</u>**

**Mining Valuation Analysis**

## EXHIBIT D

## MINING VALUATION ANALYSIS

### A.    Disclaimer

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR MINING AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.**

### B.    Valuation Estimate

In connection with developing the Plan, the Debtors directed their investment banker, Centerview, to estimate the enterprise value of Mining. This analysis has been prepared for the Debtors' sole use and is based on information provided to Centerview by the Debtors.

Based on financial projections developed by the Debtors[1] and subject to the disclaimers and the descriptions of Centerview's methodology set forth herein, and solely for purposes of the Plan, Centerview estimates the total enterprise value of Mining to be within the range of approximately $410 million to $720 million as of May 31, 2023 with an estimated midpoint of $565 million.[2]

In preparing the estimated total enterprise value for Mining, Centerview: (1) reviewed certain historical financial information of Mining for recent years and interim periods provided by the Debtors; (2) met with certain members of the Debtors' and Fahrenheit's senior management to discuss Mining operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed by Centerview to be generally comparable to Mining; (4) considered certain economic and industry information relevant to Mining; (5) prepared discounted Cash flow analyses based on the financial projections, utilizing various discount rates and assumptions in the calculation of terminal values; and (6) conducted such other analyses as Centerview deemed appropriate.

Although Centerview conducted a review and analysis of Mining including its projections and business plan, Centerview relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and other firms retained by the Debtors, and on certain publicly available information as to which Centerview does not have independent knowledge.

The financial projections provided to Centerview by the Debtors are for 2023 through September 2033. Centerview has relied on the Debtors' representation and warranty that such financial projections (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith judgments of the Debtors. Centerview does not offer an opinion as to the attainability of the financial projections. The future

---

[1]    In preparing the Financial Projections, Management conferred with the Fahrenheit Group, and agreed on certain assumptions to be used in the Financial Projections.

[2]    The endpoints of the range of estimated total enterprise value represent the arithmetic means of the endpoints of the ranges from the valuation methodologies utilized by Centerview.

results of Mining are dependent upon various factors, including future Bitcoin prices, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. Actual future results may differ materially (positively or negatively) from the financial projections and, as a result, the actual total enterprise value of Mining may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of Mining assets or component parts were sought or obtained in connection with Centerview's valuation. Centerview did not conduct an independent investigation into any of the legal, tax, pension, or accounting matters affecting Mining, and therefore makes no representations as to their impact on the financial statements of Mining.

### C.    Valuation Considerations

This valuation is based upon information available to, and analyses undertaken by, Centerview as of May 31, 2023, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the financial projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Centerview has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to May 31, 2023, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the enterprise value of Mining. Neither Centerview nor the Debtors has any obligation to update, revise, or reaffirm the valuation.

This valuation is based on market data as of May 31, 2023 and relies on a number of assumptions, including successful emergence from chapter 11 by September 30, 2023, deployment of all rigs and completion of new proprietary sites in 2024, achievement of the forecasts reflected in the financial projections, the minimum amount of Cash required to operate Mining, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of Mining.

Further, the valuation of newly issued securities, including the NewCo Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; (iv) future Bitcoin and other Cryptocurrency prices; and (v) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Mining's total enterprise value is but one component of the asset base of NewCo. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of all or any component of the post-reorganization market trading value of NewCo, Mining, or their securities. NewCo is anticipated to be a public company and will be obligated to file public reports and disclosures. There can be no assurance that any trading market will develop for the NewCo Common Stock. The estimates of value for Mining do not necessarily reflect the values that may be

attainable in public or private markets.  Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of Mining's enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of Mining operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise values of Mining with Fahrenheit as the continuing operator, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as Mining is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Centerview's estimated valuation range of Mining does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of Mining set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Centerview, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**<u>Exhibit E</u>**

**Mining Financial Projections**

**EXHIBIT E**

**MINING FINANCIAL PROJECTIONS**

In connection with the Disclosure Statement, Debtor Celsius Mining LLC's ("Celsius Mining") management team ("Management") prepared financial projections (the "Financial Projections") for the fiscal years ending September 30, 2023 through September 30, 2028 (the "Projection Period").[1] The Financial Projections are based on a number of assumptions made by Management with respect to the future performance of the assets currently held by Celsius Mining ("Reorganized Mining"). In preparing the Financial Projections, Management conferred with the Fahrenheit Group, and agreed on certain assumptions to be used in the Financial Projections.

Certain assumptions were based on information available to Management, including information derived from public sources that have not been independently verified, information and materials shared by Fahrenheit, as well as input from analyses commissioned by third parties. No representations or warranties, express or implied, are provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections, or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to Holders of Claims or Interests or other parties in interest going forward. The Debtors also will not include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT CELSIUS MINING, THE DEBTORS, REORGANIZED MINING, AND NEWCO CAN PROVIDE NO ASSURANCES THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT REORGANIZED MINING'S FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS

---

[1]    September 30 is the end of the fiscal year for each year ("Fiscal Years End").

1

DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to Management or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**Notes to Financial Projections**

### 1. Overview

Bitcoin mining is the process of validating transactions on the Bitcoin network and adding the transactions to the Bitcoin blockchain ledger. An application-specific integrated circuit ("ASICS" or "rigs") miner solves cryptographic hash puzzles, and in return the miner is rewarded with newly minted Bitcoin. Celsius Mining operates a fleet of approximately 122,000 rigs. Celsius Mining's rigs are deployed at Celsius Mining-owned and operated sites ("Proprietary Sites") and third-party hosted sites (the "Hosted Sites" and together with the Proprietary Sites, the "Sites") across the United States. The primary input cost is for energy. Celsius Mining has both fixed and variable rate contracts with the Hosted Sites and contracts directly with a retail electricity provider for the Proprietary Sites' energy needs.

### 2. Presentation and Accounting Policies

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in Celsius Mining's historical financial statements and projections.

### 3. Methodology

Management worked closely with its advisors, and considered certain input from Fahrenheit, to develop these projections and establish the deployment strategy for rigs over the Projection Period. The forecast relies on key operating inputs and assumptions, including, among others: (a) the expected future conversion rate between U.S. Dollars and BTC (the "BTC Price Forecast"); (b) the measure of the total computational power on the Bitcoin blockchain network ("Network Hashrate"); (c) the assumed operating time of Reorganized Mining's rigs during a

given period ("Assumed Uptime"); and (d) forward energy price curves, and contracted energy rates with third-party hosting providers.  The forecast also includes capital expenditures for rig replacements, driven by assumed future price and efficiency of new rigs, as well as infrastructure build costs.

The Celsius Mining BTC Price Forecast over the Projection Period relies on both a historical trend analysis and one-to-two-year outlook of analyst BTC price forecasts.  The forecast assumes a series of 24-month bull and bear market cycles, derived based on the historical realized peaks and troughs, with decreasing volatility as BTC becomes more widely adopted.

Celsius Mining developed future estimates of the Network Hashrate over the Projection Period ("Network Hashrate Forecast") based on a dynamic model that contemplates the assumed operations of other Bitcoin miners based on the aggregate Hash Price in each month.[2]  Based on current rig technology and respective rig hash rates, as well as assumed hardware efficiency improvements over the Projection Period, the Network Hashrate Forecast evaluates which of Reorganized Mining's rigs would mine profitably in each period based on the projected Hash Price and operating costs.  Lastly, the Network Hashrate Forecast accounts for two halvening dates in April 2024 and April 2028.

The Financial Projections reflect a bottoms up, rig-specific forecast constructed on a site-by-site level. The revenue and expense line items are explained in further detail below and generally rely on the assumptions outlined above and historical operating performance.

### 4.  Plan Consummation

The operating forecast assumes that the Plan will be confirmed and consummated on or around September 30, 2023 (the "Effective Date").  This date reflects the Debtors' best and current estimate, but there can be no assurance as to when the Effective Date will actually occur.

**Assumptions with Respect to the Projected Income Statement**

### 1.  Revenue

In the Financial Projections, revenues from mining operations are forecasted for each of the Sites based on the BTC Price Forecast, Network Hashrate Forecast, Assumed Uptime, and the operating characteristics of the rigs assumed to be deployed at the respective Sites.  Certain Sites have curtailment rights which allow for the rigs to be turned on and off to increase profit and reduce losses resulting from energy price volatility and changes in energy demand.  In certain markets and at certain Sites, curtailment rights may generate additional revenues for Reorganized Mining as the market compensates load centers for reducing their energy consumption during periods of high market demand. These curtailment revenues are reflected in the revenue section of the forecast alongside other mining revenues.

---

[2]    The "Hash Price" is a calculated value that considers the interrelated impacts of the BTC price, Network Hashrate, BTC rewards per block mined, and transaction fees in each period.

### 2.  Direct Costs

Direct costs include direct energy costs, profit share costs and site operating expenses as described below.

#### i.  Direct Energy Costs

Direct energy costs reflect the consumption of energy to power the rigs. These costs reflect the rigs' energy consumption in megawatt-hours ("MWh") at the market price of power.  At the Proprietary Sites, Reorganized Mining will pay for the power directly, inclusive of all delivery, transmission, and other power-related costs incurred in normal operations.  At Hosted Sites, power costs will be paid by the hosting provider and invoiced to Reorganized Mining.  The forecasted direct energy costs are based on forward energy curves or the contracted rates (fixed or variable costs).

#### ii.  Profit Share Costs

The contracts for certain Hosted Sites include a profit sharing mechanism whereby the hosting provider receives a share of the BTC mined and the energy costs incurred.  In general, the profit share is a percentage of gross profit.

#### iii.  Site Operating Expenses

At Proprietary Sites, the site operating expenses include labor, facility, software and rig maintenance expenses.  At Hosted Sites, certain charges will be passed through to Reorganized Mining.  The passed through charges generally consist of charges per rig, labor, energy adders and other operational expenses.

### 3.  Operating Expenses

Operating expenses include property insurance, security, repairs and maintenance, and custody fees.  The Financial Projections also include certain corporate operating expenses that can be generally described as corporate headcount, director and officer and cyber insurance, audit and legal costs, and other general corporate expenses.  Operating Expenses also include a $15 million annual management fee to US Bitcoin.  This management fee covers contract management, maintaining GAAP books and records, treasury services, tax compliance, curtailment software, compliance with safety guidelines, strategy development, and general management of Reorganized Mining.

### 4. Net Capital Expenditures

#### i. Infrastructure Growth Capital Expenditures

Infrastructure growth capital expenditures relates to the proposed new 100 megawatt ("MW") proprietary site that Management intends to build with US Bitcoin.  Management has assumed build costs of $395,000 per MW, which is consistent with the construction cost caps provided by US Bitcoin under the Plan Sponsor Agreement, for an all-in investment of $39.5 million.  The Financial Projections assume the new 100 MW site is built and all associated costs are incurred during the fiscal year ending September 30, 2024.

#### ii. Rig Replacement Capital Expenditures

Management assumes it maintains the existing fleet and replaces rigs based on a useful life of six years.  At end of life, these existing rigs are assumed to be replaced with new rigs reflecting the same efficiency increases contemplated in the Network Hashrate Forecast.  The least efficient rigs are assumed to be replaced first, enabling Reorganized Mining to retain market share. The replacement cost assumes that new rigs have a market value based on an assumed 18-month payback period.

As described in the Plan Sponsor Agreement, $100 million of coupons from a leading ASIC manufacturer are assumed to be applied to the purchase of new rigs, which thereby provide an effective twenty percent discount on assumed replacement costs.  Shipping, duty, and taxes are included as part of the rig replacement capital expenditure forecast.

#### iii. Rig Sales Proceeds

At the assumed end of each rig's useful life and in conjunction with the rig replacements described above, the Financial Projections assume rigs are sold for twenty-five percent of the estimated market value of the replacement rigs.

**Celsius Mining LLC**
*in Millions of U.S. Dollars*

| Fiscal Year Ended | Sep-24 | Sep-25 | Sep-26 | Sep-27 | Sep-28 | Total |
|---|---|---|---|---|---|---|
| **Revenue** | **$278.7** | **$437.5** | **$507.1** | **$341.0** | **$282.2** | **$1,846.5** |
| Direct Costs | (190.9) | (200.0) | (206.1) | (187.3) | (183.8) | (968.2) |
| **Gross Profit** | **87.8** | **237.4** | **300.9** | **153.7** | **98.4** | **878.3** |
| Operating Expenses | (26.0) | (27.7) | (28.8) | (29.3) | (29.7) | (141.4) |
| **EBITDA** | **61.8** | **209.7** | **272.2** | **124.4** | **68.8** | **736.9** |
| Net Capex | (56.5) | (12.3) | (8.2) | (39.3) | (86.6) | (202.9) |
| **EBITDA less Net Capex** [1] | **$5.4** | **$197.5** | **$263.9** | **$85.1** | **($17.8)** | **$534.1** |
| | | | | | | |
| BTC Price, EOP ($) | $47,647 | $90,587 | $92,420 | $76,622 | $105,195 | NA |
| Hashprice ($/GH/Day), EOP | 77.9 | 126.2 | 95.1 | 63.9 | 61.3 | NA |
| Network Hashrate, EOP | 307 EH/s | 374 EH/s | 524 EH/s | 668 EH/s | 600 EH/s | NA |
| Celsius Hashrate, EOP | 12.3 EH/s | 12.5 EH/s | 12.6 EH/s | 13.4 EH/s | 15.1 EH/s | NA |
| Network Share % | 3.50% | 3.79% | 2.82% | 2.24% | 2.36% | NA |
| BTC Produced, Celsius | 7,712 | 6,475 | 5,046 | 3,946 | 3,281 | 26,460 |

[1] EBITDA less Net Capex does not reflect cash taxes.

65068104 v2-WorkSiteUS-000002/3313

6

**<u>Exhibit F</u>**

**Fahrenheit Business Plan**

 Fahrenheit Group



# NewCo Transaction

Maximizing Value for Celsius Creditors

August 2023

Fahrenheit Group    2

# DISCLAIMER

This summary has been prepared by Fahrenheit, LLC ("Fahrenheit") for inclusion as an exhibit to the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization (the "Disclosure Statement") of Celsius Network LLC and its Debtor Affiliates ("Celsius," the "Company" or the "Debtors") filed with the United States Bankruptcy Court Southern District of New York (the "Bankruptcy Court") in connection with the Joint Chapter 11 Plan of Reorganization of the Debtors (the "Plan"). Fahrenheit urges creditors of the Debtors and other interested persons to read the Disclosure Statement and the Plan, including any amendments, supplements or modifications thereto, or restatements thereof, to be filed with the Bankruptcy Court in connection with the Plan, including any Definitive Documents (as defined in the Plan) contemplated by the Plan. These materials do and will contain important information about the Fahrenheit, Newco, the Plan and the NewCo Transactions (as defined in the Plan). This summary is qualified in its entirety by the Plan, the Disclosure Statement, and the Definitive Documents. The terms of the Plan and of any of the Definitive Documents, as they may be modified from time to time, may vary from those described in this summary, and in the event of any conflict between the terms of this summary the Plan and the Definitive Documents, the Plan and the Definitive Documents shall control. No representation or warranty, expressed or implied, is made as to the accuracy or completeness of the information contained in this summary. This summary does not purport to contain all information that may be required to evaluate the Plan.

The information provided in this presentation pertaining to Celsius, its business assets, strategy and operations is for general informational purposes only and is not a formal offer to sell or a solicitation of an offer to buy any securities, options, futures, or other derivatives related to securities in any jurisdiction and its content is not prescribed by securities laws. Information contained in this presentation should not be relied upon as advice to buy or sell or hold such securities or as an offer to sell such securities. This presentation does not take into account, nor does it provide any tax, legal or investment advice or opinion regarding, the specific investment objectives or financial situation of any person.

Fahrenheit and its agents, advisors, directors, officers, employees and shareholders make no representation or warranties, expressed or implied, as to the accuracy of such information and Fahrenheit expressly disclaims any and all liability that may be based on such information or errors or omissions thereof. Fahrenheit reserves the right to amend or replace the information contained herein, in part or entirely, at any time, and undertakes no obligation to provide the recipient with access to the amended information or to notify the recipient thereof. This is not a binding term sheet, no definitive documents have been signed, and parties reserve their rights in connection with any proposed transaction. Any information, representations or statements not contained herein shall not be relied upon for any purpose. Neither Fahrenheit nor any of Fahrenheit's representatives shall have any liability whatsoever, under contract, tort, trust or otherwise, to you or any person resulting from the use of the information in this presentation by you or any of your representatives or for omissions from the information in this presentation. Additionally, neither the Fahrenheit nor Fahrenheit's representatives undertake obligation to comment on the expectations of, or statements made by, third parties in respect of the matters discussed in this presentation.

This presentation contains the following measures not prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"): "EBITDA" and "Free Cash Flow." EBITDA as used herein is net income or loss excluding net finance income or expense, income tax or recovery, depreciation and amortization. Free Cash Flow as used herein is net cash provided by operating activities less purchases of property and equipment. Fahrenheit believes these non-GAAP measures are useful in evaluating the Plan. Fahrenheit's definition of these non-GAAP measures may differ from similarly titled measures of performance used by other companies in other industries or the same industry. Non-GAAP measures used in this presentation may not be indicative of actual results.

**THIS PRESENTATION IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This summary contains forward-looking statements. Forward-looking statements can be identified by words such as: "anticipate," "intend," "plan," "goal," "seek," "believe," "project," "estimate," "expect," "strategy," "future," "likely," "may," "should," "will" and other expressions that are predictions of or indicate future events and trends and that do not relate to historical matters. The forward-looking statements herein include statements about Fahrenheit's business strategy with respect to NewCo, NewCo's future revenues, profitability, cash flow capital expenditures, strategy for risk management, market conditions, liquidity and capital resources, future operations and anticipated Nasdaq or other exchange listing.

Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on Fahrenheit's current beliefs, expectations and assumptions regarding the future of the NewCo business, future plans and strategies, projections, anticipated events and trends, the economy, the regulatory environment and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of Fahrenheit's control. Important factors that could cause NewCo's actual results, financial condition and achievements to differ materially from those indicated in the forward-looking statements are set forth in the Plan Disclosure Statement under the heading "RISK FACTORS" and elsewhere in the Plan Disclosure Statement.  As set forth in the Plan Disclosure Statement, into which this summary is included as an exhibit, these factors include, without limitation:

- ‣ Risks related to bankruptcy law considerations;
- ‣ Risks related to recoveries under the Plan;
- ‣ Risks relating to Debtors' and NewCo's business;
- ‣ Risks relating to NewCo's digital asset mining and staking;
- ‣ Disclosure statement disclaimer; and
- ‣ Regulatory-related risk factors.

Fahrenheit cannot assure that NewCo will be able to achieve or obtain any of its projections, financial resources, goals, strategies, future operations or Nasdaq listing on a timely basis, if at all, or that it will otherwise be able to successfully implement that Plan and the Transactions. Any forward-looking statement made by Fahrenheit in this summary is based only on information currently available to it and speaks only as of the date on which it is made. Fahrenheit undertakes no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise.

Fahrenheit Group

4

# From Steven Kokinos, proposed CEO of NewCo



To the Celsius community:

We know that the failure of Celsius has been exceptionally difficult for you all. You placed your assets and your trust in Celsius, and that trust was betrayed. We cannot undo the wrongs of the past, but we can seek to learn from them. We are humbled by the opportunity to redefine a new path for the creditors of Celsius and the broader crypto community.

With this in mind, I am excited to share our vision for the future of Celsius through the creation of NewCo, a new business to be formed out of the Celsius bankruptcy. NewCo's equity will be held by, and a majority of its board of directors will be appointed by, Celsius's creditors.

As the managers of NewCo, our goal will be to maximize value while minimizing risk for NewCo's shareholders (i.e., Celsius creditors). Our plan is intended to drive risk-adjusted value through a highly efficient growth model while retaining the optionality for opportunistic expansion. It is underpinned by a proactive risk management strategy and seeks to optimize valuation and liquidity through a public listing on Nasdaq.

This presentation provides a high-level overview of what our crypto-native team has put together. We appreciate the input and feedback from the Special Committee of the Board and the Official Committee of Unsecured Creditors as it was developed, and we look forward to further collaboration with all stakeholders—including the Celsius creditor community—as we embark on this next chapter together. We intend to work tirelessly as an organization to drive the next wave of Web3 adoption through NewCo.

As we move forward, we maintain the utmost respect for the process. We also recognize that transparency and open communication will be critical. We are committed to keeping you informed about our progress, challenges, and milestones as a new organization emerges from bankruptcy.

I am thrilled to be part of this journey and enthusiastic about what lies ahead.

Steven Kokinos
Fahrenheit Group



**AGENDA**

**Executive Summary**

Strategy

Execution

Risk Management

Structure

Potential Opportunity Areas

# Fahrenheit has applied a fourfold lens to restructuring NewCo



**Objective:** Maximize shareholder value

**4** Structure

**1** Strategy

**2** Execution

**3** Risk Management

**With the goal of maximizing shareholder value, Fahrenheit Group's restructuring plan for NewCo is:**

**1** Built on the foundation of **two core business lines: Bitcoin mining and Ethereum staking**

**2** Powered by **seasoned, crypto-native operators** with a track record of **financial discipline that we believe is best-in-class**

**3** Underpinned by a **proactive risk management** strategy intended to mitigate downside tail risk in underlying markets

**4** Designed with the goal of optimizing valuation and liquidity through a **public Nasdaq listing**

NewCo Restructuring Plan | Executive Summary

**Fahrenheit Group**

# The plan focuses on growing and maximizing the mining division of NewCo

$ millions

| | Period | Base case[1] | Fahrenheit illustrative case |
|---|---|---|---|
| **Revenue** | 2024 | 279 | 321 |
| | 2025 | 438 | 640 |
| | 2026 | 507 | 907 |
| | 2027 | 341 | 838 |
| | 2028 | 282 | 866 |
| | **Total** | **1,847** | **1.93x** ⟶ **3,572** |
| **EBITDA** | 2024 | 62 | 77 |
| | 2025 | 210 | 307 |
| | 2026 | 272 | 481 |
| | 2027 | 124 | 350 |
| | 2028 | 69 | 294 |
| | **Total** | **737** | **2.05x** ⟶ **1,509** |

Note: (1) Base case utilizes figures from the Debtors' mining valuation contained in the Disclosure Statement.

**Commentary**

▸ **Both cases show potential revenue that could be generated by the mining division of NewCo only**

▸ **The Fahrenheit illustrative case includes potential revenue that could be generated by expanding the mining division through the strategic ASIC partnership committed by Fahrenheit Group***

*The ASIC partnership is an option and subject to NewCo board approval, NewCo funding, and other contingencies; see pages 10 and 14–16 for further information

**Key Fahrenheit case assumptions**

▸ Initial $100M investment to fund site expansion through the strategic ASIC partnership

▸ Illustrative investment of 75% of projected NewCo cash flow; actual investment levels can be adjusted by NewCo Management and Board based on market conditions

▸ Initial buildout speed capped at 120 MW per 6 months, which is to be adjusted based on market conditions

▸ Buildout cost cap of $395K per MW

▸ BTC price, hashrate growth, network difficulty assumptions are unchanged from the base case

NewCo Restructuring Plan | Executive Summary

**Fahrenheit Group**

8

# Potential revenue from self-staking (and other assets) would be incremental

| Fahrenheit's intent is to structure the balance sheet of NewCo with the goal of providing the company with flexibility to: |
| --- |

▸ **Manage potentially adverse market conditions**

▸ **Make additional opportunistic investments in mining** based on market conditions and other contingencies

▸ **Potentially develop new product offerings, make further strategic acquisitions, or enter into additional strategic partnerships**, subject in all respects to NewCo board approval, regulatory considerations, and market conditions

| Fahrenheit intends for NewCo to self-stake cryptocurrency on its balance sheet with the goal of generating incremental revenue: |
| --- |

**Illustrative contribution margin[1]**
Ethereum self-staking, $ millions

| | |
| --- | --- |
| **2024** | 23.6 |
| **2025** | 37.3 |
| **2026** | 45.9 |
| **2027** | 38.3 |
| **2028** | 39.6 |

Any potential revenue from NewCo's other assets (e.g., institutional loan book, DeFi and venture assets) would be incremental to any mining and self-staking revenue

Note: (1) Assumes initial self-staking of $350 million of balance sheet ETH and staking yield range of 4.5% to 5.5%

NewCo Restructuring Plan | Executive Summary

Fahrenheit Group      9

# Key business terms of Fahrenheit's proposal (1 of 3)

| Category | Item | Description[1] |
|---|---|---|
| **General** | **$50M contribution** | ‣ Fahrenheit purchasing $50M of NewCo equity through primary or secondary purchases (at option of Debtors/Committee) |
| | **NewCo management** | ‣ Steve Kokinos serving as CEO of NewCo and Joel Block serving as CFO of NewCo<br>‣ NewCo executive management team compensation to be deducted from Fahrenheit Group's management fee |
| | **NewCo board** | ‣ NewCo's board to consist of a majority of directors appointed by fiduciary for Celsius creditors (i.e., the Official Committee of Unsecured Creditors)<br>‣ Fahrenheit to manage NewCo at the direction of the NewCo board<br>‣ NewCo board to approve all significant investment and capital allocation decisions |
| **Bitcoin mining consideration (1 of 3)** | **Operating partner** | ‣ US Bitcoin Corp (USBTC) managing the NewCo mining assets |
| | **Operating software** | ‣ USBTC offering NewCo a royalty-free license to its proprietary miner management and energy curtailment software |
| | **100 MW site buildout** | ‣ USBTC building and energizing a 100 MW mining site for NewCo within 12 months of the plan effective date.<br>‣ If the site is not energized within 12 months of the effective date, the following year's mining management fee to be reduced by $1M per month that the energization is delayed, subject to a $6M total reduction<br>‣ The construction of medium voltage to plug ready infrastructure will be capped at $395K/MW for a period of 24 months after the Effective Date; any costs in excess of the cap to be offset against future mining management fees<br>‣ The same capped construction and allocation of costs in excess will apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW (for a total of 400 MW) |

Note: (1) Descriptions contained herein are indicative. Parties should refer to the Plan Sponsor Agreement, Fahrenheit Plan Term Sheet (attached to the Plan Sponsor Agreement), Plan, and Disclosure Statement for a complete description of the Fahrenheit proposal.

NewCo Restructuring Plan | Executive Summary

 10

# Key business terms of Fahrenheit's proposal (2 of 3)

| Category | Item | Description |
|---|---|---|
| **Bitcoin mining consideration (2 of 3)** | **Site-level labor cost cap** | ‣ USBTC providing all site level employees (excluding security) for all existing Celsius self-mining facilities and any facilities developed by Celsius or NewCo for cost and subject to a cost cap calculated at $2M per 100 MW<br>‣ To the extent cost exceeds this cap, any excess to be deducted from the mining management fee |
| | **240 MW site contribution** | ‣ USBTC contributing to NewCo the leasehold and development rights to an additional 240 MW behind-the-meter site |
| | **50 MW site purchase option** | ‣ USBTC providing option to purchase USBTC Alpha, an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such property) for $575,000/MW and support the immediate installation of miners at such site |
| | **43,500 rack plugs for hosting** | ‣ USBTC providing NewCo with up to 43,500 rack plugs at competitive or below market terms for hosting of NewCo machines:<br>‣ 8,500 rack plugs are available at USBTC Alpha, with hosting terms for up to five years similar to the Hardin contract, which includes pass-through costs and a 30% profit split<br>‣ 20,000 rack plugs are available at a site owned by a USBTC partner with two pricing options: an all-inclusive rate of $72/MWh or a variable rate based on the current hashprice, which stands at $62.50/MWh<br>‣ 15,000 rack plugs at various sites owned or operated by strategic partners on competitive market terms |
| | **Strategic ASIC partnership** | ‣ US Bitcoin contributing to NewCo a strategic partnership agreement with a leading ASIC manufacturer<br>‣ NewCo intends to host the partner's portion of rigs at a minimum breakeven rate; NewCo intends to build and own all infrastructure<br>‣ Under partnership, the strategic partner would provide NewCo with up to 180,000 new generation rigs, which would be intended to be the latest generation models in scale production at the time of delivery, at no cost to operate in a profit-sharing model with NewCo owning initially 30% of rigs (i.e., up to 54,000)<br>‣ Partnership would provide for gradual transfer ownership of the rigs to NewCo such that after the second year of operating the rigs in a profit-sharing model, NewCo would own 50% of the rigs (i.e., up to 90,000) |


# Key business terms of Fahrenheit's proposal (3 of 3)

| Category | Item | Description |
|---|---|---|
| **Bitcoin mining consideration (3 of 3)** | **$100M mining rig coupon** | ‣ USBTC contributing to NewCo $100M in coupons from another leading ASIC manufacturer which have no expiration and can be applied to future machine purchases by NewCo |
| | **Operating cost savings** | ‣ USBTC providing immediate cost savings via reduced pool fees for Celsius / NewCo mining<br>‣ USBTC lowering energy procurement costs via its internal energy team and direct connectivity to energy trading desks at no cost |
| **Ethereum staking consideration** | **Immediate engagement** | ‣ USBTC has already been engaged and provided tangible, demonstrable benefits at no cost to the estate |
| | **Operating partner** | ‣ Proof Group managing the self-staking of Ethereum held by NewCo on its balance sheet |
| **DeFi and venture investing consideration** | **Self-staking technology** | ‣ Proof Group providing NewCo with a royalty-free, perpetual license to IP owned by Proof Group with respect to self-staking<br>‣ Goal will be for NewCo to leverage this IP to self-stake NewCo ETH at no fee |
| | **Operating partner** | ‣ Arrington Capital managing the optimization and wind-down of the existing portfolio of DeFi and venture assets |

**AGENDA**

Executive Summary

**Strategy**

Execution

Risk Management

Structure

Potential Opportunity Areas

NewCo Restructuring Plan | Strategy

Fahrenheit Group    13

# Fahrenheit intends for NewCo's foundation to consist of two core business lines

**Fahrenheit plan by Celsius asset class**

| Category | Celsius assets | Fahrenheit plan |
|---|---|---|
| **Core NewCo business line** | **Mining assets** — US BITCOIN CORP | **US Bitcoin Corp** to operate the mining division of NewCo, managing and optimizing the existing fleet of (~122,000) rigs and mining sites while executing a plan intended to scale and vertically integrate the business |
| | **Liquid cryptocurrency** — PROOF GROUP | **Proof Group** to leverage proprietary IP to stake and manage ETH owned by NewCo. Fahrenheit intends to reinvest returns with goal of growing the mining business and reducing the need for external capital |
| **Other assets contributed to NewCo** | **DeFi and venture investments** — arrington CAPITAL | **Arrington Capital** to manage the monetization of the existing portfolio of DeFi and venture investments |
| | **Other assets** — NewCo | **NewCo** to manage the monetization of other assets including the remaining institutional loan portfolio |

NewCo Restructuring Plan | Strategy

Fahrenheit Group    14

# <u>Mining</u>: Fahrenheit proposes a phased strategy to build the mining division

**Phase 1: Deploying full fleet via hosting**　　　　**Phase 2: Vertical integration**

**Celsius fleet**
~122,000 machines

**Currently deployed**
~83,000 machines

**In storage**
~39,000 machines

**To be deployed by Fahrenheit and debtors**
~39,000 machines

‣ **Celsius**
27,368 machines

‣ **Mawson**
20,196 machines

‣ **Global X**
17,219 machines

‣ **Hardin**
12,298 machines

‣ **EZ Blockchain**
5,435 machines

‣ **USBTC Delta**
~20,000 machines

‣ **USBTC Alpha**
~8,500 machines

‣ **Supplybit**
~8,000 machines

‣ **EZ Blockchain**
~3,000 machines

**1. Fahrenheit to construct 240 MW site in two phases**

‣ **Phase 1:** 100 MW

‣ **Phase 2:** 140 MW

**2. Fahrenheit to upgrade rigs by leveraging ASIC partnership and ASIC manufacturer coupons**

‣ Estimated useful life of five years

# Mining: Optional Phase 2 expansion via ASIC partnership with goal of self-funding

**Note: Subject to approval of NewCo Board, funding requirements, and other contingencies**

**Capital outflow**

### 2a Strategic ASIC partnership

The strategic ASIC partnership could enable ~**3x leverage on CAPEX for infrastructure buildout** versus the standard self-mining model

**Intended to drive efficient expansion of mining operations and cash flows**

### 2b Reinvestment of cash flows

Strategy: Cash flows from self-mining and hosted machines to be **reinvested to self-fund mining division expansion** through the strategic ASIC partnership

**This structure is intended to grow EBITDA and EV without additional debt**

**Capital inflow**



NewCo Restructuring Plan | Strategy

Fahrenheit Group    16

# <u>Mining</u>: Goal of ASIC partnership opportunity would be to increase CAPEX leverage

| Traditional model | NewCo ASIC partnership |
|---|---|
| **Bitcoin miners deploy ~67% of CAPEX on miners and the remaining ~33% of CAPEX on infrastructure** | **All else equal, ASIC miner contributions could enable NewCo to deploy almost 100% of CAPEX on infrastructure** |

**Unit economics of illustrative $38M investment**

| | CAPEX | Units | Total |
|---|---|---|---|
| **Miners** | $25.5M | 1.0 | 12K |
| **Infrastructure** | $12.5M | 1.0 | 38 MW |
| **Total** | **$38M** | | |



| | CAPEX | Units | Total |
|---|---|---|---|
| | $0M | ▲ 1.5 | ▲ 18K |
| | $38M | ▲ 3.0 | ▲ 117 MW |
| | **$38M** | | |

Through the profit share and hosting model of the ASIC partnership, NewCo could own 1.5x units of machines and 3.0x units of infrastructure after 2 years

NewCo Restructuring Plan | Strategy

# <u>Staking</u>: NewCo intends to self-stake Ethereum (ETH)

## ETH staking overview

**What is staking?**

▸ Staking refers to the **process through which transactions are validated** on the Ethereum blockchain network, which uses a proof-of-stake consensus protocol

▸ When staking, a user locks in, or stakes, ETH tokens on the blockchain to **qualify for validator privileges to help secure the network and earn rewards**

**What is self-staking?**

▸ Each validator must stake 32 ETH of bond and has both a (1) validator key and a (2) withdrawal address, where all rewards and ETH are sent when exiting staking

▸ **Self-staking allows the withdrawal address to remain at a custodian with the intent that the user should always have control over its funds**

## Benefits of self-staking ETH

**Risk reduction** — Self-staking is intended to enable Fahrenheit to retain full control over its ETH and reduce counterparty risk

**Profit potential** — Self-staking is intended to eliminate the need for pools and associated fees

**Security and governance** — Self-staking contributes directly to network security and users play a more significant role in governance

**Reputation** — Self-staking can increase institutional credibility in the crypto space

**NewCo could reinvest self-staking returns opportunistically, reducing the need for external capital**

**AGENDA**

Executive Summary

Strategy

**Execution**

Risk Management

Structure

Potential Opportunity Areas

NewCo Restructuring Plan | Execution

**Fahrenheit Group** · 19

# Fahrenheit is a coalition of Web3 pioneers dedicated to NewCo

 US BITCOIN CORP

**arrington** CAPITAL

**Founded:** 2020

**Headquarters:** Miami, FL

**Leading operator of Bitcoin mining sites specializing in the design, construction, and management of data centers with access to low-cost and sustainable sources of energy**

▸ Operates four mining sites across the US with total capacity of more than 730 MW

▸ Announced all-stock merger of equals with Hut 8 Mining (NASDAQ: HUT) on 2/7/2023

**PROOF GROUP** .

**Founded:** 2021

**Headquarters:** Menlo Park, CA

**Team of former crypto founders and venture investors backing the next generation of founders building disruptive financial technology**

▸ Supports founders in aligned structures from day zero all the way through the public markets



**Fahrenheit Group** is a coalition of seasoned operators with decades of collective experience across the Web3 ecosystem.

We believe in a decentralized future, and we are committed to the long-term success of crypto in the US and beyond—including optimal outcomes for those impacted by corporate failure.

**Founded:** 2018

**Headquarters:** Seattle, WA

**Digital asset management firm primarily focused on blockchain-based capital markets**

▸ Founded by TechCrunch and CrunchBase founder Michael Arrington and TechCrunch CEO Heather Harde

▸ Since launching Arrington XRP Capital, its first fund, the firm has expanded to multiple funds over time

▸ Dual-strategy with a liquid market trading organization and a robust portfolio of 158 web3 venture investments

▸ Seasoned, international team composed of Silicon Valley veterans and operators with deep venture capital experience and crypto native roots

NewCo Restructuring Plan | Execution

**Fahrenheit Group**   20

# NewCo will be led by seasoned, crypto-native operators

**Fahrenheit Group leadership team**



**Steven Kokinos, proposed CEO of NewCo**
Founder and Managing Director, Sonic Boom Ventures
- Former founding CEO of Layer 1 blockchain Algorand
- Founder of Fuze (acquired by 8x8 in 2022) and BladeLogic (2007 IPO)
- $1.5B in total capital raised for companies founded or led as CEO



**Michael Arrington**
Founder and Managing Director, Arrington Capital
- Founder of TechCrunch and CrunchFund (Uber, Airtable, Pinterest, etc.)
- Named to the Time 100 list of the world's most influential people
- Author of *The Initial Public Offering: A Practical Guide for Investors*



**Joel Block, proposed CFO of NewCo**
CFO, US Bitcoin Corp
- Former CEO of Collegewise, global college counseling firm
- 9 years with Credit Suisse in interest rate derivatives
- Member of Young Presidents Organization (YPO)



**Keli Callaghan**
Partner, Arrington Capital
- Former CMO at Algorand; grew ecosystem from inception to thriving community and partnered with FIFA, World Chess, TD Garden, and others
- Former Senior Director at Avid Technology



**Asher Genoot**
Co-founder and President, US Bitcoin Corp
- Co-founded and scaled venture-backed bitcoin mining organization from 0 to 140 employees and 0 to 772 MW in <2 years
- Member of Young Presidents Organization (YPO)



**Bhavik Patel**
Partner and Chief Investment Officer, Arrington Capital
- Former Chief Product Officer and Head of Derivatives at BitMEX
- Former APAC Derivatives Strategist at UBS
- Master of Mathematics, University of Oxford



**Noah Jessop**
Founder and Managing Director, Proof Group
- Former SVP at Core Scientific, Product Manager at Libra Association, CEO at CommandIQ, and VC Investor at Founder Collective
- MIT Mathematics and Computer Science



**Ravi Kaza**
Founder, Seasons Capital Management; Strategic Advisor, Arrington Capital
- Former Vice President at Pequot Capital Management
- Former Investment Banker with Frank Quattrone (Amazon, Apple, etc.)
- Former Managing Director of Duquesne Capital Management

NewCo Restructuring Plan | Execution

**Fahrenheit Group**    21

# Fahrenheit intends for financial discipline to be a primary focus of NewCo

  US BITCOIN CORP        **PROOF GROUP** •        **arrington** CAPITAL

| | Bitcoin mining | Ethereum (ETH) staking | DeFi and venture investing |
|---|---|---|---|
| **Strategic mandate** | Deploy the Celsius machine fleet and build a sophisticated, cost-efficient bitcoin mining business for Newco | Establish self-staking of ETH and deploy an advanced, cost-effective proof-of-stake operation for Newco | Manage and monetize the existing venture portfolio to maximize returns for NewCo |
| **Track record** | From inception[1] to date, USBTC has generated 3.5x return on equity | ‣ Manages a nine-figure staking operation, extending support to Ethereum and other premier Proof-of-Stake (PoS) networks<br><br>‣ Demonstrates significant experience in administering and upkeeping high-availability, mission-critical infrastructure<br><br>‣ Proficient in employing industry-leading security practices, bolstering system and data integrity | ‣ Decades of experience in venture investing, with the past 6 years dedicated to growing a strong and resilient Web3<br><br>‣ Intimate familiarity with complex deal structures<br><br>‣ Complementary investment and liquid market strategies teams to enable robust market perspectives<br><br>‣ Cumulative fund performance outperforming BTC, ETH, and trade benchmarks by multiples |

**Track record chart:**

3.5x

$380M

| | |
|---|---|
| $400M | |
| $300M | |
| $200M | |
| $100M | $110M |
| $0M | |

Equity raised    Market cap (T3M average)

Note: (1) December 2020

NewCo Restructuring Plan | Execution



22

# Fahrenheit believes that the economics of the mining business require NewCo at the outset to partner with a proven operator such as USBTC

## Bitcoin mining revenue drivers

$$\frac{Company\ hashrate}{Network\ hashrate} \times Price\ of\ BTC \times (Block\ reward + Transaction\ premium) \times Number\ of\ blocks$$

(1)                                    (2)

## Bitcoin mining cost drivers

$$Cost\ of\ energy + Operating\ expenses + SG\&A\ expenses$$

(3)                    (4)

## Commentary

(1) Hashrate refers to the amount of computing power generated by a company's mining rigs and is the only revenue driver under a company's control. **It is critical to optimize and grow hashrate to maintain and grow revenue**

(2) The price of BTC, block rewards, transaction premiums, and number of blocks are **not under a company's control**

(3) Energy typically accounts for ~80% of the cost of Bitcoin mining. **It is critical to secure and maintain access to low-cost energy to operate profitably through market cycles**

(4) By decreasing operating and SG&A expenses, Bitcoin miners can **further decrease their breakeven point** and maintain profitability through market cycles

## US Bitcoin Corp (USBTC) value proposition

**Revenue maximization**

▸ USBTC intends to provide to NewCo with a **market-pioneering, CAPEX-light growth model through the strategic ASIC partnership**, which could enable NewCo to scale without deploying CAPEX on machines

▸ USBTC's plan is to deploy its **proprietary miner management and energy curtailment software** with the goal of maximizing miner uptime, protecting against downside during periods of high energy pricing, and optimizing revenue generated by NewCo's rig fleet

▸ USBTC believes it has demonstrated an ability to make capital go further with faster, more cost-effective site buildout, backed by its **buildout cost cap of $395K/MW and commitment to build 100 MW of capacity for NewCo within 12 months**

**Cost minimization**

▸ USBTC's plan provides **access to its in-house energy team at no cost to NewCo**, unlocking market-leading expertise and experience in energy markets and hedging

▸ USBTC has committed to a **labor cost cap of $2M per 100 MW** for all NewCo sites

**AGENDA**

Executive Summary

Strategy

Execution

**Risk Management**

Structure

Potential Opportunity Areas

NewCo Restructuring Plan | Risk Management



24

# Proactive risk management strategy with goal of mitigating downside risk (1 of 2)



| **Financial risk management** | Operational risk management |

**Proactive balance sheet management** intended to ensure sufficient liquidity to execute NewCo business strategy

**Consideration of tail hedges in cheaper, more liquid incumbent TradFi markets** such as SPX and VIX based on projected correlations in stress scenarios

**Modelling of stress scenarios in the relationship between BTC price and aggregate BTC Network Hash Rate ("BNHR")** to assess worst-case scenarios for revenue generated from a given amount of mining capacity

**Cost-benefit analysis of BTC hedging and forward sale strategies** with the goal of managing BTC mining revenue risk

**Proactive yield generation strategies** such as smart rules-based optimized covered call sale strategies

**Correlation analysis of NewCo energy price per unit and the BTC-BNHR relationship**

# Proactive risk management strategy with goal of mitigating downside risk (2 of 2)



| Financial risk management | Operational risk management |
|---|---|

| Governance and compliance | Bitcoin mining | Ethereum staking |
|---|---|---|
| ▸ **Board composition and oversight** NewCo's board will consist of a majority of directors appointed by Celsius creditors<br><br>▸ **Controls: Risk management systems** Fahrenheit intends to design a risk management framework for NewCo consisting of clear management controls and delegation of authority; formal risk management, compliance, and/or controllership functions; and internal/external audit systems<br><br>▸ **Regulatory risk management** NewCo intends for all business lines to be regulatorily compliant | ▸ **Counterparty risk management** Fahrenheit intends to vertically integrate the mining division, building proprietary sites to reduce reliance on third party hosting partners<br><br>▸ **Execution risk management** Fahrenheit plans to partner with a proven operator, USBTC, to build and operate mining sites faster and more cost-effectively than possible otherwise<br><br>▸ **Cost management** Fahrenheit intends to continually improve hosting terms and hedge power costs with less capital investment by leveraging the negotiating power and relationships of USBTC | ▸ **Counterparty risk management** Fahrenheit intends to leverage the proprietary IP of Proof Group to establish a self-staking operation for NewCo and eliminate reliance on third party staking partners |

**AGENDA**

Executive Summary

Strategy

Execution

Risk Management

**Structure**

Potential Opportunity Areas

NewCo Restructuring Plan | Structure



27

# Public listing of NewCo with goal of optimizing valuation and liquidity

**Case study**

MicroStrategy (MSTR): A beneficiary of structural valuation premium and robust liquidity

**Adjusted enterprise value premium**



**Commentary**

▸ **MSTR's adjusted enterprise value has historically represented a premium to its BTC holdings** (now in excess of $3.5B), averaging 68%[1]

▸ **MSTR has a holder base that includes well-known institutions in traditional finance**; Top 10 investors include Capital Group (15%), Vanguard (9%), Fidelity (7%), Blackrock (7%) , State Street, and Morgan Stanley

▸ **MSTR has average daily trading volume of ~$200 million**



Fahrenheit expects to retain future free cash-flow in the form of liquid BTC/ETH, and, by seeking to list NewCo on a traditional stock exchange, intends to position NewCo to reach large traditional investors with the goal of maximizing liquidity over time

Note: (1) Comparing MSTR's fully diluted enterprise value for each of the last 10 quarters to end-of-quarter BTC holdings based on MSTR public disclosures; legacy approximately $75M EBITDA software business assumed value of $750M or 10x EBITDA.

NewCo Restructuring Plan | Structure

**Fahrenheit Group** | 1

# Public listing is intended to provide accelerated path to liquidity for creditors

**Celsius assets to be transferred to NewCo (illustrative)**



**Approximately $300 million in assets anticipated to be <u>illiquid</u> as of the Effective Date**
Institutional loan portfolio, DeFi cryptocurrency assets, and PE & VC investments

▸ Illiquid assets are **not** anticipated to be available in the form of either Cash or Liquid Cryptocurrency as of the Effective Date

▸ Illiquid assets are **not** anticipated to be available for near-term distribution in context of Orderly Wind Down

▸ Under Orderly Wind Down, debtors estimate that **the process of monetizing these illiquid assets could take approximately five years to complete**



The Fahrenheit plan, via the intended listing on Nasdaq, is intended to allow investors seeking liquidity to monetize their interests in NewCo (including in the illiquid assets) on or as soon as reasonably practicable following the Effective Date

**AGENDA**

Executive Summary

Strategy

Execution

Risk Management

Structure

**Potential Opportunity Areas**

# Transforming Bitcoin mining infrastructure for a smarter future: Unleashing the power of AI

## Potential to repurpose & diversify BTC mining infrastructure for AI

**Potentially unlock new realm of growth potential** by repurposing electrical infrastructure for AI

**Could result in diversified revenue streams and optimized** operations through utilizing idle or underused electrical resources

**Intended to position NewCo to capitalize on growing demand** for AI-driven solutions

**Would showcase NewCo** as a brand that is ahead of future trends



**BTC mining infrastructure may offer a powerful framework for AI mining**

NewCo Restructuring Plan | Potential Opportunity Areas

**Fahrenheit Group**

31

# Bitcoin mining infrastructure appears to be well-suited for AI and other next gen workloads



**Existing infrastructure**

NewCo may be able to use existing or new facilities to create a diversified revenue stream by leveraging existing access to:

▸ Low-cost energy

▸ Cooling systems

▸ Fiber connectivity

**Moving forward**

▸ Evaluate potential strategies to capitalize on new trends and diversify revenue streams

▸ Explore potential of revenue stream for building a protocol specific to running AI workloads

▸ Seek to position NewCo ahead of the trend of the intersection of AI and crypto—a potentially significant opportunity for entrepreneurs and established organizations



NewCo Restructuring Plan | Potential Opportunity Areas

# Potential areas of opportunity with the future of ETH staking

**ETH staking potential areas of opportunity**

## Restaking with goal of realizing unique yield opportunity

Intended to enable staked ETH holders to earn additional yield by providing validation to other blockchain networks without extra capital

## Could represent compelling development opportunity for developers

Restaking utilizes ~$30B+ in staked ETH to launch networks with strong security, saving both cost and time.
NewCo could be positioned to be a scaled player and would potentially have differentiated opportunity set

## Positive growth cycle

Increased demand for validation services could boosts rewards, incentivize participation, and potentially accelerate the development of the ETH ecosystem

## May yield operational efficiencies

Potentially quick to prototype, with goal of beginning new revenue generation using existing capital base





## EXHIBIT G

**Navigating the Ballot—Retail Borrower Deposit Claims**

**If you are a Holder of Retail Borrower Deposit Claim, start here.**

*All defined terms are defined in the Plan.*

Do you wish to opt out of the Class Claim Settlement? (Review Item 8 on your Ballot.)

**Yes.** Your total Account Holder Claim (excluding your Custody Claim (if any)) will be treated as a Disputed Claim under the Plan, regardless of whether or how you vote on the Plan. Your Disputed Claim will have to be resolved in the claims reconciliation process before you can receive any distribution.

**No.** Your total Account Holder Claim (excluding your Custody Claim (if any)) is increased by 5%.

Do you wish to make the Retail Advance Obligation Repayment Election? (Review Item 3 on your Ballot.)

**Yes.** After you actually repay all or a portion of your Retail Advance Obligation(s) in accordance with the Retail Advance Obligation Repayment Instructions, you will receive an amount of BTC or ETH, at your election, equal to the repayment amount. The remaining amount of your Retail Borrower Deposit Claim is known as your Retail Borrower Post-Set Off Claim.

**No.** You will receive the Set Off Treatment: You will retain the proceeds of your Retail Advance Obligation(s) and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligation(s) outstanding as of the Petition Date. The remaining amount of your Retail Borrower Deposit Claim is known as your Retail Borrower Post-Set Off Claim.

Is the value of your total Account Holder Claim (excluding your Custody Claims (if any) and Retail Borrower Deposit Claims (if any) but including your Retail Borrower Post-Set Off Claim (if any) and the 5% increase if you did not opt out of the Class Claim Settlement) greater than $10† but less than or equal to $5,000 as of the Petition Date?

**Yes.** Your total Account Holder Claim will be treated as a Class 4 Convenience Claim. (Review Items 4, 9 on your Ballot.) Review the Convenience Claim Chart for a summary of your options with respect to your Class 4 Convenience Claim.

**Yes.** Your Claim(s) is automatically counted as a vote to accept the Plan in Class 2 and, if applicable, Class 5 or Class 7, and the total value of your Account Holder Claim is reduced to $5,000. You will now receive the same treatment as a Holder of a Class 4 Convenience Claim on behalf of *all* of your Account Holder Claims.

**No.** Do you wish to make the Convenience Claim Election? (Review Item 5 on your Ballot.)

You vote to accept the Plan. You have the option to make an Unsecured Claim Distribution Mix Election, *provided* that if you have other Account Holder Claims on account of which you are receiving the Unsecured Claim Distribution Consideration (*e.g.*, a General Earn Claim), any Unsecured Claim Distribution Mix Election you make will apply to those Claims as well. (Review Item 6 on your Ballot and the Unsecured Claim Distribution Election Chart for more details).

Because you have a Retail Borrower Post Set-Off Claim, any Liquid Cryptocurrency Weighted Distribution Election you make on account of your Retail Borrower Post Set-Off Claim will have priority over other Liquid Cryptocurrency Distribution Elections made by other Account Holders.

In addition, because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

**No.** You have a Retail Borrower Post-Set Off Claim that will receive the same treatment as a General Earn Claim. In the NewCo Transaction, you will receive your Pro Rata share of (a) Liquid Cryptocurrency, (b) Litigation Proceeds, and (c) NewCo Common Stock. In the Orderly Wind Down, you will receive your Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights.

You vote to reject the Plan OR you do not vote on the Plan. You have the option to opt out of the releases (review Item 10 on your Ballot), but you will *not* have the option to make any Unsecured Claim Distribution Mix Election.

If you opt out of the releases, you will (1) not receive a Debtor Release or a Third-Party Release and (2) not provide the Released Parties with a Third-Party Release.

If you do not opt out of the release, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

Do you vote to accept the Plan? (Review Items 3, 9 on your Ballot.)

† Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

**<u>EXHIBIT H</u>**

**Navigating the Ballot—Convenience Claims**

**If you are a Holder of Convenience Claim, start here.***

*All defined terms are defined in the Plan.*

Do you wish to *opt out* of the Class Claim Settlement below?

**Yes.*** Is the value of your total Account Holder Claim (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) greater than $10*** and less than $5,000 as of the Petition Date?)

**No.†** Is 105% of the value of your total Account Holder Claim (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims and including the 5% increase if you did not opt out of the Class Claim Settlement) greater than $10*** and less than $5,000 as of the Petition Date?)

**Yes.** You are a Holder of a Class 4 Convenience Claim and you may vote to reject or accept the Plan. **Do you vote to accept or reject the Plan?** (Review Items 4, 9 on your Ballot.)

**No.** You are not a Holder of a Class 4 Convenience Claim. You may, however, make the Convenience Claim Election. For the avoidance of doubt, even if you make the Convenience Claim Election below and, on your Ballot, your vote(s) will be counted as a Class 2 Retail Borrower Deposit Claim, Class 5 General Earn Claim, and/or a Class 7 Withhold Claim, as applicable. **Do you make the Convenience Claim Election?** (Review Item 5 on your Ballot.)

**You vote to reject the Plan. You can decide whether to opt out of the releases.** (Review Item 10 on your Ballot.)

**You vote to accept the Plan.**

**You make the Convenience Claim Election and *opt in* to receive the Convenience Class treatment.**

**You do not make the Convenience Claim Election.**

**You are a Holder of a Class 4 Convenience Claim and you will receive Convenience Class treatment if the Plan is Confirmed.** In either the NewCo Transaction or the Orderly Wind Down, you will receive Liquid Cryptocurrency in an amount that provides 70% recovery on account of your Convenience Claim.

**If you opt out of the release,** you will (1) not receive a Debtor Release or a Third-Party Release and (2) not provide the Released Parties with a Third-Party Release.

**If you do not opt out of the release** you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

**You are a Holder of a Class 4 Convenience Claim and you will receive Convenience Class treatment if the Plan is Confirmed.** In either the NewCo Transaction or the Orderly Wind Down, you will receive Liquid Cryptocurrency in an amount that provides 70% recovery on account of your Convenience Claim.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

**Your Claim(s) is automatically counted as a vote to accept the Plan in Class 2, Class 5, and/or Class 7, as applicable.**

**The total value of your Account Holder Claim is reduced to $5,000.**

Please review the respective Charts for Retail Borrower Deposit Claim, General Earn Claim, and Withhold Claim for the summary of your options with respect to your Retail Borrower Deposit Claim, General Earn Claim, and/or Withhold Claim.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

| | |
|---|---|
| * | This chart assumes that your *only* Claims are Account Holder Claims that may result in a Class 4 Convenience Claim and that you do not have any other Claims. |
| ** | If you opt out of the Class Claim Settlement, your Account Holder Claims will be treated as Disputed Claims under the Plan, regardless of whether or how you vote on the Plan. |
| *** | Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution. |
| † | You will receive a claim equal to 105% of your scheduled Account Holder Claims (other than Custody Claims) for purposes of distribution, but you can only vote the amount of your scheduled Account Holder Claims. |

### EXHIBIT I

**Navigating the Ballot—General Earn Claims**

**If you are a Holder of a General Earn Claim, start here.**

*All defined terms are defined in the Plan.*

**General Earn Claim\***

\*   If your Account Holder Claim is not otherwise classified under the Plan, you have a General Earn Claim.

\*\*   Please review the Withhold Claim Chart for a summary of your options with respect to your Withhold Claim.

\*\*\*   Please review the Retail Borrower Deposit Claim Chart for a summary of your options with respect to your Retail Borrower Deposit Claim.

†   Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

‡   If you opt out of the Class Claim Settlement, your Account Holder Claims will be treated as Disputed Claims under the Plan, regardless of whether or how you vote on the Plan.

&   You will receive a claim equal to 105% of your scheduled Account Holder Claims (other than Custody Claims) for purposes of distribution, but you can only vote the amount of your scheduled Account Holder Claims.

**Do you wish to *opt out* of the Class Claim Settlement? (Review Item 8 on your Ballot.)**

**Yes.‡ Is the value of your total Account Holder Claim (excluding your Custody Claims and Retail Borrower Deposit Claims (if any) but including your Retail Borrower Post-Set Off Claim (if any)) greater than $10† but less than or equal to $5,000 as of the Petition Date?**

**No.& Is 105% of the value of your total Account Holder Claim (excluding your Custody Claims and Retail Borrower Deposit Claims (if any) but including your Retail Borrower Post-Set Off Claim (if any)) greater than $10† but less than or equal to $5,000 as of the Petition Date?**

**Yes. You are *not* a Holder of a Class 5 General Earn Claim. You are a Holder of a Class 4 Convenience Claim. (Review Items 4, 9 on your Ballot.)** Review the Convenience Claim Chart for a summary of your options with respect to your Class 4 Convenience Claim.

**No. If one of your Account Holder Claims is a General Earn Claim, then you are a Holder of a Class 5 General Earn Claim and, if you have a Withhold Claim\*\* or Retail Borrower Deposit Claim,\*\*\* the Holder of a Class 2 Retail Borrower Deposit Claim or Class 7 Withhold Claim in the amounts set forth in your Ballot.  Do you vote to accept the Plan? (Review Item 9 on your Ballot.)**

**You vote to accept the Plan.  You have the option to make the Convenience Claim Election. (Review Item 5 on your Ballot.) For the avoidance of doubt, even if you make the Convenience Claim Election on your Ballot, your vote(s) will be counted as a Class 5 General Earn Claim, and, if applicable, a Class 2 Retail Borrower Deposit Claim or Class 7 Withhold Claim in the scheduled amount.  Do you make the Convenience Claim Election?  (Review Item 5 on your Ballot.)**

**You vote to reject the Plan.  You can decide whether to opt out of the releases.  (Review Item 10 on your Ballot.)**

**You make the Convenience Claim Election and *opt in* to receive the Convenience Class treatment.**

**Your Claim(s) is automatically counted as a vote to accept the Plan in Class 5 and, if applicable, Class 2 or Class 7.**

**The total value of your Account Holder Claim is reduced to $5,000.**

**You will now receive the same treatment as a Holder of a Class 4 Convenience Claim on behalf of *all* of your Account Holder Claims.**  For example, if you had both a General Earn Claim and a Withhold Claim, you will receive one distribution on the same treatment terms as a Convenience Claim, which means you will receive Liquid Cryptocurrency in an amount that provides 70% recovery on account of your Convenience Claim.

**You do not make the Convenience Claim Election.**

**You are a Holder of a Class 5 General Earn Claim.** Because you vote to accept the Plan, you have the option to make the Unsecured Claim Distribution Mix Election.  Please refer to the Unsecured Claim Distribution Mix Election Chart on the next page to understand your treatment election options.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party.  Review Article III.LL for more information on the releases.

**You are a Holder of a Class 5 General Earn Claim.** In the NewCo Transaction, you will receive your Pro Rata share of (a) Liquid Cryptocurrency, (b) Litigation Proceeds, and (c) NewCo Common Stock.

In the Orderly Wind Down, you will receive your Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights.

In both the NewCo Transaction and the Orderly Wind Down, you will *not* have the option to make any Unsecured Claim Distribution Mix Elections because you voted to reject the Plan.

**If you opt out of the releases**, you will not receive a Debtor Release or a Third-Party Release and you will not provide the Released Parties with a Third-Party Release.

**If you do not opt out of the releases** and you are not an Excluded Party, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties a Third-Party Release regardless of whether you are an Excluded Party.  Review Article III.LL for more information on the releases.

**Unsecured Claim Distribution Mix Election**

**If you are entitled to receive the Unsecured Claim Distribution Consideration on account of your Retail Borrower Post-Set Off Claim, General Earn Claim, or Withhold Claim, AND you have voted to accept the Plan, you have the option to make an Unsecured Claim Distribution Mix Election.*  Do you want to make the Unsecured Claim Distribution Mix Election?** (Review Item 6 on your Ballot.)

**Yes.  You want to make an Unsecured Claim Distribution Mix Election. Would you like to receive a greater share of the Unsecured Claim Distribution Consideration or a greater share of the NewCo Common Stock?**

**No.  You do not want to make an Unsecured Claim Distribution Mix Election.**

**You would like to receive a greater share of the Liquid Cryptocurrency Distribution Amount instead of some or all of your Pro Rata share of NewCo Common Stock.  You make the Liquid Cryptocurrency Weighted Distribution Election.** (Review Item 6 on your Ballot.)

**If the Plan is confirmed, and if your election is honored,^ you may receive incremental Liquid Cryptocurrency at a 30% discount to the amount of NewCo Common Stock that you are forfeiting depending on what transaction is consummated.**

**You would like to receive a greater share of NewCo Common Stock instead of some or all of your Pro Rata share of the Liquid Cryptocurrency Distribution Amount.  You make the NewCo Common Stock Weighted Distribution Election.** (Review Item 6 on your Ballot.)

**If the Plan is confirmed, and if your election is honored,^ you may receive incremental NewCo Common Stock equal to 30% more than the Liquid Cryptocurrency Distribution Amount that you forfeited depending on what type of transaction is consummated.**

**If the Plan is confirmed, in the NewCo Transaction you will receive your Pro Rata share of (a) Liquid Cryptocurrency, (b) Litigation Proceeds, and (c) NewCo Common Stock.**

**In the Orderly Wind Down, you will receive Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights.**

**Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party.  Review Article III.LL for more information on the releases.**

**The Orderly Wind Down is consummated.**

**The NewCo Transaction is consummated.**

**The Orderly Wind Down is consummated.**

**The NewCo Transaction is consummated.**

**You will receive your Pro Rata share of Liquid Cryptocurrency, Backup MiningCo Common Stock, Litigation Proceeds, and Illiquid Recovery Rights without consideration of any of your elections.#**

**To the extent possible, depending on the Unsecured Claim Distribution Mix Elections made by all Holders of Claims entitled to make such election, you will receive a greater share of Liquid Cryptocurrency instead of some or all of your Pro Rata share of NewCo Common Stock.#**

**You will receive your Pro Rata share of Liquid Cryptocurrency, Backup MiningCo Common Stock, Litigation Proceeds, and Illiquid Recovery Rights without consideration of any of your elections.#**

**To the extent possible, depending on the Unsecured Claim Distribution Mix Elections made by all Holders of Claims entitled to make such election, you will receive a greater share of NewCo Common Stock instead of some or all of your Pro Rata share of the Liquid Cryptocurrency Distribution Amount.#**

\*        Any Unsecured Claim Distribution Mix Election you make shall apply to all Claims on account of which you receive the Unsecured Claim Distribution Consideration.

^        The Debtors' ability to accommodate Account Holders' individual elections will ultimately depend on the Unsecured Claim Distribution Mix Election made by all Holders of Claims in the aggregate, including the priority given to Holders of Retail Borrower Post-Set Off Claims in making the Liquid Cryptocurrency Weighted Election.  The Debtors will use reasonable efforts to arrange the Unsecured Claim Distribution Consideration provided to the Holders of Claims to satisfy the aggregate Unsecured Claim Distribution Mix Election.

#        Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party.  Review Article III.LL for more information on the releases.

## EXHIBIT J

**Navigating the Ballot—Custody Claims**

**If you are a Holder of a Custody Claim, start here.**

*All defined terms are defined in the Plan.*

**Is at least some of your Custody Claim authorized to be withdrawn pursuant to the Custody Withdrawal Order? (Is your name listed on the Revised Withdrawal Notice [Docket No. 2491]?)\***

**Yes** → **You are a Holder of a Class 6B Withdrawable Custody Claim.**

You are presumed to accept the Plan, solely with respect to your Class 6B Claim, and are not entitled to vote your Class 6B Claim.

You can decide whether to opt out of the releases. (Review the Notice of Non-voting Status.)

You will be eligible to withdraw 100% of the Cryptocurrency making up your Class 6B Claim in accordance with the Custody Withdrawal Order.

**If you opt out of the release**, you will not receive a release and you will not provide the Released Parties with a release, solely with respect to your Class 6B Claim.

**If you do not opt out of the release**, you will receive a release and you will provide the Released Parties with a release, solely with respect to your Class 6B Claim.

If a portion of your Custody Claim is not on the Revised Withdrawal Notice (because it was transferred from the Earn Program or Borrow Program into the Custody Program <u>and it</u> was valued at more than \$7,575 in the aggregate, valued at the time of the transfer), restart this chart with a "No" answer to review the options on account of that portion of your Custody Claim.

**No** → **You are a Holder of a Class 6A General Custody Claim.**

**Did you *opt in* to the Custody Settlement on or before April 24, 2023?**

**Yes** → **You are a Holder of a Class 6A General Custody Claim** and you are deemed to accept the Plan with respect to your Class 6A Claim, regardless of whether you return your Ballot or vote to reject the Plan on your Ballot, as you agreed to do in accepting the Custody Settlement.

**Have you previously withdrawn any amounts of your Custody Claim pursuant to the Custody Settlement?**

**Yes** → **You will receive a distribution in the amount of Treatment A *minus* any amounts you have previously withdrawn from the Debtors' platform.** In either the NewCo Transaction or the Orderly Wind Down, you will be eligible to withdraw 72.5% of the Cryptocurrency in your Allowed Class 6A General Custody Claim, less any amounts (up to 36.25%) previously withdrawn, on or shortly after the Effective Date.

You will also receive a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Class 6A General Custody Claim.+

**No** → **You will receive a distribution in the amount of Treatment A.** If the Plan is Confirmed, in either the NewCo Transaction or the Orderly Wind Down, you will be eligible to withdraw 72.5% of the Cryptocurrency in your Allowed Class 6A General Custody Claim on or shortly after the Effective Date.

You will also receive a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Class 6A General Custody Claim.+

**No** → **You are a Holder of a Class 6A General Custody Claim** and you may vote to reject or accept the Plan. **Do you vote to accept or reject the Plan?** (Review <u>Items 6, 9</u> on your Ballot.)

**You vote to accept the Plan.**

**You vote to reject the Plan or you abstain (do nothing) from voting your Class 6A General Custody Claim on the Plan.**

→ **You will receive Treatment B.** In either the NewCo Transaction or the Orderly Wind Down, 100% of the Cryptocurrency associated with your Class 6A General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and will be subject to all Avoidance Actions and other claims with respect to such Class 6A General Custody Claim. The Litigation Administrator(s) shall have 180 days (or longer if approved by the Bankruptcy Court) to bring any Avoidance Action or other claim against you with respect to such assets. If no action is brought and no settlement is reached in such time period (as extended), such assets shall be released to you. Any such Allowed General Custody Claim will be subject to the ADR Procedures.

You will not receive a release with respect to your Class 6A General Custody Claim and you will not provide the Released Parties with a release with respect to your Class 6A General Custody Claim.

---

\*   Assets that are eligible to be withdrawn pursuant to the Custody Settlement Order are those that either (a) were only ever held in the Custody Program or (b) were transferred from the Earn Program or the Borrow Program into the Custody Program <u>and</u> were valued at less than \$7,575 in the aggregate, valued at the time of the transfer.

+   If your Withdrawal Preference Exposure is under \$100,000 (review <u>Items 1, 12</u> on your Ballot), and you either (a) have no other Claims to vote or (b) have other Claims to vote and vote *all* of those Claims to accept the Plan, then you will receive a 100% recovery of your Class 6A General Custody Claim.

**<u>EXHIBIT K</u>**

**Navigating the Ballot—Withhold Claims**

**If you are a Holder of a Withhold Claim, start here.**

*All defined terms are defined in the Plan.*

\*  Ineligible Withhold Assets are not considered Withhold Claims. If you have Ineligible Withhold Assets, you will receive 100% of your Ineligible Withhold Assets held on the Withhold Assets Distribution Date.

\*\*  If you opt out of the Class Claim Settlement, your Account Holder Claims will be treated as Disputed Claims under the Plan, regardless of whether or how you vote on the Plan.

\*\*\*  Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

†  You will receive a claim equal to 105% of your scheduled Account Holder Claims (other than Custody Claims) for purposes of distribution, but you can only vote the amount of your scheduled Account Holder Claims.

+  If you have any other Claims (other than a Custody Claim), you *must* vote ALL Claims to accept the Plan. To be clear, you do *not* have to vote your Custody Claim to accept the Plan if you vote your Withhold Claim to accept the Plan.

Withhold Claims\* ⟶ Did you participate in the Withhold Settlement? ⟶ **Yes. You no longer have a Withhold Claim. You have a Class 5 General Earn Claim.** Please review the General Earn Claim Chart for a summary of your options with respect to your General Earn Claim.

No. Do you wish to *opt out* of the Class Claim Settlement? (Review **Item 8** on your Ballot.)

**Yes.\*\*** Is the value of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) greater than $10\*\*\* but less than or equal to $5,000 as of the Petition Date?

No. Is 105% of the value of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) greater than $10\*\*\* but less than or equal to $5,000 as of the Petition Date?

Yes. **You are not a Holder of a Class 7 Withhold Claim. You are a Holder of a Class 4 Convenience Claim.** (Review **Items 4, 9** on your Ballot.) Review the Convenience Claim Chart for a summary of your options with respect to your Class 4 Convenience Claim.

No. **You are a Holder of a Class 7 Withhold Claim and, if you have a Retail Borrower Deposit Claim or General Earn Claim,\*\* the Holder of a Class 2 Retail Borrower Deposit Claim, or Class 5 General Earn Claim in the amounts set forth in your Ballot. Do you vote to accept the Plan?** (Review **Items 9** on your Ballot.)

Yes. You vote to accept the Plan. You have the option to make the Convenience Claim Election. (Review **Item 5** on your Ballot.) For the avoidance of doubt, even if you make the Convenience Claim Election below and on your Ballot, your vote(s) will be counted as a Class 7 Withhold Claim, and, if applicable, a Class 2 Retail Borrower Deposit Claim, or Class 5 General Earn Claim. **Do you want to make the Convenience Claim Election?** (Review **Item 5** on your Ballot.)

No. You vote to reject the Plan. You can decide whether to opt out of the releases. (Review **Item 10** on your Ballot.)

Yes. You make the Convenience Claim Election and *opt in* to receive the Convenience Class Distribution.

No. You do not make the Convenience Claim Election.

Your Claim(s) is automatically counted as a vote to accept the Plan in Class 7 and, if applicable, Class 2 or 5.

The total value of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) is reduced to $5,000.

**You will now receive the same treatment as a Holder of a Class 4 Convenience Claim on behalf of all of your Account Holder Claims.** For example, if you had both a Withhold Claim and a General Earn Claim, you will receive one distribution on the same terms as a Convenience Claim, which means you will receive Liquid Cryptocurrency in an amount that provides a 70% recovery on account of such Convenience Claim.

**You are a Holder of a Class 7 Withhold Claim.** In either the NewCo Transaction or the Orderly Wind Down, if Class 7 votes to accept the Plan, then you will receive a distribution of Cryptocurrency equal to 15% of the value of your Withhold Claim, distributed on or shortly after the Effective Date. The remaining 85% of your Withhold Claim will receive a Pro Rata share of the Unsecured Claim Distribution Consideration.

If Class 7 votes to reject the Plan, then your entire Withhold Claim will be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration, but you will not be able to make any elections with respect to such

**You are a Holder of a Class 7 Withhold Claim.** In either the NewCo Transaction or the Orderly Wind Down, if Class 7 votes to accept the Plan, you will receive a distribution of Liquid Cryptocurrency equal to 15% of the value of your Withhold Claim, distributed on or shortly after the Effective Date. The remaining 85% of your Withhold Claim will receive a Pro Rata share of the Unsecured Claim Distribution Consideration.

If Class 7 votes to reject the Plan, then your entire Withhold Claim will be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration, but you will not be able to make any elections with respect to such treatment.

**If you opt out of the releases**, you will not receive a Debtor Release or a Third-Party Release and you will not provide the Released Parties with a Third-Party Release.

**If you do not opt out of the releases** and you are not an Excluded Party, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. *To be clear, even if Class 7 votes to reject the Plan, your release is binding.* Review Article III.LL for more information on the releases.

**Exhibit L**

**Cryptocurrency Conversion Table**

## Exhibit L

### Cryptocurrency Conversion Table

*The below table contains the Debtors' view of prices for all types of cryptocurrencies listed on the Debtors' schedules as of 8:10 p.m., prevailing Eastern Time, on July 13, 2022 (i.e., approximately the time the Debtors commenced their chapter 11 cases). Prepetition, in the ordinary course of business, the Debtors determined the price of coins utilized in their services primarily by referencing pricing feeds such as Coingecko and CoinPaprika. For certain coins, the Debtors used "CPS," the Debtors' proprietary pricing engine. CPS processes inputs from five external sources (Chainlink, Coinmarketcap, Coingecko, CoinPaprika, and Fixer) to determine the price of a coin. The system evaluates averages, closing prices, and ten-day low prices from one or more of the inputs in assigning a price. In some circumstances, only a single input is utilized because it is all that is available (or reliably available) for a particular coin. The use of multiple inputs allows CPS to reduce the risk that outlier data points will result in an inaccurate price and also allows the Debtors' platform to support a wider variety of coins, as not every coin is priced on every input.*

[*Remainder of page intentionally left blank.*]

**Cryptocurrency Conversion Table**
**Petition Date USD Coin Prices as of 8:10 PM ET on 7/13/2022**

| Coin | USD Price |
|------|-----------|
| 1INCH | 0.581744108 |
| AAVE | 78.24291593 |
| ADA | 0.427003308 |
| AVAX | 18.49035408 |
| BADGER | 3.285369715 |
| BAT | 0.37621662 |
| BCH | 100.546894 |
| BNB | 226.92614 |
| BNT | 0.450047559 |
| BSV | 50.99015321 |
| BTC | 19881.00134 |
| BTG | 15.14018234 |
| BUSD | 1 |
| CEL | 0.81565 |
| COMP | 47.33041601 |
| CRV | 1.032841943 |
| CVX | 6.08763006 |
| DAI | 1 |
| DASH | 41.79955662 |
| DOGE | 0.061140905 |
| DOT | 6.360775884 |
| EOS | 0.929357695 |
| ETC | 14.12753443 |
| ETH | 1088.170943 |
| GUSD | 1 |
| KNC | 1.263392739 |
| LINK | 6.077201511 |
| LPT | 8.033566927 |
| LTC | 48.75597218 |
| LUNC | 0.00009241 |
| MANA | 0.80042259 |
| MATIC | 0.609434275 |
| MCDAI | 1 |
| MKR | 839.8922442 |
| OMG | 1.71960007 |
| ORBS | 0.040053336 |
| PAX | 1 |
| PAXG | 1738.836303 |
| SGA | 1.214643649 |
| SGB | 0.026003699 |
| SGR | 1.214643649 |
| SNX | 2.465894386 |
| SOL | 34.24173443 |
| SPARK | 0 |
| SUSHI | 1.214062046 |
| TAUD | 0.6748 |
| TCAD | 0.7701 |
| TGBP | 1.1881 |
| THKD | 0.1274 |
| TUSD | 1 |
| UMA | 2.487366187 |
| UNI | 6.014518833 |
| USDC | 1 |
| USDT ERC20 | 1 |
| UST | 0.039474965 |
| WBTC | 19852.24182 |
| WDGLD | 168 |
| XAUT | 1741.393614 |
| XLM | 0.104188979 |
| XRP | 0.321111953 |
| XTZ | 1.483213139 |
| YFI | 5742.188874 |
| ZEC | 53.54163596 |
| ZRX | 0.277486691 |
| ZUSD | 1 |

**<u>Exhibit B</u>**

**Redline**

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile:  (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile:  (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

The Debtors are providing the information in this Disclosure Statement to Holders of Claims in the Voting Classes for purposes of soliciting votes to accept or reject the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates*. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan (as defined herein), each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article VIII herein.

The Debtors urge Holders of Claims whose votes are being solicited to accept the Plan.

The Debtors urge each Holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, and certain anticipated events in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. The Plan and other documents incorporated herein will govern for all purposes in the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference. Factual information contained in this Disclosure Statement has been provided by the Debtors' management team and is as of the date of this Disclosure Statement except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records and various assumptions regarding the Debtors' business. While the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' business or their future results or operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof unless otherwise specifically noted, and there is no assurance that the statements contained herein will be correct at any time after such date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any part of this Disclosure Statement, including the exhibits and any forward-looking statements whether as a result of new information, future events, or otherwise. Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the

right to File an amended or modified Plan and related Disclosure Statement from time to time, subject to the terms of the Plan and Plan Sponsor Agreement.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

This Disclosure Statement does not constitute and may not be construed as an admission of fact, liability, stipulation, or waiver. The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

If the Bankruptcy Court confirms the Plan and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims and Interests who do not submit Ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby. The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied or waived. You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VIII entitled "Risk Factors," before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan. The information contained in this Disclosure Statement is included for purposes of soliciting votes for and Confirmation of the Plan and may not be relied on for any other purpose. This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws. The Securities and Exchange Commission or any similar federal, state, local, or foreign regulatory agency has not approved or disapproved this Disclosure Statement; nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code to the extent permitted under applicable law. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. If exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act. The Debtors recommend that potential

recipients of securities issued under the Plan consult their own counsel concerning their ability to freely trade such securities in compliance with the federal securities laws and any applicable "Blue Sky" laws.  The Debtors make no representation concerning the ability of a person to dispose of such Securities.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws.  The Debtors consider all statements regarding anticipated or future matters to be forward-looking statements.  Although the Debtors believe the expectations reflected in such forward-looking statements are based on reasonable assumptions, the Debtors can give no assurance that their expectations will be attained, and it is possible that actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties.  Such factors include, but are not limited to, the following:

- plans, objectives, expectations, and intentions;

- business and financial strategies, budgets, and projections;

- changes in political, economic, or market conditions generally and in the Cryptocurrency industry specifically;

- governmental regulation and taxation applicable to the Debtors, Post-Effective Date Debtors, or NewCo, including any changes thereto;

- possible restrictions on the ability of the Debtors, Post-Effective Date Debtors, or NewCo to operate;

- the unfavorable resolution of legal or regulatory proceedings;

- the regulatory licenses held by the Debtors, Post-Effective Date Debtors, or NewCo;

- risks associated with the chapter 11 process, including the Debtors' ability to develop, confirm, and consummate a plan under chapter 11;

- inability to maintain relationships with customers, employees, and other third parties as a result of the Chapter 11 Cases or other failure of such parties to comply with their contractual obligations; and

- failure to satisfy the Debtors', Post-Effective Date Debtors', or NewCo's short- or long-term liquidity needs, including their inability to generate sufficient cash flow from operations or to obtain adequate financing;

- the Debtors' or NewCo's technology and ability to adapt to rapid technological change;

- the outcome of pending and future litigation;

- exchange rate fluctuations and Cryptocurrency price fluctuations;

- risks in connection with dispositions of assets; and

- risk of information technology or data security breaches or other cyberattacks.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE NEWCO'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE PROJECTED, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:**

- the Debtors' ability to confirm and consummate the Plan;

- the potential that the Debtors may need to pursue an alternative transaction if the plan is not confirmed;

- the potential adverse impact of the Chapter 11 Cases on the Debtors', Post-Effective Date Debtors', or NewCo's operations, management, and employees;

- the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases;

- general economic, business, and market conditions;

- Cryptocurrency fluctuations;

- interest rate fluctuations;

- price increases;

- exposure to litigation;

- a decline in the Debtors' or NewCo's market share due to competition;

- adverse tax changes;

- limited access to capital resources;

- the impact of a Cryptocurrency market downturn on the Debtors' or NewCo's business;

- changes in domestic and foreign laws and regulations;

- trade balance;

- natural disasters;

- geopolitical instability; and

- the effects of governmental regulation on the Debtors' or NewCo's business.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
**SOLICITATION OF VOTES TO ACCEPT OR REJECT THE**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**
DATED ~~July [●]~~August 9, 2023

**YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE AS OF THE VOTING RECORD DATE, YOU HELD A CLAIM AGAINST THE DEBTORS IN ONE OF THE FOLLOWING CLASSES AND ARE THEREFORE ENTITLED TO VOTE ON THE PLAN:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|---|---|
| 2 | Retail Borrower Deposit Claims |
| 4 | Convenience Claims |
| 5 | General Earn Claims |
| 6A | General Custody Claims |
| 7 | Withhold Claims |
| 8 | Unsecured Loan Claims |
| 9 | General Unsecured Claims |
| 10 | State Regulatory Claims |
| 1~~3~~4 | Series B Preferred Interests |

| DELIVERY OF BALLOTS |
|---|

1.      For your vote to be counted to accept or reject the Plan, your Ballot must be actually received by Stretto, Inc. ("Stretto" or the "Solicitation Agent") before the Voting Deadline (4:00 p.m., prevailing Eastern Time, on [September ~~18~~20], 2023).[2]

2.      Ballots may be returned by the following methods:

   a) For Holders of Claims in Class 2, Class 4, Class 5, Class 6A, and Class 7: via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at ~~https://cases.stretto.com/Celsius~~https://case.stretto.com/Celsius/balloting.

   b) For Holders of Claims in Class 8, Class 9, Class 10, and Class 1~~3~~4: (i) via electronic submission through the Claims, Noticing, and Solicitation Agent's online voting portal at ~~https://cases.stretto.com/Celsius~~https://case.stretto.com/Celsius/balloting; (ii) in the enclosed pre-paid, pre-addressed return envelope; or (iii) via first class mail, overnight courier, or hand delivery to the address set forth below:

   Celsius Ballot Processing
   c/o Stretto
   410 Exchange, Suite 100
   Irvine, CA 92602

If you have any questions on the procedures for voting on the Plan, as defined herein, please contact the Solicitation Agent by emailing celsiusinquiries@stretto.com and referencing "In re Celsius – Solicitation Inquiry" in the subject line, or by calling (855) 423-1530 (Toll-Free) or (949) 669-5873 (International).

---

[2]      This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this date once the Voting Deadline is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................................................. 1

II.  PRELIMINARY STATEMENT .......................................................................................... 1
    A.  These Chapter 11 Cases. ................................................................................... 1
    B.  The Restructuring Transactions. ....................................................................... 5
    C.  Summary of Treatment Under the NewCo Transaction. ................................... 13
    D.  Recommendation. ............................................................................................. 23̶4̶

III.  QUESTIONS AND ANSWERS ABOUT THIS DISCLOSURE STATEMENT AND PLAN ........ 24̶5̶
    A.  What is chapter 11? .......................................................................................... 24̶5̶
    B.  Why are the Debtors sending me this Disclosure Statement? ........................... 24̶5̶
    C.  Am I entitled to vote on the Plan? .................................................................... 24̶5̶
    D.  How are Claims valued under the Plan?  How will the value of my Claim affect the
        amount of my distribution under the Plan? ...................................................... 25̶6̶
    E.  What will I receive from the Debtors if the Plan is consummated? ................... 27̶8̶
    F.  What will I receive from the Debtors if I hold an Allowed Administrative Claim or
        Priority Tax Claim? .......................................................................................... 35̶6̶
    G.  Why do the Debtors believe that the Plan provides the greatest distribution possible to
        Holders of Claims? ........................................................................................... 36̶7̶
    H.  What is the "NewCo Transaction"? .................................................................. 36̶8̶
    I.  What is the "Orderly Wind Down"? .................................................................. 37̶9̶
    J.  Can I vote if I have transferred my Claim to someone else? ............................. 3̶8̶40
    K.  Can I vote if I am the Holder of a Transferred Claim and if so, how? .............. 3̶8̶41
    L.  What does it mean if I have a Convenience Claim? .......................................... 3̶8̶41
    M.  What is the Convenience Claim Election and what are the consequences of making the
        Convenience Claim Election? ........................................................................... 3̶9̶41
    N.  Are any regulatory approvals required to consummate the Plan? ..................... 44̶3̶
    O.  When will I receive my distribution under the Plan?  What is meant by "Confirmation,"
        "Effective Date," and "Consummation?" .......................................................... 41̶4̶
    P.  What happens to my recovery if the Plan is not confirmed or does not go effective? ........ 42̶5̶
    Q.  If the Plan provides that I get a distribution, how will I receive my distribution? ....... 43̶5̶
    R.  How will undeliverable distributions and unclaimed property be treated under the Plan? ... 439
    S.  How will I receive my recovery if the Orderly Wind Down, including the Backup Plan
        Sponsor Transaction, is consummated? ............................................................ 4̶4̶50
    T.  What is NewCo Common Stock? ...................................................................... 4̶4̶50
    U.  Can I trade or sell my NewCo Common Stock? ................................................ 451
    V.  How much NewCo Common Stock will I receive under the Plan? .................... 451
    W.  How can I elect to receive more NewCo Common Stock in lieu of Liquid
        Cryptocurrency?  Can I elect to receive a greater distribution of Liquid Cryptocurrency
        instead? ............................................................................................................ 451
    X.  What happens to my NewCo Common Stock in an Orderly Wind Down? ......... 4̶9̶55
    Y.  Are there risks to owning NewCo Common Stock upon emergence from Chapter 11? ..... 50̶6̶
    Z.  How will Holders know what NewCo is doing after the Effective Date? .......... 50̶6̶
    AA.  What is a Plan Administrator?  Who will be the Plan Administrator? ............... 50̶6̶
    BB.  What are the roles of the Plan Administrator? .................................................. 54̶7̶
    CC.  What is a Litigation Administrator?  What is the Litigation Oversight Committee?  Who
        will be the Litigation Administrator?  Who will be on the Litigation Oversight
        Committee? ...................................................................................................... 54̶7̶
    DD.  What are the roles of the Litigation Administrator and the Litigation Oversight
        Committee? ...................................................................................................... 53̶8̶

EE.    Will the Litigation Administrator(s) be paid?  If so, who will pay the Litigation
       Administrator(s)? ....................................................................................................... 5~~3~~9

FF.    How will I receive Litigation Proceeds?  What happens to the Cash left in the Litigation
       Recovery Account after the Litigation Administrator(s) have completed their duties? ........ ~~54~~60

GG.    What are Contributed Claims? Should I contribute my Contributed Claims to the
       Litigation Administrator? .......................................................................................... ~~54~~60

HH.    What is the difference between a Plan Administrator and a Litigation Administrator? ........ ~~55~~61

II.    How will the preservation of the Causes of Action affect my recovery under the Plan? ..... ~~55~~61

JJ.    Does the Plan subordinate any Claims?  What does it mean to subordinate Claims?
       Whose Claims are subordinated under the Plan and why? ........................................... 5~~6~~2

KK.    Is there potential litigation related to the Plan? .......................................................... 65~~7~~

LL.    Will there be releases and exculpation granted to parties in interest as part of the Plan?
       What are "releases" and "exculpation"? ...................................................................... ~~57~~66

MM.    Are any specific individuals or entities specifically excluded from the Plan's release or
       exculpation provisions? ............................................................................................. ~~64~~73

NN.    Do I have to grant the releases under the Plan?  Can I opt out of the releases? ............... ~~65~~73

OO.    What is an injunction, and does the Plan contain any injunctions? ................................. ~~65~~74

PP.    What is the Account Holder Avoidance Action Settlement? ............................................. 76~~7~~

QQ.    Will I receive a distribution on the Effective Date if the Debtors have potential
       Avoidance Actions against me or otherwise dispute my Claim? ...................................... ~~68~~2

RR.    How and when will potential Avoidance Actions and disputes with respect to Claims be
       resolved? ................................................................................................................. ~~69~~83

SS.    What is the effect of the Plan on the Debtors' business? ............................................... ~~69~~83

TT.    What is the Custody Settlement, how does it work, and who is affected by it? .................. ~~70~~84

UU.    What is the Withhold Settlement, how does it work, and who is affected by it? ................. ~~75~~88

VV.    What is the Series B Settlement, how does it work, and who is affected by it? .................. ~~77~~91

WW.    What do I receive on behalf of my Retail Borrower Deposit Claim? .................................. ~~79~~2

XX.    How does the Plan classify Claims for damages arising from the alleged wrongful
       liquidation of loans issued under the Borrow program? ................................................. 95

~~XX~~YY.   What is the CEL Token Settlement and what is the basis for the valuation of CEL
       Tokens? .................................................................................................................... ~~81~~96

~~YY~~ZZ.   What is "substantive consolidation" and what entities have been "substantively
       consolidated" pursuant to the Plan? ............................................................................ ~~83~~97

~~ZZ~~AAA.  How are "Flare Tokens" treated under the Plan?  Will they be distributed to Holders of
       Earn or Custody Claims based on XRP transferred to the Debtors? ................................ ~~84~~99

~~AAA~~BBB.  What are "EIP Awards" and who is eligible to receive one?  Why do the Debtors
       believe EIP Awards are necessary? ............................................................................. ~~85~~99

~~BBB~~CCC.  What is an executory contract or unexpired lease, and what does it mean for the
       Debtors to "assume," "reject," or "assume and assign" such contracts, and why is this
       important? ................................................................................................................ ~~88~~103

~~CCC~~DDD. Can and will the Debtors assume or reject any executory contracts? ............................. ~~89~~104

~~DDD~~EEE.  What is the deadline to vote on the Plan? .................................................................... ~~9~~104

~~EEE~~FFF.  What is the deadline to object to the Confirmation of the Plan? ..................................... ~~9~~104

~~FFF~~GGG.  How do I vote for or against the Plan? ......................................................................... ~~9~~105

~~GGG~~HHH. If I vote to accept the Plan, am I voting only for the NewCo Transaction or am I voting for both the NewCo Transa

~~HHH~~III.  When is the Confirmation Hearing set to occur? ........................................................... ~~9~~106

~~III~~JJJ.  What is the purpose of the Confirmation Hearing? ........................................................ ~~9~~106

~~JJJ~~KKK.  I Filed a Proof of Claim.  How will that affect how much I will receive under the Plan
       and when that distribution will be made? ..................................................................... ~~92~~106

~~KKK~~LLL.  What do the recent actions by the SEC, FTC, CFTC, and USAO mean and how do they
       affect my recovery? ~~92~~ How do the Debtors propose to treat the Claims of state regulators and how will this propose

~~LLL~~MMM.    What is the Class Claim Settlement, how does it work, and who is affected by
       it? ........................................................................................................................... ~~93~~108

NNN.   What are the ADR Procedures and how do they work? .................................................. 110

OOO.   How will the Debtors' books and records be preserved? ................................................ 112

~~MMM~~PPP. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ...... ~~95~~113

IV.  THE DEBTORS' PLAN OF REORGANIZATION. .................................................... 96113

     A.   Means for Implementation of the Plan. ....................................................... 97114
     B.   Corporate Action. ...................................................................................... 114132
     C.   Cancellation of Notes, Instruments, Certificates, and Other Documents. ..... 114132
     D.   Employee Obligations. ............................................................................... 115133
     E.   Effectuating Documents; Further Transactions. ........................................... 118136
     F.   Exemptions from Certain Taxes and Fees. .................................................. 119137
     G.   Preservation of Causes of Action. .............................................................. 119137
     H.   Election to Contribute Claims. ................................................................... 120138
     I.   Contribution of Contributed Claims. ........................................................... 120138
     J.   Retiree Benefits. ........................................................................................ 121139

V.   THE DEBTORS' CORPORATE STRUCTURE, HISTORY, AND BUSINESS OVERVIEW ... 121139

     A.   The Debtors' Corporate Structure and History. ........................................... 121139
     B.   The Debtors' Prepetition Capital Structure, Operations, and Revenue. ......... 123141
     C.   Prepetition Regulatory Actions and Responses. .......................................... 132150

VI.  EVENTS LEADING TO THESE CHAPTER 11 CASES ........................................... 1535

     A.   Rapid Growth, Business Losses Suffered, and Business Transition. ............... 1535
     B.   Turbulent Market Conditions. ..................................................................... 136154
     C.   The "Cryptopocalypse." ............................................................................. 136154
     D.   The Effect of the "Cryptopocalypse" on the Company's Recovering Balance Sheet. ... 139157
     E.   The Pause. ................................................................................................ 139157
     F.   Governance Initiatives. .............................................................................. 140158

VII. EVENTS OF THESE CHAPTER 11 CASES ......................................................... 14159

     A.   First Day and Second Day Motions and Relief. ........................................... 14159
     B.   The Debtors' Motions to Protect Personally Identifiable Information. ............ 144162
     C.   Appointment of the Unsecured Creditors' Committee. .................................. 1646
     D.   Schedules and Statements. ........................................................................ 1646
     E.   341 Creditors' Meetings. ............................................................................ 147165
     F.   The Key Employee Retention Plan. ............................................................ 148166
     G.   Appointment of the Examiner and Cooperation with the Examiner. ............... 15068
     H.   Bar Date Motion. ...................................................................................... 15472
     I.   The Request for Appointment of an Equity Committee. ................................ 15674
     J.   The Special Committee Investigation. ......................................................... 158176
     K.   Litigation Matters. ..................................................................................... 1685
     L.   Resolution of Key Legal Issues. ................................................................. 18207
     M.   The Post-Petition Sale and Marketing Process. ........................................... 2197
     N.   Postpetition Disposition of Certain Property. .............................................. 2134
     O.   Employee Expense Reimbursement Motion. ................................................ 21736
     P.   Insurance Motions. .................................................................................... 2138
     Q.   Agreements with Mawson Infrastructure Group Inc. and Its Affiliates. ......... 22039
     R.   Navigating Developments in the Cryptocurrency Industry. ............................ 22041

VIII. RISK FACTORS ............................................................................................ 2249

     A.   Bankruptcy Law Considerations. ................................................................ 2249
     B.   Risks Related to Recoveries Under the Plan. ............................................... 22954
     C.   Risks Related to the Debtors' and NewCo's Businesses. ............................... 2361
     D.   Risks Related to NewCo's Digital Asset Mining and Staking. ........................ 24165
     E.   Disclosure Statement Disclaimer. ............................................................... 25377
     F.   Regulatory-Related Risk Factors. ................................................................ 25479

IX.   SOLICITATION AND VOTING PROCEDURES ........................................... 26185

       A.   Holders of Claims and Interests Entitled to Vote on the Plan. ................... 2861
       B.   Votes Required for Acceptance by a Class. ................................................ 2862
       C.   Certain Factors to Be Considered Prior to Voting. ................................... 26287
       D.   Classes Not Entitled to Vote on the Plan. .................................................. 26387
       E.   Solicitation Procedures. ............................................................................. 26488
       F.   Voting on the Plan. ...................................................................................... 26690
       G.   Voting Tabulations. ..................................................................................... 26691
       H.   Ballots Not Counted. ................................................................................... 26792

X.    CONFIRMATION OF THE PLAN ................................................................ 26892

       A.   Confirmation Hearing. ................................................................................ 26892
       B.   Requirements for Confirmation of the Plan. .............................................. 26893
       C.   Best Interests of Creditors/Liquidation Analysis. ..................................... 2693
       D.   Feasibility. .................................................................................................... 2694
       E.   Acceptance by Impaired Classes. ................................................................ 27094
       F.   Confirmation without Acceptance by All Impaired Classes. ...................... 27094

XI.   CERTAIN SECURITIES LAW MATTERS ................................................. 27195

XII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............... 2972

       A.   Introduction. ................................................................................................ 2972
       B.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. ....... 27498
       C.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
            Claims Entitled to Vote. ............................................................................... 276300
       D.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and
            Disposing of Consideration Received Under the Plan. .............................. 23084
       E.   Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of
            Allowed Claims. ........................................................................................... 285309
       F.   FATCA. ......................................................................................................... 286311
       G.   Information Reporting and Back-Up Withholding. ..................................... 287311

XIII. RECOMMENDATION OF THE DEBTORS ................................................ 31288

## **EXHIBITS**[3]

**EXHIBIT A**   Plan of Reorganization

**EXHIBIT B**   Liquidation Analysis

**EXHIBIT C**   Orderly Wind Down Analysis

**EXHIBIT D**   Mining Valuation Analysis

**EXHIBIT E**   Mining Financial Projections

**EXHIBIT F**   Fahrenheit Business Plan

**EXHIBIT G**   Navigating the Ballot—Retail Borrower Deposit Claims

**EXHIBIT H**   Navigating the Ballot—Convenience Claims

**EXHIBIT I**   Navigating the Ballot—General Earn Claims

**EXHIBIT J**   Navigating the Ballot—Custody Claims

**EXHIBIT K**   Navigating the Ballot—Withhold Claims

**EXHIBIT L**   Cryptocurrency Conversion Table

---

[3]   Each Exhibit is incorporated by reference herein.

## I.    INTRODUCTION

Celsius Network LLC ("Network LLC") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor Affiliates, the "Company" or "Celsius")[1] provide this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement") to creditors and other parties in interest to provide them with information regarding the Debtors' *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be supplemented or amended from time to time, the "Plan").  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[2]  This Disclosure Statement contains important information regarding the Debtors' history, assets, a summary of recoveries under and analysis of the Plan, the NewCo Transaction, an alternative Orderly Wind Down if the NewCo Transaction cannot be consummated, financial information, risk factors with respect to the Plan, tax information, and answers to certain questions that the Debtors and the Committee believe creditors will have regarding the Plan.

The Plan provides for an allocation of the entire value of the Debtors' Estates among their creditors and other stakeholders.  This introduction is meant to provide a succinct summary of the Plan.  The Plan includes many compromises that are meant to create the most equitable, efficient, and economical outcome for all creditors and stakeholders.

**AT THIS TIME, THE DEBTORS AND THE COMMITTEE BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS AND THE COMMITTEE STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

### A.    These Chapter 11 Cases.

Soon after its inception, Celsius grew to be one of the largest Cryptocurrency based finance platforms in the world, providing financial services to institutional, corporate, and retail clients across more than 100 countries.  Unfortunately, Celsius' growth outpaced its ability to effectively manage its assets and keep up with increasing regulatory scrutiny.  As a result, Celsius experienced a number of losses that, coupled with the 2022 "crypto winter," resulted in a short-term "run on the bank" that led to a liquidity crisis.  On June 12, 2022, Celsius "paused" all withdrawals, swaps, and transfers of Tokens on the Celsius platform to prevent an unequal distribution of assets to its creditors (the "Pause").  Celsius ultimately had no choice but to file the Debtor entities for chapter 11 protection on July 13, 2022 (the "Petition Date").

Since the outset of these Chapter 11 Cases, the Debtors have been focused on three main issues

---

[1]    Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor other than Celsius Network Limited ("CNL"), Network LLC, Celsius Lending LLC ("Lending LLC"), and Celsius Networks Lending LLC ("Networks Lending LLC"), for which the Debtors propose a substantive consolidation and joint Plan (for all purposes).

[2]    Except as otherwise provided herein, capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, Plan Supplement, and documents being summarized.  The Plan governs in the event of any inconsistencies between it and the Disclosure Statement.**

with the goal of successfully emerging from bankruptcy: (i) understanding what went wrong historically so the Debtors can determine the appropriate path forward and put in place processes to address and prevent those historical wrongs in the future; (ii) determining novel legal issues regarding the distribution of the Debtors' assets to creditors and reaching consensus wherever possible; and (iii) maximizing the value of their assets for the benefit of their creditors by, among other things, conducting several strategic asset sales and developing a new reorganized business that complies with all regulatory requirements.

### 1. *Historical Analysis.*

As described in more detail in Article V and Article VI of this Disclosure Statement, the Debtors' prepetition business lacked certain necessary financial and regulatory controls. This lack of control resulted in significant losses that ultimately caused the Debtors to file these Chapter 11 Cases.

Shortly after the Petition Date, the Debtors' Special Committee commenced an investigation into the Debtors' prepetition business operations, including reviewing, among other things, Celsius' policies and internal controls, public statements, and CEL Token transactions. As a result of these investigations, in September 2022, the Special Committee determined that Alex Mashinsky and Daniel Leon needed to be removed from their positions within the Company. Both Mr. Mashinsky and Mr. Leon voluntarily resigned shortly thereafter.

In addition, throughout these Chapter 11 Cases, the Special Committee has cooperated with third-party investigations into the Debtors, including by the Examiner and the Committee. Following the appointment of the Examiner, the Special Committee, the Debtors, and their employees cooperated with the Examiner's requests for interviews and documents. The Examiner issued a nearly 500-page final report on a variety of topics, including, among other things, Celsius' prepetition misrepresentations to its customers. The Special Committee also cooperated with the Committee's investigation into the Debtors and the actions of the Debtors' current and former directors, officers, and employees. The Committee's investigation resulted in the filing of a complaint detailing claims against certain former insiders of Celsius and other related parties (the "Committee Insiders Complaint") and a class claim on behalf of all Account Holders asserting Causes of Action relating to prepetition misrepresentations by Celsius. The Debtors and the Special Committee agreed that any claims and Causes of Action set forth in the Committee Insiders Complaint will be contributed to the Litigation Recovery Account and that such litigation will be pursued and overseen by the Litigation Administrator. In so doing, the Debtors and the Special Committee have ensured that any value recovered in connection with the Committee Insiders Complaint will be for the benefit of the Debtors' creditors.

Finally, the Debtors have met frequently with various regulators and other governmental parties, including the United States Attorney's Office for the Southern District of New York ("USAO"), the Securities and Exchange Commission (the "SEC"), the United States Commodity Futures Trading Commission (the "CFTC"), the Federal Trade Commission (the "FTC"), and various state regulators. The Debtors also responded to extensive information requests from these regulators and numerous current and former employees have met with regulators and provided additional information. On July 13, 2023, the Debtors reached a consensual resolution of civil and criminal claims asserted by these government agencies based upon the Debtors' prepetition conduct. *See* [Docket No. 3016]. The Debtors agreed to the relief requested by the federal government, including injunctions prohibiting violations of securities, commodities, and other applicable laws and regulations, and a monetary judgment in the amount of $4.7 billion. Importantly, this monetary judgment is suspended, so that the Debtors can fully distribute their assets to their creditors under the Plan.

### 2. *Legal Issues.*

At the first day hearing in these Chapter 11 Cases, the Debtors identified key legal issues that must be resolved for the Debtors to successfully exit from bankruptcy, including, among others:  (a) whether the Cryptocurrency in the Debtors' possession is property of the estate; (b) whether the Debtors can pursue certain Avoidance Actions; (c) which Debtor entities customers have claims against; and (d) what rights retail and institutional borrowers have with respect to any amounts deposited on the Debtors' platform.

The Debtors have spent the last year resolving many of these legal issues before the Bankruptcy Court and through consensual resolutions with key stakeholders.  The results are embodied in the Plan and described in this Disclosure Statement.

There have been numerous resolutions by the Bankruptcy Court of these key legal issues.  First, in December 2022, the Debtors held two separate trials with respect to:  (a) whether the assets held in Custody Accounts and Withhold Accounts are property of the Debtors' Estates, and, even if they are not, whether the Debtors can maintain possession of such assets pending resolution of any Avoidance Actions; and (b) whether the assets transferred on to the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' estates, and if so, whether the Debtors may sell stablecoins held in the Earn Program.  With respect to the Custody and Withhold issues, the Bankruptcy Court found that the assets in the Custody Accounts were property of the Account Holders. The Bankruptcy Court did not determine who owned the assets associated with Withhold Accounts. Finally, the Bankruptcy Court found that, regardless of who owns the assets associated with the Custody Accounts and the Withhold Accounts, the Debtors could maintain possession of those assets pending resolution of any Avoidance Actions.  After these rulings were issued, the Debtors entered into the Custody Settlement and the Withhold Settlement, which are embodied in the treatment provided to Holders of Custody Claims and Holders of Withhold Claims under the Plan.  With respect to the Earn ownership issues, the Bankruptcy Court found that the assets transferred onto the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' Estates, and granted the Debtors the authority to sell stablecoins.

The Debtors and the Committee have also resolved many of the open legal issues through consensual settlements with the Debtors' creditors.  Following a three-day mediation before the Honorable Judge Michael E. Wiles of the United States Bankruptcy Court for the Southern District of New York, the Debtors, the Committee, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, and certain individual creditors executed a term sheet reflecting the terms of an amended Plan that would resolve the treatment of the Earn creditors and Borrow creditors.  Specifically, this mediated resolution provides Retail Borrowers with the option to repay the principal balance of their loans (*i.e.*, the Retail Borrower Advance Obligations) in exchange for an equivalent amount of Cryptocurrency, which could result in tax benefits for such Holders as compared to the Set Off Treatment described below.  In addition, Retail Borrowers will have priority compared to other creditors when electing to exchange the NewCo Common Stock for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency Weighted Distribution Election) for their distributions under the Plan.  Also, each of the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group will have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee.  This settlement fully resolves all issues between the mediation parties relating to the Plan and will lead to the withdrawal of numerous adversary proceedings filed by the mediation parties.

The amended Plan reflects this mediated settlement.  The revised treatment gives Holders of Retail Borrower Deposit Claims two options.  They can repay the principal balance of their loan (or a portion of that principal balance) and receive an equivalent amount of Cryptocurrency in return and, if the loan was overcollateralized, have the remainder of their Retail Borrower Deposit Claim receive either the treatment provided to Holders of Convenience Claims or General Earn Claims, as further explained below.  If the loan is not repaid, the Debtors will "set off" the amount of the loan owed by an Account

3

Holder against the Claim of that borrower. In this scenario, the borrower's loan from Celsius will be forgiven and the borrower will not need to repay the loan. The Account Holder will then have a Claim for the difference between their Claim and the amount forgiven, which will receive either the treatment provided to Holders of Convenience Claims or General Earn Claims, as further explained below.

The Debtors and the Committee also consensually resolved the recovery of the Debtors' preferred equity holders. The Series B Holders argued that they were entitled to recover ahead of Account Holders on their approximately $690 million investment because Account Holders only had claims against Network LLC. The Debtors and the Committee argued that Account Holders had both contractual and noncontractual claims against all Debtor entities. The Bankruptcy Court ruled in favor of the Series B Holders and determined that customers could only assert contractual claims against Network LLC and not all Celsius entities. Importantly, however, the Bankruptcy Court noted that there may be non-contractual claims against other Celsius entities. The Debtors and the Committee then commenced a series of related litigations, including an estimation proceeding on the value of an intercompany claim held by Network LLC against CNL and motions to substantively consolidate Network LLC and CNL. The Committee also sought to avoid the Debtors' transfer of Account Holder obligations form the UK to the U.S. in 2021 due to allegations brought by the Financial Conduct Authority of the United Kingdom (the "UK FCA").

The Committee also Filed a class Claim on behalf of all Account Holders. Ultimately, the Debtors, the Committee, and the Series B Holders reached a global settlement of these issues and the Bankruptcy Court entered an order approving the settlement [Docket No. 3074]. The settlement provides for a $25 million Cash payment to the Series B Holders in exchange for a release of all claims between the participating Series B Holders and the Debtors and the Committee. The settlement avoids litigation, the costs of that litigation, and ensures that Account Holders will be able to recover the value of all of the Debtors' assets.

The Debtors and the Committee have now reached settlements with representatives for the Earn, Borrow, Custody, and Withhold programs and each of the ad hoc groups representing each program now supports the amended version of the Plan.

> 3.  *Maximizing Returns to Creditors.*

The ultimate goal of these Chapter 11 Cases has always been to find a way to limit the harm to creditors and distribute as much value to creditors as possible. To that end, from day one, the Debtors have been committed to preserving the value of the Cryptocurrency on the Debtors' platform. In the early stages of these Chapter 11 Cases, the Debtors negotiated a security protocol with the Committee that has governed the Debtors' storage and use of Cryptocurrency during these Chapter 11 Cases.

In addition, as noted above, the Debtors have been involved in extensive discussions with regulators regarding distributions of Cryptocurrency and other digital assets to creditors in connection with consummation of the Plan. As a result of these discussions, the Debtors have decided to convert nearly all of their Cryptocurrency to BTC and ETH prior to the Effective Date so that distributions of Cryptocurrency are regulatorily compliant.

Finally, the Debtors have valuable illiquid assets that cannot be readily liquidated without losing material value to distribute to creditors, like the large mining operation that was in the process of being built by the Debtors prior to the Petition Date. The Debtors ran an extensive marketing and sale process to buy or manage their illiquid assets. The Debtors received three actionable Bids and held a competitive auction to sponsor the Plan. The Debtors and the Committee selected as plan sponsor Fahrenheit, LLC ("Fahrenheit," the "Fahrenheit Group," or the "Plan Sponsor"), a consortium of crypto-native operators consisting of US Bitcoin Corp., Arrington Capital, Proof Group Capital Management, Steven Kokinos,

4

and Ravi Kaza, as the winning bidder.  As described in more detail below, if the Plan is Confirmed and Consummated, a new compliant public Cryptocurrency company will be created that will be owned by creditors and managed by Fahrenheit.

The Debtors are ready to solicit the Plan, move forward with the implementation of the NewCo Transaction, and distribute Liquid Cryptocurrency and NewCo Common Stock to Account Holders.

## B.    The Restructuring Transactions.

In October 2022, the Debtors commenced a marketing and sale process for all of the Debtors' assets.  The Debtors and their advisors contacted over 130 parties that they believed would be interested in a potential transaction.  This marketing process resulted in six non-binding bids for their Retail Platform Assets (or portions thereof), three non-binding bids for their mining business, and other bids for individual assets.

On February 15, 2023, the Debtors announced that, in consultation with the Committee, they had reached an agreement in principle with NovaWulf for NovaWulf to sponsor the Debtors' reorganization. On March 1, 2023, NovaWulf was designated as the Stalking Horse Bidder and received certain Bid Protections while the Debtors and the Committee continued to engage in conversations with other bidders pending the Final Bid Deadline of April 17, 2023.  On March 31, 2023, the Debtors filed a chapter 11 plan for the NovaWulf Transaction [Docket No. 2358].

Prior to the Final Bid Deadline, the Debtors and the Committee identified two additional Qualified Bidders—(a) the Fahrenheit Group; and (b) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (collectively, the "BRIC").  As a result, the Debtors and the Committee determined to hold an Auction to determine the highest and best bid.  Starting on April 25, 2023, and ending on May 24, 2023, the Debtors conducted multiple rounds of bidding ending in the selection of Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.  The revised Plan incorporates both of these bids and provides the Debtors with the ability to toggle to the backup bid if Fahrenheit's NewCo proposal cannot be completed.  No matter what transaction is ultimately pursued, the Debtors' creditors will receive significant value.  The Plan contemplates that the Debtors will first pursue the NewCo Transaction (a reorganization) *and* that, if the NewCo Transaction cannot be pursued, the Debtors can pivot to the Orderly Wind Down (a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets).

Under either transaction, the Debtors will promptly distribute at least $2.03 billion of Cryptocurrency to their creditors, subject to the fluctuations in Cryptocurrency prices.

The NewCo Transaction sponsored by the Fahrenheit Group recognizes and seizes on the long-term promise and potential of Cryptocurrency, particularly with respect to the two primary consensus mechanisms for verifying Cryptocurrency transactions on the blockchain—mining and staking.  The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.  NewCo will have no funded debt and will be equipped to capitalize on an industry that is poised for significant future growth.  Moreover, the Fahrenheit Group intends to list NewCo Common Stock on NASDAQ, which is intended to maximize liquidity for creditors and better position NewCo to potentially access the capital markets in the future at the discretion of the NewCo board of directors, a majority of whom will be appointed by customers.

Upon emergence, NewCo will be managed by Fahrenheit, which is comprised of experienced crypto-native operators, each of whom have industry-leading experience in various facets of the Cryptocurrency space and are well positioned to lead NewCo for the benefit of the Debtors' creditors.

Fahrenheit has committed to buy (with $50 million in Cash) a meaningful equity stake in NewCo, and Fahrenheit's management team will receive a portion of their compensation in NewCo Common Stock, thereby aligning the interests of the Fahrenheit Group and the holders of NewCo Common Stock (*i.e.*, the Debtors' creditors) and incentivizing Fahrenheit to grow NewCo for the benefit of NewCo's stakeholders.

Additional detail and information regarding the Fahrenheit Group and its vision and plan for NewCo (the "Fahrenheit Business Plan") is set forth in **Exhibit F** to this Disclosure Statement.

The Orderly Wind Down is an alternative to the NewCo Transaction and operates as a failsafe "Plan B" alternative if the NewCo Transaction cannot be completed for any reason. The Orderly Wind Down avoids a fire-sale liquidation that would result in significantly lower recoveries to creditors. This alternative is contemplated by the Plan because the Cryptocurrency landscape has proven to be dynamic and unpredictable. The Debtors and the Committee believe it is important for the Debtors to be able to pivot quickly to an alternative, without the need to restart the plan process and propose and solicit a new chapter 11 plan, and incur additional administrative expense, in the event the NewCo Transaction cannot be consummated for any reason.

     *1. The NewCo Transaction.*

The NewCo Transaction provides stakeholders with the opportunity to own NewCo and realize the potential upside value of a new Cryptocurrency company that will emerge from chapter 11 with a fresh start and will be ready to operate responsibly and transparently for the benefit of creditors. At its core, the NewCo Transaction provides for (a) the distribution of a significant amount of the Debtors' Liquid Cryptocurrency to creditors on or around the Effective Date of the Plan, and (b) the creation of NewCo — a new public-reporting, compliant entity, which will be owned by the Debtors' customers when the Debtors exit bankruptcy. NewCo will be predicated on transparency and governed by a board of directors, a majority of which will be appointed by the Debtors' creditors.

Fahrenheit will form NewCo prior to the Effective Date. On the Effective Date, NewCo will be vested with the NewCo Assets (including the mining business, institutional loan portfolio, and other alternative investments), which Fahrenheit will manage for the benefit of NewCo's stakeholders. As equity owners of NewCo, the value of Fahrenheit's efforts will ultimately be realized by the Debtors' Account Holders. For information regarding the Fahrenheit Group, the potential value of NewCo, and its plan and vision for NewCo, please see the Fahrenheit Business Plan attached as **Exhibit F** to this Disclosure Statement.

Fahrenheit intends to list the equity of NewCo on NASDAQ. An equity listing on a public exchange such as NASDAQ is intended to provide creditors with maximum flexibility to decide for themselves whether they want to (a) hold their shares in NewCo and remain investors in NewCo's long-term vision, or (b) sell their shares in NewCo and thereby immediately monetize their share of the Debtors' illiquid assets and the other assets held by NewCo.

As further described in the Fahrenheit Business Plan, NewCo will have two main operating business lines: Bitcoin mining and staking.

*Mining*. U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin") will run NewCo's mining operations. US Bitcoin is one of the largest and most successful ~~b~~Bitcoin mining operators in the country, and has included a variety of potential partnerships, options, and guarantees for NewCo's mining operations that provides a clear path to energize NewCo's entire existing fleet of miners, de-risk the build out of additional mining capacity, and grow or replenish NewCo's mining rigs in a cost-controlled and efficient manner.

*Staking*.  Proof Group Capital Management ("Proof Group") will lead NewCo's staking efforts. Proof Group has substantial experience staking Cryptocurrency worth hundreds of millions of dollars for its own clients.  Through the NewCo Transaction, Proof Group will contribute its staking intellectual property to NewCo and assist NewCo in developing and growing its staking infrastructure.  NewCo will, therefore, be set up with a significant and sophisticated staking platform, which could be utilized to create more value for NewCo to the extent that any new, regulatorily-compliant staking opportunities develop.

NewCo will be seeded with up to $450 million of the Debtors' Cryptocurrency.  Subject to the direction of the NewCo board of directors, the Fahrenheit Group intends to utilize much of NewCo's balance sheet to invest in and grow the NewCo staking and mining businesses, and to develop and execute on the partnerships that Fahrenheit is bringing to NewCo.  While the Debtors have significant mining operations today, Fahrenheit will optimize, improve, and grow the mining business.  The Debtors and the Committee believe the investment in NewCo creates the opportunity to generate significant value for Celsius creditors.

As demonstrated by the charts below, the value generated by NewCo is expected to be significantly higher than liquidating the Debtors' assets and distributing that value to creditors.  To the extent NewCo is successful in its new business development endeavors or if the Cryptocurrency markets continue to improve, NewCo offers additional upside, and the value of NewCo Common Stock could ultimately be multiples of the projections contained in this Disclosure Statement.

Under the NewCo Transaction, creditors will receive:  (a) BTC and ETH; (b) NewCo Common Stock; and/or (c) Litigation Proceeds (collectively, the "Unsecured Claim Distribution Consideration").  The recoveries provided to creditors under the NewCo Transaction are significant:

- 865.46% for Holders of Retail Borrower Deposit Claims, which represents a midpoint recovery based on the average loan to value ("LTV") ratio of the total Retail Borrower Advance Obligations against the Retail Borrower Deposit Claims;[3]

- 70% for Holders of Convenience Claims;

- 687.50% for Holders of General Earn Claims;

- 72.5% of the Cryptocurrency transferred to the Debtors for Holders of General Custody Claims who accept the Custody Settlement; and

- 73.2.0% for Holders of Withhold Claims.[4]

---

[3]  The individual recovery for any Holder of a Retail Borrower Deposit Claim will vary based on the LTV associated with a Retail Borrower Deposit Claim.

[4]  Recoveries are for illustrative purposes only and may materially differ from the amount portrayed in the chart.  Account Holder Claims shall be valued in U.S. Dollars as of the Petition Date consistent with section 502(b) of the Bankruptcy Code.

[5]  For the avoidance of doubt, not all Classes of Claims are included in this table.

| | Liquid Cryptocurrency | NewCo Common Stock | Litigation Proceeds | Other |
|---|---|---|---|---|
| **Class 2 — Retail Borrower Deposit Claims**[6] | ✓ | ✓ | ✓ | Set Off Treatment or Retail Advance Obligation Repayment Election |
| **Class 4 — Convenience Claims** | ✓ | ✗ | ✗ | ✗ |
| **Class 5 — General Earn Claims** | ✓ | ✓ | ✓ | ✗ |
| **Class 6 — Custody Claims** | ✓ | ✗ | ✗ | Percentage of Cryptocurrency coins in Custody Account to be returned |
| **Class 7 — Withhold Claims** | ✓ | ✓ | ✓ | ✗ |
| **Class 8 — Unsecured Loan Claims** | ✓ | ✓ | ✓ | ✗ |
| **Class 9 — General Unsecured Claims** | ✓ | ✓ | ✓ | ✗ |

Distributions to creditors under the NewCo Transaction will occur quicker than in the Orderly Wind Down.  If the Plan is confirmed in the fall of 2023 as currently contemplated, creditors will likely start receiving distributions before the end of 2023.  The Debtors and the Committee also believe that NewCo Common Stock will provide greater liquidity and value to creditors who wish to sell their equity compared to liquidation trust interests, which historically trade for a fraction of the value of the assets that make up the liquidation trust.

Finally, Holders of Claims that vote to accept the Plan will have the option to elect to receive more NewCo Common Stock or more Liquid Cryptocurrency at a discount (the "Unsecured Claim Distribution Mix Election").  Account Holders will get to make that election when they vote on the Plan, which will not occur until after the Bankruptcy Court approves this Disclosure Statement.  The Debtors' ability to honor such elections will depend on whether other creditors make the opposite election.

(a)      Liquid Cryptocurrency Distributions.

The NewCo Transaction provides creditors with meaningful recoveries in Cryptocurrency as soon as reasonably practicable.  On or shortly after the Effective Date, the Debtors will distribute Liquid Cryptocurrency (BTC and/or ETH) to creditors entitled to receive Liquid Cryptocurrency under the Plan (as shown above).  The Debtors believe that nearly all of their creditors will be eligible for this form of distribution.

The amount of Cryptocurrency that will be distributed to creditors (including administrative

---

[6]      Holders of Retail Borrower Deposit Claims that receive the Convenience Claim treatment on behalf of their Retail Borrower Post-Set Off Claims will only receive Liquid Cryptocurrency.

creditors) shortly after the Effective Date is expected to be approximately $2.03 billion in the aggregate. The estimated recoveries for the various creditor Classes under the Plan from the Liquid Cryptocurrency Distribution Amount are shown in the tables below, however, those percentages are subject to change depending on the value of BTC and ETH on or around the Effective Date and the Unsecured Claim Election Distribution Mix, among other things.[2]

~~The~~Because of the cost of keeping the Debtors' platform open to process withdrawals, the Debtors believe that it is in the interest of the Debtors' Estates and creditors for the Debtors to use third-party Distribution Agents to make all distributions of Liquid Cryptocurrency and for the Celsius App to become inactive after a set period of time.  Among other things, the Debtors would have to continue employing and compensating numerous employees for an extended period of time to oversee and approve distributions through the Celsius platform.  Accordingly, the Debtors have been working to identify Distribution Agents who could make ~~all~~ distributions of Liquid Cryptocurrency to the Debtors' creditors under the Plan in a regulatorily compliant way and to enter into agreements with such Distribution Agents setting forth the terms on which the Distribution Agents may distribute Liquid Cryptocurrency or, in certain circumstances discussed below, fiat currency (the "Distribution Agreements").  As of the date of the ~~f~~Filing of this Disclosure Statement, the Debtors have identified PayPal as a potential Distribution Agent ~~that could make~~for certain distributions of Liquid Cryptocurrency to individual (non-corporate) creditors (other than with respect to Custody and Withhold creditors) in the United States (other than Hawaii).  ~~PayPal would make all distributions of Liquid Cryptocurrency under the Plan to these creditors.~~

For all distributions of Cryptocurrency that ~~cannot~~are not or will not be made by PayPal (including distributions to international creditors, corporate creditors, and Custody and Withhold creditors), the Debtors continue to explore potential Distribution Agents.  ~~In any event, if~~If another Distribution Agent cannot be located to make those distributions, the Debtors will keep ~~their own distribution~~the Celsius platform open for ninety days after the Effective Date to make distributions to these creditors through the Celsius ~~a~~App (similar to how the Debtors have processed ~~Court-approved~~Court-approved withdrawals for certain Custody and Withhold users).  The Debtors would prefer to identify a Distribution Agent who can make these distributions to international and corporate creditors~~,~~ because it is expensive to keep the Debtors' platform open to process withdrawals. Ninety days after the Effective Date, any applicable creditor who has not claimed their distribution of Cryptocurrency from the Debtors' platform will ~~have their claim migrated to~~receive their distributions, if any, through PayPal or another Distribution Agent, and may receive fiat currency if a Distribution Agent does not have the requisite licenses to distribute Cryptocurrency to that creditor.

Upon the Deactivation Date, the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.  The Debtors chose a ninety-day period based on their experience enabling withdrawals of Cryptocurrency from the Celsius App for Custody and Withhold Account Holders pursuant to the Custody and Withhold Settlements.  Specifically, the vast majority of the value eligible to be withdrawn pursuant to the Custody and Withhold Settlements was withdrawn within ninety days.

On the Deactivation Date, the Celsius App will cease to exist and users will no longer be able to log-in to the Celsius App and/or access their Celsius Account.  Users are encouraged to download their transaction history for their personal records starting now to ensure that they have a copy of such history before the Celsius App ceases to exist.

---

[2]   ~~The Debtors are finalizing their agreement with the Distribution Agent and will provide additional details on how creditors will receive distributions in a revised version of the Disclosure Statement.~~

The Debtors are also working to streamline distribution mechanics with respect to Persons and Entities that may not have opened an account with Celsius directly but earned rewards on their digital assets in accounts set up with other exchanges or from companies which were part of Celsius' partner programs as further explained herein.

The Debtors will provide additional information regarding Liquid Cryptocurrency distributions to all applicable creditors, including Partners' customers, once the Debtors finalize agreements with the Distribution Agent(s).

(b)    NewCo Common Stock.

The Debtors, the Committee, and the Plan Sponsor also wanted to provide creditors with an opportunity to capitalize on what they believe is the undeniable long-term value proposition of Cryptocurrency and Bitcoin mining.  The NewCo Transaction accomplishes this by providing certain creditors with a distribution in the form of NewCo Common Stock (as shown above)—in other words, certain creditors will receive an ownership interest in NewCo.

(c)    Litigation Proceeds.

In addition, the Plan ensures that certain Claims and Causes of Action with respect to the Debtors' prepetition operations will be preserved and monetized for the benefit of Holders of Claims entitled to Litigation Proceeds (as shown above).  Through the establishment of a Litigation Recovery Account, which will be overseen and monitored by a Litigation Administrator and Litigation Oversight Committee (each of which will be appointed by the Committee), creditors entitled to the Litigation Proceeds may receive additional distributions over time depending on the results of the litigation to be pursued by the Litigation Administrator.

The Litigation Administrator(s) will work to undertake legal action against individuals such as certain former directors and officers of Celsius, including Alex Mashinsky and Shlomi Daniel Leon, in connection with their management of the Debtors prior to or after the Petition Date.  The Litigation Administrator(s) will also work to collect the Goldstein Loan (the $4.2 million loan issued to Hanoch "Nuke" Goldstein), and the Leon Loan (the $4 million loan issued to Shlomi Daniel Leon).  Finally, the Litigation Administrator(s) will pursue other Claims the Debtors have against third parties.  The value of any litigation will ultimately be distributed for the benefit of Holders of Claims entitled to Litigation Proceeds under the Plan.

Importantly, the Litigation Proceeds have not been separately valued, given the uncertainty regarding the timing and outcome of the various litigations, *so any value of the Litigation Proceeds will be additive to the currently projected recoveries for Holders of Claims entitled to a share of the Litigation Proceeds*.  The Litigation Administrator(s) will be provided with up to $50 million to pursue Claims and Causes of Action on behalf of creditors.  To the extent it is not economical for the Litigation Administrator(s) to pursue any Claims or Causes of Action further, the Litigation Oversight Committee will distribute the Litigation Proceeds and any remaining funding to Holders of Claims entitled to Litigation Proceeds under the Plan.

2.    *The Orderly Wind Down.*

The Debtors are aware that there are risks to implementing the NewCo Transaction.  Those potential risks are described in detail in this Disclosure Statement.  The Debtors and the Committee believe that it is in the best interests of all stakeholders to prepare for a scenario where the NewCo Transaction cannot be completed.  The Plan contemplates an option for the Debtors to "toggle" to the Orderly Wind Down at any time if they determine in good faith that, an Orderly Wind Down is in the

best interests of the Debtors' Estates due to complications or delays in implementing the NewCo Transaction.

If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in the Backup Plan Sponsor Agreement that they have negotiated with the Backup Plan Sponsor, the BRIC — or on terms that provide a better recovery to the Debtors' creditors than the Backup Plan Sponsor Agreement, which terms may be with a different Backup Plan Sponsor than the BRIC.

The current Backup Plan Sponsor Transaction contemplates providing recoveries to creditors in the following ways: (a) 100 percent of the equity interests in a pure play, publicly traded mining business with a potential management contract with GXD Labs LLC; (b) a Liquid Cryptocurrency distribution on or as soon as practicable after the Effective Date; and (c) a timely monetization of the remaining assets of the Debtors' Estates and subsequent Liquid Cryptocurrency distributions to creditors from the proceeds thereof, likely through the creation of a liquidating trust.

Unlike the NewCo Transaction, the Orderly Wind Down is expected to take up to five years to complete and offers limited upside as compared to the equity in NewCo. Moreover, none of the partnership and other strategic opportunities contained in the NewCo Transaction, which are intended to position NewCo to grow its mining business responsibly and significantly, would be available under the Orderly Wind Down. The Orderly Wind Down, however, will provide creditors with better recoveries than a straightforward chapter 7 liquidation.

A comparison of the anticipated recoveries to creditors under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation is provided in the chart below:

**(Modified graphics)**

| Class | | NewCo | Orderly Wind Down | Liquidation Analysis |
|---|---|---|---|---|
| Other Secured Claims | Class 1 | N/A | N/A | N/A |
| Retail Borrower Deposit Claims | Class 2 | 83.6% | 83.6% | 47.4% |
| Other Priority Claims | Class 3 | N/A | N/A | N/A |
| Convenience Claims | Class 4 | 70.0% | 70.0% | N/A |
| General Earn Claims | Class 5 | 67.0% | 61.2% | 47.4% |
| General Custody Claims [1] | Class 6A | 72.5% | 72.5% | 72.5% |
| Withdrawable Custody Claims [1] | Class 6B | 100.0% | 100.0% | 100.0% |
| Withhold Claims | Class 7 | 72.0% | 67.1% | 47.4% |
| Unsecured Loan Claims | Class 8 | 67.0% | 61.2% | 47.4% |
| General Unsecured Claims | Class 9 | 67.0% | 61.2% | 37.5% |
| De Minimis Claims | Class 10 | 0.0% | 0.0% | 0.0% |
| State Regulatory Claims | Class 11 | N/A | N/A | 47.5% |
| Intercompany Claims | Class 12 | N/A | N/A | N/A |
| Intercompany Interests | Class 13 | N/A | N/A | 17.3% |
| Series B Preferred Interests | Class 14 | 0.0% | 0.0% | N/A |
| Other Interests | Class 15 | 0.0% | 0.0% | 0.0% |
| Section 510(b) Claims | Class 16 | N/A | N/A | N/A |
| Equitably Subordinated Claims | Class 17 | 0.0% | 0.0% | 0.0% |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*

*(2) The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators*

The chart on the next page provides a more granular comparison of the distribution of Liquid Cryptocurrency under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation:

# (Modified graphics)



| | NewCo Plan | Orderly Wind Down | Liquidation (Mid-Point) |
|---|---|---|---|
| **Liquid Cryptocurrency** | | | |
| Gross Liquid Cryptocurrency | $  2,679 | $  2,657 | $  2,604 |
| Plan Administration and Operating Expenses | (125) | (203) | (159) |
| Net Liquid Cryptocurrency | $  2,554 | $  2,394 | $  2,444 |
| **Distributions to Claims Available for Unsecured Claims** | $  1,583 | $  1,858 | $  2,153 |
| Liquid Cryptocurrency Available for Unsecured Claims | $  1,584 | $  1,859 | $  2,153 |
| Initial Liquid Cryptocurrency Distribution % | 37.5% | 44.0% | N/A |
| NewCo Common Stock Recovery % | 29.5% | 10.0% | N/A |
| Chapter 7 Liquidation Cash Recovery % | N/A | 7.2% | 47.4% |
| **Total Recovery %** | 67.0% | 61.2% | 47.4% |

(1) In the Orderly Wind Down, Liquid Cryptocurrency is reduced by approximately $22 million relative to the Liquid Cryptocurrency in NewCo. There is a corresponding increase in the value of illiquid assets in the Orderly Wind Down related to collateral held on behalf of institutional loan counterparties

(2) Funding amount is still under discussion. Amount not to exceed $50 million

(3) In NewCo, funds to capitalize the NewCo mining business are included in the Liquid Cryptocurrency Holdback for NewCo

(4) Unsecured Claims includes Retail Borrower Post-Set Off Claim, General Earn Claims, Unsecured Loan Claims, General Unsecured Claim and the remaining 85% of Withhold Claims, all of which are eligible for Unsecured Claim Distribution Consideration.

(5) Under Chapter 7 liquidation, no distributions will be made in Liquid Cryptocurrency. All Liquid Cryptocurrency, illiquid assets and mining assets will be liquidated and distributed in cash to creditors at the end of the Liquidation Period

(6) The midpoint valuation for mining under NewCo is estimated to be $565 million. For illustrative purposes the mining valuation has been reduced to reflect $50 million of mining capitalization that is included within NewCo Cryptocurrency for the sole purposes of this illustrative exhibit

(7) The non-mining assets in NewCo NAV reflect the net asset value of these assets at the projected Emergence Date and do not reflect any potential upside associated with NewCo's non-mining business lines. Additionally, NewCo NAV does not reflect potential future dilution related to the NewCo management agreement

Finally, the chart below illustrates the timeline of distributions to Holders of unsecured Claims (*i.e.*, General Earn Claims, Unsecured Loan Claims, General Unsecured Claims, Retail Borrower Post-Set Off Claims, and 85% of Withhold Claims) under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation:





(1) Unsecured Claims includes Retail Borrower Post-Set Off Claim, General Earn Claims, Unsecured Loan Claims, General Unsecured Claims and the remaining 85% of Withhold Claims, all of which are eligible for Unsecured Claim Distribution Consideration. The
(2) Under Chapter 7 liquidation, no distribution will be made in Liquid Cryptocurrency. All illiquid cryptocurrency, illiquid assets and mining assets will be liquidated and distributed in cash to creditors at the end of the liquidation Period

*(1) Unsecured Claims includes Retail Borrower Post-Set Off Claim, General Earn Claims, Unsecured Loan Claims, General Unsecured Claims and the remaining 85% of Withhold Claims, all of which are eligible for Unsecured Claim Distribution Consideration. The*
*(2) Under Chapter 7 liquidation, no distribution will be made in Liquid Cryptocurrency. All illiquid cryptocurrency, illiquid assets and mining assets will be liquidated and distributed in cash to creditors at the end of the liquidation Period*

Following the Debtors' announcement of the terms of the Backup Plan Sponsor Transaction, the Debtors received Bids for alternative backup transactions. As explained in Article VII.M.3(c) of this Disclosure Statement, the Debtors intend to continue to explore the viability of the alternative Bids in consultation with the Committee. To the extent the Debtors select an alternative backup transaction and pivot to the Orderly Wind Down, they will File additional disclosure on the docket.

The Debtors, the Committee, and the Plan Sponsor have worked to negotiate and formulate a Plan ~~the~~that provides Holders of Claims with the maximum recoveries, on the quickest timeline, and with the greatest amount of flexibility.

### C.    Summary of Treatment Under the NewCo Transaction.

As noted above, the NewCo Transaction is a transaction that will result in the distribution of both the Debtors' liquid and illiquid assets to creditors. Before voting on the Plan, however, it is important that you understand how your Claims are proposed to be treated under the Plan and your projected recoveries under the Plan. This is particularly true if you are an Account Holder as your Claims will be listed in U.S. Dollars (based on Cryptocurrency prices on the Petition Date) on your Ballot and not in the types or amount of Cryptocurrency associated with your Claims.

The below tables provide a simplified roadmap of this Disclosure Statement for Account Holders to understand the various recoveries contemplated by the Plan with respect to each Account Holder Claim. The tables are intended to be a guide to help you navigate this complex document, however, ***this Disclosure Statement and the Plan should be read in their entirety to provide a complete understanding of the transactions contemplated by the Plan***.

After the Bankruptcy Court approves the Disclosure Statement, you will receive a Ballot setting forth the types and amount (in U.S. Dollars based on Cryptocurrency prices on the Petition Date) of your Claims.  The Ballot will also explain to you the various notices and options on how to receive your distributions under the NewCo Transaction depending on which Class your Claims are in.  Finally, the Ballot will provide you with instructions on how to vote your Claims to accept or reject the Plan and what releases are provided under the Plan, among other things.  Other than with respect to any Custody Claims you may hold *you must vote all of your Claims to either accept or reject the Plan*.

**Class 2 — *Retail Borrower Deposit Claims***.  Account Holders that participated in the Debtors' Borrow Program will likely have a Retail Borrower Deposit Claim.  If you have a Retail Borrower Deposit Claim, you may elect to repay your loan (by making the Retail Advance Obligation Repayment Election), or else you will receive the Set Off Treatment.

If you make the Retail Advance Obligation Repayment Election, you must repay all or a portion of the proceeds of the loan you took out under the Debtors' Borrow Program (defined in the Plan as the "Retail Advance Obligation").  If you ~~actually~~ repay all or a portion of your Retail Advance Obligation in accordance with the instructions provided by the Debtors,[87] and you make this repayment on or prior to five calendar days prior to the Effective Date of the Plan,[98] then you will receive an amount of BTC or ETH equal to the amount that you paid back.  You can make an election as to whether to receive BTC or ETH.  The remaining amount of your Retail Borrower Deposit Claim after the repayment is made (the "Retail Borrower Post-Set Off Claim")[109] will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable.  In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, and will receive either a 6~~8~~7.~~5~~0% recovery on account of your Retail Borrower Post-Set Off Claim if your Retail Borrower Post-Set Off Claim receives the General Earn Claim treatment, or a 70% recovery if your Retail Borrower Post-Set Off Claim receives the Convenience Class Claim treatment.

If you do not make the Retail Advance Obligation Repayment Election or you fail to repay your Retail Advance Obligation in accordance with the Debtors' instructions and by the specific deadline, then you will receive the Set Off Treatment.  Under the Set Off Treatment, you will retain the proceeds of the Retail Advance Obligation and have your associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date.  The remaining amount of your Retail Borrower Deposit Claim[1110] after such set off is accounted for is your Retail Borrower Post-Set Off Claim, which will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable.  In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, either a 6~~8~~7.~~5~~0% recovery on account of your Retail Borrower Post-Set Off Claim

---

[87]  The "Retail Advance Obligation Repayment Instructions" will be provided by the Debtors via email to all Retail Borrowers at least thirty calendar days prior to the anticipated Effective Date.

[98]  This is defined in the Plan as the "Retail Advance Obligation Repayment Deadline."

[109]  "Retail Borrower Post-Set Off Claim" means a Retail Borrower's remaining Claim after ~~(a)~~application of any Retail Advance Obligation Repayment Amounts transferred by such Retail Borrower by the Retail Advance Obligation Repayment Deadline and/or the application of the Set Off Treatment ~~has been applied~~ to such ~~Holder's~~Retail Borrower's Retail Borrower Deposit Claim~~or (b) the repayment of the Retail Advance Obligation pursuant to the Retail Advance Obligation Repayment Election~~.

[1110]  Calculated in U.S. Dollars as of the Petition Date utilizing the conversion rates provided in the Cryptocurrency Conversion Table.

if your Retail Borrower Post-Set Off Claim receives the General Earn Claim treatment or a 70% recovery if your Retail Borrower Post-Set Off Claim receives the Convenience Class Claim treatment, and **_you will not have to repay your loan or owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of your Retail Borrower Deposit Claim (i.e., your loan is being forgiven)_**.

If you receive the Unsecured Claim Distribution Consideration on account of your Retail Borrower Post-Set Off Claim, you will receive a combination of (a) Liquid Cryptocurrency (BTC and ETH), (b) NewCo Common Stock, and (c) Litigation Proceeds. If you receive the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim (_i.e._, if the total amount of your Account Holder Claims, including your Retail Borrower Post-Set Off Claim, is equal to or less than $5,000), you will receive only Liquid Cryptocurrency. Your Ballot will explain whether you will receive the Unsecured Claim Distribution Consideration or the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of Retail Borrower Deposit Claims, your related rights, and how to vote your Retail Borrower Deposit Claim to accept or reject the Plan.

| Type of Distribution | Estimated NewCo Transaction Recovery Under the Plan[21] | Certain Key Provisions of this Disclosure Statement Relevant to Holders of Retail Borrower Deposit Claims | Navigating the Ballot |
|---|---|---|---|
| Set Off Treatment or Retail Advance Obligation Repayment Election - and - If total Account Holder Claims is equal to or less than $5,000: • Liquid Cryptocurrency - or - If total Account Holder Claims is | 865.46% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.OQ<br>• Article III.T<br>• Article III.V<br>• Article III.W<br>• Article III.X<br>• Article III.FF | _See_ **Exhibit G** |

[21] In the NewCo Transaction, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 687.50% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment). Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

| greater than $5,000 • Liquid Cryptocurrency • NewCo Common Stock • Litigation Proceeds | | • Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.WW<br>• Article III.XX<br>• Article III.MMM<br>• Article III.YY<br>• Article VIII<br>• Article IX<br>• Article XI<br>• Article XII | |

The below tables provide examples of illustrative recoveries that a Holder of a Retail Borrower Deposit Claim may receive on behalf of her Retail Borrower Deposit Claim in the event the NewCo Transaction is consummated.[312]

(Modified)

**Account Holder Claim 1 – 0.50 Retail Borrower Deposit Claim, No Retail Advance Obligation**

| Coin | # of Coins | Petition Date Coin Price | USD ($) |
|---|---|---|---|
| *Retail Borrower Deposit Claim* | | | |
| BTC | 0.50 | 19,881.00 $ | 9,940.50 |
| *Set Off: Retail Advance Obligation* | | | |
| USDC / USD | 5,000.00 | 1.00 $ | 5,000.00 |
| Retail Borrower Post-Set off Claim ($) | | $ | 4,940.50 |

| Recovery Scenario - Convenience Class | | | |
|---|---|---|---|
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 25,352.93 % | 0.06 $ | 1,759.18 |
| Liquid Cryptocurrency | | $ | 3,459.35 |
| Value Recovered ($) on Retail Borrower Post-Set off Claim | | $ | 3,459.35 |
| Recovery % on Retail Borrower Post-Set off Claim | | | 70.0% |
| Recovery % on Retail Advance Obligation | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | **85.2%** |

**Account Holder Claim 2 – $16,322.56 Retail Borrower Deposit Claim, $5,000 Retail Advance Obligation**

| Coin | # of Coins | Petition Date Coin Price | USD ($) |
|---|---|---|---|
| *Retail Borrower Deposit Claim* | | | |
| ETH | 15.00 | 1,088.17 $ | 16,322.56 |
| *Set Off: Retail Advance Obligation* | | | |
| USDC / USD | 5,000.00 | 1.00 $ | 5,000.00 |
| Retail Borrower Post-Set off Claim ($) | | $ | 11,322.56 |

| Recovery Scenario (consistent with General Earn treatment) | | | |
|---|---|---|---|
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,322.06 | 0.098 $ | 2,042.68 |
| ETH | 1,857.61 | 1.113 | 2,042.68 |
| Liquid Cryptocurrency[12] | | $ | 4,214.36 |
| NewCo Common Stock[12] | N/A | N/A | 3,483.90 |
| Value Recovered ($) on Retail Borrower Post-Set off Claim | | $ | 7,758.27 |
| Liquid Cryptocurrency Recovery % | | | 37.2% |
| NewCo Common Stock Recovery % | | | 30.8% |
| Recovery % on Retail Borrower Post-Set off Claim | | | 68.5% |
| Recovery % on Retail Advance Obligation | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | **78.1%** |

---

[312] The tables include the following assumptions: (1) the Holder only has a Retail Borrower Deposit Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

# (Modified) Retail Borrower Deposit Claim, $30,000 (Set Off Treatment)

| Coin | # of Coins | Petition Date Coin Price | USD ($) |
|---|---|---|---|
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $ 49,702.50 |
| *Set Off: Retail Advance Obligation* | | | |
| USDC (USD) | 30,000.00 | $ 1.00 | 30,000.00 |
| **Retail Borrower Post-Set off Claim ($)** | | | $ 19,702.50 |

## Recovery Scenario (consistent with General Earn treatment)

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| BTC | $ 27,323.96 | 0.14 | $ 3,709.96 |
| ETH | 1,879.61 | 1.96 | 3,709.96 |
| Liquid Cryptocurrency [122] | | | $ 7,483.02 |
| NewCo Common Stock [1,2] | N/A | N/A | 6,582.00 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | | $ 13,426.42 |
| *Liquid Cryptocurrency Recovery %* | | | 35.4% |
| *NewCo Common Stock Recovery %* | | | 30.9% |
| *Recovery % on Retail Borrower Post-Set off Claim* | | | 64.0% |
| *Recovery % on Retail Advance Obligation* | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | 87.5% |

18

**(Modified)**

| | 1.50 Retail Borrower Deposit Claim, $30,000 (Advance Obligation Repayment Election) | | |
|---|---|---|---|
| **Coin** | **# of Coins** | **Petition Date Coin Price** | **USD ($)** |
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $ 49,702.50 |
| *Retail Advance Obligation Borrower Repayment* | | | |
| USDC / USD | (30,000.00) | $ 1.00 | $ (30,000.00) |
| **Retail Borrower Post-Set off Claim ($)** | | | $ 19,702.50 |

| **Recovery Type** | **5/31 Coin Price** | **# of Coins Recovered** | **Recovery Value ($)** |
|---|---|---|---|
| *Retail Advance Obligation Return to Borrower* | | | |
| BTC | $ 27,323.96 | 1.10 | $ 30,000.00 |
| *Retail Borrower Post-Set Off Claim Recovery* | | | |
| BTC | $ 27,323.96 | 0.14 | $ 3,701.96 |
| ETH | 1,879.61 | 1.9% | 3,701.96 |
| Liquid Cryptocurrency[15] | | | $ 7,403.92 |
| NewCo Common Stock[1,2] | N/A | N/A | 5,820.56 |
| Value Recovered on Retail Borrower Post-Set off Claim | | $ | 13,224.47 |
| Liquid Cryptocurrency Recovery % | | | 37.5% |
| NewCo Common Stock Recovery % | | | 29.5% |
| Recovery % on Retail Borrower Post-Set off Claim | | | 67.0% |
| Recovery % on Retail Advance Obligation | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | **87.3%** |

*Class 4 — Convenience Claims*.  If you have a Convenience Claim, that means the total amount of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) is greater than $10 but less than or equal to $5,000. Holders of Convenience Claims will only receive a recovery in the form of Liquid Cryptocurrency.  Your Ballot will explain whether you have a Convenience Claim or separate Account Holder Claims.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of Convenience Claims, your related rights, and how to vote your Convenience Claim to accept or reject the Plan.

| Type of Distribution | Estimated NewCo Transaction Recovery Under the Plan | Certain Key Provisions of this Disclosure Statement Relevant to Holders of Convenience Claims | Navigating the Ballot |
|---|---|---|---|
| Liquid Cryptocurrency | 70% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.Q<br>• Article III.LL<br>• Article III.NN | *See* **Exhibit H** |

| | | • Article III.OO | |
| | | • Article III.PP | |
| | | • Article III.QQ | |
| | | • <u>Article III.MMM</u> [413] | |
| | | • Article VIII | |
| | | • Article IX | |
| | | • Article XII | |

The below tables provide examples of illustrative recoveries that a Holder of a Convenience Claim may receive on behalf of her Convenience Claim in the event the NewCo Transaction is consummated, including if such Holder is the Holder of a General Earn Claim and makes the Convenience Claim Election on her Ballot because she wishes to receive a smaller recovery entirely in Liquid Cryptocurrency instead of the Unsecured Claim Distribution (*see* Account Holder Claim 2).[413]

**Account Holder Claim 1 - $5,000**

| Coin | Petition Date Coin Price | # of Coins | USD ($) |
|---|---|---|---|
| BTC | $ 19,881.00 | 0.19 | 3,813.89 |
| ETH | 1,088.17 | 0.50 | 544.09 |
| USDC | 1.00 | 150.00 | 150.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| **Total Initial Claim ($)** | | $ | 5,000.00 |
| *Forfeited Claim* | | | - |
| **Total Adjusted Claim ($)** | | $ | 5,000.00 |

**Account Holder Claim 2 - $7,500 (opt-in, forfeit portion of claim)**

| Coin | Petition Date Coin Price | # of Coins | USD ($) |
|---|---|---|---|
| BTC | $ 19,881.00 | 0.29 | 5,813.89 |
| ETH | 1,088.17 | 0.50 | 544.09 |
| USDC | 1.00 | 650.00 | 650.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| **Total Initial Claim ($)** | | $ | 7,500.00 |
| *Forfeited Claim* | | | (2,500.00) |
| **Total Adjusted Claim ($)** | | $ | 5,000.00 |

**Recovery Scenario**

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| BTC | $ 27,323.96 | 0.06 | 1,750.00 |
| ETH | 1,879.61 | 0.93 | 1,750.00 |
| **Total Value Recovered ($)** | | $ | 3,500.00 |
| *Recovery %* | | | 70.0% |

**Recovery Scenario**

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| BTC | $ 27,323.96 | 0.06 | 1,750.00 |
| ETH | 1,879.61 | 0.93 | 1,750.00 |
| **Total Value Recovered ($)** | | $ | 3,500.00 |
| *Recovery %* | | | 70.0% |

***Class 5 — General Earn Claims***.  Account Holders that participated in the Debtors' Earn Program will likely have a General Earn Claim.  If you have a General Earn Claim, you will receive the Unsecured Claim Distribution Consideration, which means you will receive a combination of (a) Liquid Cryptocurrency (BTC and ETH), (b) NewCo Common Stock, and (c) Litigation Proceeds.  Your Ballot will explain whether you have a General Earn Claim or whether the total amount of your Account Holder Claims means you have a Convenience Claim.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of General Earn Claims, your related rights (including various elections available to you), and how to vote your General Earn Claim to accept or reject the Plan.

| Type of Distribution | Estimated NewCo Transaction Recovery Scenario | Certain Key Provisions of this Disclosure Statement Relevant to Holders of General Earn Claims | Navigating the Ballot |
|---|---|---|---|

[413]  The tables include the following assumptions: (1) the Holder does not have any General Claims; and (2) Liquid Cryptocurrency values are as of May 31, 2023.

| | | | |
|---|---|---|---|
| • Liquid Cryptocurrency<br>• NewCo Common Stock<br>• Litigation Proceeds | ~~68~~7.50% | • Article III.C<br>• Article III.D<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.Q<br>• Article III.T<br>• Article III.V<br>• Article III.W<br>• Article III.X<br>• Article III.FF<br>• Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.YY<br>• Article III.MMM<br>• Article VIII<br>• Article IX<br>• Article XI<br>• Article XII | *See* **Exhibit I** |

The below table provides an example of an illustrative recovery that a Holder of a General Earn Claim may receive on behalf of her General Earn Claim in the event the NewCo Transaction is consummated.[514]

[514]  The table includes the following assumptions: (1) the Holder only has a General Earn Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

**(Modified graphics)**

| Coin | Petition Date Coin Price | # of Coins | USD ($) |
|---|---|---|---|
| BTC | $ 19,881.00 | 0.40 | $ 7,952.40 |
| ETH | 1,088.17 | 1.00 | 1,088.17 |
| USDC | 1.00 | 1,500.00 | 1,500.00 |
| DOT | 6.36 | 37.00 | 235.35 |
| ZRX | 0.28 | 925.00 | 256.68 |
| **Total Claim ($)** | | | **$ 9,682.60** |

| Recovery Scenario | | | |
|---|---|---|---|
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.07 | $ 1,837.03 |
| ETH | 1,870.61 | 0.97 | 1,837.03 |
| Liquid Cryptocurrency (1,2) | | | $ 3,644.06 |
| NewCo Common Stock (3) | N/A | N/A | 2,987.91 |
| **Total Value Recovered ($)** | | | **$ 6,631.96** |
| *Liquid Cryptocurrency Recovery %* | | | *37.6%* |
| *NewCo Common Stock Recovery %* | | | *30.9%* |
| *Total Recovery % (3)* | | | *68.5%* |

Scenario 2: If total Claim is less than $5,000, see Class 4 - Convenience Recovery Scenarios

***Class 6A — General Custody Claims***.  Account Holders that participated in the Debtors' Custody Program will likely have a General Custody Claim.  If you are the Holder of a General Custody Claim, you have the opportunity, through your Ballot, to participate in the Custody Settlement.  You can participate in the Custody Settlement by voting your General Custody Claim to accept the Plan.  If you do that, then you will receive Treatment A under the Plan, which essentially provides you with the same recovery as the Settling Custody Account Holders, as further explained herein.  Pursuant to Treatment A, on or shortly after the Effective Date, you will receive (a) a distribution of Cryptocurrency equal to 72.5% of the amount of your Allowed General Custody Claim in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions.

If you are the Holder of a General Custody Claim and you vote your Claim to reject the Plan or you do not vote your Claim, then you will not receive the Custody Settlement.  You will receive Treatment B under the Plan.  Pursuant to Treatment B, on or shortly after the Effective Date, Holders of General Custody Claims will have an amount corresponding to each Holder's Allowed General Custody Claim transferred to a segregated wallet held by the Post-Effective Date Debtors.  The amount held in that segregated wallet will be subject to all Avoidance Actions and other claims by the Debtors' Estate with respect to such Allowed General Custody Claim.  The Litigation Administrator will have 180 days following the Effective Date to bring any Avoidance Action or other claim against you, with respect to

the amount of your General Custody Claim.  You will not receive a distribution of *any* amounts on the Effective Date in this scenario.

Unlike with other Claims, you do *not* have to vote your General Custody Claim in the same way you vote any other Claims you may have.  For example, you may vote to reject the Plan with respect to your General Custody Claim but vote to accept the Plan with respect to all other Claims you have.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of General Custody Claims, your related rights (including various elections available to you), and how to vote your General Custody Claim to accept or reject the Plan.

| Type of Distribution | Estimated NewCo Transaction Recovery Under the Plan[1615] | Certain Key Provisions of this Disclosure Statement Relevant to Holders of General Custody Claims | Navigating the Ballot |
|---|---|---|---|
| Cryptocurrency (in-kind) | 72.5% | • Article III.C<br>• Article III.D<br>• Article III.E<br>• Article III.O<br>• Article III.Q<br>• Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.TT<br>• Article VIII<br>• Article IX<br>• Article XII | *See* **Exhibit J** |

The below table provides an example of an illustrative recovery that a Holder of a General Custody Claim may receive on behalf of her General Custody Claim in the event the NewCo Transaction is consummated and where she voted to accept the Plan.[1616]

---

[1615]  Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, *not* a percentage of the value of their General Custody Claims as of the Petition Date.

[1616]  The table includes the following assumptions:  (1) the Holder only has a General Custody Claim and no other Claims; and (2) recovery percentage reflects a percentage of the Cryptocurrency held in such Holder's Custody Account and *not* a percentage of the total value of the General Custody Claim as of the Petition Date.

| Account Holder Claim | | | |
|---|---|---|---|
| **Coin** | **Petition Date Coin Price** | **# of Coins** | **USD ($)** |
| BTC | N/A | 0.10 | N/A |
| ETH | N/A | 0.50 | N/A |
| USDC | N/A | 150.00 | N/A |
| DOT | N/A | 37.00 | N/A |
| ZRX | N/A | 925.00 | N/A |
| **Total Claim ($)** | | **In Kind**[1] | |

| Recovery Scenario |
|---|
| *Treatment A:* |
| Holders who elect Treatment A will receive a distribution of Cryptocurrency equal to 72.5% of their coins in kind, and a full and final release of all Causes of Action, including Avoidance Actions. |
| *Recovery %*                            *72.5%* |
| Holders with Withdrawal Preference Exposure under $100,000 shall receive 100% recovery under this treatment. |
| *Recovery %*                            *100.0%* |
| *Treatment B:* |
| Holders who elect Treatment B will transfer the Cryptocurrency assets associated with their claim to a segregated wallet held by the Post-Effective Date Debtors. Provided no Avoidance Actions and other claims are brought and no settlement is reached within 180 days (or an extended period), such assets shall be released to the Holder. |
| *Recovery %*                            *TBD* |

***Class 7 — Withhold Claims***.  Account Holders with a "Withhold Account" will likely have a Withhold Claim or a Convenience Claim.  Your Ballot will explain whether you have a Withhold Claim or whether the total amount of your Account Holder Claims means you have a Convenience Claim.

If you are the Holder of a Withhold Claim, you have the opportunity, through your Ballot, to participate in the Withhold Settlement.  If you vote your Withhold Claim to accept the Plan, and if Class 7 votes to accept the Plan, which means more than two-thirds of the amount of Withhold Claims and more than one-half of the number of Holders of Withhold Claims that vote on the Plan vote to accept the Plan, then you and everyone else in Class 7 (regardless of how they voted) will receive Treatment A under the Plan, which is the same treatment as the Withhold Settlement.  The Withhold Settlement provides for the right to withdraw an in-kind distribution equal to fifteen (15) percent of the value, as of the Petition Date, of your Withhold Distribution Claims, calculated in accordance with the Conversion Procedure, ***plus*** the treatment of your remaining eighty-five (85) percent of your Withhold Distribution Claim as a General Earn Claim.

If, however, Class 7 does not vote to accept the Plan, then even if you voted your Class 7 Claim to accept the Plan you will not receive Treatment A, or the Withhold Settlement, under the Plan.  Instead, you and everyone else in Class 7 (regardless of how they voted) will receive Treatment B under the Plan, which means your Claim will receive the same treatment as a General Earn Claim.

The following table is a helpful place to start in understanding how the Plan proposes to treat Holders of Withhold Claims, your related rights (including various elections available to you), and how

24

to vote your Withhold Claim to accept or reject the Plan.

| | Type of Distribution | Estimated NewCo Transaction Recovery Under the Plan[17] | Certain Key Provisions of this Disclosure Statement Relevant to Holders of Withhold Claims | Navigating the Ballot |
|---|---|---|---|---|
| | • Liquid Cryptocurrency<br>• NewCo Common Stock<br>• Litigation Proceeds | 73.2.0% | • Article III.C<br>• Article III.D<br>• Article III.L<br>• Article III.M<br>• Article III.O<br>• Article III.Q<br>• Article III.T<br>• Article III.V<br>• Article III.W<br>• Article III.X<br>• Article III.FF<br>• Article III.LL<br>• Article III.NN<br>• Article III.OO<br>• Article III.PP<br>• Article III.QQ<br>• Article III.UU<br>• Article III.UUMMM<br>• Article VIII<br>• Article IX<br>• Article XI<br>• Article XII | See Exhibit K |

The below tables provide examples of illustrative recoveries that a Holder of a Withhold Claim may receive on behalf of her Withhold Claim in the event the NewCo Transaction is consummated and either (a) Class 7 voted to accept the Plan or (b) Class 7 voted to reject the Plan.[18]

---

[17] This estimated recovery assumes that Class 7 votes to accept the Plan.  If Class 7 votes to reject the Plan, but the Plan is confirmed, then the estimated recovery is 68.7.50% (i.e., the same as General Earn Claims).

[18] The tables include the following assumptions:  (1) the Holder only has a Withhold Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.



D.    **Recommendation.**

The Debtors strongly believe that the Plan is in the best interests of the Debtors' Estates and maximizes stakeholder recoveries in the Chapter 11 Cases.   In particular, the NewCo Transaction with Fahrenheit provides meaningful Liquid Cryptocurrency distributions to the majority of creditors and valuable ownership in a go-forward enterprise through NewCo Common Stock.  ***The Debtors strongly urge all Holders of Claims and Interests entitled to vote to accept the Plan by returning their Ballots no later than [September ~~18~~20], 2023, at [4]:00 p.m., prevailing Eastern Time (the "Voting Deadline")***.  Stretto must receive Ballots from voting creditors and in accordance with the Solicitation Procedures (as defined herein) on or before the Voting Deadline.  If the Plan receives the requisite acceptances, the Debtors will seek confirmation of the Plan at a hearing (the "Confirmation Hearing") before the Bankruptcy Court on **[~~September~~October 2~~9~~], 2023, at [●2]:00 [●p].m., prevailing Eastern Time.**[2019]

---

[2019] ~~This~~These dates ~~is~~are subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once

## III.    QUESTIONS AND ANSWERS ABOUT THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions and other provisions prescribed in the Bankruptcy Code. The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date that the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until the chapter 11 plan is consummated.

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as the bankruptcy court may order. Subject to certain limited exceptions, a bankruptcy court order confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class, such as Holders of Claims under the Plan, to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.

This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Whether you may vote on the Plan depends on what type of Claim or Interest you hold. The Classes of Claims and Interests created by the Plan, and their respective voting status, are set forth below. The definitions in the Plan describe what Claims are included in each Class.

Please note that, for purposes of voting on the Plan, Holders of Account Holder Claims are entitled to vote only such Account Holder Claims that (a) were scheduled by the Debtors (in the amounts set forth in the Schedules (as defined herein)) and not in the amounts set forth in any Filed Proofs of Claim related to such Account Holder Claims, or (b) if not scheduled by the Debtors, are based on Filed Proofs of Claim (solely to the extent such Proofs of Claim are not disputed) in the amounts set forth in such Filed Proofs of Claim. If you are the Holder of an Account Holder Claim described in clause (a) of the preceding sentence and would like your vote to be based on your Filed Proof of Claim and the amounts or categorizations reflected therein, you must File a motion under Bankruptcy Rule 3018(a) asking the Bankruptcy Court to temporarily allow the Claim or Interest in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

---

for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Deadline and Confirmation Hearing is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

For the avoidance of doubt, Holders of Claims other than Account Holder Claims shall be entitled to vote such Claims in the Filed amount unless the Debtors have Filed an objection to such Claim.[2420] If an objection to such Claim has been filed, then such Holder will only be able to vote on such Claim in the amount of $1.00. If any Holders of Claims subject to an objection would like their votes to be based on the amounts set forth in the Filed Proofs of Claims and the amounts or categorizations reflected therein, they must File a motion under Bankruptcy Rule 3018(a) asking the Bankruptcy Court to temporarily allow the Claim or Interest in an amount which the Bankruptcy Court deems proper for the purpose of accepting or rejecting the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Retail Borrower Deposit Claims | Impaired | Entitled to Vote |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | General Earn Claims | Impaired | Entitled to Vote |
| 6A | General Custody Claims | Impaired | Entitled to Vote |
| 6B | Withdrawable Custody Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Withhold Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Loan Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | State Regulatory Claims | Impaired | Entitled to Vote |
| 10~~1~~ | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11~~2~~ | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 12~~3~~ | Intercompany Interests | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 13~~4~~ | Series B Preferred Interests | Impaired | Entitled to Vote |
| 14~~5~~ | Other Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 15~~6~~ | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 16~~7~~ | Equitably Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[2420] The majority of these Claims are General Unsecured Claims that were either not scheduled by the Debtors or the Filed Proof of Claim includes supporting documents that differ from the amounts scheduled by the Debtors.

D.      **How are Claims valued under the Plan?  How will the value of my Claim affect the amount of my distribution under the Plan?**

Because many of the Claims are denominated in Cryptocurrency, the section below describes how the Debtors will value and make distributions on such Claims.

*General Earn Claims, Withhold Claims, and Convenience Claims*

Under the Plan, all Claims relating to Cryptocurrency (other than CEL Token Deposit Claims) associated with the Earn Program and Withhold Accounts[21]—Class 4 Convenience Claims, Class 5 General Earn Claims, and Class 7 Withhold Claims—are valued based on the dollar value of the applicable Cryptocurrency that comprises such Claims on the Petition Date based on the Cryptocurrency Conversion Table.[22]

Because (i) distributions to Classes 4, 5, and 7 are a percentage of the applicable Claim, (ii) some or all of the amount being distributed in Liquid Cryptocurrency, and (iii) the value of the Cryptocurrency to be distributed will change over time, it is necessary to determine a date by which the value of the Cryptocurrency distributed to those Holders will be determined.  Those values will be included in the Distribution Valuation Table.  The intention is to File that table as close to the Effective Date as possible (approximately 15 days prior to the Effective Date) so that the Distributions actually provided to Holders on the Effective Date reflect current Cryptocurrency prices and the Debtors, or the Distribution Agent, are able to administer the distributions.[23]

---

[21]   For the avoidance of doubt, this does not include any Withhold Claims previously paid pursuant to the Withhold Settlement.

[22]   The Cryptocurrency Conversion Table is Filed at [Docket No. 1420] and attached to this Disclosure Statement as **Exhibit L**.

[23]   The examples provided herein are based on the price of Cryptocurrency on May 31, 2023.  For the avoidance of doubt, this date will not be used in the Distribution Valuation Table.

**(Modified)** 3 - $36,203.57

| Coin | Petition Date Coin Price | # of Coins | USD ($) |
|---|---|---|---|
| BTC | $19,884.00 | 1.00 | $19,884.00 |
| ETH | $1,088.17 | 15.00 | $16,322.56 |
| Total Claim ($) | | | $36,203.57 |

**Recovery Scenario**

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| BTC | $27,323.96 | 0.25 | $6,784.01 |
| ETH | $1,879.61 | 3.61 | $6,784.01 |
| Liquid Cryptocurrency[1,2] | | | $13,568.03 |
| NewCo Common Stock[1,2] | N/A | N/A | 10,695.23 |
| Total Value Recovered ($) | | | $24,263.26 |
| Liquid Cryptocurrency Recovery % | | | 37.5% |
| NewCo Common Stock Recovery % | | | 29.5% |
| Total Recovery %[3] | | | 67.0% |

***Custody Claims***

The percentage recovery provided to Holders of Custody Claims is based on the percentage of Cryptocurrency owed by the Debtors to Holders of Custody Claims. In other words, if a Holder of a General Custody Claim accepts the Custody Settlement, on the Effective Date she will receive 72.5% of the amount of Cryptocurrency coins in her Custody Account instead of the dollar value of such coins on the Petition Date, as with other Account Holder Claims. The difference between the treatment of General Custody Claims and Claims associated with the Borrow Program, Earn Program, and Withhold Accounts is because the Bankruptcy Court has found that Cryptocurrency held in Custody Accounts is property of the applicable Account Holder.

***Retail Borrower Deposit Claims***

Under the Set Off Treatment, the amount of a Holder's Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligation outstanding on the Petition Date. The remaining amount of the Retail Borrower Deposit Claim—the Retail Borrower Post-Set Off Claim—will be determined based on the value of the applicable Cryptocurrency (other than CEL Token) on the Petition Date based on the Cryptocurrency Conversion Table.

If you make the Retail Advance Obligation Repayment Election and repay all or a portion of the proceeds of the loan you took out under the Debtors' Borrow Program by the Retail Advance Obligation Repayment Deadline and in accordance with the Retail Advance Obligation Repayment Instructions, you will receive an amount of BTC or ETH equal to the amount that you paid back (you can choose whether to receive BTC or ETH). For example, if you took out a loan for $15,000 (this would be your Retail Advance Obligation), and you repaid $10,000 of that loan in Cash, you would receive $10,000 worth of

BTC or ETH (depending on which you elect), valued as of noon prevailing Eastern Time on the date of repayment based on prices on a Cryptocurrency exchange agreed upon by the Debtors and the Ad Hoc Group of Borrowers.

The remaining amount, or the Retail Borrower Post-Set Off Claim, will (as under the Set Off Treatment) be based on the value of the applicable Cryptocurrency (other than CEL Token) on the Petition Date based on the Cryptocurrency Conversion Table.

### E.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the currently anticipated recoveries to Holders of Claims and Interests under the Plan.  Any estimates of the potential recoveries for the Claims and Interests in a particular Class in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  The amount of such distributions is also based on the total amount of Claims Allowed in the applicable Class, which is based on factors that are not within the Debtors' control, including future litigation regarding, among other things, the amount and allowances of claims against the Debtors.  The Debtors have assumed the scheduled amount of Account Holder Claims for purposes of calculating the estimated recovery percentages in the table below.

The amount of projected recoveries in each of the scenarios are estimates that are based on valuations performed by the Debtors' valuation expert and analysis performed by the Debtors' financial advisors and investment bankers.  As part of those analyses, the Debtors and their professionals were required to make a number of assumptions with respect to future events and the value of assets.  Those assumptions are described in more detail in **Exhibit D** (the "Mining Valuation Analysis") and **Exhibit E** (the "Mining Financial Projections").  Amounts in the far-right column in the table below under the heading "Estimated Recovery Under Chapter 7" are based on certain assumptions set forth in greater detail in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis").  Such recoveries are for comparison only and are only applicable in the event of a chapter 7 liquidation, which will not occur if the Plan is confirmed and becomes effective.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, CHANGES IN CRYPTOCURRENCY PRICES,[24] ALLOWED CLAIMS ARISING FROM THE REJECTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES, CLAIMS ASSERTED BY GOVERNMENT ENTITIES, INCLUDING TAXING AUTHORITIES, AND THE RESOLUTION OF DISPUTED CLAIMS. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, YOU SHOULD READ THE PLAN.**

| **SUMMARY OF EXPECTED RECOVERIES[25]** |
| --- |

---

[24] The projected recoveries in this Disclosure Statement are based on the value of Cryptocurrency on May 31, 2023.

[25] **The projected recoveries in this Disclosure Statement are subject to material change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general**

| Class No. | Type of Claim | Treatment | Projected Total Amount of Claims ($ in millions) [3326] | Estimated NewCo Transaction Recovery Under Plan | Projected Orderly Wind Down Recovery Under the Plan | Estimated Recovery Under Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| **Classified Claims and Interests of the Debtors** | | | | | | |
| **Class 1** | **Other Secured Claims** | Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor(s) as agreed to by the Debtors and the Committee, either: (i) payment in full in Cash; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of such Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | N/A | N/A | N/A | N/A |
| **Class 2** | **Retail Borrower Deposit Claims** [3827] | Each Holder of an Allowed Retail Borrower Deposit Claim shall receive: | $73~~1~~2 | 86~~5~~.4~~6~~% | 83.~~3~~0% | 47.~~6~~4% |

amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions. For purposes of estimating class recoveries, the Class Claim (as defined herein) Filed by the Committee and described in detail in Article VII.K.4 of this Disclosure Statement, is not taken into account.

[3326] The projected total amount of Claims is subject to material change based upon the Debtors' claim reconciliation process, among other things. Claim amounts may vary slightly in the Liquidation Analysis due to treatment of certain classes.

[3827] In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 6~~8~~7.50% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment). Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

(i)  Repayment Election:  If the Retail Borrower, (~~i~~1) makes the Retail Advance Obligation Repayment Election and (~~ii~~2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

*or*

~~Setoff~~Set Off Treatment:  If the Retail Borrower (~~i~~1) does not make the Retail Advance Obligation Repayment Election or (~~ii~~2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment [on account of any Retail Advance Obligations it has not repaid] in accordance with (i) above;

*plus*

(ii)  On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). ~~For the avoidance of any doubt, any~~ Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (~~c~~d) the Illiquid Recovery Rights, without

| | | | | | | |
|---|---|---|---|---|---|---|
| | | regard to Unsecured Claim Distribution Mix Elections. ~~For the avoidance of any doubt, all recoveries on account of a Retail Borrower Deposit Claim shall be capped at the value of such Holder's Retail Borrower Deposit Claim.~~ | | | | |
| **Class 3** | **Other Priority Claims** | Each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee. | N/A | N/A | N/A | N/A |
| **Class 4** | **Convenience Claims** | Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount ~~sufficient to provide the same percentage recovery to Holders of Convenience Claims that Holders of General Earn Claims will be provided, as set forth in the final version of the Disclosure Statement that is approved pursuant to the Disclosure Statement Order, but in no case less than~~that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim. | $34~~5~~6 | 70% | 70% | N/A |
| **Class 5** | **General Earn Claims** | Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (i.e., Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). | $3,7~~36~~54 | 6~~8~~7.~~5~~0% | 61.~~5~~2% | 47.~~6~~4% |
| | | In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (~~e~~d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. | | | | |
| **Class 6A** | **General Custody** | | | | | |

| Claims[3928] | For Holders of Allowed General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order: Each such Holder of an Allowed General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in this Disclosure Statement, one of two treatments:<br><br>**Treatment A:** (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim *provided* that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure under $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3. of the Plan.<br><br>**Treatment B**: The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim. The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing. To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as | $2,198[3929] | 72.5% | 72.5% | 72.5% |
|---|---|---|---|---|---|

[3928] Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim. Any such Allowed General Custody Claim will be subject to the ADR Procedures. <br><br> <u>For Custody Settlement Participants:</u> Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; *provided* that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; *provided*, *further*, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure under $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan. | | | | |
| **Class 6B** | **Withdrawable Custody Claims** | Each Holder of an Allowed Withdrawable Custody Claim that is not an ~~Excluded Party~~<span style="color:blue"><u>Equitably Subordinated Claim</u></span> shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order. | $48 | 100% | 100% | 100% |
| **Class 7** | **Withhold Claims**[3029] | Each Holder of an Allowed Withhold Claim that is not an ~~Excluded Party~~<span style="color:blue"><u>Equitably Subordinated Claim</u></span> shall receive the following treatment, as applicable: <br><br> **Treatment A:** If Class 7 votes to | $14~~3~~<u>3</u> | 7~~3.~~2.0% | 67.~~3~~<u>1</u>% | 47.~~6~~<u>4</u>% |

[3029] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

36

| | | accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in this Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

**Treatment B**: If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (ed) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement. | | | | |
|---|---|---|---|---|---|
| **Class 8** | **Unsecured Loan Claims** | Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock) sufficient to provide a recovery of the same percentage as the Class 5 (General | $88 | 6~~8~~7.~~5~~0% | 61.~~5~~2% | 47.~~6~~4% |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | ~~Earn Claim) recovery set forth in this Disclosure Statement~~.<br><br>In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (~~c~~d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. | | | | |
| Class 9 | **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive ~~Unsecured Claim Distribution Consideration (*i.e.,*~~a combination of (a) Liquid Cryptocurrency~~,~~ or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock~~)~~ sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in this Disclosure Statement.<br><br>In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount,~~ (b)~~ (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) the Litigation Proceeds, and (~~c~~d) the Illiquid Recovery Rights~~, without regard to Unsecured Claim Distribution Mix Elections~~. | $50 | 6~~8~~7.~~5~~0% | 61.~~5~~2% | 37.6% |
| Class 10 | **State Regulatory Claims**[30] | Each Holder of an Allowed State Regulatory Claim shall have its Claim subordinated to all Account Holder Claims and General Unsecured Claims. On the Effective Date, all State Regulatory Claims shall be cancelled, released, and extinguished and will be of no further force or effect, regardless of whether Holders of State Regulatory Claims receive a distribution. | N/A | [0%] | [0%] | [0%] |

---

[30] The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators. *See* Article III.LLL and Article VII.J.1 for more information about the proposed treatment of State Regulatory Claims.

| Class 1~~0~~1 | *De Minimis* Claims | All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | $0 | 0% | 0% | 0% |
|---|---|---|---|---|---|---|
| Class 1~~1~~2 | **Intercompany Claims** | Each Allowed Intercompany Claim shall, at the option of the applicable Debtor(s) with the consent of the Committee be: (i) Reinstated; or (ii) set off, settled, distributed, addressed, converted to equity, contributed, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum. | N/A | N/A | N/A | 47.~~5~~3% |
| Class 1~~2~~3 | **Intercompany Interests** | Each Intercompany Interest shall, at the option of the applicable Debtor(s) with the consent of the Committee, be: (i) Reinstated; or (ii) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum. | N/A | N/A | N/A | N/A |
| Class 1~~3~~4 | **Series B Preferred Interests** | Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to any order approving the Series B Settlement Order. | $686 | 0.1% | 0.1% | 0.1% |
| Class 1~~4~~5 | **Other Interests** | Holders of Other Interests shall not receive any distribution on account of such Other Interests, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. | N/A | 0% | 0% | 0% |

| Class 1~~5~~6 | Section 510(b) Claims[31] | Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect. | N/A | N/A | N/A | N/A |
|---|---|---|---|---|---|---|
| Class 1~~6~~7 | **Equitably Subordinated Claims** | Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court. | [TBD] | 0% | 0% | 0% |

> **As detailed further herein and in the Liquidation Analysis, in a hypothetical liquidation under chapter 7 of the Bankruptcy Code, Holders of Account Holder Claims, Unsecured Loan Claims, and General Unsecured Claims would likely receive a significantly reduced recovery relative to what such Holders would receive under the Plan**. In the event of a chapter 7 liquidation, the Bankruptcy Court would appoint a chapter 7 trustee (the "Liquidating Trustee") to oversee and effectuate the liquidation of the Debtors' assets. The Liquidating Trustee's fees and expenses would be paid by the Debtors and would be paid prior to any Account Holder Claims, Unsecured Loan Claims, or General Unsecured Claims. Given the novelty and complexity of the Debtors' business and the potential that any Liquidating Trustee appointed by the Bankruptcy Court may have minimal Cryptocurrency experience, the Liquidating Trustee's fees and expenses and the anticipated reduction in value obtained through the monetization of Cryptocurrency by the Liquidating Trustee would likely result in Account Holders, Holders of Unsecured Loan Claims, and Holders of General Unsecured Claims receiving significantly reduced recoveries. Moreover, in a liquidation, the Debtors' mining business would likely be sold for far less than if it was reorganized as contemplated by the Plan. Finally, all distributions in a chapter 7 liquidation would be made in Cash.

### F. What will I receive from the Debtors if I hold an Allowed Administrative Claim or Priority Tax Claim?

Allowed Administrative Claims and Priority Tax Claims are not classified in Article III of the Plan because the Bankruptcy Code generally requires that such Claims be paid in full on the Effective Date. The treatment of Allowed Administrative Claims and Priority Tax Claims is summarized in the table below.

---

[31] For the avoidance of doubt, the Debtors do not believe that any "Side C" insurance coverage under the Debtors' directors' and officers' liability insurance policy will be available as a distribution to any parties on account of any securities-related litigation, including the federal securities class action lawsuit styled as *Goines v. Celsius Network LLC, et al.*, No. 2:22-cv-04560-KM-ESK (D.N.J. 2022) because the coverage under the policies is extremely limited. When certain parties in interest Filed motions requesting the lifting of the automatic stay for purposes of accessing the Debtors' directors' and officers' liability policies, the Debtors explained in their objection thereto and during the hearing thereon that coverage under the policies was limited and could be exhausted relatively quickly. *See* Article VII.P for a detailed discussion of the D&O insurance policies. *See also* June 28, 2023 Hr'g Tr. 61:18–24 ("We have a very limited amount [of insurance proceeds available] here.").

| Claim | Summary of Treatment | Plan Section | Estimated Recovery |
|---|---|---|---|
| __Administrative Claims__ | Each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such allowance or as soon as reasonably practicable thereafter, but in any event no later than ninety days after the date on which an order allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court. | Article II, Section A | 100% |
| __Priority Tax Claims__ | Each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | Article II, Section C | 100% |

### G.    Why do the Debtors believe that the Plan provides the greatest distribution possible to Holders of Claims?

The Debtors believe that the Plan, which provides the Debtors with two comprehensive and orderly paths for emergence from these Chapter 11 Cases, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.  The Plan provides for a larger distribution to all Holders of Claims than would otherwise result from any other available alternative, including a chapter 7 liquidation, as illustrated in the Liquidation Analysis set forth in **Exhibit B** attached hereto.

If the Plan is effectuated through the NewCo Transaction, the Plan will provide Account Holders with a distribution of Liquid Cryptocurrency on the Effective Date as well as the opportunity to enjoy significant potential value growth through the ongoing management of the NewCo Assets by NewCo.  If the Plan is effectuated through the Orderly Wind Down, the Debtors will be wound down through an orderly process that is expected to yield higher sale prices on the Debtors' assets than a typical chapter 7 liquidation, as illustrated in the Liquidation Analysis set forth in **Exhibit B** attached hereto.  The Orderly

Wind Down, however, does not provide for the same opportunity to enjoy the upside in the equity of NewCo and its development of regulatorily compliant operating businesses.

### H.    What is the "NewCo Transaction"?

The Plan provides for the implementation and consummation of the NewCo Transaction.  Under the NewCo Transaction, a new entity — NewCo — will be formed and, on the Effective Date, the Debtors will transfer to NewCo the NewCo Assets, consisting of:  (a) the DeFi Cryptocurrency Assets; (b) the Institutional Loan portfolio; (c) PE & VC Investments; (d) Mining; and (e) the NewCo Capitalization Amount.  The equity in NewCo (*i.e.*, the NewCo Common Stock) will be distributed to certain Holders of Allowed Claims as set forth under the Plan.  "NewCo" is a general placeholder term that represents the new business.  The Debtors, the Committee, and the Plan Sponsor are currently evaluating a final name for the new, reorganized company.

Under the NewCo Transaction, NewCo will be managed by the Plan Sponsor (*i.e.*, Fahrenheit) for the benefit of all of NewCo's equity holders.  Fahrenheit is a coalition of crypto-native operators comprised of US Bitcoin Corp, Arrington Capital, Proof Group Capital Management, Steven Kokinos, and Ravi Kaza.  Information respecting the background and experience of the Fahrenheit members is attached to this Disclosure Statement as **Exhibit F**.

Prior to or on the Effective Date, the Plan Sponsor and NewCo will enter into the Management Agreement respecting the Plan Sponsor's management of NewCo from and after the Effective Date. Further, NewCo and US Bitcoin will enter into the US Bitcoin Agreements respecting the management of the Mining assets from and after the Effective Date.  An overview of the Plan Sponsor's intended strategy respecting NewCo, including core business lines, illustrative projections, risk management structure, and liquidity approach, is attached to this Disclosure Statement as **Exhibit F**.

There are certain key elements of the NewCo Transaction that will add value to NewCo and be provided to creditors in the form of NewCo Common Equity, as explained below and in **Exhibit F**.

| Bid Item | Potential Impact / Benefit to MiningCo | Included in Mining Business Plan Projections |
|---|---|---|
| Construction of a 100 MW mining facility within one year of the Effective Date | Enhances MiningCo's vertical integration strategy in the near-term | Included |
| Construction cap of $395K / MW | Better control of the cost to build new sites, especially as the Company pursues its vertical integration strategy | Included |
| Contribute leasehold and development rights to an additional 240 MW site | Provides the opportunity to fully integrate MiningCo's entire fleet to proprietary sites over time | Not included |
| 8,500 rack spaces at US Bitcoin's Alpha facility | Rigs are expected to be deployed in the near term at the Alpha site, which historically has had favorable power costs | Included |
| $100MM in coupons from a leading ASIC manufacturer | Reduces capital expenditures for future new and replacement rig purchases | Included |
| Potential strategic partnership with an ASIC manufacturer | Provides the opportunity to scale up to 180,000 rigs with the | Not included |

| | opportunity to own 90,000 and take advantage of proprietary capacity in the pipeline | |

These elements will build on the current value of Celsius Mining.  For example, during the 3-month period May, June and July 2023, the Company generated an average of 363 gross BTC per month, or an average daily production of 12 BTC per day.  As of July 31, 2023, the Company had over 79,000 rigs deployed, of which 22% are deployed at the Company's Proprietary Sites.

Moreover, the Company's adjusted gross margin has averaged roughly 27% across April, May, and June 2023.  The Company has taken several steps to improve the adjusted gross margin.  First, Celsius Mining has a fixed power price hedge for a portion of its Proprietary Sites, which allows it to participate in ERCOT's energy management programs and take advantage of power price volatility. Second, Celsius Mining has entered into new hosting agreements with improved economics, deploying 52,000 rigs this calendar year. This includes locations with historically lower or more stable power prices, the ability to share in energy management revenue and curtailment rights.  Third, the Company has installed software on its rigs that help improve the overall efficiency the miners.  This software is particularly important during the hotter summer months, especially in Texas, as rigs can continue to operate, albeit at a lower uptime.  The NewCo Transaction intends to build on this value as shown above.

The management of NewCo will be overseen by the New Board of NewCo, which will initially consist of seven members:  (i) two of whom will be appointed by the Plan Sponsor; (ii) three of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose the identity and affiliations of any Person proposed to serve on the New Board in the Plan Supplement.

In connection with the NewCo Transaction, on or prior to the Effective Date, the Plan Sponsor will purchase $50 million of NewCo Common Stock pursuant to the Plan Sponsor Contribution Agreement.  Such equity shall be purchased, at the determination of the Debtors and the Committee, through either a primary purchase of NewCo Common Stock or through the Secondary Market Purchase.

I.      What is the "Orderly Wind Down"?

The Plan permits the Debtors and the Committee to implement an "Orderly Wind Down."  If, at any time prior to or after the Confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction, the Debtors will request approval from the Bankruptcy Court to pivot to an Orderly Wind Down.  An Orderly Wind Down would provide for the liquidation of the majority of the Debtors' assets and development of the Backup MiningCo Transaction as opposed to a restructuring of the Debtors through the NewCo Transaction.  Both the NewCo Transaction and the Orderly Wind Down are a part of the Plan.  In other words, if you vote to accept the Plan, you are voting to authorize the Debtors both to pursue the NewCo Transaction in the first instance *and* to pivot to the Orderly Wind Down if the Debtors, the Committee, and their respective advisors, in good faith and in an exercise of their fiduciary duties, elect to pursue the Orderly Wind Down.

At a high level, in the Orderly Wind Down: (1) the Debtors will seek to distribute Liquid Cryptocurrency in a manner designed to minimize the cost of such distribution to creditors; (2) the

Debtors' illiquid assets will be liquidated and proceeds will be returned to creditors; and (3) the Debtors will pursue the Backup MiningCo Transaction, a pure play, publicly traded mining business in which creditors will receive 100% of the equity interests. The Debtors estimate that the Orderly Wind Down could take approximately five years to complete.

If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in the Backup Plan Sponsor Agreement that they have negotiated with the Backup Plan Sponsor, the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (collectively, the "BRIC")—or on terms that provide a better recovery to the Debtors' creditors than the Backup Plan Sponsor Agreement, which terms may be with a different Backup Plan Sponsor than the BRIC. The BRIC was chosen as the Backup Plan Sponsor pursuant to the Auction held by the Debtors, which is explained in greater detail in Article VII.M.3 of the Disclosure Statement. The Debtors may select a different Backup Plan Sponsor if a different party provides terms superior to those offered by BRIC.

If Holders of Claims and Interests approve the Plan and the Debtors pivot to the Orderly Wind Down, the Debtors will begin to initiate distributions to Holders of Claims without the need to restart the Disclosure Statement and Plan solicitation process. As a result, Holders of Claims will receive the recovery of the initial liquid distribution under the Plan faster than if the Debtors had to recommence the solicitation process on a standalone liquidating plan. The Debtors believe that resoliciting the Plan would result in significant costs for the Estates. In the Orderly Wind Down scenario, the Debtors will still be required to administer claims and litigate certain disputes with respect to claimants' respective rights in certain property. Moreover, it is likely that the value of the Debtors' illiquid assets would be impaired to some extent in such scenario, when compared with the assumed value of such assets in the New Co Transaction. Please refer to the "Summary of Expected Recoveries" chart in Article III.E of this Disclosure Statement for a comparison of the recovery under the NewCo Transaction and the Orderly Wind Down.

Should the Debtors, the Committee, and their respective advisors decide to toggle to the Orderly Wind Down, the Debtors will (i) provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (ii) consult with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Immanuel Herrmann ("Mr. Herrmann"), Daniel Frishberg ("Mr. Frishberg"), Cameron Crews ("Mr. Crews"), and Ignat Tuganov ("Mr. Tuganov") regarding the decision to toggle, (iii) will File a "Wind-Down Motion" that explains for electing to pursue the Orderly Wind Down and includes the Wind-Down Procedures, and (iv) may File an amended Plan conformed to include the changes described in the summary table in Article IV.A.4 of this Disclosure Statement. Parties in interest will have at least ten (10) days to object to the Wind-Down Motion. In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.

The table in Article VIV.A.4 of this Disclosure Statement and Article IV.E.1 of the Plan summarizes the changes that would be made in an amended Plan if the Debtors and the Committee elect to toggle from the NewCo Transaction to the Orderly Wind Down.

### J.      Can I vote if I have transferred my Claim to someone else?

If you transfer all your Claim to a third party by [July 24], 2023 (the Voting Record Date),[3132] you may **not** vote the portion of the Transferred Claim. As explained in the question and answer immediately

---

[3132]  This date is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Record Date is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

following this answer, any Holders of Transferred Claims are entitled to vote, but each portion of the Claim (if more than one portion) must vote collectively to accept or reject the Plan. If Ballots are received that do not vote each portion of the Claim identically, the Ballots will not be counted.

**K.      Can I vote if I am the Holder of a Transferred Claim and if so, how?**

If you are the Holder of a Transferred Claim and you have fulfilled the requirements of Bankruptcy Rule 3001(e) and the transfer is reflected on the Claims Register by [July 24], 2023 (the Voting Record Date) [333] you may vote the Transferred Claim. The Claims Register can be accessed through the "Search Claims" button at cases.stretto.com/celsius.

If Ballots are received that do not vote each portion of the Claim identically, the Ballots will not be counted. If you are entitled to vote a Transferred Claim or a portion of a Claim, you will receive a Ballot.

**L.      What does it mean if I have a Convenience Claim?**

If you have a Convenience Claim, that means the total amount of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) is greater than $10 but less than or equal to $5,000. As set forth in the Plan, Holders of Convenience Claims will receive Liquid Cryptocurrency in an amount equal to the greater of (a) the percentage recovery for General Earn Claims set forth in the final version of this Disclosure Statement and (b) 70% recovery on account of such Convenience Claims.

For example, if you have an Earn Claim valued at $2,000 and a Withhold Claim valued at $1,000, instead of having two claims—one in Class 5 (General Earn Claim) and one in Class 7 (Withhold Claim)—and receiving two different types of treatment, you will have one in Class 4 (Convenience Claim) and will receive one form of treatment on behalf of the aggregate amount of both of your Claims. As a result, your vote will be counted as a Class 4 Convenience Claim in the amount of $3,000 and you will receive Liquid Cryptocurrency with a value equal to no less than 70% of the $3,000 Convenience Claim (*i.e.*, Liquid Cryptocurrency worth at least $2,100).

As further explained herein, Holders of Account Holder Claims may be eligible to opt-in to the Convenience Class by making the Convenience Claim Election. The Convenience Claim Election is explained in the question immediately following this answer.

**M.      What is the Convenience Claim Election and what are the consequences of making the Convenience Claim Election?**

The Convenience Claim Election, which is made on the Ballot when voting on the Plan, is an option available to Account Holders whose Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) total greater than $5,000 to irrevocably elect to have their Claims reduced to $5,000 and treated as Convenience Claims.[334] If you are an Account Holder of such Claims, you ***must vote to accept the Plan*** to make the Convenience Claim Election.

---

[333] This date is subject to Bankruptcy Court approval. Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov. The Debtors will update this paragraph once the Voting Record Date is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

[334] Please review Item 5 on your Ballot to make the Convenience Claim Election.

*Holders of Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) Greater than $5,000*[3435]

If you are an Account Holder whose Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) exceed the Convenience Claim Threshold,[3536] the Convenience Claim Election allows you to *opt in* to receiving the Convenience Class treatment instead of receiving the applicable treatment available to each of your Claims. By opting in to the Convenience Class treatment, the aggregate amount of your Account Holder Claims (excluding Custody Claims and pre-Set Off Treatment Retail Borrower Deposit Claims) will be reduced to $5,000.

For example, assume you have an Earn Claim in the amount of $4,000 and a Withhold Claim in the amount of $3,000 as of the Petition Date.[3637] Your Ballot will indicate that you have a Class 5 General Earn Claim in the amount of $4,000 and a Class 7 Withhold Claim in the amount of $3,000. If you vote to accept the Plan, you will have the option to elect how you would like to receive a distribution. *Regardless of what option you select, your vote will be counted as a vote to accept the Plan in Class 5 in the amount of $4,000 and a vote to accept the Plan in Class 7 in the amount of $3,000*.

*Option 1*. You decide you would like to receive the Convenience Claim treatment. To receive the Convenience Claim treatment, you make the Convenience Claim Election on your Ballot.[3238] The total amount of your Class 5 and Class 7 Claims is reduced from $7,000 to $5,000 (you cannot opt in to the Convenience Class treatment for one Claim and receive the class recovery for your other Claim). If either a NewCo Transaction or an Orderly Wind Down is consummated, on the Effective Date, you will receive the greater of (a) the percentage recovery for General Earn Claims set forth in the final version of this Disclosure Statement and (b) 70% recovery on account of such $5,000 Convenience Claim in the form of Liquid Cryptocurrency. In other words, you will receive not less than $3,500 in the form of Liquid Cryptocurrency.

*Option 2*. You decide you would not like to receive the Convenience Claim treatment. Rather, you would like to receive the General Earn Claim treatment with respect to your $4,000 Earn Claim and the Withhold Claim treatment with respect to your $3,000 Withhold Claim. To receive the original treatment offered on behalf of your Class 5 and Class 7 Claims, you do not make the Convenience Claim Election on your Ballot, but may have the opportunity to make other elections.[3839] The amount and form of your recoveries will vary, as further explained below.

*Recovery Outcome A (Option 2 Only)*. If either a NewCo Transaction or an Orderly Wind Down is consummated and Class 7 (Withhold Claims) votes to accept the Plan, you will receive the following:

---

[3435]  Please review Item 1 on your Ballot to see what type of Claim you have.

[3536]  Please review Item 1 on your Ballot to see what type of Claim you have.

[3637]  For purposes of this example, you do not hold any other Claims.

[3238]  Please review Item 5 on your Ballot to make the Convenience Claim Election.

[3839]  Please review Item 6 on your Ballot to make further elections.

| | Withhold Claim ($3,000) | Remainder of Withhold Claim ($2,550) [39][40] | General Earn Claim ($4,000) [40][41] | Total |
|---|---|---|---|---|
| Liquid Cryptocurrency | $450 | $95~~60~~ | $1,~~505~~499 | $2,9~~1~~05 |
| NewCo Common Stock[41] ~~or~~ [42] or Backup MiningCo Common Stock / Illiquid Recovery Rights [42][43] | N/A | $78~~7~~53 | $1,18~~2~~34 | $~~2,021~~1,935 |
| Litigation Proceeds | N/A | The right to receive a share of the Litigation Proceeds. | | |

<div align="right">

Distribution Amount    $4,~~936~~840

</div>

**Recovery Outcome B (Option 2 Only).**  If either a NewCo Transaction or an Orderly Wind Down is consummated and Class 7 (Withhold Claims) votes to reject the Plan, you will receive the following:

| | Withhold Claim ($3,000) [43][44] | General Earn Claim ($4,000) [44][45] | Total |
|---|---|---|---|
| Liquid Cryptocurrency | $1,12~~9~~4 | $1,~~505~~499 | $2,634 |
| NewCo Common Stock[45] ~~or~~ [46] or Backup MiningCo Common Stock / Illiquid Recovery Rights [46][47] | $~~92~~886 | $1,18~~2~~34 | $2,~~160~~068 |

---

[39][40]  Assumes a 6~~8~~7.~~50~~% recovery for General Earn Claims.  Pursuant to the Plan, the remainder of Class 7 Withhold Claims receive the General Earn Claim treatment.

[40][41]  Assumes a 6~~8~~7.~~50~~% recovery for General Earn Claims.  For the purposes of this example, you do not make any Unsecured Claim Distribution Mix Elections.

[41]  ~~Assumes the NewCo Transaction is consummated.~~

[42]  Assumes the NewCo Transaction is consummated.

[42][43]  Assumes the Orderly Wind Down is consummated.

[43][44]  Assumes a 6~~8~~7.~~50~~% recovery for General Earn Claims.  Pursuant to the Plan, the remainder of Class 7 Withhold Claims receive the General Earn Claim treatment.

[44][45]  Assumes a 6~~8~~7.~~50~~% recovery for General Earn Claims.  For the purposes of this example, you do not make any Unsecured Claim Distribution Mix Elections.

[45]  ~~Assumes the NewCo Transaction is consummated.~~

[46]  Assumes the NewCo Transaction is consummated.

[46][47]  Assumes the Orderly Wind Down is consummated.

| Litigation Proceeds | The right to receive a share of the Litigation Proceeds. |
|---|---|

*Distribution Amount*    $4,~~769~~**5**1

### N.    Are any regulatory approvals required to consummate the Plan? [4748]

Yes, there are a number of regulatory approvals required to consummate the Plan, including:

- obtaining pre-clearance from the SEC confirming the financial statement presentation for the registration statement on Form 10 (the "Registration Statement") pursuant to the Securities and Exchange Act of 1934 (as amended) (the "Exchange Act") to be filed by NewCo;

- obtaining no-action relief or other reasonably acceptable assurances from the SEC with respect to NewCo's status as an investment company under the provisions of the Investment Company Act of 1940, or any rules or regulations promulgated thereunder; and

- obtaining temporary licensure from the State of New York to distribute and stake ETH.

Please see Article XI of this Disclosure Statement for a description of "Certain Securities Law Matters" related to approval of the Plan.

### O.    When will I receive my distribution under the Plan?   What is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan by entering the Confirmation Order.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After the Bankruptcy Court confirms the Plan, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Unless otherwise provided under the Plan, distributions to Holders of Allowed Claims and Interests will only be made starting on the date the Plan becomes effective—*i.e.*, the "Effective Date" or "Consummation"—or as soon as reasonably practicable thereafter, as specified in the Plan.  A "Notice of Effective Date" will be Filed on the Bankruptcy Court docket notifying all parties when the conditions precedent to the Effective Date have been satisfied.  *See* Article X of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion of the conditions that need to be satisfied or waived before the Effective Date and Consummation of the Plan.

The following distributions will be made on or shortly after the Effective Date, depending on the treatment of each Class:  (a) Liquid Cryptocurrency; (b) NewCo Common Stock (in the event the NewCo Transaction is consummated); (c) Cash; and (d) collateral securing Allowed Other Secured Claims. Depending on the amount and types of elections Holders of Claims make in each Class, all as further explained herein, it may take several months for these distributions to be made.

---

[4748]  "Regulatory approvals" means any consents, approvals, or permissions of Governmental Authorities, including, for the avoidance of doubt, the SEC, that are necessary to implement and consummate the Restructuring Transactions, which shall be set forth in greater detail on a schedule to be delivered by the Plan Sponsor to the Debtors and the Committee.

"Governmental Authority" means (i) any U.S. federal, state, county, civil, or local legislative, administrative, self-regulatory or regulatory authority, agency court, tribunal, or judicial or arbitral body or other governmental or quasi-governmental entity with competent jurisdiction or (ii) any supranational or non-U.S. authority of similar jurisdiction.

In both the NewCo Transaction and the Orderly Wind Down, including the Backup Plan Sponsor Transaction, distributions of Litigation Proceeds from the Litigation Recovery Account will be made periodically as determined by the Litigation Administrator(s) and the Litigation Oversight Committee. In the event of an Orderly Wind Down, Holders of General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims will receive Backup MiningCo Common Stock and Illiquid Recovery Rights instead of NewCo Common Stock. Holders of such Claims will receive Backup MiningCo Common Stock and Illiquid Recovery Rights in the same percentage of any such Claim that was to be paid in NewCo Common Stock, which will provide Holders with equity in Backup MiningCo and preserve such Holders' rights to recoveries on the Debtors' illiquid assets, which may be (but are not required to be) tokenized.

In no event will Holders of Allowed Claims or Interests be entitled to interest, dividends, or accruals on the distributions provided for in the Plan regardless of whether such distribution is delivered on or after the Effective Date. In addition, no distributions will be made to any Holder of Allowed Claims in an aggregate amount less than or equal to $10. The Debtors shall not be required to make any distributions on account of Claims where the associated Withdrawal Fees would exceed the value of the distribution.

Distributions will only be made to Persons or Entities who are Holders of Allowed Claims on the Distribution Record Date, or such other date used to determine which Holders of Allowed Claims will be eligible to receive distributions under the Plan. Holders of Allowed Claims on the Distribution Record Date will receive distributions on the Effective Date (or as soon as possible thereafter), or in the time period otherwise described in the Plan. The Distribution Record Date is expected to be the date on which the Bankruptcy Court enters the Confirmation Order, or such other date as is announced by the Debtors or set forth in an Order of the Bankruptcy Court.

If a Claim is transferred twenty or fewer days before the Distribution Record Date, distributions will be made to the transferee of such Claim (*i.e.*, the Person or Entity to whom the Claim is transferred) only to the extent practicable, and in any event, only if the relevant Claim transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. The Debtors will have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

In addition, to be eligible to receive a distribution, Account Holders will have to complete the KYC process, provide required tax documents to the Debtors, sign up for an account with the Distribution Agent, and otherwise comply with the directions provided by the Debtors to receive a distribution.

Finally, the Distribution Agent may be unable to make distributions to certain parties for legal or other reasons, including to Holders of Claims that live in prohibited jurisdictions, as further explained in Article VIII of this Disclosure Statement, entitled "Risk Factors." In certain circumstances, these legal or other reasons may prevent the Distribution Agent from making any distributions, and in other circumstances, the Distribution Agent may only be able to make such distributions in Cash.

**P.        What happens to my recovery if the Plan is not confirmed or does not go effective?**

There is no assurance that the Debtors will be able to reorganize their businesses if the Plan is not confirmed or does not go effective.  It is likely that any alternative transaction may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan, including pursuant to a liquidation under chapter 7 of the Bankruptcy Code.  A more detailed description of the consequences of an extended chapter 11 case or of a liquidation scenario is described in Article X.C of this Disclosure Statement entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit B**.

**Q.        If the Plan provides that I get a distribution, how will I receive my distribution?**

The initial distribution of Liquid Cryptocurrency will be distributed by the Distribution Agent, which will likely be the Post-Effective Date Debtors~~or a~~, PayPal, or another third-party provider, as applicable and depending on where you live, via the Celsius platform (or other platform) to an external wallet address on or shortly after the Effective Date.  The NewCo Common Stock will be distributed by NewCo on or shortly after the Effective Date.  As previously stated, however, you will be required to complete or fulfill certain registration requirements and compliance with certain AML/KYC policies and provide certain tax documents to the Debtors to receive a distribution.  Distributions of the Pro Rata shares of the Litigation Recovery Account will be distributed periodically.  The Litigation Administrator and the Litigation Oversight Committee will determine the frequency and timing of distributions.

Because of the cost of keeping the Debtors' platform open to process withdrawals, the Debtors believe that it is in the interest of the Debtors' Estates and creditors for the Debtors to use third-party Distribution Agents to make all distributions of Liquid Cryptocurrency and for the Celsius App to become inactive after a set period of time.  Among other things, the Debtors would have to continue employing and compensating numerous employees for an extended period of time to oversee and approve distributions through the Celsius platform.  Accordingly, the Debtors have been working to identify Distribution Agents who could make distributions of Liquid Cryptocurrency to the Debtors' creditors under the Plan in a regulatorily compliant way and to enter into agreements with such Distribution Agents setting forth the terms on which the Distribution Agents may distribute Liquid Cryptocurrency or, in certain circumstances discussed below, fiat currency (the "Distribution Agreements").  As of the date of the Filing of this Disclosure Statement, the Debtors have identified PayPal as a potential Distribution Agent for certain distributions of Liquid Cryptocurrency to individual (non-corporate) creditors (other than with respect to Custody and Withhold creditors) in the United States (other than Hawaii).

For all distributions of Cryptocurrency that are not or will not be made by PayPal (including distributions to international creditors, corporate creditors, and Custody and Withhold creditors), the Debtors continue to explore potential Distribution Agents.  If another Distribution Agent cannot be located to make those distributions, the Debtors will keep the Celsius platform open for ninety days after the Effective Date to make distributions to these creditors through the Celsius App (similar to how the Debtors have processed Court-approved withdrawals for certain Custody and Withhold users).  The Debtors would prefer to identify a Distribution Agent who can make these distributions to international and corporate creditors because it is expensive to keep the Debtors' platform open to process withdrawals.  Ninety days after the Effective Date, any applicable creditor who has not claimed their distribution of Cryptocurrency from the Debtors' platform will receive their distributions, if any, through PayPal or another Distribution Agent, and may receive fiat currency if a Distribution Agent does not have the requisite licenses to distribute Cryptocurrency to that creditor.

~~Prior to~~Upon the ~~Effective~~Deactivation Date, the Debtors ~~will provide detailed~~may instruct~~ions to all claimants of the steps they must take to receive their distributions.  Once the Distribution Agent is selected, Holders of Claims will also receive more information on how they will receive their~~

distributions one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors. The Debtors chose a ninety-day period based on their experience enabling withdrawals of Cryptocurrency from the Celsius App for Custody and Withhold Account Holders pursuant to the Custody and Withhold Settlements. Specifically, the vast majority of the value eligible to be withdrawn pursuant to the Custody and Withhold Settlements was withdrawn within ninety days.

On the Deactivation Date, the Celsius App will cease to exist and users will no longer be able to log-in to the Celsius App and/or access their Celsius Account. Users are encouraged to download their transaction history for their personal records starting now to ensure that they have a copy of such history before the Celsius App ceases to exist.

The Debtors are also working to streamline distribution mechanics with respect to Persons and Entities that may not have opened an account with Celsius directly but earned rewards on their digital assets in accounts set up with other exchanges or from companies which were part of Celsius' partner programs (the "Partners"). Such Partners generally fall into two categories, "Segmented Partners" and "Omnibus Partners" (and the users thereof, "Segmented Partner Users" and "Omnibus Partner Users," respectively). The Debtors had eight Segmented Partners: Bitfinex; Blockbasis; Monarch; Paxful; B21; BitWala; Digifox; and Outlet (of which B21, BitWala, Digifox, Outlet are no longer operational). The Debtors have twelve Omnibus Partners: AmonInstitutional; BTTF; Public Mint; Anubi Digital; Mode; Line-Bitfront; Line-Bitmax; Liquid; KingdomTrust; Celsius Institutional; Civic; and Fabrx (of which Liquid, KingdomTrust, Celsius Institutional, Civi, and Fabrx are no longer operational).

Segmented Partner Users did not open accounts on the Celsius platform but instead accessed Celsius products through their accounts with, for example, BitWala. The Debtors, however, have existing Celsius accounts set up for each of those users on the Company's backend operations, and the Debtors generally have contact information for these users (name, email, and other information necessary to operate Celsius user accounts). Further, these Segmented Partner Users accepted the Terms of Use. While these users were previously unable to access the Celsius App directly, the Debtors are able to activate these Celsius Accounts for distribution purposes. Accordingly, the Debtors currently plan to make distributions to Segmented Partner Users in the same way as for customers who opened accounts with Celsius directly. Segmented Partner Users are encouraged to reach out to the Debtors through Stretto to ensure that the Debtors have accurate contact information on file.

With respect to Omnibus Partner Users, the Company does not have any individual accounts for Omnibus Partner Users set up on the Company's backend operations. Instead, the Company only had an account for the Omnibus Partners themselves, who then further managed the provision of Celsius products to their users. Omnibus Partner Users only interacted with the Omnibus Partner and had no contact with the Company, did not accept the Terms of Use, and were unable to access the Celsius App directly. The Company also does not have any contact information for these users and only has an obligation to make distributions to the Omnibus Partners. Accordingly, the Company will make distributions to the Omnibus Partners and the Omnibus Partners are responsible for making any relevant distributions to Omnibus Partner Users. Omnibus Partner Users are encouraged to reach out to the Debtors through Stretto to ensure that the Debtors have accurate contact information on file.

The Debtors will provide additional information regarding Liquid Cryptocurrency distributions to all applicable creditors once the Debtors finalize agreements with the Distribution Agent(s).

The table below summarizes how distributions are expected to be made based on account and creditor type:

| Account and/or Claim | User Location (Based on | Distribution Agent for | Distribution Agent Starting |
|---|---|---|---|

| Type | KYC and Location) | Days 1–90 | on Day 91 |
|---|---|---|---|
| Custody Account (individual)<br><br>Withhold Account (individual) | United States, excluding Hawaii | Company (all Custody assets) or another Distribution Agent (BTC/ETH)<br><br>*Custody Account Holders can withdraw starting on the Confirmation Date. | PayPal (BTC/ETH) or another Distribution Agent (Cash or BTC/ETH) |
| Custody Account (corporate)<br><br>Withhold Account (corporate) | United States | Company (all Custody assets) or another Distribution Agent (BTC/ETH)<br><br>*Custody Account Holders can withdraw starting on the Confirmation Date. | Another Distribution Agent (Cash or BTC/ETH) |
| Earn Account (individual)<br><br>Retail Borrower Deposit Claim (individual)[49]<br><br>Convenience Claims (individual)<br><br>Unsecured Loan Claims (individual) | United States, excluding Hawaii | PayPal (BTC/ETH) | PayPal (BTC/ETH) or [another Distribution Agent (Cash or BTC/ETH)] |
| Earn Account (corporate)<br><br>Convenience Claims (corporate)<br><br>Unsecured Loan Claims (corporate) | United States, excluding Hawaii | Company (BTC/ETH) or another Distribution Agent (BTC/ETH) | Another Distribution Agent (Cash or BTC/ETH) |
| Earn Account (individual and corporate) | Hawaii | PayPal (Cash, for individuals only) or another Distribution Agent (BTC/ETH), but unlikely to find a Distribution Agent to distribute in BTC/ETH | Same as Days 1–90 |

---

[49] This does not account for Cryptocurrency that you will receive when you make the Retail Advance Obligation Repayment Election and repay your Retail Advance Obligation in accordance with the Retail Advance Obligation Repayment Instructions and by the Retail Advance Obligation Repayment Deadline.

| | | | |
|---|---|---|---|
| Retail Borrower Deposit Claim (individual and corporate)<br><br>Convenience Claims (individual and corporate)<br><br>Custody Account (individual)<br><br>Withhold Account (individual)<br><br>Unsecured Loan Claims | | | |
| Earn Account (individual and corporate)<br><br>Retail Borrower Deposit Claim (individual and corporate)<br><br>Convenience Claims (individual and corporate)<br><br>Unsecured Loan Claims | International | Company (BTC/ETH) or another Distribution Agent (BTC/ETH) | Another Distribution Agent (Cash or BTC/ETH) |

Finally, the Debtors and any applicable Distribution Agent will comply with applicable privacy and data laws in making distributions to Account Holders and other creditors. One method that the Debtors are exploring is "hashing." "Hashing" is a series of mathematical operations (collectively a "hashing algorithm") that transforms a string of characters (like an e-mail address or name) into a meaningless sequence of characters (the "hash"). Importantly, the resulting hash has two properties that are critical: (1) the "hash" is meaningless to anyone who might view the hash, such that there is no known method to reverse the hash and discover the string of characters from which the hash was created; and (2) if you start with the exact same string of characters, and apply the same hashing algorithm, you will always get the same resulting hash.

For example, the Holders of Claims may register with a Distribution Agent in connection with distributions as explained above and will be required by applicable laws and regulations to provide to the Distribution Agent certain personal information to verify such Holder's identity, such as an e-mail address. Celsius will also have that same information about Account Holders in its own file. If hashing is employed, the Distribution Agent and Celsius would each use the agreed upon hashing algorithm to create a unique hash from such customer information, *without Celsius or the Distribution Agent ever sharing the underlying customer information*. If the resulting hashes match, Celsius and the Distribution Agent will know that the person that registered with the Distribution Agent is the same as the person for whom Celsius has an associated approved claim, and Celsius can thereafter instruct the Distribution Agent to make a distribution to such person on account of the approved claim. At no time, however, would any private customer information be exchanged, other than the sequence of characters comprising the hash. If the hash is disclosed, it would be meaningless to anyone who might see it because the hash algorithm cannot be reversed.

**R.    How will undeliverable distributions and unclaimed property be treated under the Plan?**

In the event that the NewCo Transaction is consummated, any distribution under the Plan that is unclaimed or otherwise remains undeliverable for a period of one year after the first attempt to deliver shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and shall automatically and irrevocably revert to NewCo, in the case of NewCo Common Stock, or the Litigation Recovery Account, to the extent it is Liquid Cryptocurrency, and shall be distributed Pro Rata to Holders entitled to receive ~~Liquid Cryptocurrency~~Litigation Proceeds under the Plan (*i.e.*, General Earn Claims, Unsecured Loan Claims, Retail Borrower Deposit Claims, and General Unsecured Claims).

~~Unclaimed property will be redistributed to Holders of Claims entitled to receive the Unsecured Claim Distribution Consideration.   The Debtors and the Committee are continuing to discuss the best way to effectuate this redistribution and will provide an update to Holders of Claims once settled.~~ Any unclaimed property under the Series B Settlement will be redistributed in accordance with Section 4 of the Series B Settlement Agreement.

In the event that the Debtors decide to toggle to the Orderly Wind Down, any unclaimed distributions or unclaimed property shall be (a) distributed to Holders of Illiquid Recovery Rights, (b) utilized to fund Wind-Down Expenses, or (c), if no Wind-Down Expenses remain, contributed to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code.

Once a distribution is determined to be unclaimed property as set forth above and in the Plan, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

Accordingly, Holders of Claims should timely respond to NewCo's or the Post-Effective Date Debtors' communications and attempts to complete Distributions, including by completing required KYC processes, to avoid forfeiting Distributions to which they are entitled.

Finally, the Distribution Agent may be unable to make distributions to certain parties for legal or other reasons, including to Holders of Claims that live in prohibited jurisdictions, as further explained in Article VIII of this Disclosure Statement, entitled "Risk Factors."  In certain circumstances, these legal or other reasons may prevent the Distribution Agent from making any distributions, and in other circumstances, the Distribution Agent may only be able to make such distributions in Cash.

**S.    How will I receive my recovery if the Orderly Wind Down, including the Backup Plan Sponsor Transaction, is consummated?**

In the event of an Orderly Wind Down, whether pursuant to the Backup Plan Sponsor Transaction or otherwise, the Plan Administrator will administer the Post-Effective Date Debtors' estates in accordance with the Plan Administrator Agreement and the Wind-Down Procedures, including with respect to distributions.

For distributions of Cryptocurrency, the Plan Administrator may consider making distributions through Account Holders' existing Celsius Accounts subject to certain AML/KYC requirements and the provision of applicable tax documents.  For further distributions, including Litigation Proceeds, the Litigation Administrator will determine the most effective means of distributing the Litigation Proceeds.

The Debtors will provide detailed instructions to all claimants of the steps they must take to receive their distributions in the event of an Orderly Wind Down.

**T.        What is NewCo Common Stock?**

NewCo Common Stock is the common stock of NewCo to be issued by NewCo and distributed on the Effective Date to certain Holders of Claims, including Holders of General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims.  Holders of Retail Borrower Deposit Claims may also receive NewCo Common Stock on behalf of any portion of their Retail Borrower Deposit Claims that receives the Unsecured Claim Distribution Consideration.  Pursuant to the Plan, 100 percent of the NewCo Common Stock representing all of NewCo's common equity will be distributed to eligible Holders of Claims as part of their recoveries under the Plan (subject to dilution by the Management Equity Compensation and the Employee and NewCo Board Equity Compensation provided and any stock purchased by the Plan Sponsor for cash through a primary purchase).

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act, and, except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  The issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) is being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.  Such NewCo Common Stock will be considered "restricted securities."

Due to the number of Holders that will receive Newco Common Stock under the Plan, NewCo will file a Registration Statement pursuant to the Exchange Act.  After the Registration Statement is effective, NewCo intends to provide Holders of NewCo Common Stock financial disclosures and transparency on an ongoing basis through the filing of all periodic reports and disclosures (*e.g.*, Form 10-Ks and 10-Qs), as required by the Exchange Act and the rules and regulations of the SEC promulgated thereunder.

Please see Article XI of this Disclosure Statement for a description of "Certain Securities Law Matters" for more information.

**U.        Can I trade or sell my NewCo Common Stock?**

On or shortly after the Effective Date, the NewCo Common Stock will be issued to Holders of Retail Borrower Deposit Claims, General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims,[4850] subject to certain applicable federal and state securities laws and AML/KYC compliance, as required by NewCo and its partners.  Such NewCo Common Stock will be freely tradeable.  Prior to the Effective Date, NewCo intends to file a Registration Statement with respect to the NewCo Common Stock and for such Registration Statement to be effective.  Fahrenheit intends for the NewCo Common Stock to trade on NASDAQ at or as soon as reasonably practicable after the Effective Date.

---

[4850]    Holders of Retail Borrower Deposit Claims will receive NewCo Common Stock to the extent their Retail Borrower Post-Set Off Deposit Claims receive the Unsecured Claim Distribution Consideration.

In the event of an Orderly Wind Down, Backup MiningCo Common Stock and Illiquid Recovery Rights will be issued instead of NewCo Common Stock.

Please see Article XI of this Disclosure Statement for a description of "Certain Securities Law Matters" for more information.

### V.    How much NewCo Common Stock will I receive under the Plan?

If the NewCo Transaction is consummated, Holders of Retail Borrower Deposit Claims, General Earn Claims, Withhold Claims, Unsecured Loan Claims, and General Unsecured Claims,[49][51] will each be entitled to such Holder's Pro Rata share of NewCo Common Stock (in addition to such Holder's Liquid Cryptocurrency Distribution Amount and Litigation Proceeds, as applicable), regardless of whether such Holder voted to accept the Plan, voted to reject the Plan, or abstained from voting on the Plan.

The default treatment under the Plan is that each Holder that receives the Unsecured Claim Distribution Consideration on behalf of such Holder's Claim, or portion of Claim, will receive a share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) NewCo Common Stock based on its Pro Rata portion of all Claims entitled to receive such consideration. But, as further explained in the question and answer immediately following this answer, certain Holders of Claims are eligible to elect to request receive a greater amount of NewCo Common Stock than their Liquid Cryptocurrency Distribution Amount and vice versa, as discussed in more detail below.

### W.    How can I elect to receive more NewCo Common Stock in lieu of Liquid Cryptocurrency?  Can I elect to receive a greater distribution of Liquid Cryptocurrency instead?

Holders of General Earn Claims (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) that vote to accept the Plan may indicate a preference on their Ballots to receive a greater share of NewCo Common Stock instead of some or all of their Pro Rata share of the Liquid Cryptocurrency Distribution Amount. This is referred to in the Plan and in the Ballot as the "NewCo Common Stock Weighted Distribution Election."[50][52] Similarly, such Holders may indicate a preference on their Ballot to receive a greater share of the Liquid Cryptocurrency Distribution Amount instead of some or all of their Pro Rata share of NewCo Common Stock. This is referred to in the Plan and in the Ballot as the "Liquid Cryptocurrency Weighted Distribution Election."[51][53]

To be clear, you are only eligible to make the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election if you (a) are a Holder of any Claim that will receive the Unsecured Claim Distribution Consideration **and** (b) you vote to accept the Plan. You are not eligible to make any of these elections if you vote to reject the Plan.[52][54] Moreover, any Unsecured Claim Distribution Mix Election that you make will apply to ***all of your Claims that will***

---

[49][51]    Holders of Retail Borrower Deposit Claims will receive NewCo Common Stock to the extent their Retail Borrower Post-Set Off Deposit Claims receive the Unsecured Claim Distribution Consideration.

[50][52]    Please review Item 6 on your Ballot to make the NewCo Common Stock Weighted Distribution Election.

[51][53]    Please review Item 6 on your Ballot to make the Liquid Cryptocurrency Weighted Distribution Election.

[52][54]    For the avoidance of doubt, if you have a Custody Claim and you vote your Custody Claim to reject the Plan, you are still entitled to make elections with respect to any Claim that will receive the Unsecured Claim Distribution Consideration that you voted to accept the Plan.

*receive the Unsecured Claim Distribution Consideration.*[5355]

In addition, any NewCo Common Stock Weighted Distribution Elections and Liquid Cryptocurrency Weighted Distribution Elections will *only be honored if a NewCo Transaction is consummated*. These elections will not be honored if an Orderly Wind Down is consummated. For the elections to be honored in a NewCo Transaction, each of the NewCo Common Stock Weighted Distribution Election and the Liquid Cryptocurrency Weighted Distribution Election will have to be selected by a sufficient number of Holders. In other words, if every Holder makes the NewCo Common Stock Weighted Distribution Election, the Debtors will be unable to honor those elections and will default to Pro Rata distributions. Further, the recovery you ultimately receive will also depend on the aggregate number of Holders who do or do not make the NewCo Common Stock Weighted Distribution Elections and Liquid Cryptocurrency Weighted Distribution Elections. The Debtors may also be unable to honor elections for administrative reasons. For the avoidance of doubt, there is no guarantee that a Holders' Unsecured Claim Distribution Mix Election will be honored.

Further, by making an Unsecured Claim Distribution Mix Election *you are agreeing that up to all of your Liquid Cryptocurrency may be converted to NewCo Common Stock or that up to all of NewCo Common Stock may be converted to Liquid Cryptocurrency*, as applicable.

Finally, any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim will be given priority over the Liquid Cryptocurrency Weighted Distribution Elections made by other eligible Holders of Claims.

For example, assume you are the Holder of a General Earn Claim[5456] in an amount of $10,000 as of the Petition Date. You vote to accept the Plan. On your Ballot, you can either (a) choose not to make an election, (b) make the NewCo Common Stock Weighted Distribution Election, or (c) make the Liquid Cryptocurrency Weighted Distribution Election.[5557]

If you choose not to make an election, then on or shortly after the Effective Date, you will receive a distribution in the amount of 6~~8~~7.~~50~~% of the value of your General Earn Claim, for a total consideration of $6,~~849~~702, through the following distributions:

- $3,7~~64~~8 in Liquid Cryptocurrency;

- $~~3,086~~2,954 worth of NewCo Common Stock; and

- the right to receive a share of the Litigation Proceeds.

If you choose to make either the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election, then the type and amount of your distribution will change as further explained below.

### NewCo Common Stock Weighted Distribution Election

Pursuant to the NewCo Common Stock Weighted Distribution Election, eligible Holders may

---

[5355] Please review Item 6 on your Ballot to make the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election.

[5456] For purposes of this example, you do not hold any other Claims.

[5557] Please review Item 6 on your Ballot to make the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election.

make an election on their Ballots to receive a greater share of NewCo Common Stock instead of all or a portion of their Liquid Cryptocurrency Distribution Amount. Any Holder that makes such election, and to the extent such election is honored, will receive incremental NewCo Common Stock at a 30% premium to the Liquid Cryptocurrency Distribution Amount such Holder forfeits. Although the ultimate amount of Liquid Cryptocurrency that is forfeited will be based on the aggregate Unsecured Claim Distribution Mix Election, by making this election on the Ballot, such Holder is ***agreeing*** that her ***total*** Liquid Cryptocurrency Distribution Amount may be forfeited in exchange for more NewCo Common Stock. ***Please consider this carefully before making the NewCo Common Stock Weighted Distribution Election on your Ballot***.[6658]

Using the example above that you are the Holder of a General Earn Claim[6259] in an amount of $10,000 as of the Petition Date, assume you make the NewCo Common Stock Weighted Distribution Election on your Ballot because you would rather receive more NewCo Common Stock than Liquid Cryptocurrency on the Effective Date. As a result of that election, and after taking into account the Unsecured Claim Distribution Mix Election for all Holders, the Debtors determine that your NewCo Common Stock Weighted Distribution Election will result in your Liquid Cryptocurrency Distribution Amount being reduced by 50% in exchange for a greater distribution of NewCo Common Stock.[6860] Thus, instead of receiving $3,76~~4~~8 in Liquid Cryptocurrency, you will receive the following:

- $1,88~~2~~74 in Liquid Cryptocurrency (instead of the $3,76~~4~~8 in Liquid Cryptocurrency noted above); and

- $2,4~~43~~36[6961] worth of NewCo Common Stock (in addition to the $~~3,086~~2,954 worth of NewCo Common Stock noted above).

As a result, instead of receiving $~~3,086~~2,954 in value in the form of NewCo Common Stock, you will receive $5,~~53~~290 in value in the form of NewCo Common Stock. The incremental $2,4~~43~~36 in value of your NewCo Common Stock is a result of the $1,88~~2~~74 of Liquid Cryptocurrency that you forfeited multiplied by a 30% premium.

Now, because you made the NewCo Common Stock Weighted Distribution Election, on or shortly after the Effective Date, you will receive a total consideration of $7,62~~41~~14, in the following ways:

- $1,88~~2~~74 in Liquid Cryptocurrency;

- $5,~~53~~290 worth of NewCo Common Stock; and

- the right to receive a share of the Litigation Proceeds.

In other words, the amount of your recovery increases slightly and is no longer split in the Pro Rata amounts offered to Holders of General Earn Claims under the Plan.

---

[6658] Please review <u>Item 6</u> on your Ballot to make the NewCo Common Stock Weighted Distribution Election.

[6259] For purposes of this example, you do not hold any other Claims.

[6860] This 50% reduction is for illustrative purposes only and is not based on any specific assumption with respect to all Unsecured Claim Distribution Mix Elections.

[6961] This amount is calculated as follows: (a) $3,76~~4~~8*50% = $1,88~~2~~74; and (b) $1,8~~2~~74*130% = $2,4~~43~~36.

### *Liquid Cryptocurrency Weighted Distribution Election*

Conversely, pursuant to the Liquid Cryptocurrency Weighted Distribution Election, eligible Holders may make an election on their Ballots to receive a greater distribution of Liquid Cryptocurrency instead of all or a portion of their NewCo Common Stock. Any Holder that makes such election, and to the extent such election is honored, will receive Liquid Cryptocurrency at a 30% discount to the amount of NewCo Common Stock such Holder forfeits. Although the ultimate amount of NewCo Common Stock that is forfeited will be based on the aggregate Unsecured Claim Distribution Mix Election, by making this election the Ballot, such Holder is ***agreeing*** that ***all*** of her NewCo Common Stock may be forfeited in exchange for Liquid Cryptocurrency. ***Please consider this carefully before making the Liquid Cryptocurrency Weighted Distribution Election on your Ballot.***[6062]

Please also note that any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim will be given priority over the Liquid Cryptocurrency Weighted Distribution Elections made by other eligible Holders of Claims.

Using the example above that you are the Holder of a General Earn Claim[6163] in an amount of $10,000 as of the Petition Date, assume you make the Liquid Cryptocurrency Weighted Distribution Election on your Ballot because you would rather receive more Liquid Cryptocurrency than NewCo Common Stock on the Effective Date. As a result of that election, and after taking into account the Unsecured Claim Distribution Mix Election for all Holders, the Debtors determine that your Liquid Cryptocurrency Weighted Distribution Election will result in the value of the NewCo Common Stock you would have received being reduced by a total of 50% in exchange for a greater distribution of Liquid Cryptocurrency.[6264] Thus, instead of receiving $~~3,086~~2,954 worth of NewCo Common Stock, you will receive the following:

- $1,~~543~~477 worth of NewCo Common Stock (instead of the $~~3,086~~2,954 noted above); and

- $1,~~080~~34[6365] in Liquid Cryptocurrency (in addition to the $3,7~~64~~8 in Liquid Cryptocurrency noted above).

As a result, instead of receiving $3,7~~64~~8 ~~in value in the form of NewCo Common Stock, you will receive $4,844~~ in value in the form of Liquid Cryptocurrency, you will receive $4,782 in value in the form of Liquid Cryptocurrency. This increase of $1,~~080~~34 in value of your Liquid Cryptocurrency is a result of the $1,~~543~~477 of NewCo Common Stock that you forfeited multiplied by a 30% discount.

Now, because you made the Liquid Cryptocurrency Weighted Distribution Election, on or shortly after the Effective Date, you will receive a total consideration of $6,~~386~~259, in the following ways:

- $4,~~784~~42 in Liquid Cryptocurrency;

---

[6062] Please review Item 6 on your Ballot to make the Liquid Cryptocurrency Weighted Distribution Election.

[6163] For purposes of this example, you do not hold any other Claims.

[6264] This 50% reduction is for illustrative purposes only and is not based on any specific assumption with respect to all Unsecured Claim Distribution Mix Elections.

[6365] This amount is calculated as follows: (a) $~~3,086~~2,954*50% = $1,~~543~~477; and (b) $1,~~543~~477*70% = $1,~~080~~34.

- $1,~~543~~77 worth of NewCo Common Stock; and

- the right to receive a share of the Litigation Proceeds.

A side-by-side comparison of the three different treatment outcomes for a Holder of a General Earn Claim[6466] in the amount of $10,000 based on a 6~~8~~7.~~50~~% recovery is shown below:

| | No Election (Default) | NewCo Common Stock Weighted Distribution Election[6567] | Liquid Cryptocurrency Weighted Distribution Election[6668] |
|---|---|---|---|
| Liquid Cryptocurrency | $3,7~~64~~8 | $1,88~~2~~74 | $4,78~~4~~42 |
| NewCo Common Stock | $~~3,086~~2,954 | $5,~~532~~90 | $1,~~543~~77 |
| Litigation Proceeds | The right to receive a share of the Litigation Proceeds | | |
| **Total Recovery:** | ***$6,~~849~~702*** | ***$7,~~264~~14*** | ***$6,~~386~~259*** |
| **% of Recovery Change:** | ***N/A*** | ***Increase of ~8%*** | ***Decrease of ~7%*** |

### *Unsecured Claim Distribution Mix Elections*

The Debtors' ability to accommodate Holders' specified preferences will ultimately depend on what elections all Holders make on their Ballots. The Debtors will use reasonable efforts to redistribute the consideration provided to Holders to satisfy the aggregate Unsecured Claim Distribution Mix but cannot guarantee that Holders will receive what they requested.

**X.    What happens to my NewCo Common Stock in an Orderly Wind Down?**

In an Orderly Wind Down, no NewCo Common Stock will be distributed to any Holders of Claims. Rather, in an Orderly Wind Down, Holders of Claims on account of which the Holder will receive the Unsecured Claim Distribution Consideration will receive a combination of Backup MiningCo Common Stock and Illiquid Recovery Rights instead of NewCo Common Stock. As a result, such Holders will receive their Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Backup MiningCo Common Stock, (c) Litigation Proceeds, and (~~e~~d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

---

[6466] For purposes of this example, the Holder does not have any other Claims.

[6567] Assumes that your Liquid Cryptocurrency Distribution Amount is reduced by 50% in exchange for a greater distribution of NewCo Common Stock.

[6668] Assumes the value of the NewCo Common Stock you would have received is reduced by a total of 50% in exchange for a greater distribution of Liquid Cryptocurrency.

"Backup MiningCo Common Stock" is the new common stock of Backup MiningCo.

"Illiquid Recovery Rights" are Claims that will remain outstanding after the Effective Date in the case of Orderly Wind Down for purposes of preserving such Holders' rights to recoveries on the Debtors' illiquid assets, which may be (but are not required to be) tokenized.

**Y.      Are there risks to owning NewCo Common Stock upon emergence from Chapter 11?**

Yes, see Article VIII of this Disclosure Statement, entitled "Risk Factors," for a further discussion of the risks associated with owning NewCo Common Stock.

Among other things, the ownership percentage represented by the NewCo Common Stock will be subject to dilution from securities that may be issued post-emergence, including the issuance of NewCo Common Equity to the Manager pursuant to the Management Equity Compensation and the issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than the Secondary Market Purchase).

Moreover, as discussed further herein and in the Plan, the success of NewCo is not guaranteed. NewCo's performance could affect the value of the NewCo Common Stock, and/or NewCo's capacity to issue and/or pay any dividends.  NewCo's business model is subject to a variety of risks including (a) the market forces and volatility common to the Cryptocurrency markets, (b) NewCo's capacity to maintain necessary regulatory licenses and approvals, and (c) the risks involved in the mining and staking businesses.   In the event that NewCo does not achieve its projected financial results or the value of certain NewCo assets are assessed to be materially different than financial valuations herein, the value of NewCo Common Stock could be negatively affected and/or NewCo may lack sufficient liquidity to operate as planned after it is established on the Effective Date.

Finally, there is also a risk that Fahrenheit may not succeed in listing NewCo Common Stock on NASDAQ or another public exchange, as it currently intends to do.

**Z.      How will Holders know what NewCo is doing after the Effective Date?**

NewCo will provide holders of NewCo Common Stock financial disclosures and transparency on an ongoing basis through the filing of all periodic reports and disclosures (*e.g.*, Form 10-Ks and 10-Qs), as required by the Exchange Act and the rules and regulations of the SEC promulgated thereunder.

Holders of NewCo Common Stock will also be entitled to receive certain information and/or vote on certain matters pursuant to the New Organizational Documents.  The Debtors will File the New Organizational Documents in substantially final form prior to the Disclosure Statement Hearing.

**AA.      What is a Plan Administrator?  Who will be the Plan Administrator?**

A "Plan Administrator" is a Person or Entity that will be appointed in either a NewCo Transaction or the Orderly Wind Down, whether pursuant to the Backup Plan Sponsor Transaction or otherwise, to act in a fiduciary capacity to administer the Post-Effective Date Debtors' estates.  The Plan Administrator will be selected by the Debtors, in consultation with the Committee, and will be identified in the Plan Supplement.

The Plan Administrator's appointment will be approved when the Plan is confirmed by the Bankruptcy Court entering the Confirmation Order.  The Plan Administrator's duties will officially begin as of the Effective Date.

**BB.    What are the roles of the Plan Administrator?**

The Plan Administrator's roles will be identified in the Plan Administrator Agreement, which will be included in the Plan Supplement, and will include a range of administrative duties such as:

- administering the Special Committee D&O Liability Insurance Policies;

- implementing the Orderly Wind Down, as applicable, and making (or arranging for the Distribution Agent to make) the distributions contemplated by the Plan;

- marshalling, marketing for sale, and winding down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated and to the extent not duplicative of the Litigation Administrator's responsibilities);

- recovering and compelling turnover of the Debtors' property in connection with the Plan, as long as this is not duplicative of the Litigation Administrator's work;

- managing the Plan Administrator Budget or Wind-Down Budget, as applicable, and paying the Wind-Down Expenses, if any;

- abandoning property or assets belonging to the Post-Effective Date Debtors that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective;

- preparing and Filing post-Effective Date operating reports;

- filing any necessary tax returns in the exercise of the Plan Administrator's fiduciary obligations;

- hiring the professionals necessary to help the Plan Administrator fulfil its fiduciary duties; and

- taking such actions as are necessary and reasonable to carry out the purposes of the Plan or Wind-Down Procedures, as applicable, including winding down the Debtors' business affairs.

The Plan Administrator will also take all necessary steps to dissolve the Post-Effective Date Debtors at the necessary and appropriate time.

**CC.    What is a Litigation Administrator?  What is the Litigation Oversight Committee?
Who will be the Litigation Administrator?  Who will be on the Litigation Oversight
Committee?**

A "Litigation Administrator" is a Person or Entity that will be appointed to prosecute (*i.e.*, file lawsuits), settle, or otherwise resolve all remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to this Plan), the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans.  One or more Litigation Administrator(s) will be appointed and such administrator(s)'

duties will commence on the Effective Date. The Litigation Administrator(s) will be selected by the Committee, and the appointment will be approved by the Bankruptcy Court as part of the Bankruptcy Court's confirmation, or approval, of the Plan. The identity of the Litigation Administrator(s) will be disclosed in the Plan Supplement, and, if there are multiple Litigation Administrators, the Plan Supplement will disclose the responsibilities for each Litigation Administrator. For example, the Committee may identify (x) a Litigation Administrator to manage Account Holder Avoidance Actions for the benefit of Holders of Claims entitled to Litigation Proceeds as set forth in the Plan and (y) a Litigation Administrator to manage all Recovery Causes of Action, other than Account Holder Avoidance Actions, for the benefit of Holders of Claims entitled to Litigation Proceeds as set forth in the Plan. The Plan Supplement will also contain the Litigation Administrator Agreement(s), which will set forth the duties and powers of the Litigation Administrator(s) in greater detail.

The Litigation Administrator will act in a fiduciary capacity for all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account. That means that the Litigation Administrator will prosecute, settle, collect, or otherwise resolve the Claims and Causes of Action for which it is responsible in a manner that is consistent with the best interests of all Holders of Claims entitled to receive Litigation Proceeds. Recoveries on account of those Claims and Causes of Action will be made Pro Rata to Holders of Claims entitled to receive Litigation Proceeds.

No individual Holder of a Claim shall be able to direct the actions of the Litigation Administrator(s). The Litigation Administrator(s) will report to, and act at the direction of, the "Litigation Oversight Committee," which will oversee the work of the Litigation Administrator(s). The Litigation Oversight Committee will have seven members, which will be identified in the Plan Supplement. Two of the members of the ~~members of the~~ Litigation Oversight Committee will be selected by the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group, each subject to the consent of the Committee. ~~The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee, which shall be the same members appointed to the Litigation Oversight Committee~~. The remaining members of the Litigation Oversight Committee shall be determined by the Committee through an open interview process. [6769] At least two members of the Litigation Trust Oversight Committee will not be Committee members.

The Litigation Oversight Committee will also contain a three ~~(3)~~ member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders. At least two ~~(2)~~ members of the subcommittee shall not be current members of the Committee. In addition, two members of the subcommittee will be selected by the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group, subject to the consent of the Committee, and which will be the same members that the Earn Ad Hoc Group and Retail Borrower Ad Hoc Group appoint to the Litigation Oversight Committee. The Avoidance Action subcommittee shall confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety days prior to the Petition Date.

---

[6769] Applications for a position on the Litigation Oversight Committee were open until July 7, 2023.

**DD.  What are the roles of the Litigation Administrator and the Litigation Oversight Committee?**

As explained above, the Litigation Administrator(s)'s primary role will be to undertake legal action to recover assets and property belonging to the Debtors' estates that can then be distributed back to Holders of Claims entitled to Litigation Proceeds under the Plan.  The Litigation Oversight Committee will guide, manage, and review the work of the Litigation Administrator.

Responsibilities of the Litigation Administrator(s) shall be as identified in the Litigation Administrator Agreement(s) and shall include, but are not limited to:

- filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted;

- filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court;

- exercising the Debtors' rights with respect to (a) the Goldstein Loan, (b) the Leon Loan, and (c) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party;

- managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan;

- retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and

- taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement.

For example, the Litigation Administrator(s) will undertake legal action against individuals such as Alex Mashinsky ("Mr. Mashinsky"), Shlomi Daniel Leon ("Mr. Leon"), and others, in connection with the management or affairs of the Debtors prior to or after the Petition Date.  The Litigation Administrator(s) will also work to collect the Goldstein Loan (the $4.2 million loan issued by one or more of the Debtors to Hanoch "Nuke" Goldstein), the Leon Loan (the $4 million loan issued by one or more of the Debtors to Mr. Leon), and any other CEL Insider Loans, the value of which will ultimately be distributed for the benefit of Holders of Claims entitled to Litigation Proceeds under the Plan.

**EE.  Will the Litigation Administrator(s) be paid?  If so, who will pay the Litigation Administrator(s)?**

The Litigation Administrator(s) will be paid by the Litigation Recovery Account.  The Litigation Recovery Account will be a segregated account established by the Post-Effective Date Debtors on the Effective Date and funded with the Initial Litigation Funding Amount.[6870]  The Litigation Recovery Account will be controlled by the Litigation Administrator(s), and the funds in the Litigation Recovery

---

[6870]  "Initial Litigation Funding Amount" means Cash in an amount ~~to~~of up to $50,000,000, which amount shall be agreed upon by the Debtors~~,~~ and the Committee~~, and the Plan Sponsor prior to the hearing to consider approval of the Disclosure Statement, in accordance with the Plan Sponsor Agreement~~.

Account shall be available to pay the costs and fees of the Litigation Administrator(s) (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action, all in accordance with the terms of the Litigation Administrator Agreement(s).

The terms of the Litigation Administrator(s)'s compensation will be disclosed in the Plan Supplement.

**FF.    How will I receive Litigation Proceeds?  What happens to the Cash left in the Litigation Recovery Account after the Litigation Administrator(s) have completed their duties?**

Holders of Claims entitled to receive Litigation Proceeds under the Plan will receive periodic distributions on account of recoveries from the Recovery Causes of Action from the Litigation Recovery Account.  The frequency and timing of distributions from or in respect of the Litigation Recovery Account shall be determined by the Litigation Administrator(s) and the Litigation Oversight Committee in accordance with the Litigation Administrator Agreement(s).  The parties are discussing the most efficient means to make distributions to Holders of Claims entitled to Litigation Proceeds under the Plan.

To the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account will be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds under the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrators' reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii)(a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court.

**GG.    What are Contributed Claims? Should I contribute my Contributed Claims to the Litigation Administrator?**

Contributed Claims are any causes of action that Holders of Claims or Interests may have against persons or entities other than the Debtors whose prepetition acts or omission harmed such Holders in their capacity as creditors of the Debtors.  These Contributed Claims include, but are not limited to, any causes of action arising out of:  (a) the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Celsius' platform; (b) the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; or (c) any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date.  For instance, a Contributed Claim may include an Account Holder's claim directly against Mr. Mashinsky alleging that Mr. Mashinsky made various public misrepresentations that fraudulently induced the Account Holder to transfer their digital assets to the Celsius platform.  Contributed Claims do not, however, include (i) any derivative claims of the Debtors (*e.g.*, a claim where the principal harm was against the Debtors or another Person, which indirectly harmed the Contributed Claimant), ~~and~~ (ii) any direct claims against the Released Parties, or (iii) any claims that cannot be assigned under applicable law.

Any Holder of a Claim or Interest can elect through their Ballot to contribute such Holder's Contributed Claims to the applicable Post-Effective Date Debtor(s) in order for the Litigation Administrator to prosecute such Causes of Action for the benefit of Holders of Claims entitled to receive Litigation Proceeds under the Plan.

By contributing a potential Contributed Claim, a Contributing Claimant (the person who contributed such Contributed Claim) is expressly forfeiting their right to receive any recovery on account of such Contributed Claim separate from their entitlement (if any) to receive a Pro Rata share of the Litigation Proceeds. The proceeds of any recovery on account of a Contributed Claim will go entirely to the Litigation Recovery Account and Contributing Claimants will only be entitled to any Litigation Proceeds they are entitled to in connection with their Allowed Claims.

The Debtors and the Committee believe that most Contributing Claimants will likely benefit from contributing their Contributed Claims due to the time and cost likely required to resolve such Causes of Action. At the same time, however, the Debtors recognize that certain potential Contributing Claimants may benefit from retaining their claims. For example, a potential Contributing Claimant who is not entitled to Litigation Proceeds as a form of distribution under the Plan cannot benefit from contributing a claim. Similarly, the Litigation Administrator(s) have no obligation or duties to the Contributing Claimants independent of their entitlement to a share of the Litigation Proceeds, and the Litigation Administrator(s) may determine that pursuing a Contributed Claim does not serve the best interests of the Holders of Claims entitled to the Litigation Proceeds under the Plan as a whole. Put another way, the singular objective of the Litigation Administrator(s) is to maximize the total Litigation Proceeds and not to pursue every potential cause of action.

The Debtors and the Committee believe that the Litigation Administrator(s) are uniquely qualified to resolve the Contributed Claims in a manner that maximizes the Litigation Proceeds because the Litigation Administrator(s) have: (a) visibility into a large number of Claims; (b) the oversight and input to be provided by the Litigation Oversight Committee; and (c) access to the Litigation Recovery Account. While the Debtors believe that Contributed Claims will serve to benefit the Debtors' stakeholders in the aggregate, including the Contributing Claimants, the Debtors cannot make a recommendation as to whether it is the best interest of a particular Contributing Claimant to contribute a particular Claim. The Debtors recommend that potential Contributing Claimants consult their own counsel concerning their ability to resolve (and the potential benefits of not contributing) their potential Contributed Claims.

Any election to contribute Contributed Claims to the Litigation Administrator is irrevocable. That means that once individual Holders agree to contribute their Contributed Claims, they may not rescind that election. To complete the contribution of Contributed Claims to the Litigation Administrator, each Contributing Claimant will execute appropriate documentation reasonably requested by the Post-Effective Date Debtors or the Litigation Administrator(s). Finally, any Contributing Claimant that contributes their Contributed Claims will not be able to direct the actions of the Litigation Administrator with respect to such Contributed Claims.

### HH.    What is the difference between a Plan Administrator and a Litigation Administrator?

The Plan Administrator will be tasked with handling administrative duties related to the Post-Effective Date Debtors' Estates. Examples of such tasks include filing any necessary tax returns or making distributions to Holders of Claims (in the event of the Orderly Wind Down).

In contrast, the Litigation Administrator will be tasked with taking legal actions such as resolving disputed claims and filing lawsuits to recover property for the Debtors' estates, which can then be distributed to Holders of Claims entitled to Litigation Proceeds under the Plan. The Litigation Administrator and the Litigation Oversight Committee will determine the frequency and timing of distributions of the Litigation Recovery Account.

The Plan Administrator Agreement and the Litigation Administrator Agreement will identify the roles and duties of each Person or Entity acting as a Plan Administrator or Litigation Administrator and ensure that they are not duplicative.

**II.    How will the preservation of the Causes of Action affect my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.  *See* Article IV.M of the Plan. Recoveries on account of such Causes of Action may be distributed to Holders of Claims entitled to receive Litigation Proceeds under the Plan.

Each Post-Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date.  The Schedule of Retained Causes of Action, which will be included in the Plan Supplement, will identify certain of these Causes of Action.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it.  The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court**.

**JJ.    Does the Plan subordinate any Claims?  What does it mean to subordinate Claims?**
*Whose Claims are subordinated under the Plan and why?*

*1.    Does the Plan subordinate any Claims and what does it mean to subordinate Claims?*

Yes, the Plan subordinates Claims in Class 1~~5~~6 (Section 510(b) Claims) and Class 1~~6~~7 (Equitably Subordinated Claims) (collectively, the "Subordinated Claims").  To subordinate a claim means to rank it below other claims of the same or lower priority.  The "subordinated" claim only receives a recovery or distribution under a plan after all claims and interests ranked above it are paid in full.  Put another way, a claim that would otherwise be senior or equal to other claims can be demoted, under certain circumstances, to a more junior priority level.  Pursuant to the terms of the Plan, the Subordinated Claims will only be paid if Claims in Classes 1–1~~4~~5 are paid in full.  In other words, Claims in Classes ~~15 and~~ 16 and 17 are placed at a lower priority than Claims in Classes 1–1~~4~~5.

Claims in Class 1~~5~~6 are subordinated pursuant to section 510(b) of the Bankruptcy Code.  Section 510(b) of the Bankruptcy Code requires the subordination of any claim that (a) arises from the cancellation of a purchase or sale of a "security" in a debtor or a debtor's affiliate, (b) seeks damages arising from the purchase or sale of such a security, or (c) seeks reimbursement or contribution on account of a claim otherwise allowed under the Bankruptcy Code.  The purpose of section 510(b) is to prevent claims arising on account of equity securities of the Debtors from being treated the same as creditor claims.

Here, the Section 510(b) Claims include, among others, Claims arising out of or relating to (a) CEL Tokens (other than CEL Token Deposit Claims), including damages arising from the purchase or sale of CEL Token, certain damages for reimbursement or contribution on account of such a Claim, and Claims arising from the cancellation of a contract for the purchase or sale of CEL Token, and (b) the purchase or sale of preferred shares in CNL or other equity interests in any Debtor.

For example, a Claim for damages allegedly incurred through the purchase of CEL Token at a price fraudulently inflated by the Debtors would be a Section 510(b) Claim and will receive no distribution under the Plan (notwithstanding any recovery on account of a related CEL Token Deposit Claim, ~~which, itself, is for the value of the CEL Token~~).  Similarly, while Holders of the Series B Preferred Interests in the Debtors shall receive treatment as Class 1~~3~~4 (Series B Preferred Interests), any Claims asserted in connection with the purchase or sale of the Series B Preferred Interests will be subordinated as Section 510(b) Claims.

In addition to subordination pursuant to section 510(b), claims may be subordinated pursuant to section 510(c) of the Bankruptcy Code.  Section 510(c) allows for subordination of other types of claims pursuant to a principle known as "equitable subordination."  Section 510(c) of the Bankruptcy Code provides that bankruptcy courts may, under principles of equitable subordination, subordinate all or part of an allowed claim to all or part of another claim or all or part of an allowed interest to all or part of another allowed interest.  Bankruptcy courts have ruled that equitable subordination is proper where three conditions are met:  (a) the claimant engaged in some type of inequitable conduct; (b) the misconduct resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (c) equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code.  *See In re LightSquared Inc.*, 511 B.R. 253, 346 (Bankr. S.D.N.Y. 2014) (*citing Benjamin v. Diamon (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir. 1977)).

*2.    Whose Claims are equitably subordinated under the Plan and why?*

Here, the Debtors seek to equitably subordinate the Holders of Claims identified as having engaged in inequitable conduct that harmed the Debtors' creditors.  These Class 1~~6~~7 Equitably Subordinated Claims include:  ~~(a)~~ those Claims identified on the Schedule of Equitably Subordinated Claims, which ~~shall~~will be ~~f~~Filed ~~with~~in the Plan Supplement ~~and shall~~on or about the time the final Disclosure Statement is Filed (subject to revision prior to the Confirmation Hearing) and will include the Claims of Persons or Entities who (i) participated in, or had direct knowledge of, the prepetition manipulation of the price of the CEL Token, or (ii) engaged in other misconduct, including fraud, willful misconduct, or other wrongful or inequitable conduct~~; and (b) all other Claims of any Person or Entity with a Claim identified on the Schedule of Equitably Subordinated Claims, unless otherwise expressly provided therein~~.

Currently, the Debtors intend to equitably subordinate the Claims of Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Harumi Urata-Thompson ("Ms. Urata-Thompson"), Johannes Treutler ("Mr. Treutler"), Roni Cohen-Pavon ("Mr. Cohen-Pavon"),  and certain of their affiliated Entities, including AM Ventures Holding, Inc., Koala1 LLC, Koala2 LLC, Koala3 LLC (Entities affiliated with Mr. Mashinsky), Alchemy Capital Partners LP (an Entity affiliated with Mr. Leon), Bits of Sunshine LLC and Four Thirteen LLC (Entities affiliated with Mr. Goldstein), and any mediate or intermediate transferee of any of the foregoing.

These Persons and Entities are defined in the Plan as the Equitably Subordinated Parties.  The Debtors, in consultation with the Committee, determined that it was appropriate to equitably subordinate the Claims of these individuals and their related Entities because of their fraud, recklessness, gross mismanagement, irrational indifference, and self-interested conduct, as revealed in the investigations conducted by the Examiner, the Special Committee, and the Committee, the criminal and civil complaints filed by the federal government against some of these individuals, and New York state's complaint against Mr. Mashinsky.

The Equitably Subordinated Parties were among the defendants identified in the draft complaint prepared by the Committee[71] whose conduct was detailed in the Committee's Class Claim,[72] both of which are incorporated in this section in their entirety.  The Committee's draft complaint (the "Committee Insiders Complaint") asserts claims for breach of fiduciary duties, avoidance of actual and constructive fraudulent transfers, and avoidance of preferential transfers arising from, among other things, the prepetition mismanagement of Celsius and self-interested conduct, as carried out by these and other defendants (all such defendants, the "UCC Claims Stipulation Defendants").[73]  The Committee Insiders Complaint alleges that these individuals, among other things:  (a) made negligent, reckless, and sometimes self-interested investments that caused Celsius to lose more than $1 billion in a single year; (b) caused Celsius to use customer money to increase the token's price, while selling the Defendants' own holdings of CEL Token for personal gain; (c) engaged in a pattern of misrepresenting Celsius' business and financial condition to the public to convince additional retail investors to transfer their assets to Celsius, systematically obscuring certain (but not all) of those misstatements, and failing to correct those misrepresentations; (d) received loans or withdrew assets from Celsius shortly after they were informed that Celsius was massively insolvent and would likely not survive; and (e) breached their fiduciary duties by engaging in self-interested transactions, including the Debtors' acquisition of KeyFi and purchase of CEL Tokens, and gross mismanagement.[74]  The Committee Insiders Complaint also seeks the disallowance of the UCC Claims Stipulation Defendants' Claims against the Debtors, pending the return of any avoidable transfers to the Debtors' estates.[75]  The Committee Insiders Complaint will be prosecuted by the Litigation Administrator on behalf of the Debtors' Estates once a plan is confirmed in these Chapter 11 Cases (or earlier if agreed by the Debtors and the Committee or ordered by the Court), and any value recovered in connection with the Committee Insiders Complaint will be returned to the Debtors' creditors in the form of Litigation Proceeds.  More information about the Committee Insiders Complaint is set forth in in Article VII.K.3 of this Disclosure Statement.

---

[71] *Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2054].

[72] *Notice of Filing of Class Proof of Claim by the Official Committee of Unsecured Creditors on Behalf of the Class Representatives Asserting Non-Contract Claims on Behalf of Themselves and Other Similarly Situated Account Holders* [Docket No. 2556] (the "Class Claim").

[73] *Id.* ¶¶ 45–505 (Counts I–XXXII).

[74] *Id.* ¶ 3.

[75] *Id.* ¶¶ 506–09 (Count XXXIII).

The Committee Insiders Complaint and the Committee's Class Claim set forth in detail the Equitably Subordinated Parties' prepetition misconduct.  Similarly, the Final Examiner Report describes in detail certain of the Equitably Subordinated Parties' involvement in the prepetition manipulation of the price of CEL Token.  Specifically, the Examiner found that Celsius purchased CEL Token to artificially inflate the price of CEL Token resulting in, among other things, the corresponding overstatement of Celsius' balance sheet.    The Examiner also found that Mr. Mashinsky, Ms. Urata-Thompson, Mr. Treutler, and Mr. Cohen-Pavon were all directly involved in the purchase of CEL Token.   Mr. Mashinsky, Mr. Leon and Mr. Goldstein all likely sold CEL Token with knowledge of the Debtors' purchases of CEL Token and often in violation of the Debtors' policies regarding those sales.  Certain of the Equitably Subordinated Parties also caused the Debtors to sell customer deposits of other digital assets to fund the purchase of CEL Token and payment of customer rewards in CEL Token.  A more detailed summary of the findings of the Final Examiner Report is set forth in Article VII.G.2 of this Disclosure Statement.

Since the publication of the Final Examiner Report and the Filing of the Committee Insiders Complaint, several of the individuals whose Claims are proposed to equitably subordinated have also been criminally indicted by the USAO on behalf of the Department of Justice or are the subjects of civil complaints filed by the SEC, CFTC, and FTC in the District Court.  As discussed in greater detail in Article III.LLL and Article VII.J.1(a) of this Disclosure Statement, Mr. Mashinsky and Mr. Cohen-Pavon face criminal charges recently unsealed by the USAO.  The indictment charges Mr. Mashinsky and Mr. Cohen-Pavon with securities fraud, commodities fraud, and wire fraud, asserting that Mr. Mashinsky defrauded and misled customers with respect to Celsius' profitability and how it invested the Cryptocurrency customers transferred to Celsius.  The indictment further charges Mr. Mashinsky and Mr. Cohen-Pavon with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token.

Finally, with respect to Mr. Mashinsky, a recent court ruling against him also demonstrates his inequitable misconduct warranting equitable subordination of his Claims.  The New York State Attorney General (the "NYAG") commenced an action against Mr. Mashinsky asserting that he violated New York state laws and carried out a scheme to defraud investors, by inducing them, through false and misleading statements, to deposit their Cryptocurrency on the Celsius platform.[76]  Mr. Mashinsky filed a motion to dismiss the complaint, which the NYAG opposed.  On August 4, 2023, the Supreme Court of the State of New York (the "New York State Court") issued a ruling denying Mr. Mashinsky's motion to dismiss.[77]  In denying Mr. Mashinsky's motion to dismiss, the New York State Court found that the state's complaint contained sufficient details regarding Mr. Mashinsky's alleged misstatements to target new and existing Celsius investors.[78]  Further, the New York State Court found that New York's complaint plausibly alleges fraudulent or misleading practices by Mr. Mashinsky through his promotional efforts,[79] misstatements concerning regulatory approval and compliance,[80] and misrepresentations about Celsius' deployment strategies.[81]  As a result of this ruling, New York's case against Mr. Mashinsky will continue.

The ~~Debtors believe equitable subordination is warranted in light of the~~ inequitable misconduct of ~~the Holders of the Equitable Subordination Claims and the~~ Mr. Mashinsky, Mr. Leon, Mr. Goldstein, Mr. Cohen-Pavon, Ms. Urata-Thompson, Mr. Treutler, and the other Equitably Subordinated Parties caused severe harm caused to the Debtors' other creditors (*e.g.*, the Account Holders).  Accordingly, the Debtors believe that the equitable subordination of their Claims is warranted.

### KK.    Is there potential litigation related to the Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well.  *See* Article VIII.C.1 of this Disclosure Statement entitled "NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases" for further discussion on this issue.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determinates that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan" for further discussion on "cramdown" under the Bankruptcy Code.

---

[76]    The case is styled *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. 2023).

[77]    Decision and Order on Motion to Dismiss, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. Aug. 4, 2023) (the "Mashinsky Ruling").

[78]    Mashinsky Ruling at 13.

[79]    Id.

[80]    *Id.* at 17.

[81]    *Id.*

**LL.    Will there be releases and exculpation granted to parties in interest as part of the Plan?  What are "releases" and "exculpation"?**

Yes, both releases and exculpations will be granted to parties in interest as part of the Plan. The descriptions of the Plan's releases and exculpations are summaries only and, to the extent of any conflict between such summaries and the Plan, the Plan shall control.  You are advised to read the Plan in its entirety.

### *Releases*

A release is when Party A (the releasing party) "releases" Party B (the released party) from some claims or causes of action (the released claim) in exchange for some form of consideration from Party B. Sometimes, as is the case in some releases under the Plan, Party A releases Party B in exchange for Party B releasing Party A.  Such releases are called "mutual releases."  Releases are common features of settlements and chapter 11 plans because they provide finality.

There are three different kinds of releases pertaining to Account Holders under the Plan.  Please note the following explanations of the releases are summaries only.  Parties are encouraged to read the releases as set forth in Article VIII of the Plan and/or the applicable settlement agreement, and as reproduced below, to understand the full scope of the releases.

> *1.    Releases under the Custody Settlement ~~and~~, Withhold Settlement, Series B Settlement, and Class Claim Settlement.*

The Custody Settlement ~~and~~, the Withhold Settlement, and the Class Claim Settlement each provide specific releases by and among the Debtors, the Committee, and the respective Account Holders who participate in the respective settlement.  The Series B Settlement provides certain Holders of Series B Preferred Interests with certain releases.

With respect to the Custody Settlement, releases are provided in two different ways.  First, Holders of Allowed General Custody Claims that are Custody Settlement Participants, in connection with their participation in the Custody Settlement, previously agreed not to pursue any litigation, such as seeking relief from the automatic stay, against the Debtors.  Likewise, the Debtors previously released all Avoidance Actions they may have against Custody Settlement Participants.  On the Plan Effective Date, the Debtors and the Custody Settlement Participants will mutually release all Causes of Action, including Avoidance Actions and setoff rights, related to the Cryptocurrency that Holders transferred to the Custody Program.  These mutual releases apply ***only*** to the assets such Holders transferred to the Custody Program.  Claims and Causes of Action related to such Holders' assets that are not in the Custody Program will ***not*** be released pursuant to the Custody Settlement.  Second, Holders of Allowed General Custody Claims (Class 6A) that elect Treatment A under the Plan are also agreeing to a mutual release with the Debtors of all Causes of Action, including Avoidance Actions and setoff rights, related to assets such Holders transferred to the Custody Program.

With respect to the Withhold Settlement, Holders of Allowed Withhold Claims that participated in the Withhold Settlement were released by the Debtors from all Avoidance Actions that the Debtors may have had against them, solely with respect to such Holders' Withhold Account assets.  At the same time, Holders of Allowed Withhold Claims who participated in the Withhold Settlement agreed not to pursue any litigation against the Debtors, including seeking relief from the automatic stay, and the conversion of 85% of such members' Withhold Claim to an Earn Claim under the Withhold Settlement. Holders of Allowed Withhold Claims that participated in the Withhold Settlement no longer have

Allowed Withhold Claims.  Current Holders of Allowed Withhold Claims may agree to a mutual release with the Debtors as further explained herein.

With respect to the Class Claim Settlement, Account Holders who participate in the Class Claim Settlement will (i) no longer be entitled to seek recovery of the amounts set forth on the Proof of Claim they Filed, if any, which Proof of Claim will be superseded, expunged, and extinguished; (ii) no longer be entitled to prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim; and (iii) no longer be entitled to receive any other recovery from the Debtors in addition to that provided pursuant to the Class Claim Settlement.

With respect to the Series B Settlement, the Initial Consenting Series B Preferred Holders and their Related Parties are now Released Parties and Releasing Parties under the Plan.

### 2.  *Account Holder Avoidance Action Release.*

The Plan provides that the Debtors will release certain Account Holders that vote to accept the Plan from Avoidance Actions if the Withdrawal Preference Exposure of such Account Holders is below $100,000, as further explained below.  This is called the "Account Holder Avoidance Action Release" and is granted in connection with the "Account Holder Avoidance Action Settlement," which is further explained in Article IV.B.3 of the Plan.  The amount of each Account Holder's Withdrawal Preference Exposure will be set forth in each Account Holder's Ballot.[6982]

If the total value of the assets that an Account Holder transferred from the Earn Program or the Borrow Program to either the Custody Program or entirely off the platform during the 90 days before July 13, 2022 (*i.e.*, between April 14, 2022, and July 13, 2022) is less than $100,000, valued at the time of such transfers, and such an Account Holder (1) votes all Claims to accept the Plan and (2) does not elect to opt out of the releases on the Ballot,[7083] the Debtors will release all Avoidance Actions against such Account Holder.

If the total value of the assets an Account Holder transferred from the Earn Program or the Borrow Program off the platform during the 90 days before July 13, 2022 (*i.e.*, between April 14, 2022, and July 13, 2022) is equal to or exceeds $100,000, valued at the time of such transfers, and such an Account Holder (1) votes all Claims to accept the Plan, (2) does not elect to opt out of the releases on the Ballot,[7184] and (3) pays the Debtors or the Litigation Administrator 27.5% of the amount such Account Holder withdrew during the 90 day time period described above no later than 14 days prior to the anticipated Effective Date of the Plan, the Debtors will release all Avoidance Actions against such an Account Holder.

For example, if an Account Holder withdrew $150,000 off the Debtors' platform, valued at the time of such transfers, between April 14, 2022, and July 13, 2022, and such an Account Holder (1) votes all Claims to accept the Plan, (2) does not elect to opt out of the releases on the Ballot,[7285] and (3) pays the Debtors or the Litigation Administrator $41,250 (27.5% of $150,000) in Cash, BTC, or ETH no later

---

[6982]  Please review Item 1 and Item 1~~4~~2 on your Ballot to see your Withdrawal Preference Exposure.

[7083]  Please review Item ~~9~~10 on your Ballot to determine whether to opt out of the Third-Party Release.

[7184]  Please review Item ~~9~~10 on your Ballot to determine whether to opt out of the Third-Party Release.

[7285]  Please review Item ~~9~~10 on your Ballot to determine whether to opt out of the Third-Party Release.

than 14 days prior to the anticipated Effective Date of the Plan, then the Debtors will release all Avoidance Actions against such Account Holder.

The Plan will not release the Debtors' Avoidance Actions against: (1) certain Insiders, including Mr. Mashinsky, Mr. Leon, and certain current and former directors, officers, and employees of the Debtors, regardless of the amount of such Avoidance Actions; (2) Custody Account Holders who (a) transferred more than $100,000.00 from the Earn Program or the Borrow Program to the Custody Program during the 90 days before July 13, 2022 (*i.e.*, between April 14, 2022, and July 13, 2022), (b) do not participate in the Custody Settlement, and (c) do not vote to accept the Plan; or (3) Avoidance Actions against entities that are not Account Holders.

### 3. Debtor Release and Third-Party Release.

The Plan also proposes certain releases by the Debtors and the Holders of Claims and Interests, as outlined below.

As defined in the Plan, **Released Parties** means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (e) (f) the Committee and each of its members; (f) (g) any Litigation Administrator(s); (g) (h) the Plan Sponsor and each of its members; (h) (i) NewCo and its directors and officers; (i) (j) the Retail Borrower Ad Hoc Group and each of its members; (j) (k) the Earn Ad Hoc Group and each of its members, (k) (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) (m) the Class Claim Representatives; (m) (n) the Initial Series B Preferred Holders and their Related Parties; (n) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (o) Christopher Ferraro; (p) the BRIC Parties; (q) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (r) any Releasing Party. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in the this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided*, *further*, that, notwithstanding anything to the contrary in the this Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided*, *further*, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.

As defined in the Plan, **Releasing Parties** means, collectively: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).

The Debtor Release under the Plan provides, in sum, that the Debtor will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, **with several important exceptions**. For

example, the Debtors are not proposing to release (a) any Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

The Third-Party Release under the Plan provides, in sum, that the Releasing Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not affirmatively opt out of the Plan's release provisions,  will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, *with several important exceptions*.  For example, the Releasing Parties will not release the Released Parties from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

Article VIII.C–D of the Plan contains the release provisions, as set forth below.

### 3. *Debtor Release Provision.*

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Post-Effective Date Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise that the Debtors, their Estates, or the Post-Effective Date Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in-or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument,**

document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock **or Backup MiningCo Common Stock, as applicable**) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor **rR**elease is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Post-Effective Date Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

4.   *Third-Party Release Provision.*

**Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement, or (d) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.**

### *Exculpation*

The Plan also provides for exculpation of certain parties.  Exculpation provisions shield parties from liability regarding a certain act or event.  In chapter 11 cases, exculpation provisions are included in chapter 11 plans to provide certain parties with protection from liability for conduct during, and claims relating to, the chapter 11 cases.  Unlike releases, which release parties from a broad range of pre-confirmation and prepetition conduct, exculpation is limited to the time period of the chapter 11 cases.  The parties that are usually exculpated are the debtors' professionals, debtors' employees, estate fiduciaries, such as official committees, and others directly involved in the chapter 11 cases who participated in administering such cases.  Like releases, exculpation clauses are common features in chapter 11 plans because they help encourage active participation in the chapter 11 process by various parties in interest.

The Plan proposes that the Exculpated Parties are granted immunity from liability for actions between the Petition Date and the Effective Date arising in relation to the Chapter 11 Cases except for actions or omissions that are the result of bad faith, actual fraud, willful misconduct, or gross negligence.  Furthermore, the Exculpated Parties are not exculpated from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky and Mr. Leon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

As defined in the Plan, "***Exculpated Parties***" means, collectively:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the ~~Post-Effective Date Debtors~~Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties.  Notwithstanding anything to the contrary in ~~the~~this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity ~~under the Plan~~hereunder.

An excerpt of the exculpation provision found in Article VIII.E of the Plan is set forth below.

> *5.   Exculpation Provision.*

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is ~~released and~~ exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the formulation, preparation, dissemination, negotiation, entry into, termination of, or filing of, as applicable, the Chapter 11 Cases, the Plan Sponsor Agreement, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction (if applicable), the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into before or during the Chapter 11 Cases in connection with the Chapter 11 Cases (including the trading and sales of Cryptocurrencies and Tokens in connection with the Chapter 11 Cases), the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan, the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or the Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property, Cryptocurrency, or Tokens under the Plan (including the NewCo Assets) or any other related agreement or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, ~~the releases~~ an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above ~~do~~ does not exculpate (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released hereunder, including pursuant to the Account Holder Avoidance Action Settlement.**

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party.**

**MM.   Are any specific individuals or entities specifically excluded from the Plan's release or exculpation provisions?**

Yes, certain Excluded Parties will not receive the benefit of the Plan's releases or exculpation provisions, and all claims against such parties are fully preserved.  These Excluded Parties include:

- Mr. Mashinsky;

- Mr. Leon;

- ~~Roni Cohen-Pavon~~ ("Mr. Cohen-Pavon");

- The other defendants named in the draft complaint Filed by the Committee (*see* [Docket ~~No~~Nos. 2054, 2349]) ~~and any amended version of that complaint~~, including Mr. Goldstein, ~~Harumi Urata-Thompson ("Ms. Urata-Thompson"), Jeremie Beaudry ("Mr. Beaudry"), Johannes Treutler ("Mr. Treutler"), Kristine Meehan Mashinsky ("Ms. Mashinsky"), Aliza Landes ("Ms. Landes")~~, AM Ventures Holding, Inc., Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and any mediate or intermediate transferees of these parties;

- Any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party on the Schedule of Released <u>and Exculpated</u> Parties or by name in the defined term "Released Party~~"~~;<u>;"</u>

- Any party on the Schedule of Excluded Parties, which will be Filed with the Plan Supplement in advance of the Confirmation Hearing; and

- With respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified as a Released Party on the Schedule of Released <u>and Exculpated</u> Parties or by name in the defined term "Released Party."

Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity.

**NN.   Do I have to grant the releases under the Plan?  Can I opt out of the releases?**

You cannot opt out of the releases under the Plan with respect to any Claims you vote to accept the Plan.  By voting to accept the Plan, you are consenting to the releases.  ***If you vote to accept the Plan, you cannot opt out of the releases***.

You can opt out of the releases if you are (a) a Holder of a Claim that is presumed to accept the Plan and you affirmatively opt out of the releases provided by the Plan, (b) a Holder of ~~Claim or Interest that is deemed to reject the Plan and you affirmatively opt out of the releases provided by the Plan, (c) a Holder of~~ a Claim and you do not vote on the Plan, but you affirmatively opt out of the releases provided by the Plan, or (<u>d</u>~~c~~) a Holder of a Claim who votes to reject the Plan and you affirmatively opt out of the releases provided by the Plan.

<u>If you are a Holder of a Claim entitled to vote on the Plan and you (a) do not vote on the Plan or (b) vote to reject the Plan, you may affirmatively opt out of the Third-Party Release by following the</u>

instructions on your Ballot.  **To opt out of the Third-Party Release, please follow the instructions on your Ballot.**

If you are ~~(a)~~ a Holder of a Claim that is presumed to accept the Plan ~~or (b) a Holder of Claim or Interest that is deemed to reject the Plan~~, you will receive a ~~Non Voting~~ Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot.  The Non-Voting Status Notice will include (a) the mechanism for opting out of the Third-Party Release, (b) a disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan, (c) notice of the deadline to object to the confirmation of the Plan, and (d) notice of the hearing for the confirmation of the Plan, among other information.  **To opt out of the Third-Party Release, please follow the instructions on the Non-Voting Status Notice**.

If you are ~~a~~ the Holder of a Claim ~~entitled to vote on the Plan and you (a) do not vote on the Plan or (b) vote~~ or Interest that is deemed to reject the Plan, ~~you may affirmatively opt out of~~ the releases will not apply to you unless you ***opt into*** the releases.  You will receive a Non-Voting Status Notice for Holders Deemed to Reject in lieu of a Ballot, which will include (a) the mechanism for opting into the Third-Party Release ~~by following the~~, (b) a disclosure regarding the settlement, release, exculpation, and injunction language set forth in Article VIII of the Plan, (c) notice of the deadline to object to the confirmation of the Plan, and (d) notice of the hearing for the confirmation of the Plan, among other information.  **To opt into the Third-Party Release, please follow the** instructions on ~~your Ballot~~ **the Non-Voting Status Notice**.

In addition, the Ballot contains the following information regarding your rights and responsibilities with respect to the Third-Party Release.  Please review the language carefully in making your decision.

THE PLAN CONTAINS MUTUAL THIRD-PARTY RELEASES.  ALL PARTIES THAT GRANT A RELEASE TO THE RELEASING PARTIES ARE ALSO RELEASED PARTIES.  IF YOU DO NOT WISH TO GRANT (AND RECEIVE) THIS MUTUAL THIRD-PARTY RELEASE, YOU MUST (I) VOTE TO REJECT THE PLAN OR ABSTAIN FROM VOTING ON THE PLAN AND (II) OPT OUT OF THE THIRD-PARTY RELEASES.  IF YOU DO NOT OPT OUT OF THE THIRD-PARTY RELEASES, THIS FAILURE TO ACT WILL BE CONSTRUED BY THE DEBTORS AS CONSENT TO THE THIRD-PARTY RELEASES.  THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO DEEM YOUR FAILURE TO OPT OUT AS CONSENT TO THE THIRD-PARTY RELEASES, INCLUDING CONSENT TO THE BANKRUPTCY COURT'S AUTHORITY TO GRANT THE THIRD-PARTY RELEASES.

**OO.    What is an injunction, and does the Plan contain any injunctions?**

An injunction is typically a court order that requires a person to do or to stop doing something. The Plan contains an injunction provision.  *See* Article VIII.F of the Plan.

When a debtor files for bankruptcy, the "automatic stay" goes into effect and prohibits the debtor's creditors from trying to collect any debts the debtor owed to the creditors before the date of the bankruptcy filing.  Once a debtor's plan of reorganization is approved and confirmed by the Bankruptcy Court, however, the automatic stay terminates.  At that time, the Bankruptcy Code's "discharge" provision goes into effect, and the debtor is discharged from having to pay any debts that arose prior to the petition date of the bankruptcy case other than on the terms set forth in the approved plan (*i.e.* a permanent discharge injunction).  In other words, the debtor only has to pay back the amount of its prepetition debt that is required in the plan and all other prepetition debt is discharged.  This helps fulfill the Bankruptcy Code's purpose of providing debtors with a "fresh start."

The injunction provision in the Plan protects the Debtors from further litigation over the "discharge" of the Debtors' prepetition debt that is not paid pursuant to the Plan. Here, upon the Effective Date of the Plan, the Debtors' creditors are enjoined from acting to collect discharged debts, interfering with the implementation of the Plan, or taking similar actions. If creditors violate the discharge injunction by, for example, sending the Debtors collection letters related to prepetition debt or calling the Debtors to try to collect such a debt, the Bankruptcy Court has the authority to punish such creditors for violating the discharge provided in the Plan.

The bankruptcy injunction is authorized by section 524(a) of the Bankruptcy Code. Section 524(a) provides, in relevant part, that a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived."

In this case, the Plan's injunction provision states that any person or entity that holds a Claim or Interest that has been released, discharged, or that is subject to exculpation is permanently prohibited after the Effective Date from taking any actions to recover or collect any debt or property on account of such a Claim or Interest. Therefore, if an Account Holder receives a distribution on account of his General Earn Claim after the Plan is confirmed, the Account Holder cannot sue the Debtors or the Post-Effective Date Debtors to try to recover more from them on account of that same General Earn Claim. For example, once the Debtors pay a Holder of a Convenience Claim 70% of the amount of such Convenience Claim as provided under the terms of the Plan, then the remaining 30% is discharged. The Holder of the Convenience Claim is "enjoined" from seeking to collect the remaining 30% from the Debtors. Further, Confirmation of the Plan prohibits anyone from undertaking any "Cause of Action," as defined in the Plan, that is released or exculpated pursuant to the Plan. Finally, Confirmation of the Plan prohibits Holders of Claims and Interests from interfering with the implementation of the Plan. For the avoidance of doubt, the injunction will apply in the NewCo Transaction or the Orderly Wind Down.

Article VIII.F of the Plan contains the injunction provision, as set forth below:

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests;  (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the**

commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including the Causes of Action released or exculpated in this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

PP.    What is the Account Holder Avoidance Action Settlement?

The Account Holder Avoidance Action Settlement is a compromise between the Debtors and Account Holders that, if approved under the Plan, will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The Account Holder Avoidance Action Settlement is a settlement of all Avoidance Actions against qualifying Account Holders, as explained below, in exchange for mutual releases. The Debtors submit that their entry into the Account Holder Avoidance Action Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

Pursuant to section 547 of the Bankruptcy Code, the Debtors can pursue Avoidance Actions against Account Holders for certain withdrawals Account Holders made from the Debtors' platform within 90 days of the Petition Date, which are referred to as "preferences." An Avoidance Action would be pursued by filing a lawsuit against the Account Holder requesting the return of the withdrawals identified as preferences. As defined under the Plan, an Account Holder's Withdrawal Preference Exposure is (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (i.e., between April 14, 2022, and July 13, 2022), valued as of the time of such withdrawals, minus (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in this period, valued as of the time of such deposits. For example, an Account Holder who withdrew Cryptocurrency with an aggregate value of $120,000 from her Celsius Account on April 19, 2022, would have a Withdrawal Preference Exposure of $120,000. An Account Holder who made that same withdrawal but then deposited, on May 5, 2022, Cryptocurrency with an aggregate value of $50,000, would have a Withdrawal Preference Exposure of $70,000.

6.    *What kinds of transactions count as "withdrawals" and "deposits" for purposes of calculating the Withdrawal Preference Exposure?*

The table below summarizes the types of transactions considered in determining an Account Holder's Withdrawal Preference Exposure (*i.e.*, what transactions are counted as transfers on to the platform versus what transactions are counted as transfers off the platform):

| Transaction Type | Transaction Description | Preference Treatment |
|---|---|---|
| Deposit | Incoming transfer of assets into an Account Holder's Celsius Account that results in an increase in the account balance of coin that was deposited. | Decreases an Account Holder's Withdrawal Preference Exposure if Deposited to Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if Deposited to Custody. |
| Withdrawal | Asset withdrawals are reductions to an Account Holder's balance. | Increases an Account Holder's Withdrawal Preference Exposure if Withdrawn from Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if Withdrawn from Custody. |
| Inbound Transfer | CelPay was a crypto-remittance product where Account Holders were able to initiate crypto-asset transfers to other Celsius Account Holders. Instead of initiating a transfer to a crypto wallet address, a link was generated and shared with the proposed receiver. This represents the inbound side of the transaction. | Decreases an Account Holder's Withdrawal Preference Exposure if received in Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if received in Custody. |
| Outbound Transfer | See above. This represents the outbound side of the transaction. | Increases an Account Holder's Withdrawal Preference Exposure if sent from Earn or Withhold.<br><br>Does not change an Account Holder's Withdrawal Preference Exposure if sent from Custody. |
| Internal Account Transfer | Movement of funds between Celsius Earn, Custody or Withhold account types. | Increases Account Holder's Withdrawal Preference Exposure if the Transfers are made from Earn or Withheld to Custody.<br><br>Decreases Account Holder's Withdrawal Preference Exposure if the Transfers are made from Custody to Earn or Withheld. |

| Swap In | Represents the funds received in a swap transaction (*e.g.* if you buy 1 BTC with 30,000 USDC, you will see a swap in transaction for + 1 BTC). | Increases Account Holder's Withdrawal Preference Exposure if Swapped into Custody.<br><br>Does not change Account Holder's Withdrawal Preference Exposure if Swapped into Earn or Withheld.<br><br>[NOTE: Netted out with Swap Outs, overall.] |
|---|---|---|
| Swap Out | Represents the funds paid in a swap transaction (*e.g.* if you buy 1 BTC with 30,000 USDC, you will see a swap out transaction for -30,000 USDC). | Decreases Account Holder's Withdrawal Preference Exposure if Swapped Out from Custody.<br><br>Does not change Account Holder's Withdrawal Preference Exposure if Swapped Out from Earn or Withheld.<br><br>[NOTE: Netted out with Swap Ins, overall.] |
| Loan Principal Payment | Represents the amounts funded for the loan and the amounts paid by the Account Holder to repay loan principal. | Incoming Loan Principal Payment (Payment from Celsius to Account Holder):<br><br>• Increases Account Holder's Withdrawal Preference Exposure if Incoming Loan Principal Payment is made to Custody or made in USD.<br><br>• Does not change Account Holder's Withdrawal Preference Exposure if Incoming Loan Principal Payment is made to Earn or Withheld.<br><br>Outgoing Loan Principal Payment (Payment from Account Holder to Celsius):<br><br>• Decreases Account Holder's Withdrawal Preference Exposure if Outgoing Loan Principal Payment is made from Custody or made in USD (i.e., USD payments from outside of the platform).<br><br>• Does not change Account |

|  |  | Holder's Withdrawal Preference Exposure if Outgoing Loan Principal Payment is made from Earn or Withheld. |
| Loan Interest Payment | Represents payments made to satisfy loan interest. | Decreases Account Holder's Withdrawal Preference Exposure if Loan Interest Payment is made from Custody or made in USD (i.e., USD payments from outside of the platform). Does not change Account Holder's Withdrawal Preference Exposure if Loan Interest Payment is made from Earn or Withheld. |
| Loan Principal Liquidation | Represents the amount of collateral sold to pay off the borrowed principal (e.g. if a loan for $20K USD is liquidated, and the price of BTC is $16K then this field will equal -1.25 (BTC); number should be a negative)). This transaction reduces the overall Account Holder account balance (of the token held in collateral) by the amount of the token that was liquidated. | Decreases Account Holder's Withdrawal Preference Exposure if Loan Principal Liquidation is made from Custody. Does not change Account Holder's Withdrawal Preference Exposure if Loan Principal Liquidation is made from Earn or Withheld. |
| Loan Interest Liquidation | The final interest charged on the liquidation of a loan. | Decreases Account Holder's Withdrawal Preference Exposure if Loan Interest Liquidation is made from Custody. Does not change Account Holder's Withdrawal Preference Exposure if Loan Interest Liquidation is made from Earn or Withhold. |
| Collateral | Coin pledged as security for repayment of a loan in the event of a borrower's default. Will include any initial collateral posted as security, as well as any additional collateral provided in response to margin calls. Collateral transaction line items do not represent actual coin movement. These line items reflect system designations that separately identify pledged coin from non-pledged coin in a given account. | Incoming Collateral (From Celsius to Account Holder): • Increases Account Holder's Withdrawal Preference Exposure if Incoming Collateral is returned to Custody. • Does not change Account Holder's Withdrawal Preference Exposure if Incoming Collateral is returned to Earn or Withhold. Outgoing Collateral (From Account |

| | | Holder to Celsius): |
|---|---|---|
| | | • Decreases Account Holder's Withdrawal Preference Exposure if Outgoing Collateral is made from Custody.<br><br>• Does not change Account Holder's Withdrawal Preference Exposure if Outgoing Collateral is made from Earn or Withhold. |

The following are examples of how Withdrawal Preference Exposure is calculated according to the above considerations.

**Account Holder with Withdrawal Preference Exposure of $85,000:**

| Transaction Date | Transaction | Transaction Type | Withdrawal Amount | Deposit Amount |
|---|---|---|---|---|
| May 2, 2022 | Transfer $10,000 of cryptocurrency from Custody Account to Earn Account. | Internal Account Transfer | -- | --*<br><br>*Does not constitute a Deposit because it occurs prior to the first Withdrawal in the 90-day window. |
| May 4, 2022 | Transfer from user's Earn Account into Custody Account of $145,000 worth of Cryptocurrency | Internal Account Transfer | $145,000*<br><br>*This constitutes the first withdrawal made in the ninety-day period before the Petition Date. | -- |
| May 7, 2022 | Use 30,000 USDC from Custody Account to purchase $30,000 in BTC | Swap Out | -- | $30,000 |
| May 7, 2022 | Receive $30,000 in BTC in Custody in exchange for preceding Swap Out of 30,000 USDC. | Swap In | $30,000 | -- |
| May 25, 2022 | Use CelPay to send $45,000 worth of BTC from Custody Account to another user. | Outbound Transfer | --*<br><br>*Does not constitute a Withdrawal because it originates from Custody. | -- |

88

| June 1, 2022 | Wired $100,000 to Celsius to repay loan principal | Loan Principal Payment | -- | $100,000 |
|---|---|---|---|---|
| June 1, 2022 | Wire $15,000 to Celsius make loan interest payment. | Loan Interest Payment | -- | $15,000 |
| June 1, 2022 | $400,000 of BTC Collateral returned to Earn Account | Collateral | -- | -- |
| June 10, 2022 | Withdraw $55,000 worth of ETH from Earn to external wallet. | Withdrawal | $55,000 | |
| | | ***Total:*** | ***$230,000*** | ***$145,000*** |

The Withdrawal Preference Exposure is determined by calculating the total withdrawals made from the platform based on the eligible transactions ($230,000 in this example), and subtracting the total deposits made onto the platform based on the eligible transactions ($145,000 in this example), which yields a Withdrawal Preference Exposure of $85,000.

*7.    How does the Account Holder Avoidance Action Settlement work?*

Pursuant to the terms of the Account Holder Avoidance Action Settlement, the Debtors have agreed to release any potential preference claims, which are defined as Avoidance Actions, against certain Account Holders, subject to certain conditions as further explained herein. The Account Holder Avoidance Action Settlement is not available to (a) the Excluded Parties or (b) ADR-Ineligible Potential Defendants.

Under the terms of the Account Holder Avoidance Action Settlement, the Debtors agree to release claims against qualifying Account Holders, (this is known as the "**Account Holder Avoidance Action Release**") in exchange for which the Account Holders will also agree to certain terms:

- **For Account Holders with a Withdrawal Preference Exposure under $100,000**: such Account Holder must (i) vote ***all Claims*** to accept the Plan; and (ii) agree to release all claims against the Released Parties (*i.e.*, not opt out of the releases).

- **For Account Holders with a Withdrawal Preference Exposure equal to or above $100,000**: such Account Holder must (i) vote ***all Claims*** to accept the Plan; (ii) agree to release all claims against the Released Parties; and (iii) provide the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the expected Effective Date of the Plan.

A summary of the amount of potential preferential Avoidance Actions by number of claimants and amounts is included below:

| (Del)fs | Preference Exposure | | |
|---|---|---|---|
| | Less Than $100k | $100K or More | Total |
| All Claimant Types ($) | $904 | $2,571 | $3,475 |
| Claimants (#) | 30,075 | 5,612 | 35,687 |

Source: SOFA 3

Eligible Account Holders who enter into the Account Holder Avoidance Action Settlement will otherwise be entitled to their full distribution under the Plan (*e.g.*, 100% of their Earn or Custody Claim minus any payments made pursuant to the Account Holder Avoidance Action Settlement). The amount of each Account Holder's Withdrawal Preference Exposure, if any, will be noted on such Holder's Ballot.

For example, an eligible Account Holder with a $70,000 Withdrawal Preference Exposure would receive the Account Holder Avoidance Action Release in return for (a) voting ***all Claims*** to accept the Plan, and (b) releasing all claims against the Released Parties.

In comparison, an Account Holder with a $120,000 Withdrawal Preference Exposure, however, would only receive the Account Holder Avoidance Action Release if such Account Holder (a) voted ***all Claims*** to accept the Plan, (b) released all claims against the Released Parties, and (c) made a payment in Cash, Bitcoin, or ETH no later than 14 days prior to anticipated Effective Date of the Plan equal to 27.5% ($33,000) of their total Withdrawal Preference Exposure. Account Holders who settle would otherwise receive treatment of their Claims under the Plan consistent with their Claims (*e.g.*, they would be entitled to 100% of any distributions on account of their Earn Claims). Notwithstanding the foregoing, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

The Account Holder Avoidance Action Settlement is reasonable because it avoids complex and expensive litigation with eligible Account Holders who elect to participate and expedites distributions to such eligible Account Holders. Certain Account Holders have asserted they hold defenses to Avoidance Actions, including (a) the securities safe harbor in section 546(e) of the Bankruptcy Code, which provides that preferential transfers involving margin payments or settlement payments in connection with securities contracts may not be clawed back, and (b) the ordinary course defense in section 547(c)(2) of the Bankruptcy Code, which provides that preferential transfers may not be avoided if they are made in the ordinary course of business. While the Bankruptcy Court has not adjudicated these defenses in these Chapter 11 Cases and in the context of the Account Holder Avoidance Actions, it is possible that Account Holders may prevail on these defenses and defeat Avoidance Actions asserted against them. On the other hand, it is also possible that those defenses and safe harbors will be found not to apply. The Account Holder Avoidance Action Settlement is a fair resolution of these issues and participation is entirely voluntary. Accordingly, the Debtors and the Committee seek approval of the Account Holder Avoidance Action Settlement through the Plan.

### QQ.    Will I receive a distribution on the Effective Date if the Debtors have potential Avoidance Actions against me or otherwise dispute my Claim?

No. If a Claim (or a portion thereof) is Disputed, if the Holder of a Claim is subject to an Avoidance Action (including Eligible Account Holders who do not participate in the Account Holder Avoidance Action Settlement), or if the Claim is held by any of the UCC Claims Stipulation Defendants, no payment or distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or such Avoidance Action is settled or otherwise resolved. ***This is true even if such Holder voted to accept the Plan or voted to reject the Plan and did not opt out of the releases***. The only exception is if the Holder of the Claim participates in the Account

Holder Avoidance Action Settlement and receives the Account Holder Avoidance Action Settlement Release.

After the Effective Date, the Litigation Administrator will have the authority to file, withdraw, or litigate to judgement objections to Claims, and settle or compromise any Disputed Claim.  If a Disputed Claim ultimately becomes an Allowed Claim or an Avoidance Action against the applicable Holder is settled or otherwise resolved, distributions will be made to the Holder of such Allowed Claim in accordance with their entitlements under the Plan to the extent possible.[386]  The Distribution Agent will make any distribution as soon as reasonably practicable after resolution by the Bankruptcy Court.

For example, Holders of General Custody Claims *who elect Treatment B* will not receive any Cryptocurrency on the Effective Date.  Instead, the Cryptocurrency will be transferred to a segregated wallet held by the Post-Effective Date Debtors and the Litigation Administrator(s) will have 180 days to bring any Avoidance Action or other claim against such Holders, although this time period may be extended by the Bankruptcy Court following notice and a hearing.   To the extent the Litigation Administrator does not bring an Avoidance Action or other claim against Holders of General Custody Claims who elect Treatment B, and no settlement is reached in that time, the Cryptocurrency will then be released to the Holder.

### RR. How and when will potential Avoidance Actions and disputes with respect to Claims be resolved?

Disputed Claims and potential or outstanding Avoidance Actions that are not settled or otherwise released prior to the Effective Date are expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date.  The Litigation Administrator will prosecute, settle, or otherwise resolve any of the Recovery Causes of Action, including Avoidance Actions, and Contributed Claims.

The Avoidance Action subcommittee will confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the 90 days prior to the Petition Date.

Additional information on the procedures for resolving Disputed Claims and other Causes of Action will be set forth by the Debtors in the alternative dispute resolution procedures related to the determination of claims against the Estates, which will be included in the Plan Supplement.  Such alternative dispute resolution procedures will allow the Litigation Administrator(s) and Account Holders to submit evidence and arguments to a neutral third-party for resolution in an efficient manner, with the goal of reducing the expenses and time that would otherwise be associated with litigation in the court system.

### SS. What is the effect of the Plan on the Debtors' business?

Following Confirmation, the Plan will be consummated on the Effective Date, which is the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of

---

[386] The Litigation Administrator may need to make distributions to Holders of these Claims in Cash or Liquid Cryptocurrency only depending on the timing of such distributions.

the Plan have been satisfied or waived in accordance with Article X.B of the Plan and (b) the Plan is declared effective by the Debtors.

On or after the Effective Date, except as otherwise set forth in the Plan, NewCo and each Post-Effective Date Debtor may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Equity Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. In addition, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

Prior to the Effective Date and as more fully set forth in the Plan or the Plan Supplement (including the Transaction Steps Memorandum), the Debtors will take actions necessary to effectuate the NewCo Transaction. On the Effective Date (a) the DeFi Cryptocurrency Assets, (b) the Institutional Loan portfolio, (c) PE & VC Investments, (d) Mining, and (e) the NewCo Capitalization Amount (the "NewCo Assets") will vest in NewCo. The Post-Effective Date Debtors will retain all other property in each of the Debtors' Estates, all Causes of Action, including the Recovery Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Post-Effective Date Debtor, in each case free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations on account of Secured Claims that are Reinstated pursuant to the Plan, as applicable). Additionally, after the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

In both the NewCo Transaction and the Orderly Wind Down, one or more of the Debtors shall continue in existence after the Effective Date, each as a Post-Effective Date Debtor, for purposes of (1) preserving the Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds under the Plan, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors after the Effective Date and after consummation of the NewCo Transaction, (3) performing their obligations under any transition services agreement entered into by and between the Post-Effective Date Debtors and NewCo and/or its subsidiaries, (4) resolving any Disputed Claims, (5) paying Allowed Claims for which there is not a Distribution Agent other than the Post-Effective Date Debtors, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtors or the Litigation Administrator(s) to file motions or substitutions of parties or counsel in each such matter.

**TT.    What is the Custody Settlement, how does it work, and who is affected by it?**

This section describes the details of the Custody Settlement and how it may affect you. For a comprehensive background discussion regarding the resolution of issues surrounding assets in the Custody Program (such assets, "Custody Assets" and such accounts, the "Custody Accounts") and the negotiation and development of the Custody Settlement, please refer to Article VII.L.2 of this Disclosure Statement entitled "Custody/Withhold Briefing."

In sum, the Custody Settlement is a compromise between the Debtors and Holders of Custody Claims that, if approved under the Plan, will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. As further explained in the Custody Settlement Motion, the Debtors'

entry into the Custody Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

### 1.  To whom is the Custody Settlement being offered?

Between March 21, 2023, and April 24, 2023, the Custody Settlement was offered to all Account Holders with Custody Accounts other than "insiders" as defined in section 101(31) of the Bankruptcy Code.  This included all Account Holders with Custody Accounts who also had an outstanding obligation owed to the Debtors through the Debtors' Borrow Program.

Under the Plan, the Custody Settlement is offered to any Holder of a General Custody Claim other than Excluded Parties.

In other words, under the Plan, the Custody Settlement is available to Account Holders with Custody Accounts (the "Custody Account Holders") who are not otherwise authorized to fully withdraw the substantial majority of their Custody Assets from Celsius' platform pursuant to the Custody Withdrawal Order and the Custody Withdrawal Notice previously entered by the Bankruptcy Court (and as defined and discussed in Article VII.L.2 of this Disclosure Statement entitled "Custody/Withhold Briefing").

### 2.  How do I participate in the Custody Settlement?

If you returned an Election Form (as defined in the Custody Settlement Motion) between March 21, 2023, and April 24, 2023, then you have already elected to participate in the Custody Settlement. Your General Custody Claim will automatically be counted as a vote to accept the Plan pursuant to the terms of the Custody Settlement.  If your Withdrawal Preference Exposure is under $100,000, you **must** vote your General Custody Claim (and all other Claims) to accept the Plan to receive a 100% recovery on your General Custody Claim and receive the Account Holder Avoidance Action Release.

If you are the Holder of a General Custody Claim under the Plan, and you did not return an Election Form between March 21, 2023, and April 24, 2023, you **must vote to accept** the Plan to participate in the Custody Settlement.

### 3.  What do I receive if I opted into the Custody Settlement during the Custody Settlement Election Period?

Each Custody Account Holder who opted into the Custody Settlement during the Custody Settlement Election Period (each, a "Settling Custody Account Holder") received the right to withdraw **two** in-kind distributions of 36.25% of such Custody Account Holder's Custody Distribution Claim[2487] in the Cryptocurrency associated with such Custody Distribution Claim, for a total recovery of 72.5% (the "Custody Settlement Payments").  Settling Custody Account Holders were eligible to withdraw the first Custody Settlement Payment as soon as reasonably practicable after the (i) entry of the Custody

---

[2487] A "Custody Distribution Claim" means the balance of the Custody Account of a Custody Account Holder (such balance, the "Custody Account Balance") minus (a) any Withdrawable Custody Assets and (b) any further amounts for which such Custody Account Holder is alleged to be obligated or indebted to the Debtors, except on account of (1) Avoidance Actions or (2) an obligation with respect to an outstanding retail loan to the extent such loan obligation is supported by an allowed Borrow Claim (as defined in the Plan) in an amount that results in a loan to value ratio of equal to or less than 80% on the date of the entry of the Order (it is expected that no such claims exist).  With respect to (b)(2), the Debtors shall be authorized to subtract from the Custody Account Balance any amounts necessary to make any such outstanding retail loan's loan to value ratio equal 80%, which shall be calculated as of the date such Custody Account Holder's Custody Distribution Claim is calculated.

Settlement Order and (ii) the expiration of the Custody Settlement Election Period, and will be able to withdraw the second Custody Settlement Payment upon the earliest of the Custody Distribution Dates.[2588] If the Debtors' confirm the Plan on the currently proposed timeline, Settling Custody Account Holders will be eligible to withdraw the second Custody Settlement Payment on or shortly after the Effective Date.

Settling Custody Account Holders also received a release from the Debtors with respect to all Causes of Action, including Avoidance Actions (*e.g.*, preference claims), that the Debtors' estates may assert against such Settling Custody Account Holder on account of such holder's Custody Distribution Claim.

If you opted in to the Custody Settlement during the Custody Settlement Election Period, please review the Custody Settlement Order and related exhibits to fully understand your rights and obligations. *See* Docket No. 2291.

4. *If I am a Settling Custody Account Holder, can I abstain from voting my General Custody Claim on the Plan or vote my General Custody Claim to reject the Plan?*

No. If you are a Settling Custody Account Holder, you are deemed to accept the Plan. Any Settling Custody Account Holder who attempts to votes her General Custody Claim to reject the Plan or does not vote her General Custody Claim will nonetheless be deemed to have voted her General Custody Claim to accept the Plan.

To be clear, however, if you are a Settling Custody Account Holder and you **do not affirmatively** vote to accept the Plan, your vote will still be deemed a vote to accept the Plan, but you will not be eligible for a 100% recovery if your Withdrawal Preference Exposure is under $100,000, or otherwise be eligible for the Account Holder Avoidance Action Release.

5. *Can I still receive the Custody Settlement even if I did not opt into it during the Custody Settlement Election Period?*

Yes. If you are the Holder of a General Custody Claim, and you did not participate in the Custody Settlement during the Custody Settlement Election Period because you either (a) did not timely return an Election Form and/or (b) you were not eligible to participate in the Custody Settlement during the Custody Settlement Election Period, you may now receive the Custody Settlement by voting your Class 6A General Custody Claim Custody to accept the Plan.

6. *What do I receive if I am the Holder of a Class 6A General Custody Claim and I vote my Class 6A General Custody Claim to accept the Plan?*

You will receive Treatment A under the Plan, which essentially provides you with the same recovery as the Settling Custody Account Holders. Pursuant to Treatment A, on or shortly after the Effective Date, Holders of General Custody Claims will receive (a) a distribution of Cryptocurrency equal to 72.5% of the amount of their Allowed General Custody Claim in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions.

---

[2588] The "Custody Distribution Dates" are: (i) the Effective Date of the Plan, (ii) the occurrence of a Rejection Event, (iii) June 11, 2023 if the Debtors do not File a chapter 11 plan by such date, and (iv) December 31, 2023. A "Rejection Event" means the date the Debtors' chapter 11 cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

In addition, if you vote all of your Claims to accept the Plan, and you transferred assets totaling under $100,000 in the aggregate from the Earn Program to the Custody Program, or off the platform entirely, you will receive all (100%) of your General Custody Claim and the Account Holder Avoidance Action Release.

If you vote all of your Claims to accept the Plan and you do not qualify for the Account Holder Avoidance Action Release, you will still receive a release under the Plan with respect to all Causes of Action other than Avoidance Action.

> 7. *What do I receive if I am the Holder of a Class 6A General Custody Claim and I vote my Class 6A General Custody Claim to reject the Plan or I do not vote my Class 6A General Custody Claim at all?*

If you are the Holder of a Class 6A General Custody Claim and you vote your Class 6A General Custody Claim to reject the Plan or you do not vote your Class 6A General Custody Claim, then you will receive Treatment B under the Plan.

Under Treatment B, on or shortly after the Effective Date, Holders of General Custody Claims will have an amount corresponding to each Holder's Allowed General Custody Claim transferred to a segregated wallet held by the Post-Effective Date Debtors. The amount held in that segregated wallet will be subject to all Avoidance Actions and other claims by the Debtors' Estate with respect to such Allowed General Custody Claim. The Litigation Administrator will have 180 days following the Effective Date to bring any Avoidance Action or other claim against such Account Holders, with respect to the amount of such Account Holder's General Custody Claim. For the avoidance of doubt, the Account Holder Avoidance Action Releases provided by the Plan to Account Holders who withdrew assets from the Debtors' platform does not apply to Holders of General Custody Claims that receive Treatment B, and the Litigation Administrator will have the right to bring any Avoidance Action against any such Holder with respect to her General Custody Claim, regardless of the amount.

If, after 180 days (or such longer period as approved in an order from the Bankruptcy Court), the Litigation Administrator does not bring an action against, or enter a settlement agreement with, any Holder of a General Custody Claim that received Treatment B, then such Holder shall be entitled to receive the entire amount of her General Custody Claim. [2689]

If you do not vote your Class 6A Claim to accept the Plan, either because you voted to reject and/or did not vote, you will not be eligible for the Account Holder Avoidance Action Release. You may receive other releases under the Plan if you vote your other Claims to accept the Plan as further explained herein.

> 8. *How does the way I vote my Class 6A General Custody Claim affect my rights with respect to my other Claims?*

The way Holders of Class 6A General Custody Claims vote on the Plan may affect to their other rights under the Plan, including with respect to how they must vote their other Claims and the releases they receive under the Plan. The following summaries explain how votes of Holders of Class 6A General Custody Claim will interact with their other rights under the Plan.

---

[2689]  The Allowed Custody Claims of such Non-Settling Custody Account Holders will be subject to the ADR Procedures as defined in the Plan and provided for in the Plan Supplement.

*Holder of Class 6A General Custody Claim votes to **accept** the Plan.*  The Holder may (a) vote her other Claims to accept the Plan, (b) vote her other Claims to reject the Plan, or (c) not vote her other Claims.  If she (i) votes her other Claims to accept the Plan, and (ii) does not opt out of the releases in the Plan (if applicable),[7290] then she is eligible to receive the Account Holder Avoidance Action Release if she qualifies for such release.  She would also be considered a "Released Party" and a "Releasing Party" under the Plan with respect to ***all*** of her Claims.

| *Holder of Class 6A General Custody Claim votes to **accept** the Plan.* | | | |
|---|---|---|---|
| Votes all other Claims to Accept | Votes all other Claims to Reject / Does Not Vote all other Claims | Opts out of the Releases (if applicable) | Types of Releases Granted |
| Yes | No | No or N/A | Account Holder Avoidance Action Release (if qualifies)<br><br>"Released Party" and a "Releasing Party" with respect to ***all*** Claims |
| Yes | No | Yes | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to ***all*** Claims where opt out did not occur |
| No | Yes | Yes | No Account Holder Avoidance Action Release<br><br>Mutual releases ***solely*** with respect to Class 6A General Custody Claim |
| No | Yes | No | Account Holder Avoidance Action Release (if qualifies)<br><br>"Released Party" and a "Releasing Party" with respect to ***all*** Claims |

*Holder of Class 6A General Custody Claim votes to **reject** the Plan or **does not vote** on the Plan.*  The Holder may (a) vote her other Claims to accept the Plan, (b) vote her other Claims to reject the Plan, or (c) not vote her other Claims.  Regardless of how she votes her other Claims or whether she opts out of the releases in the Plan (if applicable) she is ***not*** eligible to receive the Account Holder Avoidance Action Release.

If she (i) votes her other Claims to accept the Plan, and (ii) does not opt out of the releases in the Plan (if applicable),[7891] then she would be considered a "Released Party" and a "Releasing Party" under the Plan with respect to ***all*** of her Claims ***except for her Class 6A General Custody Claim***.

---

[7290]  Holders of Class 6B Withdrawable Custody Claims are unimpaired under the Plan (which means they will receive 100% recovery on their Class 6B Claim), and thus, are presumed to accept the Plan and not entitled to vote on the Plan.  Holders of Class 6B Withdrawable Custody Claims are, however, entitled to opt out of the releases provided by the Plan with respect to such Holder's Class 6B Claim.

[7891]  Holders of Class 6B Withdrawable Custody Claims are unimpaired under the Plan (which means they will receive 100% recovery on their Class 6B Claim), and thus, are presumed to accept the Plan and not entitled to vote on the Plan.  Holders of Class 6B Withdrawable Custody Claims are, however, entitled to opt out of the releases provided by the Plan with respect to such Holder's Class 6B Claim.

| Holder of Class 6A General Custody Claim votes to **reject** the Plan or **does not vote** on the Plan. | | | |
|---|---|---|---|
| Votes all Claims to Accept | Votes all Claims to Reject / Does Not Vote all Claims | Opts out of the Releases (if applicable) | Types of Releases Granted |
| Yes | No | No or N/A | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to **all** Claims *except for Class 6A General Custody Claims* |
| Yes | No | Yes | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to **all** Claims where opt out did not occur *except for Class 6A General Custody Claims* |
| No | Yes | Yes | No Account Holder Avoidance Action Release<br><br>No other releases |
| No | Yes | No | No Account Holder Avoidance Action Release<br><br>"Released Party" and a "Releasing Party" with respect to **all** Claims *except for Class 6A General Custody Claims* |

### UU.    What is the Withhold Settlement, how does it work, and who is affected by it?

This section describes the details of the Withhold Settlement and how it may affect you.  For a comprehensive background discussion regarding the resolution of issues surrounding assets in Withhold Accounts (such assets, "Withhold Assets") and the negotiation and development of the Withhold Settlement, please refer to Article VII.L.2 of this Disclosure Statement entitled "Custody/Withhold Briefing."

In sum, the Withhold Settlement is a compromise between the Debtors and Holders of Withhold Claims that, if approved under the Plan, will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  As further explained in the Withhold Settlement Motion, the Debtors' entry into the Withhold Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

*1.   To whom is the Withhold Settlement being offered?*

The Withhold Settlement was previously offered only to the members of the Withhold Ad Hoc Group.

Under the Plan, the Withhold Settlement is offered to any Holder of a Withhold Claim,[2992] other than any Excluded Parties, on the conditions set forth herein.

---

[2992] Please check your Ballot to confirm whether you have a Withhold Claim.  If the total amount of your Withhold Claim and your Earn Claim (if any) is greater than $10 but less than or equal to $5,000, you will have a Class 4 Convenience Claim and not a Withhold Claim.

###### 2.    *How do I participate in the Withhold Settlement?*

If you are a member of the Withhold Ad Hoc Group that signed the Withhold Settlement, then you have already elected to participate in the Withhold Settlement.  You no longer have a Withhold Claim.  The remaining amount of your previous Withhold Claim has been reclassified as an Earn Claim.

If you are the Holder of a Withhold Claim under the Plan, Class 7 ***must vote to accept*** the Plan for you to receive Treatment A under the Withhold Settlement, as further explained herein.  Thus, if you would like to participate in the Withhold Settlement, you are encouraged to ***vote to accept*** the Plan.

###### 3.    *What do I receive if I am a member of the Withhold Ad Hoc Group who signed the Settlement Agreement?*

Members of the Withhold Ad Hoc Group who signed the Withhold Settlement Agreement will receive the right to withdraw an in-kind distribution equal to fifteen (15) percent of the value, as of the Petition Date, of such members' Withhold Distribution Claims,[8093] calculated in accordance with the Conversion Procedure[8194] (the "Withhold Settlement Payments"), ***plus*** the treatment of such members' remaining eighty-five (85) percent of Withhold Distribution Claim as a General Earn Claim under the Plan.

As part of the Withhold Settlement, the Debtors, the Committee, and the Withhold Ad Hoc Group each agreed to settle all Causes of Action held by (i) the Debtors against the Settling Withhold Account Holders, including any Avoidance Actions, and (ii) the Settling Withhold Account Holders against the Debtors, including seeking relief from the automatic stay, turnover, or the conversion of such Holder's Withhold Claim to a General Earn Claim pursuant to the Withhold Settlement.

###### 4.    *If I previously settled my Withhold Claim, can I abstain from voting my General Earn Claim on the Plan or vote my General Earn Claim to reject the Plan?*

Yes.  If you previously settled your Withhold Claim and you now have a General Earn Claim, you may vote such Claim to reject the Plan or choose not to vote such Claim.

###### 5.    *Can I still receive the Withhold Settlement even if I did not sign the Withhold Settlement Agreement?*

Maybe.  If you are the Holder of a Withhold Claim, and you did not participate in the Withhold Settlement because you either (a) did not sign the Withhold Settlement Agreement and/or (b) you were not eligible to participate in the Withhold Settlement, you may vote your Class 7 Withhold Claim to accept the Plan.

---

[8093]  A "Withhold Distribution Claim" means an Allowed Withhold Claim minus any Ineligible Withhold Assets. A "Withhold Claim" means a Claim, arising from an attempted transfer of Cryptocurrency in a jurisdiction in which the Debtors did not offer the Custody Program, which transfers were placed in Withhold Accounts, less any amounts withdrawn under the Custody Withdrawal Order, *i.e.*, a Claim on account of the Transferred Withhold Assets.

[8194]  The "Conversion Procedure" means the following process by which the Withhold Settlement Payment is calculated based on Exhibit A attached to the *Notice of Filing of Cryptocurrency Conversion Rates* [Docket No. 1420] (the "Cryptocurrency Conversion Table"): (a) converting the value of the Withhold Distribution Claim into a U.S. Dollar amount according to the prices of any Cryptocurrency that makes up the Withhold Distribution Claim on the Petition Date as reflected in the Conversion Table, (b) calculating what the value of 15 percent of that U.S. Dollar amount equals, and (c) converting the value of 15 percent of that U.S. Dollar amount into Cryptocurrency based on the prices of such Cryptocurrency on April 20, 2023, the date the Withhold Settlement Order is entered.

If Class 7 votes to accept the Plan, which means more than two-thirds of the amount of Claims and more than one-half of the number of Holders of Claims that vote on the Plan vote to accept the Plan, then you and everyone else in Class 7 (regardless of how they voted) will receive Treatment A under the Plan, which is the same treatment as the Withhold Settlement.

If, however, Class 7 does not vote to accept the Plan, then even if you voted your Class 7 Claim to accept the Plan you will not receive Treatment A, or the Withhold Settlement, under the Plan.  Instead, you and everyone else in Class 7 (regardless of how they voted) will receive Treatment B under the Plan, which means your Claim will receive the same treatment as a General Earn Claim.

6.  *What do I receive if I am the Holder of a Class 7 Withhold Claim and Class 7 votes to accept the Plan?*

You receive Treatment A under the Plan, which essentially provides you with the same amount of recovery as Holders that participated in the Withhold Settlement.  Pursuant to Treatment A, on or shortly after the Effective Date, all Holders of Withhold Claims will receive (a) a distribution of Cryptocurrency equal to 15% of the amount of their Withhold Distribution Claim in accordance with the Conversion Procedure, and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be provided the same treatment as a General Earn Claim.

You will receive this treatment even if you voted your Class 7 Claim to reject the Plan or did not vote your Class 7 Claim.  Importantly, however, if you (a) voted to reject the Plan or did not vote on the Plan and (b) affirmatively opted out of the releases in the Plan, ***you will not be considered a "Released Party" and a "Releasing Party" with respect to your Class 7 Withhold Claim***.

7.  *What do I receive if I am the Holder of a Class 7 Withhold Claim and Class 7 votes to reject the Plan?*

You receive Treatment B under the Plan.  Pursuant to Treatment B, your entire Withhold Claim will receive the same treatment as a General Earn Claim.

You will receive this treatment even if you voted your Class 7 Claim to accept the Plan.  Importantly, however, if you voted to accept the Plan, ***you will still be considered a "Released Party" and a "Releasing Party" with respect to your Class 7 Withhold Claim***.

8.  *How does the way I vote my Class 7 Withhold Claim affect my rights with respect to my other Claims?*

The way Holders of Class 7 Withhold Claims vote on the Plan affects their rights and treatment under the Plan with respect to their other Claims, including with respect to how they must vote their other Claims and the releases provided under the Plan.  The following summaries explain how the way a Holder of a Class 7 Withhold Claim votes may affect her rights under the Plan with respect to her other Claims and the releases granted under the Plan.

*Holder of Class 7 Withhold Claim votes to **accept** the Plan*.  The Holder must vote all other Claims (other than any Custody Claims) to ***accept*** the Plan.  The Holder is also ineligible to opt out of any releases except with respect to any Custody Claims and any attempt to opt out of the releases will not be effective. ***This is true regardless of whether Class 7 votes to accept or reject the Plan***.

In addition, if Class 7 votes to accept the Plan, the Holder will receive General Earn Claim treatment with respect to 85% of such Holder's Allowed Withhold Distribution Claim.  This amount will

be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

If Class 7 votes to reject the Plan, the Holder will receive General Earn Claim treatment with respect to 100% of such Holder's Allowed Withhold Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

*Holder of Class 7 Withhold Claim votes to **reject** the Plan or **does not vote** on the Plan*. The Holder must vote all other Claims (other than any Custody Claims) to **reject** the Plan or must not vote any of its Claims. A Holder who (a) votes to reject the Plan or does not vote on the Plan and (b) affirmatively opt out of the releases in the Plan will not be considered a "Released Party" and a "Releasing Party" with respect to her Class 7 Withhold Claim. ***This is true regardless of whether Class 7 votes to accept or reject the Plan***.

In addition, if Class 7 votes to accept the Plan, the Holder will receive General Earn Claim treatment with respect to 85% of such Holder's Allowed Withhold Distribution Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

If Class 7 votes to reject the Plan, however, the Holder will receive General Earn Claim treatment with respect to 100% of such Holder's Allowed Withhold Claim. This amount will be subject to the same Unsecured Claim Distribution Mix Election that such Holder may have made with respect to any other Claim, if any.

**VV.    What is the Series B Settlement, how does it work, and who is affected by it?**

This section describes the details of the Series B Settlement and how it may affect you. For a comprehensive background discussion regarding the negotiation and development of the Series B Settlement, please refer to Article VII.L.5 of this Disclosure Statement as well as the Series B Settlement Motion Filed on June 27, 2023 [Docket No. 2899].

In sum, the Series B Settlement is a compromise negotiated by the Debtors, the Committee, and Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (collectively, the "Series B Holders" or, with respect to the Series B Settlement specifically, the "Initial Consenting Series B Preferred Holders") that provides a resolution of issues related to the Series B Preferred Interests, which are the approximately 33,821 shares of series B preferred stock issued by CNL. The Bankruptcy Court recently approved the Series B Settlement (such order, the "Series B Settlement Order") [Docket No. 3074], and the Series B Settlement will be effectuated pursuant to Bankruptcy Rule 9019. As further explained in the Series B Settlement Motion, the Debtors' entry into the Series B Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

*1. To whom is the Series B Settlement being offered?*

The Series B Settlement was offered only to Holders of Series B Preferred Interests (even though it was negotiated by a smaller group of such Holders, the Series B Holders). All Holders of Series B Preferred Interests were able to participate in the settlement up until the start of the July 18, 2023 hearing on the Series B Settlement Motion.

*2. How do I participate in the Series B Settlement?*

Holders of Series B Preferred Interests were able to opt into the Series B Settlement by returning the signature page of the settlement agreement attached as <u>Exhibit 1</u> to the Series B Settlement Motion (the "<u>Series B Settlement Agreement</u>") to the Debtors, the Committee, and counsel to the Series B Holders before the July 18, 2023 hearing on the Series B Settlement Motion. Holders of Series B Preferred Interests who opted into the Series B Settlement before the start of the hearing on the Series B Settlement Motion are deemed "Consenting Series B Holders."

*3. What do I receive if I am a Consenting Series B Holder? Must I do anything if I am a Consenting Series B Holder?*

The Series B Settlement provides for a $25 million Cash settlement (the "<u>Series B Settlement Consideration</u>") in exchange for a release of all claims between the Consenting Series B Holders on the one hand and the Debtors and the Committee on the other. The Series B Settlement Consideration will be distributed as follows.

Within three days of entry of the Series B Settlement Order, the Series B Holders will receive $24 million of the Series B Settlement Consideration on account of the fees and expenses incurred by them in connection with their litigation and negotiation efforts in these Chapter 11 Cases. Holders of Series B Preferred Interests who are Consenting Series B Holders as of July 24, 2023, which is the date the Series B Settlement Order was entered, will receive their Pro Rata share of the remaining $1 million of the Series B Settlement Consideration, also within three days of entry of the Series B Settlement Order. All Consenting Series B Holders and certain related parties are deemed to be "Releasing Parties" and "Released Parties" under the Plan, meaning that they will provide the Debtors and the Committee, among others defined as "Released Parties," a release of all claims, and will receive a release of all claims from those parties in return.

Consenting Series B Holders must not directly or indirectly oppose, or support any party who opposes, any relief sought by the Debtors or the Committee in these Chapter 11 Cases that is not inconsistent with the Series B Settlement Agreement. Consenting Series B Holders must vote for any plan that is not inconsistent with the Series B Settlement Agreement, and cannot directly or indirectly oppose such a plan.

*4. Can I still receive the Series B Settlement even if I did not sign the Series B Settlement Agreement?*

Yes. If you are a Holder of Series B Preferred Interests and you did not participate in the Series B Settlement because you did not sign the Series B Settlement, you will receive your Pro Rata share of the $1 million of the Series B Settlement Consideration (to be shared with the Consenting Series B Holders) on the Effective Date of the Plan. ***However, you will not receive a release from the Releasing Parties, and you will not provide the Released Parties with a release***.

**WW.    What do I receive on behalf of my Retail Borrower Deposit Claim?**

Account Holders that participated in the Debtors' Borrow Program will likely have a Retail Borrower Deposit Claim. If you have a Retail Borrower Deposit Claim, you can choose between two possible treatments of your Retail Borrower Deposit Claim: you may elect to make the Retail Advance Obligation Repayment Election or to receive the Set Off Treatment.

If you make the Retail Advance Obligation Repayment Election, you must repay all or a portion of the proceeds of the "loan" you took out under the Debtors' Borrow Program, or the Retail Advance

Obligation.  If you actually repay all or a portion of your Retail Advance Obligation in accordance with the Retail Advance Obligation Repayment Instructions, which will be provided by the Debtors via email to all Retail Borrowers at least thirty calendar days prior to the anticipated Effective Date, and you make this repayment by the Retail Advance Obligation Repayment Deadline, which is five calendar days prior to the Effective Date of the Plan, then you will receive an amount of BTC or ETH equal to the amount that you paid back.  You can make an election as to whether to receive BTC or ETH.  In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, and will receive either a 67.50% recovery on account of your Retail Borrower Post-Set Off Claim if your Retail Borrower Post-Set Off Claim receives the General Earn Claim treatment, or a 70% recovery if your Retail Borrower Post-Set Off Claim receives the Convenience Claim treatment.  There may be tax benefits to making the Retail Advance Obligation Repayment Election, and you are advised to confer with your own tax counsel to evaluate whether to make the Retail Advance Obligation Repayment Election.

If you do not make the Retail Advance Obligation Repayment Election or you fail to repay your Retail Advance Obligation in accordance with the Debtors' instructions and by the deadline, then you will receive the Set Off Treatment.  Under the Set Off Treatment, you will retain the proceeds of the Retail Advance Obligation and have your associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date.  The remaining amount of your Retail Borrower Deposit Claim,[8295] *i.e.*, your Retail Borrower Post-Set Off Claim, will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable.  In other words, you will receive a 100 percent recovery on your Retail Advance Obligation, will receive either a 67.50% or a 70% recovery on account of the Retail Borrower Post-Set Off Claim, and ***you will not have to repay your loan or owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of your Retail Borrower Deposit Claim (i.e., your loan is being forgiven)***.

If you receive the Unsecured Claim Distribution Consideration on account of your Retail Borrower Post-Set Off Claim, you will receive a combination of (a) Liquid Cryptocurrency (BTC and ETH), (b) NewCo Common Stock, and (c) Litigation Proceeds.  If you receive the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim (*i.e.*, if the total amount of your Account Holder Claims, including your Retail Borrower Post-Set Off Claim, is equal to or less than $5,000), you will receive only Liquid Cryptocurrency.  Your Ballot will explain whether you will receive the Unsecured Claim Distribution Consideration or the Convenience Class Distribution on account of your Retail Borrower Post-Set Off Claim.

For example, if you have a Retail Borrower Deposit Claim valued at $49,702.50 and a Retail Advance obligation of $30,000, as a result of the Retail Advance Obligation Repayment Election, you would receive the following:

---

[8295]    Calculated in U.S. Dollars as of the Petition Date utilizing the conversion rates provided in the Cryptocurrency Conversion Table.

| Account Holder Claim 3 – $49,702.50 Retail Borrower Deposit Claim, $30,000 Retail Advance Obligation (Retail Advance Obligation Repayment Election) | | | |
|---|---|---|---|
| Coin | # of Coins | Petition Date Coin Price | USD ($) |
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $   49,702.50 |
| | | | |
| *Retail Advance Obligation Borrower Repayment* | | | |
| USDC / USD | (30,000.00) | $    1.00 | $   (30,000.00) |
| **Retail Borrower Post-Set off Claim ($)** | | | $   19,702.50 |

| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
|---|---|---|---|
| **Retail Advance Obligation Return to Borrower** | | | |
| BTC | $   27,323.96 | 1.10 | $   30,000.00 |
| | | | |
| **Retail Borrower Post-Set Off Claim Recovery** | | | |
| BTC | $   27,323.96 | 0.14 | $   3,707.53 |
| ETH | 1,879.61 | 1.97 | 3,707.53 |
| Liquid Cryptocurrency [1,2] | | $ | 7,415.06 |
| NewCo Common Stock [1,2] | N/A | N/A | 6,079.91 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | $ | 13,494.96 |
| **Liquid Cryptocurrency Recovery %** | | | 37.6% |
| **NewCo Common Stock Recovery %** | | | 30.9% |
| **Recovery % on Retail Borrower Post-Set off Claim** [3] | | | 68.5% |
| **Recovery % on Retail Advance Obligation** | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | 87.5% |

If, on the other hand, you do not make the Retail Advance Obligation Repayment Election or you fail to repay your Retail Advance Obligation in accordance with the Debtors' instructions and by the deadline, you would receive the Set Off Treatment according to the following. [396]

---

[396]  The tables include the following assumptions:  (1) the Holder only has a Retail Borrower Deposit Claim and no other Claims; (2) Litigation Proceeds are not included as they are an additional recovery to the above and the amount of Litigation Proceeds any Holder receives will not be known on the Effective Date; and (3) Liquid Cryptocurrency values are as of May 31, 2023.

| Account Holder Claim 3 - $49,702.50 Retail Borrower Deposit Claim, $30,000 Retail Advance Obligation (Set Off Treatment) | | | |
| --- | --- | --- | --- |
| Coin | # of Coins | Petition Date Coin Price | USD ($) |
| *Retail Borrower Deposit Claim* | | | |
| BTC | 2.50 | 19,881.00 | $ 49,702.50 |
| *Set Off:  Retail Advance Obligation* | | | |
| USDC / USD | 30,000.00 | $ 1.00 | $ 30,000.00 |
| **Retail Borrower Post-Set off Claim ($)** | | | $ 19,702.50 |

| Recovery Scenario (consistent with General Earn treatment) | | | |
| --- | --- | --- | --- |
| Recovery Type | 5/31 Coin Price | # of Coins Recovered | Recovery Value ($) |
| BTC | $ 27,323.96 | 0.14 | $ 3,707.53 |
| ETH | 1,879.61 | 1.97 | 3,707.53 |
| Liquid Cryptocurrency[1,2] | | | $ 7,415.06 |
| NewCo Common Stock[1,2] | N/A | N/A | 6,079.91 |
| **Value Recovered ($) on Retail Borrower Post-Set off Claim** | | $ | 13,494.96 |
| *Liquid Cryptocurrency Recovery %* | | | 37.6% |
| *NewCo Common Stock Recovery %* | | | 30.9% |
| *Recovery % on Retail Borrower Post-Set off Claim [3]* | | | 68.5% |
| *Recovery % on Retail Advance Obligation* | | | 100.0% |
| **Total Recovery % on Retail Borrower Deposit Claim** | | | 87.5% |

As further explained herein, Holders of Claims that receive the Unsecured Claim Distribution Consideration may make Unsecured Claim Distribution Mix Elections, which could alter the recovery shown above.

Please see Article XII of this Disclosure Statement for an explanation of "Certain U.S. Federal Income Tax Consequences of the Plan" with respect to the Set Off Treatment.

### XX.    How does the Plan classify Claims for damages arising from the alleged wrongful liquidation of loans issued under the Borrow program?

Certain former and current participants in the Debtors' Borrow program have asserted that they hold Claims or Causes of Action against the Debtors related to the liquidation of certain of their Retail Deposit Advance Obligations during and around the Pause.

As a general matter, the Terms of Use applicable to the Borrow program permitted the Debtors to liquidate Borrow program loans once a loan reached a maximum loan-to-value ("LTV") threshold.  Upon liquidation, the Company reduced the Borrow account balance by the amount owed by the Account Holder with respect to the loan, charged a 2-3% liquidation fee as permitted under the Terms of Use, and then returned the remaining amount to the Account Holder's "Celsius Account," which was the program associated with the Account Holder's balance prior to being transferred to the Borrow program.  The Debtors have investigated these liquidations and believe the Debtors' actions complied with the Terms of

Use and that Account Holders do not hold valid Claims for damages arising from the liquidation of their loans.

To the extent Account Holders assert Claims on account of the alleged improper liquidation of their Retail Borrower Deposit Claims, those Claims are contingent, unliquidated, and disputed Claims and the remaining assets returned to the Account Holder's "Celsius Account" after liquidation will be treated as (a) General Earn Claims or Convenience Class Claims under the Plan to the extent the applicable Account Holder has a General Earn Claim or Convenience Class Claim arising from the liquidation, (b) Custody Claims to the extent the assets were returned to the Account Holder's Custody Account, or (c) a General Unsecured Claim to the extent there is no Account Holder Claim associated with the liquidation.

Any such Claims (other than the Custody Claims) will be subject to the Class Claim Settlement described in Article III.MMM of this Disclosure Statement. *If any Claimants want to pursue these Claims instead of receiving the 5% increase to their Scheduled Account Holder Claims under the Class Claim Settlement, they should opt out of the Class Claim Settlement by making the applicable election on their Ballot*.

### YY. ~~XX.~~ What is the CEL Token Settlement and what is the basis for the valuation of CEL Tokens?

The CEL Token Settlement is a settlement of disputes regarding the treatment and priority of all Claims and Causes of Action arising from~~out~~ of or related to the CEL Token ~~in accounts on the Debtors' platform~~. If approved under the Plan, the settlement will be effectuated pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry into the CEL Token Settlement is an exercise of the Debtors' business judgment and represents a fair and equitable compromise of the issues described below that falls well within the range of reasonableness.

Under the Plan, Holders of CEL Token Deposit Claims will receive treatment otherwise consistent with the treatment of the program in which their CEL Tokens were deployed, such as General Earn Claim treatment. The amount of treatment provided to Holders of CEL Token Deposit Claims will be based on a valuation of $0.2~~0~~5 per CEL Token. For example, a Holder of a CEL Token Deposit Claim on account of 100,000 CEL Tokens transferred to the Earn Program would be entitled to treatment consistent with an Earn Claim valued at $20,000.

All other Claims with respect to CEL Tokens, including other Claims for damages relating to CEL Token and Claims of the ~~UCC Claims Stipulation Defendants~~Equitably Subordinated Parties, will be subordinated and will receive no distribution under the Plan. The UCC Claims Stipulation Defendants include defendants who participated in, or had direct knowledge of, the manipulation of CEL Token prior to the Petition Date.

The Debtors, in consultation with the Committee, determined that a $0.2~~0~~5 valuation of the CEL Token is appropriate in light of strong arguments that CEL Token Deposit Claims should be subordinated and the true value of CEL Token on the Petition Date was likely not reflected by the market price of such tokens. The valuation offered under the CEL Token Settlement is the same price at which CEL Token was offered through a private sale prior to the initial coin offering and is close to the price of CEL Token at the time of the Pause. Moreover, the valuation reflects the difficulty of fairly valuing an asset that had its value manipulated and that will almost certainly have no go-forward value. Further, CEL Tokens could be treated as securities, which would result in CEL Token Deposit Claims being subordinated and Holders receiving $0.00 on account of such Claims. Finally, as stated above, the market price of CEL

Token as of the Petition Date is likely not reflective of the true value of CEL Token due to extremely low trading volume between the Pause and the Petition Date and potential effects on the price.

Valuing the CEL Token at $0.2~~0~~5 per CEL Token is equitable to other Account Holders. There are approximately $220 million of CEL Token Deposit Claims if such Claims are valued at $0.81—the Petition Date trading price. Yet, CEL Token cannot be distributed or sold. If CEL Token Deposit Claims are valued at the Petition Date price, the recoveries of other Account Holders will be severely limited—even though those Account Holders did not assume the unique risks associated with the CEL Token, a highly speculative asset with a price closely linked to the value of the Celsius platform and dependent on its continued viability.

In reaching the terms of a settlement that would be in the best interest of all creditors, the Debtors also assessed the potential of returning CEL Token in-kind to Holders of CEL Token Deposit Claims. This approach, however, would neither be feasible nor equitable. Distribution would be impractical due to the significant regulatory hurdles and risks associated with the distribution of what is likely an unregistered security. Moreover, an in-kind distribution would not effectively return value to Holders of CEL Token Deposit Claims because the value of CEL Token is predicated on the continued operation of the Celsius platform, which will not continue after the Effective Date.

Accordingly, the Debtors, in consultation with the Committee, determined that valuing CEL Token at $0.2~~0~~5 per token represented an appropriate settlement of the issues set forth above.

Although the Debtors and the Committee support the CEL Token Settlement, certain Account Holders Filed motions in the Bankruptcy Court seeking an order valuing CEL Token at $0.81 per CEL Token (the "CEL Token Valuation Motions").[497] The Committee Filed an objection to the CEL Token Valuation Motions,[498] joined by the Debtors,[499] which asserted the points above in support of valuing CEL Token at $0.2~~0~~5 per CEL Token. The Court heard the CEL Token Valuation Motions on June 28, 2023 and dismissed both motions without prejudice but did not issue a ruling with respect to the valuation of CEL Token. If the CEL Token Settlement is not approved, the Court may determine the appropriate valuation of CEL Token at the Confirmation Hearing or in the claims resolution process, which may ultimately result in CEL Token being valued at $0.00 or $0.81, or the CEL Token Deposit Claims being subordinated, or such other treatment as may be ordered by the Bankruptcy Court. The Debtors and the Committee believe that the CEL Token Settlement provides a reasonable valuation of CEL Token, eliminates costly and uncertain litigation, and expedites distributions to Account Holders.

### ZZ. ~~YY.~~ What is "substantive consolidation" and what entities have been "substantively consolidated" pursuant to the Plan?

"Substantive consolidation" means that the separate legal status of two or more entities (in this case, CNL, Network LLC, Lending LLC, and Networks Lending LLC) is ignored and they are treated as

---

[497] *See Santos Caceres' Motion for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; if Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief* [Docket No. 2169]; *Sean StJohn's Motion for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; if Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief* [Docket No. 2216].

[498] *See The Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2840].

[499] *See Debtors' Joinder in Support of the Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2846].

one entity so that their assets are combined and creditors' recoveries can be based on those combined assets. Celsius Network Limited (or "CNL," as it is defined and used throughout this Disclosure Statement) and Celsius Network LLC (or "Network LLC," as it is defined and used throughout this Disclosure Statement) have already been "substantively consolidated" for the purposes of the Plan. The Plan also seeks to substantively consolidate Celsius Lending LLC (or "Lending LLC," as defined in this Disclosure Statement) and Celsius Networks Lending LLC (or "Networks Lending LLC," as defined in this Disclosure Statement).[87100]

The Debtors, in consultation with the Committee, believe that the substantive consolidation of CNL, Network LLC, Lending LLC, and Networks Lending LLC is an appropriate means of implementing a Plan that unlocks value and maximizes recoveries for the Account Holders.

As discussed in Article VII.L.3 of this Disclosure Statement, while the Bankruptcy Court held that Account Holders can only assert contractual Claims against Network LLC pursuant to the Terms of Use, the Bankruptcy Court expressly reserved the Account Holders' right to assert non-contractual Claims against the other Debtors, including non-customer facing entities such as CNL.[88101] Following the Customer Claims Ruling, the Debtors established a Supplemental Bar Date for affected Claims, which allowed Account Holders to assert non-contractual Claims, including for fraud and misrepresentation, against CNL.[89102]

The Debtors and the Committee asserted that substantive consolidation is appropriate because creditors dealt with the Debtors as a single economic unit and did not rely on the Debtors' corporate separateness, and because the Debtors' assets and records are so hopelessly entangled that it would be value destructive and unduly time intensive to unscramble their affairs. On the first point, the majority of stakeholders—most importantly, Account Holders—transacted with Celsius as an integrated corporate group and did not rely on CNL and Network LLC operating separately with distinct assets. To the contrary, the Debtors' management, including Mr. Mashinsky, represented to Account Holders that all of the Debtors' assets—not just the assets of Network LLC—would be available to creditors in the event of the Debtors' insolvency. On the second prong, the Debtors did not maintain detailed corporate records that are necessary to account for any separate liabilities or assets of CNL and Network LLC.[90103]

Pursuant to the consolidation as set forth under the Plan, Account Holders will have claims against the assets of the Consolidated Debtors. CNL, Network LLC, Lending LLC, and Networks Lending LLC will be consolidated for purposes including voting, Confirmation, and Plan distributions, and subject to the following: (a) all assets and all liabilities of CNL, Network LLC, Lending LLC, and Networks Lending LLC as consolidated Debtors (the "Consolidated Debtors") shall be treated as though they were merged; (b) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (c) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (d) all Claims between any Consolidated Debtors shall be deemed cancelled; and (e) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the

---

[87100] CNL and Network LLC were substantively consolidated pursuant to the Series B Settlement Order [Docket No. 3074].

[88101] Customer Claims Ruling (as defined herein) at 4, 38.

[89102] *See Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

[90103] *Id.*

Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.  In other words, the assets and liabilities of CNL, Network LLC, Lending LLC, and Networks Lending LLC will be combined; any joint obligations that CNL, Network LLC, Lending LLC, and Networks Lending LLC have will be treated as one obligation and the Claims against such obligations will be treated as a single Claim; any debt that one Consolidated Debtor owes another will be canceled (because they would be considered one and the same entity under substantive consolidation so they would be unable to have Claims against each other); and any creditor Claim filed or scheduled against any one Consolidated Debtor will be treated as a Claim against all Consolidated Debtors.

### AAA. ~~ZZ.~~ How are "Flare Tokens" treated under the Plan?  Will they be distributed to Holders of Earn or Custody Claims based on XRP transferred to the Debtors?

Any Flare Tokens (as defined below) transferred to or held by the Debtors will be transferred to NewCo on the Effective Date.  Holders of Claims will not receive any distributions of Flare Tokens under the Plan.

Pursuant to an agreement entered into between CNL and Flare Network Limited ("Flare" and the "Flare Agreement," respectively), the Debtors are entitled to receive from Flare certain newly minted tokens ("Flare Tokens").   Under the terms of the Flare Agreement, Celsius is entitled to receive a grant of 150 million Flare Tokens as consideration for agreeing to distribute approximately 209 million Flare Tokens to the Celsius Accounts of customers holding XRP tokens on December 12, 2020 (such customers, the "Eligible XRP Customers," and such date, the "Snapshot Date").

On January 24, 2023, the Bankruptcy Court entered the *Order Authorizing the Debtors to Credit Flare Tokens to Eligible Account Holders* [Docket No. 1931] (the "Flare Order"), which authorized the Debtors to credit Flare Tokens to the accounts of the Eligible XRP Customers.   As of the date of Filing of this Disclosure Statement, however, and although the Debtors are in communication with Flare, Flare has not complied with the terms of the Flare Agreement, and the Debtors are therefore unable to credit Eligible XRP Customers' accounts with the portion of Flare Tokens they are eligible to receive.  The Debtors are continuing to work with Flare on resolving this issue and agreeing on a distribution mechanism.

Pursuant to the Flare Order, the Debtors will credit the Flare Tokens to the Accounts of Eligible Customers in a manner consistent with the distribution scheme set forth under the Flare Agreement.  All Flare Tokens credited to Eligible XRP Customers' Accounts will be treated as Earn Assets since the Custody Program did not exist on the Snapshot Date.  As such, all Flare Tokens will be held as the exclusive property of the Debtors, and Eligible Customers will only be entitled to an amended Claim to the extent the amount of the Flare Tokens credited to their Account.  The value of the Flare Tokens will be determined by the market price of Flare Tokens on the date that Flare transfers the Flare Tokens to the Debtors.

### BBB. ~~AAA.~~ What are "EIP Awards" and who is eligible to receive one?  Why do the Debtors believe EIP Awards are necessary?

The Plan includes an "EIP," or "Emergence Incentive Plan," which will provide for the distribution of Cash awards, or "EIP Awards," to certain employees, the "EIP Participants," if the Plan is Confirmed and Consummated.  The Debtors believe that an EIP is necessary to address the Debtors' ongoing issues with employee retention and ensure that the Plan, once Confirmed by the Bankruptcy Court, can be successfully implemented.

Since the Petition Date, the Debtors have lost hundreds of employees.  Moreover, the Debtors' compensation of certain essential members of senior management and key employees is currently at or

below market relative to their peers. Further, the Restructuring Transactions contemplated by the Plan are extraordinarily complex and will require the dedicated efforts of a highly skilled employee base. The Debtors believe that it is in the interest of all stakeholders that the employees who will be tasked with implementing the Plan remain motivated.

The EIP Participants are, collectively: (a) Christopher Ferraro, Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer; (b) Guillermo Bodnar, Chief Technology Officer; (c) Oren Blonstein, Chief Product Officer; (d) Ron Deutsch, General Counsel; (e) Trunshedda Ramos, Chief Human Resources Officer; (f) Adrian Alisie, Chief Compliance Officer; (g) Jenny Fan, Chief Financial Officer of Mining; (h) Dave Albert, Chief Administrative Officer of Mining; and (i) Quinn Lawlor, Chief Strategy Officer of Mining.

The EIP Participants are essential to the successful Consummation of the NewCo Transaction and are responsible for (a) ensuring the safety and security of assets on the Debtors' platform, (b) overseeing the processing of customer withdrawals from the Custody and Withhold Accounts, (c) effectuating the distribution of Liquid Cryptocurrency to creditors in accordance with the Plan, (d) managing operations at Mining, and (e) supervising all human resources, payroll matters, and monthly financial reporting.

The EIP will provide EIP Participants the ability to earn EIP Awards based on their performance relative to certain metrics, as set forth below:

Platform Metrics: Oren Blonstein, Trunshedda Ramos, Guillermo Bodnar, Adrian Alisie, and Ron Deutsch are eligible to earn an EIP Award based on the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

  (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

  (b) threshold performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (30% of the EIP Award):

  (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by ~~Emergence~~the Effective Date; and

  (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup between the date set forth in the applicable agreement and within ~~forty-five~~thirty days ~~of Emergence~~afterthe Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024; and

<u>Mining Metrics</u>: Jenny Fan, Dave Albert, and Quinn Lawlor are eligible to earn an EIP Award based on the following metrics:

- East Stiles Site Metric (25% of EIP Award):

    (a) target performance requires that the East Stiles site is completed and operational by September 30, 2023; and

    (b) threshold performance requires that the East Stiles site is completed and operational between October 1, 2023 and November 30, 2023.

- Effective Date Metric (25% of EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (25% of EIP Award): [94][104]

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing

---

[94][104] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

(b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

- Midland Texas Gross Margin Metric (25% of EIP Award):

  (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 above 25%; and

  (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 between 20% and 25%.

Chris Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

  (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

  (b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (20% of the EIP Award):

  (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by ~~Emergence~~the Effective Date; and

  (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days ~~of Emergence~~after the Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

  (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

  (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

111

- Effective Date Metric (10% of the EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (10% of EIP Award): [105]

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

If an EIP Participant's employment is terminated by the Debtors without "cause," by the EIP Participant for "good reason," or upon death or disability of the EIP Participant, the EIP Participant will be entitled to 100 percent of the EIP Award that would otherwise have been earned based on the percentage of the performance period the EIP Participant was engaged by the Debtors. If an EIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for "cause"), any EIP Award will be forfeited. The maximum aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.

EIP Awards will be made on the Effective Date, and the KEIP Motion will be withdrawn with prejudice.

### CCC. ~~BBB.~~ What is an executory contract or unexpired lease, and what does it mean for the Debtors to "assume," "reject," or "assume and assign" such contracts, and why is this important?

An "executory contract" is a contract that has not been fully completed. In other words, the parties to the contract still owe obligations to one another. One example of an executory contract is an "unexpired lease," or a residential or business lease that has not ended yet because the landlord and the tenant owe each other obligations until the end of the lease term (*e.g.*, the tenant must pay the landlord rent every month, and the landlord must continue to provide for services such as heat, garbage pick up, etc.).

Companies in bankruptcy can "assume" executory contracts, meaning they have the ability to take on the contract and acknowledge that the contract is one to which it intends to remain party. By

---

[105] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

assuming a contract, companies in bankruptcy promise to continue fulfilling their obligations under the contract. They can also "reject" executory contracts, meaning that companies can decide that they do not wish to perform under the contract any longer. For example, if a company in bankruptcy determines that it has a burdensome office lease, the company could reject the lease and stop fulfilling its obligations under the contract. The company's landlord, however, would have an unsecured claim for the damages it suffers as a result of the company's rejection of the contract.

Finally, companies can also "assume and assign" executory contracts, meaning that they can opt to remain party to the contract and can then assign both the benefits and the obligations of the contract to a third party. For example, if a company in bankruptcy were to assume an office lease but did not want to remain a tenant of the office, they could assign that lease to another affiliate of the company, or to a third party seeking to move into that property. Each of these three tools—assumption, rejection, and assumption and assignment—are beneficial for companies in bankruptcy and fulfill the Bankruptcy Code's purpose of helping the debtor with a fresh start.

### DDD.    ~~CCC.~~ Can and will the Debtors assume or reject any executory contracts?

The Debtors are party to numerous Executory Contracts and Unexpired Leases that may be assumed, rejected, or assumed and assigned.

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be considered rejected by the Debtors or Post Effective Date Debtors unless such Executory Contract and Unexpired Lease:  (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan. Entry of the Confirmation Order will be considered an order approving the rejections of Executory Contracts or Unexpired Leases. *See* Article V.A of the Plan.

With respect to (a), the Debtors will list executory contracts they plan to assume (or assume and assign) on the Schedule of Assumed Executory Contracts and Unexpired Leases, and they will list executory contracts they plan to reject on the Schedule of Rejected Executory Contracts and Unexpired Leases. Both the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases will be Filed as part of the Plan Supplement.

In addition, all Institutional Loans, and any agreements, documents, or instruments relating to such Institutional Loans are Executory Contracts that the Debtors will assume and assign to NewCo under the Plan if a NewCo Transaction is consummated. In the event of an Orderly Wind Down, all agreements related to Institutional Loans shall be treated as all other Executory Contracts as provided in Article V.A of the Plan. *See* Articles V.E–V.D. of the Plan

Creditors may hold Claims (*i.e.*, have a right to payment) arising from the Debtors' rejection of Executory Contracts or Unexpired Leases for the outstanding amount owed to the creditor under the contract. In that case, the creditor must file a Proof of Claim within thirty days of rejection with the Solicitation Agent. If a creditor fails to file a Proof of Claim, his or her Claim will forever be barred and the creditor will be unable to collect payment on it.

### EEE.    ~~DDD.~~ What is the deadline to vote on the Plan?

As requested in the Disclosure Statement Motion [Docket No. 2970], the Voting Deadline is expected to be [September ~~18~~20], 2023, at ~~4:00 p.m.~~[4:00] p.m. prevailing Eastern Time.  This date, however, is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Voting Deadline is set by the Bankruptcy Court and prior to distribution of this Disclosure Statement.

### FFF.    ~~EEE.~~ What is the deadline to object to the Confirmation of the Plan?

As requested in the Disclosure Statement Motion [Docket No. 2970], the Plan Objection Deadline is expected to be [September ~~18~~20], 2023, at ~~4:00 p.m.~~[4:00] p.m. prevailing Eastern Time.  This date, however, is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Plan Objection Deadline is set by the Bankruptcy Court and prior to distribution of this Disclosure Statement.

### GGG.    ~~FFF.~~ How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  To be counted as votes to accept or reject the Plan, each Ballot must be properly completed, executed, and delivered in accordance with the instructions provided such that the Ballot is **actually received** by the Debtors' Solicitation Agent **on or before the Voting Deadline,** *i.e.* **[September ~~18~~20], 2023, at [4:00] p.m., prevailing Eastern Time**.[93106]

Holders must vote all of their Claims (other than their Custody Claims, if any) either to accept or reject the Plan and may not split any votes between Classes (other than with respect to a Custody Claim).  Accordingly, a Ballot that partially rejects and partially accepts the Plan (other than with respect to a Custody Claim) will not be counted, including a Ballot that accepts the Plan with respect to one Class and rejects the Plan with respect to another Class.

For example, a Holder with a General Earn Claim and a Withhold Claim must vote both Claims to either accept the Plan or reject the Plan.  In comparison, a Holder with a General Earn Claim and a General Custody Claim may vote each Claim differently—such Holder may vote to accept the Plan with respect to her General Earn Claim and may vote to reject the Plan with respect to her General Custody Claim.

Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures," and Article X of this Disclosure Statement for more information.[94107]

---

[93106] This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Voting Deadline is set by the Bankruptcy Court and prior to the distribution of the final version of this Disclosure Statement.

[94107] The Debtors have also Filed Solicitation and Voting Procedures as Exhibit 1 to the order attached as Exhibit A to the Disclosure Statement Motion [Docket No. 2970].  All exhibits to the Disclosure Statement Motion were also Filed separately at [Docket No. 2971].  Revised Exhibits are Filed concurrently with the Disclosure Statement on August 9, 2023.

---

IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT AT: (855) 423-1530 (TOLL-FREE) OR +1 (949) 669-587 (INTERNATIONAL) OR EMAIL CELSIUSINQUIRIES@STRETTO.COM AND REFERENCE "IN RE CELSIUS - SOLICITATION INQUIRY" IN THE SUBJECT LINE.

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL <u>NOT</u> BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.

---

**HHH.** ~~GGG.~~ **If I vote to accept the Plan, am I voting only for the NewCo Transaction or am I voting for both the NewCo Transaction and the Orderly Wind Down? Can I vote to accept the Plan only with respect to the NewCo Transaction? Can I vote to accept the Plan only with respect to the Orderly Wind Down?**

If you vote to accept the Plan, you are voting to accept *both* the NewCo Transaction and the Orderly Wind Down. To be clear, you cannot vote to accept *only* the NewCo Transaction or *only* the Orderly Wind Down.

The Plan incorporates both the NewCo Transaction and the Orderly Wind Down, and provides the Debtors the option to pursue either of these transactions. The Debtors' goal is to consummate the NewCo Transaction, which the Debtors believe is the most value-maximizing transaction for all stakeholders. If the NewCo Transaction cannot be completed due to complications or delays, however, the Plan gives the Debtors the option to pursue the Orderly Wind Down instead. As explained throughout this Disclosure Statement and in particular in Article III.I, the Orderly Wind Down is a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets. The Debtors may decide to pursue the Orderly Wind Down before or after the Confirmation of the Plan and in consultation with their advisors, the Committee, the Committee's advisors, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, Mr. Herrmann, Mr. Frishberg, Mr. Crews, and Mr. Tuganov. If the Debtors decide to toggle to the Orderly Wind Down, they will File a motion requesting authority to do so and including proposed Wind-Down Procedures, as well as an amended Plan.

As you consider whether to vote to accept the Plan, you should review and evaluate both the NewCo Transaction and the Orderly Wind Down and how they may affect you and your potential recoveries.

**III.** ~~IIII.~~ **When is the Confirmation Hearing set to occur?**

In their revised proposed Disclosure Statement Motion order [Docket No. ~~2970~~[●]], the Debtors requested that the Bankruptcy Court schedule the Confirmation Hearing ~~for September~~on October 2~~9~~, 2023, at 2:00 p.m. prevailing Eastern Time. This date, however, is subject to Bankruptcy Court approval. The Bankruptcy Court must approve the Disclosure Statement Motion for the date of the Confirmation Statement Hearing to be set. The Confirmation Hearing may be adjourned from time to time and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.

**JJJ.** ~~III.~~ **What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is for the Debtors to seek approval of the Plan from the Bankruptcy Court. The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be

ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### KKK. ~~JJJ.~~ I Filed a Proof of Claim.  How will that affect how much I will receive under the Plan and when that distribution will be made to me?

The Bankruptcy Code requires debtors to file a schedule of the company's assets, liabilities, expenses, obligations, and debts owed to creditors and other parties in interest.  The debtor company's record of how much it owes a creditor is known as a "scheduled claim."  Unless they are labeled as "disputed," "contingent," or "unliquidated" on the debtor's schedules, scheduled claims are presumed to be accurate and valid, or "allowed."  This means that creditors whose claims are scheduled can, under a plan of reorganization, receive a distribution on account of that scheduled claim.  Any creditor whose claim is not scheduled or whose claim is scheduled as disputed, contingent, or unliquidated, or who disagrees with the scheduled claim, can file a proof of claim instead.  That filed claim will replace and supersede any scheduled claim.

Filed proofs of claim, however, may not be accurate or valid.  Instead, they have to be reviewed as part of the claims reconciliation process and reconciled against the debtor's records.  If the debtor does not object to the filed proof of claim, the filed proof of claim will be deemed "allowed," or considered valid, and the creditor will be able to receive distributions under the plan.  If the debtor disputes a filed proof of claim by filing an objection with the bankruptcy court, the bankruptcy court has to determine whether to "allow" or "disallow" the filed proof of claim.  A debtor may object to a filed proof of claim on numerous grounds, including the following:

- the filed claim duplicates other claims;

- the claim was filed in the wrong case;

- the claim was not timely filed; and

- the claim amount is incorrect;

For the avoidance of doubt, only "allowed" claims can receive a distribution under a confirmed plan of reorganization.

Accordingly, Filed Claims will have to be reviewed as part of the Debtors' claim reconciliation process.  The claims reconciliation process in these Chapter 11 Cases is already underway, but will likely take significant time to be completed given the volume of Claims that have been Filed.  Further, as of the date of the Filing of this Disclosure Statement, the claims reconciliation process is not expected to be complete by the Effective Date of the Plan.  This means that you will not be eligible to receive a distribution under the Plan until your Filed Claim is reconciled and "allowed."  If your Filed Claim is ultimately "disallowed," you will not receive a distribution on that Filed Claim.  However, if you are an Account Holder with a Filed Claim, and if you do not opt out of the Class Claim Settlement, you will receive the treatment provided under the Class Claim Settlement (described in Article III.~~LL~~MMM of this Disclosure Statement) even though your Filed Claim will be expunged.

**LLL.** ~~KKK.~~ **What do the recent actions by the SEC, FTC, CFTC, and USAO mean and how do they affect my recovery?**  **How do the Debtors propose to treat the Claims of state regulators and how will this proposed treatment affect my recovery?**

From the outset of these Chapter 11 Cases, the Debtors have met frequently with various regulators and other governmental parties, including the USAO on behalf of the United States Department of Justice, the SEC, the CFTC, the FTC, and various state regulators, to address concerns related to the Debtors' prepetition conduct and their future operations.  On July 13, 2023, the Debtors released a statement and press release [Docket No. 3016] explaining that they had entered into a non-prosecution agreement (the "NPA") with the USAO as well as consent orders with the SEC, CFTC, and FTC consensually resolving the agencies' civil claims against them.

On July 11, 2023, the USAO filed a criminal indictment against Mr. Mashinsky and Mr. Cohen-Pavon.  The indictment charges Mr. Mashinsky with securities fraud, commodities fraud, and wire fraud, and asserts that Mr. Mashinsky defrauded and misled customers with respect to Celsius' profitability and how it invested the Cryptocurrency customers transferred to Celsius.  The indictment further charges Mr. Mashinsky and Mr. Cohen-Pavon with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token.  Specifically, the USAO asserts that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices.  Pursuant to the NPA, however, the USAO will not criminally prosecute the Debtors themselves for any involvement in this conduct.

The SEC, CFTC, and FTC also filed civil complaints alleging the following.  The SEC alleges that CNL and Mr. Mashinsky committed fraud and violated federal securities law by failing to register the Earn Program as a securities offering, making false and misleading statements about the Earn Program and the CEL Token, and engaging in market manipulation of the CEL Token.  The CFTC filed a civil complaint against Network LLC and Mr. Mashinsky and alleged that Network LLC's prepetition activities violated the Commodity Exchange Act and the regulations promulgated thereunder.  The FTC alleges that certain of the Debtors and Mr. Mashinsky, Mr. Leon, and Mr. Goldstein (i) violated the Federal Trade Commission Act by making false or misleading representations in connection with the marketing of Celsius' products and services and misappropriating consumers' Cryptocurrency deposits, and (ii) violated the Gramm-Leach-Bliley Act by using false or fraudulent statements to obtain or attempt to obtain certain financial information of customers such as bank account numbers and Cryptocurrency wallet addresses.

Pursuant to the NPA and each settlement with the federal civil regulatory agencies, the Debtors are permanently restrained, enjoined, and prohibited from engaging in conduct that violates federal laws and regulations.  The settlements also provide for a $4.7 billion monetary judgment against the Debtors. *This monetary judgment, however, is suspended and the Debtors will not be required to pay a judgment or have any of their assets seized.  Instead, the settlements allow the Debtors to proceed with making a full distribution of their assets to their creditors pursuant to the Plan.*

 As noted, while the Debtors have entered into an NPA with the USAO and settlements with the federal civil regulatory agencies, the indictment and/or civil complaints against Mr. Mashinsky, Mr. Leon, Mr. Goldstein, and Mr. Cohen-Pavon will proceed.

Since the Filing of the revised Disclosure Statement on July 29, 2023, the Debtors have also been engaging with state regulators regarding a potential settlement of their Claims against the Debtors.  As of the date of the Filing of this Disclosure Statement, the Debtors proposed that the State entities that Filed Claims against the Debtors would effectively have their Claims subordinated to Account Holder Claims (by agreement of the parties or otherwise as ordered by the Court) such that any fine, penalty, or judgment resulting from States' Claims would be suspended and the Debtors could maximize the

117

recoveries of Account Holders.  The Debtors extended this proposal to the NAAG and the states of New Jersey, Texas, Vermont, and Tennessee on or around August 2, 2023 and indicated it would be applicable to all States.  As of the date of the Filing of this Disclosure Statement, those parties are evaluating the proposal and remain in discussions with the Debtors, but no agreement has yet been reached.

A mMore detailed summaryies of the NPA with the USAO and, each of the settlements with the federal civil regulatory agencies is, and the proposed treatment of state Claims, are set forth in Article VII.J.1 of this Disclosure Statement.

**MMM. LLL. What is the Class Claim Settlement, how does it work, and who is affected by it?**

This section describes the details of the Class Claim Settlement and how it may affect you.  For a comprehensive background discussion regarding the negotiation and development of the Class Claim Settlement, including the Class Claim Mediation, please refer to Articles VII.K.4 of this Disclosure Statement as well as the Class Claim Settlement Motion Filed on July 20, 2023 [Docket No. 3064].

In sum, theThe Class Claim Settlement is a compromise negotiated between the Debtors, the Committee, the Retail Borrower Ad Hoc Group, and the Earn Ad Hoc Group, with participation from certain individual creditors.  The settlement provides a comprehensive resolution of the Class Claim as well as the more than 30,000 claims totaling over $78.2 billion that have been Filed against the Debtors that do not elect to opt out of the Class Claim Settlement, many by Account Holders for non-contractual Claims (*e.g.*, Claims based on alleged conduct such as fraud, misrepresentation, and similar actions). The core of

Under the Class Claim Settlement is that, Account Holders who participate (by not opting out, as explained in greater detail below), will receive a 5% increase to their scheduled Claim on account of any non-contractual Claims.  In exchange, participating Account Holders' Filed Proofs of Claim will be superseded, expunged, and extinguished.  In other words, you cannot receive both a 5% increase to your scheduled Claim and retain your Filed Proof of Claim.

The Debtors' and the Committee's joint motion to approve the Class Claim Settlement is scheduled to be heard by the Bankruptcy Court on August 14, 2023.   The Bankruptcy Court must approve the Class Claim Settlement before it can become effective.  If approved, the Class Claim Settlement will be effectuated pursuant to Bankruptcy Rule 9019.  As further explained in the Class Claim Settlement Motion, the Debtors' entry into the Class Claim Settlement is an exercise of their business judgment and represents a fair and equitable compromise that falls well within the range of reasonableness.

As of the date of the Filing of this Disclosure Statement, the Bankruptcy Court is scheduled to hear the Class Claim Settlement Motion on August 10, 2023.

*1. To whom is the Class Claim Settlement being offered?*

The Class Claim Settlement is offered to all Account Holders with Account Holder Claims that are not Custody Claims.  The Settlement is not being offered to Holders of non-Account Holder Claims or Custody Claims, and it is not being offered to Excluded Parties.

*2. How do I participate in the Class Claim Settlement?*

Participation in the Class Claim Settlement is automatic:  Account Holders do ***not*** need to do anything to participate in the Class Claim Settlement.  The Class Claim Settlement is an opt-out settlement, meaning only those Account Holders who ***do not*** wish to participate in the Class Claim

Settlement will need to act.  For the avoidance of doubt, Account Holders who wish to participate in the Class Claim Settlement need ***not*** file any Proof of Claim or make any election on their Ballots.  ~~Further, if~~***If you have an Account Holder Claim that is not a Custody Claim (e.g., a Retail Borrower Deposit Claim, a Convenience Class Claim, a General Earn Claim, or a Withhold Claim), and you do not timely opt out of the Class Claim Settlement before the Voting Deadline, you will be deemed a participant in the Class Claim Settlement regardless of whether you vote to accept the Plan, vote to reject the Plan, or do not vote on the Plan***.

### 3.  How do I opt out of the Class Claim Settlement?

***Account Holders can opt out by checking the box to opt out on the Account Holder Ballot. The opt out process is described in detail in the Solicitation Package.*** Account Holders who wish to opt out should ~~follow~~ing the instructions that will be provided in the Solicitation Package that they will receive once the Bankruptcy Court approves the Disclosure Statement.  As a part of the Solicitation Package, the Debtors will provide all eligible Account Holders with a Notice of Claims Settlement, which will explain the terms of the Settlement, the process of opting-out, and the consequences of not opting out of the Settlement.

***IF YOU WISH TO PURSUE A TIMELY FILED PROOF OF CLAIM AGAINST THE DEBTORS, YOU MUST OPT OUT OF THE CLASS CLAIM SETTLEMENT ON YOUR ACCOUNT HOLDER BALLOT.***

The deadline for opting out will be the conclusion of the time period in which Account Holders can vote to accept or reject the Plan, *i.e.*, the Voting Deadline.

### 4.  What do I receive if I participate in the Class Claim Settlement?

By participating in (*i.e.*, not opting out of) the Class Claim Settlement, your Account Holder Claims as scheduled by the Debtors (other than your Custody Claim) will be increased by 5% and you will receive a corresponding increase in the recovery you receive, depending on the treatment of your specific Account Holder Claims under the Plan.  For example, by participating in the Class Claim Settlement, an Account Holder with a scheduled General Earn Claim of $10,000 will receive the same distribution under the Plan as an Account Holder with a scheduled General Earn Claim of $10,500 who does not participate in the Class Claim Settlement.

Account Holders who participate in the Class Claim Settlement will receive their distribution under the Plan on the Effective Date or as soon as practicable thereafter.  In addition, they will (i) no longer be entitled to the amounts set forth on the Proof of Claim they Filed, if any, which Proof of Claim will be superseded, expunged, and extinguished; (ii) no longer be entitled to prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim; and (iii) will no longer be entitled to receive any other recovery from the Debtors in addition to that provided pursuant to the Class Claim Settlement.

### 5.  How will Account Holder Claims be calculated?

All Account Holder Claims, except for any such Claims associated with CEL Token and any Custody Claims, will be calculated by converting the value of the Claim into Cash as of the Petition Date using the conversion rates provided in the Cryptocurrency Conversion Table [Docket No. 1420].  CEL Token will be valued as provided in Article IV.B.2 of the Plan.

### 6.   *What do I receive if I opt out of the Class Claim Settlement?*

Account Holders who timely opt out of the Class Claim Settlement will retain their rights to pursue their individual Proofs of Claim against the Debtors.  However, their Claims will be treated as Disputed Claims under the Plan and will not receive any distribution on the Effective Date.  In addition, Account Holders who opt out (i) will not receive the 5% increase in their Claim amounts, (ii) will not receive any distribution from the Debtors until their applicable Proofs of Claims are fully and finally resolved in the claims reconciliation process by the Litigation Administrator in the Bankruptcy Court, which likely will be months, or even possibly years, after the Effective Date, and (iii) will have to meet the high bar of proving their allegations and liquidating their damages.

### NNN.   What are the ADR Procedures and how do they work?

The ADR Procedures establish a process that will be implemented post-Effective Date to promote the efficient resolution of certain disputed prepetition Claims against the Debtors' Estates, as well as claims held by the Debtors, including Avoidance Actions, against certain individuals and entities. A copy of the ADR Procedures were Filed on the docket on July 28, 2023 [Docket No. 3115].[108]

### 7.   *Who may participate in the ADR Procedures?*

Any person or entity that has timely Filed a Proof of Claim may be selected by the Litigation Administrator to participate in the ADR process, provided that any "Excluded Claim" (as defined in the ADR Procedures),[109] shall not be eligible to participate.  Although the ADR Procedures encourage voluntary participation by Third Parties, they do not compel parties that have not Filed a Proof of Claim or otherwise subjected themselves to the jurisdiction of the Bankruptcy Court to participate.

### 8.   *How will I receive notice if I am selected to participate in the ADR Procedures?*

The Litigation Administrator will initiate the ADR Procedures by serving upon each selected Participating Claimant, at the address listed on the Participating Claimant's most recently Filed Proof of Claim or amended Proof of Claim or, if no such address is available, the email address of such Participating Claimant, if applicable, as well as upon any counsel of record, notice of the ADR Procedures and their selection as a Participating Claimant, together with a copy of the ADR Procedures and a Valuation Form.

### 9.   *Can I opt out of the ADR Procedures?*

Yes.  If a Participating Claimant does not believe the ADR Procedures are reasonably likely to result in the resolution of its Claim, they may choose to opt out within twenty-one (21) days of service of the ADR Initiation Package.  The Litigation Administrator, however, may file a motion with the Bankruptcy Court seeking an order from the Bankruptcy Court requesting that such Participating Claimant adhere to the ADR Procedures.  For the avoidance of doubt, if within twenty-one (21) days of

---

[108]   Capitalized terms used but not otherwise defined in this "Question and Answer" shall have the meanings ascribed to them in the ADR Procedures.

[109]   An "Excluded Claim" is defined in the ADR Procedures to mean "(a) claims for which the automatic stay under section 362 of the Bankruptcy Code was modified by prior order of the Bankruptcy Court to allow for litigation of the claim to proceed in another forum, (b) tax claims, (c) claims where there is a judgment entered or settlement already agreed to and signed by all applicable parties, including the Class Claim Settlement, (d) any declaratory judgment actions or any other actions regarding insurance coverage issues; (e) any Avoidance Action claims against ADR-Ineligible Potential Defendants; and (f) claims subject to a separate order of the Bankruptcy Court providing for arbitration or mediation.

service of the ADR Initiation Package, a Participating Claimant serves a written request for exclusion from the ADR Procedures, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.

*10. How long will the ADR Procedures take?*

The ADR Procedures consist of five sequential steps:  (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure.  While there is no guarantee, the Initial Assessment Procedure may take sixty (60) to seventy-five (75) days, subject to any written agreement to extend certain deadlines.  It may be much shorter if an agreement is reached without mediation.  All deadlines established by the ADR Procedures may be extended by written agreement of the Litigation Administrator and the applicable Participating Claimant.

*11. Are all five steps of the ADR Procedures required?*

No.  The ADR Procedures are intended to facilitate an efficient exchange of information to reach a resolution that will be binding on the parties and to save estate resources.  To the extent the informal Settlement Offer Exchange process does not yield a result, and the parties wish to continue in the ADR process, the ADR Procedures provide a clear path to resolution vis-à-vis mediation, and optional binding arbitration which is most likely quicker and more cost effective than proceeding before the Bankruptcy Court.

*12. Do I need an attorney to participate in the ADR Procedures?*

No, but you should consider seeking representation if you are selected to participate in the ADR Procedures.

*13. Will I have to pay anything to participate in the ADR Procedures?*

If you are a Participating Claimant in the ADR process, and engage in the mediation process, each party shall be responsible for fifty percent (50%) of the costs for the mediator, provided that if there are more than two parties involved in the mediation, each party shall be liable for their equal share of the costs.  The Committee is working with counsel to the Ad Hoc Group of Withhold Account Holders to determine a list of preapproved mediators with an eye towards experience and cost.

*14. What happens if I fail to comply with the ADR Procedures?*

If a Participating Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the Litigation Administrator may go to the Bankruptcy Court and seek appropriate relief.  Everyone will be provided with a hearing.  This is not meant to be a way to default Claimants or otherwise deny them their day in court.

*15. What if I have an objection to the terms of the ADR Procedures?*

To the extent any parties object to the terms of the ADR Procedures those objections may be raised at the Confirmation hearing, if not resolved before then.

**OOO.   How will the Debtors' books and records be preserved?**

Once the Plan enters into force on the Effective Date, the Debtors' books and records will be transferred to the Post Effective Date Debtors, which shall preserve all books, records, electronically

stored information, and other documents that are currently in the Debtors' possession. The Post-Effective Date Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, and other documents without (i) providing advance notice to the SEC (c/o Therese A. Scheuer, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549, scheuert@sec.gov) and (ii) the permission of the Litigation Administrator(s) or authorization from the Bankruptcy Court.

The Debtors, the Post-Effective Date Debtors, and any transferee or custodian of the Debtors will preserve and maintain any documents associated with the federal securities class action litigation captioned *Goines v. Celsius Network, LLC, et. al.*, Case No. 2:22-CV-04560-KM-ESK (D.N.J. 2022) until the entry of a Final Order of judgment or settlement with respect to all defendants now or hereafter named in the Securities Litigation. These documents will be preserved and maintained as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil procedure, and will not be destroyed, abandoned, transferred or otherwise rendered unavailable. For the avoidance of doubt, the injunction set forth in Article VIII.F of the Plan shall not affect in any manner any rights of the lead plaintiff and the class in the Securities Litigation to seek and obtain Securities Litigation Documents through discovery in the Securities Litigation.

**PPP.** ~~MMM.~~ **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement of the Plan, please contact the Solicitation Agent via one of the following methods:

By electronic mail at:
celsiusinquiries@stretto.com with a reference to "In re Celsius – Solicitation Inquiry" in the subject line.

By telephone at:
(855) 423-1530 (Toll-Free) or (949) 669-5873 (International)

You may also contact the Debtors at CelsiusCreditorQuestions@kirkland.com.

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/Celsius (free of charge) or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/ecf-and-pacer-information (for a fee). PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

## IV.   THE DEBTORS' PLAN OF REORGANIZATION.

This section provides a summary of the structure and means for implementation of the Plan and the documents referred to therein and is qualified in its entirety by reference to the Plan. Such summaries do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

In general, the Plan is divided into several key sections, all of which may be reviewed in detail in the Plan attached hereto as **Exhibit A**.

| Article | Summary |
|---------|---------|
| I.A | This section contains the definitions of various capitalized terms that are used throughout the Plan. The defined terms are an essential part of the Plan. Creditors should cross-reference capitalized terms used in the Plan to the definitions provided in this section to understand what is being described throughout the Plan. |
| III.B | This section describes the treatment to be given to Holders of Claims against the Debtors and Interests in the Debtors.  Claims and Interests are separated into different Classes and provided treatment based on their relative legal rights against the Debtors. Article III sets forth the distributions that the Debtors are proposing to provide to their various stakeholders, including account holders. <br><br> The projected recoveries to Holders of Claims and Interests under the Plan are set forth in Article III.E of this Disclosure Statement. |
| IV | This section describes various provisions for implementing the Plan, including the NewCo Transaction, the substantive consolidation of CNL, Network LLC, Lending LLC, and Networks Lending LLC, the creation of the Litigation Administrator and Litigation Oversight Committee, and the various settlements proposed to be implemented under the Plan. <br><br> Article IV of the Plan is restated below. |
| V | This section describes the process by which the Debtors may reject, assume, and assume and assign executory contracts and unexpired leases. |
| VI | This section has certain provisions regarding distributions to be made under the Plan. <br><br> A description of how Holders of Allowed Claims will receive distributions under the Plan, to the extent such Holders are entitled to receive any under the Plan, is set forth in Article III.Q of this Disclosure Statement. |
| VII | This section contains the procedures for the allowance of claims and resolving, among other things, Disputed Claims. |
| VIII | This section has certain release, exculpation, and injunction provisions. <br><br> These provisions of the Plan are restated in [Article III.LL and Article III.OO] of this Disclosure Statement. |
| IX | This section has certain conditions that must be satisfied before the Plan can become effective and distributions can be made. <br><br> An explanation of "Confirmation," "Effective Date," and "Consummation" is set forth in Article [III.O] of this Disclosure Statement. |

### A.    Means for Implementation of the Plan.

#### 1.    Substantive Consolidation.

The substantive consolidation of the Initial Consolidated Debtors (*i.e.*, ~~CNL and~~Celsius Network Limited and Celsius Network LLC) for purposes of their Plans has been approved as set forth in the Series B Settlement Order and ~~the~~this Plan.   The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate Celsius Lending LLC and Celsius Networks Lending LLC with the Initial Consolidated Debtors on the same terms, effective as of the Effective Date.

Except as otherwise provided therein, the Consolidated Debtors (*i.e.*, the Initial Consolidated Debtors plus Celsius Lending LLC and Celsius Networks Lending LLC) are substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, and subject to the following sentence:  (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.   The substantive consolidation and deemed merger effected pursuant to the Plan shall not affect (other than for purposes of the Plan as set forth in Article IV.A.1 thereof) (x) the legal and organizational structure of the Consolidated Debtors, except as provided in the Transaction Steps Memorandum, including, for the avoidance of doubt, the legal existence of any Claim of one Consolidated Debtor against another Consolidated Debtor; (y) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; *provided* that any Claim that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of the Consolidated Debtors; or (z) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts.

#### 2.    Plan Settlement Provisions Regarding Claims and Interests.

##### (a)    General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.   Subject to Article VI~~V of the Plan~~thereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)    CEL Token Settlement.

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in Article IV.B.2 of the Plan and in this Article IV.A.2.(b) of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to the Earn Program or otherwise giving rise to General Earn Claims with respect to the CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in Article III.B.1 6 7 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.2 0 5/CEL Token (*i.e.*, 1 CEL Token equals a $0.2 0 5 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed, or as otherwise determined by the Bankruptcy Court.

- All Claims on account of CEL Token held by UCC Claims Stipulation Defendants or otherwise identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.1 5 6 or Article III.B.1 6 7 of the Plan, as applicable.

In the event that the Bankruptcy Court does not approve the CEL Token Settlement, CEL Token Deposit Claims shall either be treated as Section 510(b) Claims or receive such other treatment as the Bankruptcy Court orders.  For the avoidance of doubt, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims will be classified as Class 15 Section 510(b) Claims and treated as provided in Article III.B.1 5 6 of the Plan, meaning that they will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

An explanation of the CEL Token Settlement is set forth in Article III. XX YY of this Disclosure Statement.

(c)    Account Holder Avoidance Action Settlement.

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in Article IV.B.3 of the Plan and in this Disclosure Statement, the Plan shall effectuate the Account Holder Avoidance Action Settlement.  Pursuant to the Account Holder Avoidance Action Settlement, the Debtor Release contained in Article VIII.C of the Plan shall also release Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure under $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan.

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure of more than $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan.

For the avoidance of doubt:  (a) all Avoidance Actions against ADR-Ineligible Potential Defendants and Excluded Parties are not included in the Account Holder Avoidance Action Settlement and expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims shall be released if such Account Holder with a *De Minimis* Claim otherwise complies with the requirements set forth above other than voting in favor of the Plan (as such Account Holders are not entitled to vote), and (c) as a result of the Account Holder Avoidance Action Release, any Custody Settlement Participant with Withdrawal Preference Exposure under $100,000 shall receive a 100% recovery on their Allowed General Custody Claim.

~~Each Account Holder's Withdrawal Preference Exposure shall be set forth in the customized Ballot distributed to each Account Holder.~~

For the avoidance of doubt, the rights of Account Holders to receive a distribution under the Plan on account of their Claims are not released pursuant to the Account Holder Avoidance Action Settlement.  Notwithstanding anything to the contrary in the Plan, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

Each Account Holder's Withdrawal Preference Exposure shall be set forth in the customized Ballot distributed to each Account Holder.

An explanation of the Account Holder Avoidance Action Settlement is set forth in Article III.PP of this Disclosure Statement.

(d)     <u>Custody Settlement.</u>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Custody Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Custody Settlement as set forth in the Custody Settlement Order.

An explanation of the Custody Settlement is set forth in Article III.TT of this Disclosure Statement.

(e)     <u>Withhold Settlement.</u>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises

described in the Withhold Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Withhold Settlement.

An explanation of the Withhold Settlement is set forth in Article III.UU of this Disclosure Statement.

<p style="text-align:center">(f)    <u>Series B Settlement.</u></p>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Series B Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Series B Settlement in accordance with the Series B Settlement Agreement.

An explanation of the Series B Settlement is set forth in Article III.VV of this Disclosure Statement.

<p style="text-align:center">(g)    <u>Retail Borrower Settlement.</u></p>

As part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise of the adversary proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors described in this Disclosure Statement, the Plan shall effectuate the Retail Borrower Settlement. Pursuant to the Retail Borrower Settlement, (a) Holders of Retail Borrower Deposit Claims have the option to repay their Retail Borrower Advance Obligations in exchange for an equivalent amount of Liquid Cryptocurrency, which the applicable Retail Borrower may specify to receive in either BTC or ETH, (b) any obligation of the Retail Borrowers to pay any interest on account of Retail Advance Obligations for the duration of these Chapter 11 Cases is waived, and (c) Liquid Cryptocurrency Weighted Distribution Elections on account of Retail Borrower Post-Set Off Claims shall be given priority over all other Liquid Cryptocurrency Weighted Distribution Elections. The adversary proceedings brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors and the Pending Withdrawal Adversary Proceeding shall be dismissed with prejudice pursuant to the Confirmation Order upon the Effective Date.

To the extent the Retail Borrower Ad Hoc Group, the Debtors, or the Committee identify a source of third-party financing reasonably acceptable to the Debtors, the Debtors shall take commercially reasonable efforts to facilitate such party in refinancing applicable Retail Advance Obligations with the consideration provided to Retail Borrowers under the Plan.

An explanation of the Retail Borrower Settlement is set forth in Article II.A.2 and Article III.WW of this Disclosure Statement.

<p style="text-align:center">(h)    <u>Class Claim Settlement.</u></p>

As part of the general settlement described in  Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise described in the Class Claim Settlement Motion and in this Disclosure Statement, the Plan shall effectuate the Class Claim Settlement. ~~Pursuant to~~Except as otherwise provided in the Order approving the Class Claim Settlement, under the Class Claim Settlement, if a Holder does not opt-out of the Class Claim Settlement, such Holder's Account Holder Claims, other than Custody Claims, shall receive, in lieu of any scheduled Claim or Filed Proof of Claim, an Allowed Claim in an amount that is 105% of the scheduled amount of such Claim, in each case of the same Class as the originally scheduled Claim.  Proofs of Claim filed by Class Claim Settlement Participants (*i.e.*, Holders of Account Holder

<p style="text-align:center">127</p>

Claims (other than Account Holders who only hold Custody Claims) that do not opt out of Class Claim Settlement) shall be expunged from the Claims Register and shall be of no further force and effect.

An explanation of the Class Claim Settlement is set forth in Article III.~~LLL~~MMM and Article VII.K.4 of this Disclosure Statement.

> ### 3. *Restructuring Transactions.*

The Plan may be effectuated through either the NewCo Transaction or, if applicable in accordance with Article IV.E of the Plan, the Orderly Wind Down. In the event that the Plan is effectuated through the NewCo Transaction, Article IV.D of the Plan shall govern and Article IV.E of the Plan shall be disregarded unless specifically provided therein. Conversely, in the event that the Plan is effectuated through the Orderly Wind Down, Article IV.E of the Plan shall govern, and Article IV.D of the Plan shall be disregarded unless specifically provided therein. All other subsections of Article IV of the Plan shall apply regardless of whether the Orderly Wind Down or the NewCo Transaction is effectuated.

On or before the Effective Date, the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable, shall take any action as may be necessary or appropriate to effect the NewCo Transaction or Orderly Wind Down, as applicable, including those steps set forth in the Transaction Steps Memorandum. The actions to implement the NewCo Transaction or Orderly Wind Down may include, in addition to those steps set forth in the Transaction Steps Memorandum: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and Filing, if applicable, of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (4) the issuance, transfer, or distribution of NewCo Common Stock; (5) to the extent applicable, the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of NewCo and/or its subsidiaries (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (6) all transactions necessary to provide for the transfer of some or all of the assets or Interests of any of the Debtors to NewCo and/or one or more of its subsidiaries, which transfer may be structured as a taxable transaction for United States federal income tax purposes; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents and take any other actions as the Debtors reasonably determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the NewCo Transaction or the Orderly Wind Down, as applicable.

(a)    <u>NewCo Restructuring Transactions.</u>

(i)    **Transfer of Assets to NewCo and Vesting of Assets in the Post-Effective Date Debtors.**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, pursuant to sections 363, 1123(a)(5), and 1141(c) of the Bankruptcy Code: (1) all NewCo Assets shall be transferred to and vest in NewCo and/or its subsidiaries free and clear of all Liens, Claims, Interests, charges, or other encumbrances, and (2) all other property in each Debtor's Estate, all Causes of Action (including all Recovery Causes of Action) that are not released, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Post-Effective Date Debtor, free and clear of all Liens, Claims, Interests, charges, or other encumbrances. For the avoidance of doubt, (i) NewCo shall not assume, be deemed to have assumed, or be liable for any liabilities of any of the Debtors except as, and solely to the extent, expressly set forth herein; (ii) the NewCo Transactions are not, and shall not be deemed to be, a *de facto* merger of any of the Debtors and NewCo, or any Affiliates of the foregoing; (iii) NewCo is not, and shall not be deemed to be, a continuation of any of the Debtors, any Affiliates thereof, or any of their respective businesses or operations; and (iv) the NewCo Transactions have been entered into in good faith and not for any fraudulent purpose or to escape any liabilities of the Debtors. On and after the Effective Date, except as otherwise provided herein, NewCo and/or its subsidiaries and each Post-Effective Date Debtor (or the Plan Administrator or applicable Litigation Administrator) may operate its business in accordance with applicable Law and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(ii)    **Post-Effective Date Debtors.**

One or more of the Debtors shall continue in existence after the Effective Date, each as a Post-Effective Date Debtor, for purposes of (1) preserving the Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors after the Effective Date and after consummation of the NewCo Transaction, (3) performing their obligations under any transition services agreement entered into by and between the Post-Effective Date Debtors and NewCo and/or its subsidiaries, (4) resolving any Disputed Claims, (5) paying Allowed Claims for which there is not a Distribution Agent other than the Post-Effective Date Debtors, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Post-Effective Date Debtors or the Litigation Administrator(s) to file motions or substitutions of parties or counsel in each such matter.

Except as otherwise provided in the Plan or the Plan Supplement (including the Transaction Steps Memorandum), or any agreement, instrument, or other document incorporated therein, each Post-Effective Date Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(iii)    **Sources of Consideration for Plan Distributions.**

The Debtors and the Post-Effective Date Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand as of the Effective Date, including from the Plan Sponsor Contribution and net proceeds from the sale of GK8; (2) Liquid Cryptocurrency (in the Liquid Cryptocurrency Distribution Amount); (3) NewCo Common Stock; and (4) Litigation Proceeds.

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

After the Effective Date, the Post-Effective Date Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable NewCo and/or its subsidiaries and the Post-Effective Date Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan.

(iv)    **Distribution Mechanics.**

The Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.

Unless otherwise specified in the Plan Supplement, until the Deactivation Date, all distributions to Custody Claim Holders, Withhold Claim Holders, or Account Holders to whom no other Distribution Agent is eligible to make distributions shall be made by the Debtors or the Post-Effective Date Debtors, as applicable. On the Deactivation Date, the Celsius platform will cease to exist and Account Holders will no longer be able to log-in to the Celsius platform and/or access their Celsius Account, including for purposes of distributions.

~~Until~~After the Deactivation Date ~~(i.e., 90 days after the Effective Date), all distributions to Custody Claim Holders, Withhold Claim Holders, and PayPal Crypto Restricted Account Holders shall be made by the Debtors or the Post-Effective Date Debtors, as applicable, or another Distribution Agent identified by the Debtors. Distributions to all other Account Holders shall be made by PayPal,~~ the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors. Such distributions may be in Liquid Cryptocurrency or fiat currency, but in no circumstances will any Distribution Agent make distributions in Cryptocurrency other than Liquid Cryptocurrency. Any post-Deactivation Date distributions to Holders of Allowed Custody Claims or Withhold Claims that did not retrieve their Plan distributions from the Celsius platform by the Deactivation Date shall be valued in accordance with the Deactivation Date Cryptocurrency Conversion Table.

~~After the Deactivation Date, distributions to Custody Claim Holders, Withhold Claim Holders, and PayPal Crypto Restricted Account Holders shall be made by PayPal. PayPal is subject to Cryptocurrency trading regulatory limitations in the PayPal Restricted Jurisdictions. In such jurisdictions, PayPal may not be able to distribute Cryptocurrency to Account Holders, or the Cryptocurrency distributed may be subject to secondary transfer restrictions. Accordingly, any distributions made by PayPal to PayPal Crypto Restricted Account Holders may be processed in fiat in PayPal's discretion. For the avoidance of doubt, to the extent reasonably practicable, Custody Claim Holders, Withhold Claim Holders, and PayPal Crypto Restricted Account Holders will be offered the option to receive distributions in Liquid Cryptocurrency from PayPal following the Deactivation Date. Any such distributions shall be valued in accordance with the Deactivation Date Conversion Table. In no circumstances will PayPal make distributions in Cryptocurrency other than Liquid Cryptocurrency.~~

To be eligible to receive a distribution under this Plan, Account Holders must update the AML/KYC Compliance Information for their Celsius Account and~~/or register with PayPal, including~~ may be required to register or complete additional onboarding with a Distribution Agent, which may require providing any requested AML/KYC Compliance Information.

(v)    **NewCo Common Stock.**

On the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Transaction Steps Memorandum, NewCo shall issue the NewCo Common Stock. The Confirmation Order shall authorize the issuance of NewCo Common Stock in one or more issuances without the need for any further corporate action, and the Debtors or NewCo, as applicable, shall be authorized to take any action necessary or appropriate in furtherance thereof. On the Effective Date or as soon as reasonably practicable thereafter, the applicable Holders of Claims shall receive NewCo Common Stock in

131

satisfaction of such Holders' Allowed Claims pursuant to Article III.B of the Plan.  The Confirmation Order shall further authorize the New Board, in its sole discretion, to issue the Employee and Board Equity Compensation.

Entry of the Confirmation Order shall authorize the clearance and trading of the NewCo Common Stock, subject to resale restrictions applicable to "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, on or as promptly as practicable after the Effective Date, and NewCo shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such NewCo Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of NewCo in all respects, without the need for any further corporate action.  The Debtors or Post-Effective Date Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.

All of the NewCo Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Further, except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution, all NewCo Common Stock will be issued in reliance upon section 1145 of the Bankruptcy Code.  The issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.

The distribution and issuance of the NewCo Common Stock under the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance.  Any Person's or Entity's acceptance of NewCo Common Stock shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Person or Entity will be bound thereby in all respects.

<div align="center">(vi)        <b>Exemption from Registration Requirements.</b></div>

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act.  Except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution, the NewCo Common Stock will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.

Securities issued in reliance upon section 1145 of the Bankruptcy Code to an entity that is not an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable under U.S. federal securities laws by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of NewCo or the Post Effective Date Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, (iii) has not acquired such securities from an "affiliate" within one year of such transfer and (iv) is not an entity that is an "underwriter," as defined under section 1145(b) of the Bankruptcy Code.

The issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder. Such NewCo Common Stock will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Debtors recommend that potential recipients of NewCo Common Stock consult their own counsel: (i) with respect to the NewCo Common Stock issued under the Plan, concerning whether such potential recipients will constitute "underwriters" pursuant to section 1145(b) of the Bankruptcy Code at the time of the issuance of the NewCo Common Stock; and (ii) the ability of such potential recipients to freely trade NewCo Common Stock in compliance with the federal securities laws and any applicable Blue Sky laws, including certain Blue Sky state notice requirements that may continue to apply with respect to resales of the NewCo Common Stock. The Debtors make no representation concerning the ability of a person to dispose of any NewCo Common Stock.

The Post-Effective Date Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including The Depository Trust Company and any transfer agent for the NewCo Common Stock) with respect to the treatment of the NewCo Common Stock to be issued under the Plan under applicable securities laws. The Depository Trust Company and any transfer agent for the NewCo Common Stock shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock is exempt from registration and/or eligible for The Depository Trust Company book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, (i) any partner of NewCo or the Plan Sponsor, (ii) The Depository Trust Company, and (iii) any transfer agent for the NewCo Common Stock) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock is exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services.

A description of "Certain Securities Law Matters" is set forth in Article XI of this Disclosure Statement.

(vii)    **Directors and Officers.**

On the Effective Date, the terms of the current members of the CNL Board shall expire. For the avoidance of any doubt, no current director of the Debtors will remain a director or have any control over NewCo, the Debtors, or the Post-Effective Date Debtors unless explicitly provided herein or in the Plan Supplement. The New Board of NewCo will consist of those directors identified in the Plan Supplement. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose the identity and affiliations of any Person proposed to serve on the New Board in the Plan Supplement. The New Board shall initially consist of seven members: (i) two of whom will be appointed by the Plan Sponsor; (ii) three of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange. For the

avoidance of doubt, the composition of the New Board shall comply with any applicable listing standards and rules of any applicable exchanges on which the NewCo Common Stock is or will be listed.

Members of the New Board (other than the designees of the Plan Sponsor) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member may be reelected at the end of their term; *provided* that for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect two members of the New Board.

After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

The Post-Effective Date Debtors shall be governed by the Plan Administrator in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Post-Effective Date Debtors shall be deemed to be terminated and such individuals shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole director and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors as further described in the Plan Administrator Agreement. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

(viii)    **Income Tax Matters.**

For U.S. federal and applicable state and local income tax purposes the Debtors and Holders of Claims will treat and report the return of Liquid Cryptocurrency to Holders of Claims under the Plan, to the extent such amounts are of the same type of Cryptocurrency in which a Holder's Claim was denominated, as a non-taxable transaction to such Holder, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Code.

A description of "Certain U.S. Federal Income Tax Consequences of the Plan" is set forth in Article XII of this Disclosure Statement.

4.    *Orderly Wind Down.*

Subject to Bankruptcy Court approval, the Debtors will effectuate an Orderly Wind Down if, at any time prior to or after the confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction. In the event the Debtors pursue an Orderly Wind Down, distributions under the Plan shall be funded from the Wind-Down Assets.

For more information on the Orderly Wind Down, please review Article III.I of this Disclosure Statement.

(a)    <u>Orderly Wind-Down Toggle.</u>

To toggle to an Orderly Wind Down, the Debtors (i) shall provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (ii) shall consult with the Earn Ad Hoc

Group, Retail Borrower Ad Hoc Group, Mr. Herrmann, Mr. Frishberg, Mr. Crews, and Mr. Tuganov regarding the decision to toggle, (iii) shall inform the U.S. Trustee of their intent to file the Wind-Down Motion, (iv) shall File the Wind-Down Motion, which shall include the Wind-Down Procedures, and (v) may File an amended Plan conformed to include the changes described in the table below.  Parties in interest shall have no fewer than ten (10) days to object to the Wind-Down Motion.  In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.

| Orderly Wind-Down Plan Changes | |
| --- | --- |
| **Provision/Concept** | **Change** |
| NewCo | Concept eliminated, replaced in certain places with "Post-Effective Date Debtors" and "Plan Administrator," as further described herein and as applicable.  Related concepts, such as "NewCo Capitalization Amount" will similarly be eliminated. |
| Plan Sponsor Contribution | Concept eliminated.  Related concepts, such as "Management Compensation" (and its component concepts) will similarly be eliminated. |
| NewCo Common Stock | Concept eliminated, replaced with "Backup MiningCo Common Stock" and "Illiquid Recovery Rights," as applicable. |
| Unsecured Claim Distribution Mix Elections | Concept eliminated, all Holders of ~~General Earn~~ Claims to receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections. |
| Wind-Down Procedures | Concept to become operative.  As provided herein, the Debtors shall File the Wind-Down Procedures within fourteen (14) days of the decision to implement an Orderly Wind Down, in connection with the Wind-Down Motion.  Such procedures shall provide additional details regarding the Wind-Down Assets, the Wind-Down Budget, and any revisions to the Wind-Down Procedures and shall be subject to approval by the Bankruptcy Court in connection with Wind-Down Motion.  Related concepts shall similarly become operative. |
| Backup Plan Sponsor & Backup Plan Sponsor Transaction | Concept becomes operative, subject to a market test of the fees contained in the Backup Plan Administrator Term Sheet; *provided* that (i) Liquid Cryptocurrency, (ii) ~~the equity of~~Backup MiningCo Common Stock, (iii) Illiquid Recovery Rights, and (iv) Litigation Proceeds shall be distributed according to this Plan, as revised to reflect the toggle to the Orderly Wind Down. |
| Proof Group IP License | Concept eliminated.  Related consideration, such as any Proof Group customers to be transferred to NewCo, shall revert to Proof Group. |
| US Bitcoin Agreements | Concept eliminated, unless US Bitcoin is selected as the Mining manager in connection with the Orderly Wind Down. |

| Orderly Wind-Down Plan Changes | |
|---|---|
| Provision/Concept | Change |
| Institutional Loan Agreements | Concept in Article V.D of the Plan eliminated. All agreements related to Institutional Loans shall be treated as all other Executory Contracts as provided in Article V.A of the Plan. |
| Article IV.D of the Plan (NewCo Restructuring Transactions) | Concept eliminated. Article IV.E of the Plan (Orderly Wind Down) to become operative instead. |

In the event that the Debtors elect to toggle to the Orderly Wind Down, the Debtors shall appoint a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet.

The Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Orderly Wind Down pursuant to the Wind Down Procedures and the Plan (conformed as described above).

> 5.  *Plan Administrator.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, a Plan Administrator will be appointed to administer the Post-Effective Date Debtors' estates in accordance with the Plan Administrator Agreement. For the avoidance of doubt, unless otherwise specified, Causes of Action shall remain with the Post-Effective Date Debtors and shall not be NewCo Assets.

The Plan Administrator shall be selected by the Debtors, in consultation with the Committee, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

The Plan Administrator shall administer the distributions of the Orderly Wind Down, if applicable. Except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Wind Down Procedures, if applicable, on and after the Effective Date, the Post Effective Date Debtors may operate their businesses (to the extent permitted under applicable Law) and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than the Recovery Causes of Action) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtors in the Plan Administrator Agreement shall be terminated.

The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

(b)    <u>Responsibilities of Plan Administrator.</u>

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include:

- administering the Special Committee D&O Liability Insurance Policies;

- implementing the Orderly Wind Down, as applicable, and making (or arranging for a Distribution Agent to make) the distributions contemplated by the Plan;

- to the extent not duplicative with the responsibilities of any Litigation Administrator, marshalling, marketing for sale, and winding down of the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

- to the extent not duplicative with the responsibilities of any Litigation Administrator, recovering and compelling turnover of the Debtors' property in accordance with the Plan;

- managing the Plan Administrator Budget or Wind-Down Budget, as applicable, and paying the Wind-Down Expenses, if any;

- abandoning any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

- preparing and Filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

- filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

- retaining such professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and

- taking such actions as are necessary and reasonable to carry out the purposes of the Plan or Wind-Down Procedures, as applicable, including winding down the Debtors' business affairs.

(c)    <u>Expenses of Plan Administrator.</u>

All costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, on or after the Effective Date, or in any manner connected, incidental, or related thereto, shall be paid by the Post-Effective Date Debtors as they are incurred without the need for Bankruptcy Court approval. In

the event of an Orderly Wind Down, the Wind-Down Expenses shall be paid from the Wind-Down Assets.

(d)    Fiduciary Duties of Plan Administrator.

Pursuant to the Plan and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.  The Plan Administrator shall be appointed and act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or officers of the Debtors shall be terminated and such individuals shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers.   From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors.  The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former employee, manager, or officer, including pursuant to any transition services agreement entered into by the Post-Effective Date Debtors in connection with the Employee Transition Services Agreement.

(e)    Wind-Down.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Post Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby; (2) take any actions necessary to wind down the Post Effective Date Debtors' Estates; provided that the Post Effective Date Debtors shall not be dissolved until all Causes of Action included in the Schedule of Retained Causes of Action are prosecuted and the conditions precedent to such dissolution in Article IV.F.6 of the Plan are satisfied; and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. From and after the Effective Date, except as set forth herein, the Post Effective Date Debtors for all purposes (x) shall be deemed to have withdrawn their business operations from any state in which the Post Effective Date Debtors were previously conducting, or are registered or licensed to conduct, their business operations, (y) shall not be required to File any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The Filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

(f)    No Liability of the Post-Effective Date Debtors.

On and after the Effective Date, the Post-Effective Date Debtors shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement.

138

All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

(g)    Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Effective Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Post Effective Date Debtors' Chapter 11 Cases, and the conclusion of all litigation being pursued by the Litigation Administrator(s), the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Post Effective Date Debtors is formed or any other jurisdiction.  The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

For the avoidance of doubt, notwithstanding the Post-Effective Date Debtors' dissolution on or after the Effective Date, the Post-Effective Date Debtors shall be deemed to remain intact solely with respect to the preparation, Filing, review, and resolution of applications for Professional Fee Claims.

To the extent the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator(s), such Cash or other property shall be distributed Pro Rata to the Holders of NewCo Common Stock or Illiquid Recovery Rights, as applicable, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; provided that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated.

6.    *Litigation Administrator, Litigation Oversight Committee, and Contributed Claims.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, one or more Litigation Administrators will be appointed to prosecute, settle, or otherwise resolve any remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to the Plan), the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the benefit of Holders of General Earn Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures. Notwithstanding anything to the contrary in the Plan or the Plan Supplement, the Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan shall remain with the Post-Effective Date Debtors, shall not be NewCo Assets, and shall be controlled by the applicable Litigation Administrator(s). For the avoidance of doubt, the Litigation Administrator shall also serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to all retained Causes of Action related to Disputed Claims or Disputed Interests.

(a)    Litigation Administrator(s).

The Litigation Administrator(s) shall be selected by the Committee, and shall be identified in the Plan Supplement.  The appointment of the Litigation Administrator(s) shall be approved in the Confirmation Order, and the Litigation Administrator's duties shall commence as of the Effective Date. The Litigation Administrator(s) shall prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to the Plan), the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans.  The Litigation Administrator shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates related to Disputed Claims or Disputed Interests that are not released, waived, settled, compromised, or transferred pursuant to the Plan (including, for the avoidance of doubt, the Recovery Causes of Action and Claims objections). Notwithstanding anything to the contrary in the Plan, the Committee may elect to identify separate Litigation Administrators to manage Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder.  Solely by way of example, the Committee may identify (x) a Litigation Administrator to manage Account Holder Avoidance Actions for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder and (y) a Litigation Administrator to manage all Recovery Causes of Action, other than Account Holder Avoidance Actions, for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder.  The identity of any Litigation Administrator, including

the Recovery Causes of Action that any such Litigation Administrator shall manage for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, shall be disclosed in the Plan Supplement.

In accordance with the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall serve in such capacity through the earlier of (a) the date on which all Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans are fully resolved in accordance with the applicable Litigation Administrator Agreement, and (b) the date on which such Litigation Administrator resigns, is terminated, or is otherwise unable to serve; *provided, however*, that, in the event that a Litigation Administrator resigns, is terminated, or is otherwise unable to serve prior to the full resolution of all Recovery Causes of Action and Contributed Claims, the Goldstein Loan, the Leon Loan, or any other CEL Insider Loans for which such Litigation Administrator is responsible, the Litigation Oversight Committee shall appoint a successor to replace such Litigation Administrator in accordance with the applicable Litigation Administrator Agreement.  If the Litigation Oversight Committee does not appoint a successor within the time periods specified in the applicable Litigation Administrator Agreement (as may be extended by the Bankruptcy Court), then the Bankruptcy Court, upon the motion of any party in interest, may approve a successor to serve as the Litigation Administrator.

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Recovery Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date.  The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, Filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided, further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

No action taken by the Debtors, the Committee, or the Litigation Administrator(s) shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Committee, or the Litigation Administrator(s), including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

### 7.  *Responsibilities of Litigation Administrator.*

Responsibilities of the Litigation Administrator(s) shall be as identified in the Litigation Administrator Agreement(s) and shall include, but are not limited to:

(a)  filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted;

(b)  filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court;

(c) exercising the Debtors' rights with respect to (a) the Goldstein Loan, (b) the Leon Loan, and (c) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party;

(d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 ~~hereof;~~ of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all Entities' respective rights and priorities are undisturbed by the Plan;

(e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and

(f) taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement;

in each case, for the benefit of the Holders of Claims entitled to Litigation Proceeds hereunder and, as applicable, in accordance with the ADR Procedures.

## 8. *Rights Under D&O Liability Insurance Policies.*

On the Effective Date, the Litigation Administrator(s) shall, to the extent provided in the UCC Claims Stipulation, succeed to the rights of the Debtors under certain of their D&O Liability Insurance Policies. For the avoidance of doubt, the Litigation Administrator(s) shall not succeed to the Debtors' rights with respect to the Special Committee D&O Liability Insurance Policies.

## 9. *Litigation Recovery Account.*

On or before the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall establish a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator(s). The funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action.

Holders of Claims entitled to Litigation Proceeds hereunder will receive periodic distributions on account of recoveries from the Recovery Causes of Action. The frequency and timing of distributions from or in respect of the Litigation Recovery Account shall be determined by the Litigation Administrator(s) and the Litigation Oversight Committee in accordance with the Litigation ~~Administrator~~ Agreement(s).

To the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account shall promptly be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's ~~'~~ reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii)(a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts

142

to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

### 10. Litigation Oversight Committee.

The Litigation Administrator(s) shall report to, and act at the direction of, the Litigation Oversight Committee, whose members shall be selected by the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, and the Committee, as set forth in the definition of Litigation Oversight Committee and identified in the Plan Supplement; *provided* that: (a) prior to selecting any such members, the Committee will solicit potential candidates to serve on the Litigation Oversight Committee from the Holders of Claims entitled to receive Litigation Proceeds hereunder through an open interview process; (b) the Litigation Oversight Committee shall include at least one member of the Committee (unless no member of the Committee wishes to join); (c) the Litigation Oversight Committee shall include at least two individuals that are not members of the Committee; and (d) the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Litigation Oversight Committee (subject to the consent of the Committee).

The Litigation Oversight Committee shall contain a three (3) member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders. At least two (2) members of the Avoidance Action subcommittee shall not be current members of the Committee. The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action subcommittee, subject to the consent of the Committee, which shall be the same members appointed to the Litigation Oversight Committee. The Avoidance Action subcommittee shall confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date.

The Litigation Oversight Committee (at the recommendation of the applicable Litigation Administrator) will determine the frequency and quantum of any distributions from the Litigation Recovery Account (including the distribution of the Initial Litigation Funding Amount if appropriate). The Litigation Oversight Committee, in consultation with the Litigation Administrator(s), shall be entitled to control the financing of any litigation, with the right to cause the Litigation Administrator(s) to pledge or transfer a portion of the Recovery Causes of Action, the Litigation Recovery Account, or any proceeds of the foregoing to facilitate such financing, and may obtain such financing from NewCo or third party third-party sources, in their respective business judgment.

### 11. Fiduciary Duties of the Litigation Administrator.

Pursuant to the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan.

### B. Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including all steps necessary for the implementation of the NewCo Transaction or Orderly Wind Down (as applicable), and all other actions desirable or appropriate to promptly consummate the NewCo

Transaction or Orderly Wind Down (as applicable), including those contemplated under the Transaction Steps Memorandum.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors. The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non bankruptcy Law.

### C.    Cancellation of Notes, Instruments, Certificates, and Other Documents.

Upon the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan: (1) the obligations of the Debtors and their Affiliates under any terms of use, certificate, Security, share, note, bond, indenture, purchase right, option, warrant, agreement, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are Reinstated pursuant to the Plan) shall be cancelled and surrendered, and neither the Post-Effective Date Debtors nor the Debtors' Affiliates shall have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or their Affiliates (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are specifically Reinstated pursuant to the Plan) shall be released; *provided*, for the avoidance of doubt, that nothing herein shall release any Excluded Party from any claim or obligation.

### D.    Employee Obligations.

#### 1.    *Employee Transition Services Agreement.*

The Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Employee Transition Services Agreement set forth in the Plan Supplement. The Employee Transition Services Agreement will provide that employees of NewCo are available to provide transition services to the Debtors, Post-Effective Debtors, and/or the Plan Administrator to effectuate the NewCo Transaction and to wind down the Debtors' Estates. Except as provided in the Employee Transition Services Agreement, employee contracts shall be treated in accordance with Article V of the Plan.

#### 2.    *EIP Awards.*

On the Effective Date, the EIP Awards shall be effective without any further action by the Debtors or Post-Effective Date Debtors, and the KEIP Motion shall be withdrawn with prejudice. The

Emergence Incentive Plan provides EIP Participants the ability to earn EIP Awards based on their performance relative to the metrics described in Article IV.J.2 of the Plan. Unless otherwise noted below, target performance shall result in a 100% payout and threshold performance shall result in a 50% payout for each respective metric. For the avoidance of doubt, the Emergence Incentive Plan is a post-Effective Date compensation plan and EIP Awards, to the extent earned, shall be paid by the Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation. Any EIP Award shall be subject to clawback in the event that an EIP Participant is later found guilty of a crime in connection with their employment at Celsius.

Platform Metrics: Oren Blonstein, Trunshedda Ramos, Guillermo Bodnar, Adrian Alisie, and Ron Deutsch are eligible to earn an EIP Award based on the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

   (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

   (b) threshold performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (30% of the EIP Award):

   (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by ~~Emergence~~the Effective Date; and

   (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup ~~between the date set forth in the applicable agreement and within forty-five days of Emergence~~within thirty days after the Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

   (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

   (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

   (a) target performance requires the Effective Date occur by December 31, 2023;

(b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

(c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024; and

<u>Mining Metrics</u>: Jenny Fan, Dave Albert, and Quinn Lawlor are eligible to earn an EIP Award based on the following metrics:

- East Stiles Site Metric (25% of EIP Award):

  (a) target performance requires that the East Stiles site is completed and operational by September 30, 2023; and

  (b) threshold performance requires that the East Stiles site is completed and operational between October 1, 2023 and November 30, 2023.

- Effective Date Metric (25% of EIP Award):

  (a) target performance requires the Effective Date occur by December 31, 2023;

  (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

  (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (25% of EIP Award): [95][110]

  (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

  (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

- Midland Texas Gross Margin Metric (25% of EIP Award):

  (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 above 25%; and

---

[95][110] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

(b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 between 20% and 25%.

Chris Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

- Liquid Cryptocurrency Distribution Metric (50% of the EIP Award):

    (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

    (b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- Distribution Agreement Metric (20% of the EIP Award):

    (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by ~~Emergence~~the Effective Date; and

    (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days ~~of Emergence~~after the Effective Date.

- Chapter 11 Plan Confirmation Metric (10% of the EIP Award):

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- Effective Date Metric (10% of the EIP Award):

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- Mining Rig Metric (10% of EIP Award): [96111]

> (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

> (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

If an EIP Participant's employment is terminated by the Debtors without "cause," by the EIP Participant for "good reason," or upon death or disability of the EIP Participant, the EIP Participant will be entitled to 100 percent of the EIP Award that would otherwise have been earned based on the percentage of the performance period the EIP Participant was engaged by the Debtors. If an EIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for "cause"), any EIP Award will be forfeited. The maximum aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.

### 3.  Emergence Retention Plan.

To the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Emergence Retention Plan set forth in the Plan Supplement. The Emergence Retention Plan will provide for the distribution of Cash retention awards to certain employees of the Debtors to motivate such employees to remain with the Post-Effective Date Debtors to effectuate distributions contemplated under the Plan.

### E.    Effectuating Documents; Further Transactions.

On and after the Effective Date, NewCo and/or its subsidiaries, the Plan Administrator, or the Post-Effective Date Debtors, as applicable, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### F.    Exemptions from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to NewCo and/or its subsidiaries or a Post Effective Date Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, the Post-Effective Date Debtors, or NewCo; (2) the NewCo Transaction or the Orderly Wind Down, as applicable; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or

---

[96111] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

###   G.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, each Post Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action.  The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan; provided that, notwithstanding anything to the contrary in the Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.

The Litigation Administrator(s) may pursue the Recovery Causes of Action, and the Plan Administrator may pursue all other Causes of Action, as appropriate in accordance with the best interests of the Holders of Claims entitled to receive Litigation Proceeds (as to Recovery Causes of Action) or the Post-Effective Date Debtors (as to all other Causes of Action).  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it.  The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  The Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.**  If there is any dispute regarding the inclusion of any Cause of

Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, and the objecting party, such objection shall be resolved by the Bankruptcy Court.  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors free and clear of any Claims, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.  The applicable Post-Effective Date Debtors, through their authorized agents or representatives, including the Plan Administrator and the Litigation Administrator(s), shall retain and may exclusively enforce any and all such Causes of Action.  The Post-Effective Date Debtors, the Plan Administrator, and the Litigation Administrator(s), as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**H.      Election to Contribute Claims.**

Because aggregating all Contributed Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its Ballot, to contribute its Contributed Claims to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds.  By electing such option on its Ballot, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the appointment of the Litigation Administrator(s), it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Claims to the Post-Effective Date Debtor(s), and (ii) to have agreed to execute any documents reasonably requested by the Post-Effective Date Debtor(s) or the Litigation Administrator(s) to memorialize and effectuate such contribution.

**I.      Contribution of Contributed Claims.**

On the Effective Date, all Contributed Claims will be irrevocably contributed to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds and shall thereafter be Recovery Causes of Action for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Litigation Administrator Agreement(s), the Plan Supplement, or any other document as any indication that the Litigation Administrator(s) will or will not pursue any and all available Contributed Claims against such Person.  The Litigation Administrator(s) shall have, retain, reserve, and be entitled to assert all Contributed Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Claims shall not include the rights of any of the Contributing Claimants to receive the

distributions under the Plan on account of their Claims or Interests and shall not include any claims that cannot be assigned under applicable law.

### J.    Retiree Benefits.

Notwithstanding anything herein to the contrary, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

For the avoidance of doubt, the Debtors do not believe that any such obligations exist.

## V.    THE DEBTORS' CORPORATE STRUCTURE, HISTORY, AND BUSINESS OVERVIEW

### A.    The Debtors' Corporate Structure and History.

#### 1.    Corporate Structure.

Celsius is comprised of twenty-three entities (eleven of which are Debtors).  On July 13, 2022, eight Celsius entities each Filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Initial Debtors").  On December 7, 2022 (the "GK8 Petition Date"), three additional entities–GK8 Ltd., GK8 UK Limited, and GK8 USA LLC–each Filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (such Debtors, "GK8").  A simplified organizational chart is included below.

As set forth in the organizational chart, Debtor CNI directly owns 100 percent of the equity in Debtor Celsius Networks Lending LLC, and directly owns approximately 60 percent of the Ordinary B Shares in Debtor CNL, which directly or indirectly owns each of the other Debtor and non-Debtor entities.  The remaining 40 percent of the equity in CNL is in the form of Class A Preferred Shares, Class A1 Preferred Shares, and Class B Preferred Shares, which are owned by institutional investors (including WestCap Group LLC ("WestCap"), Caisse de dépôt et placement du Québec ("CDPQ"), Tether International Ltd., and BNK to the Future) and certain individuals.  The common stock and stock options of CNI are owned by Mr. Mashinsky and Mr. Leon, as well as certain other employees as part of an employee stock option plan.

In addition, CNL directly owns 100 percent of the equity of non-Debtor Celsius Network IL Ltd., which directly owns 100 percent of the equity of Debtor GK8 Ltd.  Debtor GK8 Ltd. directly owns 100 percent of each of Debtor GK8 UK Limited and Debtor GK8 USA LLC.



*Organizational Structure*

2. *History.*

On February 8, 2018, Mr. Mashinsky and Mr. Leon incorporated CNI in Delaware, the first of the business entities that today are generally known as Celsius. On February 9, 2018, Mr. Mashinsky and Mr. Leon incorporated CNL as a United Kingdom private limited company. CNL was the original entity through which Celsius operated its retail customer-facing business through the summer of 2021. While CNL was formally headquartered in the United Kingdom, Mr. Mashinsky and many of Celsius' other executives led its operations from New Jersey in the United States.

Prior to the Petition Date, Celsius operated as one of the largest Cryptocurrency based finance platforms in the world, providing financial services to institutional, corporate, and retail clients across more than 100 countries. Celsius initially offered two primary products: its users could transfer digital assets to Celsius and (a) earn rewards on digital assets and/or (b) take loans based upon the deposit of those transferred digital assets, with a contractual right to the return of like kind assets upon repayment.

In June 2018, Celsius launched version 1.0 of its mobile app (the "Celsius App"). By August 2018, users had received their first rewards on the Celsius App. At the end of 2018, users had transferred $50 million in digital assets to Celsius. By the spring of 2019, Celsius exceeded $200 million in digital assets and $1.2 billion in loan originations. As 2019 came to an end, Celsius' platform was available in over 100 countries.

Celsius continued its growth in 2020. In a round of funding at the end of 2020, many individual investors invested in Celsius through a crowd-funded equity raise on the platform BNK to the Future. By March 2021, Celsius had surpassed $10 billion in digital assets and 200 employees. In May of that year, Celsius launched its new website app, which made its platform available on any device, not just through a mobile device. In October 2021, the Company expanded its business by purchasing Debtor GK8 Ltd.,

an Israeli company, for $115 million.  GK8 Ltd. was a blockchain security company offering financial institutions an end-to-end platform, or "vault," for managing blockchain-based assets on their own. Celsius intended to integrate GK8 Ltd. into its platform to enhance Celsius' ability to provide consumers with custody services.  In December 2021, Celsius announced the first closing of its Series B equity funding for $600 million at an implied enterprise value of approximately $3 billion.

By May 2022, the Company had raised approximately $690 million from the Series B financing, primarily from WestCap and CDPQ, with all but $6 million of that amount funded.  By July 2022, Celsius had approximately 1.7 million registered users and approximately 300,000 active users with account balances of more than $100.  At that time, Celsius had approximately $6.6 billion in assets and was preparing to go forward with an initial public offering of Debtor Celsius Mining.

## B.    The Debtors' Prepetition Capital Structure, Operations, and Revenue.

### 1.    The Debtors' Prepetition Capital Structure.

The Debtors do not have any long-term or funded debt.  Prior to the Petition Date, Celsius' business model was centered on deploying digital assets transferred by users to generate income for Celsius and its operations and growth, as described further herein.  In addition to its lending services and revenue generated by Celsius Mining, Celsius engaged in other asset deployment activities to generate returns.  For instance, Celsius deployed digital assets into automated market maker or lending protocols for a fee.  Celsius also borrowed U.S. Dollars as stablecoins from decentralized finance ("DeFi") protocols collateralized by digital assets.  These DeFi loans are governed by "smart contracts" that are self-executing on the blockchain and are typically overcollateralized.

On June 27, 2022, the Company had approximately $648 million in DeFi borrowing collateralized by approximately $1.61 billion in digital assets based on market values as of June 27, 2022. These DeFi loans were held on four different DeFi protocols:  (i) Maker (MKR) ($225 million loan collateralized by $499 million in digital assets); (ii) AAVE ($263 million loan collateralized by $708 million in digital assets); (iii) Compound ($157 million loan collateralized by $409 million in digital assets); and (iv) Notional Finance ($3.2 million loan collateralized by $6.6 million in digital assets).  The Company had an additional $108 million loan collateralized by $403 million in digital assets on the FTX Cryptocurrency exchange.

By the Petition Date, the Company had unwound nearly all of its DeFi loans and the FTX loan, with only the Notional Finance loan remaining.  On December 21, 2022, the Debtors also took steps to unwind the Notional Finance loan.  Nearly all of the Initial Debtors' liabilities relate to user accounts and potential Claims by Account Holders, whereas the majority of GK8's liabilities relate to trade payables, employee-related payables, intercompany obligations, taxes, and potential Claims by Account Holders. As of the Petition Date, the Initial Debtors had approximately $130 million in Cash on hand.  As of the Petition Date, GK8 also had approximately $1.6 million in Cash on hand.

### 2.    The Debtors' Prepetition Operations.

Prior to the Petition Date, Celsius' primary operations consisted of:  (a) financial services through which retail and institutional users were able to (i) earn rewards on Cryptocurrency they transferred to Celsius, (ii) securely store and access Cryptocurrency, (iii) borrow fiat based upon Cryptocurrency transferred to Celsius; and (b) Bitcoin mining through Celsius Mining.  Additionally, customers were able to send and receive Cryptocurrency using Celsius' CelPay services and swap types of Cryptocurrency.  Finally, Celsius also engaged in other deployment activities such as DeFi protocols (as explained above), staking, lending Cryptocurrency to institutions, and exchange deployments.

(a)    <u>Financial Services.</u>

(i)    **Buy and Swap Services.**

Through the Celsius App, Celsius provided both institutional and retail users with the ability to purchase Cryptocurrency with fiat currency utilizing the services of select third party providers to conduct the transactions; notably, Celsius was not a counterparty to these transactions.  In addition, Celsius offered users the ability to "swap" ("trade" or "convert") eligible Cryptocurrencies for other types of eligible Cryptocurrencies without paying a fee.  This allowed users to efficiently exchange digital assets as the market changed.  On the Pause, as described below, Celsius stopped offering its buy and swap services.

(ii)    **Earn Services.**

Through the Company's Earn Program, users who transferred certain Cryptocurrencies to Celsius earned "rewards" or interest on their digital assets in the form of payment in-kind interest or distributions of "CEL Token," the Cryptocurrency Token native to the Debtors' platform.  Celsius publicly advertised that users could earn up to 17 percent annual percentage yield ("<u>APY</u>") on certain digital assets.  On average, users earned a 4.5–5 percent APY on assets transferred to Celsius under the Earn Program.

The Company's Terms of Use provided that, once users transferred their digital assets onto the Celsius platform, Celsius held all rights and title to such digital assets.  As a result, after users transferred their digital assets to Celsius for use in the Earn Program, Celsius used those assets in its sole discretion, including by rehypothecating the assets (*e.g.*, using the assets as collateral to take out additional loans) to generate a yield for Celsius.  Celsius then paid rewards to users based on the rates published on the Celsius App.  The amount of rewards a user received depended on the type and amount of digital asset transferred to the Company's platform, with higher rewards or interest rates available for users that elected to receive rewards in CEL Tokens.

From August 2018 until April 2022, Celsius offered the Earn Program to all of its users, regardless of location and regardless of whether users were unaccredited or accredited investors under applicable United States law.  Celsius received significant regulatory scrutiny related to the Earn Program, however, including from the UK FCA, the New Jersey Bureau of Securities (the "<u>New Jersey Bureau</u>"), the Department of Financial Institutions for the State of Kentucky (the "<u>Kentucky DFI</u>"), and other regulatory authorities in the United States, as discussed in greater detail in Article V.C of this Disclosure Statement.  After receiving cease and desist orders from the New Jersey Bureau and the Kentucky DFI, Celsius restricted, as of April 15, 2022, the creation of new accounts in the Earn Program (the "<u>Earn Accounts</u>") to international-based users and U.S. accredited users.  U.S. non-accredited users who had a balance in their Earn Accounts prior to April 15, 2022 were allowed to keep such balances in the Earn Program and continued to earn rewards thereon.

As of the Petition Date, over 600,000 Earn users had transferred digital assets to Celsius with a market value of approximately $4.4 billion as of July 13, 2022.  On the Petition Date, Celsius stopped offering rewards on digital assets transferred to Celsius through the Earn Program.

(iii)    **Custody Program.**

On April 15, 2022, Celsius launched the Custody Program for unaccredited users in the United States who could no longer open Earn Accounts due to the cease and desist orders from the New Jersey

Bureau and Kentucky DFI.[112]  Due to certain licensing requirements, however, Celsius did not provide the Custody Program to users in nine states.  Those nine states were Connecticut, Louisiana, Nebraska, Nevada, New York, North Carolina, Ohio, Vermont, and Washington.

The Custody Program allowed eligible users to transfer and store Cryptocurrency on the Celsius platform.  Celsius did not deploy Cryptocurrency held in the Custody Program and such Cryptocurrency did not earn rewards.  Instead, pursuant to the terms of use in effect as of April 14, 2022, which were the first terms of use to reference the Custody Program (the "General Terms of Use," and all such terms of use versions as amended, supplemented, and modified, the "Terms of Use"), title to digital assets held in the Custody Program "at all times remain[ed] with the [user]" and Celsius agreed "not [to] transfer, sell, loan or otherwise rehypothecate" digital assets in the Custody Program unless "specifically instructed by [users], except as required by valid court order, competent regulatory agency, government agency or applicable law."[113]  Under the General Terms of Use, the Company is, however, entitled to set off any obligations owed by a user to the Company against the user's assets held in the Custody Program.[114]  As of the Petition Date, approximately 58,000 users were utilizing the Custody Program, with digital assets worth a market value of approximately $201.6 million as of July 13, 2022 held by Celsius.

(iv)    **Withhold Accounts.**

Upon commencement of the Debtors' Custody Program in April 2022, customers in the nine states where the Custody Program was unavailable attempted to participate in the Custody Program by either (a) transferring Cryptocurrency to Celsius and the Custody Program from external platforms, or (b) withdrawing Cryptocurrency from the Earn Program, which now required that Cryptocurrency pass through the Custody Program before going off the platform.  Because of the nature of the blockchain, the Debtors could not prohibit or stop these transfers from users who already had a Celsius wallet address.  Accordingly, the Debtors noted these transfers in accounts the Debtors called Withhold Accounts (the "Withhold Accounts").  These Withhold Accounts were also used to show balances of Cryptocurrency which was not supported on the Debtors' platform.  Notably, the General Terms of Use do not contain any provisions addressing the Debtors' and customers' rights and responsibilities related to the Withhold Accounts, and the Debtors did not have a specific wallet designated to hold Cryptocurrency in Withhold Accounts.

As of the Petition Date, approximately 6,000 users held Withhold Assets worth approximately $13.6 million (valued in U.S. Dollars as of the Petition Date).

(v)    **Borrowing Services.**

*Borrow*.  Celsius also provided loans denominated in U.S. Dollars or stablecoins to institutional and retail parties supported by digital assets transferred to the Celsius platform.  As with the Earn Program, Celsius rehypothecated digital assets transferred by borrowers to Celsius to support those loans.

*Borrow—Retail Lending*.  The Company's retail lending was generally conducted through Debtor Lending LLC.  Borrowers in certain domestic states and foreign jurisdictions in which Lending operated were able to choose from different loan products based upon loan-to-value ("LTV") ratios of transferred digital assets ranging from 25% to 70%, with applicable interest rates being higher for higher

---

[112]  *See infra*, Article V.C.3 for more information about the regulatory developments that spurred the creation of the Custody Program.

[113]  General Terms of Use § 4(b).

[114]  *Id.* § 9.

LTV loans.  With market fluctuations, Lending was permitted to (a) issue margin calls requiring borrowers to lower the LTV by adding additional digital assets or repaying the loan and/or (b) liquidate digital assets when certain LTV ratios were met, close the loans, and return any excess digital assets to the borrowers' Celsius accounts (after satisfying liquidation fees and interest owed).  The retail loans ranged widely in principal amount, including certain loans as small as $100 and as large as $14 million (in U.S. Dollars or stablecoins).  As of the Petition Date, Lending had approximately 23,000 outstanding loans to retail borrowers in the aggregate amount of approximately $411 million backed by digital assets with a market value of approximately $765.5 million.

*Borrow—Institutional Lending*.  Through CNL, the Company lent Cryptocurrency to institutional clients such as hedge funds and market-makers.  Unlike retail lending, institutional loans were mainly in the form U.S. Dollars or stablecoins, and sometimes in Cryptocurrency.  In addition, the terms and conditions of institutional loans were based on master loan agreements ("MLAs") and term sheets that set forth the detailed terms of any specific transaction.  The Company provided institutional borrowers with either secured or unsecured loans.  As of July 13, 2022, CNL had approximately twenty institutional borrowers with approximately $126 million of aggregate outstanding performing loans, and the Company held digital assets with a market value of approximately $77 million to support such loans.  As of May 26, 2023, the Debtors had approximately fifteen institutional borrowers with approximately $133 million of aggregate outstanding obligations supported by approximately $23 million in digital assets.[115]

(vi)    **CelPay.**

Celsius also offered its users a feature known as "CelPay."  Available through the Celsius App, CelPay allowed a Celsius user to "pay" another user by transferring the first user's right to receive the return of certain Cryptocurrencies from Celsius to the second user.  The transfer of rights to receive Cryptocurrency using CelPay was not recorded on the blockchain, but rather in Celsius' books and records.

(vii)   **CEL Token.**

The CEL Token was a primary topic of the Examiner's investigation.[116]  The description of the CEL Token is taken from the Examiner's investigation and cites to the relevant portions of the Examiner's reports for the descriptions included herein.  For the avoidance of doubt, the Debtors' inclusion of such description is not intended to be and should not be construed as an admission that the Examiner's reports are evidence and/or conclusive on the topic of CEL Tokens or otherwise and are provided here solely for descriptive purposes.

(1)    The Initial Coin Offering.

CEL Tokens were primarily issued in connection with the Company's loyalty and rewards program (the "CEL Loyalty Program").  In March 2018, Celsius solicited capital through the public initial coin offering of CEL Tokens (the "ICO").  In connection with the ICO, Celsius advertised CEL Tokens as serving two main purposes:  *first*, providing customers who held CEL Token discounted interest rates when applying for loans in fiat currency; and *second*, providing customers with CEL

---

[115]    The *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818] ¶ 9.  *See infra*, Article VII.N for a detailed description thereof.

[116]    *See* Interim Examiner Report at 18–19; Final Examiner Report at 76–120.  *See also infra*, Article VII.G.

Tokens tiered benefits on the Celsius platform.  Account Holders could elect to receive weekly rewards payments (or interest) in CEL Tokens.  Interest in CEL Tokens was paid at a higher rate than if the Account Holder elected to receive interest in the deposited Cryptocurrency (*i.e.*, in-kind).  In addition, Celsius provided CEL Tokens to employees as part of their compensation, and collateralized certain fiat and stablecoin margin loans to employees and Account Holders with CEL Tokens.

In connection with the ICO, CEL Token was priced at $0.20 in a private sale and $0.30 in the public ICO.[117]  Of the 700 million CEL Tokens minted, 203 million were sold in the ICO and the private sales and distributed to purchasers in April 2018, 50 million were placed in a smart contract, 325 million were held in Celsius' treasury account, 4.33 million that were returned from or not sold to purchasers were burned (permanently removed from circulation by transferring the unsold tokens to a wallet from which they cannot be recovered), and 117 million were set aside as agreed under an $18 million option agreement with AM Venture Holdings, Inc. ("AM Venture"), an entity owned by Mr. Mashinsky.[118]  AM Venture, however, never purchased the 117 million CEL Tokens as required by the option agreement.[119]

(2)    The Utility of the CEL Token.

Celsius used a flywheel diagram to demonstrate the benefits the CEL Token was purported to provide to Token holders and Celsius.



The flywheel evolved over time, but the general concept was that customers would deposit digital assets onto the Celsius platform.  Celsius would lend the coins to third parties to earn yield. Celsius would use the return from its investments to buy CEL Tokens on the market.  Celsius would pay interest in CEL Tokens to electing holders, whose balances would increase.  Celsius would earn yield on the increased balances and pay its users additional interest in CEL Tokens.

(3)    Inflation of the Price of the CEL Token.

To support the market value of CEL Token and to satisfy the obligation to pay customer rewards in CEL Tokens, Celsius purchased CEL Tokens on the secondary market, publicly disclosing only a

---

[117]    Final Examiner Report at 84–85.

[118]    *Id.* at 85–86.

[119]    *Id.* at 86–87.

limited number of these purchases. Celsius used BTC, ETH, and stablecoins to fund these purchases. According to the Examiner's analysis, Celsius transferred at least 19.9 million CEL Tokens from secondary markets to its wallets in 2018, at least 113.2 million in 2019, and at least 106.9 million in 2020.[105][120] In 2020, Celsius adopted several new strategies to further support the price of CEL Tokens: (a) buying back more than 50% of the CEL Tokens used to pay weekly customer rewards from the market; (b) placing "resting orders" to automatically purchase CEL Tokens if the price decreased to a specified point; and (c) using its over-the-counter trading desk to sell CEL Tokens for later repurchases. Also in 2020, Mr. Mashinsky represented that Celsius had registered with the SEC and that CEL Token was a "registered" token, when in fact, Celsius had only filed a Form D with the SEC in April 2018 and in September 2020, which provided that Celsius' ICO and subsequent token sale were exempt from registration.

The price of the CEL Token correlated with Celsius' marketing, buybacks, and market-making efforts. At the end of October 2019, CEL Token's price was $0.05, but by June 2021, CEL Token it was $8.01—its highest price.

According to the Examiner's analysis, the increasing price of CEL Tokens had three significant consequences for Celsius and its insiders. *First*, it significantly inflated Celsius' balance sheet.[106][121] Celsius recorded CEL Tokens on its financial statements either as "Treasury CEL Tokens," consisting of the CEL Tokens Celsius minted at the time of the ICO but did not offer for sale, and "Non-Treasury CEL Tokens," consisting of the CEL Tokens Celsius bought in the secondary market. Both Treasury and Non-Treasury CEL Tokens were added at mark-to-market value, such that the value of Treasury CEL Tokens recorded on Celsius books was $1.5 billion at the end of 2020, and $1.7 billion by the end of the second quarter of 2021. As of June 4, 2021, CEL Tokens comprised $5.1 billion (or 29.6%) of Celsius' assets under management. According to the Examiner's analysis, however, Celsius had few options for deploying CEL Tokens, and the market for CEL Tokens was created and then largely supported by Celsius itself.

*Second*, the increasing price of CEL Token benefited Celsius' insiders who held most of the CEL Tokens following the ICO.[107][122] Between 2018 and the Petition Date, Mr. Mashinsky sold at least 25 million CEL Tokens, realizing at least $68.7 million on these sales.[108][123] Mr. Leon sold at least 2.6 million CEL Tokens in return for at least $9.74 million. Mr. Goldstein either directly sold or swapped at least 2.5 million CEL Tokens in return for at least $2.8 million. Many of these sales were also in violation of a trading policy implemented by Celsius in July 2020, which restricted sales of CEL Tokens by executive officers and directors of Celsius. The policy specifically prohibited, among other things, officers and directors from buying and selling CEL Tokens in an amount of more than $20,000 per day or $50,000 per week.

*Third*, Celsius did not earn sufficient yield on its crypto asset deployments to fully fund its buy orders. As a result, it began using customer deposited BTC and ETH to fund its CEL Token purchases,

---

[120]    Final Examiner Report at 91, 103.

[106][121]    *Id.* at 8–9.

[107][122]    *Id.*

[108][123]    *Id.*

taking assets from its general omnibus wallets (where all customer funds were accepted and commingled).[~~109~~124]

In May 2022, in the face of increasing liquidity pressure, Celsius reined in its efforts to support the price of CEL Token. On May 12, 2022, when Mr. Mashinsky directed the purchase of $5 million worth of CEL Tokens, Celsius only had $1.6 million of stablecoins needed to make the purchase. From the end of that day to the date of the Pause, the price of CEL Token dropped from $0.98 to $0.28. From 2018 through the Petition Date, Celsius spent at least $558 million buying at least 223 million CEL Tokens on the market.[~~110~~125] In sum, Celsius bought more CEL Tokens (223 million in total) than were sold to the public in the ICO (203 million).

(4)    Increasing Liquidity Pressure.

The steady fall in the CEL Token's price beginning in Summer 2021 presented a significant challenge for Celsius.[~~111~~126] Beginning in October 2021, Celsius began burning CEL Tokens worth 10% of the rewards it paid every week to reduce the supply and stabilize the price of CEL Tokens.[~~112~~127] In total, from October 1, 2021 through June 10, 2022, Celsius burned a total of 2.9 million CEL Tokens.[~~113~~128]

(b)    Celsius Mining LLC.

In addition to its financial and trading operations, the Company, through Celsius Mining ~~LLC~~ (~~"Celsius Mining"~~), operated one of the largest crypto mining enterprises in the United States. To expand Celsius Mining's operations, and thus generate a greater yield, effective as of November 1, 2020, and through 2021, CNL entered into an intercompany revolving loan facility with Celsius Mining for up to $750 million. The loan was a long-term investment in Celsius Mining that the Company expected to generate significant yield. As of the Petition Date, the outstanding loan balance owed to CNL was approximately $649 million. As of the Petition Date, Celsius Mining owned 123,590 rigs, 44,085 of which were deployed, and had an investment plan to operate approximately 120,000 rigs by the end of 2022. Celsius Mining generated a total of 3,128 Bitcoin during 2021. Up to the Petition Date, Celsius Mining generated 5,773 Bitcoin. As of ~~the date of the Filing of this Disclosure Statement~~June 27, 2023, Celsius Mining owned 122,585 rigs. From the Petition Date through ~~the date of the Filing of this Disclosure Statement~~June 27, 2023, Celsius Mining generated approximately 4,300 Bitcoin.

(c)    Other Deployment Activities.

(i)    **Staking.**

To further generate yield, the Company also engaged in "staking." Utilizing the Lido Finance DeFi protocol, Celsius "staked" its digital assets in ETH on the Ethereum 2.0 Beacon Chain—a network that has merged with the main Ethereum network and transitioned the blockchain from a Proof of Work (PoW) to a Proof of Stake (PoS) blockchain (the "Merge"). In exchange for staking its ETH on the Beacon Chain, Lido Finance provided Celsius with staked ETH. The Company also engaged in direct

---

[~~109~~124]    *Id.*

[~~110~~125]    Final Examiner Report at 123.

[~~111~~126]    *Id.* at 114.

[~~127~~127]    *Id.* at 116.

[~~113~~128]    *Id.* at 118.

staking of ETH as well as other Cryptocurrencies for yield-generating purposes, leveraging staking as a service provider.[114][129]

(ii)    **Exchange deployments.**

In addition to DeFi protocols and staking, Celsius engaged in five different types of exchange deployments:  (i) Cash and Carry; (ii) Market Making; (iii) Swing Trading; (iv) Funding; and (v) Spot Trading.  Celsius also maintained limited exchange deployments in certain futures as of the Petition Date.  The Company's prepetition exchange deployments are described in further detail in the Final Examiner Report.[116][130]

(d)    The Company's Communications – AMA Videos.

Every week starting in April 2020, Celsius live-streamed "AMA" sessions, short for "Ask Mashinsky Anything," to the Celsius community.  In the AMAs, Mr. Mashinsky and his guests, including other Celsius employees and Cryptocurrency promoters, discussed Celsius' business and products, CEL Tokens, reward rates, what Cryptocurrency was supported on the Celsius platform, Celsius' financial health, and Celsius' growth.  The AMAs were an integral part of Celsius' marketing efforts aimed at new and existing Account Holders.  The AMAs were regularly viewed by tens of thousands of people.  According to Account Holders, "the AMAs [were] very important to their perceived understanding of Celsius and their desire to deposit crypto assets with Celsius."[116][131]

Through the AMAs, Mr. Mashinsky made a series of representations to Account Holders regarding Celsius' business model and the risks associated with transferring Cryptocurrency to Celsius.  These representations included:

- **Celsius was safer than other digital asset platforms**.  In an April 30, 2021 AMA, Mr. Mashinsky stated, "[a] run on the bank cannot happen at Celsius because Celsius never lends more than what it has.  We always have enough coins and enough collateral and so on to return *all the assets to all of our users*."[115][132]  On October 1, 2021, Mr. Mashinsky told viewers that "[o]ur number one priority is keeping the funds that we're lending out safe and we would rather lend large scale to a counterparty than to risk earning a ridiculously high yield lending to a shady character."[118][133]  And, on December 16, 2021, Mr. Mashinsky explained that "Celsius takes full responsibility if anything goes bad.  [W]e take full responsibility; that's part of why we raised [] 750 million and

---

[114][129]    Directly staked ETH became available to unstake and withdraw in April 2023, and withdrawals were available from the Lido staking protocol starting in May 2023.  Following April 2023, the Company redeemed its staked ETH for ETH on the LIDO platform and directly staked the withdrawn ETH with the staking service providers Blockdaemon and Figment.  As of the date of the Filing of this Disclosure Statement, the Company has 762,528 ETH directly staked or in pending staking activation status on the Ethereum network.

[116][130]    *Id.* at 171, 215–23.  For the avoidance of doubt, the Debtors do not agree with certain aspects of the Examiner's characterization of the Company's prepetition exchange deployments.

[131]    *Id.* at 267.

[117][132]    *Id.* at 245 (emphasis added).

[118][133]    *Id.* at 243.

now we have over two billion dollars on our balance sheet—again more than anybody else."[119]

- **Celsius deployed Account Holders' digital assets in safe, prudent, and low-risk investments**. In a March 13, 2020 AMA, Mr. Mashinsky stated that Celsius deployed digital assets only to institutions of the "highest quality," and did not "lend[] to risky institutions or risky hedge funds."[120] Similarly, on November 6, 2020, Mr. Mashinsky stated, "[w]e [Celsius] have zero bad loans, we have zero loans that don't pay their interest. Celsius is very, very strict who we lend to, we only lend to the first tier institutions, first tier exchanges. We do not do unsecured lending."[121]

- **Celsius returned 80% of its revenues to Account Holders participating in the Earn Program**. In numerous AMAs, Mr. Mashinsky stated that Celsius returned 80% of the gross revenue it received from its investments to Account Holders.[122]

- **Account Holders retained ownership of the digital assets that they transferred to Celsius**. In a November 26, 2019 AMA, Mr. Mashinsky stated, "***[t]hese are your coins, not our coins***. Whatever you put in, if you put in one Bitcoin, you will be withdrawing one Bitcoin. It's always your Bitcoin. Always your Ether. Always your CEL Token."[123] Similarly, in a June 24, 2020 AMA, Mr. Mashinsky stated, "when you give us Bitcoin it is not like it is ours, right, it is yours. ***Legally it is still your Bitcoin***, the only thing we do is when you lend us your Bitcoin, we lend them to people who pay us interest, when they return them it goes back to the wallet and it is still ***yours*** from that wallet."[124]

As explained by the Examiner, many of the representations Mr. Mashinsky made during the AMAs were "inaccurate and misleading."[125] In fact, the Examiner concluded, "Celsius conducted its business in a starkly different manner than how it marketed itself to its customers in every key respect."[126]

       (e)      The Company's Records and Bookkeeping.

Celsius maintained its financial accounting records through "QuickBooks" accounting software. Because this software is not as well-equipped as other more sophisticated software to manage the records and books of a business as voluminous and complex as Celsius' business, Celsius' ability to track its financial positions (including deployment activities and profitability) or evaluate and manage risks was limited. In May 2021, Celsius started using the "Freeze Report," a Google spreadsheet intended to

---

[119] *Id.* at 245–46.

[120] *Id.* at 243.

[121] *Id.* at 245; *see also id.* at 243.

[122] *Id.* at 248 n.962.

[138] *Id.* at 251 (emphasis added).

[124] *Id.* at 252 (emphasis added).

[125] *Id.* at 256.

[126] *Id.* at 5.

provide a snapshot of the Company's assets and liabilities at a given time, *i.e.*, the quantity and price of each Cryptocurrency, with values calculated on the respective date. The Company then used this information to develop its balance sheet calculations. Also in May 2021, Celsius began using the "Waterfall Report" to track its liquidity and deployment activities, including the metric that compared, on a coin-by-coin basis, the yield that Celsius generated by deploying a certain Cryptocurrency against the reward rates that it paid to customers in the Earn Program. Around the same time, Celsius also developed a third report, the "Liquidity Reserve/Modeled Liquidity Outflow" report, to monitor liquidity on a coin-by-coin basis under different stress scenarios, thereby seeking to ensure that Celsius would maintain a minimum level of liquidity for each type of coin supported on the platform. Celsius' policy was to maintain each type of Cryptocurrency supported on its platform such that it could access that token and move it off Celsius' platform (for example, due to customer withdrawals) if either the Company's one-day or the seven-day stress test model was triggered.

(f)    The Company as a Consolidated Enterprise.

Although Celsius is comprised of twenty-three entities (eleven of which are Debtors), the Examiner's investigation suggests that Celsius typically operated as a consolidated enterprise prior to the Petition Date. For instance, the Examiner noted that, "Celsius' management does not appear to have considered any corporate distinction in their decision-making processes and deliberations when it came to coin deployment or liquidity."[142] Rather, "Celsius generally viewed coins available for deployment on a consolidated basis."[143] Similarly, when "analyzing Celsius' liquidity and financial condition, Celsius management rarely differentiated among different Celsius legal entities, instead evaluating its financial condition, liquidity needs, and risk on a consolidated basis."[144] As one example, "Celsius' Waterfall Report tracked Celsius' liquidity and deployment activities, and included all of Celsius' assets by factoring in Celsius' investments, Celsius Mining, Custody, and DeFi, among others," aggregated across all Celsius entities.[145] Finally, Account Holders have also asserted that Celsius "held themselves out to the world and conducted their businesses" as "one integrated enterprise" when transacting with Account Holders.[146]

**C.    Prepetition Regulatory Actions and Responses.**

*1.    UK Regulatory Action.*

Until the summer of 2021, Celsius operated its retail customer-facing business through CNL and all customer liabilities were recognized at CNL. CNL was also the top operating company in the Celsius corporate structure and the direct or indirect owner of all other Celsius entities.

In June 2020, CNL registered, on a temporary basis, as a crypto asset business with the UK FCA. Approximately one year later, on June 11, 2021, the UK FCA informed Celsius by letter that Celsius had to withdraw its pending regulatory application and stop conducting any retail operations in the UK because the UK FCA believed that CNL's business was an unregulated collective investment scheme

---

[142]    *Id.* at 365–66.

[143]    *Id.* at 366.

[144]    *Id.* at 208–09.

[145]    *Id.*

[146]    Tuganov Complaint (as defined herein) ¶ 4.

under the UK's Financial Services and Markets Act, 2010.  Unregulated collective investment schemes cannot be marketed and promoted to the public.

### 2.    The Migration.

In response to the regulatory action taken by the UK FCA, during the summer of 2021, Celsius migrated all customer liabilities from CNL to Network LLC, a Delaware limited liability company established on June 14, 2021 (the "Migration").

The Examiner described the Migration as follows:

> Prior to the summer of 2021, all customer liabilities were recognized at the [CNL] level, which was the top- tier operating company and the direct or indirect owner of all other Celsius businesses and investments.  As a result, [CNL] directly or indirectly owned all of the equity in Celsius Mining, as well as all other investments within the Celsius corporate chain. . . .
>
> From July 22 until August 23, 2021, [CNL] migrated all customer obligations arising from transactions on the Celsius App from [CNL] to the newly-formed [Network LLC].  That migration was eventually memorialized in an Asset Transfer Agreement between [CNL] and [Network LLC] dated December 29, 2021, with an effective date of August 19, 2021.  Under that agreement, [Network LLC] accepted and assumed substantially all assets and liabilities related to transactions on the Celsius App.  However, not all customer assets were moved from [CNL] to [Network LLC] as part of the migration.  The assets associated with DeFi and staking strategies, as well as undeployed assets, were transferred to [Network LLC].  But [Network LLC] lent—or more accurately, permitted [CNL] to retain—billions of dollars of customer-related assets that were being deployed on exchanges or for institutional lending, so that [CNL] could continue to deploy them for [Network LLC's] benefit.  Thereafter, [CNL] continued to engage in both existing and new deployment activities in these areas. . . . Even though the migration was concluded by August 2021, the intercompany arrangement between [CNL] and [Network LLC] was not formally documented until more than four months later.  In the interim, [CNL] continue[d] to deploy billions of dollars of crypto assets associated with the migrated business.[147]

Celsius disclosed the Migration to existing Account Holders through notifications on the Celsius App and through emails.  Those disclosures informed Account Holders that Celsius had modified its Terms of Use to, among other things, "change" the customer-facing "legal entity" to Network LLC and "change" the law "applicable" to the Terms of Use from UK law to New York law.[148]  In addition,

---

[147]    Final Examiner Report at 363–66.  *See also Debtors' Motion Seeking Entry of an Order (I) Substantially Consolidating the Estates of Celsius Network Limited and Celsius Network LLC and (II) Granting Related Relief* [Docket No. 2563] ¶¶ 32–34.

[148]    *In re Celsius Network LLC*, 649 B.R. 87, 93 (Bankr. S.D.N.Y. 2023) (discussing disclosure of change to Terms of Use).

during a June 25, 2021 AMA, a Celsius representative stated that the Migration "is not going to affect [Account Holders] in any way."[~~134~~149]

The Migration created intercompany claims owing from CNL in favor of Network LLC—the new customer-facing entity.  First, to account for the customer-related liabilities, "Celsius booked an offsetting $10.3 billion intercompany receivable due to [Network LLC] from [CNL] that was recorded in the respective general ledgers of each company."[~~135~~150]  Second, to account for the deployed and undeployed assets, Celsius "booked" an approximately $3.3 billion receivable due to CNL from Network LLC and $7.8 billion to the equity of Network LLC, which corresponded to the appreciation in value of certain DeFi, staked, and undeployed assets remaining at CNL in excess of their cost basis.[~~136~~151]

Even though Celsius attempted to reflect the value of the Migration in its books and records, the Examiner explained that these figures are likely inaccurate:

> Because of the manner in which the migration was accounted for, in theory as [Network LLC] satisfied customer obligations over time, the [Network LLC] intercompany receivable and [CNL] intercompany payable should have been reduced.  As a practical matter, however, it was impossible to tie customer redemptions to migrated assets, and thus the receivables and payables were not adjusted.  As a result, [Network LLC's] records reflect a multi-billion dollar asset in the form of an intercompany receivable from [CNL], which does not accurately reflect the status of that account receivable.

> The continued deployment of crypto assets by [CNL] created further complications.  Accounting entries were not made reflecting the hundreds if not thousands of individual transactions involving the deployment or unwinding of deployments.  Instead, month-end adjustments to equity were made reflecting the overall changes in the value of assets deployed by [CNL].  Accounting for crypto asset transactions in this manner did not allow for an accurate accounting of the intercompany receivables and payables booked with respect to the migrated customer assets and liabilities.[~~137~~152]

Accordingly, in these Chapter 11 Cases, the Bankruptcy Court has established a litigation schedule to estimate the appropriate value of the various intercompany claims arising from the Migration.[~~138~~153]  Simultaneously, the Bankruptcy Court will also consider whether the Migration should be

---

149  Celsius AMA, YOUTUBE (June 25, 2021), available at https://www.youtube.com/watch?v=DdYrYPvY5OU at 5:50.

150  Final Examiner Report at 366; *see also Debtors' Statement with Respect to Intercompany Claims Held by Debtor Celsius Network LLC Against Its Debtor Affiliates* [Docket No. 2092].

~~136~~151  *See Debtors' Statement with Respect to Intercompany Claims Held by Debtor Celsius Network LLC Against Its Debtor Affiliates* [Docket No. 2092] for a detailed evaluation of the intercompany claim between CNL and Network LLC and the Final Examiner Report at 363–369 for a detailed summary of the Migration.

~~137~~152  Final Examiner Report at 368–69.

153  *See Order Setting Schedule Regarding (I) Estimation of Certain Intercompany Contract Claims Between Celsius Network LLC and Celsius Network Limited, (II) Substantive Consolidation of Celsius Network LLC and Celsius Network Limited, and (III) Constructive Fraudulent Transfer Claim* [Docket No. 2522] (the "Estimation Scheduling Order").

disregarded on theories of fraudulent transfer and substantive consolidation, as set forth in Articles VII.K.5–6 of this Disclosure Statement.[~~139~~154]

### 3.   *U.S. Regulatory Action and the Custody Program.*

Although the Migration did not start until the summer of 2021, the SEC and multiple state securities regulators in the U.S. had begun investigating Celsius' Earn Program around May 2021 to determine whether Celsius was offering an unregistered security in violation of state laws.  The SEC and regulators in New Jersey, Texas, Kentucky, Arkansas, Oklahoma, Pennsylvania, and Washington served Celsius with requests for documents or subpoenas, requests with which the Company complied in early summer 2021.  In September 2021, New Jersey and Kentucky issued cease-and-desist orders against Celsius' Earn Program.  Additional requests for documents and information by Alabama, Pennsylvania, the SEC, Massachusetts, and New York followed.  Actions by state regulators included the following:

- On September 16, 2019, the Washington Department of Financial Institutions and CNI entered into a consent order prohibiting CNI from holding itself out as a provider of money services to consumers in the state of Washington until such time as CNI obtained a license in accordance with the Uniform Money Services Act.

- On September 16, 2021, the Alabama Securities Commission issued an order to show cause as to why the Alabama Securities Commission should not order Celsius to cease and desist from further offers or sales of securities in Alabama.

- On September 17, 2021, the New Jersey Bureau issued a cease-and-desist order against Network LLC, prohibiting it from (1) offering for sale any security to or from New Jersey without first registering the security or qualifying for an exemption, (2) accepting any additional assets into an existing Earn account, and (3) violating any securities law.

- On September 17, 2021, the Texas State Securities Board issued a Notice of Hearing scheduled for February 14, 2022, for the purpose of determining whether to issue a cease-and-desist order against Network LLC and Lending LLC.

- On September 23, 2021, the Kentucky DFI issued an Emergency Order to Cease and Desist against Network LLC, prohibiting it from (1) soliciting or selling any security in Kentucky unless that security is registered with the Department and (2) any and all activity which would violate the Securities Act of Kentucky.

- On August 8, 2022, the California Department of Financial Protection and Innovation issued a desist-and-refrain order against CNI, CNL, Celsius US Holding LLC, their subsidiaries, and Mr. Mashinsky, ordering them to refrain from further offers and sales of securities unless such sales are qualified under California law or an exemption applies, and to desist and refrain from offering securities in California by means in violation of section 24501 of the California Corporations Code.

---

[~~139~~154]    Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the litigation related to the Migration.

## VI.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.    Rapid Growth, Business Losses Suffered, and Business Transition.

Celsius is a company in a novel and developing industry that experienced rapid growth and popularity in 2020 and 2021. During this period of rapid growth, the Company suffered a series of losses that impacted its ability to match its assets and liabilities.

In particular, certain asset deployment decisions were made in the midst of its unexpected asset growth that in hindsight proved problematic. Although the Company took the necessary steps to "unwind" these deployments, unfortunately, the damage was done.

Celsius also suffered other unanticipated losses. For example, in June 2021, StakeHound, an Eth2 staking service provider, announced that it had misplaced the "keys" to over 38,000 ETH tokens, including 35,000 of the Company's Ether, due to an alleged error by StakeHound's third-party crypto custody provider Fireblocks. StakeHound is currently engaged in legal proceedings with Fireblocks.

Moreover, to support its operations, from October 2019 to February 2021, the Company took out collateralized term loans from Equities First Holdings, LLC ("EFH"). In July 2021, when Celsius attempted to repay one of its loans, it was informed for the first time that EFH was unable to return the Company's collateral on a timely basis, resulting in Celsius having an approximately $509 million uncollateralized claim against EFH after it set off its own loan obligations to the lender. Since September 2021, the lender has made some principal payments to the Company. As of May 26, 2023, the aggregate principal owed to the Company stands at approximately $409 million, consisting of $308 million in USD and 3,765 BTC, the latter worth approximately $101 million.

Due to these losses, the Company began evaluating its business model and corporate policies with the goal of right-sizing its balance sheet, reducing risk, and aligning the quantum of digital assets with digital asset liabilities.

### B.    Turbulent Market Conditions.

In the midst of Celsius' expansion and incurrence of significant losses from risky investments, the onset of the COVID-19 pandemic drove many investors to exit the market altogether. Following an initial crash, both the traditional and Cryptocurrency markets experienced a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve (the "Federal Reserve")) enacted relief programs and adopted accommodative monetary policy, including quantitative easing and asset purchasing programs designed to bridge the global economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and Cryptocurrency markets, and investment into new Cryptocurrency projects skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove equity markets sideways through the end of 2021. Strong selloffs in "risk-on" sectors of the economy, such as technology and early-stage equities, led to selloffs in the Cryptocurrency market as investors trimmed exposure. Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it appeared like markets were beginning to recover from the COVID-19 pandemic and that its lingering effects would be minimal. But discussions around a possible recession in 2022 began to materialize as inflation rose, along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

2022 was marked by historic levels of volatility in the traditional markets and Cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. Western countries imposed a series of financial, trade, and travel sanctions against Russia in an effort to weaken Russia's ability to pursue the war, which led to a rampant increase in commodity prices. This instability has only continued in 2023, with no end in sight to the Ukrainian War.

In the year leading up to the Petition Date, the Federal Reserve increasingly raised the federal funds rate and instituted a quantitative tightening of approximately $95 billion per month starting in Q3 of 2022. These actions signaled a "risk off" to the markets resulting in the sharpest drop in Bitcoin value in its thirteen-year history. In June 2022, market analysts officially labeled 2022 a "bear market."

### C.    The "Cryptopocalypse."

The widespread selloff in traditional markets was mirrored in the Cryptocurrency industry. All major Cryptocurrencies experienced significant declines in the first half of 2022; by June 2022, the crypto market had lost $2 trillion of its peak $3 trillion market capitalization achieved in November 2021. By mid-June of 2022, seventy-two of the top one hundred digital assets had dropped by over 90% from their all-time highs.



Several negative events in the crypto space, including the implosion of Terra LUNA ("LUNC Token") and its TerraUSD stablecoin ("UST"), exacerbated this "Cryptocurrency winter." The eventual implosion of Terra and the loss of over $50 billion in values of the LUNC Token and UST coins over a three-day period created a domino effect, creating immediate issues for many market participants, including Three Arrows Capital, Babel Finance, Vauld, BlockFi, Genesis Trading, Blockchain.com, Crypto.com, and Voyager Digital Holdings, Inc., among many others, leading to the eventual "cryptopocalyse." Many of these market participants had to halt operations, limit withdrawals, or take emergency bailout loans to survive.

### 4.    The Terra Luna Collapse.

Terra was an open-source blockchain protocol created by Terraform Labs that authorized blockchain developers to make custom blockchains and decentralized applications for a variety of uses. Terra issued its own native token, LUNC Token, a Cryptocurrency that was used to execute transactions

on the Terra blockchain.  In early April 2022, LUNC Token traded at approximately $114 and had a market capitalization of approximately $41 billion.  By mid-May 2022, the market capitalization had dropped to approximately $500 million.

Terra's stablecoin, UST, historically traded at $1.  As previously explained, stablecoins are usually pegged 1:1 with a tangible asset, such as gold or dollars.  UST, however, was "pegged" to LUNC Token using "algorithmic pegging."  By virtue of a smart contract, LUNC Tokens were used to "mint" new UST, which was supposed to maintain the UST price stable and LUNC Token deflationary.  Thus, regardless of the market conditions, $1 of UST could always be redeemed for $1 of LUNC Token, and $1 of LUNC Token could always be redeemed for $1 of UST.

For example, if UST was trading at $1.50, a trader holding LUNC Token could "burn" the LUNC Token worth $1.00 by converting it into UST, immediately sell its UST, and pocket the $0.50 difference (and vice versa).  As more holders would do the same to realize a profit, more LUNC Token would be "burned," making the remaining LUNC Token supply more valuable until UST and LUNC Token were back to a 1:1 ratio.  This arbitrage trade was intended to keep the two tokens equally scarce and limit oversupply or undersupply of the two tokens.  To incentivize traders to burn LUNC Token to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5 percent yield (payable in UST) on Terra's Anchor protocol.

On May 7, 2022, $2 billion of UST was reported as unstaked (taken out of the Anchor protocol) and immediately sold.  As a result of such a massive sale, UST's price dropped to $0.91.  Traders moved quickly to burn LUNC Token and "arbitrage" the price of UST; however, only $100 million of UST could be burned for LUNC Token each day.  Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

The Terra blockchain protocol was widely viewed as a project with significant promise—LUNC Token had attracted significant interest from institutional investors and retail investors alike.  The LUNC Token collapse erased approximately $40 billion of value and contributed to further selloffs in the Cryptocurrency sector.  Many projects and funds which relied on UST as a stablecoin saw their treasury wiped out.  Many others who took out loans to invest in UST faced the reality that they could not repay those loans.

Unlike many of these Cryptocurrency platforms, Celsius avoided losing a significant amount of its assets in the LUNC Token collapse.  When LUNC Token started to "de-peg," Celsius immediately withdrew all deployed UST and suffered a loss of approximately $30 million on all activity related to LUNC Token or UST.  Celsius may have claims related to this event.

### 5. The "Domino Effect."

The collapse of LUNC Token had a significant effect on the Cryptocurrency industry.  Many Cryptocurrency-focused hedge funds and other Cryptocurrency companies held LUNC Token and incurred losses on their position after they sold.  Some participants were unable to sell their LUNC Tokens under staking agreements or other lock-up agreements, which can require up to twenty-two days to unstake or return loans—such participants were forced to incur up to a 99 percent loss on their investment if they were prohibited from selling their LUNC Tokens.

In early June 2022, it was reported that Three Arrows Capital ("3AC") may have incurred significant losses due to LUNC Token's collapse.  On June 15, 2022, one of 3AC's founders stated that the fund incurred significant losses on account of its staked LUNC Token position and had hired legal and financial advisors to explore potential liquidity solutions.  On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

The collapse of 3AC directly impacted Celsius and other crypto companies such as Voyager Digital Holdings, Inc.  Celsius had extended two loans totaling $75 million to 3AC.  When 3AC failed to meet a margin call, Celsius liquidated the collateral that 3AC had pledged, and its claim against 3AC now totals $40.6 million.

### 6.    The "depegging" of Staked Ether.

As a result of the LUNC Token collapse, and the need for 3AC to quickly liquidate its other assets to repay its own institutional loans, staked ETH started to "depeg" from its 1:1 ratio with ETH.  In mid-May 2022, the staked ETH to ETH exchange ratio dropped slightly creating a 2–3 percent gap in prices.  The gap widened in June to 5–6 percent.  After the LUNC Token and UST losses, continued market downturn, and the widening "depegging" of staked ETH, many Celsius users sought to withdraw their ETH from Celsius' platform.  To meet these demands, Celsius was forced to sell some of its own staked ETH, which further exacerbated market conditions.

### D.    The Effect of the "Cryptocalypse" on the Company's Recovering Balance Sheet.

During the initial stages of the "cryptocalypse," the Company expected that, with sufficient time, it would level-set and stabilize its balance sheet.  Unfortunately, due to ever worsening market conditions, among other factors, the value of the CEL Token declined.

Moreover, as a part of its asset deployment decisions, a number of Celsius' assets were tied up in illiquid investments, including staked ETH and the CNL loan to Celsius Mining, that were intended to generate profit over time.  Celsius had also borrowed over $1 billion in stablecoin loans that were secured by BTC and ETH.  As the price of BTC and ETH declined, the Company was required to post additional coins as collateral to avoid liquidation.  The combination of the decline in crypto prices, uptick of user withdrawals from Celsius' platform, and the need to post additional collateral left Celsius struggling to deal with two competing demands on its liquid assets:  Celsius could either process user withdrawals or transfer additional collateral to DeFi protocols and its institutional lenders to support its already existing loans and avoid liquidation of its collateral and subsequent additional losses.

In May and June 2022, Celsius decided to forgo providing one of its lenders, Tether (issuer of the USDT stablecoin), additional collateral and agreed to an orderly liquidation of its loan.  During the market crash, Tether issued a margin call to Celsius with regard to an outstanding $841 million USDT loan.  The Company agreed to an orderly liquidation and settlement of its loan with Tether to preserve the remaining collateral in excess of the value of the loan.  This resulted in a loss of approximately $97 million.[~~140~~155]

By mid-June 2022, the amount of the Company's liquid assets and the dollar value of all remaining assets had decreased so significantly that Celsius lost the ability to continue borrowing stablecoins.

### E.    The Pause.

Starting in May 2022, Celsius began processing significant customer withdrawals—experiencing a net outflow of over $1.4 billion in assets between May 9, 2022 and May 24, 2022 alone.  This flurry of withdrawals resumed just before the Pause.  For example, between June 10, 2022 and June 13, 2022, more than 198 million USDC, 5,500 BTC, and 117,500 ETH were withdrawn from the platform.  On

---

[~~140~~155]    Since the commencement of the Chapter 11 Cases, the Committee has evaluated potential causes of action arising from the liquidation of the Tether loan.

June 12, 2022, CNL had an emergency meeting of its board of directors (the "CNL Board"). At that meeting, the CNL Board unanimously determined that the best way to protect all users would be to pause withdrawals. This step was not taken lightly as the CNL Board knew that the Pause would fuel speculation and damage the Company's reputation. But the CNL Board was unanimous in its decision that a pause would protect users by maximizing recoveries for all users. Later that night, the Company announced that it was pausing all account withdrawals and transfers due to extreme market conditions. The decision to enact the Pause was intended to preserve all digital assets for distribution to customers on an equal basis and avoid irreparable damage to Celsius' business.

As of July 29, 2022, Celsius had approximately 14,578 BTC, 23,348 wBTC, 417,392 ETH, 410,517 staked ETH, and 278,751,125 USDC, among other Cryptocurrencies, stored on Fireblocks or staked or deployed via loans and on exchanges.[156] As of May 26, 2023, Celsius had approximately 37,000 BTC, 448,000 ETH, 424,000 staked ETH, and 273,448,000 USDC, among other Cryptocurrencies.[157]

### F.    Governance Initiatives.

On or around June 19, 2022, CNL formed the Special Committee, which is currently comprised of disinterested directors Alan Carr and David Michael Barse, both appointed on or around June 30, 2022.[158] The charter for the Special Committee (the "Special Committee Charter") vested the Special Committee with the authority to consider, review, evaluate, and execute strategic and/or financial alternatives with respect to the Company and its subsidiaries to address their liabilities in light of prevailing industry conditions and the Company's liquidity demands and operational results (each, a "Possible Transaction," and collectively, the "Possible Transactions"). Specifically, the Special Committee Charter vested the Special Committee with the authority to, among other things:

- review and evaluate the terms and conditions and various methods to effect any Possible Transaction[159] and determine the advisability of any Possible Transaction or any proposals for any Possible Transaction and various methods to effect any such Possible Transaction or proposals therefor;

- negotiate the consideration, structure, form, terms and conditions of any Possible Transaction or any proposals for any Possible Transaction and the form, terms and conditions of any definitive agreements in connection therewith and review and comment upon any and all documents and other instruments used in connection with any Possible Transaction, including any and all materials to be filed with governmental and non-governmental persons and entities;

---

[156]    Detailed reports of the Debtors' postpetition coin holdings can be found in the coin reports Filed by the Debtors [Docket Nos. 447, 811, 2122, 2361, and 2648].

[157]    Coin Report [Docket No. 2361].

[158]    There was a prior special committee appointed that was replaced around the same time the Company replaced its restructuring counsel.

[159]    "Possible Transaction" means one or more alternative debt or equity financings, or a sale, merger, consolidation, restructuring, reorganization, recapitalization, liquidation or other transaction or related financing or refinancing involving the Company and/or one or more of its subsidiaries, whether by Filing a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code or otherwise.

- determine (a) whether a Possible Transaction negotiated by the Special Committee is in the best interests of CNL and (b) whether the CNL Board should recommend such Possible Transaction to CNL's stockholders if the consent of the CNL's stockholders is required in connection therewith;

- approve a Possible Transaction and the execution and delivery of documents necessary or advisable in connection with a Possible Transaction;

- direct the officers, employees, legal counsel, financial and other advisors, consultants, agents and representatives of CNL to take such actions or refrain from taking such actions relating to any Possible Transaction as the Special Committee may direct from time to time;

- take all actions of the CNL Board with respect to certain issues and items necessary to commence a chapter 11 case; and

- exercise any other power or authority that may be otherwise exercised by the CNL Board and that the Special Committee may determine is necessary or advisable in order to fulfill its duties and responsibilities in connection with the evaluation of any Possible Transaction and the execution of any Possible Transaction.

After the Petition Date, on August 2, 2022, CNL revised and updated the Special Committee Charter. Thereafter, the Special Committee was also vested with the authority to review and consider issues related to conflicts of interest and to investigate allegations of misconduct of the Company. Specifically, the Special Committee is vested with the authority to:

- review, evaluate, negotiate, approve, and authorize any other matter in which the Special Committee determines that there may be an actual or perceived conflict of interest between interested members of the CNL Board and the Company (a "Conflicts Matter"), and any related issues thereto;

- review and, if appropriate, investigate credible allegations of misconduct by the Company or its current or former employees, officers, or directors, including working with independent counsel as appropriate to assist in any such investigation;

- consider, authorize, and implement any recommendations, remediation, or disciplinary action in connection with such investigation and authorized under the Special Committee Charter;

- communicate with regulators and third parties as necessary in connection with any investigation authorized under the Special Committee Charter; and

- consider such other matters as may be requested by the CNL Board, or as the Special Committee may deem to be necessary and appropriate for the Special Committee to fulfill its duties and functions as are authorized under the Special Committee Charter, and make any recommendations to the CNL Board with respect thereto that the Special Committee deems appropriate.

## VII.    EVENTS OF THESE CHAPTER 11 CASES[~~145~~160]

### A.    First Day and Second Day Motions and Relief.

On the Petition Date, the Initial Debtors[~~146~~161] Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations. Following hearings on July 18, 2022 and August 16, 2022 (the "Second Day Hearing"), the Bankruptcy Court entered orders granting certain of the First Day Motions and applications on interim and final bases:

- the **Order Retaining Stretto as Noticing Agent** authorizing the Debtors to retain Stretto as third-party claims and noticing agent [Docket No. 54];

- the **Creditor Matrix Order** authorizing the Debtors to (a) File a consolidated list of creditors (the "Creditor Matrix"), (b) File a consolidated list of the Debtors' fifty (50) largest unsecured creditors; and (c) redact certain personal identification information [Docket No. 55];

- the **Schedules and Statements Order** extending the deadline by which the Debtors' Schedules and Statements were to be Filed [Docket No. 57];[~~147~~162]

- the **Automatic Stay Order** restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and ipso facto protections of the Bankruptcy Code [Docket No. 60];

- the **Interim and Second Interim Cash Management Order** authorizing the Debtors to continue to operate their cash management system on terms agreed between the Debtors and the Committee [Docket Nos. 56 and 513];

- the **Interim and Final Wages Orders** authorizing the Debtors to continue paying prepetition wages and continue employee benefits programs [Docket Nos. 61 and 518];

- the **Interim and Final Critical Vendors Orders** authorizing the Debtors to honor certain payments to vendors incurred in the ordinary course of business before the Petition Date [Docket Nos. 80 and 520];

- the **Interim and Final Insurance Orders** authorizing the Debtors to honor existing insurance obligations [Docket Nos. 59 and 524];

- the **Interim and Final NOL Orders** approving certain notifications and procedures regarding the transfer of, and declarations of worthlessness with respect to, common

---

[~~145~~160]    As further explained here, pursuant to the *Order (I) Applying Certain Orders in Initial Debtors' Chapter 11 Cases To, GK8 LTD., GK8 USA LLC, and GK8 UK Limited and (II) Granting Related Relief* [Docket No. 1655] applying certain orders entered in the Initial Debtors' chapter 11 cases to GK8, effective as of the GK8 Petition Date, the events described here apply with equal force to GK8 except for in certain circumstances.

[161]    As further explained herein, GK8 Filed voluntary petitions for chapter 11 relief on December 7, 2022.

[~~147~~162]    *See infra*, Article VII.D for more information about the procedural history of the Schedules and Statements Order, including further extensions of the deadline by which the Debtors had to File their Schedules and Statements.

stock of Celsius Network Inc. and CNL [Docket Nos. 58 and 525];

- the **Interim and Final Taxes Orders** authorizing the Debtors to pay certain taxes and fees that arose in the ordinary course of business before the Petition Date [Docket Nos. 62 and 526];

- the **Utilities Order** approving the Debtors' proposed adequate assurance of payment for future utility services under section 366 of the Bankruptcy Code and prohibiting utility providers from altering, refusing, or discontinuing services [Docket No. 527]; and

- the **Interim and Final Case Management Orders** approving and implementing certain notice, case management, and administrative procedures [Docket Nos. 63 and 528].[163]

In the weeks following the Second Day Hearing, the Bankruptcy Court also granted the following First Day Motions on interim and final bases:

- the **Bidding Procedures Order** approving the Debtors' bidding procedures with respect to the sale of the equity interests in GK8 Ltd. or some or all of its assets [Docket No. 687]; and

- the **Third Interim and Final Cash Management Orders** authorizing the Debtors to continue to operate their cash management system on terms agreed between the Debtors and the Committee [Docket Nos. 699 and 1152].

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at: https://cases.stretto.com/celsius.

The Debtors also Filed several other motions subsequent to the Petition Date (the "Second Day Motions") to facilitate the Debtors' restructuring efforts and ease administrative burdens. Following the Second Day Hearing, the Bankruptcy Court entered orders granting the following relief:

- the **Mined Bitcoin Order** authorizing the Debtors continue to sell their mined Bitcoin subject to certain requirements between the Debtors and the Committee [Docket No. 514];

- the **Contract Procedures Order** authorizing and approving procedures to reject or assume executory contracts and unexpired leases [Docket No. 517];

- the **Ordinary Course Professionals Order** approving procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses [Docket No. 519];

- the **Interim Compensation Order** approving procedures for the compensation of retained professionals in these Chapter 11 Cases [Docket No. 521];

- the **De Minimis Assets Order** approving expedited procedures for the sale or abandonment of certain de minimis assets [Docket No. 692];

---

[163]    The Final Case Management Order was subsequently amended with respect to procedures for obtaining hearing dates for *pro se* filers and the extension of objection deadlines. *See Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 1181] ¶¶ 19, 27.

- the **Bidding Procedures Sealing Order** authorizing the Debtors to File under seal the names of certain confidential parties in interest related to the Debtors' potential sale of certain assets [Docket No. 697]; and

- the **Retention Orders** granting the Debtors' applications to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code.[~~149~~164]

The foregoing professionals, among others, are each integral to the Debtors' restructuring efforts and ultimate emergence from chapter 11. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

Given the unique nature of, and the number of professionals working in these cases, the U.S. Trustee, the Debtors, and the Committee agreed to the appointment of an independent fee examiner.[~~150~~165] After a hearing on October 20, 2022, the Bankruptcy Court appointed Christopher Sontchi, the former Chief Judge of the United States Bankruptcy Court for the District of Delaware, as the fee examiner (the "Fee Examiner") to review and assess all interim and final applications for allowance of compensation and reimbursement of expenses Filed by retained professionals for compliance with (1) Bankruptcy Code sections 329, 330 and 331, as applicable, (2) Bankruptcy Rule 2016, (3) the Interim Compensation Order, and (4) and rule 2016-1 of the Local Bankruptcy Rules for the Southern District of New York and the applicable guidelines for compensation.[~~151~~166]

## B.    The Debtors' Motions to Protect Personally Identifiable Information.

In addition to the First Day and Second Day Motions, the Debtors Filed a set of motions in the early days of these Chapter 11 Cases seeking enhanced protection of their stakeholders' personally identifiable information. In particular, the Debtors were aware of (i) the concerns of many customers, employees, and the Debtors' directors and officers that the public disclosure of their home addresses, email addresses, or names on the docket could potentially subject them and their families to identity theft, blackmail, harassment, stalking, and doxxing;[~~152~~167] and (ii) the possibility of "customer poaching" by

---

[164]    Latham & Watkins LLP as Special Counsel, effective as of the Petition Date [Docket No. 838]; Stretto as Administrative Advisor, effective as of the Petition Date [Docket No. 841]; Alvarez & Marsal North America, LLC as Financial Advisor, effective as of the Petition Date [Docket No. 842]; Akin Gump Strauss Hauer & Feld LLP as Special Litigation Counsel, effective as of the Petition Date [Docket No. 843]; Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession, effective as of the Petition Date [Docket No. 845]; Centerview Partners LLC as Investment Bankers, effective as of the Petition Date [Docket No. 846]; Ernst & Young LLP as tax compliance services and tax advisory services provider, effective as of the Petition Date [Docket No. 1766]; Fischer (FBC & Co.) as Special Counsel, effective as of December 7, 2022 [Docket No. 1906]; A.M. Saccullo Legal, LLC as Special Counsel, effective as of December 1, 2022 [Docket No. 2142]; Stout Risius Ross, LLC as the Debtors' valuation advisor, effective as of February 21, 2023 [Docket No. 2498]; Andersen LLP as UK tax services provider, effective as of February 28, 2023 [Docket No. 2755]; and Mark Andrews & Company, d/b/a KE Andrews, as property tax services provider, effective as of January 1, 2023 [Docket No. 2753].

[165]    *See* Oct. 20, 2022 Hr'g Tr. 108:1–109:20; *see also Notice of Presentment of Order Appointing Independent Fee Examiner and Establishing Related Procedures for the Review of Fee Applications of Retained Professionals* [Docket No. 1117].

[~~153~~166]    *Order Appointing Independent Fee Examiner and Establishing Related Procedures for the Review of Fee Applications of Retained Professionals* [Docket No. 1151] ¶¶ 1–6.

[~~153~~167]    Doxxing is a form of cyberbullying and is the term used for the harassment technique of finding and then posting a user's sensitive personal information, including addresses, phone numbers, and even social security numbers. *See Dox*, Merriam Webster, https://www.merriam-webster.com/dictionary/dox (last visited March 11, 2023).

the Debtors' competitors using the home addresses, email addresses, and names of the Debtors' customers published on the docket. Accordingly, on August 3, 2022, the Debtors Filed the *Debtors' Ex Parte Motion Pursuant to Section 107 of the Bankruptcy Code Seeking Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information from the Creditor Matrix, Schedules and Statements, and Related Documents and (II) Granting Related Relief* [Docket No. 344] (the "Sealing Motion"). The Sealing Motion sought to maintain public access to Bankruptcy Court records while protecting over 600,000 individuals from having home addresses, email addresses, and names (where applicable) published without their consent on the internet in a format easy to "data-mine" and readily accessible from anywhere in the world at a keystroke. In the Sealing Motion, the Debtors sought to redact (a) the home addresses and email addresses of any citizens of the United States located in the United States, including the Debtors' employees, individual shareholders, and individual customers, and (b) the names, home addresses, and email addresses of any citizens of the United Kingdom or European Economic Area member countries and any individual whose citizenship is unknown. The Sealing Motion was joined by the Committee [Docket No. 399] and supported by the Ad Hoc Group of Withhold Account Holders [Docket No. 633] and the Ad Hoc Group of Custodial Account Holders [Docket No. 642], but objected to by the U.S. Trustee [Docket Nos. 600 and 607].

To further secure their individual customers' safety and limit the unnecessary risks of theft, on August 30, 2022, the Debtors Filed the *Debtors' Motion Pursuant to Section 107 of the Bankruptcy Code Seeking Entry of an Order (I) Authorizing the Debtors to (A) Redact Individual Names, and (B) Implement an Anonymized Identification Process, and (II) Granting Related Relief* [Docket No. 639] (the "Anonymization Motion"), requesting that the Bankruptcy Court grant the additional relief of redacting individual customer names regardless of where such individual customers are located, in any instance when individual customer names would be disclosed in connection with customer account balances, including in the Schedules and Statements.[168]

The U.S. Trustee Filed an objection to the Sealing Motion [Docket No. 607], to which the Debtors Filed an omnibus reply [Docket No. 638].[169] The Debtors subsequently Filed a supplemental reply in support of the Sealing Motion and the Anonymization Motion [Docket No. 782] (the "Redaction Reply"). The Redaction Reply emphasized that, although the Debtors sought to redact and anonymize certain information due to the undue risk of identity theft, safety, and security created by the particular circumstances of these Chapter 11 Cases, the Debtors would be able to balance the countervailing need for public access and transparency by providing unredacted documents to the Bankruptcy Court, U.S. Trustee, counsel to the Committee, and certain other parties in interest upon request.[170] The Committee supported the Sealing Motion and the Anonymization Motion and Filed a joinder to the Sealing Motion and supplemental joinder to the Redaction Reply [Docket Nos. 399 and 785].

On September 28, 2022, the Bankruptcy Court entered the *Memorandum Opinion and Order on the Debtors' Sealing Motion* [Docket No. 910] (the "Sealing Opinion"), granting in part and denying in part the relief requested in the Sealing Motion and the Anonymization Motion. Specifically, the Bankruptcy Court (a) authorized the Debtors to, among other things, redact the home addresses and email addresses of individual creditors,[171] (b) denied the request to redact the names of individuals and the

---

[168]    Anonymization Motion ¶¶ 3–4.

[169]    In addition to replying in support of the Sealing Motion, the Debtors' reply also responded to the U.S. Trustee's *Omnibus Objection to the Debtors' Retention Applications* [Docket No. 601].

[170]    Redaction Reply ¶ 3.

[171]    Sealing Opinion at 4.

request to redact the names, email addresses, and, to the extent requested, the physical addresses of business entities, and (c) denied the Anonymization Motion.[172]   The Bankruptcy Court found that, while customers' email and physical addresses, "in combination with their names, could make individual account holders more vulnerable to identify theft and render account holders' crypto assets more susceptible to criminal theft," "customer names alone, without their addresses and emails, would not unequivocally identify people."[173]

The Debtors have continued their efforts to protect personally identifiable information of all Account Holders where possible.  Throughout the course of these Chapter 11 Cases, there have been several phishing attempts targeting Account Holders, with suspected aims ranging from gaining remote access to Account Holders' computers and stealing financial assets and inducing payments of fraudulent "filing fees" and "tax fees," to obtaining personally identifiable information and account information from Account Holders.[174]   To date, the Debtors have Filed five notices to warn Account Holders and all parties in interests of these phishing attempts, and will continue to do so for the remainder of these Chapter 11 Cases.[175]

### C.    Appointment of the Unsecured Creditors' Committee.

On July 27, 2022, the U.S. Trustee Filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 241], appointing the following unsecured creditors to the Committee: Caroline G. Warren, Thomas DiFiore, Scott Duffy for ICB Solutions, Christopher Coco, Andrew Yoon, Mark Robinson, and Keith Noyes for Covario AG.  The Committee also Filed applications to retain their professionals pursuant to sections 327 and 328 of the Bankruptcy Code, which the Bankruptcy Court granted.[176]

### D.    Schedules and Statements.

On October 5, 2022, the Debtors Filed their schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs (the "Schedules") [Docket Nos. 973 and 974].[177]   As described further herein, the Debtors amended their Schedules

---

[172]   *Id.*

[173]   *Id.* at 25, 27.

[174]   *See, e.g.*, *Notice of Phishing Attempts* [Docket No. 1527] (informing parties in interest of phishing emails sent to certain of the Debtors' customers purporting to be from restructuring associates at Kirkland & Ellis LLP and requesting that customers submit their wallet addresses and other account information to receive claim distributions).

[175]   *See* [Docket Nos. 1527, 1681, 1904, 1992, and 2082].  All notices of phishing attempts may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius/content/1804-phishing-attempts/.

[176]   White & Case LLP as Counsel, effective as of July 29, 2022 [Docket No. 829]; Perella Weinberg Partners LP as Investment Banker, effective as of August 2, 2022 [Docket No. 1096]; Elementus Inc. as Blockchain Forensics Advisor, effective as of August 1, 2022 [Docket No. 1097]; M3 Advisory Partners, LP as Financial Advisor, effective as of August 1, 2022 [Docket No. 1098]; Gornitzky & Co. as Israeli Counsel, effective as of November 2, 2022 [Docket No. 1760]; Selendy Gay Elsberg PLLC as Co-Counsel, effective as of January 8, 2023 [Docket No. 2251]; and Kroll Restructuring Administration LLC as Noticing and Information Agent, effective as of August 5, 2022 [Docket No. 827].

[177]   On October 14, 2022, the Debtors withdrew the Third SOFAs and Schedules Extension Motion [Docket No. 1064].

on March 24, 2023.[163178]Interested   parties   may   review   the   Schedules   free   of   charge   at https://cases.stretto.com/Celsius.

On October 25, 2022, the Series B Holders, as beneficial holders, or investment advisors or managers of beneficial holders, of the Series B Preferred Interests, Filed the *Series B Preferred Holders' Motion Pursuant to Bankruptcy Rule 1009 for Entry of An Order Directing the Debtors to Amend Their Schedules* [Docket No. 1183] (the "Series B Motion to Amend the Schedules") requesting that the Bankruptcy Court direct the Debtors to amend the Debtors' Schedules E/F such that each Claim is denominated in U.S. Dollar amounts as of the Petition Date instead of *only* providing native Cryptocurrency coin counts."[164179]   The Debtors Filed the *Debtors' Objection to Series B Preferred Holders' Motion Pursuant to Bankruptcy Rule 1009 for Entry of an Order Directing the Debtors to Amend Their Schedules* [Docket No. 1304] (the "Debtors' Objection to the Series B Motion to Amend the Schedules") maintaining that the Filed Schedules comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), and Official Bankruptcy Forms, and, to the extent they do not, the Bankruptcy Court should otherwise permit the Schedules to remain as Filed pursuant to Bankruptcy Rule 1007(b).[165180]

Prior to the hearing on the Series B Motion to Amend the Schedules scheduled for November 14, 2022, and after discussions with the Debtors and Committee, the Series B Holders Filed the *Notice of Filing Revised Proposed Order Pursuant to Bankruptcy Rule 1009 Directing the Debtors to Amend Their Schedules* [Docket No. 1342] (the "Revised Proposed Order to Amend the Schedules"), which was agreed upon by the Debtors and the Committee.[166181]   The Revised Proposed Order provided that (a) the Debtors would File a Conversion Table that includes all listed Cryptocurrency on the Schedules as of the Petition Date, and (b) all parties' rights are reserved with respect to the issues of (i) whether Account Holder Claims, or distributions on account of such Claims, are required to be stated in U.S. Dollars or determined by reference to U.S. Dollars, and (ii) whether the U.S. Dollar amounts of Account Holder Claims is relevant in any future proceeding in these cases.  Following the hearing, the Bankruptcy Court entered the order as requested [Docket No. 1387].

The issues reserved in the Revised Proposed Order to Amend the Schedules are interconnected with the Debtors' and Series B Holders' resolution of issues related to the Bar Date Motion and the Revised Proposed Bar Date Order (each as defined herein).  Further, as discussed in Article VII.L.3 of this Disclosure Statement, the Debtors subsequently Filed a motion seeking the establishment of a briefing schedule to resolve certain closely related legal issues, specifically, whether all Debtors were liable to Account Holders under the Terms of Use [Docket No. 1338].  Following the Customer Claims Ruling (as defined herein), which held that only Network LLC could be held contractually liable for Account Holders' contract claims under the Terms of Use,[167182] the Debtors began the process of amending their Schedules and Statements to reflect that (a) contract claims related to the Debtors' Earn Program, Custody Program, and Withhold Accounts are only against Network LLC and not any other Debtor entity, and (b) contract claims related to the Debtors' Borrow Program are only against Lending LLC.  On March 24, 2023, the Debtors Filed these amendments to Schedule F, Statement of Financial

---

[163178]   *See Notice of Filing of Amended Global Notes, Statement of Financial Affairs 3 and 4, and Schedule F* [Docket No. 2311] (the "Amended Schedules").

[164179]   Series B Motion to Amend the Schedules ¶¶ 1–5.

[165180]   *See generally* Debtors' Objection to the Series B Motion to Amend the Schedules.

[166181]   *See generally* Nov. 15, 2022 Hr'g Tr. [Docket No. 1386] at 18:10–25, 19:1, 5–25, 20:1–12.

[167182]   Customer Claims Ruling (as defined herein) at 38.

Affairs 3 and 4, and the Global Notes. In connection with the Debtors' amended Schedules and Statements, the Debtors established April 28, 2023, as a Supplemental Bar Date for any affected claims.¹⁶⁸¹⁸³ As explained further in Article VII.H of this Disclosure Statement, however, the Supplemental Bar Date was stayed until entry of the *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors Establishing Account Holder Bar Date* [Docket No. 3066] (the "July Bar Date Stipulation"), which establishes August 2, 2023, at 5:00 p.m., prevailing Eastern time, as the Bar Date.

## E.    341 Creditors' Meetings.

On August 15, 2022, the U.S. Trustee Filed a notice setting the first meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for August 19, 2022, at 9:00 a.m., prevailing Eastern Time [Docket No. 459].¹⁶⁹¹⁸⁴ Because the Debtors Filed the Second SOFAs and Schedules Extension Motion requesting an extension of the deadline to File schedules and statements to September 12, 2022, the Debtors did not File their Schedules and Statements in advance of the first 341 Meeting. At the first 341 Meeting, the U.S. Trustee; the Committee; and customers questioned the Company's Chief Financial Officer, Chris Ferraro ("Mr. Ferraro"), over a period of several hours about a wide range of topics, including the Debtors' financial affairs, the details of the Debtors' mining operations, ongoing investigations into the Debtors, and other issues.

Subsequent to the Debtors' Filing of the Schedules and Statements, the U.S. Trustee Filed a notice setting the second meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for October 13, 2022, at 9:30 a.m., prevailing Eastern Time [Docket No. 1004].¹⁷⁰¹⁸⁵ As at the first 341 meeting, the U.S. Trustee, White & Case, and multiple customers questioned Mr. Ferraro over a period of several hours, primarily regarding the Schedules and Statements.

On January 13, 2023, the U.S. Trustee Filed a notice setting the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code for GK8 for January 26, 2023, at 11:00 a.m., prevailing Eastern Time [Docket No. 1857].¹⁷¹¹⁸⁶ The U.S. Trustee and two retail customers briefly questioned Mr. Ferraro, as the Director and Chief Financial Officer of GK8 Ltd., Director of GK8 USA LLC, and Director of GK8 UK Limited, regarding the GK8 Sale. ¹⁷²¹⁸⁷

## F.    The Key Employee Retention Plan.

On October 11, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1021] (the "KERP Motion" and the plan set forth therein, the "KERP"), seeking approval of the proposed KERP. The proposed KERP provided for payment of Cash retention awards to sixty-two of the Debtors' non-insider employees (the "KERP Participants") who perform vital roles in cash and digital asset management, IT infrastructure and data management, digital security, accounting, legal, compliance, and

---

¹⁸³    *See Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

¹⁶⁹¹⁸⁴    *See generally* Aug. 19, 2022 341 Meeting Tr.

¹⁷⁰¹⁸⁵    *See generally* Oct. 13, 2022 341 Meeting Tr.

¹⁷¹¹⁸⁶    *See generally* Jan. 26, 2023 341 Meeting Tr.

¹⁸⁷    *See infra*, Article VII.M.1 for more information about the GK8 Sale.

other critical functions.[173188]  The KERP was necessary to prevent employee attrition and avoid the further cost and time required in connection with replacing employees—indeed, between the Petition Date and the Filing of the KERP Motion, 99 of the Debtors' employees had resigned.[174189]

The proposed KERP was supported by the Committee but objected to by the U.S. Trustee.[175190] The Committee underscored the Debtors' concerns that continued attrition of key employees could frustrate the Debtors' stability and prevent them from accomplishing the milestones necessary to emerge from chapter 11.[176191]  The U.S. Trustee stated that the Filed KERP, which was redacted, did not provide enough information for the public to determine conclusively whether any of the KERP Participants were insiders.[177192]

After a hearing on November 1, 2022, the Bankruptcy Court denied, without prejudice, both the KERP Motion and the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1020] (the "KERP Sealing Motion").[178193]  In doing so, the Bankruptcy Court found that the "proposed redactions [in the KERP Sealing Motion] essentially prevent anyone who does not see the unredacted motion from having any idea what the Debtors are asking the Court to approve" and that the Debtors "have not provided enough information for the Court to evaluate the relationship between the proposed KERP payments and the results sought to be achieved."[179194]  To rectify these issues, the Bankruptcy Court directed the Debtors to "provide a public evidentiary record that establishes that each of the proposed KERP recipients is not an insider, and that each of the proposed recipients, *based on the job responsibilities that each recipient is expected to perform*, is expected to fulfill job responsibilities related to the restructuring process (either in a standalone plan or proposed going concern sale) beyond what they were expected to do before bankruptcy."[180195]

On November 22, 2022, the Debtors Filed the *Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No.

---

[173188]    *See generally* KERP Motion.

[174189]    Simultaneously with the KERP Motion, the Debtors also Filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1020], seeking permission to redact and File under seal the KERP Participants' job titles, job descriptions, supervisors, hiring personnel, corresponding salaries, and proposed KERP awards.

[175190]    *See The Official Committee of Unsecured Creditors' Statement With Respect to the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1187] (the "Committee Statement on the KERP"); *Objection of the United States Trustee to Motion of Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1207] (the "UST Objection to the KERP").

[176191]    Committee Statement on KERP ¶ 3.

[177192]    UST Objection to the KERP at 2.

[178193]    *Order Denying Debtors' KERP Sealing Motion and Denying Without Prejudice Debtors' KERP Motion* [Docket No. 1268] (the "First KERP Order").

[194]    First KERP Order at 1–2.

[180195]    First KERP Order at 3 (emphasis original).  The Bankruptcy Court also stated, "For both competitive reasons and physical risks potentially faced by its employees, the Court will permit the Debtors to redact the names of each proposed KERP recipient from the public record…The redacted public record must also include the current salary information in reasonably narrow dollar ranges (but not the exact salary amount for each employee) and the proposed KERP payments (again in reasonably narrow dollar ranges (but not the exact dollar amounts))."  *Id.* at 4.

1426] (the "Amended KERP Motion") and the *Debtors' Amended Motion for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Confidential Information Related to the Debtors' Key Employee Retention Plan* [Docket No. 1425] (the "Amended KERP Sealing Motion"). The U.S. Trustee again objected.[196] *Pro se* creditor Victor Ubierna de las Heras also Filed an objection, asserting that any employees who withdrew Cryptocurrency from the Celsius platform in late May or early June based on inside information should not be a KERP Participant.[197]

The Debtors agreed to exclude any KERP Participant who withdrew Cryptocurrency from the Celsius platform or transferred Cryptocurrency from another service into the Custody Program within ninety (90) days before the Petition Date pending further analysis.[198]

The Bankruptcy Court granted both the Amended KERP Sealing Motion and the Amended KERP Motion during the hearing on December 5, 2022, explaining that the Bankruptcy Court was "satisfied that the participants are not insiders" and that the Debtors "have provided detailed information about the participants' duties, salary, and position within the reporting structure."[199] Importantly, the KERP Order prevented the Debtors from making payments to any proposed KERP Participants who withdrew Cryptocurrency from the platform, or transferred Cryptocurrency from another program into the Custody Program within ninety (90) days before the Petition Date, pending further investigation and analysis.[200]

Pursuant to the KERP Order, the Debtors investigated proposed KERP Participants who withdrew Cryptocurrency from the platform, or transferred Cryptocurrency from another program into the Custody Program within ninety (90) days before the Petition Date, including a review of the relevant transaction history and interviews with each of the relevant KERP Participants.[201] As a result of the investigations, the Debtors decided to reinclude twelve proposed KERP Participants in the KERP, three of whom will be reincluded following the satisfaction of certain conditions, which include, as relevant, returning withdrawn funds to the platform and authorizing the Debtors to reverse transfers made into the Custody Program, as set forth and authorized by the KERP Order.[202]

---

[196]    *Objection of the United States Trustee to the Amended Motion of Debtors for Entry of Order Approving Debtors' Key Employee Retention Plan* [Docket No. 1551].

[197]    *Victor Ubierna de las Heras Objection to Debtors' Amended Motion for Entry of an Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1544] ¶ 1.

[198]    *Id.* ¶ 3.

[199]    Dec. 5 Hr'g Tr. 191:16–19.  The Bankruptcy Court read its full opinion from the bench, *see id.* 186–198; *see also Order (I) Approving the Debtors' Key Employee Retention Plan and (II) Granting Related Relief* [Docket No. 1683].

[200]    KERP Order ¶ 4.  If, following analysis and investigation, the Debtors determine that any excluded KERP Participant did not transact on the basis of inside information, the Debtors may, after providing notice to counsel to the Committee and the U.S. Trustee, propose their re-inclusion in the KERP.  *Id.*  The Debtors may also add a replacement participant(s) to the KERP upon the resignation or the termination for cause of any KERP Participant after providing the requisite notice and information about the replacement participant(s) to the counsel to the Committee and the U.S. Trustee.  *Id.* at ¶ 5.

[201]    *Declaration of Allison Lullo Regarding Investigation into Certain Proposed Participants in the Key Employee Retention Plan* [Docket No. 1892] (the "KERP Investigation Declaration") ¶ 3.

[202]    KERP Investigation Declaration ¶ 4; *see also Notice of Reinclusion of Participants in the Key Employee Retention Program* [Docket No. 1893].  Information about each reincluded KERP Participant's job description, division, supervisor's name and title, the hiring person, cash salary range, and award range was attached to the KERP Investigation Declaration as Exhibit A.

In addition, on March 29, 2023, the Debtors Filed the *Notice of Addition of New KERP Participants to the Key Employee Retention Plan* [Docket No. 2339], noting that twelve new KERP Participants were added to the KERP in accordance with the procedures established by the KERP Order, that counsel to the Committee and the U.S. Trustee were provided with the requisite notice and information, and that neither objected to the addition of these new KERP Participants.

### G.    Appointment of the Examiner and Cooperation with the Examiner.[203]

On August 18, 2022, United States Trustee Filed the *Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 546].  On September 14, 2022, the Bankruptcy Court entered an order [Docket No. 820] (the "Examiner Order") directing the appointment of an Examiner (the "Examiner").[204]  On September 29, 2022, the United States Trustee appointed Shoba Pillay, of Jenner & Block LLP, as Examiner [Docket No. 920] and the Bankruptcy Court entered the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923].

In the Examiner Order, the Bankruptcy Court directed that the scope of the Examiner's investigation include:

- an examination of the Debtors' Cryptocurrency holdings, including a determination as to where the Debtors' Cryptocurrency holdings were stored prepetition, where they were being stored postpetition, and whether different types of accounts are commingled;

- an examination as to why there was a change in account offerings beginning in April 2022 from the Earn Program to the Custody Service for some customers while others were placed in a "Withhold Account;"

- an examination of the Debtors' procedures for paying sales taxes, use taxes, and value added taxes and the extent of the Debtors' compliance with any non-bankruptcy laws with respect thereto; and

- an examination of the status of the utility obligations of the Debtors' mining business.[205]

On November 1, 2022, the Bankruptcy Court entered the *Order Approving Examiner's Motion to Confirm Examination Scope or Alternatively for Expansion of the Scope of the Examination* [Docket No. 1260] (the "Examination Scope Expansion Order"), clarifying that topic (i) of the Examiner's investigation also included "an examination of the Debtors' CEL [T]okens, including why and how other digital assets were converted into CEL [T]okens, and how these tokens were marketed, stored, and traded – including whether any of the Debtors' trading practices involving CEL [T]okens generally or

---

[203]    Capitalized terms used but not defined in this section have the meaning ascribed to such terms in the Interim Examiner Report and the Final Examiner Report.  The following summaries of the Interim Examiner Report and the Final Examiner Report are not intended to replace or fully summarize the content of the Reports.

[204]    Following extensive discussions with the U.S. Trustee and the Committee, the Debtors reached a resolution providing for the appointment of an examiner with a defined scope that would not duplicate the ongoing investigations already being conducted by the Committee and the Debtors' Special Committee, as explained in the *Debtors' Response and Limited Objection to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 757], *The Official Committee of Unsecured Creditors' Limited Objection and Reservation of Rights to the Motion of the United States Trustee for Entry of an Order Directing the Appointment of an Examiner* [Docket No. 758], and the *Notice of Filing of Agreed Proposed Order Granting Examiner Motion* [Docket No. 752].

[205]    Examiner Order ¶ 3.

determinations of CEL [T]okens awarded as part of the Earn Rewards program – impacted their value" and that topic (ii) included "an examination of the representations Debtors generally made in public representations to customers to attract them to their platform about their cryptocurrency holdings and account offerings."[206] The scope of the Examiner's investigation was further modified on November 14, 2022, when the Bankruptcy Court entered the *Stipulation and Agreed Order Modifying Scope of Examiner Order* [Docket No. 1343] (the "Examination Scope Modification Order") directing that the Examiner's scope "expand[] to include an investigation and report on whether the Debtors used new deposits being made by customers to make payments or otherwise meet obligations to existing customers at a time when the Debtors had no other sources (whether liquid or which could have been monetized) from which to make such payments or meet such obligations[.]"[207]

Throughout the Examiner's investigation, the Debtors and the Committee cooperated extensively with the Examiner to ensure she had the requisite information to complete her investigation. Over the course of the Examiner's investigation, the Debtors provided the Examiner with approximately 500 gigabytes of data and records, which included 231,000 documents, and made numerous current and former Celsius employees and customers available for interviews.[208] On April 4, 2023, following the Examiner's motion requesting discharge,[209] the Bankruptcy Court discharged the Examiner.[210]

*1. Interim Examiner Report.*

The Examiner released the *Interim Report of Shoba Pillay, Examiner* [Docket No. 1411] (the "Interim Examiner Report") on November 19, 2022, and the *Final Report of Shoba Pillay, Examiner* [Docket No. 1956] (the "Final Examiner Report") on January 31, 2023. The Examiner's overarching finding in the Interim Examiner Report was that the Custody Program was launched as a swift response to regulatory scrutiny and remained a work-in-process after its April 15, 2022 launch date.[211] The Interim Examiner Report also described that Withhold Accounts were established to help the Company handle digital assets that Celsius could not accept or digital assets that were transferred by non-accredited U.S. Account Holders living in states where Celsius did not have the appropriate licenses to offer Custody Accounts.[212] These Withhold Assets were not separated from other digital assets but were commingled with other digital assets on the Debtors' platform and deployed like other Celsius assets, including deposits in the Earn Program.[213]

Finally, the Interim Examiner Report detailed the status of Custody Assets, Withhold Assets, and related liabilities in the time immediately before and after the Pause.[214] Shortly before and after the Pause, the delta between the Custody Program's liabilities to customers and the amount of digital assets

---

[206]    Examination Scope Expansion Order ¶ 2–3.

[207]    Examination Scope Modification Order ¶ 1.

[208]    Final Examiner Report at 33–35.

[209]    *Examiner's Motion for Entry of an Order Discharging Examiner* [Docket No. 2284].

[210]    *Order Discharging Examiner* [Docket No. 2364].

[211]    Interim Examiner Report at 27–60.

[212]    *Id.* at 70.

[213]    *Id.* at 70–74.

[214]    *Id.* at 74–81.

in the Custody Wallets shifted significantly.[200][215] Thus, the initial surplus of digital assets in Custody Wallets compared to the liabilities owed to Custody users deteriorated approaching the Pause and resulted in a material shortfall.[201][216] Celsius also recorded increased Withhold Assets in the same time period.[202][217] Shortly after the Pause, Custody and Withhold Account balances increased due to customer transfers, attempted withdrawals from the Earn Program that were halted in the Custody Program, and Celsius' system permitting some transfers from the Earn Program to the Custody Program post-Pause.[203][218] Celsius continued to manually reconcile digital assets held in Custody and the Custody Wallets post-Pause, which resulted in a smaller deficit at the Petition Date.[204][219]

### 2. Final Examiner Report.

On January 31, 2023, the Examiner issued the Final Examiner Report. The Examiner's main finding in the Final Examiner Report was that, pre-petition, Celsius was unable to successfully execute its business plan and therefore engaged in various risky investments in an attempt to grow and maintain its customer base.[205][220] In particular, Celsius purchased CEL Token such that the price of CEL Token was artificially inflated and Celsius' balance sheet was correspondingly overstated, the Debtors' former executives benefitted by selling their holdings of CEL Token, and the Debtors sold customer deposits of other digital assets to fund customer rewards in CEL Token.[206][221] This, coupled with a lack of sufficient internal controls, resulted in shortfalls of various types of digital assets.[207][222] In addition, the Examiner determined that the rewards Celsius paid to customers were not based on Celsius' revenue, but Celsius nonetheless continued this practice to remain competitive in the market.[208][223] Attempts to earn the unsustainable yield it paid to customers through strategic investments pushed the Debtors' management towards riskier deployments and investments such as increased unsecured lending.[209][224] When it started experiencing significant losses, Celsius began the process of establishing a risk management policy, but was unable to fully do so before Filing for chapter 11.[210][225] Further, customers were not aware of the challenges Celsius faced because of misstatements made by Mr. Mashinsky and other of Celsius' former executives regarding the state of the business and the level of risk of Celsius' investments.[211][226]

---

[200][215]     *Id.* at 76–77.

[216]     *Id.* at 77.

[202][217]     *Id.* at 76.

[203][218]     *Id.* at 79.

[204][219]     *Id.* at 79–80.

[220]     Final Examiner Report at 3.

[206][221]     *Id.* at 6–10.

[207][222]     *Id.* at 10–11.

[208][223]     *Id.* at 14.

[209][224]     *Id.* at 15–16.

[210][225]     *Id.* at 19.

[211][226]     *Id.* at 20–21.

The Examiner also determined that Celsius did not have adequate procedures for ensuring appropriate tax was paid to various taxing authorities, particularly with respect to Celsius Mining and CNL.[227] As a result, Celsius Mining likely has pre- and postpetition use tax liability and CNL may owe value-added taxes, although the Examiner noted that the Debtors' current tax professionals are attempting to resolve these outstanding issues.[228] With respect to the mining business generally, the Examiner also reviewed the business' utility obligations and found that they are satisfied with two exceptions: (i) one relating to an ongoing dispute with Core Scientific (as defined herein) as to the amount of the claims; and (ii) one relating to prepetition amounts that may nevertheless be satisfied by prepayment balances.[229]

Finally, the Examiner recounted the market collapse that exacerbated Celsius' existing problems and forced the Company to institute the Pause and then to File for chapter 11 protection.[230] During this time of extreme industry volatility, Celsius faced increasing customer withdrawals that it ultimately could not satisfy, despite contrary public statements made to the community.[231] In reviewing how Celsius satisfied withdrawal requests during this industry crisis, the Examiner determined that Celsius largely satisfied withdrawal requests from the commingled pool of assets already under management, although the Examiner identified two instances in which the commingled assets in the pool that funded withdrawals of a certain coin type consisted of new customer deposits of that coin type.[232]

The Final Examiner Report explained that Celsius' customer facing advertisements, messaging, and other representations masked how Celsius actually operated its businesses and subsequent missteps to curb the damage caused by poor investment decisions and other losses.[233] Celsius' artificial manipulation of CEL Token, inability to manage risk or deploy investments appropriately, and personnel deficiencies within many segments of the Company created an unsustainable business model kept afloat by misleading customers about the health of the business.[234] Industry headwinds led to a "run on the bank," exposing these internal fractures and compelling the Debtors to File for chapter 11 protection.[235]

### H.    Bar Date Motion.

On October 11, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Submitting Proofs of Claim, (II) Approving Procedures for Submitting Proofs of Claim, (III) Approving Notice Thereof, and (IV) Granting Related Relief* [Docket No. 1019] (the "Bar Date Motion") seeking approval of an order (a) setting bar dates for creditors to submit proofs of Claims (the "Bar Dates, and "Proofs of Claim," respectively), (b) approving the procedures and proposed form for submitting Proofs of Claim, (c) approving the form and manner of service of the notice of the Bar

---

[227] *Id.* at 30–31.

[228] *Id.* at 31–32, 33.

[229] *Id.* at 377–78, 402.

[230] *Id.* at 22–26.

[231] *Id.* at 25–26.

[232] *Id.* at 29, 350–54.

[233] *Id.* at 3–22.

[234] *Id.* at 3–22, 30–33.

[235] *Id.* at 22–26.

Dates, including the form of publication notice and (d) granting related relief. On November 16, 2022, the Bankruptcy Court entered an order granting the relief set forth in the Bar Date Motion, as amended by a revised proposed bar date order [Docket No. 1368] (the "Bar Date Order").

The Bar Date Order established the following dates and deadlines with respect to the Debtors: (a) January 3, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all persons and entities were required to submit Proofs of Claim based on prepetition Claims, including requests for payment under section 503(b)(9) of the Bankruptcy Code (the "General Claims Bar Date"); (b) January 10, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all Governmental Units were required to file Proofs of Claim (the "Governmental Bar Date"); (c) solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, establishing the later of (i) the General Claims Bar Date and (ii) any date the Bankruptcy Court may fix in the applicable order authorizing such rejection and, if no such date is provided, thirty days from the date of entry of such order; and (d) in the event the Debtors amend or supplement their Schedules, supplemental bar dates (any such date, a "Supplemental Bar Date") which shall afford parties at least thirty-five days from the date on which such notice is given to submit a Proof of Claim.[236]

Pursuant to the Bar Date Order, any party required to file a Proof of Claim under the Bar Date Order that failed to do so before the applicable Bar Date is forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors are forever discharged from any indebtedness or liability relating to such claim. ***Such party will not be permitted to vote or accept or reject the Plan or receive any recovery under the Plan.***[237]

On January 10, 2023, the Bankruptcy Court entered an order extending the deadlines for submitting Proofs of Claim as to the Initial Debtors [Docket No. 1846] to February 9, 2023, at 5:00 p.m., prevailing Eastern Time.

On March 14, 2023, the Debtors established Supplemental Bar Dates for GK8.[238] The Debtors established (a) April 18, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all persons and entities are required to file Proofs of Claim against GK8, and (b) June 5, 2023, at 5:00 p.m., prevailing Eastern Time, as the deadline by which all governmental units are required to file Proofs of Claim against GK8.[239]

On October 14, 2022, the Debtors Filed the *Notice of Presentment and Opportunity for Hearing on Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Extend the Deadline for Filing a Nondischargeability Complaint* [Docket No. 1066], thereby agreeing to extend the Governmental Bar Date for the Federal Trade Commission (the "FTC") to March 31, 2023.[240] The Debtors Filed two more stipulations further agreeing to extend the Governmental Bar Date for the FTC [Docket Nos. 2354, 2705, and 2976]; the Governmental Bar Date for the FTC is now August 14, 2023. Similarly, on December 23, 2022, the Debtors Filed the *Notice of Presentment and Opportunity for Hearing on Joint Stipulation and Agreed Order Extending the Bar Date for the Securities and Exchange*

---

[236] *Bar Date Order* ¶¶ 2–4.

[237] *Id.* ¶ 6.

[238] *Notice of Deadline Requiring Submission of Proofs of Claim Against the Gk8 Debtors on or Before April 18, 2023, and Related Procedures for Submitting Proofs of Claim in the Chapter 11 Cases of the GK8 Debtors* [Docket No. 2231].

[239] *Id.*

[240] The Bankruptcy Court entered the order on November 7, 2022 [Docket No. 1296].

*Commission and the Debtors to Extend the Filing Deadline for Filing a Nondischargeability Complaint* [Docket No. 1095] thereby agreeing to extend the Governmental Bar Date for the SEC to March 31, 2023.[226][241]  Pursuant to additional stipulations, the Governmental Bar Date for the SEC has been extended to August 14, 2023 [Docket Nos. 2346, 2710, and 3014].

The Debtors also extended the General Claims Bar Date following the Bankruptcy Court's resolution of the question of whether the General Terms of Use limit customer Claims to Network LLC only, and not any other Debtor or non-Debtor affiliate (as described in Article VII.L.3 of this Disclosure Statement).[227][242]  Accordingly, the Debtors established a Supplemental Bar Date requiring that any claims arising from the amendment of the Schedules and Statements be filed by April 28, 2023.[228][243]  The Debtors also informed Account Holders that they must file an additional Proof of Claim in the event that they wished to assert a non-contractual claim against an entity besides Celsius Network LLC.[229][244]

On April 18, 2023, however, the Bankruptcy Court approved the Committee's motion requesting authority to File a class action proof of claim or other representative action against CNL and other Debtor entities for non-contract claims—such as claims for alleged fraud, negligent misrepresentation, or other statutory or common law claims—on behalf of all account holders [Docket No. 2496].  That order provided that the Supplemental Bar Date would be stayed until the Court ruled on the certification of the putative class.[230][245]

On July 20, 2023, following mediation (and as discussed in further detail in Article III.~~LLL~~MMM and Article VII.K.4 of this Disclosure Statement), the Debtors reached a settlement with the Committee, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and certain individual creditors regarding, among other issues, the certification of the putative class, and Filed a motion requesting that the Bankruptcy Court approve the Class Claim Settlement (as defined herein).  Pursuant to the Class Claim Settlement, the Debtors agree to certification of the putative class, as requested by the Committee.

Thereafter, the Debtors and the Committee Filed, and the Bankruptcy Court approved and entered, the July Bar Date Stipulation, which establishes August 2, 2023, at 5:00 p.m., prevailing Eastern time, as the <u>final deadline for submitting Proofs of Claim (the "Bar Date")</u>.

In light of the number of Proofs of Claim filed, on February 1, 2023, the Debtors Filed the *Debtors' Motion for an Order (I) Approving (A) Omnibus Claims Objection Procedures and Form of Notice, (B) Omnibus Substantive Claims Objections, and (C) Satisfaction Procedures and Form of Notice and (II) Modifying Bankruptcy Rule 3007(e)(6)* [Docket No. 1972] (the "<u>Omnibus Claims Objection Motion</u>").  Therein, the Debtors sought approval of procedures and form of notice to expedite and complete the Claims reconciliation process in a timely, efficient, and cost-effective manner.  On February

---

[226][241]    The Bankruptcy Court entered the order on January 13, 2023 [Docket No. 1858].

[242]    <u>Customer Claims Ruling</u> at 28.

[228][243]    *Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

[229][244]    *Id.*

[230][245]    *Order Granting the Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert Non-Contract Claims on Behalf of Account Holders* [Docket No. 2496].

16, 2023, the Bankruptcy Court granted the relief requested in the Omnibus Claims Objection Motion [Docket No. 2090].

The Debtors received 24,859 Proofs of Claim, totaling approximately $78.2 billion, timely filed by the General Claims Bar Date.  In addition, the Debtors received 81 Proofs of Claim by Governmental Units totaling approximately $7~~7~~.2 billion timely filed by the Governmental Bar Date.  ~~As of the date of the Filing of this Disclosure Statement~~Additional Proofs of Claim were Filed until the Bar Date and, as of June 27, 2023, the Debtors received an additional 4,992 Proofs of Claim, totaling approximately $53 million.  The Debtors received one Proof of Claim by a Governmental Unit totaling approximately $22,000.

## I.    The Request for Appointment of an Equity Committee.

On September 22, 2022, the Series B Holders Filed the *Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 880] (the "Equity Committee Motion") requesting that the Bankruptcy Court appoint an Equity Committee.[~~244~~246]  The Series B Holders argued that an Equity Committee was warranted given the number of unresolved key legal issues which could impact the recoveries of the preferred equity holders (the "Preferred Equity Holders") of CNL, and the divergent interests of the Preferred Equity Holders, on the one hand, and the Committee and Debtors, on the other hand.[~~232~~247]  A joinder to the Equity Committee Motion was Filed by Andersen Invest Luxembourg S.A. SPF, an 0.05% equity holder in CNL (together with the Series B Holders, the "Requesting Equity Holders").[~~233~~248]

On October 13, 2022, the Debtors Filed an objection to the Equity Committee Motion.[~~234~~249]  Therein, the Debtors argued that the Requesting Equity Holders failed to satisfy their high burden of showing that an Equity Committee is necessary—with two key considerations being (a) whether equity holders are unable to represent themselves, and (b) whether there is a substantial likelihood that the equity holders would receive a meaningful distribution under a strict application of the absolute priority rule.[~~235~~250]  The Committee also Filed an objection to the Equity Committee Motion.[~~236~~251]

---

[~~231~~246]    Previously, on July 19, July 22, and July 28, 2022, counsel for the Series B Holders sent a letter to the U.S. Trustee requesting the appointment of an official committee of the holders of CNL's preferred equity securities (an "Equity Committee").  The Committee responded to the Series B Holders' letters on August 10, 2022.  The Debtors also responded to the Series B Holders on the same day, and the Series B Holders replied to the Debtors' response on August 15, 2022.  Upon reviewing these communications, the U.S. Trustee—which has the discretion to appoint an Equity Committee—did not make a determination on whether an Equity Committee should be appointed in these Chapter 11 Cases.

[~~232~~247]    Equity Committee Motion ¶ 1.

[~~233~~248]    *Joinder of Andersen Invest Luxembourg SA SPF to the Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 924].

[249]    *Debtors' Objection to Motion for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 1045] (the "Objection to the Equity Committee Motion").

[250]    *Id.* ¶¶ 16–18.

[~~236~~251]    *The Official Committee of Unsecured Creditors' Objection to the Motion of Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. for Entry of an Order Directing the Appointment of an Official Preferred Equity Committee* [Docket No. 1048] (the "Committee Objection to the Equity Committee Motion").  The Committee Objection to the Equity Committee Motion made arguments similar to those in the

On October 24, 2022, the Bankruptcy Court issued the *Memorandum Opinion and Order Denying Motion for the Appointment of an Official Preferred Equity Committee* [Docket No. 1166] (the "Equity Committee Memorandum Opinion") denying, without prejudice, the relief requested in the Equity Committee Motion for three primary reasons:  (a) the equity holders were adequately represented and were not found to need additional representation; (b) the Series B Holders did not meet their burden of demonstrating a substantial likelihood of equity recovery; and (c) "other factors such as the balance of costs and benefits to the estate" did not weigh in favor of appointment.[237][252]

On May 17, 2023, the Series B Holders sent a letter to the U.S. Trustee to renew their request for the appointment of an Equity Committee (the "Equity Committee Letter").  The Equity Committee Letter sets forth a number of reasons why a renewed request and the appointment of an Equity Committee is appropriate, including:  (a) the Customer Claims Order's impact on Account Holder Claims against CNL, (b) the Series B Holders' belief that the Debtors will not zealously defend CNL against the Committee's Class Claim against CNL, (c) the Debtors' stipulation with the Committee granting the Committee authority to prosecute fraudulent transfer claims on behalf of Network LLC against CNL, (d) the Committee joining the Debtors in seeking substantive consolidation of Network LLC and CNL, and (e) the fact that the Plan provides no recovery to Preferred Equity Holders.[238][253]  The Series B Holders assert that an Equity Committee is appropriate because the Preferred Equity Holders lack meaningful representation and because CNL is not hopelessly insolvent.[239][254]

As of the date of the Filing of this Disclosure Statement, ~~no Equity Committee has been appointed and the Debtors Filed~~ the Series B Settlement ~~Motion~~Order was entered, mooting the need for an Equity Committee.

**J.      The Special Committee Investigation.**

*1.   General Scope and Mandate.*

As noted elsewhere in this Disclosure Statement, as part of its work, the Special Committee is vested with the authority to, among other things:  (i) review and, if appropriate, investigate credible allegations of misconduct by the Company or its current or former employees, officers, or directors, including working with independent counsel as appropriate to assist in any such investigation, (ii) consider, authorize, and implement any recommendations, remediation, or disciplinary action in connection with any such investigation, and (iii) communicate with regulators and third parties as necessary in connection with any such investigation.  The Special Committee retained Kirkland & Ellis LLP ("Special Committee Counsel") to provide independent advice to, and act at the exclusive direction of, the Special Committee in connection with the Special Committee's mandate.

During its investigation, Special Committee Counsel has sought and received information related to, among other things: (i) Company policies and internal controls; (ii) public statements related to the Company, including on social media and Ask Mashinsky Anything sessions; and (iii) CEL Token

---

Debtors' Objection to the Equity Committee Motion and highlighted the various constituencies which represented the interests of the equity holders.  *See generally id.*  The Committee Objection to the Equity Committee also disputed the notion that customers' and equity holders' interests were "uniquely adverse." *Id.* ¶ 22.

[237][252]     Equity Committee Memorandum Opinion at 9.

[253]     Equity Committee Letter at 2–3.

[239][254]     *Id.* at 3–4.

purchases and sales, including by executives and the Company. Among other things, Celsius provided access to email, Slack communications, Google Drive documents, and, in certain cases, mobile phone messaging data, from numerous Company employees. In addition to reviewing documents and information related to the aforementioned topics, Special Committee Counsel interviewed Celsius employees and attended interviews of Celsius employees conducted by the Examiner and the Committee.

The Special Committee, through Special Committee Counsel, has also interfaced with various regulators, including the USAO, SEC, CFTC, FTC, and various state regulators. As a result, on July 13, 2023, the Debtors announced that they had reached settlements and/or a non-prosecution agreement with these federal regulatory agencies, as described in further detail below. At the same time, these federal agencies announced indictments or filed charges against one or a combination of Mr. Mashinsky, Mr. Leon, Mr. Goldstein, and Mr. Cohen-Pavon.

Since the Filing of the revised Disclosure Statement on July 29, 2023, the Debtors have also been engaging with state regulators regarding a potential settlement of their Claims against the Debtors, as explained below.

(a)     The Debtors' Non-Prosecution Agreement with the USAO.

(i)     **The indictment of Mr. Mashinsky and Mr. Cohen-Pavon.**

On July 13, 2023, the USAO unsealed an indictment against Mr. Mashinsky and Mr. Cohen-Pavon and announced that it had entered into the NPA with the Debtors. The USAO's indictment charges Mr. Mashinsky with securities fraud, commodities fraud, and wire fraud, asserting that Mr. Mashinsky defrauded and misled customers with respect to Celsius' profitability and how it invested the Cryptocurrency customers transferred to Celsius. The indictment further charges Mr. Mashinsky and Mr. Cohen-Pavon with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token. Specifically, the USAO asserts that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices.

The indictment alleges that two schemes were orchestrated. In the first, Mr. Mashinsky falsely represented Celsius as a profitable company and safe financial investment. Specifically, the indictment alleges that Mr. Mashinsky misrepresented the nature of Celsius' profitability, its yield-generating activities, the long-term sustainability of high rewards rates offered to customers, the risks associated with using Celsius, the percentage of revenue Celsius returned to customers in the form of rewards, the collateralization of the Company's loans, institutional counterparty defaults, and Celsius' regulatory compliance.[255] The indictment further alleges that Mr. Mashinsky made false statements during the AMAs that he regularly hosted, and that these AMAs had to be edited by other employees after the fact, although no correction was issued in relation to any AMA. In reality, Mr. Mashinsky openly discussed Celsius' lack of profitability with other Company executives internally,[256] Celsius paid out more in rewards than it earned,[257] Celsius suffered large and undisclosed losses, including a shortfall of hundreds of millions of dollars' worth of BTC,[258] and though Mr. Mashinsky claimed that the

---

[255]     United States of America v. Alexander Mashinsky, et al., ¶ 15, 23 Cr. (S.D.N.Y. July 13, 2023).

[256]     Id. ¶ 25.

[257]     Id. ¶ 26.

[258]     Id. ¶ 30.

Company's loans were fully or partially collateralized, uncollateralized loans actually made up a substantial and growing percentage of Celsius' institutional loan portfolio.[244259]

In the second scheme, the indictment alleges that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token, causing the public to purchase CEL Token at inflated prices and then selling their own holdings of CEL Tokens at those prices for profit, and that Mr. Mashinsky made additional false statements with respect to this scheme. For instance, the indictment alleges, Mr. Mashinsky repeatedly stated publicly that Celsius had sold all of its CEL Token in its ICO and thereby raised a total of $50 million, when it had in fact only sold one-third of all available CEL Token and raised $32 million.[245260] After the ICO, Mr. Mashinsky and Mr. Cohen-Pavon caused Celsius to purchase CEL Token, including by using customer deposits, which led to an increase in the price of CEL Token, at which point they sold their personal holdings of the token.[246261] The indictment alleges that Mr. Mashinsky netted approximately $42 million and Mr. Cohen-Pavon approximately $3.6 million from the sale of their CEL Tokens.[247262]

### (ii)    The NPA.

On July 11, 2023, the Debtors entered into the NPA with the USAO. Pursuant to the NPA, which only binds the USAO and no other federal, state, or local prosecuting or regulatory authority, the USAO will not criminally prosecute the Debtors for their involvement in the above schemes. Specifically, the Debtors will not be criminally prosecuted with respect to the first scheme to defraud and mislead customers about Celsius' yield-generating activities and the degree of risk to which customers' transferred cryptocurrency was exposed as a result, and the Debtors will not be criminally prosecuted with respect to the second scheme to manipulate the price and volume of CEL Tokens.

*Acceptance of Responsibility.* The Debtors accept and acknowledge as true, and the NPA incorporates, a statement of facts describing the two schemes discussed above and Mr. Mashinsky's and Celsius' role therein (the "Statement of Facts"). The Statement of Facts describes the Debtors' background, history, prepetition operations, and the services they offered. The Statement of Facts further states that the two schemes discussed above were carried out under the supervision and at the direction of Mr. Mashinsky starting in or about 2018 up to and including in or about May 2022. The Statement of Facts describes Mr. Mashinsky's conduct, stating that he made false and misleading statements about core aspects of Celsius' business in order to convince customers to transfer to or continue to hold Cryptocurrency on Celsius' platform. The Statement of Facts further describes Mr. Mashinsky's and other executives' statements regarding Celsius and CEL Token in the media, on social media, and via the AMAs. The Statement of Facts details how, beginning in 2020, Celsius employees repeatedly raised concerns about Mr. Mashinsky's statements on AMAs and that Mr. Mashinsky's misrepresentations on the AMAs were edited after the fact before the AMAs were posted online, but that no corrections were ever issued to the public. Further, Mr. Mashinsky also made such misrepresentations in video and print publications, and no corrections of such misrepresentations were ever issued. The Statement of Facts details Mr. Mashinsky's and Celsius' misrepresentations about how many CEL Tokens were sold in the ICO and how much money was really raised from the ICO, and explains how Mr. Mashinsky portrayed the CEL Token as an indicator of Celsius' success and profitability more broadly. Despite Mr.

---

[244259]    *Id.* ¶¶ 35–36.

[245260]    *Id.* ¶ 5.

[261]    *Id.* ¶ 6.

[247262]    *Id.* ¶ 8.

Mashinsky's public statements, the Statement of Facts explains, Celsius earned a profit in only a few months, and experienced significant losses that were not shared publicly. Celsius' financial situation was precarious in 2022 in the months leading up to the Pause.

*Continuing Obligation to Cooperate*. The NPA provides that Celsius has a continuing obligation to cooperate with the USAO in any and all matters relating to the events described in the NPA and its Statement of Facts until all investigations and prosecutions arising out of these events are concluded. The NPA also requires Celsius to cooperate fully with other United States law enforcement, regulatory authorities, and regulatory agencies with respect to the events described in the NPA and its Statement of Facts and any other conduct being investigated by the USAO.

*Restitution and Remedial Obligations*. The NPA makes clear that the USAO will not impose a fine or seek a forfeiture of Celsius' assets because of the Debtors' efforts in their Chapter 11 Cases to maximize recoveries for customers.

*Additional Obligations*. The NPA provides that the Debtors will be criminally prosecuted if they commit any crimes after entering into the NPA, if it is determined that the Debtors have given false, incomplete, or misleading testimony or information, or if they violate any part of the NPA. If the Debtors are found to have done any of these things, all statements made by the Debtors to the USAO, the SEC, the CFTC, or other law enforcement, and any testimony given by any then current officer, agent, or employee of Celsius before a grand jury or other tribunal, before or after the signing of the NPA, and any leads procured from such statements, will be admissible as evidence in any criminal proceeding brought against Celsius. Further, Celsius will not be able to assert that any such statements or leads generated by such statements should be suppressed according to Rule 410 of the Federal Rules of Evidence or any other such federal rule.

The NPA tolls the statute of limitations for any prosecution that is not already time-barred by July 11, 2023, and the Debtors waive all defenses based on the statute of limitations by entering into the NPA.

Finally, any successor entity must formally adopt and execute the NPA in order to receive its protections, no matter if the successor's interest arises through a merger or plan of organization. Similarly, any purchasers of all or substantially all of the Debtors' assets must enter into a written agreement and agree to a continuing obligation to cooperate in order to receive the protections of the NPA.

<div align="center">(b)    <u>Settlements with Regulatory Agencies.</u></div>

<div align="center">(i)    <b>The SEC Settlement.</b></div>

In addition to the criminal indictment by the USAO, several regulatory agencies filed civil complaints against one or a combination of Mr. Mashinsky, Mr. Leon, and Mr. Goldstein. The Debtors consensually resolved all such actions against the Debtors as corporate defendants.

On July 13, 2023, the SEC filed a complaint in the United States District Court for the Southern District of New York (the "<u>District Court</u>") against CNL and Mr. Mashinsky (the "<u>SEC Complaint</u>").[248263] The SEC alleges that CNL and Mr. Mashinsky committed fraud and violated federal securities law by

---

[248263]    *See generally* Complaint, *SEC v. Celsius Network Limited*, 1:23-cv-6005 (PC) (S.D.N.Y., July 13, 2023) [SEC Docket No. 1].

failing to register the Earn Program as a securities offering, making false and misleading statements about the Earn Program and the CEL Token, and engaging in market manipulation of the CEL Token.

Specifically, the SEC alleges that the CEL Token constituted a crypto asset security, and that the Earn Program also constituted a securities offering.[264] Further, it asserts that Celsius marketed and sold the Earn Program without filing a registration statement, even though no exemption from registration was available under the law.[265] The SEC also alleges that CNL and Mr. Mashinsky manipulated the market for the CEL Token by secretly repurchasing CEL Token in an effort to inflate the token's price at the expense of customers and to enrich CNL and Mr. Mashinsky.[266] Finally, the SEC alleges that CNL and Mr. Mashinsky perpetuated the fraudulent scheme to induce investors to purchase CEL Token and invest in the Earn Program through false and misleading statements about CNL's business model, the risks involved, the safety of customer assets and CNL's compliance with laws and regulations, the success of the ICO, the size of the Company's customer base, and the Company's profitability.[267]

Such conduct, the SEC alleges, violated Sections 5(a), 5(c), and 17(a) of the Securities Act; Sections 9(a)(2) and 10(b) of the Exchange Act; and Rule 10b-5 promulgated under Section 10(b) of the Exchange Act.[268] Sections 5(a) and 5(c) of the Securities Act require issuers of securities to file a registration statement with the SEC that provides investors information about the securities offering, the issuer, and the risks involved in the offering. Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder provide for liability for the fraudulent sale of securities. The SEC Complaint charges Mr. Mashinsky and CNL with four counts of fraud and one count of making unregistered offers and sales of securities. The SEC Complaint requests that:

- the District Court find that Mr. Mashinsky and CNL committed the violations alleged in the SEC Complaint;

- Mr. Mashinsky and CNL be permanently prohibited from engaging in any further conduct that violates the Securities Act and the Exchange Act;

- Mr. Mashinsky be prohibited from ever again serving as an officer or director of any issuer of securities registered under the Exchange Act;

- Mr. Mashinsky be permanently prohibited from participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset securities, or engaging in activities for the purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by others; and

- Mr. Mashinsky be ordered to give up any profit gained from the conduct alleged by the SEC, pay prejudgment interest, and pay civil penalties.

---

[264]    SEC Complaint ¶ 3.

[265]    SEC Complaint ¶¶ 1, 3, Section I.B.

[266]    SEC Complaint ¶10, Section IV; *see also* Press Release, SEC, SEC Charges Celsius Network Limited and Founder Alex Mashinsky with Fraud and Unregistered Offer and Sale of Securities (July 13, 2023), https://www.sec.gov/news/press-release/2023-133 (the "SEC Press Release").

[267]    SEC Complaint ¶¶ 3–9, Section III; SEC Press Release.

[268]    SEC Complaint ¶ 14; SEC Press Release.

Following a consensual resolution between the SEC and the Debtors, the SEC filed the *Plaintiff's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited*, requesting entry of a final judgment (the "SEC Final Judgment") that enjoins CNL from violating Sections 5 and 17(a) of the Securities Act and Sections 9(a) and 10(b) of the Exchange Act, namely from unlawfully selling securities as well as committing fraud and making false statements in connection with the sale of securities.[269]  Pursuant to the settlement, however, the Debtors will not be required to pay a fine  or penalty, which will allow the Debtors to provide as large a recovery as possible to their creditors.  The SEC will continue pursuing its claims against Mr. Mashinsky.

(ii)     **The CFTC Settlement.**

On July 13, 2023, the CFTC filed a complaint in the District Court against Network LLC and Mr. Mashinsky in connection with Celsius' prepetition activities (the "CFTC Complaint" and "CFTC Defendants," respectively).[270]  The CFTC alleges, among other things, that Network LLC's prepetition activities violated the Commodity Exchange Act and the regulations promulgated thereunder (the  "CFTC Regulations").[271]

Specifically, the CFTC alleges that the CFTC Defendants made false and misleading statements to "induce customers to deposit and not withdraw their digital asset commodities from the Celsius platform" and that Network LLC operated as an unregistered commodity pool operator in violation of the Commodity Exchange Act.[272]  As described in the CFTC Complaint, the CFTC seeks injunctive and equitable relief as well as civil monetary penalties.

Substantially contemporaneously with the filing of the CFTC Complaint, the CFTC and Network LLC filed a proposed consent order of permanent injunction against Network LLC that represents a full and final settlement of any alleged violations by Network LLC under the Commodities Exchange Act or the CFTC Regulations without Network LLC admitting or denying the allegations raised in the CFTC Complaint.[273]

The District Court entered the *Consent Order of Permanent Injunction Against Defendant Celsius Network LLC* [CFTC Docket No. 11] (the "CFTC Consent Order") on July 17, 2023.  Pursuant to the CFTC Consent Order, Network LLC is permanently restrained, enjoined, and prohibited from directly or indirectly engaging in conduct that violates Sections 4k(2), 4m(1), 4o(1)(A)-(B), and 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and the CFTC Regulations.  Network LLC has also agreed to cooperate with the CFTC in the proceeding and any investigation, litigation, or proceeding relating to the CFTC Complaint.[274]  Mr. Mashinsky was not a

---

[269]     *See Plaintiff's Motion for Entry of a Final Judgment Against Defendant Celsius Network Limited*, *SEC v. Celsius Network Limited*, 1:23-cv-6005 (PC) (July 13. 2023) [SEC Docket No. 6], ¶¶ 2-4; *Notice of Press Release* [Docket No. 3016].

[270]     *CFTC v. Celsius Network, LLC*, 1:23-cv-6008 (S.D.N.Y. July 13, 2023) [Docket No. 1] (the "CFTC Docket").

[271]     CFTC Complaint ¶ 12.  The CFTC Complaint alleges that Network LLC violated Sections 4k(2), 4m(1), 4o(1)(A)-(B) and 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. §§ 6k(2), 6(m)(1), 6o(1)(A)-(B), and 9(1), and CFTC Regulations 4.21(a)(1) and 180.1(a)(1)-(3). 17 C.F.R. § § 4.21(a)(1), 180.1(a)(1)-(3). *Id*.

[272]     CFTC Complaint ¶¶ 3, 11.

[273]     *Consent Order of Permanent Injunction Against Defendant Celsius Network LLC* [CFTC Docket No. 5] ¶ 12.

[274]     CFTC Consent Order at 5.

party to the CFTC Consent Order, and the CFTC's action against him continues. As with the NPA and the settlements with the SEC and FTC, the CFTC Consent Order resolves all claims against the Debtors without the imposition of any fine or seizure of assets so that the Debtors can maximize creditor returns.

(iii)    **The FTC Settlement.**

On July 13, 2023, the FTC[260][275] filed a complaint in the District Court against Debtors Network LLC, Networks Lending LLC, Lending LLC, Celsius Mining, Celsius Network Inc., Celsius KeyFi LLC, and Celsius US Holding LLC (collectively the "FTC Debtor Defendants"), non-Debtors Celsius US LLC and Celsius Management Corp. (the "FTC Non-Debtor Defendants," and together with the FTC Debtor Defendants, the "FTC Corporate Defendants"), and Mr. Mashinsky, Mr. Leon, and Mr. Goldstein (together with the FTC Corporate Defendants, the "FTC Defendants"), seeking a permanent injunction, monetary relief, and other relief pursuant to the Federal Trade Commission Act, 15 U.S.C. §§ 53(b), 57b and the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6821 *et seq.*[261][276]

Specifically, the FTC Complaint alleges that the FTC Defendants (i) violated the Federal Trade Commission Act by making false or misleading representations in connection with the marketing of Celsius' products and services and misappropriating consumers' Cryptocurrency deposits, and (ii) violated the Gramm-Leach-Bliley Act by using false or fraudulent statements to obtain or attempt to obtain certain financial information of customers such as bank account numbers and Cryptocurrency wallet addresses.[262][277]

Simultaneously with the filing of the FTC Complaint, the FTC and the FTC Corporate Defendants filed a joint motion in the District Court representing that the parties had reached a settlement resolving the FTC Complaint with respect to the FTC Corporate Defendants and requesting that the District Court stay the FTC Complaint as to the FTC Corporate Defendants until the earlier of (i) 45 days from July 13, 2023 (*i.e.*, until August 28, 2023) or (ii) the Bankruptcy Court's approval of the stipulated order reflecting the settlement.[263][278] If the Bankruptcy Court approves the FTC Stipulated Order, the FTC and FTC Corporate Defendants will also file a motion in the District Court for approval thereof.

The FTC Stipulated Order, attached as Exhibit A to the FTC Stay Motion, provides for the following. First, the FTC Corporate Defendants are permanently prohibited from engaging in certain activities. Specifically, they are restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing, of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary. The FTC Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the Stipulated Order, are also permanently restrained and enjoined from, directly or indirectly

---

[260][275]    Prior to July 13, 2023, the Debtors and the FTC had entered into, and the Bankruptcy Court approved, four stipulations to extend the deadline for the FTC to file a nondischargeability complaint, through and including August 14, 2023 [Docket Nos. 1296, 2485, 2705, 2976].

[276]    *Federal Trade Commission v. Celsius Network Inc. et al*, Case No. 1:23-cv-06009-DLC (S.D.N.Y July 13, 2023) (the "FTC Docket"). *See Complaint for Permanent Injunction, Monetary Relief, and Other Relief* [FTC Do~~Action~~cket No. 1] ("FTC Complaint").

[262][277]    FTC Complaint at ¶¶ 95–113.

[263][278]    *See generally Joint Motion for Stay as to Corporate Defendants* [FTC ~~Action~~ Docket No. 3] (the "FTC Stay Motion"), and the *Stipulated Order for Permanent Injunction, Monetary Judgment and Other Relief Against Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, and Celsius Management Corp* (the "FTC Stipulated Order").

and in connection with promoting or offering for sale any product or service, (i) making misrepresentations about the benefits of or material facts about the FTC Defendants' products and services, (ii) obtaining or attempting to obtain customer financial information by false, fictitious, or fraudulent representations, (iii) violating the Gramm-Leach-Bliley Act, and (iv) disclosing Nonpublic Personal Information[279] about a consumer without the consumer's Express Informed Consent.[280]

Second, the FTC Stipulated Order provides that judgment in the amount of $4.72 billion (the "FTC Judgment") is entered in favor of the FTC against FTC Corporate Defendants. The FTC Stipulated Order provides, however, that the FTC Judgment is suspended as to the FTC Non-Debtor Defendants if certain reports and statements provided by the FTC Non-Debtor Defendants to the FTC are truthful, accurate, and complete and with regard to the FTC Debtor Defendants, the FTC Judgment is suspended so long as these Chapter 11 Cases are not closed, dismissed, or otherwise concluded without the Debtors' Estates being fully administered, including any distributions to creditors, in accordance with the Bankruptcy Code, as more fully set forth in the FTC Stipulated Order.[281] In other words, the Debtors do not actually have to pay the FTC Judgment as long as they abide by the terms of the FTC Stipulated Order.

Third, the FTC Stipulated Order provides that the FTC Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the FTC Stipulated Order, are required to comply with certain obligations with respect to (i) customer information, (ii) cooperation with the FTC, (iii) acknowledgement of the FTC Stipulated Order, (iv) compliance reporting, (v) recordkeeping, and (vi) compliance monitoring, as more fully set forth in the FTC Stipulated Order.[282]

Importantly, the FTC Stipulated Order does ***not*** (i) restrain or enjoin the deposit, exchange, distribution, investment, or withdrawal of assets owned or held by the FTC Debtor Defendants and being administered in accordance with the Bankruptcy Code and orders of the Bankruptcy Court, (ii) create a contingent liability against the FTC Debtor Defendants, or (iii) preclude the full distribution of assets held by the FTC Debtor Defendants in these chapter 11 cases.[283] In other words, as with the NPA and the settlements with the SEC and CFTC, the settlement with the FTC does not prevent the Debtors from returning as many assets as possible to creditors, because the FTC Judgment is suspended.

---

[279] "Nonpublic Personal Information" means "[a]ny information that Defendants obtain about a consumer in connection with providing a product or service to that consumer," or "[a]ny list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Nonpublic Personal Information that is not publicly available." FTC Stipulated Order at 5.

[280] "Expressed Informed Consent" means "an affirmative act communicating unambiguous assent made after receiving and in close proximity to a Clear and Conspicuous disclosure of all information material to the provision of consent." Assent obtained through any practice or user interface that has the effect of subverting or impairing consumer autonomy, decision-making, or choice, including using text that is not easily legible or disclosing material terms behind a hyperlink, dropdown icon, tooltip, or other similar interface, does not constitute Express Informed Consent. Acceptance of a general or broad terms of use or similar document that contains descriptions of agreement by the individual along with other, unrelated information, does not constitute Express Informed Consent. "Clear and Conscious" has the meaning ascribed to it in the FTC Stipulated Order.

[281] FTC Stipulated Order at 7, 8.

[282] *Id.* at 9–14.

[283] *Id.* at 6–7.

The Debtors, in the sound exercise of their business judgment, determined that the consensual resolution of the FTC Complaint with respect to the FTC Debtor Defendants via the FTC Stipulated Order reduces ongoing litigation and regulatory uncertainties, maximizes returns for all creditors, and is in the best interest of their Estates.

On July 26, 2023, the Debtors Filed the *Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Enter into Stipulated Order in the District Court* [Docket No. 3095], requesting the Bankruptcy Court's authorization for the Debtors to enter into the FTC Stipulated Order and take all necessary action to implement the settlement with the FTC.  On August 2, 2023, the Committee Filed a limited objection [Docket No. 3136], seeking to clarify that the FTC Judgment will not attach to the assets transferred to NewCo, and that the Debtors will not be required to reserve any funds for paying the FTC Judgement after the Effective Date.

(c)    The Proposed Settlement with State Regulators.

Pursuant to the Debtors' consent orders with the SEC, CFTC, and FTC consensually resolving the agencies' civil claims against them, the Debtors are not required to pay a fine, penalty, or judgment, and the government will not seize any of their assets.  Further, the federal agencies agreed to either have no Claim against the Debtors or to have their Claims against the Debtors subordinated to the Claims of Account Holders.  The Debtors' consensual resolutions with the federal agencies ensure that the Debtors will be able to distribute Estate assets to, and maximize the recoveries of, Account Holders.  The settlements also reduce the cost of ongoing litigation and regulatory uncertainties.

In addition to the Claims asserted by the federal agencies, several states Filed Claims against the Debtors totaling approximately $7.2 billion, including New Jersey, which Filed Claims against all eleven Debtors, with a Claim against each Debtor in the amount of approximately $6.9 billion.  New Jersey's eleven Claims make up nearly all of the liquidated Claims Filed by state regulators (approximately $6.9 billion of the total of $7.2 billion), although there are a number of unliquidated Claims as well.

Following the announcement of the Debtors' entry into the NPA with the USAO and consent orders with the SEC, CFTC, and FTC, the Debtors commenced discussions with certain state regulators, including those represented by counsel for the National Association of Attorneys General (the "NAAG") and the states of New Jersey, Texas, Vermont, and Tennessee, regarding the treatment of the state regulators' Claims against the Debtors.  The Debtors have proposed to enter into similar arrangements with state regulators to ensure that Account Holders will receive the maximum value possible from the Debtors' Estates and not have their Claims diluted by large Claims of state regulators.  These state regulators include the states named above and other state entities that have scheduled and/or Filed Claims in these Chapter 11 Cases.

As with the federal agencies' Claims, as of the date of the Filing of this Disclosure Statement, the Debtors proposed that the states that Filed Claims against the Debtors would effectively have their Claims subordinated to Account Holder Claims (by agreement of the parties or otherwise as ordered by the Court) such that any fine, penalty, or judgment resulting from states' Claims would be suspended and the Debtors could maximize the recoveries of Account Holders.  The Debtors extended this proposal to the NAAG and the states of New Jersey, Texas, Vermont, and Tennessee on or around August 2, 2023 and indicated it would be applicable to all States.  As of the date of the Filing of this Disclosure Statement, those parties are evaluating the proposal and remain in discussions with the Debtors, but no agreement has been reached as yet.

If and when the Debtors and the state entities, or any portion thereof, reach an agreement, the Debtors will File a notice on the docket explaining the agreed-upon resolution.

### 2.  Resignation of Alex Mashinsky and S. Daniel Leon.

Pursuant to its authority to remove and appoint any director of direct and indirect subsidiaries of CNL, on or around September 23, 2022, the Special Committee resolved that Mr. Mashinsky and Mr. Leon should be terminated from their positions with CNL and its subsidiary entities.[269][284]  On September 27, 2022, Mr. Mashinsky voluntarily resigned as Chief Executive Officer of CNL and from all other positions at the Company except for his directorship on the CNL Board.[270][285]  On September 30, 2022, Mr. Leon initiated the process of resigning as Chief Strategy Officer of CNL and from all other positions at the Company.[271][286]

### K.    Litigation Matters.

### 1.  Certain Non-Bankruptcy Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### (a)    Goines v. Celsius Network LLC, et al.

On July 13, 2022, a putative federal securities class action was filed against Network LLC, Lending LLC, Celsius KeyFi LLC, and certain of the Debtors' directors and officers in the United States District Court for the District of New Jersey (the "Securities Class Action" and such defendants, the "Securities Class Defendants").[287]  The Securities Class Action is brought on behalf of the class comprised of all persons, excluding any of the Securities Class Defendants, who were (a) Earn Program customers, (b) purchasers of CEL Token, or (c) borrowers through the Debtors' Borrow Program between February 9, 2018 and July 13, 2022.  The Securities Class Action asserts claims under the Securities Act, Exchange Act, and under theories of common law.

---

[269][284]    *Declaration of Alan Carr, Director of Celsius Network Limited, in Support of (I) the Debtors' Second Exclusivity Extension and (II) the Debtors' Objection to the Motion to Appoint a Chapter 11 Trustee* [Docket No. 2047] (the "Carr Declaration") ¶ 14.

[270][285]    *Id. See also Statement of the Official Committee of Unsecured Creditors Regarding (I) the Resignation of Alexander Mashinsky and (II) Other Transition Matters* [Docket No. 903] ¶ 3 ("The Committee believes that today's announcement [of Mr. Mashinsky's resignation] is a positive step that will allow the Debtors, the Committee, and all other stakeholders to focus on moving these cases forward in a prompt and efficient manner.").

[271][286]    Carr Declaration ¶ 14.

[287]    *Goines v. Celsius Network, LLC*, 2:22-cv-04560-KM-ESK (D.N.J. July 13, 2022).  An amended complaint was filed on June 19, 2023.

2.  *Core Scientific Litigation.*

On September 28, 2022, the Debtors Filed the *Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* [Docket No. 917] (the "Debtors' Motion to Compel Core Scientific") in response to what they believed were Core Scientific, Inc.'s ("Core Scientific")[288] willful violations of the automatic stay in connection with certain contractual obligations owed to the Debtors.[289]  On December 18, 2020, prior to the Petition Date, Core Scientific and Celsius Core LLC[290] entered into a Master Services Agreement to provide certain services in connection with Celsius' digital asset mining rigs, including services relating to colocation, hosting, monitoring, maintenance and repair, technical support, and heat and thermal management (the "Core MSA").[291]  In the Debtors' Motion to Compel Core Scientific, the Debtors allege that Core Scientific willfully violated the automatic stay through continued failure to uphold its contractual obligations under the Core Agreement (as defined herein).[292]  Specifically, the Debtors allege that Core Scientific (a) refused to perform its contractual obligations due to Celsius Mining under the Core Agreement,[293] (b) threatened to terminate the Core Agreement until Celsius Mining paid its prepetition obligations,[294] and (c) started adding improper surcharges, called "power cost pass-throughs," to Mining's invoices following the Petition Date—charges which are a breach of the fixed price structure of the Core Agreement, and which constitute an illegitimate attempt to setoff Celsius' prepetition debts.[295]

On October 19, 2022, Core Scientific Filed *Core Scientific, Inc.'s Objection to Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* [Docket No. 1140] (the "Core Objection to Debtors' Motion to Compel Core Scientific"), countering that Core Scientific did not violate the automatic stay.  Core Scientific argued that:  (a) it was not in breach of the Core Agreement because (i) Core Scientific was permitted under the Core Agreement to pass the increased power costs through to Mining, (ii) Core Scientific was performing in satisfaction of its hosting obligations by deploying all of

---

[288]  The specific entity that entered into agreements with Celsius Mining was "Core Scientific, Inc.," which subsequently changed its name to "Core Scientific Operating Company."  The lead debtor in the Core Scientific Bankruptcy (as defined herein) is a separate entity called "Core Scientific, Inc."  For simplicity, this section uses the term "Core Scientific" to refer to both the entity Celsius Mining entered into agreements with (Core Scientific Operating Company f/k/a Core Scientific, Inc.) and the lead debtor in the Core Scientific Bankruptcy (Core Scientific, Inc.).

[289]  *See generally* Debtors' Motion to Compel Core Scientific.

[290]  Celsius Core LLC was the predecessor entity of Celsius Mining.

[291]  *Declaration of Quinn Lawlor in Support of Debtors' Motion to Enforce the Automatic Stay and for Civil Contempt* [Docket No. 918] (the "Core Declaration") ¶ 1.  Under the Core MSA, Core Scientific and Core Celsius LLC executed a series of orders (the "Orders," and collectively with the Core MSA, the "Core Agreement"), including Order #10, which was executed on September 27, 2021.  Core Scientific Motion to Compel ¶ 9.  Celsius Mining and Core Scientific Operating Company (the entity formerly known as Core Scientific Inc.) executed a second master service agreement in December 2021 (the "2021 MSA," and together with the Core MSA, the "Core MSAs"), under which one additional order (Order No. 1A) was executed (the Core Agreement, the 2021 MSA, the Orders, Order No. 1A, and any related agreements, the "Core Contracts").

[292]  *See generally* Debtors' Motion to Compel Core Scientific.

[293]  Core Scientifics's failures to uphold its contractual obligations include failing to provide Celsius Mining with the hosting capacity it is entitled to under the Core Agreement, timely deploy Celsius Mining's rigs, or notify Celsius Mining of additional hosting capacity.  *Id.* ¶¶ 16–24.

[294]  Core Scientific threatened to not deploy new rigs until Celsius caught up on its payments.  *Id.* ¶ 25.

[295]  *Id.* ¶ 2.  Under the terms of Order #10, Core Scientific was obligated to provide Celsius a specified power allocation under an agreed upon schedule and to provide such services at a fixed rate.  *Id.* ¶¶ 9–14, 26–32.

Mining's rigs without unjustifiable delay, and (iii) Core Scientific lacked additional hosting availability and therefore did not breach the "notification of hosting availability" requirement under the Core Agreement; (b) Core Scientific did not threaten to terminate the Core MSA; and (c) Core Scientific's postpetition conduct did not otherwise violate the automatic stay.[280296]

On the same day, Core Scientific also Filed the *Motion of Core Scientific, Inc. (I) to Compel Immediate Payment of Administrative Expenses and (II) (A) For Relief from the Automatic Stay to Exercise Rights Under Master Services Agreement and Related Orders or (B) in the Alternative, to Compel Assumption or Rejection of Master Services Agreement and Related Orders* [Docket No. 1144] (the "Core Scientific Motion for Relief from Automatic Stay," and together with the Debtors' Motion to Compel Core Scientific, the "Core Scientific Motions"). Core Scientific argued that, pursuant to the Core Agreement, it is entitled to the payment of an administrative expense on account of the increased power costs charged by utility providers and passed through by Core Scientific to Mining and is entitled to the continued payment of such charges on a go-forward basis.[281297] Core Scientific also requested that the Bankruptcy Court lift the automatic stay so that it could exercise its rights under the Core Agreement, including its right to terminate.[283298]

Following the Filing of the Core Scientific Motions, Core Scientific and its debtor affiliates filed their own chapter 11 petitions in the Bankruptcy Court for the Southern District of Texas on December 21, 2022 (the "Core Scientific Bankruptcy").[283299] During the course of the Core Scientific Bankruptcy proceedings, Core Scientific filed the *Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining, LLC* [Core Scientific Docket No. 189] (the "Core Scientific Rejection Motion") seeking to reject the Core Contracts with Celsius Mining. On January 2, 2023, the Debtors filed a preliminary objection to the Core Scientific Rejection Motion [Core Scientific Docket No. 211].[284300] The Debtors contended that the rejection was sought at an inappropriate time.[285301] The Debtors argued that the circumstances, a product of Core Scientific's own actions, did not warrant a hearing on two business days' notice, which failed to provide the Debtors adequate time to consult with its stakeholders or to negotiate an orderly transition of the Debtors' mining rigs held by Core Scientific.[286302]

The Debtors further argued that rejection of the Core Contracts amounted to a technical violation of the automatic stay through Core Scientific's non-performance of its contractual obligations.[287303] On January 4, 2023, the Bankruptcy Court of the Southern District of Texas (the "Core Bankruptcy Court")

---

[280296]    *See generally* Core Objection to Debtors' Motion to Compel Core Scientific.

[281297]    *See generally* Core Scientific Motion for Relief from the Automatic Stay.

[298]    *See generally id.*

[283299]    *In re Core Scientific, Inc.*, No. 22-90341 (DRJ) (Bankr. S.D. Tex. 2022) (the "Core Scientific Docket").

[284300]    *Celsius Mining LLC's Preliminary Objection to the Debtors' Emergency Motion for Entry of an Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* [Core Scientific Docket No. 211] (the "Objection to the Core Scientific Rejection Motion").

[285301]    *Id.*

[286302]    *Id.* ¶¶ 2, 6, 7.

[287303]    *Id.* ¶¶ 3, 10.

approved the rejection of the Core Agreement and the process of transitioning the mining rigs back to the Debtors.[288304]

Following Core Scientific's rejection of the Core Contracts, the Debtors have worked with Core Scientific to coordinate the transition and return of the Debtors' rigs. As of the date of the Filing of this Disclosure Statement [/June 27, 2023], the Debtors have received approximately 37,539 rigs from Core Scientific. The Debtors or NewCo plan to put a combination of these rigs and other rigs into production in the near term. The NewCo Transaction provides a path to put the entire existing fleet of rigs into production in the near-term following emergence.

On January 3, 2023, Core Scientific Filed an initial Proof of Claim against Celsius Mining for approximately $1.4 million. On February 9, 2023, Core Scientific amended its Proof of Claim against Celsius Mining for approximately $3.9 million in connection with services provided under the Core Contracts, which include "hosting services for [rigs], prepayments for the hosting services, [and] building infrastructure."[289305]

On April 14, 2023, Celsius Mining filed a Proof of Claim in the Core Scientific Bankruptcy for approximately $312.3 million and additional unliquidated amounts (the "Core Claim").[290306] The Core Claim is comprised of five parts:

- Core Prepetition Breach Claim. A prepetition breach of contract claim on account of Core Scientific's breach of the Core Contracts (for an estimated amount of $111,998,000);

- Core Postpetition Breach Claim. A postpetition pre-rejection breach of contract claim on account of Core Scientific's breach of the Core Agreement (for an estimated amount of $1,497,000) (together with the Core Prepetition Breach Claim, the "Core Breach Claims");

- Core Administrative Claim. An administrative expense claim for the return of Celsius' postpetition pre-rejection prepayment of amounts invoiced under the Core Contracts in December 2022 for services to be provided in January 2023 (the "Core Prepayment") (for an estimated amount of $4,719,000);

- Core Rejection Claim. A claim for damages arising from Core Scientific's rejection of the Core Contracts (for an estimated amount of $194,104,000); and

---

[288304]    *Order Authorizing Rejection of Executory Contracts with Celsius Mining LLC* [Core Scientific Docket No. 232]; *see also Notice of Entry of Order Rejecting Contracts with Celsius Mining LLC in Core Scientific, Inc. Chapter 11 Cases* [Docket No. 1820].

[289305]    Claim No. 23022. Core Scientific has a Scheduled Claim of approximately $1.1 million against Celsius Mining. Scheduled Claim No. 2410085.

[290306]    *In re Core Scientific, Inc.* (Claim Nos. 425, 497) (claim number 497 amended claim number 425). According to Core Scientific, any claims asserted against Core Scientific Inc. by Celsius pursuant to contracts signed by Core Scientific Inc. and Celsius Mining prior to January 2022 "are more properly claims Core Scientific Operating Company" because the original Core Scientific Inc. entity changed its name to Core Scientific Operating Company in January 2022. *Debtors' Objection to Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. 503(B)(1)(A) and (II) Granting Related Relief* [Core Docket No. 861] (the "Core Administrative Claim Objection") fn. 2; *see also Declaration of Michael Bros in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Core Docket No. 5] ¶ 31.

- <u>Claim for Damages to Celsius Mining Rigs</u>.  An unliquidated claim for damages to Celsius Mining's rig as a result of Core Scientific's breach of the Core Contracts arising from its failure to maintain and inspect Celsius Mining's rigs in its possession.[291307]

On April 15, 2023, Celsius Mining filed *Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative Expense Claim Pursuant to 11 U.S.C. § 503(b)(1)(A) and (II) Granting Related Relief* [Core Docket No. 801] (the "Core Administrative Claim Motion"), requesting the prompt payment of the Core Administrative Claim.  As noted, the Core Administrative Claim stems from a December 2022 invoice, which sought payment of amounts including the Core Prepayment of $4.7 million.[292308]  On December 22, 2022, the same day as the first day hearing in the Core Scientific Bankruptcy, at which counsel to Core Scientific indicated that they looked forward to engaging with Celsius Mining, Celsius Mining sent a wire transfer to pay the invoiced amounts, which included the full Core Prepayment.[293309]  Because Core Scientific only performed under the Core Contracts until January 3, 2023, Celsius Mining requested that the Core Administrative Claim be allowed in the amount of the Core Prepayment less any services received through January 3, 2023.[294310]  The Core Administrative Claim Motion explained that treatment as an administrative expense was appropriate, for among other reasons, because (a) the Core Administrative Claim arose from a postpetition transaction with the Debtors, and (b) the Core Prepayment enhanced the ability of Core Scientific to function as a going concern."[295311]  Moreover, Celsius Mining argued that prompt payment was justified under the circumstances due to the hardships delay would cause—Celsius Mining has "net cash outflows and limited cash on hand."[296312]

On April 24, Core Scientific filed the *Debtors' Objection to Proof of Claim Nos. 425 and 497 Filed by Celsius Mining LLC* [Core Docket No. 819] (the "Core Claim Objection") requesting that the Core Bankruptcy Court disallow the Core Claim.  Core Scientific asserted that the Core Claim should be disallowed because:  (a) Celsius Mining is not entitled to any recovery on its Core Claim; (b) any amounts Celsius Mining may be entitled to are subject to the limitations of damages provisions under the Core Contracts;[297313] and (c) any amounts Celsius Mining may be entitled to are less than the amount Celsius Mining owes Core Scientific under the Core Contracts.[298314]

On May 5, 2023, Core Scientific filed an objection to the Core Administrative Claim Motion [Core Docket No. 861] (the "Core Administrative Claim Objection"), requesting the Core court deny the Core Administrative Claim Motion and, alternatively, direct the parties to mediation.[299315]  Core Scientific

---

[291307]    *See generally* Core Claim.

[292308]    Core Administrative Claim Motion ¶ 7.  The total invoiced amount was $5.8 million.  The $4.7 million Core Prepayment was equal to the estimated cost of hosting services to be provided in January 2023

[293309]    *Id.* ¶ 9.

[294310]    *Id.* ¶ 12–13.

[295311]    *Id.* ¶ 15.

[296312]    *Id.* ¶ 21.

[297313]    In particular, the Core Claim Objection claims that the Core MSAs expressly preclude "recoverable damages to an aggregate of one month's fee payable pursuant to the applicable order.  Core Claim Objection ¶ 32.

[298314]    Core Claim Objection ¶ 12.  Core Scientific argues that to the extent Celsius Mining would be entitled to recover, the Core Claim would be subject to defenses of set off and recoupment."  *Id.* ¶ 33.

[299315]    *Debtors' Objection to Celsius Mining LLC's Motion for Entry of an Order (I) Allowing and Directing Payment of its Administrative expense Claim Pursuant to 11 U.S.C. 503(B)(1)(A) and (II) Granting Related Relief* [Core Docket No. 861]

argued that treatment of the Core Prepayment as an administrative expense was inappropriate for reasons including, among others, that the amounts paid in connection with the Core Prepayment should instead be applied to older outstanding amounts then due under the Core Contracts.[316]  Core Scientific also argued that, to the extent that the Core Administrative Claim was allowed, that immediate payment would be inappropriate.[317]  A hearing on the Core Administrative Claim Motion was originally scheduled for May 22, 2023 [Core Docket No. 907], but has since been adjourned pending mediation.

On May 30, 2023, Core Scientific filed *Debtors' Motion for Partial Summary Judgment With Respect to Proof of Claim Nos. 425 and 497 Filed by Celsius Mining LLC* [Core Docket No. 942] (the "Core Motion for Summary Judgment "), requesting (a) that the Core Bankruptcy Court issue a judgment as a matter of law that limits Core Scientific's total aggregate liability on account of the Core Claim to $5.7 million (the "Core Claim Cap"), and (b) preclude Celsius Mining from asserting damages arising from lost profit or loss of revenues.[318]

Specifically, Core Scientific argues that the unambiguous language of the Core MSAs supports the Core Bankruptcy Court limiting the Core Claim (if allowed) to the Core Claim Cap as a matter of law.  In support, Core Scientific points to language in the Core MSAs which it claims limits total aggregate liability to an "amount equal to one (1) months fee payable to [Core Scientific] pursuant to the applicable order."[319]  Core Scientific also argues that the Core Breach Claims and Core Rejection Claim (total estimated amount of $307.6 million) should be disallowed as a matter of law because the Core MSAs prevent Celsius Mining from asserting damages for "lost profits; loss of business; loss of revenues; loss, interruption or use of data or loss of use of Celsius equipment; any consequential, or indirect damages; or cost of cover, incidental, special, reliance or punitive damages."[320]

On June 16, 2023, Celsius Mining, the Committee, and Core Scientific filed the *Joint Stipulation and Agreed Order Appointing a Mediator and Governing Mediation Procedures* [Core Docket No. 968] (the "Core Mediation Stipulation"), requesting the appointment of the Honorable Marvin Isgur, United States Bankruptcy Judge for the Southern District of Texas, to serve as mediator and facilitate the parties' consensual resolution of a number of interrelated issues and disputes (respectively, the "Core

---

*Administrative expense Claim Pursuant to 11 U.S.C. 503(B)(1)(A) and (II) Granting Related Relief* [Core Docket No. 861] ¶ 10.

[316]    *Id.* ¶ 44.  The outstanding amounts owed relate to the disputed pass through charges under the Core Agreement.  *Id.*

[317]    Core Scientific argued that immediate payment would be inappropriate due to (a) the prejudice it would pose to Core Scientific, (b) the lack of hardship Celsius would face, and (c) the harm it would cause to other creditors.  *Id.* ¶ 4–8.

[318]    Core Motion for Summary Judgment ¶ 2.

[319]    *Id.* ¶ 25 (citing Core MSAs § 5(d)).  Core Scientific claims that the one month's fee payable refers to the amount of the most recent month's invoice, which was approximately $5.7 million in December 2022.

[320]    *Id.*

Mediator" and the "Core Mediation").[305][321] The Core Mediation Stipulation also established a briefing schedule regarding Core's Motion for Summary Judgment.[306][322]

On June 21, 2023, Celsius Mining filed its objection to Core's Motion for Summary Judgment [Core Docket No. 984] requesting that the Core Motion for Summary Judgment be denied. As set forth therein, Celsius Mining argues that summary judgment is inappropriate because questions of material fact exist as to whether Core Scientific engaged in bad faith conduct by knowingly and willfully misinterpreting the Core Agreements as a basis for passing through fixed hosting costs to Celsius Mining.[308][323] Celsius Mining also asserts that summary judgment is premature because it has not yet had the opportunity to take discovery of all five components of the Core Claim and therefore cannot confirm whether issues of material facts exist.[308][324] Lastly, with respect to the Core Administrative Claim, Celsius Mining argues that summary judgment is inappropriate because the Core Prepayment is not covered by the limitation of liability provision under the Core MSA as argued by Core Scientific.[309][325]

As of the date of the Filing of this Disclosure Statement, the Core Mediation was cancelled as the result of constructive discussions between the parties, and the parties continue to negotiate a potential resolution of this dispute.

### 3. The Committee's Standing Stipulation and Proposed Complaint.

Since its appointment, the Committee has actively investigated the Debtors and the actions of their current and former directors, officers, and employees. As part of that investigation, the Committee reviewed tens of thousands of documents and, in cooperation with the Examiner, conducted more than 25 interviews with current and former employees of the Debtors. The Committee also spoke with many victims that have been affected by the actions of the Debtors' former directors and officers. The Committee's investigation uncovered significant claims and Causes of Action based on fraud, recklessness, gross mismanagement, and self-interested conduct by the Debtors' former directors and officers.

~~On~~As explained in Article III.JJ of this Disclosure Statement, on February 14, 2023, the Committee Filed a motion seeking approval of a stipulation preserving the Causes of Action set forth in ~~a draft~~the Committee Insiders ~~c~~Complaint prepared by the Committee for prosecution by the Litigation Administrator on behalf of the Debtors' estates against ~~Mr. Mashinsky (the co-founder, director, and former CEO of Celsius), Mr. Leon (the co-founder, director, and former Chief Strategy Officer and Chief Operating Officer of Celsius), Mr. Goldstein (the co-founder and former Chief Technology Officer of Celsius), Ms. Urata Thompson (the former Chief Financial Officer and Chief Investment Officer of Celsius), Mr. Beaudry (the former General Counsel and Chief Compliance Officer of Celsius), Mr.~~

---

[305][321]   Core Mediation Stipulation ¶¶ 1–2. The mediation topics include the (i) the Core Motions, (ii) the Core Objection to Debtors' Motion to Compel Scientific, (ii) the Core Scientific Rejection Motion, (iv) the Core Claim, (v) Core Scientific's Claim against Celsius Mining, (vi) the Core Administrative Claim Motion, (vii) the Core Claim Objection, (viii) the Core Administrative Claim Objection, and (xi) the Core Motion for Summary Judgment and related pleadings (collectively, the "Core Mediation Topics"). Core Mediation Stipulation, at 4. Pursuant to the Core Mediation Stipulation, the parties authorized the Core Mediator to mediate any issues and disputes concerning the Core Mediation Topics. *Id.* ¶ 2.

[306][322]   *Id.* ¶ 4.

[308][323]   Objection to Core's Motion for Summary Judgment ¶¶ 6, 8–14.

[308][324]   *Id.* ¶ 4.

[309][325]   *Id.* ¶¶ 15–17. Celsius Mining argues that "it is absurd to suggest that the return of the prepayments should be subject to a provision addressing a limitation of liability intended to cap damages." *Id.* ¶ 17.

~~Treutler (the former head of Celsius' trading desk), Ms. Landes (the former Vice President of Lending of Celsius and spouse of Mr. Leon), Ms. Mashinsky (the spouse of Mr. Mashinsky), various entities owned by the foregoing individuals, and various John Does (the "Committee Insiders Complaint").~~[310]the UCC Claims Stipulation Defendants.  The Committee Insiders Complaint asserts claims for breach of fiduciary duties, avoidance of actual and constructive fraudulent transfers, and avoidance of preferential transfers arising from the Debtors' prepetition mismanagement of Celsius.[311]  The Committee Insiders Complaint also seeks the disallowance of claims of the defendants, pending their return of any avoidable transfers to the Debtors' estates.[312]

On March 8, 2023, the Bankruptcy Court entered an order finding that the "pursuit of the claims and causes of action" set forth in the Committee Insiders Complaint "is in the best interest of the Debtors' estate and necessary to a fair and efficient resolution of these Chapter 11 Cases."[313326]  The Bankruptcy Court further directed that the claims and Causes of Action set forth in the Committee Insiders Complaint be contributed to an adequately funded litigation trust pursuant to any plan of reorganization confirmed in these Chapter 11 Cases.[314327]  Finally, the Bankruptcy Court ordered that no defendants named in the Committee Insiders Complaint (or any amended version of the Committee Insiders Complaint) should receive a release or exculpation under any plan.[315328]

On March 30, 2023, the Committee Filed an amended version of the Committee Insiders Complaint, which adds additional counts asserted against certain defendants, asserts additional factual allegations, and makes certain miscellaneous corrections.[316329]  Ultimately, after a plan is confirmed, the Litigation Administrator will File and prosecute the Committee Insiders Complaint.

#### 4.    The Committee's Class Claim.

On April 10, 2023, the Committee Filed a motion requesting authority to prosecute on behalf of all Account Holders a class action proof of claim asserting non-contract claims—including claims for fraud and negligent misrepresentation, as well as other statutory and common law claims—against CNL and other Debtor entities.[317330]  The Committee sought this authority as a result of the Bankruptcy Court's ruling, discussed in Article VII.L.3 below, that Account Holders may only assert contract claims for breach of the Terms of Use against Network LLC, but not CNL or any other affiliates.  The Committee argued that it would be infeasible and value destructive to require every Account Holder to File

---

[310]   ~~*Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2054].~~

[311]   ~~*Id.* ¶¶ 45–505 (Counts I–XXXII).~~

[312]   ~~*Id.* ¶¶ 506–09 (Count XXXIII).~~

[313326]   *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2201] ¶ 2.

[314327]   *Id.* ¶¶ 3, 5.

[315328]   *Id.* ¶ 8.

[316329]   *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

[317330]   *Motion of the Official Committee of Unsecured Creditors (I) For Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* [Docket No. 2399].

individualized non-contract claims when all Account Holders possess non-contract claims against CNL and its affiliates based upon the Debtors' prepetition conduct.[318][331]    While Account Holders Filed statements generally in support of a class Proof of Claim,[319][332] the Series B Holders and the U.S. Trustee objected.[320][333]    The Series B Holders and U.S. Trustee argued that the Committee was not an appropriate representative for the class of Account Holders,[321][334] and the Series B Holders argued that a class Proof of Claim would unduly delay the administration of the Chapter 11 Cases.[322][335]    On April 18, 2023, the Bankruptcy Court overruled the objections and entered an order authorizing the Committee to File a class Proof of Claim.[323][336]

On April 28, 2023, the Committee Filed Proof of Claim No. 29068 on the Debtors' claims register (the "Class Claim") in accordance with the Bankruptcy Court's order.[324][337]    The Committee Filed the Class Claim on behalf of claimants Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov in their individual and representative capacities (the "Class Representatives").[325][338]    The Class Representatives assert the Class Claim on behalf of all Celsius Account Holders who were harmed by CNL's (i) violations of the New York Deceptive Practices Act, New York False Advertising Act, and New Jersey Consumer Fraud Act; (ii) fraudulent misrepresentation, negligent misrepresentation, fraudulent concealment, and unjust enrichment under New York common law; (iii) breach of the implied duty of good faith and fair dealing; (iv) fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment under English common law; and (v) violations of Section 2 of the Misrepresentation Act 1967 under English law.[326][339]    The Class Claim seeks damages "not less than USD $5,217,542,781, equaling the outstanding obligations of all [A]ccount [H]olders that transferred coins to Celsius as part of the Earn, Borrow or Custody programs, or have balances associated with balances in 'Withhold Accounts,' as of the Petition Date, in addition to damages in an amount to be determined at trial."[327][340]

On May 17, 2023, the Committee moved to certify the proposed class of Account Holders (the "Committee's Class Certification Motion").[328][341]    Pursuant to a scheduling order issued by the

---

[331]    *Id.* ¶¶ 1–7, 26–29, 33–35.

[319][332]    *Ignat Tuganov's Response to The Committee's Class Claim Motion* [Docket No. 2474]; *Immanuel Herrmann, Daniel Frishberg, and Rebecca Gallagher's Response to the Committee's Class Claim Motion* [Docket No. 2476].

[320][333]    *Series B Holders' Objection to the Committee's Class Claim Motion* [Docket No. 2467] (the "Series B Holders' Class Claim Objection"); *Statement of the United States Trustee in Response to the Committee's Class Claim Motion* [Docket No. 2484] (the "U.S. Trustee's Class Claim Objection").

[321][334]    Series B Holders' Class Claim Obj. ¶¶ 7–10, 23–38; U.S. Trustee's Class Claim Obj. at 2–3.

[322][335]    Series B Holders' Class Claim Obj. ¶¶ 11–22.

[336]    *Order Granting the Motion of the Official Committee of Unsecured Creditors (I) For Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders* [Docket No. 2496].

[324][337]    *Notice of Filing of Class Proof of Claim by the Official Committee of Unsecured Creditors on Behalf of the Class Representatives Asserting Non-Contract Claims on Behalf of Themselves and Other Similarly Situated Account Holders* [Docket No. 2556].

[325][338]    *Id.*

[326][339]    *Id.* Ann. A ¶ 109.

[327][340]    *Id.* ¶ 13.

[328][341]    *Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas Difiore, Rebecca Gallagher, and Ignat Tuganov as the*

Bankruptcy Court, a hearing on the Committee's class certification motion will be held during the week of September 25, 2023.[342][342] The Committee will also propose appropriate procedures to permit Account Holders to opt-out of the prosecution and settlement of the Class Claim. Ultimately, if the class is certified and a plan confirmed, the Litigation Administrator will prosecute the Class Claim.

Starting on July 17, 2023, the Debtors, the Committee, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and certain individual Account Holders (including *pro se* Account Holders) entered into mediation with Judge Michael E. Wiles, Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York (the "Class Claim Mediation").[343][343] Following three days of mediation, the parties reached a settlement regarding the resolution of the Class Claim and the treatment of Retail Borrower Deposit Claims under the Plan, among other matters (the "Class Claim Settlement"). On July 20, 2023, the mediation parties Filed the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064] (the "Class Claim Settlement Motion"), requesting that the Bankruptcy Court approve the Class Claim Settlement. On August 3, 2023, the parties Filed the Class Claim Settlement agreement [Docket No. 3138].

The Class Claim Settlement is an opt-out settlement that binds all Account Holders unless and until they opt out before the Voting Deadline according to the instructions that will be provided in the Solicitation Package. Account Holders who do not timely opt out of the Class Claim Settlement will have their Account Holder Claims (other than any Custody Claims) increased by 5% as a settlement for any alleged damages they incurred on account of the prepetition misconduct of the Debtors' former management team (such increased claim, the "Class Claim Settlement Claim").[344][344] For the Account Holders who do not timely opt out of the Class Claim Settlement, (i) their Class Claim Settlement Claim will supersede and expunge any Proofs of Claims they Filed; (ii) they can no longer prosecute any allegations against the Debtors set forth in any such Proof of Claim or the Class Claim; and (iii) their recovery from the Debtors will be limited to the recovery provided to the corresponding Class Claim Settlement Claim under the Plan.

Account Holders who timely opt out of the Class Claim Settlement according to the instructions provided in the Solicitation Package will have their Account Holder Claims (other than their Custody Claims) treated as Disputed Claims under the Plan. They will not receive a distribution on the Effective Date even if they vote to accept the Plan. Instead, they will only receive a distribution (if any) on the date their Disputed Claim is resolved in the claims reconciliation process. If they vote for the Plan, however, they will be bound by the releases set forth in the Plan and will only retain their rights with respect to their Proof of Claim.

---

*Non-Contract Claims Against the Debtors, (II) Appoint Thomas Difiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2670].

[342]    *Order Establishing Schedule for Litigation of the Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas Difiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2795].

[343]    Judge Wiles presided over the chapter 11 cases of the cryptocurrency exchange Voyager, *In re Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y. Jul. 5, 2022).

[344][344]    For example, a scheduled General Earn Claim for $10,000 shall receive a scheduled General Earn Claim in an amount of $10,500 or a Retail Borrower Deposit Claim for $10,000 shall receive a Retail Borrower Deposit Claim for $10,500.

If approved, the Class Claim Settlement will resolve the Class Claim and the Committee's Class Certification Motion, among other things. The Debtors will support the certification of the proposed class of Account Holders to the extent applicable and necessary, and the Allowance of the Class Claim Settlement Claims will constitute a full and final resolution of the Class Claim on behalf of all Account Holders that do not opt out of the Class Claim Settlement. Upon entry of the order by the Bankruptcy Court approving the Class Claim Settlement, the Committee shall not prosecute the Class Claim on behalf of any or all Account Holders.

The Class Claim Settlement will (i) increase Account Holders' recovery on account of their Account Holder Claims without requiring them to pass the high bar of obtaining a judgment and liquidating their damages with respect to their non-contract Claims, (ii) significantly reduce the time and costs the Debtors and the Committee would otherwise have to spend on litigating the Committee's Class Certification Motion and the Class Claim, (iii) streamline the claim reconciliation process for the more than 30,000 claims totaling over $78.2 billion that have been filed against the Debtors, (iv) allow the Debtors to promptly commence distribution to Account Holders under the Plan on the Effective Date, and (v) provide all Account Holders who wish to pursue non-contract claims on their own the flexibility to opt out.

As of the date of the Filing of this Disclosure Statement, the Class Claim Settlement Motion is pending before the Bankruptcy Court, with a hearing scheduled for August 10, 2023.

### 5. The Committee's Fraudulent Transfer Complaint.

On May 1, 2023, the Committee, as a representative of Network LLC's estate,[345] commenced an adversary proceeding and Filed a complaint against CNL [Adv. No. 23-01104, Docket No. 1] (the "Committee AP Complaint"). The Committee AP Complaint alleges that, facing adverse regulatory actions in the United Kingdom, CNL entered into a series of sham transactions via the Migration.[346] Those transactions, the Committee alleges, were designed to keep CNL's business running at the expense of its Account Holders who now may find themselves with no recourse against the entity that actually holds a material portion of the digital assets they transferred to Celsius.[347] Specifically, the Committee AP Complaint alleges that through a set of conflicted, undated, incomplete, and unobserved contractual agreements, CNL purported to transfer all of the assets and liabilities connected to its customer-facing business to Network LLC.[348] CNL, however, retained nearly all Account Holder assets so that it could continue to deploy them despite warnings from the UK FCA that CNL was to cease all retail operations in the United Kingdom.[349] At the same time, CNL transferred billions of dollars' worth of liabilities to Network LLC without capitalizing Network LLC sufficiently to support those liabilities.[350]

---

[345]    *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors With Respect to Certain Claims and Causes of Action Set Forth in the Scheduling Order* [Docket No. 2562] ¶ 2 ("The Debtors and any successor thereto hereby grant nonexclusive standing to the Committee to pursue and litigate constructive fraudulent transfer/conveyance and similar claims set forth in the Scheduling Order held by Celsius Network LLC against Celsius Network Limited").

[346]    Committee AP Complaint ¶ 1.

[347]    *Id.*

[348]    *Id.*

[349]    *Id.*

[350]    *Id.*

The Committee AP Complaint seeks extensive relief, including but not limited to: (i) damages in an amount to be proven at trial; (ii) punitive damages in an amount to be proven at trial; (iii) a determination that each transfer of liabilities and obligations from CNL to Network LLC and each transfer of assets from Network LLC to CNL is avoidable as a fraudulent transfer; (iv) a determination that Network LLC may avoid the transfer of liabilities from CNL to Network LLC and, at its election, assert a claim against CNL for the total value of the transferred liabilities, or, alternatively, a declaration that Network LLC's customers may recover the value of their claims directly from CNL; and (v) a determination that Network LLC may recover, and CNL must turn over, for the benefit of Network LLC and its creditors, any digital assets transferred from Network LLC to CNL.[351]

As a result of the Series B Settlement, the fraudulent transfer litigation is presently stayed.[352] Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the fraudulent transfer litigation.

### 6.   Substantive Consolidation of Debtors CNL and Network LLC.

On May 1, 2023, the Debtors and the Committee each Filed motions requesting that the Bankruptcy Court substantively consolidate the estates of Debtors CNL and Network LLC.  The Debtors asserted that substantive consolidation is appropriate under sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code when creditors dealt with a debtor group as a "single economic unit" and did not rely on debtors' corporate separateness, *or* when a debtor group's assets and records are so hopelessly entangled that it would be value destructive and unduly time intensive to "unscramble" their affairs.[353] On the first prong, the Debtors asserted that all stakeholders—most importantly, Account Holders—transacted with Celsius as an integrated corporate group and did not rely on CNL and Network LLC operating separately with distinct assets.[354]   On the second prong, the Debtors argued that the affairs of CNL and Network LLC were hopelessly entangled because the Debtors did not maintain adequately detailed corporate records before or after the Migration.[355]   That lack of appropriate recordkeeping "may" make it "impossible" to distinguish any separate liabilities of CNL and Network LLC, or to determine the value of the intercompany claims owing from CNL to Network LLC.[356] Accordingly, the Debtors requested that the Court substantively consolidate "the estates of CNL and [Network] LLC for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions."[357]

---

[351]      *Id.* at 24.

[352]      Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors, the Initial Consenting Series B Preferred Holders, and the Debtors Regarding Litigation Stay [Docket No. 2960] (the "Phase II Litigation Stay Stipulation") ¶ 3.

[353]      *Debtors' Motion Seeking Entry of an Order (I) Substantively Consolidating the Estates of Celsius Network Limited and Celsius Network LLC and (II) Granting Related Relief* [Docket No. 2563] (the "Substantive Consolidation Motion") ¶ 20.

[354]      *Id.* ¶¶ 22–29.

[355]      *Id.* ¶¶ 30–34.

[356]      *Id.*

[357]      *Id.* ¶ 16.

The Committee joined the Debtors' request.[358] The Committee agreed with the Debtors that substantive consolidation is appropriate because the Debtors' operations and books and records were hopelessly entangled.[359] The Committee also provided additional examples of how Celsius represented to Account Holders that they were transacting with the Celsius corporate group as a whole, and how all of the assets of Celsius (not just the assets of Network LLC) would be available to satisfy Account Holder claims.[360] For instance, the Committee highlighted instances where Mr. Mashinsky (in his dual capacities as CEO of CNL and Network LLC) told Account Holders that Celsius, on a consolidated basis, had billions of dollars of assets, including its mining business, that could be "return[ed] to the community if something bad happens."[361] As a result of this statement and many others like it, the Committee asserted that CNL and Network LLC should be substantively consolidated in accordance with the expectations of Account Holders and the Debtors' other creditors.[362]

As a result of the Series B Settlement, the substantive consolidation litigation is presently stayed.[363] Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the substantive consolidation litigation.

7. *Certain Adversary Proceedings.*

(b) ~~(a)~~ Celsius Network Limited, *et al.* v. Prime Trust, LLC.

On August 23, 2022, CNL and Network LLC (together, the "Celsius Prime Trust Plaintiffs") Filed a complaint and initiated an adversary proceeding against Prime Trust LLC ("Prime Trust") alleging turnover and breach of contract arising out of Prime Trust's alleged failure to return Celsius' digital assets held by Prime Trust (the "Prime Trust Digital Assets") following the purported termination of Prime Trust and Celsius' contractual relationship.[364] The Celsius Prime Trust Plaintiffs and Prime Trust reached a settlement (the "Prime Trust Settlement") on October 19, 2022 pursuant to which Prime Trust agreed to return the Prime Trust Digital Assets to Celsius wallets and Celsius agreed that it would not use or access the Prime Trust Digital Assets, among other agreements.[365] The Bankruptcy Court approved the settlement on December 6, 2022.[366] The Celsius Prime Trust Plaintiffs Filed a notice of

---

[358] *Motion by the Official Committee of Unsecured Creditors for Entry of an Order Substantively Consolidating the Estates of Celsius Network Limited and Celsius Network LLC, and Joinder in the Debtors' Motion Seeking the Same Relief* [Docket No. 2565] (the "Committee's Substantive Consolidation Motion" and together with the Debtors' Substantive Consolidation Motion, the "Substantive Consolidation Motions").

[359] *Id.* ¶ 4.

[360] *Id.* ¶¶ 13–23.

[361] *Id.* ¶ 17.

[362] *Id.*

[363] Phase II Litigation Stay Stipulation ¶ 3.

[364] *Celsius Network Limited et al. v. Prime Trust LLC*, Case No. 22-10964, Adv. No. 22-01140 (MG) (Bankr. S.D.N.Y. Aug. 23, 2022).

[365] *Motion to Approve Settlement With Prime Trust, LLC Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Adv. No. 22-01140, Docket No. 13].

[366] *Order Granting Motion to Approve Settlement With Prime Trust, LLC Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Adv. No. 22-01140, Docket No. 20].

voluntary dismissal dismissing all claims with prejudice on December 20, 2022.[354367] On January 4, 2023, the Bankruptcy Court entered an order terminating and closing this adversary proceeding. Approximately six months after Prime Trust transferred the Prime Trust Digital Assets to segregated Celsius wallets, the Debtors Filed a motion requesting authority to transfer the Prime Trust Digital Assets from segregated wallets to a workspace where the Prime Trust Digital Assets will be commingled with other Celsius digital assets and available for the Debtors to use in the ordinary course of business.[355368] The Bankruptcy Court granted the motion on June 28, 2023 [Adv. No. 22-01140, Docket No. 2926].

As of the date of the Filing of this Disclosure Statement, this adversary proceeding is closed.

### (c)        (b) Celsius Network Limited, et al. v. Stone, *et al.*

Prior to the Petition Date, on July 7, 2022, KeyFi, Inc. Filed a complaint against CNL and Celsius KeyFi LLC in New York state court.[356369]   On August 23, 2022, CNL and Celsius KeyFi LLC (together with CNL, the "Celsius KeyFi Plaintiffs") initiated an adversary proceeding against KeyFi, Inc. and the chief executive officer and founder of KeyFi, Inc., Jason Stone (together, the "KeyFi Defendants"), and Filed an amended complaint (the "KeyFi Amended Complaint") on October 13, 2022.[357370]   The amended complaint alleged conversion, fraudulent misrepresentation, breach of fiduciary duty, and unjust enrichment, and demanded turnover, replevin, and accounting in connection with digital assets the KeyFi Defendants accessed through their business relationship with the Celsius KeyFi Plaintiffs to deploy Celsius assets in decentralized financing and staking investment strategies.[358371] In particular, the KeyFi Amended Complaint alleges that the KeyFi Defendants unlawfully transferred assets from Celsius wallets to the KeyFi Defendants' wallets, which the KeyFi Defendants went on to sell, exchange for other digital assets, and purchase interests in other companies.[359372]

The KeyFi Defendants Filed a motion to dismiss on October 27, 2022,[360373] and two amended motions to dismiss on November 1 and November 4, 2022, respectively.[361374]   The Bankruptcy Court denied the motions to dismiss on December 8, 2022.[362375]   The KeyFi Defendants then Filed an answer denying the allegations and asserting seven affirmative defenses.[363376]   The Celsius KeyFi Plaintiffs sought

---

[354367]     *Plaintiffs' Notice of Voluntary Dismissal* [Adv. No. 22-01140, Docket No. 22].

[355368]     *Motion to Approve the Transfer of Property Pursuant to Bankruptcy Code Section 105 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2758]; *Amended Notice of Motion to Approve the Transfer of Property Pursuant to Bankruptcy Code Section 105 and Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2772].

[369]     *KeyFi, Inc. v. Celsius Network Limited and Celsius KeyFi LLC*, Index No. 652367/2022 (N.Y. Sup. Ct. July 7, 2022).

[370]     *Celsius Network Limited et al. v. Stone, et al.*, Case No. 22 10964, Adv. No. 22-01139 (MG) (Bankr. S.D.N.Y. Aug. 23, 2022); *First Amended Complaint* [Adv. No. 22-01139, Docket No. 10].

[358371]     KeyFi Amended Complaint ¶ 3.

[359372]     *Id.*

[360373]     *Motion to Dismiss the Complaint in the Adversary Proceeding* [Adv. No. 22-01139, Docket No. 17].

[361374]     *Amended Motion to Dismiss the Complaint in the Adversary Proceeding* [Adv. No. 22-01139, Docket No. 18]; *Amended Motion to Dismiss the Complaint in the Adversary Proceeding* [Adv. No. 22-01139, Docket No. 19].

[362375]     *Memorandum Opinion and Order Denying Defendants' Motion to Dismiss the First Amended Complaint* [Adv. No. 22-01139, Docket No. 47].

[376]     *Answer to First Amended Complaint and Seven Affirmative Defenses* [Adv. No. 22-01139, Docket No. 55].

a preliminary injunction to prevent the KeyFi Defendants from accessing, transferring, or disposing of Celsius' digital assets in addition to requiring the KeyFi Defendants to identify the digital assets and provide Celsius the private keys to access the digital assets.[364][377]  On December 16, 2023, the Bankruptcy Court entered the *Joint Stipulation and Agreed Order Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc.* [Adv. No. 22-01139, Docket No. 52], which required the KeyFi Defendants to identify Celsius' wallets and provide the KeyFi Plaintiffs the means which with to access the wallets, and prevented the KeyFi Defendants from accessing Celsius' wallets or accessing, transferring, or disposing of certain of Celsius' digital assets.

Following an evidentiary hearing on the Motion for a Preliminary Injunction, the Bankruptcy Court issued a temporary restraining order enjoining the KeyFi Defendants from making any transfers or dispositions of the digital assets at issue until the preliminary injunction has been decided, but allowed the KeyFi Defendants to continue to deploy certain of the digital assets in decentralized finance activities.[365][378]  The Bankruptcy Court requested additional briefing, and the parties submitted post-trial briefs in mid-February.[366][379]  The parties Filed and the Bankruptcy Court signed a joint stipulation to stay all formal party discovery for sixty days and ordered additional diligence from the KeyFi Defendants.[367][380]  On March 15, 2023, Judge Glenn entered an order noting that the KeyFi Plaintiffs and the KeyFi Defendants consented to a jury trial.[368][381]  The Court held a status conference on March 15, 2023 regarding Mr. Stone's requests of the Debtors regarding his ability to manage the assets within the scope of the temporary restraining order.[369][382]  Following the status conference, the Court entered an amended temporary restraining order expanding the scope of property subject to the temporary restraining order.[370][383]  On April 29, 2023, the parties agreed to stay certain deadlines (the "Stone Stay") until June 2, 2023.[371][384]  On June 2, 2023, the parties Filed a~~the first~~ joint stipulation to extend the Stone Stay through June 16, 2023,[372][385] which the Bankruptcy Court entered the same day.[373][386]  On June 16, 2023, the parties Filed a~~the second~~ joint stipulation to extend the Stone Stay through June 30, 2023 [Adv. No. 22-01139, Docket No. 92], which the Court entered on June 20, 2023 [Adv. No. 22-01139, Docket No. 93].  On June 29, 2023, the parties Filed ~~another~~the third stipulation ~~seeking a further extension to~~to extend the

---

[364][377]    *Motion of Plaintiffs for Preliminary Injunction Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure* [Adv. No. 22-01139, Docket No. 20] (the "Motion for a Preliminary Injunction").

[365][378]    *Temporary Restraining Order* [Adv. No. 22-01139, Docket No. 76].

[366][379]    *Defendants Jason Stone and KeyFi Inc.'s Post-Trial Memorandum in Opposition to Celsius's Motion for Preliminary Injunction* [Adv. No. 22-01139, Docket No. 78]; *Plaintiffs' Post-Trial Brief* [Adv. No. 22-01139, Docket No. 79].

[367][380]    *Joint Stipulation and Stay Order* [Adv. No. 22-01139, Docket No. 82].

381 -   *Joint Stipulation and Order Regarding Jury Trial* [Adv. No. 22-01139, Docket No. 85].

[369][382]    Mar. 15, 2023 Hr'g Tr. [Adv. No. 22-01139, Docket No. 88] (the "Mar. 15, 2023 Hr'g Tr.").

[370][383]    *Amended Temporary Restraining Order* [Adv. No. 22-01139, Docket No. 86].

[371][384]    *Joint Stipulation Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc. Regarding an Extension of the Stay Period Pursuant to the Stay Order* [Adv. No. 22-01139, Docket No. 87].

[372][385]    *Joint Stipulation and Stay Order Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc. Regarding an Extension of the Stay Period Pursuant to the Stay Order* [Adv. No. 22-01139, Docket No. 90].

[373][386]    *Joint Stipulation and Stay Order Between Plaintiffs Celsius Network Limited and Celsius KeyFi LLC and Defendants Jason Stone and KeyFi Inc. Regarding an Extension of the Stay Period Pursuant to the Stay Order* [Adv. No. 22-01139, Docket No. 87].

Stone Stay through July 30, 2023  [Adv. No. 22-01139, Docket No. 95], which the Bankruptcy Court entered on June 30, 2023  [Adv. No. 22-01139, Docket No. 96].  On July 31, 2023, the parties Filed the fourth stipulation to extend the Stone Stay through September 5, 2023 [Adv. No. 22-01139, Docket No. 98], which the Bankruptcy Court entered on August 4, 2023 [Adv. No. 22-01139, Docket No. 99].

As of the date of the Filing of this Disclosure Statement, this adversary proceeding is still pending.

(d)        (c) Frishberg v. Celsius Network LLC, *et al.*

On December 9, 2022, *pro se* creditor Daniel Frishberg ("Mr. Frishberg") Filed a complaint and initiated an adversary proceeding against the Debtors.[387]  Mr. Frishberg argued that because he requested that the Debtors close his Earn Account on July 5, 2022, before the Debtors Filed for chapter 11 protection, title to the Cryptocurrency in his Earn Account transferred to him.[388]  On March 9, 2023, Mr. Frishberg Filed a demand for jury trial [Adv. No. 22-01179, Docket No. 17] and an amended complaint [Adv. No. 22-01179, Docket No. 18].  On May 18, 2023, the parties Filed a joint stipulation agreeing to the further amendment of Mr. Frishberg's complaint and extending the Debtors' deadline to respond to June 20, 2023 [Adv. No. 22-01179, Docket No. 28], which the Bankruptcy Court entered on May 19, 2023 [Adv. No. 22-01179, Docket No. 30].  On June 16, 2023, the parties Filed an additional joint stipulation agreeing to the further amendment of Mr. Frishberg's complaint and extending the Debtors' deadline to respond to July 20, 2023 [Adv. No. 22-01179, Docket No. 34], which the Bankruptcy Court entered on June 20, 2023 [Adv. No. 22-01179, Docket No. 35].

On February 20, 2023, the Debtors Filed the *Debtors' Objection to Proof of Claim No. 24480 of Daniel A. Frishberg* [Docket No. 2107] (the "Objection to Frishberg's POC").  Therein, the Debtors explained that the Bankruptcy Court's *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling"), issued on January 4, 2023, is instructive on Mr. Frishberg's circumstances.  Specifically, the Debtors noted that the Earn Ruling provided that the "Debtors' Terms of Use presumptively constitute a binding contract governing the relationship between the Debtors and their Account Holders, and that according to the unambiguous language of the Terms of Use, the assets associated with the Earn Program are property of the Debtors' estates."[389]

At his own request, Mr. Frishberg participated in the Class Claim Mediation, which is discussed in greater detail in Article VII.K.4 of this Disclosure Statement.  As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, Mr. Frishberg agreed to execute a restructuring support agreement to support the Plan and not take any actions inconsistent with such support.  Accordingly, as of the date of the Filing of this Disclosure Statement, Mr. Frishberg and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[390]

(e)        (d) Fred Shanks v. Celsius Network LLC, *et al.*

---

[387] *Frishberg v. Celsius Network LLC et al*, Case No. 22-10964, Adv. No. 22-01179 (MG) (Bankr. S.D.N.Y.).

[388] *Complaint* [Adv. No. 22-01179, Docket No. 1] (the "Frishberg Complaint").

[389] Objection to Frishberg's POC ¶ 14.

[390] Class Claim Settlement Motion, Exhibit B, at 4.

On December 20, 2022, Fred M. Shanks ("Mr. F. Shanks") Filed a complaint and initiated an adversary proceeding against the Debtors.[378391]  On January 7, 2023, Mr. F. Shanks Filed an *Amended Complaint* [Adv. No. 22-01190, Docket No. 8] ("F. Shanks Amended Complaint").  Mr. F. Shanks alleges that the Debtors breached their contract with him when they initiated a margin call on his loan but did not allow him to resolve the same due to the Pause.[379392]  Mr. F. Shanks seeks a ruling that the assets at issue are not property of the Debtors' estates, that he be compensated based on his allegations, that he be allowed to close his account after the Debtors unfreeze it and allow him to transfer all remaining coins to an external wallet, and that the Debtors pay all of his expenses associated with Filing his adversary proceeding.[380393]

On February 22, 2023, the Debtors Filed the *Debtors' Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law* [Adv. No. 22-01190, Docket No. 17] (the "Debtors' Motion to Dismiss the F. Shanks Adversary Proceeding").  Therein, the Debtors asserted that the Earn Ruling barred Mr. F. Shanks from litigating his breach of contract claim through this adversary proceeding,[381394] that Mr. F. Shanks did not demonstrate that the Debtors breached the Terms of Use, and that the F. Shanks Amended Complaint failed to plead sufficient facts upon which the requested relief can be granted.[382395]  On February 23, 2023, Mr. F. Shanks Filed the *Notice of Objection on Debtors' Motion to Dismiss of Claim No. 22-01190 of Fred M. Shanks* [Adv. No. 22-01190, Docket No. 18] (the "F. Shanks Objection"), asserting, among other things, that the Terms of Use provided multiple avenues to resolve issues with his loans and that the Debtors breached the same by not letting him exercise these rights, that the Debtors put the plaintiff under duress of impossibility and economic duress, and that he suffered injuries by having his Cryptocurrency liquidated.[383396]  The hearing on the Debtors' Motion to Dismiss the F. Shanks Adversary Proceeding was scheduled for June 28, 2023 [Adv. No. 22-01190, Docket No. 19].  On May 16, 2023, however, Mr. F. Shanks Filed a second amended complaint largely restating his arguments [Adv. No. 22-01190, Docket No. 21].   On June 2, 2023, the Bankruptcy Court entered a jointly Filed stipulation, which explained that the Debtors would File a renewed motion to dismiss the amended complaint and setting a briefing schedule with respect to the same [Adv. No. 22-01190, Docket No. 25].

On June 23, 2023, the Debtors Filed the *Notice of Hearing on Debtors' Motion to Dismiss the Second Amended Complaint and Incorporated Memorandum of Law* [Adv. No. 22-01190, Docket No. 27], to which Mr. F. Shanks Filed an objection [Adv. No. 22-01190, Docket No. 30].  During the July 18, 2023 omnibus hearing, the Debtors announced that the parties were working to schedule a joint hearing schedule for numerous adversary proceedings, including Mr. F. Shanks' adversary proceeding.

As of the date of the Filing of this Disclosure Statement, such hearing schedule has not yet been established.

(f)        (e) Christopher Lee Shanks v. Celsius Network LLC, *et al.*

---

[378391]    *Shanks v. Celsius Network LLC, et al*, Case No. 22-10964, Adv. No. 22-01190 (MG) (Bankr. S.D.N.Y.).

[392]    F. Shanks Amended Complaint at 4–5.

[380393]    *Id.* at 7.

[381394]    Debtors' Motion to Dismiss the F. Shanks Adversary Proceeding ¶ 35.

[382395]    *Id.* ¶ 57.

[383396]    F. Shanks Objection at 2.

On February 10, 2023, Christopher Lee Shanks ("Mr. C. Shanks") Filed a complaint and initiated an adversary proceeding against the Debtors. On February 21, 2023, Mr. C. Shanks Filed an *Amended Complaint* [Adv. No. 23-01010, Docket No. 4] (the "C. Shanks Amended Complaint"). Mr. C. Shanks alleges that the Debtors initiated a margin call on his loan but did not allow him to withdraw funds or resolve the same due to the Pause.[384397] He seeks a ruling that the Cryptocurrency associated with his account was not property of the estate, that the Debtors should be compelled to provide an accounting and turn over the Cryptocurrency, that the Debtors' loan agreements with customers constituted consumer credit transactions, that the Debtors engaged in deceptive business practices and committed fraud, that the Debtors breached their contract, and that the Debtors have been unjustly enriched.[385398] On April 12, 2023, the Debtors Filed their *Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law* [Adv. No. 23-01010, Docket No. 9] (the "Debtors' Motion to Dismiss the C. Shanks Adversary Proceeding"), and a status conference thereon was held on June 28, 2023.[386399] During the July 18, 2023 omnibus hearing, the Debtors announced that the parties were working to schedule a joint hearing schedule for numerous adversary proceedings, including Mr. C. Shanks' adversary proceeding.

As of the date of the Filing of this Disclosure Statement, such hearing schedule has not yet been established.

### (g)    (f) Celsius Network Limited v. Fabric Ventures Group SARL.

On January 17, 2023, CNL Filed a complaint and initiated an adversary proceeding against Fabric Ventures Group SARL ("Fabric Ventures") [Adv. No. 23-01002, Docket No. 1] (the "Fabric Ventures Complaint"). The complaint alleges a breach of contract arising out of Fabric Ventures' alleged commitment to purchase CNL's Series B Preferred Interests with alleged damages of approximately $6 million.[387400] At the March 8, 2023 hearing, the Debtors updated the Bankruptcy Court that the defendant's time to respond had not run yet.[388401]

As of the date of the Filing of this Disclosure Statement, Fabric Ventures has not formally responded to the Fabric Ventures Complaint.

### (h)    (g) Yanchuk v. GK8 Ltd/GK8 UK Limited/GK8 U.S.A. LLC

On January 18, 2023, Valeriya Yanchuk ("Yanchuk") Filed a complaint and initiated an adversary proceeding against GK8 [Docket No. 1882; Adv. No. 23-01003] (the "Yanchuk Complaint"). The Yanchuk Complaint, which has not yet been served on the GK8 Debtors, alleges that Yanchuk is entitled to recover her digital assets held on Celsius' platform.[389402] The Debtors have attempted to engage

---

[384397]    C. Shanks Amended Complaint ¶¶ 14–15, 17.

[398]    *Id.* ¶ 4.

[386399]    June 28, 2023 Hr'g Tr. 93:24–25, 94–96.

[387400]    Fabric Ventures Complaint ¶¶ 1, 47–51.

[388401]    Mar. 8, 2023 Hr'g Tr. 58:1–5.

[389402]    *See generally* Yanchuk Complaint.

with Yanchuk regarding her adversary proceeding and proof of claim, but as of the date of the Filing of this Disclosure Statement have been unsuccessful in doing so.[390403]

(i)    (h) Retail Borrower Ad Hoc Group v. Celsius Network LLC, *et al.*

On February 7, 2023, a group of Celsius customers who participated in the Borrow Program (the "Retail Borrower Ad Hoc Group," as it is defined in the Plan and used throughout this Disclosure Statement) Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01007, Docket No. 2001] (the "Borrow Complaint"). The Borrow Complaint requests declaratory judgments that the Retail Borrower Ad Hoc Group members' Cryptocurrency in the Borrow Program is not property of the estate (and that, to the extent the Debtors hold any interest in such Cryptocurrency, such interest is limited to the outstanding balance of the applicable loans), that loans in the Borrow Program are entitled to the protections of Section 363(o) of the Bankruptcy Code, that the loan agreements are not enforceable, and that the loans are void and unenforceable due to fraudulent inducement.[391404] The Borrow Complaint further (i) requests a judgment requiring the Debtors to account for and turn over the Retail Borrower Ad Hoc Group members' Cryptocurrency,[392405] and (ii) alleges causes of action for deceptive trade practices concerning misrepresentations of the circumstances of the Retail Borrower Ad Hoc Group members' Cryptocurrency on the platform, consumer fraud regarding misrepresentations of the Borrow Program, unlawful provision of money services, fraudulent misrepresentations, breach of contract of the loan agreements, and unjust enrichment.[393406]

The Retail Borrower Ad Hoc Group participated in the Class Claim Mediation. As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, the Retail Borrower Ad Hoc Group agreed to execute a restructuring support agreement to support the Plan and not to take any actions inconsistent with such support, *provided* that a restructuring support agreement executed by a member of the Retail Borrower Ad Hoc Group does not bind other non-signatory members. Pursuant to the Class Claim Settlement, as of the date of the Filing of this Disclosure Statement, the Retail Borrower Ad Hoc Group and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[394407]

(j)    (i) Georgiou, *et al.* v. Celsius Network LLC, *et al.*

On February 28, 2023, Georges Georgiou, Philip Harris Stewart, and Gilbert Castillo (collectively, the "Georgiou Plaintiffs") Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01016, Docket No. 1] (the "Georgiou Complaint"). The Georgiou Plaintiffs collectively (a) allege (i) that the Debtors knowingly altered their historical data to mislead the Georgiou Plaintiffs, (ii) claims for conversion when the Debtors did not return the assets to the Georgiou Plaintiffs, (iii) "failure of contract" claims related to the General Terms of Use, and (b) seek declaratory judgments that the Georgiou Plaintiffs' assets are not property of the estate.[395408] Georges Georgiou also asserts claims of "failure of contract" regarding the terms of use applicable to loan agreements in effect as of

---

[390403]    Mar. 8, 2023 Hr'g Tr. 58:20–25, 59:1–5.

[391404]    Borrowers' Complaint ¶¶ 33–48, 90–106.

[392405]    *Id.* ¶¶ 39–43.

[393406]    *Id.* ¶¶ 49–89, 107–119.

[394407]    Class Claim Settlement Motion, Exhibit B, at 4.

[395408]    Georgiou Complaint ¶¶ 46–77.

February 23, 2022 (the "Loan Terms of Use Version 9"), unjust enrichment, and declaratory judgments that his loan Cryptocurrency is not property of the estate and that a constructive trust for his Cryptocurrency has been established.[396][409]    On May 3, 2023, the Bankruptcy Court signed the joint stipulation agreed to by the parties setting a briefing schedule agreed to by the parties [Adv. No. 23-01016, Docket No. 6].  On May 17, 2023, the Debtors Filed the *Debtors' Motion to dismiss the Complaint and Incorporated Memorandum of Law* [Adv. No. 23-01016, Docket No. 9] (the "Debtors' Motion to Dismiss the Georgiou Complaint").  The Debtors argued therein that the Georgiou Plaintiffs' claims, which relate to Cryptocurrency in Earn Accounts, are resolved by the Bankruptcy Court's Earn Ruling and are more appropriate for the claims resolution process rather than an adversary proceeding.[397][410]    The Debtors also argued that the Georgiou Plaintiffs failed to plead facts sufficient to support their various causes of action for fraud, conversion, establishment of a constructive trust, and unjust enrichment, primarily because a valid, enforceable contract existed between the parties and precludes such claims.[398][411]  On June 14, 2023, the Georgiou Plaintiffs Filed the *Plaintiffs' Opposition to Defendants' Motion to Dismiss* [Adv. No. 23-01016, Docket No. 12] ("Georgiou Plaintiffs Opposition"), arguing that the Debtors had not met the burden to dismiss because the Georgiou Complaint had sufficiently pled facts regarding the Debtors' alleged conduct that was outside the parties' contractual relationship and because the facts in this adversary proceeding were distinct from the facts in other adversary proceedings in this case.[399][412]  The Debtors Filed the *Debtors' Reply in Support of Debtors' Motion to Dismiss the Complaint and Incorporated Memorandum of Law* [Adv. No. 23-01016, Docket No. 13] (the "Debtors' Reply in Support of Debtors' Motion to Dismiss the Georgiou Complaint") arguing that a motion to dismiss is appropriate as the Georgiou Plaintiffs' factual allegations do not support their conclusion that the Terms of Use were terminated.[400][413]  Further, Account Holders of Earn Accounts must submit their Claims through the claims resolution process.[401][414]  During the July 18, 2023 omnibus hearing, the Debtors announced that the parties were working to schedule a joint hearing schedule for numerous adversary proceedings, including the Georgiou Plaintiffs' adversary proceeding.

As of the date of the Filing of this Disclosure Statement, such hearing schedule has not yet been established.

### (k)    (j) Tuganov v. Celsius Network LLC, *et al*.

On March 20, 2023, Mr. Tuganov Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01024, Docket No. 1] (the "Tuganov Complaint").  Mr. Tuganov seeks declaratory judgments that prepetition the Debtors operated as a Ponzi scheme, the Debtors should be substantively consolidated in the chapter 11 cases, and that all contracts with the Debtors, including the Terms of Use, are null and void due to the Debtors' operation as a Ponzi scheme.[402][415]  On April 21, 2023, Mr. Tuganov, the Committee, and the Debtors Filed the *Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors, the Debtors, and Ignat Tuganov with Respect to Certain*

---

[396][409]    *Id.* ¶¶ 78–104.

[397][410]    Debtors' Motion to Dismiss the Georgiou Complaint ¶¶ 2, 34.

[398][411]    *Id.* ¶ 3.

[399][412]    Georgiou Plaintiffs' Opposition ¶¶ 1–8.

[400][413]    Debtors' Reply in Support of Debtors' Motion to Dismiss the Georgiou Complaint ¶¶ 8, 14.

[414]    *Id.* ¶ 3.

[402][415]    Tuganov Complaint ¶¶ 1, 90–112.

*Deadlines* [Adv. No. 23-01024, Docket No. 5], agreeing to hold in abeyance all responsive deadlines. The Bankruptcy Court approved the joint stipulation on April 27, 2023 [Adv. No. 23-01024, Docket No. 6].

At his own request, Mr. Tuganov participated the Class Claim Mediation. As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, Mr. Tuganov agreed to execute a restructuring support agreement to support the Plan and not take any actions inconsistent with such support. Accordingly, as of the date of the Filing of this Disclosure Statement, Mr. Tuganov and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[403416]

(l)   (k) Herrmann v. Celsius Network LLC, *et al.*

On March 21, 2023, Mr. Herrmann Filed a complaint and initiated an adversary proceeding against the Debtors [Adv. No. 23-01025, Docket No. 1] (the "Herrmann Complaint"). Mr. Herrmann seeks declaratory judgments that certain loan Cryptocurrency in the Borrow Program is not property of the estate, that a constructive trust existed, that the Terms of Use and the Loan Terms of Use Version 9 are not enforceable, and that the Terms of Use and Loan Terms of Use Version 9 are void and unenforceable due to fraudulent inducement and securities fraud.[404417] Mr. Herrmann also alleges claims of conversion of such loan Cryptocurrency, failure of contract regarding the Terms of Use, unjust enrichment, deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, and conversion of collateral into unregistered securities and securities fraud.[405418] On May 18, 2023, the parties Filed a joint stipulation agreeing to the further amendment of Mr. Herrmann's complaint and extending the Debtors' deadline to respond to June 20, 2023 [Adv. No. 23-01025, Docket No. 7], which the Bankruptcy Court subsequently entered [Adv. No. 23-01025, Docket No. 8]. On June 16, 2023, the parties Filed an additional joint stipulation agreeing to the further amendment of Mr. Herrmann's complaint and extending the Debtors' deadline to respond to July 20, 2023 [Adv. No. 23-01025, Docket No. 12], which the Bankruptcy Court entered on June 20, 2023 [Adv. No. 23-01025, Docket No. 13].

On February 19, 2023, the Debtors Filed the *Debtors' Objection to Proof of Claim No. 24604 of Immanuel Herrmann* [Docket No. 2105] (the "Objection to Herrmann's POC"). Therein, the Debtors explained that the Bankruptcy Court's decision with respect to the question of who owns assets in Earn Accounts, issued on January 4, 2023, is instructive to Mr. Herrmann's circumstances.

At his own request, Mr. Herrmann participated the Class Claim Mediation. As a result of the Class Claim Mediation and as a part of the Class Claim Settlement, Mr. Herrmann agreed to execute a restructuring support agreement to support the Plan and not take any actions inconsistent with such support. Accordingly, as of the date of the Filing of this Disclosure Statement, Mr. Herrmann and the Debtors agreed to stay all deadlines in this adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[406419]

(m)   (l) Rhodium Enterprises, Inc. v. Celsius Mining LLC.

---

[403416]   Class Claim Settlement Motion, Exhibit B, at 4.

[404417]   Herrmann Complaint ¶¶ 155-161.

[405418]   Herrmann Complaint pp. 14–25; Claims Six, Seven, Eight, Nine, Ten, and Twelve.

[406419]   Class Claim Settlement Motion, Exhibit B, at 4.

On April 21, 2023, Rhodium Enterprises, Inc. ("Rhodium") Filed a complaint and initiated an adversary proceeding against Debtor Celsius Mining [Adv. No. 23-01101, Docket No. 1] (the "Rhodium Complaint").  Rhodium seeks a declaratory judgment regarding certain rights of Celsius Mining under a "Simple Agreement for Future Equity" ("SAFE")[420] between Celsius Mining and Rhodium in connection with Rhodium's pending merger with non-party SilverSun Technologies, Inc. ("SilverSun"). Specifically, under the SAFE, Celsius paid $50 million to Rhodium in exchange for certain consideration upon the occurrence of certain triggering events.[421]  At issue is what kind of triggering event Rhodium's merger with SilverSun is; the consideration owed to Celsius Mining depends on that categorization.[422]  Because the merger may be terminated if not closed by June 30, 2023, Rhodium seeks a declaratory judgment that under the SAFE and the merger agreement, (1) Celsius Mining is only entitled to $50 million in SilverSun shares under the SAFE and not Cash,[423] and (2) Celsius Mining is not entitled to either challenge the $650 million valuation or receive additional information on how that valuation is calculated, among other things.[424]

Celsius Mining maintains that under the SAFE and Rhodium's merger agreement with SilverSun, (1) Celsius Mining is entitled to a discount on the valuation used to calculate the shares owed to it–and thus a larger number of shares in SilverSun, (2) Celsius Mining is entitled to receive $50 million in Cash rather than stocks in the post-merger entity, and (3) the $650 million valuation of Rhodium is inflated, and Rhodium and SilverSun should provide more information as to how they arrived at this figure.[425]

Following a conference held on May 2, 2023, the Bankruptcy Court entered the *Case Management and Scheduling Order* [Adv. No. 23-01101, Docket No. 23] setting deadlines with respect to briefing, disclosures, and discovery, and other guidelines, and the Debtors served discovery requests on Rhodium.[426]  The parties subsequently entered into a *Confidentiality Agreement and Stipulated Protective Order* [Adv. No. 23-01101, Docket No. 24].  On May 18, 2023, however, Rhodium Filed a notice voluntarily dismissing its adversary proceeding without prejudice [Adv. No. 23-01101, Docket No. 25].  Subsequently, on May 22, the Debtors Filed their Ex Parte *Motion for Entry of an Order Pursuant to Bankruptcy Code Section 105 and Federal Rules of Bankruptcy Procedure 2004 and 9016 Authorizing the Examination of Rhodium Enterprises, Inc.* [Docket No. 2697] (the "Application for Rule 2004 Examination of Rhodium") requesting authority to proceed with a Rule 2004 examination and for approval of expedited procedures for resolving any disputes related to Rhodium's responses to discovery in connection with the Rule 2004 examination.  Therein, the Debtors stated that Rhodium had dismissed the adversary proceeding unilaterally, without consulting the Debtors, and that it did so to avoid

---

[420]    A SAFE is a type of financing agreement that provides investors the right to receive shares or other consideration in the future from a company at an agreed-upon price.

[421]    Rhodium Complaint ¶ 2.

[422]    *Id.* ¶ 7.

[423]    Specifically, Rhodium argues that Celsius Mining should receive a number of shares equal to the price Celsius paid to purchase the SAFE ($50 million), divided by the price per share based on Rhodium's $650 million valuation. *Id.* ¶¶ 64–66.

[424]    *Id.* ¶¶ 89–90.

[425]    *Id.* ¶¶ 75–76.

[426]    Application for Rule 2004 Examination of Rhodium (as defined herein) ¶ 1.

responding to the Debtors' discovery requests.[414427]   The Bankruptcy Court entered the order granting the Application for Rule 2004 Examination of Rhodium the next day [Docket No. 2701].

After entry of the Rhodium Rule 2004 Order, the Debtors issued a subpoena seeking Rhodium's production of certain documents and records.  Rhodium filed a response and objections to the Debtors' subpoena on June 2, 2023.  Thereafter, on July 24, 2023, the Debtors and Rhodium Filed the *Stipulation and Agreed Order Between Debtors and Rhodium Enterprises, Inc. Regarding ESI Review and Production in Connection With Rule 2004 Examination* [Docket No. 3083] (the "Production Stipulation"), which sets forth an agreed upon document production process and schedule.  The Production Stipulation was approved by the Bankruptcy Court the next day [Docket No. 3086].

<div style="text-align:center">(n)        (m) Celsius Network Limited v. StakeHound SA.</div>

On July 11, 2023, CNL Filed a complaint and initiated an adversary proceeding against StakeHound SA ("StakeHound") [Adv. No. 23-01138, Docket No. 1] (the "StakeHound Complaint").  The Stakehound Complaint alleges a violation of the automatic stay, turnover of estate property, and breach of contract arising out of StakeHound's alleged failure to return certain of Celsius' digital assets worth approximately $150 million, including ETH, MATIC, and DOT tokens, that were entrusted to StakeHound as part of Celsius' staking strategy.[415428]   StakeHound allegedly lost the keys associated with certain of Celsius' staked ETH and maintained that it was not required to return any of Celsius' staked ETH, whether lost or otherwise.[416429]   StakeHound then commenced arbitration in Switzerland to resolve the dispute, thereby, according to CNL, violating of the automatic stay.[417430]   Celsius then requested the return of Celsius' other staked digital assets pursuant to agreements between the parties, which has not occurred.[418431]   CNL issued a summons and a notice of pretrial conference, and as of the date of the Filing of this Disclosure Statement, such pretrial conference is scheduled for August 29, 2023.[419432]

On July 19, 2023, CNL Filed the *Plaintiff Celsius Network Limited's Motion for An Order Authorizing Alternative Service on Defendant ~~Stakehound~~StakeHound SA Pursuant to Federal Rule of Civil Procedure 4(f)(3)* [Adv. No. 23-01138, Docket No. 9] (the "Alternative Service Motion"), requesting that CNL be allowed to serve the StakeHound Complaint on StakeHound via email instead of the Hague Convention, which could take up to six months and result in dissipation of the property at issue.  On July 27, 2023, ~~Stakehound~~StakeHound Filed the *Defendant ~~Stakehound~~StakeHound, S.A.'s Objection to Plaintiff's Motion for an Order Authorizing Alternative Service Pursuant to Federal Rule of Civil Procedure 4(f)(3)* [Adv. No. 23-01138, Docket No. 13], arguing that CNL should not be allowed to circumvent the Hague Convention.   At a hearing on August 2, 2023 on CNL's motion with respect to service of the StakeHound Complaint, the Bankruptcy Court listened to the parties' arguments but ultimately adjourned the hearing, directed the parties to engage in discussions as to a possible path forward, and directed the parties to return to the Bankruptcy Court on August 7, 2023 for additional

---

[414427]   *Id.* ¶ 5.

[415428]   StakeHound Complaint ¶ 1–2, 4, 50–71.

[416429]   *Id.* ¶ 5, 42-45.

[417430]   *Id.* ¶ 6, 46–49, 51–59.

[431]   *Id.* ¶ 7, 66–71.

[419432]   Summons and Notice of Pretrial Conference in an Adversary Proceeding [Adv. No. 23-01138, Docket No. 7].

argument.[433]   On August 7, 2023, StakeHound Filed a letter [Adv. No. 23-01138, Docket No. 21] representing to the Bankruptcy Court that it had shared with CNL a proposed stipulation in which it agreed to accept service of process via email to its U.S. counsel and proposed a briefing schedule for its prospective motion to compel arbitration, among other things.   CNL Filed a reply letter [Adv. No. 23-01138, Docket No. 22] clarifying that it will consider the Alternative Service Motion moot if the StakeHound Complaint is deemed duly served, and that it is willing to continue to meet and confer with StakeHound over early motion practices.

As of the date of the Filing of this Disclosure Statement, the Bankruptcy Court has not ruled on CNL's motion with respect to service of the StakeHound Complaintthe Alternative Service Motion.

## L.    Resolution of Key Legal Issues.

At the outset of these Chapter 11 Cases, the Debtors identified certain key legal issues that would be critical to the outcome of the Chapter 11 Cases.[434]

One such issue was the question of whether the Cryptocurrency transferred to the Debtors' platform constituted property of the Debtors' estate, and whether the answer to this question was different for Cryptocurrency assets in the Earn Program, the Custody Program, or Withhold Accounts.[435]   In the course of the Chapter 11 Cases, the parties in interest also identified an interconnected issue, namely the question of which Debtor entities are liable to Account Holders under the Terms of Use between Network LLC and its Account Holders, and subsequently engaged in similarly extensive briefing and hearings on this issue.  Finally, on April 24, 2023, the Bankruptcy Court entered an order setting a briefing and discovery schedule to estimate the amount of the intercompany claim owed to Network LLC by CNL [Docket No. 2522].

### 1.    Cryptocurrency Held in the Earn Program and Sale of Stablecoin.

On September 15, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 832] (the "Original Motion to Sell Stablecoin") seeking authority to sell stablecoins held by the Debtors to fund operating expenses, including the administration of these Chapter 11 Cases.   The Debtors asserted that the sale of stablecoins was consistent with prepetition practice, was an efficient way to generate liquidity to help fund the Debtors' operations, and was a reasonable exercise of the Debtors' business judgment.[436]   Following further analysis and review, and as a result of the Debtors receiving a significant number of formal and informal responses and objections, however, the Debtors recognized that any sale of stablecoins in the Earn Program required the Debtors to establish title to those stablecoins, which also required a determination as to who holds title to Cryptocurrency in the Debtors' Earn Program——the Debtors or Account Holders.[437]

---

[433]   Aug. 2, 2023 Hr'g. Tr. 45:23–25, 46:1–10.

[434]   *See First Day Hearing Presentation* [Docket No. 45].

[435]   *See id.*

[436]   Original Motion to Sell Stablecoin ¶ 11.

[437]   *See Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief* [Docket No. 1228] (the "Statement on the Original Stablecoin Motion") ¶ 1.  A list of the objections received by the Debtors is included in the Statement on the Original Stablecoin Motion.  *Id.* ¶ 1 n.3.

Accordingly, on November 11, 2022, the Debtors Filed an amended motion [Docket No. 1325] (the "Amended Earn/Stablecoin Motion") seeking entry of an order (i) establishing ownership of assets in the Earn Program, (ii) permitting the sale of stablecoins consistent with past practice and in the ordinary course of business, and (iii) granting related relief. The Debtors argued that the question of whether Earn Assets constituted property of the Debtors' estate was a question of contract law that could be resolved by analysis of the Terms of Use, which all Celsius customers had to accept in order to use the Earn Program.[438] The Amended Earn/Stablecoin Motion did not seek a determination as to whether any Account Holders in the Earn Program held valid defenses to the purported contract between them and the Debtors under the Terms of Use, and reserved the rights of all parties with respect to the foregoing.[439]

Contemporaneously with the Filing of the Amended Earn/Stablecoin Motion, the Debtors Filed the *Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (the "Proposed Scheduling Order"), which established the following objectives: (a) a determination of ownership rights to assets transferred by Account Holders and designated to be part of the Earn Program based on the unambiguous plain language of each version of the Terms of Use; (b) a determination as to whether each applicable version of the Terms of Use forms a binding contract with users who transferred assets to the Debtors while such Terms of Use were in effect; (c) a determination as to whether subsequent amendments to the Terms of Use were binding on users who transferred their assets to the Debtors prior to the effectiveness of the subsequently amended Terms of Use; and (d) a determination as to whether the specific stablecoin sought to be sold is property of the Debtors' estates (if not covered by the previous three issues).[440] The Proposed Scheduling Order also identified matters that were beyond the scope of the Amended Earn/Stablecoin Motion, including whether any Account Holder has a valid defense to the purported contract between Account Holders and the Debtors under the Terms of Use, and reserving all parties' rights with respect to the foregoing.

Pursuant to the Proposed Scheduling Order, the Debtors agreed to respond to certain written deposition questions Filed by the Committee, and agreed to make each Earn Declarant available for one day of oral deposition.[441] In formulating the written deposition questions, the Committee consulted (a) the U.S. Trustee, (b) certain state regulators, including the Texas Attorney General, the Vermont Attorney General, and the National Association of Attorneys General, and (c) certain *pro se* creditors.[442] The Debtors answered forty-five of the Earn Deposition Questions on November 18, 2022 [Docket No. 1306]. While only the Committee was entitled to submit written deposition questions, parties attending the oral depositions were entitled to ask questions, subject to a cumulative seven-hour time limit for each deposition.[443] Mr. Ferraro was deposed by the Committee, the U.S. Trustee, state regulators, and *pro se* creditors on November 21, 2022.[444] The other Earn Declarants were deposed by

---

[438]    Amended Earn/Stablecoin Motion ¶ 14.

[439]    *Id.* ¶ 16. The Debtors submitted the declarations of Oren Blonstein ("Mr. Campagna"), Christopher Ferraro ("Mr. Ferraro"), and Robert Campagna ("Mr. Campagna") in support of the Amended Earn/Stablecoin Motion [Docket Nos. 1326–1328] (Mr. Campagna, Mr. Ferraro, and Mr. Blonstein, each an "Earn Declarant," and collectively, the "Earn Declarants").

[440]    Proposed Scheduling Order ¶ 3.

[441]    *Id.* ¶¶ 1, 6.

[442]    *See Official Committee of Unsecured Creditors' Written Deposition Questions for the Debtors in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1345] Exhibit A (the "Earn Deposition Questions") ¶ 6.

[443]    Proposed Scheduling Order ¶ 6.

the Committee, U.S. Trustee, state regulators, and *pro se* creditors on November 22, 2022.[444][445]    At the request of *pro se creditor* Mr. Frishberg, Mr. Blonstein was made available for additional and limited oral questioning on December 2, 2022.[432][446]    The Proposed Scheduling Order was never entered by the Bankruptcy Court; however, the Debtors and other parties abided by the process outlined therein. Over thirty objections and letters, many from *pro se* creditors, were Filed with the Bankruptcy Court in response to the Amended Earn/Stablecoin Motion.[433][447]    The objections to the Amended Earn/Stablecoin Motion principally argued that Account Holders did not intend to transfer title over Cryptocurrency to the Debtors, the Terms of Use did not provide for the transfer of title to the Debtors, and that the Debtors had not proven their reasonable business judgment in attempting to sell stablecoins.

On December 5, 2022, the Bankruptcy Court held an in-person trial on the Amended Earn/Stablecoin Motion.[434][448]    The Debtors argued in support of the Amended Earn/Stablecoin Motion, and the Committee agreed with the Debtors that the Terms of Use unambiguously grant the Debtors ownership of the Earn Assets.[435][449]    Mr. Blonstein testified that over 90 percent of Account Holders, representing 99 percent of asset value, affirmatively accepted Terms of Use version 6 or later.[436][450]    The Bankruptcy Court acknowledged that the question of ownership was clear in "Version 6 forward."[437][451]    The U.S. Trustee, the Texas State Securities Board and Texas Department of Banking, the National Association of Attorneys General, the New Jersey Bureau of Securities, and numerous *pro se* creditors spoke in opposition to the Debtors' Amended Earn/Stablecoin Motion.[438][452]    On January 4, 2023, the Bankruptcy Court issued its *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling"), holding that the "Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously

---

[430][444]    *Notice of Deposition of Christopher Ferraro in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1389].

[431][445]    *Notice of Deposition of Oren Blonstein in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1388]; *Official Committee of Unsecured Creditors' Notice of Deposition of Robert Campagna in Connection with the Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors' Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course and (III) Granting Related Relief* [Docket No. 1418].

[432][446]    Mr. Frishberg sent a letter to the Bankruptcy Court requesting Mr. Blonstein be made available for additional questions due to insufficient time on November 22, 2022 [Docket No. 1534].  On December 1, 2022, the Debtors sent a letter to the Bankruptcy Court opposing the request for additional deposition of Mr. Blonstein [Docket No. 1540].  Mr. Blonstein was deposed by Mr. Frishberg on December 2, 2022.  *Daniel Frishberg's Notice of Deposition of Oren Blonstein* [Docket No. 1577].

[433][447]    *See Debtors' Reply in Support of Debtors' Amended Motion for Entry of an Order (I) Establishing Ownership of Assets in the Debtors Earn Program, (II) Permitting the Sale of Stablecoin in the Ordinary Course, and (III) Granting Related Relief and Response to Certain Objections Thereto* [Docket No. 1578] (the "Earn/Stablecoin Reply"), Exhibit A, which provides a summary chart of all objections Filed in response to the Amended Earn/Stablecoin Motion.

[448]    *See generally* Dec. 5, 2022 Hr'g Tr. [Docket No. 1656].

[435][449]    *Id.* at 116:6–9, 15–22; 122:7–124:15.

[436][450]    *Id.* at 103:3–7.

[437][451]    *Id.* at 105:13.

[438][452]    *See generally id.*

transfer title and ownership of Earn Assets deposited into Earn Accounts from Account Holders to the Debtors," and authorizing the Debtors to sell stablecoins to provide liquidity for these Chapter 11 Cases.[453]

The Earn Ruling first addressed the threshold questions of contract formation and modification. First, the Bankruptcy Court found that the Terms of Use formed a valid contract between the Account Holders and the Debtors because the "Second Circuit is clear that clickwrap contracts such as the Terms of Use are valid and binding," thus providing a sufficient basis for the "mutual assent element of contract formation."[454]    Second, the Bankruptcy Court found that the Debtors successfully modified the Terms of Use:  "Notwithstanding the language in the Terms of Use permitting [unilateral] modification by the Debtors, the Debtors specifically required all Account Holders to affirmatively accept Terms Version 6."[455]    The Bankruptcy Court found that the steps taken by the Debtors, including the use of pop-ups and prominent hyperlinks to the updated Terms of Use, satisfied the standard for valid clickwrap agreements under New York.[456]    After finding that the Terms of Use formed a valid contract between Account Holders and the Debtors, the Bankruptcy Court determined that the contract unambiguously granted the Debtors ownership of the Earn Assets.  Additionally, the Bankruptcy Court found no basis in the Terms of Use to distinguish between the treatment of stablecoins and other Earn Assets.[457]

The Earn Ruling answered the gating question of whether the Terms of Use granted the Debtors' ownership of the Earn Assets.  The Bankruptcy Court, however, made clear that this determination was not the end of the matter— the Earn Ruling expressly reserved "creditors' rights with respect to various defense to and breach of contract claims," which are reserved for the claims resolution process.[458]    The Bankruptcy Court, in explaining its sequencing of these distinct questions, explained that, "as a prerequisite to those [creditor] claims, the Court first must establish that a contract was formed and must interpret the contract terms."[459]

Numerous *pro se* creditors have appealed the Earn Ruling.  On January 18, 2023, *pro se* creditors Daniel A. Frishberg, Georges Georgiou, Immanuel J. Hermann, Kulpreet Khanuja, Christopher J. Little, and Luke P. Nowak (the "Earn Appellants") Filed the *Notice of Appeal and Statement of Election and the Motion to Authorize Certain Procedural Relief, And If Needed, for Leave to Appeal* [Docket No. 1894, Earn Appeal Docket No. 1] (the "Earn Appeal") in the United States District Court for the Southern District of New York (the "District Court") seeking leave to appeal the Earn Ruling.[460]    The parties

[453]    Earn Ruling at 30.

[454]    *Id.* at 33.

[455]    *Id.* at 35.

[456]    *Id.* at 36.

[457]    *Id.* at 5, 30.

[458]    *Id* at 45.

[459]    *Id* at 44.

[460]    The case is *In re Celsius Network LLC*, 1:23-cv-00523-JPO (S.D.N.Y. January 20, 2023) (the "Earn Appeal Docket"). Separate appeals to the Earn Ruling were Filed by Kwok Mei Po and Courtney Burks Steadman.  *Notice of Appeal and Statement of Election* [Docket No. 1952] (the "Kwok Joinder"); *Notice of Appeal and Statement of Election* [Docket No. 1973] (the "Steadman Appeal").  Steadman's case is *In re Celsius Network, LLC*, 1:23-cv-01302-JPO (S.D.N.Y. February 15, 2023) (the "Steadman Appeal Docket").  On February 15, 2023, Steadman Filed her *Statement of Issues to Be Presented and Designation of Items to Be Included in the Record of Appeal* [Docket No. 2121] (the "Steadman

Filed various motions concerning the issues on appeal and the record on appeal.[447461]    On February 2, 2023, the Debtors filed the *Debtors' Response in Opposition to Appellants' Motion for Leave to Appeal* [Earn Appeal Docket No. 3], requesting that the District Court deny the Earn Appeal and Kwok Joinder on the basis that the Earn Ruling is interlocutory, and an interlocutory appeal would be value destructive.

On March 27, 2023, the District Court denied the Earn Appellants' motion for leave to appeal and dismissed the Earn Appeal, Steadman Appeal, and Khanuja Appeal on the basis that (a) the Earn Ruling is not a final order, and (b) the circumstances do not warrant an interlocutory appeal.[448462]

2.    *Custody/Withhold Briefing.*

On August 31, 2022, an ad hoc group of Celsius customers with digital assets in the Custody Program (the "Custody Ad Hoc Group") Filed a complaint and initiated an adversary proceeding against Celsius requesting a declaratory judgment that assets in Custody Accounts are not property of the Debtors' estates.[449463]    On September 1, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "Motion to Return Assets").    In their Motion to Return Assets, the Debtors requested authority to allow withdrawals of Cryptocurrency that was only ever in Custody Accounts and Withhold Accounts as well as Cryptocurrency transfers made in the ninety days before the Petition Date from the Earn Program or Borrow Program to Custody Accounts or Withhold Accounts that were, in the aggregate, under the statutory cap of $7,575 set out in section 547(c)(9) of the Bankruptcy Code.[450464]    The requested relief did not apply to current or former employees of Celsius or insiders, any affiliates of

---

Designation").  In response to the Steadman Designation, the Debtors Filed a motion to strike certain items from the record [Docket No. 2127] (the "Steadman Motion to Strike").  Steadman also filed a statement of relatedness to the Earn Appeal [Steadman Appeal Docket No. 2].  The Kwok Joinder was withdrawn on February 17, 2023.  *Notice to Withdraw Kwok Mei Po's Amended Notice of Appeal (court docket 1952)* [Docket No. 2096].

Separately, Kulpreet Khanuja appealed the *Order Denying Kulpreet Khanuja's Motion Seeking a Ruling That Personal Earn Assets Are Not Property of the Debtors' Estates* [Docket No. 1934] (the "Khanuja Order").  *Notice of Appeal and Statement of Election* [Docket No. 1974].  The case is *In re Celsius Network LLC*, 1:23-cv-1243-JHR (S.D.N.Y. February 13, 2023) (the Khanuja Appeal").  On February 13, 2023, Kulpreet Khanuja Filed the *Appellants' Statement of Issues to Be Presented and Designation of Items to Be Included in the Record on Appeal* [Docket No. 2063] (the "Khanuja Designation").  On February 15, 2023, the Debtors filed the *Debtors' Response to Kulpreet Khanuja's Notice of Appeal* [Khanuja Appeal Docket No. 3].  The Debtors also Filed a motion to strike from the record certain items requested in the Khanuja Designation [Docket No. 2126] (the "Khanuja Motion to Strike").  The Earn Appellants sent a letter to Judge Oetken requesting that the Earn Appeal, Steadman Appeal, Khanuja Appeal, and Kwok Joinder be consolidated [Earn Appeal Docket No. 7].  On February 28, 2023, the District Court entered an order requiring the Debtors to respond to the Earn Appellants' letter and address the questions of whether the Khanuja Appeal should be consolidated with the other cases, and whether the Khanuja Order is a final appealable order [Earn Appeal Docket No. 9].  On March 3, 2023, the Debtors filed their reply [Earn Appeal Docket No. 10].  The Debtors agreed that consolidation of the Earn Appeal and Khanuja Appeal is appropriate but maintained that the Khanuja Order and Earn Order are not final appealable orders, and therefore, the District Court should deny the appellants' leave to appeal [Earn Appeal Docket No. 10].

[447461]    *See generally* [Docket Nos. 1976, 2085, 2164, 2187, Earn Appeal Docket No. 5].

[448462]    *See generally* [Docket No. 2323, Earn Appeal Docket No. 12].

[449463]    *Ad Hoc Group of Custodial Account Holders v. Celsius Network LLC, et. al.*, Case No. 22-10964, Adv. No. 22-01142 (MG) (Bankr. S.D.N.Y. Aug. 31, 2022); *Complaint for Declaratory Judgment* [Adv. Pro. 22-10964, Docket No. 1].

[450464]    Motion to Return Assets ¶¶ 4-5, 10.

current or former employees or insiders, or to customers with an outstanding loan.[451][465]    On September 7, 2022, an ad hoc group of Celsius customers with digital assets in Withhold Accounts (the "Withhold Ad Hoc Group" and together with the Debtors, the Custody Ad Hoc Group, and the Committee, the "Custody and Withhold Parties") Filed the *Ad Hoc Group of Withhold Account Holders' Motion for Relief from the Automatic Stay* [Docket No. 737] arguing that Cryptocurrency in Withhold Accounts is not property of the Debtors' estates and requesting that Cryptocurrency in Withhold Accounts be returned to members of the Withhold Ad Hoc Group.

The Bankruptcy Court ordered the Custody and Withhold Parties to "meet and confer" with regards to the overlapping issues raised in the pleadings.  Following the meet and confer, the Custody and Withhold Parties Filed a briefing schedule in the *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Orders* [Docket No. 1044], consisting of two phases ("Phase I" and "Phase II").

Following a trial on Phase I issues on December 7, 2022, the Bankruptcy Court ruled from the bench that digital assets in the Custody Wallets and digital assets transferred to Celsius' platform that were not supported on the platform (the "Ineligible Withhold Assets") are not property of the Debtors' estates.[452][466]    The Bankruptcy Court subsequently entered an order permitting the Debtors to release to customers (i) digital assets that were only ever in the Custody Program, (ii) transfers of digital assets to the Custody Program made in the ninety days before the Petition Date when such transfers were, in the aggregate, less than $7,575 at the time of the transfers, and (iii) Ineligible Withhold Assets in the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "Custody Withdrawal Order").

On January 19, 2023, the Bankruptcy Court entered an order directing the parties to meet and confer regarding the distribution of "assets that all Parties agree are Custody Assets, setting aside for later determination, on a coin-by-coin basis, any shortfall as to which a further determination by the Bankruptcy Court is necessary before such shortfall can be allocated."[453][467]    On January 31, 2023, the Debtors Filed the *Notice of Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 1958]  (the "Custody Withdrawal Notice") detailing the eligibility requirements for withdrawal, identifying the Custody users eligible to withdraw, and explaining the process for withdrawal.  The Custody Withdrawal Notice permitted eligible users to withdraw 94% of their assets eligible for withdrawal in light of the six percent shortfall between the aggregate liabilities of the Custody Program and the digital assets actually held in Custody Wallets (the "Shortfall Issue").[454][468]    In mid-February 2023, the Debtors sent eligible users communications via email and the Celsius application informing them of their eligibility and the steps they were required to take in order to withdraw, including updating specific customer information related to Anti-Money Laundering (AML) and Know Your Customer (KYC) procedures.  On February 28, 2023, the Debtors Filed the *Notice of Potential Increase to Amount of Distributable Custody Assets* [Docket No. 2149] alerting Account Holders that Custody users may receive a greater distribution than anticipated by the Custody Withdrawal Notice pursuant to the pending settlement agreement between the Debtors, the Committee, and the Custody Ad Hoc Group (the "Custody Settlement"), as further explained below.  Withdrawals pursuant to the

---

[465]    *Id.* ¶ 6.

[452][466]    Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684].

[453][467]    *Order Directing Certain Parties to Confer Regarding Custody Assets Shortfall Issue* [Docket No. 1880].

[454][468]    Custody Withdrawal Notice ¶ 4.

Custody Withdrawal Notice opened on March 2, 2023, as described in the *Notice of Withdrawals Opening for Eligible Custody Users* [Docket No. 2176], and were processed thereafter. On April 17, 2023, the Debtors Filed the *Notice of Revised Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 2491], informing all Custody users eligible for withdrawal that they were now entitled to withdraw the full 100% of their assets eligible for withdrawal. The Debtors have also informed Custody users eligible for withdrawal of changes in withdrawal fees.[469]

As of the date of the Filing of this Disclosure Statement, over 15,300, or approximately 39% of eligible users have withdrawn approximately 83% of the value available for withdrawal (approximately $72.7 million in U.S. Dollars as of the Petition Date) off the Debtors' platform pursuant to the Custody Withdrawal Order, the Custody Settlement, and other orders by the Bankruptcy Court authorizing withdrawals off of the platform.

(a)    The Custody Settlement.

After entry of the Custody Withdrawal Order, the disposition of Custody Assets that are subject to (i) Avoidance Actions by the Debtors and (ii) the Debtors' right to setoff in connection with outstanding retail loans (the "Non-Withdrawable Custody Assets") remained unresolved. Also unresolved was the Shortfall Issue and how it would affect the withdrawal process.

After the completion of Phase I, the Debtors, the Committee, and the Custody Ad Hoc Group began negotiating a possible settlement as an alternative to moving to Phase II. The negotiations led to a resolution, and thus, on February 28, 2023, the Debtors, the Custody Ad Hoc Group, and the Committee Filed the Custody Settlement Motion, wherein they requested the Bankruptcy Court's approval of a settlement that would dispose of the Non-Withdrawable Custody Assets, resolve the Shortfall Issue, and provide a clear path forward for all Custody Account Holders.

The terms of the Custody Settlement are discussed in greater detail in Article III.TT of this Disclosure Statement. At a high level, the settlement provides that Custody Account Holders who elect to participate in the settlement will receive 72.5% of the digital assets in their Custody Accounts and the settlement of all Causes of Action the Debtors hold against Custody Account Holders, solely with respect to such Holders' Custody Accounts, in exchange for granting title of the remaining 27.5% of the Custody Account Holder's digital assets to the Debtors.[470] The Custody Settlement also provides that Custody users already eligible to withdraw pursuant to the Custody Withdrawal Notice will be entitled to withdraw the full balance of their Custody Assets eligible for withdrawal.[471] Following a hearing on March 21, 2023, the Bankruptcy Court approved the settlement and entered the Custody Settlement Order.

---

[469]    *Notice of Increased Withdrawal Fees* [Docket No. 2600]; *Notice of Decreased Withdrawal Fees* [Docket No. 2686].

[470]    Custody Settlement Motion ¶ 1.

[471]    *Id.* ¶ 4.

(b)  The Withhold Settlement.

While the Custody Withdrawal Order provided that Ineligible Withhold Assets could be withdrawn from the platform, it did not provide for the withdrawal of Transferred Withhold Assets. While the Bankruptcy Court has yet to determine whether Transferred Withhold Assets are property of the Debtors' estates, on March 28, 2023, the Debtors, the Withhold Ad Hoc Group, and the Committee Filed the Withhold Settlement Motion, requesting the Bankruptcy Court's approval of a settlement that resolved all disputes with respect to the Transferred Withhold Assets, and provided a clear path forward for all Withhold Account Holders (the "Withhold Settlement").  Following a hearing on April 18, 2023, the Bankruptcy Court approved the settlement and entered the *Order (I) Approving the Settlement By and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2509] (the "Withhold Settlement Order").

The terms of the Withhold Settlement are discussed in greater detail in Article III.UU of this Disclosure Statement.  At a high level, the settlement provides that Withhold Account Holders who are members of the Withhold Ad Hoc Group and opt into the Withhold Settlement pursuant to its terms will receive 15% of their Withhold Distribution Claim in kind and the remaining 85% will be converted to an Earn Claim.  Withhold Account Holders who are not members of the Withhold Ad Hoc Group can also receive the benefits of the Withhold Settlement when they vote on the Plan.  If the class of Withhold Claims votes to accept the Plan, all Withhold Account Holders will receive the terms set out in the Withhold Settlement; however, if the class of Withhold Claims votes to reject the Plan, the class of Withhold Claims will receive the same treatment as Earn Claims under the Plan.

3.  *Customer Claims Briefing.*

On November 14, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Setting A Briefing Schedule and (II) Granting Related Relief* [Docket No. 1338] to determine which Debtor entities are liable to Account Holders under the Terms of Use (the "Customer Claims Issue").

The Debtors, the Series B Holders, and the Committee Filed briefs addressing the Customer Claims Issue.[472]  The Debtors and the Committee argued, among other things, that the plain language of the Terms of Use, which define "Celsius" as "Celsius Network LLC and its Affiliates," meant that each of the Debtors should be considered an "Affiliate" pursuant to the Terms of Use and that each of the Debtors therefore have liability to Account Holders.[473]  The Series B Holders countered that the indemnification and limitation of liability provision of the April 2022 Terms of Use restricts liability to LLC only.[474]  The Series B Holders further argued that additional support for their position can be found in certain "extrinsic evidence" such as statements by the Debtors related to the migration of the

---

[472]  *Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Docket No. 1795] ("Series B Holders' Brief on Account Holders' Claims"); *The Official Committee of Unsecured Creditors' Opening Brief Regarding Debtors That Are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [Docket No. 1797] ("Committee Brief on Account Holders' Claims"); *Debtors' Opening Brief Regarding Account Holders' Claims Issues* [Docket No. 1799] ("Debtors' Brief on Account Holders' Claims"); *Series B Preferred Holders' Response Brief on the Issue of Which Debtors are Liable to Customers Under the Terms of Use* [Docket No. 1960] ("Series B Holders' Response Brief on Account Holders' Claims"); *Debtors' Response Brief Regarding Account Holders' Claims Issues* [Docket No. 1962] ("Debtors' Response Brief on Account Holders' Claims"); *The Official Committee of Unsecured Creditors' Response Brief Regarding Debtors that are Liable to Account Holders Under the Global Contract (the "Terms of Use") Between Celsius and Account Holders* [Docket No. 1965] ("Committee Response Brief on Account Holders' Claims").

[473]  *Id.* ¶¶ 6, 7, 20; Committee Brief on Account Holders' Claims ¶¶ 1, 10, 17.

[474]  Series B Holders' Brief on Account Holders' Claims ¶¶ 2, 25, 29.

customer-facing business from CNL to LLC, CNL's course of conduct following this migration, and postpetition statements and documents Filed in these Chapter 11 Cases.[461][475]

Following an evidentiary hearing, on March 9, 2023, the Bankruptcy Court issued the *Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205] (the "Customer Claims Ruling"). The Bankruptcy Court determined that the General Terms of Use were ambiguous, requiring the Bankruptcy Court to review extrinsic evidence.[462][476] Review of the extrinsic evidence led the Bankruptcy Court to conclude that the General Terms of Use limit customer claims to LLC only, and do not permit account holders to assert contractual claims against any other Debtor or non-Debtor affiliate.[463][477] The Bankruptcy Court clarified, however, that the General Terms of Use do not limit customers from asserting non-contract claims against CNL or other Debtors or non-Debtors.[464][478] The Bankruptcy Court noted that its "decision could have little or no effect on the pool of assets available to satisfy [c]ustomer claims" depending on the resolution of two further issues not yet addressed: namely, the Debtors' and Committee's argument that CNL is obligated on an intercompany claim to LLC of at least $3.5 billion and the Committee's argument that substantive consolidation of all assets and liabilities, which would increase the total amount of assets available for customer claims, is appropriate in these Chapter 11 Cases.[465][479]

On March 17, 2023, the Bankruptcy Court entered the *Order Regarding Which Debtor Entities Have Liability for Customer Contract Claims Under the Terms of Use* [Docket No. 2265] (the "Customer Claims Order"). The Bankruptcy Court reiterated its main findings that only LLC is liable for customer contract claims under the Terms of Use, that the Terms of Use do not limit liability of LLC, CNL, or any other affiliate of LLC for non-contract claims, and that nothing in the Customer Claims Ruling affects the rights of parties in interest to assert non-contract claims against any Debtor.[466][480]

On March 31, 2023, the Committee Filed its *Notice of Appeal* of the Customer Claims Order [Docket No. 2356]. On April 5, 2023, Mr. Herrmann also Filed a *Notice of Appeal* of the Customer Claims Order [Docket No. 2375]. On April 27, 2023, Mr. Herrmann and Mr. Frishberg also Filed a motion seeking a stay of the relief granted in the Customer Claims Order until the disposition of their appeal of the same [Docket No. 2545], which the Bankruptcy Court denied [Docket No. 2663]. Thereafter, on June 15, 2023, Mr. Herrmann and Mr. Frishberg Filed a motion to vacate the relief granted in the Customer Claims Order, arguing that the Debtors did not provide adequate service to creditors of the briefing schedule on the Customer Claims Issue [Docket No. 2811]. The Bankruptcy Court denied Mr. Herrmann's and Mr. Frishberg's motion on June 20, 2023 [Docket No. 2819], and Mr. Herrmann and Mr. Frishberg then Filed a *Notice of Appeal* [Docket No. 2823]. On July 26, 2023, the Committee and the Series B Holders Filed a joint stipulation voluntarily dismissing the Committee's appeal of the Customer Claims Order. Mr. Herrmann's and Mr. Frishberg's appeals remain pending.

---

[461][475]    *Id.* ¶¶ 5, 33, 37, 41–49.

[476]    Customer Claims Ruling at 4.

[463][477]    *Id.*

[464][478]    *Id.*

[465][479]    *Id.* n.1.

[466][480]    Customer Claims Order ¶¶ 1–2.

Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the appeals of the Customer Claims Order.

### 4. Estimation of the CNL-Network LLC Intercompany Claim.

On February 9, 2023, the Bankruptcy Court entered an order requiring the Debtors to File on the docket information regarding the amount and type of any potential intercompany claims held by Network LLC against the other Debtors [Docket No. 2017].  The Debtors Filed the Intercompany Statement, which highlighted that, among other claims, Network LLC holds a valuable intercompany claim against CNL arising from the migration of customer-facing business from CNL to Network LLC, among other intercompany transactions (the "CNL-Network LLC Intercompany Claim").[467481]  While the Debtors initially scheduled the CNL-Network LLC Intercompany Claim in excess of $9.1 billion, as a result of certain adjustments made in an attempt to reconcile the Debtors' books and records, the Debtors disclosed its value to be approximately $3.5 billion.[468482]  On April 4, 2023, the Committee and the Series B Holders each Filed motions to establish procedures to estimate the value of the CNL-Network LLC Intercompany Claim.  The Committee argued that it is appropriate to estimate the CNL-Network LLC Intercompany Claim because it is currently unliquidated (as demonstrated by the Debtors' different valuations of the CNL-Network LLC Intercompany Claim), and estimating the CNL-Network LLC Intercompany Claim would avoid undue delay in these Chapter 11 Cases and aid in confirmation of the Plan.[469483]  The Series B Holders agreed that estimation was appropriate because of the uncertain value of the CNL-Network LLC Intercompany Claim and the requirements for the Debtors to confirm the Plan.[470484]

Please see Article VII.L.5 of this Disclosure Statement for more detail on how the Series B Holders Settlement affects the estimation litigation.

### 5. The Series B Settlement.

Following written discovery and leading up to the commencement of the trial on the estimation of the CNL-Network LLC Intercompany Claim, the Series B Holders, the Debtors, and the Committee successfully reached a settlement agreement (the "Series B Settlement").  On June 27, 2023, the Debtors, the Series B Holders,[471485] and the Committee Filed the *Joint Motion for Entry of an Order (I) Approving the Settlement By and Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899] (the "Series B Settlement Motion") requesting the Bankruptcy Court's approval of the Series B Settlement, which resolves all disputes between the Debtors, the Committee, and any Holders of Series B Preferred Interests who consent to the settlement before the start of the hearing on the Series B Settlement Motion (the "Consenting Series B

---

[467481]    Intercompany Statement ¶ 12.

[482]    *Id.*

[469483]    *Motion of the Official Committee of Unsecured Creditors For Entry of an Order (I) Establishing Procedures to Estimate the Intercompany Claim That Celsius Network, LLC Has Against Celsius Network Limited and (II) Granting Related Relief* [Docket No. 2369] (the "Committee Estimation Motion") ¶¶ 1–3.

[470484]    *Series B Preferred Holders' Motion for Entry of an Order Establishing Estimation Procedure For the Intercompany Claim Between Celsius Network LLC and Celsius Network Limited in Furtherance of Formulating the Debtors' Plan of Reorganization* [Docket No. 2367] (the "Series B Holders Estimation Motion") ¶¶ 1–5.

[471485]    As noted in Article III.VV of this Disclosure Statement, the term "Series B Holders" refers to certain Holders of Series B Preferred Interests who have been primarily involved in litigation throughout these Chapter 11 Cases and the negotiation of the Series B Settlement, but does not include *all* Holders of Series B Preferred Interests.

Holders"). The Series B Settlement Motion was heard by the Bankruptcy Court on July 18, 2023, and the Bankruptcy Court entered the Series B Settlement Order on July 24, 2023 [Docket No. 3074].

At a high level, the Series B Settlement provides for the Series B Settlement Consideration, a $25 million fund to be paid to the Consenting Series B Holders, in exchange for a release of all claims between the Consenting Series B Holders on the one hand and the Debtors and the Committee on the other. The Series B Settlement ends all ongoing litigation between the parties regarding substantive consolidation, the allowance of the CNL-Network LLC Intercompany Claim, and the Committee AP Complaint, and resolves the issue of how much Holders of Series B Preferred Interests can recover from the Debtors' Estates.

All Holders of Series B Preferred Interests were eligible to participate in the Settlement. Within three days of entry of the Series B Settlement Order (*i.e.*, by July 27, 2023), the Series B Holders received $24 million of the Series B Settlement Consideration on account of the fees and expenses incurred by them in connection with their litigation and negotiation efforts in these Chapter 11 Cases. The Consenting Series B Holders are "Releasing Parties" and "Released Parties" under the Plan. All other Holders of Series B Preferred Interests will receive their Pro Rata share of the remaining $1 million of the Series B Settlement Consideration on the Effective Date of the Plan.

The Series B Settlement Order also provided for the approval of the substantive consolidation of CNL and Network LLC. Approval of the substantive consolidation of CNL and Network LLC requires the withdrawal of the Committee AP Complaint and the Estimation Motions. As of the date of the Filing of this Disclosure Statement, [such withdrawal is pending].

**M.     The Post-Petition Sale and Marketing Process.**

Since the outset of these Chapter 11 Cases, the Debtors and the Committee have diligently worked to identify a sale and restructuring transaction that maximizes the value of their liquid and illiquid assets and businesses for the benefit of their stakeholders. To that end, they pursued both sales of individual assets of particular interest for the Cryptocurrency and tech markets and also conducted a whole-company sale process.

*1.     The GK8 Sale.*

The Debtors anticipated that, apart from a whole-company sale process, certain of the Debtors' assets associated with GK8, along with the GK8 founders and senior management team (the "GK8 Assets"), would be clear targets of interest for an asset sale. Accordingly, on July 25, 2022, the Debtors Filed a motion [Docket No. 188] requesting that the Bankruptcy Court approve the bidding procedures for the sale of the GK8 Assets (the "GK8 Bidding Procedures").

In close consultation with the Committee, the Debtors drafted the GK8 Bidding Procedures, which provided for substantial flexibility with respect to the structure of any transaction—*e.g.*, they allowed the Debtors to select a stalking horse bidder and provide bid protections if the Debtors believed, in an exercise of their business judgement, that doing so would maximize the value of the estate. On September 1, 2022, the Bankruptcy Court approved the GK8 Bidding Procedures [Docket No. 687] (the "GK8 Bidding Procedures Order").

In accordance with the GK8 Bidding Procedures and to maximize returns for stakeholders, the Debtors continued to engage with potential buyers during a time of Cryptocurrency market turmoil, including the chapter 11 filing of FTX Trading Ltd.[472486] During the marketing process, the Debtors

---

[472486]     As part of the strategy to maximize returns from the sale of the GK8 Assets, the Debtors, in consultation with the Committee, extended the final bid deadline three times to November 2, 2022 [Docket Nos. 878, 956, and 1060], and

ultimately engaged with forty-four parties, including other companies in the Cryptocurrency ecosystem, scaled fintech companies, and traditional financial institutions. At least thirty parties executed non-disclosure agreements associated with the sale of the GK8 Assets, and approximately 15 parties who engaged in meaningful discussions with the Debtors and their advisors were able to obtain access to a virtual data room including diligence materials associated with a sale of the GK8 Assets. As negotiations intensified, the Debtors and their advisors received six bids for the GK8 Assets. After discussions with the Special Committee, the Debtors' advisors, and the Committee, four interested bidders moved to the second round, and after further discussion, negotiation, and diligence, one strategic bidder, Galaxy Digital Trading, LLC ("Galaxy"), sent a revised bid and deposit at the final bid deadline implemented by the Bankruptcy Court.

On December 2, 2022, the Debtors executed an asset purchase agreement with Galaxy and announced that Galaxy was the Successful Bidder as defined by the GK8 Bidding Procedures [Docket No. 1549]. On the same date, the Debtors Filed a supplemental motion [Docket No. 1620] requesting that the Bankruptcy Court authorize the Debtors to enter into a definitive purchase agreement (the "GK8 APA," and the transaction provided therein, the "GK8 Sale") with Galaxy.[487] The GK8 APA provides $44.1 million of aggregate deal consideration equal to (a) the assumption of certain liabilities[474488] and (b) a Cash payment of $44 million. The GK8 APA contemplates the purchase of all GK8 Assets free and clear of any liens or encumbrances, the assumption of liabilities associated with the GK8 Assets and all other liabilities of GK8's business, and the exclusion of customer-related liabilities that may potentially be asserted against GK8's business arising under the Terms of Use.

### 2. GK8 Chapter 11 Filing.

To facilitate the sale of the GK8 Assets free and clear of any liens or encumbrances, thus maximizing the likelihood of a successful sale, and as previously noted in Article VII.A of this Disclosure Statement, GK8 Filed petitions for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of GK8's chapter 11 cases is set forth in the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 1629].

The Bankruptcy Court held a hearing on December 8, 2022, both as the sale hearing for the GK8 Sale pursuant to the GK8 Bidding Procedures Order and as the first-day hearing for GK8. After the hearing, the Bankruptcy Court entered the *Order (I) Applying Certain Orders in Initial Debtors' Chapter 11 Cases To, GK8 LTD., GK8 USA LLC, and GK8 UK Limited and (II) Granting Related Relief* [Docket No. 1655] (the "GK8 Order"), applying certain orders previously entered in the Initial Debtors' Chapter 11 Cases to GK8, effective as of the GK8 Petition Date.[475489]

On February 24, 2023, the Bankruptcy Court entered the *Supplemental Order (I) Applying Certain Orders in Initial Debtors' Chapter 11 Cases to GK8 LTD., GK8 USA LLC, AND GK8 UK*

---

Committee, extended the final bid deadline three times to November 2, 2022 [Docket Nos. 878, 956, and 1060], and extended the auction date, the cure objection deadline, the sale objection deadline, and the sale hearing six additional times to December 2, December 6, December 6, and December 8, 2022, respectively [Docket Nos. 1299, 1323, 1460, 1461, 1480, and 1522].

[487]    *See also* Notice of Filing of Asset Purchase Agreement [Docket No. 1586] (attaching the GK8 APA thereto as Exhibit A).

[474488]    *See* GK8 APA, Article I, section 1.3.

[475489]    A complete list of such orders is attached to the GK8 Order as Exhibit 1.

*Limited and (II) Granting Related Relief* [Docket No. 2138] (the "<u>Supplemental GK8 Order</u>"), applying certain retention orders previously entered in the Initial Debtors' Chapter 11 Cases to GK8.[476][490]

The Bankruptcy Court expressed concerns regarding the preservation of any avoidance claims that the Initial Debtors may have against directors and officers associated with GK8, and directed the Debtors and the Committee to File additional briefs on this issue.[477][491]  On December 12, 2022, both the Debtors and the Committee Filed briefs clarifying that only Claims and Causes of Action held exclusively by GK8 would be transferred to Galaxy under the GK8 APA and that such Claims and Causes of Action were speculative and not valuable to the Debtors' estates.[478][492]  In addition, the Debtors Filed a revised sale order [Docket No. 1673] further clarifying that any Claims and Causes of Action, including avoidance claims under chapter 5 of the Bankruptcy Code, that belong to any Initial Debtor or any Affiliate of an Initial Debtor (other than a GK8 entity) would not be transferred to Galaxy pursuant to the GK8 Sale.

On December 13, 2022, the Bankruptcy Court entered an order approving the GK8 Sale [Docket No. 1686] (the "<u>GK8 Sale Order</u>") after finding that the Debtors conducted the GK8 Sale in accordance with the GK8 Bidding Procedures Order, that the consideration provided by Galaxy under the GK8 APA constituted the highest or otherwise best offer and provides fair and reasonable consideration to the Debtors for the GK8 Sale, and that the consummation of the GK8 Sale under the GK8 APA was in the best interests of the Debtors, their respective creditors, Estates, and other parties in interest.[479][493]

On December 27, 2022, *pro se* creditor Mr. Frishberg Filed a motion [Docket No. 1794] requesting that the Bankruptcy Court reconsider the GK8 Sale Order, alleging without basis that the Debtors were concealing "substantial assets" in the form of insurance policies from Aon and USI and committing "bankruptcy fraud," notwithstanding the Debtors' repeated explanation to Mr. Frishberg that he misunderstood GK8's referral arrangements with both Aon and USI.  After the Debtors Filed their objection [Docket No. 1869], and the Bankruptcy Court held a hearing on the motion on January 24, 2023, the Bankruptcy Court entered an opinion [Docket No. 1941] denying the GK8 Reconsideration Motion.[480][494]

### 3.  The Whole-Company Sale Process.

Parallel to the GK8 sale process, the Debtors, in close consultation with the Committee and its advisors, also pursued a dual-track process of marketing the Debtors' entire retail platform and other

---

[476][490]    A complete list of such retention orders is attached to the Supplemental GK8 Order as <u>Exhibit 1</u>.

[477][491]    Dec. 8 Hr'g Tr. at 73:2–4 ("I was very concerned whether avoidance claims that the Celsius debtors have against anybody associated with GK8 are not going to disappear."); *Id.* at 79:23–82:25.

[478][492]    *See Debtors' Statement in Support of Entry of the Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the GK8 Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1671] ¶¶ 5–11; *The Official Committee of Unsecured Creditors' Memorandum of Law with Respect to the Proposed Sale of the GK8 Assets* [Docket No. 1674] ¶¶ 8–11.

[493]    *See* GK8 Sale Order at 3–7 (explaining the reasons for approving the sale under the APA).

[480][494]    The Bankruptcy Court held that, "even when liberally construed, provide[d] no legal support for [the] requested relief and is entirely without merit for three reasons":  (i) lack of new evidence or "any of the other grounds for reconsideration of a judgment"; (ii) failure to show that the Debtors lacked a sound business justification for the GK8 Sale; and (iii) failure to demonstrate by clear and convincing evidence that the GK8 Sale Order was procured by fraud.  *Memorandum Opinion and Order Denying Daniel A. Frishberg's Motion for Reconsideration of the GK8 Sale* [Docket No. 1941] at 7–10.

assets and, separately, the mining business while simultaneously evaluating a potential standalone reorganization. As a result, the Debtors, with input from the Committee and its professionals, determined that the best way to maximize value for all stakeholders was to conduct a robust, transparent process to solicit proposals from potentially interested parties for the Debtors' assets, including but not limited to the Debtors' retail platform, the loan portfolio, their mining operations, and related technology and assets.

In September 2022, the Debtors, through their investment banker Centerview, began a marketing process designed to identify potential bidders for and maximize the value of all or substantially all of the Debtors' assets, properties, goodwill, and rights relating to their businesses. The Debtors, in consultation with Centerview, developed a list of over 130 parties whom they believed would be interested in, and whom the Debtors reasonably believed would have the financial resources to consummate, a sale. The parties who were contacted included strategic parties, private equity firms, other companies in the Cryptocurrency ecosystem, scaled fintech companies, and traditional financial institutions.

On September 29, 2022, to enable the Debtors and their advisors to move expeditiously to complete a thorough marketing process, receive, evaluate, and improve upon bids, identify one or more potential stalking horse bidders, and hold an auction, if necessary, to determine the highest or otherwise best bid, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 929] (the "Bidding Procedures Motion"). The Bidding Procedures Motion requested that the Bankruptcy Court authorize and approve the bidding procedures (which were developed in close consultation with the Committee and its advisors) set forth therein (the "Bidding Procedures"), establish certain milestones in connection with the marketing process, and authorize the Debtors to select one or more stalking horse bidder(s) that would be entitled to certain bid protections, among other relief. After a hearing on October 20, 2022, the Bankruptcy Court entered an opinion granting the Bidding Procedures Motion after finding that the revised Bidding Procedures "work to ensure a fair bidding process and to maximize the sale price of the property in the auction," and that the Debtors had articulated a sound business purpose for the sale and the sale timeline.[481][495] On November 11, 2022, the Bankruptcy Court entered an order approving the Bidding Procedures as set forth therein (the "Bidding Procedures Order").[482][496]

The Bidding Procedures Order contained provisions related to: (1) the submission of a non-binding indication of interest; (2) the eligibility to participate in bidding; (3) the requirements for the form of bids and accompanying documents; (4) the sharing of information with regulators about potential bidders; (5) the use of back-up bidders; (6) the selection, with approval of the Bankruptcy Court, of a stalking horse bidder with the corresponding stalking horse agreement and bid protections; (7) the procedures for the holding of a potential auction, including the bidding increment the Debtors plan to use at such auction; and (8) the criteria under which the Debtors will select the highest or otherwise best bid.[483][497] The Bidding Procedures Motion contemplated certain milestones in connection with the sale of

---

[481][495]    *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures in Connection with the Sale of Substantially All the Debtors' Assets* [Docket No. 1167] at 17–25.

[482][496]    *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272].

[483][497]    *See generally* Bidding Procedures Motion.

the Debtors' "Retail Platform Assets" (defined in the Bidding Procedures Motion to include the assets, properties, goodwill, and rights comprising the Debtors' retail platform business, including any Cryptocurrency or digital assets held by the Debtors) and for the Debtors' "remaining assets" (including the mining assets and the Retail Platform Assets to the extent they are not sold at the November 28, 2022 sale hearing). The Debtors, in consultation with the Committee, extended the final bid deadline to April 17, 2023, at 5:00 p.m. (prevailing Eastern Time) (the "Final Bid Deadline").

In light of the heightened concerns over keeping certain personally identifiable information of the Debtors' customers private in these chapter 11 cases, the Bankruptcy Court also appointed a consumer privacy ombudsman (the "CPO") pursuant to sections 363(b)(1)(B) and 332(a) of the Bankruptcy Code in connection with its approval of the Bidding Procedures Motion.[498] On January 27, 2023, the CPO Filed the first report, providing a number of suggestions to the Debtors in connection with the potential sale of the Debtors' assets.[499]

In accordance with the Bidding Procedures and in consultation with Centerview, the Debtors contacted over 130 parties they believed may be interested in a transaction. As part of that process, the Debtors executed over forty confidentiality agreements with prospective bidders, and such parties were granted access to a virtual data room populated with diligence materials to facilitate their assessment of the Debtors' assets. Parties that expressed interest in a transaction were also given the opportunity to discuss the business with the Debtors' management team.

The Debtors' robust marketing process ultimately produced six non-binding bids for their Retail Platform Assets (or portions thereof), three non-binding bids for their mining business, and certain other bids for individual assets. Importantly, none of the bids for the Debtors' mining business were Cash bids above liquidation value—all were preliminary and non-binding, contingent on raising financing, and would have significantly diluted creditors' equity stake in the mining business.

(a)    The Stalking Horse Bid.

The Debtors and the Committee thoroughly analyzed and worked to improve each bid to identify the bid that provided the value-maximizing solution for the Debtors' liquid and illiquid assets. On February 15, 2023, the Debtors announced that, in consultation with the Committee, they had reached an agreement in principle with NovaWulf Digital Management, LP ("NovaWulf")[500] to sponsor a plan of

---

[498]    *Memorandum Opinion and Order Granting Motion to Approve Bidding Procedures in Connection with the Sale of Substantially All the Debtors' Assets* [Docket No. 1167] at 24 ("[G]iven the significant amount of potential customer data that could be included in a sale, the Court finds that appointing a neutral Consumer Privacy Ombudsman early in the sale process will ensure that any sale adequately protects such customer data."); *see also Order Approving the Appointment of Consumer Privacy Ombudsman* [Docket No. 1208] (appointing Lucy L. Thomson as the CPO).

[499]    *See, e.g.*, the CPO's *First Report to the Court* [Docket No. 1948] at 8, 40–41 (suggesting that the Bankruptcy Court only approve a sale transaction to a "qualified buyer" as that term has been defined in prior case law, such as when the purchaser is in the same line of business as the Debtors and agrees to comply with the Debtors current privacy policy); *id.* at 7, 26, 32 (suggesting that the Debtors limit the transfer of customer data active accounts and that the Bankruptcy Court use its discretion to decide what customer data should be transferred or sold).

[500]    NovaWulf is an SEC-registered investment advisor and NovaWulf's management team has decades of experience in finance, restructuring, and technology, having managed tens of billions of dollars in assets. Additional information on NovaWulf's co-founders and managing partners, Jason New and Michael Abbate, is attached as Exhibit A to the Bid Protections Statement (as defined below) [Docket No. 2326].

reorganization for the Debtors (the "NovaWulf Transaction"). [487][501]

In accordance with the Bidding Procedures, on March 1, 2023, the Debtors Filed a notice [Docket No. 2150] designating NovaWulf as the stalking horse bidder (the "Stalking Horse Bidder"), NovaWulf's bid as the stalking horse bid (the "Stalking Horse Bid"), and announcing that the Debtors, the Committee, and NovaWulf executed a plan sponsor agreement (the "NovaWulf Plan Sponsor Agreement"). The NovaWulf Plan Sponsor Agreement provided for, among other things, certain bid protections, including: (a) a break-up fee of $5 million (the "Break-Up Fee"); and (b) reimbursement of NovaWulf's reasonable and documented out-of-pocket fees and expenses, initially up to a maximum of $15 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections"), to compensate NovaWulf for the substantial time and resources it had spent, and expected to continue to spend, in negotiating and consummating the complex and novel NovaWulf Transaction, in each case payable upon certain termination events as set forth in the NovaWulf Plan Sponsor Agreement. Simultaneously therewith, the Debtors also Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2151] (the "Bid Protections Motion"), requesting that the Bankruptcy Court approve the Bid Protections and attaching the NovaWulf Plan Sponsor Agreement as an exhibit thereto. Importantly, the NovaWulf Plan Sponsor Agreement included a broad provision known as a "fiduciary out" that allowed the Debtors or the Committee, consistent with their fiduciary duties, to terminate the NovaWulf Plan Sponsor Agreement to the extent the Debtors and/or the Committee identified an alternative proposal that the Debtors and/or the Committee believed is higher or otherwise better than the NovaWulf Transaction.

The Bid Protections Motion was supported by the Committee, which noted that the NovaWulf Transaction was not only "the highest and best proposal" on the table at the time, but also "the only feasible transaction other than a value-destructive liquidation," and that the approval of the Bid Protections would ensure NovaWulf's "ongoing participation" in Debtors' restructuring and set a floor for the Debtors' ongoing competitive auction process. [488][502] The U.S. Trustee, the Series B Holders, the Ad Hoc Group of Borrowers, and two creditors, on the other hand, objected to the Bid Protection Motion.

The U.S. Trustee argued that the Debtors should have provided additional information in the Bid Protections Motion with respect to (1) any changes to the NovaWulf Transaction that were necessitated by the Customer Claims Ruling, (2) how the Break-Up Fee and the Expense Reimbursement were calculated, and (3) the treatment of the Convenience Class. [489][503] The Series B Holders objected that the Bid Protections were excessive when compared solely to NovaWulf's $45 million cash contribution under the NovaWulf Plan Sponsor Agreement. [490][504] The Ad Hoc Group of Borrowers also objected to the Bid Protections Motion on the ground that the NovaWulf Plan Sponsor Agreement lacked adequate safeguards to protect borrowers electing a specific treatment from certain future risks, in addition to

---

[487][501]    *See generally Debtors' Statement with Respect to the Status of the Debtors' Chapter 11 Plan Process* [Docket No. 2066].

[488][502]    *The Official Committee of Unsecured Creditors' Statement in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2302] ¶¶ 2, 3.

[489][503]    *Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2218] at 7–10.

[490][504]    *Limited Objection and Reservation of Rights in Connection with the Debtors' Motion for an Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor* [Docket No. 2229] ¶¶ 3, 4.

raising certain regulatory concerns.[495] In addition, Mr. Tuganov Filed a joinder to the objection by the U.S. Trustee, and argued that, in light of the Customer Claims Ruling, the Debtors should disclose whether and to what extent customers have alleged non-contract claims against all Debtor entities and the Bankruptcy Court should consider whether to allow creditors to amend their proofs of claims.[496] Lastly, *pro se* creditor Víctor Ubierna de las Heras also Filed a joinder to the objections Filed by the U.S. Trustee and Mr. Tuganov, arguing that the Debtors should disclose treatment to customers in "unsupported jurisdictions inside the United States of America and to customers in [other] countries," and "how withdrawals amounts will be calculated."[497] On March 22, 2023, the Debtors Filed a reply (the "Bid Protections Reply") in support of the Bid Protections Motion, responding to the objectors' arguments and disclosing that NovaWulf had agreed to reduce the cap of the Expense Reimbursement from $15 million to $13 million.[498]

During the hearing on March 23, 2022, the Bankruptcy Court inquired as to whether NewCo and the NovaWulf Transaction would be regulatorily compliant.[499] Accordingly, the Bankruptcy Court directed certain state and federal regulators to File statements with respect to the Bid Protections Motion by 12:00 p.m. (prevailing Eastern Time) on March 28, 2023.[500] Three statements were Filed. First, the SEC Filed a statement noting that it is not aware of any published SEC guidance that addresses "whether an expense reimbursement and/or breakup fee for a bidder are appropriate where the proposed transaction is contingent on obtaining regulatory approvals."[501] The statement Filed by the New Jersey Bureau of Securities (the "Bureau") indicated that "the Debtors have shared documents listing various licenses already held by the proposed Figure entity partners," and that "other required licenses and approvals for the involved entities are in place or efforts are being made to obtain them."[502] Further, the Bureau noted that it "appreciate[d] the efforts" by the Debtors, the Committee, and NovaWulf "to reach regulatory compliance," and that "the plan terms outlined thus far show that that there is a path towards regulatory compliance."[503] The statement Filed by the National Association of Attorneys General and joined by the states of Alabama, Arkansas, California, District of Columbia, Hawaii, Maine, North Dakota, Oklahoma, Tennessee, Texas, Vermont, Washington, and Wisconsin indicated that these states were "not asking the Court to deny the [Bid Protections Motion]" given that they were "not currently

---

[495]  *Objection of the Ad Hoc Group of Borrowers to the Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2256] ¶¶ 3–6.

[496]  *Joinder and Supplement to Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2224] ¶¶ 6–9.

[497]  *Joinder and Supplement to Objection of the United States Trustee to Debtors' Motion for an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief and Joinder to Joinder and Supplement Filed by Ignat Tuganov* [Docket No. 2236] ¶¶ 4–7.

[498]  *Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2297] ¶¶ 2, 7–9.

[499]  *See, e.g.*, Mar. 23 Hr'g Tr. 69:16–20 [Docket No. 2317].

[500]  *Id*. at 87:22–88:2.

[501]  *Statement Regarding Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2322] (the "SEC Statement") at 3.

[502]  *Statement of the New Jersey Bureau of Securities Regarding Regulatory Compliance and Reservation of Rights* [Docket No. 2318] (the "New Jersey Statement") ¶ 3

[503]  *Id.*

aware of any specific issues in the general plan outline that the Debtors have provided in the [Bid Protections Motion] that would inherently preclude" the Debtors from proposing a plan and disclosure statement that are regulatorily compliant.[514]  In all three statements, the regulators reserved the right to raise any regulatory issues to the extent any such issues arose subsequently.[515]

Also on March 28, 2023 the Debtors Filed a statement (the "Bid Protections Statement") in support of the Bid Protections Motion, indicating that the Debtors and NovaWulf were willing to delay approval of $5 million of the proposed Expense Reimbursement until the Disclosure Statement is approved by the Bankruptcy Court.[516]  On March 30, 2023, the Bankruptcy Court entered an order approving the Bid Protections Motion, as modified by the accommodations set forth in the Bid Protections Reply and the Bid Protections Statement, including approval of a Break-Up Fee of $5 million and an Expense Reimbursement of up to $8 million, with approval of an additional $5 million Expense Reimbursement subject to further order of the Bankruptcy Court following the approval of the Disclosure Statement.[517]  The Bankruptcy Court was "satisfied" that the modified Bid Protections were proper "[s]ince the regulators did not identify any immediate threats to the [NovaWulf Plan Sponsor Agreement's] regulatory compliance, and since NovaWulf is willing to delay part of the Expense Reimbursement.[518]  The Bankruptcy Court found that the Debtors "satisfied the requirements for court approval of bid protections," and that the "proposed [Bid Protection] amounts are reasonable."[519]

(b)      The Auction.

As noted above, while the Debtors selected NovaWulf as the Stalking Horse Bidder, the Final Bid Deadline was April 17, 2023, at 5:00 p.m. (prevailing Eastern Time) and the Debtors continued reviewing and evaluating additional bids that they received until that time.

Prior to the Final Bid Deadline, the Debtors received three additional bids, and after consultation with the Committee, determined that two of those were Qualified Bids (as defined in the Bidding Procedures).  The two additional Qualified Bids were from (a) Fahrenheit, LLC ("Fahrenheit"), the equity of which is owned, directly or indirectly, by Arrington Capital ("Arrington"), U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin"), Proof Group Capital Management LLC ("Proof Group"), Steven Kokinos, and Ravi Kaza, and (b) the Blockchain Recovery Investment Consortium, which includes Van Eck Absolute Return Advisers Corporation and GXD Labs LLC (the "BRIC," and together with Fahrenheit and NovaWulf, the "Bidders," and each Bidder's bid, a "Bid").[520]  Fahrenheit's proposal reflected the "NewCo" transaction structure contemplated by the Stalking Horse Bid, including both (a) the distribution of a significant amount of the Debtors' Liquid Cryptocurrency to Account Holders, and (b) the establishment of a NewCo that would manage all of the NewCo Assets as part of

---

[514]      *Response of Undersigned States to Debtors' Motion for Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor* [Docket No. 2325] (the "NAAG Statement") ¶ 6.

[515]      *See* SEC Statement at 3, New Jersey Statement ¶¶ 4–5; NAAG Statement ¶¶ 2, 5.

[516]      *Debtors' Statement in Further Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2326] ¶ 4.

[517]      *Order Granting the Debtors' Motion for Bid Protections as Modified* [Docket No. 2344].

[518]      *Id.* at 4.

[519]      *Id.*

[520]      *Notice of Auction* [Docket No. 2519] at 2.

single go-forward business (Fahrenheit's Bid and NovaWulf's Bid, each a "NewCo Bid"). The BRIC Bid contemplated (a) the establishment of a pure-play, publicly traded mining business in which the Debtors' creditors will receive 100% of equity interests (the "Backup MiningCo"), (b) a distribution of all of the Liquid Cryptocurrency on or as soon as practicable after the Effective Date, (c) the timely monetization of the Debtors' remaining assets and subsequent Liquid Cryptocurrency distributions to creditors, and (d) an orderly wind down of the Estates.[521] The BRIC also expressed a willingness to provide certain consultation services to the Debtors, including developing distribution procedures and making distributions to creditors (the "BRIC Consultation Services").

Pursuant to paragraph G of the Bidding Procedures Order and Section XI of the Bidding Procedures, the Debtors, in consultation with the Committee, determined that conducting an Auction (as defined in the Bidding Procedures Order) would maximize the value of the Debtors' assets and subsequently invited the three Qualified Bidders to participate in the Auction.[522] The Auction commenced on April 25, 2023 at the offices of Kirkland & Ellis LLP in New York, New York ("Kirkland New York").[523] Interested parties, including regulatory agencies and Account Holders who executed confidentiality agreements with the Debtors, were permitted to listen to the on-the-record proceedings via Zoom.[524]

At the beginning of the Auction, the Debtors announced that the BRIC Bid, which was for an orderly wind down, was the leading proposal due to several factors including, among others, (a) the quantum and structure of the management fees under the NewCo Bids, and (b) the amount of Liquid Cryptocurrency to be distributed to Account Holders under the NewCo Bids.[525] The Debtors also informed the Bidders that the Debtors would not consider proposals for individual assets or components of the Plan, including, among others, any proposed settlement terms with the Retail Borrower Ad Hoc Group, Convenience Class treatment, or treatment of CEL Token Deposit Claims.[526] The Debtors also summarized the key terms of the Fahrenheit Bid and the BRIC Bid.[527] The Auction continued on the record later that evening, at which point the Debtors announced that NovaWulf had submitted a revised Bid.[528] A representative from NovaWulf announced the terms of the revised Bid on the record. The Auction was adjourned on April 25, 2023 at 8:04 p.m. (prevailing Eastern Time).[529]

---

[521]    As part of the BRIC Bid, the BRIC also proposed working with Gemini Trust Company, LLC ("Gemini" or the "BRIC Exchange Partner"). All distributions contemplated under the BRIC Bid would be made through Gemini as the BRIC Exchange Partner.

[522]    *Id.*

[523]    *Id.* at 3.

[524]    *Id.*

[525]    April 25, 2023 Auction Tr. 16:7–19:20.

[526]    *Id.* at 2:11–22.

[527]    *See generally id.*

[528]    *Id.* 52:21–25.

[529]    *Id.* at 61:6.

The Auction continued on April 26, 2023 at 10:00 a.m. (prevailing Eastern Time).[516530]    At approximately 11:30 a.m. (prevailing Eastern Time), the Debtors announced on the record that the Bidders were to assume that (a) the Retail Borrower Deposit Claim Settlement will not be part of the Debtors' chapter 11 plan of reorganization, and (b) that NewCo will be capitalized with approximately $450 million of Liquid Cryptocurrency.[517531]    The Auction went off the record at 11:38 a.m. (prevailing Eastern Time).

The Auction was scheduled to continue on April 27, 2023 at 10:00 a.m. (prevailing Eastern Time) at Kirkland New York.[518532]    At 12:47 p.m. (prevailing Eastern Time), the Debtors announced on the record that the Debtors, in consultation with the Committee, had determined that each NewCo Bid was higher and better than the BRIC Bid, and that the most recent NovaWulf Bid was the leading Bid.[519533]    The Debtors also described revisions and clarifications to the Fahrenheit Bid and NovaWulf Bid on the record.[520534]    The revised and leading NovaWulf proposal included a number of improvements over the Stalking Horse Bid, including (a) moving to a fixed management fee (inclusive of mining) of $40 million per year instead of a fixed management fee determined by assets under management,[521535] (b) replacing the Stalking Horse Bid's incentive fee structure with a grant of 5% restricted stock units and 5% stock options (both to vest ratably over a 5-year term),[522536] (c) providing an additional one billion HASH Tokens, and (d) contributing Figure equity of $25 million.[523537]    In announcing the latest NovaWulf Bid as the leading Bid, the Debtors also explained that the factors they considered when evaluating the Bids included, among others (a) aggregate management fees, including fixed fees and incentive fees, (b) the break-up fee and expense reimbursement pursuant to the Bid Protections Order, (c) any incremental consideration provided, (d) regulatory considerations, (e) execution risk, (f) strength of the management teams, and (g) the liquidity of NewCo equity.[524538]    The Debtors and the Committee continued discussions with the BRIC to develop a backup bid (the "Backup Bid," and such Bidder, the "Backup Bidder") to the extent that a NewCo Bid could not be consummated.[525539]    The Debtors informed Fahrenheit that they were "on the clock" to return with a revised Bid.[526540]

The Auction continued on April 28, 2023 at 10:00 a.m. (prevailing Eastern Time) at Kirkland New York.[527541]    The Debtors announced on the record that they had received a revised Fahrenheit Bid that

---

[516530]    Notice of Adjournment of Auction [Docket No. 2538] at 3.

[531]    April 26, 2023 Auction Tr. 2:7–22.

[518532]    Notice of Adjournment of Auction [Docket No. 2542] at 3.

[519533]    April 27, 2023 Auction Tr. 4:20–23.

[520534]    *Id.* at 5:20–6:23.

[521535]    April 25, 2023 Auction Tr. 56:3-6 (not inclusive of the proposed incentive fee).

[522536]    *Id.* at 56:17–57:15.

[537]    April 27, 2023 Auction Tr at 55:13–56:1.    The Figure equity was based on a 2021 valuation.    The Debtors and the Committee's advisors spoke with Figure and its investors to conduct diligence on the value of the equity contribution.

[524538]    *Id.* at 7:2–9:23.

[525539]    *Id.* at 5:3–9.

[526540]    *Id.* at 9:22.

[527541]    *Notice of Adjournment of Auction* [Docket No. 2547].

was determined to be higher and better than the previously leading NovaWulf Bid.[542]    The revised Fahrenheit Bid included a reduced management fee of $35 million per year ($5 million less than the then-leading NovaWulf Bid).[543]    Fahrenheit also agreed to increase the proposed management contribution to $50 million, which was to be used to purchase NewCo equity in either the primary or secondary market at the discretion of the Debtors and the Committee.[544]    The Fahrenheit Bid was read into the record by a member of the Fahrenheit team.[545]    The Debtors also announced that they had received a revised proposal from the BRIC, which the Debtors, in consultation with the Committee, did not determine to be higher or better than the previously leading NovaWulf Bid.[546]    The Debtors announced that they were continuing to discuss the terms of a Wind-Down Bid as a potential Backup Bid,[547] and that the Auction would be adjourned to a date and time to be announced.[548]    In the meantime, the Debtors, the Committee, and the Bidders worked to develop revised Bids.

The Auction continued on May 3, 2023 at Kirkland New York.[549]    The Debtors announced on the record the receipt of a revised NovaWulf Bid, which the Debtors, in consultation with the Committee, determined was the highest and best Bid.[550]    The Debtors read the terms of the revised NovaWulf Bid into the record.[551]    The revised terms included, among other things, an additional contribution of $25 million of Figure equity, bringing the total Figure equity to $50 million, structured as ten-year penny warrants.[552]    At NewCo's option, Figure also agreed to commit all of its lending licenses, services, and capabilities, and migrate its crypto lending business to NewCo at an agreed upon amount not to exceed the lesser of 125% of Figure's cost of service and market rate for those services.[553]    Figure would not engage in crypto lending outside of NewCo and would work with NewCo to introduce products and services.  NovaWulf's revised Bid included a NewCo Capitalization Amount of $500 million through either a primary purchase or a Secondary Market Purchase, thereby increasing the amount of Liquid Cryptocurrency to be distributable to Account Holders under the Plan.  The Debtors also announced that the BRIC submitted revised documentation of its proposal and that the Debtors, in consultation with the Committee, accepted the BRIC Bid as the Backup Bid, the terms of which would be memorialized in a backup plan sponsor agreement.[554]    The Auction continued on May 4, 2023, and May 5, 2023, but did

---

[542]    April 28, 2023 Auction Tr. 4:17–22.

[543]    *Id.* at 5:7–20.

[544]    *Id.* at 5:21–6:6.

[545]    *Id.* at 5:2–6:14.

[546]    *Id.* at 9:21–25.

[547]    *Id.* at 10:2–6.

[548]    *Notice of Adjournment of Auction* [Docket No. 2554].

[549]    *Notice of Continuation of Auction* [Docket No. 2561].

[550]    May 3, 2023 Auction Tr. 14:2–4.

[551]    *Id.* at 4:21–12:22.

[552]    *Id.* at 5:10–25,

[553]    *Id.* at 6:6–19.

[554]    *Id.* at 14:14–18:1.

not go on the record either day.[541555]  The Debtors continued to work with the Committee and the Bidders on their proposals.

Fahrenheit submitted a revised Bid, including a detailed legal term sheet, on May 9, 2023, and the Debtors announced on the record that the Fahrenheit Bid was the leading Bid.[542556]  The Debtors reiterated the quantitative and qualitative factors considered, which included, among others:  (a) the ability of each Bidder's management team to create value for customers, including each management team's ability to build out Mining and develop new lines of business (*e.g.*, staking); (b) the quantum and structure of management fees and expenses; (c) the ability to become regulatorily compliant; and (d) the costs and time associated with emergence.[543557]  Fahrenheit's latest Bid included a minimum NewCo Capitalization Amount of $450 million (with a maximum of $500 million) and an increase in management contribution to $50 million,[544558] and significant additional commitments to Mining,[545559] including:

---

[541555]    *See generally Notice of Adjournment of Auction* [Docket No. 2586]; *Notice of Adjournment of Auction* [Docket No. 2588]; *Notice of Adjournment of Auction* [Docket No. 2591].

[542556]    May 9, 2023 Auction Tr. 6:11–16.

[543557]    May 9, 2023 Auction Tr. 5:15–6:11.

[544558]    *Id.* at 8–11.

[559]    *Id.* at 10:18–14:5.

- the buildout and energization of 100 megawatts ("MW") of new bitcoin mining facilities at capped constructions costs, which facilities will be energized within 12 months of the Effective Date (subject to funding approval by the NewCo Board);

- the option to purchase a fully permitted and as-is built 50 MW facility and support respecting the immediate installation of miners at such site;

- subject to certain terms and conditions, the contribution of certain leasehold and development rights respecting a 240 MW behind-the-meter site;

- the option to utilize up to 20,000 rack spaces at various facilities located in the U.S. on certain terms and conditions;

- assistance in maximizing the value of existing credits and coupons for the benefit of the Debtors and NewCo;

- the provision of site-level employees for all existing and developed mining facilities at certain capped costs; and

- access to intellectual property licenses for miner management and curtailment software, US Bitcoin's energy management team, and energy trading desks.

- The revised Fahrenheit bid also provided additional consideration respecting NewCo's staking platform, including:

- access to certain intellectual property, technology, or software owned by Proof Group ("Proof Group IP") with respect to staking services;

- a commitment to support staking in NewCo using the Proof Group IP at no cost to NewCo; and

- subject to certain conditions, the migration of Proof Group's existing staking business to NewCo.

Finally, the Fahrenheit bid contemplated that the NewCo equity would be distributed in the form of shares of common stock and that such equity would be listed on a traditional exchange (e.g., NASDAQ) to provide maximum liquidity to NewCo's stakeholders.[560] The Auction was adjourned on May 9, 2023.

On May 14, 2023, NovaWulf submitted a revised Bid, which the Debtors, the Committee, and NovaWulf documented in a revised term sheet. The Debtors also received a "best and final" Bid from Fahrenheit on May 18, 2023, which was not considered in evaluating NovaWulf's latest Bid. The Debtors announced that the Auction would continue on May 19, 2023 at 2:00 p.m. (prevailing Eastern Time) via Zoom.[561] Around that time, the Debtors announced on the record that the revised NovaWulf Bid was the leading Bid and described its revised terms.[562] NovaWulf's revised Bid included a total

---

[560] _Id._ 11:2–22.

[561] _Notice of Continuation of Auction_ [Docket No. 2689].

[562] May 19, 2023 Auction Tr. 6:3–15:24.

annual management fee of $35 million—down from $40 million.[549563] NovaWulf also (a) matched the $50 million management contribution proposed by Fahrenheit,[550564] (b) increased its contribution of Figure equity $100 million,[551565] and (c) made significant revisions to its mining proposal, including (i) a commitment to manage the mining assets with the support of BeoWulf Energy and (ii) a commitment to build 100 MW of Bitcoin mining facilities within 12 months of emergence.[552566] The Debtors instructed both NovaWulf and Fahrenheit to submit "best and final" Bids by Monday, May 22, 2023, at 5:00 p.m. (prevailing Eastern Time).[553567] The Debtors announced that they would make a decision and conclude the Auction on May 24, 2023.[554568]

On May 22, 2023, the Debtors received "best and final" Bids from NovaWulf and Fahrenheit. The Debtors and the Committee met with NovaWulf and Fahrenheit to discuss the terms of their respective final Bids and visons for NewCo.[555569] The Debtors and the Committee considered both final Bids to be significant improvements over the Stalking Horse Bid. Relative to the Stalking Horse Bid, both the final NovaWulf Bid and Fahrenheit Bid each included: (a) a significantly reduced minimum NewCo Capitalization Amount; (b) a fixed management fees as opposed to a fee determined by assets under management; (c) an incentive fee composed of options with strike prices that will either be (i) based on a crypto-index, or (ii) the price of NewCo's stock at the close of the preceding year; and (d) significantly improved mining terms.

NovaWulf's "best and final" Bid included a total annual management fee of $30 million, which was a further reduction from its $35 million proposed management fee in the prior round.[556570] NovaWulf's Bid also revised its incentive fee—previously structured as 5% restricted stock units and 5% stock options—to 4% in restricted stock units and 6% stock options respectively.[557571] In addition, NovaWulf increased its contribution of Figure equity to $125 million.[558572]

Fahrenheit's Bid did not revise the total annual management fee or incentive fee, which remained at $35 million and 5% of restricted stock units and 5% of stock options, respectively.[559573] Fahrenheit's revised "best and final" Bid included a number of additional Mining commitments above and beyond the significant Mining consideration contained in Fahrenheit's prior bid.[560574] These additional commitments included:

---

[549563]    *Id.* at 4:14–22, 6:22–25.

[550564]    *Id.* at 6:6–15.

[565]    *Id.* at 10:23–11:10.

[552566]    *Id.* at 8:5–17.

[553567]    *Id.* at 5:10–14.

[554568]    *Id.* at 5:15–19.

[555569]    May 24, 2023 Auction Tr. 4:7–10.

[556570]    *Id.* at 6:4–11.

[571]    *Id.* at 6:6–14.

[558572]    *Id.* at 6:15–20.

[559573]    *Id.* at 7:6–8.

[560574]    *Id.* at 7:8–8:25.

- the option to enter into a strategic partnership agreement with a leading ASIC manufacturer that would provide NewCo with the ability to scale up to 180,000 mining machines and ultimately own up to 90,000 new mining machines, subject to certain terms and conditions;

- one hundred million dollars ($100,000,000) in coupons from another leading ASIC manufacturer, which coupons would have no expiration and would be applicable to future machine purchases by NewCo, subject to certain terms and conditions;

- the option to utilize up to 43,500 rack spaces at various facilities located in the U.S.; and

- the option to purchase certain substation materials, containers, and transformers at no greater than cost.

Subsequently, on May 24, 2023 at 10:36 p.m. (prevailing Eastern Time), the Debtors announced on the record that, in consultation with the Committee, that the Debtors selected Fahrenheit as the Successful Bidder and winner of the Auction.[575]    The Debtors then described the quantitative and qualitative factors that had been considered in reaching the Debtors' decision.[576]    The Debtors further elaborated that, while they did not give any credit to Fahrenheit's or NovaWulf's proposed future business plans because they found both parties to have qualified management teams "capable of building valuable NewCo businesses to maximize the value of the Debtors' assets," the Committee (and its advisors) believed that the Fahrenheit management team would create more value for NewCo over time, and therefore the Committee in its assessment gave significant weight to that qualitative factor in making its determination.[577]    The Debtors explained that, in coming to a decision, deference was given to the Committee's judgement on this significant factor due to the Committee's role as the fiduciary for the Account Holders, who will become the future equity owners of NewCo.[578]    The Committee explained that even though fees were lower in the NovaWulf Bid, the "Committee chose the Bid that it thought provided the best opportunity to make creditors whole and hopefully more than whole over the long run."[579]

On May 25, 2023, the Debtors filed the *Notice of Successful and Backup Bidder* [Docket No. 2713] (the "Notice of Successful and Backup Bidders"), announcing the selection of Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder.  The Notice of Successful and Backup Bidders included the Fahrenheit Plan Term Sheet and the BRIC Backup Plan Administration Agreement Term Sheet, to be effectuated through a plan sponsor agreement and backup plan sponsor agreement, respectively.[580]    The Debtors, the Committee, Fahrenheit, and the BRIC spent the following days working on definitive documentation.

---

[575]    *Id.* at 4:11–13.

[576]    *Id.* at 4:14–20.

[577]    *Id.* at 4:21–5:8.

[578]    *Id.* at 5:9–13.

[579]    *Id.* at 12:1–4.

[580]    Notice of Successful and Backup Bidder at 3.

On June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into a plan sponsor agreement (the "Plan Sponsor Agreement"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid to establish the NewCo (the "NewCo Transaction").[581]

(c)    The Backup Bid.[582]

As contemplated by the Backup Bid, in the event the Debtors elect to terminate the NewCo Transaction and pivot to the Backup Plan Sponsor Transaction, an entity designated by the BRIC will manage the Wind Down Estate as the "Backup Plan Administrator."[583]  In exchange, the Backup Plan Administrator will be entitled to certain fees (the "Backup Plan Fees"), including:  (a) a $50 million administration fee, which shall be payable in $10 million annual installments (the "Backup Plan Administration Fee"),[584] (b) a percentage of any distributions made to creditors from the Wind Down Estates, (c) an incentive fee based on the value recovered by the Backup Plan Administrator in excess above the initial asset valuation (excluding price appreciation of liquid BTC/ETH upon emergence), and (d) an efficiency incentive fee based on annual cost savings generated.[585]

On June 7, 2023, the Debtors, the Committee, the BRIC, and the BRIC Exchange Partner executed a backup plan sponsor agreement (the "Backup Plan Sponsor Agreement").[586]  As set forth in the Backup Plan Sponsor Agreement, the BRIC has agreed to serve as the Backup Bidder through December 31, 2023.  The BRIC has also committed to provide the BRIC Consultation Services to assist the Debtors and Fahrenheit in preparing for the consummation of the NewCo Transactions and minimize unnecessary delays to the Chapter 11 Cases in the event the Debtors pivot to the Backup Bid.

The BRIC Consultation Services will include, among other things and solely to the extent requested by the Debtors:  (a) sharing analyses and guidance with respect to the more than 100 Cryptocurrency assets owned by the Debtors; (b) assisting the Debtors with the development of strategies to maximize the value of the Debtors' illiquid assets, including developing trading strategies for Cryptocurrency assets; (c) consulting with the Debtors on mining operations strategy and execution; (d) advising the Debtors on the process for developing models and data science tools in preparation for distributions, including timing and reserves; and (e) consulting with the Debtors on distribution mechanics, including claim calculations, appropriate reserves, KYC/AML processes, tax complexities, and timing.[587]

The Backup Plan Sponsor Agreement also provides for the Debtors' prompt payment of certain fees and expenses to the BRIC (and certain affiliated parties) (the "BRIC Fees") to compensate the BRIC

---

[581]    *Notice of Debtors' Entry into Plan Sponsor Agreement* [Docket No. 2759].

[582]    The terms of the Backup Bid are subject to change prior to any approval by the Bankruptcy Court.

[583]    *See generally* Backup Plan Sponsor Agreement.

[584]    To the extent the Chapter 11 Cases are closed before the fifth anniversary of the Effective Date, the remaining balance of the $50 million will be paid immediately.

[585]    For the avoidance of doubt, the Backup Plan Administrator will only be entitled to the Backup Plan Fees to the extent the Debtors make the Backup Bid Election and the Backup Plan Transactions are consummated.

[586]    *Notice of Hearing on Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2774].

[587]    The Debtors are authorized to terminate the Consultation Services; however, in the event of termination, the BRIC shall no longer be obligated to serve as the Backup Bidder.

for serving as the Backup Bidder, the substantial time and resources expended by the BRIC and its affiliates in connection with the Auction and execution of the Backup Plan Sponsor Agreement, and for the BRIC Consultation Services.[574][588]    The BRIC Fees include (a) a commitment fee of $1.5 million; (b) the reimbursement of all reasonable and documented fees and expenses incurred by the BRIC, the BRIC Exchange Partner, and certain affiliated parties (collectively, the "BRIC Parties") in connection with the Auction and Backup Plan Sponsor Transaction; and (c) a $500,000 monthly fee for the Consultation Services retroactive to May 1, 2023.    Absent the prompt payment of the BRIC Fees as administrative expenses, the BRIC and BRIC Exchange Partner have made clear that they will terminate the Backup Plan Sponsor Agreement.

Simultaneously with executing the Backup Plan Sponsor Agreement, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2774] (the "Backup Bid Fees Motion"), which included the Backup Plan Sponsor Agreement as an exhibit, requesting that the Bankruptcy Court approve the BRIC Fees.    The Debtors believe that the BRIC Fees are a necessary inducement for the BRIC to serve as the Backup Bidder, which the Debtors and the Committee have determined is critical to maintaining a degree of optionality under the Plan.[575][589]    The BRIC Consultation Services will provide meaningful value regardless of whether the Debtors pivot to the Backup Plan Sponsor Transaction.[576][590]    Importantly, the Backup Plan Sponsor Agreement includes a "fiduciary out" that allows the Debtors or the Committee, consistent with their fiduciary duties, to terminate the Backup Plan Sponsor Agreement to consider alternative restructuring proposals which are inconsistent with the Backup Plan Sponsor Transaction (*i.e.*, not the NewCo Transaction).[577][591]    Furthermore, in light of increased regulatory scrutiny and market volatility, the Debtors and the Committee believe it is in the best interest of the Debtors' estates to secure the BRIC Bid as the Backup Bid—the Backup Plan Sponsor Transaction have a meaningfully different risk profile than the NewCo Transaction and the BRIC has agreed to serve as the Backup Plan Administrator even if the Debtors are unable to proceed with establishing the Backup MiningCo.[578][592]

On June 21, 2023, the U.S. Trustee Filed the *Objection of the United States Trustee to Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor Agreement and (II) Granting Related Relief* [Docket No. 2847] (the "UST Backup Bid Fees Objection"), which argued that the Court should deny the BRIC Fees because the Debtors did not demonstrate that the BRIC Fees were necessary to preserve the value of the estate or were necessary to induce BRIC's participation in the auction.[579][593]    The UST Backup Bid Fees Objection also asserted that the Debtors could not justify the BRIC Fees because the "Debtors had multiple suitors anxious to bid on assets."[580][594]    In response to the UST Backup Bid Fees Objection and in support of the Backup Bid Fees

---

[574][588]    *Id.* at §13.

[575][589]    Backup Bid Fees Motion ¶ 7.

[576][590]    *Id.* ¶ 9.

[577][591]    Backup Plan Sponsor Agreement at §§ 12.02(c), 12.03(c).

[578][592]    Backup Bid Fees Motion at ¶ 37.

[593]    UST Backup Bid Fees Objection at 14.

[580][594]    *Id.*  The U.S. Trustee relies on the argument that the Court's approval of the BRIC Fees would create bad precedent that creates perverse bidding incentives:  "To award these protections to BRIC, would open the floodgates for all losing bidders, or perhaps uninterested bidders, to seek compensation for performing diligence and participating in bankruptcy auctions."  *Id.* at 2.

Motion, the Debtors Filed the *Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2908] (the <u>Backup Bid Fees Reply</u>").[595]

As described in the Backup Bid Fees Reply, after the Debtors executed the Backup Plan Sponsor Agreement, a third-party submitted a competing proposal for the Backup Plan Sponsor Transaction.[596] Upon receiving this competing offer, the Debtors asked the BRIC to revise the terms of the BRIC Fees and Backup Plan Sponsor Agreement.[597] In response to the Debtors' request, the BRIC and the BRIC Exchange Partner agreed to materially improve the terms of the BRIC Fees and the Backup Plan Sponsor Agreement.[598] The revised BRIC Fees included (a) reducing the Consultation Services Fee to $450,000 per month with the Consultation Services Fee payable retroactive to June 1, 2023, and (b) reducing the Expense Reimbursement Monthly Cap to $300,000 per month (to be measured over any rolling three-month period).[599] The BRIC and the BRIC Exchange Partner also agreed to reduce the Backup Plan Fees, which would be payable to the Backup Plan Administrator solely to the extent the Debtors consummate the Backup Plan Sponsor Transaction. The revisions to the Backup Plan Fees included (a) reducing the Backup Plan Administration Fee from $50 million to $46 million, with the last two years of the five-year term reduced to $8 million each, and (b) reducing the initial distribution fee from $15 million to $12 million.[600] The Debtors maintained that payment of the BRIC Fees constitutes a sound exercise of the Debtors' business judgment that would ensure that the Debtors could quickly and seamlessly pivot to the Backup Plan Sponsor Transaction (if in the best interest of the Debtors' Estates).[601]

A hearing on the Backup Bid Motion was held on June 28, 2023, at which the Bankruptcy Court expressed concerns about the BRIC Fees and indicated that the Consultation Services Fee could not be approved without the Backup Plan Sponsor being retained by the Debtors' Estates under section 327 of the Bankruptcy Code.[602] After the hearing, the Bankruptcy Court denied the Backup Bid Motion without prejudice.[603]

To address the Bankruptcy Court's concerns with the BRIC Fees, the Debtors, the Committee, and the Backup Plan Sponsor decided to remove the Consultation Services Fee entirely from the Backup Plan Sponsor Agreement (*i.e.*, the BRIC Fees would only consist of the Commitment Fee and Expense

---

[595]   Contemporaneously with filing the Backup Bid Fees reply, the Debtors Filed the *Declaration of Samuel Schreiber, Senior Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2909].

[596]   Backup Bid Fees Reply ¶ 2.

[597]   *Id.* ¶ 3.

[598]   *Id.* ¶ 3.

[599]   *Id.* ¶ 4.

[600]   *Id.* ¶ 4.  Under the proposed terms, the payment of the Backup Plan Administration Fee would be reduced to $8 million in years 4 and 5.

[601]   *Id.* ¶ 7.

[602]   June 28, 2023 Hr'g at 48:25–50:13.

[603]   *Order Denying Without Prejudice Debtors' Motion to Pay Fees to the Backup Plan Sponsor* [Docket No. 2923] (the "<u>Initial Backup Bid Fee Order</u>").

Reimbursement).  On July 8, 2023, the Debtors Filed the renewed Backup Bid Fee Motion on an emergency basis [Docket No. 2978] (the "Renewed Backup Bid Motion").[590604]

On July 10, 2023, in connection with the Renewed Backup Bid Motion and in accordance with the Bidding Procedures, the Debtors Filed a notice [Docket No. 2983] announcing that the Debtors intend to solicit and consider alternative restructuring proposals for the Backup Plan Sponsor Transactions and that the Debtors, the Committee, the BRIC, and the BRIC Exchange Partner executed an amended and restated Backup Plan Sponsor Agreement.[591605]  On July 20, 2023, the Bankruptcy Court entered an order approving the BRIC Fees [Docket No. 3057].

On or about July 31, 2023, the Debtors received two bids for alternative backup plan sponsor transactions.  As of the date of this Disclosure Statement, the Debtors continue to diligence each proposal and have not determined whether either alternative backup plan sponsor transaction is superior to the BRIC proposal.  The Debtors will continue to diligence and negotiate with the BRIC and additional bidders with respect to the terms of the Backup Plan Sponsor Transaction, including with respect to reducing the fees payable by the Post-Effective Date Debtors under the Backup Plan Sponsor Transaction.  If the Debtors, the Committee, and interested parties agree to revised terms for the Backup Plan Sponsor Transaction, the Debtors will File a notice describing such revised terms prior to the Effective Date of the Plan.

### N.    Postpetition Disposition of Certain Property.

In accordance with their business judgment as debtors in possession, and to maximize value to all stakeholders, the Debtors have sought authorization from the Bankruptcy Court to dispose of certain assets postpetition when doing so would benefit the estates.

On November 14, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Decentralized Finance Loans and (II) Granting Related Relief* [Docket No. 1360], requesting that the Bankruptcy Court authorize the repayment of an outstanding decentralized finance loan of approximately $3.26 million so that approximately $7.5 million of digital assets collateralizing the loan could be returned to the estates.  After a hearing on December 8, 2022, the Bankruptcy Court authorized the Debtors to repay the decentralized finance loan [Docket No. 1761] (the "DeFi Order").[592606]  As of December 21, 2022, the Debtors deposited approximately $3.26 million to repay the loan and withdrew 446.9013 wBTC that collateralized the loan.

On January 3, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Return Postpetition Cryptocurrency Transfers to Account Holders and*

---

[590604]    The Debtors filed a motion to hear the Renewed Backup Bid Motion on an expedited basis [Docket No. 2979], which the Bankruptcy Court granted on June 10, 2023 [Docket No. 2982].  In support of the Renewed Backup Bid Motion, the Debtors submitted the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2984].

[591605]    Interested parties are invited to submit competing restructuring proposals by Monday, July 31, 2023 at 11:59 p.m. (prevailing Eastern Time).

[592606]    The DeFi Order provided that to the extent consistent with the Earn Ruling, the Debtors are authorized, but not directed, to swap or sell coins from the Debtors' general coin holdings (in the Earn Program) to generate sufficient USD Coin to repay the loan.  DeFi Order ¶ 3.  Upon repayment and the return of the digital assets collateralizing the loan, the Debtors are authorized, but not directed, to swap or sell such returned collateral to replenish the coins in the Earn Program that were swapped or sold to generate the USD Coin used to repay the loan and convert the remaining digital assets into cash in the form of United States Dollars.  *Id.* ¶ 4.

*(II) Granting Related Relief* [Docket No. 1817], requesting that the Bankruptcy Court authorize the Debtors to return Cryptocurrency assets of approximately $1.3 million that were transferred to the Debtors' platform postpetition. After a hearing on January 24, 2023, the Bankruptcy Court authorized the Debtors to return the postpetition transfers [Docket No. 1929]. After engaging with their advisors to establish an efficient return process, the Debtors filed a notice on the docket regarding the withdrawal procedures on May 17, 2023 [Docket No. 2667]. As of the date of the Filing of this Disclosure Statement, withdrawals are underway.

On January 3, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818], requesting that the Bankruptcy Court authorize the Debtors to exercise certain rights under their master lending agreements with institutional borrowers. Specifically, the Debtors requested authority to, among other things, (i) return Cryptocurrency assets serving as collateral on account of loans to institutional customers upon repayment of each loan and (ii) apply Cryptocurrency assets serving as collateral on account of institutional loans at the prevailing market price to the balance of such outstanding loans. After a hearing on January 24, 2023, the Bankruptcy Court authorized the Debtors, in consultation with the advisors to the Committee, to exercise their rights under each master lending agreement with respect to each corresponding outstanding institutional loan without further notice and hearing [Docket No. 1944].

On February 9, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) the Sale of Bitmain Coupons and (B) the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2022], requesting that the Bankruptcy Court authorize the Debtors to monetize their coupons and credits that discount the purchase of mining rigs at Bitmain Technologies Ltd. Specifically, the Debtors requested authority to (i) sell the coupons through a private sale process, and (ii) convert the credits into purchase orders for mining rigs and sell the Debtors' interest under such purchase order to a third party. In January 2023, the Debtors executed a contract to sell 2,490 mining rigs for approximately $1.2 million in Cash. From late January 2023 through May, the Debtors sold five coupons with approximately $30.8 million of face value for approximately $4.5 million in Cash.

Subsequently, the Bankruptcy Court approved the coupon sale [Docket No. 2086]. After the Debtors Filed two revised orders and a declaration[593607] providing that (i) the Debtors will request that the contractual assignee transfer the full amount of the purchase price prior to the Debtors placing and executing the purchase orders, which the Debtors will hold in escrow and (ii) the proceeds from the credit conversion will be subject to the applicable provisions of the Final Cash Management Order [Docket No. 1152], the Bankruptcy Court approved the credit conversion [Docket No. 2139].

On June 7, 2023, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Sale of Osprey BTC Shares and (II) Granting Related Relief* [Docket No. 2775] (the "Osprey BTC Motion"), requesting that the Bankruptcy Court authorize the Debtors to sell approximately 2.9 million shares issued by the Osprey Bitcoin Trust (the "Osprey BTC Shares"). The

---

[593607]    *Notice of Filing Revised Proposed Order (I) Authorizing (A) the Sale of Bitmain Coupons and (B) the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2069]; *Supplemental Declaration of Christopher Ferraro in Support of Entry of an Order (I) Authorizing the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2124]; *Notice of Filing Further Revised Proposed Order (I) Authorizing the Conversion of Bitmain Credits into Mining Rigs and Assignment of Rights in Such Mining Rigs, and (II) Granting Related Relief* [Docket No. 2125].

Osprey Bitcoin Trust is a Delaware statutory trust managed by Osprey Funds, LLC that owns Bitcoin and largely tracks the price of Bitcoin, and each Osprey BTC Share represents a share of ownership of the Bitcoin the trust holds.[608]  Osprey BTC Shares can be bought in-kind or with fiat currency and can be purchased through brokerage accounts.[609]  They are also transferable and tradable over the counter, although the secondary market for Osprey BTC Shares is relatively illiquid.[610]

As part of their prepetition investment strategy, the Debtors bought the Osprey BTC Shares for 1,000 Bitcoin, representing an aggregate consideration of approximately $55.3 million.[611]  However, due to the significant decrease in the value of Bitcoin since the time of the Debtors' purchase of the Osprey BTC Shares, the value of each Osprey BTC Share has decreased from the March 2021 purchase price.[612]  As of June 7, 2023, each Osprey BTC Share was valued at $5.06, and the Debtors estimate that the Osprey BTC Shares in their possession, which represented approximately 36.65 percent of the total number of outstanding Osprey BTC Shares, have a current market value of approximately $15 million.[613]

In April 2023, the Debtors received a proposal from Anax Trading, LLC ("Anax"), a third party not affiliated with the Debtors, to purchase all Osprey BTC Shares in the Debtors' possession for approximately $16 million in Cash consideration.[614]  The Debtors believe, in a sound exercise of their reasonable business judgement, that the $16 million selling price is commensurate with the market and the transaction is in the best interests of their estates and creditors in light of the continued volatility of Bitcoin prices, the low trading volume of the shares, the Debtors' significant holdings, and the difficulty of finding purchasers on the secondary market.[615]  The Debtors received no objections to the Osprey BTC Motion.  The Bankruptcy Court heard arguments on the Osprey BTC Motion on June 28, 2023 and entered the order authorizing the sale on the same day [Docket No. 2925].

As of the date of the Filing of this Disclosure Statement, the sale of the Osprey BTC Shares has closed and the Debtors have received approximately $19 million in Cash consideration.

### O.    Employee Expense Reimbursement Motion.

On February 28, 2023, the Debtors Filed *The Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Enter Into Witness Cooperation Agreements with Certain Current and*

---

[608]    *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion Seeking Entry of an Order (I) Authorizing the Sale of Osprey BTC Shares and (II) Granting Related Relief* [Docket No. 2776] (the "Osprey BTC Declaration") ¶ 5.

[609]    *Id.*

[610]    *Id.* ¶ 6.

[611]    *Id.* ¶ 4.

[612]    *Id.* ¶¶ 6, 11.

[613]    *Id.* ¶ 7.

[614]    *Id.* ¶ 9.  The Debtors and Anax further agreed that a condition to Anax's obligation to close the sale is that the closing price on the purchase date, divided by the net asset value of the Osprey BTC Trust on such date, does not exceed 67.84 percent of the net asset value of the Osprey BTC Trust, and a condition to the Debtors' obligation to close the sale is that the closing price on the purchase date, divided by the net asset value of the Osprey BTC Trust on such date, is not lower than 62.57 percent of the net asset value of the Osprey BTC Trust.

[615]    *Id.* ¶ 12.

*Former Employees, (II) Authorizing Reimbursement of Past and Future Out-of-Pocket Expenses of Cooperating Witnesses, Including Attorney's Fees, and (III) Granting Related Relief* [Docket No. 2147] (the "Employee Expense Reimbursement Motion"). In the Employee Expense Reimbursement Motion, the Debtors sought approval to enter into cooperating witness agreements and reimburse the expenses of cooperating employees who have played a role in cooperating with numerous ongoing investigations into the Debtors' prepetition business practices.[2616]

Mr. Tuganov, the Committee, and the U.S. Trustee Filed responses or objections in opposition to the motion.[2617] Mr. Tuganov requested that the Debtors make the transcripts of the employee interviews available to creditors who Filed timely proofs of claim in the Debtors' Chapter 11 Cases.[2618] The Committee argued that the proposed payments of employee expenses were not in the ordinary course of business of the Debtors and did not satisfy the business judgment rule;[2619] employees seeking reimbursement already have a right to a prepetition claim against the Debtors for their litigation-related expenses, rendering the motion unnecessary;[2620] and the Employee Expense Reimbursement Motion was premature because the proposed reimbursement payments may have to be clawed back in the event that a cooperating witness was found to be culpable for certain of the alleged litigation claims.[2621] The U.S. Trustee argued that the Debtors provided no factual basis to make employee expense reimbursements, that the cooperation of employees in investigations was part of their employment and could be compensated through the Key Employee Retention Program awards, and that the Debtors' counsel can adequately represent the interests of the Debtors in investigations such that cooperating employees do not need their own counsel.[2622]

In advance of the May 17, 2023 hearing on the motion, the Debtors worked with the Committee to resolve the Committee's objections. The Debtors also Filed a revised proposed order [Docket No. 2643], a declaration by Mr. Ferraro [Docket No. 2654], and a reply addressing Mr. Tuganov's and the U.S. Trustee's objection [Docket No. 2653] (the "Employee Expense Reimbursement Motion Reply"). In response to Mr. Tuganov's request for transcripts of employee interviews, the Debtors explained therein that providing all creditors with such access is not within the Debtors' control as the investigations are conducted by other parties, the investigations are confidential and ongoing, and the Debtors do not participate in many of the interviews.[2623] In response to the U.S. Trustee's objections, the Debtors explained that the U.S. Trustee misunderstood the purpose of the Employee Expense Reimbursement Motion, that Debtors' counsel cannot represent any employees in their individual capacity as part of any investigations into the Debtors due to conflict of interest concerns, and that the

---

[2616]    Employee Expense Reimbursement Motion ¶¶ 2, 5.

[2617]    [Docket No. 2223] (the "Tuganov Response to Employee Expense Motion"), [Docket No. 2227] (the "Committee Objection to Employee Expense Motion"), and [Docket No. 2230] (the "U.S. Trustee Objection to Employee Expense Motion") respectively.

[2618]    Tuganov Response to Employee Expense Motion ¶¶ 4, 8.

[2619]    Committee Objection to Employee Expense Motion ¶¶ 8, 23.

[2620]    *Id.* ¶ 14.

[2621]    *Id.* ¶¶ 23, 25.

[2622]    U.S. Trustee Objection to Employee Expense Motion at 4–5.

[2623]    Employee Expense Reimbursement Motion Reply ¶ 2.

Employee Expense Reimbursement Motion does not call for any reimbursement of expenses related to investigations into employees themselves.[624]

As of the date of the Filing of this Disclosure Statement, the Bankruptcy Court has not yet ruled on the Employee Expense Reimbursement Motion.

### P.    Insurance Motions.

On May 3, 2023, Euclid Financial Institution Underwriters, LLC ("Euclid") Filed the *Motion of Euclid Financial Institution Underwriters, LLC, a Duly Authorized Agent of Certain Underwriters at Lloyds of London and Republic Vanguard Insurance for Relief from the Automatic Stay to the Extent Applicable* [Docket No. 2585] (the "Euclid D&O Motion") requesting the authority to advance or pay certain defense costs to individuals insured under a Directors & Officer's Liability and Corporate Securities Liability insurance policy (the "Policy") issued by underwriters at Lloyds of London and Republic Vanguard Insurance (the "Underwriters") to Celsius.[625]

The Euclid D&O Motion was Filed in connection with the Underwriters receiving a number of notices from insured individuals (including directors, officers, and employees) seeking payment of defense costs incurred in connection with ongoing investigations, lawsuits, and arbitration proceedings arising in connection with the events leading to the Debtors' chapter 11 cases.[626]  The Policy contains three types of coverage:  (a) coverage for losses incurred by Insured Individuals (to the extent such loss is not indemnified by Celsius) ("Side A Coverage"); (b) coverage for Celsius in the event Celsius indemnifies an Insured Individual for covered losses ("Side B Coverage"); and (c) coverage for Celsius resulting for claims directly made against Celsius ("Side C Coverage").[627]  The Policy has a total aggregate liability limit of $1.5 million, (inclusive of defense costs), and is subject to a $2.5 million retention per claim for claims under the Policy's Side B Coverage or Side C Coverage.[628]

The Euclid D&O Motion argues that to the extent the automatic stay is applicable, cause exists to grant relief from the stay and permit the advancement of defense costs because of the greater harms to be faced by the Individual Insureds and the Policy's priority of payment provision, which it alleges prioritizes individual directors and officers over Celsius' clams.[629]

On June 7, 2023, counsel for Mr. Leon and Ms. Landes Filed the *Motion of Shlomi Daniel Leon and Aliza Landes for Relief from the Automatic Stay, as Applicable, to Permit Payments Under D & O Insurance and Joinder in Insurer's Motion Seeking the Same Relief* [Docket No. 2760] joining the Euclid

---

[624]    *Id.* ¶ 3.

[625]    Euclid Motion ¶ 1.  The individual insureds under the policy include current and former directors, officers, and employees of Celsius (the "Insured Individuals").

[626]    *Id.* ¶ 17.

[627]    *Id.* ¶ 7.

[628]    *See generally* Policy (V. Retentions).

[629]    Euclid D&O Motion ¶¶22–24.  The Euclid D&O Motion also references a number of cases where bankruptcy courts have found insurance proceeds to not be property of the estate and therefore not subject to the automatic stay.  Euclid D&O Motion ¶¶ 19–21 (discussing where a debtor's interest in a policy's proceeds are only "hypothetical or speculative" and "no longer protecting the estate's other assets from diminution.").

D&O Motion and seeking relief from the automatic stay (together with the Euclid D&O Motion, the "D&O Motions").

On June 21, 2023, the Debtors Filed the *Debtors' Limited Objection and Reservation of Rights Regarding Euclid Financial Institution Underwriters, LLC's Motion for Relief from the Automatic Stay* [Docket No. 2842] (the "Euclid Limited Objection") requesting that the Bankruptcy Court establish certain procedures as a condition of providing individuals insured coverage under Side A for defense costs.[630] Specifically, the Debtors requested that the Court impose (a) certain quarterly reporting requirements, (b) a pro rata coverage scheme to protect the interests of all individual insureds and avoid a "run on the bank," and (c) a requirement that all individuals receiving payments under the Policy consent to the Bankruptcy Court's jurisdiction.[631] The Debtors believe that the proposed procedures are appropriate and necessary to balance the interests of the individuals seeking coverage while reducing the likelihood the policy is inequitably exhausted.[632]

On June 21, 2023, *pro se* creditor Víctor Ubierna de las Heras Filed an objection to the D&O Motions [Docket No. 2849] asserting, among other things, that the Policy's proceeds are property of the Estates and that the balance of harms weighs against providing individuals coverage because doing so would deplete the amount of proceeds which may become available to the Debtors' unsecured creditors.

The Bankruptcy Court held a hearing on the D&O motions on June 28, 2023, and entered an opinion on July 10, 2023.[633] The Bankruptcy Court found that cause exists to lift the automatic stay and allow Euclid to advance or pay certain defense costs to individual insureds, but also called for the adoption of certain of the conditions requested by the Debtors and the Committee.[634] The Bankruptcy Court declined to adopt the Debtors' request for a pro rata coverage scheme, however, explaining that neither the Debtors nor the Committee provided legal precedent for this type of condition on a lift stay motion.[635]

Q.    **Agreements with Mawson Infrastructure Group Inc. and Its Affiliates.**

4.    *The Co-Location Agreement.*

On February 23, 2022, Debtor Celsius Mining and Luna Squares LLC ("Luna") entered into a customer equipment co-location agreement (~~the "~~together with all supporting schedules and addenda,

---

[630]    The Euclid Limited Objection was Filed as the Debtors, the Committee, and Euclid worked towards a consensual resolution to address the Debtors' and the Committee's concerns. The Euclid Limited Objection expressly reserved the question of whether the Policy's proceeds are property of the Debtors' Estates, and the Debtors' rights under Side B and/or Side C of the Policy, the Debtors' other insurance policies. Euclid Limited Objection ¶¶ 24–25. The Committee also Filed a limited objection to the D&O Motions [Docket No. 2839] and raised the same concerns and requested the same procedures and conditions as the Debtors.

[631]    *Id.* ¶¶ 19–21.

[632]    Euclid Limited Objection ¶¶ 19–23.

[633]    *Memorandum Opinion Granting Motion for Relief from the Automatic Stay, to Allow Advancement and Payment of Insureds' Defense Costs Under D&O Policies* [Docket No. 2981] (the "D&O Ruling").

[634]    *Id.* at 17.

[635]    *Id.* at 23.

the "Co Co Location Agreement"), pursuant to which Luna agreed to provide a hosting facility, electrical power, and internet access for the Debtors' mining rigs.

On July 20, 2023, Celsius sent Luna a notice of Celsius' intent not to renew the Co-Location Agreement on the existing terms. Luna has repeatedly and consistently failed to fulfill its obligations since March 2022. The Co-Location Agreement obligated Luna to deploy a certain number of rigs beginning in certain months of the contract. It detailed the deployment month (e.g., March), the approximate quantity of rigs to be deployed (e.g., 2,000), and the term of the contract (e.g., until August 23, 2023). Celsius Mining was responsible for delivering rigs in advance of the deployment date to ensure Luna could satisfy its obligations. The first month of deployment was scheduled to be March 2022. At the end of March, despite Celsius Mining having delivered over 4,000 rigs, Luna had not deployed any of those rigs. By the end of April, Celsius Mining had delivered a total of 5,400 rigs, and Luna had deployed less than 1,000 rigs. This pattern continued, and for nearly half of the term of the Co-Location Agreement, the deficit between deployed rigs and the number of rigs Celsius Mining delivered exceeded 10,000. Luna also chose to deploy more than 5,000 of its own rigs earlier this year while approximately 10,000 of Celsius Mining's rigs were sitting idle at Luna's facility. Luna argues that construction delays contributed in part to the delayed deployment of Celsius, notwithstanding Luna's installation of its own rigs, and the extended delays.

As part of the Co-Location Agreement, Celsius Mining paid deposits totaling over $15.3 million in the aggregate to Luna that are returnable to Celsius at the expiration of the Co-Location Agreement, the vast majority of which will be due and owing to Celsius upon conclusion of the Co-Location Agreement this month. Luna asserts these deposits have been forfeited by Celsius. Celsius disputes this assertion and is working to ensure the return of the over $15.3 million to the estates using all means legally available to them.

Celsius Mining also believes Luna has inappropriately failed to charge the actual power costs incurred, by not taking into account the revenue generated from re-selling power that was reserved for Celsius.

Celsius has reserved all rights with respect to these breaches, and others, under the Co-Location Agreement.

5.    *The Cooperation Agreement.*

On the same day the Co-Location Agreement was signed, Celsius Mining and Luna's parent company, Mawson Infrastructure Group Inc. ("Mawson") executed a Cooperation Agreement, which requires Mawson to offer any additional availability it has for hosting services or power capacity to Celsius Mining before offering the availability to any third parties. On July 25, 2023, Mawson issued a press release inviting indications of interest for its hosting and co-location services and no offer has been made to Celsius Mining. Celsius Mining is continuing to evaluate its options as a result of this announcement and reserves all its rights.

6.    *The Promissory Note and Related Agreements.*

At the same, time, Celsius Mining loaned Luna $20 million to purchase and install modular transformers and assist Luna with meeting its obligations under the Co-Location Agreement. In exchange for the loan, Celsius Mining provided Celsius Mining with a promissory note (the "Promissory Note") secured by certain of Luna's assets of Luna. In addition, Luna's parent company, Mawson Infrastructure Group Inc. ("Mawson")Mawson and Cosmos Infrastructure LLC ("Cosmos"), an affiliate of Luna ("Cosmos," and together with Luna and Mawson, the "Mawson Entities"), executed a guaranty and

security agreement guaranteeing Luna's obligations under the Promissory Note and granting Celsius Mining a security interest in the certain additional collateral.

As of the date of the Filing of this Disclosure Statement, $8 million plus interest in the aggregate is outstanding under the Promissory Note and will be due this month.

~~On July 20, 2023, Celsius sent Luna a notice of Celsius's intent not to renew the Co-Location Agreement on the existing terms.  As part of the Co-Location Agreement, Celsius Mining has paid deposits totaling over $15.3 million in the aggregate to Luna that are returnable to Celsius at the expiration of the Co-Location Agreement.  Celsius understands that Luna believes these deposits have been forfeited by Celsius.  Celsius disputes this assertion and is working to ensure the return of the over $15.3 million to the estates.~~

*7.    Recent Developments.*

Mawson Infrastructure's annual Form 10-K for the year ended December 31, 2022 (released on March 23, 2023) contained a "going concern" qualification to the independent auditors' opinion contained therein.

On July 25, 2023, the Debtors Filed the *Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas for Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares, and Cosmos Infrastructure LLC* [Docket No. 3088], and the Bankruptcy Court entered an order on July 26, 2023, authorizing the Debtors to take discovery of the Mawson Entities [Docket No. 3091].  The Debtors intend to take discovery of the Mawson Entities to evaluate the status of the liens securing the Promissory Note and other potential claims the Debtors may have against the Mawson Entities, including with respect to the Co-Location Agreement.

As of the date of the Filing of this Disclosure Statement, such discovery is still ~~ongoing~~in process.

**R.    Navigating Developments in the Cryptocurrency Industry.**

In addition to resolving the key legal issues above, the Debtors have navigated these Chapter 11 Cases through a period of great volatility in both the Cryptocurrency industry and traditional markets.

*1.    FTX Bankruptcy.*

On November 11 and 14, 2022, FTX Trading Ltd. and 101 of its affiliates (collectively, "FTX") each Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[636]

As part of the Debtors' efforts to reduce exposure to third-party Cryptocurrency trading platforms during the weeks before the Petition Date, the Company reduced its exposure to FTX from approximately $3.6 billion in January of 2022, to approximately $437 million around the Pause, and further to approximately $354 million immediately before the Petition Date, in part by paying down and unwinding over-collateralized loans from FTX and in exchange for a return of the excess collateral.[637]

---

[636] *In re FTX Trading Ltd. et al.*, Case No. 22-11068 (Bankr. D. Del. Nov. 11, 2022).

[637] Nov. 15, 2022 Hr'g Tr. 28:12–19.

The significant drop in the Company's exposure to FTX was primarily due to the Company's efforts to pay down loans it received from FTX in order to unlock and recover collateral.

During a hearing on November 15, 2022, the Debtors provided the Bankruptcy Court an update regarding their exposure to FTX:  as of November 15, 2022, the Debtors' total exposure to FTX consisted of "four loans outstanding to Alameda [Research Ltd.] totaling around $12 million or [$]11 million of net exposure, including the collateral," and certain coins transferred to  FTX Trading Ltd. or Quoine Pte. Ltd., "mostly unlocked SRM tokens with a value of approximately one million," for "a total net exposure of [$]12 million."[638]  Notwithstanding the Debtors' limited exposure to FTX, the Debtors continue to monitor the developments of the FTX bankruptcy on an ongoing basis to assess any potential impact on the Debtors.  In conjunction therewith, the Debtors expect to file a claim in the FTX bankruptcy by June 30, 2023, the general bar date in the case.

The Committee has also requested Bankruptcy Court authority to serve FTX with subpoenas *duces tecum* for purposes of evaluating the fair market value of CEL Token as of the Petition Date by analyzing certain trading on FTX's exchange [Docket No. 2541].  Following the Bankruptcy Court's order authorizing the same [Docket No. 2626], the Committee Filed a notice of these subpoenas on May 15, 2023 [Docket No. 2642].

On June 29, 2023, the Debtors filed proofs of claim in the FTX bankruptcy.  Debtor CNL asserted a secured claim against FTX debtor Alameda Research, Ltd., based upon a loan agreement previously executed between the parties, in the amount of $14,176,995.81, or 10,000,000 ADA tokens, 83,553 LTC tokens, 1,303,482 EOS tokens, and 3,125,000 MATIC tokens, whichever is greater in value, plus interest, taxes, and certain fees.[639]  Separately, the Debtors asserted a contingent, unliquidated, general unsecured claim against FTX in an amount no less than $2 billion, plus interest, taxes, fees, costs, penalties, and any other sums as may be determined by a court of competent jurisdiction, or any other similarly situated hearing officer, administrator, arbitrator, mediator, or in a documented or court-approved settlement or compromise.[640]  The Debtors expect that their claims against the FTX debtors will be subject to extensive litigation.  Accordingly, because of such litigation risk and because FTX is in bankruptcy, any recovery on account of these claims is speculative.

### 2. *Failure of Silicon Valley Bank and Signature Bank.*

On Friday, March 10, 2023, the California Department of Financial Protection and Innovation closed Silicon Valley Bank and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver.[641]  On Sunday, March 12, 2023, the New York State Department of Financial Services closed Signature Bank and appointed the FDIC as receiver.[642]  Shortly thereafter, Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg issued the *Joint Statement by Treasury, Federal Reserve, and FDIC* (the "Banking

---

[638]    *Id.* 27:25–28:6.

[639]    Claim Number 3752.

[640]    The Debtors filed separate (but identical) proofs of claim against each FTX debtor entity, for a total of 100 proofs of claim.  *See, e.g.*, Claim Number 3021.

[641]    Press Release, FDIC, FDIC Acts to Protect All Depositors of the former Silicon Valley Bank, Santa Clara, California (March 10, 2023, last updated March 12, 2023), https://www.fdic.gov/news/press-releases/2023/pr23016.html.

[642]    Press Release, FDIC, FDIC Establishes Signature Bridge Bank, N.A., as Successor to Signature Bank, New York, NY (March 12, 2023), https://www.fdic.gov/news/press-releases/2023/pr23018.html.

Statement") describing the actions taken to fortify the banking system, including "fully protect[ing] all depositors" at Silicon Valley Bank and similarly making all depositors at Signature Bank whole.[643]

Pursuant to the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152] (the "Final Cash Management Order"), the Debtors maintained bank accounts for some of their fiat currency at Signature Bank.  In light of the fluctuations in the banking system, on March 13, 2023 the Debtors Filed the *Debtors' Statement Regarding Their Cash Management System* [Docket No. 2219], noting the steps the Debtors had taken to confirm the Debtors' funds at Signature Bank were secured pursuant to the Banking Statement and anticipating the transfer of funds from Signature Bank to another authorized depository in compliance with *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines").

As of the date of the Filing of the Disclosure Statement, the Debtors are diversifying where they hold their fiat currency in compliance with the Final Cash Management Order and the U.S. Trustee Guidelines, and in consultation with the Committee as contemplated by the Final Cash Management Order.

### 3.  EFH Default.

As noted in Article VI.A of this Disclosure Statement, Celsius had an approximately $509 million uncollateralized claim against EFH after it set off its own loan obligations to the lender prepetition, which balance was $409 million as of May 2023.  While EFH had made some payments to the Company since September 2021, EFH stopped making those payments in June 2023.  As of the date of the Filing of this Disclosure Statement, the Debtors are in contact with the lender and continue to discuss possible resolutions of the Company's claim.

### 4.  The SEC v. Ripple Labs, Inc. Decision.

On December 22, 2020, the SEC filed a complaint against Ripple Labs, Inc. ("Ripple"), Bradley Garlinghouse, and Christian A. Larsen (collectively, the "Ripple Defendants"), alleging that they engaged in the unlawful offer and sale of securities in violation of section 5 of the Securities Act.[644] These allegations arose in connection with the Ripple Defendants' sale of XRP.[645]

The SEC's allegations against Ripple relate to three primary offerings or sales of XRP: (a) Ripple's sale of XRP to institutional buyers (the "Institutional XRP Sales," and the "Institutional

---

[643]    Press Release, Department of the Treasury, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Joint Statement by Treasury, Federal Reserve, and FDIC (March 12, 2023), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.

[644]    *See SEC v. Ripple Labs, Inc.*, 20-cv-10832 (AT) (S.D.N.Y. Dec. 22, 2020) [Docket No. 46] (the "Ripple Amended Complaint").

[645]    *SEC v. Ripple Labs, Inc.*, 20-cv-10832 (AT) (S.D.N.Y. June 13, 2023) [Docket No. 874], at 2 (the "Ripple Opinion"). XRP Ledger is a blockchain developed in 2011 and early 2012 by Arthur Britto, Jed McCaleb, and David Schwartz that requires XRP to operate.  *Id.* at 3.  Ripple was founded by Britto, McCaleb, and Larsen in 2012 with the purpose of developing a "global payments network for international currency transfers."  *Id.* at 3.  XRP Ledger generated 100 billion XRP—20 billion XRP were distributed to the three founders with the remainder provided to Ripple.  *Id.* at 2–3.  While "[s]ome, not all, of Ripple's products and services rely on the XRP Ledger and XRP," Ripple and XRP have been closely connected since inception:  *Id.* at 3.

XRP Buyers," respectively);[632646](b) Ripple's sale of XRP through market transactions on digital asset exchanges "programmatically" or through trading algorithms (the "Programmatic XRP Sales");[633647] and (c) Ripple's distributions of XRP as a form of payment of services (*e.g.*, employee compensation) (the "Other XRP Distributions," and together with the Institutional XRP Sales and Programmatic XRP Sales, the "XRP Offerings").[634648]

In connection with these activities, the SEC alleges that the Ripple Defendants "sold XRP as an [unregistered] 'investment contract'" in violation of Section 5 of the Securities Act.[635649] On July 13, 2023, the District Court for the Southern District of New York (the "Ripple Court") ruled on the parties' cross motions for summary judgment. Specifically, the Ripple Court granted in part and denied in part both motions, accepting the SEC's position that the Institutional XRP Sales constituted an unregistered offer or sale of investment contracts but finding that the Programmatic XRP Sales and Other XRP Distributions were not offers or sales of investment contracts.[636650]

In making its determination, the Ripple Court reviewed each set of transactions and conducted the fact-intensive analysis required by *SEC v. W.J. Howey Co.* (*i.e.*, the *Howey* test).[637651] In discussing *Howey*, the Ripple Court made an important distinction between the XRP Offerings and XRP: "XRP, as a digital token is not in and of itself a 'contract, transaction[,] or scheme' that embodies the Howey requirements of an investment contract."[638652]

However, the Ripple Court ultimately determined that the Institutional XRP Sales were investment contracts. Those sales met all three prongs of the *Howey* test: (a) the Institutional XRP Buyers paid Ripple money in exchange for XRP; (b) Ripple used the funds to finance operations and the "fortunes of the Institutional Buyers were tied to the success of the enterprise as well as to the success of other Institutional Buyers;" and (c) a reasonable investor in the position of the Institutional Buyers "would have purchased XRP with the expectation that they would derive profits from Ripple's efforts" for reasons including, among others, that Ripple's marketing efforts to the Institutional Buyers would

---

[632646]   *Id.* at 4. The Institutional XRP Buyers included hedge funds, and on demand liquidity customers, pursuant to written contracts. *Id.* at 4. Per the SEC's allegations, the Institutional XRP Sales generated total proceeds of approximately $728.9 million. *Id.*

[633647]   *Id.* at 4. The SEC estimated the programmatic sales to total approximately $757.6 million in the aggregate. *Id.* at 4. The SEC's allegations against Larsen and Garlinghouse relate to their sales of XRP in their individual capacities through market transactions (*i.e.*, Programmatic XRP Sales) and aiding and abetting Ripple's sales as executives of Ripple. *Id.* at 5. Per the SEC's allegations, Larsen's and Garlinghouse' s sales resulted in over $450 million. *Id.*

[648]   *Id.* at 4–5. "The SEC alleges that Ripple recognized revenue of $609 million from its distributions of XRP to individuals and entities in exchange for services." *Id.* at 5.

[635649]   *Id.* at 10. The parties did not dispute that the Ripple Defendants did not file a registration statement, which would be required to the extent the offerings were investment contracts. *Id.* at 11.

[636650]   *See Id.* at 34. The Ripple Opinion also denied the SEC's motion for summary judgment on claims against Larsen and Garlinghouse for aiding and abetting Ripple's violations of the Securities Act. *Id.* at 31.

[637651]   *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). "In *SEC v. W.J. Howey Co.*, the Supreme Court held that under the Securities Act, an investment contract is "a contract, transaction[,] or scheme whereby a person [(1)] invests his money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 11. The Ripple Opinion declined to adopt the "essential ingredients" test advocated for by the Ripple Defendants, which would impose additional requirements beyond *Howey*. *Id.*

[638652]   *Id.* at 15.

have led a reasonable investor to believe that the proceeds would be used to "improve the market for XRP and develop uses for the XRP Ledger, thereby increasing the value of XRP."[653]

The Ripple Court found that the Programmatic XRP Sales and Other XRP Distributions did not amount to the unregistered offering or sale of investment contracts under *Howey*. The Ripple Opinion explained that the Programmatic XRP Sales failed to satisfy the third *Howey* prong; there was no expectation of profit "derive[d] from Ripple's efforts" because the buyers purchased XRP through blind bid/ask transactions on digital asset exchanges and "could not have known if their payments of money went to Ripple." [654] Finally, the Ripple Court found that the Other XRP Distributions did not meet the first prong of *Howey* because there was no investment of money.[655]

*5.    The SEC v. Terraform Labs Pte Ltd. and Do Hyeong Kwon Decision.*

On February 16, 2023, the SEC filed a complaint against Terraform Labs PTE Ltd. ("Terraform") and Do Hyeong Kwon ("Kwon" and together with Terraform, the "Terraform Defendants").[656] The Terraform Complaint alleges that the Terraform Defendants: (a) "orchestrated a multi-billion-dollar fraud involving the development, marketing, and sale" of LUNC Token, UST, wLUNA, mAssets, and MIR token (collectively, the "Terraform Tokens") in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, including rule 10b-5, 17 C.F.R. § 240.10-5, promulgated thereunder; and (b) offered and sold unregistered securities and security-based swaps with non-eligible participants in violation of Section 5 of the securities Act.[657]

The Terraform Complaint alleges that the Terraform Defendants solicited investors by touting, among other things, the Terraform Token's profit potential and secondary market liquidity, both of which would be the result of Terraform's unique ability to create, develop, and grow the Terraform ecosystem.[658] In connection with these activities, the SEC alleges that the Terraform Defendants, with

---

[653] *Id.* at 16–21. The Ripple Opinion notes that while it accepted the SEC's argument to the extent that it held Ripple's sale of XRP to the Institutional XRP Buyers amounted to the offer and sale of investment contracts, it rejected the premise that through the Institutional XRP Sales Ripple "sold investment contracts to the public and used the Intuitional Buyers as underwriters." *Id.* at 22 n. 15. The Ripple Opinion also rejected the defenses raised by the Ripple Defendants under the due process clause, including Ripple's "fair notice" argument. *See id.* at 29.

[654] *Id.* at 23–24. The Ripple Court does not reach the first or second prongs of *Howey* with respect to the Programmatic XRP Sales. *Id.* at 25 fn.17. The Ripple Opinion does not discuss the question of "whether secondary market sales of XRP constitute offers and sales of investment contracts because that question is not properly before the Court." *Id.* at 23 fn. 16.

[655] *Id.* at 26. The Ripple Court did not reach whether the second or third *Howey* prongs were satisfied. *Id.* at 27 n. 18. In rejecting the Other XRP Distributions as Investment Contracts, the SEC's argument that the Other XRP Distributions were indirect public offerings was also rejected. *See id.* at 26–27.

[656] *See SEC v. Terraform Labs PTE Ltd.*, 23-cv-1346 (JSR) (S.D.N.Y. Feb. 16, 2023). An amended complaint was filed on April 3, 2023 [Terraform Docket No. 25] (the "Terraform Complaint"). Kwon is the sole director, chief executive officer, and majority shareholder of Terraform. *Id.* The SEC Complaint alleges that Kwon as its chief executive officer and co-founder, is jointly and severally liable with Terraform for any securities law violations committed by Terraform.

[657] *See SEC v. Terraform Labs PTE Ltd.*, 23-cv-1346 (JSR) (S.D.N.Y. July 31, 2023) (the "Terraform Opinion"). *See* Section V.I.C. for a discussion of UST and LUNC Token. The wLUNA token allowed holders of LUNC Token, which were only available for use on the Terra blockchain, to use LUNC Token in transactions on other blockchains. Terraform Opinion at 3. The mAssets "functioned as "security-based swaps" (as opposed to tokens) whose value 'mirrored' the price of securities exchanged on stock exchange," thereby allowing investors to "gauge the risk of investing in that [underlying] security without 'the burdens of owning or transacting in real assets." *Id.* MIR tokens were the governance token of the Mirror Protocol and entitled its holders to receive the value generated by the Mirror Protocol. Terraform Complaint ¶ 38.

[658] Terraform Complaint ¶ 39. Terraform is alleged to have aggressively marketed and solicited to U.S. investors through social media posts, media interviews and quotes, investor meetings in New York and San Francisco, industry conferences,

full knowledge and intent, violated the registration requirements of the Securities Act through the (a) sale of LUNC Tokens to institutional buyers with no restrictions on resale and (b) through loans of LUNC Token for the purpose of promoting market liquidity.[659]   The SEC further alleges that the Terraform Defendants engaged in a fraudulent scheme by (a) deceiving and misleading investors into believing that the "Terraform blockchain was being used to process and settle real world purchases by retail consumers in Korea and (b) misrepresenting that the UST's "peg was restored due to the success of UST's algorithm."[660]

On July 31, 2023, the District Court for the Southern District of New York before which the complaint was filed (the "Terraform Court") denied the Terraform Defendants' motion to dismiss finding that the SEC adequately alleged that (a) the Terraform Defendants engaged in in the unlawful offering of unregistered securities and (b) "used false and materially misleading statements to entice U.S. investors to purchase and hold on to defendants' products."[661]

As a threshold question the Terraform Court answered whether the Terraform Tokens were securities and therefore subject to the SEC's jurisdiction and the securities laws by applying the *Howey* test.[662]   While the Terraform Court acknowledged that standalone tokens might not securities when viewed independently of the investment protocols, the Terraform Court declined to "erect an artificial barrier between the tokens and the investment protocols which they are closely related."[663]   This point was most relevant to UST as the Terraform Court observed that stablecoin holders do not have a reasonable expectation of profit.[664]   The Terraform Court appears to view this isolated analysis as irrelevant because, unlike other stablecoins, (a) the vast majority of UST was deployed in the Anchor protocol and (b) UST could be converted to LUNC tokens.[665]

---

social media posts, media interviews and quotes, investor meetings in New York and San Francisco, industry conferences, and arranging to have several of the Terraform Tokens listed on "several major crypto-trading platforms, including a prominent U.S.-based platform." *Id.* ¶¶42–43.  Based on such allegations, the SEC has held that the Terraform Tokens are investment contracts or security-based swaps and therefore subject to the SEC's jurisdiction and the securities laws.

[659]   *Id.* ¶¶ 105–10. The SEC made similar allegations with respect to MIR tokens including that the Terraform Defendant's (a) sold and loaned MIR tokens with no restrictions on resale and (b) entered into "a listing agreement with at least one U.S. crypto asset trading platform."  *Id.* at 112–14.  The Terraform Complaint also alleges that "Terraform created, offered, sold, and effected transactions in mAssets through the Mirror Protocol to persons who were not eligible contract participants."  *Id.* ¶ 116.

[660]   *Id.* ¶ 118.

[661]   Terraform Opinion at 1–2.

[662]   Prior to reaching the *Howey* analysis, the Terraform Court also addressed and rejected the Terraform Defendants' arguments that (a) the Terraform Court lacked personal jurisdiction, (b) that the SEC lacks jurisdiction under the "major questions doctrine," and (c) the action violates the Terraform Defendants' due process rights.  *See generally id.* at 11–28.

[663]   *Id.* at 31–32.  When considered in isolation [LUNC Token and UST] might not have been by themselves, investment contracts.  Much as the orange groves in Howey would not be considered securities if they were sold apart from the cultivator's promise to share any profits, the term "security" also cannot be used to describe any crypto-assets that were not somehow intermingled with one of the investment "protocols," did not confer a "right to . . . purchase" another security, or were otherwise not tied to the growth of the Terraform blockchain ecosystem."  *Id.* at 33.

[664]   *Id.* at 33.

[665]   *Id.* at 34.  This appears to conflict with the Ripple Court's approach to applying *Howey* as discussed in the Terraform Opinion with respect to types of purchasers.

The Terraform Court then focused its analysis on the second and third prongs of the *Howey* test: (a) whether there is a common enterprise and (b) whether investors have a reasonable expectation of profit derived from the managerial efforts of the promoter or a third party.[666]

First, the Terraform Court found the SEC to have adequately alleged that purchasers invested in a common enterprise.[667]  For UST in the Anchor protocol, this requirement was satisfied because UST was "pooled together in the Anchor protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed . . . on a pro-rata basis."[668]  Similarly, investors in LUNC Token were found to have invested in a common enterprise because Terraform used the sale proceeds to develop the Terraform blockchain and represented that these improvements would increase" the value of LUNC Token.[669]  As a result of LUNC Token satisfying the second *Howey* prong, the Terraform Court also found wLUNA to meet the requirement because wLUNA tokens could be exchanged for LUNC Tokens.[670]  Similar to LUNC token, MIR tokens also satisfy the common enterprise requirement because the "proceeds from sales of the MIR tokens were 'pooled together' to improve the Mirror Protocol" and any "profits derived from the use of the Mirror Protocol" were to be distributed on a "pro-rata basis."[671]

The Terraform Court also found that investors in all Terraform Tokens had a reasonable expectation of profits.[672]  The Terraform Complaint alleges that the Terraform Defendants "repeatedly touted the profitability of the Anchor Protocol," encouraged UST purchasers to deposit into the Anchor protocol, and led purchasers to believe that these profits were the result of the Terraform Defendants' "unique combination of investing and engineering experience."[673]  Similarly, LUNC Token (and indirectly wLUNA) investors had a reasonable expectation of profit based on the SEC's allegations that the Terraform Defendants "coaxed investors to continue purchasing . . . by pointing out the possibility of future investment returns" and the Terraform Defendant's claims "that profits from the continued sale of LUNA coins would be fed back into further development of the Terraform ecosystem, which would, in turn, increase the value of the LUNA coins."[674]  Like LUNC Tokens, the MIR Tokens created a

---

[666] *Id.* at 35.  The parties did not dispute the first prong of the *Howey* test.  *Id.*

[667] *Id.* at 35.

[668] *Id.* at 36.  The Terraform Court explained that this was *horizontal* commonality.  The Terraform Court did not assess whether there may also be vertical commonality.  *Id.* at 36 n. 6.

[669] *Id.* at 36–37.

[670] *Id.*  The common enterprise requirement was not directly addressed in connection with non-deposited UST, however, because UST was marketed in connection with the Anchor protocol and could be swapped for LUNC Token, it appears that the Terraform Court deemed the requirement to be satisfied.

[671] *Id.* at 37–38.  The Terraform Court noted the, the mAssets were "on their face intended to reflect the fortunes of the existing securities they mirrored."  *Id.*

[672] *Id.* at 38.

[673] *Id.* at 39.

[674] *Id.*

reasonable expectation of profit as a result of the Terraform Defendants' efforts to grow and develop the Mirror protocol.[675]

Of particular interest, the Terraform Court declined to draw a distinction based on the manner in which Terraform Tokens were sold.  The Terraform Court directly rejected the distinction the Ripple Court drew between Institutional XRP Buyers and Programmatic XRP Buyers in making a determination as to a purchaser's reasonable expectation of profit.[676]  The Terraform Opinion noted the SEC's allegations that the Terraform Defendants marketed to both retail and institutional investors and claimed that "sales from purchases of all crypto-assets—no matter where the coins were purchased—would be fed back into the Terraform blockchain."[677]

The Terraform Court next rejected the Terraform Defendants' argument that its offering and sale of LUNC Token and MIR tokens did not constitute unregistered public distributions of securities in violation of Section 5 of the Securities Act.[678]  The Terraform Court accepted the SEC's position that the sale and loan of LUNC tokens "essentially amounted to large-scale unregistered public distributions of [LUNC Token]" because "liability for violations of Section 5 extends to those who have engaged in steps necessary to the distribution of [unregistered security issues."[679]  The Terraform Court observed that, as alleged, the Terraform Defendants' scheme "is the very disguised public distribution that Section 5 seeks to prohibit."[680]  The Terraform Opinion found that the Terraform Defendants failed to show that the distributions were exempt from the Securities Act.[681]  The Terraform Court reaches the same conclusion with respect to the MIR tokens.[682]

The Terraform Defendants also argued that the offering and sale of mAssets did not violate, as claimed by the SEC, Sections 5(e) and 5(l) of the Securities Act because mAssets are not security-based swaps as they "do not involve a payment from one party to their counterparty based on a change in value in an underlying security."[683]  The Terraform Court rejected this argument on the basis that while there is no counterparty after the mAsset is purchased, the original purchase involves a counterparty "and a transfer of financial risk based on a stock or security's future value."[684]  Moreover, notwithstanding the fact that the Terraform Defendants did "not *technically* sell the mAssets through the Mirror Protocol, which programmatically generated the tokens," they were allegedly "necessary participants" because

---

[675] *Id.* at 39–40.  The Court said that a similar expectation of profits was also created for the mAssets.  *Id.* at 40.

[676] *Id.* at 40.  The Terraform Court notes that *Howey* makes no distinction between "a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts."  *Id.* at 41.

[677] *Id.* at 42.

[678] *Id.*  The Terraform Complaint only alleges facts in support of this claim for LUNC Token and MIR tokens, and not UST, wLUNA, or mAssets.

[679] *Id.* at 43.

[680] *Id.* 43–44.

[681] *Id.* at 44.

[682] *Id.* at 45.

[683] *Id.*

[684] *Id.* at 46.

they were "responsible for the Protocol's creation, upkeep, and promotion to the general public."[685]  The Terraform Opinion also found the SEC's fraud claims to survive the Terraform Defendant's motion to dismiss.[686]

~~In these Chapter 11 Cases, the~~The Terraform Opinion casts doubt on the Ripple Opinion and demonstrates the unsettled application of securities laws to Cryptocurrencies and the fact-intensive analysis required.  The Bankruptcy Court may find the Ripple Opinion and the Terraform Opinion relevant if the CEL Token ~~S~~settlement is not implemented and if the Bankruptcy Court is required to determine whether CEL Tokens are securities~~, but~~.  Neither the Ripple Opinion ~~is no~~t~~r~~ the Terraform Opinion are binding authority on the Bankruptcy Court.

### 6. New York v. Mashinsky

---

[685] *Id.* at 46–47.

[686] *Id.* at 48–50.

On January 5, 2023, the NYAG commenced a civil action in New York State Court against Mr. Mashinsky alleging securities fraud, failure to register securities, and repeated and consistent fraud and illegality in violation of New York law.[687] The complaint alleges that Mr. Mashinsky induced investors to deposit Cryptocurrency with Celsius through false and misleading statements, including that Mr. Mashinsky publicly touted the safety of the Celsius platform for customers' Cryptocurrency despite Celsius' high-risk investment strategy, and other misrepresentations.[688] The NYAG seeks relief barring Mr. Mashinsky from engaging in any business related to securities, including Cryptocurrency, holding an officer or director position in any company in New York, and requiring payment of damages, restitution, and disgorgement.[689] Mr. Mashinsky filed a motion to dismiss the complaint on May 2, 2023, arguing that the NYAG had failed to state a claim and had not sufficiently plead the factual circumstances giving rise to the claims, particularly that Earn Accounts and CEL tokens are not securities.[690] The NYAG opposed the motion.[691] The New York State Court denied Mr. Mashinsky's motion to dismiss on August 4, 2023.[692] As noted in Article III.JJ of this Disclosure Statement, in allowing the case to go forward, the New York State Court found that the Mashinsky Complaint sufficiently plead that the New York State Court found that New York's complaint plausibly alleges fraudulent or misleading practices by Mr. Mashinsky through his promotional efforts[693] misstatements concerning regulatory approval and compliance,[694] and misrepresentations about Celsius' deployment strategies.[695]

## VIII.   RISK FACTORS

Holders of Claims and Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors are not the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.   Bankruptcy Law Considerations.

It is impossible to predict with certainty the amount of remaining time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  The occurrence or non-occurrence of any or all of the following contingencies and any others could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a

---

[687] Complaint, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. Jan.. 4, 2023) ¶¶ 113-132 (the "Mashinsky Complaint").

[688] Mashinsky Complaint ¶ 1.

[689] Mashinsky Complaint at 33.

[690] Defendant's Memorandum of Law in Support of Motion to Dismiss Complaint, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. May 2, 2023).

[691] Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss Complaint, *New York v. Mashinsky*, No. 450040/2023 (MC) (N.Y. Sup. Ct. June 6, 2023).

[692] Mashinsky Ruling at 1.

[693] Id.

[694] *Id.* at 17.

[695] *Id.*

re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

   1. *Parties In Interest May Object to The Plan's Classification of Claims and Interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes of Claims and Interests each encompass Claims or Interests that are substantially similar to the other Claims or Interests in the particular Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

   2. *The Debtors May Not Be able to Execute Certain Required Agreements and New Organizational Documents on Acceptable Terms Before the Disclosure Statement Hearing.*

The Plan requires that certain key agreements must be entered into between the Debtors, NewCo, Fahrenheit, and third parties.  Such agreements must be Filed as part of the Plan Supplement, and include, for instance, the Management Agreement, the New Organizational Documents, and the Litigation Administrator Agreement(s), among numerous others.  Negotiating and entering into these agreements will require significant coordination between the Debtors, NewCo, Fahrenheit, and various third parties.  These negotiations are expected to be complex, and there is no guarantee that the Debtors will be able to enter into these agreements on acceptable terms.

   3. *The Debtors May Fail to Satisfy Vote Requirements.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan as promptly as practicable thereafter.  However, if sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Claims as those proposed in the Plan.

   4. *The Debtors May Not Be Able to Secure Confirmation of the Plan.*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, the Bankruptcy Court to find that (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes, (b) a liquidation or a need for further financial reorganization does not follow confirmation of such plan unless such liquidation or reorganization is contemplated in the plan, and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  And if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of a Claim or Interest might challenge the treatment of its Claims or Interests under the Plan or specific provisions in the Plan.  If the Bankruptcy Court overrules these objections, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Bankruptcy Court does not confirm the Plan, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders

of Allowed Claims and Interests against them would ultimately receive on account of such Allowed Claims and Interests.

There can be no guarantee that the Debtors will be able to secure Confirmation of the Plan and it is possible that the Bankruptcy Court will find that the current Plan structure violates the absolute priority rule, the applicable provisions of the Bankruptcy Code, or other provisions of the Bankruptcy Code.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests as well as any class junior to such non-accepting class than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.  *Nonconsensual Confirmation.*

If any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. The pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation and delays in the Confirmation schedule. Notwithstanding such efforts, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan is fair and equitable or does not unfairly discriminate against a dissenting impaired class.

### 6.  *The Conditions Precedent to Confirmation and to the Effective Date of the Plan May Not Occur.*

Article IX of the Plan contains the conditions precedent to Confirmation, or the conditions that must be satisfied before Confirmation can occur, and Article X of the Plan contains the conditions precedent to the Effective Date, or the conditions that must be satisfied before the Effective Date of the Plan can occur. Conditions precedent to Confirmation include: that the Bankruptcy Court shall have entered the Disclosure Statement Order (meaning that the Bankruptcy Court approves the Disclosure Statement) and the Confirmation Order (meaning that the Bankruptcy Court confirms and approves the Plan); that the Management Agreement, the New Organizational Documents, the ~~Valon Agreements (if any), the~~ Proof Group IP License (if any), the distribution agent agreement(s), and the US Bitcoin Agreements are agreed to as required under the Plan Sponsor Agreement; and that the Plan Supplement and related documents will have been Filed. If such conditions precedent are not waived or not met, Confirmation will not be able to occur.

Conditions precedent to the Effective Date include:  that the final version of the Plan Supplement and related documents will have been executed and Filed; that the Litigation Administrator Agreement(s) shall have been executed; that the NewCo Assets shall have been transferred to NewCo as described in the Plan; that the Registration Statement shall have been Filed and become effective; and numerous others.  If such conditions precedent are not waived or not met, the Effective Date will not take place and the Plan will not be in force.

266

### 7. Continued Risk Upon Confirmation and Potential Appeal of Confirmation.

Even if the Plan is consummated, there may be continued risks, including certain risks that are beyond the control of the Debtors, the Post-Effective Date Debtors, and NewCo, such as further deterioration or other changes in economic conditions, changes in the Cryptocurrency industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for Cryptocurrency, and increase in expenses. *See* Article VIII.C of this Disclosure Statement entitled "Risks Related to the Debtors' and NewCo's Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Even if the Plan is confirmed, there is no guarantee that the NewCo Transaction or the Orderly Wind Down will be implemented, and the Debtors will continue to face uncertainty. Specifically, it is possible that the Plan's confirmation is appealed and its implementation subsequently paused until further litigation takes place.

### 8. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. Parties in interest may object to the release, injunction, and exculpation provisions in the Plan, and such provisions may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Plan may not be Confirmed.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions to the implementation of the transactions contemplated by the Plan. As a result, the releases and exculpation are inextricable components of the Plan. The Bankruptcy Court, however, may not agree and may not approve the releases and exculpation provisions. As noted above, in the *Voyager Digital Holdings, Inc.* chapter 11 case, the U.S. Department of Justice and the U.S. Trustee appealed the bankruptcy court's confirmation of the plan due to concerns associated with the exculpation clauses included in the confirmation order.[642696] After the District Court issued a stay pending the appeal, Voyager and the U.S. Department of Justice agreed to allow the *Voyager* transaction to proceed, while preserving the stay pending appeal as to the exculpation provisions.[643697]

### 9. Filing of Competing Plans.

At the outset of a chapter 11 case, the Bankruptcy Code provides debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. The Debtors had the exclusive right to propose the Plan in these Chapter 11 Cases through March 31, 2023.[644698] On March 31,

---

[642696]    *See In re Voyager Digital Hold., Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. 2022) [Docket No. 1165]; *see also In re Voyager Digital Hold., Inc.*, Case No. 23-02171 (JHR) (S.D.N.Y. 2023).

[643697]    *In re Voyager Digital Hold., Inc.*, Case No. 23-02171 (JHR) (S.D.N.Y. 2023) [Docket No. 71].

[644698]    On November 9, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1317], seeking an extension of the exclusivity period to March 31, 2023. At the February 15, 2023 hearing, the Bankruptcy Court approved a bridge order, granting the Debtors an extension

2023, the Debtors Filed their *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2358].  Because the Debtors Filed the Plan by the March 31, 2023 exclusivity deadline, the Debtors had the exclusive right to solicit Ballots for the Plan through June 30, 2023.  Following the Auction, the Debtors Filed a revised Plan on June 15, 2023 [Docket No. 2807].  At the same time, the Debtors also Filed the *Debtors' Third Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 2805] (the "Third Exclusivity Motion"), which was heard by the Bankruptcy Court on June 28, 2023 and granted on June 29, 2023 [Docket No. 2935], therefore preserving the Debtors' right to solicit votes on the revised Plan.

### 10. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate such debtor's assets for distribution in accordance with the priorities set forth in the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the business in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts in connection with cessation of operations.

### 11. One Or More of the Chapter 11 Cases May Be Dismissed.

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

### 12. Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date will occur at least several weeks after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur.  The Effective Date will occur on the date that (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X of the Plan have been satisfied or waived in accordance with Article X.B of the Plan, and (b) the Plan is declared effective by the Debtors.

---

of exclusivity until the next hearing on March 8, 2023.  At the March 8, 2023 hearing, the Bankruptcy Court approved the *Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 1940], extending the Debtors' exclusivity period to March 31, 2023.  *See* Mar. 8, 2023 Hr'g Tr. 34:23–25, 35:1–25.

*13. The Debtors May Object to The Amount or Classification of a Claim or Interest.*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest where such Claim or Interest is subject to an objection cannot rely on the estimates in the Disclosure Statements. As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

*14. Contingencies Could Affect Allowed Claims Classes.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, including that the actual Allowed amounts of Claims equals the scheduled amount of those Claims. The actual Allowed amounts of Claims may significantly differ from the estimates and would affect the recovery estimates in this Disclosure Statement. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

*15. Estimated Recoveries May Change Due to Litigation Arising Out of the Claims Allowance and Reconciliation Process.*

Only Allowed Claims will receive distributions pursuant to the Plan. If the Holder of a Claim pursues litigation and seeks an Allowed Claim in excess of the Cryptocurrency balance of the Holder's account, the Holder will not receive any recovery until such dispute is fully and finally resolved. To account for such litigation and Holders who are asserting Allowed Claims for more value, the Debtors and the Post-Effective Date Debtors will need to reserve sufficient Cryptocurrency to account for Holders that are asserting Allowed Claims of greater value. Accordingly, the estimated distributions will likely occur over time as Claims are resolved and reserves can be distributed.

**B.      Risks Related to Recoveries Under the Plan.**

*1. If the Restructuring Transactions are Not Implemented, the Debtors Will Consider ~~all~~All Available Alternative Restructuring Proposals, and ~~such~~Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.*

If neither the NewCo Transaction nor the Orderly Wind Down are implemented, the Debtors will consider all other restructuring alternatives available, which may include the ~~f~~Filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of

269

rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would also have other adverse effects on the Debtors.  For example, it would also adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' ability to retain key employees;

- the Debtors' liquidity;

- how the Debtors' business is viewed by regulators, investors, and lenders; and

- the Debtors' enterprise value.

*2.  Risk of Termination of the Plan Sponsor Agreement.*

The Plan Sponsor Agreement contains certain provisions that give the parties the ability to terminate the Plan Sponsor Agreement upon the occurrence of certain events.  Termination of the Plan Sponsor Agreement would also mean that the Restructuring Transactions contemplated therein and memorialized by the Plan could not be consummated.

*3.  The Debtors Cannot Guarantee Recoveries or the Timing of such Recoveries.*

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates.  Creditor recoveries could be materially reduced or eliminated if Allowed Claims are materially higher than estimated.  In addition, the timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing or amount of any recovery on an Allowed Claim.  Further, to the extent a Holder of Allowed Claims is entitled to receive a Liquid Cryptocurrency Distribution, such Holder's failure to satisfy applicable registration and AML/KYC requirements could delay or prevent recoveries.

*4.  Substantive Consolidation May Not Be Granted.*

The substantive consolidation of the Initial Consolidated Debtors (*i.e.*, CNL and Network LLC) for purposes of their Plans has been approved as set forth in the Series B Settlement Order and the Plan.  The Plan also serves as a motion seeking, and entry of the Confirmation Order will constitute, the approval pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate Lending LLC and Networks Lending LLC with the Initial Consolidated Debtors on the same terms, effective as of the Effective Date.  A detailed explanation of the reasons for and effects of this consolidation can be found in Articles III.~~YY~~ZZ and IV.A.1 of this Disclosure Statement.

If the consolidation of these Debtor entities is not approved under the Plan, the amount of assets available to satisfy Account Holders' Claims will be reduced.

*5. The Debtors' Assets are Largely Based on, and Highly Correlated to, the Volatility of Cryptocurrency.*

The volatility of the Cryptocurrency market may adversely affect the fair market value of the Debtors' assets, which could result in lower recoveries for Holders of Claims than the Debtors' current estimates.

*6. The Debtors May "Toggle" to the Orderly Wind Down, which is Estimated to Result in Lower Recoveries.*

Before or after the Plan is confirmed, the Debtors may determine that it is in the best interests of the Estates to "toggle," or pivot, from Consummation of the NewCo Transaction to the pursuit of the Orderly Wind Down. The Orderly Wind Down is an alternative to the NewCo Transaction. Recoveries under the Orderly Wind Down are estimated to be lower than the recoveries estimated under the NewCo Transaction. Further, the Orderly Wind Down does not include any go-forward business, thus terminating any potential for future upside. Please see Article III.I for additional discussion of the Orderly Wind Down.

*7. The Orderly Wind Down May Take Longer and Cost More than Estimated, which May Decrease Recoveries.*

The Orderly Wind Down also presents risks for interested parties. The Orderly Wind Down is estimated to take up to five years to be completed. This is merely an estimate, however, and it is entirely possible that it could take longer to complete the organized liquidation contemplated by the Orderly Wind Down. In the event the Orderly Wind Down takes longer than estimated to be completed, the associated costs, such as professional fees, could also be higher than estimated. Accordingly, estimated recoveries pursuant to the Orderly Wind Down could also be lower than estimated.

*8. NewCo May Not Be Able to Achieve Projected Financial Results.*

NewCo may not be able to achieve its projected financial results. The Financial Projections set forth in this Disclosure Statement represent the best estimate of NewCo's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of NewCo's business model and operations and, in particular, the Cryptocurrency market in which the Debtors operate. Although the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized, particularly in the light of the volatile nature of Cryptocurrency. If NewCo does not achieve its projected financial results, the value of NewCo Common Stock may be negatively affected and NewCo may lack sufficient liquidity to operate as planned after it is established on the Effective Date, both of which would negatively impact the recoveries available to Holders of Claims. Moreover, the financial condition and results of NewCo's operations from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements, including because the Debtors' historical financial statements include only the mining business and not the other business of the Debtors.

NewCo's business model is subject to inherent risks. NewCo's financial results may be impacted by the broader market forces and volatility common to the Cryptocurrency market. Similarly, NewCo's financial projections rely on NewCo's capacity to maintain necessary regulatory licenses and approvals required to operate. There can be no guarantees that NewCo and any partners are able to maintain the required licenses or approvals, nor can there be assurances that the regulatory requirements imposed on NewCo will not change, particularly in a rapidly evolving Cryptocurrency industry. As discussed herein, the Debtors cannot make any assurances that national or state regulators will not promulgate rules, update policies, or take actions that could severely restrict or prohibit NewCo's ability

to operate.  Moreover, the Debtors cannot guarantee that NewCo's operations in mining, staking, and other Cryptocurrency business operations will be successful.  Staking Cryptocurrency is inherently risky, and there is no guarantee that the mining or staking of Cryptocurrency will be a profitable enterprise for NewCo.

NewCo will likely also be required to adopt fresh start accounting, in which case its assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.

Lastly, there can be no assurances that NewCo's business plan will not change, perhaps materially, as a result of decisions that the New Board may make after fully evaluating the strategic direction of NewCo and its business plan.  Any deviations from NewCo's business plan would necessarily cause a deviation in projected financial results.

### 9. *NewCo May Not Be Able to Accurately Report Its Financial Results.*

NewCo will establish internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in NewCo's financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If NewCo fails to maintain the adequacy of its internal controls, NewCo may be unable to provide financial information in a timely and reliable manner within the time periods required for NewCo's financial reporting under SEC rules and regulations to the extent applicable.  Any such difficulties or failure could materially adversely affect NewCo's business, results of operations, and financial condition.  Further, NewCo may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect its businesses, results of operations, and financial condition.

### 10. *The Value of Litigation Proceeds that the Litigation Administrator May Secure Is Uncertain, which May Affect the Value that Can Be Distributed to Holders of Claims Entitled to Receive Litigation Proceeds.*

The Plan foresees the establishment, on or before the Effective Date, of a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, to pursue the prosecution of the Recovery Causes of Action.  Pursuant to the Plan, Holders of Claims entitled to Litigation Proceeds will receive periodic distributions on account of recoveries from the Recovery Causes of Action.  There can be no guarantee, however, that the Litigation Recovery Account is adequately funded by the Initial Litigation Funding Amount.  There can also be no guarantee as to the success of the prosecution of the Recovery Causes of Action, and the value of Litigation Proceeds that can be distributed to Holders of Claims entitled to receive them.  No value has been ascribed to the Litigation Proceeds in this Disclosure Statement.

*11. The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims Against or Interests in the Debtors.*

The Debtors have not obtained or requested a fairness opinion from any banking or other firm as to the fairness of the consideration under the Plan.

*12. Regulatory Approvals May Not Be Granted.*

Consummation of the Restructuring Transactions may depend on obtaining Regulatory Approvals. Failure by any governmental authority, including the SEC, to grant a necessary or advisable Regulatory Approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan.

The Debtors are currently engaging with the applicable Governmental Units and regulatory bodies, many of whom, while reserving all rights, have expressed an openness to working with the Debtors towards achieving the Consummation of the NewCo Transaction.[645699] Due to the complex and rapidly evolving environment in which the Debtors operate, however, no assurances can be made as to whether the Debtors will receive all required U.S. federal and state regulatory approvals. Cryptocurrency has developed quickly, and regulators have taken different approaches to regulating the industry. The Debtors cannot assess with any certainty that the SEC or other regulators will not take actions that would prevent the Debtors from effectuating the Restructuring Transactions or otherwise prevent Plan Confirmation. Moreover, in the wake of the FTX bankruptcy and a general "crypto winter" that has seen retail investors lose billions in value, the SEC has taken a more active approach to enforcement with respect to the Cryptocurrency industry.

For example, while the Debtors, like most industry participants, believe that ETH and stablecoins are commodities not subject to securities laws, as indicated by the CFTC,[646700] the Debtors cannot be certain that certain regulators such as the SEC will not take a contrary view. At least one state regulator, the Attorney General of the State of New York, has taken the position that ETH and at least one stablecoin do not constitute commodities not subject to state "blue sky" securities laws, including the Martin Act in New York State.

This is a risk inherent to the Cryptocurrency industry, and one inherent to the Debtors' Plan. Although the Debtors believe that the Plan and Restructuring Transactions do not involve the types of business operations that have received the strongest scrutiny from the SEC (*e.g.*, services provided by Cryptocurrency exchanges), the Debtors cannot be certain that the SEC will not take actions that could prevent the confirmation of the Plan.

*13. The Debtors and Post-Effective Date Debtors are Unable to Make Distributions to Holders of Claims in Locations Where Cryptocurrency, or Certain Types Thereof, Is Banned.*

Certain countries have taken harsh regulatory action to curb the use of digital assets and have

---

[645699]    *Response of Undersigned States to Debtors' Motion for Order Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor* [Docket No. 2325] ¶ 6 ("[T]he States are not currently aware of any specific issues in the general plan outline that the Debtors have provided in Docket Nos. 2066 and 2151 that would inherently preclude it from being able to propose a plan and disclosure statement that could comply with their applicable statutory and administrative requirements.").

[646700]    *See, e.g.*, *CFTC v. Nishad Sing*, Case No. 23-CV-1684 (Case No. 23-02171) (S.D.N.Y. 2023) [Docket No. 1].

completely restricted the right to acquire, own, hold, sell, or use these digital assets or to exchange them for fiat currency. The Debtors and Post-Effective Date Debtors will be unable to make distributions pursuant to the Plan to Holders of Claims whose accounts reflect that they reside in such countries.

*14. Certain Tax Implications of the Plan.*

Holders of Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors and/or have an impact on creditors' personal tax obligations. The Debtors do not know your specific tax situation. If you have any questions about the discussion of taxes in this Disclosure Statement, you should consult a tax professional.

*15. The Debtors' Substantial Ongoing Liquidity Needs May Affect Recoveries.*

Although the Debtors' operations with respect to their core business model have been completely paused since the Petition Date, and although the Debtors' workforce has been significantly reduced as a result, the Debtors have nonetheless had to maintain significant operations to comply with the demands of the chapter 11 process and the negotiation of the contemplated Restructuring Transactions and Plan. Accordingly, depending on how long the Chapter 11 Cases are, the recoveries that Holders of Claims are estimated to receive will be impacted by the Debtors' ongoing liquidity requirements.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the Cash necessary to fund the ongoing operations necessary to comply with the demands of these Chapter 11 Cases, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of the Chapter 11 Cases. The Debtors cannot guarantee that Cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate Cash on hand; (b) their ability to confirm and consummate the Plan; and (c) the ultimate cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to raise liquidity in different ways, including by selling assets or seeking additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

*16. A Liquid Trading Market for the NewCo Common Stock May Not Develop and the Trading Price for the NewCo Common Stock May Be Depressed or Volatile Following the Effective Date.*

The liquidity of any market for shares of NewCo Common Stock will depend upon, among other things, the number of holders of shares of NewCo Common Stock, NewCo's financial performance, and the market for similar securities, none of which can be determined or predicted. Accordingly, there can be no assurance that an active trading market for the NewCo Common Stock that an active trading market for the NewCo Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the

ability to transfer or sell NewCo Common Stock may be substantially limited. If a trading market were to develop, future trading prices of the NewCo Common Stock may be volatile and will depend on many factors, including the following: (a) the Reorganized Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar securities. Further, certain shares of NewCo Common Stock may be subject to transfer restrictions. The liquidity of the NewCo Common Stock depends on whether it is listed on an exchange, trades through an ATS, or trades over-the-counter. The ability of NewCo to list NewCo Common Stock on an exchange is not certain.

### 17. *Certain Holders of NewCo Common Stock May Be Restricted in Their Ability to Transfer or Sell Their Securities.*

Under the Plan, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act the offer, issuance, and distribution of the NewCo Common Stock issued under the Plan with the exception of the issuance and sale of the NewCo Common Stock in connection with to the Plan Sponsor Contribution. To the extent that securities issued pursuant to the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code, with respect to such securities. Resales by holders of Claims or Interests (as applicable) who receive NewCo Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempt by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 of the Securities Act. Resale restrictions are discussed in more detail in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters."

To transfer or sell shares of NewCo, a Holder will likely have to open a brokerage account with an institution that can hold and transfer its shares. It may be difficult for Holders in certain foreign jurisdictions to open brokerage accounts.

### 18. *Securities Subject to Resale Restrictions Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They are Registered Under the Securities Act or an Exemption from Registration Applies.*

Under the Plan, the Debtors shall rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act the offer, issuance, and distribution of the NewCo Common Stock issued under the Plan with the exception of the issuance and sale of the NewCo Common Stock in connection with the Plan Sponsor Contribution. Any securities issued in reliance on Section 4(a)(2) of the Securities Act, including in compliance with Rule 506 of Regulation D and/or Regulation S, will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law such as, under certain conditions, the resale provisions of Rule 144 or Regulation S of the Securities Act. Holders of such securities may not be entitled to have their securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act."

Holders of NewCo Common Stock who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters."

*19. The Bankruptcy Court May Not Approve the CEL Token Settlement, or May Determine That CEL Token Should Have a Different Valuation, in which Case Projected Recoveries May Change.*

As described in Article IV.B.2 of the Plan and Article III.~~XX~~YY of this Disclosure Statement, the Debtors have proposed the CEL Token Settlement as a settlement of all disputes regarding the treatment and priority of Claims arising from CEL Tokens in accounts on the Debtors' platform. Pursuant to the settlement, Holders of CEL Token Deposit Claims will receive treatment otherwise consistent with the treatment of the program in which their CEL Tokens were deployed, such as General Earn Claim treatment. However, pursuant to the settlement, CEL Tokens will be valued at $0.2~~0~~5 per CEL Token (*i.e.*, 1 CEL Token = $0.2~~0~~5 CEL Token Deposit Claim). This means that a Holder with 100,000 CEL Tokens in an Earn Account would have a CEL Token Deposit Claim of $2~~0~~5,000, which would receive the General Earn Claim treatment under the Plan. Article III.~~XX~~YY of this Disclosure Statement describes how the Debtors, in consultation with the Committee, determined that a valuation of $0.2~~0~~5 per CEL Token was appropriate.

The Bankruptcy Court must decide whether to approve the CEL Token Settlement, including the proposed CEL Token valuation of $0.2~~0~~5, as part of the Plan's Confirmation. If the Bankruptcy Court does not approve the CEL Token Settlement during Confirmation or determines that the proposed valuation of $0.2~~0~~5 is not appropriate, then the Bankruptcy Court will have to determine the appropriate value CEL Token should have for purposes of the Plan and distributions thereunder.

This determination may change the overall projected recoveries under the Plan. If the Bankruptcy Court determines that CEL Token should be valued higher than $0.2~~0~~5, then recoveries on account of CEL Token Deposit Claims will increase. Holders of CEL Token Deposit Claims will therefore receive higher recoveries than projected, which will correspondingly dilute the recoveries available to other Holders. If, on the other hand, the Bankruptcy Court determines that CEL Token should have a valuation less than $0.2~~0~~5, then recoveries to Holders of CEL Token Deposit Claims will be less than projected and recoveries to other Holders will be higher than projected.

**C.    Risks Related to the Debtors' and NewCo's Businesses.**

*1. NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.*

In the future, NewCo and the Post-Effective Date Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that NewCo or the Post-Effective Date Debtors may become party to, nor the final resolution of such litigation.

*2. NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Ongoing Litigation Arising Out of a Patent Dispute Against the Plan Sponsor.*

US Bitcoin is party to patent infringement litigation in the United States District Court for the Western District of Texas. Lancium LLC ("Lancium") filed a complaint for patent infringement against US Bitcoin and two of its subsidiaries on May 10, 2023.[647][701] Lancium alleges that certain of US Bitcoin's

---

[647][701]    *Lancium LLC vs. U.S. Data Mining Grp., Inc.*, No. 6:23-cv-00344 (W.D. Tex. May 10, 2023).

276

mining datacenters and operations infringe on Lancium's patents relating to optimizing electricity generation. US Bitcoin disputes the allegations raised by Lancium and is defending itself in the lawsuit.

US Bitcoin does not believe the lawsuit will have a material impact on its ability to effectuate the Restructuring Transactions or NewCo's business and operations, and has provided reassurance and protection, including indemnification and termination rights, to the Debtors and NewCo, as more fully set forth in the Fahrenheit Plan Term Sheet. Nonetheless, there is a risk that such litigation may adversely affect the Debtors' ability to effectuate the Restructuring Transactions and emerge from bankruptcy and/or NewCo's business and operations, and such effect may be material. Further, such litigation is costly and time-consuming, and could result in settlements or damages that could significantly affect the Debtors' and NewCo's financial results.

Should US Bitcoin be found to have infringed the patents at issue, US Bitcoin may have to materially change its mining operations at certain mining sites, which may have an adverse effect on NewCo's mining operations and business. Even if the parties settle this intellectual property dispute through licensing or similar arrangements, the costs associated with such arrangements may be substantial, could include ongoing royalties, and the necessary licenses might not be available to NewCo on terms they believe to be acceptable.

      3.   *The Continued Loss of Key Personnel Could Adversely Affect the Debtors' Ability to Consummate the Plan.*

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees, and the Debtors have suffered significant attrition since the Petition Date. Because competition for experienced personnel can be significant and it is difficult to hire as a debtor in chapter 11, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to lead these Chapter 11 Cases to resolution by consummating the Plan. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to fulfill responsibilities related to their Chapter 11 Cases and emerge successfully therefrom.

      4.   *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' Filing of their Petitions or before Confirmation of the Plan (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

The Debtors are aware that certain Governmental Units, including the SEC, are of the opinion that certain claims by Governmental Units, including claims of the kind specified under sections 523(a)(2)(A) and 523(a)(2)(B) of the Bankruptcy Code, may be nondischargeable pursuant to section 1141(d)(6) of the Bankruptcy Code. Further, a discharge under the Bankruptcy Code would not prevent the SEC or other governmental entities from bringing enforcement actions against NewCo or the

Post-Effective Date Debtors.[648702]

> 5.  *NewCo Will Operate in an Industry Subject to Various Regulatory and Technological Uncertainties.*

NewCo will operate Bitcoin mining and ETH staking operations.  As Bitcoin, other digital assets, and blockchain technologies evolve and become more widely available, the services and products associated with them may evolve.  Future regulations may require NewCo to change its business model to comply fully with federal and state laws regulating power generation, Bitcoin mining, or provision of Bitcoin mining and ETH staking, or provision of Bitcoin mining services to third parties.  To remain competitive with peers, NewCo may need to modify aspects of its business model from time to time.  The Debtors cannot offer any assurance that these or any other changes will be successful or will not result in harm to NewCo's business.  NewCo may not be able to manage its growth effectively, which could damage its reputation, limit its growth, and negatively affect its operating results.  Furthermore, the Debtors cannot provide any assurance that NewCo will successfully identify all emerging trends and growth opportunities in the market.  As a result, NewCo may not capture those opportunities. Such circumstances could have a material adverse effect on NewCo's business, prospects, or operations.

> 6.  *The Cost of Obtaining New and Replacement Miners and Parts Can Be Capital-Intensive, which Could Materially and Adversely Affect Newco's Business, Financial Condition, and Results of Operations.*

NewCo's mining and staking operations can be profitable only if the costs, inclusive of hardware and electricity costs, associated with mining digital assets is lower than the price of the digital assets mined at the time of sale.  Miners experience ordinary wear and tear from operation and may also face more significant malfunctions caused by factors which may be beyond NewCo's control.  Additionally, as technology evolves, the company may acquire newer models of miners to remain competitive in the market. For example, the miners and other equipment to be transferred to NewCo on the Effective Date will eventually degrade due to ordinary wear and tear from usage and may also be lost or damaged due to factors outside of NewCo's control.  When this happens, these miners and equipment will need to be repaired or replaced.  The process of upgrading mines and equipment requires substantial capital investment, and NewCo may face challenges in executing upgrades on a timely and cost-effective basis based on availability of new miners and the company's access to adequate capital.  If NewCo is unable to obtain a sufficient unit volume of miners and equipment at scale, it may be unable to remain competitive in a highly competitive and evolving industry.  If this happens, NewCo may not be able to mine digital assets as efficiently or at a comparable scale as competitors.  As a result, NewCo's business, financial condition, and results of operations could suffer.  This could, in turn, materially and adversely affect the trading price of NewCo Common Stock.

> 7.  *The Price of New Miners May Be Linked to the Price of Bitcoin and Other Digital Assets, and the Cost of Obtaining New and Replacement Miners May Increase if the Price Of Bitcoin Rises, which Could Materially and Adversely Affect NewCo's Business, Financial Condition, and Results of Operations.*

There are reports indicating that miner manufacturers adjust miner prices based on the price of Bitcoin.  As a result, NewCo's cost of obtaining new miners may be unpredictable and subject to volatility.  NewCo's business, financial condition, and results of operations will be dependent on its ability to sell the Bitcoin it mines at a price greater than its cost to produce Bitcoin.  As the cost of

---

[648702]    *See Stipulation and Agreed Order Extending Time to Take Action, To the Extent Necessary, To Determine the Nondischargeability of a Debtor Owing To a Governmental Unit Pursuant to 11 U.S.C. §1141(d)(6)* [Docket No. 1095].

obtaining new miners increases, the cost of producing Bitcoin also increases.  This would require a corresponding increase in the price of Bitcoin for NewCo to maintain profitability.  NewCo may incur a significant upfront capital cost each time it acquires new miners, and the company may not realize the benefit of these capital expenditures.  If this occurs, NewCo's business, financial condition, and results of operations could be materially and adversely affected should the future price of Bitcoin not be sufficiently high.

8. *NewCo May Be Unable to Purchase Miners at Scale or Face Delays or Difficulty in Obtaining New Miners at Scale, which Could Materially and Adversely Affect Its Business, Financial Condition, and Results Of Operations.*

There may be periods of shortage in new miners available for purchase and a delay in delivery schedules for new miner purchases.  There is no assurance that miner manufacturers or any other equipment manufacturers will be able to keep pace with potential surges in demand for mining equipment.  It is uncertain how manufacturers will respond to increased global demand and whether they fulfill purchase orders fully and in a timely manner.  In the event that miner manufacturers or other suppliers are not able to keep pace with, or fail to satisfy, demand, NewCo may not be able to purchase miners or other equipment in sufficient quantities or on the delivery schedules required to meet its business needs.  Additionally, should any suppliers default on purchase agreements with NewCo, the company may need to pursue recourse under international jurisdictions, which could be costly and time-consuming.  Furthermore, there is no guarantee that NewCo would succeed in recovering any of deposits paid for such purchases (including advance deposits that may be required), which could materially and adversely affect its business, financial condition, and results of operations.  Fahrenheit has obtained a commitment from a leading mining manufacturer for discounted rates on the purchase of new mining machines.  That commitment may not be finalized, which could affect the performance of NewCo.

9. *If There Are Significant Changes to the Method of Validating Blockchain Transactions, such Changes Could Reduce Demand for NewCo's Miner Equipment.*

New digital asset transaction protocols are continuously being deployed, and existing and new protocols are in a state of constant change and development.  While certain validation protocols currently employ a "proof of work" consensus algorithm, whereby transaction processors are required to expend significant amounts of electrical and computing power to solve complex mathematical problems in order to validate transactions and create new blocks in a blockchain, there may be a shift towards adopting alternative validating protocols.  These protocols may include a "proof of stake" algorithm or an algorithm based on a protocol other than proof of work, which may decrease the reliance on computing power as an advantage to validating blocks.  NewCo's transaction processing operations will be designed to primarily support a proof of work consensus algorithm.  Should the algorithm shift from a proof of work validation method to a proof of stake method, mining would require less energy and may render any company that maintains advantages in the current climate less competitive.

10. *Failure of Critical Systems of the Facilities Operated by NewCo Could Have a Material Adverse Effect on Its Business, Financial Condition, and Results of Operations.*

The critical systems of the facilities that will be operated by NewCo will be subject to failure. Any such failure, including a breakdown in critical plant, equipment or services, routers, switches or other equipment, power supplies or network connectivity, power loss, equipment failure, human error and accidents, network connectivity downtime and fiber cuts, security breaches, animal incursions, water damage, extreme temperatures, public health emergencies, terrorism, fire, earthquake, hurricane, tornado,

flood and other natural disasters, whether or not within the company's control, could result in damaged equipment, significant business disruption, and reduced revenue, including through the reduction in the amount of Bitcoin mined by the company, and, consequently, reduced profitability.  The destruction or severe impairment of any of the facilities operated by NewCo could have a material and adverse impact on NewCo's business, operations, and financial condition.

> *11. NewCo May Face Risks of Internet Disruptions, which Could Have an Adverse Effect on the Price of Bitcoin.*

A disruption of the Internet may affect the use of Bitcoin and subsequently the value of NewCo.  Generally, Bitcoin is dependent on the Internet, and NewCo's business of mining and staking digital assets will be dependent on the Internet as well.  A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect on the price of Bitcoin and NewCo's ability to contribute computing power to pools that mine Bitcoin.

> *12. NewCo's Financial Performance May Be Affected by Price Fluctuations in the Power Market, as well as Other Market Factors that are Beyond NewCo's Control.*

NewCo's revenues, cost of doing business, results of operations, and operating cash flows generally may be impacted by price fluctuations in the power market and other market factors beyond NewCo's control.  Market prices for power, capacity, and other ancillary services are unpredictable and tend to fluctuate substantially.  Unlike most other commodities, electric power can only be stored on a very limited basis and generally must be produced concurrently with its use.  As a result, power prices are subject to significant volatility due to supply and demand imbalances, especially in the day-ahead and spot markets. Long- and short-term power prices may also fluctuate substantially due to other factors outside of NewCo's control, including:

- changes in generation capacity in NewCo's markets, including the addition of new supplies of power as a result of the development of new plants, expansion of existing plants, the continued operation of uneconomic power plants due to state subsidies, or additional transmission capacity;

- environmental regulations and legislation;

- electric supply disruptions, including plant outages and transmission disruptions;

- changes in power transmission infrastructure;

- fuel transportation capacity constraints or inefficiencies;

- changes in law, including judicial decisions;

- weather conditions, including extreme weather conditions and seasonal fluctuations, including the effects of climate change;

- changes in commodity prices and the supply of commodities, including but not limited to natural gas, coal and oil;

- changes in the demand for power or in patterns of power usage, including the potential development of demand-side management tools and practices, distributed generation, and more efficient end-use technologies;

- development of new fuels, new technologies and new forms of competition for the production of power;

- fuel price volatility;

- economic and political conditions;

- supply and demand for energy commodities;

- supply chain disruption of electrical components needed to transmit energy;

- availability of competitively priced alternative energy sources;

- ability to procure satisfactory levels of inventory; and

- changes in capacity prices and capacity markets.

Such factors and the associated fluctuations in power and prices could affect wholesale power generation profitability and cost of power for NewCo's Bitcoin mining and ETH staking activities.

> *13. NewCo May Be Required to Obtain, and to Comply with, Government Permits and Approvals.*

NewCo may be required to obtain, and to comply with, numerous permits and licenses from federal, state and local governmental agencies. The process of obtaining and renewing necessary permits and licenses can be lengthy and complex and can sometimes result in the establishment of conditions that make the project or activity for which the permit or license was sought unprofitable or otherwise unattractive. In addition, such permits or licenses may be subject to denial, revocation or modification under various circumstances. Failure to obtain or comply with the conditions of permits or licenses, or failure to comply with applicable laws or regulations, may result in the delay or temporary suspension of NewCo's operations.

**D.      Risks Related to NewCo's Digital Asset Mining and Staking.**

> *1. There are Risks Related to Technological Obsolescence, the Vulnerability of the Global Supply Chain to Bitcoin Hardware Disruption, and Difficulty in Obtaining New Hardware which May Have a Negative Effect on NewCo's Business.*

NewCo's mining and staking operations may be successful and ultimately profitable only if the costs of mining Bitcoin or staking ETH, including hardware and electricity costs, associated with mining Bitcoin or staking ETH are lower than the price of a Bitcoin or an ETH, respectively. As NewCo's mining facility operates, its miners experience ordinary wear and tear and general hardware breakdown and may also face more significant malfunctions caused by a number of extraneous factors beyond NewCo's control. The physical degradation of NewCo's miners or staking nodes will require NewCo to, over time, replace those miners or staking nodes that are no longer functional. Additionally, as the technology evolves, NewCo may be required to acquire newer models of miners or servers to remain competitive in the market. Reports have been released which indicate that players in the mining equipment business adjust the prices of miners according to Bitcoin mining revenues, so the cost of new machines is unpredictable but could be extremely high. As a result, at times, NewCo may obtain miners and other hardware from third parties at premium prices, to the extent they are available. In order to keep pace with technological advances and competition from other mining companies, it will be necessary to

purchase new miners, which will eventually need to be repaired or replaced along with other equipment from time to time to stay competitive. This upgrading process requires substantial capital investment, and NewCo may face challenges in doing so on a timely and cost-effective basis. Also, because NewCo expects to depreciate all new miners, NewCo's reported operating results will be negatively affected.

The global supply chain for Bitcoin miners particularly, and computer hardware generally, is presently constrained due to unprecedented demand coupled with a global semiconductor (including microchip) shortage and further amplified due to the COVID-19 pandemic, with a significant portion of available miners being acquired by companies with substantial resources. Semiconductors are utilized in various devices and products and are a crucial component of miners; supply chain constraints coupled with increasing demand has led to increased pricing and limited availability for semiconductors. Prices for both new and older models of miners have been on the rise and these supply constraints are expected to continue for the foreseeable future. China, a major supplier of Bitcoin miners, has seen a production slowdown as a result of COVID-19. Should similar outbreaks or other disruptions to the China-based global supply chain for Bitcoin hardware or microprocessors occur, NewCo may not be able to obtain adequate replacement parts for its existing miners or to obtain additional miners on a timely basis, if at all, or NewCo may only be able to acquire miners or servers at premium prices. Such events could have a material adverse effect on NewCo's ability to pursue its strategy, which could have a material adverse effect on its business and the value of its securities. Moreover, NewCo may experience unanticipated disruptions to operations or other difficulties with its supply chain due to volatility in regional markets where its miners or microprocessors are sourced, changes in the general macroeconomic outlook, political instability, expropriation or nationalization of property, civil strife, strikes, insurrections, acts of terrorism, acts of war or natural disasters.

*2. NewCo May Not Adequately Respond to Price Fluctuations and Rapidly Changing Technology, which May Negatively Affect Its Business.*

Competitive conditions within the digital assets industry require that NewCo use sophisticated technology in the operation of its business. The industry for blockchain technology is characterized by rapid technological changes, new product introductions, enhancements, and evolving industry standards. New technologies, techniques or products could emerge that might offer better performance than the software and other technologies that NewCo currently utilizes, and NewCo may have to manage transitions to these new technologies to remain competitive. NewCo may not be successful, generally or relative to its competitors in the digital assets industry, in timely implementing new technology into its systems, or doing so in a cost-effective manner. During the course of implementing any such new technology into its operations, NewCo may experience system interruptions and failures during such implementation. Furthermore, there can be no assurances that NewCo will recognize, in a timely manner or at all, the benefits that it may expect as a result of its implementing new technology into its operations. As a result, NewCo's business and operations may suffer, and there may be adverse effects on the value of NewCo.

*3. The Bitcoin Reward for Successfully Uncovering a Block Will Halve Several Times in the Future and Bitcoin Value May Not Adjust to Compensate NewCo for the Reduction in the Rewards NewCo Receives From Its Mining Effort.*

Halving is a process incorporated into many proof-of-work consensus algorithms that reduces the coin reward paid to miners over time according to a pre-determined schedule. This reduction in reward spreads out the release of digital assets over a long period of time resulting in an even smaller number of coins being mined. At a predetermined block, the mining reward is cut in half, hence the term "halving." For Bitcoin, the reward was initially set at 50 Bitcoin currency rewards per block and this was cut in half to 25 on November 28, 2012 at block 210,000, then again to 12.5 on July 9, 2016 at block 420,000. The most recent halving for Bitcoin happened on May 11, 2020, at block 630,000 and the reward reduced to

6.25.  The next halving appears likely to occur in 2024.  This process will reoccur until the total amount of Bitcoin currency rewards issued reaches 21 million, which is presently expected to occur around 2140. While the Bitcoin price has had a history of price fluctuations around the halving of its rewards, there is no guarantee that the price change will be favorable or would compensate for the reduction in mining reward.  If a corresponding and proportionate increase in the trading price of Bitcoin or a proportionate decrease in mining difficulty does not follow these anticipated halving events, the revenue that NewCo would earn from its Bitcoin mining operations would see a corresponding decrease, which would have a material adverse effect on its business and operations.

> 4.    *NewCo's Future Success Will Depend Upon the Value of Bitcoin and Other Digital Assets; the Value of Bitcoin May Be Subject to Pricing Risk and Has Historically Been Subject to Wide Swings.*

NewCo's operating results will depend in part on the value of Bitcoin, as it is presently the only digital asset that NewCo intends to mine. Specifically, NewCo's revenues from its Bitcoin mining operations and ETH staking operations will be based principally on two factors: (1) the number of Bitcoin and ETH rewards, respectively, that NewCo successfully mines or stakes; and (2) the value of Bitcoin and ETH, respectively. In addition, NewCo's operating results will be directly impacted by changes in the value of Bitcoin and ETH, because under the value measurement model, both realized and unrealized changes will be reflected in NewCo's statement of operations. This means that NewCo's operating results will be subject to swings based upon increases or decreases in the value of Bitcoin or ETH. If other digital assets were to achieve acceptance at the expense of Bitcoin or ETH causing the value of Bitcoin or ETH to decline, or if Bitcoin were to switch its proof of work encryption to an algorithm for which NewCo's miners are not specialized, or the value of Bitcoin or ETH were to decline for other reasons, particularly if such decline were significant or over an extended period of time, NewCo's operating results would be adversely affected, and there could be a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on its business, prospects or operations, and harm investors. The market price of Bitcoin and ETH, which have historically been volatile and are each impacted by a variety of factors (including those discussed herein), are each determined primarily using data from various exchanges, over-the-counter markets and derivative platforms. Furthermore, such prices may be subject to factors such as those that impact commodities, more so than business activities, which could be subjected to additional influence from fraudulent or illegitimate actors, real or perceived scarcity, and political, economic, regulatory or other conditions. Pricing may be the result of, and may continue to result in, speculation regarding future appreciation in the value of Bitcoin or ETH, or NewCo's share price, inflating and making their market prices more volatile or creating "bubble" type risks for Bitcoin, ETH, and shares of NewCo Common Stock.

> 5.    *Demand for Bitcoin Is Driven, in part, by its Status as the Most Prominent and Secure Digital Asset.  It is Possible that Digital Assets other than Bitcoin Could Have Features that make them more Desirable to a Material Portion of the Digital Asset User Base, Resulting in a Reduction in Demand for Bitcoin, which Could Have a Negative Effect on the Price of Bitcoin and Adversely Affect an Investment in NewCo.*

Bitcoin, as an asset, holds "first-to-market" advantages over other digital assets.  This first-to-market advantage is driven in large part by having the largest user base and, more importantly, the largest mining power in use to secure its blockchain and transaction verification system.  Having a large mining network results in greater user confidence regarding the security and long-term stability of a digital asset's network and its blockchain; as a result, the advantage of more users and miners makes a digital asset more secure, which makes it more attractive to new users and miners, resulting in a network

effect that strengthens the first-to-market advantage. Despite the first-mover advantage of the Bitcoin network over other digital asset networks, it is possible that another digital asset could become materially popular due to either a perceived or exposed shortcoming of the Bitcoin network protocol that is not immediately addressed by the Bitcoin contributor community or a perceived advantage of an altcoin that includes features not incorporated into Bitcoin. If a digital asset obtains significant market share (either in market capitalization, mining power or use as a payment technology), this could reduce Bitcoin's market share as well as other digital assets that NewCo may become involved in and have a negative effect on the demand for, and price of, such digital assets and could adversely affect NewCo. It is possible that NewCo could mine alternative digital assets in the future, but NewCo may not have as much experience mining such assets, which may put NewCo at a competitive disadvantage.

> 6. *Forks In a Digital Asset Network May Occur in the Future Which May Affect the Value of Bitcoin or ETH Held by NewCo.*

To the extent that a significant majority of users and miners on a digital asset network install software that changes the digital asset network or properties of a digital asset, including the irreversibility of transactions and limitations on the mining of new digital asset, the digital asset network would be subject to new protocols and software. However, if less than a significant majority of users and miners on the digital asset network consent to the proposed modification, and the modification is not compatible with the software prior to its modification, the consequence would be what is known as a "fork" of the network, with one prong running the pre-modified software and the other running the modified software. The effect of such a fork would be the existence of two versions of the digital asset running in parallel that lack interchangeability and necessitate an exchange-type transaction to convert currencies between the two forks. Additionally, it may be unclear following a fork which fork represents the original asset and which is the new asset. Different metrics adopted by industry participants to determine which is the original asset include: referring to the wishes of the core developers of a digital asset, blockchains with the greatest amount of hashing power contributed by miners or validators; or blockchains with the longest chain. The Ethereum network previously forked in 2016 as a consequence of a hack of a decentralized autonomous organization, and the Ethereum network may fork again, which could adversely affect NewCo's operations. A fork in the Bitcoin network could adversely affect an investment in NewCo securities or its ability to operate. NewCo may not be able to realize the economic benefit of a fork, either immediately or ever, which could adversely affect an investment in its securities. If NewCo holds Bitcoin or ETH at the time of a hard fork of either into two digital assets, industry standards would dictate that NewCo would be expected to hold an equivalent amount of the old and new assets following the fork. NewCo may not be able, or it may not be practical, however, to secure or realize the economic benefit of the new asset for various reasons. Additionally, laws, regulation or other factors may prevent NewCo from benefiting from the new asset even if there is a safe and practical way to custody and secure the new asset.

> 7. *If a Malicious Actor or Botnet Obtains Control in Excess of 50% of the Processing Power Active on Any Digital Asset Network, Including the Bitcoin Network or Ethereum Network, it Is Possible that Such Actor or Botnet Could Manipulate the Blockchain in a Manner that Adversely Affects the Value of NewCo.*

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to mining on any digital asset network, including the Bitcoin network or Ethereum network, it may be able to alter the blockchain by constructing alternate blocks if it is able to solve for such blocks faster than the remainder of the miners on the blockchain can add valid blocks. In such alternate blocks, the malicious actor or botnet could control, exclude, or modify the ordering of

284

transactions, though it could not generate new digital assets or transactions using such control.  Using alternate blocks, the malicious actor could "double-spend" its own digital assets (*i.e.*, spend the same digital assets in more than one transaction) and prevent the confirmation of other users' transactions for so long as it maintains control.  To the extent that such a malicious actor or botnet does not yield its majority control of the processing power, or the digital asset community does not reject the fraudulent blocks as malicious, reversing any changes made to the blockchain may not be possible.  Such changes could adversely affect the value of NewCo.

> 8.  *Digital Assets, Including those Maintained by or for NewCo, May Be Exposed to Cybersecurity Threats and Hacks.*

As with any computer code generally, flaws in digital asset cryptographic primitives such as hash functions, Merkle trees and digital signatures or similar cryptographic methods, and the implementations of any digital asset protocol software, including those used by Bitcoin, have been and may be vulnerable to exploitation by malicious actors.  Several such errors and defects have been found in multiple Cryptocurrency networks, including Bitcoin, previously, including those that would have allowed attackers to shut down a Cryptocurrency network through denial of service, disable functionality for users and expose users' information, or take or create Cryptocurrency balances.  NewCo's devices, as well as its miners, computer systems and those of third parties that it uses in its operations, may be vulnerable to cyber security risks, including cyber-attacks such as viruses and worms, phishing attacks, denial-of-service attacks, physical or electronic break-ins, employee theft or misuse, and similar disruptions from unauthorized tampering with NewCo miners and computer systems or those of third parties that NewCo uses in its operations.  Such events could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin that NewCo mines or otherwise acquires or holds for its own account.

> 9.  *If the Bitcoin Reward for Solving Blocks and Transaction Fees Is Not Sufficiently High, NewCo May Not Have an Adequate Incentive to Continue Mining and May Cease Mining Operations, which Would Likely Result in NewCo's Failure to Achieve Profitability.*

As the number of Bitcoins awarded for solving a block in a blockchain decreases, NewCo's ability to achieve profitability would become more remote.  Decreased use and demand for Bitcoin rewards may adversely affect NewCo's incentive to expend processing power to solve blocks.  If the award of Bitcoin rewards for solving blocks and transaction fees are not sufficiently high, NewCo may not have an adequate incentive to continue mining and may cease its mining operations.  Miners ceasing operations would reduce the collective processing power on the network, which would adversely affect the confirmation process for transactions (*i.e.*, temporarily decreasing the speed at which blocks are added to a blockchain until the next scheduled adjustment in difficulty for block solutions) and make the Bitcoin network more vulnerable to a malicious actor or botnet obtaining control in excess of 50% of the processing power active on a blockchain, potentially permitting such actor or botnet to manipulate a blockchain in a manner that adversely affects NewCo's activities.  A reduction in confidence in the confirmation process or processing power of the network could result and be irreversible.  Such events could have a material adverse effect on NewCo's ability to continue to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin it mines or otherwise acquires or holds for its own account.

> 10.  *NewCo May Suffer Losses Due to Staking.*

Staking ETH may require ETH to be transferred into smart contracts or staking pools on the underlying Ethereum network not under NewCo's control.  If NewCo's validator, any third-party service

providers, or smart contracts fail to behave as expected, suffer cybersecurity attacks, experience security issues, or encounter other problems, ETH that NewCo has staked may be irretrievably lost. In addition, certain networks and staking pools dictate requirements for participation in the relevant decentralized governance activity, and may impose penalties, or "slashing," if the relevant activities are not performed correctly, such as if the staker, delegator, or baker acts maliciously on the network, "double signs" any transactions, or experience extended downtimes. If NewCo or any of its service providers are slashed by the underlying network or staking pool, the ETH that NewCo has staked may be confiscated, withdrawn, or burned by the network, resulting in losses. Furthermore, certain types of staking require the payment of transaction fees on the underlying network or staking pool and such fees can become significant as the amount and complexity of the transaction grows, depending on the degree of network congestion and the price of ETH, which could result in NewCo incurring significant costs. Any penalties or slashing events could cause NewCo to suffer financial losses and adversely impact its business.

> *11. Transactional Fees May Decrease Demand for Bitcoin and Prevent Expansion that Could Adversely Affect the Value of NewCo.*

As the number of Bitcoin currency rewards awarded for solving a block in a blockchain decreases, the incentive for miners to continue to contribute to the Bitcoin network may transition from a set reward to transaction fees. To incentivize miners to continue to contribute to the Bitcoin network, the Bitcoin network may either formally or informally transition from a set reward to transaction fees earned upon solving a block. This transition could be accomplished by miners independently electing to record in the blocks they solve only those transactions that include payment of a transaction fee. If transaction fees paid for Bitcoin transactions become too high, the marketplace may be reluctant to accept Bitcoin as a means of payment and existing users may be motivated to switch from Bitcoin to another digital asset or to fiat currency. Either the requirement from miners of higher transaction fees in exchange for recording transactions in a blockchain or a software upgrade that automatically charges fees for all transactions may decrease demand for Bitcoin and prevent the expansion of the Bitcoin network to retail merchants and commercial businesses, resulting in a reduction in the price of Bitcoin that could adversely impact the value of NewCo. Decreased use and demand for Bitcoins that NewCo has accumulated may adversely affect their value and may adversely affect NewCo.

> *12. To the Extent that the Profit Margins of Bitcoin Mining or ETH Staking Operations Are Not Sufficiently High, Operators of Bitcoin Mining or ETH Staking Operations Are More Likely to Immediately Sell Bitcoins or ETH Earned by Mining or Staking, as Applicable, in the Bitcoin and ETH Exchange Markets, Resulting in a Reduction in the Price of Bitcoin or ETH, as applicable, that Could Adversely Affect NewCo.*

Bitcoin network mining and Ethereum network staking operations have evolved from individual users mining with computer processors, graphics processing units and first-generation ASIC servers. Currently, new processing power brought onto the Bitcoin and Ethereum networks is predominantly added by incorporated and unincorporated "professionalized" mining operations. Professionalized mining and staking operations may use proprietary hardware or sophisticated ASIC machines acquired from ASIC manufacturers. As a result, professionalized mining operations are of a greater scale than prior Bitcoin network miners and Ethereum network stakers and have more defined, regular expenses and liabilities. These regular expenses and liabilities require professionalized mining and staking operations to more immediately sell Bitcoins and ETH earned from mining operations on a Bitcoin or ETH exchange market. The immediate selling of newly acquired Bitcoins and ETH increases the supply of Bitcoins or ETH on the Bitcoin or ETH exchange markets, as applicable, creating downward pressure on the price of Bitcoins or ETH, as applicable. The extent to which the value of Bitcoin mined or ETH staked by a professionalized mining or staking operation, as applicable, exceeds the allocable capital and

286

operating costs determines the profit margin of such operation. A professionalized mining or staking operation may be more likely to sell a higher percentage of its newly acquired Bitcoin or ETH, as applicable, rapidly if it is operating at a low profit margin-and it may partially or completely cease operations if its profit margin is negative. In a low profit margin environment, a higher percentage could be sold into the Bitcoin or ETH exchange markets more rapidly, thereby potentially reducing Bitcoin or ETH prices, as applicable. Lower Bitcoin or ETH prices could result in further tightening of profit margins, particularly for professionalized mining operations with higher costs and more limited capital reserves, creating a negative effect that may further reduce the price of Bitcoin or ETH, as applicable, until mining or staking operations with higher operating costs become unprofitable and remove mining power from the Bitcoin network or staking power from the Ethereum network. The network effect of reduced profit margins resulting in greater sales of newly mined Bitcoin or staked ETH could result in a reduction in the price of Bitcoin or ETH, as applicable, that could adversely affect NewCo.

13. *To the Extent that any Miners Cease to Record Transactions in Solved Blocks, Transactions that Do Not Include the Payment of a Transaction Fee Will Not Be Recorded on the Bitcoin Blockchain Until a Block Is Solved by a Miner That Does Not Require the Payment of Transaction Fees. Any Widespread Delays in the Recording of Transactions Could Result in a Loss of Confidence in the Bitcoin Network, which Could Adversely Affect NewCo.*

To the extent that any miners cease to record transaction in solved blocks, such transactions will not be recorded on the blockchain. Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (*e.g.*, a collective movement among miners or one or more mining pools forcing Bitcoin users to pay transaction fees as a substitute for or in addition to the award of new Bitcoins upon the solving of a block), actions of miners solving a significant number of blocks could delay the recording and confirmation of transactions on the Bitcoin blockchain. Any systemic delays in the recording and confirmation of transactions on its blockchain could result in greater exposure to double-spending transactions and a loss of confidence in the Bitcoin network, which could adversely affect NewCo.

14. *Because the Number of Bitcoins Awarded for Solving a Block in the Bitcoin Network Blockchain Continually Decreases, Miners Must Invest in Increasing Processing Power to Maintain Their Yield of Bitcoins, which Might Make Bitcoin Mining Uneconomical for NewCo.*

The award of new Bitcoin for solving blocks continually declines, so that Bitcoin miners must invest in increasing processing power to maintain or increase their yield of Bitcoin. If the pricing of Bitcoin were to decline significantly, there can be no assurance that NewCo would be able to recover its investment in the computer hardware and processing power required to upgrade its mining operations. There can, moreover, be no assurance that NewCo will have the resources to upgrade its processing power to maintain the continuing profitability of its mining operations. Also, the developers of the Bitcoin network or other programmers could propose amendments to the network's protocols and software that, if accepted, might require NewCo to modify and increase its investment in its Bitcoin mining operations to maintain profitability. There can be no assurance, however, that NewCo will be able to do so.

15. *The Open-Source Structure of the Digital Asset Network Protocol, Including Bitcoin and Ethereum, means that the Contributors to the Protocol Are Generally Not Directly Compensated for their Contributions in Maintaining and Developing the Protocol. A Failure to Properly Monitor and Upgrade the Protocol Could Damage the Applicable Network and the Value of NewCo.*

The Bitcoin and Ethereum networks each operate based on an open-source protocol maintained by contributors, largely on the Bitcoin Core project on GitHub in the case of Bitcoin, and the Ethereum Foundation in case of Ethereum. As an open-source project, Bitcoin is not represented by an official organization or authority and its software is available free of charge in accordance with the terms of open-source licenses such as the MIT License. As the Bitcoin network protocol is not commercially licensed and its use does not generate revenues for contributors, contributors are generally not compensated for maintaining and updating the Bitcoin network protocol. Although the MIT Media Lab's Digital Currency Initiative funds the current maintainer, Wladimir J. van der Laan, among others, this type of financial incentive is not typical. The lack of guaranteed financial incentive for contributors to maintain or develop the Bitcoin network and the lack of guaranteed resources to adequately address emerging issues with the Bitcoin network may reduce incentives to address the issues adequately or in a timely manner. Although the open-source Ethereum network protocol is funded and maintained in part by the Ethereum Foundation, a non-profit organization dedicated to supporting Ethereum, there can be no guarantee that such support will continue or be sufficient in the future. Alternatively, some developers may be funded by entities whose interests are at odds with other participants in the Ethereum network. To the extent that material issues arise with the Ethereum network protocol and the core developers and open-source contributors are unable to address the issues adequately or in a timely manner, the Ethereum network and the business of the NewCo may be adversely affected. Changes to a digital asset network which NewCo is mining or staking on may adversely affect NewCo's business, operations, and financial condition.

16. *Significant Bitcoin Network Contributors Could Propose Amendments to the Bitcoin Network's Protocols and Software that, if Accepted and Authorized by the Bitcoin Network, Could Adversely Affect NewCo.*

Significant Bitcoin network contributors could propose refinements or improvements to the Bitcoin network's source code through one or more software upgrades that alter the protocols and software that govern the Bitcoin network and the properties of Bitcoin, including the irreversibility of transactions and limitations on the mining of new Bitcoins. Proposals for upgrades and discussions relating thereto take place on online forums. For example, there is an ongoing debate regarding altering the Bitcoin blockchain by increasing the size of blocks to accommodate a larger volume of transactions. Although some proponents support an increase, other market participants oppose an increase to the block size as it may deter miners from confirming transactions and concentrate power into a smaller group of miners. Additionally, Bitcoin could change its mining algorithm in a fashion which could render NewCo's ASIC mining equipment obsolete. To the extent that a significant majority of the users and miners on the Bitcoin network install such software upgrade(s), the Bitcoin network would be subject to new protocols and software that may adversely affect NewCo's business, operations, and financial condition.

17. *Banks and Financial Institutions Vary in the Services they Provide to Businesses that Engage in Bitcoin- or ETH-Related Activities or that Accept Bitcoin or ETH as Payment.*

Although a number of significant U.S. banks and investment institutions, such as Goldman Sachs, Citigroup, J. P. Morgan and BlackRock, allow customers to carry and invest in Bitcoin and other

digital assets such as ETH, the acceptance and use by banks of digital assets, including Bitcoin and ETH, varies. A number of companies that provide Bitcoin, ETH, or other digital asset-related services, however, have been unable to find banks or financial institutions that are willing to provide them with bank accounts and other services. This risk may be further exacerbated in the current environment in light of several high-profile bankruptcies in the digital assets industry, as well as recent bank failures, which have disrupted investor confidence in digital assets and led to a rapid escalation of oversight of the digital asset industry. For example, certain banks have implemented enhanced know-your-customer and anti-money laundering requirements in connection with potential digital asset customers. These enhanced requirements may make it more difficult for digital asset-related companies to find banking or financial services.

Additionally, a number of companies and individuals or businesses associated with digital assets may have had and may continue to have their existing banking services discontinued with financial institutions in response to government action, particularly in China, where regulatory response to digital assets has been to exclude their use for ordinary consumer transactions. In May 2021, the Chinese government called for a crackdown on Bitcoin and ETH mining, staking, and trading. In September 2021, Chinese regulators instituted the China Ban. However, in 2020, the Office of the Comptroller of the Currency of the U.S. Treasury Department announced that national banks and federal savings associations may provide digital asset custody services for customers. NewCo cannot accurately predict the level and scope of services that these institutions will offer to businesses engaging in Bitcoin or other digital asset related activities.

The usefulness of Bitcoin and ETH, the only digital assets that NewCo intends to mine or stake, as applicable, as a payment system and the public perception of Bitcoin or ETH could be damaged if banks or financial institutions were to close the accounts of businesses engaging in Bitcoin, ETH, and/or other digital asset-related activities. This could occur as a result of compliance risk, cost, government regulation or public pressure. The risk applies to securities firms, clearance and settlement firms, national stock and derivatives on commodities exchanges, the over-the-counter market, and the Depository Trust Company, which, if any of such entities adopts or implements similar policies, rules or regulations, could negatively affect its relationships with financial institutions and impede NewCo's ability to convert Bitcoin or ETH to fiat currencies. Such factors could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects or operations and harm stakeholders.

### 18. NewCo May Not Be Able to Compete with other Companies, Some of Whom have Greater Resources and Experience.

NewCo may not be able to compete successfully against present or future competitors. NewCo may not have the resources to compete with larger providers of similar services at this time. The digital asset industry has attracted various high-profile and well-established operators, some of which have substantially greater liquidity and financial resources than NewCo may have. Additionally, the number of Bitcoin, ETH, and other digital asset mining and staking companies has increased in recent years. With the limited resources that NewCo will have available, NewCo may experience great difficulties in expanding and improving its network of computers to remain competitive. Competition from existing and future competitors, particularly those that have access to competitively priced energy, including energy providers themselves, could result in NewCo's inability to secure acquisitions and partnerships that NewCo may need to expand its business in the future. This competition from other entities with greater resources, experience and reputations may result in NewCo's failure to maintain or expand its business, as NewCo may never be able to successfully execute its business plan. If NewCo is unable to expand and remain competitive, its business could be negatively affected which would have an adverse effect on the trading price of its common stock, which would harm NewCo's value.

19. *Acceptance and/or Widespread Use of Bitcoin, ETH, and Other Digital Assets Is Uncertain.*

Currently, there is a relatively limited use of any digital assets, with Bitcoin being the most utilized, in the retail and commercial marketplace, thus contributing to price volatility that could adversely affect an investment in NewCo Common Stock.  Banks and other established financial institutions may refuse to process funds for Bitcoin or ETH transactions, process wire transfers to or from digital assets exchanges, digital assets-related companies or service providers, or maintain accounts for persons or entities transacting in Bitcoin, ETH, or other digital assets. Conversely, a significant portion of Bitcoin and ETH demand is generated by investors seeking a long-term store of value or speculators seeking to profit from the short- or long-term holding of the asset.  Price volatility undermines the role of Bitcoin and ETH as mediums of exchange, as retailers are much less likely to accept it as a form of payment.  Market capitalization for Bitcoin and ETH as mediums of exchange and payment methods may always be low.  The relative lack of acceptance of Bitcoin and ETH in the retail and commercial marketplace, or a reduction of such use, limits the ability of end users to use Bitcoin and ETH to pay for goods and services.  Such lack of acceptance or decline in acceptances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of Bitcoin that NewCo mines or otherwise acquires or holds for its own account.

20. *The Decentralized Nature of Digital Asset Systems May Lead to Slow or Inadequate Responses to Crises, which May Negatively Affect NewCo's Business.*

The decentralized nature of the governance and administration of digital asset systems may lead to ineffective decision making that slows development or prevents a network from overcoming emergent obstacles.  Governance of many digital asset systems is by voluntary consensus and open competition with no clear leadership structure or authority.  To the extent lack of clarity in governance of the Bitcoin or ETH systems leads to ineffective decision making that slows development and growth of Bitcoin or ETH, or slows a response to a problem such as addressing a critical vulnerability in the cryptographic primitives or software implementation of Bitcoin or ETH, the value of NewCo's securities may be adversely affected.

21. *Digital Assets May Have Concentrated Ownership and Large Sales or Distributions by Holders of Such Digital Assets Could Have an Adverse Effect on the Market Price of Such Digital Asset.*

Historically, a limited number of Bitcoin and ETH wallets held a significant portion of the Bitcoins and ETH in circulation.  Moreover, it is possible that other persons or entities control multiple wallets that collectively hold a significant number of Bitcoins and ETH, even if they individually only hold a small amount, and it is possible that some of these wallets are controlled by the same person or entity.  Similar or more concentrated levels of ownership may exist for other digital assets as well.  As a result of this concentration of ownership, large sales or distributions by such holders could have an adverse effect on the market price of Bitcoin, ETH, and other digital assets.

22. *NewCo's Operations, Investment Strategies, and Profitability May Be Adversely Affected by Competition from other Methods of Investing in Bitcoin.*

NewCo will compete with other users and/or companies that are mining Bitcoin or staking ETH and other potential financial vehicles, including securities backed by or linked to Bitcoin or ETH through entities similar to NewCo.  Market and financial conditions, and other conditions beyond NewCo's control, may make it more attractive to invest in other financial vehicles, or to invest in Bitcoin or ETH

directly, which could limit the market for its shares and reduce its liquidity. The emergence of other financial vehicles and exchange-traded funds have been scrutinized by regulators and such scrutiny and the negative impressions or conclusions resulting from such scrutiny could be applicable to NewCo and impact NewCo's ability to successfully pursue its strategy or operate at all, or to establish or maintain a public market for its securities. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on its business, prospects, or operations and potentially the value of any Bitcoin it mines or ETH it stakes, or Bitcoin or ETH it or otherwise acquires or holds for its own account, and harm investors.

> 23. *The Development and Acceptance of Competing Blockchain Platforms or Technologies May Cause Consumers to Use Alternative Distributed Ledgers or other Alternatives.*

The development and acceptance of competing blockchain platforms or technologies may cause consumers to use alternative distributed ledgers or an alternative to distributed ledgers altogether. NewCo's business utilizes presently existent digital ledgers and blockchains and NewCo could face difficulty adapting to emergent digital ledgers, blockchains, or alternatives thereto. This may adversely affect NewCo and its exposure to various blockchain technologies and prevent NewCo from realizing the anticipated profits from its investments. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin it mines or ETH it stakes, or Bitcoin or ETH it otherwise acquires or holds for its own account, and harm investors.

> 24. *The Loss or Destruction of Private Keys Required to Access any Digital Assets Held in Custody for NewCo's Own Account May Be Irreversible. If NewCo is Unable to Access its Private Keys or if NewCo Experiences a Hack or Other Data Loss Relating to its Ability to Access any Digital Assets, it Could Cause Regulatory Scrutiny, Reputational Harm, and other Losses.*

Digital assets are generally controllable only by the possessor of the unique private key relating to the digital wallet in which the digital assets are held. While blockchain protocols typically require public addresses to be published when used in a transaction, private keys must be safeguarded and kept private to prevent a third party from accessing the digital assets held in such a wallet. To the extent that any of the private keys relating to any of NewCo's hot wallet or cold storage containing digital assets held for its own account or for its customers is lost, destroyed, or otherwise compromised or unavailable, and no backup of the private key is accessible, NewCo will be unable to access the digital assets held in the related wallet. Further, NewCo cannot provide assurance that its wallet will not be hacked or compromised. Digital assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store NewCo's digital assets could adversely affect NewCo's ability to access or sell its digital assets and subject NewCo to significant financial losses. As such, any loss of private keys due to a hack, employee or service provider misconduct or error, or other compromise by third parties could result in significant losses and adversely affect its business.

> 25. *NewCo's Digital Assets May Be Subject to Loss, Damage, Theft, or Restriction on Access. Additionally, Incorrect or Fraudulent Digital Asset Transactions May Be Irreversible.*

There is a risk that part or all of NewCo's digital assets could be lost, stolen, or destroyed. Digital assets are stored in digital asset sites commonly referred to as "wallets" which may be accessed to exchange a holder's digital assets. Access to NewCo's Bitcoin assets could also be restricted by

cybercrime (such as a denial-of-service attack) against a service at which NewCo maintains a hosted wallet.  Access to NewCo's digital currency assets could also be restricted by cybercrime (such as a denial-of-service attack) against a service at which NewCo maintains a hosted hot wallet.  A hot wallet refers to any digital currency wallet that is connected to the Internet.  Generally, hot wallets are easier to set up and access than wallets in cold storage, but they are also more susceptible to hackers and other technical vulnerabilities.  Cold storage refers to any digital currency wallet that is not connected to the Internet.  Cold storage is generally more secure but is not ideal for rapid or regular transactions.  NewCo may hold a portion of its digital currencies in cold storage to reduce the risk of malfeasance, but this risk cannot be eliminated.  NewCo's digital assets may be an appealing target to hackers or malware distributors seeking to destroy, damage, or steal such digital assets.  Hackers or malicious actors may attempt to steal Bitcoins or ETH, such as by attacking the Bitcoin or ETH networks' source code, exchange miners, nodes, third-party platforms, storage locations or software, NewCo's general computer systems or networks, or by other means.  NewCo may be unable to prevent loss, damage, or theft, whether caused intentionally, accidentally or by act of God.  Access to its digital assets could also be restricted by natural events (such as an earthquake or flood) or human actions (such as a terrorist attack).  Any of these events may adversely affect NewCo's operations and, consequently, an investment in NewCo.  Further, it is possible that, through computer or human error, theft, or criminal action, NewCo's digital assets could be transferred in incorrect amounts or to unauthorized third parties or accounts.  In general, Bitcoin and ETH transactions are irrevocable, and stolen or incorrectly transferred digital assets may be irretrievable, and NewCo may have extremely limited or no effective means of recovering such Bitcoins or ETH.  As a result, any incorrectly executed or fraudulent Bitcoin or ETH transactions could adversely affect NewCo's business.

### 26. Digital Assets Held by NewCo Are Not Subject to FDIC or SIPC Protections.

NewCo will not hold its digital assets with a banking institution or a member of the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC") and, therefore, NewCo's digital assets will not be subject to the protections provided to depositors with FDIC or SIPC member institutions.

### 27. Intellectual Property Rights Claims May Adversely Affect the Operation of Some or All Digital Asset Networks.

Third parties have asserted and may assert intellectual property claims relating to the holding and transfer of digital assets and their source code.  Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in some or all digital asset networks' long-term viability or the ability of end-users to hold and transfer digital assets may adversely affect NewCo.  Additionally, a meritorious intellectual property claim could prevent NewCo and other end-users from accessing some or all digital asset networks or holding or transferring their digital assets.  As a result, an intellectual property claim against NewCo or other large digital asset network participants could adversely affect NewCo.

### 28. There Is a Risk of Additional Bitcoin Mining or Staking Capacity from Competing Bitcoin Miners or ETH Stakers, which Would Decrease NewCo's Effective Market Share.

The barriers to entry for new Bitcoin miners and ETH stakers are relatively low, which can give rise to additional capacity from competing Bitcoin miners or ETH stakers.  The Bitcoin protocol responds to increasing total hashrate by increasing the "difficulty" of Bitcoin mining.  If this "difficulty" increases at a significantly higher rate, NewCo would need to increase its hashrate at the same rate to maintain market share and generate equivalent block rewards.  A decrease in NewCo's effective network hashrate market share would result in a reduction in NewCo's share of block rewards and transaction

fees, which could materially adversely affect its financial performance and financial position. Staking rewards on ETH will increase or decrease depending on the number of validators and amount of ETH being staked on the network, which may vary over time. A reduction in the staking reward rate and other factors like network performance could materially adversely affect its financial performance and financial position.

> 29. *There Is a Lack of Liquid Markets in Digital Assets, and These Markets are Subject to Possible Manipulation.*

Digital assets that are represented and trade on a ledger-based platform may not necessarily benefit from viable trading markets. Stock exchanges have rules and regulations regarding marketplace conduct and monitor investors transacting on such platform for fraud and other improprieties. These conditions may not necessarily be replicated on a distributed ledger platform, depending on the platform's controls and other policies. The more relaxed a distributed ledger platform is about vetting issuers of digital assets or users that transact on the platform, the higher the potential risk for fraud or the manipulation of the ledger due to a control event. These factors may decrease liquidity or volume or may otherwise increase volatility of investment securities or other assets trading on a ledger-based system, which may adversely affect NewCo. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations and potentially the value of any Bitcoin it mines or ETH it stakes, or Bitcoin or ETH it otherwise acquires or holds for its own account, which could harm investors.

> 30. *The Digital Assets Exchanges on Which Bitcoin and ETH Trade are Relatively New and, in most cases, Largely Unregulated and May Therefore Be More Exposed to Fraud and Failure Compared to Established, Regulated Exchanges for other Assets. In the Event that Digital Assets Exchanges Representing a Substantial Portion of the Volume in Bitcoin or ETH Trading are Involved in Fraud or Experience Security Failures or Other Operational Issues, Such Digital Assets Exchanges' Failures May Result in a Reduction in the Price of Bitcoin and ETH and Can Adversely Affect NewCo.*

Digital assets exchanges on which the Bitcoins and ETH trade are new and, in most cases, largely unregulated. Furthermore, many digital assets exchanges (including several of the most prominent U.S. Dollar Denominated Bitcoin Exchanges) do not provide the public with significant information regarding their ownership structure, management teams, corporate practices, or regulatory compliance. As a result, the marketplace may lose confidence in, or may experience problems relating to, digital assets exchanges, including prominent exchanges handling a significant portion of the volume of Bitcoin and ETH trading. A lack of stability in the digital assets exchange market and the closure or temporary shutdown of Bitcoin exchanges due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in the Bitcoin and Ethereum networks and result in greater volatility in Bitcoin or ETH value. These potential consequences of a digital assets exchange's failure could adversely affect NewCo.

### E.    Disclosure Statement Disclaimer.

> 1. *The Financial Information Is Based on the Debtors' Books and Records.*

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their

financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.   *No Legal or Tax Advice Is Provided by this Disclosure Statement.*

This Disclosure Statement is not legal advice to any person or Entity.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each reader should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation of the Plan.

3.   *No Admissions Made.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, NewCo, the Post-Effective Date Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4.   *Failure To Identify Litigation Claims or Projected Objections.*

No reliance should be placed on the fact that any particular litigation claims or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims and Interests.

5.   *Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.*

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

7. *No Representations Outside this Disclosure Statement Are Authorized.*

**NO REPRESENTATIONS CONCERNING OR RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE VOTING HOLDERS' ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY VOTING HOLDERS IN ARRIVING AT THEIR DECISION. VOTING HOLDERS SHOULD PROMPTLY REPORT UNAUTHORIZED REPRESENTATIONS OR INDUCEMENTS TO COUNSEL TO THE DEBTORS AND THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE SOUTHERN DISTRICT OF NEW YORK.**

F.      **Regulatory-Related Risk Factors.**

1. *The Debtors Are Subject to an Extensive and Wide-Ranging Regulatory Landscape and Any Adverse Changes to, or Their Failure to Comply with, Any Laws and Regulations Could Adversely Affect their Brand, Reputation, Business, Assets, Operating Results, and Financial Condition.*

The Post-Effective Date Debtors and NewCo will be subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which the Debtors operate, including those governing money transmission, financial services, banks and trust companies, securities, broker-dealers and alternative trading systems, or ATS, commodities and commodities interests such as derivatives, credit, Cryptocurrency asset custody, exchange, and transfer, cross-border and domestic money and Cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, retail protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing, among others. The Debtors are exposed to risks with respect to their business and operations, environmental issues, and technology, among other things.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, Cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the Cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Moreover, the complexity and

evolving nature surrounding the regulation of the Cryptocurrency economy could require the Post-Effective Date Debtors and NewCo to exercise their judgment as to whether certain laws, rules, and regulations apply to NewCo, and it is possible that governmental bodies and regulators may disagree with their conclusions.  To the extent the Post-Effective Date Debtors and NewCo do not comply with such laws, rules, and regulations, they could be subject to significant fines, revocation of licenses, limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, operating results, and financial condition.

Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Post-Effective Date Debtors and/or NewCo from engaging in transactions in or relating to certain countries, individuals, and entities.  The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

The Debtors have engaged with state and federal regulators throughout the bankruptcy process and will continue to actively do so with the goal of ensuring that Plan provides for compliance by the Post-Effective Date Debtors and NewCo with all applicable state and federal law.  The federal and state regulators, however, may have broad discretion as to the approvals required in connection with the Plan, thus it is not possible to predict with certainty the scope of such approvals, whether they will ultimately be granted, and the expected timeframes of such determinations.  There are unresolved questions of law with respect to the intersection of state money transmission statutes and the Bankruptcy Code, and the answers to those questions may impact the ability of certain state regulators to require certain approvals with respect to confirmation of the Plan.  The Debtors may be unable to consummate the Restructuring Transactions in the event they determine that NewCo will not be able to meet all necessary regulatory requirements.  Furthermore, the Debtors cannot guarantee that NewCo will be able to remain compliant with all Laws and/or maintain all applicable licenses following the Effective Date.

> 2. *If NewCo Were Deemed to be an Investment Company Under the Investment Company Act, Applicable Restrictions Could Make it Impractical or Impossible For NewCo to Continue its Business as Contemplated and Could Have A Material Adverse Effect on its Business, Financial Condition, and Results of Operations.*

The SEC and its staff have taken the position that certain digital assets fall within the definition of a "security" under the U.S. federal securities laws.  Although public statements by senior officials and the staff of the SEC indicate that the SEC does not intend to take the position that Bitcoin is a security (in its current form), such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court.  The classification of Bitcoin or ETH as a security by the SEC could result in NewCo being deemed to be an "investment company" under the U.S. Investment Company Act.  Classification as an investment company under the U.S. Investment Company Act requires registration with the SEC.  If an investment company fails to register, it would have to stop doing almost all business, and its contracts would become voidable.  Registration is time-consuming and restrictive and would require a restructuring of NewCo's operations, and NewCo would be materially constrained in the kind of business it could do as a registered investment company.  Further, NewCo would become subject to substantial regulation concerning management, operations, transactions with affiliated persons, and portfolio composition, and would need to file reports under the U.S. Investment Company Act regime.  NewCo registering and complying with relevant

regulation would result in NewCo incurring substantial additional expenses and would have a materially adverse impact on NewCo's operations.

It is not intended for NewCo to be engaged in the business of investing, reinvesting, or trading in securities, and NewCo will not hold itself out as being engaged in those activities. Nevertheless, NewCo could determine that it has become an inadvertent investment company under the second definition above. An inadvertent investment company can avoid being classified as an investment company if it can rely on one of the exclusions or exemptions under the Investment Company Act. One such exemption, Rule 3(a)(2) under the Investment Company Act, allows an inadvertent investment company a grace period of one year from the earlier of (a) the date on which an issuer owns securities and/or cash having a value exceeding 50% of the issuer's total assets on either a consolidated or unconsolidated basis and (b) the date on which an issuer owns or proposes to acquire investment securities having a value exceeding 40% of the value of such issuer's total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. If NewCo becomes an inadvertent investment company in the future, NewCo may take actions to cause the investment securities held by it to be less than 40% of its total assets, which may include acquiring assets with the cash and Bitcoin on hand or liquidating investment securities or Bitcoin or seeking a no-action letter from the SEC if NewCo is unable to acquire sufficient assets or liquidate sufficient investment securities in a timely manner. Liquidating investment securities or Bitcoin could result in losses. As the Rule 3(a)(2) exemption is available to a company no more than once every three years, and assuming no other exclusion or exemption would be available to NewCo, NewCo would have to keep within the 40% limit for at least three years after it relies on Rule 3(a)(2) and subsequently cease being an inadvertent investment company. This could limit NewCo's ability to make certain investments or enter into joint ventures that could otherwise have a positive impact on NewCo's earnings.

   3.   *NewCo Will Be subject to a Highly Evolving Cryptocurrency Regulatory Landscape and any Adverse Changes to, or its Failure to Comply with, any Laws and Regulations Could Adversely Affect Its Business, Prospects, or Operations.*

Bitcoin, ETH, and other forms of digital assets have been the source of significant regulatory scrutiny in the United States and internationally. Bitcoin, ETH, and other digital assets are viewed disparately across various regulatory and standards-setting organizations internationally, as well as in the United States at the federal and state levels. For example, the FATF and the IRS consider a digital asset as currency or an asset or property. Further, the IRS applies general tax principles that apply to property transactions to transactions involving virtual currency. The CFTC classifies Bitcoin and ETH as commodities. The SEC has also publicly stated that it considers Bitcoin to be a commodity, but that some digital assets should be categorized as securities. The SEC has not taken a position as to whether ETH is a commodity or a security. How a digital asset is characterized by a regulator impacts the rules that apply to activities related to that digital asset.

As digital assets have grown in both popularity and market size, governments around the world have reacted differently. Certain governments have deemed digital assets illegal or have severely curtailed the use of digital assets by prohibiting the acceptance of payment in Bitcoin, ETH, and other digital assets for consumer transactions and barring banking institutions from accepting deposits of digital assets. Other nations, however, allow digital assets to be used and traded without significant restrictions. In some jurisdictions, such as in the United States, digital assets are subject to regulatory requirements and considerations. For example, the SEC and its staff have taken the position that certain cryptocurrencies fall within the definition of a "security" under the U.S. federal securities laws and have issued reports, orders, and statements that provide guidance on when a cryptocurrency may be a security for purposes of the U.S. federal securities laws. The SEC generally does not provide advance guidance or confirmation on the status of any particular cryptocurrency as a security. Public statements made by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin is a

security (as currently offered and sold).  Such statements are not official policy statements by the SEC, however, and reflect only the speakers' views, which are not binding on the SEC or any other agency or court and cannot be generalized to any other digital asset.  As of the date of this prospectus, with the exception of certain centrally issued digital assets that have received "no-action" letters from the SEC staff, Bitcoin and ETH are the only cryptocurrencies that senior officials at the SEC have publicly stated are unlikely to be considered securities.  If laws and regulations evolve or the SEC changes its position with respect to whether Bitcoin is regarded as a type of security, NewCo may become subject to the Investment Company Act and other regulations surrounding securities.

There is also a risk that relevant authorities in any jurisdiction may impose more onerous regulation on or scrutiny of Bitcoin, ETH, and other digital assets, for example banning their use, regulating their operation, or otherwise changing the relevant regulatory treatment.  Such changes could involve significant compliance or other costs, or otherwise have a material adverse impact on NewCo's business model, operations, and financial performance.  If the use of Bitcoin, ETH, and other digital assets is made illegal in jurisdictions where Bitcoin, ETH, and other digital assets are currently traded, the available market for Bitcoin, ETH, and other digital assets may contract.  For example, on September 24, 2021, the People's Bank of China announced that all activities involving digital assets in mainland China are illegal, which corresponded with a significant decrease in the price of Bitcoin and ETH.  If another government with considerable economic power were to ban digital assets or related activities, this could have further adverse impact on the price of Bitcoin or ETH.

Digital asset trading platforms may also be subject to increased regulation, and there is a risk that increased compliance costs are passed through to users, including NewCo, as it exchanges Bitcoin earned through its mining activities and ETH earned in its staking activities.  There is a risk that a lack of stability in the digital assets exchange market and the closure or temporary shutdown of digital assets exchanges due to fraud, business failure, hackers, malware, or government-mandated restrictions may reduce confidence in the Bitcoin and ETH networks and result in greater volatility in or suppression of Bitcoin's or ETH's value and consequently have a material adverse impact on NewCo's operations and financial performance.  Note that although Bitcoin and ETH are not currently treated as securities by the SEC, the exchanges on which Bitcoin and ETH are traded typically provide trading services with respect to numerous other digital assets, some of which may be deemed to be securities by the SEC, and some of them are currently under investigation by the SEC and other regulators as well.  If any of these exchanges are shut down due to regulatory action or have their activities significantly curtailed or otherwise modified, it could become more difficult for NewCo and other holders of Bitcoin and ETH to monetize holdings.  This could also result in a decrease in the overall price of Bitcoin or ETH which could have a material adverse impact on NewCo's operations and financial performance.

The SEC has recently proposed regulations which would require investment advisers (including fund managers of many funds) to custody all digital assets they hold on behalf of clients with "qualified custodians."  Because the majority of digital assets exchanges are not "qualified custodians," and because these exchanges require users to prefund their trades (in effect requiring users to place digital assets in custody with them), it may be practically impossible for investment advisers to hold digital assets on behalf of their institutional clients or managed funds.  The exit of institutional investors and funds from the market for Bitcoin could have a material adverse effect on the price of Bitcoin and thus on NewCo's operations.

In the U.S., the Federal Reserve Board, U.S. Congress, certain U.S. federal agencies (*e.g.*, the CFTC, the SEC, the Financial Crimes Enforcement Network, and the Federal Bureau of Investigation), and state regulators have begun to examine the operations of the Bitcoin and ETH networks, Bitcoin and ETH users, and the digital asset exchange market, in light of the FTX and other bankruptcies, including the Debtors' bankruptcy.  Increasing regulation and regulatory scrutiny may result in new costs for NewCo and its management may have to devote increased time and attention to regulatory matters or

change aspects of its business.  Increased regulation may also result in limitations on the use cases of Bitcoin.  In addition, regulatory developments may require NewCo to comply with certain regulatory regimes.  Furthermore, in the future, foreign governments may decide to subsidize or in some other way support certain large-scale Bitcoin mining projects, thus adding hashrate to the overall network.  Such circumstances could have a material adverse effect on the amount of Bitcoin that NewCo may be able to mine as well as the value of Bitcoin and, consequently, NewCo's business, prospects, financial condition, and operating results.

> 4.  *The Digital Asset Economy is Novel and Has Little to no Access to Policymakers or Lobbying Organizations, which May Harm NewCo's Ability to Effectively React to Proposed Legislation and Regulation of Digital Assets or Digital Asset Platforms Adverse to Its Business.*

As digital assets have grown in both popularity and market size, various U.S. federal, state, and local and foreign governmental organizations, consumer agencies, and public advocacy groups have been examining the operations of digital asset networks, users, and platforms, with a focus on how digital assets can be used to launder the proceeds of illegal activities, fund criminal or terrorist enterprises, and the safety and soundness of platforms and other service providers that hold digital assets for users.  Many of these entities have called for heightened regulatory oversight and have issued consumer advisories describing the risks posed by digital assets to users and investors.  For instance, in July 2019, then-U.S. Treasury Secretary Steven Mnuchin stated that he had "very serious concerns" about digital assets.  In recent months, members of Congress have made inquiries into the regulation of digital assets, and Gary Gensler, Chair of the SEC, has made public statements regarding increased regulatory oversight of digital assets.  Outside the United States, several jurisdictions such as China and South Korea have banned so-called initial coin offerings, while Canada, Singapore, Hong Kong have opined that token offerings may constitute securities offerings subject to local securities regulations.  In July 2019, the United Kingdom's FCA proposed rules to address harm to retail customers arising from the sale of derivatives and exchange-traded notes that reference certain types of digital assets, contending that they are "ill-suited" to retail investors due to extreme volatility, valuation challenges and association with financial crimes.  In May 2021, the Chinese government called for a crackdown on Bitcoin mining and trading, and in September 2021, Chinese regulators instituted a blanket ban on all digital asset mining and transactions, including overseas digital asset exchange services taking place in China, effectively making all digital asset-related activities illegal in China (the "China Ban").

The digital asset economy is novel and has little to no access to policymakers and lobbying organizations in many jurisdictions.  Competitors from other, more established industries, including traditional financial services, may have greater access to lobbyists or governmental officials, and regulators that are concerned about the potential for digital assets for illicit usage may affect statutory and regulatory changes with minimal or discounted inputs from the digital asset economy.  As a result, new laws and regulations may be proposed and adopted in the United States and internationally, or existing laws and regulations may be interpreted in new ways that harm the digital asset economy or digital asset platforms, which could adversely affect NewCo's business.

> 5.  *Bitcoin's, ETH's, and Other Digital Assets' Status as a "Security," a "Commodity" or a "Financial Instrument" in any Relevant Jurisdiction is subject to a High Degree of Uncertainty, and if NewCo Is Unable to Properly Characterize a Digital Asset, NewCo May Be Subject to Regulatory Scrutiny, Investigations, Fines, and Other Penalties, which May Adversely Affect NewCo's Business, Operating Results, and Financial Condition.*

The SEC and its staff have taken the position that certain digital assets fall within the definition of a "security" under the U.S. federal securities laws.  The legal test for determining whether any given

digital asset is a security is a highly complex, fact-driven analysis. The SEC has indicated that the determination of whether or not a digital asset is a security depends on the characteristics and use of that particular asset. The SEC generally does not provide advance guidance or confirmation on the status of any particular digital asset as a security. However, the SEC and its staff have taken positions that certain digital assets are "securities"—often in the context of enforcement actions—and, as of the Effective Date, NewCo will not hold any digital assets for which the SEC or its staff has taken such a position. Prior public statements by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin is a security (in its current form). Bitcoin is the only digital asset as to which senior officials at the SEC have publicly expressed such a view. The SEC has not taken a position on whether ETH is a security, and certain public statements by senior officials at the SEC indicate that the SEC may or may not take the position that ETH is a security. Moreover, such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court, cannot be generalized to any other digital asset, and may evolve. Similarly, although the SEC's Strategic Hub for Innovation and Financial Technology published a framework for analyzing whether any given digital asset is a security in April 2019, this framework is also not a rule, regulation, or statement of the SEC and is not binding on the SEC. With the exception of certain centrally issued digital assets that have received "no-action" letters from the SEC staff, Bitcoin and ETH are the only Cryptocurrencies that senior officials at the SEC have publicly stated are unlikely to be considered securities.

As of the Effective Date, NewCo will hold only Bitcoin and ETH, which have not been treated as a "security" by the SEC. To the extent that the SEC or a court determines that any digital assets that NewCo holds, or chooses to hold in the future, are securities, however, that determination could prevent NewCo from continuing to hold or mine those digital assets. It could also result in regulatory enforcement penalties and financial losses. NewCo could be subject to judicial or administrative sanctions for failing to offer or sell the digital asset in compliance with securities registration requirements. Such an action could result in injunctions and cease and desist orders, as well as civil monetary penalties, fines, disgorgement, criminal liability, and reputational harm. Moreover, the networks on which such digital assets are used might be required to be regulated as securities intermediaries, and subject to applicable rules, which could effectively render the network impracticable for its existing purposes. Further, any determination that Bitcoin or ETH is a security could draw negative publicity and cause a decline in the general acceptance of digital assets. Also, it would make it more difficult for Bitcoin or ETH, as applicable, to be traded, cleared, and custodied as compared to other digital assets that are not considered to be securities. Lastly, any determination that a digital asset that NewCo holds, or chooses to hold in the future, is a "security" may require NewCo to register as an investment company under the Investment Company Act.

> 6. *It May Be Illegal Now, or in the Future, To Acquire, Own, Hold, Sell, or Use Bitcoin, ETH, or Other Digital Assets, Participate in Blockchains or Utilize Similar Digital Assets in One or More Countries, which Would Adversely Affect NewCo's Business Operations.*

Although digital assets currently are generally not regulated or are lightly regulated in most countries, countries such as China and Russia have taken harsh regulatory action to curb the use of digital assets and may continue to take regulatory action in the future that could severely restrict the right to acquire, own, hold, sell, or use these digital assets or to exchange them for fiat currency. In 2021, China instituted the China Ban. In other nations, including Russia, it is illegal to accept payment in Bitcoin, ETH, or other digital assets for consumer transactions, and banking institutions are barred from accepting deposits of Bitcoin or ETH. Such restrictions may adversely affect NewCo as the large-scale use of Bitcoin and ETH as means of exchange is presently confined to certain regions globally. Such circumstances could have a material adverse effect on NewCo's ability to continue as a going concern or

to pursue its strategy at all, which could have a material adverse effect on NewCo's business, prospects, or operations, and potentially the value of any Bitcoin that NewCo mines or otherwise acquires or holds for its own account, ultimately harming investors.

> 7. *NewCo's Business May Be Subject to Substantial Environmental Legislation and Energy Regulation and May Be Adversely Affected by Legislative or Regulatory Changes, as well as Liability Under, or any Future Inability to Comply with, Existing or Future Energy Regulations or Requirements.*

NewCo's business operations are, and may become subject to, further U.S. federal, state, and local laws and regulations governing air and water quality, hazardous and solid waste disposal, and other environmental matters. Compliance with, or changes to, the requirements under these legal and regulatory regimes may cause NewCo to incur significant additional costs or adversely impact NewCo's ability to compete on favorable terms with competitors. Failure to comply with such requirements could result in the shutdown of a non-complying facility, the imposition of liens, fines, and/or civil or criminal liability, and/or costly litigation before the agencies and/or in state or federal court. The regulatory environment has undergone significant changes in the last several years due to state and federal policies affecting wholesale competition and the creation of incentives for the addition of large amounts of new renewable generation and, in some cases, transmission. These changes are ongoing, and NewCo will not be able to predict the future design of the power markets or the ultimate effect that the changing regulatory environment will have on NewCo's business. These changes and regulatory developments could adversely impact NewCo's operations, increase NewCo's environmental compliance costs, and potentially reduce the extent of NewCo's business, any of which could have a material adverse effect on NewCo's business, results of operations, and financial condition. If competitive restructuring of the electric power markets is reversed, discontinued, delayed, or materially altered, NewCo's business, financial condition, results of operations, and prospects could be negatively affected.

> 8. *NewCo Could Be Materially and Adversely Affected if Currently Proposed and/or New Regulations Related to Global Climate Change Are Implemented or if New Foreign, Federal or State Legislation or Regulations Are Adopted to Address Global Climate Change, or if NewCo Is Subject to Lawsuits for Alleged Damage to Persons or Property Resulting from Greenhouse Gas ("GHG") Emissions.*

There is attention and interest nationally and internationally about global climate change and how GHG emissions, such as $CO_2$, contribute to global climate change. A number of governments or governmental bodies have introduced or are contemplating legislative and regulatory changes in response to the increasing focus on climate change and its potential impact, including from governmental bodies, interest groups and stakeholders. Over the last several years, the U.S. Congress and state and federal authorities have considered and debated several proposals intended to address climate change using different approaches, including a cap on carbon emissions with emitters allowed to trade unused emission allowances (cap-and-trade), a tax on carbon or GHG emissions, incentives for the development of low-carbon technology, and federal renewable portfolio standards. Foreign jurisdictions have also adopted legislation relating to global climate change and GHG emissions, and the United States and other countries have enacted legislation, regulations, policies and programs to address global climate change and GHG emissions. For example, the Paris Agreement became effective in November 2016, and signatories are required to submit their most recent emissions goals in the form of nationally determined contributions.

Given the significant amount of electrical power required to operate Bitcoin mining machines, as well as the environmental impact of mining for the rare earth metals used in the production of mining

servers, the Bitcoin mining industry may become a target for future environmental and energy regulation. Legislation and increased regulation regarding climate change could impose significant costs on NewCo and its suppliers, including costs related to increased energy requirements, capital equipment, environmental monitoring and reporting, costs to purchase renewable energy credits or allowances and other costs to comply with such regulations. Specifically, imposition of a tax or other regulatory fee in a jurisdiction where NewCo operates or on electricity that NewCo purchases could result in substantially higher energy costs, and due to the significant amount of electrical power required to operate Bitcoin mining machines, could in turn put NewCo facilities at a competitive disadvantage. Any future climate change regulations could also negatively affect NewCo's ability to compete with companies situated in areas not subject to such limitations. Any of the foregoing could have a material adverse effect on NewCo's financial position, results of operations and cash flows.

Additionally, a number of federal court cases have been filed in recent years asserting damage claims related to GHG emissions, and the results in those proceedings could establish adverse precedent that might apply to companies (including NewCo) that produce GHG emissions. NewCo could be materially and adversely affected if new federal and/or state legislation or regulations are adopted to address global climate change or if NewCo is subject to lawsuits for alleged damage to persons or property resulting from GHG emissions.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the solicitation package (the "Solicitation Package"), about which more detail is provided below.

---

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**

**PLEASE REFER TO THE DISCLOSURE STATEMENT MOTION AND DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

---

### A.    Holders of Claims and Interests Entitled to Vote on the Plan.

The Bankruptcy Code does not require or permit all holders of claims against and/or interests in a debtor to vote on a chapter 11 plan.  Only impaired creditors who are receiving a distribution under the plan are entitled to vote.  According to section 1124 of the Bankruptcy Code, a creditor's claim is "impaired" if the creditor's legal, equitable, or contractual rights are altered by the plan of reorganization.  For example, a creditor's claim is impaired if the plan provides that the creditor will receive a distribution that is less than the full value of the claim.

### 1.    The Voting Classes.

The following Classes are entitled to vote to accept or reject the Plan (collectively, the "Voting Classes):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 2 | Retail Borrower Deposit Claims | Impaired |

| | | |
|---|---|---|
| 4 | Convenience Claims | Impaired |
| 5 | General Earn Claims | Impaired |
| 6A | General Custody Claims | Impaired |
| 7 | Withhold Claims | Impaired |
| 8 | Unsecured Loan Claims | Impaired |
| 9 | General Unsecured Claims | Impaired |
| 10 | State Regulatory Claims | Impaired |
| 134 | Series B Preferred Interests | Impaired |

The table shown in Article III.C of this Disclosure Statement provides a full summary of the status and voting rights of each Holder of a Claim or Interest in a Class (absent an objection to the Holder's Claim or Interest) under the Plan. Holders in the Voting Classes are Impaired under the Plan and are receiving a distribution under the Plan, subject to certain applicable conditions. Accordingly, Holders of Claims and Interests in the Voting Classes have the right to vote to accept or reject the Plan. *If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package.*

**B.    Votes Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims is determined by calculating the amount and number of allowed claims voting to accept, as a percentage of the allowed claims that have voted. Acceptance of a chapter 11 plan by a class of interests is determined by calculating the amount of allowed interests voting to accept, as a percentage of the allowed interests that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

For example, in a class of 100 creditors holding a total of $6 million in claims, and assuming every creditor votes on the plan, then for the class to accept the plan, at least 51 creditors need to vote to accept the plan and at least $4 million of claims need to vote to accept the plan. In other words, the class will be deemed to accept the plan if at least 51 creditors holding $4 million or more of the total amount in such class vote to accept the plan.

**C.    Certain Factors to Be Considered Prior to Voting.**

There are a variety of factors that all Holders of Claims and Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may affect recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor guarantee that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a resolicitation of the votes of Holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to "Risk Factors" described in Article VIII of this Disclosure Statement.

### D.    Classes Not Entitled to Vote on the Plan.

Under the Bankruptcy Code, holders of claims or interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Interests in the Debtors are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status |
|---|---|---|
| 1 | Other Secured Claims | Unimpaired |
| 3 | Other Priority Claims | Unimpaired |
| 6B | Withdrawable Custody Claims | Unimpaired |
| 1~~0~~1 | *De Minimis* Claims | Impaired |
| 1~~1~~2 | Intercompany Claims | Impaired/Unimpaired |
| 1~~2~~3 | Intercompany Interests | Impaired/Unimpaired |
| 1~~4~~5 | Other Interests | Impaired |
| 1~~5~~6 | Section 510(b) Claims | Impaired |
| 1~~6~~7 | Equitably Subordinated Claims | Impaired |

Holders of Claims in Classes 1, 3, and 6B are not entitled to vote because they are deemed to accept the Plan because such Claims are Unimpaired.  Holders of Claims in Classes 1~~0~~1, ~~14,~~ 15, ~~and~~ 16, and 17 are not entitled to vote because they are Impaired and are therefore deemed to reject the Plan. Finally, Holders of Claims in Classes ~~11 and~~ 12 and 13 are not entitled to vote because they are either

Impaired or Unimpaired and are either deemed to reject or accept.

      E.      **Solicitation Procedures.**

         *1.   Solicitation Agent.*

The Debtors have retained Stretto to act, among other things, as a Solicitation Agent in connection with solicitation of votes to accept or reject the Plan. As the Solicitation Agent, Stretto will be responsible for distributing the Solicitation Package to Holders of Claims in the Voting Classes and for reviewing and tabulating the Ballots.

         *2.   Solicitation Package.*

The following materials constitute the Solicitation Package distributed to Holders of Claims and Interests in the Voting Classes:

- a copy of the Solicitation and Voting Procedures;

- the applicable form of Ballot (as described in greater detail below), together with detailed voting instructions and instructions on how to submit the Ballot;

- the cover letter, which describes the contents of the Solicitation Package and urges Holders of Claims in each of the Voting Classes to vote to accept the Plan;

- the Committee's letter recommending that Holders of Claims vote to accept the Plan;

- this Disclosure Statement (and exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits, except the Solicitation and Voting Procedures);

- the Confirmation Hearing Notice (as defined in the Disclosure Statement Order); and

- such other materials as the Bankruptcy Court may direct.

         *3.   Form of Ballots.*

The Debtors have prepared [four] different types of Ballots. Holders of Class 2 Retail Borrower Deposit Claims, Class 4 Convenience Claims, Class 5 General Earn Claims, Class 6A General Custody Claims, and Class 7 Withhold Claims (collectively, the "Account Holder Voting Classes") will receive the account holder ballot (the "Account Holder Ballot"). Holders of Class 8 Unsecured Loan Claims, Class 9 General Unsecured Claims Ballot, [Class 10 State Regulatory Claims,] and Class 134 Series B Preferred Interests will each receive separate Ballots (the "Class 8 Unsecured Loan Claims Ballot," "Class 9 General Unsecured Claims Ballot," "Class 10 State Regulatory Claims Ballot," and "Class 134 Series B Preferred Interests Ballot," respectively). The Ballots (except for the Class 10 State Regulatory Claims Ballot) are attached as Exhibit 3A, Exhibit 3B, Exhibit 3C, and Exhibit 3D to the order of the Disclosure Statement Motion [Docket No. 2970], and were also Filed separately at [Docket No. 2971]. Revised forms of Ballots have been Filed on the docket concurrently herewith.

The Account Holder Ballot will be pre-populated with the amount of each Claim held by the Holder in each of the Account Holder Voting Classes as reflected on the Debtors' Schedules. Account Holders may not vote a Claim amount inconsistent with the Schedules unless the Bankruptcy Court has entered an order approving such relief for that Holder after the Holder files a motion seeking such relief

pursuant to Bankruptcy Rule 3018(a).    The Account Holder Ballot will also provide explanations of elections available to each Holder and will contain the net preference exposure of the Account Holder, which is relevant to whether such Account Holder is eligible to participate in the Account Holder Avoidance Action Settlement and whether distributions may be held back on account of potential Avoidance Actions against such Account Holder.  The Account Holder Ballot on the online voting portal will provide user-friendly prompts to ensure that any elections the Holder makes are consistent, thus preventing Holders from inadvertently submitting a defective Ballot and ensuring that votes to accept or reject the Plan from Holders in the Account Holder Voting Classes will be properly counted.

You should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.  If a Holder fills out the Ballot incorrectly, the Ballot will be defective and will not be counted.

*4.    Distribution of Solicitation Package and Plan Supplement.*

The Solicitation Agent shall distribute the Solicitation Package to Holders of Claims in the Voting Classes by no later than [August 21], 2023 (the "Solicitation Deadline").[703]  The Debtors will make every reasonable effort to ensure that each Holder of a Claim or Interest entitled to vote will receive only one Solicitation Package.

The Solicitation Package will be distributed via email in electronic format to the Account Holder Voting Classes.  Holders of Claims in Account Holder Voting Classes will also receive a "push" notification to the Debtors' mobile application, which will link to the Account Holder Ballot on the Solicitation Agent's online voting portal.  The Solicitation Package will be distributed via email (to the extent the Debtors have such email addresses) or by first-class U.S. mail to Holders of Claims in Classes 8, 9, and 13.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by (a) calling (855) 423-1530 (toll free) or +1 (949) 669-5873 (international), (b) electronic mail at CelsiusInquiries@stretto.com (reference "In re: Celsius – Solicitation Inquiry" in the subject line), or (c) writing to Celsius Inquiries, c/o Stretto, Inc., 410 Exchange, Suite 100, Irvine, CA 92602.  You may also download the exhibits and documents (as well as any pleadings filed with the Bankruptcy Court) for free on the Debtors' restructuring website at https://cases.stretto.com/celsius or from the Bankruptcy Court for a fee on PACER at https://ecf.nysb.uscourts.gov.  Any party that receives the Solicitation Package in electronic format but would prefer paper format may contact the Solicitation Agent and request paper copies of the corresponding materials already provided in electronic format (to be provided at the Debtors' expense).  Additionally, the Debtors shall electronically serve all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

No later than fourteen (14) days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court, the Debtors will File the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve copies of the Plan Supplement; *however*, parties may obtain a copy of the Plan Supplement from the

---

[703]    This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Solicitation Deadline is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

Solicitation Agent by: (a) calling the Solicitation Agent at the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, https://cases.stretto.com/celsius, or (c) emailing the Solicitation Agent at CelsiusInquiries@Stretto.com.

F.      **Voting on the Plan.**

**The Voting Record Date is [July 24, 2023]**.[~~650~~704]  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

**The Voting Deadline is [September ~~18~~20], 2023, at 4:00 p.m. (prevailing Eastern Time)**.[~~651~~705] A ballot must be properly executed, completed, and delivered as directed in order to be counted towards acceptance or rejection of the Plan.  The Solicitation Agent must **actually receive** the completed Ballot on or before the Voting Deadline.  Ballots may be submitted to the Solicitation Agent via the Solicitation Agent's online voting portal at https://case.stretto.com/Celsius or via mail to:

Celsius Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Holder is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim, and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the purchaser provides satisfactory confirmation of the transfer to the Solicitation Agent.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (855) 423-1530, INTERNATIONAL AT +1 (949) 669-5873, OR VIA ELECTRONIC MAIL TO CELSIUSINQUIRIES@STRETTO.COM.**

G.      **Voting Tabulations.**

1.    *Ballots Must Be Received by the Solicitation Agent by the Voting Deadline.*

A Ballot will be deemed delivered only when the Solicitation Agent **actually receives** the executed Ballot as instructed in the voting instructions.  No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors.  Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted.

---

[~~650~~704]    This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Voting Record Date is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

[~~651~~705]    This date is subject to Bankruptcy Court approval.  Parties should monitor the docket for these Chapter 11 Cases for updates at https://cases.stretto.com/celsius or https://ecf.nysb.uscourts.gov.  The Debtors will update this paragraph once the Voting Deadline is set by the Bankruptcy Court and prior to distribution of the final version of this Disclosure Statement.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Confirmation of the Plan.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

In the event that a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Debtors will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the voting report prepared by the Solicitation Agent (the "Voting Report").  The Voting Report shall, among other things, provide the votes received to accept or reject the Plan, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each, an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged.  The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots.  Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification.

> 2.  *Holders of Claims in More than One Voting Class Must Vote All Claims Together.*

Holders must vote all of their Claims either to accept or reject the Plan (except for any such Holder's General Custody Claim, if applicable), and may not split any votes between Classes.  For the avoidance of doubt, a Holder must vote all of her Claims, except for her Custody Claim (if applicable), either to accept the Plan *or* to reject the Plan.  As an example, in the event that you are a Holder of a Class 2 Retail Borrower Deposit Claim and a Class 5 General Earn Claim, you must vote to accept the Plan with respect to both the Retail Borrower Deposit Claim and the General Earn Claim or to reject the Plan with respect to both the Retail Borrower Deposit Claim and the General Earn Claim.  You cannot vote your Retail Borrower Deposit Claim to accept the Plan and vote your General Earn Claim to reject the Plan.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.

> 3.  *Elections Will Not Change in Which Class Your Vote Is Counted.*

Holders of Class 2 Retail Borrower Deposit Claims, Class 5 General Earn Claims, Class 7 Withhold Claims, Class 8 Unsecured Loan Claims, and Class 9 General Unsecured Claims have the option of making certain elections to change the treatment of their Claim, and therefore the distribution, that they will receive if the Plan is Confirmed.  Notwithstanding any elections a Holder may make, the Holder's vote will nonetheless be allocated to the Holder's original Class.

For example, Holders of Class 5 General Earn Claims and Class 7 Withhold Claims whose Claims are above the Convenience Claim Threshold of $5,000 can opt into the Convenience Class, in which case their Claims are reduced to $5,000 and they will receive a distribution of at least 70% of their $5,000 Convenience Class Claim.  Regardless of the election a Holder of a Class 5 General Earn Claim and Class 7 Withhold Claim makes, however, such Holder's votes will be counted as a Class 5 General Earn Claim and/or a Class 7 Withhold Claim.

Detailed information about the Convenience Claim Election can be found in Article III.M of this

Disclosure Statement and in **Exhibit H** attached to this Disclosure Statement.

H.    **Ballots Not Counted.**

**A Ballot will not be counted if, among other things:** (1) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (2) if it does not vote all of the Holder's Claims (except for such Holder's General Custody Claim, if applicable) either to accept the Plan *or* to reject the Plan; (3) it was transmitted by facsimile, email or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (4) an Entity that does not hold a Claim or Interest in a Voting Class casts the ballot in violation of the Solicitation Procedures; (5) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors instead of the Solicitation Agent; (6) it is cast for a Claim scheduled as wholly ~~wholly~~ unliquidated, -contingent, or -disputed and the claimant has not filed a superseding proof of claim; (7) it is unsigned or lacking an original signature (note that a ballot submitted via the Solicitation Agent's online balloting portal shall be deemed an original signature); (8) it is not marked to accept or reject the Plan or marked both to accept and reject the Plan; or (9) it is submitted via improper means, as described in the Solicitation Procedures. **Please refer to the Disclosure Statement Order and Solicitation Package for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL-FREE AT (866) 423-1530 OR INTERNATIONAL AT +1 (949) 669-5873.**
**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

---

X.    **CONFIRMATION OF THE PLAN**

A.    **Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of such plan. **The Bankruptcy Court has not yet scheduled the Confirmation Hearing.** The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the Filing of a notice of such adjournment. Any objection to the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules and the Local Rules, (3) state the name, address, phone number, and e-mail address of the objecting party and the amount and nature of the Claim or Interest of such entity, if any, (4) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (5) be Filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that the parties entitled to notice **actually receive** such objection no later than the Plan Objection Deadline. **The Bankruptcy Court may not consider an objection unless an objection to the Plan is timely served and Filed.**

B.    **Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are the following: (1) all impaired classes of claims or interests must accept the plan or, if the impaired class rejects the plan, the plan "does not discriminate unfairly" and is "fair and

equitable" as to the rejecting impaired class; (2) the plan is feasible; and (3) the plan is in the "best interests" of holders of claims or interests. At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 for plan confirmation.

### C.    Best Interests of Creditors/Liquidation Analysis.

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find that a chapter 11 plan provides that in each impaired class each holder of a claim or an equity interest either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7. This requirement is often called the "best interest" test.

A plan is in the best interests of each impaired class when the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan. The Debtors believe that under the Plan all Holders of impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. Attached hereto as **Exhibit B** and incorporated herein by reference is the Liquidation Analysis that the Debtors prepared with the assistance of their advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in a substantially less value to Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the highly unique nature of the Debtors' assets, the time delay associated with the chapter 7 trustee's learning curve for these assets, and any upcoming lease expirations associated with the Debtors' properties. Recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs associated with the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' specialized assets, and these specific Chapter 11 Cases to complete the administration of the Estate. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. § 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Accordingly, the Debtors believe that a chapter 7 liquidation would not result in distributions as favorable as those under the Plan.

### D.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that neither liquidation nor the need for further financial restructuring of the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization) is likely to follow confirmation of a plan of reorganization. The Debtors, with the assistance of their relevant advisors, have analyzed their ability to meet their respective obligations under the Plan to determine whether the Plan meets this feasibility requirement. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections"). Creditors and other interested parties should review Article VIII of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Mining Financial Projections are attached hereto as **Exhibit E** and incorporated by reference herein.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of Claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[706]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by Holders of at least two-thirds in dollar and more than one-half in a number of Allowed Claims in that class, counting only those Claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by Holders of at least two-thirds in amount of Allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such class.

### F.    Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement

---

[706]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination.

The "unfair discrimination" test applies to classes of Claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of Claims receive more than 100 percent of the amount of the Allowed Claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of Claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank, and in accordance with each class's legal rights.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    CERTAIN SECURITIES LAW MATTERS

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act, except for the NewCo Common Stock issued in connection with the Plan Sponsor Contribution and will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.

Securities issued in reliance upon section 1145 of the Bankruptcy Code to an entity that is not an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable under U.S. federal securities laws by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of NewCo or the Post Effective Date Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, and (iii) is not an entity that is an "underwriter," as defined under section 1145(b) of the Bankruptcy Code.

Resales of NewCo Common Stock by entities deemed to be "underwriters" are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act.  Under certain circumstances, holders of NewCo Common Stock who are deemed to be "underwriters" may be entitled

to resell their NewCo Common Stock pursuant to the limited safe harbor resale provisions of rule 144 of the Securities Act ("Rule 144"). Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the applicable holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular person would be deemed to be an "underwriter" (including whether the person is a "controlling person") with respect to the NewCo Common Stock would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any person would be deemed an "underwriter" with respect to NewCo Common Stock and, in turn, whether any person may freely resell NewCo Common Stock.

The issuance and sale of the NewCo Common Stock in connection with to the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder. Such NewCo Common Stock will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Debtors recommend that potential recipients of NewCo Common Stock consult their own counsel: (i) with respect to the NewCo Common Stock issued under the Plan, concerning whether such potential recipients will constitute "underwriters" pursuant to section 1145(b) of the Bankruptcy Code at the time of the issuance of the NewCo Common Stock; and (ii) the ability of such potential recipients to freely trade NewCo Common Stock in compliance with the federal securities laws and any applicable Blue Sky laws, including certain Blue Sky state notice requirements that may continue to apply with respect to resales of the NewCo Common Stock. The Debtors make no representation concerning the ability of a person to dispose of any NewCo Common Stock.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT AND STATE "BLUE SKY LAWS," INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF PLAN TOKENS ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

313

## XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is an overview of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Post-Effective Date Debtors, and to Holders entitled to vote to accept or reject the Plan. This overview is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

The application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to Cryptocurrency in general, is subject to an unusually high level of uncertainty. No opinion of counsel has been or will be obtained and the Debtors have not requested, and do not expect to seek, a ruling or determination from the IRS as to any of the tax consequences of the Plan. No portion of this discussion is binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position that the Debtors, Holders, or Post-Effective Date Debtors take.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN. THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to certain Holders in light of their individual circumstances. This discussion also does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, accrual-method U.S. Holders (as defined below) that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. Dollar, U.S. expatriates, broker-dealers, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, Persons (other than, if applicable, the Debtors) using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-income, or non-U.S. taxation is addressed. Furthermore, this preliminary overview assumes that a Holder holds only Claims or Interests in a single Class and, except as set forth below, holds such Claims or Interests only as "capital assets" (within the meaning of section 1221 of the IRC). This preliminary overview also assumes that the various debt and other arrangements to which the Debtors and Post-Effective Date Debtors are, or will be, a party to will be respected for U.S. federal income tax purposes in accordance with their form, and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This preliminary overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors,

Post-Effective Date Debtors, and Holders of Claims and Interests described below also may vary depending on the ultimate nature of any Restructuring Transactions that the Debtors and/or Post-Effective Date Debtors engage in.  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is:  (1) an individual who is a citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of Cryptocurrency deposits that customers made to the Debtors in connection with the Borrow Program and the Earn Program when customers made such deposits.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in such deposited Cryptocurrency.  On the other hand, the below discussion assumes that the Debtors did not obtain tax ownership of Cryptocurrency deposits that customers made to the Debtors in connection with the Custody Program.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors did not have the right to transfer, rehypothecate, or otherwise deal in such deposited Cryptocurrency.  If the Debtors were determined to not have tax ownership of Cryptocurrency received in connection with the Borrow Program or the Earn Program, or to have tax ownership of Cryptocurrency received in connection with the Custody Program, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER.  THIS DISCUSSION DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

**B.**      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

The Plan may be effectuated through either the NewCo Transaction or the Orderly Wind Down.

In the case of the NewCo Transaction, the Debtors would, among other things, (x) make "in-kind" distributions of Liquid Cryptocurrency to certain Holders in partial satisfaction of certain Claims related to deposits (including, for the avoidance of doubt, Claims with respect to both the Borrow Program and Earn Program) of Cryptocurrency, and (y) sell in a taxable transaction some of its assets to NewCo or a subsidiary thereof in exchange for NewCo Common Stock (which NewCo Common Stock the Debtors would then transfer to certain Holders in partial satisfaction of certain Claims pursuant to the Plan) and an assumption of certain liabilities. As a result and in connection therewith, the Debtors will realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Amounts subject to the Liquid Cryptocurrency distribution referenced above will, from the Debtors' perspective, result in the recognition of income equal to the difference between the value of what Holders receive in exchange for their Claims (including any in-kind distribution) and the amount of their Claims (determined without regard to "dollarization" of such Claims). Income generated in connection with the foregoing will be reduced by the amount of tax attributes (if any) and other deductions (including with respect to certain intercompany obligations among the Debtors) (if any) available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.

In the case of an Orderly Wind Down, the Debtors would, among other things, (x) make "in-kind" distributions of Liquid Cryptocurrency to certain Holders in partial satisfaction of certain Claims related to deposits of Cryptocurrency (with the same treatment to the Debtors as described immediately above), (y) potentially sell certain assets to third parties or otherwise monetize assets (resulting in gain or loss to the Debtors in an amount equal to the difference between the value of the consideration received by the Debtors and the Debtors' tax basis in such assets), and (z) potentially distribute Cash and/or property to Holders in satisfaction of Claims (resulting in income equal to the difference between the value of what Holders receive in exchange for their Claims (including any in-kind distribution) and the amount of their Claims (determined without regard to "dollarization" of such Claims). As above, income will be reduced by the amount of tax attributes (if any) and other deductions (including with respect to certain intercompany obligations among the Debtors) (if any) available for use by the Debtors, and any remaining income will be recognized by the Debtors and result in a cash tax obligation.

Thus, the U.S. federal income tax consequences of the Restructuring Transactions to the Debtors will in large part be a function of (a) the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, (b) the difference between the value of what Holders receive in exchange for their Claims and the amount of their Claims, and (c) the Debtors' ability to demonstrate the existence of tax losses, including losses that may be generated as a result of the implementation of the Restructuring Transactions and historically incurred losses. There is generally no direct guidance under Applicable Tax Law on how to treat a customer's transfer of Cryptocurrency to a business like that of the Debtors (and as a result there is significant (and unusual) uncertainty with respect to the Debtors' tax basis in such Cryptocurrency) or the transferee's utilization of the transferred Cryptocurrency (for example, and without limitation, holding it and doing nothing more, lending it, staking it, selling it, or using it in a short sale). Accordingly, there is significant uncertainty with respect to the tax consequences of the Restructuring Transactions to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' Cryptocurrency. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from the Restructuring Transactions, potentially in a way that has a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

Regardless of how the Debtors consummate the Plan, it will likely be necessary to transfer property from non-U.S. Debtors to U.S. Debtors. Any such transfer may directly or indirectly create a material tax liability under non-U.S. tax law, which is not discussed here, and which the Debtors continue to evaluate.

Because the Plan is being structured as a taxable transaction or a liquidation, the Debtors' tax attributes (if any) will not survive the implementation of the Plan. Accordingly, the rules regarding cancellation of indebtedness income are generally inapplicable and the rules regarding section 382 of the IRC are inapplicable and, in each case, not discussed further with respect to the Debtors.

The Debtors continue to evaluate how "dollarization" of certain Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.

The Debtors currently cannot say that there will not be material administrative income tax liabilities that must be satisfied under the Plan.

C.     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.**

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to any U.S. Holder of such a Claim which U.S. Holder will or may receive an in-kind distribution of Liquid Cryptocurrency pursuant to the Plan (either upfront, or a delayed distribution as part of an Orderly Wind Down) which Cryptocurrency (x) the Debtors took U.S. federal income tax ownership of upon such Holder's transfer of such Cryptocurrency to the Debtors, and (y) is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date.

The tax treatment of such Holders under the Plan depends significantly on the tax treatment of their transfer of Cryptocurrency to the Debtors in the first instance. There is uncertainty with respect to whether deposits in which tax ownership of the Cryptocurrency transferred to the Debtors were taxable when they occurred, but the Debtors generally expect that most customers have taken the position that the act of depositing Cryptocurrency with the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of Cryptocurrency for a contractual right to the return of such Cryptocurrency is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on case law that predates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058. On the other hand, with respect to customers, there is also support for the position that the initial deposit of Cryptocurrency is a taxable event because of various provisions in the Terms of Use that narrow a customer's rights with respect to the deposited Cryptocurrency (in particular, provisions related to the Debtors' ability to not support "airdropped" Cryptocurrency or Cryptocurrency issued pursuant to a "hard fork").

To the extent an initial deposit of Cryptocurrency was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of the same kind of Cryptocurrency to customers, because the exchange of the contractual right to the return of such Cryptocurrency for the underlying Cryptocurrency is itself not an exchange of property "differing materially either in kind or in extent." The Debtors emphasize that, like other aspects of Cryptocurrency taxation, this position is subject to significant uncertainty, including because of the existence of Proposed Treasury Regulation Section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities transferred, or

317

otherwise defaults under the agreement.  While this Proposed Treasury Regulation is inapplicable by its terms to Cryptocurrency,  it would very likely cause such a transaction to be taxable to a customer (or other Person that transferred Cryptocurrency to the Debtors in a transaction (such as a "loan" (for commercial purposes but not tax purposes) of Cryptocurrency) intended to be treated as non-taxable in the first instance) if it applied to Cryptocurrency.  Furthermore, with respect to a Holder that receives Cryptocurrency and non-Cryptocurrency in satisfaction of its Claim, if the foregoing argument would apply in the first place to a recovery that comprised solely Cryptocurrency, such argument would need to be supplemented by a general "bifurcation" approach that permitted Holders to take the position that Holders retained their Cryptocurrency positions in a tax-free manner, even if the receipt of other consideration constituted a taxable exchange.  The Debtors emphasize that these positions are unclear.

For Holders whose claims are "dollarized,"[653707] the ability to take the position that an in-kind distribution of Liquid Cryptocurrency is not taxable to Holders is subject to increased risk as a result of such "dollarization" of Claims.  It may be the case that "dollarization" resulted, or will result, in a taxable event to Holders, either as of the Petition Date or as of the Confirmation Date.  If such a taxable event were determined to have occurred, it would be because the contract to receive particular Cryptocurrency was modified, as a result of dollarization, to have an economic "cap."  In light of this, it is unclear whether the argument described above that supports tax-free treatment of an in-kind distribution could still apply.  Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying Cryptocurrency.  However, the Debtors also believe it would be reasonable to assert that this is not a material enough change to underlying entitlements to cause tax events, either because of dollarization in the first instance or to the extent of an in-kind distribution.

Notwithstanding the foregoing uncertainty, the following intended tax treatment is set forth in the Plan: "the Debtors and Holders of Claims will treat and report the return of Liquid Cryptocurrency to Holders of Claims under the Plan, to the extent such amounts are of the same type of Cryptocurrency in which a Holder's Claim was denominated, as a non-taxable transaction to such Holder, except to the extent otherwise required pursuant to a 'final determination' within the meaning of section 1313(a) of the Code."  In other words, and very generally, the Plan provides that the Debtors and such Holders of Claims will treat the return of such Cryptocurrency as a non-taxable event from the Holders' perspective unless, among other things, a court requires otherwise.  The Debtors are not guaranteeing or otherwise making any promises or giving any assurances as to whether such intended tax treatment will be upheld if challenged by any taxing authority.

The Debtors emphasize in the strongest possible terms that the law applicable to deposits and withdrawals of Cryptocurrency from the Debtors, "dollarization," and the consummation of the Plan is subject to extreme uncertainty.  Although there are instructive analogous authorities, there is effectively no "controlling" authority on any of these issues.  Accordingly, there is a material risk that the positions described throughout this discussion (including any intended tax treatment) may not be sustained.  The concept of a non-taxable in-kind distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in-kind to a Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the Holder deposited property with the Debtors.  Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either

---

[653707]    In general, all Claims were "dollarized" as of the Petition Date.

in kind or in extent" from the one that existed when the Holder deposited property with the Debtors (and thus tax-free in-kind treatment would likely be unavailable).

### 3. Class 2 Retail Borrower Deposit Claims.

In satisfaction of its Claim, each Holder of a Retail Borrower Deposit Claim shall receive one of the following treatments: (1) If the Retail Borrower, (i) makes the Retail Advance Obligation Repayment Election and (ii) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Repayment Amount or (2) If the Retail Borrower (i) does not make the Retail Advance Obligation Repayment Election or (ii) fails to repay its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (1) above. Under the Set Off Treatment, such Holder's Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligations outstanding on the Petition Date, and the Retail Borrower will retain the proceeds of its Retail Advance Obligation and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date.

The Retail Borrower ~~Post Set Off~~Post-Set Off Claim, if any, will receive either (i) in a NewCo Transaction, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its pro rata amount of the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable (provided that, for the avoidance of any doubt, any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections). or (ii) in an Orderly Wind Down, its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections. In connection with the above treatment, any interest accrued in respect of a loan owed to the Debtors on and following the Petition Date will not need to be paid or subject to the Set Off Treatment (*i.e.*, it is not included in the definition of Retail Advance Obligation).

Under treatment (1), the repayment of Retail Advance Obligations would be a tax-free transaction to the Class 2 Holder because such repayment would not involve a disposition of Cryptocurrency. To the extent any Cryptocurrency that a U.S. Holder of a Class 2 Claim receives in satisfaction of its Claim under treatment (1) is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

If such tax-free treatment did not apply with respect to such consideration, and with respect to any consideration that a U.S. Holder of a Class 2 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder, with the consequences described below for a Class 4 Holder.

Under treatment (2) (the Set Off Treatment), the setoff would be a taxable transaction to the Class 2 Holder. The setoff could be treated as a disposition of the applicable portion of the Cryptocurrency that such Holder transferred in connection with such Retail Advance Obligation ("Deposit Claim Assets") by the Debtors on behalf of the Holder (following a deemed distribution of such Deposit Claim Assets to such Holder) and the application of the resultant proceeds to such Holder's Retail Advance Obligations. Under such treatment, such U.S. Holder would recognize gain or loss in an

amount equal to the difference between the fair market value of the applicable portion of its Retail Advance Obligations and its adjusted tax basis in the applicable portion of the Deposit Claim Assets. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Deposit Claim Assets constituted a capital asset in the hands of the U.S. Holder, and, potentially, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Under this treatment, there is some amount of uncertainty with respect to how a Holder with differing amounts of tax basis in its deposited Cryptocurrency would calculate taxable income or loss, because it is unclear what portion of the Holder's Cryptocurrency would be treated as having been sold by the Debtors on the Holder's behalf. One possibility is that a "blended" approach would be applied, another is that a Holder could specifically identify lots of Cryptocurrency that are treated as having been sold.

Another possible tax treatment is that the setoff could be treated as a taxable disposition of the applicable portion of such Holder's Retail Borrower Deposit Claim in satisfaction of the Holder's Retail Advance Obligations. If such treatment applied, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of the applicable portion of its Retail Advance Obligations and its adjusted tax basis in the applicable portion of the Retail Borrower Deposit Claim. The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

For the treatment of the Retail Borrower Post-Set Off Claim under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down), see the sections below discussing the tax consequences to General Earn Claims (for the consequences of receiving the Unsecured Claim Distribution Consideration pursuant to a NewCo Transaction or for the consequences of an Orderly Wind Down) or Convenience Claims (for the consequences of receiving the Convenience Class Distribution pursuant to a NewCo Transaction), as applicable.

As noted above, under the Plan, an obligor under a Retail Advance Obligation will not need to pay interest that otherwise would have accrued on and following the Petition Date. The consequences of that are unclear. It is possible that the treatment of postpetition interest under the Plan could cause an obligor to recognize cancellation of indebtedness income ("COD Income"), because such obligor is being relieved from the need to pay such interest or otherwise suffer any economic consequence as a result of such interest. Alternatively, an obligor may be able to take the position that no COD Income should arise as a result of the treatment of such interest under the Plan. Such a position could be supported by the application of the so-called "disputed claims doctrine," pursuant to which the cancellation or settlement of an obligation that is the subject of a bona fide dispute as to its existence or enforceability. In light of the circumstances surrounding Retail Advance Obligations and postpetition interest in respect of such amounts, the Debtors acknowledge that an obligor may take the view that such interest never would have been owed under the relevant contract, even if the Debtors had not made the decision to not attempt to collect such interest (or subject such interest to the ~~Setoff~~ Set Off Treatment). There may be other arguments that an obligor could assert to avoid recognizing COD Income as a result of interest under the Plan. Obligors should consult their own tax advisors regarding the tax consequences of the treatment of postpetition interest under the Plan.

320

4.    *Class 4 Convenience Claims.*

In satisfaction of its Claim, each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount ~~sufficient to provide the same percentage recovery to Holders of Convenience Claims that Holders of General Earn Claims will be provided, as set forth in the final version of the Disclosure Statement that is approved pursuant to the Disclosure Statement Order, but in no case less than~~that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

To the extent any such consideration that a U.S. Holder of a Class 4 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

If such tax-free treatment did not apply with respect to such consideration, or with respect to any consideration that a U.S. Holder of a Class 4 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder.  In such case, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Plan and such U.S. Holder's adjusted tax basis in the Claim (this assumes that all of the consideration is received in a taxable fashion; see immediately below for a discussion of a bifurcated approach).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such Holder's tax basis in such consideration should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in such consideration should begin on the day after the Effective Date.

Where a Holder receives some consideration tax-free and other consideration that is taxable (*e.g.*, some but not all of the consideration that a U.S. Holder of a Class 4 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date), such U.S. Holder would recognize gain or loss in an amount equal to the difference between (x) the fair market value of such consideration received under the Plan in a taxable fashion, and (y) while subject to uncertainty, a proportionate portion of the tax basis in such Claim (possibly based on relative fair market values of the consideration received in a tax-free fashion and the consideration received in a taxable fashion, although other potential ways of calculating gain or loss may exist).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such Holder's tax basis in any consideration received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such consideration should begin on the day after the Effective Date.

 For a very simplified numerical example of the abovementioned methodology (which, for the avoidance of doubt, may be one among others) for determining gain or loss where a Holder receives some consideration tax-free and other consideration that is taxable, assume the following: (a) such Holder has a basis in its Claim of $1,000; (b) such Claim corresponds entirely to Bitcoin that such Holder

previously deposited with the Debtors; and (c) such Holder receives, in satisfaction of its Claim, Bitcoin worth $3,000 and Ethereum worth $2,000.  Pursuant to the above methodology, the Holder would have gain equal to the difference between (x) $2,000 (the fair market value of the Ethereum), and (y) [$2,000 / ($3,000 + $2,000)] x $1,000, i.e., $1,600 of gain.

   5. *Class 5 General Earn Claims.*

    (a) <u>NewCo Transaction.</u>

   In a NewCo Transaction, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall, in satisfaction of its Claim, receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

   To the extent any such consideration constituting Liquid Cryptocurrency that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

   If such tax-free treatment did not apply with respect to such consideration constituting Liquid Cryptocurrency, and with respect to any consideration (including, for the avoidance of doubt, NewCo Common Stock, the receipt of which will be taxable to a U.S. Holder) that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder, with the consequences described above for a Class 4 Holder.

   It is generally expected that a Class 5 Holder should not be taxed on Litigation Proceeds until such Class 5 Holder actually receives such Litigation Proceeds (if at all) after the Effective Date.

    (b) <u>Orderly Wind Down.</u>

   In an Orderly Wind Down, each Holder of an Allowed General Earn Claim shall in satisfaction of its Claim receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

   To the extent any such consideration constituting the Liquid Cryptocurrency Distribution Amount that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

   If such tax-free treatment did not apply with respect to such consideration constituting the Liquid Cryptocurrency Distribution Amount, or with respect to any consideration that a U.S. Holder of a Class 5 Claim receives in satisfaction of its Claim that is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then the exchange will be taxable to the U.S. Holder, with the consequences described above for a Class 4 Holder.

   It is generally expected that a Class 5 Holder should not be taxed on Litigation Proceeds or (if received after the Effective Date) Illiquid Recovery Rights until such Class 5 Holder actually receives such consideration (if at all) after the Effective Date, *provided* that if the consideration ultimately received in respect of the Illiquid Recovery Rights is Cryptocurrency that is the same as the type of

Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then such return may be treated as a tax-free in-kind distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the intended tax treatment set forth above.

### 6.    *Class 6A General Custody Claims.*

Each Holder of an Allowed Custody Claim shall in satisfaction of its Claim receive a distribution of Cryptocurrency, provided, the timing of such distribution and the amount of such distribution will depend on certain elections available to such Holders as described in the Plan. In particular, for a Holder that does not elect to participate in the Custody Settlement Motion and selects Treatment B on its Ballot, the Cryptocurrency associated with the applicable Allowed Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed Custody Claim, and the Litigation Administrator shall have a certain amount of time to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing.

The Debtors have taken the position that they never took ownership for U.S. federal income tax purposes of the Cryptocurrency that Holders of Custody Claims transferred to the Debtors in respect of such Custody Claims. As such, the Debtors believe that it is relatively clear that any such Cryptocurrency that a Class 6 Holder receives in satisfaction of its Claim should be received by such Class 6 Holder in a tax-free manner so long as it is the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, consistent with the intended tax treatment described above.

However, if any such Cryptocurrency is not the same as the type of Cryptocurrency in such U.S. Holder's Celsius Account as of the Petition Date, then it is generally expected that the exchange will be taxable to the U.S. Holder to the extent of such different Cryptocurrency. There is significant uncertainty as to the characterization of the deemed transaction or transactions that would have to occur in order to explain (for tax purposes) how the U.S. Holder receives property other than the property that such U.S. Holder transferred to the Debtors (with the Debtors not initially taking tax ownership of such property), and any Holder in such position is urged to consult its own tax advisors with respect thereto. The Debtors intend to take the position that the appropriate characterization of such transaction is that the Debtors are treated as having exchanged the originally-deposited Cryptocurrency for the type of Cryptocurrency returned in respect of such Claim on the Holder's behalf, resulting in a taxable exchange for such Holder.

### 7.    *Class 7 Withhold Claims.*

In satisfaction of its Claim, each Holder of an Allowed Withhold Claim [654708] that is not an Excluded Party shall receive, as applicable: (1) if Class 7 votes to accept the Plan, (a) a distribution of Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure, and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock); or (2) if Class 7 does not vote to accept the Plan, each such Holder of an Allowed Withhold

---

[654708]    This discussion is only with respect to Holders of Class 7 Claims who initially participated in the Earn Program or Borrow Program (as opposed to other Holders of Class 7 Claims, if any). With respect to those other Holders of Class 7 Claims, it is generally expected that their treatment will be the same as a Holder of a Class 6A Claim to the extent any exist.

Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In an Orderly Wind Down, the above (1) and (2) shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

The U.S. federal income tax consequences to a Holder of an Allowed Withhold Claim of receiving consideration under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down) should be the same as for a Holder of an Allowed General Earn Claim.

### 8. *Class 8 Unsecured Loan Claims.*

In a NewCo Transaction, in satisfaction of its Claim, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock) sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in Article III.M of the Disclosure Statement.

In an Orderly Wind Down, in satisfaction of its Claim, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

The exchange will be taxable to the U.S. Holder. The U.S. Holder will recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down) and such U.S. Holder's adjusted tax basis in the Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder has previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange. Such Holder's tax basis in any such property should equal the fair market value of such property as of the Effective Date, and such Holder's holding period in any such property should begin on the day after the Effective Date.

### 9. *Class 9 General Unsecured Claims.*

In a NewCo Transaction, in satisfaction of its Claim, each Holder of an Allowed General Unsecured Claim shall receive Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock) sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in Article III.ME of the Disclosure Statement.

In an Orderly Wind Down, in satisfaction of its Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

The treatment to each such Holder under the Plan (either pursuant to a NewCo Transaction or an Orderly Wind Down) will be as described for Holders of Allowed Class 8 Claims.

### 10. Class 1~~04~~ Series B Preferred Interests.

In satisfaction of its Claim, each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to the Series B Settlement Order.

Because a Holder of an Allowed Series B Preferred Interest will have no continuing interest in NewCo after the Effective Date, the exchange will be treated as a redemption for U.S. federal income tax purposes and will therefore be taxable to such Holder.  Such Holder will recognize gain or loss in an amount equal to the difference between the fair market value of such Pro Rata share of the Series B Settlement Consideration and such U.S. Holder's adjusted tax basis in the Claim.  In light of the terms of the Series B Settlement, which provides for a payment of approximately $25 million, of which $24 million is owed to counsel for Series B Holders, it is somewhat unclear whether Holders should be treated for U.S. federal income tax purposes as receiving as consideration under the Series B Settlement $25 million or $1 million.  While not free from doubt, if a Holder was treated as receiving its Pro Rata share of $25 million (*i.e.*, the Cash settlement amount *gross* of fees), a Holder would potentially be able to reduce its Pro Rata share of such amount realized by its Pro Rata allocation of the fees incurred in connection with receiving such recovery or, potentially, claim a deduction in respect of the incurrence of such fees.  Alternatively, while not free from doubt, if a Holder was treated as receiving its Pro Rata share of $1 million (*i.e.*, the Cash settlement amount *net* of fees), then such Holder would presumably not be entitled to also capitalize or deduct the associated legal fees.  Holders of Allowed Series B Preferred Interests should consult their own tax advisors regarding the appropriate treatment of the Series B Settlement Consideration.

### 11. Net Investment Income Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 12. Limitations on Use of Capital Losses.

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Consideration Received Under the Plan.

#### 1.    Cryptocurrency.

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control

and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party Cryptocurrency exchange (if any) to which such Holder transfers any such Cryptocurrency, and (ii) the activities that such Holder and/or such third-party Cryptocurrency exchange (if applicable) pursue with respect to such Cryptocurrency. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Cryptocurrency (regardless of how the Restructuring Transactions are consummated).

2. *NewCo Common Stock.*

Any distributions made on account of the NewCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of NewCo as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its NewCo Common Stock. Any such distributions in excess of the U.S. Holder's basis in its NewCo Common Stock (determined on a share-by-share basis) generally will be treated as capital gain. Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of NewCo Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the NewCo Common Stock for more than one year, taking into account the holding period rules described above. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations.

**E.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder and the ownership and disposition of NewCo Common Stock, as applicable.

1. *Gain Recognition.*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United

States).  If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  *The taxation of Cryptocurrency is extremely uncertain, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Cryptocurrency-related activities (including activities on exchanges such as the Debtors').*

> 2.  *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Cryptocurrency Received Under the Plan.*

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Cryptocurrency received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party Cryptocurrency exchange (if any) to which such Holder transfers any such Cryptocurrency, and (ii) the activities that such Holder and/or such third-party Cryptocurrency exchange (if applicable) pursue with respect to such Cryptocurrency.  Non-U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Cryptocurrency (regardless of how the Restructuring Transactions are consummated).

> 3.  *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of NewCo Common Stock Received Under the Plan.*

> (a)  Dividends on NewCo Common Stock.

Any distributions made with respect to NewCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of NewCo's current or accumulated earnings and profits as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain).  Except as described below, such dividends paid with respect to NewCo Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to NewCo Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits

327

tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(b)     Sale, Redemption, or Repurchase of NewCo Common Stock.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of stock unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such stock is or has been during a specified testing period a "U.S. real property holding corporation" under the Foreign Investment in Real Property Tax Act rules.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

F.    FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### G.     Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.  THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.**

## XIII.   RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: ~~July~~August ~~2~~9, 2023          Celsius Network LLC
                                             on behalf of itself and all other Debtors

_/s/ Christopher Ferraro_

Name:  Christopher Ferraro

Title:    Interim Chief Executive Officer, Chief Financial
Officer, and Chief Restructuring Officer
Celsius Network LLC

## EXHIBIT A

**Plan of Reorganization**

[*Filed Separately*]

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

# EXHIBIT B

# LIQUIDATION ANALYSIS

**INTRODUCTION**

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that each holder of a claim or interest in each impaired class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests test, the Debtors, with the assistance of their financial advisors, have prepared this hypothetical liquidation analysis (the "**Liquidation Analysis**") and have taken the following steps:

    i)   estimated the cash proceeds that a chapter 7 trustee (a "**Trustee**") would generate if each Debtor's chapter 11 case was converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated (the "**Liquidation Proceeds**");

    ii)  determined the distribution that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme set forth in chapter 7 of the Bankruptcy Code (the "**Liquidation Distribution**"); and

    iii) compared each Holder's Liquidation Distribution to the distribution such Holder would receive under the Debtors' Plan if the Plan were confirmed and consummated.

This Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is, therefore, a hypothetical analysis based on certain assumptions discussed herein and in the Disclosure Statement. As such, asset values and claims discussed herein may differ materially from amounts referred to in the Plan and Disclosure Statement. This Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth below.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in

---

[1]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Disclosure Statement to which this Liquidation Analysis is attached as <u>Exhibit B</u> or the Plan attached to the Disclosure Statement as <u>Exhibit A</u> thereto, as applicable.

accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended, and should not be used, for any other purpose.

All limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein.  The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants and was not prepared to comply with Generally Accepted Accounting Principles or SEC reporting requirements.

Based on this Liquidation Analysis, the Debtors, with the assistance of their advisors, believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.  The Debtors believe that this Liquidation Analysis and the conclusions set forth herein are fair and represent the Debtors' best judgment regarding the results of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS.  IN THE EVENT THESE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7 LIQUIDATIONS, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH IN THIS LIQUIDATION ANALYSIS.

**BASIS OF PRESENTATION**

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation commences on or about November 30, 2023 (the "**Liquidation Date**"). The pro forma values referenced herein are projected as of the Liquidation Date and utilize (i) a valuation of certain of the Debtors' assets prepared by Stout Risius Ross, LLC as of May 31, 2023 (the "**Valuation Report**"), (ii) input from the Debtors' management team and advisors, and (iii) projected results of operations and cash flows over the period from May 31, 2023 to the Liquidation Date (the "**Projection Period**"). The Liquidation Analysis was prepared on a legal entity basis for each Debtor and, for presentation purposes, summarized into a consolidated report. As part of the Liquidation Analysis, the Debtors assume the Trustee would liquidate each of the Debtors and each of the wholly-owned non-filing subsidiaries of the Debtors.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based on scheduled liabilities as of the Petition Date and certain Filed claims following the Petition Date and during the Projection Period. The cessation of business in a liquidation is likely to trigger certain claims and funding requirements that would otherwise not exist under the Plan. Such claims could include contract rejection damages claims, chapter 7 administrative expense claims, including wind down costs, trustee fees, and professional fees, among other claims. Some of these claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from Liquidation Proceeds. The Debtors' estimates of Allowed Claims set forth in the Liquidation Analysis should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM OR INTEREST BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

The Liquidation Analysis assumes Celsius Network Limited, Celsius Network LLC, Celsius Networks Lending LLC, and Celsius Lending LLC (the "**Consolidated Debtors**") are substantively consolidated for purposes of the Plan, subject to the following: (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.

To the extent the consolidation of the Consolidated Debtors is not approved under the Plan, the Debtors, with the assistance of their advisors, still believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the

Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

Chapter 7 administrative expense claims that arise in a liquidation scenario would be paid in full from the Liquidation Proceeds prior to proceeds being made available for distribution to Holders of Allowed Claims.  Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full.  The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

The commencement of chapter 7 liquidation may trigger certain additional claims that would otherwise not exist under the Plan, such as contract rejection damage claims, that are not reflected herein.  Additionally, the Liquidation Analysis does not estimate contingent, unliquidated claims, regulatory claims, or the Class Claim Filed by the Committee.  Finally, the Liquidation Analysis does not include estimates for the tax consequences that may be triggered upon the liquidation and sale of assets.  Such tax consequences could be material.

Proceeds available for distribution to Holders of Allowed Claims under the Liquidation Analysis are reduced by the Initial Litigation Funding Amount.  The Liquidation Analysis does not include any recoveries from the Litigation Recovery Account, as any such recoveries, including their amounts and frequencies, are uncertain.

**LIQUIDATION PROCESS**

The Debtors' liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code.  The Debtors have assumed that their liquidation would occur over a period of approximately six months (the "**Liquidation Period**") during which time the Trustee would monetize substantially all the assets on the consolidated balance sheet and administer and wind down the Estates.[2]

As part of the Trustee's liquidation process, the initial step would be to develop a liquidation plan designed to generate proceeds from the sale of assets that the Trustee would then distribute to creditors.  The Liquidation Analysis assumes all Liquid Cryptocurrency is sold.  This liquidation process would have four major components:

    i)   Cash proceeds from asset sales, including the sale of all Cryptocurrency, illiquid assets, and the mining assets ("**Gross Liquidation Proceeds**");

    ii)   Costs to liquidate the business and administer the Estates under chapter 7 ("**Liquidation Adjustments**");

    iii)  Redistribution of assets on account of intercompany claims and interests ("**Intercompany Redistributions**"); and

    iv)  Remaining proceeds available for distribution to claimants ("**Net Liquidation Proceeds Available for Distribution**").

---

[2]    Although the Liquidation Analysis assumes the liquidation process would occur over a period of six months, it is possible the disposition and recovery from certain assets could take shorter or longer to realize.

#### i)  Gross Liquidation Proceeds

The Gross Liquidation Proceeds reflect the estimated proceeds the Trustee would generate from a hypothetical chapter 7 liquidation.  Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.  This Liquidation Analysis assumes the Trustee will market the assets on an accelerated timeline and consummate the sale transactions within six months from the Liquidation Date.  The Liquidation Analysis assumes the sale of all Cryptocurrency for Cash, including Liquid Cryptocurrency and other illiquid Cryptocurrency investments.  Asset values in the liquidation process will likely be materially reduced due to, among other things, (i) the accelerated time frame in which the assets are marketed and sold, (ii) negative vendor and customer reaction, and (iii) the generally forced nature of the sale.

The Trustee would also seek to sell substantially all of the Debtors' mining assets on an expedited basis, consistent with section 704 of the Bankruptcy Code.  It is unlikely that a Trustee would be able to sell the assets as a going-concern business, and the total proceeds from the sale of the mining assets may be materially lower than the value that would otherwise be realized under the Plan.

#### ii)  Liquidation Adjustments

Liquidation Adjustments reflect the costs the Trustee would incur to monetize the assets and wind down the Estates in chapter 7 and include the following:

- Expenses necessary to efficiently and effectively monetize the assets (the "**Liquidation Costs**");

- Chapter 7 professional fees (lawyers, financial advisors, and investment bankers to support the sale and transition of assets over the Liquidation Period); and

- Chapter 7 Trustee fees.

#### iii) Intercompany Redistributions

For purposes of determining the recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor affiliates and (ii) the Debtors' equity interests in non-Debtor affiliate subsidiaries, individual liquidation analyses were performed on each Debtor and non-Debtor affiliate on a standalone basis.  When a Debtor has an intercompany receivable or interest in another Debtor, this serves to redistribute proceeds available for distribution amongst each Debtor entity.

#### iv)  Net Liquidation Proceeds Available for Distribution

The Net Liquidation Proceeds Available for Distribution reflect estimated amounts available to Holders of Claims and Interests after the Liquidation Adjustments are netted against the Gross Liquidation Proceeds.  Under this analysis, the Liquidation Proceeds are distributed to Holders of

Claims against, and Interests in, the Debtors in accordance with the Bankruptcy Code's priority scheme.

**CONCLUSION**

The Debtors have determined, as summarized in the table below, on the Effective Date, that the Plan, under both a NewCo Plan or a toggle to Orderly Wind Down, will provide all Holders of Allowed Claims and Interests with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code. [3]

**(Modified graphics)**

| Class | | Recovery Under Plan | | Liquidation Analysis |
| --- | --- | --- | --- | --- |
| | | NewCo | Orderly Wind Down | |
| Other Secured Claims | Class 1 | N/A | N/A | N/A |
| Retail Borrower Deposit Claims | Class 2 | 86.4% | 83.3% | 47.6% |
| Other Priority Claims | Class 3 | N/A | N/A | N/A |
| Convenience Claims | Class 4 | 70.0% | 70.0% | N/A |
| General Earn Claims (1) | Class 5 | 68.5% | 61.5% | 47.6% |
| General Custody Claims (1) | Class 6A | 72.5% | 72.5% | 72.5% |
| Withdrawable Custody Claims (1) | Class 6B | 100.0% | 100.0% | 100.0% |
| Withhold Claims | Class 7 | 73.3% | 67.3% | 47.6% |
| General Unsecured Claims | Class 8 | 68.5% | 61.5% | 37.6% |
| State Regulatory Claim (2) | Class 9 | 68.5% | 61.5% | 37.6% |
| De Minimis Claims | Class 10 | 0.0% | 0.0% | 0.0% |
| Intercompany Claims | Class 11 | N/A | N/A | 47.5% |
| Intercompany Interests | Class 12 | N/A | N/A | N/A |
| Series B Preferred Interests | Class 13 | 0.1% | 0.1% | 0.1% |
| Other Interests | Class 14 | 0.0% | 0.0% | 0.0% |
| Section 510(b) Claims | Class 15 | N/A | N/A | N/A |
| Equitably Subordinated Claims | Class 16 | 0.0% | 0.0% | 0.0% |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*

*(2) The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators*

**The Liquidation Analysis should be reviewed with the accompanying "Specific Notes to the Liquidation Analysis" set forth on the following pages. The below tables reflect the consolidation of the standalone liquidation analyses for each Affiliate Debtor for illustrative purposes.**

---

[3] Recoveries shown in the table do not contemplate any Allowed Claims on account of contingent, unliquidated claims, regulatory claims, or the Class Claim brought by the Committee.

## Consolidated Debtor Liquidation Waterfall

**(Modified graphics)**

| Liquidated Balance Sheet | | /2023 | Adj. | Pro Forma | Low | Mid | High | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Assets** | | | **Estimated Recovery - %** | | | **Estimated Liquidation Value** | |
| Cash | [A] | $ 92 | $ (92) | $ - | - | - | - | $ - | $ - | $ - |
| Fireblocks | [B] | 1,031 | (120) | 911 | 94% | 97% | 100% | 855 | 883 | 909 |
| Institutional Loans receivable | [C] | 75 | - | 75 | 28% | 37% | 47% | 21 | 28 | 35 |
| DeFi/Staking Assets | [D] | 1,653 | (56) | 1,597 | 91% | 94% | 98% | 1,456 | 1,509 | 1,558 |
| Custody Holdings | [E] | 160 | 93 | 253 | 90% | 95% | 99% | 228 | 241 | 250 |
| Investments | [F] | 129 | - | 129 | 25% | 50% | 75% | 32 | 64 | 97 |
| Retail Advance Obligation | [G] | 410 | (410) | - | - | - | - | - | - | - |
| Mining Assets | [H] | 565 | - | 565 | 12% | 16% | 19% | 70 | 88 | 105 |
| **Gross Liquidation Assets** | | **$ 4,114** | **$ (585)** | **$ 3,529** | **75%** | **80%** | **84%** | **$ 2,662** | **$ 2,812** | **$ 2,953** |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | | | |
| Liquidation Costs | [I] | | | | | | | (50) | (50) | (50) |
| Chapter 7 Professional and Broker Fees | [J] | | | | | | | (25) | (25) | (25) |
| Chapter 7 Trustee Fees | [K] | | | | | | | (80) | (84) | (89) |
| **Total Chapter 7 Liquidation Adjustments** | | | | | | | | **$ (155)** | **$ (159)** | **$ (164)** |
| **Net Liquidation Assets** | | | | | | | | **$ 2,507** | **$ 2,653** | **$ 2,790** |
| **Redistribution on Account of Intercompany Claims and Interests** | | | | | | | | | | |
| Redistribution on Account of Pre-Petition Intercompany Balances | [L] | | | | | | | - | - | - |
| Redistribution on Account of Post-Petition Intercompany Balances | [M] | | | | | | | 0 | 0 | 0 |
| Redistribution on Account of Intercompany Interests | [N] | | | | | | | 58 | 58 | 62 |
| **Total Recovery on Account of Intercompany Claims and Interests** | | | | | | | | **$ 58** | **$ 58** | **$ 62** |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | | | | **$ 2,562** | **$ 2,711** | **$ 2,852** |

### Claims and Recoveries

| Administrative Claims | | Petition Date | Adj. | Claim | Low | Mid | High | Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Total Estimated Claim** | | | **Total Recovery - %** | | | **Total Recovery - $** | |
| Administrative Claims | | 85 | - | 85 | 100% | 100% | 100% | 85 | 85 | 85 |
| Priority Tax Claims | | - | - | - | - | - | - | - | - | - |
| **Total Administrative Claims** | [O] | **$ 85** | **$ -** | **$ 85** | **100%** | **100%** | **100%** | **$ 85** | **$ 85** | **$ 85** |
| **Remaining Distributable Value after Administrative Claims** | | | | | | | | **$ 2,477** | **$ 2,626** | **$ 2,767** |
| **Settled Claims** | | | | | | | | | | |
| Withdrawable Custody Claims[1] | [P] | 48 | - | 48 | 100% | 100% | 100% | 48 | 48 | 48 |
| General Custody Claims[1] | [Q] | 218 | - | 218 | 73% | 73% | 73% | 158 | 158 | 158 |
| **Total Settled Claims** | | **$ 266** | **$ -** | **$ 266** | **77%** | **77%** | **77%** | **$ 206** | **$ 206** | **$ 206** |
| **Remaining Distributable Value after Settled Claims** | | | | | | | | **$ 2,270** | **$ 2,419** | **$ 2,560** |
| **Unsecured Claims** | | | | | | | | | | |
| General Earn Claims | [R] | 4,083 | - | 4,083 | 44% | 48% | 50% | 1,818 | 1,933 | 2,049 |
| Withhold Claims | [S] | 13 | - | 13 | 44% | 48% | 50% | 6 | 6 | 7 |
| Unsecured Loan Claims | [T] | 88 | - | 88 | 44% | 48% | 50% | 39 | 42 | 44 |
| Retail Borrower Deposit Claims | [U] | 763 | - | 763 | 44% | 48% | 50% | 339 | 362 | 382 |
| General Unsecured Claims | [V] | 50 | - | 50 | 35% | 38% | 40% | 17 | 19 | 20 |
| Intercompany Claims | | 121 | - | 121 | 44% | 47% | 50% | 54 | 57 | 60 |
| **Total Unsecured Claims** | | **$ 5,117** | **$ -** | **$ 5,117** | **44%** | **47.87%** | **50%** | **$ 2,270** | **$ 2,419** | **$ 2,560** |
| **Remaining Distributable Value after Unsecured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Redistribution on Account of Intercompany Interests | | | | | | | | - | - | - |
| **Remaining Distributable Value after Intercompany Interests** | | | | | | | | **$ -** | **$ -** | **$ -** |
| **Total Claims / Total Recovery** | | **$ 5,468** | **$ -** | **$ 5,468** | **47%** | **50%** | **52%** | **$ 2,562** | **$ 2,711** | **$ 2,852** |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*

SPECIFIC NOTES TO THE LIQUIDATION ANALYSIS

*Gross Liquidation Proceeds from External Assets*

The below table summarizes the estimated recovery percentages for each of the Debtors' assets. Net Liquidation Proceeds Available for Distribution resulting from the sales of non-Debtor assets are recovered by the Debtors via settlement of intercompany receivables and/or equity distributions taking into account the priority of claims that reside at each non-Debtor.

| Note | Asset Type / Assumptions | Debtors' Projected Recovery (Mid) |
|---|---|---|
| A | Cash consists of all unrestricted Cash deposits in savings, operating, receipt, and disbursement accounts. The valuation date Cash balance has been adjusted pro forma to the Liquidation Date, including monetization of coins in Fireblocks for the estimated cash shortfall to fund these Chapter 11 Cases through the Liquidation Date. | 100% |
| B | Fireblocks includes Liquid Cryptocurrency coins and tokens held on in Fireblocks. Although these coins and tokens are generally liquid and available to trade, certain coins have more liquidity than others on exchanges or the open market. BTC, ETH, and stablecoins are estimated to recover 95% to 100%, while less liquid alt coins are estimated to recover 50% to 90%. The blended recovery for assets in Fireblocks is estimated to be 94% to 100%. | 97% |
| C | Institutional Loans receivable reflects the receivable for principal issued to Holders of Institutional Loans<br><br>**Active Counterparties:**<br>Loans with active counterparties are estimated to recover 30% to 50% of their fair market value.<br><br>**Default Counterparties:**<br>The analysis assumes minimal or no recovery on defaulted loans. | 37% |
| D | DeFi/Staking Assets consist of Cryptocurrency directly staked on respective networks, undeployed ETH held in DeFi workspaces, and Cryptocurrency staked through Stakehound or placed onto DeFi protocols. Direct staked ETH and undeployed ETH in DeFi workspaces are assumed to be liquid prior to the Liquidation Date, | 94% |

| Note | Asset Type / Assumptions | Debtors' Projected Recovery (Mid) |
|------|--------------------------|-----------------------------------|
|  | and thus estimated to recover 95% to 100% similar to Cryptocurrency in Fireblocks. Stakehound and assets in DeFi protocols are assumed to not be immediately available in liquidation and are estimated to recover 30% to 50%. The aggregate recovery on total DeFi/Staking Assets is estimated to be 91% to 98%. |  |
| E | Custody Holdings reflect Cryptocurrency deposited into Custody Wallets that are assumed to be available to liquidate on or shortly after the Liquidation Date. Certain users were granted the ability to withdraw their Custody balances in advance of the Effective Date; however, the Liquidation Analysis reflects the estimated full Custody Asset amount for illustrative purposes. Cryptocurrency held in Custody is assumed to receive the same recovery by coin type as Fireblocks assets resulting in an estimated recovery of 90% to 99%. | 95% |
| F | Investments reflects alternative investments made in blockchain platforms, mining platforms, convertible notes and equity investments. The fair market value of these investments was estimated in the Valuation Report. An adjustment to the fair value of the investments was applied in the Liquidation Analysis due to the expedited sale of these assets and the uncertainty of recoverability, resulting in an estimate recovery of 25% to 75% of the fair market value. | 50% |
| G | The Liquidation Analysis assumes borrowers are unlikely to repay their Retail Advance Obligations and would not be granted the set-off against Retail Borrower Deposit Claims that is currently contemplated in the Plan. The Liquidation Analysis estimates 0% recovery on Retail Advance Obligations. | 0% |
| H | Mining Assets include mining hardware and proprietary mining sites owned by the Debtors. Although a valuation analysis was performed to value these assets, certain components were valued as a going concern. The Liquidation Analysis assumes that these rigs and proprietary sites will be liquidated on a condensed timeline and estimates a recovery of 12% to 19% of the fair market value of the going concern business. | 16% |

### *Liquidation Adjustments*

I.  Wind-Down Costs

Consist of employee costs; sales, general and administrative ("**SG&A**") expenses, third-party distribution fees, network fees, and expense reimbursement for plan termination. Employee costs include payroll taxes, employee benefits and retention bonuses that may be necessary to retain certain employees to effectuate the liquidation. Third-party costs to distribute represent fees paid to a third-party to meet certain regulatory requirements for customers (including "Know Your Customer" activities), set up receiving wallets, and manage distributions. Total wind-down costs are estimated to be $50 million.

J.  Chapter 7 Professional Fees

The chapter 7 professional fees include estimates for certain professionals that will provide assistance and services to the Trustee during the Liquidation Period. The Liquidation Analysis assumes the Trustee will retain lawyers, financial advisors, and investment bankers to assist in the liquidation. These advisors will assist in marketing the Debtors' assets, litigating claims and resolving tax litigation matters, and resolving other matters relating to the liquidation of the Debtors' Estates. The advisors will also collect broker fees for the sale of certain alternative investments. Total professional fees are estimated to be $25 million.

K.  Trustee Fees

Section 326(a) of the Bankruptcy Code provides that Trustee fees may not exceed 3% of distributable proceeds *in excess* of $1 million. The Liquidation Analysis assumes the Trustee fees would be approximately 3% of Gross Liquidation Proceeds from external assets, which equals approximately $80 million to $89 million, in the low and high cases, respectively.

### *Recovery on Intercompany Receivables and Interests*

For purposes of determining the recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor affiliates and (ii) the Debtors' equity interests in non-Debtor affiliate subsidiaries, individual liquidation analyses were performed on each Debtor and non-Debtor affiliate on a standalone basis. The recoverability of the Debtors' intercompany receivables and investments in subsidiaries was calculated prior to determining the Net Liquidation Proceeds Available for Distribution to the Debtors' Claimants.

L.  Prepetition Intercompany Receivables

Historically, the Debtors and their Debtor and non-Debtor affiliates created intercompany receivables and payables primarily driven by the transfer of Cryptocurrency denominated assets and liabilities between entities. The Liquidation Analysis does not assume any recoverability of prepetition intercompany receivables owed to the Debtors from non-Debtor affiliates.

M.  Postpetition Intercompany Balances

Intercompany receivables between Debtor and non-Debtor entities that occurred from postpetition transactions receive superpriority administrative expense status, in accordance with

the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152].

N.  Intercompany Interests

The Debtors' investments in affiliates and subsidiaries include the Debtors' equity interests in Debtor and non-Debtor affiliates.  The recoverability of the investments in affiliates and subsidiaries owed to the Debtors is estimated to be approximately $54 million to $62 million resulting from the remaining distributable assets from subsidiaries that are not distributed to Claimants at those entities.

### ***Net Liquidation Proceeds Available for Distribution***

Based on the Liquidation Analysis, the Net Liquidation Proceeds Available for Distribution to the Debtors' Holders of Claims and Interests range from approximately $2.6 billion to $2.9 billion.

### ***Claims***

O.  Administrative Claims

For the purposes of this Liquidation Analysis, Administrative Claims consist of claims for costs and expenses of administration incurred during the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, claims for postpetition accounts payable, postpetition accrued taxes, accrued and unpaid fees and expenses as of the Liquidation Date of professionals other than Debtor Professionals and Committee Professionals.  The Liquidation Analysis estimates approximately $85 million in Chapter 11 Administrative Claims at the Liquidation Date.  The Liquidation Analysis estimates 100% recovery to Chapter 11 Administrative Claims.

P.  Withdrawable Custody Claims

Consists of all Pure Custody Claims and Eligible Transferred Custody Claims that are eligible for withdrawal under the Custody Settlement Order.  These Claims are estimated to receive 100% recovery through in-kind distribution under the Liquidation Analysis rather than a percentage of their coins dollarized as of the Petition Date.

Q.  General Custody Claims

Consist of Claims from customers with deposits in Custody Wallets that were not permitted to withdraw under the Custody Settlement Order.  These claims are estimated to receive 72.5% recovery through in-kind Cryptocurrency distributions under the Liquidation Analysis rather than a percentage of their coins dollarized as of the Petition Date.

R.  General Earn Claims

General Earn Claims consist of user Cryptocurrency deposit balances in the Earn Program. Cryptocurrency balances are dollarized as of the Petition Date except for CEL Tokens which receive a claim of $0.2~~0~~5.  Total General Earn Claims are estimated to be approximately $4.1 billion and recover 4~~5~~4% to 50% in liquidation.

S.  <u>Withhold Claims</u>

Under a chapter 7 liquidation, the Withhold Settlement will not occur, and Withhold Claims will receive treatment *pari passu* to unsecured claims and receive a Pro Rata share of the Unsecured Claim Distribution Consideration.  Withhold Claims will receive an approximate recovery of 4~~5~~4% to 50%.

T.  <u>Unsecured Loan Claims</u>

Unsecured Loan Claims arise from borrowings made by the Debtors with institutional counterparties.  These counterparties have filed claims totaling $88 million and are estimated to recover 4~~5~~4% to 50% in liquidation.

U.  <u>Retail Borrower Deposit Claims</u>

Retail Borrower Deposit Claims represent the full balance of the Cryptocurrency transferred by Retail Borrowers in connection with their Retail Advance Obligations,[4] dollarized as of the Petition Date. Retail Borrower Deposit Claims are estimated to be $76~~1~~3 million and recover 4~~5~~4% to 50% in the Liquidation Analysis.

V.  <u>General Unsecured Claims</u>

Claims without security interests and not otherwise entitled to administrative or priority treatment including, but not limited to, prepetition trade amounts not paid pursuant to relief granted pursuant to the First Day Motions, rejected and contemplated rejection of executory contracts.  The Liquidation Analysis assumes there would be 35% to 40% recovery for General Unsecured Claims.

---

[4]    "Retail Advance Obligation" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

**<u>EXHIBIT C</u>**

**Orderly Wind Down Analysis**

## EXHIBIT C

## ORDERLY WIND DOWN

### INTRODUCTION

The Debtors will effectuate an Orderly Wind Down if, at any time prior to or after Confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine that an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing NewCo; *provided* that the Debtors and Committee may move for an Orderly Wind Down by providing written notice to the Plan Sponsor and after notice and a hearing before the Bankruptcy Court.

In the event of an Orderly Wind Down, (a) the Backup Plan Sponsor, with the support of the Debtors and their advisors, will wind down the Estates and (b) the Debtors' Cryptocurrency, Cash, and other assets will be distributed, in each case, in an orderly manner.

Upon the Debtors' determination, in consultation with the Committee, the Backup Plan Sponsor will adopt and implement the services detailed in the Backup Plan Sponsor Agreement,[1] and approve and oversee the investment policy, any policies regarding conflicts of interest, and all major investment and operational decisions of the Estates. In accordance with the Plan Administrator Agreement and the Wind-Down Procedures, the Backup Plan Sponsor will perform the following services:

- Manage the Estates' day-to-day business and operations, including managing their liquidity and capital resources;

- Evaluate, manage, negotiate, and oversee the disposition of all or any part of the property or assets of the Estates;

- Establish a pure play, publicly traded mining business in which the Debtors' creditors will receive 100% of the equity interests;

- Oversee and manage the timely distributions of Liquid Cryptocurrency and equity interests in the mining business pursuant to the Plan and the Confirmation Order in an expeditious but orderly manner that does not unduly prolong the duration of such distributions; and

- Perform any other services for and on behalf of the Estates to the extent necessary or appropriate.

All limitations and risk factors set forth in the Disclosure Statement are applicable to this Orderly Wind Down and are incorporated by reference herein. The underlying financial information in the Orderly Wind Down was not compiled or examined by independent accountants and was not prepared to comply with Generally Accepted Accounting Principles or SEC reporting requirements.

---

[1]    If the Debtors decide to pivot to the Orderly Wind Down, they may do so on terms set forth in the Backup Plan Sponsor Agreement or on terms that provide a better recovery to the Debtors' creditors than the Backup Plan Sponsor Agreement.

THE DEBTORS AND THEIR ADVISORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES CONTAINED HEREIN OR THE BACKUP PLAN SPONSOR'S ABILITY TO ACHIEVE FORECASTED RESULTS.  IN THE EVENT THE PLAN IS CONVERTED TO AN ORDERLY WIND DOWN, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES SET FORTH HEREIN.

### BASIS OF PRESENTATION

The Orderly Wind Down has been prepared assuming that the Debtors, the Committee, and their respective advisors determine to toggle to an Orderly Wind Down that commences on or about November 30, 2023 (the "**Wind Down Date**").  The pro forma values referenced herein are projected as of the Wind Down Date and utilize (i) a valuation of certain of the Debtors' assets prepared by Stout Risius Ross, LLC as of May 31, 2023, (the "**Valuation Report**"), (ii) input from the Debtors' management team and advisors, and (iii) projected results of operations and cash flows over the period from May 31, 2023 to the assumed Wind Down Date (the "**Projection Period**").

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE FINANCIAL RESULTS AND MUST BE CONSIDERED.  ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

As part of the Orderly Wind Down, administration of the Debtors' assets (the "Wind Down Estate") would be assumed by the Backup Plan Sponsor to manage the wind down of the Debtors' operations and make timely distributions in accordance with the Plan.  In preparing the Orderly Wind Down, the Debtors estimated Allowed Claims based on scheduled liabilities as of the Petition Date and certain Filed Claims.  The commencement of an Orderly Wind Down may trigger certain additional Claims that would otherwise not exist under the Plan, such as contract rejection damage claims, that are not reflected herein.  Additionally, the Orderly Wind Down does not estimate contingent, unliquidated claims, regulatory claims, or the Class Claim brought by the Committee.  Finally, the Orderly Wind Down does not include estimates for the tax consequences that may be triggered upon the wind down and sale of assets.  Such tax consequences could be material.

The Orderly Wind Down may also result in additional fees that would otherwise not exist under the Plan for wind down Plan administration. Some of these Claims and funding obligations could be significant and would be entitled to administrative or priority status in payment from the distributable assets of the Estate. The Debtors' estimates of Allowed Claims set forth in the Orderly Wind Down should not be relied on for the purpose of determining the value of any distribution to be made on account of Allowed Claims or Interests under the Plan.

Administrative expense claims that arise in an Orderly Wind Down would be paid in full from the Orderly Wind Down proceeds, prior to proceeds being made available for distribution to Holders of Allowed Claims. Under the "absolute priority rule," no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Orderly Wind Down are estimated in accordance with the absolute priority rule.

NOTHING CONTAINED IN THE ORDERLY WIND DOWN IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM OR INTEREST BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS AND INTERESTS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE ORDERLY WIND DOWN. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

Proceeds available for distribution to Holders of Allowed Claims under the Orderly Wind Down are reduced by the Initial Litigation Funding Amount. The Orderly Wind Down does not include any recoveries from the Litigation Recovery Account, as any such recoveries, including their amounts and frequency, are uncertain.

### WIND DOWN PROCESS

The Orderly Wind Down would be conducted pursuant to the Wind-Down Procedures and the Plan. The Debtors have assumed that the wind down would occur over a period of approximately five years (the "**Wind Down Period**") during which time the Backup Plan Sponsor would monetize, in a value-maximizing, orderly process, substantially all the Debtors' non-mining assets while managing the day-to-day operations required to do so.[2] Additionally, the Backup Plan Sponsor would work to establish a pure play, publicly traded mining business in which the Holders of Allowed Claims would receive 100% of the equity interests.

As part of the Wind-Down Procedures, an asset sale process would be established to generate proceeds from the sale of assets that would then be distributed to creditors. This wind down process would include three major components:

i) **Proceeds:** Liquid Cryptocurrency, proceeds from asset sales, and the equity in a pure play, publicly traded mining business (collectively, the "**Gross Wind Down Proceeds**"):

---

[2] Although the Orderly Wind Down assumes the Wind Down Period would occur over a period of five years, it is possible the disposition and recovery from certain assets could take shorter or longer to realize.

ii) **Expenses:** fees and expenses to administer the wind down ("**Orderly Wind Down Expenses**"); and

iii) **Recoveries:** periodic distributions of Liquid Cryptocurrency and equity in the mining business to Claimants resulting from the Orderly Wind Down ("**Wind Down Recoveries**").

## i)   Gross Wind Down Proceeds

The Gross Wind Down Proceeds reflect total Liquid Cryptocurrency, proceeds generated from the sale and collection of assets during the Wind Down Period, and equity in the publicly traded mining business. This Orderly Wind Down assumes assets are marketed in a value-maximizing manner over the Wind Down Period. The proceeds are expected to be greater than those that would be realized under a Chapter 7 liquidation due to, among other factors, (i) the longer time frame under which assets will be sold, (ii) the ability to operate the Wind Down Estate to earn yield/interest on certain assets, and (iii) the industry knowledge and network of the Backup Plan Sponsor to monetize assets at or near market values. Additionally, the Gross Wind Down Proceeds include the equity in a pure play, publicly traded mining business, which the Backup Plan Sponsor will seek to establish with the Debtors' mining assets.

## ii)  Orderly Wind Down Expenses

The Orderly Wind Down Expenses reflect the fees incurred and paid to the Backup Plan Sponsor as defined in the Backup Plan Sponsor Agreement, professional fees, and operating expenses incurred by the Wind Down Estate over the Wind Down Period.

## iii) Wind Down Distributions

The Wind Down Distributions represent periodic distributions of assets made by the Backup Plan Sponsor to claimants pursuant to the Wind-Down Procedures and the Plan.

## Conclusion

The table below summarizes the projected recoveries to Holders of Allowed Claims under the Orderly Wind Down.[3]

| Claim | Class | Recovery % |
|---|---|---|
| Other Secured Claims | Class 1 | N/A |
| Retail Borrower Deposit Claims[1] | Class 2 | 83.3% |
| Other Priority Claims | Class 3 | N/A |
| Convenience Claims | Class 4 | 70.0% |
| General Earn Claims | Class 5 | 61.5% |
| General Custody Claims[2] | Class 6A | 72.5% |
| Withdrawable Custody Claims[2] | Class 6B | 100.0% |
| Withhold Claims | Class 7 | 67.3% |
| Unsecured Loan Claims | Class 8 | 61.5% |
| General Unsecured Claims | Class 9 | 61.5% |
| State Regulatory Claims | Class 10 | 0.0% |
| De Minimis Claims | Class 11 | 0.0% |
| Intercompany Claims | Class 12 | N/A |
| Intercompany Interests | Class 13 | N/A |
| Series B Preferred Interests | Class 14 | 0.1% |
| Other Interests | Class 15 | 0.0% |
| Section 510(b) Claims | Class 16 | N/A |
| Equitably Subordinated Claims | Class 17 | 0.0% |

*(1) Holders of Retail Borrower Deposit Claims will receive a 100% recovery on the amount of their Claim equivalent to the Retail Advance Obligation; the Retail Borrower Post-Set-off Claim will receive a recovery equivalent to the recovery of the General Earn class. The recovery percentage shown represents the average recovery of all Holders of Retail Borrower Deposit Claims, but individual Holders may have a higher or lower recovery based on their specific Retail Borrower Deposit Claim and Retail Advance Obligation*

*(2) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date; the amounts shown reflect coin balances converted to USD as of the Petition Date*

*(3) The amounts are estimated and remain subject to ongoing discussions with state regulators*

---

[3]    Recoveries shown in the table do not contemplate any Allowed Claims on account of contingent, unliquidated claims, regulatory claims, or the Class Claim brought by the Committee.

**ORDERLY WIND DOWN DISTRIBUTION WATERFALL**

# (Modified graphics)

| | Notes | Valuation Date | Pro Forma Adjustments | Emergence Pro Forma Value |
|---|---|---|---|---|
| Cash | [A] | $ 916 | $ (916) | $ -- |
| Liquid Cryptocurrency | [B] | 2,558 | (116) | 2,442 |
| Institutional Loans | [C] | 745 | -- | 745 |
| Illiquid DeFi and Staking Assets | [D] | 1,120 | (18) | 1,102 |
| Custody Assets | [E] | 1,859 | 938 | 2,852 |
| Investments | [F] | 129 | -- | 129 |
| Retail Loans | [G] | 441 | (441) | -- |
| **Cash Value Available for Distribution** | | **$ 3,527** | **$ (564)** | **$ 2,962** |
| Going Concern Mining - Equity Recovery | [H] | 568 | (104) | 423 |
| **Total Gross Distributable Assets** | | **$ 4,099** | **$ (710)** | **$ 3,388** |

## Orderly Wind Down Expenses

| | Notes | | | Expenses |
|---|---|---|---|---|
| Plan Administration Fee | [I] | | | $ 44.6 |
| Distribution Fees | [J] | | | 11.2 |
| Oversight Committee Fee | [K] | | | 13.8 |
| Mining Capitalization | [L] | | | 50.0 |
| Litigation Trust | [M] | | | 50.0 |
| Professional Fees | [N] | | | 33.5 |
| Operating Expenses | [O] | | | 5.863 |
| **Total Expenses** | | | | **$ 226.3** |
| **Total Available for Distribution** | | | | **$ 3,102** |

## Orderly Wind Down Distribution

| | Notes | Estimated Claim Value ($) | Recovery (%) | Recovery ($) |
|---|---|---|---|---|
| Administrative Claims | [P] | 885 | 100.0% | $ 885 |
| Convenience Claims | [Q] | 348 | 70.0% | 244 |
| General Custody Claims(1) | [R] | 2,188 | 72.5% | 1,587 |
| Withdrawable Custody Claims(1) | [S] | 448 | 100.0% | 448 |
| Withhold Claims (Eligible 15% Distribution)(2) | [T] | 220 | 100.0% | 220 |
| Retail Borrower Deposit Claims | [U] | 783 | 83.3% | 660 |
| Other Unsecured Claims(3) | [V] | 3,990 | 60.52% | 2,360 |
| **Total Claims / Recoveries(4)** | | **$ 5,383** | **66.52%** | **$ 3,550** |

*(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date*

*(2) Withhold Claims receive a blended recovery of 65.1% resulting from (1) a liquid crypto distribution of 15% of their claim and (2) the remaining 85% receiving Unsecured Claim Distribution Consideration*

*(3) Includes General Earn Claims, Unsecured Loan Claims, General Unsecured Claims and the remaining 85% of Withhold Claims*

*(4) Total Claims and Recoveries include $410.4 million of amounts set-off on account of Retail Advance Obligations*

SPECIFIC NOTES TO THE ORDERLY WIND DOWN

### *Gross Wind Down Proceeds*

A. <u>Cash</u>:    Consists of all unrestricted Cash deposits in savings, operating, receipt, and disbursement accounts.  The valuation date Cash balance has been adjusted pro forma to the Wind Down Date, including monetization of coins in Fireblocks for the estimated Cash shortfall to fund these Chapter 11 cases through the Wind Down Date.

B. <u>Liquid Cryptocurrency</u>:  Includes Liquid Cryptocurrency coins and tokens held in Fireblocks, Cryptocurrency directly staked on respective networks, and undeployed ETH held in DeFi workspaces, which are assumed to be available to distribute, subject to any required reserves for disputed and unliquidated Claims, on or shortly after the Wind Down Date.

C. <u>Institutional Loans</u>:  Consist of loans receivable balances with active and defaulted counterparties.  The institutional loans are assumed to carry forward within the Wind Down Estate and will be monetized through negotiations with counterparties.  The values shown include consideration of the relative risk of counterparty default and estimated probability of collectability of these loans.

D. <u>Illiquid Defi and Staking Assets</u>:  Consist of Cryptocurrency staked through StakeHound or placed onto DeFi protocols which will be monetized over the Wind Down Period.

E. <u>Custody Assets</u>:   Reflects Liquid Cryptocurrency deposited into Custody Wallets that is assumed to be available to distribute on or shortly after the Wind Down Date.  Certain users were granted the ability to withdraw their Custody balances in advance of the Effective Date.  The Orderly Wind Down analysis reflects the estimated full distribution and recovery amounts for illustrative purposes.

F. <u>Investments</u>:    Reflects alternative investments made in blockchain platforms, mining platforms, convertible notes, and equity investments.  These investments would be monetized at various periods throughout the Wind Down Period when most economically viable.

G. <u>Retail Loans</u>: Pursuant to the Plan, Retail Advance Obligations will be set off against Retail Borrower Deposit Claims.  As a result, the Orderly Wind Down assumes no Gross Wind Down Proceeds on account of Retail Advance Obligations.

H. <u>Mining Equity</u>:  The Mining Equity Recovery value is based on the going-concern valuation of Mining included in the NewCo Transaction of a midpoint of $565 million, adjusted to account for the uncertainty that may result from the decision to proceed with the Orderly Wind Down.  If the Debtors move for an Orderly Wind Down, certain benefits to the mining business from Fahrenheit may no longer be available.  These items include, but are not limited to, (i) US Bitcoin's new site build construction cap of $395,000 per megawatt ("MW") and expertise in the building sites, (ii) $100 million of coupons from a leading ASIC manufacturer that can be applied to new rig purchases, (iii) proprietary software, site-level operational management (with annual $2 million expense caps per 100 MW), and a number of other qualitative factors the US Bitcoin team brings to managing and operating the Mining fleet and sites.  It is possible that as a standalone business, the loss of economies of scale could negatively impact mining and higher fees may be incurred for similar services.  An

8

assumed 25% discount to the going-concern valuation has been applied to account for these factors. The Mining Equity Recovery value is inclusive of the $50 million contribution from the Estate to capitalize the mining business.

### *Orderly Wind Down Expenses*

I.   Plan Administration Fee:  $46 million due to the Backup Plan Sponsor.

J.   Distribution Fees:  Fees paid to the Backup Plan Sponsor for the distribution of assets over the Wind Down Period, as reflected in the Backup Plan Administrator Term Sheet.

K.   Oversight Committee Fee:   Fees paid to the members of the Wind Down Oversight Committee. This analysis assumes approximately $13.8 million paid over the Wind Down Period.  The actual amounts would be set by the Debtors and the Committee in accordance with the Wind-Down Procedures.

L.   Mining Capitalization:  Contribution of $50 million from the Estate for the capitalization of the publicly traded mining business that the Backup Plan Sponsor will seek to establish. This contribution is included in the Mining Equity Recovery value.

M.   Litigation Trust:  The Orderly Wind Down assumes the Initial Litigation Funding Amount.

N.   Professional Fees:  Consists of professional fees for legal counsel, financial advisors, claims agents, and any other advisors engaged during the Wind Down Period.

O.   Operating Expenses:  Operating expenses incurred during the Wind Down Period, including but not limited to, employee payroll, valuation and audit fees, IT and compliance fees, insurance costs, and costs for management of the non-affiliate Debtors, exclusive of costs attributed to Mining.

### *Wind Down Distribution*

P.   <u>Administrative Claims</u>:  For the purposes of this Orderly Wind Down, Administrative Claims consist of Claims for costs and expenses of administration incurred during the Chapter 11 Cases that are Allowed under sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, Claims for postpetition accounts payable, postpetition accrued taxes, and accrued and unpaid fees and expenses as of the Wind Down Date of professionals other than Debtor professionals and Committee professionals.  The Orderly Wind Down assumes approximately $85 million in Chapter 11 Administrative Claims at the Wind Down Date.

Q.   <u>Convenience Class Claims</u>:  The Orderly Wind Down proposes the same treatment for Allowed Convenience Claims as set forth in the NewCo Transaction.  The Orderly Wind Down does not consolidate creditor balances across multiple platforms when considering claims that fall into the Convenience Class.

R.   <u>General Custody Claims</u>:  Consist of Claims from customers with deposits in Custody Wallets who were not permitted to withdraw their Cryptocurrency prior to the Effective Date or were permitted to but did not yet withdraw.  As detailed in the Custody Settlement Order, these Claims are priority to other *pari passu* unsecured Claims and receive a 72.5% recovery of their outstanding coin balances as of the Petition Date through in-kind Cryptocurrency distributions rather than a percentage of their coins dollarized as of the Petition Date.

S.   <u>Withdrawable Custody Claims</u>:  Consist of Claims for customers with deposits in Custody Wallets that were permitted to withdraw their Cryptocurrency prior the Effective Date.  As detailed in the Custody Settlement Order, these Claims are priority to other *pari passu* unsecured Claims and receive 100% recovery through in-kind Cryptocurrency distributions.

T.   <u>Withhold Claims (Eligible 15% Distribution)</u>:  Represents the Liquid Cryptocurrency distribution for 15% of the Allowed Withhold Distribution Claims, assuming the entire Class votes to accept the Plan.  The remaining 85% of Allowed Withhold Claims will be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration.  Withhold Claims will receive a blended recovery of these distributions.

U.   <u>Retail Borrower Deposit Claims</u>:  Holders of Retail Borrower Deposit Claims will receive a 100% recovery on the amount of their Claim equivalent to the Retail Advance Obligation; the Retail Borrower Post-Set off Claim will receive a recovery equivalent to the recovery of the General Earn class.

V.   <u>Other Unsecured Claims</u>:

Unsecured Claims consist of the following:

o   <u>General Earn Claims</u>:  General Earn Claims consist of user Cryptocurrency deposit balances in the Earn Program.

o   <u>Withhold Claims (Remaining 85%)</u>: The remaining 85% of Allowed Withhold Claims.

o   <u>Unsecured Loan Claims</u>:  Claims arising from borrowings made by the Debtors with institutional counterparties.

- o <u>Other General Unsecured Claims</u>:  Claims without security interests and not otherwise entitled to administrative or priority treatment including, but not limited to, prepetition trade amounts not paid pursuant to relief granted pursuant to the First Day Motions, rejected and contemplated to be rejected executory contracts.

## EXHIBIT D

**Mining Valuation Analysis**

## EXHIBIT D

## MINING VALUATION ANALYSIS

### A.    Disclaimer

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR MINING AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS.

### B.    Valuation Estimate

In connection with developing the Plan, the Debtors directed their investment banker, Centerview, to estimate the enterprise value of Mining. This analysis has been prepared for the Debtors' sole use and is based on information provided to Centerview by the Debtors.

Based on financial projections developed by the Debtors[1] and subject to the disclaimers and the descriptions of Centerview's methodology set forth herein, and solely for purposes of the Plan, Centerview estimates the total enterprise value of Mining to be within the range of approximately $410 million to $720 million as of May 31, 2023 with an estimated midpoint of $565 million.[2]

In preparing the estimated total enterprise value for Mining, Centerview: (1) reviewed certain historical financial information of Mining for recent years and interim periods provided by the Debtors; (2) met with certain members of the Debtors' and Fahrenheit's senior management to discuss Mining operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed by Centerview to be generally comparable to Mining; (4) considered certain economic and industry information relevant to Mining; (5) prepared discounted Cash flow analyses based on the financial projections, utilizing various discount rates and assumptions in the calculation of terminal values; and (6) conducted such other analyses as Centerview deemed appropriate.

Although Centerview conducted a review and analysis of Mining including its projections and business plan, Centerview relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and other firms retained by the Debtors, and on certain publicly available information as to which Centerview does not have independent knowledge.

The financial projections provided to Centerview by the Debtors are for 2023 through September 2033. Centerview has relied on the Debtors' representation and warranty that such financial projections (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith judgments of the Debtors. Centerview does not offer an opinion as to the attainability of the financial projections. The future

---

[1]    In preparing the Financial Projections, Management conferred with the Fahrenheit Group, and agreed on certain assumptions to be used in the Financial Projections.

[2]    The endpoints of the range of estimated total enterprise value represent the arithmetic means of the endpoints of the ranges from the valuation methodologies utilized by Centerview.

results of Mining are dependent upon various factors, including future Bitcoin prices, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. Actual future results may differ materially (positively or negatively) from the financial projections and, as a result, the actual total enterprise value of Mining may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of Mining assets or component parts were sought or obtained in connection with Centerview's valuation. Centerview did not conduct an independent investigation into any of the legal, tax, pension, or accounting matters affecting Mining, and therefore makes no representations as to their impact on the financial statements of Mining.

### C.    <u>Valuation Considerations</u>

This valuation is based upon information available to, and analyses undertaken by, Centerview as of May 31, 2023, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the financial projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Centerview has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to May 31, 2023, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the enterprise value of Mining. Neither Centerview nor the Debtors has any obligation to update, revise, or reaffirm the valuation.

This valuation is based on market data as of May 31, 2023 and relies on a number of assumptions, including successful emergence from chapter 11 by September 30, 2023, deployment of all rigs and completion of new proprietary sites in 2024, achievement of the forecasts reflected in the financial projections, the minimum amount of Cash required to operate Mining, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of Mining.

Further, the valuation of newly issued securities, including the NewCo Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; (iv) future Bitcoin and other Cryptocurrency prices; and (v) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Mining's total enterprise value is but one component of the asset base of NewCo. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of all or any component of the post-reorganization market trading value of NewCo, Mining, or their securities. NewCo is anticipated to be a public company and will be obligated to file public reports and disclosures. There can be no assurance that any trading market will develop for the NewCo Common Stock. The estimates of value for Mining do not necessarily reflect the values that may be

attainable in public or private markets.  Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of Mining's enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of Mining operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise values of Mining with Fahrenheit as the continuing operator, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as Mining is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Centerview's estimated valuation range of Mining does not constitute a recommendation to any holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of Mining set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Centerview, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**<u>EXHIBIT E</u>**

**Mining Financial Projections**

## EXHIBIT E

## MINING FINANCIAL PROJECTIONS

In connection with the Disclosure Statement, Debtor Celsius Mining LLC's ("Celsius Mining") management team ("Management") prepared financial projections (the "Financial Projections") for the fiscal years ending September 30, 2023 through September 30, 2028 (the "Projection Period").[1] The Financial Projections are based on a number of assumptions made by Management with respect to the future performance of the assets currently held by Celsius Mining ("Reorganized Mining"). In preparing the Financial Projections, Management conferred with the Fahrenheit Group, and agreed on certain assumptions to be used in the Financial Projections.

Certain assumptions were based on information available to Management, including information derived from public sources that have not been independently verified, information and materials shared by Fahrenheit, as well as input from analyses commissioned by third parties. No representations or warranties, express or implied, are provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections, or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to Holders of Claims or Interests or other parties in interest going forward. The Debtors also will not include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT CELSIUS MINING, THE DEBTORS, REORGANIZED MINING, AND NEWCO CAN PROVIDE NO ASSURANCES THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT REORGANIZED MINING'S FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS

---

[1]    September 30 is the end of the fiscal year for each year ("Fiscal Years End").

DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Financial Projections contain certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including those summarized herein. When used in the Financial Projections, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, the Debtors cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to Management or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth herein. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

**Notes to Financial Projections**

### 1. Overview

Bitcoin mining is the process of validating transactions on the Bitcoin network and adding the transactions to the Bitcoin blockchain ledger. An application-specific integrated circuit ("ASICS" or "rigs") miner solves cryptographic hash puzzles, and in return the miner is rewarded with newly minted Bitcoin. Celsius Mining operates a fleet of approximately 122,000 rigs. Celsius Mining's rigs are deployed at Celsius Mining-owned and operated sites ("Proprietary Sites") and third-party hosted sites (the "Hosted Sites" and together with the Proprietary Sites, the "Sites") across the United States. The primary input cost is for energy. Celsius Mining has both fixed and variable rate contracts with the Hosted Sites and contracts directly with a retail electricity provider for the Proprietary Sites' energy needs.

### 2. Presentation and Accounting Policies

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in Celsius Mining's historical financial statements and projections.

### 3. Methodology

Management worked closely with its advisors, and considered certain input from Fahrenheit, to develop these projections and establish the deployment strategy for rigs over the Projection Period. The forecast relies on key operating inputs and assumptions, including, among others: (a) the expected future conversion rate between U.S. Dollars and BTC (the "BTC Price Forecast"); (b) the measure of the total computational power on the Bitcoin blockchain network ("Network Hashrate"); (c) the assumed operating time of Reorganized Mining's rigs during a

2

given period ("Assumed Uptime"); and (d) forward energy price curves, and contracted energy rates with third-party hosting providers. The forecast also includes capital expenditures for rig replacements, driven by assumed future price and efficiency of new rigs, as well as infrastructure build costs.

The Celsius Mining BTC Price Forecast over the Projection Period relies on both a historical trend analysis and one-to-two-year outlook of analyst BTC price forecasts. The forecast assumes a series of 24-month bull and bear market cycles, derived based on the historical realized peaks and troughs, with decreasing volatility as BTC becomes more widely adopted.

Celsius Mining developed future estimates of the Network Hashrate over the Projection Period ("Network Hashrate Forecast") based on a dynamic model that contemplates the assumed operations of other Bitcoin miners based on the aggregate Hash Price in each month.[2] Based on current rig technology and respective rig hash rates, as well as assumed hardware efficiency improvements over the Projection Period, the Network Hashrate Forecast evaluates which of Reorganized Mining's rigs would mine profitably in each period based on the projected Hash Price and operating costs. Lastly, the Network Hashrate Forecast accounts for two halvening dates in April 2024 and April 2028.

The Financial Projections reflect a bottoms up, rig-specific forecast constructed on a site-by-site level. The revenue and expense line items are explained in further detail below and generally rely on the assumptions outlined above and historical operating performance.

### 4. Plan Consummation

The operating forecast assumes that the Plan will be confirmed and consummated on or around September 30, 2023 (the "Effective Date"). This date reflects the Debtors' best and current estimate, but there can be no assurance as to when the Effective Date will actually occur.

**Assumptions with Respect to the Projected Income Statement**

### 1. Revenue

In the Financial Projections, revenues from mining operations are forecasted for each of the Sites based on the BTC Price Forecast, Network Hashrate Forecast, Assumed Uptime, and the operating characteristics of the rigs assumed to be deployed at the respective Sites. Certain Sites have curtailment rights which allow for the rigs to be turned on and off to increase profit and reduce losses resulting from energy price volatility and changes in energy demand. In certain markets and at certain Sites, curtailment rights may generate additional revenues for Reorganized Mining as the market compensates load centers for reducing their energy consumption during periods of high market demand. These curtailment revenues are reflected in the revenue section of the forecast alongside other mining revenues.

---

[2]    The "Hash Price" is a calculated value that considers the interrelated impacts of the BTC price, Network Hashrate, BTC rewards per block mined, and transaction fees in each period.

### 2. Direct Costs

Direct costs include direct energy costs, profit share costs and site operating expenses as described below.

#### i. Direct Energy Costs

Direct energy costs reflect the consumption of energy to power the rigs. These costs reflect the rigs' energy consumption in megawatt-hours ("MWh") at the market price of power.  At the Proprietary Sites, Reorganized Mining will pay for the power directly, inclusive of all delivery, transmission, and other power-related costs incurred in normal operations.  At Hosted Sites, power costs will be paid by the hosting provider and invoiced to Reorganized Mining.  The forecasted direct energy costs are based on forward energy curves or the contracted rates (fixed or variable costs).

#### ii. Profit Share Costs

The contracts for certain Hosted Sites include a profit sharing mechanism whereby the hosting provider receives a share of the BTC mined and the energy costs incurred.  In general, the profit share is a percentage of gross profit.

#### iii. Site Operating Expenses

At Proprietary Sites, the site operating expenses include labor, facility, software and rig maintenance expenses.  At Hosted Sites, certain charges will be passed through to Reorganized Mining.  The passed through charges generally consist of charges per rig, labor, energy adders and other operational expenses.

### 3. Operating Expenses

Operating expenses include property insurance, security, repairs and maintenance, and custody fees.  The Financial Projections also include certain corporate operating expenses that can be generally described as corporate headcount, director and officer and cyber insurance, audit and legal costs, and other general corporate expenses.  Operating Expenses also include a $15 million annual management fee to US Bitcoin.  This management fee covers contract management, maintaining GAAP books and records, treasury services, tax compliance, curtailment software, compliance with safety guidelines, strategy development, and general management of Reorganized Mining.

### 4. Net Capital Expenditures

#### i. Infrastructure Growth Capital Expenditures

Infrastructure growth capital expenditures relates to the proposed new 100 megawatt ("MW") proprietary site that Management intends to build with US Bitcoin. Management has assumed build costs of $395,000 per MW, which is consistent with the construction cost caps provided by US Bitcoin under the Plan Sponsor Agreement, for an all-in investment of $39.5 million. The Financial Projections assume the new 100 MW site is built and all associated costs are incurred during the fiscal year ending September 30, 2024.

#### ii. Rig Replacement Capital Expenditures

Management assumes it maintains the existing fleet and replaces rigs based on a useful life of six years. At end of life, these existing rigs are assumed to be replaced with new rigs reflecting the same efficiency increases contemplated in the Network Hashrate Forecast. The least efficient rigs are assumed to be replaced first, enabling Reorganized Mining to retain market share. The replacement cost assumes that new rigs have a market value based on an assumed 18-month payback period.

As described in the Plan Sponsor Agreement, $100 million of coupons from a leading ASIC manufacturer are assumed to be applied to the purchase of new rigs, which thereby provide an effective twenty percent discount on assumed replacement costs. Shipping, duty, and taxes are included as part of the rig replacement capital expenditure forecast.

#### iii. Rig Sales Proceeds

At the assumed end of each rig's useful life and in conjunction with the rig replacements described above, the Financial Projections assume rigs are sold for twenty-five percent of the estimated market value of the replacement rigs.

**Celsius Mining LLC**
*in Millions of U.S. Dollars*

| Fiscal Year Ended | Sep-24 | Sep-25 | Sep-26 | Sep-27 | Sep-28 | Total |
|---|---|---|---|---|---|---|
| Revenue | $278.7 | $437.5 | $507.1 | $341.0 | $282.2 | $1,846.5 |
| Direct Costs | (190.9) | (200.0) | (206.1) | (187.3) | (183.8) | (968.2) |
| Gross Profit | 87.8 | 237.4 | 300.9 | 153.7 | 98.4 | 878.3 |
| Operating Expenses | (26.0) | (27.7) | (28.8) | (29.3) | (29.7) | (141.4) |
| EBITDA | 61.8 | 209.7 | 272.2 | 124.4 | 68.8 | 736.9 |
| Net Capex | (56.5) | (12.3) | (8.2) | (39.3) | (86.6) | (202.9) |
| EBITDA less Net Capex [1] | $5.4 | $197.5 | $263.9 | $85.1 | ($17.8) | $534.1 |
| BTC Price, EOP ($) | $47,647 | $90,587 | $92,420 | $76,622 | $105,195 | NA |
| Hashprice ($/GH/Day), EOP | 77.9 | 126.2 | 95.1 | 63.9 | 61.3 | NA |
| Network Hashrate, EOP | 307 EH/s | 374 EH/s | 524 EH/s | 668 EH/s | 600 EH/s | NA |
| Celsius Hashrate, EOP | 12.3 EH/s | 12.5 EH/s | 12.6 EH/s | 13.4 EH/s | 15.1 EH/s | NA |
| Network Share % | 3.50% | 3.79% | 2.82% | 2.24% | 2.36% | NA |
| BTC Produced, Celsius | 7,712 | 6,475 | 5,046 | 3,946 | 3,281 | 26,460 |

[1] EBITDA less Net Capex does not reflect cash taxes.

65068104 v2-WorkSiteUS-000002/3313

## Exhibit L

### Cryptocurrency Conversion Table

*The below table contains the Debtors' view of prices for all types of cryptocurrencies listed on the Debtors' schedules as of 8:10 p.m., prevailing Eastern Time, on July 13, 2022 (i.e., approximately the time the Debtors commenced their chapter 11 cases). Prepetition, in the ordinary course of business, the Debtors determined the price of coins utilized in their services primarily by referencing pricing feeds such as Coingecko and CoinPaprika. For certain coins, the Debtors used "CPS," the Debtors' proprietary pricing engine. CPS processes inputs from five external sources (Chainlink, Coinmarketcap, Coingecko, CoinPaprika, and Fixer) to determine the price of a coin. The system evaluates averages, closing prices, and ten-day low prices from one or more of the inputs in assigning a price. In some circumstances, only a single input is utilized because it is all that is available (or reliably available) for a particular coin. The use of multiple inputs allows CPS to reduce the risk that outlier data points will result in an inaccurate price and also allows the Debtors' platform to support a wider variety of coins, as not every coin is priced on every input.*

[*Remainder of page intentionally left blank.*]

**Cryptocurrency Conversion Table**
**Petition Date USD Coin Prices as of 8:10 PM ET on 7/13/2022**

| Coin | USD Price |
|---|---|
| 1INCH | 0.581744108 |
| AAVE | 78.24291593 |
| ADA | 0.427003308 |
| AVAX | 18.49035408 |
| BADGER | 3.285369715 |
| BAT | 0.37621662 |
| BCH | 100.546894 |
| BNB | 226.92614 |
| BNT | 0.450047559 |
| BSV | 50.99015321 |
| BTC | 19881.00134 |
| BTG | 15.14018234 |
| BUSD | 1 |
| CEL | 0.81565 |
| COMP | 47.33041601 |
| CRV | 1.032841943 |
| CVX | 6.08763006 |
| DAI | 1 |
| DASH | 41.79955662 |
| DOGE | 0.061140905 |
| DOT | 6.360775884 |
| EOS | 0.929357695 |
| ETC | 14.12753443 |
| ETH | 1088.170943 |
| GUSD | 1 |
| KNC | 1.263392739 |
| LINK | 6.077201511 |
| LPT | 8.033566927 |
| LTC | 48.75597218 |
| LUNC | 0.00009241 |
| MANA | 0.80042259 |
| MATIC | 0.609434275 |
| MCDAI | 1 |
| MKR | 839.8922442 |
| OMG | 1.71960007 |
| ORBS | 0.040053336 |
| PAX | 1 |
| PAXG | 1738.836303 |
| SGA | 1.214643649 |
| SGB | 0.026003699 |
| SGR | 1.214643649 |
| SNX | 2.465894386 |
| SOL | 34.24173443 |
| SPARK | 0 |
| SUSHI | 1.214062046 |
| TAUD | 0.6748 |
| TCAD | 0.7701 |
| TGBP | 1.1881 |
| THKD | 0.1274 |
| TUSD | 1 |
| UMA | 2.487366187 |
| UNI | 6.014518833 |
| USDC | 1 |
| USDT ERC20 | 1 |
| UST | 0.039474965 |
| WBTC | 19852.24182 |
| WDGLD | 168 |
| XAUT | 1741.393614 |
| XLM | 0.104188979 |
| XRP | 0.321111953 |
| XTZ | 1.483213139 |
| YFI | 5742.188874 |
| ZEC | 53.54163596 |
| ZRX | 0.277486691 |
| ZUSD | 1 |

**<u>EXHIBIT F</u>**

**Fahrenheit Business Plan**





# NewCo Transaction

Maximizing Value for Celsius Creditors

August 2023

Fahrenheit Group    2

## DISCLAIMER

This summary has been prepared by Fahrenheit, LLC ("Fahrenheit") for inclusion as an exhibit to the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization (the "Disclosure Statement") of Celsius Network LLC and its Debtor Affiliates ("Celsius," the "Company" or the "Debtors") filed with the United States Bankruptcy Court Southern District of New York (the "Bankruptcy Court") in connection with the Joint Chapter 11 Plan of Reorganization of the Debtors (the "Plan"). Fahrenheit urges creditors of the Debtors and other interested persons to read the Disclosure Statement and the Plan, including any amendments, supplements or modifications thereto, or restatements thereof, to be filed with the Bankruptcy Court in connection with the Plan, including any Definitive Documents (as defined in the Plan) contemplated by the Plan. These materials do and will contain important information about the Fahrenheit, Newco, the Plan and the NewCo Transactions (as defined in the Plan). This summary is qualified in its entirety by the Plan, the Disclosure Statement, and the Definitive Documents. The terms of the Plan and of any of the Definitive Documents, as they may be modified from time to time, may vary from those described in this summary, and in the event of any conflict between the terms of this summary the Plan and the Definitive Documents, the Plan and the Definitive Documents shall control. No representation or warranty, expressed or implied, is made as to the accuracy or completeness of the information contained in this summary. This summary does not purport to contain all information that may be required to evaluate the Plan.

The information provided in this presentation pertaining to Celsius, its business assets, strategy and operations is for general informational purposes only and is not a formal offer to sell or a solicitation of an offer to buy any securities, options, futures, or other derivatives related to securities in any jurisdiction and its content is not prescribed by securities laws. Information contained in this presentation should not be relied upon as advice to buy or sell or hold such securities or as an offer to sell such securities. This presentation does not take into account, nor does it provide any tax, legal or investment advice or opinion regarding, the specific investment objectives or financial situation of any person.

Fahrenheit and its agents, advisors, directors, officers, employees and shareholders make no representation or warranties, expressed or implied, as to the accuracy of such information and Fahrenheit expressly disclaims any and all liability that may be based on such information or errors or omissions thereof. Fahrenheit reserves the right to amend or replace the information contained herein, in part or entirely, at any time, and undertakes no obligation to provide the recipient with access to the amended information or to notify the recipient thereof. This is not a binding term sheet, no definitive documents have been signed, and parties reserve their rights in connection with any proposed transaction. Any information, representations or statements not contained herein shall not be relied upon for any purpose. Neither Fahrenheit nor any of Fahrenheit's representatives shall have any liability whatsoever, under contract, tort, trust or otherwise, to you or any person resulting from the use of the information in this presentation by you or any of your representatives or for omissions from the information in this presentation. Additionally, neither the Fahrenheit nor Fahrenheit's representatives undertake obligation to comment on the expectations of, or statements made by, third parties in respect of the matters discussed in this presentation.

This presentation contains the following measures not prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"): "EBITDA" and "Free Cash Flow." EBITDA as used herein is net income or loss excluding net finance income or expense, income tax or recovery, depreciation and amortization. Free Cash Flow as used herein is net cash provided by operating activities less purchases of property and equipment. Fahrenheit believes these non-GAAP measures are useful in evaluating the Plan. Fahrenheit's definition of these non-GAAP measures may differ from similarly titled measures of performance used by other companies in other industries or the same industry. Non-GAAP measures used in this presentation may not be indicative of actual results.

THIS PRESENTATION IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This summary contains forward-looking statements. Forward-looking statements can be identified by words such as: "anticipate," "intend," "plan," "goal," "seek," "believe," "project," "estimate," "expect," "strategy," "future," "likely," "may," "should," "will" and other expressions that are predictions of or indicate future events and trends and that do not relate to historical matters. The forward-looking statements herein include statements about Fahrenheit's business strategy with respect to NewCo, NewCo's future revenues, profitability, cash flow capital expenditures, strategy for risk management, market conditions, liquidity and capital resources, future operations and anticipated Nasdaq or other exchange listing.

Forward-looking statements are neither historical facts nor assurances of future performance. Instead, they are based only on Fahrenheit's current beliefs, expectations and assumptions regarding the future of the NewCo business, future plans and strategies, projections, anticipated events and trends, the economy, the regulatory environment and other future conditions. Because forward-looking statements relate to the future, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict and many of which are outside of Fahrenheit's control. Important factors that could cause NewCo's actual results, financial condition and achievements to differ materially from those indicated in the forward-looking statements are set forth in the Plan Disclosure Statement under the heading "RISK FACTORS" and elsewhere in the Plan Disclosure Statement.  As set forth in the Plan Disclosure Statement, into which this summary is included as an exhibit, these factors include, without limitation:

▸ Risks related to bankruptcy law considerations;
▸ Risks related to recoveries under the Plan;
▸ Risks relating to Debtors' and NewCo's business;
▸ Risks relating to NewCo's digital asset mining and staking;
▸ Disclosure statement disclaimer; and
▸ Regulatory-related risk factors.

Fahrenheit cannot assure that NewCo will be able to achieve or obtain any of its projections, financial resources, goals, strategies, future operations or Nasdaq listing on a timely basis, if at all, or that it will otherwise be able to successfully implement that Plan and the Transactions. Any forward-looking statement made by Fahrenheit in this summary is based only on information currently available to it and speaks only as of the date on which it is made. Fahrenheit undertakes no obligation to publicly update any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future developments or otherwise.

Fahrenheit Group    4

# From Steven Kokinos, proposed CEO of NewCo



To the Celsius community:

We know that the failure of Celsius has been exceptionally difficult for you all. You placed your assets and your trust in Celsius, and that trust was betrayed. We cannot undo the wrongs of the past, but we can seek to learn from them. We are humbled by the opportunity to redefine a new path for the creditors of Celsius and the broader crypto community.

With this in mind, I am excited to share our vision for the future of Celsius through the creation of NewCo, a new business to be formed out of the Celsius bankruptcy. NewCo's equity will be held by, and a majority of its board of directors will be appointed by, Celsius's creditors.

As the managers of NewCo, our goal will be to maximize value while minimizing risk for NewCo's shareholders (i.e., Celsius creditors). Our plan is intended to drive risk-adjusted value through a highly efficient growth model while retaining the optionality for opportunistic expansion. It is underpinned by a proactive risk management strategy and seeks to optimize valuation and liquidity through a public listing on Nasdaq.

This presentation provides a high-level overview of what our crypto-native team has put together. We appreciate the input and feedback from the Special Committee of the Board and the Official Committee of Unsecured Creditors as it was developed, and we look forward to further collaboration with all stakeholders—including the Celsius creditor community—as we embark on this next chapter together. We intend to work tirelessly as an organization to drive the next wave of Web3 adoption through NewCo.

As we move forward, we maintain the utmost respect for the process. We also recognize that transparency and open communication will be critical. We are committed to keeping you informed about our progress, challenges, and milestones as a new organization emerges from bankruptcy.

I am thrilled to be part of this journey and enthusiastic about what lies ahead.

Steven Kokinos
Fahrenheit Group



**AGENDA**

**Executive Summary**

Strategy

Execution

Risk Management

Structure

Potential Opportunity Areas

# Fahrenheit has applied a fourfold lens to restructuring NewCo

**Objective:** Maximize shareholder value



With the goal of maximizing shareholder value, Fahrenheit Group's restructuring plan for NewCo is:

**1** Built on the foundation of **two core business lines: Bitcoin mining and Ethereum staking**

**2** Powered by **seasoned, crypto-native operators** with a track record of **financial discipline that we believe is best-in-class**

**3** Underpinned by a **proactive risk management** strategy intended to mitigate downside tail risk in underlying markets

**4** Designed with the goal of optimizing valuation and liquidity through a **public Nasdaq listing**



7

# The plan focuses on growing and maximizing the mining division of NewCo

$ millions

| Period | Base case[1] | Fahrenheit illustrative case |
|--------|--------------|------------------------------|
| **Revenue** | | |
| **2024** | 279 | 321 |
| **2025** | 438 | 640 |
| **2026** | 507 | 907 |
| **2027** | 341 | 838 |
| **2028** | 282 | 866 |
| **Total** | **1,847** | 1.93x → **3,572** |
| **EBITDA** | | |
| **2024** | 62 | 77 |
| **2025** | 210 | 307 |
| **2026** | 272 | 481 |
| **2027** | 124 | 350 |
| **2028** | 69 | 294 |
| **Total** | **737** | 2.05x → **1,509** |

Note: (1) Base case utilizes figures from the Debtors' mining valuation contained in the Disclosure Statement.

## Commentary

‣ **Both cases show potential revenue that could be generated by the mining division of NewCo only**

‣ **The Fahrenheit illustrative case includes potential revenue that could be generated by expanding the mining division through the strategic ASIC partnership committed by Fahrenheit Group***

*The ASIC partnership is an option and subject to NewCo board approval, NewCo funding, and other contingencies; see pages 10 and 14–16 for further information

## Key Fahrenheit case assumptions

‣ Initial $100M investment to fund site expansion through the strategic ASIC partnership

‣ Illustrative investment of 75% of projected NewCo cash flow; actual investment levels can be adjusted by NewCo Management and Board based on market conditions

‣ Initial buildout speed capped at 120 MW per 6 months, which is to be adjusted based on market conditions

‣ Buildout cost cap of $395K per MW

‣ BTC price, hashrate growth, network difficulty assumptions are unchanged from the base case

# Potential revenue from self-staking (and other assets) would be incremental

| Fahrenheit's intent is to structure the balance sheet of NewCo with the goal of providing the company with flexibility to: | Fahrenheit intends for NewCo to self-stake cryptocurrency on its balance sheet with the goal of generating incremental revenue: |
|---|---|

▶ **Manage potentially adverse market conditions**

▶ **Make additional opportunistic investments in mining** based on market conditions and other contingencies

▶ **Potentially develop new product offerings, make further strategic acquisitions, or enter into additional strategic partnerships**, subject in all respects to NewCo board approval, regulatory considerations, and market conditions

**Illustrative contribution margin[1]**
Ethereum self-staking, $ millions

| | |
|---|---|
| **2024** | 23.6 |
| **2025** | 37.3 |
| **2026** | 45.9 |
| **2027** | 38.3 |
| **2028** | 39.6 |

**Any potential revenue from NewCo's other assets (e.g., institutional loan book, DeFi and venture assets) would be incremental to any mining and self-staking revenue**

Note: (1) Assumes initial self-staking of $350 million of balance sheet ETH and staking yield range of 4.5% to 5.5%

# Key business terms of Fahrenheit's proposal (1 of 3)

| Category | Item | Description[1] |
|---|---|---|
| **General** | **$50M contribution** | ‣ Fahrenheit purchasing $50M of NewCo equity through primary or secondary purchases (at option of Debtors/Committee) |
| | **NewCo management** | ‣ Steve Kokinos serving as CEO of NewCo and Joel Block serving as CFO of NewCo<br>‣ NewCo executive management team compensation to be deducted from Fahrenheit Group's management fee |
| | **NewCo board** | ‣ NewCo's board to consist of a majority of directors appointed by fiduciary for Celsius creditors (i.e., the Official Committee of Unsecured Creditors)<br>‣ Fahrenheit to manage NewCo at the direction of the NewCo board<br>‣ NewCo board to approve all significant investment and capital allocation decisions |
| **Bitcoin mining consideration (1 of 3)** | **Operating partner** | ‣ US Bitcoin Corp (USBTC) managing the NewCo mining assets |
| | **Operating software** | ‣ USBTC offering NewCo a royalty-free license to its proprietary miner management and energy curtailment software |
| | **100 MW site buildout** | ‣ USBTC building and energizing a 100 MW mining site for NewCo within 12 months of the plan effective date.<br>‣ If the site is not energized within 12 months of the effective date, the following year's mining management fee to be reduced by $1M per month that the energization is delayed, subject to a $6M total reduction<br>‣ The construction of medium voltage to plug ready infrastructure will be capped at $395K/MW for a period of 24 months after the Effective Date; any costs in excess of the cap to be offset against future mining management fees<br>‣ The same capped construction and allocation of costs in excess will apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW (for a total of 400 MW) |

Note: (1) Descriptions contained herein are indicative. Parties should refer to the Plan Sponsor Agreement, Fahrenheit Plan Term Sheet (attached to the Plan Sponsor Agreement), Plan, and Disclosure Statement for a complete description of the Fahrenheit proposal.

# Key business terms of Fahrenheit's proposal (2 of 3)

| Category | Item | Description |
|---|---|---|
| **Bitcoin mining consideration (2 of 3)** | **Site-level labor cost cap** | ‣ USBTC providing all site level employees (excluding security) for all existing Celsius self-mining facilities and any facilities developed by Celsius or NewCo for cost and subject to a cost cap calculated at $2M per 100 MW<br>‣ To the extent cost exceeds this cap, any excess to be deducted from the mining management fee |
| | **240 MW site contribution** | ‣ USBTC contributing to NewCo the leasehold and development rights to an additional 240 MW behind-the-meter site |
| | **50 MW site purchase option** | ‣ USBTC providing option to purchase USBTC Alpha, an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such property) for $575,000/MW and support the immediate installation of miners at such site |
| | **43,500 rack plugs for hosting** | ‣ USBTC providing NewCo with up to 43,500 rack plugs at competitive or below market terms for hosting of NewCo machines:<br>‣ 8,500 rack plugs are available at USBTC Alpha, with hosting terms for up to five years similar to the Hardin contract, which includes pass-through costs and a 30% profit split<br>‣ 20,000 rack plugs are available at a site owned by a USBTC partner with two pricing options: an all-inclusive rate of $72/MWh or a variable rate based on the current hashprice, which stands at $62.50/MWh<br>‣ 15,000 rack plugs at various sites owned or operated by strategic partners on competitive market terms |
| | **Strategic ASIC partnership** | ‣ US Bitcoin contributing to NewCo a strategic partnership agreement with a leading ASIC manufacturer<br>‣ NewCo intends to host the partner's portion of rigs at a minimum breakeven rate; NewCo intends to build and own all infrastructure<br>‣ Under partnership, the strategic partner would provide NewCo with up to 180,000 new generation rigs, which would be intended to be the latest generation models in scale production at the time of delivery, at no cost to operate in a profit-sharing model with NewCo owning initially 30% of rigs (i.e., up to 54,000)<br>‣ Partnership would provide for gradual transfer ownership of the rigs to NewCo such that after the second year of operating the rigs in a profit-sharing model, NewCo would own 50% of the rigs (i.e., up to 90,000) |


# Key business terms of Fahrenheit's proposal (3 of 3)

| Category | Item | Description |
|---|---|---|
| **Bitcoin mining consideration (3 of 3)** | **$100M mining rig coupon** | ‣ USBTC contributing to NewCo $100M in coupons from another leading ASIC manufacturer which have no expiration and can be applied to future machine purchases by NewCo |
| | **Operating cost savings** | ‣ USBTC providing immediate cost savings via reduced pool fees for Celsius / NewCo mining<br>‣ USBTC lowering energy procurement costs via its internal energy team and direct connectivity to energy trading desks at no cost |
| **Ethereum staking consideration** | **Immediate engagement** | ‣ USBTC has already been engaged and provided tangible, demonstrable benefits at no cost to the estate |
| | **Operating partner** | ‣ Proof Group managing the self-staking of Ethereum held by NewCo on its balance sheet |
| **DeFi and venture investing consideration** | **Self-staking technology** | ‣ Proof Group providing NewCo with a royalty-free, perpetual license to IP owned by Proof Group with respect to self-staking<br>‣ Goal will be for NewCo to leverage this IP to self-stake NewCo ETH at no fee |
| | **Operating partner** | ‣ Arrington Capital managing the optimization and wind-down of the existing portfolio of DeFi and venture assets |

**AGENDA**

Executive Summary

**Strategy**

Execution

Risk Management

Structure

Potential Opportunity Areas

# Fahrenheit intends for NewCo's foundation to consist of two core business lines

| Fahrenheit plan by Celsius asset class | | | |
| --- | --- | --- | --- |
| **Category** | **Celsius assets** | **Fahrenheit plan** | |
| **Core NewCo business line** | **Mining assets** | US BITCOIN CORP | **US Bitcoin Corp** to operate the mining division of NewCo, managing and optimizing the existing fleet of (~122,000) rigs and mining sites while executing a plan intended to scale and vertically integrate the business |
| | **Liquid cryptocurrency** | PROOF GROUP | **Proof Group** to leverage proprietary IP to stake and manage ETH owned by NewCo. Fahrenheit intends to reinvest returns with goal of growing the mining business and reducing the need for external capital |
| **Other assets contributed to NewCo** | **DeFi and venture investments** | arrington CAPITAL | **Arrington Capital** to manage the monetization of the existing portfolio of DeFi and venture investments |
| | **Other assets** | NewCo | **NewCo** to manage the monetization of other assets including the remaining institutional loan portfolio |

## <u>Mining</u>: Fahrenheit proposes a phased strategy to build the mining division



# Mining: Optional Phase 2 expansion via ASIC partnership with goal of self-funding

Note: Subject to approval of NewCo Board, funding requirements, and other contingencies



**Capital outflow**

**2a   Strategic ASIC partnership**

The strategic ASIC partnership could enable ~**3x leverage on CAPEX for infrastructure buildout** versus the standard self-mining model

**Intended to drive efficient expansion of mining operations and cash flows**

**2b   Reinvestment of cash flows**

Strategy: Cash flows from self-mining and hosted machines to be **reinvested to self-fund mining division expansion** through the strategic ASIC partnership

**This structure is intended to grow EBITDA and EV without additional debt**

**Capital inflow**

## <u>Mining</u>: Goal of ASIC partnership opportunity would be to increase CAPEX leverage

| Traditional model | NewCo ASIC partnership |
|---|---|
| **Bitcoin miners deploy ~67% of CAPEX on miners and the remaining ~33% of CAPEX on infrastructure** | **All else equal, ASIC miner contributions could enable NewCo to deploy almost 100% of CAPEX on infrastructure** |

**Unit economics of illustrative $38M investment**

| | CAPEX | Units | Total |
|---|---|---|---|
| **Miners** | $25.5M | 1.0 | 12K |
| **Infrastructure** | $12.5M | 1.0 | 38 MW |
| **Total** | **$38M** | | |



| CAPEX | Units | Total |
|---|---|---|
| $0M | ▲ 1.5 | ▲ 18K |
| $38M | ▲ 3.0 | ▲ 117 MW |
| **$38M** | | |

Through the profit share and hosting model of the ASIC partnership, NewCo could own 1.5x units of machines and 3.0x units of infrastructure after 2 years

# <u>Staking</u>: NewCo intends to self-stake Ethereum (ETH)

## ETH staking overview

**What is staking?**

▸ Staking refers to the **process through which transactions are validated** on the Ethereum blockchain network, which uses a proof-of-stake consensus protocol

▸ When staking, a user locks in, or stakes, ETH tokens on the blockchain to **qualify for validator privileges to help secure the network and earn rewards**

**What is self-staking?**

▸ Each validator must stake 32 ETH of bond and has both a (1) validator key and a (2) withdrawal address, where all rewards and ETH are sent when exiting staking

▸ **Self-staking allows the withdrawal address to remain at a custodian with the intent that the user should always have control over its funds**

## Benefits of self-staking ETH

| | |
|---|---|
| **Risk reduction** | Self-staking is intended to enable Fahrenheit to retain full control over its ETH and reduce counterparty risk |
| **Profit potential** | Self-staking is intended to eliminate the need for pools and associated fees |
| **Security and governance** | Self-staking contributes directly to network security and users play a more significant role in governance |
| **Reputation** | Self-staking can increase institutional credibility in the crypto space |

**NewCo could reinvest self-staking returns opportunistically, reducing the need for external capital**

**AGENDA**

Executive Summary

Strategy

**Execution**

Risk Management

Structure

<u>Potential Opportunity Areas</u>

# Fahrenheit is a coalition of Web3 pioneers dedicated to NewCo

 **US BITCOIN CORP**





**Fahrenheit Group** is a coalition of seasoned operators with decades of collective experience across the Web3 ecosystem.

We believe in a decentralized future, and we are committed to the long-term success of crypto in the US and beyond—including optimal outcomes for those impacted by corporate failure.

**Founded:** 2020

**Headquarters:** Miami, FL

**Leading operator of Bitcoin mining sites specializing in the design, construction, and management of data centers with access to low-cost and sustainable sources of energy**

- ‣ Operates four mining sites across the US with total capacity of more than 730 MW
- ‣ Announced all-stock merger of equals with Hut 8 Mining (NASDAQ: HUT) on 2/7/2023

## PROOF GROUP

**Founded:** 2021

**Headquarters:** Menlo Park, CA

**Team of former crypto founders and venture investors backing the next generation of founders building disruptive financial technology**

- ‣ Supports founders in aligned structures from day zero all the way through the public markets

**Founded:** 2018

**Headquarters:** Seattle, WA

**Digital asset management firm primarily focused on blockchain-based capital markets**

- ‣ Founded by TechCrunch and CrunchBase founder Michael Arrington and TechCrunch CEO Heather Harde
- ‣ Since launching Arrington XRP Capital, its first fund, the firm has expanded to multiple funds over time
- ‣ Dual-strategy with a liquid market trading organization and a robust portfolio of 158 web3 venture investments
- ‣ Seasoned, international team composed of Silicon Valley veterans and operators with deep venture capital experience and crypto native roots

NewCo Restructuring Plan | Execution

**Fahrenheit Group**    20

# NewCo will be led by seasoned, crypto-native operators

**Fahrenheit Group leadership team**



**Steven Kokinos, proposed CEO of NewCo**
Founder and Managing Director, Sonic Boom Ventures
- Former founding CEO of Layer 1 blockchain Algorand
- Founder of Fuze (acquired by 8x8 in 2022) and BladeLogic (2007 IPO)
- $1.5B in total capital raised for companies founded or led as CEO



**Joel Block, proposed CFO of NewCo**
CFO, US Bitcoin Corp
- Former CEO of Collegewise, global college counseling firm
- 9 years with Credit Suisse in interest rate derivatives
- Member of Young Presidents Organization (YPO)



**Asher Genoot**
Co-founder and President, US Bitcoin Corp
- Co-founded and scaled venture-backed bitcoin mining organization from 0 to 140 employees and 0 to 772 MW in <2 years
- Member of Young Presidents Organization (YPO)



**Noah Jessop**
Founder and Managing Director, Proof Group
- Former SVP at Core Scientific, Product Manager at Libra Association, CEO at CommandIQ, and VC Investor at Founder Collective
- MIT Mathematics and Computer Science



**Michael Arrington**
Founder and Managing Director, Arrington Capital
- Founder of TechCrunch and CrunchFund (Uber, Airtable, Pinterest, etc.)
- Named to the Time 100 list of the world's most influential people
- Author of *The Initial Public Offering: A Practical Guide for Investors*



**Keli Callaghan**
Partner, Arrington Capital
- Former CMO at Algorand; grew ecosystem from inception to thriving community and partnered with FIFA, World Chess, TD Garden, and others
- Former Senior Director at Avid Technology



**Bhavik Patel**
Partner and Chief Investment Officer, Arrington Capital
- Former Chief Product Officer and Head of Derivatives at BitMEX
- Former APAC Derivatives Strategist at UBS
- Master of Mathematics, University of Oxford



**Ravi Kaza**
Founder, Seasons Capital Management; Strategic Advisor, Arrington Capital
- Former Vice President at Pequot Capital Management
- Former Investment Banker with Frank Quattrone (Amazon, Apple, etc.)
- Former Managing Director of Duquesne Capital Management



21

# Fahrenheit intends for financial discipline to be a primary focus of NewCo

 US BITCOIN CORP

PROOF GROUP.



| | Bitcoin mining | Ethereum (ETH) staking | DeFi and venture investing |
|---|---|---|---|
| **Strategic mandate** | Deploy the Celsius machine fleet and build a sophisticated, cost-efficient bitcoin mining business for Newco | Establish self-staking of ETH and deploy an advanced, cost-effective proof-of-stake operation for Newco | Manage and monetize the existing venture portfolio to maximize returns for NewCo |
| **Track record** | From inception[1] to date, USBTC has generated 3.5x return on equity | ‣ Manages a nine-figure staking operation, extending support to Ethereum and other premier Proof-of-Stake (PoS) networks<br><br>‣ Demonstrates significant experience in administering and upkeeping high-availability, mission-critical infrastructure<br><br>‣ Proficient in employing industry-leading security practices, bolstering system and data integrity | ‣ Decades of experience in venture investing, with the past 6 years dedicated to growing a strong and resilient Web3<br><br>‣ Intimate familiarity with complex deal structures<br><br>‣ Complementary investment and liquid market strategies teams to enable robust market perspectives<br><br>‣ Cumulative fund performance outperforming BTC, ETH, and trade benchmarks by multiples |

**3.5x**

$380M

$400M
$300M
$200M
$110M
$100M
$0M

Equity raised    Market cap (T3M average)

Note: (1) December 2020



# Fahrenheit believes that the economics of the mining business require NewCo at the outset to partner with a proven operator such as USBTC

| Bitcoin mining revenue drivers | Bitcoin mining cost drivers |
|---|---|

$$\underline{\frac{Company\ hashrate}{Network\ hashrate}} \times Price\ of\ BTC \times (Block\ reward + Transaction\ premium) \times Number\ of\ blocks \qquad Cost\ of\ energy + Operating\ expenses + SG\&A\ expenses$$

① ② ③ ④

| Commentary | US Bitcoin Corp (USBTC) value proposition |
|---|---|

**Commentary**

① Hashrate refers to the amount of computing power generated by a company's mining rigs and is the only revenue driver under a company's control. **It is critical to optimize and grow hashrate to maintain and grow revenue**

② The price of BTC, block rewards, transaction premiums, and number of blocks are **not under a company's control**

③ Energy typically accounts for ~80% of the cost of Bitcoin mining. **It is critical to secure and maintain access to low-cost energy to operate profitably through market cycles**

④ By decreasing operating and SG&A expenses, Bitcoin miners can **further decrease their breakeven point** and maintain profitability through market cycles

**US Bitcoin Corp (USBTC) value proposition**

**Revenue maximization**

‣ USBTC intends to provide to NewCo with a **market-pioneering, CAPEX-light growth model through the strategic ASIC partnership**, which could enable NewCo to scale without deploying CAPEX on machines

‣ USBTC's plan is to deploy its **proprietary miner management and energy curtailment software** with the goal of maximizing miner uptime, protecting against downside during periods of high energy pricing, and optimizing revenue generated by NewCo's rig fleet

‣ USBTC believes it has demonstrated an ability to make capital go further with faster, more cost-effective site buildout, backed by its **buildout cost cap of $395K/MW and commitment to build 100 MW of capacity for NewCo within 12 months**

**Cost minimization**

‣ USBTC's plan provides **access to its in-house energy team at no cost to NewCo**, unlocking market-leading expertise and experience in energy markets and hedging

‣ USBTC has committed to a **labor cost cap of $2M per 100 MW** for all NewCo sites

**AGENDA**

Executive Summary

Strategy

Execution

**Risk Management**

Structure

Potential Opportunity Areas


# Proactive risk management strategy with goal of mitigating downside risk (1 of 2)

| Financial risk management | Operational risk management |
|---|---|

**Proactive balance sheet management** intended to ensure sufficient liquidity to execute NewCo business strategy

**Consideration of tail hedges in cheaper, more liquid incumbent TradFi markets** such as SPX and VIX based on projected correlations in stress scenarios

**Modelling of stress scenarios in the relationship between BTC price and aggregate BTC Network Hash Rate ("BNHR")** to assess worst-case scenarios for revenue generated from a given amount of mining capacity

**Cost-benefit analysis of BTC hedging and forward sale strategies** with the goal of managing BTC mining revenue risk

**Proactive yield generation strategies** such as smart rules-based optimized covered call sale strategies

**Correlation analysis of NewCo energy price per unit and the BTC-BNHR relationship**

# Proactive risk management strategy with goal of mitigating downside risk (2 of 2)



| Financial risk management | Operational risk management |
|---|---|

| Governance and compliance | Bitcoin mining | Ethereum staking |
|---|---|---|
| ▸ **Board composition and oversight**<br>NewCo's board will consist of a majority of directors appointed by Celsius creditors<br><br>▸ **Controls: Risk management systems**<br>Fahrenheit intends to design a risk management framework for NewCo consisting of clear management controls and delegation of authority; formal risk management, compliance, and/or controllership functions; and internal/external audit systems<br><br>▸ **Regulatory risk management**<br>NewCo intends for all business lines to be regulatorily compliant | ▸ **Counterparty risk management**<br>Fahrenheit intends to vertically integrate the mining division, building proprietary sites to reduce reliance on third party hosting partners<br><br>▸ **Execution risk management**<br>Fahrenheit plans to partner with a proven operator, USBTC, to build and operate mining sites faster and more cost-effectively than possible otherwise<br><br>▸ **Cost management**<br>Fahrenheit intends to continually improve hosting terms and hedge power costs with less capital investment by leveraging the negotiating power and relationships of USBTC | ▸ **Counterparty risk management**<br>Fahrenheit intends to leverage the proprietary IP of Proof Group to establish a self-staking operation for NewCo and eliminate reliance on third party staking partners |

**AGENDA**

Executive Summary

Strategy

Execution

Risk Management

**Structure**

Potential Opportunity Areas

# Public listing of NewCo with goal of optimizing valuation and liquidity

**Case study**

MicroStrategy (MSTR): A beneficiary of structural valuation premium and robust liquidity



**Adjusted enterprise value premium**



**Commentary**

‣ **MSTR's adjusted enterprise value has historically represented a premium to its BTC holdings** (now in excess of $3.5B), averaging 68%[1]

‣ **MSTR has a holder base that includes well-known institutions in traditional finance**; Top 10 investors include Capital Group (15%), Vanguard (9%), Fidelity (7%), Blackrock (7%) , State Street, and Morgan Stanley

‣ **MSTR has average daily trading volume of ~$200 million**



Fahrenheit expects to retain future free cash-flow in the form of liquid BTC/ETH, and, by seeking to list NewCo on a traditional stock exchange, intends to position NewCo to reach large traditional investors with the goal of maximizing liquidity over time

Note: (1) Comparing MSTR's fully diluted enterprise value for each of the last 10 quarters to end-of-quarter BTC holdings based on MSTR public disclosures; legacy approximately $75M EBITDA software business assumed value of $750M or 10x EBITDA.

NewCo Restructuring Plan | Structure

Fahrenheit Group    1

# Public listing is intended to provide accelerated path to liquidity for creditors



**Celsius assets to be transferred to NewCo (illustrative)**

Institutional loan portfolio
DeFi cryptocurrency assets
PE & VC investments

Liquid cryptocurrency

Mining assets

**Approximately $300 million in assets anticipated to be illiquid as of the Effective Date**
Institutional loan portfolio, DeFi cryptocurrency assets, and PE & VC investments

- Illiquid assets are **not** anticipated to be distributed as either Cash or Liquid Cryptocurrency as of the Effective Date
- Illiquid assets are **not** anticipated to be available for distribution in context of Orderly Wind Down
- Under Orderly Wind Down, debtors estimate the process of **monetizing these illiquid assets could take approximately five years from** date

The Fahrenheit plan, via the intended listing on Nasdaq, is intended to allow investors seeking liquidity to monetize their interests in NewCo (including in the illiquid assets) on or as soon as reasonably practicable following the Effective Date

**AGENDA**

Executive Summary

Strategy

Execution

Risk Management

Structure

**Potential Opportunity Areas**

# Transforming Bitcoin mining infrastructure for a smarter future: Unleashing the power of AI

| Potential to repurpose & diversify BTC mining infrastructure for AI |
| --- |

| | |
| --- | --- |
| **Potentially unlock new realm of growth potential** by repurposing electrical infrastructure for AI | **Could result in diversified revenue streams and optimized** operations through utilizing idle or underused electrical resources |
| **Intended to position NewCo to capitalize on growing demand** for AI-driven solutions | **Would showcase NewCo** as a brand that is ahead of future trends |



| |
| --- |
| **BTC mining infrastructure may offer a powerful framework for AI mining** |

# Bitcoin mining infrastructure appears to be well-suited for AI and other next gen workloads



## Existing infrastructure

NewCo may be able to use existing or new facilities to create a diversified revenue stream by leveraging existing access to:

▸ Low-cost energy

▸ Cooling systems

▸ Fiber connectivity

## Moving forward

▸ Evaluate potential strategies to capitalize on new trends and diversify revenue streams

▸ Explore potential of revenue stream for building a protocol specific to running AI workloads

▸ Seek to position NewCo ahead of the trend of the intersection of AI and crypto—a potentially significant opportunity for entrepreneurs and established organizations





# Potential areas of opportunity with the future of ETH staking

**ETH staking potential areas of opportunity**

### Restaking with goal of realizing unique yield opportunity

Intended to enable staked ETH holders to earn additional yield by providing validation to other blockchain networks without extra capital

### Could represent compelling development opportunity for developers

Restaking utilizes ~$30B+ in staked ETH to launch networks with strong security, saving both cost and time.
NewCo could be positioned to be a scaled player and would potentially have differentiated opportunity set

### Positive growth cycle

Increased demand for validation services could boosts rewards, incentivize participation, and potentially accelerate the development of the ETH ecosystem

### May yield operational efficiencies

Potentially quick to prototype, with goal of beginning new revenue generation using existing capital base





## EXHIBIT G

**Navigating the Ballot—Retail Borrower Deposit Claims**

Retail Borrower Deposit Claim

**If you are a Holder of Retail Borrower Deposit Claim, start here.**

*All defined terms are defined in the Plan.*

**Do you wish to opt out of the Class Claim Settlement?** (Review Item 8 on your Ballot.)

**Yes.** Your total Account Holder Claim (excluding your Custody Claim (if any)) will be treated as a Disputed Claim under the Plan, regardless of whether or how you vote on the Plan. Your Disputed Claim will have to be resolved in the claims reconciliation process before you can receive any distribution.

**No.** Your total Account Holder Claim (excluding your Custody Claim (if any)) is increased by 5%.

**Do you wish to make the Retail Advance Obligation Repayment Election?** (Review Item 3 on your Ballot.)

**Yes.** After you actually repay all or a portion of your Retail Advance Obligation(s) in accordance with the Retail Advance Obligation Repayment Instructions, you will receive an amount of BTC or ETH, at your election, equal to the repayment amount. The remaining amount of your Retail Borrower Deposit Claim is known as your Retail Borrower Post-Set Off Claim.

**No.** You will receive the Set Off Treatment: You will retain the proceeds of your Retail Advance Obligation(s) and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligation(s) outstanding as of the Petition Date. The remaining amount of your Retail Borrower Deposit Claim is known as your Retail Borrower Post-Set Off Claim.

**Yes. Your total Account Holder Claim will be treated as a Class 4 Convenience Claim.** (Review Items 4, 9 on your Ballot.) Review the Convenience Claim Chart for a summary of your options with respect to your Class 4 Convenience Claim.

**Is the value of your total Account Holder Claim (excluding your Custody Claims (if any) and Retail Borrower Deposit Claims (if any) but including your Retail Borrower Post-Set Off Claim (if any) and the 5% increase if you did not opt out of the Class Claim Settlement) greater than $10† but less than or equal to $5,000 as of the Petition Date?**

**Yes.** Your Claim(s) is automatically counted as a vote to accept the Plan in Class 2 and, if applicable, Class 5 or Class 7, and the total value of your Account Holder Claim is reduced to $5,000. **You will now receive the same treatment as a Holder of a Class 4 Convenience Claim on behalf of *all* of your Account Holder Claims.**

**No.** Do you wish to make the Convenience Claim Election? (Review Item 5 on your Ballot.)

You vote to accept the Plan. You have the option to make an Unsecured Claim Distribution Mix Election, *provided* that if you have other Account Holder Claims on account of which you are receiving the Unsecured Claim Distribution Consideration (*e.g.*, a General Earn Claim), any Unsecured Claim Distribution Mix Election you make will apply to those Claims as well. (Review Item 6 on your Ballot and the Unsecured Claim Distribution Election Chart for more details).

Because you have a Retail Borrower Post Set-Off Claim, any Liquid Cryptocurrency Weighted Distribution Election you make on account of your Retail Borrower Post Set-Off Claim will have priority over other Liquid Cryptocurrency Distribution Elections made by other Account Holders.

In addition, because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

**No.** You have a Retail Borrower Post-Set Off Claim that will receive the same treatment as a General Earn Claim. In the NewCo Transaction, you will receive your Pro Rata share of (a) Liquid Cryptocurrency, (b) Litigation Proceeds, and (c) NewCo Common Stock. In the Orderly Wind Down, you will receive your Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights.

**Do you vote to accept the Plan?** (Review Items 3, 9 on your Ballot.)

You vote to reject the Plan OR you do not vote on the Plan. You have the option to opt out of the releases (review Item 10 on your Ballot), but you will *not* have the option to make any Unsecured Claim Distribution Mix Election.

If you opt out of the releases, you will (1) not receive a Debtor Release or a Third-Party Release and (2) not provide the Released Parties with a Third-Party Release.

If you do not opt out of the release, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

† Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

## EXHIBIT H

**Navigating the Ballot—Convenience Claims**

**If you are a Holder of Convenience Claim, start here.***

*All defined terms are defined in the Plan.*

Do you wish to *opt out* of the Class Claim Settlement? (Review Item 6 on your Ballot.)

**Yes.*** Is the value of your total Account Holder Claim (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) greater than $10*** and less than $5,000 as of the Petition Date?)

**No.†** Is 105% of the value of your total Account Holder Claim (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims and including the 5% increase if you did not opt out of the Class Claim Settlement) greater than $10*** and less than $5,000 as of the Petition Date?)

**Yes.** You are a Holder of a Class 4 Convenience Claim and you may vote to reject or accept the Plan. **Do you vote to accept or reject the Plan?** (Review Items 4, 9 on your Ballot.)

**No.** You are not a Holder of a Class 4 Convenience Claim. You may, however, make the Convenience Claim Election. For the avoidance of doubt, even if you make the Convenience Claim Election below and, on your Ballot, your vote(s) will be counted as a Class 2 Retail Borrower Deposit Claim, Class 5 General Earn Claim, and/or a Class 7 Withhold Claim, as applicable. **Do you make the Convenience Claim Election?** (Review Item 5 on your Ballot.)

**You vote to reject the Plan. You can decide whether to opt out of the releases.** (Review Item 10 on your Ballot.)

**You vote to accept the Plan.**

**You make the Convenience Claim Election and *opt in* to receive the Convenience Class treatment.**

**You do not make the Convenience Claim Election.**

**You are a Holder of a Class 4 Convenience Claim and you will receive Convenience Class treatment if the Plan is Confirmed.** In either the NewCo Transaction or the Orderly Wind Down, you will receive Liquid Cryptocurrency in an amount that provides 70% recovery on account of your Convenience Claim.

**If you opt out of the release,** you will (1) not receive a Debtor Release or a Third-Party Release and (2) not provide the Released Parties with a Third-Party Release.

**If you do not opt out of the release** you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

**You are a Holder of a Class 4 Convenience Claim and you will receive Convenience Class treatment if the Plan is Confirmed.** In either the NewCo Transaction or the Orderly Wind Down, you will receive Liquid Cryptocurrency in an amount that provides 70% recovery on account of your Convenience Claim.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

**Your Claim(s) is automatically counted as a vote to accept the Plan in Class 2, Class 5, and/or Class 7, as applicable.**

**The total value of your Account Holder Claim is reduced to $5,000.**

Please review the respective Charts for Retail Borrower Deposit Claim, General Earn Claim, and Withhold Claim for the summary of your options with respect to your Retail Borrower Deposit Claim, General Earn Claim, and/or Withhold Claim.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.

\* This chart assumes that your *only* Claims are Account Holder Claims that may result in a Class 4 Convenience Claim and that you do not have any other Claims.

\*\* If you opt out of the Class Claim Settlement, your Account Holder Claims will be treated as Disputed Claims under the Plan, regardless of whether or how you vote on the Plan.

\*\*\* Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

† You will receive a claim equal to 105% of your scheduled Account Holder Claims (other than Custody Claims) for purposes of distribution, but you can only vote the amount of your scheduled Account Holder Claims.

## EXHIBIT I

**Navigating the Ballot—General Earn Claims**

**If you are a Holder of a General Earn Claim, start here.**

*All defined terms are defined in the Plan.*

**General Earn Claim***

\* If your Account Holder Claim is not otherwise classified under the Plan, you have a General Earn Claim.

\*\* Please review the Withhold Claim Chart for a summary of your options with respect to your Withhold Claim.

\*\*\* Please review the Retail Borrower Deposit Claim Chart for a summary of your options with respect to your Retail Borrower Deposit Claim.

† Claims below \$10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

‡ If you opt out of the Class Claim Settlement, your Account Holder Claims will be treated as Disputed Claims under the Plan, regardless of whether or how you vote on the Plan.

& You will receive a claim equal to 105% of your scheduled Account Holder Claims (other than Custody Claims) for purposes of distribution, but you can only vote the amount of your scheduled Account Holder Claims.

**Do you wish to *opt out* of the Class Claim Settlement? (Review Item 8 on your Ballot.)**

**Yes.‡ Is the value of your total Account Holder Claim (excluding your Custody Claims and Retail Borrower Deposit Claims (if any) but including your Retail Borrower Post-Set Off Claim (if any)) greater than \$10† but less than or equal to \$5,000 as of the Petition Date?**

**No.& Is 105% of the value of your total Account Holder Claim (excluding your Custody Claims and Retail Borrower Deposit Claims (if any) but including your Retail Borrower Post-Set Off Claim (if any)) greater than \$10† but less than or equal to \$5,000 as of the Petition Date?**

**Yes. You are *not* a Holder of a Class 5 General Earn Claim. You are a Holder of a Class 4 Convenience Claim. (Review Items 4, 9 on your Ballot.) Review the Convenience Claim Chart for a summary of your options with respect to your Class 4 Convenience Claim.**

**No. If one of your Account Holder Claims is a General Earn Claim, then you are a Holder of a Class 5 General Earn Claim and, if you have a Withhold Claim** or Retail Borrower Deposit Claim,*** the Holder of a Class 2 Retail Borrower Deposit Claim or Class 7 Withhold Claim in the amounts set forth in your Ballot. Do you vote to accept the Plan? (Review Item 9 on your Ballot.)**

**You vote to accept the Plan. You have the option to make the Convenience Claim Election. (Review Item 5 on your Ballot.) For the avoidance of doubt, even if you make the Convenience Claim Election on your Ballot, your vote(s) will be counted as a Class 5 General Earn Claim, and, if applicable, a Class 2 Retail Borrower Deposit Claim or Class 7 Withhold Claim in the scheduled amount. Do you make the Convenience Claim Election? (Review Item 5 on your Ballot.)**

**You vote to reject the Plan. You can decide whether to opt out of the releases. (Review Item 10 on your Ballot.)**

**You make the Convenience Claim Election and *opt in* to receive the Convenience Class treatment.**

**Your Claim(s) is automatically counted as a vote to accept the Plan in Class 5 and, if applicable, Class 2 or Class 7.**

**The total value of your Account Holder Claim is reduced to \$5,000.**

**You will now receive the same treatment as a Holder of a Class 4 Convenience Claim on behalf of *all* of your Account Holder Claims. For example, if you had both a General Earn Claim and a Withhold Claim, you will receive one distribution on the same treatment terms as a Convenience Claim, which means you will receive Liquid Cryptocurrency in an amount that provides 70% recovery on account of your Convenience Claim.**

**You do not make the Convenience Claim Election.**

**You are a Holder of a Class 5 General Earn Claim. Because you vote to accept the Plan, you have the option to make the Unsecured Claim Distribution Mix Election. Please refer to the Unsecured Claim Distribution Mix Election Chart on the next page to understand your treatment election options.**

**Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.**

**You are a Holder of a Class 5 General Earn Claim. In the NewCo Transaction, you will receive your Pro Rata share of (a) Liquid Cryptocurrency, (b) Litigation Proceeds, and (c) NewCo Common Stock.**

**In the Orderly Wind Down, you will receive your Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights.**

**In both the NewCo Transaction and the Orderly Wind Down, you will *not* have the option to make any Unsecured Claim Distribution Mix Elections because you voted to reject the Plan.**

**If you opt out of the releases, you will not receive a Debtor Release or a Third-Party Release and you will not provide the Released Parties with a Third-Party Release.**

**If you do not opt out of the releases and you are not an Excluded Party, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL for more information on the releases.**

**Unsecured Claim Distribution Mix Election**

**If you are entitled to receive the Unsecured Claim Distribution Consideration on account of your Retail Borrower Post-Set Off Claim, General Earn Claim, or Withhold Claim, AND you have voted to accept the Plan, you have the option to make an Unsecured Claim Distribution Mix Election.\*  Do you want to make the Unsecured Claim Distribution Mix Election?** (Review Item 6 on your Ballot.)

**Yes.  You want to make an Unsecured Claim Distribution Mix Election. Would you like to receive a greater share of the Unsecured Claim Distribution Consideration or a greater share of the NewCo Common Stock?**

**No.  You do not want to make an Unsecured Claim Distribution Mix Election.**

**You would like to receive a greater share of the Liquid Cryptocurrency Distribution Amount instead of some or all of your Pro Rata share of NewCo Common Stock.  You make the Liquid Cryptocurrency Weighted Distribution Election.** (Review Item 6 on your Ballot.)

**If the Plan is confirmed, and if your election is honored,^ you may receive incremental Liquid Cryptocurrency at a 30% discount to the amount of NewCo Common Stock that you are forfeiting depending on what transaction is consummated.**

**You would like to receive a greater share of NewCo Common Stock instead of some or all of your Pro Rata share of the Liquid Cryptocurrency Distribution Amount.  You make the NewCo Common Stock Weighted Distribution Election.** (Review Item 6 on your Ballot.)

**If the Plan is confirmed, and if your election is honored,^ you may receive incremental NewCo Common Stock equal to 30% more than the Liquid Cryptocurrency Distribution Amount that you forfeited depending on what type of transaction is consummated.**

**If the Plan is confirmed, in the NewCo Transaction you will receive your Pro Rata share of (a) Liquid Cryptocurrency, (b) Litigation Proceeds, and (c) NewCo Common Stock.**

**In the Orderly Wind Down, you will receive Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) Litigation Proceeds, and (c) the Illiquid Recovery Rights.**

**Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party.  Review Article III.LL for more information on the releases.**

**The Orderly Wind Down is consummated.**

**The NewCo Transaction is consummated.**

**The Orderly Wind Down is consummated.**

**The NewCo Transaction is consummated.**

**You will receive your Pro Rata share of Liquid Cryptocurrency, Backup MiningCo Common Stock, Litigation Proceeds, and Illiquid Recovery Rights without consideration of any of your elections.#**

**To the extent possible, depending on the Unsecured Claim Distribution Mix Elections made by all Holders of Claims entitled to make such election, you will receive a greater share of Liquid Cryptocurrency instead of some or all of your Pro Rata share of NewCo Common Stock.#**

**You will receive your Pro Rata share of Liquid Cryptocurrency, Backup MiningCo Common Stock, Litigation Proceeds, and Illiquid Recovery Rights without consideration of any of your elections.#**

**To the extent possible, depending on the Unsecured Claim Distribution Mix Elections made by all Holders of Claims entitled to make such election, you will receive a greater share of NewCo Common Stock instead of some or all of your Pro Rata share of the Liquid Cryptocurrency Distribution Amount.#**

\*    Any Unsecured Claim Distribution Mix Election you make shall apply to all Claims on account of which you receive the Unsecured Claim Distribution Consideration.

^    The Debtors' ability to accommodate Account Holders' individual elections will ultimately depend on the Unsecured Claim Distribution Mix Election made by all Holders of Claims in the aggregate, including the priority given to Holders of Retail Borrower Post-Set Off Claims in making the Liquid Cryptocurrency Weighted Election.  The Debtors will use reasonable efforts to arrange the Unsecured Claim Distribution Consideration provided to the Holders of Claims to satisfy the aggregate Unsecured Claim Distribution Mix Election.

#    Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party.  Review Article III.LL for more information on the releases.

## <u>EXHIBIT J</u>

**Navigating the Ballot—Custody Claims**

**If you are a Holder of a Custody Claim, start here.**

*All defined terms are defined in the Plan.*

**Is at least some of your Custody Claim authorized to be withdrawn pursuant to the Custody Withdrawal Order? (Is your name listed on the Revised Withdrawal Notice [Docket No. 2491]?)\***

**Yes** → | ← **No**

**You are a Holder of a Class 6B Withdrawable Custody Claim.**

You are presumed to accept the Plan, solely with respect to your Class 6B Claim, and are not entitled to vote your Class 6B Claim.

You can decide whether to opt out of the releases. (Review the Notice of Non-voting Status.)

You will be eligible to withdraw 100% of the Cryptocurrency making up your Class 6B Claim in accordance with the Custody Withdrawal Order.

**If you opt out of the release,** you will not receive a release and you will not provide the Released Parties with a release, solely with respect to your Class 6B Claim.

**If you do not opt out of the release,** you will receive a release and you will provide the Released Parties with a release, solely with respect to your Class 6B Claim.

If a portion of your Custody Claim is not on the Revised Withdrawal Notice (because it was transferred from the Earn Program or Borrow Program into the Custody Program **and it** was valued at more than $7,575 in the aggregate, valued at the time of the transfer), restart this chart with a "No" answer to review the options on account of that portion of your Custody Claim.

**You are a Holder of a Class 6A General Custody Claim.**

**Did you *opt in* to the Custody Settlement on or before April 24, 2023?**

**Yes** ← | → **No**

**You are a Holder of a Class 6A General Custody Claim** and you are deemed to accept the Plan with respect to your Class 6A Claim, regardless of whether you return your Ballot or vote to reject the Plan on your Ballot, as you agreed to do in accepting the Custody Settlement.

**Have you previously withdrawn any amounts of your Custody Claim pursuant to the Custody Settlement?**

**Yes** | **No**

**You are a Holder of a Class 6A General Custody Claim** and you may vote to reject or accept the Plan. **Do you vote to accept or reject the Plan?** (Review **Items 6, 9** on your Ballot.)

**You vote to accept the Plan.**

**You vote to reject the Plan or you abstain (do nothing) from voting your Class 6A General Custody Claim on the Plan.**

**You will receive a distribution in the amount of Treatment A *minus* any amounts you have previously withdrawn from the Debtors' platform.** In either the NewCo Transaction or the Orderly Wind Down, you will be eligible to withdraw 72.5% of the Cryptocurrency in your Allowed Class 6A General Custody Claim, less any amounts (up to 36.25%) previously withdrawn, on or shortly after the Effective Date.

You will also receive a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Class 6A General Custody Claim.+

**You will receive a distribution in the amount of Treatment A.** If the Plan is Confirmed, in either the NewCo Transaction or the Orderly Wind Down, you will be eligible to withdraw 72.5% of the Cryptocurrency in your Allowed Class 6A General Custody Claim on or shortly after the Effective Date.

You will also receive a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Class 6A General Custody Claim.+

**You will receive Treatment B.** In either the NewCo Transaction or the Orderly Wind Down, 100% of the Cryptocurrency associated with your Class 6A General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and will be subject to all Avoidance Actions and other claims with respect to such Class 6A General Custody Claim. The Litigation Administrator(s) shall have 180 days (or longer if approved by the Bankruptcy Court) to bring any Avoidance Action or other claim against you with respect to such assets. If no action is brought and no settlement is reached in such time period (as extended), such assets shall be released to you. Any such Allowed General Custody Claim will be subject to the ADR Procedures.

You will not receive a release with respect to your Class 6A General Custody Claim and you will not provide the Released Parties with a release with respect to your Class 6A General Custody Claim.

\*       Assets that are eligible to be withdrawn pursuant to the Custody Settlement Order are those that either (a) were only ever held in the Custody Program or (b) were transferred from the Earn Program or the Borrow Program into the Custody Program **and** were valued at less than $7,575 in the aggregate, valued at the time of the transfer.

+       If your Withdrawal Preference Exposure is under $100,000 (review **Items 1, 12** on your Ballot), and you either (a) have no other Claims to vote or (b) have other Claims to vote and vote *all* of those Claims to accept the Plan, then you will receive a 100% recovery of your Class 6A General Custody Claim.

## EXHIBIT K

**Navigating the Ballot—Withhold Claims**

**If you are a Holder of a Withhold Claim, start here.**

*All defined terms are defined in the Plan.*

\*    Ineligible Withhold Assets are not considered Withhold Claims. If you have Ineligible Withhold Assets, you will receive 100% recovery on such Ineligible Withhold Assets as of the Petition Date.

\*\*    If you opt out of the Class Claim Settlement, your Account Holder Claims will be treated as Disputed Claims under the Plan, regardless of whether or how you vote on the Plan.

\*\*\*    Claims below $10 (the *De Minimis* Claims Threshold) are not entitled to distribution.

†    You will receive a claim equal to 105% of your scheduled Account Holder Claims (other than Custody Claims) for purposes of distribution, but you can only vote the amount of your scheduled Account Holder Claims.

+    If you have any other Claims (other than a Custody Claim), you *must* vote ALL Claims to accept the Plan. To be clear, you do *not* have to vote your Custody Claim to accept the Plan if you vote your Withhold Claim to accept the Plan.

Withhold Claims\* ⟶ Did you participate in the Withhold Settlement? ⟶ **Yes. You no longer have a Withhold Claim. You have a Class 5 General Earn Claim.** Please review the General Earn Claim Chart for a summary of your options with respect to your General Earn Claim.

No. Do you wish to *opt out* of the Class Claim Settlement? (Review **Item 8** on your Ballot.)

**Yes.\*\*** Is the value of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) greater than $10\*\*\* but less than or equal to $5,000 as of the Petition Date?

No. Is 105% of the value of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) greater than $10\*\*\* but less than or equal to $5,000 as of the Petition Date?

**Yes. You are not a Holder of a Class 7 Withhold Claim. You are a Holder of a Class 4 Convenience Claim.** (Review **Items 4, 9** on your Ballot.) Review the Convenience Claim Chart for a summary of your options with respect to your Class 4 Convenience Claim.

**No. You are a Holder of a Class 7 Withhold Claim and, if you have a Retail Borrower Deposit Claim or General Earn Claim,\*\* the Holder of a Class 2 Retail Borrower Deposit Claim, or Class 5 General Earn Claim** in the amounts set forth in your Ballot. **Do you vote to accept the Plan?** (Review **Items 9** on your Ballot.)

Yes. You vote to accept the Plan. You have the option to make the Convenience Claim Election. (Review **Item 5** on your Ballot.) For the avoidance of doubt, even if you make the Convenience Claim Election below and on your Ballot, your vote(s) will be counted as a Class 7 Withhold Claim, and, if applicable, a Class 2 Retail Borrower Deposit Claim, or Class 5 General Earn Claim. **Do you want to make the Convenience Claim Election?** (Review **Item 5** on your Ballot.)

No. You vote to reject the Plan. You can decide whether to opt out of the releases. (Review **Item 10** on your Ballot.)

Yes. You make the Convenience Claim Election and *opt in* to receive the Convenience Class Distribution.

No. You do not make the Convenience Claim Election.

Your Claim(s) is automatically counted as a vote to accept the Plan in Class 7 and, if applicable, Class 2 or 5.

The total value of your Account Holder Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) is reduced to $5,000.

**You will now receive the same treatment as a Holder of a Class 4 Convenience Claim on behalf of all of your Account Holder Claims.** For example, if you had both a Withhold Claim and a General Earn Claim, you will receive one distribution on the same terms as a Convenience Claim, which means you will receive Liquid Cryptocurrency in an amount that provides a 70% recovery on account of such Convenience Claim.

**You are a Holder of a Class 7 Withhold Claim.** In either the NewCo Transaction or the Orderly Wind Down, if Class 7 votes to accept the Plan, then you will receive a distribution of Cryptocurrency equal to 15% of the value of your Withhold Claim, distributed on or shortly after the Effective Date. The remaining 85% of your Withhold Claim will receive a Pro Rata share of the Unsecured Claim Distribution Consideration.

If Class 7 votes to reject the Plan, then your entire Withhold Claim will be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration, but you will not be able to make any elections with respect to such

**You are a Holder of a Class 7 Withhold Claim.** In either the NewCo Transaction or the Orderly Wind Down, if Class 7 votes to accept the Plan, you will receive a distribution of Liquid Cryptocurrency equal to 15% of the value of your Withhold Claim, distributed on or shortly after the Effective Date. The remaining 85% of your Withhold Claim will receive a Pro Rata share of the Unsecured Claim Distribution Consideration.

If Class 7 votes to reject the Plan, then your entire Withhold Claim will be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration, but you will not be able to make any elections with respect to such treatment.

**If you opt out of the releases,** you will not receive a Debtor Release or a Third-Party Release and you will not provide the Released Parties with a Third-Party Release.

**If you do not opt out of the releases** and you are not an Excluded Party, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. Review Article III.LL.

Because you vote to accept the Plan, you will (1) receive a Debtor Release and a Third-Party Release if you are not an Excluded Party and (2) provide the Released Parties with a Third-Party Release regardless of whether you are an Excluded Party. *To be clear, even if Class 7 votes to reject the Plan, your release is binding.* Review Article III.LL for more information on the releases.

## Exhibit L

### Cryptocurrency Conversion Table

*The below table contains the Debtors' view of prices for all types of cryptocurrencies listed on the Debtors' schedules as of 8:10 p.m., prevailing Eastern Time, on July 13, 2022 (i.e., approximately the time the Debtors commenced their chapter 11 cases). Prepetition, in the ordinary course of business, the Debtors determined the price of coins utilized in their services primarily by referencing pricing feeds such as Coingecko and CoinPaprika. For certain coins, the Debtors used "CPS," the Debtors' proprietary pricing engine. CPS processes inputs from five external sources (Chainlink, Coinmarketcap, Coingecko, CoinPaprika, and Fixer) to determine the price of a coin. The system evaluates averages, closing prices, and ten-day low prices from one or more of the inputs in assigning a price. In some circumstances, only a single input is utilized because it is all that is available (or reliably available) for a particular coin. The use of multiple inputs allows CPS to reduce the risk that outlier data points will result in an inaccurate price and also allows the Debtors' platform to support a wider variety of coins, as not every coin is priced on every input.*

[*Remainder of page intentionally left blank.*]

**Cryptocurrency Conversion Table**
**Petition Date USD Coin Prices as of 8:10 PM ET on 7/13/2022**

| Coin | USD Price |
|---|---|
| 1INCH | 0.581744108 |
| AAVE | 78.24291593 |
| ADA | 0.427003308 |
| AVAX | 18.49035408 |
| BADGER | 3.285369715 |
| BAT | 0.37621662 |
| BCH | 100.546894 |
| BNB | 226.92614 |
| BNT | 0.450047559 |
| BSV | 50.99015321 |
| BTC | 19881.00134 |
| BTG | 15.14018234 |
| BUSD | 1 |
| CEL | 0.81565 |
| COMP | 47.33041601 |
| CRV | 1.032841943 |
| CVX | 6.08763006 |
| DAI | 1 |
| DASH | 41.79955662 |
| DOGE | 0.061140905 |
| DOT | 6.360775884 |
| EOS | 0.929357695 |
| ETC | 14.12753443 |
| ETH | 1088.170943 |
| GUSD | 1 |
| KNC | 1.263392739 |
| LINK | 6.077201511 |
| LPT | 8.033566927 |
| LTC | 48.75597218 |
| LUNC | 0.00009241 |
| MANA | 0.80042259 |
| MATIC | 0.609434275 |
| MCDAI | 1 |
| MKR | 839.8922442 |
| OMG | 1.71960007 |
| ORBS | 0.040053336 |
| PAX | 1 |
| PAXG | 1738.836303 |
| SGA | 1.214643649 |
| SGB | 0.026003699 |
| SGR | 1.214643649 |
| SNX | 2.465894386 |
| SOL | 34.24173443 |
| SPARK | 0 |
| SUSHI | 1.214062046 |
| TAUD | 0.6748 |
| TCAD | 0.7701 |
| TGBP | 1.1881 |
| THKD | 0.1274 |
| TUSD | 1 |
| UMA | 2.487366187 |
| UNI | 6.014518833 |
| USDC | 1 |
| USDT ERC20 | 1 |
| UST | 0.039474965 |
| WBTC | 19852.24182 |
| WDGLD | 168 |
| XAUT | 1741.393614 |
| XLM | 0.104188979 |
| XRP | 0.321111953 |
| XTZ | 1.483213139 |
| YFI | 5742.188874 |
| ZEC | 53.54163596 |
| ZRX | 0.277486691 |
| ZUSD | 1 |