Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' OMNIBUS**
**REPLY IN SUPPORT OF THE ADEQUACY OF**
**THE DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
submit this omnibus reply (this "Reply") in support of the *Debtors' Disclosure Statement for the
Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates*
[Docket No. 3223] (including all exhibits thereto, and as may be amended, modified, or
supplemented from time to time, the "Disclosure Statement")[2] and the *Debtors' Motion for Entry*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    The Debtors filed previous versions of the Disclosure Statement at [Docket Nos. 2907 and 3117].

*of an Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the*

*Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Joint Plan of*

*Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith,*

*(IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving*

*Reimbursement of Certain of the Plan Sponsor's Fees And Expenses, and (VI) Granting Related*

*Relief* [Docket No. 2970] (the "Disclosure Statement Motion")[3] and in response to certain of the

objections, limited objections, letters in response to, and reservations of right with respect to the

Disclosure Statement and the Disclosure Statement Motion (collectively, the "Objections" filed by

the "Objecting Parties").[4]  In further support of the Disclosure Statement Motion and this Reply,

the Debtors state the following:[5]

## **Preliminary Statement**

1.      Although it has been more than a year since the Petition Date, these Chapter 11

Cases have reached their final stages.  The Debtors have worked hand-in-glove with the Committee

to identify and develop the Fahrenheit Plan to maximize the value of the Debtors' liquid and

illiquid assets for the benefit of their creditors.  The Plan is the culmination of a months'-long

competitive auction process that generated hundreds of millions of dollars of additional value for

creditors.  Following the auction, the Debtors worked tirelessly to build additional consensus for

the Plan.  The amount of support that the Plan has garnered is remarkable, particularly given the

---

[3]     The Debtors filed a revised proposed order seeking approval of the Disclosure Statement contemporaneously with this Reply.

[4]     A list and summary of all the Objections filed in response to the Disclosure Statement and Disclosure Statement Motion and the Debtors' responses thereto are provided in the objection chart attached hereto as **Exhibit A** (the "Objection Chart").

[5]     Capitalized terms used but not defined herein have the meaning ascribed to them in the Objection Chart, Disclosure Statement, or the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3222] (as may be amended, modified, or supplemented from time to time, the "Plan").

unique nature of these Chapter 11 Cases and the significant failings of Celsius' prepetition business practices. The Court has already approved settlements with the Custody and Withhold ad hoc groups that resolved contentious litigation and formed the basis for the Plan treatment of those groups. The Debtors and the Committee also settled the multi-faceted litigation with the Series B Preferred Holders, perhaps the most significant hurdle to confirmation, allowing the Debtors to return the value of CNL, Mining, and GK8 to Account Holders.

2.      In addition, following a three-day mediation with Judge Wiles, the Debtors, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group signed a term sheet that resolved key intercreditor issues between the Earn and Borrow customers. The Debtors and the Committee have also resolved the Class Claim Settlement Motion as part of that mediation term sheet, which will greatly streamline the claims reconciliation process and allow distributions to be made to creditors promptly upon the Effective Date of the Plan, as well as increase Claims by Account Holders (other than Custody Claims) who do not opt out of the class settlement by 5% on account of Celsius' prepetition fraud, misrepresentations, and other noncontractual claims.

3.      The Debtors now seek approval of their Disclosure Statement—a tome of over 300 pages even prior to the lengthy exhibits—which provides significant and adequate disclosure regarding the Plan. These Chapter 11 Cases are unique and complex, the transactions contemplated by the Debtors' Plan are similarly unique and complex, and the Debtors' diverse creditor body has varying levels of familiarity with the bankruptcy law process. Accordingly, the Debtors have worked diligently to tailor their Disclosure Statement to their creditor body—to explain the Plan and what it means for creditors in "plain English" wherever possible to ensure that Account Holders understand the proposed transactions and are provided with adequate

information to make an informed decision regarding whether to vote to accept or reject the Plan, as required by section 1125 of the Bankruptcy Code.

4.       Put simply, there can be no serious dispute that the Disclosure Statement provides adequate information regarding the Plan and should be approved.  The Disclosure Statement begins with an executive summary of over twenty pages that straightforwardly explains the key terms of the Plan, with detailed charts for each type of Account Holder Claims detailing the treatment being provided to Earn, Borrow, Custody and Withhold, and the elections open to each Account Holder.  The Disclosure Statement also includes nearly ninety pages of "frequently asked questions" and answers to streamline the most sought-after information regarding the Plan and what it means for creditors.  Finally, the Disclosure Statement includes detailed financial projections and valuations, as well as a presentation from Fahrenheit which is tailored to explain their vision for NewCo to the Debtors' creditors, who will be the equity owners of NewCo.

5.       As is typical in large Chapter 11 Cases, although over a dozen Objections were filed, the vast majority of which do not actually argue that the Disclosure Statement does not provide adequate information.  Instead, these Objections are premature confirmation objections that are not properly considered at a Disclosure Statement.    To the extent the Court entertains these premature confirmation objections at the Disclosure Statement hearing, it is not even a close call:  the Plan is not patently unconfirmable, and the Court should overrule the confirmation-related objections at this stage.  The Debtors recognize that certain creditors, particularly the vocal holders of CEL Token who are objecting to the proposed valuation of the CEL Token contained in the Plan, may not presently support the Plan.  That does not, however, render the disclosure about the Plan, the proposed CEL Token Settlement, the treatment of CEL Token Claims, and the valuation

of CEL Token, among other issues, inadequate.  These creditors will "have their day in court" and be able to object to the Plan at the appropriate time—the confirmation hearing.

6.        Likewise, the U.S. Trustee's objection is premature, and the issues raised therein are better suited for the confirmation hearing.  While the U.S. Trustee asserts that the Disclosure Statement does not include adequate disclosure regarding the proposed releases, that is simply not credible—the Disclosure Statement includes a section explaining the proposed releases and exculpations in plain English for approximately ten pages.  The Debtors intended this disclosure to be the most robust and understandable explanation of releases given that most of the Debtors' creditors are retail holders.  The substantive objections to the Plan in the U.S. Trustee's objection are similarly fatally flawed.  The objection includes a significant misunderstanding of the applicable standards in this Circuit for exculpations and consensual third-party releases.  Large chapter 11 cases in this District routinely include consensual third-party releases, and this Court routinely approves them.  This case is not *Purdue*, where the Sackler family was seeking a ***nonconsensual*** release, which is a plan provision that must demonstrate that the heightened *Metromedia* factors have been satisfied to justify such extraordinary relief.  The Plan, by contrast, merely includes a typical consensual release, which is mutual—each Releasing Party is also a Released Party, and all parties have the opportunity to opt out of the releases.  As a settlement with the SEC, the Debtors agreed to revise the Plan to have the release be "opt in" for classes deemed to reject the Plan.   As to the exculpation provisions, the U.S. Trustee curiously argues that the exculpation must have an opt out option for creditors, without providing any precedent or legal authority for that proposition.  But these are all issues that the Court can decide at confirmation and need not reach at the Disclosure Statement hearing.

7.      The remaining "patently unconfirmable" objections are of the same vein.
Perplexingly, the Earn Ad Hoc Group filed a reservation of rights regarding, among other issues,
governance concerns, despite the fact that they signed a term sheet following mediation that
included a resolution of these same governance issues—including the right of the Earn Ad Hoc
Group to appoint a member of the Litigation Oversight Committee as the result of that mediated
agreement.  But putting that peculiarity to the side, the governance of the NewCo is simply not
before the Court at the Disclosure Statement hearing.  Additionally, Mr. Kieser, a member of the
Retail Borrower Ad Hoc Group, argues that all of the Earn creditors should be subordinated to the
retail borrowers' claims because the Earn claims arise from the purchase or sale of a security
pursuant to section 510(b) of the Bankruptcy Code.   This transparently self-serving argument (that
over 90% of the Debtors' creditors should be subordinated to claims of the type held by Mr. Kieser)
is as preliminary as it is legally incorrect.

8.      Certain of the reservations of rights also bear mentioning.   The Debtors have
worked constructively with federal and state regulators to ensure that the Plan (and NewCo's
business) is fully regulatorily compliant.  The SEC filed a reservation of rights noting its concerns
regarding the potential tokenization of the Illiquid Recovery Rights under the Plan.  In response,
the Debtors removed that potential outcome from the Plan and Disclosure Statement.  Notably, the
SEC noted that the Debtors "cooperated with the staff in addressing other concerns regarding the
Disclosure Statement and Plan."  SEC Reservation of Rights at 3.  Likewise, the state regulators
filed reservations of rights noting that constructive dialogues were ongoing regarding the treatment
of state regulatory claims, and the Debtors believe that they have now resolved all of such concerns
for purposes of the Disclosure Statement.

9.      Put simply, the Debtors' 300-plus-page Disclosure Statement addresses all of the disclosure-related Objections and otherwise contains adequate information to satisfy the requirements of section 1125 of the Bankruptcy Code.  Accordingly, the Disclosure Statement Motion should be granted, and the Disclosure Statement should be approved.  The Debtors look forward to commencing solicitation on the Plan and working towards their ultimate goal of confirming the Plan and commencing distributions to creditors by the end of 2023.

## Reply

10.      The Debtors received approximately forty total Objections, two of which are formal reservations of rights, and approximately twenty-three of which are letters that the Debtors are treating as Objections, as well as a number of informal comments.  The Objections generally fall into one or more of the following two categories:  (a) Objections arguing that the Disclosure Statement does not provide adequate information as required under section 1125 of the Bankruptcy Code; and (b) Objections arguing that the Disclosure Statement cannot be approved because the Plan is patently unconfirmable (which are more accurately objections to the Plan and are therefore premature and must be addressed during the confirmation process).  As further set forth below, the Disclosure Statement was either revised to address the disclosure-related Objections, or these Objections should be overruled, and the Disclosure Statement should be approved.

