**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com
*Counsel to the Official Committee of Unsecured Creditors*

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
        gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' (I) JOINDER TO THE DEBTORS' REPLY AND (II) RESPONSE TO OBJECTIONS TO AND STATEMENT IN FURTHER SUPPORT OF THE DEBTORS' DISCLOSURE STATEMENT MOTION AND THE SETTLEMENT MOTION

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the

chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively the

"**Debtors**") files this (i) joinder to the *Debtors' Omnibus Reply in Support of the Adequacy of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* (the "**Debtors' Reply**") and (ii) responses to certain objections to, and statement in support of, the (1) *Debtors' Motion for Entry Of an Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees And Expenses, and (VI) Granting Related Relief* [Docket No. 2970] (the "**Disclosure Statement Motion**") and (2) the *Joint Motion for Entry of an Order (I) Approving the Settlement By and Among the Debtors and the Committee With Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064] (the "**Settlement Motion**") (this "**Response**").  The Committee respectfully states as follows.[2]

## PRELIMINARY STATEMENT

1.      The purpose of a disclosure statement is to provide a debtor's stakeholders with adequate information to cast an informed vote on a plan.  The Debtors' proposed Disclosure Statement does that by, among other things, providing (1) detailed answers to more than 65 commonly asked questions, (2) a summary of the Debtors' prepetition conduct, these chapter 11 cases, the Court's opinions and the settlements reached thus far, (3) risk disclosures with respect to the proposed plan transactions, (4) projections and valuations of the Debtors' Bitcoin mining business, and (5) a presentation from the proposed Plan Sponsor with respect to the proposed new company ("**NewCo**").  Although the Disclosure Statement is long, complicated restructuring transactions cannot be adequately described in 280 characters and attempts to do so often mischaracterize facts and important elements of the restructuring.  The Preliminary Statement

---

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* (the "**Plan**"), filed contemporaneously herewith.

included at the beginning of the Disclosure Statement, however, provides a 24-page plain English summary of the transactions proposed by the Plan with detailed examples of how those transactions impact the recoveries each class of creditors stands to receive.

2.      Nonetheless, various parties have filed Objections to approval of the Disclosure Statement.  To the extent the Objections (as defined below) requested the disclosure of additional information that the Committee believes would be helpful for creditors to make an informed decision to vote to accept or reject the Plan, the Committee has encouraged the Debtors to amend the Disclosure Statement to include more information.  The Debtors have cooperated with those requests and similar disclosure and cooperation requests from government agencies.  *See SEC Reservation of Rights* [Docket No. 3150].

3.      The Debtors have taken a similarly cooperative approach with respect to the formulation of the Plan.  The Plan is the product of a competitive auction process that resulted in the selection of Fahrenheit LLC ("**Fahrenheit**") as Plan Sponsor by the Debtors and the Committee.  And, the treatment provided to Holders of each of General Earn Claims, Retail Borrower Deposit Claims, General Custody Claims, and Withhold Claims results from settlements reached with representatives of each group of such Holders.

4.      The Debtors have conservatively valued NewCo, as they should.  Although there can be no guarantees, the Committee believes that the recovery analysis fairly analyzes recoveries that creditors may achieve if the Plan is consummated, but that NewCo has significant potential upside.  Fahrenheit is a group of best-in-class operators that bring partnerships and opportunities to the table that no other bidder offered.  Indeed, in the short period since the auction, the Debtors have already realized value from US Bitcoin's[3] assistance in improving the

---

[3]      US Bitcoin is the member of the Fahrenheit team that will be tasked with managing NewCo's mining business.

Debtors' mining operations and benefited from opportunities that the Debtors might not otherwise have been able to progress on their own. The Debtors have included a presentation from Fahrenheit as Exhibit F to the Disclosure Statement explaining Fahrenheit's plan for NewCo and providing illustrative projections. Any plan is subject to risk. That is especially true in the cryptocurrency industry which involves novel technology, is subject to an evolving legal framework, and has experienced significant market volatility both historically and recently. However, NewCo will be a well-capitalized, public-reporting entity owned by customers and free from the overhang that burdens many of its competitors. It will therefore be well-positioned to capitalize on market opportunities after emerging from bankruptcy.

5.      Getting to this point has taken significant time and considerable effort. Attempting to stabilize the Debtors' operations through a prolonged period of distress and no fewer than six concurrent investigations has been a difficult and expensive task. Litigating each party's relative share of the Debtors' estates and determining how best to reorganize Celsius has been arduous as well. It is time to move forward and return coins to creditors.

6.      That goal was collectively expressed at the mediation, at which the Debtors, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, Mr. Tuganov, and certain *pro se* creditors executed a term sheet that resolved many important plan issues.[4] The Committee engaged in that mediation and agreed to the term sheet in good faith and with the expectation that the other parties to the settlement would abide by their agreements. Nonetheless, certain parties have filed pleadings that, at best, raise doubts about their compliance with the agreement reached by the parties,

---

[4]    The mediation was before the Honorable Michael Wiles and was attended in person by (1) the Debtors' Special Committee, (2) Committee members, Thomas DiFiore, Scott Duffy, and Andrew Yoon, (3) members of the steering Committee of the Retail Borrower Ad Hoc Group, Zaryn Dentzel, Veton Vejseli, Chris Villinger, and Greg Kieser, (4) members of the Earn Ad Hoc Group, Brett Perry and Immanuel Herrmann, (5) counsel for Ignat Tuganov, and (6) *pro se* creditors Cameron Crews and Daniel Frishberg, and advisors for each group.

