Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF CONSENSUAL RESOLUTIONS OF GOVERNMENT INVESTIGATIONS

**PLEASE TAKE NOTICE** that on July 13, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") issued a press release [Docket No. 3016] (the "Press Release") announcing consensual resolutions of the investigations of the United States Department of Justice (the "DOJ"), the Securities and Exchange Commission (the "SEC"), the Federal Trade Commission ("FTC"), and the United States Commodity Futures Trading Commission ("CFTC") (collectively, the "Investigations").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that the non-prosecution agreement entered between the Debtors and the DOJ is attached hereto as **Exhibit A** (the "DOJ Non-Prosecution Agreement").

**PLEASE TAKE FURTHER NOTICE** that the SEC's complaint against Celsius Network Limited is attached hereto as **Exhibit B-1**.[2] The SEC and Celsius Network Limited have agreed to the entry of a consent order for the resolution of the SEC's action against the Debtors, which remains subject to approval in the SEC Case (the "SEC Consent Order").[3] The proposed SEC Consent Order is attached hereto as **Exhibit B-2**.

**PLEASE TAKE FURTHER NOTICE** that the CFTC's complaint against Celsius Network LLC (the "CFTC Complaint") is attached hereto as **Exhibit C-1**.[4] On July 17, 2023, a consent order for final judgment was entered in the CFTC Case [CFTC Case Docket No. 11], which is attached hereto as **Exhibit C-2**.

**PLEASE TAKE FURTHER NOTICE** that the FTC Complaint against certain of the Debtors is attached hereto as **Exhibit D-1**.[5] The FTC and the Debtors have reached a settlement resolving the FTC's Action against the Debtors. On July 26, 2023, the Debtors and the FTC filed the *Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Enter Into Stipulated Order in the District Court* [Docket No. 3095] (the "FTC Joint Stipulation

---

[2]    *SEC v. Celsius Network Ltd.*, No. 1:23-cv-6009 (PAC) (S.D.N.Y. July 13, 2023) (the "SEC Case").

[3]    The SEC Consent Order was attached as an exhibit to the *Plaintiff's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited* [SEC Docket No. 6].

[4]    *CFTC v. Celsius Network LLC*, No. 1:23-06008 (ER) (S.D.N.Y. July 13, 2023) (the "CFTC Case").

[5]    *FTC v. Celsius Network Inc.*, No. 1:23-cv-6009 (DLC) (S.D.N.Y. July 13, 2023) (the "FTC Case").

and Agreed Order") requesting the Bankruptcy Court's approval of the stipulated order.[6]  The FTC Joint Stipulation and Agreed Order is attached hereto as **Exhibit D-2**.  Additionally, the FTC and the Debtor defendants in the FTC Case filed a joint motion in the FTC Case to stay the FTC's action against the Corporate Defendants pending the Bankruptcy Court's approval of the parties' proposed consent order (the "FTC Joint Motion") [FTC Case Docket No. 3].[7]  The FTC Joint Motion is attached hereto as **Exhibit D-3**.  On July 20, 2023, the FTC Joint Motion was granted in the FTC Case [FTC Case Docket No. 18].  On August 14, 2023, the Bankruptcy Court approved the Debtors' stipulated order with the FTC [Docket No. 3289].

**PLEASE TAKE FURTHER NOTICE** that copies of the DOJ Non-Prosecution Agreement, the SEC Complaint, the SEC Consent Order, the CFTC Complaint, the CFTC Consent Order, the FTC Complaint, the FTC Joint Motion, the FTC Joint Stipulation and Agreed Order, the Press Release and all other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of all pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

---

[6]  Capitalized terms used but notherwise defined herein shall have the meanings acribed to them in the Joint Stipulation and Agreed Order.  The Stipulated Order is attached to the Joint Stipulation and Agreed Order as Exhibit 1.

[7]  The Corproate Defendants include Debtors Celsius Network Inc., Celsius Network LLC, Celsius Network Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC and non-Debtors Celsius US LLC and Celsius Management Corp.

New York, New York
Dated: August 14, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:      joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:      patrick.nash@kirkland.com
            ross.kwasteniet@kirkland.com
            chris.koenig@kirkland.com
            dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**DOJ Non-Prosecution Agreement**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 29, 2023

Asheesh Goel, Esq.
Mark Filip, Esq.
Zachary Brez, Esq.
Robert Allen, Esq.
Allison Lullo, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

      **Re:    Celsius Network LLC**

Dear Counsel:

      On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will not criminally prosecute Celsius Network LLC, Celsius Network Limited, and their affiliated entities listed as debtors in the Chapter 11 bankruptcy Case No. 22-10964 (MG) (together, "Celsius") for any crimes (except for criminal tax violations, as to which this Office cannot and does not make any agreement) related to a scheme to defraud investors in Celsius by (1) making false and misleading statements about the degree of risk to which those investors' funds were exposed through Celsius's yield-generating activities, and (2) manipulating the market price and volume of CEL to give investors the impression that CEL was more valuable and liquid than it actually was, during the period from approximately 2018 to June 2022. This conduct is described more fully in the Statement of Facts attached hereto as Exhibit A and incorporated herein by reference.

      Moreover, if Celsius fully complies with the understandings specified in this agreement, no information provided by or on behalf of Celsius or any testimony given by any then-current employees at the request of this Office (or any other information directly or indirectly derived therefrom) will be used against Celsius in any criminal tax prosecution. This Agreement does not provide any protection against prosecution for any crimes except as set forth above, and applies only to Celsius and not to any other identities or individuals except as set forth herein. Celsius expressly understands that the protections provided to Celsius by this agreement shall not apply to any successor entities, whether the successor's interest arises through a merger or plan of reorganization, unless and until such successor formally adopts and executes this Agreement. The protections arising from this Agreement will not apply to any purchasers of all or substantially all of the assets of Celsius, unless such purchaser enters into a written agreement, on terms acceptable to this Office, agreeing in substance to undertake all obligations set forth in the Continuing Obligation to Cooperate paragraphs.

2023.02.10

Page 2

### Continuing Obligation to Cooperate

Celsius acknowledges and understands that the cooperation it has provided to date in connection with a criminal investigation by this Office, and its pledge of continuing cooperation, are important and material factors underlying this Office's decision to enter this Agreement. Specifically, Celsius acknowledges and understands that for a period of many months at the beginning of this Office's investigation, Celsius's cooperation was insufficient to earn credit based on the factors set forth in the Principles of Federal Prosecution of Business Organizations (Justice Manual § 9-28.000 *et seq*.). After this Office brought, among other things, Celsius's failure to make timely disclosure of relevant facts, including its slow pace of document production and non-production of relevant documents, to the attention of the Special Committee in or about February 2023, the Special Committee effected a change of counsel, and Celsius's cooperation dramatically improved.

It is understood that Celsius shall cooperate fully with this Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts until the date upon which all investigations and prosecutions arising out of such conduct are concluded. At the request of this Office, Celsius shall also cooperate fully with other United States law enforcement and regulatory authorities and agencies in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and any other conduct under investigation by this Office. Celsius's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine. It is further understood that Celsius shall commit no crimes whatsoever. Moreover, any assistance Celsius may provide to federal criminal investigators shall be pursuant to the specific instructions and control of this Office and designated investigators.

### Acceptance of Responsibility

It is understood that Celsius accepts and acknowledges as true the facts set forth in the Statement of Facts attached as Exhibit A.

### Restitution and Remedial Obligations

Celsius acknowledges and understands that this Office will not impose a fine, nor seek forfeiture of Celsius's assets to provide for restitution of the victims of the fraud described in Exhibit A, in light of Celsius's remedial efforts to maximize recovery for victims in connection with the bankruptcy proceedings.

### Additional Obligations

It is understood that, should Celsius commit any crimes subsequent to the date of signing of this Agreement, or should it be determined that Celsius has given false, incomplete, or misleading testimony or information, or should Celsius otherwise violate any provision of this Agreement, Celsius shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. The running of the

2023.02.10

statute of limitations with respect to any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement shall be tolled from the date hereof until the aforementioned period of cooperation has expired. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any such prosecution that is not time-barred on the date that this Agreement is signed, to the extent set forth above.

It is understood that if it is determined that Celsius has committed any crime after signing this Agreement or has given false, incomplete, or misleading testimony or information, or has otherwise violated any provision of this Agreement; (a) all statements made by Celsius to this Office, the SEC, the CFTC, or other designated law enforcement agents, and any testimony given by any then current officer, agent or employee of Celsius before a grand jury or other tribunal; whether prior to or subsequent to the signing of this agreement, and any leads from such statements or testimony shall be admissible in evidence. in any criminal proceeding brought against Celsius; and (b) Celsius shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting or regulatory authority other than this Office. This Office will, however, bring the cooperation and remedial actions of Celsius to the attention of other prosecuting offices or regulatory authorities, if requested by Celsius.

This Agreement supersedes any prior understandings, promises, or conditions between this Office and Celsius. No additional understandings, promises, or conditions have been entered into

2023.02.10

Page 4

other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: _____

Adam Hobson
Allison Nichols
Noah Solowiejczyk
Assistant United States Attorney
(212) 637-2366

APPROVED:

_____

Daniel Gitner
Chief, Criminal Division

AGREED AND CONSENTED TO:

_____
Christopher Ferraro
Interim Chief Executive Officer,
Chief Restructuring Officer, Chief
Financial Officer,
Celsius Network LLC

_____
DATE

APPROVED:

_____
Asheesh Goel, Esq.
Mark Filip, Esq.
Zachary Brez, Esq.
Robert Allen, Esq.
Allison Lullo, Esq.
Kirkland & Ellis LLP
Attorneys for Celsius Network LLC

7-11-23
_____
DATE

2023.02.10

Page 4

other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: _____

Adam Hobson
Allison Nichols
Noah Solowiejczyk
Assistant United States Attorney
(212) 637-2366

APPROVED:

_____

Daniel Gitner
Chief, Criminal Division

AGREED AND CONSENTED TO:

_____          7-10-23
Christopher Ferraro                          _____
Interim Chief Executive Officer,                      DATE
Chief Restructuring Officer, Chief
Financial Officer,
Celsius Network LLC

APPROVED:

_____          _____
Asheesh Goel, Esq.                           DATE
Mark Filip, Esq.
Zachary Brez, Esq.
Robert Allen, Esq.
Allison Lullo, Esq.
Kirkland & Ellis LLP
Attorneys for Celsius Network LLC

2023.02.10

**Exhibit B-1**

**SEC Complaint**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**CELSIUS NETWORK LIMITED and ALEXANDER "ALEX" MASHINSKY,**<br><br>      **Defendants.** | **Civil Action No.** 1:23-cv-6005<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

## SUMMARY OF ACTION

1.       From March 2018 through June 2022, Defendants Celsius Network Limited ("Celsius") and its founder and CEO Alexander "Alex" Mashinsky ("Mashinsky") raised billions of dollars from investors through unregistered and fraudulent offers and sales of crypto asset securities.  Defendants falsely promised investors a safe investment with high returns through its "Earn Interest Program," they misled investors about the financial success of Celsius's business, and they fraudulently manipulated the price of Celsius's own crypto asset security—the so-called "CEL" token.  Defendants' scheme unraveled in June 2022, leaving investors unable to withdraw billions of dollars in crypto assets from Celsius's online platform.  Celsius filed for bankruptcy a month later, stating that the company's liabilities exceeded its assets by approximately $1.2 billion.

2.       Mashinsky founded Celsius in 2018.  The company claimed it was an alternative to traditional financial institutions and would provide investors who held crypto assets "financial freedom" and "economic opportunity."  Defendants promoted the Celsius platform as offering

safe investment opportunities for retail investors to earn interest on their crypto assets, and the company claimed to generate revenue by lending and investing crypto assets.

3.     Celsius marketed two core investment opportunities to investors.  First, Celsius offered and sold its own crypto asset security, CEL.  Defendants promised high "earning rates" to investors who purchased CEL and marketed CEL as an investment in the success of Celsius itself.  Second, Celsius offered an Earn Interest Program whereby investors tendered their crypto assets to Celsius in exchange for interest payments.  Defendants promised investors in the Earn Interest Program returns as high as 17%.  Defendants never filed a registration statement for their offers and sales of the Earn Interest Program, however, and no exemption from registration was available.

4.     Defendants made numerous false and misleading statements to induce investors to purchase CEL and invest in the Earn Interest Program.  Among other false representations, Defendants misrepresented Celsius's central business model and the risks to investors by claiming that Celsius did not make uncollateralized loans, the company did not engage in risky trading, and the interest paid to investors represented 80% of the company's revenue.

5.     None of these claims was true.  Celsius could not consistently generate the revenue needed to make the required interest payments to investors with respect to the Earn Interest Program.  The company engaged in risky trading practices and made uncollateralized loans to try to generate the necessary revenue, putting the entire Celsius enterprise at grave risk.  Celsius was unsuccessful and, as a result, frequently paid much more than 80% of its revenue to satisfy the company's interest payment obligations—a business practice that was hidden from investors, unsustainable, and ultimately led to the company's collapse.

6.     Defendants also misrepresented Celsius's financial success to make the company

2

appear more profitable and stable than it was (and, therefore, CEL to be a more attractive and safe investment than it really was). For example, Defendants claimed that the company raised $50 million from its so-called initial coin offering ("ICO") of CEL. In reality, Celsius raised less than 65% of the amount it had been trying to raise. To make up the shortfall, Mashinsky secretly sought to purchase the unsold $18 million in CEL himself through an undisclosed transaction with Celsius. Defendants never consummated the deal, however, and, contrary to Mashinsky's representation to the public, the outstanding CEL remained unsold.

7. Defendants also falsely claimed that Celsius had 1 million active users on Celsius's platform. It did not. Celsius's own internal data—which was regularly shared with Mashinsky—showed that the company only had approximately 500,000 users who had ever deposited crypto assets on the company's platform and that many were no longer active users.

8. In addition, Defendants falsely stated that Celsius had not experienced any institutional loan defaults. In fact, Celsius and Mashinsky knew that the company had experienced defaults by institutional borrowers totaling hundreds of millions of dollars.

9. Defendants also misrepresented the safety of investor assets deposited on Celsius's platform. Defendants claimed that Celsius had received approval from state and federal regulators for its business even though they knew the company had not. Defendants also falsely portrayed investor assets as being insured, knowing the company had no such insurance.

10. In addition to making numerous false statements about Celsius's business, Defendants also manipulated the market for CEL. Defendants publicly touted a "buy back" program whereby Celsius purchased the amount of CEL needed to make interest payments to investors. In reality, Celsius bought, at Mashinsky's direction, millions of dollars of additional CEL to bolster the price of CEL and induce investors to buy it. Defendants timed their CEL

3

purchases to have the greatest market impact. At the same time, Celsius and Mashinsky reaped millions of dollars in profits for themselves from sales of CEL.

11. By 2022, Celsius's business was unsustainable, and it became clear internally that the company would fail. One employee called Celsius a "sinking ship," while another wrote that "there is no hope . . . there is no plan" and that Celsius's business model "is fundamentally broken." On May 21, 2022, a Celsius executive candidly acknowledged in an internal message: "We don't have any profitable services."

12. A report that circulated among Celsius's executives, including Mashinsky, reached the same conclusion. The report began: "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints. The current business model is not financially sustainable." In fact, Celsius had incurred losses of more than $800 million in 2021 and an additional $165 million during the first quarter of 2022.

13. Even though they knew that Celsius was failing, Defendants continued to tell the investing public a very different story. In May 2022, Celsius claimed that it "abides by robust risk management frameworks," that "[a]ll user funds are safe," and that it "continue[s] to be open for business as usual." Mashinsky asserted that "Celsius has not experienced any significant losses and funds are safe." On June 10, 2022, Mashinsky sought to reassure investors further by claiming that Celsius has "billions in liquidity." Two days later, however, Celsius stopped allowing investors to withdraw crypto assets from its platform, and the company filed for bankruptcy the next month.

14. By engaging in the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. §§ 78i(a)(2), 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5]. Defendants will continue to violate the federal securities laws unless they are

restrained and enjoined by this Court.

<u>**JURISDICTION AND VENUE**</u>

15.     The SEC brings this action pursuant to Sections 20 and 22 of the Securities Act [15

U.S.C. §§ 77t, 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)]

to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business

alleged in this Complaint, and transactions, acts, practices, and courses of business of similar

purport and object. The SEC also seeks against Mashinsky civil penalties, disgorgement of his ill-

gotten gains plus prejudgment interest, an officer and director bar, and a conduct-based injunction

that prohibits him from (i) participating, directly or indirectly, in the purchase, offer, or sale of any

crypto asset securities, or (ii) engaging in activities for the purposes of inducing or attempting to

induce the purchase, offer, or sale of any crypto asset securities by others.

16.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities

Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d),

78u(e), 78aa], and 28 U.S.C. § 1331.

17.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391.

18.     Defendants, directly and indirectly, made use of the mails, and the means and

instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and

courses of business alleged in this Complaint.

19.     Certain of the transactions, acts, practices, and courses of business constituting

violations of the Securities Act and the Exchange Act occurred in this District. For example,

Defendants made materially false and misleading statements in this District regarding CEL and the

Earn Interest Program, and Defendants offered and sold CEL and the Earn Interest Program to

investors who reside in this District. Investors in the United States, including this District, were able

to invest in the various investment opportunities available on the Celsius platform through Celsius's

website and mobile application. In addition, Mashinsky resides in this District, and he and Celsius

regularly conducted business in this District.

## DEFENDANTS

20.     Celsius Network Ltd. is a United Kingdom registered company that served as the

primary company involved with most investor services and activities related to CEL and the Earn

Interest Program. The company's principal place of business is Hoboken, New Jersey, and it

regularly conducted business in New York, NY. Celsius is the parent of various operating

subsidiary companies, including U.S. entities. Celsius is itself the subsidiary of Celsius Network

Inc., a Delaware corporation that is the holding company for all Celsius entities.

21.     Alexander "Alex" Mashinsky, age 57, is the Co-Founder and former Chief

Executive Officer of Celsius. Mashinsky resides in New York, NY, where he ran Celsius and

frequently conducted business on its behalf until he was asked to resign from the company and

did so on September 27, 2022. Mashinsky has an 83.7% equity stake in Celsius Network Inc.,

which is the majority owner of Celsius.

## BACKGROUND ON SECURITIES OFFERINGS

22.     Congress enacted the Securities Act nearly a century ago to regulate the offer and

sale of securities. In contrast to the commercial principle of *caveat emptor*, Congress established

a regime of full and fair disclosure, requiring those who offer and sell securities to the investing

public to provide sufficient and accurate information to allow investors to make informed

decisions before they invest.

23.     Sections 5(a) and 5(c) of the Securities Act require issuers of securities like

Celsius to register offers and sales of those securities with the SEC when they offer and sell

securities to the public.  Registration statements relating to an offering of securities provide

investors with important information about the issuer and the offering, including financial and

managerial information, how the issuer will use offering proceeds, and the risks and trends that

affect the enterprise and an investment in its securities.

24.     The Securities Act and Exchange Act also contain anti-fraud provisions to prevent

fraudulent conduct in the offer, sale, and purchase of securities.  Section 17(a) of the Securities

Act and Section 10(b) of the Exchange Act, for example, seek to ensure honest behavior and fair

dealing in securities transactions.

25.     Congress used a broad definition of "security" in the Securities Act and Exchange

Act.  A "security" encompasses a wide range of investments, including investment contracts.

Investment contracts are instruments through which a person invests money in a common

enterprise and reasonably expects profits or returns derived from the entrepreneurial or

managerial efforts of others.  In this case, Celsius offered and sold CEL and the Earn Interest

Program as securities.

## BACKGROUND ON CRYPTO ASSETS

26.     The term "crypto asset" generally refers to an asset issued and/or transferred using

distributed ledger or blockchain technology, including assets sometimes referred to as

"cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

27.     A blockchain or distributed ledger is a peer-to-peer database spread across a

network of computers that records all transactions in theoretically unchangeable, digitally

7

recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

28.     Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger. Crypto assets may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

29.     A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

30.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were offered and sold as investment contracts and, thus, securities.

## FACTS

I.     **Mashinsky Launches Celsius and Claims to Provide "Financial Freedom" and "Economic Opportunity" to Investors**

31.     Mashinsky and another individual founded Celsius in 2018.

32.     Mashinsky marketed Celsius as an alternative to traditional financial institutions—a place for retail investors to earn interest on their crypto assets invested on Celsius's platform. Celsius and Mashinsky publicized that investors could "unbank" themselves and enjoy "financial freedom" as part of the Celsius community.

33.     Celsius promoted itself as an altruistic organization and referred to its investors as "Celsians." Celsius stated in a blog post: "Can we really bring unprecedented financial freedom, economic opportunity and income equality to everyone in the world? We are Celsius.

We dream big."

34.      Mashinsky was the CEO, public face, and primary promoter of Celsius.

35.      Mashinsky frequently spoke about and on behalf of Celsius on social media platforms like Twitter, in interviews, podcasts, live television appearances, and in articles circulated on the internet.

36.      Inside Celsius, Mashinsky actively participated in discussions regarding all aspects of the company's business and also dictated many of the company's business decisions.

37.      Mashinsky was also a member of Celsius's Executive Committee ("EXCO"), Risk Committee, Asset-Liability Committee ("ALCO"), Investment Committee, and Deployment Committee.  Each of these committees met regularly to discuss certain high-level aspects of Celsius's business, strategy, and financial condition.

38.      Since being founded in 2018, Celsius grew quickly in terms of headcount, assets on its balance sheet, and number of users.  From 2018 to 2022, the company went from having only a handful of employees to approximately 900 employees.  From 2018 until November 2021, Celsius went from having $49.8 million of assets to having $28.6 billion of assets on its balance sheet.  By March 2022, Celsius had approximately 285,000 active users.

## II.      Celsius's Core Investments:  the CEL Token and Earn Interest Program

### A.      Celsius Offers and Sells CEL

39.      In March 2018, Celsius conducted an offer and sale of its own crypto asset security in a so-called "ICO."  Celsius created and called the crypto asset security "CEL."

40.      Celsius initially offered CEL at $0.30 per token with a cap of $50 million to be raised from the sale of CEL.

41.      All CEL tokens were fungible with each other, meaning that buying one unit of

one CEL token did not entitle investors to any separately managed accounts. Instead, all CEL tokens changed in price together, such that an investor's returns were directly proportional to the amount of CEL purchased.

42. Accredited investors in the United States could purchase and sell CEL directly from and to Celsius through the company's over-the-counter desk ("OTC"). Investors were later able to buy and sell CEL on the secondary market through various crypto asset trading platforms, and they did so.

43. According to Celsius's OTC Policies and Procedures, "To comply with CEL tokens status as a security with the SEC, all US purchases via OTC must be locked for 1-year within their wallet immediately after settlement."

44. The price of CEL fluctuated significantly over time, ranging from a low of $0.03 per token in January 2019 to a high of $8.02 per token in June 2021.

45. Since the founding of Celsius, CEL played a critical role in the company. In a March 2018 white paper, Celsius described CEL as "the backbone of the Celsius Network." CEL was a token that unlocked discounts and features on Celsius's platform, such that the greater the number of people who wanted to use the platform, the higher the demand would be for CEL.

46. On March 8, 2018, Mashinsky further explained in a livestreamed event: "We are focused on enabling the community, on creating a large community because everything we do is measured by the [CEL] token." Mashinsky went on to say: "The token price goes up, our entire compensation is the token. So our job is to do everything we can to increase the price of the token as long as it's in the best interest of the community."

47. Mashinsky also publicly described the price of CEL as a measure "of the

10

profitability or how well is Celsius doing." In other words, the price of CEL would increase when Celsius successfully attracted more users, and the price of CEL would decrease when the demand for Celsius's investment services declined.

48. Consistent with their public statements, Mashinsky and others at Celsius viewed CEL as comparable to stock in a public company. Mashinsky wrote in an internal message that he wanted "to be able to talk about CEL just like public companies talk about their stock."

49. The fortunes of CEL purchasers were tied to one another, as well as to Celsius's and Mashinsky's fortunes with respect to CEL. Mashinsky and other Celsius executives received CEL as part of the ICO and as part of their compensation. Celsius's founders were allocated over 100 million CEL, and compensation for Mashinsky and Celsius's employees was partially tied to the price of CEL, with bonuses triggering when CEL reached certain price thresholds. As a result, the better CEL performed, the more Mashinsky and Celsius employees benefitted financially as well.

50. In fact, Celsius was the largest holder of CEL, and the company controlled over half the supply of available CEL through its corporate Treasury. After Celsius, Mashinsky was the second largest holder of CEL.

51. Celsius controlled how funds received from the sale of CEL were used. Celsius pooled proceeds from the sale of CEL, both in the ICO and in later CEL sales, for general use in its business, including funding the development of its infrastructure and related capital costs.

52. Celsius and Mashinsky publicly promoted CEL as an investment on which investors could profit based on Celsius's efforts. The company's white paper touted that investors could earn interest and rewards by purchasing CEL. Celsius and Mashinsky also marketed CEL as a profitable asset growing in value. On Twitter, they advertised the percentage

11

price increase in CEL.  Celsius also publicized whenever CEL was listed on a new crypto asset

trading platform where it could be traded for other assets.

53.     Celsius also publicized the profitability of CEL based on its management team's

efforts—tying CEL's price to Celsius's success.  The white paper highlighted the management

team's entrepreneurial experience and success in creating profitable businesses.

54.     Mashinsky similarly publicly emphasized the profitability of CEL based on the

efforts of Celsius and its management team, saying in a January 12, 2022 livestream event:

> We believe that the token has not shown its full potential yet. A lot of it is on us . . . we
> are launching big things this year, and obviously these things are going to have major,
> major impact on the price of CEL.

55.     Celsius and Mashinsky also publicly touted how much investors could earn by

investing in CEL (e.g., "CEL is earning 5.25% APR").  They also encouraged investors to

purchase and hold onto CEL with the expectation that its value would increase, using marketing

phrases like "HODL" (an acronym used in the crypto industry meaning "hold on for dear life")

and "to the moon" (a reference to a rising price).

56.     Celsius also touted on its website the "higher earning rates" investors could earn:



57.     Mashinsky also regularly highlighted the financial performance of CEL, including tweeting links to performance charts and news articles, while noting the increase in CEL's price.

58.     For example, in June 2020, Mashinsky tweeted that CEL had increased in value by 364% during the last three months and it was at an all-time high.  In December 2021, Mashinsky tweeted:  "CEL Rallies by 15% Following Celsius Network's Latest Award."  He included a link to an article touting the increase in the price of CEL during that month.

59.     In other words, Defendants told investors they would earn returns as a result of the company's efforts by the price of CEL increasing and through interest payments.

**B.     Celsius's Earn Interest Program**

60.     From around June 2018 until it paused withdrawals in June 2022, Celsius offered and sold interests in the Earn Interest Program to investors in the United States and elsewhere.

61.     To invest in the Earn Interest Program, investors tendered crypto assets to Celsius in exchange for Celsius's promise to provide investors periodic interest payments proportional to their investments in the program.  Celsius called these interest payments "rewards."

62.     The crypto assets tendered to Celsius through the Earn Interest Program were not subject to a lock-up period and investors could retrieve their assets from Celsius on demand.

63.     The investor assets tendered to Celsius through the Earn Interest Program were for the company's general use in its business, which produced income for Celsius and which Celsius indicated would generate returns for its investors.

64.     Celsius pooled the assets received from investors in the Earn Interest Program together with other Celsius assets and exercised full discretion and control over how the pooled assets were used.  Celsius deployed the assets it received through the Earn Interest Program into the same revenue-generating activities (e.g., lending), and the company paid returns to investors

13

in the Earn Interest Program on a *pro rata* basis on their investment.

65. The Terms of Use for Celsius provided the following:

ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE
SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACOUNT
. . . AND UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD ITS
DIGITAL ASSETS ON YOUR BEHALF AS PART OF THE SERVICES.

66. Celsius's Terms of Use also contained the following disclosure:

We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise
dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible
Digital Assets with counterparties, and we will use our best commercial and
operational efforts to prevent losses.

67. Celsius marketed the Earn Interest Program to U.S. investors through general

solicitations on the company's website, mobile application, and on social media sites.

68. Celsius publicized that investing in the Earn Interest Program was easy and a

passive way for investors to earn returns.

69. In response to a CNBC reporter's question about whether it was "difficult" for a

"regular investor" to invest in the Earn Interest Program, Mashinsky stated: "No, it's pretty

simple. You download the Celsius Network app or you can also register on our website. And

you have to move over your crypto assets. We only accept crypto assets. And you earn yield

automatically." Mashinsky went on to say: "You don't have to do anything. All you do is you

put the assets in and every Monday you get yield in your account. You don't have to do

[anything], we do all the hard work."

70. Celsius promoted the Earn Interest Program as a profit-making opportunity,

including emails with phrases like "Pour Yourself a Cup of Profits" and "Profits in your Pocket."

71. Mashinsky also marketed the Earn Interest Program through frequent social media

postings on his Twitter account and in livestreamed personal appearances.

14

72.     On its website, Celsius promised investors returns of up to 17% on the crypto

assets they invested in the Earn Interest Program:



73.     Celsius specifically invited investors to expect that any profits earned would come

from Celsius's efforts, stating on its website:  "The Celsius finance team generates returns for

our community by lending out our community's digital assets to institutional and retail

borrowers.  We aim to return up to 80% of the revenues made from lending out our community's

assets back to our community on a weekly basis.  Due to the rate of returns we can achieve in the

lending market change nearly every day [sic], we adjust the rates that our community earns on

their digital assets on a weekly basis."

74.     Celsius also wrote on its website:  "Weekly rewards are calculated every Friday at

05:00:00 UTC, according to prices at that moment.  That means that our rates change on a

weekly basis depending on the current market conditions."

15

75. Celsius emphasized on its website that up to 80% of the company's revenue is
paid back to investors:



76. Mashinsky elaborated on the concept that investor returns would come from
Celsius's managerial and entrepreneurial efforts in an online interview with Forbes on May 4,
2020, that was posted to Celsius's website: "Celsius Network goes out to find the best yield for
your asset with the lowest risk and then delivers 80% of the value created back to the user[.]"
Mashinsky went on to say: "I turn back the majority of my profits to my depositors" and "we
share 80% of these revenues with our customers."

77. Mashinsky similarly stated in an interview posted on YouTube on April 13, 2022:
"[W]e give most of the profits or most of the yield back to the community. So Celsius, as an
example, has paid the community over $1 billion in yield."

78. In other words, the more revenue Celsius generated from investor funds though its
managerial efforts, the greater the returns would be for investors in the Earn Interest Program.

79. Celsius accepted crypto assets from any investor willing to sign up for the Earn
Interest Program.

16

80.     The high returns Celsius promised made the Earn Interest Program attractive to retail investors.  In a March 18, 2020 interview with Cointelegraph, Mashinsky noted that "about 90% of the deposits come from the retail clients."

81.     The value of crypto assets that investors invested in the Earn Interest Program is staggering.  As of August 22, 2021, Earn Interest Program balances equaled more than $13 billion.

82.     Celsius and Mashinsky never filed a registration statement or had one in effect with the SEC for their offers and sales of securities through the Earn Interest Program.

83.     Celsius's public disclosures regarding the Earn Interest Program contained limited or inadequate information about Celsius's operations, financial condition, liquidity, and other factors relevant in considering whether to invest in the Earn Interest Program.

## III.     Defendants Defrauded Investors Who Invested in CEL or in the Earn Interest Program

84.     Celsius told the investing public that it generated revenue to pay investors by lending the "community's assets to safe institutions looking to borrow coins."  Celsius also emphasized that its Earn Interest Program was a way for retail investors to obtain "high yield at a low risk."

85.     The reality was much different.  Celsius and Mashinsky deployed investor assets in a variety of ways—many of which were much riskier than institutional lending—including directional trading (trading that bets on the value of an asset or security going up or down), providing liquidity on certain so-called DeFi platforms, staking crypto assets with respect to certain blockchain protocols, and funding crypto asset mining activities.

86.     Celsius needed and relied upon revenue generated from these activities to fund interest payments to investors in the Earn Interest Program and to generate income for the

company such that the riskier these activities, the riskier the Earn Interest Program investment became to unknowing investors.

87.     At the same time, Celsius and Mashinsky engaged in a concerted campaign to persuade investors to purchase CEL and invest in the Earn Interest Program.

88.     Celsius and Mashinsky frequently posted information on social media sites such as Twitter, Facebook, and Instagram, as well as on other online platforms like LinkedIn.

89.     Mashinsky also communicated regularly with the investing public through weekly livestreamed events called "Ask Mashinsky Anything" ("AMAs").  Each of these so-called AMA events was viewed, on average, by a thousand to several thousand individuals.

90.     Celsius would then upload a recording of each AMA episode onto YouTube, where an additional ten to fifteen thousand viewers, on average, watched the AMA.

91.     Mashinsky began regularly holding these AMAs in April 2020, and they continued until June 2022.

92.     Celsius and Mashinsky marketed the AMAs extensively on social media channels, and Mashinsky and others at Celsius viewed these episodes as a key way to obtain and retain investors in CEL and the Earn Interest Program.

93.     The AMAs were effective at reaching a large audience, but they also frequently included false or misleading statements, including many of the statements discussed below.

94.     By around May 2021, Mashinsky's public misrepresentations about CEL and the Earn Interest Program were so pervasive and, as Celsius employees recognized, so problematic that Celsius put in place a process to remove certain statements from the AMA episodes before they were posted on Celsius's YouTube channel.  This editing process (the "AMA Editing Process") occurred, however, only after the videos had aired live.

18

95.     Celsius did not publicly correct the false or misleading statements for those who watched the live AMAs, nor did it disclose that this editing process existed.  In addition, the AMA Editing Process was limited to contemporaneous AMAs produced and livestreamed by Celsius.  The company did not have the ability to edit other statements Mashinsky made to the public via third parties, including Twitter Spaces or news outlets.

96.     Although Mashinsky was not directly involved in the AMA Editing Process, he was aware that it existed, and Celsius employees told him that certain statements he made during the AMAs were not accurate.

### A.     Defendants Misrepresented Celsius's Central Business Model and the Risks to Investors

97.     Celsius and Mashinsky repeatedly promoted Celsius as a community-based company focused on a simple and safe business model.  In reality, their representations about core aspects of Celsius's business were materially false and misleading.

### 1.     Celsius and Mashinsky Falsely Represented That Celsius Did Not Make Uncollateralized Loans with Investor Assets

98.     A central tenet of Celsius's promotion of its business was that it did not make uncollateralized loans when deploying investor funds from the Earn Interest Program.  Celsius and Mashinsky made this representation frequently and in numerous different outlets.  For example, in a November 26, 2019 livestreamed event, Mashinsky said:  "I can tell you there are other lenders in the market who lend with no collateral or lend to anybody.  Good.  Good for them.  We will never do that."

99.     Mashinsky made the same false claim in a March 13, 2020 "Crypto Market Commentary with Alex Mashinsky" video:  "Credit goes to the Finance Department, Credit Risk

management for not lending to risky institutions or risky hedge funds. We stick with the highest quality, we don't do non-collateralized loans, we always have collateral."

100. In an April 14, 2020 video, Mashinsky similarly stated: "For us, I mean, we are – there are crazy guys out there that lend with no collateral. We don't do that, so, we have very tight controls."

101. Mashinsky also reiterated the point in a July 17, 2020 AMA: "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."

102. Mashinsky continued making similar false statements through 2022. In a January 7, 2022 interview with RealVision Finance, Mashinsky stated: "We don't do uncollateralized lending . . . . Obviously, we only do asset backed lending." Mashinsky reiterated in an April 13, 2022 interview with CNBC: "[W]e do not offer any non-collateralized loans."

103. In reality, despite the numerous public assurances to the contrary, Celsius made many uncollateralized institutional loans totaling millions of dollars. In fact, in November 2019, Celsius had more than $17 million in uncollateralized institutional loans.

104. Throughout 2020, the percentage of Celsius's institutional loan book that was uncollateralized consistently increased. It went from 16.27% in the first quarter to 26.4% in the second quarter. By the third quarter, 28.4% of Celsius's institutional loans were uncollateralized, and by the fourth quarter the percentage had increased to 31.33%.

105. By the second quarter of 2021, the percentage of uncollateralized institutional loans held by Celsius had ballooned to 38%. These loans totaled approximately $531 million in value.

106.    By 2022, Celsius's uncollateralized institutional loans ranged from $1.3 billion to $1.96 billion in value and accounted for 34-48% of the company's entire institutional loan portfolio.

