

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4

5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    CELSIUS NETWORK LLC,

9

10            Debtor.

11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    August 14, 2023

17                    10:02 AM

18

19

20

21    B E F O R E :

22    HON MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  KS

Page 2

1    HEARING re Zoom for Government Hearing with Respect to

2    Confirmation of the Debtors Joint Plan of Reorganization,

3    (III) Approving the Form of Ballots and Notices in

4    Connection Therewith, (IV) Scheduling Certain Dates with

5    Respect Thereto, (V) Authorizing and Approving Reimbursement

6    of Certain of the Plan Sponsors Fees And Expenses, and (VI)

7    Granting Related Relief. (Doc## 2970, 2971, 2977, 3011,

8    3061, 3084, 3104, 3115, 3116, 3117, 3118, 3122 to 3125,

9    3139, 3140, 3142, 3143, 3146, 3149, 3150, 3153, 3154, 3156

10   to 3159, 3161, 3162, 3163, 3164, 3168, 3169, 3173 to 3178,

11   3179, 3181, 3182, 3185 to 3188, 3201, 3202, 3206, 3129,

12   3130, 3133, 3134, 3135, 3137, 3206, 3210, 3214, 3215, 3219,

13   3220, 3222 to 3228, 3236, 3241, 3245, 3256, 3265, 3266,

14   3267, 3269, 3273 to 3276)

15

16   HEARING re Zoom for Government Hearing RE: Joint Motion for

17   Entry of an Order (I) Approving the Settlement by and Among

18   the Debtors and the Committee with Respect to the Committees

19   Class Claim and (II) Granting Related Relief. (Doc## 3064,

20   3124, 3138, 3144, 3170, 3219, 3226, 3266, 3271)

21

22   HEARING re Zoom for Government Hearing RE: Motion of

23   Terraform Labs PTE Ltd. For Leave To Serve Rule 45 Document

24   Subpoena(s) On Debtors. (Doc## 3129, 3130, 3133, 3134, 3135,

25   3137, 3219)

1   HEARING re Status Conference RE: Rule 2004 Motion and 60(b)

2   Motion. (Doc ## 3261 to 3264)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS LLP

4        Attorneys for Debtors

5        300 North Salle

6        Chicago, IL 60654

7

8    BY:  ROSS KWASTENIET

9        CHRIS KOENIG

10       ELIZABETH JONES

11       DAN LATONA

12       CHRISTOPHER FERRARO

13       T.J. MCCARRICK

14

15   WHITE & CASE LLP

16       Attorneys for the Official Committee of Unsecured

17       Creditors

18       555 South Flower Street, Suite 2700

19       Los Angeles, CA 90071

20

21   BY:  AARON COLODNY

22       KEITH WOFFORD

23

24

25

**Page 5**

```
 1    TEXAS OFFICE OF ATTORNEY GENERAL

 2         Attorney for Texas State Securities Board

 3         PO Box 12548

 4         Austin, TX 78711-2548

 5

 6    BY:  LAYLA MILLIGAN

 7

 8    MCCARTER ENGLISH, LLP

 9         Attorney for Zaryn Dentzel

10         245 Park Avenue

11         New York, NY 10167

12

13    BY:  DAVID ADLER

14

15    UNITED STATES DEPARTMENT OF JUSTICE

16         Attorneys for the U.S. Trustee

17         201 Varick Street, Suite 1006, 10th Floor

18         New York, NY 10014

19

20    BY:  SHARA CORNELL

21

22

23

24

25
```

Page 6

1    LATHAM & WATKINS

2    Attorneys for Debtors

3    330 North Wabash Avenue, Ste 2800

4    Chicago, IL 60611

5

6    US SECURITIES AND EXCHANGE COMMISSION

7         Attorneys for the SEC

8         100 F Street NE

9         Washington, D.C. 20549

10

11   BY:  THERESE SCHEUER

12        WILLIAM UPTEGROVE

13

14   NATIONAL ASSOCIATION OF ATTORNEYYS GENERAL

15        Attorneys for a Number of States

16        1850 M Street NW, 12th Floor

17        Washington, D.C. 20036

18

19   BY:  KAREN CORDRY

20

21

22

23

24

25

```
1   HUGHES HUBBARD REED LLP
2        Attorneys for Gemini Trust Company, LLC
3        One Battery Park Plaza
4        New York, NY 10004
5
6   BY:  ELIZABETH A. BEITLER
7
8   FOX ROTHSCHILD LLP
9        Attorneys for Mawson Infrastructure Group
10       49 Market Street
11       Morristown, NJ 07960
12
13  BY:  MICHAEL R. HERZ
14       MICHAEL ADAM SWEET
15
16  FEDERAL TRADE COMMISSION
17       Attorneys for Federal Trade Commission
18       600 Pennsylvania Avenue NW
19       Washington, D.C. 20877
20
21  BY:  KATHERINE AIZPURU
22       KATHERINE JOHNSON
23
24
25
```

1   VENABLE LLP

2        Attorneys for Nate Tuganov

3        Rockefeller Center

4        1270 Avenue of the Americas

5        New York, NY 10020

6

7   BY:  JEFFREY S. SABIN

8

9   LOWENSTEIN SANDLER

10        Attorneys for Securities Class Action Plaintiffs

11        One Lowenstein Drive

12        Roseland, NJ 07068

13

14   BY:  ANDREW BEHLMANN

15

16   DENTONS US LLP

17        Attorneys for Terraform Labs PTE Ltd.

18        1221 Avenue of the Americas, 25th Floor

19        New York, NY 10020

20

21   BY:  SARAH M. SCHRAG

22

23

24

25

1    WILLKIE FARR GALLAGHER LLP

2         Attorneys for BRIC (Blockchain Recovery Investment

3         Consortium)

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:  BRIAN S. LENNON

8

9    TROUTMAN PEPPER

10        Attorneys for Ad Hoc Group of Withhold Accountholders

11        4000 Town Center, Suite 1800

12        Southfield, MI 48075

13

14   BY:  DEBORAH KOVSKY-APAP

15

16   LAW OFFICE OF EDUARDO J. GLAS

17        Attorneys for Greg Kieser

18        345 Seventh Avenue, 21st Floor

19        New York, NY 10001

20

21   BY:  EDUARDO J. GLAS

22

23

24

25

Page 10

1   BROWN RUDNICK LLP

2        Attorneys for Fahrenheit LLC

3        7 Times Square, 47th Floor

4        New York, NY 10036

5

6   BY:  ANDREW CARTY

7

8   KLEINBERG KAPLAN WOLFF COHEN PC

9        Attorneys for Harrison Schoenau

10       500 Fifth Avenue

11       New York, NY 10110

12

13  BY:  DOV R. KLEINER

14

15  RUSKIN MOSCOU FALTISCHEK PC

16       Attorneys for Koala 1 LLC and AM Ventures Holdings,

17       Inc.

18       1425 RXR Plaza, 15th Floor

19       Uniondale, NY 11556

20

21  BY:  SHERYL P. GIUGLIANO

22

23

24

25

Page 11

1    OFFIT KURMAN PA

2         Attorneys for Ad Hoc Group of Earn Account Holders

3         590 Madison Avenue, 6th Floor

4         New York, NY 10022

5

6    BY:   JOYCE A. KUHNS

7         JASON A. NAGI

8

9    ALSO PRESENT:

10   JAMES RYAN

11   VICTOR UBIERNA DE LAS HERAS

12   JASON IOVINE

13   DANIEL FRISHBERG

14   OTIS DAVIS

15   SANTOS CACERES

16   COURTNEY BURKS STEADMAN

17   LAWRENCE PORTER

18   ARTUR ABREU

19

20

21

22

23

24

25

Page 12

1                    P R O C E E D I N G S

2             THE COURT:  Yes, I would.  Good morning,

3    everybody.  So this is the disclosure statement hearing in

4    Celsius.  Let me briefly, because there's a lot of

5    materials, a lot of participants who've made filings, I'd

6    like to proceed in the following way.

7             I want to start with a brief -- I'm asking for a

8    brief presentation by Debtors' counsel and specifically

9    covering any additional resolutions that have been reached

10   since the filings were done.  After the Debtors make their

11   brief presentation, I'd like a brief presentation by the

12   Committee as well.

13            Third, I would like to hear the U.S. Trustee's

14   objections.  Fourth, I'd like to hear the state or federal

15   regulators' objections.  Fifth, I'd like to hear any other

16   creditor objections, that's both those who are represented

17   by counsel and those who are pro se.  And then finally, I

18   would like a response from the Debtors and/or the Committee.

19            So that's how we'll proceed.  The -- as in the

20   past, we'll use the Zoom hand raising function when people

21   wish to be identified, but I want to proceed, as I say, I

22   want to proceed:  Debtors, Committee, U.S. Trustee, state or

23   federal regulators, other creditors, both those by counsel

24   or pro se, and then the responses.

25            I've reviewed -- I certainly -- unless anything

Page 13

1    came in overnight that I didn't see, it wouldn't be timely

2    if it did, but I think I reviewed everything that's been

3    filed on the docket so far.  Who's going to begin for the

4    Debtors?

5              MR. KOENIG:  Good morning, Your Honor.  It's Chris

6    Koenig of Kirkland & Ellis for Celsius.  Can you hear me

7    okay?

8              THE COURT:  Yes, I can, Mr. Koenig.

9              MR. KOENIG:  Wonderful.  So we'll start with the

10   disclosure statement and then we'll turn to the other items

11   on the agenda.

12             THE COURT:  Go ahead.

13             MR. KOENIG:  Okay.  Wonderful.  So, today is a

14   very important day in the Chapter 11 cases.  It is the most

15   important hearing in the cases and the culmination of a

16   marketing and sale process that spanned many months and

17   ultimately culminated in a one-month long auction.  At the

18   conclusion of that auction, the Debtors and the Committee

19   selected Fahrenheit as the plan sponsor for the Newco being

20   proposed under the plan and we also selected the Brick as

21   the stalking horse for the backup transaction that would be

22   implemented if the Newco transaction cannot be completed for

23   any reason.

24             And the plan and disclosure statement now include

25   a mediated settlement between the Debtors, the Committee,

Page 14

1    the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group

2    that was reached after three days of mediation with Judge

3    Wiles.

4         If the disclosure statement is approved today,

5    that will allow the Debtors to commence solicitation on our

6    Chapter 11 plan, which will lead to a confirmation hearing

7    in early October and set us up very well for our ultimate

8    goal of having our Chapter 11 plan go effective by the end

9    of this year so that distributions to our creditors can

10   commence in 2023.

11        We've of course received a number of objections to

12   the disclosure statement which we'll go through in more

13   detail, but the simple question before the Court today is

14   whether the disclosure statement contains adequate

15   information that is sufficient to allow a hypothetical

16   creditor to make an informed decision to vote on the plan.

17   And after reviewing the disclosure statement and all of its

18   materials, the only possible answer to that question is yes.

19        The disclosure statement is a tome of a document.

20   It spans more than 300 pages of body text and 400 (audio

21   glitch) the appended exhibits, but it is not just (audio

22   glitch) of information.  Instead, the disclosure statement

23   is carefully tailored to provide information to account

24   holders in a form that will actually be useful to them.  It

25   includes a 23-page preliminary statement that is written not

Page 15

1    in legalese, but in plain English to try to explain the

2    complex plan transactions and what it means for all account

3    holders.

4            This preliminary statement includes detailed

5    charts and explanations of the options available to account

6    holders in each of the Debtors' programs -- being Earn,

7    Custody, Borrow, and Withhold -- and the rest of the

8    disclosure statement likewise provides more than adequate

9    information for account holders and other creditors.  It

10   includes 90 pages of frequently asked questions and the

11   index of the disclosure statement includes each of those

12   questions specifically listed out so that account holders

13   can readily locate their question and flip to the

14   appropriate page to get the answer.

15           And the disclosure statement and its exhibits also

16   include nearly 300 pages of additional disclosure on such

17   topics such as mining, financial projections, the history of

18   these cases, and a description of the various settlements

19   and transactions that are included in the plan.

20           Of course, not everybody supports the plan.  We

21   received a number of objections that are effectively

22   objections to confirmation, but again, what is before the

23   Court today is whether the plan -- whether the disclosure

24   statement contains adequate information and the only answer

25   is yes.  To Your Honor's question, I'm pleased to report

Page 16

1   several resolutions that we were able to reach over the past

2   few days.

3            First, we've had very constructive discussions

4   with the U.S. Trustee who objected on the grounds of both

5   additional disclosure that they wanted to see included in

6   the document and substantive objections that they had to the

7   releases, the exculpations, and the KEIP that is effectively

8   embedded in the plan.

9            As part of the revised disclosure statement that

10  we filed last Wednesday, we included significant additional

11  disclosure on the items requested by the U.S. Trustee, such

12  as how distributions will be made to creditors.  On the

13  exculpation, we clarified in a few places in the plan that

14  the exculpations we were seeking only cover the period from

15  the petition date through the effective date of the plan.

16           For that reason, we agreed to remove the post-

17  effective date Debtors from the exculpation because the

18  post-effective date Debtors cannot exist pre-emergence.  But

19  we left the other entities that will be created to implement

20  the plan such as the plan administrator and the litigation

21  administrator, we left those entities in because those

22  parties may well be created pre-emergence to take actions to

23  support the implementation of the plan pre-emergence.  So

24  the exculpation would cover those pre-emergence actions, but

25  again, the exculpation is time limited and would not cover

Page 17

1    post-emergence actions by those entities.

2              We also agreed with the U.S. Trustee that we would

3    put on the record that the Debtors and the solicitation

4    agent will be tracking how many solicitation packages go

5    out, how many are returned as undeliverable, how many opt-

6    outs and opt-ins there are, and all of that detail will be

7    included in the voting report that will be filed ahead of

8    confirmation.

9              And finally, and perhaps most importantly, to

10   preserve estate resources and in the spirit of our ongoing

11   productive negotiations with the U.S. Trustee, we've agreed

12   that the Debtors and the U.S. Trustee will defer the

13   argument on the plan objections raised by the U.S. Trustee -

14   - that is, their objections to the releases, the

15   exculpations, and the KEIP -- to the confirmation hearing

16   with all parties' rights reserved on that issue.

17             So we understand that with those agreements and

18   clarifications on the record, the U.S. Trustee will not be

19   pressing its objection to the disclosure statement today.

20   We and the Committee have also had productive discussions

21   with the Earn Ad Hoc Group who had filed a reservation of

22   rights on governance issues and certain other issues.  They

23   amended their reservation of rights over the weekend to

24   reflect our ongoing constructive discussions and we look

25   forward to continuing to engage with them ahead of

1    confirmation.

2              And these constructive developments with both the

3    U.S. Trustee and Earn Ad Hoc Group are emblematic of the way

4    the Debtors think about the disclosure statement.  We

5    understand that not every party supports the plan today.

6    Several of the objectors have raised substantive objections

7    to the plan.

8              Those will all have to be resolved at

9    confirmation, including issues relating to loans and CEL

10   token.  And if we're not able to reach a negotiated

11   resolution of those issues, the Debtors will have to carry

12   their burden at the confirmation hearing that the plan

13   should be confirmed.  But those arguments should not prevent

14   the disclosure statement from being approved today,

15   solicitation to commence.

16             So with those opening remarks (audio glitch), I'd

17   like to -- just some housekeeping and the evidence in

18   support of the disclosure statement motion.  The disclosure

19   statement motion sought approval of up to $5 million of

20   expense reimbursement for Fahrenheit as the plan sponsor.

21   Your Honor may recall that the prior stalking horse deal

22   that we had with NovaWulf, NovaWulf had the right to receive

23   up to $13 million of expense reimbursement.  It was divided

24   into two tranches.  The first $8 million was payable before

25   the disclosure statement hearing.  The second tranche of $5

Page 19

1    million would only be approved after the disclosure

2    statement hearing.

3            So at the auction, the deal that we came to with

4    Fahrenheit included Fahrenheit effectively slotting in for

5    that second $5 million because the estate was already

6    obligated to pay NovaWulf and that obligation fell away when

7    we named Fahrenheit as the winning bidder.  Fahrenheit has

8    been working around the clock to do all of the work that is

9    needed to stand up the Newco as part of the Chapter 11 plan.

10   We believe their reimbursement is reasonable, should be

11   approved today in the order approving the disclosure

12   statement.

13           No party objected to this relief as part of the

14   disclosure statement motion, but we submitted a declaration

15   by Mr. Ferraro in support of that $5 million expense

16   reimbursement.  That that declaration is filed at Docket No.

17   3220 and at this time, I'd like to move it into evidence.

18           THE COURT:  All right, are there any objections to

19   the Court admitting into evidence the Ferraro declaration

20   which is ECF 3220?  Hearing none, it's admitted in evidence.

21           (Ferraro declaration entered into evidence)

22           MR. KOENIG:  Thank you, Your Honor.  Those are my

23   preliminary comments.  We filed a presentation overnight.

24   We plan to present our case in chief, but happy to proceed

25   however Your Honor would like.  If you'd like us to present

Page 20

1    more detailed case in chief or if you'd like to turn it over

2    to Mr. Colodny.

3            THE COURT:  No, I'd like to turn it over to Mr.

4    Colodny now.

5            MR. KOENIG:  Thank you, Judge.

6            THE COURT:  Thank you.  Mr. Colodny.

7            MR. COLODNY:  Good morning, Judge.  Aaron Colodny

8    from White & Case on behalf of the Official Committee of

9    Unsecured Creditors.  The Committee supports the Debtors'

10   motion to approve the disclosure statement and begin

11   solicitation of the plan.  We also filed a letter in support

12   of the plan which is at Docket No. 3116, which will be

13   included in the solicitation package if it is approved by

14   the Court this morning.

15           I think it's safe to say that the plan is a

16   product of a very lengthy process and it's a process that's

17   both been competitive, collaborative, and open.  It includes

18   a month-long auction to select the plan sponsor and it also

19   includes extensive negotiations with all of the creditor

20   constituencies, including the Committee, the Earn Group, the

21   Borrow Group, the Custody Group, and the Withhold Group.  It

22   also includes the results of litigation to determine the

23   relative rights of certain of those creditor constituencies

24   that Your Honor did earlier last year.

25           While we understand that certain creditors may be

Page 21

1    dissatisfied with some of those outcomes, there will never

2    be a perfect plan.  Process was run the right way.  It

3    involves groups of creditors and a remarkable level of

4    involvement from pro se parties and reflects all of their

5    feedback.  Debtors have now been in bankruptcy for over a

6    year and they've worked cooperatively to develop a plan that

7    needs to be put to a vote.

8            When I think about the disclosure statement,

9    there's been a lot of pro se involvement in people that are

10   actively involved, but a large amount of Debtors' creditors

11   have not been, and whenever I was reviewing the disclosure

12   statement and the ballot specifically, I put myself in the

13   shoes of those creditors and thought, what would they need

14   to see to cast an informed vote on the plan.

15           As Mr. Koenig summarized, the disclosure statement

16   provides that information, provides a plain English summary,

17   provides answers to frequently asked questions, detailed

18   risk factors, tax information, financial projections, mining

19   projections, and a dec from Fahrenheit, the plan sponsor, as

20   to what it believes the Newco will look like.

21           We -- I want to specifically address the

22   reservation of rights that was filed by the Earn Ad Hoc

23   Group.  I think that our resolution of that reservation is

24   indicative of how these cases have progressed.  We filed our

25   reply to the Earn Ad Hoc Group.  I think both parties had

Page 22

1    their differences, but we did not stop there.  We met for

2    hours with the Earn Ad Hoc Group over the past few days

3    discussing the matters that were raised in their objection.

4         We had a meeting with the Debtors and their

5    financial advisors to go through the disclosure statements

6    and their questions on financial projections.  We had a

7    meeting directly with the members of the Earn Ad Hoc Group

8    and the Committee members to discuss important parts such as

9    governance, which I want to pause for a minute to discuss.

10        This is not the typical Chapter 11 case where

11   somebody -- a large party comes in, purchases the Debtors,

12   and appoints a board.  Newco will be primarily owned by

13   creditors.  And the Earn Ad Hoc Group, like a lot of

14   creditors, feel very strongly that certain members of the

15   board should be existing creditors in Celsius.  The

16   Committee as a fiduciary for all account holders and

17   unsecured creditors agrees and is committed to select a

18   qualified board with appropriate expertise and experience.

19        To that end, we've run the process to identify a

20   group of qualified candidates for board positions.  That

21   group includes individuals proposed by the Earn Group

22   including certain of its members.  It also includes certain

23   members of the Committee who have indicated they are

24   interested to be considered for a board seat.  Those

25   committee members have spent a year serving as a fiduciary

Page 23

1    for all creditors and devoted thousands of volunteer hours

2    to making difficult decisions presented by this case, and I

3    think their record speaks for itself.

4           I want to be clear that no decisions or promises

5    have been made with respect to membership of the board and

6    the Committee is committed to ensuring that all candidates

7    are fairly considered.  We will ensure a fair process is

8    employed to make sure we get the best board to oversee the

9    new company moving forward.

10           I also want to discuss the toggle feature briefly.

11   As we discussed with Your Honor before, the toggle feature

12   is an alternative.  It is a backup transaction.  It is a

13   break in case of emergency transaction that was put into

14   place due to the regulatory uncertainties that surround the

15   cryptocurrency industry and the Committee and Debtors'

16   firsthand experience watching the Voyager case where the

17   backup transaction that they had put into place was actually

18   executed and allowed for the return of money to creditors as

19   quickly as possible.

20           It is not a transition to a new plan with

21   different recoveries under any circumstances, and it's being

22   solicited as part of this plan.  As agreed at the mediation,

23   the Debtors and the Committee will concert -- will consult

24   with the Earn and Borrow Groups prior to triggering the

25   orderly winddown or the transition to the backup plan.  To

Page 24

1    the extent that the Earn or Borrow Groups believe that the

2    toggle is not appropriate, they will be able to raise those

3    issues with Your Honor.

