Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' BRIEF IN SUPPORT OF CEL TOKEN SETTLEMENT**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

**Preliminary Statement**................................................................................................1

**Background** ...............................................................................................................3

I.     CEL Token Overview. ........................................................................................3

         A.     CEL Token Functionality. ...............................................................3

         B.     CEL Token Initial Coin Offering.......................................................3

II.    CEL Token Valuation Disputes. .......................................................................4

III.   Recent Regulatory Developments.....................................................................7

IV.   The Settlement .................................................................................................8

**Basis for Relief**.........................................................................................................8

I.     The Settlement Reflects the Balance of Likely Outcomes of Legal and Factual
      Disputes.........................................................................................................11

         A.     CEL Is a Utility Token with No Utility. ..................................................11

         B.     CEL Is Likely a Security...........................................................................12

         C.     Even if CEL Is Not a Security, CEL is Likely Worth Less than
              $0.81...........................................................................................................13

II.    Litigation Regarding the Value of CEL Token is a Certainty Absent the
      Settlement. .....................................................................................................14

III.   The Settlement Is in the Best Interests of the Debtors' Estates, Is Supported by
      Key Parties in Interest, and Is Subject to Solicitation.......................................15

IV.   The Settlement Does Not Contemplate Any Releases Beyond the Releases
      Contained in the Plan. ....................................................................................17

V.    The Settlement is Supported by the Experience of Counsel and Is the Product of
      Arm's-Length Bargaining. ..............................................................................17

         A.     Counsel to the Estate Fiduciaries Support the Settlement. ........................17

         B.     The Settlement is the Product of Arm's Length Bargaining......................17

**Conclusion** ..............................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abeles v. Infotechnology (In re Infotechnology)*,
  1995 U.S. App. LEXIS 39883 (2d Cir. Nov. 9, 1995)................................................9

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)....................................................................10

*Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
  855 F.3d 459 (2d Cir. 2017)....................................................................................13

*In re Capmark Fin. Grp., Inc.*,
  438 B.R. 471 (Bankr. D. Del. 2010)........................................................................15

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009)..........................................................9, 15, 16

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983).....................................................................................9

*In re Dewey & LeBoeuf LLP*,
  478 B.R. 627 (Bankr. S.D.N.Y. 2012) (Glenn, J.)......................................9, 15, 16

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991).................................................................9, 11

*In re Hibbard Brown & Co.*,
  217 B.R. 41 (Bankr. S.D.N.Y. 1998)......................................................................10

*In re Ionosphere Clubs, Inc.*,
  156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994).........................11

*In re Iridium Operating LLC*,
  478 F.3d 452 (2d Cir. 2007)....................................................................................10

*In re Key3Media Grp. Inc.*,
  336 B.R. 87 (Bankr. D. Del. 2005).........................................................................15

*In re LATAM Airlines Group S.A.*,
  2022 WL 272167 (Bankr. S.D.N.Y. Jan. 28, 2022)................................................10

*In re Michael Milken & Assocs. Secs. Litig.*,
  150 F.R.D. 46 (S.D.N.Y. 1993)..............................................................................10

*Nellis v. Shugrue*,
    165 B.R. 115 (S.D.N.Y. 1994)..............................................................................................9, 10

*Rombro v. Dufrayne (In re Med. Diversified, Inc.)*,
    (F.3d 251 )2d Cir. 2006 461 ..........................................................................................................13

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
    No. 20 CIV. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ...............................13

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
    No. 23-CV-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023)...................................13

*In re Soup Kitchen Int'l., Inc.*,
    506 B.R. 29 (Bankr. E.D.N.Y. 2014)....................................................................................15

*In re WorldCom*,
    347 B.R. 123 ...........................................................................................................................18

**Statutes**

Bankruptcy Code section 510(b) ........................................................................................5, 11, 13

**Rules**

Bankruptcy Rule 9019 .................................................................................................*passim*

Bankruptcy Rule 9019(a) ...................................................................................................9

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, "Celsius") submit this brief (this "Brief") in accordance with the Court-approved schedule contained in the *Notice of Discovery Schedule for Confirmation Hearing* [Docket No 3356]. In support of the proposed CEL Token Settlement contained in the Plan, the Debtors state the following:

