**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
      sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Carolyn P. Gurland
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
      gregory.pesce@whitecase.com
      carolyn.gurland@whitecase.com

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### BRIEF OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING LEGAL ISSUES WITH RESPECT TO THE TREATMENT OF CEL TOKEN UNDER THE DEBTORS' PLAN OF REORGANIZATION

---

[1] The Debtors in these Chapter 11 Cases (as defined below), along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 USA LLC (9450); GK8 Ltd. (1209); and GK8 UK Limited (0893). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................................ I

TABLE OF AUTHORITIES .......................................................................................... 1

PRELIMINARY STATEMENT .................................................................................... 3

FACTUAL BACKGROUND .......................................................................................... 5

    A.    The Initial Coin Offering ................................................................... 6

    B.    Celsius Sold CEL Tokens Directly to Public Investors ................................. 7

    C.    Earn in CEL ................................................................................... 7

    D.    Celsius' Disclaimers Regarding the CEL Token ...................................... 8

    E.    The Majority of CEL Tokens Were Owned By Celsius and its Founders .......... 9

    F.    Celsius had no Payment or Other Financial Obligations on Account of CEL Token ........................................................................................... 10

    G.    The Advertised CEL Token Business Model ....................................... 11

    H.    Celsius Advertised to the Public that the Price of CEL Token Reflected the Value of Celsius ........................................................................... 12

    I.    Celsius Executives Acknowledged That CEL Token Is a Security ............... 14

    J.    Celsius Manipulated the Price of CEL Token ...................................... 15

    K.    Other Efforts By Celsius to Increase the Price of CEL Token ................... 18

    L.    Proposed Treatment of CEL Token Under the Plan ............................... 20

ARGUMENT ............................................................................................................... 21

I.    The Plan's Proposed Settlement of CEL Token Issues Is Fair and Equitable ............. 23

II.    Claims on Account of CEL Token Should Be Subordinated Under Section 510(b) .... 25

    A.    CEL Token Is a Security of the Debtors ............................................. 26

    B.    Claimants Purchased CEL Token ..................................................... 34

C.    Claims for the Return of CEL Token Arise from the Purchase or Sale of CEL Token ........................................................................................................... 35

D.    CEL Token Represents an Interest in the Debtors ........................................... 37

III.    CEL Token had No or *DeMinimis* Value on the Petition Date ................................... 40

A.    CEL Token was not Traded in an Efficient Market ......................................... 41

B.    CEL Token has no Utility ................................................................................ 42

CONCLUSION ................................................................................................................... 43

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*Adler v. Lehman Bros. Holdings* (*In re Lehman Bros. Holdings*),
    855 F.3d 459 (2d Cir. 2017) ........................................................................ passim

*Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago*
    (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414 (S.D.N.Y. 1993),
    *aff'd*, 17 F.3d 600 (2d Cir. 1994) ..........................................................................21

*Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599 (2d Cir. 1983).....................21

*Gallagher v. Roberts*, No. 3:16-cv-01437, 2017 U.S. Dist. LEXIS 57714
    (S.D. Cal. Apr. 11, 2017) ..................................................................................25, 26

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ....................22

*In re Charter Commc'ns*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) ................................21

*In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493,497
    (Bankr. S.D.N.Y. 1991) ...................................................................................21, 22

*In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006)..............................27, 33, 34

*In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...........................27

*In re Lehman Bros. Inc.*, 519 B.R. 434 ........................................................................33

*In re Live Primary, LLC,* 626 B.R. 171 (Bankr. S.D.N.Y. 2021)...........................36, 37

*In re Lynch*, No. 19-cv-3837(GRB), 2022 U.S. Dist. LEXIS 91195
    (E.D.N.Y. May 20, 2022)
    ..................................................................................................................................21

*In re MarketXT Holdings Corp.*, No. 04-12078 (ALG),
    2008 Bankr. LEXIS 5038 (Bankr. S.D.N.Y. Jan. 3, 2008).....................................35

*In re MF Global Holdings, Ltd.*, No. 11-15059 (MG),
    2014 Bankr. LEXIS 3333 (Bankr. S.D.N.Y. Aug. 6, 2014) ..............................33, 34

*In re MF Global Inc.*, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ..............21

*In re WorldCom, Inc.*, 329 B.R. 10 (Bankr. S.D.N.Y. 2005).................................33, 34

*KIT Digital, Inc. v. Invigor Group Ltd.* (*In re KIT Digital, Inc.*),
    497 B.R. 170 (Bankr. S.D.N.Y. 2013)..............................................................33, 34

*Motorola, Inc. v. Off. Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*),
    478 F.3d 452 (2d Cir. 2007) ............................................................................22

*People v. Mashinsky*, 193 N.Y.S.3d 700 (N.Y. Sup. Ct. 2023) .....................................36

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ........................................................................................21

*Queen v. Official Comm. of Unsecured Creditors* (*In re Response U.S.A., Inc.*),
    288 B.R. 88 (D.N.J. 2003) ...............................................................................33

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ....................................27, 28, 29

*Rombro v. Dufrayne* (*In re Med Diversified, Inc.*), 461 F.3d 251 (2d Cir. 2006) .........35

*SEC v. LBRY, Inc.*, 2022 U.S. Dist. LEXIS 202738 (D.N.H. Nov. 7, 2022) ................30

*SEC v. Shavers*, No. 4:13-CV-416, 2013 U.S. Dist. LEXIS 110018
    (E.D. Tex. Aug. 6, 2013) ..................................................................................25

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ..................................................... passim

*United States SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ............... passim

*Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 544 B.R. 75
    (Bankr. S.D.N.Y. 2016) ...................................................................................37

## STATUTES AND RULES

11 U.S.C. § 101(49) ........................................................................................23

11 U.S.C. § 510(b) ....................................................................................... passim

## MISCELLANEOUS

Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*,
    25 J. of Fin. 383, 383 (1970) ............................................................................41

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the chapter 11 cases (these "**Chapter 11 Cases**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, "**Celsius**") files this *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues with Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* (this "**Brief**")[2] pursuant to the *Notice of Discovery Schedule for Confirmation Hearing* [Docket No. 3356] and respectfully states as follows:[3]

### Preliminary Statement

1.     Celsius pitched the price of CEL Token as a direct reflection of Celsius's performance and success.  Celsius executives admitted internally that CEL Token is a security. They were correct, as CEL Token is an interest tied to the firm's overall success.  Moreover, each of the schemes through which Celsius sold CEL Token clearly meets the test established by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), which courts commonly apply to determine whether transactions concerning digital assets are investment contracts (a type of security).

2.     The value of CEL Token, as promoted, depended on Celsius convincing customers

---

[2]    In support of this Brief, the Committee relies upon and incorporates by reference (i) the *Declaration of Aaron Colodny in Support of the Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2844] (the "**First Colodny Declaration**"); (ii) the *Declaration of Aaron Colodny in Support of the Brief of the Official Committee of Unsecured Creditors Regarding CEL Token Issues* filed concurrently herewith (the "**Second Colodny Declaration**"), filed contemporaneously herewith, and (ii) the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer or the Debtors in Support of the Proposed CEL Token Settlement* (the "**Ferraro Declaration**"), filed contemporaneously herewith.

[3]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (the "**Plan**") [Docket No. 3319].

to elect to receive "rewards" in CEL Token rather than in the kind of cryptocurrency they transferred to Celsius. Celsius openly advertised that it would purchase CEL Token to make those rewards payments and that its purchases would drive demand for the token. But Celsius did not advertise that it was also artificially increasing the price of CEL Token to portray the appearance of success at an otherwise floundering enterprise. The Debtors have since admitted that Celsius executives orchestrated a scheme to manipulate and artificially support the price of CEL Token in connection with a non-prosecution agreement entered between the Debtors and the United States Department of Justice.

3.      Celsius also disclosed, in risk disclosures that were accepted by all Account Holders, that "CEL Tokens may become unusable, illiquid and/or worthless in the event that Celsius's platform ceases to operate for any reason whatsoever. Celsius will not redeem or repurchase any Tokens in any such event." That day has now come. CEL Token is a speculative instrument that was issued by the Debtors and which they cannot return. Given that CEL Token is a security issued by the Debtors, any claims arising from the purchase of CEL Token—*e.g.*, claims for Celsius's failure or inability to return the token, fraud, and the like—should be subordinated under section 510(b) of the Bankruptcy Code and receive no recovery. Any argument that CEL Token is a utility token or was designed for a consumptive purpose does not alter that conclusion. Although CEL Token may have had some utility when Celsius operated, any value from that utility was lost when the Debtors shut their doors.

4.      No CEL Token holder has advocated that CEL Token should be returned to creditors. Nor does the trading price for CEL Token on the Petition Date (which certain creditors have instead demanded), indicate the true value of the token. Prior to the Pause, Celsius had manipulated the price of the CEL Token. As of June 12, 2022 – the date of the Pause – CEL Token

traded at 28 cents per token.  After the Pause, approximately 95% of the supply of CEL Token was locked on the Celsius platform, and there was little visibility into, among other things, Celsius's solvency or the extent to which the price of CEL Token had been manipulated.  There was no "efficient market" for the CEL Token and the market price on that date was not a true barometer of the value of CEL Token.

5.      The Debtors and the Committee have proposed a settlement that would value CEL Token at $0.25 for Holders of CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims.  Although the Committee believes that there are strong arguments that CEL Token has no value, either because such claims should be subordinated under section 510(b) or because the market price of CEL Token on the Petition Date does not reflect its true value, the proposed settlement is a fair compromise that limits dilution of other creditors' recoveries who did not chose to invest in the Debtors' speculative token, while providing Holders of CEL Token Deposit Claims with a recovery, in a circumstance where Celsius had warned there would likely be none.

