Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Debtors and Debtors in Possession*

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | )  Case No. 22-10964 (MG) |
| Debtors. | ) )  (Jointly Administered) |

**DECLARATION OF CHRISTOPHER FERRARO,**
**INTERIM CHIEF EXECUTIVE OFFICER, CHIEF**
**RESTRUCTURING OFFICER, AND CHIEF FINANCIAL OFFICER OF**
**THE DEBTORS, IN SUPPORT OF THE PROPOSED CEL TOKEN SETTLEMENT**

I, Christopher Ferraro, hereby declare under penalty of perjury that the following is true

and correct to the best of my knowledge, information, and belief:

1.    I am the interim Chief Executive Officer, Chief Restructuring Officer, and Chief

Financial Officer of Celsius Network LLC ("Celsius," and together with the above-captioned

debtors and debtors-in-possession, the "Debtors").  I joined Celsius on March 21, 2022.  I was

appointed as Chief Financial Officer on July 11, 2022, and I was appointed as interim Chief

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Executive Officer and Chief Restructuring Officer by the Special Committee of Debtor Celsius Network Limited on September 27, 2022.

2.      I am providing this declaration (this "Declaration") in support of the *Debtors' Brief in Support of CEL Token Settlement*, filed contemporaneously herewith.  I am over the age of 18, and if called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

3.      In my capacity as the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business, recordkeeping practices, financial affairs, and the ongoing restructuring efforts.  Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, discussions with other members of Celsius' management team, employees, and advisors, and my review of relevant documents and information concerning the CEL Token (as defined herein) that were provided to me in connection with this Declaration.  While I am generally familiar with the CEL Token and its history, I do not have independent knowledge regarding Celsius' internal policies regarding CEL Token or the specifics of the relevant transaction data.

**I.      CEL Token Overview.**

4.      In 2018, Celsius generated an ERC-20 token ("CEL" or "CEL Token")[2] on the Ethereum blockchain to utilize on, and raise funds for, its platform.  CEL Tokens are fungible; each CEL Token is the same and all CEL Tokens are interchangeable with one another.  The smart contracted associated with CEL Token limits the total supply of CEL Tokens to 700 million.  The contract provides that no more CEL Tokens can ever be created.

---

[2]     Terms capitalized but not defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319].

5.      CEL Tokens were described by Celsius to be a "a utility token." The use of CEL Token evolved over time, however, its three primary uses were to (i) provide Celsius account holders who entered into margin loan transactions discounts on the interest rates of such loans if they paid their interest in CEL Token, (ii) provide increased rewards (*i.e.*, interest) on account holder's Earn Account balances, and (iii) award access to certain features on the Celsius platform.[3] These benefits increased in tiers based on a user's CEL Token balance, encouraging account holders to receive rewards in CEL Token and to hold CEL Tokens in their Celsius wallets.



## More CEL. More rewards.
## It's not rocket science.

| Reward Status | CEL Ratio | or CEL Balance | Bonus Rewards | Loan Interest Discount |
|---|---|---|---|---|
| NONE | 0%–5% | 0 CEL | 0% | 5% |
| BRONZE | 5%–10% | 1 CEL | 10% | 5% |
| SILVER | 10%–15% | 1,000 CEL | 15% | 10% |
| GOLD | 15%–25% | 10,000 CEL | 20% | 15% |
| PLATINUM | 25%–100% | 25,000 CEL | 30% | 25% |

*The above table reflects the CEL Token benefit tiers as advertised on the Celsius website on the Petition Date.*

6.      Celsius did not have any payment obligations (repurchase, redemption, or otherwise) with respect to CEL Tokens. Although CEL Tokens deposited in Earn accounts earned interest or rewards in CEL Token, the CEL Token itself did not entitle a holder of such token to any payments. For instance, Celsius had no obligation to pay interest on CEL Tokens held on other exchanges or at a third-party exchange.

---

[3]      CEL Token Explained, Celsius, *https://celsius.network/cel-token-explained* (last visited September 5, 2023).

## II.    CEL Token Sales.

### A.    The Initial Coin Offering.

7.     In early 2018, Celsius offered 325 million CEL Tokens in an initial coin offering (including presale, the "ICO"), with the intent of raising a total of $50 million.[4]  To market the ICO, Celsius published a whitepaper in March 2018 (the "Whitepaper"), attached hereto as **Exhibit A**.  The Whitepaper presented Celsius' product roadmap and presented the CEL Token as a "utility token" that would be the core of the Celsius platform.[5]  The Whitepaper described how the proceeds of the ICO would be used to fund Celsius' business plan and operations and stated that any of the 325 million CEL Tokens allocated to be sold in the ICO that were not sold would be "burned" (*i.e.*, destroyed).[6]  According to the Whitepaper, CEL Tokens minted were to be allocated:  (1) 40 percent to the presale, (2) 10 percent to the public sale, and (3) 50 percent to treasury to use in connection with new loans and to incentivize team members, partners, and advisors.[7]

8.     In total, Celsius sold approximately 203 million CEL Tokens and raised approximately $32.8 million through the ICO.[8]  It is my understanding that these proceeds were not segregated from any of Celsius' other funds.

9.     After making all sale distributions, approximately 121.33 million of unsold CEL Token remained.  After the ICO, an entity related to Alex Mashinsky ("Mashinsky"), AM Venture Holdings, Inc. ("AM Ventures"), entered into a purchase agreement providing for the purchase of

---

[4]    *See* Whitepaper at 12.

[5]    *See id.* at 3, 6–8.

[6]    *See id.* at 12.  In addition to the 325 million tokens to be offered through the presale and ICO, Celsius also planned to place 325 million tokens in a smart contract that would be released in 25 million-token increments depending on the average price of CEL token on the secondary market. *Id.*

[7]    *See id.* at 14.

[8]    *See* CELSIUSNETWORK_00480591, Celsius Investor Presentation (Feb. 2019) (representing that $32.8 million was "net" raised from the ICO).

"up to" 117 million of the unsold CEL Tokens at $0.20/CEL (the "AMV Purchase Agreement").

A copy of the AMV Purchase Agreement is attached hereto as **Exhibit B**. Celsius' records reflect

that the transactions contemplated by the AMV Purchase Agreement were never consummated,

and the agreement was ultimately terminated.

### B. The Unsold Tokens.

10.      Notwithstanding the representations in the Whitepaper that any unsold CEL Tokens

would be "burned," on April 7, 2020, the Board (consisting, at the time, of Alex Mashinsky,

S. Daniel Leon, and MF Partners LTD) determined not to burn the 117 million unsold CEL Tokens

and to instead place them in a segregated account only for use in "times of great financial need"

and subject to the requirement that "any transaction involving these tokens must be specifically

approved by the Board."[9]

11.      On December 31, 2020, Celsius included the 117 million of unsold CEL Tokens as

"Auxiliary Treasury" on its balance sheet with a mark-to-market valuation of $639 million.

The 117 million CEL Tokens remained in a segregated account at Celsius as of the Petition Date.[10]

---

[9]      *See* Full Minutes of the Board of Directors of Celsius Network Ltd. (April 7, 2020) (the "AMV Backstop Tokens Board Minutes"), attached hereto as **Exhibit C**.
[10]     See Final Examiner Report at 89.

12.    Below is a timeline of key events and official filings related to the ICO:



13.    The SEC filings made with respect to the CEL token are attached hereto as **Exhibit D** and **Exhibit E**, respectively.

### C.    Over-The-Counter Trading.

14.    Following the ICO, Celsius continued to sell CEL Token directly to customers through its "over-the-counter" ("OTC") trading desk.  Customers would pay cash or any cryptocurrency supported on Celsius' platform and receive CEL Token in exchange at prices agreed on by the parties.  Cash received from OTC CEL Token sales was deposited into Celsius' main bank account and used by Celsius for general corporate purposes.  Customers who purchased CEL Token through the OTC trading desk also executed subscription agreements with Celsius.  Examples of those purchase agreements for U.S. and international customers are attached hereto as **Exhibit F** and **G**.  The applicable purchase agreements provided that CEL Tokens sold through the OTC transactions were "locked" and could not be resold for a year following their purchase.

15.    Celsius also continued to market CEL Token to investors following the ICO. For example, in June 2020, Celsius presented a slide deck to potential investors that described that "CEL Reflects the Success of Celsius."  That presentation is attached hereto as **Exhibit H**.

### D.    CEL Token Holdings and Transactions.

16.    Celsius account holders could purchase CEL Tokens from Celsius, elect to receive CEL Tokens through Celsius' rewards program in lieu of in-kind rewards, receive CEL Tokens through promotions on the Celsius platform, and trade CEL Tokens in secondary transactions on cryptocurrency exchanges.[11]  Celsius also offered CEL Token to employees as part of their compensation packages, with amounts of CEL Token vesting or unlocking based on the passage of time or CEL Token achieving certain price targets for a period of time, or a combination of the two.

17.    Company records reflect that although Celsius had enough CEL tokens to satisfy its liability to Account Holders, there were no internal measures created for the purpose of segregating CEL Tokens related to any of these transactions from Celsius' aggregator wallets (*i.e.*, tokens and cash proceeds were generally comingled).  As of the Petition Date, Celsius' liability to approximately 258,000 Account Holders totaled to an aggregate of 254,000,000 CEL Tokens.  On the Petition Date, Celsius held approximately 653,967,000 CEL Token, including Account Holder deposits, in its wallets and treasury, and Celsius' co-founders and their related entities and family members had the following CEL Token account balances:

---

[11]    *Id.*  The Celsius team secured agreements with certain centralized cryptocurrency exchanges to list CEL Token to be traded on those exchanges, including FTX and Liquid Exchange.  Celsius also engaged third-party institutions and lent such institutions CEL Token to make a market for CEL Tokens.

| Individual | Position | CEL Token Balance | | |
|---|---|---|---|---|
| | | Earn Account | Custody Account | Borrow Account |
| Alexander Mashinsky[12] | Co-Founder, Director, and Former CEO | 57,167,763 | 13,114 | N/A |
| Schlomi Daniel Leon[13] | Co-Founder, Director, and Former CSO | 898,811 | 536 | 15,027,916 |
| Hanoch "Nuke" Goldstein | Co-Founder and Former CTO and President of Labs | 66,097 | 10,806 | 9,628,852 |
| Roni Cohen-Pavon | Chief Revenue Officer | 85,678 | N/A | N/A |

18.     As of the Petition Date, approximately 94% of the total available supply of CEL

Token was held in cryptocurrency wallets owned or controlled by Celsius, which Celsius froze.

Except in connection with withdrawals from the Custody Program that have been approved by this

Court, Celsius has not purchased, sold, or transferred CEL Token since the Petition Date.

### III.    CEL Token Buybacks and the Flywheel.

19.     As early as 2018, Celsius began repurchasing CEL Tokens on the secondary

market, with the stated intention of repurchasing the amount necessary to cover weekly rewards.[14]

These repurchases or "buybacks" were both contemplated by the Whitepaper and announced by

Alex Mashinsky in an AMA—described as a means of fueling Celsius' "flywheel" business model.

---

[12]  Mr. Mashinsky owns 80.7% of the equity of Celsius Network, Inc.

[13]  Mr. Leon owns 15.7% of the equity of Celsius Networks, Inc.

[14]  *See* Celsius AMA, YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ ("[A]bout 48% of the community said I don't want Bitcoin, I don't want Ethereum, I want you to give me CEL token instead. I believe in the CEL token.  So we then have to go and buy the CEL token on exchanges with BTC, with ETH, and deliver that CEL token to the community.  That's what we've been doing for about a year."); Celsius AMA, YouTube (Dec. 31, 2021), https://www.youtube.com/watch?v=miXgxNqwFag ("Over 1,700 people already are accredited to earn in CEL . . . that represents $3.8 billion that are going to hopefully switch from earning in-kind to earning in CEL . . . which will require us Celsius to buy at least twice as much as many CEL tokens every week. . . .  Celsius is the only one that goes to market and buys its own token every week based on how much was basically how many people chose to earn in CEL.").

20.    The Celsius "flywheel" model hypothesized that as more individuals lent Celsius their cryptocurrency for large-scale lending and rehypothecation, the value accrued from that



*The Celsius "Flywheel"*

lending could be paid to account holders in CEL Token.  By paying rewards in CEL Token, Celsius could increase demand for (and, by extension, the price of) CEL Token, which in turn would fuel customer growth, demand for lending services, and ultimately, profit.  This flywheel would theoretically continue *ad infinitum*, driving the growth of Celsius.

21.    At least initially, Celsius represented that it only repurchased CEL Tokens utilizing interest earned from its rehypothecation efforts as necessary to satisfy obligations to account holders who elected to earn "rewards" (*i.e.*, interest) in CEL Token.[15]  Almost immediately, however, records reflect that Celsius began repurchasing CEL Tokens in amounts greater than the proceeds earned from rehypothecation, using buybacks as a means of supporting the price of CEL Token.[16]

---

[15] *See* Celsius AMA, YouTube (June 14, 2018) https://www.youtube.com/watch?v=P89WfneySwE&t=60s ("We've . . . started earning interest and started buying some CEL tokens on the open market. . . . you can do simple math look at basically how much interest we're earning by looking at how many coins we bought"); Whitepaper at 34 ("The Celsius Token (CEL) is converted from fees paid by borrowers (margin traders).  This fee, although charged in fiat, is converted to CEL tokens by the Celsius service and distributed to the lenders' wallets as daily interest . . . Celsius releases CEL tokens from an internal cache according to the value of the fees and commissions.  If needed, CEL tokens may be purchased on open markets.").

[16] *See* CELSIUSNETWORK_00278619, Slack messages between Urata-Thompson and Treutler (March 21, 2021).

22.    Following investigation, I have become aware that Celsius' buyback strategies included placing standing purchase orders to protect the price of CEL Token from decreasing in the event that market prices dropped (*i.e.*, Celsius would put in place a standing purchase order to drive up purchase activity in the event the price of CEL Token dipped to certain levels). I learned that Celsius also coordinated buybacks to occur contemporaneously with Celsius' "Ask Mashinsky Anything" online Q&A sessions to increase consumer confidence and demand.[17]  Despite the dramatic expansion of the buyback program, Celsius continued to market the buybacks as only occurring in connection with the payment of account holder rewards.[18]  Indeed, as late as January 2022, Celsius explicitly represented that Celsius did not decide how much CEL Token it purchased from the market (impliedly because the amount of buybacks is determined by the interest paid to account holders).[19]  The buyback operations expanded by over 400% between 2019 and 2020, and buybacks continued until shortly before the pause in 2022.  In total, Celsius repurchased over 195 million CEL Tokens for over $540 million.

**IV.    CEL Token Burn Program.**

23.    Celsius' burn program went hand-in-glove with the CEL Token buybacks.  Data analysis reveals that by September 2021, Celsius' buyback operations grew so large that Celsius was at times the only buyer in the market.  In October 2021, Celsius announced the burn program,

---

[17]  *See* CELSIUSNETWORK_01721882, e-mail from Treutler to Mashinsky, Leon, Urata-Thompson, and others (May 31, 2020) ("We made a first small purchase of (82k of the 482k CEL) to test the water a few minutes after the AMA started . . . the community saw the large buy volume during the AMA & was loving the AMA even more . . . now every new buy orders coming in from our community (that was motivated by the awesome AMA) drove the price a bit higher."); *see also* CELSIUSNETWORK 00768405, Slack messages from Johannes Treutler to Connor Nolan (Oct. 30, 2020) (discussing plans to purchase CEL twenty minutes after the AMA begins and explaining that doing so will make "people start searching their credit card to buy more").

[18]  *See* Celsius AMA, YouTube (Dec. 10, 2021), https://www.youtube.com/watch?v=X304U3isWzg ("We purchased, just in 2021, we purchased $421 million worth of CEL Token . . . Obviously most of this is [] to pay the community, to pay the people who earn in CEL.").

[19]  *See* Celsius AMA, YouTube (Jan. 7, 2022), https://www.youtube.com/watch?v=6631ORa2v4M ("Celsius does not decide how many CEL tokens to buy, and then how many of them to burn.  You guys decide.").

whereby Celsius would buy and burn CEL Tokens equal to 10% of the total CEL Token rewards paid each week.[20]  This amount was advertised as formulaic—"Celsius does not decide how many CEL Tokens to buy, and then how many of them to burn.  You guys decide [by earning rewards in CEL Token]."[21]  Celsius periodically provided announcements concerning the amount of CEL Tokens burned in connection with this formula.  For example, on May 20, 2022, Celsius announced:  "10% of the total number of CEL bought in the market this week, to pay Celsians as rewards, has been burned.  142,068 is now permanently removed from the supply."[22]

24.     A review of Celsius' records reveals that the amount of CEL Token repurchased and burned dwarfed the actual amount of CEL Token purchased through the repurchase program. In 2022, Celsius burned 2.1 million CEL Token, which under the formula would have indicated Celsius paid 21 million CEL Token as rewards and repurchased 23 million CEL Token in total— Celsius actually bought back 79 million CEL Tokens in 2022.

25.     The CEL Token repurchasing program came to an end on May 12, 2022, when, after the Terra/Luna collapse, Celsius held only $1.6 million in the stablecoin needed to repurchase CEL Token.

**V.     Conclusion.**

26.     It is difficult to determine the true value of CEL Token, if any, at any given time, due to the wide variety of actions taken to regulate the supply of CEL Token and otherwise influence the price of CEL Token.  While CEL Token was marketed as a "utility token," the token

---

[20]  *See* Celsius AMA, YouTube (Dec. 31, 2021), https://www.youtube.com/watch?v=miXgxNqwFag.

[21]  *See* Celsius AMA, YouTube (Jan. 7, 2022), https://www.youtube.com/watch?v=6631ORa2v4M.

[22]  *See*  @CelsiusNetwork  Twitter  post  from  May  20,  2022  (archived), https://web.archive.org/web/20220520174834/https://twitter.com/CelsiusNetwork/status/152770782394509721 6.

has no go-forward utility, as the Celsius platform will be retired following distributions in these chapter 11 cases.[23]

27.    When Celsius' buyback program ceased, the market reevaluated the price of CEL Token.  On May 12, 2022, Celsius made its final CEL Token purchase, and the price jumped from $0.57/CEL to $0.90/CEL.  Thereafter, the price of CEL Token began to fully collapse, reaching $0.28/CEL on June 12, 2022, the day of the pause.  Between the Pause and the Petition Date, the market price fluctuated, settling at $0.81/CEL on the Petition Date.

*[Remainder of page intentionally left blank.]*

---

[23]    *See* Plan at Art. IV.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  September 6, 2023

/s/ *Christopher Ferraro*
Name:  Christopher Ferraro
Title:    Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of Debtor Celsius Network LLC

## <u>Exhibit A</u>

**Whitepaper**



**Deposit coins. Borrow cash against your cryptocurrency. Earn interest.**

# The Celsius Wallet



The Celsius Wallet will be one of the only online crypto wallets designed to allow members to use coins as collateral to get a loan in dollars, and in the future, to lend their crypto to earn interest on deposited coins (when they're lent out).



## Crypto Collateral

Members will be able to borrow USD against their crypto holdings in their wallet which will be used as collateral. Our goal is to allow anyone who's in need of cash to easily borrow from the Celsius platform without having to sell their crypto holdings. The ability to take loans in dollars against your cryptocurrency will be available after the Celsius tokens are issued.



## Crypto Interest

In the future, through the Celsius Network, cryptocurrencies deposited by members into their Celsius Wallet will earn POS fees and be available on the network for immediate borrowing and shorting for a fee. Coins that are lent from member wallets or used as POS collateral will begin to accrue interest in the form of Celsius Tokens (CEL), allowing members to earn up to 9% annual interest*.

* This functionality is not yet available and will be rolled out in future. This functionality may be conditional on regulatory approvals, which Celsius will obtain as a condition for rolling out these features.

Celsius Network: Borrow cash. Earn interest.

# Introducing: The Celsius Token (CEL)



In conjunction with the launch of the Celsius Crypto Wallet, we're excited to introduce the Celsius Token (CEL). After our Token Generation Event, members will be able to use their CEL tokens to secure access to loans in dollars using their crypto as collateral. In the future, members who deposit coins in their Celsius Wallets will also be able to earn CEL Tokens as a reward for lending to the network.

We're designing CEL (ERC20 Token) to be the backbone of the Celsius Network, creating a value-driven lending and borrowing platform for all our members.

The Celsius Token (CEL), at the moment of the Token Generation Event (TGE),  will have utilities including:

- **the ability to become a member in the Celsius platform and community**
- **the ability to deposit your cryptocurrencies in the Celsius wallet**
- **the ability to apply for dollar loans with cryptocurrencies as collateral**
- **the ability to pay interest on these loans at a discount**

In the future, the CEL token will have additional utilities including:

- **allowing members to lend cryptocurrencies in order to gain interest**
- **achieving seniority in the platform which will impact the interest rate gained**
- **get interest rewards on cryptocurrencies lended**



Celsius' community will continue to grow as more and more people are able to get loans in dollars using their crypto as collateral or as they lend their unused coins as credit to other members. Crypto assets holders can get more CEL tokens the more they loan and borrowers pay less to hedge their positions. As more people join the Celsius ecosystem, the more everyone benefits.

# Banking is Broken



Celsius is driven to create a financial platform where your interests are our top priority.

**1**

## Sometimes You Just Need Cash

Members may be holding crypto, but now they need to buy a car or pay down expensive credit card debt. Unfortunately, most car dealerships or banks still don't want cryptocurrency. We believe crypto assets hold real value, and it should be easy for crypto holders to leverage this value to borrow cash.

### Crypto Collateral = Cash in Hand

We want to make borrowing cash a whole lot easier. Celsius' goal is to allow its members to use their crypto holdings as collateral in order to secure low interest loans in dollars. Rather than selling their crypto (pay taxes and forfeit potential future gains), with Celsius they can leverage their cryptocurrency to borrow the cash they need today, while still maintaining their crypto portfolio for future value.

**2**

## Wallets Without Interest, Nobody Wins

Anyone with cryptocurrency sitting in cold storage or on some exchange or wallet, is earning exactly zero interest. We believe there should be a way for crypto holders to HODL coins while still leveraging their crypto assets and helping other crypto holders.

### Crypto Interest

By depositing coins on the Celsius Network, crypto asset holders will be able to earn up to **9%** interest for their lent coins. We plan to offer a large array of lending options, from one-day to one-year contracts, all with highly competitive interest rates. With Celsius, members will be able to easily earn interest on their crypto assets the same way they earn on the savings in the bank - but with much better rates.

# Banking is Broken



**3**

## The 99% Not The 1%

Most financial institutions still don't get cryptocurrency. They want to short the market because they're blinded by being so late to the party on this one. Right now, there's no good place for them to go to bet against the cryptocurrency market other than expensive futures markets like the CME and centralized exchanges.

## Sure, Go ahead and short

Hedge funds, family offices and crypto funds still want to play in the world of cryptocurrency. Fortunately for us, they are willing to pay high fees to do so, so many of them want to short the market. After the Token Generation Event is completed, we will begin working on our platform that will allow us to make the most of their greed by taking up to 50% cash deposits and charging them interest when they hedge. This lets us pass most of the earnings back to the community and lend more dollars to the rest of the Celsius community.

Cryptocurrency prices are volatile, and we get that. Like any market, prices are going to jump up and down due to a number of factors. While many of us are excited about the rising valuations, some believe many coins are overvalued and are interested in shorting. With Celsius, we will make it easy for those people to borrow coins from our community and short them on the market. Celsius will never take a position or trade against its coin holders or Lenders. Our interests are aligned with our lenders to charge the borrowers looking to short as much as possible to grow the community.

