**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

---

### THIRD NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Notice of Plan Supplement")[2] to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3222] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[3] as set forth in the Plan and in accordance with the terms and conditions in the Plan Support Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Notice of Plan Supplement").[4]

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "Third Notice of Plan Supplement" and, together with the First Notice

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] The First Notice of Plan Supplement had attached as Exhibit A: Schedule of Released and Exculpated Parties; and Exhibit B: Alternative Dispute Resolution Procedures.

[3] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3223] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable.

[4] The Second Notice of Plan Supplement had attached as Exhibit A: Schedule of Retained Causes of Action; Exhibit B: Schedule of Equitably Subordinated Claims; and Exhibit C: Schedule of Excluded Parties.

of Plan Supplement and Second Notice of Plan Supplement, the "Plan Supplement"),[5] which includes the following documents:

| Exhibit | Document |
|---------|----------|
| A | New Organizational Documents |
| B | Identities of the members of the New Board of NewCo |
| C | Schedule of Rejected Executory Contracts and Unexpired Leases |
| D | Schedule of Assumed Executory Contracts and Unexpired Leases |
| E | Litigation Administrator Agreements |
| F | Identity of Litigation Administrator |
| G | Identities of Litigation Oversight Committee Members |
| H | Employee Transition Services Agreement |
| I | Plan Administrator Budget |
| J | ADR Procedures (Redline at J-1) |
| K | Schedule of Retained Causes of Action (Redline at K-1) |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Plan Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Plan Support Agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims, Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re:

---

[5] Note that the Plan indicates the Emergence Incentive Plan will be filed in the Plan Supplement, but the Emergence Incentive Plan was filed within the Plan at Art. IV.J.2

Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

*[Rest of page intentionally left blank]*

New York, New York
Dated: September 8, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
    ross.kwasteniet@kirkland.com
    chris.koenig@kirkland.com
    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

### **New Organizational Documents**

This **Exhibit A** includes the following New Organizational Documents for NewCo and any subsidiaries thereof:

- <u>Exhibit A(i)</u>:  Certificate of Incorporation of NewCo

- <u>Exhibit A(ii)</u>:  NewCo Bylaws

**Exhibit A(i)**

**Certificate of Incorporation of NewCo**

*[DRAFT]*

**[NEWCO, INC.]**

**[AMENDED & RESTATED][1] CERTIFICATE OF INCORPORATION**

[NewCo, Inc.], a Delaware corporation, hereby certifies as follows:

1. The name of this corporation is "[NewCo, Inc.]" The date of the filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware was [●] under the name [Private NewCo, Inc.]

2. The [Amended & Restated] Certificate of Incorporation of this corporation attached hereto as Exhibit A, which is incorporated herein by this reference, and which restates, integrates and amends the provisions of the Certificate of Incorporation of this corporation, has been duly adopted by this corporation's Board of Directors and by the stockholders in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, with the approval of this corporation's stockholders having been given by written consent without a meeting in accordance with Section 228 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, this corporation has caused this [Amended & Restated] Certificate of Incorporation to be signed by its duly authorized officer and the foregoing facts stated herein are true and correct.

Dated: [●]

[NEWCO, INC.]
By: /s/ [●]
Name: [●]
Title: [●]

---

[1] NTD: likely will need an interim COI between the exit from bankruptcy.

*[DRAFT]*

## EXHIBIT A

## [NEWCO, INC.]

## [AMENDED & RESTATED] CERTIFICATE OF INCORPORATION

### ARTICLE I: NAME

The name of the corporation is [NewCo, Inc.] (the "***Corporation***").

### ARTICLE II: AGENT FOR SERVICE OF PROCESS

The address of the registered office of this Corporation in the State of Delaware is [●] in the City of Wilmington, County of New Castle, Delaware [●]. The name of its registered agent at such address is [●].

### ARTICLE III: PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (the "***General Corporation Law***").

### ARTICLE IV: AUTHORIZED STOCK

**1. <u>Total Authorized</u>**. The total number of shares of all classes of stock that the Corporation has authority to issue is [●] shares, consisting of [●] shares of Class A Common Stock, $[●] par value per share (the "***Class A Common Stock***"), 1 share of Class B Common Stock, $[●] par value per share (the "***Class B Common Stock***" and, with the Class A Common Stock, the "***Common Stock***"), and [●] shares of Preferred Stock, $[●] par value per share ("***Preferred Stock***").

**2. <u>Designation of Additional Series</u>**.

(a) The Board of Directors of the Corporation (the "***Board***") is authorized, subject to any limitations prescribed by the law of the State of Delaware and this Certificate of Incorporation, to provide for the issuance of the shares of Preferred Stock in one or more series, and, by filing a Certificate of Designation pursuant to the applicable law of the State of Delaware ("***Certificate of Designation***"), to establish from time to time the number of shares to be included in each such series, to fix the designation, vesting, powers (including voting powers), preferences and relative, participating, optional or other special rights, if any, of the shares of each such series and any qualifications, limitations or restrictions thereof, and, except where otherwise provided in the applicable Certificate of Designation, to thereafter increase (but not above the total number of authorized shares of the Preferred Stock) or decrease (but not below the number of shares of such series then outstanding) the number of shares of any such series. The number of authorized shares of Preferred Stock may also be increased or decreased (but not below the number of

shares thereof then outstanding) by such affirmative vote as may be required at that time by the General Corporation Law.

(b) Except as otherwise expressly provided in this Certificate of Incorporation and in any Certificate of Designation designating any series of Preferred Stock pursuant to the foregoing provisions of this Article IV, any new series of Preferred Stock may be designated, fixed and determined as provided herein by the Board without approval of the holders of Common Stock or the holders of Preferred Stock, or any series thereof, and any such new series may have powers, preferences and rights, including, without limitation, voting powers, dividend rights, liquidation rights, redemption rights and conversion rights, senior to, junior to or pari passu with the rights of the Common Stock, any series of Preferred Stock or any future class or series of capital stock of the Corporation.

(c) Except as otherwise required by law and subject to the rights of the sole holder of the Class B Common Stock (the "***Class B Holder***") set forth in Article IV, Section 3(h) of this Certificate of Incorporation, each outstanding share of Class A Common Stock shall entitle the holder thereof to one vote on each matter properly submitted to the stockholders of the Corporation for their vote and holders of Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including the adoption or amendment of any Certificate of Designation relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any Certificate of Designation relating to any series of Preferred Stock).

**3. Rights of Class A Common Stock and Class B Common Stock**

(a) *Status of Class A and Class B Common Stock Generally*.  Subject to the preferential or other rights of any holders of Preferred Stock then outstanding, the holders of shares of Class A Common Stock shall be entitled to receive ratably in proportion to the number of shares of Class A Common Stock held by them such dividends and distributions (payable in cash, stock or otherwise), if any, as may be declared thereon by the Board at any time and from time to time out of any funds of the Corporation legally available therefor.

(b) *Voting Generally*.  Except as otherwise expressly provided by this Certificate of Incorporation (including Article IV, Section 3(h) of this Certificate of Incorporation) and in any Certificate of Designation designating any series of Preferred Stock or as required by applicable law, the holders of shares of Common Stock shall (i) be entitled to notice of any stockholders' meeting in accordance with the [Amended & Restated] Bylaws of the Corporation (as the same may be amended and/or restated from time to time, the "***Bylaws***") and (ii) have one vote for each share of Common Stock which is outstanding in his, her or its name on the books of the Corporation on all matters on which stockholders are entitled to vote generally.

(c) *No Cumulative Voting*.  The holders of the Common Stock shall not have cumulative voting rights (as defined in Section 214 of the General Corporation Law).

3

(d) _No Class B Common Stock Dividend or Distribution Rights_.  Dividends and other distributions shall not be declared or paid on the Class B Common Stock.

(e) _Liquidation, Dissolution or Winding Up_.  Subject to the preferential or other rights of any holders of Preferred Stock then outstanding, in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, the holders of all outstanding shares of Class A Common Stock shall be entitled to receive the remaining assets of the Corporation available for distribution ratably in proportion to the number of shares held by each such stockholder, and the Class B Holder as such, shall not be entitled to receive any assets of the Corporation in the event of any voluntary or involuntary liquidation, dissolution or winding up of the affairs of the Corporation.

(f) _Class B Common Stock Ownership_.  The share of Class B Common Stock shall be issued only to, and shall be held only by, [Fahrenheit], a [Delaware limited liability company] ("**Fahrenheit**"), and Affiliates of [Fahrenheit] (as such term is defined in the Management Services Agreement dated as of [●], 2023, by and among the Corporation, Fahrenheit, as such agreement may be amended, supplemented, restated or otherwise modified from time to time (the "**Management Services Agreement**")) (including all successors by way of merger or consolidation) (the "**Permitted Class B Owners**"). Any purported sale, transfer, pledge or other disposition of the share of Class B Common Stock to any person other than a Permitted Class B Owner shall be null and void and of no force and effect.

(g) _No Preemptive Rights_.  Subject to the preferential or other rights of any holders of Preferred Stock then outstanding, no stockholder of the Corporation shall have preemptive rights to acquire additional, unissued or treasury shares of the Corporation or securities of the Corporation convertible into or carrying a right to subscribe to or acquire shares of the Corporation, whether such preemptive rights are purported to be granted by a provision in this Certificate of Incorporation, the Bylaws or by contract.

(h) _Class B Common Stock Consent Rights_.  To the fullest extent permitted by law, without the consent of the Class B Holder, and any other applicable stockholder approval requirements required by law, and subject to the preferential or other rights of any holders of Preferred Stock then outstanding, the Corporation shall not take, and shall cause its subsidiaries not to take or consummate, any of the following actions or transactions (any such action or transaction without such prior written consent being null and void ab initio and of no force or effect) amend, alter, modify, or repeal this Certificate of Incorporation, or the Bylaws, including the amendment of this Certificate of Incorporation by the adoption or amendment of any Certificate of Designation or similar document, or amend the organizational documents of any subsidiary of the Corporation, in any such case in any manner that adversely affects the rights or powers of the Class B Common Stock or the Class B Directors (as defined below), including (i) with respect to the power and authority of the Class B Holder to elect [three] directors; (ii) increase the authorized number of directors constituting the Whole Board to more than [nine]; or (iii) increase or decrease the number of authorized shares of Class B Common Stock, or authorize the issuance of or issue any shares of Class B Common Stock.  The term "**Whole Board**" shall mean the total

number of authorized directors whether or not there exist any vacancies in previously authorized directorships.

**4. Class B Common Stock Redemption**.

(a) Immediately upon the termination of the Management Services Agreement in accordance with its terms, the Corporation shall immediately effect, out of funds legally available therefor, a redemption of the outstanding share of Class B Common Stock (a "***Class B Redemption***") for a price per share equal to $1.00 per share of Class B Common Stock (the "***Class B Redemption Price***").

(b) To effect a Class B Redemption, the Corporation shall send written notice (the "***Class B Redemption Notice***") to the Class B Holder. Each Class B Redemption Notice shall state: (i) that the outstanding share of Class B Common Stock shall be redeemed; (ii) the date of the closing of the Class B Redemption, which date shall not be sooner than 10 days following the date of the Class B Redemption Notice (the "***Class B Redemption Date***"), and the Class B Redemption Price; and (iii) the manner of the Class B Redemption, including the manner and place designated for surrender by the holder to the Corporation or the Corporation's transfer agent, as applicable, of his, her or its certificate, if any, representing the share of Class B Common Stock to be redeemed.[2]

(c) If on the Class B Redemption Date, the Class B Redemption Price is paid (or tendered for payment) for all of the outstanding share of Class B Common Stock to be redeemed on such Class B Redemption Date, then on such date all rights of the Class B Holder with respect to the share of Class B Common Stock so redeemed and paid or tendered shall cease, and such share of Class B Common Stock shall no longer be deemed issued and outstanding. The certificate, if any, representing the share of Class B Common Stock shall be legended to reflect the restrictions on transfer and automatic redemption provided for herein.[3]

**5. Non-Voting Equity**. The Corporation shall not issue nonvoting equity securities to the extent prohibited by Section 1123(c)(6) of title 11 of the United States Code (as amended, the "***Bankruptcy Code***"); *provided*, *however*, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

## ARTICLE V: AMENDMENT OF BYLAWS

Subject to the rights of the Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation, the Board shall have the power to adopt, amend or repeal the Bylaws without the assent or vote of the stockholders in any manner not inconsistent with the laws of the State of Delaware or this Certificate of Incorporation. Subject to the rights of the Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation, any adoption, amendment or

---

[2] NTD: Mechanics of redemption to be confirmed with transfer agent.

[3] NTD: Mechanics of redemption to be confirmed with transfer agent.

repeal of the Bylaws by the Board shall require the approval of a majority of the directors then in office.  Subject to the rights of the Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation and to the rights of any class or series of stock of the Corporation, the stockholders shall also have the power to adopt, amend or repeal the Bylaws by the affirmative vote of the holders of a majority of the voting power of all then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

### ARTICLE VI: MATTERS RELATING TO THE BOARD OF DIRECTORS

**1. Director Powers**. Except as otherwise provided by the General Corporation Law, the Bylaws or this Certificate of Incorporation, the business and affairs of the Corporation shall be managed by or under the direction of the Board.

**2. Number and Election of Directors**.

(a) Subject to Section 2(b) of this Article VI, the total number of directors constituting the Whole Board shall be fixed from time to time exclusively by resolution adopted by a majority of the directors then in office Board.

(b) For so long as the share of Class B Common Stock remains outstanding, unless prior written consent of the Class B Holder is obtained to increase the authorized number of directors constituting the Whole Board to more than [nine] (in accordance with Article IV, Section 3(h) of this Certificate of Incorporation), the Whole Board shall consist of not more than [nine] directors, [three] of which shall be nominated and elected exclusively by the Class B Holder (the "*Class B Directors*"), voting as a separate class.  The holders of the Class A Common Stock, voting as a separate class, shall have the exclusive right to elect the remaining directors.

(c)  Subject to Section 2(b) of this Article VI, the vote required for the election of a director by the stockholders at a meeting of stockholders shall be the affirmative vote of a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors (for the avoidance of doubt, holders of shares of Class A Common Stock are not entitled to vote on the election of the Class B Directors).

**3. Classified Board**.  Subject to any special rights of the holders of one or more series of Preferred Stock to elect additional directors, the directors shall be divided, with respect to the time for which they hold office, into three classes designated as Class I, Class II and Class III, respectively (the "*Classified Board*"). The Board is authorized to assign members of the Board already in office to Class I, Class II or Class III, which assignments shall become effective at the same time that the Classified Board becomes effective. Directors shall be assigned to each class in accordance with a resolution or resolutions adopted by the Board. Class B Directors shall not be re-assigned to a class other than the class to which a Class B Director was initially assigned, unless any re-assignment is consented to by the Class B Holder and the Board. The number of directors in each class shall be divided as nearly equal as is practicable.  The initial term of office of the Class I directors shall expire at the Corporation's first annual meeting of stockholders following the effectiveness of the Corporation's registration statement on Form 10 filed with the

Securities and Exchange Commission under the Securities and Exchange Act of 1934, as amended (the "***Exchange Act Registration***"), which annual meeting is expected to be held during 2025, the initial term of office of the Class II directors shall expire at the Corporation's second annual meeting of stockholders following the Exchange Act Registration and the initial term of office of the Class III directors shall expire at the Corporation's third annual meeting of stockholders following the Exchange Act Registration.  At each annual meeting of stockholders following the Exchange Act Registration, directors elected to succeed those directors of the class whose terms then expire shall be elected for a term of office expiring at the third succeeding annual meeting of stockholders after their election.

**4.  Term**. Each director shall hold office until the annual meeting at which such director's term expires and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal; *provided, however,* that the term of any Class B Director shall terminate immediately upon the effective date of a Class B Redemption. Any director may resign at any time by delivering a resignation in writing or by electronic transmission, signed by such director, to the Chair of the Board or the Secretary of the Corporation.

5. **Removal.** Subject to any special rights of the holders of any series of Preferred Stock, any director shall be removed from the Board at any time only (i) with cause and (ii) by the affirmative vote of the holders of a majority of the voting power of the then outstanding shares of capital stock of the Corporation entitled to vote thereon, voting together as a single class, *provided, however*, that a Class B Director shall only be removed from office, with or without cause, by the Class B Holder. No increase or decrease in the number of directors constituting the Board shall shorten the term of any incumbent director.

**6. Board Vacancies and Newly Created Directorships**. Subject to any special rights of the holders of any series of Preferred Stock and the rights of Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation, any vacancy occurring in the Board for any cause and any newly created directorship resulting from any increase in the authorized number of directors shall, unless (a) the Board determines by resolution that any such vacancies or newly created directorships shall be filled by the stockholders or (b) as otherwise provided by law, be filled only by the affirmative vote of a majority of the directors (other than the Class B Directors) then in office, even if less than a quorum, or by a sole remaining director, and shall not be filled by the stockholders, *provided, however*, that, unless no share of Class B Common Stock is then outstanding, any vacancy in the Board of Directors of a director elected by the Class B Holder or otherwise designated as a Class B Director (a "***Class B Vacancy***"), whether such vacancy results from death, resignation, retirement, disqualification, removal from office, or other cause, shall be filled only by the Class B Holder. Any director elected to fill a vacancy or newly created directorship in accordance with the preceding sentence shall hold office for a term expiring at the next election of the class for which such director shall have been chosen and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal.

**7. Vote by Ballot**. The election of directors need not be by written ballot unless the Bylaws shall so provide.

7

## ARTICLE VII: LIMITATION OF LIABILITY

**1. <u>Limitation of Liability</u>**. To the fullest extent permitted by law, neither a director of the Corporation nor an officer of the Corporation shall be personally liable for monetary damages for breach of fiduciary duty as a director or officer, as applicable. Without limiting the effect of the preceding sentence, if the General Corporation Law is hereafter amended to authorize the further elimination or limitation of the liability of a director or officer, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law, as so amended.

**2. <u>Indemnification</u>**.  To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify and hold harmless, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether brought by or in the right of the Corporation (including whether to procure a judgment in its favor) or otherwise, whether civil, criminal, administrative, legislative, investigative or other nature and including any and all appeals (collectively, each a "***Proceeding***") by reason of the fact that such person is or was a director or officer of the Corporation, or while a director of the Corporation or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise (an "***Indemnitee***"), against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such Indemnitee in connection with such Proceeding.  To the fullest extent permitted by applicable law, expenses (including attorneys') fees incurred by an Indemnitee in defending any Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding upon receipt of a written request therefor and an undertaking, by or on behalf of the Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that the Indemnitee is not entitled to be indemnified under this <u>Article VII, Section 2</u> or otherwise. The rights to indemnification and advancement of expenses conferred by this <u>Article VII, Section 2</u> shall be contractual rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators. Notwithstanding the foregoing provisions of this <u>Article VIII Section 2</u>, except for Proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify and advance expenses to an Indemnitee in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors. The indemnification and advancement of expenses provided by, or granted pursuant to, this <u>Article VII, Section 2</u> shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under this Certificate of Incorporation as it may be further amended from time to time, the Bylaws or any statute, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The Corporation is specifically authorized to enter into individual

contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the General Corporation Law or other applicable law.

**3. <u>No Limitation</u>**.  This <u>Article VII</u> shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than Indemnitees.

**4. <u>Vested Rights</u>**.  Any repeal or amendment of this <u>Article VII</u> by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Certificate of Incorporation inconsistent with this <u>Article VII</u>, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any Proceeding (regardless of when such Proceeding is first threatened, commenced or completed) arising out of, or related to, any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

## ARTICLE VIII: MATTERS RELATING TO STOCKHOLDERS

**1. <u>No Action by Written Consent of Stockholders</u>**. Subject to the rights of any series of Preferred Stock then outstanding, no action shall be taken by the stockholders of the Corporation except at a duly called annual or special meeting of stockholders and no action shall be taken by the stockholders of the Corporation by written consent in lieu of a meeting.

**2. <u>Special Meeting of Stockholders</u>**. Special meetings of the stockholders of the Corporation shall be called only by (a) the Chairperson of the Board, (b) the Board acting pursuant to a resolution adopted by a majority of the directors then in office, or (c) by the holders of at least 25% of the outstanding voting stock entitled to vote delivering a request to the Secretary of the Corporation, which request shall state the purpose(s) of the meeting to be called.

**3. <u>Advance Notice of Stockholder Nominations and Business Transacted at Special Meetings</u>**. Advance notice of stockholder nominations for the election of directors of the Corporation and of other business to be brought by stockholders before any meeting of stockholders of the Corporation shall be given in the manner provided in the Bylaws. Business transacted at special meetings of stockholders shall be limited to the purpose or purposes stated in the notice of meeting.

## ARTICLE IX: CHOICE OF FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall, to the fullest extent permitted by law, be the sole and exclusive forum for: (a) any derivative action or proceeding brought on behalf of the Corporation; (b) any action asserting a claim of breach of a fiduciary duty owed by, or other wrongdoing by, any director, officer, stockholder, employee or agent of the Corporation to the

Corporation or the Corporation's stockholders; (c) any action asserting a claim against the Corporation or any director, officer, stockholder, employee or agent of the Corporation arising pursuant to any provision of the General Corporation Law, this Certificate of Incorporation or the Bylaws or as to which the General Corporation Law confers jurisdiction on the Court of Chancery of the State of Delaware; (d) any action to interpret, apply, enforce or determine the validity of this Certificate of Incorporation or the Bylaws; or (e) any action asserting a claim against the Corporation or any director, officer, stockholder, employee or agent of the Corporation governed by the internal affairs doctrine. Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by the DGCL, this Certificate of Incorporation or the Bylaws, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Article IX.

## ARTICLE X: BUSINESS COMBINATION LAW

The Corporation shall not be governed by, or subject to, Section 203 of the General Corporation Law.

## ARTICLE XI: CERTAIN CORPORATE OPPORTUNITIES

**1. No Agency**.  Nothing contained in this Certificate of Incorporation or in any other agreement delivered pursuant hereto shall be construed to create any agency relationship among the stockholders.

**2. Corporate Opportunities Generally**.  (x) Directors who are not employees or officers of the Corporation or its subsidiaries and (y) stockholders of the Corporation (other than stockholders of the Corporation who are employees of the Corporation or its subsidiaries), solely by virtue of each such stockholder's status as a stockholder of the Corporation (such members of the Board of Directors and stockholders, the "*Identified Persons*" and each, individually, an "*Identified Person*"), shall, to the fullest extent permitted by applicable law, have no duty to refrain from, directly or indirectly, (a) engaging in the same or similar activities or lines of business in which the Corporation or any of its affiliates, directly or indirectly, now engages or may engage or (b) otherwise competing with the Corporation or any of its affiliates, and, to the fullest extent permitted by applicable law, no Identified Person shall be liable to the Corporation or its stockholders or to any affiliate of the Corporation for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities. To the fullest extent permitted by applicable law, the Corporation, pursuant to Section 122(17) of the General Corporation Law, hereby renounces any interest or expectancy in, or right to be offered an opportunity to participate in, any potential transaction or business opportunity for an Identified Person and the Corporation or any of its affiliates, except as provided in Article XI, Section 3 of this Certificate of Incorporation. Subject to Article XI, Section 3 of this Certificate of Incorporation, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity that may be a corporate opportunity for itself, herself or

himself and the Corporation or any of its affiliates, such Identified Person shall, to the fullest extent permitted by applicable law, have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its affiliates and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or its stockholders or to any affiliate of the Corporation for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself, herself or himself, or offers or directs such corporate opportunity to another Person.

**3. <u>Certain Limitations</u>**.

(a) Notwithstanding <u>Article XI, Section 2</u> of this Certificate of Incorporation, the Corporation does not renounce its interest in any corporate opportunity offered to any Identified Person if such opportunity is (i) expressly offered to such person solely in his or her capacity as a director, officer, consultant or employee of the Corporation or (ii) identified by an Identified Person solely through the disclosure of information by or on behalf of the Corporation.

(b) In addition to and notwithstanding the provisions of this <u>Article XI</u>, a corporate opportunity shall not be deemed to be a potential corporate opportunity for the Corporation if it is a business opportunity that (i) the Corporation is neither financially or legally able, nor contractually permitted to undertake, (ii) from its nature, would not be reasonable for the Corporation to pursue or (iii) is one in which the Corporation has no interest or reasonable expectancy.

**4. <u>Related Companies</u>**.  Subject to any contractual obligations between an Identified Person and the Corporation or its subsidiaries, the Identified Persons may now own, may continue to own, and from time to time may acquire and own, to the fullest extent permitted by applicable law, investments in one or more other entities (such entities collectively, "***Related Companies***") that are direct competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of the Corporation's stockholders or any of their respective affiliates, and (a) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Certificate of Incorporation shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Certificate of Incorporation shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (i) the ownership by an Identified Person of any interest in any Related Company, (ii) the affiliation of any Related Company with an Identified Person or (iii) any action taken or omitted by an Identified Person in respect of any Related Company, (b) no Identified Person shall, solely by reason of such ownership, affiliation or action, become subject to any fiduciary duty to the Corporation, any of the Corporation's stockholders or any of their respective affiliates, (c) none of the duties imposed on an Identified Person by law do or shall limit or impair the right of any Identified Person lawfully to compete with the Corporation, any of the Corporation's stockholders or any of their respective affiliates and (d) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of the Corporation's stockholders or any of their respective affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of the Corporation's

stockholders or any of their respective affiliates in any such business or as to any such opportunities.

**5. Other Protections**.  This Article XI shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Certificate of Incorporation, the Bylaws or applicable law.

**6. Amendments**.  Neither the alteration, amendment, addition to or repeal of this Article XI, nor the adoption of any provision of this Certificate of Incorporation (including any Certificate of Designation) inconsistent with this Article XI, shall eliminate or reduce the effect of this Article XI in respect of any business opportunity first identified, or any other matter occurring, or any cause of action, suit or claim that, but for this Article XI, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption.

## ARTICLE XII: AMENDMENT OF CERTIFICATE OF INCORPORATION

If any provision of this Certificate of Incorporation shall be held to be invalid, illegal, or unenforceable, then such provision shall nonetheless be enforced to the maximum extent possible consistent with such holding and the remaining provisions of this Certificate of Incorporation (including, without limitation, all portions of any section of this Certificate of Incorporation containing any such provision held to be invalid, illegal, or unenforceable, which is not invalid, illegal, or unenforceable) shall remain in full force and effect. The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation: *provided*, *however*, that, notwithstanding any other provision of this Certificate of Incorporation or any provision of law that might otherwise permit a lesser vote or no vote (but subject to the rights of the Class B Holder set forth in Article IV, Section 3(h) of this Certificate of Incorporation and the rights of any series of Preferred Stock set forth in any Certificate of Designation), but in addition to any vote of the holders of any class or series of the stock of the Corporation required by law or by this Certificate of Incorporation, the affirmative vote of the holders of a majority of the voting power of all then outstanding shares of capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required to amend or repeal such provisions of Certificate of Incorporation.

***********

**Exhibit A(ii)**

**NewCo Bylaws**

*[DRAFT]*

**[AMENDED AND RESTATED]**
**BYLAWS OF [NEWCO, INC.]**
(Effective as of [●])

## ARTICLE I
## CORPORATE OFFICES

Section 1.1    Registered Office. The registered office of [NewCo, Inc.] (the "***Corporation***") shall be set forth in the Corporation's Certificate (as defined below). References in these [amended and restated] bylaws (these "***Bylaws***") to the certificate of incorporation, as the same shall be amended and/or restated from time to time (the "***Certificate***"), shall include the terms of any certificate of designations of any series of preferred stock of the Corporation ("***Preferred Stock***").

Section 1.2    Other Offices. The Corporation also may have offices at such other places, both within and without the State of Delaware, as the Board of Directors of the Corporation (the "***Board***") may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

Section 2.1    Time and Place of Meetings. Annual and special meetings of stockholders shall be held at any time and place, within or without the State of Delaware, or in whole or in part by means of remote communication, as shall be designated by the Board. In the absence of any such designation, stockholders' meetings shall be held at the Corporation's principal executive office.

Section 2.2    Annual Meeting. At the annual meeting, directors shall be elected and any other business properly brought before the meeting may be transacted. For purposes of this Article II, the 202[4] annual meeting of the stockholders shall be deemed to have been held on [●], 202[4]. The Board may cancel, postpone or reschedule any previously scheduled annual meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

Section 2.3    Special Meeting.

