Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) |
|  | ) Case No. 22-10964 (MG) |
| Debtors. | ) |
|  | ) (Jointly Administered) |

**THE DEBTORS' *EX PARTE* MOTION FOR AN ORDER**
**UNDER FEDERAL RULES OF BANKRUPTCY PROCEDURE**
**2004 AND 9016 FOR SUBPOENAS FOR EXAMINATION OF,**
**AND PRODUCTION OF DOCUMENTS FROM, MONTANA OP LLC**

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), by and through their counsel, hereby submit this motion for the entry of an order pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); Rule 26.3 of the Local Rules of United States District Courts of the Southern and Eastern Districts of New York, made applicable to this matter by Rule 2004-1 of the Local Bankruptcy Rules for the Southern District of New York; and Federal Rule of Civil Procedure ("<u>Federal Rule</u>") 45, made applicable to this matter by Bankruptcy Rule 9016, authorizing, among other things, subpoenas for the examination of, and the production of documents from, Montana OP LLC ("<u>Montana</u>"). The Debtors respectfully represent as follows:

## **Preliminary Statement**

1.      Celsius Mining LLC ("<u>Celsius</u>") and Montana are parties to an agreement, effective April 1, 2023, under which Montana must host Celsius's Bitcoin mining equipment at Montana's cryptocurrency mining datacenter and power generation plant (the "<u>Agreement</u>").[2]  As a part of that Agreement, Montana is obligated to provide A/C power and internet access at 100mbps to Celsius's serving power distribution units ("<u>PDUs</u>"), among other requirements.  The Agreement also permits Montana to curtail power and instead sell that power on the market, provided that if Montana does so, it must split the sale profits with Celsius.

2.      The current dispute, among others, centers around Montana's failure to provide critical information that would enable Celsius to definitively determine whether Montana has breached its contractual obligations to provide the power and internet required by the parties' Agreement, and therefore whether Celsius may pursue claims against Montana for breaching the Agreement or exercise Celsius's right to terminate the Agreement.  In addition, Montana has

---

[2] The Agreement is attached hereto as **Exhibit A**.

continuously charged Celsius for costs that Celsius believes that the Agreement requires Celsius—not Montana—to bear, including charging Celsius for periods when Celsius's miners are not operating.  Based on the data available to Celsius, it appears that Montana has fallen far short of its contractual obligations and is in breach of the Agreement.

3.      To avoid formal discovery, Celsius has repeatedly asked Montana for information that would allow Celsius to assess whether Montana has met its contractual obligations.  Montana has refused to provide this information.  The Debtors are therefore forced to bring this motion to compel discovery of crucial information regarding whether Montana has met its obligations, including whether Montana has been providing the requisite power and internet to Celsius's serving PDUs, and whether Montana has been appropriately charging Celsius under the Agreement.

## **Relief Requested**

4.      Pursuant to Bankruptcy Rule 2004, the Debtors hereby move the Court for entry of an order (i) directing Montana to produce to the Debtors the documents described in **Exhibit C** to this motion (the "Request for Production of Documents") within five days from the date of service or at such other time as counsel may agree and (ii) ordering a corporate deposition of Montana, as described in **Exhibit D**, within five days after the deadline for the substantial completion of document production, or at such other time as counsel may agree.  Montana is charged with the duty to supplement its answers to the Request for Production of Documents if it later learns that such answers are in some respect incomplete or incorrect.  The Debtors also respectfully request that the Court enter an order pursuant to Bankruptcy Rule 2004, substantially in the form of the proposed order attached hereto as **Exhibit E**, authorizing the Debtors to serve the Request for Production of Documents.

**Jurisdiction and Venue**

5.      The United States Bankruptcy Court for the Southern District of New York (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the Southern District of

New York, entered February 1, 2012.  The Debtors confirm their consent to the Court entering a

final order in connection with this motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are Section 105(a) of title 11 of

the United States Code, 11 U.S.C. §§ 101 et seq., (the "Bankruptcy Code") and Bankruptcy Rules

2004 and 9016.

**Factual Background**

8.      Celsius and Montana entered into the Agreement, effective April 1, 2023, under

which Montana agreed to host, operate, and manage Celsius's Bitcoin mining equipment at

Montana's cryptocurrency mining datacenter and power generation plant located in Hardin,

Montana.  Under the Agreement, Montana must provide Celsius with 45 MW of power each

month, representing 50% of Hardin's 90 MW capacity.  As a part of the agreement, Montana

promised to "ma[ke] available" "A/C power to the outbound port on Customer's serving power

distribution unit (PDU) and internet access at 100mbps . . . [for] 95 % of the time in a calendar

year," subject to certain limitations, including limited permitted curtailment events and actual

preventative maintenance.  Agreement § 2.2.3(iv).  The Agreement further provides that, in the

event that either of the parties should decide to curtail power, Celsius and Montana will "split the revenue from the energy sales." *Id.* § 4.8; *see also id.* § 2.4.

9.      Based on the information currently available to Celsius, it appears that Montana shirked its contractual obligations from the start and has refused to provide Celsius with information that Celsius needs in order to assess the full extent of Montana's apparent breaches.

10.      ***First***, based on the information that Montana has made available to Celsius, Montana has breached Section 2.2.3(iv) by failing to provide "A/C power to the outbound port on [Celsius's] serving [PDUs]" for "95 % of the time in a calendar year[.]" *Id.* § 2.2.3(iv). Excluding downtime for actual preventative maintenance, Celsius believes that Montana has failed to provide A/C power for at least 893 hours, as of September 5. Under Celsius's calculations, due to Montana's persistent failure to provide A/C power, Celsius calculates that it is now mathematically impossible for Montana to meet its contractual 95% threshold.

11.      ***Second***, based on the information available to Celsius, Montana has prospectively breached Section 2.2.3(iv) by telling Celsius that the Hardin facility will be down for preventative maintenance for longer than the Agreement permits. The Agreement limits "downtime for actual preventative maintenance of the Facility" to "four (4) weeks of downtime a year" (*i.e.*, twenty-eight days). *Id.* § 2.2.3(iv). By Celsius's calculations, the Hardin facility has already been down for preventative maintenance for twenty-four days, and Montana has told Celsius that facility will be down an additional two weeks for preventative maintenance in October.

12.      ***Third***, starting with the first invoice—and continuing every month thereafter—Montana has been charging Celsius for greater than allowed costs. The Agreement provides that Celsius's share of the expenses is "limited to [Celsius's] allocated share of usage of the Facility and only includes those periods of time when [Celsius's] mining equipment is operational." *See*

*id.*, Schedule A.  Despite this, Montana has persistently charged Celsius for costs that exceed Celsius's share of the 90 MW capacity of the Hardin facility, by (i) calculating April through August costs, expenses, and taxes based on the variable actual MW output of the Hardin facility—which may vary from month to-month depending on Montana's other customers and uptime percentages—instead of based on Celsius's "allocated share of usage" of the total 90 MW capacity of the Hardin facility, and (ii) charging Celsius for costs, expenses, and taxes during periods when Celsius's miners are offline.  *See id*.  As a result, it appears that Montana is continuously and impermissibly passing onto Celsius costs exceeding what the Agreement permits.

13.     Rather than remediating its breaches, Montana has denied all of them without adequate explanation, and has refused to provide Celsius with necessary information to understand Montana's positions, or to assess definitively which provisions Montana has breached.

14.     In particular, Montana has claimed that it has met its obligation to provide A/C power to Celsius's serving PDUs, claiming that "the 95% rate could well be met or exceeded," that Celsius's calculation "appears to be determined by reference to hours Mining Units were in service, rather than hours A/C power was made available to the PDU's outbound port," and that "A/C power was made available to the PDU at an uptime rate of 92%, accounting for permitted downtime allowance."  *See* **Exhibit B**, Aug. 24, 2023 Montana Ltr.  Montana has also disclaimed its prospective breach of the four-week downtime limit, *see* **Exhibit B**, Aug. 17, 2023 Montana Ltr., and has asserted—without adequate justification—that it has not charged Celsius for costs that the Agreement does not require Celsius to pay, *see, e.g., id*.

15.     Celsius has repeatedly attempted to resolve these disputes with Montana without judicial intervention.  In addition to informal communications between Celsius and Montana, on June 30, July 25, August 18, and September 1, 2023, Celsius sent formal notices to Montana

notifying Montana of its breaches and requesting that Montana resolve them.  *See* **Exhibit B**.  Most recently, in Celsius's September 1 letter, Celsius requested that Montana provide details regarding the number of hours that Montana has made A/C power and internet access at 100mbps available to Celsius's serving PDUs and the number of hours of permitted downtime that have occurred since the effective date of the Agreement.  *See* **Exhibit B**, Sept. 1, 2023 Celsius Ltr.

16.    To date, Montana has refused to provide Celsius with details about how Montana has calculated its downtime metrics or invoices.

17.    Therefore, Montana has left Celsius with no choice but to seek this Court's intervention to obtain critical information that Celsius requires in order to determine whether Montana has breached the Agreement.

## Requested Examination

18.    To maximize the value of the estate for all creditors, the Debtors seek to examine materials in connection with Montana's hosting services.  The requested examination will permit the Debtors to evaluate whether Montana is in breach of its contractual obligations and, therefore, whether Celsius has claims against Montana or a basis to terminate the Agreement.  Celsius has attempted to obtain information from Montana regarding these issues but has been unsuccessful.

19.    The discovery that the Debtors seek is narrowly tailored to the critical information about Montana's provision of services under the Agreement.  The requested information should be readily available to Montana, given that the information pertains to the property of Montana.

20.    To facilitate the necessary discovery, the Debtors respectfully request that the Court enter the proposed order granting their motion and requiring Montana to produce documents responsive to the requests, contained in **Exhibit C**, and requiring a corporate deposition of Montana, contained in **Exhibit D**.

**Basis for Relief**

21.    Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). The purposes of Rule 2004 discovery are to assist with "determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see also St. Clair v. Cadles of Grassy Meadows II, LLC*, 550 B.R. 655, 659 (E.D.N.Y. 2016) ("The purpose of a Rule 2004 examination is to allow the court to gain a clear picture of the condition and whereabouts of the bankrupt's estate.") (internal quotations omitted). Rule 2004 is a key "pre-litigation device" for assessing potential claims in connection with the bankruptcy estate, *In re Corso*, 328 B.R. 375, 383 (E.D.N.Y. 2005), and permits the examination without the requirement of an adversary proceeding, *In re Recoton Corp.*, 307 B.R. at 755.

22.    In light of Rule 2004's purpose of facilitating the proper administration of the bankruptcy estate, "a third party who has a relationship with the debtor may be subject to a Rule 2004 examination in order to aid in discovery of assets." *See In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002). Montana so qualifies because Montana is a party to an agreement with Celsius. The Debtors may properly bring this motion because they are parties in interest. *See In re Washington Mut., Inc.*, 408 B.R. 45, 53 (Bankr. D. Del. 2009) (granting the debtors' Rule 2004 motion).

23.    Bankruptcy Rule 2004 authorizes a broad scope of examination that includes both document production and testimony related to the "property" of a debtor. Fed. R. Bankr. P. 2004(b)-(c). The permissible scope of a Rule 2004 examination is "unfettered and broad." *In re Washington Mut., Inc.*, 408 B.R. at 49 (internal quotations omitted); *see also In re Hughes*,

281 B.R. at 226.  Notably, "[t]he scope of examination permitted pursuant to Rule 2004 is wider

than that allowed under the Federal Rules of Civil Procedure."  *St. Clair*, 550 B.R. at 668; *see also*

*In re Corso*, 328 B.R. at 383.

24.     Rule 2004 discovery is warranted when the movant has good cause for a Rule 2004

examination.  *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004).  Good cause exists when

"the examination is necessary to establish the claim of the party seeking the examination, or if the

denial of such request would cause the examiner undue hardship or injustice."  *Id.* at 268, 270.

The court may also "balanc[e] the competing interests of the parties, weighing the relevance of

and necessity for the information sought by the examiner against the extent of inconvenience and

intrusion to the witness."  *In re Kreiss*, 46 B.R. 164, 165 (Bankr. E.D.N.Y. 1985); *see also*

*In re Pub. Serv. Co. of New Hampshire*, 91 B.R. 198, 199 (Bankr. D.N.H. 1988).

25.     Rule 2004 discovery is appropriate here because the Debtors have good cause for a

Rule 2004 examination.  *See In re Metiom, Inc.*, 318 B.R. at 268.  The examination is necessary to

enable the Debtors to obtain key documents and information for evaluating whether Montana has

breached the Agreement, whether they have a claim against Montana related to the same that may

impact the bankruptcy estate, and whether Celsius may terminate the Agreement, and the evidence

that the Debtors have about Montana's performance under the Agreement is insufficient.  Montana

alone has key information and documents about its performance.  Because the Debtors have no

other way to obtain these documents and information, denial of this motion would impose undue

hardship on the Debtors and preclude them from assessing whether they have potential claims

against Montana or a basis to terminate the Agreement, which may materially affect recovery for

the secured and unsecured creditors.

26.     The Debtors anticipate that the initial request for production of documents and the corporate deposition set forth in **Exhibits C** and **D** hereto will need to be supplemented as the Debtors learn more facts, and therefore request that the Court impose a continuing obligation on Montana to respond to discovery requests and deposition notices made by the Debtors.

## Reservation of Rights

27.     Nothing contained in this motion or any actions taken pursuant to any order granting the relief requested by this motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

28.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Local Bankruptcy Rule 9013-1(a).

**Notice**

29.     The Debtors will provide notice of this motion to the following parties or their

respective counsel: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the holders of the 50

largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States

Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the

offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and

Exchange Commission; (h) Montana; and (i) any party that has requested notice pursuant to

Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no

other or further notice need be given.

**No Prior Request**

30.     No prior request for the relief sought in this motion has been made to this or any

other court.

WHEREFORE, the Debtors respectfully request that the Court enter the order granting the

relief requested herein and such other relief as the Court deems appropriate under the

circumstances.

New York, New York
Dated: September 11, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

-and

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 839-5200
Email:        jdbrown@kirkland.com
              tj.mccarrick@kirkland.com
              grace.brier@kirkland.com
              hannah.simson@kirkland.com
              joseph.dantonio@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Agreement**

DocuSign Envelope ID: CA79AFDF-6388-4820-A894-D436EE38D09A

*Execution Copy*

# HOSTING SERVICES AGREEMENT

This **HOSTING SERVICES AGREEMENT** (this "*Agreement*"), effective as of April 1, 2023 (the "*Effective Date*"), is entered into by and between Celsius Mining, a limited liability company organized under the laws of the State of Delaware ("*Customer*"), and MONTANA OP LLC, a limited liability company organized under the laws of the State of Delaware, ("*Service Provider*"; Customer and Service Provider each a "*Party*" and, collectively, the "*Parties*").

A.   Service Provider owns and operates a cryptocurrency mining datacenter and a power generation plant  located at 643 Industrial Park Road,  Hardin, Montana  59034 (the "*Facility*").

B.   Customer owns or has the contracted legal rights for certain equipment to mine ("*Mining Equipment*") for Bitcoin ("*BTC*").

C.   Customer desires (a) to have Customer's Mining Equipment delivered to Service Provider's Facility to generate computational power there and mine BTC on its behalf and (b) to have Service Provider host, operate and manage the Mining Equipment there in accordance with the terms and conditions of this Agreement set forth below.

D.   In exchange Service Provider agrees to (i) host, operate and manage Customer's Mining Equipment and (ii) any BTC mined by Customer's Mining Equipment (the "*Mining Output*") will be transferred to the Customer's designated Wallet in accordance with the terms and conditions of this Agreement.

E.   Service Provider agrees to provide Customer with a total utilizable energy capacity of 45MWs at the Facility to operate the miners. The energy capacity will be shared evenly over the Site.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

1.       MINING EQUIPMENT

1.1   *Miner Specifications*. Subject to the conditions set forth hereinbelow, Customer agrees to provide Service Provider with miners capable of hashing at 35 J/TH or better (e.g. Bitmain S19J Pro, Bitmain S19, Micro BT M30S, Micro BT M30S+ and Micro BT M30S++) with a specified energy utilization capacity of Forty-Five Megawatts (45 MWs) ("*Total Utilizable Capacity*") necessary to generate computational power at the Facility.  Customer is solely responsible for delivering all Mining Units and the equipment necessary to operate such Mining Units within the Service Provider's Facility, including hash boards, controller boards, case assembly, fans, power cords, and power units at its own cost and expense.

1.2   *Transfer of Mining Equipment*. Other than in connection with the repair or replacement of Mining Equipment, Customer shall not remove or transfer the Mining

DocuSign Envelope ID: CA79AEDF-6388-4820-A884-D413F5E38D0A

*Execution Copy*

Equipment from the Facility except in the event that BTC mining operations become unprofitable for a continuous period of 90 days and Increased Power Costs (as defined in Clause 4.10) are in effect.  Other than in connection with the repair or replacement of Mining Equipment, if Customer removes or transfers any Mining Equipment from the Facility, Customer forfeits any right or claim it may have to a share of the energy sales profits set forth in Section 4.10 below in respect of the portion of the capacity corresponding to the Mining Equipment removed.

2.    HOSTING SERVICES

2.1    *The Facility*. Service Provider shall provide the electric power infrastructure to operate at an energy utilization capacity of at least Forty-Five Megawatts (45 MWs). Thereafter, Service Provider shall provide hosting services that include data center infrastructure, internet connectivity and monitoring as well as physical security ("*Services*") for Customer's Mining Equipment at its Facility.

2.2    *Service Level.* Service Provider shall provide the Services to Customer in a professional and workmanlike manner consistent with the terms and conditions of this Agreement, industry standards and operating requirements of the Mining Equipment. The specific maintenance tasks and services shall include those provided below:

2.2.1    Power Infrastructure Management.

i)  Transformer management

ii)  General checks and maintenance of all breakers and breaker panels;

iii)  Coordination with transmission curtailment implementation strategy  with all technical stakeholders such as transmission provider and energy provider on all shut offs and re-energizations.

2.2.2    Network Infrastructure Management

i)  Maintain the network switches, connectivity, and all IP equipment to    ensure miner connectivity;

ii)  Maintain all Customer boards, PSUs, power cords and ethernet cords to be in good working order; and

iii)  Identify the miner username and it is correct IP range of network switches as well any gateway and subnet mask.

2.2.3    Miner Management

i)  Physical miner maintenance and interface with Facility;

ii) Coordination of all shipping and delivery;

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413F5E3B0D0

*Execution Copy*

iii)  Monitoring of hash board status and user adherence to user specifications;

iv)  A/C power to the outbound port on Customer's serving power distribution unit (PDU) and internet access at 100mbps shall be available 95 % of the time in a calendar year, subject in all cases to (A) the Curtailment Events (defined below) pursuant to Section 2.4, (B) energy curtailment pursuant to Section 4.8 and (C) solely until the Facility is interconnected with NorthWestern Energy's electricity distribution system, downtime for actual preventative maintenance of the Facility, in any event not to exceed four (4) weeks of downtime a year;

v)  Filtered ambient air; and

vi)  In the event any Miners malfunction or cease to function, Service Provider shall proceed in accordance with Section 2.5 below.

2.3    *Customer Miner Delivery*.  Within one month of the Effective Date, Customer shall have delivered to Service Provider enough miners to utilize the full 45 MW of energy capacity and Service Provider shall install such Mining Equipment and make the full 45 MW of energy available within two (2) months of the Effective Date.

2.4    *Curtailment of Power*.  Subject to the terms of this Agreement, Service Provider shall be entitled, at its sole discretion and without any liability to Customer, to curtail the power at its Facility in response to calls issued under grid relief or similar programs that Service Provider participates in ("*Curtailment Events*"). The proceeds or benefits from any such Curtailment Events or participation in any such programs shall be shared between Customer and Service Provider according to the Curtailment Split (defined below).

2.5  *Malfunctioning Mining Unit*. Any Mining Unit that cannot be returned to full service remotely will be rebooted, and if necessary, removed from its shelf for repair within five (5) days from its first reported downtime and use its reasonable efforts to repair such Mining Unit promptly. At the direction of Customer, Service Provider will ship any Mining Unit to an external maintenance facility at Customer's sole cost and expense; provided Customer provides all necessary information to do so.

3.      TERM AND TERMINATION; MINING EQUIPMENT REMOVAL.

3.1    *Term*. This Agreement shall be effective as of the Effective Date and shall remain in effect for three years, specifically until April 1, 2026 (the "*Term*") provided that  NovaWulf sponsored Plan of Reorganization filed in  *Celsius Network LLC, et al* (Case Number 22-10964 (MG)) is confirmed by the U.S. Bankruptcy Court for the Southern District of New York within six (6) months of the Effective Date. The Term may be extended for an additional three-year term under the terms and fee structure set forth herein upon mutual written agreement of both Parties.

3.2    *Termination for Default by Customer*. Service Provider may terminate this Agreement for cause upon written notice to Customer if Customer: (a) fails to make any payment(s) due pursuant to this Agreement; (b) violates, or fails to perform or fulfill any material covenant or provision of this Agreement, and any such failure is not cured within ten (10) days after written notice thereof from Service Provider; (c) enters into bankruptcy, dissolution,

financial failure or insolvency ("*Bankruptcy Event*") other than in connection with the Customer's pending bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York as of the Effective Date, and such Bankruptcy Event has not been thoroughly dismissed within sixty (60) days; or (d)  enters into an assignment, sale or merger with a third party with respect to all or substantially all of Customer's business, unless approved in writing in advance and such approval shall not be unreasonably withheld by Service Provider; (each, a "*Customer Default*") of this Agreement, and any such failure is not cured within ten (10) days after written notice thereof from Customer. Customer may remove any of its Mining Equipment not receiving electricity upon written notice to Service Provider.

