**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## FOURTH NOTICE OF FILING OF PLAN SUPPLEMENT

 **PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Plan Supplement") to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3222] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and conditions in the Plan Sponsor Agreement.

 **PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Plan Supplement").

 **PLEASE TAKE FURTHER NOTICE THAT** on September 8, 2023, the Debtors filed the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Plan Supplement").

 **PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "Fourth Plan Supplement" and, together with the First Plan Supplement, the Second Plan Supplement, and the Third Plan Supplement, the "Plan Supplement")[3], which includes the following documents:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3223] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable.

[3] **Annex 1** contains a listing of all documents filed in the First Plan Supplement, the Second Plan Supplement, and the Third Plan Supplement.

| **Exhibit** | **Document** |
|---|---|
| A | Fahrenheit Management Agreement |
| B | Transaction Steps Memorandum |
| C | U.S. Bitcoin Agreements |
| D | Proof Group IP License |
| E | Plan Sponsor Contribution Agreement |
| F | Paxos Custodial Agreement |
| G | Coinbase Agreements |
| H | PayPal Agreement |
| I | Plan Administrator Agreement |
| J | Figure Lending, LLC Refinancing Term Sheet |
| K | NewCo Organizational Documents |
| K-1 | (Redline) New Organizational Documents |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Plan Sponsor Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims, Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re: Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

New York, New York
Dated: September 15, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                   ross.kwasteniet@kirkland.com
                   chris.koenig@kirkland.com
                   dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Annex 1**

I.    ***Notice of Filing of Plan Supplement* [Docket No. 3115].**

Exhibit    Document

A    Schedule of Released and Exculpated Parties

B    ADR Procedures

II.    ***Second Notice of Filing of Plan Supplement* [Docket No. 3273].**

Exhibit    Document

A    Schedule of Retained Causes of Action

B    Schedule of Equitably Subordinated Claims

C    Schedule of Excluded Parties

III.    ***Third Notice of Filing of Plan Supplement* [Docket No. 3444].**

Exhibit    Document

A    New Organizational Documents

B    Identities of the members of the New Board of NewCo

C    Schedule of Rejected Executory Contracts and Unexpired Leases

D    Schedule of Assumed Executory Contracts and Unexpired Leases

E    Litigation Administrator Agreements

F    Identity of Litigation Administrator

G    Identities of Litigation Oversight Committee Members

H    Employee Transition Services Agreement

I    Plan Administrator Budget

J    ADR Procedures (Redline at Exhibit J-1)

K    Schedule of Retained Causes of Action (Redline at Exhibit K-1)

## **Exhibit A**

**Fahrenheit Management Agreement**

DRAFT

# MANAGEMENT SERVICES AGREEMENT

## By and between

## Fahrenheit, LLC, as Manager

## And

## [NewCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) Fahrenheit LLC, a Delaware limited liability company ("**Fahrenheit**" or the "**Manager**"), (ii) [NewCo, Inc.], a Delaware corporation (the "**Company**"), (iii) [Proof Group Capital Management LLC], a [Delaware] limited liability company ("**Proof Group**") and (iv) [Arrington Capital], a [●] ("**Arrington**") (in the case of (iii) and (iv), solely with respect to Section 11 and Exhibit C). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, on the Effective Date, the NewCo Assets (as defined in the Plan) were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations;

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, those certain persons set forth on <u>Exhibit A</u> that shall serve in the roles of (a) Chief Executive Officer, (b) Chief Operating Officer, (c) Chief Financial Officer, (d) Chief Marketing Office; (e) General Counsel, (f) Chief Accounting Officer, (g) Chief Risk Officer, (h) Head of Mining,[1] (i) other C-suite executives or heads of staking businesses (if any), and (j) any other roles traditionally satisfied by individuals with the foregoing titles, regardless of the ultimate title so assigned (each of the foregoing and his or her replacement or successor, a "**Management Team Member**" and together, the "**Management Team**") are entering into employment agreements with the Company as described on <u>Exhibit A</u> (each a "**Management Team Employment Agreement**" and together the "**Management Team Employment Agreements**"), which Management Team Employment Agreements provide that the applicable Management Team Member shall receive certain compensation as specifically described therein; and

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, U.S. Data Management Group LLC (d/b/a US Bitcoin Corp) ("**US Bitcoin**") is entering into that certain Management Services Agreement by and between US Bitcoin and the Company, dated as of the date hereof (as amended or restated from time to time, the "**USBTC Mining Management Agreement**"), whereby US Bitcoin shall manage the mining assets and business of the Company and its subsidiaries.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.        <u>Appointment</u>. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Section 3(a). The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, the Budget (as defined below) previously approved by the New Board) with respect to any third-party contractor providing services: (i) with an aggregate value in excess of $250,000 during any rolling twelve-month period (not to be unreasonably withheld, delayed or conditioned), or (ii) that are typically performed by a C-suite officer or employee of a publicly-traded company (a "**Third-Party Contractor**"), to provide all or any part of the Services at no additional cost to the Company; <u>provided</u>, <u>however</u>, that the Manager shall in all cases remain fully responsible and liable for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself, and shall be solely responsible and liable for the payment of any fees payable to such Affiliate or Third-Party Contractors in connection with the provision of any Services; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, the Manager shall not be liable for, nor shall it be obligated to pay or reimburse any fees or expenses of, any professionals (e.g., attorneys, auditors, accountants, financial advisors, consultants), vendors, service providers, or other third-parties that enter into agreements with or are retained directly by the Company, in accordance with the terms of this Agreement. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the board of directors of the Company (the "**New Board**") acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person

---

[1] **Note to Draft:** Identity of Head of Mining to be agreed between the parties in a side letter on or prior to the [Plan Supplement Date].

that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    <u>Term and Termination</u>.

(a)    <u>Term</u>. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring three years after the date hereof (the "**Initial Term**"); <u>provided</u>, <u>however</u>, that in the event that the Company has formed a New Business meeting the criteria set forth in <u>Exhibit D</u> hereto (the "**Minimum Success Criteria**") by the completion of the full 8th fiscal quarter after the date of this Agreement, (i) the Initial Term shall be extended by one year and, (ii) at the end of such one-year extension, the Company, by providing written notice to the Manager of no more than 12 months and no less than three months prior to the end of the Initial Term (as extended), may renew the Term for a further one-year term (each one-year extension a, "**Term Extension**").

(b)    This Agreement may be terminated, during the Initial Term or any Term Extensions, only as follows:

(i)    By mutual agreement, in writing, of both the Manager and the Company.

(ii)    By the Manager: (A) in the event that the Company fails to pay or issue the consideration set forth in Section 4 with respect to an amount, individually or in the aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 4(f), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 4(f)); <u>provided</u>, <u>however</u>, that any termination under this provision shall be in accordance with the procedures set forth in Section 2(c); <u>provided</u> <u>further</u> that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) (i) if the Company has made payment or issued such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii), (ii) if the failure of the Company to make payment arises directly from the action or failure to act of any Management Team Member appointed by the Manager or with the Manager's consent and such action or failure to act was done willfully with the intent to cause such failure to make a payment, and was not done at the instruction of the New Board or (iii) unless and until the Manager has provided at least 10 days' prior written notice to the New Board notifying its intent to terminate this Agreement; (B) upon a Change of Control of the Company without the prior written consent of the Manager; or (C) in accordance with Section 4(c)(v). For the purposes of this Agreement, "**Change of Control**" means either party's consummation of a sale, exchange or other transfer, whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the party, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the party by another entity by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) of any reorganization, merger or consolidation in which the corporation is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party; <u>provided</u> that "**Change of Control**" shall exclude, (x) any transaction effected exclusively for the purpose of changing the domicile of the party and (y) any transaction following which the party's stockholders of record as constituted immediately prior to such transaction will, immediately after such transaction (by virtue of their continuing to hold such stock and/or their receipt in exchange therefor of securities issued as consideration for the party's outstanding stock) hold at least 50% of the voting power of the surviving or acquiring entity or the successor entity (including a newly formed entity) for the combined business.

3

(iii)    By the Company:

(A) in the event of the Manager's or Fahrenheit Party's fraud, willful misconduct or gross negligence;

(B) if the Manager or any Fahrenheit Party materially breaches this Agreement and such material breach substantially defeats the fundamental purpose of this Agreement, it being agreed that such material breach shall be deemed to include, without limitation (i) any failure to follow, or any act or omission that violates any policy, resolution, or direct instruction that is issued by the New Board in good faith and consistent with its fiduciary duties and (ii) any action or inaction of the Manager that has resulted or is reasonably expected to result in pending regulatory action (except for any actions taken at the direction of the New Board);

(C) if the Manager and/or any of the Fahrenheit Parties is indicted of any act which is a felony, theft of corporate properties property or a misdemeanor involving moral turpitude and fraud, or is the defendant to a civil judgment relating to, or settlement admitting, financial fraud or financial misconduct; provided that the "**Fahrenheit Parties**" shall mean (i) Steve Kokinos, (ii) while he is employed by the Company, Joel Block, (iii) Ravi Kaza, (iv) Noah Jessop, (v) Asher Genoot, and (vi) Michael Arrington;

(D) [RESERVED];

(E) in the event that the USBTC Mining Management Agreement has been terminated in accordance with Section 2(b)(iii) thereof and Manager has failed to designate, within a period of 9 months from the date of termination of the USBTC Mining Management Agreement, a replacement provider or up to two providers or such additional number of providers as approved by the New Board  (the "**USBTC Replacement(s)**") to perform the "Services" and remaining "Projects" (as such terms are defined under the USBTC Mining Management Agreement), reasonably satisfactory to and approved in writing by the New Board, which approval shall (i) be at the sole discretion of the New Board if such provider or providers are not Qualified USBTC Replacement(s) and (ii) not be unreasonably withheld, conditioned or delayed if such provider or providers are Qualified USBTC Replacement(s). "**Qualified USBTC Replacement(s)**" shall mean, if any, a provider that (i) has comparative and demonstrated experience providing services substantially similar in the aggregate to the "Services" and "Projects" (as such terms are defined under the USBTC Mining Management Agreement) and (ii) is not a person listed on Exhibit E.  If (x) the New Board approves the USBTC Replacement, (y) the scope of services provided by the USBTC Replacement are substantially similar in the aggregate to the "Services" and "Projects" (as such terms are defined under the USBTC Mining Management Agreement), and (z) such USBTC Replacement is subject to substantially the same obligations of US Bitcoin under the USBTC Mining Management Agreement, then the New Board shall not disapprove annualized compensation payable to the Qualified USBTC Replacement(s) that is of equal or lesser value than the Base Management Mining Fee (as that term is defined in the USBTC Mining Management Agreement) that would have been payable to US Bitcoin had it performed under the USBTC Mining Management Agreement for the remainder of the term thereunder. Unless otherwise agreed by the New Board, to the extent the annualized compensation

payable to any USBTC Replacement(s) is greater than such Base Management Mining Fee (such excess, the **"Excess Compensation"**), then such Excess Compensation shall be the sole responsibility of the Manager;

(F) upon a Change of Control of the Manager without the prior written consent of the Company; and

(G) for convenience with at least 30 days prior written notice.

(c)    <u>Termination Event Procedures.</u>

(i)    Termination of this Agreement sought pursuant to Section 2(b)(ii)(A) (by the Manager), or pursuant to Section 2(b)(iii)(B) (by the Company) (each of Sections 2(b)(ii)(A) or 2(B)(iii)(B)), each a "**Potential Termination Event**") shall comply with the following procedures:

(A) The party asserting that a Potential Termination Event has occurred shall provide (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(B) Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(C) Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii)(A) or Section 2(b)(iii)(B), the Non-Terminating Party shall have 60 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(ii)    When terminating this Agreement in accordance with its terms, the Company may include in any Termination Notice provided to the Manager an effective date in the future on which termination shall take effect on a date not to exceed 180 days from the date of any Termination Notice ("**Future Termination Effective Date**"), and following such notice, until such Future Termination Effective Date, upon written request by the Company, the Manager shall provide all reasonable cooperation and assistance to the Company to enable to transition the Services to the Company's nominated successors. The Manager shall perform such transition services on the terms, and in accordance with the performance standards, set forth in this Agreement, and shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to such transition services. For the avoidance of doubt, until the Future Termination Effective Date, this Agreement and the terms hereof shall continue with full force and effect.

(d)    <u>Effect of Termination</u>.

(i)    Upon the effective date of the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; <u>provided, however</u>, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration. For clarity, after the effective date of the termination of this

Agreement, the Company shall have no obligation to pay any compensation under Section 4 of this Agreement (other than for Services rendered prior to such termination). After the effective date of such termination, the Manager shall continue to provide reasonable cooperation and assistance to the Company in transitioning the Services for a period of no more than 45 days following such termination; provided that, after the effective date of such termination, the Manager shall not be obligated to incur any third party or other out of pocket costs in connection with such transition that is not reimbursed by the Company.

(ii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii)(A) or (B) or Section 2(b)(iii)(G), then upon the effective date of such termination:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement;

(B)    any Unvested Shares (as defined in the Restricted Stock Purchase Agreement) and/or any Unvested Warrants (as defined in the Warrant Agreements) (such agreements together, the "**Equity Agreements**" and such securities, together, the "**Unvested Securities**"), shall be, immediately and without any action on the part of the Company, New Board, the Manager or any other person, cancelled for no consideration in accordance with the terms of the respective Equity Agreements and the Manager shall cease to have any rights with respect thereto; and

(C)    and the Manager shall pay to the Company by wire transfer of immediately available cash any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, pro rated for the number of days left in such quarter from the effective date of termination.

(iii)    If this Agreement is terminated pursuant to Section 2(b)(ii)(A) or (B) or Section 2(b)(iii)(G), then upon the effective date of such termination:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to 100% of the aggregate Base Cash Fees that would have become due and payable after the date of termination had the Services been performed for the remainder of the then-current Initial Term or Term Extension (as applicable) ("**Termination Payment Amount**"), which Termination Payment Amount shall be immediately due and payable upon termination and

(B)    all Unvested Securities which would have vested after the date of termination had the Services been performed for the remainder of the then-current Initial Term or Term Extension (as applicable) shall immediately and without any action on the part of the Company, New Board, the Manager or any other person, vest, in accordance with the terms of the respective Equity Agreement; provided, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements).

6

(iv)    Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager (x) receives the Termination Payment Amount and (y) all of the Unvested Securities are vested pursuant to Section 2(d)(iii)(B), such payment of the Termination Payment Amount and receipt of Unvested Securities shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable Laws arising out of any such breach, termination or failure, in each case, other than any (a) any termination payment due under this Section 2(d), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including termination or other breakage payments), (e) obligations of the Company to indemnify the Manager for Losses arising from third party claims under Section 9 (*Indemnification*) and (f) damages resulting from the Company's breach of Section 5 (*Confidentiality*) or Section 7 (*Intellectual Property*). For clarity, this Section 2(d)(iv) shall not result in any double payment by the Company for the same underlying obligation.

(v)    Upon the effective date of termination of this Agreement, the Manager shall immediately cause its designated directors to resign from the New Board and the Class B Shares of the Company held by the Manager shall be deemed redeemed and cancelled for no consideration in accordance with the Certificate of Incorporation of the Company.

(vi)    The provisions of this Section 2(d), Section 5, Section 6, Section 7, and Section 10 through Section 24 shall survive the termination of this Agreement.

3.    Manager Services; Executive Management Team; Obligations of the Company.

(a)    Services. Subject to the oversight of the New Board, the Manager or any of its Affiliates shall provide the following services to the Company and its subsidiaries: (i) manage, supervise, oversee, and monetize with the goal of maximizing shareholder value, on behalf of the Company and its subsidiaries, the DeFi Cryptocurrency Assets, the Institutional Loan portfolio, the PE & VC Investments, (ii) manage, supervise, and oversee with the goal of maximizing return on investment of the NewCo Capitalization Amount, (iii) set strategy and capital allocation on behalf of the Company for the bitcoin mining business; and manage, supervise, and oversee, on behalf of the Company, the provision of the services under the USBTC Mining Management Agreement or otherwise performed by any Qualified USBTC Replacement(s), and (iv) set strategy, capital allocation, and manage and supervise, on behalf of the Company, the staking business, including managing and overseeing staking counterparties, setting investment decisions, and seeking to maximize the value of contributed intellectual property owned by Proof Group (or other rights to use the applicable software or proprietary technology)  (collectively, the "**Services**"). Each Management Team Member shall, and the Manager shall cause each Management Team Member to, actively participate in the management of the Company and comply with the policies and procedures set by the New Board in good faith and in accordance with the New Board's fiduciary duties. Each Management Team Member shall, and the Manager shall cause each Management Team Member to, implement and enforce remedies on behalf of the Company for the underperformance or the lack of performance by US Bitcoin of the "Services" and "Projects" as described in the USBTC Mining Management Agreement.

(b)    Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased

7

Assets. The Manager may consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 18 of this Agreement.

   (c) <u>Service Standard</u>. The Manager shall (and, if applicable, shall cause its Affiliates and Third-Party Contractors to) provide the Services and perform its obligations under this Agreement in all material respects in a professional, competent, diligent and workmanlike manner by knowledgeable, trained and qualified personnel, all in accordance with the terms of this Agreement, and the standards of performance considered generally acceptable in the industry for similar services, tasks and projects.

   (d) <u>Supervision of the Manager</u>. Notwithstanding the foregoing or anything to the contrary herein, the Manager agrees that it will (and, if applicable, will cause its Affiliates and Third-Party Contractors and the Fahrenheit Parties to), in providing the Services and performing its obligations under this Agreement: (i) follow at the direction of and subject to the supervision of the New Board, and (ii) comply with (v) the terms hereof, (w) any applicable international, federal and state laws, (x) the governing documents of the Company, and (y) any instructions, directions, and objectives provided by the New Board in good faith and in accordance with the New Board's fiduciary duties, and (z) any policies or procedures adopted by the New Board in good faith and in accordance with the New Board's fiduciary duties, including without limitation as set out in Section 3(g) hereof.  The Management Team Members shall each serve at the pleasure of the New Board. The initial Management Team Members, and any replacements thereof, shall be approved in writing by the Committee and, after the Effective Date, the New Board in accordance with this Agreement.

   (e) <u>Executive Management Team</u>. Subject to the written approval of the New Board and the terms of the applicable Management Team Member Employment Agreement, (1) Steven Kokinos will serve as the initial Chief Executive Officer of the Company; and (2) Joel Block will serve as the initial Chief Financial Officer of the Company (together with their respective successors or replacements, the "**Executive Management Team**"). The Executive Management Team will be assisted by Michael Arrington, Ravi Kaza and Noah Jessop and other industry leaders in operating PoS networks, venture/defi/token portfolio management, and monetization capabilities in relation to the Company. For the avoidance of doubt, the compensation of the Executive Management Team is a part of (and not in addition to) the Aggregate Management Team Cash Consideration (as defined below).

   (f) <u>Obligations of the Company</u>. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

     (i) Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to the facilities, assets and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or deemed commercially sensitive by the Company) solely for the purpose of the facilitating the Manager Personnel to deliver the Services; and

     (ii) Grant the Manager, its Affiliates, any Third-Party Contractor and the Manager Personnel access to any materials or information reasonably requested by such parties for the purpose of providing Services under this Agreement.

   (g) <u>New Board</u>. Notwithstanding anything to the contrary herein, the New Board shall have authority to adopt and approve (and, for the avoidance of doubt, no such actions shall be taken without

8

such adoption or approval, as applicable): (i) the investment policy; (ii) the dividend policy; (iii) policies regarding potential conflicts of interest (including with respect to the Manager, the Company and their respective personnel and Affiliates); (iv) all major investment and operational decisions of the Company (taking into account the recommendation of the Executive Management Team); and (v) a policy governing the involvement and commitment of each Management Team Member. The Manager and each Management Team Member shall at all times perform the Services in accordance with and otherwise adhere to the policies set by the New Board in good faith and in accordance with the New Board's fiduciary duties.

(h)     Loan Portfolio. Manager shall cause Peter Briger to consult and advise the Company with respect to the loan portfolio. Peter Briger's engagement shall be at no additional cost of the Company, and the Manager shall in all cases remain solely responsible and liable for the payment of any fees or compensation payable to Peter Briger.

4.     Compensation for Services and Expense Reimbursement.

(a)     Cash Compensation for Services. As consideration for providing the Services to the Company, the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $20,000,000, which shall be paid quarterly in an amount equal to $5,000,000 ("**Base Cash Fee**") on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less the Aggregate Management Team Cash for the immediately prior quarterly period (such calculated amount, the "**Cash Fee**"); provided, however, that, during any Term Extension, the Base Cash Fee payable to the Manager shall be an amount equal to the Base Cash Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided further that the first payment of the Cash Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment of $5,000,000 multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its successor Index) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm), (D) "**Management Team Cash Consideration**" means with respect to any Management Team Member, any (i) wages, salary, bonus and other payments, including any deferred cash compensation payments when received by the applicable Management Team Member, if any (but excluding any equity compensation) (in each case, including any amount accrued), (ii) costs (including imputed costs) associated with group life insurance, group medical insurance, hospitalization, retirement, and severance payments (unless such severance payment is approved by the New Board or is in accordance with any severance policy adopted by the New Board), and (iii) any payroll taxes, social security taxes and other direct costs, charges or taxes incurred the Company in relation to the payment or provision to Management Team Members of the items set forth in (i) or (ii) above, collectively, and (E) the "**Aggregate Management Team Cash Consideration**" means the aggregate Management Team Cash Consideration for all Management Team Members. In no event shall any of the Management Team Cash Consideration be a negative amount. For the avoidance of doubt, it is clarified that, there shall be no duplication of payments required under this Agreement and the USBTC Mining Management Agreement.  At the end of the Term (as extended from time to time), to the extent there is any Management Team Cash Consideration not previously deducted from the Base Cash Fee, Manager shall

9

pay to the Company by wire transfer of immediately available cash amounts equal to any such Management Team Cash Consideration.

    (b)    <u>Equity Compensation for Services</u>.

    (i)    As additional consideration for providing the Services to the Company, the Company shall, simultaneously with the execution hereof (the "**Equity Fee**"):

    (A)    execute and deliver to the Manager that certain Restricted Stock Purchase Agreement between the Company and the Manager, dated as of the date hereof (the "**Restricted Stock Purchase Agreement**"); and

    (B)    execute and deliver to Manager those certain Warrant Agreements between the Company and the Manager, dated as of the date hereof (the "**Warrant Agreement**").

    (c)    <u>Management Team Employment Agreements</u>.

    (i)    The Company may not enter into any employment agreement after the Effective Date that shall be included as a Management Team Employment Agreement hereunder (a "**New Management Team Employment Agreement**") unless the terms of any such New Management Team Employment Agreements, including any Management Team Cash Consideration thereunder, are approved in writing by the Manager and the New Board; whereupon <u>Exhibit A</u> shall be amended to include such New Management Team Employment Agreement and attached to this Agreement.

    (ii)    Notwithstanding the foregoing or anything to the contrary herein, the Company may amend any Management Team Employment Agreement or otherwise take action that may increase the Management Team Cash Consideration that may be paid to such Management Team Member during the Term; <u>provided</u>, <u>however</u>, that any resulting increase in the Management Team Cash Consideration for such Management Team Member during the Term shall not be included in the Aggregate Management Team Cash Consideration or otherwise deducted from or setoff against amounts any Cash Fee or Equity Fee owing to the Manager under this Agreement without the prior written consent of the Manager.

    (iii)    In the event that any Management Team Member (other than Messrs. Kokinos and Block) resigns for "good reason" from his or her employment or is terminated by the Company without "cause", as provided for in the applicable Management Team Employment Agreement, then (A) the applicable Management Team Cash Consideration for such individual shall only be included in the next calculation of the Aggregate Management Team Cash Consideration as of the date of such resignation or termination but not any future calculation of the Aggregate Management Team Cash Consideration and (B) the Manager shall nominate, and, subject to consent by the New Board (not to be unreasonably withheld) the Company shall hire (or engage as a consultant, as applicable) the replacement Management Team Member in accordance with their applicable Management Team Employment Agreement.

    (iv)    In the event that any Management Team Member (other than Steve Kokinos or Joel Block) [resigns from his or her employment without "good reason" or] is terminated by the Company for "cause", as provided for in the applicable Management Team Employment Agreement (a "**Terminated for Cause Management Team Member**"), then (A) the then applicable Management Team Cash Consideration for such Management Team Member shall only

10

be included in the next calculation of the Aggregate Management Team Cash Consideration as of the date of such resignation or termination but not any future calculation of the Aggregate Management Team Cash Consideration and (B) the Company may, at the direction of or with the prior written approval of the New Board, appoint a replacement Management Team Member for such Terminated for Cause Management Team Member.

(v)    In the event that either Steve Kokinos or Joel Block resigns or are terminated for any reason (as provided under their respective Management Team Employment Agreements) then (A) the applicable Management Team Cash Consideration for such individual shall only be included in the next calculation of the Aggregate Management Team Cash Consideration as of the date of such resignation or termination but not any future calculation of the Aggregate Management Team Cash Consideration and (B) the New Board shall, after reasonable consultation with the Manager, appoint the replacement Management Team Member to operate as Chief Executive Officer or Chief Financial Officer, as applicable (such person, together with any replacement Management Team Member referred to in Section 4(c)(iii) or Section 4(c)(iv), the "**Replacement Management Team Member**"); provided, however, that if the Manager has provided to the Company its written disapproval of the appointment of such replacement Management Team Member, then within 10 days of the appointment of such replacement Management Team Member, the Manager may, by providing written notice to the Company, terminate this Agreement.

(vi)    Any Management Team Cash Consideration payable to a Replacement Management Team Member (including for the avoidance of doubt Messrs. Kokinos and Block) shall be deducted from the Base Cash Fee for the purposes of determining the Cash Fee calculated under and payable in accordance with Section 4(a); provided that, if the estimated aggregate amount of the Management Team Cash Consideration payable to the then current Management Team Members that includes any Replacement Management Team Member (the "**Estimated Replacement Compensation**") is greater than the estimated aggregate amount of the Management Team Cash Consideration that would have been payable to the Management Team Members initially appointed on or following the date of this Agreement and, in the case of any Management Team Member that is a member of the Manager, the Management Team Cash Consideration that reasonably would have been paid to such Management Team Member had such Management Team Member not been a Member of the Manager (the "**Estimated Original Total Compensation**"), as reasonably agreed to by the Manager and the Company, then the Management Team Cash Consideration of the Replacement Management Team Member will only be deducted from the Base Cash Fee up to the amount of the Estimated Original Total Compensation. If the Company and the Manager cannot reasonably agree on the Estimated Replacement Compensation and Estimated Original Total Compensation at least 15 days prior to any Fee Payment Date after the Replacement Management Team Member is appointed, then the matter shall be submitted to the Independent Accountant for determination of the Estimated Replacement Compensation and Estimated Original Total Compensation in accordance with the procedures set forth in Section 4(f)(ii). Notwithstanding the foregoing, if the Company and the Manager cannot reasonably agree on the Management Team Cash Consideration that would reasonably have been paid to a Management Team Member that is a Member of the Manager had such Management Team Member not been a Member of the Manager, then such amount shall equal the market compensation for a similarly situated executive in a similar industry as determined by a third party valuer mutually agreed between the Company and the Manager acting reasonably. The decision of such third party valuer shall be final, binding and non-appealable upon the Company and Manager and the decision of such third party valuer shall constitute an arbitral award that is final, binding and non appealable and upon which a judgment may be entered by a court having jurisdiction thereover.

11

(d)    [RESERVED][2]

(e)    Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate shall accrue and be payable by the Company on any unpaid Cash Fee (except for disputed amounts, which shall not accrue interest until such amounts are adjudicated as owed by the Independent Accountant under Section 4(f)), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(f)    Review and Objections.

(i)    During the Term and for three months following the end of the Term, but no more than once per year, (1) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice in order to determine the Aggregate Management Team Cash Consideration and the resulting Cash Fees paid on any prior Fee Payment Date in respect of the prior 12 months and (2) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice in order to review the Company's determination of the Aggregate Management Team Cash Consideration and the resulting Cash Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)    The Manager may object to the Company's determination of the Aggregate Management Team Cash Consideration and the resulting Cash Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Aggregate Management Team Cash Considerations and resulting Cash Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Aggregate Management Team Cash Considerations and resulting Cash Fees for the applicable period; provided that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll][3], or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions

---

[2] NTD: This provision was meant to address termination of USBTC for convenience, which has now been removed. Termination for cause is addressed separately so this should be deleted.

[3] **Note to Draft**: To confirm Kroll not currently utilized by any party.

and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Cash Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne equally by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

    (g)    <u>Expenses</u>.

    (i)    The Company shall reimburse the Manager, its Affiliates or Third-Party Contractors for any reasonable and documented out-of-pocket travel and related costs and expenses incurred in connection with the performance of the Services, subject to, and to the extent consistent with, any relevant expense policy established by the New Board from time to time, which are expressly incorporated into this Agreement (the "**Manager Expenses**").

    (ii)    The Company shall pay or reimburse any Manager Expenses within 15 Business Days of receiving written notice from the Company (on behalf of itself or a Management Team Member), its Affiliates or a Third-Party Contractor, as applicable, of the incurrence of such Manager Expense and the underlying invoices.

    5.    <u>Confidentiality</u>.

    (a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 5 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 5; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Work Product, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

6.    Intellectual Property.

(a)    The Company is, and shall be, the sole and exclusive owner of all right, title, and interest in and to all documents, materials, works of authorship, software, specifications, ideas, inventions, know-how, methods, data, and other work product that is prepared by or on behalf of the Manager in the course of performing the Services and are related to the Services ("**Work Product**"), including all Intellectual Property Rights therein. The Manager agrees, and will cause its Manager Personnel to agree, that with respect to any Work Product that may qualify as "work made for hire" as defined in 17 U.S.C. § 101 of the Copyright Act of 1976 (or as contemplated under any other applicable body of copyright law throughout the world), all such Work Product is deemed a "work made for hire" for the Company. To the extent that any right, title, or interest (including Intellectual Property Rights) in any of the Work Product does not vest in Company, the Manager hereby irrevocably assigns, and shall cause the Manager Personnel to irrevocably assign, to the Company, in each case without additional consideration, all right, title, and interest throughout the world in and to the Work Product, including all Intellectual Property Rights therein, whether or not such Work Product is fully or partially complete, including all such right, title, and interest as may have initially vested in the Manager, the Manager Personnel or any of their respective personnel or Affiliates. The Manager hereby irrevocably waives, and shall cause the Manager Personnel to irrevocably waive, to the extent permitted by applicable law, any and all claims such Manager Personnel may now or hereafter have in any jurisdiction to so-called "moral rights" or rights of droit moral or similar rights of authors with respect to the Work Product. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    The Manager and its licensors are, and shall remain, the sole and exclusive owners of all right, title, and interest in and to the Pre-Existing Materials, including all Intellectual Property Rights therein. The Manager hereby grants to the Company a worldwide, perpetual, irrevocable, royalty-free, transferable, and sublicenseable (through multiple tiers) license to use any and all Pre-Existing Materials to the extent incorporated in, combined with or otherwise necessary for the use of the Work Product. All other

14

rights in and to the Pre-Existing Materials are expressly reserved by Manager. For the purposes of this Agreement, "**Pre-Existing Materials**" means all documents, materials, works of authorship, software, specifications, ideas, inventions, know-how, methods, and data provided by or used by the Manager in connection with performing the Services, in each case developed or acquired by the Manager prior to the commencement or independently of this Agreement.

(c)    The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 6.

(d)    The Company hereby grants to the Manager a worldwide, royalty-free, transferable (solely as permitted under Section 15), and sublicenseable (through multiple tiers) license to use any and all Intellectual Property Rights held by the Company solely for the purpose of, and solely to the extent necessary for, the Manager to perform the Services.

7.    Non-Compete. Notwithstanding the termination of this Agreement, for the Term hereof, the Manager will not directly or indirectly engage in, or attempt to engage in, as an employee, principal, agent, shareholder, representative, consultant, independent contractor, or otherwise in any capacity similar to the capacity in which Manager provides the Services, the delivery or performance of any services or commercial activities, that are in competition with the performance of the Services under this Agreement or the conduct of the Company's business.

8.    Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses arising out of or in connection with the performance of any obligations contemplated by this Agreement, unless such Losses shall be proven to result directly from the gross negligence, willful misconduct, fraud, violation of law or breach of Section 5 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"). Except for any Losses arising out of or in connection with a breach of Section 5 or the indemnification obligations pursuant to Section 9, in no event will either party be liable to the other for special or punitive damages, or indirect or consequential damages. Except for any Liability Exceptions, under no circumstances will the liability of the parties exceed, in the aggregate, the Cash Fee actually paid to the Manager hereunder (or, in the case of liability of the Company, Cash   required to be paid to the Manager hereunder if less than then amount actually paid); provided that this Section 8 shall not apply in any way to (a) any termination payment due under this Section 2(d), (b) any accrued and unpaid amounts due under Section 4 this Agreement, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (e) obligations of the Company to indemnify the Manager or obligations of the Manager to indemnify the Company for third party claims under Section 9 (*Indemnification*) and (f) damages resulting from breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*).

9.    Indemnification.

(a)    Company Indemnification. Subject to Section 9(c), except in connection with matters contemplated by Section 9(b) or with respect to any of the Company's breach that arises directly from the action or failure to act of the Manager or any Fahrenheit Party that was done in a grossly negligent manner or willfully while this Agreement is in full force and effect and was not done at the instruction of the New Board, the Company shall indemnify and hold harmless the Manager and each of its Related Parties

15

(each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, damages, liabilities, joint or several ("**Losses**"), to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, or fraud, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the breach, gross negligence, willful misconduct, fraud, violation of law or breach of Section 5 by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9(a) shall be in addition to any liability which the Company may otherwise have. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in the Section 9 shall not extend to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)    Manager Indemnification. Subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, or alleging that the Services or any Work Product or the Company Indemnified Party's use thereof in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, and the Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach, gross negligence, willful misconduct, fraud, violation of law or breach of Section 5 by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate

16

counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

(d)    Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Cash Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the Company and the Manager, to be payable or owing to a Company Indemnified Party (the "**Resolution**"). The Manager shall, pending a Resolution, set aside such amount of cash into a segregated escrow account that would be reasonably sufficient to secure the payment of any claims of any Company Indemnified Party under this Agreement.

10.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

11.    <u>Conflict Policy; Global Allocation Policy; Permissible Activities</u>.

(a)    The Manager shall: (i) work in good faith with the New Board to create appropriate conflict and disclosure policies; and (ii) disclose all financial conflicts that it may have while advising and managing the Company.

(b)    Proof Group and Arrington shall work in good faith with the New Board to create appropriate conflict and disclosure policies. Further, Proof Group, Arrington Capital, US Bitcoin, Steve Kokinos and Ravi Kaza shall disclose all financial conflicts that they may respectively have while advising and managing the Company.

(c)    The Company may, at its sole discretion, become an investor in any of the member funds of the Manager, Proof Group, Arrington, as the case maybe, solely for the purpose of receiving customary investor disclosures, including quarterly portfolio detail, investor communications, and audited financials of such member funds. Exclusively for the purpose of this Section 11(c), each of the Manager, Proof Group, and Arrington, shall cause the general partners of their respective member funds, to waive any minimum fund requirements with respect to the Company, to the extent such waiver is allowed under applicable laws.

(d)    For so long as this Agreement is in full force and effect, the Manager, Proof Group and Arrington (together with their respective, directors, officers, employees, members and parents, ("**Principals**") of Proof Group and Arrington, the "**Fahrenheit Exclusivity Parties**") will adhere to a customary global allocation policy that is reasonably agreed to by the Manager and Company and includes the Company.  The Company shall have a right of first offer, as laid out in Exhibit C hereto, on [(i) the creation of operating cryptocurrency businesses by any of the Fahrenheit Exclusivity Parties, and (ii) cryptocurrency-related investments (including acquisitions of ownership stakes in new operating cryptocurrency businesses or acquisitions of the material assets of operating cryptocurrency businesses) with a proposed investment in excess of $20 million that is proposed to be entered into by any of the Fahrenheit Exclusivity Parties or any of their respective managed funds or entities]; <u>provided</u>, <u>however</u>,

17

that the any of the Fahrenheit Exclusivity Parties shall be deemed to have satisfied this obligation to the extent that any investment opportunity in the preceding (1) or (2) was provided to the Company, regardless of whether the Company chooses to pursue the opportunity and regardless of whether the Company reaches agreement with the potential counterparty. Each Fahrenheit Exclusivity Party shall be responsible for any breach of the terms of this Agreement by any of such Fahrenheit Exclusivity Party's Principals.

12.    <u>Permissible Activities</u>. Subject to the foregoing, the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement) and Section 7, nothing herein shall otherwise preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others.

13.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 13).

If to the Company:                              [COMPANY ADDRESS]

                                                Email: [EMAIL ADDRESS]
                                                Attention:        [TITLE OF OFFICER TO RECEIVE NOTICES]


with a copy to:                                 [COMPANY LAW FIRM]

                                                Email: [EMAIL ADDRESS]
                                                Attention:        [ATTORNEY NAME]


If to the Manager:                              [MANAGER ADDRESS]

                                                Email: [EMAIL ADDRESS]
                                                Attention:        [TITLE OF OFFICER TO RECEIVE NOTICES]


with a copy to:                                 Brown Rudnick LLP

                                                7 Times Square,

18

New York, NY 10036
Email: jfitzsimons@brownrudnick.com
Attention: Jonathan Fitzsimons

14.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates and (b) the Company may assign its rights and obligations to a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, in connection with a tax-deferred exchange, to an entity in which the Company has sole ownership interest, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

18.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of

process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.    <u>Waiver of Jury Trial</u>. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

24.    <u>Fiduciary Obligations.</u>    Subject to the obligations of the Company expressly set forth herein, nothing in this Agreement, will require the New Board to take any action or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable law.

25.    <u>Fees and Expense</u>s. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives), regardless of whether the transactions contemplated hereby are consummated; [provided that, if there is a dispute regarding payment of the Base Cash Fee (including the payment of the Termination Payment Amount) or any unvested portion of the Equity Fee to the Manager, then any legal costs or expenses incurred with respect to such dispute shall be paid by the Manager, on the one hand, and the Company on the other hand, based upon the percentage that the portion of the contested amount not awarded to each party bears to the amount actually contested by such party, as determined by a court of competent jurisdiction.]

26.    <u>Interpretation.</u> Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific

or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:

Fahrenheit LLC

By_____
Name:
Title:

**<u>Exhibit A</u>**

**Management Team**

**<u>Exhibit B</u>**

**USBTC Mining Management Agreement**

## Exhibit C

## Right of First Offer

1.      [For as so long as this Agreement is in full force and effect ("**ROFO Period**"), prior to any Fahrenheit Exclusivity Party ("**ROFO Trigger Party**"), whether directly or indirectly through any of their respective managed funds or entities, entering into any agreement or consummating any transaction relating to (i) the creation of any operating cryptocurrency businesses including [●][2] ("**Crypto Business**"), or (ii) cryptocurrency-related investments (including acquisitions of ownership stakes in new operating cryptocurrency businesses or acquisitions of the material assets of operating cryptocurrency businesses) with a proposed investment in excess of $20,000,000 ("**Crypto Investment**" and together with Crypto Business ("**Restricted Transactions**"), including, without limitation, pursuant to an unsolicited offer, with any person other than the Company, such Fahrenheit Exclusivity Party shall comply with the terms and conditions of this Exhibit C.

2.      If at any time during the ROFO Period, any ROFO Trigger Party is contemplating to enter into any agreement relating to, or consummate, a Restricted Transaction, such ROFO Trigger Party may provide written notice to the Company of its indicative intention to enter into such a transaction (the "**Indicative Offer Notice**"), which such notice shall contain the proposed financial, business and other terms and conditions of such Restricted Transaction, including, without limitation, the business plans and presentations, product and team descriptions, if any, the purchase price or proposed investment amount and a description of any non-cash consideration in sufficient detail to permit the valuation thereof, the proposed date and timing or indicative timeline of closing of the Restricted Transaction (the "**Material Terms**"). This is understood to be a somewhat informal process, and ROFO Trigger Party is under no obligation to present any Indicative Offer Notice.

3.      Upon receipt of an Indicative Offer Notice by the Company, the Company may communicate to the ROFO Trigger Party its interest in pursuing the proposed transaction further (the "**Indication of Interest**"), but is under no obligation to provide an Indication of Interest, and is under no obligation to complete a transaction in the event it provides an Indication of Interest.

4.      Upon receipt of an Indication of Interest, the ROFO Trigger Party will begin transitioning discussions with any third parties involved in the Restricted Transaction (such as the company seeking investment, or the proposed employees or consultants of any Crypto Business) ("**Third Parties**") in order to facilitate the Company completing the transaction instead of the ROFO Trigger Party completing the transaction. The ROFO Trigger party will meet and confer in good faith with the Company during this period to discuss the proposed transaction and will, if requested, introduce the Company to the Third Parties to negotiate directly if desired.

5.      Following this initial period contemplated in Sections 3 and 4 above, if the ROFO Trigger Party wishes to enter into any agreement relating to, or consummate, a Restricted

Transaction, such ROFO Trigger Party shall provide written notice to the Company of its bona fide intention to enter into such transaction (the "**Firm Offer Notice**"). The Firm Offer Notice shall provide the Material Terms and the latest drafts of documents being proposed.

6.      In order to disclose the Material Terms in either the Indicative Offer Notice or the Firm Offer Notice, a reasonable mutual non disclosure agreement must be in effect between the Company and the ROFO Trigger Party.

7.      If, (i) an Indicative Offer Notice has been delivered to the Company in accordance with the terms of this Exhibit C, at any time prior to the expiration of 7 days following the Company's receipt of a Firm Offer Notice or (ii), an Indicative Offer Notice has not been delivered to the Company in accordance with the terms of this Exhibit C, at any time prior to the expiration of 21 days following the Company's receipt of a Firm Offer Notice (each such 7 or 21 day period, the "**Exercise Period**", as applicable) the Company may indicate in writing to the ROFO Trigger Party that it wishes to trigger the ROFO and enter into the transaction(s) contemplated by the Firm Offer Notice. The ROFO Trigger party will meet and confer in good faith with the Company during the applicable Exercise Period to discuss the proposed transaction and will, if requested, introduce the Company to the Third Parties to negotiate directly if desired.

8.      If the Company indicates to the ROFO Trigger Party that it is not interested in pursuing the Potential Transaction, or if the Company fails to respond to the Firm Offer Notice within the applicable Exercise Period, or if the Third Parties do not wish to consummate the transaction(s) with the Company, and provided that the ROFO Trigger Party has complied with all of the provisions of this Exhibit C, the ROFO Trigger Party may pursue and consummate such transaction(s) with the Third Parties on Material Terms that are substantially the same as the Material Terms set forth in the Firm Offer Notice during the 270 day period thereafter, provided that if such transaction(s) are not completed within such 270 day period, then the ROFO Trigger Party shall comply with the terms of this Exhibit C again prior to pursuing or consummating such transaction(s) or any other Restricted Transaction.

## Exhibit D

## Minimum Success Criteria

1. On or before the completion of the full 8th fiscal quarter after the date of this Agreement , one or more new lines of business of the Company shall have been created other than the Bitcoin mining business and the staking business, having Quarterly Run Rate of $7,500,000 (any such new line of business referred to as "**New Business**"). For the avoidance of doubt, any businesses adjacent to Bitcoin mining and self-staking, including staking-as-a-service, re-staking, synthetic hash-rate, and infrastructure hosting (including AI), if proposed by the Manager and approved by the New Board, shall qualify as potential new lines of business; provided that, if so approved by the New Board, only revenues generated by, and to the extent of, such expanded or additional activities will be counted towards Quarterly Run Rate (defined below) and revenues from the Bitcoin mining businesses, staking businesses and other adjacent businesses prior to such expansion shall not count towards the Quarterly Run Rate.

2. "**Quarterly Run Rate**" shall mean recurring quarterly revenue from operations, measured for the full 8th fiscal quarter after the date of this Agreement as determined by the New Board in good faith, which shall include such revenue generated by the Company from a joint venture, partnership or similar structure (but only to the extent of the Company's ownership percentage or other similar proportion), and shall exclude any non-recurring, one-off or extraordinary items. Any adjustment to the method of calculating revenue or the inclusion of any other revenues for the purposes of determining Quarterly Run Rate shall be subject to the prior written approval of the New Board.

It is hereby agreed that (i) the creation of any new lines of business of the Company or its affiliate by way of acquisition (e.g.. a "bolt-on" or "platform" acquisition) shall not be considered a New Business, any revenues generated by such acquisition shall not be counted towards Annual Run Rate; but (ii) any acquisition by the Company or its affiliate that contributes revenue to a New Business (e.g. a "roll-up" acquisition), that has been approved by the New Board, shall be counted towards Annual Run Rate. As soon as practicable after the date of this Agreement, the New Board shall adopt an investment policy for the Company that acknowledges the shared objective of creating New Businesses. The New Board shall consider any proposals by the Manager for the creation of New Businesses in good faith and in accordance with their fiduciary duties. For the avoidance of doubt, any new business lines proposed by the Manager to be created as New Businesses must be approved by the New Board.

## **Exhibit B**

**Transaction Steps Memorandum**

## Transaction Steps Memorandum

In accordance with the Plan,[1] the Debtors intend to implement and effectuate either (I) the following NewCo Transaction in accordance with Article IV.D of the Plan or (II) the following Orderly Wind Down in accordance with Article IV.E of the Plan

This Transaction Steps Memorandum is intended only as a draft summary of the NewCo Transaction and Orderly Wind Down and represents a simplified and illustrative set of steps. For the avoidance of doubt, this **Exhibit B** reflects the Debtors' current intentions with respect to NewCo Transaction and Orderly Wind Down (as applicable). Nothing in this **Exhibit B** shall be viewed as the final version of the NewCo Transaction or Orderly Wind Down, nor shall it limit or modify, in any way, any section of the Plan, the Plan Supplement or any related provisions in the Confirmation Order, or any authority or discretion granted to the Debtors and/or Post-Effective Date Debtors thereby. The Debtors and their advisors will continue to review the NewCo Transaction and Orderly Wind Down in this **Exhibit B** from a legal, operational, regulatory, and tax perspective.

The parties reserve all rights to amend, revise, or supplement the Plan Supplement, including the NewCo Transaction and Orderly Wind Down in this **Exhibit B**, subject to any limitations or applicable consent rights under the Plan, at any time prior to the Effective Date or any other such date as may be provided for by the Plan or by order of the Bankruptcy Court.

In furtherance of the Plan, either (I) the NewCo Transaction or (II) the Orderly Wind Down shall occur at the time and in the sequence as described in this **Exhibit B**.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

## I.    NewCo Transaction

### A.    On or before the Effective Date,[2]

1. Celsius Network Europe d.o.o. Beograd ("**Celsius Serbia**"), Celsius EU UAB ("**Celsius Lithuania**"), Celsius Services CY Ltd ("**Celsius Cyprus**"), Celsius (AUS) Pty Ltd. ("**Celsius Australia**"), Celsius Network (Gibraltar) Limited ("**Celsius Gibraltar**"), GK8 Ltd ("**Celsius Israel**"), Celsius Networks Lending LLC ("**Networks Lending**"), and Celsius Network Inc. ("**Network Inc.**" and, together with Celsius Serbia, Celsius Lithuania, Celsius Cyprus, Celsius Australia, Celsius Gibraltar, Celsius Israel, and Network Lending, the "**Other Celsius Entities**") transfer (directly or indirectly as determined by the Debtors, potentially including by way of resolution of Intercompany Claims, distributions, contributions, setoffs, or otherwise) (i) any assets they have that are ultimately being distributed to Holders of Claims, transferred to NewCo or its subsidiaries, or monetized by the Post-Effective Date Debtors,[3] to Celsius Network LLC and (ii) in the case of Celsius Lithuania, certain liabilities to Celsius Network Limited.

2. Celsius Network Limited transfers 100% of its assets that are ultimately being distributed to Holders of Claims, transferred to NewCo or its subsidiaries, or monetized by the Post-Effective Date Debtors, to Celsius Network LLC in partial satisfaction of the Intercompany Claim between Celsius Network Limited and Celsius Network LLC.

3. The Plan Sponsor forms [NewCo, Inc.] ("**NewCo**"), a Delaware [corporation].

4. NewCo forms [Intermediate, Inc.] ("**Intermediate**"), a Delaware [corporation].

5. Intermediate forms [Buyer, Inc.] ("**Buyer**"), a Delaware [corporation].

6. Buyer may form one or more subsidiaries, including [US Mining LeaseCo], [US MiningCo], [US ServiceCo], [NewCo Capital LLC], and [NewCo Strategy HQ]; and [NewCo Strategy HQ] may form [StakingCo].

### B.    On or after the Effective Date,

1. Prior to any other event occurring on the Effective Date, with respect to certain Intercompany Claims owed by Celsius Network Limited to other entities, parties to such Intercompany Claims enter into a modified loan arrangement, pursuant to which such Intercompany Claims may be repaid in U.S. Dollars or the relevant fiat currency of the entity that is owed the Intercompany Claim by Celsius Network Limited.

2. After Step B.1, on the Effective Date, the Plan Sponsor contributes the Plan Sponsor Contribution (to the extent that such contribution takes the form of a

---

[2] Note to Draft: Subject to ongoing discussions regarding possible transfers of assets from non-Debtor entities

[3] The Post-Effective Date Debtors shall include, at a minimum, Celsius US Holding LLC and Celsius Network LLC.

primary equity purchase) to NewCo in exchange solely for the applicable amount of NewCo Common Stock. NewCo issues and contributes (i) 100% of the NewCo Common Stock, less any NewCo Common Stock to which the Plan Sponsor is entitled pursuant to the Plan Sponsor Contribution, and (ii) such Plan Sponsor Contribution to Intermediate, which then contributes such NewCo Common Stock and Plan Sponsor Contribution to Buyer.

3. After Step B.2, on the Effective Date, Buyer acquires specified assets of Celsius US Holding LLC and its subsidiaries (such entities, collectively, "**Celsius US Entities**") (including certain assets transferred to Celsius Network LLC by Celsius Network Limited and Other Celsius Entities) in exchange for NewCo Common Stock.

4. [After Step B.3, on the Effective Date, Buyer contributes certain assets received in Step B.3 to certain direct and indirect subsidiaries.][4]

5. After Step B.2 (continuing after the Effective Date, to the extent necessary), the Celsius US Entities distribute cash, Liquid Cryptocurrency, NewCo Common Stock, and Litigation Proceeds to applicable creditors in satisfaction of their Claims in accordance with the Plan. [With respect to any such distributions made on account of Claims against any Debtors other than Celsius US Entities, either

   a. Distributions are made directly by the Celsius US Entities to Holders of such Claims in exchange for the creation of a new Intercompany Claim (which may be immediately cancelled), partial satisfaction of Intercompany Claims owed to such entities by the Celsius US Entities, or as a deemed direct or indirect distribution to such other entity, as determined by the Debtors, or

   b. The relevant consideration is transferred by the Celsius US Entities to such other entity in exchange for the creation of a new Intercompany Claim (which may be immediately cancelled), partial satisfaction of Intercompany Claims owed to such entities by the Celsius US Entities, or as a direct or indirect distribution to such other entity, as determined by the Debtors, and such other entity distributes the relevant consideration to Holders of Claims directly.][5]

6. After Step B.5, the Debtors may cancel or otherwise address some or all Intercompany Claims in their discretion as provided by the Plan.

7. After Step B.5, the Celsius US Entities formally adopt a plan of liquidation for U.S. federal income tax (and applicable state and local) tax purposes.

---

[4] Note to Draft: Subject to revision to provide for acquisition of assets directly by additional NewCo subsidiaries.

[5] Note to Draft: To discuss, from a restructuring perspective, whether Celsius Network LLC should transfer assets back to Celsius Network Limited on account of these Claims and then have Celsius Network Limited make distributions to creditors (in partial satisfaction of the existing Intercompany Claim).

8.      After Step B.5, the Debtors other than the Post-Effective Date Debtors formally liquidate (including under applicable local law, to the extent such steps remain necessary notwithstanding the self-effectuating nature of the Plan and with respect to Debtors other than the Celsius US Entities).

9.      Following the Effective Date, to the extent additional proceeds (including Litigation Proceeds) are acquired by the Post-Effective Date Debtors, such additional proceeds are distributed to Holders of Claims by the Post-Effective Date Debtors or the applicable Distribution Agent in accordance with the Plan.

10.     Following the completion of all remaining post-emergence matters, including all distributions to creditors, the Post-Effective Date Debtors wind down and formally liquidate (including under applicable local law, to the extent such local law steps remain necessary notwithstanding the self-effectuating nature of the Plan with respect to the Post-Effective Date Debtors).

## II.    Orderly Wind Down

### A.    *On or before the Effective Date,* [6]

1.      Celsius Network Europe d.o.o. Beograd ("**Celsius Serbia**"), Celsius EU UAB ("**Celsius Lithuania**"), Celsius Services CY Ltd ("**Celsius Cyprus**"), Celsius (AUS) Pty Ltd. ("**Celsius Australia**"), Celsius Network (Gibraltar) Limited ("**Celsius Gibraltar**"), GK8 Ltd ("**Celsius Israel**"), Celsius Networks Lending LLC ("**Networks Lending**"), and Celsius Network Inc. ("**Network Inc.**" and, together with Celsius Serbia, Celsius Lithuania, Celsius Cyprus, Celsius Australia, Celsius Gibraltar, Celsius Israel, and Network Lending, the "**Other Celsius Entities**") transfer (directly or indirectly as determined by the Debtors, potentially including by way of resolution of Intercompany Claims, distributions, contributions, setoffs, or otherwise) (i) any assets they have that are ultimately being distributed to Holders of Claims or monetized by the Post-Effective Date Debtors,[7] to Celsius Network LLC and (ii) in the case of Celsius Lithuania, certain liabilities to Celsius Network Limited.

2.      Celsius Network Limited transfers 100% of its assets that are ultimately being distributed to Holders of Claims or monetized by the Post-Effective Date Debtors, to Celsius Network LLC in partial satisfaction of the Intercompany Claim between Celsius Network Limited and Celsius Network LLC.

### B.    *On or after the Effective Date,*

1.      Prior to any other event occurring on the Effective Date, with respect to certain Intercompany Claims owed by Celsius Network Limited to other entities, parties

---

[6] Note to Draft: Subject to ongoing discussions regarding possible transfers of assets from non-Debtor entities

[7] The Post-Effective Date Debtors shall include, at a minimum, Celsius US Holding LLC and Celsius Network LLC.

to such Intercompany Claims enter into a modified loan arrangement, pursuant to which such Intercompany Claims may be repaid in U.S. Dollars or the relevant fiat currency of the entity that is owed the Intercompany Claim by Celsius Network Limited.

2.      After Step B.1 (continuing after the Effective Date, to the extent necessary), the Celsius US Entities distribute Liquid Cryptocurrency, Backup MiningCo Common Stock, Litigation Proceeds, and the Illiquid Recovery Rights to applicable creditors in satisfaction of their Claims in accordance with the Plan. [With respect to any such distributions made on account of Claims against any Debtors other than Celsius US Entities, <u>either</u>

   a.      Distributions are made directly by the Celsius US Entities to Holders of such Claims in exchange for the creation of a new Intercompany Claim (which may be immediately cancelled), partial satisfaction of Intercompany Claims owed to such entities by the Celsius US Entities, or as a deemed direct or indirect distribution to such other entity, as determined by the Debtors, <u>or</u>

   b.      The relevant consideration is transferred by the Celsius US Entities to such other entity in exchange for the creation of a new Intercompany Claim (which may be immediately cancelled), partial satisfaction of Intercompany Claims owed to such entities by the Celsius US Entities, or as a direct or indirect distribution to such other entity, as determined by the Debtors, and such other entity distributes the relevant consideration to Holders of Claims directly.][8]

3.      After Step B.2, the Debtors may cancel or otherwise address some or all Intercompany Claims in their discretion as provided by the Plan.

4.      After Step B.2, the Celsius US Entities formally adopt a plan of liquidation for U.S. federal income tax (and applicable state and local) tax purposes.

5.      After Step B.2, the Debtors other than the Post-Effective Date Debtors formally liquidate (including under applicable local law, to the extent such steps remain necessary notwithstanding the self-effectuating nature of the Plan and with respect to Debtors other than the Celsius US Entities).

6.      Following the Effective Date, to the extent additional proceeds (including Litigation Proceeds) are acquired by the Post-Effective Date Debtors, such additional proceeds are distributed to Holders of Claims by the Post-Effective Date Debtors or the applicable Distribution Agent in accordance with the Plan.

7.      Following the completion of all remaining post-emergence matters, including all distributions to creditors, the Post-Effective Date Debtors wind down and

---

[8] Note to Draft: To discuss, from a restructuring perspective, whether Celsius Network LLC should transfer assets back to Celsius Network Limited on account of these Claims and then have Celsius Network Limited make distributions to creditors (in partial satisfaction of the existing Intercompany Claim).

formally liquidate (including under applicable local law, to the extent such local law steps remain necessary notwithstanding the self-effectuating nature of the Plan with respect to the Post-Effective Date Debtors).

## **Exhibit C**

**U.S. Bitcoin Agreements**

*DRAFT*

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [NewCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [NewCo, Inc.], a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, on the Effective Date, the NewCo Assets (as defined in the Plan), including the Mining (as defined in the Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, Fahrenheit LLC ("**Fahrenheit**") is entering into that certain Management Services Agreement by and between Fahrenheit and the Company, dated as of the date hereof (as amended or restated from time to time, the "**Fahrenheit Management Agreement**"), whereby Fahrenheit shall provide certain management services to the Company and its subsidiaries.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Appointment. The Company hereby engages the Manager[ on a non-exclusive basis], and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    Term and Termination.

(a)    Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof.

(b)    Termination. This Agreement may be terminated only as follows:

(i)    By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

2

(ii)    By the Manager, in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); and

(iii)    By the Company, during the Initial Term or the Term Extension:

(A)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)    in the event of the Manager's persistent and material failure to competently manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)    [if Asher Genoot ("**Genoot**") ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or is indicted of any act which is a felony involving financial crimes or theft of corporate property;][1]

(D)    [in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;][2] or

(E)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(iv)    [For the purposes of this Agreement, "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on Exhibit D hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or

---

[1] **Note to Draft**: Reserved. Parties to work together in good faith to agree on language by September 30, 2023.

[2] **BR NTD**: Reserved. Parties to work together in good faith to agree on language by September 30, 2023.

substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.][3]

(c)    <u>Termination Event Procedures</u>. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(d)    <u>Effect of Termination</u>.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; <u>provided, however</u>, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms.[4] For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)    Upon the termination of this Agreement pursuant to Section 2(b)(iii) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall

---

[3] **BR NTD**: Reserved. Parties to work together in good faith to agree on language by September 30, 2023.

[4] **Note to Draft**: Reserved. Parties to work together in good faith to agree on language that deal with transition on the unfinished Projects in a reasonable manner.

4

**Error! Unknown document property name.**

use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"); provided, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a).[5]

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement; and

(B)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a pro rated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; and

(B)    in the event that the Fahrenheit Management Agreement is no longer in effect upon the effective date of termination or at the time that the

---

[5] Note to BR: As mentioned on the call, we don't think the obligation to pay Fahrenheit Cash Fee Split need to be repeated here, which is already governed by Section 5(b).

AMERICAS 124751481
**Error! Unknown document property name.**

Manager receives a Non-Renewal Notice (as applicable), the Manager shall also receive the following as additional consideration, due upon the effective date of such expiration or termination: (i) 31.881% of the Base Cash Fee (as defined in the Fahrenheit Management Agreement) ("**Fahrenheit Cash Fee Split**") that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) if the Fahrenheit Management Agreement were still in effect, to be paid in one lump-sum; and (ii) 31.881% of the Equity Fee (as defined in the Fahrenheit Management Agreement) that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) if the Fahrenheit Management Agreement were still in effect ("**Fahrenheit Equity Fee Split**"). With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 2(d)(iv)(B), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents necessarily required in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(v)     Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager receives all amounts payable pursuant to Sections 2(d)(i) – (iv), such payment shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager for Losses arising from third party claims under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(v) shall not result in any double payment by the Company for the same underlying obligation.

(vi)     The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.     Services.

(a)     Services. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on Exhibit A hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on Exhibit B hereto (collectively, the "**Projects**").

6

**Error! Unknown document property name.**

4.    Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company.

(a)    The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to competently provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on Exhibit B hereto.

(b)    [RESERVED].

(c)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with Exhibit A for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with Exhibit A for the prior quarter.

(d)    Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(e)    Obligations of the Manager. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

7

Error! Unknown document property name.

(v)    Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)    Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)    At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(c)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)    (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

8

(f)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)    Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)    Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)    At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(d)(iv) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this Section 4(f), failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget..

5.    Compensation for Services and Expense Reimbursement.

(a)    Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $15,000,000, which shall be paid in quarterly installments each in an amount equal to $3,750,000 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**"); provided, however, that, during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes

9

**Error! Unknown document property name.**

of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its successor Index)  ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm).  In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)  <u>Other Consideration</u>. To the extent that the Fahrenheit Agreement is no longer in effect, then the Manager shall receive the Fahrenheit Cash Fee Split and Fahrenheit Equity Fee Split as additional consideration for providing the Services. The Fahrenheit Cash Fee Split shall be paid quarterly in roughly equal amounts (subject to adjustment as described in Section 4(a) of the Fahrenheit Management Agreement) on the first Business Day of each January, April, July, and October. With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 5(b), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents the Manager deems necessary or advisable in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(c)  <u>Interest on Unpaid Amounts</u>. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; <u>provided</u>, <u>however</u>, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)  <u>Review and Objections</u>.

(i)  During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)  The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an

10

**Error! Unknown document property name.**

"**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, <u>provided</u>, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll],[6] or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)      Expenses.

(i)      The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on Exhibit A, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of

---

[6] **BR NTD**: To confirm Kroll not currently utilized by any party.

AMERICAS 124751481
**Error! Unknown document property name.**

early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)    The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.

(iii)    The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

12

Error! Unknown document property name.

6.      Confidentiality.

(a)      During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)      Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)      Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

13

**Error! Unknown document property name.**

7.      Intellectual Property.

(a)      Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicenseable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)      All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. [The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).]

(c)      Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

(d)      The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

(e)      "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall provide reasonable support and assistance for the implementation and use of the Software, as reasonably

14

**Error! Unknown document property name.**

requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.    Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of $[10,000,000] in the aggregate, unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"). Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business; provided that with respect to: (1) the Company's liability, this Section 8 shall not apply to (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and [(viii) reasonable expenses incurred [by the Manager] in enforcing its rights under this Agreement against the Company;][7] and (2) the Manager's liability, this Section 8 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.    Indemnification.

(a)    Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under

---

[7] **Note to Draft**: Reserved. To be negotiated by parties in good faith by September 30, 2023.

**Error! Unknown document property name.**

this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)    Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, [violation of law] or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except, in the case of the Services, to the extent such alleged infringement, misappropriation, or other violation could not be avoided while following the Company's instructions regarding the performance of the Services. The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or [violation of law] by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)    <u>Third Party Claims Indemnification Procedure</u>. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of

16

**Error! Unknown document property name.**

the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.     Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); provided, that, from and after the later of (i) the fourth anniversary of this Agreement and (ii) the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for at least than 12 months ("**Unrestricted Employees**"); provided further that at the Company's request, the Manager shall make reasonable transition plans for, and communications to, the Unrestricted Employees during the twelve month period prior to the Non-Solicit Fallaway Date for the Unrestricted Employees to be transferred to the Company.

11.     Force Majeure.

(a)     Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or tribunal of competent jurisdiction.

(b)     Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period, if the Excluded Event has resulted in miners under management by the Manager having an output capacity below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the output capacity (in megawatts) and the denominator of which is 200 megawatts.[8] In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to

---

[8] **Note to Draft**: Mechanics to be further refined to account for the fact that the payment of Mining Management Fee is paid in advance. So refund/credit mechanics will be introduced.

17

pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

(c)    During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

|  |  |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |

18

**Error! Unknown document property name.**

| If to the Manager: | [MANAGER ADDRESS] |
|---|---|
| | Email: [EMAIL ADDRESS] |
| | Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |

| with a copy to: | Brown Rudnick LLP |
|---|---|
| | 7 Times Square, |
| | New York, NY 10036 |
| | Email: jfitzsimons@brownrudnick.com |
| | Attention: Jonathan Fitzsimons |

15.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision

19

of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.    <u>Waiver of Jury Trial</u>. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Fees and Expenses</u>. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives), regardless of whether the transactions contemplated hereby are consummated; provided that, if there is a dispute regarding payment of the Base Cash Fee or any unvested portion of the Equity Fee to the Manager, then any legal costs or expenses incurred with respect to such dispute shall be paid by the Manager, on the one hand, and the Company on the other hand, based upon the percentage that the portion of the contested amount not awarded to each

20

**Error! Unknown document property name.**

party bears to the amount actually contested by such party, as determined by a court of competent jurisdiction.

26.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

AMERICAS 124751481
**Error! Unknown document property name.**

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:

U.S. Data Management Group, LLC

By_____
Name:
Title:

22

**Error! Unknown document property name.**

*PRIVILEGED AND CONFIDENTIAL*

**W&C Comments: September 13, 2023**

## Exhibit A

### Services

| Description of Service / Activity | Fee Structure |
|---|---|
| Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| Use of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee  [NTD: added in start up costs if any custom developed software is required. Updates/patches should be included in base fee as well as basic reporting. Presume any modifications would be IP of USBTC to use for other aires/customers and we shouldn't fund that as a pass through cost] |
| Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| Customer contract management will be performed by the Manager through its hosting team. Only where additional individuals need to be hired to service exclusively this Project and those individuals are budgeted and approved by owner will it be a passthrough. | Fixed fee / Pass-Through Expenses (see description) |
| Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, | Fixed fee |

| Description of Service / Activity | Fee Structure |
|---|---|
| condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | |
| Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted and approved by the owner will it be pass-through. | Fixed fee / Pass-Through Expenses (see description) [NTD: r company should have discretion whether resources belong in USBTC or NewCo if we're hiring or funding dedicated FTE] |
| Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. | Fixed fee [NTD: Maintaining and training staff should be part of the site SOPs and would not require dedicated personnel] |
| Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. | Fixed fee [NTD: dedicated personnel here should be employees of NewCo or part of a specific build project as covered below in pass through costs.] |

24

**Error! Unknown document property name.**

| Description of Service / Activity | Fee Structure |
|---|---|
| The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company | Pass-Through Expenses |
| Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |
| Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| Office supplies, job supplies & other business expenses. | Pass-Through Expenses |

AMERICAS 124751481
**Error! Unknown document property name.**

| Description of Service / Activity | Fee Structure |
|---|---|
| Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |
| Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| Insurance related expenses. | Pass-Through Expenses |
| Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |
| Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |

26

**Error! Unknown document property name.**

| Description of Service / Activity | Fee Structure |
|---|---|
| Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |

27

**Error! Unknown document property name.**

## Exhibit B

## Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this Exhibit B, and the transactions contemplated thereby, may be documented in one or more agreements by and among the Manager, the Company, and/or their Affiliates, and any third parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent that the provisions of a Definitive Agreement directly conflict with those contained in this Exhibit B, the terms of the applicable obligation or condition herein shall be deemed modified or waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement; provided, that any silence on an obligation or condition in such Definitive Agreement shall not be construed as an intention to waive such obligation or condition.][9]

1. The Manager shall use its commercially reasonable efforts to contribute to the Company the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to the Manager identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that the Manager is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.

2. The Manager will provide the Debtors or the Company, as applicable, with an option which can be exercised on or before December 5, 2023 to purchase an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such site) identified to the Debtors and the Committee during the bid process for $575,000 per MW that is "plug ready," and support the immediate installation at miners at such site upon Bankruptcy Court approval of such purchase. To the extent that the Fahrenheit Plan is not confirmed or does not go effective, the Debtors or NewCo (as applicable) shall enter into a mining management agreement with the Manager respecting such 50 MW site on terms acceptable to the parties.

3. To the extent that the Debtors or the Company, as applicable, elect not to purchase the Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

4. The Manager will offer up to 50 MW of immediately available containers and transformers currently owned by the Manager, and other supplies to the Debtors or the Company, as applicable, at the lower of its cost to obtain such items or market prices.

5. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month

---

[9] **BR NTD**: Subject to further review and agreement by the parties.

**Error! Unknown document property name.**

option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

6. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

7. The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

8. The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in [the accompanying letter agreement].

9. The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in [the accompanying letter agreement].

10. The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments[10]**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

---

[10] **W&C Note to Draft**: Subject to further review.

**Error! Unknown document property name.**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; provided, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

**Error! Unknown document property name.**

**[Exhibit C]**[11]

**Insurance Requirements**

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) <u>Worker's Compensation and Employer's Liability</u>.

      Worker's Compensation with limits no less than the minimum amount required by applicable law.*

      Employer's Liability with limits no less than:*

      i)   $1,000,000 Bodily Injury by Accident (Each Accident)

      ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

      iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) <u>Worker's Compensation and Employer's Liability</u>.

      Worker's Compensation with limits no less than the minimum amount required by applicable law.

---

[11] **<u>W&C Note to Draft:</u>** Subject to further review against insurance package proposal being prepared by Fahrenheit.

**Error! Unknown document property name.**

Employer's Liability with limits no less than:

i)   $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3) All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4) The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## Exhibit D

## Prohibited Change of Control Parties

**Error! Unknown document property name.**

## **Exhibit C(i)**

**U.S. Bitcoin Cedarvale Interim Services Agreement**

PRELIMINARY DRAFT—SUBJECT TO MATERIAL REVIEW AND REVISION

## INTERIM SERVICES AGREEMENT

### By and between

### [U.S. Data Management Group, LLC], as Manager

### And

### [Celsius Mining LLC], as Company[1]

This Interim Services Agreement (this "**Agreement**") is made and entered as of [●] (the "**Effective Date**"), by and between (i) [U.S. Data Management Group, LLC],[2] a [Delaware limited liability company] (the "**Manager**"), and (ii) [Celsius Mining LLC], a [Delaware limited liability company] (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a 240MW bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**");

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1.        Appointment. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on Exhibit A of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.        Term and Termination.

(a)        Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i)        the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**") becomes effective in accordance with its terms and the terms of the order confirming the Plan as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**");

(ii)        the Services are completed, in which case the Parties shall enter into a market-based agreement for the Manager to oversee the operation and maintenance of the Project on terms reasonably acceptable to both parties (operations and maintenance services are not included in the Services under this Agreement). In the event that any

---

[1] **W&C Note to Draft**: To confirm parties to this Agreement.

[2] **Note to USBTC**: Confirm entity.

portion of the Project is completed prior to the end of the Term of this Agreement, the Parties shall enter into a market-based agreement for the Manager to oversee operation and maintenance of the completed portion of the Project for the duration of the Term on terms reasonably acceptable to both Parties;

(iii)     any date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise select an alternative to the Plan, in which case the Manager shall continue to provide the Services on the terms set forth on Exhibit [●];[3] and

(iv)     December 31, 2023, in which case the Manager shall continue to provide the Services on the terms set forth on Exhibit [●];[4]

(b)     <u>Termination</u>. This Agreement may be terminated only as follows:

(i)     by mutual agreement, in writing, of both the Manager and the Company;

(ii)     by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of 10 days after receipt by the Company of written notice of such failure by the Manager; provided, however, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if (x) the Company cures such failure within such 30-day cure period;

(iii)     by the Company:

(A)     in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)     if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company; or

(C)     if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

---

[3] NTD: Terms TBD and to be set forth on Exhibit TBD.

[4] NTD: Terms TBD and to be set forth on Exhibit TBD.

(c)     Effect of Termination.

(i)      Upon the termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

(ii)     Upon the termination of this Agreement by either Party, at the request of the Company, the Manager shall provide all reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"), for a period of no more than 30 days following such termination (the "**Transition Period**"). The Manager shall be entitled to prompt reimbursement of any out of pocket costs incurred by the Manager in connection with the performance of the Transition Services and shall perform such Transition Services until the completion of such transition. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

(iii)    The provisions of this Section 2(c), Sections 6 and 7, and Sections 8 through 23 shall survive the termination of this Agreement.

3.      Duties of the Manager. The Manager or any of its Affiliates shall perform the services set forth on Exhibit A (collectively, the "**Services**").

4.      Performance Standards.

(a)     The Manager shall cause the Services to be performed in all material respects: (a) by qualified personnel (as to training, skill and experience); (b) in a good, professional and workmanlike manner; (c) consistent with applicable industry standards and best practices; and (d) with the experience and expertise necessary to provide the Services in accordance with this Agreement.

(b)     Every two weeks, the Manager shall provide a report to the Company setting forth the Manager's performance and progress towards each of the milestones set forth on Exhibit B and, together with any other information reasonably requested by the Company relating to the performance of the Services hereunder.

(c)     Modification of Services. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager may consider such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, then such amendment such amendment will be adopted in accordance with Section 18 and attached to this Agreement.

(d)     Obligations of the Manager. The Manager will:

(i)      Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for

3

the performance of its obligations under this Agreement; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner to fulfill Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

(v)    Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)    Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)    At all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any

obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)    Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)    Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services;

(ii)    Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)    Creating a working group which, as of the Effective Date, will comprise of [●], [●], and [●], and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any individual member of the Working Group at any time following consultation with the Manager;

(iv)    Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)    [Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of

5

either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify and hold harmless the other under this Agreement).][5]

5.    <u>Compensation for Services</u>.

(a)    <u>Compensation for Services</u>.

(i)    As sole and exclusive consideration payable to Manager for providing the Services to Company, Company shall reimburse Manager's development costs on a monthly basis as follows (collectively, the "**Development Costs**"):

| Item | $/Month |
|------|---------|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |
| Construction Management | $220,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| T&E - Per Diem (employee meals, etc.) | $15,900 |
| T&E - Transportation (rental cars and fuel) | $15,100 |
| T&E - Flights | $10,000 |
| T&E - Housing and Hotels | $14,000 |
| **Total** | **$787,000** |

(ii)    Manager shall invoice all non T&E costs on a fixed basis per month in the amount specified above for the items.

(iii)    Manager shall invoice the costs incurred for the "Per Diem", "Transportation", "Flights", and "Housing and Hotels" items specified above based on actual reasonable and documented costs incurred. The amounts specified above for these items are estimates.

(iv)    Development Costs shall be reimbursed within ten (10) days of receipt by Company of Manager's invoices.

---

[5] **<u>Note to Draft</u>**: Parties to discuss Company's insurance obligations relative to Company's anticipated activities during buildout.

(b)     Reimbursement for Vertical Exhaust Units.

(i)     Manager shall contribute to the Project sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW. As sole and exclusive consideration payable to Manager for such contributions (including (i) shipping, handling and storage costs, and(ii) sales, use and other excise taxes, associated with such units or the contribution of such assets), Company shall reimburse Manager's costs for each such unit within ten (10) days of receipt by Company of Manager's invoices. Manager's estimated aggregate costs for all such units, including storage costs, is $[●].[6]

(ii)     To the extent Manager contributes any other Manager owned assets to the Project such contributions shall be reimbursed by Company at cost within ten (10) days of receipt by Company of Manager's invoices.

(iii)     Company understands, agrees and acknowledges that: (i) Company, by the execution of this Agreement, agrees to accept any vertical exhaust units or any other assets contributed to the Project "AS IS" at the time of contribution, and will not be entitled to a refund under any circumstances, and (ii) that Manager neither has made nor is making any representation or warranty, express or implied, regarding the condition of any such vertical exhaust unit or other asset contributed to the Project (or any part thereof) or its suitability for Company's proposed use. Without limiting the foregoing, Manager agrees to allow Company to call upon any warranties provided by the manufacturers of the vertical exhaust units or any other assets contributed to the Project under this Section 5.

(c)     Reimbursement for Budgeted Expenses. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages incurred as a result of such early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate and entered into by Manager or its Affiliates in furtherance of the provision of Services hereunder and in accordance with a Project budget (or as otherwise approved by the Company).

(d)     Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any amounts owed hereunder (except for amounts disputed in good faith, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the parties), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(e)     To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered (the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement, by and between

---

[6] NTD: Amount to be updated.

the Manager and [NewCo, Inc.], dated on or about the Plan Effective Date (the "**USBTC Management Agreement**")[7].

6.    <u>Confidentiality</u>.

(a)    During the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; <u>provided</u>, <u>however</u>, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    <u>Limitation of Liability</u>. Neither the Manager nor any of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a

---

[7] **<u>W&C Note to Draft</u>**: Consider attaching final Management Agreement as Exhibit.

"**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement unless such loss, liability, damage, or expense shall be proven to result directly from the gross negligence, willful misconduct, or fraud. Notwithstanding the foregoing, in no event shall the Manager be liable to the Company or any of its Affiliates for special, indirect, punitive, or consequential damages, including loss of profits or lost business. For the avoidance of doubt, this Section 7 shall not apply to any amounts owed pursuant to Section 2(c) or Section 5.

8.      <u>Indemnification</u>.

(a)      Except in connection with matters contemplated by Section 8(b), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, claims, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or violation of law, and the Company will reimburse any Manager Indemnified Party for all costs and expenses (including reasonable attorneys' fees and expenses) subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the willful misconduct or fraud by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 8(a) shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(b)      Except in connection with matters contemplated by Section 8(a), the Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's willful misconduct or fraud. Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 8(b) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the material breach, gross negligence, willful misconduct, fraud, or violation of law by such Company Indemnified Party.

(c)      <u>Third Party Claims Indemnification Procedure</u>. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have

9

employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.      Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates.

10.     Force Majeure. The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, including the following Excluded Events: (a) acts of God; (b) flood, fire, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) changes to requirements imposed by Law; (e) actions, embargoes, or blockades in effect on or after the date of this Agreement; (f) action or inaction by any Governmental Authority; and (g) national or regional emergency. The Manager shall use reasonable efforts to end the failure or delay, to minimize the effects of an Excluded Event, and to resume Services as soon as practicable. "**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order, or other requirement or rule of law of any Governmental Authority. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

11.     Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.     Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.     Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such

10

communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 13).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Manager: | [MANAGER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

14.    <u>Entire Agreement</u>. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party, without the written consent of the other Party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Manager or any sale of all or substantially all of the business of the Manager, including for the avoidance of doubt, that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation; and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

18.    Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    Severability. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.    Waiver of Jury Trial. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.     <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

24.     <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the

date first written above.

[Celsius Mining LLC]

By_____

Name:

Title:


[U.S. Data Management Group, LLC]

By_____

Name:

Title:

## Exhibit A

### Services[8]

[The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

The Services to be provided pursuant to this Agreement do not include operations and maintenance services.

### A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

    a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

    b. confirm reusability of existing equipment; and

---

[8] **W&C Note to Draft**: Populated with Schedule 1 to Project Management Agreement draft received from B.R. 9.1.23 p.m. Subject in all respects to ongoing review and comment.

      c.   identify additional equipment to be sourced (if required).

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility.

7. Modify and/or finalize engineered plans and designs as necessary for:

      a.   civil scope;

      b.   mechanical scope;

      c.   electrical scope; and

      d.   networking scope.

8. Source and procure all necessary equipment in accordance with engineered plans and as identified in prior diligence and planning efforts.

9. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

      a.   civil contractor;

      b.   mechanical contractor;

      c.   electrical contractor; and

      d.   network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

## B. Project 2 Services

The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):

1. Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

2. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3. Initiate handoff of existing ISP service.*

4. Assist as necessary for the handoff of property ownership including existing and required easements.*

5. Engage a general contractor to:

    a. outline full project scope (to be used in division of responsibilities matrix);

    b. clearly identify work that is already complete;

    c. clearly identify previously completed work that needs to be revisited and/or repaired; and

    d. clearly identify work that is not yet complete.

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7. Coordinate and lead the effort to modify and/or finalize engineered plans and design sets as necessary for:

    a. civil scope

    b. mechanical scope

    c. MV electrical scope

    d. LV electrical scope

    e. networking scope; and

    f. security scope.

8. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9. Facilitate RFP process for:

    a. general contractor;

    b. civil contractor(s);

    c. mechanical contractor(s);

17

     d.   electrical contractor(s); and

     e.   network and cabling contractor(s).

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance to engineered plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

]

## **Exhibit B**

### **Milestones**

The major milestones for Project 1 and Project 2 are set forth below:

### **Project 1**

**Step 1:** Deliver a design & schedule
**Step 2:** Receive approval for design & schedule
**Step 3:** Deliver a budget
**Step 4:** Receive approval for budget
**Step 5:** Award bids to contractors

### **Project 2**

**Step 1:** Deliver a design & schedule
**Step 2:** Receive approval for design & schedule
**Step 3:** Deliver a budget
**Step 4:** Receive approval for budget
**Step 5:** Award bids to contractors

Following final approvals on design, schedule, and budget for each project, Manager will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

## Exhibit C

## [Insurance Requirements][9]

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   b) <u>Worker's Compensation and Employer's Liability</u>.

      Worker's Compensation with limits no less than the minimum amount required by applicable law.*

      Employer's Liability with limits no less than:*

      i) $1,000,000 Bodily Injury by Accident (Each Accident)

      ii) $1,000,000 Bodily Injury by Disease (Policy Limit)

      iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   c) <u>Worker's Compensation and Employer's Liability</u>.

---

[9] **W&C Note to Draft**: To be updated as applicable relative to the scope of Services agreed and set forth in Exhibit A.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i)  $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this Exhibit C shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

**4)**  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## **Exhibit C(ii)**

**Lancium Litigation Indemnification Agreement**

DRAFT

# INDEMNIFICATION AGREEMENT

This Indemnification Agreement (this "**Agreement**"), dated as of [●], 2023, is made by and among [**NewCo, Inc.**] (the "**Indemnitee**"), **Fahrenheit LLC** ("**Fahrenheit**") and **U.S. Data Management Group, LLC** ("**Data Management**", and, together with Fahrenheit, the "**Indemnitors**").

## Recitals

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended, in the Unites States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction  to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, concurrently with the execution of this Agreement and in accordance with the Plan, Fahrenheit and the Indemnitee have entered into the management agreement (as amended or restated from time to time, the "**Fahrenheit Management Agreement**"), pursuant to which Fahrenheit, among other things, Fahrenheit has agreed to provide certain management services to the Indemnitee under the terms therein;

**WHEREAS**, concurrently with the execution of this Agreement and in accordance with the Plan, Data Management is entering into that certain management services agreement with the Indemnitee (as amended or restated from time to time, the "**USBTC Mining Management Agreement**"), whereby Data Management shall manage the mining assets and business of the Indemnitee and its subsidiaries ("**Services**");

**WHEREAS**, U.S. Data Mining Group Inc., an affiliate of Data Management, is party to that certain case administered and known as *Lancium LLC v. U.S. Data Mining Group, Inc. et al.* (W.D. Tex. Civ. A. No. 6:23- cv-00344) (the "**Litigation**"); and

**WHEREAS**, as set forth in the Plan, the Indemnitors have agreed to jointly and severally indemnify, defend and hold harmless the Indemnified Parties from and against all Losses incurred by the Indemnified Parties related to or in connection with the Litigation.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **Indemnification**.   To the fullest extent permitted by applicable law, the Indemnitors shall, jointly and severally, indemnify, defend and hold harmless the Indemnitee, its subsidiaries, and their respective officers, directors, managers, and employees, solely in their respective capacities as such (collectively the "**Indemnified Parties**"), from and against, any and all Losses actually incurred by such Indemnified Parties with respect to, in connection with or arising from the Litigation (including if any Indemnified Party was, is, or is threatened to be made, a party to or a participant (as a witness, deponent or otherwise) in the Litigation by reason of being the recipient of any Services). For the purposes of this Agreement, "**Losses**" means all losses, liability, demand, claim, action, cause of action, cost, damage, deficiency, tax, penalty, fines or Expenses. "**Expenses**" shall include, without limitation, all direct and indirect costs, fees and expenses of any type or nature whatsoever, including, without limitation, all reasonable and documented attorneys' fees and costs, retainers, court costs, transcript costs, fees and cost of experts, witness fees, travel expenses, fees of private investigators and professional advisors, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, fax transmission charges and all other reasonable and documented disbursements, obligations or expenses, in each instance to the extent actually and reasonably incurred by an Indemnified Party in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settlement or appeal of, or otherwise participating in, any action relating to the Litigation. Expenses also shall include Expenses incurred in connection with any appeal resulting from the Litigation, including without limitation the principal, premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent.

2. **Advances of Expenses.** To the fullest extent permitted by applicable law, the Indemnitors shall pay the Expenses actually incurred by any Indemnified Party in connection with the Litigation, within thirty days after the receipt by the Indemnitors of a statement or statements requesting such advances from time to time, prior to the final disposition of the Litigation. Advances shall, to the fullest extent permitted by law, be unsecured and interest free. Advances shall be made without regard to the Indemnified Party's ability to repay the Expenses. Advances shall, to the fullest extent permitted by law, include any and all reasonable Expenses incurred

pursuing a proceeding to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Indemnitors to support the advances claimed.

### 3.    Additional Covenants.

(a)    To the fullest extent permissible under applicable law, if the indemnification or hold harmless rights provided for in this Agreement are unavailable to the Indemnified Parties in whole or in part for any reason whatsoever, the Indemnitors, in lieu of indemnifying, holding harmless or exonerating the Indemnified Parties, shall pay, in the first instance, the entire amount incurred by the Indemnified Parties, for Losses in connection with the Litigation without requiring Indemnitee to contribute to such payment.

### 4.    Indemnification Procedures.

(a)    If an Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding (collectively, a "**Claim**") made or brought by any person against any Indemnified Party with respect to which the Indemnitors are obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnitors prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnitors of their indemnification obligations, except and only to the extent that the Indemnitors are actually and materially prejudiced in their defense of such Claim as a result of such failure. Such notice by the Indemnified Party shall describe the Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the loss that has been or may be sustained by the Indemnified Party. The Indemnitors shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Claim at the Indemnitors' expense and in the Indemnitors' sole discretion. Whether the Indemnified Party or the Indemnitors undertake the defense of a claim, each party shall cooperate with the other, in all reasonable respects in good faith, in such defense. In the event that the Indemnitors assume the defense of any Claim, subject to Section 4(e), they shall have the right to take such action as they deem necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Claims in the name and on behalf of the Indemnified Party.

(b)    Subject to the Indemnitors' right to control the defense of any Claim that it assumes the defense of as set forth in Section 4(a), the Indemnified Parties shall have the right, at its own cost and expense, to participate in the defense of any Claim with counsel selected by it unless: (i) the employment of legal counsel by the Indemnified Party has been authorized by an Indemnitor, (ii) the Indemnified Party has reasonably determined that there is a conflict of interest between the Indemnified Party and an Indemnitor in the defense of the Claim, or (iii) the Indemnitors shall not in fact have employed counsel to assume the defense of such Claim, in each of which cases all Expenses of the Claims actually incurred shall be borne by the Indemnitors.

(c)    To the fullest extent permitted by law, the Indemnitors' assumption of the defense of a Claim in accordance with Section 4(a) will constitute an irrevocable acknowledgement by the Indemnitors that any and all Losses suffered or incurred by the Indemnified Parties are indemnifiable by the Indemnitors under this Agreement.

**(d)**      If the Indemnitors elect not to compromise or defend such Claim or fail to promptly notify the Indemnitee in writing of its election to defend as provided in this Agreement, the Indemnitee or any Indemnified Party may, subject to Section 4(e), settle, pay, compromise or defend such Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Claim.

**(e)**      Notwithstanding any other provision of this Agreement, the Indemnitors shall not enter into the settlement of any Claim without the prior written consent of the Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed), except as provided in this Section 4(e). If a firm offer is made to settle a Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Parties and provides for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Claim and the Indemnitors desire to accept and agree to such offer, the Indemnitors shall give written notice to that effect to the Indemnitee. If the Indemnitee fails to consent to such firm offer within fifteen (15) days after its receipt of such notice, the Indemnitee or any Indemnified Party may continue to contest or defend such Claim and in such event, the maximum liability of the Indemnitors as to such Claim shall not exceed the amount of such settlement offer. If the Indemnitee or any Indemnified Party has assumed the defense pursuant to 4(a), it shall not agree to any settlement without the prior written consent of the Indemnitors (which consent shall not be unreasonably withheld, conditioned or delayed).

**(f)**      The determination whether to grant the Indemnified Party's indemnification request shall be made promptly and in any event within sixty days following the receipt of a request for indemnification in accordance with this Agreement.  If the Indemnitors determine that the Indemnified Party is entitled to such indemnification or, as contemplated by Section 4(c), the Indemnitors have acknowledged such entitlement, the Indemnitors shall make payment to the Indemnified Party of the indemnifiable amount within such sixty-day period.

**(g)**      Indemnified Party's Expenses incurred in connection with the Indemnified Party successfully establishing in a final non-appealable judgment of a court of competent jurisdiction the Indemnified Party's right to indemnification or Expenses, in whole or in part, in any such proceeding or otherwise shall also be indemnified by the Indemnitors to the fullest extent permitted by applicable law.

**5.**      **Offset**. Notwithstanding anything in this Agreement, the Fahrenheit Management Agreement or the USBTC Mining Management Agreement to the contrary, if an Indemnitor shall fail to pay any amounts that it is obligated to pay to an Indemnified Party under this Agreement, including all Losses comprising amounts that such Indemnitor is obligated to pay pursuant to the indemnification obligations set forth in this Agreement, then the Indemnitee shall have the right to set off all or any portion of such amounts against any amounts due and owing from the Indemnitee to the Indemnitors (including any amounts owed by Indemnitee under the Fahrenheit Management Agreement or USBTC Mining Management Agreement). Any amounts so set off shall be deemed to have been paid to the Indemnitor pursuant to the applicable agreement.

**6.**      **Insurance**

**(a)**     The purchase, establishment, and maintenance of any insurance by the Indemnitee shall not in any way limit or affect the rights and obligations of the Indemnitors or of Indemnified Parties under this Agreement, and the execution and delivery of this Agreement by the Indemnitors and the Indemnitee shall not in any way limit or affect the rights and obligations of the Indemnitors or the other party or parties thereto with respect to any such insurance.

**(b)**     It is further agreed that, (i) the Indemnitee or any Indemnified Party shall have no obligation to pursue any indemnification, hold harmless, advancement, contribution or insurance coverage among multiple parties possessing such duties to Indemnitee or the Indemnified Parties prior to the Indemnitors' satisfaction and performance of all their obligations under this Agreement, and (ii) the Indemnitors shall perform fully their obligations under this Agreement without regard to whether the Indemnitee or any Indemnified Party holds, may pursue or has pursued any indemnification, advancement, hold harmless, contribution or insurance coverage rights against any person or entity other than the Indemnitors.

**(c)**     In the event the Indemnitee or any other Indemnified Party pursues any indemnification, hold harmless, advancement, contribution or insurance coverage, the person that has paid the Indemnitee or other Indemnity Party, to the fullest extent permitted by law, shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnified Parties.[1]

**7.**     **Notices**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by  e-mail of a PDF document; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, post-age prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7).

If to the Indemnified Parties:          [COMPANY ADDRESS]

Email: [EMAIL ADDRESS]

Attention: [TITLE OF OFFICER TO RECEIVE

NOTICES]

---

[1] **W&C Note to Draft**: In the event that any of Company's D&O files a claim relating to this Litigation under the Celsius D&O policies, Celsius will need to pay them under its indemnification obligations. This provision is to ensure that Celsius has a right to claim under this agreement if it pertains to the Litigation.

with a copy to:                    [COMPANY LAW FIRM]

                                   Email: [EMAIL ADDRESS]

                                   Attention: [ATTORNEY NAME]


If to the Indemnitors:             [FAHRENHEIT ADDRESS]

                                   Email: [EMAIL ADDRESS]

                                   Attention: [TITLE OF OFFICER TO RECEIVE

                                   NOTICES]


                                   [DATA MANAGEMENT ADDRESS]

                                   Email: [EMAIL ADDRESS]

                                   Attention: [TITLE OF OFFICER TO RECEIVE

                                   NOTICES]


with a copy to:                    Brown Rudnick LLP

                                   7 Times Square,

                                   New York, NY 10036

                                   Email: jfitzsimons@brownrudnick.com

                                   Attention: Jonathan Fitzsimons


    **8.**    **Severability.**  If any provision of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever, (a) the validity, legality and enforceability of the remaining provisions of the Agreement (including without limitation, all portions of any paragraphs of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Agreement (including, without limitation, all portions of any paragraph of this Agreement containing any such

provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

9. **Amendment and Waiver.** No supplement, modification, amendment, or cancellation of this Agreement shall be binding unless executed in writing by the Indemnitee and the Indemnitor. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

10. **Governing Law and Venue.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

11. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

12. **Headings.** The headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

13. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings and negotiations, written and oral, between the parties with respect to the subject matter of this Agreement.

14. **No Third Party Beneficiaries**. This Agreement is not intended, and shall not be deemed, to confer any rights or remedies upon any person other than the parties hereto and their respective successors and permitted assigns or to otherwise create any third-party beneficiary hereto; provided that the Indemnified Parties (other than the Indemnitee) are express third party beneficiaries of this Agreement and shall be entitled to enforce their right pursuant to this Agreement. The Indemnitors shall require and cause any successor (whether direct or indirect by

purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part, of the business and/or assets of the either Indemnitor, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement to the fullest extent permitted by law

[*Signature pages follow*]

DRAFT

The parties hereto have entered into this Indemnification Agreement effective as of the date first above written.

**INDEMNITEE**

NEWCO, INC.

By: _____
Name: _____
Title: _____

**INDEMNITORS**

FAHRENHEIT LLC

By: _____
Name: _____
Title: _____

U.S. DATA MANAGEMENT GROUP, LLC

By:_____
Name:_____
Title:_____

65110880 v7-WorkSiteUS-039525/0002

[Signature Page – Indemnification Agreement]

**<u>Exhibit D</u>**

**Proof Group IP License**

# INTELLECTUAL PROPERTY LICENSE AND SUPPORT AGREEMENT

## By and between

## [Proof Group Capital Management LLC]

## And

## [NewCo, Inc.]

This Intellectual Property License and Support Agreement (this "**Agreement**"), is made and entered as of [●], by and among (i) [Proof Group Capital Management LLC], a [Delaware] limited liability company ("**Provider**"), (ii) Noah Jessop ("**Jessop**", and together with the Provider, the "**Provider Parties**"), and (iii) [NewCo, Inc.], a Delaware corporation (the "**Company**" and together with the Provider, the "**Parties**" and each a "**Party**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected Fahrenheit LLC ("**Fahrenheit**") as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, pursuant to the Plan Term Sheet, the Company and Fahrenheit entered into that certain Management Services Agreement by and between Fahrenheit and the Company, dated [●], 2023 (the "**Management Agreement**");

**WHEREAS**, on August 15, 2023, the Debtors filed the fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], 2023, the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**"), and on [●], 2023 (the "**Effective Date**"), the Plan became effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the Company desires to license certain intellectual property described herein, and the Provider is willing to license such intellectual property to the Company; and

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    <u>Intellectual Property License</u>.

(a)    The Provider[1] hereby grants to the Company, on behalf of themselves and their affiliates, a fully paid-up, royalty-free, worldwide, exclusive (except as to the Provider), non-transferable (except to the extent permitted by Section 14), non-sublicensable (except to any of the Company's affiliates or to contractors of the Company or its affiliates acting on behalf of the Company or any of its affiliates), perpetual and irrevocable license effective as of the date of this Agreement to use (i) the Proof Group Software and (ii) the Proof Group IP solely to the extent that such Proof Group IP is incorporated in or practiced or embodied by the Proof Group Software, in each of the foregoing cases (i) and (ii), [for purposes of the Company staking or offering staking services].[2] "**Proof Group IP**" means any Intellectual Property Rights in or to the Proof Group Software. "**Proof Group Software**" means all software and other technology owned by Provider or any of its affiliates from time to time during the term of this Agreement that relates to staking (as defined below) functionalities, together with all documentation relating thereto. "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (a) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (b) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (c) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (a)-(b), and (e) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    On the date of this Agreement, the Provider shall deliver to the Company copies of the Proof Group Software, including all then-current commented source code and related documentation, and all other documents, tangible embodiments or other materials necessary for Company to use the Proof Group Software. Thereafter, the Provider shall deliver to the Company copies of all new versions, bug fixes, improvements and other updates to the Proof Group Software, in each case, promptly after the development or acquisition thereof.

(c)    If the Provider believes that any of the Proof Group IP is being infringed or misappropriated by a third party, the Provider possessing such belief or awareness of such claims

---

[1] Note to BR: Limitation to single grantor subject to IP due diligence.

[2] Note to BR: Under continuing review by debtor staking team.

shall promptly provide written notice to the Company and provide it with all details of such infringement or claim, as applicable, that are known by the Provider.

(d)     The Company shall have the first right, but not the obligation to bring an infringement or misappropriation action concerning any Proof Group IP, defend any declaratory judgment action concerning any Proof Group IP, and protect, enforce, or defend any Proof Group IP and control the conduct thereof and attempt to resolve any claims relating thereto. The Provider shall provide all reasonable cooperation and assistance, including providing access to relevant documents and other evidence, making its employees available at reasonable business hours and being joined as a party to such action. The Provider shall and hereby does irrevocably and unconditionally waive any objection to the Company's joinder of any of the Provider to any proceeding described in this Section on any grounds whatsoever, including on the grounds of personal jurisdiction, venue, or forum non conveniens. Any recovery, damages, or settlement derived from a suit, action or other proceeding brought by the Company as contemplated by this Section will be retained in its entirety by the Company, and the Company may settle any such suit, action, or other proceeding, whether by consent order, settlement, or other voluntary final disposition, without the prior written approval of either Provider Party. After the Term, in the event that the Company decides not to take action against an infringement or misappropriation of Proof Group IP, it shall promptly inform the Provider, and the Provider shall then have the right (but not the obligation) to enforce the rights in the Proof Group IP. Any recovery, damages, or settlement derived from a suit, action or other proceeding brought by the Provider as contemplated by this Section shall be retained in its entirety by the Provider, and the Company hereby expressly waives any claim thereto.

2.     <u>Staking Support</u>. The Provider shall provide support services for the implementation of staking within the Company utilizing the Proof Group Software at no cost to the Company. Until such time that the Company has the capability and infrastructure to stake tokens (as reasonably determined by the Company and notified by the Company to the Provider in writing which notice shall be provided by the Company to the Provider promptly following such determination), the Provider shall provide the Company with staking services on the same terms and conditions as set forth in that certain Ethereum Staking and Services Agreement (the "**Staking and Services Agreement**") between the Provider and Celsius Network LLC, dated July 31, 2023 [(for clarity, notwithstanding the termination of the Staking and Services Agreement)] (except as modified herein); provided, however, that no fees shall apply to such staking services. [For purposes of this Agreement, to "**stake**" means to operate one or more validator nodes (or similar nodes that may earn rewards) in connection with a digital asset network, whether or not the operator holds title to any or all tokens staked in connection with such node.][3] After the Company has notified the Provider that the Company has the capability and infrastructure to stake tokens, (i) the Provider shall provide ongoing support services for the Company's staking efforts utilizing the Proof Group Software and (ii) Jessop shall provide reasonable assistance in furtherance of the Provider's performance of the foregoing ongoing support services, in each case, at no cost to the Company. The Provider Parties represent, warrant, and covenant that all services contemplated by

---

[3] Note to BR: Under continuing review by debtor staking team.

this paragraph will be provided in a good and workmanlike manner consistent with industry best practices.

3.    <u>Third Party Staking Option</u>. [At any time prior to the termination of this Agreement the Company may, by providing written notice to the Provider, elect to cause the Provider to migrate the Provider's and its affiliates' staking services customers ("**Customers**") to the Company (the "**Migration Notice**").][4] Upon the Provider's receipt of the Migration Notice, the Provider shall use (and cause its affiliates to use) commercially reasonable efforts to migrate the Customers to the Company such that the Customers shall become staking services customers of the Company; <u>provided</u>, <u>however</u>, that the Provider shall not be required to migrate Customers that do not agree to such migration ("**Non-Consenting Customers**"). The Provider shall (i) notify each Customer of the proposed migration, and if such migration is not accepted the termination, of its agreement with the Provider for staking services within 5 business days after the Provider's receipt of the Migration Notice and (ii) terminate the provision of staking services to all Non-Consenting Customers as soon as practicable, and in any event no later than the 60th day following the Provider's receipt of the Migration Notice (the "**Migration End Date**"). The Provider shall not solicit or directly induce or encourage any Non-Consenting Customer's migration to any third party provider of staking services. The Provider and its affiliates shall promptly remit to the Company all funds they receive in consideration for providing staking services between the date of the Migration Notice and the date 60 days after the Migration End Date.

4.    <u>Exclusivity</u>.

(a)    Each of the Provider and Jessop covenants and agrees that, for the period beginning on the Effective Date and ending on the date of expiration or termination of this Agreement, that it or he (as applicable) shall not (and the Provider shall cause its affiliates not to), directly or indirectly engage in or assist any other Person in engaging in the Restricted Business (including by referring potential customers to any such other Person), other than (i) providing staking services to existing Customers prior to the termination or migration of staking services for each such Customer pursuant to the provisions of Section 3 hereof; (ii) in the course of providing services to the Company; or (iii) as otherwise consented to in writing by the Company. Notwithstanding the foregoing, (y) Jessop represents that <u>Exhibit A</u> contains a true, accurate and complete list of all of his roles and positions as of the date of this Agreement and as of the Effective Date, the participation in which would otherwise violate this Section 4(a); and (z) Jessop's participation therein will not constitute a breach of this Section 4(a) from the date of this Agreement until a determination by the board of directors of the Company as to whether such participation is permitted, and thereafter for so long as any such participation is permitted by the board of directors. "**Restricted Business**" means the business of providing services relating to staking.

(b)    Except as otherwise expressly provided in this Agreement, neither the Provider nor Jessop is restricted hereunder from engaging in any business activities or from performing services for its own account or for the account of others, including, without limitation,

---

[4] Note to BR: Under continuing review by debtor staking team – in particular, whether Newco will be ready for migration prior to the Effective Date.

companies which may be in competition with the business conducted by the Company or any of its affiliates. Notwithstanding anything to the contrary, each of the Provider and Jessop may own, directly or indirectly, solely as an investment, up to twenty percent (20%) (or any other percentage value that may be provided in a conflicts policy that is duly adopted by the board of directors of the Company, provided such percentage value is not lower than 10%) of any class securities of any business engaged in the Restricted Business.

(c)    [Upon the delivery of a Migration Notice and the migration or termination (as applicable) of all Customers and Non-Consenting Customers,][5] the license granted in Section 1 will (automatically and without further action by either Party) convert into an exclusive license (even as to the Provider, except with respect to the Provider's use of the Proof Group Software to support Non-Consenting Customers solely to the extent permitted by Section 3).

5.    <u>Term and Termination</u>. This Agreement shall be coterminous with the Management Agreement and shall immediately terminate upon the expiration or termination of the Management Agreement; <u>provided</u>, <u>however</u>, that Sections 1(a), 1(d), 7, and 9-23 hereof shall survive the expiration and/or termination of this Agreement. Upon the expiration or termination of this Agreement, the license granted in Section 1 will (automatically and without further action by either Party) convert into an exclusive license (except as to the Provider).

6.    <u>Provider Representations and Warranties</u>. The Provider represents and warrants that: (i) none of the Proof Group Intellectual Property, the Proof Group Software, or the Company's use of either of the foregoing does or will infringe, misappropriate, or otherwise violate the Intellectual Property Rights of any Person; (ii) to the knowledge of the Provider, no Person is infringing, misappropriating, or otherwise violating any Proof Group Intellectual Property; and (iii) the execution of this Agreement and the performance of the Provider's obligations hereunder will not violate or conflict with any contractual or other legal obligations of the Provider. For the purposes of this Agreement, "knowledge of the Provider" shall mean the actual knowledge of Noah Jessop. and "**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

7.    <u>Confidentiality</u>.

(a)    During the Term and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the

---

[5] Note to BR: Under continuing discussion between the Parties.

"**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations or exercising its rights under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 7 (or are bound by comparable contractual or professional obligations) and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent permissible, the disclosing party (the "**Disclosing Party**"), and, at the Disclosing Party's request and expense, take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel that it is legally bound to disclose under such Governmental Order. Notwithstanding anything to the contrary (i) the Proof Group Software is the Confidential Information of both the Provider and the Company; and (ii) until the delivery of a Migration Notice and the migration or termination (as applicable) of all Customers and Non-Consenting Customers, the Provider may use the Proof Group Software, which may include disclosure of the Proof Group Software (solely in object code form) to its Customers and to third parties, solely as necessary for Provider to provide staking services to such Customers and to fulfill the Provider's obligations under Section 3. For the purposes of this Agreement, (A) "**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order, or other requirement or rule of law of any Governmental Authority, (B) "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction, (C) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, subpoena, warrant, demand, or determination entered by, with, or pursuant to the authority of any Governmental Authority, and (D) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 7; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information, except for the Proof Group Software. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable Law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

8.    Disclaimer. THE PROOF GROUP SOFTWARE IS PROVIDED "AS IS" AND OTHER THAN AS EXPRESSLY SET FORTH HEREIN PROVIDER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE PROOF GROUP SOFTWARE, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET COMPANY'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE.

9.    Limitation of Liability.

(a)    NEITHER PARTY NOR ANY OF ITS AFFILIATES WILL BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, OR ENHANCED DAMAGES, OR FOR ANY LOSS OF ACTUAL OR ANTICIPATED PROFITS, ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE USE OF THE PROOF GROUP SOFTWARE, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), STATUTE, OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE AND WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    NOTWITHSTANDING ANYTHING IN THIS SECTION 9 TO THE CONTRARY, IN NO EVENT WILL JESSOP'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING UNDER OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL OR EQUITABLE THEORY, EXCEED $1,000,000.

(c)    THE LIMITATIONS IN SECTIONS 9(a) DO NOT APPLY TO BREACHES OF THE CONFIDENTIALITY PROVISIONS SET FORTH IN SECTION 7, THIRD-PARTY CLAIMS THAT ARE SUBJECT TO INDEMNIFICATION UNDER SECTION 10, OR ANY PERSON'S LIABILITY ARISING FROM ITS, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE PERSONNEL'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

10.    Indemnification.

(a)    The Provider (the "**Indemnifying Party**") shall indemnify and hold harmless the Company, its affiliates and its and their officers, directors, employees, agents, successors, and assigns (each, an "**Indemnified Party**") from and against any and all losses, claims, actions, damages, and liabilities, joint or several ("**Losses**") arising from any claim, action or demand brought by or on behalf of any third party ("**Claim**") alleging that the Company's or any of its affiliates' or contractors' use of the Proof Group Software in accordance with this Agreement violates or infringes any Intellectual Property Rights; and the Indemnifying Parties will

reimburse all Indemnified Parties for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense of any such pending or threatened claim, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The reimbursement and indemnity obligations of the Indemnifying Party under this Section 10 shall be in addition to any liability which the Provider may otherwise have.

(b)    Notwithstanding anything to the contrary, Indemnifying Party will have no obligation under this Section 10 to indemnify or hold harmless an Indemnified Party or any other Person for Losses arising from the other Party's or such Person's negligence, willful misconduct, or breach of this Agreement. In the event of a claim, action, or demand that may give rise to obligations of the Indemnifying Party under this Section 10, the applicable Indemnified Party must promptly notify the Indemnifying Party in writing after receiving the Claim; provided, however, that a failure of the Indemnified Party to deliver such notice promptly shall only relieve the Indemnifying Party of its obligations to the extent actually prejudiced thereby. The Indemnified Party will have control of the defense and all negotiation for any settlement or compromise of any Claim, acting reasonably and in good faith, at the Indemnifying Party's sole expense. Furthermore, at the Indemnifying Party's expense, the Indemnifying Party will assist and cooperate in the defense of any Claim as reasonably requested by the Indemnified Party.

11.    [6]Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Provider shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Provider or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

12.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12).

If to the Company:                    [COMPANY ADDRESS]
                                      Email: [EMAIL ADDRESS]

---

[6] NTD: Miscellaneous provisions from here down to be conformed to agreed miscellaneous provisions for the Fahrenheit Management Agreement (as appropriate).

<table>
<tr><td></td><td>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES]</td></tr>
</table>

with a copy to:                          [COMPANY LAW FIRM]
                                         Email: [EMAIL ADDRESS]
                                         Attention: [ATTORNEY NAME]


If to the Provider:                      [PROVIDER ADDRESS]
                                         Email: [EMAIL ADDRESS]
                                         Attention: [TITLE OF OFFICER TO RECEIVE NOTICES]


with a copy to:                          Brown Rudnick LLP
                                         7 Times Square,
                                         New York, NY 10036
                                         Email: jfitzsimons@brownrudnick.com
                                         Attention: Jonathan Fitzsimons

13.    Entire Agreement.  This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

14.    Successor and Assigns; Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Provider may assign its rights and obligations hereunder to any of its affiliates, and (b) the Company may assign its rights and obligations to any of its affiliates.

15.    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

16.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.    Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to

exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

18.    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

20.    WAIVER OF JURY TRIAL. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 20.

21.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic

transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

22.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

23.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

11 of 13

**IN WITNESS WHEREOF**, the parties hereto have executed this Intellectual Property License and Support Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:

[Proof Group Capital Management LLC]

By_____
Name:
Title:

Noah Jessop

_____

<u>Exhibit A</u>

1.  Nine Realms – investor, common stock stockholder, and director on the board of
    directors
2.  Stader – investor, and token holder
3.  Gynx – advisor

**<u>Exhibit E</u>**

**Plan Sponsor Contribution Agreement**

*DRAFT*

**[NewCo, Inc.]**

---

**PLAN SPONSOR CONTRIBUTION AGREEMENT**

---

## PLAN SPONSOR CONTRIBUTION AGREEMENT

This Plan Sponsor Contribution Agreement (this "Agreement"), is made as of [●], by and between [NewCo, Inc.], [a Delaware corporation] (the "Company"), and [Fahrenheit, LLC], [a Delaware limited liability company] (the "Plan Sponsor").

**WHEREAS,** on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "Plan"); and

**WHEREAS**, on August 17, 2023, the Debtors filed their fourth revised *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "Disclosure Statement"); and

**WHEREAS,** on August 17, 2023, the Bankruptcy Court entered its Order approving the Disclosure Statement and granting related relief; and

**WHEREAS,** on [●], 2023, the Bankruptcy Court entered its Order confirming the Plan and granting related relief; and

**WHEREAS,** pursuant to the Plan, the Company will issue to the Plan Sponsor, and the Plan Sponsor shall purchase from the Company, up to $50,000,000 of shares of the Company's Class A common stock, par value $[●] per share (the "Common Stock"), subject to the terms and conditions herein and enter into that certain Management Services Agreement by and between the Company and the Plan Sponsor dated on the date hereof (the "Fahrenheit Management Agreement"); and

**WHEREAS,** as of the date of this Agreement, the Company has also entered into that certain US Bitcoin management agreement U.S. Data Management Group, LLC (the "US Bitcoin Management Agreement").

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements and covenants herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Plan Sponsor hereby represent and agree as follows:

1.    ISSUANCE AND CONTRIBUTION.

1

(a)    <u>Initial Investment</u>.    By wire transfer to the Company of immediately available funds on the date of purchase of the Common Stock, the Plan Sponsor shall purchase from the Company for an aggregate purchase price of $[33,188,119] (the "<u>Initial Plan Sponsor Investment</u>") the number of shares of Common Stock (the "<u>Initial Plan Sponsor Shares</u>") equal to the product of: (i) the sum of all outstanding shares of Common Stock issued or anticipated to be issued on the Effective Date (as defined under the Plan) (the "<u>Issued Shares</u>") *plus* (ii) the number of shares of Common Stock reserved for issuance in accordance with the Plan for Claims (as defined in the Plan) that are Disputed (as defined in the Plan),[1] as well as any other shares of Common Stock that are reserved for issuance or subject to holdbacks as of the Effective Date of the Plan (the "<u>Reserve Shares</u>") *plus* (iii) the number of shares of Common Stock reserved for issuance in accordance with any equity incentive plan approved or contemplated under the Plan or approved by the board of directors of the Company on the Effective Date (the "<u>Plan Shares</u>", and together with Reserve Shares and the Issued Shares, the "<u>Effective Date Shares</u>"); *multiplied by* (iii) a fraction, the numerator of which is the Initial Plan Sponsor Investment, and the denominator of which is the [Plan Value (as such term is defined under the Plan)][2], which for the avoidance of doubt shall not include the Initial Plan Sponsor Investment (the "<u>Company Net Asset Value</u>"). An illustrative calculation of the foregoing formula is depicted below.

| | | Initial Plan Sponsor Investment (*i.e.*, $33,188,119) |
|---|---|---|
| (The sum the Issued Shares *plus* the Reserve Shares *plus* the Plan Shares) | × | Company Net Asset Value as of Effective Date (not including Initial Plan Sponsor Investment) |

Subject to the conditions specified in Section 5 hereof, the closing of the issuance and purchase of the Common Stock contemplated by this <u>Section 1(a)</u> will take place on the Effective Date (as defined in the Plan) (the "<u>Initial Closing Date</u>") upon the declaration of the effectiveness of the Plan in accordance with its terms.

(b)    <u>Subsequent Investments</u>.

i.    If the Company extends the Initial Term or the first Term Extension (as defined in each of the Fahrenheit Management Agreement) under the Fahrenheit Management Agreement, the Plan Sponsor shall, on the first business day of the first Term Extension or second Term Extension (as applicable), purchase from the Company, for an aggregate purchase price of $[6,811,881], the number of shares of Common Stock equal to the product of: the number of the Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock

---

[1] **W&C Note to Draft**: Language aligned to Warrant Agreement.

[2] **Note to Draft**: The definition of Plan Value to be confirmed under the Plan that will be published by the Debtors on the measurement date prior to the Effective Date.  To be equivalent to NewCo net asset value as of Effective Date.

2

dividend or similar event effected by the Company with respect to the Common Stock) *multiplied by* a fraction, the numerator of which is $[6,811,881], and the denominator of which is the Company Net Asset Value.

ii.    If the Company extends the Initial Term (as defined in the US Bitcoin Management Agreement) under the US Bitcoin Management Agreement, the Plan Sponsor shall purchase from the Company, for an aggregate purchase price of $[3,188,119], the number of shares of Common Stock equal to the product of: the number of Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock) *multiplied by* a fraction, the numerator of which is $[3,188,119], and the denominator of which is the Company Net Asset Value.

iii.    Subject to the conditions specified in <u>Section 5</u> hereof, the closing of the issuance and purchase of the Common Stock contemplated by this <u>Section 1(b)</u> will take place on the first business date of each Term Extension (as defined in the Fahrenheit Management Agreement or US Bitcoin Management Agreement, as applicable) (each such date a "<u>Subsequent Closing Date</u>").

(c)    For the purposes of this Agreement, (1) "<u>Subsequent Plan Sponsor Investment</u>" shall mean any purchase price payable by the Plan Sponsor in accordance with the subsequent investments set forth in <u>Section 1(b)</u>, (2)  "<u>Plan Sponsor Investment</u>" shall mean the sum of the Initial Plan Sponsor Investment and any Subsequent Plan Sponsor Investments, (3) "<u>Plan Sponsor Shares</u>" shall mean, collectively, the shares of Common Stock purchased in the Initial Plan Sponsor Investment and any Subsequent Plan Sponsor Investment, and (4) "<u>Closing Date</u>" shall refer to each of the Initial Closing Date for purposes of the Initial Plan Sponsor Investment and any Subsequent Closing Dates for each applicable Subsequent Plan Sponsor Investment.

(d)    For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Plan Sponsor shall be solely responsible for any monetary obligations owed by it under this Agreement.

2.    <u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>.

As of the date hereof and as of each Closing Date, the Company represents and warrants to the Plan Sponsor as follows:

(a)    The Company is duly incorporated and validly existing under the laws of the state of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

(b)    The Company has the requisite corporate or other applicable power and authority to execute and deliver this Agreement and perform its obligations hereunder, and this Agreement and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite action.

3

(c)     This Agreement has been duly and validly executed and delivered by the Company and constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(d)     The Plan Sponsor Shares have been duly authorized and, upon payment of the Initial Plan Sponsor Investment and/or each Subsequent Plan Sponsor Investment, as the case maybe, pursuant to the terms of this Agreement, will be validly issued, fully paid and nonassessable, and conform in all material respects to the description thereof set forth in the Disclosure Statement and the Exchange Act Registration Statement (as defined below).

(e)     Neither the Company, nor any of its subsidiaries, is and, immediately after giving effect to the offering and sale of the Plan Sponsor Shares and the application of the proceeds thereof, will be an "investment company", as such term is defined in the Investment Company Act of 1940, as amended, including the rules and regulations of the Securities and Exchange Commission (the "<u>Commission</u>") promulgated thereunder.

(f)     A registration statement on Form 10 (File No. [●]), as amended (the "<u>Exchange Act Registration Statement</u>"), in respect of the Common Stock has been filed with the Commission, and the Exchange Act Registration Statement in the form heretofore delivered to the Plan Sponsor has become effective.

(g)     The financial statements included in the Exchange Act Registration Statement, together with the related schedules and notes, present fairly in all material respects the financial position of the Company and its subsidiaries at the dates indicated and the statement of operations, stockholders' equity and cash flows of the Company and its subsidiaries for the periods specified.  Said financial statements have been prepared in conformity with U.S. generally accepted accounting principles ("<u>GAAP</u>") applied on a consistent basis throughout the periods involved. The supporting schedules, if any, present fairly in all material respects in accordance with GAAP the information required to be stated therein. The summary financial information included in the Exchange Act Registration Statement present fairly in all material respects the information shown therein and have been compiled on a basis consistent with that of the audited financial statements included therein.

(h)     The Initial Plan Sponsor Shares were offered and sold pursuant to an exemption from registration under the Securities Act of 1933, as amended, including the rules and regulations of the Commission promulgated thereunder (the "<u>Securities Act</u>"), provided by Section 1145(a) of the Bankruptcy Code.

3.     <u>REPRESENTATIONS AND WARRANTIES OF THE PLAN SPONSOR</u>.

As of the date hereof and as of each Closing Date, the Plan Sponsor represents and warrants to the Company as follows:

(a)     The Plan Sponsor is duly organized and validly existing under the laws of the state of Delaware, with full power and authority to conduct its business as it is currently being conducted and to own its assets.

4

(b)    The Plan Sponsor has the requisite limited liability company or other applicable power and authority to execute and deliver this Agreement and perform its obligations hereunder, and this Agreement and the consummation by the Plan Sponsor of the transactions contemplated hereby have been duly authorized by all requisite action.

(c)    This Agreement has been duly and validly executed and delivered by the Plan Sponsor and constitutes the valid and binding obligation of the Plan Sponsor, enforceable against the Plan Sponsor in accordance with its terms.

(d)    The execution, delivery and performance by Plan Sponsor of this Agreement, including the consummation of the transactions contemplated hereby will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Plan Sponsor pursuant to the terms of (i) any indenture, mortgage, deed of trust, loan agreement, lease, license or other agreement or instrument to which Plan Sponsor is a party or by which Plan Sponsor is bound or to which any of the property or assets of Plan Sponsor is subject; (ii) Plan Sponsor's organizational documents or under any law, rule, regulation, agreement or other obligation by which Plan Sponsor is bound; and (iii) any statute or any judgment, order, rule or regulation of any court or governmental agency or body, domestic or foreign, having jurisdiction over Plan Sponsor or any of their respective properties, that would reasonably be expected to have a material adverse effect on the ability of the Plan Sponsor to enter into and timely perform its obligations under this Agreement.

(e)    The Plan Sponsor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

(f)    The Plan Sponsor acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, liabilities, properties, contracts, employee matters, regulatory compliance, business risks, and prospects) of the Company and its affiliates, and, in making its determination to proceed with the transactions contemplated hereby, the Plan Sponsor has relied, is relying, and will rely, solely, on the representations of the Company set forth herein (the "Express Representations") and the results of the Plan Sponsor's own independent investigation and verification and has not relied on, is not relying on, and will not rely on any information, statements, disclosures, documents, projections, forecasts or other material made available to the Plan Sponsor or any of its affiliates, advisors, or representatives, in any "dataroom", any "information presentation" or similar document, or any Projections (defined below) or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of the Company or any of its affiliates, Celsius Network LLC or any of its affiliates, or any predecessor, advisors or representative of any of the foregoing (the "Disclaimed Persons"), or any failure of any of the Disclaimed Persons to disclose or contain any information, except for the Express Representations. The Plan Sponsor acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to the Plan Sponsor and on which the Plan Sponsor may rely in connection with the transactions contemplated hereby and (ii) all other representations, warranties and statements of any kind or nature expressed or implied,

5

statutory, whether in written, electronic or oral form are, in each case, specifically disclaimed by the Company and the foregoing persons.

(g)     Without limiting the generality of the foregoing, in connection with the investigation by the Plan Sponsor, the Plan Sponsor and its advisors and representatives have received or may receive certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in any "information presentation" or similar document, any dataroom, any management meetings, etc.) (collectively, "Projections"). The Plan Sponsor acknowledges and agrees that (i) such Projections are being provided solely for the convenience of the Plan Sponsor to facilitate its own independent investigation, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) the Plan Sponsor is familiar with such uncertainties, and (iv) the Plan Sponsor is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections). The Disclaimed Persons are intended third party beneficiaries of these paragraphs 3(f) and 3(g) and shall be entitled to enforce this these paragraphs 3(f) and 3(g) as if a party directly hereto.

4.     COMPLIANCE WITH THE SECURITIES ACT.

(a)     The parties agree that the Plan Sponsor Shares are "restricted securities" under the Securities Act and have not been registered under the Securities Act nor qualified under any state securities laws, and that the Plan Sponsor Shares are offered and sold in reliance upon the exemption from the registration requirements of the Securities Act provided in Section 4(a)(2) under the Securities Act and Regulation D promulgated under the Securities Act or Section 1145(a) of the Bankruptcy Code.

(b)     To the extent applicable, the Plan Sponsor Shares issued by the Company in connection with this Agreement (unless registered under the Securities Act and the Company determines in its reasonable discretion that such legend is not required) may be stamped or imprinted with a legend in substantially the following form:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SECURITIES IS EFFECTIVE UNDER THE ACT OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL SATISFACTORY TO THE COMPANY."

5.     CONDITIONS TO CLOSING.

(a)     The obligations of the Plan Sponsor to purchase and pay for the Plan Sponsor Shares is subject to the following condition precedent: (i) the representations and warranties of the Company contained in Section 2 hereof shall be true and correct as of the

applicable Closing Date in all respects with the same effect as though such representations and warranties had been made on and as of the applicable Closing Date, (ii) solely for purposes of the Initial Plan Sponsor Investment, the Plan has been declared effective in accordance with its terms, (iii) solely for purposes of any Subsequent Plan Sponsor Investment under Section 1(b)(i) hereof, the Company has extended the Fahrenheit Management Agreement through the first Term Extension and/or second Term Extension, as applicable and (iv) solely for purposes of any Subsequent Plan Sponsor Investment under Section 1(b)(ii) hereof, the Company has extended the US Bitcoin Management Agreement through the Term Extension.

(b)    The obligations of the Company to issue and sell the Plan Sponsor Shares is subject to the following conditions precedent: (i) the representations and warranties of the Plan Sponsor contained in Section 3 hereof shall be true and correct as of the applicable Closing Date in all respects with the same effect as though such representations and warranties had been made on and as of the applicable Closing Date, (ii) solely for purposes of the Initial Plan Sponsor Investment, the Plan has been declared effective in accordance with its terms, (iii) the Plan Sponsor has delivered to the Company the Initial Plan Sponsor Investment or the Subsequent Plan Sponsor Investment (as applicable) by wire transfer of immediately available funds, (iv) solely for purposes of any Subsequent Plan Sponsor Investment under Section 1(b)(i) hereof, the Company has extended the Fahrenheit Management Agreement through the first Term Extension and/or second Term Extension, as applicable and (iv) solely for purposes of any Subsequent Plan Sponsor Investment under Section 1(b)(ii) hereof, the Company has extended the US Bitcoin Management Agreement through the Term Extension.

6.    LOCK-UP.

(a)    Lock-up Period.  Subject to the provisions of Section 6(b) hereof, during the period beginning from the date hereof and continuing until the second anniversary of the Initial Closing Date (the "Lock-up Period"), the Plan Sponsor shall, without the prior written consent of the Company (which consent shall have been approved by the audit committee of the Company's board of directors), not either directly or indirectly: (i) offer, sell, contract to sell, hypothecate or pledge, grant any option to purchase or otherwise dispose of, make any short sale or otherwise transfer or dispose of, directly or indirectly, the Initial Plan Sponsor Shares; (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Initial Plan Sponsor Shares, whether any such transaction is to be settled by delivery of such Initial Plan Sponsor Shares, in cash or otherwise, or (iii) public announcement of any intention to effect any transaction specified in clause (i) or (ii) hereof, *provided*, *however*, that the foregoing restrictions shall not apply to sales or other dispositions of Initial Plan Sponsor Shares, in each case that are made exclusively between and among the Plan Sponsor and its affiliates, including its members, and including distributions, transfers or dispositions without consideration by the Plan Sponsor to its members or other equity holders (such transferees collectively referred as, the "Permitted Transferees"), *provided, further*, that, simultaneously with such transfer or distribution, as the case may be, such Permitted Transferees execute a joinder agreement substantially in the form attached hereto as Exhibit A.

7

(b)    Unlock Period.  During the period commencing on the first anniversary of the Initial Closing Date and expiring at the conclusion of the Lock-up Period (the "Unlock Period"):

(i)    In the event that, during the Unlock Period, the Trading Price (defined below) of the Common Stock is equivalent to or greater than 150% of the NAV Per Share (defined below), the Plan Sponsor and its Permitted Transferees may collectively sell up to 30% of the Initial Plan Sponsor Shares then held by the Plan Sponsor and its Permitted Transferees; and

(ii)    In the event that, during the Unlock Period, the Trading Price of the Common Stock is equivalent to or greater than 200% of the NAV Per Share on the Closing Date, the Plan Sponsor and its Permitted Transferees may collectively sell (in addition to Common Stock sold in accordance with clause (i) above) up to 30% of the Initial Plan Sponsor Shares then held by the Plan Sponsor and its Permitted Transferees (for the avoidance of doubt, it is clarified that the Plan Sponsor and its Permitted Transferees shall not collectively sell more than 60% of the Initial Plan Sponsor Shares they hold collectively during the Unlock Period).

7.    DEFINED TERMS. For the purposes of this Agreement:

(a)    "Business Day" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York.

(b)    "NAV Per Share" shall mean the Company Net Asset Value *divided by* the Effective Date Shares (as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock).

(c)    "OTC Bulletin Board" means the Financial Industry Regulatory Authority OTC Bulletin Board electronic inter-dealer quotation system.

(d)    "Pink OTC Markets" means the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB, and OTC Pink.

(e)    "Trading Price" shall mean as of any particular date: (a) the volume-weighted average price for the Common Stock on any national securities exchange for any 15 Business Days within any 30-consecutive Business Day period Days ending on (and including) the Business Day immediately preceding the date of measurement as reported by Bloomberg; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the highest bid and lowest asked prices for the Common Stock on all such exchanges at the end of such day; (c) if on any such day the Common Stock is not listed on a national securities exchange, the closing sales price of the Common Stock as quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association

8

for such day; or (d) if there have been no sales of the Common Stock on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association on such day, the average of the highest bid and lowest asked prices for the Common Stock quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association at the end of such day; in each case of clauses (b) through (d), averaged over 20 consecutive Business Days ending on the Business Day immediately prior to the day as of which "Trading Price" is being determined; *provided*, that if the Common Stock is listed on any national securities exchange, the term "Business Day" as used in this sentence means Business Days on which such exchange is open for trading. If at any time the Common Stock is not listed on any national securities exchange or quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association, the "Trading Price" of the Common Stock shall be the fair market value per share as determined in good faith by the Company's board of directors.

8.    VOTING.  At any time during which the Fahrenheit Management Agreement is in full force and effect, the Plan Sponsor and any Permitted Transferees, in their capacity as stockholders or proxy holders of the Company, irrevocably and unconditionally agree that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company, the Plan Sponsor and such Permitted Transferees shall vote or cause to be voted at such meeting (or execute and return an action by written consent with respect to) all Plan Sponsor Shares owned by the Plan Sponsor or the Permitted Transferee (as applicable) as of the record date for such meeting (or the date that any written consent is executed by the Plan Sponsor or the Permitted Transferees (as applicable)) in accordance with the recommendations of the board of directors of the Company.  The Plan Sponsor hereby grants the Company an irrevocable proxy to vote the Plan Sponsor Shares as provided in this Section 8, *provided*, *however*, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the Fahrenheit Management Agreement.

9.    INTERPRETATION OF THIS AGREEMENT.

(a)    Directly or Indirectly.  Where any provision in this Agreement refers to action to be taken by any party, or which such party is prohibited from taking, such provision will be applicable whether such action is taken directly or indirectly by such party.

(b)    Governing Law; Jurisdiction.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive

9

jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

(c)    Waiver of Jury Trial.  Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (i) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (ii) such party has considered the implications of this waiver; (iii) such party makes this waiver voluntarily; and (iv) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 9(c).

(d)    Section Headings.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(e)    Construction.  This Agreement has been freely and fairly negotiated between the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.

10.    MISCELLANEOUS.

(a)    Notices.  All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission). Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10(a)).

|                    |                              |
|--------------------|------------------------------|
| If to the Company: | [COMPANY ADDRESS]            |
|                    | E-mail: [E-MAIL ADDRESS]     |
|                    | Attention: [TITLE OF OFFICER]|
| with a copy to:    | [COMPANY LAW FIRM]           |
|                    | E-mail: [E-MAIL ADDRESS]     |
|                    | Attention: [ATTORNEY NAME]   |

10

|                              |                                    |
|------------------------------|------------------------------------|
| If to the Plan Sponsor:      | [PLAN SPONSOR ADDRESS]             |
|                              | E-mail: [E-MAIL ADDRESS]           |
|                              | Attention:      [TITLE OF OFFICER] |
| with a copy to:              | Brown Rudnick LLP                  |
|                              | 7 Times Square,                    |
|                              | New York, NY 10036                 |
|                              | Email:                             |
|                              | jfitzsimons@brownrudnick.com       |
|                              | Attention: Jonathan Fitzsimons     |
| If to a Permitted Transferee: | The address set forth in the joinder agreement in the form set forth in Exhibit A hereto. |

(b)      Cumulative Remedies. The rights and remedies provided in this Agreement are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

(c)      Successor and Assigns; No Third Party Beneficiaries.  This Agreement is not assignable by the either party without the prior written consent of the other party. This Agreement and its rights, powers and duties set forth herein will inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties. This Agreement is for the sole benefit of the Company and the Plan Sponsor and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

(d)      Non-Recourse. This Agreement may only be enforced against, and any claim, action, or proceeding based upon, arising out of or related to this Agreement may only be brought against, the persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, affiliate, agent, advisor, or representative of any party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any dispute related hereto, and (ii) in no event shall any Non-Recourse Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Non-Recourse Person.  The Non-Recourse Persons are intended third party beneficiaries of this Section 10(d) and shall be entitled to enforce this Section 10(d) as if a party directly hereto

11

(e)    <u>Equitable Relief</u>.  Each of the Company and the Plan Sponsor acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction.

(f)    <u>Survival</u>.  All representations and warranties of the parties contained in this Agreement shall survive the applicable Closing Date.

(g)    <u>Entire Agreement; Amendment and Waiver</u>. This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter contained herein, and supersedes all prior understandings among such parties with respect to the matters covered herein.  This Agreement may be amended, and the observance of any term of this Agreement may be waived, with (and only with) the written consent of the Company and the Plan Sponsor.

(h)    <u>Severability</u>.  If any provision of this Agreement or the application of such provision to any person or circumstance is held to be invalid by any court of competent jurisdiction, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid will not be affected thereby.

(i)    <u>Counterparts; Facsimile and PDF Signatures</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or portable document format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, each of the parties has executed this Plan Sponsor Contribution Agreement as of the date first above written.

**[NewCo, Inc.]**

By: _____

Name:

Title:

**Fahrenheit LLC**

By: _____

Name:

Title:

[Signature Page to Plan Sponsor Contribution Agreement]

## **Exhibit A**

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Plan Sponsor Contribution Agreement, dated as of [●], and as amended from time to time (the "Plan Sponsor Contribution Agreement"), among [NewCo, Inc.] (the "Company") and the stockholders of the Company parties thereto. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan Sponsor Contribution Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to the Plan Sponsor Contribution Agreement as of the date hereof as if he, she or it had executed the Plan Sponsor Contribution Agreement as the Plan Sponsor. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions applicable to the Plan Sponsor contained in the Plan Sponsor Contribution Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

**[JOINING PARTY]**

By: _____

Name:    [●]
Title:    [●]

Address: [●]

Date: [●]

**<u>Exhibit F</u>**

**Paxos Custodial Agreement**

DRAFT

# CUSTODIAL SERVICES AGREEMENT

**THIS CUSTODIAL SERVICES AGREEMENT** (this "**Agreement**") is made and entered into effect on September __, 2023 (the "**Effective Date**") by and between [Celsius Network LLC], a Delaware limited liability company ("**Client**"), and Paxos Trust Company, LLC, a New York limited purpose trust company ("**Paxos**" and together with Client, the "**Parties**" and each, a "**Party**").

**WHEREAS**, Paxos is a regulated financial institution (licensed as a New York limited purpose trust company) that provides custody services for certain Digital Assets (the "**Custodial Services**");

**WHEREAS**, Client and certain of its affiliates are debtors-in-possession under title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and on July 13, 2022, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") captioned as Case Number 22-10964 (MG) (the "**Case**");

**WHEREAS**, on August 9, 2023, Client filed a revised proposed Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (as such may be amended or supplemented hereafter, and further subject to and as may hereafter be approved by the Court, the "**Plan**");

**WHEREAS**, Client desires to obtain access to and use the Custodial Services to hold Digital Assets on its behalf or on behalf of its creditors who may become entitled to receive distributions of Digital Assets from Client's assets in accordance with the orders of the Court and any approved Plan, and on behalf of its customers that the Court has determined own certain custodial Digital Assets currently held by Client on behalf of such customers (such creditors and custodial customers collectively the "**End Users**"); and

**WHEREAS**, Client has, contemporaneous with execution of this Agreement, entered into a separate agreement with PayPal, Inc. ("**PayPal**") whereby Client agrees to utilize the services of PayPal for the transfer and distribution of certain Digital Assets and/or Fiat currency to End Users.

**NOW THEREFORE**, in consideration of the mutual promises and covenants herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows.

1.    **APPOINTMENT**

1.1.    Subject to approval of the Court, Client hereby appoints Paxos as custodian of the Digital Assets held under this Agreement. Paxos hereby accepts such appointment and agrees to establish on its books, pursuant to the terms of this Agreement a custody account or accounts for the receipt, safekeeping and maintenance of the Digital Assets (together, the "**Custody Account**").

1.2.    **Acceptance of Digital Assets.** Paxos will accept those Digital Assets into custody as set forth in clause 1 of Schedule 1, or as may otherwise be mutually agreed by the Parties from time to time, and will hold such Digital Assets in registered form in Client's name; provided, however, that Paxos may refuse custody of any Digital Asset at its sole discretion, acting reasonably, if the acceptance thereof may violate applicable law or the terms of this Agreement or pose a material risk to either Client or Paxos.  In the event that Paxos refuses custody of any Digital Asset, Paxos shall provide Client with a written explanation of the reasons for such refusal (to the extent permissible under

applicable law or regulatory guidance) and shall reasonably cooperate with and assist Client to find legally compliant alternative solutions for such rejected Digital Assets.

1.3.    **Designation of Accounts.** The Custody Account will be in the name of Client, in each case as set forth in Schedule 1 and as Client may reasonably designate to Paxos in writing. Paxos shall segregate via subledgering, the Custody Account and all Client provided Digital Assets from the proprietary property of Paxos and the Digital Assets of other clients.

1.4.    **Status of Custodian**. Paxos Trust Company, LLC is a limited liability company and limited purpose trust chartered and regulated by the New York State Department of Financial Services. As a limited purpose trust company licensed by the New York State Department of Financial Services, Custodian is a trust company and bank under §100 of the New York Banking Law. The address of Paxos is 450 Lexington Ave., #3952, New York, NY 10017.

1.5.    **Effectiveness of Agreement; Subject to Court Approval**. Notwithstanding anything to the contrary herein, this Agreement shall be subject to, and shall be effective immediately upon, order of the Court authorizing the Client to enter into this Agreement, subject to any conditions imposed by the Court in such order, that are agreed upon by Paxos, provided that such order shall not have been stayed (or if such order is stayed, then upon the earliest of expiration or termination of such stay).

2.    **CUSTODY ACCOUNT PROCEDURES**

2.1.    **Credits to the Custody Account.** Paxos is not obligated to credit any Digital Assets to the Custody Account before Paxos actually receives such Digital Assets by final settlement.

2.2.    **Debits to the Custody Account**. If Paxos receives any Instruction (pursuant to Section 3 below) that would result in the delivery of Digital Assets exceeding the credit to the Custody Account for that Digital Asset, Paxos may, in its sole and absolute discretion, not act on such Instruction until sufficient Digital Assets are available in the Custody Account or request a revised Instruction from the Client.

2.3.    **Investment in Digital Assets**. Except as otherwise set forth in Section 12.3, Client shall bear the sole risk and expense associated with any loss of value of Digital Assets and with any loss of use of any Digital Asset that becomes orphaned by virtue of any Fork or failure of the blockchain underlying such Digital Asset.

3.    **INSTRUCTIONS**

3.1.    **Authorized Persons**. Client shall designate persons authorized to act on its behalf in the performance of any act, discretion or duty under this Agreement ("**Authorized Persons**") in a form reasonably acceptable to Paxos, an example of which is attached hereto as Schedule 2, which shall include the contact information, title and specimen signature of such persons. If at any time there are no Authorized Persons designated by Client, the officers of Client designated by the Court to

1

act on behalf of Client shall be deemed Authorized Persons hereunder. Paxos is entitled to rely and act upon Instructions of any Authorized Person unless or until Paxos (i) receives written notice of any change thereto from Client and (ii) has a reasonable time to note and implement such change.

3.2.    **Instruction**. Paxos may act upon and rely upon any Instruction received from, or reasonably believed by Paxos to be from, an Authorized Person, subject to compliance with the validation procedures set forth in Schedule 1. The validation procedures are designed only to verify the source of the Instruction and not to detect errors in the content of that Instruction or to prevent duplicate Instructions. Client agrees that Paxos is not responsible for any errors made by or on behalf of Client (other than by Paxos) or any errors resulting, directly or indirectly, from fraud or the duplication of any Instruction by or on behalf of Client.

3.3.    **Rejection of Instruction**. Paxos may decide not to act on an Instruction where it reasonably doubts such Instruction's contents, authorization, origination or compliance with any procedures in place, and Paxos covenants to promptly notify Client of its decision in such instance.

3.4.    **Cut-Off Times**. Paxos is only obligated to act on Instructions during normal business hours on days in which Paxos and the applicable financial markets are open for business in the ordinary course.

4.    **ANTI-MONEY LAUNDERING COMPLIANCE AND CIP; SANCTIONS SCREENING**

4.1.    **Paxos Requirements.** Client transactions will be subject to Paxos ongoing due diligence requirements, including know your client (KYC) procedures and monitoring, including sanctions screening, customer risk rating and engaging in customer due diligence and enhanced due diligence as appropriate and in accordance with Paxos' regulatory obligations.  Client agrees to cooperate in connection with any such regulatory requirements and provide any information reasonably requested by Paxos that may be required for Paxos' compliance with its regulatory obligations.

4.2.    **AML and KYC.** In the event that Client submits an Instruction to Paxos to transfer Digital Assets from the Custody Account to a Digital Asset wallet address other than the PayPal Distribution Account, Paxos may require that, Client confirm to Paxos that it has performed (or that PayPal has performed on Client's behalf) appropriate anti-money laundering (AML) and know your client (KYC) reviews as required by applicable law and consistent with international money transmitter policies with respect to the End Users and wallet addresses included in such Instruction. Client will provide Paxos evidence of such AML and KYC reviews as reasonably requested by Paxos. Notwithstanding the foregoing, Client shall be entitled to rely upon PayPal's AML and KYC services with respect to distributions made through the PayPal Distribution Account, and Client shall not be required to maintain separate AML or KYC programs for such distributions.

5.    **PERFORMANCE BY PAXOS**

5.1.    **Custodial Duties Requiring Instructions.** Upon receipt of a specific Instruction, Paxos shall carry out the following applicable actions requested and authorized by such Instruction:

i.        Receive, deliver or dispose of any Digital Assets, except as otherwise specifically provided for in this Agreement;

ii.       Carry out any action affecting Digital Assets and the Custody Account; provided, however, that (a) each instance shall be subject to the prior approval and agreement of Paxos and (b) all instructions regarding Forked Currencies are subject to Section 7; and

iii.     Transfer Digital Assets to the PayPal Distribution Account, except as otherwise specifically provided for in this Agreement.

5.2.    **Non-Discretionary Custodial Duties**. Absent a contrary Instruction, Paxos shall be permitted, and is hereby authorized and directed by Client, to carry out any of the following actions without any further Instructions or approval by or on behalf of Client:

i.        In Client's name or on its behalf, sign any affidavits, certificates of ownership and other certificates and documents relating to Digital Assets which may be required (a) to obtain any Digital Assets or (b) by any tax or regulatory authority having jurisdiction over the Digital Assets and the Custody Account;

ii.       Notify Client of notices, circulars, reports and announcements that require discretionary action, in each case, which Paxos has received in the course of acting in the capacity of custodian of any Digital Assets held on Client's behalf; and

iii.     Attend to all non-discretionary matters in connection with anything provided in this Section 5.2 or any Instruction.

5.3.    **Reporting**. Paxos will provide Client with access, via SFTP server, to a daily reconciliation file identifying the Digital Assets in the Custody Account and setting forth all transactions in the Custody Account.

6.    **TAX STATUS / WITHHOLDING STATUS**

6.1.    **Information.** The Parties will comply with applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable taxing authorities) in respect of the reporting and payment of any Taxes resulting from this Agreement (if any). Each Party will cooperate with the other Party to provide all available information as reasonably requested from time to time, as may be necessary or proper to fulfill their respective obligations under applicable law (if any).

6.2.    **Payment.** If any Taxes become payable with respect to any payment to be made to either Party, the other Party may withhold the amount of such Taxes from such payment to such Party and pay such withheld amounts over to the applicable governmental body in accordance with the requirements of applicable laws. Any amount so withheld and paid over shall be treated as having

3

been paid to the Party in respect of which such withholding was made. Each Party (or, if applicable, its regarded owner for U.S. federal income tax purposes) shall deliver an IRS Form W-9 to the other Party.

6.3.    **Tax Relief.** In the event Client requests, whether in its Instruction or other written agreement, that Paxos provide tax relief and Paxos agrees to provide such services, Paxos shall apply for appropriate tax relief (either by way of reduced tax rates at the time of an income payment or retrospective tax relief as is available in certain markets and as agreed from time to time); provided that the provision of any such tax relief shall require Client to provide to Paxos such documentation and information as to Client or its underlying beneficial owner as is reasonably necessary to secure such tax relief. In no event shall Paxos be responsible or liable for any Taxes resulting from the inability to secure tax relief, or for the failure of Client or any beneficial owner thereof to obtain the benefit of any credits, on the basis of foreign taxes withheld against income.

## 7.    DIGITAL CURRENCY FORKS

7.1.    **Fork Rights.** In the event of a Fork, Paxos retains the right, in its sole discretion, to determine whether or not to support (or cease supporting) each Forked Currency entirely, provided that Paxos will provide notice to Client of such determination promptly following such determination.

7.2.    **Unsupported Forked Currency**. In the event that Paxos determines, in its sole discretion, to not support any Forked Currency, Paxos shall distribute the unsupported Forked Currency to Client in a commercially reasonable manner within (i) ten (10) days from the last day of support by Paxos for such Forked Currency; provided that such ten (10)-day period may be extended by an additional twenty (20) days (to up to thirty (30) total days) from the last day of support by Paxos for such Forked Currency so long as Paxos continues to support such Forked Currency for such thirty (30)-day period in a manner that is sufficient to enable Paxos to return such Forked Currency to Client; or (ii) such other period as may be agreed between the Parties. Client acknowledges that there may be a delay between a Fork and the distribution of an unsupported Forked Currency to Client. Client agrees that Paxos will not be liable for any loss in value of the unsupported Forked Currency during such transfer period.

7.3.    **Support of Forked Currency.** In the event that Paxos opts to support both Forked Currencies and Client does not instruct Paxos otherwise, then both Forked Currencies become Digital Assets subject in all respects to this Agreement, including, without limitation, any fees charged by Paxos relating hereto.

## 8.    TRANSFER; FLUCTUATION IN VALUE OF DIGITAL ASSETS

8.1.    **Transfer.** Client, in its sole discretion, may transfer Digital Assets, including to PayPal's account on the Exchange (the "**PayPal Distribution Account**"), for purposes of distributing the Digital Assets to End Users by providing an Instruction as described herein. Client acknowledges that there may be a delay, which shall be no longer than twenty-hour (24) hours, between Paxos' receipt of a

valid Instruction to transfer Digital Assets and the availability of such Digital Assets in the PayPal Distribution Account.

8.2. **Value Fluctuation.** Client understands that the value of the Digital Assets and any unsupported Forked Currency can fluctuate substantially, which may result in a significant or total loss of the value of the Digital Assets or the unsupported Forked Currency held by Paxos on Client's behalf. Subject to Section 12.3 and solely with respect to any loss due to the fluctuation of the value of the Digital Assets or the unsupported Forked Currency, Client agrees that Paxos will not be liable for such loss in value of the Digital Assets or unsupported Forked Currency at any time.

8.3. **Digital Assets Supported by Paxos.** Client understands that Paxos only supports specific types of Digital Assets (including those listed on Schedule 1) and that Paxos does not provide Custodial Services or any other services with respect to unsupported Digital Assets.  In the event that Paxos determines to cease to support any a specific type of Digital Asset previously accepted for custody under this Agreement (other than as provided above in the case of a Fork), Paxos shall, wherever possible and permissible under applicable law or the direction of its regulators, provide Client reasonable written notice in advance of such change in supported Digital Asset types, and shall provide reasonable cooperation and assistance in order to facilitate moving any affected Digital Assets within Paxos' custody to a third party custodian at Client's sole discretion at Client's cost, subject to Paxos compliance with applicable law and the direction of its regulators.

9. **REPRESENTATIONS AND WARRANTIES**

9.1. **General.** Each party hereto represents and warrants to the other party, as of the date of this Agreement, that:

   i.      It is duly organized and in good standing in its jurisdiction of formation;

   ii.     It has the requisite power and authority to execute this Agreement and to perform its obligations hereunder;

   iii.    It has taken all necessary action to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby;

   iv.     This Agreement, when executed and delivered, will be its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy or other similar laws;

   v.      Any consent, authorization or Instruction required in connection with its execution and performance of this Agreement has been provided by any relevant third party;

   vi.     Any act reasonably required by any relevant governmental or other authority to be done in connection with its execution and performance of this Agreement has been or will be done (and will be renewed if necessary); and

5

vii.    Neither the execution nor performance of this Agreement by such party will materially breach any applicable law, regulation, contract or other requirement to which such party is bound.

9.2.    **Client.** In addition to the general representations set forth in Section 9.1, Client also represents, warrants and covenants to Paxos that:

i.    It has the requisite power and authority to deposit the Digital Assets in the Custody Account;

ii.    There is no claim pending, or to Client's knowledge, threatened, and no encumbrance or other lien, in each case, that may adversely affect any delivery of Digital Assets made in accordance with this Agreement;

iii.    Where it acts as an agent on behalf of any of its End Users, whether or not expressly identified to Paxos from time to time, any such End Users shall not be customers or indirect customers of Paxos by virtue of the Custodial Services provided hereunder; and

iv.    It has not relied on any oral or written representation or warranties made by Paxos or any other person on Paxos's behalf, other than those explicitly set forth in Section 9.1.

9.3.    **Paxos**. In addition to the general representations set forth in Section 9.1, Paxos also represents, warrants and covenants to Client that Paxos has implemented and will maintain a reasonable information security program in accordance with the Security Addendum attached hereto.

## 10.    SCOPE OF RESPONSIBILITY

10.1.    **Standard of Care.** Paxos shall exercise the due care of a professional custodian, in accordance with applicable industry standards within the State of New York.

10.2.    **Limitations on Paxos' Responsibility.**

i.    **General.** Paxos shall only be responsible for the performance of those duties as are expressly set forth herein, including the performance of any Instruction given in accordance with this Agreement. Paxos shall have no implied duties or obligations whatsoever.

ii.    **No Liability for Third Parties.** Paxos is not responsible for the acts, omissions, defaults or insolvency of any third party, including, but not limited to PayPal.

iii.    **Performance Subject to Laws.** Client understands and agrees that Paxos' performance of this Agreement is subject to the relevant local laws, regulations, decrees, orders and government acts.

iv.    **Preventing Performance.** Paxos will not be responsible for any failure to perform any of its obligations if such performance is prevented, hindered or delayed by a Force Majeure Event. In such case, Paxos's obligations will be suspended for so long as the Force Majeure Event continues. In the event that a Force Majeure Event suspends Paxos's performance of any of its obligations for a duration that exceeds thirty (30) days, Client shall have the right, upon written notice to Paxos, to immediately terminate this Agreement.

v.    **Validity of Digital Assets.** Paxos shall exercise reasonable care in receiving Digital Assets but does not warrant or guarantee the authenticity, value or validity of any Digital Asset received by Paxos.

vi.    **Capacity of Custodian.** Paxos is not acting under this Agreement as an investment manager, nor as an investment, legal or tax adviser to Client, and Paxos' duty is solely to act as a custodian in accordance with the terms of this Agreement.

vii.    **Forwarded Information.** Paxos is not responsible for the form, accuracy or content of any notice, circular, report, announcement or other material provided under Section 5.2(ii) of this Agreement not prepared by Paxos.

## 11.    SUBROGATION

To the extent permissible by law or regulation and upon Client's written request, Client shall be subrogated to the rights of Paxos with respect to any claim for any loss, damage or claim suffered by Client, in each case, to the extent that Paxos fails to pursue any such claim or Client is not made whole in respect of such loss, damage or claim. Notwithstanding any other provision hereof, in no event is Paxos obliged to bring suit in its own name or to allow suit to be brought in its name.

## 12.    INDEMNITY; LIABILITY

12.1.    **Indemnity to Paxos.** Client agrees to indemnify Paxos, its parent companies, subsidiaries and affiliates, its and their respective directors, officers, employees, representatives, agents and consultants (the "**Paxos Indemnified Parties**") and to defend and hold the Paxos Indemnified Parties harmless from all losses, damages, reasonable and documented costs and expenses (including reasonable and documented legal fees), and liabilities for any third-party claims, demands or actions (each, a "**Loss**"), incurred by the Paxos Indemnified Parties to the extent resulting from (i) Client's or any End User's actions or inaction in connection with this Agreement, or (ii) an Instruction given by Client, an Authorized Person or on which Paxos is entitled to rely hereunder, except in each case (i) and (ii) with respect to the extent of any such Loss resulting from Paxos or any such Paxos Indemnified Party's failure to comply with federal or state laws and regulations applicable to it, failure to execute valid and clear Instructions, self-dealing, breach of fiduciary duty (if any) or actions or omissions to act arising out of mistake or misconduct (including but not limited to negligence, willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts).

7

12.2.    **Client's Direct Liability.** The disclosure by Client to Paxos that Client has entered into this Agreement as the agent or representative of another person shall not relieve Client of any of its obligations under this Agreement, including Section 12.1.

12.3.    **Limitation of Liability.**

i.    EXCEPT AS PROVIDED IN SECTION 12.3(ii), (A) IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE, OR PROFIT OR LOSS OF DATA OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) IN NO EVENT WILL EITHER PARTY'S LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE LESSER OF (Y) THE REPLACEMENT OF ANY FUNDS OR DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AND (Z) THE MARKET VALUE OF THE DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AT THE TIME SUCH PARTY REASONABLY SHOULD HAVE BEEN AWARE OF SUCH LOSS OR DAMAGE.

ii.    <u>Exceptions</u>.  The exclusions and limitations in Section 12.3(i) shall not apply to:

(a)    Losses arising out of or relating to Paxos' gross negligence or more culpable conduct, including any fraud, willful misconduct or intentional wrongful acts;

(b)    Losses arising from a Party's indemnification obligations hereunder;

(c)    A Party's failure to comply with federal or state laws and regulations applicable to it;

(d)    Paxos' failure to properly execute the Custodial Services, including without limitation the failure to correctly execute valid and clear Instructions and/or the failure to safekeep the Digital Assets (each failure an "**Error**"), provided that in such case the Loss shall be limited to the notional value of the Digital Assets at 12:01 a.m. Prevailing Eastern Time on the date of such Error; or

(e)    Losses for death, bodily injury, or damage to real or tangible personal property arising out of or relating to a Party's negligent or more culpable acts or omissions.

13.    **INFORMATION**

13.1.    Each of Paxos and Client agrees that during the term of this Agreement and for a period of two (2) years thereafter, it will maintain any confidential and proprietary information disclosed to it by the

other party hereto ("**Confidential Information**") in a confidential manner using the same care it uses to protect the confidentiality of its own confidential information, and will not use for its own benefit or otherwise the Confidential Information of the other party except (i) as expressly authorized by this Agreement and to the extent necessary for performance of this Agreement or (ii) upon the prior written consent of the other party; provided, however, that each of Paxos and Client may disclose any such confidential or proprietary information of the other party to those of its affiliates and its and their respective officers, directors, employees, agents (including attorneys and financial advisors), and contractors, in each case, who need to know such information for purposes of this Agreement and who are bound by confidentiality obligations consistent with the terms hereof. Notwithstanding the foregoing, Confidential Information shall not include information that was (i) publicly available prior to disclosure by such disclosing party, (ii) already in the receiving party's possession and not subject to an obligation of confidentiality, (iii) obtained by the receiving party from a third party without restriction on disclosure or (iv) entirely independently developed by the receiving party without reference to any Confidential Information of the disclosing party.

13.2.    If, at any time, the receiving party is required by law or regulation to make any disclosure of any of the Confidential Information, by subpoena, judicial or administrative order or otherwise, the receiving party shall (to the extent permissible and practicable under the circumstances) give prompt prior written notice of such requirement to the disclosing party and permit the disclosing party to intervene in any relevant proceedings to protect its interests in the Confidential Information, and provide reasonable cooperation and assistance to the disclosing party in seeking to obtain such protection, at the disclosing party's sole expense. Notwithstanding the foregoing, Paxos may disclose Client's Confidential Information to Paxos' regulators without any notice thereof.

13.3.    Notwithstanding the foregoing, Client agrees that Paxos' governing regulatory authority, the New York Department of Financial Services ("**DFS**"), shall have the right to examine all books, records and information of Client as maintained by Paxos to the extent relating to the services provided by Paxos hereunder.

14.    **ADVERTISING**

Neither Client nor Paxos shall display the name, trademark, or service mark of the other without the prior written approval of the other. Client shall not advertise or promote the services provided by Paxos hereunder without Paxos's prior written consent.

15.    **TERMINATION**

15.1.    **Termination for Convenience**. Either Party may terminate this Agreement in whole or in part, with or without cause, by giving not less than six (6) months prior written notice to the other Party.

15.2.    **Termination for Cause**. Without prejudice to any accrued rights and remedies under this Agreement, either Party may terminate this Agreement immediately by giving written notice to the other Party if the other party commits any material breach of any of its obligations under this

Agreement and, in the case of any breach which is capable of remedy, fails to remedy such breach within fourteen (14) days of delivery of a written notice specifying such breach (or such longer period as the notice may specify).

15.3. **Termination for Regulatory Reasons**.  Either Party may terminate this Agreement in the event such Party is required to terminate at the direction of applicable governmental regulators pursuant to a valid court order or other binding document setting forth such termination requirement.

15.4. **Effect of Property.** Upon termination of this Agreement for any reason and subject to Paxos's compliance with applicable law, Paxos shall deliver the Digital Assets as instructed by Client or any Authorized Person in writing. If by the termination date Client or any Authorized Person has not given instructions to Paxos regarding where to deliver any Digital Assets, Paxos will continue to safekeep such Digital Assets until Client or any Authorized Person provides such written Instructions to effect a free delivery of such and Client shall be liable to pay monthly storage fees in the amount of the monthly storage fee then in effect until all Digital Assets are delivered to Client. However, Paxos will provide no other services with respect to any such Digital Assets following termination. Notwithstanding termination of this Agreement or any Instruction, Paxos may retain sufficient Digital Assets to close out or complete any transaction that was in process prior to such termination or to pay any amounts otherwise outstanding hereunder.

15.5. **Surviving Terms**. [The rights and obligations contained in Sections 9, 11, 15, 16, 17 and 18 of this Agreement shall survive the termination of this Agreement.][1]

## 16.    GOVERNING LAW AND JURISDICTION

16.1. **Governing Law.** This Agreement is solely and exclusively governed, construed and enforced in accordance with the laws of the State of New York (without regard to the conflicts of law provisions thereof).

16.2. **Jurisdiction.** Both parties submit to personal jurisdiction in the federal and state courts located in New York City, State of New York, and further agree that any and all claims and controversies arising out of this Agreement that cannot be amicably resolved by the parties shall be brought solely and exclusively in the Court if subject matter jurisdiction lies therein, and otherwise if the Court lacks such jurisdiction in a court having subject matter jurisdiction located in New York City, State of New York.

16.3. **Venue.** Each party hereto waives any objection it may have at any time, to the laying of venue of any actions or proceedings brought in an inconvenient forum and further waives the rights to object that such court does not have jurisdiction over such parties.

---

[1] Note to Draft: To be updated.

16.4.    **Sovereign Immunity.** Client and Paxos each irrevocably waives, with respect to itself and its revenues and Digital Assets, all immunity on the ground of sovereignty or similar grounds in respect of its obligations under this Agreement.

17.    **MISCELLANEOUS**

17.1.    **Entire Agreement; Amendments.** This Agreement consists exclusively of this document together with the schedules hereto. Except as specified in this Agreement, the Agreement may only be modified by written agreement of Client and Paxos.

17.2.    **Severability.** If any provision of this Agreement is or becomes illegal, invalid, or unenforceable under any applicable law, the remaining provisions shall remain in full force and effect (as shall that provision under any other law).

17.3.    **Waiver of Rights.** No failure or delay of Client or Paxos in exercising any right or remedy under this Agreement shall constitute a waiver of that right. Any waiver of any right will be limited to the specific instance. The exclusion or omission of any provision or term from this Agreement shall not be deemed to be a waiver of any right or remedy Client or Paxos may have under applicable law.

17.4.    **Assignment.** No party may assign or transfer any of its rights or obligations under this Agreement without the other's prior written consent, which consent will not be unreasonably withheld or delayed; provided; however, that Client may make such assignment or transfer without Paxos's consent to an entity in which Client has sole ownership interest or a successor entity in the event of Client's dissolution or otherwise winding down of Client entity.

17.5.    **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including, without limitation, any reorganized Client.

17.6.    **Headings.** Titles to Sections of the Agreement are included for convenience of reference only and shall be disregarded in construing the language contained in this Agreement.

17.7.    **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

18.    **DEFINITIONS AND INTERPRETATION.**

For purposes of this Agreement and any exhibit or schedule hereto, the following terms shall have the meanings ascribed to them below:

18.1.    "**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, which blockchains include the digital token blockchains set forth in Schedule 1 together with any

additional blockchains supported from time to time by Paxos, in each case where such tokens are held from time to time held for Client under the terms of this Agreement.

18.2.    "**Exchange**" means the virtual crypto-currency exchange operated by Paxos.

18.3.    "**Force Majeure Event**" means any event due to any cause beyond the reasonable control of Paxos, such as restrictions on convertibility or transferability, requisitions, involuntary transfers, unavailability of communications system, sabotage, fire, flood, explosion, acts of God, civil commotion, pandemics, strikes or industrial action of any kind, riots, insurrection, war or acts of government.

18.4.    "**Fork**" means an event in which (i) a blockchain underlying a Digital Asset has been changed in a way that makes it incompatible with respect to future transactions and blocks with the unchanged version of the blockchain, (ii) a material population of miners or validators, as applicable, and/or users of the such Digital Asset accept the changes, and (iii) the two resulting blockchains have not been merged together in a timely manner.

18.5.    "**Forked Currency**" means the resulting branches of a blockchain that has undergone a Fork.

18.6.    "**Instruction**" means any instruction, limitation, approval, consent or notice provided hereunder.

18.7.    "**Taxes**" means all taxes, levies, imposts, charges, assessments, deductions, withholdings and related liabilities, including, without limitation, additions to tax, penalties and interest imposed on or in respect of (i) Digital Assets, (ii) the transactions effected under this Agreement or (iii) Client; *provided*, however, that "Taxes" do not include income or franchise taxes imposed on or measured by the net income of Paxos or its agents.

[Signature Page Follows]

12

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized.


[CELSIUS NETWORK LLC]

By:_____

Name:_____

Title:_____


PAXOS TRUST COMPANY, LLC

By:_____

Name:_____

Title:_____

## SCHEDULE 1
## DIGITAL ASSETS, WITHDRAWAL

●    <u>Digital Assets</u>: Bitcoin (BTC), Ethereum (ETH)

●    <u>Withdrawing or Transferring Digital Assets and Unsupported Forked Currencies</u>. In order to withdraw or transfer Digital Assets or unsupported Forked Currencies from the Custody Account to the PayPal Distribution Account, an Authorized Person designated by Client must sign a written Instruction specifying the amount and destination of the withdrawal or transfer, as well as such other details as Paxos may reasonably request. The written instructions must be delivered to the following email address or such other address as may be notified by Paxos to Client from time to time: info@paxos.com.

     A.    Following receipt of the Instruction requesting withdrawal or transfer, Paxos will verify the instructions by calling two other Authorized Persons at the contact numbers provided by Client.

     B.    If the withdrawal or transfer Instruction is verified in accordance with this Schedule 1, Paxos shall transfer the Digital Assets or unsupported Forked Currencies as specified therein.

●    <u>Timing; Size</u>. Generally, delivery of Digital Assets to a destination specified by Client will be completed within twelve (12) business hours (i.e., 9AM to 5PM EST) of Paxos' receipt of such Instruction. The Parties agree that withdrawal or transfer of the Digital Assets from the Custody Account to the PayPal Distribution Account will happen in tranches of not less than $[●][2] worth of Digital Asset per Digital Asset.

●    <u>Authentication of Other Instructions</u>. Paxos may rely on the signature of an Authorized Person for any Instructions other than Instructions to withdraw or transfer Digital Assets or unsupported Forked Currencies.

---

[2] Note to Draft: Parties to discuss.

**SCHEDULE 2**
**FORM OF INSTRUCTION**

**[To be added]**

## SECURITY ADDENDUM

[To be added]

**<u>Exhibit G</u>**

**Coinbase Agreements**

# COINBASE PRIME BROKER AGREEMENT

## General Terms and Conditions

### 1.      Introduction

This agreement (including, the Coinbase Custody Custodial Services Agreement attached hereto as Exhibit A (the "Custody Agreement"), the Coinbase Master Trading Agreement attached hereto as Exhibit B (the "MTA"), and all other exhibits, addenda and supplements attached hereto or referenced herein, collectively, the "Coinbase Prime Broker Agreement"), is entered into by and between Celsius Network LLC, ("Client"), and Coinbase, Inc. ("Coinbase"), on behalf of itself and as agent for Coinbase, Coinbase Custody Trust Company, LLC ("Coinbase Custody"), and, as applicable, Coinbase Credit, Inc. ("Coinbase Credit," and collectively with Coinbase and Coinbase Custody, the "Coinbase Entities"). This Coinbase Prime Broker Agreement sets forth the terms and conditions pursuant to which the Coinbase Entities will open and maintain the prime broker account (the "Prime Broker Account") for Client and provide services relating to custody, trade execution, lending or post-trade credit (if applicable), and other services (collectively, the "Prime Broker Services") for certain digital assets ("Digital Assets") as set forth herein. Client and the Coinbase Entities (individually or collectively, as the context requires) may also be referred to as a "Party". Capitalized terms not defined in these General Terms and Conditions (the "General Terms") shall have the meanings assigned to them in the respective exhibit, addendum or supplement. In the event of a conflict between these General Terms and any exhibit, addendum or supplement hereto, then the document governing the specific relevant Prime Broker Service shall control in respect of such Prime Broker Service.

### 2.      Conflicts of Interest Acknowledgement

Client acknowledges that the Coinbase Entities may have actual or potential conflicts of interest in connection with providing the Prime Broker Services including that (i) Orders (as such term is defined in the MTA) may be routed to Coinbase's exchange platform where Orders may be executed against other Coinbase customers or with Coinbase acting as principal, (ii) the beneficial identity of the purchaser or seller with respect to an Order is unknown and therefore may inadvertently be another Coinbase client, (iii) Coinbase does not engage in front-running, but is aware of Orders or imminent Orders and may execute a trade for its own inventory (or the account of an affiliate) while in possession of that knowledge and (iv) Coinbase may act in a principal capacity with respect to certain Orders (*e.g.*, to fill residual Order size) when a portion of an Order may be below the minimum size accepted by the Connected Trading Venues (as defined in the MTA). As a result of these and other conflicts, the Coinbase Entities may have an incentive to favor their own interests and the interests of their affiliates over a particular Client's interests and has in place certain policies and procedures in place that are designed to mitigate such conflicts.

### 3.      Account Statements

Client authorizes Coinbase to combine information regarding all Prime Broker Services activities into a single statement. Coinbase will provide Client with an electronic account statement every month, at a minimum. Each account statement will identify the amount of cash and each Digital

Asset in Client's Prime Broker Account at the end of the period and set forth all Prime Broker Account activity during that period.

**4.      Client Instructions**

4.1     In a written notice to Coinbase, Client may designate persons and/or entities authorized to act on behalf of Client with respect to the Prime Broker Account (the "Authorized Representative"). Upon such designation, Coinbase may rely on the validity of such appointment until such time as Coinbase receives Instructions from Client revoking such appointment or designating a new Authorized Representative.

4.2     The Coinbase Entities may act upon instructions received from Client or Client's Authorized Representative ("Instructions"). When taking action upon Instructions, the applicable Coinbase Entity shall act in a reasonable manner, and in conformance with the following: (a) Instructions shall continue in full force and effect until executed, cancelled or superseded; (b) if any Instructions are ambiguous, the applicable Coinbase Entity shall refuse to execute such Instructions until any such ambiguity has been resolved to the Coinbase Entity's satisfaction; (c) the Coinbase Entities may refuse to execute Instructions if in the applicable Coinbase Entity's opinion such Instructions are outside the scope of its obligations under this Coinbase Prime Broker Agreement or are contrary to any applicable laws, rules and regulations; and (d) the Coinbase Entities may rely on any Instructions, notice or other communication believed by it in good faith to be given by Client or Client's Authorized Representative. Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability with respect to, any and all Claims and Losses arising out of or relating to inaccurate or ambiguous Instructions.

4.3     Coinbase will comply with the Client's Instructions to stake, stack or vote the Client's Digital Assets to the extent the applicable Coinbase Entity supports proof of stake validation, proof of transfer validation, or voting for such Digital Assets. The Coinbase Entities may, in their sole discretion, decide whether or not to support (or cease supporting) staking services or stacking or voting for a Digital Asset.

**5.      Representations, Warranties, and Additional Covenants**

Client represents, warrants, and covenants that:

5.1     Client is currently under supervision of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") following the filing of voluntary bankruptcy (collectively, the "Chapter 11 Cases") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

5.2     Subject to the Bankruptcy Code, any orders of the Bankruptcy Court, and the Bankruptcy Court's approval of Client's entry into this Coinbase Prime Broker Agreement, Client has the full power, authority, and capacity to enter into this Coinbase Prime Broker Agreement and to engage in transactions with respect to all Digital Assets relating to the Prime Broker Services;

2

5.3     Except as disclosed to the Coinbase Entities, Client, to the best of its knowledge, is and shall remain in full material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Client operates or otherwise uses the Prime Broker Services, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including AML Laws, USA PATRIOT Act and Bank Secrecy Act requirements, and other anti-terrorism statutes, regulations, and conventions of the United States or other international jurisdictions;

5.4     Except as disclosed to the Coinbase Entities, Client is and shall remain materially in good standing with all relevant government agencies, departments, regulatory, and supervisory bodies in all relevant jurisdictions in which Client does business, and Client will promptly notify Coinbase if Client ceases to be in good standing with any regulatory authority;

5.5     Client shall promptly provide information as the Coinbase Entities may reasonably request in from time to time regarding: (a) Client's policies, procedures, and activities which relate to the Prime Broker Services, and (b) Client's use of the Prime Broker Services, in each case to the extent reasonably necessary for the Coinbase Entities to comply with any applicable laws, rules, and regulations (including money laundering statutes, regulations and conventions of the United States or other jurisdictions), or the guidance or direction of, or request from, any regulatory authority or financial institution;

5.6     Client's use of the Prime Broker Services shall be for commercial, business purposes only, limited to activities disclosed in the due diligence information submitted to Coinbase, and shall not include any personal, family or household purposes. Client shall promptly notify Coinbase in writing in the event it intends to use the Prime Broker Services in connection with any business activities not previously disclosed to Coinbase. Coinbase may, in its sole discretion, prohibit Client from using the Prime Broker Services in connection with any business activities not previously disclosed;

5.7     Client's Authorized Representatives have the (a) full power, authority and capacity to access and use the Prime Broker Services and (b) appropriate sophistication, expertise, and knowledge necessary to understand the nature and risks, and make informed decisions, in respect of Digital Assets and the Prime Broker Services;

5.8     Client either owns or possess lawful authorization to transact with all Digital Assets involved in any Custody Transactions;

5.9     This Coinbase Prime Broker Agreement is Client's legal, valid, and binding obligation, enforceable against it in accordance with its terms; and

5.10    Unless Client advises Coinbase to the contrary in writing, at all times, none of Client's assets constitute, directly or indirectly, plan assets subject to the fiduciary responsibility and prohibited transaction sections of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), the prohibited transaction provisions of the Internal Revenue Code of 1986, as amended, or any federal, state, local or non-U.S. law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, and Client shall immediately provide Coinbase with

3

a written notice in the event that Client becomes aware that Client is in breach of the foregoing.

Coinbase, on behalf of itself and each other Coinbase Entity, represents, warrants, and covenants that:

5.11   It possesses and will maintain, all licenses, registrations, authorizations and approvals required by any applicable government agency or regulatory authority for it to operate its business and provide the Prime Broker Services;

5.12   It has the full power, authority, and capacity to enter into and be bound by this Coinbase Prime Broker Agreement; and

5.13   This Coinbase Prime Broker Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

## 6.   No Investment Advice or Brokerage

6.1   Client assumes responsibility for each transaction in or for its Prime Broker Account. Client understands and agrees that none of the Coinbase Entities are an SEC/FINRA registered broker-dealer or investment adviser to Client in any respect, and the Coinbase Entities have no liability, obligation, or responsibility whatsoever for Client decisions relating to the Prime Broker Services. Client should consult its own legal, tax, investment and accounting professionals.

6.2   While the Coinbase Entities may make certain general information available to Client, the Coinbase Entities are not providing and will not provide Client with any investment, legal, tax or accounting advice regarding Client's specific situation. Client is solely responsible, and shall not rely on the Coinbase Entities, for determining whether any investment, investment strategy, or transaction involving Digital Assets is appropriate for Client based on Client's investment objectives, financial circumstances, risk tolerance, and tax consequences. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever regarding any Client decision to enter into in any transaction with respect to any Digital Asset.

## 7.   Opt-In to Article 8 of the Uniform Commercial Code

Client Assets in the Trading Balance and Vault Balance will be treated as "financial assets" under Article 8 of the New York Uniform Commercial Code ("Article 8"). Coinbase and Coinbase Custody are "securities intermediaries," the Trading Balance and Vault Balance are each "securities accounts," and Client is an "entitlement holder" under Article 8. This Agreement sets forth how the Coinbase Entities will satisfy their Article 8 duties. Treating Client Assets in the Trading Balance and Vault Balance as financial assets under Article 8 does not determine the characterization or treatment of the cash and Digital Assets under any other law or rule. New York will be the securities intermediary's jurisdiction with respect to Coinbase and Coinbase Custody, and New York law will govern all issues addressed in Article 2(1) of the Hague Securities Convention. Coinbase and Coinbase Custody will credit the Client with any payments or distributions on any Client Assets it holds for Client's Trading Balance and Vault Balance.

Coinbase and Coinbase Custody will comply with Client's Instructions with respect to Client Assets in Client's Trading Balance or Vault Balance, subject to the terms of the MTA or Custody Agreement, as applicable, and related Coinbase rules, including the Coinbase Trading Rules (as such term is defined in the MTA).

**8.    General Use, Security and Prohibited Use**

8.1    *Prime Broker Site and Content*. During the term of this Coinbase Prime Broker Agreement, the Coinbase Entities hereby grant Client a limited, nonexclusive, non-transferable, non-sublicensable, revocable and royalty-free license, subject to the terms of this Coinbase Prime Broker Agreement, to access and use the Coinbase Prime Broker Site accessible at prime.coinbase.com ("Coinbase Prime Broker Site") and related content, materials, and information (collectively, the "Content") solely for Client's internal business use and other purposes as permitted by Coinbase in writing from time to time. Any other use of the Coinbase Prime Broker Site or Content is hereby prohibited. All other right, title, and interest (including all copyright, trademark, patent, trade secrets, and all other intellectual property rights) in the Coinbase Prime Broker Site, Content, and Prime Broker Services is and will remain the exclusive property of the Coinbase Entities and their licensors. Client shall not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Prime Broker Services or Content, in whole or in part. "Coinbase," "Coinbase Prime," "prime.coinbase.com," and all logos related to the Prime Broker Services or displayed on the Coinbase Prime Broker Site are either trademarks or registered marks of the Coinbase Entities or their licensors. Client may not copy, imitate or use them without Coinbase's prior written consent. The license granted under this Section 8.1 will automatically terminate upon termination of this Coinbase Prime Broker Agreement, or the suspension or termination of Client's access to the Coinbase Prime Broker Site or Prime Broker Services.

8.2    *Unauthorized Users.* Client shall not permit any person or entity that is not the Client or an Authorized Representative (each, an "Unauthorized User") to access, connect to, and/or use Client's Prime Broker Account. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, and Client shall be fully responsible and liable for, any and all Claims and Losses arising out of or relating to the acts and omissions of any Unauthorized User in respect of the Prime Broker Services, Prime Broker Account, and/or the Prime Broker Site. Client shall notify Coinbase immediately if Client believes or becomes aware that an Unauthorized User has accessed, connected to, or used Client's Prime Broker Account.

8.3    *Password Security; Contact Information*. Client is fully responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys, YubiKeys, other security or confirmation information or hardware, and any other codes that Client uses to access the Prime Broker Account and Prime Broker Services. Client agrees to keep Client's email address and telephone number up to date in Client's Prime Broker Account in order to receive any notices or alerts that the Coinbase Entities may send to Client. Client shall be fully responsible for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, any

5

Losses that Client may sustain due to compromise of Prime Broker Account login credentials. In the event Client believes Client's Prime Broker Account information has been compromised, Client must contact Coinbase immediately.

8.4 *Prohibited Use*. Client shall not engage in any of the following activities with its use of the Prime Broker Services:

8.4.1 *Unlawful Activity*. Activity that would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Coinbase conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information;

8.4.2 *Abusive Activity*. Actions that impose an unreasonable or disproportionately large load on Coinbase's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to Coinbase systems that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to Coinbase systems, other Coinbase accounts, computer systems or networks connected to Coinbase systems, Coinbase Site, through password mining or any other means; use Coinbase Account information of another party to access or use the Coinbase systems, except in the case of specific Clients and/or applications which are specifically authorized by a Client to access such Client's Coinbase Account and information; or transfer Client's account access or rights to Client's account to a third party, unless by operation of law or with the express permission of Coinbase; and

8.4.3 *Fraud*. Activity which operates to defraud Coinbase or any other person or entity.

8.5 *Computer Viruses*. The Coinbase Entities shall not have any liability, obligation, or responsibility whatsoever for any damage or interruptions caused by any computer viruses, spyware, scareware, Trojan horses, worms or other malware that may affect Client's computer or other equipment, or any phishing, spoofing or other attack, unless such damage or interruption directly resulted from the Coinbase Entities' gross negligence, fraud, or willful misconduct. Client agrees to access and use its Prime Broker Account through the Coinbase Prime Broker Site to review any Orders, deposits or withdrawals or required actions to confirm the authenticity of any communication or notice from the Coinbase Entities.

## 9. Taxes

9.1 *Taxes*. Except as otherwise expressly stated herein or required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities), Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, the payment of any and all present and future tariffs, duties or taxes (including withholding taxes, transfer taxes, stamp taxes, documentary taxes, value added

6

taxes, personal property taxes and all similar costs) imposed or levied by any government or governmental agency (collectively, "Taxes") and any related Claims and Losses or the accounting or reporting of income or other Taxes arising from or relating to any transactions Client conducts through the Prime Broker Services; *provided, however*, that for the avoidance of doubt, if any applicable legal requirement imposes information reporting or similar obligations with respect to the matters governed by this Agreement, the Coinbase Entities shall comply in full with any such requirements that apply to them and Client shall comply in full with any such requirements that apply to it.  The Client and the Coinbase Entities shall each file any and all Tax returns, reports, and disclosures required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities).

9.2    *Withholding Tax*. Except as required by applicable law, each payment under this Coinbase Prime Broker Agreement or collateral deliverable by Client to any Coinbase Entities shall be made, and the value of any collateral or margin shall be calculated, without withholding or deducting of any Taxes. If any Taxes are required to be withheld or deducted, Client (a) authorizes the Coinbase Entities to effect such withholding or deduction and remit such Taxes to the relevant taxing authorities and (b) shall pay such additional amounts or deliver such further collateral as necessary to ensure that the actual net amount received by the Coinbase Entities is equal to the amount that the Coinbase Entities would have received had no such withholding or deduction been required; *provided, however*, that the Coinbase Entities shall reasonably cooperate with Client to minimize or eliminate any such withholding or deduction requirements to the extent permitted by applicable Law. Client agrees that the Coinbase Entities may disclose any information with respect to Client Assets, the Prime Broker Account, Custodial Accounts, Trading Accounts, and transactions required by any applicable taxing authority or other governmental entity. The Client agrees that the Coinbase Entities may withhold or deduct Taxes as may be required by applicable law. From time to time, Coinbase Entities and the Client may request from the other tax documentation or certification of the Coinbase Entities' or Client's (as applicable) taxpayer status as required by applicable law, and any failure by the Coinbase Entities or Client (as applicable) to comply with this request in the time frame identified may result in withholding and/or remission of taxes to a tax authority as required by applicable law.

## 10.    Prime Broker Services Fees

10.1    Client agrees to pay all commissions and fees in connection with the Orders and Prime Broker Services on a timely basis as set forth in the fee schedule agreed between the parties. If agreed by Client and Coinbase in writing, Client authorizes the Coinbase Entities to pay themselves for fees and commissions relating to the Trading Account and Custodial Account by deducting fees from the Vault Balance or Trading Balance, as applicable, to satisfy Client's fees owed.

10.2    Client acknowledges that Coinbase's fees may include but are not limited to: (a) bank wire fees to deposit and/or withdraw Client Cash; (b) internal transfers from its Vault Balance to its Trading Balance; and (c) external withdrawals of Client Assets. Client further

7

acknowledges that Coinbase Custody will charge fees for any balance of Digital Assets that Client keeps in the Vault Balance.

**11.    Confidentiality**

11.1    Client and Coinbase Entities each agree that with respect to any non-public, confidential or proprietary information of the other Party, including the existence and terms of this Coinbase Prime Broker Agreement and information relating to the other party's business operations or business relationships (including the Coinbase Entities' fees), and any arbitration pursuant to Section 22 (collectively, "Confidential Information"), it (a) will not disclose such Confidential Information except to such party's officers, directors, agents, employees and professional advisors who need to know the Confidential Information for the purpose of assisting in the performance of this Coinbase Prime Broker Agreement and who are informed of, and agree to be bound by obligations of confidentiality no less restrictive than those set forth herein and (b) will protect such Confidential Information from unauthorized use and disclosure. Each Party shall use any Confidential Information that it receives solely for purposes of (i) exercising its rights and performing its duties under the Coinbase Prime Broker Agreement and (ii) complying with any applicable laws, rules and regulations; *provided* that, the Coinbase Entities may use Confidential Information for (1) risk management; and (2) to develop, enhance and market their products and services. Confidential Information shall not include any (w) information that is or becomes generally publicly available through no fault of the recipient; (x) information that the recipient obtains from a third party (other than in connection with this Coinbase Prime Broker Agreement) that, to the recipient's best knowledge, is not bound by a confidentiality agreement prohibiting such disclosure; (y) information that is independently developed or acquired by the recipient without the use of Confidential Information provided by the disclosing party; or (z) disclosure with the prior written consent of the disclosing Party.

11.2    Notwithstanding the foregoing, each Party may disclose Confidential Information of the other Party to the extent required by a court of competent jurisdiction or governmental authority or otherwise required by law; *provided, however*, the Party making such required disclosure shall first notify the other Party (to the extent legally permissible) and shall afford the other Party a reasonable opportunity to seek confidential treatment if it wishes to do so and will consider in good faith reasonable and timely requests for redaction. For purposes of this Section 11, no Affiliate (as defined below) of Coinbase shall be considered a third party of any Coinbase Entity, and the Coinbase Entities may freely share Client's Confidential Information among each other and with such affiliates. All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of the receiving Party shall be and remain the property of the disclosing Party and shall be promptly returned to the disclosing Party or destroyed, each upon the disclosing Party's request; *provided, however*, notwithstanding the foregoing, the receiving Party may retain one (1) copy of Confidential Information if (a) required by law or regulation; or (b) retained pursuant to an established document retention policy.

"Affiliate" means, with respect to any specified legal entity, any other legal entity that, directly or indirectly, through one or more intermediaries, owns or controls, is owned or

8

controlled by, or is under common ownership or control with, such specified legal entity. As used in this definition, the concept of control refers to the beneficial ownership by one legal entity of the majority of the voting power of another legal entity.

## 12.    Market Data

Client agrees that its use of data made available to it through the Trading Platform's application programming interface(s), which may include the prices and quantities of orders and transactions executed on Trading Platform (collectively "Market Data"), is subject to the Market Data Terms of Use, as amended and updated from time to time at *https://www.coinbase.com/legal/market_data* or a successor website.

## 13.    Recording of Conversations

For compliance and monitoring purposes, Client authorizes each Coinbase Entity at its sole discretion to record conversations between such Coinbase Entity and Client or its Authorized Representatives relating to this Coinbase Prime Broker Agreement, the Prime Broker Account and the Prime Broker Services;

## 14.    Security and Business Continuity

The Coinbase Entities have implemented and will maintain a reasonable information security program in accordance with security terms as disclosed to Client.

## 15.    Acknowledgement of Risks

Client hereby acknowledges, that: (i) Digital Assets are not legal tender, are not backed by any government, and are not subject to protections afforded by the Federal Deposit Insurance Corporation or Securities Investor Protection Corporation; (ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and/or value of Digital Assets; (iii) transactions in Digital Assets are irreversible, and, accordingly, Digital Assets lost due to fraudulent or accidental transactions may not be recoverable; (iv) certain Digital Assets transactions will be deemed to be made when recorded on a public blockchain ledger, which is not necessarily the date or time that Client initiates the transaction or such transaction enters the pool; (v) the value of Digital Assets may be derived from the continued willingness of market participants to exchange any government issued currency ("Fiat Currency") for Digital Assets, which may result in the permanent and total loss of value of a Digital Asset should the market for that Digital Asset disappear; (vi) the volatility of the value of Digital Assets relative to Fiat Currency may result in significant losses; (vii) Digital Assets may be susceptible to an increased risk of fraud or cyber-attack; (viii) the nature of Digital Assets means that any technological difficulties experienced by a Coinbase Entity may prevent the access or use of Client Digital Assets; and (ix) any bond or trust account maintained by Coinbase Entities for the benefit of its customers may not be sufficient to cover all losses (including Losses) incurred by customers.

## 16.    Operation of Digital Asset Protocols

16.1    The Coinbase Entities do not own or control the underlying software protocols which govern the operation of Digital Assets. Generally, the underlying software protocols and, if applicable, related smart contracts (referred to collectively as "Protocols" for purposes of this Section 16) are open source and anyone can use, copy, modify or distribute them. By using the Prime Broker Services, Client acknowledges and agrees that (i) the Coinbase Entities make no guarantee of the functionality, security, or availability of underlying Protocols; (ii) some underlying Protocols are subject to consensus-based proof of stake validation methods which may allow, by virtue of their governance systems, changes to the associated blockchain or digital ledger ("Governance Modifiable Blockchains"), and that any Client transactions validated on such Governance Modifiable Blockchains may be affected accordingly; and (iii) the underlying Protocols are subject to sudden changes in operating rules (a/k/a "forks"), and that such forks may materially affect the value, function, and/or even the name of the Digital Assets. In the event of a fork, Client agrees that the Coinbase Entities may temporarily suspend Prime Broker Services (with or without notice to Client) and that the Coinbase Entities may, in their sole discretion, determine whether or not to support (or cease supporting) either branch of the forked protocol entirely. In the event that Coinbase decides not to support (or ceases supporting) either branch of a forked protocol, Coinbase will use reasonable efforts to notify Client in advance wherever reasonably practicable to do so. Client agrees that the Coinbase Entities shall have no liability, obligation or responsibility whatsoever arising out of or relating to the operation of Protocols, transactions affected by Governance Modifiable Blockchains, or an unsupported branch of a forked protocol and, accordingly, Client acknowledges and assumes the risk of the same. The Coinbase Entities shall use commercially reasonable efforts to timely select at least one of the forked protocol branches to support and will identify such selection in a notice reasonably in advance of such fork (to the extent practicable) to provide Client the opportunity to arrange for the transfer of the relevant Digital Assets, which the Coinbase Entities shall use commercially reasonable efforts to accomplish in advance of such fork. With respect to a forked protocol branch that the Coinbase Entities choose not to support, upon Client's request, the Coinbase Entities will use commercially reasonable efforts to deliver the relevant Digital Assets from such forked protocol branch to Client, including any credentials, keys, or other information sufficient to gain control over such Digital Assets through other means within a commercially reasonable period of time.

16.2    Unless specifically communicated by the Coinbase Entities through a written public statement on the Coinbase website, the Coinbase Entities do not support airdrops, metacoins, colored coins, side chains, or other derivative, enhanced or forked protocols, tokens or coins, which supplement or interact with a Digital Asset (collectively, "Advanced Protocols") in connection with the Prime Broker Services. The Prime Broker Services are not configured to detect, process and/or secure Advanced Protocol transactions and neither Client nor the Coinbase Entities will be able to retrieve any unsupported Advanced Protocol. Coinbase shall have no liability, obligation or responsibility whatsoever in respect to Advanced Protocols.

10

## 17.    Set-off

Upon the occurrence of a default or an event of default under, an agreement with a Coinbase Entity (including an "Event of Default" as such term is defined in the PTC Agreement (in each case, at maturity, upon acceleration or otherwise)) or the occurrence of an event that constitutes "Cause" (as defined below) (each, a "Setoff Event"), each Coinbase Entity may set off and net the amounts due from it or any of its affiliates to Client and from Client to it or any other Coinbase Entity, so that a single payment (the "Net Payment") shall be immediately due and payable by the Client or the Coinbase Entity to the other (subject to the other provisions hereof and of any agreement with a Coinbase Entity). If any amounts cannot be included within the Net Payment, such amounts shall be excluded but may still be netted against any other similarly excluded amounts. Upon the occurrence of a Setoff Event, each Coinbase Entity may also set off and net any Net Payment or any other obligation owed to the Client by any Coinbase Entity against (i) any or all collateral or margin posted by any Coinbase Entity to Client (or the U.S. dollar value thereof, determined by Coinbase in its sole discretion on the basis of a recent price at which the relevant Digital Asset was sold to customers on the Trading Platform); and (ii) any Net Payment, unpaid trade credits or any other obligation owed by Client to any Coinbase Entity (in each case, whether matured or unmatured, fixed or contingent, or liquidated or unliquidated). Client agrees that in the exercise of setoff rights or secured party remedies, the Coinbase Entities may value Client Digital Assets using the same valuation methods and processes that are otherwise used when a Coinbase customer sells an asset on the Trading Platform (as such term is defined in the MTA) or any other commercially reasonable valuation method as determined by Coinbase in its sole discretion. For the avoidance of doubt and notwithstanding anything to the contrary, the Coinbase Entities shall not be permitted to set off against, liquidate or apply any assets or amounts in Client's Vault Balance.

## 18.    Disclaimer of Warranties

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE PRIME BROKER SERVICES AND THE COINBASE WEBSITE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OF ANY KIND, AND THE COINBASE ENTITIES HEREBY SPECIFICALLY DISCLAIM ALL WARRANTIES WITH RESPECT TO THE PRIME BROKER SERVICES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES AND/OR CONDITIONS OF TITLE, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT. THE COINBASE ENTITIES DO NOT WARRANT THAT THE PRIME BROKER SERVICES, INCLUDING ACCESS TO AND USE OF THE COINBASE WEBSITES, OR ANY OF THE CONTENT CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, COMPATIBLE WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, SECURE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE.

## 19.    Indemnification

19.1    Client shall defend and indemnify and hold harmless each Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to Client's breach of this Coinbase Prime Broker Agreement, Client's violation of any law, rule or regulation, or

rights of any third party, or Client's gross negligence, fraud or willful misconduct, unless such Claims or Losses arise out of or relate to Coinbase's gross negligence, fraud, willful misconduct. This obligation will survive any termination of this Coinbase Prime Broker Agreement.

19.2 Coinbase shall defend and indemnify and hold harmless Client, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to any (i) violation, misappropriation, or infringement upon any United States patent, copyright, trademark, trade secret or other intellectual property right of a third party or (ii) violation of applicable law, rule or regulation, or rights of any third party, or Coinbase's gross negligence, fraud or willful misconduct unless such Claims or Losses arise out of or relate to Client's gross negligence, fraud, willful misconduct, or breach of this Coinbase Prime Broker Agreement. This obligation will survive any termination of this Coinbase Prime Broker Agreement.

Each Party's (the "Indemnitor") indemnification obligation under Section 18 of this Coinbase Prime Broker Agreement shall apply only if the other Party (the "Indemnitee") does the following: (a) notifies the Indemnitor promptly in writing, not later than thirty (30) days after the Indemnitee receives notice of the Claim (or sooner if required by applicable law); (b) gives the Indemnitor sole control of the defense and any settlement negotiations (subject to the below); and (c) gives the Indemnitor the information, authority, and assistance such Indemnitor needs to defend against or settle the Claim.

No Party providing indemnification pursuant to this Section 19 shall accept any settlement of any Claims or Losses if such settlement imposes any financial or non-financial liabilities, obligations, or restrictions on, or requires an admission of guilt or wrong-doing from, any party indemnified pursuant to this Section 19, without such party's prior written consent.

19.3 For the purposes of this Coinbase Prime Broker Agreement:

(a) "Claim" means any action, suit, litigation, demand, charge, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other governmental, regulatory or administrative body or any arbitrator or arbitration panel; and

(b) "Losses" means any liabilities, damages, diminution in value, payments, obligations, losses, interest, costs and expenses, security or other remediation costs (including any regulatory investigation or third party subpoena costs, reasonable attorneys' fees, court costs, expert witness fees, and other expenses relating to investigating or defending any Claim); fines, taxes, fees, restitution, or penalties imposed by any governmental, regulatory or administrative body, interest on and additions to tax with respect to, or resulting from, Taxes imposed on Client's assets, cash, other property, or any income or gains derived therefrom; and judgments (at law or in equity) or awards of any nature.

12

20. **Limitation of Liability**

The Coinbase Prime Broker Agreement shall be subject to a limitation of liability as agreed between the Parties.

21. **Privacy**

Except as set forth herein, the Coinbase Entities shall use and disclose Client's and its Authorized Representatives' non-public personal information in accordance with the Coinbase Privacy Policy, as set forth at *https://www.coinbase.com/legal/privacy* or a successor website, and as amended and updated from time to time.

22. **Arbitration**

22.1    Subject to the jurisdiction of the Bankruptcy Court, any Claim arising out of or relating to this Coinbase Prime Broker Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including any determination of the scope or applicability of the agreement to arbitrate as set forth in this Section 22, shall be determined by arbitration in the state of New York or another mutually agreeable location, before one neutral arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, and the award of the arbitrator (the "Award") shall be accompanied by a reasoned opinion. Judgment on the Award may be entered in any court having jurisdiction. This Coinbase Prime Broker Agreement shall not preclude the Parties from seeking provisional relief, including injunctive relief, in any court of competent jurisdiction. Seeking any such provisional relief shall not be deemed to be a waiver of such party's right to compel arbitration. The Parties expressly waive their right to a jury trial to the extent permitted by applicable law.

22.2    In any arbitration arising out of or related to this Coinbase Prime Broker Agreement, the arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" mean all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees.

22.3    The Parties acknowledge that this Coinbase Prime Broker Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision herein with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Coinbase Prime Broker Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16).

23. **Term, Termination and Suspension**

This Coinbase Prime Broker Agreement is effective as of the entry of the Confirmation Order and shall remain in effect until terminated by Coinbase or Client as follows:

(a)  Either Party may terminate this Coinbase Prime Broker Agreement in its entirety for any reason and without Cause by providing at least 90 days' prior written notice to the other party; *provided, however*, Client's termination of this Coinbase Prime Broker Agreement shall not be effective until Client has fully satisfied its obligations hereunder. Notwithstanding the foregoing, the Coinbase Entities acknowledge that the Custodial Services are critical to the Client and shall use its reasonable efforts to continue to offer such Custodial Services to the Client for a least one-hundred and eighty (180) days following any termination of this Coinbase Prime Broker Agreement at a rate that is twice the rate applicable during the term.

(b)  Regardless of any other provision of this Coinbase Prime Broker Agreement, the Coinbase Entities may, in their sole discretion, suspend, restrict or terminate the Client's Prime Broker Services, including by suspending, restricting or closing the Client's Prime Broker Account and/or any associated Trading Account, Custodial Account or any credit account (as applicable), for Cause, at any time and without prior notice to the Client.

"Cause" shall mean: (i) Client materially breaches any provision of this Coinbase Prime Broker Agreement and fails to cure such breach within ten (10) days following notice by the Coinbase Entities to the Client of the occurrence of such breach; (ii) the Bankruptcy Court enters an order, or Client or any of its debtor-affiliates in the Chapter 11 Cases (each, a "Debtor" and collectively, the "Debtors") files or supports an application, motion, or request for an order,  that has the effect of amending, vacating, reversing, supplementing, or modifying the  this Coinbase Prime Broker Agreement or the provisions of the Confirmation Order concerning this Coinbase Prime Broker Agreement (the "**Approval Provisions**") in a manner that a Coinbase Entity determines in its reasonable discretion is materially adverse to a Coinbase Entity; (iii) the Bankruptcy Court has made a judicial finding, or any Debtor has declared, that any Debtor is administratively insolvent; (iv) after its entry, the Approval Provisions ceases to be in full force and effect; (v) termination is required pursuant to a facially valid subpoena, court order or binding order of a government authority; (vi) Client's Prime Broker Account is subject to any pending litigation, investigation or government proceeding and/or Coinbase reasonably perceives a materially heightened risk of legal regulatory non-compliance by the Coinbase Entities associated with Client's use of Prime Broker Services; or (vii) Coinbase acting in a commercially reasonable manner suspects Client of attempting to circumvent Coinbase's controls or uses the Prime Broker Services in a manner Coinbase otherwise deems inappropriate or potentially harmful to itself or third parties.

In the event that the Bankruptcy Court does not enter a Confirmation Order containing the Approval Provisions by [December 31, 2023] in form and substance reasonably satisfactory to Coinbase, this Coinbase Prime Broker Agreement shall be null and void without any further action by either party.

(c)  Client acknowledges that the Coinbase Entities' decision to take certain actions, including suspending, restricting or terminating Client's Prime Broker Account or Prime Broker Services, may be based on confidential criteria that are essential to Coinbase's risk management and security practices and agrees that the Coinbase

14

Entities are under no obligation to disclose the details of its risk management and security practices to Client.

## 24.    Severability

If any provision or condition of this Coinbase Prime Broker Agreement shall be held invalid or unenforceable, the remainder of this Coinbase Prime Broker Agreement shall continue in full force and effect.

## 25.    Waiver

Any waivers of rights by the Parties under this Coinbase Prime Broker Agreement must be in writing and signed by such Party or Parties. A waiver will apply only to the particular circumstance giving rise to the waiver and will not be considered a continuing waiver in other similar circumstances. A Party's failure to insist on strict compliance with this Coinbase Prime Broker Agreement or any other course of conduct by such Party shall not be considered a waiver of their rights under this Coinbase Prime Broker Agreement.

## 26.    Survival

All provisions of this Coinbase Prime Broker Agreement which by their nature extend beyond the expiration or termination of this Coinbase Prime Broker Agreement shall survive the termination or expiration of this Coinbase Prime Broker Agreement.

## 27.    Governing Law

This Coinbase Prime Broker Agreement, Client's Prime Broker Account, and the Prime Broker Services will be governed by and construed in accordance with the laws of the State of New York, excluding its conflicts of laws principles, except to the extent such state law is preempted by federal law.

## 28.    Force Majeure

The Coinbase Entities shall not be liable for delays, suspension of operations, whether temporary or permanent, failure in performance, or interruption of service which result directly or indirectly from any cause or condition beyond the reasonable control of the Coinbase Entities, including any act of God; embargo; natural disaster; act of civil or military authorities; act of terrorists; terrorist related hacking, government restrictions; any ruling by any Connected Trading Venue, exchange or market; market volatility or disruptions in order trading on any Connected Trading Venue, exchange or market; suspension of trading; civil disturbance; war; strike or other labor dispute; fire; severe weather; interruption in telecommunications, Internet services, or network provider services; failure of equipment and/or software; failure of computer or other electronic or mechanical equipment or communication lines; outbreaks of infectious disease (other than COVID-19) or any other public health crises, including quarantine or other employee restrictions; acts or omissions of any Connected Trading Venue; or any other catastrophe or other occurrence which is beyond the reasonable control of the Coinbase Entities (each, a "Force Majeure Event"); *provided, however*, that this Section 28 shall only apply for so long as such delay or prevention is occurring; *provided further*, that should such delay or prevention remain ongoing for fifteen (15)

15

days, Client may request withdrawal of the USD equivalent of any assets then held in a Digital Asset Wallet or Fiat Wallet so long as such delay or suspension does not affect the transfer or settlement of USD.

## 29.    Entire Agreement; Headings

This Coinbase Prime Broker Agreement, together with all exhibits, addenda and supplements attached hereto or referenced herein, comprise the entire understanding between Client and the Coinbase Entities as to the Prime Broker Services and supersedes all prior discussions, agreements and understandings, including any previous version of this Coinbase Prime Broker Agreement, and the Custodial Services Agreement between Client and any Coinbase Entity, including all exhibits, addenda, policies, and supplements attached thereto or referenced therein. Section headings in this Coinbase Prime Broker Agreement are for convenience only and shall not govern the meaning or interpretation of any provision of this Coinbase Prime Broker Agreement.

## 30.    Amendments

Any modification or addition to this Coinbase Prime Broker Agreement must be in writing and either (a) signed by a duly authorized representative of each party, or (b) accepted and agreed to by Client.

## 31.    Assignment

Any assignment of Client's rights and/or licenses granted under this Coinbase Prime Broker Agreement without obtaining the prior written consent (not to be unreasonably withheld) of Coinbase shall be null and void. Coinbase reserves the right to assign its rights under this Coinbase Prime Broker Agreement without restriction, including to any of the Coinbase Entities or their affiliates or subsidiaries, or to any successor in interest of any business associated with the Prime Broker Services, such affiliate, subsidiary or successor, an ("Assignee"), *provided* that Coinbase shall notify Client within a reasonable amount of time prior to such assignment and that Client shall be entitled to terminate this Coinbase Prime Broker Agreement with immediate effect following such assignment; *provided further*, that any such Assignee has the operational capacity and all necessary legal and/or regulatory approvals, licenses and permissions to provide the Prime Broker Services to Client, and that the security measures utilized by such Assignee shall be equivalent to those employed by Coinbase.

## 32.    Electronic Delivery of Communications

Client agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that the Coinbase Entities provide in connection with Client's Prime Broker Account and Client's use of Prime Broker Services. Communications include: (a) terms of use and policies Client agrees to, including updates to policies or the Coinbase Prime Broker Agreement, (b) Prime Broker Account details, including transaction receipts, confirmations, records of deposits, withdrawals or transaction information, (c) legal, regulatory and tax disclosures or statements the Coinbase Entities may be required to make available to Client and (d) responses to claims or customer support inquiries filed in connection with Client's Prime Broker Account.

16

Coinbase will provide these Communications to Client by posting them on the Prime Broker Site, emailing them to Client at the primary email address on file with Coinbase, communicating to Client via instant chat, and/or through other means of electronic communication. The Client agrees that electronically delivered Communications may be accepted and agreed to by Client through the Prime Broker Services interface. Furthermore, the Parties consent to the use of electronic signatures in connection with Client's use of the Prime Broker Services.

### 33. Notice and Contacts

33.1    All notices required or permitted to be given hereunder shall be in writing delivered to the Party at its address specified below via an overnight mailing company of national reputation. Any Party that changes its notice address must notify the other Party promptly of such change.

If to any Coinbase Entity:

> Legal Department Coinbase, Inc.
> 248 3rd St, #434
> Oakland, CA 94607
> legal@coinbase.com

If to Client, the address specified in its signature block on the Execution Page.

33.2    In the event of any market operations, connectivity, or erroneous trade issues that require immediate attention including any unauthorized access to Client's Prime Broker Account, please contact:

To Coinbase: support@coinbase.com.

To Client: the email address specified in its signature block on the Execution Page.

It is solely Client's responsibility to provide Coinbase with a true, accurate and complete contact information including any e-mail address, and to keep such information up to date. Client understands and agrees that if Coinbase sends Client an electronic Communication but Client does not receive it because Client's primary email address on file is incorrect, out of date, blocked by Client's service provider, or Client is otherwise unable to receive electronic Communications, Coinbase will be deemed to have provided the Communication to Client. Client may update Client's information via Client's Prime Broker Account and visiting settings or by providing a notice to Coinbase as prescribed above.

33.3    To see more information about our regulators, licenses, and contact information for feedback, questions or complaints, please visit *https://www.coinbase.com/legal/licenses*.

### 34. Client

To the extent Client is a natural person over 18 years of age, if Coinbase receives legal documentation confirming Client's death or other information leading Coinbase to believe Client

is deceased, Coinbase will freeze Client's Prime Broker Account ("<u>Freeze Period</u>"). During the Freeze Period, no transactions may be completed until: (i) Client's designated fiduciary has opened a new Prime Broker Account, as further described below, and the entirety of Client's Prime Broker Account has been transferred to such new Prime Broker Account, or (ii) Client has received proof in a form satisfactory to Coinbase that Client is not deceased. If Coinbase has reason to believe Client is deceased but Coinbase does not have proof of Client's death in a form satisfactory to Coinbase, Client authorizes Coinbase to make inquiries, whether directly or through third parties, that Coinbase considers necessary to ascertain whether Client is deceased. Upon receipt by Coinbase of proof satisfactory to Coinbase that Client is deceased, the fiduciary Client designated in a valid will or similar testamentary document will be required to open a new Prime Broker Account. If Client has not designated a fiduciary, then Coinbase reserves the right to (i) treat as Client's fiduciary any person entitled to inherit Client's Prime Broker Account, as determined by Coinbase upon receipt and review of the documentation Coinbase, in its sole and absolute discretion, deems necessary or appropriate, including (but not limited to) a will, a living trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over Client's estate. In the event Coinbase determines, in its sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, Coinbase reserves the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to Client's Prime Broker Account. Pursuant to the above, the opening of a new Prime Broker Account by a designated fiduciary is mandatory following the death of Client, and Client hereby agrees that its fiduciary shall be required to open a new Prime Broker Account and provide required account opening information to gain access to the contents of Client's Prime Broker Account.

## 35.   Counterparts

This Coinbase Prime Broker Agreement may be executed in one or more counterparts, including by facsimile or email of .pdf signatures or DocuSign (or similar electronic signature software), each of which shall be deemed to be an original document, but all such separate counterparts shall constitute only one and the same Coinbase Prime Broker Agreement.

*[Signatures on following page]*

**IN WITNESS WHEREOF**, the Parties have caused this Coinbase Prime Broker Agreement, including the Custody Agreement and MTA, to be duly executed and delivered as of the date below.

**COINBASE, INC. For itself and as agent for the Coinbase Entities**

    **By:** _____

    **Name:** _____

    **Title:** _____

    **Date:** _____

**CLIENT:**

    **By:** _____

    **Name:** _____

    **Title:** _____

    **Date:** _____

    **Address:** _____

    _____

    **E-Mail:** _____

## EXHIBIT A
### to the Coinbase Prime Broker Agreement

### COINBASE CUSTODY CUSTODIAL SERVICES AGREEMENT

This Custody Agreement is entered into between Client and Coinbase Custody and forms a part of the Coinbase Prime Broker Agreement between the Client and the Coinbase Entities. Capitalized terms used in this Custody Agreement that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Broker Agreement.

## 1.      Custodial Services.

Coinbase Custody shall provide Client with a segregated custody account controlled and secured by Coinbase Custody ("Custodial Account") to store certain Digital Assets supported by Coinbase Custody, on Client's behalf ("Custodial Services"). Coinbase Custody is a fiduciary under § 100 of the New York Banking Law and a qualified custodian for purposes of Rule 206(4)-2(d)(6) under the Investment Advisers Act of 1940, as amended, and is licensed to custody Client's Digital Assets in trust on Client's behalf. Digital Assets in Client's Custodial Account shall (i) be segregated from the assets held by Coinbase Custody as principal and the assets of other customers of Coinbase Custody, (ii) not be treated as general assets of Coinbase Custody, and except as otherwise provided herein, Coinbase Custody shall have no right, title or interest in such Digital Assets, (iii) constitute custodial assets and Client's property. In addition, Coinbase Custody shall maintain adequate capital and reserves to the extent required by applicable law and shall not, directly or indirectly, lend, pledge, hypothecate or re-hypothecate any Digital Assets in the Custodial Account.

## 2.      Custodial Account.

2.1     *In General.* The Custodial Services shall permit the Client (i) to hold its Vault Balance in its Custodial Account and transfer Digital Assets to and from its Trading Balance, (ii) to deposit supported Digital Assets from a public blockchain address controlled by Client into its Custodial Account, (iii) withdraw supported Digital Assets from its Custodial Account to a public blockchain address controlled by Client and (iv) certain additional services as may be agreed to between the Client and Coinbase Custody from time to time. Each such deposit or withdrawal shall be referred to as a "Custody Transaction" and shall conform to Instructions provided by Client through the Coinbase Prime Broker Site. Client shall only withdraw or deposit Digital Assets to public blockchain addresses and accounts owned by Client or an address for which Client has conducted the necessary Know Your Customer ("KYC") and anti-money laundering ("AML") due diligence. Digital Assets shall be held in Client's Custodial Account in accordance with the terms of this Custody Agreement and shall not be commingled with other clients' Digital Assets. **Coinbase Custody reserves the right to refuse to process or to cancel any pending Custody Transaction to comply with applicable law or in response to a subpoena, court order or other binding government order, or to enforce transaction, threshold and condition limits, or if Coinbase Custody reasonably believes that the Custody Transaction may violate or facilitate the violation of an applicable law, regulation or rule of a governmental authority or self-regulatory organization.**

20

2.2    *Digital Asset Deposits and Withdrawals.* Coinbase Custody will process supported Digital Asset Custody Transaction according to the Instruction received from Client or Client's Authorized Representatives, and Coinbase Custody does not guarantee the identity of any user, receiver, requestee or other party. Client must verify all deposit and withdrawal information prior to submitting Instructions to Coinbase Custody regarding a Custody Transaction. Coinbase Custody shall have no liability, obligation, or responsibility whatsoever for Client Digital Asset transfers sent or received pursuant to inaccurate Instructions or received from a wrong party. Coinbase Custody reserves the right to charge network fees (including miner fees) to process a Custody Transaction on Client's behalf. Coinbase Custody will calculate the network fee, if any, in its sole and absolute discretion, although Coinbase Custody will always notify Client of the network fee at or before the time Client authorizes the Custody Transaction. Coinbase Custody reserves the right to delay any Custody Transaction if it perceives a risk of fraud or illegal activity.

2.3    *Digital Asset Storage and Transmission Delays.* Coinbase Custody requires up to twenty-four (24) hours between any request to withdraw Digital Assets from Client's Custodial Account and submission of Client's withdrawal to the applicable Digital Asset network. Since Coinbase Custody securely stores all Digital Asset private keys in offline storage, it may be necessary to retrieve certain information from offline storage in order to facilitate a withdrawal in accordance with Client's Instructions, which may delay the initiation or crediting of such withdrawal. Client acknowledges and agrees that a Custody Transaction may be delayed, and that Digital Assets shall not be deposited or withdrawn upon less than twenty-four (24) hours' notice initiated from Client's Custodial Account. The time of such request shall be the time such notice is transmitted from Client's Custodial Account. Except as specified, Coinbase Custody makes no representations or warranties with respect to the availability and/or accessibility of (1) the Digital Assets, (2) a Custody Transaction, (3) the Custodial Account, or (4) the Custodial Services. Except as specified, while Coinbase Custody will make reasonable efforts to process Client initiated deposits in a timely manner, Coinbase Custody makes no representations or warranties regarding the amount of time needed to complete processing as such processing is dependent upon many factors outside of Coinbase Custody's control.

2.4    *Supported Digital Assets.* The Custodial Services are available only in connection with those Digital Assets that Coinbase Custody, in its sole discretion, decides to support, which may change from time to time. Prior to initiating a deposit of Digital Asset to Coinbase Custody, Client must confirm that Coinbase Custody offers Custodial Services for that specific Digital Asset. By initiating a deposit of any Digital Asset to a Custodial Account, Client attests that Client has confirmed that the Digital Asset being transferred is a supported Digital Asset offered by Coinbase Custody. Under no circumstances should Client attempt to use the Custodial Services to deposit or store Digital Assets in any forms that are not supported by Coinbase Custody. Depositing or attempting to deposit Digital Assets that are not supported by Coinbase Custody may result in such Digital Asset being irretrievable by Client and Coinbase Custody. Client shall be fully responsible and liable, and Coinbase Custody shall have no liability, obligation, or responsibility whatsoever, regarding any unsupported Digital Asset sent or attempted to be sent to it, or regarding any attempt to use the Custodial Services for Digital Assets that Coinbase Custody does not support. Digital Assets supported by Coinbase Custody shall be listed on the Coinbase

Prime Broker Site. Coinbase Custody recommends that Client deposit a small amount of supported Digital Asset as a test prior to initiating a deposit of a significant amount of supported Digital Asset. Coinbase Custody shall provide Client with thirty (30) days' written notice before ceasing to support a Digital Asset, unless Coinbase Custody is required to cease such support by court order, statute, law, rule (including a self-regulatory organization rule), regulation, code, or other similar requirement.

2.5   *Use of the Custodial Services.* Client acknowledges and agrees that Coinbase Custody may monitor use of the Custodial Account and the Custodial Services and the resulting information may be utilized, reviewed, retained and or disclosed by Coinbase Custody for its internal purposes or in accordance with the rules of any applicable legal, regulatory or self-regulatory organization or as otherwise may be required to comply with relevant law, sanctions programs, legal process or government request.

2.6   *Independent Verification.* If Client is subject to Rule 206(4)-2 under the Investment Advisers Act of 1940, Coinbase Custody shall, upon written request, provide Client's authorized independent public accountant confirmation of or access to information sufficient to confirm (i) Client's Digital Assets as of the date of an examination conducted pursuant to Rule 206(4)-2(a)(4), and (ii) Client's Digital Assets are held either in a separate account under Client's name or in accounts under Client's name as agent or trustee for Client's clients.

2.7   *Third Party Payments.* The Custodial Services are not intended to facilitate third party payments of any kind. As such, Coinbase Custody has no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that Client may purchase or sell to or from a third party (including other users of Custodial Services) involving Digital Assets that Client intends to store, or have stored, in Client's Custodial Account.

2.8   *Termination, and Cancellation.* If Coinbase Custody closes Client's Custodial Account or terminates Client's use of the Custodial Services, Client will be permitted to withdraw Digital Assets associated with Client's Custodial Account for a period of up to ninety (90) days following the date of deactivation or cancellation to the extent not prohibited (i) under applicable law, including applicable sanctions programs, or (ii) by a facially valid subpoena, court order, or binding order of a government authority.

**3.   Coinbase Custody Obligations**

3.1   *Bookkeeping.* Coinbase Custody shall keep timely and accurate records as to the deposit, disbursement, investment and reinvestment of the Digital Assets, as required by applicable law and in accordance with Coinbase Custody's internal document retention policies.

3.2   *Insurance.* Coinbase Custody shall obtain and maintain, at its sole expense, insurance coverage in such types and amounts as shall be commercially reasonable for the Custodial Services provided hereunder. Upon Client's written request and in accordance with Coinbase Custody policies, procedures, any confidentiality obligation and any applicable

law, Coinbase Custody might provide the Client reasonable evidence detailing the nature and amount of such insurance coverage.

**4.      Additional Matters**

In addition to any additional service providers that may be described in an addendum or attachment hereto, Client acknowledges and agrees that the Custodial Services may be provided from time to time by, through or with the assistance of affiliates of, or vendors to, Coinbase Custody. Client shall receive notice of any material change in the entities that provide the Custodial Services.

*[Remainder of page intentionally left blank]*

**EXHIBIT B**
**to the Coinbase Prime Broker Agreement**

## COINBASE MASTER TRADING AGREEMENT

Client should carefully consider whether trading or holding Digital Assets is suitable for its purpose, including in relation to Client's knowledge of Digital Assets and Digital Asset markets and Client's financial condition. All investments involve risk, and the past performance of a financial product does not guarantee future results or returns.

This Master Trading Agreement ("MTA") sets forth the terms and conditions for clients to trade Digital Assets through the Coinbase prime broker execution platform ("Trading Platform") and forms a part of the Coinbase Prime Broker Agreement between Client and the Coinbase Entities. Pursuant to this MTA, Coinbase shall open a Trading Account for the Client on the Trading Platform consisting of linked accounts at Coinbase and Coinbase Custody, each accessible via the Trading Platform ("Trading Account"). The Trading Platform shall provide Client with access to trade execution and automated trade routing services and Coinbase Execution Services (as defined below) to enable Clients to submit orders ("Orders") to purchase and sell specified Digital Assets in accordance with this MTA and the Coinbase Trading Rules set forth at *https://www.coinbase.com/legal/trading_rules* or a successor website (as amended and updated from time to time, the "Coinbase Trading Rules") (such services, the "Trading Services"). Capitalized terms used in this MTA that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Broker Agreement.

1.      **Order Routing and Connected Trading Venue**

1.1     The Trading Platform operates a trade execution service through which Client may submit Orders to purchase or sell Digital Assets. After Client submits an Order, the Trading Platform will automatically route the Order (or a portion of the Order) to one of the trading venues to which the Trading Platform has established connections (each such venue, a "Connected Trading Venue"). Each Order will be sent, processed and settled at each Connected Trading Venue to which it is routed. Once an Order to purchase Digital Assets has been placed, the associated Client Assets (as defined below) used to fund the Order will be placed on hold and will generally not be eligible for other use or withdrawal.

1.2     With each Connected Trading Venue, Coinbase shall establish an account in its name, or in its name for the benefit of clients, to trade on behalf of its clients, and the establishment of a Trading Account will not cause Client to have a direct legal relationship, or account with, any Connected Trading Venue. The Trading Platform will not intentionally match the buy and sell orders of its clients against each other and will not intentionally settle Orders against or otherwise trade with Coinbase's principal funds. Client acknowledges that Coinbase and its other clients may trade in their own interests on the Connected Trading Venues and could, therefore, be the counterparty to a Client Order on a Connected Trading Venue.

1.3     Client acknowledges that Coinbase has sole discretion to determine the Connected Trading Venues with which it will establish connections. Coinbase will direct Orders to the

24

Connected Trading Venues on an automated basis and generally will not manually route orders. In designing algorithms that determine an Order's routing logic, Coinbase considers a variety of factors relating to the Order and the Connected Trading Venues, including the speed of execution, whether the venue is able to consummate off-chain transactions, the availability of efficient and reliable systems, the level of service provided, and the cost of executing orders. Coinbase may receive cash payments or other financial incentives (such as reciprocal business arrangements) from Connected Trading Venues.

1.4    Coinbase makes no representation or warranty of any kind regarding any Connected Trading Venue, including as to its financial condition, data, security or quality of its execution services, and shall have no liability, obligation, or responsibility whatsoever for the selection or performance of any Connected Trading Venue. Digital Assets may trade at different prices on different trading venues, and other Connected Trading Venues and/or trading venues not used by Coinbase may offer better prices and/or lower costs than the Connected Trading Venue used to execute Client's Order.

1.5    Coinbase acts in an agency capacity for purposes of certain Orders, and may also act in a principal capacity for certain other Orders, as specified in the Coinbase Trading Rules. In the Request For Quotation ("RFQ") service, Coinbase may act as principal to fill Orders by providing indicative firm pricing in accordance with a variety of market factors, at its sole discretion. Each Client should independently evaluate whether such services are appropriate given its own investing profile and sophistication, among other considerations.

## 2.    Client Trading Balance and Vault Balance

2.1    For purposes of this MTA, Client's Digital Assets are referred to as "Client Digital Assets," Client's cash is referred to as "Client Cash," and Client Digital Assets and Client Cash are together referred to as "Client Assets."

2.2    Within the Trading Platform, Coinbase provides access to two types of accounts with balances relating to Client Assets: (1) the "Trading Balance" (as described below in Section 2.3) and (2) the "Vault Balance" (as described below in Section 2.5). The Trading Account provides a record of both the Trading Balance and the Vault Balance. Client determines the allocation of its Client Digital Assets between the Trading Balance and the Vault Balance. Maintenance of the Vault Balance shall be subject to the terms of the Custody Agreement; *provided, however*, Client's Trading Balance is separate from any Digital Assets Client maintains directly with Coinbase Custody.

2.3    Client Digital Assets credited to the Trading Balance are immediately available to Client for purposes of submitting an Order. Coinbase holds Digital Assets credited to the Trading Balance in one of three ways: (i) in omnibus hot wallets (each, an "Omnibus Hot Wallet"); (ii) in omnibus cold wallets (each, an "Omnibus Cold Wallet"); and (iii) in Coinbase's accounts with the Connected Trading Venues ("Coinbase Connected Trading Venue Digital Asset Balance"). Client agrees that Coinbase has sole discretion in determining the allocation of Digital Assets credited to the Trading Balance. Because Digital Assets credited to the Trading Balance are held on an omnibus basis and because of the nature of certain Digital Assets, Client does not have an identifiable claim to any particular Digital

25

Asset. Instead, Client's Trading Balance represents an entitlement to a *pro rata* share of the Digital Assets Coinbase has allocated to the Omnibus Hot Wallets, Omnibus Cold Wallets and Coinbase Connected Trading Venue Digital Asset Balance. Coinbase relies on the Connected Trading Venues for the Coinbase Connected Trading Venue Digital Asset Balance, and Client has no contractual relationship with the Connected Trading Venues with respect to Digital Assets credited to the Trading Balance.

2.4    Client may maintain Client Cash in the Trading Balance but not in the Vault Balance. Coinbase holds Client Cash credited to the Trading Balance in one of two ways: (i) in one or more omnibus accounts in Coinbase's name for the benefit of customers at one or more U.S. insured depository institutions (each, an "FBO account") and (ii) in Coinbase's omnibus accounts at Connected Trading Venues. Coinbase will title the FBO accounts it maintains with U.S. depository institutions and maintain records of Client's interest in a manner designed to enable receipt of Federal Deposit Insurance Corporation ("FDIC") deposit insurance, where applicable and up to the deposit insurance limits applicable under FDIC regulations and guidance, on Client Cash for the Client's benefit on a pass-through basis. Coinbase does not guarantee that pass-through FDIC deposit insurance will apply to Client Cash, since such insurance is dependent in part on compliance of the depository institutions. Coinbase may also title its accounts at some or all Connected Trading Venues and maintain records of Client interests in those accounts in a manner consistent with FDIC requirements for pass-through deposit insurance, but availability of pass-through deposit insurance, up to the deposit insurance limits applicable under FDIC regulations and guidance, is also dependent on the actions of the Connected Trading Venues and any depository institutions they use, which may not be structured to provide pass-through deposit insurance. FDIC insurance applies to cash deposits at banks and other insured depository institutions in the event of a failure of that institution, and does not apply to any Coinbase Entity or to any Digital Asset held by a Coinbase Entity on Client's behalf. Client Cash is immediately available to Client for purposes of submitting an Order, unless a restriction applies.

2.5    At Client's election, all or a portion of Client Digital Assets may also be allocated to the Vault Balance which is held in a Custodial Account in Client's name at Coinbase Custody pursuant to the Custody Agreement. Such Vault Balance will be divided between segregated hot storage in Client's name ("Hot Vault Balance") and segregated cold storage in Client's name ("Cold Vault Balance"). Client shall have sole discretion to allocate Digital Assets between the Hot Vault Balance and Cold Vault Balance. Digital Assets in the Hot Vault Balance may be transferred immediately to Client's Trading Balance unless a restriction applies. A transfer of Digital Assets in the Cold Vault Balance to Client's Trading Balance will be subject to Coinbase Custody's standard cold storage withdrawal procedures. Client hereby appoints Coinbase as Client's agent for purposes of instructing Coinbase Custody to transfer Client Digital Assets between Client's Vault Balance and Client's Trading Balance. Client agrees that an Instruction to Coinbase to settle an Order to or from Client's Vault Balance constitutes authorization to Coinbase to transfer Client Digital Assets to or from Client's Vault Balance as necessary or appropriate to consummate such settlement.

2.6    In all circumstances and consistent with laws and regulations applicable to Coinbase, Coinbase will keep an internal ledger that specifies the Client Assets credited to Client's Trading Balance and enables Coinbase and its auditors and regulators to identify Client and the Client Assets.

2.7    Coinbase treats all Client Assets as custodial assets held for the benefit of Client. No Client Assets credited to the Trading Balance shall be considered to be the property of, or loaned to, Coinbase, except as provided in any loan agreement between Client and any Coinbase Entity. Neither Coinbase nor any Coinbase Entity will sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance unless instructed by Client pursuant to an agreement between Client and a Coinbase Entity.

**3.    Role of Coinbase Custody**

3.1    To facilitate the Trading Services, Coinbase may at its sole discretion maintain portions of the Omnibus Hot Wallet and the Omnibus Cold Wallet in one or more custodial FBO accounts with its affiliate, Coinbase Custody. In such circumstances, although the Omnibus Hot Wallet and the Omnibus Cold Wallet are held in Coinbase's FBO accounts with Coinbase Custody, Client's legal relationship for purposes of Digital Assets held in the Omnibus Hot Wallet and the Omnibus Cold Wallet will not be, directly or indirectly, with Coinbase Custody and the terms, conditions and agreements relating to those wallets are to be governed by this MTA.

3.2    Client Digital Assets held in the Hot Vault Balance and Cold Vault Balance are maintained directly between Client and Coinbase Custody in Client's name and are subject to the terms of the Client's Custody Agreement.

**4.    Cash and Digital Asset Deposits and Withdrawals**

4.1    <u>To deposit Client Cash</u>, Client must initiate a transfer from a linked bank account, a wire transfer, a SWIFT transfer, a Silvergate Exchange Network deposit or other form of electronic payment approved by Coinbase from time to time to Coinbase's bank account, the instructions for which are available on the Coinbase Prime Broker Site. Coinbase will credit the Trading Balance with Client Cash once the associated cash is delivered to Coinbase.

4.2    <u>To withdraw Client Cash</u>, Client may also initiate a withdrawal of Client Cash from the Trading Balance at any time using the withdrawal function on the Trading Platform.

4.3    <u>To deposit Client Digital Assets</u>, Clients may transfer Client Digital Assets directly to the Omnibus Hot Wallet or Omnibus Cold Wallet, the instructions for which are available on the Coinbase Prime Broker Site. Client may transfer funds to and among its Hot Vault Balance or Cold Vault Balance. When Client transfers Digital Assets to Coinbase or Coinbase Custody, it delivers custody and control of the Digital Assets to Coinbase, Coinbase Custody or Coinbase's designee, as applicable. Client represents and warrants that any Digital Asset so transferred shall be free and clear of all liens, claims and encumbrances.

4.4    <u>To withdraw Client Digital Assets,</u> Client must provide applicable Instructions via the Coinbase Prime Broker Site ("<u>Withdrawal Transfer</u>"). Once Client has initiated a Withdrawal Transfer, the associated Client Digital Assets will be in a pending state and will not be included in the Client's Trading Balance or Vault Balance. Client acknowledges that Coinbase may not be able to reverse a Withdrawal Transfer once initiated. Client may withdraw Client Digital Assets at any time, subject to delays for Digital Assets held in Cold Vault Balance, and any applicable account restrictions.

4.5    Client must verify all transaction information prior to submitting withdrawal Instructions to Coinbase, as Coinbase cannot and does not guarantee the identity of the wallet owner or bank account to which Client is sending Client Digital Assets or Client Cash, as applicable. Coinbase shall have no liability, obligation, or responsibility whatsoever for Client Cash or Client Digital Asset transfers sent to or received from an incorrect party or sent or received via inaccurate Instructions.

## 5.    Disruption to Trading Platform

5.1    Client acknowledges that electronic facilities and systems such as the Trading Platform are vulnerable to disruption, delay or failure and, consequently, such facilities and systems may be unavailable to Client as a result of foreseeable and unforeseeable events. Client understands and agrees that Coinbase does not guarantee uninterrupted access to the Trading Platform or all features of the Trading Services. Client acknowledges that although Coinbase will attempt to provide notice of any scheduled or unscheduled unavailability that would result in Client being unable to access the Trading Platform or the Trading Services, Coinbase cannot guarantee advanced notice to Client.

5.2    Coinbase may, in its sole discretion, take any of the following actions, and in the case of clause (i), shall use reasonable efforts to provide Client with as much prior notice as is practicable: (i) halt or suspend Trading Services, including trading on the Trading Platform or the trading of any Digital Assets or currency, or (ii) impose limits on the amount or size of Client's Orders. Coinbase shall have no liability, obligation, or responsibility to Client as a result of making any changes to or suspending the Trading Platform.

## 6.    Coinbase Trading Rules and Order Types

6.1    Client agrees to comply with the Coinbase Trading Rules in effect at the time of any Order. Client agrees to review and become familiar with the terms of the various types of Orders (each an "<u>Order Type</u>") available through the Trading Service. A detailed description of the terms of all Orders is contained in the Coinbase Trading Rules. Coinbase reserves the right to modify the terms of any Order Type and the Coinbase Trading Rules at any time and without prior notice to Client, and Client acknowledges that it is solely responsible for ensuring knowledge of applicable Order Types and Coinbase Trading Rules prior to placing an Order.

6.2    Coinbase may modify the terms of, or cancel, any Order executed on Trading Platform if Coinbase determines in its sole reasonable discretion that the Order was clearly erroneous

according to the Coinbase Trading Rules. Coinbase shall have no liability, obligation, or responsibility to Client as a result of exercising its rights under this Section 6.

## 7.    Coinbase Supported Digital Assets

Coinbase determines in its sole discretion which Digital Assets to support for use with the Trading Services, as specified on the Coinbase Prime Broker Site. Not all Digital Assets supported for Custodial Services are also supported for Trading Services.

## 8.    Coinbase Execution Services

8.1    At Coinbase's sole discretion, Client may elect to submit Orders to Coinbase Execution Services ("CES"), a Trading Service through which CES personnel will execute Orders on behalf of Client. CES will execute Orders by using automated trade routing services through Client's Prime Broker Account or by filling Orders on Coinbase's over-the-counter ("OTC") trading service ("OTC Services"). Coinbase has sole and absolute discretion to accept or reject any Order. Coinbase and Client may communicate regarding Instructions related to Orders on a mutually agreed communication medium, including instant messaging, email, and telephone.

8.2    CES brokers Orders on a commercially reasonable basis as Client's agent and may exercise discretion in executing Orders. Client must pre-fund its Trading Balance prior to submitting Orders. By electing to use CES, Client agrees that it is authorizing CES personnel to access its Prime Broker Account to initiate and execute Orders. Client acknowledges that CES personnel will retain access to the Client Prime Broker Account until Client provides Coinbase with Instructions to terminate such access. Absent express written agreement between the Parties, Coinbase will accept Orders only from Authorized Representatives that are designated in the Client's Prime Broker Account as having trading authority with respect to the Prime Broker Account.

8.3    For OTC Services, CES personnel will confirm the terms of an Order (which terms shall include asset, quantity, price, settlement timing and fees) with Client prior to executing the Order. Coinbase has policies and procedures in place that are reasonably designed to prevent the disclosure of any Client identity to its OTC counterparty. Coinbase may, in its sole and absolute discretion, accept the following statements (or similar or analogous statements) as Client's final and binding agreement to the terms of an Order: "done," "I buy," "bought," "I sell," or "sold." A completed, executed and settled Order will be reflected in Client's Prime Broker Account.

8.4    For Orders fulfilled via OTC Services ("OTC Orders"), each of Client's and its OTC counterparty's confirmations of the terms of the OTC Order deems such OTC Order as binding and final, and thereby executed. Client's failure to timely settle an executed OTC Order in accordance with the settlement terms will constitute a default under the Coinbase Prime Brokerage Agreement. Upon Client's default of an OTC Order:

Without prior notice to Client, Coinbase shall have the right to: (i) transfer Client Assets from Client's Trading Balance to Coinbase to settle the OTC Order subject to default,

29

and/or (ii) liquidate or cancel outstanding OTC Orders (including OTC Orders that have been submitted or are in the process of being fulfilled).

If the above actions are not sufficient to satisfy all obligations of Client to Coinbase in respect of OTC Orders subject to default, Coinbase shall have the right to liquidate any and all of Client's assets and positions held with Coinbase or Coinbase Custody, including the Trading Balance and Vault Balance in Client's Custodial Account, to cover any Losses incurred by Client's failure to settle the OTC Order. In connection with liquidating such assets, Client authorizes Coinbase, in Coinbase's sole discretion, to liquidate any of Client's Digital Assets in a commercially reasonable sale at the market price that otherwise applies to such Digital Assets at the time of liquidation, without regard to whether Client would recognize a gain or loss on such sale or would recognize a greater or lesser gain or loss if different Digital Assets were sold. Client understands that the value of Digital Assets may rise or fall quickly, and Coinbase has no obligation to liquidate Client's Digital Assets at a time that provides the best price for Client. Client agrees that Digital Assets held in its Trading Balance and the Vault Balance in Client's Custodial Account are of a kind or type customarily sold on recognized markets, subject to standard price quotations and may decline speedily in value. Client agrees that if Coinbase exercises its setoff rights or secured party remedies against Client's Digital Assets, that Coinbase may value such Digital Assets using the same valuation method and same process that is otherwise used when Digital Assets are sold on the Trading Platform or any other commercially reasonable valuation method. A sale by Coinbase of Client's Digital Assets, without notice, at a private sale using the valuation and method described above shall be a commercially reasonable method of disposition.

## 9.    Determination of Suitability; All Risks Not Disclosed

Coinbase's provision of the Trading Services is neither a recommendation that Client enter into a particular Order nor a representation that any product described on the Trading Platform is suitable or appropriate for Client. Many of the Trading Services described on Trading Platform involve significant risks, and Client should not use the Trading Services unless it has fully understood all such risks and has independently determined that such Orders are appropriate. Any discussion of the risks contained in this MTA or on the Trading Platform should not be considered to be a disclosure of all risks or a complete discussion of the applicable risks.

## 10.    Characterization of Trading Services; Not a Registered Broker-Dealer or Investment Adviser

Client understands and acknowledges that no transactions executed in connection with Client's Trading Account or the Trading Services are securities transactions, and Coinbase is not registered with the U.S. Securities and Exchange Commission as a broker-dealer or an investment adviser or licensed under any state securities laws. Coinbase is not acting as a fiduciary in respect of Client (including in connection with its rights under this MTA) and does not have any responsibility under the standards governing the conduct of broker-dealers, fiduciaries, investment advisers or investment managers. Client agrees and acknowledges that any information or advice provided by Coinbase or any other Coinbase Entity does not and will not serve as the basis of any investment decision by Client.

30

## 11.    Coinbase Corporate Accounts

Coinbase and its affiliates may transact through Trading Accounts on the Trading Platform ("Coinbase Corporate Accounts") for purposes including inventory management, to facilitate Client Orders, and for other corporate purposes. To the extent that a Coinbase Corporate Account transacts on the Trading Platform, the Coinbase Corporate Account (i) will not have any special priority vis-a-vis Client Orders and will be subject to the Coinbase Trading Rules, (ii) will trade only on Market Data available to all Clients, and (iii) will not access any non-public data of other Clients. Coinbase's internal ledger will indicate the amount of each Digital Asset held for each client and each such Coinbase Corporate Account.

## 12.    Term, Termination and Suspension

12.1    Regardless of any other provision of this MTA, Coinbase has the sole discretion to decline to provide Trading Services to Client and may, in its sole discretion, suspend, restrict or terminate the Client's Trading Services, including by suspending, restricting or closing the Client's Trading Account, in accordance with the General Terms.

12.2    If Client is subject to termination, Client agrees to transfer any Client Assets off the Trading Platform within thirty (30) days of receipt of the termination notice unless such transfer is otherwise prohibited (i) under applicable law, including any sanctions programs, or (ii) by a facially valid subpoena or court order. Client agrees to promptly provide Coinbase with Instructions as to where its Client Assets should be transferred, and agrees that failure to do so within thirty (30) days of receipt of notice of termination may result in Client Assets being transferred to the Client's linked bank account or Digital Asset wallet on file, in each case subject to off-set for any outstanding obligations to any Coinbase Entity in accordance with the General Terms. Final disbursement of assets may be delayed until any remaining obligations or indebtedness have been satisfied. Client is responsible for all debits, costs, commissions, and losses arising from any actions Coinbase must take to liquidate or close transactions in the Client's Trading Account.

## 13.    Unclaimed Property

If Coinbase is holding Client Assets in the Trading Balance, has no record of Client's use of the Trading Services for an extended period, and is otherwise unable to contact Client, Coinbase may be required under applicable laws, rules or regulations to report these assets as unclaimed property and to deliver such unclaimed property to the applicable authority. Coinbase may deduct a dormancy fee or other administrative charge from such unclaimed funds, as permitted by applicable laws, rules or regulations.

**Distribution and Exchange Term Sheet**

This non-exhaustive, non-binding term sheet (the "Term Sheet") sets forth certain terms and conditions for a distribution and exchange arrangement (the "Distribution Addendum") related to  that certain Coinbase Prime Broker Agreement (the "Agreement") to be entered into between Coinbase, Inc. ("CB Inc."), Coinbase Custody Trust Company, LLC ("CB Custody") (for purposes of the Term Sheet, CB Inc. and CB Custody are collectively referred to herein as, "Coinbase") and the Client set forth in the Agreement (together with Coinbase, the "Parties", and each, a "Party"). Terms not defined herein have the meaning ascribed to them in the Agreement.

**Transaction Overview**

| | |
|---|---|
| **Appointment as Custodian** | Client will appoint Coinbase as a non-exclusive worldwide custodian and distribution agent for Distributions to Claimants pursuant to the Reorganization Plan.  Except as otherwise described, such services will be provided in accordance with the Agreement. |
| **Services** | Client will provide CB Custody with written instructions ("Instructions") to distribute to one or more Claimants a portion or all of, the payment owed to such Claimant(s) under the Reorganization Plan (each such distribution, a "Distribution"). Each such Instruction shall be provided in accordance with the terms set forth in the Agreement. CB Custody shall, directly or through one of its affiliates, make Distributions in accordance with Instructions provided by Client (the "Distribution Services"). |
| **Distributions to Supported Jurisdictions** | Client will direct Coinbase to make Distributions only of Supported Cryptocurrencies and only to Claimants in Supported Jurisdictions.  No Distributions shall be made to Claimants who Reside in a jurisdiction that is not a Supported Jurisdiction. |
| **Indemnification** | Client shall defend and indemnify and hold harmless Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses (each as defined in the Agreement) arising out of or relating to Coinbase's compliance with any Instruction by Client. |
| **Applicable Law** | Coinbase shall not be required to process any Instructions if Coinbase reasonably determines that such refusal or cancellation is necessary to comply with applicable law or regulations, or in response to a subpoena, court order or other binding government order, or if Coinbase reasonably believes that compliance with the Instruction may violate, facilitate the violation of, or is inconsistent with an applicable law, regulation or rule of a governmental authority or self-regulatory organization, or if changes in applicable law substantially increase the cost to Coinbase of processing Instructions. |
| **KYC Requirements** | Coinbase shall not be required to process any Client Instructions regarding Distributions to Claimants unless such Claimants have met the requirements of Coinbase's AML and KYC processes, as the same may be modified by Coinbase from time to time. |
| **Establishment of Accounts** | Subject to approval of the Bankruptcy Court, Client will establish one or more Custodial Accounts (each a "Celsius Custody Account").  For the avoidance of doubt, Client is not required to use Coinbase as a Custodian or for any custodian services or as prime exchange provider related to the Distribution Addendum and Client may, in its sole and absolute discretion, elect to use Coinbase and/or any other third party as a Custodian. |
| **Exchange Account Terms** | The Parties will agree to operational procedures and enter into any associated agreement pursuant to which CB Custody will make transfers from the Celsius Custody Account to Claimants. |
| **Supported Digital Assets** | Coinbase will provide services in respect of Supported Cryptocurrencies. |
| **Designation of Accounts** | The Celsius Custody Account will be held on behalf of Client, in accordance with the terms of the Agreement |
| **Account Process** | Client shall identify for Coinbase all Claimants for which Client wishes to use Coinbase to |

| | |
|---|---|
| | make a Distribution and shall provide information to Coinbase on all such Claimants as Coinbase shall reasonably require. Client shall notify Claimants that they may be eligible to receive Distributions in respect of their Claim (as defined in the Reorganization Plan) through Coinbase. Client shall ensure all Digital Assets to be distributed are made available in the applicable Celsius Custody Account prior to any Distribution and will inform Coinbase that Claimants may be eligible to receive Distributions in respect of their Claim. |
| **No Obligations to Claimants** | Coinbase's obligations arising under the Agreement and the Distribution Addendum will be solely to Client, and Coinbase shall have no obligations to any Claimant absent a separate agreement established between Coinbase and such Claimant. |
| **Governing Terms** | Except as otherwise provided, all activities by Claimants shall be governed by the Coinbase TOS. Client shall not be responsible for Claimants' compliance with the Coinbase TOS and shall not be held liable for any noncompliance (or any resulting damages of any kind) by such Claimants. |
| **Term** | Unless terminated earlier in accordance with the terms of the Agreement or the Distribution Addendum, the Distribution Addendum will be effective as of the entry of the Confirmation Order and shall remain in force for a period of one year thereafter (the "Term"), except as otherwise agreed by the parties. |
| **Fees** | Fees pertaining to the Distribution Addendum will be paid pursuant to an agreement between the parties and are estimated to total approximately USD $5 million. |
| **Definitions** | "**Claimant**" means any party that holds a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan). <br><br> "**Confirmation Order**" has the meaning set forth in the Reorganization Plan. <br><br> "**Disclosure Statement Approval Date**" means date of the Bankruptcy Court (as defined in the Agreement) order approving the Disclosure Statement (as defined in the Reorganization Plan). <br><br> "**Coinbase Account**" means a customer account at Coinbase, which may or may not have successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities. <br><br> "**Coinbase TOS**" means Coinbase's standard and cryptocurrency terms and conditions applicable to any particular Coinbase Account, as revised from time to time. <br><br> "**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, where such tokens are held from time to time held for Client under the terms of the Distribution Addendum. <br><br> "**Reorganization Plan**" means the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, In re Celsius Network LLC, No. 22-10964 (MG) (Bankr. S.D.N.Y. Mar. 31, 2023), ECF No. 3222, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms. <br><br> "**Reside**" means, with respect to any Claimant, such Claimant's principal residence as determined by Coinbase through the AML/KYC information that such Claimant provides to Coinbase. <br><br> "**Supported Jurisdiction**" means each jurisdiction in which Coinbase holds all licenses and registrations necessary to engage in the activities contemplated in the Distribution Addendum with respect to Supported Cryptocurrency in such jurisdiction; *provided*, however, that any list reflecting such jurisdictions submitted to the Court in connection with this Term Sheet is current as of the filing date of such submission, and may be subject to revisions, amendments, changes, or updates by Coinbase in its sole discretion from time to time. |

|  | **"Supported Cryptocurrency"** means the versions of Bitcoin and Ether commonly accepted as the official Bitcoin and Ether cryptocurrencies, respectively, by the three largest cryptocurrency trading platforms in the United States by trading volume for the preceding 12-month period. Supported Cryptocurrency shall not include any airdrops related to Bitcoin or Ether unless Coinbase notifies Client in writing that Coinbase has decided, in its sole and absolute discretion, to treat such airdropped asset as a Supported Cryptocurrency. |
|---|---|

## COINBASE SUPPORTED COUNTRIES FOR DISTRIBUTION

Canada
Mexico
Argentina
Bolivia
Brazil
Cayman Islands
Chile
Colombia
Costa Rica
Dominican Republic
Ecuador
El Salvador
Guatemala
Jamaica
Panama
Peru
Saint Kitts and Nevis
Saint Martin (French part)
Saint Maarten (Dutch part)
Uruguay
Venezuela
British Virgin Islands
Albania
Andorra
Austria
Belgium
Bulgaria
Croatia
Cyprus
Czechia
Denmark
Estonia
Faroe Islands
Finland
France
Germany
Gibraltar
Greece
Guernsey
Hungary

Iceland
Ireland
Isle of Man
Italy
Jersey
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Monaco
Netherlands
Norway
Poland
Portugal
Romania
San Marino
Slovakia
Slovenia
Spain
Sweden
Switzerland
United Kingdom
Azerbaijan
Benin
Burkina Faso
Cameroon
Curaçao
Georgia
Ghana
Jordan
Kenya
Kuwait
Madagascar
Mali
Nigeria
Serbia
Seychelles
South Africa
Togo
Tunisia
Turkey
Uganda
Ukraine

United Arab Emirates
Yemen
Zambia
Zimbabwe
Australia
Hong Kong
India
Indonesia
Japan
Kazakhstan
Mongolia
Nepal
New Zealand
Pakistan
Philippines
Singapore
Sri Lanka
Taiwan

**<u>Exhibit H</u>**

**PayPal Agreement**

DRAFT

**Summary of Agreement Between Debtors and PayPal for
Distribution of Assets to Claimants**

This document provides a high-level summary of the agreement (the "Agreement") that Celsius (together with its successors and assigns as permitted hereunder, "Celsius") intends to enter into to use PayPal's cryptocurrency and fiat payment distribution infrastructure to distribute certain assets of the Celsius estate to claimants in Celsius' Chapter 11 bankruptcy case (the "Services"). The Services are contemplated to be provided to certain parties that hold a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan) as described below (each a "Claimant"). Claimants may receive a portion or all of the payment owed to such Claimant under the Reorganization Plan as set forth in the Agreement (each, a "Distribution"). This document is not in any way, and should not in any way be construed as, a legally binding commitment between Celsius and PayPal (the "Parties"), and does not present many of the terms, conditions, covenants, representations, warranties, and other provisions that the Parties would require in any definitive documentation.

*Purpose of the Agreement*

- Celsius intends to enter the Agreement with PayPal under which PayPal, acting through its PayPal fiat currency and cryptocurrency hubs and its Venmo fiat currency and cryptocurrency hubs, would facilitate distribution of:

  o Bitcoin ("BTC") and Ether ("ETH") from Celsius to natural persons with Allowed Claims against Celsius who are resident in the United States and its territories, excluding the state of Hawaii (each, a "Crypto Claimant"); and

  o Fiat currency from Celsius to parties with Allowed Claims against Celsius for Distributions in Hawaii and the jurisdictions listed on PayPal's website at https://www.paypal.com/us/webapps/mpp/country-worldwide, which may be amended from time to time at PayPal's discretion and as required by applicable law (each, a "Fiat Claimant").

*Process for Distributions*

- Celsius will establish a custodial account at Paxos Trust Company LLC ("Paxos") ("Celsius Custody Account"). PayPal has an existing custodial account at Paxos for the benefit of ("FBO") its customers ("PayPal Custody Account").

- Celsius will make one or more on-chain transfers of BTC and ETH into the Celsius Custody Account.

- PayPal will develop a dedicated portal (the "Portal") through which a Claimant can input identifying information to request distribution of assets in respect of their Claim through PayPal. Celsius and PayPal will use a mutually agreed mechanism to keep personally identifiable information confidential.

- A Crypto Claimant is required to be provisioned by PayPal for cryptocurrency activity in order to receive Distributions of ETH or BTC through the PayPal cryptocurrency hub or Venmo cryptocurrency hub. In order to be so provisioned, Crypto Claimants that are not provisioned for cryptocurrency activity at the time the Agreement is entered into will need to (1) affirmatively accept PayPal's or Venmo's Cryptocurrency Terms and Conditions, as applicable, and (2) successfully complete PayPal's KYC, AML, and other applicable processes and requirements, as determined by PayPal. PayPal may reject provisioning a Claimant if the Claimant previously had a PayPal account terminated or frozen for a violation of PayPal's terms of service.

- Celsius will provide PayPal with instructions for the distribution of BTC and ETH to Crypto Claimants (the "Distribution Instructions"). If the Distribution Instructions are valid, PayPal will instruct the custodian to make off-chain transfers of BTC and ETH from the Celsius Custody Account to the PayPal Custody Account as necessary to effectuate the Distribution Instructions.

- After each such transfer, PayPal will reflect the relevant BTC and ETH positions in the appropriate Crypto Claimants' PayPal account(s).

- Celsius will provide similar Distribution Instructions for distributions of fiat currency to Fiat Claimants.

*Fees*

- PayPal will not charge Crypto Claimants any fee to receive Distributions or to withdraw Distributions directly from a PayPal or Venmo account. Any subsequent activity by Crypto Claimants, including any conversion of BTC, ETH or U.S. dollars to any other cryptocurrency or fiat currency, will be subject to PayPal's standard fees, as applicable. A Claimant may, at their discretion, make a subsequent on-chain transfer to an external platform, wallet or address after receiving a Distribution; in such an event, PayPal will pass on any applicable cryptocurrency network fee to the Crypto Claimant incurred by such on-chain transfer.

- PayPal will not charge Fiat Claimants any fee to receive Distributions or to withdraw Distributions directly from a PayPal or Venmo account via PayPal's standard withdrawal process. PayPal may charge a premium for expedited or instant withdrawals.

- PayPal will not charge Celsius any fee for providing the Services.

- PayPal will pay all of Paxos's fees associated with establishing and maintaining the Celsius Custody Account for the first twelve months after the Celsius Custody Account is established.

- PayPal will pay Celsius a fee equal to 25% of the revenue PayPal generates from new cryptocurrency customers during the first 180 days after the new cryptocurrency customer receives its first distribution of cryptocurrency under the Agreement. This fee will be reduced by certain losses PayPal incurs during that same time period.

- PayPal will not pay Celsius any fee with respect to the Fiat Claimants.

*Other Provisions of the Agreement*

- An order of the Bankruptcy Court (which, for the avoidance of doubt, may be the Confirmation Order) shall approve the entry by Celsius into the Agreement (such provisions relating to approval of the Agreement, the "Approval Order"), which must be in form and substance acceptable to PayPal in its sole discretion. The Agreement will only be effective if the Bankruptcy Court enters the Approval Order within 60 days of the Parties entering into the Agreement. The Agreement will be null and void in certain circumstances, including if the Bankruptcy Court enters an order, or if Celsius or any of the other Debtors support an order, that has the effect of amending the Approval Order or this Agreement in a manner that PayPal determines in its reasonable discretion is materially adverse to PayPal.

2

- PayPal shall not be obligated to perform any action or actions under the Agreement to which the New York State Department of Financial Services objects.

- The Approval Order will provide that relevant fees and expenses are entitled to priority as administrative expenses.

- Each Party will provide appropriate representations and warranties to each other.

- Celsius shall obtain approval to include PayPal as an Exculpated Party under the Debtors' Chapter 11 plan, which exculpation shall (1) provide for and include the Services set forth herein and (2) be effective for the period from the petition date through the effective date of such plan.

- Each Party will provide appropriate indemnifications to the other for third party claims and will be subject to appropriate limitation of liabilities.

- Each Party will have the ability to terminate for cause after an appropriate cure period.  The Agreement will also terminate upon the issuance of a final, unappealable order by a court of competent jurisdiction closing the last remaining Chapter 11 case.

## **Exhibit I**

**Plan Administrator Agreement**

*Initial Filing Version – Subject to Ongoing Discussions*

## PLAN ADMINISTRATOR AGREEMENT

This PLAN ADMINISTRATOR AGREEMENT (this "Agreement"), which shall constitute the "Plan Administrator Agreement" under, as defined in, and for all purposes of the Plan, unless and until it is replaced by an agreement with a successor "Plan Administrator" appointed under the Plan pursuant to Section 8 hereof, dated as of [●], by and among (a) Celsius Network LLC, on behalf of itself and its debtor subsidiaries (collectively, the "Debtors" or the "Post-Effective Date Debtors," as applicable), (b) Christopher Ferraro, who shall constitute (and is deemed designated) the "Plan Administrator" under, as defined in, and for all purposes of the Plan, unless and until the Plan Administrator ceases to be the "Plan Administrator" hereunder (the "Plan Administrator"), and (c) the Committee (together with the Debtors and the Plan Administrator, the "Parties"), sets forth the Plan Administrator's rights, powers, and obligations in connection with the Plan pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (as may be amended, modified, or supplemented from time to time, the "Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1.    Appointment.    Effective as of the Effective Date (as defined in the Plan), the Plan Administrator will be appointed to act as the Plan Administrator under the Plan for the purpose of effectuating the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, the Confirmation Order, and the Wind-Down Procedures, if applicable (collectively, the "Plan Documents"). As set forth in the Plan Documents, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors, the Debtors' officers, directors, managers, members, shareholders, and the Debtors' Estates from and following the Effective Date. Notwithstanding the foregoing, the sole and limited duties of the Plan Administrator are the responsibilities set out in Section 2.

2.    Scope of Services.    The Plan Administrator shall provide post-Effective Date administration, wind down, dissolution, and liquidation services that are necessary, required, desirable, or advisable to effectuate the Plan Documents and to make certain distributions under the Plan. Without limiting the provisions of the Plan applicable to the Plan Administrator, the Plan Administrator will perform the following services for the Post-Effective Date Debtors' Estates in its role as Plan Administrator for all purposes of the Plan (as such services may be further described in the Plan Documents or additional tasks required to be performed by the Plan Administrator as described in the Plan Documents):

(a)    make (or arrange for a Distribution Agent to make) the distributions contemplated by the Plan;

(b)    administer the Special Committee D&O Liability Insurance Policies;

(c)    cooperate with the Litigation Administrator with respect to its duties, as set forth in the Plan Documents and the Litigation Administrator Agreement;

(d)    to the extent not duplicative with the responsibilities of any Litigation Administrator, marshal, market for sale, and wind down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(e)    to the extent not duplicative with the responsibilities of any Litigation Administrator, recover and compel turnover of the Debtors' property in accordance with the Plan;

(f)    manage the Plan Administrator Budget or Wind-Down Budget, as applicable, and pay the Wind-Down Expenses, if any;

(g)    to the extent not duplicative with the responsibilities of any Litigation Administrator, abandon any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(h)    prepare and file post-Effective Date operating reports (including the month in which the Effective Date occurs);

(i)    file appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(j)    at the appropriate time, file a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Post-Effective Date Debtors under the applicable laws of their respective states of incorporation or formation (as applicable);

(k)    be responsible for the ongoing administration of the Chapter 11 Cases and all actions related to the closing of the Chapter 11 Cases;

(l)    retain such professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations;

(m)    take such actions as are necessary and reasonable to carry out the purposes of the Plan, including winding down the Debtors' business affairs; and

(n)    implement the Orderly Wind Down, if applicable.

3.    Timing and Fees.

(a)    The Plan Administrator will commence its responsibilities on the Effective Date.

(b)    The Post-Effective Date Debtors shall pay the Plan Administrator's compensation and reimburse the Plan Administrator's expenses as set forth herein as such amounts come due without the need for Bankruptcy Court approval.

(c)    The Plan Administrator's annual compensation shall be as follows: $[●] per month until [sixty (60) days] following the revesting of the initial Unclaimed Distributions pursuant to the Plan, and $[●] per month thereafter until the termination of this Agreement, which

2

shall be payable from the Post-Effective Date Debtors' Assets on a monthly basis in advance not later than the first business day of each month.  In addition, sixty (60) days following the revesting of Unclaimed Distributions pursuant to the Plan, the Plan Administrator shall receive a substantial completion bonus in the amount of $[●], and upon the closing of these Chapter 11 Cases, the Plan Administrator shall receive a completion bonus in the amount of $[●], each of which shall be payable from the Post-Effective Date Debtors' Assets.[1]

(d)    In addition to the foregoing, the Plan Administrator shall be entitled to reimbursement of actual, reasonable, out-of-pocket and direct expenses incurred in connection with the services to be provided under this Agreement and/or the Plan Documents, as applicable.

(e)    The Plan Administrator may retain any professionals reasonably necessary to the Plan Administrator, and any professionals retained by the Plan Administrator pursuant to the terms of this Agreement shall be paid as set forth in the applicable professional's engagement letter, which shall be payable from the Post-Effective Date Debtors' Assets in accordance with the terms of this Agreement.

4.    Relationship of the Parties.  The Parties intend that an independent contractor relationship shall be created by this Agreement.  The Plan Administrator shall not be entitled to receive from the Debtors or Post-Effective Date Debtors or their Estates any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.

5.    D&O Liability Insurance.  The Post-Effective Date Debtors shall purchase director and officer liability insurance ("D&O Insurance") that will cover the Plan Administrator with respect to carrying out the Plan Administrator's duties in an amount and on terms reasonably acceptable to the Plan Administrator.

6.    Confidentiality.  The Plan Administrator shall treat confidentially all information not publicly available that is received by the Plan Administrator in connection with this engagement or that is developed during this engagement, and the Plan Administrator shall not disclose such information except as required by a court order or other legal process.

7.    Indemnity.  The Post-Effective Date Debtors shall indemnify and defend the Plan Administrator and all professionals engaged by the Plan Administrator from and against any and all claims, liability, loss, costs, damage, or expense (including reasonable attorneys' fees) (collectively, "Damages") asserted against it by reason of or arising out of or related to this Agreement or performance under this Agreement or any related transactions that are taken or omitted to be taken as set forth in this Agreement; provided that there shall be no obligation to indemnify or defend the Plan Administrator or its professionals on account of damages that are determined to have arisen primarily from the Plan Administrator's or such professional's gross negligence or willful misconduct.

---

[1]    [NTD:  The Plan Administrator's compensation, including the conditions to and amounts of the substantial completion bonus and the completion bonus, remain subject to discussion among the proposed Plan Sponsor, the Debtors, and the Committee.]

8.      Exculpation.  The Plan Administrator and any professional engaged by the Plan Administrator shall not be liable for any act or omission in connection with the discharge by the Plan Administrator or such professional of the powers and duties conferred upon the Plan Administrator by the Plan, this Agreement, any Final Order, or applicable law, except to the extent that such liability is due to an act or omission that is determined, in a Final Order, to be due to the Plan Administrator's or such professional's gross negligence or willful misconduct.  Nothing contained in this Section 7 shall preclude or impair any Holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Plan Administrator to compel the Plan Administrator to make the distributions contemplated by the Plan on account of such Allowed Claim.

9.      Termination; Effect of Termination.

        (a)      This Agreement shall terminate automatically after all of the Chapter 11 Cases have been closed and all payments have been made under the Plan (including the Plan Administrator's compensation and reimbursement).

        (b)      The Plan Administrator may resign its duties at any time upon thirty (30) days' written notice to the Bankruptcy Court and the Notice Parties, provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, who shall be selected by the Plan Administrator and reasonable acceptable to the Litigation Oversight Committee.  Upon the appointment of a successor Plan Administrator, such successor shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order, and all responsibilities of the predecessor Plan Administrator shall be terminated.

        (c)      This Agreement may be terminated for cause shown pursuant to a Final Order entered by the Bankruptcy Court after notice and a hearing; provided that in the event that this Agreement is terminated before its automatic termination as provided in Section 8(a), the Bankruptcy Court shall appoint a successor Plan Administrator to fill the vacancy left by the termination of this Agreement.

        (d)      Upon termination of this Agreement or resignation of the Plan Administrator, the Plan Administrator shall be entitled to all fees and expenses accrued to that date pursuant to this Agreement, including any travel or related expenses incurred in returning from the location of the services being provided under this Agreement prior to the termination date or resignation date.

10.     Effectiveness.  This Agreement shall be effective upon the Effective Date.

11.     Notice.  All invoices, notices, requests, demands, and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given:  (a) when personally delivered; (b) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (d) three (3) Business Days following mailing by certified or registered mail, postage prepaid and

return receipt requested.  Unless another address is specified in writing, notices, requests, demands, and communications to the Parties hereto shall be sent to the addresses indicated below:

To the Post-Effective Date Debtors:

> c/o Celsius Network LLC
> 50 Harrison Street, Suite 209F
> Hoboken, New Jersey 07030
> Attn:   Ron Deutsch
> E-mail:legal@celsius.network

with copy to:

> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, Illinois 60654
> Attn:   Patrick J. Nash, P.C.; Ross Kwasteniet, P.C.;
> Christopher S. Koenig; Dan Latona
> E-mail: patrick.nash@kirkland.com
>           chris.koenig@kirkland.com
>           dan.latona@kirkland.com

> - and -

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn:   Joshua Sussberg, P.C.
> E-mail: joshua.sussberg@kirkland.com

To the Plan Administrator:

> Christopher Ferraro
> E-mail: [TO COME]

To the Committee:

> White & Case LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attn: David M. Turetsky, Samuel P. Hershey, Keith H.
> Wofford
> Email: david.turetsky@whitecase.com
>           sam.hershey@whitecase.com
>           kwofford@whitecase.com

> - and -

> White & Case LLP
> 111 South Wacker Drive, Suite 5100
> Chicago, Illinois 60606
> Telephone: (312) 881-5400
> Attn: Gregory F. Pesce

Email: gregory.pesce@whitecase.com

- and –

White & Case LLP
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (212) 819-8200
Attn: Aaron E. Colodny
Email: aaron.colodny@whitecase.com

12.    Miscellaneous.

(a)    Sections 5, 6, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

(b)    In the event of an inconsistency between this Agreement and the Plan Documents, the terms of the Plan Documents shall control in all respects.

(c)    If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the maximum extent provided by applicable law.

(d)    Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party.

(e)    This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or principles thereof.  In any court proceeding arising out of or related to this Agreement, each of the Parties hereby waive any right to trial by jury.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding arising from or related to this Agreement, and each of the Parties agrees not to commence any action, suit, or proceedings relating thereto except in the Bankruptcy Court.

(f)    This Agreement and the Plan Documents encompass all of the terms and conditions between the Debtors and the Plan Administrator concerning the subject matter hereof. This Agreement may not be amended or modified in any respect except in a writing signed by each of the Parties.

(g)    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (.pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGES FOLLOW]

THE DEBTORS:

CELSIUS NETWORK LLC, ON BEHALF
OF ITSELF AND ITS AFFILIATED
DEBTORS


By:_____
Name: Ron Deutsch
Title: General Counsel

*Signature Page to Plan Administrator Agreement*

THE PLAN ADMINISTRATOR:

CHRISTOPHER FERRARO


By:_____
Name: Christopher Ferraro

THE COMMITTEE:

___, ON BEHALF OF THE COMMITTEE
OF UNSECURED CREDITORS


By:_____
Name:
Title:

**<u>Exhibit J</u>**

**Figure Lending, LLC Refinancing Term Sheet**

## Overview of Refinancing Proposal from Figure

Article IV.B.7 of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt. No. 3319] (the "**Plan**")[1] states that "[t]o the extent the Retail Borrower Ad Hoc Group, the Debtors, or the Committee identify a source of third-party financing reasonably acceptable to the Debtors, the Debtors shall take commercially reasonable efforts to facilitate such party in refinancing applicable Retail Advance Obligations with the consideration provided to Retail Borrowers under the Plan."

The Debtors, the Committee, and the Retail Borrower Ad Hoc Group have identified Figure Technologies, Inc. and its affiliates, including Figure Lending, LLC, a licensed consumer lender ("**Figure**"), as a potential source of third-party financing that has offered to refinance applicable Retail Advance Obligations of eligible, electing Retail Borrowers.  Indicative terms of the proposed loans are attached hereto as Annex 1.  Any refinancing is optional and Retail Borrowers are not required to take any action.

To the extent a Holder of a Retail Borrower Claim elects to refinance its Retail Advance Obligation, any post-Effective Date obligation will be between such Holder and Figure. The Debtors will facilitate the repayment by Figure of the Retail Advance Obligation (that would otherwise be paid by the applicable Holder) and the delivery to Figure of the distribution that would otherwise have been paid by the Debtors to such Holder under the Plan.  The Debtors will have no other involvement in any loan issued by Figure to a Holder of Retail Borrower Claim.

The ability of a Holder of a Retail Borrower Claim to refinance its Retail Advance Obligation with Figure is contingent on (1) such Holder making the Liquid Cryptocurrency Weighted Distribution Election on their Ballot, (2) the Debtors being able to satisfy such elections of Retail Borrowers in full,[2] (3) such Holder executing a loan agreement with Figure, (4) such Holder completing KYC/AML and other filings required by Figure, (5) such Holder satisfying the minimum loan to value ratio required by Figure and any other conditions to such loan, (6) confirmation of the Plan, (7) the occurrence of the Effective Date, (8) the applicable Retail Deposit Claim being an Allowed Claim and either (a) such Holder is not subject to Withdrawal Preference Exposure or (b) any such Withdrawal Preference Exposure is settled under the Account Holder Avoidance Action Settlement, and (9) Figure securing the anticipated capital to fund payment to the Debtors of the Retail Advance Obligations of electing Retail Borrowers.

The Debtors, the Committee, and the Retail Borrower Ad Hoc Group have been approached by other potential third-party financing sources.  To the extent the Debtors, the Committee, and the Retail Borrower Ad Hoc Group identify additional acceptable third-party

---

[1] Where context requires, capitalized terms used by not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[2] The Debtors' ability to satisfy the Liquid Cryptocurrency Weighted Distribution Elections will depend on the aggregate Unsecured Claim Distribution Mix Elections.  Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.  *See* Plan, Art. I.A.144; *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt No. 3332] (the "**Disclosure Statement**") at 51-55.

financing sources, the Debtors will file an additional Plan Supplement document describing the terms of the proposed financing.

     ***The Debtors are not endorsing, sponsoring, or recommending any Holder enter into an agreement with Figure or refinance their Retail Advance Obligation. Other than the transactions described in this Plan Supplement document, neither the Debtors nor the Committee have any agreement with Figure. Other than the repayment of the Retail Advance Obligation to the Debtors under the Plan, neither the Debtors nor the Committee will receive any consideration from Figure or any other party on account of any agreement between a Holder of a Retail Borrower Claim and Figure.***

## Summary of Transaction

     Under the Plan, a Holder of a Retail Borrower Claim is provided with the option to repay all or a portion of its Retail Advance Obligation (*i.e.*, the outstanding principal amount of their loan owed to the Debtors) in return for an amount of BTC or ETH (at the Retail Borrower's election) equal to the amount repaid on account of the Retail Advance Obligation. *Plan*, Art. III, B.2(b)(i). Such Holder will also receive its Pro Rata amount of Unsecured Claim Distribution Consideration (*i.e.* Liquid Cryptocurrency, NewCo Common Stock, and Litigation Proceeds) on account of its Retail Borrower Post-Set Off Claim (*i.e.,* the amount of its Retail Borrower Claim in excess of its Retail Advance Obligation). *Id.*, Art. III, B.2(b)(ii).

     Holders of Retail Borrower Claims are given priority with respect to their elections to receive more Liquid Cryptocurrency than NewCo Common Equity (*i.e.* the Liquid Cryptocurrency Weighted Distribution Election). *Id.* The Liquid Cryptocurrency Weighted Distribution Election is described in detail at page 51 of the Disclosure Statement.

     Holders of Retail Borrower Claims that wish to enter into a new loan agreement with Figure should Accept the Liquid Cryptocurrency Weighted Distribution Election in Item 6 on their Ballots. Whether the Debtors may honor any Liquid Cryptocurrency Weighted Distribution Election depends on the elections made by all Account Holders. *See* Plan, Art.I.A.144. The Debtors will determine whether they are able to satisfy the Liquid Cryptocurrency Weighted Distribution Elections of Holders of Retail Borrower Claims following the September 22, 2023 voting deadline.

     If the Debtors are able to satisfy such elections, they will file a notice on the Bankruptcy Court docket with information for how eligible holders may contact Figure regarding a potential refinancing.

     Upon the completion of all documentation and other conditions required by Figure, Figure shall provide a written authorization to the Debtors executed by the applicable Holder specifying whether such Holder elects to receive BTC or ETH and authorizing the Debtors to provide such Holders' distribution under the Plan to Figure.

     Prior to the Effective Date, Figure shall repay the applicable Holders' Retail Advance Obligation.

On the Effective Date, the Debtors shall provide such Holders' distribution under the Plan to Figure.

The Debtors shall have no other obligations with respect to such Holders' distribution and any agreement entered into between such Holder and Figure.

For the avoidance of any doubt, the ability of a Holder of a Retail Borrower Claim to refinance its Retail Advance Obligation with Figure is contingent on (1) such Holder making the Liquid Cryptocurrency Weighted Distribution Election on their Ballot, (2) the Debtors being able to satisfy such elections of Retail Borrowers in full,[3] (3) such Holder executing a loan agreement with Figure, (4) such Holder completing KYC/AML and other filings required by Figure, (5) such Holder satisfying the minimum loan to value ratio required by Figure and any other conditions to such loan, (6) confirmation of the Plan, (7) the occurrence of the Effective Date, (8) the applicable Retail Deposit Claim being an Allowed Claim and either (a) such Holder is not subject to Withdrawal Preference Exposure or (b) any such Withdrawal Preference Exposure is settled under the Account Holder Avoidance Action Settlement, and (9) Figure securing the anticipated capital to fund payment to the Debtors of the Retail Advance Obligations of electing Retail Borrowers..

## Defined Terms[4]

"**Account Holder**" means a Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date.

"**Account Holder Avoidance Action Settlement**" means the settlement of Avoidance Actions between the Debtors and certain Account Holders, the terms of which are set forth in Article IV.B.3 of the Plan.

"**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

"**Ballot**" means the ballot, approved pursuant to the Disclosure Statement Order, distributed to Holders of Impaired Claims entitled to vote on the Plan, on which such Holders desiring to vote shall indicate acceptance or rejection of the Plan and, as applicable, make any additional settlement and treatment elections contained in such ballot.

---

[3] The Debtors' ability to satisfy the Liquid Cryptocurrency Weighted Distribution Elections will depend on the aggregate Unsecured Claim Distribution Mix Elections. Any Liquid Cryptocurrency Weighted Distribution Election on account of Retail Borrower Post-Set Off Claim shall be given priority over all other such elections. *See* Plan, Art. I.A.144; *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt No. 3332] (the "**Disclosure Statement**") at 51-55.

[4] The defined terms listed below are copied from the Plan verbatim and included for the reader's convenience. To the extent there are any inconsistencies between the definitions listed in the Plan and this Plan Supplement Document, the Plan shall control,

"**Committee**" means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on July 27, 2022 [Docket No. 241].

"**Effective Date**" means the date on which (a) all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and (b) the Plan is declared effective in accordance with its terms.

"**Holder**" means an Entity holding a Claim against or an Interest in any Debtor.

"**Liquid Cryptocurrency**" means the types of Cryptocurrency to be distributed to Holders of Claims pursuant to this Plan, which may include: (a) BTC and (b) ETH.

"**Liquid Cryptocurrency Weighted Distribution Election**" means the Ballot election of a Holder of a Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration expressing a preference to receive a greater share of the Liquid Cryptocurrency Distribution Amount in lieu of some or all of such Holder's Pro Rata share of NewCo Common Stock; *provided* that, to the extent a Holder's Liquid Cryptocurrency Weighted Distribution Election is honored, such Holder will forfeit all or a portion of the Holder's NewCo Common Stock distribution at a 30% discount to the Liquid Cryptocurrency it is receiving. The amount of NewCo Common Stock forfeited, and therefore the amount of Liquid Cryptocurrency received, will depend on the aggregate Unsecured Claim Distribution Mix Elections. For the avoidance of doubt, (a) any Liquid Cryptocurrency Weighted Distribution Election shall apply to all Claims on account of which the electing Account Holder is receiving the Unsecured Claim Distribution Consideration and (b) any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

"**Litigation Proceeds**" means the proceeds of the Recovery Causes of Action.

"**NewCo Common Stock**" means the common stock of NewCo to be distributed on the Effective Date in accordance with the terms hereof.

"**Pro Rata**" means the proportion that the U.S. Dollar value of an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate U.S. Dollar value of all Allowed Claims or Allowed Interests in that Class (or as otherwise specified), in each case calculated as of the Petition Date. For the avoidance of doubt, the denominator for purposes of the "Pro Rata" calculation with respect to Claims on account of which the Holder will receive the Unsecured Claim Distribution Consideration shall include all Claims receiving the Unsecured Claim Distribution Consideration.

"**Retail Advance Obligations**" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

"**Retail Advance Obligation Repayment Amount**" means an amount of BTC or ETH that is equivalent in value to the amount of the Retail Advance Obligations repaid by the applicable Retail Borrower pursuant to the Retail Advance Obligation Repayment Election, which BTC or ETH shall be valued as of the day that such repayment is made as of 12:00 p.m., prevailing Eastern

Time, on a cryptocurrency exchange to be agreed upon by the Debtors and the Retail Borrower Ad Hoc Group.

"**Retail Advance Obligation Repayment Deadline**" means five (5) calendar days prior to the Effective Date.

"**Retail Advance Obligation Repayment Election**" means the Ballot election of a Retail Borrower to repay its Retail Advance Obligations.

"**Retail Borrower Ad Hoc Group**" means that certain ad hoc group of Retail Borrower Deposit Claim Holders represented by McCarter & English, LLP as set forth in the First Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019 [Docket No. 1920].

"**Retail Borrower Deposit Claim**" means a Retail Borrower's Claim against the Debtors on account of the Cryptocurrency such Retail Borrower transferred in connection with its Retail Advance Obligation(s).

"**Retail Borrower Post-Set Off Claim**" means a Retail Borrower's remaining Claim after application of any Retail Advance Obligation Repayment Amounts transferred by such Retail Borrower by the Retail Advance Obligation Repayment Deadline and/or the application of the Set Off Treatment to such Retail Borrower's Retail Borrower Deposit Claim.

"**Retail Borrowers**" means the individual Account Holders with outstanding Retail Advance Obligations in the Debtors' Borrow Program as of the Petition Date; provided that Daniel Leon and Hanoch "Nuke" Goldstein shall not be considered to be Retail Borrowers.

"**Set Off Treatment**" means, with respect to any Retail Borrower Deposit Claim, the treatment option pursuant to which such Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligations outstanding on the Petition Date. Under the Set Off Treatment, the Retail Borrower will retain the proceeds of its Retail Advance Obligations and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date. The remaining amount of the Retail Borrower Deposit Claim (*i.e.*, the Retail Borrower Post-Set Off Claim) will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable. For the avoidance of doubt, if a Holder's Retail Borrower Deposit Claim receives the Set Off Treatment, such Holder will not owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of such Retail Borrower Deposit Claim.

"**Unsecured Claim Distribution Consideration**" means (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of the NewCo Common Stock (subject to dilution by the Management Equity Compensation and the Employee and NewCo Board Equity Compensation).

"**Unsecured Claim Distribution Mix Election**" means either a Liquid Cryptocurrency Weighted Distribution Election or NewCo Common Stock Weighted Distribution Election. The Debtors shall use reasonable efforts to redistribute the consideration provided to the Holders of General

Earn Claims (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) to satisfy Unsecured Claim Distribution Mix Elections.

"**Withdrawal Preference Exposure**" means (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (*i.e.*, on or after April 14, 2022), valued as of the time of such withdrawals less (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits.  The details of how Withdrawal Preference Exposure is calculated are included in Article.III.PP of the Disclosure Statement.

**<u>Annex 1</u>**

**Indicative Refinancing Term Sheet from Figure Lending, LLC**

## Annex 1
## Indicative Refinancing Term Sheet from Figure

# FIGURE

| Attribute | Description |
|---|---|
| Loan Amount[1] | Min. $5,000      Max N/A |
| Maturity | 3 years from Effective Date |
| Rate | 15% |
| Monthly Payment Amount | Interest only; payment can be made in cash or as PIK against crypto collateral (subject to Eligibility terms below); certain loans may be eligible for PIK against balance |
| Eligibility (based on Crypto Value v. Tender Amount) | Initial Collateral Value (value of crypto on settlement Effective Date) – loan-to-value (LTV) ratio must be less than 75 LTV at Effective Date |
| | Current Crypto Value (value of crypto at any given time) – If value drops to the levels identified below, additional crypto must be deposited so Current Crypto Value yields a 75 LTV ratio:<br>● If value drops such that LTV ratio is between 80 and 90, one day notice will be provided before a Liquidation Event<br>● If value drops such that LTV ratio is 90 or above, immediate Liquidation Event |
| Liquidation Event[2] | Crypto is liquidated (and liquidation proceeds, less liquidation costs, are used to pay down the loan) in an amount necessary to bring LTV ratio to 50 |
| Prepayment[3] | ● If prepayment of Loan Amount prior to 1 year from Effective Date, 35% penalty (0.35 * value crypto in excess of loan balance) retained<br>● If prepayment of Loan Amount between 1 year and 2 years from Effective Date, 25% penalty (0.25 * value of crypto in excess of loan balance) retained |

---

[1]   General minimum and maximum may vary subject to state-specific legal limitations.
[2]   Liquidation mechanics may vary subject to state-specific legal limitations.
[3]   Prepayment terms may vary subject to state-specific legal limitations.

**<u>Exhibit K(i)</u>**

**New Organizational Documents:**

**Director and Officer Indemnification Agreement**

*DRAFT*

# INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("*Agreement*") is made as of [●], 2023 by and between [NewCo, Inc.], a Delaware corporation (the "*Company*"), and the individual identified as the Indemnitee on the signature page hereto ("*Indemnitee*").

## RECITALS:

WHEREAS, directors, officers and other persons in service to corporations or business enterprises are subjected to the risk of expensive and time-consuming litigation relating to, among other things, matters that traditionally would have been brought only against the Company or business enterprise itself;

WHEREAS, in order to attract highly competent persons, who have become more reluctant to serve as directors, officers or in other capacities, it is desirable that they are provided with adequate protection through insurance and adequate indemnification against inordinate risks of claims and actions against them arising out of their service to and activities on behalf of the Company;

WHEREAS, the Board of Directors of the Company (the "*Board*") has determined that the desirability of attracting and retaining such persons is in the best interests of the Company and its stockholders and that the Company should act to assure such persons that there will be increased certainty of such protection in the future;

WHEREAS, (i) the Amended & Restated Certificate of Incorporation of the Company (as may be amended and/or restated, the "*Certificate of Incorporation*") and the Amended & Restated Bylaws of the Company (as may be amended and/or restated, the "*Bylaws*") each requires indemnification of the officers and directors of the Company, (ii) Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware ("*DGCL*"), and (iii) the Certificate of Incorporation, the Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive and thereby contemplate that contracts may be entered into between the Company and members of the Board, officers and other persons with respect to indemnification;

WHEREAS, this Agreement is a supplement to and in furtherance of the Certificate of Incorporation and the Bylaws and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefore, nor to diminish or abrogate any rights of Indemnitee thereunder; and

WHEREAS, the Company desires Indemnitee to serve as a director or officer of the Company and Indemnitee is willing to serve, continue to serve and to take on additional service for or on behalf of the Company on the condition that Indemnitee be so indemnified.

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

Section 1. **Definitions**.

(a) As used in this Agreement:

"**Affiliate**" of any specified Person shall mean any other Person directly or indirectly controlling, controlled by or under common control with such specified Person.

"**Corporate Status**" describes the status of a person who is or was a director, officer, trustee, partner, general partner, manager, managing member, employee, agent or fiduciary of (i) the Company or

(ii) any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other Enterprise which such person is or was serving at the request of the Company.

"**Disinterested Director**" shall mean a director of the Company who is not and was not a party to the Proceeding in respect of which indemnification is sought by Indemnitee.

"**Enterprise**" shall mean the Company and any other corporation, constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger to which the Company (or any of its wholly owned subsidiaries) is a party, limited liability company, partnership, joint venture, trust, employee benefit plan, non-profit entity or other enterprise of which Indemnitee is or was serving at the request of the Company as a director, officer, general partner, manager, managing member, employee, trustee, agent or fiduciary.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Expenses**" shall mean all reasonable costs, expenses, fees and charges of any type or nature whatsoever, including, without limitation, attorneys' fees, retainers, court costs, transcript costs, fees of experts, witness fees, travel expenses, fees of private investigators and professional advisors, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, fax transmission charges, secretarial services and all other disbursements or expenses incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settlement or appeal of, or otherwise participating in, a Proceeding, including reasonable compensation for time spent by Indemnitee for which he or she is not otherwise compensated by the Company or any third party. Expenses also shall include, without limitation, (i) Expenses incurred in connection with any appeal resulting from, incurred by Indemnitee in connection with, arising out of, or in respect of or relating to, any Proceeding, including, without limitation, the principal, premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, (ii) for purposes of Section 12(d) hereof only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise, (iii) any federal, state, local or foreign taxes imposed on Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, and (iv) any interest, assessments or other charges in respect of the foregoing. "Expenses" shall not include "Liabilities."

"**Indemnity Obligations**" shall mean all obligations of the Company to Indemnitee under this Agreement, including the Company's obligations to provide indemnification to Indemnitee and advance Expenses to Indemnitee under this Agreement.

"**Independent Counsel**" shall mean a law firm of national reputation in the United States, or a partner or member of such a law firm, that is experienced in matters of corporation law and neither presently is, nor in the past five (5) years has been, retained to represent: (i) the Company or Indemnitee in any matter material to either such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements), or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder; provided, however, that the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

"**Liabilities**" shall mean all claims, liabilities, damages, losses, judgments, orders, fines, penalties and other amounts payable in connection with, arising out of, or in respect of or relating to any Proceeding, including, without limitation, amounts paid in settlement in any Proceeding and all costs and expenses in complying with any judgment, order or decree issued or entered in connection with any

Proceeding or any settlement agreement, stipulation or consent decree entered into or issued in settlement of any Proceeding.

"**Person**" shall mean any individual, corporation, partnership, limited partnership, limited liability company, trust, governmental agency or body or any other legal entity.

"**Proceeding**" shall mean any threatened, pending or completed action, claim, suit, arbitration, mediation, alternate dispute resolution mechanism, formal or informal hearing, inquiry or investigation, litigation, inquiry, administrative hearing or any other actual, threatened or completed judicial, administrative or arbitration proceeding (including, without limitation, any such proceeding under the Securities Act of 1933, as amended (the "***Securities Act***"), or the Exchange Act or any other federal law, state law, statute or regulation), whether brought in the right of the Company or otherwise, and whether of a civil, criminal, administrative or investigative nature, in each case, in which Indemnitee was, is or will be, or is threatened to be, involved as a party, potential party, witness (including as a non-party witness) or otherwise by reason of the fact that Indemnitee is or was a director or officer of the Company, by reason of any actual or alleged action taken by Indemnitee (or a failure to take action by Indemnitee) or of any action (or inaction) on Indemnitee's part while acting as director or officer of the Company, or by reason of the fact that Indemnitee is or was serving at the request of the Company as a director, officer, trustee, partner, managing member, employee, agent or fiduciary of another corporation, limited liability company, partnership, joint venture, trust, employee benefit plan, non-profit entity or other Enterprise, in each case whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement, or advancement can be provided under this Agreement.

Section 2. **Indemnity in Third-Party Proceedings**. The Company shall indemnify and hold harmless Indemnitee, to the fullest extent permitted by applicable law, from and against all Liabilities and Expenses suffered or reasonably incurred (and, in the case of retainers, reasonably expected to be incurred) by Indemnitee or on Indemnitee's behalf in connection with any Proceeding (other than any Proceeding brought by or in the right of the Company to procure a judgment in its favor, which is provided for in Section 3 below), or any claim, issue or matter therein.

Section 3. **Indemnity in Proceedings by or in the Right of the Company**. The Company shall indemnify and hold harmless Indemnitee, to the fullest extent permitted by applicable law, from and against all Liabilities and Expenses suffered or reasonably incurred (and, in the case of retainers, reasonably expected to be incurred) by Indemnitee or on Indemnitee's behalf in connection with any Proceeding brought by or in the right of the Company to procure a judgment in its favor, or any claim, issue or matter therein. No indemnification for Expenses shall be made under this Section 3 in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudged by a court to be liable to the Company, unless and only to the extent that the Delaware Court (as hereafter defined) or any court in which the Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification.

Section 4. **Indemnification for Expenses of a Party Who is Wholly or Partly Successful**. Notwithstanding any other provisions of this Agreement, and without limiting the rights of Indemnitee under any other provision hereof, including any rights to indemnification pursuant to Sections 2 or 3 hereof, to the fullest extent permitted by applicable law, to the extent that Indemnitee is successful, on the merits or otherwise, in any Proceeding or in defense of any claim, issue or matter therein, in whole or in part, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred (and, in the case of retainers, reasonably expected to be incurred) by Indemnitee or on Indemnitee's behalf in connection with each successfully resolved Proceeding, claim, issue or matter. For purposes of this Section 4 and without limitation, the termination of any Proceeding or claim, issue or matter in such a

Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

Section 5. **Indemnification For Expenses of a Witness**. Notwithstanding any other provision of this Agreement, to the fullest extent permitted by applicable law and to the extent that Indemnitee is, by reason of Indemnitee's Corporate Status, a witness or otherwise a participant, including by receipt of a subpoena, in any Proceeding to which Indemnitee is not a party and is not threatened to be made a party, Indemnitee shall be indemnified against all Expenses suffered or reasonably incurred (or, in the case of retainers, reasonably expected to be incurred) by Indemnitee or on Indemnitee's behalf in connection therewith.

Section 6. **Additional Indemnification**. Notwithstanding any limitation in Sections 2, 3, 4 or 5 hereof, the Company shall indemnify Indemnitee to the fullest extent permitted by applicable law if Indemnitee is a party to or threatened to be made a party to any Proceeding (including a Proceeding by or in the right of the Company to procure a judgment in its favor) by reason of Indemnitee's Corporate Status against all Liabilities and Expenses suffered or reasonably incurred (and, in the case of retainers, reasonably expected to be incurred) by Indemnitee in connection with such Proceeding. For purposes of this Section 6, "to the fullest extent permitted by applicable law" shall include, but not be limited to:

(a) the fullest extent permitted by the provision of the DGCL that authorizes or contemplates additional indemnification by agreement, or the corresponding provision of any amendment to or replacement of the DGCL; and

(b) the fullest extent authorized or permitted by any amendments to or replacements of the DGCL adopted after the date of this Agreement that increase the extent to which a corporation may indemnify its officers and directors.

In the event of any change in any applicable law, statute or rule which narrows the right of a Delaware corporation to indemnify a member of its board of directors or an officer, such change, to the extent not otherwise required by such law, statute or rule to be applied to this Agreement, shall have no effect on this Agreement or the parties' rights and obligations hereunder.

Section 7. **Exclusions**. Notwithstanding any provision in this Agreement, the Company shall not be obligated under this Agreement to indemnify or hold harmless Indemnitee, or, in the case of (a) and (c), to advance Expenses to Indemnitee:

(a) for which payment has actually been made to or on behalf of Indemnitee under any insurance policy obtained by the Company or under any other indemnity provision, except with respect to any excess beyond the amount paid under such insurance policy or such other indemnity provision;

(b) for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Exchange Act or similar provisions of state statutory law or common law;

(c) except as provided in Section 12(d) of this Agreement, in connection with any Proceeding (or any part of any Proceeding) initiated by Indemnitee against the Company or its directors, officers, employees or other indemnitees, unless (i) the Board authorized the Proceeding (or any part of any Proceeding) prior to its initiation, (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law or (iii) such Proceeding is being brought by Indemnitee to assert, interpret or enforce Indemnitee's rights under this Agreement (for the avoidance of doubt, Indemnitee shall not be deemed, for purposes of this subsection, to have initiated or brought any claim by reason of (A) having asserted any affirmative defenses in connection with a claim

4

*DRAFT*

not initiated by Indemnitee or (B) having made any counterclaim (whether permissive or mandatory) in connection with any claim not initiated by Indemnitee);

      (d)   for any expenses incurred by Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous;

      (e) if a final decision by a court having jurisdiction in the matter that is not subject to appeal shall determine that such indemnification is not lawful or based upon or attributable to the Indemnitee's in fact having gained any personal profit or advantage to which he or she was not legally entitled; or

      (f)   for any reimbursement of the Company by such Indemnitee of any bonus or other incentive-based or equity- based compensation or of any profits realized by such person from the sale of securities of the Company, as required in each case under the Exchange Act (including any such reimbursements that arise from an accounting restatement of the Corporation pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (the "***Sarbanes-Oxley Act***") or Section 952 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the payment to the Company of profits arising from the purchase and sale by such Indemnitee of securities in violation of Section 306 of the Sarbanes-Oxley Act), if such Indemnitee is held liable therefor (including pursuant to any settlement arrangements)

      (g) if prohibited by applicable law, *provided*, *however*, that if any of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (1) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any section or clause containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (2) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each such portion of any section or clause containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable

Notwithstanding anything contained herein to the contrary, Indemnitee shall not be entitled to recover amounts under this Agreement which, when added to the amount of indemnification payments made to, or on behalf of, Indemnitee, under the Certificate of Incorporation or By-laws of the Company, in the aggregate exceed the Expenses, judgments, fines, penalties and amounts paid in settlement actually and reasonably incurred by Indemnitee ("***Excess Amounts***").   To the extent the Company has paid Excess Amounts to Indemnitee, Indemnitee shall be obligated to reimburse the Company for such Excess Amounts.

    Section 8. **<u>Advancement</u>**. Notwithstanding any provision of this Agreement to the contrary, the Company shall advance, to the extent not prohibited by applicable law, the Expenses reasonably incurred by Indemnitee in connection with (i) any Proceeding (or any part of any Proceeding) not initiated by Indemnitee or, (ii) any Proceeding (or any part of any Proceeding) initiated by Indemnitee, with the prior approval of the Board as provided in <u>Section 7(c)</u>, and such advancement shall be made within thirty (30) days after the receipt by the Company of a statement or statements requesting such advances from time to time, whether prior to or after final disposition of any Proceeding. Advances shall be unsecured and interest free. Advances shall be made without regard to Indemnitee's ability to repay the Expenses and without regard to Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement. Advances shall include any and all Expenses reasonably incurred pursuing an action to enforce this right of advancement, including Expenses incurred preparing and forwarding statements to the Company to support the advances claimed. Indemnitee shall qualify for advances upon the execution and delivery to the Company of this Agreement, which shall constitute an undertaking providing that

*DRAFT*

Indemnitee undertakes to repay the amounts advanced to the extent that it is ultimately determined that the Indemnitee is not entitled to be indemnified by the Company. Nothing in this <u>Section 8</u> shall limit Indemnitee's right to advancement pursuant to <u>Section 12(d)</u> of this Agreement. This <u>Section 8</u> shall not apply to any claim made by Indemnitee for which indemnity is excluded pursuant to <u>Section 7</u> hereof.

Section 9. **<u>Procedure for Notification and Defense of Claim</u>**.

(a) Indemnitee shall promptly notify the Company in writing of any Proceeding with respect to which Indemnitee intends to seek indemnification or advancement hereunder following the receipt by Indemnitee of written notice thereof (the date of such notification, the "***Submission Date***"). The written notification to the Company shall include a description of the nature of the Proceeding and the facts underlying the Proceeding. To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request, including therein or therewith such documentation and information as is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of such Proceeding, including any appeal therein. Any delay or failure by Indemnitee to notify the Company hereunder will not relieve the Company from any liability which it may have to Indemnitee hereunder or otherwise than under this Agreement, and any delay or failure in so notifying the Company shall not constitute a waiver by Indemnitee of any rights under this Agreement. The Secretary of the Company shall, promptly upon receipt of such a request for indemnification, advise the Board in writing that Indemnitee has requested indemnification.

(b) In the event Indemnitee is entitled to indemnification and/or advancement with respect to any Proceeding, Indemnitee may, at Indemnitee's option, (i) retain counsel (including local counsel) selected by Indemnitee and approved by the Company to defend Indemnitee in such Proceeding, at the sole expense of the Company (which approval shall not be unreasonably withheld, conditioned or delayed), or (ii) have the Company assume the defense of Indemnitee in such Proceeding, in which case the Company shall assume the defense of such Proceeding with counsel selected by the Company and approved by Indemnitee (which approval shall not be unreasonably withheld, conditioned or delayed) within ten (10) days of the Company's receipt of written notice of Indemnitee's election to cause the Company to do so. If the Company is required to assume the defense of any such Proceeding, it shall engage legal counsel for such defense, and the Company shall be solely responsible for all fees and expenses of such legal counsel and otherwise of such defense. Such legal counsel may represent both Indemnitee and the Company (and any other party or parties entitled to be indemnified by the Company with respect to such matter) unless, in the reasonable opinion of legal counsel to Indemnitee, there is a conflict of interest between Indemnitee and the Company (or any other such party or parties) or there are legal defenses available to Indemnitee that are not available to the Company (or any such other party or parties). Notwithstanding either party's assumption of responsibility for defense of a Proceeding, each party shall have the right to engage separate counsel at its own expense. If the Company has responsibility for defense of a Proceeding, the Company shall provide the Indemnitee and its counsel with all copies of pleadings and material correspondence relating to the Proceeding. Indemnitee and the Company shall reasonably cooperate in the defense of any Proceeding with respect to which indemnification is sought hereunder, regardless of whether the Company or Indemnitee assumes the defense thereof. Indemnitee may not settle or compromise any Proceeding without the prior written consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed. The Company may not settle or compromise any Proceeding without the prior written consent of Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed), unless such settlement provides for a full and final release of all claims asserted against Indemnitee.

Section 10. **<u>Procedure Upon Application for Indemnification</u>**.

*DRAFT*

(a) Upon written request by Indemnitee for indemnification pursuant to <u>Section 9(a)</u> hereof, if any determination by the Company is required by applicable law with respect to Indemnitee's entitlement thereto, such determination shall be made (i) if Indemnitee shall request such determination be made by Independent Counsel, by Independent Counsel, and (ii) in all other circumstances, (A) by a majority vote of the Disinterested Directors, even though less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum of the Board, (C) if there are no such Disinterested Directors or, if such Disinterested Directors so direct, by Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to Indemnitee, or (D) if so directed by the Board, by the stockholders of the Company holding a majority of the securities of the Company entitled to vote; and, if it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within ten (10) days after such determination. Indemnitee shall cooperate with the person, persons or entity making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any Expenses incurred by Indemnitee in so cooperating with the person, persons or entity making such determination shall, to the fullest extent permitted by law, be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom. The Company will not deny any written request for indemnification hereunder made in good faith by Indemnitee unless a determination as to Indemnitee's entitlement to such indemnification described in this <u>Section 10(a)</u> has been made. The Company agrees to pay the reasonable fees and expenses of the Independent Counsel referred to above and to fully indemnify such counsel against any and all Liabilities and Expenses arising out of or relating to this Agreement or its engagement pursuant hereto.

(b) In the event the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to <u>Section 10(a)</u> hereof, (i) the Independent Counsel shall be selected by the Company within ten (10) days of the Submission Date (the cost of such Independent Counsel to be paid by the Company), (ii) the Company shall give written notice to Indemnitee advising it of the identity of the Independent Counsel so selected and (iii) Indemnitee may, within ten (10) days after such written notice of selection shall have been given, deliver to the Company Indemnitee's written objection to such selection. Such objection by Indemnitee may be asserted only on the ground that the Independent Counsel selected does not meet the requirements of "Independent Counsel" as defined in this Agreement. If such written objection is made and substantiated, the Independent Counsel selected shall not serve as Independent Counsel unless and until Indemnitee withdraws the objection or a court has determined that such objection is without merit. Absent a timely objection, the person so selected shall act as Independent Counsel. If no Independent Counsel shall have been selected and not objected to before the later of (A) thirty (30) days after the Submission Date and (B) ten (10) days after the final disposition of the Proceeding, including any appeal therein, each of the Company and Indemnitee shall select a law firm or member of a law firm meeting the qualifications to serve as Independent Counsel, and such law firms or members of law firms shall select the Independent Counsel.(c) Upon the due commencement of any judicial proceeding or arbitration pursuant to <u>Section 12(a)</u> of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

Section 11. **<u>Presumptions and Effect of Certain Proceedings</u>**.

(a) In making a determination with respect to entitlement to indemnification hereunder, the person, persons or entity making such determination shall, to the fullest extent not prohibited by applicable law, presume that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with <u>Section 9(a)</u> of this Agreement, and the

*DRAFT*

Company shall, to the fullest extent not prohibited by applicable law, have the burden of proof to overcome that presumption in connection with the making by any person, persons or entity of any determination contrary to that presumption. Neither the failure of the Company (including by its directors or Independent Counsel) to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor an actual determination by the Company (including by its directors or Independent Counsel) that Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b) Subject to Section 12(e) hereof, if the person, persons or entity empowered or selected under Section 10 of this Agreement to determine whether Indemnitee is entitled to indemnification shall not have made a determination within sixty (60) days after receipt by the Company of the request therefore, the requisite determination of entitlement to indemnification shall, to the fullest extent not prohibited by applicable law, be deemed to have been made and Indemnitee shall be entitled to such indemnification, absent a prohibition of such indemnification under applicable law; provided, however, that such 60-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the determination is to be made by Independent Counsel and Indemnitee objects to the Company's selection of Independent Counsel and the Independent Counsel ultimately selected requires such additional time for the obtaining or evaluating of documentation or information relating thereto; provided further, however, that such 60-day period may also be extended for a reasonable time, not to exceed an additional sixty (60) days, if the determination of entitlement to indemnification is to be made by the stockholders of the Company.

(c) The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.

(d) **Reliance as Safe Harbor**. For purposes of any determination of good faith, Indemnitee shall be deemed to have acted in good faith if Indemnitee's action is based on the records or books of account of the Enterprise, including financial statements, or on information supplied to Indemnitee by the directors, managers, or officers of the Enterprise in the course of their duties, or on the advice of legal counsel for the Enterprise, its board, any committee of the board or any director, trustee, general partner, manager, or managing member, or on information or records given or reports made to the Enterprise by an independent certified public accountant or by an appraiser or other expert selected with the reasonable care by the Enterprise, its board, any committee of the board or any director, trustee, general partner, manager, or managing member. The provisions of this Section 11(d) shall not be deemed to be exclusive or to limit in any way the other circumstances in which Indemnitee may be deemed to have met the applicable standard of conduct set forth in this Agreement.

(e) **Actions of Others**. The knowledge or actions, or failure to act, of any director, officer, agent, employee, or other representative of the Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

(f) **Allowance for Compliance with SEC Requirements**. Indemnitee acknowledges that the Securities and Exchange Commission ("*SEC*") has expressed the opinion that indemnification of directors and officers from liabilities under the Securities Act, is against public policy as expressed in the Act and, is therefore, unenforceable. Indemnitee hereby agrees that he or she will not be a breach of this Agreement for

the Company to undertake with the SEC in connection with the registration for sale of any stock or other securities of the Company from time to time that, in the event a claim for indemnification against such liabilities (other than the payment by the Company of expenses incurred or paid by a director, officer, agent, employee, or other representative of the Enterprise in the successful defense of any Proceeding) is asserted in connection with such stock or other securities being registered, the Company will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of competent jurisdiction on the question of whether or not such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.  Indemnitee further agrees that such submission to a court of competent jurisdiction shall not be a breach of this Agreement.

Section 12.  **Remedies of Indemnitee**.

(a)  Subject to Section 12(d) hereof, in the event that (i) a determination is made pursuant to Section 10 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement is not timely made pursuant to Section 8 of this Agreement, (iii) no determination of entitlement to indemnification shall have been timely made pursuant to Section 10(a) of this Agreement within sixty (60) days after receipt by the Company of the request for indemnification, (iv) payment of indemnification is not made pursuant to Sections 4 or 5 or the third to the last sentence of Section 10(a) of this Agreement within ten (10) days after receipt by the Company of a written request therefor, (v) payment of indemnification pursuant to Sections 2, 3 or 6 of this Agreement is not made within ten (10) days after a determination has been made that Indemnitee is entitled to indemnification, or (vi) in the event that the Company or any other Person takes or threatens to take any action to declare this Agreement void or unenforceable, or institutes any litigation or other action or proceeding designed to deny, or to recover from, Indemnitee the benefits provided or intended to be provided to Indemnitee hereunder, Indemnitee shall be entitled to an adjudication by a court of competent jurisdiction of Indemnitee's entitlement to such indemnification or advancement. Alternatively, Indemnitee, at Indemnitee's option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.  The Company shall indemnify the Indemnitee against any and all expenses that are incurred by the Indemnitee in connection with any action for indemnification or advancement of expenses from the Corporation under this Section 12(a), to the extent such Indemnitee is successful in such action, and to the extent not prohibited by law.

(b)  In the event that a determination shall have been made pursuant to Section 10(a) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 12 shall be conducted in all respects as a *de novo* trial, or arbitration, on the merits and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 12 the Company shall have the burden of proving Indemnitee is not entitled to indemnification or advancement, as the case may be.

(c)  If a determination shall have been made pursuant to Section 10(a) of this Agreement that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding or arbitration commenced pursuant to this Section 12, absent a prohibition of such indemnification under applicable law.

(d)  The Company shall, to the fullest extent not prohibited by applicable law, be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 12 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement. It is the intent of the Company that Indemnitee not be required to incur Expenses associated with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement by litigation

*DRAFT*

or otherwise because the cost and expense thereof would substantially detract from the benefits intended to be extended to Indemnitee hereunder. The Company shall indemnify Indemnitee against any and all Expenses and, if requested by Indemnitee, shall (within ten (10) days after receipt by the Company of a written request therefore) advance, to the extent not prohibited by applicable law, such Expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advancement from the Company under this Agreement or the Certificate of Incorporation, or under any directors' and officers' liability insurance policies maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, advancement or insurance recovery, as the case may be.

(e) Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding, including any appeal therein; provided that, in absence of any such determination with respect to such Proceeding, the Company shall advance Expenses with respect to such Proceeding.

Section 13. **Non-Exclusivity; Survival of Rights; Insurance; Subrogation**.

(a) The rights of indemnification and to receive advancement as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Certificate of Incorporation, the Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in Indemnitee's Corporate Status prior to such amendment, alteration or repeal. The Company shall not adopt any amendment or alteration to, or repeal of, the Certificate of Incorporation or the Bylaws, the effect of which would be to deny, diminish or encumber the Indemnitee's rights to indemnification pursuant to this Agreement, the Certificate of Incorporation, the Bylaws or applicable law relative to such rights prior to such amendment, alteration or repeal. To the extent that a change in Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement than would be afforded currently under the Certificate of Incorporation, the Bylaws or this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b) To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, officers, employees, trustees, or agents of any Enterprise, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such director, officer, employee, trustee or agent under such policy or policies and such policies shall provide for and recognize that the insurance policies are primary to any rights to indemnification, advancement or insurance proceeds to which Indemnitee may be entitled from one or more Persons with whom or which Indemnitee may be associated to the same extent as the Company's indemnification and advancement obligations set forth in this Agreement. If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary and desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such Proceeding in accordance with the terms of such policies.

(c) In the event of any payment under this Agreement, the Company shall be subrogated to the rights of recovery of Indemnitee, including rights of indemnification provided to Indemnitee from any other person or entity with whom Indemnitee may be associated; provided, however, that the Company shall not be subrogated to the extent of any such payment of all rights of recovery of Indemnitee with respect to any Person with whom or which Indemnitee may be associated.

(d) The indemnification and contribution provided for in this Agreement will remain in full force and effect regardless of any investigation made by or on behalf of Indemnitee.

Section 14. **Duration of Agreement; Not Employment Contract**. This Agreement shall continue until and terminate upon the latest of: (i) ten (10) years after the date that Indemnitee shall have ceased to serve as director, officer, employee or agent of the Company or any other Enterprise and (ii) one (1) year after the date of final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement hereunder and of any proceeding, including any appeal, commenced by Indemnitee pursuant to Section 12 of this Agreement relating thereto. This Agreement shall be binding upon the Company and its successors and assigns and shall inure to the benefit of Indemnitee and Indemnitee's heirs, executors and administrators. The Company shall require and cause any successor, and any direct or indirect parent of any successor, whether direct or indirect by purchase, merger, consolidation or otherwise, to all, substantially all or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any other Enterprise) and Indemnitee. Indemnitee specifically acknowledges that Indemnitee's employment with the Company (or any of its subsidiaries or any other Enterprise), if any, is at will, and Indemnitee may be discharged at any time for any reason, with or without cause, except as may be otherwise provided in any written employment contract between Indemnitee and the Company (or any of its subsidiaries or any other Enterprise), other applicable formal severance policies duly adopted by the Board, or, with respect to service as a director of the Company, by the Certificate of Incorporation, the Bylaws or the DGCL.

Section 15. **Severability**. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by applicable law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any Section of this Agreement containing any such provision held to be invalid, illegal or unenforceable that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

Section 16. **Enforcement**.

(a) The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve as a director or officer of the Company or as a director, officer, trustee, partner, managing member, employee, agent or fiduciary of the Enterprise, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company or as a director, officer, trustee, partner, managing member, employee, agent or fiduciary of the Enterprise.

*DRAFT*

(b) This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; provided, however, that this Agreement is a supplement to and in furtherance of the Certificate of Incorporation, the Bylaws and applicable law, and shall not be deemed a substitute therefore, nor diminish or abrogate any rights of Indemnitee thereunder.

Section 17. **Modification and Waiver**. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by the parties thereto. No waiver of any of the provisions of this Agreement shall be deemed to be or shall constitute a waiver of any other provision of this Agreement nor shall any waiver constitute a continuing waiver.

Section 18. **Notices**. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered by hand and receipted for by the party to whom said notice or other communication shall have been directed, (b) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed, (c) mailed by reputable overnight courier and receipted for by the party to whom said notice or other communication shall have been directed or (d) sent by email or facsimile transmission, with receipt of oral or email confirmation that such transmission has been received:

(i)     If to Indemnitee, at the address indicated on the signature page of this Agreement, or such other address as Indemnitee shall provide to the Company in accordance with the notice provisions in this Section of this Agreement.

(ii)    If to the Company to:

    [NewCo, Inc.]
    [Address]
    Attention:
    E-mail:

or to any other address as may have been furnished to Indemnitee by the Company in accordance with the notice provisions in this Section of this Agreement.

Section 19. **Contribution**. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for Liabilities or for Expenses, in connection with any Proceeding, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Proceeding in order to reflect (a) the relative benefits received by the Company and Indemnitee as a result of the event(s) and transaction(s) giving cause to such Proceeding; and (b) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and transaction(s).

Section 20. **Applicable Law and Consent to Jurisdiction**. This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 12(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (a) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Chancery Court of the State of Delaware (the "***Delaware Court***"), and not in any other state or federal court in the United States of America or any

*DRAFT*

court in any other country, (b) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (c) consent to service of process at the address set forth in <u>Section 18</u> of this Agreement with the same legal force and validity as if served upon such party personally within the State of Delaware, (d) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (e) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

Section 21. **<u>Counterparts</u>**. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

Section 22. **<u>Miscellaneous</u>**. Use of the masculine pronoun shall be deemed to include usage of the feminine pronoun where appropriate. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

*[signature page follows]*

*DRAFT*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**[NEWCO, INC.]**                                    **INDEMNITEE:**

By: _____            By: _____
Name:                                                       Name:
Title:                                                        Title:
                                                                 Address:

*[Signature Page to Indemnification Agreement]*

**<u>Exhibit K(ii)</u>**

**New Organizational Documents:**

**NewCo Restricted Stock Purchase Agreement**

*DRAFT*

## RESTRICTED STOCK PURCHASE AGREEMENT

This Restricted Stock Purchase Agreement (the "Agreement") is made as of [●], by and between [NewCo, Inc.], a Delaware corporation (the "Company"), and Fahrenheit LLC, a Delaware LLC (the "Purchaser").

In consideration of the foregoing, and the mutual covenants and representations set forth below, the parties hereto agree as follows:

1. **Purchase and Sale of the Shares**. Subject to the terms and conditions of this Agreement, the Company agrees to issue and sell to the Purchaser, and the Purchaser agrees to purchase from the Company, [●] shares[1] of the Company's Class A common stock, $[●] par value per share (the "Class A Common Stock") of the Company (the "Shares") for a purchase price per share of $[●] for an aggregate purchase price of $[●][2] (the "Purchase Price"). Payment of the Purchase Price shall be made by check or wire transfer, the receipt of which is hereby acknowledged by the Company. The closing of the purchase and sale of the Shares shall occur at a closing (the "Closing") to be held on the date first set forth above, or at any other time mutually agreed upon by the Company and the Purchaser. At the Closing, upon receipt from the Purchaser of the Purchase Price as aforesaid, the Company will cause the transfer agent for the Class A Common Stock (the "Transfer Agent") to issue in book-entry form on the stock register maintained by the Transfer Agent for such purpose, the Shares registered in the name of the Purchaser.

2. **Company Warranty**. The Company represents and warrants that the Shares, when issued, and assuming the payment to the Company by the Purchaser of the Purchase Price, will be duly authorized, validly issued, fully paid and nonassessable.

3. **Purchaser Warranty**. The Purchaser represents that such Shares are being acquired for the Purchaser's own account, for investment and not with a view to the distribution or resale thereof. The Purchaser understands that such shares of Class A Common Stock have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities or blue sky laws, by reason of their issuance in a transaction exempt from the registration requirements thereunder and may not be resold unless a subsequent disposition thereof is registered thereunder (the Company being under no obligation to so register) or is exempt from registration thereunder. The Purchaser represents that the Purchaser has access to the same kind of information which would be available in a registration statement filed under the Securities Act. The Purchaser further represents that the Purchaser is an accredited investor as defined in Rule 501(c) promulgated by the Securities and Exchange Commission.

4. **Vesting and Restrictions on Shares**.

(a) *Vesting.* Provided that the Purchaser shall remain a "Manager" pursuant to the terms of that certain Management Agreement, dated as of [●], by and between the Company and the Purchaser (the "Management Agreement"), the Shares shall vest as provided in this Section 4. Any Shares that have not vested are referred to as "Unvested Shares". In each case with respect to 20% of the Shares, the date hereof and the first, second, third and fourth anniversary hereof shall be a "Vesting

---

[1] NTD: 5% of Class A on a fully diluted basis. When calculating the fully diluted shares, the denominator will include shares that are reserved/held-back for disputed claims under the Plan.
[2] NTD: to be equal to par value.

Period Commencement Date" and the Shares will vest in equal proportions on the first anniversary of the respective Vesting Period Commencement Date (each such anniversary, a "Vesting Date").

      (b)    *Acceleration of Vesting.*  Notwithstanding Section 4(a) or anything to the contrary herein:

      (i)    *Termination of Management Agreement Other Than for Cause or Non-Extension of Management Agreement; USBTC Management Agreement Remains in Effect.* In the event that (x) (A) the Management Agreement is validly terminated other than pursuant to Section 2(b)(ii)(A), Section 2(b)(ii)(B) or Section 2(b)(iii)(G) of the Management Agreement (*Termination by Manager for Cause*), (B) the initial term of the Management Agreement is not extended in accordance with the terms thereof (such that the Management Agreement expires as of the end of the Initial Term) or (C) the first Term Extension (as defined the Management Agreement) is not extended in accordance with the terms of the Management Agreement (such that the Management Agreement expires at the end of the first Term Extension) and (y) the Management Services Agreement, dated as of the date hereof, by and between the Company and US Data Management Group, LLC (the "USBTC Management Agreement") is in full force and effect as of the effective date of such termination or expiration, as applicable, of the Management Agreement, then notwithstanding the foregoing, as of the business day following such termination or expiration, as applicable: (1) [68.119]% of the Unvested Shares (as determined on the business day following such termination or expiration) shall immediately be cancelled in full with no further action on the part of the parties hereto and the Purchaser shall have no rights with respect thereto (provided that, for the avoidance of doubt, any Shares with a Vesting Date that is the same date as the date of such termination or expiration shall be deemed to have vested prior to such termination or expiration); and (2) the Vesting Period Commencement Date and Vesting Date with respect to the remaining Unvested Shares ("Remaining Unvested Shares") following the cancellation of Unvested Shares described in clause (1) shall continue during the full period of the Initial Term and any Term Extension (whether or not exercised) (as defined in the Management Agreement) of the Management Agreement as if no such termination or expiration of the Management Agreement had occurred; *provided*, *however*, that (x) if the USBTC Management Agreement subsequently expires in accordance with Section 2(a) of the USBTC Management Agreement (*Non-Renewal*) or is subsequently terminated in accordance with Section 2(b)(i) (*Termination by Mutual Agreement*) or Section 2(b)(iii) of the USBTC Management Agreement (*Termination by Company for Cause*)[3], any Remaining Unvested Shares for which the Vesting Date has not occurred as of the effective date of termination of the USBTC Management Agreement shall, upon such termination or expiration of the USBTC Management Agreement, immediately be cancelled in full with no further action on the part of the parties hereto and the Purchaser shall have no rights with respect thereto (*provided* that, for the avoidance of doubt, any Shares with a Vesting Date that is the same date as the date of such termination or expiration shall be deemed to have vested prior to such termination or expiration), and, (y) if the USBTC Management Agreement is subsequently terminated in accordance with Section 2(b)(ii) of the USBTC Management Agreement (*Non-Payment by Company*)[4], the Vesting Date of any Remaining Unvested Share shall immediately and with no further action on the part of the parties hereto be deemed to be the last business day of (A) the Initial Term (as defined in the USBTC Management Agreement) in the case

---

[3] NTD:  To reference termination by non-renewal, termination by mutual agreement and termination by the Company for cause clause in USBTC Management Agreement.

[4] NTD:  To reference termination by USBTC clauses in USBTC Management Agreement .

the Company has provided a Notice of Non-Renewal (as defined in the USBTC Management Agreement) or (B) the Term Extension (as defined in the USBTC Management Agreement) if the Company has not provided a Notice of Non-Renewal, in each case, in accordance with the terms of the USBTC Management Agreement.[5]

(ii)    *Termination of Management Agreement by Manager for Cause.* In the event that the Management Agreement is validly terminated pursuant to Section 2(b)(ii)(A), Section 2(b)(ii)(B) or Section 2(b)(iii)(G)[6] of the Management Agreement (*Termination by Manager for Cause*), the Vesting Date of any Unvested Share shall immediately and with no further action on the part of the parties hereto be deemed to be the effective date of such termination.

(iii)    *Non-Extension of Management Agreement; USBTC Management Agreement Not in Force.* In the event that (x) the initial term of the Management Agreement is not extended in accordance with the terms thereof and (y) the USBTC Management Agreement is not in full force and effect as of the expiration of the Management Agreement, then the Unvested Shares (as determined as of the business day following such expiration) shall be cancelled in full as of the business day following such expiration of the Management Agreement with no further action on the part of the parties hereto and the Purchaser shall have no rights with respect thereto (provided that, for the avoidance of doubt, any Shares with a Vesting Date that is the same date as the date of such expiration shall be deemed to have vested prior to such expiration).

5.    **Transfer Restrictions**. For so long as any Unvested Shares remain outstanding, the Purchaser shall not sell, assign, transfer, pledge, hypothecate or otherwise dispose of, any such Unvested Shares without the Company's written consent, except for dispositions that are made exclusively between and among the Purchaser and its affiliates, including distributions, transfers or dispositions without consideration by the Purchaser to any of its equity holders, *provided, however*, that such transfer is valid only if the transferee/donee executes a joinder agreement substantially in the form attached Exhibit A hereto.

6.    **Securities Laws**. The Purchaser understands that: (i) the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and are "restricted securities" within the meaning of Rule 144 under the Securities Act; and (ii) the Shares cannot be sold, transferred or otherwise disposed of unless they are subsequently registered under the Securities Act or an exemption from registration is then available.

7.    **Restrictive Legends**. The Purchaser understands and agrees that certificate(s) evidencing ownership of the Shares, if any, shall be affixed with legends substantially in the following forms, together with any other legends that may be required by the Company or by applicable state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS

---

[5] NTD: We included the concepts of extension/failure to extend the Management Agreement in (i) so were able to delete subsections (iv) and (v). Please let us know if you believe they are still needed. Think we also need situation where one but not both extensions of the Management Agreement are exercised. Have built into (i).

[6] NTD: Cross reference refers to Manager's termination due to Company's failure to pay or the Company's change of control or the Company's termination for convenience.

AMENDED (THE "ACT"), AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT, (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT UNLESS AND UNTIL REGISTERED UNDER THE ACT, OR (III) IN THE OPINION OF COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR PLEDGE, HYPOTHECATION OR TRANSFER OTHERWISE COMPLIES WITH THE ACT.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN A RESTRICTED STOCK PURCHASE AGREEMENT BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS ARE BINDING ON TRANSFEREES OF THESE SHARES.

8.     **Section 83(b) Elections**. The Purchaser may make an election under Code Section 83(b) with respect to the Shares.  If the Purchaser elects to make such a Section 83(b) election, the Purchaser shall provide the Company with a copy of an executed version and satisfactory evidence of the filing of the executed Section 83(b) election with the US Internal Revenue Service. The Purchaser agrees to assume full responsibility for ensuring that the Section 83(b) election is actually and timely filed with the US Internal Revenue Service and for all tax consequences resulting from the Section 83(b) election.

9.     **Registration Rights**.  At all times that the Company is a publicly traded entity with common equity quoted on or listed for trading on The Nasdaq Capital Market, The Nasdaq Global Select Market, The Nasdaq Global Market, the NYSE American, or The New York Stock Exchange and registered under the Securities Exchange Act of 1934, as amended, the Company shall use its commercially reasonable efforts to cause the Shares to be listed on any national securities exchange upon which shares of Class A Common Stock are listed.  All Shares shall be subject to that certain Registration Rights Agreement between the Purchaser and the Company, dated as of [●] (the "Registration Rights Agreement") as such Registration Rights Agreement may be amended, modified, restated.

10.     **Acknowledgment by Purchaser**.

(a)     Purchaser acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, liabilities, properties, contracts, employee matters, regulatory compliance, business risks, and prospects) of the Company and its affiliates, and, in making its determination to proceed with the transactions contemplated hereby, Purchaser has relied, is relying, and will rely, solely, on the representations of the Company set forth herein (the "Express Representations") and the

ME1 24127276v.1

results of Purchaser's own independent investigation and verification and has not relied on, is not relying on, and will not rely on any information, statements, disclosures, documents, projections, forecasts or other material made available to Purchaser or any of its affiliates, advisors, or representatives, in any "dataroom", any "information presentation" or similar document, or any Projections or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of the Company or any of its affiliates, Celsius Network LLC or any of its affiliates, or any predecessor, advisors or representative of any of the foregoing (the "Disclaimed Persons"), or any failure of any of the Disclaimed Persons to disclose or contain any information, except for the Express Representations. Purchaser acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the transactions contemplated hereby and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, statutory, whether in written, electronic or oral form are, in each case, specifically disclaimed by the Company and the foregoing persons.

(b)    Without limiting the generality of the foregoing, in connection with the investigation by Purchaser, Purchaser and its advisors and representatives have received or may receive certain projections, forward-looking statements and other forecasts (whether in written, electronic, or oral form, and including in any "information presentation" or similar document, any dataroom, any management meetings, etc.) (collectively, "Projections"). Purchaser acknowledges and agrees that (i) such Projections are being provided solely for the convenience of Purchaser to facilitate its own independent investigation, (ii) there are uncertainties inherent in attempting to make such Projections, (iii) Purchaser is familiar with such uncertainties, and (iv) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all Projections (including the reasonableness of the assumptions underlying such Projections).

(c)    The Disclaimed Persons are intended third party beneficiaries of this Section 9 and shall be entitled to enforce this Section 9 as if a party directly hereto.

11.    **Non-Recourse**. This Agreement may only be enforced against, and any claim, action, or proceeding based upon, arising out of or related to this Agreement may only be brought against, the persons that are expressly named as parties to this Agreement or successors in interest to such persons. Except to the extent named as a party to this Agreement or a successor in interest to such party, and then only to the extent of the specific obligations of such parties set forth in this Agreement or such parties' successors in interest, no past, present or future shareholder, member, partner, manager, director, officer, employee, affiliate, agent, advisor, or representative of any party (each, a "Non-Recourse Person") will have any liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or liabilities of any of the parties to this Agreement or for any dispute related hereto, and (ii) in no event shall any Non-Recourse Person have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or fraud (including through equitable claims (such as unjust enrichment) not requiring proof of wrongdoing committed by the subject of such claims) of any other Non-Recourse Person.  The Non-Recourse Persons are intended third party beneficiaries of this Section 9 and shall be entitled to enforce this Section 9 as if a party directly hereto.

12.    **Notice**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when

ME1 24127276v.1

delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9).

|  |  |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>E-mail: [E-MAIL ADDRESS]<br>Attention: [TITLE OF OFFICER] |
| with a copy to: | [COMPANY LAW FIRM]<br>E-mail: [E-MAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Purchaser: | [PURCHASER ADDRESS]<br>E-mail: [E-MAIL ADDRESS]<br>Attention:      [TITLE OF OFFICER] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |
| If to a transferee/donee: | To the address set forth for such person in the joinder agreement in the form set forth in Exhibit A hereto. |

13.    **Entire Agreement**. This Agreement constitutes the entire contract between the parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof.

14.    **Assignment; Transfers**. Except as set forth in this Agreement, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by the Purchaser without the prior written consent of the Company. Any attempt by the Purchaser without such consent to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement shall be void. Except as set forth in this Agreement, any transfers in violation of any restriction upon transfer contained in any section of this Agreement shall be void, unless such restriction is waived in accordance with the terms of this Agreement.

15.    **Waiver**. Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are

cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

16.    **Severability**. Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

17.    **Rights as Stockholder; Voting**.

(a)    Subject to the terms and conditions of this Agreement, the Purchaser shall have the rights of a stockholder of the Company with respect to the Shares from and after the date that the Purchaser delivers a fully executed copy of this Agreement and full payment for the Shares to the Company, and until such time as the Purchaser disposes of the Shares in accordance with this Agreement.

(b)    For so long as the Management Agreement remains in full force and effect, the Purchaser, in its capacity as stockholder of the Company, irrevocably and unconditionally agrees that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company, the Purchaser shall  vote (or execute and return a written consent), or cause to be voted at such meeting (or validly execute and return and cause such consent to be granted with respect to ), all Shares owned by the Purchaser and subject to this Agreement as of the record date for such meeting (or the date that any written consent is executed by the Purchaser) in accordance with the recommendations of the board of directors of the Company. The Purchaser hereby grants an irrevocable proxy to vote the Shares owned by the Purchaser and subject to this Agreement as provided in this Section 17(b), *provided*, *however*, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the Management Agreement.

(c)    Any dividends paid in the form of Class A Common Stock issued with respect to the Unvested Shares will be treated as additional Unvested Shares purchased hereunder as of the date such dividend is distributed and will be subject to the same terms and conditions as the underlying Unvested Shares, including the vesting and forfeiture provisions set forth in Section 4. Any dividends paid in the form of cash with respect to the Unvested Shares shall be subject to the vesting and forfeiture provisions set forth in Section 4, and such cash dividends shall be paid in a single lump sum as soon as practicable following the vesting date of such Unvested Share (but in no event later than the end of the year in which vesting occurs).

(d)    Upon transfer, the Purchaser shall have no further rights as a holder of the Shares so transferred except (in the case of a transfer to the Company) the right to receive payment for the Shares so transferred, and the Purchaser shall forthwith cause the certificate(s) evidencing the Shares so transferred, if any, to be surrendered to the Company for transfer or cancellation.

18.    **Governing Law and Submission to Jurisdiction**.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the

transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

19.    **Availability of Injunctive Relief**. Both parties agree that any party may petition a court for injunctive relief as permitted by the rules. Both parties understand that any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor and both parties hereby consent to the issuance of an injunction. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

20.    **Counterparts; Facsimiles**. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement.  Facsimile copies of signed signature pages shall be binding originals.

*[Signature Page Follows]*

*DRAFT*

**IN WITNESS WHEREOF**, each of the parties has executed this Restricted Stock Purchase Agreement as of the date first above written.

**[NewCo, Inc.]**

By: _____

Name:

Title:

**Fahrenheit LLC**

By: _____

Name:

Title:

*[Signature Page to Restricted Stock Purchase Agreement]*

*DRAFT*

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Restricted Stock Purchase Agreement, dated as of [●], and as amended from time to time (the "Restricted Stock Purchase Agreement"), among [NewCo, Inc.] (the "Company") and [●]. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Restricted Stock Purchase Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Purchaser" under, the Restricted Stock Purchase Agreement as of the date hereof as if he, she or it had executed the Restricted Stock Purchase Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Restricted Stock Purchase Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

**[JOINING PARTY]**

By:    _____

Name:    [●]
Title:    [●]
Address: [●]

Date: [●]

**<u>Exhibit K(iii)</u>**

**New Organizational Documents:**

**Warrant Agreement**

DRAFT

# WARRANT AGREEMENT

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND, IF THE COMPANY REASONABLY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

Warrant Certificate No.: [NUMBER]

Original Issue Date: [DATE]

FOR VALUE RECEIVED, [NewCo], a Delaware corporation (the "**Company**"), hereby certifies that Fahrenheit LLC, a Delaware limited liability company, or its registered assigns (the "**Holder**") is entitled to purchase from the Company a number of duly authorized, validly issued, fully paid, and nonassessable shares of Common Stock equal to (a) 1% of the Common Stock Deemed Outstanding less (b) the aggregate number of shares of Common Stock previously issued as adjusted from time to time as a result of any partial exercise of this Warrant in accordance with Section 3, at a purchase price per share equal to the Exercise Price (defined below), all subject to the terms, conditions, and adjustments set forth below in this Warrant. Certain capitalized terms used herein are defined in Section 1 hereof.

This Warrant has been issued in accordance with the terms of that certain Management Agreement, dated as of [DATE] (the "**Management Agreement**"), between the Company, or a subsidiary thereof, and the Holder.

      1.    <u>Definitions</u>. As used in this Warrant, the following terms have the respective meanings set forth below:

           "**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to Section 3 hereof, multiplied by (b) the Exercise Price.

           "**Board**" means the board of directors of the Company.

           "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York

           "**Common Stock**" means (i) the Class A common stock, par value $[___] per share, of the Company, [(ii) any other class or series of common stock on parity with such Class A common stock with respect to dividends rights and/or distribution rights upon the liquidation, winding-up or dissolution ("**Parity**"),] and (iii) any capital stock into which

1

any such capital stock described in clauses (i) or (ii) above shall have been converted, exchanged, or reclassified following the date hereof, including any capital stock on Parity with respect thereto consistent with the adjustment provision provided in Section 4(a).

"**Common Stock Deemed Outstanding**" means, at any given time, the sum of (a) the number of shares of Common Stock actually outstanding as of 11:59 p.m. Eastern time on the Original Issue Date, plus (b) the number of shares of Common Stock reserved for issuance in accordance with the Plan for Claims (as defined in the Plan) that are Disputed (as defined in the Plan) plus (c) the number of shares of Common Stock reserved for issuance in accordance with any equity incentive plan approved by the Board of Directors of the Company on the Original Issue Date (in each case, as adjusted to take into account any stock split, reverse stock split or share consolidation, stock dividend or similar event effected by the Company with respect to the Common Stock).

"**Company**" has the meaning set forth in the preamble.

"**Convertible Securities**" means any securities (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

"**Excluded Issuance**" means any issuance or sale by the Company after the Original Issue Date of: (a) shares of Common Stock issued upon the exercise of this Warrant or any other Warrants issued to the Holder on the Original Issuance Date[1]; (b) Common Stock issued directly or upon the exercise of Options to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company, or their retention as consultants by the Company, in each case authorized by the Board and issued pursuant to any Company equity incentive plan; (c) shares of Common Stock issued upon the conversion or exercise of Options (other than Options covered by clause (b) above) or Convertible Securities issued prior to the Original Issue Date; (d) shares of Common Stock, Options, or Convertible Securities issued (i) to persons in connection with a joint venture, strategic alliance, or other commercial relationship with such person (including persons that are customers, suppliers, service providers and strategic partners of the Company) relating to the operation of the Company's business and not for the primary purpose of raising equity capital, (ii) in connection with a transaction in which the Company, directly or indirectly, acquires another business or its tangible or intangible assets, or (iii) to lenders as equity kickers in connection with debt financings of the Company, in each case where such transactions have been approved by the Board; (e) shares of Common Stock in an offering for cash for the account of the Company that is underwritten on a firm commitment basis and is registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended; or (f) shares of Common Stock, Options, or Convertible Securities issued to the lessor or vendor in any office lease or equipment lease or similar equipment financing

---

[1] NTD: This is necessary to address that there are separate warrants for each vesting date.

2

DRAFT

transaction in which the Company obtains the use of such office space or equipment for its business.

"**Exercise Date**" means, for any given exercise of this Warrant, the date on which the conditions to such exercise as set forth in Section 3 shall have been satisfied at or prior to 5:00 p.m., Eastern time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Agreement and the Aggregate Exercise Price.

"**Exercise Agreement**" has the meaning set forth in Section 3(a)(i).

"**Exercise Period**" has the meaning set forth in Section 2.

"**Exercise Period Commencement Date**" has the meaning set forth in Section 2.

"**Exercise Price**" means [    ].[2]

"**Fair Market Value**" means, as of any particular date: (a) the volume-weighted average price for the Common Stock on any national securities exchange for the ten (10) consecutive Business Days ending on (and including) the Business Day immediately preceding the date of measurement as reported by Bloomberg; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the highest bid and lowest asked prices for the Common Stock on all such exchanges at the end of such day; (c) if on any such day the Common Stock is not listed on a national securities exchange, the closing sales price of the Common Stock as quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association for such day; or (d) if there have been no sales of the Common Stock on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association on such day, the average of the highest bid and lowest asked prices for the Common Stock quoted on the OTC Bulletin Board, the Pink OTC Markets, or similar quotation system or association at the end of such day; in each case, averaged over twenty (20) consecutive Business Days ending on the Business Day immediately prior to the day as of which "Fair Market Value" is being determined; provided, that if the Common Stock is listed on any national securities exchange, the term "Business Day" as used in this sentence means Business Days on which such exchange is open for trading. If at any time the Common Stock is not listed on any national securities exchange or quoted on the OTC Bulletin

---

[2] NTD: Exercise Price definition to be determined by election of Debtors or Committee prior to Effective Date in accordance with the Plan.  Committee to confirm whether to set strike price for each year (1) at the trading price of the NewCo Equity as of the close of the market on the preceding business day or (2) at the trailing 90-day average level of the CMC 200 Index including BTC or other index to be agreed in good faith by the Debtors, Fahrenheit, and the Committee on or prior to the Effective Date, where the index level used to set the strike price of each year's option issuance would be based on the cumulative change in the index from the Effective Date, and the initial strike price would be calculated using Effective Date NAV (calculated using the midpoint of the valuation in the Disclosure Statements) divided by outstanding shares at emergence

3

DRAFT

Board, the Pink OTC Markets, or similar quotation system or association, the "Fair Market Value" of the Common Stock shall be the fair market value per share as determined jointly by the Board and the Holder.

"**Holder**" has the meaning set forth in the preamble.

"**Options**" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"**Original Issue Date**" means [DATE].[3]

"**OTC Bulletin Board**" means the Financial Industry Regulatory Authority OTC Bulletin Board electronic inter-dealer quotation system.

"**Plan**" has the meaning set forth in the Management Agreement.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization, or government or department or agency thereof.

"**Pink OTC Markets**" means the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB, and OTC Pink.

"**Transfer Agent**" shall mean the then Transfer Agent for the Common Stock, which shall initially be Equiniti.

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Common Stock or other capital stock of the Company then purchasable upon exercise of this Warrant in accordance with the terms of this Warrant.

2.    <u>Term of Warrant</u>.

(a)    Subject to the terms and conditions hereof, at any time or from time to time on or after the [first][4] anniversary hereof (subject to adjustment as provided in Section 2(b) hereof, the "**Exercise Period Commencement Date**") and prior to 5:00 p.m., Eastern time, on the fifth anniversary of the Exercise Period Commencement Date (the "**Exercise Period**"), the Holder of this Warrant may exercise this Warrant for all or any part of the Warrant Shares then purchasable hereunder (subject to adjustment as provided herein).

---

[3] NTD: Original issue date to be effective date of the Plan.

[4] NTD: Each warrant exercise to start on the first, second, and third and, if the Management Agreement is extended, fourth or fifth anniversary of the effective date of the Plan.

AMERICAS 124752590

DRAFT

(b)      Notwithstanding the foregoing or anything to the contrary herein:

(i)      *Termination of Management Agreement Other Than for Cause or Non-Extension of Management Agreement; USBTC Management Agreement Remains in Effect.* In the event that (x) (A) the Management Agreement is validly terminated other than pursuant to Section 2(b)(ii)(A), Section 2(b)(ii)(B) or Section 2(b)(iii)(G) of the Management Agreement (*Termination by Manager for Cause*), (B) the initial term of the Management Agreement is not extended in accordance with the terms thereof (such that the Management Agreement expires as of the end of the Initial Term) or (C) the first Term Extension (as defined the Management Agreement) is not extended in accordance with the terms of the Management Agreement (such that the Management Agreement expires at the end of the first Term Extension) and, (y) the Management Services Agreement, dated as of the date hereof, by and between the Company and US Data Management Group, LLC (the "**USBTC Management Agreement**") is in full force and effect as of the effective date of the termination or expiration, as applicable, of the Management Agreement, then notwithstanding the foregoing or anything to the contrary herein, upon the business day following the termination or expiration of the Management Agreement, but solely to the extent that the termination or expiration of the Management Agreement occurs prior to the Exercise Period Commencement Date, (1) subclause (a) of the "For Value Received" paragraph of this Warrant shall immediately and without any action on the part of the parties hereto be deemed amended and restated in its entirety to state "[0.31881]% of the Common Stock Deemed Outstanding"; (2) the Exercise Period Commencement Date and Exercise Period with respect to the remaining Warrants for which the Exercise Period Commencement Date has not occurred (the "**Unvested Warrants**") following the amendment described in clause (1) shall continue during the Initial Term of the Management Agreement and any Term Extension (whether or not exercised) (as defined in the Management Agreement) of the Management Agreement as if no such termination had occurred (provided that, notwithstanding anything to the contrary in the foregoing, for the avoidance of doubt, in the event that the termination or expiration date of the Management Agreement is the same date as the Exercise Period Commencement Date with respect to a Warrant, such Warrant shall be deemed to be vested);   *provided*, *however*, that (x) if the USBTC Management Agreement subsequently expires in accordance with Section 2(a) of the USBTC Management Agreement (*Non-Renewal*) or is subsequently terminated in accordance with Section 2(b)(i) (*Termination by Mutual Agreement*) or Section 2(b)(iii) of the USBTC Management Agreement (*Termination by Company for Cause*)[5], any Unvested Warrants for which the Exercise Period Commencement Date has not occurred as of the effective date of such termination or expiration of the USBTC Management Agreement (the "**Remaining Unvested Warrants**") shall, upon such termination of the USBTC Management Agreement, immediately

---

[5] NTD:  To reference termination by non-renewal, termination by mutual agreement and termination by the Company for cause clause in USBTC Management Agreement.

5

DRAFT

be cancelled in full with no further action on the part of the parties hereto and the Holder shall have no rights with respect thereto (provided that, notwithstanding anything to the contrary in the foregoing, for the avoidance of doubt, in the event that the termination or expiration date of the Management Agreement is the same date as the Exercise Period Commencement Date with respect to a Warrant, such Warrant shall be deemed to be vested) and, (y) if the USBTC Management Agreement is subsequently terminated in accordance with Section 2(b)(ii) of the USBTC Management Agreement (*Non-Payment by Company*)[6], the Exercise Period Commencement Date of any Remaining Unvested Warrants shall immediately and with no further action on the part of the parties hereto be deemed to be the last business day of (A) the Initial Term (as defined in the USBTC Management Agreement) in the case the Company has elected to provide a Notice of Non-Renewal (as defined in the USBTC Management Agreement) or (B) the Term Extension (as defined in the USBTC Management Agreement) if the Company has elected not to provide a Notice of Non-Renewal, in each case, in accordance with the terms of the USBTC Management Agreement.[7]

(ii)     *Termination of Management Agreement by Manager for Cause.* In the event that the Management Agreement is validly terminated pursuant to Section 2(b)(ii)(A), Section 2(b)(ii)(B) or Section 2(b)(iii)(G)[8] of the Management Agreement (*Termination by Manager for Cause*), the Exercise Period Commencement Date of any Unvested Warrant shall immediately and with no further action on the part of the parties hereto be deemed to be the effective date of such termination.[9]

(iii)     [*Non-Extension of Management Agreement; USBTC Management Agreement Not in Force*. In the event that (x) the initial term of the Management Agreement is not extended in accordance with the terms thereof and (y) the USBTC Management Agreement is not in full force and effect as of the expiration of the Management Agreement, then the Unvested Warrants shall with no further action on the part of the parties hereto terminate on the business day following the effective date of such expiration of the Management Agreement and be of no further force and effect (provided that, notwithstanding anything to the contrary in the foregoing, for the avoidance of doubt, in the event that the expiration date of the

---

[6] NTD:  To reference termination by USBTC clauses in USBTC Management Agreement .

[7] NTD:  This new language should cover old (iv) and (v) in the prior draft.

[8] NTD: Cross reference refers to Manager's termination due to Company's failure to pay or the Company's change of control or the Company's termination for convenience.

[9] NTD: Section references to be amended to line up with the terms of the Management Agreement as necessary.

6

DRAFT

Management Agreement is the same date as the Exercise Period Commencement Date with respect to a Warrant, such Warrant shall be deemed to be vested).][10]

3.    <u>Exercise of Warrant</u>.

(a)    <u>Exercise Procedure</u>. This Warrant may be exercised from time to time on any Business Day during the Exercise Period, for all or any part of the unexercised Warrant Shares, upon:

(i)    an Exercise Agreement in the form attached hereto as **Exhibit A** (each, an "**Exercise Agreement**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii)    payment to the Company of the Aggregate Exercise Price in accordance with Section 3(b).

(b)    <u>Payment of the Aggregate Exercise Price</u>. Payment of the Aggregate Exercise Price shall be made, at the option of the Holder as expressed in the Exercise Agreement, by the following methods:

(i)    by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designated in writing by the Company, in the amount of such Aggregate Exercise Price;

(ii)    by instructing the Company to issue Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula:

$$X = Y(A - B) \div A$$

Where:

$X$ = the number of Warrant Shares to be issued to the Holder.

$Y$ = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a).

$A$ = the Fair Market Value of one Warrant Share as of the applicable Exercise Date.

---

[10] NTD: To be inserted for the year 4 and 5 warrants.

7

DRAFT

B = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

(iii)    by surrendering to the Company (x) Warrant Shares previously acquired by the Holder with an aggregate Fair Market Value as of the Exercise Date equal to such Aggregate Exercise Price and/or (y) other securities of the Company having a value as of the Exercise Date equal to the Aggregate Exercise Price (which value in the case of debt securities shall be the principal amount thereof plus accrued and unpaid interest, in the case of preferred stock shall be the liquidation value thereof plus accumulated and unpaid dividends and in the case of shares of Common Stock shall be the Fair Market Value thereof); or

(iv)    any combination of the foregoing.

In the event of any withholding of Warrant Shares or surrender of other equity securities pursuant to Sections 3(b)(ii), 3(b)(iii), or 3(b)(iv) above where the number of shares whose value is equal to the Aggregate Exercise Price is not a whole number, the number of shares withheld by or surrendered to the Company shall be rounded up to the nearest whole share and the Company shall make a cash payment to the Holder (by delivery of a certified or official bank check or by wire transfer of immediately available funds) based on the incremental fraction of a share being so withheld by or surrendered to the Company in an amount equal to the product of (x) such incremental fraction of a share being so withheld or surrendered multiplied by (y) in the case of Common Stock, the Fair Market Value per Warrant Share as of the Exercise Date, and, in all other cases, the value thereof as of the Exercise Date determined in accordance with Section 3(b)(iii) above.

(c)    Delivery of Warrant Shares. Upon receipt by the Company of the Exercise Agreement, surrender of this Warrant, and payment of the Aggregate Exercise Price (in accordance with Section 3(a) hereof), the Company shall, as promptly as practicable, and in any event within two (2) Business Days thereafter, either (i) in the event that there is a registration statement covering the issuance or resale of the Warrant Shares available for the issuance or resale, as applicable, of such Warrant Shares, cause the Transfer Agent to issue in book-entry form to be so held through the facilities of the Depository Trust Company ("**DTC**") in an amount equal to the Warrant Shares issuable upon exercise together with cash in lieu of any fraction of a share, as provided in Section 3(d) hereof, or, (ii) in all other cases, cause the Transfer Agent to issue in book-entry form on the Warrant Register maintained by the Transfer Agent for such purpose, the Warrant Shares issuable upon such exercise, together with cash in lieu of any fraction of a share, as provided in Section 3(d) hereof. The Warrant Shares so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Agreement and shall be registered in the name of the Holder (or such Holder's broker or DTC, as applicable) or, subject to compliance with Section 6 below, such other Person's name as shall be designated in the Exercise Agreement. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be

8

DRAFT

named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d)    <u>Fractional Shares</u>. The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant. As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Fair Market Value of one Warrant Share on the Exercise Date.

(e)    <u>Valid Issuance of Warrant and Warrant Shares; Payment of Taxes</u>. With respect to the exercise of this warrant, the Company hereby represents, covenants, and agrees:

(i)    This Warrant is, and any Warrant issued in substitution for or replacement of this Warrant shall be, upon issuance, duly authorized and validly issued.

(ii)    All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid, and non-assessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all taxes, liens, and charges.

(iii)    The Company shall take all such actions as may be necessary to ensure that all such Warrant Shares are issued without violation by the Company of any applicable law or governmental regulation or any requirements of any national securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares may be listed at the time of such exercise (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).

(iv)    At all times that this Warrant is outstanding and the Company is a publicly traded entity with common equity quoted on or listed for trading on a national securities exchange and registered under the Securities Exchange Act of 1934, as amended, the Company shall use its commercially reasonable efforts to cause the Warrant Shares to be listed on any national securities exchange upon which shares of Common Stock or other securities constituting Warrant Shares are listed.

(v)    Any Warrant Shares shall be subject to that certain Registration Rights Agreement (the "Registration Rights Agreement") between the Holder and the Company dated on or about the date hereof, as such Registration Rights Agreement may be amended.

9

DRAFT

(vi)    The Company shall pay all expenses in connection with, and all taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Warrant Shares upon exercise of this Warrant; *provided*, that the Company shall not be required to pay any tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Warrant Shares to any Person other than the Holder, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such tax, or has established to the satisfaction of the Company that such tax has been paid.

(f)    <u>Conditional Exercise</u>. Notwithstanding any other provision hereof, if an exercise of any portion of this Warrant is to be made in connection with a public offering or a sale of the Company (pursuant to a merger, sale of stock, or otherwise), such exercise may at the election of the Holder be conditioned upon the consummation of such transaction, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such transaction.

(g)    <u>Reservation of Shares</u>. During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Warrant Shares, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the applicable Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon the exercise of this Warrant.

4.    <u>Effect of Certain Events on Warrant Shares</u>.

(a)    [<u>Adjustment to Warrant Shares Upon Reorganization, Reclassification, Consolidation, or Merger</u>. In the event of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up, or combination of shares), (iii) consolidation or merger of the Company with or into another Person, (iv) sale of all or substantially all of the Company's assets to another Person or (v) other similar transaction, in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) stock, securities, or assets with respect to or in exchange for Common Stock and which does not result in a [Change of Control of the Issuer], each Warrant shall, immediately after such reorganization, reclassification, consolidation, merger, sale, or similar transaction, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Warrant Shares then exercisable under this Warrant, be exercisable for the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Holder would have been entitled upon such reorganization, reclassification, consolidation, merger, sale, or similar transaction if

10

DRAFT

the Holder had exercised this Warrant in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale, or similar transaction and acquired the applicable number of Warrant Shares then issuable hereunder as a result of such exercise (without taking into account any limitations or restrictions on the exercisability of this Warrant); and, in such case, appropriate adjustment (in form and substance satisfactory to the Holder) shall be made with respect to the Holder's rights under this Warrant to insure that the provisions of this Warrant shall thereafter be applicable, as nearly as possible, to any shares of stock, securities, or assets thereafter acquirable upon exercise of this Warrant. The provisions of this Section 4(a) shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales, or similar transaction. The Company shall not effect any such reorganization, reclassification, consolidation, merger, sale, or similar transaction that does not result in a Change of Control of the Issuer unless, prior to the consummation thereof, the successor Person (if other than the Company) resulting from such reorganization, reclassification, consolidation, merger, sale, or similar transaction, shall assume, by written instrument substantially similar in form and substance to this Warrant and satisfactory to the Holder, the obligation to deliver to the Holder such shares of stock, securities, or assets which, in accordance with the foregoing provisions, such Holder shall be entitled to receive upon exercise of this Warrant. Notwithstanding anything to the contrary contained herein, with respect to any corporate event or other transaction contemplated by the provisions of this Section 4(a), the Holder shall have the right to elect prior to the consummation of such event or transaction, to give effect to the exercise rights contained in Section 2 instead of giving effect to the provisions contained in this Section 4(a) with respect to this Warrant.

(b)    With respect to any of such reorganization, reclassification, consolidation, merger, sale, or similar transaction that results in a Change of Control (as such term is defined in the Management Agreement), (x) each Warrant that has vested prior to the effective time of such transaction shall, immediately prior to such transaction, be cancelled and converted into the right to receive the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the Holder would have been entitled upon such reorganization, reclassification, consolidation, merger, sale, or similar transaction if the Holder had exercised this Warrant in full immediately prior to the time of such transaction in accordance with Section 3(b)(ii) and acquired the applicable number of Warrant Shares then issuable hereunder as a result of such exercise (without taking into account any limitations or restrictions on the exercisability of this Warrant) and (y) any Unvested Warrant at the time of such reorganization, reclassification, consolidation, merger, sale, or similar transaction shall vest immediately prior to the effectiveness of the Change of Control.][11]

---

[11] NTD: Section 4(a) and 4(b) are subject to further review by Fahrenheit and are open items. Furthermore, the removal of previous Section 4(b) regarding dividends is likewise subject to further review by Fahrenheit and is an open item.

11

DRAFT

(c)    <u>Certificate as to Adjustment</u>.

(i)    As promptly as reasonably practicable following any adjustment of the kind of Warrant Shares pursuant to the provisions of Section 4(a), but in any event not later than ten (10) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii)    As promptly as reasonably practicable following the receipt by the Company of a written request by the Holder, but in any event not later than five (5) Business Days thereafter, the Company shall furnish to the Holder a certificate of an executive officer certifying the amount of other shares of stock, securities, or assets then issuable upon exercise of the Warrant and the Exercise Price thereof.

(d)    <u>Notices</u>. In the event:

(i)    that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon exercise of the Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, to vote at a meeting (or by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(ii)    of any capital reorganization of the Company, any reclassification of the Common Stock of the Company, any consolidation or merger of the Company with or into another Person, or sale of all or substantially all of the Company's assets to another Person; or

(iii)    of the voluntary or involuntary dissolution, liquidation, or winding-up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Holder at least ten (10) Business Days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting, or consent or other right or action, and a description of such dividend, distribution, or other right or action to be taken at such meeting or by written consent, or (B) the effective date on which such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation, or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon exercise of the Warrant) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale,

12

DRAFT

dissolution, liquidation, or winding-up, and the amount per share and character of such exchange applicable to the Warrant and the Warrant Shares.

5.    Purchase Rights. In addition to any adjustments pursuant to Section 4(a) above, if at any time the Company grants, issues or sells any shares of Common Stock, Options, Convertible Securities, or rights to purchase stock, warrants, securities, or other property pro rata to the record holders of Common Stock (the "**Purchase Rights**"), then the Holder shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder would have acquired if the Holder had held the number of Warrant Shares acquirable upon complete exercise of this Warrant immediately before the date on which a record is taken for the grant, issuance, or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue, or sale of such Purchase Rights. Anything herein to the contrary notwithstanding, the Holder shall not be entitled to the Purchase Rights granted herein with respect to any Excluded Issuance.

6.    Transfer of Warrant. Neither this Warrant nor any of the rights, interests or obligations under this Warrant shall be assigned, in whole or in part, by operation of law or otherwise by any Holder without the prior written consent of the Company, which consent may be withheld, delayed or conditioned. Notwithstanding the foregoing or anything to the contrary herein, the Holder may assign the rights, interests or obligations under this Warrant to any equity member of the Holder (or their affiliates) without the consent of the Company. Any purported assignment not in compliance with the terms of this Section 6 shall be null and void. .

7.    Holder Not Deemed a Stockholder; Limitations on Liability. Except as otherwise specifically provided herein (including without limitation Section 5), prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give, or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance, or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company. Notwithstanding this Section 7 the Company shall provide the Holder with copies of the same notices and other information given to the stockholders of the Company generally, contemporaneously with the giving thereof to the stockholders.

8.    Division and Combination. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance with the applicable provisions of this Warrant as

13

DRAFT

to any transfer or assignment which may be involved in such division or combination, the Company shall at its own expense execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for an equivalent number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

9.      <u>No Impairment</u>. The Company shall not, by amendment of its Certificate of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed by it hereunder, but shall at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may reasonably be requested by the Holder in order to protect the exercise rights of the Holder against dilution or other impairment, consistent with the tenor and purpose of this Warrant.

10.      <u>Compliance with the Securities Act</u>.

(a)      Agreement to Comply with the Securities Act; Legend. The Holder, by acceptance of this Warrant, agrees to comply in all respects with the provisions of this Section 10 and the restrictive legend requirements set forth on the face of this Warrant and further agrees that such Holder shall not offer, sell, or otherwise dispose of this Warrant or any Warrant Shares to be issued upon exercise hereof except under circumstances that will not result in a violation of the Securities Act of 1933, as amended (the "**Securities Act**"). This Warrant and all Warrant Shares issued upon exercise of this Warrant (unless registered under the Securities Act), to the extent applicable may be stamped or imprinted with a legend in substantially the following form:

"THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND, IF THE COMPANY REASONABLY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL."

(b)      Representations of the Holder. In connection with the issuance of this Warrant, the Holder specifically represents, as of the date hereof, to the Company by acceptance of this Warrant as follows:

(i)      The Holder is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act. The Holder is acquiring this Warrant and the Warrant Shares to be issued upon exercise hereof for investment

14

DRAFT

for its own account and not with a view towards, or for resale in connection with, the public sale or distribution of this Warrant or the Warrant Shares, except pursuant to sales registered or exempted under the Securities Act.

(ii)     The Holder understands and acknowledges that this Warrant and the Warrant Shares to be issued upon exercise hereof are "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, such securities may be resold without registration under the Securities Act only in certain limited circumstances. In addition, the Holder represents that it is familiar with Rule 144 under the Securities Act, as presently in effect, and understands the resale limitations imposed thereby and by the Securities Act.

(iii)    The Holder acknowledges that it can bear the economic and financial risk of its investment for an indefinite period, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Warrant and the Warrant Shares. The Holder has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Warrant and the business, properties, prospects, and financial condition of the Company.

11.    <u>Warrant Register</u>. The Transfer Agent[12] shall keep, at an office designated for such purpose, books (the "<u>Warrant Register</u>") in which, subject to such reasonable regulations as it may prescribe, it shall register the original issuance of the Warrant and any assignment, division, combination, or other transfer of the Warrant. The Company and the Transfer Agent may deem and treat the Person in whose name the Warrant is registered on such Warrant Register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination, or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

12.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12).

---

[12] NTD: TA has agreed to take on this role with respect to warrants.

15

AMERICAS 124752590

DRAFT

| If to the Company: | [COMPANY ADDRESS] |
| | E-mail: [E-MAIL ADDRESS] |
| | Attention: [TITLE OF OFFICER] |

with a copy to:    [COMPANY LAW FIRM]
E-mail: [E-MAIL ADDRESS]
Attention: [ATTORNEY NAME]

If to the Holder:    [HOLDER ADDRESS]
E-mail: [E-MAIL ADDRESS]
Attention:    [TITLE OF OFFICER]

with a copy to:
Brown Rudnick LLP
7 Times Square,
New York, NY 10036
Email: jfitzsimons@brownrudnick.com
Attention: Jonathan Fitzsimons

13.    <u>Voting</u>.  For so long as the Management Agreement remains in full force and effect, the Holder, in its capacity as stockholder of the Company, irrevocably and unconditionally agrees that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company, the Holder shall vote (or execute and return a written consent), or cause to be voted at such meeting (or validly execute and return and cause such consent to be granted with respect to ), all Warrant Shares owned by the Holder as of the record date for such meeting (or the date that any written consent is executed by the Holder) in accordance with the recommendations of the board of directors of the Company. The Holder hereby grants an irrevocable proxy to vote the Warrant Shares owned by the Holder as provided in this Section 13, provided, however, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the Management Agreement.

14.    <u>Cumulative Remedies</u>. Except to the extent expressly provided in Section 7 to the contrary, the rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity, or otherwise.

15.    <u>Equitable Relief</u>. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction.

AMERICAS 124752590

DRAFT

16.     <u>Entire Agreement</u>. This Warrant, together with the Registration Rights Agreement, constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the Registration Rights Agreement, the statements in the body of this Warrant shall control.

17.     <u>Successor and Assigns</u>. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

18.     <u>No Third-Party Beneficiaries</u>. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Warrant.

19.     <u>Headings</u>. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

20.     <u>Amendment and Modification; Waiver</u>. Except as otherwise provided herein, this Warrant may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

21.     <u>Severability</u>. If any term or provision of this Warrant is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

22.     <u>Governing Law and Submission to Jurisdiction</u>. This Warrant shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive

17

jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

23.    <u>Waiver of Jury Trial</u>. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

24.    <u>Counterparts</u>. This Warrant may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Warrant delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant.

25.    <u>No Strict Construction</u>. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

[SIGNATURE PAGE FOLLOWS]

18

DRAFT

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

[NEWCO]

By: _____
[NAME]
[TITLE]

Accepted and agreed,

Fahrenheit LLC

By: _____
[NAME]
[TITLE]

65113572 v1-WorkSiteUS-039525/0001

19

**<u>Exhibit K(iv)</u>**

**New Organizational Documents**

**Investors' and Registration Rights Agreement**

### INVESTORS' AND REGISTRATION RIGHTS AGREEMENT

This Investors' and Registration Rights Agreement (this "***Agreement***"), dated as of [●], is entered into by and among [NewCo, Inc.], a Delaware corporation (the "***Company***"), [Fahrenheit, LLC], a Delaware limited liability company ("***Fahrenheit***"), and [U.S. Data Management Group, LLC, a Delaware limited liability company][1] ("***US Bitcoin***" and, together with the Company and Fahrenheit, the "***Parties***").

**WHEREAS**, on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "***Plan***");

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan;

**WHEREAS,** pursuant to the Plan, the Parties entered into that certain Plan Sponsor Contribution Agreement, dated as of [●] (the "***Contribution Agreement***"), pursuant to which, among other things, Fahrenheit and US Bitcoin agreed to purchase a total of $50,000,000 worth of shares of the Company's Class A common stock, par value $[●] per share (as further defined below, the "***Class A Common Stock***"), from the Company and/or in secondary market purchases (as such term is defined in the Contribution Agreement, the "***Plan Sponsor Shares***");

**WHEREAS,** pursuant to the Plan, the Parties entered into those certain Warrant Agreements, dated as of [●] (the "***Warrant Agreements***"), pursuant to which, among other things, Fahrenheit and US Bitcoin received warrants to purchase shares of Class A Common Stock (the "***Warrant Shares***");

**WHEREAS,** pursuant to the Plan, the Parties entered into those certain [Restricted Stock Agreements], dated as of [●] (the ["***Restricted Stock Agreements***"]), pursuant to which, among other things, Fahrenheit agreed to purchase shares of Class A Common Stock from the Company subject to certain terms and conditions (the "***Restricted Stock Agreement Shares***" and, with the Plan Sponsor Shares and the Warrant Shares, the "***Initial Shares***");

**WHEREAS,** the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreements all contemplate that the Parties will enter into a registration rights agreement; and

**WHEREAS,** the Parties are entering into this Agreement in furtherance of the

---

[1] Note to USBTC: Confirm entity. Given split of equity comp between Fahrenheit and US Bitcoin, it makes sense to us for both to be parties.

AMERICAS 124964997

aforementioned provisions of the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreements.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party hereto, the Parties hereby agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings indicated:

"***Affiliate***" means, with respect to any specified Person, a Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such specified Person.[2]

"***Automatic Shelf Registration Statement***" means an "automatic shelf registration statement" as defined under Rule 405.

"***Board***" means the board of directors of the Company.

"***Business Day***" means any day other than a Saturday, Sunday, any federal holiday or any other day on which banking institutions in the State of New York are authorized or required to be closed by law or governmental action.

"***Class A Common Stock***" means the Company's Class A common stock, par value $[●] per share, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"***Commission***" means the Securities and Exchange Commission or any other federal agency then administering the Securities Act or Exchange Act.

"***Company Securities***" means any equity interest of any class or series in the Company.

"***Controls***," "***Controlled by***" and "***under common Control with***" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Effective Date***" means the time and date that a Registration Statement is first declared effective by the Commission or otherwise becomes effective.

---

[2] NTD: TBD if there are specific Affiliates we want to add in for Fahrenheit or USBTC specifically.

AMERICAS 124964997

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Fahrenheit Management Agreement*" means that certain Management Agreement, dated as of [●], by and between the Company and Fahrenheit.

"*FINRA*" means the Financial Industry Regulatory Authority.

"*Holder*" means (a) Fahrenheit, unless and until Fahrenheit ceases to hold any Registrable Securities; and (b) any holder of Registrable Securities to whom registration rights conferred by this Agreement have been transferred in compliance with Section 9(e) hereof; *provided*, that any Person referenced in clause (b) of this definition shall be a Holder only if such Person agrees in writing to be bound by and subject to the terms and conditions set forth in this Agreement.

"*Material Adverse Change*" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or in the over-the-counter market in the United States; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States; (c) a material outbreak or escalation of armed hostilities or other international or national calamity involving the United States or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any event, change, circumstance or effect that is or is reasonably likely to be materially adverse to the business, properties, assets, liabilities, condition (financial or otherwise), operations, results of operations or prospects of the Company and its subsidiaries taken as a whole.

"*Person*" means an individual, corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited partnership, limited liability company, joint stock company, estate, trust, government (or an agency or subdivision thereof) or other entity of any kind.

"*Proceeding*" means any action, claim, suit, proceeding or investigation (including a preliminary investigation or partial proceeding, such as a deposition) pending or, to the knowledge of the Company, threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A, Rule 430B or Rule 430C promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means the Shares; *provided*, *however*, that Registrable Securities shall not include:  (a) any Shares that have been registered under the Securities Act and disposed of pursuant to an effective Registration Statement or otherwise

4

transferred to a Person who is not entitled to the registration rights and other rights hereunder; (b) any Shares that have been sold or transferred by the Holder thereof pursuant to Rule 144 (or any similar provision then in force under the Securities Act) and the transferee thereof does not receive "restricted securities" as defined in Rule 144, as a result of which the legend on any certificate or book-entry notation, as the case may be, representing such Registrable Security restricting transfer of such Registrable Security has been removed; (c) any Shares that are eligible for resale without restriction (including any limitation thereunder on volume or manner of sale) and without the need for current public information pursuant to any provision of Rule 144 (or any similar provision then in force under the Securities Act); and (d) any Shares that cease to be outstanding (whether as a result of repurchase and cancellation, conversion or otherwise).

"***Registration Statement***" means a registration statement of the Company in the form required to register under the Securities Act, the Exchange Act or other applicable law for the resale of the Registrable Securities in accordance with the intended plan of distribution of each Holder included therein, and including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***Rule 144***" means Rule 144 promulgated by the Commission pursuant to the Securities Act.

"***Rule 405***" means Rule 405 promulgated by the Commission pursuant to the Securities Act.

"***Rule 415***" means Rule 415 promulgated by the Commission pursuant to the Securities Act.

"***Rule 424***" means Rule 424 promulgated by the Commission pursuant to the Securities Act.

"***Rule 430A***" means Rule 430A promulgated by the Commission pursuant to the Securities Act.

"***Rule 430B***" means Rule 430B promulgated by the Commission pursuant to the Securities Act.

"***Rule 430C***" means Rule 430C promulgated by the Commission pursuant to the Securities Act.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Selling Expenses***" means all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder in connection with such sale (except as set forth in Section 5).

"**Shares**" means the shares of Class A Common Stock now held or hereafter acquired by the Holders, including without limitation the Initial Shares and any other shares of Class A Common Stock held by the Holders as of the date hereof, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"**Shelf Registration Statement**" means a Registration Statement filed with the Commission on Form S-3 (or any successor form or other appropriate form under the Securities Act) for an offering to be made on a continuous or delayed basis pursuant to Rule 415 (or any similar rule that may be adopted by the Commission) or, if the Company is not then eligible to file on Form S-3, on Form S-1 or any other appropriate form under the Securities Act, or any successor rule that may be adopted by the Commission, and all amendments and supplements to such Registration Statement (including post-effective amendments), covering the Registrable Securities, as applicable.

"**Trading Market**" means the principal national securities exchange on which Registrable Securities are listed.

"**Underwritten Offering**" means an underwritten offering of Class A Common Stock for cash (whether a Requested Underwritten Offering or in connection with a public offering of Class A Common Stock by the Company, stockholders or both), excluding an offering relating solely to an employee benefit plan, an offering relating to a transaction on Form S-4 or Form S-8 or an offering on any registration statement form that does not permit secondary sales.

"**US Bitcoin Management Agreement**" means that certain Management Agreement, dated as of [●], by and between the Company and US Bitcoin.

"**VWAP**" means, as of a specified date and in respect of Registrable Securities, the volume weighted average price for such security on the Trading Market for the five trading days immediately preceding, but excluding, such date.

"**WKSI**" means a "well-known seasoned issuer" as defined under Rule 405.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections refer to sections of this Agreement; (c) the terms "include," "includes," "including" and words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "hereto," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall include all rules and regulations promulgated thereunder, and references to any law or statute shall be construed as including any legal and statutory provisions consolidating,

6

amending, succeeding or replacing the applicable law or statute; (h) references to any Person include such Person's successors and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated.

2.    <u>Registration</u>.

(a)    <u>Initial Shelf Registration Statement</u>.

(i)    Notwithstanding anything to the contrary contained in this Agreement, as soon as practicable following the first date of the Company's eligibility to file a Registration Statement on Form S-3 (but no later than 30 days following such date), the Company shall use reasonable best efforts to file with the Commission a Shelf Registration Statement on Form S-3 (as such Registration Statement may be amended from time to time, the "***Initial Shelf Registration Statement***"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall have timely requested inclusion therein of some or all of its Registrable Securities by written notice to the Company. The Company shall use its reasonable best efforts to have the Initial Shelf Registration Statement declared effective by the Commission as soon as reasonably practicable after the Company files the Initial Shelf Registration Statement but no later than the fifth Business Day following the date on which the Commission informs the Company that it does not intend to review the Initial Shelf Registration Statement or the fifth Business Day following the resolution or clearance of all Commission comments to the Initial Shelf Registration Statement, as applicable.

(ii)    The Company shall use reasonable best efforts to keep the Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the date on which all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "***Initial Shelf Expiration Date***").

(iii)    Until the Initial Shelf Expiration Date, the Company shall file any supplements or post-effective amendments required to be filed by applicable law so that (A) the Initial Shelf Registration Statement does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (B) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K.

(b)    <u>Demand Registration</u>.

(i)    Subject to the provisions of <u>Section 2(b)(x)</u>, Fahrenheit[3] shall have the option and right, exercisable by delivering a written notice to the Company (a "***Demand Notice***"), to require the Company to, pursuant to the terms of and subject to the limitations contained in this Agreement, prepare and file with the Commission a Registration Statement registering the offering and sale of the number and type of

---

[3] NTD: Intention is to limit the demand right to Fahrenheit, but to allow all Holders to participate pro rata. **Note to BR**: Should USBTC be included?

Registrable Securities on the terms and conditions specified in the Demand Notice, which may include sales on a delayed or continuous basis pursuant to Rule 415 on a Shelf Registration Statement (a "***Demand Registration***").  The Demand Notice must set forth the number of Registrable Securities that Fahrenheit and other Holders, as applicable, intend to include in such Demand Registration and the intended timing and method of disposition thereof.  Notwithstanding anything to the contrary herein, in no event shall the Company be required to effectuate a Demand Registration unless the Registrable Securities of the Holders to be included therein after compliance with Section 22(b)(ii) and Section 2(b)(x): (i) have an aggregate value of at least $[20] million based on the VWAP or (ii) represent at least [30%] of  the Registrable Securities eligible for registration in accordance with Section 2(b)(x) (the "***Minimum Amount***")[4] as of the date of the Demand Notice.

(ii)    Within [five] Business Days (or if the Registration Statement will be a Shelf Registration Statement, within [two] Business Days) after the receipt of the Demand Notice, the Company shall give written notice of such Demand Notice to all Holders and, within [30] days after receipt of the Demand Notice (except if the Company is not then eligible to register for offer and resale the Registrable Securities on Form S-3, in which case, within [90] days thereof), shall, subject to the limitations of this Section 2(b), file a Registration Statement in accordance with the terms and conditions of, and the intended timing and method of disposition described in, the Demand Notice, which Registration Statement shall cover all of the Registrable Securities eligible for registration in accordance with Section 2(b)(x) that the Holders shall in writing request to be included in the Demand Registration (such request to be given to the Company within three Business Days (or if the Registration Statement will be a Shelf Registration Statement, within [one] Business Day) after receipt of notice of the Demand Notice given by the Company pursuant to this Section 2(b)(ii)).  The Company shall use reasonable best efforts to cause such Registration Statement to become, as soon as reasonably practicable after the filing thereof, and remain continuously, effective under the Securities Act until the earlier of (A) 180 days (or three years if a Shelf Registration Statement is requested) after the Effective Date of such Registration Statement or (B) the date on which all Registrable Securities covered by such Registration Statement have been sold or otherwise disposed of or such Shares are no longer Registrable Securities (the "***Effectiveness Period***"); *provided*, *however*, that such period shall be extended for a period of time equal to the period the Holders refrain from selling any securities included in such Registration Statement at the request of an underwriter of the Company or the Company pursuant to this Agreement.

(iii)    Subject to the other limitations contained in this Agreement, the Company is not obligated hereunder to effect (A) a Demand Registration within 90 days after the closing of any Requested Underwritten Offering, (B) more than a total of [four] Demand Registrations, and (C) a subsequent Demand Registration pursuant to a Demand Notice if a Registration Statement covering all of the Registrable Securities held by the Holders shall have become and remains effective under the Securities Act and is

---

[4] NTD: Business team to discuss Minimum Amount thresholds.

AMERICAS 124964997

sufficient to permit offers and sales of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice in accordance with the intended timing and method of disposition thereof specified in the Demand Notice; *provided*, that a demand for a Shelf Registration Statement shall not count against the number of allowable Demand Registrations for subclause (B) of this paragraph.  No Demand Registration shall be deemed to have occurred for purposes of this Section 2(b)(iii) if the Registration Statement relating thereto does not become effective or is not maintained effective for its entire Effectiveness Period, in which case Fahrenheit shall be entitled to an additional Demand Registration in lieu thereof. Further, a Demand Registration shall not constitute a Demand Registration for purposes of this Section 2(a)(iii) if, as a result of Section 2(b)(vi), there is included in the Demand Registration less than the Minimum Amount of Registrable Securities.

(iv)    A Holder may withdraw all or any portion of its Registrable Securities included in a Demand Registration from such Demand Registration at any time prior to the effectiveness of the applicable Registration Statement.  Upon receipt of a notice from Fahrenheit that Fahrenheit (and/or other applicable Holders) are withdrawing all of their Registrable Securities from the Demand Registration such that the remaining amount of Registrable Securities to be included in the Demand Registration is below the Minimum Amount, the Company shall cease all efforts to secure effectiveness of the applicable Registration Statement.  Such registration nonetheless shall be deemed a Demand Registration for purposes of Section 2(b)(iii) unless (A) Fahrenheit shall have paid or reimbursed the Company for all reasonable and documented out-of-pocket fees and expenses incurred by the Company in connection with the withdrawn registration of such Registrable Securities (based on the number of securities Fahrenheit sought to register, as compared to the total number of securities included in such Demand Registration) or (B) the withdrawal is made following the occurrence of a Material Adverse Change or pursuant to the Company's request for suspension pursuant to Section 3(o).

(v)    The Company may include in any such Demand Registration other Company Securities for sale for its own account or for the account of any other Person, subject to Section 2(b)(vi) and Section 2(e)(iii).

(vi)    In the case of a Demand Registration not being underwritten, if Fahrenheit advises the Company that in its reasonable opinion the aggregate number of securities requested to be included in such registration exceeds the number that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the Company shall include in such Demand Registration only that number of securities that, in the reasonable opinion of Fahrenheit, will not have such adverse effect, with such number to be allocated as follows: (A) first, pro-rata among all Holders (including Fahrenheit) that have requested to participate in such Demand Registration based on the relative number of Registrable Securities then held by each such Holder, (B) second, if there remains availability for additional securities to be included in such Demand Registration, to the Company, and (C) third, if there remains availability for additional securities to be included in such Demand Registration following the allocation provided in clauses (A)

9

and (B) above, to any other holders of Company Securities entitled to participate in such Demand Registration, if applicable, based on the relative number of Company Securities such holder is entitled to include in such Demand Registration.

(vii)     Subject to the limitations contained in this Agreement, the Company shall effect any Demand Registration on such appropriate registration form of the Commission (A) as shall be selected by the Company and (B) as shall permit the disposition of the Registrable Securities in accordance with the intended method of disposition specified in the Demand Notice; *provided*, that if the Company becomes, and is at the time of its receipt of a Demand Notice, a WKSI, the Demand Registration for any offering and selling of Registrable Securities shall be effected pursuant to an Automatic Shelf Registration Statement, which shall be on Form S-3 (if available to the Company. If at any time a Registration Statement on Form S-3 is effective and a Holder provides written notice to the Company that it intends to effect an offering of all or part of the Registrable Securities included on such Registration Statement, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable such offering to take place.

(viii)    Without limiting Section 3, in connection with any Demand Registration pursuant to and in accordance with this Section 2(b), the Company shall (A) promptly prepare and file or cause to be prepared and filed (1) such additional forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary or advisable to register or qualify the Registrable Securities subject to such Demand Registration, including under the securities laws of such jurisdictions as the Holders shall reasonably request; *provided*, *however*, that no such qualification shall be required in any jurisdiction where, as a result thereof, the Company would become subject to general service of process or to taxation or qualification to do business in such jurisdiction solely as a result of such registration and (2) such forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary to apply for listing or to list the Registrable Securities subject to such Demand Registration on the Trading Market and (B) do any and all other acts and things that may be reasonably necessary or appropriate or reasonably requested by the Holders to enable the Holders to consummate a public sale of such Registrable Securities in accordance with the intended timing and method of distribution thereof.

(ix)     In the event a Holder transfers Registrable Securities included on a Registration Statement and such Registrable Securities remain Registrable Securities following such transfer, at the request such Holder, the Company shall amend and supplement such Registration Statement as may be necessary in order to enable the transferee of such Registrable Securities to offer and sell such Registrable Securities pursuant to such Registration Statement; *provided*, that in no event shall the Company be required to file a post-effective amendment to the Registration Statement unless (A) such Registration Statement includes only Registrable Securities held by the Holder, Affiliates of the Holder or transferees of the Holder or (B) the Company has received written consent therefor from each other Holder for whom Registrable Securities have been

10

registered on (but not yet sold under) such Registration Statement, other than the Holder, Affiliates of the Holder or transferees of the Holder.

(x)    Fahrenheit's option and right with respect to Demand Registrations set forth in this Section 2(b) shall apply to the Registrable Securities as follows: (A) with respect to the Plan Sponsor Shares, immediately upon the earlier to occur of the expiration of the Lock-Up Period (as such term is defined in the Plan Sponsor Contribution Agreement) or, with respect to such Plan Sponsor Shares as shall have vested thereupon, the commencement of the Unlock Period (as such term is defined in the Plan Sponsor Contribution Agreement); (B) with respect to the Restricted Stock Agreement Shares, immediately upon the vesting of the Restricted Stock Agreement Shares in accordance with the terms of the applicable Restricted Stock Agreement; (C) with respect to the Warrant Shares, immediately upon the Exercise Period Commencement Date (as such term is defined in the applicable Warrant Agreement); and (D) with respect to such Shares that Fahrenheit may acquire after the date hereof, upon the earliest to occur of the events set forth in subclauses (A), (B) or (C) of this Section 2(b)(x) following the acquisition of such Shares.[5]

(c)    Requested Underwritten Offering. If Fahrenheit[6] is able to effectuate a Demand Registration pursuant to the terms of Section 2(b) (or has previously effectuated a Demand Registration pursuant to Section 2(b) but has not engaged in an Underwritten Offering in respect of such Demand Registration) Fahrenheit shall have the option and right, exercisable by delivering written notice to the Company of its intention to distribute Registrable Securities that are then not otherwise subject to restrictions on transfer other than those provided by applicable securities law by means of an Underwritten Offering (an "***Underwritten Offering Notice***"), to require the Company, pursuant to the terms of and subject to the limitations of this Agreement, to effectuate a distribution of any or all of its and other Holders' Registrable Securities by means of an Underwritten Offering pursuant to a new Demand Registration or pursuant to an effective Registration Statement covering such Registrable Securities (a "***Requested Underwritten Offering***"); *provided*, that if the Requested Underwritten Offering is pursuant to a new Demand Registration, then the Registrable Securities requested to be included in such Requested Underwritten Offering equal or exceed the Minimum Amount. The Underwritten Offering Notice must set forth the number of Registrable Securities that are intended to be included in such Requested Underwritten Offering. The Company shall propose three or more nationally prominent firms of investment bankers reasonably acceptable to Fahrenheit to act as the managing underwriter or managing underwriters in connection with such Underwritten Offering from which Fahrenheit shall select the managing underwriter or managing underwriters. Fahrenheit, in connection with any other Holder participating in such Underwritten Offering, shall determine the pricing of the Registrable Securities offered pursuant to any Requested Underwritten Offering and the applicable underwriting discounts and commissions and determine the timing of any such Requested Underwritten Offering. Notwithstanding the foregoing, the Company is not obligated to effect more than a total of three Requested

---

[5] NTD: Conform definitions/usage among the various agreements as required.

[6] NTD: Intention is to limit the demand right to Fahrenheit, but to allow all Holders to participate pro rata.

11

Underwritten Offerings, but in no more than (x) two within 90 days after the closing of an Underwritten Offering and (y) two within any 12-month period. Any Requested Underwritten Offering (other than the first Requested Underwritten Offering made in respect of a prior Demand Registration) shall constitute a Demand Registration of Fahrenheit for purposes of Section 2(b)(iii) (it being understood that if requested concurrently with a  Demand Registration then, together, such Demand Registration and Requested Underwritten Offering shall count as one Demand Registration); *provided*, *however*, that a Requested Underwritten Offering shall not constitute a Demand Registration of Fahrenheit for purposes of Section 2(b)(iii) if, as a result of Section 2(e)(iii)(A), the Requested Underwritten Offering includes less than the lesser of (i) Registrable Securities having a VWAP measured on the effective date of the related Registration Statement of $[●] million and (ii) [two-thirds] of the number of Registrable Securities set forth in the applicable Underwritten Offering Notice.

(d)    Block Trades. Notwithstanding anything contained in this Section 2, in the event a sale of Registrable Securities is an underwritten transaction requiring the involvement of the Company but not involving (i) any "road show" or (ii) a lock-up agreement of more than [45] days to which the Company is a party, and which is commonly known as a "block trade" (a "***Block Trade***"), (1) the requesting Holder or Holders shall (A) give at least [three] Business Day prior notice in writing of such transaction to the Company (B) with respect to any Block Trade, identify the potential underwriter in such notice with contact information for such underwriter; and (2) the Company shall cooperate with such requesting Holder or Holders to the extent it is reasonably able and shall not be required to give notice thereof to other Holders or permit their participation therein unless reasonably practicable. Any Block Trade shall be for at least $[5,000,000] in expected gross proceeds.[7] The Company shall not be required to effectuate more than [three] Block Trades in any 90-day period. For the avoidance of doubt, a Block Trade shall not constitute a Requested Underwritten Offering.

(e)    Piggyback Registration and Piggyback Underwritten Offering.

(i)    If the Company shall, at any time, propose to file a registration statement under the Securities Act with respect to an offering of Class A Common Stock (other than a registration statement on Form S-4 or Form S-8 filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan and other than a Demand Registration), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least five Business Days, except if the registration statement will be a Shelf Registration Statement, at least three Business Days, before) the anticipated filing date (the "***Piggyback Registration Notice***").  The Piggyback Registration Notice shall offer all Holders the opportunity to include for registration in such registration statement the number of Registrable Securities as they may request in writing (a "***Piggyback Registration***").  The Company shall use commercially reasonable efforts to include in each such Piggyback Registration such Registrable Securities for which the Company has received written requests for inclusion therein within [ten] Business Days or, if the Piggyback Registration will be on a Shelf Registration Statement, within [five] Business

---

[7] NTD: Costs to comply are too high to justify a $500,000 sale.

AMERICAS 124964997

Day, after sending the Piggyback Registration Notice. Each Holder shall be permitted to withdraw all or part of such Holder's Registrable Securities from a Piggyback Registration by giving written notice to the Company of its request to withdraw; *provided*, that (A) such request must be made in writing and delivered prior to the effectiveness of such Registration Statement and (B) such withdrawal shall be irrevocable and, after making such withdrawal, such Holder shall no longer have any right to include Registrable Securities in the Piggyback Registration as to which such withdrawal was made. Notwithstanding anything to the contrary in this Section 2(e)(i), if the Underwritten Offering pursuant to this Section 2(e)(i) is a "bought deal" (other than a variable price reoffer) or Overnight Underwritten Offering and the Managing Underwriter advises the Company that the giving of notice pursuant to this Section 2(e)(i) would have an adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Offering, no such notice shall be required. Any withdrawing Holder shall continue to have the right to include any Registrable Securities in any subsequent Registration Statement as may be filed by the Company with respect to offerings of Class A Common Stock, all upon the terms and conditions set forth herein.

(ii)    If the Company shall, at any time, propose to conduct an Underwritten Offering (including a Requested Underwritten Offering), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least [ten] Business Days, except if the Underwritten Offering will be made pursuant to a Shelf Registration Statement, at least [five] Business Days, before) the commencement of such Underwritten Offering, which notice shall set forth the principal terms and conditions of the issuance, including the proposed offering price or range of offering prices (if known), the anticipated filing date of the related Registration Statement (if applicable) and the number of shares of Class A Common Stock that are proposed to be registered (the "***Underwritten Offering Piggyback Notice***"). Receipt of any Underwritten Offering Piggyback Notice required to be provided in this Section 2(e)(ii) to Holders shall be kept confidential by the Holder until such proposed Underwritten Offering is (A) publicly announced or (B) such Holder receives notice that such proposed Underwritten Offering has been abandoned, which such notice shall be provided as reasonably practicable by the Company. The Underwritten Offering Piggyback Notice shall offer the Holders the opportunity to include in such Underwritten Offering (and any related registration of Company Securities, if applicable) the number of Registrable Securities as they may request in writing (an "***Underwritten Piggyback Offering***"); *provided*, *however*, that in the event that the Company proposes to effectuate the subject Underwritten Offering pursuant to an effective Shelf Registration Statement other than an Automatic Shelf Registration Statement, only Registrable Securities of Holders that are subject to an effective Shelf Registration Statement may be included in such Underwritten Piggyback Offering, unless the Company is then able to file an Automatic Shelf Registration Statement and, in the reasonable judgment of the Company, the filing of the Automatic Shelf Registration Statement including Registrable Securities of Holders that are not otherwise included in an effective Shelf Registration Statement would not have any material adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Piggyback Offering. The Company shall use commercially reasonable efforts to include in each such Underwritten Piggyback Offering such Registrable Securities for which the

13

Company has received written requests for inclusion therein within [ten] Business Days or, if such Underwritten Piggyback Offering will be made pursuant to a Shelf Registration Statement, within [five] Business Day after sending the Underwritten Offering Piggyback Notice. Each Holder shall be permitted to withdraw all or part of its Registrable Securities from an Underwritten Piggyback Offering at any time prior to the effectiveness of the applicable Registration Statement, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

(iii)    If the managing underwriter or managing underwriters of an Underwritten Offering advise the Company and the Holders that, in their reasonable opinion, the inclusion of all of the Registrable Securities requested for inclusion in the subject Underwritten Offering (and any related registration, if applicable) (and any other Class A Common Stock proposed to be included in such Underwritten Offering) exceeds the number of shares of Class A Common Stock that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the Company Securities offered or the market for the Company Securities offered, the Company shall include in such Underwritten Offering (and any related registration, if applicable) only that number of shares of Class A Common Stock proposed to be included in such Underwritten Offering (and any related registration, if applicable) that, in the reasonable opinion of the managing underwriter or managing underwriters, will not have such significant adverse effect, with such number of shares of Class A Common Stock to be allocated as follows: (A) in the case of a Requested Underwritten Offering, (1) first, pro-rata among all Holders (including Fahrenheit) that have requested to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, (2) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to the Company, and (3) third, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of shares of Class A Common Stock then held by each such holder; and (B) in the case of any other Underwritten Offerings, (x) first, to the Company, (y) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, pro-rata among all Holders desiring to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, and (z) third, if there remains availability for additional shares of Class A Common Stock to be included in such registration, pro-rata among any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of Class A Common Stock then held by each such holder. If any Holder disapproves of the terms of any such Underwritten Offering, such Holder may elect to withdraw therefrom by written notice to the Company and the managing underwriter(s) delivered on or prior to the time of the commencement of such Underwritten Offering. Any Registrable Securities withdrawn from such Underwritten Offering shall be excluded and withdrawn from the registration, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

14

(iv)    The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2(e) at any time in its sole discretion whether or not any Holder has elected to include Registrable Securities in such Registration Statement.  The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 5.

3.    Registration and Underwritten Offering Procedures.  The procedures to be followed by the Company and each Holder electing to sell Registrable Securities in a Registration Statement pursuant to this Agreement, and the respective rights and obligations of the Company and such Holder, with respect to the preparation, filing and effectiveness of such Registration Statement and the effectuation of any Underwritten Offering, are as follows:

(a)    In connection with a Demand Registration, the Company will, at least [five] Business Days prior to the anticipated filing of the Registration Statement and any related Prospectus or any amendment or supplement thereto (other than, after effectiveness of the Registration Statement, any filing made under the Exchange Act that is incorporated by reference into the Registration Statement) (for purposes of this subsection, supplements and amendments shall not be deemed to include any filing that the Company is required to make pursuant to the Exchange Act or any amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), (i) furnish to such Holders and the representatives of such Holders copies of all such documents prior to filing and (ii) provide such Holders and the representatives of such Holders the opportunity to (A) review and comment on such documents and (B) object to any information pertaining to such Holder and its plan of distribution that is contained therein, and, in either such case, the Company shall use commercially reasonable efforts to address any changes reasonably requested by such Holder prior to the filing of the Registration Statement.

(b)    In connection with a Piggyback Registration, Underwritten Piggyback Offering or a Requested Underwritten Offering, the Company will, at least [five] Business Days (or in the case of a Shelf Registration Statement or an offering that will be made pursuant to a Shelf Registration Statement, at least [three] Business Day) prior to the anticipated filing of any initial Registration Statement that identifies the Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), as applicable, furnish to such Holders copies of any such Registration Statement or related Prospectus or amendment or supplement thereto that identify such Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name such Holders and provide information with respect thereto).  The Company will also use commercially reasonable efforts to address in each such document when so filed with the Commission such comments as such Holders reasonably shall propose prior to the filing thereof.

(c)    The Company will use commercially reasonable efforts to, as promptly as reasonably practicable, (i) prepare and file with the Commission such amendments, including post-effective amendments, and supplements to each Registration Statement as may be necessary under applicable law to keep such Registration Statement continuously effective with respect to

15

the disposition of all Registrable Securities covered thereby for its Effectiveness Period and, subject to the limitations contained in this Agreement, prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the applicable Holders; (ii) cause the related Prospectus to be amended or supplemented by any required prospectus supplement and, as so supplemented or amended, to be filed pursuant to Rule 424; (iii) respond to any comments received from the Commission with respect to each Registration Statement and, as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the Commission relating to such Registration Statement that pertains to such Holders as a selling stockholders but not any comments that would result in the disclosure to such Holders of material and non-public information concerning the Company; and (iv) cause such Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable such Holders to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof.

(d)    The Company will comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the Registration Statement and the disposition of all Registrable Securities covered by a Registration Statement.

(e)    The Company will notify such Holders who are included in a Registration Statement as promptly as reasonably practicable: (i)(A) when a Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement in which such Holder is included has been filed; (B) when the Commission notifies the Company whether there will be a "review" of the applicable Registration Statement and when the Commission comments in writing on such Registration Statement (in which case the Company shall provide true and complete copies thereof and all written responses thereto to each of such Holders that pertain to such Holders as selling stockholders); and (C) with respect to each applicable Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (ii) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to such Registration Statement or Prospectus or for additional information that pertains to such Holders as sellers of Registrable Securities; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence (but not the details) of any event or passage of time that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, *however*, that no notice by the Company shall be required pursuant to this clause (v) in the event that the Company either promptly files a prospectus supplement to update the Prospectus or a Form 8-K or other appropriate Exchange Act report that is incorporated by reference into the Registration Statement, which, in either case,

16

contains the requisite information that results in such Registration Statement no longer containing any untrue statement of material fact or omitting to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f)    The Company will use commercially reasonable efforts to avoid the issuance of or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction, as promptly as reasonably practicable, or if any such order or suspension is made effective during any Blackout Period or Suspension Period, as promptly as reasonably practicable after such Blackout Period or Suspension Period ends.

(g)    During the Effectiveness Period, the Company will furnish to each such Holder, without charge, at least one conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Holder (including those incorporated by reference) as promptly as reasonably practical after the filing of such documents with the Commission; *provided*, that the Company will not have any obligation to provide any document pursuant to this clause that is available on the Commission's EDGAR system.

(h)    The Company will as promptly as reasonably practical deliver to each Holder, without charge, as many copies of each Prospectus (including each form of prospectus) authorized by the Company for use and each amendment or supplement thereto as such Holder may reasonably request during the Effectiveness Period. Subject to the terms of this Agreement, including Section 9(b), the Company consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(i)    The Company will cooperate with such Holders to facilitate the timely preparation and delivery of certificates (or book-entry shares) representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates (or book-entry shares) shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holder may request in writing.  In connection therewith, if required by the Company's transfer agent, the Company will promptly, after the Effective Date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to, and maintained with, its transfer agent, together with any other authorizations, certificates and directions required by the transfer agent that authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the applicable Holder of such Registrable Securities under the Registration Statement.

(j)    Upon the occurrence of any event contemplated by Section 3(e)(v), as promptly as reasonably practicable, the Company will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to

17

be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(k)     With respect to Underwritten Offerings, subject to the right of a Holder to withdraw such Holder's Registrable Securities from an Underwritten Offering in accordance with the terms of this Agreement, (i) the right of any Holder to include such Holder's Registrable Securities in an Underwritten Offering shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein, (ii) each Holder participating in such Underwritten Offering severally agrees to enter into and execute an underwriting agreement in customary form and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangement approved by the Persons entitled to select the managing underwriter hereunder and (iii) each Holder participating in such Underwritten Offering severally agrees to complete and execute all questionnaires, powers of attorney, indemnities, and other documents customarily and reasonably required under the terms of such underwriting arrangement. Any such underwriting agreement to be entered into among the Company, managing underwriter of such offering and each Holder participating in such Underwritten Offering shall contain representations and warranties by such Holders and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions on the part of selling stockholders. All of the representations and warranties by, and the other agreements on the part of, the Company to, and for the benefit of, the underwriter of such offering, included in each such underwriting agreement shall also be made to, and for the benefit of, such Holder participating in such Underwritten Offering, and any or all of the conditions precedent to the obligations of such underwriter under such underwriting agreement shall be conditions precedent to the obligations of such Holders. No Holder shall be required in any such underwriting agreement to make any representations or warranties to, or agreements with, the Company or the underwriter other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Securities, such Holder's intended method of distribution and any other representations required by applicable law or reasonably required by the underwriter or the Company.  The Company hereby agrees that, in connection with any Underwritten Offering in accordance with the terms hereof, it will negotiate in good faith and execute all indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangement, including using commercially reasonable efforts to procure customary legal opinions and auditor "comfort" letters.

(l)     For a reasonable period of time prior to the filing of any Registration Statement and throughout the Effectiveness Period, the Company will make available, upon reasonable notice at the Company's principal place of business or such other reasonable place as determined by the Company in its discretion, for inspection during normal business hours by a representative of the selling Holders, the managing underwriter and any attorneys or accountants retained by the selling Holders or managing underwriter, all such financial and other information and books and records of the Company, and cause the officers, employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably necessary (and in the case of counsel, not violate an attorney-client privilege in such

18

counsel's reasonable belief) to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act; *provided*, *however*, that any information that is not generally publicly available at the time of delivery of such information shall be kept confidential by such Persons unless disclosure of such information is required by court or administrative order or, in the opinion of counsel to such Person, applicable law, in which case, such Person shall be required to give the Company written notice of the proposed disclosure prior to such disclosure and, if requested by the Company, assist the Company in seeking to prevent or limit the proposed disclosure.

(m)     In connection with any Requested Underwritten Offering, the Company will use commercially reasonable efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable notice, to meet with prospective investors in presentations, meetings and road shows.

(n)     Each Holder agrees to furnish to the Company any other information regarding the Holder and the distribution of such securities as the Company reasonably determines is required to be included in any Registration Statement or any Prospectus or prospectus supplement relating to an Underwritten Offering.

(o)     Notwithstanding any other provision of this Agreement, the Company shall not be required to file a Registration Statement (or any amendment thereto) or effect a Requested Underwritten Offering (or, if the Company has filed a Shelf Registration Statement and has included Registrable Securities therein, the Company shall be entitled to suspend the offer and sale of Registrable Securities pursuant to such Registration Statement) for a period of up to [60] days if (i) the Board determines that a postponement is in the best interest of the Company and its stockholders generally due to a pending transaction involving the Company (including a pending securities offering by the Company), (ii) the Board determines such registration would render the Company unable to comply with applicable securities laws or (iii) the Board determines such registration would require disclosure of material information that the Company has a bona fide business purpose for preserving as confidential (any such period, a "***Blackout Period***"); *provided*, *however*, that in no event shall any Blackout Period together with any Suspension Period exceed an aggregate of 120 days in any 12-month period.  In the event that a Registration Statement withdrawn pursuant to this <u>Section 3(o)</u> relates to a Demand Registration pursuant, then Fahrenheit shall be entitled to withdraw the Demand Registration and, if such request is withdrawn, it shall not count against the limits imposed pursuant to <u>Section 2(b)(iii)</u>.  In effecting a Blackout Period, the Company shall not disclose any material non-public information that is the basis for such Blackout Period to a Holder without the express written consent of such Holder.

(p)     In connection with an Underwritten Offering, the Company shall use commercially reasonable efforts to provide to each Holder named as a selling stockholder in any Registration Statement a copy of any auditor "comfort" letters and customary legal opinions, in each case that have been provided to the managing underwriter in connection with the Underwritten Offering, not later than the Business Day prior to the effective date of such Registration Statement.

AMERICAS 124964997

(q)      In connection with any Underwritten Offering made pursuant to a Registration Statement filed pursuant to <u>Section 2</u>, if requested by the managing underwriter in an Underwritten Offering, each Holder shall execute a customary "lock-up" agreement with the underwriters of such Underwritten Offering containing a lock-up period equal to the shorter of (i) the shortest number of days that a director of the Company or "executive officer" (as defined under Section 16 of the Exchange Act) of the Company contractually agrees with the underwriters of such Underwritten Offering not to sell any Company Securities following such Underwritten Offering and (ii) [90] days from the date of the execution of the underwriting agreement with respect to such Underwritten Offering.  Notwithstanding the foregoing, any discretionary waiver or termination of this lock-up provision by the Company or the underwriters with respect to any of the Holders shall apply to the other Holders as well, pro rata based upon the number of shares subject to such obligations.

(r)      Notwithstanding anything to the contrary in this Agreement, any Holder may make a written election (an "***Opt-Out Election***") to no longer receive from the Company any Demand Notice, Piggyback Registration Notice or Underwritten Offering Piggyback Notice (each, a "***Covered Notice***"), and, following receipt of such Opt-Out Election, the Company shall not be required to, and shall not, deliver any such Covered Notice to such Holder from the date of receipt of such Opt-Out Election and such Holder shall have no right to participate in any Registration Statement or Underwritten Offering as to which such Covered Notices pertain. An Opt-Out Election shall remain in effect until it has been revoked in writing and received by the Company. A Holder who previously has given the Company an Opt-Out election may revoke such election at any time in writing, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-Out Elections.

4.      <u>No Inconsistent Agreements; Additional Rights</u>**.**  The Company shall not hereafter enter into, and is not currently a party to, any agreement with respect to its securities that is inconsistent in any material respect with the rights granted to the Holders by this Agreement. The Company shall not, prior to the termination of this Agreement, grant any registration rights that are superior to, conflict with, or would otherwise prevent the Company from performing, the rights granted to the Holders hereby.

5.      <u>Registration Expenses</u>.  All Registration Expenses incident to the Parties' performance of or compliance with their respective obligations under this Agreement or otherwise in connection with any Demand Registration, Requested Underwritten Offering, Piggyback Registration or Underwritten Piggyback Offering (in each case, excluding any Selling Expenses) shall be borne by the Company, whether or not any Registrable Securities are sold pursuant to a Registration Statement or whether or not a Registration Statement is filed or becomes effective.  "***Registration Expenses***" means all expenses incurred in connection with registrations, filings or qualifications pursuant to <u>Section 2</u> and <u>Section 3</u>, (i) registration and filing fees (including fees and expenses (A) with respect to filings required to be made with the Trading Market, (B) in compliance with applicable state securities or "Blue Sky" laws and (C) with respect to filings with FINRA), (ii) printing expenses (including expenses of printing certificates for Company Securities and of printing Prospectuses if the printing of Prospectuses is reasonably requested by a Holder of Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel, auditors and accountants, (v) Securities Act liability insurance, if the Company so

20

desires such insurance, (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement, (vii) all expenses relating to marketing the sale of the Registrable Securities, including expenses related to conducting a "road show" and (viii) reasonable and documented fees and expenses of one counsel to the Holders reasonably acceptable to the Company and selected by the Holders that hold a majority of the Registrable Securities to be included in such filing in connection with the filing or amendment of any Registration Statement or Prospectus hereunder. In addition, the Company shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including expenses payable to third parties and all salaries and expenses of their officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on the Trading Market.

6.  Indemnification.

(a)  The Company shall indemnify and hold harmless each Holder, its Affiliates and each of their respective officers and directors and any agent thereof (collectively, "***Holder Indemnified Persons***"), to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Holder Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act or otherwise (collectively, "***Losses***"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, in any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of or, based upon the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of or based upon the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current); *provided*, *however*, that the Company shall not be liable to any Holder Indemnified Person to the extent that any such claim arises out of, is based upon or results from an untrue or alleged untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Holder Indemnified Person, in its capacity as such, or any underwriter specifically for use in the preparation thereof.  The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding of which the

21

Company is aware in connection with the transactions contemplated by this Agreement.  This indemnity shall be in addition to any liability the Company may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder Indemnified Person or any Indemnified Party and shall survive the transfer of such securities by such Holder.  Notwithstanding anything to the contrary herein, this <u>Section 6</u> shall survive any termination or expiration of this Agreement indefinitely.

(b)    In connection with any Registration Statement in which a Holder participates, such Holder, solely in its capacity as such, shall, severally and not jointly, indemnify and hold harmless the Company, its Affiliates and each of their respective officers, directors and any agent thereof, to the fullest extent permitted by applicable law, from and against any and all Losses as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, in any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of or, based upon the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of or based upon the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), but only to the extent that the same are made in reliance and in conformity with information relating to the Holder furnished in writing to the Company by such Holder, solely in its capacity as such, expressly for use therein.  This indemnity shall be in addition to any liability such Holder may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party (as defined below). In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder from the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)    Any Person entitled to indemnification hereunder (each, an "***Indemnified Party***") shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) unless in such Indemnified Party's reasonable judgment a conflict of interest between such Indemnified Party and indemnifying party may exist with respect to such claim or there may be reasonable defenses available to the Indemnified Party that are different from, or additional to, those available to the indemnifying party, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the Indemnified Party.  If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the Indemnified Party without its consent (but such consent may not be unreasonably withheld, delayed or conditioned).  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (in addition to any local counsel) for all parties indemnified by such indemnifying party with respect to such claim,

22

unless, in the reasonable judgment of any Indemnified Party, there may be one or more legal or equitable defenses available to such Indemnified Party that are in addition to, or may conflict with, those available to another Indemnified Party with respect to such claim.  Failure to give prompt written notice as provided in clause (i) above shall not release the indemnifying party from its obligations hereunder.

(d)      If the indemnification provided for in this <u>Section 6</u> is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any Losses referred to herein, the indemnifying party, in lieu of indemnifying such Indemnified Party thereunder, shall, to the extent permitted by applicable law, contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the Indemnified Party, on the other hand, in connection with the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact that resulted in such Losses, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the Indemnified Party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or alleged statement or omission or alleged omission; *provided*, that in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by such Holder.

7.      <u>Facilitation of Sales Pursuant to Rule 144</u>.  To the extent is shall be required to do so under the Exchange Act, the Company shall timely file the reports required to be filed by it under the Exchange Act or the Securities Act (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144) and shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act pursuant to Rule 144.  Upon the request of any Holder in connection with such Holder's sale pursuant to Rule 144 the Company shall deliver to such Holder a written statement as to whether it has complied with the applicable requirements.

8.      <u>Voting</u>.  At any time during which the Fahrenheit Management Agreement or US Bitcoin Management Agreement, as applicable, is in full force and effect, Fahrenheit and US Bitcoin, in their capacity as stockholders or proxy holders of the Company, irrevocably and unconditionally agree that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company: (i) each of Fahrenheit and US Bitcoin shall, and shall cause any other holder of record of any of such Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions) to vote (or execute and return an action by written consent), or cause to be voted at such meeting (or validly execute and return and cause such consent to be granted with respect to), all of such Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions) owned as of the record date for such meeting (or the date that any written consent is executed by Fahrenheit and US Bitcoin) in accordance with the recommendations of the board of

23

directors of the Company and (ii) each of Fahrenheit and US Bitcoin shall not commit any act that restricts its legal power, authority and right to vote all of the Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions) to vote (or execute and return an action by written consent) then beneficially owned by it or otherwise prevent or disable it from performing any of its obligations under this <u>Section 8</u>. Without limiting the generality of the foregoing, except for this Agreement, none of Fahrenheit or US Bitcoin shall (A) enter into any voting agreement with any person with respect to any of the Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions), (B) grant any person any proxy (revocable or irrevocable) or power of attorney with respect to any of the Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions), (C) deposit any of the Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions) in a voting trust or otherwise enter into any agreement or arrangement with any person (other than the Company) limiting or affecting its legal power, authority or right to vote the Initial Shares and other securities of the Company (including those obtained by dividends, stock splits, and similar transactions) in accordance with this <u>Section 8</u>, (D) acquire, offer or propose to acquire or solicit an offer to sell any securities of the Company, (E) (1) make, engage in, or in any way participate in any "solicitation" of "proxies" (as such terms are used in the rules of the Securities and Exchange Commission promulgated under Section 14 of the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), but without regard to the exclusion set forth in Rule 14a-1(l)(2)(iv) promulgated under the Exchange Act) or any consents to vote, call or seek to call a meeting of stockholders or otherwise seek to influence the timing of any meeting of stockholders, (3) submit, initiate, participate in or encourage the submission of any proposal for action by the stockholders, (4) seek the removal of any member of the board of directors or otherwise seek representation on the board of directors in any manner, (5) seek to advise or influence in any manner whatsoever any Person with respect to the voting of any securities or (6) otherwise seek to control, change or influence the management, board of directors , governing documents, policies or affairs, in each case of or with respect to the Company, (F) form, join or in any way participate in a "group" (as defined in Section 13(d)(3) of the Exchange Act) or otherwise act in concert with any other Person with respect to any securities of the Company or any actions prohibited by this Section 8 or (G) disclose publicly any intention to take any action prohibited by this Section 8. Each of Fahrenheit and US Bitcoin hereby grants the Company an irrevocable proxy to vote all shares of Class A Common Stock owned by it in accordance with this <u>Section 8</u>.

   9. <u>Miscellaneous</u>.

   (a) <u>Remedies</u>.  In the event of actual or potential breach by the Company of any of its obligations under this Agreement, each Holder, in addition to being entitled to exercise all rights granted by applicable law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  The Company agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

24

(b)    <u>Discontinued Disposition</u>.  Upon receipt of a notice from the Company of the occurrence of any event of the kind described in clauses (ii) through (v) of <u>Section 3(e)</u> (provided that the Company shall not disclose any material non-public information that is the basis for such notice to the Holder without the express written consent of the Holder), each Holder will forthwith discontinue disposition of any applicable Registrable Securities under the applicable Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus or amended Registration Statement as contemplated by <u>Section 3(j)</u> or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement (a "***Suspension Period***").  The Company may provide appropriate stop orders to enforce the provisions of this <u>Section 9(b)</u>.

(c)    <u>Amendments and Waivers</u>.  No provision of this Agreement may be waived or amended except in a written instrument signed by the Company, Fahrenheit and Holders that hold a majority of the Registrable Securities as of the date of such waiver or amendment, *provided*, *however*, that any waiver or amendment that would have a disproportionate adverse effect on a Holder relative to the other Holders shall further require the consent of such Holder.  The Company shall provide prior notice to all Holders of any proposed waiver or amendment.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

(d)    <u>Notices</u>.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this <u>Section 9(d)</u> prior to 5:00 p.m. in the time zone of the receiving party on a Business Day, (ii) the Business Day after the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this Agreement later than 5:00 p.m. in the time zone of the receiving party on any date and earlier than 11:59 p.m. in the time zone of the receiving party on such date, (iii) the Business Day following the date of mailing, if sent by nationally recognized overnight courier service or (iv) upon actual receipt by the Party to whom such notice is required to be given.  The address for such notices and communications shall be as follows:

If to the Company:        [NewCo, Inc.]
                          [●]
                          Attention: [●]
                          E-mail: [●]

25

<table>
<tr><td></td><td>With copy to:</td></tr>
</table>

| | |
|---|---|
| | [●]<br>Attention:  [●]<br>E-mail: [●] |
| If to Fahrenheit | [●]<br>E-mail: [●]<br>Attention: [●] |
| | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |
| If to any Holder other than Fahrenheit | To the address set forth for such Holder in the joinder agreement in the form set forth in Exhibit A hereto. |

    (e)    <u>Successors and Assigns; Transfer of Registration Rights</u>.

    (i)    This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns.  Except as provided in <u>Section 9(e)(ii)</u>, this Agreement, and any rights or obligations hereunder, may not be assigned without the prior written consent of the Company and Fahrenheit.  The Company may not assign its rights or obligations hereunder without the prior written consent of Fahrenheit.

26

(ii)      Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws and the Company's certificate of incorporation and bylaws then in effect; (b) such transferee agrees in writing to become subject to the terms of this Agreement by executing a joinder agreement substantially in the form set forth in <u>Exhibit A</u> hereto and delivers it to the Company as promptly as reasonably practicable; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee and identifying the Registrable Securities with respect to which such rights are being Transferred and provide the amount of any other capital stock of the Company beneficially owned by such transferee; *provided, however*, that (i) any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. Following a Transfer in accordance with this <u>Section 9(e)</u>, the Company shall update the applicable prospectus to include the transferee as a selling holder thereunder promptly upon the receipt of the required information from such transferee.

(f)      <u>No Third-Party Beneficiaries</u>.  Nothing in this Agreement, whether express or implied, shall be construed to give any Person, other than the Parties or their respective successors and permitted assigns and any Indemnified Party, any legal or equitable right, remedy, claim or benefit under or in respect of this Agreement.

(g)      <u>Execution and Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  In the event that any signature is delivered by facsimile or electronic mail transmission, such signature shall create a valid binding obligation of the Party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such signature delivered by facsimile or electronic mail transmission were the original thereof.

(h)      <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and

27

irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum. Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

(i)     <u>Cumulative Remedies</u>.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(j)     <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the Parties shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.  It is hereby stipulated and declared to be the intention of the Parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(k)     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and the matters addressed or governed hereby, whether oral or written.

(l)     <u>Termination</u>.  Except for Section 8 (which shall terminate upon termination of the Fahrenheit Management Agreement or US Bitcoin Management Agreement, as applicable) and <u>Section 6</u>, this Agreement shall terminate as to any Holder when all Registrable Securities held by such Holder no longer constitute Registrable Securities.

*[Signature page follows.]*

28

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**[NEWCO, INC.]**

By: _____
Name:
Title:

**[FAHRENHEIT LLC]**

By: _____
Name:
Title:

**[US BITCOIN]**

By: _____
Name:
Title:

*Signature Page to Investors' and Registration Rights Agreement*

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "<u>Joinder Agreement</u>") is made as of the date written below by the undersigned (the "<u>Joining Party</u>") in accordance with the Investors' and Registration Rights Agreement, dated as of [●], and as amended from time to time (the "<u>Investors' and Registration Rights Agreement</u>"), among [NewCo, Inc.] (the "<u>Company</u>") and the stockholders of the Company parties thereto. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Investors' and Registration Rights Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "<u>Holder</u>" under, the Registration Rights Agreement as of the date hereof as if he, she or it had executed the Investors' and Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Investors' and Registration Rights Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

[JOINING PARTY]


By: _____
Name: [●]
Title:  [●]


Date: [●]

65123582 v4-WorkSiteUS-039525/0001

AMERICAS 124964997

**<u>Exhibit K(v)</u>**

**New Organizational Documents:**

**NewCo Bylaws**

*DRAFT*

**[AMENDED AND RESTATED]**
**BYLAWS OF [NEWCO, INC.]**
(Effective as of [●])

## ARTICLE I
## CORPORATE OFFICES

Section 1.1   Registered Office. The registered office of [NewCo, Inc.] (the "***Corporation***") shall be set forth in the Corporation's Certificate (as defined below). References in these [amended and restated] bylaws (these "***Bylaws***") to the certificate of incorporation, as the same shall be amended and/or restated from time to time (the "***Certificate***"), shall include the terms of any certificate of designations of any series of preferred stock of the Corporation ("***Preferred Stock***").

Section 1.2   Other Offices. The Corporation also may have offices at such other places, both within and without the State of Delaware, as the Board of Directors of the Corporation (the "***Board***") may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

Section 2.1   Time and Place of Meetings. Annual and special meetings of stockholders shall be held at any time and place, within or without the State of Delaware, or in whole or in part by means of remote communication, as shall be designated by the Board. In the absence of any such designation, stockholders' meetings shall be held at the Corporation's principal executive office.

Section 2.2   Annual Meeting. At the annual meeting, directors shall be elected and any other business properly brought before the meeting may be transacted. For purposes of this Article II, the 202[4] annual meeting of the stockholders shall be deemed to have been held on [●], 202[4]. The Board may cancel, postpone or reschedule any previously scheduled annual meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

Section 2.3   Special Meeting.

(i)   A special meeting of the stockholders, other than those required by statute, may be called at any time only in the manner provided in the Certificate and these Bylaws. The Board may cancel, postpone or reschedule any previously scheduled special meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

(ii)   The notice of a special meeting shall include the purpose for which the meeting is called. Only such business shall be conducted at a special meeting of stockholders as shall have been set forth in the notice of such meeting. Nothing contained in this Section 2.3(ii) shall be construed as limiting, fixing or affecting the time when a meeting of stockholders called by action of the Board may be held.

(iii)    Subject to Section 2.3(iv), the Board shall call a special meeting of stockholder upon the written request (the "***Meeting Request***") of the stockholders of record of at least 25%, in the aggregate, of the voting power of the outstanding shares of all classes of shares entitled to vote at such a meeting (the "***Required Percentage***"), delivered to the secretary of the Corporation (the "***Secretary***").[1] The Board shall designate a date for such special meeting not more than 90 days after the date that the Secretary received the valid Meeting Request (the "***Request Delivery Date***"). In fixing a date and time for any special meeting requested by stockholders of record, the Board may consider such factors as it deems relevant, including without limitation, the nature of the matters to be considered, the facts and circumstances related to any request for a meeting, and any plan of the Board to call an annual meeting or special meeting.

(iv)    *Stockholder Request for Special Meeting.*

(a)    Any Meeting Request shall be signed and dated by one or more stockholders of record and each beneficial owner, if any, on whose behalf the Meeting Request is being made, or—in each case—such stockholder's or beneficial owner's duly authorized agent (each, a "***Requesting Stockholder***"), and shall set forth: (1) a statement of the specific purpose of the meeting and the matters proposed to be acted on at the meeting, the reasons for conducting such business at the meeting and any material interest of the Requesting Stockholder in such business; (2) the name and address of each Requesting Stockholder [as it appears on the Corporation's stock ledger (or, with respect to all shares to be included in the Required Percent that are owned beneficially but not of record by each such Requesting Stockholder, the name of each broker, bank or custodian (or similar entity) of each such Requesting Stockholder with respect to such shares)][2]; (3) the number of shares of each class of voting shares owned of record and beneficially by each such Requesting Stockholder; (4) a description of all arrangements or understandings between any Requesting Stockholder and any other person regarding the meeting and the matters proposed to be acted on at the meeting; (5) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws or the Certificate, the language of the proposed amendment) conforming in all material respects with the requirements of Section 14(a) of the Securities Exchange Act of 1934 and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the "***Exchange Act***") ][3]; and (6) all of the information regarding the Requesting Stockholders that would be

---

[1] BR Note to Draft: The requirement that stockholder holder 25% <u>and have held the shares for more than a year</u> was inserted originally in a W&C/K&E draft. Is there a reason it was now removed?

[2] NTD: Subject to further review.

[3] NTD: Subject to further review.

*DRAFT*

required by Section 2.4(iii)–(v) of these Bylaws if each Requesting Stockholder were intending to make a nomination or to bring any other matter before a stockholder meeting (except that, for purposes of this paragraph, references to the "Noticing Stockholder" and "Holders" shall instead refer to each "Requesting Stockholder"); [(7) an agreement by the Requesting Stockholder to notify the Corporation promptly in the event of (x) any disposition prior to the time of the special meeting of any shares held by a Requesting Stockholder as of the date on which the Meeting Request was delivered to the Secretary and (y) any other change prior to the time of the special meeting in the shares owned by any Requesting Stockholder; and (8) an acknowledgement that (x) the Requesting Stockholder is entitled to vote at such special meeting, (y) any disposition prior to the date of the special meeting of any capital stock of the Corporation including any Requesting Stockholder's shares as of the date on which the Meeting Request was delivered to the Secretary shall be deemed to be a revocation of such Meeting Request with respect to such disposed shares and (z) that any decrease in the Requesting Stockholders' aggregate share ownership to less than the Required Percent shall be deemed to be an absolute revocation of such Meeting Request][4]. The requirement set forth in clause (6) of the immediately preceding sentence shall not apply to (x) any stockholder of record, or beneficial owner, as applicable, who has provided a written request solely in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act, by way of a solicitation statement filed on Schedule 14A or (y) any stockholder of record that is a broker, bank or custodian (or similar entity) and is acting solely as nominee on behalf of a beneficial owner. A Requesting Stockholder may revoke its request for a special meeting at any time by written revocation delivered to the Secretary,  [and if, following such revocation, there are un-revoked Meeting Requests from less than the Required Percent, the Board, in its discretion, may cancel the special meeting.][5]

(b)     The Board shall have the authority to determine not to call a special meeting requested by stockholders if (a) the Board has called or calls an annual or special meeting of stockholders to be held not more than 90 days after the Request Delivery Date and the purpose of such stockholder meeting includes (among any other matters properly brought before the meeting) the purpose specified in the Meeting Request; (b) within 12 months prior to the Request Delivery Date, an annual or special meeting was held that considered the purpose

---

[4] NTD: Subject to further review.

[5] NTD: Subject to further review.

*DRAFT*

specified in the Meeting Request or an identical or substantially similar item of business (as determined in good faith by the Board in its sole and absolute discretion), except for the election of one or more directors; (c) the Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; or (d) such request was made in violation of Regulation 14A under the Exchange Act, to the extent applicable, or other applicable law. The Board is authorized to determine in good faith the purpose of a stockholder meeting. If none of the Requesting Stockholders appears or sends a qualified representative to present the business and/or nominations specified in the Meeting Request to be presented for consideration, or any Requesting Stockholder or any nominee for director (as applicable) acted contrary to any representation, certification or agreement required by this Section 2.3 (or otherwise failed to comply with this Section 2.3 (or any law, rule or regulation identified in this Section 2.3 or Section 2.4)) or provided false or misleading information to the Corporation, the Corporation need not present such business for a vote at the special meeting (and any such nominee shall be disqualified from standing for election or re-election), notwithstanding that proxies in respect of such business may have been received by the Corporation.

Section 2.4    Advance Notice Procedures for Director Nominations and Business Proposals.

(i)    *Annual Meetings of Stockholders*. At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, nominations of persons for election to the Board or other proposals of business to be transacted at an annual meeting of stockholders must be: (a) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board (or any duly authorized committee thereof) with respect to such meeting, (b) otherwise properly brought before the annual meeting by or at the direction of the Board (or any duly authorized committee thereof), or (c) otherwise properly brought before the annual meeting by a stockholder of the Corporation who (1) is a stockholder of record at the time of the giving of the notice required by this Section 2.4, on the record date for the determination of stockholders entitled to notice of and to vote at such annual meeting and at the time of such annual meeting, (2) is entitled to vote at such annual meeting and (3) has timely complied in proper written form with the procedures set forth in this Section 2.4. In addition, for business to be properly brought before an annual meeting by a stockholder, such business must be a proper matter for stockholder action pursuant to these Bylaws and applicable law. Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board, for the avoidance of doubt, clause (c) above shall be the exclusive means for a stockholder to bring business before an annual meeting of stockholders.

(ii)    For business to be properly brought before an annual meeting by a stockholder of record pursuant to clause Section 2.4(i)(c) above, the stockholder of record bringing

4

the notice (the "***Noticing Stockholder***") must have delivered (as defined below) timely notice thereof in proper written form, setting forth all information required under this Section 2.4, to the Secretary at the principal executive offices of the Corporation. In order to be timely, the Noticing Stockholder's notice must be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business (as defined below) on the 90th day nor earlier than the Close of Business on the 120th day before the one-year anniversary of the preceding year's annual meeting; *provided*, *however*, that in the event that no annual meeting was held in the previous year or if the date of the annual meeting is advanced by more than 30 days prior to or delayed by more than 60 days after the one-year anniversary of the date of the previous year's annual meeting, then, for notice by any Noticing Stockholder to be timely, it must be so delivered to the Secretary not earlier than the Close of Business on the 120th day prior to such annual meeting and not later than the Close of Business on the later of (i) the 90th day prior to such annual meeting or (ii) the 10th day following the day on which a Public Announcement (as defined below) of the date of such annual meeting is first made by the Corporation. In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described in this Section 2.4. Notwithstanding anything in this Section 2.4(ii) to the contrary, in the event that the number of directors to be elected to the Board (other than any Class B Directors (as such term is defined in the Certificate, "***Class B Directors***")) is increased (subject, in all cases, to Article IV, Section 3(h) of the Certificate) and there is no Public Announcement by the Corporation naming all of the nominees for director proposed by the Board (other than any Class B Directors) or specifying the size of the increased Board at least 10 days prior to the last day a Noticing Stockholder may deliver a notice of nominations in accordance with the second sentence of this Section 2.4(ii), a Noticing Stockholder's notice required by this Section 2.4(ii) shall also be considered timely, but only with respect to proposed nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business on the 10th day following the day on which a Public Announcement of such increase is first made by the Corporation.

       (iii)      To be in proper written form, the Noticing Stockholder's notice must also set forth:

       (a)      as to each person whom the Noticing Stockholder proposes to nominate for election or re-election as a director (1) the name, age, business address and residence address of the person, (2) a complete biography and statement of such person's qualifications in compliance with the provisions of Item 401 (or any successor provision) of Regulation S-K, as amended ("***Regulation S-K***"), under the Securities Act of 1933, as amended (the "***Securities Act***"), including the principal occupation or employment of the person (at present and for the past five years), (3) the Specified Information (as defined below) for the person and any immediate family member (as defined below) of the person, or any affiliate or associate (each, as defined below) of the person, or any person acting in concert therewith, (4) a complete and accurate description of all direct and indirect compensation and other monetary or non-monetary agreements, arrangements and understandings

*DRAFT*

(whether written or oral) existing presently, that existed during the past three years or that were offered during the past three years (whether accepted or declined), and any other material relationships, between or among the Holders or any Stockholder Associated Person (each, as defined below), on the one hand, and the person, and any immediate family member of the person, and the person's respective affiliates and associates, or others acting in concert therewith, or any other person or persons, on the other hand (including the names of such persons), and all biographical, related party transaction and other information that would be required to be disclosed pursuant to the federal and state securities laws, including without limitation Item 404 (or any successor provision) under Regulation S-K, if any Holder or any Stockholder Associated Person was the "registrant" for purposes of such rule and such person was a director or executive officer of such registrant, (5) any other information relating to the person that would be required to be disclosed in a proxy statement or any other filings required to be made in connection with solicitations of proxies for the election of directors in a contested election or that is otherwise required pursuant to and in accordance with Section 14 of the Exchange Act (including such person's written consent to being named in proxy statements as a proposed nominee of the Noticing Stockholder and to serving as a director if elected), and (6) a completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4;

(b)  as to any other business that the Noticing Stockholder proposes to bring before the meeting (1) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend the Certificate, and/or these Bylaws, the text of the proposed amendment(s)), (3) a description of all agreements, arrangements and understandings (whether written or oral) between each Holder and any Stockholder Associated Person and any other person or persons (including such persons' names) in connection with the proposal of such business by the Noticing Stockholder and any material interest of each such Holder or any Stockholder Associated Person in such business, and (4) a complete and accurate description of any material interest of each such Holder or any Stockholder Associated Person in or with respect to such business; and

(c)  as to the Noticing Stockholder and any beneficial owner on whose behalf the nomination is being made or the other business is being proposed (collectively with the Noticing Stockholder, the "***Holders***" and, each, a "***Holder***"): (1) the name and address of each Holder, as the

*DRAFT*

name and address appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (2) (aa) the class or series and number of shares of capital stock or other securities of the Corporation which are, directly or indirectly, held of record or owned beneficially by each Holder or any Stockholder Associated Person (provided that, for the purposes of this Section 2.4, any such person shall in all events be deemed to beneficially own any class or series of shares of capital stock or other securities of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future (whether such right is exercisable immediately or only after the passage of time or the fulfillment of a condition or both)), (bb) any short position, profits interest, option, warrant, convertible security, stock appreciation right or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of capital stock or other securities of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of capital stock or other securities of the Corporation, or any derivative or synthetic arrangement having the characteristics of a long position in any class or series of shares of capital stock or other securities of the Corporation, or any contract, derivative, swap or other transaction or series of transactions designed to produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of capital stock or other securities of the Corporation, including due to the fact that the value of such contract, derivative, swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of capital stock or other securities of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of capital stock or other securities of the Corporation through the delivery of cash or other property, or otherwise, and without regard to whether the Holder or any Stockholder Associated Person may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "***Derivative Instrument***") directly or indirectly owned or held, including beneficially, by each Holder or any Stockholder Associated Person, (cc) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which each Holder or any Stockholder Associated Person has any right to vote or has granted a right to vote any class or series of shares of capital stock or other securities of the Corporation, (dd) any agreement, arrangement, understanding, relationship or otherwise, including any repurchase or similar so-called

7

"stock borrowing" agreement or arrangement, involving any Holder or any Stockholder Associated Person, on the one hand, and any person acting in concert therewith, on the other hand, directly or indirectly, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of any class or series of shares of capital stock or other securities of the Corporation by, manage the risk of price changes for, or increase or decrease the voting power of, such Holder or any Stockholder Associated Person with respect to any class or series of shares of capital stock or other securities of the Corporation, or which provides, directly or indirectly, the opportunity to profit or share in any profit derived from any decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "***Short Interest***"), and any Short Interest held by each Holder or any Stockholder Associated Person within the last 12 months in any class or series of shares of capital stock or other securities of the Corporation, (ee) any rights to dividends or payments in lieu of dividends on shares of capital stock of the Corporation owned beneficially by each Holder or any Stockholder Associated Person that are separated or separable from the underlying shares of capital stock or other securities of the Corporation, (ff) any proportionate interest in any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or other entity in which any Holder or any Stockholder Associated Person is a general partner or directly or indirectly beneficially owns an interest in a general partner of a general or limited partnership, or is the manager or managing member or directly or indirectly beneficially owns an interest in the manager or managing member of a limited liability company or other entity, (gg) any performance-related fees (other than an asset-based fee) that each Holder or any Stockholder Associated Person is or may be entitled to based on any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments, if any, including, without limitation, any such interests held by immediate family members sharing the same household of such Holder or any Stockholder Associated Person, (hh) any direct or indirect legal, economic or financial interest (including a Short Interest) of each Holder or any Stockholder Associated Person in the outcome of (I) any vote to be taken at any annual or special meeting of stockholders of the Corporation, or (II) any meeting of stockholders of any other entity with respect to any matter that is related, directly or indirectly, to any nomination or business proposed by any Holder under these Bylaws, (ii) any direct or indirect legal, economic or financial interest or any Derivative Instruments or Short Interests in any principal competitor of the

*DRAFT*

Corporation held by each Holder or any Stockholder Associated Person, (jj) any direct or indirect interest of each Holder or any Stockholder Associated Person in any contract with the Corporation, any affiliate of the Corporation or any principal competitor of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), and (kk) any material pending or threatened action, suit or proceeding (whether civil, criminal, investigative, administrative or otherwise) in which any Holder or any Stockholder Associated Person is, or is reasonably expected to be made, a party or material participant involving the Corporation or any of its officers, directors or employees, or any affiliate of the Corporation, or any officer, director or employee of such affiliate (all information contained in subclause (2) of this Section 2.4(iii)(c) shall be referred to as the "***Specified Information***"), (3) a representation by the Noticing Stockholder that such stockholder is a holder of record of shares of capital stock of the Corporation entitled to vote at such meeting, will continue to be a stockholder of record of the Corporation entitled to vote at such meeting through the date of such meeting and intends to appear in person or by proxy at the meeting to propose such nomination or other business, (4) any other information relating to each Holder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement and form of proxy or other filings required to be made in connection with solicitations of proxies for, as applicable, the election of directors in a contested election and/or the proposal pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (5) a representation by the Noticing Stockholder as to whether any Holder and/or any Stockholder Associated Person intends or is part of a group which intends: (aa) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to elect the proposed nominee or to approve or adopt the other business being proposed, and/or (bb) otherwise to solicit proxies from stockholders in support of such nomination or other business, (6) a certification by the Noticing Stockholder that each Holder and any Stockholder Associated Person has complied with all applicable federal, state and other legal requirements in connection with its acquisition of shares of capital stock or other securities of the Corporation and/or such person's acts or omissions as a stockholder of the Corporation, (7) the statement required by Rule 14a-19(b)(3) of the Exchange Act (or any successor provision), (8) the names and addresses of other stockholders (including beneficial owners) known by any Holder, proposed nominee or Stockholder Associated Person to support such nominations and/or proposals, and, to the extent known, the class or series and number of shares of capital stock or other securities of the Corporation which are,

9

*DRAFT*

directly or indirectly, held of record or owned beneficially by each such other stockholder or beneficial owner, and (9) a representation by the Noticing Stockholder as to the accuracy of the information set forth in the notice.

(iv)    The Corporation may also, as a condition to any such nomination or other business being deemed properly brought before a meeting of stockholders, require any Holder or any proposed nominee to deliver to the Secretary, within five Business Days (as defined below) of any such request, such other information as may reasonably be requested by the Corporation, including (a) such other information as may reasonably be required by the Board, in its sole discretion, to determine (1) the eligibility of any such proposed nominee to serve as a director of the Corporation, and (2) whether any such proposed nominee qualifies as an "independent director" or "audit committee financial expert," or otherwise meets heightened standards of independence, under applicable law, securities exchange rule or regulation or any publicly disclosed corporate governance guideline or committee charter of the Corporation, and (b) such other information that the Board determines, in its sole discretion, could be material to a reasonable stockholder's understanding of the diversity and independence, or lack thereof, of any such proposed nominee.

(v)    In addition to the other requirements of this Section 2.4, each person who a Noticing Stockholder proposes to nominate for election or re-election as a director of the Corporation must deliver in writing (in accordance with the time periods prescribed for delivery of notice under this Section 2.4) to the Secretary at the principal executive offices of the Corporation (a) a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request), and (b) a written representation and agreement (in the form provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request) that such person (1) is not and will not become a party to (aa) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (solely for purposes of this Section 2.4, a "***Voting Commitment***") that has not been disclosed to the Corporation, or (bb) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law, (2) is not and will not become a party to any agreement, arrangement or understanding (whether written or oral) with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation, (3) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the Corporation, and will comply with all applicable rules of the exchanges upon which the securities of the Corporation are listed and all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation, and (4) in such person's individual capacity and on behalf of any Holder on whose

10

*DRAFT*

behalf the nomination is being made, intends to serve a full term if elected as a director of the Corporation.

(vi)    *Special Meetings of Stockholders.* Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting: (i) by or at the direction of the Board and (ii) provided that the Board has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who (1) is a stockholder of record on the date of the giving of the notice provided for in this Section 2.4, on the record date for the determination of stockholders entitled to notice of, and to vote at, such special meeting and at the time of such special meeting, (2) is entitled to vote at such special meeting, and (3) complies with the notice procedures set forth in this Section 2.4. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board, any Noticing Stockholder entitled to vote in such election of directors may nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, if the Noticing Stockholder's notice as required by Section 2.4(i) (including the completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4) shall be delivered to the Secretary at the principal executive offices of the Corporation in proper written form not earlier than the Close of Business on the 120th day prior to the special meeting and not later than the Close of Business on the later of the 90th day prior to the special meeting or the 10th day following the day on which Public Announcement of the date of the special meeting and of the nominees proposed by the Board to be elected at such meeting is first made by the Corporation. In no event shall the Public Announcement of an adjournment, recess, rescheduling or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described above.

(vii)    *General.*

(a)    Only such persons who are nominated in accordance with the procedures set forth in subsections (i) and (ii) of this Section 2.4 (in the case of an annual or special meeting) shall be eligible for election to serve as directors and only such other business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.4. Except as otherwise provided by law, the Certificate or these Bylaws, the Chair of the Board shall have the power and duty to determine whether a nomination or any other business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in these Bylaws (including whether the Noticing Stockholder or other Holder, if any, on whose behalf the nomination is being made or other business is being proposed solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in support of such Noticing Stockholder's nominee or other business in compliance with such stockholder's representation as required by clauses (5) and (7) of Section 2.4(iii)(c)). If any proposed nomination or other business was not made or proposed in compliance with these Bylaws, the chair of the meeting of stockholders shall have the power and duty to declare to the meeting that any such nomination or other business was not properly brought before the meeting and in accordance with the provisions of these Bylaws, and that such nomination or other business not properly brought before the meeting shall be disregarded and/or shall not be transacted.

*DRAFT*

(b)    In addition, to be considered timely, a Noticing Stockholder's notice shall be further updated and supplemented, if necessary, so that the information provided or required to be provided in such notice shall be true and correct as of the record date for the meeting and as of the date that is 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof, and such update and supplement shall be delivered to the Secretary at the principal executive offices of the Corporation not later than five Business Days after the record date for the meeting in the case of the update and supplement required to be made as of the record date, and not later than eight Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof in the case of the update and supplement required to be made as of 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof. In addition, if the Noticing Stockholder has delivered to the Corporation a notice relating to the nomination of directors, the Noticing Stockholder shall deliver to the Corporation not later than eight Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof reasonable evidence that it has complied with the requirements of Rule 14a-19 of the Exchange Act (or any successor provision). For the avoidance of doubt, the obligation to update and supplement set forth in this paragraph or any other Section of these Bylaws shall not (x) limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, (y) extend any applicable deadlines hereunder or (z) enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding nominees, matters, business and/or resolutions proposed to be brought before a meeting of stockholders.

(c)    Notwithstanding anything to the contrary in these Bylaws, if the Noticing Stockholder (or a qualified representative of the Noticing Stockholder) does not appear at the annual or special meeting of stockholders, as applicable, to present a nomination or other business, such nomination shall be disregarded and such other business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Section 2.4, to be considered a "qualified representative" of the Noticing Stockholder, a person must be authorized by a document authorizing another person or persons to act for such stockholder as proxy at the meeting of stockholders and such person must produce the document or a reliable reproduction of such document at the meeting of stockholders. A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder. If it is determined that such transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information upon which such inspectors or such persons relied.

(d)    For purposes of these Bylaws,

(1)    "***affiliate***" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

(2)    "***associate***" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

(3)    "***Business Day***" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York, New York are authorized or obligated by law or executive order to close;

(4)    "***Close of Business***" on a particular day means 5:00 p.m. local time at the principal executive offices of the Corporation, and, if an applicable deadline falls on the Close of Business on a day that is not a Business Day, then the applicable deadline shall be deemed to be the Close of Business on the immediately preceding Business Day;

(5)    "***delivered***" means, solely for purposes of this Article II, both (x) hand delivery, overnight courier service or sent and received by certified or registered mail, return receipt requested, in each case, to the Secretary at the principal executive offices of the Corporation, and (y) electronic mail to the Secretary;

(6)    "***immediate family member***" means a person's child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law and anyone (other than a tenant or employee) sharing the household of such person;

(7)    "***Public Announcement***" means disclosure (x) in a press release released by the Corporation, provided such press release is released by the Corporation following its customary procedures, as reported by the Dow Jones News Service, Associated Press or a comparable national news service, or is generally available on internet news sites, or (y) in a document publicly filed by the Corporation with the SEC pursuant to Sections 13, 14 or 15(d) of the Exchange Act; and

(8)    "***Stockholder Associated Person***" of any Holder means (x) any person acting in concert with such Holder, (y) any person controlling, controlled by or under common control with such Holder or any of the Holder's respective affiliates and associates (each, as defined in Rule 12b-2 under the

13

Exchange Act), or any person acting in concert therewith, and (z) any immediate family member of such Holder or an affiliate or associate of such Holder.

(viii)  *Other Requirements and Rights*. In addition to the foregoing provisions of this Section 2.4, a stockholder must also comply with all applicable requirements of state law and of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 2.4. Notwithstanding anything to the contrary contained in this Section 2.4, the sole holder of shares of Class B Common Stock (as defined in the Certificate) (such sole holder, the "***Class B Holder***") shall not be subject to the notice procedures set forth in this Section 2.4 with respect to nominations of persons for election to the Board as Class B Directors at any annual or special meeting of stockholders of the Corporation. Nothing in this Section 2.4 shall be deemed to affect any rights of:

(a)  a stockholder to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act; or

(b)  the Corporation to omit a proposal from the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act.

Section 2.5    Notice of Stockholders' Meetings. The Corporation shall give a notice in writing of the place, if any, date and hour of each meeting of stockholders and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Without limiting the manner by which notice otherwise may be given effectively to stockholders, if such notice is mailed, it shall be deemed to have been given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the record of the Corporation. Except as otherwise provided in the General Corporation Law of the State of the Delaware (the "***General Corporation Law***"), the Certificate or these Bylaws, the written notice of any meeting of stockholders shall be given not less than 10 nor more than 60 days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

Section 2.6    Quorum. The holders of one-third of the aggregate voting power of the capital stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders, except where a different quorum is required by the General Corporation Law, the Certificate or these Bylaws. Where a separate vote by a class or series or classes or series is required, one-third of the outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum (as to such class or series) entitled to take action with respect to that vote on that matter, except as otherwise provided by law, the Certificate or these Bylaws.

Abstentions and non-votes by brokers are counted as present for purposes of determining a quorum.

If a quorum is not present or represented at any meeting of the stockholders, then either (i) the chair of the meeting, or (ii) the holders of a majority of the shares entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

Section 2.7    Adjourned Meeting; Notice. When a meeting is adjourned to another time and/or place, unless these Bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are (i) announced at the meeting at which the adjournment is taken, (ii) displayed, during the time scheduled for the meeting, on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication or (iii) set forth in the notice of meeting given in accordance with these Bylaws. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days or a new record date for stockholders entitled to vote is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.8    Conduct of Business. The Board may, to the extent not prohibited by law or in contravention of the provisions of these Bylaws or the Certificate, adopt such rules and regulations for the conduct of meetings of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the chair of any meeting of stockholders shall have the exclusive right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of the chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present, including regulation of the manner of voting and the conduct of discussion; (iii) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chair of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on or the elimination of time allotted to questions or comments by participants; and (vi) restrictions on the use of cell phones, audio or video recording devices and other devices at the meeting. The chair of any meeting of stockholders shall be designated by the Board; in the absence of such designation, the Chair of the Board, if any, the Lead Independent Director (in the absence of the Chair of the Board), the Chief Executive Officer (in the absence of the Chair of the Board and the Lead Independent Director) or the President (in the absence of the Chair of the Board and the Lead Independent Director and the Chief Executive Officer), or in their absence any other director or officer of the Corporation selected by the Board, shall serve as chair of the stockholder meeting.

*DRAFT*

The chair of the meeting shall have the power, right and authority to convene, recess or adjourn any meeting of stockholders.

Section 2.9    Voting.

(i)    *Voting Rights.* Except as may be otherwise provided by law, the Certificate, these Bylaws or any Certificate of Designation (as such term is defined in the Certificate), each stockholder of record of any series of Preferred Stock shall be entitled at each meeting of the stockholders to such number of votes, if any, for each share of such stock as may be fixed in the Certificate or in the resolution or resolutions adopted by the Board providing for the issuance of such stock, the Class B Holder shall be entitled to the voting rights set forth in the Certificate, and each stockholder of record of the Corporation's Common Stock (as defined in the Certificate) shall be entitled at each meeting of the stockholders to one vote for each such share of such stock registered in such stockholder's name on the books of the Corporation on the date fixed pursuant to Section 2.11 of these Bylaws as the record date for the determination of stockholders entitled to notice of and to vote at such meeting. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights.

(ii)    *Vote Required.* Except as otherwise required by law, the Certificate or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of the shares cast shall be the act of the stockholders. Except as with respect to the election of Class B Directors and except as otherwise required by law, the Certificate or these Bylaws, the vote required for election of a director by the stockholders at a meeting of stockholders shall be the affirmative vote of a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

(iii)    *Abstentions and Broker Non-Votes.* In determining the number of votes cast for or against, as applicable, a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast. A non-vote by a broker will be counted for purposes of determining a quorum but not for purposes of determining the number of votes cast.

Section 2.10    No Stockholder Action by Written Consent Without a Meeting. Except as otherwise set forth in the Certificate, subject to the rights of any series of Preferred Stock then outstanding, no action shall be taken by the stockholders of the Corporation except at a duly called annual or special meeting of stockholders and no action shall be taken by the stockholders of the Corporation by written consent in lieu of a meeting.

Section 2.11    Record Dates.

(i)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date

for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting.

(ii)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 2.12    Proxies. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy but such proxy, whether revocable or irrevocable, must comply with the applicable requirements of Delaware law.

Section 2.13    List of Stockholders Entitled to Vote. The Corporation shall prepare no later than the 10th day before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; *provided, however*, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of 10 days ending on the day before the meeting date: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list was provided with the notice of the meeting; or (ii) during ordinary business hours, at the principal place of business of the Corporation. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

## ARTICLE III
## DIRECTORS

Section 3.1    Board Power. The business and affairs of the Corporation shall be managed by and under the direction of the Board, except as may be otherwise provided in the General Corporation Law or the Certificate. In addition to the powers and authority expressly conferred upon them by applicable law or by the Certificate or these Bylaws, the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the

Corporation, except as otherwise specifically required by law or as otherwise provided in the Certificate.

Section 3.2    Board Size. Subject to the provisions of the Certificate, the Board shall consist of no less than five members and no more than 15 members, each of whom shall be a natural person.[6] The number of directors shall be determined from time to time solely by resolution of the Board in accordance with the provisions of the Certificate. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Section 3.3    Election, Qualification and Term of Office of Directors. Except as provided in Section 3.4 of these Bylaws and subject to the provisions of the Certificate, each director shall hold office until the annual meeting at which such director's term expires and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders unless so required by the Certificate or these Bylaws. The Certificate or these Bylaws may prescribe other qualifications for directors.

Section 3.4    Removal of Directors. Directors may be removed from the Board at any time as provided in the Certificate.

Section 3.5    Resignation and Vacancies.

(i)    Any director may resign at any time by delivering a resignation in writing or by electronic transmission, signed by such director, to the Chair of the Board or the Secretary; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the director. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. Acceptance of such resignation shall not be necessary to make it effective.

(ii)    Vacancies and newly created directorships on the Board shall be filled in the manner provided in the Certificate. A person so elected to fill a vacancy or newly created directorship shall hold office for a term expiring at the next election of the class for which such director shall have been chosen and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal.

Section 3.6    Place of Meetings; Meetings by Remote Communication. The Board may hold meetings, both regular and special, either within or without the State of Delaware. Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of remote communication, including without limitation, by means of conference telephone or other communications equipment by means of which all persons

---

[6] *Note to W&C/K&E: This should align with COI – COI just provides further limitations while Class Bs are outstanding.*

*DRAFT*

participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.7    Regular Meetings. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

Section 3.8    Special Meetings; Notice. Special meetings of the Board for any purpose or purposes may be called at any time by the Chairperson of the Board, the Lead Independent Director, a Class B Director or a majority of the directors then in office, at such times and places as such person or persons shall designate. Notice of special meetings of the Board shall be given to each director by mailing it to such director's residence or usual place of business (accompanied by an electronic transmission of such notice) at least three business days before the date of the meeting or by telephone or electronic transmission at least three business days before the meeting. Notice need not be given to any director who submits a signed waiver of notice before or after the meeting or who attends the meeting without protesting the lack of notice to such person, either before the meeting or when it begins. Notice of any adjourned meeting need not be given, other than by announcement at the meeting at which the adjournment is taken.

Section 3.9    Quorum; Voting. At all meetings of the Board, (i) a majority of the total number of directors (other than the Class B Directors) then in office plus (ii) at least one of the Class B Directors shall constitute a quorum for the transaction of business, unless a greater number is required by applicable law. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present; provided, however, that clause (ii) of the immediately preceding sentence shall not be required to constitute a quorum if (A) a meeting has been adjourned for at least two days on two consecutive occasions due to the failure of clause (ii) of the immediately preceding sentence to be satisfied and (B) at the third consecutive re-convened meeting (held at least two days after the previously adjourned meeting), the absence of Class B Directors is the cause of a quorum not being satisfied. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required quorum for that meeting. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate or these Bylaws.

Section 3.10    Board Action by Written Consent Without a Meeting. Unless otherwise restricted by the Certificate or these Bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee.

Section 3.11    Fees and Compensation of Directors. Unless otherwise restricted by the Certificate or these Bylaws, the Board shall have the authority to fix the compensation of directors.

Section 3.12    The Chair of the Board. [The Chair of the Board shall have the powers and duties customarily and usually associated with the office of the Chair of the Board. The Chair of the Board shall preside at meetings of the stockholders and of the Board.][7]

Section 3.13    Lead Independent Director. A majority of the Independent Directors (as defined below) may, in their discretion and in accordance with any corporate governance policies adopted by the Corporation, elect a lead independent director from among their members that are Independent Directors (as defined below) (such director, the "***Lead Independent Director***"), which may be the Chair of the Board if the Chair is independent. The Lead Independent Director shall preside at all meetings at which the Chair of the Board is not present and shall exercise such other powers and duties as may from time to time be assigned to him or her by the Board or as prescribed by these Bylaws. For purposes of these Bylaws, "***Independent Director***" has the meaning ascribed to such term under the rules of the exchange upon which the Corporation's Class A Common Stock is primarily traded.

# ARTICLE IV
## COMMITTEES

Section 4.1    Committees of Directors. The Board, by resolution adopted by a majority of the entire Board, may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Subject to Section 4.5 of these Bylaws, the Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee, to the extent provided in the resolution of the Board or in these Bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; *provided, however,* that no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the General Corporation Law to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation.

Section 4.2    Committee Minutes. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

Section 4.3    Meetings and Action of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)    Section 3.6 (place of meetings and meetings by telephone);

(ii)    Section 3.7 (regular meetings);

---

[7] NTD: Role to be discussed.

(iii)    Section 3.8 (special meetings; notice);

(iv)    Section 3.9 (quorum; voting); *provided, however*, that the provisions of Section 3.9 regarding the presence of a Class B Director to establish a quorum shall not be required for committees upon which no Class B Director serves;

(v)    Section 3.10 (action without a meeting); and

(vi)    Section 7.5 (waiver of notice) with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(a)    the time of regular meetings of committees may be determined by resolution of the committee or the chair of such committee; and

(b)    special meetings of committees may also be called by resolution of the committee or the chair of such committee.

The Board may adopt rules for the governance of any committee not inconsistent with the provisions of these Bylaws. Any committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board. Unless the Board provides otherwise, at all meetings of such committee, the majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of the majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Unless the Board provides otherwise, each committee designated by the Board may make, alter, and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board conducts its business.

Section 4.4    Subcommittees. Unless otherwise provided under applicable law, or in the Certificate, these Bylaws or the resolutions of the Board designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

Section 4.5    Class B Directors. For so long as that certain Management Services Agreement by and between the Corporation and [Fahrenheit, LLC] dated as of [●] remains in full force and effect, to the extent permissible under applicable law and the listing rules of any exchange upon which the Corporation's securities are traded, any committee of the Board, including without limitation any committee that oversees: (i) material investments or divestitures, strategic transactions and other significant transactions not in the ordinary course of the Corporation's business, and (ii) the Corporation's governance and the evaluation of nominees for election to the Board (including, without limitation, any nominating committee that satisfies

*DRAFT*

Nasdaq Listing Rule 5605(e)(2) or Section 303A.04 of the New York Stock Exchange Listed Company Manual), shall include at least one Class B Director; provided, however, for the avoidance of doubt, that any committee of the Board performing the functions of an audit committee (including, without limitation, any audit committee that satisfies Nasdaq Listing Rule 5605(c) or Section 303A.06 of the New York Stock Exchange Listed Company Manual) shall not be required to include a Class B Director in accordance with applicable law and listing rules.

## ARTICLE V
## OFFICERS

Section 5.1    Officers. The officers of the Corporation shall be a Chief Executive Officer, a Chief Financial Officer, a Secretary and such other officers and assistant officers as may be deemed necessary or desirable by the Board. Any number of offices may be held by the same person. In its discretion, the Board may choose not to fill any office for any period as it may deem advisable; *provided, however*, that there shall always be (i) a Chief Executive Officer and (ii) a Secretary.

Section 5.2    Appointment of Officers. The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws, subject to the rights, if any, of an officer under any contract of employment. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Article V for the regular election to such office.

Section 5.3    Subordinate Officers. The Board may appoint, or empower the Chief Executive Officer to appoint, such other officers and agents as the business of the Corporation may require. Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board may from time to time determine.

Section 5.4    Removal and Resignation of Officers. Any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board. Any officer may resign at any time by giving written or electronic notice to the Corporation; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the officer. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

Section 5.5    Vacancies in Offices. Any vacancy occurring in any office of the Corporation shall be filled by the Board as provided in Section 5.2 and 5.3.

Section 5.6    Representation of Shares of Other Corporations. The Chair of the Board, the Lead Independent Director, the Chief Executive Officer, the Chief Financial Officer the

22

*DRAFT*

Secretary, or any other person authorized by the Board, the Chair of the Board, the Lead Independent Director or the Chief Executive Officer is authorized to vote, represent, and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

Section 5.7    Authority and Duties of Officers. All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

Section 5.8    The Chief Executive Officer. The Chief Executive Officer shall have, subject to the supervision, direction and control of the Board, ultimate authority for decisions relating to the supervision, direction and management of the affairs and the business of the Corporation customarily and usually associated with the position of Chief Executive Officer, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Corporation. If at any time the office of the Chair and Lead Independent Director of the Board shall not be filled, or in the event of the temporary absence or disability of the Chair of the Board and the Lead Independent Director, the Chief Executive Officer shall perform the duties and exercise the powers of the Chair of the Board unless otherwise determined by the Board.

Section 5.9    The Secretary.

(i)    The Secretary shall attend meetings of the Board and meetings of the stockholders and record all votes and minutes of all such proceedings in a book or books kept for such purpose. The Secretary shall have all such further powers and duties set forth in these Bylaws and as are customarily and usually associated with the position of Secretary or as may from time to time be assigned to him or her by the Board, the Chair of the Board, or the Chief Executive Officer.

Section 5.10    The Chief Financial Officer.

(i)    The Chief Financial Officer shall be responsible for maintaining the Corporation's accounting records and statements, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation. The Chief Financial Officer shall also maintain adequate records of all assets, liabilities and transactions of the Corporation and shall assure that adequate audits thereof are currently and regularly made. The Chief Financial Officer shall have all such further powers and perform all such further duties as are customarily and usually associated with the position of Chief Financial Officer, or as may from time to time be assigned to him or her by the Board, the Chair of the Board or the Chief Executive Officer. Unless a treasurer has been appointed separately in accordance with these Bylaws, the Chief Financial Officer shall also perform the duties customarily and usually associated with the position of treasurer.

*DRAFT*

## ARTICLE VI
## CAPITAL STOCK

Section 6.1    Stock Certificates; Uncertificated Shares. The shares of the Corporation may be represented by certificated or uncertificated shares and may be evidenced by a book-entry system maintained by the registrar of such shares, as determined by the Corporation in accordance with applicable law. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

(i)    Shares with Certificates. Each certificate of stock issued by the Corporation shall be signed (either manually or in facsimile) by any two authorized officers of the Corporation representing the number of shares registered in certificate form. If any person who signed a certificate no longer holds office when the certificate is issued, the certificate will be nonetheless valid. The Corporation shall not have power to issue a certificate in bearer form. If the Board chooses to issue shares of stock evidenced by a certificate or certificates, each individual certificate shall include the following on its face: (i) the Corporation's name, (ii) the fact that the Corporation is organized under the laws of Delaware, (iii) the name of the person to whom the certificate is issued, (iv) the number of shares represented thereby, (v) the class of shares and the designation of the series, if any, which the certificate represents, and (vi) such other information as required under the Certificate or applicable law or as may be lawful. If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series (and the authority of the Board to determine variations for future series) shall be summarized on the front or back of each certificate. Alternatively, each certificate shall state on its front or back that the Corporation will furnish the stockholder this information in writing, without charge, upon request.

(ii)    Shares without Certificates. If the Board chooses to issue shares of stock without certificates, the Corporation, if required by the Exchange Act, shall, within a reasonable time after the issue or transfer of shares without certificates, send the stockholder a written notice containing the information required to be set forth or stated on certificates pursuant to the General Corporation Law. The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

Section 6.2    Lost, Stolen or Destroyed Certificates. Except as provided in this Section 6.2, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

Section 6.3    Dividends. The Board, subject to any restrictions contained in the Certificate or applicable law, may declare and pay dividends upon the shares of the Corporation's capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock, subject to the provisions of the Certificate.

Section 6.4    Transfer of Stock. Transfers of record of shares of stock of the Corporation shall be made only upon its books by the holders thereof, in person or by an attorney duly authorized, and, if such stock is certificated, upon the surrender of a certificate or certificates for a like number of shares, properly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer; provided, however, that such succession, assignment or authority to transfer is not prohibited by the Certificate, these Bylaws, applicable law or contract.

Section 6.5    Stock Transfer Agreements. The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law.

Section 6.6    Registered Stockholders. The Corporation:

(i)    shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii)    shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii)    shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII
## MANNER OF GIVING NOTICE AND WAIVER

Section 7.1    Notice of Stockholders' Meetings. Notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the Corporation's records. An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

Section 7.2    Notice by Electronic Transmission. Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the General Corporation Law, the Certificate or these Bylaws, any notice to stockholders given by the Corporation under any provision of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice

*DRAFT*

is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if:

> (i)    the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent; and
>
> (ii)   such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

> (I)    if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;
>
> (II)   if by electronic mail, when directed to the stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) the General Corporation Law;
>
> (III)  if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and
>
> (IV)   if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

An "***electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

26

*DRAFT*

Section 7.3 _Notice to Stockholders Sharing an Address_. Except as otherwise prohibited under the General Corporation Law, without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under the provisions of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any stockholder who fails to object in writing to the Corporation, within 60 days of having been given written notice by the Corporation of its intention to send the single notice, shall be deemed to have consented to receiving such single written notice.

Section 7.4 _Notice to Person with Whom Communication Is Unlawful_. Whenever notice is required to be given under the General Corporation Law, the Certificate or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate under the General Corporation Law, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Section 7.5 _Waiver of Notice_. Whenever notice is required to be given to stockholders, directors or other persons under any provision of the General Corporation Law, the Certificate or these Bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders or the Board, as the case may be, need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate or these Bylaws.

## ARTICLE VIII
## INDEMNIFICATION[8]

Section 8.1 _Indemnification of Directors and Officers in Third Party Proceedings_. Subject to the other provisions of this _Article VIII_, the Corporation shall indemnify and hold harmless, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether civil, criminal, administrative, legislative, investigative

---

[8] Note to BR: Make sure consistent with COI.

27

*DRAFT*

or other nature and including any and all appeals (collectively, each a "***Proceeding***") (other than an action by or in the right of the Corporation to procure a judgement in its favor) by reason of the fact that such person is or was a director or officer of the Corporation, or while a director of the Corporation or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

Section 8.2    Indemnification of Directors and Officers in Actions by or in the Right of the Corporation. Subject to the other provisions of this Article VIII, the Corporation shall indemnity, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Corporation to procure a judgement in its favor by reason of the fact that such person is or was a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Section 8.3    Successful Defense. To the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise in defense of any Proceeding described in Section 8.1 or Section 8.2, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith to the extent not already advanced pursuant to Section 8.5.

Section 8.4    Indemnification of Others. Subject to the other provisions of this Article VIII, the Corporation shall have power to indemnify its employees and its agents to the extent not prohibited by the General Corporation Law or other applicable law. The Board shall have the

28

*DRAFT*

power to delegate the determination of whether employees or agents shall be indemnified to such person or persons as the board of determines.

Section 8.5    Advanced Payment of Expenses. To the fullest extent permitted by applicable law, expenses (including attorneys' fees) incurred by an officer or director of the Corporation in defending any Proceeding shall be paid by the Corporation, and expenses (including attorneys' fees) incurred by the Corporation's employees and agents in defending any Proceeding shall be paid by the Corporation, in advance of the final disposition of such Proceeding upon receipt of a written request therefor and an undertaking, by or on behalf of the person, to repay such amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that such person is not entitled to be indemnified under this Article VIII or the General Corporation Law.

Section 8.6    Non-Exclusivity of Rights. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate (including the indemnification provisions set forth in Article VII, Section 2 of the Certificate) or any statute, bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the General Corporation Law or other applicable law.

Section 8.7    Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the General Corporation Law.

Section 8.8    Survival. Notwithstanding anything to the contrary, the rights to indemnification and advancement of expenses conferred by this Article VIII shall be contract rights and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

Section 8.9    Effect of Repeal or Modification. Any amendment, alteration or repeal of this Article VIII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to such amendment, alteration or repeal.

Section 8.10    Certain Definitions. For purposes of this Article VIII, references to the "*Corporation*" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or

29

agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued. For purposes of this Article VIII, references to "***other enterprises***" shall include employee benefit plans; references to "***fines***" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "***serving at the request of the Corporation***" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "***not opposed to the best interests of the Corporation***" as referred to in this Article VIII.

## ARTICLE IX
## GENERAL MATTERS

Section 9.1    Execution of Corporate Contracts and Instruments. Except as otherwise provided by law, the Certificate or these Bylaws, the Board may authorize any officer or officers, or agent or agents, to enter into any contract or execute any document or instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 9.2    Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

Section 9.3    Seal. The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Section 9.4    Construction; Definitions. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Certificate and the General Corporation Law shall govern the construction of these Bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both an entity and a natural person.

## ARTICLE X
## AMENDMENTS

The Board and stockholders may adopt, amend and repeal the Bylaws in the manner provided in the Certificate.

**<u>Exhibit K-1</u>**

**(Redline) New Organizational Documents:**

**NewCo Bylaws**

*{DRAFT}*

**[AMENDED AND RESTATED]**
**BYLAWS OF [NEWCO, INC.]**
(Effective as of [●])

## ARTICLE I
## CORPORATE OFFICES

Section 1.1    Registered Office. The registered office of [NewCo, Inc.] (the "**Corporation**") shall be set forth in the Corporation's Certificate (as defined below). References in these [amended and restated] bylaws (these "**Bylaws**") to the certificate of incorporation, as the same shall be amended and/or restated from time to time (the "**Certificate**"), shall include the terms of any certificate of designations of any series of preferred stock of the Corporation ("**Preferred Stock**").

Section 1.2    Other Offices. The Corporation also may have offices at such other places, both within and without the State of Delaware, as the Board of Directors of the Corporation (the "**Board**") may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEETINGS OF STOCKHOLDERS

Section 2.1    Time and Place of Meetings. Annual and special meetings of stockholders shall be held at any time and place, within or without the State of Delaware, or in whole or in part by means of remote communication, as shall be designated by the Board. In the absence of any such designation, stockholders' meetings shall be held at the Corporation's principal executive office.

Section 2.2    Annual Meeting. At the annual meeting, directors shall be elected and any other business properly brought before the meeting may be transacted. For purposes of this Article II, the 202[4] annual meeting of the stockholders shall be deemed to have been held on [●], 202[4]. The Board may cancel, postpone or reschedule any previously scheduled annual meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

Section 2.3    Special Meeting.

(i)    A special meeting of the stockholders, other than those required by statute, may be called at any time only in the manner provided in the Certificate and these Bylaws. The Board may cancel, postpone or reschedule any previously scheduled special meeting at any time, before or after the notice for such meeting has been sent to the stockholders.

(ii)    The notice of a special meeting shall include the purpose for which the meeting is called. Only such business shall be conducted at a special meeting of stockholders as shall have been set forth in the notice of such meeting. Nothing contained in this Section 2.3(ii) shall be construed as limiting, fixing or affecting the time when a meeting of stockholders called by action of the Board may be held.

1

*{DRAFT}*

(iii)    Subject to Section 2.3(iv), the Board shall call a special meeting of stockholder upon the written request (the "***Meeting Request***") of the stockholders of record of at least 25%, in the aggregate, of the voting power of the outstanding shares of all classes of shares entitled to vote at such a meeting (the "***Required Percentage***"), delivered to the secretary of the Corporation (the "***Secretary***").[1] The Board shall designate a date for such special meeting not more than 90 days after the date that the Secretary received the valid Meeting Request (the "***Request Delivery Date***"). In fixing a date and time for any special meeting requested by stockholders of record, the Board may consider such factors as it deems relevant, including without limitation, the nature of the matters to be considered, the facts and circumstances related to any request for a meeting, and any plan of the Board to call an annual meeting or special meeting.

(iv)    *Stockholder Request for Special Meeting*.

(a)    Any Meeting Request shall be signed and dated by one or more stockholders of record and each beneficial owner, if any, on whose behalf the Meeting Request is being made, or—in each case—such stockholder's or beneficial owner's duly authorized agent (each, a "***Requesting Stockholder***"), and shall set forth: (1) a statement of the specific purpose of the meeting and the matters proposed to be acted on at the meeting, the reasons for conducting such business at the meeting and any material interest of the Requesting Stockholder in such business; (2) the name and address of each Requesting Stockholder [as it appears on the Corporation's stock ledger (or, with respect to all shares to be included in the Required Percent that are owned beneficially but not of record by each such Requesting Stockholder, the name of each broker, bank or custodian (or similar entity) of each such Requesting Stockholder with respect to such shares)][2]; (3) the number of shares of each class of voting shares owned of record and beneficially by each such Requesting Stockholder; (4) a description of all arrangements or understandings between any Requesting Stockholder and any other person regarding the meeting and the matters proposed to be acted on at the meeting; (5) the text of the proposal or business (including the text of any resolutions proposed for consideration and in the event that such business includes a proposal to amend these Bylaws or the Certificate, the language of the proposed amendment) conforming in all material respects with the requirements of Section 14(a) of the Securities Exchange Act of 1934 and the rules and regulations thereunder (as so amended and inclusive of such rules and regulations, the

---

[1] BR Note to Draft: The requirement that stockholder holder 25% and have held the shares for more than a year was inserted originally in a W&C/K&E draft. Is there a reason it was now removed?

[2] NTD: Subject to further review.

*{DRAFT}*

"**Exchange Act**") ][3]; and (6) all of the information regarding the Requesting Stockholders that would be required by Section 2.4(iii)–(v) of these Bylaws if each Requesting Stockholder were intending to make a nomination or to bring any other matter before a stockholder meeting (except that, for purposes of this paragraph, references to the "Noticing Stockholder" and "Holders" shall instead refer to each "Requesting Stockholder"); [(7) an agreement by the Requesting Stockholder to notify the Corporation promptly in the event of (x) any disposition prior to the time of the special meeting of any shares held by a Requesting Stockholder as of the date on which the Meeting Request was delivered to the Secretary and (y) any other change prior to the time of the special meeting in the shares owned by any Requesting Stockholder; and (8) an acknowledgement that (x) the Requesting Stockholder is entitled to vote at such special meeting, (y) any disposition prior to the date of the special meeting of any capital stock of the Corporation including any Requesting Stockholder's shares as of the date on which the Meeting Request was delivered to the Secretary shall be deemed to be a revocation of such Meeting Request with respect to such disposed shares and (z) that any decrease in the Requesting Stockholders' aggregate share ownership to less than the Required Percent shall be deemed to be an absolute revocation of such Meeting Request][4]. The requirement set forth in clause (6) of the immediately preceding sentence shall not apply to (x) any stockholder of record, or beneficial owner, as applicable, who has provided a written request solely in response to a solicitation made pursuant to, and in accordance with, Section 14(a) of the Exchange Act, by way of a solicitation statement filed on Schedule 14A or (y) any stockholder of record that is a broker, bank or custodian (or similar entity) and is acting solely as nominee on behalf of a beneficial owner. A Requesting Stockholder may revoke its request for a special meeting at any time by written revocation delivered to the Secretary, [and if, following such revocation, there are un-revoked Meeting Requests from less than the Required Percent, the Board, in its discretion, may cancel the special meeting.][5]

(b)      The Board shall have the authority to determine not to call a special meeting requested by stockholders if (a) the Board has called or calls an annual or special meeting of stockholders to be held not more than 90 days after the Request Delivery Date and the purpose of such

---

[3] NTD: Subject to further review.

[4] NTD: Subject to further review.

[5] NTD: Subject to further review.

stockholder meeting includes (among any other matters properly brought before the meeting) the purpose specified in the Meeting Request; (b) within 12 months prior to the Request Delivery Date, an annual or special meeting was held that considered the purpose specified in the Meeting Request or an identical or substantially similar item of business (as determined in good faith by the Board in its sole and absolute discretion), except for the election of one or more directors; (c) the Meeting Request relates to an item of business that is not a proper subject for stockholder action under applicable law; or (d) such request was made in violation of Regulation 14A under the Exchange Act, to the extent applicable, or other applicable law. The Board is authorized to determine in good faith the purpose of a stockholder meeting. If none of the Requesting Stockholders appears or sends a qualified representative to present the business and/or nominations specified in the Meeting Request to be presented for consideration, or any Requesting Stockholder or any nominee for director (as applicable) acted contrary to any representation, certification or agreement required by this Section 2.3 (or otherwise failed to comply with this Section 2.3 (or any law, rule or regulation identified in this Section 2.3 or Section 2.4)) or provided false or misleading information to the Corporation, the Corporation need not present such business for a vote at the special meeting (and any such nominee shall be disqualified from standing for election or re-election), notwithstanding that proxies in respect of such business may have been received by the Corporation.

Section 2.4    Advance Notice Procedures for Director Nominations and Business Proposals.

(i)    *Annual Meetings of Stockholders*. At an annual meeting of the stockholders, only such business shall be conducted as shall have been properly brought before the meeting. To be properly brought before an annual meeting, nominations of persons for election to the Board or other proposals of business to be transacted at an annual meeting of stockholders must be: (a) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board (or any duly authorized committee thereof) with respect to such meeting, (b) otherwise properly brought before the annual meeting by or at the direction of the Board (or any duly authorized committee thereof), or (c) otherwise properly brought before the annual meeting by a stockholder of the Corporation who (1) is a stockholder of record at the time of the giving of the notice required by this Section 2.4, on the record date for the determination of stockholders entitled to notice of and to vote at such annual meeting and at the time of such annual meeting, (2) is entitled to vote at such annual meeting and (3) has timely complied in proper written form with the procedures set forth in this Section 2.4. In addition, for business to be properly brought before an annual meeting by a stockholder, such business must be a proper matter for stockholder action pursuant to these Bylaws and applicable law. Except for proposals properly made in accordance with Rule 14a-8 under the Exchange Act, and included in the notice of meeting given by or at the direction of the Board, for the avoidance

*[DRAFT]*

of doubt, clause (c) above shall be the exclusive means for a stockholder to bring business before an annual meeting of stockholders.

(ii)    For business to be properly brought before an annual meeting by a stockholder of record pursuant to clause Section 2.4(i)(c) above, the stockholder of record bringing the notice (the "***Noticing Stockholder***") must have delivered (as defined below) timely notice thereof in proper written form, setting forth all information required under this Section 2.4, to the Secretary at the principal executive offices of the Corporation. In order to be timely, the Noticing Stockholder's notice must be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business (as defined below) on the 90th day nor earlier than the Close of Business on the 120th day before the one-year anniversary of the preceding year's annual meeting; *provided*, *however*, that in the event that no annual meeting was held in the previous year or if the date of the annual meeting is advanced by more than 30 days prior to or delayed by more than 60 days after the one-year anniversary of the date of the previous year's annual meeting, then, for notice by any Noticing Stockholder to be timely, it must be so delivered to the Secretary not earlier than the Close of Business on the 120th day prior to such annual meeting and not later than the Close of Business on the later of (i) the 90th day prior to such annual meeting or (ii) the 10th day following the day on which a Public Announcement (as defined below) of the date of such annual meeting is first made by the Corporation. In no event shall any adjournment or postponement of an annual meeting or the announcement thereof commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described in this Section 2.4. Notwithstanding anything in this Section 2.4(ii) to the contrary, in the event that the number of directors to be elected to the Board (other than any Class B Directors (as such term is defined in the Certificate, "***Class B Directors***")) is increased (subject, in all cases, to Article IV, Section 3(h) of the Certificate) and there is no Public Announcement by the Corporation naming all of the nominees for director proposed by the Board (other than any Class B Directors) or specifying the size of the increased Board at least 10 days prior to the last day a Noticing Stockholder may deliver a notice of nominations in accordance with the second sentence of this Section 2.4(ii), a Noticing Stockholder's notice required by this Section 2.4(ii) shall also be considered timely, but only with respect to proposed nominees for any new positions created by such increase, if it shall be delivered to the Secretary at the principal executive offices of the Corporation not later than the Close of Business on the 10th day following the day on which a Public Announcement of such increase is first made by the Corporation.

(iii)    To be in proper written form, the Noticing Stockholder's notice must also set forth:

(a)    as to each person whom the Noticing Stockholder proposes to nominate for election or re-election as a director (1) the name, age, business address and residence address of the person, (2) a complete biography and statement of such person's qualifications in compliance with the provisions of Item 401 (or any successor provision) of Regulation S-K, as amended ("***Regulation S-K***"), under the Securities Act of 1933, as amended (the "***Securities Act***"), including the principal occupation or employment of the person (at present and for

5

*{DRAFT}*

the past five years), (3) the Specified Information (as defined below) for the person and any immediate family member (as defined below) of the person, or any affiliate or associate (each, as defined below) of the person, or any person acting in concert therewith, (4) a complete and accurate description of all direct and indirect compensation and other monetary or non-monetary agreements, arrangements and understandings (whether written or oral) existing presently, that existed during the past three years or that were offered during the past three years (whether accepted or declined), and any other material relationships, between or among the Holders or any Stockholder Associated Person (each, as defined below), on the one hand, and the person, and any immediate family member of the person, and the person's respective affiliates and associates, or others acting in concert therewith, or any other person or persons, on the other hand (including the names of such persons), and all biographical, related party transaction and other information that would be required to be disclosed pursuant to the federal and state securities laws, including without limitation Item 404 (or any successor provision) under Regulation S-K, if any Holder or any Stockholder Associated Person was the "registrant" for purposes of such rule and such person was a director or executive officer of such registrant, (5) any other information relating to the person that would be required to be disclosed in a proxy statement or any other filings required to be made in connection with solicitations of proxies for the election of directors in a contested election or that is otherwise required pursuant to and in accordance with Section 14 of the Exchange Act (including such person's written consent to being named in proxy statements as a proposed nominee of the Noticing Stockholder and to serving as a director if elected), and (6) a completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4;

(b)     as to any other business that the Noticing Stockholder proposes to bring before the meeting (1) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and, in the event that such business includes a proposal to amend the Certificate, and/or these Bylaws, the text of the proposed amendment(s)), (3) a description of all agreements, arrangements and understandings (whether written or oral) between each Holder and any Stockholder Associated Person and any other person or persons (including such persons' names) in connection with the proposal of such business by the Noticing Stockholder and any material interest of each such Holder or any Stockholder Associated Person in such

*{DRAFT}*

business, and (4) a complete and accurate description of any material interest of each such Holder or any Stockholder Associated Person in or with respect to such business; and

(c)      as to the Noticing Stockholder and any beneficial owner on whose behalf the nomination is being made or the other business is being proposed (collectively with the Noticing Stockholder, the "***Holders***" and, each, a "***Holder***"): (1) the name and address of each Holder, as the name and address appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (2) (aa) the class or series and number of shares of capital stock or other securities of the Corporation which are, directly or indirectly, held of record or owned beneficially by each Holder or any Stockholder Associated Person (provided that, for the purposes of this Section 2.4, any such person shall in all events be deemed to beneficially own any class or series of shares of capital stock or other securities of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future (whether such right is exercisable immediately or only after the passage of time or the fulfillment of a condition or both)), (bb) any short position, profits interest, option, warrant, convertible security, stock appreciation right or similar right with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series of shares of capital stock or other securities of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of capital stock or other securities of the Corporation, or any derivative or synthetic arrangement having the characteristics of a long position in any class or series of shares of capital stock or other securities of the Corporation, or any contract, derivative, swap or other transaction or series of transactions designed to produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of capital stock or other securities of the Corporation, including due to the fact that the value of such contract, derivative, swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of capital stock or other securities of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of capital stock or other securities of the Corporation through the delivery of cash or other property, or otherwise, and without regard to whether the Holder or any Stockholder Associated Person may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the

*{DRAFT}*

Corporation (any of the foregoing, a "***Derivative Instrument***") directly or indirectly owned or held, including beneficially, by each Holder or any Stockholder Associated Person, (cc) a description of any proxy, contract, arrangement, understanding or relationship pursuant to which each Holder or any Stockholder Associated Person has any right to vote or has granted a right to vote any class or series of shares of capital stock or other securities of the Corporation, (dd) any agreement, arrangement, understanding, relationship or otherwise, including any repurchase or similar so-called "stock borrowing" agreement or arrangement, involving any Holder or any Stockholder Associated Person, on the one hand, and any person acting in concert therewith, on the other hand, directly or indirectly, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of any class or series of shares of capital stock or other securities of the Corporation by, manage the risk of price changes for, or increase or decrease the voting power of, such Holder or any Stockholder Associated Person with respect to any class or series of shares of capital stock or other securities of the Corporation, or which provides, directly or indirectly, the opportunity to profit or share in any profit derived from any decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation (any of the foregoing, a "***Short Interest***"), and any Short Interest held by each Holder or any Stockholder Associated Person within the last 12 months in any class or series of shares of capital stock or other securities of the Corporation, (ee) any rights to dividends or payments in lieu of dividends on shares of capital stock of the Corporation owned beneficially by each Holder or any Stockholder Associated Person that are separated or separable from the underlying shares of capital stock or other securities of the Corporation, (ff) any proportionate interest in any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or other entity in which any Holder or any Stockholder Associated Person is a general partner or directly or indirectly beneficially owns an interest in a general partner of a general or limited partnership, or is the manager or managing member or directly or indirectly beneficially owns an interest in the manager or managing member of a limited liability company or other entity, (gg) any performance-related fees (other than an asset-based fee) that each Holder or any Stockholder Associated Person is or may be entitled to based on any increase or decrease in the price or value of any class or series of shares of capital stock or other securities of the Corporation or Derivative Instruments, if any, including, without limitation, any such interests held by immediate family members sharing the same household of such Holder or any

*[DRAFT]*

Stockholder Associated Person, (hh) any direct or indirect legal, economic or financial interest (including a Short Interest) of each Holder or any Stockholder Associated Person in the outcome of (I) any vote to be taken at any annual or special meeting of stockholders of the Corporation, or (II) any meeting of stockholders of any other entity with respect to any matter that is related, directly or indirectly, to any nomination or business proposed by any Holder under these Bylaws, (ii) any direct or indirect legal, economic or financial interest or any Derivative Instruments or Short Interests in any principal competitor of the Corporation held by each Holder or any Stockholder Associated Person, (jj) any direct or indirect interest of each Holder or any Stockholder Associated Person in any contract with the Corporation, any affiliate of the Corporation or any principal competitor of the Corporation (including, in any such case, any employment agreement, collective bargaining agreement or consulting agreement), and (kk) any material pending or threatened action, suit or proceeding (whether civil, criminal, investigative, administrative or otherwise) in which any Holder or any Stockholder Associated Person is, or is reasonably expected to be made, a party or material participant involving the Corporation or any of its officers, directors or employees, or any affiliate of the Corporation, or any officer, director or employee of such affiliate (all information contained in subclause (2) of this Section 2.4(iii)(c) shall be referred to as the "***Specified Information***"), (3) a representation by the Noticing Stockholder that such stockholder is a holder of record of shares of capital stock of the Corporation entitled to vote at such meeting, will continue to be a stockholder of record of the Corporation entitled to vote at such meeting through the date of such meeting and intends to appear in person or by proxy at the meeting to propose such nomination or other business, (4) any other information relating to each Holder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement and form of proxy or other filings required to be made in connection with solicitations of proxies for, as applicable, the election of directors in a contested election and/or the proposal pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder, (5) a representation by the Noticing Stockholder as to whether any Holder and/or any Stockholder Associated Person intends or is part of a group which intends: (aa) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to elect the proposed nominee or to approve or adopt the other business being proposed, and/or (bb) otherwise to solicit proxies from stockholders in support of such nomination or other business, (6) a certification by the Noticing Stockholder that each Holder and any Stockholder Associated Person has complied

with all applicable federal, state and other legal requirements in connection with its acquisition of shares of capital stock or other securities of the Corporation and/or such person's acts or omissions as a stockholder of the Corporation, (7) the statement required by Rule 14a-19(b)(3) of the Exchange Act (or any successor provision), (8) the names and addresses of other stockholders (including beneficial owners) known by any Holder, proposed nominee or Stockholder Associated Person to support such nominations and/or proposals, and, to the extent known, the class or series and number of shares of capital stock or other securities of the Corporation which are, directly or indirectly, held of record or owned beneficially by each such other stockholder or beneficial owner, and (9) a representation by the Noticing Stockholder as to the accuracy of the information set forth in the notice.

(iv)     The Corporation may also, as a condition to any such nomination or other business being deemed properly brought before a meeting of stockholders, require any Holder or any proposed nominee to deliver to the Secretary, within five Business Days (as defined below) of any such request, such other information as may reasonably be requested by the Corporation, including (a) such other information as may reasonably be required by the Board, in its sole discretion, to determine (1) the eligibility of any such proposed nominee to serve as a director of the Corporation, and (2) whether any such proposed nominee qualifies as an "independent director" or "audit committee financial expert," or otherwise meets heightened standards of independence, under applicable law, securities exchange rule or regulation or any publicly disclosed corporate governance guideline or committee charter of the Corporation, and (b) such other information that the Board determines, in its sole discretion, could be material to a reasonable stockholder's understanding of the diversity and independence, or lack thereof, of any such proposed nominee.

(v)     In addition to the other requirements of this Section 2.4, each person who a Noticing Stockholder proposes to nominate for election or re-election as a director of the Corporation must deliver in writing (in accordance with the time periods prescribed for delivery of notice under this Section 2.4) to the Secretary at the principal executive offices of the Corporation (a) a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request), and (b) a written representation and agreement (in the form provided by the Secretary upon written request of any stockholder of record identified by name within five Business Days of such written request) that such person (1) is not and will not become a party to (aa) any agreement, arrangement or understanding (whether written or oral) with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question (solely for purposes of this Section 2.4, a "**Voting Commitment**") that has not been disclosed to the Corporation, or (bb) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the Corporation, with such person's fiduciary duties under applicable law, (2) is not

*{DRAFT}*

and will not become a party to any agreement, arrangement or understanding (whether written or oral) with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed to the Corporation, (3) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the Corporation, and will comply with all applicable rules of the exchanges upon which the securities of the Corporation are listed and all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading policies and guidelines of the Corporation, and (4) in such person's individual capacity and on behalf of any Holder on whose behalf the nomination is being made, intends to serve a full term if elected as a director of the Corporation.

(vi)     *Special Meetings of Stockholders*. Nominations of persons for election to the Board may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting: (i) by or at the direction of the Board and (ii) provided that the Board has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who (1) is a stockholder of record on the date of the giving of the notice provided for in this Section 2.4, on the record date for the determination of stockholders entitled to notice of, and to vote at, such special meeting and at the time of such special meeting, (2) is entitled to vote at such special meeting, and (3) complies with the notice procedures set forth in this Section 2.4. In the event the Corporation calls a special meeting of stockholders for the purpose of electing one or more directors to the Board, any Noticing Stockholder entitled to vote in such election of directors may nominate a person or persons (as the case may be) for election to such position(s) as specified in the Corporation's notice of meeting, if the Noticing Stockholder's notice as required by Section 2.4(i) (including the completed and signed questionnaire, representation and agreement and any and all other information required by Section 2.4) shall be delivered to the Secretary at the principal executive offices of the Corporation in proper written form not earlier than the Close of Business on the 120th day prior to the special meeting and not later than the Close of Business on the later of the 90th day prior to the special meeting or the 10th day following the day on which Public Announcement of the date of the special meeting and of the nominees proposed by the Board to be elected at such meeting is first made by the Corporation. In no event shall the Public Announcement of an adjournment, recess, rescheduling or postponement of a special meeting commence a new time period (or extend any time period) for the giving of a Noticing Stockholder's notice as described above.

(vii)     *General*.

(a)     Only such persons who are nominated in accordance with the procedures set forth in subsections (i) and (ii) of this Section 2.4 (in the case of an annual or special meeting) shall be eligible for election to serve as directors and only such other business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this Section 2.4. Except as otherwise provided by law, the Certificate or these Bylaws, the Chair of the Board shall have the power and duty to determine whether a nomination or any other business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in these

*[DRAFT]*

Bylaws (including whether the Noticing Stockholder or other Holder, if any, on whose behalf the nomination is being made or other business is being proposed solicited (or is part of a group which solicited) or did not so solicit, as the case may be, proxies in support of such Noticing Stockholder's nominee or other business in compliance with such stockholder's representation as required by clauses (5) and (7) of Section 2.4(iii)(c)). If any proposed nomination or other business was not made or proposed in compliance with these Bylaws, the chair of the meeting of stockholders shall have the power and duty to declare to the meeting that any such nomination or other business was not properly brought before the meeting and in accordance with the provisions of these Bylaws, and that such nomination or other business not properly brought before the meeting shall be disregarded and/or shall not be transacted.

(b)     In addition, to be considered timely, a Noticing Stockholder's notice shall be further updated and supplemented, if necessary, so that the information provided or required to be provided in such notice shall be true and correct as of the record date for the meeting and as of the date that is 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof, and such update and supplement shall be delivered to the Secretary at the principal executive offices of the Corporation not later than five Business Days after the record date for the meeting in the case of the update and supplement required to be made as of the record date, and not later than eight Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof in the case of the update and supplement required to be made as of 10 Business Days prior to the meeting or any adjournment, recess, rescheduling or postponement thereof. In addition, if the Noticing Stockholder has delivered to the Corporation a notice relating to the nomination of directors, the Noticing Stockholder shall deliver to the Corporation not later than eight Business Days prior to the date of the meeting or any adjournment, recess, rescheduling or postponement thereof reasonable evidence that it has complied with the requirements of Rule 14a-19 of the Exchange Act (or any successor provision). For the avoidance of doubt, the obligation to update and supplement set forth in this paragraph or any other Section of these Bylaws shall not (x) limit the Corporation's rights with respect to any deficiencies in any notice provided by a stockholder, (y) extend any applicable deadlines hereunder or (z) enable or be deemed to permit a stockholder who has previously submitted notice hereunder to amend or update any proposal or to submit any new proposal, including by changing or adding nominees, matters, business and/or resolutions proposed to be brought before a meeting of stockholders.

(c)     Notwithstanding anything to the contrary in these Bylaws, if the Noticing Stockholder (or a qualified representative of the Noticing Stockholder) does not appear at the annual or special meeting of stockholders, as applicable, to present a nomination or other business, such nomination shall be disregarded and such other business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Section 2.4, to be considered a "qualified representative" of the Noticing Stockholder, a person must be authorized by a document authorizing another person or persons to act for such stockholder as proxy at the meeting of stockholders and such person must produce the document or a reliable reproduction of such document at the meeting of stockholders. A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or

12

like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder. If it is determined that such transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information upon which such inspectors or such persons relied.

    (d)    For purposes of these Bylaws,

        (1)    "***affiliate***" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

        (2)    "***associate***" shall have the meaning attributed to such term in Rule 12b-2 under the Exchange Act;

        (3)    "***Business Day***" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York, New York are authorized or obligated by law or executive order to close;

        (4)    "***Close of Business***" on a particular day means 5:00 p.m. local time at the principal executive offices of the Corporation, and, if an applicable deadline falls on the Close of Business on a day that is not a Business Day, then the applicable deadline shall be deemed to be the Close of Business on the immediately preceding Business Day;

        (5)    "***delivered***" means, solely for purposes of this Article II, both (x) hand delivery, overnight courier service or sent and received by certified or registered mail, return receipt requested, in each case, to the Secretary at the principal executive offices of the Corporation, and (y) electronic mail to the Secretary;

        (6)    "***immediate family member***" means a person's child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law and anyone (other than a tenant or employee) sharing the household of such person;

        (7)    "***Public Announcement***" means disclosure (x) in a press release released by the Corporation, provided such press release is released by the Corporation following its customary procedures, as reported by the Dow Jones News Service, Associated Press or a comparable national news service, or is generally available on internet news sites, or

13

*{DRAFT}*

(y) in a document publicly filed by the Corporation with the SEC pursuant to Sections 13, 14 or 15(d) of the Exchange Act; and

(8)    "***Stockholder Associated Person***" of any Holder means (x) any person acting in concert with such Holder, (y) any person controlling, controlled by or under common control with such Holder or any of the Holder's respective affiliates and associates (each, as defined in Rule 12b-2 under the Exchange Act), or any person acting in concert therewith, and (z) any immediate family member of such Holder or an affiliate or associate of such Holder.

(viii)    *Other Requirements and Rights.* In addition to the foregoing provisions of this Section 2.4, a stockholder must also comply with all applicable requirements of state law and of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this Section 2.4. Notwithstanding anything to the contrary contained in this Section 2.4, the sole holder of shares of Class B Common Stock (as defined in the Certificate) (such sole holder, the "***Class B Holder***") shall not be subject to the notice procedures set forth in this Section 2.4 with respect to nominations of persons for election to the Board as Class B Directors at any annual or special meeting of stockholders of the Corporation. Nothing in this Section 2.4 shall be deemed to affect any rights of:

(a)    a stockholder to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act; or

(b)    the Corporation to omit a proposal from the Corporation's proxy statement pursuant to Rule 14a-8 (or any successor provision) under the Exchange Act.

Section 2.5    Notice of Stockholders' Meetings. The Corporation shall give a notice in writing of the place, if any, date and hour of each meeting of stockholders and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at the meeting, if such date is different from the record date for determining stockholders entitled to notice of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Without limiting the manner by which notice otherwise may be given effectively to stockholders, if such notice is mailed, it shall be deemed to have been given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the record of the Corporation. Except as otherwise provided in the General Corporation Law of the State of the Delaware (the "***General Corporation Law***"), the Certificate or these Bylaws, the written notice of any meeting of stockholders shall be given not less than 10 nor more than 60 days before the date of the

14

*[DRAFT]*

meeting to each stockholder entitled to vote at such meeting as of the record date for determining the stockholders entitled to notice of the meeting.

Section 2.6    Quorum. The holders of one-third of the aggregate voting power of the capital stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders, except where a different quorum is required by the General Corporation Law, the Certificate or these Bylaws. Where a separate vote by a class or series or classes or series is required, one-third of the outstanding shares of such class or series or classes or series, present in person or represented by proxy, shall constitute a quorum (as to such class or series) entitled to take action with respect to that vote on that matter, except as otherwise provided by law, the Certificate or these Bylaws. Abstentions and non-votes by brokers are counted as present for purposes of determining a quorum.

If a quorum is not present or represented at any meeting of the stockholders, then either (i) the chair of the meeting, or (ii) the holders of a majority of the shares entitled to vote at the meeting, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At such adjourned meeting at which a quorum is present or represented, any business may be transacted that might have been transacted at the meeting as originally noticed.

Section 2.7    Adjourned Meeting; Notice. When a meeting is adjourned to another time and/or place, unless these Bylaws otherwise require, notice need not be given of the adjourned meeting if the time, place, if any, thereof and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting are (i) announced at the meeting at which the adjournment is taken, (ii) displayed, during the time scheduled for the meeting, on the same electronic network used to enable stockholders and proxy holders to participate in the meeting by means of remote communication or (iii) set forth in the notice of meeting given in accordance with these Bylaws. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days or a new record date for stockholders entitled to vote is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 2.8    Conduct of Business. The Board may, to the extent not prohibited by law or in contravention of the provisions of these Bylaws or the Certificate, adopt such rules and regulations for the conduct of meetings of stockholders as it shall deem appropriate. Except to the extent inconsistent with such rules and regulations as adopted by the Board, the chair of any meeting of stockholders shall have the exclusive right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of the chair, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board or prescribed by the chair of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) rules and procedures for maintaining order at the meeting and the safety of those present, including regulation of the manner of voting and the conduct of discussion; (iii) limitations on attendance

at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chair of the meeting shall determine; (iv) restrictions on entry to the meeting after the time fixed for the commencement thereof; (v) limitations on or the elimination of time allotted to questions or comments by participants; and (vi) restrictions on the use of cell phones, audio or video recording devices and other devices at the meeting. The chair of any meeting of stockholders shall be designated by the Board; in the absence of such designation, the Chair of the Board, if any, the Lead Independent Director (in the absence of the Chair of the Board), the Chief Executive Officer (in the absence of the Chair of the Board and the Lead Independent Director) or the President (in the absence of the Chair of the Board and the Lead Independent Director and the Chief Executive Officer), or in their absence any other director or officer of the Corporation selected by the Board, shall serve as chair of the stockholder meeting. The chair of the meeting shall have the power, right and authority to convene, recess or adjourn any meeting of stockholders.

Section 2.9    Voting.

(i)    *Voting Rights.* Except as may be otherwise provided by law, the Certificate, these Bylaws or any Certificate of Designation (as such term is defined in the Certificate), each stockholder of record of any series of Preferred Stock shall be entitled at each meeting of the stockholders to such number of votes, if any, for each share of such stock as may be fixed in the Certificate or in the resolution or resolutions adopted by the Board providing for the issuance of such stock, the Class B Holder shall be entitled to the voting rights set forth in the Certificate, and each stockholder of record of the Corporation's Common Stock (as defined in the Certificate) shall be entitled at each meeting of the stockholders to one vote for each such share of such stock registered in such stockholder's name on the books of the Corporation on the date fixed pursuant to Section 2.11 of these Bylaws as the record date for the determination of stockholders entitled to notice of and to vote at such meeting. Any share of capital stock of the Corporation held by the Corporation shall have no voting rights.

(ii)    *Vote Required.* Except as otherwise required by law, the Certificate or these Bylaws, in all matters other than the election of directors, the affirmative vote of a majority of the shares cast shall be the act of the stockholders. Except as with respect to the election of Class B Directors and except as otherwise required by law, the Certificate or these Bylaws, the vote required for election of a director by the stockholders at a meeting of stockholders shall be the affirmative vote of a plurality of the votes cast in respect of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors.

(iii)    *Abstentions and Broker Non-Votes.* In determining the number of votes cast for or against, as applicable, a proposal or nominee, shares abstaining from voting on a matter will not be treated as a vote cast. A non-vote by a broker will be counted for purposes of determining a quorum but not for purposes of determining the number of votes cast.

Section 2.10    No Stockholder Action by Written Consent Without a Meeting. Except as otherwise set forth in the Certificate, subject to the rights of any series of Preferred Stock then outstanding, no action shall be taken by the stockholders of the Corporation except at a duly

called annual or special meeting of stockholders and no action shall be taken by the stockholders of the Corporation by written consent in lieu of a meeting.

Section 2.11    Record Dates.

(i)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board and which record date shall not be more than 60 nor less than 10 days before the date of such meeting. If the Board so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting.

(ii)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

Section 2.12    Proxies. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for such stockholder by proxy but such proxy, whether revocable or irrevocable, must comply with the applicable requirements of Delaware law.

Section 2.13    List of Stockholders Entitled to Vote. The Corporation shall prepare no later than the 10th day before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting; *provided, however*, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the 10th day before the meeting date, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder. The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting for a period of 10 days ending on the day before the meeting date: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list was provided with the notice of

*{DRAFT}*

the meeting; or (ii) during ordinary business hours, at the principal place of business of the Corporation. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger and the list of stockholders or to vote in person or by proxy at any meeting of stockholders.

# ARTICLE III
# DIRECTORS

Section 3.1    Board Power. The business and affairs of the Corporation shall be managed by and under the direction of the Board, except as may be otherwise provided in the General Corporation Law or the Certificate. In addition to the powers and authority expressly conferred upon them by applicable law or by the Certificate or these Bylaws, the Board is hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, except as otherwise specifically required by law or as otherwise provided in the Certificate.

Section 3.2    Board Size. Subject to the provisions of the Certificate, the Board shall consist of no less than five members and no more than 15 members, each of whom shall be a natural person.[6] The number of directors shall be determined from time to time solely by resolution of the Board in accordance with the provisions of the Certificate. No reduction of the authorized number of directors shall have the effect of removing any director before that director's term of office expires.

Section 3.3    Election, Qualification and Term of Office of Directors. Except as provided in Section 3.4 of these Bylaws and subject to the provisions of the Certificate, each director shall hold office until the annual meeting at which such director's term expires and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal. Directors need not be stockholders unless so required by the Certificate or these Bylaws. The Certificate or these Bylaws may prescribe other qualifications for directors.

Section 3.4    Removal of Directors. Directors may be removed from the Board at any time as provided in the Certificate.

Section 3.5    Resignation and Vacancies.

(i)    Any director may resign at any time by delivering a resignation in writing or by electronic transmission, signed by such director, to the Chair of the Board or the Secretary; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the director. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date

---

[6] *Note to W&C/K&E: This should align with COI – COI just provides further limitations while Class Bs are outstanding.*

or an effective date determined upon the happening of an event or events. Acceptance of such resignation shall not be necessary to make it effective.

(ii)    Vacancies and newly created directorships on the Board shall be filled in the manner provided in the Certificate. A person so elected to fill a vacancy or newly created directorship shall hold office for a term expiring at the next election of the class for which such director shall have been chosen and until such director's successor shall have been duly elected and qualified, or until such director's earlier death, resignation, disqualification or removal.

Section 3.6    Place of Meetings; Meetings by Remote Communication. The Board may hold meetings, both regular and special, either within or without the State of Delaware. Members of the Board, or any committee designated by the Board, may participate in a meeting of the Board, or any committee, by means of remote communication, including without limitation, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and such participation in a meeting shall constitute presence in person at the meeting.

Section 3.7    Regular Meetings. Regular meetings of the Board may be held without notice at such time and at such place as shall from time to time be determined by the Board.

Section 3.8    Special Meetings; Notice. Special meetings of the Board for any purpose or purposes may be called at any time by the Chairperson of the Board, the Lead Independent Director, a Class B Director or a majority of the directors then in office, at such times and places as such person or persons shall designate. Notice of special meetings of the Board shall be given to each director by mailing it to such director's residence or usual place of business (accompanied by an electronic transmission of such notice) at least three business days before the date of the meeting or by telephone or electronic transmission at least three business days before the meeting. Notice need not be given to any director who submits a signed waiver of notice before or after the meeting or who attends the meeting without protesting the lack of notice to such person, either before the meeting or when it begins. Notice of any adjourned meeting need not be given, other than by announcement at the meeting at which the adjournment is taken.

Section 3.9    Quorum; Voting. At all meetings of the Board, (i) a majority of the total number of directors (other than the Class B Directors) then in office plus (ii) at least one of the Class B Directors shall constitute a quorum for the transaction of business, unless a greater number is required by applicable law. If a quorum is not present at any meeting of the Board, then the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present; provided, however, that clause (ii) of the immediately preceding sentence shall not be required to constitute a quorum if (A) a meeting has been adjourned for at least two days on two consecutive occasions due to the failure of clause (ii) of the immediately preceding sentence to be satisfied and (B) at the third consecutive re-convened meeting (held at least two days after the previously adjourned meeting), the absence of Class B Directors is the cause of a quorum not being satisfied. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of directors, if any action taken is approved by at least a majority of the required

*{DRAFT}*

quorum for that meeting. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board, except as may be otherwise specifically provided by statute, the Certificate or these Bylaws.

Section 3.10    Board Action by Written Consent Without a Meeting. Unless otherwise restricted by the Certificate or these Bylaws, any action required or permitted to be taken at any meeting of the Board, or of any committee thereof, may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the minutes of proceedings of the Board or committee.

Section 3.11    Fees and Compensation of Directors. Unless otherwise restricted by the Certificate or these Bylaws, the Board shall have the authority to fix the compensation of directors.

Section 3.12    The Chair of the Board. [The Chair of the Board shall have the powers and duties customarily and usually associated with the office of the Chair of the Board. The Chair of the Board shall preside at meetings of the stockholders and of the Board.][7]

Section 3.13    Lead Independent Director. A majority of the Independent Directors (as defined below) may, in their discretion and in accordance with any corporate governance policies adopted by the Corporation, elect a lead independent director from among their members that are Independent Directors (as defined below) (such director, the "***Lead Independent Director***"), which may be the Chair of the Board if the Chair is independent. The Lead Independent Director shall preside at all meetings at which the Chair of the Board is not present and shall exercise such other powers and duties as may from time to time be assigned to him or her by the Board or as prescribed by these Bylaws. For purposes of these Bylaws, "***Independent Director***" has the meaning ascribed to such term under the rules of the exchange upon which the Corporation's Class A Common Stock is primarily traded.

# ARTICLE IV
# COMMITTEES

Section 4.1    Committees of Directors. The Board, by resolution adopted by a majority of the entire Board, may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Subject to Section 4.5 of these Bylaws, the Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. Any such committee, to the extent provided in the resolution of the Board or in these Bylaws, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it; *provided, however,* that no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter (other than the election

---

[7] NTD: Role to be discussed.

*[DRAFT]*

or removal of directors) expressly required by the General Corporation Law to be submitted to stockholders for approval, or (ii) adopt, amend or repeal any bylaw of the Corporation.

Section 4.2    Committee Minutes. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

Section 4.3    Meetings and Action of Committees.

Meetings and actions of committees shall be governed by, and held and taken in accordance with, the provisions of:

(i)    Section 3.6 (place of meetings and meetings by telephone);

(ii)    Section 3.7 (regular meetings);

(iii)    Section 3.8 (special meetings; notice);

(iv)    Section 3.9 (quorum; voting); *provided, however*, that the provisions of Section 3.9 regarding the presence of a Class B Director to establish a quorum shall not be required for committees upon which no Class B Director serves;

(v)    Section 3.10 (action without a meeting); and

(vi)    Section 7.5 (waiver of notice) with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board and its members. *However*:

(a)    the time of regular meetings of committees may be determined by resolution of the committee or the chair of such committee; and

(b)    special meetings of committees may also be called by resolution of the committee or the chair of such committee.

The Board may adopt rules for the governance of any committee not inconsistent with the provisions of these Bylaws. Any committee, to the extent permitted by applicable law, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation and may authorize the seal of the Corporation to be affixed to all papers that may require it to the extent so authorized by the Board. Unless the Board provides otherwise, at all meetings of such committee, the majority of the then authorized members of the committee shall constitute a quorum for the transaction of business, and the vote of the majority of the members of the committee present at any meeting at which there is a quorum shall be the act of the committee. Unless the Board provides otherwise, each committee designated by the Board may make, alter, and repeal rules and procedures for the conduct of its business. In the absence of such rules and procedures each committee shall conduct its business in the same manner as the Board conducts its business.

*[DRAFT]*

Section 4.4    Subcommittees. Unless otherwise provided under applicable law, or in the Certificate, these Bylaws or the resolutions of the Board designating the committee, a committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee.

Section 4.5    Class B Directors. ~~To~~For so long as that certain Management Services Agreement by and between the Corporation and [Fahrenheit, LLC] dated as of [●] remains in full force and effect, to the extent permissible under applicable law and the listing rules of any exchange upon which the Corporation's securities are traded, any committee of the Board, including without limitation any committee that oversees: (i) material investments or divestitures, strategic transactions and other significant transactions not in the ordinary course of the Corporation's business, ~~or~~and (ii) the Corporation's governance and the evaluation of nominees for election to the Board (including, without limitation, any nominating committee that satisfies Nasdaq Listing Rule 5605(e)(2) or Section 303A.04 of the New York Stock Exchange Listed Company Manual), shall include at least one Class B Director; provided, however, for the avoidance of doubt, that any committee of the Board performing the functions of an audit committee (including, without limitation, any audit committee that satisfies Nasdaq Listing Rule 5605(c) or Section 303A.06 of the New York Stock Exchange Listed Company Manual) shall not be required to include a Class B Director in accordance with applicable law and listing rules.

## ARTICLE V
## OFFICERS

Section 5.1    Officers. The officers of the Corporation shall be a Chief Executive Officer, a Chief Financial Officer, a Secretary and such other officers and assistant officers as may be deemed necessary or desirable by the Board. Any number of offices may be held by the same person. In its discretion, the Board may choose not to fill any office for any period as it may deem advisable; *provided, however*, that there shall always be (i) a Chief Executive Officer and (ii) a Secretary.

Section 5.2    Appointment of Officers. The Board shall appoint the officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 5.3 of these Bylaws, subject to the rights, if any, of an officer under any contract of employment. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in this Article V for the regular election to such office.

Section 5.3    Subordinate Officers. The Board may appoint, or empower the Chief Executive Officer to appoint, such other officers and agents as the business of the Corporation may require. Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these Bylaws or as the Board may from time to time determine.

Section 5.4    Removal and Resignation of Officers. Any officer may be removed, either with or without cause, by an affirmative vote of the majority of the Board at any regular or

22

special meeting of the Board or, except in the case of an officer chosen by the Board, by any officer upon whom such power of removal may be conferred by the Board. Any officer may resign at any time by giving written or electronic notice to the Corporation; *provided, however*, that if such notice is given by electronic transmission, such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the officer. Any resignation shall take effect at the date of the receipt of that notice or at any later time specified in that notice. Unless otherwise specified in the notice of resignation, the acceptance of the resignation shall not be necessary to make it effective. Any resignation is without prejudice to the rights, if any, of the Corporation under any contract to which the officer is a party.

Section 5.5    Vacancies in Offices. Any vacancy occurring in any office of the Corporation shall be filled by the Board as provided in Section 5.2 and 5.3.

Section 5.6    Representation of Shares of Other Corporations. The Chair of the Board, the Lead Independent Director, the Chief Executive Officer, the Chief Financial Officer the Secretary, or any other person authorized by the Board, the Chair of the Board, the Lead Independent Director or the Chief Executive Officer is authorized to vote, represent, and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation. The authority granted herein may be exercised either by such person directly or by any other person authorized to do so by proxy or power of attorney duly executed by such person having the authority.

Section 5.7    Authority and Duties of Officers. All officers of the Corporation shall respectively have such authority and perform such duties in the management of the business of the Corporation as may be designated from time to time by the Board and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board.

Section 5.8    The Chief Executive Officer. The Chief Executive Officer shall have, subject to the supervision, direction and control of the Board, ultimate authority for decisions relating to the supervision, direction and management of the affairs and the business of the Corporation customarily and usually associated with the position of Chief Executive Officer, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Corporation. If at any time the office of the Chair and Lead Independent Director of the Board shall not be filled, or in the event of the temporary absence or disability of the Chair of the Board and the Lead Independent Director, the Chief Executive Officer shall perform the duties and exercise the powers of the Chair of the Board unless otherwise determined by the Board.

Section 5.9    The Secretary.

(i)    The Secretary shall attend meetings of the Board and meetings of the stockholders and record all votes and minutes of all such proceedings in a book or books kept for such purpose. The Secretary shall have all such further powers and duties set forth in these Bylaws and as are customarily and usually associated with the position of Secretary or as may

23

from time to time be assigned to him or her by the Board, the Chair of the Board, or the Chief Executive Officer.

Section 5.10    The Chief Financial Officer.

(i)    The Chief Financial Officer shall be responsible for maintaining the Corporation's accounting records and statements, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation. The Chief Financial Officer shall also maintain adequate records of all assets, liabilities and transactions of the Corporation and shall assure that adequate audits thereof are currently and regularly made. The Chief Financial Officer shall have all such further powers and perform all such further duties as are customarily and usually associated with the position of Chief Financial Officer, or as may from time to time be assigned to him or her by the Board, the Chair of the Board or the Chief Executive Officer. Unless a treasurer has been appointed separately in accordance with these Bylaws, the Chief Financial Officer shall also perform the duties customarily and usually associated with the position of treasurer.

## ARTICLE VI
## CAPITAL STOCK

Section 6.1    Stock Certificates; Uncertificated Shares. The shares of the Corporation may be represented by certificated or uncertificated shares and may be evidenced by a book-entry system maintained by the registrar of such shares, as determined by the Corporation in accordance with applicable law. Except as otherwise expressly provided by law, the rights and obligations of the holders of uncertificated stock and the rights and obligations of the holders of certificates representing stock of the same class and series shall be identical.

(i)    Shares with Certificates. Each certificate of stock issued by the Corporation shall be signed (either manually or in facsimile) by any two authorized officers of the Corporation representing the number of shares registered in certificate form. If any person who signed a certificate no longer holds office when the certificate is issued, the certificate will be nonetheless valid. The Corporation shall not have power to issue a certificate in bearer form. If the Board chooses to issue shares of stock evidenced by a certificate or certificates, each individual certificate shall include the following on its face: (i) the Corporation's name, (ii) the fact that the Corporation is organized under the laws of Delaware, (iii) the name of the person to whom the certificate is issued, (iv) the number of shares represented thereby, (v) the class of shares and the designation of the series, if any, which the certificate represents, and (vi) such other information as required under the Certificate or applicable law or as may be lawful. If the Corporation is authorized to issue different classes of shares or different series within a class, the designations, relative rights, preferences and limitations determined for each series (and the authority of the Board to determine variations for future series) shall be summarized on the front or back of each certificate. Alternatively, each certificate shall state on its front or back that the Corporation will furnish the stockholder this information in writing, without charge, upon request.

(ii)    <u>Shares without Certificates</u>. If the Board chooses to issue shares of stock without certificates, the Corporation, if required by the Exchange Act, shall, within a reasonable time after the issue or transfer of shares without certificates, send the stockholder a written notice containing the information required to be set forth or stated on certificates pursuant to the General Corporation Law. The Corporation may adopt a system of issuance, recordation and transfer of its shares of stock by electronic or other means not involving the issuance of certificates, provided the use of such system by the Corporation is permitted in accordance with applicable law.

<u>Section 6.2</u>    <u>Lost, Stolen or Destroyed Certificates</u>. Except as provided in this Section 6.2, no new certificates for shares shall be issued to replace a previously issued certificate unless the latter is surrendered to the Corporation and cancelled at the same time. The Corporation may issue a new certificate of stock or uncertificated shares in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate or uncertificated shares.

<u>Section 6.3</u>    <u>Dividends</u>. The Board, subject to any restrictions contained in the Certificate or applicable law, may declare and pay dividends upon the shares of the Corporation's capital stock. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock, subject to the provisions of the Certificate.

<u>Section 6.4</u>    <u>Transfer of Stock</u>. Transfers of record of shares of stock of the Corporation shall be made only upon its books by the holders thereof, in person or by an attorney duly authorized, and, if such stock is certificated, upon the surrender of a certificate or certificates for a like number of shares, properly endorsed or accompanied by proper evidence of succession, assignation or authority to transfer; provided, however, that such succession, assignment or authority to transfer is not prohibited by the Certificate, these Bylaws, applicable law or contract.

<u>Section 6.5</u>    <u>Stock Transfer Agreements</u>. The Corporation shall have power to enter into and perform any agreement with any number of stockholders of any one or more classes of stock of the Corporation to restrict the transfer of shares of stock of the Corporation of any one or more classes owned by such stockholders in any manner not prohibited by the General Corporation Law.

<u>Section 6.6</u>    <u>Registered Stockholders</u>. The Corporation:

(i)    shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends and to vote as such owner;

(ii)    shall be entitled to hold liable for calls and assessments the person registered on its books as the owner of shares; and

(iii)    shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of another person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

## ARTICLE VII
## MANNER OF GIVING NOTICE AND WAIVER

Section 7.1    Notice of Stockholders' Meetings. Notice of any meeting of stockholders, if mailed, is given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the Corporation's records. An affidavit of the Secretary or an Assistant Secretary of the Corporation or of the transfer agent or other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

Section 7.2    Notice by Electronic Transmission. Without limiting the manner by which notice otherwise may be given effectively to stockholders pursuant to the General Corporation Law, the Certificate or these Bylaws, any notice to stockholders given by the Corporation under any provision of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if:

(i)    the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent; and

(ii)    such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice.

However, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

Any notice given pursuant to the preceding paragraph shall be deemed given:

(I)    if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice;

(II)    if by electronic mail, when directed to the stockholder's electronic mail address unless the stockholder has notified the Corporation in writing or by electronic transmission of

26

*{DRAFT}*

an objection to receiving notice by electronic mail or such notice is prohibited by Section 232(e) the General Corporation Law;

(III)    if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice; and

(IV)    if by any other form of electronic transmission, when directed to the stockholder.

An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

An "***electronic transmission***" means any form of communication, not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

Section 7.3    Notice to Stockholders Sharing an Address. Except as otherwise prohibited under the General Corporation Law, without limiting the manner by which notice otherwise may be given effectively to stockholders, any notice to stockholders given by the Corporation under the provisions of the General Corporation Law, the Certificate or these Bylaws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any stockholder who fails to object in writing to the Corporation, within 60 days of having been given written notice by the Corporation of its intention to send the single notice, shall be deemed to have consented to receiving such single written notice.

Section 7.4    Notice to Person with Whom Communication Is Unlawful. Whenever notice is required to be given under the General Corporation Law, the Certificate or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. In the event that the action taken by the Corporation is such as to require the filing of a certificate under the General Corporation Law, the certificate shall state, if such is the fact and if notice is required, that notice

*{DRAFT}*

was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Section 7.5    Waiver of Notice. Whenever notice is required to be given to stockholders, directors or other persons under any provision of the General Corporation Law, the Certificate or these Bylaws, a written waiver, signed by the person entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time of the event for which notice is to be given, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders or the Board, as the case may be, need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by the Certificate or these Bylaws.

## ARTICLE VIII
## INDEMNIFICATION[8]

Section 8.1    Indemnification of Directors and Officers in Third Party Proceedings. Subject to the other provisions of this Article VIII, the Corporation shall indemnify and hold harmless, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit, arbitration, alternative dispute resolution mechanism, investigation, inquiry, judicial, administrative or legislative hearing, or any other threatened, pending or completed proceeding, whether civil, criminal, administrative, legislative, investigative or other nature and including any and all appeals (collectively, each a "*Proceeding*") (other than an action by or in the right of the Corporation to procure a judgement in its favor) by reason of the fact that such person is or was a director or officer of the Corporation, or while a director of the Corporation or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful.

---

[8] Note to BR: Make sure consistent with COI.

28

*{DRAFT}*

Section 8.2    Indemnification of Directors and Officers in Actions by or in the Right of the Corporation. Subject to the other provisions of this Article VIII, the Corporation shall indemnify, to the fullest extent permitted by the General Corporation Law, as now or hereinafter in effect, any person who was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Corporation to procure a judgement in its favor by reason of the fact that such person is or was a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against all liability and loss suffered and expenses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes, damages, claims, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such Proceeding, if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation; except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

Section 8.3    Successful Defense. To the extent that a present or former director or officer of the Corporation has been successful on the merits or otherwise in defense of any Proceeding described in Section 8.1 or Section 8.2, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith to the extent not already advanced pursuant to Section 8.5.

Section 8.4    Indemnification of Others. Subject to the other provisions of this Article VIII, the Corporation shall have power to indemnify its employees and its agents to the extent not prohibited by the General Corporation Law or other applicable law. The Board shall have the power to delegate the determination of whether employees or agents shall be indemnified to such person or persons as the board of determines.

Section 8.5    Advanced Payment of Expenses. To the fullest extent permitted by applicable law, expenses (including attorneys' fees) incurred by an officer or director of the Corporation in defending any Proceeding shall be paid by the Corporation, and expenses (including attorneys' fees) incurred by the Corporation's employees and agents in defending any Proceeding shall be paid by the Corporation, in advance of the final disposition of such Proceeding upon receipt of a written request therefor and an undertaking, by or on behalf of the person, to repay such amounts so advanced if it shall ultimately be determined by final judicial decision of a court of competent jurisdiction from which there is no further right to appeal that such person is not entitled to be indemnified under this Article VIII or the General Corporation Law.

Section 8.6    Non-Exclusivity of Rights. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of

29

*{DRAFT}*

any other rights to which those seeking indemnification or advancement of expenses may be entitled under the Certificate (including the indemnification provisions set forth in Article VII, Section 2 of the Certificate) or any statute, bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. The Corporation is specifically authorized to enter into individual contracts with any or all of its directors, officers, employees or agents respecting indemnification and advancement of expenses, to the fullest extent not prohibited by the General Corporation Law or other applicable law.

Section 8.7    Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of the General Corporation Law.

Section 8.8    Survival. Notwithstanding anything to the contrary, the rights to indemnification and advancement of expenses conferred by this Article VIII shall be contract rights and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

Section 8.9    Effect of Repeal or Modification. Any amendment, alteration or repeal of this Article VIII shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to such amendment, alteration or repeal.

Section 8.10    Certain Definitions. For purposes of this Article VIII, references to the "***Corporation***" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued. For purposes of this Article VIII, references to "***other enterprises***" shall include employee benefit plans; references to "***fines***" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "***serving at the request of the Corporation***" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "***not opposed to the best interests of the Corporation***" as referred to in this Article VIII.

*{DRAFT}*

## ARTICLE IX
## GENERAL MATTERS

Section 9.1    Execution of Corporate Contracts and Instruments. Except as otherwise provided by law, the Certificate or these Bylaws, the Board may authorize any officer or officers, or agent or agents, to enter into any contract or execute any document or instrument in the name of and on behalf of the Corporation; such authority may be general or confined to specific instances. Unless so authorized or ratified by the Board or within the agency power of an officer, no officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 9.2    Fiscal Year. The fiscal year of the Corporation shall be fixed by resolution of the Board and may be changed by the Board.

Section 9.3    Seal. The Corporation may adopt a corporate seal, which shall be adopted and which may be altered by the Board. The Corporation may use the corporate seal by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Section 9.4    Construction; Definitions. Unless the context requires otherwise, the general provisions, rules of construction, and definitions in the Certificate and the General Corporation Law shall govern the construction of these Bylaws. Without limiting the generality of this provision, the singular number includes the plural, the plural number includes the singular, and the term "person" includes both an entity and a natural person.

## ARTICLE X
## AMENDMENTS

The Board and stockholders may adopt, amend and repeal the Bylaws in the manner provided in the Certificate.