Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) ) ) ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | | Case No. 22-10964 (MG) |
| Debtors. | | (Jointly Administered) |

## NOTICE OF ENTRY INTO PLAN SUPPORT AGREEMENT

**PLEASE TAKE NOTICE** that on September 21, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), the official committee of unsecured creditors, the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders, and the Consenting Dixon Parties executed a Plan Support Agreement, attached hereto as **Exhibit A**.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not defined in this Notice shall have the meanings given to them in the Plan Support Agreement.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Support Agreement and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: September 21, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## <u>Exhibit A</u>

**Plan Support Agreement**

*EXECUTION VERSION*

THIS PLAN SUPPORT AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.

### PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with <u>Section 15.02</u>, this "**Agreement**") is made and entered into as of September 20, 2023 (the "**Execution Date**"), by and among the following parties (each, a "**Party**" and collectively the "**Parties**"):

(i) Celsius Network LLC, a company incorporated under the Laws of Delaware ("**Celsius**"), and each of its affiliated debtors and debtors in possession in these Chapter 11 Cases (collectively, the "**Debtors**");

(ii) the official committee of unsecured creditors of the Debtors, appointed by the United States Trustee for Region 2 (the "**U.S. Trustee**") in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (as defined herein) on July 27, 2022 [Docket No. 241], as may be reconstituted from time to time (the "**Committee**");

(iii) the undersigned Holders of Earn Claims against the Debtors who are members of that certain ad hoc group of Holders of Earn Claims as set forth in the *Verified Statement Pursuant to Bankruptcy Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2553] (the "**Earn Ad Hoc Group**") and that have executed and delivered counterpart signature pages to this Agreement or subsequently deliver a Joinder to counsel to all Parties (each, a "**Consenting Earn Account Holders**," and collectively, the "**Consenting Earn Account Holders**");

(iv) the undersigned individual Holders of Earn Claims against the Debtors (each, a "**Consenting Individual Earn Account Holder**," and collectively, the "**Consenting Individual Earn Account Holders**"); and

(vi) the undersigned claimants, Simon Dixon, an individual, and BNK To The Future, a company incorporated in the Cayman Islands ("**BNK To The Future**" and, together with Simon Dixon, each, a "**Consenting Dixon Party**," and collectively, the "**Consenting Dixon Parties**").

### *RECITALS*

**WHEREAS,** on July 13, 2022 and December 7, 2022, as applicable, each of the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, the Parties agree to consensually resolve the following adversary proceedings brought by certain Consenting Earn Account Holders and Consenting Individual Earn Account Holders as set forth herein: (a) *Daniel Frishberg v. Celsius Network LLC, et al.*, Case No. 22-0091179 (MG) (Bankr. S.D.N.Y. Dec. 9, 2022); (b) *Ignat Tuganov v. Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. March 20, 2023); and (c) *Immanuel Hermann v. Celsius Network LLC, et al.*, Case No. 23-01025 (MG) (Bankr. S.D.N.Y. March 21, 2023) (collectively, the "**Earn Adversary Proceedings**");

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding certain restructuring transactions (the "**Restructuring Transactions**") to be implemented through the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (including all schedules and exhibits thereto, and as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms or to implement the Restructuring Transactions contemplated by this Agreement, the "**Plan**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Plan and the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, each Party, intending to be legally bound hereby, agrees as follows:

### *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**Affiliate**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of any doubt, includes all the exhibits, annexes, and schedules hereto in accordance with <u>Section 15.02</u>.

"**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to an Alternative Transaction.

"**Alternative Transaction**" means a sale (including, for the avoidance of any doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code), disposition, new-money investment, restructuring, reorganization, merger, amalgamation, joint venture, partnership, acquisition, consolidation, dissolution, winding up, debt investment, equity investment, liquidation, tender offer, rights offering, recapitalization, plan of reorganization or liquidation, share exchange, business combination, or similar transaction, in each case involving any one or more Debtors or the debt, equity, or other interests in any one or more Debtors that is inconsistent with this Agreement and the Restructuring Transactions.

"**Auction**" means the auction commenced on April, 25, 2023 for substantially all of the Debtors' assets as described in the *Notice of Auction* [Docket No. 2519].

"**Backup Plan Sponsor**" has the meaning set forth in the Current Proposed Plan.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"**Committee**" has the meaning set forth in the preamble to this Agreement.

"**Confirmation Hearing**" has the meaning set forth in the Current Proposed Plan.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Consenting Dixon Parties**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Earn Account Holders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Individual Earn Account Holders**" has the meaning set forth in the preamble to this Agreement.

"**Current Proposed Plan**" means the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means the documents listed in <u>Section 3.01</u>.

"**Earn Adversary Proceedings**" has the meaning set forth in the recitals to this Agreement.

"**Earn Claims**" has the meaning set forth in the Current Proposed Plan.

"**Earn Plaintiff**" means Daniel Frishberg, Immanuel Hermann, or Ignat Tuganov, individually, in their respective Earn Adversary Proceedings.

"**Plan Effective Date**" means the date on which (a) all conditions precedent to the occurrence of the consummation of the Plan have been satisfied or waived in accordance with the Plan (including receipt of all Regulatory Approvals and the expiration or early termination of any applicable waiting periods related thereto) and (b) the Plan is declared effective by the Debtors.

"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**General Earn Claims**" has the meaning set forth in the Current Proposed Plan.

"**Governmental Authority**" means (i) any U.S. federal, state, county, civil, or local legislative, administrative, self-regulatory or regulatory authority, agency court, tribunal, or judicial or arbitral body or other governmental or quasi-governmental entity with competent jurisdiction or (ii) any supranational or non-U.S. authority of similar jurisdiction.

"**Interest**" has the meaning set forth in the Current Proposed Plan.

"**Joinder**" means a joinder to this Agreement, substantially in the form attached hereto as **Exhibit A**, providing, among other things, that such newly joining Person or Entity signatory thereto is bound by the terms of this Agreement.  For the avoidance of any doubt, any party that executes a Joinder shall be a "Party" under this Agreement as provided therein and herein.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" has the meaning set forth in <u>Section 4</u> of this Agreement.

"**NewCo Transaction**" has the meaning set forth in the Current Proposed Plan.

"**Non-Discretionary Dixon Parties**" means (i) BNK To The Future Celsius US SP, a Segregated Portfolio of BNK To The Future Capital SPC, (ii) BNK To The Future Celsius SP, a Segregated Portfolio of BNK To The Future Capital SPC, and (iii) BF Portfolio Builder SPC.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"**Plan**" has the meaning set forth in the recitals to this Agreement.

"**Plan Effective Date**" means the date on which (a) all conditions precedent to the occurrence of the consummation of the Plan have been satisfied or waived in accordance with the Plan (including receipt of all Regulatory Approvals and the expiration or early termination of any applicable waiting periods related thereto) and (b) the Plan is declared effective by the Debtors.

"**Plan Sponsor**" has the meaning set forth in the Current Proposed Plan.

"**Plan Supplement**" has the meaning set forth in the Current Proposed Plan.

"**Regulatory Approvals**" means any consents, approvals, or permissions of Governmental Authorities, including, for the avoidance of any doubt, the U.S. Securities and Exchange Commission, that are necessary to implement and consummate the Restructuring Transactions, which shall be set forth in greater detail on a schedule to be delivered by the Plan Sponsor to the Debtors and the Committee.

"**Rejection Event**" means the date (if any) on which the Debtors' Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.

"**Required Consenting Earn Account Holders**" means Consenting Earn Account Holders who hold, in aggregate, at least 50.01 percent of all the General Earn Claims held by the Consenting Earn Account Holders.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Standstill**" means the earlier of (a) the occurrence of a Rejection Event, (b) the Plan Effective Date, (c) the Termination Date, and (d) 180 days after the Confirmation Hearing on the Plan, regardless of whether such Plan is confirmed.

