Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF MODIFIED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE** that on August 15, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (the "Solicitation Plan").

**PLEASE TAKE FURTHER NOTICE** that on August 17, 2023, the United States Bankruptcy Court for the Southern District of New York (the "Court") entered an order

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[Docket No. 3337] (the "Disclosure Statement Order") (i) approving the adequacy of the Debtors' Disclosure Statement, (ii) approving the solicitation and voting procedures with respect to confirmation of the Solicitation Plan, (iii) approving the form of ballots and notices in connection therewith, (iv) scheduling certain dates with respect thereto, (v) authorizing and approving reimbursement of certain of the plan sponsor's fees and expenses, and (vi) granting related relief.

     **PLEASE TAKE FURTHER NOTICE** that the Debtors solicited votes to accept or reject the Solicitation Plan in accordance with the Disclosure Statement Order.

     **PLEASE TAKE FURTHER NOTICE** that, pursuant to section 1127(a) of the Bankruptcy Code, the Debtors hereby file the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates*, attached hereto as **Exhibit A** (the "Modified Plan").

     **PLEASE TAKE FURTHER NOTICE** that a comparison between the Solicitation Plan and the Modified Plan is attached hereto as **Exhibit B**.

     **PLEASE TAKE FURTHER NOTICE** that copies of the Solicitation Plan, Modified Plan, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Celsius. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

New York, New York
Dated:  September 27, 2023

_/s/ Joshua A. Sussberg_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_

## Exhibit A

**Modified Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**MODIFIED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

---

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Dated: September 27, 2023

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW, AND OTHER REFERENCES..........................................................1
    A.    Defined Terms. ...........................................................................................1
    B.    Rules of Interpretation...............................................................................25
    C.    Computation of Time. ...............................................................................26
    D.    Governing Law...........................................................................................26
    E.    Reference to Monetary Figures. ................................................................26
    F.    Valuation of Claims. .................................................................................26
    G.    Reference to the Debtors or the Post-Effective Date Debtors...................27
    H.    Controlling Documents..............................................................................27
    I.    Consultation, Information, Notice, and Consent Rights. ..........................27

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS.......................................27
    A.    Administrative Claims................................................................................27
    B.    Professional Fee Claims. ...........................................................................28
    C.    Priority Tax Claims....................................................................................29
    D.    Statutory Fees. ...........................................................................................29

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ...................29
    A.    Classification of Claims and Interests........................................................29
    B.    Treatment of Classes of Claims and Interests............................................30
    C.    Special Provision Governing Unimpaired Claims. ....................................38
    D.    Elimination of Vacant Classes. .................................................................38
    E.    Voting Classes; Deemed Acceptance by Non-Voting Classes. .................38
    F.    Subordinated Claims. ................................................................................38
    G.    Intercompany Interests...............................................................................38
    H.    Controversy Concerning Impairment or Classification. ............................39
    I.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.................39

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN.................................39
    A.    Substantive Consolidation..........................................................................39
    B.    Plan Settlement Provisions Regarding Claims and Interests. ....................39
    C.    Restructuring Transactions. .......................................................................42
    D.    NewCo Restructuring Transactions. ..........................................................43
    E.    Orderly Wind Down. .................................................................................47
    F.    Plan Administrator. ...................................................................................48
    G.    Litigation Administrator(s), Litigation Oversight Committee, and Contributed Claims.................52
    H.    Corporate Action. ......................................................................................55
    I.    Cancellation of Notes, Instruments, Certificates, and Other Documents........................55
    J.    Employee Obligations................................................................................55
    K.    Effectuating Documents; Further Transactions.........................................59
    L.    Exemptions from Certain Taxes and Fees.................................................59
    M.    Preservation of Causes of Action. .............................................................59
    N.    Election to Contribute Claims....................................................................60
    O.    Contribution of Contributed Claims..........................................................60
    P.    Retiree Benefits. ........................................................................................61

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES..............................61
    A.    Rejection, Assumption, and Assumption and Assignment of Executory Contracts and
        Unexpired Leases. .....................................................................................61

i

B. Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim. ..................................................................................62
C. Cure of Defaults and Objections to Cure and Assumption (or Assumption and Assignment). ...............................................................................................................62
D. Institutional Loans & Retail Advances. ...................................................................63
E. Indemnification Provisions. .....................................................................................64
F. Director, Officer, Manager, and Employee Liability Insurance. ..............................64
G. Modifications, Amendments, Supplements, Restatements, or Other Agreements. ....64
H. Reservation of Rights. ..............................................................................................65
I. Nonoccurrence of Effective Date. ............................................................................65

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...................................................65
A. Distributions on Account of Claims or Interests Allowed as of the Effective Date. ......65
B. Timing, Calculation, and Currency of Amounts to Be Distributed. .........................65
C. Distributions on Account of Obligations of Multiple Debtors....................................66
D. Distribution Agent. ..................................................................................................66
E. Rights and Powers of Distribution Agent. ...............................................................66
F. Delivery of Distributions.........................................................................................66
G. Manner of Payment. ................................................................................................68
H. Compliance Matters. ...............................................................................................68
I. Foreign Currency Exchange Rate. ...........................................................................68
J. No Postpetition or Default Interest on Claims. ........................................................68
K. Allocation Between Principal and Accrued Interest. ................................................69
L. Setoffs and Recoupment. .........................................................................................69
M. Claims Paid or Payable by Third Parties.................................................................69

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS...................................................................................................................70
A. Disputed Claims Process. ........................................................................................70
B. Allowance of Claims. ...............................................................................................70
C. Claims Administration Responsibilities....................................................................70
D. Adjustment to Claims or Interests Without Objection. ..............................................71
E. Reservation of Rights to Object to Claims. ..............................................................71
F. Estimation of Claims. ...............................................................................................71
G. Disputed and Contingent Claims Reserve.................................................................71
H. Disallowance of Claims. ..........................................................................................72
I. Amendments to Proofs of Claim or Interests. ...........................................................72
J. No Distributions Pending Allowance or Resolution of Recovery Causes of Action.......72
K. Distributions After Allowance. .................................................................................72

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........73
A. Discharge of Claims and Termination of Interests....................................................73
B. Release of Liens. ......................................................................................................73
C. Debtor Release. .......................................................................................................74
D. Third-Party Release.................................................................................................75
E. Exculpation. ............................................................................................................76
F. Injunction. ...............................................................................................................77
G. Additional Provisions Regarding Governmental Units..............................................78
H. Protection Against Discriminatory Treatment. .........................................................79
I. Reimbursement or Contribution. ..............................................................................79
J. Term of Injunctions or Stays. ...................................................................................79
K. Document Retention. ................................................................................................79

ARTICLE IX. CONDITIONS TO CONFIRMATION ....................................................................80
A. Conditions Precedent to Confirmation. ....................................................................80
B. Waiver of Conditions to Confirmation......................................................................80

ARTICLE X. CONDITIONS TO THE EFFECTIVE DATE......................................................................80
    A.    Conditions Precedent to the Effective Date. ..................................................................80
    B.    Waiver of Conditions to the Effective Date. ................................................................81
    C.    Substantial Consummation..............................................................................................81
    D.    Effect of Non-Occurrence of Conditions to Consummation.........................................81

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................82
    A.    Modification of Plan......................................................................................................82
    B.    Effect of Confirmation on Modifications. .....................................................................82
    C.    Revocation or Withdrawal of Plan. ...............................................................................82

ARTICLE XII. RETENTION OF JURISDICTION..............................................................................82

ARTICLE XIII. MISCELLANEOUS PROVISIONS ............................................................................84
    A.    Immediate Binding Effect. .............................................................................................84
    B.    Additional Documents....................................................................................................84
    C.    Reservation of Rights.....................................................................................................85
    D.    Successors and Assigns...................................................................................................85
    E.    Notices...........................................................................................................................85
    F.    Entire Agreement. ..........................................................................................................87
    G.    Plan Supplement Exhibits. .............................................................................................87
    H.    Non-Severability. ...........................................................................................................87
    I.    Votes Solicited in Good Faith. ......................................................................................87
    J.    Closing the Chapter 11 Cases.........................................................................................87
    K.    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment. ......................88
    L.    Waiver or Estoppel.........................................................................................................88

## INTRODUCTION

Celsius Network LLC and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors" and, together with their non-Debtor Affiliates, "Celsius") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article I.A of the Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor other than Celsius Network Limited, Celsius Network LLC, Celsius Lending LLC, and Celsius Networks Lending LLC, for which the Debtors propose a substantive consolidation and joint Plan on the terms set forth herein. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of the Plan, the NewCo Transaction, the Orderly Wind Down, and certain related matters. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A.    *Defined Terms*.

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Account Holder*" means a Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date.

2.    "*Account Holder Avoidance Action*" means an Avoidance Action against an Account Holder.

3.    "*Account Holder Avoidance Action Release*" means a release of an Account Holder Avoidance Action pursuant to the Account Holder Avoidance Action Settlement.

4.    "*Account Holder Avoidance Action Settlement*" means the settlement of Avoidance Actions between the Debtors and certain Account Holders, the terms of which are set forth in Article IV.B.3 herein.

5.    "*Account Holder Ballot*" means the Ballot distributed to Holders of Account Holder Claims.

6.    "*Account Holder Claim*" means any Claim held by an Account Holder that arises out of or relates to a Celsius Account, including any Claim for damages against any Debtor related thereto.

7.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date through the Effective Time pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date through the Effective Time of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) the reasonable and documented fees and out-of-pocket expenses of counsel to (i) the Custody Ad Hoc Group, (ii) the Withhold Ad Hoc Group, (iii) the Earn Ad Hoc Group, (iv) the Retail Borrower Ad Hoc Group, (v) the Pending Withdrawal Ad Hoc Group, and (vi) Ignat Tuganov, in each case to the extent that the Bankruptcy Court has entered a Final Order finding that they have provided a substantial contribution to the Debtors' estates pursuant to section 503(b)(3)(D); (d) the reasonable and documented court fees and out-of-pocket expenses of (i) Immanuel Herrmann, (ii) Daniel Frishberg, and (iii) Cameron Crews, in each case to the extent that the Bankruptcy Court has entered a Final Order finding that they have provided a substantial contribution to the Debtors' estates pursuant to section 503(b)(3)(D); (e) the reasonable and documented fees and out-of-pocket

expenses of counsel to any members of the Committee; (f) all fees and charges assessed against the Estates pursuant to section 1930 of the Judicial Code; and (g) the reasonable and documented fees and expenses of the Plan Sponsor and its counsel and advisors on the terms and conditions set forth in the Plan Sponsor Agreement, including that such fees and expenses shall not exceed $5,000,000, in the aggregate. For the avoidance of doubt, "State Regulatory Claims" hereunder shall not include any Administrative Claims of Governmental Units that are taxing authorities.

8.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Administrative Claims arising under 503(b)(9) of the Bankruptcy Code shall be the Bar Date.

9.      "*ADR Procedures*" means the alternative dispute resolution procedures related to the determination of claims against the Estates, which shall be included in the Plan Supplement.

10.      "*ADR-Ineligible Potential Defendants*" means any potential Avoidance Action defendant that (a) is an equity holder of the Debtors, (b) is a current or former Insider of the Debtors, (c) is an Excluded Party, (d) is party to an agreement with the Debtors to promote the Debtors' business to potential Account Holders (*e.g.*, a promoter or brand ambassador agreement), or (e) controls or is an Affiliate of a potential Avoidance Action defendant described in clause (d) hereof.

11.      "*Affiliate*" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

12.      "*Allowed*," "*Allowing*," and "*Allowance*" means, with respect to any Claim or Interest, except as otherwise provided herein, including the Class Claim Settlement: (a) a Claim or Interest in a liquidated amount that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, the Bar Date Order, or another Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors previously objected or which the Bankruptcy Court previously disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest (i) no objection to the allowance thereof or request for estimation has been or, in the Debtors' or Post-Effective Date Debtors' (or their agent or representative) reasonable good faith judgment, may be interposed within the latest applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection or request for estimation is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order, and (ii) such Claim or Interest has not been designated for resolution under the ADR Procedures; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Post-Effective Date Debtor, as applicable; *provided, further*, that, except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. For the avoidance of doubt, a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.

13.      "*AML/KYC Compliance Information*" means any information required to be provided by Account Holders to ensure compliance with applicable Know Your Customer and Anti-Money Laundering laws, regulations, and guidelines, including, but not limited to the US Patriot Act of 2001, 8 U.S.C. § 1701 *et. seq.*, the United Kingdom's

Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations of 2017, and Canada's Proceeds of Crime (Money Laundering) and Terrorist Financing Act.

14.    "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

15.    "*Backup MiningCo*" means, under the Orderly Wind Down, a pure play, publicly traded mining business that will own the assets of Mining in which creditors will receive 100% of the equity interests, with a potential management contract with GXD Labs LLC or other manager identified by the Debtors and the Committee pursuant to the Wind-Down Procedures.

16.    "*Backup MiningCo Common Stock*" means the new common stock of Backup MiningCo.

17.    "*Backup Plan Administration Agreement Term Sheet*" means the term sheet attached to the Backup Plan Sponsor Agreement as <u>Exhibit A</u> that contains the terms and conditions under which the BRIC has agreed to serve as the Plan Administrator in the event that the Orderly Wind Down is consummated.

18.    "*Backup Plan Sponsor*" means the BRIC.

19.    "*Backup Plan Sponsor Agreement*" means that certain agreement, dated June 7, 2023, by and among the Debtors, the Committee, and the BRIC, including all exhibits, annexes, and schedules thereto, as such agreement may be amended, restated, amended and restated, modified, or otherwise supplemented from time to time in accordance with its terms.

20.    "*Backup Plan Sponsor Transaction*" means, as contemplated by the Backup Plan Sponsor Agreement, an Orderly Wind Down, including:  (a) the creation of the Backup MiningCo; (b) a Liquid Cryptocurrency distribution to creditors on or as soon as practicable after the Effective Date; and (c) a timely monetization of the remaining assets of the Debtors' estates and subsequent Liquid Cryptocurrency distributions to creditors from the proceeds thereof.

21.    "*Ballot*" means the ballot, approved pursuant to the Disclosure Statement Order, distributed to Holders of Impaired Claims entitled to vote on the Plan, on which such Holders desiring to vote shall indicate acceptance or rejection of the Plan and, as applicable, make any additional settlement and treatment elections contained in such ballot.

22.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

23.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

24.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, in each case as now in effect or hereafter amended.

25.    "*Bar Date*" means the applicable date established by the Bankruptcy Court by which Proof of Claims must be Filed for all Claims and Interests, other than Administrative Claims (with the exception of requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), as such date may be extended from time to time.  Unless otherwise extended, the Bar Date is February 9, 2023 for the Debtors other than GK8 and April 18, 2023 with respect to GK8; *provided* that, for the avoidance of any doubt, the Bar Date with respect

3

to any Account Holder Claim against any Debtor other than Celsius Network LLC or any other Claims affected by the Bar Date Amendment is August 2, 2023.

26.    "*Bar Date Amendment*" means that certain amendment to the Schedules to reflect that (a) contract claims related to the Debtors' Earn Program, Custody Program, and Withhold Accounts are only against Celsius Network LLC and (b) contract claims related to the Debtors' Borrow Program are only against Celsius Lending LLC, as set forth in the *Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

27.    "*Blockchain Recovery Investment Consortium*" or "*BRIC*" means (i) Van Eck Absolute Return Advisers Corporation and (ii) GXD Labs LLC.

28.    "*Borrow Program*" means the prepetition program through which the Debtors provided retail advances to Retail Borrowers pursuant to Section 4.E of the General Terms of Use.

29.    "*BRIC Parties*" means the Blockchain Recovery Investment Consortium and the BRIC Support Parties.

30.    "*BRIC Support Parties*" means any party designated by the BRIC and agreed by the Debtors and the Committee to work with the BRIC to implement the Backup Plan Sponsor Transaction, presently contemplated to be:  (i) Gemini Trust Company, LLC and (ii) Global X Digital, LLC, or an affiliate thereof; *provided* that any changes to the foregoing BRIC Support Parties will be disclosed in a revised Plan or in the Plan Supplement.

31.    "*BTC*" means bitcoin, a form of Cryptocurrency introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto, transactions in which are recorded on the Bitcoin blockchain.

32.    "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

33.    "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks, and other similar items.

34.    "*Cause of Action*" means, whether asserted against a Debtor or any other Person or Entity, any claim, counterclaim, cross-claim, interest, damages, remedy, cause of action, demand, right, action, controversy, proceeding, agreement, suit, obligation, liability, account, judgment, defense, offset, power, privilege, license, lien, indemnity, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, asserted or assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  For the avoidance of doubt, Causes of Action include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest, recharacterize, reclassify, subordinate, or disallow Claims or Interests; (d) claims or defenses pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any state or foreign law fraudulent transfer or similar claim; and (g) any other Avoidance Action.

35.    "*CEL Insider Loan*" means any Retail Advance Obligations of (a) an Insider of the Debtors, (b) an employee of the Debtors, (c) a former Insider of the Debtors, (d) a former employee of the Debtors, (e) an Excluded Party, (f) an individual or Entity identified on the Schedule of Subordinated Claims, or (g) any Related Party of the foregoing (a) through (f), in each case, that is supported by CEL Token.

36.    "*CEL Token*" means the Cryptocurrency Token native to the Debtors' platform defined by the smart contract code located at:  https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code.

37. "*CEL Token Deposit Claim*" means any Claim against the Debtors on account of the Debtors' obligation to return or distribute CEL Token to any Entity.

38. "*CEL Token Settlement*" means the settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, the terms of which are set forth in <u>Article IV.B.2</u> herein.

39. "*Celsius Account*" means any active account, as defined in Section 4.A of the General Terms of Use, identified in the Debtors' books and records as having a balance as of the Petition Date. For the avoidance of doubt, (a) Celsius Accounts are not "accounts" within the meaning of Article 9 of the Uniform Commercial Code; (b) each Account Holder's Celsius Accounts shall be aggregated such that each Account Holder's holdings are reflected in a single Celsius Account; and (c) the consolidation described in (b) shall not eliminate the designations associated with such assets based on the program(s) the Account Holders participated in (*e.g.*, "Earn," "Custody," etc.).

40. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated and jointly administered cases styled *In re Celsius Network LLC*, Case No. 22-10964 (MG).

41. "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

42. "*Claims Register*" means the official register of Claims against the Debtors maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

43. "*Class*" means a class of Claims or Interests, pursuant to section 1122(a) of the Bankruptcy Code, as set forth in <u>Article III</u> hereof.

44. "*Class Certification Motion*" means the *Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2670].

45. "*Class Claim*" means Claim No. 29046 filed by the Committee on behalf of all Account Holders.

46. "*Class Claim Representatives*" means Thomas DiFiore, Ignat Tuganov, and Rebecca Gallagher.

47. "*Class Claim Settlement*" means the full and final settlement and resolution of the Class Claim, all Proofs of Claim filed by Class Claim Settlement Participants, and the Class Certification Motion, as set forth in <u>Article IV.B.7</u> hereof and the Class Claim Settlement Order.

48. "*Class Claim Settlement Motion*" means the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064].

49. "*Class Claim Settlement Order*" means the *Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee Class Claim and (II) Granting Related Relief* [Docket No. 3288], the proposed form of which is attached to the Class Claim Settlement Motion.

50. "*Class Claim Settlement Participant*" means a Holder of an Account Holder Claim, other than an Account Holder who only holds Custody Claims, who did not opt out of the Class Claim Settlement on such Holder's Ballot.

51. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

52.     "*CNL Board*" means the board of directors of Celsius Network Limited.

53.     "*Code*" means the Internal Revenue Code of 1986, as amended.

54.     "*Committee*" means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on July 27, 2022 [Docket No. 241].

55.     "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

56.     "*Confirmation Date*" means the date on which Confirmation occurs.

57.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

58.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

59.     "*Consolidated Debtors*" means the Initial Consolidated Debtors, Celsius Lending LLC, and Celsius Networks Lending LLC.

60.     "*Consummation*" means the occurrence of the Effective Date.

61.     "*Contributed Claim*" means any direct Cause of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective Affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Celsius, including (a) any Cause of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Celsius' platform; (b) any Cause of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) any Cause of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Released Parties, or (iii) any claims that cannot be assigned under applicable law.

62.     "*Contributing Claimant*" means any Holder of a Claim or Interest that elects through its Ballot to contribute their Contributed Claims to the applicable Post-Effective Date Debtor(s) in order for the Litigation Administrator to prosecute such Contributed Claims for the benefit of Holders of Claims entitled to receive Litigation Proceeds hereunder.

63.     "*Convenience Claim*" means any aggregate Account Holder Claim (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) valued greater than the *De Minimis* Claim Threshold ($10.00) but less than or equal to the Convenience Claim Threshold ($5,000); *provided* that Account Holders whose Claims exceed the Convenience Claim Threshold may irrevocably elect to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims.  For the avoidance of doubt, (x) Celsius Accounts shall be consolidated for purposes of applying the Convenience Claim Threshold such that each unique Account Holder only maintains one Celsius Account, and (y) Custody Claims shall be treated in accordance with the Custody Settlement and shall be (i) disregarded for purposes of evaluating whether a Claim is within the Convenience Claim Threshold and (ii) unaffected by Convenience Claim Elections.

64.     "*Convenience Claim Election*" means the election, through an Account Holder Ballot in accordance with the procedures set forth in the Disclosure Statement Order, pursuant to which Account Holders whose Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) exceed the Convenience Claim Threshold will be offered an opportunity to irrevocably elect to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims.  For the avoidance of doubt, any

Convenience Claim Election shall apply to all Convenience Class eligible Claims held by the electing Account Holder (*i.e.*, all Claims held by such Account Holder other than Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims).

65.    "*Convenience Claim Threshold*" means $5,000.

66.    "*Convenience Class*" means Class 4 Convenience Claims after giving effect to any Convenience Claim Elections.

67.    "*Convenience Class Distribution*" means Liquid Cryptocurrency in an amount sufficient to provide Holders of Convenience Claims a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table), in full and final satisfaction of such Convenience Claims.

68.    "*Cryptocurrency*" means a fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a decentralized protocol, operating independently from a central bank.

69.    "*Cryptocurrency Conversion Table*" means the conversion table attached as <u>Exhibit A</u> to the *Notice of Filing of Cryptocurrency Conversion Rates* [Docket No. 1420].

70.    "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code; *provided* that if no Cure is listed for any assumed Executory Contract or Unexpired Lease, the Cure shall be $0.00.

71.    "*Custody Ad Hoc Group*" means that certain *ad hoc* group of Custody Claim Holders represented by Togut, Segal & Segal LLP as set forth in the *Second Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1284].

72.    "*Custody Claim*" means any Claim on account of Cryptocurrency transferred into the Custody Program.

73.    "*Custody Program*" means the prepetition program through which the Debtors allowed Account Holders to store Cryptocurrency on the Debtors' platform pursuant to Section 4.B of the General Terms of Use.

74.    "*Custody Provider Agreements*" means the agreements entered into by NewCo and/or its subsidiaries with one or more federally-licensed custody providers for the provision of services to NewCo and/or its subsidiaries following the Effective Date, each of which shall be on terms reasonably acceptable to the Debtors, the Committee, and the Plan Sponsor.

75.    "*Custody Settlement*" means the full and final settlement and resolution of all disputes regarding the Custody Program with respect to Custody Settlement Participants, as set forth in <u>Article III.B.6A</u> herein and the Custody Settlement Order.

76.    "*Custody Settlement Motion*" means the *Joint Motion for Entry of an Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2148].

77.    "*Custody Settlement Order*" means the *Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2291].

78.    "*Custody Settlement Participant*" means, as context requires, a Holder of a Custody Claim who has opted into the Custody Settlement either (a) in accordance with the Custody Settlement Order or (b) in such Holder's Ballot.

79.    "*Custody Withdrawal Order*" means the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767].

80.    "*D&O Liability Insurance Policy*" any insurance policy (including any "tail policy") covering any of the Debtors' current or former directors, members, trustees, officers, and managers' liability issued at any time to any of the Debtors or any of their Affiliates or predecessors, and any agreements, documents, and instruments related thereto.

81.    "*De Minimis Claim Threshold*" means $10.00.

82.    "*De Minimis Claim*" means any Claims held by an Entity with an aggregate value less than or equal to the *De Minimis* Claim Threshold.  For the avoidance of doubt, such Claims shall be classified as Class 9 *De Minimis* Claims and shall be cancelled and discharged without distribution.

83.    "*Deactivation Date*" means the date after which the Post-Effective Date Debtors will no longer make Plan distributions through the Celsius platform, which date the Debtors or Post-Effective Date Debtors (as applicable) will announce in a notice filed on the docket at least seven (7) days in advance thereof, which is expected to be approximately ninety (90) days after the Confirmation Date.

84.    "*Deactivation Date Cryptocurrency Conversion Table*" means the conversion table the Distribution Agent shall use to calculate the Claims of Holders of Allowed Custody Claims that did not retrieve their Plan distribution from the Celsius platform by the Deactivation Date in Cash and Liquid Cryptocurrency, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date.  Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court.  For the avoidance of doubt, following the Deactivation Date, such Claims shall be subject to further conversion pursuant to any applicable Distribution Cryptocurrency Conversion Table in connection with subsequent distributions.

85.    "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in <u>Article VIII.C</u> of the Plan.

86.    "*DeFi Cryptocurrency Assets*" means the Cryptocurrency assets at Stakehound or in other DeFi protocols.

87.    "*Disallowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, any Claim or Interest that is finally determined to be not Allowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable.

88.    "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2902] as may be modified, amended, or supplemented from time to time, to be approved pursuant to the Disclosure Statement Order.

89.    "*Disclosure Statement Order*" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

90.    "*Disputed*" means, as to a Claim or an Interest (or portion thereof):  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a

party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

91.      "*Disputed and Contingent Claims Reserve*" means any reserve or account or fund for Claims that are Disputed, contingent, or have not yet been Allowed, or where the Holder is or may be subject to an Avoidance Action.

92.      "*Distribution Agent*" means the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or any Litigation Administrator (as applicable), or the Entity or Entities selected by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or any Litigation Administrator and agreed by the Debtors, the Committee, and the Plan Sponsor, to make or facilitate distributions contemplated under the Plan.

93.      "*Distribution Cryptocurrency Conversion Table*" means the conversion table the Debtors shall use to calculate the amount of any Cryptocurrency a Holder of an Allowed Claim (other than Custody Claims prior to the Deactivation Date) shall receive under the Plan, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee (or by agreement of the Plan Administrator and Litigation Administrator for distributions after the Effective Date), which date is expected to be approximately fifteen (15) days prior to the applicable anticipated Liquid Cryptocurrency distribution date. For the avoidance of any doubt, the Distribution Cryptocurrency Conversion Table and the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court.

94.      "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is announced by the Debtors or designated in a Final Order.

95.      "*Earn Ad Hoc Group*" means that certain *ad hoc* group of Earn Claim Holders represented by Offit Kurman, P.A., as set forth in the *Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2553].

96.      "*Earn Claim*" means any (i) Claim arising out of or related to the Earn Program or (ii) Account Holder Claim not separately classified under the Plan.

97.      "*Earn Program*" means the prepetition program through which the Debtors allowed Account Holders to earn "rewards" in exchange for transferring their Cryptocurrency to the Debtors pursuant to Section 4.D of the General Terms of Use.

98.      "*Effective Date*" means the date on which (a) all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and (b) the Plan is declared effective in accordance with its terms.

99.      "*Effective Time*" means the clock time at which the Effective Date occurs, which shall be noted in the notice of the occurrence of the Effective Date.

100.     "*EIP Award*" means any Cash incentive award to be paid by the Debtors or the Post-Effective Date Debtors on the Effective Date under the Emergence Incentive Plan.

101.     "*EIP Participants*" means, collectively: (a) Christopher Ferraro, Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer; (b) Guillermo Bodnar, Chief Technology Officer; (c) Oren Blonstein, Chief Product Officer; (d) Ron Deutsch, General Counsel; (e) Trunshedda Ramos, Chief Human Resources Officer; (f) Adrian Alisie, Chief Compliance Officer; (g) Jenny Fan, Chief Financial Officer of Mining; (h) Dave Albert, Chief Administrative Officer of Mining; and (i) Quinn Lawlor, Chief Strategy Officer of Mining.

102.     "*Eligible Transferred Custody Claim*" means any Custody Claim on account of Cryptocurrency that was transferred to the Custody Program from the Earn Program or Borrow Program that is eligible for withdrawal

under the Custody Settlement Order (*i.e.*, a Custody Claim on account of Cryptocurrency transferred from the Earn Program or Borrow Program that is valued at less than $7,575 in the aggregate, valued as of the date of the transfer(s) to the Custody Program and meets the other requirements of the Custody Settlement Order).

103.    "*Emergence Incentive Plan*" means the emergence incentive plan providing for the distribution of Cash awards to the EIP Participants upon emergence, the terms of which are set forth in Article IV.J.2.

104.    "*Emergence Retention Plan*" means the emergence retention plan providing for the distribution of Cash retention awards to certain of employees of the Debtors to motivate such employees to remain with the Post-Effective Date Debtors to effectuate distributions contemplated under the Plan, the terms of which will be set forth in the Plan Supplement.

105.    "*Employee and NewCo Board Equity Compensation*" means NewCo Common Stock (or warrants or similar interests) in an amount not to exceed an aggregate total of one and one half (1.5%) percent of the sum of: (i) all outstanding shares of NewCo Common Stock issued on the Effective Date *plus* (ii) any NewCo Common Stock anticipated to be issued pursuant to reserves and holdbacks under this Plan following the Effective Date (but in all cases excluding any shares of NewCo Common Stock issued or anticipated to be issued to the Plan Sponsor if the Plan Sponsor Contribution takes the form of a primary equity purchase).  The Employee and NewCo Board Equity Compensation may be issued to members of management and employees of NewCo (other than the NewCo Management Team, which for the avoidance of doubt may be compensated from the Management Equity Compensation) and to persons serving on the New Board.

106.    "*Employee Transition Services Agreement*" means the agreement containing the terms and conditions under which certain of the Debtors' and/or NewCo's employees will be available to provide transition services to the Debtors, the Post-Effective Date Debtors, and/or the Plan Administrator, as applicable.

107.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

108.    "*Equitably Subordinated Claims*" means (a) those Claims identified by the Committee and agreed by the Debtors to be subordinated pursuant to the Plan, which shall be identified on the Schedule of Equitably Subordinated Claims and shall include Claims on account of the Goldstein Loan and the Leon Loan and (b) all other Claims, however classified under this Plan, of Persons or Entities whose Claims are identified on the Schedule of Equitably Subordinated Claims, unless otherwise expressly provided therein.

109.    "*Equitable Subordination Stay Order*" means the *Joint Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors and the United States Attorney's Office for the Southern District of New York With Respect to Agreement to Stay the Proceedings With Respect to Equitably Subordinated Claims* [Docket No. 3450].

110.    "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

111.    "*ETH*" means ether, the native Cryptocurrency of the Ethereum platform, that is not wrapped, staked, or otherwise subject to a trade restriction.

112.    "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78pp, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

113.    "*Excluded Party*" means each of the following:  (a) Alexander Mashinsky; (b) Shlomi Daniel Leon; (c) Roni Cohen Pavon; (d) the other UCC Claims Stipulation Defendants; (e) any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party in this Plan or the Schedule of Released and Exculpated Parties, except current and former managing partners, officers, directors, and employees of the Initial Consenting Series B Preferred Holders, WestCap Management LLC, and Caisse de dépôt et placement du Québec, CDPQ Placements privés Québec Inc., CDPQ Placements privés Inc., and CDPQ U.S. Inc.; (f) any party on the Schedule of Excluded Parties; and

(g) with respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified in this Plan or the Schedule of Released and Exculpated Parties as a Released Party. Notwithstanding anything to the contrary in this Plan, no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.

114.    "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.

115.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

116.    "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

117.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

118.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

119.    "*Fixed Management Fee*" means $20 million per year, which is inclusive of all Cash compensation for the NewCo Management Team, as more fully set forth in, and subject to the terms and conditions of, the Management Agreement.

120.    "*Former Celsius Account*" means an account on the Debtors' platform that would have been a Celsius Account had it been active and/or had a balance as of the Petition Date.

121.    "*FTC Stipulation*" means the *Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Enter into Stipulated Order in the District Court* [Docket No. 3289].

122.    "*General Custody Claim*" means any Custody Claim that is not a Withdrawable Custody Claim, less any amounts withdrawn under the Custody Settlement Order.

123.    "*General Earn Claims*" means Earn Claims (other than Convenience Claims).

124.    "*General Terms of Use*" means the general Terms of Use governing each Account Holder's access to, and use of, the Debtors' products and services as well as the Debtors' mobile and web-based application(s),

website(s), software, programs, documentation, tools, hardware, Internet-based services, components, and any updates (including software maintenance, service information, help content, bug fixes or maintenance releases) provided to Account Holders by the Debtors, directly or indirectly, as amended, modified, or supplemented from time to time in accordance with their terms. Unless otherwise specified, "General Terms of Use" refers to Version 8 of the General Terms of Use, effective April 14, 2022.

125.    "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors, other than: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Intercompany Claim; (e) a Convenience Claim; (f) a General Earn Claim; (g) a Custody Claim; (h) a Withhold Claim; (i) a Retail Borrower Deposit Claim (and any corresponding Retail Borrower Post-Set Off Claim); (j) an Unsecured Loan Claim; (k) a Section 510(b) Claim; (l) a State Regulatory Claim; or (m) an Equitably Subordinated Claim. For the avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims, but Claims for damages or other Unsecured Claims on account of Former Celsius Accounts shall be General Unsecured Claims.

126.    "*GK8*" means, collectively, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC.

127.    "*Goldstein Loan*" means the $4.2 million loan issued by one or more of the Debtors to Hanoch "Nuke" Goldstein on April 1, 2021.

128.    "*Governmental Unit*" has the meaning as set forth in section 101(27) of the Bankruptcy Code.

129.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

130.    "*Illiquid Recovery Rights*" means, in the event of an Orderly Wind Down, the Claims of any creditor that would have received NewCo Common Stock had the NewCo Transaction been consummated, which Claims shall remain outstanding after the Effective Date for purposes of preserving such Holders' rights to recoveries on the Debtors' illiquid assets.

131.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

132.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, equity holders, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

133.    "*Ineligible Withhold Assets*" means any assets transferred to the Debtors' platform that were not eligible for the designated service or otherwise not supported on the Debtors' platform.

134.    "*Initial Consenting Series B Preferred Holders*" means Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc.

135.    "*Initial Consolidated Debtors*" means Celsius Network Limited and Celsius Network LLC.

136.    "*Initial Litigation Funding Amount*" means Cash in an amount of $50,000,000, which amount shall be agreed upon by the Debtors and the Committee.

137.    "*Insider*" means an "insider" (as defined in section 101(31) of the Bankruptcy Code) of the Debtors or a non-statutory insider of the Debtors identified in the Schedule of Equitably Subordinated Claims.

138.    "*Institutional Loan*" means any loan from the Debtors to an institutional borrower arranged on an "over the counter" basis. Institutional Loans are governed by master loan agreements and term sheets setting forth their terms.

139.    "*Intercompany Claim*" means any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor.

140.    "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor.

141.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

142.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

143.    "*KEIP Motion*" means the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Incentive Program and (II) Granting Related Relief* [Docket No. 2336].

144.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

145.    "*Leon Loan*" means the $4 million loan issued by one or more of the Debtors to Shlomi Daniel Leon on April 13, 2022.

146.    "*Lien*" has the meaning defined in section 101(37) of the Bankruptcy Code.

147.    "*Liquid Cryptocurrency*" means the types of Cryptocurrency to be distributed to Holders of Claims pursuant to this Plan, which may include:  (a) BTC and (b) ETH.

148.    "*Liquid Cryptocurrency Distribution Amount*" means the amount of Liquid Cryptocurrency to be distributed as part of the Unsecured Claim Distribution Consideration, which shall be an amount equal to the total value of Liquid Cryptocurrency held by the Debtors on the Effective Date less, without duplication, Liquid Cryptocurrency amounts needed for (or needed to be liquidated for):  (a) distributions of Liquid Cryptocurrency to (or reserves for) Holders of (i) Allowed Convenience Claims and (ii) Allowed Custody Claims and Allowed Withhold Claims; (b) the NewCo Capitalization Amount; (c) the Professional Fee Escrow Account; (d) the Initial Litigation Funding Amount; (e) Cash needed at emergence (pre-transaction items); and (f) the Senior Claims Amount.

149.    "*Liquid Cryptocurrency Weighted Distribution Election*" means the Ballot election of a Holder of a Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration expressing a preference to receive a greater share of the Liquid Cryptocurrency Distribution Amount in lieu of some or all of such Holder's Pro Rata share of NewCo Common Stock; *provided* that, to the extent a Holder's Liquid Cryptocurrency Weighted Distribution Election is honored, such Holder will forfeit all or a portion of the Holder's NewCo Common Stock distribution at a 30% discount to the Liquid Cryptocurrency it is receiving.  The amount of NewCo Common Stock forfeited, and therefore the amount of Liquid Cryptocurrency received, will depend on the aggregate Unsecured Claim Distribution Mix Elections.  For the avoidance of doubt, (a) any Liquid Cryptocurrency Weighted Distribution Election shall apply to all Claims on account of which the electing Account Holder is receiving the Unsecured Claim Distribution Consideration and (b) any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

150.    "*Litigation Administrator*" means any Person or Entity appointed by the Committee, in consultation with the Special Committee, to fulfill the duties described in Article IV.G (in a fiduciary capacity), including any successors thereto.  The identity of each Litigation Administrator, including the Recovery Causes of Action for which such Litigation Administrator shall be responsible, shall be disclosed in the Plan Supplement.

151.    "*Litigation Administrator Agreement(s)*" means the agreement providing for the prosecution of the Recovery Causes of Action by the Litigation Administrator(s) and the oversight role of the Litigation Oversight Committee, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof that, among other things, provides for the Initial Litigation Funding Amount and governs the powers, duties, and responsibilities of the Litigation Administrator(s), which shall be Filed as part of the Plan Supplement.

152.    "*Litigation Oversight Committee*" means the seven (7) member committee that will oversee (in a fiduciary capacity) the Litigation Administrator's prosecution of the Recovery Causes of Action in accordance with the Plan and shall be identified and disclosed in the Plan Supplement, and any successors thereto appointed pursuant to and in accordance with the Litigation Administrator Agreement(s).  The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Litigation Oversight Committee, subject to the consent of the Committee.  The remaining members of the Litigation Oversight Committee shall be determined by the Committee through an open interview process, and at least two (2) of the members of the Litigation Oversight Committee shall not be Committee members.

153.    "*Litigation Proceeds*" means the proceeds of the Recovery Causes of Action.

154.    "*Litigation Recovery Account*" means the segregated account established by the Post-Effective Date Debtors on the Effective Date and funded with the Initial Litigation Funding Amount.  The Litigation Recovery Account shall be controlled by the Litigation Administrator(s), and the funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator(s) (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action, all in accordance with the terms of the Litigation Administrator Agreement(s).

155.    "*Management Agreement*" means the agreement or agreements to be entered into between NewCo, the Plan Sponsor, and/or the NewCo Management Team, to be agreed to by the Debtors, the Committee, and the Plan Sponsor, containing the terms and conditions under which the Plan Sponsor and NewCo Management Team will manage the operations of NewCo and/or its subsidiaries, including the detailed terms of the Management Compensation.

156.    "*Management Compensation*" means any amounts payable to the Plan Sponsor or any member of the NewCo Management Team (or their designees) by NewCo under the Management Agreement or US Bitcoin Agreements, including the (a) Fixed Management Fee; (b) Mining Management Fee; and (c) Management Equity Compensation.

157.    "*Management Equity Compensation*" means, (a) five percent (5%) of NewCo Common Stock on a fully diluted basis, which shall vest ratably over five (5) years annually commencing on the Effective Date, with such vesting to occur at the end of the applicable one (1) year period; and (b) options to purchase five percent (5%) of NewCo Common Stock on a fully diluted basis, structured in five (5) tranches of five (5) year options of 1.0% with one (1) tranche granted each year at the anniversary of the Effective Date, with the strike price for each year set at either, at the election of the Debtors and Committee to be made as of or prior to the Effective Date, (x) the trading price of the NewCo Common Stock as of the close of the market on the preceding business day; or (y) the trailing 90-day average level of the CMC 200 Index including BTC or other index to be agreed in good faith by the Plan Sponsor, the Debtors, and the Committee on or prior to the Effective Date; *provided* that the index level used to set the strike price of each year's option issuance shall be based on the cumulative change in the index from the Effective Date; *provided further* that the initial strike price shall be calculated using the net asset value of the NewCo Assets as of the Effective Date (calculated using the midpoint of the valuation in the Disclosure Statement) divided by the outstanding shares of NewCo Common Stock issued on the Effective Date.

158.    "*Mining*" means Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Debtor Celsius Mining LLC and its non-Debtor subsidiary Celsius Mining IL Ltd.

159.    "*Mining Management Fee*" means $15 million per year, subject to the terms and conditions of, and as more fully set forth in, the Management Agreement and US Bitcoin Agreements, including those providing for

potential reductions to the Mining Management Fee in the event that targets and milestones set forth in the Plan Sponsor Agreement are not met.

160.    "*New Board*" means the board of directors of NewCo, which shall be appointed as provided herein. The identities of the members of the New Board shall be disclosed in the Plan Supplement.

161.    "*New Mining Facilities*" means one or more new bitcoin mining facilities, with an aggregate capacity of 100 megawatts, that US Bitcoin will build and energize within 12 months of the Effective Date, as provided in the US Bitcoin Agreements, and subject to the terms and conditions thereof, including the approval by the New Board of not less than $39,500,000 in funding for the buildout and energization of such facilities.

162.    "*New Organizational Documents*" means the documents providing for corporate governance of NewCo, and any subsidiaries thereof, including charters, bylaws, operating agreements, agreements providing indemnification, contribution, or reimbursement to any Person or Entity, other organizational documents or agreements, and investment guidelines, as applicable.

163.    "*NewCo*" means the Entity to be managed by the Plan Sponsor following the Effective Date, which shall hold and operate the NewCo Assets for the benefit of holders of NewCo Common Stock.

164.    "*NewCo Assets*" means the assets that shall be transferred or assigned to NewCo or its subsidiaries on the Effective Date, free and clear of any Liens, Claims, interests, charges, or encumbrances, which shall consist of (a) the DeFi Cryptocurrency Assets; (b) the Institutional Loan portfolio; (c) PE & VC Investments; (d) Mining; and (e) the NewCo Capitalization Amount.

165.    "*NewCo Capitalization Amount*" means $450 million of Liquid Cryptocurrency (valued as of the Effective Date) to be transferred by the Debtors to NewCo and/or its subsidiaries free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date, subject to potential reduction for investments in Mining made by the Debtors prior to the Effective Date that are approved by the Debtors, the Committee, and the Plan Sponsor, but solely to the extent that any such reduction is approved in writing by the Plan Sponsor in its sole discretion.  For the avoidance of doubt, if the Plan Sponsor Contribution takes the form of a primary equity purchase, the proceeds of the Plan Sponsor Contribution shall also be contributed to NewCo on the Effective Date.

166.    "*NewCo Common Stock*" means the common stock of NewCo to be distributed on the Effective Date in accordance with the terms hereof.

167.    "*NewCo Common Stock Weighted Distribution Election*" means the Ballot election of a Holder of a General Earn Claim (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) expressing a preference for a greater share of NewCo Common Stock in lieu of some or all of such Holder's Pro Rata share of the Liquid Cryptocurrency Distribution Amount; *provided* that, to the extent a Holder's NewCo Common Stock Weighted Distribution Election is honored, such Holder will receive incremental NewCo Common Stock at a 30% premium to the Liquid Cryptocurrency Distribution Amount the Holder forfeits.  The Liquid Cryptocurrency Distribution Amount forfeited, and therefore the amount of additional NewCo Common Stock received, will depend on the aggregate Unsecured Claim Distribution Mix Elections.  For the avoidance of doubt, any NewCo Common Stock Weighted Distribution Election shall apply to all Claims on account of which the electing Account Holder is receiving the Unsecured Claim Distribution Consideration.

168.    "*NewCo Management Team*" means the (a) chief executive officer, (b) chief operating officer, (c) chief financial officer, (d) chief marketing officer, (e) general counsel, (f) chief accounting officer, (g) chief risk officer, (h) other C-suite executives or heads of staking and mining businesses (if any), and (i) any individuals filling roles traditionally satisfied by individuals with the foregoing titles, in each case with respect to NewCo, regardless of the ultimate title assigned to such individuals.

169.    "*NewCo Transaction*" means the transactions contemplated by the Plan, other than <u>Article IV.E</u>, which shall occur on the Effective Date if the Debtors do not elect to pursue the Orderly Wind Down.

170.    "*Orderly Wind Down*" means the orderly wind down of the Debtors' Estates pursuant to the Wind-Down Procedures, as set forth in Article IV.E, solely to the extent applicable as set forth therein.

171.    "*Other CEL Token Claim*" means any Claim, including any Account Holder Claim, arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token.

172.    "*Other Interest*" means any Interest other than Series B Preferred Interests and Intercompany Interests.

173.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

174.    "*Other Secured Claim*" means any Secured Claim against a Debtor, other than a Secured Tax Claim.

175.    "*Pause*" means the pause by the Debtors, effective June 12, 2022, of all withdrawals, swaps, and transfers of Tokens on the Celsius platform.

176.    "*PE & VC Investments*" means the Debtors' alternative investments as identified in the schedules of Celsius Network Ltd. Case No. 22-10966 (MG), Docket No. 7 and the Disclosure Statement, unless such investments were sold, monetized, or otherwise disposed of prior to the Effective Date.

177.    "*Pending Withdrawal Ad Hoc Group*" means that certain *ad hoc* group of Account Holders represented by The Law Offices of Adrienne Woods, P.C. as set forth in the *Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 2155].

178.    "*Person*" means a "Person" as defined in section 101(41) of the Bankruptcy Code.

179.    "*Petition Date*" means July 13, 2022 with respect to the Debtors other than GK8, and December 7, 2022 with respect to GK8.

180.    "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated by the Debtors in consultation with the Committee, whose identity shall be disclosed in the Plan Supplement, and who shall have all powers and authorities set forth in Article IV.F herein (as may be modified by Article IV.E.1).

181.    "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, and the Plan Administrator governing the Plan Administrator's rights and obligations in connection with the Plan and/or Orderly Wind Down, which shall be executed no later than the Effective Date.  The Plan Administrator Agreement shall be included in the Plan Supplement.

182.    "*Plan Administrator Budget*" means, in the event that the NewCo Transaction is implemented, a budget funded by the Debtors for the reasonable activities and expenses to be incurred in connection with the Plan Administrator's duties under the Plan Administrator Agreement, which budget, activities, and reasonable expenses shall be reasonably acceptable to the Debtors and the Committee and included in the Plan Supplement.

183.    "*Plan Sponsor*" means Fahrenheit, LLC (together with any successors thereto).

184.    "*Plan Sponsor Agreement*" means that certain agreement, dated June 5, 2023, by and among the Debtors, the Committee, and the Plan Sponsor, including all exhibits, annexes, and schedules thereto, as such agreement may be amended, restated, amended and restated, modified, or otherwise supplemented from time to time in accordance with its terms.  For the avoidance of any doubt, "Plan Sponsor Agreement" includes the term sheet attached thereto as Exhibit B.

185.    "*Plan Sponsor Contribution*" means the Plan Sponsor's purchase of $50 million of NewCo Common Stock, either as a purchase of primary equity from NewCo or through the Secondary Market Purchase, as will be more fully set forth in the Plan Sponsor Contribution Agreement.  To the extent that the Plan Sponsor Contribution is used to purchase primary equity from NewCo, the amount of NewCo Common Stock purchased by the Plan Sponsor from NewCo shall be equal to the product of: (i) the sum of all outstanding shares of NewCo Common Stock issued or anticipated to be issued on the Effective Date *plus* any NewCo Common Stock issued or anticipated to be issued pursuant to reserves and holdbacks under this Plan following the Effective Date, *multiplied by* (ii) a fraction, the numerator of which is the Plan Sponsor Contribution (*i.e.*, $50 million), and the denominator of which is the net asset value of NewCo as of the Effective Date.  An illustrative calculation of the foregoing formula is depicted below.

$$\left(\begin{array}{l}\text{The sum of all outstanding shares of NewCo Common Stock} \\ \text{issued or anticipated to be issued on the Effective Date } \textit{plus} \\ \text{any NewCo Common Stock issued or anticipated to be issued} \\ \text{pursuant to reserves and holdbacks under this Plan following} \\ \text{the Effective Date}\end{array}\right) \times \frac{\text{Plan Sponsor Contribution (\textit{i.e.}, \$50 million)}}{\text{NewCo Net Asset Value as of Effective Date}}$$

186.    "*Plan Sponsor Contribution Agreement*" means the agreement setting forth the terms and conditions of the Plan Sponsor Contribution, which shall be reasonably acceptable to the Debtors, the Committee, and the Plan Sponsor, and included in the Plan Supplement.

187.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreement, schedules, and exhibits to the Plan, in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with its terms, the Plan Sponsor Agreement, the Bankruptcy Code, and the Bankruptcy Rules, to be filed (unless otherwise expressly required under this Plan or the Plan Sponsor Agreement to be filed by a different date) by the Debtors no later than fourteen (14) days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court, including the following, as applicable: (a) the Management Agreement; (b) the New Organizational Documents; (c) the identities of the members of the New Board; (d) the Schedule of Rejected Executory Contracts and Unexpired Leases; (e) the Schedule of Assumed Executory Contracts and Unexpired Leases; (f) the Schedule of Released and Exculpated Parties; (g) the Schedule of Retained Causes of Action; (h) the Employee Transition Services Agreement; (i) the Schedule of Equitably Subordinated Claims; (j) the Schedule of Excluded Parties; (k) the Transaction Steps Memorandum; (l) the Litigation Administrator Agreement(s); (m) the identity of the Litigation Administrator; (n) the identities of the members of the Litigation Oversight Committee; (o) the US Bitcoin Agreements; (p) the Proof Group IP License; (q) the Plan Sponsor Contribution Agreement; (r) the Custody Provider Agreements; (s) the Plan Administrator Agreement; (t) the Plan Administrator Budget; (u) the key terms of agreements with Distribution Agents; (v) the Figure Lending, LLC Refinancing Term Sheet; and (w) the ADR Procedures.  The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth therein in full; *provided* that in the event of a conflict between the Plan and the Plan Supplement, the Plan shall control, except with respect to the Management Agreement, the New Organizational Documents, the US Bitcoin Agreements, the Proof Group IP License, and the Plan Sponsor Contribution Agreement.

188.    "*Post-Effective Date Debtors*" means, collectively, all Debtors and successors thereto after the Effective Date that are not acquired by NewCo or any of its subsidiaries or otherwise managed by the Plan Sponsor, which shall be responsible for winding down the Debtors' Estates pursuant to the terms of the Plan.

189.    "*Post-Effective Date Debtors' Assets*" means any assets not transferred to NewCo or any of its subsidiaries, as applicable, which assets shall vest in the Post-Effective Date Debtors.  For the avoidance of doubt, the Post-Effective Date Debtors' Assets shall include the Recovery Causes of Action.

190.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.  For the avoidance of doubt, Priority Tax Claims are excluded from "State Regulatory Claims" hereunder.

191.    "*Pro Rata*" means the proportion that the U.S. Dollar value of an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate U.S. Dollar value of all Allowed Claims or Allowed Interests in that Class (or as otherwise specified), in each case calculated as of the Petition Date.  For the avoidance of doubt, the denominator for purposes of the "Pro Rata" calculation with respect to Claims on account of which the Holder will receive the Unsecured Claim Distribution Consideration shall include all Claims receiving the Unsecured Claim Distribution Consideration.

192.    "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

193.    "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

194.    "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

195.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtor prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B.3 of the Plan.

196.    "*Proof Group*" means Proof Group Capital Management LLC.

197.    "*Proof Group IP License*" means, if applicable, a royalty-free, perpetual license, without sublicense rights, of intellectual property owned by Proof Group (or other rights to use the applicable software or proprietary technology) with respect to staking services, which shall be included in the Plan Supplement.

198.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date as established by the Bankruptcy Court.

199.    "*PSA Definitive Documents*" means "Definitive Documents," as defined in the Plan Sponsor Agreement.

200.    "*Pure Custody Claim*" means any Custody Claim on account of Cryptocurrency that was never used in any of the Debtors' services other than the Custody Program that is eligible for withdrawal under the Custody Settlement Order.

201.    "*Recovery Causes of Action*" means, to the extent not expressly released pursuant to the terms of the Plan or the Confirmation Order, any (a) Causes of Action that the Debtors or their Estates may have that are based on or related to actions taken by, or omissions of, any Excluded Party or any other Person or Entity that is not a Released Party in connection with the management or affairs of the Debtors prior to or after the filing of the Chapter 11 Cases and (b) Avoidance Actions.  For the avoidance of doubt, the Recovery Causes of Action shall include (x) those Causes of Action identified in (i) the complaint attached as Exhibit 2 to the UCC Claims Stipulation Motion, as may be amended from time to time, and (ii) the Schedule of Retained Causes of Action, (y) the Contributed Claims, and (z) any additional Causes of Action determined to be included by the Bankruptcy Court and described in the Confirmation Order.

202.    "*Registration Statement*" means the registration statement on Form 10 registering the NewCo Common Stock pursuant to Section 12(b) or Section 12(g) under the Exchange Act.

203.    "*Regulatory Approvals*" means any consents, approvals, or permissions of governmental authorities, including, for the avoidance of doubt, the SEC, that are necessary to implement or consummate the Plan and the NewCo Transaction (if any).

204.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claims or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

205.    "*Related Party*" means, with respect to an Entity, each of, and in each case solely in its capacity as such, (a) such Entity's current and former Affiliates and (b) such Entity's, and such Entity's current and former Affiliates', directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated Entities, managed or advised Entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Distribution Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing.  Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Related Party under the Plan, except for purposes of the Excluded Party definition (which utilizes the term "Related Party").

206.    "*Released Parties*" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party.  Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided, further*, that, notwithstanding anything to the contrary in this Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided, further*, that Causes of Action against Released Parties, if any, listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.  For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, or Other Interest shall not be a Released Party in its capacity as such unless such Holder opts into becoming a Releasing Party.

207.    "*Releasing Parties*" means, collectively: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).  For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, or Other Interest that fails to opt into the Plan's releases shall not be a Releasing Party in its capacity as such.

208.    "*Retail Advance Obligations*" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

209.    "*Retail Advance Obligation Repayment Amount*" means an amount of BTC or ETH that is equivalent in value to the amount of the Retail Advance Obligations repaid by the applicable Retail Borrower pursuant to the Retail Advance Obligation Repayment Election, which BTC or ETH shall be valued as of the day that such repayment is made as of 12:00 p.m., prevailing Eastern Time, on a cryptocurrency exchange to be agreed upon by the Debtors and the Retail Borrower Ad Hoc Group.

210.    "*Retail Advance Obligation Repayment Deadline*" means five (5) calendar days prior to the Effective Date.

211.    "*Retail Advance Obligation Repayment Election*" means the election of a Retail Borrower to repay its Retail Advance Obligations, which will be in the Retail Advance Obligations Repayment Instructions.

212.    "*Retail Advance Obligation Repayment Instructions*" means the instructions regarding repayment of Retail Advance Obligations, which instructions the Debtors shall e-mail to all Retail Borrowers at least thirty (30) calendar days prior to the anticipated Effective Date and which instructions shall specify the Retail Advance Obligation Repayment Deadline.

213.    "*Retail Borrower Ad Hoc Group*" means that certain *ad hoc* group of Retail Borrower Deposit Claim Holders represented by McCarter & English, LLP as set forth in the *First Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1920].

214.    "*Retail Borrower Deposit Claim*" means a Retail Borrower's Claim against the Debtors on account of the Cryptocurrency such Retail Borrower transferred in connection with its Retail Advance Obligation(s).

215.    "*Retail Borrower Post-Set Off Claim*" means a Retail Borrower's remaining Claim after application of any Retail Advance Obligation Repayment Amounts transferred by such Retail Borrower by the Retail Advance Obligation Repayment Deadline and/or the application of the Set Off Treatment to such Retail Borrower's Retail Borrower Deposit Claim.

216.    "*Retail Borrower Settlement*" means the settlement of the adversary proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors and Claims held by Retail Borrowers, the terms of which are set forth in <u>Article IV.B.7</u> herein.

217.    "*Retail Borrowers*" means the individual Account Holders with outstanding Retail Advance Obligations in the Debtors' Borrow Program as of the Petition Date; *provided* that Daniel Leon and Hanoch "Nuke" Goldstein shall not be considered to be Retail Borrowers.

218.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors or Post-Effective Date Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

219.    "*Schedule of Equitably Subordinated Claims*" means the schedule of Claims identified by the Committee and agreed by the Debtors to be subordinated pursuant to the Plan on equitable grounds, subject to Bankruptcy Court approval, including (i) participation in, or direct knowledge of, the prepetition manipulation of the price of the CEL Token or (ii) other misconduct, including fraud, willful misconduct, or other wrongful or inequitable conduct, as the same may be amended, modified, or supplemented from time to time.  For the avoidance of any doubt, unless specifically provided in the Schedule of Equitably Subordinated Claims, all Claims held by any Holder of an Equitably Subordinated Claim shall be Equitably Subordinated Claims.

220.    "*Schedule of Excluded Parties*" means the schedule of current or former officers, directors, managers, employees, professionals, other agents of the Debtors, or third parties agreed by the Debtors and the Committee specifically not to be Released Parties and Exculpated Parties, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

221.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Post-Effective Date Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

222.    "*Schedule of Released and Exculpated Parties*" means the schedule of current or former officers, directors, managers, employees, professionals, or other agents of the Debtors and the Committee to be Released Parties and Exculpated Parties, which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement and shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

223.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, which may include categories of Causes of Actions and potential defendants and shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

224.    "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as such Schedules may be amended, modified, or supplemented from time to time.

225.    "*SEC*" means the Securities and Exchange Commission.

226.    "*Secondary Market Purchase*" means the Plan Sponsor's purchase of $50 million of NewCo Common Stock through secondary equity purchases, which secondary purchases, if so elected by the Debtors and the Committee, shall comprise the Plan Sponsor Contribution.

227.    "*Securities Litigation*" means the litigation captioned as *Goines v. Celsius Network, LLC, et. al.*, Case No. 2:22-CV-04560-KM-ESK pending in the United States District Court for the District of New Jersey.

228.    "*Securities Litigation Documents*" means all books, records, documents, files, electronic data (in whatever format, including native format, and from every source and location, including but not limited to all hard drives, servers, and cloud-based storage located in the United States and overseas), or any tangible object or other item of evidence, wherever stored, relevant or potentially relevant to the Securities Litigation.

229.    "*Section 502(h) Claim*" means any Claim that would arise under section 502(h) of the Bankruptcy Code.

230.    "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code, including Other CEL Token Claims.

231.    "*Secured Claim*" means any claim that is:  (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.  Except as otherwise specified in the Plan, any Final Order, or as otherwise agreed by the Debtors, and except for any Claim that is secured by property of a value in excess of the principal amount of such Claim (as determined by Final Order of the Bankruptcy Court), the amount of an Allowed Secured Claim shall not include interest or fees on such Claim accruing from and after the Petition Date.

232.    "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time

limitations), including any related Secured Claim for penalties. For the avoidance of doubt, Secured Tax Claims are excluded from "State Regulatory Claims" hereunder.

233.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

234.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

235.    "*Senior Claims Amount*" means an amount equal to an amount determined by the Debtors, and consented to by the Committee (not to be unreasonably withheld, conditioned, or delayed), as reasonably necessary to pay in full, or reserve for payment in full of, all Allowed Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims.

236.    "*Series B Preferred Interests*" means the Class B Preferred Shares issued by Celsius Network Limited.

237.    "*Series B Settlement*" means the settlement of Claims and Interests held by Holders of Series B Preferred Interests, the terms of which are set forth in Article IV.B.6 herein.

238.    "*Series B Settlement Agreement*" means the settlement agreement governing the Series B Settlement.

239.    "*Series B Settlement Consideration*" means $1 million in Cash from the cash proceeds referenced in paragraph 9 of the *Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the GK8 Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1686].

240.    "*Series B Settlement Order*" means the *Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 3058].

241.    "*Set Off Treatment*" means, with respect to any Retail Borrower Deposit Claim, the treatment option pursuant to which such Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligations outstanding on the Petition Date. Under the Set Off Treatment, the Retail Borrower will retain the proceeds of its Retail Advance Obligations and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date. The remaining amount of the Retail Borrower Deposit Claim (*i.e.*, the Retail Borrower Post-Set Off Claim) will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable. For the avoidance of doubt, if a Holder's Retail Borrower Deposit Claim receives the Set Off Treatment, such Holder will not owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of such Retail Borrower Deposit Claim.

242.    "*Solicitation Agent*" means Stretto, Inc., the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

243.    "*Solicitation Materials*" means the solicitation materials with respect to the Plan, including the court-approved Disclosure Statement, form of ballots, and any other solicitation materials, including the solicitation version of the Plan.

244.    "*Special Committee*" means David M. Barse and Alan J. Carr, together, solely in their capacity as the special committee of the CNL Board.

245.    "*Special Committee D&O Liability Insurance Policies*" means the D&O Liability Insurance Policies with Berkley Professional Liability (Policy No. BPRO8086972), XL Specialty Insurance Co. (Policy

No. ELU184224-22), Endurance American Insurance Co. (Policy No. FIX30022208200), which provide insurance coverage to the members of the Special Committee in their capacities as such.

246.     *"State Regulatory Claim"* means any Unsecured Claim against any of the Debtors held by a state Governmental Unit on account of its regulatory authority over the Debtors' business operations, including any claims for penalties or fines; *provided*, for the avoidance of doubt, that such State Regulatory Claims do not include tax Claims or any other Claims not related to the State's regulatory authority.

247.     "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.D of the Plan.

248.     "*Token*" means a unit of Cryptocurrency.

249.     "*Transaction Steps Memorandum*" means that certain memorandum, as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the restructuring contemplated by the Plan, the form of which shall be included in the Plan Supplement.

250.     "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

251.     "*UCC Claims Stipulation*" means the *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2201].

252.     "*UCC Claims Stipulation Defendants*" means each of the defendants identified in the complaint attached as Exhibit 2 to the UCC Claims Stipulation Motion, including Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and any mediate or intermediate transferee of the foregoing.

253.     "*UCC Claims Stipulation Motion*" means the *Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2054].

254.     "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within one year of receipt; (b) given notice to NewCo, the Post-Effective Date Debtors, or the Distribution Agent, as applicable, of an intent to accept a particular distribution within one year of receipt; (c) responded to the Debtors', NewCo's, the Post-Effective Date Debtors', or the Distribution Agent's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

255.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

256.     "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

257.     "*Unsecured Claim*" means any Claim that is not a Secured Claim.

258.     "*Unsecured Claim Distribution Consideration*" means (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of the NewCo Common Stock (subject to dilution by the Management Equity Compensation and the Employee and NewCo Board Equity Compensation).

259.    "*Unsecured Claim Distribution Mix Election*" means either a Liquid Cryptocurrency Weighted Distribution Election or NewCo Common Stock Weighted Distribution Election.  The Debtors shall use reasonable efforts to redistribute the consideration provided to the Holders of General Earn Claims (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) to satisfy Unsecured Claim Distribution Mix Elections.

260.    "*Unsecured Loan Claims*" means any Unsecured Claim arising on account of a loan agreement under which a Debtor is a borrower.

261.    "*US Bitcoin*" means U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.).

262.    "*US Bitcoin Agreements*" means, collectively, the US Bitcoin Management Agreement and one or more agreements providing for the following:  (i) at the Debtors' option, a royalty-free license for the US Bitcoin IP, without sublicense rights, for the duration of the term of the US Bitcoin Management Agreement, (ii) both US Bitcoin and the Plan Sponsor's indemnity of NewCo with respect to all claims and damages related to the causes of action asserted in the lawsuit styled *Lancium LLC v. U.S. Data Mining Group, Inc.*, *et al.* (W.D. Tex. Civ. A. No. 6:23-cv-00344), (iii) the US Bitcoin New York Facility Option, and (iv) US Bitcoin's provision of the New Mining Facilities to NewCo, each of which shall be included in the Plan Supplement and shall be consistent in all respects with the Plan Sponsor Agreement.

263.    "*US Bitcoin IP*" means intellectual property owned by US Bitcoin (or other rights to use the applicable software or proprietary technology) for (i) the miner management software referred to as the Operator and (ii) curtailment management software referred to as the Reactor.

264.    "*US Bitcoin Management Agreement*" means one or more operating and services agreements to be entered into between US Bitcoin and NewCo (or in the case of the Interim Services Agreement on the Ward County, Texas Bitcoin mining data center site commonly known as Cedarvale, between US Bitcoin and Celsius Mining) on or before the Effective Date containing the terms on which US Bitcoin will manage NewCo's mining business, including, without limitation, the US Bitcoin Management Agreement and the Interim Services Agreement relating to construction of the 215 MW Cedarvale project, in each case, filed in substantially final form in the Plan Supplement (as may be modified, amended, or supplemented).

265.    "*US Bitcoin New York Facility Option*" means the option provided by US Bitcoin to the Debtors to (i) purchase an existing, fully permitted bitcoin mining facility with a 50 megawatt capacity, located in upstate New York, including the 12 years of existing leasehold rights and renewal terms for such facility and (ii) have US Bitcoin facilitate the immediate installation at miners at such facility, all as provided in the US Bitcoin Agreements.

266.    "*Voting Deadline*" means the date and time by which the Solicitation Agent must actually receive the Ballots, as set forth on the Solicitation Materials.

267.    "*Wind-Down Assets*" means, in the event of an Orderly Wind Down, all of the Debtors' assets, which shall vest in the Post-Effective Date Debtors pursuant to the Plan Administrator Agreement.

268.    "*Wind-Down Budget*" means, in the event of an Orderly Wind Down, that certain budget governing the fees, expenses, and disbursements required for the Orderly Wind Down, which shall be filed in connection with the Wind-Down Motion.

269.    "*Wind-Down Expenses*" means, in the event of an Orderly Wind Down, all actual and necessary costs and expenses incurred by the Plan Administrator in connection with carrying out the Orderly Wind Down pursuant to the terms of the Plan, the Plan Administrator Agreement, and the Wind-Down Procedures.

270.    "*Wind-Down Motion*" means the motion to be filed by the Debtors to implement an Orderly Wind Down in accordance with Article IV.E.  The Wind-Down Motion shall include any proposed revisions to the Wind-Down Procedures and the Wind-Down Budget.  Parties in interest shall have no fewer than ten days to object to the Wind-Down Motion and any exhibits thereto.

271.    "*Wind-Down Procedures*" means the procedures that identify the mechanics and procedures to effectuate the Orderly Wind Down, which shall be Filed as part of the Plan Supplement.

272.    "*Withdrawable Custody Claim*" means, collectively, all Pure Custody Claims and Eligible Transferred Custody Claims that are eligible for withdrawal under the Custody Settlement Order.

273.    "*Withdrawal Fee*" means any gas fees or transaction costs (or a fee approximating such costs) necessary to effectuate the withdrawal or transfer of Cryptocurrency.

274.    "*Withdrawal Preference Exposure*" means (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (*i.e.*, on or after April 14, 2022), valued as of the time of such withdrawals <u>*less*</u> (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits.  The details of how Withdrawal Preference Exposure is calculated are included in <u>Article.III.PP</u> of the Disclosure Statement.  For the avoidance of doubt, the Debtors' calculation of Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action.

275.    "*Withhold Account*" means a Celsius Account with a balance representing (a) Ineligible Withhold Assets or (b) Cryptocurrency transferred from the Earn or Borrow Programs in states in which the Debtors did not offer the Custody Program.

276.    "*Withhold Ad Hoc Group*" means that certain *ad hoc* group of Holders of Withhold Claims represented by Troutman Pepper Hamilton Sanders LLP as set forth in the *Corrected Fourth Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1886].

277.    "*Withhold Claim*" means a Claim arising from an attempted transfer of Cryptocurrency in a jurisdiction in which the Debtors did not offer the Custody Program, which transfers were placed in "Withhold Accounts," less any amounts withdrawn under the Custody Withdrawal Order.

278.    "*Withhold Distribution Claim*" means an Allowed Withhold Claim minus any Ineligible Withhold Assets.

279.    "*Withhold Settlement*" means the settlement of Withhold Claims between the Debtors and certain Account Holders, the terms of which are set forth in <u>Article IV.B.5</u> herein.

280.    "*Withhold Settlement Motion*" means the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334].

B.    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any party's consent rights over any of the PSA Definitive Documents or any amendments thereto as provided for in the Plan Sponsor Agreement; (3) except as otherwise specified herein, any reference herein to an existing document, schedule, or exhibit, whether Filed, having been Filed, or to be Filed shall mean that document schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular

portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any capitalized term used herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (15) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (16) references to "corporate action," "corporate structure," and other references to "corporate" and "corporation" will, except as the context may otherwise require, be deemed to include other forms of entities as well; (17) any effectuating provisions may be interpreted by the Debtors, or after the Effective Date, NewCo, the Plan Administrator, or any Litigation Administrator, as applicable, in their sole discretion in a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, without waiver of the rights of any Entity; (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (19) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; and (20) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to NewCo, the Debtors, or the Post-Effective Date Debtors shall be governed by the laws of the jurisdiction of incorporation or formation of NewCo, the Debtors, and the Post-Effective Date Debtors, respectively.

E.      *Reference to Monetary Figures.*

All references herein to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.  Unless otherwise expressly provided herein, references to Cryptocurrency denoted with a $ refer to the value of such Cryptocurrency in Cash as of the Petition Date, utilizing the conversion rates provided in the Cryptocurrency Conversion Table.  For the avoidance of doubt, CEL Token shall be valued as provided in Article IV.B.2.

F.      *Valuation of Claims.*

Unless otherwise expressly provided herein, the value of a Claim denominated in Cryptocurrency shall be calculated by converting the value of the Claim into Cash as of the Petition Date, utilizing the conversion rates

26

provided in the Cryptocurrency Conversion Table.  For the avoidance of doubt, CEL Token shall be valued as provided in Article IV.B.2.

G.      *Reference to the Debtors or the Post-Effective Date Debtors*.

Except as otherwise specifically provided herein, references to the Debtors or the Post-Effective Date Debtors herein mean the Debtors or the Post-Effective Date Debtors, as applicable, to the extent the context requires. References to the Post-Effective Date Debtors mean the Post-Effective Date Debtors, the Plan Administrator, or a Litigation Administrator, as applicable, to the extent the context requires.

H.      *Controlling Documents*.

In the event of an inconsistency between the Plan and the Plan Sponsor Agreement or the Backup Plan Sponsor Agreement, the terms of the Plan shall control in all respects, except as set forth in Article I.I below.  In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of any inconsistency between any of the Plan and the Confirmation Order, the Confirmation Order shall control.

I.      *Consultation, Information, Notice, and Consent Rights*.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Plan Sponsor Agreement set forth in the Plan Sponsor Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other PSA Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Plan Sponsor Agreement shall not impair such rights and obligations.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, statutory fees under section 1930 of the Judicial Code, and payments pursuant to settlement agreements have not been classified and thus are excluded from the Classes of Claims set forth in Article III hereof.

A.      *Administrative Claims*.

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, or as otherwise set forth in an order of the Bankruptcy Court, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such allowance or as soon as reasonably practicable thereafter, but in any event no later than ninety days after the date on which an order allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action

by the Holders of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, NewCo, or the property of any of the foregoing, and such Administrative Claims shall be deemed compromised, settled, and discharged as of the Effective Date. For the avoidance of doubt, the Plan Sponsor and its counsel and other advisors are not required to file a request for payment of any Administrative Claims respecting any fees or expenses payable under the Plan Sponsor Agreement.

B.    *Professional Fee Claims.*

1.    Professional Fee Escrow Account.

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or NewCo and/or its subsidiaries.

The Debtors' and Post-Effective Date Debtors' obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals, any remaining funds held in the Professional Fee Escrow Account shall be transferred to the Litigation Recovery Account, and shall be promptly distributed Pro Rata to Holders of Claims entitled to receive Litigation Proceeds under this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) utilize such amounts to fund Wind-Down Expenses in the event an Orderly Wind Down is consummated.

2.    Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) calendar days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders. The Post-Effective Date Debtors shall pay the Professional Fee Claims in Cash, including from the Professional Fee Escrow Account, in the amount the Bankruptcy Court allows as soon as reasonably practicable after such Professional Fee Claims are Allowed. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. Allowed Professional Fee Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

3.    Professional Fee Escrow Amount.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five (5) calendar days before the anticipated Effective

Date; *provided* that such estimate shall not be deemed an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound by such estimates in any way.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, taking into account any prior payments.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

        4.        <u>Post Confirmation Date Fees and Expenses</u>.

From and after the Confirmation Date, the Debtors, or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Post-Effective Date Debtors, as applicable.  After the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.      *Statutory Fees*.

The Debtors and the Post-Effective Date Debtors, as applicable, shall pay all U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or the Post-Effective Date Debtors' business (or such amount agreed to with the U.S. Trustee or ordered by the Bankruptcy Court), for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  On and after the Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*.

Except for the Claims addressed in <u>Article II</u> of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in <u>Article III.D</u> hereof.  The following represents a summary of the classification of Claims and Interests for each Debtor pursuant to the Plan:

1.        Class Identification for Claims or Interests.

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against, and Interests in, the Debtors pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Retail Borrower Deposit Claims | Impaired | Entitled to Vote |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | General Earn Claims | Impaired | Entitled to Vote |
| 6A | General Custody Claims | Impaired | Entitled to Vote |
| 6B | Withdrawable Custody Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Withhold Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Loan Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | State Regulatory Claims | Impaired | Entitled to Vote |
| 11 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 13 | Intercompany Interests | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 14 | Series B Preferred Interests | Impaired | Entitled to Vote |
| 15 | Other Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 16 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 17 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.        *Treatment of Classes of Claims and Interests*.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Post-Effective Date Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business.

1.    <u>Class 1 — Other Secured Claims</u>.

    (a)    *Classification*:  Class 1 consists of all Other Secured Claims.

    (b)    *Treatment*:  Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor(s) as agreed by the Debtors and the Committee, either:

        (i)    payment in full in Cash;

        (ii)    the collateral securing such Allowed Other Secured Claim;

        (iii)    Reinstatement of such Allowed Other Secured Claim; or

        (iv)    such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 — Retail Borrower Deposit Claims</u>.

    (a)    *Classification*:  Class 2 consists of all Retail Borrower Deposit Claims.

    (b)    *Treatment*:  Each Holder of a Retail Borrower Deposit Claim shall receive:

        (i)    **Repayment Election**:  If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

        *<u>or</u>*

        **Set Off Treatment**:  If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

        *<u>plus</u>*

        (ii)    On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).  Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

        In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of

(a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(c)    *Voting*:  Class 2 is Impaired under the Plan.  Holders of Retail Borrower Deposit Claims are entitled to vote to accept or reject the Plan.

3.    Class 3 — Other Priority Claims.

(a)    *Classification*:  Class 3 consists of all Other Priority Claims.

(b)    *Treatment*:  Each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee.

(c)    *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.    Class 4 — Convenience Claims.

(a)    *Classification*:  Class 4 consists of all Convenience Claims.

(b)    *Treatment*:  Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

(c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Convenience Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 — General Earn Claims.

(a)    *Classification*:  Class 5 consists of all General Earn Claims.  For the avoidance of doubt, (i) General Earn Claim means Earn Claims (other than Convenience Claims) and (ii) any Account Holder Claim not separately classified under the Plan shall default to classification as an Earn Claim.

(b)    *Treatment*:  Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of General Earn Claims are entitled to vote to accept or reject the Plan.

6A.    <u>Class 6A — General Custody Claims</u>.

(a)    *Classification*:  Class 6A consists of all General Custody Claims.

(b)    *Treatment*:

(i)    <u>For Holders of General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order</u>: Each such Holder of a General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in <u>Article IX</u> of the Disclosure Statement, one of two treatments:

a.    **Treatment A**:  (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim; *provided* that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery under Treatment A, as provided in <u>Article IV.B.3</u>.

b.    **Treatment B**:  The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim.  The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing. To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim.  Any such Allowed General Custody Claim will be subject to the ADR Procedures.

(ii)    <u>For Custody Settlement Participants</u>:  Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; *provided* that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; *provided*, *further*, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery, as provided in <u>Article IV.B.3</u>.

(c)    *Voting*:  Class 6A is Impaired under the Plan.  Holders of General Custody Claims are entitled to vote to accept or reject the Plan.

6B.    <u>Class 6B —Withdrawable Custody Claims</u>.

(a)    *Classification*:  Class 6B consists of all Withdrawable Custody Claims.

(b)    *Treatment*:  Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order.  For the avoidance of doubt, any Holder of an Allowed Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

(c)    *Voting*:  Class 6B is Unimpaired under the Plan.  Holders of Allowed Withdrawable Custody Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Withdrawable Custody Claims are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 — Withhold Claims</u>.

(a)    *Classification*:  Class 7 consists of all Withhold Claims.

(b)    *Treatment*:

(i)    Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:

a.    **Treatment A**:  If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Liquid Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in the Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

b.    **Treatment B**:  If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(ii)    For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement.

(c)    *Voting*:  Class 7 is Impaired under the Plan.  Holders of Withhold Claims are entitled to vote to accept or reject the Plan.

34

8. <u>Class 8 — Unsecured Loan Claims</u>.

(a) *Classification*: Class 8 consists of all Unsecured Loan Claims.

(b) *Treatment*: Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(c) *Voting*: Class 8 is Impaired under the Plan. Holders of Unsecured Loan Claims are entitled to vote to accept or reject the Plan.

9. <u>Class 9 — General Unsecured Claims</u>.

(a) *Classification*: Class 9 consists of all General Unsecured Claims. For the avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims.

(b) *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in <u>Article III.M</u> of the Disclosure Statement.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights.

(c) *Voting*: Class 9 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

10. <u>Class 10 — State Regulatory Claims</u>.

(a) *Classification*: Class 10 consists of all State Regulatory Claims.

(b) *Treatment*: Each Holder of an Allowed State Regulatory Claim shall be entitled to the same recovery as a Holder of a General Unsecured Claim; *provided* that notwithstanding the foregoing, all State Regulatory Claims shall be suspended against the Debtors and will not be Allowed Claims and shall not receive any distributions in these Chapter 11 Cases, in each case, so long as the Debtors' Plan becomes effective and is fully administered as proposed; *provided*, *further*, that the suspension in the foregoing proviso shall be lifted as to the Debtors if the Chapter 11 Cases are closed, dismissed, or otherwise concluded, in each case, without the Estate(s) being fully administered, including any distributions to creditors, in accordance with the Plan and the Bankruptcy Code. For the avoidance of doubt, the State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.

(c) *Voting*: Class 10 is Impaired under the Plan. Holders of State Regulatory Claims are entitled to vote to accept or reject the Plan.

11.     Class 11 — *De Minimis* Claims.

(a)     *Classification*:  Class 11 consists of all *De Minimis* Claims.

(b)     *Treatment*:  All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

(c)     *Voting*:  Class 11 is Impaired under the Plan.  Holders of *De Minimis* Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of *De Minimis* Claims are not entitled to vote to accept or reject the Plan.

12.     Class 12 — Intercompany Claims.

(a)     *Classification*:  Class 12 consists of all Intercompany Claims, which shall be Allowed in amounts to be agreed by the Debtors and the Committee.

(b)     *Treatment*:  Each Allowed Intercompany Claim shall, at the option of the applicable Debtor(s) with the consent of the Committee, be:

(i)     Reinstated; or

(ii)    set off, settled, distributed, addressed, converted to equity, contributed, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum.

(c)     *Voting*:  Class 12 is either Unimpaired under the Plan or Impaired under the Plan.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

13.     Class 13 — Intercompany Interests.

(a)     *Classification*:  Class 13 consists of all Intercompany Interests.

(b)     *Treatment*:  Each Intercompany Interest shall, at the option of the applicable Debtor(s) with the consent of the Committee, be:

(i)     Reinstated; or

(ii)    set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum.

(c)     *Voting*:  Class 13 is either Unimpaired under the Plan or Impaired under the Plan.  Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

14.     <u>Class 14 — Series B Preferred Interests</u>.

    (a)     *Classification*:  Class 14 consists of all Holders of Series B Preferred Interests.

    (b)     *Treatment*:  Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to the Series B Settlement Order.

    (c)     *Voting*:  Class 14 is Impaired under the Plan.  Holders of Allowed Series B Preferred Interests are entitled to vote to accept or reject the Plan.

15.     <u>Class 15 — Other Interests</u>.

    (a)     *Classification*:  Class 15 consists of all Interests in any Debtors that are not Series B Preferred Interests or Intercompany Interests.

    (b)     *Treatment*:  Holders of Other Interests shall not receive any distribution on account of such Other Interests, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

    (c)     *Voting*:  Class 15 is Impaired under the Plan.  Holders of Allowed Other Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Other Interests are not entitled to vote to accept or reject the Plan.

16.     <u>Class 16 — Section 510(b) Claims</u>.

    (a)     *Classification*:  Class 16 consists of all Section 510(b) Claims.

    (b)     *Treatment*:  Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

    (c)     *Voting*:  Class 16 is Impaired under the Plan.  Holders of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

17.     <u>Class 17 — Equitably Subordinated Claims</u>.

    (a)     *Classification*:  Class 17 consists of all Equitably Subordinated Claims.

    (b)     *Treatment*:  Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date (except as otherwise provided herein), and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court following the resolution of the litigation of the subordination of the Equitably Subordinated Claims.  For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed by the Equitable Subordination Stay Order.  Holders of Equitably Subordinated Claims need not object to the Plan to preserve all of their rights to contest the proposed classification and equitable subordination of their Claims at the appropriate time; a schedule for this litigation will be set by the Bankruptcy Court or agreement of the parties once the stay in the Equitable Subordination Stay Order ends.

(c)     *Voting*: Class 17 is Impaired under the Plan.  Therefore, Holders of Equitably Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

C.     *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', NewCo's, or the Post-Effective Date Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.     *Elimination of Vacant Classes*.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes; Deemed Acceptance by Non-Voting Classes*.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.     *Subordinated Claims*.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Post-Effective Date Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

The Plan shall be deemed to constitute a motion to subordinate all Claims listed on the Schedule of Equitably Subordinated Claims pursuant to section 510(c) of the Bankruptcy Code or, in the case of Other CEL Token Claims and other Section 510(b) Claims, pursuant to section 510(b) of the Bankruptcy Code, as applicable.  In the event that the Bankruptcy Court denies the proposed subordination of the Equitably Subordinated Claims, such Claims shall receive treatment on account of such Claim consistent with similarly-situated creditors under the Plan (including, if applicable, treatment consistent with that afforded to other CEL Token Deposit Claims) following the resolution of the litigation regarding the subordination of the Equitably Subordinated Claims or such other treatment as is ordered by the Bankruptcy Court.  For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed in accordance with the terms of the Equitable Subordination Stay Order.

G.     *Intercompany Interests*.

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Post-Effective Date Debtor's agreement under the Plan to make certain distributions to Holders of Allowed Claims.

H.    *Controversy Concerning Impairment or Classification.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, or whether the classification of Claims or Interests is appropriate, the Bankruptcy Court shall determine such controversy at the Confirmation Hearing.

I.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Substantive Consolidation.*

The substantive consolidation of the Initial Consolidated Debtors (*i.e.*, Celsius Network Limited and Celsius Network LLC) for purposes of their Plans has been approved as set forth in the Series B Settlement Order and this Plan. The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate Celsius Lending LLC and Celsius Networks Lending LLC with the Initial Consolidated Debtors on the same terms, effective as of the Effective Date.

Except as otherwise provided herein, the Consolidated Debtors (*i.e.*, the Initial Consolidated Debtors plus Celsius Lending LLC and Celsius Networks Lending LLC) are substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, and subject to the following sentence: (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors. The substantive consolidation and deemed merger effected pursuant to this Plan shall not affect (other than for purposes of the Plan as set forth in this Article IV.A.1) (x) the legal and organizational structure of the Consolidated Debtors, except as provided in the Transaction Steps Memorandum, including, for the avoidance of doubt, the legal existence of any Claim of one Consolidated Debtor against another Consolidated Debtor; (y) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; *provided* that any Claim that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of the Consolidated Debtors; or (z) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts.

B.    *Plan Settlement Provisions Regarding Claims and Interests.*

1.    General Settlement of Claims and Interests.

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

2.    CEL Token Settlement.

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in this Article IV.B.2 and in Article IV.A.2.(b) of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in Article III.B.17, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

- All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17, as applicable.

- Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25.

Because over two thirds in dollar amount and over half in number of eligible Holders of CEL Token Deposit Claims voted to accept the Plan or not opt out of the Class Claim Settlement, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation.

In the event that the Bankruptcy Court does not approve the CEL Token Settlement, CEL Token Deposit Claims shall either be treated as Section 510(b) Claims or receive such other treatment as the Bankruptcy Court orders. For the avoidance of doubt, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims will be classified as Class 15 Section 510(b) Claims and treated as provided in Article III.B.16.

3.    Account Holder Avoidance Action Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in this Article IV.B.3 and in Article IV.A.2.(c) of the Disclosure Statement, the Plan shall effectuate the Account Holder Avoidance Action Settlement.  Pursuant to the Account Holder Avoidance Action Settlement, the Debtor Release contained in Article VIII.C shall also release Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure less than or equal to $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan.

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure less than or equal to $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account

Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan.

For the avoidance of doubt:  (a) all Avoidance Actions against ADR-Ineligible Potential Defendants and Excluded Parties are not included in the Account Holder Avoidance Action Settlement and expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims shall be released if (i) their Withdrawal Preference Exposure is less than or equal to $100,000 or (ii) their Withdrawal Preference Exposure is over $100,000 and they make the requisite payments, and (c) as a result of the Account Holder Avoidance Action Release, any Custody Settlement Participant with Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery on their Allowed General Custody Claim.

For the avoidance of doubt, the rights of Account Holders to receive a distribution under the Plan on account of their Claims are not released pursuant to the Account Holder Avoidance Action Settlement.  Notwithstanding anything to the contrary in the Plan, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

Prior to the Effective Date, the Debtors and the Committee (and after the Effective Date, the Litigation Administrator in consultation with the Plan Administrator) may enter into agreements with any Account Holders that agreed to settle their Withdrawal Preference Exposure as set forth herein, and make agreements regarding setting off the amount to be repaid against the recovery to be received under this Plan.

4.    Custody Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Custody Settlement Motion and in Article IV.A.2.(d) of the Disclosure Statement, the Plan shall effectuate the Custody Settlement as set forth in the Custody Settlement Order.

5.    Withhold Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Withhold Settlement Motion and in Article IV.A.2.(e) of the Disclosure Statement, the Plan shall effectuate the Withhold Settlement.

6.    Series B Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise described in Article VII.L.5 of the Disclosure Statement, the Plan shall effectuate the Series B Settlement in accordance with the Series B Settlement Agreement.

7.    Retail Borrower Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise of the adversary proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors described in Article II.A.2 and Article III.WW of the Disclosure Statement, the Plan shall effectuate the Retail Borrower Settlement.  Pursuant to the Retail Borrower Settlement, (a) Holders of Retail Borrower Deposit Claims have the option to repay their Retail Advance Obligations in exchange for an equivalent amount of Liquid Cryptocurrency, which the applicable Retail Borrower may specify to receive in either BTC or ETH, (b) any obligation of the Retail Borrowers to pay any interest on account of Retail Advance Obligations for the duration of these Chapter 11 Cases is waived, and (c) Liquid Cryptocurrency Weighted Distribution Elections on account of Retail Borrower Post-Set Off Claims shall be given priority over all other Liquid Cryptocurrency Weighted Distribution Elections.  The adversary proceedings brought by the Retail Borrower Ad Hoc

Group and participating *pro se* creditors and the Pending Withdrawal Ad Hoc Group shall be dismissed with prejudice pursuant to the Confirmation Order upon the Effective Date.

To the extent the Retail Borrower Ad Hoc Group, the Debtors, or the Committee identify a source of third-party financing reasonably acceptable to the Debtors, the Debtors shall take commercially reasonable efforts to facilitate such party in refinancing applicable Retail Advance Obligations with the consideration provided to Retail Borrowers under the Plan.

        8.     <u>Class Claim Settlement</u>.

As part of the general settlement described in <u>Article IV.B.1</u>, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise described in the Class Claim Settlement Motion and in <u>Article III.LLL</u> and <u>Article VII.K.4</u> of the Disclosure Statement, the Plan shall effectuate the Class Claim Settlement. Except as otherwise provided in the Order approving the Class Claim Settlement, under the Class Claim Settlement, if a Holder does not opt-out of the Class Claim Settlement, such Holder's Account Holder Claims, other than Custody Claims, shall receive, in lieu of any scheduled Claim or Filed Proof of Claim, an Allowed Claim in an amount that is 105% of the scheduled amount of such Claim, in each case of the same Class as the originally scheduled Claim. Proofs of Claim filed by Class Claim Settlement Participants (*i.e.*, Holders of Account Holder Claims (other than Account Holders who only hold Custody Claims) that do not opt out of Class Claim Settlement) shall be expunged from the Claims Register and shall be of no further force and effect.

C.     *Restructuring Transactions*.

The Plan may be effectuated through either the NewCo Transaction or, if applicable in accordance with <u>Article IV.E</u>, the Orderly Wind Down. In the event that the Plan is effectuated through the NewCo Transaction, <u>Article IV.D</u> shall govern and <u>Article IV.E</u> shall be disregarded unless specifically provided herein. Conversely, in the event that the Plan is effectuated through the Orderly Wind Down, <u>Article IV.E</u> shall govern, and <u>Article IV.D</u> shall be disregarded unless specifically provided herein. All other subsections of this <u>Article IV</u> shall apply regardless of whether the Orderly Wind Down or the NewCo Transaction is effectuated.

On or before the Effective Date, the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable, shall take any action as may be necessary or appropriate to effect the NewCo Transaction or Orderly Wind Down, as applicable, including those steps set forth in the Transaction Steps Memorandum. The actions to implement the NewCo Transaction or Orderly Wind Down may include, in addition to those steps set forth in the Transaction Steps Memorandum: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (4) the issuance, transfer, or distribution of NewCo Common Stock; (5) to the extent applicable, the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of NewCo and/or its subsidiaries (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (6) all transactions necessary to provide for the transfer of some or all of the assets or Interests of any of the Debtors to NewCo and/or one or more of its subsidiaries, which transfer may be structured as a taxable transaction for United States federal income tax purposes; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents and take any other actions as the Debtors reasonably determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the NewCo Transaction or the Orderly Wind Down, as applicable.

D.    *NewCo Restructuring Transactions.*

1.    <u>Transfer of Assets to NewCo and Vesting of Assets in the Post-Effective Date Debtors</u>.

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, pursuant to sections 363, 1123(a)(5), and 1141(c) of the Bankruptcy Code: (1) all NewCo Assets shall be transferred to and vest in NewCo and/or its subsidiaries free and clear of all Liens, Claims, interests, charges, or other encumbrances, and (2) all other property in each Debtor's Estate, all Causes of Action (including all Recovery Causes of Action) that are not released, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Post-Effective Date Debtor, free and clear of all Liens, Claims, Interests, charges, or other encumbrances. For the avoidance of doubt, (i) NewCo shall not assume, be deemed to have assumed, or be liable for any liabilities of any of the Debtors except as, and solely to the extent, expressly set forth herein; (ii) the NewCo Transactions are not, and shall not be deemed to be, a *de facto* merger of any of the Debtors and NewCo, or any Affiliates of the foregoing; (iii) NewCo is not, and shall not be deemed to be, a continuation of any of the Debtors, any Affiliates thereof, or any of their respective businesses or operations; and (iv) the NewCo Transactions have been entered into in good faith and not for any fraudulent purpose or to escape any liabilities of the Debtors. On and after the Effective Date, except as otherwise provided herein, NewCo and/or its subsidiaries and each Post-Effective Date Debtor (or the Plan Administrator or applicable Litigation Administrator) may operate its business in accordance with applicable Law and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any NewCo Assets shall vest in NewCo as of the Effective Date. The Debtors and NewCo are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties. No action taken by the Debtors or NewCo shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or NewCo, including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

2.    <u>Post-Effective Date Debtors</u>.

One or more of the Debtors shall continue in existence after the Effective Date, each as a Post-Effective Date Debtor, for purposes of (1) preserving the Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors after the Effective Date and after consummation of the NewCo Transaction, (3) performing their obligations under any transition services agreement entered into by and between the Post-Effective Date Debtors and NewCo and/or its subsidiaries, (4) resolving any Disputed Claims, (5) paying Allowed Claims for which there is not a Distribution Agent other than the Post-Effective Date Debtors, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the

43

Post-Effective Date Debtors or the Litigation Administrator(s) to file motions or substitutions of parties or counsel in each such matter.

Except as otherwise provided in the Plan or the Plan Supplement (including the Transaction Steps Memorandum), or any agreement, instrument, or other document incorporated therein, each Post-Effective Date Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3.    Sources of Consideration for Plan Distributions.

The Debtors and the Post-Effective Date Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand as of the Effective Date and net proceeds from the sale of GK8, (2) Liquid Cryptocurrency (in the Liquid Cryptocurrency Distribution Amount), (3) the NewCo Common Stock, and (4) Litigation Proceeds.

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

After the Effective Date, the Post-Effective Date Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable NewCo and/or its subsidiaries and the Post-Effective Date Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan.

4.    Distribution Mechanics.

Distributions shall generally commence on, or as soon as reasonably practicable after, the Effective Date. The Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agent agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.

Unless otherwise specified in the Plan Supplement, until the Deactivation Date, all distributions to Custody Claim Holders or Account Holders to whom no other Distribution Agent is eligible to make distributions shall be made by the Debtors or the Post-Effective Date Debtors, as applicable.  On the Deactivation Date, the Celsius platform will cease to exist and Account Holders will no longer be able to log-in to the Celsius platform and/or access their Celsius Account, including for purposes of distributions.

After the Deactivation Date, the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agent agreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.  Such distributions may be in Liquid Cryptocurrency or fiat currency, but in no circumstances will any Distribution Agent make distributions in Cryptocurrency other than Liquid Cryptocurrency.  On the Deactivation Date, the Allowed Custody Claims of Holders that did not retrieve their Plan distributions from the Celsius platform by the Deactivation Date shall be valued in accordance with the Deactivation Date Cryptocurrency Conversion Table and shall receive such distribution in the amount calculated based on the Deactivation Date Cryptocurrency Conversion Table in Liquid Cryptocurrency or fiat.  For the avoidance of any doubt,

the Debtors or Post-Effective Date Debtors, as applicable, may elect in their reasonable discretion to make any distribution in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.

To be eligible to receive a distribution under this Plan, Account Holders must update the AML/KYC Compliance Information for their Celsius Account and may be required to register or complete additional onboarding with a Distribution Agent, which may require providing any requested AML/KYC Compliance Information.

5.  <u>NewCo Common Stock</u>.

On the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Transaction Steps Memorandum, NewCo shall issue the NewCo Common Stock. The Confirmation Order shall authorize the issuance of NewCo Common Stock in one or more issuances without the need for any further corporate action, and the Debtors or NewCo, as applicable, shall be authorized to take any action necessary or appropriate in furtherance thereof. On the Effective Date or as soon as reasonably practicable thereafter, the applicable Holders of Claims shall receive NewCo Common Stock in satisfaction of such Holders' Allowed Claims pursuant to <u>Article III.B</u>. The Confirmation Order shall further authorize the New Board, in its sole discretion, to issue the Employee and NewCo Board Equity Compensation. For the avoidance of doubt, the NewCo Common Stock issued on the Effective Date may, with the consent of the Committee and the Plan Sponsor (not to be unreasonably delayed, withheld, or conditioned), be issued into a trust or similar structure to be held for the beneficial interest of Holders of Allowed Claims; *provided*, *however*, that no distributions shall be made prior to such time as a modified version of the Transaction Steps Memorandum is filed with the Bankruptcy Court updating the relevant steps.

Entry of the Confirmation Order shall authorize the clearance and trading of the NewCo Common Stock, subject to resale restrictions applicable to "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, on or as promptly as practicable after the Effective Date, and NewCo shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such NewCo Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of NewCo in all respects, without the need for any further corporate action. The Debtors or Post-Effective Date Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.

All of the NewCo Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Further, the NewCo Common Stock issued in connection with the satisfaction, settlement, release, and discharge of Allowed Claims will be issued in reliance upon section 1145 of the Bankruptcy Code. All other NewCo Common Stock issued or sold on the Effective Date will be issued or sold in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.

The distribution and issuance of the NewCo Common Stock under the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance. Any Person's or Entity's acceptance of NewCo Common Stock shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Person or Entity will be bound thereby in all respects.

6.  <u>Exemption from Registration Requirements</u>.

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act. The NewCo Common Stock issued in connection with the satisfaction, settlement, release, and discharge of Allowed Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.

Securities issued in reliance upon section 1145 of the Bankruptcy Code to an entity that is not an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law

requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable under U.S. federal securities laws by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of NewCo or the Post-Effective Date Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, (iii) has not acquired such securities from an "affiliate" within one year of such transfer and (iv) is not an entity that is an "underwriter," as defined under section 1145(b) of the Bankruptcy Code.

All other NewCo Common Stock issued or sold on the Effective Date will be issued or sold in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder. Such NewCo Common Stock will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Debtors recommend that potential recipients of NewCo Common Stock consult their own counsel: (i) with respect to the NewCo Common Stock issued under the Plan, concerning whether such potential recipients will constitute "underwriters" pursuant to section 1145(b) of the Bankruptcy Code at the time of the issuance of the NewCo Common Stock; and (ii) the ability of such potential recipients to freely trade NewCo Common Stock in compliance with the federal securities laws and any applicable Blue Sky laws, including certain Blue Sky state notice requirements that may continue to apply with respect to resales of the NewCo Common Stock. The Debtors make no representation concerning the ability of a person to dispose of any NewCo Common Stock.

The Post-Effective Date Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including The Depository Trust Company and any transfer agent for the NewCo Common Stock) with respect to the treatment of the NewCo Common Stock to be issued under the Plan under applicable securities laws. The Depository Trust Company and any transfer agent for the NewCo Common Stock shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock is exempt from registration and/or eligible for The Depository Trust Company book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, (i) any partner of NewCo or the Plan Sponsor, (ii) The Depository Trust Company, and (iii) any transfer agent for the NewCo Common Stock) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock are exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services.

7.    Directors and Officers.

On the Effective Date, the terms of the current members of the CNL Board shall expire. For the avoidance of any doubt, no current director of the Debtors will remain a director or have any control over NewCo, the Debtors, or the Post-Effective Date Debtors unless explicitly provided herein or in the Plan Supplement. The New Board of NewCo will consist of those directors identified in the Plan Supplement. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose the identity and affiliations of any Person proposed to serve on the New Board in the Plan Supplement. The New Board shall initially consist of nine members: (i) three of whom will be appointed by the Plan Sponsor; (ii) four of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange. For the avoidance of doubt, the composition of the New Board shall comply with any applicable listing standards and rules of any applicable exchanges on which the NewCo Common Stock is or will be listed.

Members of the New Board (other than the designees of the Plan Sponsor) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member

may be reelected at the end of their term; *provided* that for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect three members of the New Board.

After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

The Post-Effective Date Debtors shall be governed by the Plan Administrator in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Post-Effective Date Debtors shall be deemed to be terminated and such individuals shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole director and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors as further described in the Plan Administrator Agreement. The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

        8.      <u>Income Tax Matters</u>.

For U.S. federal and applicable state and local income tax purposes the Debtors and Holders of Claims will treat and report the return of Liquid Cryptocurrency to Holders of Claims under the Plan, to the extent such amounts are of the same type of Cryptocurrency in which a Holder's Claim was denominated, as a non-taxable transaction to such Holder, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Code.

E.      *Orderly Wind Down*.

Subject to Bankruptcy Court approval, the Debtors will effectuate an Orderly Wind Down if, at any time prior to or after the confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction. In the event the Debtors pursue an Orderly Wind Down, distributions under the Plan shall be funded from the Wind-Down Assets.

        1.      <u>Orderly Wind-Down Toggle</u>.

To toggle to an Orderly Wind Down, the Debtors (i) shall provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (ii) shall consult with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Immanuel Herrmann, Daniel Frishberg, Cameron Crews, and Ignat Tuganov regarding the decision to toggle, (iii) shall inform the U.S. Trustee of their intent to file the Wind-Down Motion, (iv) shall file the Wind-Down Motion, which shall include the Wind-Down Procedures, and (v) may file an amended Plan conformed to include the changes described in the table below. Parties in interest shall have no fewer than ten (10) days to object to the Wind-Down Motion. In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.

| Orderly Wind-Down Plan Changes | |
|---|---|
| **Provision/Concept** | **Change** |
| NewCo | Concept eliminated, replaced in certain places with "Post-Effective Date Debtors" and "Plan Administrator," as further described herein and as applicable. Related concepts, such as "NewCo Capitalization Amount" will similarly be eliminated. |
| Plan Sponsor Contribution | Concept eliminated. Related concepts, such as "Management Compensation" (and its component concepts) will similarly be eliminated. |

| Orderly Wind-Down Plan Changes | |
|---|---|
| **Provision/Concept** | **Change** |
| NewCo Common Stock | Concept eliminated, replaced with "Backup MiningCo Common Stock" and "Illiquid Recovery Rights," as applicable. |
| Unsecured Claim Distribution Mix Elections | Concept eliminated, all Holders of Claims to receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections. |
| Wind-Down Procedures | Concept to become operative. As provided herein, the Debtors shall file the Wind-Down Procedures within fourteen (14) days of the decision to implement an Orderly Wind Down, in connection with the Wind-Down Motion. Such procedures shall provide additional details regarding the Wind-Down Assets, the Wind-Down Budget, the identity of the Mining manager, and any revisions to the Wind-Down Procedures and shall be subject to approval by the Bankruptcy Court in connection with Wind-Down Motion. Related concepts shall similarly become operative. |
| Backup Plan Sponsor & Backup Plan Sponsor Transaction | Concept becomes operative, subject to a market test of the fees contained in the Backup Plan Administrator Term Sheet; *provided* that (i) Liquid Cryptocurrency, (ii) the Backup MiningCo Common Stock, (iii) Illiquid Recovery Rights, and (iv) Litigation Proceeds shall be distributed according to this Plan, as revised to reflect the toggle to the Orderly Wind Down. |
| Proof Group IP License | Concept eliminated. Related consideration, such as any Proof Group customers to be transferred to NewCo, shall revert to Proof Group. |
| US Bitcoin Agreements | Concept eliminated, unless US Bitcoin is selected as the Mining manager in connection with the Orderly Wind Down. |
| Institutional Loan Agreements | Concept in Article V.D eliminated. All agreements related to Institutional Loans shall be treated as all other Executory Contracts as provided in Article V.A. |
| Article IV.D (NewCo Restructuring Transactions) | Concept eliminated. This Article IV.E (Orderly Wind Down) to become operative instead. |
| Article X Conditions to the Effective Date | Those conditions to the Effective Date specific to the NewCo Transaction shall be removed or revised, including the condition in Section 12 which requires a Registration Statement respecting the NewCo Common Stock shall have been filed and such Registration Statement shall have become effective. |

In the event that the Debtors elect to toggle to the Orderly Wind Down, the Debtors shall appoint a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet.

The Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Orderly Wind Down pursuant to the Wind-Down Procedures and the Plan (conformed as described above).

F.    *Plan Administrator*.

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, a Plan Administrator will be appointed to administer the Post-Effective Date Debtors' estates in accordance with the Plan

Administrator Agreement.  For the avoidance of doubt, unless otherwise specified, Causes of Action shall remain with the Post-Effective Date Debtors and shall not be NewCo Assets.

The Plan Administrator shall be selected by the Debtors, in consultation with the Committee, and shall be identified in the Plan Supplement.  The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

The Plan Administrator shall administer the distributions of the Orderly Wind Down, if applicable.  Except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Wind-Down Procedures, if applicable, on and after the Effective Date, the Post-Effective Date Debtors may operate their businesses (to the extent permitted under applicable Law) and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than the Recovery Causes of Action) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided* that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement.  Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtors in the Plan Administrator Agreement shall be terminated.

The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

1.    <u>Responsibilities of Plan Administrator</u>.

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include:

(a)    administering the Special Committee D&O Liability Insurance Policies;

(b)    implementing the Orderly Wind Down, as applicable, and making (or arranging for a Distribution Agent to make) the distributions contemplated by the Plan;

(c)    to the extent not duplicative with the responsibilities of any Litigation Administrator, marshalling, marketing for sale, and winding down of the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(d)    to the extent not duplicative with the responsibilities of any Litigation Administrator, recovering and compelling turnover of the Debtors' property in accordance with the Plan;

(e)    managing the Plan Administrator Budget or Wind-Down Budget, as applicable, and paying the Wind-Down Expenses, if any;

(f)    abandoning any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(g)    preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(h)     filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(i)     retaining such professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and

(j)     taking such actions as are necessary and reasonable to carry out the purposes of the Plan or Wind-Down Procedures, as applicable, including winding down the Debtors' business affairs.

The Debtors (and, following the Effective Date, the Plan Administrator) shall use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in this Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible. If an Account Holder's Claim is not Allowed as of the Effective Date or otherwise retained on account of such claim being subject to Withdrawal Preference Exposure, the Liquid Cryptocurrency that would otherwise be distributed on account of such Account Holder's Claim shall be held in the Disputed and Contingent Claims Reserve in the form of Liquid Cryptocurrency. The Plan Administrator, as a fiduciary for parties entitled to receive distributions under the Plan, shall exercise his business judgment regarding whether to continue to hold such Liquid Cryptocurrency or convert to other Liquid Cryptocurrency or fiat, including, without limitation, market forces and whether there is a Distribution Agent capable of making distributions to creditors at a particular time. If there is no Distribution Agent capable of making a distribution to the Account Holder in Liquid Cryptocurrency at the time such Account Holder's Claim becomes an Allowed Claim and the Plan Administrator has not otherwise converted such Liquid Cryptocurrency to fiat, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall convert the Liquid Cryptocurrency that would otherwise be distributed to the Account Holder to fiat currency as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency to the Account Holder. If the Debtors, Post-Effective Date Debtors or Plan Administrator determine, in the exercise of their fiduciary duties and in their business judgment, that it is no longer commercially reasonable to continue to hold Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall provide notice, Filed on the docket, of the intent to sell the Liquid Cryptocurrency.

2.      Expenses of Plan Administrator.

All costs, expenses, and obligations incurred by the Plan Administrator in administering this Plan, on or after the Effective Date, or in any manner connected, incidental, or related thereto, shall be paid by the Post-Effective Date Debtors as they are incurred without the need for Bankruptcy Court approval. In the event of an Orderly Wind Down, the Wind-Down Expenses shall be paid from the Wind-Down Assets.

3.      Fiduciary Duties of the Plan Administrator.

Pursuant to the Plan and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan. The Plan Administrator shall be appointed and act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or officers of the Debtors shall be terminated and such individuals shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors. The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former employee, manager, or officer, including pursuant to any transition services agreement entered into by the Post-Effective Date Debtors in connection with the Employee Transition Services Agreement.

4.        Wind-Down.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Post-Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby; (2) take any actions necessary to wind down the Post-Effective Date Debtors' Estates; *provided* that the Post-Effective Date Debtors shall not be dissolved until all Causes of Action included in the Schedule of Retained Causes of Action are prosecuted and the conditions precedent to such dissolution in Article IV.F.6 are satisfied; and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, except as set forth herein, the Post-Effective Date Debtors for all purposes (x) shall be deemed to have withdrawn their business operations from any state in which the Post-Effective Date Debtors were previously conducting, or are registered or licensed to conduct, their business operations, (y) shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

5.        No Liability of the Post-Effective Date Debtors.

On and after the Effective Date, the Post-Effective Date Debtors shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement.  All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

6.        Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Effective Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Post-Effective Date Debtors' Chapter 11 Cases, and the conclusion of all litigation being pursued by the Litigation Administrator(s), the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Post-Effective Date Debtors is formed or any other jurisdiction.  The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

For the avoidance of doubt, notwithstanding the Post-Effective Date Debtors' dissolution on or after the Effective Date, the Post-Effective Date Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

To the extent the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator(s), such Cash or other property shall be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated.

G.    *Litigation Administrator(s), Litigation Oversight Committee, and Contributed Claims.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, one or more Litigation Administrators will be appointed to prosecute, settle, or otherwise resolve any remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to this Plan), the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the benefit of Holders of General Earn Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, the Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan shall remain with the Post-Effective Date Debtors, shall not be NewCo Assets, and shall be controlled by the applicable Litigation Administrator(s). For the avoidance of doubt, the Litigation Administrator shall also serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to all retained Causes of Action related to Disputed Claims or Disputed Interests.

1.    <u>Litigation Administrator(s).</u>

The Litigation Administrator(s) shall be selected by the Committee, and shall be identified in the Plan Supplement. The appointment of the Litigation Administrator(s) shall be approved in the Confirmation Order, and the Litigation Administrator's duties shall commence as of the Effective Date. The Litigation Administrator(s) shall prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to this Plan), the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans. The Litigation Administrator shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates related to Disputed Claims or Disputed Interests that are not released, waived, settled, compromised, or transferred pursuant to this Plan (including, for the avoidance of doubt, the Recovery Causes of Action and Claims objections). Notwithstanding anything to the contrary in the Plan, the Committee may elect to identify separate Litigation Administrators to manage Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder. Solely by way of example, the Committee may identify (x) a Litigation Administrator to manage Account Holder Avoidance Actions for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder and (y) a Litigation Administrator to manage all Recovery Causes of Action, other than Account Holder Avoidance Actions, for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder. The identity of any Litigation Administrator, including the Recovery Causes of Action that any such Litigation Administrator shall manage for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, shall be disclosed in the Plan Supplement.

In accordance with the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall serve in such capacity through the earlier of (a) the date on which all Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan are fully resolved in accordance with the applicable Litigation Administrator Agreement, and (b) the date on which such Litigation Administrator resigns, is terminated, or is otherwise unable to serve; *provided, however,* that, in the event that a Litigation Administrator resigns, is terminated, or is otherwise unable to serve prior to the full resolution of all Recovery Causes of Action and Contributed Claims, the Goldstein Loan, the Leon Loan, or any other CEL Insider Loans for which such Litigation Administrator is responsible, the Litigation Oversight Committee shall appoint a successor to replace such Litigation Administrator in accordance with the applicable Litigation Administrator Agreement. If the Litigation Oversight Committee does not appoint a successor within the time periods specified in the applicable Litigation Administrator Agreement (as may be extended by the Bankruptcy Court), then the Bankruptcy Court, upon the motion of any party-in-interest, may approve a successor to serve as the Litigation Administrator.

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Recovery Causes of Action held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition

case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided, further,* that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

No action taken by the Debtors, the Committee, or the Litigation Administrator(s) shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Committee, or the Litigation Administrator(s), including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

2. <u>Responsibilities of Litigation Administrator(s).</u>

Responsibilities of the Litigation Administrator(s) shall be as identified in the Litigation Administrator Agreement(s) and shall include, but are not limited to:

(a)    filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted;

(b)    filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court;

(c)    exercising the Debtors' rights with respect to (a) the Goldstein Loan, (b) the Leon Loan, and (c) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party;

(d)    managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and <u>Article IV.G.3</u> hereof; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Plan;

(e)    retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and

(f)    taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement;

in each case, for the benefit of the Holders of Claims entitled to Litigation Proceeds hereunder and, as applicable, in accordance with the ADR Procedures.

3. <u>Rights Under D&O Liability Insurance Policies.</u>

On the Effective Date, the Litigation Administrator(s) shall, to the extent provided in the UCC Claims Stipulation, succeed to the rights of the Debtors under certain of their D&O Liability Insurance Policies. For the avoidance of doubt, the Litigation Administrator(s) shall not succeed to the Debtors' rights with respect to the Special Committee D&O Liability Insurance Policies.

4.     Litigation Recovery Account.

On or before the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall establish a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator(s). The funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action.

Holders of Claims entitled to Litigation Proceeds hereunder will receive periodic distributions on account of recoveries from the Recovery Causes of Action. The frequency and timing of distributions from or in respect of the Litigation Recovery Account shall be determined by the Litigation Administrator(s) and the Litigation Oversight Committee in accordance with the Litigation Administrator Agreement(s).

To the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account shall promptly be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

5.     Litigation Oversight Committee.

The Litigation Administrator(s) shall report to, and act at the direction of, the Litigation Oversight Committee, whose members shall be selected by the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, and the Committee, as set forth in the definition of Litigation Oversight Committee and identified in the Plan Supplement; *provided* that: (a) prior to selecting any such members, the Committee will solicit potential candidates to serve on the Litigation Oversight Committee from the Holders of Claims entitled to receive Litigation Proceeds hereunder through an open interview process; (b) the Litigation Oversight Committee shall include at least one member of the Committee (unless no member of the Committee wishes to join); (c) the Litigation Oversight Committee shall include at least two individuals that are not members of the Committee; and (d) the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Litigation Oversight Committee (subject to the consent of the Committee).

The Litigation Oversight Committee shall contain a three (3) member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders. At least two (2) members of the Avoidance Action subcommittee shall not be current members of the Committee. The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action subcommittee, subject to the consent of the Committee, which members shall be the same members appointed to the Litigation Oversight Committee. The Avoidance Action subcommittee shall confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date.

The Litigation Oversight Committee (at the recommendation of the applicable Litigation Administrator) will determine the frequency and quantum of any distributions from the Litigation Recovery Account (including the distribution of the Initial Litigation Funding Amount, if appropriate). The Litigation Oversight Committee, in consultation with the Litigation Administrator(s), shall be entitled to control the financing of any litigation, with the right to cause the Litigation Administrator(s) to pledge or transfer a portion of the Recovery Causes of Action, the Litigation Recovery Account, or any proceeds of the foregoing to facilitate such financing, and may obtain such financing from NewCo or third-party sources, in their respective business judgment.

6.      Fiduciary Duties of the Litigation Administrator(s).

Pursuant to the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to Plan.

H.      *Corporate Action.*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including all steps necessary for the implementation of the NewCo Transaction or Orderly Wind Down (as applicable), and all other actions desirable or appropriate to promptly consummate the NewCo Transaction or Orderly Wind Down (as applicable), including those contemplated under the Transaction Steps Memorandum.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy Law.

I.      *Cancellation of Notes, Instruments, Certificates, and Other Documents.*

Upon the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan:  (1) the obligations of the Debtors and their Affiliates under any terms of use, certificate, Security, share, note, bond, indenture, purchase right, option, warrant, agreement, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are Reinstated pursuant to the Plan) shall be cancelled and surrendered, and neither the Post-Effective Date Debtors nor the Debtors' Affiliates shall have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or their Affiliates (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are specifically Reinstated pursuant to the Plan) shall be released; *provided*, for the avoidance of doubt, that nothing herein shall release any Excluded Party from any claim or obligation.

J.      *Employee Obligations.*

1.      Employee Transition Services Agreement.

The Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Employee Transition Services Agreement set forth in the Plan Supplement. The Employee Transition Services Agreement will provide that employees of NewCo are available to provide transition services to the Debtors, Post-Effective Date Debtors, and/or Plan Administrator to effectuate the NewCo Transaction and to wind down the Debtors' Estates.  Except as provided in the Employee Transition Services Agreement, employee contracts shall be treated in accordance with Article V.

2.       EIP Awards.

On the Effective Date, the Emergence Incentive Plan shall be effective, the KEIP Motion shall be deemed withdrawn with prejudice, and the Plan Administrator may distribute the EIP Awards, subject to the Plan Administrator confirming to Committee counsel in writing (e-mail being sufficient) that the applicable metrics have been satisfied, without any further action by the Debtors or the Post-Effective Date Debtors. The Emergence Incentive Plan provides EIP Participants the ability to earn EIP Awards based on their performance relative to the metrics described in this Article IV.J.2. Unless otherwise noted below, target performance shall result in eligibility for a 100% payout and threshold performance shall result in eligibility for a 50% payout for each respective metric. For the avoidance of doubt, the Emergence Incentive Plan is a post-Effective Date compensation plan and EIP Awards, to the extent earned and authorized by the Plan Administrator, shall be paid by the Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation. Any EIP Award shall be subject to clawback in the event that an EIP Participant is later found guilty of a crime in connection with their employment at Celsius.

Platform Metrics: Oren Blonstein, Trunshedda Ramos, Guillermo Bodnar, Adrian Alisie, and Ron Deutsch are eligible to earn an EIP Award based on the following metrics:

- *Liquid Cryptocurrency Distribution Metric (50% of the EIP Award)*:

    (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

    (b) threshold performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- *Distribution Agreement Metric (30% of the EIP Award)*:

    (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

    (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- *Chapter 11 Plan Confirmation Metric (10% of the EIP Award)*:

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- *Effective Date Metric (10% of the EIP Award)*:

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

<u>Mining Metrics</u>: Jenny Fan, Dave Albert, and Quinn Lawlor are eligible to earn an EIP Award based on the following metrics:

- *East Stiles Site Metric (25% of EIP Award)*:

    (a) target performance requires that the East Stiles site is completed and operational by September 30, 2023; and

    (b) threshold performance requires that the East Stiles site is completed and operational between October 1, 2023 and November 30, 2023.

- *Effective Date Metric (25% of EIP Award)*:

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- *Mining Rig Metric (25% of EIP Award)*:[2]

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

- *Midland Texas Gross Margin Metric (25% of EIP Award)*:

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 above 25%; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 between 20% and 25%.

Christopher Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

- *Liquid Cryptocurrency Distribution Metric (50% of the EIP Award)*:

    (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

---

[2]    Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

(b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- *Distribution Agreement Metric (20% of the EIP Award)*:

  (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

  (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- *Chapter 11 Plan Confirmation Metric (10% of the EIP Award)*:

  (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

  (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- *Effective Date Metric (10% of the EIP Award)*:

  (a) target performance requires the Effective Date occur by December 31, 2023;

  (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

  (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- *Mining Rig Metric (10% of EIP Award)*:[3]

  (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

  (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

If an EIP Participant's employment is terminated by the Debtors without "cause," by the EIP Participant for "good reason," or upon death or disability of the EIP Participant, the EIP Participant will be entitled to 100 percent of the EIP Award that would otherwise have been earned based on the percentage of the performance period the EIP Participant was engaged by the Debtors. If an EIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for "cause"), any EIP Award will be forfeited. The maximum

---

[3]    Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.

3.    Emergence Retention Plan.

To the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Emergence Retention Plan set forth in the Plan Supplement. The Emergence Retention Plan will provide for the distribution of Cash retention awards to certain employees of the Debtors to motivate such employees to remain with the Post-Effective Date Debtors to effectuate distributions contemplated under the Plan.

K.    *Effectuating Documents; Further Transactions.* On and after the Effective Date, NewCo and/or its subsidiaries, the Plan Administrator, or the Post-Effective Date Debtors, as applicable, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

L.    *Exemptions from Certain Taxes and Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to NewCo and/or its subsidiaries or a Post-Effective Date Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, the Post-Effective Date Debtors, or NewCo; (2) the NewCo Transaction or the Orderly Wind Down, as applicable; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, each Post-Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan; *provided* that, notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.

The Litigation Administrator(s) may pursue the Recovery Causes of Action, and the Plan Administrator may pursue all other Causes of Action, as appropriate in accordance with the best interests of the Holders of Claims entitled

to receive Litigation Proceeds (as to Recovery Causes of Action) or the Post-Effective Date Debtors (as to all other Causes of Action). **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, and the objecting party, such objection shall be resolved by the Bankruptcy Court. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all Causes of Action, for later adjudication, and therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors free and clear of any Claims, except as otherwise expressly provided in the Plan, including <u>Article VIII</u> hereof. The applicable Post-Effective Date Debtors, through their authorized agents or representatives, including the Plan Administrator and the Litigation Administrator(s), shall retain and may exclusively enforce any and all such Causes of Action. The Post-Effective Date Debtors, the Plan Administrator, and the Litigation Administrator(s), as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.    *Election to Contribute Claims.*

Because aggregating all Contributed Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its Ballot, to contribute its Contributed Claims to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds. By electing such option on its Ballot, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the appointment of the Litigation Administrator(s), it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Claims to the Post-Effective Date Debtor(s), and (ii) to have agreed to execute any documents reasonably requested by the Post-Effective Date Debtor(s) or the Litigation Administrator(s) to memorialize and effectuate such contribution.

O.    *Contribution of Contributed Claims.*

On the Effective Date, all Contributed Claims will be irrevocably contributed to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds and shall thereafter be Recovery Causes of Action for all purposes. No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Litigation Administrator Agreement(s), the Plan Supplement, or any other document as any indication that the Litigation

Administrator(s) will or will not pursue any and all available Contributed Claims against such Person. The Litigation Administrator(s) shall have, retain, reserve, and be entitled to assert all Contributed Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date. For the avoidance of doubt, the Contributed Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests and shall not include any claims that cannot be assigned under applicable law.

P.      *Retiree Benefits*.

Notwithstanding anything herein to the contrary, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

For the avoidance of doubt, the Debtors do not believe that any such obligations exist.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Rejection, Assumption, and Assumption and Assignment of Executory Contracts and Unexpired Leases*.

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, including the Employee Transition Services Agreement, all Executory Contracts and Unexpired Leases of the Debtors, including any employee benefit plans, severance plans, or other Executory Contracts under which employee obligations arise, shall be deemed rejected by the Debtors or Post-Effective Date Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract and Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

Pursuant to sections 365(a) and 1123 of the Bankruptcy Code, entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection, assumption, or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, effective as of the Effective Date unless otherwise specified. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Post-Effective Date Debtor according to its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law. Any motions to assume any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases identified in this <u>Article V.A</u> of the Plan and in the Plan Supplement at any time through and including forty-five (45) days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases

that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections of any Executory Contracts or Unexpired Leases as provided for in the Plan and the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Solicitation Agent and served on Debtors or the Post-Effective Date Debtors, as applicable, no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, their Estates, or their property, without the need for any objection by the Debtors or Post-Effective Date Debtors or any further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in <u>Article VIII.F</u> of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to <u>Article III.B</u> of the Plan and may be objected to in accordance with the provisions of <u>Article VII</u> of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults and Objections to Cure and Assumption (or Assumption and Assignment).*

The Debtors or the Post-Effective Date Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter, except as otherwise provided herein. Unless otherwise agreed upon in writing by the Debtors or Post-Effective Date Debtors, as applicable, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount (including pursuant to the Plan) must be Filed and actually received by counsel to the Debtors on or before the deadline by which objections to confirmation of the Plan must be Filed on the Bankruptcy Court's docket, or such other deadline that may be set by the Bankruptcy Court. In the event that the Debtors modify the Schedule of Assumed Executory Contracts and Unexpired Leases after the Confirmation Hearing, such objections shall be Filed and actually received by counsel to the Debtors no later than thirty days after the date of such modification, or such other deadline that may be set by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount.

**Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure amount and to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease, and any Claim arising out of the assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be subject to the permanent injunction set forth in <u>Article VIII.F</u> of the Plan, notwithstanding anything in a Proof of Claim to the contrary. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be zero.**

In the event of a dispute regarding: (1) the amount of any payments to cure an alleged default; (2) the ability of the Post-Effective Date Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure

payment shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Any monetary or nonmonetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, and any associated Cure Claims, shall be deemed fully satisfied, released, and discharged upon payment (1) by the Debtors or the Post-Effective Date Debtors of the Cure amount, if any, in Cash on the Effective Date, (2) by NewCo and/or its subsidiaries in the ordinary course of business, or (3) on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure amount despite the failure of the relevant counterparty to File a Cure objection. Following the Effective Date, the Post-Effective Date Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtors or the Post-Effective Date Debtors, as applicable, in the exercise of their business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the applicable Post-Effective Date Debtor. Such rejected contracts, if any, shall be deemed as listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any.

**Any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Institutional Loans & Retail Advances.*

1.      <u>Institutional Loans.</u>

Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtors shall be deemed to have assumed and assigned to NewCo and/or its subsidiaries all such agreements, documents, and instruments under the Plan; *provided* that if any such agreements, documents, or instruments are (i) Executory Contracts and (ii) on the Schedule of Rejected Contracts, such agreements, documents, or instruments will be rejected as set forth elsewhere in this Plan. To the extent required, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption and assignment to NewCo and/or its subsidiaries of all such Institutional Loans and related agreements, documents, and instruments, and all Institutional Loans and obligations thereunder shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Institutional Loans.

Nothing contained in the Plan or Confirmation Order shall discharge, impair, or otherwise modify any obligations assumed and assigned by this <u>Article V.D</u>, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors and assigned to NewCo and/or its subsidiaries under the Plan as to which no Proof of Claim or Cure Claim need be Filed. To the extent there are cure amounts owed either prepetition and/or postpetition, such amounts shall survive and will not be discharged on the Effective Date; *provided* that any such cure amounts shall either be satisfied in full by the Debtors or otherwise resolved in a manner acceptable to the Plan Sponsor.

2.      <u>Retail Advances.</u>

Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Retail Advances are Executory Contracts, the Debtors shall be deemed to have rejected all such agreements, documents, and instruments under the Plan. To the extent required, entry of the Confirmation Order shall

constitute the Bankruptcy Court's approval of the rejection of all such agreements, documents, and instruments related to Retail Advances.

E.    *Indemnification Provisions.*

On and as of the Effective Date, the Indemnification Provisions applicable to current directors and officers of the Debtors who are not Excluded Parties will be assumed and irrevocable and will survive the effectiveness of the Plan.  None of the Debtors, or the Post-Effective Date Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate, or adversely affect any of the Debtors' or the Post-Effective Date Debtors' obligations to provide such indemnification rights or such directors', officers', managers', employees', equityholders', advisory directors', attorneys', other professionals', or agents' indemnification rights (other than with respect to any such rights in favor of any Excluded Party); *provided* that, notwithstanding anything in the Indemnification Provisions or herein to the contrary, the Post-Effective Date Debtors' obligation to fund obligations under such Indemnification Provisions shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Post-Effective Date Debtors or the Litigation Administrator(s), including any D&O Liability Insurance Policies.  For the avoidance of doubt, (i) neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses and (ii) under no circumstance shall the Debtors' Estates be required to provide any additional consideration beyond the Settlement Funds (as defined in the Series B Settlement Agreement) to any Holders of Series B Preferred Interests or their Related Parties.

Notwithstanding anything to the contrary herein, any obligation of the Debtors to indemnify, defend, reimburse, or limit the liability of any Excluded Party in any capacity against any claim, demand, Cause of Action, suit, proceeding, judgment, fine, loss, damage, or other amount, whether under applicable law or in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, contracts, or otherwise, shall terminate and be discharged upon Confirmation of the Plan.

F.    *Director, Officer, Manager, and Employee Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, to the extent that the D&O Liability Insurance Policies are Executory Contracts, the Debtors shall be deemed to have assumed all such D&O Liability Insurance Policies under the Plan, subject to any succession rights provided in Article IV.G.3.  To the extent required, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption of all such D&O Liability Insurance Policies, and all D&O Liability Insurance Policies and obligations thereunder shall remain in full force and effect in accordance with their terms.  For the avoidance of doubt, the Post-Effective Date Debtors shall not have any obligation to pay any deductible, retention, or any other cost or expense under, arising from, or related to, the D&O Liability Insurance Policies in connection with any such policy or claim made thereunder.

The succession rights provided in Article IV.G.3 shall not limit any third parties' rights with respect to such D&O Liability Insurance Policies.

None of the Debtors or the Post-Effective Date Debtors shall, before or after the Effective Date, terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies; *provided* that the foregoing shall not limit the Debtors' ability to utilize the D&O Liability Insurance Policies prior to the Effective Date.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights.*

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts and Unexpired Leases nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Post-Effective Date Debtor, as applicable, has any liability thereunder.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Post-Effective Date Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

I.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims or Interests Allowed as of the Effective Date.*

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Post-Effective Date Debtors, as the case may be, and the Holder of the applicable Claim or Interest, the Distribution Agent shall make initial distributions under the Plan on account of Claims or Interests Allowed on the Effective Date or as soon as reasonably practical thereafter; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.C; and (c) distributions to Holders of Allowed Custody Claims may, in the Debtors' discretion, begin on the Confirmation Date.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business. Notwithstanding anything to the contrary herein, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

B.      *Timing, Calculation, and Currency of Amounts to Be Distributed.*

Unless otherwise provided herein, on the Effective Date, each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

Holders of Claims who are projected to receive more than $100,000 in distributions in Liquid Cryptocurrency (after aggregating all Claims held by such Holder) may contact the Debtors at CelsiusDistributions@kirkland.com to discuss potential individualized accommodations to the composition of their Liquid Cryptocurrency recovery (at such Holder's sole cost and expense), and the Debtors, in consultation with the Committee, shall use commercially reasonable efforts to accommodate those requests, in the aggregate solely to the extent permitted by applicable regulatory requirements; *provided* that the foregoing compositional accommodations, if any, shall not result in the Debtors distributing any Cryptocurrency other than BTC or ETH.

C.      *Distributions on Account of Obligations of Multiple Debtors.*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

D.      *Distribution Agent.*

Except as otherwise provided for in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date or as soon as reasonably practicable thereafter. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

E.      *Rights and Powers of Distribution Agent.*

1.      Powers of the Distribution Agent.

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Post-Effective Date Debtors; *provided*, that, unless specifically provided, NewCo shall be responsible for any fees and expenses NewCo incurs on or after the Effective Date, and the Plan Sponsor shall be liable for any pre-Effective Date fees and expenses incurred by the Plan Sponsor, Plan Sponsor Counsel, and the Plan Sponsor Advisors (each as defined in the Plan Sponsor Agreement) in excess of $5,000,000 in the aggregate in accordance with the Plan Sponsor Agreement.

F.      *Delivery of Distributions.*

1.      Delivery of Distributions in General.

Except as otherwise provided for in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent, as appropriate and in the Distribution Agent's reasonable judgment:  (a) to the designated digital wallet associated with the Holder's AML/KYC Compliance Information; (b) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein at the address provided therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of

a change of address and a distribution must be delivered by mail); (c) at the addresses set forth in any written notices of address changes delivered to the Post-Effective Date Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (d) to any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf or in accordance with instructions provided thereby.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Post-Effective Date Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for in the case of fraud, gross negligence, or willful misconduct.

2.     Record Date for Distributions.

On the Distribution Record Date, the Claims Register shall be closed, and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practicable and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

3.     Minimum Distributions.

No payment, in Cash, Cryptocurrency, or otherwise, will be made to a stakeholder holding aggregate Allowed Claims less than or equal to $10.00 on account of such Allowed Claims.  Such Claims shall be classified as Class 9 De Minimis Claims and shall be cancelled and discharged without distribution.

In addition, the Debtors shall not be required to make any distributions on account of Claims where the associated Withdrawal Fees would exceed the value of the distribution.

4.     Undeliverable Distributions and Unclaimed Property.

Any distribution under the Plan that is an Unclaimed Distribution or otherwise remains undeliverable for a period of one year after the first attempt to deliver (which, for Liquid Cryptocurrency, shall be the first date on which such distributions are open for a particular Holder), (i) in the event the NewCo Transaction is consummated, such distribution shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall irrevocably revert to (1) NewCo, in the case of NewCo Common Stock, or (2) the Post-Effective Date Debtors, to the extent it is Liquid Cryptocurrency, and shall be promptly distributed Pro Rata to Holders of Claims entitled to receive Litigation Proceeds under this Plan, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property laws to the contrary); and (ii) in the event the Orderly Wind Down is consummated, such distribution shall be (a) distributed to Holders of Illiquid Recovery Rights, (b) utilized to fund Wind-Down Expenses or, if no such expenses remain, (c) contributed to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  Notwithstanding anything to the contrary in the two foregoing sentences, any Unclaimed Distribution under the Series B Settlement shall be redistributed in accordance with Section 4 of the Series B Settlement Agreement.

5.     Surrender of Cancelled Instruments or Securities.

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and their Affiliates (other than Excluded Parties), and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect

to such certificate or instrument, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan.

G.      *Manner of Payment.*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements. Notwithstanding anything to the contrary herein, the Distribution Agent may, in its sole and absolute discretion, make any distributions provided for herein in a specific Cryptocurrency or fiat as required in its business and legal judgment to remain compliant with applicable laws and regulatory requirements.

H.      *Compliance Matters.*

In connection with the Plan, to the extent applicable, the Post-Effective Date Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Post-Effective Date Debtors, the Distribution Agent, and NewCo shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Post-Effective Date Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, and such distributions shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Notwithstanding anything to the contrary herein, in the event that (a) any regulatory authority having jurisdiction over the Post-Effective Date Debtors, NewCo, or any Account Holder (including, for the avoidance of doubt, any Retail Borrower) has asserted in any enforcement action, litigation, policy, guidance, or official public pronouncement that a Cryptocurrency to be distributed to an Account Holder under or in connection with the Plan is a security under that jurisdiction's securities laws, or is otherwise restricted from being transferred to such Account Holder under any applicable laws of such jurisdiction, and (b) such Account Holder fails or is otherwise unable to provide documentation and legal analysis to NewCo or the Plan Administrator, as applicable, demonstrating to the reasonable satisfaction of NewCo or the Plan Administrator, as applicable, that a clear and valid exemption to such law(s) applies to such Account Holder with respect to the transfer of such coins, then, in such event, NewCo, any Litigation Administrator, or the Plan Administrator, as applicable, may, in its sole and absolute discretion, convert such coins into other Cryptocurrency or fiat as required in its business and legal judgment to remain compliant with applicable laws and distribute such converted Cryptocurrency or fiat to the Account Holder.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government-issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall automatically be deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition* on the Petition Date.

J.      *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (a) postpetition and/or default interest shall not accrue or be paid on any Claims and (b) no Holder of a Claim shall be entitled to: (i) interest accruing on or after the Petition Date on any such Claim; or (ii) interest at the contract default rate, as applicable.

Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

K.      *Allocation Between Principal and Accrued Interest.*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

L.      *Setoffs and Recoupment.*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor, each Post-Effective Date Debtor, and NewCo, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Post-Effective Date Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtors, such Post-Effective Date Debtors, or NewCo of any such claims, rights, and Causes of Action that such Post-Effective Date Debtors may possess against such Holder.

In the event of a successful Avoidance Action, the associated Section 502(h) Claims will be preemptively set off against the property to be recovered, with such Section 502(h) Claims assumed to recover the same percentage as the Class 5 (General Earn Claim) recovery set forth in <u>Article III.M</u> of the Disclosure Statement; *provided* that the foregoing recovery assumptions shall not apply to any Equitably Subordinated Claims. For the avoidance of doubt, the Debtors may withhold distributions on account of outstanding Avoidance Actions and, to account for the setoff of such Section 502(h) Claim, set off such distributions against the amount to be paid by the Account Holder subject to such Avoidance Action.

In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any claim, right, or Cause of Action of the Debtors or Post-Effective Date Debtors (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

M.      *Claims Paid or Payable by Third Parties.*

1.      <u>Claims Paid by Third Parties.</u>

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Post-Effective Date Debtor. Subject to the last sentence of this paragraph, to the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Post-Effective Date Debtor or other Distribution Agent on account of such Claim, such Holder shall, within fourteen days of receipt thereof, repay or return the distribution to the applicable Post-Effective Date Debtor or other Distribution Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Post-Effective Date Debtor or Distribution Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

69

2.        <u>Claims Payable by Third Parties</u>.

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Post-Effective Date Debtors, as applicable. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim may be expunged on the Claims Register by the Solicitation Agent to the extent of any agreed upon satisfaction without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.        <u>Applicability of Insurance Policies</u>.

Except as otherwise provided for in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any insurance policies, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.       *Disputed Claims Process.*

The Debtors, the Plan Administrator, and any Litigation Administrator(s), as applicable, shall have the exclusive authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (x) the Effective Date or (y) the applicable claims Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Post-Effective Date Debtor, without the need for any objection by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or any Litigation Administrator(s) or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.**

B.       *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, the Post-Effective Date Debtors and any Litigation Administrator(s), as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order and the order approving the Class Claim Settlement Motion), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

C.       *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Litigation Administrator(s) shall have the sole authority to: (a) File, withdraw, or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Post-Effective Date Debtor and the Litigation Administrator(s) shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the related Causes of Action retained pursuant to <u>Article IV.M</u> of the Plan.

D.    *Adjustment to Claims or Interests Without Objection.*

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan or the order approving the Class Claim Settlement Motion) may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) without the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) without the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Reservation of Rights to Object to Claims.*

The failure of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s), as applicable, to object to any Claim shall not be construed as an admission to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s), as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

F.    *Estimation of Claims.*

Before, on, or after the Effective Date, Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s), as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court; *provided* that with respect to Account Holder Claims, the Debtors shall estimate such Claims in their Scheduled amounts unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

G.    *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors, the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or NewCo, as applicable, may establish one or more Disputed and Contingent Claims Reserves, in an amount or amounts as reasonably determined by the applicable Debtors or Post-Effective Date Debtors, as applicable, in consultation with the Committee, consistent with the Proof of Claim Filed by the applicable

Holder of such Disputed Claim and/or the Withdrawal Preference Exposure amount associated with such Claim. For any Disputed and Contingent Claims Reserve, the Debtors, Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or NewCo, as applicable, may take the position that grantor trust treatment applies in whole or in part. To the extent such treatment applies to any Disputed and Contingent Claims Reserve, for all U.S. federal income tax purposes, the beneficiaries of the any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such Disputed and Contingent Claims Reserve would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes the beneficiaries of any such account or fund would be treated as if they had received an interest in such account or fund's assets and then contributed such interests to such account or fund. Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. If such rules apply, such assets would be subject to entity-level taxation, and the Debtors or Post-Effective Date Debtors would be required to comply with the relevant rules. For the avoidance of doubt, no reserves need be created nor distributions need to be held back on account of the State Regulatory Claims or the Claims of the Federal Trade Commission described in the FTC Stipulation.

H.      *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is or may be recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is or may be avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and either (i) the full amount of such obligation to the Debtors or the Post-Effective Date Debtors has been paid or turned over or (ii) with respect to obligations owed by potential Holders of Section 502(h) Claims, the amount of such obligations to the Debtors or the Post-Effective Date Debtors after giving effect to Article VI.L has been paid or turned over; *provided* that the Litigation Administrator(s) shall commence any such action to recover property within 180 days following the Effective Date (subject to extension by the Bankruptcy Court upon notice and a hearing).

Except as provided herein or otherwise agreed to by the applicable Litigation Administrator(s) in its sole discretion, any and all Proofs of Claim Filed after the applicable Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

I.      *Amendments to Proofs of Claim or Interests.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the applicable Litigation Administrator(s), and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; *provided* that the foregoing shall not apply to Administrative Claims Filed prior to the Administrative Claims Bar Date or Professional Fee Claims.

J.      *No Distributions Pending Allowance or Resolution of Recovery Causes of Action.*

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim or the Holder of such Claim is subject to a Recovery Cause of Action, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or such Recovery Cause of Action is settled or otherwise resolved.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or a Recovery Cause of Action against the applicable Holder is settled or otherwise resolved, distributions (if any) shall be made to the Holder of such

Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or resolving a Recovery Cause of Action becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

For the avoidance of doubt, interest shall not accrue or be paid on any Disputed Claim or Claim where the Holder is subject to a Recovery Cause of Action with respect to the period from the Effective Date to the date a distribution is made on account of such Disputed Claim or Claim where the Holder is subject to a Recovery Cause of Action, if and when such Disputed Claim becomes an Allowed Claim or such Recovery Cause of Action is settled or otherwise resolved.

## ARTICLE VIII.
### SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Post-Effective Date Debtors or the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties (including the NewCo Assets), regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Reinstated Claims, if any) and Interests (other than Intercompany Interests that are Reinstated, if any) subject to the occurrence of the Effective Date.

B.      *Release of Liens.*

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (including the NewCo Assets) shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Post-Effective Date Debtors, or any other Holder of a Secured Claim. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the**

Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors the Post-Effective Date Debtors, or the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Post-Effective Date Debtors and the Plan Administrator shall be entitled to make any such filings or recordings on such Holder's behalf.

C.    *Debtor Release.*

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Post-Effective Date Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise that the Debtors, their Estates, or the Post-Effective Date Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in-or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

74

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Post-Effective Date Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

Notwithstanding anything contained herein to the contrary, nothing in the Plan or Confirmation Order shall release or exculpate any claims or causes of action against any of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW).

D.      *Third-Party Release.*

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, (c) any Avoidance Action not released pursuant to

the Account Holder Avoidance Action Settlement, or (d) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

E.    *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Chapter 11 Cases, the Plan Sponsor Agreement, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction (if applicable), the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into during the Chapter 11 Cases in connection with the Chapter 11 Cases (including the trading and sales of Cryptocurrencies and Tokens in connection with the Chapter 11 Cases), the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan, the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or the Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property, Cryptocurrency, or Tokens under the Plan (including the NewCo Assets) or any other related agreement or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released hereunder, including pursuant to the Account Holder Avoidance Action Settlement.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be,

liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party.

Notwithstanding anything contained herein to the contrary, nothing in the Plan or Confirmation Order shall release or exculpate any claims or causes of action against any of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW).

F.    *Injunction.*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including the Causes of Action released or exculpated in this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this <u>Article VIII.F</u>.

No Releasing Party may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties that (i) is a core claim that arises from or relates to the Chapter 11 Cases and (ii) relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to <u>Article VIII.C</u>, <u>Article VIII.D</u>, or <u>Article VIII.E</u> hereof, without the Bankruptcy Court (x) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (y) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate whether such a-colorable Claim or Causes of Action exists.  For the avoidance of doubt, the foregoing shall not limit the scope of the releases contained in Article VIII.C, Article VIII.D, or Article VIII.E or Article XII's retention of jurisdiction.

G.    *Additional Provisions Regarding Governmental Units.*

As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in this Plan or the Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Post-Effective Date Debtors are entitled to under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action.

Accordingly, notwithstanding anything contained in this Plan or the Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors or Post-Effective Date Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Confirmation Date. Nor shall anything in this Plan or the Confirmation Order: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Plan, the Confirmation Order, or the Bankruptcy Code.

Moreover, nothing in this Plan or the Confirmation Order shall release or exculpate any non-debtor, including any Released Parties, from any liability to any Governmental Unit, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties, nor shall anything in this Plan or the Confirmation Order enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against the Released Parties for any liability whatsoever; *provided*, *however*, that the foregoing sentence shall not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

Nothing contained in this Plan or the Confirmation Order shall diminish the scope of any qualified immunity, protections, or defenses to which any party is entitled under applicable law.

Nothing contained in this Plan or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Post-Effective Date Debtors, nor shall this Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

With respect to any Governmental Unit, nothing in this Plan or the Confirmation Order, including the four paragraphs above, shall limit or expand the meaning or effect of section 1141(c) of the Bankruptcy Code with respect to the asset transfers set forth in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan. Accordingly, notwithstanding anything to the contrary in this Plan or the Confirmation Order, including <u>Article IV.D.1</u> of this Plan, to the fullest extent permitted under section 1141(c) of the Bankruptcy Code, the NewCo Assets are transferred free and clear of all Claims (including Administrative Claims, Priority Claims, Secured Claims, and Unsecured Claims) and Interests arising through the Effective Time, but nothing in this Plan or the Confirmation Order releases, nullifies, precludes or enjoins the enforcement of any post-Effective Time liability to a governmental unit under police and regulatory statutes or regulations (including, but not limited to, environmental, health, and safety laws or regulations), and any associated liabilities for penalties, damages, cost recovery or injunctive relief that any entity would be subject to as the owner, lessor, lessee or operator of the NewCo Assets after the Effective Time. Further, notwithstanding anything to the contrary in this Plan or the Confirmation Order, including <u>Article IV.D.1</u> of this Plan, nothing contained in this Plan or in the Confirmation Order shall in any way diminish the obligation of any entity, including the Debtors, Post-Effective Date Debtors, and NewCo, to comply with environmental, health, and safety laws. Nothing in this Plan or the Confirmation Order authorizes the transfer to NewCo of any licenses, permits, registrations or governmental authorizations and approvals without NewCo's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

The Debtors and their successors and assigns are permanently restrained and enjoined from transacting business, directly or indirectly, as an issuer, issuer agent, broker-dealer, broker-dealer agent, investment adviser, and/or investment adviser representative or otherwise offering and/or selling securities and/or providing banking or money services.  For the avoidance of doubt, the preceding sentence does not apply to NewCo, although NewCo shall comply with state and federal laws and regulations as required going forward.  Any and all state regulatory orders and judgments issued to or against Debtors prior to or during these Chapter 11 Cases are not discharged, released, or otherwise affected by confirmation of the Plan; *provided*, for the avoidance of doubt, that any monetary amounts provided for therein shall be treated as State Regulatory Claims hereunder.  For the avoidance of doubt, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan, regardless of whether or how such Holders have voted on the Plan.

H.    *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Post-Effective Date Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Debtors or Post-Effective Date Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

J.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.    *Document Retention.*

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Post-Effective Date Debtors, which shall preserve all books, records, electronically stored information, and other documents that are currently in the Debtors' possession.  The Post-Effective Date Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, and other documents without (i) providing advance notice to the SEC (c/o Therese A. Scheuer, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549, scheuert@sec.gov) and (ii) the permission of the Litigation Administrator(s) or authorization from the Bankruptcy Court.  Nothing in the Plan or this Confirmation Order shall affect the obligations of the Debtors, the Post-Effective Date Debtors, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

Until the entry of a Final Order of judgment or settlement with respect to all defendants now or hereafter named in the Securities Litigation, the Debtors, Post-Effective Date Debtors, and any transferee or custodian of the Debtors shall preserve and maintain the Securities Litigation Documents as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil procedure, and shall not

destroy, abandon, transfer or otherwise render unavailable such Securities Litigation Documents. For the avoidance of doubt, the injunction set forth in Article VIII.F of the Plan shall not affect in any manner any rights of the lead plaintiff and the class in the Securities Litigation to seek and obtain Securities Litigation Documents through discovery in the Securities Litigation.

## ARTICLE IX.
## CONDITIONS TO CONFIRMATION

A.    *Conditions Precedent to Confirmation.*

It shall be a condition to confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article X.B, in each case:

1.    the Bankruptcy Court shall have entered the Disclosure Statement Order;

2.    the Management Agreement, the New Organizational Documents, the Proof Group IP License (if any), the distribution agent agreement(s), and the US Bitcoin Agreements shall be agreed as required under the Plan Sponsor Agreement;

3.    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and

4.    the Bankruptcy Court shall have entered the Confirmation Order.

B.    *Waiver of Conditions to Confirmation.*

Other than to the extent specifically set forth in the Plan or the Plan Sponsor Agreement, each condition precedent to the Effective Date set forth in Article X.A may be waived in whole or in part at any time without notice, leave, or an order of the Bankruptcy Court only if waived in writing by the Debtors, the Committee, and the Plan Sponsor.

## ARTICLE X.
## CONDITIONS TO THE EFFECTIVE DATE

A.    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B, in each case:

1.    the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order);

2.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with this Plan and the Plan Sponsor Agreement in all material respects, and shall have been executed and Filed in a manner consistent with this Plan and the Plan Sponsor Agreement;

3.    the Debtors shall have Cash on hand or shall have transferred, liquidated, monetized, or sold Cryptocurrency such that they have sufficient Cash to pay the Senior Claims Amount and the amount of all Cure Claims;

4.    the Litigation Administrator Agreement(s) shall have been executed and the Litigation Recovery Account shall have been established and funded with the Initial Litigation Funding Amount;

5.    each PSA Definitive Document and each other document contained in any supplement to this Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, if applicable, in form and substance consistent in all material respects with this Plan and the Plan Sponsor Agreement, and shall not have been modified in a manner inconsistent therewith;

6.    the Professional Fee Escrow Account shall have been established and funded with Cash in accordance with this Plan;

7.    a segregated account shall have been established and funded with Cash in an amount necessary to fund the Plan Administrator Budget in accordance with the terms of the Plan Administrator Agreement;

8.    the Debtors or NewCo shall have purchased a directors' and officers' liability insurance policy for the benefit of the New Board, which policy shall be reasonably acceptable to the Debtors, the Committee, and the Plan Sponsor;

9.    the NewCo Assets shall have been transferred to NewCo as set forth in this Plan, the Debtors shall have taken all other actions necessary to consummate the NewCo Transactions hereunder as required under this Plan and the Plan Sponsor Agreement, and the NewCo Transactions contemplated under the Transaction Steps Memorandum shall have been consummated;

10.    the Debtors shall have identified and delivered to the Plan Sponsor a list of all NewCo Assets to be transferred to NewCo, and an estimate of the book value of such NewCo Assets, in each case as of the Effective Date of the Plan, and such list of NewCo Assets and estimated book values shall be reasonably acceptable to the Plan Sponsor;

11.    a PCAOB-registered audit firm shall have been engaged to deliver an audit of the opening balance sheet of NewCo, which PCAOB-registered audit firm shall be subject to the mutual consent of the Debtors and the Plan Sponsor, which consent shall not be unreasonably withheld;

12.    the Registration Statement respecting the NewCo Common Stock shall have been filed and such Registration Statement shall have become effective;

13.    all consents, approvals, or permissions, including all Regulatory Approvals, necessary to consummate and implement the Plan and the NewCo Transactions shall have been obtained; and

14.    this Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

B.    *Waiver of Conditions to the Effective Date.*

Other than to the extent specifically set forth in the Plan or the Plan Sponsor Agreement, each condition precedent to the Effective Date set forth in Article X.A may be waived in whole or in part at any time without notice, leave, or an order of the Bankruptcy Court only if waived in writing by the Debtors, the Committee, and the Plan Sponsor.

C.    *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

D.    *Effect of Non-Occurrence of Conditions to Consummation.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Plan Sponsor Agreement, or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims

by the Debtors or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided* that all provisions of the Plan Sponsor Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan.*

The Debtors reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and the terms set forth herein and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Notwithstanding anything set forth in this Article XI, the Debtors shall not modify:  (i) this Article XI or Article X hereof without the express written consent of the Plan Sponsor (e-mail being sufficient); or (ii) any other provision of the Plan in a way that is adverse to the interests of the Plan Sponsor without the express written consent of the Plan Sponsor (e-mail being sufficient).

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, but excluding any settlement that was separately approved by the Bankruptcy Court), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Plan Administrator's amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the (i) Schedule of Assumed Executory Contracts and Unexpired Leases or (ii) the Schedule of Rejected Executory Contracts and Unexpired Leases, or otherwise changing their decision whether to assume or reject any Executory Contract or Unexpired Lease; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.  ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.  enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of, or determine any matters that may otherwise arise in connection with or relate to the Plan, the Confirmation Order, and all contracts, instruments, releases, indentures, and other agreements or documents entered into or delivered in connection therewith or otherwise approved by a Final Order of the Bankruptcy Court, including the Plan Sponsor Agreement;

8.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10. resolve any cases, controversies, suits, disputes, Causes of Action, or other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, the NewCo Transaction, or the Orderly Wind Down or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, the NewCo Transaction, or the Orderly Wind Down;

11. resolve any cases, controversies, suits, disputes, Causes of Action, or other matters that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator in the Bankruptcy Court;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.M;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications to the Plan, including to cure or remedy any defect or omission or to reconcile or clarify any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or any other Bankruptcy Court order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. hear and determine matters related to any requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

19. enforce all orders previously entered by the Bankruptcy Court;

20. enter an order or decree contemplated under Bankruptcy Rule 3022 concluding or closing the Chapter 11 Cases; and

21. hear any other matter not inconsistent with the Bankruptcy Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Post-Effective Date Debtors and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.    *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims and Interests receiving

distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

| If to the Debtors: | If to Counsel to the Debtors: |
|---|---|
| Celsius Network LLC<br>50 Harrison Street, Suite 209F<br>Hoboken, New Jersey 07030<br>Attention:  Ron Deutsch | **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:          (212) 446-4800<br>Facsimile:          (212) 446-4900<br>Email:                joshua.sussberg@kirkland.com<br><br>- and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:          (312) 862-2000<br>Facsimile:          (312) 862-2200<br>Email:                patrick.nash@kirkland.com<br>                          ross.kwasteniet@kirkland.com<br>                          chris.koenig@kirkland.com<br>                          dan.latona@kirkland.com |

| If to the U.S. Trustee: | If to Counsel to the Committee: |
|---|---|
| Shara Claire Cornell<br>Mark Bruh<br>Trial Attorneys Office of the United States Trustee<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, New York 10014 | **WHITE & CASE LLP**<br>David M. Turetsky<br>Samuel P. Hershey<br>Keith H. Wofford<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone:    (212) 819-8200<br>Facsimile:    (212) 354-8113<br>Email:    david.turetsky@whitecase.com<br>    sam.hershey@whitecase.com<br>    kwofford@whitecase.com<br><br>- and -<br><br>**WHITE & CASE LLP**<br>Gregory F. Pesce (admitted *pro hac vice*)<br>111 South Wacker Drive, Suite 5100<br>Chicago, Illinois 60606<br>Telephone:    (312) 881-5400<br>Facsimile:    (312) 881-5450<br>Email:    mandolina@whitecase.com<br>    gregory.pesce@whitecase.com<br><br>- and -<br><br>**WHITE & CASE LLP**<br>Aaron E. Colodny (admitted *pro hac vice*)<br>555 South Flower Street, Suite 2700<br>Los Angeles, California 90071<br>Telephone:    (212) 819-8200<br>Facsimile:    (212) 354-8113<br>Email:    aaron.colodny@whitecase.com |
| **If to Counsel to the Plan Sponsor:** | |
| **BROWN RUDNICK LLP**<br>Andrew M. Carty<br>Catherine (Katy) Gardner<br>Matthew E. Uretsky<br>7 Times Square<br>New York, New York 10036<br>Telephone:    (212) 209-4800<br>Facsimile:    (212) 209-4801<br>Email:    acarty@brownrudnick.com<br>    kgardner@brownrudnick.com<br>    muretsky@brownrudnick.com | |

After the Effective Date, the Post-Effective Date Debtors and the Plan Administrator shall have authority to send a notice requiring Entities receiving documents pursuant to Bankruptcy Rule 2002 to File a renewed request to continue receiving documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Post-Effective Date Debtors and the Plan Administrator are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.     *Entire Agreement.*

Except as otherwise indicated in the Plan or the Confirmation Order, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  Except as otherwise indicated in the Plan or the Confirmation Order, in the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

G.     *Plan Supplement Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://cases.stretto.com/Celsius or the Bankruptcy Court's website at https://www.nysb.uscourts.gov.  The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.     *Non-Severability.*

If any term or provision of the Plan is found or held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, *however*, that any such alteration or interpretation must be consistent with the Plan Sponsor Agreement. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

Except as provided in the preceding paragraph, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Post-Effective Date Debtors; and (c) non-severable and mutually dependent.

I.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties or individuals, nor the Post-Effective Date Debtors, will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

J.     *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases shall be deemed closed, except for one of the Post-Effective Date Debtors' cases, as determined by the Post-Effective Date Debtors, which shall be designated as the lead case (the "Remaining Case").  All contested matters and adversary proceedings relating to any of the Debtors or Post-Effective Date Debtors, as applicable, including objections to Claims, shall be Filed, administered, and adjudicated in the Remaining Case without the need to reopen any case.

K.      *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment.*

Following the Effective Date, the Committee shall survive for the purpose of filing, prosecuting, reviewing, and objecting to any applications for compensation and reimbursement of expenses filed pursuant to Article II.B hereof.  The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.  Upon the resolution of all matters set forth in this section, the Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

L.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, as a Secured Claim or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  September 27, 2023

Celsius Network LLC
on behalf of itself and all other Debtors

*/s/ Christopher Ferraro*
Name:  Christopher Ferraro
Title:    Interim Chief Executive Officer, Chief Financial
            Officer, and Chief Restructuring Officer
            Celsius Network LLC

**Exhibit B**

**Redline to Solicitation Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MODIFIED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

> **THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ~~ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.~~ NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, AND THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Dated: ~~August 15,~~ September 27, 2023

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ...................................................... 1
    A.      Defined Terms. ............................................................................................ 1
    B.      Rules of Interpretation. ............................................................................... 25
    C.      Computation of Time. ................................................................................. 256
    D.      Governing Law. ........................................................................................... 26
    E.      Reference to Monetary Figures. ................................................................ 26
    F.      Valuation of Claims. .................................................................................. 26
    G.      Reference to the Debtors or the Post-Effective Date Debtors. ................. 267
    H.      Controlling Documents. ............................................................................. 267
    I.      Consultation, Information, Notice, and Consent Rights. ......................... 267

ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ........................................... 27
    A.      Administrative Claims. .............................................................................. 27
    B.      Professional Fee Claims. ........................................................................... 278
    C.      Priority Tax Claims. ................................................................................... 289
    D.      Statutory Fees. ........................................................................................... 289

ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ................................................................................................. 29
    A.      Classification of Claims and Interests. ..................................................... 29
    B.      Treatment of Classes of Claims and Interests. ......................................... 30
    C.      Special Provision Governing Unimpaired Claims. ................................... 378
    D.      Elimination of Vacant Classes. ................................................................. 378
    E.      Voting Classes; Deemed Acceptance by Non-Voting Classes. ................ 378
    F.      Subordinated Claims. ................................................................................ 378
    G.      Intercompany Interests. .............................................................................. 378
    H.      Controversy Concerning Impairment or Classification. .......................... 389
    I.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................................................................................... 389

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .................................. 389
    A.      Substantive Consolidation. ........................................................................ 389
    B.      Plan Settlement Provisions Regarding Claims and Interests. ................... 389
    C.      Restructuring Transactions. ....................................................................... 412
    D.      NewCo Restructuring Transactions. ......................................................... 423
    E.      Orderly Wind Down. ................................................................................. 467
    F.      Plan Administrator. .................................................................................... 478
    G.      Litigation Administrator(s), Litigation Oversight Committee, and Contributed Claims. ................................................................................. 502
    H.      Corporate Action. ...................................................................................... 535
    I.      Cancellation of Notes, Instruments, Certificates, and Other Documents. ... 535
    J.      Employee Obligations. .............................................................................. 545
    K.      Effectuating Documents; Further Transactions. ....................................... 579
    L.      Exemptions from Certain Taxes and Fees. ............................................... 579
    M.      Preservation of Causes of Action. ............................................................. 589
    N.      Election to Contribute Claims. ................................................................. 5960
    O.      Contribution of Contributed Claims. ........................................................ 5960
    P.      Retiree Benefits. ........................................................................................ 5961

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................ 59 61

   A.   Rejection, Assumption, and Assumption and Assignment of Executory Contracts and Unexpired Leases. ........................ 59 61

   B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim. ........................ 60 2

   C.   Cure of Defaults and Objections to Cure and Assumption (or Assumption and Assignment). ........................ 60 2

   D.   Institutional Loans & Retail Advances. ........................ 61 3

   E.   Indemnification Provisions. ........................ 62 4

   F.   Director, Officer, Manager, and Employee Liability Insurance. ........................ 62 4

   G.   Modifications, Amendments, Supplements, Restatements, or Other Agreements. ........................ 63 4

   H.   Reservation of Rights. ........................ 63 5

   I.   Nonoccurrence of Effective Date. ........................ 63 5

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........................ 63 5

   A.   Distributions on Account of Claims or Interests Allowed as of the Effective Date. ........................ 63 5

   B.   Timing, Calculation, and Currency of Amounts to Be Distributed. ........................ 64 5

   C.   Distributions on Account of Obligations of Multiple Debtors. ........................ 64 6

   D.   Distribution Agent. ........................ 64 6

   E.   Rights and Powers of Distribution Agent. ........................ 64 6

   F.   Delivery of Distributions. ........................ 65 6

   G.   Manner of Payment. ........................ 66 8

   H.   Compliance Matters. ........................ 66 8

   I.   Foreign Currency Exchange Rate. ........................ 67 8

   J.   No Postpetition or Default Interest on Claims. ........................ 67 8

   K.   Allocation Between Principal and Accrued Interest. ........................ 67 9

   L.   Setoffs and Recoupment. ........................ 67 9

   M.   Claims Paid or Payable by Third Parties. ........................ 68 9

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ........................ 68 70

   A.   Disputed Claims Process. ........................ 68 70

   B.   Allowance of Claims. ........................ 68 70

   C.   Claims Administration Responsibilities. ........................ 69 70

   D.   Adjustment to Claims or Interests Without Objection. ........................ 69 71

   E.   Reservation of Rights to Object to Claims. ........................ 69 71

   F.   Estimation of Claims. ........................ 69 71

   G.   Disputed and Contingent Claims Reserve. ........................ 70 1

   H.   Disallowance of Claims. ........................ 70 2

   I.   Amendments to Proofs of Claim or Interests. ........................ 70 2

   J.   No Distributions Pending Allowance or Resolution of Recovery Causes of Action. ........................ 71 2

   K.   Distributions After Allowance. ........................ 71 2

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........................ 71 3

   A.   Discharge of Claims and Termination of Interests. ........................ 71 3

   B.   Release of Liens. ........................ 72 3

   C.   Debtor Release. ........................ 72 4

   D.   Third-Party Release. ........................ 73 5

   E.   Exculpation. ........................ 74 6

   F.   Injunction. ........................ 75 7

   G.   Additional Provisions Regarding Governmental Units. ........................ 76 8

   H.   Protection Against Discriminatory Treatment. ........................ 77 9

   I.   Reimbursement or Contribution. ........................ 77 9

   J.   Term of Injunctions or Stays. ........................ 77 9

   K.   Document Retention. ........................ 77 9

ARTICLE IX. CONDITIONS TO CONFIRMATION ................................................................. 780
    A.      Conditions Precedent to Confirmation. ................................................................. 780
    B.      Waiver of Conditions to Confirmation. ................................................................. 780

ARTICLE X. CONDITIONS TO THE EFFECTIVE DATE ...................................................... 780
    A.      Conditions Precedent to the Effective Date. ......................................................... 780
    B.      Waiver of Conditions to the Effective Date. .......................................................... 7981
    C.      Substantial Consummation. ..................................................................................... 7981
    D.      Effect of Non-Occurrence of Conditions to Consummation. ................................. 7981

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....... 802
    A.      Modification of Plan. ............................................................................................... 802
    B.      Effect of Confirmation on Modifications. ............................................................... 802
    C.      Revocation or Withdrawal of Plan. ......................................................................... 802

ARTICLE XII. RETENTION OF JURISDICTION ................................................................... 802

ARTICLE XIII. MISCELLANEOUS PROVISIONS .................................................................. 824
    A.      Immediate Binding Effect. ...................................................................................... 824
    B.      Additional Documents. ............................................................................................ 824
    C.      Reservation of Rights. ............................................................................................. 835
    D.      Successors and Assigns. .......................................................................................... 835
    E.      Notices. .................................................................................................................... 835
    F.      Entire Agreement. ................................................................................................... 857
    G.      Plan Supplement Exhibits. ...................................................................................... 857
    H.      Non-Severability. .................................................................................................... 857
    I.      Votes Solicited in Good Faith. ................................................................................ 857
    J.      Closing the Chapter 11 Cases. ................................................................................ 857
    K.      Dissolution of Statutory Committees and Cessation of Fee and Expense Payment. ...... 868
    L.      Waiver or Estoppel. ................................................................................................ 868

**INTRODUCTION**

Celsius Network LLC and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors" and, together with their non-Debtor Affiliates, "Celsius") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Article I.A of the Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor other than Celsius Network Limited, Celsius Network LLC, Celsius Lending LLC, and Celsius Networks Lending LLC, for which the Debtors propose a substantive consolidation and joint Plan on the terms set forth herein. Holders of Claims or Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, risk factors, a summary and analysis of the Plan, the NewCo Transaction, the Orderly Wind Down, and certain related matters. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

A.    *Defined Terms*.

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*Account Holder*" means a Person or Entity that maintained a Celsius Account with the Debtors as of the Petition Date.

2.    "*Account Holder Avoidance Action*" means an Avoidance Action against an Account Holder.

3.    "*Account Holder Avoidance Action Release*" means a release of an Account Holder Avoidance Action pursuant to the Account Holder Avoidance Action Settlement.

4.    "*Account Holder Avoidance Action Settlement*" means the settlement of Avoidance Actions between the Debtors and certain Account Holders, the terms of which are set forth in Article IV.B.3 herein.

5.    "*Account Holder Ballot*" means the Ballot distributed to Holders of Account Holder Claims.

6.    "*Account Holder Claim*" means any Claim held by an Account Holder that arises out of or relates to a Celsius Account, including any Claim for damages against any Debtor related thereto.

7.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases arising on or after the Petition Date ~~and prior to~~through the Effective ~~Date~~Time pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date ~~until and including~~through the Effective ~~Date~~Time of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) the reasonable and documented fees and out-of-pocket expenses of counsel to (i) the Custody Ad Hoc Group, (ii) the Withhold Ad Hoc Group, (iii) the Earn Ad Hoc Group, (iv) the Retail Borrower Ad Hoc Group, (v) the Pending Withdrawal Ad Hoc Group, and (vi) Ignat Tuganov, in each case to the extent that the Bankruptcy Court has entered a Final Order finding that they have provided a substantial contribution to the Debtors' estates pursuant to section 503(b)(3)(D); (d) the reasonable and documented court fees and out-of-pocket expenses of (i) Immanuel Herrmann, (ii) Daniel Frishberg, and (iii) Cameron Crews, in each case to the extent that the Bankruptcy Court has entered a Final Order finding that they have provided a substantial contribution to the Debtors' estates pursuant to section 503(b)(3)(D); (e) the

reasonable and documented fees and out-of-pocket expenses of counsel to any members of the Committee; (f) all fees and charges assessed against the Estates pursuant to section 1930 of the Judicial Code; and (g) the reasonable and documented fees and expenses of the Plan Sponsor and its counsel and advisors on the terms and conditions set forth in the Plan Sponsor Agreement, including that such fees and expenses shall not exceed $5,000,000, in the aggregate.  For the avoidance of doubt, "State Regulatory Claims" hereunder shall not include any Administrative Claims of Governmental Units that are taxing authorities.

8.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be thirty days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five days after the Effective Date; *provided*, *however*, that the deadline for Filing requests for payment of Administrative Claims arising under 503(b)(9) of the Bankruptcy Code shall be the Bar Date.

9.    "*ADR Procedures*" means the alternative dispute resolution procedures related to the determination of claims against the Estates, which shall be included in the Plan Supplement.

10.    "*ADR-Ineligible Potential Defendants*" means any potential Avoidance Action defendant that (a) is an equity holder of the Debtors, (b) is a current or former Insider of the Debtors, (c) is an Excluded Party, (d) is party to an agreement with the Debtors to promote the Debtors' business to potential Account Holders (*e.g.*, a promoter or brand ambassador agreement), or (e) controls or is an Affiliate of a potential Avoidance Action defendant described in clause (d) hereof.

11.    "*Affiliate*" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

12.    "*Allowed*," "*Allowing*," and "*Allowance*" means, with respect to any Claim or Interest, except as otherwise provided herein, including the Class Claim Settlement: (a) a Claim or Interest in a liquidated amount that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, the Bar Date Order, or another Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; (c) a Claim or Interest that is Allowed (i) pursuant to the Plan; (ii) in any stipulation that is approved by the Bankruptcy Court; (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (iv) by Final Order (including any such Claim to which the Debtors previously objected or which the Bankruptcy Court previously disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest (i) no objection to the allowance thereof or request for estimation has been or, in the Debtors' or Post-Effective Date Debtors' (or their agent or representative) reasonable good faith judgment, may be interposed within the latest applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection or request for estimation is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order, and (ii) such Claim or Interest has not been designated for resolution under the ADR Procedures; *provided*, *further*, that no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Post-Effective Date Debtor, as applicable; *provided, further*, that, except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt, a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.

13.    "*AML/KYC Compliance Information*" means any information required to be provided by Account Holders to ensure compliance with applicable Know Your Customer and Anti-Money Laundering laws, regulations,

and guidelines, including, but not limited to the US Patriot Act of 2001, 8 U.S.C. § 1701 *et. seq.*, the United Kingdom's Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations of 2017, and Canada's Proceeds of Crime (Money Laundering) and Terrorist Financing Act.

14.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

15.     "*Backup MiningCo*" means, under the Orderly Wind Down, a pure play, publicly traded mining business that will own the assets of Mining in which creditors will receive 100% of the equity interests, with a potential management contract with GXD Labs LLC or other manager identified by the Debtors and the Committee pursuant to the Wind-Down Procedures.

16.     "*Backup MiningCo Common Stock*" means the new common stock of Backup MiningCo.

17.     "*Backup Plan Administration Agreement Term Sheet*" means the term sheet attached to the Backup Plan Sponsor Agreement as Exhibit A that contains the terms and conditions under which the BRIC has agreed to serve as the Plan Administrator in the event that the Orderly Wind Down is consummated.

18.     "*Backup Plan Sponsor*" means the BRIC.

19.     "*Backup Plan Sponsor Agreement*" means that certain agreement, dated June 7, 2023, by and among the Debtors, the Committee, and the BRIC, including all exhibits, annexes, and schedules thereto, as such agreement may be amended, restated, amended and restated, modified, or otherwise supplemented from time to time in accordance with its terms.

20.     "*Backup Plan Sponsor Transaction*" means, as contemplated by the Backup Plan Sponsor Agreement, an Orderly Wind Down, including:   (a) the creation of the Backup MiningCo; (b) a Liquid Cryptocurrency distribution to creditors on or as soon as practicable after the Effective Date; and (c) a timely monetization of the remaining assets of the Debtors' estates and subsequent Liquid Cryptocurrency distributions to creditors from the proceeds thereof.

21.     "*Ballot*" means the ballot, approved pursuant to the Disclosure Statement Order, distributed to Holders of Impaired Claims entitled to vote on the Plan, on which such Holders desiring to vote shall indicate acceptance or rejection of the Plan and, as applicable, make any additional settlement and treatment elections contained in such ballot.

22.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

23.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

24.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, in each case as now in effect or hereafter amended.

25.     "*Bar Date*" means the applicable date established by the Bankruptcy Court by which Proof of Claims must be Filed for all Claims and Interests, other than Administrative Claims (with the exception of requests for payment of Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code), as such date may be extended from time to time.  Unless otherwise extended, the Bar Date is February 9, 2023 for the Debtors other than

GK8 and April 18, 2023 with respect to GK8; *provided* that, for the avoidance of any doubt, the Bar Date with respect to any Account Holder Claim against any Debtor other than Celsius Network LLC or any other Claims affected by the Bar Date Amendment is August 2, 2023.

26.    "*Bar Date Amendment*" means that certain amendment to the Schedules to reflect that (a) contract claims related to the Debtors' Earn Program, Custody Program, and Withhold Accounts are only against Celsius Network LLC and (b) contract claims related to the Debtors' Borrow Program are only against Celsius Lending LLC, as set forth in the *Notice of Amended Bar Date for Submission of Proofs of Claim* [Docket No. 2310].

27.    "*Blockchain Recovery Investment Consortium*" or "*BRIC*" means (i) Van Eck Absolute Return Advisers Corporation and (ii) GXD Labs LLC.

28.    "*Borrow Program*" means the prepetition program through which the Debtors provided retail advances to Retail Borrowers pursuant to Section 4.E of the General Terms of Use.

29.    "*BRIC Parties*" means the Blockchain Recovery Investment Consortium and the BRIC Support Parties.

30.    "*BRIC Support Parties*" means any party designated by the BRIC and agreed by the Debtors and the Committee to work with the BRIC to implement the Backup Plan Sponsor Transaction, presently contemplated to be:  (i) Gemini Trust Company, LLC and (ii) Global X Digital, LLC, or an affiliate thereof; *provided* that any changes to the foregoing BRIC Support Parties will be disclosed in a revised Plan or in the Plan Supplement.

31.    "*BTC*" means bitcoin, a form of Cryptocurrency introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto, transactions in which are recorded on the Bitcoin blockchain.

32.    "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

33.    "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks, and other similar items.

34.    "*Cause of Action*" means, whether asserted against a Debtor or any other Person or Entity, any claim, counterclaim, cross-claim, interest, damages, remedy, cause of action, demand, right, action, controversy, proceeding, agreement, suit, obligation, liability, account, judgment, defense, offset, power, privilege, license, lien, indemnity, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, disputed or undisputed, liquidated or unliquidated, secured or unsecured, asserted or assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise.  For the avoidance of doubt, Causes of Action include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest, recharacterize, reclassify, subordinate, or disallow Claims or Interests; (d) claims or defenses pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (f) any state or foreign law fraudulent transfer or similar claim; and (g) any other Avoidance Action.

35.    "*CEL Insider Loan*" means any Retail Advance Obligations of (a) an Insider of the Debtors, (b) an employee of the Debtors, (c) a former Insider of the Debtors, (d) a former employee of the Debtors, (e) an Excluded Party, (f) an individual or Entity identified on the Schedule of Subordinated Claims, or (g) any Related Party of the foregoing (a) through (f), in each case, that is supported by CEL Token.

36.    "*CEL Token*" means the Cryptocurrency Token native to the Debtors' platform defined by the smart contract code located at:  https://etherscan.io/token/0xaaaebe6fe48e54f431b0c390cfaf0b017d09d42d#code.

37.    "*CEL Token Deposit Claim*" means any Claim against the Debtors on account of the Debtors' obligation to return or distribute CEL Token to any Entity.

38.    "*CEL Token Settlement*" means the settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, the terms of which are set forth in Article IV.B.2 herein.

39.    38. "*Celsius Account*" means any active account, as defined in Section 4.A of the General Terms of Use, identified in the Debtors' books and records as having a balance as of the Petition Date.  For the avoidance of doubt, (a) Celsius Accounts are not "accounts" within the meaning of Article 9 of the Uniform Commercial Code; (b) each Account Holder's Celsius Accounts shall be aggregated such that each Account Holder's holdings are reflected in a single Celsius Account; and (c) the consolidation described in (b) shall not eliminate the designations associated with such assets based on the program(s) the Account Holders participated in (*e.g.*, "Earn," "Custody," etc.).

40.    39. "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated and jointly administered cases styled *In re Celsius Network LLC*, Case No. 22-10964 (MG).

41.    40. "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

42.    41. "*Claims Register*" means the official register of Claims against the Debtors maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

43.    42. "*Class*" means a class of Claims or Interests, pursuant to section 1122(a) of the Bankruptcy Code, as set forth in <u>Article III</u> hereof.

44.    43. "*Class Certification Motion*" means the *Motion of the Official Committee of Unsecured Creditors to (I) Certify the Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III) Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023* [Docket No. 2670].

45.    44. "*Class Claim*" means Claim No. 29046 filed by the Committee on behalf of all Account Holders.

46.    45. "*Class Claim Representatives*" means Thomas DiFiore, Ignat Tuganov, and Rebecca Gallagher.

47.    46. "*Class Claim Settlement*" means the full and final settlement and resolution of the Class Claim, all Proofs of Claim filed by Class Claim Settlement Participants, and the Class Certification Motion, as set forth in <u>Article IV.B.7</u> hereof and the Class Claim Settlement Order.

48.    47. "*Class Claim Settlement Motion*" means the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064].

49. 48. "*Class Claim Settlement Order*" means the *Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee Class Claim and (II) Granting Related Relief* [Docket No. [  ]3288], the proposed form of which is attached to the Class Claim Settlement Motion.

50. 49. "*Class Claim Settlement Participant*" means a Holder of an Account Holder Claim, other than an Account Holder who only holds Custody Claims, who did not opt out of the Class Claim Settlement on such Holder's Ballot.

51. 50. "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

52. 51. "*CNL Board*" means the board of directors of Celsius Network Limited.

53. 52. "*Code*" means the Internal Revenue Code of 1986, as amended.

54. 53. "*Committee*" means the official committee of unsecured creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on July 27, 2022 [Docket No. 241].

55. 54. "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

56. 55. "*Confirmation Date*" means the date on which Confirmation occurs.

57. 56. "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

58. 57. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

59. 58. "*Consolidated Debtors*" means the Initial Consolidated Debtors, Celsius Lending LLC, and Celsius Networks Lending LLC.

60. 59. "*Consummation*" means the occurrence of the Effective Date.

61. 60. "*Contributed Claim*" means any direct Cause of Action that any Contributing Claimant has against any Person (other than a Debtor) that had a direct relationship with the Debtors, their predecessors, or respective Affiliates and that harmed such Contributing Claimant in the claimant's capacity as a creditor of Celsius, including (a) any Cause of Action based on, arising out of, or related to the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Celsius' platform; (b) any Cause of Action based on, arising out of, or related to the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; and (c) any Cause of Action based on, arising out of, or related to any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date; *provided*, *however*, that Contributed Claims do not include (i) any derivative claims of the Debtors, (ii) any direct claims against the Released Parties, or (iii) any claims that cannot be assigned under applicable law.

62. 61. "*Contributing Claimant*" means any Holder of a Claim or Interest that elects through its Ballot to contribute their Contributed Claims to the applicable Post-Effective Date Debtor(s) (as specified in the Transactions Steps Memorandum) in order for the Litigation Administrator to prosecute such Contributed Claims for the benefit of Holders of Claims entitled to receive Litigation Proceeds hereunder.

63. 62. "*Convenience Claim*" means any aggregate Account Holder Claim (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) valued greater than the *De Minimis* Claim Threshold ($10.00) but less than or equal to the Convenience Claim Threshold ($5,000); *provided* that Account Holders whose Claims exceed the Convenience Claim Threshold may irrevocably elect to

have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims. For the avoidance of doubt, (x) Celsius Accounts shall be consolidated for purposes of applying the Convenience Claim Threshold such that each unique Account Holder only maintains one Celsius Account, and (y) Custody Claims shall be treated in accordance with the Custody Settlement and shall be (i) disregarded for purposes of evaluating whether a Claim is within the Convenience Claim Threshold and (ii) unaffected by Convenience Claim Elections.

64. 63. "*Convenience Claim Election*" means the election, through an Account Holder Ballot in accordance with the procedures set forth in the Disclosure Statement Order, pursuant to which Account Holders whose Claims (excluding Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims) exceed the Convenience Claim Threshold will be offered an opportunity to irrevocably elect to have their Claims reduced to the Convenience Claim Threshold and treated as Convenience Claims. For the avoidance of doubt, any Convenience Claim Election shall apply to all Convenience Class eligible Claims held by the electing Account Holder (*i.e.*, all Claims held by such Account Holder other than Custody Claims and Retail Borrower Deposit Claims but including Retail Borrower Post-Set Off Claims).

65. 64. "*Convenience Claim Threshold*" means $5,000.

66. 65. "*Convenience Class*" means Class 4 Convenience Claims after giving effect to any Convenience Claim Elections.

67. 66. "*Convenience Class Distribution*" means Liquid Cryptocurrency in an amount sufficient to provide Holders of Convenience Claims a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table), in full and final satisfaction of such Convenience Claims.

68. 67. "*Cryptocurrency*" means a fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a decentralized protocol, operating independently from a central bank.

69. 68. "*Cryptocurrency Conversion Table*" means the conversion table attached as Exhibit A to the *Notice of Filing of Cryptocurrency Conversion Rates* [Docket No. 1420].

70. 69. "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code; *provided* that if no Cure is listed for any assumed Executory Contract or Unexpired Lease, the Cure shall be $0.00.

71. 70. "*Custody Ad Hoc Group*" means that certain *ad hoc* group of Custody Claim Holders represented by Togut, Segal & Segal LLP as set forth in the *Second Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1284].

72. 71. "*Custody Claim*" means any Claim on account of Cryptocurrency transferred into the Custody Program.

73. 72. "*Custody Program*" means the prepetition program through which the Debtors allowed Account Holders to store Cryptocurrency on the Debtors' platform pursuant to Section 4.B of the General Terms of Use.

74. 73. "*Custody Provider Agreements*" means the agreements entered into by NewCo and/or its subsidiaries with one or more federally-licensed custody providers for the provision of services to NewCo and/or its subsidiaries following the Effective Date, each of which shall be on terms reasonably acceptable to the Debtors, the Committee, and the Plan Sponsor.

75. 74. "*Custody Settlement*" means the full and final settlement and resolution of all disputes regarding the Custody Program with respect to Custody Settlement Participants, as set forth in Article III.B.6A herein and the Custody Settlement Order.

76. 75. "*Custody Settlement Motion*" means the *Joint Motion for Entry of an Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2148].

77. 76. "*Custody Settlement Order*" means the *Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2291].

78. 77. "*Custody Settlement Participant*" means, as context requires, a Holder of a Custody Claim who has opted into the Custody Settlement either (a) in accordance with the Custody Settlement Order or (b) in such Holder's Ballot.

79. 78. "*Custody Withdrawal Order*" means the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767].

80. 79. "*D&O Liability Insurance Policy*" any insurance policy (including any "tail policy") covering any of the Debtors' current or former directors, members, trustees, officers, and managers' liability issued at any time to any of the Debtors or any of their Affiliates or predecessors, and any agreements, documents, and instruments related thereto.

81. 80. "*De Minimis Claim Threshold*" means $10.00.

82. 81. "*De Minimis Claim*" means any Claims held by an Entity with an aggregate value ~~equal to or~~ less than or equal to the *De Minimis* Claim Threshold. For the avoidance of doubt, such Claims shall be classified as Class 9 *De Minimis* Claims and shall be cancelled and discharged without distribution.

83. 82. "*Deactivation Date*" means the date after which the Post-Effective Date Debtors will no longer make Plan distributions through the Celsius platform, which date the Debtors or Post-Effective Date Debtors (as applicable) will announce in a notice filed on the docket at least seven (7) days in advance thereof, which is expected to be approximately ninety (90) days after the ~~Plan Effective Date if the Debtors are the Distribution Agent for international Account Holder Claims, and which is expected to be the Effective Date or shortly thereafter if the Debtors are not the Distribution Agent for international Account Holder Claims.~~Confirmation Date.

84. 83. "*Deactivation Date Cryptocurrency Conversion Table*" means the conversion table the Distribution Agent shall use to calculate the ~~amount of Cash or Cryptocurrency to distribute to a~~Claims of Holders of ~~an~~ Allowed Custody Claims ~~or Withhold Claim~~ that did not retrieve ~~its~~their Plan distribution from the Celsius platform by the Deactivation Date in Cash and Liquid Cryptocurrency, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date. Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court. For the avoidance of doubt, following the Deactivation Date, such Claims shall be subject to further conversion pursuant to any applicable Distribution Cryptocurrency Conversion Table in connection with subsequent distributions.

85. 84. "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C of the Plan.

86.    85.  "*DeFi Cryptocurrency Assets*" means the Cryptocurrency assets at Stakehound or in other DeFi protocols.

87.    86.  "*Disallowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, any Claim or Interest that is finally determined to be not Allowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable.

88.    87.  "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2902] as may be modified, amended, or supplemented from time to time, to be approved pursuant to the Disclosure Statement Order.

89.    88.  "*Disclosure Statement Order*" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

90.    89.  "*Disputed*" means, as to a Claim or an Interest (or portion thereof):  (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

91.    "*Disputed and Contingent Claims Reserve*" means any reserve or account or fund for Claims that are Disputed, contingent, or have not yet been Allowed, or where the Holder is or may be subject to an Avoidance Action.

92.    90.  "*Distribution Agent*" means the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or any Litigation Administrator (as applicable), or the Entity or Entities selected by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or any Litigation Administrator and agreed by the Debtors, the Committee, and the Plan Sponsor, to make or facilitate distributions contemplated under the Plan.

93.    91.  "*Distribution Cryptocurrency Conversion Table*" means the conversion table the Debtors shall use to calculate the amount of any Cryptocurrency a Holder of an Allowed Claim (other than Custody Claims prior to the Deactivation Date) shall receive under the Plan, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee (or by agreement of the Plan Administrator and Litigation Administrator for distributions after the Effective Date), which date is expected to be approximately fifteen (15) days prior to the applicable anticipated Effective Liquid Cryptocurrency distribution Ddate.  For the avoidance of any doubt, the Distribution Cryptocurrency Conversion Table and the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court.

94.    92.  "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as is announced by the Debtors or designated in a Final Order.

95.    93.  "*Earn Ad Hoc Group*" means that certain *ad hoc* group of Earn Claim Holders represented by Offit Kurman, P.A., as set forth in the *Verified Statement Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 2553].

96.    94.  "*Earn Claim*" means any (i) Claim arising out of or related to the Earn Program or (ii) Account Holder Claim not separately classified under the Plan.

97.    95.  "*Earn Program*" means the prepetition program through which the Debtors allowed Account Holders to earn "rewards" in exchange for transferring their Cryptocurrency to the Debtors pursuant to Section 4.D of the General Terms of Use.

98.    96. "*Effective Date*" means the date on which (a) all conditions precedent to the occurrence of the Effective Date of the Plan have been satisfied or waived in accordance with the Plan and (b) the Plan is declared effective in accordance with its terms.

99.    "*Effective Time*" means the clock time at which the Effective Date occurs, which shall be noted in the notice of the occurrence of the Effective Date.

100.    97. "*EIP Award*" means any Cash incentive award to be paid by the Debtors or the Post-Effective Date Debtors on the Effective Date under the Emergence Incentive Plan.

101.    98. "*EIP Participants*" means, collectively: (a) Christopher Ferraro, Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer; (b) Guillermo Bodnar, Chief Technology Officer; (c) Oren Blonstein, Chief Product Officer; (d) Ron Deutsch, General Counsel; (e) Trunshedda Ramos, Chief Human Resources Officer; (f) Adrian Alisie, Chief Compliance Officer; (g) Jenny Fan, Chief Financial Officer of Mining; (h) Dave Albert, Chief Administrative Officer of Mining; and (i) Quinn Lawlor, Chief Strategy Officer of Mining.

102.    99. "*Eligible Transferred Custody Claim*" means any Custody Claim on account of Cryptocurrency that was transferred to the Custody Program from the Earn Program or Borrow Program that is eligible for withdrawal under the Custody Settlement Order (*i.e.*, a Custody Claim on account of Cryptocurrency transferred from the Earn Program or Borrow Program that is valued at less than $7,575 in the aggregate, valued as of the date of the transfer(s) to the Custody Program and meets the other requirements of the Custody Settlement Order).

103.    100. "*Emergence Incentive Plan*" means the emergence incentive plan providing for the distribution of Cash awards to the EIP Participants upon emergence, the terms of which are set forth in Article IV.J.2.

104.    101. "*Emergence Retention Plan*" means the emergence retention plan providing for the distribution of Cash retention awards to certain of employees of the Debtors to motivate such employees to remain with the Post-Post-Effective Date Debtors to effectuate distributions contemplated under the Plan, the terms of which will be set forth in the Plan Supplement.

105.    102. "*Employee and NewCo Board Equity Compensation*" means NewCo Common Stock (or warrants or similar interests) in an amount not to exceed an aggregate total of one and one half (1.5%) percent of the sum of:  (i) all outstanding shares of NewCo Common Stock issued on the Effective Date *plus* (ii) any NewCo Common Stock anticipated to be issued pursuant to reserves and holdbacks under this Plan following the Effective Date (but in all cases excluding any shares of NewCo Common Stock issued or anticipated to be issued to the Plan Sponsor if the Plan Sponsor Contribution takes the form of a primary equity purchase).  The Employee and NewCo Board Equity Compensation may be issued to members of management and employees of NewCo (other than the NewCo Management Team, which for the avoidance of doubt may be compensated from the Management Equity Compensation) and to persons serving on the New Board.

106.    103. "*Employee Transition Services Agreement*" means the agreement containing the terms and conditions under which certain of the Debtors' and/or NewCo's employees will be available to provide transition services to the Debtors, the Post-Effective Date Debtors, and/or the Plan Administrator, as applicable.

107.    104. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

108.    105. "*Equitably Subordinated Claims*" means (a) those Claims identified by the Committee and agreed by the Debtors to be subordinated pursuant to the Plan, which shall be identified on the Schedule of Equitably Subordinated Claims and shall include Claims on account of the Goldstein Loan and the Leon Loan and (b) all other Claims, however classified under this Plan, of Persons or Entities whose Claims are identified on the Schedule of Equitably Subordinated Claims, unless otherwise expressly provided therein.

109.    "*Equitable Subordination Stay Order*" means the *Joint Stipulation and Agreed Order Between the Debtors, the Official Committee of Unsecured Creditors and the United States Attorney's Office for the Southern District of New York With Respect to Agreement to Stay the Proceedings With Respect to Equitably Subordinated Claims* [Docket No. 3450].

110.    ~~106.~~ "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

111.    ~~107.~~ "*ETH*" means ether, the native Cryptocurrency of the Ethereum platform, that is not wrapped, staked, or otherwise subject to a trade restriction.

112.    ~~108.~~ "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78pp, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

113.    ~~109.~~ "*Excluded Party*" means each of the following: (a) Alexander Mashinsky; (b) Shlomi Daniel Leon; (c) Roni Cohen Pavon; (d) the other UCC Claims Stipulation Defendants; (e) any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party in this Plan or the Schedule of Released and Exculpated Parties, except current and former managing partners, officers, directors, and employees of the Initial Consenting Series B Preferred Holders, WestCap Management LLC, and Caisse de dépôt et placement du Québec, CDPQ Placements privés Québec Inc., CDPQ Placements privés Inc., and CDPQ U.S. Inc.; (f) any party on the Schedule of Excluded Parties; and (g) with respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified in this Plan or the Schedule of Released and Exculpated Parties as a Released Party. Notwithstanding anything to the contrary in this Plan, no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.

114.    ~~110.~~ "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's ~~current~~ financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.

115.    ~~111.~~ "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

116.    ~~112.~~ "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

117.    ~~113.~~ "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

118.    ~~114.~~ "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order

even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided, further*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

119.    ~~115.~~ "*Fixed Management Fee*" means $~~35~~20 million per year, which is inclusive of ~~(a) the Mining Management Fee and (b) subject to the terms and conditions of, and as more fully set forth in, the Management Agreement,~~ all Cash compensation for the NewCo Management Team, as more fully set forth in, and subject to the terms and conditions of, the Management Agreement.

120.    ~~116.~~ "*Former Celsius Account*" means an account on the Debtors' platform that would have been a Celsius Account had it been active and/or had a balance as of the Petition Date.

121.    "*FTC Stipulation*" means the *Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Enter into Stipulated Order in the District Court* [Docket No. 3289].

122.    ~~117.~~ "*General Custody Claim*" means any Custody Claim that is not a Withdrawable Custody Claim, less any amounts withdrawn under the Custody Settlement Order.

123.    ~~118.~~ "*General Earn Claims*" means Earn Claims (other than Convenience Claims).

124.    ~~119.~~ "*General Terms of Use*" means the general Terms of Use governing each Account Holder's access to, and use of, the Debtors' products and services as well as the Debtors' mobile and web-based application(s), website(s), software, programs, documentation, tools, hardware, Internet-based services, components, and any updates (including software maintenance, service information, help content, bug fixes or maintenance releases) provided to Account Holders by the Debtors, directly or indirectly, as amended, modified, or supplemented from time to time in accordance with their terms.  Unless otherwise specified, "General Terms of Use" refers to Version 8 of the General Terms of Use, effective April 14, 2022.

125.    ~~120.~~ "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors, other than: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Intercompany Claim; (e) a Convenience Claim; (f) a General Earn Claim; (g) a Custody Claim; (h) a Withhold Claim; (i) a Retail Borrower Deposit Claim (and any corresponding Retail Borrower Post-Set Off Claim); (j) an Unsecured Loan Claim; (k) a Section 510(b) Claim; (l) a State Regulatory Claim; or (m) an Equitably Subordinated Claim.  For the avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims, but Claims for damages or other Unsecured Claims on account of Former Celsius Accounts shall be General Unsecured Claims.

126.    ~~121.~~ "*GK8*" means, collectively, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC.

127.    ~~122.~~ "*Goldstein Loan*" means the $4.2 million loan issued by one or more of the Debtors to Hanoch "Nuke" Goldstein on April 1, 2021.

128.    ~~123.~~ "*Governmental Unit*" has the meaning as set forth in section 101(27) of the Bankruptcy Code.

129.    ~~124.~~ "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

130.    ~~125.~~ "*Illiquid Recovery Rights*" means, in the event of an Orderly Wind Down, the Claims of any creditor that would have received NewCo Common Stock had the NewCo Transaction been consummated, which Claims shall remain outstanding after the Effective Date for purposes of preserving such Holders' rights to recoveries on the Debtors' illiquid assets.

131.    ~~126.~~ "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

132.    127. "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, equity holders, attorneys, other professionals, and agents and such current and former directors, officers, and managers' respective Affiliates.

133.    128. "*Ineligible Withhold Assets*" means any assets transferred to the Debtors' platform that were not eligible for the designated service or otherwise not supported on the Debtors' platform.

134.    129. "*Initial Consenting Series B Preferred Holders*" means Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc.

135.    130. "*Initial Consolidated Debtors*" means Celsius Network Limited and Celsius Network LLC.

136.    131. "*Initial Litigation Funding Amount*" means Cash in an amount of ~~up to~~ $50,000,000, which amount shall be agreed upon by the Debtors and the Committee.

137.    132. "*Insider*" means an "insider" (as defined in section 101(31) of the Bankruptcy Code) of the Debtors or a non-statutory insider of the Debtors identified in the Schedule of Equitably Subordinated Claims.

138.    133. "*Institutional Loan*" means any loan from the Debtors to an institutional borrower arranged on an "over the counter" basis.  Institutional Loans are governed by master loan agreements and term sheets setting forth their terms.

139.    134. "*Intercompany Claim*" means any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor.

140.    135. "*Intercompany Interest*" means any Interest in one Debtor held by another Debtor.

141.    136. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

142.    137. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

143.    138. "*KEIP Motion*" means the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Key Employee Incentive Program and (II) Granting Related Relief* [Docket No. 2336].

144.    139. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

145.    140. "*Leon Loan*" means the $4 million loan issued by one or more of the Debtors to Shlomi Daniel Leon on April 13, 2022.

146.    141. "*Lien*" has the meaning defined in section 101(37) of the Bankruptcy Code.

147.    142. "*Liquid Cryptocurrency*" means the types of Cryptocurrency to be distributed to Holders of Claims pursuant to this Plan, which may include:  (a) BTC and (b) ETH.

148.    143. "*Liquid Cryptocurrency Distribution Amount*" means the amount of Liquid Cryptocurrency to be distributed as part of the Unsecured Claim Distribution Consideration, which shall be an amount equal to the

total value of Liquid Cryptocurrency held by the Debtors on the Effective Date less, without duplication, Liquid Cryptocurrency amounts needed for (or needed to be liquidated for): (a) distributions of Liquid Cryptocurrency to (or reserves for) Holders of (i) Allowed Convenience ~~Class~~ Claims and (ii) Allowed Custody Claims and Allowed Withhold Claims ~~to the extent such claims are entitled to in-kind distributions~~; (b) the NewCo Capitalization Amount; (c) ~~amounts liquidated to fund~~ the Professional Fee Escrow Account; (d) the Initial Litigation Funding Amount; (e) Cash needed at emergence (pre-transaction items); and (f) ~~Cryptocurrency or Cash in an amount equal to~~ the Senior Claims Amount. ~~The Committee, in consultation with the Debtors, shall have the discretion to adjust the Liquid Cryptocurrency Distribution Amount downward based upon the amount of aggregate Unsecured Claim Distribution Mix Elections, the status and funding of the Litigation Recovery Account, or any other factors affecting the evaluation or liquidity of the assets anticipated to be transferred to NewCo and/or its subsidiaries on the Effective Date of the Plan.~~

149. ~~144.~~ "*Liquid Cryptocurrency Weighted Distribution Election*" means the Ballot election of a Holder of a Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration expressing a preference to receive a greater share of the Liquid Cryptocurrency Distribution Amount in lieu of some or all of such Holder's Pro Rata share of NewCo Common Stock; *provided* that, to the extent a Holder's Liquid Cryptocurrency Weighted Distribution Election is honored, such Holder will forfeit all or a portion of the Holder's NewCo Common Stock distribution at a 30% discount to the Liquid Cryptocurrency it is receiving. The amount of NewCo Common Stock forfeited, and therefore the amount of Liquid Cryptocurrency received, will depend on the aggregate Unsecured Claim Distribution Mix Elections. For the avoidance of doubt, (a) any Liquid Cryptocurrency Weighted Distribution Election shall apply to all Claims on account of which the electing Account Holder is receiving the Unsecured Claim Distribution Consideration and (b) any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

150. ~~145.~~ "*Litigation Administrator*" means any Person or Entity appointed by the Committee, in consultation with the Special Committee, to fulfill the duties described in Article IV.G (in a fiduciary capacity), including any successors thereto. The identity of each Litigation Administrator, including the Recovery Causes of Action for which such Litigation Administrator shall be responsible, shall be disclosed in the Plan Supplement.

151. ~~146.~~ "*Litigation Administrator Agreement(s)*" means the agreement providing for the prosecution of the Recovery Causes of Action by the Litigation Administrator(s) and the oversight role of the Litigation Oversight Committee, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with the terms thereof that, among other things, provides for the Initial Litigation Funding Amount and governs the powers, duties, and responsibilities of the Litigation Administrator(s), which shall be Filed as part of the Plan Supplement.

152. ~~147.~~ "*Litigation Oversight Committee*" means the ~~five (5) to~~ seven (7) member committee that will oversee (in a fiduciary capacity) the Litigation Administrator's prosecution of the Recovery Causes of Action in accordance with the Plan and shall be identified and disclosed in the Plan Supplement, and any successors thereto appointed pursuant to and in accordance with the Litigation Administrator Agreement(s). The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Litigation Oversight Committee, subject to the consent of the Committee. The remaining members of the Litigation Oversight Committee shall be determined by the Committee through an open interview process, and at least two (2) of the members of the Litigation Oversight Committee shall not be Committee members.

153. ~~148.~~ "*Litigation Proceeds*" means the proceeds of the Recovery Causes of Action.

154. ~~149.~~ "*Litigation Recovery Account*" means the segregated account established by the Post-Effective Date Debtors on the Effective Date and funded with the Initial Litigation Funding Amount. The Litigation Recovery Account shall be controlled by the Litigation Administrator(s), and the funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator(s) (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action, all in accordance with the terms of the Litigation Administrator Agreement(s).

155.  150.  "*Management Agreement*" means the agreement or agreements to be entered into between NewCo, the Plan Sponsor, and/or the NewCo Management Team, to be agreed to by the Debtors, the Committee, and the Plan Sponsor, containing the terms and conditions under which the Plan Sponsor and NewCo Management Team will manage the operations of NewCo and/or its subsidiaries, including the detailed terms of the Management Compensation.

156.  151.  "*Management Compensation*" means any amounts payable to the Plan Sponsor or any member of the NewCo Management Team (or their designees) by NewCo under the Management Agreement or US Bitcoin Agreements, including the (a) Fixed Management Fee and; (b) Mining Management Fee; and (c) Management Equity Compensation.

157.  152.  "*Management Equity Compensation*" means, (a) five percent (5%) of NewCo Common Stock on a fully diluted basis, which shall vest ratably over five (5) years annually commencing on the Effective Date, with such vesting to occur at the end of the applicable one (1) year period; and (b) options to purchase five percent (5%) of NewCo Common Stock on a fully diluted basis, structured in five (5) tranches of five (5) year options of 1.0% with one (1) tranche granted each year at the anniversary of the Effective Date, with the strike price for each year set at either, at the election of the Debtors and Committee to be made as of or prior to the Effective Date, (x) the trading price of the NewCo Common Stock as of the close of the market on the preceding business day; or (y) the trailing 90-day average level of the CMC 200 Index including BTC or other index to be agreed in good faith by the Plan Sponsor, the Debtors, and the Committee on or prior to the Effective Date; *provided* that the index level used to set the strike price of each year's option issuance shall be based on the cumulative change in the index from the Effective Date; *provided further* that the initial strike price shall be calculated using the net asset value of the NewCo Assets as of the Effective Date (calculated using the midpoint of the valuation in the Disclosure Statement) divided by the outstanding shares of NewCo Common Stock issued on the Effective Date.

158.  153.  "*Mining*" means Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Debtor Celsius Mining LLC and its non-Debtor subsidiary Celsius Mining IL Ltd.

159.  154.  "*Mining Management Fee*" means $15 million per year, subject to the terms and conditions of, and as more fully set forth in, the Management Agreement and US Bitcoin Agreements, including those providing for potential reductions to the Mining Management Fee in the event that targets and milestones set forth in the Plan Sponsor Agreement are not met.

160.  155.  "*New Board*" means the board of directors of NewCo, which shall be appointed as provided herein. The identities of the members of the New Board shall be disclosed in the Plan Supplement.

161.  156.  "*New Mining Facilities*" means one or more new bitcoin mining facilities, with an aggregate capacity of 100 megawatts, that US Bitcoin will build and energize within 12 months of the Effective Date, as provided in the US Bitcoin Agreements, and subject to the terms and conditions thereof, including the approval by the New Board of not less than $39,500,000 in funding for the buildout and energization of such facilities.

162.  157.  "*New Organizational Documents*" means the documents providing for corporate governance of NewCo, and any subsidiaries thereof, including charters, bylaws, operating agreements, agreements providing indemnification, contribution, or reimbursement to any Person or Entity, other organizational documents or agreements, and investment guidelines, as applicable.

163.  158.  "*NewCo*" means the Entity to be managed by the Plan Sponsor following the Effective Date, which shall hold and operate the NewCo Assets for the benefit of holders of NewCo Common Stock.

164.  159.  "*NewCo Assets*" means the assets that shall be transferred or assigned to NewCo or its subsidiaries on the Effective Date, free and clear of any Liens, Claims, interests, charges, or encumbrances, which shall consist of (a) the DeFi Cryptocurrency Assets; (b) the Institutional Loan portfolio; (c) PE & VC Investments; (d) Mining; and (e) the NewCo Capitalization Amount.

165. 160. "*NewCo Capitalization Amount*" means $450 million of Liquid Cryptocurrency (valued as of the Effective Date) to be transferred by the Debtors to NewCo and/or its subsidiaries free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date, subject to potential reduction for investments in Mining made by the Debtors prior to the Effective Date that are approved by the Debtors, the Committee, and the Plan Sponsor, but solely to the extent that any such reduction is approved in writing by the Plan Sponsor in its sole discretion.  For the avoidance of doubt, if the Plan Sponsor Contribution takes the form of a primary equity purchase, the proceeds of the Plan Sponsor Contribution shall also be contributed to NewCo on the Effective Date.

166. 161. "*NewCo Common Stock*" means the common stock of NewCo to be distributed on the Effective Date in accordance with the terms hereof.

167. 162. "*NewCo Common Stock Weighted Distribution Election*" means the Ballot election of a Holder of a General Earn Claim (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) expressing a preference for a greater share of NewCo Common Stock in lieu of some or all of such Holder's Pro Rata share of the Liquid Cryptocurrency Distribution Amount; *provided* that, to the extent a Holder's NewCo Common Stock Weighted Distribution Election is honored, such Holder will receive incremental NewCo Common Stock at a 30% premium to the Liquid Cryptocurrency Distribution Amount the Holder forfeits. The Liquid Cryptocurrency Distribution Amount forfeited, and therefore the amount of additional NewCo Common Stock received, will depend on the aggregate Unsecured Claim Distribution Mix Elections.  For the avoidance of doubt, any NewCo Common Stock Weighted Distribution Election shall apply to all Claims on account of which the electing Account Holder is receiving the Unsecured Claim Distribution Consideration.

168. 163. "*NewCo Management Team*" means the (a) chief executive officer, (b) chief operating officer, (c) chief financial officer, (d) chief marketing officer, (e) general counsel, (f) chief accounting officer, (g) chief risk officer, (h) other C-suite executives or heads of staking and mining businesses (if any), and (i) any individuals filling roles traditionally satisfied by individuals with the foregoing titles, in each case with respect to NewCo, regardless of the ultimate title assigned to such individuals.

169. 164. "*NewCo Transaction*" means the transactions contemplated by the Plan, other than Article IV.E, which shall occur on the Effective Date if the Debtors do not elect to pursue the Orderly Wind Down.

170. 165. "*Orderly Wind Down*" means the orderly wind down of the Debtors' Estates pursuant to the Wind-Down Procedures, as set forth in Article IV.E, solely to the extent applicable as set forth therein.

171. 166. "*Other CEL Token Claim*" means any Claim, including any Account Holder Claim, arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token.

172. 167. "*Other Interest*" means any Interest other than Series B Preferred Interests and Intercompany Interests.

173. 168. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

174. 169. "*Other Secured Claim*" means any Secured Claim against a Debtor, other than a Secured Tax Claim.

175. 170. "*Pause*" means the pause by the Debtors, effective June 12, 2022, of all withdrawals, swaps, and transfers of Tokens on the Celsius platform.

176.    ~~171.~~ "*PE & VC Investments*" means the Debtors' alternative investments as identified in the schedules of Celsius Network Ltd. Case No. 22-10966 (MG), Docket No. 7 and the Disclosure Statement, unless such investments were sold, monetized, or otherwise disposed of prior to the Effective Date.

177.    ~~172.~~ "*Pending Withdrawal Ad Hoc Group*" means that certain *ad hoc* group of Account Holders represented by The Law Offices of Adrienne Woods, P.C. as set forth in the *Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 2155].

178.    ~~173.~~ "*Person*" means a "Person" as defined in section 101(41) of the Bankruptcy Code.

179.    ~~174.~~ "*Petition Date*" means July 13, 2022 with respect to the Debtors other than GK8, and December 7, 2022 with respect to GK8.

180.    ~~175.~~ "*Plan Administrator*" means the Person or Entity, or any successor thereto, designated by the Debtors in consultation with the Committee, whose identity shall be disclosed in the Plan Supplement, and who shall have all powers and authorities set forth in <u>Article IV.F</u> herein (as may be modified by <u>Article IV.E.1</u>).

181.    ~~176.~~ "*Plan Administrator Agreement*" means that certain agreement by and among the Debtors, the Committee, and the Plan Administrator governing the Plan Administrator's rights and obligations in connection with the Plan and/or Orderly Wind Down, which shall be executed no later than the Effective Date.  The Plan Administrator Agreement shall be included in the Plan Supplement.

182.    ~~177.~~ "*Plan Administrator Budget*" means, in the event that the NewCo Transaction is implemented, a budget funded by the Debtors for the reasonable activities and expenses to be incurred in connection with the Plan Administrator's duties under the Plan Administrator Agreement, which budget, activities, and reasonable expenses shall be reasonably acceptable to the Debtors and the Committee and included in the Plan Supplement.

183.    ~~178.~~ "*Plan Sponsor*" means Fahrenheit, LLC (together with any successors thereto).

184.    ~~179.~~ "*Plan Sponsor Agreement*" means that certain agreement, dated June 5, 2023, by and among the Debtors, the Committee, and the Plan Sponsor, including all exhibits, annexes, and schedules thereto, as such agreement may be amended, restated, amended and restated, modified, or otherwise supplemented from time to time in accordance with its terms.  For the avoidance of any doubt, "Plan Sponsor Agreement" includes the term sheet attached thereto as <u>Exhibit B</u>.

185.    ~~180.~~ "*Plan Sponsor Contribution*" means the Plan Sponsor's purchase of $50 million of NewCo Common Stock, either as a purchase of primary equity from NewCo or through the Secondary Market Purchase, as will be more fully set forth in the Plan Sponsor Contribution Agreement.  To the extent that the Plan Sponsor Contribution is used to purchase primary equity from NewCo, the amount of NewCo Common Stock purchased by the Plan Sponsor from NewCo shall be equal to the product of: (i) the sum of all outstanding shares of NewCo Common Stock issued or anticipated to be issued on the Effective Date *plus* any NewCo Common Stock issued or anticipated to be issued pursuant to reserves and holdbacks under this Plan following the Effective Date, *multiplied by* (ii) a fraction, the numerator of which is the Plan Sponsor Contribution (*i.e.*, $50 million), and the denominator of which is the net asset value of NewCo as of the Effective Date.  An illustrative calculation of the foregoing formula is depicted below.

(The sum of all outstanding shares of NewCo Common Stock issued or anticipated to be issued on the Effective Date *plus* any NewCo Common Stock issued or anticipated to be issued pursuant to reserves and holdbacks under this Plan following the Effective Date) $\times$ $\dfrac{\text{Plan Sponsor Contribution (\textit{i.e.}, \$50 million)}}{\text{NewCo Net Asset Value as of Effective Date}}$

186. 181. "*Plan Sponsor Contribution Agreement*" means the agreement setting forth the terms and conditions of the Plan Sponsor Contribution, which shall be reasonably acceptable to the Debtors, the Committee, and the Plan Sponsor, and included in the Plan Supplement.

187. 182. "*Plan Supplement*" means the compilation of documents and forms of documents, agreement, schedules, and exhibits to the Plan, in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with its terms, the Plan Sponsor Agreement, the Bankruptcy Code, and the Bankruptcy Rules, to be filed (unless otherwise expressly required under this Plan or the Plan Sponsor Agreement to be filed by a different date) by the Debtors no later than fourteen (14) days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court, including the following, as applicable:  (a) the Management Agreement; (b) the New Organizational Documents; (c) the identities of the members of the New Board; (d) the Schedule of Rejected Executory Contracts and Unexpired Leases; (e) the Schedule of Assumed Executory Contracts and Unexpired Leases; (f) the Schedule of Released and Exculpated Parties; (g) the Schedule of Retained Causes of Action; (h) the ~~Schedule of Additional Recovery Causes of Action~~Employee Transition Services Agreement; (i) the Schedule of Equitably Subordinated Claims; (j) the Schedule of Excluded Parties; (k) the Transaction Steps Memorandum; (l) the Litigation Administrator Agreement(s); (m) the identity of the Litigation Administrator~~(s)~~; (n) the identit~~y~~ies ~~and proposed compensation (if known)~~ of the members of the Litigation Oversight Committee; (o) the US Bitcoin Agreements; (p) the Proof Group IP License ~~(if applicable)~~; (q) the Plan Sponsor Contribution Agreement; (r) the Custody Provider Agreements; (s) the ~~Employee Transition Services Agreement; (t) the~~ Plan Administrator Agreement; ~~(u)~~ (t) the Plan Administrator Budget; ~~(v) the Emergence Incentive Plan~~(u) the key terms of agreements with Distribution Agents; (v) the Figure Lending, LLC Refinancing Term Sheet; and (w) the ADR Procedures.  The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth therein in full; *provided* that in the event of a conflict between the Plan and the Plan Supplement, the Plan shall control, except with respect to the Management Agreement, the New Organizational Documents, the US Bitcoin Agreements, the Proof Group IP License ~~(if applicable)~~, and the Plan Sponsor Contribution Agreement.

188. 183. "*Post-Effective Date Debtors*" means, collectively, all Debtors and successors thereto after the Effective Date that are not acquired by NewCo or any of its subsidiaries or otherwise managed by the Plan Sponsor, which shall be responsible for winding down the Debtors' Estates pursuant to the terms of the Plan.

189. 184. "*Post-Effective Date Debtors' Assets*" means any assets not transferred to NewCo or any of its subsidiaries, as applicable, which assets shall vest in the Post-Effective Date Debtors.  For the avoidance of doubt, the Post-Effective Date Debtors' Assets shall include the Recovery Causes of Action.

190. 185. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.  For the avoidance of doubt, Priority Tax Claims are excluded from "State Regulatory Claims" hereunder.

191. 186. "*Pro Rata*" means the proportion that the U.S. Dollar value of an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate U.S. Dollar value of all Allowed Claims or Allowed Interests in that Class (or as otherwise specified), in each case calculated as of the Petition Date.  For the avoidance of doubt, the denominator for purposes of the "Pro Rata" calculation with respect to Claims on account of which the Holder will receive the Unsecured Claim Distribution Consideration shall include all Claims receiving the Unsecured Claim Distribution Consideration.

192. 187. "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

193. 188. "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and

including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

194. 189. "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

195. 190. "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtor prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B.3 of the Plan.

196. 191. "*Proof Group*" means Proof Group Capital Management LLC.

197. 192. "*Proof Group IP License*" means, if applicable, a royalty-free, perpetual license, without sublicense rights, of intellectual property owned by Proof Group (or other rights to use the applicable software or proprietary technology) with respect to staking services, which shall be included in the Plan Supplement.

198. 193. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date as established by the Bankruptcy Court.

199. 194. "*PSA Definitive Documents*" means "Definitive Documents," as defined in the Plan Sponsor Agreement.

200. 195. "*Pure Custody Claim*" means any Custody Claim on account of Cryptocurrency that was never used in any of the Debtors' services other than the Custody Program that is eligible for withdrawal under the Custody Settlement Order.

201. 196. "*Recovery Causes of Action*" means, to the extent not expressly released pursuant to the terms of the Plan or the Confirmation Order, any (a) Causes of Action that the Debtors or their Estates may have that are based on or related to actions taken by, or omissions of, any Excluded Party or any other Person or Entity that is not a Released Party in connection with the management or affairs of the Debtors prior to or after the filing of the Chapter 11 Cases and (b) Avoidance Actions. For the avoidance of doubt, the Recovery Causes of Action shall include (x) those Causes of Action identified in (i) the complaint attached as Exhibit 2 to the UCC Claims Stipulation Motion, as may be amended from time to time, and (ii) the Schedule of ~~Additional Recovery~~Retained Causes of Action, (y) the Contributed Claims, and (z) any additional Causes of Action determined to be included by the Bankruptcy Court and described in the Confirmation Order.

202. 197. "*Registration Statement*" means the registration statement on Form 10 registering the NewCo Common Stock pursuant to Section 12(b) or Section 12(g) under the Exchange Act.

203. 198. "*Regulatory Approvals*" means any consents, approvals, or permissions of governmental authorities, including, for the avoidance of doubt, the SEC, that are necessary to implement or consummate the Plan and the NewCo Transaction (if any).

204. 199. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claims or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

205. 200. "*Related Party*" means, with respect to an Entity, each of, and in each case solely in its capacity as such, (a) such Entity's current and former Affiliates and (b) such Entity's current and former Affiliates', directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, associated Entities, managed or advised Entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, fiduciaries, trustees, employees, agents (including any Distribution Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives,

and other professionals, representatives, advisors, predecessors, successors, and assigns (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants, and nominees of the foregoing. Notwithstanding anything to the contrary in the Plan, no Excluded Party shall constitute a Related Party under the Plan, except for purposes of the Excluded Party definition (which utilizes the term "Related Party").

206. 201. "*Released Parties*" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided*, *further*, that, notwithstanding anything to the contrary in this Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided*, *further*, that Causes of Action against Released Parties, if any, listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein. For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, or Other Interest shall not be a Released Party in its capacity as such unless such Holder opts into becoming a Releasing Party.

207. 202. "*Releasing Parties*" means, collectively: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f). For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, or Other Interest that fails to opt into the Plan's releases shall not be a Releasing Party in its capacity as such.

203. "*Retail Advance Obligation Repayment Election*" means the Ballot election of a Retail Borrower to repay its Retail Advance Obligations.

208. 204. "*Retail Advance Obligations*" means any claim of the Debtors against a Retail Borrower with respect to advances made by the Debtors in connection with the Debtors' Borrow Program as of the Petition Date.

209. 205. "*Retail Advance Obligation Repayment Amount*" means an amount of BTC or ETH that is equivalent in value to the amount of the Retail Advance Obligations repaid by the applicable Retail Borrower pursuant to the Retail Advance Obligation Repayment Election, which BTC or ETH shall be valued as of the day that such repayment is made as of 12:00 p.m., prevailing Eastern Time, on a cryptocurrency exchange to be agreed upon by the Debtors and the Retail Borrower Ad Hoc Group.

210. 206. "*Retail Advance Obligation Repayment Deadline*" means five (5) calendar days prior to the Effective Date.

211. *"Retail Advance Obligation Repayment Election"* means the election of a Retail Borrower to repay its Retail Advance Obligations, which will be in the Retail Advance Obligations Repayment Instructions.

212. 207. *"Retail Advance Obligation Repayment Instructions"* means the instructions regarding repayment of Retail Advance Obligations, which instructions the Debtors shall e-mail to all Retail Borrowers at least thirty (30) calendar days prior to the anticipated Effective Date and which instructions shall specify the Retail Advance Obligation Repayment Deadline.

213. 208. *"Retail Borrower Ad Hoc Group"* means that certain *ad hoc* group of Retail Borrower Deposit Claim Holders represented by McCarter & English, LLP as set forth in the *First Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1920].

214. 209. *"Retail Borrower Deposit Claim"* means a Retail Borrower's Claim against the Debtors on account of the Cryptocurrency such Retail Borrower transferred in connection with its Retail Advance Obligation(s).

215. 210. *"Retail Borrower Post-Set Off Claim"* means a Retail Borrower's remaining Claim after application of any Retail Advance Obligation Repayment Amounts transferred by such Retail Borrower by the Retail Advance Obligation Repayment Deadline and/or the application of the Set Off Treatment to such Retail Borrower's Retail Borrower Deposit Claim.

216. 211. *"Retail Borrower Settlement"* means the settlement of the adversary proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors and Claims held by Retail Borrowers, the terms of which are set forth in Article IV.B.7 herein.

217. 212. *"Retail Borrowers"* means the individual Account Holders with outstanding Retail Advance Obligations in the Debtors' Borrow Program as of the Petition Date; *provided* that Daniel Leon and Hanoch "Nuke" Goldstein shall not be considered to be Retail Borrowers.

213. *"Schedule of Additional Recovery Causes of Action"* means the schedule of additional Causes of Action agreed between the Debtors and the Committee to be Recovery Causes of Action, which schedule may include categories of Causes of Actions and potential defendants and shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

218. 214. *"Schedule of Assumed Executory Contracts and Unexpired Leases"* means the schedule of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors or Post-Effective Date Debtors pursuant to the Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

219. 215. *"Schedule of Equitably Subordinated Claims"* means the schedule of Claims identified by the Committee and agreed by the Debtors to be subordinated pursuant to the Plan on equitable grounds, subject to Bankruptcy Court approval, including (i) participation in, or direct knowledge of, the prepetition manipulation of the price of the CEL Token or (ii) other misconduct, including fraud, willful misconduct, or other wrongful or inequitable conduct, as the same may be amended, modified, or supplemented from time to time. For the avoidance of any doubt, unless specifically provided in the Schedule of Equitably Subordinated Claims, all Claims held by any Holder of an Equitably Subordinated Claim shall be Equitably Subordinated Claims.

220. 216. *"Schedule of Excluded Parties"* means the schedule of current or former officers, directors, managers, employees, professionals, other agents of the Debtors, or third parties agreed by the Debtors and the Committee specifically not to be Released Parties and Exculpated Parties, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

221. 217. *"Schedule of Rejected Executory Contracts and Unexpired Leases"* means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Post-Effective Date Debtors pursuant to the

Plan, which shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

222. ~~218.~~ "*Schedule of Released and Exculpated Parties*" means the schedule of current or former officers, directors, managers, employees, professionals, or other agents of the Debtors agreed by the Debtors and the Committee to be Released Parties and Exculpated Parties, which shall be in substantially final form prior to the hearing to consider approval of the Disclosure Statement and shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

223. ~~219.~~ "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, which may include categories of Causes of Actions and potential defendants and shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

224. ~~220.~~ "*Schedules*" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as such Schedules may be amended, modified, or supplemented from time to time.

225. ~~221.~~ "*SEC*" means the Securities and Exchange Commission.

226. ~~222.~~ "*Secondary Market Purchase*" means the Plan Sponsor's purchase of $50 million of NewCo Common Stock through secondary equity purchases, which secondary purchases, if so elected by the Debtors and the Committee, shall comprise the Plan Sponsor Contribution.

227. ~~223.~~ "*Securities Litigation*" means the litigation captioned as *Goines v. Celsius Network, LLC, et. al.*, Case No. 2:22-CV-04560-KM-ESK pending in the United States District Court for the District of New Jersey.

228. ~~224.~~ "*Securities Litigation Documents*" means all books, records, documents, files, electronic data (in whatever format, including native format, and from every source and location, including but not limited to all hard drives, servers, and cloud-based storage located in the United States and overseas), or any tangible object or other item of evidence, wherever stored, relevant or potentially relevant to the Securities Litigation.

229. ~~225.~~ "*Section 502(h) Claim*" means any Claim that would arise under section 502(h) of the Bankruptcy Code.

230. ~~226.~~ "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code, including Other CEL Token Claims.

231. ~~227.~~ "*Secured Claim*" means any claim that is:  (a) secured by a lien on property in which any of the Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.  Except as otherwise specified in the Plan, any Final Order, or as otherwise agreed by the Debtors, and except for any Claim that is secured by property of a value in excess of the principal amount of such Claim (as determined by Final Order of the Bankruptcy Court), the amount of an Allowed Secured Claim shall not include interest or fees on such Claim accruing from and after the Petition Date.

232. ~~228.~~ "*Secured Tax Claim*" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.  For the avoidance of doubt, Secured Tax Claims are excluded from "State Regulatory Claims" hereunder.

233.    229. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

234.    230. "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

235.    231. "*Senior Claims Amount*" means an amount equal to an amount determined by the Debtors, and consented to by the Committee (not to be unreasonably withheld, conditioned, or delayed), as reasonably necessary to pay in full, or reserve for payment in full of, all Allowed Administrative Claims, Priority Tax Claims, Secured Claims, and Other Priority Claims.

236.    232. "*Series B Preferred Interests*" means the Class B Preferred Shares issued by Celsius Network Limited.

237.    233. "*Series B Settlement*" means the settlement of Claims and Interests held by Holders of Series B Preferred Interests, the terms of which are set forth in Article IV.B.6 herein.

238.    234. "*Series B Settlement Agreement*" means the settlement agreement governing the Series B Settlement.

239.    235. "*Series B Settlement Consideration*" means $1 million in Cash from the cash proceeds referenced in paragraph 9 of the *Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests, and Encumbrances, (II) Authorizing the GK8 Debtors to Enter into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1686].

240.    236. "*Series B Settlement Order*" means the *Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 3058].

241.    237. "*Set Off Treatment*" means, with respect to any Retail Borrower Deposit Claim, the treatment option pursuant to which such Retail Borrower Deposit Claim will be set off or recouped against the applicable Retail Advance Obligations outstanding on the Petition Date. Under the Set Off Treatment, the Retail Borrower will retain the proceeds of its Retail Advance Obligations and have the associated Retail Borrower Deposit Claim reduced by the amount of the Retail Advance Obligations outstanding as of the Petition Date. The remaining amount of the Retail Borrower Deposit Claim (*i.e.*, the Retail Borrower Post-Set Off Claim) will receive the Unsecured Claim Distribution Consideration or Convenience Class Distribution, as applicable. For the avoidance of doubt, if a Holder's Retail Borrower Deposit Claim receives the Set Off Treatment, such Holder will not owe additional amounts to the Debtors, NewCo, or the Post-Effective Date Debtors on account of such Retail Borrower Deposit Claim.

242.    238. "*Solicitation Agent*" means Stretto, Inc., the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

243.    239. "*Solicitation Materials*" means the solicitation materials with respect to the Plan, including the court-approved Disclosure Statement, form of ballots, and any other solicitation materials, including the solicitation version of the Plan.

244.    240. "*Special Committee*" means David M. Barse and Alan J. Carr, together, solely in their capacity as the special committee of the CNL Board.

245.    241. "*Special Committee D&O Liability Insurance Policies*" means the D&O Liability Insurance Policies with Berkley Professional Liability (Policy No. BPRO8086972), XL Specialty Insurance Co. (Policy

No. ELU184224-22), Endurance American Insurance Co. (Policy No. FIX30022208200), which provide insurance coverage to the members of the Special Committee in their capacities as such.

246. 242. *"State Regulatory Claim"* means any Unsecured Claim against any of the Debtors held by a state Governmental Unit on account of its regulatory authority over the Debtors' business operations, including any claims for penalties or fines; *provided*, for the avoidance of doubt, that such State Regulatory Claims do not include tax Claims or any other Claims not related to the State's regulatory authority.

247. 243. "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.D of the Plan.

248. 244. "*Token*" means a unit of Cryptocurrency.

249. 245. "*Transaction Steps Memorandum*" means that certain memorandum, as may be amended, supplemented, or otherwise modified from time to time, describing the steps to be carried out to effectuate the restructuring contemplated by the Plan, the form of which shall be included in the Plan Supplement.

250. 246. "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

251. 247. "*UCC Claims Stipulation*" means the *Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2201].

252. 248. "*UCC Claims Stipulation Defendants*" means each of the defendants identified in the complaint attached as Exhibit 2 to the UCC Claims Stipulation Motion, including Alexander Mashinsky, Shlomi Daniel Leon, Hanoch Goldstein, Harumi Urata-Thompson, Jeremie Beaudry, Johannes Treutler, Kristine Meehan Mashinsky, Aliza Landes, AM Ventures Holding, Inc., Koala1 LLC, Alchemy Capital Partners LP, Bits of Sunshine LLC, and any mediate or intermediate transferee of the foregoing.

253. 249. "*UCC Claims Stipulation Motion*" means the *Motion of the Official Committee of Unsecured Creditors to Approve Joint Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors and the Debtors with Respect to Certain Claims and Causes of Action Belonging to the Debtors' Estates* [Docket No. 2054].

254. 250. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within one year of receipt; (b) given notice to NewCo, the Post-Effective Date Debtors, or the Distribution Agent, as applicable, of an intent to accept a particular distribution within one year of receipt; (c) responded to the Debtors', NewCo's, the Post-Effective Date Debtors', or the Distribution Agent's requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

255. 251. "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

256. 252. "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

257. 253. "*Unsecured Claim*" means any Claim that is not a Secured Claim.

258. 254. "*Unsecured Claim Distribution Consideration*" means (i) the Liquid Cryptocurrency Distribution Amount, (ii) Litigation Proceeds, and (iii) 100% of the NewCo Common Stock (subject to dilution by the Management Equity Compensation and the Employee and NewCo Board Equity Compensation).

259. 255. "*Unsecured Claim Distribution Mix Election*" means either a Liquid Cryptocurrency Weighted Distribution Election or NewCo Common Stock Weighted Distribution Election. The Debtors shall use reasonable efforts to redistribute the consideration provided to the Holders of General Earn Claims (or any Claim on account of which the Holder will receive the Unsecured Claim Distribution Consideration) to satisfy Unsecured Claim Distribution Mix Elections.

260. 256. "*Unsecured Loan Claims*" means any Unsecured Claim arising on account of a loan agreement under which a Debtor is a borrower.

261. 257. "*US Bitcoin*" means U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.).

262. 258. "*US Bitcoin Agreements*" means, collectively, the US Bitcoin Management Agreement and one or more agreements providing for the following: (i) at the Debtors' option, a royalty-free license for the US Bitcoin IP, without sublicense rights, for the duration of the term of the US Bitcoin Management Agreement, (ii) both US Bitcoin and the Plan Sponsor's indemnity of NewCo with respect to all claims and damages related to the causes of action asserted in the lawsuit styled *Lancium LLC v. U.S. Data Mining Group, Inc.*, *et al.* (W.D. Tex. Civ. A. No. 6:23-cv-00344), (iii) the US Bitcoin New York Facility Option, and (iv) US Bitcoin's provision of the New Mining Facilities to NewCo, each of which shall be included in the Plan Supplement and shall be consistent in all respects with the Plan Sponsor Agreement.

263. 259. "*US Bitcoin IP*" means intellectual property owned by US Bitcoin (or other rights to use the applicable software or proprietary technology) for (i) the miner management software referred to as the Operator and (ii) curtailment management software referred to as the Reactor.

264. 260. "*US Bitcoin Management Agreement*" means one or more operating and services agreements to be entered into between US Bitcoin and NewCo (or in the case of the Interim Services Agreement on the Ward County, Texas Bitcoin mining data center site commonly known as Cedarvale, between US Bitcoin and Celsius Mining) on or before the Effective Date containing the terms on which US Bitcoin will manage NewCo's mining business, including, without limitation, the US Bitcoin Management Agreement and the Interim Services Agreement relating to construction of the 215 MW Cedarvale project, in each case, filed in substantially final form in the Plan Supplement (as may be modified, amended, or supplemented).

265. 261. "*US Bitcoin New York Facility Option*" means the option provided by US Bitcoin to the Debtors to (i) purchase an existing, fully permitted bitcoin mining facility with a 50 megawatt capacity, located in upstate New York, including the 12 years of existing leasehold rights and renewal terms for such facility and (ii) have US Bitcoin facilitate the immediate installation at miners at such facility, all as provided in the US Bitcoin Agreements.

266. 262. "*Voting Deadline*" means the date and time by which the Solicitation Agent must actually receive the Ballots, as set forth on the Solicitation Materials.

267. 263. "*Wind-Down Assets*" means, in the event of an Orderly Wind Down, all of the Debtors' assets, which shall vest in the Post-Effective Date Debtors pursuant to the Plan Administrator Agreement.

268. 264. "*Wind-Down Budget*" means, in the event of an Orderly Wind Down, that certain budget governing the fees, expenses, and disbursements required for the Orderly Wind Down, which shall be filed in connection with the Wind-Down Motion.

269. 265. "*Wind-Down Expenses*" means, in the event of an Orderly Wind Down, all actual and necessary costs and expenses incurred by the Plan Administrator in connection with carrying out the Orderly Wind Down pursuant to the terms of the Plan, the Plan Administrator Agreement, and the Wind-Down Procedures.

270. 266. "*Wind-Down Motion*" means the motion to be filed by the Debtors to implement an Orderly Wind Down in accordance with Article IV.E. The Wind-Down Motion shall include any proposed revisions to the

Wind-Down Procedures and the Wind-Down Budget.  Parties in interest shall have no fewer than ten days to object to the Wind-Down Motion and any exhibits thereto.

271. 267. "*Wind-Down Procedures*" means the procedures that identify the mechanics and procedures to effectuate the Orderly Wind Down, which shall be Filed as part of the Plan Supplement.

272. 268. "*Withdrawable Custody Claim*" means, collectively, all Pure Custody Claims and Eligible Transferred Custody Claims that are eligible for withdrawal under the Custody Settlement Order.

273. 269. "*Withdrawal Fee*" means any gas fees or transaction costs (or a fee approximating such costs) necessary to effectuate the withdrawal or transfer of Cryptocurrency.

274. 270. "*Withdrawal Preference Exposure*" means (i) the aggregate value of all assets an Account Holder withdrew from the Debtors' platform in the 90 days prior to the Petition Date (*i.e.*, on or after April 14, 2022), valued as of the time of such withdrawals *less* (ii) the aggregate value of any deposits such Account Holder made after such Account Holder's first withdrawal in such period, valued as of the time of such deposits.  The details of how Withdrawal Preference Exposure is calculated are included in Article.III.PP of the Disclosure Statement.  For the avoidance of doubt, the Debtors' calculation of Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action.

275. 271. "*Withhold Account*" means a Celsius Account with a balance representing (a) Ineligible Withhold Assets or (b) Cryptocurrency transferred from the Earn or Borrow Programs in states in which the Debtors did not offer the Custody Program.

276. 272. "*Withhold Ad Hoc Group*" means that certain *ad hoc* group of Holders of Withhold Claims represented by Troutman Pepper Hamilton Sanders LLP as set forth in the *Corrected Fourth Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1886].

277. 273. "*Withhold Claim*" means a Claim arising from an attempted transfer of Cryptocurrency in a jurisdiction in which the Debtors did not offer the Custody Program, which transfers were placed in "Withhold Accounts," less any amounts withdrawn under the Custody Withdrawal Order.

278. 274. "*Withhold Distribution Claim*" means an Allowed Withhold Claim minus any Ineligible Withhold Assets.

279. 275. "*Withhold Settlement*" means the settlement of Withhold Claims between the Debtors and certain Account Holders, the terms of which are set forth in Article IV.B.5 herein.

280. 276. "*Withhold Settlement Motion*" means the *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334].

B.    *Rules of Interpretation*.

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any party's consent rights over any of the PSA Definitive Documents or any amendments thereto as provided for in the Plan Sponsor Agreement; (3) except as otherwise specified herein, any reference herein to an existing document, schedule, or exhibit, whether Filed, having been Filed, or to be Filed shall mean that document schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or the Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that

Entity's successors and assigns; (5) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) any capitalized term used herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (15) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (16) references to "corporate action," "corporate structure," and other references to "corporate" and "corporation" will, except as the context may otherwise require, be deemed to include other forms of entities as well; (17) any effectuating provisions may be interpreted by the Debtors, or after the Effective Date, NewCo, the Plan Administrator, or any Litigation Administrator, as applicable, in their sole discretion in a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, without waiver of the rights of any Entity; (18) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (19) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; and (20) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to NewCo, the Debtors, or the Post-Effective Date Debtors shall be governed by the laws of the jurisdiction of incorporation or formation of NewCo, the Debtors, and the Post-Effective Date Debtors, respectively.

E.    *Reference to Monetary Figures.*

All references herein to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.  Unless otherwise expressly provided herein, references to Cryptocurrency denoted with a $ refer to the value of such Cryptocurrency in Cash as of the Petition Date, utilizing the conversion

rates provided in the Cryptocurrency Conversion Table.  For the avoidance of doubt, CEL Token shall be valued as provided in Article IV.B.2.

F.    *Valuation of Claims*.

Unless otherwise expressly provided herein, the value of a Claim denominated in Cryptocurrency shall be calculated by converting the value of the Claim into Cash as of the Petition Date, utilizing the conversion rates provided in the Cryptocurrency Conversion Table.  For the avoidance of doubt, CEL Token shall be valued as provided in Article IV.B.2.

G.    *Reference to the Debtors or the Post-Effective Date Debtors*.

Except as otherwise specifically provided herein, references to the Debtors or the Post-Effective Date Debtors herein mean the Debtors or the Post-Effective Date Debtors, as applicable, to the extent the context requires.  References to the Post-Effective Date Debtors mean the Post-Effective Date Debtors, the Plan Administrator, or a Litigation Administrator, as applicable, to the extent the context requires.

H.    *Controlling Documents*.

In the event of an inconsistency between the Plan and the Plan Sponsor Agreement or the Backup Plan Sponsor Agreement, the terms of the Plan shall control in all respects, except as set forth in Article I.I below. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of any inconsistency between any of the Plan and the Confirmation Order, the Confirmation Order shall control.

I.    *Consultation, Information, Notice, and Consent Rights*.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Plan Sponsor Agreement set forth in the Plan Sponsor Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, and the Plan Supplement, and all other PSA Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Plan Sponsor Agreement shall not impair such rights and obligations.

## ARTICLE II.
### ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, statutory fees under section 1930 of the Judicial Code, and payments pursuant to settlement agreements have not been classified and thus are excluded from the Classes of Claims set forth in ~~Article III~~Article III hereof.

A.    *Administrative Claims*.

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, or as otherwise set forth in an order of the Bankruptcy Court, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an

Administrative Claim is Allowed on or prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (1) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such allowance or as soon as reasonably practicable thereafter, but in any event no later than ninety days after the date on which an order allowing such Administrative Claim becomes a Final Order; (1) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (1) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Post-Effective Date Debtors, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Post-Effective Date Debtors, NewCo, or the property of any of the foregoing, and such Administrative Claims shall be deemed compromised, settled, and discharged as of the Effective Date. For the avoidance of doubt, the Plan Sponsor and its counsel and other advisors are not required to file a request for payment of any Administrative Claims respecting any fees or expenses payable under the Plan Sponsor Agreement.

B.    *Professional Fee Claims.*

1.    Professional Fee Escrow Account.

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Estates, the Debtors, or NewCo and/or its subsidiaries.

The Debtors' and Post-Effective Date Debtors' obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals, any remaining funds held in the Professional Fee Escrow Account shall be transferred to the Litigation Recovery Account, and shall be promptly distributed Pro Rata to Holders of Claims entitled to receive Litigation Proceeds under this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) utilize such amounts to fund Wind-Down Expenses in the event an Orderly Wind Down is consummated.

2.    Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) calendar days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders. The Post-Effective Date Debtors shall pay the Professional Fee Claims in Cash, including from the Professional Fee Escrow Account, in the amount the Bankruptcy Court allows as soon as reasonably practicable after such Professional Fee Claims are Allowed. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan. Allowed Professional Fee Claims shall not be subject to

disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

       3.       <u>Professional Fee Escrow Amount</u>.

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than five (5) calendar days before the anticipated Effective Date; *provided* that such estimate shall not be deemed an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound by such estimates in any way. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, taking into account any prior payments. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

       4.       <u>Post Confirmation Date Fees and Expenses</u>.

From and after the Confirmation Date, the Debtors, or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Post-Effective Date Debtors, as applicable. After the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.       *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.       *Statutory Fees*.

The Debtors and the Post-Effective Date Debtors, as applicable, shall pay all U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or the Post-Effective Date Debtors' business (or such amount agreed to with the U.S. Trustee or ordered by the Bankruptcy Court), for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. On and after the Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.

### ARTICLE III.
### CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A.       *Classification of Claims and Interests*.

Except for the Claims addressed in <u>Article II</u> of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving

distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III.D hereof. The following represents a summary of the classification of Claims and Interests for each Debtor pursuant to the Plan:

    1.    <u>Class Identification for Claims or Interests</u>.

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against, and Interests in, the Debtors pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Retail Borrower Deposit Claims | Impaired | Entitled to Vote |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Convenience Claims | Impaired | Entitled to Vote |
| 5 | General Earn Claims | Impaired | Entitled to Vote |
| 6A | General Custody Claims | Impaired | Entitled to Vote |
| 6B | Withdrawable Custody Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Withhold Claims | Impaired | Entitled to Vote |
| 8 | Unsecured Loan Claims | Impaired | Entitled to Vote |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote |
| 10 | State Regulatory Claims | Impaired | Entitled to Vote |
| 11 | De Minimis Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 12 | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 13 | Intercompany Interests | Impaired/ Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 14 | Series B Preferred Interests | Impaired | Entitled to Vote |
| 15 | Other Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 16 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 17 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Classes of Claims and Interests*.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the

Debtors or the Post-Effective Date Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business.

1.  Class 1 — Other Secured Claims.

    (a)  *Classification*: Class 1 consists of all Other Secured Claims.

    (b)  *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor(s) as agreed by the Debtors and the Committee, either:

        (i)  payment in full in Cash;

        (ii)  the collateral securing such Allowed Other Secured Claim;

        (iii)  Reinstatement of such Allowed Other Secured Claim; or

        (iv)  such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)  *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.  Class 2 — Retail Borrower Deposit Claims.

    (a)  *Classification*: Class 2 consists of all Retail Borrower Deposit Claims.

    (b)  *Treatment*: Each Holder of a Retail Borrower Deposit Claim shall receive:

        (i)  **Repayment Election**: If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

        *or*

        **Set Off Treatment**: If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

        *plus*

        (ii)  On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution

Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(c)     *Voting*: Class 2 is Impaired under the Plan. Holders of Retail Borrower Deposit Claims are entitled to vote to accept or reject the Plan.

3.     Class 3 — Other Priority Claims.

(a)     *Classification*: Class 3 consists of all Other Priority Claims.

(b)     *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee.

(c)     *Voting*: Class 3 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.     Class 4 — Convenience Claims.

(a)     *Classification*: Class 4 consists of all Convenience Claims.

(b)     *Treatment*: Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

(c)     *Voting*: Class 4 is Impaired under the Plan. Holders of Convenience Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 — General Earn Claims.

(a)     *Classification*: Class 5 consists of all General Earn Claims. For the avoidance of doubt, (i) General Earn Claim means Earn Claims (other than Convenience Claims) and (ii) any Account Holder Claim not separately classified under the Plan shall default to classification as an Earn Claim.

(b)     *Treatment*: Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds,

and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of General Earn Claims are entitled to vote to accept or reject the Plan.

6A.    <u>Class 6A — General Custody Claims</u>.

(a)    *Classification*:  Class 6A consists of all General Custody Claims.

(b)    *Treatment*:

(i)    <u>For Holders of General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order</u>: Each such Holder of a General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in <u>Article IX</u> of the Disclosure Statement, one of two treatments:

a.    **<u>Treatment A</u>**:  (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim; *provided* that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure ~~under~~<u>less than or equal to</u> $100,000 shall receive a 100% recovery under Treatment A, as provided in <u>Article IV.B.3</u>.

b.    **<u>Treatment B</u>**:  The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim.  The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing.  To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim.  Any such Allowed General Custody Claim will be subject to the ADR Procedures.

(ii)    <u>For Custody Settlement Participants</u>:  Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; *provided* that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; *provided*, *further*, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure ~~under~~<u>less than or equal to</u> $100,000 shall receive a 100% recovery, as provided in <u>Article IV.B.3</u>.

(c)     *Voting*:  Class 6A is Impaired under the Plan.  Holders of General Custody Claims are entitled to vote to accept or reject the Plan.

6B.     Class 6B —Withdrawable Custody Claims

(a)     *Classification*:  Class 6B consists of all Withdrawable Custody Claims.

(b)     *Treatment*:  Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order.  For the avoidance of doubt, any Holder of an Allowed Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

(c)     *Voting*:  Class 6B is Unimpaired under the Plan.  Holders of Allowed Withdrawable Custody Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Withdrawable Custody Claims are not entitled to vote to accept or reject the Plan.

7.     Class 7 — Withhold Claims.

(a)     *Classification*:  Class 7 consists of all Withhold Claims.

(b)     *Treatment*:

(i)     Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:

a.     **Treatment A**:  If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Liquid Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in the Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

b.     **Treatment B**:  If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(ii)     For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement.

(c)     *Voting*:  Class 7 is Impaired under the Plan.  Holders of Withhold Claims are entitled to vote to accept or reject the Plan.

8.     Class 8 — Unsecured Loan Claims.

(a)     *Classification*:  Class 8 consists of all Unsecured Loan Claims.

(b)     *Treatment*:  Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

(c)     *Voting*:  Class 8 is Impaired under the Plan.  Holders of Unsecured Loan Claims are entitled to vote to accept or reject the Plan.

9.     Class 9 — General Unsecured Claims.

(a)     *Classification*:  Class 9 consists of all General Unsecured Claims.  For the avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims.

(b)     *Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in Article III.M of the Disclosure Statement.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights.

(c)     *Voting*:  Class 9 is Impaired under the Plan.  Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

10.     Class 10 — State Regulatory Claims.[2]

(a)     *Classification*:  Class 10 consists of all State Regulatory Claims.

(b)     *Treatment*:  Each Holder of an Allowed State Regulatory Claim shall ~~have its Claim subordinated to all Account Holder Claims.  On the Effective Date~~ be entitled to the same recovery as a Holder of a General Unsecured Claim; *provided* that notwithstanding the foregoing, all State Regulatory Claims shall be ~~cancelled, released, and extinguished and~~

---

[2]  ~~The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators.~~

will be of no further force or effect, regardless of whether Holders of suspended against the Debtors and will not be Allowed Claims and shall not receive any distributions in these Chapter 11 Cases, in each case, so long as the Debtors' Plan becomes effective and is fully administered as proposed; *provided, further,* that the suspension in the foregoing proviso shall be lifted as to the Debtors if the Chapter 11 Cases are closed, dismissed, or otherwise concluded, in each case, without the Estate(s) being fully administered, including any distributions to creditors, in accordance with the Plan and the Bankruptcy Code.  For the avoidance of doubt, the State Regulatory Claims receive a distribution shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.

(c)     *Voting*:  Class 10 is Impaired under the Plan.  Holders of State Regulatory Claims are entitled to vote to accept or reject the Plan.

11.    Class 11 — *De Minimis* Claims.

(a)     *Classification*:  Class 11 consists of all *De Minimis* Claims.

(b)     *Treatment*:  All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

(c)     *Voting*:  Class 11 is Impaired under the Plan.  Holders of *De Minimis* Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of *De Minimis* Claims are not entitled to vote to accept or reject the Plan.

12.    Class 12 — Intercompany Claims.

(a)     *Classification*:  Class 12 consists of all Intercompany Claims, which shall be Allowed in amounts to be agreed by the Debtors and the Committee.

(b)     *Treatment*:  Each Allowed Intercompany Claim shall, at the option of the applicable Debtor(s) with the consent of the Committee, be:

(i)      Reinstated; or

(ii)     set off, settled, distributed, addressed, converted to equity, contributed, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum.

(c)     *Voting*:  Class 12 is either Unimpaired under the Plan or Impaired under the Plan.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

13.    Class 13 — Intercompany Interests.

(a)     *Classification*:  Class 13 consists of all Intercompany Interests.

(b)     *Treatment*:  Each Intercompany Interest shall, at the option of the applicable Debtor(s) with the consent of the Committee, be:

(i)      Reinstated; or

(ii)    set off, settled, addressed, distributed, contributed, merged, cancelled, or released, in each case, in accordance with the Transaction Steps Memorandum.

(c)    *Voting*:  Class 13 is either Unimpaired under the Plan or Impaired under the Plan. Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

14.    Class 14 — Series B Preferred Interests.

(a)    *Classification*:  Class 14 consists of all Holders of Series B Preferred Interests.

(b)    *Treatment*:  Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to the Series B Settlement Order.

(c)    *Voting*:  Class 14 is Impaired under the Plan.  Holders of Allowed Series B Preferred Interests are entitled to vote to accept or reject the Plan.

15.    Class 15 — Other Interests.

(a)    *Classification*:  Class 15 consists of all Interests in any Debtors that are not Series B Preferred Interests or Intercompany Interests.

(b)    *Treatment*:  Holders of Other Interests shall not receive any distribution on account of such Other Interests, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 15 is Impaired under the Plan.  Holders of Allowed Other Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Other Interests are not entitled to vote to accept or reject the Plan.

16.    Class 16 — Section 510(b) Claims.

(a)    *Classification*:  Class 16 consists of all Section 510(b) Claims.

(b)    *Treatment*:  Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

(c)    *Voting*:  Class 16 is Impaired under the Plan.  Holders of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

17.    Class 17 — Equitably Subordinated Claims.

(a)    *Classification*:  Class 17 consists of all Equitably Subordinated Claims.

(b)    *Treatment*:  Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date (except as otherwise provided herein), and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court following the resolution of the

38

litigation of the subordination of the Equitably Subordinated Claims.  For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed by the Equitable Subordination Stay Order.  Holders of Equitably Subordinated Claims need not object to the Plan to preserve all of their rights to contest the proposed classification and equitable subordination of their Claims at the appropriate time; a schedule for this litigation will be set by the Bankruptcy Court or agreement of the parties once the stay in the Equitable Subordination Stay Order ends.

(c)    *Voting*:    Class 17 is Impaired under the Plan.    Therefore, Holders of Equitably Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', NewCo's, or the Post-Effective Date Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Deemed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Post-Effective Date Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

The Plan shall be deemed to constitute a motion to subordinate all Claims listed on the Schedule of Equitably Subordinated Claims pursuant to section 510(c) of the Bankruptcy Code or, in the case of Other CEL Token Claims and other Section 510(b) Claims, pursuant to section 510(b) of the Bankruptcy Code, as applicable. In the event that the Bankruptcy Court denies the proposed subordination of the Equitably Subordinated Claims, such Claims shall receive ~~the treatment~~treatment on account of such Claim consistent with similarly-situated creditors under the Plan (including, if applicable, treatment consistent with that afforded to other CEL Token Deposit Claims) following the resolution of the litigation regarding the subordination of the Equitably Subordinated Claims or such other treatment as is ordered by the Bankruptcy Court.  For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed in accordance with the terms of the Equitable Subordination Stay ~~o~~Order~~s~~.

G.      *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' and Post- Post- Effective Date Debtor's agreement under the Plan to make certain distributions to Holders of Allowed Claims.

H.      *Controversy Concerning Impairment or Classification.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, or whether the classification of Claims or Interests is appropriate, the Bankruptcy Court shall determine such controversy at the Confirmation Hearing.

I.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Substantive Consolidation.*

The substantive consolidation of the Initial Consolidated Debtors (*i.e.*, Celsius Network Limited and Celsius Network LLC) for purposes of their Plans has been approved as set forth in the Series B Settlement Order and this Plan. The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate Celsius Lending LLC and Celsius Networks Lending LLC with the Initial Consolidated Debtors on the same terms, effective as of the Effective Date.

Except as otherwise provided herein, the Consolidated Debtors (*i.e.*, the Initial Consolidated Debtors plus Celsius Lending LLC and Celsius Networks Lending LLC) are substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, and subject to the following sentence: (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors. The substantive consolidation and deemed merger effected pursuant to this Plan shall not affect (other than for purposes of the Plan as set forth in this Article IV.A.1) (x) the legal and organizational structure of the Consolidated Debtors, except as provided in the Transaction Steps Memorandum, including, for the avoidance of doubt, the legal existence of any Claim of one Consolidated Debtor against another Consolidated Debtor; (y) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; *provided* that any Claim that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of the Consolidated Debtors;

or (z) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts.

B.      *Plan Settlement Provisions Regarding Claims and Interests.*

     1.      <u>General Settlement of Claims and Interests.</u>

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to ~~Article VI~~<u>Article VI</u> hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

     2.      <u>CEL Token Settlement.</u>

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in <u>Article IV.B.1</u>, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in this <u>Article IV.B.2</u> and in <u>Article IV.A.2.(b)</u> of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in <u>Article III.B.17</u>, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

- All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in <u>Article III.B.16</u> or <u>Article III.B.17</u>, as applicable.

- ~~The Debtors will evaluate the votes cast by Holders of CEL Token Deposit Claims (not including CEL Token Deposit Claims held by Equitably Subordinated Parties) and the number of Holders of CEL Token Deposit Claims that opt out of the Class Claim Settlement. Such votes will be disclosed on the voting report to be filed by the Solicitation Agent. To the extent the majority of eligible Holders of CEL Token Deposit Claims vote to accept the Plan or not opt out of the Class Claim Settlement and/or the Debtors and the Committee reach an agreement with an ad hoc group of Holders of CEL Token Deposit Claims, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation. To the extent a majority of Holders of CEL Token Deposit Claims vote to reject the Plan, the Debtors will seek a determination from the Court of the relative rank and value of CEL Token on the Petition Date at Confirmation~~

- <u>Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25.</u>

Because over two thirds in dollar amount and over half in number of eligible Holders of CEL Token Deposit Claims voted to accept the Plan or not opt out of the Class Claim Settlement, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation.

In the event that the Bankruptcy Court does not approve the CEL Token Settlement, CEL Token Deposit Claims shall either be treated as Section 510(b) Claims or receive such other treatment as the Bankruptcy Court orders. For the avoidance of doubt, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims will be classified as Class 15 Section 510(b) Claims and treated as provided in Article III.B.16.

3.    Account Holder Avoidance Action Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in this Article IV.B.3 and in Article IV.A.2.(c) of the Disclosure Statement, the Plan shall effectuate the Account Holder Avoidance Action Settlement. Pursuant to the Account Holder Avoidance Action Settlement, the Debtor Release contained in ~~Article VIII.C~~Article VIII.C shall also release Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure ~~under~~less than or equal to $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan.

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure ~~of more~~less than or equal to $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan.

For the avoidance of doubt: (a) all Avoidance Actions against ADR-Ineligible Potential Defendants and Excluded Parties are not included in the Account Holder Avoidance Action Settlement and expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims shall be released if ~~such Account Holder with a *De Minimis* Claim otherwise complies with the requirements set forth above other than voting in favor of the Plan (as such Account Holders are not entitled to vote)~~(i) their Withdrawal Preference Exposure is less than or equal to $100,000 or (ii) their Withdrawal Preference Exposure is over $100,000 and they make the requisite payments, and (c) as a result of the Account Holder Avoidance Action Release, any Custody Settlement Participant with Withdrawal Preference Exposure ~~under~~less than or equal to $100,000 shall receive a 100% recovery on their Allowed General Custody Claim.

For the avoidance of doubt, the rights of Account Holders to receive a distribution under the Plan on account of their Claims are not released pursuant to the Account Holder Avoidance Action Settlement. Notwithstanding anything to the contrary in the Plan, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

Prior to the Effective Date, the Debtors and the Committee (and after the Effective Date, the Litigation Administrator in consultation with the Plan Administrator) may enter into agreements with any Account Holders that agreed to settle their Withdrawal Preference Exposure as set forth herein, and make agreements regarding setting off the amount to be repaid against the recovery to be received under this Plan.

4.    Custody Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Custody

Settlement Motion and in Article IV.A.2.(d) of the Disclosure Statement, the Plan shall effectuate the Custody Settlement as set forth in the Custody Settlement Order.

5.  Withhold Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in the Withhold Settlement Motion and in Article IV.A.2.(e) of the Disclosure Statement, the Plan shall effectuate the Withhold Settlement.

6.  Series B Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise described in Article VII.L.5 of the Disclosure Statement, the Plan shall effectuate the Series B Settlement in accordance with the Series B Settlement Agreement.

7.  Retail Borrower Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise of the adversary proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors described in Article II.A.2 and Article III.WW of the Disclosure Statement, the Plan shall effectuate the Retail Borrower Settlement. Pursuant to the Retail Borrower Settlement, (a) Holders of Retail Borrower Deposit Claims have the option to repay their Retail Advance Obligations in exchange for an equivalent amount of Liquid Cryptocurrency, which the applicable Retail Borrower may specify to receive in either BTC or ETH, (b) any obligation of the Retail Borrowers to pay any interest on account of Retail Advance Obligations for the duration of these Chapter 11 Cases is waived, and (c) Liquid Cryptocurrency Weighted Distribution Elections on account of Retail Borrower Post-Set Off Claims shall be given priority over all other Liquid Cryptocurrency Weighted Distribution Elections. The adversary proceedings brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors and the Pending Withdrawal Ad Hoc Group shall be dismissed with prejudice pursuant to the Confirmation Order upon the Effective Date.

To the extent the Retail Borrower Ad Hoc Group, the Debtors, or the Committee identify a source of third-party financing reasonably acceptable to the Debtors, the Debtors shall take commercially reasonable efforts to facilitate such party in refinancing applicable Retail Advance Obligations with the consideration provided to Retail Borrowers under the Plan.

8.  Class Claim Settlement.

As part of the general settlement described in Article IV.B.1, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromise described in the Class Claim Settlement Motion and in Article III.LLL and Article VII.K.4 of the Disclosure Statement, the Plan shall effectuate the Class Claim Settlement. Except as otherwise provided in the Order approving the Class Claim Settlement, under the Class Claim Settlement, if a Holder does not opt-out of the Class Claim Settlement, such Holder's Account Holder Claims, other than Custody Claims, shall receive, in lieu of any scheduled Claim or Filed Proof of Claim, an Allowed Claim in an amount that is 105% of the scheduled amount of such Claim, in each case of the same Class as the originally scheduled Claim. Proofs of Claim filed by Class Claim Settlement Participants (*i.e.*, Holders of Account Holder Claims (other than Account Holders who only hold Custody Claims) that do not opt out of Class Claim Settlement) shall be expunged from the Claims Register and shall be of no further force and effect.

C.  *Restructuring Transactions.*

The Plan may be effectuated through either the NewCo Transaction or, if applicable in accordance with Article IV.E, the Orderly Wind Down. In the event that the Plan is effectuated through the NewCo Transaction, Article IV.D shall govern and Article IV.E shall be disregarded unless specifically provided herein. Conversely, in

the event that the Plan is effectuated through the Orderly Wind Down, <u>Article IV.E</u> shall govern, and <u>Article IV.D</u> shall be disregarded unless specifically provided herein. All other subsections of this <u>Article IV</u> shall apply regardless of whether the Orderly Wind Down or the NewCo Transaction is effectuated.

On or before the Effective Date, the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable, shall take any action as may be necessary or appropriate to effect the NewCo Transaction or Orderly Wind Down, as applicable, including those steps set forth in the Transaction Steps Memorandum. The actions to implement the NewCo Transaction or Orderly Wind Down may include, in addition to those steps set forth in the Transaction Steps Memorandum: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable Law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (4) the issuance, transfer, or distribution of NewCo Common Stock; (5) to the extent applicable, the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of NewCo and/or its subsidiaries (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Post-Effective Date Debtors, as applicable); (6) all transactions necessary to provide for the transfer of some or all of the assets or Interests of any of the Debtors to NewCo and/or one or more of its subsidiaries, which transfer may be structured as a taxable transaction for United States federal income tax purposes; and (7) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan. All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall prepare, execute, and deliver any agreements or documents and take any other actions as the Debtors reasonably determine are necessary or advisable to effectuate the provisions and intent of the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the NewCo Transaction or the Orderly Wind Down, as applicable.

D.    *NewCo Restructuring Transactions.*

1.    <u>Transfer of Assets to NewCo and Vesting of Assets in the Post-Effective Date Debtors</u>.

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, pursuant to sections 363, 1123(a)(5), and 1141(c) of the Bankruptcy Code: (1) all NewCo Assets shall be transferred to and vest in NewCo and/or its subsidiaries free and clear of all Liens, Claims, interests, charges, or other encumbrances, and (2) all other property in each Debtor's Estate, all Causes of Action (including all Recovery Causes of Action) that are not released, and any property acquired by any of the Debtors under the Plan shall vest in the applicable Post-Effective Date Debtor, free and clear of all Liens, Claims, Interests, charges, or other encumbrances. For the avoidance of doubt, (i) NewCo shall not assume, be deemed to have assumed, or be liable for any liabilities of any of the Debtors except as, and solely to the extent, expressly set forth herein; (ii) the NewCo Transactions are not, and shall not be deemed to be, a *de facto* merger of any of the Debtors and NewCo, or any Affiliates of the foregoing; (iii) NewCo is not, and shall not be deemed to be, a continuation of any of the Debtors, any Affiliates thereof, or any of their respective businesses or operations; and (iv) the NewCo Transactions have been entered into in good faith and not for any fraudulent purpose or to escape any liabilities of the Debtors. On and after the Effective Date, except as otherwise provided herein, NewCo and/or its subsidiaries and each Post-Effective Date Debtor (or the Plan Administrator or applicable Litigation Administrator) may operate its business in accordance with applicable Law and may use, acquire, or

dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any NewCo Assets shall vest in NewCo as of the Effective Date. The Debtors and NewCo are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties. No action taken by the Debtors or NewCo shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors or NewCo, including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

       2.       <u>Post-Effective Date Debtors</u>.

One or more of the Debtors shall continue in existence after the Effective Date, each as a Post-Effective Date Debtor, for purposes of (1) preserving the Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, (2) winding down the Debtors' remaining businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Post-Effective Date Debtors after the Effective Date and after consummation of the NewCo Transaction, (3) performing their obligations under any transition services agreement entered into by and between the Post-Effective Date Debtors and NewCo and/or its subsidiaries, (4) resolving any Disputed Claims, (5) paying Allowed Claims for which there is not a Distribution Agent other than the Post-Effective Date Debtors, (6) filing appropriate tax returns, and (7) administering the Plan in an efficacious manner. The Post-Effective Date Debtors shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, the Post-Effective Date Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (a) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (b) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the <u>Post</u>-<s>Post</s>-Effective Date Debtors or the Litigation Administrator(s) to file motions or substitutions of parties or counsel in each such matter.

Except as otherwise provided in the Plan or the Plan Supplement (including the Transaction Steps Memorandum), or any agreement, instrument, or other document incorporated therein, each Post-Effective Date Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Effective Date, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

       3.       <u>Sources of Consideration for Plan Distributions</u>.

The Debtors and the Post-Effective Date Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand as of the Effective Date and net proceeds from the sale of GK8, (2) Liquid Cryptocurrency (in the Liquid Cryptocurrency Distribution Amount), (3) the NewCo Common Stock, and (4) Litigation Proceeds.

Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

After the Effective Date, the Post-Effective Date Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable NewCo and/or its subsidiaries and the Post-Effective Date Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will not violate the terms of the Plan.

4.      Distribution Mechanics.

Distributions shall generally commence on, or as soon as reasonably practicable after, the Effective Date. The Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agent Aagreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors.

Unless otherwise specified in the Plan Supplement, until the Deactivation Date, all distributions to Custody Claim Holders, Withhold Claim Holders, or Account Holders to whom no other Distribution Agent is eligible to make distributions shall be made by the Debtors or the Post-Effective Date Debtors, as applicable. On the Deactivation Date, the Celsius platform will cease to exist and Account Holders will no longer be able to log-in to the Celsius platform and/or access their Celsius Account, including for purposes of distributions.

After the Deactivation Date, the Debtors may instruct one or more Distribution Agents, subject to the terms of the applicable Distribution Agent Aagreement, to make distributions in a form and amount of Liquid Cryptocurrency or fiat currency to be specified by the Debtors. Such distributions may be in Liquid Cryptocurrency or fiat currency, but in no circumstances will any Distribution Agent make distributions in Cryptocurrency other than Liquid Cryptocurrency. AnyOn the post-Deactivation Date distributions to Holders of the Allowed Custody Claims or Withhold Claimsof Holders that did not retrieve their Plan distributions from the Celsius platform by the Deactivation Date shall be valued in accordance with the Deactivation Date Cryptocurrency Conversion Table and shall receive such distribution in the amount calculated based on the Deactivation Date Cryptocurrency Conversion Table in Liquid Cryptocurrency or fiat. For the avoidance of doubt, the Debtors or Post-Effective Date Debtors, as applicable, may elect in their reasonable discretion to make any distribution in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.

To be eligible to receive a distribution under this Plan, Account Holders must update the AML/KYC Compliance Information for their Celsius Account and may be required to register or complete additional onboarding with a Distribution Agent, which may require providing any requested AML/KYC Compliance Information.

5.      NewCo Common Stock.

On the Effective Date or as soon as reasonably practicable thereafter, in accordance with the Transaction Steps Memorandum, NewCo shall issue the NewCo Common Stock. The Confirmation Order shall authorize the issuance of NewCo Common Stock in one or more issuances without the need for any further corporate action, and the Debtors or NewCo, as applicable, shall be authorized to take any action necessary or appropriate in furtherance thereof. On the Effective Date or as soon as reasonably practicable thereafter, the applicable Holders of Claims shall receive NewCo Common Stock in satisfaction of such Holders' Allowed Claims pursuant to Article III.B. The Confirmation Order shall further authorize the New Board, in its sole discretion, to issue the Employee and NewCo Board Equity Compensation. For the avoidance of doubt, the NewCo Common Stock issued on the Effective Date may, with the consent of the Committee and the Plan Sponsor (not to be unreasonably delayed, withheld, or conditioned), be issued into a trust or similar structure to be held for the beneficial interest of Holders of Allowed Claims; provided, however, that no distributions shall be made prior to such time as a modified version of the Transaction Steps Memorandum is filed with the Bankruptcy Court updating the relevant steps.

Entry of the Confirmation Order shall authorize the clearance and trading of the NewCo Common Stock, subject to resale restrictions applicable to "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, on or as promptly as practicable after the Effective Date, and NewCo shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such NewCo Common Stock, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of NewCo in all respects, without the need for any further corporate action. The Debtors or Post-Effective Date Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.

All of the NewCo Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Further, ~~except for~~ the NewCo Common Stock issued in connection with the ~~Plan Sponsor Contribution, all NewCo Common Stock~~ satisfaction, settlement, release, and discharge of Allowed Claims will be issued in reliance under section 1145 of the Bankruptcy Code. ~~The issuance and sale of the~~ All other NewCo Common Stock ~~in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made in~~ issued or sold on the Effective Date will be issued or sold in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.

The distribution and issuance of the NewCo Common Stock under the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person or Entity receiving such distribution or issuance. Any Person's or Entity's acceptance of NewCo Common Stock shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their respective terms, and each such Person or Entity will be bound thereby in all respects.

6.    Exemption from Registration Requirements.

The NewCo Common Stock being issued under the Plan will constitute "equity securities" as defined in Section 3(a)(11) of the Exchange Act. ~~Except for the~~ The NewCo Common Stock issued in connection with the ~~Plan Sponsor Contribution, the NewCo Common Stock~~ satisfaction, settlement, release, and discharge of Allowed Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.

Securities issued in reliance upon section 1145 of the Bankruptcy Code to an entity that is not an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable under U.S. federal securities laws by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of NewCo or the Post-Effective Date Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety (90) days of such transfer, (iii) has not acquired such securities from an "affiliate" within one year of such transfer and (iv) is not an entity that is an "underwriter," as defined under section 1145(b) of the Bankruptcy Code.

~~The issuance and sale of the~~ All other NewCo Common Stock ~~in connection with the Plan Sponsor Contribution (to the extent the Plan Sponsor Contribution is made through a primary purchase rather than through the Secondary Market Purchase) are being made~~ issued or sold on the Effective Date will be issued or sold in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder. Such NewCo Common Stock will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Debtors recommend that potential recipients of NewCo Common Stock consult their own counsel: (i) with respect to the NewCo Common Stock issued under the Plan, concerning whether such potential recipients will constitute "underwriters" pursuant to section 1145(b) of the Bankruptcy Code at the time of the issuance of the NewCo Common Stock; and (ii) the ability of such potential recipients to freely trade NewCo Common Stock in compliance with the federal securities laws and any applicable Blue Sky laws, including certain Blue Sky state notice requirements that may continue to apply with respect to resales of the NewCo Common Stock. The Debtors make no representation concerning the ability of a person to dispose of any NewCo Common Stock.

The Post-Effective Date Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including The Depository Trust Company and any transfer agent for the NewCo Common Stock) with respect to the treatment of the NewCo Common Stock to be issued under the Plan under applicable securities laws. The Depository Trust Company and any transfer agent for the NewCo Common Stock shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the NewCo Common Stock is exempt from registration and/or eligible for The Depository Trust Company book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, (i) any partner of NewCo or the Plan Sponsor, (ii) The Depository Trust Company, and (iii) any transfer agent for the NewCo Common Stock) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the NewCo Common Stock are exempt from registration and/or eligible for book-entry, delivery, settlement, and depository services.

7.    Directors and Officers.

On the Effective Date, the terms of the current members of the CNL Board shall expire. For the avoidance of any doubt, no current director of the Debtors will remain a director or have any control over NewCo, the Debtors, or the Post-Effective Date Debtors unless explicitly provided herein or in the Plan Supplement. The New Board of NewCo will consist of those directors identified in the Plan Supplement. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose the identity and affiliations of any Person proposed to serve on the New Board in the Plan Supplement. The New Board shall initially consist of ~~seven~~nine members: (i) ~~two of whom will be appointed by the Plan Sponsor; (ii)~~ three of whom will be appointed by the Plan Sponsor; (ii) four of whom will be appointed by the Committee, in its sole discretion; and (iii) two of whom will be appointed by the Committee and consented to by the Plan Sponsor (whose consent shall not be unreasonably withheld or conditioned), which directors contemplated in the foregoing clause (iii) shall be independent as such term is generally used for public companies listed on a registered exchange. For the avoidance of doubt, the composition of the New Board shall comply with any applicable listing standards and rules of any applicable exchanges on which the NewCo Common Stock is or will be listed.

Members of the New Board (other than the designees of the Plan Sponsor) shall have staggered terms classified across three approximately equal classes, with one class subject to reelection each year. Each board member may be reelected at the end of their term; *provided* that for so long as the Management Agreement is in effect, the Plan Sponsor shall have the right to nominate and elect ~~two~~three members of the New Board.

After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

The Post-Effective Date Debtors shall be governed by the Plan Administrator in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Post-Effective Date Debtors shall be deemed to be terminated and such individuals shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole director and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors as further described in the Plan Administrator Agreement. The Plan Administrator shall

use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

        8.     <u>Income Tax Matters</u>.

For U.S. federal and applicable state and local income tax purposes the Debtors and Holders of Claims will treat and report the return of Liquid Cryptocurrency to Holders of Claims under the Plan, to the extent such amounts are of the same type of Cryptocurrency in which a Holder's Claim was denominated, as a non-taxable transaction to such Holder, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Code.

E.     *Orderly Wind Down*.

Subject to Bankruptcy Court approval, the Debtors will effectuate an Orderly Wind Down if, at any time prior to or after the confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction. In the event the Debtors pursue an Orderly Wind Down, distributions under the Plan shall be funded from the Wind-Down Assets.

        1.     <u>Orderly Wind-Down Toggle</u>.

To toggle to an Orderly Wind Down, the Debtors (i) shall provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (ii) shall consult with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Immanuel Herrmann, Daniel Frishberg, Cameron Crews, and Ignat Tuganov regarding the decision to toggle, (iii) shall inform the U.S. Trustee of their intent to file the Wind-Down Motion, (iv) shall file the Wind-Down Motion, which shall include the Wind-Down Procedures, and (v) may file an amended Plan conformed to include the changes described in the table below. Parties in interest shall have no fewer than ten (10) days to object to the Wind-Down Motion. In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.

| Orderly Wind-Down Plan Changes | |
|---|---|
| **Provision/Concept** | **Change** |
| NewCo | Concept eliminated, replaced in certain places with "Post-Effective Date Debtors" and "Plan Administrator," as further described herein and as applicable. Related concepts, such as "NewCo Capitalization Amount" will similarly be eliminated. |
| Plan Sponsor Contribution | Concept eliminated. Related concepts, such as "Management Compensation" (and its component concepts) will similarly be eliminated. |
| NewCo Common Stock | Concept eliminated, replaced with "Backup MiningCo Common Stock" and "Illiquid Recovery Rights," as applicable. |
| Unsecured Claim Distribution Mix Elections | Concept eliminated, all Holders of Claims to receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections. |

| Orderly Wind-Down Plan Changes | |
|---|---|
| **Provision/Concept** | **Change** |
| Wind-Down Procedures | Concept to become operative. As provided herein, the Debtors shall file the Wind-Down Procedures within fourteen (14) days of the decision to implement an Orderly Wind Down, in connection with the Wind-Down Motion. Such procedures shall provide additional details regarding the Wind-Down Assets, the Wind-Down Budget, the identity of the Mining manager, and any revisions to the Wind-Down Procedures and shall be subject to approval by the Bankruptcy Court in connection with Wind-Down Motion. Related concepts shall similarly become operative. |
| Backup Plan Sponsor & Backup Plan Sponsor Transaction | Concept becomes operative, subject to a market test of the fees contained in the Backup Plan Administrator Term Sheet; *provided* that (i) Liquid Cryptocurrency, (ii) the Backup MiningCo Common Stock, (iii) Illiquid Recovery Rights, and (iv) Litigation Proceeds shall be distributed according to this Plan, as revised to reflect the toggle to the Orderly Wind Down. |
| Proof Group IP License | Concept eliminated. Related consideration, such as any Proof Group customers to be transferred to NewCo, shall revert to Proof Group. |
| US Bitcoin Agreements | Concept eliminated, unless US Bitcoin is selected as the Mining manager in connection with the Orderly Wind Down. |
| Institutional Loan Agreements | Concept in Article V.D eliminated. All agreements related to Institutional Loans shall be treated as all other Executory Contracts as provided in Article V.A. |
| Article IV.D (NewCo Restructuring Transactions) | Concept eliminated. This Article IV.E (Orderly Wind Down) to become operative instead. |
| Article X Conditions to the Effective Date | Those conditions to the Effective Date specific to the NewCo Transaction shall be removed or revised, including the condition in Section 12 which requires a Registration Statement respecting the NewCo Common Stock shall have been filed and such Registration Statement shall have become effective. |

In the event that the Debtors elect to toggle to the Orderly Wind Down, the Debtors shall appoint a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet.

The Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions as may be deemed necessary or appropriate to consummate the Orderly Wind Down pursuant to the Wind-Down Procedures and the Plan (conformed as described above).

F.      *Plan Administrator.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, a Plan Administrator will be appointed to administer the Post-Effective Date Debtors' estates in accordance with the Plan Administrator Agreement. For the avoidance of doubt, unless otherwise specified, Causes of Action shall remain with the Post-Effective Date Debtors and shall not be NewCo Assets.

The Plan Administrator shall be selected by the Debtors, in consultation with the Committee, and shall be identified in the Plan Supplement. The appointment of the Plan Administrator shall be approved in the Confirmation Order, and the Plan Administrator's duties shall commence as of the Effective Date.

The Plan Administrator shall administer the distributions of the Orderly Wind Down, if applicable. Except as otherwise provided in the Plan, the Plan Administrator Agreement, and the Wind-Down Procedures, if applicable, on and after the Effective Date, the Post-Effective Date Debtors may operate their businesses (to the extent permitted under applicable Law) and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than the Recovery Causes of Action) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; *provided* that the Bankruptcy Court shall retain jurisdiction to resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with any of the foregoing.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court; *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator in accordance with the Plan Administrator Agreement. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor (as set forth in the Plan Administrator Agreement) and all responsibilities of the predecessor Plan Administrator relating to the Post-Effective Date Debtors in the Plan Administrator Agreement shall be terminated.

The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Plan Administrator Budget or Wind-Down Budget, as applicable.

1.    <u>Responsibilities of Plan Administrator</u>.

Responsibilities of the Plan Administrator shall be as identified in the Plan Administrator Agreement and shall include:

(a)    administering the Special Committee D&O Liability Insurance Policies;

(b)    implementing the Orderly Wind Down, as applicable, and making (or arranging for a Distribution Agent to make) the distributions contemplated by the Plan;

(c)    to the extent not duplicative with the responsibilities of any Litigation Administrator, marshalling, marketing for sale, and winding down of the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(d)    to the extent not duplicative with the responsibilities of any Litigation Administrator, recovering and compelling turnover of the Debtors' property in accordance with the Plan;

(e)    managing the Plan Administrator Budget or Wind-Down Budget, as applicable, and paying the Wind-Down Expenses, if any;

(f)    abandoning any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(g)    preparing and filing post-Effective Date operating reports (including the month in which the Effective Date occurs);

(h)    filing appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the

administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(i)     retaining such professionals as are necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations; and

(j)     taking such actions as are necessary and reasonable to carry out the purposes of the Plan or Wind-Down Procedures, as applicable, including winding down the Debtors' business affairs.

The Debtors (and, following the Effective Date, the Plan Administrator) shall use commercially reasonable efforts to make distributions of Liquid Cryptocurrency as provided for in this Plan to Account Holders in Liquid Cryptocurrency (as opposed to fiat) to the greatest extent possible. If an Account Holder's Claim is not Allowed as of the Effective Date or otherwise retained on account of such claim being subject to Withdrawal Preference Exposure, the Liquid Cryptocurrency that would otherwise be distributed on account of such Account Holder's Claim shall be held in the Disputed and Contingent Claims Reserve in the form of Liquid Cryptocurrency. The Plan Administrator, as a fiduciary for parties entitled to receive distributions under the Plan, shall exercise his business judgment regarding whether to continue to hold such Liquid Cryptocurrency or convert to other Liquid Cryptocurrency or fiat, including, without limitation, market forces and whether there is a Distribution Agent capable of making distributions to creditors at a particular time. If there is no Distribution Agent capable of making a distribution to the Account Holder in Liquid Cryptocurrency at the time such Account Holder's Claim becomes an Allowed Claim and the Plan Administrator has not otherwise converted such Liquid Cryptocurrency to fiat, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall convert the Liquid Cryptocurrency that would otherwise be distributed to the Account Holder to fiat currency as close to the anticipated date of distribution as reasonably practical under the circumstances, and shall distribute such fiat currency to the Account Holder. If the Debtors, Post-Effective Date Debtors or Plan Administrator determine, in the exercise of their fiduciary duties and in their business judgment, that it is no longer commercially reasonable to continue to hold Liquid Cryptocurrency in the Disputed and Contingent Claims Reserve, the Debtors, Post-Effective Date Debtors or Plan Administrator, as applicable, shall provide notice, Filed on the docket, of the intent to sell the Liquid Cryptocurrency.

2.      Expenses of Plan Administrator.

All costs, expenses, and obligations incurred by the Plan Administrator in administering this Plan, on or after the Effective Date, or in any manner connected, incidental, or related thereto, shall be paid by the Post-Effective Date Debtors as they are incurred without the need for Bankruptcy Court approval. In the event of an Orderly Wind Down, the Wind-Down Expenses shall be paid from the Wind-Down Assets.

3.      Fiduciary Duties of the Plan Administrator.

Pursuant to the Plan and the Plan Administrator Agreement, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan. The Plan Administrator shall be appointed and act for the Post-Effective Date Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, or officers of the Debtors shall be terminated and such individuals shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Post-Effective Date Debtors, and shall succeed to the powers of the Post-Effective Date Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtors. The foregoing shall not limit the authority of the Post-Effective Date Debtors or the Plan Administrator, as applicable, to continue the employment of any former employee, manager, or officer, including pursuant to any transition services agreement entered into by the Post-Effective Date Debtors in connection with the Employee Transition Services Agreement.

4.        Wind-Down.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Post-Effective Date Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall: (1) cause the Post-Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby; (2) take any actions necessary to wind down the Post-Effective Date Debtors' Estates; *provided* that the Post-Effective Date Debtors shall not be dissolved until all Causes of Action included in the Schedule of Retained Causes of Action are prosecuted and the conditions precedent to such dissolution in Article IV.F.6 are satisfied; and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  From and after the Effective Date, except as set forth herein, the Post-Effective Date Debtors for all purposes (x) shall be deemed to have withdrawn their business operations from any state in which the Post-Effective Date Debtors were previously conducting, or are registered or licensed to conduct, their business operations, (y) shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (z) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly operating reports shall be the responsibility of the Plan Administrator.

5.        No Liability of the Post-Effective Date Debtors.

On and after the Effective Date, the Post-Effective Date Debtors shall have no liability on account of any Claims or Interests except as set forth herein and in the Plan Administrator Agreement.  All payments and all distributions made by the Plan Administrator hereunder shall be in exchange for all Claims or Interests against the Debtors.

6.        Dissolution of the Post-Effective Date Debtors.

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of the occurrence of the Effective Date, all distributions having been made, completion of all its duties under the Plan, and entry of a final decree closing the last of the Post-Effective Date Debtors' Chapter 11 Cases, and the conclusion of all litigation being pursued by the Litigation Administrator(s), the Post-Effective Date Debtors shall be deemed to be dissolved without any further action by the Post-Effective Date Debtors, the Plan Administrator, or the Bankruptcy Court, including the filing of any documents with the secretary of state for each state in which each of the Post-Effective Date Debtors is formed or any other jurisdiction.  The Plan shall constitute a plan of distribution as contemplated in the Delaware General Corporation Law. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve the Post-Effective Date Debtors in and withdraw the Post-Effective Date Debtors from applicable state(s).

For the avoidance of doubt, notwithstanding the Post-Effective Date Debtors' dissolution on or after the Effective Date, the Post-Effective Date Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

To the extent the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator(s), such Cash or other property shall be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to

the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated.

G.    *Litigation Administrator(s), Litigation Oversight Committee, and Contributed Claims.*

Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, one or more Litigation Administrators will be appointed to prosecute, settle, or otherwise resolve any remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to this Plan), the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the benefit of Holders of General Earn Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, the Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan shall remain with the Post-Effective Date Debtors, shall not be NewCo Assets, and shall be controlled by the applicable Litigation Administrator(s). For the avoidance of doubt, the Litigation Administrator shall also serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to all retained Causes of Action related to Disputed Claims or Disputed Interests.

1.    Litigation Administrator(s).

The Litigation Administrator(s) shall be selected by the Committee, and shall be identified in the Plan Supplement. The appointment of the Litigation Administrator(s) shall be approved in the Confirmation Order, and the Litigation Administrator's duties shall commence as of the Effective Date. The Litigation Administrator(s) shall prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to this Plan), the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans. The Litigation Administrator shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Causes of Action belonging to the Estates related to Disputed Claims or Disputed Interests that are not released, waived, settled, compromised, or transferred pursuant to this Plan (including, for the avoidance of doubt, the Recovery Causes of Action and Claims objections). Notwithstanding anything to the contrary in the Plan, the Committee may elect to identify separate Litigation Administrators to manage Recovery Causes of Action for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder. Solely by way of example, the Committee may identify (x) a Litigation Administrator to manage Account Holder Avoidance Actions for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder and (y) a Litigation Administrator to manage all Recovery Causes of Action, other than Account Holder Avoidance Actions, for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder. The identity of any Litigation Administrator, including the Recovery Causes of Action that any such Litigation Administrator shall manage for the benefit of Holders of Claims entitled to Litigation Proceeds hereunder, shall be disclosed in the Plan Supplement.

In accordance with the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall serve in such capacity through the earlier of (a) the date on which all Recovery Causes of Action, the Contributed Claims, the Goldstein Loan, the Leon Loan, and any other CEL Insider Loans are fully resolved in accordance with the applicable Litigation Administrator Agreement, and (b) the date on which such Litigation Administrator resigns, is terminated, or is otherwise unable to serve; *provided, however*, that, in the event that a Litigation Administrator resigns, is terminated, or is otherwise unable to serve prior to the full resolution of all Recovery Causes of Action and Contributed Claims, the Goldstein Loan, the Leon Loan, or any other CEL Insider Loans for which such Litigation Administrator is responsible, the Litigation Oversight Committee shall appoint a successor to replace such Litigation Administrator in accordance with the applicable Litigation Administrator Agreement. If the Litigation Oversight Committee does not appoint a successor within the time periods specified in the applicable Litigation Administrator Agreement (as may be extended by the Bankruptcy Court), then the Bankruptcy Court, upon the motion of any party-in-interest, may approve a successor to serve as the Litigation Administrator.

Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Recovery Causes of Action held by the Debtors

pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; *provided*, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

No action taken by the Debtors, the Committee, or the Litigation Administrator(s) shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtors, the Committee, or the Litigation Administrator(s), including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

2.    <u>Responsibilities of Litigation Administrator(s)</u>.

Responsibilities of the Litigation Administrator(s) shall be as identified in the Litigation Administrator Agreement(s) and shall include, but are not limited to:

(a)    filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted;

(b)    filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court;

(c)    exercising the Debtors' rights with respect to (a) the Goldstein Loan, (b) the Leon Loan, and (c) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party;

(d)    managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and <u>Article IV.G.3</u> hereof; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Plan;

(e)    retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and

(f)    taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement;

in each case, for the benefit of the Holders of Claims entitled to Litigation Proceeds hereunder and, as applicable, in accordance with the ADR Procedures.

3.    <u>Rights Under D&O Liability Insurance Policies</u>.

On the Effective Date, the Litigation Administrator(s) shall, to the extent provided in the UCC Claims Stipulation, succeed to the rights of the Debtors under certain of their D&O Liability Insurance Policies. For the

avoidance of doubt, the Litigation Administrator(s) shall not succeed to the Debtors' rights with respect to the Special Committee D&O Liability Insurance Policies.

4.    Litigation Recovery Account.

On or before the Effective Date, the Debtors or the Post-Effective Date Debtors, as applicable, shall establish a segregated Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator(s). The funds in the Litigation Recovery Account shall be available to pay the costs and fees of the Litigation Administrator (and any fees associated with the Litigation Recovery Account), including professional fees, costs, and expenses in connection with the prosecution of the Recovery Causes of Action.

Holders of Claims entitled to Litigation Proceeds hereunder will receive periodic distributions on account of recoveries from the Recovery Causes of Action. The frequency and timing of distributions from or in respect of the Litigation Recovery Account shall be determined by the Litigation Administrator(s) and the Litigation Oversight Committee in accordance with the Litigation Administrator Agreement(s).

To the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account shall promptly be distributed Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

5.    Litigation Oversight Committee.

The Litigation Administrator(s) shall report to, and act at the direction of, the Litigation Oversight Committee, whose members shall be selected by the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, and the Committee, as set forth in the definition of Litigation Oversight Committee and identified in the Plan Supplement; *provided* that: (a) prior to selecting any such members, the Committee will solicit potential candidates to serve on the Litigation Oversight Committee from the Holders of Claims entitled to receive Litigation Proceeds hereunder through an open interview process; (b) the Litigation Oversight Committee shall include at least one member of the Committee (unless no member of the Committee wishes to join); (c) the Litigation Oversight Committee shall include at least two individuals that are not members of the Committee; and (d) the Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Litigation Oversight Committee (subject to the consent of the Committee).

The Litigation Oversight Committee shall contain a three (3) member subcommittee to oversee the settlement and prosecution of Avoidance Actions against non-Insider (or former Insider) individual Account Holders. At least two (2) members of the Avoidance Action subcommittee shall not be current members of the Committee. The Earn Ad Hoc Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action subcommittee, subject to the consent of the Committee, which members shall be the same members appointed to the Litigation Oversight Committee. The Avoidance Action subcommittee shall confer with the applicable Litigation Administrator with respect to, and oversee the potential prosecution or settlement of, any Avoidance Action against any such individual Account Holder for a prepetition transfer of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date.

The Litigation Oversight Committee (at the recommendation of the applicable Litigation Administrator) will determine the frequency and quantum of any distributions from the Litigation Recovery Account (including the distribution of the Initial Litigation Funding Amount, if appropriate). The Litigation Oversight Committee, in consultation with the Litigation Administrator(s), shall be entitled to control the financing of any litigation, with the

right to cause the Litigation Administrator(s) to pledge or transfer a portion of the Recovery Causes of Action, the Litigation Recovery Account, or any proceeds of the foregoing to facilitate such financing, and may obtain such financing from NewCo or third-party sources, in their respective business judgment.

      6.      <u>Fiduciary Duties of the Litigation Administrator(s)</u>.

Pursuant to the Litigation Administrator Agreement(s), the Litigation Administrator(s) shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to Plan.

H.     *Corporate Action*.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including all steps necessary for the implementation of the NewCo Transaction or Orderly Wind Down (as applicable), and all other actions desirable or appropriate to promptly consummate the NewCo Transaction or Orderly Wind Down (as applicable), including those contemplated under the Transaction Steps Memorandum.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Effective Date Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Effective Date Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Effective Date Debtors.  The authorizations and approvals contemplated by this <u>Article IV.H</u> shall be effective notwithstanding any requirements under non-bankruptcy Law.

I.     *Cancellation of Notes, Instruments, Certificates, and Other Documents*.

Upon the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan:  (1) the obligations of the Debtors and their Affiliates under any terms of use, certificate, Security, share, note, bond, indenture, purchase right, option, warrant, agreement, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are Reinstated pursuant to the Plan) shall be cancelled and surrendered, and neither the Post-Effective Date Debtors nor the Debtors' Affiliates shall have any continuing obligations thereunder; and (2) the obligations of the Debtors and their Affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or their Affiliates (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors or their Affiliates that are specifically Reinstated pursuant to the Plan) shall be released; *provided*, for the avoidance of doubt, that nothing herein shall release any Excluded Party from any claim or obligation.

J.     *Employee Obligations*.

      1.      <u>Employee Transition Services Agreement</u>.

The Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Employee Transition Services Agreement set forth in the Plan Supplement. The Employee Transition Services Agreement will provide that employees of NewCo are available to provide

transition services to the Debtors, Post-Effective Date Debtors, and/or Plan Administrator to effectuate the NewCo Transaction and to wind down the Debtors' Estates.  Except as provided in the Employee Transition Services Agreement, employee contracts shall be treated in accordance with Article V.

2.    EIP Awards.

On the Effective Date, the ~~EIP Awards~~Emergence Incentive Plan shall be effective, the KEIP Motion shall be deemed withdrawn with prejudice, and the Plan Administrator may distribute the EIP Awards, subject to the Plan Administrator confirming to Committee counsel in writing (e-mail being sufficient) that the applicable metrics have been satisfied, without any further action by the Debtors or ~~Post-~~the Post-Effective Date Debtors~~, and the KEIP Motion shall be withdrawn with prejudice~~.   The Emergence Incentive Plan provides EIP Participants the ability to earn EIP Awards based on their performance relative to the metrics described in this ~~Article IV.J.2~~Article IV.J.2. Unless otherwise noted below, target performance shall result in eligibility for a 100% payout and threshold performance shall result in eligibility for a 50% payout for each respective metric.  For the avoidance of doubt, the Emergence Incentive Plan is a post-Effective Date compensation plan and EIP Awards, to the extent earned and authorized by the Plan Administrator, shall be paid by the Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation.  Any EIP Award shall be subject to clawback in the event that an EIP Participant is later found guilty of a crime in connection with their employment at Celsius.

Platform Metrics:  Oren Blonstein, Trunshedda Ramos, Guillermo Bodnar, Adrian Alisie, and Ron Deutsch are eligible to earn an EIP Award based on the following metrics:

- *Liquid Cryptocurrency Distribution Metric (50% of the EIP Award)*:

  (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

  (b) threshold performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- *Distribution Agreement Metric (30% of the EIP Award)*:

  (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

  (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- *Chapter 11 Plan Confirmation Metric (10% of the EIP Award)*:

  (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

  (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- *Effective Date Metric (10% of the EIP Award)*:

(a) target performance requires the Effective Date occur by December 31, 2023;

(b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

(c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

Mining Metrics: Jenny Fan, Dave Albert, and Quinn Lawlor are eligible to earn an EIP Award based on the following metrics:

- *East Stiles Site Metric (25% of EIP Award)*:

    (a) target performance requires that the East Stiles site is completed and operational by September 30, 2023; and

    (b) threshold performance requires that the East Stiles site is completed and operational between October 1, 2023 and November 30, 2023.

- *Effective Date Metric (25% of EIP Award)*:

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- *Mining Rig Metric (25% of EIP Award)*:[32]

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

---

[32] Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

- *Midland Texas Gross Margin Metric (25% of EIP Award)*:

    (a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 above 25%; and

    (b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, achieve average monthly gross margin for the Midland, TX sites between June 2023 to October 2023 between 20% and 25%.

Christopher Ferraro is eligible to earn an EIP Award based on his performance relative to the following metrics:

- *Liquid Cryptocurrency Distribution Metric (50% of the EIP Award)*:

    (a) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution by thirty days after the Effective Date; and

    (b) target performance requires that sufficient Liquid Cryptocurrency is available for substantially all Holders of Allowed Claims to withdraw their initial distribution between thirty-one and sixty days after the Effective Date.

- *Distribution Agreement Metric (20% of the EIP Award)*:

    (a) target performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup by the Effective Date; and

    (b) threshold performance requires that Holders of Allowed Claims may begin providing AML/KYC Compliance Information and the Debtors, Post-Effective Date Debtors, Plan Administrator, or any Litigation Administrator (as applicable) have provided appropriate data to the Distribution Agent with respect to wallet setup within thirty days after the Effective Date.

- *Chapter 11 Plan Confirmation Metric (10% of the EIP Award)*:

    (a) target performance requires confirmation of a chapter 11 plan by October 31, 2023; and

    (b) threshold performance requires confirmation of a chapter 11 plan between November 1, 2023 and December 31, 2023.

- *Effective Date Metric (10% of the EIP Award)*:

    (a) target performance requires the Effective Date occur by December 31, 2023;

    (b) threshold performance (for a 50% payout) requires the Effective Date occur between January 1, 2024 and January 31, 2024; and

    (c) threshold performance (for a 25% payout) requires the Effective Date occur between February 1, 2024 and February 28, 2024.

- *Mining Rig Metric (10% of EIP Award):*[43]

(a) target performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023 and 95,000 mining rigs hashing, or energized but not hashing due to market conditions, by September 30, 2023; and

(b) threshold performance requires that the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, have 85,000 mining rigs hashing, or energized but not hashing due to market conditions, by August 31, 2023.

If an EIP Participant's employment is terminated by the Debtors without "cause," by the EIP Participant for "good reason," or upon death or disability of the EIP Participant, the EIP Participant will be entitled to 100 percent of the EIP Award that would otherwise have been earned based on the percentage of the performance period the EIP Participant was engaged by the Debtors. If an EIP Participant's employment is terminated for any other reason (voluntary termination, termination by the Debtors for "cause"), any EIP Award will be forfeited. The maximum aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.

3.    Emergence Retention Plan.

To the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo as applicable, shall be authorized to implement the Emergence Retention Plan set forth in the Plan Supplement. The Emergence Retention Plan will provide for the distribution of Cash retention awards to certain employees of the Debtors to motivate such employees to remain with the Post-Effective Date Debtors to effectuate distributions contemplated under the Plan.

K.    *Effectuating Documents; Further Transactions.* On and after the Effective Date, NewCo and/or its subsidiaries, the Plan Administrator, or the Post-Effective Date Debtors, as applicable, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

L.    *Exemptions from Certain Taxes and Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to NewCo and/or its subsidiaries or a Post-Effective Date Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, Reinstatement, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, the Post-Effective Date Debtors, or NewCo; (2) the NewCo Transaction or the Orderly Wind Down, as applicable; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any

---

[43]    Mining Rig levels subject to adjustment, with the consent of the Committee, based upon ongoing discussions with current hosting providers.

such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

M.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, each Post-Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan; *provided* that, notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.

The Litigation Administrator(s) may pursue the Recovery Causes of Action, and the Plan Administrator may pursue all other Causes of Action, as appropriate in accordance with the best interests of the Holders of Claims entitled to receive Litigation Proceeds (as to Recovery Causes of Action) or the Post-Effective Date Debtors (as to all other Causes of Action). **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, and the objecting party, such objection shall be resolved by the Bankruptcy Court. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors free and clear of any Claims, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Post-Effective Date Debtors, through their authorized agents or representatives, including the Plan Administrator and the Litigation Administrator(s), shall retain and may exclusively enforce any and all such Causes of Action. The Post-Effective Date Debtors, the Plan Administrator, and the Litigation Administrator(s), as applicable, shall have the exclusive right, authority, and

discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.      *Election to Contribute Claims.*

Because aggregating all Contributed Claims may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner, each Holder of a Claim or Interest may agree, by electing on its Ballot, to contribute its Contributed Claims to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds.  By electing such option on its Ballot, each Contributing Claimant agrees that, subject to the occurrence of the Effective Date and the appointment of the Litigation Administrator(s), it will be deemed, without further action, (i) to have irrevocably contributed its Contributed Claims to the Post-Effective Date Debtor(s), and (ii) to have agreed to execute any documents reasonably requested by the Post-Effective Date Debtor(s) or the Litigation Administrator(s) to memorialize and effectuate such contribution.

O.      *Contribution of Contributed Claims.*

On the Effective Date, all Contributed Claims will be irrevocably contributed to the Post-Effective Date Debtor(s) for the Litigation Administrator(s) to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds and shall thereafter be Recovery Causes of Action for all purposes.  No Person may rely on the absence of a specific reference in the Plan, the Disclosure Statement, the Confirmation Order, the Litigation Administrator Agreement(s), the Plan Supplement, or any other document as any indication that the Litigation Administrator(s) will or will not pursue any and all available Contributed Claims against such Person.  The Litigation Administrator(s) shall have, retain, reserve, and be entitled to assert all Contributed Claims fully to the same extent that the Contributing Claimants could have asserted such claims prior to the Effective Date.  For the avoidance of doubt, the Contributed Claims shall not include the rights of any of the Contributing Claimants to receive the distributions under the Plan on account of their Claims or Interests and shall not include any claims that cannot be assigned under applicable law.

P.      *Retiree Benefits.*

Notwithstanding anything herein to the contrary, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

For the avoidance of doubt, the Debtors do not believe that any such obligations exist.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Rejection, Assumption, and Assumption and Assignment of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, including the Employee Transition Services Agreement, all Executory Contracts and Unexpired Leases of the Debtors, including any employee benefit plans, severance plans, or other Executory Contracts under which employee obligations arise, shall be deemed rejected by the Debtors or Post-Effective Date Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract and Unexpired Lease:  (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in

connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

Pursuant to sections 365(a) and 1123 of the Bankruptcy Code, entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejection, assumption, or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, effective as of the Effective Date unless otherwise specified. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Post-Effective Date Debtor according to its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law. Any motions to assume any Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Post-Effective Date Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases identified in this <u>Article V.A</u> of the Plan and in the Plan Supplement at any time through and including forty-five (45) days after the Effective Date.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections of any Executory Contracts or Unexpired Leases as provided for in the Plan and the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Solicitation Agent and served on Debtors or the Post-Effective Date Debtors, as applicable, no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Post-Effective Date Debtors, their Estates, or their property, without the need for any objection by the Debtors or Post-Effective Date Debtors or any further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in <u>Article VIII.F</u> of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to <u>Article III.B</u> of the Plan and may be objected to in accordance with the provisions of <u>Article VII</u> of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.      *Cure of Defaults and Objections to Cure and Assumption (or Assumption and Assignment).*

The Debtors or the Post-Effective Date Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter, except as otherwise provided herein. Unless otherwise agreed upon in writing by the Debtors or Post-Effective Date Debtors, as applicable, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount (including pursuant to the Plan) must be Filed and actually received by counsel to the Debtors on or before the deadline by which objections to confirmation of the Plan must be Filed on the Bankruptcy Court's docket, or such other deadline that may be set by the Bankruptcy Court. In the event that the Debtors modify the Schedule of Assumed Executory Contracts and Unexpired Leases after the Confirmation Hearing, such objections shall be Filed and actually received by counsel to the Debtors no later than thirty days after the date of such modification, or such other deadline that may be set by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that does not receive a notice, and believes a Cure amount is owed, shall have thirty days after the Effective Date to File a Proof of Claim with respect to such alleged Cure amount.

**Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure amount and to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease, and any Claim arising out of the assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be subject to the permanent injunction set forth in <ins>Article VIII.F</ins> of the Plan, notwithstanding anything in a Proof of Claim to the contrary. For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be zero.**

In the event of a dispute regarding: (1) the amount of any payments to cure an alleged default; (2) the ability of the Post-Effective Date Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the Cure payment shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

Any monetary or nonmonetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, and any associated Cure Claims, shall be deemed fully satisfied, released, and discharged upon payment (1) by the Debtors or the Post-Effective Date Debtors of the Cure amount, if any, in Cash on the Effective Date, (2) by NewCo and/or its subsidiaries in the ordinary course of business, or (3) on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree; *provided* that nothing herein shall prevent the Post-Effective Date Debtors from paying any Cure amount despite the failure of the relevant counterparty to File a Cure objection. Following the Effective Date, the Post-Effective Date Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors or the Post-Effective Date Debtors, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtors or the Post-Effective Date Debtors, as applicable, in the exercise of their business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the applicable Post-Effective Date Debtor. Such rejected contracts, if any, shall be deemed as listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, if any.

**Any Proof of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.       *Institutional Loans & Retail Advances.*

1.       Institutional Loans.

Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtors shall be deemed to have assumed and assigned to NewCo and/or its subsidiaries all such agreements, documents, and instruments under the Plan; *provided* that if any such agreements, documents, or instruments are (i) Executory Contracts and (ii) on the Schedule of Rejected Contracts, such agreements, documents, or instruments will be rejected as set forth elsewhere in this Plan. To the extent required, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption and assignment to NewCo and/or its subsidiaries of all such Institutional Loans and related agreements, documents, and instruments, and all Institutional Loans and obligations thereunder shall remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Institutional Loans.

Nothing contained in the Plan or Confirmation Order shall discharge, impair, or otherwise modify any obligations assumed and assigned by this Article V.D, and each such obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors and assigned to NewCo and/or its subsidiaries under the Plan as to which no Proof of Claim or Cure Claim need be Filed. To the extent there are cure amounts owed either prepetition and/or postpetition, such amounts shall survive and will not be discharged on the Effective Date; *provided* that any such cure amounts shall either be satisfied in full by the Debtors or otherwise resolved in a manner acceptable to the Plan Sponsor.

2.       Retail Advances.

Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Retail Advances are Executory Contracts, the Debtors shall be deemed to have rejected all such agreements, documents, and instruments under the Plan. To the extent required, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all such agreements, documents, and instruments related to Retail Advances.

E.       *Indemnification Provisions.*

On and as of the Effective Date, the Indemnification Provisions applicable to current directors and officers of the Debtors who are not Excluded Parties will be assumed and irrevocable and will survive the effectiveness of the Plan. None of the Debtors, or the Post-Effective Date Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate, or adversely affect any of the Debtors' or the Post-Effective Date Debtors' obligations to provide such indemnification rights or such directors', officers', managers', employees', equityholders', advisory directors', attorneys', other professionals', or agents' indemnification rights (other than with respect to any such rights in favor of any Excluded Party); *provided* that, notwithstanding anything in the Indemnification Provisions or herein to the contrary, the Post-Effective Date Debtors' obligation to fund obligations under such Indemnification Provisions shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors and assigned to the Post-Effective Date Debtors or the Litigation Administrator(s), including any D&O Liability Insurance Policies. For the avoidance of doubt, (i) neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses and (ii) under no circumstance shall the Debtors' Estates be required to provide any additional consideration beyond the Settlement Funds (as defined in the Series B Settlement Agreement) to any Holders of Series B Preferred Interests or their Related Parties.

Notwithstanding anything to the contrary herein, any obligation of the Debtors to indemnify, defend, reimburse, or limit the liability of any Excluded Party in any capacity against any claim, demand, Cause of Action, suit, proceeding, judgment, fine, loss, damage, or other amount, whether under applicable law or in the Debtors'

bylaws, certificates of incorporation, other formation documents, board resolutions, contracts, or otherwise, shall terminate and be discharged upon Confirmation of the Plan.

F.    *Director, Officer, Manager, and Employee Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, to the extent that the D&O Liability Insurance Policies are Executory Contracts, the Debtors shall be deemed to have assumed all such D&O Liability Insurance Policies under the Plan, subject to any succession rights provided in <u>Article IV.G.3</u>. To the extent required, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the assumption of all such D&O Liability Insurance Policies, and all D&O Liability Insurance Policies and obligations thereunder shall remain in full force and effect in accordance with their terms, except as specifically provided in this Article V.F with respect to Excluded Parties. For the avoidance of doubt, the Post-Effective Date Debtors shall not have any obligation to pay any deductible, retention, or any other cost or expense under, arising from, or related to, the D&O Liability Insurance Policies in connection with any such policy or claim made thereunder.

The succession rights provided in <u>Article IV.G.3</u> shall not limit any third parties' rights with respect to such D&O Liability Insurance Policies.

None of the Debtors or the Post-Effective Date Debtors shall, before or after the Effective Date, terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies; *provided* that the foregoing shall not limit the Debtors' ability to utilize the D&O Liability Insurance Policies prior to the Effective Date.

G.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.    *Reservation of Rights.*

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or Schedule of Rejected Executory Contracts and Unexpired Leases nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Post-Effective Date Debtor, as applicable, has any liability thereunder.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Post-Effective Date Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

I.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

67

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims or Interests Allowed as of the Effective Date.*

Except as otherwise provided herein, a Final Order, or as otherwise agreed to by the Debtors or the Post-Effective Date Debtors, as the case may be, and the Holder of the applicable Claim or Interest, the Distribution Agent shall make initial distributions under the Plan on account of Claims or Interests Allowed on the Effective Date or as soon as reasonably practical thereafter; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (b) Allowed Priority Tax Claims shall be paid in accordance with <u>Article II.C</u>; and (c) distributions to Holders of Allowed Custody Claims may, in the Debtors' discretion, begin on the Confirmation Date.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.  Notwithstanding anything to the contrary herein, the Distribution Agent shall not be required to make a distribution to any Account Holder with unresolved Withdrawal Preference Exposure until such Withdrawal Preference Exposure is resolved.

B.      *Timing, Calculation, and Currency of Amounts to Be Distributed.*

Unless otherwise provided herein, on the Effective Date, each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in <u>Article VII</u>.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

Holders of Claims who are projected to receive more than $100,000 in distributions in Liquid Cryptocurrency <u>(after aggregating all Claims held by such Holder)</u> may contact the Debtors at CelsiusDistributions@kirkland.com to discuss potential individualized accommodations to the composition of their Liquid Cryptocurrency recovery (at such Holder's sole cost and expense), and the Debtors, in consultation with the Committee, shall use commercially reasonable efforts to accommodate those requests, in the aggregate solely to the extent permitted by applicable regulatory requirements; *provided* that the foregoing compositional accommodations, if any, shall not result in the Debtors distributing any Cryptocurrency other than BTC or ETH.

C.      *Distributions on Account of Obligations of Multiple Debtors.*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

D.      *Distribution Agent.*

Except as otherwise provided for in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date or as soon as reasonably practicable thereafter.  The Distribution Agent

shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

E.    *Rights and Powers of Distribution Agent.*

    1.    <u>Powers of the Distribution Agent</u>.

The Distribution Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

    2.    <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Post-Effective Date Debtors; *provided*, that, unless specifically provided, NewCo shall be responsible for any fees and expenses NewCo incurs on or after the Effective Date, and the Plan Sponsor shall be liable for any pre-Effective Date fees and expenses incurred by the Plan Sponsor, Plan Sponsor Counsel, and the Plan Sponsor Advisors (each as defined in the Plan Sponsor Agreement) in excess of $5,000,000 in the aggregate in accordance with the Plan Sponsor Agreement.

F.    *Delivery of Distributions.*

    1.    <u>Delivery of Distributions in General</u>.

Except as otherwise provided for in the Plan, distributions to Holders of Allowed Claims or Allowed Interests shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent, as appropriate and in the Distribution Agent's reasonable judgment:  (a) to the designated digital wallet associated with the Holder's AML/KYC Compliance Information; (b) to the signatory set forth on any Proof of Claim or Proof of Interest Filed by such Holder or other representative identified therein at the address provided therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is Filed or if the Debtors have not been notified in writing of a change of address and a distribution must be delivered by mail); (c) at the addresses set forth in any written notices of address changes delivered to the Post-Effective Date Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (d) to any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf or in accordance with instructions provided thereby. Subject to this ~~Article VI~~Article VI, distributions under the Plan on account of Allowed Claims or Allowed Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Allowed Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Post-Effective Date Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for in the case of fraud, gross negligence, or willful misconduct.

    2.    <u>Record Date for Distributions</u>.

On the Distribution Record Date, the Claims Register shall be closed, and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practicable and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

3.      Minimum Distributions.

No payment, in Cash, Cryptocurrency, or otherwise, will be made to a stakeholder holding aggregate Allowed Claims less than or equal to $10.00 on account of such Allowed Claims. Such Claims shall be classified as Class 9 *De Minimis* Claims and shall be cancelled and discharged without distribution.

In addition, the Debtors shall not be required to make any distributions on account of Claims where the associated Withdrawal Fees would exceed the value of the distribution.

4.      Undeliverable Distributions and Unclaimed Property.

Any distribution under the Plan that is an Unclaimed Distribution or otherwise remains undeliverable for a period of one year after the first attempt to deliver (which, for Liquid Cryptocurrency, shall be the first date on which such distributions are open for a particular Holder), (i) in the event the NewCo Transaction is consummated, such distribution shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall irrevocably revert to (1) NewCo, in the case of NewCo Common Stock, or (2) the ~~Litigation Recovery Account~~Post-Effective Date Debtors, to the extent it is Liquid Cryptocurrency, and shall be promptly distributed Pro Rata to Holders of Claims entitled to receive Litigation Proceeds under this Plan, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property laws to the contrary); and (ii) in the event the Orderly Wind Down is consummated, such distribution shall be (a) distributed to Holders of Illiquid Recovery Rights, (b) utilized to fund Wind-Down Expenses or, if no such expenses remain, (c) contributed to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. Notwithstanding anything to the contrary in the two foregoing sentences, any Unclaimed Distribution under the Series B Settlement shall be redistributed in accordance with Section 4 of the Series B Settlement Agreement.

5.      Surrender of Cancelled Instruments or Securities.

On the Effective Date, or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.I hereof shall be deemed to have surrendered such certificate or instrument to the Debtors. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and their Affiliates (other than Excluded Parties), and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan.

G.      *Manner of Payment.*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements. Notwithstanding anything to the contrary herein, the Distribution Agent may, in its sole and absolute discretion, make any distributions provided for herein in a specific Cryptocurrency or fiat as required in its business and legal judgment to remain compliant with applicable laws and regulatory requirements.

H.      *Compliance Matters.*

In connection with the Plan, to the extent applicable, the Post-Effective Date Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Post-Effective Date Debtors, the Distribution Agent, and NewCo shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate

sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Post-Effective Date Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, and such distributions shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

Notwithstanding anything to the contrary herein, in the event that (a) any regulatory authority having jurisdiction over the Post-Effective Date Debtors, NewCo, or any Account Holder (including, for the avoidance of doubt, any Retail Borrower) has asserted in any enforcement action, litigation, policy, guidance, or official public pronouncement that a Cryptocurrency to be distributed to an Account Holder under or in connection with the Plan is a security under that jurisdiction's securities laws, or is otherwise restricted from being transferred to such Account Holder under any applicable laws of such jurisdiction, and (b) such Account Holder fails or is otherwise unable to provide documentation and legal analysis to NewCo or the Plan Administrator, as applicable, demonstrating to the reasonable satisfaction of NewCo or the Plan Administrator, as applicable, that a clear and valid exemption to such law(s) applies to such Account Holder with respect to the transfer of such coins, then, in such event, NewCo, any Litigation Administrator, or the Plan Administrator, as applicable, may, in its sole and absolute discretion, convert such coins into other Cryptocurrency or fiat as required in its business and legal judgment to remain compliant with applicable laws and distribute such converted Cryptocurrency or fiat to the Account Holder.

I.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim, asserted in government-issued currency (for the avoidance of doubt, not including any Cryptocurrency) other than U.S. dollars shall automatically be deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition* on the Petition Date.

J.      *No Postpetition or Default Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (a) postpetition and/or default interest shall not accrue or be paid on any Claims and (b) no Holder of a Claim shall be entitled to: (i) interest accruing on or after the Petition Date on any such Claim; or (ii) interest at the contract default rate, as applicable.

Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

K.      *Allocation Between Principal and Accrued Interest.*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

L.      *Setoffs and Recoupment.*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor, each Post-Effective Date Debtor, and NewCo, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Post-Effective Date Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or

settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided, however* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtors, such Post-Effective Date Debtors, or NewCo of any such claims, rights, and Causes of Action that such Post-Effective Date Debtors may possess against such Holder.

In the event of a successful Avoidance Action, the associated Section 502(h) Claims will be preemptively set off against the property to be recovered, with such Section 502(h) Claims assumed to recover the same percentage as the Class 5 (General Earn Claim) recovery set forth in <u>Article III.M</u> of the Disclosure Statement; *provided* that the foregoing recovery assumptions shall not apply to any Equitably Subordinated Claims.  For the avoidance of doubt, the Debtors may withhold distributions on account of outstanding Avoidance Actions and, to account for the setoff of such Section 502(h) Claim, set off such distributions against the amount to be paid by the Account Holder subject to such Avoidance Action.

In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any claim, right, or Cause of Action of the Debtors or Post-Effective Date Debtors (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

M.    *Claims Paid or Payable by Third Parties.*

1.    <u>Claims Paid by Third Parties.</u>

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Post-Effective Date Debtor.  Subject to the last sentence of this paragraph, to the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Post-Effective Date Debtor or other Distribution Agent on account of such Claim, such Holder shall, within fourteen days of receipt thereof, repay or return the distribution to the applicable Post-Effective Date Debtor or other Distribution Agent, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Post-Effective Date Debtor or Distribution Agent annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

2.    <u>Claims Payable by Third Parties.</u>

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Post-Effective Date Debtors, as applicable.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurer's agreement, such Claim may be expunged on the Claims Register by the Solicitation Agent to the extent of any agreed upon satisfaction without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Applicability of Insurance Policies.</u>

Except as otherwise provided for in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any insurance policies, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process.*

The Debtors, the Plan Administrator, and any Litigation Administrator(s), as applicable, shall have the exclusive authority to (a) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a Claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. **Except as otherwise provided herein, all Proofs of Claim Filed after the earlier of: (x) the Effective Date or (y) the applicable claims Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Post-Effective Date Debtor, without the need for any objection by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or any Litigation Administrator(s) or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, a Proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.**

B.      *Allowance of Claims.*

Except as otherwise set forth in the Plan, after the Effective Date, the Post-Effective Date Debtors and any Litigation Administrator(s), as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order and the order approving the Class Claim Settlement Motion), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

C.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Litigation Administrator(s) shall have the sole authority to:  (a) File, withdraw, or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Post-Effective Date Debtor and the Litigation Administrator(s) shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the related Causes of Action retained pursuant to Article IV.M of the Plan.

D.      *Adjustment to Claims or Interests Without Objection.*

Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan or the order approving the Class Claim Settlement Motion) may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) without the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) without the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Reservation of Rights to Object to Claims.*

The failure of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s), as applicable, to object to any Claim shall not be construed as an admission as to the validity or amount of any such Claim, any portion thereof, or any other claim related thereto, whether or not such claim is asserted in any currently pending or subsequently initiated proceeding, and shall be without prejudice to the right of the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s), as applicable, to contest, challenge the validity of, or otherwise defend against any such claim in the Bankruptcy Court or non-bankruptcy forum.

F.    *Estimation of Claims.*

Before, on, or after the Effective Date, Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s), as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court; *provided* that with respect to Account Holder Claims, the Debtors shall estimate such Claims in their Scheduled amounts unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, the Post-Effective Date Debtors, or the applicable Litigation Administrator(s) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

G.    *Disputed and Contingent Claims Reserve.*

On or after the Effective Date, the Debtors, the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or NewCo, as applicable, may establish one or more ~~reserves or accounts or funds for Claims that are Disputed, contingent, or have not yet been Allowed, or where the Holder is or may be subject to an Avoidance Action~~<u>Disputed and Contingent Claims Reserves</u>, in an amount or amounts as reasonably determined by the applicable Debtors or Post-Effective Date Debtors, as applicable, in consultation with the Committee, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim and/or the Withdrawal Preference Exposure amount associated with such Claim.  For any ~~such~~<u>Disputed and Contingent Claims</u> <u>r</u>Reserve ~~or account or fund~~, the Debtors, Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or NewCo, as applicable, may take the position that grantor trust treatment applies in whole or in part.  To the extent such treatment applies to any ~~such account or fund~~<u>Disputed and Contingent Claims Reserve</u>, for all U.S. federal income tax purposes, the beneficiaries of the any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such ~~account or fund~~<u>Disputed and Contingent Claims</u> <u>Reserve</u> would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes the beneficiaries of any such account or fund would be treated as if they had received an interest in such account or fund's assets and then contributed such interests ~~(in accordance with the Transaction Steps Memorandum)~~ to such account or fund.  Alternatively, any such account or fund may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9.  If such rules apply, such assets would be subject to entity-level taxation, and the Debtors or Post-Effective Date Debtors would be

required to comply with the relevant rules.  For the avoidance of doubt, no reserves need be created nor distributions need to be held back on account of the State Regulatory Claims or the Claims of the Federal Trade Commission described in the FTC Stipulation.

H.    *Disallowance of Claims.*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is or may be recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is or may be avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and either (i) the full amount of such obligation to the Debtors or the Post-Effective Date Debtors has been paid or turned over or (ii) with respect to obligations owed by potential Holders of Section 502(h) Claims, the amount of such obligations to the Debtors or the Post-Effective Date Debtors after giving effect to Article VI.L has been paid or turned over; *provided* that the Litigation Administrator(s) shall commence any such action to recover property within 180 days following the Effective Date (subject to extension by the Bankruptcy Court upon notice and a hearing).

Except as provided herein or otherwise agreed to by the applicable Litigation Administrator(s) in its sole discretion, any and all Proofs of Claim Filed after the applicable Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

I.    *Amendments to Proofs of Claim or Interests.*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the applicable Litigation Administrator(s), and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; *provided* that the foregoing shall not apply to Administrative Claims Filed prior to the Administrative Claims Bar Date or Professional Fee Claims.

J.    *No Distributions Pending Allowance or Resolution of Recovery Causes of Action.*

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim or the Holder of such Claim is subject to a Recovery Cause of Action, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or such Recovery Cause of Action is settled or otherwise resolved.

K.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or a Recovery Cause of Action against the applicable Holder is settled or otherwise resolved, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or resolving a Recovery Cause of Action becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

For the avoidance of doubt, interest shall not accrue or be paid on any Disputed Claim or Claim where the Holder is subject to a Recovery Cause of Action with respect to the period from the Effective Date to the date a distribution is made on account of such Disputed Claim or Claim where the Holder is subject to a Recovery Cause of

Action, if and when such Disputed Claim becomes an Allowed Claim or such Recovery Cause of Action is settled or otherwise resolved.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Post-Effective Date Debtors or the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties (including the NewCo Assets), regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Reinstated Claims, if any) and Interests (other than Intercompany Interests that are Reinstated, if any) subject to the occurrence of the Effective Date.

B.    *Release of Liens.*

**Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (including the NewCo Assets) shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Post-Effective Date Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors the**

Post-Effective Date Debtors, or the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Post-Effective Date Debtors and the Plan Administrator shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Debtor Release.*

        Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Post-Effective Date Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise that the Debtors, their Estates, or the Post-Effective Date Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in-or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or Filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the Plan (including, for the avoidance of doubt, the Plan Supplement), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

        Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and

opportunity for hearing; and (f) a bar to any of the Debtors, the Post-Effective Date Debtors, or the Debtors' Estates asserting any claim or Cause of Action released pursuant to the Debtor Release. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

**Notwithstanding anything contained herein to the contrary, nothing in the Plan or Confirmation Order shall release or exculpate any claims or causes of action against any of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW).**

D.      *Third-Party Release.*

**Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property under the Plan (including the NewCo Assets) or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, (c) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement, or (d) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of**

the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any Excluded Party.

E.    *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the ~~formulation, preparation, dissemination, negotiation, entry into, termination of, or filing~~negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Chapter 11 Cases, the Plan Sponsor Agreement, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, the New Organizational Documents, the NewCo Transaction (if applicable), the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into ~~before or~~ during the Chapter 11 Cases in connection with the Chapter 11 Cases (including the trading and sales of Cryptocurrencies and Tokens in connection with the Chapter 11 Cases), the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Plan, the Disclosure Statement, the New Organizational Documents, the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the NewCo Common Stock or the Backup MiningCo Common Stock, as applicable) pursuant to the Plan, or the distribution of property, Cryptocurrency, or Tokens under the Plan (including the NewCo Assets) or any other related agreement or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, ~~actual~~ fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising on or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Schedule of Retained Causes of Action or against an Excluded Party, or (c) any Avoidance Action not released hereunder, including pursuant to the Account Holder Avoidance Action Settlement.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the foregoing exculpation does not exculpate any Excluded Party.

Notwithstanding anything contained herein to the contrary, nothing in the Plan or Confirmation Order shall release or exculpate any claims or causes of action against any of the Debtors' advisors arising

**out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW).**

F.      *Injunction.*

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any Causes of Action released pursuant to this Plan, including the Causes of Action released or exculpated in this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Except as otherwise set forth in the Confirmation Order, each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.

No ~~Person or Entity~~**Releasing Party** may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties that **(i) is a core claim that arises from or relates to the Chapter 11 Cases and (ii)** relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, or Article VIII.E hereof, without the Bankruptcy Court (~~i~~**x**) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (~~ii~~**y**) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Post-Effective Date Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate ~~the underlying~~**whether such a**-colorable Claim or Causes of Action~~.~~ **exists.  For the avoidance of doubt, the foregoing shall not limit the scope of the releases contained in Article VIII.C, Article VIII.D, or Article VIII.E or Article XII's retention of jurisdiction.**

G.      *Additional Provisions Regarding Governmental Units.*

As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in this Plan or the Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or

Post-Effective Date Debtors are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the entry of the Confirmation Order, pursuing any police or regulatory action.

Accordingly, notwithstanding anything contained in this Plan or the Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors or Post-Effective Date Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates or leases after the Confirmation Date.  Nor shall anything in this Plan or the Confirmation Order: (i) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Plan, the Confirmation Order, or the Bankruptcy Code.

Moreover, nothing in this Plan or the Confirmation Order shall release or exculpate any non-debtor, including any Released Parties, from any liability to any Governmental Unit, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties, nor shall anything in this Plan or the Confirmation Order enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against the Released Parties for any liability whatsoever; *provided*, *however*, that the foregoing sentence shall not (i) limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code or (ii) the penultimate sentence of Article IV.D.1 of this Plan..

Nothing contained in this Plan or the Confirmation Order shall diminish the scope of any qualified immunity, protections, or defenses to which any party is entitled under applicable law.

Nothing contained in this Plan or the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Post-Effective Date Debtors, nor shall this Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

With respect to any Governmental Unit, nothing in this Plan or the Confirmation Order, including the four paragraphs above, shall limit or expand the meaning or effect of section 1141(c) of the Bankruptcy Code with respect to the asset transfers set forth in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan.  Accordingly, notwithstanding anything to the contrary in this Plan or the Confirmation Order, including Article IV.D.1 of this Plan, to the fullest extent permitted under section 1141(c) of the Bankruptcy Code, the NewCo Assets are transferred free and clear of all Claims (including Administrative Claims, Priority Claims, Secured Claims, and Unsecured Claims) and Interests arising through the Effective Time, but nothing in this Plan or the Confirmation Order releases, nullifies, precludes or enjoins the enforcement of any post-Effective Time liability to a governmental unit under police and regulatory statutes or regulations (including, but not limited to, environmental, health, and safety laws or regulations, but, for the avoidance of doubt, excluding any tax laws or regulations), and any associated liabilities for penalties, damages, cost recovery or injunctive relief that any entity would be subject to as the owner, lessor, lessee or operator of the TransferredNewCo Assets after the date of entry of the Confirmation OrderEffective Time.  Further, notwithstanding anything to the contrary in this Plan or the Confirmation Order, including Article IV.D.1 of this Plan, nothing contained in this Plan or in the Confirmation Order shall in any way diminish the obligation of any entity, including the Debtors, Post-Effective Date Debtors, and NewCo, to comply with environmental, health, and safety laws.  Nothing in this Plan or the Confirmation Order authorizes the transfer to NewCo of any licenses, permits, registrations or governmental authorizations and approvals without NewCo's's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

The Debtors and their successors and assigns are permanently restrained and enjoined from transacting business, directly or indirectly, as an issuer, issuer agent, broker-dealer, broker-dealer agent, investment adviser, and/or investment adviser representative or otherwise offering and/or selling securities and/or providing banking or money services.  For the avoidance of doubt, the preceding sentence does not apply to NewCo, although NewCo shall comply with state and federal laws and regulations as required going forward.  Any and all state regulatory orders and judgments issued to or against Debtors prior to or during these Chapter 11 Cases are not discharged, released, or otherwise affected by confirmation of the Plan; *provided*, for the avoidance of doubt, that any monetary amounts provided for therein shall be treated as State Regulatory Claims hereunder.  For the avoidance of doubt, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan, regardless of whether or how such Holders have voted on the Plan.

H.    *Protection Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Post-Effective Date Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Debtors or Post-Effective Date Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

J.    *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.    *Document Retention.*

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Post-Effective Date Debtors, which shall preserve all books, records, electronically stored information, and other documents that are currently in the Debtors' possession.  The Post-Effective Date Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, and other documents without (i) providing advance notice to the SEC (c/o Therese A. Scheuer, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549, scheuert@sec.gov) and (ii) the permission of the Litigation Administrator(s) or authorization from the Bankruptcy Court.  Nothing in the Plan or this Confirmation Order shall affect the obligations of the Debtors, the Post-Effective Date Debtors, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

Until the entry of a Final Order of judgment or settlement with respect to all defendants now or hereafter named in the Securities Litigation, the Debtors, Post-Effective Date Debtors, and any transferee or custodian of the Debtors shall preserve and maintain the Securities Litigation Documents as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil procedure, and shall

not destroy, abandon, transfer or otherwise render unavailable such Securities Litigation Documents.  For the avoidance of doubt, the injunction set forth in Article VIII.F of the Plan shall not affect in any manner any rights of the lead plaintiff and the class in the Securities Litigation to seek and obtain Securities Litigation Documents through discovery in the Securities Litigation.

## ARTICLE IX.
## CONDITIONS TO CONFIRMATION

A.      *Conditions Precedent to Confirmation.*

It shall be a condition to confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to Article X.B, in each case:

1.      the Bankruptcy Court shall have entered the Disclosure Statement Order;

2.      the Management Agreement, the New Organizational Documents, the Proof Group IP License (if any), the distribution agent agreement(s), and the US Bitcoin Agreements shall be agreed as required under the Plan Sponsor Agreement;

3.      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed; and

4.      the Bankruptcy Court shall have entered the Confirmation Order.

B.      *Waiver of Conditions to Confirmation.*

Other than to the extent specifically set forth in the Plan or the Plan Sponsor Agreement, each condition precedent to the Effective Date set forth in Article X.A may be waived in whole or in part at any time without notice, leave, or an order of the Bankruptcy Court only if waived in writing by the Debtors, the Committee, and the Plan Sponsor.

## ARTICLE X.
## CONDITIONS TO THE EFFECTIVE DATE

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article X.B, in each case:

1.      the Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order);

2.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with this Plan and the Plan Sponsor Agreement in all material respects, and shall have been executed and Filed in a manner consistent with this Plan and the Plan Sponsor Agreement;

3.      the Debtors shall have Cash on hand or shall have transferred, liquidated, monetized, or sold Cryptocurrency such that they have sufficient Cash to pay the Senior Claims Amount and the amount of all Cure Claims;

4.      the Litigation Administrator Agreement(s) shall have been executed and the Litigation Recovery Account shall have been established and funded with the Initial Litigation Funding Amount;

5.      each PSA Definitive Document and each other document contained in any supplement to this Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications or supplements thereto or other documents contained therein, shall have been executed or Filed, if applicable, in form and substance consistent in all material respects with this Plan and the Plan Sponsor Agreement, and shall not have been modified in a manner inconsistent therewith;

6.      the Professional Fee Escrow Account shall have been established and funded with Cash in accordance with this Plan;

7.      a segregated account shall have been established and funded with Cash in an amount necessary to fund the Plan Administrator Budget in accordance with the terms of the Plan Administrator Agreement;

8.      the Debtors or NewCo shall have purchased a directors' and officers' liability insurance policy for the benefit of the New Board, which policy shall be reasonably acceptable to the Debtors, the Committee, and the Plan Sponsor;

9.      the NewCo Assets shall have been transferred to NewCo as set forth in this Plan, ~~and~~ the Debtors shall have taken all other actions necessary to consummate the NewCo Transactions hereunder as required under this Plan and the Plan Sponsor Agreement, and the NewCo Transactions contemplated under the Transaction Steps Memorandum shall have been consummated;

10.     the Debtors shall have identified and delivered to the Plan Sponsor a list of all NewCo Assets to be transferred to NewCo, and an estimate of the book value of such NewCo Assets, in each case as of the Effective Date of the Plan, and such list of NewCo Assets and estimated book values shall be reasonably acceptable to the Plan Sponsor;

11.     a PCAOB-registered audit firm shall have been engaged to deliver an audit of the opening balance sheet of NewCo, which PCAOB-registered audit firm shall be subject to the mutual consent of the Debtors and the Plan Sponsor, which consent shall not be unreasonably withheld;

12.     the Registration Statement respecting the NewCo Common Stock shall have been filed and such Registration Statement shall have become effective;

13.     all consents, approvals, or permissions, including all Regulatory Approvals, necessary to consummate and implement the Plan and the NewCo Transactions shall have been obtained; and

14.     this Plan shall have been substantially consummated or shall be anticipated to be substantially consummated concurrently with the occurrence of the Effective Date.

B.      *Waiver of Conditions to the Effective Date.*

Other than to the extent specifically set forth in the Plan or the Plan Sponsor Agreement, each condition precedent to the Effective Date set forth in Article X.A may be waived in whole or in part at any time without notice, leave, or an order of the Bankruptcy Court only if waived in writing by the Debtors, the Committee, and the Plan Sponsor.

C.      *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

D.      *Effect of Non-Occurrence of Conditions to Consummation.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Plan Sponsor Agreement, or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims

by the Debtors or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; *provided* that all provisions of the Plan Sponsor Agreement that survive termination thereof shall remain in effect in accordance with the terms thereof.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification of Plan.*

The Debtors reserve the right to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and the terms set forth herein and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Notwithstanding anything set forth in this ~~Article XI~~Article XI, the Debtors shall not modify:  (i) this Article XI or Article X hereof without the express written consent of the Plan Sponsor (e-mail being sufficient); or (ii) any other provision of the Plan in a way that is adverse to the interests of the Plan Sponsor without the express written consent of the Plan Sponsor (e-mail being sufficient).

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests, but excluding any settlement that was separately approved by the Bankruptcy Court), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any

Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Plan Administrator's amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, the (i) Schedule of Assumed Executory Contracts and Unexpired Leases or (ii) the Schedule of Rejected Executory Contracts and Unexpired Leases, or otherwise changing their decision whether to assume or reject any Executory Contract or Unexpired Lease; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.  ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.  enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of, or determine any matters that may otherwise arise in connection with or relate to the Plan, the Confirmation Order, and all contracts, instruments, releases, indentures, and other agreements or documents entered into or delivered in connection therewith or otherwise approved by a Final Order of the Bankruptcy Court, including the Plan Sponsor Agreement;

8.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10. resolve any cases, controversies, suits, disputes, Causes of Action, or other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, the NewCo Transaction, or the Orderly Wind Down or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, the NewCo Transaction, or the Orderly Wind Down;

11. resolve any cases, controversies, suits, disputes, Causes of Action, or other matters that may arise in connection with the Recovery Causes of Action brought by the Litigation Administrator in the Bankruptcy Court;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may

be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

13. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.M;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications to the Plan, including to cure or remedy any defect or omission or to reconcile or clarify any inconsistency in the Plan, the Disclosure Statement, the Confirmation Order, any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or any other Bankruptcy Court order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. hear and determine matters related to any requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

18. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

19. enforce all orders previously entered by the Bankruptcy Court;

20. enter an order or decree contemplated under Bankruptcy Rule 3022 concluding or closing the Chapter 11 Cases; and

21. hear any other matter not inconsistent with the Bankruptcy Code.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Post-Effective Date Debtors and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims against and Interests

in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Post-Effective Date Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

D.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and confirmed, addressed as follows:

| If to the Debtors: | If to Counsel to the Debtors: |
| :---: | :---: |

| Celsius Network LLC<br>50 Harrison Street, Suite 209F<br>Hoboken, New Jersey 07030<br>Attention:  Ron Deutsch | **KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:　　(212) 446-4800<br>Facsimile:　　(212) 446-4900<br>Email:　　joshua.sussberg@kirkland.com<br><br>- and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:　　(312) 862-2000<br>Facsimile:　　(312) 862-2200<br>Email:　　patrick.nash@kirkland.com<br>　　ross.kwasteniet@kirkland.com<br>　chris.koenig@kirkland.com<br>　　dan.latona@kirkland.com |
| **If to the U.S. Trustee:** | **If to Counsel to the Committee:** |

| | |
|---|---|
| Shara Claire Cornell<br>Mark Bruh<br>Trial Attorneys Office of the United States Trustee<br>U.S. Federal Office Building<br>201 Varick Street, Room 1006<br>New York, New York 10014 | **WHITE & CASE LLP**<br>David M. Turetsky<br>Samuel P. Hershey<br>Keith H. Wofford<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone:        (212) 819-8200<br>Facsimile:         (212) 354-8113<br>Email:              david.turetsky@whitecase.com<br>                        sam.hershey@whitecase.com<br>                        kwofford@whitecase.com<br><br>- and -<br><br>**WHITE & CASE LLP**<br>Gregory F. Pesce (admitted *pro hac vice*)<br>111 South Wacker Drive, Suite 5100<br>Chicago, Illinois 60606<br>Telephone:        (312) 881-5400<br>Facsimile:         (312) 881-5450<br>Email:              mandolina@whitecase.com<br>                        gregory.pesce@whitecase.com<br><br>- and -<br><br>**WHITE & CASE LLP**<br>Aaron E. Colodny (admitted *pro hac vice*)<br>555 South Flower Street, Suite 2700<br>Los Angeles, California 90071<br>Telephone:        (212) 819-8200<br>Facsimile:         (212) 354-8113<br>Email:              aaron.colodny@whitecase.com |
| **If to Counsel to the Plan Sponsor:** | |
| **BROWN RUDNICK LLP**<br>Andrew M. Carty<br>Catherine (Katy) Gardner<br>Matthew E. Uretsky<br>7 Times Square<br>New York, New York 10036<br>Telephone:        (212) 209-4800<br>Facsimile:         (212) 209-4801<br>Email:              acarty@brownrudnick.com<br>                        kgardner@brownrudnick.com<br>                        muretsky@brownrudnick.com | |

After the Effective Date, the Post-Effective Date Debtors and the Plan Administrator shall have authority to send a notice requiring Entities receiving documents pursuant to Bankruptcy Rule 2002 to File a renewed request to continue receiving documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Post-Effective Date Debtors and the Plan Administrator are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

F.      *Entire Agreement.*

Except as otherwise indicated in the Plan or the Confirmation Order, the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  Except as otherwise indicated in the Plan or the Confirmation Order, in the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

G.      *Plan Supplement Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://cases.stretto.com/Celsius or the Bankruptcy Court's website at https://www.nysb.uscourts.gov.  The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

H.      *Non-Severability.*

If any term or provision of the Plan is found or held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided*, *however*, that any such alteration or interpretation must be consistent with the Plan Sponsor Agreement.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

Except as provided in the preceding paragraph, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination that each term and provision of the Plan is:  (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Post-Effective Date Debtors; and (c) non-severable and mutually dependent.

I.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties or individuals, nor the Post-Effective Date Debtors, will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

J.      *Closing the Chapter 11 Cases.*

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases shall be deemed closed, except for one of the Post-Effective Date Debtors' cases, as determined by the Post-Effective Date Debtors, which shall be designated as the lead case (the "Remaining Case").  All contested matters and adversary proceedings relating to any of the Debtors or Post-Effective Date Debtors, as applicable, including objections to Claims, shall be Filed, administered, and adjudicated in the Remaining Case without the need to reopen any case.

K.      *Dissolution of Statutory Committees and Cessation of Fee and Expense Payment*.

Following the Effective Date, the Committee shall survive for the purpose of filing, prosecuting, reviewing, and objecting to any applications for compensation and reimbursement of expenses filed pursuant to Article II.B hereof.  The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.  Upon the resolution of all matters set forth in this section, the Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

L.      *Waiver or Estoppel*.

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, as a Secured Claim or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  August 15, September 27, 2023          Celsius Network LLC
                                               on behalf of itself and all other Debtors


                                               */s/ Christopher Ferraro*
                                               Name:  Christopher Ferraro
                                               Title:   Interim Chief Executive Officer, Chief Financial
                                                        Officer, and Chief Restructuring Officer
                                                        Celsius Network LLC