Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DECLARATION OF CHRISTOPHER FERRARO, INTERIM**
**CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING**
**OFFICER, AND CHIEF FINANCIAL OFFICER OF THE DEBTORS,**
**IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

Pursuant to 28 U.S.C. § 1746, I, Christopher Ferraro, hereby declare as follows under

penalty of perjury:

**Background and Qualifications**

1.    I am the interim Chief Executive Officer, Chief Restructuring Officer, and Chief

Financial Officer of Celsius Network LLC ("<u>Celsius</u>" and together with the above-captioned

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

debtors and debtors-in-possession, the "Debtors").  I joined Celsius on March 21, 2022.  I was appointed as Chief Financial Officer on July 11, 2022, and I was appointed as interim Chief Executive Officer and Chief Restructuring Officer by the Special Committee of Debtor Celsius Network Limited on September 27, 2022, following the resignation of the Debtors' co-founder and former chief executive officer, Alex Mashinsky.

2.      In my capacity as the interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and ongoing restructuring efforts, including, but not limited to, the Restructuring Transactions contemplated under the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC And Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

3.      Except as otherwise indicated herein, all facts in this declaration (this "Declaration") are based upon (a) my personal knowledge of the Debtors' operations, (b) my discussions with other members of the Debtors' management team and advisors, and (c) my review of relevant documents and information concerning the Debtors' operations.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### The Proposed Restructuring Transactions

4.      Based on my extensive and intimate involvement throughout the course of these Chapter 11 Cases, including the highly competitive marketing and sales process and Plan negotiations, I firmly believe that the restructuring transactions set forth in the Plan provide the

---

[2]   Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan, the Disclosure Statement, or the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto* (the "Memorandum"), filed contemporaneously herewith, as applicable.

Debtors and their creditors the best possible recovery and a clear pathway to prompt emergence from bankruptcy.

5.    Specifically, the Plan is the culmination of months of discussions and negotiations with the Debtors' stakeholders and dozens of parties in the cryptocurrency and finance industries. The Plan memorializes the NewCo Transaction, which contemplates a series of transactions that will, among other things, (a) distribute a significant amount of the Debtors' liquid cryptocurrency to Account Holders beginning on the Effective Date of the Plan, (b) create a new entity that will operate and/or manage the Debtors' substantial illiquid assets (including the mining business, institutional loan portfolio, and other alternative investments), (c) implement the terms of the CEL Token Settlement, and (d) preserve Claims and Causes of Action with respect to the Debtors' prepetition operations for the benefit of Holders entitled to receive Litigation Proceeds under the Plan for prosecution by a litigation vehicle.  Importantly, Holders of Account Holder Claims and other unsecured claims will receive nearly all of the common equity of NewCo, subject only to dilution by the Management Compensation.  The Plan also includes a "Plan B" in the event the NewCo Transaction cannot be consummated for any reason—namely, the Orderly Wind Down of the Debtors' estates.  No matter what transaction is ultimately pursued, Account Holders will receive significant value in receiving approximately $2 billion worth of liquid cryptocurrency upon the Effective Date of the Plan.

## The Plan Satisfies the Requirements of Confirmation

6.    As discussed above, the Plan seeks to effectuate a NewCo Transaction that will create a new company to maximize the value of the Debtors' illiquid assets, which will be owned almost entirely by their former Account Holders.  Additionally, to the extent that the NewCo Transaction cannot be completed for any reason, the Plan contemplates the Orderly Wind Down.

The NewCo Transaction and Orderly Wind Down both have the objective of maximizing creditor recoveries and distributing estate property in accordance with the priorities set forth in the Bankruptcy Code. I believe the Plan maximizes the value of the Debtors' estates and provides as meaningful a recovery to as many of the Debtors' stakeholders as is possible under the circumstances of these Chapter 11 Cases.

7.      As the Debtors' Interim Chief Executive Officer, Chief Financial Officer, and Chief Restructuring Officer, I was involved in the formulation and negotiation of the key deal terms of the Plan, including at the auction this past spring. The Plan is the product of extensive, good faith, arm's-length negotiations between the Debtors and their key stakeholders, including the Committee, Plan Sponsor, and Backup Plan Sponsor, and, in my opinion, represents the best path available to expeditiously conclude these Chapter 11 Cases and maximize creditor recoveries.

