Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DECLARATION OF ROBERT CAMPAGNA
## IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

I, Robert Campagna, hereby declare under penalty of perjury, as follows:

1.    I am a Managing Director with Alvarez & Marsal North America, LLC (together with its wholly-owned subsidiaries and independent contractors and also with employees of its professional service provider affiliates, all of which are wholly-owned by its parent company and employees, "A&M"), a restructuring advisory services firm with numerous offices throughout the country.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

2.      Except as otherwise noted, I have personal knowledge of the matters set forth herein or have been informed of such matters by professionals of A&M or the Debtors' management team or other advisors.

3.      I submit this Declaration in support of confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), and the *Debtors' Memorandum of Law In Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto* (the "Memorandum"),[2] filed contemporaneously herewith.

4.      Unless otherwise indicated, the statements set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' business, (b) information learned from my review of relevant documents, (c) information I received from the A&M team working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional.  I am not being specifically compensated for this testimony other than through payments that are proposed to be received by A&M as a professional retained by the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## I.      QUALIFICATIONS

5.      Since 1983, A&M has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas.  A&M's debtor advisory services have encompassed a wide range of activities

---

[2]      Capitalized terms used but not defined herein shall have the meanings given to such terms in the Plan, Memorandum, Disclosure Statement, Liquidation Analysis, or Orderly Wind Down Analysis as applicable.

targeted at stabilizing and improving a company's financial position, including developing and validating forecasts and business plans; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages.

6.      Since the Debtors engaged A&M in June of 2022, I have worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including assisting the Debtors in preparing cash flow projections, budgets, and other financial information.  I lead the A&M team advising the Debtors.

7.      I have over twenty-five years of distressed company advisory experience.  Through roles in both senior management and as a restructuring advisor, I have substantial experience helping financially distressed companies stabilize their financial condition, analyze their operations, and develop business plans to accomplish the necessary restructuring of their operations and finances.  I have advised clients in numerous major bankruptcy cases, including *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH); *In re Stearns Holdings, LLC*, No. 19-12226 (SCC); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ); *In re Payless Holdings LLC*, No. 17-42257 (KSS); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH); *GT Advanced Techs. Inc.*, No. 14-11916 (HJB); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS); *V2V Holding LLC*, No. 12-11385 (MG); *Education Holdings 1, Inc.*, No. 13-10101 (BLS); *Orchard Brands Corp.*, No. 20-10566 (MFW); *Cooper Standard Auto.*, No. 09-12743; and *Interstate Bakeries Corp.*, No. 04-45814 (JWV).  I received my bachelor's degree in business administration from Bucknell University.  I am a Certified Public Accountant (inactive) and a Certified Insolvency and Restructuring Advisor.

## II.    The Plan Satisfies the Confirmation Requirements

8.    I have been advised of the applicable standards under which a chapter 11 plan may be confirmed pursuant to section 1129(a) of the Bankruptcy Code.  Furthermore, I understand that the Ferraro Declaration addresses feasibility, third-party releases, and various Plan-specific concepts.  Accordingly, this Declaration does not address those points and instead addresses certain other confirmation requirements.  For the reasons detailed below, and with the consultation and guidance of the Debtors' advisors, I believe, to the best of my knowledge, that the Plan satisfies the applicable Bankruptcy Code requirements as noted below for confirmation of a plan.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan and related documents.

### A.    The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code — § 1129(a)(1).

9.    I understand that section 1129(a)(1) of the Bankruptcy Code requires a chapter 11 plan to comply with all applicable provisions of the Bankruptcy Code including those that follow:

#### 1.    Proper Classification of Claims and Interests — § 1122 and § 1123(a)(1)

10.    I understand that sections 1122 and 1123(a)(1) of the Bankruptcy Code govern the manner in which a debtor classifies claims and interests.  I believe that the Plan's classification of Claims and Interests satisfies the requirements of sections 1122 and 1123(a)(1) of the Bankruptcy Code because the Plan places Claims and Interests into seventeen separate Classes, with the Claims and Interests in each differing legally or factually from those in other Classes or being grouped separately based on other relevant criteria.

