**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## SIXTH NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Plan Supplement") to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and conditions in the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 8, 2023, the Debtors filed the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fourth Notice of Filing of Plan Supplement* [Docket No. 3483] (the "Fourth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fifth Notice of Filing of Plan Supplement* [Docket No. 3550] (the "Fifth Plan Supplement").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "<u>Sixth Plan Supplement</u>" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, and the Fifth Plan Supplement, the "<u>Plan Supplement</u>")[3], which includes the following documents:

| <u>Exhibit</u> | <u>Document</u> |
|---|---|
| A | Identities of Litigation Oversight Committee Members |
| A-1 | (Redline) Identities of Litigation Oversight Committee Members |
| B | Coinbase Agreements |
| B-1 | (Redline) Coinbase Agreements |
| C | Litigation Administrator Agreement |
| C-1 | (Redline) Litigation Administrator Agreement |
| D | Plan Administrator Agreement |
| D-1 | (Redline) Plan Administrator Agreement |
| E | Schedule of Excluded Parties |
| E-1 | (Redline) Schedule of Excluded Parties |
| F | Board Observer Agreement |
| G | Identities of the Board Observers |
| H | NewCo Board Terms |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Plan Sponsor Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims,

---

[3]   **Annex 1** contains a listing of all documents filed in the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, and the Fifth Plan Supplement.

Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re: Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

*[Rest of page intentionally left blank]*

New York, New York
Dated: September 27, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Annex 1**

I.    ***Notice of Filing of Plan Supplement*** **[Docket No. 3115].**

Exhibit        Document

A            Schedule of Released and Exculpated Parties

B            ADR Procedures

II.    ***Second Notice of Filing of Plan Supplement*** **[Docket No. 3273].**

Exhibit        Document

A            Schedule of Retained Causes of Action

B            Schedule of Equitably Subordinated Claims

C            Schedule of Excluded Parties

III.    ***Third Notice of Filing of Plan Supplement*** **[Docket No. 3444].**

Exhibit        Document

A            New Organizational Documents

B            Identities of the members of the New Board of NewCo

C            Schedule of Rejected Executory Contracts and Unexpired Leases

D            Schedule of Assumed Executory Contracts and Unexpired Leases

E            Litigation Administrator Agreements

F            Identity of Litigation Administrator

G            Identities of Litigation Oversight Committee Members

H            Employee Transition Services Agreement

I            Plan Administrator Budget

J            ADR Procedures (Redline at Exhibit J-1)

K            Schedule of Retained Causes of Action (Redline at Exhibit K-1)

IV.    ***Fourth Notice of Filing of Plan Supplement*** **[Docket No. 3483].**

| Exhibit | Document |
| --- | --- |
| A | Fahrenheit Management Agreement |
| B | Transaction Steps Memorandum |
| C | U.S. Bitcoin Agreements |
| D | Proof Group IP License |
| E | Plan Sponsor Contribution Agreement |
| F | Paxos Custodial Agreement |
| G | Coinbase Agreements |
| H | PayPal Agreement |
| I | Plan Administrator Agreement |
| J | Figure Lending, LLC Refinancing Term Sheet |
| K | NewCo Organizational Documents |
| K-1 | (Redline) NewCo Organizational Documents |

V.    ***Fifth Notice of Filing of Plan Supplement*** **[Docket No. 3550].**

| Exhibit | Document |
| --- | --- |
| A | Identities of the members of the New Board of NewCo |
| A-1 | (Redline) Identities of the members of the New Board of NewCo |

## Exhibit A

**Identities of Litigation Oversight Committee Members**

## <u>Litigation Oversight Committee Members</u>

1. Mark Robinson

2. Keith Noyes

3. Gerard Uzzi

4. Vik Jindal

5. Deirdre O'Connor

6. Cameron Crews, designated by the Earn Ad Hoc Group

7. David Adler, designated by the Retail Borrower Ad Hoc Group

**Exhibit A-1**

**(Redline) Identities of Litigation Oversight Committee Members**

**Litigation Oversight Committee Members**

1. Mark Robinson

2. Keith Noyes

3. Gerard Uzzi

4. Vik Jindal

5. ~~One (1) additional individual to be designated by the Committee~~

5. Deirdre O'Connor

6. ~~One (1) individual to be~~ Cameron Crews, designated by the Earn Ad Hoc Group~~, subject to the consent of the Committee~~

7. ~~One (1) individual to be~~ David Adler, designated by the Retail Borrower Ad Hoc Group~~, subject to the consent of the Committee~~

# Exhibit B

## Coinbase Agreements

# COINBASE PRIME BROKER AGREEMENT

## General Terms and Conditions

## 1.    Introduction

This agreement (including, the Coinbase Custody Custodial Services Agreement attached hereto as Exhibit A (the "Custody Agreement"), the Coinbase Master Trading Agreement attached hereto as Exhibit B (the "MTA"), and all other exhibits, addenda and supplements attached hereto or referenced herein, collectively, the "Coinbase Prime Broker Agreement"), is entered into by and between Celsius Network LLC, ("Client"), and Coinbase, Inc. ("Coinbase"), on behalf of itself and as agent for Coinbase, Coinbase Custody Trust Company, LLC ("Coinbase Custody"), and, as applicable, Coinbase Credit, Inc. ("Coinbase Credit," and collectively with Coinbase and Coinbase Custody, the "Coinbase Entities"). This Coinbase Prime Broker Agreement sets forth the terms and conditions pursuant to which the Coinbase Entities will open and maintain the prime broker account (the "Prime Broker Account") for Client and provide services relating to custody, trade execution, lending or post-trade credit (if applicable), and other services (collectively, the "Prime Broker Services") for certain digital assets ("Digital Assets") as set forth herein. Client and the Coinbase Entities (individually or collectively, as the context requires) may also be referred to as a "Party". Capitalized terms not defined in these General Terms and Conditions (the "General Terms") shall have the meanings assigned to them in the respective exhibit, addendum or supplement. In the event of a conflict between these General Terms and any exhibit, addendum or supplement hereto, then the document governing the specific relevant Prime Broker Service shall control in respect of such Prime Broker Service.

Notwithstanding anything to the contrary in this Coinbase Prime Broker Agreement, the Distribution Addendum, or any confidential side letter between the Parties, Celsius shall not (a) utilize any digital asset trading for selling and/or buying Digital Assets, brokerage, lending, or post-trade credit services with Coinbase or (b) transfer any digital assets pursuant to this Coinbase Prime Broker Agreement other than, in the case of (b), to facilitate (i) the custodial services as set forth in Exhibit A to this Coinbase Prime Broker Agreement, (ii) distribution services as set forth in the Addendum to this Coinbase Prime Broker Agreement, and (iii) transfers between Celsius-owned accounts and wallets.

## 2.    Conflicts of Interest Acknowledgement

Client acknowledges that the Coinbase Entities may have actual or potential conflicts of interest in connection with providing the Prime Broker Services including that (i) Orders (as such term is defined in the MTA) may be routed to Coinbase's exchange platform where Orders may be executed against other Coinbase customers or with Coinbase acting as principal, (ii) the beneficial identity of the purchaser or seller with respect to an Order is unknown and therefore may inadvertently be another Coinbase client, (iii) Coinbase does not engage in front-running, but is aware of Orders or imminent Orders and may execute a trade for its own inventory (or the account of an affiliate) while in possession of that knowledge and (iv) Coinbase may act in a principal capacity with respect to certain Orders (*e.g.*, to fill residual Order size) when a portion of an Order may be below the minimum size accepted by the Connected Trading Venues (as defined in the MTA). As a result of these and other conflicts, the Coinbase Entities may have an incentive to

favor their own interests and the interests of their affiliates over a particular Client's interests and has in place certain policies and procedures in place that are designed to mitigate such conflicts.

## 3.    Account Statements

Client authorizes Coinbase to combine information regarding all Prime Broker Services activities into a single statement. Coinbase will provide Client with an electronic account statement every month, at a minimum. Each account statement will identify the amount of cash and each Digital Asset in Client's Prime Broker Account at the end of the period and set forth all Prime Broker Account activity during that period.

## 4.    Client Instructions

4.1    In a written notice to Coinbase, Client may designate persons and/or entities authorized to act on behalf of Client with respect to the Prime Broker Account (the "Authorized Representative"). Upon such designation, Coinbase may rely on the validity of such appointment until such time as Coinbase receives Instructions from Client revoking such appointment or designating a new Authorized Representative.

4.2    The Coinbase Entities may act upon instructions received from Client or Client's Authorized Representative ("Instructions"). When taking action upon Instructions, the applicable Coinbase Entity shall act in a reasonable manner, and in conformance with the following: (a) Instructions shall continue in full force and effect until executed, cancelled or superseded; (b) if any Instructions are ambiguous, the applicable Coinbase Entity shall refuse to execute such Instructions until any such ambiguity has been resolved to the Coinbase Entity's satisfaction; (c) the Coinbase Entities may refuse to execute Instructions if in the applicable Coinbase Entity's opinion such Instructions are outside the scope of its obligations under this Coinbase Prime Broker Agreement or are contrary to any applicable laws, rules and regulations; and (d) the Coinbase Entities may rely on any Instructions, notice or other communication believed by it in good faith to be given by Client or Client's Authorized Representative. Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability with respect to, any and all Claims and Losses arising out of or relating to inaccurate or ambiguous Instructions.

4.3    Coinbase will comply with the Client's Instructions to stake, stack or vote the Client's Digital Assets to the extent the applicable Coinbase Entity supports proof of stake validation, proof of transfer validation, or voting for such Digital Assets. The Coinbase Entities may, in their sole discretion, decide whether or not to support (or cease supporting) staking services or stacking or voting for a Digital Asset.

## 5.    Representations, Warranties, and Additional Covenants

Client represents, warrants, and covenants that:

5.1    Client is currently under supervision of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") following the filing of voluntary

2

bankruptcy (collectively, the "Chapter 11 Cases") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

5.2     Subject to the Bankruptcy Code, any orders of the Bankruptcy Court, and the Bankruptcy Court's approval of Client's entry into this Coinbase Prime Broker Agreement, Client has the full power, authority, and capacity to enter into this Coinbase Prime Broker Agreement and to engage in transactions with respect to all Digital Assets relating to the Prime Broker Services;

5.3     Except as disclosed to the Coinbase Entities, Client, to the best of its knowledge, is and shall remain in full material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Client operates or otherwise uses the Prime Broker Services, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including AML Laws, USA PATRIOT Act and Bank Secrecy Act requirements, and other anti-terrorism statutes, regulations, and conventions of the United States or other international jurisdictions;

5.4     Except as disclosed to the Coinbase Entities, Client is and shall remain materially in good standing with all relevant government agencies, departments, regulatory, and supervisory bodies in all relevant jurisdictions in which Client does business, and Client will promptly notify Coinbase if Client ceases to be in good standing with any regulatory authority;

5.5     Client shall promptly provide information as the Coinbase Entities may reasonably request in from time to time regarding: (a) Client's policies, procedures, and activities which relate to the Prime Broker Services, and (b) Client's use of the Prime Broker Services, in each case to the extent reasonably necessary for the Coinbase Entities to comply with any applicable laws, rules, and regulations (including money laundering statutes, regulations and conventions of the United States or other jurisdictions), or the guidance or direction of, or request from, any regulatory authority or financial institution;

5.6     Client's use of the Prime Broker Services shall be for commercial, business purposes only, limited to activities disclosed in the due diligence information submitted to Coinbase, and shall not include any personal, family or household purposes. Client shall promptly notify Coinbase in writing in the event it intends to use the Prime Broker Services in connection with any business activities not previously disclosed to Coinbase. Coinbase may, in its sole discretion, prohibit Client from using the Prime Broker Services in connection with any business activities not previously disclosed;

5.7     Client's Authorized Representatives have the (a) full power, authority and capacity to access and use the Prime Broker Services and (b) appropriate sophistication, expertise, and knowledge necessary to understand the nature and risks, and make informed decisions, in respect of Digital Assets and the Prime Broker Services;

5.8     Client either owns or possess lawful authorization to transact with all Digital Assets involved in any Custody Transactions;

3

5.9    This Coinbase Prime Broker Agreement is Client's legal, valid, and binding obligation, enforceable against it in accordance with its terms; and

5.10    Unless Client advises Coinbase to the contrary in writing, at all times, none of Client's assets constitute, directly or indirectly, plan assets subject to the fiduciary responsibility and prohibited transaction sections of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), the prohibited transaction provisions of the Internal Revenue Code of 1986, as amended, or any federal, state, local or non-U.S. law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, and Client shall immediately provide Coinbase with a written notice in the event that Client becomes aware that Client is in breach of the foregoing.

Coinbase, on behalf of itself and each other Coinbase Entity, represents, warrants, and covenants that:

5.11    It possesses and will maintain, all licenses, registrations, authorizations and approvals required by any applicable government agency or regulatory authority for it to operate its business and provide the Prime Broker Services;

5.12    It has the full power, authority, and capacity to enter into and be bound by this Coinbase Prime Broker Agreement; and

5.13    This Coinbase Prime Broker Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

## 6.    No Investment Advice or Brokerage

6.1    Client assumes responsibility for each transaction in or for its Prime Broker Account. Client understands and agrees that none of the Coinbase Entities are an SEC/FINRA registered broker-dealer or investment adviser to Client in any respect, and the Coinbase Entities have no liability, obligation, or responsibility whatsoever for Client decisions relating to the Prime Broker Services. Client should consult its own legal, tax, investment and accounting professionals.

6.2    While the Coinbase Entities may make certain general information available to Client, the Coinbase Entities are not providing and will not provide Client with any investment, legal, tax or accounting advice regarding Client's specific situation. Client is solely responsible, and shall not rely on the Coinbase Entities, for determining whether any investment, investment strategy, or transaction involving Digital Assets is appropriate for Client based on Client's investment objectives, financial circumstances, risk tolerance, and tax consequences. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever regarding any Client decision to enter into in any transaction with respect to any Digital Asset.

4

### 7.    Opt-In to Article 8 of the Uniform Commercial Code

Client Assets in the Trading Balance and Vault Balance will be treated as "financial assets" under Article 8 of the New York Uniform Commercial Code ("Article 8"). Coinbase and Coinbase Custody are "securities intermediaries," the Trading Balance and Vault Balance are each "securities accounts," and Client is an "entitlement holder" under Article 8. This Agreement sets forth how the Coinbase Entities will satisfy their Article 8 duties. Treating Client Assets in the Trading Balance and Vault Balance as financial assets under Article 8 does not determine the characterization or treatment of the cash and Digital Assets under any other law or rule. New York will be the securities intermediary's jurisdiction with respect to Coinbase and Coinbase Custody, and New York law will govern all issues addressed in Article 2(1) of the Hague Securities Convention. Coinbase and Coinbase Custody will credit the Client with any payments or distributions on any Client Assets it holds for Client's Trading Balance and Vault Balance. Coinbase and Coinbase Custody will comply with Client's Instructions with respect to Client Assets in Client's Trading Balance or Vault Balance, subject to the terms of the MTA or Custody Agreement, as applicable, and related Coinbase rules, including the Coinbase Trading Rules (as such term is defined in the MTA).

### 8.    General Use, Security and Prohibited Use

8.1    *Prime Broker Site and Content.* During the term of this Coinbase Prime Broker Agreement, the Coinbase Entities hereby grant Client a limited, nonexclusive, non-transferable, non-sublicensable, revocable and royalty-free license, subject to the terms of this Coinbase Prime Broker Agreement, to access and use the Coinbase Prime Broker Site accessible at prime.coinbase.com ("Coinbase Prime Broker Site") and related content, materials, and information (collectively, the "Content") solely for Client's internal business use and other purposes as permitted by Coinbase in writing from time to time. Any other use of the Coinbase Prime Broker Site or Content is hereby prohibited. All other right, title, and interest (including all copyright, trademark, patent, trade secrets, and all other intellectual property rights) in the Coinbase Prime Broker Site, Content, and Prime Broker Services is and will remain the exclusive property of the Coinbase Entities and their licensors. Client shall not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Prime Broker Services or Content, in whole or in part. "Coinbase," "Coinbase Prime," "prime.coinbase.com," and all logos related to the Prime Broker Services or displayed on the Coinbase Prime Broker Site are either trademarks or registered marks of the Coinbase Entities or their licensors. Client may not copy, imitate or use them without Coinbase's prior written consent. The license granted under this Section 8.1 will automatically terminate upon termination of this Coinbase Prime Broker Agreement, or the suspension or termination of Client's access to the Coinbase Prime Broker Site or Prime Broker Services.

8.2    *Unauthorized Users.* Client shall not permit any person or entity that is not the Client or an Authorized Representative (each, an "Unauthorized User") to access, connect to, and/or use Client's Prime Broker Account. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, and Client shall be fully responsible and liable

5

for, any and all Claims and Losses arising out of or relating to the acts and omissions of any Unauthorized User in respect of the Prime Broker Services, Prime Broker Account, and/or the Prime Broker Site. Client shall notify Coinbase immediately if Client believes or becomes aware that an Unauthorized User has accessed, connected to, or used Client's Prime Broker Account.

8.3    *Password Security; Contact Information*. Client is fully responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys, YubiKeys, other security or confirmation information or hardware, and any other codes that Client uses to access the Prime Broker Account and Prime Broker Services. Client agrees to keep Client's email address and telephone number up to date in Client's Prime Broker Account in order to receive any notices or alerts that the Coinbase Entities may send to Client. Client shall be fully responsible for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, any Losses that Client may sustain due to compromise of Prime Broker Account login credentials. In the event Client believes Client's Prime Broker Account information has been compromised, Client must contact Coinbase immediately.

8.4    *Prohibited Use*. Client shall not engage in any of the following activities with its use of the Prime Broker Services:

8.4.1    *Unlawful Activity*. Activity that would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Coinbase conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information;

8.4.2    *Abusive Activity*. Actions that impose an unreasonable or disproportionately large load on Coinbase's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to Coinbase systems that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to Coinbase systems, other Coinbase accounts, computer systems or networks connected to Coinbase systems, Coinbase Site, through password mining or any other means; use Coinbase Account information of another party to access or use the Coinbase systems, except in the case of specific Clients and/or applications which are specifically authorized by a Client to access such Client's Coinbase Account and information; or transfer Client's account access or rights to Client's account to a third party, unless by operation of law or with the express permission of Coinbase; and

8.4.3    *Fraud*. Activity which operates to defraud Coinbase or any other person or entity.

8.5    *Computer Viruses*. The Coinbase Entities shall not have any liability, obligation, or responsibility whatsoever for any damage or interruptions caused by any computer viruses, spyware, scareware, Trojan horses, worms or other malware that may affect Client's

6

computer or other equipment, or any phishing, spoofing or other attack, unless such damage or interruption directly resulted from the Coinbase Entities' gross negligence, fraud, or willful misconduct. Client agrees to access and use its Prime Broker Account through the Coinbase Prime Broker Site to review any Orders, deposits or withdrawals or required actions to confirm the authenticity of any communication or notice from the Coinbase Entities.

## 9.    Taxes

9.1    *Taxes*. Except as otherwise expressly stated herein or required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities), Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, the payment of any and all present and future tariffs, duties or taxes (including withholding taxes, transfer taxes, stamp taxes, documentary taxes, value added taxes, personal property taxes and all similar costs) imposed or levied by any government or governmental agency (collectively, "Taxes") and any related Claims and Losses or the accounting or reporting of income or other Taxes arising from or relating to any transactions Client conducts through the Prime Broker Services; *provided, however*, that for the avoidance of doubt, if any applicable legal requirement imposes information reporting or similar obligations with respect to the matters governed by this Agreement, the Coinbase Entities shall comply in full with any such requirements that apply to them and Client shall comply in full with any such requirements that apply to it.  The Client and the Coinbase Entities shall each file any and all Tax returns, reports, and disclosures required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities).

9.2    *Withholding Tax*. Except as required by applicable law, each payment under this Coinbase Prime Broker Agreement or collateral deliverable by Client to any Coinbase Entities shall be made, and the value of any collateral or margin shall be calculated, without withholding or deducting of any Taxes. If any Taxes are required to be withheld or deducted, Client (a) authorizes the Coinbase Entities to effect such withholding or deduction and remit such Taxes to the relevant taxing authorities and (b) shall pay such additional amounts or deliver such further collateral as necessary to ensure that the actual net amount received by the Coinbase Entities is equal to the amount that the Coinbase Entities would have received had no such withholding or deduction been required; *provided, however*, that the Coinbase Entities shall reasonably cooperate with Client to minimize or eliminate any such withholding or deduction requirements to the extent permitted by applicable Law. Client agrees that the Coinbase Entities may disclose any information with respect to Client Assets, the Prime Broker Account, Custodial Accounts, Trading Accounts, and transactions required by any applicable taxing authority or other governmental entity. The Client agrees that the Coinbase Entities may withhold or deduct Taxes as may be required by applicable law. From time to time, Coinbase Entities and the Client may request from the other tax documentation or certification of the Coinbase Entities' or Client's (as applicable) taxpayer status as required by applicable law, and any failure by the Coinbase

7

Entities or Client (as applicable) to comply with this request in the time frame identified may result in withholding and/or remission of taxes to a tax authority as required by applicable law.

## 10.    Prime Broker Services Fees

10.1    Client agrees to pay all commissions and fees in connection with the Orders and Prime Broker Services on a timely basis as set forth in the fee schedule agreed between the parties. If agreed by Client and Coinbase in writing, Client authorizes the Coinbase Entities to pay themselves for fees and commissions relating to the Trading Account and Custodial Account by deducting fees from the Vault Balance or Trading Balance, as applicable, to satisfy Client's fees owed.

10.2    Client acknowledges that Coinbase's fees may include but are not limited to: (a) bank wire fees to deposit and/or withdraw Client Cash; (b) internal transfers from its Vault Balance to its Trading Balance; and (c) external withdrawals of Client Assets. Client further acknowledges that Coinbase Custody will charge fees for any balance of Digital Assets that Client keeps in the Vault Balance.

## 11.    Confidentiality

11.1    Client and Coinbase Entities each agree that with respect to any non-public, confidential or proprietary information of the other Party, including the existence and terms of this Coinbase Prime Broker Agreement and information relating to the other party's business operations or business relationships (including the Coinbase Entities' fees), and any arbitration pursuant to Section 22 (collectively, "Confidential Information"), it (a) will not disclose such Confidential Information except to such party's officers, directors, agents, employees and professional advisors who need to know the Confidential Information for the purpose of assisting in the performance of this Coinbase Prime Broker Agreement and who are informed of, and agree to be bound by obligations of confidentiality no less restrictive than those set forth herein and (b) will protect such Confidential Information from unauthorized use and disclosure. Each Party shall use any Confidential Information that it receives solely for purposes of (i) exercising its rights and performing its duties under the Coinbase Prime Broker Agreement and (ii) complying with any applicable laws, rules and regulations; *provided* that, the Coinbase Entities may use Confidential Information for (1) risk management; and (2) to develop, enhance and market their products and services. Confidential Information shall not include any (w) information that is or becomes generally publicly available through no fault of the recipient; (x) information that the recipient obtains from a third party (other than in connection with this Coinbase Prime Broker Agreement) that, to the recipient's best knowledge, is not bound by a confidentiality agreement prohibiting such disclosure; (y) information that is independently developed or acquired by the recipient without the use of Confidential Information provided by the disclosing party; or (z) disclosure with the prior written consent of the disclosing Party.

11.2    Notwithstanding the foregoing, each Party may disclose Confidential Information of the other Party to the extent required by a court of competent jurisdiction or governmental

8

authority or otherwise required by law; *provided, however*, the Party making such required disclosure shall first notify the other Party (to the extent legally permissible) and shall afford the other Party a reasonable opportunity to seek confidential treatment if it wishes to do so and will consider in good faith reasonable and timely requests for redaction. For purposes of this Section 11, no Affiliate (as defined below) of Coinbase shall be considered a third party of any Coinbase Entity, and the Coinbase Entities may freely share Client's Confidential Information among each other and with such affiliates. All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of the receiving Party shall be and remain the property of the disclosing Party and shall be promptly returned to the disclosing Party or destroyed, each upon the disclosing Party's request; *provided, however*, notwithstanding the foregoing, the receiving Party may retain one (1) copy of Confidential Information if (a) required by law or regulation; or (b) retained pursuant to an established document retention policy.

"Affiliate" means, with respect to any specified legal entity, any other legal entity that, directly or indirectly, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, such specified legal entity. As used in this definition, the concept of control refers to the beneficial ownership by one legal entity of the majority of the voting power of another legal entity.

## 12. Market Data

Client agrees that its use of data made available to it through the Trading Platform's application programming interface(s), which may include the prices and quantities of orders and transactions executed on Trading Platform (collectively "Market Data"), is subject to the Market Data Terms of Use, as amended and updated from time to time at *https://www.coinbase.com/legal/market_data* or a successor website.

## 13. Recording of Conversations

For compliance and monitoring purposes, Client authorizes each Coinbase Entity at its sole discretion to record conversations between such Coinbase Entity and Client or its Authorized Representatives relating to this Coinbase Prime Broker Agreement, the Prime Broker Account and the Prime Broker Services;

## 14. Security and Business Continuity

The Coinbase Entities have implemented and will maintain a reasonable information security program in accordance with security terms as disclosed to Client.

## 15. Acknowledgement of Risks

Client hereby acknowledges, that: (i) Digital Assets are not legal tender, are not backed by any government, and are not subject to protections afforded by the Federal Deposit Insurance Corporation or Securities Investor Protection Corporation; (ii) Legislative and regulatory changes

9

or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and/or value of Digital Assets; (iii) transactions in Digital Assets are irreversible, and, accordingly, Digital Assets lost due to fraudulent or accidental transactions may not be recoverable; (iv) certain Digital Assets transactions will be deemed to be made when recorded on a public blockchain ledger, which is not necessarily the date or time that Client initiates the transaction or such transaction enters the pool; (v) the value of Digital Assets may be derived from the continued willingness of market participants to exchange any government issued currency ("Fiat Currency") for Digital Assets, which may result in the permanent and total loss of value of a Digital Asset should the market for that Digital Asset disappear; (vi) the volatility of the value of Digital Assets relative to Fiat Currency may result in significant losses; (vii) Digital Assets may be susceptible to an increased risk of fraud or cyber-attack; (viii) the nature of Digital Assets means that any technological difficulties experienced by a Coinbase Entity may prevent the access or use of Client Digital Assets; and (ix) any bond or trust account maintained by Coinbase Entities for the benefit of its customers may not be sufficient to cover all losses (including Losses) incurred by customers.

## 16.    Operation of Digital Asset Protocols

16.1    The Coinbase Entities do not own or control the underlying software protocols which govern the operation of Digital Assets. Generally, the underlying software protocols and, if applicable, related smart contracts (referred to collectively as "Protocols" for purposes of this Section 16) are open source and anyone can use, copy, modify or distribute them. By using the Prime Broker Services, Client acknowledges and agrees that (i) the Coinbase Entities make no guarantee of the functionality, security, or availability of underlying Protocols; (ii) some underlying Protocols are subject to consensus-based proof of stake validation methods which may allow, by virtue of their governance systems, changes to the associated blockchain or digital ledger ("Governance Modifiable Blockchains"), and that any Client transactions validated on such Governance Modifiable Blockchains may be affected accordingly; and (iii) the underlying Protocols are subject to sudden changes in operating rules (a/k/a "forks"), and that such forks may materially affect the value, function, and/or even the name of the Digital Assets. In the event of a fork, Client agrees that the Coinbase Entities may temporarily suspend Prime Broker Services (with or without notice to Client) and that the Coinbase Entities may, in their sole discretion, determine whether or not to support (or cease supporting) either branch of the forked protocol entirely. In the event that Coinbase decides not to support (or ceases supporting) either branch of a forked protocol, Coinbase will use reasonable efforts to notify Client in advance wherever reasonably practicable to do so. Client agrees that the Coinbase Entities shall have no liability, obligation or responsibility whatsoever arising out of or relating to the operation of Protocols, transactions affected by Governance Modifiable Blockchains, or an unsupported branch of a forked protocol and, accordingly, Client acknowledges and assumes the risk of the same. The Coinbase Entities shall use commercially reasonable efforts to timely select at least one of the forked protocol branches to support and will identify such selection in a notice reasonably in advance of such fork (to the extent practicable) to provide Client the opportunity to arrange for the transfer of the relevant Digital Assets, which the Coinbase Entities shall use commercially reasonable efforts to

10

accomplish in advance of such fork. With respect to a forked protocol branch that the Coinbase Entities choose not to support, upon Client's request, the Coinbase Entities will use commercially reasonable efforts to deliver the relevant Digital Assets from such forked protocol branch to Client, including any credentials, keys, or other information sufficient to gain control over such Digital Assets through other means within a commercially reasonable period of time.

16.2    Unless specifically communicated by the Coinbase Entities through a written public statement on the Coinbase website, the Coinbase Entities do not support airdrops, metacoins, colored coins, side chains, or other derivative, enhanced or forked protocols, tokens or coins, which supplement or interact with a Digital Asset (collectively, "Advanced Protocols") in connection with the Prime Broker Services. The Prime Broker Services are not configured to detect, process and/or secure Advanced Protocol transactions and neither Client nor the Coinbase Entities will be able to retrieve any unsupported Advanced Protocol. Coinbase shall have no liability, obligation or responsibility whatsoever in respect to Advanced Protocols.

## 17.    Set-off

Upon the occurrence of a default or an event of default under, an agreement with a Coinbase Entity (including an "Event of Default" as such term is defined in the PTC Agreement (in each case, at maturity, upon acceleration or otherwise)) or the occurrence of an event that constitutes "Cause" (as defined below) (each, a "Setoff Event"), each Coinbase Entity may set off and net the amounts due from it or any of its affiliates to Client and from Client to it or any other Coinbase Entity, so that a single payment (the "Net Payment") shall be immediately due and payable by the Client or the Coinbase Entity to the other (subject to the other provisions hereof and of any agreement with a Coinbase Entity). If any amounts cannot be included within the Net Payment, such amounts shall be excluded but may still be netted against any other similarly excluded amounts. Upon the occurrence of a Setoff Event, each Coinbase Entity may also set off and net any Net Payment or any other obligation owed to the Client by any Coinbase Entity against (i) any or all collateral or margin posted by any Coinbase Entity to Client (or the U.S. dollar value thereof, determined by Coinbase in its sole discretion on the basis of a recent price at which the relevant Digital Asset was sold to customers on the Trading Platform); and (ii) any Net Payment, unpaid trade credits or any other obligation owed by Client to any Coinbase Entity (in each case, whether matured or unmatured, fixed or contingent, or liquidated or unliquidated). Client agrees that in the exercise of setoff rights or secured party remedies, the Coinbase Entities may value Client Digital Assets using the same valuation methods and processes that are otherwise used when a Coinbase customer sells an asset on the Trading Platform (as such term is defined in the MTA) or any other commercially reasonable valuation method as determined by Coinbase in its sole discretion. For the avoidance of doubt and notwithstanding anything to the contrary, the Coinbase Entities shall not be permitted to set off against, liquidate or apply any assets or amounts in Client's Vault Balance.

## 18.    Disclaimer of Warranties

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE PRIME BROKER SERVICES AND THE COINBASE WEBSITE ARE PROVIDED ON AN "AS IS" AND "AS

11

AVAILABLE" BASIS WITHOUT ANY WARRANTY OF ANY KIND, AND THE COINBASE ENTITIES HEREBY SPECIFICALLY DISCLAIM ALL WARRANTIES WITH RESPECT TO THE PRIME BROKER SERVICES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES AND/OR CONDITIONS OF TITLE, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT. THE COINBASE ENTITIES DO NOT WARRANT THAT THE PRIME BROKER SERVICES, INCLUDING ACCESS TO AND USE OF THE COINBASE WEBSITES, OR ANY OF THE CONTENT CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, COMPATIBLE WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, SECURE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE.

## 19.    Indemnification

19.1    Client shall defend and indemnify and hold harmless each Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to Client's breach of this Coinbase Prime Broker Agreement, Client's violation of any law, rule or regulation, or rights of any third party, or Client's gross negligence, fraud or willful misconduct, unless such Claims or Losses arise out of or relate to Coinbase's gross negligence, fraud, willful misconduct. This obligation will survive any termination of this Coinbase Prime Broker Agreement.

19.2    Coinbase shall defend and indemnify and hold harmless Client, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to any (i) violation, misappropriation, or infringement upon any United States patent, copyright, trademark, trade secret or other intellectual property right of a third party or (ii) violation of applicable law, rule or regulation, or rights of any third party, or Coinbase's gross negligence, fraud or willful misconduct unless such Claims or Losses arise out of or relate to Client's gross negligence, fraud, willful misconduct, or breach of this Coinbase Prime Broker Agreement. This obligation will survive any termination of this Coinbase Prime Broker Agreement.

Each Party's (the "Indemnitor") indemnification obligation under Section 18 of this Coinbase Prime Broker Agreement shall apply only if the other Party (the "Indemnitee") does the following: (a) notifies the Indemnitor promptly in writing, not later than thirty (30) days after the Indemnitee receives notice of the Claim (or sooner if required by applicable law); (b) gives the Indemnitor sole control of the defense and any settlement negotiations (subject to the below); and (c) gives the Indemnitor the information, authority, and assistance such Indemnitor needs to defend against or settle the Claim.

No Party providing indemnification pursuant to this Section 19 shall accept any settlement of any Claims or Losses if such settlement imposes any financial or non-financial liabilities, obligations, or restrictions on, or requires an admission of guilt or wrong-doing from, any party indemnified pursuant to this Section 19, without such party's prior written consent.

12

19.3    For the purposes of this Coinbase Prime Broker Agreement:

(a)    "Claim" means any action, suit, litigation, demand, charge, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other governmental, regulatory or administrative body or any arbitrator or arbitration panel; and

(b)    "Losses" means any liabilities, damages, diminution in value, payments, obligations, losses, interest, costs and expenses, security or other remediation costs (including any regulatory investigation or third party subpoena costs, reasonable attorneys' fees, court costs, expert witness fees, and other expenses relating to investigating or defending any Claim); fines, taxes, fees, restitution, or penalties imposed by any governmental, regulatory or administrative body, interest on and additions to tax with respect to, or resulting from, Taxes imposed on Client's assets, cash, other property, or any income or gains derived therefrom; and judgments (at law or in equity) or awards of any nature.

## 20.    Limitation of Liability

The Coinbase Prime Broker Agreement shall be subject to a limitation of liability as agreed between the Parties.

## 21.    Privacy

Except as set forth herein, the Coinbase Entities shall use and disclose Client's and its Authorized Representatives' non-public personal information in accordance with the Coinbase Privacy Policy, as set forth at *https://www.coinbase.com/legal/privacy* or a successor website, and as amended and updated from time to time.

## 22.    Arbitration

22.1    Subject to the jurisdiction of the Bankruptcy Court, any Claim arising out of or relating to this Coinbase Prime Broker Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including any determination of the scope or applicability of the agreement to arbitrate as set forth in this Section 22, shall be determined by arbitration in the state of New York or another mutually agreeable location, before one neutral arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, and the award of the arbitrator (the "Award") shall be accompanied by a reasoned opinion. Judgment on the Award may be entered in any court having jurisdiction. This Coinbase Prime Broker Agreement shall not preclude the Parties from seeking provisional relief, including injunctive relief, in any court of competent jurisdiction. Seeking any such provisional relief shall not be deemed to be a

13

waiver of such party's right to compel arbitration. The Parties expressly waive their right to a jury trial to the extent permitted by applicable law.

