**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
         sam.hershey@whitecase.com
         jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
Email:  kwofford@whitecase.com

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
         gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:  (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
### (I) JOINDER TO THE DEBTORS' CONFIRMATION BRIEF
### AND (II) STATEMENT IN SUPPORT OF CONFIRMATION OF
### THE DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ...........................................................................................................................6

    I.     The CEL Token Objections Should Be Overruled and the Proposed
          Settlement Should Be Approved .........................................................................6

         A.     Account Holders Accepted the CEL Token Settlement by an
               Overwhelming Amount ...........................................................................7

         B.     The CEL Token Objections Offer No Basis to Value CEL Token
               at the Petition Date Market Price ...........................................................11

    II.    The Phillips Objection Should Be Overruled .......................................................13

         A.     Mr. Phillips' Attempts to Smear Mr. Aidoo Are Without Merit ...............14

         B.     There Is No Basis to Exclude W&C and PWP From the Plan's
               Exculpation Provision .............................................................................19

    III.   The Schoenau Objection Should Be Overruled .....................................................22

CONCLUSION .........................................................................................................................26

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Aegean Marine Petroleum Network, Inc.*,
  599 B.R. 717 (Bankr. S.D.N.Y. 2019) ...................................................................................20

*In re Apex Oil Co.*,
  118 B.R. 683 (E.D. Mo. 1990) ...............................................................................................14

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) .....................................................................................8

*In re Dana Corp.*,
  2007 Bankr. LEXIS 4404 (Bankr. S.D.N.Y. Dec. 26, 2007) .................................................22

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009) ...................................................................................14

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012) ....................................................................................10

*In re LATAM Airlines Group S.A.*,
  2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) .............................................................21

*Mathias v. Jacobs*,
  238 F. Supp. 2d 556 (S.D.N.Y. 2002) ....................................................................................12

*In re MF Global Inc.*,
  2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ..............................................................8

*Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) .....................................................................................................8

*Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) ..............................................................................................................7, 8

*Stadtmauer v. Nordlicht (In re Nordlicht)*,
  2022 U.S. Dist. LEXIS 90678 (S.D.N.Y. May 19, 2022) ........................................................8

*TD Capital Grp. LLC v. First Union Baptist Church of the Bronx*
  *(In re First Union Baptist Church of the Bronx)*,
  2018 U.S. Dist. LEXIS 20669 (S.D.N.Y. Feb. 7, 2018) ..........................................................8

*In re Voyager Digital Holdings, Inc.*,
  649 B.R. 111 (Bankr. S.D.N.Y. 2023) ...................................................................................20

## STATUTES AND RULES

11 U.S.C. § 510(b) ........................................................................................................9

11 U.S.C. § 1129(a)(5)................................................................................................14

Fed. R. Bankr. P. 9019...........................................................................................7, 8

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Chapter 11 Cases of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") files this (i) joinder to the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates and Omnibus Reply to Objections Thereto* (the "**Debtors' Confirmation Brief**") and (ii) statement in support of confirmation of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] (as it may be amended, modified, or supplemented, the "**Plan**").[1]  The Committee respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.        At the outset of these Chapter 11 Cases, the Committee acknowledged the critical role entrusted to it.[2]  The Committee committed "to put the interests of the Debtors' account holders and unsecured creditors first," and to "vigorous[ly]" work to maximize their recoveries.[3] It also committed to investigate claims against the Debtors' prepetition management and other third-parties whose fraudulent acts and omissions, and other misdeeds, precipitated these Chapter 11 Cases and left hundreds of thousands of Account Holders devastated.[4]

2.        That task has proven to be extraordinarily complex.  Among other things, the cryptocurrency sector is a novel industry in which laws and regulations are constantly being written.  The Debtors hold digital assets subject to competing, and previously untested, claims by the Debtors' Account Holders, unsecured creditors, and preferred equity holders.  The contracts governing creditors' claims to those assets are less than clear.  The Debtors have been the subject of no fewer than six concurrent investigations of their prepetition conduct during these cases,

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2]    *See generally The Official Committee of Unsecured Creditors' Statement Regarding These Chapter 11 Cases* [Docket No. 390].

[3]    *Id.* at 5.

[4]    *Id.* at 7.

including investigations by the U.S. Attorney's Office for the Southern District of New York, the

Securities and Exchange Commission, the Commodity Futures Trading Commission, the Federal

Trade Commission, the New York State Attorney General, the Committee, and the Examiner.

And the market turmoil in the cryptocurrency sector and quality of the counterparties chosen by

the Debtors' prepetition management has caused many of their investments to default and be

subject to, and held hostage by, litigation.

3.      In this context, the Committee initially focused on ensuring the Debtors' assets

were protected, investigating the prepetition conduct of the Debtors, and stabilizing the Debtors'

operating business.    The Committee also prioritized finding a sponsor for a plan of

reorganization that unlocked as much value from the Debtors' illiquid assets as possible for

creditors by reorganizing the Debtors' large, but undeveloped, Bitcoin mining business and using

the fresh start and public listing exemptions provided under the Bankruptcy Code to provide

creditors with access to the value of the Debtors' illiquid assets.

4.      By resolving gating legal issues, running a hotly contested auction process,

communicating and cooperating with regulators and law enforcement, and building consensus

among their stakeholders, the Debtors and the Committee stand on the cusp of confirming the

first plan of reorganization for a major cryptocurrency company.

5.      In a case that began with an immense amount of distrust, the voting results speak

for themselves. ***Account Holders holding over $2.85 billion of claims voted to accept the Plan

with a 96% acceptance rate***.[5] That amount of participation and acceptance is staggering.  Those

overwhelming results are a product of the deliberate and cooperative approach the Committee

has taken in these Chapter 11 Cases.  Through a competitive and collaborative process, the

---

[5]    *Amended Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3574] (the "**Voting Report**").