I.    **The Disclosure Statement Contains Adequate Information Under Section 1125 of the Bankruptcy Code.**

11.      Courts have interpreted "adequate information" to mean information that is "reasonably practicable" to permit an "informed judgment" by creditors voting on a chapter 11 plan.  *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).  The adequacy of information in a disclosure statement is determined on a case-by-case basis.  *See In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (Bankr. S.D.N.Y. 1995) (the adequacy of a disclosure statement "is

to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties"); *see also In re Oneida Motor Freight, Inc.*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."). More importantly, the adequate information standard under the Code is merely a floor—not a ceiling. *See In re Adelphia Commcn's Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Sept. 26, 2006) ("[T]he 'adequate information' requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors.").

12.    The Disclosure Statement is approximately 320 pages (not including exhibits) and includes a comprehensive summary of the complicated transactions set forth in the Plan. For the reasons set forth herein, the Disclosure Statement more than provides "adequate information" necessary to allow all creditors to make an informed decision to vote on the Plan, and all Objections to the adequacy of the Disclosure Statement should be overruled.

### A.    The Disclosure Statement Adequately Explains the Custody Account Holder Treatment and the Avoidance Action Settlement.

13.    The U.S. Trustee argues that Holders of Custody Claims are subject to an impermissible "death trap" because the Plan provides that the Debtors will release Avoidance Actions against such Holders *only* if they vote to accept the Plan. *See* U.S. Trustee Obj. at 3–4. The U.S. Trustee misunderstands the treatment of Custody Claims under the Plan. The requirement that Holders of Custody Claims vote to accept the Plan to participate in the Avoidance Action Settlement is not a "death trap," but rather a way to ensure that these Holders are consenting to both the Custody Settlement and the Avoidance Action Settlement. This is necessary with respect to Holders of Custody Claims because this Court ruled, as described in detail in Article VII.L of the Disclosure Statement, that assets held in Custody Accounts are not property of the

Debtors' Estates while also holding that the Debtors could maintain possession of such assets pending the commencement and resolution of any preference actions. The Court reiterated the importance of ***individualized consent*** for Holders of Custody Claims in the Plan when approving the Custody Settlement and noting that opting out of such settlement may subject these Holders to preference actions. *See* March 21, 2023 Hearing Transcript 16:13–17:6. Thus, the proposed treatment for Holders of Custody Claims is not improper and not a "death trap."

14.    Moreover, the Disclosure Statement comprehensively explains, in multiple places, the treatment that Holders of Custody Claims will receive under the Plan. The preliminary statement first provides a plain-English explanation of the Plan treatment of Holders of General Custody Claims and the role that Avoidance Actions play in that treatment. *See* Disclosure Statement, Art. II.C. Next, the Questions & Answers section (the "Q&A"), through eight subsections, explains the treatment of General Custody Claims in depth, including that if a Holder of such Claims votes to reject the Plan or abstains, such Holder will be subject to potential Avoidance Actions and why that is the case. *See* Disclosure Statement, Art. III.TT. In addition, Article III.PP of the Q&A explains the Account Holder Avoidance Action Settlement, including explaining what a preference is. Finally, to accommodate the U.S. Trustee's concerns, the Debtors have added a provision to the Disclosure Statement explaining that an Avoidance Action is pursued by filing a lawsuit against the Holder. *See* Disclosure Statement, Art. III.PP

**B.    The Disclosure Statement Adequately Explains the Distribution Mechanism.**

15.    The U.S. Trustee also asserts that the Disclosure Statement provides "confusing and conflicting information regarding distribution" and that the Debtors do not explain why they cannot use their own platform and why they chose 90 days as the period during which the Debtors would make Liquid Cryptocurrency distributions themselves if additional Distribution Agents

cannot be located. *See* U.S. Trustee Obj. at 4. The Debtors thoroughly explained in previous versions of the Disclosure Statement that they have been working diligently to locate a distribution partner who can make regulatorily compliant distributions in the United States and internationally, that they have been in discussions with PayPal to do so, and that it is extremely expensive for the Debtors to make Liquid Cryptocurrency distributions themselves. *See* Disclosure Statement, Art. II.B.1(a), Art. III.Q. Nonetheless, to address the U.S. Trustee's concerns, as well as other requests for additional information, the Debtors have further explained their reasoning with respect to this distribution process, which provides more information in the distribution process and the Distribution Agent than typically found in disclosure statements. *See* Disclosure Statement, Art. II.C, Art. III.Q. The Debtors also provided a comprehensive chart outlining which entity—*i.e.*, the Company, PayPal, or another Distribution Agent—will make distributions to which customers (*e.g.*, individual Earn Account Holder based in the United States (but not Hawaii)) during which time periods (in the first ninety days after the Effective Date and after ninety days). *See* Disclosure Statement, Article III.Q.

### C. The Disclosure Statement Provides Adequate Information on Equitable Subordination.

16. AM Ventures Holdings, Inc. ("<u>AM Ventures</u>") and Koala1 LLC ("<u>Koala1</u>"), entities owned by the Debtors' former Chief Executive Officer Alex Mashinsky, object that the Disclosure Statement does not provide adequate information regarding the legal basis for the equitable subordination of AM Ventures' and Koala1's Claims. *See* AM Ventures Ltd. Obj. ¶¶ 13, 15; Koala1 Ltd. Obj. ¶¶ 13, 15. At the outset, it is simply astonishing that entities affiliated with Mr. Mashinsky—who is the principal subject of a 300-plus page examiner report, has been indicted or sued by nearly half a dozen different governmental entities, and is a potential defendant under a complaint drafted by the Committee with respect to his conduct—would question the basis for

their subordination.  The Disclosure Statement, however, explains the purpose of subordination under sections 510(b) and 510(c) of the Bankruptcy Code and identifies the inequitable misconduct necessitating equitable subordination under this Plan.  *See* Disclosure Statement, Art. III.JJ.  To address AM Ventures' and Koala1's Objections, the Debtors have provided additional information that the equitable subordination of Mr. Mashinsky's Claim, and the Claims of the entities affiliated with him, is appropriate because of Mr. Mashinsky's fraud, recklessness, gross mismanagement, and self-interested conduct, as documented in the Final Examiner Report, the Committee's draft complaint against him and other defendants for prepetition conduct, the federal government's criminal indictment against him, the SEC's, CFTC's, and FTC's civil complaints against him, and the action brought against him by the New York State Attorney General's Office.  *Id.*

### D.    The Disclosure Statement Provides Adequate Information Regarding the Debtors' Efforts to Protect Customer Privacy.

17.    Victor Ubierna de las Heras ("Mr. Ubierna de las Heras") objects that the Disclosure Statement does not disclose information about customer privacy, how personally identifiable information will be treated in either of the Plan transactions, how the Debtors intend to comply with the General Data Protection Regulation, or "GDPR," and how distributions will be made to third-party customers, such as those who accessed Celsius products through the German bank Nuri (rather than through Celsius accounts).  *See* Ubierna de las Heras Obj. ¶¶ 1, 2.  The Debtors have updated the Disclosure Statement to provide additional information on the Debtors' compliance with applicable privacy and data concerns as well as how distributions will be made to third-party customers.  *See* Disclosure Statement, Art. III.Q.  With these new additions, the Debtors believe that Mr. Ubierna de las Heras' objections have been resolved.  Moreover, as explained in the Objection Chart, the Debtors already adequately explained a number of the

concerns Mr. Ubierna de las Heras raised and where such information is located in the Disclosure Statement.  *See* Obj. Chart at 4.

### E.    The Disclosure Statement Provides Adequate Information Regarding Taxes.

18.    The Earn Ad Hoc Group Reservation of Rights and Comments, which the Debtors are treating as an Objection, states that the Disclosure Statement "does not address relative tax consequences between the NewCo scenario and the orderly wind-down scenario."  *See* Earn Ad Hoc Group Reservation of Rts. and Cmts. ¶ 9.  Article XII.C.5(a) of the Disclosure Statement, however, clearly addresses the tax consequences to Class 5 General Earn Claims under the NewCo Transaction, and Article XII.C.5(b) addresses the tax consequences to Class 5 General Earn Claims under the Orderly Wind Down.  The remainder of Article XII.C of the Disclosure Statement discusses the relative tax consequences between the NewCo Transaction and the Orderly Wind Down for each type of Claim on account of which holders will receive distributions under the Plan. The Earn Ad Hoc Group wants certainty where none is possible:  the Debtors explicitly caution Account Holders that the Debtors cannot provide information on every potential tax consequence or individualized tax advice.  *See generally* Disclosure Statement, Art. XII.C.

### F.    The Disclosure Statement Provides Adequate Information on the Debtors' Mining Operations.

19.    Mr. Ubierna de las Heras and the Earn Ad Hoc Group also object to the Disclosure Statement's adequacy on account of disclosures related to mining operations.  Mr. Ubierna de las Heras argues there is not enough information about "Celsius Mining" (presumably, the proposed mining operations under NewCo rather than ongoing mining by Debtor Celsius Mining LLC) to understand the "risks posed to creditors under the plan."  *See* Ubierna de las Heras Obj. ¶ 3.  No fewer than *thirty* separate risk factors in the Disclosure Statement discuss the risks inherent in cryptocurrency mining and explains NewCo's proposed business plan for mining.  *See* Disclosure

Statement, Art. VIII.D; *see also* <u>Exhibit F</u>.  NewCo will be a new company and has no operations

yet; it is unrealistic to expect every aspect of its business plan, and every term of every contract,

to be finalized at this stage.  More importantly, Mr. Ubierna de las Heras provides no legal basis

showing that such a level of detail is required to meet the standard of adequate information when

the Disclosure Statement addresses the risks of cryptocurrency mining at length.