7.      For example, the Earn Ad Hoc Group filed a "Reservation of Rights" in which it makes demands that disregard specific elements of the mediated settlement.  The Earn Ad Hoc Group represents a small fraction of Earn holders.  Its decision to file its "Reservation of Rights" in contravention of the settlement reached in mediation exemplifies why it should not be given the control and additional governance it now demands.

8.      In addition, Mr. Kieser, a member of the steering committee of the Retail Borrower Ad Hoc Group, argues that approximately $5 billion of General Earn Claims should be subordinated to the claims of Retail Borrowers and other unsecured creditors under section 510(b) of the Bankruptcy Code.  The issue of subordination vis-à-vis General Earn Claims and Retail Borrower Deposit Claims was also settled at mediation and implemented through the settlement of the Committee's Class Claim.  Although the settlement provides a 5% increase to all Account Holder Claims (other than Custody Claims), because the increase is applied to the total Retail Borrower Deposit Claim while the principal amount of the associated loan obligation remains constant, it provides Retail Borrowers with a larger increase to the excess portion of their claims when compared to General Earn Claims.  The Retail Borrower Ad Hoc Group, including Mr. Kieser, participated in the mediation and agreed to the settlement.  While Mr. Kieser may not subscribe to the agreement his group reached, the support of other members demonstrates that the settlement satisfies the standard required by the Bankruptcy Rules.

9.      The settlement of the Committee's Class Claim will simplify the claim administration process in these cases and allow the Debtors to return more assets to creditors quicker than if they were required to resolve each and every claim and establish large reserves during the pendency of the claims resolution process.  And every creditor is free to opt out of the settlement on their ballot and pursue their claim against the Debtors on their own.  The fact that

only one objection was filed to the Settlement Motion (and duplicates the CEL Token issues described below) speaks to its reasonableness.

10.     Finally, the requests made by certain Holders of CEL Token Deposit Claims—chief among them, Mr. Davis and Mr. Caceres—should be rejected. The revised Plan includes an increased settlement for Holders of CEL Token Claims valuing CEL Token Deposit Claims at $0.25 per CEL Token obligation. Because the Debtors cannot distribute CEL Token, the treatment of CEL Token affects all creditors' recoveries and any increase to the value of CEL Token Deposit Claims reduces the recoveries to all other creditors. All creditors will be able to vote on the Plan as a whole and will determine if that settlement of the important issues regarding the rank and value of CEL Token Deposit Claims is appropriate. The Plan provides that, if the Court determines the proposed settlement does not meet the Rule 9019 standard or is otherwise not appropriate, CEL Token will be given the value or relative rank determined by the Court. Any debate over the value or rank of CEL Token will not hold up confirmation of Plan.

11.     Mr. Davis and Mr. Caceres have also requested that the Debtors pay their legal fees incurred challenging that settlement. The Committee does not believe that request is appropriate. Both Mr. Davis and Mr. Caceres were part of a represented group that included Alex Mashinsky and approached the Debtors and the Committee in the spring regarding the treatment of CEL Token Deposit Claims. The Debtors and the Committee requested that the group disclose its membership, as required by Bankruptcy Rule 2019, before proceeding with further conversations. The group did not do so and its some of its members, including Mr. Caceres, have since proceeded to communicate with certain Committee members without representation or disclosing the group's membership. The Committee does not know whether Mr. Davis or Mr. Caceres continue to be represented by counsel or continue to be part of the

group that approached the Debtors and the Committee in the spring, nor does the Committee intend to imply that these individuals continue to work with Mr. Mashinsky.  Nonetheless, it is imperative that there be full transparency with respect to any groups that seek to participate in these Chapter 11 Cases.  The estates should not, under any circumstances, be paying legal or other fees for groups that include Alex Mashinsky or others who have harmed Account Holders or are associated with those parties.  Moreover, bankruptcy law does not allow the Debtors to pay legal fees that will benefit one class at the expense of every other creditor.

12.    Based on its review of the revised Disclosure Statement, the Committee believes it meets the standard for approval required under the Bankruptcy Code.