107.    Mashinsky knew that Celsius had uncollateralized loans throughout this time period—including when he was publicly stating otherwise.  For example, beginning in 2020, Celsius's Risk Committee, of which Mashinsky was a member, held regular weekly or bi-weekly meetings in which high-level Celsius executives reviewed the loan portfolio, including the percentages of the portfolio that were uncollateralized.

108.    In addition to the information discussed at regular Risk Committee meetings, there were internal discussions about the falsity of Mashinsky's public statements regarding collateralized loans.  In an exchange on the messaging application Slack, a Celsius executive told a senior employee at the company:  "I just told [Mashinsky] that the number [of unsecured loans] is increasing and the overall ratio of collateral with institutions is going down. . . . I will talk to him.  I said this numerous times."  The executive's message was prompted by a false statement Mashinsky had made about the company's loan portfolio in a November 6, 2020 AMA.

109.    By the spring of 2021, Celsius executives identified false statements about collateralized loans as part of the AMA Editing Process.  The AMA Editing Process began just after an April 30, 2021 AMA in which a Celsius employee falsely stated, "So I would say a majority of our loans, almost 100% of them are fully collateralized, with other assets right."  A Celsius executive later told Mashinsky in an email, "I think the april 30th AMA video needs to be removed until the changes have been made," citing this misrepresentation.

110.    Nevertheless, two weeks later, at a May 14, 2021 AMA, Mashinsky echoed the April 30 misstatement by saying:  "These loans are collateralized.  This means the institutions

give Celsius assets or dollars to hold onto before we give out the digital assets. This protects the community and keeps them whole."

111. Mashinsky's May 14 statement was deleted as part of the AMA Editing Process, at the direction of a Celsius executive. That executive recognized the falsity of Mashinsky's public statement and noted: "It is crucial to: delete this section of the AMA, AND remove the curated video explanation from EVERYPLACE on the internet."

112. Mashinsky continued making similar false statements up until the time that Celsius halted withdrawals in 2022, despite having regularly attended Risk Committee meetings that discussed the large number and percentage of Celsius's unsecured institutional loans.

### 2. Celsius and Mashinsky Falsely Represented That Celsius Did Not Engage in Directional Trading

113. Additionally, Mashinsky and Celsius made several false statements regarding the company's trading activities. As an example, Mashinsky tweeted on September 29, 2020, "Celsius does not trade or take long or short positions with customer coins."

114. In reality, Celsius engaged in risky directional trading (trading that bets on the value of an asset or security going up or down) that led to large undisclosed losses for the company.

115. For instance, in 2019, Mashinsky shorted the crypto asset Bitcoin (BTC) on behalf of Celsius and using Celsius investor funds. A senior executive at Celsius ultimately unwound the positions, which resulted in a $15 million loss for the company. It also, in part, led Celsius to create a "Recovery Committee," which contemplated liquidating or selling Celsius to cover the loss. Celsius's financial condition only stabilized after a $20 million capital raise in August 2020.

22

116.    In 2021, Mashinsky and Celsius continued falsely to represent that the company did not engage in directional trading.  For example, in a July 31, 2021 interview with a crypto asset news outlet, Mashinsky said:  "Celsius does not bet on assets.  It's not like we invest in Bitcoin and hope it's going to go up.  Our job is to create yield, to create interest."

117.    Contrary to Mashinsky's statement, Celsius was engaged in directional trading in Bitcoin (BTC) and another crypto asset called Ether (ETH), sometimes following instructions provided by Mashinsky himself.

118.    As an internal Celsius document dated February 2, 2022 explained:  "Directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk.  It was presented and discussed in ExCo, ALCO, and R[isk] C[ommittee] and there is extensive supporting evidence."

119.    A Celsius employee even told Mashinsky in a private message on January 24, 2022:  "Hi Alex – on our call last evening, I agreed with reducing the directional trades, but we've effectively replaced them with another set of directional trades, so I want to share with you that I have concerns with the approach we're taking."

120.    Despite Mashinsky's knowledge of and involvement in directional trading, he continued falsely to state publicly that Celsius did not engage in directional trading.  For instance, Mashinsky stated in a December 31, 2021 AMA:  "We don't trade. We only earn yield on top of—we stick to—we don't trade around positions.  We don't buy and sell Bitcoin.  We don't do any of those things that people think will do better than the index."

121.    In response to that statement, a Celsius executive noted internally that Mashinsky's statement that the company does not engage in directional trading was "false."

23

122.    In an April 13, 2022 CNBC interview, Mashinsky again falsely stated: "We are what you call a delta-neutral strategy . . . . Celsius doesn't bet on the market going up or down."

123.    One of Celsius's Account Managers made a similar false statement in a May 27, 2022 AMA. A Celsius executive responded internally: "This is untrue and misrepresents material risk factors associated with yield accounts."

### 3.    Celsius and Mashinsky Falsely Represented That Celsius Had No Leverage

124.    Celsius and Mashinsky also falsely stated that the company had no leverage. In general, leverage is a ratio used to measure the amount of debt a company has relative to its capital. Mashinsky compared Celsius favorably to banks, which he characterized as having significant leverage.

125.    At least one Celsius executive attempted to get Mashinsky to stop saying that the company did not have leverage. The executive told Mashinsky to avoid making such statements and provided Mashinsky with data demonstrating that Celsius had leverage in similar ratios as banks.

126.    Nevertheless, Mashinsky continued to state publicly that Celsius did not have leverage. For example, in a February 22, 2022, Twitter Spaces interview, Mashinsky stated:

> Oh, yeah, we don't have leverage . . . . Banks are leveraged on average, either 10 times or 20 times depending on the balance sheet. And Celsius doesn't have any leverage, right? I mean, we, we have a little bit of leverage, because we sometimes lend out the collateral we get from third parties. So it's maybe again, instead of 1.0, it's 1.2 or something like that.

127.    Mashinsky's statement was identified by Celsius employees as part of the AMA Editing Process as among "a selection of recent misrepresentations made by Alex [Mashinsky] and other Celsius reps on Twitter Spaces AMAs."

128.    As late as May 27, 2022, just weeks before Celsius halted investor withdrawals, Mashinsky falsely claimed that "we don't offer any leverage, and we don't let you even if you want to inside our app." This statement was also identified as "incorrect" as part of the AMA Editing Process.

### 4.    Celsius and Mashinsky Falsely Represented That 80% of Celsius's Revenue Is Returned to Investors

129.    Celsius and Mashinsky repeatedly represented that Celsius paid 80% of its revenue back to investors.

130.    Beginning as early as March 7, 2019, Mashinsky made this promise in an interview with NASDAQ: "Celsius network enables you to lend them to someone else, and you get to keep 80%."

131.    From March 2019 through early 2022, Celsius and Mashinsky consistently stated that Celsius gave 80% of the company's revenue back to investors in the form of interest.

132.    For example, on September 19, 2019, Celsius tweeted: "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments."

133.    Mashinsky made the same claim in an AMA on May 15, 2020: "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day."

134.    Celsius reiterated the claim as well in a tweet on April 27, 2021: "How is it possible that we offer up to 7% APY on crypto, asks @CNBC. The answer is simple: we give 80% of our revenue back to the community. #UnbankYourself."

135.    These representations were false. Celsius paid investors in the Earn Interest Program an interest rate that was rarely, if ever, tied to the revenue received by the company or

its performance. Prior to July 2021, Celsius did not even have a formal policy on setting the interest rates paid to Earn Interest Program investors.

136. Mashinsky and other executives at Celsius feared losing investors as a result of the company lowering the interest rates it paid participants in the Earn Interest Program. As a result, Celsius largely set its interest rates in order to attract and retain investors rather than the basing them on the returns it was able to receive from its business activities.

137. Contrary to Defendants' many representations that 80% of revenue is paid to investors, Celsius consistently paid out *more* in interest than the company generated in revenue.

138. Despite the publicized growth of the company, Celsius did not experience a meaningful period of profitability during the 2018 through 2022 time period.

139. This fact was well-known to Celsius executives, including Mashinsky. For example, in February 2021, Celsius's CFO sent Mashinsky a financial document showing that for 2020, Celsius paid out $45.7 million in interest (called "rewards") but generated only $42.7 million in income. In other words, more than 100% of Celsius's revenue in 2020 went to pay purported interest to investors.

140. In 2021, Celsius paid 23% more in interest to investors in the Earn Interest Program than it generated in revenue.

141. Mashinsky and Celsius's senior leadership were aware that the company's payout ratio was above 100%, with one executive noting Celsius was "basically using user balances to pay user rewards."

142. In July 2021, Celsius implemented a formal policy on setting interest rates. Even under that policy, however, the interest rate that Celsius paid to investors in the Earn Interest Program was not directly tied to the company's revenue.

143.    Mashinsky knew of the policy and that the purported interest payments to
investors in the Earn Interest Program did not represent 80% of the company's revenue.

144.    Even after the formal policy was instituted, and in the face of clear information
about the disparity between revenue earned and interest payouts, Mashinsky continued to claim
falsely that the company was paying 80% of its revenue back to investors.

145.    Celsius's unsustainable and undisclosed practice of paying more than 80% of its
revenue back to investors had the effect of making the company's operations appear more stable
and profitable than they really were.

**B.    Defendants Misrepresented Celsius's Financial Success**

146.    From the time of the CEL ICO in March 2018 until days before Celsius halted
customer withdrawals off its platform, Celsius and Mashinsky publicly misrepresented
significant financial events and the financial condition of the company.

**1.    Celsius and Mashinsky Falsely Represented the Amount Raised by the CEL ICO**

147.    Celsius falsely stated on numerous occasions that the CEL ICO was fully
subscribed at $50 million, when in fact only approximately $32 million had been sold.

148.    Even before the ICO had closed, Celsius began falsely to claim success,
announcing in March 2018:  "We're excited to announce that we've raised over $42 million of
our $50 million hard cap."

149.    Mashinsky falsely claimed in a May 17, 2018 YouTube interview that the CEL
ICO was fully subscribed:  "We just closed our [ICO] round about a month ago, we raised $50
million."  In a July 25, 2018 Coin Central interview, Mashinsky similarly claimed:  "[I]t's funny
because our ICO raised over $50 million."

27

150.    These misrepresentations continued until March 2019, when Mashinsky falsely stated in a March 13, 2019 YouTube video:  "We did an ICO, we raised $52 million in March."

151.    The fact that the CEL ICO fell short of its goal of $50 million and raised only $32 million was well-known to Mashinsky and other Celsius executives at the time they made the misrepresentations.

152.    Indeed, Celsius and Mashinsky sought to conceal the fact that the CEL ICO was not fully funded at $50 million.  On March 29, 2018, shortly after the CEL ICO closed, Mashinsky agreed to purchase the 117 million unsold CEL (worth $18 million) himself, entering into a token sale agreement with Celsius through a company in his name called AM Ventures Holdings, Inc.

153.    The token sale agreement between Celsius and Mashinsky and the sale of CEL to Mashinsky were not disclosed to investors and Mashinsky continued to state publicly that Celsius had raised $50 million.  In addition, the sale was never completed, Mashinsky never purchased the CEL or provided the $18 million to Celsius, and the unsold CEL remained in Celsius's possession.

154.    Celsius employees were aware that the representations about the ICO being fully funded were false, and that Celsius investors would care about this misrepresentation.

155.    In a March 1, 2019 internal communication, a Celsius employee stated:  "The public believes that the ICO was fully funded and all tokens purchased.  If they find out now that there were unsold they will be upset."

156.    Likewise, in a June 3, 2020 Slack exchange, Celsius employees discussed whether the unsold CEL should be moved back into the Celsius Treasury where it would be visible to Celsius investors.  When asked whether Celsius investors would care, one of the employees

responded: "Yes, they would absolutely care . . . ou[r] 117M from old ICO stake into the Treasury would change the whole structure of how the ICO was designed—the community would be very angry."

157.    At least one Celsius executive admonished Mashinsky, telling him to stop misrepresenting the amount of CEL sold during the ICO.  In an attempt to prevent Mashinsky from making a misrepresentation about a different capital raise, the executive wrote to Mashinsky on July 23, 2020:  "This mistake was already made by us after the ICO (we didn't raise $50M but we claimed we did.)."  The executive wrote about Mashinsky's false statements to another executive:  "I need your help in making sure he [Mashinsky] doesn't continue saying wrong things.  This has gotten us into trouble time and time again and it's not healthy."

### 2.    Celsius and Mashinsky Falsely Represented the Number of Active Users on Celsius's Platform

158.    Celsius and Mashinsky falsely touted the number of users on the company's platform as another indicator of Celsius's purported success.

159.    Celsius generated, and Mashinsky received, internal data on a weekly basis that showed the number of investors using Celsius's platform.  According to Celsius's own data, in July 2021, the cumulative number of users who had invested crypto assets with Celsius since the Earn Interest Program launched three years earlier was between 200,000 and 300,000 users.

160.    Despite the company's own data, Mashinsky stated in a July 31, 2021 interview with a crypto asset news outlet:  "Today, there are 50 or so companies that are copying what Celsius has created, which is great. . . . But Celsius is by far the largest leader, with over US$15 billion in assets, and close to a million customers are earning yield on our platform."

161.    In an April 13, 2022 interview with CNBC, Mashinsky falsely claimed:  "We aggregate 1.7 million users, right, pool them together . . . ."

29

162.     In a May 13, 2022 AMA, Mashinsky again falsely stated: "We have millions of customers . . . ."

163.     An internal report dated May 28, 2022 that Mashinsky received showed that, contrary to his representations, only about 500,000 users had ever invested crypto assets with Celsius.

164.     Celsius employees marked Mashinsky's May 13, 2022 statement regarding the number of investors for removal as part of the AMA Editing Process because it was false.

### 3.     Celsius and Mashinsky Falsely Represented That Celsius Had Not Experienced Any Loan Defaults

165.     In 2021 and 2022, Mashinsky also falsely represented that Celsius had not experienced any defaults on the loans made by the company.  At the time he made these statements, Mashinsky and other Celsius executives knew the statements were false.

166.     For example, Mashinsky stated in a July 31, 2021 interview with an online news outlet: "So, in Celsius we have 350 institutional counterparties.  None of them defaulted on a loan. . . .  We had thousands of margin calls but none of our counterparties has defaulted."

167.     Similarly, in an October 15, 2021 AMA, Mashinsky said: "[A]mazingly after four years, we've never had an institution who took a loan from us that did not pay back . . . ."

168.     Mashinsky repeated the false representation again in a November 12, 2021 AMA: "In four years we have not had a single institution default either not pay the interest or not return the collateral or the . . . coins that we lent them."

169.     In a January 7, 2022 Real Vision interview, Mashinsky reiterated: "We had tens of thousands of margin calls but not a single counterparty defaulted, uh, on their loans.  So, we only lend to really responsible institutions."

30

170.    Mashinsky knew before making these statements that Celsius had experienced defaults by institutional borrowers totaling millions of dollars.

171.    In February 2021, Mashinsky and a Celsius executive discussed over email the default involving an institutional borrower, with Mashinsky commenting: "It used to be a $3m problem now it is a $17m problem . . . . We were supposed to get 200 BTC back. Never happened."

172.    In 2021, a Celsius executive asked Mashinsky to stop saying that Celsius never had an institutional loan default because such statements were not accurate.

173.    The fact that Celsius had experienced institutional defaults was also discussed at Celsius's internal ALCO meetings, which Mashinsky regularly attended. At a July 14, 2021 ALCO meeting, for example, the company identified "bad debts," including failed loans to two institutional borrowers.

174.    As of June 23, 2022, the net value of Celsius's loan defaults was approximately $208 million.

### 4. Celsius and Mashinsky Falsely Represented Celsius's Financial Condition During the Spring 2022 Crypto Asset Crash

175.    Between May 7 and 9, 2022, certain crypto assets offered by another company experienced a sharp decline in value.

176.    At that time, Celsius sought to reassure its investors by making a number of public statements about the company's healthy financial condition.

177.    On May 11, 2022, Celsius released the following statement on Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe. We continue to be open for business as usual."

31

178.    On the same day, Mashinsky similarly tweeted that "Celsius has not experienced any significant losses and all funds are safe."

179.    In reality, Celsius was in dire financial shape even before May 2022.  Contrary to the company's and Mashinsky's public statements of reassurance, Mashinsky and other company executives were communicating internally about the significant financial losses Celsius was experiencing.

180.    On April 26, 2022, Mashinsky and two other senior executives at Celsius communicated internally about the significant financial losses Celsius was suffering.

181.    One of the senior executives stated:  "While none of us want to incur any more large losses, we are hemorrhaging $7.5mm pre-tax losses each week.  We need to figure out how to scale up our deployment efforts."

182.    On May 2, 2022, Mashinsky and other senior executives attended a Celsius Board meeting in which they discussed Celsius's significant financial losses and struggling business model.  The presentation for that meeting showed overall pre-tax losses of $811 million for 2021 and $165 million in losses in the first quarter of 2022.

183.    On May 9, 2022, just two days before Celsius and Mashinsky released their reassuring statements on Twitter, a Celsius executive called the company a "sinking ship."

184.    On May 12 and 25, 2022, that same Celsius executive wrote in Slack exchanges that "there is no hope . . . there is no plan," and that Celsius's business model "is fundamentally broken."

185.    Another employee bluntly stated in an internal message on May 21, 2022:  "We don't have any profitable services."

32

186.    Mashinsky knew Celsius's continued viability was in doubt.  A Celsius executive told Mashinsky in a May 25, 2022 message:  "[W]e will continue to dig a deeper hole for many months – and the asset/liability gap is much more severe now with lower balances."

187.    Despite understanding that Celsius's financial condition was bleak, Celsius and Mashinsky continued falsely describing the company as having a strong financial condition and outlook.

188.    On June 1, 2022, Mashinsky participated in an interview segment titled, "What's up with Celsius?" and again made several statements that sought to reassure Celsius's investors. Mashinsky stated:

> Yes, so not just that they [investors' assets] are safe, but we provided anyone that wanted to withdraw, partially or fully, there were no problems. . . .  No other exposure that I know . . . . Celsius continues to do what it did for the last five years. . . . Our community is resilient.  We have billions of dollars in liquidity.

189.    On June 7, 2022, Celsius posted a blog post entitled, "Damn the Torpedoes, Full Speed Ahead."  In this blog, Celsius referenced "misinformation and confusion" around Celsius, and claimed that the company "remain[s] deeply optimistic about the future."

190.    Just days before the June 7 blog post, however, a "business outlook" presentation was circulated among Celsius executives, including Mashinsky, that reflected Celsius's true financial state and grim future outlook.

191.    The presentation started out:  "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints.  The current business model is not financially sustainable."

192.    The presentation also noted the need for a $1 billion capital raise.

193.    On June 10, 2022, Mashinsky continued to reassure investors in an AMA: "Celsius has billions in liquidity, right, and we provide immediate access [to] anyone who needs

access to it, to the liquidity.  That includes institutions and people that want to get their loans

back and people who are taking loans."

194.    Contrary to Mashinsky's assurances, Celsius's own historical liquidity model

showed significant liquidity issues with Ether (ETH) and Bitcoin (BTC).

195.    In the days leading up to the June 10 AMA, including on the very same day,

Mashinsky and another Celsius executive actively discussed last resort options to save the

company.  These options included possibly selling Celsius to another large crypto company or

getting a high interest rate loan from that company.

196.    When Mashinsky expressed hesitation about engaging with the other company,

the Celsius executive responded:  "Don't think we have that luxury."

197.    Mashinsky privately acknowledged, "CEL continues to crash.  If we don't do

anything we will have massive withdrawals."

198.    Two days after Mashinsky's June 10 AMA, Celsius halted customer withdrawals

from its platform.

**C.    Defendants Misrepresented the Safety of Customer Assets on Celsius's
Platform**

199.    Celsius and Mashinsky also made many false representations regarding the

overall safety of assets deposited by investors on the company's platform, examples of which

appear below.

**1.    Celsius and Mashinsky Falsely Touted Celsius's Regulatory
Compliance**

200.    In 2021 and 2022, Mashinsky falsely touted Celsius's regulatory compliance to

reassure investors that investing in CEL and the Earn Interest Program was safe.

201.    For example, during a December 1, 2021 interview with KITCO News in Florida, Mashinsky misrepresented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . . ."

202.    In a December 12, 2021 article with Barron's Online, Mashinsky was quoted as saying: "The regulators looked into us and said these guys know what they're doing."

203.    On April 15, 2022, Mashinsky made another statement on regulatory compliance in an AMA: "Here's clarity from different regulators, both from states and federal regulators, telling you the user that there's no issue, there's no legal issues at least with what Celsius provides."

204.    Mashinsky had no basis to make these statements.

205.    In fact, in May 2021, several state securities regulators contacted Celsius regarding concerns about the unregistered securities offering of the Earn Interest Program.

206.    These regulatory activities were known within Celsius.  An October 7, 2021 email from a senior Celsius executive to all Celsius employees, including Mashinsky, even explained that Celsius had received requests for information from several state regulators.

### 2.    Celsius and Mashinsky Misrepresented That Investors' Assets Were Insured

207.    Celsius and Mashinsky also misled investors by assuring them assets invested with Celsius were safe by falsely telling investors that their assets were insured.

208.    In an April 8, 2022 AMA, Mashinsky stated:  "The highest insurance in the industry right? 750 million, right? . . . highest level security, highest level insurance, together with Celsius highest yield in the market, and that's like win-win for everybody."

209.    Contrary to Mashinsky's statement, Celsius did not have an insurance policy for investors' crypto assets.

35

210.    In fact, the FAQs on the Celsius website in this time period stated, "Celsius does not have an insurance policy.  Fireblocks, our custodian, provides insurance on digital assets held by Celsius.  However, we generate interest rewards by deploying assets. When these assets are out of Celsius's control, they can't be insured by such insurance."

211.    The Celsius Terms of Use, as of April 8, 2022, further stated:  "[Y]our Celsius Account is not a checking or savings account, and it is not covered by insurance against losses."

## IV.    Defendants Manipulated the Market for CEL to Inflate the Value of Celsius and Induce Others to Buy CEL

### A.    As Part of an Ongoing "Buy Back" Program, Celsius and Mashinsky Purportedly Bought CEL to Fund Interest Payments to Investors

212.    Celsius and Mashinsky undertook a secret plan to increase artificially CEL's market price by buying more CEL than they were admitting publicly.

213.    In the summer of 2018, Celsius began purchasing CEL on the secondary market and used CEL it purchased to pay interest (or rewards) to investors who chose to earn their rewards in CEL.  In the AMAs and other public statements, Celsius and Mashinsky regularly described Celsius's CEL purchases as being tied specifically to CEL rewards payments.

214.    For example, Mashinsky stated:  "[J]ust in 2021, we purchased $421 million worth of CEL token . . .  Obviously most of this is . . . to pay the community, to pay the people who earn in CEL."

215.    In another example, Mashinsky stated:  "[T]he piece of how much we buy CEL has nothing to do with Celsius.  Celsius does not decide how many CEL tokens to buy, and then how many of them to burn [i.e., retire from circulation].  You guys decide."

216.    In reality, Celsius's CEL purchases greatly exceeded the purchases needed to make interest payments to investors, which Celsius and Mashinsky concealed from investors.

36

**B.** **Celsius, at Mashinsky's Direction, Bought More CEL to Support the Price of CEL and Induce Additional Purchases of CEL**

217.    By the end of October 2019, the price of CEL had dropped to $0.05 per token, which was well below the $0.30 per token price from the ICO in early 2018.

218.    Celsius, at Mashinsky's direction, took action to support the price of CEL. Specifically, Celsius and Mashinsky wanted the CEL price to mirror Celsius's user and deposit activity. In other words, if Celsius was growing in terms of users and deposits, then Celsius and Mashinsky wanted the price of CEL also to be increasing.

219.    Internally, Mashinsky was vocal about his desire for Celsius to do everything in its power to boost the price of CEL.

220.    In EXCO meetings, for example, Mashinsky frequently stated that Celsius had to get the price of CEL up.

221.    In one email, Mashinsky remarked that "[o]ur job is to protect CEL" and "the only way we loose [sic] if CEL price drops a lot and people get nervous and keep selling. We can protect against that scenario."

222.    In November 2019, Celsius disclosed that it was performing a discrete buyback (that was limited in amount) outside the purchases the company needed to pay interest.

223.    In 2020, however, Celsius had developed a plan focused on increasing the price of CEL by expanding buybacks that the company did not disclose publicly.

224.    An internal memo stated as its "Main Thesis" to increase the price of CEL, "[w]e rise and fall with CEL" and that "[t]he more customer[s] use CEL & the more it's worth, the more worth we can extract out of it (for example using it for interest payments instead of our [c]ash)."

37

225.    The internal memo described a plan to raise the price of CEL.  The plan included "[v]alue based repurchase examples" in which Celsius would repurchase certain percentages of the CEL it sold via OTC "on a case to case basis dependent on our Cash Needs."  The memo also detailed a plan that would give "value to CEL" through Celsius's increased trading activity:

- The more CEL we sell OTC
- The more CEL we can repurchase
- The more attractive CEL markets look like
- The more CEL buy orders we receive
- In the end: The more our Treasury is worth
- The less # of CEL we need to sell for the same $ value we want to raise with these OTC sales

226.    Significantly, the memo noted that implementing the proposed plan would cause "Official CEL Buybacks" (i.e., the ones that had previously been publicly disclosed) to "lose relevance" because "[e]very OTC sale of CEL is a potential 'Buyback like situation[s].'"

227.    Through the OTC desk, Celsius account holders could sell their CEL back to Celsius or purchase additional CEL.  Because these transactions occurred on the Celsius platform, they were only reflected in internal records and not on the blockchain or to other users of the Celsius platform.

228.    In a May 14, 2020 email regarding "CEL OTC," Mashinsky provided specific instructions about the company buying additional CEL more quickly if the price of CEL fell lower.

229.    In response to Mashinsky's request, a Celsius employee proposed an approach that included keeping some of the proceeds from OTC sales for profit for Celsius, while using the remainder of the proceeds to support the price of CEL and replenish the company's Treasury. Under this proposal, Celsius would sell CEL via the non-public OTC desk, and use the proceeds to turn around and repurchase CEL via public means and boost its price.  This plan also served,

as a Celsius employee wrote, to "support[] the CEL price[,] to stabilize CEL and make it even more attractive for even more OTC buyer."

230.    Celsius's expansion of CEL purchases was significant both in terms of volume and dollars.  Throughout 2020 and 2021, Celsius purchased far more CEL than was needed to pay interest and far more than the additional buybacks it disclosed.  The company purchased over $700 million worth of CEL (gross) but only used $160 million worth of CEL for interest payments and to burn (i.e., retire from circulation).

231.    In fact, from May 2019 through July 2022, less than 50% of Celsius's purchases of CEL on crypto asset platforms was used to fund interest payments to investors or burn.  That percentage decreases when Celsius's OTC purchases are included.

232.    A Celsius employee regularly updated Mashinsky on the market for CEL and Celsius's purchases and sales of CEL, but neither the company nor Mashinsky disclosed the full extent and nature of these additional buybacks of CEL to investors.

233.    For example, on December 10, 2021, a Celsius employee informed Mashinsky that in 2021, Celsius purchased 23 million CEL over what was needed to pay investors— comprising nearly half of the company's CEL net purchases for the year.  Nevertheless, Mashinsky continued stating publicly that Celsius's purchases of CEL were determined by the amount of rewards the company owed to investors.

234.    In addition to engaging in undisclosed purchases, Celsius strategically structured and timed its CEL purchases to have the greatest impact on the market.

235.    First, Celsius conducted its CEL transactions such that its purchases of CEL were primarily through crypto asset trading platforms where the fact that CEL was actively being purchased would be visible.  At the same time, Celsius concealed most of its sales through OTC

transactions via the Celsius platform that did not result in visible blockchain transactions. This reflected Mashinsky's belief that buying in the market increased demand for CEL.

236.    Second, Celsius timed purchases of CEL to coincide with AMAs or news announcements, and the company sized its CEL purchases to maximize the price impact on CEL. As one Celsius employee described the process: "when we start buying actively with good size & good timing we (the FED of CEL) made a huge positive impact."

237.    Celsius also went to great lengths to protect the price of CEL from falling. Among other things, the company used bots to monitor the price and utilized resting orders to prevent the price from dropping below certain thresholds.

238.    The plan to boost the price of CEL by Celsius and Mashinsky had the desired impact. As Celsius increased its CEL purchases, the price of CEL increased. From January 3, 2020 to December 31, 2021, CEL's price rose from $0.15 to $4.37. This represented a 2,900% increase in the price of the crypto asset.

239.    Senior Celsius employees, including Mashinsky, knew that Celsius bought CEL in excess of interest payments to affect the price of CEL and attract more CEL buyers and Earn Interest Program investors.

240.    For example, in an email chain that included Mashinsky, a Celsius executive explained that "a big part of" Celsius's CEL purchases was "supporting the CEL market." Another Celsius employee similarly noted that Celsius purchasing CEL "supports the CEL price to stabilize CEL and make it even more attractive for even more OTC buyer[s]" and that "the more CEL drops the more we buy it back." The Celsius employee also stated that "the higher" the price of CEL "the more people understand Celsius is a legit company and will get customers."

40

241.    Internally, Mashinsky directly expressed his desire to raise the price of CEL.  On
October 30, 2021, in an internal message with a Celsius employee, Mashinsky stated:  "Every
day we have all time record new users joining Celsius yet CEL [p]rice is going down."  He went
on to write:  "The price will not take care of itself if everyone will just get scared and sell."

242.    The employee was equally direct in response:  "We're not just sitting and
watching the price.  We're on it all week . . . .  The issue is that people are selling and no one is
buying except for us.  The main problem was that the value was fake and was based on us
spending millions (~$8M a week and even more until February 2020) just to keep it where it is.
This week we spent 'only' $4M (on top of the rewards) and the price is still going down."

243.    Mashinsky understood that increasing the price of CEL was vital to attracting
more investors.  He persisted in trying to develop strategies to inflate the price of CEL and wrote
to a Celsius employee on October 30, 2021:  "Everyone knows what these tokens are and want to
buy them because they think price is going up. . . . You saw that none of our announcements
which had fundamentals like Burn or funding or investment in mining moved CEL so we need to
change our tackticks [sic]."

244.    Others within Celsius also recognized that Celsius and Mashinsky were trying to
prop up CEL.  As one employee succinctly stated in a Whatsapp message on December 21,
2021:  "we artificially create CEL volume."

245.    Artificially increasing the value of CEL helped Celsius and Mashinsky mask the
company's financial difficulties and other failures.  For example, on August 10, 2021, Celsius
estimated its net equity position as approximately $1.02 billion when it included the CEL in its
Treasury in the calculation.  Without the CEL in the company's Treasury, Celsius's net equity
position was negative $789 million—a swing of nearly $1.8 billion.

C.    **Celsius and Mashinsky Concealed the Extent and Purpose of Celsius's Buybacks**

246.    Despite public assurances of transparency, Celsius and Mashinsky concealed the company's plan of artificially boosting the price of CEL.

247.    As one Celsius employee stated in March 2021:  "The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community."

248.    Another employee described one instance of Celsius buying CEL this way:  "It's like FBI.  The job we do is not to be noticed."

249.    At times, when Celsius was unable to make CEL purchases itself to boost the price, Mashinsky used his own accounts to purchase CEL in consultation with Celsius's traders.  In one such instance, an employee told Mashinsky, "you saved the day."

250.    Mashinsky knew the value of CEL was, as one employee stated, "fake" and was actually based on Celsius spending millions of dollars to maintain its price.

251.    Nevertheless, Mashinsky continued falsely to inform the investing public that Celsius's CEL purchases were to pay interest.

252.    Mashinsky made false statements such as Celsius's CEL purchases were "to pay the community" and Celsius buys CEL based on "how many people chose to earn in CEL."

253.    Mashinsky also falsely claimed in a March 19, 2021 AMA:  "It really comes down to how many buyers versus how many sellers. . . . So we obviously want CEL token to go higher in price but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that."

254.    Celsius's and Mashinsky's false statements led investors to believe incorrectly that the market reflected the fair price of CEL.  It did not.

**D.  Celsius and Mashinsky Benefited from the Artificially Inflated CEL Price**

255.    Celsius and Mashinsky benefited financially from the inflated price of CEL.

256.    First, with an inflated price of CEL, Celsius was able to portray Celsius's financial position favorably, using the Treasury's CEL holdings as a growing asset on the company's balance sheet to offset its significant liabilities.

257.    Second, Celsius also traded strategically to reap profits from the inflated prices it created.  In at least some circumstances, Celsius bought through crypto asset trading platforms only 25-50% of the CEL it needed for OTC sales and, as one employee stated in an internal message, "put the other 50-75% into our pocket as Cash."  In other words, Celsius kept the proceeds from sales at inflated prices as profit.  Celsius was thus able simultaneously to sell additional CEL at a higher price and inflate its own value as a company.

258.    Third, Mashinsky was the largest holder of CEL other than Celsius, and he personally profited from its artificially inflated price.

259.    Like other CEL holders in the Earn Interest Program, Mashinsky earned weekly interest in CEL, which only increased as the price of CEL went up.

260.    Moreover, Mashinsky withdrew and sold large amounts of CEL, despite regularly assuring investors that he was only buying CEL.  In fact, Mashinsky was selling CEL at the same time he encouraged investors to "HODL," or "hold on for dear life," their own CEL.

261.    For example, Mashinsky tweeted on December 10, 2020:  "[j]ust bought 35,000 @CelsiusNetwork CEL Token on @UniswapProtocol at $2.19."  In other words, Mashinsky publicly disclosed that he had purchased approximately $75,000 in CEL.

262.    Mashinsky did not tweet, however, that in the same month he sold approximately 1.2 million CEL tokens totaling approximately $4.6 million.

43

263.    In fact, Mashinsky appears to have publicized the single instance in which he bought CEL in December 2020, while he quietly sold CEL numerous times during the month.

264.    Available records indicate that from 2018 through May 2022, Mashinsky withdrew over 86 million CEL worth over $200 million from his accounts on Celsius's platform. Mashinsky later sold many of these tokens.

## V.    Celsius's Collapse

265.    By January 2022, the company's financial condition was dire.

266.    Despite increasing prices for crypto assets in 2021 and the fact that Celsius received a capital infusion of approximately $700 million in late 2021, the company was struggling financially as a result of its failing business model and growing expenses.

267.    In total, Celsius incurred pre-tax losses of approximately $811 million in 2021.

268.    In early 2022, Celsius executives identified core actions for the company to take to improve its condition, including reducing Earn Interest Program interest rates and eliminating riskier deployment activities.

269.    Mashinsky was aware of the company's poor financial condition, and he acknowledged in a May 20, 2022 email to a senior executive at the company "that the current business model is not sustainable and that our capital position is making things worse."

270.    By the end of the first quarter of 2022, Celsius had incurred additional pre-tax losses of approximately $165 million.

271.    Between May 7 and May 9, 2022, the Terraform Labs crypto asset called UST started rapidly losing value, which caused its companion crypto asset, LUNA, to fall from a value of approximately $80 to pennies by May 12, 2022.

272.    Celsius incurred $17.8 million in direct losses associated with the collapse of UST

and Luna and also experienced increased withdrawal requests from investors on the Celsius platform, resulting in a serious liquidity problem for the company.

273.    In May 2022 alone, net withdrawals from Celsius totaled $1.8 billion.

274.    During the last two weeks of May 2022, Mashinsky withdrew a large percentage of his Bitcoin (BTC), Ether (ETH), and the crypto asset known as USDC held in accounts at Celsius, totaling approximately $8 million.

275.    Specifically, Mashinsky withdrew approximately 90% of the combined Bitcoin (BTC) and Wrapped Bitcoin, 81% of the Ether (ETH), and nearly 100% of all non-CEL related crypto assets that he held at Celsius.

276.    By comparison, Mashinsky withdrew approximately 3% of the CEL tokens in his accounts during that same period, totaling approximately $2 million.

277.    During this time period, Celsius's total liabilities, including Celsius's CEL Treasury, exceeded its total assets by approximately $1 billion.

278.    Privately, a number of senior leaders of the company expressed grave concerns about Celsius's viability and understood the company was facing an existential crisis.  As one Celsius executive stated privately:  "I'm sorry – why aren't we talking about the elephant in the room. [S]urvival? [L]iquidity[.] [H]ow many days we have left[.]"

279.    On June 12, 2022, after failed attempts to secure additional capital and in the face of a renewed wave of withdrawals, Celsius halted all customer withdrawals, transfers, and swaps.