4              Now, the Committee has largely been silent as

5    we've been going through this plan process from the public

6    perspective, but the approval, if Your Honor grants it

7    today, of the disclosure statement allows us to solicit the

8    plan and we intend to do so.  We intend to hold regular

9    meetings and town hall meetings to walk creditors through

10   the disclosure statement, the ballot, and other forms so

11   that everybody can be sure that they are making an informed

12   decision on the plan.

13             And I want to be clear that that will, that

14   outreach, will be collaborative.  We intend to talk to

15   creditors, tell them why we support the plan, and to walk

16   them through what is a complicated document that we believe

17   provides adequate disclosure of everything required to cast

18   an informed vote on this plan.

19             Unless Your Honor has any questions, I'll pass the

20   mic to the U.S. Trustee.

21             THE COURT:  All right, thank you very much, Mr.

22   Colodny.  Who's going to speak on behalf of the U.S.

23   Trustee?

24             MS. CORNELL:  Good morning, Your Honor.  Shara

25   Cornell on behalf of the Office of the United States

Page 25

1    Trustee.

2            THE COURT:  Good morning.

3            MS. CORNELL:  Good morning.  The United States

4    Trustee appreciates the Debtors considering both our formal

5    and our informal objections and issues with the disclosure

6    statement.  They amended and included a lot more

7    information, in particular the information about adversary

8    proceedings and preferences will generally be helpful.

9            There was also additional information added

10   regarding PayPal and other distribution mechanics that we

11   feel will benefit all voters in this case in giving them

12   more information.  In an effort to conserve estate assets

13   and resources and the Court's time we've agreed to defer

14   certain arguments until confirmation, if applicable still,

15   given the Debtors revisions to their disclosure statement.

16           We look forward to continuing our dialogue with

17   the Debtors to resolve as many or all of our objections,

18   including the issues with the EIP exculpation and releases

19   prior to confirmation.  Accordingly, we reserve our rights

20   to object at confirmation, but hope that our objections

21   effectively previewed our issues to streamline the process

22   for both the Court and for the Debtors.

23           If Your Honor has any questions for me at this

24   time.

25           THE COURT:  Thank you very much, Ms. Cornell.  All

Page 26

1    right, so I know that there are a group of state and federal

2    regulators who are appearing today.  If you would just raise

3    your hand to indicate if you want to be heard and I will

4    recognize you.  All right, Ms. Cordry, I see you first, so

5    go ahead.  I'm doing them in the order I see the hands, so -

6    --

7             MS. CORDRY:  Certainly, Your Honor.  Yes, we are

8    much in the same position, I believe, as the U.S. Trustee.

9    We've had some discussions with the Debtor.  We welcome the

10   changes they made to address the U.S. Trustee's objections

11   that we didn't have to make.  We do still have some concerns

12   with the precise treatment of the state claims.  There will

13   be some, I think, probably some further injunctive language

14   we'll be talking about.

15            The way the claims are discussed in terms of being

16   expunged at confirmation is something that's a problem, but

17   again, I think those are matters we can work through

18   substantively.  I don't think they are a serious impediment

19   and in terms of the disclosure statement, they are

20   adequately disclosed there.  We will also be interested in

21   looking at further changes to the release language and so

22   forth.

23            But again, in terms of the disclosure statement

24   hearing, I think they are adequately described, what is

25   currently being proposed, and any further discussions can

Page 27

1    take place in the context of the confirmation hearing.

2    Thank you.

3              THE COURT:  Thank you very much, Ms. Cordry.  Ms.

4    Milligan.

5              MS. MILLIGAN:  Good morning, Your Honor.  I

6    largely Ms. Cordry's --

7              THE COURT:  Just indicate who you're appearing --

8              MS. MILLIGAN:  Can you hear me?

9              THE COURT:  Yeah, I can hear you fine, but just so

10   I know that --

11             MS. MILLIGAN:  I apologize.

12             THE COURT:  I know who you are, but so everybody

13   can know.

14             MS. MILLIGAN:  I sincerely apologize, Your Honor.

15   Layla Milligan with the Texas Attorney General's Office

16   appearing on behalf of the Texas State Securities Board and

17   Texas Department of Banking.

18             I largely echo Ms. Cordry's statements.  We have

19   been in discussions with the Debtors' counsel and they've

20   made modifications.  We're reserving rights to continue the

21   discussions regarding confirmation issues, but those are

22   confirmation issues and so we have -- again, are hopeful

23   that we can continue those discussions as we lead up to

24   confirmation.  But I think again, I echo Ms. Cordry's

25   statements that the issues for today have been largely

Page 28

1    resolved.  So, we'll leave it at that and I thank you, Your

2    Honor.

3           THE COURT:  Thank you very much, Ms. Milligan.

4    Ms. Scheuer?  I hope I'm pronouncing your name correctly.

5           MS. SCHEUER:  Yes, Your Honor.  Good morning.

6    Therese Scheuer for the U.S. Securities and Exchange

7    Commission.  With me on the line is William Uptegrove, also

8    for the U.S. Securities and Exchange Commission.  Can Your

9    Honor hear me okay?

10           THE COURT:  I can, thank you.

11           MS. SCHEUER:  Thank you.  So the SEC staff has

12    also been in discussions with the Debtors and provided them

13    with informal comments regarding the plan and disclosure

14    statement and many of those comments have been addressed.

15    We did file a formal reservation of rights and in response,

16    the Debtors have deleted the concept of tokenized illiquid

17    recovery rights.

18           Your Honor, the SEC continues to reserve its

19    rights to object to confirmation or to the winddown motion

20    on any bases, and as stated more fully in our filing, the

21    SEC is not opining as to the legality under the federal

22    securities laws of the transactions outlined in the plan and

23    is reserving its rights.  Thank you, Your Honor.

24           THE COURT:  Thank you very much, Ms. Scheuer.  All

25    right, are there any other state or federal regulators who

Page 29

1    want to be heard?  I don't see any hands.  So, now I want to

2    turn to the other creditors who have objections.  If you

3    would raise your hand, whether you're counsel appearing for

4    creditors or pro se, I'll try and recognize you in the order

5    in which I see the hands.  Mr. Kleiner.

6         MR. KLEINER:  Good morning, Your Honor.

7         THE COURT:  Go ahead.

8         MR. KLEINER:  Dov Kleiner from Kleinberg, Kaplan,

9    Wolff, and Cohen for creditor Harrison Schoenau.  Mr.

10   Schoenau, as we mentioned in our objection, is an account

11   holder, but he's also someone who's transacted with the

12   Debtors during the 90 days prior to the bankruptcy filing

13   and therefore may be subject to the avoidance actions, so we

14   don't actually know, but we presume that's something the

15   Debtors are considering.

16        We filed a limited objection which is on Docket

17   3161 and to be very, very clear, we don't object to the

18   language of the disclosure statement.  That wasn't the

19   purpose of our objection.  Our principal objection is that,

20   is to the mandatory ADR procedures which the Debtors are

21   effectively shoe horning into the plan process rather than

22   bringing on by motion.

23        So we really have two objections.  One is a

24   procedural one and the other is a substantive one.  The

25   procedural one, as I said, is that under local Rule 9019,

Page 30

1    there are procedures governing alternative dispute

2    alternative dispute resolution specifically.  General Order

3    M452 is incorporated in the procedures governing mediation

4    of matters and the use of early neutral evaluation.

5          That's very -- those procedures are very specific.

6    Section 1.1 of those procedures says that the Court can

7    order an ADR if it -- upon a party first filing -- a party

8    in interest first filing a motion and after the filing of a

9    first document in the case.  In other words, two things have

10   to have happened.  One is there needs to be an actual

11   motion, which is not the case here.  And second, there

12   actually has to be a case in controversy.  In the case of

13   avoidance actions, that would be the bringing of an

14   adversary proceeding.

15         Now, it looks like the procedures are set up for

16   claims disputes and dealing with objections to claims, and

17   that would make sense since proofs of claim have been filed.

18   But the Debtors have made clear that they also intend for

19   the alternative dispute resolutions to apply to adversary

20   proceedings and there aren't any.  None have been filed yet,

21   and so it doesn't make sense that these would be -- that the

22   Debtors would be requiring parties to participate in

23   alternative dispute resolutions from -- for actions that

24   haven't yet been filed.

25         That's the procedural objection.  If the Debtors

Page 31

1    would like these considered and if they'd like it considered

2    at the confirmation hearing, they need to bring on a motion.

3    They need to identify who the proper parties are to receive

4    service of that and notify them that their rights

5    specifically are being compromised, and that's -- that

6    hasn't happened here.

7              THE COURT:  Mr. Kleiner, the only thing I would

8    say is I've never understood what's in the general order as

9    limiting my power to ordering ADR and in large cases, I can

10   -- you know, there have been multiple instances over the

11   last 16 years when I don't think that it's been in a plan

12   itself, but I've ordered mandatory ADR over a large range of

13   claims.  I've usually built in a procedure where any

14   creditor who objects to the ADR can file a motion to seek to

15   be relieved from that obligation.

16             And certainly there haven't been a large number of

17   those instances, but over the last 16 years, in fact, I have

18   exercised that specific requirement and excluded parties

19   from ADR, but the burden has been on those parties to seek

20   to be relieved from an obligation of ADR.  So I'm not sure

21   that I see what the legal basis for your objection is.  You

22   know, in large cases in particular, let's take the

23   preference claims which potentially do exist here.  They

24   frequently involve common issues.  They may be unique issues

25   for individual creditors, but they frequently involve common

Page 32

1    issues as well.

2            So usually what I've done in the past is in --

3    particularly in large cases, I've insisted on the selection

4    of somewhere between three and five suggested mediators

5    because there's always the potential for a conflict and

6    require that the selection of mediators come from that list.

7    But, so I -- you know, I'm not sure.  I'll give you a chance

8    to respond about the comments I've made, but you're not

9    getting a lot of traction from me.

10           Yes, they're putting this in the plan.  They're

11   putting everybody on notice on it.  I'm not sure that I

12   agree with, 100 percent with all the language that they've

13   built in.  For example, where they say it could lead to a

14   rejection of a claim.  You know, it's for the Court to

15   decide if a party does not comply with a requirement to

16   mediate what the remedy should be.

17           So, I mean, I think the language they've put in

18   about it, one could view as precatory but, on the whole,

19   I've been -- I'm very supportive, particularly in large and

20   small cases, but particularly in the large cases as this one

21   is, of a mandatory mediation require -- I do not believe

22   mandatory mediation violates anybody's due process rights.

23   I believe, and judges across the United States, bankruptcy

24   judges, have often exercised what they believe is their

25   authority, which I believe I have the authority to order

1    mediation.

2            If someone wants to object to be including in it,

3    I've always permitted, you know, objections to be filed and

4    I'll hear that.  But so let me -- Mr. Kleiner, I'll give you

5    a chance to respond to that.

6            MR. KLEINER:  Sure.  Thank you, Your Honor.  And

7    of course, the rules, by the way, provide that the Court can

8    order --

9            THE COURT:  Yeah, I know.  That's exactly the

10   point.

11           MR. KLEINER:  Yeah.  So, that's right.  So -- but

12   I dare say that if the Court were to order this on its own,

13   I don't think it would be these procedures.  There would be

14   a much fairer set of procedure and ones that were

15   specifically designed to accommodate the issues that are

16   going to be raised in the avoidance action litigation.

17           As you know, there was an entire trial set up in

18   the Custody and Withhold litigation -- I think it was

19   supposed to be phase two -- that was never reached because -

20   - the issues weren't litigated because the parties reached a

21   settlement.  Those issues will need to be litigated at some

22   point.

23           And as far as I know, and I can't speak from Ms.

24   Kovsky who I understand may have had discussions with the

25   Debtors, we haven't participated in the designing of these

Page 34

1    procedures.  These procedures were designed by the Debtors

2    for their own purposes and for their own benefit without the

3    input of the potential claimants, or in this case, the

4    potential defendants.

5            If the Court is going to implement alternative

6    dispute resolution procedures that govern and affect the

7    rights of avoidance action defendants, then those parties

8    ought to at least participate in the designing of the

9    procedures so they're fair.  These are specifically one

10   sided, designed to advantage the Debtors.

11           THE COURT:  You know, Mr. Kleiner, I hear you, but

12   in the past I've approved procedures that I believe are fair

13   and not all creditors who wind up having to engage in ADR

14   have a voice in that.  So, all right.  Let me hear from Ms.

15   Kovsky next.

16           MS. KOVSKY-APAP:  Good morning, Your Honor.  Deb

17   Kovsky, Troutman Pepper for the Ad Hoc group of Withhold

18   Accountholders and other transferees.  We filed what is

19   largely a statement and reservation of rights recognizing

20   that these issues are probably better deferred to

21   confirmation or better yet to a negotiated resolution with

22   the Debtors and the Committee ahead of confirmation.

23           THE COURT:  That's what I would really hope would

24   happen, so.

25           MS. KOVSKY-APAP:  And that is what we are working

Page 35

1    on, Your Honor.  We've had productive discussions.  We've

2    exchanged drafts and I'm hopeful that we will get to a

3    negotiated resolution.  To be very clear, the Ad Hoc Group

4    is not opposed to the concept of ADR.  I am personally a

5    huge fan of it.

6         I think that particularly given the number and

7    scope of potential accountholder actions that might be

8    brought against accountholders that transacted with the

9    Debtors in the 90 days before the petition date, it's just

10   not going to be workable otherwise.  And accountholders need

11   to have an opportunity to, if they wish to, have some kind

12   of an organized path to a negotiated resolution.

13        Our concerns are more about the mandatory nature

14   of the ADR procedures with respect to accountholders that

15   have not been sued or served, and the fact that they could

16   require someone who is not even yet a defendant in a

17   preference lawsuit to affirmatively put a proposal on the

18   table and to offer to settle a claim that hasn't been made

19   against them yet, at risk of losing their scheduled claim in

20   the case, which as Your Honor has already indicated, might

21   be a little a little beyond the pale.

22        There's also some other issues with one-sided

23   discovery and other things that are really not -- it's

24   essentially that these procedures need to be modified to

25   make sure that they're protecting the rights of potential

Page 36

1   defendants, both in terms of the mandatory nature of

2   prelitigation ADR as well as sort of once the ADR is

3   commenced to ensure that both sides have an equal

4   opportunity and are on equal footing so that they can

5   potentially reach consensual resolutions.

6            But as I said, the Ad Hoc Group intends to

7   continue to work with the Debtors and with the Committee and

8   hopefully be able to tweak some of the provisions of the ADR

9   procedures so that they do work for everyone.

10           THE COURT:  Thank you, Ms. Kovsky.  Mr. Porter.

11   I'm going in the order -- I wrote down names as I saw hands

12   go up, so Mr. Porter next.

13           MR. PORTER:  Good day, Judge Glenn.  My name is

14   Lawrence C. Porter.  I am a creditor at Celsius.  First and

15   foremost, I want to thank everyone for the progress we have

16   made so far.  We are very worried because after an analyzing

17   this new company that the Debtor and the UCC are intent on

18   jamming us into, we now know it is a bad deal for creditors.

19   They have made guesstimates on future revenue that are based

20   on nothing more than "hopium" and creditors will be asked to

21   lose more of their money in this new venture.

22           Ten minutes of analysis will tell anyone who takes

23   the time to look at the facts that we are being jammed into

24   a bad deal and what we all want is to get back as much of

25   our money as possible, because that's the reason why we

Page 37

1     initially invested in Celsius, to have the opportunity to

2     withdraw at any time, definitely not to be forced into a

3     highly speculative bitcoin mining venture, a forced

4     investment where the sharing agreement is so lopsided that

5     it makes no sense for creditors to assume new risk.

6             Please see it in your wisdom to enable creditors

7     to have an orderly winddown of Celsius business so we can

8     maximize our return, not to be forced into another bad

9     investment.  Thank you.

10            THE COURT:  Thank you very much, Mr. Porter.  The

11    next name, and I apologize.  I didn't get it whether it was

12    a mister or a miss, is Behlmann, B-E-H-L-M-A-N-N.

13            MR. BEHLMANN:  Good morning, Your Honor.  Andrew

14    Behlmann from Lowenstein Sandler on behalf of the lead

15    plaintiffs in the Celsius securities litigation.  Your

16    Honor, we filed a limited objection at Docket No. 3149.  In

17    that objection, we raised six discrete issues.  I'm pleased

18    not to be before Your Honor this morning on all six of those

19    discrete issues.  Three of those issues have been resolved

20    between the amended documents and the Debtors' reply brief.

21            The Debtors have confirmed in their reply brief

22    that all of the non-debtor defendants in the securities

23    litigation are not and will not be receiving releases under

24    the plan.  They've added a summary of the securities

25    litigation to Article 7 of the disclosure statement and

Page 38

1      they've added a post-confirmation evidence preservation

2      obligation to the plan in Article 8 and referenced that in

3      disclosure statement Article 3.  All good things from our

4      perspective.

5              There are three issues remaining that we do see

6      some overlap between the disclosure statement stage and

7      confirmation.  As the Debtors have indicated, these are all

8      confirmation issues.  Our view is that they are sort of a

9      hybrid that overlaps the two and I'll explain why in a

10     second.

11             Those three issues are the preservation of claims

12     against the Debtors to the extent of Side C D&O coverage;

13     confirmation that the plan will not alter any party's rights

14     with respect to D&O coverage, given the assignment of the

15     D&O policies and certain rights thereunder to a litigation

16     administrator to be appointed; and third and potentially the

17     most difficult but hopefully not, is the assignment of

18     claims arising under the federal securities laws pursuant to

19     the contribution of claims mechanism in the plan.

20             With respect to Side C D&O coverage, Your Honor,

21     the Debtors' position, our position is that claims against

22     the Debtors in the securities litigation, which we recognize

23     to the extent they arise under the federal securities laws

24     or arise from purchases or sales or securities of the

25     Debtors are subordinated pursuant to Section 510(b) of the

Page 39

1    Bankruptcy Code, but we believe that those claims against

2    the Debtors should be preserved to the extent any Side C D&O

3    insurance coverage exists at the end of the day.  And I'll

4    explain why in a second.  The Debtors' position is they

5    don't believe there will be any Side C coverage left at the

6    end of the day, and because that's their current belief, the

7    plan shouldn't have to preserve claims against the Debtors

8    to the extent any such coverage does exist.

9           They say it might be misleading to creditors.  The

10   problem is, if there is any Side C coverage remaining, the

11   coverage only exists by definition for payment of securities

12   claims against the Debtors.  Substantially every corporate

13   D&O policy written in the last 20 years, as Your Honor is

14   well aware, contains a priority of payments provision that

15   subordinates the company's rights under Side C to the rights

16   of any individual insurers.

17          So the only party that gets a potential windfall

18   by failing to preserve claims against the Debtors to the

19   extent Side C coverage exists are the D&O coverage insurers

20   themselves.  How this ties back to disclosure is the Debtors

21   assert that preserving claims would be misleading because

22   they believe there will be no insurance.  But really, that's

23   beside the point.

24          All they have to do if they were to modify the

25   plan to say securities fraud claims against the Debtors are

1    preserved to the extent of available insurance, if any, is

2    say "if any" in the plan and add one sentence to the

3    disclosure statement that expresses their view that they

4    don't think there will be any.  That's all they have to do

5    to avoid being misleading, if that is truly their concern.

6         THE COURT:  May I ask you this?

7         MR. BEHLMANN:  Yes, Your Honor.

8         THE COURT:  Have you proposed any specific

9    language?  Because it would seem to me that a sentence or at

10   most two would address the issue you're raising.  Have you

11   proposed specific language to the Debtor and the Committee

12   for -- to be added to the disclosure statement?  I think,

13   you know, at bottom, the issue may be a confirmation issue,

14   but in terms of a disclosure issue, what it is that your

15   argument is and what their argument in one sentence, what

16   their argument is about why it shouldn't be included and

17   then it would be a confirmation issue.  Have you done that?

18        MR. BEHLMANN:  Your Honor, beyond what the parties

19   have said in our respective pleadings, we have not, but we

20   would certainly be happy to propose language at the end of

21   this hearing to the Debtors and the Committee.

22        THE COURT:  All right.  We'll see where we get to,

23   but anything else you want to add, Mr. Behlmann?

24        MR. BEHLMANN:  Yes, Your Honor.  So there's two

25   other issues.  The second issue is that our view is that the

Page 41

1   disclosure statement in light of the proposed assignment of

2   the D&O policies pursuant to the plan and the fact that the

3   plan in Article 4 says that one of the tasks of the

4   litigation administrator will be "managing the rights to D&O

5   liability insurance policies," we have asked for in our

6   limited objection a simple explanation in the disclosure

7   statement that the plan does not alter anyone's rights under

8   or any of the provisions of the Debtors' D&O insurance

9   policies.

10         We believe, you know, the plan has to be insurance

11   neutral.  So we don't necessarily understand why this is a

12   controversial request or why the, you know, the Debtors

13   treated it as such in their reply.  But our, you know, our

14   view is the plan should be insurance neutral and if it's

15   not, the Debtors should very clearly explain the manner in

16   which it's not because that will certainly be a confirmation

17   concern.

18         The third issue, Your Honor, is on the contributed

19   claims mechanism.  And this one from our perspective is a

20   little more thorny, although we don't know that it

21   necessarily needs to be.  We recognize, as the Debtors

22   assert, that this is a confirmation issue, but because the

23   claims contribution mechanism is built into the solicitation

24   procedures and is built into the form of ballot for

25   creditors in voting classes, we believe it does warrant some

Page 42

1    discussion in connection with the disclosure statement.