### Preliminary Statement[2]

1.      CEL Token was intended to be the "backbone of the Celsius Network." In line with this vision, CEL Token permeated the Celsius ecosystem, with approximately 43% of non-employee Earn Accounts holding CEL Token on the Petition Date. CEL is a "utility" token, whose entire purpose was to provide its holders with certain benefits on the Celsius platform, most notably higher "reward" rates and lower loan rates based on the account holder's CEL balance. The classification and valuation of CEL Token is the most complex and important unresolved issue in these cases. The litigation that would occur absent a settlement is unlikely to result in a valuation higher than $0.81/CEL and could easily result in a complete subordination of CEL Token claims. The Plan's proposed Settlement of $0.25/CEL offers a path to avoid value-destructive litigation and provides significant value to CEL Token holders, who otherwise could easily receive nothing following a full litigation of the issues.

2.      Since the first days of these cases, parties in interest have expressed strong views as to the proper value of CEL Token. Some have taken the position that CEL Token should be ascribed no value on either legal grounds (*i.e.*, CEL Token is an equity security of the Debtors that

---

[2]      Terms capitalized but not defined in this Preliminary Statement shall have the meanings ascribed to them elsewhere in this Brief, and terms capitalized but not defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

should be subordinated to all creditor claims) and/or factual grounds (*i.e.*, the CEL Token price was manipulated both prior to and following the Pause).  Additionally, there is the simple argument that CEL Token was worth $0.00 as of the Petition Date because the "utility" token ceased to have any utility.  On the other hand, several large CEL Token holders have argued that CEL should be valued at $0.81 (the price on the Petition Date) or an even higher value.  The simplest solution would be to distribute the token itself to avoid the issue of assigning it a value—the Debtors have an abundance of CEL Token in treasury—but several governmental entities have formally taken the position that CEL Token is an unregistered security.  As a result, the Debtors cannot return CEL Token in kind and must assign it some (or no) value, even if they ultimately burn all CEL Tokens in their possession on the Effective Date as they intend.[3]

3.      The alternative—absent the proposed Settlement—is to actually value the token. Valuation is notoriously time-intensive and expensive to litigate even under straightforward circumstances, and a trial regarding the value of CEL Token would be particularly complex.  While markets are generally one of the most reliable indicators of value, as detailed in the Examiner's Report, the evidence will show that the market for CEL Token was manipulated extensively by certain former Insiders prior to the Petition Date.  The evidence will further show that external market participants also sought to influence the market price of CEL Token following the Pause.

4.      Rather than litigating the myriad issues necessary to understand the true value of CEL Token, the Debtors' Plan proposes to settle all disputes regarding CEL Token (as to all parties other than the Excluded Parties) by valuing CEL Token Deposit Claims at $0.25 per token—the midpoint between the presale offering price and the crowdsale offering price and a value close to

---

[3]      The terms of the underlying smart contract and the nature of the blockchain prevent the Debtors from cancelling all CEL Tokens or stopping them from trading.

the market price on the day of the Pause ($0.31)—and eliminating all other Claims against the Debtors arising out of or relating to CEL Token.  In addition, the Plan's releases *will not* release Account Holders' claims against alleged CEL Token manipulators, which will remain available for affected individuals to pursue should they desire.

5.      The Debtors have submitted this Settlement for approval through Plan solicitation. If Account Holders accept the Settlement, the legal inquiry is simplified to one of reasonableness, and the Debtors are confident that the proposed Settlement is not only reasonable but that is also as equitable a solution as is available under the circumstances.  If the Settlement is not approved and the issue is not otherwise resolved, the Court will decide the priority and, if necessary, value of CEL Token as part of the confirmation hearing.  The Debtors do not believe such an outcome would be in the best interest of any stakeholder and therefore strongly encourage all Account Holders to accept the Plan to validate the proposed Settlement for the Court's approval.

## Background

### I.    CEL Token Overview.

#### A.    CEL Token Functionality.

6.      CEL Token is an ERC-20 token ("CEL" or "CEL Token") Celsius generated on the Ethereum blockchain to utilize on, and raise funds for, its platform.  CEL was a utility token where ownership of the token would provide Celsius account holders with various benefits, most notably discounts on loan interest rates and increased rewards in Celsius' Earn Program.  These benefits increased in tiers based on a user's CEL Token balance, encouraging account holders to receive rewards in CEL Token and to hold CEL Tokens in their Celsius wallets.