## **Factual Background**

6.      Celsius was founded in 2017.  One of Celsius's first orders of business was to mint an ERC-20 token, the CEL Token.  Ferraro Decl. ¶¶ [4, 7].[4]  A fixed supply of 700 million CEL Token was minted.  *Id.* ¶ 4.  No more CEL Token could be created.

7.      Celsius described CEL Token as "the ***backbone*** of the Celsius Network."  *Id.* at Ex.

---

[4]    By definition, ERC-20 tokens are fungible tokens deployed on the Ethereum Blockchain according to the ERC-20 Token Standard.  *See* The Ethereum Foundation, *ERC-20 TOKEN STANDARD*, available at: https://ethereum.org/en/developers/docs/standards/tokens/erc-20/ (last accessed Sept. 2, 2023) ("Tokens can represent virtually anything in Ethereum . . . . The ERC-20 introduces a standard for Fungible Tokens, in other words, they have a property that makes each Token be exactly the same (in type and value) as another Token. For example, an ERC-20 Token acts just like the ETH, meaning that 1 Token is and will always be equal to all the other Tokens.").

A at 3.  In investor presentations and on weekly "Ask Mashinsky Anything" videos ("**AMAs**"), Celsius touted that the price of CEL Token was a reflection of Celsius's performance.[5]

### A. The Initial Coin Offering

8.     Celsius raised money to launch its business through an initial coin offering or "**ICO**" of the CEL Token in the summer of 2018.  The ICO was promoted through a Whitepaper,[6] which described Celsius's proposed business model as a peer-to-peer lending platform and described that CEL Token would be a "utility token" that would be used to pay interest on loans.[7]

9.     The Whitepaper described that the proceeds of the ICO would be used to fund Celsius's business, and attributed specific amounts to specific line-item expenses.[8]  The Whitepaper also explained that 40% of CEL Tokens would be sold through a private presale, 10% would be sold through a public crowd sale, 27% would be placed in Celsius's treasury, 19% would be distributed to Celsius's directors, officers, and employees, and the remaining 4% would be distributed to partners and advisors.[9]

10.    Although Celsius's cofounder, Alexander Mashinsky, repeatedly told the public that the ICO was fully funded and Celsius had raised $50 million, those claims were untrue— Celsius only raised $32.8 million through the ICO.[10]  The funds raised from the ICO were not segregated from any of Celsius's other funds.[11]

---

[5]   *E.g.* Ferraro Decl. ¶15, Ex H; Celsius Network, *Celsius Network AMA – Ask Mashinsky Anything!,* YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at [44:40] ("The yield on CEL is an indication of profitability or how well Celsius is doing.").

[6]   Celsius Network Ltd., White Paper, (pre-March 2018).

[7]   Celsius Network Ltd., White Paper, (10) (2018).; Ferraro Decl. ¶ 5.

[8]   Celsius Network Ltd., White Paper, (14), (2018).

[9]   Celsius Network Ltd., White Paper, (14), (2018); Ferraro Decl. ¶ 7.

[10]  Ferraro Decl. ¶ 8.

[11]  Ferraro Decl. ¶ 8.

11.     As part of the ICO, CEL Tokens were granted to directors, officers and employees in three allotments which were to be released or vest when the price of CEL Token reached certain levels for a specific period of time.[12]  Celsius continued to provide CEL Token to employees as a form of compensation that would vest like restricted stock units ("**RSUs**") after the ICO.[13]

### B.     Celsius Sold CEL Tokens Directly to Public Investors

12.     Throughout its history, Celsius sold CEL Tokens directly to investors through over-the-counter ("**OTC**") transactions.  Ferraro Decl. ¶ 14.  As part of those transactions, purchasers of CEL Token were required to execute subscription agreements.[14]  The subscription agreement applicable to foreign purchasers made clear that CEL Tokens were being sold pursuant to Regulation S under the Securities Act.  First Colodny Decl., Ex. 4 at 3 (requiring the purchaser to agree that "the CEL Tokens may only be resold in accordance with the provisions of Regulation S.").[15]  The purchaser also had to acknowledge that CEL Tokens "[are] being offered and sold in reliance upon exemptions provided in the Securities Act and State Securities Laws for transactions not involving any public offering" and that "an investment in CEL Tokens is speculative and involves a risk of loss of the entire investment."  *Id.*

### C.     Earn in CEL

13.     Celsius's flagship product was its Earn program, through which customers could transfer cryptocurrency to Celsius and earn weekly "rewards" or interest on their account balances. Although rewards were often paid "in kind" (*i.e.*, in the form of digital assets initially transferred),

---

[12]   Ferraro Decl. ¶ 19; Celsius Network Ltd., White Paper, (14), (2018).

[13]   First Colodny Decl., Ex. 2.

[14]   Ferraro Decl. ¶ 14; First Colodny Decl., Ex. 4.

[15]   Regulation S is a safe harbor from the registration requirements of the Securities Act for offshore offers and sales of securities.

Celsius also provided eligible, electing customers with the ability to earn rewards in CEL Token on other digital assets transferred to Earn accounts.[16]  Rewards in CEL Token were paid at a higher rate than rewards paid in kind.  Ferraro Decl. ¶ 5.[17]  Earn Account Holders with CEL Token balances also earned rewards (in the form of CEL Token) on those CEL Token balances.  Celsius also provided discounts on loan interest rates to Account Holders who held a significant amount of CEL Token.  *Id.*  Finally, CEL Tokens operated as a loyalty program, through which Account Holders who held more CEL Tokens were provided with discounts or early access to new products on the Celsius platform.  *Id.*

> **D.    Celsius's Disclaimers Regarding the CEL Token**

14.    Celsius's Terms of Use which were accepted by substantially all users, were incorporated by reference risk factors stating that "[i]n the absence of regulatory clarity, there is a risk that the Tokens may be viewed as a security, financial instrument, specified instrument, or other regulated instrument."  Ferraro Decl. ¶ 6; *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018* [Docket No. 393] ("**Terms of Use Declaration**") at Ex. I (Risk Disclosure) at 1112.  The risk factors also disclosed that "CEL Tokens may become unusable, illiquid and/or worthless in the event that Celsius's platform ceases to operate for any reason whatsoever.  Celsius will not redeem or repurchase any Tokens in any such event."  *Id.*

---

[16]    Terms of Use Decl. Ex. A-8 (General Terms of Use from April 15, 2022 to Present) at 538-39.

[17]    *See*, *e.g.*, First Colodny Decl. Ex. 5 ("Get more bang for your buck with weekly interest rewards on your favorite cryptocurrencies!  Chose to earn in-kind or set your settings to CEL to get up to 35% more rewards each week!"); CEL Token Explained, Celsius, *https://celsius.network/cel-token-explained* (last visited January 29, 2023); Ferraro Decl. ¶ 4.

**E.      The Majority of CEL Tokens Were Owned By Celsius and its Founders**

15.      The majority of CEL Tokens were held by Celsius or its founders, including Mr. Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein.  *See Schedules of Assets and Liabilities* [Docket No. 974].

16.      Celsius Network Ltd. ("**CNL**"), which was the primary customer-facing entity for the majority of Celsius's existence, owned the majority of CEL Token in its treasury and OTC wallets—653,967,000 on the Petition Date or 94% of the total supply of CEL Tokens.  *See* Ferraro Decl. ¶ 17.  CNL included its CEL Token holdings as an asset on its balance sheet through and including the Petition Date.

17.      Mr. Mashinsky, a co-founder and the former Chief Executive Officer of Celsius, held 83.70% of the equity interests of Celsius Network Inc. and was the largest holder of CEL Token.  *Voluntary Petition for Non-Individuals Filing for Bankruptcy,* Case No. 22-10965, [Docket No.1] at 6.  On the Petition Date, Mr. Leon, another co-founder and the former Chief Strategy Officer of Celsius held 16.30% of equity interests in Celsius Network Inc.  *Id.*  Mr. Leon and his related entities held the second most CEL Tokens on the Petition Date.  Mr. Goldstein, the third co-founder and the former Chief Technology Officer of Celsius, also held a significant amount of CEL Token in his name and through related entities.  A summary of CEL Tokens held by Celsius, both on and off the platform, based on known wallets is shown in the chart below:

| CEL Tokens Owned By Certain Insiders[18] | 7/12/2022 |
|---|---|
| Alexander Mashinsky | 70,096,767 |
| Shlomi Daniel Leon | 15,934,635 |
| Hanoch "Nuke" Goldstein | 9,705,806 |
| Kristine Meehan Mashinsky | 2,117,023 |
| **Total Insider CEL Balance** | **97,854,231** |
| **Available CEL Supply** | **692,753,441** |

*Declaration of Maxwell Galka in Support of the UCC's Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims* [Docket No. 2845] at Ex. 1.

**F.    Celsius had no Payment or Other Financial Obligations on Account of CEL Token**

18.    CEL Token did not entitle Account Holders to any payment rights against Celsius. Celsius was clear that "CEL Tokens . . . do not grant their holders any rights to redeem the tokens, exchange them for any other digital assets or fiat currency, or sell them to Celsius or any third party."[19]  In that regard, although both CEL Token and the Earn Program have been alleged to be securities by several governmental entities, CEL Token is fundamentally different than Celsius's obligations to return cryptocurrency to customers based on account balances in the Earn Program. Specifically, Celsius described the transfer of cryptocurrency from a customer to the Earn Program as a loan from the customer to Celsius, under which Celsius added weekly interest amounts (*i.e.*, "rewards") to the customer's account balance and was obligated to pay the customer the principal amount of the "loan," plus accrued interest, on demand and in kind.[20]

19.    CEL Token holders were not entitled to any payment from Celsius on account of

---

[18]    Balances include related entities and collateral related to loans taken by Mr. Goldstein and Mr. Leon.  Balances include (i) on platform holdings as disclosed in the Debtors' Schedules and Statements of Financial Affairs, and (ii) Defendants' known wallets as identified by Elementus.