Members who want to borrow dollars against their crypto coins will be charged interest below 10% to further grow the community and invite outside people to buy more crypto.



# Let's Get Into the Tech

"Our platform will be a unique combination of multi-block-chain nodes, auto trading on multiple exchanges and a high-end user experience. All this is orchestrated by smart predictive algorithms designed to reduce rates, maximize profits to our members, mitigate risks, and maintain the safety and growth of the ecosystem."

Nuke Goldstein — Co-Founder and CTO

## Building Every Day

We're not thinking about a product, we're building one. Our team of 10 plus developers has already produced a working prototype of both our mobile wallet for lenders and our shorting platform for borrowers. Both products are now being beta tested and we plan for our initial public release in Fall of 2018.



**2017**

**Q2-Q3-2017**
- Concept formulated by Alex Mashinsky
- Initial team assembled

**Q3-2017**
- Version 1 of Whitepaper is released
- Tech team hired and development begins
- Version 1 of Techpaper released

**Q4-2017**
- Public announcement at BlockCon
- Private presale begins

# Road Map



## 2018

○ **Q1-2018**
- MVP of wallet prototype released
- Redesign of website goes live
- Version 2 of Whitepaper released
- Version 2 of Techpaper released

○ **March 15-22 2018**
- Public crowdsale

○  **Q2-2018**
- Phase 1 of Celsius Wallet app released (will allow members to deposit their crypto assets in wallet to use as collateral for loans)
- Expansion of Alt Coins (we will be gradually including more of the top 20 cryptocurrencies for use in our wallet)

○ **Q3 2018**
- Phase 2 of Celsius Wallet app to be released (1st USD loans to be issued, with member bank accounts linked to wallet and loans to be paid back in USD or CEL)

○ **Q4-2018**
- 3rd Party Microlender integration
- Phase 3 of Celsius Wallet (further integration of new coins, users will begin earning interest)

# Road Map





**2019**

**2019**

- Multiple blockchain type nodes to support top 20 coins
- Trading on multiple-exchanges
- Smart algorithms to manage risk
- Integration with market trading tools in order to short
- Implement Ethereum Plasma Proof-of-Stake distributions to Celsius members

# Technical Specifications



## Security and Risk

Celsius is building the platform with security at its core. We will use bank-grade security to keep our members' assets and data safe. From multi-factor authentication, to encryption, to private-key double vaults, and more. Our software is designed with security in mind.

Crypto assets will be distributed among several wallets and top exchanges. In addition, we will store a cold wallet treasury to provide last-resort insurance in case of a catastrophic event. We will also employ white-hat hackers and third party cyber security solutions to provide a continuous cover layer of audit and protection.

## Community Support

We're here for the cryptocurrency community, our goal is to support the community by providing them with access to loans using their crypto holdings as collateral and to also provide the community with a way to earn interest on their crypto assets.

## Lending Protection

Members who lend coins on the Celsius Network will be protected by the Celsius lending protection pool (funded by our fees). Any defaulted lending or coins lost will be insured through our protection pool and coin values will be restored immediately. The Celsius wallet will show our cash deposits every day which will also be audited by an outside accounting firm several times a year.

## Compliant & Legal

We adhere to all applicable rules and legal guidelines. We will be working with top-of-the-line financial institutions, and will require all members of the Celsius community to go through KYC (Know Your Customer) in order to comply with anti-terrorism and anti-money laundering (AML) laws.

## Our Fees

Celsius' model aims to protect its token holders and always do what is in their best interest by providing the most competitive rates for dollar borrowers, and in the future, token holders. We will take a variable fee based on the amount of interest charged in each borrowing transaction. Our members will always receive a minimum of at least 5% annual interest on any lent crypto currencies. We will not charge account or transaction fees.

# Celsius' Token Economics



We're building the Celsius Platform to allow our members to deposit, lend and borrow a variety of different crypto assets. The Celsius Token (CEL) will be key for users who wish to lend or borrow.

CE are a platform utility token that is rewarded to crypto holders in the Celsius Wallet as interest on their coins. That interest is generated from fees, in CEL tokens, collected from institutional traders who use the assets pool. Celsius has a non-for-profit model where proceeds are used to cover all costs and membership growth, while most are distributed back to the members community.

When the token is issued, members who own CEL tokens will be able to apply for and receive dollar loans against their current holdings. In addition, users who accept the loan may pay the interest in CEL tokens for a discount.



Loan services will be provided as part of the Celsius ecosystem, and not necessarily by Celsius itself.

# Celsius' Token Economics



Our dual-sided system will create a supply and demand cycle between institutional traders, such as hedge funds, who seek to borrow coins and require the CEL token to pay the fees and commissions; and the crypto holders around the world who receive these tokens as interest on their lent coins. This is a much-needed fundamental service which we believe will help to grow and nourish the crypto-economy.

## Ok Great, But Do You Really Need a Token?

Yes, we do. Our lending and borrowing model requires a blockchain and an open ledger technology, it also requires consensus and a global footprint of coin holders in order to really gain traction and complete our mission.

Any loan we issue may be collected from thousands of individual coin holders which may be switched at any time. Only a smart contract capable of tracking and paying in micropayments can handle such complexity. So while we will be starting with allowing our members to borrow dollars against their crypto, our long term vision is a 2-sided marketplace for lending and borrowing that will utilize:

**Open Ledger** :  With the Celsius Platform millions of transactions will be transacted between borrowers and lenders and an open ledger is the key to transparency on our platform.

**Consensus** : Whenever we issue credit or enable members to borrow coins we will employ the consensus given to us by our members.

**Global Footprint** : We are building Celsius to be a global decentralized marketplace that allows lenders from anywhere in the world to earn interest regardless of their base currency or the local laws they operate under.

# Crowdsale Begins March 15th 2018





| | |
|---|---|
| Symbol<br>**CEL** | Category<br>**Finance** |

Platform
**ERC20**

Crowdsale
**March 15th 2018**

Token Supply**
**650,000,000**

Tokens for Sale*
**325,000,000**

Accepted Currencies
**ETH, BTC & USD**

Presale Token Price
**$0.20**

Crowdsale Token Price
**$0.30**

DELIVERY DATE
We plan to deliver all contributions within a few weeks of the close of the crowdsale

Soft Cap
**$15,000,000**

Hard Cap
**$50,000,000**

*Any excess tokens will be burned after the token sale.

**At launch, there will be 650 million tokens (or slightly less as any tokens not sold will be burned). We are selling 50% of the tokens (325 million) between the presale and public sale, and will distribute tokens shortly after the close of the public sale.

The additional 50 million tokens will be placed into a smart contract, with 25m tokens being released to the Celsius Treasury only if the CEL Token price in the secondary market remains above an average of $1.50 for ten (10) days (meaning the price of CEL has increased 5x from the time of the Crowdsale).  And an additional 25,000,000 CEL Tokens will be released only if the CEL Token price in the secondary market remains above an average of $3.00 for thirty (30) days (meaning the price of CEL has increased 10x from the time of the Crowdsale).

A couple of things to note about these additional tokens: a) they are released directly to the treasury and not to any individual or exchange and b) they will be used predominantly to fund new loans (81%) with the remaining 19% used to incentivize new team members as we grow.

Tokens placed into the Treasury will be used for new loans, and not sold off immediately upon delivery. Rather, Celsius would only sell off small portions from Treasury to meet the demand for dollar loans on an as-needed basis (i.e. as our USD supply needs topping up to meet loan demand).

# Crowdsale Begins March 15th 2018





## PLATINUM LEVEL

**$0 – $5,000,000***

40% CEL Bonus

**SOLD OUT**



## GOLD LEVEL

**$5,000,000 – $10,000,000***

35% CEL Bonus

**SOLD OUT**



## SILVER LEVEL

**$10,000,000 – $15,000,000***

30% CEL Bonus

**SOLD OUT**



## BRONZE LEVEL

**$15,000,000 – $35,000,000***

20% CEL Bonus

**SOLD OUT**





## Crowdsale Token Price

### $0.30

**$100 Minimum**

Current bonus valid as of February 5th, 2018. Bonus period is subject to end at any time. Please check our website for the most recent information.

*Estimated bonus allocations

# Crowdsale Begins March 15th 2018





## How We're Going to Use the Money

- Loan Reserves: $20,209,500
- Operations + Management: $6,487,000
- Research + Development: $5,988,000
- Legal + Regulatory: $5,489,000
- General + Administrative: $5,489,000
- Sales + Marketing: $4,241,500
- Lenders' Insurance Pool: $1,996,000

## Token Allocation

- Presale: 40%
- Crowdsale: 10%
- Treasury: 27%
- Team: 19%*
- Partners: 2%
- Advisors: 2%



*Employee tokens are held in 3 allotments. The first allotment will be unlocked six months after the Token Generation Event. The second allotment of 4.75m tokens will be released only if the token price reaches an average of $1.50 for ten (10) days (meaning the price of CEL has increased 5x from the time of the Crowdsale),  and the 3rd allotment of 4.75m tokens will be released only if the average price remains $3.00 for thirty (30) days (meaning the price of CEL has increased 10x from the time of the crowdsale).

# About Celsius



We've built companies from the ground up, served hundreds of millions of users and completed multiple exits for billions of dollars (including an IPO).

This isn't our first rodeo. Our team of experienced entrepreneurs knows how to take a concept from ideation to full execution on a global scale.

Our founder, **Alex Mashinsky**, has filed over 30 patents including the original patent on VoIP technology.  He previously founded several multi-billion dollar businesses including Arbinet (IPO 2004), Transit-wireless and GroundLink. A cryptoholder since 2013, Alex serves as an advisor and investor to several Blockchain companies including Sirin Labs, MicroMoney and Ties Network.

## Our Mission

We are building a community of borrowers and lenders, with the aim of legally replacing Wall Street with blockchain, and allow all of our members to benefit from our ecosystem. Traditional Financial Institutions should no longer control the flow of credit to people across the world. We want to use a consensus-based, Proof-of-Stake approach to allow the Celsius community to borrow, lend and vouch for each other, creating a truly win-win-win self-governed solution for people involved in every step of the credit ecosystem.



Celsius Network: Borrow cash. Earn interest.

15



# Our Mission

### Main Street Takes Wall Street

**With cash, banks make rich people richer. With crypto, let's not make the same mistake.**

We are building a community of borrowers and lenders, with the aim of legally replacing Wall Street with blockchain, and sharing the profits amongst our members. Through our community pool, members will be able borrow cash using their crypto assets as collateral after the crowdsale and, in the future, earn interest on their deposited coins (when lent).

### Serious & Sustainable

The **Celsius Network** is on a long-term mission. We are conducting a crowdsale in order to achieve our goals: a decentralized network of good actors who will be supported with loans and credit. We want people to contribute to our crowdsale who not only want to get loans in dollars using their crypto as collateral but who also believe in our mission to expand the crypto community and the future of credit on the blockchain.



**Over the past 25 years, we invented and built trusted marketplaces for advertising, VoIP, electricity distribution, music, information exchanges and other markets.**

# Executive Team





## Alex Mashinsky
### Founder and CEO

Alex is a serial entrepreneur and founder of seven New York City-based startups, raising more than $1 billion and exiting over $3 billion. Alex founded two of New York City's top 10 venture-backed exits since 2000: Arbinet, with a 2004 IPO that had a market capitalization of over $750 million; and Transit Wireless, valued at $1.2 billion.

Over 30 patents have been issued to Alex, relating to exchanges, VoIP protocols, messaging and communication. In fact, Alex has a foundational patent on VoIP (Voice Over Internet Protocol) technology dating back to 1994 and is now working on MoIP (Money Over Internet Protocol) technology.

Alex has received numerous awards for innovation, including being nominated twice by E&Y as entrepreneur of the year in 2002 & 2011; Crain's 2010 Top Entrepreneur; the prestigious 2000 Albert Einstein Technology medal; and the Technology Foresight Award for Innovation (presented in Geneva at Telecom 99).

As one of the pioneers of web-based exchanges, Alex authored patents that cover aspects of the Smart Grid, ad exchanges, Twitter, Skype, App Store, Netflix streaming concept and many other popular web companies. Additionally, Arbinet's fundraising story was featured as a case study in 2001 by Harvard Business School.

# Executive Team





Daniel Leon is a business and social entrepreneur with a proven track record of growing early-stage companies and building organizations from the ground up. Daniel has co-founded and led multiple companies and not-for-profit organizations.

Before Governing Dynamics, where he is a managing partner, he was CEO of Atlis Labs, a venture-backed local discovery platform powered by real-time customer referrals. Prior to that, Daniel served as CEO of Beyon3D and chairman of HereO. He was also general manager, of GroundLink, which raised more than $30 million in funding during his tenure.

He started his career as vice president with the Gallup Organization. Daniel holds a degree in Economics from Brown University. He splits his time between New York and Tel Aviv.

**S. Daniel Leon**

**Founding President & COO**

Fazli was at Dow Jones before spending the majority of his career at Bloomberg in various engineering leadership roles where he led a large group spanning multiple continents and timezones. While at Bloomberg, Fazli streamlined operations by implementing agile development methodologies and moving legacy software systems to open-source environments. He also scaled up Tradebook's US Equity matching engine which included a smart order router to achieve 150X greater order flow.



**Syed Fazli**

**CTO**

# Executive Team



Nuke is a seasoned software developer, architect, innovator, and entrepreneur in cutting-edge technologies. His career ranges from image processing and AI to IoT and blockchain.

Prior to his work on the Celsius crypto assets lending and borrowing platform he designed P2P credit protocols using distributed storage and smart-contracts

Nuke was the CEO and founder of Sevenpop, a leading interactive music technology provider to hundreds of hotels and shopping centers across Israel.

Nuke holds a B.Sc. in computer science from the Technion in Haifa (Israel's most elite Institute of Technology). He also has black belts in Kempo Karate and Combat Ju-Jitsu. In addition, he has been awarded a grant by the National Science Foundation.



### Nuke Goldstein
### EVP of Engineering & Development



### Keith Baumwald
### CMO

Keith has spent his career as a full-stack marketer working for startups, agencies and large corporates. Before joining Celsius, he spent the past three years consulting for startups in London, Berlin and New York, primarily focused on the financial, travel and SAAS sectors.

In his last role with Travelex, Keith was named Global Head of R&D where he created and developed a new division within Travelex looking at emerging technologies like the blockchain and cryptocurrency

Keith discovered cryptocurrency in 2011 and began attending meetups in New York City and Japan. This lead to him contributing to Ethereum's crowdsale in the summer of 2014, making him our team's oldest HODLer of Ethereum. Keith also served as a Peace Corps volunteer in Uzbekistan for two years shortly after finishing university.



# Executive Team

Ms. Bacalu has has over 18 years of experience in growth companies across technology, communication real estate and financial services. Prior to joining Celsius Mrs. Bacalu served as Chief Financial Officer of Kalyx, a fully integrated real estate development company, leading multi state provider of commercial and industrial space to the highly regulated cannabis industry. Prior to that, from 2012-2015 Ms. Bacalu served as Chief Financial Officer of Sapir Organization, a leading real estate holding and development company Prior to Sapir, from 2009-2012, Ms. Bacalu was a Vice President of Finance and Chief Financial Officer of DoubleVerify and Peer39, both advancing tech companies at different stages of development. During this time, she was also an active member of the IAB (Interactive Advertising Bureau) CFO council.



**Ronit Dvir Bacalu**
**CFO**



Liz advises growth stage technology companies on a spectrum of strategic business development initiatives. For over two decades, she has consulted with founders, partners, and investors to create scalable sales and marketing structures.

Prior to entering the blockchain and crypto arena, she worked with a variety of technology and BPO companies in accessibility/assistive technology, VoIP, publishing, biotech, and healthcare. She is a current Activator at SheEO, a global initiative designed to radically transform the way investors finance and support female entrepreneurs; she has served on the boards of several startup ventures. Liz has a BA in English from Barnard College, Columbia University.

**Liz Rabban**
**VP Sales**

# Tech Team



### Mališa Pušonja
### Blockchain Architect Lead

Mališa has been a Front-end and Back-end Full Stack PHP Angular developer working on new features. He used the virtual environment, e.g. Puppet/Vagrant, and continued his professional career as a Full Stack Lead Developer at Vibe Network, working on AngularJS/JQuery, Ansible, CSS/HTMLparallax sites), MySQL/MongoDB, PHP/NodeJS, RabbitMQ, and Varnish.

Mališa then turned his attention towards the blockchain, where he built Lemon e-mail, the world's first encrypted and decentralized e-mail service, using Ethereum & IPFS decentralized platforms.

Mališa's passion for Philosophy, Data Science and Engineering have helped him become a leading, international Blockchain Expert.

### Stevan Koprivica
### Lead Backend Engineer

Stevan is in web development for more than 20 years, from the time of altavista. com, angelfire.com till nowadays. He witnessed <blink> and <marquee>, first browser war, cgi-bin/, PHP/FI, mSQL, dot-com boom/bubble, Javascript, Ajax, Web 2.0, frameworks, LAMP, MEAN, sql, noSQL, websockets, cloud computing, etc.

A web programmer with a proven track record of architectural design, development and maintenance of web sites and services of various complexity and scale for a variety of companies and industries.

He is a full-stack developer in love with plain CSS code, who thinks VBA is the only perfect programming language and environment. His favorite technologies are php and solr.

### Branislav Djuric
### Lead Frontend Engineer

Ever since he was a child, Branislav enjoyed tinkering with computers, making Computer Science an obvious career choice. He studied it at Belgrade. Honed his professional skills while working with various teams in Belgrade, Zurich, Amsterdam, Berlin and other European cities.

He believes that technology and nature intertwine, creating beautiful patterns and we need only observe them to learn from them. Branislav loves fintech applications making the blockchain realm a natural fit for him.

He is a fervent supporter of open source technology and focuses on in-browser applications, data visualization as well as human-computer interaction. He has successfully failed at starting 3 startups.

# Tech Team



### Antun Debak
### Product Design

A designer with over 12 years of experience. Antun's focus is currently on digital product design, but he has experience in various fields ranging from graphic design and coding to product management and entrepreneurship.

He has been on both sides, from freelancing and aiding small startups and design agencies worldwide, to working on a full product lifecycle projects with big players such as Microsoft, RealNetworks, Vodafone, Verizon and more. Antun loves giving back to the community by organizing conferences, design workshops, meetups and more. As a CPO at MVP Workshop, he's currently building crypto community on the Balkans and leading all of our UX and product design efforts here at Celsius.

### Filip Jovakaric
### Developer

Proficient in all things javascript related with frequent excursions into other languages like ruby and python, he embraces new and innovating technologies in this ever-changing environment. He considers blockchain technology to be a game changer for the whole world and enjoys being part of a team that will build this future.

### Nemanja Krstonic
### Blockchain R&D

Nemanja is a blockchain research & development analyst at MVP Workshop. His research is focused on structuring and analyzing types of token distribution criteria, consensus protocol, and ICO trends. He is passionate about data science, business & product development.

### Milos Jovac
### Developer

Miols started as PHP developer more than three years ago. He transitioned to Android development 4 years ago. He has also been dabbling with NodeJS backend and javascript for a few years before starting to experiment with blockchain for the past year.

### Djordje Stevanovic
### Developer

Djordje developed a card publishing system using Java EE, HTML5, CSS3, JavaScript, Typescript, Angular 2, Redux, RxJS, React. Has has also worked on a front-end for a music distribution service (HTML5, CSS3, JavaScript, Angular) as well as maintained and upgraded an existing ERP system (Java EE, Hibernate, Spring, HTML5, CSS3, JavaScript).

# Core Team



### Aliza Landes
#### Head of Sales and BD, EMEA

Aliza Landes has spent the majority of her professional career as an officer in the Israel Defense Forces, where she has served at the nexus of defense policy, communications strategy and international relations.

In 2007, Aliza enlisted into the IDF Spokesperson's Unit, where she served as a press officer and liaison to foreign media outlets. She founded the IDF's new media department in 2009 and, as its commander, revolutionized the IDF's public relations efforts.

In 2011, Aliza was recruited to the Coordinator for Government Activities in the Territories (COGAT), which is responsible for attending to the humanitarian needs of Palestinians in the West Bank and Gaza Strip. Aliza continues to serve in COGAT as a reservist with the rank of captain.

Aliza grew up in Boston. She earned her B.A. in Middle Eastern studies and Political Science from McGill University. In June 2016 Aliza completed a dual MBA and MPA at MIT Sloan and Harvard Kennedy School, respectively. During her tenure in graduate school she served as the president of the Kennedy School Israel Caucus and the MIT Sloan Israel Business Club.

 In her spare time Aliza likes to go on treks. She has climbed Kilimanjaro, hiked the Grand Canyon, Torres del Pines, the Dolomites and the Kungsleden Trail.

### Ross Gottesman
#### Head of Sales and BD, US

Ross has nearly 15 years experience in marketing, product, and sales functions, primarily in fintech. Before joining Celsius, he held a number of product management roles in digital payments at Mastercard, which included improving transaction safety and security via a proprietary alerts and controls platform. In marketing capacities at American Express, he enhanced the value proposition of prepaid cards and was instrumental in the strategy and execution of an industry development initiative that grew B2B spending. His background also includes television, video games, blogs, real estate, and mass transit. Part of his fascination with the blockchain is its potential for financial inclusion. Ross earned his B.S. with honors from Cornell University.

# Core Team



**Vid Štimac**

**Risk Management Team Lead**

Vid is a data scientist with over a decade of experience in academia (Amsterdam Institute for Advanced Labour Studies, Amsterdam Institute for International Development, European School of Management and Technology, Hertie School of Governance), management consulting (Accenture Research), international technical assistance (World Bank, UNDP, European Commission) and even the public sector (Public Policy Secretariat of the Republic of Serbia). In 2017 he co-founded VARHAK, a data science start-up, where he leads a team of data scientists, financial quants, and machine learning experts, who are developing Celsius' dedicated risk forecasting and management system: HDGCtrl

**Roman Krywulych**

**Senior Risk Manager**

Roman is a finance and risk management professional, whose experience spans both credit/counterparty risk and market risk management. Prior to joining Celsius, Roman worked at Nasdaq, where he used advanced data analytics and automation tools to build out and improve Nasdaq's consolidated risk system. The solutions Roman implemented perform credit analysis, generate alerts, and execute risk calculations in an automated fashion for Nasdaq Fixed Income (an electronic Treasuries trading platform for high-frequency traders), the OMX Nordic clearinghouse, and Nasdaq Treasury's in-house liquidity portfolio.

Roman is an avid crypto trader and has been investing/trading and attending meetups in the space since 2014. He holds a degree in Industrial and Systems Engineering from Lehigh University.

**Leah Jonas**

**Director of Client Services**

Leah is a graduate of the University of Arizona where she received a degree in Sociology and Business. Prior to joining Celsius, Leah held positions in marketing, customer service, and technology sales- in both corporate and start-up environments. It was her experiences working in start-ups (as well as reading the book Digital Gold) that helped her realize that the emerging crypto-currency market was actually a start-up industry, with tremendous opportunity. In an effort to help others understand this fast developing field, she founded the Crypto-Content Club, focusing on blockchain technology and industry developments.

# Core Team



### Kristen Ryan
**Event Coordinator**

Kristen joins Celsius with a background in tech sales, nonprofit event work and small business management. As she began learning more about blockchain in early 2017, she became passionate about the technology's humanitarian possibilities.