(i)    A special meeting of the stockholders, other than those required by statute, may be called at any time only in the manner provided in the Certificate and these Bylaws. The Board may cancel, postpone or reschedule any previously scheduled special meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

(ii)    The notice of a special meeting shall include the purpose for which the meeting is called. Only such business shall be conducted at a special meeting of stockholders as shall have been set forth in the notice of such meeting. Nothing contained in this Section 2.3(ii) shall be construed as limiting, fixing or affecting the time when a meeting of stockholders called by action of the Board may be held.

(iii)    Subject to Section 2.3(iv), the Board shall call a special meeting of stockholder upon the written request (the "***Meeting Request***") of the stockholders of record of at least 25%, in the aggregate, of the voting power of the outstanding shares of all classes of shares entitled to vote at such a meeting (the "***Required Percentage***"), delivered to the secretary of the Corporation (the "***Secretary***").[1] The Board shall designate a date for such special meeting not more than 90 days after the date that the Secretary received the valid Meeting Request (the "***Request Delivery Date***"). In fixing a date and time for any special meeting requested by stockholders of record, the Board may consider such factors as it deems relevant, including without limitation, the nature of the matters to be considered, the facts and circumstances related to any request for a meeting, and any plan of the Board to call an annual meeting or special meeting.

(iv)    *Stockholder Request for Special Meeting.*

(a)    Any Meeting Request shall be signed and dated by one or more stockholders of record and each beneficial owner, if any, on whose behalf the Meeting Request is being made, or—in each case—such stockholder's or beneficial owner's duly authorized agent (each, a "***Requesting Stockholder***"), and shall set forth: (1) a statement of the specific purpose of the meeting and the matters proposed to be acted on at the meeting, the reasons for conducting such business at the meeting and any material interest of the Requesting Stockholder in such business; (2) the name and address of each Requesting Stockholder [as it appears on the Corporation's stock ledger (or, with respect to all shares to be included in the Required Percent that are owned beneficially but not of record by each such Requesting Stockholder, the name of each broker, bank or custodian (or similar entity) of each such Requesting Stockholder with respect to such shares)][2]; (3) the number of shares of each class of voting shares owned of record and beneficially by each such Requesting Stockholder; (4) a description of all arrangements or understandings between any Requesting Stockholder and any other person regarding the meeting and the matters proposed to be acted on at the meeting; (5) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws or the Certificate, the language of the proposed amendment) conforming in all material respects with the requirements of Section 14(a) of the Securities Exchange Act of 1934 and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "***Exchange Act***") ][3]; and (6) all of the information regarding the Requesting Stockholders that would be

---

[1] BR Note to Draft: The requirement that stockholder holder 25% <u>and have held the shares for more than a year</u> was inserted originally in a W&C/K&E draft. Is there a reason it was now removed?

[2] NTD: Subject to further review.

[3] NTD: Subject to further review.

*[DRAFT]*

required by Section 2.4(iii)–(v) of these Bylaws if each Requesting Stockholder were intending to make a nomination or to bring any other matter before a stockholder meeting (except that, for purposes of this paragraph, references to the "Noticing Stockholder" and "Holders" shall instead refer to each "Requesting Stockholder"); [(7) an agreement by the Requesting Stockholder to notify the Corporation promptly in the event of (x) any disposition prior to the time of the special meeting of any shares held by a Requesting Stockholder as of the date on which the Meeting Request was delivered to the Secretary and (y) any other change prior to the time of the special meeting in the shares owned by any Requesting Stockholder; and (8) an acknowledgement that (x) the Requesting Stockholder is entitled to vote at such special meeting, (y) any disposition prior to the date of the special meeting of any capital stock of the Corporation including any Requesting Stockholder's shares as of the date on which the Meeting Request was delivered to the Secretary shall be deemed to be a revocation of such Meeting Request with respect to such disposed shares and (z) that any decrease in the Requesting Stockholders' aggregate share ownership to less than the Required Percent shall be deemed to be an absolute revocation of such Meeting Request][4]. The requirement set forth in clause (6) of the immediately preceding sentence shall not apply to (x) any stockholder of record, or beneficial owner, as applicable, who has provided a written request solely in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act, by way of a solicitation statement filed on Schedule 14A or (y) any stockholder of record that is a broker, bank or custodian (or similar entity) and is acting solely as nominee on behalf of a beneficial owner. A Requesting Stockholder may revoke its request for a special meeting at any time by written revocation delivered to the Secretary,  [and if, following such revocation, there are un-revoked Meeting Requests from less than the Required Percent, the Board, in its discretion, may cancel the special meeting.][5]

(b)    The Board shall have the authority to determine not to call a special meeting requested by stockholders if (a) the Board has called or calls an annual or special meeting of stockholders to be held not more than 90 days after the Request Delivery Date and the purpose of such stockholder meeting includes (among any other matters properly brought before the meeting) the purpose specified in the Meeting Request; (b) within 12 months prior to the Request Delivery Date, an annual or special meeting was held that considered the purpose

---

[4] NTD: Subject to further review.

[5] NTD: Subject to further review.

*[DRAFT]*

specified in the Meeting Request or an identical or substantially similar item of business (as determined in good faith by the Board in its sole and absolute discretion), except for the election of one or more directors; (c) the Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; or (d) such request was made in violation of Regulation 14A under the Exchange Act, to the extent applicable, or other applicable law. The Board is authorized to determine in good faith the purpose of a stockholder meeting. If none of the Requesting Stockholders appears or sends a qualified representative to present the business and/or nominations specified in the Meeting Request to be presented for consideration, or any Requesting Stockholder or any nominee for director (as applicable) acted contrary to any representation, certification or agreement required by this Section 2.3 (or otherwise failed to comply with this Section 2.3 (or any law, rule or regulation identified in this Section 2.3 or Section 2.4)) or provided false or misleading information to the Corporation, the Corporation need not present such business for a vote at the special meeting (and any such nominee shall be disqualified from standing for election or re-election), notwithstanding that proxies in respect of such business may have been received by the Corporation.

Section 2.4    Advance Notice Procedures for Director Nominations and Business Proposals.

(i)    *Annual Meetings of Stockholders*. At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, nominations of persons for election to the Board or other proposals of business to be transacted at an annual meeting of stockholders must be: (a) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board (or any duly authorized committee thereof) with respect to such meeting, (b) otherwise properly brought before the annual meeting by or at the direction of the Board (or any duly authorized committee thereof), or (c) otherwise properly brought before the annual meeting by a stockholder of the Corporation who (1) is a stockholder of record at the time of the giving of the notice required by this Section 2.4, on the record date for the determination of stockholders entitled to notice of and to vote at such annual meeting and at the time of such annual meeting, (2) is entitled to vote at such annual meeting and (3) has timely complied in proper written form with the procedures set forth in this Section 2.4. In addition, for business to be properly brought before an annual meeting by a stockholder, such business must be a proper matter for stockholder action pursuant to these Bylaws and applicable law. Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board, for the avoidance of doubt, clause (c) above shall be the exclusive means for a stockholder to bring business before an annual meeting of stockholders.

(ii)    For business to be properly brought before an annual meeting by a stockholder of record pursuant to clause Section 2.4(i)(c) above, the stockholder of record bringing

4

the notice (the "***Noticing Stockholder***") must have delivered (as defined below) timely notice thereof in proper written form, setting forth all information required under this Section 2.4, to the Secretary at the principal executive offices of the Corporation. In order to be timely, the Noticing Stockholder's notice must be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business (as defined below) on the 90th day nor earlier than the Close of Business on the 120th day before the one-year anniversary of the preceding year's annual meeting; *provided*, *however*, that in the event that no annual meeting was held in the previous year or if the date of the annual meeting is advanced by more than 30 days prior to or delayed by more than 60 days after the one-year anniversary of the date of the previous year's annual meeting, then, for notice by any Noticing Stockholder to be timely, it must be so delivered to the Secretary not earlier than the Close of Business on the 120th day prior to such annual meeting and not later than the Close of Business on the later of (i) the 90th day prior to such annual meeting or (ii) the 10th day following the day on which a Public Announcement (as defined below) of the date of such annual meeting is first made by the Corporation. In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described in this Section 2.4. Notwithstanding anything in this Section 2.4(ii) to the contrary, in the event that the number of directors to be elected to the Board (other than any Class B Directors (as such term is defined in the Certificate, "***Class B Directors***")) is increased (subject, in all cases, to Article IV, Section 3(h) of the Certificate) and there is no Public Announcement by the Corporation naming all of the nominees for director proposed by the Board (other than any Class B Directors) or specifying the size of the increased Board at least 10 days prior to the last day a Noticing Stockholder may deliver a notice of nominations in accordance with the second sentence of this Section 2.4(ii), a Noticing Stockholder's notice required by this Section 2.4(ii) shall also be considered timely, but only with respect to proposed nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business on the 10th day following the day on which a Public Announcement of such increase is first made by the Corporation.

        (iii)     To be in proper written form, the Noticing Stockholder's notice must also set forth:

        (a)     as to each person whom the Noticing Stockholder proposes to nominate for election or re-election as a director (1) the name, age, business address and residence address of the person, (2) a complete biography and statement of such person's qualifications in compliance with the provisions of Item 401 (or any successor provision) of Regulation S-K, as amended ("***Regulation S-K***"), under the Securities Act of 1933, as amended (the "***Securities Act***"), including the principal occupation or employment of the person (at present and for the past five years), (3) the Specified Information (as defined below) for the person and any immediate family member (as defined below) of the person, or any affiliate or associate (each, as defined below) of the person, or any person acting in concert therewith, (4) a complete and accurate description of all direct and indirect compensation and other monetary or non-monetary agreements, arrangements and understandings

*[DRAFT]*

(whether written or oral) existing presently, that existed during the past three years or that were offered during the past three years (whether accepted or declined), and any other material relationships, between or among the Holders or any Stockholder Associated Person (each, as defined below), on the one hand, and the person, and any immediate family member of the person, and the person's respective affiliates and associates, or others acting in concert therewith, or any other person or persons, on the other hand (including the names of such persons), and all biographical, related party transaction and other information that would be required to be disclosed pursuant to the federal and state securities laws, including without limitation Item 404 (or any successor provision) under Regulation S-K, if any Holder or any Stockholder Associated Person was the "registrant" for purposes of such rule and such person was a director or executive officer of such registrant, (5) any other information relating to the person that would be required to be disclosed in a proxy statement or any other filings required to be made in connection with solicitations of proxies for the election of directors in a contested election or that is otherwise required pursuant to and in accordance with Section 14 of the Exchange Act (including such person's written consent to being named in proxy statements as a proposed nominee of the Noticing Stockholder and to serving as a director if elected), and (6) a completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4;

(b)     as to any other business that the Noticing Stockholder proposes to bring before the meeting (1) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend the Certificate, and/or these Bylaws, the text of the proposed amendment(s)), (3) a description of all agreements, arrangements and understandings (whether written or oral) between each Holder and any Stockholder Associated Person and any other person or persons (including such persons' names) in connection with the proposal of such business by the Noticing Stockholder and any material interest of each such Holder or any Stockholder Associated Person in such business, and (4) a complete and accurate description of any material interest of each such Holder or any Stockholder Associated Person in or with respect to such business; and

(c)     as to the Noticing Stockholder and any beneficial owner on whose behalf the nomination is being made or the other business is being proposed (collectively with the Noticing Stockholder, the "***Holders***" and, each, a "***Holder***"): (1) the name and address of each Holder, as the

6

*[DRAFT]*

name and address appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (2) (aa) the class or series and number of shares of capital stock or other securities of the Corporation which are, directly or indirectly, held of record or owned beneficially by each Holder or any Stockholder Associated Person (provided that, for the purposes of this Section 2.4, any such person shall in all events be deemed to beneficially own any class or series of shares of capital stock or other securities of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future (whether such right is exercisable immediately or only after the passage of time or the fulfillment of a condition or both)), (bb) any short position, profits interest, option, warrant, convertible security, stock appreciation right or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of capital stock or other securities of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of capital stock or other securities of the Corporation, or any derivative or synthetic arrangement having the characteristics of a long position in any class or series of shares of capital stock or other securities of the Corporation, or any contract, derivative, swap or other transaction or series of transactions designed to produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of capital stock or other securities of the Corporation, including due to the fact that the value of such contract, derivative, swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of capital stock or other securities of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of capital stock or other securities of the Corporation through the delivery of cash or other property, or otherwise, and without regard to whether the Holder or any Stockholder Associated Person may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "***Derivative Instrument***") directly or indirectly owned or held, including beneficially, by each Holder or any Stockholder Associated Person, (cc) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which each Holder or any Stockholder Associated Person has any right to vote or has granted a right to vote any class or series of shares of capital stock or other securities of the Corporation, (dd) any agreement, arrangement, understanding, relationship or otherwise, including any repurchase or similar so-called

7

*[DRAFT]*

"stock borrowing" agreement or arrangement, involving any Holder or any Stockholder Associated Person, on the one hand, and any person acting in concert therewith, on the other hand, directly or indirectly, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of any class or series of shares of capital stock or other securities of the Corporation by, manage the risk of price changes for, or increase or decrease the voting power of, such Holder or any Stockholder Associated Person with respect to any class or series of shares of capital stock or other securities of the Corporation, or which provides, directly or indirectly, the opportunity to profit or share in any profit derived from any decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "***Short Interest***"), and any Short Interest held by each Holder or any Stockholder Associated Person within the last 12 months in any class or series of shares of capital stock or other securities of the Corporation, (ee) any rights to dividends or payments in lieu of dividends on shares of capital stock of the Corporation owned beneficially by each Holder or any Stockholder Associated Person that are separated or separable from the underlying shares of capital stock or other securities of the Corporation, (ff) any proportionate interest in any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or other entity in which any Holder or any Stockholder Associated Person is a general partner or directly or indirectly beneficially owns an interest in a general partner of a general or limited partnership, or is the manager or managing member or directly or indirectly beneficially owns an interest in the manager or managing member of a limited liability company or other entity, (gg) any performance-related fees (other than an asset-based fee) that each Holder or any Stockholder Associated Person is or may be entitled to based on any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments, if any, including, without limitation, any such interests held by immediate family members sharing the same household of such Holder or any Stockholder Associated Person, (hh) any direct or indirect legal, economic or financial interest (including a Short Interest) of each Holder or any Stockholder Associated Person in the outcome of (I) any vote to be taken at any annual or special meeting of stockholders of the Corporation, or (II) any meeting of stockholders of any other entity with respect to any matter that is related, directly or indirectly, to any nomination or business proposed by any Holder under these Bylaws, (ii) any direct or indirect legal, economic or financial interest or any Derivative Instruments or Short Interests in any principal competitor of the

8

Corporation held by each Holder or any Stockholder Associated Person, (jj) any direct or indirect interest of each Holder or any Stockholder Associated Person in any contract with the Corporation, any affiliate of the Corporation or any principal competitor of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), and (kk) any material pending or threatened action, suit or proceeding (whether civil, criminal, investigative, administrative or otherwise) in which any Holder or any Stockholder Associated Person is, or is reasonably expected to be made, a party or material participant involving the Corporation or any of its officers, directors or employees, or any affiliate of the Corporation, or any officer, director or employee of such affiliate (all information contained in subclause (2) of this Section 2.4(iii)(c) shall be referred to as the "***Specified Information***"), (3) a representation by the Noticing Stockholder that such stockholder is a holder of record of shares of capital stock of the Corporation entitled to vote at such meeting, will continue to be a stockholder of record of the Corporation entitled to vote at such meeting through the date of such meeting and intends to appear in person or by proxy at the meeting to propose such nomination or other business, (4) any other information relating to each Holder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement and form of proxy or other filings required to be made in connection with solicitations of proxies for, as applicable, the election of directors in a contested election and/or the proposal pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (5) a representation by the Noticing Stockholder as to whether any Holder and/or any Stockholder Associated Person intends or is part of a group which intends: (aa) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to elect the proposed nominee or to approve or adopt the other business being proposed, and/or (bb) otherwise to solicit proxies from stockholders in support of such nomination or other business, (6) a certification by the Noticing Stockholder that each Holder and any Stockholder Associated Person has complied with all applicable federal, state and other legal requirements in connection with its acquisition of shares of capital stock or other securities of the Corporation and/or such person's acts or omissions as a stockholder of the Corporation, (7) the statement required by Rule 14a-19(b)(3) of the Exchange Act (or any successor provision), (8) the names and addresses of other stockholders (including beneficial owners) known by any Holder, proposed nominee or Stockholder Associated Person to support such nominations and/or proposals, and, to the extent known, the class or series and number of shares of capital stock or other securities of the Corporation which are,

directly or indirectly, held of record or owned beneficially by each such other stockholder or beneficial owner, and (9) a representation by the Noticing Stockholder as to the accuracy of the information set forth in the notice.

(iv)    The Corporation may also, as a condition to any such nomination or other business being deemed properly brought before a meeting of stockholders, require any Holder or any proposed nominee to deliver to the Secretary, within five Business Days (as defined below) of any such request, such other information as may reasonably be requested by the Corporation, including (a) such other information as may reasonably be required by the Board, in its sole discretion, to determine (1) the eligibility of any such proposed nominee to serve as a director of the Corporation, and (2) whether any such proposed nominee qualifies as an "independent director" or "audit committee financial expert," or otherwise meets heightened standards of independence, under applicable law, securities exchange rule or regulation or any publicly disclosed corporate governance guideline or committee charter of the Corporation, and (b) such other information that the Board determines, in its sole discretion, could be material to a reasonable stockholder's understanding of the diversity and independence, or lack thereof, of any such proposed nominee.

(v)    In addition to the other requirements of this Section 2.4, each person who a Noticing Stockholder proposes to nominate for election or re-election as a director of the Corporation must deliver in writing (in accordance with the time periods prescribed for delivery of notice under this Section 2.4) to the Secretary at the principal executive offices of the Corporation (a) a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request), and (b) a written representation and agreement (in the form provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request) that such person (1) is not and will not become a party to (aa) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (solely for purposes of this Section 2.4, a "***Voting Commitment***") that has not been disclosed to the Corporation, or (bb) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law, (2) is not and will not become a party to any agreement, arrangement or understanding (whether written or oral) with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation, (3) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the Corporation, and will comply with all applicable rules of the exchanges upon which the securities of the Corporation are listed and all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation, and (4) in such person's individual capacity and on behalf of any Holder on whose

*[DRAFT]*

behalf the nomination is being made, intends to serve a full term if elected as a director of the Corporation.

(vi)    *Special Meetings of Stockholders*. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting: (i) by or at the direction of the Board and (ii) provided that the Board has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who (1) is a stockholder of record on the date of the giving of the notice provided for in this Section 2.4, on the record date for the determination of stockholders entitled to notice of, and to vote at, such special meeting and at the time of such special meeting, (2) is entitled to vote at such special meeting, and (3) complies with the notice procedures set forth in this Section 2.4. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board, any Noticing Stockholder entitled to vote in such election of directors may nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, if the Noticing Stockholder's notice as required by Section 2.4(i) (including the completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4) shall be delivered to the Secretary at the principal executive offices of the Corporation in proper written form not earlier than the Close of Business on the 120th day prior to the special meeting and not later than the Close of Business on the later of the 90th day prior to the special meeting or the 10th day following the day on which Public Announcement of the date of the special meeting and of the nominees proposed by the Board to be elected at such meeting is first made by the Corporation. In no event shall the Public Announcement of an adjournment, recess, rescheduling or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described above.

(vii)    *General*.

(a)    Only such persons who are nominated in accordance with the procedures set forth in subsections (i) and (ii) of this Section 2.4 (in the case of an annual or special meeting) shall be eligible for election to serve as directors and only such other business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.4. Except as otherwise provided by law, the Certificate or these Bylaws, the Chair of the Board shall have the power and duty to determine whether a nomination or any other business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in these Bylaws (including whether the Noticing Stockholder or other Holder, if any, on whose behalf the nomination is being made or other business is being proposed solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in support of such Noticing Stockholder's nominee or other business in compliance with such stockholder's representation as required by clauses (5) and (7) of Section 2.4(iii)(c)). If any proposed nomination or other business was not made or proposed in compliance with these Bylaws, the chair of the meeting of stockholders shall have the power and duty to declare to the meeting that any such nomination or other business was not properly brought before the meeting and in accordance with the provisions of these Bylaws, and that such nomination or other business not properly brought before the meeting shall be disregarded and/or shall not be transacted.

11

*[DRAFT]*

(b)    In addition, to be considered timely, a Noticing Stockholder's notice shall be further updated and supplemented, if necessary, so that the information provided or required to be provided in such notice shall be true and correct as of the record date for the meeting and as of the date that is 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof, and such update and supplement shall be delivered to the Secretary at the principal executive offices of the Corporation not later than five Business Days after the record date for the meeting in the case of the update and supplement required to be made as of the record date, and not later than eight Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof in the case of the update and supplement required to be made as of 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof. In addition, if the Noticing Stockholder has delivered to the Corporation a notice relating to the nomination of directors, the Noticing Stockholder shall deliver to the Corporation not later than eight Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof reasonable evidence that it has complied with the requirements of Rule 14a-19 of the Exchange Act (or any successor provision). For the avoidance of doubt, the obligation to update and supplement set forth in this paragraph or any other Section of these Bylaws shall not (x) limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, (y) extend any applicable deadlines hereunder or (z) enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding nominees, matters, business and/or resolutions proposed to be brought before a meeting of stockholders.

(c)    Notwithstanding anything to the contrary in these Bylaws, if the Noticing Stockholder (or a qualified representative of the Noticing Stockholder) does not appear at the annual or special meeting of stockholders, as applicable, to present a nomination or other business, such nomination shall be disregarded and such other business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Section 2.4, to be considered a "qualified representative" of the Noticing Stockholder, a person must be authorized by a document authorizing another person or persons to act for such stockholder as proxy at the meeting of stockholders and such person must produce the document or a reliable reproduction of such document at the meeting of stockholders. A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder. If it is determined that such transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information upon which such inspectors or such persons relied.

(d)    For purposes of these Bylaws,

*[DRAFT]*

(1)　　"***affiliate***" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

(2)　　"***associate***" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

(3)　　"***Business Day***" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York, New York are authorized or obligated by law or executive order to close;

(4)　　"***Close of Business***" on a particular day means 5:00 p.m. local time at the principal executive offices of the Corporation, and, if an applicable deadline falls on the Close of Business on a day that is not a Business Day, then the applicable deadline shall be deemed to be the Close of Business on the immediately preceding Business Day;

(5)　　"***delivered***" means, solely for purposes of this Article II, both (x) hand delivery, overnight courier service or sent and received by certified or registered mail, return receipt requested, in each case, to the Secretary at the principal executive offices of the Corporation, and (y) electronic mail to the Secretary;

(6)　　"***immediate family member***" means a person's child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law and anyone (other than a tenant or employee) sharing the household of such person;

(7)　　"***Public Announcement***" means disclosure (x) in a press release released by the Corporation, provided such press release is released by the Corporation following its customary procedures, as reported by the Dow Jones News Service, Associated Press or a comparable national news service, or is generally available on internet news sites, or (y) in a document publicly filed by the Corporation with the SEC pursuant to Sections 13, 14 or 15(d) of the Exchange Act; and

(8)　　"***Stockholder Associated Person***" of any Holder means (x) any person acting in concert with such Holder, (y) any person controlling, controlled by or under common control with such Holder or any of the Holder's respective affiliates and associates (each, as defined in Rule 12b-2 under the

*[DRAFT]*

Exchange Act), or any person acting in concert therewith, and (z) any immediate family member of such Holder or an affiliate or associate of such Holder.

(viii)    *Other Requirements and Rights*. In addition to the foregoing provisions of this Section 2.4, a stockholder must also comply with all applicable requirements of state law and of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 2.4. Notwithstanding anything to the contrary contained in this Section 2.4, the sole holder of shares of Class B Common Stock (as defined in the Certificate) (such sole holder, the "***Class B Holder***") shall not be subject to the notice procedures set forth in this Section 2.4 with respect to nominations of persons for election to the Board as Class B Directors at any annual or special meeting of stockholders of the Corporation. Nothing in this Section 2.4 shall be deemed to affect any rights of:

(a)    a stockholder to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act; or

(b)    the Corporation to omit a proposal from the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act.

Section 2.5    Notice of Stockholders' Meetings. The Corporation shall give a notice in writing of the place, if any, date and hour of each meeting of stockholders and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Without limiting the manner by which notice otherwise may be given effectively to stockholders, if such notice is mailed, it shall be deemed to have been given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the record of the Corporation. Except as otherwise provided in the General Corporation Law of the State of the Delaware (the "***General Corporation Law***"), the Certificate or these Bylaws, the written notice of any meeting of stockholders shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

Section 2.6    Quorum. The holders of one-third of the aggregate voting power of the capital stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders, except where a different quorum is required by the General Corporation Law, the Certificate or these Bylaws. Where a separate vote by a class or series or classes or series is required, one-third of the outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum (as to such class or series) entitled to take action with respect to that vote on that matter, except as otherwise provided by law, the Certificate or these Bylaws.

Abstentions and non-votes by brokers are counted as present for purposes of determining a quorum.

If a quorum is not present or represented at any meeting of the stockholders, then either (i) the chair of the meeting, or (ii) the holders of a majority of the shares entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

Section 2.7    Adjourned Meeting; Notice. When a meeting is adjourned to another time and/or place, unless these Bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are (i) announced at the meeting at which the adjournment is taken, (ii) displayed, during the time scheduled for the meeting, on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication or (iii) set forth in the notice of meeting given in accordance with these Bylaws. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days or a new record date for stockholders entitled to vote is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.8    Conduct of Business. The Board may, to the extent not prohibited by law or in contravention of the provisions of these Bylaws or the Certificate, adopt such rules and regulations for the conduct of meetings of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the chair of any meeting of stockholders shall have the exclusive right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of the chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present, including regulation of the manner of voting and the conduct of discussion; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chair of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on or the elimination of time allotted to questions or comments by participants; and (vi) restrictions on the use of cell phones, audio or video recording devices and other devices at the meeting. The chair of any meeting of stockholders shall be designated by the Board; in the absence of such designation, the Chair of the Board, if any, the Lead Independent Director (in the absence of the Chair of the Board), the Chief Executive Officer (in the absence of the Chair of the Board and the Lead Independent Director) or the President (in the absence of the Chair of the Board and the Lead Independent Director and the Chief Executive Officer), or in their absence any other director or officer of the Corporation selected by the Board, shall serve as chair of the stockholder meeting.

The chair of the meeting shall have the power, right and authority to convene, recess or adjourn any meeting of stockholders.

Section 2.9    Voting.

(i)    *Voting Rights.* Except as may be otherwise provided by law, the Certificate, these Bylaws or any Certificate of Designation (as such term is defined in the Certificate), each stockholder of record of any series of Preferred Stock shall be entitled at each meeting of the stockholders to such number of votes, if any, for each share of such stock as may be fixed in the Certificate or in the resolution or resolutions adopted by the Board providing for the issuance of such stock, the Class B Holder shall be entitled to the voting rights set forth in the Certificate, and each stockholder of record of the Corporation's Common Stock (as defined in the Certificate) shall be entitled at each meeting of the stockholders to one vote for each such share of such stock registered in such stockholder's name on the books of the Corporation on the date fixed pursuant to Section 2.11 of these Bylaws as the record date for the determination of stockholders entitled to notice of and to vote at such meeting. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights.

(ii)    *Vote Required.* Except as otherwise required by law, the Certificate or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of the shares cast shall be the act of the stockholders. Except as with respect to the election of Class B Directors and except as otherwise required by law, the Certificate or these Bylaws, the vote required for election of a director by the stockholders at a meeting of stockholders shall be the affirmative vote of a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

(iii)    *Abstentions and Broker Non-Votes.* In determining the number of votes cast for or against, as applicable, a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast. A non-vote by a broker will be counted for purposes of determining a quorum but not for purposes of determining the number of votes cast.

Section 2.10    No Stockholder Action by Written Consent Without a Meeting. Except as otherwise set forth in the Certificate, subject to the rights of any series of Preferred Stock then outstanding, no action shall be taken by the stockholders of the Corporation except at a duly called annual or special meeting of stockholders and no action shall be taken by the stockholders of the Corporation by written consent in lieu of a meeting.

Section 2.11    Record Dates.

(i)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date

*[DRAFT]*

for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting.

(ii)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 2.12    Proxies. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy but such proxy, whether revocable or irrevocable, must comply with the applicable requirements of Delaware law.