   3.3 *Termination for Default by Service Provider*.  Customer may terminate this Agreement for cause immediately upon written notice to Service Provider if Service Provider: (i) is unable to provide the hosting services and/or site security measures as set forth in this Agreement, (ii) violates, or fails, to perform or fulfill any material covenant or provision of this Agreement, and any such failure is not cured within ten (10) days after written notice thereof from Customer, or (iii) enters into a Bankruptcy Event and such Bankruptcy Event has not been thoroughly dismissed within sixty (60) days (each, a "*Service Provider Default*").  Customer may remove any of its Mining Equipment not receiving electricity upon written notice to Service Provider.

   3.4 *Mining Equipment Removal*. Upon termination of this Agreement and following Customer's written request, *provided* Customer has paid all undisputed amounts then due and owing under this Agreement, Service Provider shall decommission and make the Mining Equipment available to Customer for pickup at, or shipment from, the Facility within forty-five (45) calendar days after Customer's written request. Service Provider shall work to uninstall and prepare for pickup all Mining Equipment of Customer at the Facility based on a mutually agreeable deinstallation schedule. Customer shall arrange for pickup within thirty (30) days of Service Provider notifying Customer that the Mining Equipment is or will be ready for pickup (the "*Pickup Notice*"). Customer shall be solely responsible for all pickup, delivery, and transportation and any other related deinstallation costs exclusive of labor costs[1] associated with removing its Mining Equipment. If Customer does not pick up its Mining Equipment within thirty (30) days following the Pickup Notice ("*Pickup Deadline*"), Service Provider may charge Customer for storage of such Mining Equipment starting on the date of the expiration of the Pickup Deadline. Notwithstanding the foregoing, in the event of removal of Mining Equipment resulting from a failure to confirm a NovaWulf sponsored Plan of Reorganization filed in Celsius Network LLC, et al (Case Number 22-10964 (MG)), the Parties shall confer on a plan for removal of the Mining Equipment within ninety (90) days (the "*Transition Period*").  The Service Provider shall use its reasonable efforts to ensure that, subject to the terms of this Agreement and the agreed removal plan, Customer's Mining Equipment remains hosted and hashing during the Transition Period. If Customer does not remove the Mining Equipment within sixty (60) days of the Pickup Notice, the Service Provider may charge Customer for the reasonable costs of storing the Mining Equipment plus a 25% mark-up.  If the period of time

that Service Provider stores Customer's mining equipment exceeds one hundred and twenty (120) days, such mining equipment will be considered to be abandoned.

3.5  In the event a NovaWulf sponsored Plan of Reorganization filed in *Celsius Network LLC, et al* (Case Number 22-10964 (MG)) is not confirmed by the U.S. Bankruptcy Court for the Southern District of New York within six (6) months of the Effective Date and continues to be unconfirmed, Service Provider may, subject to Section 3.4, terminate this Agreement on written notice to Customer, delivered within the thirty (30) days following the expiration of the six (6) month period following the Effective Date.

4.      FEES AND REVENUE SHARING

In exchange for providing the Services hereunder, Customer shall pay the following fees:

4.1  *Prepayment of Expenses*. Customer agrees to pay all monthly operational and energy expenses, as defined below, in advance.

4.2  *Initial Deposit.* Within five (5) business days following execution of the Agreement, Customer shall pay Two Million, Five Hundred Thousand Dollars ($2,500,000.00) USD to Service Provider as a deposit against anticipated operational and energy costs, unused balance to be returned upon termination of this Agreement ("*Initial Deposit*").

4.3  *Direct Costs and Variable Expenses.*  Customer shall pay on a monthly basis, one hundred percent (100%) of the reasonable direct costs and variable expenses that Service Provider has incurred in connection with its management of the Miners and operation of the Facility as further defined on Schedule A attached hereto ("*OPEX*").

4.4  *Bitcoin Fee.* The "*Bitcoin Fee*" is the positive number denominated in Bitcoins equaling the total number of Bitcoins mined at the Facility over the preceding month, minus OPEX for the same proceeding month, and subsequently adjusted to credit each Party in accordance with the "Hashrate Split," which is 70% to Customer and 30% to Service Provider. For the purposes of calculation of the Bitcoin Fee, each day, the aggregate of all OPEX will be assigned a Bitcoin value at the average daily rate of USD/BTC available on the public reputable source to be agreed by the Parties or the average liquidation price of BTC from the OPEX Wallet (described below). The total amount of all OPEX, calculated on a daily basis for the preceding month and denominated in Bitcoin value according to the formula above, will be deducted from Customer's Bitcoins mined at the Facility over the preceding month and then apportioned in accordance with the Hashrate Split to each Party.

4.5  *Administration of BTC Rewards and Transaction Fee Awards*

Customer desires to contribute the mining hashrate generated by its Miners at the Facility to a global mining pool, selected in its discretion.  In order to comply with Service Provider's internal Customer Due Diligence protocol, in the event that Customer utilizes a mining pool operator other than Foundry or Luxor, Customer shall provide the following information to Service Provider prior to the commence of mining: identification of the mining pool operator including its country or origin, the business form and beneficial

ownership of the mining pool operator and verification of all of the information.

4.6    *Hashrate Split Transfers and Cryptocurrency Wallets*

Customer will instruct the Mining Pool Provider to direct the applicable BTC rewards and BTC transaction fee awards in accordance with the Hashrate Split percentages, set forth in Section 4.4., to the following wallets:

4.6.1    Customer Wallet – 56%

4.6.2    OPEX Wallet - 20%. All BTC deposits will be liquidated on a daily basis into United States Dollars ("*USD*").

4.6.3    Service Provider Wallet – 24%

4.7    *Wallet Security*. Customer is responsible for maintaining the confidentiality and integrity of its Wallet including access information. Customer must notify Service Provider  immediately if Customer's Wallet address has changed or if there is any other change, loss, fraud or suspicion about Customer's Wallet. Service Provider will not be held liable for any lost Wallet information or hacked Wallet, nor any loss arising thereof as a result including theft or fraud, not resulting from or caused by Service Provider's breach, negligence or misconduct.

4.8    *Energy Curtailment*. Customer will have the option to curtail the electrical load to the Facility in respect of the Mining Equipment for economic reasons. Service Provider will have the option to curtail the electrical load to the Facility for economic reasons where the day-ahead market price of energy exceeds more than Ninety Dollars ($90.00) per MWh ("*Curtailment Strike Price*"). Economic energy curtailment directed by Service Provider is limited to 15% of the total hours for a six month period. In the event that either Party exercises the economic curtailment option, Customer and Service Provider agree to split the revenue from the energy sales in excess of OPEX with 50% going to each party (the "*Curtailment Split*").

4.9    *Monthly True-Up.* No later than twenty (20) days after the end of each calendar month, Service Provider shall provide Customer with the final invoice for the immediately preceding month reflecting (i) the OPEX for that month; (ii) the amount of USD collected in the OPEX wallet after the daily liquidation of the mined BTC; and (iii) if applicable, the  Energy Curtailment revenue for such month (the "*Final Monthly Invoice*"). If the amount of the Final Monthly Invoice is greater than the amount of cash USD liquidated into the OPEX Wallet during the preceding month and Customer's share of the Energy Curtailment revenue, Customer shall pay 70% of such excess amount in USD to Service Provider within five (5) days of receipt of the Final Monthly Invoice. If the amount of the Final Monthly Invoice is less than the amount of USD in the OPEX Wallet for the preceding month, Service Provider shall apply such difference as a credit towards OPEX for the following month or refund such amounts to Customer in accordance with the Hashrate Split and the Curtailment Split.

4.10    *Overdue Amounts; Disputes*. Overdue payments will incur interest at the

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413E5E38D09

lesser of 1% per month or the maximum amount allowed under applicable law. Customer shall have the right to dispute all or a portion of any Final Monthly Invoice following the receipt of such invoice in accordance with the Dispute resolution process set forth in Section 15.6 below.

4.11    *Taxes.*

4.11.1  Customer's Tax Responsibilities. All amounts billed to Customer under this Agreement are exclusive of any applicable taxes, duties and fees Customer is solely responsible for, including federal, state and local taxes on manufacture, sales, gross income, receipts, occupation, personal property and use of Customer's Mining Equipment.

4.11.2  Service Provider's Tax Responsibilities. Service Provider is responsible for any taxes imposed on or with respect to Service Provider's income, revenues, gross receipts, personnel, or real property arising out of this Agreement.

4.11.3  Service Provider will advise Customer  whether or not Service Provider is subject to backup withholdings.

5.0    CONSTRUCTION  OF  HYDRO  POWER  INTERCONNECTION  AT  THE FACILITY

Service Provider intends to interconnect the Facility with NorthWestern Energy's electricity distribution system.

5.1    *[Reserved].*

5.2    *Interconnection Construction Cost Installment Payments.* Customer agrees to pay $875,000 to Service Provider representing its share of interconnection construction costs in the form of two advances (the "*Advances*") against Service Provider's share of the Hashrate Split and the Curtailment Split.  The first Advance shall be for $500,000 due and payable upon the confirmation of a NovaWulf sponsored Plan of Reorganization filed in  Celsius Network LLC, et al (Case Number 22-10964 (MG)) by the U.S. Bankruptcy Court for the  Southern District of New York and, conditional on the first payment having been made, the second Advance shall be for $375,000  due and payable when the interconnection is approved by Montana State regulators. Service Provider's portion of the Hashrate Split and the Curtailment Split shall go to Customer until the Advances are fully repaid and any amounts remaining unpaid upon termination of the Agreement shall be repaid to Customer as part of the true-up process for the final invoice.  Service Provider is not obligated to refund, other than through the ordinary repayment of the advances pursuant to this Section 5.2, any of Customer's installment payments if either the interconnection is not approved by regulators and/or the actual interconnect capacity approved is less than projected.

6.0    RISK

6.1    *Price Fluctuations*. Customer understands that Service Provider is not liable for price fluctuations in BTC.

6.2    *No Liability for BTC Security, Forks or Software.* By entering into this Agreement Customer acknowledges and agrees that: (a) Service Provider is not responsible for the operation of any BTC underlying protocols, and Service Provider makes no guarantee of their functionality, security, or availability; (b) BTC underlying protocols are subject to sudden changes in operating rules (a/k/a "forks"), and such forks may materially affect the value and function of the BTC; and (c) Service Provider does not own or control the underlying software protocols which govern the operation of any BTC.

6.3    *BTC Volatility.* Customer understands that Mining is an everchanging and volatile endeavor and that there is no guarantee that the Services will generate any set amount of BTC.

6.4    *No Liability for BTC Market, Technological System Failures or Customer Error*. Customer acknowledges that Service Provider shall have no responsibility or liability for: (a) events or circumstances beyond the reasonable control of Service Provider, including, without limitation, the interruption, suspension or restriction of trading on or the closure of any BTC market or system, power or other mechanical or technological failures or interruptions, computer viruses or communications disruptions, work stoppages, natural disasters, acts of war, revolution, riots or terrorism or other similar force majeure events, in each case to the extent beyond the reasonable control of Service Provider; (b) any error by any Customer; (c) any error by any Mining Pool Provider; (d) the insolvency of, or acts or omissions by a BTC trading platform; (e) any error, or any loss, destruction, corruption or other inability to use or transfer the BTC caused by the applicable blockchain or any other technology used to implement or operate any BTC, or other circumstances beyond the reasonable control of Service Provider; (f) any delay or failure of any BTC issuer, the developer or operator of any technology used to implement or operate any BTC, or any broker, agent, intermediary, bank or other commercially prevalent BTC payment or clearing system to provide any information or services required in order to enable Service Provider's performance hereunder; and (g) the effect of any provision of any law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or of any court of competent jurisdiction.

7.0    SITE ACCESS.

7.1    *Access.* Only those persons specifically authorized by Service Provider in writing may access the Facility, such authorization not to be unreasonably withheld. All Customer representatives shall follow all applicable safety protocols and directions from Service Provider's personnel while at the Facility. Customer shall be solely responsible for any damage or loss caused by Customer representative acting for or on its behalf while at the Facility.

7.2    *Hazardous Conditions.* If any hazardous conditions beyond the reasonable control of Service Provider arise at, from, or materially affecting the Facility, whether caused by Customer or a third party, Service Provider is hereby authorized to immediately suspend the Services under this

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413F5F38009

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413EE38D09A

*Execution Copy*

Agreement without subjecting Service Provider to any liability hereunder, and without constituting a Service Provider Default, and will provide notice to Customer of such suspension as soon as reasonably practicable; provided that such suspension shall be terminated upon resolution of such hazardous condition.

8.0    RELOCATION OF MINING UNITS; INTERFERENCE AND EMERGENCY

8.1    *Relocation*. Service Provider may reasonably require the relocation of some or all of Customer's Mining Units within the Facility, or to another Service Provider facility, upon twenty (20) days' prior written notice to Customer: provided, that the relocation site shall afford comparable economic, environmental and working conditions for such Mining Units and comparable accessibility to the Mining Units. Notwithstanding the foregoing, Service Provider shall not arbitrarily or capriciously require Customer to relocate the Mining Equipment. If any Mining Units are relocated according to this Section, the reasonable costs of relocating such Mining Units and improving the Facility to which such Mining Units will be relocated shall be borne solely by Service Provider. Any relocation will be completed by Service Provider's authorized staff.

8.2    *Interference.* Customer shall not operate any Mining Unit in a manner that causes or may cause unacceptable interference to existing or prospective Service Provider customers, the Facility or Service Provider's hosting operations. Service Provider may require Customer to alter, remove or relocate such Mining Unit at Customer's sole cost and expense in the event of any such interference.

8.3    *Emergency*. In the event of an emergency outside the Service Provider's reasonable control, as determined in Service Provider's reasonable discretion, Service Provider may rearrange, remove, or relocate any Customer Mining Unit without subjecting Service Provider to any liability hereunder, and without constituting a Service Provider Default. Notwithstanding the foregoing, in the case of emergency, Service Provider shall provide Customer, to the extent practicable, reasonable notice prior to rearranging, removing, or relocating Customer's Mining Units. At Customer's reasonable request, Service Provider shall reverse such rearrangement, removal or relocation once the emergency is no longer continuing.

9.    CUSTOMER RESPONSIBILITIES.

9.1    *Compliance with Laws.* Customer's use of the Facility and the Mining Equipment located at the Facility and the Service Provider's provision of the Services must at all times conform to all applicable laws, rules and regulations (collectively, "*Laws*"), including, but not limited to, the Laws of the country(ies) and States in which Customer is doing business, and the Laws of City, County and State where the Facility is located.

9.2    *Licenses and Permits*. Customer shall be responsible for obtaining all licenses, permits, consents, and approvals from any federal, state or local government that may be required to possess, own, install or operate the Mining Equipment. Service Provider shall be responsible for obtaining all licenses, permits, consents, and approvals from any federal, state or local government

9

that may be required to provide the Services. Each Party shall provide reasonable assistance to the other in order to secure licenses, permits, consents, and approvals relevant to this Agreement.

9.3     *Mining Units*. Customer shall deliver Mining Units to the Facility in good working order and suitable for use in the Facility. Customer shall be responsible for any and all costs associated with the troubleshooting and repair of Mining Units received in non-working condition. Service Provider is not responsible in any way for installation delays or loss of profits as a result of any Customer Mining Unit deemed not to be in good working order upon arrival at Facility.

9.4     *Material Modifications of Mining Equipment*. If Service Provider determined that one or more or the Customer's Equipment has been modified, altered, overclocked or the firmware adjusted (each, a "*Modification*") without Service Provider's prior written approval, such approval only to be withheld in the event that Service Provider, after reasonable investigation, determines that such Modification would be in violation of this Agreement, ("*Non-Compliant Equipment*"), Service Provider reserves the right to immediately discontinue service to such Non-Compliant Equipment and/or invoice Customer for Service Provider's incremental costs from such Non-Compliant Equipment. Customer reserves the right to dispute such incremental costs reasonably and in good faith.

9.5     *Extreme Weather Instructions*. Customer shall provide written instructions relating to powering down of its Mining Equipment in the event of extreme weather.

9.6     *Representations.* Each Party represents and warrants to the other Party that such Party (i) is properly constituted and organized, (ii) is duly authorized to conduct its business and to enter into and perform its obligations under this Agreement, and (iii) the execution and delivery of this Agreement and the performance of its duties hereunder does not violate the terms of any other agreement to which it is a party or by which it is bound.

9.6     BSA/AML and OFAC Representation. Each of Customer and Service Provider represents and warrants that it is in material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Customer or Service Provider, as applicable, operates, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including, but not limited to the Bank Secrecy Act/Anti- Money Laundering ("*BSA/AML*") and Office of Foreign Assets Control ("*OFAC*") compliance programs. Each of Customer and Service Provider will at all times comply with the laws, regulations and rules of any applicable governmental or regulatory authority, including, without limitation, Money Service Business regulations under the Financial Crimes Enforcement Network ("*FinCen*"); state money transmission laws; laws, regulations, and rules of relevant tax authorities; applicable regulations and guidance set forth by FinCEN; the Bank Secrecy Act of 1970; the USA PATRIOT Act of 2001; AML/CTF provisions as mandated by U.S. federal law and any other rules and regulations regarding AML/CTF; issuances from the Office of Foreign Assets Control ("*OFAC*"); the National Futures Association; the Financial Industry Regulatory Authority; and the Commodity Exchange Act. Customer further understands that any fines or penalties imposed on Service Provider directly as a result of Customer's breach of the representations and warranties in this Agreement may, at Service Provider's discretion, be passed

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413E5E380DA

*Execution Copy*

on to Customer and Customer acknowledges and represents that Customer will be responsible for payment to Service Provider of such fines. Each Party further agrees that any fines or penalties imposed on a Party directly as a result of other Party's breach of the representations and warranties in this Agreement may, at in their discretion, be passed on to the breaching Party and the breaching Party acknowledges and represents that it will be responsible for payment to the non-breaching Party of such fines.

10.     NOTICES. All notices and other communications between the Parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (iii) when delivered by FedEx or other nationally recognized overnight delivery service, or (iv) when e-mailed during normal business hours (and otherwise as of the immediately following business day), addressed as follows:

If to Customer:

CELSIUS MINING LLC
50 Harrison St. , Suite 209F
 Hoboken NJ 07030
Attn: Legal Department
Email: Legal@celsius.network

If to Service Provider:

MONTANA OP, LLC
9 Federal Street
Easton, MD 21601
Attn: General Counsel's Office
Email: legal@beowulfenergy.com

11.     INSURANCE.

11.1    Customer expressly acknowledges and agrees that Service Provider is not an insurer and that the Mining Equipment is not covered by any insurance policy held by Service Provider. Customer is solely responsible for obtaining insurance coverage for any and all of the Mining Equipment Customer provides to Service Provider under this Agreement.  With respect to insurance coverage of the Mining Equipment, Customer agrees that Customer's insurer will be the primary insurer in the event of any loss or injury.

11.2    Service Provider expressly acknowledges and agrees that Customer is not an insurer and that the Facility and Service Provider's assets and equipment are not covered by any insurance policy held by Customer. Service Provider is solely responsible for obtaining insurance coverage for the Facility and Service Provider's assets and equipment.

DocuSign Envelope ID: CA79AFDF-6388-4829-A894-D413FE58B0D9

*Execution Copy*

11.3    Each Party shall have commercial general liability insurance for both bodily injury and property damage of not less than one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) in the aggregate. This insurance policy shall (i) be maintained by such Party throughout the Term of this Agreement and (ii) waive any and all subrogation rights and name such other Party as additional insured.

12.    WARRANTY AND DISCLAIMER.

12.1  CUSTOMER EXPRESSLY ACKNOWLEDGES THAT SERVICE PROVIDER HAS NOT INSPECTED OR CAUSED TO BE INSPECTED THE MINING EQUIPMENT AND/OR THE INDIVIDUAL MINING UNITS FOR ANY PATENT OR LATENT DEFECTS AND EXPRESSLY AGREES THAT SERVICE PROVIDER WOULD NOT BE ENTERING INTO THIS AGREEMENT WITHOUT SUCH CERTIFICATION FROM CUSTOMER. FOR THE AVOIDANCE OF DOUBT, PATENT OR LATENT DEFECTS SHALL NOT INCLUDE ORDINARY WEAR AND TEAR FROM NORMAL USAGE OF THE MINING EQUIPMENT. SERVICE PROVIDER DOES NOT PROVIDE MECHANICAL COOLING, EXCEPT FOR FANS OR BACKUP POWER AND THE FACILITY IS SUBJECT TO SWINGS IN LOCAL TEMPERATURE, WIND, HUMIDITY AND OTHER CONDITIONS. SERVICE PROVIDER MAKES NO WARRANTY WHATSOEVER, AND HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, WITH RESPECT TO GOODS AND SERVICES SUBJECT TO THIS AGREEMENT, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF NONINFRINGEMENT AND (D) WARRANTY AGAINST INTERFERENCE.

12.2  CUSTOMER EXPRESSLY ACKNOWLEDGES AND AGREES THAT SERVICE PROVIDER DOES NOT WARRANT THAT: (A) THE SERVICES SHALL BE AVAILABLE 24/7 OR FREE FROM INTERRUPTION; (B) THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OTHER THAN AS EXPRESSLY SET FORTH HEREIN; OR (C) THE SERVICES WILL PROVIDE ANY FUNCTION NOT EXPRESSLY DESIGNATED AND SET FORTH HEREIN.

12.3    Customer and/or its commonly controlled affiliates has good and valid title to the Mining Equipment free and clear of any and all liens.

13.    LIMITATIONS OF LIABILITY.

13.1    Customer expressly acknowledges and agrees that, in certain situations, the Services and the Mining Equipment's functionality may be unavailable due to factors outside of Service Provider's reasonable control. This includes, but is not limited to, Force Majeure (as defined below), inclement weather, network failures, pool operator failures, denial of service attacks, currency network outages, hacking or malicious attacks on the crypto networks or exchanges, power outages outside the reasonable control of Service Provider, pandemics or acts of God ("*Excluded Events*").