"**Substantial Contribution Motion**" has the meaning set forth in Section 13 of this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, 12.05, 12.06, or 12.07.

"**Termination Event**" means any event described in Sections 12.01, 12.02, 12.03, 12.04, 12.05, 12.06, or 12.07.

1.02.    <u>Interpretation</u>.  For purposes of this Agreement:

(a)    capitalized terms used but not defined herein shall have the meanings ascribed to them in the Current Proposed Plan;

(b)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(c)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)    whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation;"

(j)    the words "to the extent" shall mean "the degree by which" and not "if;"

(k)    all time periods before which, within which, or following which any act is to be done or step taken pursuant to this Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a);

(l)    the word "will" will be construed to have the same meaning and effect as the word "shall."  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive;

(m)    all references to "$" and "dollars" will be deemed to refer to United States currency unless otherwise specifically provided;

(n)      all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided;

(o)      any reference to any agreement or contract will be a reference to such agreement or contract, as amended, modified, supplemented or waived, in accordance herewith, if applicable; and

(p)      where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

**Section 2.**      *Effectiveness of this Agreement*.   This Agreement shall become effective and binding upon each of the Parties at 12:01 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Debtors shall have executed this Agreement and delivered counterpart signature pages of this Agreement to each of the other Parties;

(b)      counsel to the Committee shall have executed this Agreement and delivered counterpart signature pages of this Agreement to each of the other Parties;

(c)      the counsel to the Earn Ad Hoc Group shall have executed this Agreement on behalf of Consenting Earn Account Holders comprising at least 75 percent of the General Earn Claims held by the Earn Ad Hoc Group and shall have delivered counterpart signature pages of this Agreement to each of the other Parties; *provided*, however, that signature pages on account of such executing Consenting Earn Account Holders shall be delivered to each Party to this agreement by no later than 2 calendar days following the Agreement Effective Date and upon delivery shall constitute the effective signature pages to this Agreement;

(d)      each of the Consenting Individual Earn Account Holders shall have executed this Agreement and delivered counterpart signatures to each of the other Parties; and

(e)      each of the Consenting Dixon Parties shall have executed this Agreement and delivered counterpart signatures to each of the other Parties.

**Section 3.**      *Definitive Documents*.

3.01.   The Definitive Documents are (A) the Plan (and any and all exhibits, annexes, and schedules thereto), (B) the Confirmation Order, and (C) any amendments, modifications or supplements to such documents, including, without limitation the Plan Supplement.

3.02.   The Definitive Documents not filed with the Court remain subject to negotiation and completion.   Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall (a) contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with <u>Section 14</u> and (b) be provided to the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders, and the Consenting Dixon Parties in advance of their filing with the

Bankruptcy Court and otherwise be in form and substance reasonably acceptable to the Debtors, the Committee, the Required Consenting Earn Account Holders (solely as it relates to the treatment of General Earn Claims or the treatment of other rights or benefits granted to the Consenting Earn Account Holders in the Plan), the Consenting Individual Earn Account Holders (solely as it relates to the treatment of the General Earn Claims or the treatment of other rights or benefits granted to the Consenting Individual Earn Account Holders under this Agreement or the Plan), and the Consenting Dixon Parties (solely as it relates to the treatment of the Claims of the Consenting Dixon Parties or the treatment of other rights or benefits granted to the Consenting Dixon Parties under this Agreement).

**Section 4.**     *Milestones*.  The following milestones shall apply to this Agreement (collectively, the "**Milestones**"), which in each case may be waived or extended in writing by the Debtors, the Committee, the Required Consenting Earn Account Holders, each Consenting Individual Earn Account Holder, and the Consenting Dixon Parties (electronic mail is sufficient):

(a)     by no later than October 31, 2023, the Bankruptcy Court shall have entered the Confirmation Order; and

(b)     by no later than December 31, 2023, the Plan Effective Date shall have occurred.

**Section 5.**     *Commitments of the Debtors*.

5.01.   Affirmative Commitments.  Subject in all cases to Section 10, during the Agreement Effective Period, the Debtors agree to:

(a)     support and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including, but not limited to, timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; (vi) modifying or terminating any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization; or (vii) for relief that (A) is materially inconsistent with this Agreement in any

respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(d)     use commercially reasonable efforts to obtain any and all required Regulatory Approvals and/or third-party approvals for the Restructuring Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by, and consistent with, this Agreement;

(f)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     to the extent the Debtors determine to execute the Plan wind-down, consult with each of the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders, and the Consenting Dixon Parties prior to the execution of the Plan wind-down "toggle;" and

(h)     to the extent any entity is the Holder of an Allowed Claim on the Distribution Record Date entitled to receive Liquid Cryptocurrency under the Plan, any such Claims shall be aggregated for purposes of requesting an individualized accommodation of the composition of the Liquid Cryptocurrency recovery on account of such Claims under Article VI.B. of the Plan.

5.02.   <u>Negative Commitments</u>.  Subject in all cases to <u>Section 10</u>, during the Agreement Effective Period, each of the Debtors shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)     (i) fail to draft the Plan in a manner consistent with this Agreement and the Milestones contained herein in all material respects or (ii) modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(d)     withdraw or revoke the Plan, as applicable, or publicly announce its intention not to pursue the Restructuring Transactions; or

(e)     file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not substantially in conformance with this Agreement (including in violation of the consent rights of any Party as to the form and substance of such motion, pleading, or Definitive Document) or the Plan.

**Section 6.**     *Commitments of the Committee*.

6.01.   <u>Affirmative Commitments</u>.  Subject in all cases to <u>Section 11</u>, during the Agreement Effective Period, the Committee agrees to:

(a)     support the Restructuring Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate, or otherwise give effect to the Restructuring Transactions in accordance with this Agreement, including supporting the Plan;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all commercially reasonable steps reasonably requested by the Debtors to address any such impediment;

(c)     use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, including timely filing a formal objection to any motion filed with the Bankruptcy Court by any Person or Entity seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), other than with respect to the examiner appointed pursuant to the *Order Approving the Appointment of Chapter 11 Examiner* [Docket No. 923] or any other order of the Bankruptcy Court with respect to the examiner appointed thereby; (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) seeking relief from the automatic stay with respect to any material asset or assets of the Debtors; (iv) dismissing any of the Chapter 11 Cases; (v) providing for the Bankruptcy Court to abstain from hearing any of the Chapter 11 Cases; or (vi) for relief that (A) is materially inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions;

(d)     use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from the Debtors' other stakeholders; and

(e)     to the extent the Committee determines to execute the Plan wind-down, consult with the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders and the Consenting Dixon Parties prior to the execution of the Plan wind-down "toggle."

6.02.   <u>Negative Commitments</u>.  Subject in all cases to <u>Section 11</u>, during the Agreement Effective Period, the Committee shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Restructuring Transactions described in this Agreement or the Plan; or

(c)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not substantially in conformance with this Agreement or the Plan.

**Section 7.**      *Commitments of the Consenting Earn Account Holders and the Consenting Dixon Parties*.

7.01.   <u>Affirmative Commitments</u>.  During the Agreement Effective Period, the Consenting Earn Account Holders and the Consenting Dixon Parties each agree (severally and not jointly) to:

(a)      support the Restructuring Transactions by taking all steps reasonably necessary to facilitate, implement, consummate or otherwise give effect to the Restructuring Transactions in accordance with this Agreement, including (1) voting and exercising any powers or rights available to them in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, (2) timely voting, if applicable, any and all Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of in favor of the Plan and not opting out of the release provisions in the Plan, and (3) publicly supporting the Plan, encouraging others to vote to accept the Plan, and supporting NewCo;

(b)      with respect to any Consenting Earn Account Holder who is an Earn Plaintiff, agree to withdraw, subject to the Standstill, any complaint filed in the Earn Adversary Proceedings (which shall be withdrawn with prejudice on the Plan Effective Date);

(c)      use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Restructuring Transactions from other Holders of General Earn Claims so long as: (i) Simon Dixon, Joseph Lehrfeld, and Brett Perry are appointed as observers to the NewCo board of directors, subject to the terms of the Board Observer Agreement attached hereto as **<u>Exhibit B</u>**; and (ii) Cameron Crews is appointed to the Litigation Oversight Committee; and

(d)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement.