**I.      The Plan Satisfies the Bankruptcy Code.**

8.      I have been advised of the applicable standards under which a chapter 11 plan may be confirmed pursuant to section 1123 and 1129(a) of the Bankruptcy Code. Furthermore, I understand that the Campagna Declaration addresses most of the requirements for a chapter 11 plan to be confirmed. This Declaration therefore does not address every confirmation requirement and instead only addresses the applicable confirmation requirements that relate to my personal involvement in the Plan negotiation and drafting process. For the reasons detailed below, and with the consultation and guidance of the Debtors' advisors, I believe, to the best of my knowledge, that the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a plan. I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan and related documents.

A.      **Selection of Officers and Directors — § 1123(a)(7).**

9.      I understand that section 1123(a)(7) of the Bankruptcy Code requires that any provisions in the Plan with respect to the manner of selection of any director, officer, or trustee be consistent with the interests of creditors, equity holders, and public policy.  The manner for selection of the members of the New Board are set forth in the Plan and Plan Supplement.  I understand that the Committee and Fahrenheit selected the initial directors of the Reorganized Debtors.  I discussed the selection process with the Committee and the Plan Sponsor and understand that it was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy.  I also understand that the Committee will be submitting a declaration regarding the selection process.  Accordingly, I believe that the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

B.      **Discretionary Contents of the Plan — § 1123(b).**

10.     I understand that section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  I have been advised that under section 1123(b) of the Bankruptcy Code, among other things, a proposed plan may include any other provision not inconsistent with applicable provisions of the Bankruptcy Code.  For the reasons set forth below, I believe that the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code.

11.     Specifically, I understand that the Plan contains provisions implementing certain releases and exculpations, compromising claims and interests, and enjoining certain causes of action.  I believe these provisions (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, their estates, and

these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Second Circuit law as I understand it.

12.      Given my close involvement in the marketing and sales process as well as the negotiations related to the Plan and other Definitive Documents, I have firsthand knowledge of the importance of such releases and exculpations to the successful implementation of the Plan and maximizing recoveries for creditors.  Accordingly, as described in more detail below, and based on consultation and guidance from legal counsel, I believe that these provisions satisfy section 1123(b)(3) of the Bankruptcy Code.

### i.      The Debtor Release Is Appropriate and Complies with the Bankruptcy Code.

13.      Article VIII.C of the Plan provides for consensual releases of the Debtors' claims and causes of action against the Released Parties (the "Debtor Release").  The Debtor Release is intended to release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, with several important exceptions.  For example, the Debtors are not proposing to release any Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action under the Plan against an Excluded Party (including Mr. Mashinsky, Mr. Daniel Leon, and Mr. Cohen-Pavon, among others), or any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.[3]  Moreover, the Debtor Release allows the Debtors to release Account Holders from the threat of potential preference actions if they accepted the Account Holder Avoidance Action Settlement, and therefore provides closure and comfort to

---

[3]      *See* Plan, Art. VIII.C.

participating Account Holders.  In consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential claims and causes of action of each Releasing Party.  I believe that the Debtor Release is a vital component of the Plan, is the product of good faith, arm's-length negotiations, and it is a sound exercise of the Debtors' business judgment and should be approved.

14.     **First**, each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.  Like the Debtors, these parties seek to confirm the Plan and implement the Restructuring Transactions contemplated thereunder.

15.     **Second**, the Released Parties played an integral role in the development of the Plan and have expended significant time and resources resolving the complex issues in these Chapter 11 Cases to enable the Debtors to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as quickly as possible.  Indeed, since filing for chapter 11 in July 2022, the Debtors, the Committee, various ad hoc groups, the Series B Holders, and certain *pro se* creditors negotiated multiple settlements and litigated numerous legal issues, many of which were questions of first impression.  Throughout that process, it became apparent that the Debtor Release would be an important part of providing closure to these challenging Chapter 11 Cases and a necessary condition of the consummation of the Restructuring Transactions embodied in the Plan.  Without the Debtor Release, I believe that the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the Plan in the timeframe in which the Debtors propose to exit bankruptcy.  Moreover, I believe that losing the participation of the Released Parties on the eve of confirmation would threaten the viability of the Plan, including eliminating the Debtors'

ability to make in-kind distributions and hindering the Debtors' chances of success in consummating the NewCo Transaction.