11.    I believe that valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Generally, Claims

4

(rights to payment) are classified separately from Interests (representing ownership in the businesses).  In particular, the Plan breaks out Other Secured Claims, Other Priority Claims, Unsecured Loan Claims, and General Unsecured Claims from the Account Holder Classes because they have differing legal rights and play disparate roles in ensuring the future economic viability of NewCo.  For example, Account Holder Claims are classified into separate Classes because Account Holders participated in differing Celsius programs with varying rights and obligations, and purchased products and services pursuant to different contractual terms.  For instance, as the Bankruptcy Court found, pursuant to the applicable terms of use, cryptocurrency in the Earn Program belongs to the Debtors' Estates whereas cryptocurrency in the Custody Program belongs to the customers.[3]  Accordingly, General Earn Claims are classified separately from Custody Claims under the Plan.  Similarly, Holders of Retail Borrower Deposit Claims are subject to terms of use separate and apart from Holders of Earn Claims and Holders of Custody Claims, with separate obligations owed by them to the Debtors and by the Debtors to them.  I also understand that Withhold Claims were subject to no terms of use at all, and Convenience Claims are classified differently from other Account Holder Claims because these Claims are small in amount and large in number as to make otherwise dealing with them (by classifying them as General Earn Claims, for instance) burdensome.[4]

12.    General Unsecured Claims are classified differently from other unsecured Claims because they are structurally different than Administrative Claims, Priority Tax Claims, Other Priority Claims, Intercompany Claims, Convenience Claims, General Earn Claims, Custody

---

[3]    *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (holding that assets in Earn Accounts are property of the Debtors' estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[4]    *See also* 11 U.S.C. § 1122(b).

Claims, Withhold Claims, Retail Borrower Deposit Claims, Unsecured Loan Claims, Section 510(b) Claims, State Regulatory Claims, or Equitably Subordinated Claims, and are comprised primarily of obligations of the Debtors arising in the ordinary course of business.

13.    Furthermore, the Plan breaks a subset of miscellaneous Claims and Interests into the different Classes because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' estates that are legally dissimilar to the Claims or Interests in other Classes. State Regulatory Claims are classified separately because such Claims consists of Claims held by certain state-level governmental agencies. *De Minimis* Claims are classified separately because they consist of Claims valued at less than $10, and the administrative burden on the Debtors' estates outweighs the small distributions that would be made to these *De Minimis* Claims. Intercompany Claims and Intercompany Interests are classified separately because such Claims or Interests consist of Claims or Interests held by one Debtor entity against another Debtor entity. Series B Preferred Interests are classified separately due to the settlement entered into between the Debtors and such parties, which consensually resolves the treatment of their respective Interests. Other Interests are classified separately because they consist of all Interests in any Debtors that are not Series B Preferred Interests or Intercompany Interests (which are between Debtor entities). Section 510(b) Claims are classified separately because they consist of Claims subject to subordination under section 510(b) of the Bankruptcy Code, including Other CEL Token Claims. Equitably Subordinated Claims are classified separately because they consist of Claims identified by the Committee and agreed by the Debtors to be subordinated pursuant to the Plan, which were identified on the Schedule of Equitably Subordinated Claims.

14.    Based on my understanding of the breakdown of Classes, I believe that there are valid business, legal, and/or factual reasons to justify the separate classification of the particular

Claims or Interests into the Classes created under the Plan.  I also believe that Article III of the

Plan properly designates Classes of Claims and Interests.  As such, I believe the Plan satisfies

section 1122(a) and 1123(a)(1) of the Bankruptcy Code.

### 2.    Specification of Unimpaired Classes — § 1123(a)(2)

15.    I understand that Article III.A of the Plan identifies Classes 1, 3, and 6B as

Unimpaired and preserves optionality for the Debtors to render Classes 12 and 13 Unimpaired.

### 3.    Treatment of Impaired Classes — § 1123(a)(3)

16.    I understand that Article III.A of the Plan identifies Classes 2, 4, 5, 6A, 7, 8, 9, 10,

11, 14, 15, 16, and 17 as Impaired and preserves optionality for the Debtors to render Classes 12

and 13 Impaired.

### 4.    Equal Treatment of Similarly Situated Claims and Interests — § 1123(a)(4)

17.    I understand that section 1123(a)(4) of the Bankruptcy Code requires that the Plan

provide the same rights and treatment to each Holder of Claims or Interests as other Holders of

allowed Claims or Interests within such Holders' respective Class, except where the Holder of

such Claim or Interest has agreed to a less favorable treatment.  I believe that the Plan satisfies this

requirement, as Article III of the Plan provides that Holders of Allowed Claims or Interests in a

particular Class will receive the same treatment as other Holders in such Class, except to the extent

that any such Holder agrees to less favorable treatment.