22.2    In any arbitration arising out of or related to this Coinbase Prime Broker Agreement, the arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" mean all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees.

22.3    The Parties acknowledge that this Coinbase Prime Broker Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision herein with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Coinbase Prime Broker Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16).

## 23.    Term, Termination and Suspension

This Coinbase Prime Broker Agreement is effective as of the entry of the Confirmation Order and shall remain in effect until terminated by Coinbase or Client as follows:

(a)    Either Party may terminate this Coinbase Prime Broker Agreement in its entirety for any reason and without Cause by providing at least 90 days' prior written notice to the other party; *provided, however*, Client's termination of this Coinbase Prime Broker Agreement shall not be effective until Client has fully satisfied its obligations hereunder. Notwithstanding the foregoing, the Coinbase Entities acknowledge that the Custodial Services are critical to the Client and shall use its reasonable efforts to continue to offer such Custodial Services to the Client for a least one-hundred and eighty (180) days following any termination of this Coinbase Prime Broker Agreement at a rate that is twice the rate applicable during the term.

(b)    Regardless of any other provision of this Coinbase Prime Broker Agreement, the Coinbase Entities may, in their sole discretion, suspend, restrict or terminate the Client's Prime Broker Services, including by suspending, restricting or closing the Client's Prime Broker Account and/or any associated Trading Account, Custodial Account or any credit account (as applicable), for Cause, at any time and without prior notice to the Client.

"Cause" shall mean: (i) Client materially breaches any provision of this Coinbase Prime Broker Agreement and fails to cure such breach within ten (10) days following notice by the Coinbase Entities to the Client of the occurrence of such breach; (ii) the Bankruptcy Court enters an order, or Client or any of its debtor-affiliates in the Chapter 11 Cases (each, a "Debtor" and collectively, the "Debtors") files or supports an application, motion, or request for an order,  that has the effect of amending, vacating, reversing, supplementing, or modifying the  this Coinbase Prime Broker Agreement or the provisions of the Confirmation Order concerning this Coinbase Prime Broker Agreement (the "**Approval Provisions**") in a manner that a Coinbase Entity

14

determines in its reasonable discretion is materially adverse to a Coinbase Entity; (iii) the Bankruptcy Court has made a judicial finding, or any Debtor has declared, that any Debtor is administratively insolvent; (iv) after its entry, the Approval Provisions ceases to be in full force and effect; (v) termination is required pursuant to a facially valid subpoena, court order or binding order of a government authority; (vi) Client's Prime Broker Account is subject to any pending litigation, investigation or government proceeding and/or Coinbase reasonably perceives a materially heightened risk of legal regulatory non-compliance by the Coinbase Entities associated with Client's use of Prime Broker Services; or (vii) Coinbase acting in a commercially reasonable manner suspects Client of attempting to circumvent Coinbase's controls or uses the Prime Broker Services in a manner Coinbase otherwise deems inappropriate or potentially harmful to itself or third parties.

In the event that the Bankruptcy Court does not enter a Confirmation Order containing the Approval Provisions by [December 31, 2023] in form and substance reasonably satisfactory to Coinbase, this Coinbase Prime Broker Agreement shall be null and void without any further action by either party.

(c)    Client acknowledges that the Coinbase Entities' decision to take certain actions, including suspending, restricting or terminating Client's Prime Broker Account or Prime Broker Services, may be based on confidential criteria that are essential to Coinbase's risk management and security practices and agrees that the Coinbase Entities are under no obligation to disclose the details of its risk management and security practices to Client.

## 24.    Severability

If any provision or condition of this Coinbase Prime Broker Agreement shall be held invalid or unenforceable, the remainder of this Coinbase Prime Broker Agreement shall continue in full force and effect.

## 25.    Waiver

Any waivers of rights by the Parties under this Coinbase Prime Broker Agreement must be in writing and signed by such Party or Parties. A waiver will apply only to the particular circumstance giving rise to the waiver and will not be considered a continuing waiver in other similar circumstances. A Party's failure to insist on strict compliance with this Coinbase Prime Broker Agreement or any other course of conduct by such Party shall not be considered a waiver of their rights under this Coinbase Prime Broker Agreement.

## 26.    Survival

All provisions of this Coinbase Prime Broker Agreement which by their nature extend beyond the expiration or termination of this Coinbase Prime Broker Agreement shall survive the termination or expiration of this Coinbase Prime Broker Agreement.

15

**27.      Governing Law**

This Coinbase Prime Broker Agreement, Client's Prime Broker Account, and the Prime Broker Services will be governed by and construed in accordance with the laws of the State of New York, excluding its conflicts of laws principles, except to the extent such state law is preempted by federal law.

**28.      Force Majeure**

The Coinbase Entities shall not be liable for delays, suspension of operations, whether temporary or permanent, failure in performance, or interruption of service which result directly or indirectly from any cause or condition beyond the reasonable control of the Coinbase Entities, including any act of God; embargo; natural disaster; act of civil or military authorities; act of terrorists; terrorist related hacking, government restrictions; any ruling by any Connected Trading Venue, exchange or market; market volatility or disruptions in order trading on any Connected Trading Venue, exchange or market; suspension of trading; civil disturbance; war; strike or other labor dispute; fire; severe weather; interruption in telecommunications, Internet services, or network provider services; failure of equipment and/or software; failure of computer or other electronic or mechanical equipment or communication lines; outbreaks of infectious disease (other than COVID-19) or any other public health crises, including quarantine or other employee restrictions; acts or omissions of any Connected Trading Venue; or any other catastrophe or other occurrence which is beyond the reasonable control of the Coinbase Entities (each, a "Force Majeure Event"); *provided, however*, that this Section 28 shall only apply for so long as such delay or prevention is occurring; *provided further*, that should such delay or prevention remain ongoing for fifteen (15) days, Client may request withdrawal of the USD equivalent of any assets then held in a Digital Asset Wallet or Fiat Wallet so long as such delay or suspension does not affect the transfer or settlement of USD.

**29.      Entire Agreement; Headings**

This Coinbase Prime Broker Agreement, together with all exhibits, addenda and supplements attached hereto or referenced herein, comprise the entire understanding between Client and the Coinbase Entities as to the Prime Broker Services and supersedes all prior discussions, agreements and understandings, including any previous version of this Coinbase Prime Broker Agreement, and the Custodial Services Agreement between Client and any Coinbase Entity, including all exhibits, addenda, policies, and supplements attached thereto or referenced therein. Section headings in this Coinbase Prime Broker Agreement are for convenience only and shall not govern the meaning or interpretation of any provision of this Coinbase Prime Broker Agreement.

**30.      Amendments**

Any modification or addition to this Coinbase Prime Broker Agreement must be in writing and either (a) signed by a duly authorized representative of each party, or (b) accepted and agreed to by Client.

16

**31.  Assignment**

Any assignment of Client's rights and/or licenses granted under this Coinbase Prime Broker Agreement without obtaining the prior written consent (not to be unreasonably withheld) of Coinbase shall be null and void. Coinbase reserves the right to assign its rights under this Coinbase Prime Broker Agreement without restriction, including to any of the Coinbase Entities or their affiliates or subsidiaries, or to any successor in interest of any business associated with the Prime Broker Services, such affiliate, subsidiary or successor, an ("Assignee"), *provided* that Coinbase shall notify Client within a reasonable amount of time prior to such assignment and that Client shall be entitled to terminate this Coinbase Prime Broker Agreement with immediate effect following such assignment; *provided further*, that any such Assignee has the operational capacity and all necessary legal and/or regulatory approvals, licenses and permissions to provide the Prime Broker Services to Client, and that the security measures utilized by such Assignee shall be equivalent to those employed by Coinbase.

**32.  Electronic Delivery of Communications**

Client agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that the Coinbase Entities provide in connection with Client's Prime Broker Account and Client's use of Prime Broker Services. Communications include: (a) terms of use and policies Client agrees to, including updates to policies or the Coinbase Prime Broker Agreement, (b) Prime Broker Account details, including transaction receipts, confirmations, records of deposits, withdrawals or transaction information, (c) legal, regulatory and tax disclosures or statements the Coinbase Entities may be required to make available to Client and (d) responses to claims or customer support inquiries filed in connection with Client's Prime Broker Account.

Coinbase will provide these Communications to Client by posting them on the Prime Broker Site, emailing them to Client at the primary email address on file with Coinbase, communicating to Client via instant chat, and/or through other means of electronic communication. The Client agrees that electronically delivered Communications may be accepted and agreed to by Client through the Prime Broker Services interface. Furthermore, the Parties consent to the use of electronic signatures in connection with Client's use of the Prime Broker Services.

**33.  Notice and Contacts**

33.1   All notices required or permitted to be given hereunder shall be in writing delivered to the Party at its address specified below via an overnight mailing company of national reputation. Any Party that changes its notice address must notify the other Party promptly of such change.

If to any Coinbase Entity:

Legal Department Coinbase, Inc.
248 3rd St, #434

17

Oakland, CA 94607
legal@coinbase.com

If to Client, the address specified in its signature block on the Execution Page.

33.2    In the event of any market operations, connectivity, or erroneous trade issues that require immediate attention including any unauthorized access to Client's Prime Broker Account, please contact:

To Coinbase: support@coinbase.com.

To Client: the email address specified in its signature block on the Execution Page.

It is solely Client's responsibility to provide Coinbase with a true, accurate and complete contact information including any e-mail address, and to keep such information up to date. Client understands and agrees that if Coinbase sends Client an electronic Communication but Client does not receive it because Client's primary email address on file is incorrect, out of date, blocked by Client's service provider, or Client is otherwise unable to receive electronic Communications, Coinbase will be deemed to have provided the Communication to Client. Client may update Client's information via Client's Prime Broker Account and visiting settings or by providing a notice to Coinbase as prescribed above.

33.3    To see more information about our regulators, licenses, and contact information for feedback, questions or complaints, please visit *https://www.coinbase.com/legal/licenses*.

## 34.    Client

To the extent Client is a natural person over 18 years of age, if Coinbase receives legal documentation confirming Client's death or other information leading Coinbase to believe Client is deceased, Coinbase will freeze Client's Prime Broker Account ("Freeze Period"). During the Freeze Period, no transactions may be completed until: (i) Client's designated fiduciary has opened a new Prime Broker Account, as further described below, and the entirety of Client's Prime Broker Account has been transferred to such new Prime Broker Account, or (ii) Client has received proof in a form satisfactory to Coinbase that Client is not deceased. If Coinbase has reason to believe Client is deceased but Coinbase does not have proof of Client's death in a form satisfactory to Coinbase, Client authorizes Coinbase to make inquiries, whether directly or through third parties, that Coinbase considers necessary to ascertain whether Client is deceased. Upon receipt by Coinbase of proof satisfactory to Coinbase that Client is deceased, the fiduciary Client designated in a valid will or similar testamentary document will be required to open a new Prime Broker Account. If Client has not designated a fiduciary, then Coinbase reserves the right to (i) treat as Client's fiduciary any person entitled to inherit Client's Prime Broker Account, as determined by Coinbase upon receipt and review of the documentation Coinbase, in its sole and absolute discretion, deems necessary or appropriate, including (but not limited to) a will, a living trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over Client's estate. In the event Coinbase determines, in its sole and

18

absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, Coinbase reserves the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to Client's Prime Broker Account. Pursuant to the above, the opening of a new Prime Broker Account by a designated fiduciary is mandatory following the death of Client, and Client hereby agrees that its fiduciary shall be required to open a new Prime Broker Account and provide required account opening information to gain access to the contents of Client's Prime Broker Account.

### 35.   Counterparts

This Coinbase Prime Broker Agreement may be executed in one or more counterparts, including by facsimile or email of .pdf signatures or DocuSign (or similar electronic signature software), each of which shall be deemed to be an original document, but all such separate counterparts shall constitute only one and the same Coinbase Prime Broker Agreement.

*[Signatures on following page]*

Coinbase 2022 US Version 2.0

**IN WITNESS WHEREOF**, the Parties have caused this Coinbase Prime Broker Agreement, including the Custody Agreement and MTA, to be duly executed and delivered as of the date below.

**COINBASE, INC. For itself and as agent for the Coinbase Entities**

    **By:**   _____

    **Name:**  _____

    **Title:**  _____

    **Date:**  _____

**CLIENT:**

    **By:**   _____

    **Name:**  _____

    **Title:**  _____

    **Date:**  _____

    **Address:**  _____

    _____

    **E-Mail:**  _____

20

**EXHIBIT A**
**to the Coinbase Prime Broker Agreement**

**COINBASE CUSTODY CUSTODIAL SERVICES AGREEMENT**

This Custody Agreement is entered into between Client and Coinbase Custody and forms a part of
the Coinbase Prime Broker Agreement between the Client and the Coinbase Entities. Capitalized
terms used in this Custody Agreement that are not defined herein shall have the meanings assigned
to them in the other parts of the Coinbase Prime Broker Agreement.

**1.      Custodial Services.**

Coinbase Custody shall provide Client with a segregated custody account controlled and secured
by Coinbase Custody ("Custodial Account") to store certain Digital Assets supported by Coinbase
Custody, on Client's behalf ("Custodial Services"). Coinbase Custody is a fiduciary under § 100
of the New York Banking Law and a qualified custodian for purposes of Rule 206(4)-2(d)(6) under
the Investment Advisers Act of 1940, as amended, and is licensed to custody Client's Digital
Assets in trust on Client's behalf. Digital Assets in Client's Custodial Account shall (i) be
segregated from the assets held by Coinbase Custody as principal and the assets of other customers
of Coinbase Custody, (ii) not be treated as general assets of Coinbase Custody, and except as
otherwise provided herein, Coinbase Custody shall have no right, title or interest in such Digital
Assets, (iii) constitute custodial assets and Client's property. In addition, Coinbase Custody shall
maintain adequate capital and reserves to the extent required by applicable law and shall not,
directly or indirectly, lend, pledge, hypothecate or re-hypothecate any Digital Assets in the
Custodial Account.

**2.      Custodial Account.**

2.1     *In General.* The Custodial Services shall permit the Client (i) to hold its Vault Balance in
        its Custodial Account and transfer Digital Assets to and from its Trading Balance, (ii) to
        deposit supported Digital Assets from a public blockchain address controlled by Client into
        its Custodial Account, (iii) withdraw supported Digital Assets from its Custodial Account
        to a public blockchain address controlled by Client and (iv) certain additional services as
        may be agreed to between the Client and Coinbase Custody from time to time. Each such
        deposit or withdrawal shall be referred to as a "Custody Transaction" and shall conform to
        Instructions provided by Client through the Coinbase Prime Broker Site. Client shall only
        withdraw or deposit Digital Assets to public blockchain addresses and accounts owned by
        Client or an address for which Client has conducted the necessary Know Your Customer
        ("KYC") and anti-money laundering ("AML") due diligence. Digital Assets shall be held
        in Client's Custodial Account in accordance with the terms of this Custody Agreement and
        shall not be commingled with other clients' Digital Assets. **Coinbase Custody reserves
        the right to refuse to process or to cancel any pending Custody Transaction to comply
        with applicable law or in response to a subpoena, court order or other binding
        government order, or to enforce transaction, threshold and condition limits, or if
        Coinbase Custody reasonably believes that the Custody Transaction may violate or**

21

**facilitate the violation of an applicable law, regulation or rule of a governmental authority or self-regulatory organization.**

2.2    *Digital Asset Deposits and Withdrawals.* Coinbase Custody will process supported Digital Asset Custody Transaction according to the Instruction received from Client or Client's Authorized Representatives, and Coinbase Custody does not guarantee the identity of any user, receiver, requestee or other party. Client must verify all deposit and withdrawal information prior to submitting Instructions to Coinbase Custody regarding a Custody Transaction. Coinbase Custody shall have no liability, obligation, or responsibility whatsoever for Client Digital Asset transfers sent or received pursuant to inaccurate Instructions or received from a wrong party. Coinbase Custody reserves the right to charge network fees (including miner fees) to process a Custody Transaction on Client's behalf. Coinbase Custody will calculate the network fee, if any, in its sole and absolute discretion, although Coinbase Custody will always notify Client of the network fee at or before the time Client authorizes the Custody Transaction. Coinbase Custody reserves the right to delay any Custody Transaction if it perceives a risk of fraud or illegal activity.

2.3    *Digital Asset Storage and Transmission Delays.* Coinbase Custody requires up to twenty-four (24) hours between any request to withdraw Digital Assets from Client's Custodial Account and submission of Client's withdrawal to the applicable Digital Asset network. Since Coinbase Custody securely stores all Digital Asset private keys in offline storage, it may be necessary to retrieve certain information from offline storage in order to facilitate a withdrawal in accordance with Client's Instructions, which may delay the initiation or crediting of such withdrawal. Client acknowledges and agrees that a Custody Transaction may be delayed, and that Digital Assets shall not be deposited or withdrawn upon less than twenty-four (24) hours' notice initiated from Client's Custodial Account. The time of such request shall be the time such notice is transmitted from Client's Custodial Account. Except as specified, Coinbase Custody makes no representations or warranties with respect to the availability and/or accessibility of (1) the Digital Assets, (2) a Custody Transaction, (3) the Custodial Account, or (4) the Custodial Services. Except as specified, while Coinbase Custody will make reasonable efforts to process Client initiated deposits in a timely manner, Coinbase Custody makes no representations or warranties regarding the amount of time needed to complete processing as such processing is dependent upon many factors outside of Coinbase Custody's control.

2.4    *Supported Digital Assets.* The Custodial Services are available only in connection with those Digital Assets that Coinbase Custody, in its sole discretion, decides to support, which may change from time to time. Prior to initiating a deposit of Digital Asset to Coinbase Custody, Client must confirm that Coinbase Custody offers Custodial Services for that specific Digital Asset. By initiating a deposit of any Digital Asset to a Custodial Account, Client attests that Client has confirmed that the Digital Asset being transferred is a supported Digital Asset offered by Coinbase Custody. Under no circumstances should Client attempt to use the Custodial Services to deposit or store Digital Assets in any forms that are not supported by Coinbase Custody. Depositing or attempting to deposit Digital Assets that are not supported by Coinbase Custody may result in such Digital Asset being

irretrievable by Client and Coinbase Custody. Client shall be fully responsible and liable, and Coinbase Custody shall have no liability, obligation, or responsibility whatsoever, regarding any unsupported Digital Asset sent or attempted to be sent to it, or regarding any attempt to use the Custodial Services for Digital Assets that Coinbase Custody does not support. Digital Assets supported by Coinbase Custody shall be listed on the Coinbase Prime Broker Site. Coinbase Custody recommends that Client deposit a small amount of supported Digital Asset as a test prior to initiating a deposit of a significant amount of supported Digital Asset. Coinbase Custody shall provide Client with thirty (30) days' written notice before ceasing to support a Digital Asset, unless Coinbase Custody is required to cease such support by court order, statute, law, rule (including a self-regulatory organization rule), regulation, code, or other similar requirement.

2.5    *Use of the Custodial Services.* Client acknowledges and agrees that Coinbase Custody may monitor use of the Custodial Account and the Custodial Services and the resulting information may be utilized, reviewed, retained and or disclosed by Coinbase Custody for its internal purposes or in accordance with the rules of any applicable legal, regulatory or self-regulatory organization or as otherwise may be required to comply with relevant law, sanctions programs, legal process or government request.

2.6    *Independent Verification.* If Client is subject to Rule 206(4)-2 under the Investment Advisers Act of 1940, Coinbase Custody shall, upon written request, provide Client's authorized independent public accountant confirmation of or access to information sufficient to confirm (i) Client's Digital Assets as of the date of an examination conducted pursuant to Rule 206(4)-2(a)(4), and (ii) Client's Digital Assets are held either in a separate account under Client's name or in accounts under Client's name as agent or trustee for Client's clients.

2.7    *Third Party Payments.* The Custodial Services are not intended to facilitate third party payments of any kind. As such, Coinbase Custody has no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that Client may purchase or sell to or from a third party (including other users of Custodial Services) involving Digital Assets that Client intends to store, or have stored, in Client's Custodial Account.

2.8    *Termination, and Cancellation.* If Coinbase Custody closes Client's Custodial Account or terminates Client's use of the Custodial Services, Client will be permitted to withdraw Digital Assets associated with Client's Custodial Account for a period of up to ninety (90) days following the date of deactivation or cancellation to the extent not prohibited (i) under applicable law, including applicable sanctions programs, or (ii) by a facially valid subpoena, court order, or binding order of a government authority.

## 3.    Coinbase Custody Obligations

3.1    *Bookkeeping.* Coinbase Custody shall keep timely and accurate records as to the deposit, disbursement, investment and reinvestment of the Digital Assets, as required by applicable law and in accordance with Coinbase Custody's internal document retention policies.

23

3.2     *Insurance.* Coinbase Custody shall obtain and maintain, at its sole expense, insurance coverage in such types and amounts as shall be commercially reasonable for the Custodial Services provided hereunder. Upon Client's written request and in accordance with Coinbase Custody policies, procedures, any confidentiality obligation and any applicable law, Coinbase Custody might provide the Client reasonable evidence detailing the nature and amount of such insurance coverage.

## 4.     Additional Matters

In addition to any additional service providers that may be described in an addendum or attachment hereto, Client acknowledges and agrees that the Custodial Services may be provided from time to time by, through or with the assistance of affiliates of, or vendors to, Coinbase Custody. Client shall receive notice of any material change in the entities that provide the Custodial Services.

*[Remainder of page intentionally left blank]*

24

**EXHIBIT B**
**to the Coinbase Prime Broker Agreement**

## COINBASE MASTER TRADING AGREEMENT

Client should carefully consider whether trading or holding Digital Assets is suitable for its purpose, including in relation to Client's knowledge of Digital Assets and Digital Asset markets and Client's financial condition. All investments involve risk, and the past performance of a financial product does not guarantee future results or returns.

This Master Trading Agreement ("MTA") sets forth the terms and conditions for clients to trade Digital Assets through the Coinbase prime broker execution platform ("Trading Platform") and forms a part of the Coinbase Prime Broker Agreement between Client and the Coinbase Entities. Pursuant to this MTA, Coinbase shall open a Trading Account for the Client on the Trading Platform consisting of linked accounts at Coinbase and Coinbase Custody, each accessible via the Trading Platform ("Trading Account"). The Trading Platform shall provide Client with access to trade execution and automated trade routing services and Coinbase Execution Services (as defined below) to enable Clients to submit orders ("Orders") to purchase and sell specified Digital Assets in accordance with this MTA and the Coinbase Trading Rules set forth at *https://www.coinbase.com/legal/trading_rules* or a successor website (as amended and updated from time to time, the "Coinbase Trading Rules") (such services, the "Trading Services"). Capitalized terms used in this MTA that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Broker Agreement.

1. **Order Routing and Connected Trading Venue**

1.1    The Trading Platform operates a trade execution service through which Client may submit Orders to purchase or sell Digital Assets. After Client submits an Order, the Trading Platform will automatically route the Order (or a portion of the Order) to one of the trading venues to which the Trading Platform has established connections (each such venue, a "Connected Trading Venue"). Each Order will be sent, processed and settled at each Connected Trading Venue to which it is routed. Once an Order to purchase Digital Assets has been placed, the associated Client Assets (as defined below) used to fund the Order will be placed on hold and will generally not be eligible for other use or withdrawal.

1.2    With each Connected Trading Venue, Coinbase shall establish an account in its name, or in its name for the benefit of clients, to trade on behalf of its clients, and the establishment of a Trading Account will not cause Client to have a direct legal relationship, or account with, any Connected Trading Venue. The Trading Platform will not intentionally match the buy and sell orders of its clients against each other and will not intentionally settle Orders against or otherwise trade with Coinbase's principal funds. Client acknowledges that Coinbase and its other clients may trade in their own interests on the Connected Trading Venues and could, therefore, be the counterparty to a Client Order on a Connected Trading Venue.

25

1.3    Client acknowledges that Coinbase has sole discretion to determine the Connected Trading Venues with which it will establish connections. Coinbase will direct Orders to the Connected Trading Venues on an automated basis and generally will not manually route orders. In designing algorithms that determine an Order's routing logic, Coinbase considers a variety of factors relating to the Order and the Connected Trading Venues, including the speed of execution, whether the venue is able to consummate off-chain transactions, the availability of efficient and reliable systems, the level of service provided, and the cost of executing orders. Coinbase may receive cash payments or other financial incentives (such as reciprocal business arrangements) from Connected Trading Venues.

1.4    Coinbase makes no representation or warranty of any kind regarding any Connected Trading Venue, including as to its financial condition, data, security or quality of its execution services, and shall have no liability, obligation, or responsibility whatsoever for the selection or performance of any Connected Trading Venue. Digital Assets may trade at different prices on different trading venues, and other Connected Trading Venues and/or trading venues not used by Coinbase may offer better prices and/or lower costs than the Connected Trading Venue used to execute Client's Order.

1.5    Coinbase acts in an agency capacity for purposes of certain Orders, and may also act in a principal capacity for certain other Orders, as specified in the Coinbase Trading Rules. In the Request For Quotation ("RFQ") service, Coinbase may act as principal to fill Orders by providing indicative firm pricing in accordance with a variety of market factors, at its sole discretion. Each Client should independently evaluate whether such services are appropriate given its own investing profile and sophistication, among other considerations.

**2.    Client Trading Balance and Vault Balance**

2.1    For purposes of this MTA, Client's Digital Assets are referred to as "Client Digital Assets," Client's cash is referred to as "Client Cash," and Client Digital Assets and Client Cash are together referred to as "Client Assets."

2.2    Within the Trading Platform, Coinbase provides access to two types of accounts with balances relating to Client Assets: (1) the "Trading Balance" (as described below in Section 2.3) and (2) the "Vault Balance" (as described below in Section 2.5). The Trading Account provides a record of both the Trading Balance and the Vault Balance. Client determines the allocation of its Client Digital Assets between the Trading Balance and the Vault Balance. Maintenance of the Vault Balance shall be subject to the terms of the Custody Agreement; *provided, however*, Client's Trading Balance is separate from any Digital Assets Client maintains directly with Coinbase Custody.

2.3    Client Digital Assets credited to the Trading Balance are immediately available to Client for purposes of submitting an Order. Coinbase holds Digital Assets credited to the Trading Balance in one of three ways: (i) in omnibus hot wallets (each, an "Omnibus Hot Wallet"); (ii) in omnibus cold wallets (each, an "Omnibus Cold Wallet"); and (iii) in Coinbase's accounts with the Connected Trading Venues ("Coinbase Connected Trading Venue Digital Asset Balance"). Client agrees that Coinbase has sole discretion in determining the

26

allocation of Digital Assets credited to the Trading Balance. Because Digital Assets credited to the Trading Balance are held on an omnibus basis and because of the nature of certain Digital Assets, Client does not have an identifiable claim to any particular Digital Asset. Instead, Client's Trading Balance represents an entitlement to a *pro rata* share of the Digital Assets Coinbase has allocated to the Omnibus Hot Wallets, Omnibus Cold Wallets and Coinbase Connected Trading Venue Digital Asset Balance. Coinbase relies on the Connected Trading Venues for the Coinbase Connected Trading Venue Digital Asset Balance, and Client has no contractual relationship with the Connected Trading Venues with respect to Digital Assets credited to the Trading Balance.

2.4    Client may maintain Client Cash in the Trading Balance but not in the Vault Balance. Coinbase holds Client Cash credited to the Trading Balance in one of two ways: (i) in one or more omnibus accounts in Coinbase's name for the benefit of customers at one or more U.S. insured depository institutions (each, an "FBO account") and (ii) in Coinbase's omnibus accounts at Connected Trading Venues. Coinbase will title the FBO accounts it maintains with U.S. depository institutions and maintain records of Client's interest in a manner designed to enable receipt of Federal Deposit Insurance Corporation ("FDIC") deposit insurance, where applicable and up to the deposit insurance limits applicable under FDIC regulations and guidance, on Client Cash for the Client's benefit on a pass-through basis. Coinbase does not guarantee that pass-through FDIC deposit insurance will apply to Client Cash, since such insurance is dependent in part on compliance of the depository institutions. Coinbase may also title its accounts at some or all Connected Trading Venues and maintain records of Client interests in those accounts in a manner consistent with FDIC requirements for pass-through deposit insurance, but availability of pass-through deposit insurance, up to the deposit insurance limits applicable under FDIC regulations and guidance, is also dependent on the actions of the Connected Trading Venues and any depository institutions they use, which may not be structured to provide pass-through deposit insurance. FDIC insurance applies to cash deposits at banks and other insured depository institutions in the event of a failure of that institution, and does not apply to any Coinbase Entity or to any Digital Asset held by a Coinbase Entity on Client's behalf. Client Cash is immediately available to Client for purposes of submitting an Order, unless a restriction applies.

2.5    At Client's election, all or a portion of Client Digital Assets may also be allocated to the Vault Balance which is held in a Custodial Account in Client's name at Coinbase Custody pursuant to the Custody Agreement. Such Vault Balance will be divided between segregated hot storage in Client's name ("Hot Vault Balance") and segregated cold storage in Client's name ("Cold Vault Balance"). Client shall have sole discretion to allocate Digital Assets between the Hot Vault Balance and Cold Vault Balance. Digital Assets in the Hot Vault Balance may be transferred immediately to Client's Trading Balance unless a restriction applies. A transfer of Digital Assets in the Cold Vault Balance to Client's Trading Balance will be subject to Coinbase Custody's standard cold storage withdrawal procedures. Client hereby appoints Coinbase as Client's agent for purposes of instructing Coinbase Custody to transfer Client Digital Assets between Client's Vault Balance and Client's Trading Balance. Client agrees that an Instruction to Coinbase to settle an Order

27

to or from Client's Vault Balance constitutes authorization to Coinbase to transfer Client Digital Assets to or from Client's Vault Balance as necessary or appropriate to consummate such settlement.

2.6     In all circumstances and consistent with laws and regulations applicable to Coinbase, Coinbase will keep an internal ledger that specifies the Client Assets credited to Client's Trading Balance and enables Coinbase and its auditors and regulators to identify Client and the Client Assets.

2.7     Coinbase treats all Client Assets as custodial assets held for the benefit of Client. No Client Assets credited to the Trading Balance shall be considered to be the property of, or loaned to, Coinbase, except as provided in any loan agreement between Client and any Coinbase Entity. Neither Coinbase nor any Coinbase Entity will sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance unless instructed by Client pursuant to an agreement between Client and a Coinbase Entity.

## 3.     Role of Coinbase Custody

3.1     To facilitate the Trading Services, Coinbase may at its sole discretion maintain portions of the Omnibus Hot Wallet and the Omnibus Cold Wallet in one or more custodial FBO accounts with its affiliate, Coinbase Custody. In such circumstances, although the Omnibus Hot Wallet and the Omnibus Cold Wallet are held in Coinbase's FBO accounts with Coinbase Custody, Client's legal relationship for purposes of Digital Assets held in the Omnibus Hot Wallet and the Omnibus Cold Wallet will not be, directly or indirectly, with Coinbase Custody and the terms, conditions and agreements relating to those wallets are to be governed by this MTA.

3.2     Client Digital Assets held in the Hot Vault Balance and Cold Vault Balance are maintained directly between Client and Coinbase Custody in Client's name and are subject to the terms of the Client's Custody Agreement.

## 4.     Cash and Digital Asset Deposits and Withdrawals

4.1     To deposit Client Cash, Client must initiate a transfer from a linked bank account, a wire transfer, a SWIFT transfer, a Silvergate Exchange Network deposit or other form of electronic payment approved by Coinbase from time to time to Coinbase's bank account, the instructions for which are available on the Coinbase Prime Broker Site. Coinbase will credit the Trading Balance with Client Cash once the associated cash is delivered to Coinbase.

4.2     To withdraw Client Cash, Client may also initiate a withdrawal of Client Cash from the Trading Balance at any time using the withdrawal function on the Trading Platform.

4.3     To deposit Client Digital Assets, Clients may transfer Client Digital Assets directly to the Omnibus Hot Wallet or Omnibus Cold Wallet, the instructions for which are available on the Coinbase Prime Broker Site. Client may transfer funds to and among its Hot Vault

28

Balance or Cold Vault Balance. When Client transfers Digital Assets to Coinbase or Coinbase Custody, it delivers custody and control of the Digital Assets to Coinbase, Coinbase Custody or Coinbase's designee, as applicable. Client represents and warrants that any Digital Asset so transferred shall be free and clear of all liens, claims and encumbrances.

4.4     To withdraw Client Digital Assets, Client must provide applicable Instructions via the Coinbase Prime Broker Site ("Withdrawal Transfer"). Once Client has initiated a Withdrawal Transfer, the associated Client Digital Assets will be in a pending state and will not be included in the Client's Trading Balance or Vault Balance. Client acknowledges that Coinbase may not be able to reverse a Withdrawal Transfer once initiated. Client may withdraw Client Digital Assets at any time, subject to delays for Digital Assets held in Cold Vault Balance, and any applicable account restrictions.

4.5     Client must verify all transaction information prior to submitting withdrawal Instructions to Coinbase, as Coinbase cannot and does not guarantee the identity of the wallet owner or bank account to which Client is sending Client Digital Assets or Client Cash, as applicable. Coinbase shall have no liability, obligation, or responsibility whatsoever for Client Cash or Client Digital Asset transfers sent to or received from an incorrect party or sent or received via inaccurate Instructions.

**5.     Disruption to Trading Platform**

5.1     Client acknowledges that electronic facilities and systems such as the Trading Platform are vulnerable to disruption, delay or failure and, consequently, such facilities and systems may be unavailable to Client as a result of foreseeable and unforeseeable events. Client understands and agrees that Coinbase does not guarantee uninterrupted access to the Trading Platform or all features of the Trading Services. Client acknowledges that although Coinbase will attempt to provide notice of any scheduled or unscheduled unavailability that would result in Client being unable to access the Trading Platform or the Trading Services, Coinbase cannot guarantee advanced notice to Client.

5.2     Coinbase may, in its sole discretion, take any of the following actions, and in the case of clause (i), shall use reasonable efforts to provide Client with as much prior notice as is practicable: (i) halt or suspend Trading Services, including trading on the Trading Platform or the trading of any Digital Assets or currency, or (ii) impose limits on the amount or size of Client's Orders. Coinbase shall have no liability, obligation, or responsibility to Client as a result of making any changes to or suspending the Trading Platform.

**6.     Coinbase Trading Rules and Order Types**

6.1     Client agrees to comply with the Coinbase Trading Rules in effect at the time of any Order. Client agrees to review and become familiar with the terms of the various types of Orders (each an "Order Type") available through the Trading Service. A detailed description of the terms of all Orders is contained in the Coinbase Trading Rules. Coinbase reserves the right to modify the terms of any Order Type and the Coinbase Trading Rules at any time

29

and without prior notice to Client, and Client acknowledges that it is solely responsible for ensuring knowledge of applicable Order Types and Coinbase Trading Rules prior to placing an Order.

6.2    Coinbase may modify the terms of, or cancel, any Order executed on Trading Platform if Coinbase determines in its sole reasonable discretion that the Order was clearly erroneous according to the Coinbase Trading Rules. Coinbase shall have no liability, obligation, or responsibility to Client as a result of exercising its rights under this Section 6.

## 7.    Coinbase Supported Digital Assets

Coinbase determines in its sole discretion which Digital Assets to support for use with the Trading Services, as specified on the Coinbase Prime Broker Site. Not all Digital Assets supported for Custodial Services are also supported for Trading Services.