Debtors and the Committee have developed a Plan that distributes over $2 billion in liquid cryptocurrency to creditors and creates a new company that will operate compliant Bitcoin mining and Ethereum self-staking operations after the Plan's Effective Date. Though it is not what the Debtors' creditors signed up for when they transferred their coins to Celsius, those two business lines present an opportunity for a new company to emerge from these cases that will provide creditors with the option to sell their equity in a liquid market or hold the stock and realize the potential upside under new management.[6]

6.     That new company ("**NewCo**") will be managed by a consortium of crypto-native operators consisting of US Bitcoin Corporation, Arrington Capital, Proof Group Capital Management, Ravi Kaza, and Steven Kokinos (who will act as NewCo's CEO) (collectively, the "**Fahrenheit Group**"), each of whom has demonstrated the ability to responsibly maximize shareholder value while employing appropriate financial and risk controls. Each member of the Fahrenheit Group will invest a significant amount of their own money in NewCo alongside the Debtors' creditors. The Fahrenheit Group and management of NewCo will be overseen by a qualified board of directors, a majority of whom were selected by the Committee, and three board observers, who were selected by the Earn Ad Hoc Group. The board members and observers include five significant prepetition creditors of the Debtors.

7.     Finally, the Plan provides for the preservation of valuable claims and causes of

---

[6]     The Debtors submitted a letter to the staff (the "**Staff**") of the U.S. Securities and Exchange Commission (the "**SEC**") promptly after the conclusion of the auction in July 2023 requesting preclearance with respect to the proposed presentation in the Registration Statement of audited historical financial statements and unaudited historical financial statements for only the mining company. Due to the state of their prepetition records, the Debtors are unable to prepare or audit historical financial statements for their historical retail and investing businesses. Those businesses will not be continued by NewCo. Accordingly, the Debtors believe that audited financial statements relating to those businesses are not relevant or meaningful for investors' understanding of NewCo's business. Discussions with the Staff are ongoing. Obtaining preclearance is a gating item to the effectiveness of the Registration Statement, which is necessary for creditors to sell the NewCo equity they receive, which will be issued under the section 1145 exemption, and for the NewCo equity to be listed on NASDAQ. Assuming Staff approval is received, the Debtors expect to file the Registration Statement promptly, and the SEC review period will begin. The review period is currently expected to last 60 days.

action to be pursued by a Litigation Administrator, with the proceeds of any litigation to be promptly distributed to creditors.

8.      Standing against more than ***$2.85 billion in accepting claims, voted by more than 87,000 accepting creditors*** are twenty parties that filed objections and reservations of rights, most of which take issue with specific provisions of the Plan (collectively, the "**Objections**"). The Objections lack merit, and the Court should not permit the minority of loud voices to stand in the way of confirming a Plan that the Debtors' creditors almost unanimously support and would provide all creditors with recoveries far in excess of what could be achieved by a chapter 7 trustee in a liquidation.  The Committee joins in the Debtors' Confirmation Brief and requests that the Court overrule the Objections.

9.      In addition, the Committee writes separately to address certain arguments made in three sets of Objections.  ***First***, Otis Davis and Michael Gonzalez object to the Plan's proposed settlement that values CEL Token Deposit Claims at $0.25 per CEL Token.[7]  Other holders of CEL Token Deposit Claims voted overwhelmingly (98% in number and 96% in amount of creditors voting) to accept the Plan and the proposed CEL Token Settlement.[8]  The CEL Token Settlement is reasonable and supported by nearly all affected creditors.  Two dissatisfied creditors (one of whom has admitted his coordinated efforts led to the increase in the price of CEL Token between the Pause and the Petition Date) should not be permitted to put the recovery of all other creditors at risk.

10.      ***Second***, Richard Phillips objects to the Committee's selection of Mr. Emmanuel Aidoo to serve on the New Board and accuses the Committee's legal counsel and investment

---

[7]      *Otis Davis' Limited Objection to the Debtors' Entry for an Order (I) Approving the Settlement of CEL Token at $0.25 for the Purpose of Confirming the Debtors' Plan of Reorganization (II) Granting Related Relief* [Docket No. 3532] (the "**Davis Objection**") and *Michael Gonzalez's Letter Regarding CEL Token Issues* [Docket No. 3476] (the "**Gonzalez Objection**" and, together with the Davis Objection, the "**CEL Token Objections**").

[8]      Voting Report at 12; *see also* Plan Art. IV.B.2 (describing the terms of the CEL Token Settlement).

banker of "committing provable malpractice" that led the Committee to choose the New Board over "objectively more qualified individuals"—in Mr. Phillips's opinion, himself.[9]  Mr. Phillips applied to, but was not chosen to be on, the New Board.  After running a months-long, thorough process, the Committee members selected six qualified candidates to serve as directors for NewCo.  Those candidates include the two co-chairs of the Committee, who recused themselves from their own selection and have spent the last 14 months advocating for unsecured creditors on a full-time, volunteer basis.  The Committee also selected four qualified individuals with significant experience stewarding public companies, sitting on audit committees, and overseeing entities emerging from distressed situations.  Mr. Phillips identifies no basis to conclude that the Committee did not properly exercise its business judgment when selecting those qualified individuals.

11.    In the letter to the United States Trustee that is attached to Mr. Phillips' objection and other communications directed to Committee counsel, Mr. Phillips insinuates that Mr. Aidoo, who is of African descent, was only selected to satisfy NASDAQ's diversity requirements and demeans the Committee as a group of "unsophisticated" investors doing their professional advisors' bidding.  Those untoward comments speak for themselves and vindicate the Committee's decision not to select Mr. Phillips.