20.    The Earn Ad Hoc Group objects that "no basis [is] given for the discount attributed

to Mining Co. in wind-down."  <u>Exhibit C</u> of the Disclosure Statement explains, however, that the

discount to the mining operations in the Orderly Wind Down results because "certain benefits to

the mining business from Fahrenheit may no longer be available."  *See* Disclosure Statement,

Exhibit C at 7.

### G.    The Disclosure Statement Provides Adequate Information on the ADR Procedures.

21.    Harrison Schoenau objects that the ADR Procedures have been presented

procedurally incorrectly, that the ADR Procedures are not explained adequately, among other

things. *See* Schoenau Obj. ¶¶ 1, 6, 18.  To address these concerns, the Debtors have added a section

to the Disclosure Statement describing how participants will receive notice, that participants can

opt out of the ADR Procedures, the estimated length of ADR Procedures and the steps that are

involved, whether participants are required to have an attorney, the costs associated with the ADR

Procedures, how to raise an objection to the terms of the ADR Procedures, and what happens if a

participant does not comply with the ADR Procedures.  *See* Disclosure Statement, Art. III.NN.

### H.    The Disclosure Statement Provides Adequate Information on and Addresses the Securities Plaintiffs' Concerns Regarding the Identity of Released Parties, the Preservation of Claims, Treatment of D&O Insurance Policies, and the Securities Litigation.

22.    The Securities Plaintiffs assert several arguments in their limited Objection and

reservation of rights, all of which are summarized on the Objection Chart.  *See* Obj. Chart at 8–10.

*First*, the Disclosure Statement adequately identifies that the non-debtor defendants in the Securities Plaintiffs' litigation will not receive any releases under the Plan.  The Disclosure Statement provides that the Debtors are "not proposing to release (a) any Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action against an ***Excluded Party*** (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others)…"  *See* Disclosure Statement, Art. III.LL.3.  The Plan defines "Excluded Parties" to include, among others, Alexander Mashinsky, Shlomi Daniel Leon, Roni Cohen-Pavon, and the other UCC Claims Stipulation Defendants, who include Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Kristine Mashinsky, Aliza Landes, AM Ventures, Koala1.  To the extent the Securities Plaintiffs believe the carve-outs under the releases are nonetheless inadequate, this argument is an objection to the Plan and should be raised during Confirmation.  *See, e.g.*, *In re Drexel Burnham Lambert Grp., Inc.*, No. 90-B-10421, 1992 WL 62758, at *1 (Bankr. S.D.N.Y. Mar. 5, 1992) (stating that objections to a plan of reorganization's releases and injunction provisions were in the nature of confirmation objections and therefore improperly raised as objections to the disclosure statement).

23.     ***Second***, the Debtors have clarified that, based on the limited coverage and proceeds available under the D&O Policies, they do not believe that any "Side C" coverage under the D&O Policies will be available as a distribution to any parties on account of securities-related litigation.  *See* Disclosure Statement, Article III.E.  In light of the limited proceeds available, the Debtors believe it is unnecessary and misleading to expressly preserve these claims against the Debtors to the extent of available insurance.  Furthermore, with respect to the description of the nature of the Securities Litigation, the Debtors have added a summary of the federal class action litigation to the Disclosure Statement.  *See* Disclosure Statement, Art. VII.K.1(a).  With respect to information about the management of the Debtors' D&O Policies, the Disclosure Statement is not required to

14

explain this management in detail to satisfy the adequate information standard. Finally, with respect to the preservation of the Debtors' books and records, the Debtors have added a provision to the Plan and the Disclosure Statement that provides for the preservation of books and records related to the Securities Litigation. *See* Plan, Art. VIII.K; Disclosure Statement, Art. III.OOO.

24.     As demonstrated above, the Disclosure Statement directly addresses the primary disclosure-related Objections made or has been revised to further address the Objecting Parties' concerns. To the extent not covered in the body of this Reply, the Objection Chart further addresses the Objections to the adequacy of the Disclosure Statement and includes references to the Disclosure Statement for the provisions where the information can be found. Accordingly, these Objections should be overruled.

## II.     The Plan Is Not Patently Unconfirmable.

25.     Several Objections were preliminary confirmation objections, each of which is premature, and none of which presents any basis for the Court to delay approval of the Disclosure Statement and solicitation of the Plan. The Plan must comply with the confirmation requirements in section 1129 of the Bankruptcy Code (and all other applicable provisions), and the Debtors will be prepared to carry their burden to confirm the Plan. But the appropriate time to test such compliance is at the Confirmation Hearing. *See, e.g.*, 7 Collier on Bankruptcy ¶ 1125.03 (16th ed. 2023) ("At disclosure statement hearings, courts should refuse to hear issues that are confirmation rather than disclosure issues, such as classification of claims, feasibility . . . or whether a plan is fair and equitable."); *In re Foxwood Hills Prop. Owners Ass'n, Inc.*, No. CV 20-02092-HB, 2021 WL 3059716, at *5 (Bankr. D.S.C. June 1, 2021) (same). Indeed, disputed issues related to confirmation are not relevant to assessing whether a disclosure statement contains "adequate information." *See, e.g., In re Quigley Co., Inc.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-

debtor former parent "implicate several confirmation issues"); *In re Hyatt*, 509 B.R. 707, 711 (Bankr. D.N.M. 2014) (approving the disclosure statement because questions about the debtor's proposed classification scheme "require[d] additional evidence that may be presented at a confirmation hearing" and, therefore, the "proposed classification scheme does not render the [p]lan patently unconfirmable as a matter of law."). The only time a court may entertain plan objections at a disclosure statement hearing is when any subsequent solicitation would be futile because the proposed plan is "patently unconfirmable." *See In re Quigley Co., Inc.,* 377 B.R. at 119 ("For present purposes, the application to approve the disclosure statement is granted since it contains 'adequate information,' and does not describe a plan that is unconfirmable as a matter of law.").

26.     The bar for demonstrating that a plan is patently unconfirmable is extremely high. Specifically, "a plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re American Capital Equipment, LLC*, 688 F.3d 145, 155 (3d Cir. 2012) (citing *Monroe Well Serv.*, 80 B.R. at 333). *See also In re Phoenix Petrol.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (finding that unless "the disclosure statement describes a plan that is so fatally flawed that confirmation is impossible" the court should approve a disclosure statement that otherwise adequately describes the chapter 11 plan at issue).

27.     The Objecting parties will have ample opportunity to prosecute their confirmation objections in connection with the Confirmation Hearing to the extent these issues remain disputed. Nevertheless, the Debtors briefly address below certain confirmation issues raised in the Objections to demonstrate that such issues do not render the Plan patently unconfirmable.

A.    **The U.S. Trustee's Objections to the Release and Exculpation Provisions Do Not Render the Plan Patently Unconfirmable.**

28.    The U.S. Trustee objects to the approval of the Disclosure Statement because the "nonconsensual, non-debtor, third-party releases in the Plan require denial of confirmation." U.S. Trustee Obj. at 19. As an initial matter, the U.S. Trustee misinterprets and misunderstands the proposed releases in the Plan as nonconsensual third-party releases, and, curiously, argues that the Debtors fail to comply with the (inapplicable) legal standard for nonconsensual releases set forth in *Metromedia* and *Purdue Pharmaceuticals*. To be clear, the Debtors are only proposing consensual third-party releases consistent with the applicable legal standards in this District (routinely applied and approved by this Court), and the Disclosure Statement provides more than adequate information with respect to such proposed releases. Whether the releases should be approved is an issue for the confirmation hearing, although the consensual release provisions are typical in this District and should be approved.

29.    *First*, the Plan provides for a typical "opt out" mechanism (other than with respect to those parties who are "deemed to reject" and must opt in to the third-party releases)[6] for all creditors that are presumed to accept the Plan, vote to reject the Plan, or abstain from voting on the Plan, which is sufficient to demonstrate consent and is consistent with this Court's previous rulings approving third-party releases. *See In re Avianca Holdings S.A.*, 632 B.R. 124, 136–37 (Bankr. S.D.N.Y. 2021) ("[N]umerous cases in this district and elsewhere have approved the use of an opt-out procedure . . . . the opt-out structure is permissible provided that a clear and prominent explanation of the procedure is given as it has been here.").

---

[6]    The Debtors revised the Plan to provide that the "deemed to reject" classes must "opt in" as the result of productive discussions with the SEC regarding the Plan and Disclosure Statement.

30.     Moreover, the Notice of Non-Voting Status and Ballots *clearly* explain the process
by which a creditor must opt out or opt in to the third-party releases and the implications for failing
to abide by these instructions.  Where an opt-out structure is "clear and a prominent explanation
of the procedure is given," such mechanism for granting third-party releases is sufficient to
demonstrate consent.  *See In re Avianca*, 632 B.R. at 137.  Thus, the U.S. Trustee's assertion that
the third-party releases are "nonconsensual" due to the opt-out structure is inaccurate and
unpersuasive.

31.     ***Second***, because the third-party releases are consensual, the standard set forth in
*Purdue* is inapplicable.  In the Second Circuit, where third-party releases are consensual, such as
these are here, after proper notice and absent objection, "courts generally approve them unless they
are truly overreaching on their face."  *See In re Avianca*, 632 B.R. at 133 (quoting *In re MPM
Silicones, LLC*, No. 14-22503-RDD, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014)
(rev'd in part on other grounds)).  Unless the proposed releases are "unconfirmable as a matter of
law," objections to the approval of third-party releases are confirmation objections and not
Disclosure Statement objections.  *Id*. at 132.  Here, the consensual third-party releases are not
overreaching on their face, are adequately described and explained in the Disclosure Statement,
and do not render the Plan patently unconfirmable.  Any objection that the U.S. Trustee may have
to the approval of such releases is a confirmation issue that is premature.