## JOINDER TO DEBTORS' REPLY AND STATEMENT IN SUPPORT

13.    Prior to the date hereof, forty objections to and reservations of rights regarding the Disclosure Statement (collectively, the "**Objections**") were filed.  The Committee joins in the Debtors' Reply with respect to each of the Objections and writes separately to address certain arguments made in the following Objections:

a. *Reservation of Rights and Comments of Ad Hoc Group of Earn Account Holders to Revised Disclosure Statement to Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3159] (the "**Earn AHG Reservation**");

b. *Objection of Greg Kieser to the Debtors' Disclosure Statement* [Docket No. 3154] (the "**Kieser Objection**");

c. *Objection to the Adequacy of the Disclosure Statement in Regards to CEL Token Subordination Under Rule 510(B); (II) Request for Relief in Declaring the CEL Token Not a Security and (III) Request for the Formation of a CEL Token Class with Professionals Paid for by the Estate* [Docket No. 3084] (the "**Davis Objection**"); and

d. *Santos Caceres' Limited Objection to the Debtors' Entry for an Order (I) Approving the Adequacy of the Disclosure Statement in regards to the Treatment of Non-Insider CEL Token Claims and (II) Granting Related Relief* [Docket No. 3124] (the "**Caceres DS Objection**" and, together with the Davis Objection and the Objections filed at Docket Nos. 3100, 3122, 3123, 3125, 3139, 3140, 3157, 3158, 3164, 3168, 3174, 3175, 3176, 3177, 3178, 3186, 3187, 3201, 3202, 3206, 3210, 3214 and 3215, the "**CEL Token Objections**").

Mr. Caceres also filed *Santos Caceres' Limited Objection to the Debtors' Entry for an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to Committee Class Claim (II) Granting Related Relief* [Docket No. 3170] (the "**Caceres Settlement Objection**").  The Caceres Settlement Objection, which is the only objection to the Settlement Motion, is substantially the same as the Caceres DS Objection.

14.    The Bankruptcy Code requires that a chapter 11 plan proponent provide holders of claims and interests entitled to vote on such plan with "adequate information" regarding the plan.  11 U.S.C. § 1125(a)-(b).  Bankruptcy courts have wide discretion when determining what information is necessary based on the facts and circumstances of each case.  *E.g.*, *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 6848113, at *7 (Bankr. S.D.N.Y. Nov. 6, 2015) ("Congress purposely left vague the standard for judging what constitutes adequate information to allow the Court to make a case-by-case determination.").  The adequate information standard is not intended to be burdensome and requires only that a plan proponent provide enough information for voting parties to make an informed judgment when deciding whether to accept or reject a chapter 11 plan.  *See Momentum Mfg. Corp., v. Emp. Creditors Comm.* (*In re Momentum Mfg. Corp.*), 25 F.3d 1132, 1136 (2d Cir. 1994).

15.    The appropriate time to test a plan's compliance with section 1129 (the confirmation requirements of the Bankruptcy Code) is at a confirmation hearing, not at a hearing to determine the adequacy of the debtor's disclosure statement.  *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988).  The only time a court may entertain plan objections at a disclosure statement hearing is when any subsequent solicitation would be futile because the proposed plan is "patently unconfirmable."  *In re Quigley Co., Inc.,* 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007).  That is not the case here.

8

A.   **The Earn Ad Hoc Group's "Reservations and Concerns" Violate Its Commitments**

16.     The Earn Ad Hoc Group raises several issues it claims are not adequately disclosed, which are addressed in the Debtors' Reply.  The Earn Ad Hoc Group also raises issues with business terms in the Plan.  Those issues are not the proper subject of a Disclosure Statement Objection and should be overruled.

17.     The Earn Ad Hoc Group represents Holders of less than 1% of General Earn Claims.[5]  *See Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2553].  Representatives of the Earn Ad Hoc Group "and other Earn representatives" attended a three-day mediation with the Committee, the Debtors, and the Retail Borrower Ad Hoc Group before the Honorable Michael E. Wiles.  Earn AHG Res. ¶¶ 3–4.  At the conclusion of the mediation, the attendees (including counsel to the Earn Ad Hoc Group and Mr. Herrmann) signed a term sheet memorializing the agreed settlement (the "**Term Sheet**").[6]  *Id.* ¶ 4.  While the Earn Ad Hoc Group emphasizes that no definitive documents with respect to the settlement memorialized in the Term Sheet have been executed, that does not change the commitment made by the Earn Ad Hoc Group at the mediation.

18.     The Earn Ad Hoc Group now seeks to retrade agreed-upon points.  ***First***, as part of the settlement, the Earn Ad Hoc Group agreed to specific governance provisions, which did not give the Earn Ad Hoc Group the right to appoint any members of the NewCo board.  Rather, as agreed, the Earn Ad Hoc Group has the right to appoint one member of the Litigation Oversight Committee, with the consent of the Committee.[7]  Term Sheet at 6.  In its Reservation,

---

[5]     The Earn Ad Hoc Group and one of its proposed board candidates is soliciting support for the Earn Ad Hoc Group's demands on social media and may come forward with additional members prior to the hearing on the Disclosure Statement.

[6]     The Term Sheet is attached hereto as **Exhibit A**.

[7]     The Earn Ad Hoc Group incorrectly states that it has been "inexplicably locked out of a guaranteed seat on the LOC and the selection of the Litigation Administrators."  Earn AHG Res. ¶ 11.  This is simply untrue.  The

however, the Earn Ad Hoc Group now argues that the Plan "must" give them the right to appoint "no fewer than three of the remaining five board seats," as well as one member of the Litigation Oversight Committee without the Committee's consent. Earn AHG Res. ¶¶ 10–11. ***Second***, the settlement provides the Earn Ad Hoc Group with a consultation right over the Orderly Wind Down toggle. Term Sheet at 6. The Earn Ad Hoc Group now demands that it decide whether to toggle to the Orderly Wind Down. Earn AHG Res. ¶ 16.