280.    On July 13, 2022, Celsius filed for Chapter 11 bankruptcy.

281.    At the time Celsius filed for bankruptcy, the company had approximately $1.2 billion more in liabilities than assets on its balance sheet.

**TOLLING AGREEMENTS**

282.    In March and May 2023, Celsius signed tolling agreements with the SEC for the period February 22, 2023 through August 21, 2023.  In April 2023, Mashinsky signed a tolling agreement with the SEC for the period March 13, 2023 through June 11, 2023.

283.    Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendants] authorized, instituted, or brought by . . . the [SEC] . . . arising out of the [SEC's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended. . . ."

284.    Each tolling agreement further provides that Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

**COUNT I – FRAUD**

**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)(1)]**
**(Against All Defendants)**

285.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

286.    Defendants, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

287.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C.

46

§ 77q(a)(1)].

## COUNT II – FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and (3)]
### (Against All Defendants)

288.     Paragraphs 1 through 284 are realleged and incorporated herein by reference.

289.     Defendants, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

290.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a), (b), and (c) thereunder
### [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]
### (Against All Defendants)

291.     Paragraphs 1 through 284 are realleged and incorporated by reference herein.

292.     Defendants, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

293.    By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

## COUNT IV – FRAUD

**Violations of Section 9(a)(2) of the Exchange Act
[15 U.S.C. § 78i(a)(2)]
(Against All Defendants)**

294.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

295.    By virtue of the foregoing, Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail, effected, alone or with one or more persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, or in connection with a security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

296.    By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## COUNT V – UNREGISTERED OFFERS AND SALES OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]
### (Against All Defendants)

297. Paragraphs 1 through 284 are realleged and incorporated by reference herein.

298. By virtue of the foregoing, without a registration statement in effect as to the Earn Interest Program, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use of medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

299. By engaging in the conduct described herein, Defendant Celsius violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

The SEC respectfully requests that the Court enter a Final Judgment:

1. Finding that Defendants committed the violations alleged in this Complaint;

2. Permanently restraining and enjoining Defendants from engaging in conduct in violation of the following provisions:  Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

49

3.      Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

4.      Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)], from (i) participating, directly or indirectly, in the purchase, offer, or sale of any crypto asset securities, or (ii) engaging in activities for the purposes of inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by others;

5.      Ordering Defendant Mashinsky to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay prejudgment interest, pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), (7)];

6.      Ordering Defendant Mashinsky to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court; and

7.      Ordering such other relief as this Court deems just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## **JURY TRIAL DEMAND**

The SEC demands a trial by jury as to all issues that may be so tried.


Dated: July 13, 2023                    Respectfully submitted,

                                        /s/ Harry B. Roback
                                        Harry B. Roback*
                                        Securities and Exchange Commission
                                        950 East Paces Ferry Road, NE, Suite 900
                                        Atlanta, GA 30326
                                        Tel: (404) 942-0690
                                        robackh@sec.gov

                                        James P. Connor*
                                        Securities and Exchange Commission
                                        100 F Street NE
                                        Washington, DC 20549
                                        Tel: (202) 551-8394
                                        connorja@sec.gov

                                        Attorneys for Plaintiff

*Pending admission pro hac vice

Of Counsel
Stacy L. Bogert
Pei Y. Chung
Randall D. Friedland
Christian J. Ascunce

Securities and Exchange
Commission

**Exhibit B-2**

**SEC Consent Order**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CELSIUS NETWORK LIMITED and ALEXANDER "ALEX" MASHINSKY,<br><br>Defendants. | Civil Action No. <u>1:23-cv-6005</u> |

<u>**FINAL JUDGMENT AS TO DEFENDANT CELSIUS NETWORK LIMITED**</u>

The Securities and Exchange Commission having filed a Complaint and Defendant Celsius Network Limited ("Celsius" or "Defendant") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a) to employ any device, scheme, or artifice to defraud;

1

(b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)      to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)      to employ any device, scheme, or artifice to defraud;

(b)      to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a) Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b) Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination

3

under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)], by directly or indirectly, using any means or instrumentalities of interstate commerce, or the mails, or of any facility of a national securities exchange:

(a)     For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security:

    i.     to effect any transaction in such security which involves no change in the beneficial ownership thereof, or

    ii.     to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or

    iii.     to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at

4

substantially the same time, and at substantially the same price, for the

purchase of such security, has been or will be entered by or for the same or

different parties; or

(b)      To effect, alone or with one or more other persons, a series of transactions in any

security registered on a national securities exchange, any security not so

registered, or in connection with any security-based swap or security-based swap

agreement with respect to such security creating actual or apparent active trading

in such security, or raising or depressing the price of such security, for the

purpose of inducing the purchase or sale of such security by others.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

## V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and that Defendant

shall comply with all of the undertakings and agreements set forth therein.

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated:_____, 2023        _____

UNITED STATES DISTRICT JUDGE

## Exhibit C-1

**CFTC Complaint**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 1:23-cv-6008 |
| Plaintiff, | |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| CELSIUS NETWORK, LLC and ALEXANDER MASHINSKY, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

## I.  SUMMARY

1.  Beginning in 2018 and continuing through at least June 2022 (the "Relevant Period"), Celsius Network, LLC (together with its parent and related entities, "Celsius") and Alexander Mashinsky ("Mashinsky"), one of its founders and chief executive officer ("CEO"), (together "Defendants") engaged in a scheme to defraud hundreds of thousands of customers by mispresenting the safety and profitability of its digital asset-based finance platform.

2.  Defendants, via publicly available videos, blog posts, livestreams and postings on social media and their website, touted Celsius as a "safe" alternative for customers' digital asset commodities, akin to a traditional bank.  Defendants not only promised customers that their deposited digital asset commodities would be safe with Celsius, but also promised customers high yield interest payments on these deposits.

3.  Based on Defendants' promises of high yield interest payments and bank-like investment safety, Celsius received deposits from customers totaling approximately $20 billion.

During the same time, Defendants engaged in a pattern of making misleading and false statements to induce customers to deposit and not withdraw their digital asset commodities from the Celsius platform.

4.      In order to meet the returns promised to its customers, Celsius engaged in increasingly risky investment strategies, including the extension of millions of dollars in uncollateralized loans and millions of dollars in unregulated, risky decentralized finance agreements.

5.      As the value of digital assets fell precipitously market-wide, Defendants' risky bets on uncollateralized loans and unregulated decentralized finance agreements caused Celsius to suffer losses totaling hundreds of millions of dollars, losses that had long preceded market-wide decline.

6.      Despite suffering devasting losses, Defendants continued to promote the safety and viability of Celsius, and failed to disclose these losses to customers. Even worse, despite its worsening financial position, Defendants continued to solicit new customers with the same misrepresentations that digital asset commodities deposited with Celsius were safe and would earn customers high yield returns.

7.      By May 2022, Celsius's risky investment strategies were losing millions of dollars and customers were withdrawing their digital asset commodities at an accelerated pace. These factors, among others, caused Celsius's liabilities to exceed its diminishing assets by hundreds of millions of dollars.

8.      Again, Defendants continued to falsely assure customers that Celsius was in a financially secure position, that its customers' digital asset commodities were safe and that Celsius had sufficient funds to meet its customers' withdrawal requests.

9.      In a video aired on May 13, 2022, Mashinsky described the company's condition as such:

> Celsius is stronger than ever. We have billions of dollars in liquidity. Anyone who needed to withdraw their funds, got their funds back. Anyone who wanted to come in and earn or take a loan or anything else got served. We're open for business and we continue to do what Celsius does best: serve the community, protect the community, make sure your assets are there when you need them.

10.     On June 12, 2022, Celsius froze customer withdrawals. A month later, on July 13, 2022, Celsius filed for bankruptcy, revealing that its liabilities exceeded its assets by more than one billion dollars.

11.     In addition to the Defendants' fraudulent conduct, Celsius operated a commodity pool ("Celsius Pool") in which Celsius pooled customer assets for the purpose of trading commodity interests, such as, but not limited to, futures contracts, for the benefit of Celsius's customers ("pool participants"). Celsius acted as an unregistered commodity pool operator ("CPO") of the Celsius Pool by soliciting, accepting, and receiving assets for the purpose of trading commodity interests; and Mashinsky operated as an unregistered associated person ("AP") of that CPO by soliciting members of the public to contribute to the Celsius Pool. Celsius also failed to provide prospective pool participants with pool disclosure documents.

12.     Through this conduct and the conduct further described herein, Defendants violated Sections 4k(2), 4m(1), 4o(1)(A)-(B) and 6(c)(1) of the Commodity Exchange Act (the "Act" or "CEA"), 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B) and 9(1), and Commission Regulations ("Regulations") 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022). Mashinsky, as a controlling person of Celsius, is liable for each of Celsius's violations. In addition, Mashinsky directly violated 7 U.S.C. § 6k(2) by failing to register as an AP of a CPO.

13.     Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act. In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, restitution, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

15.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Southern District of New York and engaged in acts and practices in violation of the Act and Regulations within this District. Mashinsky also resides in New York, New York.

## III.      PARTIES

## A.      The CFTC

16.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act ("CEA") and Regulations promulgated thereunder. The Commission

maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

B.   **Defendants**

17.   **Celsius Network, LLC** (together with its parent and related entities, "Celsius") is a Delaware limited liability company with its principal office in Hoboken, New Jersey. Celsius conducted its business on the internet through a website accessible to the general public at https://www.celsius.network and which was also accessible to the general public through Celsius' proprietary mobile device application.   Celsius is currently in chapter 11 bankruptcy in the U.S. Bankruptcy Court in the Southern District of New York, Case No. 22-10964 (MG).   None of the Celsius entities have ever been registered with the Commission in any capacity.

18.   **Alex Mashinsky** ("Mashinsky") is a co-founder and the former chief executive officer of Celsius. Mashinsky controlled Celsius through his position as CEO and as the largest equity stakeholder in Celsius.  Mashinsky resides in New York, New York.  Mashinsky has never been registered with the Commission in any capacity.

IV.   **STATUTORY BACKGROUND AND LEGAL FRAMEWORK**

19.   The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

20.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies, such as Bitcoin (BTC), Ether (ETH), USD Coin (USDC), and Tether (USDT), which are digital representations of value that function as mediums of exchange, units of account and/or stores of value.  Certain digital assets are "commodities," including Bitcoin, Ether, USDC, Tether, and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

21.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital asset commodities, including Bitcoin and Ether futures and options, by boards of trade designated by the Commission, including the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("CBOE").

22.     Section 6c(1) of the CEA, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

23.     CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022), promulgated pursuant to the authority in CEA Section 6(c)(1), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or

(3)  Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

24.      Section 13c(b) of the Act, 7 U.S.C. § 13c(b) provides that "any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."

25.      Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), provide that each "act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his [or her] employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

## V.  FACTS

### A.  The Founding of Celsius

26.      The idea for Celsius was conceived by Mashinsky and another individual in the summer of 2017 during the digital asset boom.

27.      Mashinsky first envisioned Celsius as a peer-to-peer lending network that would allow users to borrow tokens from or lend tokens to other users, with loans managed on the blockchain by smart contracts.

28.      Before Celsius opened for business, Mashinsky had changed the original business model from a lending facility to a "simple app that would accept your coins and we would deploy them for you . . . ."

29.    Under this model, Celsius's customers would allow Celsius to pool their digital assets and deploy these pooled assets to generate revenue for Celsius which would be returned to the customers in the form of weekly interest payments or "rewards."

30.    Starting in September 2017, Mashinsky began marketing Celsius through various social media sites, conferences and crypto industry events.

31.    In October 2017, Mashinsky began to pre-sell what would later become the "CEL" token, Celsius's native currency, in private offerings to international and accredited customers.

32.    These pre-sales, as well as an anticipated initial coin offering, would provide Celsius with the initial capital needed to fund its business operations.

33.    In March 2018, Celsius launched its platform and in June 2018, Celsius released its mobile application.

34.    Celsius claimed it was different from traditional financial institutions because it was "democratized" and "[b]uilt on the belief that financial services should only do what is in the best interests of the community."

**B.    Celsius's Business Entities**

35.    Celsius Network Inc. was incorporated in Delaware on February 8, 2018, by Mashinsky.

36.    On February 9, 2018, Celsius Network Inc. incorporated Celsius Network Limited as a United Kingdom private limited company. Celsius Network Limited was the entity that interacted with customers through the summer of 2021.

37.    Today, Celsius Network Limited operates as the holding company for roughly twenty directly or indirectly owned subsidiaries. Celsius Network, Inc. owns approximately 60% of Celsius Network Limited, and outside investors own the other approximately 40%.

38.     In October 2020, Celsius Mining LLC was incorporated as a limited liability company in Delaware.

39.     In June 2021, Celsius Network LLC was incorporated as a limited liability company in Delaware and moved its corporate headquarters from the United Kingdom to New Jersey.

40.     In August 2021, Celsius transferred all of its customer accounts from Celsius Network Limited to Celsius Network LLC.

## C.     Celsius Products and Services

41.     According to Mashinsky, Celsius was one of the first digital asset platforms that allowed customers to transfer digital assets, including digital asset commodities such as Bitcoin, Ether, USDC, Tether, and others, to a platform and then earn rewards on the transferred assets and/or take loans using the transferred assets as collateral.

42.     Celsius allowed customers to deposit their digital asset, including digital asset commodities, with Celsius in exchange for annual percentage yield ("APY") payments ranging from 4.5 to 17 percent.

43.     To generate the income to pay its customers the promised APYs, customers' digital asset commodities would be pooled and deployed by Celsius as loans to institutional and retail customers and for other revenue generating activities, including, but not limited to, the trading of futures contracts. For this trading, Celsius operated the Celsius Pool and was not registered as a CPO. Additionally, Mashinsky did not register as an AP of a CPO, despite soliciting members of the general public to contribute to the Celsius Pool.

44.     In addition, Celsius, while acting as CPO of the Celsius Pool, failed to provide pool disclosure documents as required by Regulation 4.21, 17 C.F.R. § 4.21 (2022), including but not

limited to documents providing or describing required cautionary statements, risk disclosures, fees and expenses incurred, past performance disclosures, and others.

45.    Celsius also offered customers custodial, lending and brokerage services relating to the numerous digital assets, including digital asset commodities, it accepted from customers.

46.    Celsius used the returns it received on its asset deployment to pay customers their "rewards" and kept the remaining money, when there was any, as profits for the company. If, however, Celsius failed to profitably deploy its customers' assets in investments that earned more than the interest owed to its customers, Celsius lost money.

47.    Additionally, to the extent that Celsius invested customers' assets in long-term illiquid ventures, Celsius needed to retain sufficient capital to meet the demand for withdrawals.

48.    To increase its revenue streams, aside from retail and institutional lending, Celsius also engaged in DeFi lending, staking, Bitcoin mining and custodial services.

**D.    The "Earn" Program**

49.    Celsius's most popular product was the "Earn" Program, which allowed customers who transferred certain digital assets, including the digital asset commodities described herein, to Celsius to earn rewards, referred to as yield, on their deposited assets.

50.    Celsius promoted the Earn Program by promising some of the highest yields in the market, as much as 17% per year and describing the program as the "safest place for your crypto."

51.    Mashinsky explained that the rates were "subject to change on a weekly basis as they are calculated by the weekly demand for each coin combined with our promise that up to 80% of our profits are returned to the depositors."

52.    Mashinsky described the Earn Program as "sleep to earn," where customers merely deposited their digital assets, including but not limited to digital asset commodities, and let Celsius

do all the work to generate returns. As Mashinsky explained, "you don't have to do anything, you just go to sleep, and every Monday we pay you yield."

53.    Celsius portrayed the Earn program as low risk due to the fact that Celsius only provided loans to reputable counterparties that pledged "over 100% collateral" to acquire loans from Celsius.

54.    Celsius encouraged its customers to earn rewards in CEL, by offering higher reward rates for CEL than other digital assets.

**E.    Unsustainable Business Model**

55.    Starting in mid-2020, with digital asset values soaring and Celsius offering higher reward rates than anyone else in the market, Celsius experienced positive growth indicated by the number of users on the platform, assets under management and the price of the CEL token.

56.    Despite the outward signs of success, Celsius was unable to generate sufficient returns from its asset deployments to cover the high rewards it was offering to its customers.

57.    Celsius began to operate close to, or under, net interest margin ("NIM"), which Celsius calculated by measuring the difference between the yield that Celsius earned on its deployed assets relative to the cost of those same assets.

58.    From the outset, Celsius offered some of the highest reward rates in the industry, and promised its customers that they would "always receive a minimum of at least 5% annual interest on any lent crypto currencies."

59.    In 2020, Mashinsky posted to Twitter that "[t]he best rates to earn interest are on @CelsiusNetwork" and that, with Celsius, people can "earn the highest yield in the industry."

60.    Customers began receiving rewards in the third quarter of 2018 and within months, Celsius dramatically increased the reward rates for Bitcoin, Ether and Litecoin deposits.

61.    Prior to July 1, 2021, Celsius did not have a formal policy for setting reward rates, and decisions were made regarding rates to address Mashinsky's concern that unless Celsius offered the highest in the industry, customers would choose a competing lending platform.

62.    Celsius kept the reward rates high despite the fact that it was unable to generate sufficient yield on its asset deployment to pays its customers the rates it promised.

63.    It was clear to some Celsius employees, at least as early as 2019, that the company may not have enough cash to meet its business expenses.

64.    Other Celsius employees believed that with reward rates as high as they were, the return on asset deployment would never be sufficient to keep a positive NIM.

65.    By December 29, 2021, Mashinsky continued to prioritize moving Celsius's NIM "to positive territory" but his solution was not to lower reward rates or slow customer growth, but rather to deploy Celsius's assets in riskier investments to chase higher yields.

## F.    Mounting Losses, Withdrawals and "The Pause"

66.    As the digital asset market began to cool in the summer of 2021, Celsius began to suffer large financial losses and limited opportunities to deploy its remaining assets.

67.    Despite the fact that Celsius was losing money on its asset deployments and finding it difficult to access new revenue streams, Mashinsky refused to lower reward rates for fear customers would leave the Celsius platform.

68.    As customer reward obligations mounted, Celsius was unable to generate sufficient revenue to meet these obligations. This problem was made worse by the fact that Celsius bought CEL on the open market to pay customer rewards, but then was unable to deploy the CEL to earn any additional income and had outlaid Bitcoin and other digital asset commodities to purchase the CEL.

69.     Dating back to 2020, Celsius had also used customer assets to fund operational expenses and rewards, failed to adequately track or reconcile customer assets and liabilities on a digital asset by digital asset basis, and been unable to recognize a significant shortfall in customer deposited digital asset commodities.

70.     In 2021, Celsius's reward obligations to customers exceeded net revenue by approximately $1 billion and by $380 million in the first half of 2022.

71.     At the same time, Celsius was also incurring significant losses from deployments dating back to at least 2019. In total, by May 2022, Celsius had suffered over $1.7 billion in total losses.

72.     By June 2022, Celsius began to use new deposits made by customers to make payments to existing customers.

73.     Based on the precarious state of the digital asset markets, beginning in May 2022, concerns arose that Celsius may not be able to cover its customers deposits.

74.     Between June 10 and 12, 2022, Celsius received $428.3 million in withdrawal requests, but was unable to meet these requests.

75.     On June 12, 2022, Celsius announced that it was pausing all customer withdrawals, referred to in bankruptcy filings as "The Pause."

## G.    Defendants' Materially Misrepresentations

76.    From the moment it began accepting customers funds, Defendants engaged in an aggressive and often misleading advertising campaign to find new customers and retain the customers who had already deposited their digital asset commodities with Celsius.

77.    Despite the fact that Celsius was having difficulty generating revenue to meet the rewards earned by its growing customer base and was unable to effectively deploy its assets, Defendants always painted a picture of a company that was safe and prosperous. This was false.

78.    Mashinsky regularly misrepresented the safety and profitability of Celsius in his tweets and "Ask Mashinsky Anything" videos ("AMA") that were typically live-streamed every Friday afternoon beginning in 2020.

79.    Mashinsky, and guests, discussed a wide variety of topics each week during the AMAs that often included the CEL token, reward rates, new products and services, and updates on the number of new customers and how certain assets were performing.

80.    Celsius was aware that Mashinsky was making false and misleading statements during his AMA's and other appearances so often that a team of employees were tasked with editing AMA's after they were aired to delete problematic statements; emails were circulated documenting Mashinsky's misstatements during these broadcasts, when he said them and why they were false. Mashinsky was repeatedly told not to say certain statements, but continued to do so.

81.    Defendants repeatedly represented to its customers and investing public that Celsius was better than a bank and often used the hashtag "unbank yourself" in its public communications.

82.     Defendants promised "financial freedom through crypto" and claimed to provide fair interest rates, no fees and instantaneous transactions, things a traditional bank could not provide.

83.     Celsius stated that wealth for all could be created through its business model described as such in a since-deleted blog post:

> [t]he Celsius business model is structured to do the exact opposite of what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest.

84.     In his public statements, Mashinsky also repeatedly talked about the level of trust and transparency Celsius customers enjoyed.  For example:

> a)  We have seen time and time again that customers choose Celsius for yield and loans because they trust us, and our goal is to always act in their best interests and consistently deliver industry-leading transparency.

> b)  Celsius was built to act in the best interest of the community, and we have consistently delivered honest, transparent, and rewarding financial services

> c)  Our relationships with our 230,000 community members are built on trust, because they count on us to act in their best interests . . . we're providing additional transparency into our business, which remains one of the industry's most reliable, secure and rewarding platforms for putting unparalleled economic freedom into the hands of the people

85.     Despite Mashinsky's claims of trust and transparency, Defendants, from the beginning of its existence, repeatedly misrepresented the health and safety of the company.

**H.     Defendants Repeatedly Lied about the Amount Raised in Celsius's Initial Coin Offering**

86.     Celsius's public initial coin offering ("ICO") took place in March 2018.  An ICO is the digital asset industry's equivalent of an initial public offering (IPO). A company seeking to raise money to create a new coin, app, or service can launch an ICO as a way to raise funds.

87.     Although Celsius publicly represented that its ICO had raised $50 million, in fact,
ICO sales only reached $32.8 million.

88.     On May 17, 2018, Mashinsky gave an interview from Blockchain Week in New
York that appeared on YouTube. In the interview Mashinsky responded to a question about how
the Celsius ICO did and he responded, "We raised $50 million."

89.     In an article published by CoinCentral on November 11, 2018, Mashinsky again
stated "[o]ur ICO (Initial Coin Offering) raised over $50 million."

90.     This statement was untrue, and Mashinsky knew it was false. The ICO only raised
$32.8 million. Celsius employees often discussed how Mashinsky continuously publicly
misrepresented the amount raised by the ICO and that they needed to make sure Mashinsky did
not continue to say the "wrong things" about Celsius' funding because "[t]his mistake was already
made by us after the ICO (we didn't raise $50M but we claimed we did)." By misrepresenting the
value of the ICO, Defendants mislead the public about the financial standing of Celsius and made
the ICO appear more successful than it was in reality.

**I.      Defendants Routinely Misrepresented the Profits Distributed to Customers**

91.     Defendants routinely stated that Celsius returned most of their revenue to its
customers. At times, Defendants represented that Celsius gave up to 80 percent of its revenue to
its customers.

92.     This claim was repeated in marketing materials and during Mashinsky's AMAs.

93.     For example, on March 19, 2019, Celsius posted to Twitter, "Our model is simple,
we give 80% back to the community. Banks keep 80% to themselves. It's not like there is a
complicated algorithm that nobody knows about."

94.    On September 19, 2019, Celsius replied to a tweet explaining, "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments. Your bank could pay you the same rates, they just prefer to keep the profits for themselves. #UnbankYourself."

95.    On October 11, 2021, Mashinsky gave an interview posted to YouTube on the Paul Barron Network channel.  In a written caption accompanying the video, Celsius is described as "a crypto platform with over 1 million users that earns you up to 17% yield on your crypto, rewards you every week and lets you borrow cash at the lowest rates. Up to 80% of Celsius revenue is paid back to the community as weekly rewards on crypto."

96.    During the October 11th interview, Mashinsky stated that banks "make tremendous amount of yield, they just choose to give 100 percent of that, or almost 100 percent of that to their shareholders and Celsius chooses to create the same yield and give a very large chunk of that to its customers." Mashinsky claimed that unlike a bank that shares its revenue or yield on its loans with its owners, Celsius shared most of the yield it earned with its customers.

97.    Mashinsky continued to repeat the claim that Celsius shared "most" of its yield revenue with customers.  During an interview with CNBC posted to YouTube on April 13, 2022, Mashinsky said that unlike banks who make profits from using customers' money and keep it for themselves, Celsius "give[s] most of the profit or most of the yield back to the community.  So Celsius as an example paid the community over $1 billion in yield and this is the kind of yield you cannot get from banks."

98.    Despite claiming that it gave 80% of its revenue to its customers, Celsius never set customer reward rates based on its loan yield or other asset deployment revenue, a practice of which Mashinsky had knowledge.

17

99.     In response to regulatory inquiries in June and July 2021, Celsius described its rate-setting process as involving a multitude of factors, but indicated that "a customer's return is not determined by reference (or linked) to Celsius's generation of revenues from crypto assets received from customers."

100.     Despite this admission to regulators, Defendants falsely claimed repeatedly that Celsius returned 80% of its revenue to customers.

## J.     Defendants Misrepresented the Number of Active Celsius Users

101.     In order to have a sufficient amount of deployable assets, Celsius needed a steady stream of customer deposits to sustain its growth. Mashinsky was the main promoter of Celsius and constantly used social media and other forms of outreach to solicit new customers.

102.     If Celsius failed to earn revenue from its deployed assets or had assets in long term obligations, the only remaining revenue stream available for new deployments was new customer deposits.

103.     In a blog post on March 12, 2019, Mashinsky explained: "The more people that deposit, the more profits there are to distribute to the community, and THAT is a sustainable and scalable promise."

104.     Aware that new customers were the key to sustained growth and more deposits, Mashinsky repeatedly and knowingly exaggerated the number of active Celsius's customers, making Celsius appear significantly more popular than it actually was.

105.     In a YouTube interview on November 17, 2021, for example, Mashinsky, stated "we have a million and a half customers…they hold over 25 billion dollars' worth of digital currencies…."

106.    In another YouTube interview on June 1, 2022, Mashinsky claimed: "we have a community of almost two million people…."

107.    While Celsius had approximately 1.7 million registered users as of July 2022, in reality, most of them were not active customers, a fact Mashinsky did not disclose.

108.    From 2019 through 2022, roughly two-thirds of registered U.S. Celsius users held less than one dollar's worth of digital assets in their Celsius accounts. For example, by June 17, 2022, Celsius had 584,192 registered U.S. users; of those, 386,294 (66%) had an account balance of less than one dollar.

109.    Defendants misrepresentations of the true number of active customers was misleading to customers, making it appear that Celsius was more successful and more widely used than it actually was.

**K.    Defendants Mislead Customers About Celsius' Regulatory Compliance**

110.    By 2021, Defendants were aware that regulators in several states, were investigating the business activities of Celsius and that these regulators had either directed Celsius to stop illegal activities in their states or had indicated their states' intention to seek such an order.

111.    Despite this fact, in a December 3, 2021, YouTube interview, Mashinsky falsely claimed that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything…."

112.    In an interview from April 2022, Mashinsky said that "We are monitored by eight different agencies. Companies like us are following all the rules, A to Z, seven days a week."

113.    In an April 15, 2022 AMA, Mashinsky, after explaining the level of customer concern over governmental interest in Celsius, said "There's clarity from different regulators, both

from states and federal regulators, [I am] telling you the user that there's no issue, there's no legal issues as least with what Celsius provides."

114.     Following this AMA, Mashinsky also stated on April 18, 2022 that "we have an agreement with the SEC and state regulators."

115.     Despite being aware of numerous investigations, cease and desist orders, and regulatory uncertainty surrounding Celsius's business activities, Mashinsky knowingly made the above false statements to assuage customer concerns, prevent withdrawals and entice new customer deposits under the veil of regulatory certainty.

**L.     Defendants Lied About the Safety of Customers' Assets**

116.     In order to entice customers to deposit their digital asset commodities with Celsius, Mashinsky repeatedly and misleadingly said that customer deposits with Celsius were as safe, if not safer, than money deposited in a traditional bank.

117.     Celsius's internal "Brand Guidelines" suggested to marketing personnel that they use specific language to describe the security Celsius customers could expect, such as, "We're for anyone who's ever looked at their mattress and wondered if it could do a better job of keeping their money safe."

118.     On its website, and in other communications with its customers, Celsius said that "our top priority is keeping your assets secure."

119.     In a March 7, 2019, interview at the NASDAQ MarketSite in Times Square, Mashinsky claimed that money deposited with Celsius was "as safe as it is with the bank, which is the alternative, it's just that [Celsius] network is always acting in your best interest."

120.     Beginning as early as March 2020, Mashinsky repeatedly claimed that Celsius's risk management team avoided risky investments and instead obtained high yield at low risk. On the Celsius

YouTube channel, in a video titled "How Celsius Earns Yield," Mashinsky explained, "Celsius generates a certain amount of profit by lending assets . . . the key is to get high yield at a low risk."

121.    During an AMA on October 1, 2021, Mashinsky said, "Our number one priority is keeping the funds that we're lending out safe and we would rather . . . lend large scale to a counterparty . . . than to risk earning a ridiculously high yield lending to a shady character."

122.    Mashinsky further misled customers by promising that Celsius would take full responsibility for safeguarding customer assets, including from any shortfalls or loss of value caused by Celsius's use or "deployment" of customers' digital asset commodities.

123.    In his December 10, 2021, AMA, Mashinsky declared that "Celsius takes full responsibility if anything goes bad" and claimed that if "something bad happens with the Celsius deployment … Celsius [is] standing behind it."

124.    Even as uncertainty gripped the crypto market, on May 11, 2022, both Celsius and Mashinsky posted to Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe. We continue to be open for business as usual."

125.    Despite these assurances of safety, Defendants knew that Celsius was never as safe as a traditional bank, and as its financial position became more dire, Celsius increasingly engaged in riskier investments with its customers' money.

**M.    Defendant Falsely Claimed that all Loans Made by Celsius Were Fully Collateralized**

126.    Defendants made numerous representations to their customers and potential customers about the importance of collateralized loans.

127.    Defendants told their customers that Celsius did not "do non-collateralized loans . . . . Celsius will not do that because that would be taking too much risk on your behalf." Non-

collateralized loans are problematic because if the borrower defaults on the loan, a lender, such as Celsius, has no collateral to retain or liquidate to offset the loss on the loan.

128.    On April 4, 2020, Mashinsky posted to Twitter, "We only do asset backed lending so always have 200% collateral."

129.    In a July 17, 2020 AMA, Mashinsky stated that "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."

130.    In a November 6, 2020 AMA, Mashinsky said, "We do not do unsecured lending."

131.    In an April 30, 2021 AMA Mashinsky said, "A run on the bank cannot happen at Celsius because Celsius never lends more than what it has …we always have enough coins and enough collateral and so on to return all the assets to all of our users."

132.    As late as April 2022, Mashinsky continued to repeat the claim that Celsius did not have non-collateralized loans, "On the institutional side, we have very credible counterparties that have billions of dollars on their balance sheet and for those, we have undercollateralized but we don't offer any non-collateralized loans."

133.    In reality, Celsius had numerous positions that were either not fully collateralized or had no collateral at all and Defendants were aware of these facts.

134.    In 2020, Celsius made almost $10 million in uncollateralized loans. In 2021, that number ballooned to at least $203 million, and in the first half of 2022, Celsius made at least $394 million in uncollateralized loans. In fact, in a Board meeting in May 2022 which Mashinsky attended, it was reported that only twenty percent (20%) of institutional loans by Celsius were fully collateralized and valued at $643 million while forty-seven (47%) were unsecured and were valued at $1.492 billion dollars.

135.    From 2020 through June 2022, Celsius made over 100 uncollateralized loans to at least 19 different counterparties.

22

**N.**   **Mashinsky Misrepresented the Extent and Risk of Celsius's Decentralized Finance Risk**

136.    Traditionally, in a centralized finance system, money is held by banks and similar institutions, who facilitate the movement of money between parties for a fee.

137.    With decentralized finance ("DeFi"), digital asset transactions, including loans and payments, can be enabled in a peer-to-peer approach. There is no centralized exchange that holds custody over assets, no involvement of institutional intermediaries such as a futures commission merchant, and users rely on a smart contract-based approach to execute transactions on a blockchain.

138.    DeFi transactions are complex and risky. While transactions on DeFi are usually over-collateralized by digital assets, if the market value of the collateral falls below a threshold prescribed in the smart contract, the DeFi protocols will automatically liquidate the collateral and close the loan. This can result in a significant loss of value for the borrower. DeFi protocols are also risky because they are susceptible to hackers.

139.    Mashinsky personally acknowledged that DeFi posed risks, but assured customers, in a December 3, 2021, YouTube interview, that "Celsius… helps people navigate in a safe way into [the DeFi] environment… because Celsius already did the homework and figured out what's safe."

140.    Mashinsky's statements that Celsius had figured out a safe way to deploy assets via DeFi were false. In reality, at the time of his statements, Celsius had already suffered numerous losses with DeFi transactions.

141.    In August 2020, Celsius engaged a company for the purpose of handling Celsius's DeFi investments. That company placed $500 million worth of Celsius's investor assets in risky DeFi deployments that resulted in losses of at least tens of millions of dollars.

142.    In June 2021, Celsius also lost access to 35,000 Ether worth tens of millions of dollars on a third-party service. Celsius never recovered those assets and Mashinsky failed to disclose this loss to Celsius's customers.

143.    Additionally, in December 2021, Celsius lost Bitcoin, then valued at approximately $50 million, to a hack to a DeFi protocol.

144.    Despite these loses and increasing exposure to DeFi protocols, Mashinsky continued to play down Celsius's use of DeFi. In a June 1, 2022, YouTube interview, Mashinsky stated: "Celsius continues to do what it did for the last five years. Again, most of our business, I would say 90% of our business, has nothing to do with DeFi." This was untrue.

145.    By the spring of 2022, DeFi had grown to become Celsius's single largest deployment category. As of May 25, 2022, Celsius had deployed nearly 30% of its customers' digital assets into DeFi activities, compared to only about 11% in retail lending and 12% in institutional lending.

146.    Celsius's use of DeFi protocols as its primary asset deployment vehicle was in direct contradiction to Mashinsky's repeated claims that customers' assets were deployed in high yield, low risk investments.

**O.    Defendant Misrepresented the Risk Profile of Institutional Partners**

147.    During his promotion of Celsius, Mashinsky repeatedly told customers and potential customers that Celsius only worked with credible and reputable counterparties.

148.    In his November 6, 2020, AMA, Mashinsky stated that Celsius "only lend[s] to the first-tier institutions, first tier exchanges…."

149.    Again, on April 13, 2022, Mashinsky falsely claimed that Celsius dealt only with "very credible" institutional counterparties.

150.    As a way to exemplify the quality and safety of the counterparties Celsius dealt with, in an AMA on November 12, 2021, Mashinsky stated that "In four years we have not had a single institution default either not pay the interest or not return the collateral or the long coins that we lend to them." Mashinsky further proclaimed on July 9, 2021, in a video posted on the Paul Barron Network YouTube channel, that Celsius had "Zero loans that went into default with any of our counterparties. . ."

151.    These statements were false. By early 2021, at least two companies defaulted on loans that Celsius had made to them. For example, by letter dated February 9, 2021, Celsius demanded repayment on a digital asset lending agreement entered into on December 3, 2019 and which Celsius contended that the counter party was in breach and defaulted on the loan. If not resolved, Celsius threatened formal legal action.

152.    In email written by Mashinsky to Celsius's Chief Revenue Officer, Mashinsky acknowledged the default of one of the companies noted above in paragraph 150. He stated "[i]t used to be a $3m problem now it is a $17m problem," and "[w]e were suppose to get 200 BTC back. Never happened." This default was also the subject of discussion at an Assets and Liabilities Committee meeting held on July 14, 2021 and at which Mashinsky was present.

153.    Yet, in a November 12, 2021 AMA YouTube video Mashinsky claimed "[w]e have not had a single institution default …". He did not disclose that by then, at least two institutional loan counterparties had defaulted on their agreements. The Celsius team tasked with edited out Mashinsky's false statements noted that his claim about no defaults needed to be removed.