2             So the plan gives creditors in voting classes the

3    option to elect to contribute their claims against third

4    parties that relate to the Debtor back to the estate for

5    collective prosecution by a litigation administrator and

6    participate in the proceeds thereof by virtue of their

7    claims against the Debtor.

8             Creditors in impaired non-voting classes such as a

9    securities class member who had closed their Celsius account

10   prior to the petition date, they don't have that option,

11   which we think makes perfect sense because they're receiving

12   nothing under the plan.  If they were to check the box,

13   they'd be giving something away in exchange for absolutely

14   nothing.

15            But for those that do, the mechanism is

16   potentially problematic with respect to securities fraud

17   claims.  We think that the contribution language as drafted

18   is potentially broad enough to sweep in, in electing

19   creditors' claims under the federal securities laws.  Those

20   are claims that a member of the putative class and the

21   securities class action may not even know he or she has at

22   this point because the class action is in its relative

23   infancy.

24            So they're being asked at this point to make a

25   decision that prematurely deprives them of the opportunity

Page 43

1    to participate in the securities class action, which is a

2    case that's being prosecuted and has been prosecuted for

3    more than a year, by specialized sophisticated Court-

4    appointed lead counsel that specializes in securities cases

5    in favor of some unknown mechanism to be designed in the

6    future.

7            And the real problem is that once a creditor makes

8    that election, they don't have the opportunity to undo it.

9    So somebody, you know, somebody gives their claim to the

10   estate, they -- you know, once they check the box and mail

11   the form in, they have apparently forever given up the

12   opportunity to participate in the securities class action.

13           The other issue, the Debtors suggest that those

14   claims are assignable as a matter of law, although they

15   don't cite any.  Our position is that those claims may not

16   be assignable.

17           THE COURT:  Well, you can raise that at

18   confirmation.  I mean, that would be a confirmation issue.

19           MR. BEHLMANN:  Certainly, Your Honor, and there is

20   one disclosure issue, though, that we think arises from

21   that.  There is only one reported case I'm aware of where

22   creditors were given the opportunity to assign 10(b) claims

23   to a liquidating trust pursuant to an election in a plan.

24   That was Gavin/Solomonese LLC v. D'Arnaud-Taylor, 68 F.

25   Supp. 3d 530 (SDNY).

1            Nobody there challenged the assignability of the

2      claims, so we don't have any guidance on that point, but

3      there was a practical concern in that case that warrants

4      consideration here, given the timing and that is all of the

5      10)(b) claims that were brought by the liquidating trustee

6      after the plan was confirmed ended up getting dismissed

7      because they were time barred because section B -- 10(b)

8      contains a limitations period of two years after discovery

9      or five years from the violation, whichever is earlier.

10            That two-year clock has certainly been ticking for

11      at least a year and the contribution mechanism creates a

12      material risk of that clock running out before a litigation

13      administrator has an opportunity to investigate and file a

14      suit.  So at an absolute minimum, we think the disclosure

15      statement and the ballots should make that risk clear as

16      well as the possible issue of non-assignability of

17      securities fraud claims clear.  You know --

18            THE COURT:  Thank you, Mr. Behlmann.

19            MR. BEHLMANN:  Thank you.

20            THE COURT:  All right, next is Ms. Kuhns.  You're

21      muted.

22            MS. KUHNS:  I am.  Can you hear me now?

23            THE COURT:  Yeah, I can hear you now.  Go ahead.

24            MS. KUHNS:  Okay.  Good morning, Your Honor.

25      Joyce Kuhns of Offit Kurman on behalf of the Earn Ad Hoc

Page 45

1    Group.  I want to just reiterate what Mr. Koenig and Mr.

2    Colodny said.  We did file a reservation of rights.  I am

3    happy to say that prompted a very comprehensive and

4    constructive dialogue with the Debtors and their counsel and

5    their advisors and the Committee and its counsel and

6    advisers, as well as a separate call on Friday with the

7    Committee and counsel and then the plan sponsor and counsel.

8              They listened, we listened, we believe they

9    understand our concerns and we have a better understanding

10   of their process, and that has been reflected in the

11   supplement that we put of record on Friday.  And so at this

12   point, we do look forward to the process continuing after

13   approval of the disclosure statement and for what we see as

14   an opportunity now for the Debtors and the Committee to

15   engage in a broader dialogue with the creditors on the

16   merits of the plan.

17             THE COURT:  Thank you very much, Ms. Kuhns.  Mr.

18   Glas.

19             MR. GLAS:  Good morning, Your Honor.  Eduardo Glas

20   from the Law Office of Eduardo Glas.  I'm representing Mr.

21   Kieser, a large retail borrower claimant.  He also has

22   liquidated loan claims and we submitted an objection to the

23   disclosure statement that essentially has three parts.  The

24   first one deals with the subordination of the Earn claims

25   verse one to Section 510(b).  The second one deals with the

Page 46

1    failure to treat the liquidated loans as a class in itself.

2    And the third is the failure to treat the active retail

3    loans as executory contracts.

4            And I'll deal first with the subordination of the

5    Earn claims.  There's been quite a number of filings in

6    different cases in different Courts dealing with this issue,

7    most recently in the Southern District.  The Debtor has

8    entered into a non-prosecution agreement with the U.S.

9    Attorney's Office and also in a settlement with the SEC

10   where the Debtor has essentially admitted that the Earn

11   program was a security and as such, it is -- now would be

12   stopped from arguing before Your Honor that the Earn is not

13   a security.

14           We submit that as a security, it is covered by

15   510(b).  The claims that have been asserted against the

16   Debtor based on the Earn program and therefore they should

17   be subordinated and the plan does -- I'm sorry, the

18   disclosure statement doesn't have any information regarding

19   that.  With respect to the liquidated loans, the liquidated

20   loans, the claimants that have these claims essentially have

21   non-crypto claims.

22           These are breach of contract claims and the Debtor

23   has, I think after receiving our objection has added some

24   language clarifying how these claims are supposed to be

25   treated, but the language still does not cover precisely how

Page 47

1    these claimants should be classified because the Debtor

2    essentially is treating them either as Earn claims for those

3    liquidated loans which have received back whatever was left

4    after the liquidation of collateral.

5           They could have gone into an Earn account or a

6    custody account, and if there is no account left after the

7    liquidation or meaning there is no collateral to be sent

8    back to an account, the Debtor is saying that these claims

9    are essentially unsecured claims that are disputed.

10          And our position is that even if there was a

11   collateral return to an Earn account, the earned account

12   holder claim definition only covers the deposits into those

13   Earn accounts but it doesn't include the, as I said, the

14   non-crypto claims, the breach of contract claims that these

15   claimants would have.  And so they should have a revised

16   definition if they don't want -- at least they should have a

17   revised definition if they don't want to set up another

18   class for the liquidated loans within the Earn

19   accountholders' definition that includes the non-crypto

20   claims.

21          And finally, our third point deals with the active

22   retail loans and that they should be treated as executory

23   contracts.  The Debtors pose in the disclosure statement and

24   in the plan, they are treating the institutional loans as

25   executory contracts.  But the plan nor the disclosure

Page 48

1    statement treats the retail loans in a way that should be

2    analogous to the treatment of the institutional loans.  Now

3    the Debtor says that there are differences with the terms in

4    the institutional loans that they are more individualized,

5    but that is not really -- or I should say it's a meaningless

6    distinction.

7              The idea is whether -- or what the Court needs to

8    consider is whether there are unperformed obligations on

9    both sides and clearly both the institutional loans and the

10   retail loans both have obligations on both sides.  And

11   that's why the retail loans as the institutional loans

12   should be treated as executory contracts.  And this is

13   important because even if the Debtor says that it doesn't

14   make any difference as far as the plan, it does, because the

15   rejection of the contract has consequences.

16             There may be a lot of borrowers who do not want to

17   terminate the borrowing agreement and the Debtor, because of

18   the rejection, would be unable to exercise rights under the

19   agreement, such as terminating the loans or trying to set

20   off against the collateral.

21             THE COURT:  So doesn't the Debtor have the right

22   to refuse to -- assuming they are executory contracts, the

23   Debtor can reject them.  That's not a creditor's right.

24   It's the Debtor's right.

25             MR. GLAS:  Absolutely, Your Honor.  The Debtor can

1   reject them.  And what we're saying is that if the

2   agreements are executory and they are deemed rejected

3   because they are not being assumed under the plan, there

4   should be some disclosure as to the consequences of that in

5   terms of the ability of the borrowers to continue to perform

6   if they choose so under those loans.

7           THE COURT:  All right.  Thank you very much, Mr.

8   Glas.

9           MR. GLAS:  Thank you.

10          THE COURT:  Bear with me a second here.  All

11  right, next is Mr. Ubierna de las Heras.

12          MR. UBIERNA DE LAS HERAS:  Good morning, Your

13  Honor.  Victor Ubierna de las Heras, pro se creditor.  I

14  filed an objection with Docket No. 3169.  In that objection,

15  I raised three different items and items one and two, I

16  consider them resolved.  The Debtors filed an amended

17  disclosure statement where they included some language to

18  address what I was saying, so I consider number -- items one

19  and two resolved.

20          But then no changes to mining portion on updated

21  disclosure statement for Celsius Newco.  There are no costs,

22  no expenses, no short- or long-term cost projections, no

23  contract terms for hosting, leasing, profit selling, et

24  cetera.  More information regarding the mining portion needs

25  to be included on the disclosure statement for creditors to

Page 50

1   make an informed decision.  Thank you for your time.

2            THE COURT:  Thank you very much.  Mr. Abreu.

3            I had written down on my list an objection by Mr.

4   Abreu.  Is there -- I may be mispronouncing it and I

5   apologize if I am.  Does Mr. Abreu wish to be heard?  All

6   right.

7            MR. ABREU:  Sorry, sorry.  Can you hear me?

8            THE COURT:  Yeah, I can hear you now.

9            MR. ABREU:  Sorry.  It was muted on my side.

10           THE COURT:  Okay.

11           MR. ABREU:  Your Honor, I am pro se creator and

12  for full disclosure, I was one of the main driving forces of

13  CEL token market appreciation from July 27th to August 20.

14  This was done by was done by exploiting the artificial naked

15  short and the (indiscernible) short position when it came to

16  sale on centralized exchanges, mainly FTX.  These efforts

17  did not result against me and I'm also a creditor on FTX

18  bankruptcy.  And also for full disclosure, I did short FTT

19  token, a similar token, a similar FTX token to that of CEL.

20           I want to be brief in this matter, but again, the

21  issue I have is with the general treatment of CEL by giving,

22  again, an arbitrary value and not having different

23  treatments when it comes to CEL.  CEL is only a complex

24  issue when you treat it as one asset.  But similar to what

25  Judge Analisa Torres ruled on the CAC v. Ripple case, once

Page 51

1    you look at CEL from perspective of creditors and parties

2    and how this was deployed, It's straightforward.

3            Currently, CEL is a currency as it lives outside

4    the Debtors and its efforts.  It will be forever accepted as

5    a means of exchange on the Ethereum network.  It's fungible.

6    The durability of the currency is tied to the durability of

7    the terminal blockchain.  Supply is capped on the

8    (indiscernible) of the currency, so this will not change.

9    It might not be recognized as other cryptocurrencies, but

10   it's clearly not unknown when it comes -- when you consider

11   especially the current media light.

12           So if currently -- CEL currently matches the

13   description of a currency, it means it was at least always a

14   currency the whole time.  The question is what other traits

15   it shares, potentially other assets and/or securities,

16   special when there were significant efforts including those

17   of Celsius network, the Debtors.

18           One of the main issues I have is by some previous

19   comments by the UCC members that employees would get a

20   recovery on their CEL, especially employees who receive CEL

21   at zero cost.  And this -- and they are currently creditors,

22   meaning they have a claim for CEL.  I believe the amount of

23   CEL token by these employees including also insiders is

24   significant.  On the examiner's report, Docket 1956, Page

25   489, I match the current -- the list of insiders and

Page 52

1    employees with those which are public credit claims and 32.4

2    percent of -- and they represent 32.4% of the total CEL

3    tokens claims.  So that's $58,000 on claims at the filing

4    price 81 cents.  I believe there is not significant

5    disclosures when it comes to these employees.  I even

6    believe that by offering a recovery for these employees that

7    is not CEL native or zero altogether constitutes the sale of

8    the registered -- unregistered securities by the company.

9              I see CEL when there are efforts from the company

10   as a unregistered security when it's traded freely on the

11   open market and from a person to a person is not a

12   registered security.  So if these employees are being bought

13   from the estates at any price altogether, you are buying

14   (indiscernible) security that was distributed as equity.

15   And for context, I contact a former employee who joined the

16   company in 2020.  He was a low level employee and he -- and

17   from his tenure or for -- from the period that he was an

18   employee, he got 150,000 CEL tokens at zero cost.

19             This is very significant because he was a low

20   level employee and by matching other employees and other

21   high level insiders, they -- their amount of CEL is

22   completely (indiscernible) I should.  Also, if you look at

23   the claims, around 52 percent of the entire creditor CEL

24   token claims are held by 250 people.  This I think is a fair

25   assessment that there is significant employee CEL tokens

Page 53

1    that in my view was distributed as equity that are

2    potentially getting a recovery on this plan.

3           I also have to mention that I also bought CEL OTC,

4    but I sell most of it so -- but I'm trying to defend those

5    people who actually bought OTC CEL from the company.  I

6    believe this violated many, many laws because there was a

7    complete disregard by the company by selling this

8    unregistered security and having no disclosures.

9           So the company was already having issues

10   financially in 2022 and they were still selling CEL token.

11   No disclosure was given about the health of the company and

12   they even went to misrepresent and scrub statements of the

13   CEO on live streams prior to loading.  This is mind boggling

14   and in a public company will be a crime.

15          Also the level of dilution of CEL token by giving

16   for free, non-traded CEL controlled by the company to

17   employees completely disregarding the pricing pack and

18   especially in a slower user growth environment, again, is an

19   important disclosure that is not given.  Not disclosing and

20   having the CEL being sold by insiders.  By having the

21   company purchase internally and not disclosing all the

22   related CEL holdings by the CEO and controlled entities of

23   these insiders also is a disclosure that's not given that

24   when you are dealing with selling a public stock, it's

25   always given and you can see it.

```
 1          Not disclosing the level of (indiscernible) of the
 2     company and what was engaged and the size of the liquid
 3     assets, not disclosing the price support strategies of sale,
 4     especially when these were (indiscernible) or gradually
 5     reduced according to the examiner's report.  It's due to
 6     this level of fraud and misrepresentation that all OTC
 7     investors must be given an option of preference in the
 8     recovery.  This has to be accounted for.
 9          THE COURT:  Let me ask --  let me ask you this
10     question.
11          MR. ABREU:  Go ahead.
12          THE COURT:  I mean, if in fact what the examiner's
13     report -- it's not evidence, it's hearsay -- but taking,
14     let's take it at its face value.  The examiner's report
15     included a chart that showed the substantial insider, I
16     would my characterization, not hers, washed transactions
17     between the freeze date and the petition date, that arguably
18     -- well, it increased the apparent value of CEL from like 20
19     cents to 81 cents and if the issue is a valuation at the
20     petition date, it may be zero.
21          And what the Debtor and the Committee -- Debtors
22     and Committee have proposed is now increased from 20 cents
23     to 25 cents.  But, if the valuation is challenged and
24     relevant to bankruptcy is the valuation at the petition
25     date, the fact that it may have appeared to trade at 81
```

Page 55

1   cents doesn't mean that's the value.  If the Court were to

2   do a valuation, determined that the value was zero, there'd

3   be no recovery for CEL token holders.

4           MR. ABREU:  I believe it's very important to

5   mention that those people that had CEL inside the app was

6   prevented from selling.  This is -- this does not happen to

7   a stock.  If you are arguing that CEL token is equity, then

8   equity is always traded, even in bankruptcy.  So if I had --

9           THE COURT:  Yes, but what I have to do is value it

10  in the Debtors' plan.

11          MR. ABREU:  But I can give --

12          THE COURT:  And if I -- stop.  Stop.

13          MR. ABREU:  Okay.

14          THE COURT:  If I conduct evaluation, if somehow

15  the settlement that the Debtors and the Committee have

16  proposed at 25 cents, if that's not accepted and the Court

17  conducts the valuation and concludes that the petition date,

18  the value of the CEL token was zero, that would determine

19  what the recovery in the plan would be.

20          MR. ABREU:  So there is no argument when you are

21  basically blocking people from selling that asset?

22          THE COURT:  We'll let the debtor respond to that.

23  Is there anything else you wish to add, Mr. Abreu?

24          MR. ABREU:  I just want to say that about the 81

25  cents, I believe the examiner's report again should be taken

1      with a huge grain of salt.  As I was saying, I was one of

2      the main efforts.  And what -- there is no mention --

3              THE COURT:  The one thing I don't do is take the

4      examiner's report with a grain of salt.

5              MR. ABREU:  I agree.  I agree.

6              THE COURT:  You might --

7              MR. ABREU:  -- clear.

8              THE COURT:  You might --

9              MR. ABREU:  You, Judge, were very clear on that.

10             THE COURT:  But I don't.  It's hearsay.  It

11     doesn't determine the value.

12             MR. ABREU:  Exactly, but just for a comparison, my

13     efforts were done inside the centralized exchanges and they

14     cannot be seen on the blockchain.  And the other efforts

15     that I know of by other insiders in CEL was basically

16     removing the CEL supply that was being shorted, naked

17     shorted, by other centralized exchanges.  So this had --

18     this forced those centralized exchanges to go to the market

19     and basically back the naked short position.  So they were

20     borrowing, imagine 10 million CEL spots that were -- that

21     they had the right -- the control.  So they removed from the

22     exchanges.  This force by this creditors.  It's their

23     tokens.  It's outside their app and they were following

24     market rules by removing the supply.  This --

25             THE COURT:  All right.  All right, stop.  I

Page 57

1    understand your arguments.  Mr. Caceres next.

2              MR. CACERES:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. CACERES:  Since my motion to price non-insider

5    CEL token at petition date prices was heard and denied

6    without prejudice, I have met three times with the UCC to

7    find a middle ground.  But unfortunately, the UCC only

8    improved their offer by one penny.

9              THE COURT:  No, by five cents, 20 to 25.

10             MR. CACERES:  In the discussions that we've had,

11   they've never brought that up, Your Honor.

12             THE COURT:  The amended disclosure statement, the

13   revised disclosure statement says 25 cents.

14             MR. CACERES:  Correct.  I'm referring to the

15   discussions that we had.

16             THE COURT:  All right, go ahead.

17             MR. CACERES:  Your Honor, only one member of the

18   UCC has a CEL token claim that is worth fighting for.  All

19   other members of the UCC will get a larger recovery as the

20   disclosure statement and the loans and Earn settlement is

21   currently written.  There has been an abundance of

22   irrelevant arguments presented by the UCC to justify

23   diminishing the value of CEL token.

24             All this noise has created very lawyer-lucrative

25   complexity around what really is a very simple dispute.

Page 58

1    When distilled to only relevant facts, what is left is three

2    points.  Number one, the Ripple case and XRP case has set

3    the precedent that CEL is not a security.  Only some initial

4    sales can be considered as such.  Number two, the Voyager

5    case has set the precedent that CEL token does not confer

6    neither the advantages nor the obligations of an equity

7    security.

8            The Voyager VGX token was not subjugated but

9    rather awarded its petition date value.  And number three,

10   despite over 600 pages of the examiner report, it presents

11   hearsay, obscurity, intentionally misleading charts, and yet

12   no meaningful evidence that Celsius nor its founders

13   manipulated the price of CEL to their benefit.

14           The examiner report completely disregards the

15   illegal FTX naked short and distort campaign that destroyed

16   the CEL token price from $3 to 20 cents.  Your Honor, non-

17   insider CEL token holders were exposed to the same risks,

18   founder mismanagement, damages than any other holder on the

19   Celsius platform.  Given that the UCC equity security

20   suggestion of CEL is now invalid due to the Ripple and

21   Voyager precedents and that the arguments of CEL market

22   manipulation are without merit, we cannot isolate CEL tokens

23   from any other token on the platform.

24           Fifty-two percent of retail Celsius customers have

25   CEL in their balances.  We must put an end to the UCC's

1    unlimited resource campaign to overwhelm the Court with

2    irrelevant noise, Your Honor, and I repeat irrelevant noise,

3    over what always has been and remains a simple matter.  We

4    must allow everyone to make progress towards exiting Chapter

5    11, creating Newco value maximizing solution, and receive

6    distributions.

7            Lastly, Your Honor, I request that this Court does

8    not allow the settlement between the Earns and the Borrow

9    and does not approve the disclosure statement until the non-

10   insider CEL token issues have been resolved.  Once again,

11   non-insider CEL token claims should be treated equitably at

12   the petition date price of 81 cents consistent with U.S.

13   bankruptcy law.  Thank you again --

14           THE COURT:  Yeah, the U.S. bankruptcy law --

15           MR. CACERES:  -- for the time --

16           THE COURT:  I'm sorry.  Now, the U.S. Bankruptcy

17   Code requires that I determine the value of the claims as of

18   the petition date.  If the market was manipulated, the 81

19   cents would not reflect the actual value.  So it would

20   require a valuation.  It is not -- you don't get simply to

21   rely on the fact that if -- let's assume there was

22   manipulation and it resulted in the price going from 20

23   cents to 81 cents and I realize that it had been much higher

24   earlier, but from the freeze date to the petition date, it

25   went, I think from 20 cents to 81 cents.