#### B.    CEL Token Initial Coin Offering.

7.      In Q4 2017, Celsius launched the CEL Token with a public announcement at BlockCon and commenced a private presale for its initial coin offering (including presale,

3

the "ICO"), offering CEL at $0.20/token.  In Q1 2018, Celsius conducted the crowdsale portion of the ICO, offering CEL at $0.30/token.  Celsius offered 325 million CEL through the ICO, with the intent of raising a total of $50 million.  *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement*, filed contemporaneously herewith, ¶ 5 (the "Ferraro Declaration").  In total, Celsius sold approximately 203 million CEL and raised approximately $32.8 million through the ICO.  *Id.* ¶ 6.

**II.     CEL Token Valuation Disputes.**

8.     The value of CEL Token has been a contested issue for creditors since the first days of these cases.  Some creditors immediately rallied against any return for CEL holders, describing CEL as "some destined-to-be-worthless" token.  *See, e.g.*, July 21, 2022 Letter from Jonathan Rabroker [Docket No. 154]; July 20, 2022 Letter from Immanuel Herrmann [Docket No. 75] (arguing that the value of CEL Token Deposit Claims should be "either entirely zeroed out" or "reduced in value by 90-95%").

9.     On March 1, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2151], which included a chapter 11 plan term sheet reflecting that the Debtors proposed to value CEL Token at $.20/CEL.  In response, two creditors filed motions (together, the "CEL Token Valuation Motions") requesting the Court value their non-insider CEL Token Deposit Claims at $0.81, the Petition Date price.  *See Santos Caceres' Motion for Entry of an Order (I) to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565; If Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group, (III) Granting Related Relief* [Docket No. 2169]; *Sean StJohn's Motion for Entry of an Order (I) to Dollarize Non-Insider CEL*

*Token Claims at the Petition Price of $81565; If Otherwise, (II) Request the Debtors to Submit Evidence Supporting Inequitable Treatment of Unsecured Creditors in the Earn Group (III) Granting Related Relief* [Docket No. 2216].

10.    On March 31, 2023, the Debtors filed the Plan [Docket No. 2358], which, consistent with the term sheet, proposed valuing CEL Token Deposit Claims at $0.20 per CEL Token, the pre-sale ICO price.

11.    On June 21, 2023, the Committee filed an *Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2840] (the "Committee CEL Valuation Objection"), to which the Debtors filed a joinder [Docket No. 2846].    The Committee's objection previewed arguments regarding section 510(b) of the Bankruptcy Code and highlighted the difficulties in ascertaining the value of CEL Token.

12.    In advance of the June 28 hearing regarding the CEL Token Valuation Motions, creditors filed dozens of letters on the docket regarding the value of CEL Token.  Some letters supported valuing CEL Token at $0.81, the value as of the Petition Date.  *See*, *e.g.*, June 26, 2023 Letter from Otis Davis [Docket No. 2872] (arguing that a lower valuation was "outright theft"); June 26, 2023 Letter from Marlowe Bennett [Docket No. 2874] (outlining reasons CEL Token Deposit Claims should not be subordinated); June 26, 2023 Letter from Madhu Kutty [Docket No. 2895] (same).  Other creditors argued that the market price of CEL Token had been artificially increased prior to the Petition Date through a short squeeze orchestrated by the creditors arguing for a higher valuation.  *See* June 26, 2023 Letter from Daniel Frishberg [Docket No. 2907].

13.    On July 5, 2023, following a hearing, the Court denied the CEL Token Valuation Motions without prejudice, noting that the issues raised in such motions are "properly considered

during the plan confirmation or claims objections process." *Order Denying Motions of Sean St. John and Santos Caceres Seeking to Dollarize Non-Insider CEL Token Claims at the Petition Date Price* [Docket No. 2959]. In doing so, the Court expressed the desire that resolution of this issue should be "a fair fight." Jun. 28, 2023 Hr'g Tr. 76:25, 77:1-2.