[19]    Terms of Use Decl. at Ex. A-8 (General Terms of Use from April 15, 2022 to Present) at 538-39.

[20]    *Id.*

CEL Token.  Ferraro Decl. ¶ 6.  Nor was Celsius required to make interest payments on account of CEL Tokens by virtue of being CEL Tokens (rather than by virtue of being part of the Earn Program).  For instance, Celsius owed no obligation to an individual who held CEL Token in their own private wallet or on a third-party exchange.  *Id.*  Celsius did not maintain a sinking fund for repayments of CEL Token, as none were promised.  *Id.*  There was also no security interest issued with respect to CEL Tokens, as no obligation was owed.  *Id.*  Put simply, CEL Token holders could sell the tokens on third-party exchanges but could not trade the tokens in for cash or demand repayment from Celsius.  *Id.*  CEL Token holders, therefore, do not have claims against Celsius by virtue of owning CEL Tokens.

**G.    The Advertised CEL Token Business Model**

20.    Celsius and its executives advertised that the value of CEL Token was tied to Celsius's success, which success would, in turn, increase the value of the CEL Token.  In its Whitepaper, Celsius explained the concept through a "flywheel."



The flywheel evolved over time, but the general concept was that: (1) customers would transfer cryptocurrency to the Celsius platform; (2) Celsius would lend those coins to third parties to earn

interest; (3) Celsius would use that interest to buy CEL Token on the market, in amounts required to pay rewards to electing customers; (4) Celsius would pay rewards in CEL Token to customers, whose CEL Token balances would increase; (5) Celsius would earn more interest from third parties on the increased CEL Token balances; and (6) Celsius would pay its users more rewards in CEL Token.[21]

21.     The "flywheel" and Celsius's executives' public statements acknowledged that the value of CEL Token depended on Celsius and its teams' efforts to grow the business, earn interest using customer deposits, buy CEL Token, expand the universe of third parties that would pay a yield in return for CEL Token, and increase the number of users on the Celsius platform.[22]  As Mr. Mashinsky explained in a July 17, 2020:

> [M]ore users means more deposits, more deposits means more loans, more loans means more interest for Celsius, more interest for Celsius means we are paying out more, meaning we have to buy more CEL Token.  You know what happens when you keep going to market and buying CEL Token, right, prices go up.  That is the flywheel of Celsius, we're doing that I think better than anyone else.[23]

**H.     Celsius Advertised to the Public that the Price of CEL Token Reflected the Value of Celsius**

22.     Celsius advertised CEL Token as an investment in Celsius.  It described that the market price of CEL Token was tied to the perceived value of Celsius, its continuing success, and

---

[21]    Celsius Network Ltd., White Paper, (34), (2018).; *see also* Ferraro Decl. ¶ 20.

[22]    *See* Celsius Network, *Alex Mashinsky AMA 6/14/2018,* YouTube (Jun. 14, 2018), https://www.youtube.com/watch?v=P89WfneySwE, at [9:00] ("Our wheels have started turning and the wheels that generate demand both generate income and generate demand for the CEL Token.  We want those wheels to spin faster and faster.  When we feel that the wheels are spinning fast enough to the point where organic demand for the token represents one of the biggest demand generators out there, we feel comfortable going on exchanges.")

[23]    Celsius Network, *Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon – Friday, July 17, 2020,* YouTube (July 17, 2020), https://www.youtube.com/watch?v=csFrn4XtwL0, at [5:27].

its management's ability to convince more users to transfer cryptocurrency to the Celsius platform.

That pitch was plainly stated in a June 2020 "Investor Deck," in which Celsius described that

"CEL Reflects the Success of Celsius." Ferraro Decl. ¶ 15, Ex. H.  The presentation later states

that "the performance of the CEL token is a direct reflection of the performance of Celsius and

community confidence."  *Id*.  Celsius, and specifically Mr. Mashinsky, also touted to the general

public that CEL Token reflected the value of Celsius.  For instance, in July 2020, Mr. Mashinsky

explained that "if [the Company is] more valuable, the token value will increase, and so on."[24]

Later, in a January 12, 2021 AMA, Mr. Mashinsky stated:

> Celsius community members, the ones who are earning in CEL,
> understand that they're earning twice as many CEL Tokens as they
> were when CEL Token was at eight dollars.  They're basically
> getting twice as many CEL for the same thing.  If you believe in the
> viability of the company, then you would know you're getting a 50%
> discount.  If you don't believe in it, then you probably don't want
> these CELs anyway.  If you're not sure about it, how about some of
> the world's best investors coughing up $750 million? . . . They
> bought into half of all the CEL Tokens out there.  What is the biggest
> asset that they bought into?  The biggest asset that Celsius [has]
> today is our Treasury, which is mostly CEL Token.[25]

23.    Celsius's management team also internally recognized that CEL Token was a

"barometer of [Celsius's] performance."  First Colodny Decl. Ex. 6.  As acknowledged by one

employee, "if people want to know if Celsius is doing well they look at CEL and not at anything

else."  First Colodny Decl., Ex. 7.  Celsius executives were aware that equating CEL Token to an

investment in the company rendered CEL Token a security and constantly advised Mr. Mashinsky

---

[24]    Celsius Network, *Celsius Network Team AMA – Thursday, July 2, 2020*, YouTube (July 2, 2020),
https://youtube.com/watch?v=Ym1EjbThjVk, at [38:35].

[25]    Ozi_Crypto, *Celsius Network Twitter Spaces AMA 1-12-2021*, YouTube (Jan. 12, 2021),
https://www.youtube.com/watch?v=1v9zDkWbZJc&list=PL91_dMxDmGklKGDKCX_YFDLeRk0ag2Koj&index=28, at [1:43:33] (emphasis added).

against describing CEL Token as an investment in Celsius.  *Declaration of Andrea Amulic in Support of the Motion to Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors* (the "**Amulic Declaration**"), Docket No. 2671, (May 17, 2023).  But Mr. Mashinsky did not stop making similar statements.  In an effort to hide these statements, Celsius executives reviewed and edited Mr. Mashinsky's AMA segments after they were broadcast live to remove the problematic statements and, hopefully, avoid scrutiny.  Amulic Decl., Ex. 45 at CEL-UCC-00209093.

### I.    Celsius Executives Acknowledged That CEL Token Is a Security

24.    Executives at Celsius acknowledged that CEL Token is a security.  On September 16, 2021, Roni Cohen-Pavon, an attorney and the head of Celsius's regulatory affairs, and Rodney Sunada-Wong, Celsius's Chief Risk Officer, discussed the impact of an internal meeting at which Mr. Mashinsky had shared confidential information with a large group of employees.  In considering whether they should restrict those employees from trading CEL Token, Mr. Cohen-Pavon told Mr. Sunada-Wong "CEL is a security, 100% security."  First Colodny Decl. Ex. 20.

25.    CEL Token's status as a security was further recognized when the company began burning (or destroying) CEL Token.  As Mr. Cohen-Pavon informed the Celsius Executive Committee after the burn was announced on an AMA, "CEL is much more of a security in the US than before.  This burn requires us to be much more cautious on everything we do with the token. From insider trading to investment advice.  We [have] always been careful, but now we need to be even more, and yes, even internally[.]" First Colodny Decl., Ex. 21.  Celsius's internal presentations also acknowledged that CEL Token is a security.  First Colodny Decl. Ex. 22 ("$CEL still a security").

14

### J.    Celsius Manipulated the Price of CEL Token

26.    As early as 2018, Celsius began repurchasing CEL Tokens on the secondary market, stating that its intention was to repurchase the amount of CEL Token necessary to pay weekly rewards to customers that earned rewards in CEL Token.   Ferraro Decl. ¶ 19.   The Whitepaper contemplated these buybacks, and Mr. Mashinsky often described them on AMAs, in each case as a means of fueling the CEL Token "flywheel."[26]  Celsius continued to represent that the buybacks only occurred up to the amounts needed to pay customer rewards up to at least as late as January 2022.[27]  But those representations were false.

27.    In reality, Celsius strategically timed and sized its purchases of CEL Token to support the market price of the token. *See*, *e.g.*, Ferraro Decl. ¶¶ 22; First Colodny Decl. Ex. 9 ("[W]e start to buy back CEL at the market and take care the price is visibly going up during the

---

[26]   Ferraro Decl. ¶ 19; Celsius Network Ltd., White Paper, (34), (2018); Celsius Network, *Celsius Network Team AMA – Tuesday, November 26, 2019*, YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at [3:45] ("[A]bout 48% of the community said I don't want Bitcoin, I don't want Ethereum, I want you to give me CEL token instead.  I believe in the CEL token.  So we then have to go and buy the CEL token on exchanges with BTC, with ETH, and deliver that CEL token to the community.  That's what we've been doing for about a year."); Celsius Network, *Celsius Network Team AMA – Friday,* December 31, 2021, YouTube (Dec. 31, 2021), https://www.youtube.com/watch?v=miXgxNqwFag, at [3:70] ("Over 1,700 people already are accredited to earn in CEL . . . that represents $3.8 billion that are going to hopefully switch from earning in-kind to earning in CEL . . . which will require us Celsius to buy at least twice as much as many CEL tokens every week. . . .  Celsius is the only one that goes to market and buys its own token every week based on how much was basically how many people chose to earn in CEL.").