From P2P lending to land title rights, she is eager to see the improvements blockchain technology will bring to the world! Kristen has a B.A. in Sociology from Boston College.

### Ingamar Ramirez
**Head of Marketing**

Ingamar graduated from SUNY Geneseo, majoring in English literature. He served for 3 years as a Chapter 11 bankruptcy consultant at Prime Clerk, the market-leading claims agency. Ingamar coordinated noticing and distribution payments for cases such as American Eagle, RadioShack, Sbarro, Pacific Sunwear of California, Inc., etc. Simultaneously, he consulted with local media firms, with services including SEM services, Linked-In lead generation, content writing and optimization, web design and development, which he eventually left Prime Clerk mid-2017 to pursue full-focus. This gave him plenty of time to attend cryptocurrency meetups in NYC and discuss white papers with developers and investors. Ingamar starred in a short film titled "Rope" which is undergoing post-production.

### Ashley Harrell
**Director of Operations**

Ashley comes to Celsius with a wide breadth of experience, from managing operations of a real estate investment trust to hosting interactive tour bus rides. After obtaining a B.M. In opera from UC Santa Barbara, Ashley moved to NYC with big dreams of Broadway stardom. After success in musical theater, comedy, and performing on high-end cruise ships, she found her way to business operations. Ashley worked as Director of Development for a downtown non-profit, made her way into the city's growing beer industry, worked as Operations Manager of a REIT offering space to cannabis operators, and now has found her new home in cryptocurrency. When she's not busy planning what other cutting-edge industries she can bust into, she's brewing beer or singing Schubert loudly.

# Core Team



### Kaitie Zhee
### Head of Outreach

Kaitie is the founder and CMO of Space Made Media, a full-service marketing and PR agency with the sole focus on supporting revolutionary Blockchain Technology and Cryptocurrency companies. Kaitie has been involved in cryptocurrency since 2015 and made it her full-time focus in 2017. Today she is an active advisor to select ICO projects and Crypto Coin Trader, one of the largest and most engaged crypto-communities in social media, of where she is applying her over 12 years experience and best practices in community and digital marketing for many Fortune 500 clients including Sprint, IBM, ESPN, Colgate-Palmolive, Nissan and many others. When she is not trading, talking, growth-hacking or obsessing over the incredible future of cryptocurrency, she can be found leading living room dance parties with her three kids.

### Eric Slonaker
### Community Manager

Eric is the VP of Client Relations/ strategic partners for CryptoCoinTrader.com, launching end of February 2018. Eric has made a large impact in being recognized as one of the most respected names in the space, based on his desire to maintain a large, healthy, and thriving environment for the community to prosper. Crypto Coin Trader is one of the largest and most influential cryptocurrency communities in the world, with over 100k Members, he has helped build multiple branches of CCT, targeting more specific and designated topics in crypto. Leading by example, Eric has been a staple to the crypto community, earning his place near the top over the past year.

### Shirin Semsar
### Head of UX/UI Design

A UX/UI designer with over 12 years of experience. Shirin studied computer Engineering at Tehran University and started her career working for companies like Jame Jam, Farabi Stock Marketing and Sigma Company where she was a Web/UI/UX Designer. In her next role as Lead UI/UI Designer, Shirin managed UI/UX team, created interactive prototypes & UI specifications (including screen layouts, color palettes, typography, and user-interface elements). When she moved to Hong Kong, her role as a Freelance UX/UI Designer included building UI guidelines and wireframes for two start-ups in different companies. In 2017, Shirin moved to the US where she started her graduate degree in Web and Multimedia Design at Touro College. She oversees all of Celsius' UX/UI needs and continues to teach Web Design Courses at Touro College.

# Core Team



### John Arce
### Head of Marketing, Asia

John is a Digital Marketing professional with over 8 years experience. He is the founder of WebGeek Philippines, a community platform for developers & startups. Previously, he worked as a marketing lead at Cardable, Salarium and Infoshift. He is also the lead organizer of DevCup, the biggest developer hackathon in Manila. Former curator of Techstars Startup Digest in Philippines, a weekly newsletter digest of startup events. He is passionate about startups, inbound marketing, cryptocurrency and tech communities. John is very bullish on the future of blockchain technologies and he loves working at the forefront of an innovative space.

### Lola Scheiner
### Sales Associate, EMEA

Lola has worked in few startup companies in fields of Telecommunication and web-based applications in NYC which later grew, matured and flourished to successful IPO's. In recent years Lola has been consulting to corporations and private customers in fields of cyber technology and on ways of adopting proper business communication. She holds a B.A. in Business from the Interdisciplinary Center (IDC) and a B.Ed in English and volunteers in teaching English to underprivileged children in Israel and enjoys rock climbing.

### Anita Motwani
### West Coast Sales

Anita began her career on Wall Street first in sales then later in trading. She then moved to the Bay Area and began a career working with technology and Cleantech companies. She focused on business development, strategy, sales and fundraising efforts for startups in a variety of spaces including fintech, e-commerce, digital health, sustainable agriculture, social media, insure-tech, biotech and clean technology. Anita is a Network Advisor for the only venture capital fund that invests algorithmically called Correlation Ventures. Anita is a founding member of the Silicon Valley Blockchain Society group in the Bay Area.

Celsius Network: Borrow cash. Earn interest.

# Advisors



**Miko Matsumura**
**Co-founder at Evercoin**

Miko Matsumura founded crypto exchange Evercoin, and is a Limited Partner with the Pantera Capital ICO Fund (a $100M ICO-only fund). He is personally invested in FileCoin, Brave, CIVIC, Propy and Lyft. As a 25 year operating exec in Silicon Valley, he has raised over $50 million in capital for Open Source startups. He leads the Crypto Underground meetup in San Francisco and is a speaker at the upcoming Token Fest, Keynoting at ICOnference NYC, Block Con, Global Blockchain Summit, The Future of Money Summit and a thought leader at AFP the largest organization of Financial Professionals in the US.

**Moshe Hogeg**
**Co-Founder & President of Sirin Labs**

Moshe is an accomplished serial entrepreneur in the technology sector. He is both chairman and co-founder of Singulariteam, a prominent Israeli tech venture capitalist vehicle. Moshe has played an active role across the development of SIRIN LABS, specifically in defining product functionality and underpinning technology.

**Chris Dannen**
**Founder of Iterative Capital**

Chris has extensive experience in blockchain technology including an advisor position at Blockmatics, a consultant with Bloomberg and a founder and partner at Iterative Capital Management. Chris also has a number of technology publications and has written at length about Ethereum and other cryptocurrencies. He specializes in business strategy and development.

**Sonic Zhang**

Sonic Zhang is an entrepreneur and investor. He is the Co-founder and Global Director of 20 Nations League of Block-chain (B20), an international NGO focused on bridging blockchain and crypto-currency communities worldwide. And the co-founder of ValueBank Group, a global network of fiat-crypto exchanges, with a crypto wallet and payment solution. Founder of ValueNet Capital, focusing on investing in blockchain startup and cryptos,portfolio include OmiseGo, Binance, PowerLedger, WAX, CoinPoker, PlayKey, RobotCache. Co-founder of Murint Capital, a VC Fund for tech and entertainment industries. Founder of SoRelax, a global platform for cross border marketing and services. Sonic has a MPM and a BE in Mechatronics from University of Sydney.

Celsius Network: Borrow cash. Earn interest.

# Advisors



### Rashid Al Malik

Mr. Rashid Al Malik serves as the Chairman and CEO of Haya Holdings since April 2010. Previously Al Malik was the founder and Deputy CEO/ Chief Corporate Development Office of Dubai Aerospace Enterprise. At Dubai Aerospace he was able to raise 15 bn dollars. He served as advisor to Colony Capital Chairman. he was a professional pilot with Emirates airlines for 8 years. He is an active investor in new technologies. He holds a Bachelor degree from Bucks, New University and a postgraduate master's degree (MBA) from Pepperdine University in Los Angeles.

### Ivan Bjelajac
**Operating Director at GoDaddy / Partner MVP Workshop**

Passionate about developing products, systems, and working with people dedicated to building flat organizations, Ivan is driven by a search for game-changing brands that improve consumers' lives. Ivan's engineering background is in DevOps, System Engineering and Customer Support Analytics.

In 2011 Ivan was declared one of the most successful young entrepreneurs under 30 years. From 2013 to 2016, Ivan was President of the Serbian Association of Small and Medium-Sized Enterprises (member of OECD, UEAPME, INSME, and SME Europe) and he is the Founder and President of Serbian Blockchain Initiative.

### Dr. Elliot Noma
**Algorithm/AI Advisor**

Elliot teaches machine learning at Columbia University and quantitative risk management in the masters' program for mathematical finance at Rutgers University. Elliot currently advises fin-tech companies in the application of machine learning, natural language processing and blockchain technologies. Previously, he was a portfolio manager running a fund of hedge funds and was the chief risk officer at Asset Alliance, a $3 billion seeder of hedge funds. Elliot graduated from Dartmouth College with a B.A. in mathematics. He received an M.A. in mathematics and a Ph.D. in mathematical psychology from the University of Michigan.



# Flow of Capital and
# Crypto Assets

# Cash and Crypto Money Flow Overview



This document describes the flow of funds and cryptographic assets within the Celsius Network platform. There are three key actors in the platform: lenders who commit crypto assets to a lending pool and may request for a crypto-backed fiat margin loan, borrowers who get leveraged margin trading tools, and the Celsius service which orchestrates the system using sophisticated algorithms that move crypto and fiat funds as needed and executes trade orders on several coin exchanges. The Celsius service maintains both fiat custodian accounts and crypto asset accounts, in addition funds are managed on the coin exchanges in order to provide a quick response time for trade orders.

The system also creates a supply and demand cycle of the Celsius Token (CEL). The CEL token is used as a fee for borrowers of crypto assets and rewarded as interest to lenders contributing their assets.

The following diagram provides an overview on the flow of funds and assets between the key system components and their corresponding internal accounts:



# Cash and Crypto Money Flow Overview



## Lender Wallet Activities

1. Crypto Asset holder transfers coins into the wallet (a Celsius mobile app).
2. User's crypto assets are stored in Celsius accounts called Lending Stake Pool.
3. The coins, or part of them, are transferred to several top coin **exchanges.**
4. Daily interest in the form of Celsius Tokens (CEL) is transferred into the wallet.
5. User may withdraw unlocked crypto, including CEL tokens, at any time.



## Dollar Margin Loan Using Crypto as Collateral

1. User specifies fiat amount to loan (maximum limit is based on risk parameters and current value of crypto assets),
2. Some of the user's crypto is locked and cannot be withdrawn until the loan is paid.
3. User receives fiat funds using:
   a. A debit card
   b. A direct bank transfer to Celsius **bank account**
4. User is issued with a payments installment plan and instructions.
5. In case of a value drop in crypto Celsius may issue a margin call to the user asking for:
   a. Immediate loan repay
   b. Add crypto to wallet
6. If user fails to act and crypto value continues to decline Celsius may sell crypto in the **exchanges** to recover dollars and reduce loan amount .
7. User pays interest and loan installment by:
   a. Direct payment to Celsius **bank account**
   b. Send checks to Celsius → Celsius deposits to **bank account**
   c. Pay via instructions to sell crypto or net off interest payment received
8. When principal payments are made some of the crypto assets are unlocked



Celsius Network: Borrow cash. Earn interest.

# Cash and Crypto Money Flow Overview



**Borrower Margin Trader Account and Short Selling**

1. Coin Borrower deposits a minimum of $10K into a Celsius **custodian trader account**

2. Coin borrower places a leveraged short order, where funds are locked to cover:

    a. Margin high stop limit (amount at risk)

    b. Fees and commissions

3. Fees and commission are moved to the **custodian master account**, some may be used to purchase Celsius Tokens which are distributed to the Lenders daily.

4. If needed, crypto coins from the Lending Stake Pool are transferred to several top coin **exchanges**.

5. Celsius issues a sell order of crypto on the **exchanges** to initiate the short position on behalf of the borrower (trader).

6. Some of the fiat from the sell order may be transferred from the **exchanges** to the **custodian master account**.

7. When the short order is closed, **exchanges** are ordered to purchase back the Crypto, where:

    a. If the coin value is lower than the purchase price, gains are transferred back to the **custodian's trader account**.

    b. If the coin value is higher than the purchase price, funds are deducted from the **custodian trader account** and transferred to the **custodian master account** to cover the losses.

    c. Any uncommitted capital can be withdrawn by the borrower at any time.



# Cash and Crypto Money Flow Overview



## Celsius Token Funds Flow

The Celsius Token (CEL) is converted from fees paid by borrowers (margin traders). This fee, although charged in fiat, is converted to CEL tokens by the Celsius service and distributed to the lenders' wallets as a daily interest:

1. A trader that places a margin trade order is required to pay a dollar fee, in addition a daily commission is charged as long as the position remains open.
2. Celsius releases CEL tokens from an internal cache according to the value of the fees and commissions. If needed, CEL tokens may be purchased on open markets.

3. The Celsius Service distributes to the lenders their CEL token rewards on a daily base.
4. Lenders may buy/cell CEL tokens on open markets as desired.

| 01 | 02 | 03 | 04 |
|----|----|----|----|
| BORROWER PAYS FEES & COMMISSIONS | CELSIUS CONVERTS THE FIAT TO CEL | CEL DISTRIBUTED DAILY TO LENDERS | LENDERS SELL CEL TOKENS ON OPEN MARKET |



The Tokenized Flywheel
Diagram is for illustration purposes and should not be perceived as an investment advice

34

# Legal Considerations, Risks and Disclaimer – Summary



**IMPORTANT NOTICE: PLEASE READ THE ENTIRETY OF THE "Legal Considerations, Risks and Disclaimer" SCHEDULE CAREFULLY. WE RECOMMEND YOU CONSULT A LEGAL, FINANCIAL, TAX OR OTHER PROFESSIONAL ADVISOR(S) OR EXPERTS FOR FURTHER GUIDANCE** prior to participating at the sale of the CEL Tokens to be issued by Celsius Network Ltd (the "Company"), which is a part and acting on behalf of the Celsius group, all as outlined in the Company's White Paper and the terms govern the sale.

Please note that this is a summary of the legal considerations, risks and disclaimers schedule that can be found in the following [link], and which you must read in full before: (i) making use of this White Paper and any and all information available on the website(s) of Celsius Network Ltd  and/or (ii) participating in the Company's token sale outlined in this White Paper and governing terms (the "**Token Sale**"). Any undefined capitalized terms below shall have the meaning set out in the "Legal Considerations, Risks and Disclaimer" schedule. This summary should not be relied on in place of reading the "Legal Considerations, Risks and Disclaimer" schedule in full.

The "Legal Considerations, Risks and Disclaimer" schedule applies to the Company's White Paper and any and all information available on the Company's website. The contents of the "Legal Considerations, Risks and Disclaimer" schedule outlines the terms and conditions applicable to you in connection with (i) your use of this White Paper and of any and all information available on the Website; and/or (ii) your participation in the Token Sale, in each case in addition to any other terms and conditions that we may publish from time to time relating to this White Paper, the Website and the Token Sale (such terms hereinafter referred to as the "**Terms**").

The information set forth in the "Legal Considerations, Risks and Disclaimer" schedule may not be exhaustive and does not imply any elements of a contractual relationship. While we make every reasonable effort to ensure that all information: (i) in this White Paper; and (ii) available on the Website (collectively referred to as the "**Available Information**") is accurate and up to date, such material in no way constitutes professional advice.

The Company does not recommend purchasing Tokens for speculative investment purposes.

You should not purchase Thrive Tokens for investment purposes. Such tokens are not designed for investment purposes and should not be considered as a type of investment. You acknowledge, understand and agree that holding CEL Tokens is not a guarantee, representation or warranty that the holder will be able to use the Company, or receive any tokens utilized by the Company.

You acknowledge and agree that you are not purchasing CEL Tokens for purposes of investment, speculation, as some type of arbitrage strategy, for immediate resale or other financial purposes. You acknowledge that all purchases of CEL Tokens are final and nonrefundable, and the Company is not required to provide a refund for any reason and that you will not receive money or other compensation or any form of a refund, and you consent to no right of withdrawal from the ICO.

# Legal Considerations, Risks and Disclaimer – Summary



CEL Tokens do not entitle you to any equity, corporate governance, dividends, voting or similar right or entitlement in the Company or in any of its affiliated companies. Tokens are sold as digital assets, similar to downloadable software, digital music and the like. The Company does not recommend that you purchase Tokens unless you have prior experience with cryptographic tokens, blockchain-based software and distributed ledger technology and unless you have taken independent professional advice.

Citizens, nationals, residents (tax or otherwise) and/or green card holders of each of: (i) South Korea; (ii) the People's Republic of China; (iii) State of Israel; or (iv) United States (V) any other jurisdiction which prohibits the possession, dissemination or communication of the Available Information and/or prohibits participation in the Token Sale or the purchase of Tokens or any such similar activity or any other Restricted Persons are not permitted to participate in the Token Sale.

In no event shall the Company or any current or former Company Representatives be liable for the Excluded Liability Matters.

The Company does not make or purport to make, and hereby disclaims, any representation, warranty or undertaking in any form whatsoever to any entity or person, including any representation, warranty or undertaking in relation to the truth, accuracy and completeness of any of the information set out in the Available Information.

You should carefully consider and evaluate each of the risk factors and all other information contained in the Terms before deciding to participate in the Token Sale.

## Risk Factors

The following is a summary of the risk factors in relation to the CEL Tokens sale and Company in general. This summary should not be relied on in place of reading the full risk factors section of "Legal Considerations, Risks and Disclaimer" schedule available here: [link] in full.

## Token Sale Risks

- There is no prior market for Tokens and the Token Sale may not result in an active or liquid market for the Tokens.
- Future sales or issuance of the Tokens could materially and adversely affect the market price of Tokens.
- Negative publicity may materially and adversely affect the price of the Tokens.
- There is no assurance of any success of the Company's business platform or any future Token functionality.
- The market price of the Tokens may fluctuate following the Token Sale.
- The private keys to the escrow wallet may be compromised and the cryptocurrencies may not be able to be disbursed.

# Legal Considerations, Risks and Disclaimer – Summary



- The Token may be significantly influenced by cryptocurrencies market trends and Token value may be severely depreciated due to unrelated events in the cryptocurrencies markets.

- The use of the Tokens may come under the scrutiny of governmental institutions.

- The ownership of Tokens may fall under new and unpredicted taxation laws that will erode Tokens benefits.

- There may be unanticipated risks arising from the Tokens.

- Applicable laws and regulations may limit the utility, functionality, the accessibility and transferability of the Tokens.

- Crowd sales have been known to come under malicious attacks from hackers and/or other parties resulting in theft of tokens. Such events may inflict massive losses on buyers and the company.

- The user's Wallet or Wallet service provider may not be technically compatible with the CEL token ERC-20 protocol and may result with a complete loss of the contribution.

**Company Related Risks**

- The Company may be materially and adversely affected if it fails to effectively manage its operations as its business develops and evolves which would have a direct impact on its ability to maintain or operate the Company's business platform and/or develop structure and/or license any future Token functionality.

- The Company may experience system failures, unplanned interruptions in its network or services, hardware or software defects, security breaches or other causes that could adversely affect the Company's infrastructure network, and/or the Company's business platform.

- The Company may in the future be dependent in part on the location and data center facilities of third parties.

- General global market and economic conditions may have an adverse impact on the Company's operating performance, results of operations and/or cash flows.

- The Company or the Tokens may be affected by newly implemented regulations.

- The Company may not be able to pay any anticipated rewards in the future.



# Crowdsale starts on March 15th

Join the presale now



 @celsiusnetwork

## **Exhibit B**

**AMV Purchase Agreement**



**TOKEN SALE AGREEMENT**

This Token Sale Agreement (the **"Agreement"**) is entered into as of ___[ March 29, 2018_____], (the **"Effective Date"**), by and between Celsius Network Limited, a limited liability company incorporated under the laws of England and Wales (the **"Company"**) and the entity signing this Agreement (**"Purchaser"**).

**WHEREAS**, the Company is in stages of developing a membership platform (the **"Platform"**) which allows members to store their cryptocurrency, all as described in the Company's website, https://celsius.network/ as may be updated by the Company from time to time  (the **"Company's Website"**); and

**WHEREAS**, in the next few weeks, the Company plans to conduct a smart contract-based token generation event (the **"Token Generation"**), whereby, in return for payment to the Company, the smart contract shall generate CEL Tokens (the **"CEL Tokens"**), having the functions described in the Company's Website and in the 'white paper' published on the Company's Website (**"White Paper"**); and

**WHEREAS**, to date, the Company (i) held a private sale of CEL Tokens through pre-sale agreements, and (ii) between the dates March 15 and 22, 2018, held a public crowdsale of CEL Tokens; and

**WHEREAS**, Purchaser is interested in purchasing CEL Tokens for the right to receive CEL Tokens, pursuant to the terms and conditions more fully set forth in this Agreement and to the terms and conditions published on the Company's Website;

**NOW THEREFORE**, in consideration of the mutual agreement contained below, Company and Purchaser hereby agree as follows:

1. **Consideration**

   1.1    Within 90 days of the Effective Date, Purchaser will pay the Company an aggregate amount as set forth in the signature page of this Agreement (the **"Consideration"**). If the Consideration is paid in is in U.S. Dollars (**"USD"**), the Consideration shall be transferred by wire transfer of immediately available currency to a bank account as instructed by the Company. If the Consideration is paid in Bitcoin or Ether, the Consideration shall be transferred to a virtual wallet as instructed by the Company.

   1.2    If the Consideration is paid in Bitcoin or Ether, the funds shall be deemed converted into USD at the time of actual receipt of the Consideration at the virtual wallet designated by the Company, at the conversion rate published by Gemini or other

- 2 -

exchange or custodian engaged by the Company at such time, and if the Consideration is actually converted into USD, all related conversion fees, bank fees or other costs associated with its transfer to the Company's bank account shall be deducted therefrom. The resulting amount in USD shall be the Consideration for purposes of this Agreement.

2.  **Issuance of CEL Tokens**

    2.1    Following both (i) the payment of the Consideration pursuant to Section 1.1 above, and (ii) the Token Generation, the Company will issue Purchaser, in consideration for the Consideration, such number of CEL Tokens equal to (i) the Consideration *divided by* 0.2 USD (the "**Base Tokens**"), plus (ii) such number of bonus CEL Tokens equal to the Bonus Rate set forth in the signature page *multiplied by* the Base Tokens (the "**Bonus Tokens**", and together with the Base Tokens, the "**Committed Amount of CEL**"). Purchaser acknowledges and agrees that different bonus rates may apply to difference purchasers.

    2.2    As a condition precedent to the issuance of the Committed Amount of CEL to Purchaser, Purchaser must complete a registration process, which will include provision of all of the documents and information set forth in **Exhibit A** herein, and execution of the form contained therein, required in order to complete the Company's "know your client" ("**KYC**") and anti-money laundering ("**AML**") reviews and any other regulatory review, including to verify accredited investor status. Purchaser agrees that the Company may give all information provided by Purchaser pursuant to this Section to a third-party service provider appointed by the Company to perform KYC or AML reviews. The Company may update Exhibit A at any time and Purchaser hereby agrees to provide any additional documentation as soon as possible, as well as to promptly respond and fully cooperate with all requests made by the Company or any third party service provider appointed by the Company to perform KYC or AML reviews. Purchaser understands that the outcome of such reviews, including a decision not to issue CEL Tokens to Purchaser, is within the Company's sole and absolute discretion. If the outcome of such reviews is a decision not to issue CEL Tokens to Purchaser, the Consideration, if transferred to the Company, shall be refunded.