Section 2.13    List of Stockholders Entitled to Vote. The Corporation shall prepare no later than the 10th day before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; *provided, however*, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of 10 days ending on the day before the meeting date: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list was provided with the notice of the meeting; or (ii) during ordinary business hours, at the principal place of business of the Corporation. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

## ARTICLE III
## DIRECTORS

Section 3.1    Board Power. The business and affairs of the Corporation shall be managed by and under the direction of the Board, except as may be otherwise provided in the General Corporation Law or the Certificate. In addition to the powers and authority expressly conferred upon them by applicable law or by the Certificate or these Bylaws, the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the

*[DRAFT]*

Corporation, except as otherwise specifically required by law or as otherwise provided in the Certificate.

Section 3.2     Board Size. Subject to the provisions of the Certificate, the Board shall consist of no less than five members and no more than 15 members, each of whom shall be a natural person.[6] The number of directors shall be determined from time to time solely by resolution of the Board in accordance with the provisions of the Certificate. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Section 3.3     Election, Qualification and Term of Office of Directors. Except as provided in Section 3.4 of these Bylaws and subject to the provisions of the Certificate, each director shall hold office until the annual meeting at which such director's term expires and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders unless so required by the Certificate or these Bylaws. The Certificate or these Bylaws may prescribe other qualifications for directors.

Section 3.4     Removal of Directors. Directors may be removed from the Board at any time as provided in the Certificate.

Section 3.5     Resignation and Vacancies.

(i)     Any director may resign at any time by delivering a resignation in writing or by electronic transmission, signed by such director, to the Chair of the Board or the Secretary; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the director. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. Acceptance of such resignation shall not be necessary to make it effective.

(ii)     Vacancies and newly created directorships on the Board shall be filled in the manner provided in the Certificate. A person so elected to fill a vacancy or newly created directorship shall hold office for a term expiring at the next election of the class for which such director shall have been chosen and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal.

Section 3.6     Place of Meetings; Meetings by Remote Communication. The Board may hold meetings, both regular and special, either within or without the State of Delaware. Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of remote communication, including without limitation, by means of conference telephone or other communications equipment by means of which all persons

---

[6] *Note to W&C/K&E: This should align with COI – COI just provides further limitations while Class Bs are outstanding.*

*[DRAFT]*

participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.7    Regular Meetings. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

Section 3.8    Special Meetings; Notice. Special meetings of the Board for any purpose or purposes may be called at any time by the Chairperson of the Board, the Lead Independent Director, a Class B Director or a majority of the directors then in office, at such times and places as such person or persons shall designate. Notice of special meetings of the Board shall be given to each director by mailing it to such director's residence or usual place of business (accompanied by an electronic transmission of such notice) at least three business days before the date of the meeting or by telephone or electronic transmission at least three business days before the meeting. Notice need not be given to any director who submits a signed waiver of notice before or after the meeting or who attends the meeting without protesting the lack of notice to such person, either before the meeting or when it begins. Notice of any adjourned meeting need not be given, other than by announcement at the meeting at which the adjournment is taken.

Section 3.9    Quorum; Voting. At all meetings of the Board, a majority of the total number of directors (other than the Class B Directors) then in office plus at least one of the Class B Directors shall constitute a quorum for the transaction of business. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate or these Bylaws.

Section 3.10    Board Action by Written Consent Without a Meeting. Unless otherwise restricted by the Certificate or these Bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee.

Section 3.11    Fees and Compensation of Directors. Unless otherwise restricted by the Certificate or these Bylaws, the Board shall have the authority to fix the compensation of directors.

Section 3.12    The Chair of the Board. [The Chair of the Board shall have the powers and duties customarily and usually associated with the office of the Chair of the Board. The Chair of the Board shall preside at meetings of the stockholders and of the Board.][7]

---

[7] NTD: Role to be discussed.

*[DRAFT]*

Section 3.13    Lead Independent Director. A majority of the Independent Directors (as defined below) may, in their discretion and in accordance with any corporate governance policies adopted by the Corporation, elect a lead independent director from among their members that are Independent Directors (as defined below) (such director, the "***Lead Independent Director***"), which may be the Chair of the Board if the Chair is independent. The Lead Independent Director shall preside at all meetings at which the Chair of the Board is not present and shall exercise such other powers and duties as may from time to time be assigned to him or her by the Board or as prescribed by these Bylaws. For purposes of these Bylaws, "***Independent Director***" has the meaning ascribed to such term under the rules of the exchange upon which the Corporation's Class A Common Stock is primarily traded.

# ARTICLE IV
# COMMITTEES

Section 4.1    Committees of Directors. The Board, by resolution adopted by a majority of the entire Board, may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Subject to Section 4.5 of these Bylaws, the Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee, to the extent provided in the resolution of the Board or in these Bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; *provided, however,* that no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the General Corporation Law to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation.

Section 4.2    Committee Minutes. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

Section 4.3    Meetings and Action of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)      Section 3.6 (place of meetings and meetings by telephone);

(ii)     Section 3.7 (regular meetings);

(iii)    Section 3.8 (special meetings; notice);

(iv)     Section 3.9 (quorum; voting); *provided, however*, that the provisions of Section 3.9 regarding the presence of a Class B Director to establish a quorum shall not be required for committees upon which no Class B Director serves;

(v)      Section 3.10 (action without a meeting); and

*[DRAFT]*

(vi)    Section 7.5 (waiver of notice) with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(a)    the time of regular meetings of committees may be determined by resolution of the committee or the chair of such committee; and

(b)    special meetings of committees may also be called by resolution of the committee or the chair of such committee.

The Board may adopt rules for the governance of any committee not inconsistent with the provisions of these Bylaws. Any committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board. Unless the Board provides otherwise, at all meetings of such committee, the majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of the majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Unless the Board provides otherwise, each committee designated by the Board may make, alter, and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board conducts its business.

Section 4.4    Subcommittees. Unless otherwise provided under applicable law, or in the Certificate, these Bylaws or the resolutions of the Board designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

Section 4.5    Class B Directors. To the extent permissible under applicable law and the listing rules of any exchange upon which the Corporation's securities are traded, any committee of the Board that oversees: (i) material investments or divestitures, strategic transactions and other significant transactions not in the ordinary course of the Corporation's business, or (ii) the Corporation's governance and the evaluation of nominees for election to the Board (including, without limitation, any nominating committee that satisfies Nasdaq Listing Rule 5605(e)(2) or Section 303A.04 of the New York Stock Exchange Listed Company Manual), shall include at least one Class B Director; provided, however, for the avoidance of doubt, that any committee of the Board performing the functions of an audit committee (including, without limitation, any audit committee that satisfies Nasdaq Listing Rule 5605(c) or Section 303A.06 of the New York Stock Exchange Listed Company Manual) shall not be required to include a Class B Director in accordance with applicable law and listing rules.

*[DRAFT]*

## ARTICLE V
## OFFICERS

 Section 5.1    Officers. The officers of the Corporation shall be a Chief Executive Officer, a Chief Financial Officer, a Secretary and such other officers and assistant officers as may be deemed necessary or desirable by the Board. Any number of offices may be held by the same person. In its discretion, the Board may choose not to fill any office for any period as it may deem advisable; *provided, however*, that there shall always be (i) a Chief Executive Officer and (ii) a Secretary.

 Section 5.2    Appointment of Officers. The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws, subject to the rights, if any, of an officer under any contract of employment. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Article V for the regular election to such office.

 Section 5.3    Subordinate Officers. The Board may appoint, or empower the Chief Executive Officer to appoint, such other officers and agents as the business of the Corporation may require. Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board may from time to time determine.

 Section 5.4    Removal and Resignation of Officers. Any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board. Any officer may resign at any time by giving written or electronic notice to the Corporation; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the officer. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

 Section 5.5    Vacancies in Offices. Any vacancy occurring in any office of the Corporation shall be filled by the Board as provided in Section 5.2 and 5.3.

 Section 5.6    Representation of Shares of Other Corporations. The Chair of the Board, the Lead Independent Director, the Chief Executive Officer, the Chief Financial Officer the Secretary, or any other person authorized by the Board, the Chair of the Board, the Lead Independent Director or the Chief Executive Officer is authorized to vote, represent, and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

*[DRAFT]*

Section 5.7    Authority and Duties of Officers. All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

Section 5.8    The Chief Executive Officer. The Chief Executive Officer shall have, subject to the supervision, direction and control of the Board, ultimate authority for decisions relating to the supervision, direction and management of the affairs and the business of the Corporation customarily and usually associated with the position of Chief Executive Officer, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Corporation. If at any time the office of the Chair and Lead Independent Director of the Board shall not be filled, or in the event of the temporary absence or disability of the Chair of the Board and the Lead Independent Director, the Chief Executive Officer shall perform the duties and exercise the powers of the Chair of the Board unless otherwise determined by the Board.

Section 5.9    The Secretary.

(i)    The Secretary shall attend meetings of the Board and meetings of the stockholders and record all votes and minutes of all such proceedings in a book or books kept for such purpose. The Secretary shall have all such further powers and duties set forth in these Bylaws and as are customarily and usually associated with the position of Secretary or as may from time to time be assigned to him or her by the Board, the Chair of the Board, or the Chief Executive Officer.

Section 5.10    The Chief Financial Officer.

(i)    The Chief Financial Officer shall be responsible for maintaining the Corporation's accounting records and statements, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation. The Chief Financial Officer shall also maintain adequate records of all assets, liabilities and transactions of the Corporation and shall assure that adequate audits thereof are currently and regularly made. The Chief Financial Officer shall have all such further powers and perform all such further duties as are customarily and usually associated with the position of Chief Financial Officer, or as may from time to time be assigned to him or her by the Board, the Chair of the Board or the Chief Executive Officer. Unless a treasurer has been appointed separately in accordance with these Bylaws, the Chief Financial Officer shall also perform the duties customarily and usually associated with the position of treasurer.

## ARTICLE VI
## CAPITAL STOCK

Section 6.1    Stock Certificates; Uncertificated Shares. The shares of the Corporation may be represented by certificated or uncertificated shares and may be evidenced by a book-entry system maintained by the registrar of such shares, as determined by the Corporation in accordance with applicable law. Except as otherwise expressly provided by law, the rights and obligations of

*[DRAFT]*

the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

(i)      Shares with Certificates. Each certificate of stock issued by the Corporation shall be signed (either manually or in facsimile) by any two authorized officers of the Corporation representing the number of shares registered in certificate form. If any person who signed a certificate no longer holds office when the certificate is issued, the certificate will be nonetheless valid. The Corporation shall not have power to issue a certificate in bearer form. If the Board chooses to issue shares of stock evidenced by a certificate or certificates, each individual certificate shall include the following on its face: (i) the Corporation's name, (ii) the fact that the Corporation is organized under the laws of Delaware, (iii) the name of the person to whom the certificate is issued, (iv) the number of shares represented thereby, (v) the class of shares and the designation of the series, if any, which the certificate represents, and (vi) such other information as required under the Certificate or applicable law or as may be lawful. If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series (and the authority of the Board to determine variations for future series) shall be summarized on the front or back of each certificate. Alternatively, each certificate shall state on its front or back that the Corporation will furnish the stockholder this information in writing, without charge, upon request.

(ii)      Shares without Certificates. If the Board chooses to issue shares of stock without certificates, the Corporation, if required by the Exchange Act, shall, within a reasonable time after the issue or transfer of shares without certificates, send the stockholder a written notice containing the information required to be set forth or stated on certificates pursuant to the General Corporation Law. The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

Section 6.2    Lost, Stolen or Destroyed Certificates. Except as provided in this Section 6.2, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Section 6.3    Dividends. The Board, subject to any restrictions contained in the Certificate or applicable law, may declare and pay dividends upon the shares of the Corporation's capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock, subject to the provisions of the Certificate.

Section 6.4    Transfer of Stock. Transfers of record of shares of stock of the Corporation shall be made only upon its books by the holders thereof, in person or by an attorney duly authorized, and, if such stock is certificated, upon the surrender of a certificate or certificates for a

like number of shares, properly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer; provided, however, that such succession, assignment or authority to transfer is not prohibited by the Certificate, these Bylaws, applicable law or contract.

Section 6.5    Stock Transfer Agreements. The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law.

Section 6.6    Registered Stockholders. The Corporation:

(i)     shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii)    shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii)   shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII
## MANNER OF GIVING NOTICE AND WAIVER

Section 7.1    Notice of Stockholders' Meetings. Notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the Corporation's records. An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

Section 7.2    Notice by Electronic Transmission. Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the General Corporation Law, the Certificate or these Bylaws, any notice to stockholders given by the Corporation under any provision of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if:

(i)     the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent; and

    (ii)    such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

    (I)    if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

    (II)    if by electronic mail, when directed to the stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) the General Corporation Law;

    (III)    if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and

    (IV)    if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

An "***electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

<u>Section 7.3</u>    <u>Notice to Stockholders Sharing an Address</u>. Except as otherwise prohibited under the General Corporation Law, without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under the provisions of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Any such consent shall be revocable by

*[DRAFT]*

the stockholder by written notice to the Corporation. Any stockholder who fails to object in writing to the Corporation, within 60 days of having been given written notice by the Corporation of its intention to send the single notice, shall be deemed to have consented to receiving such single written notice.

Section 7.4    Notice to Person with Whom Communication Is Unlawful. Whenever notice is required to be given under the General Corporation Law, the Certificate or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate under the General Corporation Law, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Section 7.5    Waiver of Notice. Whenever notice is required to be given to stockholders, directors or other persons under any provision of the General Corporation Law, the Certificate or these Bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders or the Board, as the case may be, need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate or these Bylaws.

## ARTICLE VIII
## INDEMNIFICATION[8]

Section 8.1    Indemnification of Directors and Officers in Third Party Proceedings. Subject to the other provisions of this Article VIII, the Corporation shall indemnify and hold harmless, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether civil, criminal, administrative, legislative, investigative or other nature and including any and all appeals (collectively, each a "***Proceeding***") (other than an action by or in the right of the Corporation to procure a judgement in its favor) by reason of the fact that such person is or was a director or officer of the Corporation, or while a director of the Corporation or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all liability and loss suffered and expenses, including, without limitation,

---

[8] Note to BR: Make sure consistent with COI.

27

attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

Section 8.2    Indemnification of Directors and Officers in Actions by or in the Right of the Corporation. Subject to the other provisions of this Article VIII, the Corporation shall indemnity, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Corporation to procure a judgement in its favor by reason of the fact that such person is or was a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Section 8.3    Successful Defense. To the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise in defense of any Proceeding described in Section 8.1 or Section 8.2, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith to the extent not already advanced pursuant to Section 8.5.

Section 8.4    Indemnification of Others. Subject to the other provisions of this Article VIII, the Corporation shall have power to indemnify its employees and its agents to the extent not prohibited by the General Corporation Law or other applicable law. The Board shall have the power to delegate the determination of whether employees or agents shall be indemnified to such person or persons as the board of determines.

Section 8.5    Advanced Payment of Expenses. To the fullest extent permitted by applicable law, expenses (including attorneys' fees) incurred by an officer or director of the Corporation in defending any Proceeding shall be paid by the Corporation, and expenses

28

(including attorneys' fees) incurred by the Corporation's employees and agents in defending any Proceeding shall be paid by the Corporation, in advance of the final disposition of such Proceeding upon receipt of a written request therefor and an undertaking, by or on behalf of the person, to repay such amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that such person is not entitled to be indemnified under this Article VIII or the General Corporation Law.

Section 8.6    Non-Exclusivity of Rights. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate (including the indemnification provisions set forth in Article VII, Section 2 of the Certificate) or any statute, bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the General Corporation Law or other applicable law.

Section 8.7    Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the General Corporation Law.

Section 8.8    Survival. Notwithstanding anything to the contrary, the rights to indemnification and advancement of expenses conferred by this Article VIII shall be contract rights and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

Section 8.9    Effect of Repeal or Modification. Any amendment, alteration or repeal of this Article VIII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to such amendment, alteration or repeal.

Section 8.10    Certain Definitions. For purposes of this Article VIII, references to the "***Corporation***" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued. For purposes of this Article VIII, references to "***other enterprises***" shall include employee benefit plans; references to

*[DRAFT]*

"***fines***" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "***serving at the request of the Corporation***" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "***not opposed to the best interests of the Corporation***" as referred to in this Article VIII.

## ARTICLE IX
## GENERAL MATTERS

Section 9.1    Execution of Corporate Contracts and Instruments. Except as otherwise provided by law, the Certificate or these Bylaws, the Board may authorize any officer or officers, or agent or agents, to enter into any contract or execute any document or instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 9.2    Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

Section 9.3    Seal. The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Section 9.4    Construction; Definitions. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Certificate and the General Corporation Law shall govern the construction of these Bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both an entity and a natural person.

## ARTICLE X
## AMENDMENTS

The Board and stockholders may adopt, amend and repeal the Bylaws in the manner provided in the Certificate.

## **Exhibit B**

**Identities of the Members of the New Board of NewCo**

### New Board Directors

Pursuant to the Plan, the Board of Directors of NewCo (the "**New Board**") was to be composed of seven directors: (i) two selected by Fahrenheit Holdings, LLC (the "**Plan Sponsor**") in its sole discretion, (ii) three selected by the Official Committee of Unsecured Creditors of Celsius Network LLC and its Debtor affiliates (the "**Committee**") in its sole discretion, and (iii) two selected by the Committee and consented to by the Plan Sponsor.  Following the filing of the Plan on August 15, 2023, the Plan Sponsor and the Committee engaged in discussions with respect to expanding the membership of the New Board from seven to nine members, with one of the additional members to be selected by the Plan Sponsor and the second additional member to be selected by the Committee.

After extensive deliberation, the Committee and the Plan Sponsor determined that it is in the best interests of NewCo to set the size of the New Board at nine members, which would give (i) the Committee the right to appoint six of the nine initial members of the New Board, with two such appointments to be subject to the approval of the Plan Sponsor, and (ii) the Plan Sponsor the right to appoint three of the nine initial members of the New Board.  The Committee further determined that its six-candidate slate should be composed of four independent directors and two prepetition creditors of the Debtors.

To facilitate the Committee's final selection, the Committee's legal and financial advisors assembled resumes, collected board questionnaires, conducted interviews with prospective board members along with the Committee members, and hired an independent investigator to conduct comprehensive background checks on candidates who all agreed to the investigations.

Upon extensively deliberating and diligently reviewing the qualifications, experience and independence of each of the candidates, the seven-member Committee voted to select Elizabeth A. LaPuma, Max Holmes, Emmanuel Aidoo, and Frederick Arnold as the independent directors to the New Board.  The three Committee members who sought appointment to the New Board were not eligible for the independent director seats.  The other prepetition creditors were considered for those seats.  At the direction of the Committee's legal advisors, the Committee members seeking appointment to the New Board recused themselves from the deliberations regarding the remaining New Board seats.  After lengthy discussions with the Committee's legal and financial advisors, the remaining members of the Committee who did not seek appointment to the New Board voted to select Scott Duffy and Thomas DiFiore as the prepetition creditors to the New Board.

Detailed profiles of the New Board directors are included on the following page.  The Committee is also in discussions with a prepetition creditor regarding a potential board observer position.



**ASHER GENOOT**

Asher Genoot is a proven entrepreneur with experience building and operating companies across the United States and China.

Asher currently serves as the President of US Bitcoin Corp (USBTC), which builds and operates data centers for bitcoin production. Since co-founding USBTC in December 2020, he has scaled the venture-backed company into one of the largest bitcoin mining organizations in the world, with funding from the likes of Peter Thiel (Thiel Capital), Eric Schmidt (Steele Perlot), Naval Ravikant (AngelList), and Justin Mateen (Tinder). Asher most recently led USBTC's takeover, and turnaround of approximately 580 MW of distressed mining assets in the Chapter 11 bankruptcy proceeding of Compute North. USBTC today manages more than 730 MW of capacity across data centers in Texas, Nebraska, and New York. Earlier this year, the company announced a merger of equals with Canadian miner Hut 8 (NASDAQ: HUT).

Prior to US Bitcoin Corp, Asher founded Curio Education, a Shanghai-based edtech startup that scaled to more than 130 employees. He is the Co-founder and Managing Partner of Flagship Endeavors, a venture incubator focused on consumer products.

Asher holds a Bachelor of Science in Business Administration from the University of Southern California, where he graduated summa cum laude at 19 years old. He is a member of YPO (Young Presidents Organization) and the Forbes 30 Under 30 Class of 2023.



**ELIZABETH A. LAPUMA**

Elizabeth A. LaPuma brings over two decades of financial advisory and board expertise across diverse industries. With a strong background in originating and structuring complex financial transactions, she is a trusted advisor to numerous business leaders.

Ms. LaPuma currently chairs the Audit Committee and is on the Compensation and Governance Committees at WeWork. Additionally, Ms. LaPuma is a board member for other businesses within the fintech, artificial intelligence, healthcare, consumer, and real estate sectors.

Prior to these roles, Ms. LaPuma was a Managing Director and Head of Balance Sheet Advisory at UBS. Prior to UBS, she was a Managing Director and head of Asset Management Services at Alvarez & Marsal, advising governments and financial institutions on diverse assets. Ms. LaPuma's earlier career includes roles at BlackRock, Lazard Frères & Co. LLC, Credit Suisse and Perella Weinberg Partners L.P.

Ms. LaPuma received her Master of Business Administration in Finance as a Palmer Scholar, Bachelor of Science in Finance and Bachelor of Arts in International Relations (Magna Cum Laude) from the Wharton School and The School of Arts and Sciences at the University of Pennsylvania.



### EMMANUEL AIDOO

Emmanuel Aidoo is a recognized leader in digital assets advisory, private capital, and restructuring banking. With a strong track record in navigating complex financial landscapes, he specializes in digital assets, blockchain technology, and innovative investment solutions. At Perella Weinberg Partners, Emmanuel leads the digital assets advisory division, driving growth and positioning the firm as a market leader in blockchain and cryptocurrencies. Previously at Credit Suisse AG for over two decades, he played key roles, including Head of Digital Assets Markets, where he advanced the firm's blockchain strategy. Emmanuel's achievements include pioneering proof-of-concepts, strategic investments in blockchain projects, and thought leadership in the global blockchain community. Aidoo has been recognized by Forbes on their Blockchain 50 list (2020), Business Insider's list of Top 10 Transforming Finance (2019) and American Banker (2018). He has served as a member of the World Economic Forum (WEF) Digital Asset Steering Committee and as the Chair of SIFMA's Blockchain Roundtable.

Emmanuel studied Computer Science at Brunel University in Uxbridge, England.



### FREDERICK ARNOLD

Frederick Arnold a seasoned professional having served in numerous operating and board positions typically in highly complex situations. He has a long track record creating value through operational improvement, and also has deep experience in board governance, strategic transactions and global capital markets. His current board positions include Lehman Brothers Holdings Inc. (current chairman, post-emergence), where he was appointed to the board by major creditors to help oversee this vast and intricate global bankruptcy estate; Navient Corporation (NASDAQ: NAVI), where he was brought onto the board as a new, independent voice for value creation when activist investor Canyon Partners was threatening a proxy battle; and Metropolitan Gaming Holdco Ltd. where he was appointed by Silver Point Capital to chair and help grow the former EMEA casino businesses of Caesars Entertainment.

Previous Board Positions include Corporate Capital Trust (NYSE: CCT) where he served as Chairman of the Board and played a pivotal role in the growth and eventual merger of this NYSE-listed BDC; Valaris PLC (NYSE: VAL), a large

offshore drilling company;  The We Company (WeWork), where he served on a special committee tasked with addressing a critical governance challenge after the departure of the charismatic founder and CEO; CIFC Corp (NASDAQ), which managed billions of dollars of CLO's; and Syncora Holdings (SYCRF), where he led a period of strategic change and significant value creation after active hedge funds suggested he join the board.

Fred has a strong track record leading finance functions in private equity-owned global companies. He excels in improving processes, reducing costs, generating cash, and increasing enterprise value. In addition, he has two decades of investment banking experience at firms including Lehman Brothers and Smith Barney, where he provided strategic financial advice to major corporations and growth companies, specializing in acquisitions, divestitures, and global capital markets transactions.

Fred holds a J.D. from Yale Law School, an MA in Jurisprudence from Oxford University, and a BA in Economics, summa cum laude, from Amherst College.



**MAX HOLMES**

Max Holmes is a seasoned professional with decades of experience spanning multiple sectors of the finance industry.  Since 2015, he has been the Chief Investment Officer of Haven Asset Management LLC, an SEC registered investment advisor in Greenwich CT.  In addition, since 2015 he has been a Senior Advisor to American Industrial Partners (AIP), a private equity firm in New York with AUM of over $10 billion focused on industrial companies.

Previously, from 2017 to 2022, Max was the Chair and CEO of Haven Holdings Inc., an insurance holding company with operations in Wisconsin and Puerto Rico. Before that, from 2005 to 2016, he was the Founder and Chief Investment Officer of Plainfield Asset Management LLC, a distressed, event and special situations asset manager in Greenwich CT with AUM of over $5 billion (including hedge funds and a Business Development Company), which invested in over 400 businesses across a wide variety of industries and capital structures.

Max's career also includes serving as a Managing Director at D.E. Shaw & Co., where he led its Distressed Securities Group.  He also worked previously at RBC Capital Markets, Gleacher NatWest, Salomon Brothers, and Drexel Burnham Lambert in Beverly Hills CA.

Since 1993, Max has been an Adjunct Professor of Finance at the Stern Graduate School of Business at New York University, where he teaches "Bankruptcy and Reorganization."

Max received a J.D. from Columbia Law School, an M.B.A. from Columbia Business School, and an A.B. from Harvard College. Max is a member of the bar in New York and Texas and has held numerous licenses from a variety of regulatory bodies.



## MICHAEL ARRINGTON

Michael Arrington is the founder of Arrington Capital, a crypto-focused hedge fund created in 2018. Arrington Capital has returned 127% net of fees and expenses since inception through YE 2022, comparing quite favorably to and more than doubling the returns of BTC (21%), ETH (55%), the NASDAQ (49%) and the S&P (42%). The fund's AUM at February 28, 2023 was approximately $412m and the fund has distributed an additional $309m to limited partners through Q1 2023.

Prior to Arrington Capital, Arrington founded Crunchfund, where he was an early investor in Uber, Airtable, Pinterest, Cloudflare and many other companies. He was named to the Time 100 list of the world's most influential people, was an attorney with O'Melveny & Myers and Wilson Sonsini Goodrich & Rosati and wrote a book, The Initial Public Offering: A Practical Guide for Investors, published by Bowne in 1998.

Michael holds a J.D. from Stanford University and a degree in economics from Claremont McKenna.



## SCOTT DUFFY

Scott Duffy is the CEO of ICB Solutions, Inc. where he has grown assets from under $2,500 to over $60 million since 2011. With a keen interest in cryptocurrency, Scott has mined Bitcoin, participated in Ethereum's growth, and developed a successful e-commerce partnership grossing over $250,000 annually. He has contributed to organizations like the Association of Governmental Accountants, American Society of Military Comptrollers, Ohio State Bar Association, and Nationwide Mutual Insurance Company.

Scott currently co-chairs the Official Committee of Unsecured Creditors at Celsius Network, contributing to negotiations, mining strategy, and fostering cooperation among stakeholders. He was previously an accountant at Defense Finance and Accounting Service (DFAS) in Columbus, where he managed complex operations, including ERP system deployments and financial system integration.

Scott holds a Bachelor of Science in Finance and Business Administration from Ohio Dominican University.



**STEVE KOKINOS (Proposed NewCo CEO)**

Steve Kokinos has raised over $1.5 billion for the companies he founded and/or led as CEO with investments from Fidelity, Battery Ventures, Bessemer Venture Partners, Union Square Ventures, Goldentree Asset Management, China Merchants Bank and Pillar VC.

Steve has been a serial entrepreneur and investor for over 25 years, founding and operating companies ranging from internet infrastructure, cloud software, communications, and crypto. Most recently the founding CEO of Algorand, a Layer-1 staking-based blockchain that he was instrumental in scaling the ecosystem to a multi billion dollar market cap. Steve was also the founder of Fuze, a cloud-based communications platform, which raised over $500 million and was acquired by 8x8, Inc. (NYSE: EGHT) in 2022. Prior to Fuze, Steve founded BladeLogic which went public in 2007 and was subsequently acquired by BMC Software in 2008 for $800 million. Prior to Fuze, Steve founded and was CEO of WebYes, which was acquired by Breakaway Solutions, which went public in 2001.

Steve holds a Bachelor of Arts in economics from McGill University in Montreal.