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D436EE38009A

13.2    NEITHER PARTY SHALL HAVE AN OBLIGATION, RESPONSIBILITY, OR LIABILITY FOR ANY OF THE FOLLOWING TO THE EXTENT OUTSIDE SUCH PARTY'S REASONABLE CONTROL: (A) ANY INTERRUPTION OR DEFECTS IN THE MINING UNITS' FUNCTIONALITY CAUSED BY ANY EXCLUDED EVENT; (B) ANY LOSS, DELETION, OR CORRUPTION OF DATA OR FILES WHATSOEVER; (C) ANY LOST REVENUE DURING OUTAGES OR FAILURES CAUSED BY AN EXCLUDED EVENT; (D) DAMAGES RESULTING FROM ANY ACTIONS OR INACTIONS OF A PARTY OR ANY THIRD PARTY NOT UNDER SUCH PARTY'S CONTROL; OR (E) DAMAGES RESULTING FROM ANY THIRD PARTY MINING EQUIPMENT.

13.3    EXCEPT FOR LIABILITIES RESULTING FROM EITHER PARTY'S GROSS NEGLIGENCE, FRAUD AND/OR WILLFUL MISCONDUCT BUT SUBJECT TO SECTION 12.2, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON, FIRM, OR ENTITY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS OF ANY KIND OR NATURE WHATSOEVER, ARISING OUT OF MISTAKES, NEGLIGENCE, ACCIDENTS, ERRORS, OMISSIONS, INTERRUPTIONS, OR DEFECTS IN TRANSMISSION, OR DELAYS, INCLUDING, BUT NOT LIMITED TO, THOSE THAT MAY BE CAUSED BY REGULATORY OR JUDICIAL AUTHORITIES, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OBLIGATIONS OF A PARTY HEREUNDER. EXCEPT FOR LIABILITIES RESULTING FROM EITHER PARTY'S GROSS NEGLIGENCE, FRAUD AND/OR WILLFUL MISCONDUCT, EACH PARTY'S TOTAL CUMULATIVE LIABILITY UNDER THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT LAW, WARRANTY, OR OTHERWISE, SHALL BE LIMITED TO DIRECT DAMAGES NOT TO EXCEED THE AMOUNTS PAID OR PAYABLE TO SERVICE PROVIDER FROM CUSTOMER IN THE SIX (6) MONTHS PRIOR TO THE DATE OF THE EVENT GIVING RISE TO THE CLAIM (OR IF SUCH EVENT OCCURS PRIOR TO THE ELAPSING OF SIX(6) MONTHS FROM THE EFFECTIVE DATE, AN ANNUALIZED AMOUNT BASED ON THE DAYS ELAPSED FROM THE EFFECTIVE DATE UNTIL THE OCCURRENCE OF SUCH EVENT).

13.4    To the maximum extent permitted by law, Service Provider is excluded from liability for any losses or damages which Customer may suffer, whether the same are suffered directly or indirectly or are immediate or consequential, which fall within any of the following categories: (i) loss of cryptocurrency arising as a result of any of Customer's acts or omissions or any acts or omissions of any third party under the control of Customer; and (ii) loss arising out of or in connection with any of the following:

(a)    any defect or insecurity in any third-party systems used to store or transmit cryptocurrency;

(b)    any inaccurate or incomplete information provided by Customer, including cryptocurrency wallet addresses;

(c)    any changes to the regulatory, legislative or technical environment applicable

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413E5E380D9

*Execution Copy*

to cryptocurrencies;

(d)     the acts or omissions of any bank or provider of banking services; or (e) any change in the value of cryptocurrency.

14.     INDEMNIFICATION.

Each Party shall indemnify, hold harmless and defend the other Party, its subsidiaries, employees, agents, directors, owners, executives, representatives, and subcontractors from any and all third-party liability, claim, judgment, loss, cost, expense or damage, including reasonable attorneys' fees and legal expenses, to the extent arising out of or relating to the breach of obligations under this Agreement, or any injuries or damages sustained by any person or property due to any direct or indirect act, omission, negligence or misconduct of a Party, its agents, representatives, employees, contractors and their employees and subcontractors and their employees. The indemnified Party shall not enter into any settlement or resolution with a third party under this Section without the indemnifying Party's prior written consent, which shall not be unreasonably withheld or conditioned.

15.     MISCELLANEOUS.

15.1    *Entire Agreement*. This Agreement, including any documents referenced herein, constitutes the Parties' entire understanding regarding its subject and supersedes all prior or contemporaneous communications, agreements and understanding between them relating thereto. Each Party acknowledges and agrees that it has not, and will not, rely upon any representations, understandings, or other agreements not specifically set forth in this Agreement. This Agreement shall not be superseded, modified or amended except by express written agreement of the Parties.

15.2    *Waiver, Severability.* The waiver of any breach or default hereunder does not constitute the waiver of any subsequent breach or default. If any provision of this Agreement is held to be illegal or unenforceable, it shall be deemed amended to conform to the applicable Laws, or, if it cannot be so amended without materially altering the intention of the Parties, it shall be stricken and the remainder of this Agreement shall continue in full force and effect.

15.3    *Assignment.* Neither this Agreement nor any right or obligation arising under this Agreement may be assigned by a Party in whole or in part, without the prior written consent of the other Party at its sole discretion. This Agreement shall be binding upon and inure to the benefit of the Parties, their legal representatives, successors, and permitted assigns.

15.4    *Force Majeure*. Neither Party shall be liable in any way for delay, failure in performance, loss or damage due to any of the following: fire, strike, embargo, explosion, power failure outside such Party's reasonable control, flood, lightning, war, water, electrical storms, high winds, snow, ice, frost, fog, extreme temperatures, labor disputes, civil disturbances, governmental requirements, acts of civil or military authority, acts of God, acts of public enemies,  pandemics (other than Covid-19) or other causes beyond its reasonable control, whether or not similar to the

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413FE38D09A

*Execution Copy*

foregoing ("*Force Majeure*").

15.5    *Governing Laws*. This Agreement will be governed by and construed in accordance with the laws of the State of New York as applied to contracts made and performed entirely therein, and without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the Parties.

15.6    *Dispute Resolution Process*. In the event that any claim, dispute, controversy, difference, disagreement or grievance under this Agreement (a "*Dispute*"), either Party shall have the right to invoke this dispute resolution process upon written notice to the other Party setting forth the particulars of the Dispute and the relief requested (a "*Dispute Notice*"). If the Parties are unable to resolve a Dispute within ten (10) days of the applicable Dispute Notice, each Party shall, within ten (10) days thereafter, appoint a senior management representative with full authority to resolve such Dispute. The Parties' designated senior management representatives shall meet within the next sixty (60) days at mutually agreeable times and locations, in person or via video conferencing. If the Dispute remains unresolved at the end of such sixty (60) day period, either party may bring suit hereunder solely in the state or federal courts located in New York, New York. Each Party consents to the exclusive jurisdiction of such courts in connection with any Dispute hereunder and waives any defense of forum inconveniens in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMISSABLE BY LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARY IN CONNECTION WITH THIS AGREEMENT.

15.7 *Relationship of the Parties*. The Parties agree that their relationship hereunder is in the nature of independent contractors. Neither Party shall be deemed to be the agent, partner, joint venturer or employee of the other, and neither shall have any authority to make any agreements or representations on the other's behalf. Each Party shall be solely responsible for the payment of compensation, insurance and taxes of its own personnel, and such personnel are not entitled to the provisions of any employee benefits from the other Party. Neither Party shall have any authority to make any agreements or representations on the other's behalf without the other's prior written consent.

15.8    *Intellectual Property*. Nothing in this Agreement shall be deemed to grant to either Party any rights or licenses, by implication, estoppel or otherwise, to any of the other Party's intellectual property. Neither Party shall contest or challenge, or assist any third party in contesting or challenging, the validity or enforceability of any of the other Party's intellectual property.

15.9    *Trademarks.* Each Party is strictly prohibited from using any product or corporate name, designation, logo, trade name, trademark, service name or service mark associated with the other Party or its affiliates in any marketing materials, regulatory filing, financial statements, offering circular, prospectus or otherwise, without the prior written consent of the first Party, which may be withheld by the first Party in its sole and absolute discretion.

15.10 *No Exclusivity.* This Agreement in no way establishes any exclusive arrangement

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D436FE38D09A

between Customer and Service Provider. Each Party acknowledges and agrees that the other Party will be free to enter into agreements and other arrangements with any third parties, at any time, regarding any products or services.

15.11 *Parties Are Sophisticated and Represented.* No preference shall be given to one Party by virtue of the fact that such Party did not draft this Agreement. No bias shall be placed against the drafter. Each Party has been advised and offered the opportunity to seek legal counsel regarding this Agreement. To the extent either Party chose not to or to limit such, such Party hereby waives any later complaint that it lacked proper counsel or understanding.

15.12 *Counterparts / Execution.* This Agreement may be executed in counterparts, which together shall constitute a single instrument, and may also be executed by electronic signature, and the Parties agree that facsimile, digitally scanned or other electronic copies of signatures shall be valid and binding as originals. 15.13 *Survival.* The provisions contained in Sections 9, 10, 11, 12, 13 and 14 shall survive the termination or expiration of this Agreement.

15.14 *Confidentiality.* The terms and conditions of this Agreement, the Services, the Bitcoin Fee, the OPEX Fee and the Energy Curtailment Share (and any other related materials or information provided by Service Provider to Customer) are Service Provider's confidential information, regardless of whether they are marked as confidential, proprietary or otherwise. The personal data provided by Customer in the context of this Agreement (and any other related materials or information provided by Customer to Service Provider) are Customer's confidential information, regardless of whether they are marked as confidential, proprietary or otherwise. The Parties shall (a) keep such confidential information strictly confidential in a manner that each Party protects its own confidential or proprietary information of a similar nature (and with no less than reasonable care); and (b) not disclose such confidential information to any third party other than each Party's employees, officers, directors, lenders, consultants and financial or legal advisors that have a need to know such information and have agreed in writing to keep such information confidential and not disclose such confidential information. Notwithstanding the foregoing, either Party may disclose confidential information as required by applicable Laws or by order of a court of competent jurisdiction, provided that, in such event (i) such Party will provide the other Party with prompt written notice of such obligation so that the other Party has an opportunity to take legal action to prevent or limit the scope of such disclosure; and (ii) such Party will furnish only that portion of the other Party's confidential information which the Party is advised by counsel is legally required and such Party will exercise commercially reasonable efforts to assisting the other Party in obtaining assurance that confidential treatment will be accorded to such confidential information.

15.15 *Third-Party Beneficiaries.* Nothing in this Agreement is intended, nor shall anything herein be construed to confer any rights, legal or equitable, in any person or entity other than the Parties hereto and their respective successors and permitted assigns.

15.16 *Affiliates.* For all purposes under this Agreement, a Service Provider shall be deemed to be responsible for and have control over the actions of its affiliates.

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413F5F3800A

15.17  *Construction; Interpretation*. Unless the context otherwise requires, words in the singular include the plural, and in the plural include the singular; masculine words include the feminine and neuter; "or" means "either or both" and shall not be construed as exclusive; "including" means "including but not limited to"; "any" and "all" shall not be construed as terms of limitation; and, a reference to a thing (including any right or other intangible asset) includes any part or the whole thereof. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply to the interpretation and construction of this Agreement, and this Agreement shall be construed as having been jointly drafted by the Parties. The titles and headings for particular paragraphs, Sections and Subsections of this Agreement have been inserted solely for reference purposes and shall not be used to interpret or construe the terms of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set out above.

Customer:                                          Service Provider:

    CELSIUS MINING LLC                        MONTANA OP LLC

By: _____          By: _____
    Name: Chris Ferraro                           Name: Mila Barrett

    Title:  Authorized Signatory                  Title:  Secretary

DocuSign Envelope ID: CA79AEDF-6388-4820-A894-D4136EE38009

*Execution Copy*

## Schedule A – OPEX

### FACILITY DIRECT AND VARIABLE COSTS TO BE INVOICED TO CELSIUS MINING LLC

All costs and expenses charged to Customer or deducted from Curtailment revenue shall be reasonable, documented and attributable to Customer's use of the Services and the Facility and, without limitation, shall not include any amounts for depreciation, capital expenditures, litigation not directly related to project level contracts, executive compensation not directly related to the Facility or mothballing/decommissioning expenses.

### I.   MINING EXPENSES

**All mining expenses listed below are limited to Customer's allocated share of usage of the Facility and only includes those periods of time when Customer's mining equipment is operational.**

A.  Fuel Costs - incurred to generate electricity for Facility.
B.  Chemicals and other variable Operations and Management Costs - incurred in the generation of electricity for Facility.
C.  Facility Operations and Maintenance Costs
D.  Facility General and Accounting Costs and local taxes -  (office expenses,  legal, plant accounting excluding any executive compensation or general overhead not directly related to the Facility).
E.  Direct costs - (miner management software, network security, internet and data center employees).
F. Cost of power from interconnect, if applicable.

### II.  ENERGY SALES EXPENSES

**All energy expenses listed below are limited to Customer's allocated share of usage of the Facility and will be deducted from Curtailment revenue prior to the Curtailment Split.**

A.  Fuel Costs – incurred to generate electricity sold to the grid for subject to Curtailment Split.
B.  Chemicals and other variable Operations and Maintenance Costs – incurred to generate electricity sold to the grid subject to Curtailment Split.
C.  Facility Labor Costs – attributable to the generation and/or sale of electricity sold to the grid subject to Curtailment Split.
D.  Facility Operations and Maintenance Costs -  attributable to generate electricity sold to grid subject to Curtailment Split.
E.  Facility General and Accounting Costs and Local Taxes -  attributable to electricity sold to grid subject to Curtailment Split. (excluding any executive compensation or general overhead not directly related to the Facility).

*Execution Copy*

### III.  FACILITY MAINTENANCE ACCRUAL EXPENSES

    A.  Related to Mining Operations

    B.  Related to Energy Sales

*Execution Copy*

## <u>SAMPLE INVOICE:  MONTANA OPERATING CO. LLC</u>

### Montana Operating Co LLC

| <u>To:</u> | **Customer** | | | **Date:** | 20-Mar-23 |
|---|---|---|---|---|---|
| | Street | | | | |
| | Address | | | **Delivery Month:** | Feb-23 |
| | City, State Zip Code | | | **Invoice:** | 0323-MOCOPa |
| | | | | **Terms:** | 25-Mar-23 |
| <u>From:</u> | **Montan Operating Co LLC** | | | | |
| | 9 Federal Street | | | | |
| | Easton, MD  21601 | | | | |

| ALL VALUES FOR ILLUSTRATIVE PURPOSE ONLY | Volume | | Price | | Amount | |
|---|---|---|---|---|---|---|
| Total Hardin Generation | *51,800.0* | *MWh* | | | | |
| Total Hosting energy Allocation | *44,200.0* | MWh | | | | |
| Total Energy Supplied to Data Center | *22,200.0* | MWh | | | | |
| Total Energy Sold to grid | *22,000.0* | MWh | | | | |
| | | | | | | |
| Total BTC Sales Revenue | *128* | BTC | *$24,000* | $ | *3,072,000.00* | |
| Total Energy Sales Revenue | *22,000* | MWh | *$135* | $ | *2,972,972.97* | |
| | | | | | | |
| Variable costs | *51,800* | MWh | *30.00* | $ | *1,554,000.00* | |
| Hardin O&M Costs | *51,800* | MWh | *12.00* | $ | *621,600.00* | |
| DC direct costs | *22,200* | MWh | *4.50* | $ | *100,000.00* | |
| Major maintenance accrual | *51,800* | MWh | *2.90* | $ | *150,000.00* | |
| | | | | | | |
| Mining Revenue to Customer | *90* | BTC | *$24,000* | $ | 2,150,400.00 | |
| Energy Revenue to Customer | *11,000* | MWh | *$135* | $ | 1,486,486.49 | |
| **Total Rev to Customer** | | | | $ | 3,636,886.49 | |
| | | | | | | |
| **Mining Expenses to Customer** | | | | | | |
| Variable costs | 15,540 | MWh | 30.00 | $ | 466,200.00 | |
| Hardin O&M Costs | 15,540 | MWh | 12.00 | $ | 186,480.00 | |
| DC Direct costs | 15,540 | MWh | 4.50 | $ | 70,000.00 | |
| Major maintenance accrual | 15,540 | MWh | 2.90 | $ | 45,000.00 | |
| | | | | | | |
| **Energy Sales Expenses to Customer** | | | | | | |
| Variable costs | 11,000 | MWh | 30.00 | $ | 330,000.00 | |
| Hardin O&M Costs | 11,000 | MWh | 12.00 | $ | 132,000.00 | |
| Major Maintenance accrual | 11,000 | MWh | 2.90 | $ | 31,853.28 | |
| | | | | | | |
| ***Customer Margin*** | | | | ***$*** | ***2,375,353.20*** | |
| | | | | | | |
| *Energy Revenue applicable to Customer* | | | | *$* | *1,486,486.49* | |
| *Liquidated OpEx wallet proceeds applicable to Customer* | | | | *$* | *430,080.00* | |
| **Customer Actual Expenses** | | | | $ | 1,261,533.28 | |
| **Net True Up Amount Owed to MoCo (Credited to Customer)** | | | | $ | (655,033.20) | |

- <u>For illustration purposes only</u>

## **Exhibit B**

**Correspondence between Celsius and Montana**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

1301 Pennsylvania Avenue NW
Washington, DC 20004
United States

Judson Brown, P.C.
To Call Writer Directly:
+1 202 389 5082
judson.brown@kirkland.com

+1 202 389 5000

Facsimile:
+1 202 654 9582

www.kirkland.com

June 30, 2023

**By E-mail**

Sean Farrell
9 Federal Street
Easton, MD 21601
Attn: General Counsel's Office
Email: legal@beowulfenergy.com

Re: *In re Celsius Network LLC, et al.*, No. 22-10964 (MG) (Jointly Administered)
Dispute Notice

Dear Mr. Farrell:

We represent Celsius Mining LLC ("Celsius"). I write concerning the Hosting Services Agreement between Celsius and Montana OP LLC ("Montana") effective April 1, 2023 (the "Agreement").

I understand that Montana is attempting to charge Celsius for fees that the Agreement does not permit in connection with the Hardin mining facility. It appears Montana is trying to improperly pass onto Celsius costs that Montana is obligated to bear under the Agreement.

From our perspective, it is Montana—not Celsius—that is violating the Agreement. Montana is doing so in at least the following ways:

- Impermissibly charging Celsius for costs that are greater than the amount that the Agreement permits. The agreement provides that "[a]ll mining expenses . . . are limited to Customer's allocated share of usage of the [Hardin] Facility . . . ." and "[a]ll costs . . . charged to Customer . . . shall be . . . attributable to Customer's use of the Services and the Facility . . . ." Agreement at Schedule A. Nonetheless, Montana has been charging Celsius for costs that exceed Celsius's allocated share of the 90MW capacity of the Hardin facility. Specifically, Montana has calculated April and May costs and taxes based on the actual MW output the Hardin facility—which may vary from month-to-month depending on Montana's other customers and uptime percentages—instead of based on Celsius's "allocated share of usage" of the total 90 MW capacity of the Hardin facility. *See id.* As a result, Montana is impermissibly passing on to Celsius

# KIRKLAND & ELLIS LLP

Sean Farrell
June 30, 2023
Page 2

costs exceeding what the Agreement permits.

- Prospectively breaching the Agreement by telling Celsius that the Hardin facility will be down for preventative maintenance for longer than the Agreement permits. The Agreement limits "downtime for actual preventative maintenance of the Facility" to "four (4) weeks of downtime per year" (*i.e.*, twenty-eight days). Agreement § 2.2.3(iv). The Hardin facility has already been down for preventative maintenance for twenty-five days, and Montana now indicates the facility will be down an additional two weeks for preventative maintenance in October.

Montana's refusal to honor its contractual obligations constitutes a breach of contract, and is an attempt to pass onto Celsius more than $213,000 in costs that Celsius does not owe.

Under the dispute resolution process in Section 15.6, the Debtors demand that Montana immediately remedy its on-going violations by (i) rescinding its blatantly wrong assertions that Celsius has not paid all amounts due, (ii) affirming that it will charge Celsius for only the portion of costs that the Agreement requires, and (iii) confirming that it will not exceed the contractual limit of four weeks for preventative maintenance. If Montana does not do so promptly, the Debtors will take all actions available to them at law and equity, including seeking expedited relief from the Bankruptcy Court, forcing Montana to specifically perform its obligations, and pursuing claims for any and all damages that the Debtors have incurred as a result of Montana's actions.

The Debtors reserve all rights at law and in equity and waive none.

Sincerely,

/s/ *Judson Brown*

Judson Brown, P.C.

cc:    Ross M. Kwasteniet, P.C.
       Christopher S. Koenig
       Christopher Ferraro
       David Albert

# EXHIBIT A

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D4136EE38D0A

*Execution Copy*

# HOSTING SERVICES AGREEMENT

This **HOSTING SERVICES AGREEMENT** (this "*Agreement*"), effective as of April 1, 2023 (the "*Effective Date*"), is entered into by and between Celsius Mining, a limited liability company organized under the laws of the State of Delaware ("*Customer*"), and MONTANA OP LLC, a limited liability company organized under the laws of the State of Delaware, ("*Service Provider*"; Customer and Service Provider each a "*Party*" and, collectively, the "*Parties*").

A.  Service Provider owns and operates a cryptocurrency mining datacenter and a power generation plant  located at 643 Industrial Park Road,  Hardin, Montana  59034 (the "*Facility*").

B.  Customer owns or has the contracted legal rights for certain equipment to mine ("*Mining Equipment*") for Bitcoin ("*BTC*").

C.  Customer desires (a) to have Customer's Mining Equipment delivered to Service Provider's Facility to generate computational power there and mine BTC on its behalf and (b) to have Service Provider host, operate and manage the Mining Equipment there in accordance with the terms and conditions of this Agreement set forth below.

D.  In exchange Service Provider agrees to provide Customer with a total utilizable energy capacity of Customer's Mining Equipment and (ii) any BTC mined by Customer's Mining Equipment (the "*Mining Output*") will be transferred to the Customer's designated Wallet in accordance with the terms and conditions of this Agreement.