7.02.   <u>Negative Commitments</u>.  During the Agreement Effective Period, each Consenting Earn Account Holder and each Consenting Dixon Party shall not, directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, confirmation or consummation of the Restructuring Transactions described in this Agreement or the Plan;

(c)      file or direct counsel to the Earn Ad Hoc Group or counsel to the Consenting Dixon Parties to file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(d)    commence, support, join, or direct counsel to the Earn Ad Hoc Group or counsel to the Consenting Dixon Parties to commence, support, or join any litigation or adversary proceeding against the Debtors, the Committee, or the Plan Sponsor;

(e)    transfer any Claim without the transferee of such Claim first executing a Joinder to this Agreement;

(f)    object, directly or indirectly, or support in any way the objection of any Party to confirmation of the Plan; or

(g)    until the earlier of (i) the Plan Effective Date and (ii) termination of this Agreement in accordance with Section 12 hereof, make or encourage or induce others to make any disparaging or untruthful public statement regarding the Plan or the Restructuring Transactions; *provided* that the foregoing shall not prevent any Consenting Earn Account Holder or any Consenting Dixon Party from (i) making any truthful statement to the extent required by Law or a Governmental Authority to disclose or make accessible such information or (ii) exercising or enforcing any of its rights under this Agreement.

7.03.    Additional Commitments with Respect to Chapter 11 Cases.  During the Agreement Effective Period, each Consenting Earn Account Holder and each Consenting Dixon Party agrees that it shall:

(a)    vote each of their Claims and/or Interests to accept the Plan by delivering their duly executed and completed ballot accepting the Plan on a timely basis;

(b)    to the extent they are permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering their duly executed and completed ballot(s) indicating such election;

(c)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in Section 7.03(a) or Section 7.03(b); and

(d)    support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Debtor or Debtor Affiliate in the Bankruptcy Court that is consistent with this Agreement.

7.04.    Non-Discretionary Dixon Parties. For the avoidance of doubt, the aforementioned commitments of this Section 8 shall not apply to the Non-Discretionary Dixon Parties; *provided*, however, that the Non-Discretionary Dixon Parties shall not object, directly or indirectly, or support in any way the objection of any Party to confirmation of the Plan.

**Section 8.**    *Commitments of the Consenting Individual Earn Account Holders.*

8.01.    Affirmative Commitments.  During the Agreement Effective Period, the Consenting Individual Earn Account Holders each agree (severally and not jointly) to:

(a)    support the Restructuring Transactions and take commercially reasonable steps necessary to cooperate with the Debtors in obtaining support for the Restructuring Transactions

from other Holders of General Earn Claims including (1) timely voting, if applicable, any and all Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of in favor of the Plan, (2) supporting and not opting out of the release provisions in the Plan, (3) publicly supporting the Plan, encourage others to vote to accept the Plan, and support NewCo;

      (b)    use commercially reasonable efforts to oppose and object to the efforts of any Person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions;

      (c)    with respect to any Consenting Individual Earn Account Holder who is an Earn Plaintiff, agree to withdraw, subject to the Standstill, any complaint filed in the Earn Adversary Proceedings (which shall be withdrawn with prejudice on the Plan Effective Date); and

      (d)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement.

      8.02.   <u>Negative Commitments</u>.  During the Agreement Effective Period, each Consenting Individual Earn Account Holder shall not, directly or indirectly:

      (a)    object to, delay, impede, or take any other action to interfere with confirmation of the Plan or acceptance, implementation, or consummation of the Restructuring Transactions;

      (b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, confirmation, or consummation of the Restructuring Transactions described in this Agreement or the Plan;

      (c)    file or direct counsel to file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

      (d)    commence, support, or join any litigation or adversary proceeding against the Debtors, the Committee, or the Plan Sponsor;

      (e)    transfer any Claim without the transferee of such Claim first executing a Joinder to this Agreement; or

      (f)    until the earlier of (i) the Effective Date and (ii) termination of this Agreement in accordance with <u>Section 12</u> hereof, make or encourage or induce others to make any disparaging or untruthful public statement regarding the Plan or the Restructuring Transactions; *provided* that the foregoing shall not prevent any Consenting Individual Earn Account Holder from (x) making any truthful statement to the extent required by Law or a Governmental Authority to disclose or make accessible such information or (y) exercising or enforcing any of its rights under this Agreement.

      8.03.   <u>Additional Commitments with Respect to Chapter 11 Cases</u>.  During the Agreement Effective Period, each Consenting Individual Earn Account Holder agrees that it shall:

(a)       vote each of their Claims and/or Interests to accept the Plan by delivering their duly executed and completed ballot accepting the Plan on a timely basis;

(b)       to the extent they are permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering their duly executed and completed ballot(s) indicating such election;

(c)       not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in <u>Section 8.03(a)</u> or <u>Section 8.03(b)</u>; and

(d)       support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Debtor or Debtor Affiliate in the Bankruptcy Court that is consistent with this Agreement.

**Section 9.** *Additional Provisions Regarding Debtors' Commitments*.

9.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel to the Debtors, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would, based on the advice of counsel to the Debtors, be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this <u>Section 9.01</u> shall not be deemed to constitute a breach of this Agreement.

9.02.   Notwithstanding anything to the contrary in this Agreement (but subject to <u>Section 9.01</u>), each Debtor and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to: (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Debtor to any Entity or enter into any confidentiality agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

9.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.** *Additional Provisions Regarding Committee's Commitments*.

10.01.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Committee, after consulting with counsel to the Committee, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action, based on the advice of counsel to the Committee, would

be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 10.01 shall not be deemed to constitute a breach of this Agreement.

10.02.  Notwithstanding anything to the contrary in this Agreement (but subject to Section 10.01), the Committee and its investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) enter into confidentiality agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Debtor, any other party in interest in the Chapter 11 Cases (including any official committee and the U.S. Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposal.

10.03.  Nothing in this Agreement shall:  (a) impair or waive the rights of the Committee to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent the Committee from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 11.    *Mutual Representations and Warranties*.**  Each of the Parties represents and warrants to each other Party that, as of the date such Party executes and delivers this Agreement and as of the Agreement Effective Date:

(a)    to the extent applicable, it is validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company, or other similar action;

(b)    this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c)    except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code (including, for the avoidance of any doubt, all Regulatory Approvals), no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)    the execution, delivery, and performance of such Party of this Agreement do not, and will not (i) violate (A) any provision of any Law or regulations applicable to it or (B) its articles of association, memorandum of association, charter, bylaws, or other governing documents or (ii) conflict with or constitute a breach of or default (without notice or lapse of time, or both)

under, or give rise to a right of termination, modification, or cancellation of any obligation under any material contractual obligation to which it is a party, except in the case of clause (i)(A) and (ii) with respect to the Debtors, as would not reasonably be expected to have a material adverse effect on the Debtors, taken as a whole;

(e)      other than with respect to the Debtors, no party is under any investigation or other similar inquiry by any governmental authority; and

(f)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**    *Termination Events*.