16.     **Third,** the Debtor Release was formulated following extensive investigations and is supported by the Committee. Specifically, during these chapter 11 cases, there were numerous investigations into the conduct of the Debtors and their current and former officers, directors, and employees, including internal investigations led by the Special Committee, an investigation by the Committee, an investigation by the Examiner that led to a 400+ page report that was published publicly, and numerous investigations by state and federal governmental entities. All of those investigations were considered and taken into account in forming the Debtor Release, and the Schedule of Excluded Parties includes individuals who the Debtors or the Committee determined should not be released. That is, the robust process run by the Debtors in close consultation with the Committee further demonstrates that the Debtor Release is appropriate and reasonable.

17.     I also know full well the contributions that the Debtors will need the Released Parties to continue to make as the Debtors emerge from chapter 11 and return funds to customers. I believe that it would be massively value-destructive and not helpful to the process, and would ultimately lead to less value to creditors, if the Debtors were to spend funds pursuing potential claims that are covered by the Debtor Release. And it is critical to the delicate process envisioned by the Plan for the Debtor Release to go into effect.

18.     For these reasons, I believe that the Debtor Release is justified, is a sound exercise of the Debtors' business judgment, is in the best interests of creditors and all stakeholders, is an integral part of the Plan, and satisfies key factors that I understand are considered by courts in determining whether a debtor release is proper.

## ii.    The Third-Party Release Is Consensual and Appropriate.

19.     I understand that Article VIII.D of the Plan contains a consensual third-party release among the Debtors, the Reorganized Debtors, and the Releasing Parties (the "Third-Party Release") in which Releasing Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not affirmatively opt out of (or for those Holders who were deemed to reject the Plan, opt into) the Plan's release provisions, will release the Released Parties from any and all Claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, with several important exceptions.  For example, like the Debtor Release, the Releasing Parties will not release the Released Parties from any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.[4]  I believe that the Third-Party Release is a vital component of the Plan, is the product of good faith, arm's-length negotiations, and it is a sound exercise of the Debtors' business judgment and should be approved.

20.     **First**, based on my discussion with the Debtors' advisors, I understand that the Third-Party Release is a wholly consensual release and that all Holders of Claims entitled to vote had the opportunity to opt out of the Third-Party Release and that the Third-Party Release contains a carve-out for actual fraud, willful misconduct, and gross negligence.  The Confirmation Hearing Notice, Ballots, and other Solicitation Package materials distributed to Holders of Claims and Interests entitled to vote on the Plan included an exact duplication of the release, and the Ballots

---

[4]    *See* Plan, Art. VIII.D.

clearly informed Holders of Claims and Interests entitled to vote on the Plan of the steps they should take if they decided to opt out of the Third-Party Release. I further understand that Holders who abstained from voting or voted to reject the Plan therefore had the opportunity to opt out of the Third-Party Release. In addition, Holders of Claims presumed to accept the Plan received a Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot, which also reproduced the release in full and provided instructions for opting out of the Third-Party Release.

21.     *Second*, after receiving informal comments from the SEC, the Debtors agreed to revise the Third-Party Release require an "opt in" from classes deemed to reject the Plan. As a result, Holders of Claims and Interests deemed to reject the Plan received a Non-Voting Notice for Holders Deemed to Reject, which also reproduced the release in full and provided instructions for opting into the Third-Party Release. Thus, affected parties were on notice of the Third-Party Release and of their ability to opt out or opt in, as applicable. My understanding is that the Claims, Noticing, and Solicitation Agent received a number of executed Opt-Out Forms, which further demonstrates that parties understood how to opt out of or into the Third-Party Release, as applicable, if they chose to do so.

22.     *Third*, as with the Debtor Release, I believe that each Released Party has made a substantial contribution to the development of the NewCo Transaction and the Orderly Wind Down justifying their release. The Released Parties have provided substantial and necessary contributions in exchange for their respective releases under the Third-Party Release. And like the Debtor Release, I believe that the Released Parties, including the Debtors, share the common goal of effectuating a successful reorganization through the creation of a new, regulatorily compliant NewCo or an organized liquidation through the Orderly Wind Down and to confirm the Plan and implement the transactions contemplated thereunder.