### 5.    Adequate Means for Implementation — § 1123(a)(5)

18.    I understand that section 1123(a)(5) of the Bankruptcy Code requires that a

chapter 11 plan provide adequate means for a plan's implementation.  The Plan provides adequate

means for implementation as required under section 1123(a)(5) of the Bankruptcy Code.  Among

other things, Article IV of the Plan sets forth means of implementation such as (a) the substantive

consolidation of the Initial Consolidated Debtors, (b) the CEL Token Settlement, (c) the Account

Holder Avoidance Action Settlement, (d) the Custody Settlement, (e) the Withhold Settlement,

(f) the Series B Settlement, (g) the Retail Borrower Settlement, (h) the Class Claim Settlement,

(i) the NewCo Restructuring Transactions, (j) the Orderly Wind Down, and (k) the Employee

Transition Services Plan.  In addition to these core transactions, the Plan sets forth other critical

mechanics of the Debtors' emergence, such as (a) the establishment of the Plan Administrator and

the authorization for the Plan Administrator to issue documents and take such actions as may be

necessary or appropriate to effectuate, implement, and further evidence the Plan and the documents

described therein, (b) the establishment of the Litigation Administrator to prosecute, settle, or

otherwise resolve, without limitation, all remaining Disputed Claims, the Recovery Causes of

Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s)

and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any

other CEL Insider Loans, (c) the establishment of the Litigation Oversight Committee, (d) the

contribution of Contributed Claims, (e) the cancellation of all notes, instruments, certificates, and

other documents, (f) the authorization, approval, and ratification of all actions contemplated by the

Plan without any further action by the equity holders, members, directors, managers, or officers of

the Debtors or the Post-Effective Date Debtors, as applicable, (g) the creation of the NewCo Board

and the appointment of such directors in accordance with the terms of the Plan, (h) the adoption

and implementation of the Employee Transition Plan, (i) the application of section 1146(a) of the

Bankruptcy Code to any transfers of property under the Plan (including the Restructuring

Transactions) or pursuant to certain other actions, (j) the preservation of Causes of Action by the

Post-Effective Date Debtors and the enforcement thereof by the Litigation Administrator(s) (with

respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action), and (k) the release of Avoidance Actions.

19.      ***Substantive Consolidation***.  As part of the mechanisms being utilized as these cases reach emergence, I believe that the substantive consolidation as contemplated under the Plan will benefit all stakeholders and helps to facilitate the implementation of the Plan.  Based on my team's analysis following discussions with the management team and a review of the Debtors' books and records, the Debtors did not record prepetition intercompany transactions in their books and records contemporaneously with such transfers, and in many cases did not record intercompany transactions at all.  This has resulted in a backlog of transactions that, to date, have not been fully reconciled and are unlikely to ever be fully reconciled.  Moreover, with respect to certain intercompany entries that represent transfers of cryptocurrency, the Debtors did not record the full value of the assets that were transferred from Celsius Network Limited to Celsius Network LLC, but rather accounted for only the cost basis of such assets through intercompany accounting.  Finally, in addition to not capturing the full market value of coins transferred via intercompany transactions, the Debtors did not engage in "mark-to-market" reconciliation practices to track the subsequent impact of market movements with respect to these transactions on an ongoing basis.

20.      Despite best efforts to understand the complete universe of intercompany transactions, I believe that a comprehensive accounting of all intercompany transactions would require extensive forensic analysis and be costly and time consuming, if it were even possible given the recordkeeping deficiencies.  For example, determining the precise balance of the intercompany claims first requires establishing the coins associated with each intercompany transaction, and then would require reconciling subsequent mark-to-market adjustments.

21.     Accordingly, I believe that the previously approved substantive consolidation of Celsius Network Limited and Celsius Network LLC was a beneficial action.  Moreover, I believe that the Plan's further substantive consolidation of the Initial Consolidated Debtors (*i.e.*, Celsius Network Limited and Celsius Network LLC), with Celsius Lending LLC and Celsius Network Lending LLC, is appropriate under the circumstances.

22.     ***Employee Incentive Plan***.  With regard to the EIP, I reviewed the performance metrics under the EIP to determine if such metrics are sufficiently challenging to satisfy the requirements of the Bankruptcy Code.  I note the following observations.

23.     I understand that the Liquid Cryptocurrency Distribution Metric is sufficiently challenging, as such process has never before been attempted by the Debtors at the large scale required to implement the Debtors' Plan within the time frame at which the Debtors must complete an initial distribution to receive a target payout under the EIP.

24.     Similarly, I believe the Distribution Agreement Metric is fundamental to allowing creditors to receive recoveries under the Plan and is sufficiently challenging due to the novel, large-scale nature of the distributions required under the Plan.