## 8.    Coinbase Execution Services

8.1    At Coinbase's sole discretion, Client may elect to submit Orders to Coinbase Execution Services ("CES"), a Trading Service through which CES personnel will execute Orders on behalf of Client. CES will execute Orders by using automated trade routing services through Client's Prime Broker Account or by filling Orders on Coinbase's over-the-counter ("OTC") trading service ("OTC Services"). Coinbase has sole and absolute discretion to accept or reject any Order. Coinbase and Client may communicate regarding Instructions related to Orders on a mutually agreed communication medium, including instant messaging, email, and telephone.

8.2    CES brokers Orders on a commercially reasonable basis as Client's agent and may exercise discretion in executing Orders. Client must pre-fund its Trading Balance prior to submitting Orders. By electing to use CES, Client agrees that it is authorizing CES personnel to access its Prime Broker Account to initiate and execute Orders. Client acknowledges that CES personnel will retain access to the Client Prime Broker Account until Client provides Coinbase with Instructions to terminate such access. Absent express written agreement between the Parties, Coinbase will accept Orders only from Authorized Representatives that are designated in the Client's Prime Broker Account as having trading authority with respect to the Prime Broker Account.

8.3    For OTC Services, CES personnel will confirm the terms of an Order (which terms shall include asset, quantity, price, settlement timing and fees) with Client prior to executing the Order. Coinbase has policies and procedures in place that are reasonably designed to prevent the disclosure of any Client identity to its OTC counterparty. Coinbase may, in its sole and absolute discretion, accept the following statements (or similar or analogous statements) as Client's final and binding agreement to the terms of an Order: "done," "I buy," "bought," "I sell," or "sold." A completed, executed and settled Order will be reflected in Client's Prime Broker Account.

8.4    For Orders fulfilled via OTC Services ("OTC Orders"), each of Client's and its OTC counterparty's confirmations of the terms of the OTC Order deems such OTC Order as binding and final, and thereby executed. Client's failure to timely settle an executed OTC Order in accordance with the settlement terms will constitute a default under the Coinbase Prime Brokerage Agreement. Upon Client's default of an OTC Order:

Without prior notice to Client, Coinbase shall have the right to: (i) transfer Client Assets from Client's Trading Balance to Coinbase to settle the OTC Order subject to default, and/or (ii) liquidate or cancel outstanding OTC Orders (including OTC Orders that have been submitted or are in the process of being fulfilled).

If the above actions are not sufficient to satisfy all obligations of Client to Coinbase in respect of OTC Orders subject to default, Coinbase shall have the right to liquidate any and all of Client's assets and positions held with Coinbase or Coinbase Custody, including the Trading Balance and Vault Balance in Client's Custodial Account, to cover any Losses incurred by Client's failure to settle the OTC Order. In connection with liquidating such assets, Client authorizes Coinbase, in Coinbase's sole discretion, to liquidate any of Client's Digital Assets in a commercially reasonable sale at the market price that otherwise applies to such Digital Assets at the time of liquidation, without regard to whether Client would recognize a gain or loss on such sale or would recognize a greater or lesser gain or loss if different Digital Assets were sold. Client understands that the value of Digital Assets may rise or fall quickly, and Coinbase has no obligation to liquidate Client's Digital Assets at a time that provides the best price for Client. Client agrees that Digital Assets held in its Trading Balance and the Vault Balance in Client's Custodial Account are of a kind or type customarily sold on recognized markets, subject to standard price quotations and may decline speedily in value. Client agrees that if Coinbase exercises its setoff rights or secured party remedies against Client's Digital Assets, that Coinbase may value such Digital Assets using the same valuation method and same process that is otherwise used when Digital Assets are sold on the Trading Platform or any other commercially reasonable valuation method. A sale by Coinbase of Client's Digital Assets, without notice, at a private sale using the valuation and method described above shall be a commercially reasonable method of disposition.

## 9.    Determination of Suitability; All Risks Not Disclosed

Coinbase's provision of the Trading Services is neither a recommendation that Client enter into a particular Order nor a representation that any product described on the Trading Platform is suitable or appropriate for Client. Many of the Trading Services described on Trading Platform involve significant risks, and Client should not use the Trading Services unless it has fully understood all such risks and has independently determined that such Orders are appropriate. Any discussion of the risks contained in this MTA or on the Trading Platform should not be considered to be a disclosure of all risks or a complete discussion of the applicable risks.

Coinbase 2022 US Version 2.0

**10.    Characterization of Trading Services; Not a Registered Broker-Dealer or Investment Adviser**

Client understands and acknowledges that no transactions executed in connection with Client's Trading Account or the Trading Services are securities transactions, and Coinbase is not registered with the U.S. Securities and Exchange Commission as a broker-dealer or an investment adviser or licensed under any state securities laws. Coinbase is not acting as a fiduciary in respect of Client (including in connection with its rights under this MTA) and does not have any responsibility under the standards governing the conduct of broker-dealers, fiduciaries, investment advisers or investment managers. Client agrees and acknowledges that any information or advice provided by Coinbase or any other Coinbase Entity does not and will not serve as the basis of any investment decision by Client.

**11.    Coinbase Corporate Accounts**

Coinbase and its affiliates may transact through Trading Accounts on the Trading Platform ("Coinbase Corporate Accounts") for purposes including inventory management, to facilitate Client Orders, and for other corporate purposes. To the extent that a Coinbase Corporate Account transacts on the Trading Platform, the Coinbase Corporate Account (i) will not have any special priority vis-a-vis Client Orders and will be subject to the Coinbase Trading Rules, (ii) will trade only on Market Data available to all Clients, and (iii) will not access any non-public data of other Clients. Coinbase's internal ledger will indicate the amount of each Digital Asset held for each client and each such Coinbase Corporate Account.

**12.    Term, Termination and Suspension**

12.1    Regardless of any other provision of this MTA, Coinbase has the sole discretion to decline to provide Trading Services to Client and may, in its sole discretion, suspend, restrict or terminate the Client's Trading Services, including by suspending, restricting or closing the Client's Trading Account, in accordance with the General Terms.

12.2    If Client is subject to termination, Client agrees to transfer any Client Assets off the Trading Platform within thirty (30) days of receipt of the termination notice unless such transfer is otherwise prohibited (i) under applicable law, including any sanctions programs, or (ii) by a facially valid subpoena or court order. Client agrees to promptly provide Coinbase with Instructions as to where its Client Assets should be transferred, and agrees that failure to do so within thirty (30) days of receipt of notice of termination may result in Client Assets being transferred to the Client's linked bank account or Digital Asset wallet on file, in each case subject to off-set for any outstanding obligations to any Coinbase Entity in accordance with the General Terms. Final disbursement of assets may be delayed until any remaining obligations or indebtedness have been satisfied. Client is responsible for all debits, costs, commissions, and losses arising from any actions Coinbase must take to liquidate or close transactions in the Client's Trading Account.

32

### 13.    Unclaimed Property

If Coinbase is holding Client Assets in the Trading Balance, has no record of Client's use of the Trading Services for an extended period, and is otherwise unable to contact Client, Coinbase may be required under applicable laws, rules or regulations to report these assets as unclaimed property and to deliver such unclaimed property to the applicable authority. Coinbase may deduct a dormancy fee or other administrative charge from such unclaimed funds, as permitted by applicable laws, rules or regulations.

Coinbase 2022 US Version 2.0

**Distribution and Exchange Term Sheet**

This non-exhaustive, non-binding term sheet (the "Term Sheet") sets forth certain terms and conditions for a distribution and exchange arrangement (the "Distribution Addendum") related to  that certain Coinbase Prime Broker Agreement (the "Agreement") to be entered into between Coinbase, Inc. ("CB Inc."), Coinbase Custody Trust Company, LLC ("CB Custody") (for purposes of the Term Sheet, CB Inc. and CB Custody are collectively referred to herein as, "Coinbase") and the Client set forth in the Agreement (together with Coinbase, the "Parties", and each, a "Party"). Terms not defined herein have the meaning ascribed to them in the Agreement.

**Transaction Overview**

| | |
|---|---|
| **Appointment as Custodian** | Client will appoint Coinbase as a non-exclusive worldwide custodian and distribution agent for Distributions to Claimants pursuant to the Reorganization Plan.  Except as otherwise described, such services will be provided in accordance with the Agreement. |
| **Services** | Client will provide CB Custody with written instructions ("Instructions") to distribute to one or more Claimants a portion or all of, the payment owed to such Claimant(s) under the Reorganization Plan (each such distribution, a "Distribution"). Each such Instruction shall be provided in accordance with the terms set forth in the Agreement. CB Custody shall, directly or through one of its affiliates, make Distributions in accordance with Instructions provided by Client (the "Distribution Services"). |
| **Distributions to Supported Jurisdictions** | Client will direct Coinbase to make Distributions only of Supported Cryptocurrencies and only to Claimants in Supported Jurisdictions.  No Distributions shall be made to Claimants who Reside in a jurisdiction that is not a Supported Jurisdiction. |
| **Indemnification** | Client shall defend and indemnify and hold harmless Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses (each as defined in the Agreement) arising out of or relating to Coinbase's compliance with any Instruction by Client. |
| **Applicable Law** | Coinbase shall not be required to process any Instructions if Coinbase reasonably determines that such refusal or cancellation is necessary to comply with applicable law or regulations, or in response to a subpoena, court order or other binding government order, or if Coinbase reasonably believes that compliance with the Instruction may violate, facilitate the violation of, or is inconsistent with an applicable law, regulation or rule of a governmental authority or self-regulatory organization, or if changes in applicable law substantially increase the cost to Coinbase of processing Instructions. |
| **KYC Requirements** | Coinbase shall not be required to process any Client Instructions regarding Distributions to Claimants unless such Claimants have met the requirements of Coinbase's AML and KYC processes, as the same may be modified by Coinbase from time to time. |
| **Establishment of Accounts** | Subject to approval of the Bankruptcy Court, Client will establish one or more Custodial Accounts (each a "Celsius Custody Account").  For the avoidance of doubt, Client is not required to use Coinbase as a Custodian or for any custodian services or as prime exchange provider related to the Distribution Addendum and Client may, in its sole and absolute discretion, elect to use Coinbase and/or any other third party as a Custodian. |
| **Exchange Account Terms** | The Parties will agree to operational procedures and enter into any associated agreement pursuant to which CB Custody will make transfers from the Celsius Custody Account to Claimants. |
| **Supported Digital Assets** | Coinbase will provide services in respect of Supported Cryptocurrencies. |
| **Designation of Accounts** | The Celsius Custody Account will be held on behalf of Client, in accordance with the terms of the Agreement |
| **Account Process** | Client shall identify for Coinbase all Claimants for which Client wishes to use Coinbase to |

| | make a Distribution and shall provide information to Coinbase on all such Claimants as Coinbase shall reasonably require. Client shall notify Claimants that they may be eligible to receive Distributions in respect of their Claim (as defined in the Reorganization Plan) through Coinbase. Client shall ensure all Digital Assets to be distributed are made available in the applicable Celsius Custody Account prior to any Distribution and will inform Coinbase that Claimants may be eligible to receive Distributions in respect of their Claim. |
|---|---|
| **No Obligations to Claimants** | Coinbase's obligations arising under the Agreement and the Distribution Addendum will be solely to Client, and Coinbase shall have no obligations to any Claimant absent a separate agreement established between Coinbase and such Claimant. |
| **Governing Terms** | Except as otherwise provided, all activities by Claimants shall be governed by the Coinbase TOS. Client shall not be responsible for Claimants' compliance with the Coinbase TOS and shall not be held liable for any noncompliance (or any resulting damages of any kind) by such Claimants. |
| **Term** | Unless terminated earlier in accordance with the terms of the Agreement or the Distribution Addendum, the Distribution Addendum will be effective as of the entry of the Confirmation Order and shall remain in force for a period of one year thereafter (the "Term"), except as otherwise agreed by the parties. |
| **Fees** | Fees pertaining to the Distribution Addendum will be paid pursuant to an agreement between the parties and are estimated to total approximately USD $5 million. |
| **Definitions** | "**Claimant**" means any party that holds a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan). <br><br> "**Confirmation Order**" has the meaning set forth in the Reorganization Plan. <br><br> "**Disclosure Statement Approval Date**" means date of the Bankruptcy Court (as defined in the Agreement) order approving the Disclosure Statement (as defined in the Reorganization Plan). <br><br> "**Coinbase Account**" means a customer account at Coinbase, which may or may not have successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities. <br><br> "**Coinbase TOS**" means Coinbase's standard and cryptocurrency terms and conditions applicable to any particular Coinbase Account, as revised from time to time. <br><br> "**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, where such tokens are held from time to time held for Client under the terms of the Distribution Addendum. <br><br> "**Reorganization Plan**" means the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, In re Celsius Network LLC, No. 22-10964 (MG) (Bankr. S.D.N.Y. Mar. 31, 2023), ECF No. 3222, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms. <br><br> "**Reside**" means, with respect to any Claimant, such Claimant's principal residence as determined by Coinbase through the AML/KYC information that such Claimant provides to Coinbase. <br><br> "**Supported Jurisdiction**" means each jurisdiction in which Coinbase holds all licenses and registrations necessary to engage in the activities contemplated in the Distribution Addendum with respect to Supported Cryptocurrency in such jurisdiction; *provided*, however, that any list reflecting such jurisdictions submitted to the Court in connection with this Term Sheet is current as of the filing date of such submission, and may be subject to revisions, amendments, changes, or updates by Coinbase in its sole discretion from time to time. |

|  | **"Supported Cryptocurrency"** means the versions of Bitcoin and Ether commonly accepted as the official Bitcoin and Ether cryptocurrencies, respectively, by the three largest cryptocurrency trading platforms in the United States by trading volume for the preceding 12-month period. Supported Cryptocurrency shall not include any airdrops related to Bitcoin or Ether unless Coinbase notifies Client in writing that Coinbase has decided, in its sole and absolute discretion, to treat such airdropped asset as a Supported Cryptocurrency. |
|---|---|

## COINBASE SUPPORTED COUNTRIES FOR DISTRIBUTION

Canada
Mexico
Argentina
Bolivia
Brazil
Cayman Islands
Chile
Colombia
Costa Rica
Dominican Republic
Ecuador
El Salvador
Guatemala
Jamaica
Panama
Peru
Saint Kitts and Nevis
Saint Martin (French part)
Saint Maarten (Dutch part)
Uruguay
Venezuela
British Virgin Islands
Albania
Andorra
Austria
Belgium
Bulgaria
Croatia
Cyprus
Czechia
Denmark
Estonia
Faroe Islands
Finland
France
Germany
Gibraltar
Greece
Guernsey
Hungary

Iceland
Ireland
Isle of Man
Italy
Jersey
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Monaco
Netherlands
Norway
Poland
Portugal
Romania
San Marino
Slovakia
Slovenia
Spain
Sweden
Switzerland
United Kingdom
Azerbaijan
Benin
Burkina Faso
Cameroon
Curaçao
Georgia
Ghana
Jordan
Kenya
Kuwait
Madagascar
Mali
Nigeria
Serbia
Seychelles
South Africa
Togo
Tunisia
Turkey
Uganda
Ukraine

United Arab Emirates
Yemen
Zambia
Zimbabwe
Australia
Hong Kong
India
Indonesia
Japan
Kazakhstan
Mongolia
Nepal
New Zealand
Pakistan
Philippines
Singapore
Sri Lanka
Taiwan

## **Exhibit B-1**

**(Redline) Coinbase Agreements**

## COINBASE PRIME BROKER AGREEMENT

### General Terms and Conditions

## 1.    Introduction

This agreement (including, the Coinbase Custody Custodial Services Agreement attached hereto as Exhibit A (the "Custody Agreement"), the Coinbase Master Trading Agreement attached hereto as Exhibit B (the "MTA"), and all other exhibits, addenda and supplements attached hereto or referenced herein, collectively, the "Coinbase Prime Broker Agreement"), is entered into by and between Celsius Network LLC, ("Client"), and Coinbase, Inc. ("Coinbase"), on behalf of itself and as agent for Coinbase, Coinbase Custody Trust Company, LLC ("Coinbase Custody"), and, as applicable, Coinbase Credit, Inc. ("Coinbase Credit," and collectively with Coinbase and Coinbase Custody, the "Coinbase Entities"). This Coinbase Prime Broker Agreement sets forth the terms and conditions pursuant to which the Coinbase Entities will open and maintain the prime broker account (the "Prime Broker Account") for Client and provide services relating to custody, trade execution, lending or post-trade credit (if applicable), and other services (collectively, the "Prime Broker Services") for certain digital assets ("Digital Assets") as set forth herein. Client and the Coinbase Entities (individually or collectively, as the context requires) may also be referred to as a "Party". Capitalized terms not defined in these General Terms and Conditions (the "General Terms") shall have the meanings assigned to them in the respective exhibit, addendum or supplement. In the event of a conflict between these General Terms and any exhibit, addendum or supplement hereto, then the document governing the specific relevant Prime Broker Service shall control in respect of such Prime Broker Service.

Notwithstanding anything to the contrary in this Coinbase Prime Broker Agreement, the Distribution Addendum, or any confidential side letter between the Parties, Celsius shall not (a) utilize any digital asset trading for selling and/or buying Digital Assets, brokerage, lending, or post-trade credit services with Coinbase or (b) transfer any digital assets pursuant to this Coinbase Prime Broker Agreement other than, in the case of (b), to facilitate (i) the custodial services as set forth in Exhibit A to this Coinbase Prime Broker Agreement, (ii) distribution services as set forth in the Addendum to this Coinbase Prime Broker Agreement, and (iii) transfers between Celsius-owned accounts and wallets.

## 2.    Conflicts of Interest Acknowledgement

Client acknowledges that the Coinbase Entities may have actual or potential conflicts of interest in connection with providing the Prime Broker Services including that (i) Orders (as such term is defined in the MTA) may be routed to Coinbase's exchange platform where Orders may be executed against other Coinbase customers or with Coinbase acting as principal, (ii) the beneficial identity of the purchaser or seller with respect to an Order is unknown and therefore may inadvertently be another Coinbase client, (iii) Coinbase does not engage in front-running, but is aware of Orders or imminent Orders and may execute a trade for its own inventory (or the account of an affiliate) while in possession of that knowledge and (iv) Coinbase may act in a principal capacity with respect to certain Orders (*e.g.*, to fill residual Order size) when a portion of an Order may be below the minimum size accepted by the Connected Trading Venues (as defined in the MTA). As a result of these and other conflicts, the Coinbase Entities may have an

incentive to favor their own interests and the interests of their affiliates over a particular Client's interests and has in place certain policies and procedures in place that are designed to mitigate such conflicts.

**3.    Account Statements**

Client authorizes Coinbase to combine information regarding all Prime Broker Services activities into a single statement. Coinbase will provide Client with an electronic account statement every month, at a minimum. Each account statement will identify the amount of cash and each Digital Asset in Client's Prime Broker Account at the end of the period and set forth all Prime Broker Account activity during that period.

**4.    Client Instructions**

4.1    In a written notice to Coinbase, Client may designate persons and/or entities authorized to act on behalf of Client with respect to the Prime Broker Account (the "Authorized Representative"). Upon such designation, Coinbase may rely on the validity of such appointment until such time as Coinbase receives Instructions from Client revoking such appointment or designating a new Authorized Representative.

4.2    The Coinbase Entities may act upon instructions received from Client or Client's Authorized Representative ("Instructions"). When taking action upon Instructions, the applicable Coinbase Entity shall act in a reasonable manner, and in conformance with the following: (a) Instructions shall continue in full force and effect until executed, cancelled or superseded; (b) if any Instructions are ambiguous, the applicable Coinbase Entity shall refuse to execute such Instructions until any such ambiguity has been resolved to the Coinbase Entity's satisfaction; (c) the Coinbase Entities may refuse to execute Instructions if in the applicable Coinbase Entity's opinion such Instructions are outside the scope of its obligations under this Coinbase Prime Broker Agreement or are contrary to any applicable laws, rules and regulations; and (d) the Coinbase Entities may rely on any Instructions, notice or other communication believed by it in good faith to be given by Client or Client's Authorized Representative. Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability with respect to, any and all Claims and Losses arising out of or relating to inaccurate or ambiguous Instructions.

4.3    Coinbase will comply with the Client's Instructions to stake, stack or vote the Client's Digital Assets to the extent the applicable Coinbase Entity supports proof of stake validation, proof of transfer validation, or voting for such Digital Assets. The Coinbase Entities may, in their sole discretion, decide whether or not to support (or cease supporting) staking services or stacking or voting for a Digital Asset.

**5.    Representations, Warranties, and Additional Covenants**

Client represents, warrants, and covenants that:

2

Coinbase 2022 US Version 2.0

5.1     Client is currently under supervision of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") following the filing of voluntary bankruptcy (collectively, the "Chapter 11 Cases") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

5.2     Subject to the Bankruptcy Code, any orders of the Bankruptcy Court, and the Bankruptcy Court's approval of Client's entry into this Coinbase Prime Broker Agreement, Client has the full power, authority, and capacity to enter into this Coinbase Prime Broker Agreement and to engage in transactions with respect to all Digital Assets relating to the Prime Broker Services;

5.3     Except as disclosed to the Coinbase Entities, Client, to the best of its knowledge, is and shall remain in full material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Client operates or otherwise uses the Prime Broker Services, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including AML Laws, USA PATRIOT Act and Bank Secrecy Act requirements, and other anti-terrorism statutes, regulations, and conventions of the United States or other international jurisdictions;

5.4     Except as disclosed to the Coinbase Entities, Client is and shall remain materially in good standing with all relevant government agencies, departments, regulatory, and supervisory bodies in all relevant jurisdictions in which Client does business, and Client will promptly notify Coinbase if Client ceases to be in good standing with any regulatory authority;

5.5     Client shall promptly provide information as the Coinbase Entities may reasonably request in from time to time regarding: (a) Client's policies, procedures, and activities which relate to the Prime Broker Services, and (b) Client's use of the Prime Broker Services, in each case to the extent reasonably necessary for the Coinbase Entities to comply with any applicable laws, rules, and regulations (including money laundering statutes, regulations and conventions of the United States or other jurisdictions), or the guidance or direction of, or request from, any regulatory authority or financial institution;

5.6     Client's use of the Prime Broker Services shall be for commercial, business purposes only, limited to activities disclosed in the due diligence information submitted to Coinbase, and shall not include any personal, family or household purposes. Client shall promptly notify Coinbase in writing in the event it intends to use the Prime Broker Services in connection with any business activities not previously disclosed to Coinbase. Coinbase may, in its sole discretion, prohibit Client from using the Prime Broker Services in connection with any business activities not previously disclosed;

5.7     Client's Authorized Representatives have the (a) full power, authority and capacity to access and use the Prime Broker Services and (b) appropriate sophistication, expertise, and knowledge necessary to understand the nature and risks, and make informed decisions, in respect of Digital Assets and the Prime Broker Services;

3

5.8     Client either owns or possess lawful authorization to transact with all Digital Assets involved in any Custody Transactions;

5.9     This Coinbase Prime Broker Agreement is Client's legal, valid, and binding obligation, enforceable against it in accordance with its terms; and

5.10    Unless Client advises Coinbase to the contrary in writing, at all times, none of Client's assets constitute, directly or indirectly, plan assets subject to the fiduciary responsibility and prohibited transaction sections of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), the prohibited transaction provisions of the Internal Revenue Code of 1986, as amended, or any federal, state, local or non-U.S. law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, and Client shall immediately provide Coinbase with a written notice in the event that Client becomes aware that Client is in breach of the foregoing.

Coinbase, on behalf of itself and each other Coinbase Entity, represents, warrants, and covenants that:

5.11    It possesses and will maintain, all licenses, registrations, authorizations and approvals required by any applicable government agency or regulatory authority for it to operate its business and provide the Prime Broker Services;

5.12    It has the full power, authority, and capacity to enter into and be bound by this Coinbase Prime Broker Agreement; and

5.13    This Coinbase Prime Broker Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

## 6.    No Investment Advice or Brokerage

6.1     Client assumes responsibility for each transaction in or for its Prime Broker Account. Client understands and agrees that none of the Coinbase Entities are an SEC/FINRA registered broker-dealer or investment adviser to Client in any respect, and the Coinbase Entities have no liability, obligation, or responsibility whatsoever for Client decisions relating to the Prime Broker Services. Client should consult its own legal, tax, investment and accounting professionals.

6.2     While the Coinbase Entities may make certain general information available to Client, the Coinbase Entities are not providing and will not provide Client with any investment, legal, tax or accounting advice regarding Client's specific situation. Client is solely responsible, and shall not rely on the Coinbase Entities, for determining whether any investment, investment strategy, or transaction involving Digital Assets is appropriate for Client based on Client's investment objectives, financial circumstances, risk tolerance, and tax consequences. The Coinbase Entities shall have no liability, obligation, or

4

responsibility whatsoever regarding any Client decision to enter into in any transaction with respect to any Digital Asset.

## 7.    Opt-In to Article 8 of the Uniform Commercial Code

Client Assets in the Trading Balance and Vault Balance will be treated as "financial assets" under Article 8 of the New York Uniform Commercial Code ("Article 8"). Coinbase and Coinbase Custody are "securities intermediaries," the Trading Balance and Vault Balance are each "securities accounts," and Client is an "entitlement holder" under Article 8. This Agreement sets forth how the Coinbase Entities will satisfy their Article 8 duties. Treating Client Assets in the Trading Balance and Vault Balance as financial assets under Article 8 does not determine the characterization or treatment of the cash and Digital Assets under any other law or rule. New York will be the securities intermediary's jurisdiction with respect to Coinbase and Coinbase Custody, and New York law will govern all issues addressed in Article 2(1) of the Hague Securities Convention. Coinbase and Coinbase Custody will credit the Client with any payments or distributions on any Client Assets it holds for Client's Trading Balance and Vault Balance. Coinbase and Coinbase Custody will comply with Client's Instructions with respect to Client Assets in Client's Trading Balance or Vault Balance, subject to the terms of the MTA or Custody Agreement, as applicable, and related Coinbase rules, including the Coinbase Trading Rules (as such term is defined in the MTA).

## 8.    General Use, Security and Prohibited Use

8.1    *Prime Broker Site and Content.* During the term of this Coinbase Prime Broker Agreement, the Coinbase Entities hereby grant Client a limited, nonexclusive, non-transferable, non-sublicensable, revocable and royalty-free license, subject to the terms of this Coinbase Prime Broker Agreement, to access and use the Coinbase Prime Broker Site accessible at prime.coinbase.com ("Coinbase Prime Broker Site") and related content, materials, and information (collectively, the "Content") solely for Client's internal business use and other purposes as permitted by Coinbase in writing from time to time. Any other use of the Coinbase Prime Broker Site or Content is hereby prohibited. All other right, title, and interest (including all copyright, trademark, patent, trade secrets, and all other intellectual property rights) in the Coinbase Prime Broker Site, Content, and Prime Broker Services is and will remain the exclusive property of the Coinbase Entities and their licensors. Client shall not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Prime Broker Services or Content, in whole or in part. "Coinbase," "Coinbase Prime," "prime.coinbase.com," and all logos related to the Prime Broker Services or displayed on the Coinbase Prime Broker Site are either trademarks or registered marks of the Coinbase Entities or their licensors. Client may not copy, imitate or use them without Coinbase's prior written consent. The license granted under this Section 8.1 will automatically terminate upon termination of this Coinbase Prime Broker Agreement, or the suspension or termination of Client's access to the Coinbase Prime Broker Site or Prime Broker Services.

5

8.2    *Unauthorized Users.* Client shall not permit any person or entity that is not the Client or an Authorized Representative (each, an "Unauthorized User") to access, connect to, and/or use Client's Prime Broker Account. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, and Client shall be fully responsible and liable for, any and all Claims and Losses arising out of or relating to the acts and omissions of any Unauthorized User in respect of the Prime Broker Services, Prime Broker Account, and/or the Prime Broker Site. Client shall notify Coinbase immediately if Client believes or becomes aware that an Unauthorized User has accessed, connected to, or used Client's Prime Broker Account.

8.3    *Password Security; Contact Information.* Client is fully responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys, YubiKeys, other security or confirmation information or hardware, and any other codes that Client uses to access the Prime Broker Account and Prime Broker Services. Client agrees to keep Client's email address and telephone number up to date in Client's Prime Broker Account in order to receive any notices or alerts that the Coinbase Entities may send to Client. Client shall be fully responsible for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, any Losses that Client may sustain due to compromise of Prime Broker Account login credentials. In the event Client believes Client's Prime Broker Account information has been compromised, Client must contact Coinbase immediately.

8.4    *Prohibited Use.* Client shall not engage in any of the following activities with its use of the Prime Broker Services:

8.4.1    *Unlawful Activity.* Activity that would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Coinbase conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information;

8.4.2    *Abusive Activity.* Actions that impose an unreasonable or disproportionately large load on Coinbase's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to Coinbase systems that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to Coinbase systems, other Coinbase accounts, computer systems or networks connected to Coinbase systems, Coinbase Site, through password mining or any other means; use Coinbase Account information of another party to access or use the Coinbase systems, except in the case of specific Clients and/or applications which are specifically authorized by a Client to access such Client's Coinbase Account and information; or transfer Client's account access or rights to Client's account to a third party, unless by operation of law or with the express permission of Coinbase; and

6

8.4.3   *Fraud*. Activity which operates to defraud Coinbase or any other person or entity.

8.5   *Computer Viruses*. The Coinbase Entities shall not have any liability, obligation, or responsibility whatsoever for any damage or interruptions caused by any computer viruses, spyware, scareware, Trojan horses, worms or other malware that may affect Client's computer or other equipment, or any phishing, spoofing or other attack, unless such damage or interruption directly resulted from the Coinbase Entities' gross negligence, fraud, or willful misconduct. Client agrees to access and use its Prime Broker Account through the Coinbase Prime Broker Site to review any Orders, deposits or withdrawals or required actions to confirm the authenticity of any communication or notice from the Coinbase Entities.

## 9.   Taxes

9.1   *Taxes*. Except as otherwise expressly stated herein or required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities), Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, the payment of any and all present and future tariffs, duties or taxes (including withholding taxes, transfer taxes, stamp taxes, documentary taxes, value added taxes, personal property taxes and all similar costs) imposed or levied by any government or governmental agency (collectively, "Taxes") and any related Claims and Losses or the accounting or reporting of income or other Taxes arising from or relating to any transactions Client conducts through the Prime Broker Services; *provided, however*, that for the avoidance of doubt, if any applicable legal requirement imposes information reporting or similar obligations with respect to the matters governed by this Agreement, the Coinbase Entities shall comply in full with any such requirements that apply to them and Client shall comply in full with any such requirements that apply to it.  The Client and the Coinbase Entities shall each file any and all Tax returns, reports, and disclosures required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities).

9.2   *Withholding Tax*. Except as required by applicable law, each payment under this Coinbase Prime Broker Agreement or collateral deliverable by Client to any Coinbase Entities shall be made, and the value of any collateral or margin shall be calculated, without withholding or deducting of any Taxes. If any Taxes are required to be withheld or deducted, Client (a) authorizes the Coinbase Entities to effect such withholding or deduction and remit such Taxes to the relevant taxing authorities and (b) shall pay such additional amounts or deliver such further collateral as necessary to ensure that the actual net amount received by the Coinbase Entities is equal to the amount that the Coinbase Entities would have received had no such withholding or deduction been required; *provided, however*, that the Coinbase Entities shall reasonably cooperate with Client to minimize or eliminate any such withholding or deduction requirements to the extent permitted by applicable Law. Client agrees that the Coinbase Entities may disclose any information with respect to Client Assets, the Prime Broker Account, Custodial Accounts, Trading Accounts, and transactions required by any applicable taxing authority

7

or other governmental entity. The Client agrees that the Coinbase Entities may withhold or deduct Taxes as may be required by applicable law. From time to time, Coinbase Entities and the Client may request from the other tax documentation or certification of the Coinbase Entities' or Client's (as applicable) taxpayer status as required by applicable law, and any failure by the Coinbase Entities or Client (as applicable) to comply with this request in the time frame identified may result in withholding and/or remission of taxes to a tax authority as required by applicable law.

## 10.    Prime Broker Services Fees

10.1    Client agrees to pay all commissions and fees in connection with the Orders and Prime Broker Services on a timely basis as set forth in the fee schedule agreed between the parties. If agreed by Client and Coinbase in writing, Client authorizes the Coinbase Entities to pay themselves for fees and commissions relating to the Trading Account and Custodial Account by deducting fees from the Vault Balance or Trading Balance, as applicable, to satisfy Client's fees owed.

10.2    Client acknowledges that Coinbase's fees may include but are not limited to: (a) bank wire fees to deposit and/or withdraw Client Cash; (b) internal transfers from its Vault Balance to its Trading Balance; and (c) external withdrawals of Client Assets. Client further acknowledges that Coinbase Custody will charge fees for any balance of Digital Assets that Client keeps in the Vault Balance.

## 11.    Confidentiality

11.1    Client and Coinbase Entities each agree that with respect to any non-public, confidential or proprietary information of the other Party, including the existence and terms of this Coinbase Prime Broker Agreement and information relating to the other party's business operations or business relationships (including the Coinbase Entities' fees), and any arbitration pursuant to Section 22 (collectively, "Confidential Information"), it (a) will not disclose such Confidential Information except to such party's officers, directors, agents, employees and professional advisors who need to know the Confidential Information for the purpose of assisting in the performance of this Coinbase Prime Broker Agreement and who are informed of, and agree to be bound by obligations of confidentiality no less restrictive than those set forth herein and (b) will protect such Confidential Information from unauthorized use and disclosure. Each Party shall use any Confidential Information that it receives solely for purposes of (i) exercising its rights and performing its duties under the Coinbase Prime Broker Agreement and (ii) complying with any applicable laws, rules and regulations; *provided* that, the Coinbase Entities may use Confidential Information for (1) risk management; and (2) to develop, enhance and market their products and services. Confidential Information shall not include any (w) information that is or becomes generally publicly available through no fault of the recipient; (x) information that the recipient obtains from a third party (other than in connection with this Coinbase Prime Broker Agreement) that, to the recipient's best knowledge, is not bound by a confidentiality agreement prohibiting such disclosure; (y) information that is independently developed or acquired by the recipient without the

8

use of Confidential Information provided by the disclosing party; or (z) disclosure with the prior written consent of the disclosing Party.

11.2    Notwithstanding the foregoing, each Party may disclose Confidential Information of the other Party to the extent required by a court of competent jurisdiction or governmental authority or otherwise required by law; *provided, however*, the Party making such required disclosure shall first notify the other Party (to the extent legally permissible) and shall afford the other Party a reasonable opportunity to seek confidential treatment if it wishes to do so and will consider in good faith reasonable and timely requests for redaction. For purposes of this Section 11, no Affiliate (as defined below) of Coinbase shall be considered a third party of any Coinbase Entity, and the Coinbase Entities may freely share Client's Confidential Information among each other and with such affiliates. All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of the receiving Party shall be and remain the property of the disclosing Party and shall be promptly returned to the disclosing Party or destroyed, each upon the disclosing Party's request; *provided, however*, notwithstanding the foregoing, the receiving Party may retain one (1) copy of Confidential Information if (a) required by law or regulation; or (b) retained pursuant to an established document retention policy.

"Affiliate" means, with respect to any specified legal entity, any other legal entity that, directly or indirectly, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, such specified legal entity. As used in this definition, the concept of control refers to the beneficial ownership by one legal entity of the majority of the voting power of another legal entity.

## 12.    Market Data

Client agrees that its use of data made available to it through the Trading Platform's application programming interface(s), which may include the prices and quantities of orders and transactions executed on Trading Platform (collectively "Market Data"), is subject to the Market Data Terms of Use, as amended and updated from time to time at *https://www.coinbase.com/legal/market_data* or a successor website.