12.    Mr. Phillips aregues that White & Case LLP ("**W&C**") and Perella Weinberg LLP ("**PWP**") should be excluded from the Plan's exculpation provision.  The Plan's exculpation provision is a market-standard term in this Circuit that protects estate fiduciaries from litigation brought by parties that seeks to second guess decisions made in the chapter 11 process.  Exculpation is designed to encourage participation in contentious and litigious chapter

---

[9]    *Limited Objection and Reservation of Rights of Rick Phillips to Debtors' Chapter 11 Plan* [Docket No. 3548] (the "**Phillips Objection**").

11 processes, like these, and thwart the type of litigation Mr. Phillips seems eager to bring here.

13.    ***Finally***, Mr. Schoenau argues that the ADR Procedures should not be approved.[10]
Prior to the Plan Objection Deadline, Committee counsel worked in good faith with Mr.
Schoenau's counsel to revise the ADR Procedures in an attempt to resolve Mr. Schoenau's
concerns.  Those changes include allowing any party to opt out of the ADR Procedures simply
by sending an email to the Litigation Administrator.  Mr. Schoenau would also like the Litigation
Administrator to pay the entire cost of any potential mediation.  The ADR Procedures provide a
means to efficiently work through complicated claims.  Mr. Schoenau seems to support that
approach, but only if someone else pays.  He, like all other creditors, is free to opt out of the
procedures and pursue traditional litigation before this Court if he so chooses.  As the Court has
previously recognized, the use of ADR Procedures is appropriate in these cases.  The revised
terms are fair and reasonable and should be approved.

## ARGUMENT

I.    **The CEL Token Objections Should Be Overruled and the Proposed Settlement
Should Be Approved**

14.    Mr. Davis and Mr. Gonzalez reject the proposed CEL Token Settlement and argue
that CEL Token should be valued either at its $0.81 market price on the Petition Date or an
unspecified higher amount.[11]  Mr. Davis also admits, however, that the upward price movement
from the Pause to the Petition Date was the result of manipulation.[12]  The Court does not need to
reach the complicated issues underlying the relative legal priority of claims arising from CEL
Token or the value of the token, as the proposed $0.25 settlement in the Plan: (i) was

---

[10]    *Objection of Harrison Schoenau to Confirmation Insofar as It Pertains to Debtors' Request for Approval of
Alternative Dispute Resolution Procedures* [Docket No. 3529] (the "**Schoenau Objection**").

[11]    Davis Obj. at 8; Gonzalez Obj. ¶ 1.

[12]    Davis Obj. at 11.

overwhelmingly accepted by CEL Token holders and (ii) falls well above the lowest point in the range of reasonableness. The CEL Token Settlement should therefore be approved by the Court under Bankruptcy Rule 9019. Even if the Court were to reach the merits, the CEL Token Objections offer no basis to conclude that their proposed higher valuations of CEL Token are appropriate.

### A. Account Holders Accepted the CEL Token Settlement by an Overwhelming Amount

15. The Plan proposes to settle the contested issue of the relative rank and value of claims relating to the CEL Token. Under that settlement, each Holder of CEL Token Deposit Claims, other than the proposed Equitably Subordinated Parties, will receive a Claim equal to $0.25 per CEL Token.[13] Those CEL Token Deposit Claims will then receive the treatment associated with the program in which the applicable CEL Tokens were deployed.[14] All Other CEL Token Claims will be subordinated and receive no recovery.[15]

16. The CEL Token Settlement was a proposal made to holders of CEL Token Deposit Claims that such holders could accept or reject through their Plan vote.[16] The Plan is clear that if "the majority of eligible holders of CEL Token Deposit Claims vote to accept the Plan," the Debtors and the Committee will present the settlement for approval under Bankruptcy Rule 9019 as part of Plan confirmation.[17]

17. To be approved under Bankruptcy Rule 9019, the proponent of a settlement must demonstrate that the settlement is above the lowest point in the range of reasonable outcomes,

---

[13]  Plan Art. IV.B.2.

[14]  *Id*. The only exception is for CEL Tokens deployed in the Custody Program, which will be treated as Custody Claims.

[15]  *Id*.

[16]  *Id.*

[17]  *Id.*

fair and equitable, and in the best interest of the estate. *See Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In determining the range of reasonableness, the Court does not need to decide issues of law and fact raised by the settlement. *TD Capital Grp. LLC v. First Union Baptist Church of the Bronx (In re First Union Baptist Church of the Bronx)*, No. 17-cv-7184, 2018 U.S. Dist. LEXIS 20669, at *14-15 (S.D.N.Y. Feb. 7, 2018); *Stadtmauer v. Nordlicht* (*In re Nordlicht*), No. 21-CV-5990 (KMK), 2022 U.S. Dist. LEXIS 90678, at *28 (S.D.N.Y. May 19, 2022). Nor is the court required to conduct a "mini-trial" of the underlying facts and merits. Rather, it must evaluate the facts that are necessary to allow it to assess the range of reasonable outcomes and make an independent judgment about the settlement. *In re Charter Commc'ns*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009). "Settlements and compromises are favored in bankruptcy," especially when they are supported by estate fiduciaries and affected creditors, "as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re MF Global Inc.*, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (Glenn, J.).

18.     Courts consider the following "*Iridium* factors" in determining whether a settlement meets the requirements of Rule 9019: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay"; (3) "the paramount interests of the creditors," including the relative benefits to each affected class "and the degree to which creditors affirmatively support or do not object to the proposed settlement;" (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and

8

(7) "the extent to which the settlement is the product of arm's length bargaining." *Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007).