32.     ***Third***, the Disclosure Statement goes above and beyond to ensure that all creditors,
particularly Account Holders, understand the implications of the third-party releases and their
related rights.  *See* Art. III.LL.1–4.  The Debtors explain what a release is generally and explain
that releases under the Plan are provided pursuant to the Custody Settlement, Withhold Settlement,
Series B Settlement, Class Claim Settlement, and Account Holder Avoidance Action Settlement,

providing a summary of each such release and distinguishing between the releases offered pursuant to each of those settlements.  *See* Art. III.LL.1.

33.    ***Fourth***, the Plan's exculpation provision is consistent with the applicable legal standards in this district.  The U.S. Trustee objects to the exculpation provisions in the Plan as "overly broad" and inconsistent with section 1125 of the Bankruptcy Code, arguing that exculpation provisions in this district are limited to "court-supervised fiduciaries" and should only cover "specific transactions approved by the Court." *See* U.S. Trustee Obj. at 23–24.  The U.S. Trustee relies primarily on *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019) for this proposition.  Yet other courts in this district have, while acknowledging *Aegean*, overruled similar U.S. Trustee objections and approved exculpation provisions that included non-estate fiduciaries.  *See In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) ("The Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision. They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases . . . the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries . . . based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court").  Here, the parties included in the Plan's exculpation provision—from the Plan Sponsor to the Committee to each such Entity's financial advisors, attorneys, and other professionals—have all been critical in moving these chapter 11 cases toward emergence through the negotiation, execution, and implementation of settlements, agreements, and transactions approved by the Court.  Accordingly, to the extent the Exculpated Parties in the Plan's exculpation provision include non-estate fiduciaries, the exculpation provision should be approved.

34.      The U.S. Trustee also argues that the exculpation provision should include an opt-out mechanism.  *See* U.S. Trustee Obj. at 23.  The U.S. Trustee provides no precedent or legal authority for this provision.  The entire purpose of an exculpation provision is to protect parties who acted in good faith during chapter 11 cases under bankruptcy court supervision.  There is no basis for an opt out provision for an exculpation, and the U.S. Trustee offers none.

35.      Similarly, the U.S. Trustee's request that the Plan's exculpation provision should carve out claims for legal malpractice must also be overruled.  *See* U.S. Trustee Obj. at 26.  The U.S. Trustee argues that release of claims based on legal malpractice is prohibited by the New York Rules of Professional Conduct.  *Id.*  But, as the *LATAM Airlines* court held, there is "no merit" to this U.S. Trustee request because the New York Rules of Professional Conduct "ha[ve] no bearing on the standard of care established" in an exculpation provision.  *LATAM Airlines,* No. 20-11254 (JLG), 2022 WL 2206829, at *50.

36.      The Debtors have, however, modified the exculpation provision in some respects as requested by the U.S. Trustee.  To address the U.S. Trustee's argument that the exculpation provision should be expressly limited to acts or omissions during these chapter 11 cases, the Debtors have clarified the exculpation provision to make more clear that it applies solely to actions taken from the Petition Date through the Effective Date.  *See* Plan, Art. VIII.E; Disclosure Statement, Art. III.LL.5.   The Debtors have also removed the "release" language from the exculpation provision of the Plan.  *Id.*  For these reasons, the U.S. Trustee's Objection should be overruled at this stage.

> **B.    The Proposed ADR Procedures Do Not Render the Plan Patently Unconfirmable.**

37.      In addition to the Schoenau Objection discussed above, which argues that the ADR Procedures have been presented procedurally incorrectly and without adequate information, the

Withhold Ad Hoc Group objects to the adequacy of the Disclosure Statement on grounds that the

proposed ADR Procedures are improper and render the Plan patently unconfirmable (although it

acknowledges that its concerns about the ADR Procedures "go to the substance of the Plan and

not strictly to the adequacy of the Disclosure Statement").  *See* Withhold Ad Hoc Grp. Obj. at 2,

fn.2.  As noted above, a plan is not patently unconfirmable where the debtor can show that "the

plan is confirmable or that defects might be cured or involve material facts in dispute."  *In re Am.*

*Capital Equip., LLC*, 688 F.3d at 155.  While the Debtors and the Committee continue to engage

with the counsel to the Withhold Ad Hoc Group in an attempt to resolve their concerns regarding

the ADR Procedures, any disputes regarding the propriety of the ADR Procedures themselves

would involve disputes of material facts, such as whether the ADR Procedures strike the right

balance between due process and efficiency and would not render the Plan patently

unconfirmable. *Cf. In re Elder*, 325 B.R. 292, 299 (N.D. Cal. 2005) (affirming the bankruptcy

court's confirmation of a plan that allowed parties to "settle claims objections through the Plan

Administrator prior to requesting a hearing before the court"); *Saggiani v. Strong*, 718 F. App'x

706, 708 (10th Cir. 2018) (describing the bankruptcy court's approval of a disclosure statement

that provides a conflict resolution procedure to resolve intercompany claims through neutral

"Conflict Referee").

### C.    The Proposed Treatment of Class 5 General Earn Claims Does Not Violate the Absolute Priority Rule.

38.    The Kieser Objection asserts that the Plan is unconfirmable because, among other

things, it violates the absolute priority rule by not subordinating General Earn Claims to Retail

Borrower Deposit Claims pursuant to section 510(b) of the Bankruptcy Code.  *See* Kieser Obj.

¶¶ 1–8.  As long as a plan's classification complies with section 1122 of the Bankruptcy Code,

however, issues related to classification of claims or absolute priority are confirmation issues

rather than disclosure issues. A "plan proponent has substantial flexibility" in determining classification of claims so long as classification abides by two key principles: "Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *In re Chateaugay Corp.,* 89 F.3d 942, 949 (2d Cir. 1996); *see also In re Quigley Co., Inc.*, 377 B.R. at 116.

39.     Here, the Debtors have appropriately classified General Earn Claims pursuant to section 1122 of the Bankruptcy Code and any further discussion of the classification or priority of General Earn Claims should occur at confirmation. That said, on the merits, the proposed treatment of Class 5 General Earn Claims is appropriate in light of this Court's previous ruling that assets in Earn Accounts constitute property of the estate and that, accordingly, Earn "Account Holders have unsecured claims against the Debtors" and that "their recovery depends on the distributions to unsecured creditors under a confirmed chapter 11 plan." *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling"). The Debtors have therefore appropriately classified such Claims at the same priority as other unsecured claims in compliance with section 1122 of the Bankruptcy Code.

40.     Nonetheless, the Debtors want to emphasize that treatment of Class 5 General Earn Claims also does not violate the absolute priority rule because General Earn Claims are not claims arising from the purchase, sale, or recission of equity securities of the Debtors. As an initial matter, this argument is settled in the Class Claim Settlement. As the result of the mediation, the Debtors and the Committee filed the Class Claim Settlement Motion, which is supported by the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group, which resolves this issue. Class Claim Settlement Motion at 15 ("Any Settlement Claims (other than Claims based on CEL Token) shall not be subject to subordination pursuant to section 510(b) of the Bankruptcy Code"). That

settlement even provides Retail Borrower Deposit Claims with more recovery from this increase compared to General Earn Claims (because the 5% increase is to the entire Retail Borrower Deposit Claim, the Retail Borrower Post-Set Off Claim—the unsecured portion of the claim—is increased by more than 5%).  Kieser did not object to the Class Claim Settlement Motion.

41.    As to the merits of Kieser's subordination argument, Kieser misunderstands both section 510(b) of the Bankruptcy Code and the nature of General Earn Claims.  The purpose of section 510(b) is to "preserve[] the absolute priority rule by ensuring that security holders may not gain parity with creditors simply by alleging claims that arise from the purchase of their securities." *In re Lehman Bros. Holdings Inc*., 855 F.3d 459, 471 (2d Cir. 2017).  Here, in contrast, General Earn Claims are not claims for such damages, but arise instead from the Debtors' contractual obligations to return the Cryptocurrency deposited by account holders on the Debtors' platform and reflected in the Debtors' schedule of assets and liabilities.  *See* Disclosure Statement Art. III.KKK (explaining that the Debtors' record of the amount the Debtors owe a creditor is known as a "scheduled claim"); *Debtors' Statement Regarding Commencement of Claims Reconciliation Process* [Docket No. 2102] (explaining that the Debtors "scheduled claims for each of its account holders according to the cryptocurrency balances reflected in Celsius' records").

42.    Therefore, even if the Earn Program is found to be a security, General Earn Claims would still not be subordinated pursuant to section 510(b) of the Bankruptcy Code because they are Claims for the return of the underlying assets of the Earn Program, not for damages arising from account holders' "purchase" of General Earn Claims.  This Court has said as much:  "The Court makes no determination as to these security issues but notes that if Earn Assets are determined to be securities, it is likely that Earn Account Holders would still be unsecured creditors.  Section 510(b) of the Bankruptcy Code subordinates claims 'arising from' the purchase

or sale of a security to the claims of general unsecured creditors. Thus, here to the extent that creditors argue that they have rescission claims for the unlawful sale of [a] security, these claims would likely squarely fall within the broach reach of section 510(b)…" *See* Earn Ruling fn.28; *see also* 4 Collier on Bankruptcy ¶ 510.04 (explaining that "claims of noteholders for payments required by the note, based upon the instrument itself, are not claims 'for damages arising from the purchase or sale of such a security' and are accordingly not subject to subordination under section 510(b)"); *In re Marketxt Holdings Corp.*, 361 B.R. 369, 389 (Bankr. S.D.N.Y. 2007) (holding that an attempt to subordinate a shareholder's *debt* claim based solely on § 510(b) "goes well beyond the outer limits of the statute") (emphasis added). Accordingly, Kieser's arguments with respect to subordination under section 510(b) are unfounded.