19.    The Earn Ad Hoc Group's inability to honor the agreement it signed, as well as its apparent intent to litigate issues that were already agreed (at great cost to the Debtors) rather than work cooperatively in accordance with the settlement, demonstrates that it should not be afforded the control and rights it demands. Unlike the Earn Ad Hoc Group which, as of this filing represents five creditors, the Committee is a fiduciary for, and has a duty to, all unsecured creditors. The Committee's members have carried out that fiduciary duty throughout these Chapter 11 Cases, made difficult decisions, stuck by those decisions, and voluntarily devoted thousands of hours to this reorganization for the benefit of unsecured creditors as a whole. All governance decisions will be disclosed, as required by the Bankruptcy Code, and, if any party believes that any governance choice prevents confirmation of the Plan, they may object at confirmation. Moreover, as is common, members of the NewCo board will have staggered terms across three classes with one class subject to re-election each year. Plan Art. IV, § D.7.

**B.    Mr. Kieser's Objection Should Be Overruled**

20.    Mr. Kieser argues that the Plan is patently unconfirmable because, among other things, all General Earn Claims should be subordinated to Retail Borrower Deposit Claims under

---

Earn Ad Hoc Group has proposed two candidates for the Litigation Oversight Committee who are being considered by the Committee. One of those candidates, or another designee of the Earn Ad Hoc Group, will be on the oversight committee. The Earn Ad Hoc Group has also proposed several NewCo board candidates who have also been included in the board selection process and are being considered.

section 510(b) of the Bankruptcy Code.  Kieser Obj. ¶¶ 1–8.  This would be a confirmation issue; however, it is addressed by the settlement reached at mediation, which settlement was memorialized in the proposed settlement of the Committee's Class Claim.  Term Sheet at 15; Settlement Motion at 15 ("Any Settlement Claims (other than Claims based on CEL Token) shall not be subject to subordination pursuant to section 510(b) of the Bankruptcy Code").  The settlement provides Holders of Retail Borrower Deposit Claims with a larger increase to the unsecured portion of their claims (the amount in excess of their loan obligation) as compared to General Earn Claims.  The Retail Borrower Ad Hoc Group supports that settlement, and the settlement is a reasonable exercise of the Debtors' business judgment.  Mr. Kieser does not object to approval of that settlement, nor could he.  The Retail Borrower Ad Hoc Group's agreement to the settlement, in which he participated, demonstrates the settlement is reasonable and should be approved, thus resolving the issue.  Fed. R. Bankr. P. 9019.

21.    Mr. Kieser's assertion that General Earn Claims must be subordinated under section 510(b) is also without legal merit.  Kieser Obj. ¶ 8.  Under the Terms of Use, the Debtors have an obligation to repay Earn Account Holders, in kind, the coins they transferred to the Debtors plus interest.  Terms of Use ¶ 4.D.  Earn Accounts are therefore akin to unsecured loans and are described as such in the Terms of Use.  *Id.*  If Earn Accounts are securities, they are debt securities, like unsecured notes.[8]  Although unsecured notes are specifically identified as securities in the Code (11 U.S.C. § 101(49)), claims on account of unsecured notes are not subject to section 510(b).  *See Nisselson v. Softbank AM Corp.* (*In re MarketXT Holdings Corp.*),

[8]    On August 4, 2023, the Supreme Court of New York issued a decision denying Mr. Mashinsky's motion to dismiss the claims brought against him by the Attorney General for New York.  *New York v. Mashinsky*, New York State Supreme Court, New York County, No. 450040/2023, Docket No. 16.  The New York court found that Earn accounts were securities.  The Committee reserves all rights with respect to that ruling.

361 B.R. 369, 388–89 (Bankr. S.D.N.Y. 2007) (promissory notes claims not subordinated).[9]

22.    Mr. Kieser also misunderstands the rationale behind section 510(b) and the investment he made.  The purpose of section 510(b) is to prevent investors in equity or equity-like instruments (such as CEL Token) from turning those equity interests or damages on account of those equity interests into unsecured claims, not to prevent creditors that have extended financing to a debtor from recovering on their loans.  *CIT Grp. Inc. v. Tyco Int'l Ltd.* (*In re CIT Grp. Inc.*), 460 B.R. 633, 640, 643 (Bankr. S.D.N.Y. 2011).  That is why courts that have considered whether promissory note claims should be subordinated to general unsecured claims under section 510(b) have uniformly found that they are not.  *See In re CIT Grp.*, 460 B.R. at 640.