**P.**    **Defendants Misrepresented that Celsius Did Not Engage in Directional Trading**

154.    From the outset, Celsius claimed to engage in a delta neutral trading strategy, meaning Celsius did not trade long or short positions to earn yield, but rather sought to capture difference in prices between products and exchanges. Delta neutral trading strategies are generally regarded as less risky, since positions are relatively insensitive to market movements and volatility. Mashinsky explained that traditional banks engaged in this type of trading all the time, but unlike Celsius who returned money to its customers, banks kept this money for themselves.

155.    In a Tweet dated September 29, 2020, Mashinsky wrote "Celsius does not trade or take long or short positions with customer coins."

156.    Mashinsky again described Celsius's trading strategy in a CBNC interview on April 13, 2022 saying "We are what's called a delta neutral strategy meaning. . .Celsius doesn't bet on the market going up or down, our job is just to take advantage of difference in prices between, for example, future and spot or one exchange and another and we take or grab that difference."

157.    Despite Mashinsky's false claims, Celsius routinely engaged in directional trading, a practice of which Mashinsky was aware.

158.    Within Celsius, directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including Mashinsky.

**Q.  Defendant Falsely Claimed Celsius Was Less Leveraged Than It Actually Was In Comparison to Traditional Banks Regarding Leveraged Trading**

159.  Mashinsky routinely said that Celsius was safer than a bank because banks were highly leveraged and Celsius was not.

160.  For example, in a May 7, 2021 AMA, Mashinsky said "And you will see that they are, their leverage is a 100 times greater than Celsius not ten times greater, 150 to 1 leverage. 0.23% leverage 0.23 versus five zero. Okay, so how many orders of magnitude are we talking about that's, you know, what is it 44.3 orders of magnitude, something like that 2.3 orders of magnitude.! That's the real risk, it's not, it's not Celsius before I went under leverage."

161.  In a February 22, 2022 Twitter Spaces broadcast Mashinsky explained: "Oh, yeah, we don't have leverage. It's not like we can go to the Fed and borrow money or, or borrow money from other banks like banks do every day. All right. So it's a completely different system. Banks are leveraged on average, either 10 times or 20 times depending on the balance sheet. And Celsius doesn't have any leverage, right? I mean, we, we have a little bit of leverage, because we sometimes lend out the collateral we get from third parties. So it's maybe again, instead of 1.0, it's 1.2 or something like that."

162.  Even though he claimed that Celsius did not have leverage akin to a bank, Mashinsky knew otherwise but falsely misrepresented this fact to customers and potential customers. Mashinsky had been told by Celsius senior management that his statements about Celsius's leverage were false and that Mashinsky should cease from making these misrepresentations to the public.

**R.** **In Promoting the Sale of CEL, Mashinsky Would Tout His Buying of CEL Without Disclosing that He was Selling More Than He was Buying**

163.    To entice customers to accept CEL through the earn program, Celsius offered its highest rates and Mashinsky constantly promoted CEL.

164.    In AMAs and other public appearances, Mashinsky promoted CEL by touting his purchases of the tokens and as importantly, that he was holding the token since its value was increasing.

165.    In reality, Mashinsky was selling more CEL than he was buying, or simply just selling the CEL he was supposedly holding. This trading was never disclosed to the public.

166.    For example, during AMAs on October 15, 2021 and December 31, 2021, Mashinsky implored his customers to "HODL" CEL, but failed to disclose that he actually sold CEL during those months.

167.    He repeated this pattern multiple times during the Relevant Period, and what might be at one of the most opportunistic times, he did so in May 2022. In an AMA on May 13, 2022, Mashinsky stated "I'm holding, I didn't sell." But in May 2022, Mashinsky had sold approximately $2 million worth of CEL.

**S.** **Mashinsky Lied to the Public about Celsius's Financial Condition Leading Up to "The Pause"**

168.    Starting in May 2022, based upon their concerns regarding the safety of their assets, Celsius customers began withdrawing hundreds of millions of dollars worth of digital assets, including, but not limited to, digital asset commodities, each day, culminating on May 12, 2002 when customers withdrew over half a billion dollars from the Celsius platform in just one day.

169.    Despite the record number of withdrawals and the fact Celsius's liabilities far exceeded its depleting assets, Mashinsky continued to solicit new customers and falsely represent that Celsius was strong and had the ability to meet the customer demands.

170.    As previously described, Mashinsky continued to implore Celsius's customer to hold on to their CEL tokens, despite the fact that he was selling his own CEL tokens and withdrawing his assets from the platform.

171.    During an AMA on May 13, 2022, Mashinsky stated that "Celsius is stronger than ever, we have billions of dollars in liquidity… and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them."

172.    On May 16, 2022, in an interview posted on YouTube Mashinsky again proclaimed that Celsius was "standing strong" and that Celsius was "ready with the liquidity."

173.    These statements by Mashinsky, made to assure Celsius's customers and entice new customers, were false and misleading.

174.    By May 13, 2022, Celsius had total assets of less than $12 billion and total liabilities of more than $12.75 billion, resulting in net assets of negative $820 million.

175.    Between May 9, 2022 and May 24, 2022, Celsius customers withdrew over $1.4 billion in assets.

176.    With customers withdrawing assets at a record pace, Mashinsky continued to solicit new customers in a desperate bid to gather assets to provide liquidity to the struggling platform.

177.    During a May 27, 2022 AMA, Mashinsky offered a referral reward for customers stating, "You'll get $50 in crypto for each completed referral. Your friend will get a $50 referral reward too."

178.    Mashinsky continued his solicitation of new customers on May 29, 2022, when he tweeted, "These are hard times for many…. I will personally give one of the new @CelsiusNetwork users $1000 this week if you show you opened an account and started #HODLing [sic] to build your #FinancialFreedom."

179.    During May and June of 2022, Celsius added almost two thousand new users and $900 million of digital assets to the Celsius platform.

180.    Into June 2022, Mashinsky continued to falsely represent that Celsius had the necessary liquidity to meet customers withdrawals and that its customers' assets were safe.

181.    On June 1, 2022, in response to the hypothetical customer question "are our funds safe at Celsius?" Mashinsky responded, "yes, so not just that they're safe… we provided anyone who wanted to withdraw partially or fully, there were no problems." But, by May 25, 2022, Celsius had les than $11 billion in assets and $11.9 billion in liabilities.

182.    On a June 10, 2022 AMA, Mashinsky claimed that "Celsius has billions in liquidity" and that "anyone what want to withdraw has no problem…."

183.    Between June 10 and June 12, 2022, Celsius customers withdrew over $672 million in digital assets.

184.    On June 12, 2002 Celsius paused withdrawals in order to "stabilize liquidity." Celsius filed for bankruptcy on July 13, 2022 at which time it had over $4.7 billion in user liabilities and only $1.75 billion in digital assets.

## VI.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) and
Regulation 180.1(a)(1)-(3), 17 C.F.R. 180.1(a)(1)-(3) (2022) (Fraud)**

185.   The allegations set forth in paragraphs 1 through 184 are re-alleged and incorporated herein by reference.

> Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:
> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

186.   Regulation 180.1, 17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

187.   During the Relevant Period, Defendants intentionally or recklessly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, directly or indirectly:  used or employed, or attempted to use or employ, a scheme or artifice to defraud; made, or attempted to make, untrue or misleading statements of a material fact or omitted to state a material fact necessary in order to make the statements made not untrue or misleading; and/or engaged, or

attempted to engage, in acts, practices, or courses of business that operated or would operate as a fraud or deceit on any person, including, but not limited to, Celsius customers.

188.    As a result of the foregoing conduct, Defendants' fraudulent conduct violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

189.    Defendants are directly liable for their actions in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)(3), 17 C.F.R. § 180.1(a)(1)-(3).

190.    Defendant Mashinsky directly or indirectly controlled Celsius did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) committed by.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as control person for each of Celsius' violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

191.    The acts and omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Celsius liable as principals for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

192.    Each and every use or employment or attempted use or employment of a scheme or artifice to defraud; or act of making or attempting to make untrue or misleading statements of a material fact or omitting to state a material fact necessary in order to make the statements not untrue or misleading; and act of engaging, or attempting to engage, in the acts, practices, or courses of business that operated or would have operated as a fraud or deceit on any person, including

Celsius customers, is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7

U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT TWO

### Violation of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)
### (Fraud and Deceit by CPOs and APs of CPOs)

193.    Paragraphs 1 through 192 are re-alleged and incorporated herein by reference.

194.    Section 1a(10) of the Act, 7 U.S.C. § 1a(10)(A), defines a commodity pool, in

relevant part, as:

> any investment trust, syndicate, or similar form of enterprise
> operated for the purpose of trading in commodity interests,
> including any –
>
> (I) commodity for future delivery, security futures product, or swap . . . .

195.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a commodity pool

operator, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool,
> investment trust, syndicate, or similar form of enterprise, and who, in
> connection therewith, solicits, accepts, or receives from others, funds,
> securities, or property, either directly or through capital contributions,
> the sale of stock or other forms of securities, or otherwise, for the
> purpose of trading in commodity interests, including any—
>
> (I) commodity for future delivery, security futures product, or
> swap . . . .

196.    By reason of the foregoing, during the Relevant Period, Celsius engaged in a

business, for compensation or profit, that is of the nature of a commodity pool, investment trust,

syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or

received from others, funds, securities, or property, either directly or through capital contributions,

the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity

interests; therefore, Celsius acted as a CPO, as defined by 7 U.S.C. § 1a(11).

197.     During the Relevant Period, Celsius was not registered with the Commission as a CPO.

198.     Regulation 1.3, 17 C.F.R. § 1.3 (2022), defines an associated person of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

199.     By reason of the foregoing, during the Relevant Period, Defendant Mashinsky was associated with a CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, or the supervision of any person or persons so engaged. Therefore, Defendant Mashinsky was an AP of a CPO as defined by 17 C.F.R. § 1.3.

200.     During the Relevant Period, Defendant Mashinsky was not registered with the Commission as an AP of a CPO.

201.     7 U.S.C. § 6o(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

202.     By reason of the foregoing, Celsius, through use of the mails or any means or instrumentality of interstate commerce: knowingly or recklessly employed devices, schemes or artifices to defraud its customers ("pool participants") and prospective pool participants, or (2)

34

engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants.

203.    By reason of the foregoing, Celsius violated 7 U.S.C. § 6*o*(1).

204.    The acts or omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Celsius is liable as principal for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius constituting violations of 7 U.S.C. § 6*o*(1).

205.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6*o*(1) committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 7 U.S.C. § 6*o*(1).

206.    Each misrepresentation and omission of material fact, including those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

## COUNT THREE

### Violation of Sections 4k(2) and 4m(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1)
### (Failure To Register as a CPO and AP of a CPO)

207.    Paragraphs 1 through 206 are re-alleged and incorporated herein by reference.

208.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

209.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall be:

> unlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent . . . in any capacity that involves
>
> (i)     the solicitation of funds, securities, or property for a participation in a commodity pool or
>
> (ii)    the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

210.     By reason of the foregoing, Celsius engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore, Celsius acted as a CPO, as defined by 7 U.S.C. § 1a(11).

211.     Celsius, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO.

212.     By reason of the foregoing, Celsius acted as an unregistered CPO in violation of 7 U.S.C. § 6m(1).

213.     By reason of the foregoing, Defendant Mashinsky associated with a CPO (as defined by 7 U.S.C. § 1a(11)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool or the

supervision of persons so engaged; therefore, Defendant Mashinsky acted as an AP of a CPO as defined by 17 C.F.R. § 1.3.

214.    Defendant Mashinsky was not registered with the Commission as an AP of a CPO.

215.    By reason of the foregoing, Defendant Mashinsky acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).

216.    The acts or omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Celsius is liable as principal for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius constituting violations of 7 U.S.C. § 6k(2).

217.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6m(1) committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 7 U.S.C. § 6m(1).

218.    Each instance that Celsius acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

219.    Each instance that Defendant Mashinsky acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

## COUNT FOUR

### Violation of Regulation 4.21, 17 C.F.R. § 4.21 (2022)
### (Failure to Provide Pool Disclosure Documents)

220.    Paragraphs 1 through 219 are re-alleged and incorporated herein by reference.

221.    17 C.F.R. § 4.21(a)(1) provides that:

> each commodity pool operator registered or required to be
> registered under the Act must deliver or cause to be delivered to a
> prospective participant in a pool that it operates or intends to
> operate a Disclosure Document for the pool prepared in accordance
> with §§ 4.24 and 4.25 by no later than the time it delivers to the
> prospective participant a subscription agreement for the pool . . . .

222.    By reason of the foregoing, Celsius was required to be registered with the
Commission as a CPO, but failed to provide prospective pool participants with pool disclosure
documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2022).

223.    By reason of the foregoing, Celsius violated 17 C.F.R. § 4.21.

224.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in
good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 17
C.F.R. § 4.21 committed by Celsius.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant
Mashinsky is also liable as a control person for each of Celsius's violations of 17 C.F.R. § 4.2.

225.    Each failure to furnish the required disclosure documents to prospective pool
participants and pool participants, including those specifically alleged herein, is alleged as a
separate and distinct violation of 17 C.F.R. § 4.21.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by
Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants, collectively and through their officers, employees
and agents, violated 4k(2), 4m(1), 4o(1)(A)-(B), 6(c)(1), of the Act, 7 U.S.C. §§ 6k(2), 6m(1),
6o(1)(A)-(B), 9(1), and Regulations 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1),
180.1(a)(1)-(3) (2022).

B.    An order of permanent injunction prohibiting Defendants and any other person or

entity associated with them, from engaging in conduct described above, in violation of Sections

4k(2), 4m(1), 4o(1)(A)-(B), 6(c)(1), of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and

Regulations 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

     C.    An order of permanent injunction prohibiting Defendants and any of their affiliates,

agents, servants, employees, successors, assigns, attorneys and persons in active concert or

participation with Defendants, from directly or indirectly:

     (i)  trading on or subject to the rules of any registered entity (as that term is

defined in Section la of the Act, 7 U.S.C. § la(40));

     (ii)  entering into any transactions involving "commodity interests" (as that term

is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital assets

that are commodities, as that term is described herein, for Defendants' own

accounts or for any account in which they have a direct or indirect interest;

     (iii)  having any commodity interests or digital assets commodities traded on

Defendants' behalf;

     (iv)  controlling or directing the trading for or on behalf of any other person or

entity, whether by power of attorney or otherwise, in any account involving

commodity interests or digital assets that are commodities, as that term is described

herein;

     (v)  soliciting, receiving, or accepting any funds from any person for the purpose

of purchasing or selling any commodity interests or digital asset commodities;

     (vi)  applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

(vii) acting as a principal (as that term is defined in Commission Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D. An order directing Defendants and any third-party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E. An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

F. An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

G. An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, Title VII, Section 701, *see* Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act, as

described herein;

    H.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

    I.    Such other and further relief as the Court deems proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff CFTC hereby demands a jury trial.

Dated: July 13, 2023             Commodity Futures Trading Commission

                        By its attorneys:

                        */s/ Jonah McCarthy*
                        Jonah McCarthy
                        S.D.N.Y. Bar No. JM1977
                        Chief Trial Attorney
                        *jmccarthy@cftc.gov*

                        Jason Gizzarelli (*Pro Hac Vice to be filed*)
                        Senior Trial Attorney
                        *jgizzarelli@cftc.gov*

                        Traci L. Rodriguez (*Pro Hac Vice to be filed*)
                        Chief Trial Attorney
                        *trodriguez@cftc.gov*

                        Paul Hayeck (*Pro Hac Vice to be filed*)
                        Deputy Director
                        *phayeck@cftc.gov*

                        Commodity Futures Trading Commission
                        1121 21st, Street, N.W.
                        Washington, D.C. 20581
                        (202) 418-5000
                        (202) 418-5521(fax)

                        *Attorneys for Plaintiff*
                        *Commodity Futures Trading Commission*

## **Exhibit C-2**

**CFTC Consent Order**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-6008 |
| CELSIUS NETWORK, LLC and ALEXANDER MASHINSKY, | |
| Defendants. | |

## CONSENT ORDER OF PERMANENT INJUNCTION
## AGAINST DEFENDANT CELSIUS NETWORK, LLC

On July 13, 2023, Plaintiff Commodity Futures Trading Commission (the "Commission") filed a four count Complaint against Celsius Network, LLC, ("Celsius") and Alexander Mashinsky ("Mashinsky") seeking a civil monetary penalty, and injunctive and other relief for violations of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 1-26 and Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2022).

### I.

### CONSENT AND AGREEMENT

In order to dispose of all the allegations and issues raised in the Complaint and effect a full and final settlement of any alleged violation of the Act or Regulations referenced above without a trial on the merits or any further judicial proceedings, Celsius, without admitting or denying any of the allegations of the Complaint:

1.  Consents to the entry of this Consent Order of Permanent Injunction Against Defendant Celsius Network, LLC. ("Order");

2.  Affirms that Celsius has read and agreed to this Order voluntarily, and that no promise or threat has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Order, other than as set forth specifically herein;

3.  Acknowledges service of the summons, Complaint and this Order;

4.  Admits jurisdiction of this Court over it and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13-a 1;

5.  Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6.  Admits that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13-a 1;

7.  Waives:

  a)  all claims which it may possess under the Equal Access to Justice Act, 5 U.S.C §504 and 28 U.S.C. §2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2022), relating to, or arising from, this action;

  b)  Any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as

amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

c)      any claim of double jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief; and

d)      Any and all rights of appeal from this Order;

8.      Agrees that the Commission is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act and the Small Business Regulatory Enforcement Act of 1996 specified in Paragraph 7;

9.      Consents to the continued jurisdiction of this Court over it for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action;

10.      Agrees that it will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

11.      Agrees that neither it nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendant's and/or its agents' and/or employees':  (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission not a party.  Defendant shall comply

with this agreement, and shall undertake all steps necessary to ensure that all of its agents and/or

employees under its authority or control understand and comply with this agreement.

       12.     Consents to the entry of this Consent Order without admitting or denying

the allegations of the Complaint, except as to jurisdiction and venue, which it admits; and

       13.     Agrees that no provision of this Consent Order shall in any way limit or

impair the ability of any other person or entity to seek any legal or equitable remedy against

Defendant in any other proceeding.

## II.

## PERMANENT INJUNCTION

Pursuant to 7 U.S.C. § 13a-1, Celsius is permanently restrained, enjoined and prohibited

from directly or indirectly engaging in conduct in violation of Sections 4k(2), 4m(1), 4o(1)(A)-

(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and Regulations

4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

## III.

## MISCELLANEOUS PROVISIONS

      A.     AMENDMENTS AND SEVERABILITY.  Nothing shall serve to amend

or modify this Order in any respect whatsoever, unless:  (i) reduced in writing; (ii) signed by all

parties; and (iii) approved by order of the Court.  If any provision of this Order or the application

of any provision or circumstances is held invalid, the remainder of this Order shall not be

affected by the holding.

      B.     SUCCESSORS AND ASSIGNS. This Order shall be binding on Celsius

and any Celsius company which is presently a debtor-in-possession participating in Bankruptcy

Case No.22-10964 (MG) before the United States Bankruptcy Court, Southern District of New York.

      C.     JURISDICTION. This Court shall retain jurisdiction of this matter to ensure compliance with this Order and for all other purposes related to this action, provided however, that nothing in this Order affects the exclusive jurisdiction of the Bankruptcy Court, Southern District of New York, with respect to matters related to the administration of the Celsius bankruptcy estate, including determination of the priority of distribution on any claims, as defined in section 101(5) of the Bankruptcy Code, arising from this Order.

      D.     COOPERATION. Celsius shall cooperate fully with the Commission in this proceeding and in any investigation, litigation or any proceeding commenced by the Commission related to this proceeding by, among other things: (a) responding promptly, completely, and truthfully to any inquiries or requests for information; (b) authenticating documents; and (c) testifying completely and truthfully.

      E.     INADMISSIBLE IN OTHER PROCEEDINGS. Except with respect to a proceeding brought by the Commission, this Order is for purposes of this proceeding only and shall not be admissible as evidence in any form or for any purpose in any judicial or administrative proceeding other than to enforce its terms; provided that Celsius does not consent to the use of this Order as the sole basis for any proceeding brought by the Commission other than a proceeding brought to enforce the terms of this Order and provided further that, nothing in this Order shall be construed to confer any rights on any third parties or inure to the benefit of any third parties.

     There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order of Permanent Injunction Against Defendant Celsius.

CONSENTED TO BY:

*Jonah C. McCarthy*

Jonah McCarthy
Jason Gizzarelli
Traci Rodriguez
Paul Hayeck
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5395

Mark Filip
Asheesh Goel
Zachary S. Brez
Robert W. Allen
Allison Lullo
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212)390-4060

Date: __July 12, 2023__

Date: July 14, 2023

Done and Ordered this 17th day of July, 2023.

Edgardo Ramos, U.S.D.J.

United States District Court Judge

**Exhibit D-1**

**FTC Complaint**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

CELSIUS NETWORK INC., a corporation,
CELSIUS NETWORK LLC, a limited liability
company, CELSIUS NETWORKS LENDING
LLC, a limited liability company, CELSIUS
LENDING LLC, a limited liability company,
CELSIUS KEYFI LLC, a limited liability
company, CELSIUS MINING LLC, a limited
liability company, CELSIUS US HOLDING LLC,
a limited liability company; CELSIUS US LLC, a
limited liability company; CELSIUS
MANAGEMENT CORP., a corporation;

ALEXANDER MASHINSKY, individually and
as an officer of Celsius Network Inc., Celsius
Network LLC, Celsius Networks Lending LLC,
Celsius Lending LLC, Celsius KeyFi LLC,
Celsius Mining LLC, and Celsius US Holding
LLC;

SHLOMI DANIEL LEON, individually and as an
officer of Celsius Network Inc., Celsius Network
LLC, Celsius Networks Lending LLC, Celsius
Lending LLC, Celsius KeyFi LLC, Celsius
Mining LLC, Celsius US Holding LLC; and

HANOCH "NUKE" GOLDSTEIN, individually
and as an officer of Celsius Network LLC and
Celsius Lending LLC,

      Defendants.

**Case No. 1:23-cv-6009**

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
RELIEF, AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 5(a), 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b) and 57b, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.*, which authorize the FTC to seek, and the Court to order, monetary relief, preliminary and permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the GLB Act. Defendants' violations are in connection with the marketing and sale of cryptocurrency lending and custody services.

## SUMMARY OF CASE

2.      Celsius[1] is a cryptocurrency company that marketed and sold crypto-based financial services to consumers. Celsius's products included interest-bearing cryptocurrency accounts, cryptocurrency-secured loans, and over-the-counter cryptocurrency sales, among other services.

3.      From at least 2019 until June 2022, Defendants duped consumers, many of whom were inexperienced with cryptocurrency, into transferring their cryptocurrency assets onto the Celsius platform. Defendants promised consumers that Celsius was "safer" than a bank or other traditional financial institution and misrepresented that their deposits were safe because Celsius earned profits at "no risk" to consumers by making secured crypto loans to other exchanges. Defendants guaranteed that if consumers transferred cryptocurrency to Celsius, they would

---

[1] Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, Celsius US Holding LLC, Celsius Mining LLC, Celsius US LLC, and Celsius Management Corp. are collectively referred to herein as "Celsius."

1

continue to own it, and they could withdraw it "at any time" because Celsius had "billions of dollars in liquidity" and maintained sufficient reserves to meet customer obligations.

4.      In reality, Defendants squandered consumer deposits, including by engaging in uncollateralized and undercollateralized lending despite their promises to the contrary. Defendants also failed to keep track of how much consumers had deposited and what Celsius's liabilities were. They failed to maintain enough liquid cryptocurrency to allow all customers to withdraw their crypto on demand. Defendants concealed these facts from the public and falsely touted Celsius as a safe alternative to banking—even though it was anything but.

5.       Defendants made other misrepresentations to market Celsius's services, too. In addition to misrepresenting Celsius's ability to satisfy obligations to customers, Defendants falsely advertised that a $750 million insurance policy covered consumers' assets. And, Defendants enticed consumers to deposit their cryptocurrency into Celsius's "Earn" program by claiming that consumers could earn "up to 17%" or "up to 18.63% APY" on deposits. In truth, more than 99% of Celsius's consumers earned APY far lower than 17%, with the average Celsius consumer receiving only about 5.611% APY.

6.      Throughout Celsius's operation, Defendants assured consumers Celsius was safe and stable. Then, on June 12, 2022, just five days after promising consumers that it "ha[d] the reserves (and more than enough ETH) to meet obligations," Defendants unexpectedly and unilaterally halted all withdrawals from and transfers on the platform, leaving hundreds of thousands of consumers without access to approximately $4.7 billion dollars' worth of crypto.

7.      On July 13, 2022, Celsius Network LLC and certain of its affiliates declared bankruptcy. The cases are pending in the U.S. Bankruptcy Court for the Southern District of

2

New York and are being jointly administered under Case No. 22-10964, *In re Celsius Network LLC*.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

10.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the GLB Act, which prohibits any person from using a false, fictitious, or fraudulent statement to obtain or attempt to obtain the customer information of a financial institution from a customer of a financial institution.

## DEFENDANTS

11.      Defendant Celsius Network Inc. ("CNI") is a Delaware corporation with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNI transacts or has transacted business in this District and throughout the United States. CNI is the parent company for entities that operate the Celsius Network platform; CNI's subsidiaries include Defendants Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp.,

3

and Celsius KeyFi LLC. At times relevant to this Complaint, acting alone or in concert with others, CNI has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

12.     Defendant Celsius Network LLC ("CNLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CNLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

13.     Defendant Celsius Networks Lending LLC ("CNLLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNLLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CNLLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

14.     Defendant Celsius Lending LLC ("CLLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CLLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CLLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

15.     Defendant Celsius Mining LLC ("CMLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CMLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CMLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

16.     Defendant Celsius US Holding LLC ("CUSHLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CUSHLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CUSHLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

17.     Defendant Celsius US LLC ("CUSLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CUSLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CUSLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

18.     Defendant Celsius Management Corp. ("CMC") is a Delaware corporation with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CMC transacts or has transacted business in this District and throughout the United States. At times

5

relevant to this Complaint, acting alone or in concert with others, CMC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

19.     Defendant Celsius KeyFi LLC ("KeyFi") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. KeyFi transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, KeyFi has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

20.     Defendant Alexander Mashinsky ("Mr. Mashinsky") is a co-founder of Celsius. He has served as a director of Celsius Network Inc. He was the Chief Executive Officer of Celsius Network LLC from its inception until September 27, 2022. He also served as CEO of Celsius US Holding LLC, Celsius Lending LLC, Celsius Networks Lending LLC, and Celsius Network Inc., as well as Executive Chairman of the Board for Celsius Mining LLC and Secretary of Celsius Network, Inc. He was also a director of Celsius KeyFi LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Lending LLC, Celsius US Holding LLC, and Celsius Networks Lending LLC from their inception until September 27, 2022. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Celsius, including the acts and practices set forth in this Complaint. Mr. Mashinsky has served on various committees within Celsius including the Executive Committee, Assets and Liability Committee, Risk Committee, Assets and Obligations Committee, Investment Committee, and Deployment Committee. He had a heavy hand in Celsius's marketing efforts. He routinely made false, misleading, and/or unsubstantiated

6

statements regarding Celsius's products and services in weekly marketing videos displayed on Celsius's official YouTube channel, as well as on his personal Twitter account. He was also personally involved in the decision to freeze withdrawals, swaps, and transfers from the Celsius platform. Mr. Mashinsky resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

21.      Defendant Shlomi Daniel Leon ("Mr. Leon") is a co-founder of Celsius. He is a director of Celsius Network Inc. He served as the Chief Strategy Officer of Celsius Network LLC until October 4, 2022. He has also served as Chief Operating Officer for Celsius Network LLC, CSO of Celsius Lending LLC, President of Celsius Mining LLC, and COO of Celsius Network Inc. He has served as a director of Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Networks Lending LLC, and Celsius US Holding LLC. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Celsius, including the acts and practices set forth in this Complaint. He has served on numerous committees within Celsius, including the Executive Committee, Assets and Liability Committee, Risk Committee, Assets and Obligations Committee, and Investment Committee. Mr. Leon was involved in and oversaw the crafting of advertisements about Celsius's products and services, and participated in the decision to freeze withdrawals, swaps, and transfers from the Celsius platform. Mr. Leon, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

22.      Defendant Hanoch "Nuke" Goldstein ("Mr. Goldstein") is a co-founder of Celsius. He served as Chief Technology Officer of Celsius Network LLC and Celsius Lending

7

LLC until March 21, 2022, and served as President of Labs for Celsius Network LLC. Acting

alone or in concert with others, he has formulated, directed, controlled, had the authority to

control, or participated in the acts and practices of Celsius, including the acts and practices set

forth in this Complaint. He has served on the Executive Committee and Risk Committee. Mr.

Goldstein actively participated in Celsius's marketing, appearing in advertising videos displayed

on Celsius's official YouTube channel. Mr. Goldstein resides in Florida and, in connection with

the matters alleged herein, transacts or has transacted business in this District and throughout the

United States.

## COMMON ENTERPRISE

23.     Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks

Lending LLC, Celsius US Holding LLC, Celsius Mining LLC, Celsius Lending LLC, Celsius

US LLC, Celsius Management Corp., and Celsius KeyFi LLC (collectively, "Corporate

Defendants") have operated as a common enterprise while engaging in the deceptive and unfair

acts and practices and other violations of law alleged below. Corporate Defendants have

conducted the business practices described below through an interrelated network of companies

that have common ownership, officers, managers, business functions, employees, and office

locations, and that commingled funds and property, including digital assets. Because these

Corporate Defendants have operated as a common enterprise, each of them is liable for the acts

and practices alleged below.

## COMMERCE

24.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## BACKGROUND ON CRYPTOCURRENCY

25.     Cryptocurrencies are digital assets that exist on a technology called a blockchain, a type of electronic ledger.

26.      There are thousands of different cryptocurrencies, sometimes called "coins" or "tokens," in existence today. Common cryptocurrencies include Bitcoin (BTC) and Ethereum (ETH). Most cryptocurrencies are not issued or created by any government or centralized banking institution.

27.     Cryptocurrency companies have invested heavily in marketing in recent years. For example, one cryptocurrency exchange announced a $100 million advertising campaign in 2021, and another spent $20 million for an advertising spot in the 2022 U.S. Super Bowl. Cryptocurrency ads often feature popular celebrities and well-known athletes. These advertising efforts have been successful: Roughly three-quarters of those who have ever invested in, traded, or used cryptocurrency say they did so for the first time within the past five years.

28.     As consumer interest in cryptocurrency has risen, so have scams and frauds involving cryptocurrencies. Since 2021, consumers have reported over $1.6 billion dollars' worth of losses to cryptocurrency-related scams. And 2022 saw the total collapse of certain cryptocurrencies, including so-called stablecoins, and popular cryptocurrency exchanges.

## DEFENDANTS' BUSINESS ACTIVITIES

29.     Founded in 2017, Celsius is a cryptocurrency financial services provider that has marketed a variety of cryptocurrency products and services to consumers. In 2018, Celsius launched the Celsius mobile app and issued its own proprietary cryptocurrency, the CEL token.

30.     Celsius has marketed a number of financial services that consumers are accustomed to encountering in the traditional financial marketplace, including interest-bearing accounts, personal loans, and currency exchanges. Celsius's services have included an Earn program that promises "rewards" (annual percentage yield or "APY") on deposits of cryptocurrency assets; a Borrow program that allows customers to take out loans secured by their crypto deposits; a Custody program that allows customers to store their crypto on the Celsius platform without earning yield; and other services that allow customers to exchange ("swap") cryptocurrency, buy cryptocurrency, or transfer assets to other Celsius users. Celsius also operates a Bitcoin mining enterprise.

31.     Since at least 2019, Defendants have promoted Celsius as a cryptocurrency-based alternative to banks—a safer place to store assets than a bank, and which supposedly always acted in its "depositors'" "best interests."  Mr. Mashinsky made many of these representations independently. Defendants have used slogans like "Banks are not your friends" and "Unbank Yourself" to position Celsius favorably relative to banks. Defendants repeatedly asserted that banks could not be trusted with consumers' hard-earned money, while Celsius was "telling you the truth" and "being transparent all the time." (Mr. Mashinsky personally made these statements in a 2021 AMA, accompanied by Mr. Goldstein.) Defendants also claimed that Celsius was a better place for consumers to store their assets because "we have less risk, we have much less

10

risk" than banks. Mr. Mashinsky even told consumers that "a run on the bank"—referring to a scenario in which mass consumer withdrawals deplete a bank's available capital and cause it to collapse—"cannot happen at Celsius."

32.     Defendants relied on digital advertising and social media to market Celsius's products and services and persuade consumers to deposit their cryptocurrency onto the Celsius platform. One of Celsius's most prominent advertising channels was its collection of "Ask Mashinsky Anything" ("AMA") videos, in which Mr. Mashinsky (and other Celsius employees, including Mr. Leon and Mr. Goldstein) advertised Celsius's products, responded to viewer questions, discussed the crypto market, and touted Celsius's purported superiority over other financial institutions and crypto companies. As of June 2022, Mr. Mashinsky had recorded 179 AMA episodes, many of which were an hour or more long and each of which was seen by thousands of viewers. Many of the AMAs were posted on Celsius's website and on its YouTube channel, where they remain accessible for public viewing today. Mr. Mashinsky, Mr. Goldstein, and Mr. Leon also used their own personal social media accounts to promote and market Celsius's products and services.

## I.     Defendants have misrepresented Celsius's products and services.

33.     Defendants have made a number of misrepresentations about the benefits of using Celsius services and the safety of consumer funds. Specifically, Defendants have claimed that: (1) Celsius did not make unsecured loans; (2) Celsius maintained sufficient liquid crypto assets to satisfy its consumer obligations; (3) consumers could withdraw the cryptocurrency they deposited at any time; (4) Celsius maintained a $750 million insurance policy for consumer deposits; and (5) consumers could earn "up to 17% APY" and "up to 18.63% APY." Each of

these claims was false or unsubstantiated at the time it was made.

**A. Defendants claimed that Celsius did not make unsecured loans.**

34.     According to Defendants, one reason Celsius was safer than a traditional bank

was because Celsius could supposedly earn yield "without taking any risk . . . or taking minimal

risk." Defendants claimed Celsius earned this no-risk revenue by lending out deposited

cryptocurrency via secured loans to highly vetted counterparties at favorable interest rates.

According to Defendants, the loans to third parties were low- or no-risk because they were

secured by cryptocurrency or other assets held by Celsius, which Celsius could liquidate if the

borrower were to default. Defendants promised consumers that their deposits would be lent out

only via "100% collateral" and denied engaging in "unsecured" lending to generate revenue.

35.     In a 2020 AMA, Mr. Mashinsky, accompanied by Mr. Leon, claimed that Celsius

did not "do non-collateralized loans . . . because that would be taking too much risk on your

behalf." In fact, in July 2020, Celsius had approximately $160,000,000 in unsecured loans.

36.     In a 2021 AMA, Mr. Mashinsky told viewers that "we only do asset back[ed]

lending meaning you have to give us an asset like crypto or things that we accept." Yet as of

August 2021, nearly half of Celsius's institutional lending portfolio (over $700 million) was

unsecured.

37.     In another 2021 AMA, Mr. Mashinsky falsely claimed that "we don't treat

businesses or individuals differently" in issuing loans, meaning that both businesses and

individuals were required to post collateral. Internally, Celsius employees complained that "we

absolutely do" treat institutional counterparties differently from individuals, because Celsius

made unsecured institutional loans. Yet only two weeks later, Mr. Mashinsky and another AMA

guest both claimed, again, that Celsius made all its institutional counterparties post collateral.

38.     In a 2021 AMA, a Celsius employee claimed that "the majority of our loans, almost 100% of them are fully collateralized, with other assets." And in April 2022, Mr. Mashinsky told a CNBC reporter that "we do not offer any non-collateralized loans." In fact, Celsius had over $1.2 billion uncollateralized loans outstanding.

39.     Consumers believed Celsius. Multiple consumers have told the bankruptcy court that they relied on Defendants' promises that "all loans are overcollateralized." As one consumer told the Bankruptcy Court, "I initially signed up with Celsius due to the advertised fact that you could earn interest in crypto with minimal risk through over-collateralized loans . . . The advertising campaigns, weekly AMAs, website, and interviews all are adamant that our funds are used in over-collateralized loans to generate yield for the depositors."

40.     Contrary to its representations to consumers, Celsius routinely made unsecured loans that gave Celsius no ability to seize collateral should the counterparty default.