Page 60

```
1          That doesn't necessarily reflect the value on that
2    date.  You simply want to rely on the fact that it appears
3    to have had an 81 cents value at the petition date, but that
4    isn't necessarily the value.  You want to cut out all of
5    that, and what the Debtor and the Committee are trying to do
6    is resolve this disputed issue because it may turn out, Mr.
7    Caceres, that the value is zero, not 81 cents.
8          MR. CACERES:  Your Honor, if I may say, when
9    there's open shorts, when the price is destroyed from $3 to
10   20 cents, there's open shorts and those open shorts need to
11   be covered.  So from the pause date to the petition date,
12   that could have been the open shorts being covered as the
13   blockchain might suggest.  So it would be a good idea if we
14   engage in a valuation and it would be a good idea to see how
15   that price went from 20 cents to 81 cents.
16          THE COURT:  All right.  Thank you very much, Mr.
17   Caceres.  Ms. Giugliano.
18          MS. GIUGLIANO:  Good morning, Your Honor.  Cheryl
19   Giugliano, Ruskin Moscow Faltischek for Koala 1 LLC and AM
20   Ventures Holdings.  Can you hear me okay?
21          THE COURT:  Yes, I can.
22          MS. GIUGLIANO:  Thank you, Your Honor.  I'm
23   appearing, again, on behalf of Koala and AM Venture Holdings
24   with objections filed at ECF doc numbers 3156 for Koala 1
25   and 3153 for AM Venture Holdings.  The objections are
```

Page 61

1    substantially similar and argue that the disclosure

2    statement does not provide adequate information with respect

3    to the proposed equitable subordination of retail customer

4    claims on behalf of Koala and AM Ventures in certain Earn

5    account, and really all claim holders whose claims will be

6    equitably subordinated as a result of their alleged

7    affiliation with Mr. Mashinsky or other insiders.  The

8    claims are not listed for Koala 1 and AM Ventures as

9    disputed contingent or unliquidated.

10          Your Honor, equitable subordination is an

11   extraordinary remedy that is to be used sparingly as noted

12   by this Court.  Bankruptcy Code Section 510(c) provides that

13   after noticing a hearing, the Court may equitably

14   subordinate hearings for distribution purposes, but it

15   doesn't provide for extinguishing and canceling claims.

16          THE COURT:  Isn't this a -- isn't this a

17   confirmation issue?

18          MS. GIUGLIANO:  Well, Your Honor, with respect to

19   whether or not the claims should be equitably subordinated,

20   it's possible that it could be raised as a plan confirmation

21   issue.  I think the problem is that the disclosure statement

22   contains the same statements that are in the plan which are

23   statements by the examiner's report, which I appreciate that

24   the Court holds in high regard and -- but they're not

25   findings by the Court and statements by the Debtors and the

Page 62

1    Committee and complaints that were not yet filed.

2            And so, while additional language was added to the

3    disclosure statement and it's addressed in the omnibus

4    reply, which we very much appreciate, those are not findings

5    by the Court and so there is no --

6            THE COURT:  Am I correct that the Committee sent

7    the Debtors a draft of a proposed complaint.  It was

8    attached as Exhibit 2 to the motion of the Official

9    Unsecured Creditors Committee to approve joint stipulation

10   that included a complaint against K1?

11           MS. GIUGLIANO:  Yes, that is correct, Your Honor.

12   But again, that's a complaint that hasn't been prosecuted or

13   heard by the Court.

14           THE COURT:  Would you like them to file it

15   tomorrow?

16           MS. GIUGLIANO:  No, that's not what I'm -- that's

17   not what I'm saying, Your Honor.  All I'm saying is that

18   equitable subordination is -- even if it's included in a

19   plan -- and you're right, Your Honor, that that could be

20   heard as part of a plan confirmation hearing -- all I would

21   say is that -- and hopefully we can discuss with the

22   Debtors' counsel and Committee's counsel when they're

23   available, is that perhaps it's premature to be proposing to

24   equitably subordinate these claims on the confirmation

25   hearing date when those conclusions by this Court could

Page 63

```
 1    prejudice those parties in civil and criminal proceedings

 2    that are ongoing, and there's really no reason that the

 3    equitable subordination, if it were to be approved, would

 4    have to happen -- or why it has to be approved and

 5    considered as part of the plan on the confirmation date when

 6    there -- really there should be notice and hearing and also,

 7    Your Honor, there are ongoing proceedings, criminal and

 8    civil, against insiders where if equitable subordination is

 9    approved by this Court as part of the plan confirmation

10    hearing, we think prematurely it could prejudice those

11    parties and there's really no reason that that --

12          THE COURT:  Would there be preclusive -- would

13    there be preclusive effect in a criminal case if this Court

14    makes a determination at confirmation?  There --

15          MS. GIUGLIANO:  It wouldn't be -- I'm sorry, Your

16    Honor.

17          THE COURT:  No, go ahead.

18          MS. GIUGLIANO:  No, no, no, I'm -- to interrupt

19    the Court, Your Honor.  I was just saying, it wouldn't be

20    helpful whether or not --

21          THE COURT:  Well, you might not like it.  I

22    understand that.

23          MS. GIUGLIANO:  Yeah, I'm not sure how it would

24    harm the Debtors, the estate, or the administration or

25    confirmation of a plan to say that equitable subordination
```

1    would not occur unless and until there are findings of fact

2    and conclusions of law and --

3            THE COURT:  I don't have to wait.  It could be

4    years before a criminal case is resolved.  I don't wait for

5    plan confirmation until, you know, state court criminal

6    cases are resolved or federal court criminal cases are

7    resolved.  Not only criminal but, you know, the state

8    attorney general has a lawsuit against Mr. Mashinsky and the

9    judge recently denied the motion to dismiss.  So --

10           MS. GIUGLIANO:  Yes --

11           THE COURT:  But that's at a pleading stage.  It

12   could be years before that's finally resolved.  I don't put

13   this on hold while state or federal court criminal or civil

14   cases go on.

15           MS. GIUGLIANO:  Yes, Your Honor.  That's true and

16   I would never propose that the plan confirmation -- these

17   parties would never propose that plan confirmation be put

18   off for that long, but there are also included as part of

19   the plan, actions and proceedings that will also likely or

20   could take years and the distributions that result from

21   recoveries from those actions will be -- of course, happen

22   after the proceedings take place.

23           So while I'm not suggesting at all that the Court

24   put off confirmation of the plan, it wouldn't be

25   unreasonable to -- for the Debtors and the Committee to

Page 65

1    consider that the equitable subordination of the proposed

2    claims be put off until those hearings are concluded, and my

3    understanding from speaking --

4              THE COURT:  Okay.  I hear your argument.  Mr.

5    Davis.

6              MS. GIUGLIANO:  Thank you, Your Honor.

7              MR. DAVIS:  Thank you, Judge.  At your last

8    hearing on July 28th, you did mention that we CEL token

9    group deserve a fair fight.  At Docket No. 3084, I did file

10   a motion with requesting that.  I do have a statement,

11   Judge, that I would like to read.  It's about 10 minutes.

12   And if that's --

13             THE COURT:  Well that's a little long, but go

14   ahead, start your statement and I'll see.  Go ahead.

15             MR. DAVIS:  Sure.  Your Honor, the UCC through

16   their lawyers White & Case have stated not one scintilla of

17   evidence, facts, or basis in law about, "Finally, the

18   request made by certain holders of CEL token deposit claims,

19   chief among them Mr. Davis and Mr. Caceres, should be

20   rejected."

21             Judge, this is nothing but hot air being spewed by

22   the UCC to this Court.  They cannot find any legitimate

23   reason to subordinate CEL token holders' claims from 81

24   cents so now they wish to take another bite of the apple by

25   attempting to personally smear me as a creditor instead of -

1           THE COURT:  Mr. Davis, I've already -- stop.  I've

2    already made clear that the 81 cents is not necessarily the

3    value on the petition date, which is the relevant thing for

4    the Bankruptcy Court.  Okay?  You do not get an automatic 81

5    cents because it may have traded at that price at the

6    petition date.

7           MR. DAVIS:  Understood, Judge.  Can we have a

8    valuation hearing to determine the price?  My position is

9    CEL token is above 81 cents.  So only -- that can only be

10   fleshed out at a valuation hearing.  And I also requested a

11   CEL token ad hoc group in my motion.

12          THE COURT:  I'm not approving an ad hoc group.  Go

13   on with your argument.

14          MR. DAVIS:  Okay, let me read.  Your Honor, the

15   relief that I'm respectfully seeking from this Court is that

16   the Court recognize the legal precedent that has been set in

17   the Ripple case and the clear -- the CEL tokens held by

18   users are not a security; that the UCC's attempt to

19   subordinate the CEL token holders be set aside and declared

20   nullified; that the settlement made by the UCC be nullified

21   as being predicated upon no basis in fact or law; and that a

22   valuation hearing be scheduled for a proper determination of

23   the petition date price; that the settlement be set aside

24   between Loans, Earn, and the UCC based on the fact that CEL

25   token holders had no seat at the table to be able to

Page 67

1    participate in that settlement and a separate new class of

2    CEL token holders be established to protect their rights

3    fairly and equitably.

4              I just heard what you said that you will not

5    approve it.

6              THE COURT:  Is there anything else you want to

7    add?

8              MR. DAVIS:  No, that's the sum and substance of

9    it.

10             THE COURT:  All right, thank you.

11             MR. DAVIS:  I think -- I just think we deserve a

12   fair fight.  We are 35,000 CEL token holders and we have no

13   representation.

14             THE COURT:  Mr. Holcomb.

15             MR. HOLCOMB:  Good morning, Your Honor.  Can you

16   hear me?

17             THE COURT:  Yes, go ahead.

18             MR. HOLCOMB:  Yeah, Lucas Holcomb.  Pro se

19   creditor.  As always, please forgive my ignorance of the

20   legal system.  I just present this issue as I want to be

21   sure that I don't inadvertently forfeit my right to a claim

22   against the Debtor by doing nothing.  In a previous hearing,

23   Your Honor asked the Debtor and their counsel to work with

24   me on unsuspending my accounts and roughly two months of

25   contact with the Debtor counsel, they were able to tell me

Page 68

1    why my accounts were suspended but did not offer a

2    possibility of resolution.

3         On July 20th, I wrote a letter to Your Honor which

4    is Docket 3065 stating the circumstances of my suspended

5    accounts.  Since then, the Debtor has written a reply

6    letter, Docket 3126, in which they stated they are amenable

7    to removing the suspension.  On August 1st, I replied to

8    their letter Docket 3132, offering a potential solution to

9    my suspended accounts.

10         This morning before Court proceedings, I was able

11   to reach Chris Koenig from the Debtors counsel and he stated

12   that he will further look into the matter tomorrow with the

13   goal of reaching a mutually agreeable solution.  Of course,

14   I'm happy to hear that and I'm hopeful that we can come to a

15   fair agreement quickly.  However, in case the solution

16   between myself and the Debtor or the multiple other

17   individuals with suspended accounts cannot be reached, I'm

18   wondering if the disclosure statement or plan should

19   reference treatment of those with suspended accounts.

20         THE COURT:  Okay.  I'm making notes of this.

21         MR. HOLCOMB:  Thank you, Your Honor.

22         THE COURT:  Anything else?

23         MR. HOLCOMB:  Again, I'm hopeful that we can work,

24   you know, work this out with the Debtor.  I know there's

25   other multiple suspended accounts as well, including some in

Page 69

1    the six figures that I've spoken with.

2           THE COURT:  All right.  Thank you very much, Mr.

3    Holcomb.

4           MR. HOLCOMB:  Thank you, Your Honor.

5           THE COURT:  Jin Kim?

6           MS. KIM:  Good morning.  Can you hear me?

7           THE COURT:  Yes, I can.

8           MS. KIM:  Yes, good morning, Your Honor.  Thank

9    you very much for giving me the opportunity to speak.  So I

10   am a Earn creditor, pro se, and I've been totally kind of

11   should I just say confused through the lack of disclosure

12   from Stretto and this whole litigation process.

13          The information that I have right now, I'm not

14   really sure if it's accurate or not, is that through this

15   proposed new agreement, if we do file and approve it, it's

16   70 percent to Earn creditors and I don't know what the

17   distribution is going to be, in Bitcoin or liquid currency

18   and how much it's going to be in the common stock and the

19   statement that I got after that is that there's a 4.7

20   billion civil settlement with FTC and that you could only

21   get that settlement if you drop any claims against Celsius.

22          So this is very confusing to me and then the

23   valuation of bitcoin, which is mostly what I held, is it

24   going to be based on the petition date when the bankruptcy

25   went into proceeding or is it going to be on the date when,

1    you know, Celsius accepted the plan proposed, drafted from

2    Newco?

3              THE COURT:  So I think the disclosure statement,

4    I'll give the Debtor and Committee a chance to respond to

5    that.  But I think the disclosure statement is clear that

6    the valuation is as of the petition date and that's

7    something that's required by Section 502 of the Bankruptcy

8    Code.  They didn't arbitrarily pick that date, but that I

9    think is pretty -- that I'll give the chance, you know, when

10   we get to the back to the responses.  I read the disclosure

11   statement as quite clear on this point.

12             MS. KIM:  Okay.  Thank you for that.  I appreciate

13   that.

14             THE COURT:  All right.  Thank you very much.  Mr.

15   Crews.

16             MR. CREWS:  Thank you, Your Honor.  With regards

17   to CEL token, there's one aspect that the Debtors have not

18   addressed.  They currently have 658 million CEL tokens in

19   their possession.  They have not disclosed what they plan to

20   do with those tokens.  Will they burn them?  Will they

21   return them to the creditors that they owe them to?  They

22   owe approximately 195 million CEL liabilities to non-

23   subordinated, non-insiders, and it would seem logical if

24   there are people arguing that these are valuable tokens

25   worth more than 20 cents or 25 cents, you could satisfy

Page 71

1    those claims by simply returning these supposed assets to

2    the people that claim they're very valuable --

3              THE COURT:  I think that position --

4              MR. CREWS:  -- actions --

5              THE COURT:  Mr. Crews, I think -- and I'll give

6    the Debtors -- you know, I want them to respond to this at

7    the end, that without a going concern, the CEL token, it

8    can't be issued.  It can't -- you know, Celsius won't exist.

9    Ultimately, the CEL token depended on the value of the

10   Celsius enterprise.  The Celsius enterprise as going concern

11   won't exist whichever, whether there's a liquidation or the

12   Fahrenheit or Brick transactions wind up as being approved.

13             There -- this is not like Bitcoin or Ethereum.  I

14   thought that was -- if I'm misunderstanding that, I'll give

15   you a chance to respond to it, but also for the Debtor and

16   the Committee to respond to that.

17             MR. CREWS:  Yes, Your Honor.  I agree that there

18   is no discernible value to this token.  It could still

19   physically be returned into the control of people who

20   believe it's somehow worth more.

21             THE COURT:  What to manipulate the price --

22             MR. CREWS:  -- rate of return --

23             THE COURT:  -- when it doesn't have -- when

24   there's no enterprise.  It was the native token for Celsius

25   as a business.  It varied over time but it's not like, you

Page 72

1       know, Bitcoin or Ethereum.  If Celsius doesn't exist, how is

2       it that the CEL token can be distributed and traded?

3              MR. CREWS:  Well, it was distributed to custody

4       holders.  I agree that there could be regulatory concerns,

5       given that there is no discernible value to this token, but

6       it's actively trading today.  And to the extent that people

7       believe it has value, I think that they should be allowed to

8       get it back rather than waste the Court's time with trying

9       to determine an alternate valuation.

10             Although I do agree, there is a profound injustice

11      to the people that were defrauded by this token, because its

12      price has been manipulated from inception from the IPO.

13      They didn't disclose they failed to sell two-thirds of the

14      token, less than two --

15             THE COURT:  That's all in the examiner's report.

16      I'm very, very aware of what -- it's hearsay, what's in the

17      examiner's report, but for this purpose, let's accept that

18      as true.  I understand that background.

19             MR. CREWS:  Yes.  And furthermore, in April of

20      2022, the top six insiders of the company sold $40 million

21      worth of CEL tokens over the OTC counter which was fobbing

22      off this worthless token to OTC CEL victims.  So my issue

23      with the 25 cent deal is not that CEL victims get some value

24      back, because I believe that is warranted, but there is no

25      value to this token.  So I believe it would be better to

Page 73

1    compensate victims based upon their pro rata, the amount

2    that they're out, because there were people that bought CEL

3    early.  A lot of the movants who (indiscernible) bought CEL

4    token at mere pennies on the dollar when it plummeted after

5    its IPO, whereas victims of this OTC CEL, bought it at $5

6    when the founders of the company were selling, using that

7    same OTC desk.  So it's a very close nexus between victims

8    who are buying this through the OTC CEL desk and the

9    perpetrators who were selling it effectively to them via one

10   step.

11          So these are people, there's a $40 million cost in

12   that April of 2022 that came directly out of the OTC CEL

13   victims, so it would be better if they got proportionally

14   more of the recoveries rather than compensating people that

15   bought it five cents equally to those that bought at $5.

16          THE COURT:  All right.  Thank you, Mr. Crews.  Mr.

17   Bronge.

18          MR. CREWS:  Thank you, Your Honor.

19          MR. BRONGE:  Yes, hello, Your Honor.  Can you hear

20   me?

21          THE COURT:  Yes, I can.  Go ahead.

22          MR. BRONGE:  Yes.  I'm Johan Bronge.  I'm pro se

23   creditor.  I filed a motion and I might be a little bit

24   wrong on the procedure, but in that motion, it's 3270 on the

25   docket, I object to changes in the language in the

Page 74

1   disclosure statement regarding the collateral and the loans

2   for the borrowers.  In the disclosure statement, the

3   collateral has now been changed to be called retail borrower

4   deposit claim and the loan is a retail borrower advance

5   obligation.

6           I object to changing those definition because

7   there is a collateral and it's same as it is for

8   institutional loans.  And I feel that this creates an

9   artificial difference between those two groups which should

10  not be there.

11          And the other point I want to make is regarding

12  tokens.  I certainly consider Bitcoin as different from all

13  the other tokens as it is money and commodity as per your

14  own definition in the Earn ruling.  So those are my

15  comments.  Thank you.

16          THE COURT:  Thank you very much, Mr. Bronge.  Mr.

17  Sabin.  You're muted.

18          MR. SABIN:  Your Honor, jeff Sabin on behalf of

19  Ignat Tuganov at Venable.  I'd like to speak in support very

20  briefly, less than three-and-a-half minutes --

21          THE COURT:  Go ahead.

22          MR. SABIN:  -- raising several issues from filings

23  last night and what you heard today.  Mr. Tuganov, as you

24  know, is a proposed class representative.  We'll hear the

25  settlement of the class action claim next, I believe.  In

Page 75

1    addition, he otherwise is a signatory and was a participant

2    in the three-day mediation, but here are the four issues for

3    today.

4            Last night's filing, late last night, there was a

5    schedule of retained causes of action filed.  I very much

6    applaud and thank all of the people at the UCC, at the

7    Debtors, and all other participants in the mediation.  They

8    have now identified various important claims including the

9    (indiscernible), the Tether, the Rhodium, all under the

10   schedule of retained causes of action, and those are

11   important things for people who will be voting on a

12   disclosure statement.

13           There are two that are not yet identified that we

14   think are important enough and of course, it's not our

15   disclosure statement, but I leave it to the Debtors and the

16   Committee.  The first are the filed two-plus billion dollar

17   face amount of claims against FTX that Celsius has filed.

18   And the second -- and whether that is a category of claim

19   that will fit under retained causes of action.  And the

20   second is an unpaid loan, defaulted unpaid loan, of about

21   $409 million of principal that was made by Celsius to EFH.

22           The second disclosure issue I'd like to raise is

23   raised by Mr. Caceres who otherwise is now asking the Court

24   as you heard today not to approve the 9019 class settlement

25   until confirmation.  For various reasons in our filing and

Page 76

1    the UCC filings, I hope that this Court approves the

2    disclosure statement, does not leave the class settlement

3    hanging, and otherwise proceeds after we finish this

4    discussion of the disclosure statement to consider the

5    actual class settlement.

6            That class settlement, among other things, as set

7    forth in the papers and reached in the mediation, does

8    subordinate and the plan now contains the proposed

9    settlement of the subordination of the CEL class, but it

10   otherwise resolves any subordination, possible subordination

11   of Earn rewards creditors or retail borrowers.  That is part

12   of the settlement.

13           Point number three, and it was raised by counsel

14   to the securities claimants.  I think there should be some

15   clarity in connection with the disclosure statement and in

16   connection with the ballot and the materials that will be

17   given to voting and/or non-voting creditors as to whether

18   they can and if they want to contribute claims -- forget as

19   a matter of law -- but if they want to contribute claims,

20   especially since there's been no certification of a class in

21   the securities class action and there's been no

22   certification of a class in Kaplan v. Mashinsky, et al.

23   which includes an amended set of claims against Wintermute.

24           The last item is one that I applaud, the Debtor

25   making so much progress with federal and state regulators

1    and with the plan sponsor, and so if there is information

2    that is relevant -- because as you heard at the start, I

3    think the most important thing in terms of the consideration

4    by account holders and other creditors, is the fact that

5    this plan could be confirmed and could go effective prior to

6    year end.  And therefore an update, if one exists as to the

7    status of efforts to obtain SEC approval of a registration

8    statement and to obtain an exemption letter contemplated as

9    plan conditions to consummation of a '40 Act exemption no

10   action letter would be relevant if they exist.  Thank you,

11   Your Honor.

12         THE COURT:  Thank you very much.  All right.  Mr.

13   Frishberg.

14         MR. FRISHBERG:  Thank you, Your Honor.  I will be

15   very brief.  I just want to reserve all my rights on

16   releases, since I know the Second Circuit has a speak now or

17   forever hold your silence precedent around, like reserving

18   rights and appeals and that's it.  That's it.  Thank you

19   very much.