14.    In the weeks leading up to the hearing on the Debtors' Disclosure Statement, creditors filed another wave of letters and pleadings concerning the value of CEL Token. *See*, *e.g.*, *(I) Objection to the Adequacy of the Disclosure Statement in Regards to CEL Token Subordination Under Rule 510(b), (II) Request for Relief in Declaring the CEL Token Not a Security and (III) Request for the Formation of a CEL Token Class with Professionals Paid For by the Estate* [Docket No. 3084]; *Santos Caceres' Limited Objection to the Debtors' Entry for an Order (I) Approving the Adequacy of the Disclosure Statement in Regards to the Treatment of Non-Insider CEL Token Claims, (II) Granting Related Relief* [Docket No. 3124]; August 10, 2023 Letter from Peter Juris [Docket No. 3245]; August 3, 2023 Letter from Sean StJohn [Docket No. 3164]. Most of these letters excerpted language from Mr. Caceres' and Mr. StJohn's filings, arguing that non-insider CEL Token holders should have their claims valued at the Petition Date market price and that the Court should rule that CEL Token is not a security. *See, e.g. Support for Objections to Adequacy of Disclosure Statement and Request for CEL Token Class Formation* filed by Ms. Schaller [Docket No. 3174]. One creditor argued that CEL Token Deposit Claims should be valued "based on how many dollars [certain creditors] lost acquiring CEL [Token]" due to the fact CEL Token has allegedly used as a "mechanism to defraud investors." *(I) Limited Objection to the Adequacy of the Disclosure Statement with Regards to CEL Token Treatment; (II) Objection to Santos Caceres' Motion to Certify a Class of Creditors for*

*Non-Insider CEL Token Claim Holders (i) Allowing the Retention of Legal Representation Paid by the Estate, (ii) Granting Related Relief* [Docket No. 3173].

15.      On August 9, 2023, the Debtors filed a revised Plan proposing to value CEL Token at $0.25 per CEL Token, the midpoint between the ICO presale offering price and the crowdsale offering price.  On August 17, 2023, the Debtors filed the solicitation version of the disclosure statement [Docket No. 3332] (the "Disclosure Statement"), which the Court approved [Docket No. 3337].

### III.    Recent Regulatory Developments.

16.      On July 13, 2023, the Federal Trade Commission (the "FTC"), the Commodity Futures Trading Commission (the "CFTC"), and the Securities and Exchange Commission (the "SEC") each filed complaints against certain of the Debtors, Alexander Mashinsky (the Debtors' former chief executive officer), and certain other members of the Debtors' prepetition management team, and the United States District Court for the Southern District of New York (the "DOJ") unsealed an indictment of Mr. Mashinsky and Roni Cohen-Pavon (the Debtors' former chief revenue officer), alleging that the defendants committed securities fraud, commodities fraud, wire fraud, conspired to manipulate the price of the CEL Token, engaged in market manipulation of the CEL Token, and conducted a fraudulent scheme to manipulate the price of the CEL Token.

17.      During the July 18, 2023 omnibus hearing, counsel for the Debtors announced that the Debtors had reached consensual resolutions with the FTC, CFTC, SEC, and the DOJ that would avoid their pursuit of billions of dollars of regulatory enforcement claims against the Debtors.[4]

---

[4]      The agreement with the FTC includes a suspended judgment in the amount of $4.7 billion, such suspended judgment is not expected to ripen into an allowed claim against the Debtors. *See* July 18, 2023 Hr'g Tr. 27:18–31:13.

In entering into these agreements, the Debtors did not agree that CEL Token was an unregistered security. The Debtors did, however, stipulate to "facts that could reasonably lead a fact finder to determine that CEL Token and Earn were securities." July 18, 2023 Hr'g Tr. 32:11–13 (Debtors' counsel describing the terms of their agreement with the SEC).

## IV.    The Settlement

18.    Following good-faith and arm's-length negotiations, including negotiations with the Committee and certain *pro se* parties, and in light of the complex issues surrounding the value of CEL Token, the Debtors' Plan proposes to value CEL Token Deposit Claims at $0.25 per CEL Token, the midpoint of the ICO pricing of CEL Token, and to release the Debtors from any further claims relating to CEL Token (the "Settlement"). The Settlement *does not* release Account Holders' claims against third parties—the Plan's releases carve out parties that manipulated the price of CEL Token.

19.    If approved, the Settlement will resolve all outstanding confirmation issues regarding CEL Token and avoid costly litigation. All CEL Token Deposit Claim Holders will have the opportunity to vote on the Settlement through the plan solicitation process. The Debtors will evaluate the votes cast by CEL Token Deposit Claim Holders and disclose the composition of the votes cast and Class Claim Settlement opt outs in the voting report to be filed by the Solicitation Agent. If a majority of eligible CEL Token Deposit Claim Holders support the settlement, the Debtors will seek approval of the Settlement from the Court under Bankruptcy Rule 9019 as set forth herein. The Settlement is supported by the Committee, which acts as a fiduciary for the Debtors' unsecured creditors.