[26]   *See* Celsius Network, *Celsius Network Team AMA – Thursday, June 14, 2018,* YouTube (June 14, 2018) https://www.youtube.com/watch?v=P89WfneySwE&t=60s, at [2:34] ("We've . . . started earning interest and started buying some CEL tokens on the open market. . . . you can do simple math look at basically how much interest we're earning by looking at how many coins we bought"); Celsius Network Ltd., White Paper, (34), (2018) ("The Celsius Token (CEL) is converted from fees paid by borrowers (margin traders).  This fee, although charged in fiat, is converted to CEL tokens by the Celsius service and distributed to the lenders' wallets as daily interest . . . Celsius releases CEL tokens from an internal cache according to the value of the fees and commissions.  If needed, CEL tokens may be purchased on open markets.").

[27]   Ferraro Decl. ¶ 22; Celsius Network, *Celsius Network Team AMA – Friday, December 10, 2021*, YouTube (Dec. 10, 2021), https://www.youtube.com/watch?v=X304U3isWzg, at [17:54] ("We purchased, just in 2021, we purchased $421 million worth of CEL Token . . . Obviously most of this is [] to pay the community, to pay the people who earn in CEL."); Celsius Network, *Celsius Network Team AMA – Friday, January 7th 2022*, YouTube (Jan. 7, 2022), https://www.youtube.com/watch?v=6631ORa2v4M, at [42:14] ("Celsius does not decide how many CEL tokens to buy, and then how many of them to burn.  You guys decide.").

buyback.").  For instance, Celsius would place resting purchase orders, which were visible on public cryptocurrency exchanges and designed to make large buy orders and maintain specific price levels.  Ferraro Decl. ¶ 22.  Celsius also coordinated buybacks to occur contemporaneously with AMA broadcasts, to increase consumer confidence in and demand for CEL Token.  Ferraro Decl. ¶ 22.[28]

28.    Celsius expanded its buyback operations by over 400% between 2019 and 2020, and buybacks continued until shortly before the Pause.  Ferraro Decl. ¶ 22.  The amount of CEL Token Celsius purchased was often determined in an *ad hoc* fashion to support the price of CEL Token and in sums that routinely exceeded the amounts owed to account holders who elected to earn rewards in CEL.  First Colodny Decl. Ex. 11 ("Just to clarify between us three: The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that is just what we told the community.").  The Debtors have accepted and acknowledged as true that:

> Mashinsky touted the CEL token and the rise in CEL token's price as an indicator of Celsius' own financial health, and encouraged the public to purchase and hold CEL token.  These claims were false and misleading.  The rise in the value of the CEL token was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL token by taking steps to artificially support the price of CEL.  For example, although Mashinsky publicly disclosed that Celsius was purchasing CEL as part of a weekly "buyback" program to pay customer rewards, Celsius did not disclose that, in many weeks, Celsius was secretly purchasing far more CEL token than was necessary to pay those rewards.  Those excess CEL purchases were not made for the purpose of paying

---

[28]    *See also* First Colodny Decl. Ex. 8 (May 31, 2020 e-mail from J. Treutler to A. Mashinsky, D. Leon, H. Urata-Thompson, and others stating: "We made a first small purchase of (82k of the 482k CEL) to test the water a few minutes after the AMA started . . . the community saw the large buy volume during the AMA & was loving the AMA even more . . . now every new buy orders coming in from our community (that was motivated by the awesome AMA) drove the price a bit higher.")).

> customer rewards or for carrying out any legitimate business
> activity. Rather, their acknowledged purpose was to artificially
> support the price of CEL token.

*Notice of Consensual Resolutions of Government Investigations* [Docket No. 3293] at Ex. A.[29]  At

the Confirmation Hearing, the Committee will demonstrate that Celsius spent millions of dollars

purchasing CEL Token in excess of the amount it needed to pay rewards to Account Holders who

elected to Earn in CEL Token.

29.    Celsius also timed certain purchases of CEL Token to counteract potential

decreases in price caused by insiders' sales of the CEL Token (particularly Mr. Mashinsky's sales).

*E.g.*, First Colodny Decl., Ex. 18.  For instance, on January 8, 2021, in response to a large sale by

Mr. Mashinsky, Harumi Urata-Thompson, the Debtors' then-CFO, told Johannes Treutler, the

employee in charge of directing CEL Token purchases, "because Alex already breached [the CEL

Token Trading Policy], let's 'breach it back' and support the market.  It is just disproportionate

how we are performing out there."  First Colodny Decl. Ex. 16.

30.    Due to Celsius's deliberate manipulation of the CEL Token price, Celsius

employees knew CEL Token's value was "fake" and that CEL Token was "worthless."   On

October 30, 2021, Mr. Cohen-Pavon commented in a WhatsApp message to Mr. Mashinsky that:

> We're not just sitting and watching the price [of CEL Token]. We're
> on it all week and even now Ron Sabo and I are live with the market
> maker.  The issue is that people are selling and no one is buying
> except for us.  The main problem was that the value was fake and
> was based on us spending million (~$8M a week and even more
> until February 2020) just to keep it where it is.  The week we spent
> 'only' $4M (on top of rewards) and the price is still going down.
> This will be a 3-4 week process until we change the trend (you see
> that the volume is already double) and we can speak about the CEL

---

[29]    The Statement of Facts that was admitted to and acknowledged by Celsius Network LLC in its Non-Prosecution
Agreement entered between the Debtors and the DOJ can be accessed at
https://www.justice.gov/media/1305436/dl?inline.

> (just like the text I gave you about the burn). We should be patient
> or decide we're spending the same level as we spent in the last few
> weeks (summed at around $45M).

Second Colodny Decl. Ex. A.

31.    Similarly, in April 2022, Dean Tappen, another Celsius employee, lamented that "We are using users USDC to pay for employees worthless CEL." First Colodny Decl., Ex. 24. On numerous other occasions, Celsius employees remarked that CEL's value should be $0. First Colodny Decl., Ex. 25 (internal message dated April 13, 2022: "CEL Token's value '[s]hould be 0'"); First Colodny Decl., Ex. 26 (internal message dated May 12, 2022: "assume CEL is $0 because we cannot liquidate our current CEL position").

### K.    Other Efforts By Celsius to Increase the Price of CEL Token

32.    Celsius and its management team engaged in additional efforts to increase the price of CEL Token.  For instance, Celsius had CEL Token listed on several centralized and decentralized exchanges, including FTX, Uniswap, Liquid Exchange, and others.  Ferraro Decl. ¶ 16. Beginning in October 2021, Celsius began burning CEL Token (*i.e.*, permanently removing tokens from circulation) to increase the price of the token.[30]  Celsius advertised that it would burn 10% of the CEL Token it purchased through buybacks.  The actual amount of CEL Token burned, however, did not correspond with the total amount of CEL Tokens repurchased.  Ferraro Decl. ¶ 23.  In 2022, Celsius burned 2.1 million CEL Token which, under the 10% formula, would have indicated that Celsius had paid 21 million CEL Token as rewards and repurchased 23 million CEL Token in total—Celsius actually bought back ***79 million*** CEL Tokens in 2022.  *Id.* ¶ 24.

---

[30]    Celsius Network, *Celsius Network Team AMA – Friday, October 1, 2021,* YouTube (Oct. 1, 2021), https://www.youtube.com/watch?v=mUokZbnfFyE (announcing CEL burn strategy— whereby Celsius would buy and burn CEL equal to 10% of the total CEL rewards paid each week—to the public).

33. Finally, as the price of CEL Token began to decrease rapidly in early 2022, Mr. Mashinsky launched a campaign called "CEL Team Six," which was a dedicated effort by Celsius to increase CEL Token prices.[31] The efforts of "CEL Team Six" included burning more CEL Tokens in correlation with the growth of the Celsius user base and creating more ways to use CEL Token.

34. After Celsius finally stopped purchasing CEL Token in mid-May 2022, the price plummeted. The last purchase by Celsius was likely made on May 12, 2022, which caused the market price per CEL Token to increase from $0.57 to $0.90. Ferraro Decl. ¶ 27. From that day until the Pause was announced, the price of CEL Token dropped to $0.28. *Id.* On the date of the Pause, approximately 95% of the total supply of CEL Token was locked on the Debtors' platform. Ferraro Decl. ¶ 18. As of the Petition Date, approximately 654 million CEL Tokens were in the Celsius treasury and other Celsius workspaces, 254 million CEL Tokens were in Earn Accounts, and two million CEL Tokens were in Custody Accounts. Ferraro Decl. ¶ 17.

35. From June 12, 2022 (the date of the Pause) until July 13, 2022 (the Petition Date), the price of CEL Token increased from approximately $0.28 to $0.81 based on transactions involving the approximately 5% of CEL Token not trapped on the Celsius platform. Ferraro Decl. ¶ 27.

36. The Celsius platform will be retired following the conclusion of these Chapter 11 Cases. The CEL Token will have no go-forward utility. Ferraro Decl. ¶ 26. Moreover, the Debtors cannot and will not distribute CEL Token under the Plan. *See* Plan, Art. I.142 (defining Liquid

---

[31] Celsius Network, *Celsius Team AMA – Friday, January 28 2022,* YouTube (Jan. 28, 2022), https://www.youtube.com/watch?v=erQn2wczFsk (introducing CEL Team Six and describing their efforts to raise the price of CEL).

Cryptocurrency to include only BTC and ETH).