3.  **Lock Up**

    The sale restrictions set forth in the White Paper will apply to the Committed Amount of CEL. For the avoidance of doubt, utilization of CEL Tokens on the Platform shall not be deemed a transfer, sale or disposal of CEL Tokens.

4.  **Cancellation**

    4.1    Purchaser's purchase of CEL Tokens from the Company is final, and there are no refunds or cancellations except as may be required by applicable law or regulation, if any, or as set out in this Agreement.

    4.2    At any time, the Company may temporarily suspend the Token Generation. During any period of suspension, CEL Tokens will not be available for purchase.

    4.3    At any time, if the Company fails to see any chance to successfully complete the Token Generation event, the Company may permanently abort the Token Generation. At such time, part of the Consideration may have already been utilized by the Company for business purposes. Therefore, in such event, Purchasers will only be entitled to receive a pro rata proportion of their respective consideration amounts. Purchaser understands such risk and agrees to bear it.

5.  **Intended Purpose and Use of CEL Tokens**

    5.1.    The intended purpose of the CEL Tokens is to facilitate the provision and receipt of

- 3 -

services and allow for the access and utilization of features and functionalities made available by the Company and its affiliates through the Platform (collectively, the "**Services**"). CEL Tokens will be utility tokens and will not be intended to be used as an investment.

5.2.    Purchaser acknowledges that the CEL Tokens will not represent or confer any ownership right or stake, share, equity or security or equivalent rights, or any right to receive future revenue shares or voting rights in the Company or in any of its affiliates or any rights in the intellectual property of the Company or of any of its affiliates. Acquiring CEL Tokens shall not grant any right or influence over the Company's or any of its affiliates' organization and governance to Purchaser, other than rights relating to the potential future provision and receipt of Services, subject to the limitations and conditions contained in this Agreement and the White Paper.

5.3.    The CEL Tokens are not intended to be and will not be a representation of money (including electronic money), security, commodity, financial instrument, bond, debt instrument or any other kind of financial instrument or investment. Protections offered by the applicable law in relation to the purchase and sale of the aforementioned financial instruments or investments do not apply to the purchase and sale of CEL Tokens. CEL Tokens should not be acquired in any case or circumstance for speculative or investment purposes with the expectation of making a profit on immediate resale or otherwise.

5.4.    Purchaser acknowledges and understands that the Company, or any affiliate thereof, does not provide any guarantee that it will establish an operative Platform and therefore it cannot guarantee that the CEL Tokens can be used to access or purchase goods or Services on the Platform. Purchaser acknowledges and understands therefore that neither the Company nor any affiliate thereof assumes any liability or responsibility whatsoever arising from any loss or damage that would result from or relate to the inability to use CEL Tokens. CEL Tokens do not constitute the provision of any goods or services as of the date of this Agreement.

5.5.    Purchaser acknowledges and understands that the Company may adjust the Platform, the Services, the Company's Website and the "hard cap" for total amount of contributions from time to time, and that Purchaser is encouraged to visit the Company's Website frequently to remain updated. Currently, the Company intends to release additional 25,000,000 CEL Tokens to the Company's token treasury and to employees if the CEL Token remains above an average price of $1.50 for ten (10) days, and additional 25,000,000 CEL Tokens if the CEL Token remains above an average price of $3.00 for thirty (30) days. In addition, Purchaser understands and accepts that it is possible and likely that the design of the CEL Token evolves until the Token Generation event. Purchaser shall not have any claim against the Company Parties (as defined below) in connection therewith.

6.    **Taxes**

The Consideration is exclusive of all applicable taxes. Purchaser is solely responsible for determining what, if any, taxes apply to Purchaser's purchase of CEL Tokens, including, but not limited to: sales, use, value added, and any other taxes that may be applicable. It is also Purchaser's sole responsibility to withhold, collect, report, pay, settle and remit the correct taxes to the appropriate tax authorities in such jurisdiction where Purchaser may be liable to pay tax. The Company is not responsible for withholding, collecting, reporting, paying, settling or remitting any sales, use, value added, or any other tax arising from Purchaser's purchase of CEL Tokens.

7.    **Purchaser's Acknowledgements; CEL Token Generation Procedures and Specifications**

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003918
CEL-UCC-00023445_R

- 4 -

7.1    Purchaser understands and accepts the risks associated with the purchase of CEL Tokens, including those risks described in **Exhibit B** attached hereto. Additional risks factors are and may be described in the White Paper. In addition, Purchaser understands that the CEL Tokens have no guaranteed value and that the creation, allocation and distribution of the CEL Tokens involve risks including, but not limited to, the risks that (a) the technology associated with the web platform in which the CEL Tokens can be used will not function as intended; (b) the web platform will fail to attract sufficient interest from key stakeholders; (c) the Company's or its affiliates' business will not progress satisfactorily and the CEL Tokens will lose all value and utility; and (d) the Company and its affiliates may be subject to investigation and punitive actions by governmental authorities. Purchaser confirms that there may be additional risks in connection with the transactions envisioned herein that are not currently known or that are currently deemed immaterial.

7.2    Purchaser acknowledges that (a) the CEL Tokens are a digital currency which is not regulated by any central bank or other government authority; (b) the Company provides no representation as to the legal status of the CEL Tokens in any jurisdiction; (c) the Company does not provide investment advice with regard to the purchase of the CEL Tokens; (d) the issuance of the CEL Tokens will be subject to the acceptance and execution by Purchaser of the relevant legal disclosures and agreements in connection therewith and the Token Generation; and (e) it is the sole responsibility of Purchaser to seek professional advice prior to executing this Agreement. Purchaser hereby confirms that it has received independent legal advice regarding this Agreement and CEL Token before entering into the Agreement.

7.3    Important information about the procedures and material specifications of the Company's Token Generation event is provided on the Company's Website and in the White Paper, including, but not limited to, details regarding the timing of and pricing of CEL Tokens at the Token Generation event, the amount of CEL Tokens the Company will sell, and the Company's anticipated use of the proceeds received in consideration for the CEL Tokens. By purchasing CEL Tokens, Purchaser acknowledges and accepts that it has read, understood and has no objection to these procedures and material specifications.

8.    **Purchaser Representations**

8.1    Purchaser has read and clearly understood the terms of this Agreement and the terms and conditions published on the Company's Website and has received independent legal advice in respect thereof.

8.2    Purchaser, if a corporate entity, is duly organized and validly existing under the applicable laws of its jurisdiction of organization, and, if an individual, is at least 18 years of age and has sufficient legal capacity to execute this Agreement.

8.3    Purchaser has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes valid and legally binding obligations, enforceable in accordance with its terms.

8.4    The entry into this Agreement with the Company will not result in any violation of, be in conflict with, or constitute a material default under: (a) any provision of Purchaser's constitutional or organizational documents, if Purchaser is a corporate entity; (b) any provision of any judgment, decree or order to which Purchaser is a party, by which Purchaser is bound or to which any of Purchaser's material assets are subject; or (c) any material agreement, obligation, duty or commitment to which Purchaser is a party or by which Purchaser is bound.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003919
CEL-UCC-00023446_R

8.5    Purchaser has experience in purchasing financial and non-financial assets, including from companies in the development stage, and acknowledges that it is able to fend for itself, can bear the economic risk of its transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the transaction contemplated by this Agreement.

8.6    Purchaser has carefully considered the risks involved in purchasing and holding digital currencies (and in particular the CEL Tokens), and Purchaser is aware that it may lose all or part of the Consideration and that the CEL Tokens may have a low or even no value. Purchaser confirms that there may be additional risks associated with the transactions envisioned herein that are not currently known or that are currently deemed immaterial.

8.7    Purchaser is not, and has not been involved in any type of activity associated with money laundering or terror financing, nor violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act (2010), Sections 290-297 of the Israeli Penal Law 1977 (Bribery Transactions), the Israeli Prohibition on Money Laundering Law, 2000, or any other applicable anti-corruption or anti-bribery statute, nor was ever subject to any investigation by, or has ever received a request for information from any governmental body relating to corruption or bribery under any statute. The Consideration is not derived from or related to any unlawful activities, including but not limited to money laundering or terrorist financing, and Purchaser will not use the CEL Tokens to finance, engage in, or otherwise support any unlawful activities. Purchaser hereby consents to the Company running any checks or enquiries with third parties and waives any privacy or other right in connection therewith and acknowledges that any breach of this representation by Purchaser will entitle the Company to terminate this Agreement with immediate effect and without liability of any kind including refunding the Consideration.

8.8    Purchaser is aware that CEL Token may be deemed a security and that the offers and sales of CEL Token have not been registered under any country's securities laws and, therefore, cannot be resold except in compliance with the applicable country's laws. This Agreement is made with Purchaser in reliance upon Purchaser's representation to the Company that the CEL Tokens acquired by Purchaser will be acquired for Purchaser's own account and Purchaser has no intention of immediately selling, transferring or distributing the CEL Tokens it is acquiring (or any part thereof) nor has Purchaser any intention of selling, granting any participation in, or otherwise distributing the same.

8.9    Purchaser, if a U.S. resident, is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder. If Purchaser is an Israeli resident, it is a qualified investor as defined in the First Addendum to the Israeli Securities Law, 1968-5728, pursuant to Section 15A(b)(1) of such law. If Purchaser is subject to the laws of any other jurisdiction, it meets the analogous criteria prescribed under such laws applicable to Purchaser, required in order to prevent its purchase hereunder from constituting a breach of the local securities laws in Purchaser's jurisdiction. The purchase of CEL Tokens will not constitute a violation of any laws or regulations, including any securities laws or investment advice laws in Purchaser's jurisdiction.

8.10   Purchaser lives or is domiciled in a jurisdiction that allows the Company to sell the CEL Tokens and does not prohibit Purchaser from participating through a token sale without requiring any local authorization. Purchaser's purchase of CEL Tokens shall be made in full compliance with any and all applicable legal and tax obligations to which Purchaser may be subject in any relevant jurisdiction.

8.11  Purchaser is not a resident or domiciliary of the People's Republic of China, South Korea, Singapore, or any jurisdiction that (a) prohibits token sales or any participation therein, or (b) is subject to any sovereign country's sanctions or embargoes (any of the foregoing, a "**Restricted Jurisdiction**"); Purchaser is not purchasing CEL Tokens from a location in a Restricted Jurisdiction and is not an entity (including but not limited to any corporation or partnership) incorporated, established or registered in or under the laws of a Restricted Jurisdiction, nor is Purchaser purchasing CEL Tokens on behalf of any such person or entity.

8.12  Purchaser represents that it has carefully considered the risks involved in purchasing and holding digital currencies and, in particular, the CEL Tokens, including those risks described in Section 7 hereto. Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token storage mechanisms (such as token wallets), blockchain technology and blockchain-based software systems to understand this Agreement and to appreciate the risks and implications of purchasing the CEL Tokens.

8.13  Purchaser has reviewed the Website carefully, and has obtained sufficient information about the Company and its officers, agents and representatives, and about the CEL Tokens to make an informed decision to purchase the CEL Tokens.

8.14  Purchaser understands that the CEL Tokens confer only the potential future right to receive Services and confer no other rights of any form with respect to the Platform, the Company, or any of its affiliate including, but not limited to, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property) or other financial or legal rights.

8.15  Purchaser is purchasing CEL Tokens in order potentially to receive Services on the Platform at a future point in time. Purchaser is not purchasing CEL Tokens for any other uses or purposes, including, but not limited to, any investment, speculative or other financial purposes.

8.16  Purchaser acknowledges that the Company may offer CEL Tokens to other purchasers prior to the Token Generation event on terms more favorable to such purchasers or otherwise different from those offered to Purchaser herein (including at a lower price per Token), as the Company may set fit at its sole and absolute discretion, and Purchaser hereby irrevocably waives any claims and demands in that regard.

8.17  Purchaser acknowledges that the Company is not a non-profit organization.

9.  **Company Representations**

9.1  The Company is duly incorporated and validly existing under the laws of England and Wales, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

9.2  The Company will be bound by the express choice of law in this Agreement, *provided* that the choice was bona fide legal and is not invalidated by reasons of public policy.

9.3  The Company has legal capacity to submit irrevocably to the jurisdiction of the courts that the parties have chosen in this Agreement and is not entitled to claim any immunity from suit or execution of any judgment on the ground of sovereignty or otherwise.

9.4  Each representation and warranty herein is deemed to be made on the date of this Agreement and to be true and correct only as of such date. Any cause of action arising from an alleged breach of such representations or warranties shall survive and be actionable only until the end of twelve (12) months from the Effective Date, at which

- 7 -

time any such cause of action will expire and be of no further effect unless a claim based on such cause had been properly brought forth by Purchaser.

10. **Disclaimers**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN WRITING BY THE COMPANY, (A) THE CEL TOKENS ARE SOLD ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITHOUT ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, AND THE COMPANY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES AS TO THE CEL TOKENS, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT; (B) THE COMPANY DOES NOT REPRESENT OR WARRANT THAT THE CEL TOKENS ARE RELIABLE, CURRENT OR ERROR-FREE, THAT THEY MEET PURCHASER'S REQUIREMENTS, OR THAT DEFECTS IN THE CEL TOKENS WILL BE CORRECTED; AND (C) THE COMPANY CANNOT AND DOES NOT REPRESENT OR WARRANT THAT THE CEL TOKENS OR THE DELIVERY MECHANISM FOR CEL TOKENS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

11. **Purchaser Indemnity**

To the fullest extent permitted by applicable law, Purchaser will fully and effectively indemnify, defend and hold harmless the Company and its respective past, present and future founders, employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the "**Company Parties**") from and against any and all claims, judgments, demands, actions, damages, losses, costs and expenses (including reasonable professional and legal fees) that arise from or relate to Purchaser's (a) purchase and use of CEL Tokens; (b) responsibilities or obligations under this Agreement; (c) violation of this Agreement, or (d) violation of any rights of any other person or entity. The Company reserves the right to exercise sole control over the defense and settlement of any claim subject to this indemnity at Purchaser's expense. This indemnity is in addition to, and not in lieu of, any other indemnities set forth in a written agreement between Purchaser and the Company.

12. **Company Limitation of Liability**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW: (A) UNDER NO CIRCUMSTANCES WILL THE COMPANY OR ANY OF THE COMPANY PARTIES, INCLUDING BUT NOT LIMITED TO ITS FOUNDERS, OFFICERS, DIRECTORS, AGENTS, JOINT VENTURES, EMPLOYEES AND SUPPLIERS, BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY LOSS OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, LOSS OF REPUTATION, LOSS OF REVENUE, INCOME OR PROFITS, LOSS OF USE OR DATA, OR DAMAGES FOR BUSINESS INTERRUPTION) ARISING OUT OF OR IN ANY WAY RELATED TO THE PURCHASE, SALE OR USE OF THE CEL TOKENS OR OTHERWISE RELATED TO THIS AGREEMENT, REGARDLESS OF THE CAUSE OF ACTION, WHETHER BASED IN CONTRACT, TORT (INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), OR ANY OTHER LEGAL OR EQUITABLE BASIS (EVEN IF THE COMPANY OR ANY OF THE COMPANY PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES AND REGARDLESS OF WHETHER SUCH LOSSES WERE FORESEEABLE); AND (B) UNDER NO CIRCUMSTANCES WILL THE AGGREGATE LIABILITY OF THE COMPANY AND THE COMPANY PARTIES, INCLUDING BUT NOT LIMITED TO ITS FOUNDERS, OFFICERS, DIRECTORS, AGENTS, JOINT VENTURES, EMPLOYEES AND SUPPLIERS (JOINTLY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE,

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

WHETHER ACTIVE, PASSIVE OR IMPUTED), OR OTHER LEGAL OR EQUITABLE BASIS, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THE CEL TOKENS, EXCEED THE CONSIDERATION RECEIVED BY THE COMPANY. THE LIMITATIONS SET FORTH HEREIN WILL NOT LIMIT OR EXCLUDE LIABILITY FOR THE GROSS NEGLIGENCE, FRAUD OR INTENTIONAL, WILLFUL OR RECKLESS MISCONDUCT OF THE COMPANY.

13.    **Miscellaneous**

13.1    Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes all prior or contemporaneous agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

13.2    Amendment; Waiver. Any provision of this Agreement may be amended, waived or modified only upon the written consent of the Company and the Purchaser.

13.3    Notices. Unless otherwise expressly stated herein, all communications under this Agreement will be in writing and may be made by letter or email. Any notice required or permitted by this Agreement will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

13.4    Assignment. The Company may in its sole and absolute discretion assign its rights and interests, as contained herein. Purchaser may not assign its rights and interests, as contained herein, without the prior written consent of the Company.

13.5    Governing Law; Arbitration. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the laws of England and Wales, without giving effect to its principles or rules of conflict of laws, to the extent such principles or rules are not mandatorily applicable by statute and would permit or require the application of the laws of another jurisdiction. Any disputes arising out of or related to this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with such Rules. The arbitration shall be conducted in London, England, and shall be held English.

13.6    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, inoperative or unenforceable for any reason, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible. The invalidity, inoperability or unenforceability of any term of the Agreement will not adversely affect the validity, operability or enforceability of the remaining terms.

13.7    Counterparts. This Agreement may be executed and delivered in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all the counterparts together shall constitute one agreement.

13.8    Forward Contract. For the purposes of U.S. subscribers, each of the Company and Purchaser agrees to treat this Agreement as a forward contract for U.S. federal, state and local income tax purposes, and will not take any position on any tax return, report, statement or other tax document that is inconsistent with such treatment, unless otherwise required by a change in law occurring after the date hereof, a closing agreement with an applicable tax authority or a final non-appealable judgment of a court

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

- 9 -

of competent jurisdiction.

13.9    <u>Further Assurances</u>.  Purchaser shall, and shall cause its affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by the Company to carry out the provisions of this Agreement and give effect to the transactions contemplated by this Agreement, including, without limitation, to enable the Company or the transactions contemplated by this Agreement to comply with applicable laws.

*[Signature Page Follows]*

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003924
CEL-UCC-00023451_R

10

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.



**Purchaser**

Signature of Purchaser: _____

Name of Purchaser: <u>AM Venture Holdings, Inc.</u>

Name of Authorized Signatory: <u>Alex Mashinsky</u>

Title of Authorized Signatory: _CEO_____

Address: **Redacted - Personal Information**

Company Number: <u>DE Tax ID</u> Redacted - Personal Information

Consideration: Up to $18,000,000

Bonus Rate: <u>30%</u> @ $0.20 per CEL

Public Address (if paid in ETH/BTC):

**Celsius Network Limited**

Signature of Company: _____

Name of Signatory: S. Daniel Leon

Title of Signatory: Founding President & COO

*[Signature Page to Token Sale Agreement]*

13.10

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

11

## EXHIBIT A

### KNOW YOUR CLIENT AND ANTI-MONEY LAUNDERING REQUIREMENTS & INFORMATION

1. **Requirements**

   1.1. For individuals:

      1.1.1. Copy of passport

      1.1.2. Proof of address (i.e. utility bill not older than three months)

      1.1.3. Bank account ownership (such approval can be a letter from the bank or a scanned copy of void check) or, as appropriate, signed confirmation of wallet address, including declaration that the wallet address is beneficially held by Purchaser.

   1.2. For entities:

      1.2.1. Certificate of incorporation or similar charter document

      1.2.2. Shareholders register, stockholders ledger, or certificate of incumbency (or any similar corporate document showing the shareholders of the entity)

      1.2.3. For each ultimate beneficial holder of the entity: copy of passport

      1.2.4. For each ultimate beneficial holder of the entity: proof of address (i.e. utility bill not older than three months)

      1.2.5. Bank account ownership (such approval can be a letter from the bank or a scanned copy of a void check) or, as appropriate, signed confirmation of wallet address, including declaration that the wallet address is beneficially held by Purchaser.

2. **Questionnaire and Acknowledgement**

   In connection with the purchase of CEL Tokens from the Company, the undersigned hereby represents, warrants and agrees as follows:

   2.1. Name of Purchaser: _Alex Moshinsky_ (the "**Purchaser**")

   2.2. Purchaser's ID/Company number: Redacted - Personal Information

   2.3. Type of Purchaser: Please check one of the following to indicate the entity type for the Purchaser:

      Individual
      ⟨Corporation⟩
      Partnership
      Trust
      Estate
      Private Foundation
      Disregarded Entity
      Governmental Organization
      Non-Governmental Organization
      International Organization
      Other, please specify: _____

   2.4. Country of Legal Domicile: _USA_

   2.5. Additional Representations:

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

12

2.5.1.   Purchaser hereby represents that neither it nor any person or entity directly or indirectly controlling, controlled by or under common control with it is a person identified as a terrorist or terrorist organization on any relevant lists maintained by any governmental authorities.

2.5.2.   None of the cash or property that Purchaser has paid or will pay the Company as Consideration has been or shall be derived from, or related to, any activity that is deemed criminal under the laws of any applicable jurisdiction.

2.5.3.   No payment by Purchaser to the Company and no transfer or distribution of CEL Tokens to Purchaser from the Company shall cause the Company or its affiliates, directors, officers or representatives to be in violation of the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, or the regulations promulgated thereunder, as such laws and regulations may be amended from time to time, or any similar laws or regulations of any other applicable jurisdiction.

2.6.   Additional Information:

2.6.1.   Purchaser agrees to provide to the Company any additional information regarding the undersigned that the Company deems necessary or convenient to ensure compliance with all applicable laws concerning money laundering, terrorism, criminal acts, and similar activities.

2.6.2.   Purchaser understands that the Company may release confidential information about Purchaser and, if applicable, any underlying beneficial owners, if the Company, in its sole discretion, determines that it is in the best interests of the Company in light of relevant rules and regulations.

The undersigned hereby undertakes to promptly notify the Company if at any time the undersigned is unable to satisfy the agreements set forth herein or if the representations set forth herein cease to be true.

**Purchaser**

Signat_____ **Redacted**

Name of Purchaser (individual or corporation): AM Ventures Holdings Inc.

Name of Authorized Signatory: Alex Mashinsky

Title of Authorized Signatory: CEO

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003927
CEL-UCC-00023454  R

## EXHIBIT B

## RISK FACTORS

*Risks Associated with the Platform Launch*

**If the Platform does not launch, you will not receive Celsius Credit Tokens.**

As of the date of this Agreement, the Token Generation has not occurred, and the Platform has not launched.  If the Token Generation does not occur, and the Platform does not launch, your rights and remedies are limited to those under this Agreement and subject to the terms and conditions set forth therein.

**If the Platform does launch but its functionality does not meet users' expectations, the value of the Tokens may be adversely affected.**

As of the date of this Agreement, the Token Generation has not occurred, and the Platform has not launched and has not been fully developed. Any or all expectations or assumptions regarding the form and functionality of the Platform or the CEL Tokens (the **"Tokens"**) (including, without limitation, user or member behaviour), including, without limitation, any or all expectations or assumptions that you may have, may not be met upon release, for any number of reasons, including, without limitation, mistaken assumptions or analysis, a change in the design and implementation plans, and execution of the Platform or client applications.  If the Platform launches, but the functionality and usefulness of the Platform does not meet users' or members' expectations, the value of the Tokens may be negatively impacted, and such impact may be material and could result in the Token having little or no value whatsoever.