**THOMAS DIFIORE**

Thomas DiFiore has been the Dealer Principal at Fullerton Auto Group since 2015. As an early Bitcoin adopter, he started a mining company that successfully solo mined over 200 blocks. For more than 8 years, he has been a member of the Advisory Council for the Somerset Patriots, the Yankees AA affiliate team. Additionally, Thomas leads a business consulting firm focused on operational and management strategies and serves as the President of a reinsurance business, managing both claims and investment decisions for the asset pool.

Tom attended Gettysburg College where he was a member of the football program.

**<u>Exhibit C</u>**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

| Debtor Obligor | Counterparty Name | Description of Contract |
| --- | --- | --- |
| Celsius Network Limited | Citigroup Global Markets Inc. | Indemnity Agreement |
| Celsius Network Limited | Laurence A. Tosi | Director/Officer Deed of Indemnity |
| Celsius Network Limited | S. Daniel Leon | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Alex Mashinsky | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Aslihan Denizkurdu | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Nuke Goldstein | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Rod Bolger | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Rodney Sunada-Wong | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Roni Cohen Pavon | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Shiran Kleiderman | Director/Officer Deed of Indemnity |
| Celsius Network Limited | Tal Bentov | Director/Officer Deed of Indemnity |
| Celsius Networks Lending LLC | Tal Bentov | Indemnity Agreement |
| Celsius US Holding LLC | Alex Mashinsky | Indemnity Agreement |
| Celsius US Holding LLC | Aslihan Denizkurdu | Indemnity Agreement |
| Celsius US Holding LLC | Nuke Goldstein | Indemnity Agreement |
| Celsius US Holding LLC | Rod Bolger | Indemnity Agreement |
| Celsius US Holding LLC | Rodney Sunada-Wong | Indemnity Agreement |
| Celsius US Holding LLC | Roni Cohen Pavon | Indemnity Agreement |
| Celsius US Holding LLC | S. Daniel Leon | Indemnity Agreement |
| Celsius US Holding LLC | Shiran Kleiderman | Indemnity Agreement |
| Celsius US Holding LLC | Tal Bentov | Indemnity Agreement |
| Celsius US Holding LLC | Tushar Nadkarni | Indemnity Agreement |
| Celsius Network Inc. | Asaf Iram | Indemnity Agreement |
| Celsius Mining LLC | Priority Power Management | Engineering, Procurement and Construction Management Agreement |

| Celsius Network Limited | 168 Trading Limited | Loan 2388 |
| Celsius Network Limited | B2C2 Ltd | Loan 2417 |
| Celsius Network Limited | B2C2 Ltd | Loan 2419 |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 1892 |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 2051 |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 2358 |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 2496 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 1976 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 1977 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 1978 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 1994 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 2007 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 2044 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 2199 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 2281 |
| Celsius Network Limited | Symbolic Capital Partners Ltd | Loan 2306 |

**<u>Exhibit D</u>**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

**Schedule of Assumed Executory Contracts and Unexpired Leases**

| Debtor Obligor | Counterparty Name | Description of Contract | Amount Required to Cure Default Thereunder, If Any |
|---|---|---|---|
| Celsius Network LLC | Adobe Inc | License Agreement | - |
| Celsius Network LLC | Adtrav Travel Management | Travel Booking Agreement | - |
| Celsius Network LLC | Atlassian Pty Ltd | License Agreement | - |
| Celsius Network LLC | Bamboo HR LLC | Enterprise License | - |
| Celsius Network Ltd | Blockdaemon Inc | Validator Agreement | - |
| Celsius Network LLC | Blockdaemon Inc | Validator Agreement | - |
| Celsius Network LLC | BitAlpha, Inc. | Enterprise License | - |
| Celsius Network LLC | Figment Inc. | Validator Agreement | - |
| Celsius Network Ltd | Fireblocks Ltd. | License Agreement (Amendment No. 1) | - |
| Celsius Network Ltd | Fireblocks Inc. | License Agreement (Amendment No. 1) | - |
| Celsius Network LLC | Globalization Partners | Service Agreement | - |
| Celsius Network LLC | HireRight, LLC | Data Processing Agreement | 43,960.48 |
| Celsius Network LLC | Insperity | Service Agreement | - |
| Celsius Network LLC | Intuit Inc. | License Agreement | - |
| Celsius Network LLC | KForce Inc. | Master Service Agreement | - |
| Celsius Network LLC | Onfido, Inc | Volume Based Service Agreement | - |
| Celsius Network Ltd | Payplus Software, Inc. | Service Agreement | - |
| Celsius Network LLC | Slack Technologies, LLC | Order Form | - |
| Celsius Network LLC | Sovos Compliance, LLC | Order Form | - |
| Celsius Network LLC | Zendesk, Inc. | Master Service Agreement | - |
| Celsius Mining LLC | MEI Rigging & Crating | Service Agreement | - |
| Celsius Mining LLC | Frontier Outpost 13, LLC | Service Agreement | - |
| Celsius Mining LLC | Frontier Apex Miner Management Platform | Service Agreement | - |
| Celsius Mining LLC | Titan Mining Pool | Service Agreement | - |

| Celsius Mining LLC | Priority Power Management LLC | Barber Lake LOI[1] | - |
|---|---|---|---|
| Celsius Mining LLC | Priority Power Management LLC | Garden City LOI[2] | - |
| Celsius Mining LLC | Priority Power Management LLC | Midland LOI (Rebel, Stiles, East Stiles) [3] | - |
| Celsius Mining LLC | Priority Power Management LLC | Energy Management Services Agreement[4] | - |
| Celsius Mining LLC | Priority Power Management LLC | Energy Management and Consulting Services Agreement[5] | 11,500.00 |
| Celsius Mining LLC | Mallard Land Development, LLC | Surface Site Lease | - |
| Celsius Mining LLC | Rick Halfmann and Rebecca Halfmann | Lease and Easement Agreement | - |
| Celsius Network Limited | Alameda Research Ltd | Loan 1073 | - |
| Celsius Network Limited | Alameda Research Ltd | Loan 1187 | - |
| Celsius Network Limited | Alameda Research Ltd | Loan 2149 | - |
| Celsius Network Limited | Alameda Research Ltd | Loan 1856 | - |
| Celsius Network Limited | B-Brick Inc | Loan 2486 | - |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 1844 | - |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 1846 | - |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 2271 | - |
| Celsius Network Limited | Blockchain Access UK Ltd | Loan 2541 | - |
| Celsius Network Limited | Equities First Holdings | Loan 2503 | - |
| Celsius Network Limited | Equities First Holdings | Loan 2531 | - |
| Celsius Network Limited | Equities First Holdings | Loan 2561 | - |
| Celsius Network Limited | Equities First Holdings | Loan 2602 | - |
| Celsius Network Limited | Equities First Holdings | Loan 2630 | - |

---

[1] Provisional assumption, subject to favorable agreed amendment.

[2] Provisional assumption, subject to favorable agreed amendment.

[3] Provisional assumption, subject to favorable agreed amendment.

[4] Provisional assumption, subject to favorable agreed amendment.

[5] Provisional assumption, subject to favorable agreed amendment.

| | | | |
|---|---|---|---|
| Celsius Network Limited | Iterative OTC LLC | Loan 1064 | - |
| Celsius Network Limited | Iterative OTC LLC | Loan 1136 | - |
| Celsius Network Limited | Liquidity Technologies LTD | Loan 2581 | - |
| Celsius Networks Lending LLC | Onchain Custodian Pte Ltd | Loan 2128 | - |
| Celsius Network Limited | Optimal Alpha Master Fund Ltd | Loan 1823 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2094 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 1793 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2339 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2521 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2523 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2537 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2576 | - |
| Celsius Network Limited | Profluent Trading Inc | Loan 2598 | - |
| Celsius Network Limited | Reliz Ltd | Loan 1234 | - |
| Celsius Network Limited | Three Arrows Capital Ltd | Loan 2618 | - |
| Celsius Network Limited | Three Arrows Capital Ltd | Loan 2621 | - |
| Celsius Network Limited | Tower BC Ltd | Loan 2470 | - |

**Exhibit E**

**Litigation Administrator Agreement**

*[DRAFT]*

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "Agreement"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "Debtor" and collectively the "Debtors"), as settlors, the Official Committee of Unsecured Creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on July 27, 2022 [Docket No. 241] (the "Committee"), and [●], as the Litigation Adminstrator referred to herein (in such capacity, the "Litigation Adminstrator"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement) (the "Plan"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

### RECITALS

WHEREAS, Celsius Network LLC and certain of its affiliates (collectively, the "Celsius Debtors") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 13, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively the "GK8 Debtors," and together with the Celsius Debtors, the "Debtors") filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (collectively with the Celsius Debtors' chapter 11 cases, the "Chapter 11 Cases"); and

WHEREAS, on [●] the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order"); and

WHEREAS, the Plan provides, among other things, as of the effective date of the Plan (the "Effective Date"), for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "Plan Claims"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "Collection Actions", and together with the Plan Claims, the "Post-Emergence Claims"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

# ARTICLE II
## ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE

2.1     Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)     The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claims Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)     The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)     The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group pursuant to the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)     The Litigation Administrator agrees to accept and administer the Post-Emergence Claims on behalf of the Claims Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement, including Section Article I hereof.

(e)     The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)     Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than one Claims Holder shall be binding and conclusive on all Claims Holders even if such Claims Holders have different or conflicting interests.

2

2.2   The Post-Emergence Claims.

(a)   From and after the Effective Date, the Debtors shall provide reasonable access to copies of the Debtors', the Estates' and the Post-Effective Date Debtors' records and information relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including electronic records or documents, copies of which shall be provided to the Litigation Administrator and its advisors, at the cost and expense of the Litigation Administrator, all in compliance with applicable law.  From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Debtors, the Estates, and the Post-Effective Date Debtors agree to provide commercially reasonable access to any relevant documents, information or personnel reasonably requested by the Litigation Administrator in connection with carrying out its responsibilities under the Plan and this Agreement so long as such access is not disruptive to normal business operations, and the Debtors, the Estates, and the Post-Effective Date Debtors agree to preserve, for the benefit of the Litigation Administrator, records and documents (including electronic records or documents) related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, or the Post-Effective Date Debtors in writing that such records are no longer required to be preserved or all necessary and available records and documents have been provided to the Litigation Administrator.  Following the Effective Date, the Parties shall use their reasonable best efforts to enter into a written agreement memorializing the common legal interest that exists among the Parties.  For the avoidance of doubt, the failure of the Parties to enter into a formal written common interest agreement shall not operate to waive any common legal interests that exist among the Parties or otherwise constitute a breach of this Agreement.

(b)   The Debtors, the Estates, the Post-Effective Date Debtors and any party under the control of such parties shall promptly transfer or make readily available to the Litigation Administrator and its advisors all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, and the Contributed Claimants; *provided,* for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

(c)   The Debtors, the Estates, the Post-Effective Date Debtors and any party under the control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, with respect to reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates or the Post-Effective Date Debtors and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate,

3

prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.   .

(d)    To the extent reasonably requested by the Litigation Administrator, the Debtors shall use commercially reasonable efforts to cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility or any non-transferred Privileges, use commercially reasonable efforts to cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims, including, without limitation, by providing access to those attorneys, accountants and other professionals with knowledge of matters relevant to the Dispute Claims, the Recovery Causes of Action, and the Contributed Claims.  The Celsius Professionals shall be reimbursed by the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals in connection with such cooperation by the Celsius Professionals.

(e)    Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof (and title thereto shall be vested in the Litigation Administrator).

2.3    Privileges.

(a)    All attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "Privileges") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "Privilege Transfer Parties") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "Transferred Privileged Information") are hereby transferred and assigned to the Litigation Administrator.  The Transferred Privileged Information shall include documents and information of all manner, whether oral, written, or digital.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Transfer Parties.

(b)    The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claims Holders.  The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the Transferred Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Transferred Privileged Information.

(c)    The Privilege Transfer Parties agree to take all necessary actions to effectuate the transfer of such Privileges, and to provide to the Litigation Administrator without the necessity of a subpoena all Transferred Privileged Information in their respective possession,

custody, or control; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision. The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute Transferred Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess Transferred Privileged Information, and no such person may object to the production to the Litigation Administrator of such Transferred Privileged Information on the basis of a Privilege held by a Privilege Transfer Party. Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, Transferred Privileged Information shall be produced solely to the Litigation Administrator or as required by law. For the avoidance of doubt, this Subsection is subject in all respects to Section 2.3(a) of this Agreement.

(d)    Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)    If a Privilege Transfer Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed Transferred Privileged Information that they return or confirm the destruction of such materials.

(f)    Notwithstanding anything to the contrary contained in Section 2.3, for the avoidance of doubt, no Privilege or Transferred Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be deemed to have been transferred or assigned to the Litigation Administrator, *provided however*, that the foregoing shall not prevent the transfer of any Privilege or Transferred Privileged Information to the extent that such Privilege or Transferred Privileged Information also relates to Post-Emergence Claims.

2.4    Payment of Fees and Expenses. The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan ("Litigation Administrator Professionals"). All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid from the Litigation Recovery Account, and solely be the obligation of, the Post-Effective Date Debtors. The Claims Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account.

2.5    Nature and Purpose of the Litigation Administrator.

(a)    Purpose.  The Litigation Administrator is organized and established, subject to the terms and conditions of this Agreement, shall implement the Plan with respect to all Debtors on behalf, and for the benefit, of the Claims Holders.  The Litigation Administrator shall (i) serve as a mechanism for prosecuting all Post-Emergence Claims, resolving all Post-Emergence Claims, monetizing the Post-Emergence Claims, distributing the Litigation Proceeds and closing the Chapter 11 Cases, in each case, in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with no objective to continue or engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement.  The Responsibilites of the Litigation Administrator shall include: (a) filing filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Plan; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement; taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement;

(b)    Relationship.  Subject to Section 4.11(y), the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claims Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Claims Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by the Plan, the Confirmation Order and this Agreement.

(c)    No Waiver of Claims.  In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all Post-Emergence Claims and objections to and resolution of Post-Emergence Claims after the Effective Date.  No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence

Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto. The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.6    Appointment as Representative. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims. Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors, and the Estates for the benefit of the Claims Holders or settle or otherwise dispose of Post-Emergence Claims. Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to the Claims Holders consistent with the provisions of the Plan, Confirmation Order, and this Agreement.

2.7    Conflicts of Interest. Notwithstanding anything to the contrary contained in this Agreement, the Litigation Oversight Committee shall have the exclusive power and right to oversee and determine any actual or potential conflicts of interest with respect to the Litigation Administrator and the Litigation Administrator's performance under this Agreement. Any decision or determination made by the Litigation Oversight Committee with respect to whether the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation Administrator. The Litigation Oversight Committee shall have the exclusive power and right, as its sole and exclusive option, to designate a member of the Litigation Oversight Committee, professional natural person, entity or financial institution with experience administering bankruptcy claims to act as the Litigation Administrator with respect to any conflict determination made by the Litigation Oversight Committee. The Litigation Administrator designated by the Litigation Oversight Committee with respect to any conflict determination made by the Litigation Oversight Committee may incur any reasonable and necessary expenses in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan.

## ARTICLE III
## INTERESTS

3.1    Interests. The Claims Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The beneficial interests in the Post-Emergence Claims will be represented by book entries on the books and records of the Litigation Administrator. The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2    Interests Beneficial Only. The ownership of the beneficial interests in the Post-Emergence Claims shall not entitle the Claims Holders to any title in or to the Post-Emergence

7

Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3     Registry of Post-Emergence Claims.

(a)     The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "Registrar"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b)     The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time and acceptable to the Litigation Administrator, a registry of the Claims Holders (the "Claims Holder Register"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe.  The Claims Holder Register shall be made available to Claims Holders upon three (3) Business Days' written notice to the Litigation Administrator.

3.4     Effect of Death, Incapacity or Bankruptcy.  The death, incapacity or bankruptcy of any Claims Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claims or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claims Holders under this Agreement.

3.5     Change of Address.  Any Claims Holders may, after the Effective Date, select an alternative distribution address by providing notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar. Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6     Absolute Owners.  The Litigation Administrator may deem and treat any Claims Holders reflected as the owner of an Agreement Claim on the applicable Claims Holder Register as the absolute owner thereof for the purposes of receiving distributions and payments on account thereof, for federal and state income tax purposes and for all other purposes whatsoever.

3.7     Standing.  No Claims Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

**ARTICLE IV**
**RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR**

4.1     Role of the Litigation Administrator.  In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan,

the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of and for the benefit of the Claims Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claims Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment of the Litigation Recovery Account.  All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court.  In all circumstances, the Litigation Administrator shall act in the best interests of all Claims Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2    <u>Power to Contract</u>.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account, to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3    <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>.  Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claims Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4    <u>Responsibility for Administration of Administrative Claims, Priority Tax Claims, and Secured Claims</u>.  [RESERVED]

4.5    <u>Authority to Prosecute and Settle Post-Emergence Claims.</u>

(a)    Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date.  The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claims Holders, and consistent with the purposes of the

9

Agreement, and shall have no liability for the outcome of its decision; *provided, however,* that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than $[●] without any approval by the Litigation Oversight Committee (if appointed).

(b)    To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]."  Without limiting the foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable Claim.  For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)    Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claims Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6    <u>Liquidation of Post-Emergence Claims.</u>  The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.2), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement.  The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claims Holders, *<u>provided</u>, <u>however</u>*, that the Litigation Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries.  Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination).  Pursuant to an agreed-upon budget in accordance with Section 4.14(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

4.7    <u>Distributions</u>.

(a)    The Litigation Administrator shall make distributions of the Litigation Proceeds to the Claims Holders only in accordance with the terms of the Plan, the Confirmation

Order, and this Agreement, net of any applicable Disputed Claims reserve and after the Litigation Proceeds are received by the Litigation Administrator, and shall make such distributions after funding any reserves deemed necessary or appropriate by the Litigation Administrator and, in accordance with the Plan, funding the Litigation Recovery Account.

(b)    In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account Pro Rata to the Claims Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

(c)    The Litigation Administrator shall make distributions to Claims Holders at the last-known address for each such Claims Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date.  Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "Litigation Administrator Account"), the option of which shall be in the sole discretion of the Litigation Administrator.  If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)    The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement.  The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)    The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal

in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim.  In the event that the value of a Debtor's claim or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)    The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)    The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of Agreement Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution. Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the Dissolution Process set forth in Section 10.1 of this Agreement.

(h)    Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 120 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors, the Post-Effective Date Debtors, or the Litigation Administrator.  In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Litigation Administrator, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.  No later than 150 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator.  For the avoidance of doubt, such list shall not include the Holders of any checks that have not been negotiated within six months after the date the check was mailed or otherwise delivered to the Holder.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(i)     Subject to Sections 4.9, 4.11 and 4.12 hereof, and the provisions of this Section 4.7, any non-Cash property transferred to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator.  Notice of such sale, transfer, abandonment or disposition shall be provided to the Claims Holders pursuant to the reporting obligations provided in Section 4.14 of this Agreement.   If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property.  Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

(j)     Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

4.8     <u>Retention of Counsel and Other Professionals</u>.  The Litigation Administrator may, but shall not be required to, retain such Litigation Administrator Professionals as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan, and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate, including contingency fee arrangements, with such retention and compensation being subject to the approval of the Litigation Oversight Committee (if appointed).  The Litigation Administrator may pay the reasonable salaries, fees and expenses of such Persons out of the Litigation Recovery Account in the ordinary course of business and neither the Litigation Administrator nor any Claims Holders shall have any liability or obligation for any fees or expenses of any such professional.  For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

4.9     <u>Management of Post-Emergence Claims.</u>

(a)     Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement.  No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)     In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement, the Litigation Administrator will have, in addition to any powers conferred upon the Litigation

Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) as set forth herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.10    Investment of Cash.  The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act; *provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses (including, but not limited to, taxes of the Post-Emergence Debtors with respect to any recoveries by the Litigation Administrator, reasonable fees and expenses in connection with liquidating the Post-Emergence Claims), subject in all cases to Section 2.4 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.4).

4.11    Additional Powers of the Litigation Administrator.  In addition to any and all of the powers enumerated above, and except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee (if appointed) as provided in this Agreement, shall be empowered to:

(a)    except (i) to the extent Disputed Claims have been previously Allowed or (ii) with respect the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Disputed Claims;

(b)    make distributions to Claims Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)    hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claims Holders (including any Litigation Proceeds);

14

(d)    perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.2 hereof;

(e)    protect and enforce the rights of the Claims Holders in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator;

(g)    subject to Section 2.3, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

(h)    make all payments relating to the administration of the Litigation Recovery Account;

(i)    expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that beginning at the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j)    obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k)    (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held by the Litigation Administrator in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l)    investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(m)    without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(n)    execute offsets or assert counterclaims against Claims Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(o)    subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(p)    retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to perform such reviews and/or audits of the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and to prepare and file any tax returns or informational returns for the Litigation Recovery account as may be required;

(q)    take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(r)    take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(s)    liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(t)    take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(u)    (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, Earn Ad Hoc Group, and Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, Earn Ad Hoc Group, and Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if by the Committee, Earn Ad Hoc Group, and Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof as provided in Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to them by the Litigation Recovery Account  and such other information deemed appropriate by the Litigation Administrator (in consultation with the Litigation Oversight

16

Committee) with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(v)    exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement.

4.12    <u>Limitations on Power and Authority of the Litigation Administrator</u>.  The Litigation Administrator will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claims Holders or assign the Debtors or Claims Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee as provided in Section 4.8, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets;

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.13    <u>Books and Records</u>.  The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are the responsibility of the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Recovery Account.  Nothing in this Agreement requires the

Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.14    Reports.

(a)    Financial and Status Reports.  The fiscal year of the Litigation Recovery Account shall be the calendar year.  Within 90 days after the end of each calendar year during the term of the Litigation Recovery Account, and within 45 days after the end of each calendar quarter during the term of the Litigation Recovery Account (other than the fourth quarter) and as soon as practicable upon termination of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claims Holders appearing in the Claims Holder Register as of the end of such period or such date of termination, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claims Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claims Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate to be disclosed by the Litigation Administrator.  In addition, the Litigation Administrator shall provide unaudited financial statements to each Claims Holders on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court).  The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claims Holders. The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claims Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claims Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

(b)    Annual Plan and Budget.  If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

## ARTICLE V
## Litigation Recovery Account

5.1     Establishment of Litigation Recovery Account.  On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the Litigation Administrator free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, and (b) fund the Litigation Administrator Expenses.  Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claims Holders in accordance with the Plan and this Agreement.

5.2     Cash in the Litigation Recovery Account.  Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the Litigation Administrator for the benefit of Claims Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan.  Cash shall be either (x) held by the Litigation Administrator in an interest-bearing account or (y) invested in interest-bearing obligations issued by the U.S. government and guaranteed by the U.S. government, and having (in either case) a maturity date of not more than 30 days.  All such Cash or investments shall be held by the Litigation Administrator in an account at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import.  Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

5.3     Distributions After Allowance of Disputed Claims or Disputed Interests.  At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter.  The balance of any Cash thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

5.4     Distributions After Disallowance of Disputed Claims.  If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable Agreement Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

## ARTICLE VI
## THE LITIGATION ADMINISTRATOR GENERALLY

6.1     <u>Independent Litigation Administrator</u>.  The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2     <u>Litigation Administrator's Term of Service, Compensation and Reimbursement</u>.

(a)     <u>Term of Service</u>.  The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)     <u>Compensation</u>.  The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on <u>Exhibit B</u> hereto (the "<u>Litigation Administrator Compensation</u>").  The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court.  Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; <u>provided</u>, <u>however</u>, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)     <u>Expenses</u>.  The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "<u>Litigation Administrator Expenses</u>" and, together with the Litigation Administrator Compensation, the "<u>Litigation Administrator Fees</u>").

(d)     <u>Payment</u>.  The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.  The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3     <u>Resignation</u>.  The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claims Holders); <u>provided, however</u>, after the closing or dismissal of the Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claims Holders.  Such resignation shall become effective on the

20

earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment. Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein. Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claims Holders.

6.4    Removal.

(a)    The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause or without Cause (as defined in Section 6.4(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

For purposes of this section:

(i)    "Cause" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (iv) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder, or (v) a Person's breach of fiduciary duties or an unresolved conflict of interest; and

(ii)    "Disability" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section 6.4(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided, however,* the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claims Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided, however,* that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder. For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)    During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator"). The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided, however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses. Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)    To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6    <u>Effect of Resignation or Removal</u>.  The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator.  In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator.

6.7    <u>Confidentiality</u>.  The Litigation Administrator shall, during the period that the Litigation Administrator serves as Litigation Administrator under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's removal or resignation hereunder, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator may be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator has become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials), until (a) such information is made public other than by disclosure by the Litigation Administrator or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator is required by law to disclose such information (in which case the Litigation Administrator shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); or (c) the Litigation Administrator obtains a waiver of confidentiality from the applicable Person.

**ARTICLE VII**
**LIABILITY AND INDEMNIFICATION**

7.1    <u>No Further Liability</u>.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless arising out of such Person's own fraud, willful misconduct or gross negligence.  Unless arising out of such Person's own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator.  Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no

liability for actions taken in reliance thereon. None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given. Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions arising out of such Person's fraud, willful misconduct or gross negligence. Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) and, in the case of the Litigation Administrator, with the express approval of the Litigation Oversight Committee will conclusively be deemed not to constitute fraud, willful misconduct or gross negligence. No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such amendment, modification or repeal.

7.2     Indemnification of the Litigation Administrator and Litigation Oversight Committee.

(a)     From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "Litigation Administrator Agreement Indemnified Party," and collectively, the "Litigation Administrator Agreement Indemnified Parties") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud, willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery account (including any insurance policy obtained by the for the benefit of Litigation

Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in Section 4.11(k) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Administrator, the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)     The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)     Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party.

(d)     The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.     For the avoidance of doubt, each Litigation Administrator Agreement Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3     Litigation Administrator Liabilities. All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law. No liability of the Litigation Administrator will be payable in whole or in part by any Claims Holders individually or in the Claims Holders' capacity, by the Litigation Administrator individually or in the Litigation

Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claims Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4     <u>Limitation of Liability</u>.    None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5     <u>Burden of Proof</u>.    In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1     <u>Treatment of Post-Emergence Claims</u>.    For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claims Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)     The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, of any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2     <u>Withholding of Taxes</u>. The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claims Holders for all purposes of this Agreement.

(a)     The Litigation Administrator shall be authorized to collect such tax information from the Claims Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claims Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claims Holders

that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)    The Litigation Administrator may refuse to make a distribution to any Claims Holders that fails to furnish such information in a timely fashion, until such information is delivered; _provided_, _however_, that, upon the delivery of such information by a Claims Holder, the Litigation Administrator shall make such distribution to which the Claims Holders is entitled, without interest; and, _provided_, _further_, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.  The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claims Holder fails to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation Administrator, that will provide twenty-one (21) days' notice before such distribution may be deemed an unclaimed distribution.

(c)    In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claims Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    Valuation.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

## ARTICLE IX
## TERMINATION OF THE AGREEMENT

9.1    Termination.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Administrator has liquidated or abandoned all Post-Emergence Claims, (b) the Litigation Administrator determines, with the approval of the Litigation Oversight Committee, that the pursuit of Post-Emergence Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Post-Emergence Claims, (c) all objections to the Disputed Claims have been resolved, and (d) all distributions required to be made by the Litigation Administrator under the Agreement have been made; _provided_, _however_, that in no event shall the Litigation Recovery Account be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; _provided further_, _however_, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy

Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator.  If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claims Holders is likely to exceed the value of the Post-Emergence Claims then remaining in the Litigation Recovery Account and provided that clause (e) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) dissolve the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "<u>Dissolution Process</u>").  Such date upon which the Litigation Recovery Account shall finally be dissolved shall be referred to herein as the "<u>Termination Date</u>."

    9.2    <u>Continuance of the Litigation Administrator for Winding Up</u>.  During the Dissolution Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have been fully performed.  During the Dissolution Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section 2.4 hereof.  Upon distribution of all the Post-Emergence Claims, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section 2.2 hereof.  At the Litigation Administrator's discretion, but subject in all cases to Section 2.2 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder).  Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claims Holders as provided herein, the Post-Emergence Claims shall be cancelled, and the Litigation Administrator will be deemed to have dissolved.