E.  Service Provider agrees to provide Customer with a total utilizable energy capacity of 45MWs at the Facility to operate the miners. The energy capacity will be shared evenly over the Site.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the adequacy, receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

1.      MINING EQUIPMENT

1.1    *Miner Specifications*. Subject to the conditions set forth hereinbelow, Customer agrees to provide Service Provider with miners capable of hashing at 35 J/TH or better (e.g. Bitmain S19J Pro, Bitmain S19, Micro BT M30S, Micro BT M30S+ and Micro BT M30S++) with a specified energy utilization capacity of Forty-Five Megawatts (45 MWs) ("*Total Utilizable Capacity*") necessary to generate computational power at the Facility.  Customer is solely responsible for delivering all Mining Units and the equipment necessary to operate such Mining Units within the Service Provider's Facility, including hash boards, controller boards, case assembly, fans, power cords, and power units at its own cost and expense.

1.2    *Transfer of Mining Equipment*. Other than in connection with the repair or replacement of Mining Equipment, Customer shall not remove or transfer the Mining

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413655380D9

Equipment from the Facility except in the event that BTC mining operations become unprofitable for a continuous period of 90 days and Increased Power Costs (as defined in Clause 4.10) are in effect.  Other than in connection with the repair or replacement of Mining Equipment, if Customer removes or transfers any Mining Equipment from the Facility, Customer forfeits any right or claim it may have to a share of the energy sales profits set forth in Section 4.10 below in respect of the portion of the capacity corresponding to the Mining Equipment removed.

2.    HOSTING SERVICES

2.1    *The Facility*. Service Provider shall provide the electric power infrastructure to operate at an energy utilization capacity of at least Forty-Five Megawatts (45 MWs). Thereafter, Service Provider shall provide hosting services that include data center infrastructure, internet connectivity and monitoring as well as physical security ("*Services*") for Customer's Mining Equipment at its Facility.

2.2    *Service Level.* Service Provider shall provide the  Services to Customer in a professional and workmanlike manner consistent with the terms and conditions of this Agreement, industry standards and operating requirements of the Mining Equipment. The specific maintenance tasks and services shall include those provided  below:

2.2.1    Power Infrastructure Management.

i)  Transformer management

ii)  General checks and maintenance of all breakers and breaker panels;

iii)  Coordination with transmission curtailment implementation strategy  with all technical stakeholders such as transmission provider and energy provider on all shut offs and re-energizations.

2.2.2    Network Infrastructure Management

i)  Maintain the network switches, connectivity, and all IP equipment to    ensure miner connectivity;

ii)  Maintain all Customer boards, PSUs, power cords and ethernet cords to be in good working order; and

iii)  Identify the miner username and it is correct IP range of network switches as well any gateway and subnet mask.

2.2.3    Miner Management

i)  Physical miner maintenance and interface with Facility;

ii) Coordination of all shipping and delivery;

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D4136EE38009

*Execution Copy*

iii)  Monitoring of hash board status and user adherence to user specifications;

iv)  A/C power to the outbound port on Customer's serving power distribution unit (PDU) and internet access at 100mbps shall be available 95 % of the time in a calendar year, subject in all cases to (A) the Curtailment Events (defined below) pursuant to Section 2.4, (B) energy curtailment pursuant to Section 4.8 and (C) solely until the Facility is interconnected with NorthWestern Energy's electricity distribution system, downtime for actual preventative maintenance of the Facility, in any event not to exceed four (4) weeks of downtime a year;

v)  Filtered ambient air; and

vi)  In the event any Miners malfunction or cease to function, Service Provider shall proceed in accordance with Section 2.5 below.

2.3    *Customer Miner Delivery*.  Within one month of the Effective Date, Customer shall have delivered to Service Provider enough miners to utilize the full 45 MW of energy capacity and Service Provider shall install such Mining Equipment and make the full 45 MW of energy available within two (2) months of the Effective Date.

2.4    *Curtailment of Power*.  Subject to the terms of this Agreement, Service Provider shall be entitled, at its sole discretion and without any liability to Customer, to curtail the power at its Facility in response to calls issued under grid relief or similar programs that Service Provider participates in ("*Curtailment Events*"). The proceeds or benefits from any such Curtailment Events or participation in any such programs shall be shared between Customer and Service Provider according to the Curtailment Split (defined below).

2.5  *Malfunctioning Mining Unit*. Any Mining Unit that cannot be returned to full service remotely will be rebooted, and if necessary, removed from its shelf for repair within five (5) days from its first reported downtime and use its reasonable efforts to repair such Mining Unit promptly. At the direction of Customer, Service Provider will ship any Mining Unit to an external maintenance facility at Customer's sole cost and expense; provided Customer provides all necessary information to do so.

3.    TERM AND TERMINATION; MINING EQUIPMENT REMOVAL.

3.1    *Term*. This Agreement shall be effective as of the Effective Date and shall remain in effect for three years, specifically until April 1, 2026 (the "*Term*") provided that  NovaWulf sponsored Plan of Reorganization filed in  *Celsius Network LLC, et al* (Case Number 22-10964 (MG)) is confirmed by the U.S. Bankruptcy Court for the Southern District of New York within six (6) months of the Effective Date. The Term may be extended for an additional three-year term under the terms and fee structure set forth herein upon mutual written agreement of both Parties.

3.2    *Termination for Default by Customer*. Service Provider may terminate this Agreement for cause upon written notice to Customer if Customer: (a) fails to make any payment(s) due pursuant to this Agreement; (b) violates, or fails to perform or fulfill any material covenant or provision of this Agreement, and any such failure is not cured within ten (10) days after written notice thereof from Service Provider; (c) enters into bankruptcy, dissolution,

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413EE53B00A

*Execution Copy*

financial failure or insolvency ("*Bankruptcy Event*") other than in connection with the Customer's pending bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York as of the Effective Date, and such Bankruptcy Event has not been thoroughly dismissed within sixty (60) days; or (d) enters into an assignment, sale or merger with a third party with respect to all or substantially all of Customer's business, unless approved in writing in advance and such approval shall not be unreasonably withheld by Service Provider; (each, a "*Customer Default*") of this Agreement, and any such failure is not cured within ten (10) days after written notice thereof from Customer. Customer may remove any of its Mining Equipment not receiving electricity upon written notice to Service Provider.

3.3    *Termination for Default by Service Provider*.  Customer may terminate this Agreement for cause immediately upon written notice to Service Provider if Service Provider: (i) is unable to provide the hosting services and/or site security measures as set forth in this Agreement, (ii) violates, or fails, to perform or fulfill any material covenant or provision of this Agreement, and any such failure is not cured within ten (10) days after written notice thereof from Customer, or (iii) enters into a Bankruptcy Event and such Bankruptcy Event has not been thoroughly dismissed within sixty (60) days (each, a "*Service Provider Default*").  Customer may remove any of its Mining Equipment not receiving electricity upon written notice to Service Provider.

3.4    *Mining Equipment Removal*. Upon termination of this Agreement and following Customer's written request, *provided* Customer has paid all undisputed amounts then due and owing under this Agreement, Service Provider shall decommission and make the Mining Equipment available to Customer for pickup at, or shipment from, the Facility within forty-five (45) calendar days after Customer's written request. Service Provider shall work to uninstall and prepare for pickup all Mining Equipment of Customer at the Facility based on a mutually agreeable deinstallation schedule. Customer shall arrange for pickup within thirty (30) days of Service Provider notifying Customer that the Mining Equipment is or will be ready for pickup (the "*Pickup Notice*"). Customer shall be solely responsible for all pickup, delivery, and transportation and any other related deinstallation costs exclusive of labor costs[1] associated with removing its Mining Equipment. If Customer does not pick up its Mining Equipment within thirty (30) days following the Pickup Notice ("*Pickup Deadline*"), Service Provider may charge Customer for storage of such Mining Equipment starting on the date of the expiration of the Pickup Deadline. Notwithstanding the foregoing, in the event of removal of Mining Equipment resulting from a failure to confirm a NovaWulf sponsored Plan of Reorganization filed in Celsius Network LLC, et al (Case Number 22-10964 (MG)), the Parties shall confer on a plan for removal of the Mining Equipment within ninety (90) days (the "*Transition Period*").  The Service Provider shall use its reasonable efforts to ensure that, subject to the terms of this Agreement and the agreed removal plan, Customer's Mining Equipment remains hosted and hashing during the Transition Period. If Customer does not remove the Mining Equipment within sixty (60) days of the Pickup Notice, the Service Provider may charge Customer for the reasonable costs of storing the Mining Equipment plus a 25% mark-up.  If the period of time

DocuSign Envelope ID: CA79AFDF-6388-4829-A894-D413EE53B0D9

that Service Provider stores Customer's mining equipment exceeds one hundred and twenty (120) days, such mining equipment will be considered to be abandoned.

3.5  In the event a NovaWulf sponsored Plan of Reorganization filed in *Celsius Network LLC, et al* (Case Number 22-10964 (MG)) is not confirmed by the U.S. Bankruptcy Court for the Southern District of New York within six (6) months of the Effective Date and continues to be unconfirmed, Service Provider may, subject to Section 3.4, terminate this Agreement on written notice to Customer, delivered within the thirty (30) days following the expiration of the six (6) month period following the Effective Date.

4.      FEES AND REVENUE SHARING

In exchange for providing the Services hereunder, Customer shall pay the following fees:

4.1  *Prepayment of Expenses*. Customer agrees to pay all monthly operational and energy expenses, as defined below, in advance.

4.2  *Initial Deposit.* Within five (5) business days following execution of the Agreement, Customer shall pay Two Million, Five Hundred Thousand Dollars ($2,500,000.00) USD to Service Provider as a deposit against anticipated operational and energy costs, unused balance to be returned upon termination of this Agreement ("*Initial Deposit*").

4.3  *Direct Costs and Variable Expenses.*  Customer shall pay on a monthly basis, one hundred percent (100%) of the reasonable direct costs and variable expenses that Service Provider has incurred in connection with its management of the Miners and operation of the Facility as further defined on <u>Schedule A</u> attached hereto ("*OPEX*").

4.4  *Bitcoin Fee.* The "*Bitcoin Fee*" is the positive number denominated in Bitcoins equaling the total number of Bitcoins mined at the Facility over the preceding month, minus OPEX for the same proceeding month, and subsequently adjusted to credit each Party in accordance with the "Hashrate Split," which is 70% to Customer and 30% to Service Provider. For the purposes of calculation of the Bitcoin Fee, each day, the aggregate of all OPEX will be assigned a Bitcoin value at the average daily rate of USD/BTC available on the public reputable source to be agreed by the Parties or the average liquidation price of BTC from the OPEX Wallet (described below). The total amount of all OPEX, calculated on a daily basis for the preceding month and denominated in Bitcoin value according to the formula above, will be deducted from Customer's Bitcoins mined at the Facility over the preceding month and then apportioned in accordance with the Hashrate Split to each Party.

4.5  *Administration of BTC Rewards and Transaction Fee Awards*

Customer desires to contribute the mining hashrate generated by its Miners at the Facility to a global mining pool, selected in its discretion.  In order to comply with Service Provider's internal Customer Due Diligence protocol, in the event that Customer utilizes a mining pool operator other than Foundry or Luxor, Customer shall provide the following information to Service Provider prior to the commence of mining: identification of the mining pool operator including its country or origin, the business form and beneficial

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413F5F3800D

*Execution Copy*

ownership of the mining pool operator and verification of all of the information.

4.6    *Hashrate Split Transfers and Cryptocurrency Wallets*

Customer will instruct the Mining Pool Provider to direct the applicable BTC rewards and BTC transaction fee awards in accordance with the Hashrate Split percentages, set forth in Section 4.4., to the following wallets:

4.6.1    Customer Wallet – 56%

4.6.2    OPEX Wallet - 20%. All BTC deposits will be liquidated on a daily basis into United States Dollars ("*USD*").

4.6.3    Service Provider Wallet – 24%

4.7    *Wallet Security*. Customer is responsible for maintaining the confidentiality and integrity of its Wallet including access information. Customer must notify Service Provider  immediately if Customer's Wallet address has changed or if there is any other change, loss, fraud or suspicion about Customer's Wallet. Service Provider will not be held liable for any lost Wallet information or hacked Wallet, nor any loss arising thereof as a result including theft or fraud, not resulting from or caused by Service Provider's breach, negligence or misconduct.

4.8    *Energy Curtailment*. Customer will have the option to curtail the electrical load to the Facility in respect of the Mining Equipment for economic reasons. Service Provider will have the option to curtail the electrical load to the Facility for economic reasons where the day-ahead market price of energy exceeds more than Ninety Dollars ($90.00) per MWh ("*Curtailment Strike Price*"). Economic energy curtailment directed by Service Provider is limited to 15% of the total hours for a six month period. In the event that either Party exercises the economic curtailment option, Customer and Service Provider agree to split the revenue from the energy sales in excess of OPEX with 50% going to each party (the "*Curtailment Split*").

4.9    *Monthly True-Up.* No later than twenty (20) days after the end of each calendar month, Service Provider shall provide Customer with the final invoice for the immediately preceding month reflecting (i) the OPEX for that month; (ii) the amount of USD collected in the OPEX wallet after the daily liquidation of the mined BTC; and (iii) if applicable, the  Energy Curtailment revenue for such month (the "*Final Monthly Invoice*"). If the amount of the Final Monthly Invoice is greater than the amount of cash USD liquidated into the OPEX Wallet during the preceding month and Customer's share of the Energy Curtailment revenue, Customer shall pay 70% of such excess amount in USD to Service Provider within five (5) days of receipt of the Final Monthly Invoice. If the amount of the Final Monthly Invoice is less than the amount of USD in the OPEX Wallet for the preceding month, Service Provider shall apply such difference as a credit towards OPEX for the following month or refund such amounts to Customer in accordance with the Hashrate Split and the Curtailment Split.

4.10    *Overdue Amounts; Disputes*. Overdue payments will incur interest at the

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D4136EE380D9

*Execution Copy*

lesser of 1% per month or the maximum amount allowed under applicable law. Customer shall have the right to dispute all or a portion of any Final Monthly Invoice following the receipt of such invoice in accordance with the Dispute resolution process set forth in Section 15.6 below.

4.11    *Taxes.*

4.11.1  Customer's Tax Responsibilities. All amounts billed to Customer under this Agreement are exclusive of any applicable taxes, duties and fees Customer is solely responsible for, including federal, state and local taxes on manufacture, sales, gross income, receipts, occupation, personal property and use of Customer's Mining Equipment.

4.11.2  Service Provider's Tax Responsibilities. Service Provider is responsible for any taxes imposed on or with respect to Service Provider's income, revenues, gross receipts, personnel, or real property arising out of this Agreement.

4.11.3  Service Provider will advise Customer  whether or not Service Provider is subject to backup withholdings.

5.0    CONSTRUCTION OF HYDRO POWER INTERCONNECTION AT THE FACILITY

Service Provider intends to interconnect the Facility with NorthWestern Energy's electricity distribution system.

5.1    *[Reserved].*

5.2    *Interconnection Construction Cost Installment Payments.* Customer agrees to pay $875,000 to Service Provider representing its share of interconnection construction costs in the form of two advances (the "*Advances*") against Service Provider's share of the Hashrate Split and the Curtailment Split.  The first Advance shall be for $500,000 due and payable upon the confirmation of a NovaWulf sponsored Plan of Reorganization filed in  Celsius Network LLC, et al (Case Number 22-10964 (MG)) by the U.S. Bankruptcy Court for the Southern District of New York and, conditional on the first payment having been made, the second Advance shall be for $375,000  due and payable when the interconnection is approved by Montana State regulators. Service Provider's portion of the Hashrate Split and the Curtailment Split shall go to Customer until the Advances are fully repaid and any amounts remaining unpaid upon termination of the Agreement shall be repaid to Customer as part of the true-up process for the final invoice.  Service Provider is not obligated to refund, other than through the ordinary repayment of the advances pursuant to this Section 5.2, any of Customer's installment payments if either the interconnection is not approved by regulators and/or the actual interconnect capacity approved is less than projected.

6.0    RISK

6.1    *Price Fluctuations*. Customer understands that Service Provider is not liable for price fluctuations in BTC.

6.2    *No Liability for BTC Security, Forks or Software.* By entering into this Agreement Customer acknowledges and agrees that: (a) Service Provider is not responsible for the operation of any BTC underlying protocols, and Service Provider makes no guarantee of their functionality, security, or availability; (b) BTC underlying protocols are subject to sudden changes in operating rules (a/k/a "forks"), and such forks may materially affect the value and function of the BTC; and (c) Service Provider does not own or control the underlying software protocols which govern the operation of any BTC.

6.3    *BTC Volatility.* Customer understands that Mining is an everchanging and volatile endeavor and that there is no guarantee that the Services will generate any set amount of BTC.

6.4    *No Liability for BTC Market, Technological System Failures or Customer Error*. Customer acknowledges that Service Provider shall have no responsibility or liability for: (a) events or circumstances beyond the reasonable control of Service Provider, including, without limitation, the interruption, suspension or restriction of trading on or the closure of any BTC market or system, power or other mechanical or technological failures or interruptions, computer viruses or communications disruptions, work stoppages, natural disasters, acts of war, revolution, riots or terrorism or other similar force majeure events, in each case to the extent beyond the reasonable control of Service Provider; (b) any error by any Customer; (c) any error by any Mining Pool Provider; (d) the insolvency of, or acts or omissions by a BTC trading platform; (e) any error, or any loss, destruction, corruption or other inability to use or transfer the BTC caused by the applicable blockchain or any other technology used to implement or operate any BTC, or other circumstances beyond the reasonable control of Service Provider; (f) any delay or failure of any BTC issuer, the developer or operator of any technology used to implement or operate any BTC, or any broker, agent, intermediary, bank or other commercially prevalent BTC payment or clearing system to provide any information or services required in order to enable Service Provider's performance hereunder; and (g) the effect of any provision of any law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or of any court of competent jurisdiction.

7.0    SITE ACCESS.

7.1    *Access.* Only those persons specifically authorized by Service Provider in writing may access the Facility, such authorization not to be unreasonably withheld. All Customer representatives shall follow all applicable safety protocols and directions from Service Provider's personnel while at the Facility. Customer shall be solely responsible for any damage or loss caused by Customer representative acting for or on its behalf while at the Facility.

7.2    *Hazardous Conditions.* If any hazardous conditions beyond the reasonable control of Service Provider arise at, from, or materially affecting the Facility, whether caused by Customer or a third party, Service Provider is hereby authorized to immediately suspend the Services under this

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413EE538D09

Agreement without subjecting Service Provider to any liability hereunder, and without constituting a Service Provider Default, and will provide notice to Customer of such suspension as soon as reasonably practicable; provided that such suspension shall be terminated upon resolution of such hazardous condition.

### 8.0    RELOCATION OF MINING UNITS; INTERFERENCE AND EMERGENCY

8.1    *Relocation*. Service Provider may reasonably require the relocation of some or all of Customer's Mining Units within the Facility, or to another Service Provider facility, upon twenty (20) days' prior written notice to Customer: provided, that the relocation site shall afford comparable economic, environmental and working conditions for such Mining Units and comparable accessibility to the Mining Units. Notwithstanding the foregoing, Service Provider shall not arbitrarily or capriciously require Customer to relocate the Mining Equipment. If any Mining Units are relocated according to this Section, the reasonable costs of relocating such Mining Units and improving the Facility to which such Mining Units will be relocated shall be borne solely by Service Provider. Any relocation will be completed by Service Provider's authorized staff.

8.2    *Interference.* Customer shall not operate any Mining Unit in a manner that causes or may cause unacceptable interference to existing or prospective Service Provider customers, the Facility or Service Provider's hosting operations. Service Provider may require Customer to alter, remove or relocate such Mining Unit at Customer's sole cost and expense in the event of any such interference.

8.3    *Emergency*. In the event of an emergency outside the Service Provider's reasonable control, as determined in Service Provider's reasonable discretion, Service Provider may rearrange, remove, or relocate any Customer Mining Unit without subjecting Service Provider to any liability hereunder, and without constituting a Service Provider Default. Notwithstanding the foregoing, in the case of emergency, Service Provider shall provide Customer, to the extent practicable, reasonable notice prior to rearranging, removing, or relocating Customer's Mining Units. At Customer's reasonable request, Service Provider shall reverse such rearrangement, removal or relocation once the emergency is no longer continuing.

### 9.    CUSTOMER RESPONSIBILITIES.

9.1    *Compliance with Laws.* Customer's use of the Facility and the Mining Equipment located at the Facility and the Service Provider's provision of the Services must at all times conform to all applicable laws, rules and regulations (collectively, "*Laws*"), including, but not limited to, the Laws of the country(ies) and States in which Customer is doing business, and the Laws of City, County and State where the Facility is located.

9.2    *Licenses and Permits*. Customer shall be responsible for obtaining all licenses, permits, consents, and approvals from any federal, state or local government that may be required to possess, own, install or operate the Mining Equipment. Service Provider shall be responsible for obtaining all licenses, permits, consents, and approvals from any federal, state or local government

*Execution Copy*

that may be required to provide the Services. Each Party shall provide reasonable assistance to the other in order to secure licenses, permits, consents, and approvals relevant to this Agreement.

9.3    *Mining Units*. Customer shall deliver Mining Units to the Facility in good working order and suitable for use in the Facility. Customer shall be responsible for any and all costs associated with the troubleshooting and repair of Mining Units received in non-working condition. Service Provider is not responsible in any way for installation delays or loss of profits as a result of any Customer Mining Unit deemed not to be in good working order upon arrival at Facility.

9.4    *Material Modifications of Mining Equipment*. If Service Provider determined that one or more or the Customer's Equipment has been modified, altered, overclocked or the firmware adjusted (each, a "*Modification*") without Service Provider's prior written approval, such approval only to be withheld in the event that Service Provider, after reasonable investigation, determines that such Modification would be in violation of this Agreement, ("*Non-Compliant Equipment*"), Service Provider reserves the right to immediately discontinue service to such Non-Compliant Equipment and/or invoice Customer for Service Provider's incremental costs from such Non-Compliant Equipment. Customer reserves the right to dispute such incremental costs reasonably and in good faith.