12.01.    Debtor Termination Events.  Any Debtor may terminate this Agreement on behalf of all Debtors as to all Parties upon prior written notice to the Committee, the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders (individually, and not collectively), and the Consenting Dixon Parties (individually, and not collectively) in accordance with Section 15.10 upon the occurrence of any of the following events:

(a)      the breach in any material respect by the Committee, any of the Consenting Earn Account Holders, any of the Consenting Individual Earn Account Holders, or any of the Consenting Dixon Parties of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Debtors transmit a written notice in accordance with Section 15.10 detailing any such breach; *provided*, that that the Debtors may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of any of the Debtors' own actions or omissions in material breach of this Agreement; *provided*, *further*, that any such breach solely with respect to any of the Consenting Earn Account Holders shall entitle the Debtors to terminate the Agreement solely with respect to the Consenting Earn Account Holders; *provided*, *further*, that any such breach solely with respect to any Consenting Individual Earn Account Holder shall entitle the Debtors to terminate the Agreement solely with respect to such Consenting Individual Earn Account Holder (individually, and not collectively); *provided*, *further*, that any such breach solely with respect to any of the Consenting Dixon Parties shall entitle the Debtors to terminate the Agreement solely with respect to the Consenting Dixon Parties (individually, and not collectively);

(b)      the board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with counsel to the Debtors, (i) that proceeding with any of the Restructuring Transactions or failing to terminate this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business

Days after the Debtors transmit a written notice in accordance with Section 15.10 detailing any such issuance; *provided* that this termination right may not be exercised by the Debtors if any Debtor sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by any Debtor;

(d)    any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Debtors, based upon the advice of counsel to the Debtors, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions; or

(e)    the Bankruptcy Court enters an order denying confirmation of the Plan.

12.02.  Committee Termination Events.  This Agreement may be terminated with respect to the Committee by the Committee by the delivery to the Debtors, the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders (individually, and not collectively), and the Consenting Dixon Parties (individually, and not collectively) of a written notice in accordance with Section 15.9 upon the occurrence of the following events:

(a)    the breach in any material respect by any of the Debtors, any of the Consenting Earn Account Holders, any of the Consenting Individual Earn Account Holders, or any of the Consenting Dixon Parties of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions and (ii) to the extent curable, remains uncured for ten (10) days after the Committee transmits a written notice in accordance with Section 15.10 detailing any such breach; *provided*, that that the Committee may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Committee's own actions or omissions in material breach of this Agreement; *provided*, *further*, that any such breach solely with respect to any of the Consenting Earn Account Holders shall entitle the Committee to terminate the Agreement solely with respect to the Consenting Earn Account Holders; *provided*, *further*, that any such breach solely with respect to any Consenting Individual Earn Account Holder shall entitle the Committee to terminate the Agreement solely with respect to such Consenting Individual Earn Account Holder (individually, and not collectively); *provided*, *further*, that any such breach solely with respect to any of the Consenting Dixon Parties shall entitle the Committee to terminate the Agreement solely with respect to the Consenting Dixon Parties (individually, and not collectively);

(b)    the entry by any Party into, implementation, modification, amendment, or filing of any of the Definitive Documents without the consent of the Committee;

(c)    the Committee determines, after consulting with counsel to the Committee, (i) that proceeding with any of the Restructuring Transactions or failing to terminate this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to support an Alternative Restructuring Proposal;

(d)    the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order that (i) enjoins the consummation of a

material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after the Debtors transmit a written notice in accordance with Section 15.10 detailing any such issuance; *provided* that this termination right may not be exercised by the Committee if the Committee sought or requested such ruling or order in contravention of any obligation set out in this Agreement or such ruling or order resulted from any breach of this Agreement by the Committee;

(e)    any Governmental Authority that must grant a Regulatory Approval has taken any action or failed to take any action that either (i) denies such approval or (ii) imposes a material condition that in the reasonable judgment of the Committee, based upon the advice of counsel to the Committee, would reasonably be expected to materially prevent or impede the implementation or consummation of a material portion of the Restructuring Transactions;

(f)    the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(g)    the Bankruptcy Court enters an order (i) denying confirmation of the Plan, (ii) granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code authorizing any party to proceed with regard to any material asset of the Debtors and such relief has a material adverse effect on the Restructuring Transactions, or (iii) granting relief that (x) is inconsistent with this Agreement in any material respect or (y) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring Transactions, unless the Debtors have sought a stay of such relief within seven Business Days after the date of such issuance, and such order is stayed, reversed, or vacated within fourteen Business Days after the date of such issuance; or

(h)    any of the Debtors proposes or explicitly supports any Alternative Transaction that proposes treatment for any class of unsecured creditors that materially and adversely deviates from the treatment specified in the Current Proposed Plan.

12.03.    <u>Consenting Earn Account Holder Termination Events</u>.    This Agreement may be terminated with respect to the Consenting Earn Account Holders by the delivery to the Debtors, the Plan Sponsor, the Committee, the Consenting Individual Earn Account Holders (individually, and not collectively), and the Consenting Dixon Parties (individually, and not collectively) of a written notice in accordance with Section 15.10 upon the occurrence of the following events:

(a)    the entry by any Party into, implementation, modification, amendment, or filing of any of the Definitive Documents without the consent of the Required Consenting Earn Account Holders if and solely to the extent such consent is required;

(b)    the failure to meet any Milestone set forth in Section 4 that has not been waived or extended in a manner consistent with this Agreement;

(c)    the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement;

(d)    the Bankruptcy Court enters an order denying confirmation of the Plan; or

(e)      the breach in any material respect by the Debtors or the Committee of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions solely as it relates to the treatment of General Earn Claims and (ii) to the extent curable, remains uncured for ten (10) days after the Consenting Earn Account Holders transmit a written notice in accordance with Section 15.10 detailing any such breach; *provided*, that that the Consenting Earn Account Holders may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of any Consenting Earn Account Holder's own actions in material breach of this Agreement.

12.04.   Consenting Individual Earn Account Holder Termination Events.  This Agreement may be terminated with respect to each Consenting Individual Earn Account Holder by delivery to the Debtors, the Plan Sponsor, the Committee, the Consenting Earn Account Holders, and the Consenting Dixon Parties (individually, and not collectively) of a written notice in accordance with Section 15.10 upon the occurrence of the following events:

(a)      the entry by any Party into, implementation, modification, amendment, or filing of any of the Definitive Documents without the consent of the Consenting Individual Earn Account Holders (individually, and not collectively) if and solely to the extent such consent is required;

(b)      the failure to meet any Milestone set forth in Section 4 that has not been waived or extended in a manner consistent with this Agreement;

(c)      the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement;

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan; or

(e)      the breach in any material respect by the Debtors or the Committee of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions solely as it relates to the treatment of General Earn Claims and (ii) to the extent curable, remains uncured for ten (10) days after the Consenting Individual Earn Account Holder transmit a written notice in accordance with Section 15.10 detailing any such breach; *provided*, that such Consenting Individual Earn Account Holder may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of any such Consenting Individual Earn Account Holder's own actions in material breach of this Agreement.

12.05.   Consenting Dixon Parties Termination Events.  This Agreement may be terminated with respect to the Consenting Dixon Parties by the delivery to the Debtors, the Plan Sponsor, the Committee, the Consenting Earn Account Holders, and the Consenting Individual Earn Account Holders (individually, and not collectively) of a written notice in accordance with Section 15.10 upon the occurrence of the following events:

(a)      the entry by any Party into, implementation, modification, amendment, or filing of any of the Definitive Documents without the consent of the Consenting Dixon Parties if and solely to the extent such consent is required;

(b)      the failure to meet any Milestone set forth in <u>Section 4</u> that has not been waived or extended in a manner consistent with this Agreement;

(c)      the Debtors withdraw or revoke the Plan or modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement;

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan; or

(e)      the breach in any material respect by the Debtors or the Committee of any of the applicable representations, warranties, or commitments set forth in this agreement that (i) would reasonably be expected to prevent, impede, or materially impair the implementation or consummation of the Restructuring Transactions solely as it relates to the treatment of Claims of the Consenting Dixon Parties or the rights and benefits granted to the Consenting Dixon Parties and (ii) to the extent curable, remains uncured for ten (10) days after the Consenting Dixon Parties transmit a written notice in accordance with <u>Section 15.10</u> detailing any such breach; *provided*, that that the Consenting Dixon Parties may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of any Consenting Dixon Party's own actions in material breach of this Agreement.