23.     **Fourth**, the Third-Party Release was given for consideration as most Holders of Claims are receiving a material recovery under the Plan.  In addition, the mutuality of such releases provides adequate consideration to parties that are otherwise not receiving any recovery under the Plan.  The contributions of all of the Released Parties will allow the Debtors to emerge from chapter 11 as a newly-formed entity, despite challenging operating conditions, and maximize value to all stakeholders.  And as indicated above, the Third-Party Release is consensual.

24.     **Finally**, as with the Debtor Release, the Third-Party Release is the product of extensive, good faith, arms'-length negations between the Debtors and myriad key stakeholders in these Chapter 11 Cases, including the Committee who represents the vast majority of the Debtors' creditor base.  As noted above, claims and causes of actions possibly assertable against certain members of the Debtors' former management team are preserved in their entirety and not released under the Plan.  In sum, the Third-Party Release is narrowly tailored to achieve a value-maximizing outcome for the Debtors and all key constituencies.  Without the Third-Party Release, the ability for the Debtors to confirm the Plan and effectuate the highly-negotiated terms of the NewCo Transaction or the Orderly Wind-Down would be jeopardized, value destructive, and ultimately dilute creditor recoveries.

25.     Accordingly, I believe that the Third-Party Release is an integral part of the Plan and should be approved.

### iii.     The Exculpation Provision Is Appropriate.

26.     Based on my experience and discussions with the Debtors' advisors, it is my belief that the exculpation provision described in Article VIII.E of the Plan is appropriate under applicable law because it was proposed in good faith, was formulated following months of extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited

in scope to only apply to estate fiduciaries, which I understand is consistent with the case law in this jurisdiction.

27.     The highly uncertain regulatory and political landscape that the Exculpated Parties have navigated throughout these Chapter 11 Cases demonstrates the need for the exculpation provision.  The exculpation provision is critical to ensuring that funds can be returned to creditors as promptly as possible through the transactions that are approved by the Bankruptcy Court and that parties are not subsequently held liable for taking actions that the Bankruptcy Court authorized them to take.

28.     Moreover, in addition to the Debtors, each of the Exculpated Parties—including the current and former directors, managers, officers, and advisors that have acted on the Debtors' or the Committee's behalf in these Chapter 11 Cases—are fiduciaries of the Debtors' estates.  The directors, managers, officers, and advisors (a) have made substantial and valuable contributions to the Debtors' restructuring and the estates, (b) have invested significant time and effort to make the restructuring a success and preserve the value of the Debtors' estates in a challenging and precarious regulatory and market environment, and (c) have met frequently and directed the restructuring negotiations that led to the highly consensual nature of the Plan that is supported by over 90 percent of all those in Account Holder Classes who voted on the Plan.  The other Exculpated Parties—including the Committee, Fahrenheit, the BRIC, PayPal, and Coinbase—also have played key roles throughout these Chapter 11 Cases that will permit the Plan to be successfully consummated.

29.     Accordingly, under the circumstances, I believe that it is appropriate for the Bankruptcy Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

#### iv.    The Injunction Provision Is Appropriate.

30.    The injunction provision set forth in Article VIII.F of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of, or in connection with, or with respect to, any such Claims or Interests discharged, released, exculpated, or settled under the Plan. I believe that the Injunction Provision is a necessary part of the Plan because it enforces the discharge, release, and exculpation provisions that are central to the Plan. Furthermore, the injunction provided for in the Plan is consensual as to any party that did not specifically object thereto. Accordingly, I believe the Injunction Provision should be approved.