25.     I understand that the Chapter 11 Plan Confirmation Metric and Effective Date Metric are sufficiently challenging, as the Plan confirmation and consummation process require significant efforts by all EIP Participants, in addition to their prepetition day-to-day responsibilities, to confirm and consummate the Plan on the timeline required to receive a target payout under the EIP.

26.     I also understand that the East Stiles Site Metric is sufficiently challenging because, while such metric has been achieved by the applicable EIP Participants, such achievement was

inherently uncertain due to prolonged delays caused by disputes with multiple mining counterparties.

27.    I believe that the Midland Texas Gross Margin Metric is sufficiently challenging due to the inherently uncertain, risky nature of the mining business, resulting in construction and delivery delays, service delays, and disputes with multiple mining counterparties.

28.    I understand that the Mining Rig Metric is sufficiently challenging, as evidenced by the fact that the applicable EIP Participants have not yet achieved target payout under such metric due.  Specifically, pursuant to the Mining Rig Metric, target performance required the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, to have, among other things, 95,000 mining rigs hashing (or energized but not hashing due to market conditions, by September 30, 2023).  As of August 31, the Debtors have only approximately 86,000 mining rigs hashing, thus falling well short of target performance.  Construction and delivery delays, disputes with mining counterparties, and the numerous financial risks associated with developing and maintaining mining sites have together prevented the Debtors from having 95,000 mining rigs hashing at this point.

29.    In sum, I understand that the precise terms governing the execution of certain of these transactions are set forth in greater detail in the applicable Definitive Documents or forms of agreements included in the Plan Supplement.  As a result, I believe the Plan satisfies section 1123(a)(5).

### 6.    Prohibition of Issuance of Non-Voting Stock — § 1123(a)(6)

30.    I understand that section 1123(a)(6) of the Bankruptcy Code requires that a debtor's organizational documents prohibit the issuance of nonvoting equity securities.  In the event that the NewCo Transactions is successfully consummated, I understand that the NewCo New

Organizational Documents prohibit the issuance of non-voting securities.  Similarly, in the event

of the Orderly Wind Down, I also understand that no non-voting stock would be issued.

Accordingly, I believe section 1123(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

### 7.    Discretionary Contents of the Plan — § 1123(b)

31.    I understand that section 1123(b) of the Bankruptcy Code sets forth various

discretionary provisions that may be incorporated into a chapter 11 plan.  I understand that pursuant

to section 1123(b) of the Bankruptcy Code, among other things, a plan may:  (a) impair or leave

unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory

contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest

belonging to the debtor or the estates; (d) include any other appropriate provision not inconsistent

with the applicable provisions of chapter 11; or (e) "include any other appropriate provision not

inconsistent with the applicable provisions of [the Bankruptcy Code]."[5]

32.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Pursuant to

Article III of the Plan, Classes 1, 3, and 6B are Unimpaired because I understand the Plan leaves

unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.

On the other hand, Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 are Impaired because the

Plan modifies the rights of the Holders of Claims or Interests, as applicable, within such Classes

as contemplated by section 1123(b)(1) of the Bankruptcy Code.[6]  Classes 12 and 13 are either

Impaired or Unimpaired, based on whether the Debtors determine to Reinstate, compromise, or

cancel such Claims or Interests without distribution.

---

[5]    11 U.S.C. § 1123(b)(1)–(3), (6).

[6]    *Id.*

33.     Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date, (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down, or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan. Accordingly, I believe that the Plan complies with section 1123(b)(2) of the Bankruptcy Code.

### 8.     The Debtors Complied with the Solicitation Requirements of the Bankruptcy Code — § 1129(a)(2).

34.     I understand that section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code and that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.

35.     I understand that the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Voting Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14. I also understand that the Debtors did not solicit votes from Holders of Claims in Classes 1, 3, and 6B because Holders of such Claims are Unimpaired and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code. Moreover, I understand that the Debtors also did not solicit votes from Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17, and Holders of Claims or

Interests, as applicable, in Classes 11, 15, 16, or 17 are deemed to reject the Plan and thus are not entitled to vote on the Plan. Finally, I understand that Holders of Claims in Class 12 and Interests in Class 13 are either deemed to reject or presumed to accept the Plan based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution. Thus, I believe that only Holders of Claims in 2, 4, 5, 6A, 7, 8, 9, 10, and 14 were entitled to vote to accept or reject the Plan.