## 13.    Recording of Conversations

For compliance and monitoring purposes, Client authorizes each Coinbase Entity at its sole discretion to record conversations between such Coinbase Entity and Client or its Authorized Representatives relating to this Coinbase Prime Broker Agreement, the Prime Broker Account and the Prime Broker Services;

## 14.    Security and Business Continuity

The Coinbase Entities have implemented and will maintain a reasonable information security program in accordance with security terms as disclosed to Client.

9

### 15.    Acknowledgement of Risks

Client hereby acknowledges, that: (i) Digital Assets are not legal tender, are not backed by any government, and are not subject to protections afforded by the Federal Deposit Insurance Corporation or Securities Investor Protection Corporation; (ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and/or value of Digital Assets; (iii) transactions in Digital Assets are irreversible, and, accordingly, Digital Assets lost due to fraudulent or accidental transactions may not be recoverable; (iv) certain Digital Assets transactions will be deemed to be made when recorded on a public blockchain ledger, which is not necessarily the date or time that Client initiates the transaction or such transaction enters the pool; (v) the value of Digital Assets may be derived from the continued willingness of market participants to exchange any government issued currency ("Fiat Currency") for Digital Assets, which may result in the permanent and total loss of value of a Digital Asset should the market for that Digital Asset disappear; (vi) the volatility of the value of Digital Assets relative to Fiat Currency may result in significant losses; (vii) Digital Assets may be susceptible to an increased risk of fraud or cyber-attack; (viii) the nature of Digital Assets means that any technological difficulties experienced by a Coinbase Entity may prevent the access or use of Client Digital Assets; and (ix) any bond or trust account maintained by Coinbase Entities for the benefit of its customers may not be sufficient to cover all losses (including Losses) incurred by customers.

### 16.    Operation of Digital Asset Protocols

16.1    The Coinbase Entities do not own or control the underlying software protocols which govern the operation of Digital Assets. Generally, the underlying software protocols and, if applicable, related smart contracts (referred to collectively as "Protocols" for purposes of this Section 16) are open source and anyone can use, copy, modify or distribute them. By using the Prime Broker Services, Client acknowledges and agrees that (i) the Coinbase Entities make no guarantee of the functionality, security, or availability of underlying Protocols; (ii) some underlying Protocols are subject to consensus-based proof of stake validation methods which may allow, by virtue of their governance systems, changes to the associated blockchain or digital ledger ("Governance Modifiable Blockchains"), and that any Client transactions validated on such Governance Modifiable Blockchains may be affected accordingly; and (iii) the underlying Protocols are subject to sudden changes in operating rules (a/k/a "forks"), and that such forks may materially affect the value, function, and/or even the name of the Digital Assets. In the event of a fork, Client agrees that the Coinbase Entities may temporarily suspend Prime Broker Services (with or without notice to Client) and that the Coinbase Entities may, in their sole discretion, determine whether or not to support (or cease supporting) either branch of the forked protocol entirely. In the event that Coinbase decides not to support (or ceases supporting) either branch of a forked protocol, Coinbase will use reasonable efforts to notify Client in advance wherever reasonably practicable to do so. Client agrees that the Coinbase Entities shall have no liability, obligation or responsibility whatsoever arising out of or relating to the operation of Protocols, transactions affected by Governance Modifiable Blockchains, or an unsupported branch of a forked protocol and, accordingly,

10

Client acknowledges and assumes the risk of the same. The Coinbase Entities shall use commercially reasonable efforts to timely select at least one of the forked protocol branches to support and will identify such selection in a notice reasonably in advance of such fork (to the extent practicable) to provide Client the opportunity to arrange for the transfer of the relevant Digital Assets, which the Coinbase Entities shall use commercially reasonable efforts to accomplish in advance of such fork. With respect to a forked protocol branch that the Coinbase Entities choose not to support, upon Client's request, the Coinbase Entities will use commercially reasonable efforts to deliver the relevant Digital Assets from such forked protocol branch to Client, including any credentials, keys, or other information sufficient to gain control over such Digital Assets through other means within a commercially reasonable period of time.

16.2    Unless specifically communicated by the Coinbase Entities through a written public statement on the Coinbase website, the Coinbase Entities do not support airdrops, metacoins, colored coins, side chains, or other derivative, enhanced or forked protocols, tokens or coins, which supplement or interact with a Digital Asset (collectively, "Advanced Protocols") in connection with the Prime Broker Services. The Prime Broker Services are not configured to detect, process and/or secure Advanced Protocol transactions and neither Client nor the Coinbase Entities will be able to retrieve any unsupported Advanced Protocol. Coinbase shall have no liability, obligation or responsibility whatsoever in respect to Advanced Protocols.

## 17.    Set-off

Upon the occurrence of a default or an event of default under, an agreement with a Coinbase Entity (including an "Event of Default" as such term is defined in the PTC Agreement (in each case, at maturity, upon acceleration or otherwise)) or the occurrence of an event that constitutes "Cause" (as defined below) (each, a "Setoff Event"), each Coinbase Entity may set off and net the amounts due from it or any of its affiliates to Client and from Client to it or any other Coinbase Entity, so that a single payment (the "Net Payment") shall be immediately due and payable by the Client or the Coinbase Entity to the other (subject to the other provisions hereof and of any agreement with a Coinbase Entity). If any amounts cannot be included within the Net Payment, such amounts shall be excluded but may still be netted against any other similarly excluded amounts. Upon the occurrence of a Setoff Event, each Coinbase Entity may also set off and net any Net Payment or any other obligation owed to the Client by any Coinbase Entity against (i) any or all collateral or margin posted by any Coinbase Entity to Client (or the U.S. dollar value thereof, determined by Coinbase in its sole discretion on the basis of a recent price at which the relevant Digital Asset was sold to customers on the Trading Platform); and (ii) any Net Payment, unpaid trade credits or any other obligation owed by Client to any Coinbase Entity (in each case, whether matured or unmatured, fixed or contingent, or liquidated or unliquidated). Client agrees that in the exercise of setoff rights or secured party remedies, the Coinbase Entities may value Client Digital Assets using the same valuation methods and processes that are otherwise used when a Coinbase customer sells an asset on the Trading Platform (as such term is defined in the MTA) or any other commercially reasonable valuation method as determined by Coinbase in its sole discretion. For the avoidance of doubt and notwithstanding anything to the

11

contrary, the Coinbase Entities shall not be permitted to set off against, liquidate or apply any assets or amounts in Client's Vault Balance.

## 18.    Disclaimer of Warranties

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE PRIME BROKER SERVICES AND THE COINBASE WEBSITE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OF ANY KIND, AND THE COINBASE ENTITIES HEREBY SPECIFICALLY DISCLAIM ALL WARRANTIES WITH RESPECT TO THE PRIME BROKER SERVICES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES AND/OR CONDITIONS OF TITLE, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT. THE COINBASE ENTITIES DO NOT WARRANT THAT THE PRIME BROKER SERVICES, INCLUDING ACCESS TO AND USE OF THE COINBASE WEBSITES, OR ANY OF THE CONTENT CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, COMPATIBLE WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, SECURE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE.

## 19.    Indemnification

19.1    Client shall defend and indemnify and hold harmless each Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to Client's breach of this Coinbase Prime Broker Agreement, Client's violation of any law, rule or regulation, or rights of any third party, or Client's gross negligence, fraud or willful misconduct, unless such Claims or Losses arise out of or relate to Coinbase's gross negligence, fraud, willful misconduct. This obligation will survive any termination of this Coinbase Prime Broker Agreement.

19.2    Coinbase shall defend and indemnify and hold harmless Client, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to any (i) violation, misappropriation, or infringement upon any United States patent, copyright, trademark, trade secret or other intellectual property right of a third party or (ii) violation of applicable law, rule or regulation, or rights of any third party, or Coinbase's gross negligence, fraud or willful misconduct unless such Claims or Losses arise out of or relate to Client's gross negligence, fraud, willful misconduct, or breach of this Coinbase Prime Broker Agreement. This obligation will survive any termination of this Coinbase Prime Broker Agreement.

Each Party's (the "Indemnitor") indemnification obligation under Section 18 of this Coinbase Prime Broker Agreement shall apply only if the other Party (the "Indemnitee") does the following: (a) notifies the Indemnitor promptly in writing, not later than thirty (30) days after the Indemnitee receives notice of the Claim (or sooner if required by applicable law); (b) gives the Indemnitor sole control of the defense and any settlement

12

negotiations (subject to the below); and (c) gives the Indemnitor the information, authority, and assistance such Indemnitor needs to defend against or settle the Claim.

No Party providing indemnification pursuant to this Section 19 shall accept any settlement of any Claims or Losses if such settlement imposes any financial or non-financial liabilities, obligations, or restrictions on, or requires an admission of guilt or wrong-doing from, any party indemnified pursuant to this Section 19, without such party's prior written consent.

19.3    For the purposes of this Coinbase Prime Broker Agreement:

(a)    "Claim" means any action, suit, litigation, demand, charge, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other governmental, regulatory or administrative body or any arbitrator or arbitration panel; and

(b)    "Losses" means any liabilities, damages, diminution in value, payments, obligations, losses, interest, costs and expenses, security or other remediation costs (including any regulatory investigation or third party subpoena costs, reasonable attorneys' fees, court costs, expert witness fees, and other expenses relating to investigating or defending any Claim); fines, taxes, fees, restitution, or penalties imposed by any governmental, regulatory or administrative body, interest on and additions to tax with respect to, or resulting from, Taxes imposed on Client's assets, cash, other property, or any income or gains derived therefrom; and judgments (at law or in equity) or awards of any nature.

## 20.    Limitation of Liability

The Coinbase Prime Broker Agreement shall be subject to a limitation of liability as agreed between the Parties.

## 21.    Privacy

Except as set forth herein, the Coinbase Entities shall use and disclose Client's and its Authorized Representatives' non-public personal information in accordance with the Coinbase Privacy Policy, as set forth at *https://www.coinbase.com/legal/privacy* or a successor website, and as amended and updated from time to time.

## 22.    Arbitration

22.1    Subject to the jurisdiction of the Bankruptcy Court, any Claim arising out of or relating to this Coinbase Prime Broker Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including any determination of the scope or applicability

13

of the agreement to arbitrate as set forth in this Section 22, shall be determined by arbitration in the state of New York or another mutually agreeable location, before one neutral arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, and the award of the arbitrator (the "Award") shall be accompanied by a reasoned opinion. Judgment on the Award may be entered in any court having jurisdiction. This Coinbase Prime Broker Agreement shall not preclude the Parties from seeking provisional relief, including injunctive relief, in any court of competent jurisdiction. Seeking any such provisional relief shall not be deemed to be a waiver of such party's right to compel arbitration. The Parties expressly waive their right to a jury trial to the extent permitted by applicable law.

22.2    In any arbitration arising out of or related to this Coinbase Prime Broker Agreement, the arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" mean all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees.

22.3    The Parties acknowledge that this Coinbase Prime Broker Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision herein with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Coinbase Prime Broker Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16).

## 23.    Term, Termination and Suspension

This Coinbase Prime Broker Agreement is effective as of the entry of the Confirmation Order and shall remain in effect until terminated by Coinbase or Client as follows:

(a)    Either Party may terminate this Coinbase Prime Broker Agreement in its entirety for any reason and without Cause by providing at least 90 days' prior written notice to the other party; *provided, however*, Client's termination of this Coinbase Prime Broker Agreement shall not be effective until Client has fully satisfied its obligations hereunder. Notwithstanding the foregoing, the Coinbase Entities acknowledge that the Custodial Services are critical to the Client and shall use its reasonable efforts to continue to offer such Custodial Services to the Client for a least one-hundred and eighty (180) days following any termination of this Coinbase Prime Broker Agreement at a rate that is twice the rate applicable during the term.

(b)    Regardless of any other provision of this Coinbase Prime Broker Agreement, the Coinbase Entities may, in their sole discretion, suspend, restrict or terminate the Client's Prime Broker Services, including by suspending, restricting or closing the Client's Prime Broker Account and/or any associated Trading Account, Custodial

14

Account or any credit account (as applicable), for Cause, at any time and without prior notice to the Client.

"Cause" shall mean: (i) Client materially breaches any provision of this Coinbase Prime Broker Agreement and fails to cure such breach within ten (10) days following notice by the Coinbase Entities to the Client of the occurrence of such breach; (ii) the Bankruptcy Court enters an order, or Client or any of its debtor-affiliates in the Chapter 11 Cases (each, a "Debtor" and collectively, the "Debtors") files or supports an application, motion, or request for an order,   that has the effect of amending, vacating, reversing, supplementing, or modifying the   this Coinbase Prime Broker Agreement or the provisions of the Confirmation Order concerning this Coinbase Prime Broker Agreement (the "**Approval Provisions**") in a manner that a Coinbase Entity determines in its reasonable discretion is materially adverse to a Coinbase Entity; (iii) the Bankruptcy Court has made a judicial finding, or any Debtor has declared, that any Debtor is administratively insolvent; (iv) after its entry, the Approval Provisions ceases to be in full force and effect; (v) termination is required pursuant to a facially valid subpoena, court order or binding order of a government authority; (vi) Client's Prime Broker Account is subject to any pending litigation, investigation or government proceeding and/or Coinbase reasonably perceives a materially heightened risk of legal regulatory non-compliance by the Coinbase Entities associated with Client's use of Prime Broker Services; or (vii) Coinbase acting in a commercially reasonable manner suspects Client of attempting to circumvent Coinbase's controls or uses the Prime Broker Services in a manner Coinbase otherwise deems inappropriate or potentially harmful to itself or third parties.

In the event that the Bankruptcy Court does not enter a Confirmation Order containing the Approval Provisions by [December 31, 2023] in form and substance reasonably satisfactory to Coinbase, this Coinbase Prime Broker Agreement shall be null and void without any further action by either party.

(c)    Client acknowledges that the Coinbase Entities' decision to take certain actions, including suspending, restricting or terminating Client's Prime Broker Account or Prime Broker Services, may be based on confidential criteria that are essential to Coinbase's risk management and security practices and agrees that the Coinbase Entities are under no obligation to disclose the details of its risk management and security practices to Client.

## 24.    Severability

If any provision or condition of this Coinbase Prime Broker Agreement shall be held invalid or unenforceable, the remainder of this Coinbase Prime Broker Agreement shall continue in full force and effect.

## 25.    Waiver

Any waivers of rights by the Parties under this Coinbase Prime Broker Agreement must be in writing and signed by such Party or Parties. A waiver will apply only to the particular circumstance giving rise to the waiver and will not be considered a continuing waiver in other

15

similar circumstances. A Party's failure to insist on strict compliance with this Coinbase Prime Broker Agreement or any other course of conduct by such Party shall not be considered a waiver of their rights under this Coinbase Prime Broker Agreement.

## 26.    Survival

All provisions of this Coinbase Prime Broker Agreement which by their nature extend beyond the expiration or termination of this Coinbase Prime Broker Agreement shall survive the termination or expiration of this Coinbase Prime Broker Agreement.

## 27.    Governing Law

This Coinbase Prime Broker Agreement, Client's Prime Broker Account, and the Prime Broker Services will be governed by and construed in accordance with the laws of the State of New York, excluding its conflicts of laws principles, except to the extent such state law is preempted by federal law.

## 28.    Force Majeure

The Coinbase Entities shall not be liable for delays, suspension of operations, whether temporary or permanent, failure in performance, or interruption of service which result directly or indirectly from any cause or condition beyond the reasonable control of the Coinbase Entities, including any act of God; embargo; natural disaster; act of civil or military authorities; act of terrorists; terrorist related hacking, government restrictions; any ruling by any Connected Trading Venue, exchange or market; market volatility or disruptions in order trading on any Connected Trading Venue, exchange or market; suspension of trading; civil disturbance; war; strike or other labor dispute; fire; severe weather; interruption in telecommunications, Internet services, or network provider services; failure of equipment and/or software; failure of computer or other electronic or mechanical equipment or communication lines; outbreaks of infectious disease (other than COVID-19) or any other public health crises, including quarantine or other employee restrictions; acts or omissions of any Connected Trading Venue; or any other catastrophe or other occurrence which is beyond the reasonable control of the Coinbase Entities (each, a "Force Majeure Event"); *provided, however*, that this Section 28 shall only apply for so long as such delay or prevention is occurring; *provided further*, that should such delay or prevention remain ongoing for fifteen (15) days, Client may request withdrawal of the USD equivalent of any assets then held in a Digital Asset Wallet or Fiat Wallet so long as such delay or suspension does not affect the transfer or settlement of USD.

## 29.    Entire Agreement; Headings

This Coinbase Prime Broker Agreement, together with all exhibits, addenda and supplements attached hereto or referenced herein, comprise the entire understanding between Client and the Coinbase Entities as to the Prime Broker Services and supersedes all prior discussions, agreements and understandings, including any previous version of this Coinbase Prime Broker Agreement, and the Custodial Services Agreement between Client and any Coinbase Entity, including all exhibits, addenda, policies, and supplements attached thereto or referenced therein.

16

Section headings in this Coinbase Prime Broker Agreement are for convenience only and shall not govern the meaning or interpretation of any provision of this Coinbase Prime Broker Agreement.

## 30.    Amendments

Any modification or addition to this Coinbase Prime Broker Agreement must be in writing and either (a) signed by a duly authorized representative of each party, or (b) accepted and agreed to by Client.

## 31.    Assignment

Any assignment of Client's rights and/or licenses granted under this Coinbase Prime Broker Agreement without obtaining the prior written consent (not to be unreasonably withheld) of Coinbase shall be null and void. Coinbase reserves the right to assign its rights under this Coinbase Prime Broker Agreement without restriction, including to any of the Coinbase Entities or their affiliates or subsidiaries, or to any successor in interest of any business associated with the Prime Broker Services, such affiliate, subsidiary or successor, an ("Assignee"), *provided* that Coinbase shall notify Client within a reasonable amount of time prior to such assignment and that Client shall be entitled to terminate this Coinbase Prime Broker Agreement with immediate effect following such assignment; *provided further*, that any such Assignee has the operational capacity and all necessary legal and/or regulatory approvals, licenses and permissions to provide the Prime Broker Services to Client, and that the security measures utilized by such Assignee shall be equivalent to those employed by Coinbase.

## 32.    Electronic Delivery of Communications

Client agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that the Coinbase Entities provide in connection with Client's Prime Broker Account and Client's use of Prime Broker Services. Communications include: (a) terms of use and policies Client agrees to, including updates to policies or the Coinbase Prime Broker Agreement, (b) Prime Broker Account details, including transaction receipts, confirmations, records of deposits, withdrawals or transaction information, (c) legal, regulatory and tax disclosures or statements the Coinbase Entities may be required to make available to Client and (d) responses to claims or customer support inquiries filed in connection with Client's Prime Broker Account.

Coinbase will provide these Communications to Client by posting them on the Prime Broker Site, emailing them to Client at the primary email address on file with Coinbase, communicating to Client via instant chat, and/or through other means of electronic communication. The Client agrees that electronically delivered Communications may be accepted and agreed to by Client through the Prime Broker Services interface. Furthermore, the Parties consent to the use of electronic signatures in connection with Client's use of the Prime Broker Services.

17

**33.**    **Notice and Contacts**

33.1    All notices required or permitted to be given hereunder shall be in writing delivered to the Party at its address specified below via an overnight mailing company of national reputation. Any Party that changes its notice address must notify the other Party promptly of such change.

If to any Coinbase Entity:

Legal Department Coinbase, Inc.
248 3rd St, #434
Oakland, CA 94607
legal@coinbase.com

If to Client, the address specified in its signature block on the Execution Page.

33.2    In the event of any market operations, connectivity, or erroneous trade issues that require immediate attention including any unauthorized access to Client's Prime Broker Account, please contact:

To Coinbase: support@coinbase.com.

To Client: the email address specified in its signature block on the Execution Page.

It is solely Client's responsibility to provide Coinbase with a true, accurate and complete contact information including any e-mail address, and to keep such information up to date. Client understands and agrees that if Coinbase sends Client an electronic Communication but Client does not receive it because Client's primary email address on file is incorrect, out of date, blocked by Client's service provider, or Client is otherwise unable to receive electronic Communications, Coinbase will be deemed to have provided the Communication to Client. Client may update Client's information via Client's Prime Broker Account and visiting settings or by providing a notice to Coinbase as prescribed above.

33.3    To see more information about our regulators, licenses, and contact information for feedback, questions or complaints, please visit *https://www.coinbase.com/legal/licenses*.

**34.**    **Client**

To the extent Client is a natural person over 18 years of age, if Coinbase receives legal documentation confirming Client's death or other information leading Coinbase to believe Client is deceased, Coinbase will freeze Client's Prime Broker Account ("Freeze Period"). During the Freeze Period, no transactions may be completed until: (i) Client's designated fiduciary has opened a new Prime Broker Account, as further described below, and the entirety of Client's Prime Broker Account has been transferred to such new Prime Broker Account, or (ii) Client has received proof in a form satisfactory to Coinbase that Client is not deceased. If Coinbase has reason to believe Client is deceased but Coinbase does not have proof of Client's death in a form

18

satisfactory to Coinbase, Client authorizes Coinbase to make inquiries, whether directly or through third parties, that Coinbase considers necessary to ascertain whether Client is deceased. Upon receipt by Coinbase of proof satisfactory to Coinbase that Client is deceased, the fiduciary Client designated in a valid will or similar testamentary document will be required to open a new Prime Broker Account. If Client has not designated a fiduciary, then Coinbase reserves the right to (i) treat as Client's fiduciary any person entitled to inherit Client's Prime Broker Account, as determined by Coinbase upon receipt and review of the documentation Coinbase, in its sole and absolute discretion, deems necessary or appropriate, including (but not limited to) a will, a living trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over Client's estate. In the event Coinbase determines, in its sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, Coinbase reserves the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to Client's Prime Broker Account. Pursuant to the above, the opening of a new Prime Broker Account by a designated fiduciary is mandatory following the death of Client, and Client hereby agrees that its fiduciary shall be required to open a new Prime Broker Account and provide required account opening information to gain access to the contents of Client's Prime Broker Account.

### 35.  Counterparts

This Coinbase Prime Broker Agreement may be executed in one or more counterparts, including by facsimile or email of .pdf signatures or DocuSign (or similar electronic signature software), each of which shall be deemed to be an original document, but all such separate counterparts shall constitute only one and the same Coinbase Prime Broker Agreement.

*[Signatures on following page]*

**IN WITNESS WHEREOF**, the Parties have caused this Coinbase Prime Broker Agreement, including the Custody Agreement and MTA, to be duly executed and delivered as of the date below.

**COINBASE, INC. For itself and as agent for the Coinbase Entities**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**CLIENT:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:**_____

20

**EXHIBIT A**
**to the Coinbase Prime Broker Agreement**

**COINBASE CUSTODY CUSTODIAL SERVICES AGREEMENT**

This Custody Agreement is entered into between Client and Coinbase Custody and forms a part of the Coinbase Prime Broker Agreement between the Client and the Coinbase Entities. Capitalized terms used in this Custody Agreement that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Broker Agreement.

**1.    Custodial Services.**

Coinbase Custody shall provide Client with a segregated custody account controlled and secured by Coinbase Custody ("Custodial Account") to store certain Digital Assets supported by Coinbase Custody, on Client's behalf ("Custodial Services"). Coinbase Custody is a fiduciary under § 100 of the New York Banking Law and a qualified custodian for purposes of Rule 206(4)-2(d)(6) under the Investment Advisers Act of 1940, as amended, and is licensed to custody Client's Digital Assets in trust on Client's behalf. Digital Assets in Client's Custodial Account shall (i) be segregated from the assets held by Coinbase Custody as principal and the assets of other customers of Coinbase Custody, (ii) not be treated as general assets of Coinbase Custody, and except as otherwise provided herein, Coinbase Custody shall have no right, title or interest in such Digital Assets, (iii) constitute custodial assets and Client's property. In addition, Coinbase Custody shall maintain adequate capital and reserves to the extent required by applicable law and shall not, directly or indirectly, lend, pledge, hypothecate or re-hypothecate any Digital Assets in the Custodial Account.

**2.    Custodial Account.**

2.1    *In General.* The Custodial Services shall permit the Client (i) to hold its Vault Balance in its Custodial Account and transfer Digital Assets to and from its Trading Balance, (ii) to deposit supported Digital Assets from a public blockchain address controlled by Client into its Custodial Account, (iii) withdraw supported Digital Assets from its Custodial Account to a public blockchain address controlled by Client and (iv) certain additional services as may be agreed to between the Client and Coinbase Custody from time to time. Each such deposit or withdrawal shall be referred to as a "Custody Transaction" and shall conform to Instructions provided by Client through the Coinbase Prime Broker Site. Client shall only withdraw or deposit Digital Assets to public blockchain addresses and accounts owned by Client or an address for which Client has conducted the necessary Know Your Customer ("KYC") and anti-money laundering ("AML") due diligence. Digital Assets shall be held in Client's Custodial Account in accordance with the terms of this Custody Agreement and shall not be commingled with other clients' Digital Assets. **Coinbase Custody reserves the right to refuse to process or to cancel any pending Custody Transaction to comply with applicable law or in response to a subpoena, court order or other binding government order, or to enforce**

21

**transaction, threshold and condition limits, or if Coinbase Custody reasonably believes that the Custody Transaction may violate or facilitate the violation of an applicable law, regulation or rule of a governmental authority or self-regulatory organization.**

2.2    *Digital Asset Deposits and Withdrawals.* Coinbase Custody will process supported Digital Asset Custody Transaction according to the Instruction received from Client or Client's Authorized Representatives, and Coinbase Custody does not guarantee the identity of any user, receiver, requestee or other party. Client must verify all deposit and withdrawal information prior to submitting Instructions to Coinbase Custody regarding a Custody Transaction. Coinbase Custody shall have no liability, obligation, or responsibility whatsoever for Client Digital Asset transfers sent or received pursuant to inaccurate Instructions or received from a wrong party. Coinbase Custody reserves the right to charge network fees (including miner fees) to process a Custody Transaction on Client's behalf. Coinbase Custody will calculate the network fee, if any, in its sole and absolute discretion, although Coinbase Custody will always notify Client of the network fee at or before the time Client authorizes the Custody Transaction. Coinbase Custody reserves the right to delay any Custody Transaction if it perceives a risk of fraud or illegal activity.

2.3    *Digital Asset Storage and Transmission Delays.* Coinbase Custody requires up to twenty-four (24) hours between any request to withdraw Digital Assets from Client's Custodial Account and submission of Client's withdrawal to the applicable Digital Asset network. Since Coinbase Custody securely stores all Digital Asset private keys in offline storage, it may be necessary to retrieve certain information from offline storage in order to facilitate a withdrawal in accordance with Client's Instructions, which may delay the initiation or crediting of such withdrawal. Client acknowledges and agrees that a Custody Transaction may be delayed, and that Digital Assets shall not be deposited or withdrawn upon less than twenty-four (24) hours' notice initiated from Client's Custodial Account. The time of such request shall be the time such notice is transmitted from Client's Custodial Account. Except as specified, Coinbase Custody makes no representations or warranties with respect to the availability and/or accessibility of (1) the Digital Assets, (2) a Custody Transaction, (3) the Custodial Account, or (4) the Custodial Services. Except as specified, while Coinbase Custody will make reasonable efforts to process Client initiated deposits in a timely manner, Coinbase Custody makes no representations or warranties regarding the amount of time needed to complete processing as such processing is dependent upon many factors outside of Coinbase Custody's control.

2.4    *Supported Digital Assets.* The Custodial Services are available only in connection with those Digital Assets that Coinbase Custody, in its sole discretion, decides to support, which may change from time to time. Prior to initiating a deposit of Digital Asset to Coinbase Custody, Client must confirm that Coinbase Custody offers Custodial Services for that specific Digital Asset. By initiating a deposit of any Digital Asset to a Custodial Account, Client attests that Client has confirmed that the Digital Asset being transferred is a supported Digital Asset offered by Coinbase Custody. Under no circumstances

22

should Client attempt to use the Custodial Services to deposit or store Digital Assets in any forms that are not supported by Coinbase Custody. Depositing or attempting to deposit Digital Assets that are not supported by Coinbase Custody may result in such Digital Asset being irretrievable by Client and Coinbase Custody. Client shall be fully responsible and liable, and Coinbase Custody shall have no liability, obligation, or responsibility whatsoever, regarding any unsupported Digital Asset sent or attempted to be sent to it, or regarding any attempt to use the Custodial Services for Digital Assets that Coinbase Custody does not support. Digital Assets supported by Coinbase Custody shall be listed on the Coinbase Prime Broker Site. Coinbase Custody recommends that Client deposit a small amount of supported Digital Asset as a test prior to initiating a deposit of a significant amount of supported Digital Asset. Coinbase Custody shall provide Client with thirty (30) days' written notice before ceasing to support a Digital Asset, unless Coinbase Custody is required to cease such support by court order, statute, law, rule (including a self-regulatory organization rule), regulation, code, or other similar requirement.

2.5   *Use of the Custodial Services.* Client acknowledges and agrees that Coinbase Custody may monitor use of the Custodial Account and the Custodial Services and the resulting information may be utilized, reviewed, retained and or disclosed by Coinbase Custody for its internal purposes or in accordance with the rules of any applicable legal, regulatory or self-regulatory organization or as otherwise may be required to comply with relevant law, sanctions programs, legal process or government request.

2.6   *Independent Verification.* If Client is subject to Rule 206(4)-2 under the Investment Advisers Act of 1940, Coinbase Custody shall, upon written request, provide Client's authorized independent public accountant confirmation of or access to information sufficient to confirm (i) Client's Digital Assets as of the date of an examination conducted pursuant to Rule 206(4)-2(a)(4), and (ii) Client's Digital Assets are held either in a separate account under Client's name or in accounts under Client's name as agent or trustee for Client's clients.

2.7   *Third Party Payments.* The Custodial Services are not intended to facilitate third party payments of any kind. As such, Coinbase Custody has no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that Client may purchase or sell to or from a third party (including other users of Custodial Services) involving Digital Assets that Client intends to store, or have stored, in Client's Custodial Account.

2.8   *Termination, and Cancellation.* If Coinbase Custody closes Client's Custodial Account or terminates Client's use of the Custodial Services, Client will be permitted to withdraw Digital Assets associated with Client's Custodial Account for a period of up to ninety (90) days following the date of deactivation or cancellation to the extent not prohibited (i) under applicable law, including applicable sanctions programs, or (ii) by a facially valid subpoena, court order, or binding order of a government authority.

23

**3.**    **Coinbase Custody Obligations**

3.1    *Bookkeeping*. Coinbase Custody shall keep timely and accurate records as to the deposit, disbursement, investment and reinvestment of the Digital Assets, as required by applicable law and in accordance with Coinbase Custody's internal document retention policies.

3.2    *Insurance.* Coinbase Custody shall obtain and maintain, at its sole expense, insurance coverage in such types and amounts as shall be commercially reasonable for the Custodial Services provided hereunder. Upon Client's written request and in accordance with Coinbase Custody policies, procedures, any confidentiality obligation and any applicable law, Coinbase Custody might provide the Client reasonable evidence detailing the nature and amount of such insurance coverage.

**4.**    **Additional Matters**

In addition to any additional service providers that may be described in an addendum or attachment hereto, Client acknowledges and agrees that the Custodial Services may be provided from time to time by, through or with the assistance of affiliates of, or vendors to, Coinbase Custody. Client shall receive notice of any material change in the entities that provide the Custodial Services.

***[Remainder of page intentionally left blank]***

24

**EXHIBIT B**
**to the Coinbase Prime Broker Agreement**

**COINBASE MASTER TRADING AGREEMENT**

Client should carefully consider whether trading or holding Digital Assets is suitable for its purpose, including in relation to Client's knowledge of Digital Assets and Digital Asset markets and Client's financial condition. All investments involve risk, and the past performance of a financial product does not guarantee future results or returns.

This Master Trading Agreement ("MTA") sets forth the terms and conditions for clients to trade Digital Assets through the Coinbase prime broker execution platform ("Trading Platform") and forms a part of the Coinbase Prime Broker Agreement between Client and the Coinbase Entities. Pursuant to this MTA, Coinbase shall open a Trading Account for the Client on the Trading Platform consisting of linked accounts at Coinbase and Coinbase Custody, each accessible via the Trading Platform ("Trading Account"). The Trading Platform shall provide Client with access to trade execution and automated trade routing services and Coinbase Execution Services (as defined below) to enable Clients to submit orders ("Orders") to purchase and sell specified Digital Assets in accordance with this MTA and the Coinbase Trading Rules set forth at *https://www.coinbase.com/legal/trading_rules* or a successor website (as amended and updated from time to time, the "Coinbase Trading Rules") (such services, the "Trading Services"). Capitalized terms used in this MTA that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Broker Agreement.

**1.    Order Routing and Connected Trading Venue**

1.1    The Trading Platform operates a trade execution service through which Client may submit Orders to purchase or sell Digital Assets. After Client submits an Order, the Trading Platform will automatically route the Order (or a portion of the Order) to one of the trading venues to which the Trading Platform has established connections (each such venue, a "Connected Trading Venue"). Each Order will be sent, processed and settled at each Connected Trading Venue to which it is routed. Once an Order to purchase Digital Assets has been placed, the associated Client Assets (as defined below) used to fund the Order will be placed on hold and will generally not be eligible for other use or withdrawal.

1.2    With each Connected Trading Venue, Coinbase shall establish an account in its name, or in its name for the benefit of clients, to trade on behalf of its clients, and the establishment of a Trading Account will not cause Client to have a direct legal relationship, or account with, any Connected Trading Venue. The Trading Platform will not intentionally match the buy and sell orders of its clients against each other and will not intentionally settle Orders against or otherwise trade with Coinbase's principal funds. Client acknowledges that Coinbase and its other clients may trade in their own interests

25

on the Connected Trading Venues and could, therefore, be the counterparty to a Client Order on a Connected Trading Venue.

1.3     Client acknowledges that Coinbase has sole discretion to determine the Connected Trading Venues with which it will establish connections. Coinbase will direct Orders to the Connected Trading Venues on an automated basis and generally will not manually route orders. In designing algorithms that determine an Order's routing logic, Coinbase considers a variety of factors relating to the Order and the Connected Trading Venues, including the speed of execution, whether the venue is able to consummate off-chain transactions, the availability of efficient and reliable systems, the level of service provided, and the cost of executing orders. Coinbase may receive cash payments or other financial incentives (such as reciprocal business arrangements) from Connected Trading Venues.

1.4     Coinbase makes no representation or warranty of any kind regarding any Connected Trading Venue, including as to its financial condition, data, security or quality of its execution services, and shall have no liability, obligation, or responsibility whatsoever for the selection or performance of any Connected Trading Venue. Digital Assets may trade at different prices on different trading venues, and other Connected Trading Venues and/or trading venues not used by Coinbase may offer better prices and/or lower costs than the Connected Trading Venue used to execute Client's Order.

1.5     Coinbase acts in an agency capacity for purposes of certain Orders, and may also act in a principal capacity for certain other Orders, as specified in the Coinbase Trading Rules. In the Request For Quotation ("RFQ") service, Coinbase may act as principal to fill Orders by providing indicative firm pricing in accordance with a variety of market factors, at its sole discretion. Each Client should independently evaluate whether such services are appropriate given its own investing profile and sophistication, among other considerations.

## 2.     Client Trading Balance and Vault Balance

2.1     For purposes of this MTA, Client's Digital Assets are referred to as "Client Digital Assets," Client's cash is referred to as "Client Cash," and Client Digital Assets and Client Cash are together referred to as "Client Assets."