19.     Here, the CEL Token Settlement satisfies the *Iridium* factors and should be approved.  ***First***, affected creditors affirmatively and overwhelmingly support the Plan and the CEL Token Settlement:

- Holders of CEL Token Deposit Claims treated as Convenience Claims voted to accept the CEL Token Settlement by ***98.3% in number (18,535 voting creditors) and 98.2% in amount ($1,082,535 in voting claims)***.

- Holders of CEL Token Deposit Claims treated as General Earn Claims voted to accept the CEL Token Settlement by ***99.2% in number (18,087 voting creditors) and 96.6% in amount ($29,633,869 in voting claims)***.[18]

All other creditors, who are similarly affected by the dilution of valuing CEL Token at $0.25 as opposed to $0.00, have also expressed overwhelming support for the Plan.[19]  The Court should honor the choice made—nearly unanimously—by holders of CEL Token Deposit Claims and approve the CEL Token Settlement.

20.     ***Second***, the CEL Token Settlement avoids complex and protracted litigation, with its attendant expense, inconvenience, and delay, and is in the best interests of the estates.  As set forth in the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues With Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3434] (the "**Committee's CEL Token Confirmation Brief**"), there are several complex, competing arguments with respect to how to properly value the CEL Token.  The Committee has argued that CEL Token Deposit Claims should be subordinated under section 510(b) of the

---

[18]    Voting Report, Ex. A.

[19]    *Id.*

Bankruptcy Code—and effectively valued at $0.00 per CEL Token.[20]  The Committee has also asserted that, even if CEL Token Deposit Claims are not subordinated, the market price on the Petition Date was not an accurate reflection of the value of the CEL Token because of the prepetition manipulation of the token and severe market dislocation following the Pause.  The Debtors have admitted the CEL Token was manipulated prepetition.[21]  There is also little doubt that the CEL Token market was dislocated following the Pause, as 95% of CEL Token was trapped on the Celsius platform.  If that CEL Token had been sold during that period, the CEL Token price would have plummeted, and it would have been worth nothing on the Petition Date.[22]  No party has responded to these arguments.

21.    If these issues are tried fully on the merits, they will require the presentation of substantial evidence and lengthy argument at the confirmation hearing regarding the prepetition manipulation of the market price of the CEL Token and market conditions and events between the Pause and the Petition Date.  Regardless of how the Court resolves the issue, proceeding through litigation rather than the proposed settlement will be expensive, dilute recoveries to creditors, potentially delay confirmation of the Plan, and threaten proposed recoveries on account of CEL Token Deposit Claims for the more than 96% of Account Holders who have accepted the settlement.

22.    **_Third_**, the proposed $0.25 value falls within the range of reasonableness.  The CEL Token Settlement is a reasonable middle ground between the Committee's position on the

---

[20]    Committee's CEL Token Confirmation Brief ¶¶ 49-76; *see also* 11 U.S.C. § 510(b).

[21]    *Notice of Consensual Resolutions of Government Investigations* [Docket. No. 3293] at Ex. A; http://www.justice.gov/media/1305436/dl?inline.

[22]    *See e.g., Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 651 (S.D.N.Y. 2012) (finding that plaintiff had not sufficiently alleged that an efficient market existed because plaintiff's allegations were limited to the defendant's conduct in creating the market by structuring, issuing, and selling securities based on assets that defendant knew would likely be unprofitable for its investors and positioning itself on the other side of such sales).

appropriate valuation of CEL Token ($0.00), the Petition Date market price as calculated by the

Debtors ($0.81), and the position asserted by Mr. Davis (some undetermined amount in excess of

$0.81).  The CEL Token Settlement balances the interests of all parties by locking in an agreed

valuation for CEL Token, providing holders of CEL Token Deposit Claims with a certain

recovery that would otherwise not be assured, and limiting the dilution to creditors who did not

invest in the Debtors' risky token.

>    **B.**    **The CEL Token Objections Offer No Basis to Value CEL Token at the Petition Date Market Price**

23.    Neither Mr. Davis nor Mr. Gonzalez address any of the legal arguments made by

the Committee in the Committee's CEL Token Confirmation Brief.  The Committee rests on its

papers with respect to those arguments, but emphasizes certain points below.

24.    Mr. Davis asserts that CEL Token should be valued higher than the Petition Date

price because actions by FTX Trading, Ltd. and its affiliates ("**FTX**") drove down the price of

CEL Token prior to the Pause.[23]  He argued that FTX purportedly allowed short sellers to trade

and sell CEL Tokens that did not exist.[24]  Mr. Davis alleges that the flood of (illegitimate) CEL

Token trades on FTX artificially decreased CEL Token's market price.[25]   In support of this

argument, Mr. Davis includes screenshots purporting to display historical trading data on FTX's

exchanges.[26]  Mr. Davis does not explain the origin of these screenshots or how they support his

case.

25.    Mr. Davis acknowledges however that the closing of the purported short positions

---

[23]    Davis Obj. 1-5.

[24]    *Id*. at 2.

[25]    *Id*. at 1.

[26]    *Id*. at 3.

created "upwards price movement from the pause date to the petition date."[27]  And has publicly

taken credit for the increase in price.[28]



26.    For purposes of this issue, it does not matter who caused the increase in the

market price of the CEL Token, just that its market price on the Petition Date did not reflect its

true value.  *See*, *e.g.*, *Mathias v. Jacobs*, 238 F. Supp. 2d 556, 576 (S.D.N.Y. 2002) (holding that

"[i]t is settled that when the value of securities is artificially inflated by fraud and improprieties

---

[27]    *Id.* at 11.