> ### D. The Plan Provides for the Proper Classification and Treatment of Class 2 Retail Borrower Deposit Claims, CEL Token Deposit Claims, Other CEL Token Claims, and Claims Related to Allegations of Improper Liquidation of Loans.

43. A number of the Objections raise issues with the Plan's treatment and classification of Class 2 Retail Borrower Deposit Claims, Other CEL Token Claims, and Claims related to allegations of improper liquidation of retail loans.[7] As noted above, issues with classification, absent a violation of section 1122 of the Bankruptcy Code, are confirmation issues rather than disclosure issues.

44. ***Class 2 Retail Borrower Deposit Claims are properly classified***. The Kieser Objection asserts that the Plan improperly classifies Class 2 Retail Borrower Deposit Claims because it does not treat the outstanding retail loans as executory contracts. *See* Kieser Obj. ¶¶ 12–14. The Debtors do not believe that the Retail Advances are Executory Contracts or that Retail

---

[7] *See generally* Kieser Obj.

Borrower Deposit Claims should be classified as Executory Contracts. Unlike Institutional Loans, Holders of Retail Borrower Deposit Claims do not have individualized contracts with the Debtors that explain the unique terms and conditions of the arrangement. Thus, at best, the proposed classification and treatment of Class 2 Retail Borrower Deposit Claims is a disputed fact that should be addressed at confirmation.

45.     In any event, even if Retail Advances are Executory Contracts, the Plan would not change. As set forth in the Plan, to the extent the Court finds that Retail Advances are Executory Contracts, the Debtors intend to reject all contracts on the Effective Date. *See* Plan Art. V.D.2. Contrary to the representation in the Kieser Objection,[8] rejection does not affect the enforceability of the rejected contracts. *See In re Lehman Bros. Inc.*, 574 B.R. 52, 63 (Bankr. S.D.N.Y. 2017) (finding that "rejection [of deferred compensation agreements as executory contracts] would not affect the enforceability of the terms of such agreements"). Rejection is merely breach, not recission of the contract. Instead, Retail Borrowers will have an unsecured claim against the Debtors for rejection damages measured as of the Petition Date,[9] and will have the duty to mitigate such damages,[10] such as by exercising setoff on their own.[11] And any such damage calculation would take into account the fact that Retail Borrowers received money from the Debtors.

---

[8]    *See* Kieser Obj. ¶ 13 ("[A]s the breaching party the Debtors would be unable to effect a setoff against the outstanding amounts owed under the loan.").

[9]    *See, e.g.*, *In re Old Carco LLC*, 424 B.R. 633, 649 (Bankr. S.D.N.Y. 2010) (holding that any claim stemming from the Debtors' rejection of an executory contract is a pre-petition general unsecured claim pursuant to section 365(g) of the Bankruptcy Code).

[10]    *See, e.g.*, *Bennett, Debra & William v. Plantations E. Condo. Assoc., Inc*., No. CIV.A. S12C-04-002ES, 2013 WL 493329, at *2 (Del. Super. Ct. Jan. 16, 2013) (holding that the plaintiff "does have a duty to mitigate her damages" and denying the plaintiff's loss of use claim when she did not use "reasonable efforts to minimize her damages").

[11]    *Cf. In re Corporate Resource Services, Inc*., 564 B.R. 196, 202 (Bankr. S.D.N.Y. 2017) (finding that section 553 of the Bankruptcy Code . . . "preserves a right to setoff created by state law or federal nonbankruptcy law").

46.    ***CEL Token Claims are properly classified and the Disclosure Statement adequately explains the reasoning for the proposed valuation of such Claims***.    The Davis Objection and the Caceres Objection,[12] supported by numerous letters,[13] assert that the Plan inappropriately subordinates the CEL Token Deposit Claims pursuant to section 510(b) of the Bankruptcy Code because CEL Tokens are not securities, and object to the (prior Plan's) $0.20/CEL valuation of CEL Token Deposit Claim—the Plan has since been revised to include a $0.25/CEL valuation.[14]    *SEC v. Ripple Labs, Inc*., No. 20 CIV. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023).[15]    These allegations misunderstand the proposed treatment of CEL Token Deposit Claims and are premature as the treatment of claims is a confirmation issue.

---

[12]    Mr. Caceres also filed an objection to the Class Claim Settlement Motion, which was virtually identical to his objection to the Disclosure Statement, objecting on the grounds that the CEL Token should not be subordinated.  But to be clear, the Class Claim Settlement does not subordinate CEL Token or ascribe any value to the CEL Token.  That issue is a Plan confirmation issue.  The Debtors respectfully submit that this objection is not an objection to the Class Claim Settlement Motion and should be overruled for substantially the same reasons set forth in this Reply—his objection is a plan confirmation issue, and he will have the right to vigorously pursue his objection at the confirmation hearing.

[13]    A variety of letters ask for the appointment of a "CEL Token Class."  Mr. Caceres recently noticed a motion seeking that relief for the September 7 hearing.  *See* [Docket No. 3200].  The Debtors reserve all rights to object to that motion at the appropriate time, but note preliminarily the payment of fees is not warranted.  A variety of ad hoc groups have formed in this case to represent the rights of similarly situated holders of claims, and to the extent these holders desire representation, they should form an ad hoc group and retain counsel just as these other ad hoc groups have.  That ad hoc group could seek payment of its fees and expenses to the extent it has demonstrated a "substantial contribution" to these chapter 11 cases, but a blanket authorization of the use of estate resources to pay for the representation of individual creditors is inappropriate under these facts and circumstances.

[14]    *See* Davis Objection at 2–9; Caceres Objection at 4–5, letter objections at ¶¶ 3, 5.  On the other hand, the Crews Objection proposed alternative treatment of the CEL Token Deposit Claims based on the differences between the prices of CEL on the date an account holder acquired and disposed of CEL, respectively.  Crews Objection ¶¶ 9–14.  The Debtors' reply to the Crews Objection can be found in the Objection Chart.

[15]    Many of the letters from CEL Token holders argue that CEL Token is not a security, pointing to the recent decision in *Ripple Labs*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023).  But those arguments misunderstand the *Ripple* decision, which is quite nuanced.  Specifically, the *Ripple* court held that certain sales of the XRP token did not violate the securities laws, but other sales did violate securities laws.  That decision's applicability to the facts and circumstances of CEL Token holders would need to be developed at the confirmation hearing.  Moreover, after the *Ripple Labs* decision, another district court in this District issued a contrary ruling in *Terraform Labs, SEC v. Terraform Labs PTE Ltd.*, 23-cv-1346 (JSR) (S.D.N.Y. July 31, 2023), which criticized the *Ripple* decision and specifically found that the crypto token at issue was a security.

47. The Plan does not propose to subordinate CEL Token Deposit Claims.[16]  Rather, the Plan proposes to:  (a) treat all CEL Token Deposit Claims as claims associated with the program in which CEL Tokens are deployed (*e.g.* an account holder's CEL Token Deposit Claim arising from CEL Tokens deployed in the Earn Program will receive the same treatment as a General Earn Claim); (b) *value* CEL Token Deposit Claims at $0.25/CEL pursuant to the proposed CEL Token Settlement; and (c) subordinate *Other CEL Token Claims*[17] pursuant to section 510(b) of the Bankruptcy Code.  *See* Plan, Art. IV.B.2 (providing the CEL Token Settlement); Disclosure Statement, Art. III.JJ.1 ("[T]he Section 510(b) Claims include, among others, Claims arising out of or relating to . . . CEL Tokens (*other than CEL Token Deposit Claims*).") (emphasis added).  In other words, while a Claim for damages allegedly incurred through the purchase of CEL Token at a price fraudulently inflated by the Debtors would be subordinated as a Section 510(b) Claim under the Plan, a CEL Token Deposit Claim arising from the Debtors' obligation to return the value of CEL Tokens deposited on the Debtors' platform would receive the same treatment as other Account Holder Claims save one difference:  while the value of other Cryptocurrencies are valued at their fair market price on the Petition Date, CEL Tokens are valued at $0.25/CEL, pursuant to the CEL Token Settlement.

48. ***Any claims for improper liquidation of loans on the Debtors' platform prior to the Petition Date do not require a separate class***.  The Kieser Objection further argues that claims

---

[16]  *See, e.g.*, Caceres Objection at 2–3 ("The Debtors disclosure statement knowingly and incorrectly treats all CEL token claims as a security subject to rule 510 (B)."); Davis Objection at 4 ("The UCC . . . claim[ed] that they are subordinating CEL Token holders' claims to $0.00 and offering $0.20 as a middle-ground settlement with the reason given that CEL Token is a security subject to Rule 510(B).").

[17]  "Other CEL Token Claim" means any Account Holder Claim arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token.

for "retail loans that were wrongfully terminated by the Debtor [sic] during the so-called Pause" should be separately classified, and to the extent any such claims are currently General Earn Claims, such classification is improper. *See* Kieser Obj. ¶¶ 9–11. Claims alleging improper liquidation of "retail loans" are prepetition litigation claims that are disputed, contingent, and unliquidated and are included in either the Earn, Custody, or General Unsecured Claim class depending on the nature of the claimant's legal rights against the Debtors, as explained in the Disclosure Statement. *See* Disclosure Statement, Art. III.XX. As noted above, the Debtors have significant flexibility as to the classification of claims, and such issue is for the confirmation hearing, not the Disclosure Statement hearing.