23.    Mr. Kieser argues that he bargained for different rights as compared to an Earn Account Holder.  He is right, in part, but the agreement on what rights he transferred to Celsius along with his cryptocurrency was the same.  Specifically, Mr. Kieser transferred Ethereum to the Debtors and received a significant amount of cash in return.  *See* Proof of Claim 24317.  He was obligated to pay 1% interest on that loan (like the majority of Celsius's loans).  That incredibly low interest rate was offered because Celsius took ownership of the ETH he transferred, along with the rights to re-lend, sell, or otherwise use that ETH.  *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 2018*, Exhibit B9 (the "**Loan Terms of Use Version 9**") at 936 [Docket No. 393] ("Digital Assets posted as Collateral shall be the exclusive property of Celsius, and you grant Celsius your explicit consent to use such Digital Assets in accordance with Section

---

[9]    The *Lehman* case that Mr. Kieser relies on found that claims for damages for breach of contract arising out of the debtor's failure to execute sale orders for bonds issued by its affiliate should be subordinated under section 501(b).  *In re Lehman Bros. Inc.*, 503 B.R. 778, 780 (Bankr. S.D.N.Y 2014).  The Committee does not believe that General Earn Claims arise from the purchase or sale of Earn Accounts and, even if they do, Earn Account Holders all have additional non-contract claims that do not arise from that transaction.

20 below, for the full term during which such Digital Assets are posted as Collateral").

24.    The difference between the Earn and Borrow Programs—that Earn Account
Holders received interest (of which they will recover only a portion through the Plan) and that
Retail Borrowers received dollars (which they are now not required to pay back)—does not
change the fact that both type of Account Holders transferred ownership of their cryptocurrency
and took counterparty risk with respect to Celsius's ability to repay them upon demand or
transfer their balance to their Celsius Account upon the repayment of their loan.  In fact, the
Terms of Use (which all creditors accepted)[10] specifically reference Earn Accounts and collateral
under the Borrow Service in their disclosures regarding bankruptcy.  Terms of Use ¶ 13 ("In the
event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its
obligations, *any Eligible Digital Assets used in the Earn Service or as collateral under the
Borrow Service* may not be recoverable, and you may not have any legal remedies or rights in
connection with Celsius' obligations to you other than your rights as a creditor of Celsius under
any applicable laws.") (emphasis added).  Like Holders of General Earn Claims, Mr. Kieser took
the "risk that [his] investments could be wiped out just like any investor who invests in a hedge
fund or some other type of investment pool."  Kieser Obj.  8.  Mr. Kieser's attempts to elevate
his claim over the $5 billion of claims of other individuals are not valid objections to the
Disclosure Statement Motion and are without merit.

C.    **The CEL Token Objections Should Be Overruled**

25.    The bulk of the filings in response to the Disclosure Statement address the
treatment of CEL Token under the Plan.  The Davis and Caceres DS Objections argue that CEL
Token is not a security and should not be subordinated under section 510(b).  As the Court stated

---

[10]    *See Memorandum Opinion and Order Regarding Ownership of Earn Assets*, at 33 [Docket No. 1822]; Loan
Terms of Use Version 9 at 932 ("In addition, our Terms of Use (the "Network Terms"), and our Privacy Policy
are incorporated into these Loan Conditions by reference.").

when addressing Mr. Caceres's previous motion, those issues will be heard at confirmation, if necessary.  Hr'g Tr. at 73:14-21 (Jun. 28, 2023).

26.    The Debtors' further amended Plan increases the value provided to Holders of CEL Token Deposit Claims to $0.25 per CEL Token.   The settlement is an offer to all creditors, each of whom is affected by the settlement and able to accept or reject the settlement, which is an essential element of the Plan, by voting to accept or reject the Plan.  To the extent the Court does not determine that the settlement falls within the lowest range of reasonableness as required by Bankruptcy Rule 9019 or is otherwise not appropriate, the Plan provides that Holders of CEL Token Deposit Claims will receive a subordinated Section 510(b) Claim, or such other claim as the Court orders at confirmation.

27.    As Mr. Caceres recounts, Mr. Davis, Mr. Caceres, and other members of their "group" have expressed their dissatisfaction over the treatment of CEL Token to the Committee since the proposed treatment of CEL Token was first disclosed.  Mr. Davis and Mr. Caceres are (or have been) associated with a group that includes Mr. Mashinsky.  Mr. Mashinsky's conduct is well documented.  *See Final Report of Shoba Pillay, Examiner* [Docket No. 1956]; *Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2564]; *Class Proof of Claim of the Official Committee of Unsecured Creditors* [Docket No. 2556] (the "**Class Claim**"); *USA v. Mashinsky*, 1:23-cr-00347, (S.D.N.Y. 2023).  When first approached by this group months ago, the Debtors and the Committee requested that it file a statement disclosing the group's composition, as required by Bankruptcy Rule 2019.  No filing has been made to date and it is unclear who is included in their group or the group members' current or prior affiliations with Celsius or Mr. Mashinsky.