41.     By June 2022, Celsius had lost over $60 million due to unsecured and under-secured lending.

42.     Internally, Celsius employees acknowledged that the promises that Celsius made only collateralized loans were false, and that Mr. Mashinsky was a "liar" for claiming that "we do not do unsecured lending." Yet Defendants continued to misrepresent how Celsius earned revenue and concealed its actual practices from the public.

**B.    Defendants assured customers that Celsius maintained sufficient reserves to meet customer obligations.**

43.    Defendants promised consumers that Celsius would always have sufficient liquid crypto reserves to meet customer obligations.

44.    Defendants told consumers that the assets on its balance sheet guaranteed the safety of customer deposits and availability of withdrawals. For example, in 2021, Mr. Mashinsky claimed that because "Celsius has over two billion dollars on its balance sheet . . . there is no safer place to give your coins to loan." Goldstein, who also appeared in the video, nodded in agreement. Mr. Mashinsky also told consumers that Celsius always had "enough liquidity on the sidelines . . . enough liquidity on hand" to satisfy consumer obligations. In 2022, Mr. Leon helped craft a blog post falsely stating that Celsius had more than enough reserves to meet its obligations.

45.    Consumers believed Celsius. Dozens of consumers have stated that Celsius's representations about its crypto reserves were an important factor in their decision to deposit crypto with Celsius. As one consumer put it, "[Mr. Mashinsky] reiterated time and time again on Twitter and on these AMAs that the company was over collateralized and that should anything go wrong they have more than enough money to make all depositors whole." Another consumer spent "100+ hours listening to Mr. Mashinsky and the communication of the company . . . every week for over a year: The worst thing that can happen is that everyone gets their coins back,' 'we have 2 billion dollars on our balance sheet so there is zero risk in depositing your crypto on Celsius . . . ."

46.    In fact, Celsius did not maintain sufficient liquid cryptocurrency reserves to satisfy consumer obligations. Rather than maintaining "enough liquidity on hand" to ensure that

14

all consumers could withdraw their crypto deposits if needed, Defendants maintained only a small capital reserve that would have allowed a fraction of its customers to withdraw their crypto within one week.

**C.    Defendants promised consumers that they could withdraw "at any time."**

47.    Between at least 2019 and June 2022, Defendants claimed that customers could withdraw their deposited cryptocurrency "at any time." Defendants claimed that customers would "always" have access to their cryptocurrency deposits and could withdraw them "whenever."

48.    Celsius's website and blog promised consumers that they could "Access your coins whenever, keep them safe forever" and "withdraw your crypto at any time":



15

49.     Defendants' marketing emails also promised that consumers could withdraw at will, promising in one: "Deposit any amount of crypto and feel good knowing you can withdraw at anytime without fees or penalties!"

50.     Defendants amplified these promises of on-demand withdrawals in Mr. Mashinsky's weekly AMA videos. Over and over, Mr. Mashinsky promised that anyone who deposited cryptocurrency with Celsius could "always" retrieve those deposits. According to Mr. Mashinsky, the "big benefit" of Celsius was that "you can withdraw at any time." He promised viewers that, "With Celsius, you can withdraw as much as you want as often as you want. No limits." Mr. Mashinsky even encouraged consumers to test Celsius by "pull[ing] out any assets you want five minutes after you put them in because you change your mind." In a 2021 tweet, he promised that "All coins are returned to their owners even in the case of bankruptcy."

51.     Consumers believed Celsius. Defendants told consumers "in plain English dozens (if not hundreds) of times that we would be able to withdraw OUR crypto whenever we wanted to," and consumers listened. One consumer told the bankruptcy court, "I chose to park my crypto there because I could withdraw at any time versus [a competitor] where they lock up your crypto . . . . [W]atch the AMA videos and you will see why we all believed."

52.     In fact, contrary to its promises, consumers could not "withdraw at any time" because Celsius did not maintain sufficient liquidity to allow everyone to withdraw on demand.

53.     Much of Defendants' assets, like Bitcoin mining equipment and stock in Bitcoin mining companies, could not quickly be converted into cryptocurrency for withdrawals. Other assets, like Celsius's proprietary CEL token, were highly volatile and illiquid, without a guaranteed market for sale.

54.     In addition, many of Celsius's deployment strategies required digital assets to be posted as collateral, "staked" (i.e., posted on the Ethereum blockchain to validate transactions, meaning that it could not be accessed for lengthy periods), or otherwise locked up and inaccessible to Celsius for significant periods of time. This meant that, even where Celsius *owned* assets equivalent to the assets consumers sought to withdraw, those assets might not be available for withdrawals. To access these illiquid cryptocurrency assets, Celsius was required to "unwind" transactions with institutional counterparties—a process that could take several days.

55.     Further, although Celsius promised consumers that it had crypto available for them to withdraw, in fact, Defendants did not even know what Celsius owned and what it owed. Defendants did not track Celsius's available assets or its consumer liabilities.

56.     Until 2021, Celsius did not use any system for monitoring movement of cryptocurrency assets to and from its platform. Nor did Celsius have any policy or procedure for ensuring that Celsius had assets available to satisfy consumer demands. In mid-2021, Celsius began using spreadsheets to track its assets and liabilities (most of which were consumer deposits). Celsius employees updated the spreadsheets manually. There was no standard process for updating the spreadsheets at regular intervals and no system for ensuring their accuracy. As a result, the spreadsheets were often inaccurate and frequently overstated Celsius's assets.

57.     Internally, Celsius employees acknowledged that its own internal financial statements were inadequate and could not be trusted, yet Defendants continued to assert that Celsius could satisfy consumer withdrawals.

17

### D. Defendants claimed consumers' crypto deposits were insured.

58.    In 2022, Defendants also advertised that it had $750 million of insurance on consumer deposits.

59.    Defendants acquired GK8 LLC, a company that specialized in custody solutions for digital assets. In multiple AMAs, Mr. Mashinsky promised consumers that GK8 had a $750 million insurance policy for deposited crypto assets, which would benefit Celsius customers. He told consumers that GK8 was "the only one in the world, as far as I know, that has [a] $750 million insurance policy from Aon." He also told consumers that GK8 offered "$750 million insurance per client," and on another AMA on April 22, 2022, a Celsius employee told viewers that GK8 offered "$750 million dollars of insurance per account."

60.    In or around June 2022, Defendants updated Celsius's website to advertise "$750M in insurance."

61.    Consumers believed Celsius. For example, in Celsius's bankruptcy proceedings, one consumer stated in a sworn declaration that he considered the claim of $750 million in insurance when deciding to keep his assets on the Celsius platform in 2022.

62.    In fact, neither Celsius nor its former subsidiary GK8 purchased or maintained a $750 million insurance policy.

### E. Defendants advertised that Earn accounts could yield "Up to 17% APY."

63.    Defendants also misled consumers by marketing high yields on cryptocurrency deposits. Celsius's primary product was its "Earn" program, which Celsius marketed as an interest-bearing deposit account. Defendants promised consumers that they would earn significant "rewards" (annual percentage yield or "APY") in exchange for depositing

18

cryptocurrency with Celsius. Once consumers transferred cryptocurrencies onto the Celsius platform, rewards appeared weekly as a deposit into the users' Earn account balance.

64.     Defendants posted yield rates for different cryptocurrencies on its website, highlighting the rates in prominent text. For example, in early 2022 Celsius declared on its homepage that consumers could "Earn up to **17% APY** on your crypto":



65.     In spring 2022, Defendants boosted Celsius's advertised rewards to over 18%:



19

66.     Despite Defendants' promises, over 99% of Celsius customers never earned APY of 17%. In fact, the median APY was around 4.9% and the average was only about 5.611%. During the periods that Celsius advertised APY up to 17% or more, less than 1% of Celsius customers actually earned rewards of 17%.

67.     Unbeknownst to consumers, Celsius did not offer the promised APY on the best known and most-used cryptocurrencies, Bitcoin and Ether. APYs of 17% and 18.63% were available only on a handful of lesser-known cryptocurrencies, sometimes called "alt-coins," even though the majority of Celsius users deposited Bitcoin and Ether, not alt-coins.

68.     Further, the highest promised APYs were available only to customers who were enrolled in Celsius's CEL Loyalty Program—a program that required users to purchase a certain amount of Celsius's own CEL token, which had limited use outside of the Celsius platform.

## II.     Celsius used its misrepresentations to entice consumers to hand over their financial information.

69.     Celsius has used the misrepresentations set forth above to obtain or attempt to obtain consumers' sensitive personal and financial information.

70.      To use Celsius's products and services, consumers had to sign up for a Celsius account and provide personal information like social security number and a copy of a government-issued identification. Only after registering could consumers transfer cryptocurrency from their own digital wallet into their Celsius account and gain access to various services. In many instances, Celsius obtained consumers' bank account information, and when consumers transferred cryptocurrency to the Celsius platform, Celsius gained access to identifying information for the wallet from which the cryptocurrency was sent.

## III. Defendants misappropriated consumers' cryptocurrency deposits.

71.     As soon as consumers deposited their assets into the Earn program, rather than ensuring the cryptocurrency would remain "yours legally" and "safe forever," as promised, Defendants took title to consumers' cryptocurrency and then transferred deposits into Celsius's pooled omnibus account, without any way to trace coins back to the consumer who deposited them, having deposits insured, maintaining reserves, or taking any step to keep them "safe forever." Celsius then used consumers' cryptocurrency to pay its bills, to fund ongoing operations, to pay rewards to other Earn consumers, and to stake or pledge as collateral. Celsius also used these coins to make high-risk investments and, admittedly, "lost too many times."

72.     Without title to their deposits, consumers became unsecured creditors, with no greater claim to their cryptocurrency than Celsius's landlords or service providers with unpaid bills. Additionally, consumers who deposited cryptocurrency into the Earn program lost the right to demand return of their cryptocurrency in-kind: those consumers now own just an IOU from Celsius, not the underlying coins, and thus—if they get paid back at all—risk receiving something different than what they deposited.

73.     Consumers had no reason to anticipate that Celsius would take legal ownership of their property. Indeed, Celsius told consumers the opposite: that deposits of crypto were "yours legally." Mr. Mashinsky claimed that, "Whatever you put in, if you put in one Bitcoin you will be withdrawing one Bitcoin. . . . It's always your Bitcoin. Always your Ether. Always your CEL token." As one consumer put it, "Celsius has stated on multiple occasions 'your coins' when referring to Celsius'[s] depositors['] crypto assets. . . . Myself and any other users were under the impression, from these verbal statements, that users' coins remained theirs . . . ."

74.     Because Defendants spent consumers' cryptocurrency for their own purposes and never maintained adequate liquidity to satisfy consumers' withdrawal requests, consumers often were unable to withdraw their assets when needed. In many instances, consumers reported being unable to withdraw their funds for days or even weeks—in direct contradiction to Celsius's widely touted claim that consumers could always withdraw "at any time." For example, in 2020, one consumer complained online about difficulties withdrawing, concluding: "10 working days have passed and no luck." Another consumer posted that their withdrawal request had been pending for 4 days, and someone responded that theirs had been pending for 6.

75.     Celsius's failure to satisfy consumers' withdrawal requests intensified in early 2022. By April 2022, high-level Celsius employees expressed concern that Celsius lacked sufficient liquidity to meet customer demands. By May, Celsius was insolvent. Celsius's top executives, including Mr. Mashinsky, Mr. Leon, and Mr. Goldstein, were aware that Celsius's "capital sits near zero" and that Celsius was having trouble satisfying customer withdrawal requests. Celsius customers seeking to withdraw their deposited cryptocurrency faced significant delays as Celsius employees scrambled to unwind agreements with counterparties and retrieve coins that Celsius had deployed. Consumers were harmed when they could not access the cryptocurrency deposits they had entrusted to Celsius—including life savings, college funds, and money saved for retirement.

76.     Yet Defendants concealed these financial realities from consumers, insisted that Celsius was stronger than ever, and doubled down on their promises that deposited assets were "safe" and consumers could withdraw cryptocurrency deposits on demand.

77.     For example, on May 11, 2022, Mr. Mashinsky tweeted that "all funds are safe."

22

78.     On May 13, 2022, Mr. Mashinsky told AMA viewers that "Celsius is stronger
than ever, we have billions of dollars in liquidity . . . and we continue to do what Celsius does
best – serve the community, protect the community, make sure your assets are there when you
need them."

79.     On May 27, 2022, Mr. Mashinsky told AMA viewers that it was "business as
usual" at Celsius. The next day, Mr. Goldstein tweeted that "the Celsius community, company,
and staff are strong as always . . . ."

80.     Defendants encouraged consumers to leave their deposits on the platform. In an
early June AMA, Mr. Mashinsky urged consumers to "HODL," meaning "hold on for dear life"
(and leave your assets on the platform). He promised that Celsius had "figured out how to make
money for all of us while you HODL."

81.     Defendants also continued to solicit *new* customers based on its misleading claims
of financial stability. Consumers created thousands of new accounts in May 2022 and deposited
millions of dollars' worth of new cryptocurrency with Celsius.

82.     In a blog post published June 7, 2022, on Celsius's official blog, which Mr. Leon
helped craft, Defendants bragged, "Damn the torpedoes, full speed ahead." In the post,
Defendants promised consumers that "Celsius continues to process withdrawals without delay.
We have not had any issues meeting withdrawal requests." Celsius also claimed that "Celsius has
the reserves (and more than enough ETH) to meet obligations." These statements were false, but
Mr. Leon and Mr. Goldstein retweeted the June 7, 2022 blog post from their personal Twitter
accounts.

23

83.    On June 10, 2022, Mr. Mashinsky claimed in an AMA that "Celsius has billions in liquidity . . . and we provide immediate access to everybody, anyone who needs access to it." He further stated that "Anyone who wants to withdraw has no problem, right."

84.    On June 11, 2022, he tweeted that the idea that Celsius was having trouble processing withdrawals was "FUD [Fear, Uncertainty, and Doubt] and misinformation." He went on to challenge his followers to find "even one person who has a problem withdrawing from Celsius." One incredulous consumer emailed Celsius in response to this tweet: "I found it ironic to dare the media to 'find one person who could not withdraw.' As a reminder, I have had issues for weeks that are still not resolved and which have prohibited me to withdraw my funds!"

85.    Then, on June 12, despite all of Defendants' promises that Celsius had "billions in liquidity" and provided "immediate access to everybody," Defendants chose to shut down consumers' ability to withdraw funds from the platform completely.

86.    Users who had pending withdrawal requests had their requests denied, and no new withdrawal requests were honored. Users with crypto-secured loans could not access their collateral (even if they paid off their loans entirely) or transfer funds within the platform to avoid margin calls or liquidation.

87.    Although Defendants claimed the freeze was a temporary measure intended to "stabilize liquidity," Defendants never resumed withdrawals. Instead, Celsius filed for bankruptcy on July 13, 2022. At that point, Celsius had over $4.7 billion in user liabilities. As one consumer lamented in a letter to the bankruptcy court, "I should have the opportunity to make appropriate fund transfers (all held by Celsius) to pay off the loan principle in kind (my

collateral, BTC). This was the agreement. However, because ALL my assets held with Celsius are frozen, hostage, it leaves me with no options that I can trust. They have seized everything."

88.     Consumers were surprised and devastated by these harsh and unexpected developments. Consumers responded to Celsius's decision to freeze their accounts by begging Celsius to restore access to life savings and assets that they expected to be able to live off of based on Defendants' representations.

89.     One customer wrote to Celsius, "Why was there no warning about this? We've been told until now that everything was ok and whoever says otherwise is a hater spreading misinformation. Now, without warning, I no longer have access to money I depend on, with no idea when/if that changes."

90.     Another wrote: "You told the entire community that we could withdraw whenever. My life savings are on that account."

91.     Tellingly, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each withdrew significant sums of crypto from Celsius in April and May 2022 before freezing consumers' accounts. Privy to the information that Celsius was headed for insolvency, these insiders acted upon this fact to protect their assets while simultaneously lying to customers to prevent them from being able to do the same. For example, as of April 4, 2022, Celsius did not have enough liquid assets to meet its expected obligations. On April 13, Mr. Leon withdrew $2,200,000 of USDC. Mr. Leon also transferred 8,000,000 CEL tokens to an account owned by a limited partnership that he controlled. That same day, Mr. Leon's limited partnership posted 7,373,272 CEL tokens as collateral and received a $4 million USD loan. On May 14, 2022, members of the risk team described the liquidity crisis facing Celsius as "existential" and the measures they were taking to

25

increase liquidity as "only buying [Celsius] time." On May 15, 2022, Mr. Mashinsky withdrew BTC, ETH, and USDC worth $1,089,137. On May 27, 2022, Celsius triggered a reduced liquidity stress test, and on that same day, Mr. Mashinsky, via a company that he controlled, withdrew substantially all of his non-CEL token cryptocurrency—worth $5,120,317. On May 31, 2022, Mr. Mashinsky complained to employees that they had had "two weeks in a raw [sic] of slow/delayed withdrawals." But that same day, CEL tokens with a value of $2,027,339 were transferred into an account controlled by Mr. Mashinsky, and Mr. Leon withdrew BTC with a value of $423,376 without delay.

92.     But unlike these insiders, most consumers had no idea what was going on. Consumers had no expectation that Celsius would not only take title to their deposits, but would then use those deposits in a manner that risked consumers' ability to access their cryptocurrency later, including by failing to insure deposits or maintain sufficient reserves. Consumers, instead, could rely only on Defendants' promises that their cryptocurrency remained "yours legally," that their deposits were "safe," and that Defendants would "make sure your assets are there when you need them." In a June 1st interview, Mr. Mashinsky claimed, "not just that they [customers' coins] are safe but we provided anyone who wanted to withdraw partially or fully, there were no problems"—a blatant falsehood. Insiders were able to withdraw all of their coins pre-freeze while many consumers were left emptyhanded.

93.     Even after Celsius halted withdrawals, deposits continued. Consumers deposited nearly $20 million in cryptocurrency onto the Celsius platform in the two weeks following the shutdown of withdrawals.

*     *     *

94.     Based on the facts and violations of law alleged in this Complaint, the FTC has

reason to believe that Defendants are violating or are about to violate laws enforced by the FTC.

Among other things, Celsius's website still contains many of the misrepresentations set forth

above. It still advertises APY up to 17% and claims that consumers should "trust" Celsius as an

alternative to a bank. The official Celsius subreddit also advertises "up to 17% AOY on crypto."

The website still links to YouTube videos containing misleading statements by Mr. Mashinsky

and others marketing Celsius as a safe place to store cryptocurrency deposits. And consumers'

funds are still frozen. Before leaving Celsius, Mr. Mashinsky proposed simply re-starting a new

cryptocurrency custody venture that would put consumers' crypto deposits back in his hands.

Further, Defendants engaged in the unlawful acts and practices above repeatedly over a period of

at least three years. And, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein maintain the means,

ability, and incentive to resume their unlawful conduct.

## VIOLATIONS OF THE FTC ACT

95.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

or practices in or affecting commerce."

96.     Misrepresentations or deceptive omissions of material fact constitute deceptive

acts or practices prohibited by Section 5(a) of the FTC Act.

97.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are

likely to cause substantial injury to consumers that consumers cannot reasonably avoid

themselves and that is not outweighed by countervailing benefits to consumers or competition.

15 U.S.C. § 45(n).

27

## Count I

## Deception

98.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of products and services offered through Celsius, including through the means described in Paragraphs 33 to 68 above, Defendants have represented, directly or indirectly, expressly or by implication, that:

(1) Celsius did not make unsecured loans;

(2) Celsius maintained sufficient liquid crypto assets to satisfy its consumer obligations;

(3) consumers could withdraw the cryptocurrency they deposited at any time;

(4) Celsius maintained a $750 million insurance policy for consumer deposits; and

(5) consumers could earn "up to 17% APY" and "up to 18.63% APY."

99.     The representations set forth in Paragraph 98 were false, misleading, or not substantiated at the time the representations were made.

100.     Therefore, the making of the representations as set forth in Paragraph 98 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

## Unfairly Misappropriating Consumers' Cryptocurrency Deposits

101.     In numerous instances, Defendants have misappropriated consumers' cryptocurrency deposits.

102.     Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

103.     Therefore, Defendants' acts or practices as set forth in Paragraphs 101 and 102 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

104.     Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November 12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. § 6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer information of a financial institution relating to another person . . . by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution."

105.     The GLB Act defines "customer" to mean "with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act defines "customer information of a financial institution" as "any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of a financial institution and is identified with the customer." 15 U.S.C. § 6827(2).

106.     Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to enforce Section 521 of the GLB Act "in the same manner and with the same power and authority as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce compliance with such Act."

29

107.    Section 814(a) of the FDCPA, in turn, makes a violation of the FDCPA an unfair

or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a). Section 814(a) of

the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act

are available to the FTC to enforce compliance by any person with the FDCPA, including the

power to enforce provisions of the FDCPA in the same manner as if the violation had been a

violation of an FTC trade regulation rule.

108.    Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section

521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an

FTC trade regulation rule.

109.    Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such

relief as the Court finds necessary to redress injury to consumers resulting from violations of

FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also

authorizes this Court to grant such relief as the Court finds necessary to redress injury to

consumers resulting from violations of the GLB Act. This relief may include, and is not limited

to, rescission or reformation of contracts, and the refund of money or return of property.

### Count III

### Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customers' Customer Information of a Financial Institution

110.    In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of products and services offered through Celsius, Defendants have made

false, fictitious, or fraudulent statements or representations to customers of financial institutions

to obtain or attempt to obtain customer information of a financial institution. The customer

information of a financial institution that Defendants obtain or attempt to obtain includes

30

consumers' bank account numbers and cryptocurrency wallet addresses.

111. Defendants have obtained or attempted to obtain the customer information of a financial institution by soliciting consumer deposits onto the Celsius platform via representations to customers of financial institutions, directly or indirectly, expressly or by implication, that consumers could withdraw their cryptocurrency at any time, that Defendants maintained sufficient liquidity reserves to satisfy all consumer obligations, that customer deposits were insured, that Celsius did not engage in unsecured lending, that Celsius offered APY up to 17%, and that consumers retained ownership of their deposited cryptocurrency.

112. Defendants' representations set forth in Paragraphs 110 and 111 above were false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

113. Therefore, Defendants' acts and practices set forth in Paragraphs 110 to 112 above violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

114. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the GLB Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and the GLB Act by Defendants;

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of consumer injury during the pendency of this action and to preserve the possibility

of effective final relief;

C.      Award monetary and other relief within the Court's power to grant; and

D.      Award any additional relief as the Court determines to be just and proper.


Respectfully submitted,


Dated: July 13, 2023                    __/s/ Katherine M. Aizpuru_____
                                        KATHERINE M. AIZPURU (Bar No. 5305990)
                                        STEPHANIE LIEBNER (*pro hac vice* forthcoming)
                                        KATHERINE WORTHMAN (*pro hac vice*
                                        forthcoming)
                                        Federal Trade Commission
                                        600 Pennsylvania Avenue NW
                                        Mail Stop: CC 6316
                                        Washington, D.C. 20580
                                        kaizpuru@ftc.gov
                                        sliebner@ftc.gov
                                        kworthman@ftc.gov
                                        202-876-5673

                                        *Attorneys for Plaintiff Federal Trade Commission*

## Exhibit D-2

**FTC Joint Stipulation and Agreed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**JOINT STIPULATION AND AGREED ORDER
BETWEEN THE FEDERAL TRADE COMMISSION AND THE
DEBTORS TO ENTER INTO STIPULATED ORDER IN THE DISTRICT COURT**

This stipulation (this "Stipulation and Agreed Order") is entered into by and among the
above-captioned debtors and debtors in possession (collectively, the "Debtors") and the U.S.
Federal Trade Commission (the "FTC" and, together with the Debtors, the "Parties").

**WHEREAS,** on July 13, 2022, each of the Initial Debtors filed a voluntary petition for
relief with the United States Bankruptcy Court for the Southern District of New York
(the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§
101–1532 (the "Bankruptcy Code");

**WHEREAS**, the Parties have entered into, and the Bankruptcy Court has approved, four
stipulations to extend the deadline for the FTC to file a nondischargeability complaint, through
and including August 14, 2023 [Docket Nos. 1296, 2485, 2705, 2976];

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956) (collectively, the "Initial Debtors"); GK8 Ltd. (1209);
GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal
place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F,
Hoboken, New Jersey 07030.

**WHEREAS**, on January 10, 2023, the FTC timely filed an unliquidated, contingent proof of claim for monetary relief arising from Debtors' alleged violations of the Federal Trade Commission Act and the Gramm-Leach-Bliley Act, Claim No. 21697;

**WHEREAS**, on July 13, 2023, the FTC commenced an action (the "FTC Action")[2] against Debtors Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC (collectively the "Debtor Defendants"), and non-Debtors Celsius US LLC and Celsius Management Corp. (collectively the "Non-Debtor Defendants," and together with the Debtor Defendants, the "Corporate Defendants," as that term is defined in **Exhibit 1**, attached hereto), and Alex Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein (together with the Corporate Defendants, the "FTC Defendants") for a permanent injunction, monetary relief, and other relief pursuant to the Federal Trade Commission Act and the Gramm-Leach-Bliley Act in the United States District Court for the Southern District of New York (the "District Court");

**WHEREAS**, on July 13, 2023, the Parties filed the *Joint Motion for Stay as to Corporate Defendants* [FTC Action Docket No. 3] (the "Stay Motion"), representing that the FTC and the Corporate Defendants have reached a settlement resolving the FTC Action vis-à-vis the Corporate Defendants and requesting that the District Court stay the FTC Action as to the Corporate Defendants until the earlier of (i) 45 days or (ii) the approval by the Bankruptcy Court for the Corporate Defendants to enter into the *Stipulated Order for Permanent Injunction, Monetary Judgment and Other Relief Against Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius Us Holding*

---

[2]    *Federal Trade Commission v. Celsius Network Inc. et al*, Case No. 1:23-cv-06009-DLC (S.D.N.Y July 13, 2023) (the "FTC Action Docket").

*LLC, Celsius Us LLC, and Celsius Management Corp*, attached to the Stay Motion as <u>Exhibit A</u> and attached hereto as **Exhibit 1** (the "<u>Stipulated Order</u>");[3]

**WHEREAS**, on July 20, 2023, the District Court granted the Stay Motion and directed the FTC and the Corporate Defendants to file, on or before August 28, 2023, a motion in the District Court seeking entry of the Stipulated Order or otherwise notify the District Court of the status of the effort to seek the Bankruptcy Court's approval for the Debtor Defendants to enter into the Stipulated Order [FTC Action Docket No. 18];

**WHEREAS**, pursuant to the Stipulated Order, the Corporate Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary;

**WHEREAS**, pursuant to the Stipulated Order, the Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the Stipulated Order, whether acting directly or indirectly and in connection with promoting or offering for sale any product or service, are permanently restrained and enjoined from (i) misrepresenting the benefits or other material facts about the FTC Defendants' products or services, (ii) obtaining customer financial information by false, fictitious, or fraudulent representations, (iii) violating the Gramm-Leach-Bliley Act, and (iv) disclosing

---

[3]    The following description of the Stipulated Order in the recitals is provided for illustrative purpose only and is qualified in its entirety by reference to the Stipulated Order.  In the event of any inconsistency between these recitals and the Stipulated Order, the Stipulated Order controls in all respects.  Furthermore, these recitals shall not be used to construe or interpret the terms of the Stipulated Order or intent of the Parties.

Nonpublic Personal Information about a consumer without the consumer's Express Informed Consent;[4]

WHEREAS, pursuant to the Stipulated Order, judgment in the amount of $4,720,000,000 (the "Monetary Judgment") is (i) entered in favor of the FTC against Corporate Defendants, jointly and severally among the Corporate Defendants and with any other FTC Defendants to the extent subsequently ordered, and (ii) suspended as to the Debtors unless these chapter 11 cases are closed, dismissed, or otherwise concluded without the Debtors' estates being fully administered, including any distributions to creditors, in accordance with the Bankruptcy Code, as more fully set forth in the Stipulated Order;

WHEREAS, pursuant to the Stipulated Order, the Debtor Defendants agree that the Monetary Judgment is not dischargeable in these chapter 11 cases and will not object to the allowance of a general unsecured claim by the FTC in these chapter 11 cases in the amount of the Monetary Judgment ($4,720,000,000), which claim shall not be allowed unless and until the conditions for lifting the suspension of the Monetary Judgment, as set forth herein and in the Stipulated Order, have been met;

WHEREAS, pursuant to the Stipulated Order, the Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the Stipulated Order, shall comply with certain obligations with respect to (i) customer information, (ii) cooperation with the FTC, (iii) acknowledgement of the Stipulated Order, (iv) compliance reporting, (v) recordkeeping, and (vi) compliance monitoring;

---

[4]  "Nonpublic Personal Information" and "Express Informed Consent" shall have the meaning ascribed to them in the Stipulated Order.

4

WHEREAS, upon entry of the Stipulated Order, and only if the suspension of the Monetary Judgment is lifted, the Corporate Defendants will relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to the Stipulated Order and may not seek the return of any assets;

WHEREAS, the Stipulated Order does not (i) restrain or enjoin the deposit, exchange, distribution, investment, or withdrawal of assets owned or held by the Debtor Defendants and being administered in accordance with the Bankruptcy Code and orders of the Bankruptcy Court, (ii) create a contingent liability against the Debtor Defendants, or (iii) preclude the full distribution of assets held by the Debtor Defendants in these chapter 11 cases to allowed claims;

WHEREAS, the Debtors, in the sound exercise of their business judgment, have determined that the consensual resolution of the FTC Action with respect to the Debtor Defendants via the Stipulated Order reduces ongoing litigation and regulatory uncertainties, maximizes return for all stakeholders, and is in the best interest of the estates; and

WHEREAS, in light of the agreement set forth in the Stipulated Order, the Parties now jointly submit this Stipulation and Agreed Order and respectfully request the Court's approval.

**IT IS THEREFORE STIPULATED AND AGREED, AND UPON BANKRUPTCY COURT APPROVAL HEREOF, IT IS HEREBY ORDERED THAT**:

1.      The Debtors are authorized and directed to enter into the Stipulated Order, attached hereto as **Exhibit 1**, and perform, execute, and deliver all documents, and take all actions necessary, to immediately continue and fully implement the settlement embodied in the Stipulated Order in accordance with the terms, conditions, and agreements set forth or provided for therein. The Stipulated Order addresses and extinguishes the FTC claim described in Claim No. 21697.

5

2.      The FTC's Monetary Judgment in the amount of $4,720,000,000 shall constitute a general unsecured claim against the Debtors that is nondischargeable pursuant to sections 523 and 1141 of the Bankruptcy Code; *provided* that the Monetary Judgment shall be suspended against the Debtors and will not be an allowed claim and shall not receive any distributions in these chapter 11 cases, in each case, so long as the Debtors comply with the applicable requirements set forth in the Stipulated Order for such suspended Monetary Judgment.

3.      Notwithstanding anything to the contrary in the Stipulated Order, the Monetary Judgment shall be suspended against the Debtors and shall not be an allowed claim or paid by the Debtors so long as the Debtors comply with the requirements set forth in the Stipulated Order. The FTC shall be entitled to enforce collection of the Monetary Judgment against the Corporate Defendants if the suspension is lifted pursuant to the conditions set forth in the Stipulated Order.

4.      Notwithstanding anything to the contrary in the Stipulated Order, nothing in this Order constitutes a finding that any claim asserted against the Debtors by the FTC, other than the general unsecured claim arising from the Monetary Judgment in the amount of $4,720,000,000, is nondischargeable pursuant to sections 523 and 1141 of the Bankruptcy Code.

5.      For the avoidance of doubt and as stated in the Stipulated Order, the Monetary Judgment and other terms of the Stipulated Order apply only to Corporate Defendants.

6.      With respect to the Monetary Judgment, the notice requirements under Bankruptcy Rule 6004(a) are hereby waived.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Stipulation and Agreed Order are immediately effective and enforceable upon its entry.

6

8.      This Stipulation and Agreed Order shall bind the Debtor Defendants, their estates, and any successors or assigns, including without limitation any trustee, liquidating trustee, litigation administrator, or other estate representative.

9.      The Bankruptcy Court retains jurisdiction with respect to any disputes arising from or any other actions to interpret, administer, or enforce the terms and provisions of this Stipulation and Agreed Order, and the Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to the implementation of this Stipulation and Agreed Order; *provided* that any disputes or controversies arising from or related to the implementation of the Stipulated Order should be submitted to the District Court.

**IT IS SO ORDERED.**

Dated:   August 14, 2023
              New York, New York

<u>      **/s/ Martin Glenn**      </u>
                MARTIN GLENN
        Chief United States Bankruptcy Judge

**IN WITNESS WHEREOF**, the Parties, by their respective authorized counsel, have
executed this Stipulation and Agreed Order as of the date written below:

New York, New York
Dated: July 26, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL**
**LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

*/s/ Katherine Aizpuru*

**FEDERAL TRADE COMMISSION**
Katherine Johnson (admitted *pro hac vice*)
Katherine Aizpuru
Stephanie Liebner
600 Pennsylvania Ave., N.W.
Mail Stop CC-9528
Washington, District of Columbia 20580
Telephone:      (202) 326-2185 (Johnson)
Telephone:      (202) 326-2870 (Aizpuru)
Facsimile:      (202) 326-3197
Email:          kjohnson3@ftc.gov
                kaizpuru@ftc.gov

*Counsel for the Federal Trade Commission*

8

## **Exhibit 1**

## **Stipulated Order**

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 1:23-cv-6009 |
| v. | **STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT AND OTHER RELIEF AGAINST CELSIUS NETWORK INC., CELSIUS NETWORK LLC, CELSIUS NETWORKS LENDING LLC, CELSIUS LENDING LLC, CELSIUS KEYFI LLC, CELSIUS MINING LLC, CELSIUS US HOLDING LLC, CELSIUS US LLC, and CELSIUS MANAGEMENT CORP.** |
| CELSIUS NETWORK INC., a corporation, CELSIUS NETWORK LLC, a limited liability company, CELSIUS NETWORKS LENDING LLC, a limited liability company, CELSIUS LENDING LLC, a limited liability company, CELSIUS KEYFI LLC, a limited liability company, CELSIUS MINING LLC, a limited liability company, CELSIUS US HOLDING LLC, a limited liability company; CELSIUS US LLC, a limited liability company; CELSIUS MANAGEMENT CORP., a corporation; | |
| ALEXANDER MASHINSKY, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC; | |
| SHLOMI DANIEL LEON, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC; and | |
| HANOCH "NUKE" GOLDSTEIN, individually and as an officer of Celsius Network LLC and Celsius Lending LLC, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint

for Permanent Injunction, Monetary Relief, and Other Relief ("Complaint"), for a permanent

injunction, monetary relief, and other relief in this matter, pursuant to Sections 13(b), 19, and

16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b, and

the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.* Corporate Defendants

have waived service of the summons and the Complaint.

Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending

LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US LLC

(collectively, "Debtor Defendants") have filed petitions for relief under Chapter 11 of the

Bankruptcy Code. *See In re Celsius Network LLC et al.*, No. 22-10964(MG) (Bankr. S.D.N.Y.)

("Bankruptcy Case").[1]

The Commission and Corporate Defendants stipulate to the entry of this Stipulated Order

for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters

in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Defendants participated in deceptive and unfair acts

or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the marketing and sale of

cryptocurrency lending and custody services. The Complaint further charges that Defendants

obtained customer information of a financial institution relating to another person by making

---

[1] On July 13, 2022, the Debtor Defendants each filed a Chapter 11 voluntary petition. *See In re Celsius KeyFi LLC*, Case No. 22-10967; *In re Celsius Lending LLC*, Case No. 22-10970; *In re Celsius Mining LLC*, Case No. 22-10968; *In re Celsius Network Inc.*, Case No. 22-10965; *In re Celsius Networks Lending LLC*, Case No. 10969; and *In re Celsius US Holding LLC*, Case No. 22-10971. The Bankruptcy Court entered an order on July 19, 2022, jointly administering these cases under the main case for Celsius Network, LLC, Case No. 22-10964. Dkt. 53. Accordingly, "Bankruptcy Case" refers to the jointly administered cases for all Debtor Defendants, as well as each case for each Debtor Defendant.

1

false, fictitious, or fraudulent statements, in violation of Section 521 of the GLB Act, 15 U.S.C. §
6821.

3.     Only for purposes of this action, Corporate Defendants admit the facts necessary
to establish jurisdiction and as otherwise specifically stated in this Order.  Corporate Defendants
further admit the facts set forth on pages 107-109 of the Debtors' Disclosure Statement filed on
June 27, 2023 in the Bankruptcy Case, Dkt. 2902.