20         THE COURT:  Thank you very much, Mr. Frishberg.

21   Mr. Kleiner, you've already been recognized.  I'm not going

22   to hear you on anything you've already talked about, and if

23   you wanted to raise something else, why didn't you raise it

24   before?

25         MR. KLEINER:  I apologize, Your Honor.  I just had

1    moved off the ADR procedures very quickly.  There were just

2    two minor housekeeping points that I wanted to mention

3    before we went back to the Debtors.  The added language to

4    the disclosure statement, there's a FAQ related to ADR

5    procedures.  The introduction points out that these would

6    apply to avoidance actions.  I just thought it was worth

7    noting that the first item of who may participate seems to

8    have inadvertently left that off.  I would just suggest that

9    the Debtors take a look, since the intention is to include

10   avoidance actions, they ought to mention that there as well.

11         And then the second, also minor housekeeping

12   point.  You had suggested that your hope that the Debtors

13   work with the avoidance action litigants on crafting

14   procedures before the confirmation hearing.  I just wanted

15   to request that we be included in that.

16         THE COURT:  All right.  All right, I've now

17   recognized everyone who had raised their hand.  Let's go

18   back to the Debtors.  Mr. Kleiner, remove your hand.  Mr.

19   Davis, you've already been recognized, please remove your

20   hand.  Okay.  Who's going to speak for the Debtor?

21         MR. KOENIG:  Good morning, again, Your Honor.

22   Chris Koenig, Kirkland & Ellis, for the Debtors.  I assume

23   you can hear me again okay.

24         THE COURT:  Yes, I can.

25         MR. KOENIG:  Wonderful.  All right, I will go

1    through my list and cover as many as I can.  The first two

2    objectors were talking about the ADR procedures.  I think

3    the colloquy that you had with those parties suggested that

4    those are confirmation issues.  We've, you know, begun

5    preliminary conversations and as to Mr. Kleiner's most

6    recent point, we're of course happy to continue to discuss

7    with them ahead of confirmation, but nothing that they said

8    suggested that the disclosure statement should not be

9    approved.  Whether the ADR procedures are appropriate or

10   changes should be made, those are all changes that Your

11   Honor to make at the confirmation hearing.

12          THE COURT:  Let me just -- let's hold on a second,

13   all right.  Let me -- I want -- back to my notes.  Okay.  I

14   had a lot of notes, so it's going to take me a minute to

15   find what I'm looking for.

16          MR. KOENIG:  No worries, Your Honor.

17          THE COURT:  Okay.  I think that the disclosure

18   statement overstates what's likely to be included in any

19   confirmed plan with respect to compulsory ADR.  First, it's

20   common for robust mandatory ADR procedures to be adopted by

21   Court in large bankruptcy cases such as this one.  That's

22   really what I said to Mr. Kleiner already.  And it's common

23   to include limited ADR opt-out procedures to permit parties

24   that object to compulsory mediation to be excluded from

25   mandatory ADR, but this Court, while I've historically

Page 80

1    provided such exclusions in rare cases, it's not -- and I've

2    already said this.

3            I don't view that as denial of due process to

4    require parties to engage in good faith, mandatory ADR, but

5    what remedies the Court may impose for refusal of parties to

6    participate in mandatory ADR in good faith is for the Court

7    to decide based on the facts and circumstances of each case.

8    So I would like the language -- because there will be a few

9    other points I'm going to raise, Mr. Koenig.

10           I would like the language of the disclosure

11   statement to be altered to remove any threats for

12   disallowance of claims for failure to participate.  You can

13   certainly say that the Debtors will ask that the claims be

14   disallowed, but the suggestion that the Court will assuredly

15   grant that is, I think, incorrect.  So I --

16           MR. KOENIG:  Understood and agreed.

17           THE COURT:  I would like that language softened a

18   bit.  Okay.

19           MR. KOENIG:  Understood, Your Honor.

20           THE COURT:  All right.  But go ahead.

21           MR. KOENIG:  Sure.  I turn next to Mr. Behlmann

22   and the securities law litigation.  He had three remaining

23   points, the preservation of claims against the Debtors.

24   Look, if he has a sentence that he would like us to add that

25   clarifies that their claims against the Debtors can be --

Page 81

1    survive the plan and the confirmation and the emergence from

2    bankruptcy solely for the effort of pursuing insurance, I

3    have no objection to that and if he would like to send us

4    that language, I'm happy to include it.  Frankly, I think

5    the plan already provides for it, but I'm more than happy to

6    take that issue off the table.

7              THE COURT:  All right.  Mr. Behlmann, do that

8    today, if you would, please.  I think -- again, I think it's

9    a very short statement.  Mr. Koenig, if you can't agree on

10   that language, contact chambers and we'll -- I'll set a

11   hearing just on that issue with maybe a couple others, we'll

12   see, but we ought -- that really is just a disclosure issue

13   and I understand both sides.  I think you ought to be able

14   to work that out.  Okay?

15             MR. KOENIG:  Yes, Your Honor.  I'm sure we'll be

16   able to do that.  On his second issue, the confirmation

17   won't alter parties' rights under the D&O coverage.  I

18   checked while everybody else was speaking and we amended the

19   plan to say exactly that, frankly, in response to Mr.

20   Behlmann's objection.  Page 153 of the PDF of the redline of

21   the plan adds some language in that respect that says,

22   "provided that the litigation administrators, management of

23   the D&O liability insurance policies do not affect the

24   rights of, one, entities covered by the D&O liability

25   insurance policies to pursue coverage under such policies;

1    or two, entities eligible to recover from the D&O liability

2    insurance policies to pursue recovery from such policies and

3    all such entities' respective rights and priorities are

4    undisturbed by this plan."

5              I don't know if that resolves Mr. Behlmann's

6    issue.  I know that he had asked --

7              THE COURT:  Mr. Behlmann, does that take care of

8    your issue on that point?

9              MR. BEHLMANN:  It does, Your Honor.

10             THE COURT:  Okay.

11             MR. KOENIG:  Wonderful.  And then on the --

12             THE COURT:  Go ahead.

13             MR. KOENIG:  Thank you.  His third point was about

14   the assignability of the securities law claims.  We added

15   some language to the plan, the disclosure statement, the

16   ballots that made clear that those claims will only be

17   assigned to the extent that assignment is permitted under

18   applicable law.  We don't have to reach the issue today --

19             THE COURT:  That's fine.  I'm satisfied with that

20   language.  Go ahead.

21             MR. KOENIG:  Okay.  I believe that that resolved

22   Mr. Behlmann's -- I believe that resolves Mr. Behlmann's

23   issues.  I'll turn next to the, the lawyer for Mr. Kieser

24   who raised a couple of issues with respect to loans and

25   subordination of the Earn claims.  I don't believe that any

Page 83

1    of this is an issue for the disclosure statement today.

2    It's a confirmation issue.  Mr. Kieser's attorney is arguing

3    that all of the Earn claims should be subordinated to his

4    client's claims.  Not an issue for today, but just very

5    briefly, I think it's a very convenient argument to make

6    that, you know, almost $5 billion of other claims should be

7    subordinated to just my claims.

8            I'd also point out that just because -- even if

9    Earn is a security, I'm not saying it is, but even if it

10   were, that doesn't mean that Earn should be subordinated

11   pursuant to Section 510(b).  There are other words in

12   Section 510(b) that are important.  It has to be arising

13   from the purchase or sale of a security.

14           There are a variety of securities of the Debtor

15   that can be issued in any case.  Bonds, indentures provide

16   for the issuance of debt securities of the Debtor.  That

17   does not mean that the bond debt claims are subordinated in

18   every bankruptcy.  If there are claims arising from the

19   purchase or sale of those bonds, for example, fraud or

20   misrepresentation associated with their sale, those claims

21   can be subordinated pursuant to Section 510(b).

22           That's the distinction, but again, not for today.

23   That's an issue --

24           THE COURT:  All right.  Next.

25           MR. KOENIG:  -- for confirmation.  Unliquidated

Page 84

1    loans, I think Mr. Kieser's attorney said that there was

2    more disclosure that was needed, but I think he clearly

3    understands it because the argument that he presented in

4    Court was if -- as if he was reading directly from the

5    disclosure statement.  So I think that we're already

6    resolved there.

7              He also argued that executory contracts, the loan

8    should be treated as executory contracts.  The plan was

9    amended to provide that to the extent the loans, the retail

10   loans are executory contracts, they will be deemed rejected.

11   That is exactly the same language that we have for

12   institutional loans except it's, if they are executory, they

13   are deemed assumed.  We're not arguing that they are or they

14   aren't, but if they are, it's just sort of a savings clause,

15   Your Honor, and the plan --

16             THE COURT:  Okay.  Next.

17             MR. KOENIG:  Mr. Ubierna, I think he said that he

18   only had one issue that remained on disclosure, which was he

19   wanted some more detail on mining.  Respectfully to Mr.

20   Ubierna, we have a ton of disclosure about mining.  It is

21   the most important asset of the Newco.  There are pages and

22   pages and pages of projections and disclosure and Q&A's and

23   all of the rest of it.  We added as many things as we could

24   to the disclosure statement as a result of his objection,

25   which we thought was very good and coherent as it always is.

Page 85

1   But we respectfully submit that the disclosure statement has

2   adequately addressed his disclosure objection.

3           THE COURT:  Okay.

4           MR. KOENIG:  I'll take the CEL token claims just

5   sort of as a group.  First of all, all of the objectors are

6   pointing to Ripple as a decision that is somehow

7   precedential or binding on this Court.  It is not, as I'm

8   sure Your Honor knows.  First of all, that decision is very

9   complicated and suggests that that the XRP token is a

10  security in certain circumstances and not a security in

11  other circumstances.

12          But even putting that decision -- we need to put

13  that decision to the side for a moment because what all the

14  objectors didn't mention is that Judge Rakoff ruled exactly

15  to the contrary in the Terraform Labs decision and found

16  that there the token was a security in all circumstances.

17          Again, these aren't issues for today, but just

18  needed to point that out since all of the objectors seem to

19  be relying on the Ripple decision as somehow binding on this

20  Court.  It is not.  It is an issue for confirmation, but

21  what we and the Committee are trying to do here is we've

22  proposed a settlement of all of the issues relating to CEL

23  token.  There are people that think it should be zero.

24  There are people that could -- that think it should be 81

25  cents.  I heard several objectors arguing that it should

Page 86

1    actually be more than 81 cents.  There are arguments that it

2    should be subordinated pursuant to Section 510(b) or

3    otherwise.  What the plan does is offer a comprehensive

4    settlement of all of those issues and value the token at 25

5    cents instead of what would otherwise be very long and

6    contentious litigation over the price of the CEL token, but

7    again, that's an issue for confirmation.

8            THE COURT:  Mr. Koenig, let me ask you now,

9    because it seemed to me that additional discussion should be

10   added to the disclosure statement about the recent New York

11   Supreme Court decision denying Mr. Mashinsky's motion to

12   dismiss the New York Attorney General's case.  That case is

13   State of New York v. Mashinsky, Index No. 45004/23.  It's a

14   decision by Judge Margaret Chan denying Mashinsky's motion.

15           It's an interesting decision.  I think it's a very

16   lengthy and well-reasoned decision.  Again, it's not binding

17   on this Court and she rejected Mr. Mashinsky's argument

18   relating to whether Celsius was a necessary party.  But it

19   seems to me -- I don't intend -- I don't know that it's

20   going to require an extremely lengthy decision.  So Ripple

21   clearly is not binding or -- on Celsius.

22           And while Judge Chan's Mashinsky decision is not

23   binding on Celsius, either, it relates specifically to

24   alleged facts relating to Celsius.  Judge Rakoff's decision

25   clearly is not binding on Celsius.  These are complicated

Page 87

1    issues.  Judge Chan's rulings are not the last word.  I

2    assume there'll be an appeal from what she ruled.  But I

3    believe she -- with respect to the CEL token, I think she

4    said it's a commodity but it would still be governed by the

5    -- it would still be subject to the Martin Act, the State

6    Martin Act.

7              So in addition to whatever federal securities

8    claims may exist, there could well be claims under state

9    securities law as well.  So I think some brief discussion

10   needs to be added to the disclosure statement about Judge

11   Chan's decision because it relates specifically to Celsius,

12   although it's not binding on Celsius.

13             MR. KOENIG:  Yes, Your Honor.  I think it -- we

14   included that description in the most recent version of the

15   disclosure statement.  I'm looking at Page 248 and 249 of

16   the disclosure statement that refers to that --

17             THE COURT:  I must've missed --

18             MR. KOENIG:  -- litigation specifically.

19             THE COURT:  I must've missed it.

20             MR. KOENIG:  No problem, Your Honor.  It's a

21   lengthy document.  We include it right after the description

22   of the Ripple and the Terraform litigation.

23             THE COURT:  What are the pages again, 248, 249?

24             MR. KOENIG:  248 and 249 and -- certainly take

25   another look at them.  And if there's some additional

Page 88

1    comments, we will certainly --

2              THE COURT:  I will again.  If it's there, I missed

3    that.  And so it may well be adequate.  But it is something

4    that, unlike Ripple and Terraform, this does relate to

5    Celsius.

6              MR. KOENIG:  Understood, Your Honor.

7              THE COURT:  Landing on the Debtor here.

8              MR. KOENIG:  Understood.  It's a long paragraph,

9    but we're of course happy to provide more disclosure if Your

10   Honor --

11             THE COURT:  Okay.  And I will confess that I

12   missed that paragraph.

13             MR. KOENIG:  As I said, it's a lengthy document.

14   I certainly understand.

15             THE COURT:  Yeah.  So let me -- actually, let me

16   raise this issue right now, because it is a lengthy

17   document, and it needs to be a lengthy document.  I'm not

18   critical about that at all.  But it seemed to me right up

19   front there needs to be a clear statement of balloting

20   deadline.  Because I didn't find it until way back in the

21   disclosure statement.  I think, you know, whether every

22   creditor is going to read the disclosure statement in its

23   entirety or not, I wouldn't want to count on that.  Many

24   will.  But I think that while the ballot will show that, the

25   disclosure statement ought to say, probably in bold language

Page 89

1    right up front a statement to the effect that -- you know,

2    with clear directions about the deadline for returning

3    ballots.  You also included about some of the resources that

4    might be available if people have questions.  I think some

5    brief reference to that as well so that even if people

6    aren't going to read the whole disclosure statement, they'll

7    know right upfront I've got to return a ballot by such-and-

8    such date.

9              MR. KOENIG:  Certainly, Your Honor.  Why don't we

10   do this?  We have a page -- it is Page 10 that has a lot of

11   these details.  Why don't we -- the box that's at the top of

12   the disclosure statement right now says something like the

13   disclosure statement is being submitted for approval but

14   hasn't been approved.  We can replace that with the voting

15   deadline is, you know, such-and-such a date.  Please see

16   Page 10 for more information and resources, something like

17   that.

18             THE COURT:  Okay.  So I have a question for you.

19   Well, go ahead and finish covering the other comments you

20   have on the other objections that were made.  And then I may

21   have a couple other thoughts.

22             MR. KOENIG:  Certainly.  All right.  So I'll just

23   cover a couple of others, and I'll try to be brief.

24             One of the pro se creditors, I think it was Mr.

25   (indiscernible), suggested that we just return the call

Page 90

1    token.  That's not --

2              THE COURT:  That's not going to happen.

3              MR. KOENIG:  I assume Ms. Scheuer's comments would

4    be much more lengthy this morning if we were suggesting that

5    we would do that.

6              THE COURT:  That isn't going to happen.

7              MR. KOENIG:  Okay.  And on the counsel for the Ad

8    Hoc Group for Cell Token, that's not before the Court today.

9    That's on September the 7th.  You know, they can of course

10   engage their own counsel as all the other ad hoc groups have

11   done.  We will continue to engage with them whether they are

12   represented by counsel or not and see if we can reach

13   consensus.  If not, you know, we'll deal with that at

14   confirmation.

15             Ms. Giugliano appearing for the two entities

16   affiliated with Mr. Mashinsky, I think equitable

17   subordination is for confirmation.  We provided additional

18   disclosure about why we're proposing to subordinate her

19   clients' claims.  I understand that she doesn't want there

20   to be rulings that could affect her client in other

21   circumstances.  We would be more than happy to enter into

22   some sort of a stipulation that subordinates its claims but

23   doesn't include any rulings, findings of fact, or

24   conclusions of law.  Happy to take that offline.  But we're

25   not going to do a significant pullback of distributions for

1    Alex Mashinsky because, you know, he would prefer for those

2    -- that litigation to wait until his criminal trials are

3    over.  We need to move forward now and make distributions to

4    our creditors.

5            THE COURT:  All right.  Next?

6            MR. KOENIG:  Just flipping through.  I think that

7    mostly covers it.  I think that mostly covers it.  I think

8    Your Honor covered the other objections or, you know, they

9    are not objections to the disclosure statement itself and

10   should be reserved for confirmation.  But I'm happy to take

11   whatever comments or questions you have.

12           THE COURT:  I do have some other questions.  So

13   assuming that the Court approves part of the plan, the cell

14   token settlement, the 25 cents, can the cell token holders

15   opt out of that settlement?

16           MR. KOENIG:  Not the way that it's currently

17   described, Your Honor.  It would be a settlement of all

18   issues relating to cell token, a 9019.

19           THE COURT:  I mean, ordinarily settlements are

20   consensual.  How is it -- what's the basis for binding any

21   of the cell token holders who object to that settlement?

22           MR. KOENIG:  I think if they object to the

23   settlement, we're going to have to make a showing that it's

24   fair, reasonable, appropriate, before we --

25           THE COURT:  Well, you're going to have to make

Page 92

1    that showing anyways.

2              MR. KOENIG:  Right, sure.  And hopefully there

3    will be enough cell token holders that vote for the plan and

4    for the settlement that we can point to that as the consent.

5    You know, in a case this large, of course you would never

6    get -- you would never have each and every holder consenting

7    to a settlement.  Right?  And so I think what we would do is

8    we will look at the ballots and the returns and use that as

9    some sense of -- we can of course track who votes and what

10   they're holding.  And I think that we're going to have to

11   look at the cell token returns and say, okay, you know,

12   hopefully a majority of cell token holders, or a significant

13   number of cell token holders accept the plan, vote to accept

14   the plan.  That's what a plan is, it's a settlement.

15             THE COURT:  All right.  Let me see if I have a few

16   other -- I do have a question.  And maybe you've posted -- I

17   think I raised this at a prior hearing.  You've entered into

18   a resolution with the DOJ, the SEC, the CFTC, and the FTC.

19   But it wasn't -- whatever that document was, it wasn't

20   public the last time I asked about it.  Is it public now?

21             MR. KOENIG:  It is public now.  I thought we had

22   filed that on the docket.  If we haven't, we will certainly

23   file it later today just to point everybody in the right

24   direction.

25             THE COURT:  Mr. Koenig, can you tell me the ECF

Page 93

1   number?  Look, I've been reviewing an enormous amount of

2   material.

3                MR. KOENIG:  Understood.  Let me check and come

4   right back to you on that, Your Honor.

5                THE COURT:  Let me ask a question.  Does that

6   settlement have any effect on the treatment of claims in the

7   plan?  Does it -- for example, does it preclude the Debtor

8   from arguing that the earn accounts are securities or that

9   whether or not cell tokens are securities?

10               MR. KOENIG:  For purposes of plan confirmation,

11   whether we could argue that?

12               THE COURT:  Yes.  Yeah.  I want -- in other words,

13   I don't -- yeah, specifically that.  Has the Debtor been

14   precluded by virtue of the terms of settlement from arguing

15   one way or the other whether earn accounts, cell tokens are

16   securities?

17               MR. KOENIG:  I don't believe that in the context

18   of plan confirmation we would be precluded from arguing

19   that, but let me -- I need to go back and read the

20   resolution in a little more detail to give you a firm answer

21   on that.  I don't believe so in the context of plan

22   confirmation.  Certainly in the context of any litigation

23   between Celsius and the government we may well be precluded

24   from making that argument.

25               THE COURT:  So I think the disclosure statement

Page 94

1    needs to state in clear terms whether or not Celsius is

2    precluded from arguing whether earn accounts and/or cell

3    tokens are or are not securities and if you are precluded,

4    for what purposes.

5             MR. KOENIG:  Understood.  We will do so.

6             MR. COLODNY:  Your Honor, Aaron Colodny from White

7    & Case on behalf of the Official Committee of Unsecured

8    Creditors.  I would just rise to note that even if the

9    Debtors have admitted it, the Committee has not and is not a

10   party to those discussions, and we reserve all rights with

11   respect to that.

12            THE COURT:  You know, for now I just want to know

13   -- something in the disclosure statement whether -- first, I

14   haven't seen the terms of the settlement.  And second,

15   assuming they're public, which they should be, what effect

16   if any does that settlement have on any positions that the

17   Debtor may take with respect to confirmation.  Okay, let me

18   see.

19            I think that -- well, let me ask you.  I may have

20   missed it if it's in there, and you'll tell me if it is.

21   But there was at least one additional risk factor that I

22   thought should be added.  I showed it at Page 293 of the

23   amended disclosure statement.  And it would be -- this is

24   what the -- and I think you've got 30 subparagraphs in

25   there.  It ends on Page 293.  I had this as Paragraph 31.

Page 95

1          "The mining business may face significant

2     counterparty risks, threatening its ability to operate

3     profitably."  And then the text -- that would be italicized.

4     And then below that, "The Debtor's recent experience has

5     demonstrated that the mining business may face important

6     counterparty risks ranging from counterparties' breach of

7     important agreements, counterparties' failure to perform in

8     accordance with contractual agreements, or counterparty

9     insolvency.  The crypto markets are highly volatile with

10    many important participants ceasing to operate, becoming

11    targets of regulatory enforcement actions, or filing

12    insolvency proceedings in the United States or elsewhere.