## Basis for Relief

20.    The Settlement represents an efficient, equitable resolution of the issues regarding the rank and value of CEL Token and should be approved pursuant to Bankruptcy Rule 9019.

Bankruptcy Rule 9019(a) provides that "after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). A settlement under Bankruptcy Rule 9019 need not result in the best possible outcome for the debtors but must not "fall below the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 595 (Bankr. S.D.N.Y. 1991).

21.     In determining the range of reasonableness, the bankruptcy court need not decide issues of law and fact raised by the settlement. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). Rather, the court must be "apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640-41 (Bankr. S.D.N.Y. 2012) (Glenn, J.). In other words, the court does not need to conduct a "mini-trial" of the underlying facts and merits. *See In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) ("The standard does not require that the settlement be the best the debtor could have obtained nor does it require the court to conduct a mini-trial of the questions of law and fact."). In conducting this assessment, "a court may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *Id.* at 641.

22.     Ultimately, the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim."); *Drexel Burnham*, 134 B.R. at 505; *see also Abeles v. Infotechnology (In re Infotechnology)*, 1995 U.S. App. LEXIS 39883,

at *4–5 (2d Cir. Nov. 9, 1995) (noting that in determining whether to approve a debtor's motion to settle a controversy, a court does not substitute its judgment for that of the debtor).  A court should exercise its discretion in favor of a settlement wherever possible, as settlements are generally favored in bankruptcy.  *In re LATAM Airlines Group S.A.*, 2022 WL 272167, at *12 (Bankr. S.D.N.Y. Jan. 28, 2022) (quoting *In re MF Global Inc.*, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (Glenn, J.)) ("Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) ("As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged."); *see also In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) ("The decision to grant or deny a settlement or compromise lies squarely within the discretion of the bankruptcy court [and such] discretion should be exercised in light of the general public policy favoring settlements.") (citing *Nellis v. Shugrue* 165 B.R. at 121); *In re Michael Milken & Assocs. Secs. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (noting the paramount public policy for settlements).

23.    In determining whether to approve a settlement as fair and equitable and in the best interests of the debtor's estate under Bankruptcy Rule 9019, courts in the Second Circuit evaluate what are often referred to as the "*Iridium*" factors:  (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay; (iii) the paramount interest of the creditors; (iv) whether other parties in interest affirmatively support the proposed settlement; (v) the nature and breadth of releases to be obtained by officers and directors; (vi) whether the competency and experience of counsel support the settlement; and (vii) the extent

to which the settlement is the product of arm's-length bargaining. *See In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007); *see also Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 428 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). The Settlement represents a fair and equitable compromise that is in the best interests of the Debtors' estates, falls well within the range of reasonableness, and satisfies the *Iridium* factors.

I.    **The Settlement Reflects the Balance of Likely Outcomes of Legal and Factual Disputes.**

24.    The Settlement satisfies the first *Iridium* factor, as the Settlement accounts for the likely resolutions of the CEL Token disputes. The Settlement is unique in that the Debtors do not have any particularized interest in the outcome, only that the outcome be equitable and efficient. As a result, the "possibility for success" factor guided the formulation of the Settlement. As the Committee discusses in greater detail in its brief filed contemporaneously herewith (the "Committee Brief"), strong arguments exist that claims on account of CEL should be subordinated under section 510(b) of the Bankruptcy Code (making it worth essentially $0.00 as a result of the Debtors' deep insolvency). Even if the Court determined not to subordinate CEL claims, it is unlikely that the Court would rule that CEL should be valued at $0.81. As a compromise, the Plan offers to value CEL at the midpoint of the ICO pricing to account for the uncertainty with respect to the determination that CEL is a security while acknowledging that the Petition Date price was not reflective of actual value due to both long-term and short-term manipulation.