### L.      Proposed Treatment of CEL Token Under the Plan

37.      Under the proposed Plan, CEL Token Deposit Claims (*i.e.*, claims based on CEL Token account balances) will be valued at $0.25 and provided with the same treatment as all other Claims associated with the applicable program (*e.g.*, CEL Token Deposit Claims on account of the Earn Program will receive the treatment provided to similarly situated Earn Claims based on a value of $0.25 per CEL Token).  Plan, Art. IV.B.2.  Other damages claims arising from the purchase of CEL Token, defined in the Plan as "Other CEL Token Claims," will be classified as Section 510(b) Claims and receive no recovery.  *Id.*

38.      That proposed treatment reflects a settlement of the issues regarding CEL Token discussed in this Brief and will be raised at the Confirmation Hearing.  Prior to the Confirmation Hearing, the Solicitation Agent will tabulate the Holders of CEL Token Deposit Claims that vote to accept the Plan.  To the extent the required thresholds of Holders of CEL Token Deposit Claims (not including Equitably Subordinated Parties) vote for the Plan or do not opt out of the Class Claims Settlement, and/or the Debtors are able to reach an agreement with an ad hoc group of Holders of CEL Token Deposit Claims, the Debtors will seek to approve the CEL Token Settlement under Bankruptcy Rule 9019 as part of Plan confirmation.  Plan Art. IV.B.2.  To the extent neither of those events occurs and the Court determines the settlement is not subject to approval under Rule 9019, the Debtors and the Committee will argue the factual and legal issues concerning CEL Token Deposit Claims and Other CEL Token Claims at confirmation, and such Claims will receive the treatment determined by the Court. *Id*.

39.      At the Confirmation Hearing, the Committee intends to present evidence on, among other factors, pre-petition manipulation of CEL Token, the scarcity created in the market following

the Pause, and the dearth of information about Celsius in the public domain.  In light of the foregoing, there is little doubt that $0.81 is not the true valuation for CEL Token.  But, also in light of those factors, it is likely not possible for an expert to testify as to what the correct valuation of CEL Token would be but for the companies' manipulation and financial issues.  The Committee believes that there are strong arguments in favor of valuing CEL Token at $0.00, but is willing to compromise with CEL Token holders to provide them with a $0.25 recovery under the settlement embodied by the Plan.  That settlement affects all Account Holders and falls well within the lowest range of reasonableness under these circumstances.

## <u>Argument</u>

40.    The legal nature of cryptocurrency tokens is subject to significant litigation. Among the most litigated topics is whether tokens issued by cryptocurrency platforms or exchanges (commonly referred to as "native cryptocurrency tokens") are securities for the purposes of determining whether sales of those tokens violate United States securities laws.  This Brief, however, addresses a different issue: whether a creditor's claim arising from the purchase of the Debtors' native token should have the same payment priority as creditors' claims against the Debtors for repayment of BTC, ETH, and other cryptocurrency not issued by the Debtors.  This question is not wholly unique to this case: many recent and ongoing cryptocurrency chapter 11 cases concern entities with similar native tokens.[32]

---

[32]    *See In re FTX Trading Ltd.* (Bankr. D. Del. July 31, 2023)), *FTX Draft Plan of Reorganization – Term Sheet* [Docket No. 2100] ("[T]he extinguishment of FTT claims in recognition of the equity-like characteristics of FTT . . .")]; *but see In re Voyager Digital Holdings, Inc., Debtors' Memorandum of Law in Support of (I) Final Approval of the Second Amended Disclosure Statement Relating to the Third Amended Joint Plan of Voyager Digital Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (II) An Order Confirming the Amended Joint Plan of Voyager Digital Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1110] at ¶ 20 ("[E]ach Holder of an Account Holder Claim is receiving a recovery based on the "dollarized" amount of such Claim as of the Petition Date[.]").

41.     Other than with respect to CEL Tokens, the Debtors generally do not have sufficient coins to make full, in-kind distributions to Account Holders.  *Debtors' Cash and Coin Report* [Docket No. 2648] (reflecting a Net Coin Position of -$3.578 billion).  Moreover, even though the Debtors have sufficient CEL Token to make full in-kind distributions with respect to CEL Token obligations to Account Holders, the Debtors are unable to make such distributions for regulatory reasons.[33]

42.     Under the Court's supervision and order, the Debtors have sold certain other cryptocurrency coins that they are prohibited from distributing to creditors and have received Bitcoin ("**BTC**") and Ethereum ("**ETH**"), which they propose to distribute to creditors under the Plan.  The Debtors, however, are not able to sell CEL Token at this time.  Accordingly, unlike nearly all other claims, any Claims on account of CEL Tokens will increase the amount owed by the Debtors, while the CEL Token assets associated with those claims will not increase the value returned to creditors.  Damages claims related to the purchase of CEL Token would also dilute recoveries provided to unsecured creditors.

43.     Nonetheless, CEL Token is a security that was issued by Celsius and CEL Token Deposit Claims and Other CEL Token Claims are subject to subordination to other claims under the Bankruptcy Code.  CEL Token, like an equity security, was a proxy for the value, and wholly depended on the continued existence of, Celsius.  Celsius explicitly disclosed that CEL Token would likely have no value if Celsius ceased to continue as a going concern to each individual who

---

[33]   Aug. 14, 2023 Hr'g Tr. 71:5-13 (The Court: "Mr. Crews, I think – and I'll give the Debtors – you know, I want them to respond to this at the end, that without a going concern, the CEL token, it can't be issued. It can't – you know, Celsius won't exist. Ultimately, the CEL Token depended on the value of the Celsius enterprise. The Celsius enterprise as going concern won't exist whichever, whether there's a liquidation or Fahrenheit or Brick transactions wind up as being approved. There – this is not like Bitcoin or Ethereum.").

elected to purchase CEL Token. Terms of Use Decl. at Ex. I (Risk Disclosure) at 1112. Moreover, given the lack of repayment or other obligations of the Debtors, all claims against the Debtors related to CEL Token would not exist but for a claimant's purchase of that security. Bankruptcy law provides that all such claims are subordinated to ensure an equitable distribution of the estate. 11 U.S.C. § 510(b). Put simply, the law provides that those creditors who did not elect to assume the risks associated with the Debtors' speculative native token should not have to share in the consequences of the investment decisions made by those that knowingly accepted that risk.

## I.    **The Plan's Proposed Settlement of CEL Token Issues Is Fair and Equitable**

44.    The Plan provides for a settlement of the issues discussed in this Brief. The settlement will provide each Holder of CEL Token Deposit Claims, other than the proposed Equitably Subordinated Parties, with a Claim equal to $0.25 per CEL Token, which CEL Token Deposit Claim will receive the treatment associated with the program in which the applicable CEL Tokens were deployed. Plan Art. IV.B.2.

45.    "Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re MF Global Inc.*, Case No. 11-2790 (MG) (SIPA), 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (Glenn, J.). To be approved under Bankruptcy Rule 9019, the resolution must only be determined to be above the lowest point in the range of reasonable outcomes, fair and equitable, and in the best interest of the estate. *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Air Line Pilots Ass'n, Int'l. v. Am. Nat'l Bank & Tr. Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991). In determining the range of reasonableness, the Court does not need to decide

issues of law and fact raised by the settlement. *Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983). Nor is the court required to conduct a "mini-trial" of the underlying facts and merits. Rather, it must evaluate the facts that are necessary to allow it to assess the range of reasonable outcomes and make an independent judgment about the settlement. *In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009). The Court should "canvas the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972).

46.     Courts in this Circuit consider the following factors in determining whether a settlement meets the requirements of Rule 9019: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining." *Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 226 (Bankr. S.D.N.Y. 2007) (citing *In re Texaco, Inc.*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988)); *Drexel Burnham*, 134 B.R. at 506.

47.     Here, there is no doubt the issues are complex and litigation of the legal and factual

issues related to the value and priority of CEL Token will be significant.  The proposed settlement also balances the interests of all creditors by providing Account Holders with CEL Token Deposit Claims with some recovery and limiting the dilution to other creditors caused by claims which should receive no recovery or be subordinated.  The CEL Token Settlement was negotiated between the Debtors and the Committee, which is a fiduciary for all unsecured creditors.  All unsecured creditors will be affected by the CEL Token Settlement and will be able to express their support through their vote on the Plan.

48.      After review of the legal arguments with respect to the value and priority of the CEL Token, there is little doubt that the CEL Token Settlement falls within the range of reasonableness.

## II.      CEL Token Deposit Claims and Other CEL Token Claims Should Be Subordinated Under Section 510(b)

49.      Section 510(b) of the Bankruptcy Code subordinates all claims for damages, rescission, or reimbursement "arising" from the "purchase or sale of a security of the debtor or of an affiliate of the debtor" to "claims or interests that are senior to or equal the claim or interest represented by such security."  11 U.S.C. § 510(b).  Accordingly, CEL Token Deposit Claims and Other CEL Token Claims must be subordinated pursuant to Section 510(b) if each of the following three conditions is met: "(1) [CEL Tokens] are securities of the Debtors, (2) the claimants acquired [CEL Tokens] in a purchase, and (3) the claims for damages arise from that purchase or the asserted rescission of [the CEL Token]."  *Adler v. Lehman Bros. Holdings* (*In re Lehman Bros. Holdings*), 855 F.3d 459, 472 (2d Cir. 2017).  Here, each of the requirements of Section 510(b) is met with respect to CEL Token Deposit Claims and Other CEL Token Claims.

### A.    CEL Token Is a Security of the Debtors

50.    Section 101(49) of the Bankruptcy Code broadly defines what kind of instrument constitutes a "security." 11 U.S.C. § 101(49). It specifies fourteen different examples of securities and further captures any "other claim or interest commonly known as 'security.'" *Id.* In the context of section 510(b), courts in the Second Circuit have defined a "security" in terms of an interest tied to a firm's overall success. *In re Lehman Bros. Holdings*, 855 F.3d at 474 (collecting cases and holding that convertible notes and unissued membership units in an LLC are securities for purposes of section 510(b)). With respect to CEL Token, the inquiry should begin and end there. Celsius touted that "CEL Reflects the Success of Celsius" and that "the performance of the CEL token is a direct reflection of the performance of Celsius and community confidence." Ferraro Decl. ¶ 15, Ex. H. Celsius executives also acknowledged—both publicly and internally— that CEL Token was a "barometer" for its success as a company and intrinsically tied to "the viability of the company." *Supra* ¶¶ 23.