**The Company's plans for the Platform or the Tokens may change prior to the Token Generation, which may adversely affect the Platform and the value of the Tokens.**

As of the date of this Agreement, the specifications for the Platform and the Tokens are still under development.  The Company may, subject to the conditions set forth in the Agreement, change the characteristics of the Platform or the Tokens, which may cause them not to meet any or all expectations or assumptions regarding the form and functionality of the Platform or the Tokens, including, without limitation, any or all expectations or assumptions that you may have.  If the Platform launches, but the functionality and usefulness of the Platform does not meet users' or members' expectations, the value of the Tokens may be negatively impacted, and such impact may be material and could result in the Token having little or no value whatsoever.

**The Company or the Celsius project may dissolve, which could prevent or impede the Token Generation or negatively affect the operation of the Platform.**

It is possible that, due to any number of reasons, including, without limitation, an unfavorable fluctuation in the value of Ether, development issues with the Platform, the failure of business relationships, or competing intellectual property claims, the Celsius project may no longer be viable as a business or otherwise and the Celsius project or the Company may dissolve or fail to launch. In such event, the amount you contribute in consideration for the Tokens may not be repaid to you, or the amount of such repayment may be less than what you paid.

*Risks Associated with the Tokens*

**Holders of Tokens may lose access to those Tokens if they can no longer access their Token wallets.**

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003928
CEL-UCC-00023455_R

The Tokens, when generated and issued, will be controllable only by the possessor of unique private keys relating to the addresses in which the Tokens are held. The theft, loss or destructions of a private key required to access Tokens is irreversible, and because the Company does not have access to those private keys, such private keys could not be restored by the Company, and the Company will not be responsible for Purchaser's loss of access to its token wallet.

**Your Tokens may be stolen, transferred, or used by others if your credentials are compromised.**

Any person that gains access to or learns of your credentials or private keys may be able to use or dispose of any or all of your Tokens. The Company does not have the ability to restore Tokens that have been stolen. Unlike bank accounts or accounts at some other financial institutions, the Tokens are uninsured and, in the event of any loss, there is no public insurer, such as the FDIC or SIPC in the United States, or private insurer, to offer recourse to you.

**The resale of the Tokens is restricted by the terms of the Transaction and, even following the Token Generation, may be illiquid.**

There are currently no exchanges upon which the Tokens trade and there may never be a secondary market for the Tokens. This could impact your ability to sell the Tokens and may negatively impact the value of the Tokens.  The liquidity of any market for the Tokens will depend upon the number of holders of the Tokens, the performance of the Platform, the market for similar tokens, and the interest of market participants in making a market in the Tokens and other factors. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Once the Token Generation event has occurred, the Tokens may not be listed on an exchange and, even if listed on an exchange, may be thinly traded or de-listed.**

Following the Token Generation event, the Tokens may be listed on one or more exchanges.  For various reasons, including, without limitation, regulatory developments and a lack of purchaser interest, the Tokens may be thinly traded or may be removed from listing on such exchanges.  This could impact your ability to sell the Tokens and may negatively impact the value of the Tokens.  Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**The transfer of the Tokens is restricted, which may adversely affect their liquidity and the price at which they may be sold.**

The Tokens have not been, and will not be, registered under the U.S. Securities Act or the securities laws of any other jurisdiction and, unless so registered, may not be offered or sold except pursuant to an exemption from, or a transaction not subject to, the registration requirements of the U.S. Securities Act and any other applicable Laws. These restrictions may limit the ability of investors to resell the Tokens. For example, Rule 144, the primary exemption for resales of restricted securities imposes a one-year holding period for restricted securities of companies, such as the Company, that do not provide current information to the public. It is your responsibility to ensure that all offers and sales of the Tokens within the United States and other jurisdictions comply with applicable securities and other laws. We have not agreed to or otherwise undertaken to register the Tokens, and do not have any intention to do so in the future.

*Risks Associated with the Platform*

**The Platform may malfunction due to problems with the Ethereum blockchain.**

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003929
CEL-UCC-00023456_R

- 15 -

The Platform is a platform intended to be based on the Ethereum blockchain. As such, any malfunction, unintended function, unexpected functioning of or attack on Ethereum may cause the Platform to malfunction or function in an unexpected or unintended manner. The impact of any such malfunction or unexpected or unintended function could be negative and material and could result in the Token having little or no value whatsoever.

**If there is insufficient interest in the Platform or blockchain technologies, the Tokens may have limited or no utility or value.**

It is possible that the Platform application will not be used by a large number of businesses, individuals, and other organizations and that there will be limited public interest in the creation and development of distributed applications. Such a lack of interest could negatively impact the utility of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

While the Tokens should not be viewed as an investment, they may have value over time. That value may be limited and may be zero if the Platform lacks use and adoption. If this becomes the case, there may be few or no markets following the launch of the application, potentially having an adverse impact on the value of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Competitive technologies could negatively impact the value of the Tokens.**

If a competitive technology is launched before or after the Token Generation, users interested in a platform like the Platform may use that technology in lieu of the Platform. In that case, the lack of use could limit the utility and value of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Security weaknesses could negatively impact the operation of the Platform.**

Developers involved in the creation and operation of the Platform software, or other persons may intentionally or unintentionally introduce weaknesses or bugs into the core infrastructural elements of the Platform, which could interfere with the operation of the Platform or result in the loss of Tokens. In addition, advances in cryptography, or technical advances such as the development of quantum computers, could present risks to cryptographic tokens (including, without limitation, the Tokens) and the Platform, which could result in the theft or loss of Tokens.

As with other decentralized cryptographic tokens and cryptocurrencies, the blockchain that the Platform may be built on has inherent risks and is susceptible to mining attacks, including, without limitation, double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and race condition attacks, and other attacks. Any successful attacks present a risk to the Platform, the Tokens, and expected proper execution and sequencing of contract computations, and the Company will have no ability to mitigate any such attacks happening on the blockchain network.

Additionally, centralized access portals on internet servers are subject to similar attacks such as denial-of-service (DoS) and distributed DoS (DDoS) attacks, which can also present issues of security to the network.

Any impact of such risks could be negative and material and could result in the Token having little or no value whatsoever.

**Following the Token Generation event, lack of sufficient funding by lenders could negatively**

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

impact borrowing activity on the Platform.

In the future, it is intended that the Platform will allow borrowers to borrow cryptocurrency in order to perform "short" positions. At such time, the success of the Platform will depend in part on the provision of sufficient funding by lenders to meet borrower demand. If lenders are unwilling to provide loans on terms that are acceptable to borrowers, borrowers and lenders may cease using the Platform and the Tokens. Any impact of such risks could be negative and material and could result in the Token having little or no value whatsoever.

**The technology underlying the Platform is new and may be subject to additional risks.**

Cryptographic tokens are a new and untested technology. In addition to the risks discussed herein, there are risks that the Company and the developers of the Platform cannot anticipate. Further risks may materialize as unanticipated combinations or variations of the discussed risks or the emergence of new risks. Any impact of such risks could be negative and material and could result in the Token having little or no value whatsoever.

**Stress on the blockchain on which the Platform is built can slow down transactions and/or increase costs associated with the transactions on the network which may negatively impact Platform's operations.**

As with any blockchain networks, a large transaction volume can put a strain on the network, slowing down the transaction time and/or increasing costs for the transactions. For example, in the case of Ethereum blockchain, the Platform is not the only decentralized application that will be built on Ethereum. Increasing saturation of applications on the Ethereum network and high volume of transactions on the Ethereum network from other participants on the network can slow down the transactions happening through the Platform.

*Legal and Regulatory Risks*

**Intellectual property claims may adversely affect the operation of the Platform.**

Third parties may assert intellectual property claims relating to the operation of the Platform or the holding or transfer of the Tokens. Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in the Platform's long-term viability or the ability of end-users to hold and transfer Tokens may adversely affect the usefulness and value of the Tokens. Additionally, a meritorious intellectual property claim could prevent the Company from improving, or end users from accessing, the Platform or holding or transferring their Tokens, which could adversely impact the utility of the Platform or the value of the Tokens, and such impact could be material and could result in the Tokens having little or no value whatsoever.

**Regulatory requirements imposed on lending and related activities may negatively affect the operation of the Platform**

Lending and related activities are heavily regulated and the source of frequent litigation, and lending on the Platform may subject the network or network participants to licensing obligations, compliance obligations, supervision and examination and/or litigation. This would extend to all aspects of the lending lifecycle, including, without limitation, advertisements and solicitations, the preparation and use of credit scores, underwriting, agreements and disclosures, payment terms, and debt collection practices. The functioning of the Platform could be impacted by these regulatory and compliance obligations, by the supervision and examination of platform activities, by one or more regulatory inquiries or actions or civil litigation. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_SEC_00003931
CEL-UCC-00023458_R

**Regulatory requirements imposed on money transmission or token exchange activities may negatively affect the operation of the Celsius Network**

Money transmission and token exchange services are heavily regulated, and providing such services on the Platform may subject the network to licensing obligations, compliance obligations, and/or supervision and examination. Such compliance obligations may include, without limitation, implementing a comprehensive Bank Secrecy Act/anti-money laundering compliance program, including, without limitation, know your customer and customer identification program procedures, automated transaction monitoring, and required reporting and recordkeeping. In addition, the Platform may be expected to have a comprehensive sanctions screening program. The functioning of the Platform could be impacted by these regulatory and compliance obligations, by the supervision and examination of platform activities, and by one or more regulatory inquiries or actions. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Unfavorable legal or regulatory action could have a negative impact the utility of the Platform and Tokens, as well as the value of Tokens.**

Blockchain technologies have been the subject of scrutiny by various regulatory bodies around the world. The functioning of the Platform and the Tokens could be impacted by one or more regulatory inquiries or actions, including, without limitation, the licensing of or restrictions on the use, sale, or possession of digital tokens like the Tokens, which could impede, limit or end the development of the Platform. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

*Risks Associated with the Subordination Provision.*

All of the obligations of the Company to Purchaser in respect of payments are unsecured and are expressly subordinated in right of payment to the prior payment in full of the senior debt, and Purchaser has expressly waived the right to pursue, encourage or support any claim or other action (including, without limitation, arbitration) seeking to obtain or require payment by the Company prior to the payment in full of the senior debt. The Company's ability to incur senior debt (including, without limitation, senior debt that may be secured by any or all of the Company's assets) is not limited or capped. Without limiting the generality of the foregoing, in the event that the Token Generation does not occur, all of the Company's reimbursement obligations to Purchaser will be subordinated in right of payment and priority of security to the prior and indefeasible repayment of all indebtedness of the Company owing to one or more persons (any or all of which may be affiliates of the Company or any of its founders).

***The tax treatment of the Agreement and the Token is uncertain and there may be adverse tax consequences for Purchasers upon certain future events.***

The tax characterization of the Agreement and the Tokens is uncertain, and each Purchaser must seek its own tax advice in connection with the Agreement and the Tokens. The Agreement and the purchase of Tokens pursuant thereto may result in adverse tax consequences to Purchasers, including withholding taxes, income taxes and tax reporting requirements. Each Purchaser should consult with and must rely upon the advice of its own professional tax advisors with respect to the tax treatment of the Agreement and the Tokens.

## **Exhibit C**

**AMV Backstop Tokens Board Minutes**

# FULL MINUTES

## OF THE BOARD OF DIRECTORS OF

## CELSIUS NETWORK LTD.

### (a UK Limited Company)

---

Dated April 7, 2020

---

1.    Appointment of Board Member.

**Alex Mashinsky (chairman)** presented to the Board the nomination of MF Partners LTD, represented by its director Patrick Martin, to act as the third member of the Board. Alex disclosed the nature of the relationship between Patrick and Celsius, including Patrick's holding of CEL tokens for his own account, and presented the added value to be brought by MF Partners LTD to the Board.

**The issue was brought to a vote, unanimously approved (by Alex Mashinsky, Daniel S. Leon) Both existing directors welcomed MF Partners LTD, represented by Patrick Martin, to the Board and the Company.**

**NOW, THEREFORE, BE IT RESOLVED**, that MF Partners LTD, represented by Patrick Martin, is appointed as Director of the Company, effective immediately, to serve until their tenure is expired or terminated in accordance with the Company's Articles of Association.

**BE IT FURTHER RESOLVED**, to approve and ratify the Directorship Agreement between the Company and MF Partners LTD, represented by Patrick Martin.

2.    Election of Officers.

**Alex Mashinsky (chairman)** presented to the Board the appointment of Jeremie Beaudry as General Counsel, Chief Compliance Officer, and secretary to the Board; and of Harumi Urata-Thompson as Chief Financial Officer.

**All agreed, and the issue was brought to a vote, unanimously approved.**

**NOW, THEREFORE, BE IT RESOLVED**, that the following individuals are appointed as officers of the Company, each to serve until his or her appointment is expired or terminated:

1.    Chief Financial Officer                                      Harumi Urata-Thompson
2.    General Counsel, CCO, and Secretary to the Board           Jeremie Beaudry

3.    Creation of Assets and Obligations Committee.

**Alex Mashinsky (chairman)** presented the next item on the agenda:

**WHEREAS**, the Board has determined that it is in the best interest of the Company to create an Assets and Obligations Committee to strengthen the Company's balance sheet and maintain financial profitability (the "**A&O Committee**"); and

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

**WHEREAS**, the A&O Committee shall meet at least monthly, and create a workable strategy to maintain the Company's financial profitability;

**WHEREAS**, the A&O Committee created a charter that delegates responsibilities and powers to the Company;

**WHEREAS**, the Board has determined that it is in the best interests of the Company to appoint Alexander Mashinsky, Daniel S. Leon, Jeremie Beaudry, Harumi Urata-Thompson, and Roni Cohen Pavon as members of the A&O Committee; and

**WHEREAS**, the Board has determined that it is in the best interests of the Company to appoint Jeremie Beaudry as the Chairperson of the A&O Committee.

**Patrick Martin** inquired ┊ Redacted ┊
┊ Redacted ┊

**Roni Cohen Pavon (HFN)** ┊ **Redacted** ┊
┊ **Redacted** ┊

**Patrick Martin** requested that all minutes of the A&O Committee be provided to the Board within 72 hours of its preparation, for the Board to be able to supervise the Committee's work.

**All agreed, and the issue was brought to a vote, unanimously approved.**

**NOW, THEREFORE, BE IT RESOLVED**, to establish the A&O Committee and the appointments of Alexander Mashinsky, Daniel S. Leon, Jeremie Beaudry, Harumi Urata-Thompson, and Roni Cohen Pavon to the A&O Committee. Jeremie Beaudry shall Chair the A&O Committee. The A&O Committee shall be granted the delegated powers and responsibilities enumerated in the A&O Committee's Charter dated as of February 17, 2020.

**RESOLVED FURTHER**, that all minutes of the A&O Committee be provided to the Board within 72 hours of its preparation, for the Board to be able to supervise the Committee's work.

4.    A&O Plan.

**Alex Mashinsky (chairman)** presented the next item on the agenda:

**WHEREAS**, the A&O Committee shall vote and approve a plan to be executed in the manner the A&O Committee sees fit.  Unless the plan requires prior Board approval under any applicable laws or the Company's Articles of Association, the A&O Committee shall have the delegated powers to execute the plan without formal Board approval.

**Patrick Martin** commented that this would grant the A&O Committee with excessive powers, overriding the Board, and he believes the Plan should be brought before the Board for its approval.

**Jeremie Beaudry** commented ┊ Redacted ┊
┊ **Redacted** ┊

**Jeremie Beaudry** suggested that ┊ Redacted ┊
┊ **Redacted** ┊

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

**All agreed, the vote was postponed to the next Board meeting.**

5.    Regulatory Committee

**Alex Mashinsky (chairman)** presented the next item on the agenda:

**WHEREAS**, the Board has determined that it is in the best interest of the Company to create a Regulatory Committee to assess, plan and coordinate the regulatory status and plans of the Company (the "**Regulatory Committee**");

**WHEREAS**, the Board has determined that it is in the best interests of the Company to appoint MF Partners LTD, represented by Patrick Martin, Jeremie Beaudry, and Roni Cohen Pavon as members of the Regulatory Committee; and

**WHEREAS**, the Board has determined that it is in the best interests of the Company to appoint MF Partners LTD, represented by Patrick Martin, as the Chairperson of the Regulatory Committee.

**The issue was brought to a vote, unanimously approved.**

**NOW, THEREFORE, BE IT RESOLVED**, to establish the Regulatory Committee and the appoint Patrick Martin, Jeremie Beaudry and Roni Cohen Pavon as its members. MF Partners LTD, represented by Patrick Martin, shall Chair the Regulatory Committee, and Jeremie Beaudry shall act as its secretary, coordinating its day-to-day activities.

6.    Deployment Committee

**Alex Mashinsky (chairman)** presented the next item on the agenda:

**WHEREAS**, the Board has determined that it is in the best interest of the Company to create a Deployment Committee, to assess and plan the Company's policies and procedures for the deployment of funds, and oversee such deployment on an ongoing basis (the "Deployment Committee");

**WHEREAS**, the Board has determined that it is in the best interests of the Company to appoint Harumi Urata-Thompson as the Chairperson of the Deployment Committee.

**Alex Mashinsky (chairman)** noted that other than Harumi Urata-Thompson as Chairperson, the agenda does not mention who will be the other members of the Committee.
**Jeremie Beaudry** noted that this is open for discussion by the Board. Jeremie recommended

<div style="border:1px dashed">

# Redacted

</div>

**Roni Cohen Pavon (HFN)** added [    Redacted    ]
[ **Redacted** ]

**Jeremie Beaudry** agreed [    Redacted    ]
[ **Redacted** ]

**Alex Mashinsky (chairman)** noted that [    Redacted    ]
[    **Redacted**    ]

**Roni Cohen Pavon (HFN)** commented ┊          **Redacted** ┊

┊          **Redacted** ┊

**Alex Mashinsky (chairman)** stated that ┊      **Redacted** ┊

┊         **Redacted** ┊

**All agreed, and the issue was brought to a vote, unanimously approved.**

**NOW, THEREFORE, BE IT RESOLVED**, to establish the Deployment Committee and the appoint Harumi Urata-Thompson, Alex Mashinsky, Patrick Holert, Asaf Iram, John Ferro, Connor Nolan, and Ashley Harrell. as its members. Harumi Urata-Thompson shall Chair and Ashley Harrell will be the secretary of the Deployment Committee.

**RESOLVED FURTHER**, that the Deployment Committee shall assemble a plan detailing its envisioned deployment models, policies and projections, to be presented to the Board in its next meeting (to be held within 14 days).

7.    <u>Capital Raise</u>

**Alex Mashinsky (chairman)** presented the next item on the agenda:

**WHEREAS**, the Board would like to approve financing for the Company and has concluded that the Company's capital should be raised through the issuance of shares;

**WHEREAS**, the Board believes that it is in the best interest of the Company to restructure the Company's balance sheet; and

**WHEREAS**, in order to facilitate the financing of the Company, the Board deems it advisable to increase the Company's authorized share capital, and issue and sell shares in accordance with the terms and conditions to be agreed upon in the final investment agreement between the Company and its potential investors.

**Patrick Martin** inquired ┊          **Redacted** ┊
┊**Redacted**┊

**Jeremie Beaudry** noted that ┊         **Redacted** ┊
┊     **Redacted** ┊

**Patrick Martin** inquired ┊         **Redacted** ┊

**Jeremie Beaudry** and **Alex Mashinsky (chairman)** agreed ┊      **Redacted** ┊
┊     **Redacted** ┊

**Alex Mashinsky (chairman)** updated the Board regarding the status of the negotiations of the financing round. The Company is in talks with Tether International as lead investor, for $5M at a discounted rate, $8M at full price, once this is closed we will approach the additional investors who have shown interest in participating in the round, and will try to close with them as well. The Tether closing is subject to a few open items:

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

a) Tether's legal counsels are waiting to receive the legal position of our UK counsel, regarding the regulatory status of the deposits activity under UK law;

b) Finalizing the agreement wording- there is a lot of legal back and forth; and

c) They are waiting on the finalized financials, Harumi is finalizing.

**Roni Cohen Pavon (HFN)** commented [ Redacted ]

# Redacted

**All agreed, and the issue was brought to a vote, unanimously approved.**

**NOW, THEREFORE, BE IT RESOLVED**, that the Board is hereby authorized and directed to take all actions that may be necessary and proper for this Company to issue and sell the above shares named in accordance with applicable laws.

8.   <u>AMV Tokens</u>

**Alex Mashinsky (chairman)** presented the next item on the agenda:

**WHEREAS**, the Board engaged a law firm, Latham & Watkins ("L&W"), to [ Redacted ]

## Redacted

[ Redacted ] The Company and AMV terminated the Token Sale Agreement, which resulted in the unsold CEL tokens. L&W prepared a memo [ Redacted ]

# Redacted

**Roni Cohen Pavon (HFN)** updated the Board about the legal memo – Latham & Watkins in their memo [ Redacted ]

[ Redacted ]

# Redacted

**Patrick Martin** noted that he is familiar with the history of this matter and understands the situation, and [ Redacted ]

[ Redacted ] As the Company does not currently need the tokens on its balance sheet, his view is

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

that the tokens should be kept in treasury, in a segregated account, and only used in times of financial needs. Such tokens shall not be taken into account in calculating commission as long as in treasury.

**Daniel S. Leon** agrees.

**The issue was brought to a vote, unanimously approved (by Patrick Martin and Daniel S. Leon). Alex Mashinsky refrained from voting.**

**Latham & Watkins' memo shall be added to this resolution as an appendix.**

**NOW, THEREFORE, BE IT RESOLVED**, to keep the AMV CEL tokens in the Company's treasury in a segregated account and only use the CEL tokens in times of great financial need, and any transaction involving these tokens must be specifically approved by the Board.

9.      Omnibus Resolutions.

**RESOLVED**, that the officers of the Company be, and each of them hereby is, authorized and empowered to take any and all such further action, to execute and deliver any and all such further agreements, instruments, documents and certificates and to pay such expenses, in the name and on behalf of the Company or such officer, as any such officer may deem necessary or advisable to effectuate the purposes and intent of the resolutions hereby adopted, the taking of such actions, the execution and delivery of such agreements, instruments, documents and certificates and the payment of such expenses by any such officer to be conclusive evidence of his or her authorization hereunder and the approval thereof; and

**RESOLVED FURTHER**, that any and all actions taken by the officers of the Company to carry out the purposes and intent of the foregoing resolutions prior to their adoption are approved, ratified and confirmed.