## ARTICLE X
## AMENDMENT AND WAIVER

    10.1    No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claims Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Sections 2.1(h) or 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e) be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2    No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

# ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2    Jurisdiction.  Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims. Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court.  Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement).  Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    Severability.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    Notices.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission

confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)      If to the Litigation Administrator, to:

[Company]
[Address]
Attn: [Lit Admin.]
Email: [●]

With a copy to:

[Counsel for Lit. Admin.]
[Address]
Attn: [●]
Email: [●]

(ii)     If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
        ross.kwasteniet@kirkland.com
        chris.koenig@kirkland.com
        dan.latona@kirkland.com

(iii)    If to the Official Committee of Unsecured Creditors, to:

White & Case LLP
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com

– and –

Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

(iv)    if to any Claims Holders, to the last known address of such Claims Holders, according to the Litigation Administrator's records;

(v)    if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

11.5    Headings.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.6    Plan and Confirmation Order.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the

Plan, on the other hand, the provisions of this Agreement shall govern and control. In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

11.7   <u>Entire Agreement</u>. This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.8   <u>Cumulative Rights and Remedies</u>. The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

11.9   <u>Meanings of Other Terms</u>. Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities. All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement. The term "including" shall mean "including, without limitation."

11.10   <u>Successors in Interest</u>. This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.2 hereto. The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.2 hereto. For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.2) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.2) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11   <u>Limitations</u>. Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement. The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any

releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12   <u>Further Assurances</u>.  From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14   <u>Authority</u>.  Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[●], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]

[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

## **EXHIBIT A**

**Initial Members of the Litigation Oversight Committee**

# EXHIBIT B

## Compensation of Litigation Administrator

The Litigation Administrator shall be entitled to compensation of $[●] per month plus [●]% of Net Litigation Recoveries.

"Net Litigation Recoveries" means gross proceeds from Post-Emergence Claims less out-of-pocket expenses (without deducting contingency counsel fees or fees and expense relating to administration of the Agreement).

**<u>Exhibit F</u>**

**Identity of Litigation Administrator**

## Litigation Administrator

| Litigation Administrator | Compensation |
| --- | --- |
| Mohsin Meghji | Mr. Meghji shall receive a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses.<br><br>Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action. Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator. |

**<u>Exhibit G</u>**

**Identities of Litigation Oversight Committee Members**

### Litigation Oversight Committee Members

1. Mark Robinson

2. Keith Noyes

3. Gerard Uzzi

4. Vik Jindal

5. One (1) additional individual to be designated by the Committee

6. One (1) individual to be designated by the Earn Ad Hoc Group, subject to the consent of the Committee

7. One (1) individual to be designated by the Retail Borrower Ad Hoc Group, subject to the consent of the Committee

## **Exhibit H**

**Employee Transition Services Agreement**

## Employee Transition Plan

Since early 2022, Celsius has reduced its employee headcount from over 900 employees to less than 150 at present. To ensure effective implementation of the distribution and wind down processes contemplated in Celsius' Plan of Reorganization, certain employees have been and may be identified to remain employed with the post-emergence Celsius estate. The Debtors' Employee Transition Plan is critical to incentivize these necessary employees to remain with the Debtors post-emergence to facilitate the distribution and wind down processes. The Employee Transition Plan is necessary under either of the scenarios contemplated in the Plan of Reorganization – the NewCo Transaction or the Orderly Wind Down.

The Employee Transition Plan contemplates providing employees who are deemed necessary to the estate and elect to remain with the Debtors post-emergence with incremental compensation in recognition of the following: (i) these employees have been identified as being necessary in order to effectuate the distribution of liquid cryptocurrency to creditors, as contemplated under the Plan; (ii) the Debtors' estates will require certain activities to be conducted to wind the entities down, close out the bankruptcy cases, and transfer all remaining assets to NewCo (in the event the NewCo Transaction is consummated) or assist the Backup Plan Sponsor in conducting its obligations (in the event the Debtors elect to pursue the Orderly Wind Down); (iii) in the absence of these employees' services, the Debtors would incur significant operational risk and additional costs in order to effectuate the Plan of Reorganization; and (iv) these employees are agreeing to support the Debtors through a finite period, with no certainty of employment at the conclusion of the distribution and wind down. As the Debtors make distributions to creditors, it is expected that the number of employees to be retained by the post-emergence estate will be reduced over time, at the discretion of the Plan Administrator.

The compensation program currently contemplated under the Employee Transition Plan would consist of an increase in each employee's base salary equivalent to 50% of their pre-emergence base salary, paid 25% each month with regular payroll, and 25% on each six-month anniversary of the Emergence Date. Additionally, at the conclusion of the wind down of the estates, or when employees are deemed to no longer be necessary by the Plan Administrator, employees will be offered severance payments ranging from two to six months base salary depending on an employee's post emergence tenure with the Debtors. In the event any employee is offered and accepts a position with NewCo, they would not be entitled to severance under this Employee Transition Plan. Where applicable and in accordance with local laws and regulations, the Employee Transition Plan also includes a lump sum payment at termination for such employees to cover their COBRA medical benefits equivalent to six months of each employee's normal benefits cost.[1] The terms of the program are subject to adjustment prior to emergence by the Plan Administrator.

The estimated costs outlined above (excluding the costs associated with NewCo employees after their transition to NewCo), together with any other estimated direct and ancillary employment costs of the Employee Transition Plan, are to be borne by the post-emergence Celsius estate and are included in the Plan Administration Budget.

---

[1] In any event, the Employee Transition Plan will be executed in compliance with each employee's local laws and regulations. In the event local laws and regulations provide for greater benefits to certain employees than those described herein, the benefits required by local laws and regulations will be provided.

# Transition & Wind Down Team / Duties

### Compliance & Operations

The Compliance & Operations team is a combination of Compliance, Customer Care and Product specialists. This team ensures business compliance with relevant and applicable laws, regulations, and agreements. This team is responsible for managing many escalated customer interactions and also supports Know Your Client and financial crimes compliance initiatives and prepares related statistical reports for high-risk clients, jurisdictions, SARs, and subpoenas. The work this team does is instrumental in ensuring Distributions are compliant and disbursed to the entitled recipient in adherence to local regulations.

### Finance & Data

The Finance team is integral to the daily operations of the Debtors. This team executes all accounting and accounts payable functions, oversees the consolidation and reporting of all financial data and business results, and oversees regulatory and audit reporting, frequently including tax planning and compliance. This team also manages treasury strategy, including structure, liquidity, and risk. Daily operational support through the monitoring and reporting of transaction flow, and the resolution of data integrity is also handled by the Finance team. This team will ensure the Debtors are able to meet and accurately report on their continued financial obligations and positions throughout the distribution and wind down processes.

### Human Resources & Operations

The Human Resources & Operations-team is a combined group of HR and Operations specialists.  This team aids in project management across the organization, including the management of document retention and production for responding to government requests and inquiries. This team manages payroll, benefits and HR Information Systems and provides analysis and verification of all associated reports. The team fields a variety of requests related to payroll, benefits, taxes, contracts, document production, and other employment related topics. This team also manages the employment life-cycle and more critically, the off-boarding of employees throughout the wind down periods according to local labor and employment laws.

### Legal

The Legal team reviews, drafts, and negotiates agreements, monitors and manages existing and potential disputes, ensures compliance of corporate transactions, and supports various strategic initiatives. This team will ensure that all activities are legally compliant throughout the distribution and wind down periods.

### Mining

The Mining team oversees all facets of Celsius' bitcoin mining operations, including (i) the management of the four proprietary sites and third-party hosting contracts, (ii) all energy and curtailment decisions (incl. energy hedges), (iii) storage and logistics of rigs, (iv) conversion of mined bitcoin to cash for operations, and (v) all financial and operational reporting. This team will ensure the continued operation of the Debtor's mining business and the transition of the mining business to NewCo (in the event of the NewCo

Transaction) or the stand up of a pure-play, publicly traded mining business (in the event of the Orderly Wind Down).

### Technology & Security

The Technology team is critical in both the Distribution and Wind Down work and responsible for assessing technical threats and vulnerabilities and performing tests on technological systems. This team assists in the security of crypto assets prior to distribution and in enabling the technology related to self-distribution and coordination with the third-party distribution agents. This team also develops and supports applications, deploys and maintains infrastructure automation, and implements solutions for identified technical issues. This team will ensure that all technical systems are functioning properly throughout the distribution and wind down phases of the case both internally and for all external facing applications.

**<u>Exhibit I</u>**

**Plan Administrator Budget**

**Celsius Network Inc.**
**Plan Administration Budget**

*$ in millions*

| | NewCo Plan[1][2] | Notes to Plan Administration Budget |
|---|---|---|
| **Plan Administration Fees** | | |
| Plan Administration Fees | $ 5 | |
| Distribution Costs and Related Expenses | 10 | Expenses associated with third-party distribution agents, distribution infrastructure/vendors, and claims reconciliation |
| **Subtotal - Plan Administration Fees** | **$ 15** | |
| | | |
| **Professional Fees** | | Professional fees for legal counsel and financial advisors to support distribution and administration of the estate |
| Legal Counsel | 10 | |
| Financial Advisor | 10 | |
| **Subtotal - Professional Fees** | **$ 20** | |
| | | |
| **Operating Expenses and Other** | | |
| Employee Costs | 30 | Includes wages, benefits, payroll taxes and other compensation-related items |
| SG&A | 10 | Expenses associated with estate accounting, legal, HR, and other administrative activities |
| Litigation Trust | 50 | |
| **Subtotal - Operating Expenses and Other** | **$ 90** | |
| | | |
| **Total** | **$ 125** | |

(1) Represents estimated costs to be incurred by the estate in effectuating the NewCo Plan. These estimates are subject to material change
(2) Total costs under the Plan Administration Budget are assumed to be escrowed upon Emergence. Any amounts not spent will be returned to creditors in subsequent distributions

## <u>Exhibit J</u>

**ADR Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

## ARTICLE I.

## PREAMBLE

The ADR Procedures[2] are designed to promote the efficient resolution of certain disputed prepetition claims against the Debtors and claims held by the Debtors, including preference actions. Although the ADR Procedures encourage voluntary participation by Third Parties, they do not compel parties that have not filed a proof of claim or otherwise subjected themselves to the jurisdiction of the Bankruptcy Court to participate, and they permit those who do not wish to participate to opt out.

The ADR Procedures provide persons or entities holding disputed claims the opportunity to participate in a streamlined process with the goal of reducing administrative costs that detract from all stakeholders' recoveries and allowing for quicker distributions on account of claims against the Debtors' estates and the entities against which the Debtors hold claims. The ADR Procedures facilitate this by establishing a standard methodology for informal and formal negotiations, fostering settlement and liquidation of Participating Claims.

Importantly, the Plan provides that disputed claims will not receive a distribution until all disputes with respect to any such claim are resolved. *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* at [Art. VII(B)], *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. [DATE]) [ECF No. [●]]. The Debtors and the Committee believe that these ADR Procedures provide creditors and the Litigation Administrator the ability to efficiently resolve disputed claims to maximize recoveries, reduce administrative

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used herein shall have the meaning set forth in Article II "Defined Terms" below. Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

expenses, and provide creditors with distributions quicker than in the traditional claims resolution process.

## 1.1.    **Overview**

Celsius was founded in 2017 and was one of the first platforms that would allow users to transfer their digital assets and (a) earn rewards on such digital assets and/or (b) take loans using those transferred digital assets as collateral.

Celsius's primary operations consisted of: (a) financial services through which retail and institutional users could (i) earn rewards on digital assets they transferred to Celsius, (ii) securely store and access digital assets, (iii) borrow fiat currency supported by digital assets transferred to Celsius, and (iv) send and receive cryptocurrency using Celsius's CelPay services; and (b) bitcoin mining.

The Participating Claims are (1) unliquidated, disputed and/or contingent prepetition claims asserted against one or more Debtors or (2) ADR-Eligible Claims held by the Debtors' estates against third parties, including creditors of the Debtors.  Prosecution of the Participating Claims against the Debtors outside of the Bankruptcy Court is currently stayed by the Debtors' Chapter 11 Cases or the Plan and Confirmation Order.

Most of the potential Participating Claims will be disputed by the Litigation Administrator and will have to be resolved by settlement or litigation.  Litigating each independent Participating Claim in a multitude of separate individual actions, however, could result in a significant consumption of limited resources (judicial, the Litigation Administrator's, and the Participating Claimants').  The cost and delay associated with ordinary litigation procedures would not be in the best interests of any Party involved.  The ADR Procedures are designed to facilitate and incentivize settlement and an efficient resolution of Participating Claims.

## 1.2.    **Summary of Procedures**

The ADR Procedures consist of five sequential steps: (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure.  For the avoidance of any doubt, nothing in the ADR Procedures shall alter, amend, or otherwise modify the terms of the Debtors' Insurance Policies.

The Initial Assessment Procedure is intended to provide a mechanism for the Litigation Administrator, Participating Claimants, and Third Party Participants, if any, to evaluate and consensually resolve Participating Claims and any of the Litigation Administrator's related claims and causes of action prior to mediation.  Under the Initial Assessment Procedure, after receiving notification of their inclusion in the ADR Procedures, Participating Claimants will provide such information to the Litigation Administrator as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim.  Upon receipt, the Litigation Administrator will determine if the Participating Claim gives rise to any related potential causes of action against such Participating Claimant and/or Third Parties and, to the extent applicable, invite such Third Parties to participate in the ADR Procedures.  The Litigation Administrator and Third Party Participants, if any, then have the opportunity to review the documents and information provided

2

by the Participating Claimants to fully assess the validity and extent of any claims and/or damages relating to the Participating Claim. The Participating Claimant may also request information from the Litigation Administrator regarding their claim. With respect to Account Holder Avoidance Actions, requests for information from any Party shall be limited to the subject matters set forth on <u>Annex A</u> to these procedures.[3]

The Settlement Offer Exchange Procedure is intended to provide the Litigation Administrator, the Participating Claimants, and the Third Party Participants, if any, the opportunity to exchange written settlement offers and engage in informal settlement negotiations after they have evaluated the Participating Claim, and certain of the Litigation Administrator's related causes of action. If the Parties are unable to resolve the Participating Claim during this process, they may proceed to Mediation.

The Mediation Procedure is intended to provide a more formal mechanism for amicable resolution of Participating Claims and any of the Litigation Administrator's related causes of action other than Excluded Claims. The Mediation Procedure is based upon generally accepted mediation procedures of professional alternative dispute resolution organizations. Participating Claimants shall be responsible for fifty (50%) percent of the costs and fees of the mediator, absent prior written agreement.[4] If Third Parties participate in the Mediation Procedure, the costs and fees of the mediator shall be equally divided among the Parties.

The Optional Binding Arbitration Procedure is intended to provide a formal binding mechanism for resolution of Participating Claims and any of the Litigation Administrator's related causes of action (other than Excluded Claims) simultaneously through joint binding arbitration. The Optional Binding Arbitration Procedure is voluntary and shall only be initiated if all Parties agree to participate. Unless the Parties agree otherwise, all costs and fees of the arbitrator shall be equally divided among all participants to the arbitration.

## **<u>DEFINED TERMS</u>**

Capitalized terms used herein without further definition, and variations thereof, shall have the meanings set forth below unless the context otherwise requires.

1.3.    **"<u>ADR-Eligible Potential Defendants</u>"** means any potential Avoidance Action defendant that is not an ADR-Ineligible Potential Defendant.

1.4.    **"<u>ADR Initiation Package</u>"** has the meaning set forth in Section 3.1.

1.5.    **"<u>ADR Organization List</u>"** has the meaning set forth in Section 2.4.

1.6.    **"<u>ADR Procedures</u>"** mean the alternative dispute resolution procedures as set forth

---

[3]   [**NTD**: A set of common information requests to be negotiated by the Litigation Administrator and parties negotiating the ADR Procedures.]

[4]   The Participating Claimant's own costs, including attorneys' fees, if any, shall be borne by the Participating Claimant. In no event shall the Litigation Administrator be responsible for any costs incurred by any entity other than the Litigation Administrator or the Approved ADR Organization.

herein.

1.7.    **"Appointed ADR Organization"** means the Approved ADR Organization appointed to conduct either a mediation or arbitration for the Parties.

1.8.    **"Approved ADR Organizations"** means those alternative dispute resolution organizations and individuals on the ADR Organization List or consented to by the Parties.[5]

1.9.    **"Assessment Period"** has the meaning set forth in Section 3.4.

1.10.    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

1.11.    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over these Chapter 11 Cases.

1.12.    **"Chapter 11 Cases"** means the cases commenced under Chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as *In re Celsius Network LLC, et. al.,* Chapter 11 Case No. 22-10964 (MG), Jointly Administered.

1.13.    **"Days" or "days"** means calendar days unless otherwise defined herein.  Days shall be counted as prescribed by Rule 9006 of the Federal Rules of Bankruptcy Procedure.

1.14.    **"Excluded Claim"** means (a) claims for which the automatic stay under section 362 of the Bankruptcy Code was modified by prior order of the Bankruptcy Court to allow for litigation of the claim to proceed in another forum, (b) tax claims, (c) claims where there is a judgment entered or settlement already agreed to and signed by all applicable parties, including the Class Claim Settlement, (d) any declaratory judgment actions or any other actions regarding insurance coverage issues; (e) any Avoidance Action claims against ADR-Ineligible Potential Defendants (as defined in the Plan); and (f) claims subject to a separate order of the Bankruptcy Court providing for arbitration or mediation.

1.15.    **"General Unliquidated Disputed Claim"** means a Participating Claim to the extent that the claim shall be treated as an unliquidated and/or disputed claim filed in these Chapter 11 Cases.

1.16.    **"Insurance Order"** means the *Final Order (I) Authorizing the Debtors to (A) Pay their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain their Surety Bond Program and (II) Granting Related Relief* [ECF No. 524], entered in the Chapter 11 Cases.

1.17.    **"Insurance Policy"** means an insurance policy that has been issued at any time to or provides coverage to the Debtors and/or all agreements, documents or instruments relating

---

[5] [**NTD**: The list of Approved ADR Organizations, including specific individual mediators, to be negotiated by the Litigation Administrator and parties negotiating the ADR Procedures.]

thereto and/or any agreements with third-party administrators.

1.18.    **"Insurer"** means any company or other entity that issued or entered into an Insurance Policy with, or that affords coverage to, the Debtors for a Participating Claim.

1.19.    **"Liquidated Allowed Claim"** means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to an allowed unsecured claim or claims to be paid on the terms set forth in the Plan.

1.20.    **"Litigation Administrator"** shall have the meaning ascribed to such term in the Plan.

1.21.    **"Local Rules"** means the Local Bankruptcy Rules for the Southern District of New York.

1.22.    **"Mediation Notice"** has the meaning set forth in Section 4.5.

1.23.    **"Participating Claim"** means (i) any disputed, unliquidated, or contingent prepetition claim, other than Excluded Claims, evidenced by a timely filed proof of claim and that is selected by the Litigation Administrator, in their sole discretion, for resolution through the ADR Procedures, or (ii) any Causes of Action (as defined in the Plan) the Estates may have against ADR-Eligible Potential Defendants; provided, subject to the limitations set forth below, that the Litigation Administrator may designate any claims (other than Excluded Claims) of creditors or other entities that are subject to the jurisdiction of the Bankruptcy Court for resolution through the ADR Procedures if the Litigation Administrator believes that, based on the nature of the potential claims, the ADR Procedures have a reasonable chance of successfully resolving the claims and the potential benefits outweigh the costs of participation.  Notwithstanding the foregoing, any disputed postpetition administrative expenses, and any claims or counterclaims asserted by the Litigation Administrator other than Excluded Claims may be submitted to the ADR Procedures by agreement of the Litigation Administrator and the applicable claimant or by further order of the Bankruptcy Court.

1.24.    **"Participating Claimant"** means any person or entity asserting a Participating Claim.

1.25.    **"Party or Parties"** means, one or more of, a Participating Claim, the Litigation Administrator, the relevant Participating Claimant, and any relevant Third Party Participants (if applicable).

1.26.    **"Plan"** means the chapter 11 plan confirmed in these Chapter 11 Cases, including all schedules and exhibits thereto, and the documents set forth in the Plan Supplement, as may be modified, amended, or supplemented from time to time.

1.27.    **"Primary Parties"** means, with respect to a Participating Claim, the Litigation Administrator and the relevant Participating Claimant.

1.28.    **"Settlement Offer Exchange Procedure"** has the meaning set forth in the preamble of Section 4.

1.29.   **"Settlement Offer Period"** has the meaning set forth in Section 3.4.

1.30.   **"Settlement Offer Period Closing"** has the meaning set forth in Section 4.4.

1.31.   **"Settlement Offer Period Notice"** has the meaning set forth in Section 4.4.

1.32.   **"Third Party"** means any person or entity that the Litigation Administrator or Participating Claimant has or may have a claim against relating to any Participating Claim.

1.33.   **"Third Party Evaluation Period"** has the meaning set forth in Section 3.3.

1.34.   **"Third Party Participant"** means any Third Party that agrees to participate in the ADR Procedures by returning a signed Third Party Participation Agreement.

1.35.   **"Third Party Participation Agreement"** means any written agreement between the Litigation Administrator and any Third Party Participant who accepts an invitation to participate in the ADR Procedures for a Participating Claim.

1.36.   **"Third Party Payable Claim"** means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to receive partial or full satisfaction of the Participating Claim directly from a Third Party Participant.

1.37.   **"Valuation Form"** means a form requesting such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related causes of action, substantially in the form attached hereto as **Exhibit 1**.

1.38.   **"Valuation Information"** means the Participating Claimant's proof of claim and Valuation Form, and any other documents or information relating to the Participating Claim provided to the Litigation Administrator.

# ARTICLE II.

# ADMINISTRATION

### 2.1.    **Administrators**.

Subject to the terms hereof, the administration of the ADR Procedures will be coordinated by the Litigation Administrator and their counsel.

### 2.2.    **No Modification of the Insurance Policies or the Insurance Order**.

Notwithstanding anything to the contrary in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing, (i) nothing shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the Insurance Policies and the terms and conditions thereof and coverage or services provided thereby, (b) the rights, defenses or obligations of any Insurer, (c) any rights or obligations of the Debtors arising out of or under any Insurance Policy, or (d) the Insurance Order; (ii) to the extent of a conflict between the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing on the one hand, and any Insurance Policy that could provide coverage or services for a Participating Claim on the other hand, the terms of the Insurance Policy shall control, and nothing in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing shall excuse, or in any way alter, the Debtors' performance under the Insurance Policies; (iii) for all issues relating to insurance coverage and claims handling services, the provisions, terms, conditions, and limitations of the Insurance Policies shall control the payment of claims covered by any Insurance Policies; (iv) the failure of any Insurer to respond to any notice provided in accordance with the ADR Procedures does not relieve the Debtors of their obligations, if any, to provide an Insurer with further information and/or notices required by any applicable Insurance Policy; (v) nothing shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the ADR Procedures; (vi) nothing imposes a good faith obligation on any Insurer that does not otherwise exist under applicable law or the Insurance Policies; and (vii) Insurers shall retain all rights, claims and defenses to challenge any award pursuant to binding arbitration undertaken pursuant to the ADR Procedures that alters the terms and conditions of any Insurance Policy, and under no circumstances shall an Insurer be deemed a party to any binding arbitration unless it determines in its sole discretion that it is permitted to participate under applicable law and elects to do so.

Notwithstanding any other provision of these ADR Procedures, the rights, obligations and defenses of any Insurers under any applicable surety bond, surety collateral agreement, surety credit agreement, or surety indemnity agreement relating to the Debtors or the Participating Claims are fully preserved, unchanged and unimpaired.

### 2.3.    **Option to Utilize Professionals**.

The Litigation Administrator is specifically authorized to retain professionals to assist in evaluating the merits of each Participating Claim, in placing a dollar amount on each Participating Claim, and in settling or otherwise resolving the Participating Claims pursuant to the ADR Procedures.

2.4.    <u>**Employment of Mediation and Arbitration Organizations**</u>.

Attached to these ADR Procedures is a list of Approved ADR Organizations (the "**ADR Organization List**"), which the Litigation Administrator may amend by providing notice to the Participating Claimant of an amended list of Approved ADR Organizations. Subject to the conditions set forth elsewhere herein, the Litigation Administrator shall retain an Approved ADR Organization to conduct the Mediation Procedure or the Optional Binding Arbitration Procedure. Effort will be made to conduct any Mediation Procedures in a location that is convenient for the Litigation Administrator, the Participating Claimants, and, as applicable, Third Party Participants, or via videoconference, at the election of any Party.

2.5.    <u>**Participation in the ADR Procedures**</u>.

All Participating Claims shall be subject to the provisions of these ADR Procedures, subject to Section 2.11 or 2.12 below. ***Participation in the ADR Procedures shall in no way alter the consequences, if any, of a Participating Claimant not having filed timely a proof of claim in these Chapter 11 Cases against any of the Debtors; failure to file a proof of claim may result in disallowance of such Participating Claimant's claims against the Debtors, provided that, except as otherwise set forth in the Plan, the disallowance of any claim against the Debtors' estates shall occur after notice and a hearing before the Bankruptcy Court. Participation in the ADR Procedures shall in no way affect the Litigation Administrator's ability to object to any Participating Claim, or oppose any motion for relief from the automatic stay or from any injunction contained in the Plan, that is not resolved through the ADR Procedures.***

Pursuant to these ADR Procedures, and absent a consensual resolution among the Parties prior to mediation, the Litigation Administrator shall be required to submit to mediation regarding any pending counterclaims or causes of action asserted by the Litigation Administrator related to the Participating Claim that are not Excluded Claims; *provided* that if the Parties enter mediation, all Claims and Causes of Action shall be put before the mediator for potential resolution, in full or in part.

No Party shall be required to employ counsel to participate in the ADR Procedures, including to participate in mediation or arbitration pursuant to the ADR Procedures.

2.6.    <u>**Effect of ADR Procedures on Pending Matters and Applicable Statutes of Limitations**</u>.

Inclusion of any Participating Claim in the ADR Procedures shall automatically stay all proceedings before the Bankruptcy Court, including but not limited to, discovery (other than discovery conducted pursuant to these ADR Procedures), motions for relief from the stay or any injunction contained in the Plan, pretrial hearing dates, and trial schedules related to the Participating Claims. Such stay shall automatically terminate thirty (30) days after any Participating Claim is removed from the ADR Procedures. Upon the written consent of the Holder of a Participating Claim (which consent shall be included on the Valuation Form), the applicable statute of limitations shall be tolled until the later of 15 days after the termination of such ADR Procedures by either party or the statute of limitations date.

2.7.    **Acceptance of Settlement Offers.**

The Litigation Administrator shall have authority to settle or compromise all Participating Claims and Causes of Action against Third Party Participants subject to the terms of the Plan.

2.8.    **Extensions.**

All deadlines established by the ADR Procedures with respect to any particular Participating Claim may be extended by written agreement of the Litigation Administrator and the applicable Participating Claimant, with notice to any Third Party Participants.

2.9.    **Service and Notices.**

To facilitate the timely completion of the ADR Procedures, all service and written notice required herein, with the exception of the ADR Initiation Package (unless the Litigation Administrator does not have a mailing address for the applicable Participating Claimant), may be done via email. The Parties shall exchange email addresses at their earliest convenience. If any Party does not wish to accept service via email, the Party shall notify all other Parties of such preference in writing. Upon the other Parties' receipt of such notice, email service upon such Party shall no longer be valid.

2.10.    **Confidentiality and Non-Admissibility.**

Any settlement discussions by and between the Parties or positions taken by them during compliance with the ADR Procedures shall remain confidential and shall not be admitted as evidence in any subsequent proceeding or context, including, but not limited to, litigation of a Participating Claim, pursuant to Rule 408 of the Federal Rules of Evidence and all similar rules and are expressly determined by the provisions herein not to be admissions by any Party. Notwithstanding the foregoing, if a Party alleges another Party has failed to participate in good faith in the ADR Procedures or disputes that a settlement had been previously reached, then settlement discussions may be used or admitted as evidence in any subsequent proceeding solely with respect to those matters. With the consent of the Litigation Administrator, or as permitted by an order entered by the Bankruptcy Court, Participating Claimants, including ADR-Eligible Potential Defendants, may share information obtained during the process and settlement discussions by and between the parties and positions taken by them with other Participating Claimants, including ADR-Eligible Potential Defendants, who are similarly situated and who agree to be bound by the terms of an appropriate protective order.

2.11.    **Failure to Comply with the ADR Procedures.**

If a Participating Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the Bankruptcy Court may, after notice and a hearing, grant any remedy deemed just and appropriate under the circumstances, including, without limitation, awarding attorneys' fees, other fees, and costs to the other party. The Litigation Administrator shall also participate in the ADR Procedures in good faith. For the avoidance of doubt, (i) the election to opt out of the ADR Procedures, (ii) the failure of an ADR-Eligible Potential Defendant to make an offer or counter-offer to settle a Cause of

Action, or (iii) the failure to extend, or seek to extend, applicable statute of limitations shall not be considered bad faith or a basis to move the Bankruptcy Court for remedies.