9.5    *Extreme Weather Instructions*. Customer shall provide written instructions relating to powering down of its Mining Equipment in the event of extreme weather.

9.6    *Representations.* Each Party represents and warrants to the other Party that such Party (i) is properly constituted and organized, (ii) is duly authorized to conduct its business and to enter into and perform its obligations under this Agreement, and (iii) the execution and delivery of this Agreement and the performance of its duties hereunder does not violate the terms of any other agreement to which it is a party or by which it is bound.

9.6    BSA/AML and OFAC Representation. Each of Customer and Service Provider represents and warrants that it is in material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Customer or Service Provider, as applicable, operates, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including, but not limited to the Bank Secrecy Act/Anti- Money Laundering ("*BSA/AML*") and Office of Foreign Assets Control ("*OFAC*") compliance programs. Each of Customer and Service Provider will at all times comply with the laws, regulations and rules of any applicable governmental or regulatory authority, including, without limitation, Money Service Business regulations under the Financial Crimes Enforcement Network ("*FinCen*"); state money transmission laws; laws, regulations, and rules of relevant tax authorities; applicable regulations and guidance set forth by FinCEN; the Bank Secrecy Act of 1970; the USA PATRIOT Act of 2001; AML/CTF provisions as mandated by U.S. federal law and any other rules and regulations regarding AML/CTF; issuances from the Office of Foreign Assets Control ("*OFAC*"); the National Futures Association; the Financial Industry Regulatory Authority; and the Commodity Exchange Act.  Customer further understands that any fines or penalties imposed on Service Provider directly as a result of Customer's breach of the representations and warranties in this Agreement may, at Service Provider's discretion, be passed

DocuSign Envelope ID: CA79AFDF-6388-4829-A894-D413FF5380DA

on to Customer and Customer acknowledges and represents that Customer will be responsible for payment to Service Provider of such fines. Each Party further agrees that any fines or penalties imposed on a Party directly as a result of other Party's breach of the representations and warranties in this Agreement may, at in their discretion, be passed on to the breaching Party and the breaching Party acknowledges and represents that it will be responsible for payment to the non-breaching Party of such fines.

10. NOTICES. All notices and other communications between the Parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (iii) when delivered by FedEx or other nationally recognized overnight delivery service, or (iv) when e-mailed during normal business hours (and otherwise as of the immediately following business day), addressed as follows:

If to Customer:

CELSIUS MINING LLC
50 Harrison St. , Suite 209F
 Hoboken NJ 07030
Attn: Legal Department
Email: Legal@celsius.network

If to Service Provider:

MONTANA OP, LLC
9 Federal Street
Easton, MD 21601
Attn: General Counsel's Office
Email: legal@beowulfenergy.com

11. INSURANCE.

11.1 Customer expressly acknowledges and agrees that Service Provider is not an insurer and that the Mining Equipment is not covered by any insurance policy held by Service Provider. Customer is solely responsible for obtaining insurance coverage for any and all of the Mining Equipment Customer provides to Service Provider under this Agreement. With respect to insurance coverage of the Mining Equipment, Customer agrees that Customer's insurer will be the primary insurer in the event of any loss or injury.

11.2 Service Provider expressly acknowledges and agrees that Customer is not an insurer and that the Facility and Service Provider's assets and equipment are not covered by any insurance policy held by Customer. Service Provider is solely responsible for obtaining insurance coverage for the Facility and Service Provider's assets and equipment.

11.3    Each Party shall have commercial general liability insurance for both bodily injury and property damage of not less than one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) in the aggregate. This insurance policy shall (i) be maintained by such Party throughout the Term of this Agreement and (ii) waive any and all subrogation rights and name such other Party as additional insured.

12.    WARRANTY AND DISCLAIMER.

12.1    CUSTOMER EXPRESSLY ACKNOWLEDGES THAT SERVICE PROVIDER HAS NOT INSPECTED OR CAUSED TO BE INSPECTED THE MINING EQUIPMENT AND/OR THE INDIVIDUAL MINING UNITS FOR ANY PATENT OR LATENT DEFECTS AND EXPRESSLY AGREES THAT SERVICE PROVIDER WOULD NOT BE ENTERING INTO THIS AGREEMENT WITHOUT SUCH CERTIFICATION FROM CUSTOMER. FOR THE AVOIDANCE OF DOUBT, PATENT OR LATENT DEFECTS SHALL NOT INCLUDE ORDINARY WEAR AND TEAR FROM NORMAL USAGE OF THE MINING EQUIPMENT. SERVICE PROVIDER DOES NOT PROVIDE MECHANICAL COOLING, EXCEPT FOR FANS OR BACKUP POWER AND THE FACILITY IS SUBJECT TO SWINGS IN LOCAL TEMPERATURE, WIND, HUMIDITY AND OTHER CONDITIONS. SERVICE PROVIDER MAKES NO WARRANTY WHATSOEVER, AND HEREBY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, WITH RESPECT TO GOODS AND SERVICES SUBJECT TO THIS AGREEMENT, INCLUDING ANY (A) WARRANTY OF MERCHANTABILITY; (B) WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; (C) WARRANTY OF NONINFRINGEMENT AND (D) WARRANTY AGAINST INTERFERENCE.

12.2    CUSTOMER EXPRESSLY ACKNOWLEDGES AND AGREES THAT SERVICE PROVIDER DOES NOT WARRANT THAT: (A) THE SERVICES SHALL BE AVAILABLE 24/7 OR FREE FROM INTERRUPTION; (B) THE SERVICES WILL MEET CUSTOMER'S REQUIREMENTS OTHER THAN AS EXPRESSLY SET FORTH HEREIN; OR (C) THE SERVICES WILL PROVIDE ANY FUNCTION NOT EXPRESSLY DESIGNATED AND SET FORTH HEREIN.

12.3    Customer and/or its commonly controlled affiliates has good and valid title to the Mining Equipment free and clear of any and all liens.

13.    LIMITATIONS OF LIABILITY.

13.1    Customer expressly acknowledges and agrees that, in certain situations, the Services and the Mining Equipment's functionality may be unavailable due to factors outside of Service Provider's reasonable control. This includes, but is not limited to, Force Majeure (as defined below), inclement weather, network failures, pool operator failures, denial of service attacks, currency network outages, hacking or malicious attacks on the crypto networks or exchanges, power outages outside the reasonable control of Service Provider, pandemics or acts of God ("*Excluded Events*").

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D4136E538D09

13.2    NEITHER PARTY SHALL HAVE AN OBLIGATION, RESPONSIBILITY, OR LIABILITY FOR ANY OF THE FOLLOWING TO THE EXTENT OUTSIDE SUCH PARTY'S REASONABLE CONTROL: (A) ANY INTERRUPTION OR DEFECTS IN THE MINING UNITS' FUNCTIONALITY CAUSED BY ANY EXCLUDED EVENT; (B) ANY LOSS, DELETION, OR CORRUPTION OF DATA OR FILES WHATSOEVER; (C) ANY LOST REVENUE DURING OUTAGES OR FAILURES CAUSED BY AN EXCLUDED EVENT; (D) DAMAGES RESULTING FROM ANY ACTIONS OR INACTIONS OF A PARTY OR ANY THIRD PARTY NOT UNDER SUCH PARTY'S CONTROL; OR (E) DAMAGES RESULTING FROM ANY THIRD PARTY MINING EQUIPMENT.

13.3    EXCEPT FOR LIABILITIES RESULTING FROM EITHER PARTY'S GROSS NEGLIGENCE, FRAUD AND/OR WILLFUL MISCONDUCT BUT SUBJECT TO SECTION 12.2, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON, FIRM, OR ENTITY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, INCLUDING LOSS OF PROFITS OF ANY KIND OR NATURE WHATSOEVER, ARISING OUT OF MISTAKES, NEGLIGENCE, ACCIDENTS, ERRORS, OMISSIONS, INTERRUPTIONS, OR DEFECTS IN TRANSMISSION, OR DELAYS, INCLUDING, BUT NOT LIMITED TO, THOSE THAT MAY BE CAUSED BY REGULATORY OR JUDICIAL AUTHORITIES, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OBLIGATIONS OF A PARTY HEREUNDER. EXCEPT FOR LIABILITIES RESULTING FROM EITHER PARTY'S GROSS NEGLIGENCE, FRAUD AND/OR WILLFUL MISCONDUCT, EACH PARTY'S TOTAL CUMULATIVE LIABILITY UNDER THIS AGREEMENT, WHETHER UNDER CONTRACT LAW, TORT LAW, WARRANTY, OR OTHERWISE, SHALL BE LIMITED TO DIRECT DAMAGES NOT TO EXCEED THE AMOUNTS PAID OR PAYABLE TO SERVICE PROVIDER FROM CUSTOMER IN THE SIX (6) MONTHS PRIOR TO THE DATE OF THE EVENT GIVING RISE TO THE CLAIM (OR IF SUCH EVENT OCCURS PRIOR TO THE ELAPSING OF SIX(6) MONTHS FROM THE EFFECTIVE DATE, AN ANNUALIZED AMOUNT BASED ON THE DAYS ELAPSED FROM THE EFFECTIVE DATE UNTIL THE OCCURRENCE OF SUCH EVENT).

13.4    To the maximum extent permitted by law, Service Provider is excluded from liability for any losses or damages which Customer may suffer, whether the same are suffered directly or indirectly or are immediate or consequential, which fall within any of the following categories: (i) loss of cryptocurrency arising as a result of any of Customer's acts or omissions or any acts or omissions of any third party under the control of Customer; and (ii) loss arising out of or in connection with any of the following:

(a)    any defect or insecurity in any third-party systems used to store or transmit cryptocurrency;

(b)    any inaccurate or incomplete information provided by Customer, including cryptocurrency wallet addresses;

(c)    any changes to the regulatory, legislative or technical environment applicable

13

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413F5E380D9

*Execution Copy*

to cryptocurrencies;

(d)     the acts or omissions of any bank or provider of banking services; or (e) any change in the value of cryptocurrency.

14.     INDEMNIFICATION.

Each Party shall indemnify, hold harmless and defend the other Party, its subsidiaries, employees, agents, directors, owners, executives, representatives, and subcontractors from any and all third-party liability, claim, judgment, loss, cost, expense or damage, including reasonable attorneys' fees and legal expenses, to the extent arising out of or relating to the breach of obligations under this Agreement, or any injuries or damages sustained by any person or property due to any direct or indirect act, omission, negligence or misconduct of a Party, its agents, representatives, employees, contractors and their employees and subcontractors and their employees. The indemnified Party shall not enter into any settlement or resolution with a third party under this Section without the indemnifying Party's prior written consent, which shall not be unreasonably withheld or conditioned.

15.     MISCELLANEOUS.

15.1    *Entire Agreement.* This Agreement, including any documents referenced herein, constitutes the Parties' entire understanding regarding its subject and supersedes all prior or contemporaneous communications, agreements and understanding between them relating thereto. Each Party acknowledges and agrees that it has not, and will not, rely upon any representations, understandings, or other agreements not specifically set forth in this Agreement. This Agreement shall not be superseded, modified or amended except by express written agreement of the Parties.

15.2    *Waiver, Severability.* The waiver of any breach or default hereunder does not constitute the waiver of any subsequent breach or default. If any provision of this Agreement is held to be illegal or unenforceable, it shall be deemed amended to conform to the applicable Laws, or, if it cannot be so amended without materially altering the intention of the Parties, it shall be stricken and the remainder of this Agreement shall continue in full force and effect.

15.3    *Assignment.* Neither this Agreement nor any right or obligation arising under this Agreement may be assigned by a Party in whole or in part, without the prior written consent of the other Party at its sole discretion. This Agreement shall be binding upon and inure to the benefit of the Parties, their legal representatives, successors, and permitted assigns.

15.4    *Force Majeure.* Neither Party shall be liable in any way for delay, failure in performance, loss or damage due to any of the following: fire, strike, embargo, explosion, power failure outside such Party's reasonable control, flood, lightning, war, water, electrical storms, high winds, snow, ice, frost, fog, extreme temperatures, labor disputes, civil disturbances, governmental requirements, acts of civil or military authority, acts of God, acts of public enemies,  pandemics (other than Covid-19) or other causes beyond its reasonable control, whether or not similar to the

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413EE38D09A

*Execution Copy*

foregoing ("*Force Majeure*").

15.5    *Governing Laws*. This Agreement will be governed by and construed in accordance with the laws of the State of New York as applied to contracts made and performed entirely therein, and without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of New York to the rights and duties of the Parties.

15.6    *Dispute Resolution Process*. In the event that any claim, dispute, controversy, difference, disagreement or grievance under this Agreement (a "*Dispute*"), either Party shall have the right to invoke this dispute resolution process upon written notice to the other Party setting forth the particulars of the Dispute and the relief requested (a "*Dispute Notice*"). If the Parties are unable to resolve a Dispute within ten (10) days of the applicable Dispute Notice, each Party shall, within ten (10) days thereafter, appoint a senior management representative with full authority to resolve such Dispute. The Parties' designated senior management representatives shall meet within the next sixty (60) days at mutually agreeable times and locations, in person or via video conferencing. If the Dispute remains unresolved at the end of such sixty (60) day period, either party may bring suit hereunder solely in the state or federal courts located in New York, New York. Each Party consents to the exclusive jurisdiction of such courts in connection with any Dispute hereunder and waives any defense of forum inconveniens in connection therewith. EACH PARTY HEREBY EXPRESSLY WAIVES, TO THE FULLEST EXTENT PERMISSABLE BY LAW, ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY OR AGAINST EITHER PARY IN CONNECTION WITH THIS AGREEMENT.

15.7 *Relationship of the Parties*. The Parties agree that their relationship hereunder is in the nature of independent contractors. Neither Party shall be deemed to be the agent, partner, joint venturer or employee of the other, and neither shall have any authority to make any agreements or representations on the other's behalf. Each Party shall be solely responsible for the payment of compensation, insurance and taxes of its own personnel, and such personnel are not entitled to the provisions of any employee benefits from the other Party. Neither Party shall have any authority to make any agreements or representations on the other's behalf without the other's prior written consent.

15.8    *Intellectual Property*. Nothing in this Agreement shall be deemed to grant to either Party any rights or licenses, by implication, estoppel or otherwise, to any of the other Party's intellectual property. Neither Party shall contest or challenge, or assist any third party in contesting or challenging, the validity or enforceability of any of the other Party's intellectual property.

15.9    *Trademarks.* Each Party is strictly prohibited from using any product or corporate name, designation, logo, trade name, trademark, service name or service mark associated with the other Party or its affiliates in any marketing materials, regulatory filing, financial statements, offering circular, prospectus or otherwise, without the prior written consent of the first Party, which may be withheld by the first Party in its sole and absolute discretion.

15.10    *No Exclusivity.* This Agreement in no way establishes any exclusive arrangement

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D436EE3809DA

between Customer and Service Provider. Each Party acknowledges and agrees that the other Party will be free to enter into agreements and other arrangements with any third parties, at any time, regarding any products or services.

15.11  *Parties Are Sophisticated and Represented.* No preference shall be given to one Party by virtue of the fact that such Party did not draft this Agreement. No bias shall be placed against the drafter. Each Party has been advised and offered the opportunity to seek legal counsel regarding this Agreement. To the extent either Party chose not to or to limit such, such Party hereby waives any later complaint that it lacked proper counsel or understanding.

15.12  *Counterparts / Execution.* This Agreement may be executed in counterparts, which together shall constitute a single instrument, and may also be executed by electronic signature, and the Parties agree that facsimile, digitally scanned or other electronic copies of signatures shall be valid and binding as originals. 15.13  *Survival.* The provisions contained in Sections 9, 10, 11, 12, 13 and 14 shall survive the termination or expiration of this Agreement.

15.14  *Confidentiality.* The terms and conditions of this Agreement, the Services, the Bitcoin Fee, the OPEX Fee and the Energy Curtailment Share (and any other related materials or information provided by Service Provider to Customer) are Service Provider's confidential information, regardless of whether they are marked as confidential, proprietary or otherwise. The personal data provided by Customer in the context of this Agreement (and any other related materials or information provided by Customer to Service Provider) are Customer's confidential information, regardless of whether they are marked as confidential, proprietary or otherwise. The Parties shall (a) keep such confidential information strictly confidential in a manner that each Party protects its own confidential or proprietary information of a similar nature (and with no less than reasonable care); and (b) not disclose such confidential information to any third party other than each Party's employees, officers, directors, lenders, consultants and financial or legal advisors that have a need to know such information and have agreed in writing to keep such information confidential and not disclose such confidential information. Notwithstanding the foregoing, either Party may disclose confidential information as required by applicable Laws or by order of a court of competent jurisdiction, provided that, in such event (i) such Party will provide the other Party with prompt written notice of such obligation so that the other Party has an opportunity to take legal action to prevent or limit the scope of such disclosure; and (ii) such Party will furnish only that portion of the other Party's confidential information which the Party is advised by counsel is legally required and such Party will exercise commercially reasonable efforts to assisting the other Party in obtaining assurance that confidential treatment will be accorded to such confidential information.

15.15  *Third-Party Beneficiaries.* Nothing in this Agreement is intended, nor shall anything herein be construed to confer any rights, legal or equitable, in any person or entity other than the Parties hereto and their respective successors and permitted assigns.

15.16 *Affiliates.* For all purposes under this Agreement, a Service Provider shall be deemed to be responsible for and have control over the actions of its affiliates.

DocuSign Envelope ID: CA79AEDF-6388-4829-A894-D413E5E3800A

15.17  *Construction; Interpretation*. Unless the context otherwise requires, words in the singular include the plural, and in the plural include the singular; masculine words include the feminine and neuter; "or" means "either or both" and shall not be construed as exclusive; "including" means "including but not limited to"; "any" and "all" shall not be construed as terms of limitation; and, a reference to a thing (including any right or other intangible asset) includes any part or the whole thereof. Any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not apply to the interpretation and construction of this Agreement, and this Agreement shall be construed as having been jointly drafted by the Parties. The titles and headings for particular paragraphs, Sections and Subsections of this Agreement have been inserted solely for reference purposes and shall not be used to interpret or construe the terms of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set out above.

Customer:                                    Service Provider:

    CELSIUS MINING LLC                    MONTANA OP LLC

By: _Chris Ferraro_____              By: _____

    Name: Chris Ferraro                   Name: Mila Barrett

    Title:  Authorized Signatory          Title:  Secretary

DocuSign Envelope ID: CA79AEDF-6388-4820-A894-D413F5E380D9

*Execution Copy*

## Schedule A – OPEX

### FACILITY DIRECT AND VARIABLE COSTS TO BE INVOICED TO CELSIUS MINING LLC

All costs and expenses charged to Customer or deducted from Curtailment revenue shall be reasonable, documented and attributable to Customer's use of the Services and the Facility and, without limitation, shall not include any amounts for depreciation, capital expenditures, litigation not directly related to project level contracts, executive compensation not directly related to the Facility or mothballing/decommissioning expenses.

## I.  MINING EXPENSES

**All mining expenses listed below are limited to Customer's allocated share of usage of the Facility and only includes those periods of time when Customer's mining equipment is operational**.

A.  Fuel Costs - incurred to generate electricity for Facility.
B.  Chemicals and other variable Operations and Management Costs - incurred in the generation of electricity for Facility.
C.  Facility Operations and Maintenance Costs
D.  Facility General and Accounting Costs and local taxes -  (office expenses,  legal, plant accounting excluding any executive compensation or general overhead not directly related to the Facility).
E.  Direct costs - (miner management software, network security, internet and data center employees).
F. Cost of power from interconnect, if applicable.

## II.  ENERGY SALES EXPENSES

**All energy expenses listed below are limited to Customer's allocated share of usage of the Facility and will be deducted from Curtailment revenue prior to the Curtailment Split.**

A.  Fuel Costs – incurred to generate electricity sold to the grid for subject to Curtailment Split.
B.  Chemicals and other variable Operations and Maintenance Costs – incurred to generate electricity sold to the grid subject to Curtailment Split.
C.  Facility Labor Costs – attributable to the generation and/or sale of electricity sold to the grid subject to Curtailment Split.
D.  Facility Operations and Maintenance Costs -  attributable to generate electricity sold to grid subject to Curtailment Split.
E.  Facility General and Accounting Costs and Local Taxes -  attributable to electricity sold to grid subject to Curtailment Split. (excluding any executive compensation or general overhead not directly related to the Facility).