12.06.  <u>Mutual Termination</u>.  This Agreement, and the obligations of the Parties hereunder, may be terminated by mutual written agreement among each of the Parties.

12.07.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

12.08.  <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement except as otherwise expressly provided herein.  Nothing in this Agreement shall be construed as prohibiting a Party from contesting whether any such termination is valid or effective in accordance with this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party, or the ability of any Party, to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against the Plan Sponsor.  No purported termination of this Agreement shall be effective under this <u>Section 12.09</u> or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to <u>Section 12.01(b)</u>, <u>12.01(e)</u>, <u>12.02(c)</u>, or <u>12.02(g)</u>.  Nothing in this <u>Section 12.09</u> shall restrict any Debtors' right to terminate this Agreement in accordance with <u>Section 12.01(b)</u> or <u>Section 12.01(e)</u>.

## Section 13.    *Expenses*.

The Debtors and the Committee shall support the request for reimbursement of the reasonable and documented out-of-pocket fees and expenses as set forth in the Plan so long as commercially reasonable.  For the avoidance of any doubt, the Debtors and the Committee are not

obligated to support any Party's application for reimbursement of fees and expenses incurred in connection with the Debtors' sale and marketing process.

The Debtors and the Committee will support any substantial contribution application or portion thereof submitted by the Consenting Dixon Parties for the payment of legal fees and expenses pursuant to section 503(b)(3)(D) of the Bankruptcy Code relating to the negotiation and execution of this Agreement. Any payment of such fees and expenses shall be subject to Bankruptcy Court approval. Nothing in this Agreement shall prevent the Consenting Dixon Parties from filing an application for substantial contribution for other fees or expenses pursuant to section 503(b)(3)(D).

The Earn Ad Hoc Group, the Consenting Individual Earn Account Holders, and the Consenting Dixon Parties shall file motions for "substantial contribution" to these Chapter 11 Cases (as defined under section 503(b)(3)(D) of the Bankruptcy Code) (collectively, the "**Substantial Contribution Motions**") on or before the deadline approved by the Bankruptcy court, and such Substantial Contribution Motions shall be heard by the Bankruptcy Court as part of the Confirmation Hearing.

**Section 14.** *Amendments and Waivers*.

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b) This Agreement may be modified, amended, or supplemented in a writing signed by: (i) each Debtor; (ii) the Committee; (iii) solely with respect to modifications that concern the Consenting Earn Account Holders, by the Required Consenting Earn Account Holders; (iv) solely with respect to modifications that concern the Consenting Individual Earn Account Holders, by the Consenting Individual Earn Account Holders (individually, and not collectively); and (v) solely with respect to modifications that concern the Consenting Dixon Parties, by the Consenting Dixon Parties (individually, and not collectively). Any provision, condition, or other term of this Agreement may be waived only in a writing signed by the Party against which enforcement of such waiver is sought.

(c) Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d) Notwithstanding anything to the contrary in this Section 14, the Milestones shall be subject to waiver and extension upon the written consent of the Debtors, the Committee, the Required Consenting Earn Account Holders, the Consenting Individual Earn Account Holders (individually, and not collectively), and the Consenting Dixon Parties (individually, and not collectively) as set forth in Section 4.

(e) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of

such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**    *Miscellaneous*.

15.01. Acknowledgement. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

15.02. Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to use commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary and not inconsistent with this Agreement, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

15.04. Complete Agreement. This Agreement, together with the other documents expressly referred to herein, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any confidentiality agreement.

15.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or do not have jurisdiction over any Party hereto.

15.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery (including pdf), each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08.  Rules of Construction.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties, including Ignat Tuganov, were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel, except for the remaining Consenting Individual Earn Account Holders other than Ignat Tuganov.

15.09.  Successors and Assigns; Third Parties.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity without the prior written consent of the other Parties.

15.10.  Notices.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, if received prior to 5:00 PM (local time of the recipient) on a Business Day or otherwise on the next Business Day, (c) the Business Day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the electronic mail address or street address, as applicable, set forth below, or at such other electronic mail address or street address as such Party may specify by written notice to the other Party.

(a)      if to the Debtors, to:

Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attention:  Ron Deutsch
E-mail address:  ron.deutsch@celsius.network

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Patrick J. Nash, P.C.; Ross M. Kwasteniet, P.C.; Christopher S.

Koenig; and Dan Latona
E-mail address:  patrick.nash@kirkland.com; ross.kwasteniet@kirkland.com;
chris.koenig@kirkland.com; and dan.latona@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Joshua A. Sussberg, P.C.
E-mail address:  joshua.sussberg@kirkland.com

(b)      if to the Committee, to:

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attn:  David M. Turetsky
E-mail address:  david.turetsky@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attention:  Gregory F. Pesce
E-mail address:  gregory.pesce@whitecase.com

and

White & Case LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Attention:  Keith H. Wofford
E-mail address: kwofford@whitecase.com

and

White & Case LLP
555 Flower Street, #2700
Los Angeles, California 90071
Attention:  Aaron Colodny
E-mail address: aaron.colodny@whitecase.com

(c)       if to the Consenting Earn Account Holders, to:

Offit Kurman, P.A.
590 Madison Avenue, 6th Floor
New York, New York 10022
Attn:  Jason A. Nagi
E-mail address:  jason.nagi@offitkurman.com

and

Offit Kurman, P.A.
1954 Greenspring Drive, Suite 605
Timonium, Maryland 21093
Attn:  Joyce A. Kuhns
E-mail address: jkuhns@offitkurman.com

(d)       if to the Consenting Individual Earn Account Holders, to:

Ignat Tuganov
c/o Venable LLP
151 West 42nd Street, 49th Floor
New York, New York 10036
Attn:  Jeffrey S. Sabin
E-mail address:  JSSabin@venable.com

and

Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Attn:  Andrew Currie
E-mail address:  AJCurrie@venable.com

and

Daniel Frishberg
c/o Offit Kurman, P.A.
1954 Greenspring Drive, Suite 605
Timonium, Maryland 21093
Attn:  Joyce A. Kuhns
E-mail address: jkuhns@offitkurman.com


and

Immanuel Herrmann
c/o Offit Kurman, P.A.

1954 Greenspring Drive, Suite 605
Timonium, Maryland 21093
Attn:  Joyce A. Kuhns
E-mail address: jkuhns@offitkurman.com

(e)    if to the Consenting Dixon Parties, to:

Simon Dixon
Willow House
Cricket Square
Grand Cayman, Cayman Islands
KY1-1001
E-mail address:  legal@banktothefuture.com

and

Ervin Cohen & Jessup LLP
9401 Wilshire Blvd., Fl. 12
Beverly Hills, CA 90212
Attn: Chris Manderson
E-mail address:  cmanderson@ecjlaw.com

15.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

15.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

15.13.  <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

15.15. <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16. <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17. <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18. <u>Survival</u>.  Notwithstanding the termination of this Agreement in accordance with its terms, <u>Sections 7.02(f)</u> and <u>8.02(f)</u> of this Agreement shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

15.19. <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u>, <u>Section 14</u>, or otherwise, including a written approval by the Debtors, the Committee, the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders, or the Consenting Dixon Parties such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel; *provided* that for any Party not represented by counsel, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if such approval is conveyed in writing (including electronic mail) by such individual Person.