### C.    The Debtors Proposed the Plan in Good Faith — Section 1129(a)(3).

31.    I understand that section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law. The Plan was proposed in good faith, with the legitimate and honest purpose of maximizing value for the Debtors and their estates. As noted throughout the course of these Chapter 11 Cases, the Debtors filed for chapter 11 for the primary reason of pursuing a transaction or series of transactions that would return digital assets to Account Holders on the fastest timeline possible. The Debtors did so under extraordinarily challenging circumstances, particularly given the tumultuous landscape of the cryptocurrency industry and the immense liquidity crunch faced by the Debtors as a result of the "crypto winter." I believe that the transactions contemplated under the Plan achieve that goal. Furthermore, as discussed above and in the Kielty Declaration, the Plan is the culmination of a several months'-long marketing and sale process that resulted in a four-weeks'-long auction. That marketing and sales process was conducted in concert with the Committee and its professionals

and at every turn, the primary goal was to maximize the value of the Debtors' estates for the benefit of their Account Holders.

32.     The Plan also seeks to implement the terms of several consensual settlements reached with myriad consistency groups, which will fully resolve several gating items to confirmation.   These settlements were the product of extensive good faith, arm's-length negotiations among the Debtors, the Committee, the Earn Ad Hoc Group, the Custody Ad Hoc Group, the Withhold Ad Hoc Group, the Retail Borrower Ad Hoc Group, certain individual creditors, and the Series B Holders, including the CEL Token Settlement as discussed in **Section IV**, *infra*.  Importantly, as discussed in the Voting Report, the unanimous support of the Plan from all Account Holder Classes—all of whom will own nearly all of NewCo—is strong evidence that the Plan is contemplates what the vast majority of creditors believe to be a value-maximizing conclusion for all stakeholders.

33.     Accordingly, I believe that the Plan was proposed in good faith and not by any means forbidden by law, and thus, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

**D.     Payment of Professional Fees and Expenses Are Subject to Court Approval — Section 1129(a)(4).**

34.     I understand that section 1129(a)(4) of the Bankruptcy Code requires a court to approve certain fees and expenses that either a plan proponent, debtor, or person receiving property distributions under the plan has paid as reasonable.  The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Bankruptcy Court approval and the reasonableness requirements under sections 328 or 330 of the Bankruptcy Code.  Article II.B of the Plan, moreover, provides that Professionals shall file all final requests for payment of

Professional Fee Claims no later than forty-five days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.

35.    Accordingly, I believe that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

### E.    The Plan Is Feasible — Section 1129(a)(11).

36.    I understand that section 1129(a)(11) of the Bankruptcy Code requires a court to determine that a chapter 11 plan is feasible, and that confirmation of such plan is not likely to be followed by the liquidation or further financial reorganization of the Debtors (or any successors thereto) unless such liquidation or reorganization is proposed in the Plan.  The Plan provides for the NewCo Transaction and in the alternative, the Orderly Wind Down.  For the following reasons, I strongly believe that confirmation of the Plan is highly unlikely to be followed by further financial reorganization not already proposed by the Plan.

37.    *First*, NewCo will be well capitalized and will have no debt at emergence.  As contemplated by the Plan, NewCo will be transferred $450 million in Liquid Cryptocurrency (valued as of the Effective Date) from the Debtors free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date.  NewCo intends to stake some or all of this Liquid Cryptocurrency, earning staking yields on the Ethereum network.  While staking yields have historically exceeded 3%, staking $350 million of NewCo's liquid cryptocurrency could generate revenues in excess of $10 million per year.  Thus, I believe that NewCo will be well-positioned to meet its Plan obligations.

38.    *Second*, in connection with proposing the Plan and in preparation for confirmation, the Debtors and their advisors thoroughly analyzed NewCo's ability to meet its post-Confirmation obligations with respect to the mining business under the Plan and to continue as a go-forward business without the need for further financial restructuring.  The Debtors, together with their

advisors, have closely evaluated the mining business's performance over the course of these Chapter 11 Cases to ensure that NewCo will be able to return significant value to the Debtors' creditors through the reorganization of the mining business, which will be well positioned to meet its obligations and continue as a going concern without the need for further reorganization. Specifically, the Debtors prepared the Mining Financial Projections for the mining business's financial performance for the fiscal years ending September 30, 2024 through September 30, 2028, which Mining Financial Projections were attached to the Disclosure Statement as <u>Exhibit E</u>. The Mining Financial Projections project a 2024 EBITDA of $61.8 million and project EBITDA above that amount for the following four fiscal years. I believe that these Mining Financial Projections demonstrate the Debtors' ability to have a viable reorganized mining business going forward.