36.    Based on my review of the Voting Report,[7] which summarizes the voting process that concluded on September 22, 2023, I understand that the Debtors solicited and tabulated votes to accept or reject the Plan in accordance with the customary solicitation procedures for chapter 11 plans of reorganization established in this district.

37.    Accordingly, I believe that the Plan complies with sections 1125 and 1126 of the Bankruptcy Code.

### 9.    The Governance Disclosure Requirements Do Not Apply to the Debtors or Are Satisfied — § 1129(a)(5).

38.    I understand that section 1129(a)(5) of the Bankruptcy Code requires (a) that a plan proponent disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor, or a successor thereto, under a chapter 11 plan, (b) that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and (c) that a plan proponent disclose the identities or affiliations of insiders to be employed or retained by the reorganized debtors as directors and officers and the nature of any compensation for such insider. I believe that Article IV.D.7 of the

---

[7]    *See Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560]. *See also Amended Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3574].

Plan, the Plan Supplement, and the New Organizational Documents provide information about the NewCo Board and the mechanism for how such members will be chosen. Specifically, I understand that the New Board shall initially consist of various members disclosed in the Plan Supplement.

39.     As such, I believe that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

**10.     The Plan Does Not Require the Government to Approve Rate Changes — § 1129(a)(6).**

40.     I understand that confirmation is permitted only if a regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan. I have been informed that no such regulatory commission exists here. As such, I do not believe that section 1129(a)(6) is applicable to the Plan.

**11.     The Plan Satisfies the Best Interests Test — § 1129(a)(7).**

41.     I understand that section 1129(a)(7) of the Bankruptcy Code requires that any chapter 11 plan must satisfy the "best interests of creditors" test, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation. As discussed in Section III, *infra*, it is my opinion that the Plan satisfies the "best interests of creditors" test based on the Liquidation Analysis prepared by the Debtors with the assistance of their advisors that is attached to the Disclosure Statement as Exhibit B. The Liquidation Analysis provides that under the Plan all Impaired Classes of Claims and Interests will receive a recovery that is greater than or equal to the recovery contemplated in a hypothetical chapter 7 liquidation. Accordingly, I believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

## 12.   Acceptance by Impaired Classes — § 1129(a)(8)

42.   I understand that the Bankruptcy Code generally requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.  I further understand that if any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.  I understand that Holders of Claims in the majority of the Voting Classes, including Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), Class 6A (General Custody Claims), Class 7 (Withhold Claims), Class 10 (State Regulatory Claims), and Class 14 (Series B Preferred Interests) voted to accept the Plan.  I understand that because certain Classes are or may be deemed to reject the Plan, however, the Debtors do not satisfy section 1129(a)(8) of the Bankruptcy Code.  Nevertheless, even though certain Classes are or may be deemed to reject the Plan, I believe that the Debtors still satisfies section 1129(b) of the Bankruptcy Code as at least one Impaired Class voted to accept the Plan, and because the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Classes (as described in greater detail below).

## 13.   Priority Cash Payments — § 1129(a)(9)

43.   I understand that the Bankruptcy Code generally requires that claims entitled to administrative priority must be paid in full in cash on the effective date or receive certain other specified treatment to which the Holder of such claim has agreed.  I understand that Article II.A of the Plan provides that each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the amount of such Allowed Administrative Claims on the Effective Date, as soon as reasonably practicable thereafter, or at such other time set forth in Article II.A of the Plan.  In addition, Articles II.C and III.B of the Plan specifically provides that Allowed Priority Tax Claims will be treated in accordance with the requirements of the Bankruptcy Code.  Accordingly, I

believe that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(9) of the Bankruptcy Code.

### 14.    At Least One Impaired Class Voted to Accept the Plan — § 1129(a)(10).

44.    I understand that the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan. I understand that Holders of Claims in Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), Class 6A (General Custody Claims), Class 7 (Withhold Claims), Class 10 (State Regulatory Claims), and Class 14 (Series B Preferred Interests)—which are Impaired Classes under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes. In accordance with the results contained in the Voting Report, I believe that the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### 15.    The Plan Provides for Payment of All Fees — § 1129(a)(12).

45.    I understand that section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930. I believe that Article II.D of the Plan provides that the Debtors and the Post-Effective Date Debtors, as applicable, shall pay all fees and charges due, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or the Post-Effective Date Debtors' business, for each quarter (including any fraction thereof) until the chapter 11 cases are converted, dismissed, or closed, whichever occurs first.