2.2     Within the Trading Platform, Coinbase provides access to two types of accounts with balances relating to Client Assets: (1) the "Trading Balance" (as described below in Section 2.3) and (2) the "Vault Balance" (as described below in Section 2.5). The Trading Account provides a record of both the Trading Balance and the Vault Balance. Client determines the allocation of its Client Digital Assets between the Trading Balance and the Vault Balance. Maintenance of the Vault Balance shall be subject to the terms of the Custody Agreement; *provided, however*, Client's Trading Balance is separate from any Digital Assets Client maintains directly with Coinbase Custody.

26

2.3    Client Digital Assets credited to the Trading Balance are immediately available to Client for purposes of submitting an Order. Coinbase holds Digital Assets credited to the Trading Balance in one of three ways: (i) in omnibus hot wallets (each, an "Omnibus Hot Wallet"); (ii) in omnibus cold wallets (each, an "Omnibus Cold Wallet"); and (iii) in Coinbase's accounts with the Connected Trading Venues ("Coinbase Connected Trading Venue Digital Asset Balance"). Client agrees that Coinbase has sole discretion in determining the allocation of Digital Assets credited to the Trading Balance. Because Digital Assets credited to the Trading Balance are held on an omnibus basis and because of the nature of certain Digital Assets, Client does not have an identifiable claim to any particular Digital Asset. Instead, Client's Trading Balance represents an entitlement to a *pro rata* share of the Digital Assets Coinbase has allocated to the Omnibus Hot Wallets, Omnibus Cold Wallets and Coinbase Connected Trading Venue Digital Asset Balance. Coinbase relies on the Connected Trading Venues for the Coinbase Connected Trading Venue Digital Asset Balance, and Client has no contractual relationship with the Connected Trading Venues with respect to Digital Assets credited to the Trading Balance.

2.4    Client may maintain Client Cash in the Trading Balance but not in the Vault Balance. Coinbase holds Client Cash credited to the Trading Balance in one of two ways: (i) in one or more omnibus accounts in Coinbase's name for the benefit of customers at one or more U.S. insured depository institutions (each, an "FBO account") and (ii) in Coinbase's omnibus accounts at Connected Trading Venues. Coinbase will title the FBO accounts it maintains with U.S. depository institutions and maintain records of Client's interest in a manner designed to enable receipt of Federal Deposit Insurance Corporation ("FDIC") deposit insurance, where applicable and up to the deposit insurance limits applicable under FDIC regulations and guidance, on Client Cash for the Client's benefit on a pass-through basis. Coinbase does not guarantee that pass-through FDIC deposit insurance will apply to Client Cash, since such insurance is dependent in part on compliance of the depository institutions. Coinbase may also title its accounts at some or all Connected Trading Venues and maintain records of Client interests in those accounts in a manner consistent with FDIC requirements for pass-through deposit insurance, but availability of pass-through deposit insurance, up to the deposit insurance limits applicable under FDIC regulations and guidance, is also dependent on the actions of the Connected Trading Venues and any depository institutions they use, which may not be structured to provide pass-through deposit insurance. FDIC insurance applies to cash deposits at banks and other insured depository institutions in the event of a failure of that institution, and does not apply to any Coinbase Entity or to any Digital Asset held by a Coinbase Entity on Client's behalf. Client Cash is immediately available to Client for purposes of submitting an Order, unless a restriction applies.

2.5    At Client's election, all or a portion of Client Digital Assets may also be allocated to the Vault Balance which is held in a Custodial Account in Client's name at Coinbase Custody pursuant to the Custody Agreement. Such Vault Balance will be divided between segregated hot storage in Client's name ("Hot Vault Balance") and segregated cold storage in Client's name ("Cold Vault Balance"). Client shall have sole discretion to

27

allocate Digital Assets between the Hot Vault Balance and Cold Vault Balance. Digital Assets in the Hot Vault Balance may be transferred immediately to Client's Trading Balance unless a restriction applies. A transfer of Digital Assets in the Cold Vault Balance to Client's Trading Balance will be subject to Coinbase Custody's standard cold storage withdrawal procedures. Client hereby appoints Coinbase as Client's agent for purposes of instructing Coinbase Custody to transfer Client Digital Assets between Client's Vault Balance and Client's Trading Balance. Client agrees that an Instruction to Coinbase to settle an Order to or from Client's Vault Balance constitutes authorization to Coinbase to transfer Client Digital Assets to or from Client's Vault Balance as necessary or appropriate to consummate such settlement.

2.6    In all circumstances and consistent with laws and regulations applicable to Coinbase, Coinbase will keep an internal ledger that specifies the Client Assets credited to Client's Trading Balance and enables Coinbase and its auditors and regulators to identify Client and the Client Assets.

2.7    Coinbase treats all Client Assets as custodial assets held for the benefit of Client. No Client Assets credited to the Trading Balance shall be considered to be the property of, or loaned to, Coinbase, except as provided in any loan agreement between Client and any Coinbase Entity. Neither Coinbase nor any Coinbase Entity will sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance unless instructed by Client pursuant to an agreement between Client and a Coinbase Entity.

## 3.    Role of Coinbase Custody

3.1    To facilitate the Trading Services, Coinbase may at its sole discretion maintain portions of the Omnibus Hot Wallet and the Omnibus Cold Wallet in one or more custodial FBO accounts with its affiliate, Coinbase Custody. In such circumstances, although the Omnibus Hot Wallet and the Omnibus Cold Wallet are held in Coinbase's FBO accounts with Coinbase Custody, Client's legal relationship for purposes of Digital Assets held in the Omnibus Hot Wallet and the Omnibus Cold Wallet will not be, directly or indirectly, with Coinbase Custody and the terms, conditions and agreements relating to those wallets are to be governed by this MTA.

3.2    Client Digital Assets held in the Hot Vault Balance and Cold Vault Balance are maintained directly between Client and Coinbase Custody in Client's name and are subject to the terms of the Client's Custody Agreement.

## 4.    Cash and Digital Asset Deposits and Withdrawals

4.1    <u>To deposit Client Cash</u>, Client must initiate a transfer from a linked bank account, a wire transfer, a SWIFT transfer, a Silvergate Exchange Network deposit or other form of electronic payment approved by Coinbase from time to time to Coinbase's bank account, the instructions for which are available on the Coinbase Prime Broker Site. Coinbase will

28

credit the Trading Balance with Client Cash once the associated cash is delivered to Coinbase.

4.2    <u>To withdraw Client Cash</u>, Client may also initiate a withdrawal of Client Cash from the Trading Balance at any time using the withdrawal function on the Trading Platform.

4.3    <u>To deposit Client Digital Assets</u>, Clients may transfer Client Digital Assets directly to the Omnibus Hot Wallet or Omnibus Cold Wallet, the instructions for which are available on the Coinbase Prime Broker Site. Client may transfer funds to and among its Hot Vault Balance or Cold Vault Balance. When Client transfers Digital Assets to Coinbase or Coinbase Custody, it delivers custody and control of the Digital Assets to Coinbase, Coinbase Custody or Coinbase's designee, as applicable. Client represents and warrants that any Digital Asset so transferred shall be free and clear of all liens, claims and encumbrances.

4.4    <u>To withdraw Client Digital Assets</u>, Client must provide applicable Instructions via the Coinbase Prime Broker Site ("<u>Withdrawal Transfer</u>"). Once Client has initiated a Withdrawal Transfer, the associated Client Digital Assets will be in a pending state and will not be included in the Client's Trading Balance or Vault Balance. Client acknowledges that Coinbase may not be able to reverse a Withdrawal Transfer once initiated. Client may withdraw Client Digital Assets at any time, subject to delays for Digital Assets held in Cold Vault Balance, and any applicable account restrictions.

4.5    Client must verify all transaction information prior to submitting withdrawal Instructions to Coinbase, as Coinbase cannot and does not guarantee the identity of the wallet owner or bank account to which Client is sending Client Digital Assets or Client Cash, as applicable. Coinbase shall have no liability, obligation, or responsibility whatsoever for Client Cash or Client Digital Asset transfers sent to or received from an incorrect party or sent or received via inaccurate Instructions.

**5.    Disruption to Trading Platform**

5.1    Client acknowledges that electronic facilities and systems such as the Trading Platform are vulnerable to disruption, delay or failure and, consequently, such facilities and systems may be unavailable to Client as a result of foreseeable and unforeseeable events. Client understands and agrees that Coinbase does not guarantee uninterrupted access to the Trading Platform or all features of the Trading Services. Client acknowledges that although Coinbase will attempt to provide notice of any scheduled or unscheduled unavailability that would result in Client being unable to access the Trading Platform or the Trading Services, Coinbase cannot guarantee advanced notice to Client.

5.2    Coinbase may, in its sole discretion, take any of the following actions, and in the case of clause (i), shall use reasonable efforts to provide Client with as much prior notice as is practicable: (i) halt or suspend Trading Services, including trading on the Trading Platform or the trading of any Digital Assets or currency, or (ii) impose limits on the amount or size of Client's Orders. Coinbase shall have no liability, obligation, or

29

responsibility to Client as a result of making any changes to or suspending the Trading Platform.

## 6.      Coinbase Trading Rules and Order Types

6.1     Client agrees to comply with the Coinbase Trading Rules in effect at the time of any Order. Client agrees to review and become familiar with the terms of the various types of Orders (each an "Order Type") available through the Trading Service. A detailed description of the terms of all Orders is contained in the Coinbase Trading Rules. Coinbase reserves the right to modify the terms of any Order Type and the Coinbase Trading Rules at any time and without prior notice to Client, and Client acknowledges that it is solely responsible for ensuring knowledge of applicable Order Types and Coinbase Trading Rules prior to placing an Order.

6.2     Coinbase may modify the terms of, or cancel, any Order executed on Trading Platform if Coinbase determines in its sole reasonable discretion that the Order was clearly erroneous according to the Coinbase Trading Rules. Coinbase shall have no liability, obligation, or responsibility to Client as a result of exercising its rights under this Section 6.

## 7.      Coinbase Supported Digital Assets

Coinbase determines in its sole discretion which Digital Assets to support for use with the Trading Services, as specified on the Coinbase Prime Broker Site. Not all Digital Assets supported for Custodial Services are also supported for Trading Services.

## 8.      Coinbase Execution Services

8.1     At Coinbase's sole discretion, Client may elect to submit Orders to Coinbase Execution Services ("CES"), a Trading Service through which CES personnel will execute Orders on behalf of Client. CES will execute Orders by using automated trade routing services through Client's Prime Broker Account or by filling Orders on Coinbase's over-the-counter ("OTC") trading service ("OTC Services"). Coinbase has sole and absolute discretion to accept or reject any Order. Coinbase and Client may communicate regarding Instructions related to Orders on a mutually agreed communication medium, including instant messaging, email, and telephone.

8.2     CES brokers Orders on a commercially reasonable basis as Client's agent and may exercise discretion in executing Orders. Client must pre-fund its Trading Balance prior to submitting Orders. By electing to use CES, Client agrees that it is authorizing CES personnel to access its Prime Broker Account to initiate and execute Orders. Client acknowledges that CES personnel will retain access to the Client Prime Broker Account until Client provides Coinbase with Instructions to terminate such access. Absent express written agreement between the Parties, Coinbase will accept Orders only from Authorized Representatives that are designated in the Client's Prime Broker Account as having trading authority with respect to the Prime Broker Account.

30

8.3     For OTC Services, CES personnel will confirm the terms of an Order (which terms shall include asset, quantity, price, settlement timing and fees) with Client prior to executing the Order. Coinbase has policies and procedures in place that are reasonably designed to prevent the disclosure of any Client identity to its OTC counterparty. Coinbase may, in its sole and absolute discretion, accept the following statements (or similar or analogous statements) as Client's final and binding agreement to the terms of an Order: "done," "I buy," "bought," "I sell," or "sold." A completed, executed and settled Order will be reflected in Client's Prime Broker Account.

8.4     For Orders fulfilled via OTC Services ("OTC Orders"), each of Client's and its OTC counterparty's confirmations of the terms of the OTC Order deems such OTC Order as binding and final, and thereby executed. Client's failure to timely settle an executed OTC Order in accordance with the settlement terms will constitute a default under the Coinbase Prime Brokerage Agreement. Upon Client's default of an OTC Order:

Without prior notice to Client, Coinbase shall have the right to: (i) transfer Client Assets from Client's Trading Balance to Coinbase to settle the OTC Order subject to default, and/or (ii) liquidate or cancel outstanding OTC Orders (including OTC Orders that have been submitted or are in the process of being fulfilled).

If the above actions are not sufficient to satisfy all obligations of Client to Coinbase in respect of OTC Orders subject to default, Coinbase shall have the right to liquidate any and all of Client's assets and positions held with Coinbase or Coinbase Custody, including the Trading Balance and Vault Balance in Client's Custodial Account, to cover any Losses incurred by Client's failure to settle the OTC Order. In connection with liquidating such assets, Client authorizes Coinbase, in Coinbase's sole discretion, to liquidate any of Client's Digital Assets in a commercially reasonable sale at the market price that otherwise applies to such Digital Assets at the time of liquidation, without regard to whether Client would recognize a gain or loss on such sale or would recognize a greater or lesser gain or loss if different Digital Assets were sold. Client understands that the value of Digital Assets may rise or fall quickly, and Coinbase has no obligation to liquidate Client's Digital Assets at a time that provides the best price for Client. Client agrees that Digital Assets held in its Trading Balance and the Vault Balance in Client's Custodial Account are of a kind or type customarily sold on recognized markets, subject to standard price quotations and may decline speedily in value. Client agrees that if Coinbase exercises its setoff rights or secured party remedies against Client's Digital Assets, that Coinbase may value such Digital Assets using the same valuation method and same process that is otherwise used when Digital Assets are sold on the Trading Platform or any other commercially reasonable valuation method. A sale by Coinbase of Client's Digital Assets, without notice, at a private sale using the valuation and method described above shall be a commercially reasonable method of disposition.

## 9.     Determination of Suitability; All Risks Not Disclosed

Coinbase's provision of the Trading Services is neither a recommendation that Client enter into a particular Order nor a representation that any product described on the Trading Platform is

31

suitable or appropriate for Client. Many of the Trading Services described on Trading Platform involve significant risks, and Client should not use the Trading Services unless it has fully understood all such risks and has independently determined that such Orders are appropriate. Any discussion of the risks contained in this MTA or on the Trading Platform should not be considered to be a disclosure of all risks or a complete discussion of the applicable risks.

## 10.    Characterization of Trading Services; Not a Registered Broker-Dealer or Investment Adviser

Client understands and acknowledges that no transactions executed in connection with Client's Trading Account or the Trading Services are securities transactions, and Coinbase is not registered with the U.S. Securities and Exchange Commission as a broker-dealer or an investment adviser or licensed under any state securities laws. Coinbase is not acting as a fiduciary in respect of Client (including in connection with its rights under this MTA) and does not have any responsibility under the standards governing the conduct of broker-dealers, fiduciaries, investment advisers or investment managers. Client agrees and acknowledges that any information or advice provided by Coinbase or any other Coinbase Entity does not and will not serve as the basis of any investment decision by Client.

## 11.    Coinbase Corporate Accounts

Coinbase and its affiliates may transact through Trading Accounts on the Trading Platform ("Coinbase Corporate Accounts") for purposes including inventory management, to facilitate Client Orders, and for other corporate purposes. To the extent that a Coinbase Corporate Account transacts on the Trading Platform, the Coinbase Corporate Account (i) will not have any special priority vis-a-vis Client Orders and will be subject to the Coinbase Trading Rules, (ii) will trade only on Market Data available to all Clients, and (iii) will not access any non-public data of other Clients. Coinbase's internal ledger will indicate the amount of each Digital Asset held for each client and each such Coinbase Corporate Account.

## 12.    Term, Termination and Suspension

12.1    Regardless of any other provision of this MTA, Coinbase has the sole discretion to decline to provide Trading Services to Client and may, in its sole discretion, suspend, restrict or terminate the Client's Trading Services, including by suspending, restricting or closing the Client's Trading Account, in accordance with the General Terms.

12.2    If Client is subject to termination, Client agrees to transfer any Client Assets off the Trading Platform within thirty (30) days of receipt of the termination notice unless such transfer is otherwise prohibited (i) under applicable law, including any sanctions programs, or (ii) by a facially valid subpoena or court order. Client agrees to promptly provide Coinbase with Instructions as to where its Client Assets should be transferred, and agrees that failure to do so within thirty (30) days of receipt of notice of termination may result in Client Assets being transferred to the Client's linked bank account or Digital Asset wallet on file, in each case subject to off-set for any outstanding obligations to any Coinbase Entity in accordance with the General Terms. Final disbursement of

32

assets may be delayed until any remaining obligations or indebtedness have been satisfied. Client is responsible for all debits, costs, commissions, and losses arising from any actions Coinbase must take to liquidate or close transactions in the Client's Trading Account.

## 13.    Unclaimed Property

If Coinbase is holding Client Assets in the Trading Balance, has no record of Client's use of the Trading Services for an extended period, and is otherwise unable to contact Client, Coinbase may be required under applicable laws, rules or regulations to report these assets as unclaimed property and to deliver such unclaimed property to the applicable authority. Coinbase may deduct a dormancy fee or other administrative charge from such unclaimed funds, as permitted by applicable laws, rules or regulations.

Coinbase 2022 US Version 2.0

**Distribution and Exchange Term Sheet**

This non-exhaustive, non-binding term sheet (the "Term Sheet") sets forth certain terms and conditions for a distribution and exchange arrangement (the "Distribution Addendum") related to  that certain Coinbase Prime Broker Agreement (the "Agreement") to be entered into between Coinbase, Inc. ("CB Inc."), Coinbase Custody Trust Company, LLC ("CB Custody") (for purposes of the Term Sheet, CB Inc. and CB Custody are collectively referred to herein as, "Coinbase") and the Client set forth in the Agreement (together with Coinbase, the "Parties", and each, a "Party"). Terms not defined herein have the meaning ascribed to them in the Agreement.

**Transaction Overview**

| | |
|---|---|
| **Appointment as Custodian** | Client will appoint Coinbase as a non-exclusive worldwide custodian and distribution agent for Distributions to Claimants pursuant to the Reorganization Plan.  Except as otherwise described, such services will be provided in accordance with the Agreement. |
| **Services** | Client will provide CB Custody with written instructions ("Instructions") to distribute to one or more Claimants a portion or all of, the payment owed to such Claimant(s) under the Reorganization Plan (each such distribution, a "Distribution"). Each such Instruction shall be provided in accordance with the terms set forth in the Agreement. CB Custody shall, directly or through one of its affiliates, make Distributions in accordance with Instructions provided by Client (the "Distribution Services"). |
| **Distributions to Supported Jurisdictions** | Client will direct Coinbase to make Distributions only of Supported Cryptocurrencies and only to Claimants in Supported Jurisdictions.  No Distributions shall be made to Claimants who Reside in a jurisdiction that is not a Supported Jurisdiction. |
| **Indemnification** | Client shall defend and indemnify and hold harmless Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses (each as defined in the Agreement) arising out of or relating to Coinbase's compliance with any Instruction by Client. |
| **Applicable Law** | Coinbase shall not be required to process any Instructions if Coinbase reasonably determines that such refusal or cancellation is necessary to comply with applicable law or regulations, or in response to a subpoena, court order or other binding government order, or if Coinbase reasonably believes that compliance with the Instruction may violate, facilitate the violation of, or is inconsistent with an applicable law, regulation or rule of a governmental authority or self-regulatory organization, or if changes in applicable law substantially increase the cost to Coinbase of processing Instructions. |
| **KYC Requirements** | Coinbase shall not be required to process any Client Instructions regarding Distributions to Claimants unless such Claimants have met the requirements of Coinbase's AML and KYC processes, as the same may be modified by Coinbase from time to time. |
| **Establishment of Accounts** | Subject to approval of the Bankruptcy Court, Client will establish one or more Custodial Accounts (each a "Celsius Custody Account").  For the avoidance of doubt, Client is not required to use Coinbase as a Custodian or for any custodian services or as prime exchange provider related to the Distribution Addendum and Client may, in its sole and absolute discretion, elect to use Coinbase and/or any other third party as a Custodian. |
| **Exchange Account Terms** | The Parties will agree to operational procedures and enter into any associated agreement pursuant to which CB Custody will make transfers from the Celsius Custody Account to Claimants. |
| **Supported Digital Assets** | Coinbase will provide services in respect of Supported Cryptocurrencies. |
| **Designation of Accounts** | The Celsius Custody Account will be held on behalf of Client, in accordance with the terms of the Agreement |
| **Account Process** | Client shall identify for Coinbase all Claimants for which Client wishes to use Coinbase to |

| | |
|---|---|
| | make a Distribution and shall provide information to Coinbase on all such Claimants as Coinbase shall reasonably require. Client shall notify Claimants that they may be eligible to receive Distributions in respect of their Claim (as defined in the Reorganization Plan) through Coinbase. Client shall ensure all Digital Assets to be distributed are made available in the applicable Celsius Custody Account prior to any Distribution and will inform Coinbase that Claimants may be eligible to receive Distributions in respect of their Claim. |
| **No Obligations to Claimants** | Coinbase's obligations arising under the Agreement and the Distribution Addendum will be solely to Client, and Coinbase shall have no obligations to any Claimant absent a separate agreement established between Coinbase and such Claimant. |
| **Governing Terms** | Except as otherwise provided, all activities by Claimants shall be governed by the Coinbase TOS. Client shall not be responsible for Claimants' compliance with the Coinbase TOS and shall not be held liable for any noncompliance (or any resulting damages of any kind) by such Claimants. |
| **Term** | Unless terminated earlier in accordance with the terms of the Agreement or the Distribution Addendum, the Distribution Addendum will be effective as of the entry of the Confirmation Order and shall remain in force for a period of one year thereafter (the "Term"), except as otherwise agreed by the parties. |
| **Fees** | Fees pertaining to the Distribution Addendum will be paid pursuant to an agreement between the parties and are estimated to total approximately USD $5 million. |
| **Definitions** | **"Claimant"** means any party that holds a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan).<br><br>**"Confirmation Order"** has the meaning set forth in the Reorganization Plan.<br><br>**"Disclosure Statement Approval Date"** means date of the Bankruptcy Court (as defined in the Agreement) order approving the Disclosure Statement (as defined in the Reorganization Plan).<br><br>**"Coinbase Account"** means a customer account at Coinbase, which may or may not have successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities.<br><br>**"Coinbase TOS"** means Coinbase's standard and cryptocurrency terms and conditions applicable to any particular Coinbase Account, as revised from time to time.<br><br>"**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, where such tokens are held from time to time held for Client under the terms of the Distribution Addendum.<br><br>**"Reorganization Plan"** means the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, In re Celsius Network LLC, No. 22-10964 (MG) (Bankr. S.D.N.Y. Mar. 31, 2023), ECF No. 3222, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms.<br><br>**"Reside"** means, with respect to any Claimant, such Claimant's principal residence as determined by Coinbase through the AML/KYC information that such Claimant provides to Coinbase.<br><br>**"Supported Jurisdiction"** means each jurisdiction in which Coinbase holds all licenses and registrations necessary to engage in the activities contemplated in the Distribution Addendum with respect to Supported Cryptocurrency in such jurisdiction; *provided*, however, that any list reflecting such jurisdictions submitted to the Court in connection with this Term Sheet is current as of the filing date of such submission, and may be subject to revisions, amendments, changes, or updates by Coinbase in its sole discretion from time to time. |

| | |
|---|---|
| | **"Supported Cryptocurrency"** means the versions of Bitcoin and Ether commonly accepted as the official Bitcoin and Ether cryptocurrencies, respectively, by the three largest cryptocurrency trading platforms in the United States by trading volume for the preceding 12-month period. Supported Cryptocurrency shall not include any airdrops related to Bitcoin or Ether unless Coinbase notifies Client in writing that Coinbase has decided, in its sole and absolute discretion, to treat such airdropped asset as a Supported Cryptocurrency. |

## COINBASE SUPPORTED COUNTRIES FOR DISTRIBUTION

Canada
Mexico
Argentina
Bolivia
Brazil
Cayman Islands
Chile
Colombia
Costa Rica
Dominican Republic
Ecuador
El Salvador
Guatemala
Jamaica
Panama
Peru
Saint Kitts and Nevis
Saint Martin (French part)
Saint Maarten (Dutch part)
Uruguay
Venezuela
British Virgin Islands
Albania
Andorra
Austria
Belgium
Bulgaria
Croatia
Cyprus
Czechia
Denmark
Estonia
Faroe Islands
Finland
France
Germany
Gibraltar
Greece
Guernsey
Hungary

Iceland
Ireland
Isle of Man
Italy
Jersey
Latvia
Liechtenstein
Lithuania
Luxembourg
Malta
Monaco
Netherlands
Norway
Poland
Portugal
Romania
San Marino
Slovakia
Slovenia
Spain
Sweden
Switzerland
United Kingdom
Azerbaijan
Benin
Burkina Faso
Cameroon
Curaçao
Georgia
Ghana
Jordan
Kenya
Kuwait
Madagascar
Mali
Nigeria
Serbia
Seychelles
South Africa
Togo
Tunisia
Turkey
Uganda
Ukraine

United Arab Emirates
Yemen
Zambia
Zimbabwe
Australia
Hong Kong
India
Indonesia
Japan
Kazakhstan
Mongolia
Nepal
New Zealand
Pakistan
Philippines
Singapore
Sri Lanka
Taiwan

**<u>Exhibit C</u>**

**Litigation Administrator Agreement**

*[DRAFT]*

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "Agreement"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "Debtor" and collectively the "Debtors"), and [Mohsin Meghji], as the Litigation Adminstrator referred to herein (in such capacity, the "Litigation Adminstrator"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement, the "Plan"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

### RECITALS

WHEREAS, each Debtor other than the GK8 Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 13, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (such cases, the "Chapter 11 Cases"); and

WHEREAS, on [●], 2023, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order"); and

WHEREAS, the Plan provides, among other things, for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "Plan Claims"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "Collection Actions", and together with the Plan Claims and any Causes of Action (as defined in the Plan) that the Plan Administrator and Litigation Administrator agree should be prosecuted for the benefit of creditors, the "Post-Emergence Claims"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order, and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

# ARTICLE I
# DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

# ARTICLE II
# ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE

2.1    Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)    The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claim Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)    The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)    The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group in accordance with the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)    The Litigation Administrator agrees to administer the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement.

(e)    The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)    Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than one Claim Holder shall be binding and conclusive on all Claim Holders even if such Claim Holders have different or conflicting interests.

2.2    Removal of Litigation Oversight Committee Members.

(a)    A Member may be removed by a majority vote of the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof.

(b)    To the extent there is any dispute regarding the removal of a Member (including any dispute relating to any portion of a Members' fees or a Members' professional fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.

For purposes of this Agreement:

(i)    "Cause" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (iv) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder, or (v) a Person's breach of fiduciary duties or an unresolved conflict of interest; and

(ii)    "Disability" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

2.3    The Post-Emergence Claims.

(a)    From and after the Effective Date, the Litigation Administrator shall have access to copies of the Debtors', the Estates', the Post-Effective Date Debtors', the Celsius Professionals' (as defined in Section 2.3(d)), and the Plan Administrator's records and information directly or indirectly relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including copies of electronic records or documents, all in compliance with applicable law.  From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Litigation Administrator shall have access to any relevant documents, information or personnel reasonably related to the Litigation Administrator's responsibilities under the Plan and this Agreement, and the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, and the Plan Administrator agree to preserve records and documents (including electronic records or documents) directly or indirectly related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, the Post-

3

Effective Date Debtors, the Celsius Professionals, or the Plan Administrator in writing that such records are no longer required to be preserved.

(b)     The Litigation Administrator and its advisors shall have access to all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, the Contributing Claimants, the Celsius Professionals, and the Plan Administrator; *provided*, for the avoidance of doubt, that such records, documents, information, and work product shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide access to, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

(c)     The Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, the Celsius Professionals, and any party under the direct or indirect control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing access to the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate, prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.

(d)     To the extent requested by the Litigation Administrator, the Debtors shall cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility, cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims. Without limiting the foregoing, the Celsius Professionals shall provide the Litigation Administrator access to those attorneys, accountants and other professionals with knowledge of matters directly or indirectly relevant to the Disputed Claims, the Recovery Causes of Action, and the Contributed Claims.    Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Post-Emergence Claims held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within

4

thirty (30) days of the Effective Date; provided, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants). The Celsius Professionals shall be reimbursed from the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals in connection with such cooperation by the Celsius Professionals.

(e)    Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof.

2.4    Privileges.

(a)    The Litigation Administrator shall, on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders, hold all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "Privileges") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, the Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "Privilege Parties") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "Privileged Information"). The Privileged Information shall include documents and information of all manner, whether oral, written, or digital. For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Parties.

(b)    The foregoing shall vest the Privileges concerning the Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claim Holders. The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Privileged Information.

(c)    The Privilege Parties agree to take all necessary actions to provide to the Litigation Administrator without the necessity of a subpoena all Privileged Information in their respective possession, custody, or control necessary for the pursuit of Post-Emergence Claims; provided that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision. The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess Privileged Information, and no such person

may object to the production to the Litigation Administrator of such Privileged Information on the basis of a Privilege held by a Privilege Party. Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, Privileged Information shall be produced solely to the Litigation Administrator or as required by law. For the avoidance of doubt, this Subsection is subject in all respects to Section 2.4(a) of this Agreement.

(d)    Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by granting access to any Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such Privileged Information between the Privilege Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)    If a Privilege Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

(f)    Notwithstanding anything to the contrary contained in Section 2.4, for the avoidance of doubt, no Privilege or Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be made accessible to the Litigation Administrator, *provided*, *however*, that the foregoing shall not prevent access to any Privileged Information to the extent that such Privileged Information also directly or indirectly relates to Post-Emergence Claims.

2.5    <u>Payment of Fees and Expenses</u>. The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan ("<u>Litigation Administrator Professionals</u>"), and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate, including contingency fee arrangements, with such retention and compensation being subject to the approval of the Litigation Oversight Committee (if appointed). All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid solely from the Litigation Recovery Account, and solely be the obligation of, the Post-Effective Date Debtors. For the avoidance of doubt, (i) neither the Plan Administrator nor the Litigation Administrator shall be required to pay any amounts owed to Litigation Administrator Professionals for which the Litigation Recovery Account does not contain adequate funds, and (ii) the Claim Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account. For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

2.6    Nature and Purpose of the Litigation Administrator.

(a)    Purpose.  The Litigation Administrator is empowered, subject to the terms and conditions of this Agreement, to implement the Plan with respect to all Debtors on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders.  The Litigation Administrator shall (i) prosecute all Post-Emergence Claims, resolve all Post-Emergence Claims, monetize the Post-Emergence Claims, and distribute the Litigation Proceeds in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with the Plan, Confirmation Order, and this Agreement, without the objective of continuing to engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement.  The Responsibilites of the Litigation Administrator shall include: (a) filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Agreement; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of this Agreement;

(b)    Relationship.  Subject to Section 4.10, the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claim Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Claim Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by the Plan, the Confirmation Order and this Agreement.  For the avoidance of doubt, the Litigation Administrator is acting on behalf of the Post-Effective Date Debtors to prosecute claims of the Debtors for the benefit of Claim Holders pursuant to the Plan and, for all purposes, the Litigation Administrator shall be treated as an agent of the Debtors or Post-Effective Date Debtors, as the case may be, rather than a separate entity.

(c)    No Waiver of Claims.  In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all Post-Emergence Claims and objections to and resolution of Disputed Claims or Interests after the Effective Date.

No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto. The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.7    Appointment as Representative.    Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims. Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors in accordance with the Transaction Steps Memorandum, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors, and the Estates for the benefit of the Claim Holders or settle or otherwise dispose of Post-Emergence Claims. Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to the Claim Holders consistent with the provisions of the Plan, Confirmation Order, and this Agreement.

2.8    Conflicts of Interest.    Notwithstanding anything to the contrary contained in this Agreement, the Litigation Oversight Committee shall have the exclusive power and right to oversee and determine any actual or potential conflicts of interest with respect to the Litigation Administrator and the Litigation Administrator's performance under this Agreement. Any decision or determination made by the Litigation Oversight Committee with respect to whether the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation Administrator. The Litigation Oversight Committee shall have the exclusive power and right, as its sole and exclusive option, to designate a member of the Litigation Oversight Committee, professional natural person, entity or financial institution with experience administering bankruptcy claims to act as the Litigation Administrator with respect to any conflict determination made by the Litigation Oversight Committee. The Litigation Administrator designated by the Litigation Oversight Committee with respect to any conflict determination made by the Litigation Oversight Committee may incur any reasonable and necessary expenses in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan.

## ARTICLE III
## INTERESTS

3.1    Interests.    The Claim Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2 <u>Interests Beneficial Only</u>.  The entitlement to Claim Holders under the Plan with respect to the Post-Emergence Claims shall not entitle the Claim Holders to any title in or to the Post-Emergence Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3 <u>Registry of Post-Emergence Claims.</u>

(a) The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "<u>Registrar</u>"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b) The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time and acceptable to the Litigation Administrator, a registry of the Claim Holders (the "<u>Claim Holder Register</u>"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe.  The Claim Holder Register shall be made available to Claim Holders upon three (3) Business Days' written notice to the Litigation Administrator.

3.4 <u>Effect of Death, Incapacity or Bankruptcy</u>.  The death, incapacity or bankruptcy of any Claim Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claim or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claim Holders under this Agreement.

3.5 <u>Change of Address</u>.  Any Claim Holders may, after the Effective Date, select an alternative distribution address by providing notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar.  Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6 <u>Standing</u>.  No Claim Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR

4.1 <u>Role of the Litigation Administrator</u>.  In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan, the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) to the

extent not duplicative with the Plan Administrator's responsibilities, prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claim Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment of the Litigation Recovery Account.  All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court.  In all circumstances, the Litigation Administrator shall act in the best interests of all Claim Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2     Power to Contract.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3     Ultimate Right to Act Based on Advice of Counsel or Other Professionals.  Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claim Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4     [RESERVED]

4.5     Authority to Prosecute and Settle Post-Emergence Claims.

(a)     Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date.  The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claim Holders, and consistent with the purposes of the Agreement, and shall have no liability for the outcome of its decision; *provided*, *however*, that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than an amount determined

by the Litigation Oversight Committee without any approval by the Litigation Oversight Committee (if appointed).

(b)    To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]."  Without limiting the foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable Claim.  For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)    Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claim Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6    <u>Liquidation of Post-Emergence Claims.</u>  The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.3), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement.  The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claim Holders, *provided*, *however*, that the Litigation Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries.  Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination).  Pursuant to an agreed-upon budget in accordance with Section 4.13(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

4.7    <u>Distributions.</u>

(a)    After the Litigation Proceeds are received by the Litigation Administrator, the Litigation Administrator shall make distributions of the Litigation Proceeds to the Claim Holders only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement

after funding any reserves deemed necessary or appropriate by the Litigation Administrator and, in accordance with the Plan, funding the Litigation Recovery Account.

(b)    In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account Pro Rata to the Claim Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

(c)    The Litigation Administrator shall make distributions to Claim Holders at the last-known address for each such Claim Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date.  Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "Litigation Administrator Account"), the option of which shall be in the sole discretion of the Litigation Administrator.  If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator Account (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)    The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement.  The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)    The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim.  In the event that the value of a Debtor's claim

or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)      The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)      The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of Allowed Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution. Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the Wind-Down Process set forth in Section 9.1 of this Agreement.