[28]    @Otisa502, TWITTER (Dec. 4, 2022 4:45 PM).

or other relevant facts of which the marketplace did not have reasonable knowledge, the public trading price of the shares is not the measure of fair market value. Rather, the market price must be adjusted downward to account for the effects on it demonstrably caused by the irregularities or undisclosed material facts."). Here, there is little doubt that the token had little to no value on the Petition Date.

27.    Finally, Mr. Gonzalez argues that the Committee has failed to disclose "substantiating evidence" for its position that the petition date market price of CEL Token is inaccurate, including because that price resulted from a short squeeze by certain creditors.[29] Mr. Gonzalez requests that the Committee "promptly provide . . . [c]omprehensive data and analyses that substantiate the occurrence of a short squeeze on the CEL [T]oken," among other items.[30] But the Court previously set a deadline for the service of written confirmation discovery requests, and neither Mr. Davis nor Mr. Gonzalez served any discovery by that deadline.[31] The Committee has served Mr. Davis, Mr. Gonzalez, and all objecting parties with a copy of its expert report in connection with this matter and will present evidence as to CEL Token's valuation at the Confirmation Hearing, should it be necessary. Here, because of the overwhelming support for the settlement, it is not.[32]

## II.    The Phillips Objection Should Be Overruled

28.    Mr. Phillips argues that W&C and PWP should be excluded from the Plan's exculpation provision because each "with intent, misadvised the UCC by advocating for the

---

[29]    Gonzalez Obj. ¶¶ 1-3.

[30]    *Id.* ¶ 3(a).

[31]    *Notice of Discovery Schedule for Confirmation Hearing* [Docket No. 3356] at 2.

[32]    Mr. Davis claims that counsel to the Committee attempted to "intimidate" him by informing him that he had to file documents marked as confidential under seal. Davis Obj. at 9. There was no threat or intimidation. And, upon reviewing the documents that were inadvertently produced to Mr. Davis—certain of which were disclosed in the Examiner's Report—the Debtors determined that the information did not need to be kept confidential and informed Mr. Davis that he did not need to file them under seal.

appointment of members of New Board over the appointment of objectively more qualified individuals."[33]  Mr. Phillips's sour grapes argument is baseless and a clear attempt to retaliate for the Committee's decision to not select him as a member of the New Board.  Exculpation provisions are designed to encourage participation by estate fiduciaries in contentious and litigious chapter 11 cases.[34]  The exculpation provision in the Plan provides specific carve outs for fraud, gross negligence, and willful misconduct.  Here, no such conduct occurred.  The Court should overrule the Phillips Objection.

### A. Mr. Phillips' Attempts to Smear Mr. Aidoo Are Without Merit

29.     To be confirmed, a plan must disclose the identities and affiliations of the individuals who will serve as directors or officers of the reorganized debtor or its successor, and the appointment of such individuals must be "consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. § 1129(a)(5).  Courts will not second-guess the selections made by estate fiduciaries in this context so long as their selections were made in good faith and on a reasonably informed basis.  *See*, *e.g.*, *In re Apex Oil Co.*, 118 B.R. 683, 704-05 (E.D. Mo. 1990).

30.     Here, the Committee was authorized to select a majority of the New Board.  The Committee members reasonably exercised their business judgment and on a fully informed basis when they selected the slate of NewCo director candidates, including Mr. Aidoo.

31.     The Committee commenced its selection process for the New Board after NovaWulf Digital Management was announced to be the stalking horse bidder for the Debtors'

---

[33]   Phillips Obj. at 1.

[34]   *See*, *e.g.*, *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) ("Exculpation provisions are frequently included in chapter 11 plans, because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties; or simply wish to second guess the decisionmakers in the chapter 11 case.").

proposed plan.[35]  The Committee's overall goal was to select a New Board whose members would be a significant counterweight to the outside managers of NewCo, but also have the expertise and credibility to work with those managers to build a successful business, without taking unnecessary or disproportionate risk with creditors' assets.[36]

32.    The Committee ran an open process to identify potential New Board members and received applications from many sources.[37]  Certain candidates expressed interest directly to the Committee by reaching out to its members or professionals.[38]  Other creditors and various ad hoc groups that have appeared in these Chapter 11 Cases proposed candidates for consideration. Three Committee members submitted themselves for consideration.[39]  Additionally, the Committee, in consultation with its advisors, determined that its advisors would also bring a roster of qualified candidates for the Committee's consideration.[40]  All connections of potential candidates to the Committee's advisors were disclosed to, and discussed among, the Committee members.[41]  Over a period of months, the Committee considered approximately 45 candidates for positions on the New Board.[42]

33.    The Committee met regularly (sometimes, multiple times per week) to discuss these candidates and the Committee's potential selections. [43]  These qualifications included, but were not limited to, prior experience serving on boards of public companies, audit committee

---

[35]    *Declaration of Mark Robinson in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3584] (the "**Robinson Declaration**"), ¶ 5.

[36]    *Id.* ¶ 6.