      **E.    The Plan's "Contributed Claims" Mechanism Now Includes a Carve Out for Claims that Cannot Be Assigned.**

      49.    The Securities Plaintiffs also object that the Plan improperly allows creditors to assign their claims, including claims related to or arising out of the Securities Litigation, to the Debtors' Estates for prosecution by a litigation administrator. The Securities Plaintiffs' Objection is that securities-related claims cannot be assigned separately from the securities themselves. *See* Securities Pl.'s Obj. ¶¶ 15–17. Setting aside that this is not a disclosure-related Objection but squarely an Objection to the Plan, the Debtors amended the Plan and Disclosure Statement to clarify that to the extent a claim cannot be assigned under applicable law, such claim will not be assigned. *See* Plan Art. IV.O. On the merits, Securities Plaintiffs' assertion—while premature—is incorrect. Courts have held that the causes of action such as securities fraud stay with the original purchasers who were actually defrauded, and do not automatically "run with the securities" to the subsequent purchasers of the underlying securities, to prevent depriving the original purchasers of their rights to recovery. Case law does not prohibit the original purchasers

themselves from voluntarily assigning their claims and right of recovery to a third party—which is all that the Plan contemplates.

### F.    The U.S. Trustee's Objection to the EIP Is Premature.

50.    The U.S. Trustee also objects that the Disclosure Statement did not explain how the proposed Emergence Incentive Program ("EIP") will comply with section 503(c) of the Bankruptcy Code or how it will replace the Debtors' pending motion to approve a proposed Key Employee Incentive Program [Docket No. 2336] (the "KEIP Motion").  ***First***, the Disclosure Statement provides adequate information regarding the EIP, including its recipients, metrics, maximum aggregate costs, and the distribution and emergence mechanism, and any objections to the appropriateness of the EIP are more properly objections to the Plan that should be raised during confirmation.  *See* Disclosure Statement, Art. III.BbB, Art. IV.D.2.   The Debtors have further clarified, in Article III.BBB of the Disclosure Statement, that the EIP effectively replaces the KEIP Motion, which will be withdrawn with prejudice on the Effective Date.  ***Second***, although the U.S. Trustee argues that the Disclosure Statement needs to include the Debtors' position on why the EIP should be approved under the Bankruptcy Code, there is no such requirement.  The Disclosure Statement does not need to explain the Debtors' legal position as to every provision of the Plan— but the Debtors will have to carry their burden and articulate why the EIP should be approved at the confirmation hearing.  As to the U.S. Trustee's objection that the EIP should not be approved because it does not comply with section 503(c) of the Bankruptcy Code, such argument is clearly a confirmation objection and will be addressed at the appropriate time.

### III.    Other Filings Should Not Prevent Approval of the Disclosure Statement.

51.    All other Objections to the Disclosure Statement should be overruled or do not prevent the Court from approving the adequacy of the Disclosure Statement.  Importantly, for purposes of approval of the Disclosure Statement, the addition of language describing the

treatment of state regulator claims and ongoing discussions with state regulators in Article III.LLL of the Disclosure Statement addresses the Texas Limited Objection and the Vermont Reservation of Rights. In addition, the SEC filed a reservation of rights with respect to the concept of potentially tokenizing Illiquid Recovery Rights. The Debtors have since removed that concept from the Plan and Disclosure Statement.

52.    Moreover, the BRIC's reservation of rights is not an issue with adequate information. The Debtors and the BRIC have continued their discussions to reach mutually agreeable language in the Disclosure Statement to adequately inform voters of the BRIC's role and the proposed Backup MiningCo transaction. Finally, as further explained in the Objection Chart, any remaining Objections to the Disclosure Statement should be overruled and the Disclosure Statement should be approved.

*[Remainder of page intentionally left blank.]*

New York, New York

Dated: August 9, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**

**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C.

601 Lexington Avenue

New York, New York 10022

Telephone:     (212) 446-4800

Facsimile:      (212) 446-4900

Email:            joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)

Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)

Christopher S. Koenig

Dan Latona (admitted *pro hac vice*)

300 North LaSalle Street

Chicago, Illinois 60654

Telephone:     (312) 862-2000

Facsimile:      (312) 862-2200

Email:            patrick.nash@kirkland.com

                       ross.kwasteniet@kirkland.com

                       chris.koenig@kirkland.com

                       dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Objection Chart**

<u>**In re Celsius Network LLC, et al., Case No. 22-10964 (MG)**</u>

**CHART OF OBJECTIONS AND RESPONSES[1] TO THE MOTION TO APPROVE THE DISCLOSURE STATEMENT[2]**

*The following chart summarizes the Objections filed in response to the Motion and provides high-level responses thereto.*

*The Debtors have done their best to accurately summarize the Objections and to provide responses to their key points where such responses are within the scope of findings sought. The omission of a response to an Objection should not be taken as a waiver of the Debtors' arguments to respond thereto at the hearing on the Motion.*

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | Objections | |
| United States Trustee for the Southern District of New York<br><br>("<u>U.S. Trustee</u>")<br><br>[Docket No. 3182]<br><br>(the "<u>U.S. Trustee Objection</u>") | 1. The Disclosure Statement does not provide adequate information for creditors to decide to accept or reject the Plan. U.S. Trustee Objection at 1.<br><br>   a. The Disclosure Statement does not sufficiently explain which releases apply to which creditors and the Debtors' legal basis for confirming a Plan with these releases. U.S. Trustee Objection at 18-19.<br><br>   b. The Disclosure Statement cannot be approved because the third party opt-out release renders the Plan unconfirmable. Consent through an opt-out is not sufficient and the releases also do not satisfy the | 1. The Disclosure Statement satisfies the requirements of section 1125 of the Bankruptcy Code with respect to the Plan's proposed release and exculpation provisions. The terms of the proposed release and exculpation provisions, and their effect on creditors, are prominently displayed in the Disclosure Statement, the Plan, and the proposed ballots and notices to both voting and non-voting classes. The Plan's releases constitute sufficient consideration on terms that have been approved in recent chapter 11 cases. Objections to the permissibility of the Plan's releases are premature. The Debtors are prepared to meet their evidentiary burden (if any) with respect to such matters at the Confirmation |

---

[1]    This chart includes objections received to the Disclosure Statement [Docket No. 2902] and Amended Disclosure Statement [Docket No. 3117].

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Reply.

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | *Purdue Pharma* factors, specifically the requirement that released parties make essential contributions to the Plan. U.S. Trustee Objection at 19-23.<br><br>c.  The exculpation provision in the Plan is too broad and exceeds Section 1125(e). U.S. Trustee Objection at 23-26.<br><br>d.  Custody claims holders are subject to an impermissible "death trap" because they are immune from avoidance actions only if such holders vote for the Plan, and the Disclosure Statement should adequately explain the risks of avoidance actions. U.S. Trustee Objection at 26-28.<br><br>e.  The Disclosure Statement needs to explain how the Plan's KEIP complies with Section 503(c). U.S. Trustee Objection at 28-29.<br><br>f.  The Disclosure Statement must provide more detail on the distribution scheme, including which claimants will receive distributions on PayPal. U.S. Trustee Objection at 29-30. | Hearing, and the rights of all parties with respect to the releases under the Plan are fully reserved and preserved and may be raised as objections to Confirmation of the Plan.<br><br>2.  The Debtors added a provision to the exculpation provision of the Plan clarifying that exculpation is limited to the time between the Petition Date and the Effective Date. *See* Plan Article VIII.E; Disclosure Statement Art. III.LL.<br><br>3.  The Debtors address the U.S. Trustee's remaining objections in the Reply. Reply ¶ 9, 11, 53. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Withhold Ad Hoc Group<br><br>("Withhold Ad Hoc Group")<br><br>[Docket No. 3146]<br><br>(the "Withhold Ad Hoc Group Statement and Reservation of Rights") | 1.  Disclosure Statement of patently unconfirmable plan cannot be approved.  Withhold Ad Hoc Group Objection at 2.<br><br>2.  The Plan is patently unconfirmable because ADR Procedures violate due process rights of potential ADR defendants.  Withhold Ad Hoc Group Objection at 2-4. | 1.  The Debtors address the Withhold Ad Hoc Group's objections regarding the ADR Procedures in the Reply.  Reply ¶ 37.<br><br>2.  The Debtors amended the Disclosure Statement to explain the ADR Procedures and ensure that all potential creditor defendants are properly informed of the process, including how to opt out of the process.  *See* Disclosure Statement, Art. III.NNN. |
| Harrison Schoenau<br><br>("Schoenau")<br><br>[Docket No. 3161]<br>(the "Schoeneau Objection") | 1.  The ADR Procedures were presented procedurally incorrectly and should be considered with an independent motion.  Schoneau Objection ¶¶ 11-20.<br><br>2.  The ADR Procedures strongly favor the Debtors at the expense of the potential defendants.  Schoneau Objection ¶ 21-24.<br><br>3.  The ADR Procedures are ill suited for preference litigation: defendants should have access to the same evidence as the Debtors and the viability of preference defenses should be collectively litigated. Schoneau Objection ¶¶ 25-32. | 1.  The Debtors amended the Disclosure Statement to explain the ADR Procedures and ensure that all potential creditor defendants are properly informed of the process, including how to opt out of the process.  *See* Disclosure Statement, Art. III.NNN.<br><br>2.  The Schoenau Objection does not provide any legal basis to show that the Disclosure Statement does not provide adequate information, the applicable standard under which the Disclosure Statement is approved.<br><br>3.  The Schoenau Objection is properly a confirmation objection and will be addressed at the appropriate time. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Víctor Ubierna de las Heras<br><br>"Mr. Ubierna de las Heras"<br><br>[Docket No. 3169]<br><br>(the "Ubierna de las Heras Objection") | 1. Disclosure Statement provides inadequate information.<br><br>   a. The Disclosure Statement does not disclose how customer PII will be treated in any transaction including compliance with GDPR. Ubierna de las Heras Objection ¶ 1.<br><br>   b. The Disclosure Statement does not provide information on distribution for third party customers of Celsius. Ubierna de las Heras Objection ¶ 2.<br><br>   c. The Disclosure Statement does not provide information on mining risks. Ubierna de las Heras Objection ¶ 3. | 1. The Debtors amended the Disclosure Statement to address Mr. Ubierna de las Heras' disclosure requests. *See* Disclosure Statement Art. III.Q, VII.B.<br><br>   a. The Disclosure Statement describes the Debtors' significant efforts to seek Court authority to comply with the GDPR. The Court has already ruled on the Debtors' required compliance in terms of data protection and privacy when the Debtors sought authority to redact the names, home addresses, and email addresses of any citizens of the United Kingdom or European Economic Area member countries (to whom the GDPR applies,) and the Debtors are complying therewith. Disclosure Statement Art. VI.B.<br><br>   b. The Debtors are not proposing to transfer any user accounts to PayPal, any other Distribution Agent, or NewCo. Disclosure Statement Art. III.Q. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Greg Kieser<br><br>("Kieser")<br><br>[Docket No. 3154]<br><br>("Kieser Objection") | 1. Plan is unconfirmable because it violates the absolute priority rule. Earn accounts are securities and Earn claims should be subordinated pursuant to Section 510(b). Kieser Objection ¶¶ 1-8.<br><br>2. Neither the Plan nor the Disclosure Statement describe liquidated loan claims or place them in their own class. Kieser Objection ¶¶ 9-11.<br><br>3. The Plan and the Disclosure Statement should assume or reject retail loan agreements because the retail loan agreements are executory contracts. Kieser Objection ¶¶ 12-14.<br><br>4. Barring assumption of the retail loan agreements, the Debtors cannot exercise their right to terminate or setoff and effectuate the Plan treatment. Kieser Objection ¶ 14. | 1. The Debtors address why the Plan does not violate the absolute priority rule in the Reply. Reply ¶ 38.<br><br>2. The Debtors address Kieser's objection regarding retail loan agreements in the Reply. Reply ¶ 45.<br><br>3. The Debtors have amended the Plan to clarify that, to the extent any retail loan agreements are deemed to be executory contracts, the Debtors will reject them. *See* Plan Art. V.D. |