28.    Mr. Davis and Mr. Caceres request that counsel be appointed to represent Holders

14

of CEL Token Deposit Claims, and that the estate pay that counsel's fees.  *See generally* CEL

Token Objections.  The appropriate standard to apply, like all other groups seeking payment of

fees is whether, under section 503(b) of the Bankruptcy Code, the group has made a "substantial

contribution" to these Chapter 11 Cases.  11 U.S.C. § 503(b)(3)(D).  In determining what

constitutes a substantial contribution, courts consider whether the services (1) benefited **all**

parties in the case or solely the requesting creditor, (2) imparted a direct, significant, and positive

benefit to the estates, and (3) were duplicative of services performed by others.  *In re Hooker*

*Invs., Inc.,* 188 B.R. 117, 120–21 (S.D.N.Y. 1995), *aff'd,* 104 F.3d 349 (2d Cir. 1996).  The

*Hooker* court found that the bankruptcy court's partial denial of a substantial contribution claim

was appropriate because the services primarily benefitted one creditor group rather than all

parties in the case.  *Id.*  Similarly, in *In re Granite Partners*, the court denied the payment of fees

of a group of shareholders that had objected to the debtors' disclosure statement stating that

"services calculated primarily to benefit [a] client do not justify an award even if they also confer

an indirect benefit on the estate."  213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997).

29.    Here, this group of CEL Token Holders preemptively seeks reimbursement of

fees incurred for services rendered solely for the benefit of those Holders—and, in fact, to the

detriment of other parties, as any additional recoveries on CEL Token Deposit Claims would

diminish other creditors' recoveries.  It is not proper for the estate to finance litigation advanced

by a group for its own benefit that is seemingly affiliated with Mr. Mashinsky and has failed to

comply with its disclosure obligations under the Bankruptcy Rules.

*[Remainder of page intentionally left blank]*

## **CONCLUSION**

30.    Accordingly, the Committee requests that the Court overrule the Objections, grant the Disclosure Statement Motion, grant the Settlement Motion, and grant such other and further relief as may be just and proper.

Dated:   August 9, 2023             Respectfully submitted,
          New York, New York

/s/ *Aaron Colodny*

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
       sam.hershey@whitecase.com
       jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
       gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email:  kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

# Exhibit A

*EXECUTION VERSION*

*In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG)

**PLAN TREATMENT TERM SHEET REGARDING CLAIMS AND OBLIGATIONS OF RETAIL BORROWERS AND GENERAL EARN CLAIMS**

This term sheet (the "**Term Sheet**") is presented in connection with the mediation of the treatment of Retail Borrow Deposit Claims and General Earn Claims in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (the "**Plan**") proposed by Celsius Network LLC and its affiliated debtors (the "**Debtors**") in the jointly-administered cases styled *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (the "**Chapter 11 Cases**").[1]

This term sheet contains certain material terms and conditions concerning a framework for a proposed settlement and treatment of the claims and obligations of individual account holders (the "**Retail Borrowers**") with outstanding obligations (each, a "**Retail Advance Obligation**") with respect to advances made by the Debtors in connection with the Debtors' Borrow program as of July 13, 2022 (the "**Petition Date**") and individual account holders with outstanding obligations in connection with the Debtors' Earn program as of July 13, 2022.

This Term Sheet is being provided for negotiation purposes only and does not address all terms, conditions, or other provisions that would be required in connection with the Plan, which terms shall be set forth in the Plan, which is subject to further negotiation between the parties. This term sheet is not an offer and is subject to definitive documentation in all respects.

**THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE CONFIRMATION OF THE PROPOSED PLAN (AND THEN ONLY AS PROVIDED THEREIN), AS APPLICABLE, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

| TERMS |
| --- |

| | |
| --- | --- |
| ***Plan Treatment of Non-Contract Claims Associated with the Earn and Borrow Accounts*** | The Debtors and the Committee shall enter into a settlement agreement resolving the Committee Class Claim and Class Certification Motion (the "Class Claim Settlement"), which shall Allow a Claim for each Account Holder who does not opt out of the Class Claim Settlement against each Debtor entity on account of their contract claims and non-contract claims as follows:<br><br>All holders of Account Holder Claims other than Custody Claims shall receive, in lieu of any scheduled claim or a proof of claim, 105% of the scheduled amount of such Claim as the same type of Account Holder Claim |