4.     Corporate Defendants waive any claim that they may have under the Equal
Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the
date of this Order, and agree to bear their own costs and attorney fees.

5.     Corporate Defendants and the Commission waive all rights to appeal or otherwise
challenge or contest the validity of this Order.

6.     Entry of this Order is in the public interest.

7.     The Commission's prosecution of this action, including entry of a money
judgment and the enforcement of a judgment (other than a money judgment) obtained in this
action are actions to enforce the Commission's police or regulatory powers. As a result, if the
Debtor Defendants' bankruptcies are pending as of the date of entry of this Order, these actions
are excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.     **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss
(i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the
following ways:

1.     In any communication that is solely visual or solely audible, the disclosure

2

must be made through the same means through which the communication is presented.
In any communication made through both visual and audible means, such as a television
advertisement, the disclosure must be presented simultaneously in both the visual and
audible portions of the communication even if the representation requiring the disclosure
is made in only one means.

    2.    A visual disclosure, by its size, contrast, location, the length of time it
appears, and other characteristics, must stand out from any accompanying text or other
visual elements so that it is easily noticed, read, and understood.

    3.    An audible disclosure, including by telephone or streaming video, must be
delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily
hear and understand it.

    4.    In any communication using an interactive electronic medium, such as the
Internet or software, the disclosure must be unavoidable.

    5.    The disclosure must use diction and syntax understandable to ordinary
consumers and must appear in each language in which the representation that requires the
disclosure appears.

    6.    The disclosure must comply with these requirements in each medium
through which it is received, including all electronic devices and face-to-face
communications.

    7.    The disclosure must not be contradicted or mitigated by, or inconsistent
with, anything else in the communication.

    8.    When the representation or sales practice targets a specific audience, such
as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable

3

members of that group.

B.    "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

    1.    "**Corporate Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, and Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp., and their successors and assigns.

    2.    "**Debtor Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC.

    3.    "**Non-Debtor Defendants**" means Celsius US LLC and Celsius Management Corp.

    4.    "**Individual Defendants**" means Alexander Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein.

C.    "**Express Informed Consent**" means an affirmative act communicating unambiguous assent made after receiving and in close proximity to a Clear and Conspicuous disclosure of all information material to the provision of consent. Assent obtained through any practice or user interface that has the effect of subverting or impairing consumer autonomy, decision-making, or choice, including using text that is not easily legible or disclosing material terms behind a hyperlink, dropdown icon, tooltip, or other similar interface, does not constitute Express Informed Consent.  Acceptance of a general or broad terms of use or similar document that contains descriptions of agreement by the individual along with other, unrelated information, does not constitute Express Informed Consent.

4

D.    **"Nonpublic Personal Information"** means:

  1. Any information that Defendants obtain about a consumer in connection with providing a product or service to that consumer; or

  2. Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Nonpublic Personal Information that is not publicly available.

## ORDER

## I. BAN

IT IS ORDERED that Corporate Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary.

## II. PROHIBITION AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product or service are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

A. the benefits of Defendants' products or services, including the existence or amount of any rewards that consumers can expect to earn; or

B. any other material fact about Defendants' products or services, such as the total costs; any material restrictions, limitations, or conditions; or any material aspect of its

performance, efficacy, nature, or central characteristics.

## III. INJUNCTION RELATING TO OBTAINING CUSTOMER FINANCIAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants and Corporate Defendants'

officers, agents, employees, and attorneys, and all other persons in active concert or participation

with any of them, who receive actual notice of this Order, whether acting directly or indirectly

are hereby permanently restrained and enjoined from:

A.    Obtaining or attempting to obtain customer information of a financial institution

(including bank account routing number, account number, log-in credentials, private keys, or

other cryptocurrency wallet information) from a consumer by making false, fictitious, or

fraudulent representations to any consumer or financial institution; or

B.    Violating the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809, §§ 6821-6827,

a copy of which is attached as **ATTACHMENT A.**

## IV. PROHIBITION AGAINST IMPROPER DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,

agents, employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Order, whether acting directly or indirectly, are

permanently restrained and enjoined from disclosing to any other person any Nonpublic Personal

Information about a consumer unless Corporate Defendants have obtained the consumer's

Express Informed Consent to disclose that Nonpublic Personal Information to that person.

## V. ORDERS OF BANKRUPTCY COURT

IT IS FURTHER ORDERED that this Order does not restrain or enjoin the deposit,

exchange, distribution, investment, or withdrawal of assets owned or held by the Debtor

Defendants and being administered in accordance with the United States Bankruptcy Code and orders of the court in the Bankruptcy Case. For the avoidance of doubt, Part VI.C-D, below, does not create a contingent liability against the Debtor Defendants and does not preclude the full distribution of assets held by the Debtor Defendants in the Bankruptcy Case.

## VI. JUDGMENT FOR MONETARY RELIEF AND ITS SUSPENSION

IT IS FURTHER ORDERED that:

A.     Judgment in the amount of $4,720,000,000 is entered in favor of the Commission against Corporate Defendants, jointly and severally, as monetary relief. The liability of Corporate Defendants shall be joint and several with any other Defendants to the extent subsequently ordered.

B.     The judgment is suspended as to Corporate Defendants subject to the subsections below.

C.     The suspension of the judgment as to the Non-Debtor Defendants is expressly premised upon the truthfulness, accuracy, and completeness of:

1.     The Financial Statement of Corporate Defendant Celsius Management Corp. signed on July 7, 2023, including attachments;

2.     The Financial Statement of Corporate Defendant Celsius US LLC signed on July 7, 2023, including attachments; and

3.     The Declaration of Christopher Ferraro signed on July 6, 2023, and sent by email from Corporate Debtors' counsel, Rich Cunningham, to Commission counsel Katherine Aizpuru on July 6, 2023.

D.     The suspension will be lifted as to Non-Debtor Defendants if, upon motion by the Commission or the Commission, the Court finds that a Non-Debtor Defendant failed to disclose

7

any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above. The suspension will be lifted as to Corporate Defendants if the Bankruptcy Case is closed, dismissed, or otherwise concluded, in each case, without the estate(s) being fully administered, including any distributions to creditors, in accordance with the Bankruptcy Code.

E.      If the suspension of the judgment is lifted, the judgment becomes immediately due as to Corporate Defendants in the amount specified in Subsection A above (which the parties stipulate only for purposes of this Section represents the consumer injury), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

## VII.   ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Corporate Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Corporate Defendants acknowledge that their Taxpayer Identification Numbers

(Social Security Numbers or Employer Identification Numbers), which Corporate Defendants

must submit to the Commission, may be used for collecting and reporting on any delinquent

amount arising out of this Order, in accordance with 31 U.S.C. §7701.

E.      Payment must be made by electronic fund transfer in accordance with instructions

provided by a representative of the Commission.

F.      All money received by the Commission pursuant to this Order may be deposited

into a fund administered by the Commission or its designee to be used for consumer relief, such

as redress and any attendant expenses for the administration of any redress fund.  If a

representative of the Commission decides that direct redress to consumers is wholly or partially

impracticable or money remains after such redress is completed, the Commission may apply any

remaining money for such related relief (including consumer information remedies) as it

determines to be reasonably related to Corporate Defendants' practices alleged in the Complaint.

Any money not used for relief is to be deposited to the U.S. Treasury.  Corporate Defendants

have no right to challenge any actions the Commission or its representatives may take pursuant

to this Subsection.

G.      The Debtor Defendants agree that the monetary judgment ordered by Section

VI.A is not dischargeable in the Bankruptcy Case.

H.      The Debtor Defendants will not object to allowance of the FTC claim in the

Bankruptcy Case as a general unsecured claim in the amount of $4,720,000,000.

## VIII.   CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,

agents, employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Order are permanently restrained and enjoined from directly or indirectly:

     A.       failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.  If a representative of the Commission requests in writing any information related to redress, Corporate Defendants must provide it, in the form prescribed by the Commission, within 14 days;

     B.       disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the marketing and sale of cryptocurrency services; and

     C.       failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## IX.    COOPERATION

IT IS FURTHER ORDERED that Corporate Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or occurrences that are the subject of the Complaint. Corporate Defendants must provide truthful and complete information, evidence, and testimony. Corporate Defendants must cause Corporate Defendants' officers, employees, representatives, or agents to appear for

interviews, discovery, hearings, trials, and any other proceedings that a Commission

representative may reasonably request upon 5 days' written notice, or other reasonable notice, at

such places and times as a Commission representative may designate, without the service of a

subpoena.

## X.     ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Corporate Defendants obtain acknowledgments of

receipt of this Order:

A.      Each Defendant, within 7 days of entry of this Order, must submit to the

Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, each Corporate Defendant must deliver a

copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2)

all employees having managerial responsibilities for conduct related to the subject matter of the

Order and all agents and representatives who participate in conduct related to the subject matter

of the Order; and (3) any business entity resulting from any change in structure as set forth in the

Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order

for current personnel.  For all others, delivery must occur before they assume their

responsibilities.

C.      From each individual or entity to which a Corporate Defendant delivered a copy

of this Order, that Corporate Defendant must obtain, within 30 days, a signed and dated

acknowledgment of receipt of this Order.

## XI.     COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Corporate Defendants make timely submissions to the

Commission:

A.      One year after entry of this Order, each Corporate Defendant must submit a

11

compliance report, sworn under penalty of perjury, that: (1) identifies the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Corporate Defendant; (2) identifies all of that Corporate Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (3) describes the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant; (4) describes in detail whether and how that Corporate Defendant is in compliance with each Section of this Order; and (5) provides a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.      For 20 years after entry of this Order, each Corporate Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following: (1) any designated point of contact; or (2) the structure of any Corporate Defendant or any entity that Corporate Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; *provided, however,* that Corporate Defendants need not submit a compliance notice associated with the administration of the Debtor Defendants' bankruptcy estates in the Bankruptcy Case.

C.      Each Corporate Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Corporate Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under

12

penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by

concluding:  "I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's

full name, title (if applicable), and signature.

     E.     Unless otherwise directed by a Commission representative in writing, all

submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement,

Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

Washington, DC  20580.  The subject line must begin:  FTC v. Celsius Network Inc., *et al.*, No.

2223137.

## XII.   RECORDKEEPING

     IT IS FURTHER ORDERED that Corporate Defendants must create certain records for

20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate

Defendants  must create and retain the following records:

     A.     accounting records showing the revenues from all goods or services sold;

     B.     personnel records showing, for each person providing services, whether as an

employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position;

dates of service; and (if applicable) the reason for termination;

     C.     records of all consumer complaints and refund requests, whether received directly

or indirectly, such as through a third party, and any response;

     D.     all records necessary to demonstrate full compliance with each provision of this

Order, including all submissions to the Commission; and

     E.     a copy of each unique advertisement or other marketing material.

# XIII.  COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Corporate Defendants'
compliance with this Order:

A.      Within 14 days of receipt of a written request from a representative of the
Commission, each Corporate Defendant must:  submit additional compliance reports or other
requested information, which must be sworn under penalty of perjury; appear for depositions;
and produce documents for inspection and copying.  The Commission is also authorized to
obtain discovery, without further leave of court, using any of the procedures prescribed by
Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45,
and 69.

B.      For matters concerning this Order, the Commission is authorized to communicate
directly with each Corporate Defendant.  Each Corporate Defendant must permit representatives
of the Commission to interview any employee or other person affiliated with any Corporate
Defendant who has agreed to such an interview.  The person interviewed may have counsel
present.

C.      The Commission may use all other lawful means, including posing, through its
representatives as consumers, suppliers, or other individuals or entities, to Corporate Defendants
or any individual or entity affiliated with Corporate Defendants, without the necessity of
identification or prior notice.  Nothing in this Order limits the Commission's lawful use of
compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIV.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this ___ day of _____, 2023.**

_____

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**  FEDERAL TRADE COMMISSION

*Katherine M. Aizpuru*                                Date: ___July 12, 2023___

Katherine M. Aizpuru
Stephanie E. Liebner
Katherine Worthman
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-876-5673
kaizpuru@ftc.gov;
sliebner@ftc.gov;
kworthman@ftc.gov

16

**FOR CORPORATE DEFENDANTS:** CELSIUS NETWORK INC.; CELSIUS NETWORK LLC; CELSIUS NETWORKS LENDING LLC; CELSIUS LENDING LLC; CELSIUS KEYFI LLC; CELSIUS MINING LLC; CELSIUS US HOLDING LLC; CELSIUS US LLC; and CELSIUS MANAGEMENT CORP.

_____    Date: _____

Richard H. Cunningham
Robert W. Allen
Hanaa Kaloti
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
202-389-5000
rich.cunningham@kirkland.com;
bob.allen@kirkland.com;
hanna.kaloti@kirkland.com

COUNSEL

_____    Date: _____

Christopher Ferraro, as an officer of Celsius
Network LLC, on behalf of Celsius Network
LLC and the other Corporate Defendants

17

# Attachment A

lines broker or agent, insurance consultant, limited insurance representative, and any other individual or entity that sells, solicits, or negotiates policies of insurance or offers advice, counsel, opinions or services related to insurance.

**(6) Insurer**

The term "insurer" has the meaning as in section 313(e)(2)(B) of title 31.

**(7) Principal place of business**

The term "principal place of business" means the State in which an insurance producer maintains the headquarters of the insurance producer and, in the case of a business entity, where high-level officers of the entity direct, control, and coordinate the business activities of the business entity.

**(8) Principal place of residence**

The term "principal place of residence" means the State in which an insurance producer resides for the greatest number of days during a calendar year.

**(9) State**

The term "State" includes any State, the District of Columbia, any territory of the United States, and Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.

**(10) State law**

**(A) In general**

The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State.

**(B) Laws applicable in the District of Columbia**

A law of the United States applicable only to or within the District of Columbia shall be treated as a State law rather than a law of the United States.

(Pub. L. 106–102, title III, §334, as added Pub. L. 114–1, title II, §202(a), Jan. 12, 2015, 129 Stat. 27.)

### Editorial Notes

#### PRIOR PROVISIONS

Provisions similar to this section were contained in section 6766 of this title, prior to the general amendment of this subchapter by Pub. L. 114–1.

A prior section 6764, Pub. L. 106–102, title III, §334, Nov. 12, 1999, 113 Stat. 1433, related to coordination with other regulators, prior to the general amendment of this subchapter by Pub. L. 114–1. See section 6761 of this title.

A prior section 6765, Pub. L. 106–102, title III, §335, Nov. 12, 1999, 113 Stat. 1433, which related to judicial review, was omitted in the general amendment of this subchapter by Pub. L. 114–1. See section 6762 of this title.

A prior section 6766, Pub. L. 106–102, title III, §336, Nov. 12, 1999, 113 Stat. 1433, which related to definitions, was omitted in the general amendment of this subchapter by Pub. L. 114–1.

## SUBCHAPTER IV—RENTAL CAR AGENCY INSURANCE ACTIVITIES

**§ 6781. Standard of regulation for motor vehicle rentals**

**(a) Protection against retroactive application of regulatory and legal action**

Except as provided in subsection (b), during the 3-year period beginning on November 12, 1999, it shall be a presumption that no State law imposes any licensing, appointment, or education requirements on any person who solicits the purchase of or sells insurance connected with, and incidental to, the lease or rental of a motor vehicle.

**(b) Preemptive of State insurance law**

No provision of this section shall be construed as altering the validity, interpretation, construction, or effect of—

(1) any State statute;

(2) the prospective application of any court judgment interpreting or applying any State statute; or

(3) the prospective application of any final State regulation, order, bulletin, or other statutorily authorized interpretation or action,

which, by its specific terms, expressly regulates or exempts from regulation any person who solicits the purchase of or sells insurance connected with, and incidental to, the short-term lease or rental of a motor vehicle.

**(c) Scope of application**

This section shall apply with respect to—

(1) the lease or rental of a motor vehicle for a total period of 90 consecutive days or less; and

(2) insurance which is provided in connection with, and incidentally to, such lease or rental for a period of consecutive days not exceeding the lease or rental period.

**(d) Motor vehicle defined**

For purposes of this section, the term "motor vehicle" has the same meaning as in section 13102 of title 49.

(Pub. L. 106–102, title III, §341, Nov. 12, 1999, 113 Stat. 1434.)

## CHAPTER 94—PRIVACY

### SUBCHAPTER I—DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

Sec.
6801.  Protection of nonpublic personal information.
6802.  Obligations with respect to disclosures of personal information.
6803.  Disclosure of institution privacy policy.
6804.  Rulemaking.
6805.  Enforcement.
6806.  Relation to other provisions.
6807.  Relation to State laws.
6808.  Study of information sharing among financial affiliates.
6809.  Definitions.

### SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

6821.  Privacy protection for customer information of financial institutions.
6822.  Administrative enforcement.

Sec.
6823.    Criminal penalty.
6824.    Relation to State laws.
6825.    Agency guidance.
6826.    Reports.
6827.    Definitions.

## SUBCHAPTER I—DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

### § 6801. Protection of nonpublic personal information

#### (a) Privacy obligation policy

It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.

#### (b) Financial institutions safeguards

In furtherance of the policy in subsection (a), each agency or authority described in section 6805(a) of this title, other than the Bureau of Consumer Financial Protection, shall establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical, and physical safeguards—

(1) to insure the security and confidentiality of customer records and information;

(2) to protect against any anticipated threats or hazards to the security or integrity of such records; and

(3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

(Pub. L. 106–102, title V, § 501, Nov. 12, 1999, 113 Stat. 1436; Pub. L. 111–203, title X, § 1093(1), July 21, 2010, 124 Stat. 2095.)

#### Editorial Notes

##### Amendments

2010—Subsec. (b). Pub. L. 111–203 inserted '', other than the Bureau of Consumer Financial Protection,'' after ''section 6805(a) of this title'' in introductory provisions.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

##### Effective Date

Pub. L. 106–102, title V, § 510, Nov. 12, 1999, 113 Stat. 1445, provided that: ''This subtitle [subtitle A (§§ 501–510) of title V of Pub. L. 106–102, enacting this subchapter and amending section 1681s of this title] shall take effect 6 months after the date on which rules are required to be prescribed under section 504(a)(3) [15 U.S.C. 6804(a)(3)], except—

''(1) to the extent that a later date is specified in the rules prescribed under section 504; and

''(2) that sections 504 [15 U.S.C. 6804] and 506 [enacting section 6806 of this title and amending section 1681s of this title] shall be effective upon enactment [Nov. 12, 1999].''

### § 6802. Obligations with respect to disclosures of personal information

#### (a) Notice requirements

Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title.

#### (b) Opt out

##### (1) In general

A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless—

(A) such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, that such information may be disclosed to such third party;

(B) the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

##### (2) Exception

This subsection shall not prevent a financial institution from providing nonpublic personal information to a nonaffiliated third party to perform services for or functions on behalf of the financial institution, including marketing of the financial institution's own products or services, or financial products or services offered pursuant to joint agreements between two or more financial institutions that comply with the requirements imposed by the regulations prescribed under section 6804 of this title, if the financial institution fully discloses the providing of such information and enters into a contractual agreement with the third party that requires the third party to maintain the confidentiality of such information.

#### (c) Limits on reuse of information

Except as otherwise provided in this subchapter, a nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not, directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, unless such disclosure would be lawful if made directly to such other person by the financial institution.

#### (d) Limitations on the sharing of account number information for marketing purposes

A financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other

marketing through electronic mail to the consumer.

**(e) General exceptions**

Subsections (a) and (b) shall not prohibit the disclosure of nonpublic personal information—

(1) as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with—

(A) servicing or processing a financial product or service requested or authorized by the consumer;

(B) maintaining or servicing the consumer's account with the financial institution, or with another entity as part of a private label credit card program or other extension of credit on behalf of such entity; or

(C) a proposed or actual securitization, secondary market sale (including sales of servicing rights), or similar transaction related to a transaction of the consumer;

(2) with the consent or at the direction of the consumer;

(3)(A) to protect the confidentiality or security of the financial institution's records pertaining to the consumer, the service or product, or the transaction therein; (B) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability; (C) for required institutional risk control, or for resolving customer disputes or inquiries; (D) to persons holding a legal or beneficial interest relating to the consumer; or (E) to persons acting in a fiduciary or representative capacity on behalf of the consumer;

(4) to provide information to insurance rate advisory organizations, guaranty funds or agencies, applicable rating agencies of the financial institution, persons assessing the institution's compliance with industry standards, and the institution's attorneys, accountants, and auditors;

(5) to the extent specifically permitted or required under other provisions of law and in accordance with the Right to Financial Privacy Act of 1978 [12 U.S.C. 3401 et seq.], to law enforcement agencies (including the Bureau of Consumer Financial Protection[1] a Federal functional regulator, the Secretary of the Treasury with respect to subchapter II of chapter 53 of title 31, and chapter 2 of title I of Public Law 91–508 (12 U.S.C. 1951–1959), a State insurance authority, or the Federal Trade Commission), self-regulatory organizations, or for an investigation on a matter related to public safety;

(6)(A) to a consumer reporting agency in accordance with the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], or (B) from a consumer report reported by a consumer reporting agency;

(7) in connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit if the disclosure of nonpublic personal information concerns solely consumers of such business or unit; or

(8) to comply with Federal, State, or local laws, rules, and other applicable legal require-

ments; to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

(Pub. L. 106–102, title V, § 502, Nov. 12, 1999, 113 Stat. 1437; Pub. L. 111–203, title X, § 1093(2), July 21, 2010, 124 Stat. 2095.)

### Editorial Notes

#### REFERENCES IN TEXT

This subchapter, referred to in subsecs. (a) and (c), was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Right to Financial Privacy Act of 1978, referred to in subsec. (e)(5), is title XI of Pub. L. 95–630, Nov. 10, 1978, 92 Stat. 3697, which is classified generally to chapter 35 (§ 3401 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 3401 of Title 12 and Tables.

Chapter 2 of title I of Public Law 91–508, referred to in subsec. (e)(5), is chapter 2 (§§ 121–129) of title I of Pub. L. 91–508, Oct. 26, 1970, 84 Stat. 1116, which is classified generally to chapter 21 (§ 1951 et seq.) of Title 12, Banks and Banking. For complete classification of chapter 2 to the Code, see Tables.

The Fair Credit Reporting Act, referred to in subsec. (e)(6)(A), is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

#### AMENDMENTS

2010—Subsec. (e)(5). Pub. L. 111–203 inserted "the Bureau of Consumer Financial Protection" after "(including".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6803. Disclosure of institution privacy policy

**(a) Disclosure required**

At the time of establishing a customer relationship with a consumer and not less than annually during the continuation of such relationship, a financial institution shall provide a clear and conspicuous disclosure to such consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, of such financial institution's policies and practices with respect to—

(1) disclosing nonpublic personal information to affiliates and nonaffiliated third parties, consistent with section 6802 of this title, including the categories of information that may be disclosed;

(2) disclosing nonpublic personal information of persons who have ceased to be customers of the financial institution; and

---

[1] So in original. Probably should be followed by a comma.

(3) protecting the nonpublic personal information of consumers.

**(b) Regulations**

Disclosures required by subsection (a) shall be made in accordance with the regulations prescribed under section 6804 of this title.

**(c) Information to be included**

The disclosure required by subsection (a) shall include—

(1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties, other than agents of the institution, consistent with section 6802 of this title, and including—

(A) the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided pursuant to section 6802(e) of this title; and

(B) the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution;

(2) the categories of nonpublic personal information that are collected by the financial institution;

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information in accordance with section 6801 of this title; and

(4) the disclosures required, if any, under section 1681a(d)(2)(A)(iii) of this title.

**(d) Exemption for certified public accountants**

**(1) In general**

The disclosure requirements of subsection (a) do not apply to any person, to the extent that the person is—

(A) a certified public accountant;

(B) certified or licensed for such purpose by a State; and

(C) subject to any provision of law, rule, or regulation issued by a legislative or regulatory body of the State, including rules of professional conduct or ethics, that prohibits disclosure of nonpublic personal information without the knowing and expressed consent of the consumer.

**(2) Limitation**

Nothing in this subsection shall be construed to exempt or otherwise exclude any financial institution that is affiliated or becomes affiliated with a certified public accountant described in paragraph (1) from any provision of this section.

**(3) Definitions**

For purposes of this subsection, the term "State" means any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, or the Northern Mariana Islands.

**(e) Model forms**

**(1) In general**

The agencies referred to in section 6804(a)(1) of this title shall jointly develop a model form

which may be used, at the option of the financial institution, for the provision of disclosures under this section.

**(2) Format**

A model form developed under paragraph (1) shall—

(A) be comprehensible to consumers, with a clear format and design;

(B) provide for clear and conspicuous disclosures;

(C) enable consumers easily to identify the sharing practices of a financial institution and to compare privacy practices among financial institutions; and

(D) be succinct, and use an easily readable type font.

**(3) Timing**

A model form required to be developed by this subsection shall be issued in proposed form for public comment not later than 180 days after October 13, 2006.

**(4) Safe harbor**

Any financial institution that elects to provide the model form developed by the agencies under this subsection shall be deemed to be in compliance with the disclosures required under this section.

**(f) Exception to annual notice requirement**

A financial institution that—

(1) provides nonpublic personal information only in accordance with the provisions of subsection (b)(2) or (e) of section 6802 of this title or regulations prescribed under section 6804(b) of this title, and

(2) has not changed its policies and practices with regard to disclosing nonpublic personal information from the policies and practices that were disclosed in the most recent disclosure sent to consumers in accordance with this section,

shall not be required to provide an annual disclosure under this section until such time as the financial institution fails to comply with any criteria described in paragraph (1) or (2).

(Pub. L. 106–102, title V, §503, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 109–351, title VI, §609, title VII, §728, Oct. 13, 2006, 120 Stat. 1983, 2003; Pub. L. 114–94, div. G, title LXXV, §75001, Dec. 4, 2015, 129 Stat. 1787.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (f). Pub. L. 114–94 added subsec. (f).
2006—Pub. L. 109–351 designated concluding provisions of subsec. (a) as (b), inserted heading, substituted "Disclosures required by subsection (a)" for "Such disclosures", redesignated former subsec. (b) as (c), and added subsecs. (d) and (e).

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## § 6804. Rulemaking

### (a) Regulatory authority

#### (1) Rulemaking

##### (A) In general

Except as provided in subparagraph (C), the Bureau of Consumer Financial Protection and the Securities and Exchange Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to their respective jurisdiction under section 6805 of this title (and notwithstanding subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]), except that the Bureau of Consumer Financial Protection shall not have authority to prescribe regulations with respect to the standards under section 6801 of this title.

##### (B) CFTC

The Commodity Futures Trading Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to the jurisdiction of the Commodity Futures Trading Commission under section 7b–2 of title 7.

##### (C) Federal Trade Commission authority

Notwithstanding the authority of the Bureau of Consumer Financial Protection under subparagraph (A), the Federal Trade Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to any financial institution that is a person described in section 1029(a) of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5519(a)].

##### (D) Rule of construction

Nothing in this paragraph shall be construed to alter, affect, or otherwise limit the authority of a State insurance authority to adopt regulations to carry out this subchapter.

#### (2) Coordination, consistency, and comparability

Each of the agencies authorized under paragraph (1) to prescribe regulations shall consult and coordinate with the other such agencies and, as appropriate, and with[1] representatives of State insurance authorities designated by the National Association of Insurance Commissioners, for the purpose of assuring, to the extent possible, that the regulations prescribed by each such agency are consistent and comparable with the regulations prescribed by the other such agencies.

#### (3) Procedures and deadline

Such regulations shall be prescribed in accordance with applicable requirements of title 5.

### (b) Authority to grant exceptions

The regulations prescribed under subsection (a) may include such additional exceptions to subsections (a) through (d) of section 6802 of this title as are deemed consistent with the purposes of this subchapter.

(Pub. L. 106–102, title V, § 504, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 111–203, title X, § 1093(3), July 21, 2010, 124 Stat. 2095.)

#### EDITORIAL NOTES

##### REFERENCES IN TEXT

This subchapter, referred to in subsecs. (a)(1) and (b), was in the original ''this subtitle'', meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Consumer Financial Protection Act of 2010, referred to in subsec. (a)(1)(A), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitle B (§§ 1021–1029A) of the Act is classified generally to part B (§ 5511 et seq.) of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitle B to the Code, see Tables.

##### AMENDMENTS

2010—Subsec. (a)(1), (2). Pub. L. 111–203, § 1093(3)(A), added pars. (1) and (2) and struck out former pars. (1) and (2) which related, respectively, to rulemaking by the Federal banking agencies, the National Credit Union Administration, the Secretary of the Treasury, the Securities and Exchange Commission, and the Federal Trade Commission, and consultation and coordination among these agencies and authorities to assure consistency and comparability of regulations.

Subsec. (a)(3). Pub. L. 111–203, § 1093(3)(B), struck out ''and shall be issued in final form not later than 6 months after November 12, 1999'' after ''title 5''.

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6805. Enforcement

### (a) In general

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:

(1) Under section 1818 of title 12, by the appropriate Federal banking agency, as defined in section 1813(q) of title 12, in the case of—

(A) national banks, Federal branches and Federal agencies of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agen-

---

[1] So in original. Probably should be ''and, as appropriate, with''.

cies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], and bank holding companies and their nonbank subsidiaries or affiliates (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), insured State branches of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers); and

(D) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, and any subsidiaries of such savings associations (except brokers, dealers, persons providing insurance, investment companies, and investment advisers).

(2) Under the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Board of the National Credit Union Administration with respect to any federally insured credit union, and any subsidiaries of such an entity.

(3) Under the Securities Exchange Act of 1934 [15 U.S.C. 78a et seq.], by the Securities and Exchange Commission with respect to any broker or dealer.

(4) Under the Investment Company Act of 1940 [15 U.S.C. 80a–1 et seq.], by the Securities and Exchange Commission with respect to investment companies.

(5) Under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.], by the Securities and Exchange Commission with respect to investment advisers registered with the Commission under such Act.

(6) Under State insurance law, in the case of any person engaged in providing insurance, by the applicable State insurance authority of the State in which the person is domiciled, subject to section 6701 of this title.

(7) Under the Federal Trade Commission Act [15 U.S.C. 41 et seq.], by the Federal Trade Commission for any other financial institution or other person that is not subject to the jurisdiction of any agency or authority under paragraphs (1) through (6) of this subsection.

(8) Under subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau of Consumer Financial Protection, in the case of any financial institution and other covered person or service provider that is subject to the jurisdiction of the Bureau and any person subject to this subchapter, but not with respect to the standards under section 6801 of this title.

**(b) Enforcement of section 6801**

**(1) In general**

Except as provided in paragraph (2), the agencies and authorities described in subsection (a), other than the Bureau of Consumer Financial Protection, shall implement the standards prescribed under section 6801(b) of this title in the same manner, to the extent practicable, as standards prescribed pursuant to section 1831p–1(a) of title 12 are implemented pursuant to such section.

**(2) Exception**

The agencies and authorities described in paragraphs (3), (4), (5), (6), and (7) of subsection (a) shall implement the standards prescribed under section 6801(b) of this title by rule with respect to the financial institutions and other persons subject to their respective jurisdictions under subsection (a).

**(c) Absence of State action**

If a State insurance authority fails to adopt regulations to carry out this subchapter, such State shall not be eligible to override, pursuant to section 1831x(g)(2)(B)(iii) of title 12, the insurance customer protection regulations prescribed by a Federal banking agency under section 1831x(a) of title 12.

**(d) Definitions**

The terms used in subsection (a)(1) that are not defined in this subchapter or otherwise defined in section 1813(s) of title 12 shall have the same meaning as given in section 3101 of title 12.

(Pub. L. 106–102, title V, §505, Nov. 12, 1999, 113 Stat. 1440; Pub. L. 111–203, title X, §1093(4), (5), July 21, 2010, 124 Stat. 2096, 2097.)

### Editorial Notes

#### REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsec. (a), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitles B (§§1021–1029A) and E (§§1051–1058) of the Act are classified generally to parts B (§5511 et seq.) and E (§5561 et seq.), respectively, of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitles B and E to the Code, see Tables.

This subchapter, referred to in subsecs. (a), (c), and (d), was in the original "this subtitle", meaning subtitle A (§§501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (a)(1)(B), is classified to subchapter I (§601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (a)(2), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (a)(3), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§78a et seq.) of this title. For complete classification of this Act to the Code, see section 78a of this title and Tables.

The Investment Company Act of 1940, referred to in subsec. (a)(4), is title I of act Aug. 22, 1940, ch. 686, 54 Stat. 789, which is classified generally to subchapter I (§80a–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80a–51 of this title and Tables.

The Investment Advisers Act of 1940, referred to in subsec. (a)(5), is title II of act Aug. 22, 1940, ch. 686, 54 Stat. 847, which is classified generally to subchapter II (§80b–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80b–20 of this title and Tables.

The Federal Trade Commission Act, referred to in subsec. (a)(7), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§ 41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

AMENDMENTS

2010—Subsec. (a). Pub. L. 111–203, § 1093(4)(A), substituted "Subject to subtitle B of the Consumer Financial Protection Act of 2010, this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:" for "This subchapter and the regulations prescribed thereunder shall be enforced by the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:".

Subsec. (a)(1). Pub. L. 111–203, § 1093(4)(B)(i), inserted "by the appropriate Federal banking agency, as defined in section 1813(q) of title 12," before "in the case of—".

Subsec. (a)(1)(A). Pub. L. 111–203, § 1093(4)(B)(ii), struck out ", by the Office of the Comptroller of the Currency" before semicolon at end.

Subsec. (a)(1)(B). Pub. L. 111–203, § 1093(4)(B)(iii), struck out ", by the Board of Governors of the Federal Reserve System" before semicolon at end.

Subsec. (a)(1)(C). Pub. L. 111–203, § 1093(4)(B)(iv), struck out ", by the Board of Directors of the Federal Deposit Insurance Corporation" before "; and".

Subsec. (a)(1)(D). Pub. L. 111–203, § 1093(4)(B)(v), struck out ", by the Director of the Office of Thrift Supervision" before period at end.

Subsec. (a)(8). Pub. L. 111–203, § 1093(4)(C), added par. (8).

Subsec. (b)(1). Pub. L. 111–203, § 1093(5), inserted ", other than the Bureau of Consumer Financial Protection," before "shall implement the standards".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6806. Relation to other provisions

Except for the amendments made by subsections (a) and (b), nothing in this chapter shall be construed to modify, limit, or supersede the operation of the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], and no inference shall be drawn on the basis of the provisions of this chapter regarding whether information is transaction or experience information under section 603 of such Act [15 U.S.C. 1681a].

(Pub. L. 106–102, title V, § 506(c), Nov. 12, 1999, 113 Stat. 1442.)

**Editorial Notes**

REFERENCES IN TEXT

Amendments made by subsections (a) and (b), referred to in text, means amendments made by section 506(a) and (b) of Pub. L. 106–102, which amended section 1681s of this title.

This chapter, referred to in text, was in the original "this title", meaning title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, as amended, which enacted this chapter and amended section 1681s of this title. For

complete classification of title V to the Code, see Tables.

The Fair Credit Reporting Act, referred to in text, is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, as amended, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

## § 6807. Relation to State laws

### (a) In general

This subchapter and the amendments made by this subchapter shall not be construed as superseding, altering, or affecting any statute, regulation, order, or interpretation in effect in any State, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter and the amendments made by this subchapter, as determined by the Bureau of Consumer Financial Protection, after consultation with the agency or authority with jurisdiction under section 6805(a) of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, § 507, Nov. 12, 1999, 113 Stat. 1442; Pub. L. 111–203, title X, § 1093(6), July 21, 2010, 124 Stat. 2097.)

**Editorial Notes**

REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 substituted "Bureau of Consumer Financial Protection" for "Federal Trade Commission".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6808. Study of information sharing among financial affiliates

### (a) In general

The Secretary of the Treasury, in conjunction with the Federal functional regulators and the Federal Trade Commission, shall conduct a study of information sharing practices among financial institutions and their affiliates. Such study shall include—

(1) the purposes for the sharing of confidential customer information with affiliates or with nonaffiliated third parties;

(2) the extent and adequacy of security protections for such information;

(3) the potential risks for customer privacy of such sharing of information;

(4) the potential benefits for financial institutions and affiliates of such sharing of information;

(5) the potential benefits for customers of such sharing of information;

(6) the adequacy of existing laws to protect customer privacy;

(7) the adequacy of financial institution privacy policy and privacy rights disclosure under existing law;

(8) the feasibility of different approaches, including opt-out and opt-in, to permit customers to direct that confidential information not be shared with affiliates and nonaffiliated third parties; and

(9) the feasibility of restricting sharing of information for specific uses or of permitting customers to direct the uses for which information may be shared.