13    This could seriously impact Newco's profitability."

14          And let me see.  The quote continues in the next

15    paragraph.  "The mining business also faces the risk of

16    significant losses if a counterparty with whom Newco stakes

17    Ether (ETH) fails for whatever reason to return Ether (ETH)

18    as contractually required."

19          I wrote that language down because that's -- you

20    know, you're in an adversary proceeding with stake count

21    with specifically that risk where they have failed to return

22    (ETH) that was staked.  And I didn't see -- if I missed it,

23    you'll tell me.  But I didn't see that additional risk

24    factor added to a discussion of the mining business.

25          MR. KOENIG:  Understood, Your Honor.  We will

Page 96

1    draft that new risk factor.  If it exists elsewhere, we will

2    supplement it accordingly.

3             THE COURT:  Let me look down my list and see

4    whether I had anything else, Mr. Koenig.

5             So I think -- this is a separate point.  I think

6    the disclosure statement did not identify by name the

7    insiders who would not receive releases.  I think this was -

8    - I'm going to refer to a page number, but -- well, I'm not

9    going to refer to a page number.  It may have moved.  I

10   think you said it was going to be in the plan supplement.

11            MR. KOENIG:  Yes, Your Honor.  That was actually

12   one of the documents that was filed overnight.  And those

13   lists will be attached to the ballots of non-released

14   parties.  That was one of the things that we were working on

15   with the committee up until the hearing.  So we're happy to

16   include a cross-reference in the disclosure statement or

17   list them out in the disclosure statement, but we did file

18   the first version of that list last night, and we intend to

19   attach them to the ballots.

20            THE COURT:  Okay.

21            MR. KOENIG:  I think that's Docket Number 3723.

22   I'm sorry, 3273.  I transposed the numbers.

23            THE COURT:  I think you ought to cross-reference

24   it.  I don't think you have to repeat it, but just cross-

25   reference it.

Page 97

1          MR. KOENIG:  Will do.

2          THE COURT:  Does the disclosure statement explain

3    the allegations in the DOJ criminal case, the SEC, CFTC, and

4    FTC complaints?  I know you reference them, but do you

5    summarize the allegations?

6          MR. KOENIG:  I believe so, Your Honor.  We will

7    look back at it.  But I recall those sections being pretty

8    robust.

9          THE COURT:  Okay.  Sorry for the delay.  I've got

10   notes I'm going through.

11          That's all that I have on my list.  Mr. Colodny,

12   do you have anything you want to add?

13          MR. COLODNY:  No, Your Honor, I do not.  I think

14   that Ms. Kim's colloquy where she had important facts I

15   think really underscores the purpose of this disclosure

16   statement and how it works.  You know, she asked three

17   pointed questions that are important to all accountholders.

18   If accountholders go to the table of contents, it's easy to

19   find answers to all of them.  This was designed by Mr.

20   Koenig and his team to be an easy-to-read document for the

21   purpose of providing Ms. Kim with information.  I thought

22   that was pretty instructive to the hearing today.

23          THE COURT:  All right.  What I'm going to do then

24   is I'm going to conditionally approve the disclosure

25   statement.  I want to see these last changes.  Put them in a

1    blackline copy against the last version so that I can look

2    at those easily.  If I'm satisfied with that language, I'm

3    going to conditionally approve the disclosure statement.

4            I think that -- and I appreciate that Ms. Cornell,

5    Ms. Cornell, Ms. Cordry, Ms. Milligan, and Ms. Scheuer

6    frankly have made my life easier for today by agreeing that

7    the issues that the regulators have raised and reserved and

8    have worked -- and I really do appreciate the fact that the

9    Debtors have tried very hard to work out with the

10   regulators, because I've said over and over I think that,

11   you know, their agreement is very important to making this

12   plan a success.  Assuming that it receives the votes of

13   creditors and we go forward with confirmation, I can deal

14   with the confirmation issues at that time.

15           So I think that since they've reserved those

16   objections, they don't have to be ruled on at the time of

17   the disclosure statement.  So I won't hear arguments or

18   anything more about it and won't enter any rulings with

19   respect to those objections, because I really do think they

20   were confirmation objections.

21           Let me just go through my notes and make sure.

22           So you'll work today I assume in trying to get Mr.

23   (indiscernible) a sentence or two that's going to go in the

24   disclosure statement that will resolve his issues.

25           MR. KOENIG:  Yes, Your Honor.

1          THE COURT:  Let me ask you this question.  And

2     just really to the Debtor and the Committee.  So your

3     position is that if I approve this settlement to value the

4     cell tokens at 25 cents that none of the cell token holders

5     will have the right to a hearing on valuation of the cell

6     tokens as of the petition date?

7          MR. KOENIG:  What I would say, Your Honor -- and

8     Mr. Colodny will obviously have his own view -- is that if

9     the -- they'll have every right to object to the settlement.

10    If the settlement is approved, I don't think that they're

11    going to have a separate right to opt out and seek their own

12    separate hearing.  That's our position.

13         THE COURT:  Mr. Colodny?

14         MR. COLODNY:  That's right, Your Honor.  I think

15    the settlement is a good-faith effort to resolve a number of

16    complex issues regarding cell tokens, including

17    subordination, valuation, rank.  I could continue.  And we

18    would propose that it meets the realm of reasonableness

19    under Rule 9019.  And, importantly, it doesn't affect just

20    cell token holders, it affects all Earn creditors.  Because

21    as you pointed out, we cannot give cell token back.  And so

22    anything that is sent to cell token holders detracts from

23    the entire (indiscernible) recovery.

24         So the way the plan is designed is cell token

25    holders are valued at the settlement amount and then they

Page 100

1    receive the treatment according to the class in which they

2    held their account if it's a deposit claim.  And all Earn

3    creditors, all borrow creditors, all custody holders will

4    get to approve or reject that settlement as part of the

5    approval/rejection process of the plan.  And we intend to

6    move forward with that settlement under the Rule 9019 to the

7    extent Your Honor believes that's the acceptable standard

8    (indiscernible).

9             THE COURT:  All right.  Now let me ask -- I see

10   hands raised, but I'm not going to recognize you.  We've --

11   I've covered all of the -- given everybody a chance to speak

12   to whatever objections they have.

13            Let me ask a separate question.  I didn't see any

14   separate objections to the form of the ballot or the

15   solicitation materials.  Does anybody wish to raise an

16   objection to the form of the ballot or the solicitation

17   materials which are also on for approval by the Court?

18            Mr. Davis, are you objecting to the form of the

19   ballot or the solicitation materials?

20            MR. DAVIS:  I'm sorry, Judge.  No, I'm not.

21            THE COURT:  Okay.

22            MR. DAVIS:  I wanted to add something to what you

23   just said regarding the settlement.  Where --

24            THE COURT:  I don't want -- I'm sorry, Mr. Davis.

25   I don't want to hear anything about any of the subjects I've

Page 101

1   already heard about.  My question is specifically whether

2   anybody --

3           MR. DAVIS:  No, Judge.

4           THE COURT:  Okay.  All right.  Is there anybody

5   who wants to be heard with respect to the form of the ballot

6   or the solicitation materials?  All right.

7           So I'm approving the form of the ballot and the

8   solicitation materials as well.  Obviously the Debtor has

9   agreed to include something right up front in the disclosure

10  statement about the deadline, et cetera.  That's fine.

11          So I am, subject to reviewing the blackline

12  changes that are going to be made after today's hearing, I

13  am approving the disclosure statement, ballot, and

14  solicitation materials.  To the extent that I've not

15  specifically addressed or ruled on any remaining disclosure

16  statement objections that were made today, they're

17  overruled.

18          To be clear, this does not preclude parties-in-

19  interest to raise issues other than the adequacy of the

20  disclosure statement, form of ballot, or solicitation

21  materials in connection with plan confirmation.  All of

22  those rights are reserved.

23          All right.  What's next on the agenda, Mr. Koenig?

24          MR. KOENIG:  Thank you, Your Honor.  Before we

25  move on, I would be remiss if I didn't point out Mr. Colodny

Page 102

1    mentioned that it was me and my team.  It was not me and my

2    team.  It was -- Elizabeth Jones, my colleague, was the

3    architect of the disclosure statement.  It is her document,

4    not my document.  I'm the one that gets to take the credit

5    for it, but it's her and her team.  Because it was obviously

6    a cast of thousands that worked on that document.  And I

7    would be remiss if I didn't give her the credit for it.  She

8    was supposed to present our case-in-chief, and for time's

9    sake, we pivoted a little bit.  But she would have done a

10   better job than I did this morning, Your Honor.

11            THE COURT:  I appreciate you singling her out for

12   credit.  I appreciate it.  Look, there was an enormous

13   amount of work that went into this disclosure statement and

14   the changes that were made to it along the way to

15   accommodate objections.  And I've already said I appreciate

16   the agreement of the regulators, federal and state, with

17   respect to those things that may be reserved.  Hopefully the

18   Debtors, the Committee, and those regulators will be able to

19   continue their dialogue and if possible avoid any

20   confirmation issues that may still exist.  So I appreciate

21   all -- look, this is a big case.

22            It's -- excuse me just a second.  Sorry about

23   that.

24            You know, an enormous amount of effort went into

25   getting us to this point.  And I appreciate that.  And

Page 103

1      there's still a lot of work that remains to be done.

2               All right.  So are we ready to move on on the

3      agenda?

4               MR. KOENIG:  We are, Your Honor.  Next up is the

5      Class Claims Settlement Motion.  This is one of the major

6      issues that's remained in these Chapter 11 cases, the claims

7      reconciliation process.

8               Now that the disclosure statement has been

9      conditionally approved, we're hoping to have a confirmation

10     hearing commencing in early October.  And if the Court

11     confirms the plan, we're hoping for the effective date to

12     take place by the end of the year so that distributions can

13     commence in 2023.  But in order for those distributions to

14     be made without significant holdbacks or reserves, most of

15     the account holder proofs of claim will have to be resolved.

16     And there are approximately 31,500 proofs of claim that have

17     been filed by accountholders to date.  So resolving these

18     claims is a critical hurdle to the Debtor's ultimate goal of

19     commencing distributions to creditors this year.

20               The Debtors have explored several different

21     strategies in these Chapter 11 cases to try to resolve

22     claims, but all of them were imperfect.  Most notably, we

23     tried the bellwether claims process.  We objected to several

24     accountholder claims with the goal of obtaining rulings that

25     we could try to apply to other accountholder claims.  But

Page 104

1    that process was delayed by the Series B ruling.  And,

2    frankly, if we were to pursue that to its conclusion, that

3    process would have ultimately led to the expenditure of

4    significant estate resources.

5             But the Committee filed its class proof of claim

6    motion on behalf of all accountholders seeking a recovery

7    against each debtor entity on account of claims for fraud,

8    misrepresentation, and other non-contractual claims.  And as

9    part of mediation, we discussed and negotiated that issue.

10            The Debtor's position throughout these cases has

11   been that accountholders do not have any claims against the

12   Debtors above and beyond their claim for the return of their

13   cryptocurrency in their Celsius accounts.  That is, the

14   Debtor's position is account holders' damages are limited to

15   the value of the cryptocurrency in their account.  But the

16   Committee and various accountholders have argued that they

17   are entitled to more than that, they are entitled to a claim

18   that is higher (indiscernible) cryptocurrency in their

19   account.

20            Given the importance of this issue to the claims

21   reconciliation process, the Debtors were willing to

22   negotiate a settlement of this issue, so we entered into the

23   Class Claim Settlement.  This settlement provides every

24   accountholder with a five percent increase to their claims

25   other than custody claims on account of this argument,

1    noncontractual claims such as fraud or misrepresentation.

2    Each accountholder will receive notice and the opportunity

3    to opt out of the settlement as part of balloting.  If they

4    do not opt out, they are bound by the settlement and any

5    related proof of claim they filed will be deemed amended,

6    superseded, and expunged by this new settlement claim.  That

7    is if an accountholder does not opt out, they will not be

8    able to pursue their separate proof of claim, but they will

9    receive this five percent increase to their claims and they

10   will be eligible for the initial distribution that will

11   commence on or around the effective date.

12           And of course every account holder has the right

13   to opt out of the settlement and take their chances with the

14   proof of claim litigation process.  They can present their

15   case that they are entitled to a claim for more than just

16   the crypto in their account.  But any accountholder who does

17   that is not going to receive a distribution on the effective

18   date because they will have a disputed claim.  They will

19   have to prove up their claim post-emergence as part of the

20   claims reconciliation process and obtain a ruling of the

21   Court.  And the bar for proving fraud and misrepresentation

22   is quite high.  That is why we've entered into the

23   settlement, to speed distributions to creditors, to have an

24   easy way to resolve this issue while allowing people the

25   right to opt out if they don't agree with the settlement and

Page 106

1    if they want to argue for something that is higher or better

2    than the settlement.

3            The way that the opt-out process will work is part

4    of solicitation.  If any accountholder wants to opt out of

5    the settlement, there is a checkbox right on the ballot.

6    Accountholders will have until the voting deadline to opt

7    out of the settlement.  Accountholders that do not opt out

8    will be bound by the settlement.  They will receive the five

9    percent increase of their claim, but they will have the

10   related proofs of claim expunged.

11           Accountholders that do opt out will retain all of

12   their rights to argue their proofs of claim in full, but

13   they will not receive the five percent increase and they

14   will likely face an objection from the litigation

15   administrator post-emergence and they will have to prove up

16   their claim.

17           The settlement is supported by the Committee and

18   Mr. Tuganov also filed a pleading in support of the

19   settlement motion.  The settlement motion was included as

20   part of the mediated three-day settlement with Judge Wiles,

21   and so the Earn, Ad Hoc Group, and Borrow Ad Hoc Group also

22   support it.

23           We think that this motion officially resolves

24   disputed and costly claims reconciliation litigation while

25   allowing any affected accountholder to opt out, and we

1    believe it should be approved.  The only objection that was

2    filed was an objection by Mr. Caseres.  His objection was

3    effectively a carbon copy of his objection to the disclosure

4    statement.  He argued various issues relating to cell token.

5              The issues relating to cell token are not really

6    before the Court today as part of this settlement.  The

7    holders of cell token will receive the same five percent

8    increase to their cell token claims as other creditors.  The

9    issue of how to value the cell token is not being resolved

10   this motion, but instead through the Chapter 11 plan.

11             Mr. Caseres clearly has strong views on cell

12   token, which is understandable.  But this settlement does

13   not resolve cell token claims under the plan, which is for

14   another day.

15             Your Honor, that concludes my remarks, and I'm

16   happy to pass the lectern to whoever else would like to

17   speak.

18             THE COURT:  Mr. Colodny, do you want to be heard?

19             MR. COLODNY:  Yes please, Your Honor.  Aaron

20   Colodny from White & Case on behalf of the Official

21   Committee of Unsecured Creditors.  I feel like I'm always

22   batting behind Mr. Koenig here, so I'll try to avoid

23   duplications.

24             But, you know, I want to go back to why we filed

25   the class claim in the first place.  And that was because of

Page 108

1    hundreds of thousands of individual accountholders bringing

2    claims for fraud, misrepresentation, and other non-contract

3    claims, it was just not going to happen, and it wasn't going

4    to work.  And I think at our hearing on the motion to

5    approve the filing of the class claim, that was made clear

6    by Your Honor.

7              I think that the settlement, it furthers that goal

8    and it makes it clear that we're not going to privilege the

9    few over the many here.  Specifically, it provides all

10   accountholders with the increased claim and make sure that

11   those that can't afford lawyers to bring complicated fraud

12   claims against the Debtors won't be disadvantaged to those

13   that can afford to pay for counsel, those that can afford to

14   wait for distributions, and those that might get more

15   because of a holdup value because of that.

16             It also streamlines the claims reconciliation

17   process, which I know Mr. Koenig focused on.  It's going to

18   dramatically lower the holdbacks here, which could be

19   massive due to the incredible size of the claims filed

20   against the Debtors.  And it also will decrease the cost

21   that would have to be spent adjudicating those claims

22   administration.  But that's not to say that we are taking

23   claims away from people.  Everybody gets a chance to opt

24   out.

25             And I went through the ballot last night, and I

1    wanted to flag it for Your Honor.  But at Docket Number

2    3224, and it's Exhibit 3A, 271 at the top of the page.  At

3    the beginning of the ballot, we put an important note

4    regarding the class claims settlement which details the

5    settlement and the consequences for not opting out.  So

6    although the election is a bit further down in the ballot, I

7    believe that that item eight right at the top, as you said,

8    with respect to the disclosure statement, we put the most

9    important thing, which is if you want to take action, you

10   have to do it on this ballot.

11          Your Honor, I don't want to belabor the point, but

12   one of the things that the settlement also does is it

13   resolves claims on account of subordination of settling

14   claims.  And the way that it does that is an agreement that

15   was reached at the mediation between the Earn and Borrow

16   groups, and it does it by --

17          THE COURT:  You've cut out, Mr. Colodny.  My

18   screen shows connecting to audio.  Your audio was obviously

19   interrupted.  But let's wait for it to reconnect.

20          Just raise your hand if you can hear me, Mr.

21   Colodny.

22          CLERK:  He is connected, Judge, I think.  Mr.

23   Colodny?

24          MR. COLODNY:  Can you hear me, Your Honor?

25          THE COURT:  Okay, you're unmuted.  Go ahead.

Page 110

1          MR. COLODNY:  You either hit the end of the Zoom

2    or my conference dial-in.  So I apologize, Your Honor.

3          THE COURT:  I didn't hit the end of the Zoom,

4    trust me.

5          MR. COLODNY:  The point I was making was we

6    reached an agreement at the settlement that resolves the

7    subordination issue with respect to settled claims.  And the

8    way that it does that is it applies the five percent to the

9    entire Borrow claim and the entire Earn claim.  And if you

10   think about the Borrow claim as a partially-secured claim by

11   right of setoff and an unsecured claim, that excess

12   unsecured claim gets an additional boost because it is

13   applied while the secured part is kept constant.  And that

14   was a mediated solution that was reached before Judge Wiles

15   that squarely resolves these issues so that we can move

16   forward with the plan and confirmation process.  And I think

17   that that's critical to the settlement, critical to the

18   implementation of the plan, and critical to moving these

19   cases forward to the conclusion.

20          So with that, Your Honor, unless you have any

21   other questions, the Committee strongly supports the

22   settlement as a way to efficiently resolve these

23   (indiscernible) and get money back to creditors.

24          THE COURT:  Thank you very much, Mr. Colodny.

25          Mr. Caceres, you filed an objection.  I would be

1    happy to hear from you now.

2         MR. CACERES:  Thank you, Your Honor.  Santos

3    Caceres, pro se again.

4         I am aware I brought a knife to a gunfight.  And

5    as I said before, only one member of the UCC has a cell

6    token claim that is worth fighting for.  All of the members

7    of the UCC will get a larger recovery as the Loans and Earn

8    settlement is currently written.  The closed-door

9    negotiations between Loans and Earn completely disregarding

10   non-insider cell token claims.  Neither I nor the multiple

11   people that wrote letters to the judge today were invited to

12   those discussions.  Therefore, I object to the settlement.

13        THE COURT:  All right.  Anybody else wish to be

14   heard?

15        Mr. Adler?

16        MR. ADLER:  Good morning.  Good afternoon, Your

17   Honor.  It's David Adler from McCarter English on behalf of

18   the Retail Ad Hoc Group.  Can you hear me?

19        THE COURT:  I can.  Go ahead.

20        MR. ADLER:  The only thing I would say, Your

21   Honor, is obviously this was all, as Mr. Colodny said, this

22   was negotiated during the three-day mediation that took

23   place July 17th, July 19th.  But it's a package, the term

24   sheet.  And I do have some concerns over splitting off one

25   part of the term sheet from the rest of it.  And given the

Page 112

1    cell people's concerns, what I would respectfully recommend

2    perhaps is because we are dealing with a class claim is that

3    the Court preliminarily approve the settlement subject to

4    final approval at the confirmation hearing.

5              That's my only comment, Your Honor.  Do you have

6    any questions?

7              THE COURT:  Well, the thing that strikes me as

8    contrary to your argument is that it's an opt-out

9    settlement.  And so I don't see any reason why I shouldn't

10   approve it.  It reserves the right of any creditors to opt

11   out.  This is not forever barring them from going forward.

12   If they really think that they can go ahead and prevail on

13   separate claims, opt out.  It's a herculean task, but it's

14   not impossible.

15             MR. ADLER:  Okay, Your Honor.  I just wanted to

16   make that clear for the record, that from our perspective

17   this was one single term sheet and it's being split.  And

18   with that I will --

19             THE COURT:  Well, it's not being split because it

20   contemplated an opt out.  And that's what they're being

21   given.

22             MR. ADLER:  Okay.  Thank you, Your Honor.

23             THE COURT:  Thank you.  Mr. Sabin?

24             MR. SABIN:  Your Honor, I speak in support.  We

25   filed our papers for Mr. Tuganov.  I'm only going to raise

Page 113

1      three points and then respond to Mr. Adler.

2              First and foremost, the five percent increase

3      against all debtors is to the scheduled amount.  The

4      importance of that of course is that there is no need if

5      this Court were to approve this settlement now for another

6      modification and opening up of a bar date.  The opt out

7      procedure applies to those who already filed claims as

8      otherwise set forth by Mr. Koenig and Mr. Colodny.  Very

9      important point.

10             Point number two.  I do not believe that there was

11     any misunderstanding amongst the mediated parties without

12     talking about any confidential information that contemplated

13     this settlement going forward independently and going

14     forward almost immediately.  If my memory is right on the

15     docket, it was filed within 24 hours after execution of the

16     term sheet.