A.    **CEL Is a Utility Token with No Utility**.

25.    It is undisputed that CEL is a "utility" token that has lost its utility. A utility token is a "form of cryptographic token[] whose primary purpose is to allow users to consume the

platform's (smart contract) services." *See* Samuel Häfner, *Blockchain Platform Design under Market Frictions: Decentralization, Service Provision, and Block Rewards* (September 4, 2023). CEL's utility function was primarily that holding the token provided discounted loan rates in the Borrow Program and increased reward rates in the Earn Program.

26.    On the Petition Date, CEL's utility evaporated when account balances were frozen. Going forward, the associated platform will entirely cease to exist. As a result, CEL Token not only did not have any utility as of the Petition Date, but it will not have utility in the future. Aug. 14, 2023 Hr'g Tr. 71: 6–12 ("[W]ithout a going concern, the CEL Token, it can't be issued. It can't—you know, Celsius won't exist. Ultimately, the CEL Token depended on the value of the Celsius enterprise. The Celsius enterprise as a going concern won't exist whichever [way], whether there's a liquidation or the Fahrenheit or BRIC transactions wind up as being approved . . .").

**B.    CEL Is Likely a Security**.

27.    Several Governmental Entities (including the SEC) have taken the position that CEL was an unregistered security. *See generally Notice of Consensual Resolutions of Government Investigations* [Docket No. 3293]. The Committee agrees with this assessment. *See generally* Committee Brief; Committee CEL Valuation Objection. The Debtors' consensual resolution with the FTC, CFTC, SEC, and DOJ did not require the Debtors to admit that CEL is a security, but the Debtors did stipulate to facts that could lead to that conclusion. *See* July 18, 2023 Hr'g Tr. 32:11–13 (Debtors' counsel describing the terms of their agreement with the SEC). Based on the foregoing and the following, the Debtors formulated the Settlement on the basis that there is a strong argument that CEL is a security.

- Founder's Representations Regarding CEL Token. The CEL Token may be construed as an equity security because its value was closely associated with the perceived value of Celsius and its continuing success. The Debtors' former chief executive officer

repeatedly asserted that the value of the CEL Token was directly related to the Debtors'
performance, including calling it an "indication of the probability or how well Celsius
is doing." Celsius Network, Celsius Network AMA–Ask Mashinsky Anything!,
YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ,
at 44:40. For a greater discussion of the Howey test, see the Committee Brief and the
Committee CEL Valuation Objection.

- <u>Section 510(b) Subordination</u>. In the event that CEL Token is a security under the
Howey test, the Second Circuit broadly construes section 510(b) of the Bankruptcy
Code to subordinate all claims with a causal connection to the purchase of a security.
*See Rombro v. Dufrayne (In re Med. Diversified, Inc.)*, 461 F.3d 251, 255–59
(2d Cir. 2006); *Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
855 F.3d 459, 471 (2d Cir. 2017). If CEL Token is a security, claims arising from the
purchase or sale of a security, including both CEL Token Deposit Claims and Other
CEL Token Claims, would be subordinated to the claims of all other unsecured
creditors, resulting in CEL Token being effectively valued at $0.00.

- *Ripple* <u>Is Non-Binding and Distinguishable</u>. Creditors who support a $0.81/CEL
valuation cite to the recent *Ripple* decision in the Southern District of New York, which
held that the relevant token was not a security. *See Sec. & Exch. Comm'n v. Ripple
Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 4507900, at *1 (S.D.N.Y. July 13, 2023)
(the "*Ripple* <u>Decision</u>"). The Court has already noted that this decision is not binding.
Aug. 14, 2023 Hr'g Tr. 86:22–87:6; *see also Sec. & Exch. Comm'n v. Terraform Labs
Pte. Ltd.*, No. 23-CV-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) (finding
that the SEC asserted a plausible claim that UST and LUNA coins were securities, and
"reject[ing] the approach recently adopted by another judge of this District in a similar
case [the *Ripple* Decision]"). For the reasons provided in the Committee Brief, the
Debtors believe that it is likely that CEL is a security, notwithstanding *Ripple*.

28. As the Court acknowledged, the trading value as of the Petition Date "isn't
necessarily the value" of CEL Token as of the Petition Date, even if CEL is not a security. Aug. 14,
2023 Hr'g Tr. 60:1–7.