51.    There are four primary schemes through which CEL Tokens were sold: (1) Celsius's sales of CEL Token through its ICO; (2) Celsius's sales of CEL Token through its OTC desk; (3) the payment of CEL Token as rewards on Earn account deposits; and (4) the payment of CEL Token to employees as part of their compensation. Each of those schemes meets the definition of an "investment contract" under the test set forth by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. at 298-99. Courts in this District have consistently applied the *Howey* test to digital asset transactions, including in the recent *Ripple Labs* and *Terraform Labs* decisions. *E.g.*, *Ripple Labs*, Inc., 2023 U.S. Dist. LEXIS 120486 at *14; *Terraform Labs Pte. Ltd.*, 2023 U.S. Dist. LEXIS 132046 at *24.

52.    It is now well established that there does not need to be a formal common-law

contract between parties for an "investment contract" to exist. *Terraform Labs*, 2023 U.S. Dist. LEXIS 132046 at \*33. Moreover, *Howey* does not limit its analysis to whether the token itself is an investment contract—in some cases it is not. *See, e.g.*, *Ripple Labs*, 2023 U.S. Dist. LEXIS 120486 at \*24 (finding that XRP "in and of itself" is not an investment contract but examining the different transactions concerning the sale of XRP to determine whether they were securities transactions).

53.    The *Howey* test requires a Court to examine whether the transaction or scheme at issue concerns (1) an investment of money, (2) in a common enterprise, (3) in which the person is led to expect profits solely from the efforts of the promoter or a third party. 328 U.S. at 298-99. In analyzing whether a scheme is an investment contract, courts focus on the "economic realities" and "substance" of the underlying transactions concerning the token at issue to determine whether the scheme meets the three *Howey* requirements under the totality of the circumstances, with the "understanding that the definition of investment contract is 'a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *United States SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (citing *Howey*, 328 U.S. at 299); *Terraform Labs*, 2023 U.S. Dist. LEXIS 132046, at \*34.

### 2.    Each Scheme Concerned an Investment of Money

54.    An investment of money exists if "the digital asset is purchased or otherwise acquired in exchange for value." *Framework for "Investment Contract" Analysis of Digital Assets* (the "**SEC Framework**") at 2;[34] *see also Balestra*, 380 F. Supp. 3d at 353 (finding "an investment

---

[34]    *SEC's Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), available at: https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

of money" where purchaser "exchanged 2.1 ETH for 388.5 ATB Coins"); *SEC v. Shavers*, No. 4:13-CV-416, 2013 U.S. Dist. LEXIS 110018, at \*4-5 (E.D. Tex. Aug. 6, 2013) (finding that investment of Bitcoin constituted "an investment of money" because "Bitcoin can be used as money . . . to purchase goods or services, and . . . it can also be exchanged for conventional currencies"). "The investment of money prong requires that an investor commit his assets to the enterprise in such a manner as to subject himself to financial loss." *Gallagher v. Roberts*, No. 3:16-cv-01437, 2017 U.S. Dist. LEXIS 57714, at \*15 (S.D. Cal. Apr. 11, 2017) (citations omitted).

55.     The first *Howey* requirement is easily met with respect to sales of CEL Token through the ICO and the OTC desk. Participants exchanged cash or cryptocurrency for CEL Token, as in *Balestra*. *See supra* ¶¶ 12. Similarly, there is little doubt that an Earn Account Holder's election to receive rewards (in return for giving Celsius ownership of assets transferred to the Earn Program) in CEL Token constitutes an investment of money. Account Holders who elected to earn rewards in CEL Token transferred ownership of their crypto to Celsius in return for a weekly rewards payment in CEL Token. *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822 at 39]. Such transfer of ownership constituted value—a commitment of assets—that these Account Holders exchanged with Celsius in return for CEL Token. Moreover, as in *Gallagher*, those Account Holders committed their assets to Celsius "in such a manner as to subject [themselves] to financial loss." *Gallagher*, 2017 U.S. Dist. LEXIS 57714, at \*15. Instead of choosing to Earn in BTC, ETH, or other non-native tokens, those Account Holders bet on CEL Token (as a proxy for Celsius) and risked financial loss if CEL Token's value deteriorated. *See supra* ¶ 12.

56.     Finally, Celsius employees' receipt of payment in CEL Token was an investment of money because those employees exchanged the value of their labor for CEL Tokens. The *Ripple*

court found that employees' receipt of XRP as compensation was not an investment of money because the employees did not provide any "tangible and definable consideration." The *Ripple* decision is not binding on this Court. Aug. 14, 2023 Hr'g Tr. 86:22–87:6; *see also Terraform Labs*, 2023 WL 4858299 at *44-45 (rejecting the approach adopted in *Ripple* to distinguish between transactions sold directly to institutional investors versus those sold through secondary market transactions).

57.    Moreover, *Ripple* is incorrect because it completely ignores the cash value of labor. *Ripple Labs*, 2023 U.S. Dist. LEXIS 120486, at *39-40, *44-45.    *Ripple Labs* is also distinguishable from the issue before this Court as that case did not involve (as this case does) the interpretation of section 510(b) of the Bankruptcy Code.    Courts in this circuit have found, in the context of Section 510(b), that employees exchanged the value of their labor for interests in their employers' companies by accepting payment in the form of such interests.    For instance, the Second Circuit found that an employee's election to receive RSUs in exchange for labor was a purchase of those RSUs.    *In re Lehman Bros.*, 855 F.3d at 474-77.    Similarly, the *Enron* court found that employees who were required to accept stock options in exchange for their labor exchanged definite value for the options.    *In re Enron Corp.*, 341 B.R. 141, 151 (Bankr. S.D.N.Y. 2006).    There, the *Enron* court refused to interpret the term "purchase" to include an employee who received cash compensation first and immediately purchased options from the employer, but exclude an employee who received options directly as compensation.    *Id.* at 150.    The same reasoning should apply here.

58.    Like in the *Lehman* and *Enron* cases, by accepting CEL Token as a form of payment, Celsius's employees purchased, or exchanged the cash value of their labor for, CEL Token.    And, as with Account Holders who elected to Earn in CEL Token, these employees risked

financial loss by accepting payment in the form of such a speculative token, whose value was highly volatile. One of the central purposes of the Bankruptcy Code is an equal distribution among similarly-situated creditors. It makes little sense to sever CEL Token awarded to employees from all other CEL Token Deposit Claims in this context.

### 3.    Each Scheme Concerned a Common Enterprise

59.    CEL Token holders are engaged in a common enterprise among one another and with Celsius. A common enterprise exists if there is *either* horizontal commonality *or* strict vertical commonality. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *Balestra*, 380 F. Supp. 3d at 353 n.10 (recognizing strict vertical commonality as valid means to establish a common enterprise); *In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (observing that "courts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*"). Both are present here.

60.    Horizontal commonality exists "when investors' assets are pooled and the fortunes of each investor [are] tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. 3d at 352 (citing *Revak*, 18 F.3d at 87); *Kik Interactive*, 492 F. Supp. 3d at 178 (quoting *Revak*, 18 F.3d at 87) ("Where horizontal commonality is present, 'the fortunes of each investor depend upon the profitability of the enterprise as a whole.'"). Horizontal commonality does not require "a pro rata distribution of revenues or income." *Telegram*, 448 F. Supp. 3d at 369 n.8; *Balestra*, 380 F. Supp. 3d at 354 ("[A] formalized profit-sharing mechanism is not required for a finding of horizontal commonality."). Instead, horizontal commonality is frequently established where digital asset purchasers "received the same fungible [token]" because appreciation of the token's value benefits each purchaser proportionally. *Ripple Labs*, 2023 U.S.

Dist. LEXIS 120486, at *28 ("When the value of XRP rose, all Institutional Buyers profited in proportion to their XRP holdings.").

61.    Here, the funds raised from ICO and OTC sales of CEL Token were pooled in common accounts that were used to fund Celsius's business.  Likewise, digital assets transferred to the Earn Program were pooled and lent, rehypothecated or invested to generate yield.  Proceeds from these investments were used to pay Celsius's obligations and purchase CEL Token, thereby increasing its price in accordance with Celsius's "flywheel" business model.  *Supra* ¶¶ 20-21. And, in each scheme of CEL Token distribution, the CEL Token investors received the same fungible token as one another.  *Supra* ¶ 6.  The appreciation in the token's price therefore derived from Celsius's pooled assets and labor, and benefited each holder ratably.

62.    Strict vertical commonality also exists here because "the fortunes of investors" are "tied to the fortunes of the promoter."  *Telegram*, 448 F. Supp. 3d at 369 (citing *Revak*, 18 F.3d at 88).  The *Telegram* court found strict vertical commonality where purchasers' "anticipated profits were directly dependent on Telegram's success in developing and launching the TON Blockchain" and Telegram "would suffer financial and reputational harm if the TON Blockchain failed."  *Id.* at 370-71.  Here, the fortunes of CEL Token holders' investments were tied to the fortunes of Celsius—the issuer, promoter, and largest holder of CEL Token—because only Celsius could develop, grow, and maintain CEL Token and, conversely, CEL Token would fail without Celsius's active support.  *Supra* ¶ 26-28.  Celsius and its insiders all profited handsomely from increases in the price of CEL Token.  Mr. Mashinsky made this clear by repeatedly noting his and Celsius's economic alignment with CEL Token holders: "The token price goes up, out entire compensation is the token.  So our job is to do everything we can to increase the price of the token as long as it's

in the best interest of the community."[35]

### 4.  Each Investor Had a Reasonable Expectation of Profit from the Entrepreneurial or Managerial Efforts of Others

63.    An investor possesses a reasonable expectation of profit from the efforts of others if the investor entered the transaction with "the prospects of a return on their investment" that would be "derived from the entrepreneurial or managerial efforts of others."  *Telegram*, 448 F. Supp. 3d at 371-75 (quoting *Howey*, 328 U.S. at 301; *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)).  The reasonable expectation of profits from the efforts of others need not be the sole reason a purchaser makes an investment.  *See SEC v. LBRY, Inc.*, 2022 U.S. Dist. LEXIS 202738, at *7 (D.N.H. Nov. 7, 2022).  An asset may be sold for both consumptive and speculative uses.  *Id.*  "The inquiry is an objective one focusing on the promises and offers made to investors; it is not a precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d. at 371.