**MEETING ADJOURNED.**

**IN WITNESS WHEREOF, THESE MINUTES ARE HEREBY EXECUTED BY EACH OF THE MEMBERS OF THE BOARD, EFFECTIVE AS OF THE DATE FIRST WRITTEN ABOVE:**



DocuSigned by:

*Alex Mashinsky*                                    4/21/2020

2ADC7A8BEB844C0

**Alexander Mashinsky**

\*with respect to resolutions number 1-7, 9

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS                    CELSIUS_AL_0000154
HIGHLY CONFIDENTIAL                                                CEL-UCC-00000291
                                                                   CEL-UCC-00000286

4/21/2020

**Daniel S. Leon**

\*with respect to resolutions
number 1-9

4/21/2020

**MF        Partners        LTD,
represented by Patrick Martin**

\*with respect to resolutions
number 2-9

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUS_AL_0000155
CEL-UCC-00000292
CEL-UCC-00000286

## Exhibit D

**SEC Form D (2018)**

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)    Previous Names    [X] None    Entity Type

0001739052

Name of Issuer
Celsius Network Ltd

Jurisdiction of Incorporation/Organization
UNITED KINGDOM

Year of Incorporation/Organization
[ ] Over Five Years Ago
[X] Within Last Five Years (Specify Year) 2018
[ ] Yet to Be Formed

[ ] Corporation
[ ] Limited Partnership
[X] Limited Liability Company
[ ] General Partnership
[ ] Business Trust
[ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer
Celsius Network Ltd

Street Address 1                          Street Address 2
35 GREAT ST HELEN'S

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| --- | --- | --- | --- |
| LONDON | UNITED KINGDOM | EC3A 6AP | 201.842.7792 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
| --- | --- | --- |
| Mashinsky | Alex | |

| Street Address 1 | Street Address 2 | |
| --- | --- | --- |
| 510 Berkeley Sq | | |

| City | State/Province/Country | ZIP/PostalCode |
| --- | --- | --- |
| Memphis | TENNESSEE | 38120 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
| --- | --- | --- |
| Leon | S. | Daniel |

| Street Address 1 | Street Address 2 | |
| --- | --- | --- |
| Pirchei Aviv 4 #3 | | |

| City | State/Province/Country | ZIP/PostalCode |
| --- | --- | --- |
| Tel Aviv | ISRAEL | 6744726 |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services
[ ] Commercial Banking
[ ] Insurance
[ ] Investing
[ ] Investment Banking
[ ] Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?
[ ] Yes      [ ] No

[ ] Other Banking & Financial Services
[ ] Business Services

Energy
[ ] Coal Mining

Health Care
[ ] Biotechnology
[ ] Health Insurance
[ ] Hospitals & Physicians
[ ] Pharmaceuticals
[ ] Other Health Care

[ ] Manufacturing

Real Estate
[ ] Commercial
[ ] Construction
[ ] REITS & Finance
[ ] Residential
[ ] Other Real Estate

[ ] Retailing
[ ] Restaurants

Technology
[ ] Computers
[ ] Telecommunications
[ ] Other Technology

Travel
[ ] Airlines & Airports
[ ] Lodging & Conventions
[ ] Tourism & Travel Services
[ ] Other Travel

[X] Other

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

---

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

---

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☐ Investment Company Act Section 3(c)

| | | |
|---|---|---|
| ☐ Rule 504(b)(1) (not (i), (ii) or (iii)) | ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Rule 504 (b)(1)(i) | ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Rule 504 (b)(1)(ii) | ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Rule 504 (b)(1)(iii) | ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☐ Rule 506(b) | ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☒ Rule 506(c) | ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Securities Act Section 4(a)(5) | ☐ Section 3(c)(7) | |

**7. Type of Filing**

[X] New Notice    Date of First Sale 2018-03-01    [ ] First Sale Yet to Occur

[ ] Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year?   [ ] Yes [X] No

**9. Type(s) of Securities Offered (select all that apply)**

[ ] Equity                                                          [ ] Pooled Investment Fund Interests

[ ] Debt                                                            [ ] Tenant-in-Common Securities

[ ] Option, Warrant or Other Right to Acquire Another Security      [ ] Mineral Property Securities

[ ] Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security      [X] Other (describe)

Purchase Agreements for Cryptocurrency

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?   [ ] Yes [X] No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $10,000 USD

**12. Sales Compensation**

Recipient                                               Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None                  (Associated) Broker or Dealer CRD Number [X] None

Street Address 1                                        Street Address 2

City                                                    State/Province/Country                          ZIP/Postal Code

State(s) of Solicitation (select all that apply)        [ ] Foreign/non-US
Check "All States" or check individual States  [ ] All States

**13. Offering and Sales Amounts**

Total Offering Amount      $50,000,000 USD  or [ ] Indefinite

Total Amount Sold          $24,572,033 USD

Total Remaining to be Sold  $25,427,967 USD  or ☐ Indefinite

Clarification of Response (if Necessary):

Total Offering Amount reflects the aggregate amount offered in connection with concurrent offerings by Issuer pursuant to Regulations D and S. Total Amount Sold does not take into account sales made pursuant to Regulation S.

---

**14. Investors**

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering. _____

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering:     1,343

---

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD ☐ Estimate

Finders' Fees $0 USD ☐ Estimate

Clarification of Response (if Necessary):

---

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$550,000 USD ☐ Estimate

Clarification of Response (if Necessary):

---

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Celsius Network Ltd | /s/ S. Daniel Leon | S. Daniel Leon | Founding President & COO | 2018-04-30 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

**<u>Exhibit E</u>**

**SEC Form D (2020)**

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

---

### 1. Issuer's Identity

CIK (Filer ID Number)　　　　　　　　Previous Names　　　[X] None　　　　　Entity Type

0001739052

Name of Issuer

Celsius Network Ltd

Jurisdiction of Incorporation/Organization

UNITED KINGDOM

Year of Incorporation/Organization

- [ ] Over Five Years Ago
- [X] Within Last Five Years (Specify Year) 2017
- [ ] Yet to Be Formed

Entity Type:
- [ ] Corporation
- [ ] Limited Partnership
- [X] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

---

### 2. Principal Place of Business and Contact Information

Name of Issuer

Celsius Network Ltd

| Street Address 1 | Street Address 2 |
| --- | --- |
| 1 Bartholomew Lane | |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
| --- | --- | --- | --- |
| LONDON | UNITED KINGDOM | EC2N 2AX | +44 2033 185636 |

---

### 3. Related Persons

| Last Name | First Name | Middle Name |
| --- | --- | --- |
| Mashinsky | Alexander | |

Street Address 1          Street Address 2

1 Bartholomew Lane

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| London | UNITED KINGDOM | EC2N 2AX |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

Chief Executive Officer

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Leon | Daniel | |

Street Address 1          Street Address 2

1 Bartholomew Lane

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| London | UNITED KINGDOM | EC2N 2AX |

Relationship: [X] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Martin | Patrick | |

Street Address 1          Street Address 2

1 Bartholomew Lane

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| London | UNITED KINGDOM | EC2N 2AX |

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

| Last Name | First Name | Middle Name |
|---|---|---|
| Beaudry | Jeremie | |

Street Address 1          Street Address 2

1 Bartholomew Lane

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| London | UNITED KINGDOM | EC2N 2AX |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Chief Legal Officer

| Last Name | First Name | Middle Name |
|---|---|---|
| Urata-Thompson | Harumi | |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 1 Bartholomew Lane | | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| London | UNITED KINGDOM | EC2N 2AX |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

Chief Financial Officer

| Last Name | First Name | Middle Name |
|---|---|---|
| Goldstein | Nuke | |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| 1 Bartholomew Lane | | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| London | UNITED KINGDOM | EC2N 2AX |

Relationship: [X] Executive Officer  [ ] Director  [ ] Promoter

Clarification of Response (if Necessary):

Chief Technology Officer

## 4. Industry Group

[ ] Agriculture

Banking & Financial Services
- [ ] Commercial Banking
- [ ] Insurance
- [ ] Investing
- [ ] Investment Banking
- [ ] Pooled Investment Fund

    Is the issuer registered as
    an investment company under
    the Investment Company
    Act of 1940?

Health Care
- [ ] Biotechnology
- [ ] Health Insurance
- [ ] Hospitals & Physicians
- [ ] Pharmaceuticals
- [ ] Other Health Care

[ ] Manufacturing

Real Estate
- [ ] Commercial

- [ ] Retailing

- [ ] Restaurants

Technology
- [ ] Computers
- [ ] Telecommunications
- [ ] Other Technology

Travel
- [ ] Airlines & Airports
- [ ] Lodging & Conventions

☐ Yes ☐ No ☐ Construction

☒ Other Banking & Financial Services ☐ REITS & Finance ☐ Tourism & Travel Services

☐ Business Services ☐ Residential ☐ Other Travel

Energy ☐ Other Real Estate ☐ Other

☐ Coal Mining

☐ Electric Utilities

☐ Energy Conservation

☐ Environmental Services

☐ Oil & Gas

☐ Other Energy

---

**5. Issuer Size**

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

---

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☐ Rule 504(b)(1) (not (i), (ii) or (iii)) ☐ Investment Company Act Section 3(c)

☐ Rule 504 (b)(1)(i) ☐ Section 3(c)(1) ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(ii) ☐ Section 3(c)(2) ☐ Section 3(c)(10)

☐ Rule 504 (b)(1)(iii) ☐ Section 3(c)(3) ☐ Section 3(c)(11)

☒ Rule 506(b) ☐ Section 3(c)(4) ☐ Section 3(c)(12)

☐ Rule 506(c)

☐ Securities Act Section 4(a)(5)

☐ Section 3(c)(5)          ☐ Section 3(c)(13)

☐ Section 3(c)(6)          ☐ Section 3(c)(14)

☐ Section 3(c)(7)

## 7. Type of Filing

☒ New Notice   Date of First Sale ☒ First Sale Yet to Occur

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?  ☐ Yes ☒ No

## 9. Type(s) of Securities Offered (select all that apply)

☐ Equity                                              ☐ Pooled Investment Fund Interests

☐ Debt                                                ☐ Tenant-in-Common Securities

☐ Option, Warrant or Other Right to Acquire Another Security   ☐ Mineral Property Securities

☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to   ☒ Other (describe)
Acquire Security

                                                      Digital token

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or   ☐ Yes ☒ No
exchange offer?

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $25,000 USD

## 12. Sales Compensation

Recipient                                             Recipient CRD Number ☒ None

(Associated) Broker or Dealer ☒ None                 (Associated) Broker or Dealer CRD Number ☒ None

Street Address 1                                      Street Address 2

City                                                  State/Province/Country                    ZIP/Postal Code

State(s) of Solicitation (select all that apply)   ☐ All States
Check "All States" or check individual States      ☐ Foreign/non-US

---

### 13. Offering and Sales Amounts

Total Offering Amount          USD  or  ☒ Indefinite

Total Amount Sold              $0 USD

Total Remaining to be Sold     USD  or  ☒ Indefinite

Clarification of Response (if Necessary):

Unable to determine exchange rate.

---

### 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such
non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total
number of investors who already have invested in the offering:                                           | 0 |

---

### 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check
the box next to the amount.

Sales Commissions $0 USD  ☐ Estimate

Finders' Fees $0 USD  ☐ Estimate

Clarification of Response (if Necessary):

---

### 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive
officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  ☐ Estimate

Clarification of Response (if Necessary):

---

### Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|--------|-----------|----------------|-------|------|
| Celsius Network Ltd | /s/ Harumi Urata-Thompson | Harumi Urata-Thompson | Chief Financial Officer | 2020-06-29 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

**Exhibit F**

**Sample Subscription Agreement**

[REGULATION D]



**CEL TOKEN**

**SUBSCRIPTION AGREEMENT**

Ladies and Gentlemen:

The undersigned (the "Subscriber") understands that Celsius Network Limited, a limited liability company incorporated under the laws of England and Wales (the "Company"), is offering for sale to the Subscriber for a purchase price of          [                 ], [             ] CEL Tokens ("CEL Tokens"), having the functions described on the Company's Website.  The Subscriber acknowledges that he, she or it is not acting on the basis of any representations or warranties other than those set forth in this subscription agreement (this "Subscription Agreement") and the user Terms of Use set forth on the Company's Website as the same may be amended from time to time (the "Terms of Use"), and understands that the offering of the CEL Tokens (the "Offering") is being made without registration of the CEL Tokens under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities, "blue sky" or other similar laws of any foreign or domestic state ("State Securities Laws"), including without limitation, the jurisdiction in which the Subscriber resides.

The Subscriber agrees as follows:

1.      <u>Subscription</u>.  The Subscriber hereby tenders this subscription and applies for the purchase of the CEL Tokens for a purchase price of          [            ] (the "Purchase Price").

2.      <u>Payment for CEL Tokens</u>.  Payment of the Purchase Price shall be made simultaneously with the execution and delivery of this Agreement by delivery to the Company by such payment method as directed or as may otherwise be acceptable to the Company.  If this subscription is not accepted or the

1

F09687-E000159661

Offering is terminated by the Company for any reason, all documents, together with the Purchase Price (without interest), will be returned to the Subscriber.  If this subscription is accepted by the Company, the Company will deliver a  countersigned copy of this Agreement  confirming the CEL Token  purchased by the Subscriber has been issued to the Subscriber promptly upon such acceptance.

3.      <u>Certain Acknowledgments and Agreements of Subscriber</u>.

(a)      The Subscriber understands and acknowledges and agrees that:  (i) the Company has the unconditional right, exercisable in its sole and absolute discretion, to accept or reject this Subscription Agreement, in whole or in part, (ii) the subscription is subject to prior sale, withdrawal, modification, or cancellation of the Offering by the Company, (iii) the subscription shall not be valid unless and until accepted by the Company, (iv) this Subscription Agreement shall be deemed to be accepted by the Company only when it is signed by an authorized officer of the Company on behalf of the Company, (v) Subscriber's acceptance of the Terms of Use is a condition precedent to the acceptance of the subscription, and (vi) notwithstanding anything in this Subscription Agreement to the contrary, the Company shall have no obligation to issue CEL Tokens to the Subscriber if such issuance would constitute a violation of the Securities Act or any State Securities Laws or any other laws.

(b)      The Subscriber further understands and acknowledges that that the CEL Tokens do not represent or confer any ownership right or stake, share, equity, ownership interest or equivalent rights, or any right to receive future revenue shares or voting rights in the Company or in any of its affiliates or any rights in the intellectual property of the Company or of any of its affiliates. Acquiring CEL Tokens shall not grant any right or influence over the Company's or any of its affiliates' organization and governance to Subscriber, other than rights relating to the potential future provision and receipt of services from the Company, subject to the limitations and conditions contained set forth in this Subscription Agreement and the Terms of Use.

4.      <u>Representations and Warranties of Company</u>.  In order to induce the Subscriber to tender this subscription, the Company hereby represents and warrants to the Subscriber as follows:

(a)      <u>Organization, Good Standing, Company Power and Qualification</u>.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of England and Wales and has all requisite company power and authority to carry on its business as presently conducted.

(b)      <u>Authorization</u>.  All action on the part of the Company necessary for (i)  the execution and delivery of this Subscription Agreement, (ii)  the performance of all obligations of the Company under this Subscription Agreement, and (iii) the issuance and delivery of the CEL Tokens has been taken or will be taken prior to acceptance of this subscription.  This Subscription Agreement, when executed and delivered by the Company, shall constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (x) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (y) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)      <u>Valid Issuance of CEL Tokens</u>.  The CEL Tokens subject to this subscription, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Subscription Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other

- 2 -

F09687-E000159661

than restrictions on transfer under the Terms of Use, applicable federal and State Securities Laws and liens or encumbrances created by or imposed by a Subscriber.

(d)      No Other Representations or Warranties.  Except for the representations and warranties made by the Company in this Agreement (the "Company Representations"), neither the Company nor any other person makes any representation or warranty with respect to the Company or its business, operations, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Subscriber or its representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing, and Subscriber is relying solely on the Company Representations in its execution, delivery and performance of this Agreement.      Each representation and warranty herein is deemed to be made on the date of this Subscription Agreement and to be true and correct only as of such date. Any cause of action arising from an alleged breach of such representations or warranties shall survive and be actionable only until the end of twelve (12) months from the date hereof, at which time any such cause of action will expire and be of no further effect unless a claim based on such cause had been properly brought forth by Subscriber by such date.

5.      Representations and Warranties of Subscriber.  In order to induce the Company to accept this subscription, the Subscriber hereby represents and warrants to the Company as follows:

(a)      The Subscriber (i) is an "Accredited Investor" as defined in Rule 501 of Regulation D under the Securities Act of 1933; or (ii) by reason of the Subscriber's business or financial experience (or the business or financial experience of the Subscriber's professional advisors who are unaffiliated with and who are not compensated by the Company or any affiliate or selling agent of the Company, directly or indirectly), has the capacity to protect the Subscriber's interests in connection with the proposed purchase of CEL Tokens;

(b)      SUBSCRIBER HAS RECEIVED, READ CAREFULLY AND UNDERSTANDS THIS SUBSCRIPTION AGREEMENT AND ALL EXHIBITS AND APPENDICES HERETO AND HAS HAD AN ADEQUATE OPPORTUNITY TO CONSULT SUBSCRIBER'S OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR SUBSCRIBER;

(c)      The Company has provided the Subscriber and his, her or its representative, if any, prior to the purchase of the CEL Tokens, with the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the financial data and business of the Company and to obtain any additional information related to the financial data and business of the Company, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory.  The Subscriber is satisfied that he, she or it has had the opportunity to ask questions of, and receive answers from, knowledgeable individuals concerning the Company and the CEL Tokens, and he, she or it has received adequate information concerning all matters which he, she or it considers material to a decision to purchase the CEL Tokens;

(d)      Subscriber understands that no offering statement, prospectus, memorandum or circular containing information with respect to the Company or the CEL Tokens has been or is to be prepared, and Subscriber has made his, her or its own inquiry and analysis with respect to the Company and the CEL Tokens.  Subscriber acknowledges receiving a copy of all documents he, she or it has requested to Subscriber's satisfaction.  Subscriber acknowledges that neither the Company nor any director or officer participated in, has any responsibility for, or makes any representations or warranties regarding the contents of any document or any omissions therefrom;

- 3 -

(e)      Subscriber understands and acknowledges that (i) Subscriber must bear the economic risk of an investment in the CEL Tokens for an indefinite period of time; (ii) the CEL Tokens have not been registered under the Securities Act or any State Securities Laws and is being offered and sold in reliance upon exemptions provided in the Securities Act and State Securities Laws for transactions not involving any public offering and, therefore, the CEL Tokens may not be resold or transferred unless it is subsequently registered under the Securities Act and applicable State Securities Laws or unless an exemption from such registration is available; and (iii) Subscriber is purchasing the CEL Tokens, and any purchase of the CEL Tokens will be, for investment purposes only for Subscriber's account and not with any view toward a distribution thereof;

(f)      Subscriber is aware and acknowledges that:  (i) an investment in the CEL Tokens is speculative and involves a risk of loss of the entire investment and no assurance can be given of any income from such investment; (ii) the Company has not made and cannot make any representation or warranty as to the future operations or financial condition of the Company; and (iii) there is no public market for, and there are substantial restrictions on the transferability of, the CEL Tokens and it may not be possible for Subscriber to liquidate the investment readily in case of an emergency;

(g)      Subscriber has adequate means of providing for all current and foreseeable needs and personal contingencies and has no need for liquidity in this investment;

(h)      Subscriber maintains a domicile or business at the address shown on the signature page of this Subscription Agreement, at which address Subscriber has subscribed for the CEL Tokens;

(i)      Subscriber has evaluated the risk of investing in the CEL Tokens, and has determined that the CEL Tokens are a suitable investment for Subscriber.  Subscriber can bear the economic risk of the investment and can afford a complete loss of the investment.  In evaluating the suitability of any investment in the CEL Tokens, Subscriber has not relied upon any representations or other information (whether oral or written) other than independent investigations made by Subscriber or Subscriber's representative(s); and

(j)      The information set forth on Appendix A attached hereto and made a part of this Subscription Agreement is true and accurate to the best of the Subscriber's knowledge and belief.  Subscriber understands that the Company will rely on the accuracy and completeness of such information.

(k)      Except for the representations and warranties made by Subscriber in this Agreement, the Terms of Use, and Appendix A hereto (the "Subscriber Representations"), Subscriber makes no representation or warranty with respect to Subscriber or, as applicable, any of Subscriber's business, operations, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Company or its representatives of any documentation or other information with respect to any one or more of the foregoing, and the Company is relying solely on the Subscriber Representations in its execution, delivery and performance of this Subscription Agreement.

(l)      Subscriber acknowledges that a breach by it of the Subscriber Representations will cause irreparable harm to the Company and that the remedies at law for Subscriber's breach of the Subscriber Representations under this Agreement will be inadequate.  Subscriber agrees, in the event of its breach of the Subscriber Representations, that the Company shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein: (i) to an injunction or injunctions restraining, preventing or curing any breach of the Subscriber Representations and to enforce specifically the terms and provisions hereof and thereof, without the necessity of showing

- 4 -

F09687-E000159661

economic loss and without any bond or other security being required, and (ii) to such other penalties it deems reasonable including, but not limited to, cancelling Subscriber's membership on the Company platform and/or burning or destroying any CEL Tokens held by Subscriber.

6.      Survival and Indemnification. All representations, warranties and covenants by Subscriber contained in this Subscription Agreement or any other documents executed and delivered in connection therewith and, including, without limitation, the indemnification contained in this Section 6 shall survive (i) the acceptance of this Subscription Agreement by the Company, (ii) changes in the transactions, documents and instruments described herein, and (iii) the death, disability or dissolution of the Subscriber.  The Subscriber acknowledges the meaning and legal consequences of the representations, warranties and covenants in determining the Subscriber's qualification and suitability to acquire the CEL Tokens.  The Subscriber hereby agrees to indemnify, defend and hold harmless the Company, and its officers, directors, employees, agents and controlling persons, from and against any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and disbursements), judgments or amounts paid in settlement of actions arising out of or resulting from the untruth of any representation herein or the breach of any warranty, covenant or acknowledgment made herein by the Subscriber.

7.      Notices. All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, confirmed e-mail or facsimile, or overnight air courier guaranteeing next day delivery:

(a)      if to the Company, to it at the following address:

Celsius Network Limited
1 Bartholomew Lane
London, UK, EC2N 2AX
Attn: Harumi Urata-Thompson
Email: OTC@celsius.network

(b)      if to the Subscriber, to the address set forth on the signature page hereto, or at such other address as either party shall have specified by notice in writing to the other.

8.      Assignability.  This Subscription Agreement is not assignable by the Subscriber, and may not be modified, waived or terminated except by an instrument in writing signed by the party against whom enforcement of such modifications, waiver or termination is sought.

9.      Entire Agreement.  This Subscription Agreement and the Terms of Use constitute the entire agreement of the Subscriber and the Company relating to the matters contained herein, superseding all prior contracts or agreements, whether oral or written.

10.     Governing Law.  This Subscription Agreement shall be governed and controlled as to the validity, enforcement, interpretation, construction and effect and in all other aspects by the substantive laws of the State of New York, without reference to conflicts of laws principles (except insofar as affected by the state securities or "blue sky" law of the jurisdiction in which the Offering has been made to Subscriber).

11.     Severability.  If any provision of this Subscription Agreement or the application thereof to any circumstance shall be held invalid or unenforceable to any extent, the remainder of this Subscription

- 5 -

F09687-E000159661

Agreement and the application of such provision to other subscriptions or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

12.     Headings.  The headings in this Subscription Agreement are inserted for convenience only and are not intended to describe, interpret, defined, or limit the scope, extent or intent of this Subscription Agreement or any provision hereof.

13.     Counterparts.  This Subscription Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

14.     Amendment and Modification.  This Subscription Agreement may be amended or modified, or any provision hereof may be waived, provided that such amendment or waiver is set forth in writing executed by the Company and the Subscriber.  No course of dealing between or among any persons having any interest in this Subscription Agreement will be deemed effective to modify, amend or discharge any part of this Subscription Agreement or any rights or obligations of any person under or by reason of this Subscription Agreement.

15.     Jurisdiction.  The Subscriber hereby irrevocably consents, to the maximum extent permitted by law, that any legal action or proceeding against it by the Company, arising out of or in any manner relating to this Subscription Agreement shall be brought exclusively in either the state or federal courts located in New York, New York.  By its execution and delivery of this Subscription Agreement, the Subscriber expressly and irrevocably consents and submits to the personal jurisdiction and jurisdiction over their property of all of such courts in any such action or proceeding.  The Subscriber expressly and irrevocably waives its claims and defenses in any such action or proceeding in any of such courts based on any alleged lack of personal jurisdiction, improper venue or forum non conveniens or any similar basis to the maximum extent permitted by law.