2.12.  **Participating Claimant Opt Out Option**.

A Participating Claimant may, at any time prior to the selection of a mediator, serve a written election (email sufficient), which will be effective upon receipt by the Litigation Administrator, for exclusion from the ADR Procedures; *provided*, *however*, that the Litigation Administrator may file a motion with the Bankruptcy Court opposing such exclusion. Other than with respect to the optional Binding Arbitration Procedure, a Participating Claimant may not opt out following the selection of a mediator without further order of the Bankruptcy Court. For the avoidance of doubt, if a Participating Claimant serves a written election for exclusion from the ADR Procedures in accordance with this Section 2.12, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.

2.13.  **Insurer Notice**.

In the event that an Insurance Policy requires that the Debtors to provide notice to an Insurer of a Participating Claim, the Debtors shall provide notice to the applicable Insurer(s) (i) by serving a copy of the corresponding ADR Initiation Package on the Insurer when it is served on the Participating Claimant and (ii) at any time during the ADR process, when the notice requirements of the Insurance Policy are triggered. If the Insurer elects, subject to the terms of the Insurance Policy, at any time to exercise its right to control the defense or settlement of a Participating Claim, the Insurer may elect to either (i) work with the Litigation Administrator, in accordance with the terms of the Insurance Policy, to resolve the Participating Claim within these ADR Procedures, or (ii) remove the Participating Claim from the ADR Procedures; *provided* that the Insurer remove the Participating Claim from the ADR Procedures within the later of (i) the time required by applicable state law or the applicable Insurance Policy for responses to claim notices, or (ii) forty-five (45) days after the Insurer receives notice of the Participating Claim.

## ARTICLE III.

## INITIAL ASSESSMENT PROCEDURE

Subject to the provisions set forth herein, the Initial Assessment Procedure is designed to foster inclusion of all appropriate Third Parties and to allow the Litigation Administrator and any Third Party Participant to evaluate fully the Participating Claim and the Litigation Administrator's related causes of action other than Excluded Claims, in an expedited manner to facilitate meaningful settlement negotiations.

3.1.  **The Litigation Administrator Shall Provide Notice**.

The Litigation Administrator shall initiate the ADR Procedures by serving upon each selected Participating Claimant, at the address listed on the Participating Claimant's most recently filed proof of claim or amended proof of claim or, if no such address is available, the email address of such Participating Claimant, if applicable, as well as upon any counsel of record, notice of the

ADR Procedures and their selection as a Participating Claimant, together with a copy of the ADR Procedures and a Valuation Form (the "**ADR Initiation Package**"). The ADR Initiation Package shall include a description of any claims and objections held by the Litigation Administrator against a Participating Claimant. For transferred claims, the Litigation Administrator also shall serve a copy of the ADR Initiation Package on the transferee identified in the notice of transfer of claim filed with the Bankruptcy Court. If a claim is transferred after the Litigation Administrator's service of the ADR Initiation Package on the Participating Claimant, such subsequent transferee shall be bound by the ADR Procedures without further order of the Bankruptcy Court.

3.2. **The Parties Shall Provide Relevant Information**.

Unless otherwise agreed by the Litigation Administrator, each Participating Claimant, shall provide to the Litigation Administrator such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related claims or causes of action. To ensure optimum efficiency and uniformity of treatment, such information shall be provided pursuant to a standardized Valuation Form, provided that, should the Litigation Administrator determine, in their sole discretion, that a standard Valuation Form is not applicable to a particular Participating Claim, the Litigation Administrator shall have the authority to revise, consistent with the ADR Procedures, the Valuation Form as the Litigation Administrator deems appropriate for such claim. All completed Valuation Forms and accompanying documents must be served on the Litigation Administrator with a copy of the Participating Claimant's proof of claim, if any, within thirty (30) days after service of the Valuation Form on such Participating Claimant. A Participating Claimant's provision of the Valuation Form and related documentation does not prohibit, or diminish in any respect, the Participating Claimant's rights to assert that responsive material is privileged and not subject to disclosure. Where the Litigation Administrator has no objections to the Participating Claimant's claim other than under section 502(d), the Litigation Administrator shall be limited to the information request listed on Annex A to these procedures.

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Litigation Administrator shall provide to the Participating Claimant such information listed on Annex A hereto that is requested by the Participating Claimant. The Litigation Administrator's provision of information and related documentation does not prohibit, or diminish in any respect, the Litigation Administrator's rights to assert that responsive material that is identified as potentially privileged is privileged and not subject to disclosure.

3.3. **Determination of Third Party Participation**.

Upon receipt of the Valuation Form, the Litigation Administrator shall have thirty (30) days (the "**Third Party Evaluation Period**"), to evaluate whether the Participating Claim gives rise to potential causes of action by the Litigation Administrator against any Third Parties or if the inclusion of any Third Parties would be beneficial to the ADR process (*e.g.* parties that may also be liable or insurance companies). Prior to the close of the Third Party Evaluation Period, the Litigation Administrator may make one or more requests for supplementation or clarification of the information supplied in the Valuation Information to assist in determining if the Participating Claim gives rise to any related causes of action against Third Parties as provided for in Section

3.4.   Should the Litigation Administrator determine that it would be beneficial to invite Third Parties to be included in the ADR process for a Participating Claim, they shall have the right, but not the duty, to invite any and all applicable Third Parties to participate in the ADR Procedures. Should the Litigation Administrator elect to invite any Third Parties to participate, the invitation to participate shall include a Third Party Participation Agreement, and notice that, if any Third Party wishes to participate in the ADR Procedures with respect to the applicable Participating Claim, it must agree in writing within fifteen (15) days of receipt.  Receipt of such invitation shall be deemed, and thus the time to respond shall begin, one business day following the date the invitation was sent.

If a Third Party accepts the Litigation Administrator's invitation to participate in the ADR Procedures, the Litigation Administrator shall immediately notify the Participating Claimant of: (i) their election to extend a Third Party invitation and the Third Party's acceptance thereof and (ii) the revised end date for the Third Party Evaluation Period.  The invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement within fifteen (15) days of receipt; *provided that* if the Primary Parties agree to extend the time to respond, the invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement by the agreed upon date within the extended Third Party Evaluation Period.  Prior to the close of the Third Party Evaluation Period, if the Litigation Administrator determines that they will not extend an invitation to one or more Third Party to participate in the ADR process, the Parties may, but are not required to, proceed directly to the Assessment Period (as defined below).  Upon receipt of a signed Third Party Participation Agreement, the Litigation Administrator shall provide the Valuation Information to such Third Party Participant.  Unless previously agreed otherwise, in writing, by the Litigation Administrator, by participating in the ADR Procedures, the Third Party Participant submits to the jurisdiction of the Bankruptcy Court to determine all claims related to the Participating Claim, including counterclaims or related causes of action against Third Parties, other than any Excluded Claims. At all times throughout the ADR Procedures, all Valuation Information and other information exchanged by the Parties, shall be considered information exchanged in compromise negotiations governed by Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.

3.4.   **Evaluation of Participating Claims and Related Causes of Action**.

Upon the close of the Third Party Evaluation Period, the Litigation Administrator and any Third Party Participants shall have thirty (30) days (the "**Assessment Period**") to evaluate each Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant based upon all relevant factors under the traditional principles of liability and damages under non-bankruptcy law.   The Litigation Administrator and any Third Party Participants shall review all materials submitted and in such review shall not be bound by the rules governing the admission of evidence in courts of law.  Prior to the close of the Assessment Period, the Litigation Administrator and each Third Party Participant may request additional information from the Participating Claimant following the procedure described in Section 3.5 below.  Within seven (7) days of the close of the Assessment Period, the Litigation Administrator shall provide written notice to the Participating Claimant and any Third Party Participants that the Assessment Period has ended and that the sixty (60) day informal settlement negotiation period (the "**Settlement Offer Period**") has begun

(the "**Settlement Offer Period Notice**").  The Settlement Offer Period Notice shall include notice of the applicable deadlines set forth in the Settlement Offer Exchange Procedure below.

All oversight mechanisms of the Litigation Administrator established in the Plan shall be binding on the Litigation Administrator under these ADR Procedures.

3.5.    **Requests for Additional Information**.

The Litigation Administrator and any Third Party Participants may make one or more reasonable requests for supplementation or clarification of information supplied in the Valuation Information to assist in a good faith evaluation of the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant.  The Assessment Period shall be extended until thirty (30) days after the date the Participating Claimant serves a written response to any initial request for supplemental information upon all participating Parties (subsequent requests for additional information shall not extend the Third Party Evaluation Period or Assessment Period, unless otherwise agreed by the Parties).

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Participating Claimant may make one or more reasonable requests for supplementation or clarification of information supplied by the Litigation Administrator pursuant to section 3.2 to assist in a good faith evaluation of the Cause of Action, any known or reasonably knowable affirmative defenses, and any related causes of action.

**ARTICLE IV.**

**SETTLEMENT OFFER EXCHANGE PROCEDURE**

Subject to the provisions set forth herein, the Settlement Offer Exchange Procedure is designed to allow the Parties to attempt to consensually settle the Participating Claim, and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants, by exchanging written settlement offers and engaging in informal negotiations.

4.1.    **Exchange of Written Settlement Offers**.

Within seven (7) days of service of the Settlement Offer Period Notice, the Litigation Administrator and/or any Third Party shall make good faith offers of settlement based upon their evaluation of the Participating Claim and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants.  Third Party Participant settlement offers may be for all or a portion of the damages asserted in a Participating Claim and, at the Third Party Participants' discretion, may cover both the Litigation Administrator's causes of action against the Third Party Participant and the Participating Claimants' direct causes of action against the Third Party Participant, if any.  Third Party Participant settlement offers shall be served on the Litigation Administrator and the Participating Claimant.  If a Third Party Participant determines that it has no liability to any Party, it shall provide a concise statement explaining such determination, rather than a good faith offer of settlement.  If no Third Party is participating in the ADR Procedures for a particular Participating Claim or if there is no Third Party settlement offer provided, the Litigation Administrator shall make a good faith offer of settlement based upon their

evaluation of the Participating Claim and/or any Causes of Action that are subject to these ADR Procedures.

The only permitted responses to a settlement offer are: acceptance of the settlement offer or rejection of the settlement offer coupled with a counteroffer, if any, served to all applicable Parties within seven (7) days of receipt of such offer. All written settlement offers and counteroffers by any Party shall remain open for seven (7) days and may be accepted within seven (7) days of receipt. Thereafter the Parties may exchange written counteroffers until such time as they have entered into a settlement agreement or reached an impasse.

### 4.2. **Informal Negotiations.**

The Parties shall use reasonable efforts to resolve consensually the Participating Claim and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants during the Settlement Offer Period and are encouraged to schedule settlement conferences or telephonic settlement conferences with each other at mutually convenient times.

### 4.3. **Settlement.**

The Parties have significant leeway to structure settlement agreements to include providing Participating Claimants with the right to receive any combination of Liquidated Allowed Claims and Third Party Payable Claims as well as waivers of the Litigation Administrator's and/or a Participating Claimant's causes of action.[6] For the avoidance of doubt, the Litigation Administrator shall be provided the ability to resolve and settle claims against creditors. In many instances, settlements may require proportional division of settlement amounts between multiple Participating Claimants or specific damages within a single Participating Claim, and nothing herein shall prevent the Parties from structuring partial settlements accordingly.

The Litigation Administrator may, at any given time, if they believe it economically beneficial and administratively convenient, offer to settle the Participating Claim for amounts approximating the cost of administering such claims in lieu of incurring the cost and expense thereof. Nothing herein shall limit the ability of a Participating Claimant and the Litigation Administrator to settle a Participating Claim by mutual consent at any time.

### 4.4. **Close of Settlement Offer Period.**

Unless the Parties have agreed to extend the Settlement Offer Period, the Settlement Offer Period shall close sixty (60) days from the service of the Settlement Offer Period Notice (the "**Settlement Offer Period Closing**").

---

[6] Under no circumstances may the Participating Claimant and the Third Party Participant enter into a settlement agreement involving the Litigation Administrator causes of action against the Third Party Participant without the written consent of the Litigation Administrator.

Upon the Settlement Offer Period Closing, the Litigation Administrator and/or any Third Party Participant may seek disallowance of the Participating Claim before the Bankruptcy Court or pursue such Cause of Action.

(a)    If the Litigation Administrator rejects the Participating Claim, they shall so advise the Participating Claimant, and any Third Party Participants, and provide a statement specifying the basis for such rejection.  Upon such rejection by the Litigation Administrator, the Participating Claim shall be removed from the ADR Procedures and treated as a Disputed Claim and shall be resolved in accordance with the Plan.  Upon such rejection by the Litigation Administrator, the Litigation Administrator reserves their rights to file an objection or take any other such action with respect to such Participating Claims in accordance with the Bankruptcy Code, Bankruptcy Rules, or Local Rules.

(b)    If a Third Party Participant rejects any liability relating to a Participating Claim, the Third Party Participant shall no longer participate in the ADR Procedures for such Participating Claim. If the Litigation Administrator does not reject the Participating Claim, however, the Litigation Administrator, the Participating Claimant, and any remaining Third Party Participants may proceed with the ADR Procedures without the rejecting Third Party Participant.

4.5.    **Initiation of the Mediation Procedure.**

If the ADR Procedures have not been terminated in accordance with Section 4.4 hereof, the Litigation Administrator shall have fifteen (15) days from the Settlement Offer Period Closing to initiate the Mediation Procedure by notifying the Participating Claimant and any Third Party Participants that such Parties have fifteen (15) days from service of such notice to select an Approved ADR Organization[7] and notify the Litigation Administrator of such appointment (the "**Mediation Notice**").  The Litigation Administrator shall include a current copy of the list of Approved ADR Organizations in the Mediation Notice.

## ARTICLE V.

## MEDIATION PROCEDURE

Upon consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participants, if any, may be referred to mediation at any time after entry of these ADR Procedures.  Unless the Parties agree otherwise and absent prior written agreement, if there is no Third Party Participant, the Litigation Administrator and the Participating Claimant shall each be responsible for fifty (50%) percent of the applicable mediation costs.[8]  Unless the Parties agree otherwise and absent prior written agreement, if one or more Third Parties are participating, the Litigation Administrator, the Participating Claimant and the Third Party Participants shall divide the costs and fees of the mediator evenly among them.  The Litigation Administrator, the Participating Claimant and the

---

[7]

[8] Mediation Costs include only those costs and fees associated with retaining a mediator.  The Litigation Administrator shall not be responsible for any of the Participating Claimants' costs or any Third Party Participants' costs associated with the mediation, if any, or any attorneys' fees other than the Litigation Administrator's attorneys' fees.

Third Party Participants shall make appropriate arrangements with the mediator for the payment of the mediator's estimated fees and costs. The Litigation Administrator's share of any costs and fees shall be paid in the ordinary course of the Litigation Administrator's business.

5.1.    **Appointment of a Mediator.**

Upon the Litigation Administrator's service of the Mediation Notice, the Litigation Administrator, the Participating Claimant and any Third Party Participants shall make a good faith effort to identify a mutually agreeable ADR Organization from the list of Approved ADR Organizations. For the avoidance of doubt, except as set forth in Section 5.2, no Party may refuse to use any listed Approved ADR Organization. If after fifteen (15) days from the service of the Mediation Notice an Approved ADR Organization has not been selected, the Litigation Administrator shall have the right to select any Approved ADR Organization. Promptly after the Approved ADR Organization has been selected, the Litigation Administrator shall notify the Appointed ADR Organization of its selection and refer the matter to the Appointed ADR Organization for mediation. Thereafter, the Parties and the Approved ADR Organization shall work in good faith to select the individual mediator at the Approved ADR Organization.

5.2.    **ADR Organization Procedures.**

Upon referral of the Participating Claim to mediation, the Appointed ADR Organization shall (i) follow its procedures with respect to the appointment of a mediator who resides in, or is familiar with the law of, the state or other relevant jurisdiction governing the Participating Claim, and (ii) provide notice to the Litigation Administrator, Participating Claimant, and Third Party Participants, if any, of such appointment. The mediation shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party. Regardless of any rules or procedures of the Appointed ADR Organization to the contrary, (i) no person shall serve as a mediator unless he or she has been trained in mediation in a recognized program such as those of the American Arbitration Association or has equivalent practical experience in the field of mediation or is otherwise agreeable to the Parties, (ii) any person who serves as a mediator shall be an impartial, neutral person, (iii) no person shall serve as a mediator if he or she has any financial or personal interest in the proceedings or, except where otherwise agreed by the Parties, in any related matters, and (iv) upon appointment, the respective mediator shall disclose any circumstances likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties. If the respective mediator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such mediator and another mediator will be chosen in a manner consistent with the ADR Procedures. A person serving as a mediator shall not testify as a witness or be subject to any discovery in any subsequent proceeding concerning the same or any other Participating Claim.

5.3.    **Conducting the Mediation.**

Mediation of Participating Claims shall be handled by the Appointed ADR Organization in the order received to the extent practicable. Any Party may be represented by legal counsel, although the participation of legal counsel shall not be required for the conduct of the mediation. The mediator shall meet with the Parties or their respective legal representatives, individually and jointly for a conference or series of conferences as determined by the mediator. The Participating

Claimant, the Litigation Administrator, and Third Party Participants, if any, or their respective authorized representatives, must be present at the conference. The mediator may review the Participating Claim and/or Cause of Action, the positions of the Parties, the prior negotiations between the Parties, all correspondence between the Parties during the Settlement Offer Period, and such additional information as the Parties may wish to submit, to aid a fair and equitable settlement. At least seven (7) days prior to the mediation conference, the Parties shall each submit to the mediator a concise confidential statement outlining each party's position on settlement value, which shall not be shared with the other Parties to the mediation and shall be deemed to be privileged as compromise and settlement negotiations pursuant to Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1. The mediator may, without court order, modify any or all of the procedures related to written submissions.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

    5.4.    **Conclusion of Mediation/Mediated Settlement.**

The mediator will work with the Parties toward reaching an acceptable, reasonable offer of settlement. The mediator shall not have the authority to impose a settlement upon the Parties. The Parties shall make reasonable efforts to commence mediation within thirty (30) days after appointment of a mediator. Unless otherwise agreed by the Parties, the mediation process will terminate not later than six (6) months after the date of referral to the Appointed ADR Organization. If the Parties do not agree to extend the mediation process or otherwise resolve the Participating Claim or Cause of Action, and all participating Parties have not agreed in writing (email being sufficient) to participate in binding arbitration, the ADR Procedures shall automatically terminate, and the Participating Claim (if any) shall become a Disputed Claim and be treated in accordance with the Plan. All settlement methods available during the Settlement Offer Exchange Period as described above in Section 5.3 shall be available during mediation.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

## ARTICLE VI.

## OPTIONAL BINDING ARBITRATION PROCEDURE

Upon written consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim may be referred to binding arbitration at any time after entry of these ADR Procedures. Unless the Parties agree otherwise, the Participating Claimant, the Litigation Administrator and the Third Party Participants shall divide the costs of binding arbitration evenly among them. The Participating Claimant, the Litigation Administrator, and Third Party Participants shall make appropriate arrangements with the Appointed ADR Organization for direct payment of their portions of the estimated costs.

6.1.    **Consent of the Parties.**

Any Party may request in writing that the others consent to the Optional Binding Arbitration Procedure, which request shall also be consented to by the requesting Party; *provided* that such a request shall be deemed rejected if the other Parties do not accept such request within ten (10) days. Such request shall include consent to appoint one or more of the Approved ADR Organizations as the Appointed ADR Organization. In the event all Parties consent to binding arbitration, and selection of the Appointed ADR Organization, the Litigation Administrator shall refer the Participating Claim, and their related causes of action against the Participating Claimant and any Third Party Participants, to the Appointed ADR Organization within seven (7) days of such consent. Thereafter, the Parties and the Approved ADR Organization shall work in good faith to select the individual arbitrator at the Approved ADR Organization within thirty (30) days after the referral to arbitration. Such proceedings shall be commenced, to the extent practicable, within thirty (30) days after the date the arbitrator is appointed. The arbitration shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party.

6.2.    **Appointment of Arbitrators.**

All arbitration proceedings shall be administered by one of the Approved ADR Organizations. Arbitrators shall be appointed to particular matters by the Appointed ADR Organization pursuant to its rules and procedures, provided however, that (i) any person who serves as an arbitrator shall be an impartial, neutral person, (ii) no person shall serve as an arbitrator if he/she has any financial or personal interest in the proceedings or, except when otherwise agreed by the Parties, in any related matters, and (iii) upon accepting an appointment, the respective arbitrator shall disclose any circumstance likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties. If the respective arbitrator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such arbitrator, and another arbitrator will be chosen in a manner consistent with the ADR Procedures.

6.3.    **Applicable Law and Procedure.**

The arbitration shall be conducted in accordance with applicable law, which shall be presumed to be the Federal Arbitration Act, Title 9, United States Code, unless the Bankruptcy Court determines on motion of any Party that another jurisdiction's law relating to arbitration should govern the proceeding. The arbitration shall be conducted pursuant to the applicable rules and procedures of the American Arbitration Association, or of the corresponding provisions of the Appointed ADR Organization's rules and procedures, if another organization is selected.

6.4.    **Arbitration Administrative Expenses.**

The Litigation Administrator's share of any costs and arbitration fees shall be paid in the ordinary course of the Litigation Administrator's business; *provided*, *however*, that the arbitrator shall in his or her sole discretion assess fees and costs against any Party for delaying or abusing the arbitration procedures set forth herein to the extent so provided in the applicable organization's applicable rules.

6.5.    **Arbitration Award.**

The amount of the award shall be within the discretion of the arbitrator; *provided* that the arbitrator may not award the Participating Claimant a claim in excess of the amount of the Participating Claimant's claim as set forth in the Participating Claimant's proof of claim or, if not liquated therein, in the Participating Claimant's Valuation Form.  The Arbitrator shall specify if any awarded claim, or any portion thereof, is to be treated as a Liquidated Allowed Claim or Third Party Payable Claim.  No Party shall have the right to appeal an arbitration award except on the grounds set forth in Section 10 of the Federal Arbitration Act.  The reference to Local Rule 9019-1 and specifically Section 9(B)(1) of the *Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings* are not applicable, and there shall be no right to a trial *de novo*.  Any award shall be subject to further oversight by the Bankruptcy Court pursuant to the Plan, including any distribution of proceeds.  Under no circumstances may any Participating Claimant seek to enforce any arbitration award against the Litigation Administrator without further order of the Bankruptcy Court.

## ARTICLE VII.

## CLAIM SATISFACTION PROCEDURE

All settled Participating Claims will result in the Participating Claimant receiving an Allowed Claim (and not a judgment against the Debtors or the Litigation Administrator) to the extent such Participating Claimant holds a Disputed Claim against the Estate or payment of an amount to the Post-Effective Date Debtors to be distributed to Holders of Claims entitled to receive Litigation Proceeds.  Each Allowed Claim shall be treated in accordance with the Plan.[9]

## ARTICLE VIII.

## Retention of Jurisdiction

The Bankruptcy Court shall have sole and exclusive jurisdiction to resolve any dispute arising from the interpretation, and enforcement of, the ADR Procedures.

---

[9] Nothing herein shall modify or enhance, in any way, the Litigation Administrator's general duty to maximize the value of the estate or require the Litigation Administrator to prosecute potential causes of action against Third Parties if they do not believe it to be in the best interests of the estate.

**<u>Exhibit J-1</u>**

**(Redline) ADR Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

### ARTICLE I.

### <u>PREAMBLE</u>

The ADR Procedures[2] are designed to promote the efficient resolution of certain disputed prepetition claims against the Debtors and claims held by the Debtors, including preference actions.  Although the ADR Procedures encourage voluntary participation by Third Parties, they do not compel parties that have not filed a proof of claim or otherwise subjected themselves to the jurisdiction of the Bankruptcy Court to participate<u>, and they permit those who do not wish to participate to opt out</u>.

The ADR Procedures provide persons or entities holding disputed claims the opportunity to participate in a streamlined process with the goal of reducing administrative costs that detract from all stakeholders' recoveries and allowing for quicker distributions on account of claims against the Debtors' estates and the entities against which the Debtors hold claims.  The ADR Procedures facilitate this by establishing a standard methodology for informal and formal negotiations, fostering settlement and liquidation of Participating Claims.

Importantly, the Plan provides that disputed claims will not receive a distribution until all disputes with respect to any such claim are resolved.  *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* at [Art. VII(~~I~~B)], *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. ~~June. 15, 2023~~[DATE]) [~~Docket~~ECF No. ~~2807~~[●]].  The Debtors and the Committee believe that these ADR Procedures provide creditors and the Litigation Administrator the ability to efficiently resolve disputed claims to maximize

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used herein shall have the meaning set forth in Article II "Defined Terms" below.  Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

recoveries, reduce administrative expenses, and provide creditors with distributions quicker than in the traditional claims resolution process.

## 1.1.    **Overview**

Celsius was founded in 2017 and was one of the first platforms that would allow users to transfer their digital assets and (a) earn rewards on such digital assets and/or (b) take loans using those transferred digital assets as collateral.

Celsius's primary operations consisted of: (a) financial services through which retail and institutional users could (i) earn rewards on digital assets they transferred to Celsius, (ii) securely store and access digital assets, (iii) borrow fiat currency supported by digital assets transferred to Celsius, and (iv) send and receive cryptocurrency using Celsius's CelPay services; and (b) bitcoin mining.

The Participating Claims are (1) unliquidated, disputed and/or contingent prepetition claims asserted against one or more Debtors or (2) ADR-Eligible Claims held by the Debtors' estates against third parties, including creditors of the Debtors.  Prosecution of the Participating Claims against the Debtors outside of the Bankruptcy Court is currently stayed by the Debtors' Chapter 11 Cases or the Plan and Confirmation Order.

Most of the potential Participating Claims will be disputed by the Litigation Administrator and will have to be resolved by settlement or litigation.  Litigating each independent Participating Claim in a multitude of separate individual actions, however, could result in a significant consumption of limited resources (judicial, the Litigation Administrator's, and the Participating Claimants').  The cost and delay associated with ordinary litigation procedures would not be in the best interests of any Party involved.  The ADR Procedures are designed to facilitate and incentivize settlement and an efficient resolution of Participating Claims.

## 1.2.    **Summary of Procedures**

The ADR Procedures consist of five sequential steps: (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure.  For the avoidance of any doubt, nothing in the ADR Procedures shall alter, amend, or otherwise modify the terms of the Debtors' Insurance Policies.

The Initial Assessment Procedure is intended to provide a mechanism for the Litigation Administrator, Participating Claimants, and Third Party Participants, if any, to evaluate and consensually resolve Participating Claims and any of the Litigation Administrator's related claims and causes of action prior to mediation.  Under the Initial Assessment Procedure, after receiving notification of their inclusion in the ADR Procedures, Participating Claimants will provide such information to the Litigation Administrator as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim.  Upon receipt, the Litigation Administrator will determine if the Participating Claim gives rise to any related potential causes of action against such Participating Claimant and/or Third Parties and, to the extent applicable, invite such Third Parties to participate in the ADR Procedures.  The Litigation

2

Administrator and Third Party Participants, if any, then have the opportunity to review the documents and information provided by the Participating Claimants to fully assess the validity and extent of any claims and/or damages relating to the Participating Claim.  The Participating Claimant may also request information from the Litigation Administrator regarding their claim. With respect to Account Holder Avoidance Actions, requests for information from any Party shall be limited to the subject matters set forth on Annex A to these procedures.[3]

The Settlement Offer Exchange Procedure is intended to provide the Litigation Administrator, the Participating Claimants, and the Third Party Participants, if any, the opportunity to exchange written settlement offers and engage in informal settlement negotiations after they have evaluated the Participating Claim, and certain of the Litigation Administrator's related causes of action.  If the Parties are unable to resolve the Participating Claim during this process, they may proceed to Mediation.

The Mediation Procedure is intended to provide a more formal mechanism for amicable resolution of Participating Claims and any of the Litigation Administrator's related causes of action other than Excluded Claims.  The Mediation Procedure is based upon generally accepted mediation procedures of professional alternative dispute resolution organizations.  Participating Claimants shall be responsible for fifty (50%) percent of the costs and fees of the mediator, absent prior written agreement.[34]  If Third Parties participate in the Mediation Procedure, the costs and fees of the mediator shall be equally divided among the Parties.