DocuSign Envelope ID: CA79AEDF-6388-4820-A894-D413FE38D09A

*Execution Copy*

### III.  FACILITY MAINTENANCE ACCRUAL EXPENSES

A.  Related to Mining Operations

B.  Related to Energy Sales

## SAMPLE INVOICE:  MONTANA OPERATING CO. LLC

### Montana Operating Co LLC

| To: | Customer | | Date: | 20-Mar-23 |
| | Street | | | |
| | Address | | **Delivery Month:** | Feb-23 |
| | City, State Zip Code | | **Invoice:** | 0323-MOCOPa |
| | | | **Terms:** | 25-Mar-23 |
| **From:** | **Montan Operating Co LLC** | | | |
| | 9 Federal Street | | | |
| | Easton, MD  21601 | | | |

| ALL VALUES FOR ILLUSTRATIVE PURPOSE ONLY | Volume | | Price | | Amount | |
|---|---|---|---|---|---|---|
| Total Hardin Generation | 51,800.0 | MWh | | | | |
| Total Hosting energy Allocation | 44,200.0 | MWh | | | | |
| Total Energy Supplied to Data Center | 22,200.0 | MWh | | | | |
| Total Energy Sold to grid | 22,000.0 | MWh | | | | |
| | | | | | | |
| Total BTC Sales Revenue | 128 | BTC | $24,000 | $ | 3,072,000.00 | |
| Total Energy Sales Revenue | 22,000 | MWh | $135 | $ | 2,972,972.97 | |
| | | | | | | |
| Variable costs | 51,800 | MWh | 30.00 | $ | 1,554,000.00 | |
| Hardin O&M Costs | 51,800 | MWh | 12.00 | $ | 621,600.00 | |
| DC direct costs | 22,200 | MWh | 4.50 | $ | 100,000.00 | |
| Major maintenance accrual | 51,800 | MWh | 2.90 | $ | 150,000.00 | |
| | | | | | | |
| Mining Revenue to Customer | 90 | BTC | $24,000 | $ | 2,150,400.00 | |
| Energy Revenue to Customer | 11,000 | MWh | $135 | $ | 1,486,486.49 | |
| **Total Rev to Customer** | | | | $ | 3,636,886.49 | |
| | | | | | | |
| **Mining Expenses to Customer** | | | | | | |
| Variable costs | 15,540 | MWh | 30.00 | $ | 466,200.00 | |
| Hardin O&M Costs | 15,540 | MWh | 12.00 | $ | 186,480.00 | |
| DC Direct costs | 15,540 | MWh | 4.50 | $ | 70,000.00 | |
| Major maintenance accrual | 15,540 | MWh | 2.90 | $ | 45,000.00 | |
| | | | | | | |
| **Energy Sales Expenses to Customer** | | | | | | |
| Variable costs | 11,000 | MWh | 30.00 | $ | 330,000.00 | |
| Hardin O&M Costs | 11,000 | MWh | 12.00 | $ | 132,000.00 | |
| Major Maintenance accrual | 11,000 | MWh | 2.90 | $ | 31,853.28 | |
| | | | | | | |
| *Customer Margin* | | | | *$* | *2,375,353.20* | |
| | | | | | | |
| *Energy Revenue applicable to Customer* | | | | *$* | *1,486,486.49* | |
| *Liquidated OpEx wallet proceeds applicable to Customer* | | | | *$* | *430,080.00* | |
| **Customer Actual Expenses** | | | | **$** | **1,261,533.28** | |
| **Net True Up Amount Owed to MoCo (Credited to Customer)** | | | | **$** | **(655,033.20)** | |

- <u>For illustration purposes only</u>

# MONTANA OP LLC

9 Federal Street
Easton, Maryland 21601

July 5, 2023

**VIA ELECTRONIC MAIL**

CELSIUS MINING LLC
50 Harrison St., Suite 209F
Hoboken NJ 07030
Attention: Legal Department
Email: legal@celsius.network

Re:   Notice of Breach and Response to Celsius Allegations and Demand for Dispute
      Resolution in connection with that certain Hosting Services Agreement, dated as of
      April 1, 2023 (the "Hosting Agreement"), by between Celsius Mining LLC
      ("Celsius") and Montana OP LLC ("Montana OP")

Ladies and Gentlemen:

Montana OP acknowledges receipt of a letter dated June 30, 2023, issued on behalf of Celsius, alleging that Montana OP is in breach of the Hosting Agreement by purportedly refusing to honor its contractual obligations thereunder and charging Celsius for costs greater than those permitted under the Hosting Agreement, and notifying Montana OP of Celsius' invocation of the Dispute Resolution Process pursuant to Section 15.6 of the Hosting Agreement.

Montana OP hereby (i) notifies Celsius of Celsius' material breach of the Hosting Agreement; (ii) responds to Celsius' mistaken allegations and (iii) agrees to participate in the Dispute Resolution Process. Capitalized terms used but not otherwise defined in this letter shall have the meaning given such terms in the Hosting Agreement.

I.    Celsius' Material Breaches and Customer Defaults

Celsius has been violating the Hosting Agreement by failing to perform its material obligations thereunder as follows:

1.    On June 6th and June 23rd (updated on June 30th), Montana OP invoiced Celsius
      for Services rendered under the Hosting Agreement in April and May 2023,
      respectively. The amounts billed under these invoices were calculated in
      accordance with the provisions of the Hosting Agreement, including its Schedule
      A – OPEX, and as set forth in the sample invoice attached thereto. Specifically,
      the mining expenses listed under item I. A through F of Schedule A and invoiced
      by Montana OP were expressly limited to the amount of MWhs of electricity
      actually used by Celsius during the applicable invoice period. Further, per
      Section 4.3 of the Hosting Agreement, Celsius is required to pay 100% of the

reasonable direct costs and variable expenses that Montana OP has incurred in connection with its management of the Miners and operation of the Facility, as further defined on Schedule A attached thereto ("OPEX").  As a result, Celsius is responsible for the full amount of these invoices. As of this date, $65,920.02 remain unpaid under the June 6 invoice, and $236,403.94 remain unpaid under the June 23 invoice.  The aggregate unpaid amount of $302,323.96 plus interest per Section 4.10 constitutes a violation of Section 4 of the Hosting Agreement. Celsius failure to make these  payments also constitutes a Customer Default pursuant to Section 3.2(a) of the Hosting Agreement.

2.     Celsius has failed to provide Montana OP with enough functioning miners to utilize 45 MWs of energy capacity as required by Section 1.1 of the Hosting Agreement. As of this date, Celsius' delivered a total Mining Unit nameplate capacity estimated to equal 43.7 MW/h which is up to 3% below the Total Utilizable Capacity.  Additionally, of the 13,440 Mining Units Celsius has delivered to Montana OP under the Hosting Agreement, more than 2,000 or 15% are non-functioning, meaning they cannot hash.  Consequently, the loss in hashrate associated with both Celsius' missing and its non-functioning Mining Units decreases Montana OP's share of the Hashrate Split per Section 4 of the Hosting Agreement.  This constitutes a breach of Sections 1.1 and 9.3 of the Hosting Agreement which requires the Mining Units to be delivered in good working order and suitable for use in the Facility.  Montana OP repeatedly alerted Celsius in writing of its defective mining equipment, yet Celsius refuses to address this issue and to repair its Mining Units.  Consequently, this constitutes a Customer Default pursuant to Section 3.2(b) of the Hosting Agreement.

3.     Lastly, Celsius' latest shipment of miners arrived at the Facility on May 24, despite the fact Celsius should have delivered all of its Mining Units on or before May 1 pursuant to Section 2.3 of the Hosting Agreement.  In fact, Celsius deliberately cancelled the last scheduled delivery of 936 Mining Units to Montana OP's Facility.  As a result, Montana OP suffered a loss of its share of the Hashrate Split associated with the delayed delivery of these miners per Section 4.  Celsius breach of Section 2.3 of the Hosting Agreement also constitutes a Customer Default pursuant to Section 3.2(b) thereof.

Montana OP hereby requests that Celsius provide the following relief or cure:

1.  Celsius to pay all outstanding amounts under Montana OP's invoices in full.

2.  Celsius to provide Montana OP with additional miners to reach the maximum energy utilization capacity of 45 MW.

3.  Celsius to make Montana OP whole for its loss in Hashrate Split for the duration of Celsius' breaches of Sections 1.1, 2.3 and 9.3 of the Hosting Agreement.

4. Celsius to provide approval for Montana OP to repair its non-functioning miners or, alternatively, Celsius to repair its non-functioning miners, in each case at Celsius' sole cost and expense pursuant to Section 9.3 of the Hosting Agreement.

To the extent one or more of Celsius' breaches are subject to cure, and notice has not previously been provided, then this Notice of Breach also serves as a notice for purposes of starting any applicable cure period under the Hosting Agreement.

II.     Response to Montana OP's Alleged Defaults:

Montana OP vigorously disputes Celsius' allegations contained in Celsius' letter. Moreover, none of the alleged defaults are material or rise to an alleged breach by Montana OP. To that end, Celsius also fails to state the relief it requests for these "defaults" as required by Section 15.6.

1. The charges for fixed costs contained in Montana OP's invoices comport with the letter and intent of the Hosting Agreement and accordingly are not "impermissible." Furthermore, Celsius' allegation of a "default" is entirely misplaced.  The parties have been actively engaged in discussions surrounding these charges and the accounting therefore since the first invoice was issued to Celsius by Montana OP.

2. Montana OP is not in breach of the Hosting Agreement Section 2.2.3 concerning downtime for maintenance on the Facility.  Even by Celsius' own accounting of downtime, which we do not agree with, the Facility's downtime has not exceeded the contractual amount, and any prospective downtime in the future remains prospective at this point.

For the avoidance of doubt, none of Celsius' two alleged defaults by Montana OP in any way relieves Celsius of its contractual obligations to pay Montana OP the outstanding amount of $302,323.96 plus interest per Section 4.10.

III.     Invocation of Dispute Resolution

Montana OP agrees to participate in the dispute resolution procedure, which should encompass both sides' alleged disputes.

In accordance with Section 15.6 of the Hosting Agreement, the first ten (10) days of this period commenced on July 1st and will expire on July 10th.  It is our understanding that the parties are set to reconvene after the July 4th holiday.

3

Montana OP reserves all its rights under the Hosting Agreement and in equity to pursue any and all available legal remedies and waives none of these rights.

Very truly yours,

Mila Barrett
Secretary

cc via Electronic Mail:

Chris Ferraro (chris.ferraro@celsius.network)
Ron Deutsch (ron.deutsch@celsius.network)
David Albert (david.albert@celsius.network)
Joseph Golding-Ochsner Celsius (joseph.golding-ochsner@celsius.network)
Judson Brown, P.C. (judson.brown@kirkland.com)

4

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

|  | 1301 Pennsylvania Avenue NW | |
|---|---|---|
| Judson Brown, P.C. | Washington, DC 20004 | |
| To Call Writer Directly: | United States | Facsimile: |
| +1 202 389 5082 | +1 202 389 5000 | +1 202 654 9582 |
| judson.brown@kirkland.com | | |
| | www.kirkland.com | |

July 25, 2023

**By E-mail**

Sean Farrell
9 Federal Street
Easton, MD 21601
Attn: General Counsel's Office
Email: legal@beowulfenergy.com

> Re: *In re Celsius Network LLC, et al.*, No. 22-10964 (MG) (Jointly Administered)
> Response and Dispute Notice

Dear Mr. Farrell:

We write on behalf of Celsius Mining LLC ("Celsius") in response to the letter from Montana OP LLC ("Montana") dated July 5, 2023 regarding the Hosting Services Agreement between Celsius and Montana OP LLC ("Montana") effective April 1, 2023 (the "Agreement"). Montana's letter response to Celsius's June 30, 2023 Dispute Notice ("Dispute Notice") omits material facts pertinent to the dispute, and misconstrues the parties' contractual obligations. Although Celsius objects to nearly all of the factual characterizations in Montana's letter, Celsius addresses the most critical points below.

***First***, as established in Celsius's Dispute Notice, from Celsius' view, it is Montana that has breached the Agreement's billings provisions, by charging Celsius for costs that the Agreement requires Montana to bear. Montana's statement that Celsius must cover "100%" of reasonable direct costs and variable expenses is grossly incomplete. Montana Letter at pg. 1-2. Importantly— as Montana omits—Schedule A explicitly provides that Celsius's share of the expenses is "***limited to [Celsius's] allocated share of usage of the [Hardin] Facility*** and ***only includes those periods of time when [Celsius's] mining equipment is operational***"—not the "100%" of the costs and expenses that Montana claims Celsius must pay. *See* Agreement, Schedule A. Despite this, Montana has charged Celsius for costs that exceed Celsius's share of the 90MW capacity of the Hardin facility, by (i) calculating April, May, and June costs, expenses, and taxes based on the

## KIRKLAND & ELLIS LLP

Sean Farrell
July 25, 2023
Page 2

variable actual MW output of the Hardin facility, instead of based on Celsius's "allocated share of usage" of the total 90 MW capacity of the Hardin facility, and (ii) charging Celsius for costs, expenses, and taxes during periods when Celsius's miners are offline. Moreover, Montana sent the April and May invoices late, thereby breaching Section 4.9. Contrary to Montana's assertions, it is Montana—not Celsius—who is violating the Agreement, and Montana has no basis for claiming that Celsius has defaulted under Section 3.2(a).

*Second*, Montana has breached Section 2.3 by failing to install enough Celsius miners to utilize the 45MW that Montana is obligated to provide by June 1, 2023, and therefore is in default under Section 3.3(i)-(ii). Agreement §§ 2.3; 3.3(i)-(ii). Celsius has provided 13,448 miners for Montana to rack—yet Montana has told Celsius that it can accommodate only 13,419 miners, and that it lacks the space to rack and run additional miners. Montana asserts that Celsius has defaulted under the Agreement by failing to deliver enough miners to utilize 45MW, but to the extent that Celsius's miners are not consuming 45MW of energy capacity, that is Montana's own fault.

*Third*, Montana is wrong when asserting that Celsius has breached Section 2.3—and is in default under Section 3.2(b)—for belatedly delivering miners. Even if Celsius had delivered miners late, Celsius has already delivered more miners than Montana can accommodate, so any Celsius default has already been cured under Section 3.2(b).

*Fourth*, Montana makes much of purported defects in Celsius's miners, while omitting critical facts that underscore Montana's misconduct. Montana refused to tell Celsius which parts needed to be repaired on various mining units, despite Celsius repeatedly requesting this information. When Montana finally provided this information to Celsius, Montana pushed Celsius to use Montana's own repair service—and now complains that Celsius has not used Montana's repair service, despite that the Agreement does not obligate Celsius to choose Montana as the repair company. As Montana knows, Celsius is actively evaluating repair options. On top of this, Montana now claims, for the first time, that over 2,000 Celsius miners are not functioning, despite previously telling Celsius that only 1,573 were not working. Finally, underscoring the pretextual nature of Montana's claims, Montana only recently began utilizing the 29 extra Celsius miners in place of the purportedly defective ones, after its July 5 letter falsely claiming breach and only after Celsius requested that Montana use these replacement miners.

*Fifth*, Montana has prospectively breached the Agreement by planning actual preventative maintenance that exceeds the contractual limit of "four (4) weeks of downtime a year." Agreement § 2.2.3(iv). In response to Celsius's Dispute Notice, Montana merely asserted that "any prospective downtime in the future remains prospective at this point" and that it "do[es] not agree with" Celsius's calculation of downtime. Montana Letter at pg. 3. Yet Montana offered no assurances that it will not breach this provision, nor does it provide how many days the Hardin facility has been down for preventative maintenance.

## KIRKLAND & ELLIS LLP

Sean Farrell
July 25, 2023
Page 3

*Sixth*, Montana's demand that Celsius make Montana "whole for its loss in Hashrate Split," Montana Letter pg. 2, fails at the outset because the Agreement precludes loss of profits. Moreover, any purported losses stem from Montana's own making—not Celsius's conduct. Specifically:

- The Agreement clearly precludes damages stemming from loss of profits. In particular, the limitation of liability provision provides that "IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY . . . FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, *INCLUDING LOSS OF PROFITS OF ANY KIND OR NATURE WHATSOEVER*," subject to exceptions not relevant here. Agreement § 13.3 (emphasis added).

- As of July 5, ten of Montana's PDUs were not working, and therefore 240 of Celsius's miners were not able to hash during this time. Though Montana has since communicated that it replaced these malfunctioning PDUs, Celsius has not verified this representation.

- Montana argues that Celsius delivered miners belatedly—but Montana repeatedly failed to install the Celsius miners in its possession. It made no sense for Celsius to continue sending miners to Montana just for those to sit idle while Montana disregarded its contractual obligations under Section 2.3. And Montana's statement that Celsius canceled a shipment is wholly misleading—in reality, Celsius canceled a shipment of *extra* miners that exceeded both Montana's capacity and what Celsius was required to send under the Agreement.

- Montana itself caused a reduction in the Hashrate Split[1] by causing the Hardin facility to be down for excessive actual preventative maintenance. Montana may not now attempt to recover from Celsius for losses that Montana itself caused.

Montana's demand that Celsius pay an unspecified amount of Hashrate Split profits is nothing more than an attempt to extort Celsius for a loss of profits that Montana's own conduct caused, and that the Agreement expressly precludes.

Contrary to Montana's mischaracterizations, its attempt to pass onto Celsius more than $308,731.06 plus interest in costs that Celsius does not owe is "material." Montana Letter at pg. 3. Montana's claim that Celsius's Dispute Notice "fail[ed] to state the relief it requests for . . . [Montana's] 'defaults' as required by Section 15.6" is also blatantly wrong. *See* Montana Letter at pg. 3; *see also* Celsius Dispute Notice at pg. 2. Celsius reiterates its requested relief, and demands that, under the Section 15.6 dispute resolution process, Montana immediately remedy its

---

[1]    Capitalized terms used but not defined herein shall have the same meaning as in the Agreement.

## KIRKLAND & ELLIS LLP

Sean Farrell
July 25, 2023
Page 4

on-going defaults under Section 3.3(i)-(ii) by: (i) recalculating the April, May, and June invoices based on what the Agreement allows; (ii) installing enough Celsius miners to utilize 45MW; (iii) affirming that it will charge Celsius for only the portion of costs, expenses, and taxes that the Agreement requires; (iv) consenting to replace the purportedly defective Celsius miners with the replacement Celsius miners that Montana already has; (v) providing Celsius with details about which parts of various miners are purportedly defective; (vi) confirming that it will not exceed the contractual limit of four weeks of preventative maintenance; and (vii) rescinding its blatantly wrong assertions that Celsius has not paid all amounts due and is otherwise in default under the Agreement. *See* Celsius Dispute Notice at pg. 2.  If Montana does not do so promptly, Celsius and the Debtors in the above-captioned action will be forced to take all actions available to them at law and equity, including seeking expedited relief from the Bankruptcy Court, forcing Montana to specifically perform its obligations, and pursuing claims for any and all damages that the Debtors have incurred as a result of Montana's actions.

The Debtors reserve all rights at law and in equity and waive none.

Sincerely,

/s/ *Judson Brown*

Judson Brown, P.C.

cc:    Ross M. Kwasteniet, P.C.
       Christopher S. Koenig
       Christopher Ferraro
       David Albert

4

# Montana OP LLC

9 Federal Street
Easton, Maryland 21601

August 17, 2023

**VIA ELECTRONIC MAIL**

CELSIUS MINING LLC
50 Harrison St., Suite 209F
Hoboken NJ 07030
Attention: Legal Department
Email: legal@celsius.network

Re:  2nd Notice of  continued Breach under that certain Hosting Services Agreement, dated as of April 1, 2023 (the "Hosting Agreement"), by between Celsius Mining LLC ("Celsius") and Montana OP LLC ("Montana OP")

Ladies and Gentlemen:

Montana OP acknowledges receipt of a letter dated July 25, 2023, issued on behalf of Celsius, alleging that Montana OP is in breach of the Hosting Agreement by allegedly "over-charging" Celsius contrary to the Hosting Agreement's billing provisions and by purportedly failing to install enough of Celsius's miners to use 45 MWs of energy utilization capacity, among other things.

Celsius's letter appears to be no more than an attempt by Celsius to avoid paying amounts owed to Montana OP.   Montana OP hereby (i) notifies Celsius of Celsius's continued material breaches of the Hosting Agreement; (ii) responds to Celsius's mistaken allegations which are false, misleading and not based on the underlying facts, and (iii) reiterates its request for relief. Capitalized terms used but not otherwise defined in this letter shall have the meaning given such terms in the Hosting Agreement.

I.    Celsius has been violating and continues to violate the Hosting Agreement by failing to perform its material obligations thereunder as follows:

1.    On August 4, Montana OP invoiced Celsius under the Hosting Agreement for Services rendered in July 2023.  The amounts billed under this invoice were calculated in accordance with the provisions of the Hosting Agreement, including its Schedule A- OPEX, and as set forth in the sample invoice attached thereto, just like the prior invoices for April, May and June Services.  *See* our July 5 letter - I. 1 and II. 1. Contrary to the statements in the July 25 letter, the invoices Montana OP has provided to Celsius to date expressly and only invoice Celsius for its allocated share of usage of the Facility and for those periods when Celsius's

mining equipment was operational.  Celsius is responsible for the full amount of these invoices. As of this date, an aggregate principal amount of $429,299.76 under these invoices remains unpaid, which, plus interest per Section 4.10, constitutes a violation of Section 4 of the Hosting Agreement. Celsius's continued failure to make these payments in full also constitutes a Customer Default pursuant to Section 3.2(a) of the Hosting Agreement.

2.      Contrary to the statements in the July 25 letter, Montana OP had and continues to have more than enough available rack space to accommodate Celsius's Mining Units utilizing 45 MWs of energy capacity.  Montana OP also installed all of the aggregate 13,448 Mining Units delivered by Celsius to the Facility, which included Celsius's last – and belated - shipment of Mining Units which was delivered on May 24, 2023. However, approx. 250 of Celsius's delivered Mining Units were so defective upon arrival that they did not even turn on upon energization; as a result, Montana OP had to uninstall and remove these non-working Mining Units, leaving 13,194 Celsius Mining Units on the racks.  Other Celsius Mining Units quickly became defective.  As described in our July 5 letter, Celsius has failed to provide Montana OP with enough functioning Mining Units to actually utilize 45 MWs of energy capacity as required by Section 1.1 of the Hosting Agreement, because approx.15% of Celsius's Mining Units were already defective upon arrival at the Facility.  The defective Mining Units could not hash due to component issues associated with their power supply units, hash boards and control boards, fans, firmware etc. To this day, Celsius has still not provided Montana OP with enough Mining Units capable of utilizing the 45 MWs of Total Utilizable Capacity, and more than 20% of Celsius's Mining Units are now defective as of the date of this letter.  Consequently, Celsius's total Mining Unit nameplate capacity is currently more than 20% below the Total Utilizable Capacity.  As a result, Celsius continues to be in Customer Default pursuant to Section 3.2(b) of the Hosting Agreement.

3.      Celsius also breached Section 2.3 of the Hosting Agreement, because it did not deliver enough of its Mining Units on or before May 1, 2023; Celsius's deliveries of Mining Units continued through May 2023 with last delivery on May 24, 2023. *See* our July 5 letter – I. 3.  In fact, Celsius deliberately cancelled the last scheduled delivery of 936 Mining Units to the Facility.  *See* attached Email from Celsius's shipper J.B. Hunt, dated May 31, 2023.  As a result, Montana OP suffered a loss of its share of the Hashrate Split associated with the delayed delivery of these Mining Units per Section 4.  Celsius breach of Section 2.3 of the Hosting Agreement also constitutes a Customer Default pursuant to Section 3.2(b) thereof.