**Debtors' Signature**
**Page to the Plan Support Agreement**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

**CELSIUS NETWORK LLC**
(on behalf of itself and its affiliated Debtors
and Debtors in Possession)

By: _____

Name:  Christopher Ferraro
Title:  Interim Chief Executive Officer, Chief Financial Officer, Chief Restructuring Officer, and/or Authorized Signatory

**Committee's Signature**
**Page to the Plan Support Agreement**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

**COMMITTEE**

By: _____

Name: Thomas DiFiore

Title: UCC CO-CHAIR

**Consenting Earn Account Holder's**
**Signature Page to the Plan Support Agreement**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

_____

Name:    Joyce A. Kuhns, Esquire, Offit Kurman, P.A.
Title:    Authorized Signatory and Counsel for
Members of the Ad Hoc Group of Earn Account Holders*

E-mail address(es):  jkuhns@offitkurman.com

| *Consenting Members of the Ad Hoc Group of Earn Account Holders* |
| --- |
| Immanuel Herrmann, Steering Committee |
| Nicholas Farr, Steering Committee |
| Brett Perry, Steering Committee |
| Joseph Lehrfeld, Steering Committee |
| Dr. Lisa Lang, representing<br>  (1) Stillahn-Lang Trust DTD 2/19/2015<br>  (2) Science of Business, Inc. Defined Benefit Pension Plan and Trust |
| Jonathan Holt |
| Bradley Giardiello |
| James Corr |
| Broad Reach Consulting, LLC<br>(Manager: Jesse Lund) |
| Courtney Burks Steadman |
| Kulpreet Khanuja |

| |
|---|
| Irina Dukhon |
| Robert Applegate |
| Mark Danenhower |
| David Gordon representing:<br>  1. David Gordon |
|   2. Rianova Limited |
| Rebecca Gallagher |
| William Harrison Waddell |
| Scott Glosenger |
| Kazuya Koyama |
| Adam Feintisch |

.

**Consenting Individual Earn Account Holder's
Signature Page to the Plan Support Agreement**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

Name: Immanuel Herrmann

Title:

E-mail address(es)

| Claim Amounts Held: | |
|---|---|
| Secured Claims | |
| Retail Deposit Claims | |
| Other Priority Claims | |
| Convenience Claims | |
| General Earn Claims | |
| Custody Claims | |

11026204.5

| Claim Amounts Held: | |
|---|---|
| Withhold Claims | |
| Unsecured Loan Claims | |
| General Unsecured Claims | |
| Government Claims | |
| De Minimis Claims | |
| Preferred Equity Interests | |
| Common Interests | |
| Section 510(b) Claims | |
| Disallowed CEL Token Claims | |

**Consenting Individual Earn Account Holder's
Signature Page to the Plan Support Agreement**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

_____

Name: Daniel Frishberg

Title:

E-mail address(es)

| *Claim Amounts Held:* | |
| --- | --- |
| Secured Claims | |
| Retail Deposit Claims | |
| Other Priority Claims | |
| Convenience Claims | |
| General Earn Claims | |
| Custody Claims | |

| Claim Amounts Held: | |
| --- | --- |
| Withhold Claims | |
| Unsecured Loan Claims | |
| General Unsecured Claims | |
| Government Claims | |
| De Minimis Claims | |
| Preferred Equity Interests | |
| Common Interests | |
| Section 510(b) Claims | |
| Disallowed CEL Token Claims | |

**Consenting Individual Earn Account Holder's
Signature Page to the Plan Support Agreement**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

_/s/ Jeffrey Sabin_

Name: Jeffrey Sabin
Title:  Attorney and Authorized Signatory for Ignat Tuganov

**Consenting Dixon Party's (BNK To The Future)
Signature Page to the Plan Support Agreement**

      **IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

21 September 2023 | 04:34:04 AM PDT

_____

Name: Simon Dixon
Title: Director, BNK To The Future Capital

E-mail address(es): legal@banktothefuture.com

| Claim Amounts Held: | |
| --- | --- |
| Secured Claims | N/A |
| Retail Deposit Claims | N/A |
| Other Priority Claims | Unknown Amount Of Attorneys' Fees For Substantial Contribution – To Be Determined Pending Outcome Of Future Motion(s). |
| Convenience Claims | N/A |
| General Earn Claims | $3,424,999.72 |
| Custody Claims | N/A |

DocuSign Envelope ID: 2C8C9482-C95C-4BEE-93A-96EAC264C659

| Claim Amounts Held: | |
| --- | --- |
| Withhold Claims | N/A |
| Unsecured Loan Claims | N/A |
| General Unsecured Claims | N/A |
| Government Claims | N/A |
| De Minimis Claims | N/A |
| Preferred Equity Interests | N/A |
| Common Interests | N/A |
| Section 510(b) Claims | N/A |
| Disallowed CEL Token Claims | N/A |

**Consenting Dixon Party's (Simon Dixon)**
**Signature Page to the Plan Support Agreement**

       **IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the day and year first above written.

21 September 2023 | 04:34:04 AM PDT

_____
Name: Simon Dixon
Title: N/A


E-mail address(es): legal@banktothefuture.com

| Claim Amounts Held: | |
| --- | --- |
| Secured Claims | N/A |
| Retail Deposit Claims | N/A |
| Other Priority Claims | Unknown Amount Of Attorneys' Fees For Substantial Contribution – To Be Determined Pending Outcome Of Future Motion(s). |
| Convenience Claims | N/A |
| General Earn Claims | $15,707,290.67 |
| Custody Claims | N/A |

DocuSign Envelope ID: 2C8C9482-C95C-4BEE-93A-96EAC264C559

| Claim Amounts Held: | |
| --- | --- |
| Withhold Claims | N/A |
| Unsecured Loan Claims | N/A |
| General Unsecured Claims | N/A |
| Government Claims | N/A |
| De Minimis Claims | N/A |
| Preferred Equity Interests | N/A |
| Common Interests | N/A |
| Section 510(b) Claims | N/A |
| Disallowed CEL Token Claims | N/A |

**Exhibit A**

**Form of Joinder**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of September [●], 2023 (the "**Agreement**")[1] by and among the Debtors, the Committee, and the other Parties and agrees to be bound by the terms and conditions of the Agreement as a _____, and shall be deemed a "**Party**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder, as applicable.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

_____

Name:

Title:

Address:

E-mail address(es):

| *Claim Amounts Held:* | |
|---|---|
| Secured Claims | |
| Retail Deposit Claims | |
| Other Priority Claims | |

---

[1] Capitalized terms not used but not otherwise defined in this Joinder shall have the meanings ascribed to such terms in the Agreement.

| Claim Amounts Held: | |
|---|---|
| Convenience Claims | |
| General Earn Claims | |
| Custody Claims | |
| Withhold Claims | |
| Unsecured Loan Claims | |
| General Unsecured Claims | |
| Government Claims | |
| De Minimis Claims | |
| Preferred Equity Interests | |
| Common Interests | |
| Section 510(b) Claims | |
| Disallowed CEL Token Claims | |

**<u>Exhibit B</u>**

**Form of Board Observer Agreement**

11026204.5

## Board Observer Agreement

This agreement (the "**Agreement**") is made effective as of [●], by [NewCo, Inc.], a Delaware corporation (the "**Company**"), and [●] (the "**Observer**").