39. ***Third***, even despite precarious market conditions facing the cryptocurrency industry and serious challenges facing the Debtors' mining business, including the rejection of the Core hosting contract, the Debtors' mining business has had positive operating cash flow since the Petition Date. Specifically, the mining business's adjusted EBITDA on an unaudited basis since the Petition Date is approximately $24.3 million.[5] That is, even during an extremely tumultuous period for the Debtors' mining business and the industry as a whole, the mining business generated revenue that is more than sufficient to cover its operating costs.

40. Moreover, the Debtors' mining business has dramatically improved over the past few months as the Debtors found new hosting providers and moved towards hosting their own rigs through their own proprietary sites. For example, in July 2022, the Debtors had approximately 49,500 mining rigs deployed; today that number is approximately 75,000. What is more, since the

---

[5] Adjusted EBITDA is consistent with the Debtors' Monthly Operating Reports and does not include certain restructuring charges.

low point of BTC prices in December 2022 ($250,000 of adjusted EBITDA with the average BTC price below $17,000), the Debtor's mining business has averaged over $1.5 million of adjusted EBITDA per month.  And as of August 2023, the Debtors' mining operations are generating approximately 300 BTC per month, or 10 BTC per day.

41.     The Debtors' self-mining capability will be further enhanced if the Debtors successfully acquire and build the 215 MW Cedarvale project, which would nearly triple the Debtors' current self-mining capacity.[6]  The Plan Supplement includes documents whereby Plan Sponsor member US Bitcoin would commence the build-out after the contemplated court approvals and closing of the acquisition of the Cedarvale site from Core Scientific, Inc. in furtherance of the consummation of the Plan.

42.     The Company has also taken several steps to improve the adjusted gross margin of the mining business.  Celsius Mining has a fixed power price hedge for a portion of its Proprietary Sites, which allows it to participate in ERCOT's energy management programs and take advantage of power price volatility.  Moreover, Celsius Mining has entered into new hosting agreements with improved economics, deploying 58,000 rigs this calendar year.  These new hosting agreements include locations with historically lower or more stable power prices, the ability to share in energy management revenue, and curtailment rights.  In periods where it is not profitable to run their rigs, the Debtor's mining business reduces its energy use leaving only operating expenses below gross profit to be incurred, thereby drastically reducing theoretical losses.  This concept of economic curtailment has improved the Debtor's mining business by allowing it to respond to instances

---

[6]     *See Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Debtors' Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and Core Scientific, (II) Authorizing Entry into the Purchase and Sale Agreement, (III) Authorizing Intercompany Transfers with Celsius Mining, and (IV) Granting Related Relief* [Docket No. 3565] for further detail regarding the Cedarvale settlement.

where potential marginal losses would occur, and thereby avoid them.  The foregoing has vastly improved the financial performance of the mining business, allows it to reduce cash burn in unfavorable macro environments and has led the mining business to cover its operating costs since July 2022.

43.    Additionally, both the Plan Sponsor and Backup Plan Sponsor have what I believe to be very competent management teams dedicated to the success of the go-forward mining operations.  NewCo will be well capitalized with $450 million and no debt, and the mining business has seen much improved results and has generated over $20 million of operating cash flow since the Petition Date, even during a tumultuous period for the Bitcoin mining industry generally. Accordingly, I am confident that the NewCo will not need to further reorganize.

44.    In light of the foregoing, I believe that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code because I believe that the Debtors will be able to meet their obligations under the Plan and are unlikely to require the need for additional financial reorganization.

**II.    The Plan Modifications Are Reasonable, Do Not Require Resolicitation, and Should Be Approved.**

45.    I understand that section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  I have also been advised that under section 1125 of the Bankruptcy Code, a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated, unless such affected creditors consent to the treatment.