### 16. The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code.

46.     It is my understanding that section 1129(a)(13) of the Bankruptcy Code requires that any applicable retiree benefits will continue to be paid post effective date at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period which the debtor has obligated itself.  I do not believe retiree benefits as defined by section 1129(a)(13) are implicated by the Plan.

### 17. Sections 1129(a)(14) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

47.     I understand that section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  The Debtors are not subject to any domestic support obligations.  Likewise, I understand that section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  None of the Debtors is an "individual."  Finally, I understand that section 1129(a)(16) of the Bankruptcy Code relates only to nonprofit corporations or trusts.  None of the Debtors is a nonprofit corporation or trust.

### 18. The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code.

#### i. The Cram Down Provisions Are Appropriate — § 1129(b).

48.     I understand that if all applicable requirements of section 1129(a) of the Bankruptcy Code are satisfied, other than section 1129(a)(8), a plan may still be confirmed so long as the requirements set forth in section 1129(b) are satisfied.  To the best of my knowledge, the Plan distributes value to Holders of Claims and Interests in the priorities set forth in the Bankruptcy Code, there is no Class receiving more than a 100 percent recovery, and other than Holders of Series B Preferred Interests that are receiving a distribution as a part of the Series B Settlement

(discussed in more detail below), no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100 percent recovery or have agreed to receive a different treatment under the Plan. As such, I believe that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.

49.     *First*, I understand that the Plan's treatment of the Impaired Classes that have been deemed to reject the Plan is proper because the Plan's overall classification scheme rests on a legally acceptable rationale and all similarly situated Claims and Interests will receive substantially similar treatment.  I have been informed that Claims in deemed rejecting Classes are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.  As such, I believe that the Plan does not discriminate unfairly with respect to the Impaired Classes that have been deemed to reject the Plan and satisfies the requirement of section 1129(b) of the Bankruptcy Code.

50.     *Second*, I understand that the only Classes of Claims and/or Interests junior to the Impaired deemed rejecting Classes that may receive any recovery are Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests).  Similarly, it is important to note that Holders of Class 14 (Series B Preferred Interests) Claims are receiving their recovery on account of a prior settlement rather than on account of their interests themselves.  I also understand that no Class of Claims is receiving more than it is owed.

51.     As a result, I believe the Plan satisfies 1129(b) of the Bankruptcy Code.

**ii.     Only One Plan Is Eligible to Be Confirmed — Section 1129(c).**

52.     I understand that section 1129(c) of the Bankruptcy Code prohibits the confirmation of multiple plans.  Section 1129(c) of the Bankruptcy Code is not implicated here because there is only one proposed plan.

### iii.    The Principal Purpose of the Plan Is Not the Avoidance of Taxes as Required Under Section 1129(d) of the Bankruptcy Code.

53.    The Plan was not filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act of 1933, as amended.  I understand that Article II.C of the Plan contemplates the full payment of all Allowed Priority Tax Claims.  I also believe that no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, I believe that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### iv.    Section 1129(e) of the Bankruptcy Code Is Inapplicable.

54.    I understand that section 1129(e) of the Bankruptcy Code does not apply to the Plan because none of the Debtors' chapter 11 cases is a "small business case" within the meaning of the Bankruptcy Code.

### III.    Liquidation Analysis

55.    The Liquidation Analysis was prepared to address the Plan's ability to satisfy the "best interests of creditors" test as defined in section 1129(a)(7) of the Bankruptcy Code, which provides that holders of claims or interests in impaired, non-accepting classes must receive under a chapter 11 plan at least as much as they would in a liquidation.[8]

56.    To prepare this Liquidation Analysis, the Debtors, with the assistance of their advisors estimated proceeds, costs, and resulting recoveries in either the event that the Plan is confirmed and consummated or the event the Plan is converted to a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors, supported by their advisors, estimated creditor recoveries

---

[8]    An explanation of the Liquidation Analysis along with a summary of the Debtors' and my assumptions were set forth as <u>Exhibit B</u> to the Disclosure Statement.

under the NewCo Transaction, including on account of NewCo Common Stock, based on the net asset value of NewCo, which is approximated to be $1.248 billion and consists of the following components:  $450 million of cryptocurrency that will "seed" NewCo, Mining; and certain illiquid assets.  Then, to compare distributions under NewCo as opposed to a chapter 7 liquidation, the Debtors estimated the total Liquidation Proceeds that a chapter 7 trustee could generate under chapter 7 and then determined the estimated Liquidation Distribution to creditors under the priority scheme set forth in chapter 7 of the Bankruptcy Code.  The Liquidation Distribution was compared to the distribution Holders would receive if the Plan were confirmed and consummated.  The Liquidation Analysis was based on a variety of assumptions that I believe are reasonable on an overall basis.