(h)      Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 180 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 180 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors, the Post-Effective Date Debtors, or any agent acting on their behalf, including the Litigation Administrator.  In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Post-Effective Date Debtors and revert to the Litigation Administrator Account, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.  No later than 180 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator.  For the avoidance of doubt, such list shall not include the Holders of any checks that have not been negotiated within 180 days after the date the check was mailed or otherwise delivered to the Holder.

13

(i)     Subject to Sections 4.8, 4.10 and 4.11 hereof, and the provisions of this Section 4.7, any non-Cash property made accessible to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator.  Notice of such sale, transfer, abandonment or disposition shall be provided to the Claim Holders pursuant to the reporting obligations provided in Section 4.13 of this Agreement.   If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property.  Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

(j)     Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

4.8     Management of Post-Emergence Claims.

(a)     Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement.  No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)     In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement, the Litigation Administrator will have, in addition to any powers conferred upon the Litigation Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) as set forth herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.9     <u>Investment of Cash.</u>  The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act; *provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses, subject in all cases to Section 2.5 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.5).

4.10     <u>Additional Powers of the Litigation Administrator.</u>  In addition to any and all of the powers enumerated above, and except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee (if appointed) as provided in this Agreement, shall be empowered to:

(a)     take any action with respect to the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims, except to the extent Disputed Claims have been previously Allowed;

(b)     make distributions to Claim Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)     hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claim Holders (including any Litigation Proceeds);

(d)     perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.3 hereof;

(e)     protect and enforce the rights of the Post-Effective Date Debtors in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)     determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator on behalf of the Post-Effective Date Debtors;

(g)     subject to Section 2.4, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

15

(h) make all payments relating to the administration of the Litigation Recovery Account;

(i) expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that beginning at the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j) obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k) (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l) request any appropriate tax determination with respect to the Post-Emergence Claims and the Litigation Proceeds, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(m) investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(n) without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(o) execute offsets or assert counterclaims against Claim Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(p) subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(q)    retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to (i) perform such reviews and/or audits of the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and (ii) prepare and file any tax returns or informational returns for the Litigation Recovery Account as may be required;

(r)    take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(s)    take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(t)    liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(u)    take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(v)    (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if agreed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to them by the Litigation Recovery Account and such other information deemed appropriate by the Litigation Administrator with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(w)    exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement; *provided* that the Litigation Administrator shall work in good faith with the Plan Administrator to ensure that services are not duplicated and to reconcile any conflicts between the Plan Administrator Agreement and this Agreement.

4.11    <u>Limitations on Power and Authority of the Litigation Administrator</u>. The Litigation Administrator will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claim Holders or assign the Debtors', Post-Effective Date Debtors', or Claim Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee as provided in Section 2.5, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.12    <u>Books and Records</u>.  The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are to be paid from the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements for the Litigation Recovery Account.  Nothing in this Agreement requires the Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.13    <u>Reports</u>.

(a)    <u>Financial and Status Reports</u>.  The fiscal year of the Litigation Recovery Account shall be the calendar year.  Within 90 days after the end of each calendar year during the existence of the Litigation Recovery Account, within 45 days after the end of each calendar quarter

during the existence of the Litigation Recovery Account (other than the fourth quarter), and as soon as practicable upon closure of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claim Holders appearing in the Claim Holder Register as of the end of such period or such date of closure, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claim Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claim Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate to be disclosed by the Litigation Administrator.  In addition, the Litigation Administrator shall provide unaudited financial statements to each Claim Holders on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court).  The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claim Holder. The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claim Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claim Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

(b)    Annual Plan and Budget.  If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

## ARTICLE V
## LITIGATION RECOVERY ACCOUNT

5.1    Establishment of Litigation Recovery Account.  On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Claims to the extent not paid by the Debtors

or the Plan Administrator either before or after the Effective Date, (c) fund Disputed Claims reserves relating to such Claims, and (d) fund the Litigation Administrator Expenses. The Litigation Administrator shall transfer any net Cash proceeds from the Post-Emergence Claims to the Litigation Recovery Account until such time as (i) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims have been paid in full or otherwise resolved or the Disputed Claims reserves relating to such Claims have been fully funded, and (ii) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired. Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claim Holders in accordance with the Plan and this Agreement.

      5.2    <u>Cash in the Litigation Recovery Account</u>. Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the Post-Effective Date Debtors for the benefit of Claim Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan. Cash shall be either (x) held in an interest-bearing account or (y) invested in interest-bearing obligations issued by the U.S. government and guaranteed by the U.S. government, and having (in either case) a maturity date of not more than 30 days. All such Cash or investments shall be held at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import. Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

      5.3    <u>Distributions After Allowance of Disputed Claims or Disputed Interests</u>. At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled on account of Litigation Proceeds under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter. The balance of any Cash thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

      5.4    <u>Distributions After Disallowance of Disputed Claims</u>. If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable Allowed Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

## ARTICLE VI
## THE LITIGATION ADMINISTRATOR GENERALLY

6.1    Independent Litigation Administrator.  The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2    Litigation Administrator's Term of Service, Compensation and Reimbursement.

(a)    Term of Service.  The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)    Compensation.  The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on Exhibit B hereto (the "Litigation Administrator Compensation").   The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court.  Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; *provided*, *however*, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)    Expenses.   The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "Litigation Administrator Expenses" and, together with the Litigation Administrator Compensation, the "Litigation Administrator Fees").

(d)    Payment.  The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.  The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3    Resignation.  The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claim Holders); *provided, however*, after the closing or dismissal of the Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claim Holders.  Such resignation shall become effective on the

earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment. Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein. Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claim Holders.

6.4    Removal.

(a)    The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause or without Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section 2.2(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided, however*, the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claim Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided, however*, that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying and transferring to

22

such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder.  For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)    During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator").    The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided, however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses. Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)    To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6    Effect of Resignation or Removal.  The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator.  In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator.

6.7    Confidentiality.  The Litigation Administrator shall, during the period that the Litigation Administrator serves as Litigation Administrator under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's removal or resignation hereunder, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator may

be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator has become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials), until (a) such information is made public other than by disclosure by the Litigation Administrator or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator is required by law to disclose such information (in which case the Litigation Administrator shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); or (c) the Litigation Administrator obtains a waiver of confidentiality from the applicable Person.

### ARTICLE VII
### LIABILITY AND INDEMNIFICATION

7.1    No Further Liability.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless arising out of such Person's own fraud, willful misconduct or gross negligence.  Unless arising out of such Person's own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator.  Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.  None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers.  Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given.  Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions arising out of such Person's fraud, willful misconduct or gross negligence.  Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) and, in the case of the Litigation Administrator, with the additional express approval of the Litigation Oversight Committee will conclusively be deemed not to constitute fraud, willful misconduct or gross negligence.  No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such amendment, modification or repeal.

24

7.2    <u>Indemnification of the Litigation Administrator and Litigation Oversight Committee</u>.

(a)    From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "<u>Litigation Administrator Agreement Indemnified Party</u>," and collectively, the "<u>Litigation Administrator Agreement Indemnified Parties</u>") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud, willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery Account (including any insurance policy obtained by the for the benefit of Litigation Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in Section 4.10(j) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Administrator, the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)    The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified.  Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)    Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party.

(d)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution.  Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.   For the avoidance of doubt, each Litigation Administrator Agreement Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3    Litigation Administrator Liabilities.  All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law.   No liability of the Litigation Administrator will be payable in whole or in part by any Claim Holders individually or in the Claim Holders' capacity, by the Litigation Administrator individually or in the Litigation Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claim Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4    Limitation of Liability.    None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5    Burden of Proof.  In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1    <u>Treatment of Post-Emergence Claims</u>.  For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claim Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)    The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2    <u>Withholding of Taxes</u>.  The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claim Holders for all purposes of this Agreement.

(a)    The Litigation Administrator shall be authorized to collect such tax information from the Claim Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claim Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claim Holders that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)    The Litigation Administrator may refuse to make a distribution to any Claim Holders that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Claim Holder, the Litigation Administrator shall make such distribution to which the Claim Holders is entitled, without interest; and, *provided*, *further*, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.  The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claim Holder fails to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation Administrator, that will provide twenty-one days' notice before such distribution may be deemed an unclaimed distribution.

(c)      In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claim Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    Valuation.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

**ARTICLE IX**
**TERMINATION OF THE AGREEMENT**

9.1    Termination.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Administrator has liquidated or (with the approval of the Litigation Oversight Committee) abandoned all Post-Emergence Claims, (b) all objections to the Disputed Claims have been resolved, and (c) all distributions required to be made by the Litigation Administrator under the Agreement have been made; *provided*, *however*, that in no event shall the Litigation Recovery Account be closed later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; *provided further*, *however*, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator.  If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claim Holders is likely to exceed the value of consideration available for distribution and provided that clause (c) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to close the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) close the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "Wind-Down Process").  Such date upon which the Litigation Recovery Account shall finally be closed shall be referred to herein as the "Termination Date."

9.2    Continuance of the Litigation Administrator for Winding Up.  During the Wind-Down Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have

28

been fully performed.  During the Wind-Down Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section 2.5 hereof.  Upon distribution of all the Litigation Proceeds, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section 2.3 hereof.  At the Litigation Administrator's discretion, but subject in all cases to Section 2.3 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder).  Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claim Holders as provided herein, the Post-Emergence Claims shall be cancelled.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1    No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claim Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Section 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e) be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2    No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2    Jurisdiction.  Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims.  Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such

action brought in the Bankruptcy Court.  Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement).  Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    <u>Severability</u>.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)    If to the Litigation Administrator, to:

M3 Advisory Partners, LP
1700 Broadway
19th Floor
New York, NY 10019
Attn: [Mohsin Meghji]
Email: mmeghji@m3-partners.com

With a copy to:

White & Case LLP
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com

– and –

Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

     (ii)    If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
     ross.kwasteniet@kirkland.com

chris.koenig@kirkland.com
dan.latona@kirkland.com

(iii)    if to any Claim Holders, to the last known address of such Claim Holders, according to the Litigation Administrator's records;

(iv)    if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

11.5    <u>Headings</u>.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.6    <u>Plan and Confirmation Order</u>.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan, on the other hand, the provisions of this Agreement shall govern and control.  In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

11.7    <u>Entire Agreement</u>.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.8    <u>Cumulative Rights and Remedies</u>.   The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

11.9    <u>Meanings of Other Terms</u>.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement.  The term "including" shall mean "including, without limitation."

11.10    <u>Successors in Interest</u>.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and

conditions hereof, including, specifically, the terms of Section 2.3 hereto. The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.3 hereto. For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.3) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.3) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11    Limitations. Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement. The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12    Further Assurances. From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument. A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14    Authority. Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[MOHSIN MEGHJI], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]

[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

## __EXHIBIT A__

### Initial Members of the Litigation Oversight Committee

1.  Mark Robinson

2.  Keith Noyes

3.  Gerard Uzzi

4.  Vik Jindal

5.  One (1) additional individual to be designated by the Committee

6.  One (1) individual to be designated by the Earn Ad Hoc Group, subject to the consent of the Committee

7.  One (1) individual to be designated by the Retail Borrower Ad Hoc Group, subject to the consent of the Committee

## <u>EXHIBIT B</u>

### Compensation of Litigation Administrator

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

"Net Litigation Recoveries" means gross proceeds from Post-Emergence Claims less out-of-pocket expenses (without deducting contingency counsel fees or fees and expense relating to administration of the Agreement).

## Exhibit C-1

**(Redline) Litigation Administrator Agreement**

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "Agreement"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "Debtor" and collectively the "Debtors"), ~~as settlors, the Official Committee of Unsecured Creditors of the Debtors, appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code on July 27, 2022 [Docket No. 241] (the "Committee"), and [●~~and [Mohsin Meghji], as the Litigation Adminstrator referred to herein (in such capacity, the "Litigation Adminstrator"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement~~)~~ *(,* the "Plan"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, ~~Celsius Network LLC and certain of its affiliates (collectively, the "Celsius~~each Debtor other than the GK8 Debtors"~~)~~ filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 13, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors~~," and together with the Celsius Debtors, the "Debtors")~~") each filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (~~collectively with the Celsius Debtors' chapter 11~~such cases, the "Chapter 11 Cases"); and

WHEREAS, on [●], 2023, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order"); and

WHEREAS, the Plan provides, among other things, ~~as of the effective date of the Plan (the "Effective Date"),~~ for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "Plan Claims"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "Collection Actions", and together with the Plan Claims and any Causes of Action (as defined in the Plan) that the Plan Administrator and Litigation Administrator agree should be prosecuted for the benefit of creditors, the "Post-Emergence Claims"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order, and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**ARTICLE II**
**ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE**

2.1    Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)    The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claims Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)    The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)    The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group pursuant to in accordance with the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)    The Litigation Administrator agrees to accept and administer the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claims Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement, including Section Article I hereof.

(e)    The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)    Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than

2

one Claims Holder shall be binding and conclusive on all Claims Holders even if such Claims Holders have different or conflicting interests.

2.2     Removal of Litigation Oversight Committee Members.

(a)     A Member may be removed by a majority vote of the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof.

(b)     To the extent there is any dispute regarding the removal of a Member (including any dispute relating to any portion of a Members' fees or a Members' professional fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.

For purposes of this Agreement:

(i)     "Cause" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (iv) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder, or (v) a Person's breach of fiduciary duties or an unresolved conflict of interest; and

(ii)     "Disability" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

2.3     2.2 The Post-Emergence Claims.

(a)     From and after the Effective Date, the Debtors Litigation Administrator shall provide reasonable have access to copies of the Debtors', the Estates' and, the Post-Effective Date Debtors', the Celsius Professionals' (as defined in Section 2.3(d)), and the Plan Administrator's records and information directly or indirectly relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including copies of electronic records or documents, copies of which shall be provided to the Litigation Administrator and its advisors, at the cost and expense of the Litigation Administrator, all in compliance with applicable law. From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Debtors, the Estates, and the Post-Effective Date Debtors agree to provide commercially reasonable Litigation Administrator shall have access to any relevant documents, information or personnel reasonably requested by related to the Litigation

3

Administrator's ~~in connection with carrying out its~~ responsibilities under the Plan and this Agreement ~~so long as such access is not disruptive to normal business operations~~, and the Debtors, the Estates, ~~and~~ the Post-Effective Date Debtors, the Celsius Professionals, and the Plan Administrator agree to preserve~~, for the benefit of the Litigation Administrator,~~ records and documents (including electronic records or documents) directly or indirectly related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, ~~or~~ the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator in writing that such records are no longer required to be preserved ~~or all necessary and available records and documents have been provided to the Litigation Administrator. Following the Effective Date, the Parties shall use their reasonable best efforts to enter into a written agreement memorializing the common legal interest that exists among the Parties. For the avoidance of doubt, the failure of the Parties to enter into a formal written common interest agreement shall not operate to waive any common legal interests that exist among the Parties or otherwise constitute a breach of this Agreement.~~.

(b)    The ~~Debtors, the Estates, the Post-Effective Date Debtors and any party under the control of such parties shall promptly transfer or make readily available to the~~ Litigation Administrator and its advisors shall have access to all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, ~~and~~ the Contributing Claimants, the Celsius Professionals, and the Plan Administrator; *provided*, for the avoidance of doubt, that such records, documents, information, and work product~~ion~~ shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide access to, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

(c)    The Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, the Celsius Professionals, and any party under the direct or indirect control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, ~~with respect to~~ reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing access to the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates ~~or~~, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate, prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.  ~~.~~

(d)    To the extent ~~reasonably~~ requested by the Litigation Administrator, the Debtors shall ~~use commercially reasonable efforts to~~ cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility ~~or any non-transferred Privileges, use commercially reasonable efforts to~~, cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims ~~, including,~~. ~~w~~Without ~~limitation, by~~limiting the foregoing, the Celsius Professionals shall provid~~ing~~e the Litigation Administrator access to those attorneys, accountants and other professionals with knowledge of matters directly or indirectly relevant to the Dispute~~d~~ Claims, the Recovery Causes of Action, and the Contributed Claims. Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Post-Emergence Claims held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; provided, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).  The Celsius Professionals shall be reimbursed ~~by~~from the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals in connection with such cooperation by the Celsius Professionals.

(e)    Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof ~~(and title thereto shall be vested in the Litigation Administrator)~~.

~~2.3  Privileges.~~

2.4      Privileges.

(a)      ~~All~~ The Litigation Administrator shall, on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders, hold all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "Privileges") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, the Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "Privilege ~~Transfer~~ Parties") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "~~Transferred~~ Privileged Information") ~~are hereby transferred and assigned to the Litigation Administrator.  The Transferred.~~ The Privileged Information shall include documents and information of all manner, whether oral, written, or digital.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege ~~Transfer~~ Parties.

(b)      The foregoing ~~transfer and assignment~~ shall vest the Privileges concerning the ~~Transferred~~ Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claims Holders.  The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the ~~Transferred~~ Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the ~~Transferred~~ Privileged Information.

(c)      The Privilege ~~Transfer~~ Parties agree to take all necessary actions to ~~effectuate the transfer of such Privileges, and to~~ provide to the Litigation Administrator without the necessity of a subpoena all ~~Transferred~~ Privileged Information in their respective possession, custody, or control necessary for the pursuit of Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.  The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute ~~Transferred~~ Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess ~~Transferred~~ Privileged Information, and no such person may object to the production to the Litigation Administrator of such ~~Transferred~~ Privileged Information on the basis of a Privilege held by a Privilege ~~Transfer~~ Party.  Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, ~~Transferred~~ Privileged Information shall be produced solely to the Litigation Administrator or as required by law.  For the avoidance of doubt, this Subsection is subject in all respects to Section ~~2.3(a)~~2.4(a) of this Agreement.

(d)      Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by ~~the transfer and assignment of the Privileges or the production of any Transferred~~granting access to any Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such ~~Transferred~~

Privileged Information between the Privilege ~~Transfer~~ Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)    If a Privilege ~~Transfer~~ Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses ~~Transferred~~ Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such ~~Transferred~~ Privileged Information.  In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed ~~Transferred~~ Privileged Information that they return or confirm the destruction of such materials.

(f)    Notwithstanding anything to the contrary contained in Section ~~2.3~~2.4, for the avoidance of doubt, no Privilege or ~~Transferred~~ Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be ~~deemed to have been transferred or assigned~~made accessible to the Litigation Administrator, *provided*, *however*, that the foregoing shall not prevent ~~the transfer of any Privilege or Transferred~~access to any Privileged Information to the extent that such ~~Privilege or Transferred~~ Privileged Information also <u>directly or indirectly</u> relates to Post-Emergence Claims.

<u>2.5</u>    ~~2.4~~ Payment of Fees and Expenses.  The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors <u>as the Litigation Administrator deems necessary</u> to aid it in fulfilling its obligations under this Agreement and the Plan ("Litigation Administrator Professionals")<u>, and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate, including contingency fee arrangements, with such retention and compensation being subject to the approval of the Litigation Oversight Committee (if appointed)</u>.  All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid <u>solely</u> from the Litigation Recovery Account, and solely be the obligation of, the Post-Effective Date Debtors.  ~~The~~<u>For the avoidance of doubt, (i) neither the Plan Administrator nor the Litigation Administrator shall be required to pay any amounts owed to Litigation Administrator Professionals for which the Litigation Recovery Account does not contain adequate funds, and (ii) the</u> Claims~~s~~ Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account.  <u>For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.</u>

<u>2.6</u>    ~~2.5~~ Nature and Purpose of the Litigation Administrator.

(a)    <u>Purpose</u>.    The Litigation Administrator is ~~organized and established~~<u>empowered</u>, subject to the terms and conditions of this Agreement, ~~shall~~<u>to</u> implement

the Plan with respect to all Debtors on behalf, and of the Post-Effective Date Debtors for the benefit, of the Claims Holders. The Litigation Administrator shall (i) serve as a mechanism for prosecuting all Post-Emergence Claims, resolving all Post-Emergence Claims, monetizing the Post-Emergence Claims, and distributing the Litigation Proceeds and closing the Chapter 11 Cases, in each case, in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with nothe Plan, Confirmation Order, and this Agreement, without the objective to continue orof continuing to engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement. The Responsibilites of the Litigation Administrator shall include: (a) filing filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this PlanAgreement; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administratorthis Agreement; taking such actions as are necessary and reasonable to carry out the purposes of the applicable Litigation Administrator Agreement;

       (b)    <u>Relationship</u>. Subject to Section 4.110(y), the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claims Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Claims Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by the Plan, the Confirmation Order and this Agreement. For the avoidance of doubt, the Litigation Administrator is acting on behalf of the Post-Effective Date Debtors to prosecute claims of the Debtors for the benefit of Claim Holders pursuant to the Plan and, for all purposes, the Litigation Administrator shall be treated as an agent of the Debtors or Post-Effective Date Debtors, as the case may be, rather than a separate entity.

       (c)    <u>No Waiver of Claims</u>. In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all

Post-Emergence Claims and objections to and resolution of ~~Post-Emergence~~Disputed Claims or Interests after the Effective Date. No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto. The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.7    ~~2.6~~ Appointment as Representative. Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims. Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors in accordance with the Transaction Steps Memorandum, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors, and the Estates for the benefit of the Claim~~s~~ Holders or settle or otherwise dispose of Post-Emergence Claims. Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to the Claim~~s~~ Holders consistent with the provisions of the Plan, Confirmation Order, and this Agreement.

2.8    ~~2.7~~ Conflicts of Interest. Notwithstanding anything to the contrary contained in this Agreement, the Litigation Oversight Committee shall have the exclusive power and right to oversee and determine any actual or potential conflicts of interest with respect to the Litigation Administrator and the Litigation Administrator's performance under this Agreement. Any decision or determination made by the Litigation Oversight Committee with respect to whether the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation Administrator. The Litigation Oversight Committee shall have the exclusive power and right, as its sole and exclusive option, to designate a member of the Litigation Oversight Committee, professional natural person, entity or financial institution with experience administering bankruptcy claims to act as the Litigation Administrator with respect to any conflict determination made by the Litigation Oversight Committee. The Litigation Administrator designated by the Litigation Oversight Committee with respect to any conflict determination made by the Litigation Oversight Committee may incur any reasonable and necessary expenses in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan.

## ARTICLE III
## INTERESTS

3.1    Interests. The Claim~~s~~ Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The ~~beneficial interests in the Post-Emergence Claims will be represented by book entries on the~~

books and records of the Litigation Administrator.  The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2    Interests Beneficial Only.  The ownership of the beneficial interests inentitlement to Claim Holders under the Plan with respect to the Post-Emergence Claims shall not entitle the Claims Holders to any title in or to the Post-Emergence Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3    Registry of Post-Emergence Claims.

(a)    The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "Registrar"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b)    The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time and acceptable to the Litigation Administrator, a registry of the Claims Holders (the "Claims Holder Register"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe.  The Claims Holder Register shall be made available to Claims Holders upon three (3) Business Days' written notice to the Litigation Administrator.

3.4    Effect of Death, Incapacity or Bankruptcy.  The death, incapacity or bankruptcy of any Claims Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claims or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claims Holders under this Agreement.

3.5    Change of Address.  Any Claims Holders may, after the Effective Date, select an alternative distribution address by providing notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar.  Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6  Absolute Owners.  The Litigation Administrator may deem and treat any Claims Holders reflected as the owner of an Agreement Claim on the applicable Claims Holder Register as the absolute owner thereof for the purposes of receiving distributions and payments on account thereof, for federal and state income tax purposes and for all other purposes whatsoever.

3.6    ~~3.7~~ Standing.  No Claim~~s~~ Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR

4.1    Role of the Litigation Administrator.  In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan, the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of ~~and~~the Debtors for the benefit of the Claim~~s~~ Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) to the extent not duplicative with the Plan Administrator's responsibilities, prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claim~~s~~ Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment of the Litigation Recovery Account.  All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court.  In all circumstances, the Litigation Administrator shall act in the best interests of all Claim~~s~~ Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2    Power to Contract.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account~~,~~ to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3    Ultimate Right to Act Based on Advice of Counsel or Other Professionals. Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claim~~s~~ Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4    ~~Responsibility for Administration of Administrative Claims, Priority Tax Claims, and Secured Claims.~~ [RESERVED]

4.5    Authority to Prosecute and Settle Post-Emergence Claims.

(a)    Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date. The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claim~s~ Holders, and consistent with the purposes of the Agreement, and shall have no liability for the outcome of its decision; *provided*, *however*, that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than ~$[●]~ an amount determined by the Litigation Oversight Committee without any approval by the Litigation Oversight Committee (if appointed).

(b)    To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]." Without limiting the foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable Claim. For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)    Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claim~s~ Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6    Liquidation of Post-Emergence Claims. The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.~2~3), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement. The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claim~s~ Holders, *provided*, *however*, that the Litigation

Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries. Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination). Pursuant to an agreed-upon budget in accordance with Section ~~4.14(b)~~4.13(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

4.7    <u>Distributions</u>.

(a)    ~~The~~<u>After the</u> Litigation <u>Proceeds are received by the Litigation Administrator, the Litigation</u> Administrator shall make distributions of the Litigation Proceeds to the Claim~~s~~ Holders only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, ~~net of any applicable Disputed Claims reserve and after the Litigation Proceeds are received by the Litigation Administrator, and shall make such distributions~~ after funding any reserves deemed necessary or appropriate by the Litigation Administrator and, in accordance with the Plan, funding the Litigation Recovery Account.

(b)    In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent by the Litigation Administrator(s), the funds in the Litigation Recovery Account Pro Rata to the Claim~~s~~ Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

(c)    The Litigation Administrator shall make distributions to Claim~~s~~ Holders at the last-known address for each such Claim~~s~~ Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date. Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "<u>Litigation Administrator Account</u>"), the option of which shall be in the sole discretion of the Litigation Administrator. If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from

13

the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator Account (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)    The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement.  The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)    The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim.  In the event that the value of a Debtor's claim or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)    The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)    The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of AgreementAllowed Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution.  Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the DissolutionWind-Down Process set forth in Section 109.1 of this Agreement.

(h)    Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 1280 days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check

14

originally was issued.  If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within ~~six months~~180 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors, the Post-Effective Date Debtors, or any agent acting on their behalf, including the Litigation Administrator.  In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Post-Effective Date Debtors and revert to the Litigation Administrator Account, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.  No later than 15~~8~~0 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator.  For the avoidance of doubt, such list shall not include the Holders of any checks that have not been negotiated within ~~six months~~180 days after the date the check was mailed or otherwise delivered to the Holder.  ~~Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.~~

      (i)    Subject to Sections ~~4.9, 4.11~~4.8, 4.10 and ~~4.12~~4.11 hereof, and the provisions of this Section 4.7, any non-Cash property ~~transferred~~made accessible to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator.  Notice of such sale, transfer, abandonment or disposition shall be provided to the Claim~~s~~ Holders pursuant to the reporting obligations provided in Section ~~4.14~~4.13 of this Agreement.  If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property.  Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

      (j)    Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

~~4.8 Retention of Counsel and Other Professionals.  The Litigation Administrator may, but shall not be required to, retain such Litigation Administrator Professionals as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan, and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate, including contingency fee arrangements, with such retention and compensation being subject to the approval of the Litigation Oversight Committee (if appointed).  The Litigation Administrator may pay the reasonable salaries, fees and expenses of such Persons out of the Litigation Recovery Account in the ordinary course of business and neither the Litigation Administrator nor any Claims Holders shall have any liability or obligation~~

for any fees or expenses of any such professional.  For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

4.8    4.9 Management of Post-Emergence Claims.

(a)    Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement.  No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)    In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement, the Litigation Administrator will have, in addition to any powers conferred upon the Litigation Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) as set forth herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.9    4.10 Investment of Cash.  The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act; *provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses (including, but not limited to, taxes of the Post-Emergence Debtors with respect to any recoveries by the Litigation Administrator, reasonable fees and expenses in connection with liquidating the Post-Emergence Claims), subject in all cases to Section 2.42.5 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the

Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.42.5).

4.10    4.11 Additional Powers of the Litigation Administrator.  In addition to any and all of the powers enumerated above, and except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee (if appointed) as provided in this Agreement, shall be empowered to:

(a)    except (i)  to the extent Disputed Claims have been previously Allowed  or (ii)take any action with respect to the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims, except to the extent Disputed Claims have been previously Allowed;

(b)    make distributions to Claims Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)    hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claims Holders (including any Litigation Proceeds);

(d)    perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.22.3 hereof;

(e)    protect and enforce the rights of the Claims HoldersPost-Effective Date Debtors in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator on behalf of the Post-Effective Date Debtors;

(g)    subject to Section 2.32.4, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

(h)    make all payments relating to the administration of the Litigation Recovery Account;

(i)    expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that

17

beginning at the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j)    obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k)    (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held ~~by the Litigation Administrator~~ in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l)    request any appropriate tax determination with respect to the Post-Emergence Claims and the Litigation Proceeds, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(m)    ~~(l)~~ investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(n)    ~~(m)~~ without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(o)    ~~(n)~~ execute offsets or assert counterclaims against Claim~~s~~ Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(p)    ~~(o)~~ subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(q)    ~~(p)~~ retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to (i) perform such reviews and/or audits of the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and ~~to~~(ii) prepare and file any tax returns or informational returns for the Litigation Recovery ~~a~~Account as may be required;

(r)     (q)  take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(s)     (r)  take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(t)     (s)  liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(u)     (t)  take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(v)     (u) (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if agreed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof as provided in Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to them by the Litigation Recovery Account and such other information deemed appropriate by the Litigation Administrator (in consultation with the Litigation Oversight Committee) with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(w)     (v)  exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement; *provided that the Litigation Administrator shall work in good faith with the Plan Administrator to ensure that services are not duplicated and to reconcile any conflicts between the Plan Administrator Agreement and this Agreement*

4.11   4.12  Limitations on Power and Authority of the Litigation Administrator.  The Litigation Administrator will not have the authority to do any of the following:

(a)     take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claims Holders or assign the Debtors', Post-Effective Date Debtors', or Claims Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee as provided in Section 4.2.8.5, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.12    4.13  Books and Records.  The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are the responsibility of the to be paid from the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of for the Litigation Recovery Account. Nothing in this Agreement requires the Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.13    4.14 Reports.

(a)    Financial and Status Reports.  The fiscal year of the Litigation Recovery Account shall be the calendar year.  Within 90 days after the end of each calendar year during the term existence of the Litigation Recovery Account, and within 45 days after the end of each calendar quarter during the term existence of the Litigation Recovery Account (other than the fourth quarter), and as soon as practicable upon termination closure of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claims Holders appearing in

the Claims Holder Register as of the end of such period or such date of ~~termination~~closure, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claims Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claims Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate to be disclosed by the Litigation Administrator. In addition, the Litigation Administrator shall provide unaudited financial statements to each Claims Holders on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court). The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claims Holders. The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claims Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claims Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

(b)    <u>Annual Plan and Budget</u>.   If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

**ARTICLE V**
~~**Litigation Recovery Account**~~**LITIGATION RECOVERY ACCOUNT**

5.1    <u>Establishment of Litigation Recovery Account</u>.   On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the ~~Litigation Administrator~~Post-Effective Date Debtors free and clear of all Claims, Liens, encumbrances, and charges. The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, ~~and~~(b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Claims to the extent not paid by the Debtors or the Plan Administrator either before or after the Effective Date, (c) fund Disputed Claims reserves relating to such

21

Claims, and (d) fund the Litigation Administrator Expenses.  The Litigation Administrator shall transfer any net Cash proceeds from the Post-Emergence Claims to the Litigation Recovery Account until such time as (i) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims have been paid in full or otherwise resolved or the Disputed Claims reserves relating to such Claims have been fully funded, and (ii) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired.  Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claims Holders in accordance with the Plan and this Agreement.

5.2    Cash in the Litigation Recovery Account.  Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the ~~Litigation Administrator~~Post-Effective Date Debtors for the benefit of Claims Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan.  Cash shall be either (x) held ~~by the Litigation Administrator~~ in an interest-bearing account or (y) invested in interest-bearing obligations issued by the U.S. government and guaranteed by the U.S. government, and having (in either case) a maturity date of not more than 30 days.  All such Cash or investments shall be held ~~by the Litigation Administrator in an account~~ at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import.  Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

5.3    Distributions After Allowance of Disputed Claims or Disputed Interests.  At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled on account of Litigation Proceeds under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter.  The balance of any Cash thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

5.4    Distributions After Disallowance of Disputed Claims.  If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable ~~Agreement~~Allowed Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable

series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

## ARTICLE VI
## THE LITIGATION ADMINISTRATOR GENERALLY

6.1    <u>Independent Litigation Administrator</u>.    The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2    <u>Litigation Administrator's Term of Service, Compensation and Reimbursement</u>.

(a)    <u>Term of Service</u>.    The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)    <u>Compensation</u>.    The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on <u>Exhibit B</u> hereto (the "<u>Litigation Administrator Compensation</u>").    The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court.    Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; *provided*, *however*, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)    <u>Expenses</u>.    The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "<u>Litigation Administrator Expenses</u>" and, together with the Litigation Administrator Compensation, the "<u>Litigation Administrator Fees</u>").

(d)    <u>Payment</u>.    The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.    The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3    <u>Resignation</u>.    The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claims Holders); *provided, however*, after the closing or dismissal of the

23

Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claims Holders. Such resignation shall become effective on the earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment. Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein. Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claims Holders.

6.4     Removal.

(a)     The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause or without Cause (as defined in Section 62.42(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)     To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

For purposes of this section:

(i) "Cause" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of notice; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (iv) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder, or (v) a Person's breach of fiduciary duties or an unresolved conflict of interest; and

(ii) "Disability" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the

24

~~Member shall have been substantially unable to perform his or her duties hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.~~

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section ~~6~~2.~~4~~2(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided*, *however*, the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator.  Such appointment shall specify the date on which such appointment shall be effective.  Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claims Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided*, *however*, that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder.  For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)    During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator").  The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided*, *however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses.  Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to

the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)    To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6    Effect of Resignation or Removal.  The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator.  In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator.

6.7    Confidentiality.  The Litigation Administrator shall, during the period that the Litigation Administrator serves as Litigation Administrator under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's removal or resignation hereunder, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator may be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator has become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials), until (a) such information is made public other than by disclosure by the Litigation Administrator or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator is required by law to disclose such information (in which case the Litigation Administrator shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); or (c) the Litigation Administrator obtains a waiver of confidentiality from the applicable Person.

**ARTICLE VII**
**LIABILITY AND INDEMNIFICATION**

7.1    No Further Liability.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless arising out of such Person's own fraud, willful misconduct or gross negligence.  Unless arising out of such Person's

own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator.   Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.   None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers.   Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given.   Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions arising out of such Person's fraud, willful misconduct or gross negligence.   Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) and, in the case of the Litigation Administrator, with the additional express approval of the Litigation Oversight Committee will conclusively be deemed not to constitute fraud, willful misconduct or gross negligence.   No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such amendment, modification or repeal.

　　　　7.2　　Indemnification of the Litigation Administrator and Litigation Oversight Committee.

　　　　　　(a)　　From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "Litigation Administrator Agreement Indemnified Party," and collectively, the "Litigation Administrator Agreement Indemnified Parties") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud,

willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery ~~a~~Account (including any insurance policy obtained by the for the benefit of Litigation Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in Section ~~4.11(k)~~4.10(j) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Administrator, the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)    The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)    Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party.