[37]    *Id.* ¶ 7

[38]    *Id.*

[39]    *Id.*

[40]    *Id.*

[41]    *Id.*

[42]    *Id.*

[43]    *Id.* ¶ 8.

experience, risk management committee related experience, cryptocurrency related experience (especially with respect to the proposed businesses of NewCo), regulatory experience, experience with the Celsius bankruptcy case, status as a prepetition creditor, and satisfaction of the NASDAQ requirements for boards of directors (including independence and diversity).[44]

34.    The Committee's evaluation of New Board candidates was thorough and comprehensive.  The Committee was provided with *curricula vitae* and additional application materials for all candidates who submitted timely applications.[45]  Based on a review of those materials, the Committee identified and interviewed candidates that it determined might possess the necessary qualifications and core competencies to serve on the New Board.[46]  Nine of the candidates interviewed in the final round were creditors of the Debtors.[47]  At the end of the process, the Committee had conducted 19 interviews over several weeks.[48]  Each of these interviews was videotaped (with the participant's consent) so that members of the Committee who could not attend live would be able to watch later.[49]  The Committee also authorized counsel to hire an independent investigator to conduct comprehensive background checks on certain candidates who were interviewed.[50]  The results of the background checks were shared with the Committee and thoroughly discussed at multiple meetings.[51]  Additionally, each candidate under consideration for interviews submitted responses to a lengthy questionnaire regarding the candidate's biographical information, independence, audit committee experience,

---

[44]    *Id.*

[45]    *Id.* ¶ 10.

[46]    *Id.*

[47]    *Id.*

[48]    *Id.*

[49]    *Id.*

[50]    *Id.*

[51]    *Id.*

and compliance with other NASDAQ requirements.[52]  Committee members had the opportunity

to ask any questions of the candidates and the Committee advisors during the process.[53]

35.    One of the candidates that the Committee interviewed and ultimately selected to

serve on the New Board is Emmanuel Aidoo.  At the time of his interview, Mr. Aidoo served as

Executive Director at PWP, investment banker to the Committee in these Chapter 11 Cases.

Prior to PWP, he worked for over 20 years at Credit Suisse, including serving as the Head of

Digital Assets Markets and the Head of Distributed Ledger and Blockchain Strategy.

Throughout his career, Mr. Aidoo has developed pioneering proof-of-concepts for digital assets,

overseen strategic investments in blockchain projects, and become a thought leader in the global

blockchain community.

36.    In addition, Mr. Aidoo has been an integral partner to the Committee and the

Debtors in these Chapter 11 Cases.  Mr. Aidoo has worked tirelessly and collaboratively with the

Committee and the Debtors to optimize the Debtors' Bitcoin mining business, increasing the

assets available to creditors during these Chapter 11 Cases and positioning NewCo to drive even

greater value from that business in the future.  Further, Mr. Aidoo has helped the Debtors obtain

valuable partnerships with other cryptocurrency companies to distribute digital assets to

creditors.

37.    At the outset of his application process, and prior to his interview, Mr. Aidoo

disclosed to the Committee's advisors certain tax arrearages, which included liens filed against

him.[54]  Mr. Aidoo disclosed that those tax liens resulted from a change in his former expatriate

employee status, and the transition from his employer previously handling his U.S. income tax

---

[52]    *Id.*

[53]    *Id.*

[54]    *Id.* ¶ 12.

17

filings while he was an expatriate.[55]    Mr. Aidoo further disclosed that the Internal Revenue

Service (the "**IRS**") was not able to reach Mr. Aidoo because he had moved U.S. addresses upon

his return, and thus he did not receive certain correspondence relating to the amounts owed.[56]  As

part of the board selection process, Mr. Aidoo provided a letter from his accountant explaining

the situation to the Committee, assuring them that he worked with the IRS to enter into an

installment payment agreement.[57]    The Committee understood, including based on that letter,

that Mr. Aidoo has fulfilled and is currently fulfilling the obligations contemplated by that

payment plan.[58]  The Committee advisors also informed the Committee of Mr. Aidoo's tax liens

through their review of the background check conducted on him.[59]    Committee members asked

questions regarding Mr. Aidoo's tax liens as part of their discussions in connection with Mr.

Aidoo's candidacy.[60]  In light of these facts, the Committee concluded that the tax lien matter did

not preclude Mr. Aidoo from serving as a director of the New Board or outweigh the other

strengths of his candidacy.[61]

     38.    An additional factor relevant to Mr. Aidoo's candidacy was his current

employment by PWP, the Committee's retained investment banker. [62]  Prior to being nominated

for consideration, Mr. Aidoo disclosed that he would be stepping down from his Executive

Director position at PWP to serve in a senior advisory capacity as an independent contractor in

---

[55]    *Id.*

[56]    *Id.*

[57]    *Id.*

[58]    *Id.*

[59]    *Id.*

[60]    *Id.*

[61]    *Id.*

[62]    *Id.* ¶ 11.

short order. [63]  Committee members understood that to mean that Mr. Aidoo would not have an economic interest in PWP upon his resignation. [64]  Committee members also understood that PWP has no contracts or arrangements to work with NewCo in the future. [65]

39.    Mr. Aidoo was not involved in the substantive discussions regarding his candidacy.  Nor was he involved in the interview process for the New Board.  Members of the PWP team were provided with access to the video interviews, but did not attend the interviews. Members of the PWP team and Mr. Aidoo recused themselves during the vote on Mr. Aidoo's candidacy.  PWP therefore did not influence or control the Committee's deliberations over Mr. Aidoo's candidacy.

40.    Based on all of the information provided to the Committee in the process for selecting the New Board, the Committee determined that Mr. Aidoo was qualified to serve on the New Board and would faithfully discharge his duties to NewCo's shareholders (the Debtors' creditors) as he has done throughout these cases.  The Committee therefore voted unanimously to select Mr. Aidoo as one member of the New Board.