| | | |
|---|---|---|
| Nicole Barstow<br><br>("Barstow")<br><br>[Docket No. 3061]<br><br>(the "Barstow Objection")[3] | 1.  Objects to the disclosure statement because:<br><br>   a.  It promotes fraud and violations of public policy;<br><br>   b.  Barstow does not agree to receive equity in NewCo;<br><br>   c.  Series B Preferred Equity Interests should not receive a distribution;<br><br>   d.  Distribution should be fixed and not mutable following the vote and Court approval;.<br><br>   e.  Debtors' obligations to claim holders regarding "securities of the entitlement claim holders" should not be discharged; and<br><br>   f.  The Committee cannot assert a class claim that does not provide Barstow with a recovery.  Barstow Objection ¶ 1-3, 7-9.<br><br>2.  Objects to amending the Disclosure Statement or financial statement following Confirmation. Barstow Objection ¶ 4. | 1.  The Barstow Objection does not provide any legal basis to show that the Disclosure Statement does not provide adequate information, the applicable standard under which the Disclosure Statement is approved.<br><br>2.  Holders of Claims entitled to vote on the Plan may vote to reject the Plan if they do not want to receive treatment they are entitled to receive under the Plan.  Further, Holders of General Earn Claims (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) may indicate a preference on their Ballot to receive a greater share of the Liquid Cryptocurrency Distribution Amount instead of some or all of their Pro Rata share of NewCo Common Stock.  This is referred to in the Plan and in the Ballot as the "Liquid Cryptocurrency Weighted Distribution Election." *See* Disclosure Statement, Art. III.W.<br><br>3.  The Series B Settlement has been approved by the Court.  *See* [Docket Nos. 3058, 3074].<br><br>4.  All Account Holder Claims will be discharged pursuant to confirmation of a plan pursuant to Section 1141(d).<br><br>5.  Participants in the Class Claim Settlement are entitled to a 5% increase of their claim.  Account Holders may opt out if they do not want to participate in the Class Claim Settlement.  *See* Disclosure Statement Art. III.MMM. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | 6. Neither the Disclosure Statement nor the Plan can be amended without Court approval following Confirmation. |
| Otis Davis<br><br>("Davis")<br><br>[Docket No. 3084]<br><br>(the "Davis Objection")[4] | 1. CEL token claims should not be subordinated because they are not a security pursuant to the Ripple decision. Davis Objection at 3-5.<br><br>2. CEL token claims are not valued correctly because FTX manipulated the price of CEL token, not the Debtors. Davis Objection at 5-7.<br><br>3. CEL token claims should be treated the same as Earn claims. Davis Objection at 8.<br><br>4. A class of CEL token holders should be formed with professionals paid for by the estate. Davis Objection at 9-10. | 1. The Debtors address the Plan's treatment of CEL token in the Reply. Reply ¶ 47.<br><br>2. Pursuant to the Plan, CEL Token Holders shall receive the treatment associated with the program in which their CEL Token was deployed. See Plan, Art. IV.B.2.<br><br>3. The subsequent requests for relief regarding CEL token are not within the scope of the Motion. |
| Limited Objections | | |
| Texas State Securities Board and Texas Department of Banking | 1. Texas reserves its rights to object pending the results of ongoing discussions with the Debtors regarding the treatment of state regulator claims and agreed upon language incorporated into a further amended Disclosure Statement. Texas Limited Objection at 2. | 1. The Debtors included language describing the treatment of state regulator claims in the Disclosure Statement. See Disclosure Statement Art. VII.J.1(c). |

---

[3]    The Barstow Objection is also a Motion to Join Joshua Cole's Secured Creditor and Relief from Automatic Stay and Competing Chapter 11 Plan Proposal. Arguments in support of such relief have been omitted as they are out of the scope of the Motion.

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| ("Texas")<br><br>[Docket No. 3181]<br><br>(the "Texas Limited Objection") | | |
| Vermont Department of Financial Regulation[5]<br><br>("Vermont")<br><br>Docket No. 3179<br><br>(the "Vermont Reservation of Rights") | 1. Vermont reserves its rights to object pending the results of ongoing discussions with the Debtors regarding the treatment of state regulator claims and agreed upon language incorporated into a further amended Disclosure Statement. Vermont Reservation of Rights at 1–2. | 1. The Debtors included language describing the treatment of state regulator claims in the Disclosure Statement. *See* Disclosure Statement Art. VII.J.1(c). |
| Zack Kaplan, Ben Kaplan, Michael Kaplan, Eli Kaplan, and Michael | 1. Disclosure Statement should:<br><br>   a. Clarify that the certain of Debtors' current and former directors/officers and three other entities who are non-debtor defendants in the Securities Plaintiff's federal securities class | 1. The releases under the Plan clearly provide that the individuals and entities identified in the Securities Plaintiffs' Objection are not Released Parties. *See* Disclosure Statement, Art. III.LL.3. The Plan defines "Excluded Parties" to include, among others, Alexander Mashinsky, Shlomi |

---

[5]   New Jersey, Tennessee, Texas, Vermont and all stated represented by National Association of Attorneys General, Arkansas, California, District of Columbia, Hawaii, Idaho, Maine, New York, Oklahoma, and South Carolina agree on Vermont's position as represented in the Vermont Reservation of Rights. Vermont Reservation of Rights at 1 n.2.