---

[1] Where context requires, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

|  | (*e.g.*, a General Earn Claim for $10,000 shall receive a General Earn Claim in an amount of $10,500 or a Retail Borrower Deposit Claim for $10,000 shall receive a Retail Borrower Deposit Claim for $10,500) (the "Settlement Claim"). |
|---|---|
|  | Each Account Holder shall receive notice and an opportunity to opt out of the Class Claim Settlement. |
|  | Any applicable scheduled claim or filed claim relating to any Account Holder who does not opt out of the Class Claim Settlement shall be deemed amended consistent with the foregoing. |
|  | For the avoidance of doubt, no Account Holder may receive value under the Plan that exceeds the amount of their Settlement Claim. |
|  | The Class Claim Settlement (other than Claims based on CEL Token) will resolve any argument that any damage claim on account of the Earn or Borrow program is subject to subordination pursuant to section 510(b) of the Bankruptcy Code. |
|  | The Earn Ad Hoc Group, Borrower Ad Hoc Group, Mr. Tuganov, Mr. Hermann, Mr. Crews, and Mr. Frishberg shall support the Class Claim Settlement. |
| ***Calculation of Retail Deposit Claims and General Earn Claims*** | All Retail Deposit Claims and General Earn Claims, except for any such claims associated with CEL Token, shall be calculated by converting the value of the Claim into Cash as of the Petition Date using the conversion rates provided in the Cryptocurrency Conversion Table [Dkt. No. 1420]. CEL Token shall be valued as provided in Article IV.B.2. |
| ***Treatment of Retail Deposit Claim*** | The Plan will be amended to provide Holders of Retail Borrower Deposit Claims the following treatment in full and final satisfaction of such Retail Borrower Deposit Claims, including, without limitation, dismissal with prejudice of the adversary proceeding brought by the Ad Hoc Group of Borrowers and participating *pro se* account holders: |
|  | o  **Optional Repayment of Retail Advance Obligation**: |
|  | A Retail Borrower must elect on its ballot whether it intends to repay its Retail Advance Obligation. To the extent a Retail Borrower makes such election and repays its Retail Advance Obligation on the terms set forth below, the Debtors shall pay an amount of BTC or ETH (at the Retail Borrower's election) equivalent to the Retail Advance Obligation repaid with such amount of BTC or ETH valued as of Noon ET on such date based on prices on a cryptocurrency exchange agreed upon by the Debtors and the Ad Hoc Group of Borrowers. |
|  | The Debtors shall email a notice of the projected Effective Date to all Retail Borrowers at least thirty (30) calendar days prior to such Effective Date and provide each such Retail Borrower with instructions on how to repay the applicable Retail Advance Obligation. |

If a Retail Borrower elects to repay its Retail Advance Obligation, it must do so no later than five (5) calendar days prior to the projected Effective Date.

To the extent a Retail Borrower elects to repay its Retail Advance Obligation, but does not repay such obligation no later than five (5) calendar days prior to the projected Effective Date, the applicable Retail Borrower's Retail Advance Obligation shall be set off against the Retail Borrower Deposit Claim. The difference between the Retail Borrower Deposit Claim and the Retail Advance Obligation, is referred to herein as the "**Retail Borrower Excess Claim.**"

o   **Treatment**:  On the Effective Date, a Retail Borrower shall receive:

A.  Either:

1.  If the Retail Borrower repays its Retail Advance Obligation, an amount of BTC or ETH (at the Retail Borrower's election) equal to the Repayment Amount; *or*
2.  If the Retail Borrower elects to not repay or fails to repay its Retail Advance Obligation, such Retail Advance Obligation shall be set off against the Retail Borrower Deposit Claim (*i.e.* the Retail Borrower Deposit Claim shall be reduced by the amount of the Retail Advance Obligation); *plus*

B.  On account of the Retail Borrower Excess Claim, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, in an amount such that the Retail Borrower receives its pro rata amount of the Unsecured Claim Distribution Consideration (*i.e.* (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of NewCo Common Stock (subject to dilution by the Management Equity Compensation); *provided,* that any election to Liquid Cryptocurrency Weighed Distribution Election shall be given priority over all other such elections.

C.  In exchange for the agreements herein, the parties acknowledge that any obligation of the Borrowers to pay any amount on account of interest owed to the Debtors on account of the applicable Retail Advance Obligation for the duration of these Chapter 11 Cases is waived.

D.  All recoveries on account of a Retail Borrower Deposit Claim shall be capped at 100% of such Claim.

| | |
|---|---|
| ***General Earn Claim Treatment*** | The Plan will be amended to provide Holders of General Earn Claims the following treatment in full and final satisfaction of such General Earn Claims:<br><br>**Treatment**: Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its pro rata share of the Unsecured Claim Distribution. |
| ***Substantive Consolidation*** | The Plan shall be amended to provide for the substantive consolidation of Celsius Network LLC, Celsius Network Limited, Celsius Lending LLC, and Celsius Networks Lending LLC. |
| ***Outstanding Adversary Proceedings*** | Following the execution of the Restructuring Support Agreements described below, the parties shall stay all deadlines related to the adversary proceedings filed by the Ad Hoc Group of Borrowers, Mr. Tuganov, Mr. Herrmann, and Mr. Frishberg; and Mr. Frishberg and Mr. Hermann's appeal of the Customer Claims Opinion and Order (the "Outstanding Litigation"). Upon the occurrence of the Effective Date, the Outstanding Litigation shall be dismissed with prejudice. |
| ***Restructuring Support Agreements*** | The Ad Hoc Group of Borrowers, Ad Hoc Group of Earn Holders, Mr. Tuganov, Mr. Herrmann, Mr. Frishberg and Mr. Crews shall execute a Restructuring Support Agreement to support the Plan (as amended in accordance with this term sheet) and not take any actions inconsistent with such support. The parties recognize that any Restructuring Support Agreement executed by an ad hoc group does not bind any individual members in such group other than the signatories. |
| ***Tax Matters*** | The parties agree to use commercially reasonable efforts to structure the transaction in a tax efficient manner for Earn and Borrow creditors. |
| ***Plan Supplement*** | The Debtors shall provide the Ad Hoc Group of Earn Holders, Mr. Tuganov, and Ad Hoc Group of Borrowers with copies of the governance documents for NewCo prior to the filing of the Plan Supplement. |
| ***Definitions*** | "*Distribution Valuation Table*" means the conversion table the Debtors shall use to calculate the amount of any Cryptocurrency a Holder of an Allowed Claim (other than Custody Claims) shall receive under the Plan, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the anticipated Effective Date.<br><br>"*Liquid Cryptocurrency Distribution Amount*" means the amount of Liquid Cryptocurrency to be distributed as part of the Unsecured Claim Distribution Consideration, which shall be an amount equal to the total value of Liquid Cryptocurrency held by the Debtors on the Effective Date less, without duplication: (a) distributions to (or reserves for) Holders of Allowed Convenience Class Claims, Allowed Custody Claims, and Allowed Withhold Claims; (b) the NewCo Capitalization Amount; (c) amounts liquidated to fund the Professional Fee Escrow Account; (d) the Initial Litigation Funding |