**(b) Consultation**

The Secretary shall consult with representatives of State insurance authorities designated by the National Association of Insurance Commissioners, and also with financial services industry, consumer organizations and privacy groups, and other representatives of the general public, in formulating and conducting the study required by subsection (a).

**(c) Report**

On or before January 1, 2002, the Secretary shall submit a report to the Congress containing the findings and conclusions of the study required under subsection (a), together with such recommendations for legislative or administrative action as may be appropriate.

(Pub. L. 106–102, title V, §508, Nov. 12, 1999, 113 Stat. 1442.)

## § 6809. Definitions

As used in this subchapter:

**(1) Federal banking agency**

The term "Federal banking agency" has the same meaning as given in section 1813 of title 12.

**(2) Federal functional regulator**

The term "Federal functional regulator" means—

(A) the Board of Governors of the Federal Reserve System;

(B) the Office of the Comptroller of the Currency;

(C) the Board of Directors of the Federal Deposit Insurance Corporation;

(D) the Director of the Office of Thrift Supervision;

(E) the National Credit Union Administration Board; and

(F) the Securities and Exchange Commission.

**(3) Financial institution**

**(A) In general**

The term "financial institution" means any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12.

**(B) Persons subject to CFTC regulation**

Notwithstanding subparagraph (A), the term "financial institution" does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.].

**(C) Farm credit institutions**

Notwithstanding subparagraph (A), the term "financial institution" does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(D) Other secondary market institutions**

Notwithstanding subparagraph (A), the term "financial institution" does not include institutions chartered by Congress specifically to engage in transactions described in section 6802(e)(1)(C) of this title, as long as such institutions do not sell or transfer nonpublic personal information to a nonaffiliated third party.

**(4) Nonpublic personal information**

(A) The term "nonpublic personal information" means personally identifiable financial information—

(i) provided by a consumer to a financial institution;

(ii) resulting from any transaction with the consumer or any service performed for the consumer; or

(iii) otherwise obtained by the financial institution.

(B) Such term does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title.

(C) Notwithstanding subparagraph (B), such term—

(i) shall include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information; but

(ii) shall not include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived without using any nonpublic personal information.

**(5) Nonaffiliated third party**

The term "nonaffiliated third party" means any entity that is not an affiliate of, or related by common ownership or affiliated by corporate control with, the financial institution, but does not include a joint employee of such institution.

**(6) Affiliate**

The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

**(7) Necessary to effect, administer, or enforce**

The term "as necessary to effect, administer, or enforce the transaction" means—

(A) the disclosure is required, or is a usual, appropriate, or acceptable method, to carry out the transaction or the product or service business of which the transaction is a part, and record or service or maintain the consumer's account in the ordinary course of providing the financial service or financial product, or to administer or service benefits or claims relating to the transaction or the product or service business of which it is a part, and includes—

(i) providing the consumer or the consumer's agent or broker with a confirmation, statement, or other record of the transaction, or information on the status or value of the financial service or financial product; and

(ii) the accrual or recognition of incentives or bonuses associated with the transaction that are provided by the financial institution or any other party;

(B) the disclosure is required, or is one of the lawful or appropriate methods, to enforce the rights of the financial institution or of other persons engaged in carrying out the financial transaction, or providing the product or service;

(C) the disclosure is required, or is a usual, appropriate, or acceptable method, for insurance underwriting at the consumer's request or for reinsurance purposes, or for any of the following purposes as they relate to a consumer's insurance: Account administration, reporting, investigating, or preventing fraud or material misrepresentation, processing premium payments, processing insurance claims, administering insurance benefits (including utilization review activities), participating in research projects, or as otherwise required or specifically permitted by Federal or State law; or

(D) the disclosure is required, or is a usual, appropriate, or acceptable method, in connection with—

(i) the authorization, settlement, billing, processing, clearing, transferring, reconciling, or collection of amounts charged, debited, or otherwise paid using a debit, credit or other payment card, check, or account number, or by other payment means;

(ii) the transfer of receivables, accounts or interests therein; or

(iii) the audit of debit, credit or other payment information.

**(8) State insurance authority**

The term "State insurance authority" means, in the case of any person engaged in providing insurance, the State insurance authority of the State in which the person is domiciled.

**(9) Consumer**

The term "consumer" means an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes, and also means the legal representative of such an individual.

**(10) Joint agreement**

The term "joint agreement" means a formal written contract pursuant to which two or more financial institutions jointly offer, endorse, or sponsor a financial product or service, and as may be further defined in the regulations prescribed under section 6804 of this title.

**(11) Customer relationship**

The term "time of establishing a customer relationship" shall be defined by the regulations prescribed under section 6804 of this title, and shall, in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer.

(Pub. L. 106–102, title V, § 509, Nov. 12, 1999, 113 Stat. 1443.)

### Editorial Notes

#### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Commodity Exchange Act, referred to in par. (3)(B), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (3)(C), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

## SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

### § 6821. Privacy protection for customer information of financial institutions

#### (a) Prohibition on obtaining customer information by false pretenses

It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person—

(1) by making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution;

(2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or

(3) by providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

#### (b) Prohibition on solicitation of a person to obtain customer information from financial institution under false pretenses

It shall be a violation of this subchapter to request a person to obtain customer information

of a financial institution, knowing that the person will obtain, or attempt to obtain, the information from the institution in any manner described in subsection (a).

### (c) Nonapplicability to law enforcement agencies

No provision of this section shall be construed so as to prevent any action by a law enforcement agency, or any officer, employee, or agent of such agency, to obtain customer information of a financial institution in connection with the performance of the official duties of the agency.

### (d) Nonapplicability to financial institutions in certain cases

No provision of this section shall be construed so as to prevent any financial institution, or any officer, employee, or agent of a financial institution, from obtaining customer information of such financial institution in the course of—

(1) testing the security procedures or systems of such institution for maintaining the confidentiality of customer information;

(2) investigating allegations of misconduct or negligence on the part of any officer, employee, or agent of the financial institution; or

(3) recovering customer information of the financial institution which was obtained or received by another person in any manner described in subsection (a) or (b).

### (e) Nonapplicability to insurance institutions for investigation of insurance fraud

No provision of this section shall be construed so as to prevent any insurance institution, or any officer, employee, or agency of an insurance institution, from obtaining information as part of an insurance investigation into criminal activity, fraud, material misrepresentation, or material nondisclosure that is authorized for such institution under State law, regulation, interpretation, or order.

### (f) Nonapplicability to certain types of customer information of financial institutions

No provision of this section shall be construed so as to prevent any person from obtaining customer information of a financial institution that otherwise is available as a public record filed pursuant to the securities laws (as defined in section 78c(a)(47) of this title).

### (g) Nonapplicability to collection of child support judgments

No provision of this section shall be construed to prevent any State-licensed private investigator, or any officer, employee, or agent of such private investigator, from obtaining customer information of a financial institution, to the extent reasonably necessary to collect child support from a person adjudged to have been delinquent in his or her obligations by a Federal or State court, and to the extent that such action by a State-licensed private investigator is not unlawful under any other Federal or State law or regulation, and has been authorized by an order or judgment of a court of competent jurisdiction.

(Pub. L. 106–102, title V, §521, Nov. 12, 1999, 113 Stat. 1446.)

## §6822. Administrative enforcement

### (a) Enforcement by Federal Trade Commission

Except as provided in subsection (b), compliance with this subchapter shall be enforced by the Federal Trade Commission in the same manner and with the same power and authority as the Commission has under the Fair Debt Collection Practices Act [15 U.S.C. 1692 et seq.] to enforce compliance with such Act.

### (b) Enforcement by other agencies in certain cases

#### (1) In general

Compliance with this subchapter shall be enforced under—

(A) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], in the case of—

(i) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

(ii) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], by the Board;

(iii) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System and national nonmember banks) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation; and

(iv) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, by the Director of the Office of Thrift Supervision; and

(B) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union.

#### (2) Violations of this subchapter treated as violations of other laws

For the purpose of the exercise by any agency referred to in paragraph (1) of its powers under any Act referred to in that paragraph, a violation of this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in paragraph (1), each of the agencies referred to in that paragraph may exercise, for the purpose of enforcing compliance with this subchapter, any other authority conferred on such agency by law.

(Pub. L. 106–102, title V, §522, Nov. 12, 1999, 113 Stat. 1447.)

### Editorial Notes

#### REFERENCES IN TEXT

The Fair Debt Collection Practices Act, referred to in subsec. (a), is title VIII of Pub. L. 90–321, as added by

Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874, as amended, which is classified generally to subchapter V (§1692 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (b)(1)(A)(ii), is classified to subchapter I (§601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (b)(1)(B), is act June 26, 1934, ch. 750, 48 Stat. 1216, as amended, which is classified generally to chapter 14 (§1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

### Statutory Notes and Related Subsidiaries

#### Transfer of Functions

Functions vested in Administrator of National Credit Union Administration transferred and vested in National Credit Union Administration Board pursuant to section 1752a of Title 12, Banks and Banking.

## § 6823. Criminal penalty

### (a) In general

Whoever knowingly and intentionally violates, or knowingly and intentionally attempts to violate, section 6821 of this title shall be fined in accordance with title 18 or imprisoned for not more than 5 years, or both.

### (b) Enhanced penalty for aggravated cases

Whoever violates, or attempts to violate, section 6821 of this title while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3) (as the case may be) of section 3571 of title 18, imprisoned for not more than 10 years, or both.

(Pub. L. 106–102, title V, §523, Nov. 12, 1999, 113 Stat. 1448.)

## § 6824. Relation to State laws

### (a) In general

This subchapter shall not be construed as superseding, altering, or affecting the statutes, regulations, orders, or interpretations in effect in any State, except to the extent that such statutes, regulations, orders, or interpretations are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter as determined by the Federal Trade Commission, after consultation with the agency or authority with jurisdiction under section 6822 of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, §524, Nov. 12, 1999, 113 Stat. 1448.)

## § 6825. Agency guidance

In furtherance of the objectives of this subchapter, each Federal banking agency (as defined in section 1813(z) of title 12), the National Credit Union Administration, and the Securities and Exchange Commission or self-regulatory organizations, as appropriate, shall review regulations and guidelines applicable to financial institutions under their respective jurisdictions and shall prescribe such revisions to such regulations and guidelines as may be necessary to ensure that such financial institutions have policies, procedures, and controls in place to prevent the unauthorized disclosure of customer financial information and to deter and detect activities proscribed under section 6821 of this title.

(Pub. L. 106–102, title V, §525, Nov. 12, 1999, 113 Stat. 1448.)

## § 6826. Reports

### (a) Report to the Congress

Before the end of the 18-month period beginning on November 12, 1999, the Comptroller General, in consultation with the Federal Trade Commission, Federal banking agencies, the National Credit Union Administration, the Securities and Exchange Commission, appropriate Federal law enforcement agencies, and appropriate State insurance regulators, shall submit to the Congress a report on the following:

(1) The efficacy and adequacy of the remedies provided in this subchapter in addressing attempts to obtain financial information by fraudulent means or by false pretenses.

(2) Any recommendations for additional legislative or regulatory action to address threats to the privacy of financial information created by attempts to obtain information by fraudulent means or false pretenses.

### (b) Annual report by administering agencies

The Federal Trade Commission and the Attorney General shall submit to Congress an annual report on number and disposition of all enforcement actions taken pursuant to this subchapter.

(Pub. L. 106–102, title V, §526, Nov. 12, 1999, 113 Stat. 1448.)

## § 6827. Definitions

For purposes of this subchapter, the following definitions shall apply:

### (1) Customer

The term ''customer'' means, with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary.

### (2) Customer information of a financial institution

The term ''customer information of a financial institution'' means any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer.

**(3) Document**

The term ''document'' means any information in any form.

**(4) Financial institution**

**(A) In general**

The term ''financial institution'' means any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution.

**(B) Certain financial institutions specifically included**

The term ''financial institution'' includes any depository institution (as defined in section 461(b)(1)(A) of title 12), any broker or dealer, any investment adviser or investment company, any insurance company, any loan or finance company, any credit card issuer or operator of a credit card system, and any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis (as defined in section 1681a(p) of this title).

**(C) Securities institutions**

For purposes of subparagraph (B)—

(i) the terms ''broker'' and ''dealer'' have the same meanings as given in section 78c of this title;

(ii) the term ''investment adviser'' has the same meaning as given in section 80b–2(a)(11) of this title; and

(iii) the term ''investment company'' has the same meaning as given in section 80a–3 of this title.

**(D) Certain persons and entities specifically excluded**

The term ''financial institution'' does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.] and does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(E) Further definition by regulation**

The Federal Trade Commission, after consultation with Federal banking agencies and the Securities and Exchange Commission, may prescribe regulations clarifying or describing the types of institutions which shall be treated as financial institutions for purposes of this subchapter.

(Pub. L. 106–102, title V, § 527, Nov. 12, 1999, 113 Stat. 1449.)

---

**Editorial Notes**

REFERENCES IN TEXT

The Commodity Exchange Act, referred to in par. (4)(D), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (4)(D), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

## CHAPTER 95—MICROENTERPRISE TECHNICAL ASSISTANCE AND CAPACITY BUILDING PROGRAM

Sec.
6901.    Definitions.
6902.    Establishment of program.
6903.    Uses of assistance.
6904.    Qualified organizations.
6905.    Allocation of assistance; subgrants.
6906.    Matching requirements.
6907.    Applications for assistance.
6908.    Recordkeeping.
6909.    Authorization.
6910.    Implementation.

**§ 6901. Definitions**

For purposes of this chapter, the following definitions shall apply:

**(1) Administration**

The term ''Administration'' means the Small Business Administration.

**(2) Administrator**

The term ''Administrator'' means the Administrator of the Small Business Administration.

**(3) Capacity building services**

The term ''capacity building services'' means services provided to an organization that is, or that is in the process of becoming, a microenterprise development organization or program, for the purpose of enhancing its ability to provide training and services to disadvantaged entrepreneurs.

**(4) Collaborative**

The term ''collaborative'' means 2 or more nonprofit entities that agree to act jointly as a qualified organization under this chapter.

**(5) Disadvantaged entrepreneur**

The term ''disadvantaged entrepreneur'' means a microentrepreneur that is—

(A) a low-income person;

(B) a very low-income person; or

(C) an entrepreneur that lacks adequate access to capital or other resources essential for business success, or is economically disadvantaged, as determined by the Administrator.

**(6) Indian tribe**

The term ''Indian tribe'' has the meaning given the term in section 4702 of title 12.

**(7) Intermediary**

The term ''intermediary'' means a private, nonprofit entity that seeks to serve microenterprise development organizations and programs as authorized under section 6904 of this title.

**(8) Low-income person**

The term ''low-income person'' has the meaning given the term in section 4702 of title 12.

## Exhibit D-3

**FTC Joint Motion**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

CELSIUS NETWORK INC., et al.,

     Defendants.

**Case No. 1:23-cv-6009**

## JOINT MOTION FOR STAY AS TO CORPORATE DEFENDANTS

Plaintiff Federal Trade Commission ("FTC" or "Commission") and Defendants Celsius

Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC,

Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, and

Celsius Management Corp. (collectively, "Corporate Defendants," and together with the FTC,

the "Parties"), by and through undersigned counsel, have reached an agreement resolving this

matter vis-à-vis the Corporate Defendants.  As a result, the Parties respectfully move this Court

to stay this action as to the Corporate Defendants for 45 days or until they obtain Bankruptcy

Court approval of the settlement agreement between them, whichever is earlier. Should the

Bankruptcy Court approve the settlement within 45 days, the FTC and Corporate Defendants will

file a separate motion in this Court seeking entry of the Stipulated Order for Permanent

Injunction, Monetary Judgment, and Other Relief ("Stipulated Order", attached as **EXHIBIT A**).

### BACKGROUND

On July 13, 2023, the FTC filed a Complaint pursuant to Sections 13(b) and 19 of the

Federal Trade Commission Act, 15 U.S.C. § 53(b) and 57b, and the Gramm-Leach-Bliley Act,

15 U.S.C. §§ 6821 *et seq.*, alleging that the Defendants engaged in unfair and deceptive business

practices in violation of the FTC Act; and violated the GLB Act by using false, fraudulent, or fictitious statements to obtaining, or attempting to obtain, consumers' financial information. The FTC seeks a permanent injunction to prevent continuation of the conduct at issue and to prevent similar and related conduct in the future, as well as monetary redress. The Corporate Defendants have reached a settlement with the FTC, as set forth in the Stipulated Order.

Seven of the nine Corporate Defendants[1] filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code on July 13, 2022. The cases are being jointly administered under *In re Celsius Network LLC*, No. 22-10964(MG) (Bankr. S.D.N.Y.).

## ARGUMENT

The Corporate Defendants have reached a settlement with the FTC that will resolve this litigation as to the Corporate Defendants. However, because seven of the Corporate Defendants are in bankruptcy proceedings, those Corporate Defendants must obtain approval of the settlement by the Bankruptcy Court under Bankruptcy Rule 9019. The Corporate Defendants and the FTC intend to file a joint motion or stipulation in the Bankruptcy Court by no later than July 21, 2023, seeking approval of the Stipulated Order as to the Corporate Defendants with active bankruptcy proceedings.

To allow the Bankruptcy Court time to consider the motion and, in its discretion, hold a hearing, the FTC and the Corporate Defendants request that the Court stay this action as to the Corporate Defendants for 45 days or until the Bankruptcy Court approves the Stipulated Order, whichever is earlier. Should the Bankruptcy Court approve the settlement within 45 days, the FTC and Corporate Defendants will file a separate motion seeking entry of the Stipulated Order

---

[1] The Corporate Defendants that filed for bankruptcy are Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC.

2

by this Court.


Dated: July 13, 2023

Respectfully submitted,

**FOR PLAINTIFF:** FEDERAL TRADE COMMISSION

 _/s/ Katherine M. Aizpuru_____
Katherine M. Aizpuru
Stephanie E. Liebner
Katherine Worthman
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-876-5673
kaizpuru@ftc.gov;
sliebner@ftc.gov;
kworthman@ftc.gov

**FOR CORPORATE DEFENDANTS:** CELSIUS NETWORK INC.; CELSIUS NETWORK
LLC; CELSIUS NETWORKS LENDING LLC; CELSIUS LENDING LLC; CELSIUS KEYFI
LLC; CELSIUS MINING LLC; CELSIUS US HOLDING LLC; CELSIUS US LLC; and
CELSIUS MANAGEMENT CORP.

  _/s/ Richard H. Cunningham_____
Richard H. Cunningham
Robert W. Allen
Hanaa Kaloti
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
202-389-5000
rich.cunningham@kirkland.com;
bob.allen@kirkland.com;
hanna.kaloti@kirkland.com

# **CERTIFICATION**

The undersigned hereby certifies that all counsel whose /s/ signature appears on the

forgoing document have consented to the use of their /s/ signature.

Dated: July 13, 2023                          */s/ Katherine M. Aizpuru*
                                               Katherine M. Aizpuru
                                               Counsel for Plaintiff

4

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 1:23-cv-6009 |
| v. | **STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT AND OTHER RELIEF AGAINST CELSIUS NETWORK INC., CELSIUS NETWORK LLC, CELSIUS NETWORKS LENDING LLC, CELSIUS LENDING LLC, CELSIUS KEYFI LLC, CELSIUS MINING LLC, CELSIUS US HOLDING LLC, CELSIUS US LLC, and CELSIUS MANAGEMENT CORP.** |
| CELSIUS NETWORK INC., a corporation, CELSIUS NETWORK LLC, a limited liability company, CELSIUS NETWORKS LENDING LLC, a limited liability company, CELSIUS LENDING LLC, a limited liability company, CELSIUS KEYFI LLC, a limited liability company, CELSIUS MINING LLC, a limited liability company, CELSIUS US HOLDING LLC, a limited liability company; CELSIUS US LLC, a limited liability company; CELSIUS MANAGEMENT CORP., a corporation; | |
| ALEXANDER MASHINSKY, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC; | |
| SHLOMI DANIEL LEON, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC; and | |
| HANOCH "NUKE" GOLDSTEIN, individually and as an officer of Celsius Network LLC and Celsius Lending LLC, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction, Monetary Relief, and Other Relief ("Complaint"), for a permanent injunction, monetary relief, and other relief in this matter, pursuant to Sections 13(b), 19, and

16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.* Corporate Defendants have waived service of the summons and the Complaint.

Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US LLC (collectively, "Debtor Defendants") have filed petitions for relief under Chapter 11 of the Bankruptcy Code. *See In re Celsius Network LLC et al.*, No. 22-10964(MG) (Bankr. S.D.N.Y.) ("Bankruptcy Case").[1]

The Commission and Corporate Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.  This Court has jurisdiction over this matter.

2.  The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the marketing and sale of cryptocurrency lending and custody services. The Complaint further charges that Defendants obtained customer information of a financial institution relating to another person by making

---

[1] On July 13, 2022, the Debtor Defendants each filed a Chapter 11 voluntary petition. *See In re Celsius KeyFi LLC*, Case No. 22-10967; *In re Celsius Lending LLC*, Case No. 22-10970; *In re Celsius Mining LLC*, Case No. 22-10968; *In re Celsius Network Inc.*, Case No. 22-10965; *In re Celsius Networks Lending LLC*, Case No. 10969; and *In re Celsius US Holding LLC*, Case No. 22-10971. The Bankruptcy Court entered an order on July 19, 2022, jointly administering these cases under the main case for Celsius Network, LLC, Case No. 22-10964. Dkt. 53. Accordingly, "Bankruptcy Case" refers to the jointly administered cases for all Debtor Defendants, as well as each case for each Debtor Defendant.

false, fictitious, or fraudulent statements, in violation of Section 521 of the GLB Act, 15 U.S.C. § 6821.

3.    Only for purposes of this action, Corporate Defendants admit the facts necessary to establish jurisdiction and as otherwise specifically stated in this Order.  Corporate Defendants further admit the facts set forth on pages 107-109 of the Debtors' Disclosure Statement filed on June 27, 2023 in the Bankruptcy Case, Dkt. 2902.

4.    Corporate Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.    Corporate Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

6.    Entry of this Order is in the public interest.

7.    The Commission's prosecution of this action, including entry of a money judgment and the enforcement of a judgment (other than a money judgment) obtained in this action are actions to enforce the Commission's police or regulatory powers. As a result, if the Debtor Defendants' bankruptcies are pending as of the date of entry of this Order, these actions are excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.    **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.    In any communication that is solely visual or solely audible, the disclosure

must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6. The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7. The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8. When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable

3

members of that group.

B.    "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

      1.    "**Corporate Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, and Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp., and their successors and assigns.

      2.    "**Debtor Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC.

      3.    "**Non-Debtor Defendants**" means Celsius US LLC and Celsius Management Corp.

      4.    "**Individual Defendants**" means Alexander Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein.

C.    "**Express Informed Consent**" means an affirmative act communicating unambiguous assent made after receiving and in close proximity to a Clear and Conspicuous disclosure of all information material to the provision of consent. Assent obtained through any practice or user interface that has the effect of subverting or impairing consumer autonomy, decision-making, or choice, including using text that is not easily legible or disclosing material terms behind a hyperlink, dropdown icon, tooltip, or other similar interface, does not constitute Express Informed Consent.  Acceptance of a general or broad terms of use or similar document that contains descriptions of agreement by the individual along with other, unrelated information, does not constitute Express Informed Consent.

4

D.    **"Nonpublic Personal Information"** means:

    1.    Any information that Defendants obtain about a consumer in connection with providing a product or service to that consumer; or

    2.    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Nonpublic Personal Information that is not publicly available.

## ORDER

### I.    BAN

IT IS ORDERED that Corporate Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary.

### II.    PROHIBITION AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product or service are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

A.    the benefits of Defendants' products or services, including the existence or amount of any rewards that consumers can expect to earn; or

B.    any other material fact about Defendants' products or services, such as the total costs; any material restrictions, limitations, or conditions; or any material aspect of its

performance, efficacy, nature, or central characteristics.

## III.   INJUNCTION RELATING TO OBTAINING CUSTOMER FINANCIAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants and Corporate Defendants'
officers, agents, employees, and attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order, whether acting directly or indirectly
are hereby permanently restrained and enjoined from:

A.      Obtaining or attempting to obtain customer information of a financial institution
(including bank account routing number, account number, log-in credentials, private keys, or
other cryptocurrency wallet information) from a consumer by making false, fictitious, or
fraudulent representations to any consumer or financial institution; or

B.      Violating the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809, §§ 6821-6827,
a copy of which is attached as **ATTACHMENT A.**

## IV.   PROHIBITION AGAINST IMPROPER DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,
agents, employees, and attorneys, and all other persons in active concert or participation with any
of them, who receive actual notice of this Order, whether acting directly or indirectly, are
permanently restrained and enjoined from disclosing to any other person any Nonpublic Personal
Information about a consumer unless Corporate Defendants have obtained the consumer's
Express Informed Consent to disclose that Nonpublic Personal Information to that person.

## V.      ORDERS OF BANKRUPTCY COURT

IT IS FURTHER ORDERED that this Order does not restrain or enjoin the deposit,
exchange, distribution, investment, or withdrawal of assets owned or held by the Debtor

Defendants and being administered in accordance with the United States Bankruptcy Code and orders of the court in the Bankruptcy Case. For the avoidance of doubt, Part VI.C-D, below, does not create a contingent liability against the Debtor Defendants and does not preclude the full distribution of assets held by the Debtor Defendants in the Bankruptcy Case.

## VI.   JUDGMENT FOR MONETARY RELIEF AND ITS SUSPENSION

IT IS FURTHER ORDERED that:

A.      Judgment in the amount of $4,720,000,000 is entered in favor of the Commission against Corporate Defendants, jointly and severally, as monetary relief. The liability of Corporate Defendants shall be joint and several with any other Defendants to the extent subsequently ordered.

B.      The judgment is suspended as to Corporate Defendants subject to the subsections below.

C.      The suspension of the judgment as to the Non-Debtor Defendants is expressly premised upon the truthfulness, accuracy, and completeness of:

1.      The Financial Statement of Corporate Defendant Celsius Management Corp. signed on July 7, 2023, including attachments;

2.      The Financial Statement of Corporate Defendant Celsius US LLC signed on July 7, 2023, including attachments; and

3.      The Declaration of Christopher Ferraro signed on July 6, 2023, and sent by email from Corporate Debtors' counsel, Rich Cunningham, to Commission counsel Katherine Aizpuru on July 6, 2023.

D.      The suspension will be lifted as to Non-Debtor Defendants if, upon motion by the Commission or the Commission, the Court finds that a Non-Debtor Defendant failed to disclose

7

any material asset, materially misstated the value of any asset, or made any other material

misstatement or omission in the financial representations identified above. The suspension will

be lifted as to Corporate Defendants if the Bankruptcy Case is closed, dismissed, or otherwise

concluded, in each case, without the estate(s) being fully administered, including any

distributions to creditors, in accordance with the Bankruptcy Code.

E.      If the suspension of the judgment is lifted, the judgment becomes immediately

due as to Corporate Defendants in the amount specified in Subsection A above (which the parties

stipulate only for purposes of this Section represents the consumer injury), less any payment

previously made pursuant to this Section, plus interest computed from the date of entry of this

Order.

## VII.    ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Corporate Defendants relinquish dominion and all legal and equitable right, title,

and interest in all assets transferred pursuant to this Order and may not seek the return of any

assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in

any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to

enforce its rights to any payment or monetary judgment pursuant to this Order, such as a

nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an

action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C.

§ 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Corporate Defendants acknowledge that their Taxpayer Identification Numbers

8

(Social Security Numbers or Employer Identification Numbers), which Corporate Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

E.      Payment must be made by electronic fund transfer in accordance with instructions provided by a representative of the Commission.

F.      All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief, such as redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Corporate Defendants' practices alleged in the Complaint. Any money not used for relief is to be deposited to the U.S. Treasury.  Corporate Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

G.      The Debtor Defendants agree that the monetary judgment ordered by Section VI.A is not dischargeable in the Bankruptcy Case.

H.      The Debtor Defendants will not object to allowance of the FTC claim in the Bankruptcy Case as a general unsecured claim in the amount of $4,720,000,000.

## VIII.   CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Order are permanently restrained and enjoined from directly or indirectly:

    A.     failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.  If a representative of the Commission requests in writing any information related to redress, Corporate Defendants must provide it, in the form prescribed by the Commission, within 14 days;

    B.     disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the marketing and sale of cryptocurrency services; and

    C.     failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

    Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## IX.   COOPERATION

    IT IS FURTHER ORDERED that Corporate Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or occurrences that are the subject of the Complaint. Corporate Defendants must provide truthful and complete information, evidence, and testimony. Corporate Defendants must cause Corporate Defendants' officers, employees, representatives, or agents to appear for

interviews, discovery, hearings, trials, and any other proceedings that a Commission

representative may reasonably request upon 5 days' written notice, or other reasonable notice, at

such places and times as a Commission representative may designate, without the service of a

subpoena.

## X.  ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Corporate Defendants obtain acknowledgments of

receipt of this Order:

A.      Each Defendant, within 7 days of entry of this Order, must submit to the

Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 20 years after entry of this Order, each Corporate Defendant must deliver a

copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2)

all employees having managerial responsibilities for conduct related to the subject matter of the

Order and all agents and representatives who participate in conduct related to the subject matter

of the Order; and (3) any business entity resulting from any change in structure as set forth in the

Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order

for current personnel.  For all others, delivery must occur before they assume their

responsibilities.

C.      From each individual or entity to which a Corporate Defendant delivered a copy

of this Order, that Corporate Defendant must obtain, within 30 days, a signed and dated

acknowledgment of receipt of this Order.

## XI.  COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Corporate Defendants make timely submissions to the

Commission:

A.      One year after entry of this Order, each Corporate Defendant must submit a

11

compliance report, sworn under penalty of perjury, that: (1) identifies the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with Corporate Defendant; (2) identifies all of that Corporate Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (3) describes the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant; (4) describes in detail whether and how that Corporate Defendant is in compliance with each Section of this Order; and (5) provides a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.    For 20 years after entry of this Order, each Corporate Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following: (1) any designated point of contact; or (2) the structure of any Corporate Defendant or any entity that Corporate Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; *provided, however,* that Corporate Defendants need not submit a compliance notice associated with the administration of the Debtor Defendants' bankruptcy estates in the Bankruptcy Case.

C.    Each Corporate Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Corporate Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under

12

penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by

concluding: "I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed on: _____" and supplying the date, signatory's

full name, title (if applicable), and signature.

      E.     Unless otherwise directed by a Commission representative in writing, all

submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement,

Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

Washington, DC  20580.  The subject line must begin:  FTC v. Celsius Network Inc., *et al.*, No.

2223137.

## XII.   RECORDKEEPING

      IT IS FURTHER ORDERED that Corporate Defendants must create certain records for

20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate

Defendants  must create and retain the following records:

      A.     accounting records showing the revenues from all goods or services sold;

      B.     personnel records showing, for each person providing services, whether as an

employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position;

dates of service; and (if applicable) the reason for termination;

      C.     records of all consumer complaints and refund requests, whether received directly

or indirectly, such as through a third party, and any response;

      D.     all records necessary to demonstrate full compliance with each provision of this

Order, including all submissions to the Commission; and

      E.     a copy of each unique advertisement or other marketing material.

## XIII.   COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Corporate Defendants'
compliance with this Order:

A.      Within 14 days of receipt of a written request from a representative of the
Commission, each Corporate Defendant must:  submit additional compliance reports or other
requested information, which must be sworn under penalty of perjury; appear for depositions;
and produce documents for inspection and copying.  The Commission is also authorized to
obtain discovery, without further leave of court, using any of the procedures prescribed by
Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45,
and 69.

B.      For matters concerning this Order, the Commission is authorized to communicate
directly with each Corporate Defendant.  Each Corporate Defendant must permit representatives
of the Commission to interview any employee or other person affiliated with any Corporate
Defendant who has agreed to such an interview.  The person interviewed may have counsel
present.

C.      The Commission may use all other lawful means, including posing, through its
representatives as consumers, suppliers, or other individuals or entities, to Corporate Defendants
or any individual or entity affiliated with Corporate Defendants, without the necessity of
identification or prior notice.  Nothing in this Order limits the Commission's lawful use of
compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

14

## XIV.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this ___ day of _____, 2023.**

_____

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**  FEDERAL TRADE COMMISSION


*Katherine M. Aizpuru*                    Date:  July 12, 2023
_____                      _____
Katherine M. Aizpuru
Stephanie E. Liebner
Katherine Worthman
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-876-5673
kaizpuru@ftc.gov;
sliebner@ftc.gov;
kworthman@ftc.gov

**FOR CORPORATE DEFENDANTS:** CELSIUS NETWORK INC.; CELSIUS NETWORK LLC; CELSIUS NETWORKS LENDING LLC; CELSIUS LENDING LLC; CELSIUS KEYFI LLC; CELSIUS MINING LLC; CELSIUS US HOLDING LLC; CELSIUS US LLC; and CELSIUS MANAGEMENT CORP.


_____          Date: _____

Richard H. Cunningham
Robert W. Allen
Hanaa Kaloti
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
202-389-5000
rich.cunningham@kirkland.com;
bob.allen@kirkland.com;
hanna.kaloti@kirkland.com


COUNSEL


_____          Date: _____

Christopher Ferraro, as an officer of Celsius
Network LLC, on behalf of Celsius Network
LLC and the other Corporate Defendants


17

# Attachment A

lines broker or agent, insurance consultant, limited insurance representative, and any other individual or entity that sells, solicits, or negotiates policies of insurance or offers advice, counsel, opinions or services related to insurance.

### (6) Insurer

The term "insurer" has the meaning as in section 313(e)(2)(B) of title 31.

### (7) Principal place of business

The term "principal place of business" means the State in which an insurance producer maintains the headquarters of the insurance producer and, in the case of a business entity, where high-level officers of the entity direct, control, and coordinate the business activities of the business entity.

### (8) Principal place of residence

The term "principal place of residence" means the State in which an insurance producer resides for the greatest number of days during a calendar year.

### (9) State

The term "State" includes any State, the District of Columbia, any territory of the United States, and Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.

### (10) State law

#### (A) In general

The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State.

#### (B) Laws applicable in the District of Columbia

A law of the United States applicable only to or within the District of Columbia shall be treated as a State law rather than a law of the United States.

(Pub. L. 106–102, title III, § 334, as added Pub. L. 114–1, title II, § 202(a), Jan. 12, 2015, 129 Stat. 27.)

#### Editorial Notes

##### Prior Provisions

Provisions similar to this section were contained in section 6766 of this title, prior to the general amendment of this subchapter by Pub. L. 114–1.

A prior section 6764, Pub. L. 106–102, title III, § 334, Nov. 12, 1999, 113 Stat. 1433, related to coordination with other regulators, prior to the general amendment of this subchapter by Pub. L. 114–1. See section 6761 of this title.

A prior section 6765, Pub. L. 106–102, title III, § 335, Nov. 12, 1999, 113 Stat. 1433, which related to judicial review, was omitted in the general amendment of this subchapter by Pub. L. 114–1. See section 6762 of this title.

A prior section 6766, Pub. L. 106–102, title III, § 336, Nov. 12, 1999, 113 Stat. 1433, which related to definitions, was omitted in the general amendment of this subchapter by Pub. L. 114–1.

## SUBCHAPTER IV—RENTAL CAR AGENCY INSURANCE ACTIVITIES

### § 6781. Standard of regulation for motor vehicle rentals

#### (a) Protection against retroactive application of regulatory and legal action

Except as provided in subsection (b), during the 3-year period beginning on November 12, 1999, it shall be a presumption that no State law imposes any licensing, appointment, or education requirements on any person who solicits the purchase of or sells insurance connected with, and incidental to, the lease or rental of a motor vehicle.

#### (b) Preeminence of State insurance law

No provision of this section shall be construed as altering the validity, interpretation, construction, or effect of—

　(1) any State statute;

　(2) the prospective application of any court judgment interpreting or applying any State statute; or

　(3) the prospective application of any final State regulation, order, bulletin, or other statutorily authorized interpretation or action,

which, by its specific terms, expressly regulates or exempts from regulation any person who solicits the purchase of or sells insurance connected with, and incidental to, the short-term lease or rental of a motor vehicle.

#### (c) Scope of application

This section shall apply with respect to—

　(1) the lease or rental of a motor vehicle for a total period of 90 consecutive days or less; and

　(2) insurance which is provided in connection with, and incidentally to, such lease or rental for a period of consecutive days not exceeding the lease or rental period.