17             Point number three.  The resolution of the 510(b)

18     issue I believe does not need to await for confirmation and

19     I believe can be approved under a 9019 standard.  There does

20     not have to be a separate motion to subordinate, an

21     adversary proceeding to subordinate.  I think the notice was

22     sufficient in the motion, et cetera.

23             I also want to point out that although the filed

24     class proof of claim and although the settlement otherwise

25     shows the five percent increase, it is against each and

Page 114

1   every debtor.  And the subcon that's now contemplated in the

2   amended plan of some of those debtors is independent of this

3   resolution that's proposed.

4            For all of those reasons and for the reasons

5   articulated by Mr. Koenig and Mr. Colodny, we strongly urge

6   this Court to approve finally this settlement now.  Thank

7   you, Your Honor.

8            THE COURT:  Thank you.  Mr. Davis?

9            MR. DAVIS:  Judge, I just had something to add

10  Santos Caceres' statement if that's okay.  If not, I won't

11  add it.

12           THE COURT:  Go ahead.

13           MR. DAVIS:  Judge, as a point of reference about

14  why the Court should approve a cell token valuation hearing,

15  the Debtors themselves have filed a $2 billion claim in the

16  FTX bankruptcy claiming that cell token was manipulated down

17  from $3 to 20 cents.  That is a reason why we should have a

18  valuation hearing.  That's all I have to say.  Thank you

19  very much.

20           THE COURT:  Thank you.

21           Mr. (indiscernible)?

22           UNIDENTIFIED SPEAKER:  Yes, Your Honor.  I'm glad

23  that we addressed that we won't be distributing the cell

24  tokens.  However, the Debtors still have not addressed what

25  their plans are.  They still have 658 million of these

Page 115

1    tokens.  So for the sake of clarity, it would be helpful if

2    they state whether they plan to either auction them off or

3    to burn them.  Thank you.

4         THE COURT:  Thank you.  Mr. Koenig, can you answer

5    that question?

6         MR. KOENIG:  Again, Chris Koenig, Kirkland &

7    Ellis, for Celsius.  We are still evaluating what to do with

8    the cell token.  We've been in discussions with various

9    parties, but we don't have a resolution.  I understand the

10   question for sure.  And whenever we have a resolution, we

11   will certainly make a statement publicly.  But we haven't

12   come to that conclusion quite yet.

13        THE COURT:  Do the parties include the regulators?

14        MR. KOENIG:  They certainly will if we propose

15   anything that includes a sale or transfer or otherwise.

16        THE COURT:  All right.  Anybody else wish to be

17   heard with respect to the 9019 motion to approve the Class

18   Claim Settlement Motion?

19        All right.  The motion is approved.  I've already

20   said previously that I greatly appreciate the efforts of my

21   colleague, Judge Wiles, in connection with the mediation.

22   You know, with the best settlements, I think it leaves

23   everyone slightly unhappy but on the whole believe that

24   they've reached the best resolution possible.  And I think

25   that this does that.

1            And because it includes the opt-out feature which

2    is prominently disclosed in the ballot, I think that

3    approving it today is appropriate rather than awaiting

4    confirmation.  No one's rights will be impacted by my

5    approving it today.  People will still have the opportunity

6    to opt out if they think that's what's in their best

7    interest.

8            So submit the order.  And I'm approving the

9    settlement and overruling the objection that's been made.

10   All right.

11           MR. KOENIG:  Thank you, Judge.  We will do so.

12           THE COURT:  Mr. Koenig, anything else for this

13   morning?  I know we have something at 2:00.

14           MR. KOENIG:  The only other item on the agenda,

15   Your Honor, was the stipulation that we entered into with

16   the FTC.  We had filed a stipulation, the Committee filed a

17   limited objection, and we filed a joint reply, the Debtors

18   and the FTC.  That was the only other matter.

19           THE COURT:  Mr. Colodny, do you want to be heard

20   on that?

21           MR. COLODNY:  Yes, please, Your Honor.  This is

22   Aaron Colodny from White & Case on behalf of the Official

23   Committee of Unsecured Creditors.

24           We filed a limited objection at Docket 3136.  And

25   based off of the FTC's response, I think that the Committee,

Page 117

1    the Debtors, and we all agree on a couple of points.  The

2    first I think was the last sentence in their section which

3    said that they believe that they are focused on maximizing

4    the returns to consumer creditors through the bankruptcy

5    process.  You know, I think that's been the kind of drumbeat

6    of these entire cases.

7            What we sought clarification on was -- I'll take

8    them in reverse order.  But first, that the Debtors wouldn't

9    have to establish reserves.  And I believe that the FTC has

10   unqualifiedly agreed to that in their response, and I don't

11   believe that any further clarification is needed on that

12   point based off of their statement on the record.

13           The second point I am a bit I guess hesitant to

14   raise, but I think we need to do it now.  And the point

15   being does this judgment travel to Newco.  And what the FTC

16   said in their response was the people that it is targeted at

17   are very clear.  It's the corporate defendants, which are a

18   number of Celsius-listed entities.  And then there's two

19   words at the end of that, successors and assigns, which are

20   the two words that give me quite a bit of pause.  And the

21   FTC says, you know, we said what we meant and we can't opine

22   on what that means today.  And that's true.  But the plan

23   also is on file before Your Honor.  You approved the

24   disclosure statement, and it's going go to out for a vote.

25   And the plan at Article 4(d)(1) clearly states that all

Page 118

1    Newco assets shall be transferred to invest in Newco free

2    and clear of all liens, claims, interest charges, and other

3    encumbrances.  It also says that Newco shall not assume or

4    be deemed to have assumed or be liable for any liabilities

5    of any of the Debtors except as and solely to the extent --

6    except as expressly set forth herein -- apologies, that was

7    a tongue twister -- and that the Newco transaction shall not

8    be deemed to be a de facto merger or a continuation of any

9    of the debtors.

10                I believe that that's clear and that Newco would

11    not be a successor or assign.  The trouble becomes that my

12    constituencies' recovery is going to be quite a bit in Newco

13    stock.  And to the extent that there is a potential $4.7

14    billion claim that is hanging over that Newco stock, I think

15    it implicates both the viability of Newco, the viability of

16    the plan, and the potential recoveries to creditors.  And so

17    I think that now is the time that we should get some

18    clarification on this so that we don't have a gotcha where

19    we send a lot of money, get all the way up to plan

20    confirmation, and then we have a challenge saying no, this

21    $4.7 billion claim somehow travels to Newco with the assets

22    and puts a cloud over the recoveries.  Because the fresh

23    start that Newco is going to get here is going to be its

24    greatest asset, and I don't believe that we should move

25    forward without clarifying that point.

Page 119

1              THE COURT:  Does anybody else want to be heard?

2    Is there anybody for the FTC who wants to be heard?  I don't

3    know --

4              MS. AIZPURU:  Your Honor.

5              THE COURT:  Yes.

6              MS. AIZPURU:  This is Katherine Aizpuru from the

7    Federal Trade Commission and I would appreciate the

8    opportunity to be heard on this.

9              THE COURT:  Sure.  Go ahead.

10             MS. AIZPURU:  Thank you, Your Honor.  I'll lower

11   my hand here.

12             So the FTC stated its position in our response

13   filed at Docket 3254.  But I would just add, Your Honor,

14   that what the settlement actually provides as to the

15   monetary judgement is that the entire amount is suspended as

16   to the debtor-defendants, and that suspension will only be

17   lifted as to the debtor-defendants if the bankruptcy case is

18   closed, dismissed, or otherwise concluded without the

19   estates being fully administered, including any

20   distributions to creditors in accordance with the Bankruptcy

21   Code.  So I'm not sure where the concern about the monetary

22   judgement remaining as a cloud on Newco following

23   confirmation of the plan comes from, but that's not

24   something that I believe is a part of the settlement or

25   included in the settlement.  And the Committee has proposed

Page 120

1    adding to a stipulation between the FTC and the Debtors

2    language that assumes whether Newco is a successor or

3    assign.  And that's not something that is contemplated in

4    the commission-approved settlement and not a question that

5    is ripe at this time.  So our view is that that proposed

6    addition to the stipulation is both premature and also

7    unnecessary.

8            THE COURT:  May I ask you this question?

9            MS. AIZPURU:  Of course.

10           THE COURT:  Do you agree if the plan is confirmed

11   and the disposition of the property is in accordance with

12   the plan, the creation of Newco, the distribution of its

13   equity all in accordance with the plan, do you agree that

14   the FTC is not asserting any claim with respect to the $4.7

15   billion if all of those steps occur?

16           MS. AIZPURU:  As I understand it, Your Honor, if

17   all of those steps occurred, then the monetary judgement

18   would not be unsuspended.  It would remain suspended and it

19   would not be collectable by the FTC at that point.

20           THE COURT:  I think Mr. Colodny's point, if I'm

21   understanding it correctly, is the creditors want the

22   certainty that if the plan is confirmed and distributions in

23   accordance with the plan occur, including the Newco stock,

24   that the FTC isn't going to suddenly raise its hand and say,

25   well, $4.7 billion, we get to recover that before the value

Page 121

1    of Newco is available for the benefit of the creditors.  And

2    if I'm understanding you correctly, you're agreeing that if

3    all of those things occur -- namely confirmation,

4    distribution accordance, et cetera, the $4.7 billion

5    judgement in favor of the FTC remains suspended.  Is that

6    correct?

7              MS. AIZPURU:  I think that's correct, Your Honor.

8    I wouldn't -- I think that's correct.  And I think that the

9    certainty that the Committee is looking for comes from a few

10   different places.  It comes from the terms of the suspension

11   as to the debtors, which again would only be lifted if the

12   bankruptcy process were not completed for some reason.

13             THE COURT:  Sure.  I mean, there's a liquidation.

14   If it's converted to a Chapter 7, all bets are off with

15   respect to the $4.7 billion judgement.

16             MS. AIZPURU:  Well, I'm not sure that's right,

17   Your Honor.  Because, again, as I understand it -- and I'm

18   not an expert in bankruptcy law by any means.  But as I

19   understand it, a liquidation can result in the estate being

20   fully administered in accordance with the Bankruptcy Code.

21   And in that scenario, the suspension would continue in

22   place.  You know, there would still be distributions.  So

23   that's the primary place where the Committee can find

24   certainty.

25             But there's also Part Five of the settlement,

1    which provides that the order does not restrain or enjoin

2    the distribution, et cetera, of assets, does not preclude

3    the full distribution of assets held by the debtor-

4    defendants.  And it also comes, Your Honor, from the plan

5    itself and from transfer documents associated with the plan.

6    And that's typically where we would expect to see provisions

7    dealing with transfers free and clear and whether purchasers

8    of assets pursuant to the plan take successor liability or

9    become successors.  You know, that's where we would expect

10   to see the language that Mr. Colodny referred to in Part

11   Four, the free and clear type language.

12          So between the plan itself, the terms of the plan,

13   what the transfer documents are expected to say, and the

14   settlement itself, I think that certainty is there, Your

15   Honor.

16          THE COURT:  All right.  Mr. Colodny, why aren't

17   you satisfied with that?

18          MR. COLODNY:  Well, Your Honor, I think I'm not

19   satisfied because of the timing issue.  Right?  Ms. Aizpuru

20   says don't worry, if the plan is fully administered and the

21   bankruptcy estate is fully administered, then we move -- the

22   judgement never gets lifted.  And if that all happens on the

23   effective date, that's great.  If we're able to distribute

24   Newco stock and we have no holdbacks and we are able to move

25   forward and close the cases right on the effective date --

Page 123

```
1              THE COURT:  Well, you know that's not going to

2      happen.  It's not going to happen on the effective date.

3              MR. COLODNY:  That's my point.  My point is --

4              THE COURT:  But I don't -- stop.  I don't see --

5      you know, there may be a considerable period of time.  I

6      mean, there may be appeals.  There may be lots of things.

7      So -- but that delayed timing it seems to me doesn't enhance

8      the rights of the FTC with respect to its judgement.  The

9      rights are the rights.

10             MR. COLODNY:  Correct.  And I guess my concern is

11     that we may be moving on to that point.  The FTC may make an

12     argument that notwithstanding the plan language, Newco --

13             THE COURT:  Mr. Colodny, if they want to come back

14     and argue that, I'll be interested in hearing the argument.

15             Mr. Koenig, is there anything you want to say on

16     this point?

17             MR. KOENIG:  Your Honor, again, Chris Koenig.  I

18     took comfort in what Ms. Aizpuru said, that if the plan goes

19     forward and if Newco is created and if distributions to

20     creditors will be made, that will not -- the judgement will

21     remain suspended, is the way I will put it, which I take

22     great comfort in.  I understood and agreed with Mr.

23     Colodny's limited objection.  I think it makes sense to get

24     some clarification, and I think we got plenty of that at

25     this hearing.
```

Page 124

```
 1              THE COURT:  So do I.  All right.  So the limited

 2     objection is overruled.

 3              Ms. Aizpuru, I appreciate your responses to my

 4     questions.  Okay?

 5              MS. AIZPURU:  Thank you, Your Honor.

 6              CLERK:  Judge, was the Terraform motion handled

 7     this morning?

 8              THE COURT:  Say that again?

 9              CLERK:  The Terraform motion.  Was that handled

10     this morning?

11              THE COURT:  Mr. Koenig?

12              MR. KOENIG:  Judge, I don't believe that we -- we

13     filed a joint reply with the Terraform -- with Terraform.

14     Your Honor had issued an order suggesting that we should

15     file briefs with respect to the issue raised in ResCap.  We

16     filed a joint reply that I think moots that.  I think we've

17     agreed to provide the -- we have agreed to provide the

18     discovery, so I don't think that we need any assistance from

19     Your Honor unless somebody kicks me and tells me I'm wrong.

20              THE COURT:  That was my understanding.  I referred

21     you all to the ResCap decision because I think that it made

22     clear that discovery is still available, but there may be

23     limitations on it.  And I understood that the Debtor and

24     Terraform were able to resolve those issues.  Does that

25     answer your --
```

Page 125

1              MR. KOENIG:  Yes, thank you, Your Honor.  It is,

2     Your Honor.  And we appreciate your looking out for the

3     Debtor and making sure that if there were extenuating

4     circumstances that would be burdensome, for example, that we

5     had the opportunity to make that argument.  Frankly, it's

6     not that burdensome and we're happy to provide the

7     discovery.

8              THE COURT:  That's fine.  I'm glad we'll have that

9     resolved.

10             Deanna, thank you for raising that.

11             MS. SCHRAG:  Good afternoon, Your Honor.  Sarah

12     Schrag of Dentons US LLP on behalf of Terraform Labs.

13             THE COURT:  Yes.

14             MS. SCHRAG:  Just for clarification, Your Honor,

15     are you saying that there's no need for entry of an order

16     and that we may proceed with the comfort that we're not

17     violating the automatic stay, et cetera, Your Honor?

18             THE COURT:  Mr. Koenig?

19             MR. KOENIG:  I believe we've committed to provide

20     you with the discovery.  So I think we're all set.  But I'm

21     certainly not going to raise the automatic stay as a

22     defense.

23             THE COURT:  Ms. Schrag, I think -- and the reason

24     that I pointed everybody to my ResCap opinion is basically

25     the automatic stay doesn't apply.  That doesn't mean that

Page 126

1    there wouldn't be limitations or restrictions that could be

2    imposed on discovery.  And I take the Debtor's agreement

3    that you'll move forward with discovery as resolving the

4    matter.  If an issue comes up, you'll come back to me.

5    Okay?

6              MS. SCHRAG:  Thank you, Your Honor.  I appreciate

7    it.

8              THE COURT:  All right.  Thank you.  All right.

9    Does that take care of our agenda for this morning?

10             MR. KOENIG:  It does, Judge.  Just one quick

11   matter of housekeeping.  We filed a motion seeking authority

12   to provide expense reimbursement for cooperating witnesses.

13   It was heard at the May 17th hearing.  I think we can read

14   the writing on the wall that that motion may not be

15   approved.  We are evaluating whether to withdraw the motion,

16   frankly, because it's starting to become a bit of a

17   hindrance for these employees, frankly.  The D&O carriers

18   are not processing their claims because it's still possible

19   that the company could reimburse those employees.  And so

20   the pendency of that motion is actually stopping them from

21   receiving a recovery from the D&O insurance.  So I just

22   wanted to raise it.  We haven't made any decisions yet.  We

23   still need to talk to a variety of the parties who would

24   obviously be affected.  But if Your Honor sees a withdrawal

25   of that motion in the coming days, that would be why.  It

Page 127

1    would just -- we're trying to speed recoveries to these

2    folks.  And as I said, I think the fact that the order has

3    not been entered yet, I think we can read the writing on the

4    wall there.

5              THE COURT:  Ms. Cornell, do you want to be heard?

6              MS. CORNELL:  Thank you, Your Honor.  Shara

7    Cornell with the Office of the United States Trustee.  I

8    haven't spoken with Mr. Koenig on this topic in recent days,

9    but obviously that result would be something that our office

10   would be very happy with.  Thank you.

11             THE COURT:  All right.  So why don't you see if

12   you can finally work this out with Ms. Cornell and if you

13   can withdraw the motion.  If not, put it back on for a

14   hearing and I'll hear it expeditiously.  Okay?

15             MR. KOENIG:  Okay.  Thank you, Judge.  That's all

16   that we have for this morning.  And I know we have another

17   hearing at 2:00.

18             THE COURT:  Mr. (indiscernible), your hand is

19   raised, but I think we finished the agenda.  What is it you

20   want to be heard on.

21             UNIDENTIFIED SPEAKER:  Yes, sorry, Your Honor.

22   It's a bit out of sequence now.  But I wondered why the

23   Debtor did not respond to that question regarding the

24   definition changes in the disclosure statement.

25             THE COURT:  That is all concluded.  I've overruled

Page 128

1    any objections that haven't otherwise been addressed.  All

2    right.

3              Mr. Koenig, what am I hearing at 2:00?

4              MR. KOENIG:  You're hearing a status conference

5    with respect to our discovery dispute with Mawson.

6              THE COURT:  Okay.  All right.  So we are adjourned

7    until 2:00 p.m.  Deanna, I am going to disconnect.  I'll

8    reconnect at 2:00.

9              CLERK:  Okay.  Thanks, Judge.

10             (Recess)

11             THE COURT:  All right, good afternoon.  This is

12   Judge Glenn.  This is a conference requested by the Debtor

13   in connection with -- I'll describe it as the Mawson

14   discovery dispute.  The Court is in receipt of

15   correspondence both from the Debtor's counsel and Mawson

16   counsel.  Who is going to speak for the Debtor?

17             MR. LATONA:  Good afternoon, Your Honor.  For the

18   record, Dan Latona of Kirkland & Ellis on behalf of --

19             THE COURT:  I'm not hearing you quite clearly.

20   I'm not sure why.

21             MR. LATONA:  Hold on one moment.

22             THE COURT:  Very low volume.

23             MR. LATONA:  Is that better, Your Honor?

24             THE COURT:  That's better.

25             MR. LATONA:  Okay.  Again, Dan Latona of Kirkland

Page 129

1    & Ellis on behalf of the Debtors.  I am joined by my

2    partner, T.J. McCarrick, who is also appearing virtually.

3              THE COURT:  Go ahead.

4              MR. MCCARRICK:  Good afternoon, Your Honor.

5              THE COURT:  Who is appearing for Mawson?

6              MR. HERZ:  Good afternoon, Your Honor.  Michael

7    Herz of Fox Rothschild on behalf of the Mawson entities.

8    And my partner, Michael Sweet, is also on the telephone

9    line.  He's traveling this afternoon.

10             THE COURT:  Sure.  That's fine.  Okay.  Go ahead.

11   Mr. Latona, are you going to begin?

12             MR. LATONA:  Yes.  Thank you, Your Honor.  As you

13   mentioned, we are here for a status conference on what we

14   are terming as the Mawson discovery dispute.  The Debtors

15   did file a Rule 2004 motion at Docket 3088 and an order was

16   entered at Docket 3091.  The relevant affidavits of service

17   were filed at Dockets 3198 and 3199.  And, Your Honor, we

18   did not want to file this motion, but unfortunately the

19   circumstances compelled us to.  And contrary to what the

20   Mawson entities allege, this is not designed as an effort to

21   intimidate and harass the entities over a commercial

22   dispute.  Rather, this is to ensure that the Debtors are

23   taking all steps necessary to protect tens of millions of

24   dollars' worth of estate assets.  And this motion was

25   unfortunately necessary to compel the Mawson entities to

Page 130

1    provide information to confirm some of the representations

2    that the Mawson entities have made in telephone

3    conversations with Celsius management, but also in emails

4    and publicly-reported filings.

5              And, Your Honor, just to take a step back and

6    provide some context, the Debtors and the Mawson entities

7    are a party to several agreements as part of a broader

8    transaction with respect to the Luna Squares Midland Mining

9    Hosting Facility.

10             First, the Debtors in Luna Squares are party to a

11   promissory note that's secured by collateral at the Midland

12   site.  That matures on August 23rd, and the aggregate

13   outstanding amount is approximately $8 million plus

14   interest.

15             Part and parcel of that transaction, Your Honor,

16   the parties entered into a hosting agreement whereby Luna

17   Squares agreed to provide certain hosting and electrical

18   power services to the Debtors, and the Debtor would ship

19   rigs to the Midland hosting site for bitcoin mining.  Now,

20   those transactions were all entered into together and the

21   hosting agreement also expires on August 23rd.

22             And, Your Honor, to be clear, the Debtors did send

23   a notice to the Mawson entities on July 20th informing them

24   that they had elected to terminate the agreement.  But

25   Celsius also expressed a willingness to discuss a continued

Page 131

1    relationship subject to understanding Mawson's financial

2    condition and where the parties intended on going.