## C. Even if CEL Is Not a Security, CEL is Likely Worth Less than $0.81.

29. No party disputes that the price of CEL Token was manipulated extensively.
Rather, creditors who support utilizing the Petition Date price maintain that CEL Token should
not be treated differently from other tokens, as the holders of CEL Token are not responsible for
its manipulation. This asserted fact, however, is also disputed. *See* Committee CEL Valuation
Objection ¶¶ 5 n.6, 54 (describing a short squeeze organized by holders of CEL Token).

13

The Settlement would avoid the need to resolve highly complex issues regarding price manipulation by fixing the value of CEL at its original offering price (which is within a few cents of the trading price at the time of the Pause).  Critically, in addition to taking a reasoned approach to the contested legal and factual issues, the Settlement allows holders of CEL Token who are disproportionally affected by the value of CEL Token to decide for themselves, based on their own personal circumstances, whether further litigation against those who manipulated CEL Token is worthwhile without requiring the estates to expend significant time and resources litigating the value of CEL Token.

30.    For these reasons, absent the Settlement, a value of $0.00/CEL is reasonable, particularly because the Debtors are unable to return CEL Token to Account Holders under applicable law.

**II.    Litigation Regarding the Value of CEL Token is a Certainty Absent the Settlement.**

31.    The second *Iridium* factor—"the likelihood of complex and protracted litigation, with its attendant expense, inconveniences, and delay"—also weighs in favor of approving the Settlement.  Without the Settlement, the Debtors, the Committee, and various *pro se* creditors are scheduled to commence a hearing regarding the valuation of CEL Token on October 16, 2023, with a pre-trial hearing on September 28, 2023.  If, however, a "CEL Token Resolution Event" occurs in advance of September 28, 2023, the Debtors will seek approval of the Settlement under Bankruptcy Rule 9019 as set forth herein, simplifying the legal inquiry to one of reasonableness and saving the attendant litigation costs.[5]  Absent a timely resolution of these issues, creditors, as the beneficiaries of the Debtors' estates, will ultimately bear the cost of this litigation.

---

[5]    "CEL Token Resolution Event" means:  (a) a majority of Holders of CEL Token Deposit Claims vote to accept the Plan or (b) the Debtors and the Committee reach an agreement with an ad hoc group of Holders of CEL Token as to the treatment of CEL Token Deposit Claims.

**III.    The Settlement Is in the Best Interests of the Debtors' Estates, Is Supported by Key Parties in Interest, and Is Subject to Solicitation.**

32.    The third and fourth *Iridium* factors address the extent to which the settlement is in the best interests of the Debtors' estates and the breadth of support for the settlement among other parties in interest.  To determine what is in the best interest of the Debtors' estates, courts consider the uncertainty of future litigation, the economic pressures imposed on the Debtors as part of the chapter 11 process, and whether the settlement provides a benefit to unsecured creditors. *See In re Dewey & LeBeouf LLP*, 478 B.R. 627, 643 (Bankr. S.D.N.Y. 2012) ("the economics of this case and the uncertainty of future litigation strongly counsel that the [settlement is] in the best interests of creditors"); *In re Charter Commc'ns*, 419 B.R. 221, 255 (Bankr. S.D.N.Y. 2009) ("[t]he [s]ettlement brings enormous value to the estate and increases the recoveries for creditors generally").  Courts have repeatedly held that even where large claim holders oppose a settlement, it may still be approved because it is in the "best interests of the estate as a whole." *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97-98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"); *see also In re Soup Kitchen Int'l., Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("the overriding consideration is the [s]ettlement's benefits to the creditor body"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors, weighs in favor of settlement").

33.    When considering whether the settlement has sufficient support from other parties in interest, courts look to the position of statutory committees which act as fiduciaries for a broader set of creditors as opposed to individual creditors asserting a more parochial set of interests.

*See, e.g.*, *Charter Commc'ns*, 419 B.R. at 255 ("the Creditor's Committee support[s] the Settlement and recognize[s] its central importance to the Plan"); *Dewey & LeBoeuf*, 478 B.R. at 643 ("Most telling is the fact that the Secured Lenders and the Unsecured Creditors Committee favor the settlements . . . .").