64.    Reliance on the "efforts of others" can be found when an issuer "controls the creation and issuance of the digital asset" or takes "actions to support a market price of the digital asset" through "buybacks, 'burning,' or other activities."  SEC Framework at 2.  Courts have also found that "[p]romotional materials emphasizing opportunities for potential profit can demonstrate that purchasers possessed the required expectation of profits."  *Telegram*, 448 F. Supp. 3d at 373; *Terraform Labs*, 2023 U.S. Dist. LEXIS 132046, at *42-43.  Such reliance is also more likely to be present when the issuer "retains a stake or interest in the digital asset" and that purchasers can reasonably expect an issuer "to undertake efforts to promote its own interests and enhance the

---

[35]    *See* Celsius Network, AMA with Alex Mashinsky, CEO of Celsius, YouTube (Mar. 8, 2018), https://www.youtube.com/watch?v=YQNdQXxPNQE, at [20:15].

value of [the security]." SEC Framework at 2; *see also Kik Interactive*, 492 F. Supp. 3d at 180.

("Kik had a unique incentive to increase demand for Kin because it retained for itself 30% of the

tokens created.").

65. Here, there is no doubt that investors had a reasonable expectation of profit on their

investments in CEL Token derived from the efforts of Celsius. Celsius advertised to ICO

purchasers that it would use the money from their investments to build the business, which would

increase the price of the CEL Token—the "backbone of Celsius." Ferarro Decl. Ex. A at 3. The

Whitepaper also first introduced the CEL Token "flywheel," pursuant to which Celsius sought to:

(1) get more users to transfer their assets to Celsius and elect to Earn in CEL Token, (2) make

investments to earn yield on those assets, and (3) purchase CEL Tokens with that yield to pay

rewards to users who elect to Earn in CEL Tokens, causing CEL Token prices to increase as well.

*Supra* ¶ 21. Celsius and its "CEL Team Six" also took direct efforts to increase the price of CEL,

including repurchasing CEL Token on the secondary market to "support" (or, more appropriately,

"pump") its price and "burning" CEL Token in 2021 to create artificial scarcity and increase the

price of the token. *Supra* ¶¶ 20-21. Such buybacks and token burning are hallmarks of an

investment contract under the SEC Framework.

66. Although Celsius did not advertise the amount of CEL Token it was purchasing or

the degree to which it was propping up the price of CEL Token, the advertised business model of

CEL Token focused on the Company's purchases from the markets. As Mr. Mashinsky explained:

> [M]ore users means more deposits, more deposits means more
> loans, more loans means more interest for Celsius, more interest for
> Celsius means we are paying out more, ***meaning we have to buy
> more CEL Token. You know what happens when you keep going
> to market and buying CEL Token, right, prices go up***. That is the

flywheel of Celsius, we're doing that I think better than anyone else.[36]

Celsius and Mr. Mashinsky's promotion of CEL Token on the weekly AMAs and in other promotional materials was pervasive and directly targeted at retail users. Although other Celsius executives counseled Mr. Mashinsky against advertising CEL Token as an investment, he simply could not help himself.

67.    Moreover, Celsius retained a substantial stake in CEL Token, holding nearly 95% of all issued CEL Token as of the Petition Date. *Supra* ¶ 16. Celsius co-founders held at least 14.3 percent of all issued CEL Token as of the Petition Date. *Id.* By retaining more than half of all issued CEL Token, Celsius and its insiders were uniquely incentivized to promote CEL Token. Ultimately, there is no doubt that the objective investor would have purchased CEL Token expecting that Celsius's efforts would lead to an increase in the token's value.

**B.    Claimants Purchased CEL Token**

68.    The second element of Section 510(b) requires that the claimant have purchased the security. As described above, individuals acquired CEL Tokens from the Debtors in four primary ways: (1) purchasing CEL Tokens through the ICO, (2) purchasing CEL Tokens through the Debtors' OTC desk, (3) electing to earn CEL Tokens as rewards on cryptocurrency transferred to the Debtors as part of the Earn Program, or (4) earning CEL Tokens as part of their compensation package. The first two are direct purchases. As discussed above, courts in the Second Circuit have interpreted the term "purchase" in section 510(b) broadly to encompass acquiring something in exchange for value, and have found that a "purchase" includes the receipt

---

[36]    Celsius Network, *Celsius Network Co-Founder AMA with Alex Mashinsky and Daniel Leon,* YouTube (July 17, 2020), https://www.youtube.com/watch?v=csFrn4XtwL0 (emphasis added).

of a security in exchange for labor.  *See supra* ¶ 57-58, *In re Lehman Bros.*, 855 F.3d at 476 (2d. Cir. 2017); *In re Enron Corp.*, 341 B.R. at 150.  Similarly, claimants that elected to receive rewards on their Earn deposits in CEL Token instead of in kind (thus taking on the risk that Celsius would not succeed) exchanged their rights to receive other digital assets for CEL Token.  Transactions in each of the four schemes under which Celsius distributed CEL Token satisfies the broad interpretation of a purchase in the Second Circuit.

      **C.**      **Claims for the Return of CEL Token Arise from the Purchase or Sale of CEL Token**

      69.      Finally, the last element of Section 510(b) requires the claim to arise from the purchase or sale of the token.  Courts interpret whether a claim "arises from" the purchase or sale of a security broadly.  *In re Lehman Bros. Holdings*, 855 F.3d at 478 (citing the "well-settled principle that [section 510(b)] is to be interpreted broadly").  For a claim to arise from the purchase of the security, the damage or illegality does not need to be connected to the purchase itself.  *In re Lehman Bros. Inc.*, 519 B.R. 434, 443-44 ("'[I]t is, in our view, more natural, as a textual matter, to read 'arising from' as requiring some nexus or causal relationship between the claims and the purchase of the securities, but not limiting the nexus to the claims alleging illegality in the purchase itself.'") (quoting *Baroda Hill Invs., Inc. v. Telegroup, Inc.* (*In re Telegroup, Inc.*), 281 F.3d 133, 138 (3d Cir. 2002)); *In re Enron Corp.*, 341 B.R. 141, 152 (Bankr. S.D.N.Y. May 2, 2006) ("[T]he use of the phrase 'arising from' suggests that the injury need not directly result from the purchase, although . . . 'there must obviously be some nexus or casual relationship between the claim and the [purchase] of the security. . . .'") (quoting *In re Telegroup, Inc.*, 281 F.3d at 138).

      70.      Courts in the Second Circuit have held that section 510(b) encompasses breach of contract and fraud claims that have a causal nexus to the purchase or sale of a security.  *See*, *e.g.*,

*In re Lehman Bros. Holdings*, 855 F.3d at 471; *Enron*, 149 B.R. at 158-62; *see also*, *e.g.*¸ *In re MF Global Holdings, Ltd.*, No. 11-15059 (MG), 2014 Bankr. LEXIS 3333, at*14-15 (Bankr. S.D.N.Y. Aug. 6, 2014); *KIT Digital, Inc. v. Invigor Group Ltd.* (*In re KIT Digital, Inc.*), 497 B.R. 170, 181 (Bankr. S.D.N.Y. 2013); *In re WorldCom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of [s]ection 510(b)[.]").  Courts have specifically found that breach of contract claims related to the applicable security are sufficiently related to the purchase of the security and subordinated under section 510(b).  *Enron*, 341 B.R. at 158 ("[T]he clear trend in the case law is to interpret section 510(b) broadly to include, for example, breach of contract claims."); *Queen v. Official Comm. of Unsecured Creditors* (*In re Response U.S.A., Inc.*), 288 B.R. 88, 94 (D.N.J. 2003) (concluding breach of contract claims must be subordinated where "they would not exist but for the [purchase of the security]", despite the claimants attempt to characterize themselves as "creditors who seek payment based on a contract.").  The broad reach of section 510(b) is consistent with its purpose—to ensure that those claimants that elected to take greater risk based on the success of the debtors are subordinated to other creditors.  *Enron*, 341 B.R. at 164-66 ("[T]he issue of risk allocation is more integral to any policy analysis of section 510(b)").

71.    In *Enron*, this Court considered whether employees' decisions to retain and not exercise options in the debtors, in reliance on the debtors' fraudulent statements, constituted claims arising from the purchase or sale of securities. 341 B.R. at 150-59.  The court explicitly found that section 510(b) should be interpreted broadly and applied even if the claimants had not actually purchased or sold the stock.  *Id*. at 151.  The court also found that claims relating to fraud, including fraudulent inducement and retention claims, clearly fall within the scope of section 510(b).  *Id*. at

151-52.  The Second Circuit agrees that section 510(b) encompasses breach of contract and fraud claims.  *In re Lehman Bros. Holdings*, 855 F.3d at 471; *see also In re MF Global Holdings, Ltd.*, 2014 Bankr. LEXIS 3333, at *14-15; *In re KIT Digital, Inc.*, 497 B.R. at 181; *In re WorldCom, Inc.*, 329 B.R. at 14 ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of [s]ection 510(b)[.]").