16.     Binding Effect.  This Subscription Agreement shall be binding upon the Subscriber and the heirs, personal representatives, successors and permitted assigns of Subscriber (provided that this Subscription Agreement and the rights and obligations of Subscriber hereunder are not transferable or assignable by Subscriber).

[Signature Page Follows]

- 6 -

IN WITNESS WHEREOF, the undersigned Subscriber has executed this Subscription Agreement as of the
___ day of _____, 2020.


_____
Subscriber's Full Legal Name                      Signature of Subscriber
(Please Print)


_____     _____
Residence Address                                 Date of Execution by Subscriber


_____
City, State, Zip Code                             U.S. Social Security or Taxpayer I.D. No.
(if Applicable)


_____
Telephone Number                                  Email Address

**Please Check Appropriate Category**:

___ Individual
___ Tenants in Common
___ Joint tenants with right of survivorship
___ As custodian, trustee or agent for:
___ Other (*e.g.*, corporation, Company, etc.)


AGREED TO AND ACCEPTED BY:                        OFFERED AMOUNT:

CELSIUS NETWORK LIMITED                           CEL Tokens                    [          ]

                                                  Total Purchase Price:         [          ]


By:_____
Name:
Title:


[SIGNATURE PAGE - CELSIUS SUBSCRIPTION AGREEMENT]

{N0445779; 1}

F09687-E000159661

**APPENDIX A**

**CELSIUS NETWORK LIMITED**
**PROSPECTIVE INVESTOR QUESTIONNAIRE**

THIS QUESTIONNAIRE MUST BE COMPLETED AND DELIVERED TO
CELSIUS NETWORK LIMITED (THE "COMPANY") BY YOU AS A PROSPECTIVE INVESTOR IN THE COMPANY.

**INSTRUCTIONS**:

The purpose of this Prospective Investor Questionnaire (the "Questionnaire") is to determine whether you or the entity on whose behalf you are completing this Questionnaire (the "Investor") meet the standards  imposed by Section 4(2) of, or Rules 501 and 506 under, the Securities Act of 1933, as amended (the "Securities Act"). This offering has not been, and will not be, registered under the Securities Act, and the securities involved in this offering are being sold in reliance upon an exemption from the registration requirements thereof. Please complete, as thoroughly as possible, sign and date this Questionnaire, and deliver it to Celsius Network Limited, attn: Harumi Urata-Thompson, at OTC@celsius.network. Please contact Harumi Urata-Thompson at OTC@celsius.network if you have any questions with respect to this Questionnaire.

If an entity is the potential investor, the term "you" in this Questionnaire refers to the entity rather than the individual completing this Questionnaire. Your answers will be kept confidential, except to the extent disclosure may be required under any federal or state laws. However, each person who agrees to invest in the Company hereby agrees that the Company may present this Questionnaire or a copy hereof to its attorneys or such other parties as it, in its sole discretion, deems appropriate to assure itself that the proposed offer and sale of the CEL Tokens (the "CEL Tokens") in the Company will not result in a violation of (i) the registration provisions of the Securities Act, (ii) the securities or "blue sky" laws of any state or (iii) any anti-money laundering statute or regulation.

Please print or type:

**A.      General Information**

Legal Name of Potential Investor:_____

Business Address:_____

_____

Business Telephone:_____

**B.      Account Information for Wire Transfers to Investor**

Name of Financial Institution:

Address of Financial Institution:

{N0445779; 1}

(Number and Street)

(City)                                    (State)           (Zip Code)                    (Country)

ABA Number:

Sub Account (if any):

Sub A/C No. (if any):

SWIFT Code:[1]*

For Further Credit (FFC) to:

Account Name:

Account Number:

Name of Banking Officer:

Telephone Number:

Facsimile Number:

[Remainder of page intentionally left blank.]

---

[1]* Required for U.S. wire transfers to non-U.S. banks.  Please contact your bank for more information.

CELSIUS NETWORK LIMITED
INVESTOR QUESTIONNAIRE

**FOR INDIVIDUALS**

***Individuals: Please complete Sections I and III of this Questionnaire***. You must also include a completed IRS Form W9. This form is available online at www.irs.gov.

**Section I.A.**        **Verification of Status as "Accredited Investor" under Regulation D**

*The Investor represents and warrants that it is an "accredited investor" within the meaning of Regulation D under the Securities Act and has initialed the applicable statements below pursuant to which the Investor so qualifies.*

<u>PLEASE INITIAL EACH APPLICABLE STATEMENT BELOW</u>

1.              The Investor is a natural person whose individual net worth[2] (or joint net worth with such person's spouse) exceeds $1,000,000.

2.              The Investor is a natural person (individual) who had an individual income in excess of $200,000 (or joint income with the Investor's spouse in excess of $300,000) in each of the two previous years and who reasonably expects a gross income in excess of $200,000 (or joint income with the Investor's spouse in excess of $300,000) this year.

3.              The Investor is a director, executive officer or general partner of the Company.

---

[2] For purposes of this item, "***net worth***" means the excess of (a) total assets at fair market value, including personal property but excluding the Subscriber's primary residence, over (b) total liabilities, including (i) any mortgage debt which exceeds the value of the Subscriber's primary residence and (ii) any mortgage debt as of the date hereof in excess of the amount outstanding 60 days prior, other than as a result of the acquisition of the primary residence.

CELSIUS NETWORK LIMITED
INVESTOR QUESTIONNAIRE

1.    **FOR ENTITIES**

***Entities (nonindividuals): Please complete Sections II and III of this Questionnaire***. You must also include a completed IRS Form W-9. This form is available online at www.irs.gov.

**Section II.A.    Verification of Status as "Accredited Investor" under Regulation D**

*The Investor represents and warrants that it is an "accredited investor" within the meaning of Regulation D under the Securities Act and has initialed the applicable statements below pursuant to which the Investor so qualifies.*

<u>PLEASE INITIAL APPLICABLE STATEMENTS BELOW</u>

1.    The Investor is either (i) a corporation, (ii) an organization described in Section 501(c)(3)of the Internal Revenue Code, (iii) a Massachusetts or similar business trust, or (iv) a partnership, in each case not formed for the specific purpose of acquiring the securities offered, <u>and</u> in each case with total assets in excess of $5,000,000.

2.    The Investor is either (i) a bank, or any savings and loan association or other institution acting in its individual or fiduciary capacity; (ii) a broker or dealer; (iii) an insurance company; (iv) an investment company or a business development company under Section 3(c)(1) of the Investment Company Act of 1940, as amended (the "1940 Act") or a private business development company under the 1940 Act; (v) a Small Business Investment Company licensed by the U.S. Small Business Administration; or (vi) an employee benefit plan whose investment decision is being made by a plan fiduciary, which is either a bank, savings and loan association, insurance company or registered investment adviser, or an employee benefit plan whose total assets are in excess of $5,000,000 or a self-directed employee benefit plan whose investment decisions are made solely by persons that are accredited investors.

3.    The Investor is a trust, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000 and whose purchase is directed by a sophisticated person.

4.    The Investor is an entity as to which all the equity owners are accredited investors.

*If only this Item (4) has been initialed (i.e., not 1, 2 or 3), please have each such equity owner fill out and sign the Questionnaire for Individuals or this Questionnaire for Entities, as applicable. Please fee free to make copies of these pages for each equity owner (or income beneficiary).*

CELSIUS NETWORK LIMITED
INVESTOR QUESTIONNAIRE

2.      **Supplemental Data for ENTITIES** (natural persons may skip this section)

If the Investor is an entity, please furnish the following supplemental data:

1.      Legal form of entity (corporation, partnership, trust, etc.):

2.      Jurisdiction of organization:

3.      Is the Investor a registered investment company or a private investment fund which is not registered under the 1940 Act in reliance on Section 3(c)(1) or 3(c)(7) thereof? Note: If the answer is "Yes", your voting power may be limited or the Company may limit your investment in the Company.

Yes _____      No _____

4.      The fiscal year-end of the Investor is                                              .
(Month/Day)

5.      Was the Investor organized for the specific purpose of acquiring the CEL Tokens?

Yes _____      No _____

6.      Will more than 40% of Investor's total assets (on a consolidated basis with its subsidiaries) (after giving effect to this subscription) be invested in the Company?

Yes _____      No _____

7.      Are the interest holders in the Investor able to decide individually whether to participate, or the extent of their participation, in the Investor's investment in the Company?

Yes _____      No _____

8.      *Authorized Signatories*. Set forth below are the names of persons authorized by the Investor to give and receive instructions between the Company and the Investor, together with their respective signatures. Such persons are the only persons so authorized until further written notice to the Company signed by one or more of such persons.
                        *(please attach additional pages if needed)*

| Name | Signature |
| --- | --- |
|  |  |
|  |  |
|  |  |

F09687-E000159661

**ALL PROSPECTIVE INVESTORS MUST COMPLETE THIS SECTION**

**Nominees:**

Please answer each of the following questions, if applicable:

(a)      Are you investing as a nominee for, or otherwise for or on behalf of, anyone other than yourself?

Yes_____    No_____

(b)      If the answer to (a) is "yes", the person for whom you are acting:

*Please check one*

_____ is an individual
_____ is an entity, but is not an investment fund
_____ is an investment fund (including any hedge fund)

If you are investing as a nominee, please complete this Section III and supply information for the individual or entity for whom you are acting.

**Information relating to Exempt Categories:**

Are you an investment company registered under the 1940 Act?

Yes_____    No_____

Are you a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934, as amended, that meets the following criteria:

the fund has investments from 1,000 or more accounts; and

the fund does not limit beneficial interests in the fund principally to trust accounts of restricted persons.

Yes_____    No_____

Are you an insurance company general, separate or investment account that meets the following criteria:

the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders; and

the insurance company does not limit the policyholders whose premiums are used to fund the account principally to restricted persons, or, if a general account, the insurance company does not limit its policyholders principally to restricted persons.

Yes_____    No_____

CELSIUS NETWORK LIMITED
INVESTOR QUESTIONNAIRE

Are you a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member of underwriter) that:

is listed on a national securities exchange;

is traded on the NASDAQ Global Market or Global Select Market; or

is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange or trading on the NASDAQ Global Market or Global Select Market.

Yes_____    No_____

Are you an investment company organized under the laws of a foreign jurisdiction, that meets the following criteria:

the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and

no person owning more than 5% of the shares of the investment company is a "restricted person".

Yes_____    No_____

Are you an Employee Retirement Income Security Act benefits plan that is qualified under Section 401(a) of the Internal Revenue Code (if such plan is sponsored solely by a broker-dealer you must check "no", however).

Yes_____    No_____

Are you a state or municipal government benefits plan that is subject to state and/or municipal regulation?

Yes_____    No_____

Are you a tax exempt charitable organization under Section 501(c)(3) of the Internal Revenue Code?

Yes_____    No_____

Are you a church plan under Section 414(e) of the Internal Revenue Code?

Yes_____    No_____

Are you an entity (including a qualified retirement plan) in which a holder of an interest may decide whether or how much to invest through you in various investment vehicles including the Company?

Yes_____    No_____

The undersigned understands that the CEL Tokens have not been, and will not be, registered under the Securities Act and are being sold in reliance upon an exemption from such Act, and that such reliance is based in part on the information herein supplied. The undersigned agrees to provide the Company with

CELSIUS NETWORK LIMITED
INVESTOR QUESTIONNAIRE

F09687-E000159661

such other information as it may reasonably request, subject to the same conditions regarding the confidentiality of such information stated on page l of this Questionnaire. The foregoing statements are true, accurate and complete to the best of the undersigned's information and belief, and the undersigned hereby agrees promptly to notify and supply corrective information to the Company if, prior to the consummation of its investment in the Company, any of such information becomes inaccurate or incomplete.

**For Execution by Natural Person(s)**

Signature of Prospective Investor:

_____

Please Print Name:

_____

Executed at _____(City, State) as of this _____ day of _____, 2020.

**For Execution by Entities**

Name of Entity
(Please Print):

_____

By:_____

Title:_____

Executed at _____(City, State) as of this _____ day of _____, 2020.

_____

CELSIUS NETWORK LIMITED
INVESTOR QUESTIONNAIRE

## **Exhibit G**

**Sample International Subscription Agreement**

[REGULATION S]



**CEL TOKEN**

**SUBSCRIPTION AGREEMENT**

Ladies and Gentlemen:

The undersigned (the "Subscriber") understands that Celsius Network Limited, a limited liability company incorporated under the laws of England and Wales (the "Company"), is offering for sale to the Subscriber for a purchase price of [                    ] (the "Purchase Price"), [                    ] CEL Tokens ("CEL Tokens"), having the functions described on the Company's Website (collectively with the aggregate amount of CEL Tokens offered to each other subscriber of the CEL Tokens, the "Offering").

The Subscriber acknowledges that it is not acting on the basis of any representations or warranties other than those set forth in this subscription agreement (this "Subscription Agreement") and the user Terms of Use set forth on the Company's Website as the same may be amended from time to time (the "Terms of Use") and understands that the Offering is being made without registration of the CEL Tokens under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities, "blue sky" or other similar laws of any foreign or domestic state ("State Securities Laws"), including without limitation, the jurisdiction in which the Subscriber resides.

The Subscriber agrees as follows:

1.      <u>Subscription</u>.    The Subscriber hereby tenders this subscription and applies for the purchase of the CEL Tokens for the Purchase Price.

2.      <u>Payment for CEL Tokens</u>.  Payment of the Purchase Price shall be made simultaneously with the execution and delivery of this Agreement by delivery to the Company by such payment method as directed or as may otherwise be acceptable to the Company.    If this subscription is not accepted or the Offering is terminated by the Company for any reason, all documents, together with the Purchase

1

F09687-E000159662

Price (without interest), will be returned to the Subscriber.  If this subscription is accepted by the Company, the Company will deliver a  countersigned copy of this Agreement  confirming the CEL Token purchased by the Subscriber has been issued to the Subscriber promptly upon such acceptance.

    3.    <u>Certain Acknowledgements and Agreements of Subscriber</u>.

    (a)    The Subscriber understands and acknowledges and agrees that: (i) the Company has the unconditional right, exercisable in its sole and absolute discretion, to accept or reject this Subscription Agreement in whole or in part, (ii) the subscription is subject to prior sale, withdrawal, modification, or cancellation of the Offering by the Company, (iii) the subscription shall not be valid unless and until accepted by the Company, (iv) this Subscription Agreement shall be deemed to be accepted by the Company only when it is signed by an authorized officer of the Company on behalf of the Company, (v) Subscriber's acceptance of the Terms of Use is a condition precedent to the acceptance of the subscription, and (vi) notwithstanding anything in this Subscription Agreement to the contrary, the Company shall have no obligation to issue CEL Tokens to the Subscriber if such issuance would constitute a violation of the Securities Act or any State Securities Laws or any other laws.

    (b)    The Subscriber further understands and acknowledges that that the CEL Tokens do not represent or confer any ownership right or stake, share, equity, ownership interest or equivalent rights, or any right to receive future revenue shares or voting rights in the Company or in any of its affiliates or any rights in the intellectual property of the Company or of any of its affiliates. Acquiring CEL Tokens shall not grant any right or influence over the Company's or any of its affiliates' organization and governance to Subscriber, other than rights relating to the potential future provision and receipt of services from the Company, subject to the limitations and conditions contained set forth in this Subscription Agreement and the Terms of Use.

    4.    <u>Representations and Warranties of Company</u>.  In order to induce the Subscriber to tender this subscription, the Company hereby represents and warrants to the Subscriber as follows:

    (a)    <u>Organization, Good Standing, Company Power and Qualification</u>.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of England and Wales and has all requisite company power and authority to carry on its business as presently conducted.

    (b)    <u>Authorization</u>.  All action on the part of the Company necessary for (i) the execution and delivery of this Subscription Agreement, (ii) the performance of all obligations of the Company under this Subscription Agreement, and (iii) the issuance and delivery of the CEL Tokens has been taken or will be taken prior to acceptance of this subscription. This Subscription Agreement, when executed and delivered by the Company, shall constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (x) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (y) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

    (c)    <u>Valid Issuance of CEL Tokens</u>.  The CEL Tokens subject to this subscription, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Subscription Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Terms of Use, applicable federal and State Securities Laws and liens or encumbrances created by or imposed by a Subscriber.

{S2595484; 1}    - 2 -

(d)    No Other Representations or Warranties.  Except for the representations and warranties made by the Company in this Agreement (the "Company Representations"), neither the Company nor any other person makes any representation or warranty with respect to the Company or its business, operations, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Subscriber or its representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing, and Subscriber is relying solely on the Company Representations in its execution, delivery and performance of this Agreement.   Each representation and warranty herein is deemed to be made on the date of this Subscription Agreement and to be true and correct only as of such date. Any cause of action arising from an alleged breach of such representations or warranties shall survive and be actionable only until the end of twelve (12) months from the date hereof, at which time any such cause of action will expire and be of no further effect unless a claim based on such cause had been properly brought forth by Subscriber by such date.

5.    Representations and Warranties of Subscriber.  In order to induce the Company to accept this subscription, the Subscriber hereby represents and warrants to the Company as follows:

(a)    Subscriber:

(i)    is not a U.S. person[1*] as that term is defined under Regulation S ("Regulation S") promulgated under the Securities Act;

(ii)    is outside the United States* as of the date of the execution and delivery of this Subscription Agreement;

(iii)    is acquiring the CEL Tokens for its own account (and/or for the account of other non-U.S. persons*, who are outside of the United States*) and not on behalf of any U.S. person, and the sale has not been prearranged with a person in the United States;

(iv)    is not acquiring the CEL Tokens with the present intention  of "distributing" the CEL Tokens on behalf of the Company or a "distributor"* as defined in Regulation S, or any of their affiliates, in the United States or to a U.S. person under Regulation S;

(v)    acknowledges that, in addition to other restraints on transfer set forth in the Terms of Use: (x) the CEL Tokens may only be resold in accordance with the provisions of Regulation S and cannot be sold by it in the United States as part of a "distribution" (as such term is defined in the federal securities laws of the United States), and (y) cannot be sold by it to any U.S. person* until after one year and one day from the date that this Subscription Agreement has been accepted by the Company; and

(vi)    agrees not to engage in any hedging transaction with regard to the CEL Tokens.

(b)    SUBSCRIBER HAS RECEIVED, READ CAREFULLY AND UNDERSTANDS THIS SUBSCRIPTION AGREEMENT AND ALL EXHIBITS AND APPENDICES HERETO AND HAS HAD AN ADEQUATE OPPORTUNITY TO CONSULT SUBSCRIBER'S OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR SUBSCRIBER;

---

[1*] "U.S. person", "United States" and "distributor" defined in Appendix A hereto.

F09687-E000159662

(c)       The Company has provided the Subscriber and his, her or its representative, if any, prior to the purchase of the CEL Tokens, with the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the financial data and business of the Company and to obtain any additional information related to the financial data and business of the Company, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory.  The Subscriber is satisfied that he, she or it has received adequate information concerning all matters which he, she or it considers material to a decision to purchase the CEL Tokens;

(d)       Subscriber understands and acknowledges that (i) Subscriber must bear the economic risk of an investment in the CEL Tokens for an indefinite period of time; (ii) the CEL Tokens have not been registered under the Securities Act or any State Securities Laws and is being offered and sold in reliance upon exemptions provided in the Securities Act and State Securities Laws for transactions not involving any public offering and, therefore, the CEL Tokens may not be resold or transferred unless it is subsequently registered under the Securities Act and applicable State Securities Laws or unless an exemption from such registration is available; and (iii) Subscriber is purchasing the CEL Tokens, and any purchase of the CEL Tokens will be, for investment purposes only for Subscriber's account and not with any view toward a distribution thereof;

(e)       Subscriber is aware and acknowledges that: (i) an investment in the CEL Tokens is speculative and involves a risk of loss of the entire investment and no assurance can be given of any income from such investment; (ii) the Company has not made and cannot make any representation or warranty as to the future operations or financial condition of the Company; and (iii) there is no public market for, and there are substantial restrictions on the transferability of, the CEL Tokens and it may not be possible for Subscriber to liquidate the investment readily in case of an emergency;

(f)       Subscriber has adequate means of providing for all current and foreseeable needs and personal contingencies and has no need for liquidity in this investment;

(g)       Subscriber maintains a domicile or business at the address shown on the signature page of this Subscription Agreement, at which address Subscriber has subscribed for the CEL Tokens; and

(h)       Subscriber has evaluated the risk of investing in the CEL Tokens, and has determined that the CEL Tokens are a suitable investment for Subscriber.  Subscriber can bear the economic risk of the investment and can afford a complete loss of the investment.  In evaluating the suitability of any investment in the CEL Tokens, Subscriber has not relied upon any representations or other information (whether oral or written) other than independent investigations made by Subscriber or Subscriber's representative(s); and

(i)       Subscriber understands that the Company will rely on the accuracy and completeness of the information provided by Subscriber in this Agreement and the Terms of Use (the "Subscriber Representations").  Such information is accurate and complete.

(j)       Subscriber acknowledges that a breach by it of the Subscriber Representations will cause irreparable harm to the Company and that the remedies at law for Subscriber's breach of the Subscriber Representations under this Agreement will be inadequate.  Subscriber agrees, in the event of its breach of the Subscriber Representations, that the Company shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein: (i) to an injunction or injunctions restraining, preventing or curing any breach of the Subscriber Representations

F09687-E000159662

and to enforce specifically the terms and provisions hereof and thereof, without the necessity of showing economic loss and without any bond or other security being required, and (ii) to such other penalties it deems reasonable including, but not limited to, cancelling Subscriber's membership on the Company platform and/or burning or destroying any CEL Tokens held by Subscriber.

6.    <u>Survival and Indemnification</u>. All representations, warranties and covenants by Subscriber contained in this Subscription Agreement or any other documents executed and delivered in connection therewith and including, without limitation, the indemnification contained in this <u>Section 6</u> shall survive (i) the acceptance of this Subscription Agreement by the Company, (ii) changes in the transactions, documents and instruments described herein, and (iii) the death, disability or dissolution of the Subscriber.   The Subscriber acknowledges the meaning and legal consequences of the representations, warranties and covenants in determining the Subscriber's qualification and suitability to acquire the CEL Tokens.  The Subscriber hereby agrees to indemnify, defend and hold harmless the Company, and its officers, directors, employees, agents and controlling persons, from and against any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and disbursements), judgments or amounts paid in settlement of actions arising out of or resulting from the untruth of any representation herein or the breach of any warranty, covenant or acknowledgment made herein by the Subscriber.

7.    <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, confirmed e-mail or facsimile, or overnight air courier guaranteeing next day delivery:

(a)    if to the Company, to it at the following address:

Celsius Network Limited
1 Bartholomew Lane
London, United Kingdom EC2N 2AX
Attn: Harumi Urata-Thompson
Email: OTC@celsius.network

(b)    if to the Subscriber, to the address set forth on the signature page hereto, or at such other address as either party shall have specified by notice in writing to the other.

8.    <u>Assignability</u>.  This Subscription Agreement is not assignable by the Subscriber, and may not be modified, waived or terminated except by an instrument in writing signed by the party against whom enforcement of such modifications, waiver or termination is sought.