The Optional Binding Arbitration Procedure is intended to provide a formal binding mechanism for resolution of Participating Claims and any of the Litigation Administrator's related causes of action (other than Excluded Claims) simultaneously through joint binding arbitration.  The Optional Binding Arbitration Procedure is voluntary and shall only be initiated if all Parties agree to participate.  Unless the Parties agree otherwise, all costs and fees of the arbitrator shall be equally divided among all participants to the arbitration.

## **DEFINED TERMS**

Capitalized terms used herein without further definition, and variations thereof, shall have the meanings set forth below unless the context otherwise requires.

1.3.    **"ADR-Eligible Potential Defendants"** means any potential Avoidance Action defendant that is not an ADR-Ineligible Potential Defendant.

1.4.    ~~1.3.~~ **"ADR Initiation Package"** has the meaning set forth in Section 3.1.

1.5.    ~~1.4.~~ **"ADR Organization List"** has the meaning set forth in Section 2.4.

---

[3]  **[NTD**: A set of common information requests to be negotiated by the Litigation Administrator and parties negotiating the ADR Procedures.]

[34]  The Participating Claimant's own costs, including attorneys' fees, if any, shall be borne by the Participating Claimant.  In no event shall the Litigation Administrator be responsible for any costs incurred by any entity other than the Litigation Administrator or the Approved ADR Organization.

1.6. ~~1.5.~~ **"ADR Procedures"** mean the alternative dispute resolution procedures as set forth herein.

1.7. ~~1.6.~~ **"Appointed ADR Organization"** means the Approved ADR Organization appointed to conduct either a mediation or arbitration for the Parties.

1.8. ~~1.7.~~ **"Approved ADR Organizations"** means those alternative dispute resolution organizations and individuals on the ADR Organization List or consented to by the Parties.[5]

1.9. ~~1.8.~~ **"Assessment Period"** has the meaning set forth in Section 3.4.

1.10. ~~1.9.~~ **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

1.11. ~~1.10.~~ **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over these Chapter 11 Cases.

1.12. ~~1.11.~~ **"Chapter 11 Cases"** means the cases commenced under Chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as *In re Celsius Network LLC, et. al.,* Chapter 11 Case No. 22-10964 (MG), Jointly Administered.

1.13. ~~1.12.~~ **"Days"** or **"days"** means calendar days unless otherwise defined herein. Days shall be counted as prescribed by Rule 9006 of the Federal Rules of Bankruptcy Procedure.

1.14. ~~1.13.~~ **"Excluded Claim"** means (a) claims for which the automatic stay under section 362 of the Bankruptcy Code was modified by prior order of the Bankruptcy Court to allow for litigation of the claim to proceed in another forum, (b) tax claims, (c) claims where there is a judgment entered or settlement already agreed to and signed by all applicable parties, including the Class Claim Settlement, (d) any declaratory judgment actions or any other actions regarding insurance coverage issues; (e) any Avoidance Action claims against ADR-Ineligible Potential Defendants (as defined in the Plan); and (f) claims subject to a separate order of the Bankruptcy Court providing for arbitration or mediation.

1.15. ~~1.14.~~ **"General Unliquidated Disputed Claim"** means a Participating Claim to the extent that the claim shall be treated as an unliquidated and/or disputed claim filed in these Chapter 11 Cases.

1.16. ~~1.15.~~ **"Insurance Order"** means the *Final Order (I) Authorizing the Debtors to (A) Pay their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain their Surety Bond Program and (II) Granting Related Relief* [ECF No. 524], entered in the Chapter 11 Cases.

---

[5] [**NTD**: The list of Approved ADR Organizations, including specific individual mediators, to be negotiated by the Litigation Administrator and parties negotiating the ADR Procedures.]

1.17. 1.16. **"Insurance Policy"** means an insurance policy that has been issued at any time to or provides coverage to the Debtors and/or all agreements, documents or instruments relating thereto and/or any agreements with third-party administrators.

1.18. 1.17. **"Insurer"** means any company or other entity that issued or entered into an Insurance Policy with, or that affords coverage to, the Debtors for a Participating Claim.

1.19. 1.18. **"Liquidated Allowed Claim"** means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to an allowed unsecured claim or claims to be paid on the terms set forth in the Plan.

1.20. 1.19. **"Litigation Administrator"** shall have the meaning ascribed to such term in the Plan.

1.21. 1.20. **"Local Rules"** means the Local Bankruptcy Rules for the Southern District of New York.

1.22. 1.21. **"Mediation Notice"** has the meaning set forth in Section 4.5.

1.23. 1.22. **"Participating Claim"** means (i) any disputed, unliquidated, or contingent prepetition claim, other than Excluded Claims, evidenced by a timely filed proof of claim and that is selected by the Litigation Administrator, in their sole discretion, for resolution through the ADR Procedures, including claims or (ii) any cCauses of aAction (as defined in the Plan) the Estates may have against ADR-Eligible Potential Defendants (as defined in the Plan); provided, subject to the limitations set forth below, that the Litigation Administrator may designate any claims (other than Excluded Claims) of creditors or other entities that are subject to the jurisdiction of the Bankruptcy Court for resolution through the ADR Procedures if the Litigation Administrator believes that, based on the nature of the potential claims, the ADR Procedures have a reasonable chance of successfully resolving the claims and the potential benefits outweigh the costs of participation. Notwithstanding the foregoing, any disputed postpetition administrative expenses, and any claims or counterclaims asserted by the Litigation Administrator other than Excluded Claims may be submitted to the ADR Procedures by agreement of the Litigation Administrator and the applicable claimant or by further order of the Bankruptcy Court.

1.24. 1.23. **"Participating Claimant"** means any person or entity asserting a Participating Claim.

1.25. 1.24. **""Party or Parties"** means, with respect toone or more of, a Participating Claim, the Litigation Administrator, the relevant Participating Claimant, and any relevant Third Party Participants (if applicable).

1.25. **"Party"** means, with respect to a Participating Claim, the Litigation Administrator, the relevant Participating Claimant, or a relevant Third Party Participant, as applicable.

1.26. **"Plan"** means the chapter 11 plan confirmed in these Chapter 11 Cases, including all schedules and exhibits thereto, and the documents set forth in the Plan Supplement, as may be

5

modified, amended, or supplemented from time to time.

1.27.    **"Primary Parties"** means, with respect to a Participating Claim, the Litigation Administrator and the relevant Participating Claimant.

1.28.    **"Settlement Offer Exchange Procedure"** has the meaning set forth in the preamble of Section 4.

1.29.    **"Settlement Offer Period"** has the meaning set forth in Section 3.4.

1.30.    **"Settlement Offer Period Closing"** has the meaning set forth in Section 4.4.

1.31.    **"Settlement Offer Period Notice"** has the meaning set forth in Section 4.4.

1.32.    **"Third Party"** means any person or entity that the Litigation Administrator or Participating Claimant has or may have a claim against relating to any Participating Claim.

1.33.    **"Third Party Evaluation Period"** has the meaning set forth in Section 3.3.

1.34.    **"Third Party Participant"** means any Third Party that agrees to participate in the ADR Procedures by returning a signed Third Party Participation Agreement.

1.35.    **"Third Party Participation Agreement"** means any written agreement between the Litigation Administrator and any Third Party Participant who accepts an invitation to participate in the ADR Procedures for a Participating Claim.

1.36.    **"Third Party Payable Claim"** means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to receive partial or full satisfaction of the Participating Claim directly from a Third Party Participant.

1.37.    **"Valuation Form"** means a form requesting such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related causes of action, substantially in the form attached hereto as **Exhibit 1**.

1.38.    **"Valuation Information"** means the Participating Claimant's proof of claim and Valuation Form, and any other documents or information relating to the Participating Claim provided to the Litigation Administrator.

## ARTICLE II.

## ADMINISTRATION

2.1.  **Administrators.**

Subject to the terms hereof, the administration of the ADR Procedures will be coordinated by the Litigation Administrator and their counsel.

2.2.  **No Modification of the Insurance Policies or the Insurance Order.**

Notwithstanding anything to the contrary in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing, (i) nothing shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the Insurance Policies and the terms and conditions thereof and coverage or services provided thereby, (b) the rights, defenses or obligations of any Insurer, (c) any rights or obligations of the Debtors arising out of or under any Insurance Policy, or (d) the Insurance Order; (ii) to the extent of a conflict between the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing on the one hand, and any Insurance Policy that could provide coverage or services for a Participating Claim on the other hand, the terms of the Insurance Policy shall control, and nothing in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing shall excuse, or in any way alter, the Debtors' performance under the Insurance Policies; (iii) for all issues relating to insurance coverage and claims handling services, the provisions, terms, conditions, and limitations of the Insurance Policies shall control the payment of claims covered by any Insurance Policies; (iv) the failure of any Insurer to respond to any notice provided in accordance with the ADR Procedures does not relieve the Debtors of their obligations, if any, to provide an Insurer with further information and/or notices required by any applicable Insurance Policy; (v) nothing shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the ADR Procedures; (vi) nothing imposes a good faith obligation on any Insurer that does not otherwise exist under applicable law or the Insurance Policies; and (vii) Insurers shall retain all rights, claims and defenses to challenge any award pursuant to binding arbitration undertaken pursuant to the ADR Procedures that alters the terms and conditions of any Insurance Policy, and under no circumstances shall an Insurer be deemed a party to any binding arbitration unless it determines in its sole discretion that it is permitted to participate under applicable law and elects to do so.

Notwithstanding any other provision of these ADR Procedures, the rights, obligations and defenses of any Insurers under any applicable surety bond, surety collateral agreement, surety credit agreement, or surety indemnity agreement relating to the Debtors or the Participating Claims are fully preserved, unchanged and unimpaired.

2.3.  **Option to Utilize Professionals.**

The Litigation Administrator is specifically authorized to retain professionals to assist in evaluating the merits of each Participating Claim, in placing a dollar amount on each

Participating Claim, and in settling or otherwise resolving the Participating Claims pursuant to the ADR Procedures.

2.4.    **Employment of Mediation and Arbitration Organizations.**

Attached to these ADR Procedures is a list of Approved ADR Organizations (the "**ADR Organization List**"), which the Litigation Administrator may amend by providing notice to the Participating Claimant of an amended list of Approved ADR Organizations. Subject to the conditions set forth elsewhere herein, the Litigation Administrator shall retain an Approved ADR Organization to conduct the Mediation Procedure or the Optional Binding Arbitration Procedure. Effort will be made to conduct any Mediation Procedures in a location that is convenient for the Litigation Administrator, the Participating Claimants, and, as applicable, Third Party Participants, or via videoconference, at the election of any Party.

2.5.    **Participation in the ADR Procedures.**

All Participating Claims shall be subject to the provisions of these ADR Procedures, subject to Section 2.11 or 2.12 below. ***Participation in the ADR Procedures shall in no way alter the*** ~~requirement that the~~***consequences, if any, of a Participating Claimant*** ~~must have~~***not having filed timely a proof of claim in these Chapter 11 Cases against any of the Debtors; failure to file a proof of claim may result in disallowance of such Participating Claimant's claims against the Debtors, provided that, except as otherwise set forth in the Plan, the disallowance of any claim against the Debtors' estates shall occur after notice and a hearing before the Bankruptcy Court. Participation in the ADR Procedures shall in no way affect the Litigation Administrator's ability to object to any Participating Claim, or oppose any motion for relief from the automatic stay or from any injunction contained in the Plan, that is not resolved through the ADR Procedures.***

Pursuant to these ADR Procedures, and absent a consensual resolution among the Parties prior to mediation, the Litigation Administrator ~~may, but is not~~shall be required to~~,~~ submit to mediation~~,~~ regarding any pending counterclaims or causes of action asserted by the Litigation Administrator related to the Participating Claim that are not Excluded Claims ~~with the consent of the applicable Participating Claimant~~; *provided* that if the Parties enter mediation, all Claims and Causes of Action shall be put before the mediator for potential resolution, in full or in part.

No Party shall be required to employ counsel to participate in the ADR Procedures, including to participate in mediation or arbitration pursuant to the ADR Procedures.

2.6.    **Effect of ADR Procedures on Pending Matters and Applicable Statutes of Limitations.**

Inclusion of any Participating Claim in the ADR Procedures shall automatically stay all proceedings before the Bankruptcy Court, including but not limited to, discovery (other than discovery conducted pursuant to these ADR Procedures), motions for relief from the stay or any injunction contained in the Plan, pretrial hearing dates, and trial schedules related to the Participating Claims. Such stay shall automatically terminate thirty (30) days after any Participating Claim is removed from the ADR Procedures. Upon the written consent of the Holder of a Participating Claim (which consent shall be included on the Valuation Form), the

applicable statute of limitations shall be tolled until the later of 15 days after the termination of such ADR Procedures by either party or the statute of limitations date.

### 2.7. **Acceptance of Settlement Offers.**

The Litigation Administrator shall have authority to settle or compromise all Participating Claims and Causes of Action against Third Party Participants subject to the terms of the Plan.

### 2.8. **Extensions.**

All deadlines established by the ADR Procedures with respect to any particular Participating Claim may be extended by written agreement of the Litigation Administrator and the applicable Participating Claimant, with notice to any Third Party Participants.

### 2.9. **Service and Notices.**

To facilitate the timely completion of the ADR Procedures, all service and written notice required herein, with the exception of the ADR Initiation Package (unless the Litigation Administrator does not have a mailing address for the applicable Participating Claimant), may be done via email. The Parties shall exchange email addresses at their earliest convenience. If any Party does not wish to accept service via email, the Party shall notify all other Parties of such preference in writing. Upon the other Parties' receipt of such notice, email service upon such Party shall no longer be valid.

### 2.10. **Confidentiality and Non-Admissibility.**

Any settlement discussions by and between the Parties or positions taken by them during compliance with the ADR Procedures shall remain confidential and shall not be admitted as evidence in any subsequent proceeding or context, including, but not limited to, litigation of a Participating Claim, pursuant to Rule 408 of the Federal Rules of Evidence and all similar rules and are expressly determined by the provisions herein not to be admissions by any Party. Notwithstanding the foregoing, if a Party alleges another Party has failed to participate in good faith in the ADR Procedures or disputes that a settlement had been previously reached, then settlement discussions may be used or admitted as evidence in any subsequent proceeding solely with respect to those matters. With the consent of the Litigation Administrator, or as permitted by an order entered by the Bankruptcy Court, Participating Claimants, including ADR-Eligible Potential Defendants, may share information obtained during the process and settlement discussions by and between the parties and positions taken by them with other Participating Claimants, including ADR-Eligible Potential Defendants, who are similarly situated and who agree to be bound by the terms of an appropriate protective order.

### 2.11. **Failure to Comply with the ADR Procedures.**

If a Participating Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the Bankruptcy Court may, after notice and a hearing, find such conduct to be in violation of the Plan or, with respect to a Participating Claimant, an abandonment of or failure to prosecute the Participating Claim, or

9

~~both.  Upon such findings, the Bankruptcy Court may, among other things, disallow and expunge the Participating Claim, in whole or part, or grant such other or further~~grant any remedy deemed just and appropriate under the circumstances, including, without limitation, awarding attorneys' fees, other fees, and costs to the other party.  The Litigation Administrator shall also participate in the ADR Procedures in good faith.  For the avoidance of doubt, (i) the election to opt out of the ADR Procedures, (ii) the failure of an ADR-Eligible Potential Defendant to make an offer or counter-offer to settle a Cause of Action, or (iii) the failure to extend, or seek to extend, applicable statute of limitations shall not be considered bad faith or a basis to move the Bankruptcy Court for remedies.

### 2.12.  **Participating Claimant Opt Out Option**.

~~If a~~A Participating Claimant ~~does not believe the ADR Procedures are reasonably likely to result in the resolution of its claim, within twenty-one (21) days of service of the ADR Initiation Package it may~~may, at any time prior to the selection of a mediator, serve a written ~~request~~election (email sufficient), which will be effective upon receipt by the Litigation Administrator, for exclusion from the ADR Procedures; *provided*, *however*, that the Litigation Administrator may file a motion with the Bankruptcy Court opposing such exclusion.  Other than with respect to the optional Binding Arbitration Procedure, a Participating Claimant may not opt out following ~~expiration of such twenty-one (21) day period~~the selection of a mediator without further order of the Bankruptcy Court.  For the avoidance of doubt, if ~~within twenty-one (21) days of service of the ADR Initiation Package,~~ a Participating Claimant serves a written ~~request~~election for exclusion from the ADR Procedures in accordance with this Section 2.12, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.

### 2.13.  **Insurer Notice**.

In the event that an Insurance Policy requires that the Debtors to provide notice to an Insurer of a Participating Claim, the Debtors shall provide notice to the applicable Insurer(s) (i) by serving a copy of the corresponding ADR Initiation Package on the Insurer when it is served on the Participating Claimant and (ii) at any time during the ADR process, when the notice requirements of the Insurance Policy are triggered.  If the Insurer elects, subject to the terms of the Insurance Policy, at any time to exercise its right to control the defense or settlement of a Participating Claim, the Insurer may elect to either (i) work with the Litigation Administrator, in accordance with the terms of the Insurance Policy, to resolve the Participating Claim within these ADR Procedures, or (ii) remove the Participating Claim from the ADR Procedures; *provided* that the Insurer remove the Participating Claim from the ADR Procedures within the later of (i) the time required by applicable state law or the applicable Insurance Policy for responses to claim notices, or (ii) forty-five (45) days after the Insurer receives notice of the Participating Claim.

## ARTICLE III.

## INITIAL ASSESSMENT PROCEDURE

Subject to the provisions set forth herein, the Initial Assessment Procedure is designed to foster inclusion of all appropriate Third Parties and to allow the Litigation Administrator and any Third Party Participant to evaluate fully the Participating Claim and the Litigation Administrator's related causes of action other than Excluded Claims, in an expedited manner to facilitate meaningful settlement negotiations.

### 3.1.    **The Litigation Administrator Shall Provide Notice.**

The Litigation Administrator shall initiate the ADR Procedures by serving upon each selected Participating Claimant, at the address listed on the Participating Claimant's most recently filed proof of claim or amended proof of claim or, if no such address is available, the email address of such Participating Claimant, if applicable, as well as upon any counsel of record, notice of the ADR Procedures and their selection as a Participating Claimant, together with a copy of the ADR Procedures and a Valuation Form (the "**ADR Initiation Package**"). The ADR Initiation Package shall include a description of any claims and objections held by the Litigation Administrator against a Participating Claimant. For transferred claims, the Litigation Administrator also shall serve a copy of the ADR Initiation Package on the transferee identified in the notice of transfer of claim filed with the Bankruptcy Court. If a claim is transferred after the Litigation Administrator's service of the ADR Initiation Package on the Participating Claimant, such subsequent transferee shall be bound by the ADR Procedures without further order of the Bankruptcy Court.

### 3.2.    **The** ~~Participating Claimant~~Parties **Shall Provide** ~~Valuation~~Relevant **Information**.

Unless otherwise agreed by the Litigation Administrator, each Participating Claimant, shall provide to the Litigation Administrator such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related claims or causes of action. To ensure optimum efficiency and uniformity of treatment, such information shall be provided pursuant to a standardized Valuation Form, provided that, should the Litigation Administrator determine, in their sole discretion, that a standard Valuation Form is not applicable to a particular Participating Claim, the Litigation Administrator shall have the authority to revise, consistent with the ADR Procedures, the Valuation Form as the Litigation Administrator deems appropriate for such claim. All completed Valuation Forms and accompanying documents must be served on the Litigation Administrator with a copy of the Participating Claimant's proof of claim, if any, within thirty (30) days after service of the Valuation Form on such Participating Claimant. A Participating Claimant's provision of the Valuation Form and related documentation does not prohibit, or diminish in any respect, the Participating Claimant's rights to assert that responsive material is privileged and not subject to disclosure. Where the Litigation Administrator has no objections to the Participating Claimant's claim other than under section 502(d), the Litigation Administrator shall be limited to the information request listed on Annex A to these procedures.

11

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Litigation Administrator shall provide to the Participating Claimant such information listed on Annex A hereto that is requested by the Participating Claimant.  The Litigation Administrator's provision of information and related documentation does not prohibit, or diminish in any respect, the Litigation Administrator's rights to assert that responsive material that is identified as potentially privileged is privileged and not subject to disclosure.

3.3.    **Determination of Third Party Participation.**

Upon receipt of the Valuation Form, the Litigation Administrator shall have thirty (30) days (the "**Third Party Evaluation Period**"), to evaluate whether the Participating Claim gives rise to potential causes of action by the Litigation Administrator against any Third Parties or if the inclusion of any Third Parties would be beneficial to the ADR process (*e.g.* parties that may also be liable or insurance companies).  Prior to the close of the Third Party Evaluation Period, the Litigation Administrator may make one or more requests for supplementation or clarification of the information supplied in the Valuation Information to assist in determining if the Participating Claim gives rise to any related causes of action against Third Parties as provided for in Section 3.4.  Should the Litigation Administrator determine that it would be beneficial to invite Third Parties to be included in the ADR process for a Participating Claim, they shall have the right, but not the duty, to invite any and all applicable Third Parties to participate in the ADR Procedures.  Should the Litigation Administrator elect to invite any Third Parties to participate, the invitation to participate shall include a Third Party Participation Agreement, and notice that, if any Third Party wishes to participate in the ADR Procedures with respect to the applicable Participating Claim, it must agree in writing within fifteen (15) days of receipt.  Receipt of such invitation shall be deemed, and thus the time to respond shall begin, one business day following the date the invitation was sent.

If a Third Party accepts the Litigation Administrator's invitation to participate in the ADR Procedures, the Litigation Administrator shall immediately notify the Participating Claimant of: (i) their election to extend a Third Party invitation and the Third Party's acceptance thereof and (ii) the revised end date for the Third Party Evaluation Period.  The invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement within fifteen (15) days of receipt; *provided that* if the Primary Parties agree to extend the time to respond, the invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement by the agreed upon date within the extended Third Party Evaluation Period.  Prior to the close of the Third Party Evaluation Period, if the Litigation Administrator determines that they will not extend an invitation to one or more Third Party to participate in the ADR process, the Parties may, but are not required to, proceed directly to the Assessment Period (as defined below).  Upon receipt of a signed Third Party Participation Agreement, the Litigation Administrator shall provide the Valuation Information to such Third Party Participant.  Unless previously agreed otherwise, in writing, by the Litigation Administrator, by participating in the ADR Procedures, the Third Party Participant submits to the jurisdiction of the Bankruptcy Court to determine all claims related to the Participating Claim, including counterclaims or related causes of action against Third Parties, other than any Excluded Claims.  At all times throughout the ADR Procedures, all Valuation

Information and other information exchanged by the Parties, shall be considered information exchanged in compromise negotiations governed by Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.

### 3.4.   **Evaluation of Participating Claims and Related Causes of Action.**

Upon the close of the Third Party Evaluation Period, the Litigation Administrator and any Third Party Participants shall have thirty (30) days (the "**Assessment Period**") to evaluate each Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant based upon all relevant factors under the traditional principles of liability and damages under non-bankruptcy law. The Litigation Administrator and any Third Party Participants shall review all materials submitted and in such review shall not be bound by the rules governing the admission of evidence in courts of law. Prior to the close of the Assessment Period, the Litigation Administrator and each Third Party Participant may request additional information from the Participating Claimant following the procedure described in Section 3.5 below. Within seven (7) days of the close of the Assessment Period, the Litigation Administrator shall provide written notice to the Participating Claimant and any Third Party Participants that the Assessment Period has ended and that the sixty (60) day informal settlement negotiation period (the "**Settlement Offer Period**") has begun (the "**Settlement Offer Period Notice**"). The Settlement Offer Period Notice shall include notice of the applicable deadlines set forth in the Settlement Offer Exchange Procedure below.

All oversight mechanisms of the Litigation Administrator established in the Plan shall be binding on the Litigation Administrator under these ADR Procedures.

### 3.5.   **Requests for Additional Information.**

The Litigation Administrator and any Third Party Participants may make one or more reasonable requests for supplementation or clarification of information supplied in the Valuation Information to assist in a good faith evaluation of the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant. The Assessment Period shall be extended until thirty (30) days after the date the Participating Claimant serves a written response to any initial request for supplemental information upon all participating Parties (subsequent requests for additional information shall not extend the Third Party Evaluation Period or Assessment Period, unless otherwise agreed by the Parties).

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Participating Claimant may make one or more reasonable requests for supplementation or clarification of information supplied by the Litigation Administrator pursuant to section 3.2 to assist in a good faith evaluation of the Cause of Action, any known or reasonably knowable affirmative defenses, and any related causes of action.

13

# ARTICLE IV.

## SETTLEMENT OFFER EXCHANGE PROCEDURE

Subject to the provisions set forth herein, the Settlement Offer Exchange Procedure is designed to allow the Parties to attempt to consensually settle the Participating Claim, and/or the Litigation Administrator's ~~related c~~Causes of ~~a~~Action against the Participating Claimant and any Third Party Participants, by exchanging written settlement offers and engaging in informal negotiations.

### 4.1.    **Exchange of Written Settlement Offers.**

Within seven (7) days of service of the Settlement Offer Period Notice, the Litigation Administrator and/or any Third Party shall make good faith offers of settlement based upon their evaluation of the Participating Claim and/or the Litigation Administrator's ~~related c~~Causes of ~~a~~Action against the Participating Claimant and any Third Party Participants.  Third Party Participant settlement offers may be for all or a portion of the damages asserted in a Participating Claim and, at the Third Party Participants' discretion, may cover both the Litigation Administrator's causes of action against the Third Party Participant and the Participating Claimants' direct causes of action against the Third Party Participant, if any.  Third Party Participant settlement offers shall be served on the Litigation Administrator and the Participating Claimant.  If a Third Party Participant determines that it has no liability to any Party, it shall provide a concise statement explaining such determination, rather than a good faith offer of settlement.  If no Third Party is participating in the ADR Procedures for a particular Participating Claim or if there is no Third Party settlement offer provided, the Litigation Administrator shall make a good faith offer of settlement based upon their evaluation of the Participating Claim and/or any ~~related c~~Causes of ~~a~~Action that are subject to these ADR Procedures.

The only permitted responses to a settlement offer are: acceptance of the settlement offer or rejection of the settlement offer coupled with a counteroffer, if any, served to all applicable Parties within seven (7) days of receipt of such offer.  All written settlement offers and counteroffers by any Party shall remain open for seven (7) days and may be accepted within seven (7) days of receipt.  Thereafter the Parties may exchange written counteroffers until such time as they have entered into a settlement agreement or reached an impasse.

### 4.2.    **Informal Negotiations.**

The Parties shall use reasonable efforts to resolve consensually the Participating Claim and/or the Litigation Administrator's ~~related c~~Causes of ~~a~~Action against the Participating Claimant and any Third Party Participants during the Settlement Offer Period and are encouraged to schedule settlement conferences or telephonic settlement conferences with each other at mutually convenient times.

### 4.3.    **Settlement.**

The Parties have significant leeway to structure settlement agreements to include providing Participating Claimants with the right to receive any combination of Liquidated Allowed Claims and Third Party Payable Claims as well as waivers of the Litigation

Administrator's and/or a Participating Claimant's causes of action.[46]  For the avoidance of doubt, the Litigation Administrator shall be provided the ability to resolve and settle claims against creditors.  In many instances, settlements may require proportional division of settlement amounts between multiple Participating Claimants or specific damages within a single Participating Claim, and nothing herein shall prevent the Parties from structuring partial settlements accordingly.

The Litigation Administrator may, at any given time, if they believe it economically beneficial and administratively convenient, offer to settle the Participating Claim for amounts approximating the cost of administering such claims in lieu of incurring the cost and expense thereof.  Nothing herein shall limit the ability of a Participating Claimant and the Litigation Administrator to settle a Participating Claim by mutual consent at any time.

### 4.4.    **Close of Settlement Offer Period.**

Unless the Parties have agreed to extend the Settlement Offer Period, the Settlement Offer Period shall close ~~forty-five~~sixty (~~45~~60) days from the service of the Settlement Offer Period Notice (the "**Settlement Offer Period Closing**").

Upon the Settlement Offer Period Closing, the Litigation Administrator and/or any Third Party Participant may ~~reject~~seek disallowance of the Participating Claim ~~and/or the Litigation Administrator's related~~before the Bankruptcy Court or pursue such ~~c~~Causes of ~~a~~Action ~~respectively~~.