4.      Celsius incorrectly alleges that Montana OP refused to tell Celsius which parts of Celsius's various Mining Units needed to be repaired.  Nothing could be further from the truth.  In fact, Montana OP has had weekly meetings with Celsius since April 17, 2023 and has been sending weekly summary meeting notes to Celsius, which consistently included detailed information about Celsius's defective Mining Units and required repairs.  *See* attached sample meeting notes provided to Celsius on July 5, 2023.  Over time, the number of Celsius's Mining Units requiring repairs continued to increase: in April, Montana OP already notified Celsius that approx. 10% of Celsius's Mining Units had fan failures; today, over 3,000 of Celsius's Mining Units are suffering from various component issues. This is not surprising given that Celsius's Mining Units had already been used prior to their delivery to and installation at Montana OP's Facility. Despite Montana OP's continued notifications about the state of Celsius's Mining Units since April, Celsius has still not made a decision regarding their repair.

5.      Further, Celsius falsely claims that Montana OP has "pushed Celsius to use Montana OP's own repair service".  In fact, Celsius expressly requested that Montana provide part and labor pricing for Celsius's required Mining Unit repairs, in response to which Montana OP presented multiple options to Celsius, including sending the defective Mining Units off-site for repair by a third party and repairing the Mining Units on site either by Montana OP or by a third party retained by Celsius.  Contrary to the statements in the July 25 letter, the 29 Mining Units referenced were not "extra"; they were part of Celsius's 250 non-working Mining Units which Montana OP had to uninstall at the outset.  Montana OP was able to successfully trouble-shoot these 29 Mining Units and swapped them out for an equal number of Celsius's previously installed 13,194 Mining Units that had become defective over time. Despite "actively evaluating repair options" as stated in the July 25 letter, Celsius has still not arranged for its other defective Mining Units to be repaired, and is now wrongly trying to hold Montana OP responsible for its malfunctioning mining equipment in violation of Sections 1.1 and 9.3 of the Hosting Agreement.

6.      The loss in hashrate associated with both Celsius's missing and its non-functioning Mining Units decreases Montana OP's share of the Hashrate Split to which Montana OP is entitled per Section 4 of the Hosting Agreement.  This constitutes a continuing breach of Sections 1.1 and 9.3 of the Hosting Agreement which requires the Mining Units to be delivered in good working order and suitable for use in the Facility.  Despite Montana OP's repeated written alerts to Celsius regarding its defective mining equipment and various proposed options for its repair, Celsius refuses to address this issue.

7.      Celsius continues to  mischaracterize Montana OP's scheduling of the Facility's downtime for preventative maintenance. In fact, scheduling actual preventative maintenance constitutes part of the services Montana OP is required to provide per Section 2.2.3(iv) of the Hosting Agreement, up to four (4) weeks (or 28 days) per year. Since the April 1, 2023 Effective Date, the Facility has only undergone preventative maintenance for 23 days.  No additional preventative maintenance has been scheduled as of the date of this letter, so Celsius's claims of a "prospective breach" are a distraction from its own continued breaches and related Customer Defaults under the Hosting Agreement.

None of Celius' alleged defaults by Montana OP in its July 25 letter relieve Celsius of its contractual obligations to pay Montana OP the outstanding amount of $429,299.76 plus interest per Section 4.10.[1]

II.     Montana OP hereby reiterates its request that Celsius provide the following relief or cure:

1.      Celsius to pay all outstanding amounts under Montana OP's invoices in full.

2.      Celsius to provide Montana OP with additional miners to reach the maximum energy utilization capacity of 45 MW.

3.      Celsius to make Montana OP whole for its loss in Hashrate Split for the duration of Celsius's breaches of Sections 1.1, 2.3 and 9.3 of the Hosting Agreement.

4.      Celsius to provide approval for Montana OP to repair its non-functioning miners or, alternatively, Celsius to repair its non-functioning miners, in each case at Celsius's sole cost and expense pursuant to Section 9.3 of the Hosting Agreement.

To the extent one or more of Celsius's breaches are subject to cure, and notice has not previously been provided, then this Notice of Breach also serves as a notice for purposes of starting any applicable cure period under the Hosting Agreement.

---

[1] Note: This letter addresses certain critical points in Celsius's July 25 letter. For the avoidance of doubt, Montana OP objects to all factual characterizations in Celsius's July 25 letter.

4

Montana OP reserves all its rights under the Hosting Agreement and in equity to pursue any and all available legal remedies and waives none of these rights.

Very truly yours,

Mila Barrett
Secretary

cc via Electronic Mail:

Chris Ferraro (chris.ferraro@celsius.network)
Ron Deutsch (ron.deutsch@celsius.network)
David Albert (david.albert@celsius.network)
Joseph Golding-Ochsner (joseph.golding-ochsner@celsius.network)
Judson Brown, P.C. (judson.brown@kirkland.com)

**Terese Martinetti**

| | |
|---|---|
| **From:** | Ashley Birge <Ashley.Birge@jbhunt.com> |
| **Sent:** | Wednesday, May 31, 2023 10:25 AM |
| **To:** | Isaac Imig; Tracy Mason |
| **Cc:** | Celsius High Value |
| **Subject:** | RE: Loads 12-15 |

[EXTERNAL EMAIL - Be cautious of attachments and links. Verify the sender is valid.]

Good morning,
This truck is not picking up today. We were advised to cancel this shipment until further notice.
Just wanted to let you know.




*Ashley Birge*
Customer Experience Representative II
Specialized Services
Direct (479) 820-0211
www.jbhunt.com

  

Intermodal | Dedicated | Final Mile | Flatbed | Truckload | Refrigerated | LTL | Managed Logistics

---

**From:** Isaac Imig <iimig@heorotpower.com>
**Sent:** Tuesday, May 23, 2023 3:05 PM
**To:** Ashley Birge <Ashley.Birge@jbhunt.com>; Tracy Mason <tmason@heorotpower.com>
**Cc:** Celsius High Value <Celsius.HighValue@jbhunt.com>
**Subject:** Re: Loads 12-15

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Thank you for letting us know.

---

**From:** Ashley Birge <Ashley.Birge@jbhunt.com>
**Sent:** Tuesday, May 23, 2023 1:47 PM
**To:** Isaac Imig <iimig@heorotpower.com>; tmason@herotpower.com <tmason@herotpower.com>
**Cc:** Celsius High Value <Celsius.HighValue@jbhunt.com>
**Subject:** RE: Loads 12-15

[EXTERNAL EMAIL - Be cautious of attachments and links. Verify the sender is valid.]

Isaac,

I just wanted to let you know that this pick up was moved to the 31st so delivery for the last truck (Truck 15) will be 6/1.



**Ashley Birge**

Customer Experience Representative II
Specialized Services
Direct (479) 820-0211
www.jbhunt.com

   

Intermodal | Dedicated | Final Mile | Flatbed | Truckload | Refrigerated | LTL | Managed Logistics

---

**From:** Ashley Birge
**Sent:** Friday, May 12, 2023 10:17 AM
**To:** PATRICK HOLERT <patrick.holert@celsius.network>; pratibha.pandey@celsius.network; Carl Tipton <ctipton@globalxdigital.com>; Greg Nelson <gnelson@globalxdigital.com>; Isaac Imig <iimig@heorotpower.com>; tmason@herotpower.com; james@novawulf.io; Supply Chain Security <Supply_Chain_Security@jbhunt.com>
**Cc:** Celsius High Value <Celsius.HighValue@jbhunt.com>
**Subject:** Loads 12-15

Good morning,

Below are the loads for the next 2 weeks. Please let us know the tracker number the day of pick up.

Adding in @Supply Chain Security for visibility

**Truck 12 -- 14X6935**
Pickup Date: 5-16-23 // 8:00-16:30
Delivery Date: 5-17-23 // 8:00 – 15:00
Tracker #

Type: Bitmain
Items: 26 pallets with 36 rigs/pallet, 936 total rigs

**Truck 13 -- 14X6996**
Pickup Date: 5-18-23 // 8:00-16:30
Delivery Date: 5-19-23 // 8:00 – 15:00
Tracker #

Type: Bitmain
Items: 26 pallets with 36 rigs/pallet, 936 total rigs

**Truck 14 -- 14X7038**
Pickup Date: 5-23-23 // 8:00-16:30
Delivery Date: 5-24-23 // 8:00 – 15:00
Tracker #

Type: Bitmain
Items: 26 pallets with 36 rigs/pallet, 936 total rigs

**Truck 15 -- 14X7052**
Pickup Date: 5-25-23 // 8:00-16:30
Delivery Date: 5-26-23 // 8:00 – 15:00
Tracker #

Type: Bitmain
Items: 26 pallets with 36 rigs/pallet, 936 total rigs



**Ashley Birge**
Customer Experience Representative II
Specialized Services
Direct (479) 820-0211
www.jbhunt.com

   

Intermodal | Dedicated | Final Mile | Flatbed | Truckload | Refrigerated | LTL | Managed Logistics

This email contains confidential material for the sole use of the intended recipient(s). Any review, use, distribution, or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.
This email and its attachments are intended only for the personal and confidential use of the designated recipient(s) named above. If you are not a designated recipient of this email, you may not rely on, duplicate or redistribute this email (and any attachments) by any means. You must immediately delete it and notify the sender that you have received it in error. This email is for informational purposes only, and may not be considered (i) an offer, or solicitation of an offer, to invest in, or to buy or sell, any interests or shares, or to participate in any investment or trading strategy, (ii) actionable corporate or financial advice or (iii) an official statement of Heorot Power Management LLC or its affiliates ("HPM"). Email transmission cannot be guaranteed to be secure or error-free; therefore, we cannot and do not accept any responsibility for any errors or omissions that may be present in this email. We also do not make any representations as to the completeness or accuracy of the information in this email, and it should not be relied upon for any purpose. All

3

information is subject to change without notice. Data presented is unaudited and may include estimates. HPM reserves the right to intercept, retain, monitor and review the content of email messages to and from its systems. Any discussion of legal, regulatory or tax matters contained in this email is not intended to be used, and cannot be used, for the purpose of avoiding any penalties, or for promoting, marketing or recommending to another party any transaction or matter addressed in this email.

This email contains confidential material for the sole use of the intended recipient(s). Any review, use, distribution, or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of this message.

**From:** Isaac Imig <iimig@heorotpower.com>
**Sent:** Wednesday, July 5, 2023 3:13 PM
**To:** Patrick Holert <patrick.holert@celsius.network>; Dave Albert <david.albert@celsius.network>; Quinn Lawlor <quinn.lawlor@celsius.network>; Michael Deeg <michael.deeg@celsius.network>; Robert Grant <rgrant@heorotpower.com>; Sean Farrell <sfarrell@heorotpower.com>; Jenny Fan <jenny.fan@celsius.network>; Christopher Klein <cklein@heorotpower.com>
**Cc:** David Subry <dsubry@heorotpower.com>; Gary Arneson <GARNESON@heorotpower.com>; Jim Nolan <JNOLAN@heorotpower.com>; Nazar Khan <Nazar@novawulf.io>
**Subject:** Re: Weekly Celsius <-> Montana OP Update / Checkpoint

7/5 Meeting Notes

1. Power Plant
    a. Status and Schedule
        i. State Highway to the coal mine closed last week for road repairs, forcing switch to Signal Peak mine and associated transportation agreements
        i. Running at reduced load due to reduced commitment of fuel from Signal Peak, but no impact to Celsius is expected at this time
2. Site Activities
    a. Troubleshooting instrumentation values for certain containers
    b. Bay 3 Fan 17 repaired (belt replacement)
    c. Container Fan Maintenance
    d. Filter wall cleaning
3. Operations (week ended 7/2)
    a. 97.57% daily average uptime
    b. 946PH/s 7-day average hash rate
    c. Began utilizing Heat Mitigation Plan
        i. Ambient temperatures in low 90s late in the week
        ii. High temp setpoint is used to trigger miners to enter LPM before they reach thermal shutdown and stop hashing
        iii. Not all miners on LPM firmware (estimated completion today)
4. Safety
    a. New employees receiving annual 8 hour safety training this week
5. Recurring Items/Open To Group
    a. Low Power Mode
        i. Targeted miners that were going into thermal shutdown for firmware updates, ended up completing updates to final version for about 50% of miners
    b. Miner Repair
        i. Updated Issue Report

1. 1323 Bad Fans
2. 866 bad hash boards
    a. 30 units with 3 bad hash boards
    b. 95 units with 2 bad hash boards
    c. 586 units with 1 bad hash board
3. 250 PSUs (estimated)
ii. Response from Celsius - still developing plan but expect a response very soon

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

1301 Pennsylvania Avenue NW
Washington, DC 20004
United States

Judson Brown, P.C.
To Call Writer Directly:
+1 202 389 5082
judson.brown@kirkland.com

+1 202 389 5000

Facsimile:
+1 202 654 9582

www.kirkland.com

August 18, 2023

**By E-mail**

Sean Farrell
9 Federal Street
Easton, MD 21601
Attn: General Counsel's Office
Email: legal@beowulfenergy.com

Re: *In re Celsius Network LLC, et al.*, No. 22-10964 (MG) (Jointly Administered)
Dispute and Default Notice

Dear Mr. Farrell:

We write on behalf of Celsius Mining LLC ("Celsius") regarding Montana OP LLC's ("Montana") ongoing material breaches of the April 1, 2023 Hosting Services Agreement between Celsius and Montana (the "Agreement"). Despite that Celsius has repeatedly put Montana on notice of its defaults, including in Celsius's June 30 and July 25 Dispute Notices, Montana has failed to cure many of its material defaults and continues to breach the Agreement in new ways. Montana's current breaches of the Agreement include at least the following:

- Montana has breached Section 2.2.3(iv) by failing to provide "A/C power to the outbound port on [Celsius's] serving [PDUs]" during "95 % of the time in a calendar year[.]" Agreement § 2.2.3(iv). Indeed, excluding downtime for actual preventative maintenance, Montana has failed to provide A/C power for at least 647 hours, as of August 17. Due to Montana's persistent failure to provide A/C power, it is now mathematically impossible for Montana to meet its contractual 95% threshold. Montana has also prospectively breached Section 2.2.3(iv) by indicating that it is planning actual preventative maintenance that exceeds the contractual limit of "four (4) weeks of downtime a year," *id.*, and Montana has refused to provide adequate assurances that it will not breach this provision.

- Despite Montana's failure to perform under the Agreement, Montana has charged Celsius for costs that the Agreement requires Montana—not Celsius—to pay, and has therefore

# KIRKLAND & ELLIS LLP

Sean Farrell
August 18, 2023
Page 2

breached the Agreement's billing provisions.  Schedule A explicitly provides that Celsius's share of the expenses is "***limited to [Celsius's] allocated share of usage of the [Hardin] Facility and only includes those periods of time when [Celsius's] mining equipment is operational.***"  *See* Schedule A.  Despite this, Montana has charged Celsius for costs that exceed Celsius's allocation of the 90MW capacity of the Hardin facility, including by (i) determining April, May, June, and July costs, expenses, and taxes based on the Hardin facility's variable actual MW output, rather than based on Celsius's "allocated share of usage" of the Hardin facility's 90 MW capacity, and (ii) charging Celsius for costs, expenses, and taxes during times when Celsius's "mining equipment is [not] operational." *See id.*  Moreover, Montana breached Section 4.9 by sending the April and May invoices late.

Montana has repeatedly and consistently "violate[d] . . . material covenant[s] or provision[s]" and is "unable to provide the hosting services . . . as set forth in this Agreement"  and therefore is in default under the Agreement.  Agreement §§ 3.3(i) and (ii).  Celsius demands that, under the Section 15.6 dispute resolution process, Montana immediately remedy its on-going defaults under Section 3.3(i)-(ii) by: (i) providing A/C power to the outbound port on Celsius's serving PDUs in compliance with its contractual obligations; (ii) confirming that it will not exceed the contractual limit of four weeks of preventative maintenance; (iii) recalculating the April, May, June, and July invoices based on Celsius's allocation of the 90MW capacity of the Hardin facility, and only for the periods when Celsius's mining equipment is operational; (iv) affirming that Montana will charge Celsius for only the portion of costs, expenses, and taxes that the Agreement requires Celsius to pay; and (v) rescinding Montana's blatantly wrong claims in its July 5 and August 17 letters that Celsius has not paid all amounts due and is otherwise in default under the Agreement.  If Montana does not do so promptly, Celsius and the Debtors in the above-captioned action will be forced to take all actions available to them at law and equity, including seeking expedited relief from the Bankruptcy Court, forcing Montana to specifically perform its obligations, pursuing claims for any and all damages that the Debtors have incurred as a result of Montana's actions, or terminating the Agreement.

The Debtors reserve all rights at law and in equity and waive none.

Sincerely,

/s/ *Judson Brown*

Judson Brown, P.C.

2

# KIRKLAND & ELLIS LLP

Sean Farrell
August 18, 2023
Page 3

cc:    Ross M. Kwasteniet, P.C.
       Christopher S. Koenig
       Christopher Ferraro
       David Albert

# MONTANA OP LLC

9 Federal Street
Easton, Maryland 21601

August 24, 2023

**<u>VIA ELECTRONIC MAIL</u>**

CELSIUS MINING LLC
50 Harrison St., Suite 209F
Hoboken NJ 07030
Attention: Legal Department
Email: legal@celsius.network

Re:  Dispute Notice regarding that certain Hosting Services Agreement, dated as of April
1, 2023 (the "<u>Hosting Agreement</u>"), by between Celsius Mining LLC ("<u>Celsius</u>")
and Montana OP LLC ("<u>Montana OP</u>")

Dear Mr. Brown:

Montana OP is in receipt of your letter dated August 18, 2023, issued on behalf of
Celsius, alleging that Montana OP is in breach of the Hosting Agreement (capitalized terms not
defined herein shall have the meaning attributed to them under the Hosting Agreement).  For the
reasons set forth in our July 5th and August 17th correspondence, it is Celsius that has breached
the Hosting Agreement, and we decline to rescind the claims in our prior letters.

The allegations in your August 18 letter continue to mischaracterize the contractual
methodology for calculating the 95% uptime threshold for power supply under the Hosting
Agreement. Montana OP's obligation to Celsius is to *make available* A/C power to the outbound
port on Customer's serving power distribution unit (PDU), subject to various limitations noted in
Section 2.2.3 and elsewhere under the Hosting Agreement. Celsius' bald assertion that it is
"mathematically impossible" to meet the 95% threshold appears to be determined by reference to
hours Mining Units were in service, rather than hours A/C power was made available to the
PDU's outbound port. In fact, A/C power was made available to the PDU at an uptime rate of
92%, accounting for permitted downtime allowance. With 44 days of the remaining 130 days left
this calendar year, the 95% rate could well be met or exceeded. Accordingly, the allegations of
continued and prospective breach are false.

Again, none of Celsius' claims of alleged defaults by Montana OP relieve Celsius of its
contractual obligations to pay Montana OP the outstanding amounts due under the Agreement.
Montana OP restates its objections to Celsius' false allegations and mischaracterizations and
again demands immediate payment of all amounts due under the Hosting Agreement. Celsius'
failure to pay Montana OP's invoices has caused damages and is a clear violation of the Hosting

Agreement.  Montana OP reserves all its rights under the Hosting Agreement and in equity to pursue any and all available legal remedies and waives none.


Very truly yours,


Mila Barrett
Secretary




cc via Electronic Mail:

Chris Ferraro (chris.ferraro@celsius.network)
Ron Deutsch (ron.deutsch@celsius.network)
David Albert (david.albert@celsius.network)
Joseph Golding-Ochsner (joseph.golding-ochsner@celsius.network)

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Judson Brown, P.C.
To Call Writer Directly:
+1 202 389 5082
judson.brown@kirkland.com

1301 Pennsylvania Avenue NW
Washington, DC 20004
United States

+1 202 389 5000

www.kirkland.com

Facsimile:
+1 202 654 9582

September 1, 2023

**By E-mail**

Sean Farrell
MONTANA OP, LLC
9 Federal Street
Easton, MD 21601
Attn: General Counsel's Office
Email: legal@beowulfenergy.com

Re: *In re Celsius Network LLC, et al.*, No. 22-10964 (MG) (Jointly Administered)
Dispute Notice

Dear Mr. Farrell:

I write on behalf of Celsius Mining LLC ("Celsius") in response to Montana's August 24 letter.  Despite Celsius's view that Montana has breached Section 2.2.3(iv) by failing to make "available" "A/C power to the outbound port on [Celsius's] serving [PDUs]" during "95 % of the time in a calendar year," Agreement § 2.2.3(iv), Montana claims that "the 95% rate could well be met or exceeded" and that Celsius's calculation "appears to be determined by reference to hours Mining Units were in service, rather than hours A/C power was made available to the PDU's outbound port."  Montana further claims that "A/C power was made available to the PDU at an uptime rate of 92%, accounting for permitted downtime allowance."  However, by Celsius's calculation, Montana has made A/C power available to Celsius's serving PDUs for just approximately 1,982 hours out of a possible 2,736 hours as of August 29, which represents an uptime rate of merely approximately 72%.  Celsius does not understand Montana's calculations and requests that Montana provide within five (5) days of the date of this letter detailed support for its assertions, including the number of hours that A/C power was made available to Celsius's serving PDUs, the number of hours internet access at 100mbps was made available to Celsius's serving PDUs, and the number of hours of "permitted" downtime since the effective date of the Agreement.

Austin   Bay Area   Beijing   Boston   Brussels   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   New York   Paris   Salt Lake City   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

Sean Farrell
September 1, 2023
Page 2

The Debtors reserve all rights at law and in equity and waive none.