WHEREAS, as an inducement and incentive for the Observer's ongoing support and advice throughout the financial restructuring process of Celsius Network LLC, to which the Company is intends to receive certain assets through the confirmation and consummation of the *Joint Chapter 11 Plan of Reorganization for Celsius Network, LLC and its Affiliated Debtors* (as may be amended from time to time, the "**Plan**"), the Company desires to provide the Observer with certain observation rights regarding the Company's board of directors (the "**Board**"), as further described, and subject to the terms and conditions set forth, herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Observer Rights.

1.1    The Company grants to the Observer the option and right to attend all meetings other than meetings held in executive session (including meetings held by telephone or electronic communication) of the Board in a non-voting, observer capacity. The Observer may participate fully in discussions of all matters brought to the Board for consideration, but in no event shall the Observer (i) be deemed to be a member of the Board or any committee of the Board (a "**Committee**") or be entitled to attend any meeting of any Committee; (ii) except for (and without limitation of) the obligations expressly set forth in this Agreement, have or be deemed to have, or otherwise be subject to, any duties (fiduciary or otherwise) to the Company or its stockholders; or (iii) have the right to propose or offer any motions or resolutions to the Board or Committees. Upon request, the Company shall allow the Observer to attend Board meetings by telephone or electronic communication. The presence of the Observer shall not be taken into account or required for purposes of establishing a quorum.

1.2    The Company shall provide to the Observer copies of all notices, minutes, consents and formal presentations, and all exhibits and annexes to any such materials, that it provides to Board members in their final and approved forms (collectively, "**Board Materials**").

1.3    Notwithstanding anything herein to the contrary, the Company may exclude the Observer from access to any Board Materials, meeting, or portion thereof if a majority of the Board concludes, acting in good faith, that (i) such exclusion is necessary to the Board voting process; (ii) such exclusion is reasonably necessary to preserve the attorney-client or work product privilege between the Company or its affiliates and its counsel; (iii) such Board Materials or discussion relates to the Company's or its affiliates' relationship, contractual or otherwise, with the Observer or his affiliated entities or any actual or potential transactions between or involving the Company or its affiliates and the Observer or his affiliated entities; (iv) such exclusion is necessary to avoid a conflict of interest or disclosure that is restricted by any agreement to which the Company or any of its affiliates is a party or otherwise bound; or (v) such exclusion is in the best interests of the Company or its stockholders (as determined by the Board in its sole discretion in connection with the exercise of its fiduciary duty).

1.4     The Observer acknowledges and agrees that the Company is not making any representation or warranty with respect to any information or materials provided or that may be provided in the future to Observer, hereunder or otherwise, and Observer has not relied, is not relying, and will not rely on any statement, materials, or other information of any type or format by, from, or on behalf of the Company in making any decision or determination with respect to any arrangement, investment, transaction, or otherwise, in each case, except as may be set forth in any definitive agreement between the Company and Observer after the date hereof and without limiting the express terms and conditions of this Agreement itself.

2.     <u>Confidential Information</u>.

2.1     To the extent that any information obtained by the Observer from the Company (or any director, officer, employee, or agent thereof) is Confidential Information (as defined below), the Observer shall treat such Confidential Information as confidential in accordance with the terms and conditions set out in this Section 2 during the term of the Observer and for two (2) years after Termination (as defined in Section 11).

2.2     As used in this Agreement, "**Confidential Information**" means any and all information or data concerning the Company or its affiliates, whether in verbal, visual, written, electronic, or other form, which is disclosed to the Observer in such capacity by the Company or any director, officer, employee, or agent of the Company (including all Board Material that is non-public information), together with all information discerned from, based on, or relating to any of the foregoing which may be prepared or created by the Observer or any of his affiliated entities, or any of their respective directors, managers, officers, employees, agents, or advisors (each, a "**Representative**"); *provided*, *however,* that "Confidential Information" shall not include information that:

    (a)     is or becomes generally available to the public other than as a result of disclosure of such information by the Observer, any of his affiliated entities, or any of their Representatives;

    (b)     is independently developed by the Observer, any of his affiliated entities, or any of their Representatives, or the Observer without violation of this Agreement or the use of, reliance on, or reference to any Confidential Information;

    (c)     becomes available to the recipient of such information at any time on a non-confidential basis from a third party that is not, to the recipient's knowledge, prohibited from disclosing such information to the Observer, any of his affiliated entities, or any of their Representatives by any contractual, legal, or fiduciary obligation to the Company; or

    (d)     was known by the Observer or any of his affiliated entities prior to receipt from the Company.

2.3     The Observer shall (a) retain all Confidential Information in strict confidence; (b) not release or disclose Confidential Information in any manner to any other person (other than disclosures to any of his affiliated entities, or any of his or their Representatives who

2

(i) have a need to know such information; and (ii) are informed of its confidential nature); and (c) use the Confidential Information solely in connection with the Observer's rights hereunder and not for any other purpose, which other purposes include, without limitation, (x) evaluating investments by the Observer or any of his affiliated entities or any of his or their Representatives, (y) providing investment advice to third parties or (z) soliciting stockholders of or investors in the Company or in any other person or entity; *provided, however*, that the foregoing shall not apply to the extent the Observer, any of his affiliated entities, or any of his Representatives is compelled to disclose Confidential Information by judicial or administrative process, pursuant to the written advice of outside counsel, or by requirements of law; *provided, further, however*, that, such disclosure does not arise as a result of a voluntary act or omission on the part of the Observer, any of his affiliated entities or any of his or their Representatives, and if legally permissible, prior written notice of such disclosure shall be given to the Company/the disclosing party shall use its best efforts to notify the Company so that the Company may take action, at its expense, to prevent such disclosure and any such disclosure is limited only to that portion of the Confidential Information which such person is compelled to disclose.

2.4    The Observer acknowledges that the Confidential Information is proprietary to the Company and may include material non-public information, trade secrets, or other business information the disclosure of which could harm the Company. None of the Observer, any of his affiliated entities, or any of his or their Representatives shall, by virtue of the Company's disclosure of, or such person's use of any Confidential Information, acquire any rights with respect thereto, all of which rights (including intellectual property rights) shall remain exclusively with the Company. The Observer shall be responsible for any breach of this Section 2 by the Observer, any of its affiliates, or any of its or their Representatives.

2.5    The Observer agrees that, upon the request of the Company, it will (and will cause the Observer, its affiliates, and its and their Representatives to) promptly (a) return or destroy, at the Company's option, all physical materials referencing, containing, or consisting of Confidential Information and all hard copies thereof in their possession or control; and (b) destroy all electronically stored Confidential Information in their possession or control; *provided, however*, that each of the Observer, any of his affiliated entities, or any of his or their Representatives may retain any electronic or written copies of Confidential Information as may be (i) stored on its electronic records or storage system resulting from automated back-up systems and only accessible to personnel whose functions are primarily information technology in nature for the sole purposes of performing their information technology duties; (ii) required by law, other regulatory requirements, or established bona fide internal document retention policies and, with respect to Representatives, solely in accordance with the professional standards of such Representatives that are outside legal counsel or external auditors, or bona fide internal policy or procedure established for the purpose of legal compliance; or (iii) contained in board presentations or minutes of board meetings of any entities affiliated with the Observer; *provided, further, however*, that any such retained Confidential Information shall remain subject to this Section 2.

2.6    Without limiting any other remedies of the Company hereunder, the unauthorized disclosure of Confidential Information by the Observer shall result in the

3

immediate and automatic termination of this Agreement and the Observer's status as an Observer.

3.    <u>Expenses</u>. The Company agrees to reimburse the Observer for reasonable out-of-pocket expenses incurred in connection with the Observer's attendance at Board meetings; *provided* that (i) all reimbursements payable by the Company pursuant to this Section 3 shall be payable in accordance with and subject to the Company's policies and practices with respect to director expense reimbursement then in effect; and (ii) the Company's expense reimbursement obligations pursuant to this Section 3 shall not exceed an amount equal to $[●] in any 12-month period.

4.    <u>Limitation of Liability</u>. The Company does not make, and expressly disclaims, any representation or warranty as to the accuracy or completeness of the Confidential Information.  In no event shall the Company, its affiliates or its or their Representatives be liable to the Observer, his affiliates, or his or their Representatives for any liabilities, losses, lost profits or damages, including without limitation consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, arising out of, relating to, or in connection with the accuracy or completeness of any Confidential Information or any use or reliance on any Confidential Information by the Observer, his affiliates, or his or their Representatives.

5.    <u>Public Company Matters</u>.

5.1    The Observer acknowledges that the Confidential Information may include material non-public information, that the United States federal securities laws prohibit persons with material non-public information about a company obtained directly or indirectly from such company from purchasing or selling securities of such company on the basis of such information or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such other person is likely to purchase or sell such securities on the basis of such information and that trading in the Company's securities is subject to such United States securities laws, including those prohibiting trading on the basis of material nonpublic information and market manipulation. The Observer shall at all times comply with the Company's insider trading policy and any related policies that are applicable to members of the Board. The Observer hereby acknowledges and consents to the use of his name and other information that may be required under applicable law in any disclosure document required to be publicly filed by the Company with the United States Securities and Exchange Commission.

5.2    To the extent any entity related to the Observer possesses or holds shares in the Company owned by third-party individuals or entities the voting rights of such shares must be owned and exercised by such individuals or entities.

5.3    The Observer must disclose to the Board all actual and potential conflicts of interest as defined in the Company's conflicts policy from time to time and regularly update such disclosure not less than monthly or immediately upon a material change.

6.    <u>Non-Solicitation</u>.  Except with the express permission of the Company, the Observer agrees that for a period commencing on the date of this Agreement and ending on the second anniversary of the date of the termination of this Agreement, neither the Observer nor his affiliates

4

or Representatives will directly or indirectly solicit or hire any officer, director, or employee of the Company, or any of its direct or indirect subsidiaries, except pursuant to a general solicitation that is not directed specifically to any such officer, director or employee.

7.    Indemnification; Advancement of Expenses. Solely in and to the extent related to the Observer's status as a board observer under this Agreement, the Observer shall be entitled to indemnification (and advancement of expenses up to $50,000) from the Company for expenses (such expenses covered hereunder solely to the extent that the Company does not tender a defense as provided in this paragraph), losses or judgments ("**Losses**") from third party claims asserted against the Observer  to the same extent provided by the Company to its directors under the Certificate of Incorporation and Bylaws of the Company as in effect on the date hereof, provided that in order to obtain indemnification hereunder, Observer must provide written notice of any such claim by the earlier of (i) within 30 days of Observer becoming aware thereof or (ii) 60 days of the filing of such claim.  If Observer notifies the Company of any claim for which Observer might be indemnified hereunder, the Company shall have the right to assume the defense of such claim with counsel of Company's choosing, such counsel to be paid by the Company, and at the Company's expense.  The Observer, in order to be entitled to such costs of defense must (i) cooperate with such defense by the Company, and (ii) agree that the Company may use a single counsel to represent one or more Observers or Directors with respect to the underlying claims, except to the extent there are conflicts between the Observer on the one hand and one or more other Observers or Directors with respect to such claim.   The Company acknowledges and agrees that the foregoing rights to indemnification and advancement of expenses constitute third-party rights extended to the Observer by the Company and do not constitute rights to indemnification or advancement as a result of the Observer serving as a director, officer, employee, or agent of the Company.

8.    Notices. Notices are to be delivered in writing, in the case of the Company, to [ADDRESS], Attention: [NAME OR TITLE OF RECIPIENT], [EMAIL] and in the case of the Observer, to [ADDRESS], [EMAIL], or to such other address as may be given by each party from time to time under this Section. Notices shall be deemed properly given upon personal delivery or, in the case of email notice, upon delivery during the recipient's business hours with receipt acknowledged.

9.    Miscellaneous Provisions. This Agreement constitutes the entire agreement and understanding of the parties, and supersedes any and all previous agreements and understandings, whether oral or written, between the parties regarding the matters set out in this Agreement. No provision of this Agreement may be amended, modified, or waived, except in a writing signed by the parties hereto. This Agreement may not be assigned by the Observer. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision, and if any restriction in this Agreement is found by a court to be unreasonable or unenforceable, then such court may amend or modify the restriction so it can be enforced to the fullest extent permitted by law. The section headings in this Agreement have been inserted as a matter of convenience of reference and are not a part of this Agreement. This Agreement may be executed by electronic signature in any number of counterparts, each of which together shall constitute one and the same instrument. Any waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed to be a waiver of any other

AMERICAS 125033710

breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist on strict adherence to any term of this Agreement on one or more occasions shall not be construed as a waiver or deprive such party of the right to thereafter insist on strict adherence to that term or any other term of this Agreement.

10.    Remedies. The Company, on the one hand, and the Observer, on the other hand, each acknowledge and agree that monetary damages would not be a sufficient remedy for any breach (or threatened breach) of this Agreement by it and that, in the event of any breach or threatened breach hereof, (a) the non-breaching party shall have the right to immediate injunctive and other equitable relief, without proof of actual damages; (b) the breaching party will not plead in defense thereto that there would be an adequate remedy at law; and (c) the breaching party agrees to waive any applicable right or requirement that a bond be posted by the non-breaching party. Such remedies will not be the exclusive remedies for a breach of this Agreement, but will be in addition to all other remedies that may be available to the non-breaching party at law or in equity.

11.    Applicable Law; Venue. This Agreement, and any and all claims, controversies, and causes of action arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, shall be governed by the laws of Delaware, including its statutes of limitations, without giving effect to any conflict-of-laws rule that would result in the application of the laws of a different jurisdiction. Each party (a) irrevocably and unconditionally consents to the personal jurisdiction and venue of the courts located in [New York City, New York]; (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court; (c) agrees that it shall not bring any action relating to this Agreement or otherwise in any court other than the courts located in [New York City, New York] or in the United States District Court for the [Southern District of New York]; and (d) irrevocably waives the right to trial by jury.

12.    Termination. This Agreement shall terminate and be of no further force and effect (a "**Termination**") upon the earliest of: (a) the date that is one (1) year from the Effective Date of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates*, which term may be subject to  one-year extension(s) if approved by the Board in its sole discretion, (b) removal of the Observer by the Board (i) with cause and (ii) by the affirmative vote of a majority of the members of the Board, (c) the Observer's resignation as an Observer, and (d) the date upon which the Observer and the Observer's affiliates cease to own at least [●] shares of Company common stock (as adjusted for any stock splits); *provided*, that Section 2, Section 5, Section 7, Section 9, Section 10, and Section 11 shall survive any such Termination.  For purposes of this Section 12, "cause" shall exist if Observer: (i) materially breaches any provision of this Agreement, or materially contravenes or fails to follow any policy, direction  or resolution of the Board, (ii) engages in fraud, illegal conduct, or gross misconduct; (iii) commits an act involving crime of moral turpitude, fraud, embezzlement, financial dishonesty or theft; (iv) is convicted of, or pleads guilty or nolo contendere to a crime of moral turpitude, fraud, embezzlement, financial dishonesty or theft or (v) is subject (or any entity under control of or affiliated with Observer is subject) to any regulatory or enforcement action by any governmental authority; *provided, however*, that if the Observer (or any applicable entity under control of or affiliated with Observer is subject) is challenging such enforcement action in good faith, "cause" shall not exist.

6

[SIGNATURE PAGE FOLLOWS]

AMERICAS 125033710

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

[NEWCO, INC.]                                    OBSERVER


By:_____                  _____
Name:                                            Name: [●]
Title:

8