46.    Here, I understand that the Debtors made certain modifications to the Plan after the Solicitation Period ended as reflected in the amended Plan.  I believe that such modifications are

either (a) immaterial or technical clarifications; or (b) modifications that resolve objections to the Plan. I understand that the Debtors have made the following non-material modifications to certain provisions in the Plan on the following topics (ordered as they appear in the Plan), as further detailed in the Memorandum:

- Deactivation Date Timing and Interaction with CEL Token Settlement;

- Distribution Cryptocurrency Conversion Table;

- Equitably Subordinated Claims;

- Exculpated Parties;

- Released Parties and Releasing Parties;

- Withdrawal Preference Exposure;

- State Regulatory Claims;

- Account Holder Avoidance Action Settlement;

- Distribution Mechanics;

- NewCo Common Stock;

- EIP Awards;

- Institutional Loans;

- Undeliverable Distributions and Unclaimed Property;

- Releases and Exculpations;

- Additional Provisions Regarding Governmental Units; and

- Ministerial Edits.

47.     Therefore, I believe that the modifications are immaterial or have been consented to after negotiations among consenting parties. Accordingly, I believe that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

**III.    Good Cause Exists to Waive the Stay of the Confirmation Order.**

48.    I understand that certain Bankruptcy Rules provide for the stay of an order confirming a chapter 11 plan, but that such a stay may be waived upon court order after a showing of good cause.

49.    Given that these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information and that each day the Debtors remain in chapter 11 they incur significant administrative and professional costs, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur as soon as needed. Additionally, given the nature of these Chapter 11 Cases, the volatility of the cryptocurrency market, and the fact that most of the Debtors' creditor body is made up of Account Holders who entrusted their hard-earned cash and/or crypto with Celsius, I believe that any further delay would cause unnecessary harm to those very same people. Accordingly, I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry, thereby expediting the return of digital assets to the Debtors' clients who have stood by patiently for over a year.

**IV.    The CEL Token Settlement is Reasonable and Should be Approved.**

50.    On September 7, 2023, I submitted the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement* [Docket No. 3435] (the "CEL Token Declaration"). I reaffirm the testimony in my CEL Token Declaration and submit this declaration to supplement my prior testimony.

51.    I have reviewed the Plan and am familiar with the terms of the CEL Token Settlement. The CEL Token Settlement provides that all Claims and Causes of Action arising out

of or related to the CEL Token will be settled by valuing all CEL Token Deposit Claims (other than Custody Claims and Claims proposed to be equitably subordinated) at $0.25/CEL Token. The CEL Token Settlement further provides that CEL Token Deposit Claims will otherwise be treated in accordance with the program in which the associated CEL Tokens were deployed (*e.g.*, CEL Token Deposit Claims in the Earn Program will be treated as General Earn Claims), and all other Claims related to CEL Token will be cancelled without distribution.

52.     It is my opinion that the CEL Token Settlement provides a reasonable resolution of the disputes related to CEL Token and is in the best interests of the Debtors' Estates and all stakeholders. I believe that litigating the issue of CEL Token's value to resolution would be complex, time consuming, and expensive because of the wide variety of actions taken to regulate the supply of CEL Token and otherwise influence the price of CEL Token, as described in my CEL Token Declaration. In fact, I believe there are persuasive arguments that the CEL Token should be ascribed no value. At the same time, I recognize that certain former Celsius insiders misled and harmed creditors, and I believe that ascribing the CEL Token no value is overly punitive. I therefore believe the CEL Token Settlement of $0.25/CEL Token appropriately balances the potential outcomes, will avoid incurring significant litigation expenses, is in the best interests of the Debtors' estates, and should be approved.

## V.    Celsius Terms of Use

53.     All references made to the Terms of Use in my Declaration, the Plan, the Disclosure Statement, and/or the Memorandum refer to those certain terms of use attached as <u>Exhibits A-1–8</u>, <u>Exhibits B-1–9</u>, <u>Exhibits C-1–3</u>, <u>Exhibit D</u>, <u>Exhibit E</u>, <u>Exhibit F</u>, <u>Exhibit G</u>, <u>Exhibit H</u>, and <u>Exhibit I</u> to Docket No. 393, as applicable. All such exhibits are fully incorporated by reference herein, and for the avoidance of any doubt, the declaration to which such exhibits are attached is not incorporated by reference herein in any respect.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated: September 27, 2023
Quito, Ecuador

*/s/ Christopher Ferraro*

Name:    Christopher Ferraro
Title:    Interim Chief Executive Officer,
          Chief Restructuring Officer, and
          Chief Financial Officer of Debtor
          Celsius Network LLC