57.     With respect to the chapter 7 liquidation scenario, the Debtors' current chapter 11 cases are assumed to be converted to cases under chapter 7 of the Bankruptcy Code on or about November 30, 2023 (the "Liquidation Date"), absent confirmation of the Plan.  Furthermore, on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee ("Trustee"), and that the Trustee would immediately sell or surrender all of the Debtors' assets and the cash proceeds of those sales, net of the liquidation-related costs, would then be distributed to creditors in accordance with applicable law.

58.     In preparing the Liquidation Analysis, the Debtors and their advisors utilized (i) a valuation of certain of the Debtors' assets prepared by Stout Risius Ross, LLC as of May 31, 2023 (the "Valuation Report"), (ii) input from the management team and advisors, and (iii) projected results of operations and cash flows over the period from May 31, 2023 to the Liquidation Date. The Liquidation Analysis was prepared on a legal entity basis for each Debtor and, for presentation purposes, summarized into a consolidated report attached to the Disclosure Statement as Exhibit B.

59.     More specifically, to estimate the creditor recoveries in each scenario, the following steps were performed:

(i)     **Estimation of Gross Proceeds**

60.     For the chapter 7 liquidation scenario, the Debtors with the assistance of their advisors, estimated the cash proceeds that the Trustee would generate if the Debtors' chapter 11 cases were converted to chapter 7 cases and the assets of the Debtors' bankruptcy estates were liquidated.

61.     For the Plan scenarios, the Debtors and their advisors estimated the proceeds that would be generated if either the NewCo transactions or the Orderly Wind Down were consummated.[9]  In the event of a liquidation, however, the accelerated time frame in which the assets are marketed and sold, the negative vendor, customer and general market reaction, and the generally forced nature of the sale would likely materially reduce recovery values for the Debtors' assets.

(ii)     **Calculation of Wind-Down Costs**

62.     In preparing the Liquidation Analysis, the Debtors made certain assumptions and estimations regarding the costs of a hypothetical chapter 7 liquidation.  As part of this process, it was estimated that a hypothetical chapter 7 would last approximately six months, to allow the chapter 7 trustee to complete the sales of substantially all remaining assets, collect receivables, pursue all preference claims, make distributions, and otherwise administer and close the Debtors' Estates.  In an actual chapter 7 liquidation, the length of the wind-down could vary significantly, which would impact recoveries.  The estimated costs of the hypothetical chapter 7 liquidation

---

[9]     An explanation of the Orderly Wind Down along with a summary of the key assumptions were set forth as <u>Exhibit C</u> to the Disclosure Statement.

contemplated under the Liquidation Analysis include:  (i) wind-down costs; (ii) chapter 7 professional fees; and (iii) chapter 7 trustee fees.  All assumptions regarding the hypothetical chapter 7 liquidation are set forth in more detail in the Liquidation Analysis.

### (iii)    Analysis of Intercompany Receivables and Interests

63.    In preparing the Liquidation Analysis, the Debtors and their advisors calculated the potential recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor affiliates and (ii) the Debtors' equity interests in non-Debtor affiliate subsidiaries.  The recoverability of the Debtors' intercompany receivables and investments in subsidiaries was calculated prior to determining the Net Liquidation Proceeds Available for Distribution to the Debtors' Claimants.  The analysis of intercompany receivables further considered the relationships of pre and postpetition intercompany balances, and the superpriority administrative expense status accorded to postpetition intercompany balances in the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152].

### (iv)    Distribution of Net Proceeds

64.    Finally, the Liquidation Analysis estimates the recoveries to creditors at each Debtor by running the Net Proceeds and estimated claims as of the Petition Date through a waterfall recovery model, which pays claims based on priority until fulfilled, and then "waterfalls" to the next lower priority claim, until all proceeds are depleted.  I believe that the distributions to creditors in the Liquidation Analysis reflect section 1129 of the Bankruptcy Code's "absolute priority rule" that no junior creditor at a given entity would receive any distribution until all senior

creditors are paid in full at that entity, and no equity holder would receive any distribution until all creditors at such entity are paid in full.

65.    In sum, the estimated total Liquidation Proceeds available for distribution for the Debtors' Holders of Claims and Interests range from approximately $2.6 billion to $2.9 billion. The distributable proceeds in the Orderly Wind Down are estimated to be in excess of $3.1 billion, and the proceeds under the NewCo Transaction are estimated to exceed $3.4 billion.

66.    The below chart compares estimated creditor recoveries under the Plan, whether under the NewCo Transaction or the Orderly Wind Down, to the estimated recoveries to creditors in a liquidation under chapter 7.  In every Class, creditors are estimated to receive an equal or greater recovery under either of the NewCo Transaction or the Orderly Wind Down than they would be entitled to receive under a chapter 7 liquidation.

| | | Recovery Under Plan | | |
| | Class | NewCo | Orderly Wind Down | Liquidation Analysis |
|---|---|---|---|---|
| Other Secured Claims | Class 1 | N/A | N/A | N/A |
| Retail Borrower Deposit Claims | Class 2 | 85.6% | 83.0% | 47.4% |
| Other Priority Claims | Class 3 | N/A | N/A | N/A |
| Convenience Claims | Class 4 | 70.0% | 70.0% | N/A |
| General Earn Claims | Class 5 | 67.0% | 61.2% | 47.4% |
| General Custody Claims[1] | Class 6A | 72.5% | 72.5% | 72.5% |
| Withdrawable Custody Claims[1] | Class 6B | 100.0% | 100.0% | 100.0% |
| Withhold Claims | Class 7 | 72.0% | 67.1% | 47.4% |
| Unsecured Loan Claims | Class 8 | 67.0% | 61.2% | 47.4% |
| General Unsecured Claims | Class 9 | 67.0% | 61.2% | 37.5% |
| State Regulatory Claims[2] | Class 10 | 0.0% | 0.0% | 0.0% |
| De Minimis Claims | Class 11 | 0.0% | 0.0% | 0.0% |
| Intercompany Claims | Class 12 | N/A | N/A | 47.3% |
| Intercompany Interests | Class 13 | N/A | N/A | N/A |
| Series B Preferred Interests | Class 14 | 0.1% | 0.1% | 0.1% |
| Other Interests | Class 15 | 0.0% | 0.0% | 0.0% |
| Section 510(b) Claims | Class 16 | N/A | N/A | N/A |
| Equitably Subordinated Claims | Class 17 | 0.0% | 0.0% | 0.0% |

(1) General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date
(2) The treatment of State Regulatory Claims remains subject to ongoing discussions with state regulators

67.     In light of the foregoing, and as illustrated in the chart above, I believe that a chapter 7 liquidation results in lower distributable value than either the NewCo Transaction or the Orderly Wind Down.  Furthermore, as the chart above shows, I believe that the NewCo Transaction and Orderly Wind Down scenarios provide higher recovery rates for each Impaired Class receiving distributions under the Plan as compared to the recoveries estimated under a chapter 7 liquidation.

68.     The chart comparing recoveries under the NewCo Transaction, the Orderly Wind Down, and a hypothetical chapter 7 liquidation scenario is included in the Conclusion to the Liquidation Analysis.  Although titled an "Orderly Wind-Down," that scenario contemplates a reorganization of the Debtors' Mining business through a pure-play publicly listed mining Company managed by an external third-party mining manager.  The Orderly Wind-Down also envisions the organized monetization of the Debtors' illiquid assets, such as their Investments and Institutional Loans, over a period of up to five years.  It is likely that a chapter 7 trustee would liquidate those assets on a much shorter timeframe resulting in significantly lower values.  The Liquidation Analysis reflects this shorter timeframe.

69.     Accordingly, it is my opinion that confirmation of the Plan will provide creditors with a recovery that is greater than or equal to what they would otherwise receive in connection with a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Moreover, I believe creditors will receive more value under confirmation of the Plan as compared to under a chapter 7 liquidation for additional reasons.  ***First***, I understand that conversion to a chapter 7 liquidation would require entry of a new bar date.  Accordingly, the amount of Claims ultimately filed and allowed against the Debtors could materially increase, thereby further reducing creditor recoveries as compared to those shown in the Liquidation Analysis in the chart above.  ***Second***, and relatedly, I understand that conversion to a chapter 7 liquidation will result in delayed recoveries to creditors,

versus under confirmation of the Plan, where the Debtors stand ready to consummate a value-maximizing transaction and return cryptocurrency in the near term.

## IV.    Conclusion

70.    In summary, it is my opinion that the Plan satisfies the standards discussed above for confirmation applicable under the Bankruptcy Code.   Among other things, the NewCo Transaction or the Orderly Wind Down will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such Holders would receive pursuant to a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated:  September 27, 2023

/s/ *Robert Campagna*
_____

Robert Campagna
Managing Director
Alvarez and Marsal, LLC