(d)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party. For the avoidance of doubt, each Litigation Administrator Agreement

Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3    <u>Litigation Administrator Liabilities</u>.  All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law.  No liability of the Litigation Administrator will be payable in whole or in part by any Claims Holders individually or in the Claims Holders' capacity, by the Litigation Administrator individually or in the Litigation Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claims Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4    <u>Limitation of Liability</u>.    None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5    <u>Burden of Proof</u>.    In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

**ARTICLE VIII**
**TAX MATTERS**

8.1    <u>Treatment of Post-Emergence Claims</u>.  For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claims Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)    The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, of any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2    <u>Withholding of Taxes</u>.  The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each

holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claims Holders for all purposes of this Agreement.

(a)    The Litigation Administrator shall be authorized to collect such tax information from the Claims Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claims Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claims Holders that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)    The Litigation Administrator may refuse to make a distribution to any Claims Holders that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Claims Holder, the Litigation Administrator shall make such distribution to which the Claims Holders is entitled, without interest; and, *provided*, *further*, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.   The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claims Holder fails to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation Administrator, that will provide twenty-one (21) days' notice before such distribution may be deemed an unclaimed distribution.

(c)    In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claims Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    <u>Valuation</u>.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

**ARTICLE IX**
**TERMINATION OF THE AGREEMENT**

9.1    <u>Termination</u>.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at

such time as (a) the Litigation Administrator has liquidated or ~~abandoned all Post-Emergence Claims, (b) the Litigation Administrator determines,~~ (with the approval of the Litigation Oversight Committee~~, that the pursuit of Post-Emergence Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such~~) abandoned all Post-Emergence Claims, (~~e~~b) all objections to the Disputed Claims have been resolved, and (~~d~~c) all distributions required to be made by the Litigation Administrator under the Agreement have been made; *provided*, *however*, that in no event shall the Litigation Recovery Account be ~~dissolved~~closed later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; *provided further*, *however*, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator.  If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claim~~s~~ Holders is likely to exceed the value of ~~the Post-Emergence Claims then remaining in the Litigation Recovery Account~~consideration available for distribution and provided that clause (~~e~~c) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to ~~dissolve~~close the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) ~~dissolve~~close the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "~~Dissolution~~Wind-Down Process").  Such date upon which the Litigation Recovery Account shall finally be ~~dissolved~~closed shall be referred to herein as the "Termination Date."

9.2    Continuance of the Litigation Administrator for Winding Up.  During the ~~Dissolution~~Wind-Down Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have been fully performed.  During the ~~Dissolution~~Wind-Down Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section ~~2.4~~2.5 hereof.  Upon distribution of all the ~~Post-Emergence Claims~~Litigation Proceeds, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section ~~2.2~~2.3 hereof.  At the Litigation Administrator's discretion, but subject in all cases to Section ~~2.2~~2.3 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder).  Except as otherwise

specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claims Holders as provided herein, the Post-Emergence Claims shall be cancelled, and the Litigation Administrator will be deemed to have dissolved.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1    No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claims Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Sections 2.1(h) or 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e) be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2    No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2    <u>Jurisdiction</u>.    Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims.    Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court.    Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement).    Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt

requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    <u>Severability</u>.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)    If to the Litigation Administrator, to:

M3 Advisory Partners, LP
[Company]1700 Broadway
[Address]19th Floor
New York, NY 10019
Attn: [Lit Admin.]Mohsin Meghji]
Email: [●]mmeghji@m3-partners.com

With a copy to:

[Counsel for Lit. Admin.]
White & Case LLP
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com
[Address]
– and –
Attn: [●]
Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

33

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: [●]kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

      (ii)     If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
      ross.kwasteniet@kirkland.com
      chris.koenig@kirkland.com
      dan.latona@kirkland.com

      (iii) If to the Official Committee of Unsecured Creditors, to:

White & Case LLP
David M. Turetsky

34

Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
          sam.hershey@whitecase.com
  and
Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com
  and
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com
  and
Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

(iii)    (iv) if to any Claims Holders, to the last known address of such Claims Holders, according to the Litigation Administrator's records;

(iv)    (v) if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

11.5    Headings.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.6    Plan and Confirmation Order.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan, on the other hand, the provisions of this Agreement shall govern and control.  In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

11.7    Entire Agreement.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.8    Cumulative Rights and Remedies.    The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

11.9    Meanings of Other Terms.    Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.    All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement.    The term "including" shall mean "including, without limitation."

11.10    Successors in Interest.    This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.22.3 hereto.    The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.22.3 hereto.    For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.22.3) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.22.3) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11    Limitations.    Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.    The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12    Further Assurances.    From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14   Authority.  Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[•MOHSIN MEGHJI], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]

[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

## EXHIBIT A

**Initial Members of the Litigation Oversight Committee**

1. Mark Robinson

2. Keith Noyes

3. Gerard Uzzi

4. Vik Jindal

5. One (1) additional individual to be designated by the Committee

6. One (1) individual to be designated by the Earn Ad Hoc Group, subject to the consent of the Committee

7. One (1) individual to be designated by the Retail Borrower Ad Hoc Group, subject to the consent of the Committee

**EXHIBIT B**

**Compensation of Litigation Administrator**

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $[●] per month plus [●]% of Net Litigation Recoveries.50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

"Net Litigation Recoveries" means gross proceeds from Post-Emergence Claims less out-of-pocket expenses (without deducting contingency counsel fees or fees and expense relating to administration of the Agreement).

## Exhibit D

**Plan Administrator Agreement**

*[DRAFT]*

## PLAN ADMINISTRATOR AGREEMENT

This PLAN ADMINISTRATOR AGREEMENT (this "Agreement"), which shall constitute the "Plan Administrator Agreement" under, as defined in, and for all purposes of the Plan, unless and until it is replaced by an agreement with a successor "Plan Administrator" appointed under the Plan pursuant to Section 8 hereof, dated as of [●], by and among (a) Celsius Network LLC, on behalf of itself and its debtor subsidiaries (collectively, the "Debtors" or the "Post-Effective Date Debtors," as applicable), (b) Christopher Ferraro, who shall constitute (and is deemed designated) the "Plan Administrator" under, as defined in, and for all purposes of the Plan, unless and until the Plan Administrator ceases to be the "Plan Administrator" hereunder (the "Plan Administrator"), and (c) the Committee (together with the Debtors and the Plan Administrator, the "Parties"), sets forth the Plan Administrator's rights, powers, and obligations in connection with the Plan pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (as may be amended, modified, or supplemented from time to time, the "Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1.      Appointment.  Effective as of the Effective Date (as defined in the Plan), the Plan Administrator will be appointed to act as the Plan Administrator under the Plan for the purpose of effectuating the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, the Confirmation Order, and the Wind-Down Procedures, if applicable (collectively, the "Plan Documents").  As set forth in the Plan Documents, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors, the Debtors' officers, directors, managers, members, shareholders, and the Debtors' Estates from and following the Effective Date.

2.      Scope of Services.  The Plan Administrator shall provide post-Effective Date administration, wind down, dissolution, and liquidation services that are necessary, required, desirable, or advisable to effectuate the Plan Documents and to make certain distributions under the Plan.  Without limiting the provisions of the Plan applicable to the Plan Administrator, the Plan Administrator shall perform the following services for the Post-Effective Date Debtors' Estates in its role as Plan Administrator for all purposes of the Plan (as such services may be further described in the Plan Documents or additional tasks required to be performed by the Plan Administrator as described in the Plan Documents):

          (a)      make (or arrange for a Distribution Agent to make) the distributions contemplated by the Plan;

          (b)      administer the Special Committee D&O Liability Insurance Policies;

          (c)      cooperate with the Litigation Administrator with respect to its duties, as set forth in the Plan Documents and the Litigation Administrator Agreement;

          (d)      prosecute any Causes of Action that vest in the Post-Effective Date Debtors and are not otherwise delegated to the Litigation Administrator pursuant to the Plan or delegated to the Litigation Administrator in writing by the Plan Administrator and the Litigation Administrator;

(e)    to the extent not duplicative with the responsibilities of any Litigation Administrator, marshal, market for sale, and wind down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(f)    to the extent not duplicative with the responsibilities of any Litigation Administrator, recover and compel turnover of the Debtors' property in accordance with the Plan;

(g)    manage the Plan Administrator Budget or Wind-Down Budget, as applicable, and pay the Wind-Down Expenses, if any;

(h)    to the extent not duplicative with the responsibilities of any Litigation Administrator, abandon any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(i)    prepare and file post-Effective Date operating reports (including the month in which the Effective Date occurs);

(j)    file appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(k)    at the appropriate time, file a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Post-Effective Date Debtors under the applicable laws of their respective states of incorporation or formation (as applicable);

(l)    be responsible for the ongoing administration of the Chapter 11 Cases and all actions related to the closing of the Chapter 11 Cases;

(m)    retain such professionals as are reasonably necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations;

(n)    cause the Post-Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby;

(o)    to the extent not duplicative with the responsibilities of any Litigation Administrator, take such actions as are necessary and reasonable to carry out the purposes of the Plan, including winding down the Debtors' business affairs; and

(p)    implement the Orderly Wind Down, if applicable, and only if the Orderly Wind Down is approved by the Bankruptcy Court.

3.    <u>Reporting</u>. The Plan Administrator shall provide quarterly reports, commencing on the date that is the three-month anniversary of the Effective Date, to the Litigation Administrator and the Litigation Oversight Committee with respect to the assets of the Post-Effective Date Debtors, the

receipts and expenditures of the Post-Effective Date Debtors, and information regarding the remaining tasks to be completed to close the Debtors' estates and the estimated time until completion of the Plan Administrator's duties under the Plan and this Agreement.

4.      Remaining Cash. To the extent that the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator, the Plan Administrator shall coordinate with the Litigation Administrator to distribute such Cash or other property Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. If such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated; provided that the Litigation Administrator or any other interested party may petition the Bankruptcy Court, upon notice and hearing, to order the Plan Administrator to distribute remaining Cash or assets to Holders of Claims entitled to receive Litigation Proceeds at an earlier date.

5.      Timing and Fees.

        (a)      The Plan Administrator will commence its responsibilities on the Effective Date.

        (b)      The Post-Effective Date Debtors shall pay the Plan Administrator's compensation and reimburse the Plan Administrator's expenses as set forth herein as such amounts come due without the need for Bankruptcy Court approval.

        (c)      [The Plan Administrator's compensation shall be based upon an initial term of up to twelve months, to be paid as follows: $200,000 per month for the first [three] months following the Effective Date and $100,000 per month for the fourth through twelfth months following the Effective Date. The [Litigation Administrator] shall have the authority, in consultation with the Plan Administrator, to reduce the initial term to less than 12 months, but at the conclusion of any such shortened term, the $1,000,000 completion fee described below shall become immediately due and payable absent fraud, gross negligence, or willful misconduct by the Plan Administrator.

        (d)      The Plan Administrator's compensation shall be payable from the Post Effective Date Debtors' Assets on a monthly basis in advance not later than the first business day of each month.

        (e)      In addition, so long as the initial revesting of Unclaimed Distributions pursuant to the Plan has occurred, at the one year anniversary of the Effective  Date (or such earlier date selected to end the initial term by the Litigation Administrator),  the Plan Administrator shall receive a substantial completion bonus in the amount of $1,000,000, which

3

shall be payable from the Post-Effective Date Debtors' Assets. From the period starting six months after the Effective Date to the one-year anniversary of the Effective Date, the Plan Administrator shall consult with the Litigation Administrator and the Litigation Oversight Committee regarding the potential selection of a successor Plan Administrator (whose compensation shall be the subject of agreement between such successor Plan Administrator, the Litigation Administrator, and the Litigation Oversight Committee, or, if no such agreement is reached, by order of the Bankruptcy Court). Alternatively, subject to agreement among the Plan Administrator and the Litigation Administrator, the Plan Administrator may at any time delegate the Plan Administrator's remaining work streams to the Litigation Administrator, subject to the oversight of the Litigation Oversight Committee.][1]

(f)    In addition to the foregoing, the Plan Administrator shall be entitled to reimbursement of actual, reasonable, out-of-pocket and direct expenses incurred in connection with the services to be provided under this Agreement and/or the Plan Documents, as applicable.

(g)    The Plan Administrator may retain any professionals reasonably necessary to the Plan Administrator, and any professionals retained by the Plan Administrator pursuant to the terms of this Agreement shall be paid as set forth in the applicable professional's engagement letter, which shall be payable from the Post-Effective Date Debtors' Assets in accordance with the terms of this Agreement and the terms of the applicable professional's engagement letter.

6.    Relationship of the Parties.  The Parties intend that an independent contractor relationship shall be created by this Agreement.  The Plan Administrator shall not be entitled to receive from the Debtors or Post-Effective Date Debtors or their Estates any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.  Notwithstanding the foregoing, as stated by the Plan, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

7.    D&O Liability Insurance.  The Post-Effective Date Debtors shall purchase director and officer liability insurance ("D&O Insurance") that will cover the Plan Administrator with respect to carrying out the Plan Administrator's duties in an amount and on terms reasonably acceptable to the Plan Administrator.

8.    Confidentiality.  The Plan Administrator shall treat confidentially all information not publicly available that is received by the Plan Administrator in connection with this engagement or that is developed during this engagement, and the Plan Administrator shall not disclose such information except as required by a court order or other legal process.

9.    Indemnity.  The Post-Effective Date Debtors shall indemnify and defend the Plan Administrator and all professionals engaged by the Plan Administrator from and against any and all claims, liability, loss, costs, damage, or expense (including reasonable attorneys' fees)

---

[1]    [**NTD**: The Plan Administrator's compensation, including the conditions to and amounts of the substantial completion bonus and the completion bonus, remain subject to discussion among the proposed Plan Sponsor, the Debtors, and the Committee.]

(collectively, "Damages") asserted against it by reason of or arising out of or related to this Agreement or performance under this Agreement or any related transactions that are taken or omitted to be taken as set forth in this Agreement; provided that there shall be no obligation to indemnify or defend the Plan Administrator or its professionals on account of damages that are determined to have arisen primarily from the Plan Administrator's or such professional's gross negligence or willful misconduct, or from the Plan Administrator's breach of the terms of this Agreement or the Plan; provided, further, that no indemnification shall be provided for any distribution agent engaged by the Plan Administrator to the extent such indemnification is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.    The indemnification established hereunder shall not be effective unless the Plan Administrator provides notice to the Litigation Administrator and its counsel of any demand for indemnification within 60 days of the Plan Administrator's knowledge of any such indemnifiable claim or expense.

10.    Exculpation.  The Plan Administrator and any professional engaged by the Plan Administrator shall not be liable for any act or omission in connection with the discharge by the Plan Administrator or such professional of the powers and duties conferred upon the Plan Administrator by the Plan, this Agreement, any Final Order, or applicable law, except to the extent that such liability is due to an act or omission that is determined, in a Final Order, to be due to the Plan Administrator's or such professional's gross negligence or willful misconduct; provided, that no exculpation shall be provided for any distribution agent engaged by the Plan Administrator to the extent such exculpation is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  Nothing contained in this Section 10 shall preclude or impair any Holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Plan Administrator to compel the Plan Administrator to make the distributions contemplated by the Plan on account of such Allowed Claim.

11.    Termination; Effect of Termination.

        (a)    This Agreement shall terminate automatically after all of the Chapter 11 Cases have been closed and all payments have been made under the Plan (including the Plan Administrator's compensation and reimbursement).

        (b)    The Plan Administrator may resign its duties at any time upon thirty (30) days' written notice to the Bankruptcy Court and the Notice Parties, provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, who shall be selected by the Plan Administrator, and who shall be reasonably acceptable to the Litigation Oversight Committee or who is otherwise approved by the Bankruptcy Court in the absence of the Litigation Oversight Committee's agreement.  Upon the appointment of a successor Plan Administrator, such successor shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order, and all responsibilities of the predecessor Plan Administrator shall be terminated.

        (c)    The Plan Administrator may be terminated by the Bankruptcy Court for cause shown after notice and a hearing.  If the Bankruptcy Court terminates the Plan Administrator, the Bankruptcy Court shall appoint a permanent or interim successor Plan Administrator, who

5

shall immediately become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order.

(d)    This Agreement may be terminated for cause shown pursuant to a Final Order entered by the Bankruptcy Court after notice and a hearing; provided that in the event that this Agreement is terminated before its automatic termination as provided in Section 11(a), the Bankruptcy Court shall appoint a successor Plan Administrator to fill the vacancy left by the termination of this Agreement.

(e)    Upon termination of this Agreement or resignation of the Plan Administrator, the Plan Administrator shall be entitled to all fees and expenses accrued to that date pursuant to this Agreement, including any travel or related expenses incurred in returning from the location of the services being provided under this Agreement prior to the termination date or resignation date.

12.    Effectiveness.  This Agreement shall be effective upon the Effective Date.

13.    Notice.  All invoices, notices, requests, demands, and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given:  (a) when personally delivered; (b) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (d) three (3) Business Days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands, and communications to the Parties hereto shall be sent to the addresses indicated below:

To the Post-Effective Date Debtors:
c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn:  Ron Deutsch
E-mail: legal@celsius.network

with copy to:      Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:  Patrick J. Nash, P.C.; Ross Kwasteniet, P.C.;
Christopher S. Koenig; Dan Latona
E-mail: patrick.nash@kirkland.com
         chris.koenig@kirkland.com
         dan.latona@kirkland.com

- and -

6

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attn:   Joshua Sussberg, P.C.
> E-mail: joshua.sussberg@kirkland.com

To the Plan Administrator:    Christopher Ferraro
                              E-mail: [TO COME]

To the Litigation Oversight Committee:

[TO COME]

14.    <u>Miscellaneous</u>.

(a)    <u>Sections 8</u>, <u>9</u>, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

(b)    In the event of an inconsistency between this Agreement and the Plan Documents, the terms of the Plan Documents shall control in all respects.

(c)    If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the maximum extent provided by applicable law.

(d)    Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party.

(e)    This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or principles thereof.  In any court proceeding arising out of or related to this Agreement, each of the Parties hereby waive any right to trial by jury.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding arising from or related to this Agreement, and each of the Parties agrees not to commence any action, suit, or proceedings relating thereto except in the Bankruptcy Court.

(f)    This Agreement and the Plan Documents encompass all of the terms and conditions between the Debtors and the Plan Administrator concerning the subject matter hereof. This Agreement may not be amended or modified in any respect except in a writing signed by each of the Parties.

(g)    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic

7

transmission (.pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGES FOLLOW]

THE DEBTORS:

CELSIUS NETWORK LLC, ON BEHALF
OF ITSELF AND ITS AFFILIATED
DEBTORS


By:_____
Name: Ron Deutsch
Title: General Counsel

THE PLAN ADMINISTRATOR:

CHRISTOPHER FERRARO


By:_____
Name: Christopher Ferraro

THE COMMITTEE:

___, ON BEHALF OF THE COMMITTEE
OF UNSECURED CREDITORS

By:_____
Name:
Title:

**<u>Exhibit D-1</u>**

**(Redline) Plan Administrator Agreement**

*Initial Filing Version – Subject to Ongoing Discussions[DRAFT]*

## PLAN ADMINISTRATOR AGREEMENT

This PLAN ADMINISTRATOR AGREEMENT (this "Agreement"), which shall constitute the "Plan Administrator Agreement" under, as defined in, and for all purposes of the Plan, unless and until it is replaced by an agreement with a successor "Plan Administrator" appointed under the Plan pursuant to Section 8 hereof, dated as of [●], by and among (a) Celsius Network LLC, on behalf of itself and its debtor subsidiaries (collectively, the "Debtors" or the "Post-Effective Date Debtors," as applicable), (b) Christopher Ferraro, who shall constitute (and is deemed designated) the "Plan Administrator" under, as defined in, and for all purposes of the Plan, unless and until the Plan Administrator ceases to be the "Plan Administrator" hereunder (the "Plan Administrator"), and (c) the Committee (together with the Debtors and the Plan Administrator, the "Parties"), sets forth the Plan Administrator's rights, powers, and obligations in connection with the Plan pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (as may be amended, modified, or supplemented from time to time, the "Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1.      Appointment.  Effective as of the Effective Date (as defined in the Plan), the Plan Administrator will be appointed to act as the Plan Administrator under the Plan for the purpose of effectuating the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, the Confirmation Order, and the Wind-Down Procedures, if applicable (collectively, the "Plan Documents").  As set forth in the Plan Documents, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors, the Debtors' officers, directors, managers, members, shareholders, and the Debtors' Estates from and following the Effective Date. ~~Notwithstanding the foregoing, the sole and limited duties of the Plan Administrator are the responsibilities set out in Section 2.~~

2.      Scope of Services.   The Plan Administrator shall provide post-Effective Date administration, wind down, dissolution, and liquidation services that are necessary, required, desirable, or advisable to effectuate the Plan Documents and to make certain distributions under the Plan.  Without limiting the provisions of the Plan applicable to the Plan Administrator, the Plan Administrator ~~will~~shall perform the following services for the Post-Effective Date Debtors' Estates in its role as Plan Administrator for all purposes of the Plan (as such services may be further described in the Plan Documents or additional tasks required to be performed by the Plan Administrator as described in the Plan Documents):

(a)      make (or arrange for a Distribution Agent to make) the distributions contemplated by the Plan;

(b)      administer the Special Committee D&O Liability Insurance Policies;

(c)      cooperate with the Litigation Administrator with respect to its duties, as set forth in the Plan Documents and the Litigation Administrator Agreement;

(d)      prosecute any Causes of Action that vest in the Post-Effective Date Debtors and are not otherwise delegated to the Litigation Administrator pursuant to the Plan or

delegated to the Litigation Administrator in writing by the Plan Administrator and the Litigation Administrator;

(e) ~~(d)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, marshal, market for sale, and wind down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(f) ~~(e)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, recover and compel turnover of the Debtors' property in accordance with the Plan;

(g) ~~(f)~~ manage the Plan Administrator Budget or Wind-Down Budget, as applicable, and pay the Wind-Down Expenses, if any;

(h) ~~(g)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, abandon any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(i) ~~(h)~~ prepare and file post-Effective Date operating reports (including the month in which the Effective Date occurs);

(j) ~~(i)~~ file appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(k) ~~(j)~~ at the appropriate time, file a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Post-Effective Date Debtors under the applicable laws of their respective states of incorporation or formation (as applicable);

(l) ~~(k)~~ be responsible for the ongoing administration of the Chapter 11 Cases and all actions related to the closing of the Chapter 11 Cases;

(m) ~~(l)~~ retain such professionals as are reasonably necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations;

(n) cause the Post-Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby;

(o) ~~(m)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, take such actions as are necessary and reasonable to carry out the purposes of the Plan, including winding down the Debtors' business affairs; and

2

(p)    (n) implement the Orderly Wind Down, if applicable, and only if the Orderly Wind Down is approved by the Bankruptcy Court.

3.    Reporting. The Plan Administrator shall provide quarterly reports, commencing on the date that is the three-month anniversary of the Effective Date, to the Litigation Administrator and the Litigation Oversight Committee with respect to the assets of the Post-Effective Date Debtors, the receipts and expenditures of the Post-Effective Date Debtors, and information regarding the remaining tasks to be completed to close the Debtors' estates and the estimated time until completion of the Plan Administrator's duties under the Plan and this Agreement.

4.    Remaining Cash. To the extent that the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator, the Plan Administrator shall coordinate with the Litigation Administrator to distribute such Cash or other property Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. If such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated; provided that the Litigation Administrator or any other interested party may petition the Bankruptcy Court, upon notice and hearing, to order the Plan Administrator to distribute remaining Cash or assets to Holders of Claims entitled to receive Litigation Proceeds at an earlier date.

5.    3. Timing and Fees.

(a)    The Plan Administrator will commence its responsibilities on the Effective Date.

(b)    The Post-Effective Date Debtors shall pay the Plan Administrator's compensation and reimburse the Plan Administrator's expenses as set forth herein as such amounts come due without the need for Bankruptcy Court approval.

(c)    [The Plan Administrator's compensation shall be based upon an initial term of up to twelve months, to be paid as follows: $200,000 per month for the first [three] months following the Effective Date and $100,000 per month for the fourth through twelfth months following the Effective Date. The [Litigation Administrator] shall have the authority, in consultation with the Plan Administrator, to reduce the initial term to less than 12 months, but at the conclusion of any such shortened term, the $1,000,000 completion fee described below shall become immediately due and payable absent fraud, gross negligence, or willful misconduct by the Plan Administrator.

(d)    (c) The Plan Administrator's annual compensation shall be as follows: $[●] per month until [sixty (60) days] following the revesting of the initial Unclaimed

3

~~Distributions pursuant to the Plan, and $[●] per month thereafter until the termination of this Agreement, which~~ shall be payable from the Post- Effective Date Debtors' Assets on a monthly basis in advance not later than the first business day of each month.

(e)    In addition, ~~sixty (60) days following the~~so long as the initial revesting of Unclaimed Distributions pursuant to the Plan has occurred, at the one year anniversary of the Effective Date (or such earlier date selected to end the initial term by the Litigation Administrator), the Plan Administrator shall receive a substantial completion bonus in the amount of $[●~~], and upon the closing of these Chapter 11 Cases, the Plan Administrator shall receive a completion bonus in the amount of $[●], each of~~1,000,000, which shall be payable from the Post-Effective Date Debtors' Assets. From the period starting six months after the Effective Date to the one-year anniversary of the Effective Date, the Plan Administrator shall consult with the Litigation Administrator and the Litigation Oversight Committee regarding the potential selection of a successor Plan Administrator (whose compensation shall be the subject of agreement between such successor Plan Administrator, the Litigation Administrator, and the Litigation Oversight Committee, or, if no such agreement is reached, by order of the Bankruptcy Court).  Alternatively, subject to agreement among the Plan Administrator and the Litigation Administrator, the Plan Administrator may at any time delegate the Plan Administrator's remaining work streams to the Litigation Administrator, subject to the oversight of the Litigation Oversight Committee.][1]

(f)    ~~(d)~~ In addition to the foregoing, the Plan Administrator shall be entitled to reimbursement of actual, reasonable, out-of-pocket and direct expenses incurred in connection with the services to be provided under this Agreement and/or the Plan Documents, as applicable.

(g)    ~~(e)~~ The Plan Administrator may retain any professionals reasonably necessary to the Plan Administrator, and any professionals retained by the Plan Administrator pursuant to the terms of this Agreement shall be paid as set forth in the applicable professional's engagement letter, which shall be payable from the Post-Effective Date Debtors' Assets in accordance with the terms of this Agreement and the terms of the applicable professional's engagement letter.

---

[1]    [**NTD**: The Plan Administrator's compensation, including the conditions to and amounts of the substantial completion bonus and the completion bonus, remain subject to discussion among the proposed Plan Sponsor, the Debtors, and the Committee.]

4

6.    4. Relationship of the Parties.    The Parties intend that an independent contractor relationship shall be created by this Agreement.  The Plan Administrator shall not be entitled to receive from the Debtors or Post-Effective Date Debtors or their Estates any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.  Notwithstanding the foregoing, as stated by the Plan, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

7.    5. D&O Liability Insurance.  The Post-Effective Date Debtors shall purchase director and officer liability insurance ("D&O Insurance") that will cover the Plan Administrator with respect to carrying out the Plan Administrator's duties in an amount and on terms reasonably acceptable to the Plan Administrator.

8.    6. Confidentiality.  The Plan Administrator shall treat confidentially all information not publicly available that is received by the Plan Administrator in connection with this engagement or that is developed during this engagement, and the Plan Administrator shall not disclose such information except as required by a court order or other legal process.

9.    7. Indemnity.  The Post-Effective Date Debtors shall indemnify and defend the Plan Administrator and all professionals engaged by the Plan Administrator from and against any and all claims, liability, loss, costs, damage, or expense (including reasonable attorneys' fees) (collectively, "Damages") asserted against it by reason of or arising out of or related to this Agreement or performance under this Agreement or any related transactions that are taken or omitted to be taken as set forth in this Agreement; provided that there shall be no obligation to indemnify or defend the Plan Administrator or its professionals on account of damages that are determined to have arisen primarily from the Plan Administrator's or such professional's gross negligence or willful misconduct., or from the Plan Administrator's breach of the terms of this Agreement or the Plan; provided, further, that no indemnification shall be provided for any distribution agent engaged by the Plan Administrator to the extent such indemnification is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  The indemnification established hereunder shall not be effective unless the Plan Administrator provides notice to the Litigation Administrator and its counsel of any demand for indemnification within 60 days of the Plan Administrator's knowledge of any such indemnifiable claim or expense.

10.    8. Exculpation.  The Plan Administrator and any professional engaged by the Plan Administrator shall not be liable for any act or omission in connection with the discharge by the Plan Administrator or such professional of the powers and duties conferred upon the Plan Administrator by the Plan, this Agreement, any Final Order, or applicable law, except to the extent that such liability is due to an act or omission that is determined, in a Final Order, to be due to the Plan Administrator's or such professional's gross negligence or willful misconduct; provided, that no exculpation shall be provided for any distribution agent engaged by the Plan Administrator to the extent such exculpation is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  Nothing contained in this Section 7 10 shall preclude or impair any Holder of an Allowed Claim from bringing an action in the

5

Bankruptcy Court against the Plan Administrator to compel the Plan Administrator to make the distributions contemplated by the Plan on account of such Allowed Claim.

11.    9. Termination; Effect of Termination.

(a)    This Agreement shall terminate automatically after all of the Chapter 11 Cases have been closed and all payments have been made under the Plan (including the Plan Administrator's compensation and reimbursement).

(b)    The Plan Administrator may resign its duties at any time upon thirty (30) days' written notice to the Bankruptcy Court and the Notice Parties, provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, who shall be selected by the Plan Administrator, and who shall be reasonabley acceptable to the Litigation Oversight Committee or who is otherwise approved by the Bankruptcy Court in the absence of the Litigation Oversight Committee's agreement.  Upon the appointment of a successor Plan Administrator, such successor shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order, and all responsibilities of the predecessor Plan Administrator shall be terminated.

(c)    The Plan Administrator may be terminated by the Bankruptcy Court for cause shown after notice and a hearing.  If the Bankruptcy Court terminates the Plan Administrator, the Bankruptcy Court shall appoint a permanent or interim successor Plan Administrator, who shall immediately become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order.

(d)    (c) This Agreement may be terminated for cause shown pursuant to a Final Order entered by the Bankruptcy Court after notice and a hearing; provided that in the event that this Agreement is terminated before its automatic termination as provided in Section 8(a)11(a), the Bankruptcy Court shall appoint a successor Plan Administrator to fill the vacancy left by the termination of this Agreement.

(e)    (d) Upon termination of this Agreement or resignation of the Plan Administrator, the Plan Administrator shall be entitled to all fees and expenses accrued to that date pursuant to this Agreement, including any travel or related expenses incurred in returning from the location of the services being provided under this Agreement prior to the termination date or resignation date.

6

12.    10. Effectiveness.  This Agreement shall be effective upon the Effective Date.

13.    11. Notice.    All invoices, notices, requests, demands, and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given:  (a) when personally delivered; (b) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (d) three (3) Business Days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands, and communications to the Parties hereto shall be sent to the addresses indicated below:

To the Post-Effective Date Debtors:
c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn:   Ron Deutsch
E-mail:        legal@celsius.network

with copy to:        Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:   Patrick J. Nash, P.C.; Ross Kwasteniet, P.C.;
Christopher S. Koenig; Dan Latona
E-mail:        patrick.nash@kirkland.com
chris.koenig@kirkland.com
dan.latona@kirkland.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua Sussberg, P.C.
E-mail:        joshua.sussberg@kirkland.com

To the Plan Administrator:    Christopher Ferraro
E-mail:        [TO COME]

To the Litigation Oversight Committee:    White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attn: David M. Turetsky, Samuel P. Hershey, Keith H. Wofford
Email: david.turetsky@whitecase.com

7

sam.hershey@whitecase.com
kwofford@whitecase.com
[TO COME]

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Attn: Gregory F. Pesce
Email: gregory.pesce@whitecase.com
and
White & Case LLP
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (212) 819-8200
Attn: Aaron E. Colodny
Email: aaron.colodny@whitecase.com

14.    12. Miscellaneous.

(a)    Sections 58, 69, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

(b)    In the event of an inconsistency between this Agreement and the Plan Documents, the terms of the Plan Documents shall control in all respects.

(c)    If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the maximum extent provided by applicable law.

(d)    Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party.

(e)    This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or principles thereof. In any court proceeding arising out of or related to this Agreement, each of the Parties hereby waive any right to trial by jury. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding arising from or related to this Agreement, and each of the Parties agrees not to commence any action, suit, or proceedings relating thereto except in the Bankruptcy Court.

(f)    This Agreement and the Plan Documents encompass all of the terms and conditions between the Debtors and the Plan Administrator concerning the subject matter hereof. This Agreement may not be amended or modified in any respect except in a writing signed by each of the Parties.

8

(g)    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Agreement.  A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (.pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGES FOLLOW]

THE DEBTORS:

CELSIUS NETWORK LLC, ON BEHALF
OF ITSELF AND ITS AFFILIATED
DEBTORS

By:_____
Name: Ron Deutsch
Title: General Counsel

THE PLAN ADMINISTRATOR:

CHRISTOPHER FERRARO


By:_____
Name: Christopher Ferraro

THE COMMITTEE:

___, ON BEHALF OF THE COMMITTEE
OF UNSECURED CREDITORS


By:_____
Name:
Title:

## Exhibit E

## Schedule of Excluded Parties

## Schedule of Excluded Parties

Pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3222] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**"), in addition to any other Excluded Parties specifically enumerated in the Plan, the following parties and each of their Affiliates and Related Parties are Excluded Parties as such term is defined therein.[1]

The Excluded Parties shall not receive the protections of the Plan's release, injunction, or exculpation provisions. **For the avoidance of doubt, no Excluded Party shall constitute a Released Party or Exculpated Party in any capacity and all claims against the Excluded Parties that are held by the Debtors or Holders of Claims and Interests are expressly preserved**.

**This Schedule of Excluded Parties may be amended, modified, or supplemented by the Debtors and the Committee at any time prior to the date the Confirmation Order is entered by the Court**.

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 1. | Adam Carver |
| 2. | Akshay Nayak |
| 3. | Alameda Research Ltd. |
| 4. | Alchemy Capital Partners LP |
| 5. | Alexander Christy |
| 6. | Alexander Mashinsky |
| 7. | Aliza Landes |
| 8. | AM Ventures Holding, Inc. |
| 9. | Amber Technologies Limited |
| 10. | Amir Ayalon |
| 11. | Amtrust Underwriters, Inc. on behalf of Associated Industries Insurance Company, Inc. |
| 12. | Anderson Tax |
| 13. | ANV Insurance |
| 14. | Aslihan Denizkurdu |
| 15. | Atlantic Insurance |
| 16. | Ayalon Insurance |
| 17. | BadgerDAO |
| 18. | Bancor |
| 19. | Battlestar Capital, LLC |
| 20. | B-Brick, Inc. |
| 21. | Benjamin Armstrong |
| 22. | Beowulf Energy LLC |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 23. | Berkley Insurance Company |
| 24. | Beyond Associates LLC |
| 25. | BitBoy Crypto |
| 26. | Bits of Sunshine LLC |
| 27. | BJ Investment Holdings, LLC |
| 28. | Blockchain Access UK Ltd. |
| 29. | Bradley Condit |
| 30. | Chainanlysis Inc. |
| 31. | Circle Internet Financial, LLC |
| 32. | Circle UK Trading Company Limited |
| 33. | Cloudflare, Inc. |
| 34. | Coin Bureau |
| 35. | Core Scientific Inc. |
| 36. | Cosmos Infrastructure LLC |
| 37. | Crum and Forster Specialty Insurance Company |
| 38. | Crypto Lark |
| 39. | CryptoWendyO |
| 40. | Darren Yarwood |
| 41. | DeFiRate |
| 42. | Deloitte & Touche LLP |
| 43. | Deloitte Tax LLP |
| 44. | Dennis Reichelt |
| 45. | Ditto PR |
| 46. | Eddie Moon |
| 47. | Endurance American Insurance Company |
| 48. | European Media Finance LTD |
| 49. | Equities First Holdings, LLC |
| 50. | EZ Blockchain Services, LLC |
| 51. | Fabric Ventures Group Sarl |
| 52. | Falvey Insurance Group |
| 53. | Fireblocks Inc. |
| 54. | Four Thirteen LLC |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 55. | Frank Van Etten |
| 56. | FTX Trading Ltd. |
| 57. | Grant Thornton LLP |
| 58. | Guy Turner |
| 59. | Haines Watts London LLP |
| 60. | Hanoch "Nuke" Goldstein |
| 61. | Harumi Urata-Thompson |
| 62. | HDR Global Trading Limited (t/a BitMEX) |
| 63. | High Throughput Productions, LLC |
| 64. | Hudson Insurance Group |
| 65. | Indian Harbor Insurance Company |
| 66. | Into the Block Corp. |
| 67. | Invest Answers |
| 68. | Iterative OTC, LLC |
| 69. | James Mullarney |
| 70. | Jason Perman |
| 71. | Jason Stone |
| 72. | Jeremie Beaudry |
| 73. | Johannes Treutler |
| 74. | Julie La Point |
| 75. | KeyFi, Inc. |
| 76. | Koala1 LLC |
| 77. | Koala 2 LLC |
| 78. | Koala 3, LLC |
| 79. | Kost Forer Gabbay & Kasierer |
| 80. | KPMG Somekh Chaikin |
| 81. | Kristine Meehan Mashinsky (née Kristine M. Meehan) |
| 82. | Lark Davis |
| 83. | Liquidity Technologies Ltd. (t/a CoinFLEX) |
| 84. | Lloyds of London Republic Vanguard Insurance Company |
| 85. | Luna Squares LLC |
| 86. | Mambu Tech B.V. |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 87. | Markel Insurance |
| 88. | Mawson Infrastructure Group Inc. |
| 89. | Mazars LLP |
| 90. | MF Partners, Ltd. |
| 91. | Michael Alfred |
| 92. | Migdal Insurance Company |
| 93. | MVP Workshop d.o.o. Beograd-Zemun and its shareholders |
| 94. | Nektar ACS Corp. |
| 95. | Nyman Lipson Paul, LLP |
| 96. | Patrick Martin |
| 97. | Peter Graham |
| 98. | Prime Trust LLC |
| 99. | Profluent Trading UK Ltd. |
| 100. | QBE Insurance Company |
| 101. | Realm Insurance Company |
| 102. | Reliz Limited |
| 103. | Rhodium Enterprises, Inc. |
| 104. | Rod Bolger |
| 105. | Rodney Sunada-Wong |
| 106. | Ron Sabo |
| 107. | Roni Cohen-Pavon |
| 108. | Sabre56 Corp. |
| 109. | Shlomi Daniel Leon |
| 110. | StakeHound SA |
| 111. | Starstone Insurance |
| 112. | Subranmaniam Vijay Konduru |
| 113. | Tether International Ltd. |
| 114. | Tether Limited |
| 115. | The Wolf of Bitcoin |
| 116. | Three Arrows Capital Ltd. |
| 117. | Timothy Shedd |
| 118. | Tom McCarthy |

| | **SCHEDULE OF EXCLUDED PARTIES** |
|---|---|
| 119. | Tushar Nadkarni |
| 120. | United States Fire Insurance Company |
| 121. | USAStrong.io |
| 122. | Voyager Digital Holdings, Inc. |
| 123. | Walter Johnson |
| 124. | Wintermute Trading Ltd. |
| 125. | XL Specialty Insurance Company |
| 126. | Yarden Noy |
| 127. | Yaron Shalem |
| 128. | Zachary Wildes |
| 129. | Zen Blockchain Foundation (d/b/a Horizen) |
| 130. | Zurich Insurance Group |
| 131. | All auditors of the Debtors |
| 132. | All promoters, marketers, and advertisers of the Debtors, including account holders and other parties who had agreements with Celsius concerning payments for referrals or who publicly disseminated referral codes through social media platforms or similar channels. |
| 133. | All Entities identified on the Schedule of Retained Causes of Action or associated with the claims and causes of action preserved on the Schedule of Retained Causes of Action. |
| 134. | Unless otherwise released pursuant to the Plan, all Entities currently party to adversary proceedings in the Debtors' Chapter 11 Cases. |
| 135. | All mediate and intermediate transferees of such Excluded Parties. |
| 136. | All parties with outstanding prepetition litigation against any of the Debtors and/or any party subject to any actual or potential counterclaim by the Debtors. |
| 137. | All Professionals of the Debtors not expressly released under the Plan, including all law firms retained by the Debtors prior to the Petition Date other than (1) Kirkland & Ellis LLP, (2) Akin Gump Strauss Hauer & Feld LLP, (3) White & Case LLP, (4) A.M. Saccullo Legal LLC; and (5) any law firm list on the Debtors' *Statement of Amounts Paid by the Debtors to Ordinary Course Professionals* in these Chapter 11 Cases as of August 13, 2022 [Docket Nos. 1455; 1954; 2557; 3120]. For the avoidance of doubt any such law firms are not "current attorneys" of the Debtors and are not Released Parties under the Plan. |
| 138. | Any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party, *provided* that all individuals who are employed by the Debtors on the date the Disclosure Statement Order is entered and that are not specifically identified as an Excluded Party on this Schedule of Excluded Parties (as such schedule may be amended prior to the date the Confirmation Order is entered) shall be Released and Exculpated except to the extent such employee is later arrested, indicted, or found liable by a court of competent jurisdiction of bad acts and omissions in connection |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| | with his or her role with the Debtors, in which case any release provided in the Plan shall be null and void and all statutes of limitation shall be tolled during such time; *provided*, *further* that any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party who subsequently enters into an agreement that includes a provision that they shall be identified as a Released Party shall be a Released Party. |
| 139. | Any Released Party that is later arrested, indicted, or found liable by a court of competent jurisdiction for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time. |
| 140. | Account Holder Avoidance Actions against Released Parties shall not be released unless released pursuant to the Account Holder Avoidance Action Settlement. |
| 141. | All Avoidance Actions against Entities that are not Account Holders. |
| 142. | All Affiliates and Related Parties of Excluded Parties |

**Exhibit E-1**

**(Redline) Schedule of Excluded Parties**

## ~~Exhibit C~~

### Schedule of Excluded Parties

Pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3222] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**"), in addition to any other Excluded Parties specifically enumerated in the Plan, the following parties and each of their Affiliates and Related Parties are Excluded Parties as such term is defined therein.[1]

The Excluded Parties shall not receive the protections of the Plan's release, injunction, or exculpation provisions. **For the avoidance of doubt, no Excluded Party shall constitute a Released Party or Exculpated Party in any capacity and all claims against the Excluded Parties that are held by the Debtors or Holders of Claims and Interests are expressly preserved.**

**This Schedule of Excluded Parties may be amended, modified, or supplemented by the Debtors and the Committee at any time prior to the date the Confirmation Order is entered by the Court.**

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 1. | Adam Carver |
| 2. | Akshay Nayak |
| 3. | Alameda Research Ltd. |
| 4. | Alchemy Capital Partners LP |
| 5. | Alexander Christy |
| 6. | Alexander Mashinsky |
| 7. | Aliza Landes |
| 8. | AM Ventures Holding, Inc. |
| 9. | Amber Technologies Limited |
| 10. | Amir Ayalon |
| 11. | Amtrust Underwriters, Inc. on behalf of Associated Industries Insurance Company, Inc. |
| 12. | Anderson Tax |
| 13. | ANV Insurance |
| 14. | Aslihan Denizkurdu |
| 15. | Atlantic Insurance |
| 16. | Ayalon Insurance |
| 17. | BadgerDAO |
| 18. | Bancor |
| 19. | Battlestar Capital, LLC |
| 20. | B-Brick, Inc. |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 21. | Benjamin Armstrong |
| 22. | Beowulf Energy LLC |
| 23. | Berkley Insurance Company |
| 24. | Beyond Associates LLC |
| 25. | BitBoy Crypto |
| 26. | Bits of Sunshine LLC |
| 27. | BJ Investment Holdings, LLC |
| 28. | Blockchain Access UK Ltd. |
| 29. | Bradley Condit |
| 30. | Chainanlysis Inc. |
| 31. | Circle Internet Financial, LLC |
| 32. | Circle UK Trading Company Limited |
| 33. | Cloudflare, Inc. |
| 34. | Coin Bureau |
| 35. | Core Scientific Inc. |
| 36. | Cosmos Infrastructure LLC |
| 37. | Crum and Forster Specialty Insurance Company |
| 38. | Crypto Lark |
| 39. | CryptoWendyO |
| 40. | Darren Yarwood |
| 41. | DeFiRate |
| 42. | Deloitte & Touche LLP |
| 43. | Deloitte Tax LLP |
| 44. | Dennis Reichelt |
| 45. | Ditto PR |
| 46. | Eddie Moon |
| 47. | Endurance American Insurance Company |
| 48. | European Media Finance LTD |
| 49. | Equities First Holdings, LLC |
| 50. | EZ Blockchain Services, LLC |
| 51. | Fabric Ventures Group Sarl |
| 52. | Falvey Insurance Group |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 53. | Fireblocks Inc. |
| 54. | Four Thirteen LLC |
| 55. | Frank Van Etten |
| 56. | FTX Trading Ltd. |
| 57. | Grant Thornton LLP |
| 58. | Guy Turner |
| 59. | Haines Watts London LLP |
| 60. | Hanoch "Nuke" Goldstein |
| 61. | Harumi Urata-Thompson |
| 62. | HDR Global Trading Limited (t/a BitMEX) |
| 63. | High Throughput Productions, LLC |
| 64. | Hudson Insurance Group |
| 65. | Indian Harbor Insurance Company |
| 66. | Into the Block Corp. |
| 67. | Invest Answers |
| 68. | Iterative OTC, LLC |
| 69. | James Mullarney |
| 70. | Jason Perman |
| 71. | Jason Stone |
| 72. | Jeremie Beaudry |
| 73. | Johannes Treutler |
| 74. | Julie La Point |
| 75. | KeyFi, Inc. |
| 76. | Koala1 LLC |
| 77. | Koala 2 LLC |
| 78. | Koala 3, LLC |
| 79. | Kost Forer Gabbay & Kasierer |
| 80. | KPMG Somekh Chaikin |
| 81. | Kristine Meehan Mashinsky (née Kristine M. Meehan) |
| 82. | Lark Davis |
| 83. | Liquidity Technologies Ltd. (t/a CoinFLEX) |
| 84. | Lloyds of London Republic Vanguard Insurance Company |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 85. | Luna Squares LLC |
| 86. | Mambu Tech B.V. |
| 87. | Markel Insurance |
| 88. | Mawson Infrastructure Group Inc. |
| 89. | Mazars LLP |
| 90. | MF Partners, Ltd. |
| 91. | Michael Alfred |
| 92. | Migdal Insurance Company |
| 93. | MVP Workshop d.o.o. Beograd-Zemun and its shareholders |
| 94. | Nektar ACS Corp. |
| 95. | Nyman Lipson Paul, LLP |
| 96. | Patrick Martin |
| 97. | Peter Graham |
| 98. | Prime Trust LLC |
| 99. | Profluent Trading UK Ltd. |
| 100. | QBE Insurance Company |
| 101. | Realm Insurance Company |
| 102. | Reliz Limited |
| 103. | Rhodium Enterprises, Inc. |
| 104. | Rod Bolger |
| 105. | Rodney Sunada-Wong |
| 106. | Ron Sabo |
| 107. | Roni Cohen-Pavon |
| 108. | Sabre56 Corp. |
| 109. | Shlomi Daniel Leon |
| 110. | StakeHound SA |
| 111. | Starstone Insurance |
| 112. | Subranmaniam Vijay Konduru |
| 113. | Tether International Ltd. |
| 114. | Tether Limited |
| 115. | The Wolf of Bitcoin |
| 116. | Three Arrows Capital Ltd. |

| | SCHEDULE OF EXCLUDED PARTIES |
|---|---|
| 117. | Timothy Shedd |
| 118. | Tom McCarthy |
| 119. | Tushar Nadkarni |
| 120. | United States Fire Insurance Company |
| 121. | USAStrong.io |
| 122. | Voyager Digital Holdings, Inc. |
| 123. | Walter Johnson |
| 124. | Wintermute Trading Ltd. |
| 125. | XL Specialty Insurance Company |
| 126. | Yarden Noy |
| 127. | Yaron Shalem |
| 128. | Zachary Wildes |
| 129. | Zen Blockchain Foundation (d/b/a Horizen) |
| 130. | Zurich Insurance Group |
| 131. | All auditors of the Debtors |
| 132. | All ~~third party public~~ promoters, marketers, and advertisers of the Debtors, including account holders and other parties ~~with~~who had agreements with Celsius concerning payments for referrals or who publicly disseminated referral codes through social media platforms or similar channels. |
| 133. | All Entities identified on the Schedule of Retained Causes of Action or associated with the claims and causes of action preserved on the Schedule of Retained Causes of Action. |
| 134. | Unless otherwise released pursuant to the Plan, all Entities currently party to adversary proceedings in the Debtors' Chapter 11 Cases. |
| 135. | All mediate and intermediate transferees of such Excluded Parties. |
| 136. | All parties with outstanding prepetition litigation against any of the Debtors and/or any party subject to any actual or potential counterclaim by the Debtors. |
| 137. | All Professionals of the Debtors not expressly released under the Plan, including all law firms retained by the Debtors prior to the Petition Date other than (1) Kirkland & Ellis LLP, (2) Akin Gump Strauss Hauer & Feld LLP, (3) White & Case LLP, (4) A.M. Saccullo Legal LLC; and (5) any law firm list on the Debtors' *Statement of Amounts Paid by the Debtors to Ordinary Course Professionals* in these Chapter 11 Cases as of August 13, 2022 [Docket Nos. 1455; 1954; 2557; 3120]. For the avoidance of doubt any such law firms are not "current attorneys" of the Debtors and are not Released Parties under the Plan. |
| 138. | Any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party, *provided* that all individuals who are employed by the Debtors on the date the Disclosure Statement Order is entered and that are not specifically identified as an Excluded Party on this Schedule of Excluded Parties |

| | **SCHEDULE OF EXCLUDED PARTIES** |
|---|---|
| | (as such schedule may be amended prior to the date the Confirmation Order is entered) shall be Released and Exculpated except to the extent such employee is later arrested, indicted, or found liable by a court of competent jurisdiction of bad acts and omissions in connection with his or her role with the Debtors, in which case any release provided in the Plan shall be null and void and all statutes of limitation shall be tolled during such time; *provided*, *further* that any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party who subsequently enters into an agreement that includes a provision that they shall be identified as a Released Party shall be a Released Party. |
| 139. | Any Released Party that is later arrested, indicted, or found liable by a court of competent jurisdiction for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time. |
| 140. | Account Holder Avoidance Actions against Released Parties shall not be released unless released pursuant to the Account Holder Avoidance Action Settlement. |
| 141. | All Avoidance Actions against Entities that are not Account Holders. |
| 142. | All Affiliates and Related Parties of Excluded Parties |

## **Exhibit F**

**Board Observer Agreement**

## Board Observer Agreement

This agreement (the "**Agreement**") is made effective as of [●], by [NewCo, Inc.], a Delaware corporation (the "**Company**"), and [●] (the "**Observer**").

WHEREAS, as an inducement and incentive for the Observer's ongoing support and advice throughout the financial restructuring process of Celsius Network LLC, to which the Company is intends to receive certain assets through the confirmation and consummation of the *Joint Chapter 11 Plan of Reorganization for Celsius Network, LLC and its Affiliated Debtors* (as may be amended from time to time, the "**Plan**"), the Company desires to provide the Observer with certain observation rights regarding the Company's board of directors (the "**Board**"), as further described, and subject to the terms and conditions set forth, herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Observer Rights</u>.

1.1    The Company grants to the Observer the option and right to attend all meetings other than meetings held in executive session (including meetings held by telephone or electronic communication) of the Board in a non-voting, observer capacity. The Observer may participate fully in discussions of all matters brought to the Board for consideration, but in no event shall the Observer (i) be deemed to be a member of the Board or any committee of the Board (a "**Committee**") or be entitled to attend any meeting of any Committee; (ii) except for (and without limitation of) the obligations expressly set forth in this Agreement, have or be deemed to have, or otherwise be subject to, any duties (fiduciary or otherwise) to the Company or its stockholders; or (iii) have the right to propose or offer any motions or resolutions to the Board or Committees. Upon request, the Company shall allow the Observer to attend Board meetings by telephone or electronic communication. The presence of the Observer shall not be taken into account or required for purposes of establishing a quorum.

1.2    The Company shall provide to the Observer copies of all notices, minutes, consents and formal presentations, and all exhibits and annexes to any such materials, that it provides to Board members in their final and approved forms (collectively, "**Board Materials**").

1.3    Notwithstanding anything herein to the contrary, the Company may exclude the Observer from access to any Board Materials, meeting, or portion thereof if a majority of the Board concludes, acting in good faith, that (i) such exclusion is necessary to the Board voting process; (ii) such exclusion is reasonably necessary to preserve the attorney-client or work product privilege between the Company or its affiliates and its counsel; (iii) such Board Materials or discussion relates to the Company's or its affiliates' relationship, contractual or otherwise, with the Observer or his affiliated entities or any actual or potential transactions between or involving the Company or its affiliates and the Observer or his affiliated entities; (iv) such exclusion is necessary to avoid a conflict of interest or disclosure that is restricted by any agreement to which the Company or any of its affiliates is a party or otherwise bound; or (v) such exclusion is in the best interests of the Company or its stockholders (as determined by the Board in its sole discretion in connection with the exercise of its fiduciary duty).

1.4    The Observer acknowledges and agrees that the Company is not making any representation or warranty with respect to any information or materials provided or that may be provided in the future to Observer, hereunder or otherwise, and Observer has not relied, is not relying, and will not rely on any statement, materials, or other information of any type or format by, from, or on behalf of the Company in making any decision or determination with respect to any arrangement, investment, transaction, or otherwise, in each case, except as may be set forth in any definitive agreement between the Company and Observer after the date hereof and without limiting the express terms and conditions of this Agreement itself.

2.    <u>Confidential Information</u>.

2.1    To the extent that any information obtained by the Observer from the Company (or any director, officer, employee, or agent thereof) is Confidential Information (as defined below), the Observer shall treat such Confidential Information as confidential in accordance with the terms and conditions set out in this Section 2 during the term of the Observer and for two (2) years after Termination (as defined in Section 11).

2.2    As used in this Agreement, "**Confidential Information**" means any and all information or data concerning the Company or its affiliates, whether in verbal, visual, written, electronic, or other form, which is disclosed to the Observer in such capacity by the Company or any director, officer, employee, or agent of the Company (including all Board Material that is non-public information), together with all information discerned from, based on, or relating to any of the foregoing which may be prepared or created by the Observer or any of his affiliated entities, or any of their respective directors, managers, officers, employees, agents, or advisors (each, a "**Representative**"); *provided*, *however*, that "Confidential Information" shall not include information that:

(a)    is or becomes generally available to the public other than as a result of disclosure of such information by the Observer, any of his affiliated entities, or any of their Representatives;

(b)    is independently developed by the Observer, any of his affiliated entities, or any of their Representatives, or the Observer without violation of this Agreement or the use of, reliance on, or reference to any Confidential Information;

(c)    becomes available to the recipient of such information at any time on a non-confidential basis from a third party that is not, to the recipient's knowledge, prohibited from disclosing such information to the Observer, any of his affiliated entities, or any of their Representatives by any contractual, legal, or fiduciary obligation to the Company; or

(d)    was known by the Observer or any of his affiliated entities prior to receipt from the Company.

2.3    The Observer shall (a) retain all Confidential Information in strict confidence; (b) not release or disclose Confidential Information in any manner to any other person (other than disclosures to any of his affiliated entities, or any of his or their Representatives who (i) have a need to know such information; and (ii) are informed of its confidential nature); and

2

(c) use the Confidential Information solely in connection with the Observer's rights hereunder and not for any other purpose, which other purposes include, without limitation, (x) evaluating investments by the Observer or any of his affiliated entities or any of his or their Representatives, (y) providing investment advice to third parties or (z) soliciting stockholders of or investors in the Company or in any other person or entity; *provided, however*, that the foregoing shall not apply to the extent the Observer, any of his affiliated entities, or any of his Representatives is compelled to disclose Confidential Information by judicial or administrative process, pursuant to the written advice of outside counsel, or by requirements of law; *provided, further, however*, that, such disclosure does not arise as a result of a voluntary act or omission on the part of the Observer, any of his affiliated entities or any of his or their Representatives, and if legally permissible, prior written notice of such disclosure shall be given to the Company/the disclosing party shall use its best efforts to notify the Company so that the Company may take action, at its expense, to prevent such disclosure and any such disclosure is limited only to that portion of the Confidential Information which such person is compelled to disclose.

2.4    The Observer acknowledges that the Confidential Information is proprietary to the Company and may include material non-public information, trade secrets, or other business information the disclosure of which could harm the Company. None of the Observer, any of his affiliated entities, or any of his or their Representatives shall, by virtue of the Company's disclosure of, or such person's use of any Confidential Information, acquire any rights with respect thereto, all of which rights (including intellectual property rights) shall remain exclusively with the Company. The Observer shall be responsible for any breach of this Section 2 by the Observer, any of its affiliates, or any of its or their Representatives.

2.5    The Observer agrees that, upon the request of the Company, it will (and will cause the Observer, its affiliates, and its and their Representatives to) promptly (a) return or destroy, at the Company's option, all physical materials referencing, containing, or consisting of Confidential Information and all hard copies thereof in their possession or control; and (b) destroy all electronically stored Confidential Information in their possession or control; *provided, however*, that each of the Observer, any of his affiliated entities, or any of his or their Representatives may retain any electronic or written copies of Confidential Information as may be (i) stored on its electronic records or storage system resulting from automated back-up systems and only accessible to personnel whose functions are primarily information technology in nature for the sole purposes of performing their information technology duties; (ii) required by law, other regulatory requirements, or established bona fide internal document retention policies and, with respect to Representatives, solely in accordance with the professional standards of such Representatives that are outside legal counsel or external auditors, or bona fide internal policy or procedure established for the purpose of legal compliance; or (iii) contained in board presentations or minutes of board meetings of any entities affiliated with the Observer; *provided, further, however*, that any such retained Confidential Information shall remain subject to this Section 2.

2.6    Without limiting any other remedies of the Company hereunder, the unauthorized disclosure of Confidential Information by the Observer shall result in the immediate and automatic termination of this Agreement and the Observer's status as an Observer.

3.  Expenses. The Company agrees to reimburse the Observer for reasonable out-of-pocket expenses incurred in connection with the Observer's attendance at Board meetings; *provided* that (i) all reimbursements payable by the Company pursuant to this Section 3 shall be payable in accordance with and subject to the Company's policies and practices with respect to director expense reimbursement then in effect; and (ii) the Company's expense reimbursement obligations pursuant to this Section 3 shall not exceed an amount equal to $[●] in any 12-month period.

4.  Limitation of Liability. The Company does not make, and expressly disclaims, any representation or warranty as to the accuracy or completeness of the Confidential Information.  In no event shall the Company, its affiliates or its or their Representatives be liable to the Observer, his affiliates, or his or their Representatives for any liabilities, losses, lost profits or damages, including without limitation consequential, indirect, incidental, special, exemplary, punitive or enhanced damages, arising out of, relating to, or in connection with the accuracy or completeness of any Confidential Information or any use or reliance on any Confidential Information by the Observer, his affiliates, or his or their Representatives.

5.  Public Company Matters.

5.1  The Observer acknowledges that the Confidential Information may include material non-public information, that the United States federal securities laws prohibit persons with material non-public information about a company obtained directly or indirectly from such company from purchasing or selling securities of such company on the basis of such information or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such other person is likely to purchase or sell such securities on the basis of such information and that trading in the Company's securities is subject to such United States securities laws, including those prohibiting trading on the basis of material nonpublic information and market manipulation. The Observer shall at all times comply with the Company's insider trading policy and any related policies that are applicable to members of the Board. The Observer hereby acknowledges and consents to the use of his name and other information that may be required under applicable law in any disclosure document required to be publicly filed by the Company with the United States Securities and Exchange Commission.

5.2  To the extent any entity related to the Observer possesses or holds shares in the Company owned by third-party individuals or entities the voting rights of such shares must be owned and exercised by such individuals or entities.

5.3  The Observer must disclose to the Board all actual and potential conflicts of interest as defined in the Company's conflicts policy from time to time and regularly update such disclosure not less than monthly or immediately upon a material change.

6.  Non-Solicitation.  Except with the express permission of the Company, the Observer agrees that for a period commencing on the date of this Agreement and ending on the second anniversary of the date of the termination of this Agreement, neither the Observer nor his affiliates or Representatives will directly or indirectly solicit or hire any officer, director, or employee of the Company, or any of its direct or indirect subsidiaries, except pursuant to a general solicitation that is not directed specifically to any such officer, director or employee.

7.    <u>Indemnification; Advancement of Expenses</u>. Solely in and to the extent related to the Observer's status as a board observer under this Agreement, the Observer shall be entitled to indemnification (and advancement of expenses up to $50,000) from the Company for expenses (such expenses covered hereunder solely to the extent that the Company does not tender a defense as provided in this paragraph), losses or judgments ("**Losses**") from third party claims asserted against the Observer  to the same extent provided by the Company to its directors under the Certificate of Incorporation and Bylaws of the Company as in effect on the date hereof, provided that in order to obtain indemnification hereunder, Observer must provide written notice of any such claim by the earlier of (i) within 30 days of Observer becoming aware thereof or (ii) 60 days of the filing of such claim.  If Observer notifies the Company of any claim for which Observer might be indemnified hereunder, the Company shall have the right to assume the defense of such claim with counsel of Company's choosing, such counsel to be paid by the Company, and at the Company's expense.   The Observer, in order to be entitled to such costs of defense must (i) cooperate with such defense by the Company, and (ii) agree that the Company may use a single counsel to represent one or more Observers or Directors with respect to the underlying claims, except to the extent there are conflicts between the Observer on the one hand and one or more other Observers or Directors with respect to such claim.   The Company acknowledges and agrees that the foregoing rights to indemnification and advancement of expenses constitute third-party rights extended to the Observer by the Company and do not constitute rights to indemnification or advancement as a result of the Observer serving as a director, officer, employee, or agent of the Company.

8.    <u>Notices</u>. Notices are to be delivered in writing, in the case of the Company, to [ADDRESS], Attention: [NAME OR TITLE OF RECIPIENT], [EMAIL] and in the case of the Observer, to [ADDRESS], [EMAIL], or to such other address as may be given by each party from time to time under this Section. Notices shall be deemed properly given upon personal delivery or, in the case of email notice, upon delivery during the recipient's business hours with receipt acknowledged.

9.    <u>Miscellaneous Provisions</u>. This Agreement constitutes the entire agreement and understanding of the parties, and supersedes any and all previous agreements and understandings, whether oral or written, between the parties regarding the matters set out in this Agreement. No provision of this Agreement may be amended, modified, or waived, except in a writing signed by the parties hereto. This Agreement may not be assigned by the Observer. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision, and if any restriction in this Agreement is found by a court to be unreasonable or unenforceable, then such court may amend or modify the restriction so it can be enforced to the fullest extent permitted by law. The section headings in this Agreement have been inserted as a matter of convenience of reference and are not a part of this Agreement. This Agreement may be executed by electronic signature in any number of counterparts, each of which together shall constitute one and the same instrument. Any waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist on strict adherence to any term of this Agreement on one or more occasions shall not be construed as a waiver or deprive such party of the right to thereafter insist on strict adherence to that term or any other term of this Agreement.

10.    <u>Remedies</u>. The Company, on the one hand, and the Observer, on the other hand, each acknowledge and agree that monetary damages would not be a sufficient remedy for any breach (or threatened breach) of this Agreement by it and that, in the event of any breach or threatened breach hereof, (a) the non-breaching party shall have the right to immediate injunctive and other equitable relief, without proof of actual damages; (b) the breaching party will not plead in defense thereto that there would be an adequate remedy at law; and (c) the breaching party agrees to waive any applicable right or requirement that a bond be posted by the non-breaching party. Such remedies will not be the exclusive remedies for a breach of this Agreement, but will be in addition to all other remedies that may be available to the non-breaching party at law or in equity.

11.    <u>Applicable Law; Venue</u>. This Agreement, and any and all claims, controversies, and causes of action arising out of or relating to this Agreement, whether sounding in contract, tort, or statute, shall be governed by the laws of Delaware, including its statutes of limitations, without giving effect to any conflict-of-laws rule that would result in the application of the laws of a different jurisdiction. Each party (a) irrevocably and unconditionally consents to the personal jurisdiction and venue of the courts located in [New York City, New York]; (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court; (c) agrees that it shall not bring any action relating to this Agreement or otherwise in any court other than the courts located in [New York City, New York] or in the United States District Court for the [Southern District of New York]; and (d) irrevocably waives the right to trial by jury.

12.    <u>Termination</u>. This Agreement shall terminate and be of no further force and effect (a "**Termination**") upon the earliest of: (a) the date that is one (1) year from the Effective Date of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates*, which term may be subject to  one-year extension(s) if approved by the Board in its sole discretion, (b) removal of the Observer by the Board (i) with cause and (ii) by the affirmative vote of a majority of the members of the Board, (c) the Observer's resignation as an Observer, and (d) the date upon which the Observer and the Observer's affiliates cease to own at least [●] shares of Company common stock (as adjusted for any stock splits); *provided*, that Sections 2, 5,7, 9, 10, and 11 shall survive any such Termination.  For purposes of this <u>Section 12</u>, "cause" shall exist if Observer: (i) materially breaches any provision of this Agreement, or materially contravenes or fails to follow any policy, direction  or resolution of the Board, (ii) engages in fraud, illegal conduct, or gross misconduct; (iii) commits an act involving crime of moral turpitude, fraud, embezzlement, financial dishonesty or theft; (iv) is convicted of, or pleads guilty or nolo contendere to a crime of moral turpitude, fraud, embezzlement, financial dishonesty or theft or (v) is subject (or any entity under control of or affiliated with Observer is subject) to any regulatory or enforcement action by any governmental authority; *provided, however*, that if the Observer (or any applicable entity under control of or affiliated with Observer is subject) is challenging such enforcement action in good faith, "cause" shall not exist.

[SIGNATURE PAGE FOLLOWS]

6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

[NEWCO, INC.]                              OBSERVER


By:_____          _____
Name:                                      Name: [●]
Title:

**Exhibit G**

**Identities of the Board Observers**



## BRETT PERRY

With a wealth of entrepreneurial experience spanning over three decades, Brett Perry has an impressive track record of identifying and transforming innovative concepts into thriving business ventures.

Armed with a degree in earth science/geology, Brett embarked on his entrepreneurial journey by establishing an environmental consulting and engineering company specializing in investigating and remediating environmentally contaminated sites. Notably, Exxon Corporation exclusively relied on his company's expertise for the removal of leaking underground storage tanks and the subsequent cleanup, leading to regulatory closure of their retail gas stations in the southwestern United States.

Recognizing early in his career the demand for specialized title industry services specifically tailored to environmental due diligence, Brett has forged over time a broad network of abstractors capable of delivering customized title searches nationwide. His firm also boasts extensive knowledge of renewable energy locations, conducting environmental encumbrance searches for numerous solar and wind farms throughout the United States, including at sites associated with Celsius' mining operations. Brett's company has earned a well-deserved reputation as a leader in providing real estate records and environmental data, including housing the largest archive of orthoimagery in the United States. Brett's company recently expanded its horizons into film studio productions and integration of AI for valuable data extraction. Brett's career reflects his status as a visionary, forward-thinker with a remarkable ability to discern and exploit untapped business opportunities.

Brett was one of the Top 50 Creditors in the Celsius bankruptcy cases. He helped found the Ad Hoc Earn Group and played a pivotal role as a member of its Steering Committee. His interest in blockchain technology and investment in cryptocurrencies date back to 2015.



## JOE LEHRFELD

Joe Lehrfeld is the Founder of JSL Ventures Inc. With over 25 years of experience as an executive, entrepreneur, and investor, Joe is known for his strategic insight and commitment to driving consistent growth. His expertise spans across diverse sectors including technology, real estate, and healthcare.

With a Bachelors in Psychology (graduating Summa Cum Laude), completion of all coursework for NYS Nursing Home Administration Certification, and a Masters in Social Work with a concentration in Business/Organizational development, Joe brings a unique blend of empathy, analytical skills and business acumen to his ventures. His wealth of experience, strategic mindset, data-driven

and elegant operational systems approach have set the standard for excellence in his endeavors.

Joe's career is characterized by a remarkable track record of success. As the President and majority shareholder of a New York-based medical transportation company, Joe increased annual sales and elevated profit margins consistently over an 18-year period. During that time, he sponsored and structured seven additional healthcare-related acquisitions, startups, and mergers. He also sat on the New York State Regional Emergency Medical Services Council and several industry associations.

Throughout his entrepreneurial journey, Joe has continuously studied emerging technologies, and founded and invested in dozens of startups as well as Bitcoin (2015) and Ethereum (2016), showcasing a deep curiosity and understanding of transformative trends. Joe was a significant Celsius creditor and served as a member of the Steering Committee of the Ad Hoc Earn Group in the Celsius bankruptcy cases.



**SIMON DIXON**

Simon Dixon mastered in Economics, is an ex-investment banker, stockbroker and trader, who left the corporate world in 2006 to go on to become a public speaker on banking and monetary reform.

In 2011, Simon published his second book: 'Bank To The Future - Protect Your Future Before Governments Go Bust'. It was the first published book in the world to include Bitcoin written shortly after Bitcoin launched. Simon presented the company he co-founded and is the CEO of Bnk To The Future at the first Bitcoin conference in Europe in 2011 when Bitcoin was $3. Bnk To The Future is one of the longest standing companies in Bitcoin and one of the world's first regulated crypto securities business. Bnk To The Future pooled together investors that later invested in the shares of Bitcoin companies like Kraken, Coinbase, Blockchain.com, Bitstamp, Circle, Robinhood and over 100 others.

Simon is the Inventor of the first bitcoin bond which launched in 2014 in Iceland. The former UK Prime Minister, Boris Johnson, sought advice from Simon on the country's bitcoin strategy. Isle of Man, the first country in the world to support Bitcoin, also sought advice from Simon on building 'crypto valley'. In 2022, Simon was invited to El Salvador to meet with President Bukele and government officials to discuss the country's Bitcoin sovereign debt strategy. El Salvador is the first country in history to make Bitcoin legal tender.

Simon is regularly quoted & appearing in much of the major press & media including BBC, FT, CNBC, Reuters, Bloomberg, Wall Street Journal to mention a few.

**<u>Exhibit F</u>**

**NewCo Board Terms**

**NewCo Board Terms**

Pursuant to Art. IV.D.7 of the Plan, the terms of the New Board Members selected by the Committee shall be as follows:

Class I (Subject to Re-Election after Year 1) – Fred Arnold and Liz LaPuma
Class II (Subject to Re-Election after Year 2) – Max Holmes and Emmanuel Aidoo
Class III (Subject to Re-Election after Year 3) – Thomas DiFiore and Scott Duffy