**B.    There Is No Basis to Exclude W&C and PWP From the Plan's Exculpation Provision**

41.    Mr. Phillips submitted himself as a candidate for the New Board. [66]  Initially, he refused to disclose his identity.  The Committee did not consider him on that basis. [67]  Ultimately, after being informed that he was the only candidate to submit an anonymous resume, Mr. Phillips disclosed his identity. [68]  As with all other candidates, the Committee fully considered

---

[63]    *Id.*

[64]    *Id.*

[65]    *Id.*

[66]    *Id.* at 16

[67]    *Id.*

[68]    *Id.*

Mr. Phillips' qualifications and his submissions to the Committee, and conducted an hour-long interview with Mr. Phillips.[69]  The Committee ultimately determined to not select Mr. Phillips to the New Board.[70]

42.    The Committee's decision has been vindicated by Mr. Phillips' recent actions. After he was not selected and the Committee reached an agreement with the Ad Hoc Earn Group, which included their selection of three significant prepetition creditors as observers to the New Board, Mr. Phillips sent an email to the U.S. Trustee suggesting that W&C and PWP breached their fiduciary duties by purportedly advising the Committee to select Mr. Aidoo rather than other more qualified candidates—*i.e.*, Mr. Phillips.[71]  In that email, Mr. Phillips accuses W&C and PWP of taking advantage of the "unsophisticated" members of the Committee—who have dedicated thousands of hours over the past 14 months to safeguard the interests of all creditors, not just themselves—to install Mr. Aidoo as the advisors' favored candidate.[72]  The implication that the Committee members cannot think for themselves is offensive.

43.    Finally, Mr. Phillips alleges that the Committee selected Mr. Aidoo solely because of his race.[73]  In a separate email to W&C and the Committee co-chairs, Mr. Phillips reiterated this point, stating that another member of the New Board satisfied NASDAQ's board diversity requirements and arguing that the "UCC only needs ONE."[74]  Mr. Phillips's email implies that the NASDAQ diversity requirement imposes a quota system, and that candidates that would meet the diversity requirement criteria are only selected for boards because they meet

---

[69]    *Id.*

[70]    *Id.*

[71]    *See* Robinson Decl., Ex. A (email correspondence from Mr. Phillips to the U.S. Trustee).

[72]    *Id.*

[73]    *Id.* Ex. A (stating that the New Board could still meet Nasdaq's diversity requirements even without Mr. Aidoo's appointment).

[74]    *Id*.

such criteria, rather than on account of their merit. The Committee selected board members based on their qualifications and ability to serve creditors' interests. As the intent is for NewCo to be listed on NASDAQ, the Committee of course also considered NASDAQ's diversity requirements, but that consideration was not a driving factor in its decision to select Mr. Aidoo or any other board members. The New Board now has four candidates that meet NASDAQ's board diversity requirement criteria. The Committee views that as a positive attribute of the New Board.

44.    In the Second Circuit, exculpation provisions like the one set forth in the Plan are regularly approved. *In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 133 (Bankr. S.D.N.Y. 2023) (collecting cases). Exculpation provisions protect estate fiduciaries like the Committee and its advisors from any claims or causes of action based upon acts or omissions in connection with the Chapter 11 Cases that do not result from bad faith, actual fraud, willful misconduct, or gross negligence. *Id.* at 133-34; *see also* Plan Art. VIII.E (limiting exculpation to acts and omissions that did not constitute "bad faith, fraud, willful misconduct, or gross negligence"). If a future litigant cannot establish bad faith, fraud, willful misconduct, or gross negligence, then they may not pursue claims related to the Chapter 11 Cases against the Exculpated Parties. *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019). "[E]xculpation provisions are based on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions" in a chapter 11 case. *Id.* at 720. Providing estate fiduciaries and their advisors with qualified immunity ensures that they can freely participate in contested chapter 11 cases and negotiate value-maximizing transactions without fear that parties dissatisfied with the result will challenge their actions in future litigation. *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18,

21

2022).

45.     That concern is present here.  Mr. Phillips objected to the Plan because he wishes that he or another creditor had been appointed to the New Board in the place of another, qualified candidate.  He is now threatening future litigation against W&C and PWP for their alleged advice to the Committee in selecting a qualified candidate who happens to not be a prepetition creditor of the Debtors or frequent commentator on X (formerly known as Twitter).[75]  W&C and PWP are entitled to the market-standard exculpation contained in the Plan so that they are not the subject of nuisance, strike litigation on account of actions taken in good faith in these Chapter 11 Cases.  The exculpation provision in the Plan should be approved as drafted to protect W&C and PWP as Exculpated Parties.

### III.    The Schoenau Objection Should Be Overruled

46.     Mr. Schoenau objected to the Plan on the basis that the ADR Procedures contained in the Plan Supplement are premature and contain unreasonable provisions.[76]  As stated in the Schoenau Objection, the parties have met and conferred to narrow the issues. Despite that good-faith effort, Mr. Schoenau reiterates the same arguments that were dismissed at the Disclosure Statement hearing—that ADR Procedures should not apply to preference defendants and should not be approved by the Court.[77]  However, it is common in this District for a court to approve ADR Procedures at the time a plan is confirmed.[78]

47.     Mr. Schoenau's objections to specific terms in the ADR Procedures are also

---

[75]    *Id.* ¶ 7.

[76]    *See generally* Schoenau Obj.

[77]    Aug. 14, 2023 Hr'g Tr. at 79:19-21 (finding that it is "common for robust mandatory ADR procedures to be adopted by [the] Court in large bankruptcy cases such as this one," provided that parties have the right to seek to opt out of those procedures).

[78]    *See, e.g.*, *In re Dana Corp.*, Case No. 06-10354 (BRL), 2007 Bankr. LEXIS 4404, at *295 (Bankr. S.D.N.Y. Dec. 26, 2007); *In re General Growth Props., Inc.*, (Bankr. S.D.N.Y. 2010, Case No. 09-11977 (ALG)) [Docket No. 3915]; *In re Navillus Tile, Inc.*, (Bankr. S.D.N.Y. 2018, Case No. 17-13162 (SHL)) [Docket No. 686].

without basis, and in some circumstances misrepresent the ADR Procedures:

48.    **ADR Costs**.  Mr. Schoenau complains that defendants "are improperly required to bear half of the cost of ADR."[79]  But the American rule is that parties are required to pay their own litigation costs.  If the Litigation Administrator sued parties on preference claims, as opposed to participating in ADR, those parties would have to pay their own counsel's fees and court costs.  The costs of ADR will be lower compared to litigation and requiring all parties to bear the costs will ensure that all parties participate actively and in good faith in ADR.  Moreover, there is an offer and acceptance protocol before mediation, which could obviate a defendant incurring any substantial cost.[80]

49.    **Mandatory ADR**.  Mr. Schoenau asserts that the ADR Procedures are mandatory for preference defendants.[81]  He fails to mention that the ADR Procedures allow defendants to simply opt out by delivering an opt-out notice via email to the Litigation Administrator at any time prior to the selection of a mediator.[82]  Mr. Schoenau asserts that this is only a "nominal" right to opt out because the Debtors may seek to compel the claimant's participation in ADR.[83]  However, the Court will adjudicate any such motion to compel and any opt-out claimant's rights to object to such a motion are fully preserved.[84]

50.    **ADR Stay**.  Mr. Schoenau notes that, when a claim is sent to ADR, all litigation

---

[79]    Schoenau Obj. ¶ 10.

[80]    *Third Notice of Filing of Plan Supplement* [Docket No. 3444], Ex. J (the "**ADR Procedures**").

[81]    Schoenau Obj. ¶ 11.

[82]    ADR Procedures § 2.12 ("For the avoidance of doubt, if a Participating Claimant serves a written election for exclusion from the ADR Procedures in accordance with this Section 2.12, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.").

[83]    Schoenau Obj. ¶ 11.

[84]    ADR Procedures § 2.12.

over that claim in the Bankruptcy Court will be stayed.[85]  He complains that this may "strip" the claimant of its right to seek to move to dismiss that litigation in the Bankruptcy Court.[86]  That is the point of ADR.  Parties utilizing ADR will attempt to reach a consensual resolution of the dispute without litigation.  They will not litigate concurrently while engaged in ADR.  If they do not reach a resolution in ADR or opt out, the ADR Procedures allow the claim to be returned to the Bankruptcy Court for litigation.[87]

51.  **Mediator Selection**.  Mr. Schoenau argues that the Debtors have the "unilateral right" to select a mediator.[88]  That is not true: "the Parties [defined to include a Participating Claimant] and the Approved ADR Organization shall work in good faith to select the individual mediator at the Approved ADR Organization."[89]

52.  **Enforcement of ADR Procedures**.  Mr. Schoenau complains that the ADR Procedures only allow the Debtors to enforce the terms of the ADR Procedures against non-compliant claimants, and not the other way around.[90]  But the ADR Procedures provide that the "Litigation Administrator shall also participate in the ADR Procedures in good faith."[91]  And the Bankruptcy Court "shall have sole and exclusive jurisdiction to resolve any dispute arising from the interpretation, and enforcement of, the ADR Procedures," which is not limited to disputes initiated by the Litigation Administrator.[92]

53.  **Discovery**.  Mr. Schoenau asserts that the ADR Procedures improperly do not

---

[85]  Schoenau Obj. ¶ 12.

[86]  *Id.*

[87]  ADR Procedures § 2.6 ("Such stay shall automatically terminate thirty (30) days after any Participating Claim is removed from the ADR Procedures.").

[88]  Schoenau Obj. ¶ 13.

[89]  ADR Procedures § 5.1.

[90]  Schoenau Obj. ¶ 14.

[91]  ADR Procedures § 2.11.

[92]  *Id.* Art. VIII.

allow for two-sided discovery as in typical civil litigation.[93]  The ADR Procedures provide for streamlined discovery by both parties.  At this time, Mr. Schoenau has made no suggestions for what information he would request.

54.    **Common Issues**.  Mr. Schoenau argues that purportedly common legal issues, like the application of section 546(e)'s safe harbor defense and section 547's ordinary course of business defense, should be resolved by the Court on a class-wide basis.[94]  But those defenses are informed by substantial issues of fact.  The mediators under the ADR Procedures are competent to evaluate the strength of those potential defenses under any claimant's specific circumstances and can recommend resolutions to the parties informed by that evaluation.  Moreover, the Litigation Administrator is able to pursue litigation as it sees fit.  If the Litigation Administrator wishes to first try common issues, it may make that decision at the appropriate time.

55.    Accordingly, the Court should overrule the Schoenau Objection and approve the ADR Procedures.

---

[93]    Schoenau Obj. ¶ 17.

[94]    *Id.* ¶¶ 19-26.

**<u>CONCLUSION</u>**

For the reasons set forth herein and in the Debtors' Confirmation Brief, the Committee

respectfully requests that the Court overrule the Objections, confirm the Plan, and grant such

other and further relief as may be just and proper.

[*Remainder of page intentionally left blank*]

Dated:    September 27, 2023
          New York, New York

Respectfully submitted,

/s/ *Aaron E. Colodny*

**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email:  david.turetsky@whitecase.com
        sam.hershey@whitecase.com
        jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  mandolina@whitecase.com
         gregory.pesce@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile:  (305) 358-5744
Email:  kwofford@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile:  (213) 452-2329
Email:  aaron.colodny@whitecase.com

*Counsel to the Official Committee of*
*Unsecured Creditors*