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Mazzotta<br><br>(the "<u>Securities Plaintiffs</u>")<br><br>[Docket No. 3149]<br><br>("<u>Securities Plaintiffs' Limited Objection</u>") | action litigation are not Released Parties. Securities Plaintiffs' Limited Objection at 5.<br><br>b. Describe securities litigation and method of preserving evidence. Securities Plaintiffs' Limited Objection at 6–9.<br><br>c. Describe if and how the claims of the Securities Litigation class will be preserved to the extent of available insurance and how D&O Policies are treated under the Plan. Securities Plaintiffs' Limited Objection at 7–8.<br><br>2. Claims under federal securities laws cannot be contributed to estate because the estate lacks standing to pursue such claims. Securities claims should be excluded from definition of Contributed Claim and accompanying disclosure on ballot. Securities Plaintiffs' Limited Objection at 6–7. | Daniel Leon, Roni Cohen-Pavon, and the other UCC Claims Stipulation Defendants, who include Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Kristine Mashinsky, Aliza Landes, AM Ventures, and Koala1.<br><br>2. To the extent the Securities Plaintiffs believe the carve-outs under the releases are nonetheless inadequate, such argument is a Plan objection that should be raised during Confirmation.<br><br>3. The Debtors have added a summary of the federal class action securities litigation. *See* Disclosure Statement, Art. VII.1(a).<br><br>4. The Debtors have added a provision to the Plan and the Disclosure Statement that provides for the preservation of books and records related to the federal class action securities litigation. *See* Plan, Art. VIII.K; Disclosure Statement, Art. III.PPP.<br><br>Based on the limited coverage and proceeds available under the D&O Policies, the Debtors do not believe that any "Side C" coverage under the D&O Policies will be available as a distribution to any parties on account of securities-related litigation. *See* Disclosure Statement, Article III.E. In light of the limited proceeds available, the Debtors believe it is |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | | unnecessary and misleading to expressly preserve these claims against the Debtors to the extent of available insurance. |
| Earn Ad Hoc Group<br><br>(the "<u>Earn Ad Hoc Group</u>")<br><br>[Docket No. 3159]<br><br>("<u>Earn Ad Hoc Group Reservation of Rights and Comments</u>") | 1. Disclosure Statement must describe:<br><br>   a. Tax consequences of NewCo and the Orderly Wind Down and continued appreciation of cryptocurrency. Earn Ad Hoc Group Reservation of Rights and Comments at 4–5.<br><br>   b. Detail on how value of illiquid assets and mining was calculated. Earn Ad Hoc Group Reservation of Rights and Comments at 6–7.<br><br>   c. Detail on whether two additional Orderly Wind Down bids would improve recoveries in Orderly Wind Down and commitment to competitive process for Orderly Wind Down bids. Earn Ad Hoc Group Reservation of Rights and Comments at 7–8.<br><br>   d. List of Excluded Parties should be shared prior to Plan Supplement filing. Earn Ad Hoc Group Reservation of Rights and Comments at 8.<br><br>   e. Additional detail on recovery waterfall, held back crypto, Plan KEIP, and Debtors' claim | 1. The Debtors address the Earn Ad Hoc Group's objection regarding taxes and mining in the reply. Reply ¶ 14-15.<br><br>2. The Earn Ad Hoc Group Reservation of Rights and Comments does not persuasively argue that the Disclosure Statement does not provide adequate information, the applicable standard under which the Disclosure Statement is approved.<br><br>3. The remaining arguments are confirmation objections. Notably, pursuant to the mediated settlement, the Earn Ad Hoc Group may appoint one member of the Litigation Oversight Committee and Avoidance Action Subcommittee subject to the consent of the Committee pursuant to the Settlement Term Sheet attached as <u>Exhibit B</u> to [Docket No. 3064]. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| | against FTX.   Earn Ad Hoc Group Reservation of Rights and Comments at 9.<br><br>2.  Earn Ad Hoc Group should receive three NewCo board seats and one seat on the Litigation Oversight Committee (without UCC approval rights).  Earn Ad Hoc Group Reservation of Rights and Comments at 5–6. | |
| Santos Caceres<br><br>("Caceres")<br><br>[Docket No. 3124]<br><br>(the "Caceres Limited Objection") | 1.  Disclosure Statement incorrectly characterizes CEL tokens as a security.  Caceres Limited Objection at 4–5.<br><br>2.  Seeks relief:<br><br>   a.  Holding that CEL token is not a security;<br><br>   b.  Nullifying attempts to subordinate CEL token claims;<br><br>   c.  Removing CEL token subordination from Disclosure Statement; and<br><br>   d.  Establishing a CEL token holders class.  Caceres Limited Objection at 7. | 1.  The Debtors address the Plan's treatment of CEL token in the Reply.  Reply ¶ 47.<br><br>2.  Pursuant to the Plan, CEL Token Holders shall receive the treatment associated with the program in which their CEL Token was deployed.  See Plan, Art. IV.B.2.<br><br>3.  The subsequent requests for relief regarding CEL token are not within the scope of the Motion. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| AM Ventures Holdings Inc.<br><br>("AM Ventures")<br><br>[Docket No. 3153]<br><br>(the "AM Ventures Limited Objection") | 1. Disclosure Statement fails to provide adequate information regarding the legal basis for equitable subordination of AM Ventures' claim. AM Ventures Limited Objection at 5–6.<br><br>2. The Plan and the Disclosure Statement don't explain how equitable subordination of AM Ventures' claim is proportionate to the harm allegedly perpetrated by AM Ventures. AM Ventures Limited Objection at 6–8. | 1. The Debtors address the Plan's proposed subordination of AM Ventures' claim in the Reply. Reply ¶ 18. |
| Koala1 LLC<br><br>("Koala1")<br><br>[Docket No. 3156]<br><br>(the "Koala1 Limited Objection") | 1. Disclosure Statement fails to provide adequate information regarding the legal basis for equitable subordination of Koala1's claim. Koala1 Limited Objection at 5–6.<br><br>2. The Plan and the Disclosure Statement don't explain how equitable subordination of AM Ventures' claim is proportionate to the harm allegedly perpetrated by AM Ventures. Koala1 Limited Objection at 6–8.<br><br>3. Koala1 is not an insider due to the information the Debtors received when Koala1 open their Celsius account. Koala1 Limited Objection at 9. | 1. The Debtors address the Plan's proposed subordination of Koala1's claim in the Reply. Reply ¶ 18. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Cameron Crews<br><br>"Crews"<br><br>[Docket No. 3173]<br><br>(the "Crews Limited Objection") | 1. CEL token is worthless per Examiner's Report. Crews Limited Objection at 2–4.<br><br>2. The Debtors should implement a "better distribution mechanism" under rule 9019. Crews Limited Objection at 4–5.<br><br>3. No CEL token holder committee should be formed. Crews Limited Objection at 5–6. | 1. The Debtors address the Plan's treatment of CEL token in the Reply. Reply ¶ 47.<br><br>2. Pursuant to the Plan, CEL Token Holders shall receive the treatment associated with the program in which their CEL Token was deployed. *See* Plan, Art. IV.B.2.<br><br>3. The subsequent requests for relief regarding CEL token are not within the scope of the Motion. |
| Reservation of Rights |||
| Securities and Exchange Commission<br><br>(the "SEC")<br><br>[Docket No. 3150]<br><br>(the "SEC Reservation of Rights") | 1. The SEC reserves its right to object to Plan confirmation or a Wind-Down motion, including tokenized Illiquid Recovery Rights. | 1. The Debtors removed the tokenized Illiquid Recovery Rights. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| The Blockchain Recovery Investment Consortium<br><br>(the "BRIC")<br><br>[Docket No. 3163]<br><br>(the "BRIC Reservation of Rights") | 1. The BRIC expects discussions with the Debtors regarding the description of the BRIC's backup plan of reorganization and recoveries in the Disclosure Statement and reserves their rights to object to any unresolved issues. | 1. The Debtors and the BRIC have continued to discuss the BRIC's comments to the Disclosure Statement and have made certain modifications to the Disclosure Statement, including the recovery charts, as the result of the BRIC's comments. |
| Letters | | |
| Iovine Letter<br><br>[Docket No. 3122] | 1. There are certain rights and interests that non-insider CEL Token creditors have which necessitate the creation of a group or voting class for purposes of Plan confirmation.<br><br>    a.    CEL Token do not meet the criteria of securities.<br><br>    b.    The Committee settlement associated with the subordination of CEL Token claim holders should be nullified, and the Court should hold a valuation or estimation hearing on the true value of CEL Token price. | 1. The Debtors address the Plan's treatment of CEL token in the Reply.  Reply ¶ 47.<br><br>2. Pursuant to the Plan, CEL Token Holders shall receive the treatment associated with the program in which their CEL Token was deployed. *See* Plan, Art. IV.B.2.<br><br>3. The subsequent requests for relief regarding CEL token are not within the scope of the Motion. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Maunder Letter<br><br>[Docket No. 3123] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| DeNash Letter<br><br>[Docket No. 3125] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Peel Letter<br><br>[Docket No. 3139] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Nguyen Letter<br><br>[Docket No. 3140] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Sanchez Letter<br><br>[Docket No. 3157] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Gonzalez Letter<br><br>[Docket No. 3158] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| StJohn Letter<br><br>[Docket No. 3164] | 1.  See Iovine Letter above.<br><br>    a.    In the Official Committee of Unsecured Creditors' objection to motions seeking the dollarization of CEL Token claims, the Official Committee of Unsecured Creditors misapplies the *Howey* test.<br><br>    b.    CEL Token is not a security and thus should not be receiving differing treatment from other cryptocurrency traded on the platform.<br><br>2.  The subordination of CEL Token claimants is unwarranted. | 1.  See Iovine Letter above. |
| Hodson Letter<br><br>[Docket No. 3168] | 1.  See Iovine and StJohn Letters above. | 1.  See Iovine Letter above. |
| Y. Schaller Letter<br><br>[Docket No. 3174] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| S. Schaller Letter<br><br>[Docket No. 3175] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| R. Schaller Letter<br><br>[Docket No. 3176] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| F. Schaller Letter<br><br>[Docket No. 3177] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Schwab Letter<br><br>[Docket No. 3178] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Helioti Letter<br><br>[Docket No. 3186] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Marshall Letter<br><br>[Docket No. 3187] | 1.  Full value of 'frozen' Celsius account will not be available for reimbursement absent disapproval of Disclosure Statement.<br><br>2.  Objector's Celsius account should be at the same priority level as Custody and Withhold Accounts. | 1.  Holders of Claims entitled to vote on the Plan may reject the Plan if they do not want to receive treatment they are entitled to receive under the Plan. |
| Foley Letter<br><br>[Docket No. 3188] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Amerson Letter<br><br>[Docket No. 3201] | 1.  See Iovine Letter above.<br><br>2.  Investors purchasing creditor claims are attempting to force an orderly wind down to receive a quicker return on their investment. | 1.  See Iovine Letter above.<br><br>2.  Pursuant to the Plan, the Debtors are effectuating a NewCo Transaction and will only pivot to a Orderly Wind Down if it is in the best interests of the Estates.  *See* Disclosure Statement Art. III.I. |

| Objecting Party and Docket No. | Objection/Response | Reply |
|---|---|---|
| Guilfoyle Letter<br><br>[Docket No. 3202] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Paraboschi Letter<br><br>[Docket No. 3206] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Kimla Letter<br><br>[Docket No. 3210] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Amerson Letter<br><br>[Docket No. 3214] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |
| Gorelik Letter<br><br>[Docket No. 3215] | 1.  See Iovine Letter above. | 1.  See Iovine Letter above. |