Amount; (e) Cash needed at emergence (pre-transaction items); and (f) Cryptocurrency in an amount equal to the Senior Claims Amount. The Committee, in consultation with the Debtors, shall have the discretion to adjust the Liquid Cryptocurrency Distribution Amount downward based upon the amount of aggregate Unsecured Claim Distribution Mix Elections, the status and funding of the Litigation Recovery Account, or any other factors affecting the evaluation or liquidity of the assets anticipated to be transferred to NewCo and/or its subsidiaries on the Effective Date of the Plan.

"*Litigation Proceeds*" means the proceeds of the Recovery Causes of Action.

"*Liquid Cryptocurrency*" means the types of Cryptocurrency to be distributed to Holders of Claims pursuant to this Plan, which may include: (a) BTC and (b) ETH.

"*NewCo Equity*" means shares of common stock in NewCo to be distributed on the Effective Date in accordance with the terms hereof, representing each such Holder's common equity interest in NewCo.

"*Recovery Causes of Action*" means, to the extent not expressly released pursuant to the terms of the Plan or the Confirmation Order, any (a) Causes of Action that the Debtors or their Estates may have that are based on or related to actions taken by, or omissions of, any Excluded Party or any other Person or Entity that is not a Released Party in connection with the management or affairs of the Debtors prior to or after the filing of the Chapter 11 Cases and (b) Avoidance Actions. For the avoidance of doubt, the Recovery Causes of Action shall include (x) those Causes of Action identified in (i) the complaint attached as <u>Exhibit 2</u> to the UCC Claims Stipulation Motion and Roni Cohen-Pavon and (ii) the Schedule of Additional Recovery Causes of Action, (y) the Contributed Claims, and (z) any additional Causes of Action determined to be included by the Court and described in the Confirmation Order.

"*Retail Advance Obligation*" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

"*Retail Borrower Deposit Claim*" means a Retail Borrower's Claim against the Debtors on account of the Cryptocurrency such Retail Borrower transferred in connection with its Retail Advance Obligation(s).

"*Retail Borrower Post-Set Off Claim*" means the amount of the Retail Borrower Deposit Claim remaining after the set off or repayment of the Retail Advance Obligation as set forth in this term sheet.

"*Unsecured Claim Distribution Consideration*" means (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of the NewCo Equity (subject to dilution by the Management Equity Compensation).

| | |
|---|---|
| *Expense Reimbursement* | The Plan shall be amended to provide for the payment of expense reimbursement for reasonable and documented expenses and legal fees incurred by the Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, the participating *pro se* claimants in their individual capacities, and Ignat Tuganov, under Section 503(b)(3)(D) of the Bankruptcy Code as consideration, in part, for the settlement of the relevant adversary proceedings and the appeal as provided herein, participation in the mediation, their role as class representative, and other contributions to the case as applicable. |
| *Governance* | The Ad Hoc Group of Earn Account Holders and the Ad Hoc Group of Borrowers shall each appoint one member of the Litigation Oversight Committee and Avoidance Action Subcommittee, which shall be subject to the consent of the Committee. |
| *Reservation of Rights* | The Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, the participating *pro se* claimants in their individual capacities, and Ignat Tuganov shall be consulted prior to the execution of the Plan wind-down "toggle."<br><br>The class representatives in the class action, the Earn Ad Hoc Group, and Borrower Ad Hoc Group (including their members and Related Parties) shall be added as Released Parties and Exculpated Parties under the Plan. |

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Celsius Network LLC and its Affiliated Debtors**

By: Christopher Ferraro

**The Official Committee of Unsecured Creditors**

By: Thomas DiFiore

**Ad Hoc Group of Borrowers**

By: Veton Vejseli

**Ad Hoc Group Earn Group**

By: Joyce Kuhns Esq.

**Ignat Tuganov**

By: Jeffrey Sabin, Esq.

7

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Cameron Crews**

By: Cameron Crews

**Daniel Frishberg**

By: Daniel Frishberg

IMMANUEL HERRMANN

8