#### (d) Motor vehicle defined

For purposes of this section, the term "motor vehicle" has the same meaning as in section 13102 of title 49.

(Pub. L. 106–102, title III, § 341, Nov. 12, 1999, 113 Stat. 1434.)

## CHAPTER 94—PRIVACY

### SUBCHAPTER I—DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

| Sec. | |
|---|---|
| 6801. | Protection of nonpublic personal information. |
| 6802. | Obligations with respect to disclosures of personal information. |
| 6803. | Disclosure of institution privacy policy. |
| 6804. | Rulemaking. |
| 6805. | Enforcement. |
| 6806. | Relation to other provisions. |
| 6807. | Relation to State laws. |
| 6808. | Study of information sharing among financial affiliates. |
| 6809. | Definitions. |

### SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

| 6821. | Privacy protection for customer information of financial institutions. |
|---|---|
| 6822. | Administrative enforcement. |

Sec.
6823. Criminal penalty.
6824. Relation to State laws.
6825. Agency guidance.
6826. Reports.
6827. Definitions.

## SUBCHAPTER I—DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

### § 6801. Protection of nonpublic personal information

#### (a) Privacy obligation policy

It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.

#### (b) Financial institutions safeguards

In furtherance of the policy in subsection (a), each agency or authority described in section 6805(a) of this title, other than the Bureau of Consumer Financial Protection, shall establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical, and physical safeguards—

(1) to insure the security and confidentiality of customer records and information;

(2) to protect against any anticipated threats or hazards to the security or integrity of such records; and

(3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

(Pub. L. 106–102, title V, § 501, Nov. 12, 1999, 113 Stat. 1436; Pub. L. 111–203, title X, § 1093(1), July 21, 2010, 124 Stat. 2095.)

#### Editorial Notes

##### AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 inserted '', other than the Bureau of Consumer Financial Protection,'' after ''section 6805(a) of this title'' in introductory provisions.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

##### EFFECTIVE DATE

Pub. L. 106–102, title V, § 510, Nov. 12, 1999, 113 Stat. 1445, provided that: ''This subtitle [subtitle A (§§ 501–510) of title V of Pub. L. 106–102, enacting this subchapter and amending section 1681s of this title] shall take effect 6 months after the date on which rules are required to be prescribed under section 504(a)(3) [15 U.S.C. 6804(a)(3)], except—

''(1) to the extent that a later date is specified in the rules prescribed under section 504; and

''(2) that sections 504 [15 U.S.C. 6804] and 506 [enacting section 6806 of this title and amending section 1681s of this title] shall be effective upon enactment [Nov. 12, 1999].''

### § 6802. Obligations with respect to disclosures of personal information

#### (a) Notice requirements

Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title.

#### (b) Opt out

##### (1) In general

A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless—

(A) such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, that such information may be disclosed to such third party;

(B) the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

##### (2) Exception

This subsection shall not prevent a financial institution from providing nonpublic personal information to a nonaffiliated third party to perform services for or functions on behalf of the financial institution, including marketing of the financial institution's own products or services, or financial products or services offered pursuant to joint agreements between two or more financial institutions that comply with the requirements imposed by the regulations prescribed under section 6804 of this title, if the financial institution fully discloses the providing of such information and enters into a contractual agreement with the third party that requires the third party to maintain the confidentiality of such information.

#### (c) Limits on reuse of information

Except as otherwise provided in this subchapter, a nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not, directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, unless such disclosure would be lawful if made directly to such other person by the financial institution.

#### (d) Limitations on the sharing of account number information for marketing purposes

A financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other

marketing through electronic mail to the consumer.

**(e) General exceptions**

Subsections (a) and (b) shall not prohibit the disclosure of nonpublic personal information—

(1) as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with—

(A) servicing or processing a financial product or service requested or authorized by the consumer;

(B) maintaining or servicing the consumer's account with the financial institution, or with another entity as part of a private label credit card program or other extension of credit on behalf of such entity; or

(C) a proposed or actual securitization, secondary market sale (including sales of servicing rights), or similar transaction related to a transaction of the consumer;

(2) with the consent or at the direction of the consumer;

(3)(A) to protect the confidentiality or security of the financial institution's records pertaining to the consumer, the service or product, or the transaction therein; (B) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability; (C) for required institutional risk control, or for resolving customer disputes or inquiries; (D) to persons holding a legal or beneficial interest relating to the consumer; or (E) to persons acting in a fiduciary or representative capacity on behalf of the consumer;

(4) to provide information to insurance rate advisory organizations, guaranty funds or agencies, applicable rating agencies of the financial institution, persons assessing the institution's compliance with industry standards, and the institution's attorneys, accountants, and auditors;

(5) to the extent specifically permitted or required under other provisions of law and in accordance with the Right to Financial Privacy Act of 1978 [12 U.S.C. 3401 et seq.], to law enforcement agencies (including the Bureau of Consumer Financial Protection[1] a Federal functional regulator, the Secretary of the Treasury with respect to subchapter II of chapter 53 of title 31, and chapter 2 of title I of Public Law 91–508 (12 U.S.C. 1951–1959), a State insurance authority, or the Federal Trade Commission), self-regulatory organizations, or for an investigation on a matter related to public safety;

(6)(A) to a consumer reporting agency in accordance with the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], or (B) from a consumer report reported by a consumer reporting agency;

(7) in connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit if the disclosure of nonpublic personal information concerns solely consumers of such business or unit; or

(8) to comply with Federal, State, or local laws, rules, and other applicable legal require-

---

[1] So in original. Probably should be followed by a comma.

---

ments; to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

(Pub. L. 106–102, title V, § 502, Nov. 12, 1999, 113 Stat. 1437; Pub. L. 111–203, title X, § 1093(2), July 21, 2010, 124 Stat. 2095.)

### Editorial Notes

#### References in Text

This subchapter, referred to in subsecs. (a) and (c), was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Right to Financial Privacy Act of 1978, referred to in subsec. (e)(5), is title XI of Pub. L. 95–630, Nov. 10, 1978, 92 Stat. 3697, which is classified generally to chapter 35 (§ 3401 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 3401 of Title 12 and Tables.

Chapter 2 of title I of Public Law 91–508, referred to in subsec. (e)(5), is chapter 2 (§§ 121–129) of title I of Pub. L. 91–508, Oct. 26, 1970, 84 Stat. 1116, which is classified generally to chapter 21 (§ 1951 et seq.) of Title 12, Banks and Banking. For complete classification of chapter 2 to the Code, see Tables.

The Fair Credit Reporting Act, referred to in subsec. (e)(6)(A), is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

#### Amendments

2010—Subsec. (e)(5). Pub. L. 111–203 inserted "the Bureau of Consumer Financial Protection" after "(including".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6803. Disclosure of institution privacy policy

### (a) Disclosure required

At the time of establishing a customer relationship with a consumer and not less than annually during the continuation of such relationship, a financial institution shall provide a clear and conspicuous disclosure to such consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, of such financial institution's policies and practices with respect to—

(1) disclosing nonpublic personal information to affiliates and nonaffiliated third parties, consistent with section 6802 of this title, including the categories of information that may be disclosed;

(2) disclosing nonpublic personal information of persons who have ceased to be customers of the financial institution; and

(3) protecting the nonpublic personal information of consumers.

**(b) Regulations**

Disclosures required by subsection (a) shall be made in accordance with the regulations prescribed under section 6804 of this title.

**(c) Information to be included**

The disclosure required by subsection (a) shall include—

(1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties, other than agents of the institution, consistent with section 6802 of this title, and including—

(A) the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided pursuant to section 6802(e) of this title; and

(B) the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution;

(2) the categories of nonpublic personal information that are collected by the financial institution;

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information in accordance with section 6801 of this title; and

(4) the disclosures required, if any, under section 1681a(d)(2)(A)(iii) of this title.

**(d) Exemption for certified public accountants**

**(1) In general**

The disclosure requirements of subsection (a) do not apply to any person, to the extent that the person is—

(A) a certified public accountant;

(B) certified or licensed for such purpose by a State; and

(C) subject to any provision of law, rule, or regulation issued by a legislative or regulatory body of the State, including rules of professional conduct or ethics, that prohibits disclosure of nonpublic personal information without the knowing and expressed consent of the consumer.

**(2) Limitation**

Nothing in this subsection shall be construed to exempt or otherwise exclude any financial institution that is affiliated or becomes affiliated with a certified public accountant described in paragraph (1) from any provision of this section.

**(3) Definitions**

For purposes of this subsection, the term "State" means any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, or the Northern Mariana Islands.

**(e) Model forms**

**(1) In general**

The agencies referred to in section 6804(a)(1) of this title shall jointly develop a model form which may be used, at the option of the financial institution, for the provision of disclosures under this section.

**(2) Format**

A model form developed under paragraph (1) shall—

(A) be comprehensible to consumers, with a clear format and design;

(B) provide for clear and conspicuous disclosures;

(C) enable consumers easily to identify the sharing practices of a financial institution and to compare privacy practices among financial institutions; and

(D) be succinct, and use an easily readable type font.

**(3) Timing**

A model form required to be developed by this subsection shall be issued in proposed form for public comment not later than 180 days after October 13, 2006.

**(4) Safe harbor**

Any financial institution that elects to provide the model form developed by the agencies under this subsection shall be deemed to be in compliance with the disclosures required under this section.

**(f) Exception to annual notice requirement**

A financial institution that—

(1) provides nonpublic personal information only in accordance with the provisions of subsection (b)(2) or (e) of section 6802 of this title or regulations prescribed under section 6804(b) of this title, and

(2) has not changed its policies and practices with regard to disclosing nonpublic personal information from the policies and practices that were disclosed in the most recent disclosure sent to consumers in accordance with this section,

shall not be required to provide an annual disclosure under this section until such time as the financial institution fails to comply with any criteria described in paragraph (1) or (2).

(Pub. L. 106–102, title V, §503, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 109–351, title VI, §609, title VII, §728, Oct. 13, 2006, 120 Stat. 1983, 2003; Pub. L. 114–94, div. G, title LXXV, §75001, Dec. 4, 2015, 129 Stat. 1787.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (f). Pub. L. 114–94 added subsec. (f).

2006—Pub. L. 109–351 designated concluding provisions of subsec. (a) as (b), inserted heading, substituted "Disclosures required by subsection (a)" for "Such disclosures", redesignated former subsec. (b) as (c), and added subsecs. (d) and (e).

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## § 6804. Rulemaking

### (a) Regulatory authority

#### (1) Rulemaking

##### (A) In general

Except as provided in subparagraph (C), the Bureau of Consumer Financial Protection and the Securities and Exchange Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to their respective jurisdiction under section 6805 of this title (and notwithstanding subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]), except that the Bureau of Consumer Financial Protection shall not have authority to prescribe regulations with respect to the standards under section 6801 of this title.

##### (B) CFTC

The Commodity Futures Trading Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to the jurisdiction of the Commodity Futures Trading Commission under section 7b–2 of title 7.

##### (C) Federal Trade Commission authority

Notwithstanding the authority of the Bureau of Consumer Financial Protection under subparagraph (A), the Federal Trade Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to any financial institution that is a person described in section 1029(a) of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5519(a)].

##### (D) Rule of construction

Nothing in this paragraph shall be construed to alter, affect, or otherwise limit the authority of a State insurance authority to adopt regulations to carry out this subchapter.

#### (2) Coordination, consistency, and comparability

Each of the agencies authorized under paragraph (1) to prescribe regulations shall consult and coordinate with the other such agencies and, as appropriate, and with[1] representatives of State insurance authorities designated by the National Association of Insurance Commissioners, for the purpose of assuring, to the extent possible, that the regulations prescribed by each such agency are consistent and comparable with the regulations prescribed by the other such agencies.

#### (3) Procedures and deadline

Such regulations shall be prescribed in accordance with applicable requirements of title 5.

[1] So in original. Probably should be ''and, as appropriate, with''.

### (b) Authority to grant exceptions

The regulations prescribed under subsection (a) may include such additional exceptions to subsections (a) through (d) of section 6802 of this title as are deemed consistent with the purposes of this subchapter.

(Pub. L. 106–102, title V, § 504, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 111–203, title X, § 1093(3), July 21, 2010, 124 Stat. 2095.)

#### Editorial Notes

##### References in Text

This subchapter, referred to in subsecs. (a)(1) and (b), was in the original ''this subtitle'', meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Consumer Financial Protection Act of 2010, referred to in subsec. (a)(1)(A), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitle B (§§ 1021–1029A) of the Act is classified generally to part B (§ 5511 et seq.) of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitle B to the Code, see Tables.

##### Amendments

2010—Subsec. (a)(1), (2). Pub. L. 111–203, § 1093(3)(A), added pars. (1) and (2) and struck out former pars. (1) and (2) which related, respectively, to rulemaking by the Federal banking agencies, the National Credit Union Administration, the Secretary of the Treasury, the Securities and Exchange Commission, and the Federal Trade Commission, and consultation and coordination among these agencies and authorities to assure consistency and comparability of regulations.

Subsec. (a)(3). Pub. L. 111–203, § 1093(3)(B), struck out ''and shall be issued in final form not later than 6 months after November 12, 1999'' after ''title 5''.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6805. Enforcement

### (a) In general

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:

(1) Under section 1818 of title 12, by the appropriate Federal banking agency, as defined in section 1813(q) of title 12, in the case of—

(A) national banks, Federal branches and Federal agencies of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agen-

cies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], and bank holding companies and their nonbank subsidiaries or affiliates (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), insured State branches of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers); and

(D) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, and any subsidiaries of such savings associations (except brokers, dealers, persons providing insurance, investment companies, and investment advisers).

(2) Under the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Board of the National Credit Union Administration with respect to any federally insured credit union, and any subsidiaries of such an entity.

(3) Under the Securities Exchange Act of 1934 [15 U.S.C. 78a et seq.], by the Securities and Exchange Commission with respect to any broker or dealer.

(4) Under the Investment Company Act of 1940 [15 U.S.C. 80a–1 et seq.], by the Securities and Exchange Commission with respect to investment companies.

(5) Under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.], by the Securities and Exchange Commission with respect to investment advisers registered with the Commission under such Act.

(6) Under State insurance law, in the case of any person engaged in providing insurance, by the applicable State insurance authority of the State in which the person is domiciled, subject to section 6701 of this title.

(7) Under the Federal Trade Commission Act [15 U.S.C. 41 et seq.], by the Federal Trade Commission for any other financial institution or other person that is not subject to the jurisdiction of any agency or authority under paragraphs (1) through (6) of this subsection.

(8) Under subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau of Consumer Financial Protection, in the case of any financial institution and other covered person or service provider that is subject to the jurisdiction of the Bureau and any person subject to this subchapter, but not with respect to the standards under section 6801 of this title.

**(b) Enforcement of section 6801**

**(1) In general**

Except as provided in paragraph (2), the agencies and authorities described in subsection (a), other than the Bureau of Consumer Financial Protection, shall implement the standards prescribed under section 6801(b) of this title in the same manner, to the extent

practicable, as standards prescribed pursuant to section 1831p–1(a) of title 12 are implemented pursuant to such section.

**(2) Exception**

The agencies and authorities described in paragraphs (3), (4), (5), (6), and (7) of subsection (a) shall implement the standards prescribed under section 6801(b) of this title by rule with respect to the financial institutions and other persons subject to their respective jurisdictions under subsection (a).

**(c) Absence of State action**

If a State insurance authority fails to adopt regulations to carry out this subchapter, such State shall not be eligible to override, pursuant to section 1831x(g)(2)(B)(iii) of title 12, the insurance customer protection regulations prescribed by a Federal banking agency under section 1831x(a) of title 12.

**(d) Definitions**

The terms used in subsection (a)(1) that are not defined in this subchapter or otherwise defined in section 1813(s) of title 12 shall have the same meaning as given in section 3101 of title 12.

(Pub. L. 106–102, title V, § 505, Nov. 12, 1999, 113 Stat. 1440; Pub. L. 111–203, title X, § 1093(4), (5), July 21, 2010, 124 Stat. 2096, 2097.)

### Editorial Notes

#### REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsec. (a), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitles B (§§ 1021–1029A) and E (§§ 1051–1058) of the Act are classified generally to parts B (§ 5511 et seq.) and E (§ 5561 et seq.), respectively, of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitles B and E to the Code, see Tables.

This subchapter, referred to in subsecs. (a), (c), and (d), was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (a)(1)(B), is classified to subchapter I (§ 601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§ 611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (a)(2), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§ 1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (a)(3), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§ 78a et seq.) of this title. For complete classification of this Act to the Code, see section 78a of this title and Tables.

The Investment Company Act of 1940, referred to in subsec. (a)(4), is title I of act Aug. 22, 1940, ch. 686, 54 Stat. 789, which is classified generally to subchapter I (§ 80a–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80a–51 of this title and Tables.

The Investment Advisers Act of 1940, referred to in subsec. (a)(5), is title II of act Aug. 22, 1940, ch. 686, 54 Stat. 847, which is classified generally to subchapter II (§ 80b–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80b–20 of this title and Tables.

The Federal Trade Commission Act, referred to in subsec. (a)(7), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

#### AMENDMENTS

2010—Subsec. (a). Pub. L. 111–203, §1093(4)(A), substituted "Subject to subtitle B of the Consumer Financial Protection Act of 2010, this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:" for "This subchapter and the regulations prescribed thereunder shall be enforced by the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:".

Subsec. (a)(1). Pub. L. 111–203, §1093(4)(B)(i), inserted "by the appropriate Federal banking agency, as defined in section 1813(q) of title 12," before "in the case of—".

Subsec. (a)(1)(A). Pub. L. 111–203, §1093(4)(B)(ii), struck out ", by the Office of the Comptroller of the Currency" before semicolon at end.

Subsec. (a)(1)(B). Pub. L. 111–203, §1093(4)(B)(iii), struck out ", by the Board of Governors of the Federal Reserve System" before semicolon at end.

Subsec. (a)(1)(C). Pub. L. 111–203, §1093(4)(B)(iv), struck out ", by the Board of Directors of the Federal Deposit Insurance Corporation" before "; and".

Subsec. (a)(1)(D). Pub. L. 111–203, §1093(4)(B)(v), struck out ", by the Director of the Office of Thrift Supervision" before period at end.

Subsec. (a)(8). Pub. L. 111–203, §1093(4)(C), added par. (8).

Subsec. (b)(1). Pub. L. 111–203, §1093(5), inserted ", other than the Bureau of Consumer Financial Protection," before "shall implement the standards".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6806. Relation to other provisions

Except for the amendments made by subsections (a) and (b), nothing in this chapter shall be construed to modify, limit, or supersede the operation of the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], and no inference shall be drawn on the basis of the provisions of this chapter regarding whether information is transaction or experience information under section 603 of such Act [15 U.S.C. 1681a].

(Pub. L. 106–102, title V, §506(c), Nov. 12, 1999, 113 Stat. 1442.)

#### Editorial Notes

##### REFERENCES IN TEXT

Amendments made by subsections (a) and (b), referred to in text, means amendments made by section 506(a) and (b) of Pub. L. 106–102, which amended section 1681s of this title.

This chapter, referred to in text, was in the original "this title", meaning title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, as amended, which enacted this chapter and amended section 1681s of this title. For

complete classification of title V to the Code, see Tables.

The Fair Credit Reporting Act, referred to in text, is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, §601, Oct. 26, 1970, 84 Stat. 1127, as amended, which is classified generally to subchapter III (§1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

## § 6807. Relation to State laws

### (a) In general

This subchapter and the amendments made by this subchapter shall not be construed as superseding, altering, or affecting any statute, regulation, order, or interpretation in effect in any State, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter and the amendments made by this subchapter, as determined by the Bureau of Consumer Financial Protection, after consultation with the agency or authority with jurisdiction under section 6805(a) of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, §507, Nov. 12, 1999, 113 Stat. 1442; Pub. L. 111–203, title X, §1093(6), July 21, 2010, 124 Stat. 2097.)

#### Editorial Notes

##### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

##### AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 substituted "Bureau of Consumer Financial Protection" for "Federal Trade Commission".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6808. Study of information sharing among financial affiliates

### (a) In general

The Secretary of the Treasury, in conjunction with the Federal functional regulators and the Federal Trade Commission, shall conduct a study of information sharing practices among financial institutions and their affiliates. Such study shall include—

(1) the purposes for the sharing of confidential customer information with affiliates or with nonaffiliated third parties;

(2) the extent and adequacy of security protections for such information;

(3) the potential risks for customer privacy of such sharing of information;

(4) the potential benefits for financial institutions and affiliates of such sharing of information;

(5) the potential benefits for customers of such sharing of information;

(6) the adequacy of existing laws to protect customer privacy;

(7) the adequacy of financial institution privacy policy and privacy rights disclosure under existing law;

(8) the feasibility of different approaches, including opt-out and opt-in, to permit customers to direct that confidential information not be shared with affiliates and nonaffiliated third parties; and

(9) the feasibility of restricting sharing of information for specific uses or of permitting customers to direct the uses for which information may be shared.

**(b) Consultation**

The Secretary shall consult with representatives of State insurance authorities designated by the National Association of Insurance Commissioners, and also with financial services industry, consumer organizations and privacy groups, and other representatives of the general public, in formulating and conducting the study required by subsection (a).

**(c) Report**

On or before January 1, 2002, the Secretary shall submit a report to the Congress containing the findings and conclusions of the study required under subsection (a), together with such recommendations for legislative or administrative action as may be appropriate.

(Pub. L. 106–102, title V, § 508, Nov. 12, 1999, 113 Stat. 1442.)

## § 6809. Definitions

As used in this subchapter:

**(1) Federal banking agency**

The term "Federal banking agency" has the same meaning as given in section 1813 of title 12.

**(2) Federal functional regulator**

The term "Federal functional regulator" means—

(A) the Board of Governors of the Federal Reserve System;

(B) the Office of the Comptroller of the Currency;

(C) the Board of Directors of the Federal Deposit Insurance Corporation;

(D) the Director of the Office of Thrift Supervision;

(E) the National Credit Union Administration Board; and

(F) the Securities and Exchange Commission.

**(3) Financial institution**

**(A) In general**

The term "financial institution" means any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12.

**(B) Persons subject to CFTC regulation**

Notwithstanding subparagraph (A), the term "financial institution" does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.].

**(C) Farm credit institutions**

Notwithstanding subparagraph (A), the term "financial institution" does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(D) Other secondary market institutions**

Notwithstanding subparagraph (A), the term "financial institution" does not include institutions chartered by Congress specifically to engage in transactions described in section 6802(e)(1)(C) of this title, as long as such institutions do not sell or transfer nonpublic personal information to a nonaffiliated third party.

**(4) Nonpublic personal information**

(A) The term "nonpublic personal information" means personally identifiable financial information—

(i) provided by a consumer to a financial institution;

(ii) resulting from any transaction with the consumer or any service performed for the consumer; or

(iii) otherwise obtained by the financial institution.

(B) Such term does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title.

(C) Notwithstanding subparagraph (B), such term—

(i) shall include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information; but

(ii) shall not include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived without using any nonpublic personal information.

**(5) Nonaffiliated third party**

The term "nonaffiliated third party" means any entity that is not an affiliate of, or related by common ownership or affiliated by corporate control with, the financial institution, but does not include a joint employee of such institution.

**(6) Affiliate**

The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

**(7) Necessary to effect, administer, or enforce**

The term "as necessary to effect, administer, or enforce the transaction" means—

(A) the disclosure is required, or is a usual, appropriate, or acceptable method, to carry out the transaction or the product or service business of which the transaction is a part, and record or service or maintain the consumer's account in the ordinary course of providing the financial service or financial product, or to administer or service benefits or claims relating to the transaction or the product or service business of which it is a part, and includes—

(i) providing the consumer or the consumer's agent or broker with a confirmation, statement, or other record of the transaction, or information on the status or value of the financial service or financial product; and

(ii) the accrual or recognition of incentives or bonuses associated with the transaction that are provided by the financial institution or any other party;

(B) the disclosure is required, or is one of the lawful or appropriate methods, to enforce the rights of the financial institution or of other persons engaged in carrying out the financial transaction, or providing the product or service;

(C) the disclosure is required, or is a usual, appropriate, or acceptable method, for insurance underwriting at the consumer's request or for reinsurance purposes, or for any of the following purposes as they relate to a consumer's insurance: Account administration, reporting, investigating, or preventing fraud or material misrepresentation, processing premium payments, processing insurance claims, administering insurance benefits (including utilization review activities), participating in research projects, or as otherwise required or specifically permitted by Federal or State law; or

(D) the disclosure is required, or is a usual, appropriate, or acceptable method, in connection with—

(i) the authorization, settlement, billing, processing, clearing, transferring, reconciling, or collection of amounts charged, debited, or otherwise paid using a debit, credit or other payment card, check, or account number, or by other payment means;

(ii) the transfer of receivables, accounts or interests therein; or

(iii) the audit of debit, credit or other payment information.

### (8) State insurance authority

The term "State insurance authority" means, in the case of any person engaged in providing insurance, the State insurance authority of the State in which the person is domiciled.

### (9) Consumer

The term "consumer" means an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes, and also means the legal representative of such an individual.

### (10) Joint agreement

The term "joint agreement" means a formal written contract pursuant to which two or more financial institutions jointly offer, endorse, or sponsor a financial product or service, and as may be further defined in the regulations prescribed under section 6804 of this title.

### (11) Customer relationship

The term "time of establishing a customer relationship" shall be defined by the regulations prescribed under section 6804 of this title, and shall, in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer.

(Pub. L. 106–102, title V, § 509, Nov. 12, 1999, 113 Stat. 1443.)

#### EDITORIAL NOTES

##### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Commodity Exchange Act, referred to in par. (3)(B), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (3)(C), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

## SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

### § 6821. Privacy protection for customer information of financial institutions

#### (a) Prohibition on obtaining customer information by false pretenses

It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person—

(1) by making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution;

(2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or

(3) by providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

#### (b) Prohibition on solicitation of a person to obtain customer information from financial institution under false pretenses

It shall be a violation of this subchapter to request a person to obtain customer information

of a financial institution, knowing that the person will obtain, or attempt to obtain, the information from the institution in any manner described in subsection (a).

#### (c) Nonapplicability to law enforcement agencies

No provision of this section shall be construed so as to prevent any action by a law enforcement agency, or any officer, employee, or agent of such agency, to obtain customer information of a financial institution in connection with the performance of the official duties of the agency.

#### (d) Nonapplicability to financial institutions in certain cases

No provision of this section shall be construed so as to prevent any financial institution, or any officer, employee, or agent of a financial institution, from obtaining customer information of such financial institution in the course of—

(1) testing the security procedures or systems of such institution for maintaining the confidentiality of customer information;

(2) investigating allegations of misconduct or negligence on the part of any officer, employee, or agent of the financial institution; or

(3) recovering customer information of the financial institution which was obtained or received by another person in any manner described in subsection (a) or (b).

#### (e) Nonapplicability to insurance institutions for investigation of insurance fraud

No provision of this section shall be construed so as to prevent any insurance institution, or any officer, employee, or agency of an insurance institution, from obtaining information as part of an insurance investigation into criminal activity, fraud, material misrepresentation, or material nondisclosure that is authorized for such institution under State law, regulation, interpretation, or order.

#### (f) Nonapplicability to certain types of customer information of financial institutions

No provision of this section shall be construed so as to prevent any person from obtaining customer information of a financial institution that otherwise is available as a public record filed pursuant to the securities laws (as defined in section 78c(a)(47) of this title).

#### (g) Nonapplicability to collection of child support judgments

No provision of this section shall be construed to prevent any State-licensed private investigator, or any officer, employee, or agent of such private investigator, from obtaining customer information of a financial institution, to the extent reasonably necessary to collect child support from a person adjudged to have been delinquent in his or her obligations by a Federal or State court, and to the extent that such action by a State-licensed private investigator is not unlawful under any other Federal or State law or regulation, and has been authorized by an order or judgment of a court of competent jurisdiction.

(Pub. L. 106–102, title V, § 521, Nov. 12, 1999, 113 Stat. 1446.)

### § 6822. Administrative enforcement

#### (a) Enforcement by Federal Trade Commission

Except as provided in subsection (b), compliance with this subchapter shall be enforced by the Federal Trade Commission in the same manner and with the same power and authority as the Commission has under the Fair Debt Collection Practices Act [15 U.S.C. 1692 et seq.] to enforce compliance with such Act.

#### (b) Enforcement by other agencies in certain cases

##### (1) In general

Compliance with this subchapter shall be enforced under—

(A) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], in the case of—

(i) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

(ii) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], by the Board;

(iii) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System and national nonmember banks) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation; and

(iv) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, by the Director of the Office of Thrift Supervision; and

(B) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union.

##### (2) Violations of this subchapter treated as violations of other laws

For the purpose of the exercise by any agency referred to in paragraph (1) of its powers under any Act referred to in that paragraph, a violation of this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in paragraph (1), each of the agencies referred to in that paragraph may exercise, for the purpose of enforcing compliance with this subchapter, any other authority conferred on such agency by law.

(Pub. L. 106–102, title V, § 522, Nov. 12, 1999, 113 Stat. 1447.)

#### Editorial Notes

##### References in Text

The Fair Debt Collection Practices Act, referred to in subsec. (a), is title VIII of Pub. L. 90–321, as added by

Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874, as amended, which is classified generally to subchapter V (§ 1692 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (b)(1)(A)(ii), is classified to subchapter I (§ 601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§ 611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (b)(1)(B), is act June 26, 1934, ch. 750, 48 Stat. 1216, as amended, which is classified generally to chapter 14 (§ 1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

### Statutory Notes and Related Subsidiaries

#### TRANSFER OF FUNCTIONS

Functions vested in Administrator of National Credit Union Administration transferred and vested in National Credit Union Administration Board pursuant to section 1752a of Title 12, Banks and Banking.

### § 6823. Criminal penalty

#### (a) In general

Whoever knowingly and intentionally violates, or knowingly and intentionally attempts to violate, section 6821 of this title shall be fined in accordance with title 18 or imprisoned for not more than 5 years, or both.

#### (b) Enhanced penalty for aggravated cases

Whoever violates, or attempts to violate, section 6821 of this title while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3) (as the case may be) of section 3571 of title 18, imprisoned for not more than 10 years, or both.

(Pub. L. 106–102, title V, § 523, Nov. 12, 1999, 113 Stat. 1448.)

### § 6824. Relation to State laws

#### (a) In general

This subchapter shall not be construed as superseding, altering, or affecting the statutes, regulations, orders, or interpretations in effect in any State, except to the extent that such statutes, regulations, orders, or interpretations are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

#### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter as determined by the Federal Trade Commission, after consultation with the agency or authority with jurisdiction under section 6822 of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, § 524, Nov. 12, 1999, 113 Stat. 1448.)

### § 6825. Agency guidance

In furtherance of the objectives of this subchapter, each Federal banking agency (as defined in section 1813(z) of title 12), the National Credit Union Administration, and the Securities and Exchange Commission or self-regulatory organizations, as appropriate, shall review regulations and guidelines applicable to financial institutions under their respective jurisdictions and shall prescribe such revisions to such regulations and guidelines as may be necessary to ensure that such financial institutions have policies, procedures, and controls in place to prevent the unauthorized disclosure of customer financial information and to deter and detect activities proscribed under section 6821 of this title.

(Pub. L. 106–102, title V, § 525, Nov. 12, 1999, 113 Stat. 1448.)

### § 6826. Reports

#### (a) Report to the Congress

Before the end of the 18-month period beginning on November 12, 1999, the Comptroller General, in consultation with the Federal Trade Commission, Federal banking agencies, the National Credit Union Administration, the Securities and Exchange Commission, appropriate Federal law enforcement agencies, and appropriate State insurance regulators, shall submit to the Congress a report on the following:

(1) The efficacy and adequacy of the remedies provided in this subchapter in addressing attempts to obtain financial information by fraudulent means or by false pretenses.

(2) Any recommendations for additional legislative or regulatory action to address threats to the privacy of financial information created by attempts to obtain information by fraudulent means or false pretenses.

#### (b) Annual report by administering agencies

The Federal Trade Commission and the Attorney General shall submit to Congress an annual report on number and disposition of all enforcement actions taken pursuant to this subchapter.

(Pub. L. 106–102, title V, § 526, Nov. 12, 1999, 113 Stat. 1448.)

### § 6827. Definitions

For purposes of this subchapter, the following definitions shall apply:

#### (1) Customer

The term "customer" means, with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary.

#### (2) Customer information of a financial institution

The term "customer information of a financial institution" means any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer.

**(3) Document**

The term "document" means any information in any form.

**(4) Financial institution**

**(A) In general**

The term "financial institution" means any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution.

**(B) Certain financial institutions specifically included**

The term "financial institution" includes any depository institution (as defined in section 461(b)(1)(A) of title 12), any broker or dealer, any investment adviser or investment company, any insurance company, any loan or finance company, any credit card issuer or operator of a credit card system, and any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis (as defined in section 1681a(p) of this title).

**(C) Securities institutions**

For purposes of subparagraph (B)—

(i) the terms "broker" and "dealer" have the same meanings as given in section 78c of this title;

(ii) the term "investment adviser" has the same meaning as given in section 80b–2(a)(11) of this title; and

(iii) the term "investment company" has the same meaning as given in section 80a–3 of this title.

**(D) Certain persons and entities specifically excluded**

The term "financial institution" does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.] and does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(E) Further definition by regulation**

The Federal Trade Commission, after consultation with Federal banking agencies and the Securities and Exchange Commission, may prescribe regulations clarifying or describing the types of institutions which shall be treated as financial institutions for purposes of this subchapter.

(Pub. L. 106–102, title V, §527, Nov. 12, 1999, 113 Stat. 1449.)

**Editorial Notes**

REFERENCES IN TEXT

The Commodity Exchange Act, referred to in par. (4)(D), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (4)(D), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

**CHAPTER 95—MICROENTERPRISE TECHNICAL ASSISTANCE AND CAPACITY BUILDING PROGRAM**

Sec.
6901. Definitions.
6902. Establishment of program.
6903. Uses of assistance.
6904. Qualified organizations.
6905. Allocation of assistance; subgrants.
6906. Matching requirements.
6907. Applications for assistance.
6908. Recordkeeping.
6909. Authorization.
6910. Implementation.

**§ 6901. Definitions**

For purposes of this chapter, the following definitions shall apply:

**(1) Administration**

The term "Administration" means the Small Business Administration.

**(2) Administrator**

The term "Administrator" means the Administrator of the Small Business Administration.

**(3) Capacity building services**

The term "capacity building services" means services provided to an organization that is, or that is in the process of becoming, a microenterprise development organization or program, for the purpose of enhancing its ability to provide training and services to disadvantaged entrepreneurs.

**(4) Collaborative**

The term "collaborative" means 2 or more nonprofit entities that agree to act jointly as a qualified organization under this chapter.

**(5) Disadvantaged entrepreneur**

The term "disadvantaged entrepreneur" means a microentrepreneur that is—

(A) a low-income person;

(B) a very low-income person; or

(C) an entrepreneur that lacks adequate access to capital or other resources essential for business success, or is economically disadvantaged, as determined by the Administrator.

**(6) Indian tribe**

The term "Indian tribe" has the meaning given the term in section 4702 of title 12.

**(7) Intermediary**

The term "intermediary" means a private, nonprofit entity that seeks to serve microenterprise development organizations and programs as authorized under section 6904 of this title.

**(8) Low-income person**

The term "low-income person" has the meaning given the term in section 4702 of title 12.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

CELSIUS NETWORK INC., et al.,

    Defendants.

**Case No. 1:23-cv-6009**

---

## [PROPOSED] ORDER STAYING ACTION
## AS TO CORPORATE DEFENDANTS FOR 45 DAYS

The Court having considered the joint motion filed by the Federal Trade Commission ("FTC") and Corporate Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, and Celsius Management Corp. (collectively, "Corporate Defendants") to stay this action for up to 45 days to permit the parties to seek approval of their settlement ("Stipulated Order") in *In re Celsius Network LLC*, No. 22-10964(MG) (Bankr. S.D.N.Y.), it is hereby ORDERED that:

    1.    The motion is GRANTED.

    2.    The above-captioned action is stayed as to Corporate Defendants until August 28, 2023 or until the Bankruptcy Court approves the Stipulated Order, whichever is earlier.

    3.    On or before August 28, 2023, the FTC and the Corporate Defendants shall file a motion seeking entry of the Stipulated Order or otherwise notify the Court of the status of the effort to seek Bankruptcy Court approval.

IT IS SO ORDERED.

Date: _____

_____

UNITED STATES DISTRICT JUDGE