3            And, Your Honor, this is a negotiation that's been

4    ongoing for several months.  In the early part of June is

5    when the parties first discussed the idea of a forbearance.

6    And as those negotiations continued later in June, Mawson

7    made a representation to Celsius management that the

8    collateral that was intended to secure the promissory note

9    was not in the legal entity it was supposed to be in.

10   Naturally, the Debtors requested information evidencing this

11   fact and several days later were provided with an Excel

12   spreadsheet that seemed to confirm that representation made

13   to Celsius management.

14           As you can imagine, Your Honor, this was very

15   distressing and disturbing to the Debtors.  So in an effort

16   to understand what the commercial relationship would look

17   like going forward, the Celsius debtors supplied the Mason

18   entities with a more detailed list of diligence that it

19   required to see before the parties would engage on future

20   discussions with respect to the Midland facility and the

21   hosting agreement.

22           Your Honor, also as part of the hosting agreement,

23   the Debtors provided Mawson approximately $15 million in

24   deposits as part of that agreement.  Again, Your Honor, in

25   representations that the Mawson entities made to the Celsius

Page 132

1    debtors, the Mawson entity said it no longer had that $15

2    million in deposits even though in publicly-reported

3    filings, most recently in their 10-Q filed on May 15th of

4    this year, on Page 28, Mawson represents that it has $15.33

5    million in customer deposits that it is required to be

6    repaid within 11 months unless those terms are negotiated.

7         But then, Your Honor, just several weeks ago in an

8    email from Mawson's counsel, Mawson is now taking the

9    position that Celsius has forfeit those deposits.  And this

10   was the first indication that the Celsius debtors had that

11   Mawson took that position.

12        So again, this is not designed to intimidate and

13   harass the Mawson entities.  It is designed to get to the

14   bottom of what the status is of tens of millions of dollars

15   of potential estate assets.  The debtors are protecting not

16   only those assets, but maximizing the value of their estates

17   for the continued Chapter 11 cases.

18        And while we would have hoped to come to some sort

19   of agreement with the Mawson entities and not required to be

20   in court, Mawson has so far refused to answer these

21   questions and has stonewalled the Celsius debtor's discovery

22   requests.  And so, Your Honor, it is under those unfortunate

23   circumstances that we felt compelled to not only file the

24   motion, but bring this matter before Your Honor since the

25   order provided 14 days for a return date.  That expired on

Page 133

1    August 9th.  The Celsius debtors have yet to receive any

2    discovery from the Mawson entities, but instead they filed a

3    Rule 60(b) motion only two days before the return date.

4              So, Your Honor, that's the current status of the

5    discovery request.  And again, these are time-sensitive

6    matters.  As I mentioned, the promissory note matures on

7    August 23rd and the hosting agreement expires on August

8    23rd.

9              Now, the Mawon entities not only say that the

10   Celsius debtors have forfeit the deposits, but they also

11   claim that we are in breach of that hosting agreement.  The

12   Debtors dispute that assertion, but instead claim that it is

13   the Mawson entities that are instead in breach and the

14   Debtors reserve all rights with respect to that dispute.

15   And we will bring it at the appropriate time if necessary

16   and if we cannot reach a consensual agreement with the

17   Mawson entities.

18             So, Your Honor, that is the context behind this

19   dispute and the reason why we are here today.  If you have

20   any questions regarding the historical context, I'm happy to

21   answer that.  If you have any questions on the procedural

22   aspects of the motion, my partner, Mr. McCarrick, is more

23   than happy to answer those.

24             THE COURT:  Thank you very much, Mr. Latona.

25             Mr. Herz?

Page 134

1          MR. HERZ:  Thank you, Your Honor.  So this has

2     been termed as a discovery dispute.  And the whole problem

3     here and I guess the reason we're here today, Your Honor,

4     and as detailed at length in our Rule 60(b) motion and

5     summarized in our letter to the Court on Friday, is that the

6     Debtors have completely disregarded the rules and process

7     here in their attempts to conduct discovery and in doing so

8     have eviscerated the Mawson entities' rights and created

9     this ambiguous situation we find ourselves in today.

10          At this point, all the Mawson entities are asking

11     for is if the Debtors want to conduct discovery, that they

12     properly follow the process in the Federal Bankruptcy and

13     Civil Rules at which point the Mawson entities will respond

14     appropriately and timely, including filing a motion to quash

15     if deemed appropriate.  But that's not an option they had

16     under the Rule 2004 order that was entered on July 26th.

17          So to give some additional background, as Mr.

18     Latona noted, the parties were engaged for much of July

19     negotiations regarding the Mawson entities' request for a

20     forbearance under the promissory note.  During this time,

21     the Mawson entities did provide responses to various

22     informal document requests on a rolling basis, but the

23     requests from the Debtors became increasing onerous.  And my

24     understanding is that at some point, the Debtors basically

25     stopped being responsive, or it was clear from discussions

Page 135

1   that there was no longer -- the discussions were no longer

2   being productive, and the Mawson entities ended up paying

3   the balance rather than continuing the forbearance

4   discussions.  And there's nothing right now due under the

5   promissory note.

6             Several days later, on about July 25th, the

7   Debtors filed this ex parte motion requesting authority to

8   issue a Rule 2004 subpoena.  That's in the caption of the

9   motion.  And the next day, the Court entered the 2004 order,

10  which again in its caption and in its introduction seek the

11  issuance of a Rule 2004 subpoena.

12            However, as detailed in our papers, the order,

13  despite its caption and introduction, instead directed the

14  Mawson entities to respond to discovery requests under the

15  Federal Rules of Civil Procedure, including responding to

16  document request and interrogatories within 14 days.  In

17  effect this ex parte 2004 motion was not a motion requesting

18  authority to issue a subpoena despite how it was dressed up,

19  but a motion seeking to compel the Mawson entities to

20  respond to discovery requests, but without providing the

21  Mawson entities with an opportunity to respond to the

22  motion, which notably was not supported by any sworn

23  statements of evidence, or an opportunity to seek to quash a

24  subpoena because there was no subpoena actually issued.  If

25  there had been, we likely would have filed a motion to quash

Page 136

1     a subpoena with the 14 days.

2            As such, because of this nebulous situation, the

3     response, particularly after the difficulty in dealing with

4     the Debtor's representatives, was to file the Rule 60(b)

5     motion, which was filed 12 days after the order, which I

6     think is imminently reasonable time under Rule 60(c).

7            Additionally, the Debtors filed the Rule 2004

8     motion despite never having issued any formal discovery

9     previously or requesting permission to do that from the

10    Court and in the absence of a contested matter at that point

11    from the parties.

12           A further notable defect in the Debtor's process

13    here is they never properly served a 2004 order.  Fox

14    Rothschild was not authorized to accept service.  The only

15    copy of the order that the Mawson entities received -- and

16    this again is noted in our papers -- was found in a security

17    shack at one of their Pennsylvania locations and without the

18    actual discovery request attached.  This location is not the

19    Mawson entity's principal place of business, nor was it

20    their registered agent.  At one point my partner, Michael

21    Sweet, asked Debtor's counsel if they actually issued a

22    subpoena under the order.  And instead of answering the

23    question, counsel responded with threats, which as Your

24    Honor can see in the emails attached to our Rule 60(b)

25    motion, has unfortunately become a pattern in dealing with

1    Debtor's counsel where there's not just threats, but

2    unprovoked insults.

3              The Debtors apparently at some point I think

4    recognized the deficiencies in how they proceeded, because

5    on August 10th, last Thursday, they set what looks to be a

6    Rule 45 subpoena to the Mawson entity's registered agent

7    attaching the aforementioned interrogatories and document

8    requests.

9              The problem with that subpoena, however, is that,

10   again, it wasn't authorized by the Rule 2004 order and it

11   contains requests such as interrogatories that are

12   inappropriate under Rule 2004.  And Rule 2004, again, was

13   the pretext for that ex parte Rule 2004 motion.

14             The irony in all this, Your Honor, is that the

15   only party currently in default is the Debtors.  They failed

16   to pay the over $1.6 million payment due in July to the

17   Mawson entities under the parties' colocation agreement.

18             Another payment is due this week.  It's unclear

19   that payment is going to be made.  The cost to operate this

20   facility, which I understand is fairly important to the

21   Debtor's operations because it hosts these mining equipment,

22   is exorbitant.  The June electricity bill alone was over

23   $1.1 million.  And I'm sure that cost likely has gone up as

24   the summer has gone on.

25             So the Debtors have basically continued to operate

Page 138

1    this facility for two months now without paying Mawson at

2    the expense on the back of Mawson.  And, you know, one would

3    think that the Debtors would be more amenable to

4    discussions.  But instead -- and again, it's I think readily

5    evident in the emails we've attached -- they seem to want to

6    intimidate and harass and insult the Mawson entities rather

7    than having a real discussion about how to resolve these

8    issues and how to pursue discovery properly.

9           So the Mawson entities, we're happy to discuss the

10   next steps.  But this process -- the Debtors want discovery,

11   the process really needs to start with the Debtors

12   conforming to the appropriate process and rules whereupon

13   the Mawson entities will avail themselves of their rights

14   under the rules, including maybe filing a motion to quash if

15   necessary.  But I think that's where the discussion has to

16   start.  I don't think there's anything else pending before

17   the Court right now other than a Rule 60(b) motion, which is

18   returnable on September 7th.

19          THE COURT:  Mr. Latona, could you address the

20   issue of service of the subpoena on Mawson?

21          MR. KOENIG:  Yes.  For that I will turn the

22   lectern over to my colleague, Mr. McCarrick.

23          THE COURT:  Mr. McCarrick?

24          MR. MCCARRICK:   Thank you, Your Honor.  T.J.

25   McCarrick Kirkland & Ellis, on behalf of the Debtors.

```
 1                    I think addressing the service of the subpoena,

 2        there's two service-related issues that Mr. Herz raised.

 3        The first issue is the service of the Rule 2004 motion and

 4        whether or not that was conducted on an ex parte basis.  The

 5        first thing I would say, Your Honor, is that we do reject

 6        the suggestion the motion was filed or the 2004 was entered

 7        without --

 8                    THE COURT:  Mr. McCarrick, I just want to know

 9        about service.  Let me say it very clearly.  The procedure

10        that was followed in the issuance of the subpoena is very

11        typical and the normal procedure in this Court.  The

12        applications are filed ex parte.  I review it.  It does not

13        affect the rights of the recipient of the subpoena to timely

14        -- timely -- object to the subpoena.  But Mr. Herz suggests

15        that you didn't properly serve the subpoena.  I just want

16        you to address the service issue.

17                    MR. MCCARRICK:  Yes, Your Honor.  The Rule 45

18        subpoena, I think as Mr. Herz acknowledged, was served on

19        their registered agent on the date here, August 10th at 2:45

20        p.m.  And I think that Mr. Herz and the Mawson entities have

21        conceded that in their letter asking for the status

22        conference to be de-calendared.  But even today they

23        continue to I would say be elliptical about whether or not

24        they intend to seek an order to quash or to raise objections

25        --
```

Page 140

1           THE COURT:  Let me ask you, when was the 2004

2     subpoena served and upon whom?

3           MR. MCCARRICK:  So the 2004 motion, Your Honor?

4           THE COURT:  No.  The 2004 subpoena was issued.

5     And that's ex parte.  But when was it served on Mawson?

6           MR. MCCARRICK:  August 10th was the 2004(c) Rule

7     45 subpoena.

8           THE COURT:  All right.  If the deadline for

9     responding was August 9th, how is it you didn't serve it

10    until August 10th?

11          MR. MCCARRICK:  Your Honor, I think the answer is

12    that we had assumed that Mawson was going to comply after

13    receiving a copy of the motion and the order and did not

14    know whether or not service or process was actually going to

15    be necessary.  In the spirit of cooperation, we were trying

16    to give them notice one, when the motion was filed, two,

17    when the order came down.  And then there, give them the

18    benefit of the full period of time to determine whether or

19    not they were going to comply.

20          THE COURT:  So you agree though that the 2004

21    subpoena was not served on Mawson until after the purported

22    response date of August 9th, correct?

23          MR. MCCARRICK:  Yes, Your Honor.

24          THE COURT:  All right.  What about Mr. Herz's

25    argument that the subpoena improperly seeks responses to

Page 141

1      interrogatories rather than document production?

2              MR. MCCARRICK:  I would say to arguments, Your

3      Honor.  Mr. Herz is certainly correct that under Rule 45,

4      interrogatories are not authorized.  What I would say is,

5      again, in the interest of avoiding a Rule 30(b)(6)

6      deposition or a corporate deposition, we thought that we

7      would be able to get the information at a low burden

8      (indiscernible) these interrogatory requests.  And of course

9      if Mr. Herz wishes to move to quash those or move for a

10     protective order on interrogatory responses, he is entitled

11     to do so.  And we of course reserve the right to seek a

12     corporate deposition on those same issues.

13             THE COURT:  So when I issue ex parte subpoenas or

14     authorize the issuance of ex parte subpoenas, which is the

15     practice and has long been the practice of this Court,

16     response to the subpoena depends on proper service.  The

17     fact that you may have presumed that if it was served on its

18     counsel, that that was enough, that doesn't prevent them

19     from arguing that it wasn't timely served.  What's your

20     response to that?

21             MR. MCCARRICK:  Your Honor, I think the biggest

22     response to that we would say at least that 2004 notice has

23     timely been served insofar as this.  Luna Squares isn't a

24     true third party, never been involved in the action before,

25     Your Honor.  They filed a proof of claim for $1.84 million.

Page 142

1    That's Claim Number 17211 and it is acknowledged in the Rule

2    60(b) response.  And so to the extent that they have filed a

3    proof of claim that (indiscernible) submitted the Court's

4    jurisdiction -- and it's not entirely clear to me now why

5    they would be able to argue that the standard mailing and

6    service process of Stretto would not actually have provided

7    the Mawson entities proper service once they have availed

8    themselves of the Court's jurisdiction.

9              And for the idea, Your Honor, that submitting a

10   proof of claim submits you to a Rule 2004 discovery request,

11   I would say In re China Fishery Group, 2017 --

12             THE COURT:  You don't have to argue that.  It

13   clearly -- in my view, they clearly subject it to the Rule

14   2004 process.  That procedure was all proper in my view.

15   The question I have is about service.  You've answered that

16   it wasn't served until August 10th.  And then the issue

17   becomes to me what's a reasonable period for them to

18   respond.  Clearly, you can't be complaining they didn't

19   respond when you hadn't properly served it.  Ordinarily,

20   these things are resolved without, if you will, the

21   technicalities.  But there's nothing that prevents Mawson

22   from asserting its rights, including that they be properly

23   served.  The question in my mind is if they were served on

24   August 10th, particularly when their counsel had plenty of

25   notice about it, what is now a sufficient time to require

Page 143

1    their response to the document requests.  The issue about

2    interrogatories is a different matter because those are not

3    authorized by Rule 2004.

4             So just tell me, what is the documents that you've

5    requested from Mawson?

6             MR. MCCARRICK:  Yes, Your Honor.  The documents

7    that we've requested in broad categories are documents about

8    the receipts of deposits paid by the Debtors.  Obviously

9    would moot any argument that the Debtors didn't pay those

10   deposits.  Documents about the use and disposition of those

11   deposits, which will help explain the reason or the delta

12   between the rigs that were sent to Mawson and the rigs that

13   were deployed.  Documents about Mawson's acknowledgement

14   that it owes Celsius those deposits back, which it has

15   acknowledged in multiple public filings, including its May

16   15th 10-Q.  Documents related to the deployment and delivery

17   or rigs, which is relevant to Mawson's claim that Celsius is

18   not entitled to offset invoices against deposit amounts

19   because it failed to deliver equipment on time.  Documents

20   related to ownership liens against disposition of and use of

21   proceeds from collateral.  And documents related to

22   curtailment, which are relevant to Mawson's claims about

23   energy costs.

24             THE COURT:  All right.

25             MR. MCCARRICK:  And if you're asking me, Your

Page 144

1    Honor, I would say given the notice here and the fact that

2    it was sought informally, that at least their counsel has

3    certainly been on notice that they've been served, I think

4    one week would be reasonable.  I don't expect there to be a

5    high volume of documents.

6              THE COURT:  Mr. Herz?

7              MR. HERZ:  Well, Your Honor, the subpoena that was

8    ultimately served on 8/10 has a return date of 8/24

9    explicitly in it.  I think it would be inappropriate to

10   expedite that date.  And I will note, Your Honor, as

11   reflected in I believe Exhibit C to our Rule 60(b) motion,

12   my partner, Michael Sweet, emailed Mr. Latona on August 2nd

13   and said was a subpoena issued.  And again, instead of

14   responding to that question or even issuing a subpoena as

15   they should have, the email response we got from counsel was

16   just threats.

17             So it sounds like based on everything we've seen

18   that the Debtors really did not adhere to process here in

19   any regard.  I think it's still questionable whether -- the

20   order itself doesn't even reference issuing a subpoena.  But

21   if the inference is there, it's there.  We're happy to meet

22   and confer to talk about the scope of discovery.

23             THE COURT:  We're doing that right now.

24             MR. HERZ:  Okay.  Well --

25             THE COURT:  I don't like the fact -- you know,

Page 145

1    well, let me leave it at that.  We're doing it right now.

2            MR. HERZ:  Okay.  Sorry, Your Honor, if I cut you

3    off.  You go on.

4            THE COURT:  Go ahead.

5            MR. HERZ:  I was just going to say, I mean, to the

6    extent we believe there's requests that are overly-broad or

7    intended to harass, I mean, that's something we could meet

8    and confer about in an attempt to narrow down the

9    production.

10           THE COURT:  Mr. McCarrick, is it correct that the

11   subpoena included a response date of August 24th, not the

12   21st?

13           MR. MCCARRICK:  Your Honor, I would have to double

14   check that, but I have no reason to doubt what Mr. Herz

15   said.

16           THE COURT:  If you want to double check it, do it

17   now.

18           MR. MCCARRICK:  Give me one second, Your Honor.

19           MR. HERZ:  Your Honor, if it helps, I am actually

20   looking at the subpoenas.  August 24th at 5:00 p.m. Eastern.

21   But I'll let Mr. McCarrick confirm as well.

22           MR. MCCARRICK:  That's correct, Your Honor.

23           THE COURT:  All right.  And does the Subpoena

24   request a deposition?

25           MR. MCCARRICK:  It does not this time, Your Honor.

Page 146

1          THE COURT:  All right.  I am going to require a

2    response to the subpoena by that date of August 24th that

3    was included within the subpoena itself.

4          I will tell you right now, Mr. Herz, if you're

5    objecting on scope or burden, it had better be a good

6    objection or you're going to wind up getting sanctioned if

7    you don't produce the documents.  Okay?  I am very concerned

8    by what I read in the letters that August 23rd is a very

9    important date because of a termination date.  The procedure

10   that was followed is clearly correct.

11         Mr. McCarrick, if you want to serve a 2004

12   deposition notice, do that promptly today.  And if you want

13   to take a deposition on August 24th, I'm going to permit you

14   to take the deposition on August 24th.

15         MR. MCCARRICK:  Yes, Your Honor.

16         THE COURT:  In terms of the 60(b) motion, that's

17   not on for today.  I have real questions whether that's the

18   appropriate procedure.  But we'll wait until -- if that's

19   noticed for hearing, I'll wait until then and I'll give the

20   Debtor an opportunity to respond to that motion.  But the --

21   Mawson has conceded that it was served with the subpoena on

22   august 10th.  The 24th would give them the 14 days that was

23   originally provided.  I believe that is a reasonable period

24   of time.

25         If the Debtor wants to serve an additional Rule

Page 147

1    2004 subpoena for deposition testimony.  With respect to the

2    documents that are going to be produced that day, I'm going

3    to permit that.  Serve it today.

4          Is there anything else I need to deal with for

5    today?  First for the debtor.

6          MR. MCCARRICK:  The only question I would have,

7    Your Honor, is if Mr. Herz is authorized to accept that

8    deposition notice or if we should go back to the

9    (indiscernible).

10         THE COURT:  Mr. Herz, what's the answer to that?

11         MR. HERZ:  Sorry, I was -- we can accept service.

12   I'm sorry, Your Honor.  That notice --

13         THE COURT:  Thank you.  I appreciate that.  I

14   expect -- this doesn't come as a surprise to Mawson and, you

15   know, I'm respecting Mawson's rights to insist on service.

16   It wasn't made until the 10th.  I'm reflecting that now.  So

17   I would hope that the two of you would work out any

18   discovery disputes.  I really expect if there are issues

19   about scope, that you will both be reasonable in trying to

20   work that out.  If you can't, contact my chambers and we'll

21   have another expedited hearing about that.  I want this

22   dispute to be fairly dealt with and the Debtor getting the

23   discovery that it wants to get and is entitled to.

24         Anything else for today?

25         MR. HERZ:  Your Honor, I will just quickly note

Page 148

1    our client is in the process of producing documents.  So we

2    hope for a collaborative approach going forward and hope

3    that when we -- if and when we do reach out to counsel,

4    we'll have reasonable and fair discussions going forward.

5              THE COURT:  All right.  I hope so, too.  Anything

6    else from the Debtor?

7              MR. LATONA:  No, Your Honor.  That's all.  Thank

8    you.

9              THE COURT:  All right.  We are adjourned.  Thank

10   you very much.

11              (Whereupon these proceedings were concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                        RULINGS

4                                          Page      Line

5    Disclosure Statement, CONDITIONALLY APPROVED  94        24

6    Class Claim Settlement Motion, GRANTED        115        19

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 150

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 16, 2023