34.     The Settlement satisfies the third *Iridium* factor because it provides benefits to the Debtors' estates and, by extension, unsecured creditors.  As discussed above, litigation concerning the value of CEL Token would be highly complex and would require the services of specialized experts.  The cost of such litigation and the corresponding diminution in the Debtors' estates would result in less value being available for distribution to *all* unsecured creditors.  In fact, litigation only provides meaningful upside to a small segment of creditors—for most creditors, litigation will result in a worse outcome based on the expense alone.  Excluding employees and Insiders, the following table reflects the number of accounts holding significant amounts of CEL:

| Threshold | # of Accounts (Rounded) |
|---|---|
| $1,000,000 \leq$ | 12 (actual, not rounded) |
| $500,000 \leq$ | 40 |
| $100,000 \leq$ | 270 |
| $90,000 \leq$ | 300 |
| $80,000 \leq$ | 330 |
| $70,000 \leq$ | 370 |
| $60,000 \leq$ | 430 |
| $50,000 \leq$ | 530 |
| $40,000 \leq$ | 660 |
| $30,000 \leq$ | 930 |
| $20,000 \leq$ | 1,500 |
| $10,000 \leq$ | 2,500 |
| $5,000 \leq$ | 4,000 |
| $1,000 \leq$ | 12,000 |
| $\leq 1,000$ | 247,000 |

35.     The Committee, as a fiduciary for the general creditor body, supports the Settlement.  Further, the Settlement is being put to a vote through solicitation to determine the support of the broader creditor body.  It is only if a CEL Token Resolution Event occurs—including a favorable vote on the Plan—that the Debtors will seek approval of the Settlement under Bankruptcy Rule 9019.  Therefore, the third and fourth *Iridium* factors will be satisfied to the extent they are relevant, notwithstanding the fact that certain holders of CEL may object.

**IV.    The Settlement Does Not Contemplate Any Releases Beyond the Releases Contained in the Plan.**

36.     The fifth *Iridium* factor, which addresses the nature and breadth of releases to be granted by a settlement to officers and directors, further supports approval of the Settlement, as the Settlement does not contemplate any additional releases beyond the releases provided in the Plan, which specifically exclude those alleged to have manipulated CEL Token.  The Settlement thus achieves the goals of reaching an expedited, fair, and value-maximizing conclusion without undermining any claimholder's ability to pursue their claims outside of these chapter 11 cases.

**V.     The Settlement is Supported by the Experience of Counsel and Is the Product of Arm's-Length Bargaining.**

37.     The sixth *Iridium* factor (the experience of counsel) and the final *Iridium* factor (if the settlement is arm's length) further support approval of the Settlement.

**A.    Counsel to the Estate Fiduciaries Support the Settlement**.

38.     With respect to the experience of counsel, counsel to the Debtors and counsel to the Committee—the only counsel the Debtors anticipate to be involved—agree that the Settlement provides an equitable solution to a complex issue and is in the best interest of the Debtors' estates.

**B.    The Settlement is the Product of Arm's Length Bargaining**.

39.     The final *Iridium* factor essentially asks whether the process was above board.  If it was "a strong initial presumption of fairness attaches to the proposed settlement."

*In re WorldCom*, 347 B.R. 123, 137–38 (quoting *In re PaineWebber Limited Partnerships Litigation*, 171 F.R.D. 104, 125 (S.D.N.Y 1997).

40.     To date, no represented party has opposed the Settlement on the record, but several *pro se* creditors have voiced disapproval.  The Committee, as a fiduciary to all unsecured creditors in these chapter 11 cases, including Holders of CEL Token Deposit Claims, conducted an investigation into the CEL Token and engaged in discussions with affected stakeholders.  The Debtors also participated in discussions.  Following these discussions, the Debtors and the Committee sought an appropriate middle ground, factoring in both the risk that CEL may be a security for which related claims are subject to subordination and the price of CEL at various times in its history.  The fact that any value is being ascribed to CEL Token is a testament to the process that occurred.

41.     The Debtors are conducting an additional check on the process by seeking approval of the Settlement through solicitation.  To the extent any parties challenge the process following the filing of this Brief, the Debtors stand ready to respond and are confident that such challenges will be defeated.

## Conclusion

42.     For the reasons set forth herein, the Settlement should be approved as in the best interests of creditors if the voting results support the requested relief.

## Reservation of Rights

43.     Except as explicitly set forth herein, nothing contained in this Brief is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Brief, (e) a request or authorization to

18

assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

### Notice

44.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) Account Holders; (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: September 6, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:              joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:              patrick.nash@kirkland.com
                        ross.kwasteniet@kirkland.com
                        chris.koenig@kirkland.com
                        dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*