72.      Claims for the return of CEL Token fall squarely within this and other courts' broad interpretations of section 510(b) and arise from the purchase of a security (here, CEL Token).  The subordination of CEL Token Deposit Claims and Other CEL Token Claims also fits squarely within the policy rationale behind section 510(b).  "Section 510(b) thus represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." *Rombro v. Dufrayne* (*In re Med Diversified, Inc.*), 461 F.3d 251, 256 (2d Cir. 2006) (quoting *In re Telegroup*, 281 F.3d at 141).  Claimants who elected to purchase or Earn in CEL Token bet on the Debtors and their success.  In contrast, creditors who elected to receive rewards in-kind, bet on other projects or, for example, a belief in Bitcoin as a store of value.  Those creditors accepted counterparty risk that the Debtors would not be able to return their coins (as ultimately proved true).  But, unlike the value of CEL Token, the value of their coins did not solely depend on the efforts and success of Celsius.

### D.      CEL Token Represents an Interest in the Debtors

73.      Importantly, Section 510(b) does not subordinate claims arising from payment obligations created by securities issued by a debtor, nor does it subordinate payment obligations that do not relate to purchases or sales of securities of a debtor.  For example, claims related to the

payment of principal and prepetition interest on a promissory note issued by a debtor are not subordinated under Section 510(b). *See In re MarketXT Holdings Corp.*, No. 04-12078 (ALG), 2008 Bankr. LEXIS 5038, at *8 (Bankr. S.D.N.Y. Jan. 3, 2008).  Similarly, claims relating to the Debtors' obligation to repay or return BTC, ETH or other cryptocurrencies not issued by the Debtors (*i.e.*, cryptocurrency other than CEL Token) under the Earn Program would not be subject to subordination under Section 510(b) even if accounts in the Earn Program are determined to be securities.  First, such claims are similar to claims for repayment under promissory notes. Moreover, such claims do not relate to the purchase or sale of a security of the Debtors insofar as BTC, ETH, and other cryptocurrencies are not securities of the Debtors (even if they are securities).[37]  The proposed Class Claim Settlement settles any dispute that non-CEL Token claims related to Earn account are subject to subordination.  *See The Official Committee of Unsecured Creditors' (I) Joinder to the Debtors' Reply and (II) Response to Objections to and Statement in Further Support of the Debtors' Disclosure Statement Motion and the Settlement Motion* [Docket No. 3226] at 13.

74.    Claims relating to CEL Token, even if such claims are associated with the Earn Program, are fundamentally different, as CEL Token is a security of the Debtors and any claim for the return of CEL Token is a claim related to the purchase or sale of that security.  Furthermore, they are different because any rights CEL Token holders may have against Celsius by virtue of their ownership of CEL Token are not claims but rather interests in the Debtor.  In determining whether rights against a debtor are claims, equity or other interests, bankruptcy courts look at the

---

[37]    Recently, in connection with overruling Mr. Mashinsky's motion to dismiss claim for securities fraud, the Supreme Court of New York in an unreported decision determined that the New York Attorney General met its burden in alleging that Earn accounts are securities.  *People v. Mashinsky*, No. 450040/2023, 2023 N.Y. Misc. LEXIS 3976(N.Y. Sup. Ct. Aug. 4, 2023). At this time, that decision is not a final judgment.  The Committee reserves all rights with respect to that determination.

economic substance of the transaction and the rights to which it gives rise. For instance, bankruptcy law provides that a court may recharacterize a claim as equity where the circumstances show that the transaction was actually an equity contribution. Courts in the Second Circuit rely on the *Autostyle Plastics* factors to determine whether to characterize an investment as debt or equity. *In re Live Primary, LLC*, 626 B.R. 171, 178 (Bankr. S.D.N.Y. 2021) (Glenn, J.) (citing *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747-48 (6th Cir. 2001). The relevant factors under that analysis are:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presences or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9) the extent to which the advances were subordinated to the claims of outside creditors;

(10) the extent to which the advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayments.

*In re Autostyle Plastics, Inc.*, 269 F.3d at 749-50.

75.    The "ultimate exercise" in evaluating the appropriate characterization of a purported claim "is to ascertain the intent of the parties." *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 544 B.R. 75, 103 (Bankr. S.D.N.Y. 2016). The power to characterize the true nature of the parties' asserted rights against a debtor is essential to the implementation of the Code's

mandate that creditors have higher priority in a bankruptcy than those with equity interests. *In re Live Primary, LLC*, 626 B.R. at 197-98. Here, most of the *AutoStyle* factors indicate that CEL Token is not a debt obligation of the Debtors.

76.    *First*, there is no maturity date or any obligation for Celsius to repay (in any form other than the return of CEL Token) CEL Token holders. *Second*, Celsius does not owe interest payments to CEL Token holders on account of their CEL Token holdings. *Supra* ¶¶ 19. *Third*, courts typically look at the identity of interest between the creditor and stockholder. Here, Celsius was the largest holder of CEL Token. Mr. Mashinsky was the largest shareholder of Celsius and the second largest holder of CEL Token. *Supra* ¶ 15. Mr. Leon held 15.71% of equity interests in Celsius and was another one of the largest holders of CEL Token. *Supra* ¶ 15. *Fourth*, because there was no repayment obligation, Celsius did not issue any security interest to CEL Token holders in connection with CEL Tokens. *Fifth*, the funds raised from the ICO and OTC sales of CEL Token were placed in Celsius's general operating accounts and used to fund Celsius's general operations. *Finally*, Celsius did not establish a sinking fund to make repayments on account of CEL Token. The *Autostyle Plastics* factors therefore demonstrate that CEL Token claims are interests in the Debtors. Even though accounts in the Earn Program and CEL Tokens may both be securities, they are fundamentally different and require different treatment under the Bankruptcy Code.

## III.    **CEL Token had No Value on the Petition Date**

77.    CEL Token should not be valued at the Petition Date price of $0.81 because the CEL Token market was not efficient and, on that date, CEL Token no longer had any utility or value.

A.       **CEL Token was not Traded in an Efficient Market**

78.       Although the price at which an instrument trades in an efficient market can be compelling evidence of its value, market prices are not always a true indication of value.  Market prices can be misinformed and/or artificially influenced by strategic and other uneconomic impulses.

79.       When considering whether a trading price reflects true market value, courts consider whether a market is "efficient."  *See U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 130 (Bankr. D. Del. 2010) (finding that trading prices of claims alone is not an accurate measure of value without also looking at the number of trades, the time period, the "openness" of the market, or other relevant factors).  Under the "Efficient Market Theory," espoused by Professor Eugene Fama, the observable market value of a company's securities can reflect the intrinsic value of a business.  The Efficient Market Theory is based on two assumptions: (1) each security's price reflects all relevant information, including the level and risk of a business's future cash flows; and (2) rational investors can immediately arbitrage away any market deviation from intrinsic value.[38]

80.       Here, the market for CEL Token both before and after the Pause was far from efficient.  As described above, prior to the Pause, the market for CEL Token was heavily manipulated by Celsius in an effort to inflate the price of the token.  *Supra ¶¶* 28-30.  Once Celsius stopped supporting the price of CEL Token before the Pause, the price of CEL Token sank precipitously to 28 cents.  Following the Pause, only approximately 5% of CEL Token existed outside of the Celsius platform and was potentially available to purchase.  Ferraro Decl. ¶

---

[38]    Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. of Fin. 383, 383 (1970).

18 .  Purchasers speculated on the future status of CEL Token and online forums were rife with individuals advocating a "short squeeze" to drive up CEL Token's price, like the GameStop phenomenon in January 2021.  Additionally, Celsius had shut down communications and no one knew the true issues that faced the Debtors, nor that Celsius was hopelessly insolvent.  The market price therefore does not provide a reliable indicator of CEL Token's actual value.  It defies logic to believe that the value of CEL Token—which was tied directly to the value of Celsius—would increase after Celsius had paused all withdrawals, particularly given Celsius's woeful insolvency.

### B.    CEL Token has no Utility

81.    As an ERC-20 token, CEL Token is programmed with basic "accounting" functionality to "transfer tokens from one account to another" and check "the current token balance of an account" or "total supply of the token available on the network." [39]  Aside from that limited "scorekeeping" functionality, CEL Token is not programmed with any utility functions.  Whereas many ERC-20 tokens can be used for voting or staking, CEL Token has no such functionality and completely lacks any decentralized governance model.  *Id.*

82.    Without Celsius, CEL Token has no independent functionality and therefore no utility.  It is just one of many tokens on the Ethereum blockchain.  With respect to a similar Ethereum token, the District Court for the Southern District of New York found that without the ecosystem to drive demand the applicable token (Kin) had "had no inherent value and will generate no profit."  *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d at 180.  Like Kin, without the Celsius ecosystem, CEL Token lacks any unique, independently meaningful functionality, and therefore has no utility or value.  At best, CEL Token is an inefficient, expensive abacus.

---

[39]  *See* Corwin Smith, *ERC-20 TOKEN STANDARD*, The Ethereum Foundation, May 20, 2023, https://ethereum.org/en/developers/docs/standards/tokens/erc-20/ (last accessed Sept. 2, 2023).

## **Conclusion**

WHEREFORE, for the reasons set forth herein, the Committee respectfully requests that this court (i) approve the CEL Token Settlement set forth in Article IV.B.2 of the Plan or, in the alternative, (ii) either (a) find that CEL Token Deposit Claims and Other CEL Token Claims are subordinated under Section 510(b) of the Bankruptcy Code, or (b) find that CEL Token should be valued at $0.00 or recharacterized as an interest under the Plan, and (iii) grant such other and further relief as may be just and proper.

*[Remainder of page intentionally left blank]*

Dated:  September 6, 2023            Respectfully submitted,
         Los Angeles, California

*/s/ Aaron E. Colodny*
_____

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
       sam.hershey@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Carolyn P. Gurland
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
       gregory.pesce@whitecase.com
       carolyn.gurland@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email:  kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of
Unsecured Creditors*