9.    <u>Entire Agreement</u>.  This Subscription Agreement and the Terms of Use constitute the entire agreement of the Subscriber and the Company relating to the matters contained herein, superseding all prior contracts or agreements, whether oral or written.

10.    <u>Governing Law</u>.  This Subscription Agreement shall be governed and controlled as to the validity, enforcement, interpretation, construction and effect and in all other aspects by the substantive laws of the State of New York, without reference to conflicts of laws principles (except insofar as affected by the state securities or "blue sky" law of the jurisdiction in which the Offering has been made to Subscriber).

F09687-E000159662

11.     <u>Severability</u>.  If any provision of this Subscription Agreement or the application thereof to any circumstance shall be held invalid or unenforceable to any extent, the remainder of this Subscription Agreement and the application of such provision to other subscriptions or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

12.     <u>Headings</u>.  The headings in this Subscription Agreement are inserted for convenience only and are not intended to describe, interpret, defined, or limit the scope, extent or intent of this Subscription Agreement or any provision hereof.

13.     <u>Counterparts</u>.  This Subscription Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

14.     <u>Amendment and Modification</u>.  This Subscription Agreement may be amended or modified, or any provision hereof may be waived, provided that such amendment or waiver is set forth in writing executed by the Company and the Subscriber.  No course of dealing between or among any persons having any interest in this Subscription Agreement will be deemed effective to modify, amend or discharge any part of this Subscription Agreement or any rights or obligations of any person under or by reason of this Subscription Agreement.

15.     <u>Jurisdiction</u>.  The Subscriber hereby irrevocably consents, to the maximum extent permitted by law, that any legal action or proceeding against it by the Company, arising out of or in any manner relating to this Subscription Agreement shall be brought exclusively in either the state or federal courts located in New York, New York.  By its execution and delivery of this Subscription Agreement, the Subscriber expressly and irrevocably consents and submits to the personal jurisdiction and jurisdiction over their property of all of such courts in any such action or proceeding.  The Subscriber expressly and irrevocably waives its claims and defenses in any such action or proceeding in any of such courts based on any alleged lack of personal jurisdiction, improper venue or forum non conveniens or any similar basis to the maximum extent permitted by law.

16.     <u>Binding Effect</u>.  This Subscription Agreement shall be binding upon the Subscriber and the heirs, personal representatives, successors and permitted assigns of Subscriber (provided that this Subscription Agreement and the rights and obligations of Subscriber hereunder are not transferable or assignable by Subscriber).

[Signature Page Follows]

F09687-E000159662

IN WITNESS WHEREOF, the undersigned Subscriber has executed this Subscription Agreement as of the ___ day of _____, 2020.

__

Subscriber's Full Legal Name

By:

Signature of Subscriber

Name:

Title:

_____

Address

Date of Execution by Subscriber

_____

City, Country

U.S. Social Security or Taxpayer I.D. No. (if Applicable)

_____

Telephone Number

Email Address

**Please Check Appropriate Category**:

___ Individual
___ Tenants in Common
___ Joint tenants with right of survivorship
___ As custodian, trustee or agent for:

___ Other (*e.g.*, corporation, Company, etc.)

AGREED TO AND ACCEPTED BY:

OFFERED AMOUNT:

CELSIUS NETWORK LIMITED

CEL Tokens                [            ]

By:_____

Total Purchase Price:      [            ]

Its:_____

F09687-E000159662

## APPENDIX A

Pursuant to Rule 902(d), (k) and (l) of Regulation S, the terms "distributor," "U.S. person" and "United States" are defined as follows:

(a)  <u>Distributor</u>.  "Distributor" means any underwriter, dealer, or other person who participates pursuant to a contractual arrangement, in the distribution of the securities offered or sold in reliance on Regulation S.

(b)  <u>U.S. Person</u>.

(A)  "U.S. person" means:

(i)  Any natural person resident in the United States;

(ii)  Any partnership or corporation organized or incorporated under the laws of the United States;

(iii)  An estate of which any executor or administrator is a U.S. person;

(iv)  Any trust of which any trustee is a U.S. person;

(v)  Any agency or branch of a foreign entity located in the United States;

(vi)  Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; and

(vii)  Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the United States; and

(viii)  Any partnership or corporation if:  (1) organized or incorporated under the laws of any foreign jurisdiction; and (2) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act of 1933, unless it is organized or incorporated and owned, by accredited investors (as defined in Rule 501(a)) who are not natural persons, estate or trusts.

(B)  Notwithstanding paragraph (k)(1) of Rule 902, any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States shall not be deemed a "U.S. person".

(C)  Notwithstanding paragraph (k)(1) of Rule 902, any estate of which any professional fiduciary acting as executor or administrator is a U.S. person shall not be deemed a U.S. person if:

(i)  An executor or administrator or the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estates; and

F09687-E000159662

(ii)    The estate is governed by foreign law.

(D)    Notwithstanding paragraph (k)(1) of Rule 902, any trust of which any professional fiduciary acting as trustee is a U.S. person shall not be deemed a U.S. person if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person.

(E)    Notwithstanding paragraph (k)(1) of Rule 902, an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country shall not be deemed a U.S. person.

(F)    Notwithstanding paragraph (o)(1) of Rule 902, any agency or branch of a U.S. person located outside the United States shall not be deemed a "U.S. person" if:

(i)    The agency or branch operates for valid business reasons; and

(ii)    The agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located.

(G)    The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, any other similar international organizations, their agencies, affiliates and pension plans shall not be deemed "U.S. persons".

(c)    <u>United States</u>.  "United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

{S2595484; 1}

**<u>Exhibit H</u>**

**CEL Token Success Presentation**

# Investor Deck

June 2020

Copyright 2019 Celsius Network  Confidential Information provided under NDA. Not for circulation. Draft 1.4

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027852
CELSIUS_CFTC_00056972
CELSIUS_CFTC_00056972



# Legal Considerations, Risks & Disclaimers

## General
· The information provided in this presentation pertaining to Celsius Network Inc. and subsidiaries. ("Celsius" or the "Company"), its business assets, strategy and operations is for general informational purposes only and is not a formal offer to sell or a solicitation of an offer to buy any securities, options, futures, or other derivatives related to securities in any jurisdiction and its content is not prescribed by securities laws. Information contained in this presentation should not be relied upon as advice to buy or sell or hold such securities or as an offer to sell such securities. This presentation does not take into account nor does it provide any tax, legal or investment advice or opinion regarding the specific investment objectives or financial situation of any person. While the information in this presentation is believed to be accurate and reliable, Celsius and its agents, advisors, directors, officers, employees and shareholders make no representation or warranties, expressed or implied, as to the accuracy of such information and Celsius expressly disclaims any and all liability that may be based on such information or errors or omissions thereof. Celsius reserves the right to amend or replace the information contained herein, in part or entirely, at any time, and undertakes no obligation to provide the recipient with access to the amended information or to notify the recipient thereof.
· The information contained in this presentation is intended only for the persons to whom it is transmitted for the purposes of evaluating the Company. The information contained in this presentation supersedes any prior presentation or conversation concerning the Company. Any information, representations or statements not contained herein shall not be relied upon for any purpose.
· Neither we nor any of our representatives shall have any liability whatsoever, under contract, tort, trust or otherwise, to you or any person resulting from the use of the information in this presentation by you or any of your representatives or for omissions from the information in this presentation. Additionally, the Company undertakes no obligation to comment on the expectations of, or statements made by, third parties in respect of the matters discussed in this presentation.

## Confidentiality
· This presentation is confidential and is intended, among other things, to present a general outline of the Company. The contents are not to be reproduced or distributed to the public or press. Each person who has received a copy of this presentation (whether or not such person purchases any securities) is deemed to have agreed: (i) not to reproduce or distribute this presentation, in whole or in part, without the prior written consent of the Company, other than to legal, tax, financial and other advisors on a need to know basis, (ii) if such person has not purchased securities, to return this presentation to the Company upon its request, (iii) without the prior written consent of the Company, not to disclose any information contained in this presentation except to the extent that such information was (a) previously known by such person through a source (other than the Company) not bound by any obligation to keep such information confidential, (b) in the public domain through no fault of such person, or (c) lawfully obtained at a later date by such person from sources (other than the Company) not bound by any obligation to keep such information confidential, and (iv) to be responsible for any disclosure of this presentation, or the information contained herein, by such person or any of its employees, agents or representatives.



FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027853
CELSIUS_CFTC_00056973
CELSIUS_CFTC_00056972



# Legal Considerations, Risks & Disclaimers

**Forward Looking Statements and Financial Projections**

· Certain information in this presentation and oral statements made in any meeting are forward-looking and relate to Celsius and its anticipated financial position, business strategy, events and courses of action. Words or phrases such as "anticipate," "objective," "may," "will," "might," "should," "could," "can," "intend," "expect," "believe," "estimate," "predict," "potential," "plan," "is designed to" or similar expressions suggest future outcomes. Forward-looking statements and financial projections include, among other things, statements about: our expectations regarding our expenses, sales and operations; our future customer concentration; our anticipated cash needs, our estimates regarding our capital requirements, our need for additional financing; our ability to anticipate the future needs of our customers; our plans for future products and enhancements of existing products; our future growth strategy and growth rate; our future intellectual property; and our anticipated trends and challenges in the markets in which we operate. Forward-looking statements and financial projections are based on the opinions and estimates of management at the date the statements are made, and are subject to a variety of risks and uncertainties and other factors that could cause actual events or results to differ materially from those anticipated in the forward-looking statements and financial projections. Although we believe that the expectations reflected in the forward-looking statements and financial projections are reasonable, there can be no assurance that such expectations will prove to be correct. We cannot guarantee future results, level of activity, performance or achievements and there is no representation that the actual results achieved will be the same, in whole or in part, as those set out in the forward-looking statements and financial projections.

· By their nature, forward-looking statements and financial projections involve numerous assumptions, known and unknown risks and uncertainties, both general and specific, that contribute to the possibility that the predictions, forecasts, projections and other forward-looking information will not occur, which may cause the Company's actual performance and financial results in future periods to differ materially from any estimates or projections of future performance or results expressed or implied by such forward-looking statements and financial projections. Important factors that could cause actual results to differ materially from expectations include, but are not limited to: business, economic and capital market conditions; the heavily regulated industry in which the Company carries on business; current or future laws or regulations and new interpretations of existing laws or regulations; legal and regulatory requirements; market conditions and the demand and pricing for our products; our relationships with our customers, developers and business partners; our ability to successfully define, design and release new products in a timely manner that meet our customers' needs; our ability to attract, retain and motivate qualified personnel; competition in our industry; competition; technology failures; failure of counterparties to perform their contractual obligations; systems, networks, telecommunications or service disruptions or failures or cyber-attack; ability to obtain additional financing on reasonable terms or at all; our ability to manage risks inherent in foreign operations; litigation costs and outcomes; our ability to successfully maintain and enforce our intellectual property rights and defend third party claims of infringement of their intellectual property rights; our ability to manage foreign exchange risk and working capital; and our ability to manage our growth. Readers are cautioned that this list of factors should not be construed as exhaustive.

· The forward-looking statements and financial projections contained in this presentation are expressly qualified by this cautionary statement. Except as required by law, we undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, after the date on which the statements are made or to reflect the occurrence of unanticipated events. Readers are cautioned not to place undue reliance on forward-looking statements or financial projections. Prospective investors should not construe the contents of this presentation as legal, tax, investment or other advice. All prospective investors should make their own inquiries and consult their own advisors as to legal, tax, investment, and related matters concerning an investment in the securities of the Company.



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027854
CELSIUS_CFTC_00056974
CELSIUS_CFTC_00056972



## Unbank Yourself

# Our Mission:

To put interest income and economic freedom in the hands of the people by taking it away from the Banks.



"

The world needs banking, but it does not need banks.

Bill Gates





FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027855
CELSIUS_CFTC_00056975
CELSIUS_CFTC_00056972



# The Problems We Are Solving

**The digital economy needs next generation financial tools and a system that will work for the benefit of the consumer and the community.**

**Nowhere to earn interest**



With banks in most developed countries paying less than 1% to depositors, there is strong demand for an alternative.

**Hard to get loans**



The world still runs on fiat. There are limited options for crypto holders seeking fiat loans against their crypto assets.

**Limited tools for pros**



As crypto markets continue to grow, the demand to borrow digital assets from institutions is growing exponentially.

**Buying and owning crypto is difficult**



The current user experience prohibits many new people from entering the crypto space.



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027856
CELSIUS_CFTC_00056976
CELSIUS_CFTC_00056972



# Our Mobile App - Buy, Earn, Borrow, Send

## Celsius offers 123,000 users the easiest way to buy, earn interest, get dollar loans, and transfer coins.



**250,000+**
downloads

**80% organic**

We give depositors up to 80% of the value we create, driving CEL adoption and the value of our 310m tokens in treasury.



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027857
CELSIUS_CFTC_00056977
CELSIUS_CFTC_00056972



# User Growth & Retention





**Over the last year, app downloads increased by over**

## 230%

Over

# 85%

of users who start registration complete KYC



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027858
CELSIUS_CFTC_00056978
CELSIUS_CFTC_00056972



# Money Over IP Business Model

## How do we generate income for our members and contributors?



**Coin Loan Business**



**Dollar Loan Business**



**B2B**

Celsius collects fees from institutional borrowers and funding markets. Loans are collateralized at up to 200%

Celsius earns 6-15% (APR) and shares 80% with our depositors

Loaned coins combined with staking pool for additional dividends

Celsius lends dollar to customers at 50% LTV using crypto as collateral

Celsius earns 5-9% (APR) on the dollars lent.

Celsius generates an additional 3-9% (APR) on the deployment of the crypto collateral

Celsius white-labels its services to partners such as exchanges and wallets

A portion of the interest income earned is distributed to the Celsius community



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027859
CELSIUS_CFTC_00056979
CELSIUS_CFTC_00056972



# Global Team - 65 STRONG



## Alex Mashinsky | Founder & CEO

- Founded two of New York City's top 20 venture-backed exits since 2000: one of his first companies, Arbinet, IPO'ed in 2004 with a market capitalization of over $750 million; and another venture, Transit Wireless, was recently valued at $1.2 billion
- One of the inventors of VoIP (Voice Over Internet Protocol).
- 41 issued patents, relating to exchanges, VOIP protocols, messaging and communication.
- Serial entrepreneur and founder of seven startups, raised more than $1B with over $3B in exits.








| S. Daniel Leon | Harumi Urata-Thompson | Nuke Goldstein | Camilla Churcher | Aliza Landes | Jeremie Beaudry |
|---|---|---|---|---|---|
| Co-founder President & COO | CFO | CTO | VP Global Business Development | VP of Lending and Exchanges | General Counsel & CCO |
| Entrepreneur with a proven track record of growing early-stage companies and building organizations from the ground up. Brown University. | CFA, PM Certified leader with cutting edge industry experience. Previously with Morgan Stanley, Citigroup, Thomson Reuters and CFA Society NY. INSEAD MBA. | Software developer, architect, innovator, and entrepreneur in cutting-edge tech, including image processing, AI, IoT and blockchain. Technion - Israel Institute of Technology. | Leader in sales and business development for new tech companies in verticals such as Finteh, Crypto and blockchain. Columbia University. | Expert in scaling initiatives and managing inter-organization al partnerships. MIT Sloan. Harvard Kennedy School, IDF Captain (Res.). | Previously Chief Compliance Officer and Corporate Counsel at BitPay. Georgia Bar, Certified AML Specialist (ACAMS). |



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027860
CELSIUS_CFTC_00056980
CELSIUS_CFTC_00056972



# Celsius Regulatory Compliance







## February 2018 Delaware C Corp File #6748208

## March 2018 FinCEN MSB Registration #: 31000122237406

## April 2018 SEC Regulation D File #:021-311253

Link

Link

Link

Celsius takes compliance very seriously. We have a robust AML program with a knowledgeable team of veteran AML professionals that are Certified Anti-Money Laundering Specialists (ACAMS). We operate under legal opinions provided by several global law firms.



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027861
CELSIUS_CFTC_00056981
CELSIUS_CFTC_00056972



# Industry Leading Providers

PrimeTrust

 Fireblocks

 EY

DavisPolk

BITFINEX


Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027862
CELSIUS_CFTC_00056982
CELSIUS_CFTC_00056972



# Industry Leading Partners

Celsius is the only crypto platform to offer an
interest income API for 25 different assets.

VOYAGER











 Tether Gold



FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027863
CELSIUS_CFTC_00056983
CELSIUS_CFTC_00056972



# Celsius Network 2020



**$6.2B**
coin loan
origination



**81%**
users depositing
more than once



**8.21x**
Average number
of deposits
per user



**$670M**
In AUM



**91% Net**
**positive days**
(days with more
deposits than
withdrawals)



**84%**
retention on
top coins



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027864
CELSIUS_CFTC_00056984
CELSIUS_CFTC_00056972



# Assets Under Management



 Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027865
CELSIUS_CFTC_00056985
CELSIUS_CFTC_00056972



# CEL Token Price and Retail Deposits



Total Retail Deposits    Market Value of CEL    *updated through February 2020

**The main driver for the price of the CEL token is the value of retail deposits.**

CEL Token is up

**303.1%**

in 2019

Celsius owns 310m CEL tokens currently valued at

**$93m**



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027866
CELSIUS_CFTC_00056986
CELSIUS_CFTC_00056972



# Deposits by Asset Type



FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027867
CELSIUS_CFTC_00056987
CELSIUS_CFTC_00056972



# Celsius is #1 in Global Market Share

## Interest Paid



Celsius pays more BTC interest to depositors than all the other lenders combined.

Over
# $18 Million
in interest paid


Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027868
CELSIUS_CFTC_00056988
CELSIUS_CFTC_00056972



# User Growth & CEL Token Adoption



**55,000+**
Passed KYC

**32,000+**
Active depositors
**4%** WoW growth

**12,500+**
Earning in CEL*

\*Due to regulatory conditions in the United States with regard to Utility Tokens, Celsius has elected to prevent US-based users from earning interest in CEL.

**38% of all users chose to earn in CEL,**

**65% of non US users chose to earn their in CEL.**

Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027869
CELSIUS_CFTC_00056989
CELSIUS_CFTC_00056972

# Our Coverage



**Celsius Users**
(live through 4-20)

**Internet Coverage**

4G CONNECTIONS
3G CONNECTIONS
2G CONNECTIONS

Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027870
CELSIUS_CFTC_00056990
CELSIUS_CFTC_00056972



# Competitive Landscape



FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027871
CELSIUS_CFTC_00056991
CELSIUS_CFTC_00056972



# Recent Funding Rounds & Valuations



**Seba** = 100m @400m

**Oasis Labs** = 45m @ 200m

**Bitpay** = 40m @ 200m

**Anchorage** = 40m @180m

**Harbor** = 28m @ 165m

**Compound** = 25m @ 75m

**Coinsquare** = 24m @ 340m

**BlockFi** = 30m @ 116m

**Celsius** = 30m @ 150m*

*Post raise



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027872
CELSIUS_CFTC_00056992
CELSIUS_CFTC_00056972



# CEL Token - More users, interest, income



**Celsius Flywheel Token Economics**

- Collect Interest
- Distribute to members
- Lend coins
- Collect interest in Coins
- Buy CEL
- Distribute to members
- User wallet balances increase
- Issue loans

**Earn More**
Earn in CEL enables users to earn up to 35% higher yields.

**Pay Less**
Pay in CEL provides users up to 30% discount on their rewards payments

The percentage increase in earned rewards or discount on rewards payment is dependent on a user's "HODL ratio."

A HODL ratio is defined as the amount of CEL to non-CEL assets a user holds in their wallet.

**Silver** = 5% - 10%
**Gold** = 10% - 15%
**Platinum** = more than 15%



22  Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027873
CELSIUS_CFTC_00056993
CELSIUS_CFTC_00056972



# CEL Reflects the Success of Celsius



**Up 303.1% in 2019**

of users earning in CEL, **82%** HODL in app

of circulating supply, **60%** is held in app

The CEL token is tied to every aspect of the Celsius operating model.

Traded on four exchanges, the performance of the CEL token is a direct reflection of the performance of Celsius and community confidence.

$ Loans Interest Payments

Membership Fee

Coin Loan Interest Payments

Deposit Interest Payments

PoS Income Payments

MARKETS*

CEL Treasury

BLOCKCHAIN
Immutable public records of transactions

Liquid    HitBTC    SwitcheoNetwork

Celsius holds 310M CEL tokens in treasury

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027874
CELSIUS_CFTC_00056994
CELSIUS_CFTC_00056972



# Celsius Equity Raise & Use of Funds

**Celsius is closing our first equity round to fuel growth and global expansion.**

| | |
|---|---|
| **HR & Operations** | $3.5M growing the team (US, Israel, Europe and Asia - 2020) |
| **Marketing** | $6.5M to strengthen the brand and drive new users and depositors |
| **Legal** | $2M to acquire various licenses in US (lending; MTL); Europe (e-money) and other legal memos as needed |
| **G&A** | $3.5M |
| **B2B & Exchanges Integration** | $5M growing and supporting biz dev activities and cost associated with the integration with various exchanges |
| **Technology** | $5.5M technology development (products, security, automation) |
| **Listings and M&A** | $4M |

24    Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027875
CELSIUS_CFTC_00056995
CELSIUS_CFTC_00056972



# Opportunity Summary

 $6.2B in coin loans in 18 months; $150M in dollar loans

 One of the most credible management teams in the industry, led by a serial entrepreneur with a proven track record in scaling and exiting businesses

 One of the few companies with live products (app and back office), protocol and private blockchain (in development)

 Partnerships with some of the industry's leading companies and customers

 Named one of the top 10 most successful blockchain companies in the world

 Celsius Network is one of the most trusted brands in the crypto community

 Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027876
CELSIUS_CFTC_00056996
CELSIUS_CFTC_00056972



# Celsius in the Media

## Forbes

**No.3** Blockchain Company to Watch:

❞❞ This FinTech startup is primed to disrupt traditional banking ❞❞

## IBINEX
JUST ADD TRADERS

**Top 5** New Blockchain Startups:

❞❞ The platform provides users a way to borrow, deposit and earn interest with cryptocurrency, actions not available in traditional banks ❞❞

## msn

**10 most** successful blockchain companies:

❞❞ The FinTech startup company offers a leveled up version of traditional banking ❞❞

## HubSpot

**11** Blockchain Companies You Should Be Paying Attention To:

❞❞ It's like banking on blockchain ❞❞

 COINTELEGRAPH

❞❞ The crypto lending industry is valued at $4.7 billion and growing.

Celsius Network is the biggest crypto loan platform in the world ❞❞

## Forbes

Celsius Network Head of Institutional Lending, Jessica Khater, named to **Forbes 30 under 30**

Class of 2020

 Nasdaq

❞❞ The opportunity with Bitcoin and stablecoins is the ability to earn interest of 7-9% interest per year ❞❞

THORITY

❞❞ Considered a co-inventor of the early blockchain, Dr. Stornetta joins a growing list of pioneers at the company headed by CEO Alex Mashinsky ❞❞



FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027877
CELSIUS_CFTC_00056997
CELSIUS_CFTC_00056972

## Contact Us

celsius
network



### Alex Mashinsky

Founder & CEO

📞  +1-646-552-4499

✉️  alex@celsius.network

🐦  @CelsiusNetwork

## THANK YOU!



Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS
HIGHLY CONFIDENTIAL

CELSIUSNETWORK_00027878
CELSIUS_CFTC_00056998
CELSIUS_CFTC_00056972