(a)    If the Litigation Administrator rejects the Participating Claim, they shall so advise the Participating Claimant, and any Third Party Participants, and provide a statement specifying the basis for such rejection.  Upon such rejection by the Litigation Administrator, the Participating Claim shall be removed from the ADR Procedures and treated as a Disputed Claim and shall be resolved in accordance with the Plan.  Upon such rejection by the Litigation Administrator, the Litigation Administrator reserves their rights to file an objection or take any other such action with respect to such Participating Claims in accordance with the Bankruptcy Code, Bankruptcy Rules, or Local Rules.

(b)    If a Third Party Participant rejects any liability relating to a Participating Claim, the Third Party Participant shall no longer participate in the ADR Procedures for such Participating Claim. If the Litigation Administrator does not reject the Participating Claim, however, the Litigation Administrator, the Participating Claimant, and any remaining Third Party Participants may proceed with the ADR Procedures without the rejecting Third Party Participant.

### 4.5.    **Initiation of the Mediation Procedure.**

If the ADR Procedures have not been terminated in accordance with Section 4.4 hereof, the Litigation Administrator shall have fifteen (15) days from the Settlement Offer Period

---

[46] Under no circumstances may the Participating Claimant and the Third Party Participant enter into a settlement agreement involving the Litigation Administrator causes of action against the Third Party Participant without the written consent of the Litigation Administrator.

Closing to initiate the Mediation Procedure by notifying the Participating Claimant and any Third Party Participants that such Parties have ~~seven~~fifteen (~~7~~15) days from service of such notice to select an Approved ADR Organization<u>7</u> and notify the Litigation Administrator of such appointment (the "**Mediation Notice**").  The Litigation Administrator shall include a current copy of the list of Approved ADR Organizations in the Mediation Notice.

**ARTICLE V.**

**MEDIATION PROCEDURE**

Upon consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participants, if any, may be referred to mediation at any time after entry of these ADR Procedures.  Unless the Parties agree otherwise and absent prior written agreement, if there is no Third Party Participant, the Litigation Administrator and the Participating Claimant shall each be responsible for fifty (50%) percent of the applicable mediation costs.[58]  Unless the Parties agree otherwise and absent prior written agreement, if one or more Third Parties are participating, the Litigation Administrator, the Participating Claimant and the Third Party Participants shall divide the costs and fees of the mediator evenly among them.  The Litigation Administrator, the Participating Claimant and the Third Party Participants shall make appropriate arrangements with the mediator for the payment of the mediator's estimated fees and costs.  The Litigation Administrator's share of any costs and fees shall be paid in the ordinary course of the Litigation Administrator's business.

    5.1.    **Appointment of a Mediator.**

Upon the Litigation Administrator's service of the Mediation Notice, the Litigation Administrator, the Participating Claimant and any Third Party Participants shall make a good faith effort to identify a mutually agreeable ADR Organization from the list of Approved ADR Organizations.  ~~If after seven (7~~<u>For the avoidance of doubt, except as set forth in Section 5.2, no Party may refuse to use any listed Approved ADR Organization.  If after fifteen (15</u>) days from the service of the Mediation Notice an Approved ADR Organization has not been selected, the Litigation Administrator shall have the right to select any Approved ADR Organization.  Promptly after the Approved ADR Organization has been selected, the Litigation Administrator shall notify the Appointed ADR Organization of its selection and refer the matter to the Appointed ADR Organization for mediation.  Thereafter, the Parties and the Approved ADR Organization shall work in good faith to select the individual mediator at the Approved ADR Organization.

---

[7]

[58] Mediation Costs include only those costs and fees associated with retaining a mediator.  The Litigation Administrator shall not be responsible for any of the Participating Claimants' costs or any Third Party Participants' costs associated with the mediation, if any, or any attorneys' fees other than the Litigation Administrator's attorneys' fees.

16

5.2.   **ADR Organization Procedures.**

Upon referral of the Participating Claim to mediation, the Appointed ADR Organization shall (i) follow its procedures with respect to the appointment of a mediator who resides in, or is familiar with the law of, the state or other relevant jurisdiction governing the Participating Claim, and (ii) provide notice to the Litigation Administrator, Participating Claimant, and Third Party Participants, if any, of such appointment.   The mediation shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party.   Regardless of any rules or procedures of the Appointed ADR Organization to the contrary, (i) no person shall serve as a mediator unless he or she has been trained in mediation in a recognized program such as those of the American Arbitration Association or has equivalent practical experience in the field of mediation or is otherwise agreeable to the Parties, (ii) any person who serves as a mediator shall be an impartial, neutral person, (iii) no person shall serve as a mediator if he or she has any financial or personal interest in the proceedings or, except where otherwise agreed by the Parties, in any related matters, and (iv) upon appointment, the respective mediator shall disclose any circumstances likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties.   If the respective mediator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such mediator and another mediator will be chosen in a manner consistent with the ADR Procedures.   A person serving as a mediator shall not testify as a witness or be subject to any discovery in any subsequent proceeding concerning the same or any other Participating Claim.

5.3.   **Conducting the Mediation.**

Mediation of Participating Claims shall be handled by the Appointed ADR Organization in the order received to the extent practicable.   Any Party may be represented by legal counsel, although the participation of legal counsel shall not be required for the conduct of the mediation. The mediator shall meet with the Parties or their respective legal representatives, individually and jointly for a conference or series of conferences as determined by the mediator. The Participating Claimant, the Litigation Administrator, and Third Party Participants, if any, or their respective authorized representatives, must be present at the conference.   The mediator may review the Participating Claim and/or Cause of Action, the positions of the Parties, the prior negotiations between the Parties, all correspondence between the Parties during the Settlement Offer Period, and such additional information as the Parties may wish to submit, to aid a fair and equitable settlement.   At least seven (7) days prior to the mediation conference, the Parties shall each submit to the mediator a concise confidential statement outlining each party's position on settlement value, which shall not be shared with the other Parties to the mediation and shall be deemed to be privileged as compromise and settlement negotiations pursuant to Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.   The mediator may, without court order, modify any or all of the procedures related to written submissions.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

17

5.4.     **Conclusion of Mediation/Mediated Settlement.**

The mediator will work with the Parties toward reaching an acceptable, reasonable offer of settlement.  The mediator shall not have the authority to impose a settlement upon the Parties. The Parties shall make reasonable efforts to commence mediation within thirty (30) days after appointment of a mediator.  Unless otherwise agreed by the Parties, the mediation process will terminate not later than six (6) months after the date of referral to the Appointed ADR Organization.  If the Parties do not agree to extend the mediation process or otherwise resolve the Participating Claim or Cause of Action, and all participating Parties have ~~rejected the option~~not agreed in writing (email being sufficient) to participate in binding arbitration, the ADR Procedures shall automatically terminate, and the Participating Claim (if any) shall become a Disputed Claim and be treated in accordance with the Plan.  All settlement methods available during the Settlement Offer Exchange Period as described above in Section 5.3 shall be available during mediation.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

## ARTICLE VI.

## OPTIONAL BINDING ARBITRATION PROCEDURE

Upon written consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim may be referred to binding arbitration at any time after entry of these ADR Procedures.  Unless the Parties agree otherwise, the Participating Claimant, the Litigation Administrator and the Third Party Participants shall divide the costs of binding arbitration evenly among them.   The Participating Claimant, the Litigation Administrator, and Third Party Participants shall make appropriate arrangements with the Appointed ADR Organization for direct payment of their portions of the estimated costs.

6.1.     **Consent of the Parties.**

Any Party may request in writing that the others consent to the Optional Binding Arbitration Procedure, which request shall also be consented to by the requesting Party; *provided* that such a request shall be deemed rejected if the other Parties do not accept such request within ten (10) days.  Such request shall include consent to appoint one or more of the Approved ADR Organizations as the Appointed ADR Organization.  In the event all Parties consent to binding arbitration, and selection of the Appointed ADR Organization, the Litigation Administrator shall refer the Participating Claim, and their related causes of action against the Participating Claimant and any Third Party Participants, to the Appointed ADR Organization within seven (7) days of such consent.  Thereafter, the Parties and the Approved ADR Organization shall work in good faith to select the individual arbitrator at the Approved ADR Organization within thirty (30) days after the referral to arbitration.  Such proceedings shall be commenced, to the extent practicable, within thirty (30) days after the date the arbitrator is appointed.  The arbitration shall be

conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party.

### 6.2. **Appointment of Arbitrators.**

All arbitration proceedings shall be administered by one of the Approved ADR Organizations. Arbitrators shall be appointed to particular matters by the Appointed ADR Organization pursuant to its rules and procedures, provided however, that (i) any person who serves as an arbitrator shall be an impartial, neutral person, (ii) no person shall serve as an arbitrator if he/she has any financial or personal interest in the proceedings or, except when otherwise agreed by the Parties, in any related matters, and (iii) upon accepting an appointment, the respective arbitrator shall disclose any circumstance likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties. If the respective arbitrator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such arbitrator, and another arbitrator will be chosen in a manner consistent with the ADR Procedures.

### 6.3. **Applicable Law and Procedure.**

The arbitration shall be conducted in accordance with applicable law, which shall be presumed to be the Federal Arbitration Act, Title 9, United States Code, unless the Bankruptcy Court determines on motion of any Party that another jurisdiction's law relating to arbitration should govern the proceeding. The arbitration shall be conducted pursuant to the applicable rules and procedures of the American Arbitration Association, or of the corresponding provisions of the Appointed ADR Organization's rules and procedures, if another organization is selected.

### 6.4. **Arbitration Administrative Expenses.**

The Litigation Administrator's share of any costs and arbitration fees shall be paid in the ordinary course of the Litigation Administrator's business; *provided*, *however*, that the arbitrator shall in his or her sole discretion assess fees and costs against any Party for delaying or abusing the arbitration procedures set forth herein to the extent so provided in the applicable organization's applicable rules.

### 6.5. **Arbitration Award.**

The amount of the award shall be within the discretion of the arbitrator; *provided* that the arbitrator may not award the Participating Claimant a claim in excess of the amount of the Participating Claimant's claim as set forth in the Participating Claimant's proof of claim or, if not liquated therein, in the Participating Claimant's Valuation Form. The Arbitrator shall specify if any awarded claim, or any portion thereof, is to be treated as a Liquidated Allowed Claim or Third Party Payable Claim. No Party shall have the right to appeal an arbitration award except on the grounds set forth in Section 10 of the Federal Arbitration Act. The reference to Local Rule 9019-1 and specifically Section 9(B)(1) of the *Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings* are not applicable, and there shall be no right to a trial *de novo*. Any award shall be subject to further oversight by the Bankruptcy Court pursuant to the Plan, including any distribution of proceeds. Under no circumstances may any Participating

Claimant seek to enforce any arbitration award against the Litigation Administrator without further order of the Bankruptcy Court.

## ARTICLE VII.

## CLAIM SATISFACTION PROCEDURE

All settled Participating Claims will result in the Participating Claimant receiving an Allowed Claim (and not a judgment against the Debtors or the Litigation Administrator) to the extent such Participating Claimant holds a Disputed Claim against the Estate or payment of an amount to the Post-Effective Date Debtors to be distributed to Holders of Claims entitled to receive Litigation Proceeds.  Each Allowed Claim shall be treated in accordance with the Plan.[69]

## ARTICLE VIII.

## Retention of Jurisdiction

The Bankruptcy Court shall have sole and exclusive jurisdiction to resolve any dispute arising from the interpretation, and enforcement of, the ADR Procedures.

---

[69] Nothing herein shall modify or enhance, in any way, the Litigation Administrator's general duty to maximize the value of the estate or require the Litigation Administrator to prosecute potential causes of action against Third Parties if they do not believe it to be in the best interests of the estate.

161180480v1

## **Exhibit K**

**Schedule of Retained Causes of Action**

## Schedule of Retained Causes of Action

Article IV.M of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3222] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**")[1] provides that: "each Post-Effective Date Debtor shall retain [and] may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. **The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u> of the Plan;** *provided that*, **notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.**"

Article IV.M of the Plan further provides that: "**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**"

Without limiting the generality of Article IV.M of the Plan, the Debtors identify the following types of Causes of Action that are expressly preserved by the Debtors and the Post-Effective Date Debtors after the Effective Date, solely to the extent such Causes of Action are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Court.

The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this Schedule of Retained Causes of Action at any time with additional Retained Causes of Action. Failure to include any Retained Cause of Action herein at any time shall not be a bar and shall not have any impact on the Post-Effective Date Debtors' and Litigation Administrators' rights to bring any Retained Cause of Action not otherwise released pursuant to the Plan.

## I.    Claims Against Third-Parties

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against all Persons or Entities that are not Released Parties, including Causes of Action that are (a) listed on <u>Schedule 1</u> attached hereto; (b) based upon any contract or quasi-contract theory of liability or recovery; (c) based upon any tort theory of liability or recovery, including, without limitation, tortious interference with existing contracts, tortious interference with contractual or business relations, conversion, theft, embezzlement, conspiracy, unfair competition, misappropriation of trade secrets, self-dealing, fraud, negligence, gross negligence, willful

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

misconduct, breach of warranty, misappropriation, or misrepresentation; (d) based upon any other legal or equitable theory of liability or recovery arising under federal, state, or other statutory or common law or otherwise, including, without limitation, breach of fiduciary duty, breach of the duty of care, breach of the duty of good faith and fair dealing, breach of the duty of loyalty, breach of the duty of candor, breach of the duty of oversight, or breach of any other duty, or aiding and abetting any such breaches of duty; (e) arising under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (f) for avoidance, fraudulent transfer, and similar Causes of Action pursuant to the Bankruptcy Code, state or other federal statutes, or common law; (g) for recharacterization, subordination, or disallowance of any Claim, or for setoff, counterclaim, recoupment; (h) actions or inaction taken to affect the price or other matters related the CEL token; (i) arising from or relating to the failure to properly oversee and govern the Debtors' operations and finances, operational mismanagement, expenditures of company funds for personal use (including, but not limited to, self-dealing, kickbacks, and embezzlement), theft of company or customer property, improper and excessive compensation, improper and excessive benefits, improper dealings with companies owned or controlled by the Debtors' former equity holders (direct or indirect), officers, directors, members, managers, employees or agents, financial and accounting mismanagement and/or impropriety, or violations of employment agreements, company agreements, or other company policies; or (j) those claims and causes of action identified in the Complaint attached to the *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

## II.   Contributed Claims

The Debtors and the Post-Effective Date Debtors expressly reserve all Contributed Claims, subject to the procedures identified in Articles IV.G and IV.O of the Plan and the ballots, which such Contributed Claims shall have been irrevocably contributed to the Post-Effective Date Debtors.

## III.   Promoter Claims

Unless otherwise specifically released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against public promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' account holders, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' platform or services.

## IV.   Claims Against Professional Persons

Unless they are Released Parties or otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against any outside attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## V.    Avoidance Actions

Unless otherwise released by the Plan, including pursuant to the Account Holder Avoidance Action Settlement, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors, the Post-Effective Date Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553 of the Bankruptcy Code, and section 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer laws.  For the avoidance of doubt, all avoidance actions against entities that are not Account Holders or avoidance actions against Account Holders who are not acting in their capacity as Account Holders (*e.g.* as a lender) are not released and expressly preserved under the Plan irrespective of whether such entity is a Releasing Party as such term is defined in the Plan.

## VI.    Claims Related to Insurance Policies

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## VII.    Claims Related to Tax Refunds

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Post-Effective Date Debtors, regardless of whether such entity is specifically identified herein.

## VIII.    Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, any claims against the

Excluded Parties or any directors, officers, employees, managers, investment committee members, executive committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with the Excluded Parties, or any of their respective Related Parties.

## IX.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all vendors, suppliers of goods and services, or similar Entities that owe or that may in the future owe money to the Debtors or Post-Effective Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.

## X.    Claims Related to Contracts and Leases

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are rejected by the Debtors, assumed pursuant to the Plan, or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**Schedule 1**

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Akshay Nayak | - | - | Current judgment entered against CNL in UK |
| Celsius Network Limited | Alexander Christy | *Celsius Network Limited v. Equities First Holdings, LLC and Alexander Christy* Adversary Proceeding No. 23−01167 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract, commercial loan default action, failure to return collateral, bad faith |
| Celsius Network Limited | Amber Technologies Limited | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | BadgerDAO and Cloudflare, Inc. | - | - | Gross negligence regarding security of Badger platform |
| Celsius Network Limited | Bancor | - | - | Damages claim |
| Celsius Network Limited | B-Brick, Inc. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Beowulf Energy LLC | - | - | Breach of contract, negligence, turnover, and related claims arising from hosting agreements |
| Celsius Network Limited | Blockchain Access UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Core Scientific Inc. | *In re Core Scientific, et al.*, Case No. 22-90341 (DRJ) | U.S. Bankruptcy Court for the Southern District of Texas | Breach of contract, intentional misconduct Proofs of Claim Nos. 379, 425, 428, 434, 436, 439, 469, 494–497, 526 |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Equities First Holdings, LLC | *Celsius Network Limited v. Equities First Holdings, LLC and Alexander Christy* Adversary Proceeding No. 23−01167 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract, commercial loan default action, failure to return collateral, bad faith |
| Celsius Network Limited | EZ Blockchain Services, LLC | - | - | Breach of contract, turnover |
| Celsius Network Limited | Fabric Ventures Group SARL | *Celsius Network Limited v. Fabric Ventures Group SARL,* Case No. 22-10964 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract |
| Celsius Network Limited | Fireblocks Inc. | - | - | Negligence, breach of contract |
| Celsius Network Limited | FTX Trading Ltd. | *In re FTX Trading Ltd.,* Case No. 22-11068 (JD) | U.S. Bankruptcy Court for the District of Delaware | Proofs of Claim Nos. 3752, 3938 |
| Celsius Network Limited | HDR Global Trading Limited t/a BitMEX | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Into the Block Corp | - | - | Gross negligence |
| Celsius Network Limited | Iterative OTC, LLC | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Jason Stone and KeyFi Inc | *Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.,* Case No. 22-01139 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Conversion, breach of contract, breach of fiduciary duties, turnover |
| Celsius Network Limited | Liquidity Technologies Ltd. t/a CoinFLEX | - | - | Breach of contract, commercial loan default action |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Mambu Tech B.V. | - | - | Breach of contract, fraudulent inducement |
| Celsius Mining LLC<br>Celsius US Holding LLC (holder of note) | Mawson Infrastructure Group Inc.<br>Luna Squares LLC<br>Cosmos Infrastructure LLC | - | - | Breach of contract, bad faith, willful misconduct |
| Celsius Mining LLC | Nektar ACS Corp. | - | - | Breach of contract |
| Celsius Network Limited | Profluent Trading UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Reliz Limited | - | - | Breach of contract, commercial loan default action<br>Collection of arbitration award in favor of Celsius |
| Celsius Mining LLC | Rhodium Enterprises, Inc. | - | - | Breach of SAFE note |
| Celsius Mining LLC | Sabre56 Corp. | - | - | Breach of contract |
| Celsius Network Limited | StakeHound SA | *Celsius Network Ltd. v. StakeHound SA*, Case No. 23-01138 (mg) | U.S. Bankruptcy Court for the Southern District of New York | Violation of the automatic stay, turnover, breach of contract, gross negligence |
| Celsius Network Limited | Tether International Ltd. | - | - | Breach of contract, liquidation of collateral at an improper discount to market |
| Celsius Network Limited | Three Arrows Capital | *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Loan default, insolvency proceeding |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited<br><br>Celsius Network LLC | Voyager Digital Holdings, Inc. | *In re Voyager Digital Holdings, Inc.*,<br><br>Case No. 22-10943 (MEW) | U.S. Bankruptcy Court for the Southern District of New York | Prepetition preferential transfers and related claims |
| Celsius Network Limited | Wintermute Trading Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network LLC | Bradley Condit | *Bradley Condit v. Celsius Network LLC & Yaron Shalem*,<br><br>Case No. 22-cv-05452 (CS) | U.S. District Court for the Southern District of New York | Wrongful termination |
| Celsius Network LLC | Walter Johnson | - | - | Wrongful termination |

## Exhibit K-1

**(Redline) Schedule of Retained Causes of Action**

## Exhibit A

## Schedule of Retained Causes of Action

Article IV.M of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3222] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**")[1] provides that: "each Post-Effective Date Debtor shall retain [and] may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. **The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in** Article VIII **of the Plan;** *provided that***, notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.**"

Article IV.M of the Plan further provides that: "**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**"

Without limiting the generality of Article IV.M of the Plan, the Debtors identify the following types of Causes of Action that are expressly preserved by the Debtors and the Post-Effective Date Debtors after the Effective Date, solely to the extent such Causes of Action are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Court.

The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this Schedule of Retained Causes of Action at any time with additional Retained Causes of Action. Failure to include any Retained Cause of Action herein at any time shall not be a bar and shall not have any impact on the Post-Effective Date Debtors' and Litigation Administrators' rights to bring any Retained Cause of Action not otherwise released pursuant to the Plan.

## I.    Claims Against Third-Parties

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against all Persons or Entities that are not Released Parties, including Causes of Action that are (a) listed on Schedule 1 attached hereto; (b) based upon any contract or quasi-contract theory of liability or recovery; (c) based upon any tort theory of liability or recovery, including, without limitation, tortious interference with existing contracts, tortious interference with contractual or

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

business relations, conversion, theft, embezzlement, conspiracy, unfair competition, misappropriation of trade secrets, self-dealing, fraud, negligence, gross negligence, willful misconduct, breach of warranty, misappropriation, or misrepresentation; (d) based upon any other legal or equitable theory of liability or recovery arising under federal, state, or other statutory or common law or otherwise, including, without limitation, breach of fiduciary duty, breach of the duty of care, breach of the duty of good faith and fair dealing, breach of the duty of loyalty, breach of the duty of candor, breach of the duty of oversight, or breach of any other duty, or aiding and abetting any such breaches of duty; (e) arising under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (f) for avoidance, fraudulent transfer, and similar Causes of Action pursuant to the Bankruptcy Code, state or other federal statutes, or common law; (g) for recharacterization, subordination, or disallowance of any Claim, or for setoff, counterclaim, recoupment; (h) actions or inaction taken to affect the price or other matters related the CEL token;  (i) arising from or relating to the failure to properly oversee and govern the Debtors' operations and finances, operational mismanagement, expenditures of company funds for personal use (including, but not limited to, self-dealing, kickbacks, and embezzlement), theft of company or customer property, improper and excessive compensation, improper and excessive benefits, improper dealings with companies owned or controlled by the Debtors' former equity holders (direct or indirect), officers, directors, members, managers, employees or agents, financial and accounting mismanagement and/or impropriety, or violations of employment agreements, company agreements, or other company policies; or (j) those claims and causes of action identified in the Complaint attached to the *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

## II.    Contributed Claims

The Debtors and the Post-Effective Date Debtors expressly reserve all Contributed Claims, subject to the procedures identified in Articles IV.G and IV.O of the Plan and the ballots, which such Contributed Claims shall have been irrevocably contributed to the Post-Effective Date Debtors.

## III.    Promoter Claims

Unless otherwise specifically released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against public promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' account holders, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' platform or services.

## IV.    Claims Against Professional Persons

Unless they are Released Parties or otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against any outside attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud,

misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## V.     Avoidance Actions

Unless otherwise released by the Plan, including pursuant to the Account Holder Avoidance Action Settlement, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors, the Post-Effective Date Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553 of the Bankruptcy Code, and section 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer laws.  For the avoidance of doubt, all avoidance actions against entities that are not Account Holders or avoidance actions against Account Holders who are not acting in their capacity as Account Holders (*e.g.* as a lender) are not released and expressly preserved under the Plan irrespective of whether such entity is a Releasing Party as such term is defined in the Plan.

## VI.    Claims Related to Insurance Policies

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## VII.   Claims Related to Tax Refunds

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Post-Effective Date Debtors, regardless of whether such entity is specifically identified herein.

## VIII.  Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases or any other type of

adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, any claims against the Excluded Parties or any directors, officers, employees, managers, investment committee members, executive committee members,  equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with the Excluded Parties, or any of their respective Related Parties.

## IX.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all vendors, suppliers of goods and services, or similar Entities that owe or that may in the future owe money to the Debtors or Post-Effective Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.

## X.    Claims Related to Contracts and Leases

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are rejected by the Debtors, assumed pursuant to the Plan, or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and

defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**Schedule 1**

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Akshay Nayak | - | - | Current judgment entered against CNL in UK |
| Celsius Network Limited | Alexander Christy | *Celsius Network Limited v. Equites First Holdings, LLC and Alexander Christy* Adversary Proceeding No. 23−01167 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract, commercial loan default action, failure to return collateral, bad faith |
| Celsius Network Limited | Amber Technologies Limited | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | BadgerDAO and Cloudflare, Inc. | - | - | Gross negligence regarding security of Badger platform |
| Celsius Network Limited | Bancor | - | - | Damages claim |
| Celsius Network Limited | B-Brick, Inc. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Beowulf Energy LLC | - | - | Breach of contract, negligence, turnover, and related claims arising from hosting agreements |
| Celsius Network Limited | Blockchain Access UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Core Scientific Inc. | *In re Core Scientific, et al.*, Case No. 22-90341 (DRJ) | U.S. Bankruptcy Court for the Southern District of Texas | Breach of contract, intentional misconduct<br>Proofs of Claim Nos. 379, 425, 428, 434, 436, 439, 469, 494−497, 526 |
| Celsius Network | Equities First | *Celsius Network* | U.S. Bankruptcy | Breach of contract, |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|--------|-----------|-------------------------------|------------------|------------------|
| Limited | Holdings, LLC | *Limited v. Equities First Holdings, LLC and Alexander Christy* Adversary Proceeding No. 23−01167 (MG) | Court for the Southern District of New York | commercial loan default action, failure to return collateral, bad faith |
| Celsius Network Limited | EZ Blockchain Services, LLC | - | - | Breach of contract, turnover |
| Celsius Network Limited | Fabric Ventures Group SARL | *Celsius Network Limited v. Fabric Ventures Group SARL,* Case No. 22-10964 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Breach of contract |
| Celsius Network Limited | Fireblocks Inc. | - | - | Negligence, breach of contract |
| Celsius Network Limited | FTX Trading Ltd. | *In re FTX Trading Ltd.,* Case No. 22-11068 (JD) | U.S. Bankruptcy Court for the District of Delaware | Proofs of Claim Nos. 3752, 3938 |
| Celsius Network Limited | HDR Global Trading Limited t/a BitMEX | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Into the Block Corp | - | - | Gross negligence |
| Celsius Network Limited | Iterative OTC, LLC | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Jason Stone and KeyFi Inc | *Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.,* Case No. 22-01139 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Conversion, breach of contract, breach of fiduciary duties, turnover |
| Celsius Network Limited | Liquidity Technologies Ltd. t/a CoinFLEX | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Mambu Tech B.V. | - | - | Breach of contract, fraudulent |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| | | | | inducement |
| Celsius Mining LLC<br><br>Celsius US Holding LLC (holder of note) | Mawson Infrastructure Group Inc.<br><br>Luna Squares LLC<br><br>Cosmos Infrastructure LLC | - | - | Breach of contract, bad faith, willful misconduct |
| Celsius Mining LLC | Nektar ACS Corp. | - | - | Breach of contract |
| Celsius Network Limited | Profluent Trading UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Reliz Limited | - | - | Breach of contract, commercial loan default action<br><br>Collection of arbitration award in favor of Celsius |
| Celsius Mining LLC | Rhodium Enterprises, Inc. | - | - | Breach of SAFE note |
| Celsius Mining LLC | Sabre56 Corp. | - | - | Breach of contract |
| Celsius Network Limited | StakeHound SA | *Celsius Network Ltd. v. StakeHound SA*, Case No. 23-01138 (mg) | U.S. Bankruptcy Court for the Southern District of New York | Violation of the automatic stay, turnover, breach of contract, gross negligence |
| Celsius Network Limited | Tether International Ltd. | - | - | Breach of contract, liquidation of collateral at an improper discount to market |
| Celsius Network Limited | Three Arrows Capital | *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Loan default, insolvency proceeding |
| Celsius Network Limited<br><br>Celsius Network | Voyager Digital Holdings, Inc. | *In re Voyager Digital Holdings, Inc.*, | U.S. Bankruptcy Court for the Southern District | Prepetition preferential transfers and related |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| LLC | | Case No. 22-10943 (MEW) | of New York | claims |
| Celsius Network Limited | Wintermute Trading Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network LLC | Bradley Condit | *Bradley Condit v. Celsius Network LLC & Yaron Shalem*, Case No. 22-cv-05452 (CS) | U.S. District Court for the Southern District of New York | Wrongful termination |
| Celsius Network LLC | Walter Johnson | - | - | Wrongful termination |