Sincerely,

/s/ *Judson Brown*

Judson Brown, P.C.

cc:   Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Christopher Ferraro
David Albert

## **Exhibit C**

**Requests for Production of Documents**

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel to the Initial Debtors and Debtors in
Possession*

Patrick J. Nash, Jr., P.C. (admitted *pro hac
vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac
vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS
INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE DEBTORS' RULE 2004 DOCUMENT DISCOVERY REQUESTS**

Pursuant to Rule 45 of the Federal Rules of Civil Procedure (the "Federal Rules"), Rules

2004, 9014, and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

and Rule 26.3 of the Local Rules of United States District Courts of the Southern and Eastern
Districts of New York (the "Local Rules"), made applicable to this matter by Rule 2004-1 of the
Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"),
the above-captioned debtors and debtors in possession (collectively, the "Debtors") request that
Montana OP LLC ("Montana") produce for their inspection and copying all documents and
tangible things requested below ("Request for Production of Documents" or "Request") in
accordance with the definitions and instructions set forth below at the offices of their counsel,
Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, or at another agreed-
upon location. Each of the following Requests is continuing in nature, such that if Montana obtains
or discovers additional responsive Documents or Communications at a later date, such Documents
and Communications are to be made available promptly to the Debtors for inspection and copying.

## DEFINITIONS

For the purposes of these Requests, the following Definitions shall apply:

1.      "Agreement" means the hosting services agreement between Celsius and Montana,
effective April 1, 2023, included as **Exhibit A**.

2.      "All," "any," or "each" shall have the meaning afforded to them by Local Rule
26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of
doubt, shall each be construed as encompassing any and all.

3.      "Celsius" means Celsius Mining LLC.

4.      The "Debtors" means the above-captioned Debtors and Debtors in Possession, and
any of their respective current or former affiliates, subsidiaries, parent corporations, predecessors,
or successor entities and all of their respective current or former directors, officers, employees,
agents, attorneys, advisors, and representatives.

3

5.      "<u>Communication</u>" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

6.      "<u>Concerning</u>" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means "relating to," "referring to," "describing," "evidencing" or "constituting."

7.      "<u>Constituting</u>," "<u>referring to</u>," "<u>regarding</u>," "<u>in connection with</u>," "<u>relating to</u>," "<u>describing</u>," or "<u>evidencing</u>" shall be construed to mean, without limitation, relating to, referring to, describing, evidencing, constituting, discussing, supporting, pertaining to, containing, analyzing, evaluating, studying, recording, showing, memorializing, reporting on, commenting on, mentioning, reviewed in conjunction with, setting forth, contradicting, refuting, considering, or recommending, in whole or in part.

8.      "<u>Document</u>" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

9.      "<u>Electronically Stored Information</u>" has the broadest possible meaning under Federal Rule 34, made applicable to this matter by Bankruptcy Rule 2004-1, and refers to all computer or electronically stored or generated data and information, and includes all attachments to and enclosures with any requested item, and all drafts thereof; information stored in any format and on any storage media, including: hard disks, floppy disks, optical disks, flash memory devices, and magnetic tape, whether fixed, portable, or removable; all associated metadata that is

maintained or saved, which includes: a Document's or Communication's title or name, file name, date and time of creation, date and time of last edit, identity of author, identity of owner, identities of editors, identities of recipients, changes, history of changes, email header information, history of who viewed an email and when, and email routing information.

10.     "Facility" refers to Montana's cryptocurrency mining datacenter and power generation plant located at 643 Industrial Park Road, Hardin, Montana 59034.

11.     "Including" shall not be construed to limit the scope of any Request.

12.     "PDU" refers to a power distribution unit, including a serving power distribution unit.

13.     "Person" or "Persons" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

14.     "Personal Electronic Accounts" means addresses, accounts, or handles on email platforms, social media websites, websites (e.g., Reddit), messaging applications, collaboration tools (e.g., Slack, Microsoft Teams), chat rooms, blogs, online forums, text messages, or social media or networking websites, applications, services, software, or other communications platforms (including but not limited to those involving video sharing, photograph sharing, blogging, messaging, or ephemeral messaging, such as WhatsApp, Signal, Telegram, "X" (f/k/a Twitter), Bloomberg, Facebook, LinkedIn, Vine, Instagram, Yahoo, Blackberry, Myspace, Google+, Snapchat, Reddit) for which You have or had an account, or for which You have used someone else's account to conduct activity.

15.    "Personal Electronic Devices" means mobile or cellular phones, computers, laptops, tablets, smart watches, e-book readers, gaming devices, personal digital assistants, or other pieces of electronic equipment with the capability to store, record, a transmit, reproduce, display, or receive text, images/video, or audio data, in Your possession, custody, or control.

16.    As the term "possession" pertains to e-mails, the term includes, but is not limited to, e-mails contained in Your electronic e-mail directories containing (1) "deleted" e-mails which have not been permanently deleted, including all subdirectories irrespective of the title of such subdirectories; (2) "sent" e-mails, including all subdirectories irrespective of the title of such subdirectories; and (3) "received" e-mails, including all subdirectories irrespective of the title of such subdirectories.

17.    "Why," "how," "when," and "whether" shall also include each of the other.

18.    "You" and "Your" means Montana and any of Montana's current or former affiliates, subsidiaries, parent corporations, predecessors, or successor entities and all of Montana's current or former directors, officers, employees, agents, attorneys, advisors, and representatives.

19.    Whenever necessary to bring within the scope of a Request information that might otherwise be construed to be outside its scope:

　　　a.    In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the use of the singular form of any word includes the plural and vice versa;

　　　b.    The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

　　　c.    In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the connectives "and" and "or" shall be construed either disjunctively or

conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

### **INSTRUCTIONS**

1.      To the extent that You have already produced to the Debtors and the Committee some Documents or Communications in response to a particular Request, the Request shall be construed as requesting only Documents and Communications that You have not yet produced.

2.      For purposes of interpreting or construing the scope of these Requests, the terms used shall be given the most expansive and inclusive interpretation, unless specifically limited in the Request.

3.      Each Request herein shall be construed independently and not with reference to any other Request, for the purposes of limitation.

4.      In responding to these Requests, You shall furnish all Documents and Communications that are available to You, including Documents and Communications that are in the possession of any of Your present or former agents, employees or representatives, or otherwise subject to Your custody or control, including, but not limited to, all responsive Documents and Communications on Your Personal Electronic Devices and Personal Electronic Accounts.

5.      If You contend that part of a Request is objectionable, You shall state the legal and factual basis for Your objection with specificity, and You shall produce Documents and Communications fully in response to that part of the Request that You do not contend is objectionable.

6.      If in the course of responding to these Requests You encounter any ambiguity in the Requests, in a definition, or in an instruction relevant to the Requests, explain what You find to be ambiguous and what construction You used in providing Your response.

7.      If You contend that You do not understand the definition of any term or phrase used in a Request, You shall explain in detail what it is that You do not understand about the term or phrase at issue, and You shall respond to that part of the Request that You do understand.

8.      If You object to any Request on the grounds that responding is unduly burdensome, describe the undue burden.

9.      If You contend that any part of a Request is overbroad, You shall explain in detail why it is that You consider that part of the Request to be overbroad, and You shall produce Documents and Communications in response to the remainder of the Request that You do not consider to be overbroad.

10.      You shall produce each Document and Communication in its entirety, without abbreviation or redaction other than for privileged information.

11.      Documents and Communications provided in response hereto shall be produced as they are kept in the ordinary course of business or shall be organized and labelled to correspond with the categories in these Requests.

12.      You shall produce as a separate Document or Communication any Document or Communication that contains any notation, addition, insertion, or marking of any kind that renders it not entirely identical to a version of that Document or Communication without such marks.

13.      In the event that any Document or Communications called for hereby was formerly in Your possession, custody, or control and has been lost or destroyed, that Document or Communication is to be identified in writing as follows: (1) addressor, addressee, Person who prepared or authorized the Document, indicated or blind copies; (2) date of preparation or transmittal; (3) subject matter; (4) number of pages, attachments, or appendices; (5) all Persons to

whom distributed; (6) date of loss or destruction; and (7) if destroyed, the manner of destruction, reason for destruction, Persons authorizing destruction, and Persons who destroyed the Document.

14.    These Requests are continuing in nature, up to and during the course of trial.  In the event that You obtain additional information that is responsive to these Requests, You shall promptly supplement Your response to each such Request to the extent permitted by the applicable rules.

15.    In the event You seek to withhold or redact any Document or Communication on the basis that it is properly entitled to some privilege or other limitation of discovery, You shall produce as much of the Document or Communication concerned as to which no claim of privilege or other limitation of discovery is made.  With Documents, Communications, or portions of Documents or Communications for which a claim of privilege or other limitation of discovery is made, You are instructed to provide a numeral list of the Documents and Communications for which a privilege or limitation is claimed that (1) identifies the nature of the privilege or limitation (including work product) asserted and, if the privilege or limitation is governed by state law, indicate the state of the privilege rule or other limitation invoked; and (2) provides the following information in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged or otherwise protected information: (i) the type of Document or Communication; (ii) the name and capacity of each author and recipient of the Document or Communication; (iii) the general subject matter of the Document or Communication in a manner sufficient to support the privilege or other protection claimed; (iv) the date of the Document or Communication; (v) such other information as is sufficient to identify the Document or Communication for a subpoena *duces tecum*, including, where appropriate, the author(s) of the Document or Communication, the addressee(s) of the Document or Communication, and any other

recipient(s) shown in the Document or Communication, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other; and (vi) the same information referenced in (i)-(v) above for each enclosure or attachment to each listed Document or Communication if the enclosure or attachment is also withheld from production. Notwithstanding the assertion of any privilege or other protection, any requested Document or Communication that contains responsive, non-privileged, or protected information should be disclosed or produced, but that portion of a Document or Communication for which the privilege or other protection is asserted may be redacted, provided that the redacted portion is identified and described consistently according to the requirements listed herein.

16.     You shall produce all Electronically Stored Information in accordance with the following specifications:

a.     Form of Production: Produce Electronically Stored Information in single-page tiff format (Group IV tiff at 300 dpi) with standard Concordance formatted load file (.dat), including all metadata. Name each tiff file with a unique name matching the bates number labelled on the corresponding page. Group every 10,000 tiffs into a new folder; do not create a separate folder for each Document and Communication.

b.     Image Load File: Provide an image load file Opticon file (.opt) that contains Document and Communication boundaries, page counts, and volume information.

c.     Document and Communication Text: For Documents and Communications that were originally stored as native electronic files and which do not have redactions, produce the extracted full text (not OCR) from the body of each Document or Communication in separate document-level *.txt files named for the beginning bates number of the associated Document or Communication. Provide OCR text for Documents and Communications without extracted text

available (non-searchable PDFs, etc.). Group 1000 document text files per incrementally named "TEXT" directories, separate from image directories. For Documents and Communications that were originally stored as native electronic files and which have redactions, produce the OCR text from the redacted image(s) associated with each Document and Communication, in separate document-level *.txt files named for the beginning bates number of the associated Document and Communication. Clearly label any redacted material to show the redactions on the tiff image. Also provide a comma-delimited extracted text list file with each Document's and Communication's beginning bates number along with the path to the associated extracted text/OCR text file.

d.       Native Production for Certain File Types: For files created by Excel or other spreadsheet programs, PowerPoint or other special presentation programs, database files, or any other file types that reasonably require viewing in their native format for a full understanding of their content and meaning, produce the files in native and tiff formats. Name the produced native file with the bates number on the first page of the corresponding tiff production of the file/document. Group native files within incrementally named "NATIVE" directories, separate from images directories.

e.       De-duplication: Produce a single copy of each electronic Document for which exact duplicates exist. For email messages, consolidate duplicates based on MD5 hash generated from the BCC, Body, CC, From, IntMsgID, To, and Attach properties.

17.       The time period for these Requests is from January 1, 2023 to the present.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

1.       All Documents and Communications, including data, relating to—or reflecting— the number of hours that A/C power has or has not been made available to the outbound port on Celsius's serving PDUs, how Montana has calculated the foregoing, and, for each instance where

A/C power has not been made available to the outbound port on Celsius's serving PDUs, the reasons thereof.

2.    All Documents and Communications, including data, relating to—or reflecting—the number of hours that internet access at 100mbps has or has not been made available to the outbound port on Celsius's serving PDUs, how Montana has calculated the foregoing, and, for each instance where internet access at 100mbps has not been made available to the outbound port on Celsius's serving PDUs, the reasons thereof.

3.    All Documents and Communications relating to—or reflecting—Your assertion in Your August 24, 2023 letter that "A/C power was made available to the PDU at an uptime rate of 92%, accounting for permitted downtime allowance. With 44 days of the remaining 130 days left this calendar year, the 95% rate could well be met or exceeded," **Exhibit B**, Aug. 24, 2023 Montana Ltr., including how Montana has calculated the foregoing.

4.    All Documents and Communications relating to—or reflecting—the number of hours Celsius's miners have or have not been operating, how Montana has calculated the foregoing, and, for each instance where Celsius's miners have not been operating, the reasons thereof.

5.    All Documents and Communications relating to—or reflecting—actual preventative maintenance or the curtailment of energy usage for Celsius's miners and/or equipment, including any policies regarding curtailment requests or Communications regarding the same, reasons for each instance of actual preventative maintenance or curtailment, and the number of hours of actual preventative maintenance or curtailment.

6.    All Documents and Communications relating to—or reflecting—any plans for or discussions about future actual preventative maintenance or future curtailment events.

7.      All Documents and Communications relating to—or reflecting—the deployment or operation of Celsius's miners, including Documents and Communications relating to or reflecting scheduled deployments, the date of deployment, Your capacity to host and deploy rigs, and delays in deployments.

8.      All Documents and Communications relating to—or reflecting—total power generated by the Facility on a daily and monthly basis, total power that the Facility has consumed on a daily and monthly basis, and power sales into the grid, including the dates of each sale, the amount of power sold on each date, and the purchase price of each sale.

9.      All Documents and Communications relating to—or reflecting—the use of proceeds from any curtailment event.

10.     All Documents and Communications relating to—or reflecting—how Montana has calculated its invoices for Celsius, including relating to or reflecting Montana's statement in its August 17, 2023 letter that "the invoices Montana OP has provided to Celsius to date expressly and only invoice Celsius for its allocated share of usage of the Facility and for those periods when Celsius's mining equipment was operational," **Exhibit B**, Aug. 17, 2023 Montana Ltr., and how Montana has calculated the foregoing.

11.     All Documents and Communications relating to—or reflecting—Montana's budget, general ledger financials by account, costs, expenses, taxes, and actual spend data, as it relates to how Montana calculates its invoices for Celsius under Schedule A of the Agreement.

12.     Documents and Communications, including draft invoices, relating to—or reflecting—calculations of the shares of usage among customers of the Facility that were generated on or prior to May 25, 2023.

13.    Documents and Communications relating to—or reflecting—billings or calculations related to invoice disputes with other customers of the Facility.

New York, New York
Dated: September 11, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com

-and-

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:     (202) 389-5000
Facsimile:     (202) 839-5200
Email:          jdbrown@kirkland.com
                 tj.mccarrick@kirkland.com
                 grace.brier@kirkland.com
                 hannah.simson@kirkland.com
                 joseph.dantonio@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit D**

**Rule 2004(c) Corporate Deposition Notice**

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## THE DEBTORS' RULE 2004(c) CORPORATE DEPOSITION NOTICE OF MONTANA OP LLC

PLEASE TAKE NOTICE that pursuant to Federal Rules of Bankruptcy Procedure

2004(c) and 9016 (the "<u>Bankruptcy Rules</u>"), which make Federal Rule of Civil Procedure 45

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

applicable to these chapter 11 cases (the "Federal Rules"), the above-captioned Debtors will take the deposition upon oral examination of Montana OP LLC ("Montana"), beginning at 9:00 a.m. (prevailing Eastern Time) on September 21, 2023 at the office of Kirkland & Ellis LLP, 601 Lexington Ave., New York, NY 10022, or an alternative place as agreed upon by the Debtors and Montana.  The matters to be inquired into are described in **Exhibit A** hereto (attached), and the designated corporate representative(s) should be prepared to testify to these matters.  The deposition will proceed before an officer authorized by law to administer oaths, will be recorded by audio, video, and/or stenographic means, and will continue from day to day until completed.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: September 11, 2023

_/s/ Joshua A. Sussberg_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

-and

Judson Brown, P.C. (admitted _pro hac vice_)
T.J. McCarrick (admitted _pro hac vice_)
Grace Brier (admitted _pro hac vice_)
Hannah Simson (admitted _pro hac vice_)
Joseph D'Antonio (admitted _pro hac vice_)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 839-5200
Email:        jdbrown@kirkland.com
              tj.mccarrick@kirkland.com
              grace.brier@kirkland.com
              hannah.simson@kirkland.com
              joseph.dantonio@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_

**EXHIBIT A**

**DEFINITIONS**

The following definitions of terms apply to all of the Topics of Examination.  Unless otherwise defined herein, all words and phrases used herein shall be accorded their usual meaning and shall be interpreted in their common, ordinary sense.

1.    "All," "any," or "each" shall have the meaning afforded to them by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, shall each be construed as encompassing any and all.

2.    "Communication" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

3.    "Document" shall have the meaning afforded to it by Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, and, for the avoidance of doubt, is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A).  A draft or non-identical copy is a separate document within the meaning of this term.

4.    "Facility" refers to Montana's cryptocurrency mining datacenter and power generation plant located at 643 Industrial Park Road, Hardin, Montana 59034.

5.    "How," "why," "when," and "whether" shall also include each of the other.

6.    "PDU" refers to a power distribution unit, including a serving power distribution unit.

7.    "You" and "Your" means Montana and any of Montana's current or former affiliates, subsidiaries, parent corporations, predecessors, or successor entities and all of

Montana's current or former directors, officers, employees, agents, attorneys, advisors, and representatives.

8.      Whenever necessary to bring within the scope of a Topic of Examination information that might otherwise be construed to be outside its scope:

        a.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the use of the singular form of any word includes the plural and vice versa;

        b.      The use of the masculine form of a noun or pronoun shall include the feminine form, and vice versa; and

        c.      In accordance with Local Rule 26.3, made applicable to this matter by Local Bankruptcy Rule 2004-1, the connectives "<u>and</u>" and "<u>or</u>" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all responses that might otherwise be construed to be outside of its scope.

## <u>TOPICS OF EXAMINATION</u>

You shall produce one or more witnesses to testify thoroughly and accurately on the following topics, including Documents and Communications produced by You related to them:

1.      The number of hours that A/C power has or has not been made available to the outbound port on Celsius's serving PDUs, the reasons thereof, and how Montana has calculated the number of hours.

2.      The number of hours that internet access at 100mbps has or has not been made available to the outbound port on Celsius's serving PDUs, the reasons thereof, and how Montana has calculated the number of hours.

3.      The number of hours Celsius's miners have or have not been operating, the reasons thereof, and how Montana has calculated the number of hours.

4.      The deployment or operation of Celsius's miners, Your capacity to host and deploy rigs, and delays in deployments.

5.      Actual preventative maintenance and the curtailment of energy usage for Celsius's miners and/or equipment, including any plans for or discussions about future actual preventative maintenance or future curtailment events and how Montana has calculated the number of hours of actual preventative maintenance and curtailment.

6.      Power generated by the Facility, power that the Facility has consumed, and power sales into the grid, including the dates of each sale, the amount of power sold on each date, the purchase price of each sale, and the use of proceeds from any curtailment event.

7.      How Montana has calculated its invoices for Celsius, including the financial data underpinning Montana's calculations, as well as calculations of shares of usage among customers of the Facility that were generated on or prior to May 25, 2023.

8.      Billings or calculations related to invoice disputes with other customers of the Facility.

New York, New York
Dated: September 11, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

-and

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace Brier (admitted *pro hac vice*)
Hannah Simson (admitted *pro hac vice*)
Joseph D'Antonio (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:      (202) 389-5000
Facsimile:      (202) 839-5200
Email:          jdbrown@kirkland.com
                tj.mccarrick@kirkland.com
                grace.brier@kirkland.com
                hannah.simson@kirkland.com
                joseph.dantonio@kirkland.com

-and-

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit E**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

### ORDER AUTHORIZING THE DEBTORS TO ISSUE SUBPOENAS
### UNDER FEDERAL RULES OF BANKRUPTCY PROCEDURE 2004
### AND 9016 TO MONTANA OP LLC GRANTING RELATED RELIEF

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession

(collectively, the "Debtors")[2] for entry of an order (this "Order"), (a) authorizing the Debtors to

issue subpoenas under Federal Rules of Bankruptcy Procedure 2004 and 9016 to Montana OP LLC

("Montana") and (b) granting related relief, all as more fully set forth in the Motion; and this Court

having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the Southern District of

New York, entered February 1, 2012; and this Court having the power to enter a final order

consistent with Article III of the United States Constitution; and this Court having found that venue

of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court

having found that the relief requested in the Motion is in the best interests of the Debtors' estates,

their creditors, and other parties in interest; and this Court having found that the Debtors' notice

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and

no other notice need be provided; and this Court having reviewed the Motion; and this Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and upon all the proceedings had before this Court; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted.

2. Montana shall comply with the document requests attached to the Motion as

**Exhibit C** by no later than five days after the entry of this Order and provide the productions to

the Debtors.

3. Montana shall comply with the corporate deposition notice attached to the Motion

as **Exhibit D** by no later than five days after the deadline for the substantial competition of

document production.

4. To the extent necessary, the Debtors' rights are reserved to request depositions and

any additional documents under Bankruptcy Rule 2004 based on any other information that may

be revealed as a result of the documents and testimony provided pursuant to this Order.

5. This Order is without prejudice to the Debtors' rights to file further motions seeking

additional documents and testimony pursuant to Bankruptcy Rule 2004(a) or any other applicable

law.

6. Notwithstanding the relief granted in this Order and any actions taken pursuant to

such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any

particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular

claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication

or admission that any particular claim is of a type specified or defined in this Order or the Motion;

2

(e) a request or authorization to assume any agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.  Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

7.      Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order, including, but not limited to, any discovery disputes that may arise between or among the parties and to interpret, implement and enforce the provisions of this Order.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE