Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF REVISED
## TABLE OF AUTHORITIES OF THE DEBTORS' MEMORANDUM OF
## LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE** that on September 27, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto* [Docket No. 3604] (the "Memorandum").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that the Debtors indicated in footnote 2 of the Memorandum that the Table of Authorities included in the Memorandum was not yet complete, and that the Debtors would file a revised Memorandum on the docket as soon as possible showing a redline reflecting that the Table of Authorities is the only change. *See* Memorandum fn.2.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file a revised *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto*, attached hereto as **Exhibit A** (the "Revised Memorandum"), which includes a finalized Table of Authorities.

**PLEASE TAKE FURTHER NOTICE THAT** a comparison between the Memorandum and the Revised Memorandum is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE THAT** copies of the Memorandum, Revised Memorandum, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Celsius. You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: September 27, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Revised Memorandum**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) ) | (Jointly Administered) |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................2

Background ...............................................................................................................9

I.      Solicitation and Notification Process. ...........................................................9

II.     The Restructuring Transactions. ..................................................................14

III.    The Objections. ...........................................................................................19

Argument ...............................................................................................................21

IV.     The Plan, as Modified, Satisfies the Requirements of Section 1127 of the
        Bankruptcy Code and Bankruptcy Rule 3019. .............................................21

V.      The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ...............25

A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code
        (§ 1129(a)(1)). ............................................................................................26

B.      The Plan Satisfies the Classification Requirements of Section 1122 of the
        Bankruptcy Code. ........................................................................................26

C.      The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the
        Bankruptcy Code. ........................................................................................30

D.      The Plan Complies With the Discretionary Provisions of Section 1123(b) of the
        Bankruptcy Code. ........................................................................................36

        1.      The Debtor Release Is Appropriate and Complies With the Bankruptcy
                Code. ...............................................................................................38

        2.      The Third-Party Release Is Wholly Consensual and Should Be Approved. .........43

        3.      The Exculpation Provision Is Appropriate and Complies With the
                Bankruptcy Code. .............................................................................52

        4.      The Injunction Provision Is Appropriate and Complies With the
                Bankruptcy Code. .............................................................................60

        5.      The CEL Token Settlement, the Account Holder Avoidance Action
                Settlement, and the Retail Borrower Settlement Comply With the
                Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors'
                Good Business Judgment. ..................................................................61

E.    The Plan Complies With Section 1123(d) of the Bankruptcy Code. .................................79

F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy Code
(§ 1129(a)(2)). ............................................................................................................83

    1.    The Debtors Complied With Section 1125 of the Bankruptcy Code. ...................84

    2.    The Debtors Complied With Section 1126 of the Bankruptcy Code. ...................85

G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law
(§ 1129(a)(3)). ............................................................................................................90

H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses
Are Subject to Court Approval (§ 1129(a)(4)). ..........................................................93

I.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers,
and Insiders (§ 1129(a)(5)). ......................................................................................94

J.    The Plan Does Not Require the Approval of a Governmental Regulatory
Commission (§ 1129(a)(6)). ......................................................................................95

K.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7))................95

L.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8))
of the Bankruptcy Code. ...........................................................................................102

M.    The Plan Provides for Payment in Full of All Allowed Priority Claims
(§ 1129(a)(9)). ..........................................................................................................104

N.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
(§ 1129(a)(10)). ........................................................................................................105

O.    The Plan Is Feasible (§ 1129(a)(11)). ............................................................................106

P.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ....................................111

Q.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ........................112

R.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply
to the Plan. ................................................................................................................112

S.    The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the
Bankruptcy Code. ......................................................................................................113

    1.    The Plan Does Not Unfairly Discriminate with Respect to Rejecting
Classes (§ 1129(b)(1)). .....................................................................................114

    2.    The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§
1129(b)(2)). .......................................................................................................120

**Page**

T.      The Debtors Complied With Section 1129(d) of the Bankruptcy Code. .........................124

VI.     Good Cause Exists to Waive the Stay of the Confirmation Order. ................................124

VII.    The Debtors' Replies to Remaining Objections. ...........................................................125

A.      The Emergence Incentive Plan Should Be Approved as Part of the Plan. .....................125

  1.    The Emergence Incentive Plan Complies With Section 503(c) of the
        Bankruptcy Code. ................................................................................................128

B.      The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections
        Related to Loans Should Be Overruled. ..........................................................................132

  1.    Plan Treatment of the Institutional Borrowers and Retail Borrowers is
        Appropriate. ........................................................................................................133

Conclusion ...................................................................................................................................139

# TABLE OF AUTHORITIES[2]

**Page(s)**

**Cases**

*In re 20 Bayard Views, LLC,*
    445 B.R. 83 (Bankr. E.D.N.Y. 2011) .................................................................. 114

*In re 203 N. LaSalle St. Ltd. P'ship.*,
    190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, Bank of Am.,
    526 U.S. 434 (1999) .............................................................................................. 113

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993) .......................................................... *passim*

*In re A.H. Robins Co.*,
    88 B.R. 742 (Bankr. E.D. Va. 1988) ..................................................................... 21

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) .................................................. 39, 43, 90, 95

*In re Adelphia Commc'ns Corp.*,
    No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] ........................... 56

*Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
    855 F.3d 459 (2d Cir. 2017) .................................................................................. 65

*In re Aegean Marine Petroleum Network, Inc.*,
    No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) ................................. 124

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*,
    89 F.3d 942 (2d Cir. 1996) ............................................................................ 27, 136

*In re Aleris Int'l, Inc.*,
    No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ........................... 21

*In re Almatis, B.V.*,
    No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] ........................... 55

*In re Ambanc La Mesa Ltd. P'ship*,
    115 F.3d 650 (9th Cir. 1997) .............................................................................. 114

---

[2]    [Resolved.]

*In re Ampex Corp.*,
No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] .............................56

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013).................................................................................21, 24

*In re Answers Holdings, Inc.*,
No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017).....................................................50, 56

*In re Avaya Inc.*,
No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017)....................................................50, 56

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021)...............................................................................46, 47

*In re Avianca Holdings S.A.*,
No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) ............................................................49

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................................114

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*,
701 F.2d 1071 (2d Cir. 1983)...............................................................................................90

*In re Bally Total Fitness of Greater N.Y., Inc.*,
No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ................. *passim*

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)...................................................................................................95, 120

*In re Barneys N.Y. Inc.*,
No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) .......................................................124

*In re Barneys New York Inc.*,
No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020) .......................................................45, 50

*In re BCBG Max Azria Global Holdings, LLC*,
No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) ....................................................50, 56

*In re BearingPoint, Inc.*,
453 B.R. 486 (Bankr. S.D.N.Y. 2011) ..................................................................................55

*In re BearingPoint, Inc.*,
No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009)..........................................................43

*In re Best Prods. Co.*,
177 B.R. 791 (S.D.N.Y. 1995)..............................................................................................24

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994)................................................................................27, 136

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985)................................................................113

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018)..............................................................115

*In re Cajun Elec. Power Co-op., Inc.*,
    150 F.3d 503 (5th Cir. 1998)..............................................................................83

*In re Calpine Corp.*,
    No. 05-60200 (BRL)...........................................................................................44

*In re Capmark Fin. Grp., Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ..................................................................66

*In re Captran Creditors' Trust*,
    128 B.R. 469 (M.D. Fla. 1991)..........................................................................53

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994).........................................................21, 90

*In re Cengage Learning, Inc.*,
    No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] ..........57

*In re Cenveo, Inc.*,
    No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685]..................55, 56

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................39

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015)..................................................................44

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...............................................................44

*In re China Fishery Grp. Ltd.*,
    No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022) ........................................49

*Complaint for Declaratory Judgment*
    [Adv. No. 23-01007, Docket No. 2001] ..............................................................77

*In re Crabtree & Evelyn, Ltd.*,
    No. 09-14267 (BRL), 2010 WL 3638369 (Bankr. S.D.N.Y. Jan. 14. 2010)..........43

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-
  10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part,
  rev'd in part*, 634 F.3d 79 (2d Cir. 2011) .......................................................55, 109

*In re Deluxe Media*,
  No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) ................................. *passim*

*In re Dewey & LeBoeuf, LLP*,
  478 B.R. 628 (Bankr. S.D.N.Y. 2012) ................................................................123

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) ............................................................ *passim*

*In re DJK Residential, LLC*,
  No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497]..............................57

*In re Dow Corning Corp.*,
  237 B.R. 374 (Bankr. E.D. Mich. 1999) ................................................................21

*In re Drexel Burnham*,
  960 F.2d 285 (2d Cir. 1992)........................................................................52, 60

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991) ...................................................................61

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ............................................................ *passim*

*In re Eastman Kodak Co.*,
  No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] ........................55

*In re Eddington Thread Mfg. Co.*,
  181 B.R. 826 (Bankr. E.D. Pa. 1995) ................................................................106

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005)...............................................................52, 55, 56

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................120

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ............................................................113

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
  10 F.3d 944 (2d Cir. 1993)......................................................................26, 136

*In re Frontier Communications Corp.*,
  No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) ........................................54

*In re Fullbeauty Brands Holdings Corp.*,
  No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019) ....................................50, 56

*In re Garrett Motion*,
  No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021) ................................49, 54

*In re Gaston & Snow*,
  Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4,
  1996) ..........................................................................................................................89

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................................43, 44, 115

*In re Glob. Home Prods., LLC*,
  369 B.R. 778 (Bankr. D. Del. 2007) .......................................................................128

*In re Global A&T Electronics Ltd.*,
  No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51] ...................56, 59

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) ..............................................................55, 120

*In re Great Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) .........................................................................114

*In re Hawker Beechcraft, Inc.*,
  479 B.R. 308 (Bankr. S.D.N.Y. 2012) .....................................................................128

*In re Health Diagnostic Lab., Inc.*,
  551 B.R. 218 (Bankr. E.D. Va. 2016) .........................................................................53

*Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe
  Enters., Ltd. II*),
  994 F.2d 1160 (5th Cir. 1993) .........................................................................25, 106

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007).............................................................27, 136

*In re Hollander Sleep Products, LLC*,
  No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019)................................. *passim*

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) .......................................................................110

*In re Ion Media Networks, Inc.*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ........................................................118, 121

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) .......................................................26, 27, 136

*In re Jartran, Inc.*,
    44 B.R. 331 (Bankr. N.D. Ill. 1984) ..................................................................56

*In re Jason Industries*,
    No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020) ......................................50

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988).......................................................114

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
    843 F.2d 636 (2d Cir. 1988)...........................................................25, 89, 106, 114

*Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*,
    374 B.R. 516 (S.D.N.Y. 2007).............................................................................61

*In re Key3Media Grp. Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005) ......................................................................66

*In re Lakeland Tours, LLC*,
    No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) ........................................50

*In re Lapworth*,
    No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)..............83

*In re LATAM Airlines Group S.A.*,
    No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)
    .......................................................................................................49, 54, 58, 59

*In re Lear Corp.*,
    2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009) ............................................44

*In re Legend Parent Inc.*,
    No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014)........................................................50

*In re Lehman Bros. Holdings. Inc.*,
    422 B.R. 407 (Bankr. S.D.N.Y. 2010) ...............................................................133

*In re Leslie Fay Companies, Inc.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ...............................................................110

*In re Lightsquared Inc.*,
    513 B.R. 56 (Bankr. S.D.N.Y. 2014) .............................................................26, 136

*In re LSC Communications, Inc.*,
    No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021) ...................................49, 54

*In re Lumileds*,
    No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022) ...................................49, 54

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005) ........................................................................43, 44, 47

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating
    LLC)*,
    478 F.3d 452 (2d Cir. 2007) ........................................................................ *passim*

*In re MPM Silicones*,
    2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) .............................................44

*Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re
    Patrician St. Joseph Partners Ltd. P'ship)*,
    169 B.R. 669 (Bankr. D. Ariz. 1994) ..................................................................106

*In re Nellson Nutraceutical, Inc.*,
    369 B.R. 787 (Bankr. D. Del. 2007) ...................................................................128

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ...............................................................39, 60

*In re Nine West Holdings, Inc.*,
    No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) .................................. *passim*

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984) ..............................................................................................90

*O'Connell v. Packles (In re Hilsen)*,
    404 B.R. 58 (Bankr. E.D.N.Y. 2009) ....................................................................61

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ...........................................................39, 43, 57

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) ..................................................................................133

*In re Philippine Airlines, Inc.*,
    No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) .........................................49

*In re Pisces Energy, LLC*,
 Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880 (Bankr. S.D.
 Tex. Dec. 21, 2009)..........................................................................................21

*In re Prudential Energy Co.*,
 58 B.R. 857 (Bankr. S.D.N.Y. 1986).........................................................107, 110

*In re Purofied Down Prods. Corp.*,
 150 B.R. 519 (S.D.N.Y. 1993)............................................................................61

*In re PWS Holding Corp.*,
 228 F.3d 224 (3d Cir. 2000)...............................................................................53

*In re Reader's Digest Ass'n, Inc.*,
 No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010).................................26, 114, 115, 136

*In re Repurchase Corp.*,
 332 B.R. 336 (Bankr. N.D. Ill. 2005) ...............................................................107

*In re Res. Cap., LLC*,
 No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] .........................55

*In re Revlon, Inc.*,
 No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023) ......................................49, 54

*Rombro v. Dufrayne (In re Med. Diversified, Inc.)*,
 461 F.3d 251 (2d Cir. 2006)...............................................................................65

*In re Sabine Oil & Gas Corp.*,
 555 B.R. 180 (Bankr. S.D.N.Y. 2016) ................................................................26

*In re Sabine Oil & Gas Corp.*,
 No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) ....................................45, 50

*In re Sea Trail Corp.*,
 No. 11-07370-8, 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012)................................114

*In re Seabras 1 USA, LLC*,
 No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020).........................................50, 55, 56, 57

*SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network
 Limited*, Exh. A, *SEC v. Celsius Network Limited et al.*,
 23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6]............................................... *passim*

*In re Sentinel Mgmt. Grp., Inc.*,
 398 B.R. 281 (Bankr. N.D. Ill. 2008) ............................................................21, 24

*In re Simplot*,
No. 06-00002 (TLM), 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007).........................25

*In re Soup Kitchen Int'l., Inc.*,
506 B.R. 29 (Bankr. E.D.N.Y. 2014) ......................................................................................66

*In re Specialty Equip. Cos.*,
3 F.3d 1043 (7th Cir. 1993) ...................................................................................................43

*In re Spiegel, Inc.*,
No. 03-11540 (BRL), 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006),
*appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28,
2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008) ........................................................................43

*In re SunEdison, Inc.*,
575 B.R. 220 (Bankr. S.D.N.Y. 2017) .................................................................................114

*In re SunEdison, Inc.*,
No. 16-10992 (SMB), 576 B.R. 453 (Bankr. S.D.N.Y. 2017).................................................44

*In re Sungard Availability Services Capital, Inc.*,
No. 19-22915 (RDD) (Bankr. S.D.N.Y. May 3, 2019).................................................50, 56, 58

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S.
Truck Co.*),
800 F.2d 581 (6th Cir. 1986) ...............................................................................................107

*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988)..........................................................................60, 89, 107

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984).......................................................................................90

*In re Tricom, S.A.*,
No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009) ...........................................................46

*United States v. Mashinsky et al.*,
23-cr-00347-UA (S.D.N.Y. 2023) ...........................................................................................64

*In re Uno Rest. Holdings Corp.*,
No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) ...............................................................55

*In re Windstream Holdings, Inc.*,
No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020).................................................. *passim*

*In re Winn-Dixie Stores, Inc.*,
356 B.R. 239 (Bankr. M.D. Fla. 2006) ....................................................................................52

*In re Worldcom, Inc.*,
  2003 WL 23861928 ................................................................. *passim*

*In re Young Broad. Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010) ........................................107

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ...................................56, 113

**Statutes**

11 U.S.C. § 502(a) ......................................................................85

11 U.S.C. § 510(b) ............................................................. *passim*

11 U.S.C. § 541(a)(1) ...............................................................133

11 U.S.C. § 547(b) ......................................................................76

11 U.S.C. § 726 ........................................................................101

11 U.S.C. § 1122(a) .................................................26, 135, 136

11 U.S.C. § 1122(b) ....................................................................29

11 U.S.C. § 1123(a)(1) ...............................................................30

11 U.S.C. § 1123(a)(2) ...............................................................30

11 U.S.C. § 1123(a)(3) ...............................................................31

11 U.S.C. § 1123(a)(4) ...............................................................31

11 U.S.C. § 1123(a)(5) ..........................................................31, 34

11 U.S.C. § 1123(a)(6) ...............................................................35

11 U.S.C. § 1123(a)(7) ...............................................................35

11 U.S.C. § 1123(b)(1)–(3) .........................................................36

11 U.S.C. § 1123(b)(6) ...............................................................36

11 U.S.C. § 1123(d) .........................................................79, 80, 82

11 U.S.C. § 1126(a) ..............................................................84, 85

11 U.S.C. § 1126(f) .....................................................................84

11 U.S.C. § 1126(g) ................................................................................................84

11 U.S.C. § 1127(a) ................................................................................................21

11 U.S.C. § 1129(a)(1) ............................................................................................25

11 U.S.C. § 1129(a)(2) ............................................................................................82

11 U.S.C. § 1129(a)(3) ..................................................................................53, 89, 92

11 U.S.C. § 1129(a)(4) ............................................................................................92

11 U.S.C. § 1129(a)(5)(A)(i) ....................................................................................93

11 U.S.C. § 1129(a)(5)(A)(ii) ...................................................................................93

11 U.S.C. § 1129(a)(5)(B) ........................................................................................93

11 U.S.C. § 1129(a)(6) ............................................................................................94

11 U.S.C. § 1129(a)(7)(A) ........................................................................................95

11 U.S.C. § 1129(a)(8) ..........................................................................................102

11 U.S.C. § 1129(a)(9)(A) ......................................................................................103

11 U.S.C. § 1129(a)(9)(B) ......................................................................................104

11 U.S.C. § 1129(a)(9)(C) ......................................................................................104

11 U.S.C. § 1129(a)(10) .........................................................................................105

11 U.S.C. § 1129(a)(11) ...................................................................................106, 107

11 U.S.C. § 1129(a)(12) .........................................................................................111

11 U.S.C. § 1129(a)(14) .........................................................................................112

11 U.S.C. § 1129(a)(15) .........................................................................................112

11 U.S.C. § 1129(a)(16) .........................................................................................112

11 U.S.C. § 1129(b) .........................................................................................102, 113

11 U.S.C. § 1129(b)(1) ...............................................................................113, 114, 135

11 U.S.C. § 1129(b)(2)(B)(i) ...................................................................................120

11 U.S.C. § 1129(b)(2)(B)(ii) ..................................................................................120

11 U.S.C. § 1129(b)(2)(C)(ii) ........................................................................120

15 U.S.C. § 77e ...........................................................................................123

28 U.S.C. § 1930 .........................................................................................111

Bankrtupcy Code § 1123 ...............................................................................80

Bankrtupcy Code § 1125(a) ...........................................................................84

Bankrtupcy Code § 1126 ...............................................................12, 85, 88

Bankrtupcy Code § 1129(a) ...........................................................................25

Bankrtupcy Code § 1129(b) ...........................................................................25

Bankrtupcy Code § 1141 ...............................................................................18

Bankrtupcy Code § 365(a) .............................................................................80

Bankrtupcy Code § 501 .............................................................................85, 88

Bankrtupcy Code § 523 .............................................................................18, 23

Bankruptcy Code ......................................................................................9, 14

Bankruptcy Code § 105(a) .............................................................................32

Bankruptcy Code § 365 .................................................................................79

Bankruptcy Code § 502 ..........................................................................63, 85, 88

Bankruptcy Code § 502(b) .............................................................................70

Bankruptcy Code § 503(c) ....................................................................... *passim*

Bankruptcy Code § 547(c)(2) .........................................................................72

Bankruptcy Code § 1102 ...............................................................................10

Bankruptcy Code § 1107(a) ...........................................................................10

Bankruptcy Code § 1108 ...............................................................................10

Bankruptcy Code § 1109 ...........................................................................18, 96

Bankruptcy Code § 1111 .............................................................................85, 88

Bankruptcy Code § 1122 ....................................................................21, 25, 26, 136

                                                                                    **Page**

Bankruptcy Code § 1123 ................................................................................21, 25, 26

Bankruptcy Code § 1123(b)(3)(A)......................................................................... *passim*

Bankruptcy Code § 1125 ........................................................................................83, 84

Bankruptcy Code § 1125(b)............................................................................................84

Bankruptcy Code § 1125(c)............................................................................................84

Bankruptcy Code § 1127 ................................................................................20, 21, 24

Bankruptcy Code § 1127(a)............................................................................................21

Bankruptcy Code § 1129 ................................................................................................25

Bankruptcy Code § 1129(a)(9) ............................................................................104, 105

Bankruptcy Code § 1146(a)............................................................................................34

Bloomberg Law, September 15, 2023, https://news.bloomberglaw.com/ip-
    law/top-celsius-executive-cohen-pavon-pleads-guilty-to-crypto-fraud..................64

## Rules

Fed. R. Bankr. P. 302....................................................................................................124

Fed. R. Bankr. P. 1015(b) ...............................................................................................10

Fed. R. Bankr. P. 3018(a) .........................................................................................86, 88

Fed. R. Bankr. P. 3019...................................................................................20, 21, 24

Fed. R. Bankr. P. 6004(h) .............................................................................................124

Fed. R. Bankr. P. 6006(d) .............................................................................................124

Fed. R. Bankr. P. 9019.....................................................................................60, 61, 70

## Other Authorities

The New York Times (International Edition) (August 25, 2023) .................................11

The New York Times (National Edition) (August 25, 2023) .......................................11

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum")[3] in support of confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be further modified, amended, or supplemented from time to time, the "Plan").[4] In support of this Memorandum and Confirmation of the Plan, the Debtors have also filed contemporaneously herewith the following declarations:  (a) *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3581] (the "Ferraro Declaration"); (b) *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3582] (the "Campagna Declaration"); (c) *Declaration of Ryan Kielty in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3592] (the "Kielty Declaration"); (d) *Declaration of Joel E. Cohen, Managing Director of Stout Risius Ross, LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3588] (the "Cohen Declaration"); (e) *Declaration of Steve Kokinos in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its*

---

[3]    Capitalized terms not immediately defined have the meaning ascribed to them elsewhere in this Memorandum, the Plan, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), or the objection tracker attached as **Exhibit A** hereto (the "Objection Tracker").

[4]    For the avoidance of doubt, citations to Plan provisions shall refer to the location of the Article or Section in the Plan filed contemporaneously herewith at [Docket No. 3577], unless otherwise noted.  Further, to the extent any of the provisions of the Plan copied in this Memorandum are inconsistent with the Plan filed at Docket No. 3577, the Plan filed at docket No. 3577 shall control.

*Debtor Affiliates* [Docket No. 3591] (the "<u>Fahrenheit Declaration</u>"); and (f) *Declaration of Allison Hoeinghaus in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3586] (the "<u>Hoeinghaus Declaration</u>").

## **Preliminary Statement**

1.        These Chapter 11 Cases were filed in July 2022 in response to dire and unexpected circumstances for Celsius' business.  During an industry-wide "crypto winter," the combination of a "run on the bank" by Celsius' Account Holders and increasing regulatory scrutiny forced Celsius to first pause all withdrawals, and then file for bankruptcy.  The early days of these Chapter 11 Cases were challenging and uncertain.  A dark cloud hung over the Debtors because of their former management team's prepetition actions and statements.  State and federal regulators routinely complained about Celsius' prepetition business practices and lack of engagement.  And the Debtors' Account Holders, many of whom invested in cryptocurrency in large part because it is decentralized and outside of traditional governmental and financial regulations, were surprised to find themselves in the most centralized proceeding possible:  a chapter 11 case.

2.        Amidst this storm, the Debtors, led by their newly-appointed Special Committee, charted a path forward based on the guiding principles of full transparency and engagement with all stakeholders.  Early in these Chapter 11 Cases, the Debtors consented to the appointment of the Examiner to investigate the Debtors' prepetition actions.  The Debtors cooperated with the Examiner and various investigations by state and federal regulators, as well as the Committee.  Mr. Mashinsky resigned after the Special Committee directed that he either resign or be terminated.   In addition to cooperating with the many investigations into the Debtors' prepetition conduct, the Debtors and their advisors also engaged with the Committee, various ad hoc groups of creditors, and individual Account Holders to resolve key legal issues, drive these Chapter 11

Cases forward, and try to maximize the value of the Debtors' assets for their stakeholders and emerge from bankruptcy as promptly as possible.

3.      The nearly fully consensual Plan is the culmination of over a year of the Debtors' engagement with their creditors, and the Debtors are pleased to report that, after tabulating more than 80,000 votes submitted by creditors holding approximately $3 billion in Claims, over 95% of voting Account Holders by both number and dollar amount voted in support of the Plan, including over 99% of Earn creditors.  This level of creditor participation and support for the Plan is simply unprecedented in large chapter 11 cases, particularly considering how contentious these cases were in their early stages.  The level of support that the Plan has now garnered from the Debtors' creditors demonstrates the broad consensus that has been built over time, particularly as these chapter 11 cases near their conclusion.   The Plan includes agreed settlements with each ad hoc group of Account Holders (Earn, Custody, Retail Borrower, and Withhold) and a resolution of the CEL Token valuation dispute.  If the Plan is confirmed, the Debtors will work to promptly implement this value-maximizing transaction.  There are only a handful of unresolved Objections to confirmation of the Plan, none of which have merit, and which should be overruled.

4.      ***First***, several Retail Borrowers have objected to their treatment under the Plan. These borrowers argue that the cryptocurrency that they deposited as "collateral" is their property, and that they should receive 100% of that cryptocurrency under the Plan.  As an initial matter, their fellow borrowers do not agree.  The Plan includes the mediated settlement of the issues relating to retail loans that was negotiated between the Debtors, the Committee, and the Retail Borrower Ad Hoc Group during a three-day mediation before the Honorable Michael E. Wiles. And over 96% of Retail Borrowers who voted on the Plan voted to accept their treatment as unsecured creditors—and Retail Borrowers also have an additional right of setoff or repayment of

3

the principal balance as detailed in the Plan and Disclosure Statement, and priority in making the Liquid Cryptocurrency Weighted Election. That is, because the class of retail borrowers voted to accept the Plan, dissenting borrowers are bound by the class vote. Moreover, the Loan Terms of Use include language that is substantially similar to the Terms of Use governing the Earn Program, and this Court ruled that the Terms of Use provide that the cryptocurrency in Earn Accounts belongs to Celsius, not the Account Holder. Accordingly, the retail loan treatment in the Plan is in line with Retail Borrowers' legal rights and should be approved.

5.      ***Second***, a large institutional unsecured creditor (Pharos) argues that the Plan fails because (a) the Series B Settlement provides a recovery to the Series B Holders who had not previously participated in the Court-approved settlement, when unsecured creditors are not being paid in full, and (b) the "best interests" test is not satisfied because the Debtors' estimates for the Orderly Wind Down are actually the proper estimates for a chapter 7 fire sale, and the NewCo equity has no value. Both arguments are without merit and should be overruled. As to the first point, the Series B Settlement was separately approved by the Court, which resolved a material dispute that the Series B Holders were structurally senior to the creditors of Celsius Network LLC and entitled to be paid ahead of creditors. These equity holders are receiving this distribution as part of this prior authorized settlement of disputed legal issues—not purely on account of their equity position—and Pharos should have objected to the Series B Settlement if it believed that the settlement was inappropriate.

6.      As to the second point, the "best interests test" requires that creditors receive as much under a chapter 11 plan as they would under a chapter 7 liquidation. The Debtors have demonstrated through the Liquidation Analysis that Holders of Claims in Class 8 receive 19.6% and that Holders of Claims in Class 9 receive 29.5% more under the Plan than a

chapter 7 liquidation.  Pharos' objection ignores the significant loss of value that would occur under a chapter 7 liquidation, and the total lack of negotiating power that the chapter 7 trustee would have with counterparties that are aware that the trustee is tasked with liquidating assets quickly.  Additionally, although Pharos argues that the equity of NewCo is worthless, NewCo is being seeded with $450 million of capital, will receive the Debtors' mining assets (valued at a midpoint of $565 million) and other illiquid assets (valued at $283 million), and NewCo will have no debt.  Even under extremely bearish assumptions, the NewCo equity has enormous value that cannot be simply brushed aside, and the evidence at the Confirmation Hearing will demonstrate that the best interests test is satisfied.

7.    ***Third***, the CEL Token Settlement is reasonable and should be approved.  The Plan was overwhelmingly approved by CEL Token Holders:  of the CEL Token holders who voted, over 98% by number and 95% by dollar amount voted to accept the Plan.  The CEL Token Settlement is a reasonable settlement of the contested issues relating to CEL Token that have been hotly contested throughout these Chapter 11 Cases, and avoids requiring that the Court rule on whether CEL Token is a security, or have a lengthy trial on the proper value of CEL Token given the alleged manipulation of the price of the token that took place prepetition.  The Debtors and the Committee have worked tirelessly to try to consensually resolve this issue and are pleased that the CEL Token Settlement has received nearly unanimous support from those that voted on the Plan. The Debtors and the Committee entered into settlement agreements with several large CEL Token holders, and the group of CEL Token holders overwhelmingly voted to accept the Plan, which includes the CEL Token Settlement.

8.    Only one party filed a formal objection to the CEL Token valuation—Otis Davis— and he fails to challenge the legal theories for why CEL should be valued at zero if the CEL Token

Settlement is not approved.  Instead, he admits that Celsius' prepetition actions inflated the CEL Token price between the Pause and the Petition Date from approximately $0.20 to approximately $0.81—which does not support Mr. Davis' argument that CEL Token should be valued at the Petition Date price of approximately $0.81.  To the contrary, the prepetition market manipulation perpetrated by Celsius' former management team (which Mr. Davis readily admits) is a key reason why the Debtors and the Committee proposed the settlement of $0.25 as a fair resolution of this complex dispute.  The Debtors believe that the CEL Token Settlement is appropriate and reasonable, and provides holders of CEL Token with a meaningful recovery instead of $0.00, which it could be if CEL Token is an equity security of Celsius or a now-worthless utility token. The Debtors believe that the overwhelming support that the CEL Token Settlement has garnered is further evidence that it is fair and reasonable, and Mr. Davis' lone resistance should not prevent the settlement from being approved.

9.      ***Fourth***, several objectors argue that the Employee Incentive Plan should not be approved as part of the Plan.  But the Plan, which incorporates the Employee Incentive Plan, was overwhelmingly accepted by creditors entitled to vote, including by each class of account holders who filed objections on this issue.  Accordingly, the Employee Incentive Plan should be approved as accepted by the affected creditor classes; the Plan is a global settlement, and the Court need not examine each component of the Plan when the classes that the objectors are in voted to accept the Plan.  Moreover, these payments (if the metrics are satisfied) would be made by the Post-Effective Date Debtors, not a chapter 11 debtor, and so the Bankruptcy Code's restrictions on executive payments do not apply.  Even if the Court applies a higher standard in evaluating the propriety of the Employee Incentive Plan, it is reasonable and should be approved.  The KEIP Motion was filed with these incentive metrics six months ago, and the applicable insiders have worked in good faith

to reach the metrics, all of which inures to the benefit of account holders.  The tireless work of these executives is why the Debtors are well positioned to promptly make distributions of Liquid Cryptocurrency under the Plan, and the mining executives' efforts to obtain new hosting for machines after the rejection of the hosting contract by Core Scientific has led to material improvements in the value of the mining business.  The evidence at the Confirmation Hearing will demonstrate that the Employee Incentive Program is reasonable and should be approved.

10.    ***Lastly***, the Debtors believe they have resolved all issues with governmental parties. As to the SEC's limited objection regarding Coinbase, the Debtors have filed a revised form of agreement with Coinbase that clarifies that the Post-Effective Date Debtors will not be using the types of services referenced in the SEC's objection.  Additionally, the Debtors have received various comments from the U.S. Trustee regarding the Plan, all of which have been included in the modified version of the Plan filed contemporaneously herewith, and the Debtors are not aware of any outstanding request from the U.S. Trustee.  And no regulator has objected to the Plan on the basis that any regulatory approval is needed to confirm or consummate the Plan.[5]

11.    The remaining objections have either been resolved or should be overruled for the reasons set forth further below.

12.    As described in detail herein and in the Disclosure Statement, the Restructuring Transactions set forth in the Plan provide the Debtors and their creditors with the best possible

---

[5]    For the avoidance of doubt, there are still certain regulatory approvals that need to be obtained the Plan to become effective.  Most notably, a Form 10 must become effective with the SEC for the NewCo Stock to be able to trade. The Debtors submitted a letter to the SEC in July 2023 seeking "preclearance" of the NewCo providing audited historical financial statements for only the Mining company in the Form 10 because the Debtors' records for their retail and investing businesses are insufficient to be audited for purposes of the Form 10.   For those reasons, the Debtors are seeking approval from the SEC to exclude those historical audited financials from the Form 10, and those discussions with the SEC remain ongoing as of the date hereof.  Once the Form 10 is finalized and filed, a 60-day waiting period must conclude before the Form 10 can become effective, which is a condition precedent to the Effective Date of the Plan.

recovery and a smooth conclusion to these Chapter 11 Cases.  As described in the Disclosure Statement, pursuant to the NewCo Transaction, the Fahrenheit-created NewCo will purchase certain assets of the Debtors, including the mining business, and in return convey 100% of the equity in NewCo to creditors.  On the Effective Date, NewCo will become a public company with its stock intended to be listed on NASDAQ.  The NewCo Transaction is, in effect, a full-scale reorganization sponsored by the Fahrenheit Group, as well as the potential to toggle to the Orderly Wind Down if necessary.  The NewCo Transaction is a full-scale reorganization that recognizes and seizes on the long-term promise and potential of cryptocurrency, while the Orderly Wind Down is a "Plan B" alternative to the NewCo Transaction that includes a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets.  If the NewCo Transaction cannot be completed for any reason, the Debtors can elect to pivot to the Orderly Wind Down.  No matter what transaction is ultimately pursued, however, the Debtors' creditors will receive significant value: under either transaction, the Plan provides that the Debtors will distribute at least $2.03 billion of cryptocurrency to their creditors, subject to the fluctuations in cryptocurrency prices.

13.    As contemplated by the NewCo Transactions, U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin"), one of the largest and most successful Bitcoin mining operators, will run NewCo's mining operations.  US Bitcoin will assist NewCo with energizing NewCo's existing fleet of miners and de-risking the build out and operation of NewCo's Bitcoin mining business.  Proof Group Capital Management LLC will lead NewCo's staking efforts— contributing its staking intellectual property to NewCo and assisting NewCo in developing and growing its staking infrastructure.  Fahrenheit intends to promptly list the equity of NewCo on NASDAQ to provide creditors receiving NewCo stock under the Plan with liquidity for the stock.

14.     The Orderly Wind Down allows the Debtors, in a manner consistent with their fiduciary duties, to quickly pivot from the NewCo Transactions, without the need to restart the plan process and propose and solicit a new chapter 11 plan, in the event the NewCo Transactions cannot be consummated.  The Orderly Wind provides for (a) the establishment of a pure play standalone mining company, (b) a timely monetization of the Debtors' illiquid assets, and (c) an orderly wind down of the Debtors' estates.  Like under the NewCo Transaction, creditors will receive recoveries in the form of an immediate distributions of BTC or ETH and Litigation Proceeds.  Instead of NewCo Common Stock, however, creditors will receive the value of the standalone mining business and proceeds from the liquidation of the Debtors' illiquid assets.

15.     The terms of the Plan are overwhelmingly supported by the Debtors' creditors and provide for a clear pathway to emergence.  The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.  The Debtors are aware, however, that there are risks to implementing the NewCo Transaction, and the Debtors and the Committee believe that it is in the best interests of all stakeholders to also prepare for a scenario where the NewCo Transaction cannot be completed.  Regardless of which transaction is ultimately implemented, the Plan provides Holders of Claims with the maximum recoveries, on the quickest timeline, and with the greatest amount of flexibility.

16.     As set forth below, the Plan satisfies the required elements of the Bankruptcy Code and should be confirmed.

## **Background**

### I.     **Solicitation and Notification Process.**

17.     On July 13, 2022, eight Celsius entities each filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Debtors") with the United States Bankruptcy Court for the

Southern District of New York (the "Court").  On December 7, 2022, three additional entities—GK8 Ltd., GK8 UK Limited, and GK8 USA LLC—each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Court (such debtors, "GK8" and, together with the Initial Debtors, the "Debtors").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[6]  These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53 and 1648].  On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 241].  On September 29, 2022, the Court entered an order directing the appointment of an examiner [Docket No. 920].  On April 4, 2023, the Court entered an order discharging the examiner [Docket No. 2364].

18.    On August 17, 2023, the Court entered the *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to the Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 3337] (the "Disclosure Statement Order") approving the Disclosure Statement.  The Disclosure Statement Order also approved, among other things, the Solicitation Deadline, Voting Record Date, Voting Deadline,

---

[6]    A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the Debtors' Chapter 11 Cases is set forth in greater detail in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "First Day Declaration").

Confirmation Brief Deadline, Plan Objection Deadline, Plan Objection Reply Deadline, 3018 Motion Objection Deadline, Publication Deadline, Plan Supplement Filing Deadline, and the deadline to file the Voting Report, and approving the forms and manner of the Confirmation Hearing Notice, the Non-Voting Status Notices, the Ballots, the Publication Notice, and the Solicitation and Voting Procedures (each as defined in the Disclosure Statement Order). The Debtors complied with the procedures approved by the Disclosure Statement Order.

19.    On August 17, 2023, the Debtors commenced solicitation on the Plan. By the Solicitation Deadline of August 25, 2023, the Debtors caused their Solicitation Agent, Stretto,[7] to distribute the Solicitation Package (as defined in the Disclosure Statement Order), which included a cover letter, the Plan, the Disclosure Statement and all exhibits thereto, the Confirmation Hearing Notice, and the applicable Ballot, to Holders of Claims and Interests entitled to vote to accept or reject the Plan as of the Voting Record Date, via electronic mail and/or first-class mail in either paper or electronic format (*i.e.*, USB flash drive format). The Debtors also caused a "push" notification to be delivered to Holders of Claims in the Account Holder Voting Classes through the Debtors' mobile application linking such Holders to the Solicitation Agent's online voting portal and the Confirmation Hearing Notice, which informed the recipients of, among other things: (a) the date and time set for the hearing to consider confirmation of the Plan; (b) the manner in which a copy of the Plan and Disclosure Statement can be obtained without a fee through the Debtors' restructuring website or for a fee at the Court's PACER website; and (c) the deadline for filing objections to the Plan and the Disclosure Statement. Finally, the Debtors caused the Publication Notice to be published in *The New York Times (National Edition)* and *The New York*

---

[7]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

*Times (International Edition)* on August 25, 2023, and every Wednesday in September starting on

September 6, 2023 on *CoinDesk* (CoinDesk.com).[8]

20.    The deadline for all Holders of Claims and Interests entitled to vote on the Plan to

cast their ballots was September 22, 2023, at 4:00 p.m. (prevailing Eastern Time) and the deadline

to file objections to confirmation of the Plan was September 22, 2023, at 4:00 p.m. (prevailing

Eastern Time).[9]    On September 27, 2023, the Debtors filed the *Amended Declaration of Brian*

*Karpuk, Managing Director of Stretto, Inc. on Behalf of Stretto Regarding Solicitation of Votes*

*and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization of Celsius*

*Network LLC and Its Debtor Affiliates* [Docket No. 3574] (the "Voting Report"),[10] which is

summarized below in detail.

21.    In compliance with the Bankruptcy Code and the Disclosure Statement Order, only

Holders of Claims in Impaired Classes entitled to receive or retain property on account of such

Claims were permitted to vote to accept or reject the Plan.[11]    Holders of Claims and Interests were

not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders

were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy

Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan

---

[8]    *See Affidavits of Publication* [Docket Nos. 3367, 3368, 3507, 3598].

[9]    *See* Disclosure Statement Order, Art. III.A.f, ¶ 23(a).   The Debtors agreed to extend the deadline to object to
confirmation of the Plan for the U.S. Trustee to September 24, 2023, at 12:00 p.m. (prevailing Eastern Time).
*See* [Docket No. 3530].

[10]    On September 25, 2023, the Debtors timely filed the *Declaration of Brian Karpuk, Managing Director of Stretto,
Inc. on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting the
Joint Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560].   On September
27, 2023, the Debtors filed an amended Voting Report with minor corrections.   For the avoidance of doubt,
references to the Voting Report in this Memorandum refer to the Voting Report filed at Docket No. [3574].

[11]    *See* 11 U.S.C. § 1126.

(in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).[12]

22.    Based upon the Voting Report, approximately 95% of Holders of Claims and Interests that voted on the Plan in Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14 (the "Voting Classes") voted to accept the Plan:

| | | Count | % | Dollars | % |
|---|---|---|---|---|---|
| **Class 2 (Retail Borrower Deposit Claims)** | | | | | |
| | Accept: | 4,215 | 98.83% | $220,581,222.65 | 96.33% |
| | Reject: | 50 | 1.17% | $8,410,803.02 | 3.67% |
| **Class 4 (Convenience Claims)** | | | | | |
| | Accept: | 38,248 | 98.25% | $59,269,958.86 | 98.69% |
| | Reject: | 681 | 1.75% | $784,185.09 | 1.31% |
| **Class 5 (General Earn Claims)** | | | | | |
| | Accept: | 38,734 | 99.35% | $2,418,402,994.19 | 99.28% |
| | Reject: | 254 | 0.65% | $17,495,733.72 | 0.72% |
| **Class 6A (General Custody Claims)** | | | | | |
| | Accept: | 2,896 | 99.51% | $87,378,989.97 | 98.78% |
| | Deemed to Accept: | 2,973 | | $52,451,991.14 | |
| | Reject: | 29 | 0.49% | $1,722,936.80 | 1.22% |
| **Class 7 (Withhold Claims)** | | | | | |
| | Accept: | 654 | 98.79% | $5,386,520.24 | 82.56% |
| | Reject: | 8 | 1.21% | $1,138,215.57 | 17.44% |
| **Class 8 (Unsecured Loan Claims)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 2 | 100.00% | $82,782,261.00 | 100.00% |
| **Class 9 (General Unsecured Claims - Consolidated Debtors)** | | | | | |
| | Accept: | 20 | 74.07% | $6,375,927.86 | 99.56% |
| | Reject: | 7 | 25.93% | $28,436.05 | 0.44% |
| **Class 9 (General Unsecured Claims - Celsius Mining LLC)** | | | | | |
| | Accept: | 1 | 50.00% | $140,000.00 | 2.58% |
| | Reject: | 1 | 50.00% | $5,284,333.82 | 97.42% |
| **Class 9 (General Unsecured Claims - Celsius Network Inc.)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 1 | 100.00% | $3,325.00 | 100.00% |

---

[12]    *See* Disclosure Statement Order ¶ 16(a).

| Class 10 (State Regulatory Claims) | | | | |
|---|---|---|---|---|
| Accept: | 1 | 100.00% | $29,843,334.00 | 100.00% |
| Reject: | 0 | 0.00% | $0.00 | 0.00% |

| Class 14 (Series B Preferred Interests) | | | | |
|---|---|---|---|---|
| | Count | % | Shares | % |
| Accept: | 7 | 98.34% | 29,585 | 98.34% |
| Reject: | 1 | 12.50% | 500 | 1.66% |

23.     The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on October 2, 2023, at 2:00 p.m. (prevailing Eastern Time).  Concurrently with this Memorandum, the Debtors have submitted the proposed *Order Confirming the Modified Joint Plan of Celsius Network LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order").

## II.    The Restructuring Transactions.

24.     The terms of the Plan provide a clear pathway to emergence. The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.

25.     Certain key terms of the Plan include:[13]

- **Retail Borrower Deposit Claims**.[14]  Each Holder of an Allowed Retail Borrower Deposit Claim shall receive:

  Repayment Election:  If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail

---

[13]    Each description of the Plan or the Disclosure Statement herein is qualified in its entirety by the terms of the Plan and the Disclosure Statement, as applicable.

[14]    In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 67.0% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment).  Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

*or*

Set Off Treatment:  If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

*plus*

(ii) On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **Convenience Claims**.  Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

- **General Earn Claims**.   Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **General Custody Claims**.[15]  For Holders of Allowed General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order:  Each such Holder of an Allowed General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in the Disclosure Statement, one of two treatments:

  Treatment A:  (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim provided that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3. of the Plan.

  Treatment B:  The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim.  The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Court following notice and a hearing.  To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim.  Any such Allowed General Custody Claim will be subject to the ADR Procedures.

  For Custody Settlement Participants:  Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; provided that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; provided, further, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan.

- **Withdrawable Custody Claims**.  Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order.  For the avoidance of doubt, any Holder of an Allowed

---

[15]   Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

- **Withhold Claims**.[16] Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:

  Treatment A:  If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Liquid Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in the Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  Treatment B:  If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

  For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement.

- **Unsecured Loan Claims**.  Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

---

[16] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

- **General Unsecured Claims**.  Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in the Disclosure Statement.

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) the Litigation Proceeds, and (d) the Illiquid Recovery Rights.

- **State Regulatory Claims**. Each Holder of an Allowed State Regulatory Claim shall be entitled to the same recovery as a Holder of a General Unsecured Claim; *provided* that notwithstanding the foregoing, all State Regulatory Claims shall be suspended against the Debtors and will not be Allowed Claims and shall not receive any distributions in these Chapter 11 Cases, in each case, so long as the Debtors' Plan becomes effective and is fully administered as proposed; *provided*, *further*, that the suspension in the foregoing proviso shall be lifted as to the Debtors if the Chapter 11 Cases are closed, dismissed, or otherwise concluded, in each case, without the Estate(s) being fully administered, including any distributions to creditors, in accordance with the Plan and the Bankruptcy Code. For the avoidance of doubt, the State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.

- **_De Minimis_ Claims**.  All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

- **Series B Preferred Interests**.  Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to any order approving the Series B Settlement Order.

- **Section 510(b) Claims**.[17]  Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

---

[17] The Confirmation Order provides that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any.  The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims.  The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

- **<u>Equitably Subordinated Claims</u>**.  Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date (except as otherwise provided herein), and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court following the resolution of the litigation of the subordination of the Equitably Subordinated Claims. For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed by the Equitable Subordination Stay Order. Holders of Equitably Subordinated Claims need not object to the Plan to preserve all of their rights to contest the proposed classification and equitable subordination of their Claims at the appropriate time; a schedule for this litigation will be set by the Bankruptcy Court or agreement of the parties once the stay in the Equitable Subordination Stay Order ends.

## III.    The Objections.

26.    The Debtors received twelve formal objections to the Plan, twelve letters (largely from *pro se* creditors), and two reservations of rights that the Debtors are treating as objections to the Plan (collectively, the "<u>Objections</u>"), as summarized and defined in the objection chart attached hereto as **<u>Exhibit A</u>** (the "<u>Objection Tracker</u>").  The Debtors also received informal comments from numerous counterparties, including the U.S. Trustee, regulators and other governmental parties, ad hoc groups, and individual creditors, among others.

27.    The Debtors have worked with objecting parties to resolve as many Objections as possible, and as of the date hereof, the Debtors have resolved the majority of Objections.[18]  The Objections have been resolved by stipulating to or including certain language in the Confirmation Order, and/or the amended Plan, as more fully set forth in the Objection Tracker.

28.    Compared to the objections that the Debtors received in the past with respect to other motions filed in these Chapter 11 Cases, including the nearly thirty objections to the Debtors'

---

[18]    The unresolved Objections are as follows:  the 168 Trading Objection, the Pharos Objection, the Bronge Objection, the Schoenau Objection, the Davis Objection, the Ubierna de las Heras Objection, the Securities Plaintiffs Objection, the Schneider Objection, the Phillips Objection, the Cassidy Letter, the First Bohon Letter, the Second Bohon Letter, the First Keeney Letter, the Second Keeney Letter, the First Windom Letter, the Johantgen Letter, the Abruzese Letter, the Truss Letter, the 3541 Letter, the Second Windom Letter, and the Lau Letter.

motion to establish that Earn assets are property of the Debtors' Estates,[19] or the fifteen formal

objections and over twenty letter objections to the approval of the Debtors' Disclosure Statement,[20]

the limited number of Objections to the Confirmation of the Plan is a testament to the Debtors'

efforts—and success—in building consensus since the outset of these Chapter 11 Cases.

29.    Notwithstanding the Objections, the Plan has overwhelming support from the

Holders of Claims and Interests who were entitled to vote.  The transactions contemplated by the

Plan represent a significant achievement for the Debtors and are the direct result of a thorough

marketing process and extensive engagement with many diverse stakeholders.  The Debtors

strongly believe that the Plan represents the best available alternative for all of their stakeholders.

The transactions embodied in the Plan will maximize the value of the Estates and maximize

recoveries to Holders of Claims and Interests.  That the Plan has overwhelming support of the

Debtors' creditor base is a significant achievement and sends the important message that the Plan

can provide a clear path to emergence.

30.    The Debtors continue to work to resolve all outstanding Objections in advance of

the Confirmation Hearing.  To the extent the Debtors are unable to consensually resolve such

Objections prior to the Confirmation Hearing, the Debtors request that the Court overrule such

Objections.  A detailed response to each of the outstanding Objections is set forth in Section VII

of this Memorandum and the Objection Tracker.

---

[19]   *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822]
(the "Earn Ruling") at 13.

[20]   *See Debtors' Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11
Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225], Exh. A.

22-10964-mg    Doc 3609    Filed 09/27/23    Entered 09/27/23 17:52:20    Main Document
Pg 42 of 325

<u>**Argument**</u>

31.    This Memorandum is divided into three parts.  ***First***, the Debtors submit that the amended Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and, therefore the Debtors do not need to resolicit the Plan.  ***Second***, the Debtors present their case in chief that the Plan satisfies all of the applicable requirements of the Bankruptcy Code by a preponderance of the evidence and, accordingly, request that the Court confirm the Plan.  ***Finally***, throughout this Memorandum and in the third part, the Debtors address the Objections and why they should be overruled.

32.    For the reasons set forth herein, and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors request that the Court find that the Debtors have satisfied their burden and confirm the Plan.

**IV.    The Plan, as Modified, Satisfies the Requirements of Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.**

33.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[21]  Further, section 1127(a) provides that when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[22]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[23]  Courts

---

[21]    11 U.S.C. § 1127(a).

[22]    *Id.*

[23]    Fed. R. Bankr. P. 3019.

21

interpreting Bankruptcy Rule 3019 have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated,[24] unless such affected creditors consent to the treatment.[25]

34.    On September 27, 2023, the Debtors filed an amended Plan [Docket No. 3577], which incorporates and reflects certain revisions.  The modifications to the Plan are not material changes.    Rather, they are either modifications to resolve objections to the Plan or permissible, technical modifications to the Plan, each of which either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.  All Holders of Claims and Interests entitled to vote on the Plan are receiving the same recovery under the Plan as amended and filed at [Docket No. 3319].

35.    The Debtors have made the following non-material modifications to the Plan (ordered as they appear in the Plan):

---

[24]  *See In re AMR Corp.*, 502 B.R. 23, 46 (Bankr. S.D.N.Y. 2013) (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) ("[N]onmaterial modifications . . . do not require resolicitation of the respective impaired classes of creditors and equity security holders.").

[25]  *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *31–32 (Bankr. D. Del. May 13, 2010) (finding that plan modifications that did not adversely affect any creditor other than consenting parties did not require resolicitation); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class' distribution was not sufficiently material to require re-solicitation); *In re Pisces Energy, LLC*, Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880, at *10 (Bankr. S.D. Tex. Dec. 21, 2009) (finding that plan modifications that only modified the rights of expressly consenting parties-in-interest did not require resolicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.").

- ***Deactivation Date Timing and Interaction with CEL Token Settlement***.  The Plan now clarifies the Deactivation Date.  Lastly, the Deactivation Date Cryptocurrency Conversion Table will provide that CEL Token is $0.25.

- ***Distribution Cryptocurrency Conversion Table***.  The Plan now clarifies the application of the Distribution Cryptocurrency Conversion Table, the time period in which such tables must be filed, and how Cryptocurrency prices in such tables will be set following the Effective Date.

- ***Equitably Subordinated Claims***.  The Plan now reflects that litigation regarding the subordination of the Equitably Subordinated Claims is stayed pursuant to the Equitable Subordination Stay Order [Docket No. 3450].

- ***Exculpated Parties***.  The Plan now clarifies that current *and former* financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals are included in the definition of "Exculpated Parties."

- ***Released Parties and Releasing Parties***.  At the request of the SEC, the Plan now clarifies that Holders of *De Minimis* Claims, Section 510(b) Claims, or Other Interests shall not be Released Parties or Releasing Parties unless such parties opt into the Plan's releases.

- ***Withdrawal Preference Exposure***.  In response to an informal request from a stakeholder, the Plan now clarifies that the Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action.  Additionally, the Plan clarifies that the Debtors and the Committee (and after the Effective Date, the Litigation Administrator in consultation with the Plan Administrator) may enter into agreements with Account Holders to settle their Withdrawal Preference Exposure.

- ***State Regulatory Claims***.  As a result of negotiations with Holders of State Regulatory Claims, the Plan now clarifies that State Regulatory Claims shall be suspended and shall not receive any distribution so long as the Debtors' Plan becomes effective and is fully administered.  The State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.  In addition, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan regardless of whether or how such Holders have voted on the Plan.

- ***Account Holder Avoidance Action Settlement***.  The Plan now clarifies that the Account Holder Avoidance Action Settlement releases Avoidance Actions against any Account Holder who is not an Excluded Party and who (i) (a) has Withdrawal Preference Exposure less than *or equal to* $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan and that such Holders will receive a 100% recovery on their Allowed General Custody Claim.

- ***Distribution Mechanics***.  The Plan now clarifies that the Debtors will not be the Distribution Agent for distributions to Withhold Claim Holders.  In addition, the Debtors may elect in their reasonable discretion to make distributions in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.

- ***NewCo Common Stock***.  The Plan now clarifies that the NewCo Common Stock issued on the Effective Date may, with the consent of the Committee and the Plan Sponsor be issued into a trust or similar structure to be held until it is fully and finally distributed to Holders of Allowed Claims as provided in the Plan and in the Transaction Steps Memorandum.  Additionally, pursuant to discussions with the SEC, the Plan now clarifies that only NewCo Common Stock issued in satisfaction, settlement, release, and discharge of Allowed Claims will be issues in reliance upon section 1145.

- ***EIP Awards***.  As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Plan Administrator may distribute the EIP Awards after confirming to Committee counsel that the applicable metrics have been satisfied.  The Plan now also clarifies that the KEIP Motion shall be deemed withdrawn with prejudice upon the Effective Date.

- ***Institutional Loans***.  In response to 168 Trading's Objection, the Plan now clarifies that Institutional Loans will be assumed and assigned to NewCo to the extent such Institutional Loans are not Executory Contracts included on the Schedule of Rejected Contracts.

- ***Undeliverable Distributions and Unclaimed Property***.  The Plan now clarifies that Unclaimed Distributions which remain undeliverable for a period of one year after *the first date on which such distributions are open for a particular Holder*, shall revert to the Post-Effective Date Debtors.

- ***Releases and Exculpations***.

  o As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Debtor Release, Third-Party Release, and Exculpation do not release or exculpate any claim or cause of action against any of the Debtors advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.).  Further, following negotiations with the U.S. Trustee, the scope of the exculpation provision was narrowed.

  o As a result of negotiations with the SEC, the Plan now clarifies that only Releasing Parties are restricted from commencing or pursuing a Claim or Cause of Action against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties without the Bankruptcy Court's approval and that such restriction applies only to (i) core claims arising from or relating to these Chapter 11 Cases or (ii) Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, Third-Party Release, or Exculpation contained in the Plan.  Further, the Plan now clarifies that the Bankruptcy Court retains sole and exclusive jurisdiction to adjudicate whether a colorable Claim or Cause of Action exists.

- ***Additional Provisions Regarding Governmental Units***.  As a result of continued negotiations with Governmental Units, the Plan now clarifies (i) the NewCo Assets are transferred free and clear or all Claims and Interests arising before the Effective Date, (ii) Governmental Units may exercise their police and regulatory powers against NewCo regarding any post-Effective Date

violations, and (iii) the Debtors and their successors and assigns, other than NewCo, shall not offer or sell securities or provide banking or money services.

- ***Ministerial Edits***.  The Debtors made formatting and grammatical updates where appropriate.

36.    Therefore, the modifications are immaterial or have been consented to after negotiations among consenting parties.  Thus, they comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.[26]  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

**V.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code**.

37.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[27]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable nonbankruptcy law.

---

[26]    *See AMR Corp.*, 502 B.R. at 46 (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Best Prods. Co.*, 177 B.R. 791, 802 (S.D.N.Y. 1995) ("The court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment."); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. at 301 ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications.  The rules applicable to such modifications should be read and interpreted consistent to that end.") (citations omitted).

[27]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (internal footnote omitted).

A.    **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1))**.

38.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[28]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[29]  As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as well as other applicable provisions.[30]

B.    **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

39.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[31]

---

[28]    11 U.S.C. § 1129(a)(1).

[29]    S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan." (citations omitted)); *In re Simplot*, No. 06-00002 (TLM), 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (noting that the objective of section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization).

[30]    *See* Campagna Decl. ¶¶ 10–14.

[31]    11 U.S.C. § 1122(a).

40.     The substantial similarity requirement does not mean that claims or interests within a particular class must be identical or that all similarly situated claims receive the same treatment under a plan.[32]   Indeed, as one court in this district has stated, "a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment."[33]   Courts generally will approve placement of similar claims in different classes, provided that a "rational" or "reasonable" basis exists for doing so.[34]   Recognizing this flexibility, courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[35]   Courts have identified several grounds justifying the separate classification of claims, including where members of a

---

[32]   *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *In re Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes." (citations omitted)).

[33]   *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

[34]   *See, e.g., In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25-123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[35]   *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

particular class possess different legal rights[36] and where the debtors have valid business reasons for separate classification.[37]

41.      The Plan's classification of Claims and Interests, as set forth in Article III therein, satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into seventeen (17) separate Classes, with the Claims and Interests in each Class either differing legally and factually from those in other Classes or being grouped separately based on other relevant criteria.  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.      <u>Class 1</u>:  Other Secured Claims;

b.      <u>Class 2</u>:  Retail Borrower Deposit Claims;

c.      <u>Class 3</u>:  Other Priority Claims;

d.      <u>Class 4</u>:  Convenience Claims;

e.      <u>Class 5</u>:  General Earn Claims;

f.      <u>Class 6A</u>:  General Custody Claims;

g.      <u>Class 6B</u>:  Withdrawable Custody Claims;

h.      <u>Class 7</u>:  Withhold Claims;

i.      <u>Class 8</u>:  Unsecured Loan Claims;

j.      <u>Class 9</u>:  General Unsecured Claims;

k.      <u>Class 10</u>:  State Regulatory Claims;

l.      <u>Class 11</u>:  De Minimis Claims;

m.      <u>Class 12</u>:  Intercompany Claims;

---

[36]   *See In re Drexel*, 138 B.R. at 715.

[37]   *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly-situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, WL 2779438, at *3.

n.      Class 13:  Intercompany Interests;

o.      Class 14:  Series B Preferred Interests;

p.      Class 15:  Other Interests;

q.      Class 16:  Section 510(b) Claims; and

r.      Class 17:  Equitably Subordinated Claims.

42.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies Claims and Interests because each Holder of such Claims or Interests may hold or have held rights in the Debtors' Estates legally dissimilar to the rights that Holder of Claims or Interests in other classes may hold or have held or because substantial administrative convenience resulted from such classification. For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business).

43.    Account Holder Claims are classified into separate Classes because Account Holders participated in differing Celsius programs with varying rights and obligations, and invested in different products and services pursuant to different contractual terms.  For instance, as has been documented extensively throughout these Chapter 11 Cases, cryptocurrency in Earn Accounts is different than cryptocurrency in Custody Accounts.  As the Court found, pursuant to the applicable Terms of Use, cryptocurrency in the Earn Program belongs to the Debtors' Estates,

whereas cryptocurrency in the Custody Program belongs to customers.[38]    Accordingly, General

Earn Claims are classified separately from Custody Claims under the Plan.  In addition, Withhold

Claims were subject to no Terms of Use at all.  Convenience Claims are classified differently from

other Account Holder Claims because these Claims are so small in amount and large in number as

to make otherwise dealing with them (by classifying them as General Earn Claims, for instance)

burdensome.[39]    General Unsecured Claims are classified differently from other unsecured Claims

because they are structurally different than Administrative Claims, Priority Tax Claims, Other

Priority Claims, Intercompany Claims, Convenience Claims, General Earn Claims, Custody

Claims, Withhold Claims, Retail Borrower Deposit Claims, Unsecured Loan Claims, Section

510(b) Claims, State Regulatory Claims, or Equitably Subordinated Claims, and are comprised

primarily of obligations of the Debtors arising in the ordinary course of business.  Accordingly,

the Debtors respectfully submit that the Plan satisfies section 1122(a) of the Bankruptcy Code.

44.    *Pro se* creditor Johan Bronge ("Mr. Bronge") objects to the Plan on the basis that,

among other things, Retail Borrowers are classified and treated differently from Institutional

Borrowers.[40]    This argument is misguided and should be overruled as further set forth in the

Debtors' response to the Bronge Objection and the several other letters filed regarding similar

issues, *infra* in Section VII of this Memorandum.

**C.    The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.**

45.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every

---

[38]    *See* Earn Ruling at 30 (holding that assets in Earn Accounts are property of the Debtors' Estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[39]    *See also* 11 U.S.C. § 1122(b).

[40]    *See generally* Bronge Obj.

chapter 11 plan must satisfy.  As detailed below, the Debtors respectfully submit that the Plan satisfies each of these requirements.[41]

46.    ***Designation of Classes of Claims and Interests (§ 1123(a)(1))***.  Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate, with specified exceptions, classes of claims and interests subject to section 1122 of the Bankruptcy Code.[42]  Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(1) of the Bankruptcy Code, and no party has asserted otherwise.

47.    ***Specification of Unimpaired Classes (§ 1123(a)(2))***.  Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[43]  Article III.A of the Plan identifies Classes 1, 3, and 6B as Unimpaired and preserves optionality for the Debtors to render Classes 12 and 13 Unimpaired.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

48.    ***Treatment of Impaired Classes (§ 1123(a)(3))***.  Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[44]  Article III.A of the Plan identifies Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 as Impaired and preserves optionality for the Debtors to render Classes 12

---

[41]  *See* Campagna Decl. ¶¶ 10–33.

[42]  11 U.S.C. § 1123(a)(1).

[43]  11 U.S.C. § 1123(a)(2).

[44]  11 U.S.C. § 1123(a)(3).

and 13 Impaired.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

49.    ***Equal Treatment Within Classes (§ 1123(a)(4))***.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[45]    Article III of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that any such Holder agrees to less favorable treatment.[46] Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

50.    ***Means for Implementation (§ 1123(a)(5))***.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.[47]    The Plan satisfies this requirement because Article IV of the Plan provides for, among other provisions, the following means by which the Plan will be implemented:

a.    Substantive consolidation of the Initial Consolidated Debtors and Celsius Lending LLC and Celsius Networks Lending LLC;[48]

---

[45]    11 U.S.C. § 1123(a)(4).

[46]    *See* Campagna Decl. ¶ 17.

[47]    11 U.S.C. § 1123(a)(5).

[48]    The substantive consolidation of Celsius Network Limited and Celsius Network LLC was previously approved by order of the Court.  *See* [Docket No. 3074].  The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate the Initial Consolidated Debtors with Celsius Lending LLC and Celsius Networks Lending LLC on the same terms, effective as of the Effective Date.

b.      the CEL Token Settlement;[49]

c.      the Account Holder Avoidance Action Settlement;[50]

d.      the Custody Settlement;[51]

e.      the Withhold Settlement;[52]

f.      the Series B Settlement;[53]

g.      the Retail Borrower Settlement;[54]

h.      the Class Claim Settlement;[55]

i.      the consummation of either the NewCo Transaction or the Orderly Wind Down in accordance with the Transaction Steps Memorandum;

j.      the appointment of the Plan Administrator as the sole director and sole officer of the Post-Effective Date Debtors, and who will administer the Post-Effective Date Debtors' estates as further described in the Plan Administrator Agreement;

k.      in the event the NewCo Transaction is consummated, the transfer of assets to NewCo and vesting of assets in the Post-Effective Date Debtors;

l.      in the event the NewCo Transaction is consummated, the issuance and distribution of NewCo Common Stock;

---

[49] The Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and resubordination. *See* Plan, Art. IV.B.2.

[50] The Plan shall effectuate the Account Holder Avoidance Action Settlement. *See* Plan, Art. IV.B.3.

[51] The Custody Settlement was previously approved by the Court. *See* [Docket No. 2291].

[52] The Withhold Settlement was previously approved by the Court. *See* [Docket No. 2509].

[53] The Series B Settlement was previously approved by the Court. *See* [Docket No. 3074].

[54] The Plan shall effectuate the Retail Borrower Settlement. *See* Plan, Art. IV.B.7.

[55] The Plan shall effectuate the Class Claim Settlement. *See* Plan, Art. IV.B.8. The Class Claim Settlement has been approved by the Court [Docket No. 3288], and Account Holders (except with respect to Custody Claims) had an opportunity to opt out of the Class Claim Settlement when voting on the Plan. As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes opted out of the Class Claim Settlement. *See* Voting Report ¶ 18.

33

m.      in the event the Orderly Wind Down is consummated, the funding of distributions from the Wind-Down Assets, which are all of the Debtors' assets and which shall vest in the Post-Effective Date Debtors pursuant to the Plan Administrator Agreement;

n.      in the event the Orderly Wind Down is consummated, the appointment of a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet;

o.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the appointment of a Litigation Administrator to prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans;

p.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of a segregated Litigation Recovery Account funded with the Initial Litigation Amount and controlled by the Litigation Administrator(s);

q.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of the Litigation Oversight Committee;

r.      the contribution of Contributed Claims;

s.      the cancellation of all notes, instruments, certificates, and other documents;

t.      the authorization, approval, and ratification of all actions contemplated by the Plan without any further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable;

u.      the creation of the NewCo Board and the appointment of such directors in accordance with the terms of the Plan;

v.      the adoption and implementation of the Emergence Incentive Plan and the grant of awards thereunder by the

Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation;

w.    to the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the adoption and implementation of the Emergence Retention Plan and the grant of awards thereunder by the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo, as applicable;

x.    the application of section 1146(a) of the Bankruptcy Code to any transfers of property under the Plan (including the Restructuring Transactions) or pursuant to certain other actions; and

y.    the preservation of Causes of Action by the Post-Effective Date Debtors and the enforcement thereof by the Litigation Administrator(s) (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action).

51.    The precise terms governing the execution of these transactions are set forth in greater detail in the applicable Definitive Documents or forms of agreements included in the Plan Supplement.    Accordingly, the Debtors respectfully submit that the Plan, together with the documents and forms of agreement included in the Plan Supplement,[56] satisfies section 1123(a)(5) of the Bankruptcy Code.

52.    ***Issuance of Non-Voting Securities (§ 1123(a)(6))***.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities and an appropriate division of voting power among the classes of securities in the reorganized debtor's corporate charter.[57]    Here, the New Organizational

---

[56]    The Plan Supplement was filed on July 28, 2023 [Docket No. 3115] (the "First Plan Supplement"), August 13, 2023 [Docket No. 3273], September 8, 2023 [Docket No. 3444] (the "Third Plan Supplement"), September 15, 2023 [Docket No. 3483], September 23, 2023 [Docket No. 3550], and September 27, 2023 [Docket No. 3583].

[57]    11 U.S.C. § 1123(a)(6).

Documents prohibit the issuance of non-voting securities.[58]  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code[, and no party has asserted otherwise].

53.     ***Directors and Officers (§ 1123(a)(7))***.  Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selecting of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[59]  The Plan identifies the manner in which members of NewCo's New Board will be selected, and the identities of such new members have been disclosed.[60]  The identities of the Plan Administrator, Litigation Administrator, and members of the Litigation Oversight Committee have also been disclosed.[61]  The selection of the initial directors of NewCo was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

54.     The Phillips Objection argues that the Committee has improperly nominated and advocated for certain directors.  The Committee is responding to the Phillips Objection and the Debtors incorporate the Committee's arguments made in such response by reference.

     **D.     The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

55.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the

---

[58]   *See* Third Plan Supp., Exh. A ¶ 5.

[59]   11 U.S.C. § 1123(a)(7).

[60]   *See* Plan, Art. IV.D.7; Third Plan Supp., Exh. B.

[61]   *See* Plan, Art. IV.F., Art. IV.G, Third Plan Supp., Exh. F, Exh. G.

Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11 of the Bankruptcy Code.[62]

56.      The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Pursuant to Article III of the Plan, Classes 1, 3, and 6B are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.  On the other hand, Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests, as applicable, within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[63]  Classes 12 and 13 are either Impaired or Unimpaired, based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.   In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease:  (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as

---

[62]      11 U.S.C. § 1123(b)(1)–(3), (6).

[63]      *Id.*

applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

57.     Finally, for the reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code.[64]  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(b) of the Bankruptcy Code.

### 1.     The Debtor Release Is Appropriate and Complies With the Bankruptcy Code.

58.     Article VIII.C of the Plan provides for releases by the Debtors of claims and causes of action against the Released Parties[65] (the "<u>Debtor Release</u>").   The Debtors will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these

---

[64]    *See* Ferraro Decl. ¶ 10.

[65]    Pursuant to the Plan, "<u>Released Parties</u>" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party.  Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided*, *further*, that, notwithstanding anything to the contrary in the Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided*, *further*, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.  For the avoidance of doubt, any Holder of a State Regulatory Claim, *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest shall not be a Released Party in its capacity as such unless such Holder opts into becoming a Releasing Party.  *See* Plan, Art. I.A.206. The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

Chapter 11 Cases and related implementation of the Plan and related documents, ***with several
important exceptions***.  For example, the Debtors are not proposing to release (a) any Cause of
Action included in the Schedule of Retained Causes of Action or any Cause of Action under the
Plan against an Excluded Party (including Mr. Mashinsky, Mr. Daniel Leon, and
Mr. Cohen-Pavon, among others), (b) any Avoidance Action not released pursuant to the Account
Holder Avoidance Action Settlement, or (c) any claims or causes of action against any of the
Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to
timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No.
22-10943 (Bankr. S.D.N.Y.) (MEW).[66]

59.    For the reasons discussed herein, the Debtor Release is the product of arm's-length
negotiations, was critical to obtaining support for the Plan from various constituencies, and is in
the best interests of the Estates.  Indeed, the Debtor Release was negotiated in connection with the
other terms of the Plan and is an indispensable component to achieving final resolution of potential
disputes, in exceedingly complex Chapter 11 Cases, that would otherwise extend and negatively
affect these Chapter 11 Cases and the recoveries available to Account Holders and other creditors.

60.    It is well-settled that a debtor is authorized to settle or release its claims in a
chapter 11 plan.[67]  Such releases are granted by courts in the Second Circuit where they are in the
"best interests of the estate."[68]  In determining whether such a release is within the best interests
of the estate, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each]

---

[66]    *See* Plan, Art. VIII.C.

[67]    *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) (holding the debtor
may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's
release of its own claims is permissible).

[68]    *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's
plan, courts consider whether such releases are in the best interest of the estate." (citation omitted)).

dispute" and "the settlement need not be the best that the debtor could have obtained."[69] Under this standard, the "court should instead 'canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[70] Courts in the Second Circuit consider the following factors to determine whether a settlement is within the range of reasonableness: (a) the balance between the claim's possibility of success and the settlement's benefits; (b) the likelihood of complex and protracted litigation, including attendant expense, inconvenience, and delay; (c) the interests of creditors; (d) whether other interested parties support the settlement; (e) the nature and breadth of releases; (f) the competency and experience of counsel supporting, and the experience and knowledge of the judge reviewing, the settlement; and (g) the extent to which the settlement is the product of arm's-length bargaining.[71]

61.    Here, the Debtor Release is a vital component of the Plan, particularly for Account Holders, and constitutes a sound exercise of the Debtors' business judgment.  The Released Parties played an integral role in the development of the Plan and have expended significant time and resources resolving the complex issues in these Chapter 11 Cases to enable the Debtors to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as quickly as possible. Over the course of the past year, as the Debtors, the Committee, various ad hoc groups, the Series B Holders, and *pro se* creditors negotiated multiple settlements and litigated numerous legal issues, many of which were questions of first impression, it became apparent that the Debtor Release would be an important part of providing closure to these challenging Chapter 11 Cases and a necessary condition of the consummation of the Restructuring Transactions embodied in the

---

[69]    *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[70]    *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

[71]    *Id.* (citing *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

Plan.[72]  Without the Debtor Release, the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the Plan, and the Debtor Release provides finality to parties in interest.  Losing the participation of the Released Parties on the eve of confirmation would threaten the viability of the Plan, including eliminating the Debtors' ability to make in-kind distributions and hindering the Debtors' chances of success in consummating the NewCo Transaction.

62.    The Debtor Release was also developed following extensive investigations and is supported by the Committee.  Specifically, during these Chapter 11 Cases, there were numerous investigations into the conduct of the Debtors and their current and former officers, directors, and employees, including internal investigations led by the Special Committee, an investigation by the Committee, an investigation by the Examiner resulting in a lengthy public report, and numerous investigations by state and federal governmental entities.  All of those investigations were considered and taken into account in forming the Debtor Release, and the Schedule of Excluded Parties that includes individuals who the Debtors or the Committee determined should not be released.  That is, the robust process run by the Debtors in close consultation with the Committee further demonstrates that the Debtor Release is appropriate and reasonable.

63.    Significantly, the Debtor Release includes releases granted pursuant to the Account Holder Avoidance Action Settlement.  In other words, the Debtor Release allows the Debtors to release Account Holders from potential preference actions if the Account Holders accept the Account Holder Avoidance Action Settlement, and therefore provides closure and comfort to Account Holders, who have consistently expressed concern over preference actions and for whom these Chapter 11 Cases have been particularly challenging.  In addition, Account Holders who

---

[72]    *See* Ferraro Decl. ¶ 15.

enter into the Account Holder Avoidance Action Settlement will receive expedited distributions because their distributions will not be held back while any preference litigation remains unresolved. In consideration for releasing Account Holders from potential preference actions, the Debtors will receive mutual releases from potential claims and causes of action against the Debtors and, if applicable, payments from Account Holders to settle their Withdrawal Preference Exposure.[73] Specifically, Account Holders with a Withdrawal Preference Exposure of more than $100,000 are required to make a payment to the Debtors of 27.5% of their total Withdrawal Preference Exposure no later than fourteen days prior to the anticipated Effective Date of the Plan.[74] Such payments will benefit the creditor body as a whole because they will increase the amount available for distribution to creditors from the Debtors' Estates without the need for costly and uncertain litigation.

64.    In consideration for the Debtor Release generally, the Debtors and their Estates will receive mutual releases from potential claims and causes of action of each Releasing Party.[75] Simply put, the Debtors do not believe that the benefits that could be obtained by pursuing causes of action against any of the Released Parties would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. The Debtor Release avoids further delay in consummating the Plan following a challenging year after

---

[73] *See generally* Plan, Art. IV.B.3.

[74] *See id.*

[75] Pursuant to the Plan, "Releasing Party" means each of the following, solely in its capacity as such: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f). *See* Plan, Art. I.A.202. The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

the Petition Date, and therefore the inclusion of the Debtor Release is worthwhile and inures to the

benefit of all the Debtors' stakeholders.  For these reasons, the Debtors' agreement to provide the

Debtor Release constitutes a sound exercise of the Debtors' business judgment.[76]  Accordingly,

there is ample justification for providing the Debtor Release, and it should be approved.

65.     The Debtors have modified the Debtor Release in response to the Ubierna

Objection and informal comments from the U.S. Trustee.  Specifically, the Debtors have added a

paragraph to the Debtor Release (and the Exculpation provision) stating that "[n]otwithstanding

anything contained [in the Plan] to the contrary, nothing in the Plan or Confirmation Order shall

release or exculpate any claims or causes of action against any of the Debtors' advisors arising out

of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim

against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.)

(MEW)."[77]

### 2.     The Third-Party Release Is Wholly Consensual and Should Be Approved.

66.     Article VIII.D of the Plan includes a consensual third-party release among the

Debtors and the Releasing Parties[78] (the "Third-Party Release").  Courts in the Second Circuit have

explained that a *consensual* third-party release may be approved with the consent of the affected

---

[76]     *See* Ferraro Decl. ¶ 18.

[77]     *See* Plan, Art. VIII.C, VIII.E.

[78]     Pursuant to the Plan, "Releasing Parties" means each of the following, solely in its capacity as such:  (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).  For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest that fails to opt into the Plan's releases shall not be a Releasing Party in its capacity as such.

party.[79]  Consistent with this instruction, courts in this jurisdiction have held that "[r]eleases can

be granted by consent and that consent can be established by a vote in favor of the plan, at least

where the consequences are plainly and unambiguously expressed to the voting creditor,"[80] and

regularly approve third party releases such as those contained in the Plan on the grounds that such

releases are consensual.[81]  Courts generally agree that an affirmative vote to accept a plan that

contains a third-party release constitutes an express consent to such release.[82]

> 67.    Here, the Third-Party Release under the Plan provides, in sum, that the Releasing

Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not

affirmatively opt out of the Plan's release provisions, will release the Released Parties from any

---

[79]    *See, e.g., In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *In re Adelphia*, 368 B.R. at 268 ("The Seventh Circuit held in *Specialty Equipment* that consensual releases are permissible, and the *Metromedia* court did not quarrel with that view." (citation and footnote omitted)); *In re Spiegel, Inc.*, No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (holding that nondebtor releases are tolerated if the creditors consent (citing *Metromedia*, 416 F.3d at 142)), *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008); *In re Oneida*, 351 B.R. at 94 (approving consensual release provisions (citing *Metromedia*, 416 F.3d at 142)).

[80]    *See, e.g., In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) Hr'g Tr. 62:16-19; *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (granting third-party release with respect to affected parties that consented to the releases by voting in favor of the plan); *In re Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan. 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and, therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties); *In re Lear Corp.*, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible; *In re Calpine Corp.*, No. 05-60200 (BRL), WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (same).

[81]    *See In re Chassix Holdings, Inc.,* 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("'Consenting Creditors' should include creditors who voted in favor of the Plan . . . [s]imilarly, creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to those releases."); *In re MPM Silicones*, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014) (citing *Metromedia*, 416 F.3d at 141*; see also Genco*, 513 B.R. at 271*; In re Chemtura Corp.,* 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010).

[82]    *E.g., In re SunEdison, Inc.*, No. 16-10992 (SMB), 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) (collecting cases).

and all Claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, *with several important exceptions*. For example, the Releasing Parties will not release the Released Parties from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.[83]

68.     Sensitive to the fact that the majority of the Debtors' creditors are Account Holders with limited prior exposure to chapter 11, the Debtors included a robust and clear explanation of releases in the Disclosure Statement. Ten pages long, the explanation on releases (and exculpations and injunctions) starts with first principles about what a release means in plain English, and includes an exact duplication of this provision, among others, in conspicuous, bold-faced type. The Confirmation Hearing Notice, Ballots, and other Solicitation Package materials distributed to Holders of Claims and Interests entitled to vote on the Plan also included an exact duplication of the release, and the Ballots clearly informed Holders of Claims and Interests entitled to vote on the Plan of the steps they should take if they decided to opt out of the Third-Party Release. Holders who abstained from voting or voted to reject the Plan therefore had the opportunity to opt out of the Third-Party Release. In addition, Holders of Claims presumed to accept the Plan received a Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot, which also reproduced the release in full and provided instructions for opting out of the Third-Party Release. As a settlement with the SEC, the Debtors also agreed to revise the Plan to

---

[83]     *See* Plan, Art. VIII.D.

have the release be "opt in" for classes deemed to reject the Plan.  As a result, Holders of Claims and Interests deemed to reject the Plan received a Non-Voting Notice for Holders Deemed to Reject, which also reproduced the release in full and provided instructions for opting into the Third-Party Release.

69.    As such, affected parties were on notice of the Third-Party Release.  By voting to accept the Plan or opting into the Third-Party Release, these parties have unambiguously consented to the releases and such releases are clearly consensual.  Courts in this District have approved third-party releases as consensual where a plan provided for a third-party release, but the affected parties were afforded the opportunity to opt out of providing such release.[84]  In *Ditech*, this Court held that "parties that did not return a ballot and failed to opt-out of the Third Party Releases are deemed to consent to the Third Party Releases."[85]  The opt-out mechanism is therefore sufficient to demonstrate consent.[86]  The Notice of Non-Voting Status and Ballots clearly explained the process by which a creditor must opt out or opt in to the Third-Party Release and the implications for failing to abide by these instructions.  Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for granting third-party releases is

---

[84]    *See e.g. In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016), *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 1359] ¶ MM (approving third-party release that contained opt out); *In re Tricom, S.A.*, No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009), Order Confirming First Modified Second Amended Prepackaged Joint Chapter 11 Plan of Reorganization For Tricom S.A. and its Affiliated Debtors (As Modified) [Docket No. 568] ¶ K (approving, as consensual, third-party releases where voting parties were afforded the option to opt out).

[85]    *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019).

[86]    *See In re Avianca*, 632 B.R. 124, 136–37 (Bankr. S.D.N.Y. 2021).

sufficient to demonstrate cause.[87]  Finally, the Third-Party Release contains a carve-out for actual

fraud, willful misconduct, and gross negligence.

70.     In addition, as set forth in the Voting Report, 0.13% (504) in number, which is

equivalent to 2.31% ($110,836,665.39), of Holders of Claims or Interests in the Voting Classes

affirmatively opted out of the Third-Party Release.[88]  Furthermore, 1.78% (9) in number, which is

equivalent to 0.09% ($36,871.63) in dollar amount, of Holders of Unimpaired, Unclassified, and

Disputed Claims who received the Non-Voting Packages affirmatively opted out of the

Third-Party Release, while 0.26% (567) in number, which is equivalent to 0.31% ($914.70) in

dollar amount, of Holders of Impaired Claims or Interests who received the Non-Voting Packages

opted into the Third-Party Release.[89]

71.     The U.S. Trustee Objection argues that the releases are "over broad" without

providing further specifics,[90] merely repeating by incorporation its objection to the Disclosure

Statement,[91] where it misinterpreted the releases in the Plan as nonconsensual third-party releases

and argued that the Debtors fail to comply with the (inapplicable) legal standard for nonconsensual

releases set forth in *Metromedia* and *Purdue Pharmaceuticals*.  As the Debtors emphasized above

and in their omnibus reply to objections to the Disclosure Statement,[92] which is incorporated herein

---

[87]   *See id.* at 137.

[88]   *See* Voting Report ¶ 19.

[89]   *See id.*

[90]   *See* U.S. Trustee Obj. at 1–2.  The Ubierna de las Heras Objection makes the same general argument.  *See* Ubierna de las Heras Objection at 2.

[91]   *See Objection of the United States Trustee to Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3182] (the "U.S. Trustee DS Objection").

[92]   *See Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225].

by reference, the Third-Party Releases are consensual, providing for a typical "opt out" mechanism (other than with respect to those parties who are "deemed to reject" and must opt in to the third-party releases)[93] for all creditors that are presumed to accept the Plan, voted to reject the Plan, or abstained from voting on the Plan, which is sufficient to demonstrate consent and is consistent with this Court's previous rulings approving third-party releases.[94]  In the Second Circuit, where third-party releases are consensual, such as these are here, after proper notice and absent objection, "courts generally approve them unless they are truly overreaching on their face."[95]

> a.    **The Released Parties Have Made Substantial Contributions to the Debtors' Restructuring Efforts.**

72.    Further, the Third-Party Release is an important component of the Plan and represents the result of a complicated, yearlong effort among multiple diverse constituencies to bring these Chapter 11 Cases to closure.  As with the Debtor Release, each Released Party has made a substantial contribution to the development of the NewCo Transaction and the Orderly Wind Down justifying their release.

73.    The Released Parties have provided substantial and necessary contributions in exchange for their respective releases under the Third-Party Release, including, among other things, the following:  (a) the Special Committee has been instrumental in advancing investigations into the Debtors' prepetition conduct and cooperating with similar third-party investigations; (b)

---

[93]    The Notice of Non-Voting Status and Ballots sent to such creditors *clearly* explained the process by which a creditor had to opt out or opt in to the third-party releases and the implications for failing to abide by these instructions.  Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for granting third-party releases is sufficient to demonstrate consent. *See In re Avianca*, 632 B.R. at 137.

[94]    *See In re Avianca Holdings S.A.*, 632 B.R. at 136–37 ("[N]umerous cases in this district and elsewhere have approved the use of an opt-out procedure . . . . the opt-out structure is permissible provided that a clear and prominent explanation of the procedure is given as it has been here.").

[95]    *See id.* at 133.  The Debtors respond to the remaining Objections to the Third-Party Release in the Objection Tracker.

the Committee has avidly represented the interests of the large body of unsecured creditors, namely Account Holders, from the day that it was appointed in July 2022,[96] and has been fully engaged in essentially *all* of the major developments, settlements, and litigations of these Chapter 11 Cases; (c) the Retail Borrower Ad Hoc Group and its members and the Earn Ad Hoc Group and its members participated in a three-day mediation in July 2023 before the Honorable Judge Michael E. Wiles of the United States Bankruptcy Court for the Southern District of New York to resolve outstanding issues regarding the treatment of Earn creditors and Borrow creditors, ultimately leading to the amendment of the Plan and revised treatment of General Earn Claims and Retail Borrower Deposit Claims, as well as the Class Claim Settlement, which inured to the benefit of all Account Holders; (d) the Initial Series B Preferred Holders and their Related Parties are Released Parties because of their participation in the negotiation of the Series B Settlement, one of the last issues resolved in these Chapter 11 Cases before commencing solicitation of the Plan[97]; (e) the majority of the foregoing parties were also instrumental in guiding the negotiation of the Plan, the selection of the Stalking Horse Bidder, and the Auction.  As Bidders, the Plan Sponsor (the Fahrenheit Group) and the BRIC Parties were core participants who made the Auction, as well as the subsequent finalization of the Restructuring Transactions and the Backup Bid, the success that it was; (f) Christopher Ferraro is a Released Party in acknowledgement of the significant responsibility he has taken on—and extraordinary leadership he has provided—in the past year as the Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors in a tumultuous environment; (g) finally, significant work will remain once the Plan is Confirmed and the Restructuring Transactions must be implemented.  The Distribution Agent,

---

[96]    *See* Notice of Appointment of Official Committee of Unsecured Creditors [Docket No. 241].

[97]    *See* Series B Settlement Order [Docket No. 3074].

the Plan Administrator, the Litigation Administrator, and (in the event the NewCo Transaction is

consummated) NewCo and its directors and officers, will have crucial roles and take on significant

responsibility to ensure that everything contemplated by the Plan occurs.  Although these Entities

will only begin their work after Confirmation, their contributions will be critical to the success of

the Plan.

74.    Without the substantial contributions and concessions by the Released Parties, the

Debtors' value-maximizing restructuring contemplated by the Plan would not be possible.  The

Released Parties share the common goal of effectuating a successful reorganization.  Courts in this

district have approved third-party releases under similar circumstances.[98]

> **b.    The Debtors' and Other Released Parties' Respective Officers, Directors, Advisors, and Other Representatives and Agents Have Made Substantial Contributions to the Debtors' Restructuring Efforts.**

75.    Finally, the remaining Released Parties include the Released Parties' current

financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and

other professionals, any Releasing Party, and, pursuant to the Schedule of Released and Exculpated

---

[98]    *See, e.g., In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re LATAM Airlines Group S.A.*, WL 2541298 at *48 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re China Fishery Grp. Ltd.*, No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022); *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Jason Industries*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020); *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020); *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019); *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017); *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016); *In re Legend Parent Inc.*, No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014).

Parties filed as part of the Plan Supplement,[99] each individual who was employed by the Debtors on the date the Disclosure Statement Order was entered[100] to the extent that each such employee is not:  (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties.

76.    Although the majority of the Debtors' operations have been paused since the Petition Date, the Debtors' employees have been instrumental in pushing these Chapter 11 Cases forward——no small feat considering that the Debtors have also experienced significant reductions in force.  As a general matter, the employees have provided the Debtors' advisors their extensive industry knowledge, which was crucial in light of the novel legal and factual issues raised by cryptocurrency.  Further, employees proved instrumental in the resolution and litigation of the core issues of these Chapter 11 Cases, including the briefing and trials related to Earn, Custody, and Withhold assets, and the negotiation of the related settlements, among other issues, by providing the Debtors' advisors their deep understanding of Company operations.  Throughout the weeks'-long Auction process, the employees also worked with the Debtors' advisors to evaluate and improve the Bids.  Finally, the consummation of the NewCo Transaction or the Orderly Wind Down cannot occur without the efforts of the Debtors' employees, and as such, these employees have made and will continue to make indispensable contributions to the successful reorganization of the Debtors.

---

[99]    *See* First Plan Supp., Exh. A.

[100]    The Disclosure Statement Order [Docket No. 3337] was entered on August 17, 2023.

77.     Ultimately, the Third-Party Release is reasonable under the circumstances of these Chapter 11 Cases and follows well-established precedent in this district regarding opt-out provisions and scope.  Accordingly, the Debtors respectfully submit that the Court should approve the Third-Party Release.[101]

### 3.     The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code.

78.     Article VIII.F of the Plan sets forth an exculpation provision exculpating the Exculpated Parties[102] from enumerated claims (the "Exculpation") between the Petition Date and the Effective Date arising in relation to the Chapter 11 Cases.  Furthermore, the Exculpated Parties are not exculpated from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky and Mr. Leon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.  Notably, following the U.S. Trustee's objection to the Disclosure Statement, and to address the U.S. Trustee's argument that the Exculpation provision should be expressly limited to acts or omissions during these Chapter 11 Cases, the Debtors modified the Exculpation provision to make clearer that it applies solely to actions taken from the

---

[101]    *See* Ferraro Decl. ¶ 25.

[102]    Pursuant to the Plan, "Exculpated Party" means, each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.  *See* Plan, Art. I.A.110.

Petition Date through the Effective Date.[103]  The Debtors also removed the "release" language from the Exculpation provision to address comments from the U.S. Trustee.

79.    Courts in the Second Circuit evaluate exculpation provisions based upon a number of factors, including whether the provision is integral to the plan and whether protection from liability was necessary for plan negotiations.[104]  Courts evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[105]  A bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[106]  Once the court makes this good-faith finding, it is appropriate to provide a standard of care for the parties involved in the negotiation and formulation of that chapter 11 plan.[107]  Exculpation provisions, therefore, prevent future collateral attacks against a court's good-faith finding.

---

[103]    *See* Plan, Art. VIII.E.

[104]    *See In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Enron Corp.*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *In re WorldCom, Inc.*, WL 23861928, at *28 (Bankr. S.D.N.Y. Oct 31, 2003) (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *see also In re Drexel Burnham*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 260-61 (Bankr. M.D. Fla. 2006) (approving an exculpation provision where the beneficiaries made significant contributions and expected an exculpation provision would be included in the plan).

[105]    *See, e.g., In re Captran Creditors' Trust*, 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the language of an exculpation provision "include, but are not limited to:  how the exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[106]    11 U.S.C. § 1129(a)(3).

[107]    *See In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) ("Exculpation provisions in chapter 11 plans are not uncommon and 'generally are permissible, so long as they are properly limited and not overly broad.'" (citation omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties.").

80.    Here, the Exculpation provision is an integral part of the Plan and satisfies the governing standards in the Second Circuit.  The Exculpation provision provides necessary and customary protections to those parties in interest (whether Estate fiduciaries or otherwise) whose efforts were, and continue to be, vital to formulating and implementing the Plan, which has garnered overwhelming support from the Debtors' voting creditors, including Account Holders. As noted throughout this Memorandum, these Chapter 11 Cases have been extraordinarily complex due to their nearly unprecedented nature, involving as they have novel legal and factual cryptocurrency-related issues, challenging settlement negotiations, and a variety of stakeholders, including vocal *pro se* creditors, with different and competing interests.

81.    The Plan and the Restructuring Transactions contemplated therein are the product of a year's-long legal and business process.  First—before they could contemplate the contours of a reimagined, regulatorily compliant cryptocurrency company—the Debtors and their stakeholders had to resolve threshold issues to determine who owned the cryptocurrency assets in the Debtors' possession and what the Debtors would ultimately be able to distribute to their creditors.  In the second phase of the Chapter 11 Cases, the Debtors negotiated the foundational elements of their envisioned reorganization by entering, first, into an agreement with NovaWulf to sponsor the Debtors' reorganization as the Stalking Horse Bidder and, second, conducting a competitive Auction process and secure improved Bids.[108]  Once the core aspects of the Restructuring Transactions with the Fahrenheit Group as Plan Sponsor were finalized, the Debtors focused on reaching consensual resolutions of contentious issues with other stakeholders such as the Series B Holders, the Retail Borrower Ad Hoc Group, and the Earn Ad Hoc Group.  In parallel, the Debtors cooperated with federal criminal and civil investigations into the Debtors' prepetition conduct, and

---

[108]    *See* Kielty Decl. ¶¶ 7–8.

the Debtors worked closely with government regulators to ensure that any contemplated cryptocurrency reorganization could be fully compliant. Finally, throughout these Chapter 11 Cases, the Debtors also worked hard to gain the trust of their creditor body; the voting results speak to the Debtors' success on that point. In light of the complex nature of these Chapter 11 Cases, it should not be controversial to state that the protections afforded by the Exculpation provision are necessary here, and that they should apply for the full life of these Chapter 11 Cases. Ultimately, the Exculpation provision provides protection to those parties that worked hand-in-hand with the Debtors and were instrumental in assuring the success of the Debtors' restructuring.

82.     In the Second Circuit, exculpation provisions that cover non-estate fiduciaries are approved regularly.[109]    In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating

---

[109]    *See, e.g., In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re Frontier Communications Corp.*, No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re LATAM Airlines Group S.A.*, WL 2541298 at *49 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, the chapter 11 cases . . . or the filing of the Restructuring Support Agreement and related prepetition transactions"); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re Res. Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] (approving exculpation of certain prepetition lenders); *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and post-petition conduct); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010), [Docket No. 559] (approving exculpation of certain prepetition lenders from liability related to acts taken, among other things, "in connection with, or arising out of, the chapter 11 cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan…the Plan, [or] the Disclosure Statement"); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (exculpation of prepetition noteholders and new investors); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation of controlling shareholder as well as estate fiduciaries); *In re Enron Corp.*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the chapter 11 cases").

the plan and bringing it to fruition, and whether the provision is integral to the plan.[110]   Where a

court finds that a plan has been proposed in good faith and meets the other requirements of

confirmation, approval of an exculpation provision is appropriate.[111]

83.    Here, the Debtors propose to exculpate the Exculpated Parties, which include

non-Estate fiduciaries, because the contributions and concessions of the Exculpated Parties have

made the Plan possible.   Such exculpation provisions are routinely approved in plans of

reorganization in cases similar to these Chapter 11 Cases,[112] which could not have progressed as

---

[110]    *E.g.*, *In re BearingPoint, Inc*., 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc*., WL 23861928, at *28 (Bankr. S.D.N.Y. 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[111]    *See In re WorldCom, Inc*., WL 23861928, at *28.

[112]    *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 39]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685]; *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *In re Enron*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] (approving exculpation for, *inter alia*, "all prepetition activities leading up to the promulgation and confirmation of this Plan," as well as for "any act or omission in connection with, or arising out of the Debtors' restructuring, including, without limitation, the negotiation and execution of this Plan, the Reorganization Cases . . . and . . . all documents ancillary thereto"); *In re Ampex Corp.*, No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] (same).

productively absent the significant contributions of the Exculpated Parties.[113]  Their concerted efforts were instrumental to the restructuring process and the Plan's overwhelming support from the vast majority of the Debtors' voting creditors and key stakeholders.

84.    The failure to include exculpation provisions in chapter 11 plans would chill the critical participation of the management and advisors to debtors in possession as well as essential creditor groups and equity holders working to formulate and negotiate consensual chapter 11 plans. In light of the bankruptcy policy in favor of consensual chapter 11 plans and the negotiations that create them, it stands to reason that exculpation provisions are essential to the process and should be approved.[114]  Further, in light of the carve out for actions or omissions that are the result of bad faith, actual fraud, willful misconduct, or gross negligence, the standard of care established by the Exculpation is entirely consistent with and appropriate under applicable law and as a matter of public policy.[115]

85.    The Debtors respectfully submit that the Court has an ample record before it to conclude that the Exculpated Parties are entitled to the Exculpation proposed in the Plan and that the protections afforded therein are reasonable and appropriate.   In short, the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of

---

[113]    *See* Ferraro Decl. ¶ 28.

[114]    *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans"); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization).

[115]    *See, e.g.*, *In re Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision the extended to estate fiduciaries and non-fiduciaries that excluded gross negligence and willful misconduct); *In re DJK Residential, LLC*, No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct).

good-faith, arms'-length negotiations, and significant sacrifice by the non-Debtor Exculpated Parties. The Exculpated Parties played a critical role in formulating the Plan, and the Exculpation provision played a role in bringing these parties to the table. Failure to include the Exculpation provision could have deterred the Exculpated Parties from collaborating with the Debtors to develop a fully consensual restructuring.[116] The scope of the Exculpation provision is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring between the Petition Date and the Effective Date, and ultimately inures to the benefit of only those parties that have made similar contributions to the Debtors' restructuring. Moreover, the scope of the Exculpation itself and the composition of the Exculpated Parties are entirely consistent with established practice in this and other jurisdictions.[117]

86.    As noted with respect to the Debtor Release, the Debtors modified the Debtor Release and the Exculpation provision to provide that the Debtors' advisors would not be released or exculpated with respect to any claims or causes of action relating to the filing of the Debtors' claim in the *Voyager* matter.[118] The U.S. Trustee Objection repeats the arguments made in its objection to the Disclosure Statement, primarily that the Exculpation provision is "over broad and contain[s] prospective parties and activities."[119] As the Debtors explained in their omnibus reply

---

[116]    *See, e.g.*, Ferraro Decl., ¶¶ 26–28.

[117]    *See, e.g.*, *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019).

[118]    *See* Plan, Art. VIII.C, VIII.E.

[119]    *See* U.S. Trustee Obj. at 2. The Ubierna de las Heras Objection makes the same argument. *See* Ubierna de las Heras Obj. at 2, 6.

to objections to the Disclosure Statement, however, other courts in this district have overruled similar U.S. Trustee objections and approved exculpation provisions that included non-estate fiduciaries.[120]

87.    The U.S. Trustee (repeating by incorporation its prior arguments) and Ubierna de las Heras also argue that the Exculpation provision should include an opt-out mechanism.[121] Neither the U.S. Trustee nor Ubierna de las Heras provide precedent or legal authority for this provision.  The entire purpose of an Exculpation provision is to protect parties who acted in good faith during chapter 11 cases under bankruptcy court supervision.  There is no basis for an opt out provision for an exculpation, and the U.S. Trustee and Mr. Ubierna de las Heras offer none.

88.    Similarly, the U.S. Trustee's prior request that the Plan's Exculpation provision should carve out claims for legal malpractice must also be overruled.[122]  The U.S. Trustee argues that release of claims based on legal malpractice is prohibited by the New York Rules of Professional Conduct.[123]  But, as the *LATAM Airlines* court held, there is "no merit" to this U.S. Trustee request because the New York Rules of Professional Conduct "ha[ve] no bearing on the standard of care established" in an exculpation provision.[124]

---

[120]    *See In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) ("The Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision.  They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases . . . the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries . . . based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court").

[121]    *See* U.S. Trustee DS Obj. at 23, Ubierna de las Heras Obj. at 6.

[122]    *See* U.S. Trustee DS Obj. at 26.

[123]    *See id.*

[124]    *LATAM Airlines,* No. 20-11254 (JLG), 2022 WL 2206829, at *50.

89.    Ultimately, exculpation provisions serve an important purpose—they protect

deserving parties from other parties who failed to timely assert their rights and who, instead, could

attempt to reopen settled litigation through back door methods and thwart the finality and closure

provided by the Plan in resolving these Chapter 11 Cases.[125]  In light of the foregoing, the Debtors

submit that the Exculpation provision is reasonable and appropriate under the circumstances of

these Chapter 11 Cases and respectfully request that the Court approve the Exculpation set forth

in Article VIII.F of the Plan.[126]

### 4.    The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code.

90.    Pursuant to section 524(a), the injunction provision set forth in Article VIII.G of

the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation

provisions.  In part, the Injunction Provision permanently enjoins all Entities from commencing or

continuing any action against the Debtors, the Post-Effective Date Debtors, the Released Parties,

or the Exculpated Parties on account of, in connection with, or with respect to any such Claims,

Interests, Causes of Action, or liabilities discharged, released, settled, compromised, or exculpated

under the Plan.  The Injunction Provision is thus a key provision of the Plan because it is necessary

to preserve and enforce the discharge provisions in the Plan, the Debtor Release,

the Third-Party Release, and the Exculpation that are central to the Plan and is narrowly tailored

---

[125]    *See In re Global A&T Electronics Ltd.*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 17, 2017) Confirmation Hr'g Tr. 116:8-117:8 ("So, I actually think 1125(e) can well apply to third parties who aren't necessarily fiduciaries as long as they're participating in the exchange.  Now here, the people who really participated all sort of are releasing each other, but I guess I appreciate your point that this probably doesn't add anything but I don't think it adds anything in a bad way, either.  I think it's consistent with the statute and the case law and, again, it's to prevent strike suits.  It's to not give anyone a back door and particularly given the fact that the releases themselves say, "to the extent permitted by applicable law", you know, that's a potential loophole that the exculpation closes. . . It's basically to protect that finding that this was good faith so you can't go back and sue some third party who said, you know, you didn't act in good faith, because it's already been found.").

[126]    The remaining Objection to the Exculpation provision is the Phillips Objection, to which the Committee is responding.  The Debtors incorporate the Committee's response by reference.

to achieve that purpose.[127]  As such, to the extent the Court finds that the Plan's exculpation and

release provisions are appropriate, the Court should approve the Injunction Provision.[128]

**5.      The CEL Token Settlement, the Account Holder Avoidance Action
Settlement, and the Retail Borrower Settlement Comply With the
Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors'
Good Business Judgment.**

91.      Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may

provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the

estate."[129]  The Plan provides for the general settlement of all Claims, Interests, Causes of Action,

and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The

Plan also provides for approval of the CEL Token Settlement, the Account Holder Avoidance

Action Settlement, and the Retail Borrower Settlement.  A settlement approved through a plan

must be "fair and equitable, and in the best interests of the estate."[130]  It is within the discretion of

---

[127]    *See In re Drexel*, 960 F.2d at 293 (holding that a court may approve injunction provision where such provision
"plays an important part in the debtor's reorganization plan").

[128]    *See* Ferraro Decl. ¶ 30.

[129]    11 U.S.C. § 1123(b)(3)(A).  *See, e.g., In re Ditech*, 606 B.R. at 622 ("A chapter 11 plan may 'provide for the
settlement or adjustment of any claim or interest belonging to the debtor or the estate.'") (citations omitted); *In
re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123
by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to
'approve a compromise or settlement.'") (citation omitted); *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y.
1988) (recognizing inapplicability of section 1123(b)(3)(A) as authority to settle creditor's claim in plan but
considering settlement under Bankruptcy Rule 9019 standards).

[130]    *In re Ditech*, 606 B.R. at 623; *see also In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr.
S.D.N.Y. 1991).

the court to determine whether a settlement satisfies those standards.[131] The court should "accord

proper deference to a debtor's business judgment" when making its determination.[132]

92.    The Second Circuit weighs the following "*Iridium*" factors in determining whether

a proposed settlement is "fair and equitable":

 a. the balance between the litigation's possibility of success and the settlement's future benefits;

 b. the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

 c. the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

 d. whether other parties in interest support the settlement;

 e. the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

 f. the nature and breadth of releases to be obtained by officers and directors; and

 g. the extent to which the settlement is the product of arm's-length bargaining.[133]

93.    Here, the CEL Token Settlement, the Account Holder Avoidance Action

Settlement, the Retail Borrower Settlement, and the general settlement of claims and controversies

---

[131] *See, e.g.*, *In re Ditech*, 606 B.R. at 623 ("The determination of whether a settlement meets those standards is within the discretion of the court."); *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion.'") (citations omitted); *Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement.") (citation omitted); *see also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) ("[T]he court must make an informed and independent judgment as to whether a proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'") (citations omitted)).

[132] *In re Ditech*, 606 B.R. at 623.

[133] *Id.* at 623–24 (*citing Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

are fair and equitable and an exercise of the Debtors' good business judgment and should therefore be approved.

### a.    The CEL Token Settlement Should Be Approved.

94.    The Debtors and the Committee previously briefed the basis for approving the CEL Token Settlement and the application of the *Iridium* factors thereto in the *Debtors' Brief in Support of CEL Token Settlement* [Docket No. 3431] (the "Debtors' CEL Token Brief") and the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues With Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3432] (the "Committee's CEL Token Brief" and together with the Debtors' CEL Token Brief, the "CEL Token Briefs"), respectively, and such briefs are incorporated herein by reference. This section supplements the arguments contained in the CEL Token Briefs by briefly reiterating how the *Iridium* factors support approval of the CEL Token Settlement addressing the voting results and the two objections filed to the settlement, which reinforce the Debtors' and the Committee's position and further demonstrate that the CEL Token Settlement should be approved.[134]

95.    The CEL Token Settlement proposed by the Plan provides that all Claims and Causes of Action arising out of or related to the CEL Token for, among other things, recharacterization and subordination, will be settled pursuant to the following terms: (i) first, except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token, and shall otherwise receive the treatment associated with the program in which they were deployed; and (ii) second, all Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or

---

[134]    *See generally* Davis Obj.; Lau Letter (arguing that a $0.25 valuation of CEL Token is unfair).

Article III.B.17 of the Plan, as applicable.[135]  In addition, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims are classified as Class 15 Section 510(b) Claims (which will not receive any distribution under the Plan).[136]  The *Iridium* factors weigh in favor of approving the CEL Token Settlement.

96.    ***First***, the *Iridium* factor weighing the balance between a litigation's possibility of success and the settlement's future benefits weighs heavily in favor of approving the CEL Token Settlement.  Certain Holders of CEL Token believe that the proper value of CEL Token is its apparent market price of $0.81 per CEL Token on the Petition Date.[137]  In comparison, the Debtors and the Committee strongly believe that the value of CEL Token on the Petition Date is not appropriate due to, among other things, market manipulation of the CEL Token price, and believe that CEL Token may be worth as little as $0.00.  For example, the price of CEL was extensively manipulated by Celsius' prepetition management.[138]  As the Debtors described in the Disclosure Statement,[139] federal prosecutors charged Alexander Mashinsky, the Debtors' founder and former

---

[135]    *See* Plan, Art. IV.B.2.

[136]    *Id.*  "Other CEL Token Claim" means any Claim, including any Account Holder Claim, arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token.  *Id.*, Art I.A.166.

[137]    *See* CEL Token Brief ¶¶ 8–15 (summarizing the CEL Token valuation disputes, including those in connection with the motions filed by creditors Santos Caceres and Sean StJohn and approval of the Disclosure Statement).

[138]    *See, e.g.*, *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement* [Docket No. 3435] (the "Ferraro CEL Token Declaration") ¶ 22 (confirming that "Celsius' buyback strategies included placing standing purchase orders to protect the price of CEL Token from decreasing in the event that market prices dropped," that "Celsius also coordinated buybacks to occur contemporaneously with Celsius' 'Ask Mashinsky Anything' online Q&A sessions to increase consumer confidence and demand," and that "[i]n total, Celsius repurchased over 195 million CEL Tokens for over $540 million"); *id.* ¶ 26 (concluding that "[i]t is difficult to determine the true value of CEL Token, if any, at any given time, due to the wide variety of actions taken to regulate the supply of CEL Token and otherwise influence the price of CEL Token").

[139]    *See, e.g.*, Disclosure Statement, Art. III.LL.1.

chief executive officer, and Roni Cohen-Pavon, the former chief revenue officer, with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token. [140] Specifically, federal prosecutors assert that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices. [141] On September 15, 2023, Mr. Cohen-Pavon pleaded guilty to four counts, including fraud, manipulation of securities prices, and conspiracy. [142]

97.    In addition, because the CEL Token was marketed as a "utility token" for the Celsius platform, it has no go-forward utility because the Celsius platform will be retired following the Debtors' emergence from chapter 11 and the completion of distributions, [143] and in any case, the Debtors are unable to return CEL Token to Account Holders under applicable law. [144] Strong arguments also exist that CEL Token is an equity security of the Debtors, [145] which would result in

---

[140]  *See Indictment*, *United States v. Mashinsky et al.*¸ 23-cr-00347-UA (S.D.N.Y. 2023) [ECF No. 1] ¶¶ 78–89; *see also id*, ¶¶ 48–71 (presenting the "CEL manipulation scheme").  As part of the non-prosecution agreement with the federal prosecutors and for the purposes of the prosecution of Mr. Mashinsky and Mr. Cohen-Pavon, Celsius accepted and acknowledged as true a set of facts, including that "the rise in value of the CEL [T]oken was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL [T]oken by taking steps to artificially support the price of CEL." *SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited*, Exh. A, *SEC v. Celsius Network Limited et al.*, 23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6] ¶ 11.

[141]  *See id.*

[142]  *See* Bob Van Voris, "Celsius Executive Pleads Guilty, Cooperates Against Mashinsky," Bloomberg Law, September 15, 2023, https://news.bloomberglaw.com/ip-law/top-celsius-executive-cohen-pavon-pleads-guilty-to-crypto-fraud.

[143]  *See* Ferraro CEL Token Decl. ¶ 26.

[144]  *See* Aug. 14, 2023 Hr'g Tr. 71: 6–12 (The Court: "without a going concern, the CEL Token, it can't be issued.  It can't—you know, Celsius won't exist.").

[145]  *See* Celsius Network, Celsius Network AMA–Ask Mashinsky Anything!, YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at 44:40.  *See also* Committee CEL Token Brief ¶¶ 75–76 (analyzing why CEL represents "an interest in the Debtors").

zero recovery on account of CEL Token Deposit Claims pursuant to the absolute priority rule, and

zero recovery on account of Other CEL Token Claims.[146]

98.    Despite these arguments, however, the value of CEL Token remains an open and

disputed issue.  Absent a settlement, the Debtors would likely need to conduct a valuation trial that

would be time-consuming, costly, and there is no certainty that the Debtors would succeed in their

arguments, as further explained below.  This valuation trial could delay distributions to creditors

and lead to a longer stay in chapter 11, which would further increase costs to the Debtors that

would likely far exceed any savings as a result of a judgment valuing CEL Token at $0.00.  The

CEL Token Settlement provides a reasonable compromise that avoids this protracted litigation and

guarantees that Holders of CEL Tokens will receive some recovery on account of their CEL Token

Deposit Claims.[147]   The certainty of the value of CEL Token at this stage in the Chapter 11 Cases

far outweighs the potential benefit to the Debtors' estates of succeeding at trial after months of

costly litigation.

99.    **Second**, the likelihood of complex and protracted litigation also weighs heavily in

favor of the CEL Token Settlement.  The Debtors, the Committee, and various *pro se* creditors are

scheduled to hold, as part of the Confirmation Hearing, a hearing on the valuation of CEL Token

commencing on October 16, 2023.  Valuation is notoriously time-intensive and expensive to

litigate even under straightforward circumstances, and a trial regarding the value of CEL Token

would be particularly complex, in part because what is often the most reliable indicator of value—

---

[146]    *See* 11 U.S.C. § 510(b); the Second Circuit broadly construes section 510(b) of the Bankruptcy Code to subordinate all claims with a causal connection to the purchase of a security.  *See Rombro v. Dufrayne (In re Med. Diversified, Inc.)*, 461 F.3d 251, 255–59 (2d Cir. 2006); *Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 471 (2d Cir. 2017).

[147]    *See* August 14, 2023 Hr'g Tr. at 55:16–19 (The Court: "if somehow the [CEL Token Settlement was not accepted] and the Court conducts the valuation and concludes that the petition date, the value of the CEL token was zero, that would determine what the recovery in the plan would be.").

market price—is no longer reliable due to market manipulation.  The CEL Token Settlement provides an elegant solution that would obviate extensive, expense, inconvenience, and delay attendant with litigation.

100.  **Third**, the paramount interests of creditors weigh in favor of the CEL Token Settlement because the settlement provides benefits to the Debtors' Estates and, by extension, unsecured creditors.  Notwithstanding objections by a few vocal holders of CEL Token, courts have repeatedly held that even where large claim holders oppose a settlement, it may still be approved because it is in the "best interests of the estate as a whole."[148]  As discussed above, litigation concerning the value of CEL Token would require the services of specialized experts and would be highly time- and cost-intensive.  While the overwhelming majority (approximately 247,000 out of approximately 259,000, or approximately 95.4%) of accounts that hold CEL Tokens have fewer than 1,000 CEL, only 12 accounts have more than 1,000,000 CEL Tokens.[149]  Given the relatively fixed amount of assets available for distribution to creditors, any increase in recovery by one sub-group will necessarily decrease the recoveries by all other creditors.  Therefore, as an attempt to avoid the costly CEL Token valuation that would provide meaningful upside only for a small group of creditors, the CEL Token Settlement is in the collective interests of the entire creditor body.

---

[148]  *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"); *see also In re Soup Kitchen Int'l., Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("the overriding consideration is the [s]ettlement's benefits to the creditor body"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors, weighs in favor of settlement").

[149]  *See Debtors' CEL Token Brief* ¶ 34.

101.     **Fourth**, creditors and other parties in interest, most notably the Committee, support the CEL Token Settlement.  Following the filing of the CEL Token Briefs, the Debtors completed solicitation of the Plan.  Holders of CEL Token Claims were not separately classified under the Plan, but the Debtors tabulated the votes of CEL Token Holders within each Class to evaluate whether Holders of CEL Token accepted the CEL Token Settlement.  Holders of CEL Token that voted on the Plan overwhelmingly accepted the Plan—98.71% of voting CEL Token Holders in the Voting Classes that submitted Ballots voted to approve the Plan.[150]  These results confirm that the fourth *Iridium* factor (regarding the breadth of support for the settlement) weighs heavily in favor of approving the CEL Token Settlement and bolster the Debtors' and Committee's determination that settling all CEL Token issues as proposed is in the best interests of creditor (in satisfaction of the third *Iridium* factor).[151]

102.     **Fifth**, the Debtors' and the Committee's counsel expended significant time and effort over the course of the previous year to investigate issues related to CEL Token and arrive at the CEL Token Settlement, including through discussions with parties in interest represented by sophisticated counsel as well as *pro se* creditors.  The ultimate terms of the CEL Token Settlement, as reflected in the Plan ($0.25/CEL, which represents a $0.05/CEL increase from the initial terms) were the result of arms'-length negotiation with certain Holders of CEL Token Deposit Claims.

103.     Only two creditors objected to the CEL Token Settlement.  These creditors believe that CEL Token's proper value is its apparent market price of $0.81 per CEL Token on the Petition Date, or even a higher price, and argue that it is inequitable for CEL Token to receive less than the Petition Date price when all other cryptocurrencies are being valued at their Petition Date prices.

---

[150]    *See* Voting Report ¶ 26.

[151]    *See* Debtors' CEL Token Brief ¶¶ 32–35.

The objections do not even attempt to address the legal arguments set forth in the CEL Token Briefs, which emphasize that CEL Token is potentially entirely valueless as an equity security and/or a utility token with no go-forward utility, and instead argue about the true value of CEL Token. Even further, the objectors' arguments support approval of the CEL Token Settlement by demonstrating the difficulty of ascertaining the true value of CEL Token as of the Petition Date.[152]

104.    The Davis Objection primarily argues that the price of CEL Token was manipulated downwards due to an alleged "naked short" orchestrated by FTX.[153] While some of Mr. Davis' arguments are plausible on their face (*e.g.*, the Committee has been investigating potential claims against FTX on behalf of the Estates, and the Debtors filed a proof of claim to preserve any such claims), others are completely baseless conspiracies (*e.g.*, the unhinged and unsupported assertion that Christopher Ferraro intentionally facilitated any FTX price manipulation or was orchestrating a coup to unseat Alex Mashinsky as Chief Executive Officer). Although Mr. Davis references certain internal Slack chats that he argues support his arguments, he is completely misrepresenting those documents, which do not actually bear any resemblance to his gross mischaracterization and misreading of those documents.

105.    While the Davis Objection references downward price pressure, he acknowledges that the price was manipulated upwards between the Pause and the Petition Date.[154] None of this supports adopting the market price as of the Petition Date as the value of CEL Token. In fact, the

---

[152]    For the avoidance of doubt, the Debtors dispute the allegations in the Davis Objection and will present argument and evidence at the Confirmation Hearing refuting such allegations as appropriate. In short, the Davis Objection misconstrues certain documents inadvertently produced to Mr. Davis as relevant and damning based solely on their unintentional production.

[153]    *See* Davis Obj. at 2–7.

[154]    *See id.* at 1–2 ("The vast majority of the ***upwards price*** action of CEL token between the pause and petition date was due to roughly 15 million illegal naked short positions being closed on FTX"; "doing so pushed the price [of CEL] up from $0.20 to $0.81") (emphasis added; citation omitted)).

Davis Objection illustrates that the value of the CEL Token is highly uncertain and a ripe issue for settlement to avoid value destructive litigation. Indeed, this price manipulation between the Pause and the Petition Date (from approximately $0.20 to approximately $0.81) is one of the key reasons why the Debtors believe that the CEL Token Settlement at $0.25 is reasonable and should be approved.

106.    Ms. Lau's letter also argues that the initial coin offering price is not fair because most creditors did not get to purchase CEL Token at that price.[155] Ms. Lau's proposed solution— that the Debtors value CEL Token at the price at which an individual creditor purchased it[156]—is infeasible and inequitable, given that no other cryptocurrency is valued at the price at the time of purchase or deposit; all cryptocurrencies are being valued at their Petition Date price except for CEL Token, due to the various unique issues and facts associated with the token. In addition to the logistics of tracking what each Holder paid, the Debtors would need to reconcile subsequent CEL Token transactions.

107.    Further, when a claim is disputed, section 502(b) of the Bankruptcy Code provides that its value should be determined as of the filing of the debtor's petition. The arguments in the Lau Letter, however, support an even lower valuation of CEL Token than Petition Date prices. For example, the Lau Letter references purchasing CEL "because [she] believed in Celsius" (suggesting that Ms. Lau viewed CEL Token as reflective of the Debtors' value, like an equity security) and also that "[she] needed [her] CEL [T]okens to maintain [her] platinum status that would allow [her] to maximize [her] earnings through staking," which made purchasing CEL Token "worth it" (ascribing value to the utility aspect of CEL Token, which no longer existed as

---

[155]    Lau Letter at 1.

[156]    *See id.* at 2.

of the Petition Date).[157]   While these arguments support the position that CEL Token should be

worth *nothing*, they also demonstrate why the Debtors and Committee determined to offer some

consideration to CEL Token victims under the Plan.

108.    Ultimately, the voting results confirm overwhelming support for avoiding a lengthy

trial regarding the value of CEL Token, while the objections to the settlement seek to litigate the

substance of the issue, rather than challenging the reasonableness of settling it.   For the reasons set

forth herein and in the CEL Token Briefs, the CEL Token Settlement satisfies the *Iridium* factors

and should be approved pursuant to Bankruptcy Rule 9019 and section 1123(b)(3)(A) of the

Bankruptcy Code.

109.    Accordingly, the CEL Token Settlement complies with section 1123(b)(3)(A) of

the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be

approved.

### b.    The Account Holder Avoidance Action Settlement Should Be Approved.

110.    The Account Holder Avoidance Action Settlement proposed by the amended Plan

provides that the Debtor Release contained in Article VIII.C of the Plan shall also release

Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure less than or equal to $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan; and

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure of more than $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of

---

[157]   *See id.* at 1–2.

such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan.[158]

The Plan clarifies, however, that (a) Avoidance Actions against ADR-Ineligible Potential Defendants and Excluded Parties are not included in the Account Holder Avoidance Action Settlement and are expressly preserved for prosecution by the Litigation Administrator(s) after the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims shall be released if such Account Holder with a *De Minimis* Claim otherwise complies with the requirements set forth above other than voting in favor of the Plan (as such Account Holders are not entitled to vote), and (c) as a result of the Account Holder Avoidance Action Release, any Custody Settlement Participant with Withdrawal Preference Exposure at or under $100,000 shall receive a 100% recovery on their Allowed General Custody Claim. On September 18, 2023, the Debtors also filed the *Notice Regarding Calculation of Withdrawal Preference Exposure* [Docket No. 3488] expressly providing, among other things, that Account Holders with a Withdrawal Preference Exposure of exactly $100,000 will receive the same treatment under the Account Holder Avoidance Action Settlement as Account Holders with a Withdrawal Preference Exposure under $100,000.[159] As with the CEL Token Settlement, here, too, the *Iridium* factors weigh in favor of approving both components of the Account Holder Avoidance Action Settlement.

---

[158] *See* Plan, Art. IV.B.3.

[159] The Notice also offered creditors the opportunity to request a recalculation of their Withdrawal Preference Exposure if they believed that their Withdrawal Preference Exposure was incorrectly calculated because they transferred cryptocurrency between multiple accounts that they controlled, to spouses or partners, and other similar situations, and if they entered into the Account Holder Avoidance Action Settlement. The Notice instructed creditors to submit requests for recalculation of Withdrawal Preference Exposure by the Voting Deadline, and explained that the Debtors would make commercially reasonable efforts to respond by the date of the Confirmation Hearing. After the Notice was filed and before the Voting Deadline, the Debtors responded to approximately three dozen such requests.

111.    *First*, the balance between the uncertain probability of success the Debtors could have litigating Avoidance Actions and the settlement's benefits weighs heavily in favor of approving the Account Holder Avoidance Action Settlement.  Given the thousands of Account Holders against whom the Debtors have potential Avoidance Actions, litigation against individual Account Holders would require extensive time, expense, inconvenience, and delay.  The Litigation Administrator would need to establish the existence of preferences as to each individual Account Holder and litigate each Account Holder's various defenses, including the safe harbor defense of section 546(e) and the ordinary course of business defense of section 547(c)(2) of the Bankruptcy Code.  Such litigation would undoubtedly be protracted and would deplete the resources available to the Litigation Administrator(s).  Indeed, the Debtors and the Committee reached the Custody Settlement and the Withhold Settlement with the Custody and Withhold Ad Hoc Groups in part because all parties recognized that, without a consensual resolution, the ensuing preference litigation would be too complicated and value destructive.[160]

112.    *Second*, the Account Holder Avoidance Action Settlement provides substantial benefits to individual Account Holders, as explained above, as well as the entire creditor body. Throughout the course of these Chapter 11 Cases, Account Holders repeatedly raised the issue of Avoidance Actions, and therefore the settlement provides necessary finality to these concerns. Further, the settlement protects and maximizes the value of the Debtors' Estates by providing a clear mechanism whereby property can be recovered and providing the Litigation Administrator clearer direction as to which Avoidance Actions to pursue.  Accordingly, the Account Holder

---

[160] *See Joint Motion for Entry of an Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2148] ¶¶ 36–42 (analyzing the *Iridium* factors with respect to the Custody Settlement); *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334] ¶¶ 35–41 (same with respect to the Withhold Settlement).

Avoidance Action Settlement strikes the appropriate balance between the aggressive pursuit of Avoidance Actions and the efficient deployment of the Litigation Administrator's resources.

113.    **Fourth**, as the voting results show, 18,080 Holders of Account Claims in the eligible Voting Classes with a total Withdrawal Preference Exposure of $831,188,879.79 elected to participate in the Account Holder Avoidance Action Settlement.[161]    Furthermore, 211 Holders of Account Claims in Class 11 (*De Minimis* Claims) with a total Withdrawal Preference Exposure of $6,117,025.48 opted into the Third-Party Release, which means that such Holders fulfilled the conditions to participate in the Account Holder Avoidance Action Settlement.[162]

114.    **Fifth**, the Debtors and the Committee were each represented by competent counsel in the negotiations of the Account Holder Avoidance Action Settlement, and the concerns of the Account Holders were considered throughout the process.  **Finally**, entry into the Account Holder Avoidance Action Settlement was optional for Account Holders, thereby providing them the opportunity to evaluate for themselves the risks and benefits of the settlement versus the potential for litigation.

115.    In line with the prominence the issue of Avoidance Actions has in the creditor body, the Debtors received several Objections addressing the Account Holder Avoidance Action Settlement.  The Cassidy Letter and the First Bohon Letter both argued that "a clause should be added to the settlement that allows custody holders to forfeit any value amount they choose to bring their settlement under the $100,000 threshold."[163]  Although the Debtors understand Account Holders' frustration at the threat of preference actions, the Debtors are acting in the best interests

---

[161]    *See* Voting Report ¶ 24.

[162]    *Id.*

[163]    *See* Cassidy Letter at 1, First Bohon Letter at 1.

of the Estates and in accordance with the Bankruptcy Code, which provides that debtors can avoid potential preference actions in the ninety-day period before the Petition Date. This Court has itself so noted.[164] Further, the Debtors are not required to set any threshold under which Avoidance Actions are automatically released and could have decided to retain the option of pursuing all Avoidance Action, no matter the Withdrawal Preference Exposure. The Debtors, however, chose to expressly include a threshold for the purpose of settling with Account Holders and to alleviate Account Holders' concerns. The Debtors sympathize with the concerns expressed in the Cassidy Letter and the First Bohon Letter, but believe the $100,000 threshold is appropriate, fair, and reasonable.

116.    The Second Bohon Letter largely repeated the concerns expressed in the First Bohon Letter but also disputed the calculation of Withdrawal Preference Exposure, stating that non-accredited investors were not able to make deposits to Earn Accounts after the creation of Custody Accounts and were thereby prejudiced because deposits to Custody Accounts do not affect Withdrawal Preference Exposure.[165] The Debtors' calculation of Withdrawal Preference Exposure, however, is wholly in line with this Court's rulings in these Chapter 11 Cases, which provide that Earn Accounts are the Debtors' property and Custody Accounts are customers' property,[166] and accordingly, deposits to Earn Accounts would decrease Withdrawal Preference Exposure by increasing assets that are property of the Estates and deposits to Custody Accounts

---

[164]    *See* March 8 Hr'g Tr. 37:6–7, 18–25 ("There's been a lot of concern about the potential for clawback actions…Under the bankruptcy law, you know, to some extent the Debtors and the committee and other professionals, they have to follow the law.").

[165]    *See* Second Bohon Letter at 1.

[166]    *See* Earn Ruling at 28 (holding that assets in Earn Accounts are property of the Debtors' estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

can have no effect on Withdrawal Preference Exposure because they merely remain the Custody Holder's property despite being deposited onto the Debtors' platform.  The Debtors have, however, modified the Plan in response to comments from counsel to certain potential preference defendants to clarify that the Debtors' calculation of Withdrawal Preference Exposure is not binding on any defendant in an Avoidance Action.[167]  Therefore, the objections in the Cassidy Letter, First Bohon Letter, and Second Bohon Letter should be overruled.

117.    The First Keeney Letter also objected to the calculation of the Withdrawal Preference Exposure, arguing (1) that it was unfair and unreasonable that withdrawal of loan principal increases an Account Holder's Withdrawal Preference Exposure and (2) that it makes no sense that preferential transfers are valued at the time of the transfer while creditors' Claims are valued as of the Petition Date.  Respectfully, there can be no real dispute about the propriety of counting loan principal payments as preferential transfers—a loan is a transfer of property from the lender, here the Debtors, to a borrower.   Moreover, a preference must be valued at the time of the transfer, in the ninety days before the Petition Date, because such a transfer is only a preference if it occurs before the Petition Date; accordingly, it cannot be valued as of the Petition Date.[168]

118.    Accordingly, the Account Holder Avoidance Action Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[169]

---

[167]    *See* Plan, Art. I.B.270.

[168]    *See* 11 U.S.C. § 547(b).

[169]    *See* Ferraro Decl. ¶ 13.

c.    **The Retail Borrower Settlement Should Be Approved.**

119.    The Retail Borrower Settlement was the result of months of negotiation between the Debtors, the Committee, and the Retail Borrower Ad Hoc Group concluding in three days of mediation with the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York.    The Retail Borrower Settlement proposed by the Plan provides the following primary terms:  (a) in addition to the Set Off Treatment, Holders of Retail Borrower Deposit Claims have the option to repay their Retail Advance Obligations (the "Retail Advance Obligation Repayment Election") before the Effective Date in exchange for an equivalent amount of cryptocurrency; and (b) priority in electing a preference to exchange the NewCo Equity for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency Weighted Distribution Election) made by such Holders under the Plan.[170]    In addition, under the Retail Borrower Settlement, the Earn Ad Hoc Group and the Borrower Ad Hoc Group would each have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee.

120.    The Settlement is appropriate under the Iridium factors.  ***First***, the balance between the uncertain probability of success of litigation and the settlement's benefits weighs heavily in favor of approving the Retail Borrower Settlement.  In February 2023, the Retail Borrower Ad Hoc Group commenced an adversary proceeding seeking a declaratory judgment that digital assets transferred to the Borrow Program are not property of the Debtors' estates and alleging deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, breach of contract, and unjust enrichment, among other things.[171]    Following

---

[170]    *See* Plan, Art. IV.B.7.

[171]    *See generally Complaint for Declaratory Judgment* [Adv. No. 23-01007, Docket No. 2001].

the mediation with Judge Wiles, the Retail Borrower Ad Hoc Group executed a settlement term sheet that embodied the Retail Borrower Settlement and stayed all deadlines in the adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[172]    The Debtors believe that they would prevail in any such adversary proceeding because the Loan Terms and Conditions provide (as further discussed in the Debtors' detailed response to Objections regarding the Retail Borrower Settlement in Section VII of this Memorandum)—unambiguously in every version and in multiple places—that Retail Borrowers transferred title of their collateral to the Debtors.  Inherent uncertainty, however, exists with respect to litigating the Retail Borrower Ad Hoc Group's adversary proceeding and other claims related to the Borrow Program, and any such litigation would require extensive delay and expense.  The litigation regarding the issue of title and ownership with respect to assets in the Earn Program[173] and the Custody Program spanned months and required multi-day trials that occurred at great expense to the Debtors' estates. Furthermore, any litigation with the Retail Borrower Ad Hoc Group at this point in these Chapter 11 Cases would be detrimental to the successful consummation of the Plan because such litigation would inevitably delay distributions to Holders of Retail Borrower Deposit Claims.  On the other hand, approving the Retail Borrower Settlement would ensure that Retail Borrowers receive their distributions and the certainty of finality and would help expedite the consummation of the Plan.  Accordingly, the uncertain probability of success to be expected in litigating the various Claims related to the Borrow Program compared to the benefits provided by the Retail Borrower Settlement weighs in favor of its approval.

---

[172]    *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064], Exh. B at 4.

[173]    *See Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (setting forth the discovery, pleading, and hearing schedule to determine the title of digital assets transferred to the Earn Program).

121.    *Second*, as discussed earlier, the Retail Borrower Settlement provides improved treatment for all Retail Borrowers regardless of whether they make the Retail Advance Obligation Repayment Election and benefits the entire creditor body by avoiding the costly and time-consuming litigation related to the Borrow Program.  *Third*, the Committee and the Retail Borrower Ad Hoc Group support the Retail Borrower Settlement.  *Fourth*, the Debtors, the Committee, and the Retail Borrower Ad Hoc Group were each represented by competent counsel in the negotiations of the Retail Borrower Settlement, including in the mediation.  *Finally*, the Retail Borrower Settlement is the product of arm's-length, multi-party negotiations and a mediation.

122.    The Bronge Objection and several other letters filed regarding similar issues argue that the Retail Borrower Settlement should not be approved.  This argument is misguided and should be overruled as further set forth in the Debtors' response, *infra* in Section VII of this Memorandum.

123.    Accordingly, the Retail Borrower Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[174]

E.    **The Plan Complies With Section 1123(d) of the Bankruptcy Code.**

124.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[175]

---

[174]    *See* Ferarro Decl. ¶ 32.

[175]    11 U.S.C. § 1123(d).

125.    The Plan provides primarily for the deemed rejection of all Executory Contracts

and Unexpired Leases, but also provides for the assumption of certain Executory Contracts and

Unexpired Leases.  Specifically, Article V.A of the Plan provides for the deemed rejection of all

Executory Contracts and Unexpired Leases without the need for any further notice to, or action,

order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code

unless such Executory Contract and/or Unexpired Lease (a) is specifically described in the Plan as

to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be

assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, (b) is subject to a

pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date,

(c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party,

as applicable, in connection with the NewCo Transaction or Orderly Wind Down, or (d) is a

contract, instrument, release, indenture, or other agreement or document entered into in connection

with the Plan.[176]

126.    Article V.A also provides, however, that pursuant to sections 365(a) and 1123 of

the Bankruptcy Code, entry of the Confirmation Order shall constitute a Court order approving the

rejection, assumption or assumption and assignment, as applicable, of such Executory Contracts

or Unexpired as provided for in the Plan, effective as of the Effective Date unless otherwise

specified.  The Debtors, or the Post-Effective Date Debtors, as applicable, will satisfy all cure

amounts in accordance with section 1123(d) of the Bankruptcy Code.  Article V.C provides that

the Debtors, or the Post-Effective Date Debtors, as applicable, shall pay cure amounts on the

Effective Date or as soon as reasonably practicable thereafter, unless otherwise provided in the

Plan.  Article V.C also provides that any counterparty to an Executory Contract or Unexpired

---

[176]   *See* Plan, Art. V.A.

Lease that fails to object timely to the cure amount will be deemed to have assented to the cure amount.  Article V.D of the Plan provides that Institutional Loans, to the extent they are Executory Contracts, will be assumed and assigned to NewCo and/or its subsidiaries, and that all such Institutional Loans and obligations thereunder shall remain in full force and effect.

127.    In response to the provisions in Article V.D of the Plan, the Debtors received an Objection from 168 Trading, which is party to the August 20, 2021 Master Loan Agreement with Celsius Network Ltd. as the lender and 168 Trading as the borrower (the "MLA"), pursuant to which 168 Trading delivered to the Debtors USDC 3 million in exchange for 126,582.28 of cryptocurrency Polkadot (DOT) (the "Collateral").  The MLA was listed on the *Debtors' Notice of (I) Executory Contracts and Unexpired Leases to Be Rejected by the Debtors Pursuant to the Plan and (II) Related Procedures in Connection Therewith* [Docket No. 3454].  168 Trading objects to the rejection of the MLA because it argues that the MLA is an Institutional Loan which cannot be rejected pursuant to Article V.D of the Plan.[177]  The Debtors have revised Article V.D of the Plan to clarify that, to the extent any contracts relating to Institutional Loans are Executory Contracts, the Debtors will be deemed to have assumed them under the Plan unless such Executory Contracts are on the Schedule of Rejected Contracts.[178]  In that case, such Executory Contracts will be rejected.  Accordingly, 168 Trading's arguments fail.

128.    The core of 168 Trading's Objection, however, has to do more with the terms of the MLA than the terms of the Plan:  168 Trading objects to the Plan to the extent the Debtors seek

---

[177]    *See generally* 168 Trading Obj.

[178]    *See* Plan, Art. V.D ("Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtors shall be deemed to have assumed and assigned to NewCo and/or its subsidiaries all such agreements, documents, and instruments under the Plan; *provided* **that if any such agreements, documents, or instruments are (i) Executory Contracts and (ii) on the Schedule of Rejected Contracts, such agreements, documents, or instruments will be rejected as set forth elsewhere in this Plan**"(emphasis added)).

to deprive 168 Trading of its right to redeem the Collateral upon repayment of the loan pursuant

to the MLA[179] and "to the extent the Debtors seek to relegate 168 Trading to an unsecured creditor"

in implied contravention of the MLA by treating, under Article V.B of the Plan, all claims for

rejection damages as unsecured.[180]

129.    With respect to its argument regarding the classification of any rejection damages,

168 Trading's argument is premature, as the Debtors have not classified the rejection damages but

merely included the MLA on a rejection notice.

130.    Further, to the extent the Debtors reject the MLA, the terms of the MLA do not

provide 168 Trading any foundation for its arguments.  168 Trading is not a secured creditor and

not entitled to the return of any Collateral under the MLA.  Section 4 of the MLA makes clear that

upon 168 Trading's transfer of the Collateral to Celsius, 168 Trading retains no interest in the

Collateral:  "The delivery of Collateral to Lender shall be on a full-title transfer basis, meaning the

*Lender shall be the legal and beneficial owner of the assets posted as Collateral and the Borrower*

*shall have no right, title or interest in those assets*" (emphasis added).[181]    Moreover, the MLA

includes language similar to the language highlighted by the Court's Earn Ruling when it held that,

pursuant to the Terms of Use, the Debtors have title to assets in Earn Accounts.[182]    Section 4.4.3.

of the MLA provides that:

> Collateral is not, and shall not be, held by Lender on behalf of the
> Borrower, *and Lender shall be the sole and exclusive owner of all*
> *Digital Assets and/or Fiat Currencies posted as Collateral.  Lender*
> *may lend, sell, pledge, hypothecate, assign, invest, use, commingle*
> *or otherwise dispose of the Collateral to counterparties or hold them*

---

[179]    *See* 168 Trading Obj. ¶ 9.

[180]    *See id.* ¶ 10.

[181]    MLA § 4.3.

[182]    *See generally* Earn Ruling.

> with counterparties, or otherwise exercise any ownership rights in
> the Collateral. Borrower shall have no right or title in or to the
> Collateral throughout the term of this Agreement, until such time as
> the Loan Amount is fully paid up and the Collateral is returned to
> the Borrower.[183]

131.    Consistent with the plain and unambiguous language of the MLA and the Earn

Ruling, 168 Trading retains no interest in any assets transferred to Celsius under the MLA.

132.    Accordingly, the 168 Trading Objection should be overruled, and the Plan satisfies

the requirements of section 1123(d) of the Bankruptcy Code.

### F. The Debtors Complied With the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

133.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which

requires that the proponent of a plan of reorganization comply with the applicable provisions of

the Bankruptcy Code regarding solicitation of acceptances of the Plan.[184] The legislative history

to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass

the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the

Bankruptcy Code.[185] As discussed below, the Debtors have complied with sections 1125 and 1126

of the Bankruptcy Code regarding disclosure and solicitation of the Plan.[186]

---

[183]    MLA § 4.4.3 (emphasis added).

[184]    11 U.S.C. § 1129(a)(2).

[185]    *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, 2003 WL 23861928 at *49 (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[186]    *See* Campagna Decl. ¶¶ 34–37.

### 1.    The Debtors Complied With Section 1125 of the Bankruptcy Code.

134.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[187] Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[188]

135.    Section 1125 of the Bankruptcy Code is satisfied here.  Before the Debtors solicited votes on the Plan, the Court entered the Disclosure Statement Order.[189]  The Court also approved the contents of the Solicitation Package provided to Holders of Claims and Interests entitled to vote on the Plan, the notices provided to Holders of Claims and Interests not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[190]  The Debtors, through their Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[191] The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.

---

[187]    *Id.*

[188]    *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obligates a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[189]    *See* [Docket No. 3337].

[190]    *See id.*

[191]    *See Affidavit of Service of Solicitation Materials* [Docket No. 3514].

Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[192]

136.    Based on the foregoing, the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.  No party has asserted otherwise.

## 2.    The Debtors Complied With Section 1126 of the Bankruptcy Code.

137.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.[193]  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.[194]

---

[192]    *See id.*

[193]    *See* 11 U.S.C. §§ 1126(a), (f), (g).

[194]    *Id.*

138.    Section 502 of the Bankruptcy Code, which is referenced in section 1126 as noted

above, provides that "(a) a claim or interest, proof of which is filed under section 501 of this title,

is deemed allowed, unless a party in interest…objects."[195]  Section 1111 of the Bankruptcy Code

further provides that:

> (a)    A proof of claim or interest is *deemed filed under section
> 501* of this title for any claim or interest that appears in the
> schedules filed under section 521(a)(1) or 1106(a)(2) of this
> title, except a claim or interest that is scheduled as disputed,
> contingent, or unliquidated.[196] (emphasis added)

Accordingly, as a result of the interconnections between sections 1126, 502, 501, and 1111 of the

Bankruptcy Code, scheduled claims (except those scheduled as disputed, contingent, or

unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed"

claims.

139.    As set forth in Part I of this Memorandum, in accordance with section 1125 of

the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders

of Claims in Voting Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14.[197]  The Debtors did not solicit votes

from Holders of Claims in Classes 1, 3, and 6B because Holders of such Claims are Unimpaired

and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.  The Debtors also

did not solicit votes from Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or

17.  Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17 are deemed to reject

the Plan and thus are not entitled to vote on the Plan.  Holders of Claims in Class 12 and Interests

---

[195]  *See* 11 U.S.C. § 502(a).

[196]  *See* 11 U.S.C. § 1126(a).

[197]  Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), Class
6A (General Custody Claims), and Class 7 (Withhold Claims) constitute Account Holder Voting Classes.  Class
8 (Unsecured Loan Claims), Class 9 (General Unsecured Claims), Class 10 (State Regulatory Claims), and Class
14 (Series B Preferred Interests) constitute Voting Classes other than Account Holder Voting Classes.

in Class 13 are either deemed to reject or presumed to accept the Plan based on whether the Debtors

determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.  Thus,

pursuant to section 1126 of the Bankruptcy Code, only Holders of Claims in 2, 4, 5, 6A, 7, 8, 9,

10, and 14 were entitled to vote to accept or reject the Plan.

140.    Pursuant to the Disclosure Statement Order, Holders of Account Holder Claims

were entitled to vote in the amount of their Scheduled Claim unless they filed a Proof of Claim

that was temporarily allowed by the Court under Bankruptcy Rule 3018(a).[198]  Holders of Account

Holder Claims were required to file any motions pursuant to Bankruptcy Rule 3018(a) by the

Voting Deadline.[199]  Holders of Claims in Voting Classes other than Account Holder Voting

Classes were eligible to vote in the amount of their Scheduled Claims unless such Scheduled Claim

was superseded by a timely filed Proof of Claim that is not subject to objection.[200]  The Class

Claim Settlement Order similarly provided that each Holder would vote the scheduled amount of

such Holder's Claim as authorized by the Court in accordance with the terms of the Disclosure

Statement Order.[201]

141.    The Debtors requested authority to have Holders of Account Holder Claims vote in

the amount of their Scheduled Claims because the Debtors and their professionals are still

undergoing a claims reconciliation process and have concluded that a fair and equitable voting

process is one that treats all similarly situated Account Holders equitably.[202]  Moreover, the Class

---

[198]    *See* Disclosure Statement Order ¶ 22.

[199]    *See id.*, Exh. 1 4(i)(c).

[200]    *See id.*, Exh. 1 4(ii)(1)(b).

[201]    *See* Class Claim Settlement Order, Exh. A ¶ 5.

[202]    *See* Disclosure Statement Mot. ¶ 65.

Claim Settlement will obviate the need for the Debtors to reconcile the Claims of any Account Holders that do not opt out of the Class Claim Settlement.[203]    The Debtors' goal was, and remains, ensuring that all Account Holders are allowed to vote the amount of their claim equal to the amount of cryptocurrency the Debtors were obligated to return based on cryptocurrency prices on the Petition Date, rather than duplicate or excessive recoveries simply because certain Account Holders filed multiple claims, overstated the amounts that they were owed, or added claims for "fraud" or "breach of contract" when other Account Holders did not.[204]    The vast majority of Account Holders did not file proofs of claim asserting "extra" damages and are relying on the Schedules as an accurate accounting of what they are owed by the Debtors.[205]    In addition, no Holders of Account Holder Claims filed any motions pursuant to Bankruptcy Rule 3018(a) to request that they vote in the amount of their Proof of Claim.

142.    As a result of the interconnections between sections 1126, 502, 501, and 1111 of the Bankruptcy Code, as explained above, scheduled claims (except those scheduled as disputed, contingent, or unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed" claims.    Accordingly, although Holders of Claims in Voting Classes were largely entitled to vote in the amount of their Scheduled Claim rather than their Allowed Claim, the Debtors satisfy the requirements of section 1126 of the Bankruptcy Code.

---

[203]    As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes elected to opt out of the Class Claim Settlement. *See* Voting Report ¶ 19.  On September 19, 2023, however, Stretto became aware that certain Holders of Class 4 (Convenience Claims) could not access the election to opt out of the Class Claim Settlement. *Id.* ¶ 18. Upon learning of this issue, Stretto immediately opened the ability to opt out of the Class Claim Settlement for Holders in Class 4 (Convenience Claims). *Id.*  Moreover, on September 25, 2023, Stretto, on behalf of the Debtors, sent an electronic correspondence to all Holders of Claims in Class 4 informing them that the Debtors extended the deadline for Holders in Class 4 (Convenience Claims) eligible to make the Class Claim Settlement Opt-Out to October 9, 2023. *Id.*

[204]    *See* Disclosure Statement Mot. ¶ 65.

[205]    *Id.*

143.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

144.    As described above, the voting parties in Classes 2, 4, 5, 6A, 7, 8, 9 (at the Consolidated Debtors), 10, and 14 entitled to vote on the Plan voted to accept the Plan in sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.[206] Specifically, 96.33% of the amount of Claims and 98.83% of the Holders of Claims in Class 2, who voted, voted to accept the Plan; 98.69% of the amount of Claims and 98.25% of the Holders of Claims in Class 4, who voted, voted to accept the Plan; 99.28% of the amount of Claims and 99.35% of the Holders of Claims in Class 5, who voted, voted to accept the Plan; 98.78% of the amount of Claims and 99.51% of the Holders of Claims in Class 6A, who voted, voted to accept the Plan; 82.56% of the amount of Claims and 98.79% of the Holders of Claims in Class 7, who voted, voted to accept the Plan; 99.56% of the amount of Claims and 74.07% of the Holders of Claims in Class 9 (at the Consolidated Debtors), who voted, voted to accept the Plan; 100% of the amount of Claims and 100% of the Holders of Claims in Class 10, who voted, voted to accept the Plan; and 98.34% of the amount of Claims and 98.34% of the Holders of Claims in Class 14, who voted, voted to accept the Plan.[207]    Voting parties in Classes 8 (Institutional Loan Claims) and

---

[206]    *See* Voting Report ¶ 13.

[207]    *See id.*

Class 9 (General Unsecured Claims; at Celsius Mining LLC and Celsius Network LLC), however, voted to reject the Plan.[208]

145.    Based upon the foregoing, the Debtors respectfully submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

**G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (§ 1129(a)(3)).**

146.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[209]    The Second Circuit has construed this good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'"[210]    Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[211]    In the context of plans of reorganization, "a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[212] The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.[213]

---

[208]    *See id.*

[209]    11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

[210]    *E.g.*, *In re Johns-Manville*, 843 F.2d at 649 (citations omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 901-07 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." (citations and quotations omitted)).

[211]    *E.g.*, *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

[212]    *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (citations omitted).

[213]    *In re Adelphia*, 368 B.R. at 247.

147.    The fundamental purpose of chapter 11 is to enable a distressed business to obtain

reorganize its affairs to prevent or limit job losses and the adverse economic effects associated

with disposing of assets at liquidation value.[214]    Here, the Debtors filed for chapter 11 protection

following the most tumultuous period for the cryptocurrency industry, and chapter 11 protection

provided them with the "breathing spell" they needed to address structural and regulatory issues

and weather out the "crypto winter."    The Plan that has been proposed allows the Debtors the

axiomatic "fresh start" by providing a comprehensive restructuring that both (i) returns significant

value to creditors on the Effective Date and (ii) seeks to capitalize on the long-term promise of

cryptocurrency.

148.    The Plan is the culmination of more than a year of comprehensive efforts to resolve

key legal questions—including questions of first impression with respect to cryptocurrency—

before the Court and through consensual resolutions with key stakeholders.    ***First***, in December

2022, the Debtors held two separate trials with respect to Custody and Withhold issues and the

Earn Program.    With respect to the Custody and Withhold issues, the Court found that the assets

in the Custody Accounts were property of the Account Holders.    The Court did not determine who

owned the assets associated with Withhold Accounts.    Finally, the Court found that, regardless of

who owns the assets associated with the Custody Accounts and the Withhold Accounts, the

Debtors could maintain possession of those assets pending resolution of any Avoidance Actions.

After these rulings were issued, the Debtors entered into the Custody Settlement and the Withhold

Settlement, which are embodied in the treatment provided to Holders of Custody Claims and

Holders of Withhold Claims under the Plan.    With respect to the Earn ownership issues, the Court

---

[214]    *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start" (citations omitted)).

found that the assets transferred onto the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' Estates and granted the Debtors the authority to sell stablecoins.

149.  **Second**, the Plan also reflects numerous consensual settlements with the Debtors' other creditors that were reached after extensive arm's-length negotiations among the Debtors, the Committee, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, certain individual creditors, and the Series B Holders.  These settlements fully resolve all issues between the non-Debtor parties and the Debtors relating to the Plan.

150.  The numerous settlements embodied in the Plan are compelling evidence of the Debtors' good faith in reaching consensual resolutions throughout these Chapter 11 Cases.  The good faith requirement does not require a debtor "to negotiate with all parties in interest at all times during a bankruptcy case."[215]  Rather, "a debtor need[s] to prioritize how it deals with its constituents."[216]  In light of the settlements the Debtors reached with key stakeholders over the course of the last year, the Plan "has all the hallmarks of good faith in that those who are actually in the money have made substantial concessions from their rights under the bankruptcy code."[217]

151.  **Third**, all of the Classes of Account Holder Claims have overwhelmingly voted to accept the Plan.[218]  This is a reflection of Account Holders' belief that the Plan has a proper purpose and that they are excited by the potential of the NewCo Transaction to provide upside with respect

---

[215]  *See In re Windstream Holdings, Inc.*, No. 19-22312 (RDD), 6/25/2020 Hr'g Tr. at 106: 23–25.

[216]  *See id.* at 107: 3–4.

[217]  *See id.* at 108: 7–10.

[218]  *See* Voting Report ¶ 13.

to cryptocurrency.  The overwhelming support also shows that the Debtors have gained Account

Holders' trust, even though these Chapter 11 Cases have sometimes been contentious.

152.    Finally, as set forth herein, the Plan complies with the Bankruptcy Code and

applicable nonbankruptcy law.  Accordingly, the Debtors respectfully submit that the Plan satisfies

section 1129(a)(3) of the Bankruptcy Code.[219]

**H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

153.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses

paid by the plan proponent, by the debtor, or by a person receiving distributions of property under

the plan be subject to approval by the bankruptcy court as reasonable.[220]  Courts have construed

this section to require that all payments of claims to professionals, similar to the Professional Fee

Claims here, paid out of estate assets be subject to review and approval by the court as to their

reasonableness.[221]

154.    Here, all payments made or to be made by the Debtors for services rendered and

expenses incurred during the Chapter 11 Cases (*i.e.*, all Professional Fee Claims) are subject to

approval by the Court as reasonable.  In addition, Article II.B of the Plan provides that all final

requests for payment of Professional Fee Claims shall be filed no later than forty-five (45) days

after the Effective Date.  After notice and a hearing, in accordance with the procedures established

by the Bankruptcy Code and prior Court orders, the Allowed amounts of such Professional Fee

---

[219]    *See* Ferraro Decl. ¶ 33.

[220]    11 U.S.C. § 1129(a)(4).

[221]    *See, e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *In re Drexel*, 138 B.R. at 760.

Claims shall be determined by the Court.[222]    Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.[223]

**I.      The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

155.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.[224]    Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[225] Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[226]    Article IV.D.7 of the Plan, the Plan Supplement, and the New Organizational Documents provide information about the NewCo Board and the mechanism for how such members will be chosen.    After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

156.    Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.[227]

---

[222]    *See id.*

[223]    *See* Ferraro Decl. ¶ 34.

[224]    11 U.S.C. § 1129(a)(5)(A)(i).

[225]    11 U.S.C. § 1129(a)(5)(B).

[226]    11 U.S.C. § 1129(a)(5)(A)(ii).

[227]    *See* Campagna Decl. ¶¶ 38–39.

**J.    The Plan Does Not Require the Approval of a Governmental Regulatory Commission (§ 1129(a)(6))**.

157.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.[228]  No such regulatory commission exists here. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

**K.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7))**.

158.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)    each holder of a claim or interest of such class—
>
>    (i)    has accepted the plan; or
>
>    (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[229]

159.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate

---

[228]   11 U.S.C. § 1129(a)(6).

[229]   11 U.S.C. § 1129(a)(7)(A).  *See also In re Adelphia*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

against the estimated recoveries under that debtor's plan of reorganization.[230] As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.

160.    As set forth in the Disclosure Statement[231] and the Campagna Declaration, the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan (the "Liquidation Analysis").[232]    The projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims and Interests in all Classes are as follows:

| Class No. | Claim or Interest | Status | Voting Rights | Estimated NewCo Transaction Recovery Under Plan | Projected Orderly Wind Down Recovery Under the Plan | Estimated Recovery Under Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| Class 2 | Retail Borrower Deposit Claims | Impaired | Entitled to Vote | 85.6% | 83.0% | 47.4% |
| Class 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| Class 4 | Convenience Claims | Impaired | Entitled to Vote | 70% | 70% | N/A |
| Class 5 | General Earn Claims | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| Class 6A | General Custody Claims[233] | Impaired | Entitled to Vote | 72.5% | 72.5% | 72.5% |
| Class 6B | Withdrawable Custody Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100.0% | 100.0% | 100.0% |

---

[230]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) of the Bankruptcy Code is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[231]    *See generally* Disclosure Statement, Exh. B.

[232]    *See* Campagna Decl. ¶ 56.

[233]    Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

| Class 7 | Withhold Claims[234] | Impaired | Entitled to Vote | 72.0% | 67.1% | 47.4% |
|---|---|---|---|---|---|---|
| Class 8 | Unsecured Loan Claims | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| Class 9 | General Unsecured Claims | Impaired | Entitled to Vote | 67.0% | 61.2% | 37.5% |
| Class 10 | State Regulatory Claims | Impaired | Entitled to Vote | [0%] | [0%] | [0%] |
| Class 11 | *De Minimis* Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| Class 12 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | 47.3% |
| Class 13 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | N/A |
| Class 14 | Series B Preferred Interests | Impaired | Entitled to Vote | 0.1% | 0.1% | 0.1% |
| Class 15 | Other Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| Class 16 | Section 510(b) Claims[235] | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | N/A |
| Class 17 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |

161.    The Pharos Objection asserts that the Debtors have not met the burden required by section 1129(a)(7)(A)(ii).  Pharos holds approximately $82 million of Claims, or 94% of the total value of Claims, in Class 8 (Unsecured Loan Claims).[236]  Class 8 voted to reject the Plan.[237]  Pharos asserts that the Debtors "have provided no evidence demonstrating that the value of the shares in

---

[234]    The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

[235]    The Confirmation Order will provide that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any.  The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims.  The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

[236]    *See* Pharos Obj. ¶ 1.

[237]    *See* Voting Report  ¶ 13.

the 'NewCo' exceed the value of the assets that would be distributed in chapter 7" and that the Liquidation Analysis "appears to assign far greater value to assets in the 'Orderly Wind Down' scenario than in a chapter 7 liquidation, even though there is no principled distinction between the two."[238] Pharos' arguments in support of this allegation fail for the reasons set forth below.

162.    *First*, Pharos' argument that its projected recoveries under the Plan are not as much as or greater than its projected recoveries under a hypothetical chapter 7 liquidation is plainly incorrect as set forth in the calculation of recoveries included in the Disclosure Statement.[239] Pharos asserts that "[t]he Debtors have provided no evidence to date supporting the value of the 'NewCo Common Stock Recovery,'" and, therefore, there is no basis to the projected recoveries under the NewCo Transaction as compared to chapter 7 liquidation.[240] The Debtors' Disclosure Statement illustrates in the preliminary statement that creditor recoveries under the NewCo Transaction—including on account of NewCo Common Stock—are based on the net asset value of NewCo, which is approximated to be $1.248 billion and consists of the following components: $450 million of cryptocurrency that will "seed" NewCo; Mining;[241] and certain illiquid assets.

---

[238] *See* Pharos Obj. ¶ 2.

[239] It should be noted that Pharos also appears to misunderstand or misread the Debtors' projected recoveries. Pharos asserts that "the Debtors indicate that 6.5%–12.5% more liquid cryptocurrency would be distributed in a chapter 7 liquidation (44%–50%) than under a 'NewCo Transaction' (37.5%)" and that it therefore "follows that the Debtors can only meet their burden under section 1129(a)(7)(A)(ii) if the value of the 'NewCo Common Stock Recovery' exceeds this delta." *See* Pharos Obj. ¶ 17. The Debtors have made clear, however, that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash. *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash."). The 44%–50% figure quoted by Pharos references the total estimated recovery for Unsecured Loan Claims in a chapter 7 liquidation, which would be in cash. *See* Disclosure Statement, Exh. B at 7.

[240] *See* Pharos Obj. ¶ 2.

[241] "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd. *See* Plan, Art. I.A.158.

Notably, the Debtors and their advisors conducted a valuation of Mining, which was found to have a midpoint valuation of $565 million, as well as their illiquid assets, which were valued at $283 million—and these valuations were explained in detail in the Disclosure Statement.[242]  Similarly, Pharos' underlying sentiment—that NewCo is worthless and therefore cannot provide any real value to creditors—is flatly wrong.  NewCo has material value and the potential to become a formidable industry player right out of the gate:  it is being seeded with $450 million of cryptocurrency while not taking on any debt *and* it will receive the benefit of a business line (Mining) that has generated over $20 million of cash flow during the Debtors' time in bankruptcy and amid a prolonged industry downturn.[243]

163.    ***Second***, Pharos' argument that "there is no principled distinction between" the Orderly Wind Down and chapter 7 liquidation is wholly misguided.  Considering the information and analysis provided about the Orderly Wind Down in the Plan and the Disclosure Statement, there can be no serious argument that the two scenarios are not distinct—or that the Orderly Wind Down will not provide higher recoveries.  As an initial matter, the Orderly Wind Down is expected to generate higher recoveries than a chapter 7 liquidation because the Orderly Wind Down, also known as the Backup Plan Sponsor Transaction, will include the creation of a Backup MiningCo, a pure play, publicly traded mining business that will own the assets of Mining[244] and in which creditors will receive 100% of the equity interests, with a potential management contract with

---

[242]    *See* Disclosure Statement, Art. II.B.2; *see also* Disclosure Statement, <u>Exh. D</u> (the Mining Valuation Analysis); Kielty Decl. ¶¶ 11–12.  The valuation of the illiquid assets factored into the Liquidation Analysis and the Orderly Wind Down as well.  *See* Disclosure Statement, <u>Exh. B–C</u>.

[243]    *See* Ferraro Decl. ¶ 4.

[244]    "<u>Mining</u>" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd.  *See* Plan, Art. I.A.158.

GXD Labs LLC or other manager identified by the Debtors and the Committee.[245]    Notably, the
Debtors still have the option of selecting a different Backup Plan Sponsor and negotiating a new
Backup Plan Sponsor Agreement—as long as those terms provide the same or higher recoveries
than the currently contemplated Backup Plan Sponsor Transaction with the BRIC.[246]    Accordingly,
recoveries under the Orderly Wind Down will include more than just the proceeds to be derived
from the liquidation of assets.[247]    In contrast, recoveries under a chapter 7 liquidation consist purely
of the proceeds to be derived from liquidation of assets.[248]

164.    Next, recoveries under the Orderly Wind Down are credibly higher than under a
chapter 7 liquidation because the Orderly Wind Down is envisioned to be a methodical liquidation
of assets that takes place over a longer period than would a chapter 7 liquidation and which will
be conducted by the Plan Administrator, who will likely be Christopher Ferraro,[249] the Debtors'
interim chief executive officer, chief financial officer, and chief restructuring officer, and the
Backup Plan Sponsor, presently the BRIC Parties.[250]    The Orderly Wind Down is estimated to take
approximately five years (or possibly even longer), whereas a chapter 7 liquidation is expected to
be complete in approximately six months.[251]    Pharos nonetheless argues that a chapter 7 trustee

---

[245]    *See generally* Disclosure Statement, <u>Exh. C</u>.

[246]    *See id.*, Art. II.B.2.

[247]    *See id.*, Art. II.B.2.

[248]    *See id.*, <u>Exh. B</u> at 2.

[249]    *See* Fourth Plan Supp., <u>Exh. I</u> (including the Plan Administrator Agreement).

[250]    The BRIC Parties are the Blockchain Recovery Investment Consortium and the BRIC Support Parties, which are
parties designated by the BRIC and agreed by the Debtors and the Committee to work with the BRIC to implement
the Backup Plan Sponsor Transaction, presently contemplated to be:  (i) Gemini Trust Company, LLC and (ii)
Global X Digital, LLC, or an affiliate thereof.  *See* Plan, Art. I.A.30–31.

[251]    *See* Disclosure Statement, Art. II, <u>Exh. B</u> at 2–3.

could achieve the same results as the Plan Administrator in the Orderly Wind Down by "request[ing] the authority to operate a business of a debtor for a limited period of time so that it can realize any additional value from assets that may be sold as a going concern."[252]  To be clear, the only part of the Debtors' business that would be operational in a chapter 7 liquidation is Mining, and it is highly unlikely that a chapter 7 trustee would have the familiarity and technical expertise necessary to keep that business operational, let alone profitable, while conducting the chapter 7 liquidation process.  Moreover, the chapter 7 trustee would likely be someone completely unfamiliar with the Debtors, their business, or the cryptocurrency industry, which are also complex and multifaceted.  In contrast, the Plan Administrator, Christopher Ferraro (who has shepherded the Debtors through the Chapter 11 Cases), and the Backup Plan Sponsor (the BRIC Parties), have an impressive combination of industry expertise and knowledge of the Debtors' business which cannot but help ensure that the monetization of assets in the Orderly Wind Down captures the highest value possible.  Therefore, it is reasonable that the Plan Administrator and Backup Plan Sponsor would be able to monetize assets at or near market values, whereas a chapter 7 trustee would not.  Accordingly, Pharos' objection that the Debtors' projected realization for assets such as the Institutional Loans receivable, various investments, and mining assets in the Orderly Wind Down is too high compared to the projected realization in a chapter 7 liquidation should be overruled.[253]

165.    Finally, the Orderly Wind Down is distinct from a chapter 7 liquidation—and provides higher and better recoveries to creditors than a chapter 7 liquidation—because the Orderly

---

[252]    *See* Pharos Obj. ¶ 19.

[253]    *See* Pharos Obj. ¶¶ 18(a)–(c) for Pharos' complaints respecting the difference between projected realization of those assets under the Orderly Wind Down versus chapter 7 liquidation.

Wind Down contemplates the preservation and distribution of Liquid Cryptocurrency to creditors, which the Debtors recognized as a crucial concern for creditors from the outset of these Chapter 11 Cases,[254] whereas a chapter 7 trustee would be charged with monetizing assets and making distributions in cash.[255] As noted above, the Debtors have made clear that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.[256] Accordingly, because it addresses creditors' long-standing wishes to receive distributions in cryptocurrency, the Orderly Wind Down is preferable to a chapter 7 liquidation.

166.    Additionally, all Holders of Claims entitled to vote on the Plan have received the Liquidation Analysis (attached as Exhibit B to the Disclosure Statement) and have been provided ample time to consider the contents thereof. Accordingly, the Debtors respectfully submit that the Plan complies with section 1129(a)(7) of the Bankruptcy Code.[257]

**L.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code.**

167.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[258] If any class of claims or

---

[254] *See* July 18 Hr'g Tr. 15:18–25, 16:1–2 ("Certainly, undoubtedly, some percentage of [our customers], some number of them, will be interested in getting a recovery in U.S. dollars or other fiat currency…But we definitely expect that the majority are going to be interested in, you know, riding out what you've heard referred to as this crypto winter, remaining long crypto, having the opportunity to realize their recovery through and appreciation in the macro crypto market or environment").

[255] 11 U.S.C. § 726.

[256] *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash").

[257] *Id*.

[258] 11 U.S.C. § 1129(a)(8).

interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[259]

168.    Here, the Plan satisfies either the voting requirements or the cramdown requirements with respect to nearly all Classes.  The Impaired Voting Classes of Claims and Interests under the Plan in Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), and Class 6A (General Custody Claims), Class 7 (Withhold Claims), Class 9 (General Unsecured Claims; at the Consolidated Debtors); Class 10 (State Regulatory Claims), Class 14 (Series B Preferred Interests) voted to accept the Plan.  Class 1 (Other Secured Claims), Class 3 (Other Priority Claims), Class 6B (Withdrawable Custody Claims) are Unimpaired and are presumed to accept the Plan.  Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) are deemed to accept or reject and are proponents of the Plan.  Such Intercompany Claims shall be Reinstated or set off, settled, addressed, distributed, addressed, converted to equity, contributed, cancelled, or released and such Intercompany Interests shall be Reinstated or set off, settled, addressed, distributed, contributed, merged, cancelled, or released consistent with the Transactions Steps Memorandum on or before the Effective Date by the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable. Class 8 (Unsecured Loan Claims) voted to reject the Plan, and Class 9 (General Unsecured Creditors) voted to reject the Plan at Celsius Mining LLC and Celsius Network Inc. (Class 9 voted to accept at the Consolidated Debtors).  Finally, Class 11 (*De Minimis* Claims), Class 15 (Other Interests), Class 16 (Section 510(b) Claims), and Class 17 (Equitably Subordinated Claims) are deemed to reject the Plan.  Notwithstanding those Classes that rejected the Plan or were deemed

---

[259]    11 U.S.C. § 1129(b).

to reject the Plan, as discussed below, the Plan satisfies the cramdown requirements of section 1129(b) with respect to these Classes.

169.    Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the "cramdown" requirements of the Bankruptcy Code.[260]

**M.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

170.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments unless such holders agree to different treatment for such claim. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[261] Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[262] Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority

---

[260]    *See* Campagna Decl. ¶ 42.

[261]    11 U.S.C. § 1129(a)(9)(A).

[262]    11 U.S.C. § 1129(a)(9)(B).

tax claims—must receive cash payments over a period not to exceed five years from the petition

date, the present value of which equals the allowed amount of the claim.[263]

171.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  *First*, the Plan

satisfies section 1129(a)(9)(A) of the Bankruptcy Code because Article II.A of the Plan provides

that each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the

amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably

practicable thereafter, or at such other time as provided in Article II.A of the Plan.

172.    *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because

no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[264]

*Finally*, the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because Articles II.C and

III.B of the Plan specifically provide that Holders of Allowed Priority Tax Claims or Allowed

Other Priority Claims, respectively, shall receive treatment in a manner consistent with section

1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee.  Thus, the

Debtors respectfully submit that the Plan satisfies each of the requirements set forth in

section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.[265]

**N.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

173.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an

impaired class of claims, at least one impaired class of claims must accept the plan "without

including any acceptance of the plan by any insider" as an alternative to the requirement under

---

[263]    11 U.S.C. § 1129(a)(9)(C).

[264]    *See* Plan, Art. III.B.

[265]    *See* Campagna Decl. ¶ 43.

section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[266]

174.    As set forth above, Holders of Claims in Classes 2, 4, 5, 6A, 7, 9 (at the Consolidated Debtors), and 10—which are Impaired Classes under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes.[267]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.[268]

### O.    The Plan Is Feasible (§ 1129(a)(11)).

175.    Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[269]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; rather, a debtor must demonstrate a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization.[270]  Feasibility cannot be defeated by

---

[266]    11 U.S.C. § 1129(a)(10).

[267]    *See* Voting Report, Exh. A.

[268]    *See* Campagna Decl. ¶ 44.

[269]    11 U.S.C. § 1129(a)(11).

[270]    *See In re Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required." (citation omitted)); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*), 169 B.R. 669, 674

"speculative prospects of failure" or the "mere prospect of financial uncertainty."[271]    As

demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the

Bankruptcy Code.

176.    In determining standards of feasibility, courts in this jurisdiction and others have

identified the following probative factors:

> a.    the adequacy of the capital structure;
>
> b.    the earning power of the business;
>
> c.    the economic conditions;
>
> d.    the ability of management;
>
> e.    the probability of the continuation of the same management; and
>
> f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[272]

These factors "are neither exhaustive nor exclusive" as the determination is "fact intensive" and

made on a "case by case" basis.[273]

177.    The Restructuring Transactions contemplated by the Plan have been described in

detail elsewhere in this Memorandum.  In short, the Plan provides for the NewCo Transaction and,

if the NewCo transaction cannot be completed, the option for the Debtors to pivot to the Orderly

Wind Down.  The Debtors have structured the Restructuring Transactions to ensure that in either

---

(Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable." (citation omitted)).

[271]    *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

[272]    *See, e.g., In re WorldCom*, 2003 WL 23861928, at *58; *Texaco*, 84 B.R. at 910; *Drexel Burnham.*, Inc., 138 B.R. at 762–63; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

[273]    *In re Young Broad. Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010).

scenario, liquidation or the further reorganization not contemplated by the Plan is highly unlikely. For the following reasons, the Plan is feasible as required by section 1129(a)(11).

178.    **First**, as set forth in the Ferraro Declaration, NewCo will be well capitalized and will carry zero debt.[274]   As part of the Plan, the Debtors will seed NewCo with $450 million in Liquid Cryptocurrency free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date.[275]   Thus, NewCo's capital structure will be more than adequate to meet NewCo's Plan obligations.

179.    **Second**, with respect to the viability of the Debtors' reorganized mining business, which will be a central feature for both NewCo under the NewCo Transaction and the pure play, publicly traded mining business in the Orderly Wind Down, the Debtors prepared Financial Projections for Mining's financial performance for the fiscal years ending September 30, 2024 through September 30, 2028, which were attached to the Disclosure Statement as <u>Exhibit E</u>.[276] The Debtors and their advisors thoroughly analyzed the Financial Projections and the mining business's ability to meet post-Confirmation Plan obligations and to continue as a go-forward business.   As set forth in the Ferraro Declaration, the Debtors believe that these Financial Projections demonstrate the Debtors' ability to meet their obligations under the Plan and to have a viable reorganized business going forward.[277]

180.    Additionally, as set forth in the Ferraro Declaration, despite numerous challenges facing the Debtors' mining business at the Petition Date, including fluctuating market conditions

---

[274]   *See* Ferraro Decl. ¶ 37.

[275]   *See id.*

[276]   *See id.* ¶ 38.

[277]   *See id.*; *see also* Fahrenheit Decl. ¶ 16.

and the rejection of the Core hosting contract and defaults by counterparties, the Debtors' mining business has had positive cash flow since the Petition Date.[278]  Since the Petition Date, the mining business's adjusted EBITDA on an unaudited basis since the Petition Date is approximately $24.3 million.[279]  Thus, even during an extremely tumultuous period, the Debtors' mining business did not lose money.

181.    In fact, the Debtors' mining business has done more than just avoid losing money— it has led to significant positive cash flows.  The Debtors found new hosting providers and moved towards hosting their own rigs through their own proprietary sites.[280]  Based on these improvements, the Debtors' have generated over $20 million of operating cash flow since the Petition Date, even during a tumultuous period for the Bitcoin mining industry generally.[281] Further, the Debtors have improved the adjusted gross margin of the mining business through a fixed power priced hedge, new hosting agreements with improved economics, and new software on their rigs to improve efficiency.[282]

182.    *Third*, the Debtors' Auction was highly competitive (and had to be extended repeatedly as a result) and the Debtors were able to attract multiple strategic Bids from sophisticated investors and industry professionals.[283]  Further, all of the proposals the Debtors received during the month-long Auction—those proposed by the current Plan Sponsor

---

[278]    *See* Ferraro Decl. ¶ 39.

[279]    *Id.*

[280]    *Id.* ¶ 40; *see also* Fahrenheit Decl. ¶ 16.

[281]    *See* Ferraro Decl. ¶ 43.

[282]    *See id.* ¶ 42.

[283]    *See* Kielty Decl. ¶¶ 8–9.

(the Fahrenheit Group), the former Plan Sponsor and Stalking Horse Bidder (NovaWulf), and the

current Backup Plan Sponsor (the BRIC)—are anchored by the reorganized mining business,

indicating a consensus among these sophisticated parties regarding not just the feasibility, but also

the long-term profitability, of mining.  As this Court has done previously, the Court here should

look positively on the Debtors' ability to attract strategic proposals and attention for their assets.[284]

Notably, NewCo will be directed and managed by sophisticated crypto-natives and business

professionals who have significant experience with mining, the cryptocurrency market, and

corporate governance.[285]

183.    ***Fourth***, the Debtors have included extensive disclosure about the risks of NewCo

in the Disclosure Statement, including risks that the Debtors may toggle to the Orderly Wind

Down, the NewCo may not be able to achieve the projected financial results, certain regulatory

approval may not be granted, a liquid trading market for the NewCo Common Stock may not

develop and may result in a depressed or volatile trading price, and the mining business is subject

to the volatility of Bitcoin prices, utility prices, and rapidly changing technology.  In other words,

this is not a case where the debtors are imagining an "overnight reversal of fortune" or otherwise

not "consider[ing] the present and future nature of the industry"—which can be fatal to feasibility

in this district.[286]  Importantly, despite the risks the Debtors enumerated, the majority of creditors

---

[284] *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 194 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010
WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010)
(finding that a revenue-less debtor's reorganization plan was feasible when their FCC authorization was highly
valuable and likely to appeal to a strategic partner to fund capital expenditures); Disclosure Statement, Art.
VII.M.3 (describing the whole-company sale process and the Auction).

[285] *See Third Plan Supp.* [Docket No. 3444], Exh. B (introducing the members of the board of directors of NewCo);
Disclosure Statement, Exh. F at 20 (introducing the managers of NewCo); *see also* Ferraro Decl. ¶ 40; *see also*
Fahrenheit Decl. ¶¶ 11-13.

[286] *See, e.g.*, *Prudential Energy Co.*, 58 B.R. at 863.  There, court found a debtor did not meet the feasibility standard
when the plan imagined "an overnight reversal of fortune" as the debtor had been experiencing decreasing levels
of investment in oil and gas projects prior to the bankruptcy and had no confirmed investments exiting bankruptcy.

have overwhelmingly voted to accept the Plan, indicating their confidence in the go-forward value

of the NewCo. Thorough disclosure of risks, coupled with support by creditors, are factors calling

for the confirmation of a plan.[287]

184.    *Fifth*, with respect to the viability of the Orderly Wind Down, the Debtors prepared

the Orderly Wind Down Analysis, attached to the Disclosure statement as <u>Exhibit C</u>, utilizing the

Valuation Report, input from the Debtors' management team and advisors, and projected results

of operations and cash flows in the period from May 31, 2023 to the assumed Wind Down Date.

The Orderly Wind Down Analysis demonstrates the Debtors' ability to meet their obligations

under the Plan even in the event of a toggle to the Orderly Wind Down.

185.    Thus, the Debtors respectfully submit that the Plan satisfies section 1129(a)(11) of

the Bankruptcy Code.

### P.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).

186.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees

payable under section 1930 of title 28 of the United States Code, as determined by the court at the

hearing on confirmation of the plan."[288] Article II.D of the Plan provides that the Debtors and the

Post-Effective Date Debtors, as applicable, shall pay all fees and charges due, including Plan

payments and disbursements in and outside the ordinary course of the Debtors' or the Post-

---

The court further noted that the debtors could not rely on "past experience" as "a valid barometer of future performance" and should have considered these macro effects in developing their plan. *Id.*

[287]    *See In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (confirming a plan "when [the] debtors fully and fairly disclosed the risks associated with variances from projections, the lack of a trading market for the shares, the leveraged condition of [NewCo], the competitive conditions in the industry, and certain tax matters associated with the plan" and the debtors enjoyed "[t]he overwhelming support of the creditors, garnered after their professionals reviewed the debtors' projections" which "len[t] credence to the debtors' belief in the feasibility of the plan."); *see also In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (finding that "the best indicator of feasibility is the position of the creditors whose economic interests are at stake").

[288]    11 U.S.C. § 1129(a)(12); *see also* 28 U.S.C. § 1930.

Effective Date Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. On and after the Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.[289]

### Q.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)).

187.    Section 1129(a)(13) of the Bankruptcy Code requires all retiree benefits to continue post-confirmation in accordance with section 1114 of the Bankruptcy Code. To the best of the Debtors' knowledge and belief, they do not have any retiree benefit obligations. Out of an abundance of caution, Article IV.P of the Plan provides that, from and after the Effective Date, all retiree benefits as defined in section 1114 of the Bankruptcy Code will continue in the ordinary course in accordance with applicable law. Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.[290]

### R.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.

188.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[291] Because the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an

---

[289]    *See* Campagna Decl. ¶ 45.

[290]    *See id.* ¶ 46.

[291]    *See* 11 U.S.C. § 1129(a)(14).

"individual" as defined in the Bankruptcy Code.[292]  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.[293]  Accordingly, the Debtors respectfully submit that the Plan is not subject to the requirements of sections 1129(a)(14)–(16) of the Bankruptcy Code, and no party has asserted otherwise.

### S.    The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the Bankruptcy Code.

189.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[294]  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[295]

190.    As explained herein, the Debtors respectfully submit that the Plan does not "discriminate unfairly" and is "fair and equitable."

---

[292]    11 U.S.C. § 1129(a)(15).

[293]    11 U.S.C. § 1129(a)(16).

[294]    *See* 11 U.S.C. § 1129(b).

[295]    *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'").

### 1.    The Plan Does Not Unfairly Discriminate with Respect to Rejecting Classes (§ 1129(b)(1)).

191.    The Plan does not discriminate unfairly with respect to the impaired classes that have rejected the Plan.  Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[296]  The purpose underlying the unfair discrimination requirement is to "ensure[ ] that a dissenting class will receive value equal to the value given to all other similarly situated classes."[297]  Thus, courts have adopted various tests in order to determine whether discrimination between classes of claimants is "unfair."[298]

192.    Generally, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similarly situated claims receive materially different treatment without a reasonable basis for the disparate treatment.[299]  A plan does not unfairly discriminate where it provides different treatment to two or more classes that are

---

[296]    *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[297]    *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988); *accord In re SunEdison, Inc.*, 575 B.R. 220 (Bankr. S.D.N.Y. 2017); *In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011).

[298]    *In re Sea Trail Corp.*, No. 11-07370-8, 2012 WL 5247175, at *7 (Bankr. E.D.N.C. Oct. 23, 2012) ("Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1). . . . These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.").

[299]    *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination . . . .").

comprised of dissimilar claims or interests.[300]  Likewise, there is no unfair discrimination if, taking

into account the particular facts and circumstances of the case, there is a reasonable basis for the

disparate treatment.[301]  In this regard, the caselaw recognizes that, by its terms, section 1129(b)(1)

of the Bankruptcy Code makes clear that not all "discrimination" is impermissible—only unfair

discrimination.[302]

193.    Courts in this Circuit consider four factors in determining whether to permit the

separate treatment of claims:  (a) whether there is a reasonable basis for discrimination; (b) whether

the debtor can consummate the plan without the discrimination; (c) whether the discrimination is

proposed in good faith; and (d) whether the degree of discrimination is proportional to its

rationale.[303]  In construing the test, leading courts and commentators have concluded that the "test

boils down to whether the proposed discrimination has a reasonable basis and is necessary for

reorganization."[304]

194.    Here, the Plan's treatment of the Impaired Classes that have rejected the Plan, are

deemed to reject the Plan, or may be deemed to reject the Plan is proper because the Plan's overall

classification scheme rests on a legally acceptable rationale and all similarly situated Claims and

---

[300]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom.*, 843 F.2d 636 (2d Cir. 1988).

[301]  *In re Aztec Co.*, 107 B.R. at 590.

[302]  *See In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 758] Hr'g Tr. 118:4–7 ("Clearly, one of the areas of flexibility that Congress provided in Chapter 11 is the unfair discrimination test of 1129, recognizing implicitly in the plain language that some forms of discrimination are fair.").

[303]  *In re Genco Shipping*, 513 B.R. at 242–43 (collecting cases); *Buttonwood*, 111 B.R. at 63.

[304]  *In re Breitburn Energy Partners LP*, 582 B.R. 321, 351 (Bankr. S.D.N.Y. 2018) (citing 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.03[3][a], at 1129–66); *In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No 758] Hr'g Tr. 112:21-23 (interpreting the *Buttonwood* test as providing a "reminder[] to the fact finder to focus his or her inquiry on the reasonable basis for discriminating").

Interests will receive substantially similar treatment. Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.

195.    No unfair discrimination exists as to Impaired Class 8 (Unsecured Loan Claims) and Class 9 (General Unsecured Claims) that have rejected the Plan. Holders of Claims in Classes 8 and 9[305] are receiving the same or a very similar recovery as the other Holders of unsecured Claims, in particular Holders of Claims in Class 5 (General Earn Claims). Under either the NewCo Transaction or the Orderly Wind Down, Holders of Claims in Classes 8 and 9 will receive the exact same recovery as Holders of Claims in Class 5—67% and 61.2%, respectively.

196.    Further, Holders of Claims in Classes 8 and 9 will receive almost the same recovery as Holders of Convenience Claims in Class 4, which are receiving 70%. The Claims in the Convenience Class, while consisting of Account Holder Claims, are distinct from the unsecured Claims in Classes 8 and 9 because Class 4 was created for administrative convenience and also provides other Account Holders the ability to opt into the same treatment as Holders of Claims in the Convenience Class if such Account Holders want to reduce the aggregate value of their Claim to $5,000 in exchange for the same 70% recovery.

197.    Claims in Classes 8 and 9 are different than General Custody Claims in Class 6A, Withhold Claims in Class 7, and Retail Borrower Deposit Claims in Class 2. General Custody Claims are receiving 72.5% recovery because assets in Custody Accounts are subject to unique Terms of Use and the Court has already ruled that the assets in Custody Accounts belong to Account Holders. Moreover, the Court previously approved the Custody Settlement, which

---

[305] Classes 8 and 9 are receiving the exact same recovery—67% under the NewCo Transaction and 61.2% under the Orderly Wind Down.

provided that Holders of General Custody Claims would receive the same opportunity to participate in the Custody Settlement under the Plan. In addition, Withhold Claims are receiving 72% in the NewCo Transaction and 67.1% in the Orderly Wind Down because assets in Withhold Account present a unique issue, were not subject to any Terms of Use, and have been litigated and negotiated at length throughout these Chapter 11 Cases, culminating in the Withhold Settlement that was approved by the Court, which also provided that non-settling Holders of Withhold Claims would have the opportunity to participate in the Withhold Settlement under the Plan.

198.    Finally, Retail Borrower Deposit Claims in Class 2 are receiving a different recovery than Claims in Classes 8 and 9 because Retail Borrower Deposit Claims, though unsecured, have different legal rights from other unsecured Claims in that they are subject to the Loan Terms and Conditions. Those Loan Terms and Conditions provide the Debtors the right to set off Retail Borrowers' obligations. Accordingly, Class 2 is projected to receive a recovery of 85.6% under the NewCo Transaction or 83% under the Orderly Wind Down on account of these setoff rights. Notably, however, the total percentage of recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim. In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or a 67% recovery on their Retail Borrower Post-Set Off Deposit Claim. The proposed recovery for Retail Borrower Post-Set Off Deposit Claims is the same as the proposed recovery for Claims in Classes 8 and 9. As with Custody Claims and Withhold Claims, the treatment of Retail Borrower Deposit Claims was heavily negotiated throughout the Chapter 11 Cases, culminating in the Retail Borrower Settlement

following a three-day mediation between the Retail Borrower Ad Hoc Group, the Debtors, the Committee, the Earn Ad Hoc Group, and certain individual creditors.

199.    Neither does unfair discrimination exist between the Classes of Account Holder Claims that are Impaired, entitled to vote, and can expect to receive a recovery, and *De Minimis* Claims in Class 11, which are Impaired, deemed to reject, and will receive no recovery. *De Minimis* Claims are Account Holder Claims with an aggregate value equal to or less than $10.00. *De Minimis* Claims are classified separately because of the significant administrative convenience involved in grouping together all such Claims. Further, *De Minimis* Claims are not receiving a recovery because in most cases, the cost associated with making distributions on account of these Claims would be higher than the distributions to which such Claims would be entitled. This is consistent with the Debtors' previous treatment of other "de minimis" claims. For example, the Custody Withdrawal Order, which authorized the Debtors to reopen withdrawals for Custody Settlement participants, also authorized the Debtors to not permit withdrawals where the account balance was not sufficient to satisfy gas fees or transaction costs necessary to make the distribution itself.[306] Moreover, although Holders of *De Minimis* Claims were not entitled to vote, the releases under the Plan only apply to those Holders if they affirmatively opted into them.

200.    Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given that their legal character is distinctly different from all other Claims and Interests. The Debtors separately classified Class 12 (Intercompany Claims) from other unsecured claims and Class 13 (Intercompany Interests) from other interests based on ownership in the Plan and to preserve the option to either Reinstate, compromise, or cancel these Claims and Interests. Such treatment will allow the Debtors greater flexibility when they are

---

[306]    *See* Custody Withdrawal Order ¶ 4.

implementing the Restructuring Transactions. Significantly, the optionality with respect to Intercompany Claims and Intercompany Interests does not affect the stakeholders' recovery under the Plan and is intended for only administrative convenience in the restructuring process. Reinstatement is merely a technical preservation of Claims and Interests necessary to preserve the Debtors' corporate structure, does not have any economic substance, and does not enable any junior creditor or interest holder to retain or recover any value under the Plan.[307]

201.    With respect to Class 16 Section 510(b) Claims, the Debtors formed Class 16 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code. The Plan's treatment of Class 16 is proper because no similarly situated class will receive more favorable treatment. Further, section 510(b) of the Bankruptcy Code requires the subordination of any claim that (a) arises from the cancellation of a purchase or sale of a "security" in a debtor or a debtor's affiliate, (b) seeks damages arising from the purchase or sale of such a security, or (c) seeks reimbursement or contribution on account of a claim otherwise allowed under the Bankruptcy Code. Here, the classification of Class 16 comports with section 510(b) because the Section 510(b) Claims include, among others, Claims arising out of or relating to (a) CEL Token (other than CEL Token Deposit Claims), including damages arising from the purchase or sale of CEL Token, certain damages for reimbursement or contribution on account of such a Claim, and Claims arising from the cancellation of a contract for the purchase or sale of CEL Token, and (b) the purchase or sale of preferred shares in Celsius Network Ltd or other equity interests in any Debtor.

---

[307]    *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 600–01 (Bankr. S.D.N.Y. 2009) (overruling an objection that reinstatement of an intercompany interest violates the absolute priority rule because "the retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

202.    With respect to Class 17 Equitably Subordinated Claims, the Debtors formed Class 17 to include Holders of Claims that may be equitably subordinated pursuant to the Plan, which have been identified on the Schedule of Equitably Subordinated Claims.  The Plan's treatment of Class 17 is proper because no similarly situated class will receive more favorable treatment.

203.    Accordingly, the Plan does not discriminate unfairly with respect to the Impaired Classes that have been deemed to reject the Plan and satisfies the requirements of 1129(b)(1).

### 2.    The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§ 1129(b)(2)).

204.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2).[308]  Generally, this requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[309]  Additionally, for a plan to be "fair and equitable," no creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its claim).[310]

---

[308]    11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[309]    *See In re 203 N. LaSalle*, 526 U.S. at 459.

[310]    *See* 7 Collier on Bankruptcy ¶1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del 2003) ("[A] corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

205.    The Impaired rejecting Classes here are Class 8 (Unsecured Loan Claims), Class 9 (General Unsecured Loan Claims),[311] and Class 11 (*De Minimis* Claims).  Under the Plan, no Holder of a Claim or Interest junior to these Classes will receive any recovery on account of such Claim or Interest.  Although Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) may be Unimpaired, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  Rather, Intercompany Claims and Intercompany Interests will be Unimpaired, if at all, for purposes of maintaining the prepetition organizational structure for the administrative benefit of the Post-Effective Date Debtors and such recovery has no economic substance.  Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule.[312]  Moreover, as set forth in the Debtors' Disclosure Statement, no Class of Claims is receiving more than what it is owed.[313]

206.    In its Objection, Pharos asserts that the Debtors' Plan violates the absolute priority rule because, it argues, Series B Preferred Interests in Class 14 (which are junior to Class 8 Unsecured Loan Claims) are receiving a 0.1% recovery "on account of their interests" in either the NewCo Transaction or the Orderly Wind Down.[314]  These arguments have no merit.  The distributions that will be made to Holders of Series B Preferred Interests are not being made "on

---

[311]    Class 9 rejected the Plan at Celsius Mining LLC and Celsius Network LLC, and accepted the Plan at the Consolidated Debtors.

[312]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[313]    *See* Disclosure Statement, Art. III.E.

[314]    See Pharos Obj. ¶ 22.

account" of such interests themselves but pursuant to, and to implement, a settlement previously approved by the Court, *i.e.*, the Series B Settlement.

207.    Prior to the Series B Settlement, the Series B Holders argued that they were entitled to receive recoveries ahead of unsecured Account Holder Claims because Account Holders only had claims against Celsius Network LLC.[315]    Calling it a "gating question" for these Chapter 11 Cases, the Court found that customers could only assert contractual claims against Network LLC and not all Celsius entities.[316]    Importantly, however, the Court noted that there may be non-contractual claims against other Celsius entities.[317]    As a result, to address these potential non-contractual claims, the Debtors and the Committee commenced a series of related litigations, including with respect to the issues of substantive consolidation, the allowance of an intercompany claim between Celsius Network Ltd and Celsius Network LLC, and an alleged constructive transfer.    While this litigation was ongoing, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of Ultimately, however, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of the issues between the parties.    These negotiations were successful and the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders reached a global settlement and filed, on June 27, 2023, a joint motion requesting

---

[315]    *See generally Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Docket No. 1795].

[316]    *See Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205].

[317]    *See id.* at 4.

entry of an order approving the same,[318] which the Court subsequently entered.[319]    The settlement

agreement expressly noted that it was "for settlement purposes only"[320] and the parties explained

in their joint motion that the $25 million cash funds (the "Settlement Funds") that would be

distributed pursuant to the Series B Settlement "ends all ongoing litigation between the parties

regarding substantive consolidation, the allowance of an intercompany claim between CNL and

LLC, and an alleged constructive transfer."[321]    Accordingly, payments to Holders of Series B

Preferred Interests are being made on account of the Series B Settlement—and the multiple

complex issues it resolves—and not purely on account of their Interests.

208.    If Pharos believed that the Series B Settlement had any potential to prejudice its

interests as a general unsecured creditor, Pharos should have objected to the Series B Settlement

Motion, but it did not.    More importantly, however, absent the Series B Settlement, if the Initial

Consenting Series B Preferred Holders had been successful in their arguments, they would

potentially be senior to Pharos in receiving distributions from certain Debtors.    A settlement of

these issues does not violate the absolute priority rule.

209.    The Debtors do not believe that the Series B Settlement deviates from the absolute

priority rule, but even if it did, as the Court opined in *Dewey & LeBoeuf*, "a court in its discretion

can approve a settlement that does not comply strictly with the absolute priority rule, as long as

---

[318]    *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899] (the "Series B Settlement Motion").

[319]    *See Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 3058] (the "Series B Settlement Order"); *see also Memorandum Opinion Approving the Settlement Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders* [Docket No. 3074].

[320]    *See* Series B Settlement Order, Exh. 1.

[321]    *See* Series B Settlement Mot. ¶ 1.

the settling parties can justify the divergence, and the court can 'clearly articulate the reasons for approving…a settlement that deviates from the absolute priority rule.'"  This Court has already approved the Series B Settlement, and therefore any challenge to it on account of the absolute priority rule is moot.[322]

210.    Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.[323]

### T.    The Debtors Complied With Section 1129(d) of the Bankruptcy Code.

211.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[324]  Article II.C of the Plan contemplates the full payment of all Allowed Priority Tax Claims.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.[325]

## VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.

212.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[326]  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

---

[322]    *In re Dewey & LeBoeuf, LLP*, 478 B.R. 628, 642 (Bankr. S.D.N.Y. 2012) (approving a settlement between a debtor law firm and many of its former partners, which included mutual releases that an ad hoc committee argued constituted a distribution that would violate the absolute priority rule).

[323]    *See* Campagna Decl. ¶¶ 48–51.

[324]    15 U.S.C. § 77e.

[325]    *See* Campagna Decl. ¶ 53.

[326]    Fed. R. Bankr. P. 3020(e).

contract or unexpired lease under section 365(f) of the Bankruptcy Code.[327]  Each rule also permits

modification of the imposed stay upon court order.[328]

213.    The Debtors submit that good cause exists for waiving and eliminating any stay of

the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

proposed Confirmation Order will be effective immediately upon its entry.[329]  The restructuring

transactions contemplated by the Plan were vigorously negotiated among sophisticated parties, and

the Plan has been accepted by the Voting Class.  Further, each day the Debtors remain in

chapter 11, they incur significant administrative and professional costs—expenses that are

unnecessary in light of the overwhelming support for the Plan among the Voting Class.

Importantly, not a single creditor in a Voting Class voted to reject the Plan.  Accordingly, the

Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed

Confirmation Order may be effective immediately upon its entry.

## VII.    The Debtors' Replies to Remaining Objections.

### A.    The Emergence Incentive Plan Should Be Approved as Part of the Plan.

214.    Victor Ubierna de las Heras ("Mr. Ubierna de las Heras") objects to the Emergence

Incentive Plan because he believes it does not satisfy the requirements of section 503(c) of

the Bankruptcy Code.[330]  Mr. Ubierna de las Heras, however, is an outlier in this regard, as over

---

[327]   Fed. R. Bankr. P. 6004(h), 6006(d).

[328]   *Id.*

[329]   *See, e.g.*, *In re Windstream Holdings, Inc.,* No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Barneys N.Y. Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) (same); *In re Deluxe Ent. Servs. Grp. Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) (same); *In re Hollander Sleep Prods., LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sept. 5, 2019) (same); *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) (same); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) (same).

[330]   *See generally* Ubierna de las Heras Obj.

95% of the number of Claims that voted, voted to accept the Plan, including the Emergence Incentive Plan. Indeed, Mr. Ubierna de las Heras and the one additional creditor who raised concerns with the Court regarding the Emergence Incentive Plan hold claims in the Account Holder Voting Classes, which overwhelmingly voted to accept the Plan. On this basis alone the objections to the Emergence Incentive Plan should be overruled. The Debtors worked with the Committee to develop the Emergence Incentive Plan and select metrics that would challenge and incentivize the EIP Participants. The Account Holder Classes have voiced their clear support of the Plan and terms contained therein, including the Emergence Incentive Plan, and dissenters in those classes must accept this outcome. The Committee's support of the Emergence Incentive Plan, coupled with the voting results, demonstrates that creditors acting in their own interest as well as their appointed fiduciary believe the Emergence Incentive Plan is appropriate under the circumstances.

215. The Ubierna de las Heras Objection to the Emergence Incentive Plan is premised on the alleged applicability of section 503(c) of the Bankruptcy Code and the appropriateness of the Emergence Incentive Plan under the facts and circumstances of these Chapter 11 Cases. In particular, Mr. Ubierna de las Heras asserts that the Debtors are required to satisfy section 503(c) of the Bankruptcy Code for the EIP to be in the Plan and have failed to present sufficient evidence that the Emergence Incentive Plan satisfies such requirements.

216. The Ubierna de las Heras Objection is misplaced. As an initial matter, the payments will be made by the Post-Effective Date Debtors, not any chapter 11 debtor, and so any restriction on the Debtors under the Bankruptcy Code are inapplicable. Even if a higher standard is applied, the Emergence Incentive Plan is justified under the facts and circumstances of these Chapter 11 Cases, as the Plan allows the Post-Effective Date Debtors to compensate key members of

management who have focused their collective efforts on maximizing value for all stakeholders and providing key services related to the consummation of the Debtors' Plan. Specifically, these executives have worked tirelessly and will continue to work hard distributing Liquid Cryptocurrency to the Debtors' stakeholders, maximizing the value of the Debtors' mining operations, and maintaining security of the Debtors' platform for a period of time after the Effective Date to ensure the security of the Debtors' Liquid Cryptocurrency. The ultimate success of the Debtors' Chapter 11 Cases is heavily reliant on the continued efforts of the EIP Participants, as they possess the specific expertise, knowledge, and familiarity with the Debtors' business and operations, making them indispensable to the Debtors' Plan consummation and the obligations of the Post-Effective Date Debtors.

217.    The demands placed upon the EIP Participants have been, and will continue to be, significant in light of the facts and circumstances of these Chapter 11 Cases, especially at this critical juncture of confirming and consummating the Plan. Contrary to Mr. Ubierna de las Heras' assertion, many of the demands that the EIP Participants face go well beyond the demands of their prepetition day-to-day responsibilities. The EIP Participants' critical roles are even more challenging due to the Debtors' significantly depleted workforce. In fact, many EIP Participants assumed additional roles and responsibilities resulting from the reduction in workforce from over 900 employees in early 2022 to fewer than 150 employees today. Moreover, headcount is expected to continue to fall between now and the anticipated emergence date and the Company is preparing for further attrition due to turnover and reductions in force of approximately 33%. As such, it is vital that the Debtors boost morale among the EIP Participants and incentivize the EIP Participants to continue to meet onerous demands. Ultimately, incentivizing the EIP Participants will inure to the benefit of all stakeholders by ensuring the EIP Participants are focused on facilitating a

value-maximizing resolution to these Chapter 11 Cases, thus maximizing recoveries for the Debtors' stakeholders.

218.    Moreover, Mr. Ubierna de las Heras' contention that "compensation above base salary should be reviewed by the Debtors' post-confirmation Board" misses the mark.[331]    Under the Plan, NewCo will not be responsible for distributing the EIP Awards.[332]    Rather, the Plan Administrator will distribute the EIP Awards subject to his verification of the EIP Participants' satisfaction of the applicable performance metrics under the Emergence Incentive Plan.[333]

### 1.    The Emergence Incentive Plan Complies With Section 503(c) of the Bankruptcy Code.

219.    Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.    Thus, the Ubierna de las Heras Objection should be overruled.

220.    The Debtors maintain that section 503(c) is not the relevant standard given that the Emergence Incentive Plan was incorporated in the Plan that was accepted by Account Holder Classes.    The Emergence Incentive Plan, as its name suggests, is an incentive-based program— not a "pay-to-stay" retention plan prohibited by section 503(c)(3).

---

[331]    *See id.* at 3.

[332]    *See* Plan, Art. IV.J.2.

[333]    *See id.* ("On the Effective Date, the Emergence Incentive Plan shall be effective, the KEIP Motion shall be deemed withdrawn with prejudice, and the Plan Administrator *may* distribute the EIP Awards, ***subject to the Plan Administrator to confirming that the applicable metrics have been satisfied***, without any further action by the Debtors or the Post-Effective Date Debtors.").

221.    In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work."[334]    As evidenced by its terms, the purpose of the Emergence Incentive Plan is to incentivize the EIP Participants to maximize the value of the Post-Effective Date Debtors after emergence from chapter 11 by distributing EIP Awards subject to the satisfaction of certain metrics and subject to the discretion of the Plan Administrator.[335]    Contrary to Mr. Ubierna de las Heras' assertion that the Emergence Incentive Program's "retentive purpose is obvious from the easily achievable benchmarks,"[336] the program does not contain any retention-based components, as the EIP Participants are not merely paid for maintaining their employment for a certain time period.[337]    Rather, the Emergence Incentive Plan incentivizes the EIP Participants to rise to the challenge of consummating the Debtors' Plan.  Importantly, the metrics are not easily achievable, demonstrated by the fact that certain of the metrics have not been achieved—specifically, pursuant to the Mining Rig Metric, target performance required the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, to have, among other things, 95,000 mining rigs hashing (or energized but not hashing due to market conditions, by September 30, 2023).[338]    As of August 31, the Debtors have only approximately 86,000 mining rigs hashing, thus falling well short of target performance.

---

[334]    *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the debtor's business" (emphasis in original)); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance.").

[335]    *See* Plan, Art. IV.J.2.

[336]    *See* Ubierna de las Heras Obj. at 3.

[337]    *See* Plan, Art. IV.J.2; *cf. In re Hawker Beechcraft*, 479 B.R. at 315 (denying KEIP approval where lower threshold was attainable so long as debtor did not encounter "any 'whoopsies'").

[338]    *See* Campagna Decl. ¶ 28.

Construction and delivery delays, disputes with mining counterparties, and the numerous financial risks associated with developing and maintaining mining sites have together prevented the Debtors from having 95,000 mining rigs hashing at this point.[339] Furthermore, when developing the Mining Metrics, the Debtors and their advisors reached agreement with the Committee to make the Mining Metrics, specifically, more challenging under the facts and circumstances of these Chapter 11 Cases in exchange for the Committee's support of the Emergence Incentive Plan. Significantly, even despite precarious market conditions facing the cryptocurrency industry and serious challenges facing the Debtors' mining business, including the rejection of the Core hosting contract, the Debtors' mining business has maintained a positive operating cash flow since the Petition Date.[340]

222.    Furthermore, under the Liquid Cryptocurrency Distribution Metric, certain EIP Participants are incentivized to ensure sufficient Liquid Cryptocurrency is available for the initial distribution to all Holders of Allowed Claims within thirty days of the Effective Date, ensuring that the Debtors' Account Holders are able to access their distributions as expeditiously as possible. This is no small undertaking—the Debtors anticipate that approximately 400,000 customers will be entitled to receive distributions under the Plan. The Emergence Incentive Plan ensures that those EIP Participants are working toward the goal of maximizing the distributions to account holders who have been waiting for their cryptocurrency for over sixteen months. As such, Mr. Ubierna de las Heras' objection to the metrics is misguided and without merit.

---

[339]    *See id.*

[340]    *See* Ferraro Decl. ¶ 43.

223.    Despite Mr. Ubierna de las Heras' assertion that "[a] CEO getting his company out of bankruptcy is just doing his job,"[341] each of the EIP Participants have assumed significant, additional responsibilities and stresses of the key roles and responsibilities as a result of these Chapter 11 Cases.  Importantly, the EIP Participants are not required to remain employed with the Debtors after the Effective Date but have agreed to do so to effectuate the Restructuring Transactions and maximize value for stakeholders.  To properly incentivize the EIP Participants to achieve these results, the Emergence Incentive Plan included specific metrics to ensure an expeditious distribution of liquid cryptocurrency.  The EIP Participants possess the skills, knowledge, and experience that are critical to the Debtors' ability to consummate the Debtors' Plan for the benefit of all stakeholders in these Chapter 11 Cases.  To receive the target EIP Award opportunity, the EIP Participants must achieve multiple performance metrics as reflected in the Plan, including, among others, confirming and consummating the Plan, achieving performance targets regarding the distribution of liquid cryptocurrency under the Plan, and, for some EIP Participants, achieving certain mining rig hashing and profit goals.[342]  As such, the Emergence Incentive Plan properly incentivizes the EIP Participants to maximize the value of the Debtors' estates.  The Emergence Incentive Plan is therefore structured to drive performance from these key parties by providing incentives to achieve targeted goals in a manner that will benefit all parties— particularly the Debtors' stakeholders—if the performance targets are achieved.  Furthermore, the overall cost of the Emergence Incentive Plan—$2.6 million—is reasonable and appropriate under the circumstances.[343]

---

[341]    *See* Ubierna de las Heras Obj. at 4.

[342]    *See* Plan, Art. IV.J.2.

[343]    *See* Hoeinghaus Decl. at ¶ 22.

224.    Moreover, implementing the Emergence Incentive Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates and stakeholders. The Emergence Incentive Plan is the result of an independent analysis undertaken by the Debtors in conjunction with market guidance from their restructuring advisor Alvarez & Marsal North America, LLC ("A&M") and the Debtors' other advisors to ensure that the Emergence Incentive Plan is market-based, consistent with competitive practices, and compliant with the Bankruptcy Code  The Emergence Incentive Plan was subject to further review and approval from the Special Committee, none of whom are current EIP Participants.  Absent the Emergence Incentive Plan, the EIP Participants may be undercompensated, under-incentivized at this critical stage of the Debtors' Chapter 11 Cases, and at risk of leaving the Debtors before certain key milestones are achieved, including the distribution of a significant amount of liquid cryptocurrency.  Such incentives are an important tool for driving performance by key personnel and effectively align the interests of the EIP Participants with those of the Debtors' stakeholders.

225.    Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, has the support of an overwhelming number of creditors who voted to accept the Plan, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.  Thus, Mr. Ubierna de las Heras's objection should be overruled.

**B.      The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections Related to Loans Should Be Overruled.**

226.    Several creditors objected to confirmation of the Plan with respect to the treatment of the loans of the Retail Borrowers.  Specifically, as noted, Mr. Bronge filed the Bronge Objection

and several other Retail Borrowers wrote letters on this issue.[344]  As further set forth below, the

Bronge Objection and the Loan Letters should be overruled.

### 1.    Plan Treatment of the Institutional Borrowers and Retail Borrowers is Appropriate.

227.    The Bronge Objection asserts that the Plan should provide similar treatment to both

the Retail Borrowers and Institutional Borrowers.  Specifically, Mr. Bronge asserts that Retail

Borrowers, like Institutional Borrowers, should be allowed to repay outstanding loan balances

(including interest) in exchange for the full amount of their collateral, with any such amount to be

paid in kind with "full unencumbered property rights."

### a.    Retail Borrowers Do Not Own Their Collateral and are Instead Unsecured Creditors of the Debtors.

228.    The Debtors' Estates consist of "all legal or equitable interests of the debtor in

property as of the commencement of the case."[345]  The Loan Terms and Conditions provide—

unambiguously in every version and in multiple places—that Retail Borrowers transferred title of

their collateral to the Debtors.  For example, the current version of the Loan Terms and Conditions

---

[344]    Prior to the Bronge Objection, Mr. Bronge also filed a *Motion for Repayment of Loans and Return of Collateral* [Docket No. 3270] (the "Bronge Motion"), which was not yet scheduled for a hearing.  There, Mr. Bronge raised similar arguments regarding the treatment of Retail Borrower Deposit Claims and sought a ruling that (a) allows him to redeem the digital assets he transferred to the Borrow Program by repaying the principal and interest of his retail loans, (b) establishes that only the outstanding balance of his retail loans is property of the Debtors' Estates and the digital assets he transferred to the Borrow program are his "encumbered property" until his repayment, and (c) requires the Plan and the Disclosure Statement to use the same definitions and terminologies as the Loan Terms and Conditions.  *See* Bronge Motion at 3–4.  The Bronge Motion and the Bronge Objection were joined by the following letters (collectively, the "Loan Letters"): the First Windom Letter [Docket No. 3533] (joining the Bronge Motion); the Abruzese Letter [Docket No. 3540] (joining the Bronge Objection); the Truss Letter [Docket No. 3541] (joining the Bronge Objection); and the Dame Letter [Docket No. 3543] (joining the Bronge Motion).  In addition, other creditors' letters raise similar arguments.  *See, e.g.*, the Second Windom Letter [Docket No. 3546] ¶ 6 (arguing that Retail Borrowers should have the same opportunity as Institutional Borrowers to repay the loan and redeem the digital assets transferred to the Borrow Program); the Johantgen Letter [Docket No. 3538] (arguing that the Plan's treatment of Retail Borrower Deposit Claims is unfair because he would receive fewer digital assets than what he transferred to the Borrow Program).

[345]    *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)).

provide that "Digital Assets posted as Collateral shall be the exclusive property of [Lending]," that Borrowers "grant [Lending] and any of its Affiliates the right . . . to hold the Digital Assets provided as Collateral in [Lending's] name or in another name . . . with all attendant rights of ownership . . . ," and that Borrowers "acknowledge that, with respect to Digital Assets used by Lending . . . [they] will not be able to exercise any rights of ownership."[346] When the contract is clear and unambiguous, courts will "give effect to the plain meaning of the contract's terms and provisions."[347] As a result, the digital assets Retail Borrowers transferred via the Borrow Program are property of the Debtors' Estates, just as this Court found that assets in Earn Accounts are property of the Debtors' Estates.[348]

229.    These arguments were raised in connection with the mediation between the Debtors, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and the Committee, which led to the Retail Borrower Settlement that has been incorporated into the Plan.  The Retail Borrower Settlement and the Plan establish a mechanism through which the rights of the Debtors and the Holders of Retail Borrower Deposit Claims are reconciled.[349]  This a value-maximizing result that avoids further litigation, which would only drain estate resources to be distributed to the Debtors' stakeholders.  The broad agreement of the Holders of Retail Borrower Deposit Claims can be inferred from their overwhelming support for the Plan, as described below.

---

[346]    *See* Loan T&C version 9, "Collateral," "Consent to Celsius' Use of Your Digital Assets."  *See also* Loan T&C version 8 at 6, 12; Loan T&C version 7 at 14; Loan T&C version 6 at 14; Loan T&C version 5 at 14; Loan T&C version 4 at 14; Loan T&C version 3 at 13; Loan T&C version 2 at 12; Loan T&C version 1 at 11.

[347]    *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[348]    *See, e.g.*, *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] at 30 (holding that "the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors").

[349]    *See* Disclosure Statement, Art. II.A.2.

**b.    The Bronge Objection Misunderstands the Institutional Loan Order.**

230.    Moreover, the Bronge Objection also references the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818], which was approved by the Court,[350] to argue that the Retail Borrowers should be afforded the same treatment as Institutional Borrowers.  This order, however, only "authorized, but [did] not direct[]" the Debtors to exercise their rights under the Master Loan Agreements to settle the Institutional Loans.  Nothing in the Institutional Loan Order requires the Debtors to return such collateral.  Instead, it provided the Debtors with the authority to negotiate with Institutional Borrowers to return a portion of their collateral.  Such relief was granted because the Institutional Borrowers are subject to Master Lending Agreements that provided that they retained ownership of the collateral they provided to the Debtors, unlike the Loan Terms and Conditions applicable to Retail Borrowers.

**c.    Separate Classification of Retail Borrower and Institutional Borrower Claims is Appropriate Under the Bankruptcy Code.**

231.    As an initial matter, Mr. Bronge has no grounds to object to the treatment of the Retail Borrower Deposit Claims on the grounds of unfair discrimination because the Class overwhelmingly voted to accept the Plan.  Section 1129(b)(1) of the Bankruptcy Code only provides an opportunity for a member of a class to object to a plan of reorganization on the grounds that the plan discriminates unfairly against that class if the class "is impaired under, and has not

---

[350]    *See Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) The Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1944] (the "Institutional Loan Order").

accepted, the plan."[351]    There can be no dispute that the vote of 98.83% of the Holders of Retail

Borrower Deposit Claims in favor of the Plan constitutes anything less than an overwhelming show

of support.[352]    Because he is a member of a class that has voted to accept the Plan, Mr. Bronge is

bound to accept his treatment and the Debtors do not have to demonstrate that the class is not the

product of unfair discrimination against similarly situated creditors.

232.    Even if the Debtors were required to demonstrate that the Retail Borrower Deposit

Claims class treatment is not the product of unfair discrimination, such differences in treatment

between that class and Institutional Borrowers would be justified based on the differences in the

legal rights accruing to the Holders of each set of claims.    The classification requirement of

section 1122(a) of the Bankruptcy Code provides, in pertinent part, "[e]xcept as provided in

subsection (b) of this section, a plan may place a claim or an interest in a particular class only if

such claim or interest is substantially similar to the other claims or interests of such class."[353]

233.    Courts generally will approve placement of similar claims in different classes,

provided that a "rational" or "reasonable" basis exists for doing so.[354]    Recognizing this flexibility,

---

[351]    11 U.S.C. § 1129(b)(1).

[352]    *See* Voting Report ¶ 13.

[353]    11 U.S.C. § 1122(a).

[354]    *See, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25–123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[355] Courts have identified several grounds justifying the separate classification of claims, including where members of a particular class possess different legal rights[356] and where the debtors have valid business reasons for separate classification.[357]

234.    The Plan's classification of Retail Borrowers in Class 2, as set forth in Article III of the Plan, satisfies the requirements of section 1122 of the Bankruptcy Code because the Retail Borrowers and Institutional Borrowers have different legal rights, and the Debtors have valid business reasons for separate classification. Specifically, Retail Borrowers initiated loans through their Celsius Accounts and all were subject to the same Loan Terms and Conditions (each as amended). On the other hand, Celsius originated institutional loans with Institutional Borrowers on an individual basis, entering into separate master lending agreements with each Institutional Borrower. As such, the rights of Retail Borrowers are distinct from those of Institutional Borrowers, and the fact that all Retail Borrowers are subject to the Loan Terms and Conditions serves as a valid reason for the Debtors to classify Retail Borrower Deposit Claims in their own Class.

---

[355] *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[356] *See Drexel*, 138 B.R. at 715.

[357] *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, 2007 WL 2779438, at *3.

        **d.**      **The Debtors' Valuation of the Collateral Related to the Retail Borrower Claims is Appropriate.**

235.    The Bronge Objection argues that the valuation of the collateral related to the Retail Borrower Deposit Claims using a price reflecting the value of such collateral on the Petition Date for the purposes of distributions and using the current market price to determine the value of the collateral for the purposes of the Set Off Treatment evinces a "lack of fairness" because "[t]his approach may result in an unjustifiable loss of actual BTC or ETH beyond the general 'haircut' that all unsecured claimants are subjected to."[358]  As an initial matter, Mr. Bronge has failed to identify any statutory basis upon which this portion of his objection rests.  Further, this treatment is precisely that which was determined to be appropriate under the Retail Borrower Settlement and represents a consensual compromise concerning the various rights and obligations applicable to Retail Borrowers.  Finally, the Debtors' use of different prices to value collateral for the purposes of distributions and for the purposes of setoff is valid.  A distribution under the Plan is on account of a prepetition obligation of the Debtors and is therefore sensibly valued as of the Petition Date.  The Set Off Treatment described in the Plan, however, contemplates a transaction occurring between the Debtors and the relevant Retail Borrowers as of the Effective Date of the Plan and therefore appropriately uses market valuation to account for the value of the collateral at the time of that transaction.[359]

        **e.**      **The Terminology Used by the Debtors in the Plan and Retail Borrower Settlement is Appropriate.**

236.    Last, Mr. Bronge objects to the Debtors' use of terminology describing the Retail

---

[358]   *See* Bronge Obj., "Valuation of Collateral."

[359]   *See* Disclosure Statement, Art. II.A.2.

Borrower Settlement and related provisions in the Plan.[360]   Mr. Bronge cites no provisions of the

Bankruptcy Code, nor any case law, that requires the Plan definitions to conform to a particular

contract.  Accordingly, the Bronge Objection and the Loan Letters should be overruled.

237.    The remaining Objections, to the extent not discussed in the body of the

Memorandum, are addressed in the Objection Tracker attached hereto as **Exhibit A**.

## **Conclusion**

238.    For all of the reasons set forth herein and in the Ferraro Declaration, the Campagna

Declaration, the Kielty Declaration, the Cohen Declaration, the Fahrenheit Declaration, and the

Hoeinghaus Declaration, Debtors respectfully request that the Court confirm the Plan as fully

satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed

Confirmation Order, and granting such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

---

[360]   *See* Bronge Obj., "Terminology."

New York, New York
Dated: September 27, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
    ross.kwasteniet@kirkland.com
    chris.koenig@kirkland.com
    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Objection Tracker**

**Exhibit B**

**Redline**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT**
**OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF CELSIUS NETWORK LLC AND ITS**
**DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO**

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS[2]

**Page**

Preliminary Statement .......................................................................................... 2

Background .......................................................................................................... 9

I. Solicitation and Notification Process. ......................................................... 9

II. The Restructuring Transactions. ................................................................. 14

III. The Objections. ........................................................................................ 19

Argument ............................................................................................................ 21

IV. The Plan, as Modified, Satisfies the Requirements of Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. ....................................... 21

V. The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ... 25

A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ................................................................................ 26

B. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. .......................................................................... 26

C. The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code. .......................................................................... 30

D. The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. .......................................................... 36

 1. The Debtor Release Is Appropriate and Complies With the Bankruptcy Code. ........................................................................ 38

 2. The Third-Party Release Is Wholly Consensual and Should Be Approved. ... 43

 3. The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code. ........................................................... 52

 4. The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code. ............................................................... 60

 5. The CEL Token Settlement, the Account Holder Avoidance Action Settlement, and the Retail Borrower Settlement Comply With the

---

[2] [Resolved.]

Page

Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors'
Good Business Judgment. ................................................................. 61

E.   The Plan Complies With Section 1123(d) of the Bankruptcy Code. ............ 79

F.   The Debtors Complied With the Applicable Provisions of the Bankruptcy Code
(§ 1129(a)(2)). .......................................................................... 83

1.   The Debtors Complied With Section 1125 of the Bankruptcy Code. ..... 84

2.   The Debtors Complied With Section 1126 of the Bankruptcy Code. ..... 85

G.   The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law
(§ 1129(a)(3)). .......................................................................... 90

H.   The Plan Provides That the Debtors' Payment of Professional Fees and Expenses
Are Subject to Court Approval (§ 1129(a)(4)). ..................................... 93

I.   The Debtors Disclosed All Necessary Information Regarding Directors, Officers,
and Insiders (§ 1129(a)(5)). ........................................................... 94

J.   The Plan Does Not Require the Approval of a Governmental Regulatory
Commission (§ 1129(a)(6)). ........................................................... 95

K.   The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ... 95

L.   The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8))
of the Bankruptcy Code. ............................................................... 102

M.   The Plan Provides for Payment in Full of All Allowed Priority Claims
(§ 1129(a)(9)). .......................................................................... 104

N.   At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
(§ 1129(a)(10)). ......................................................................... 105

O.   The Plan Is Feasible (§ 1129(a)(11)). ............................................... 106

P.   All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ................ 111

Q.   All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ....... 112

R.   Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply
to the Plan. .............................................................................. 112

S.   The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the
Bankruptcy Code. ...................................................................... 113

1.      The Plan Does Not Unfairly Discriminate with Respect to Rejecting Classes (§ 1129(b)(1)). ......114

2.      The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§ 1129(b)(2)). ......120

T.      The Debtors Complied With Section 1129(d) of the Bankruptcy Code. ......124

VI.     Good Cause Exists to Waive the Stay of the Confirmation Order. ......124

VII.    The Debtors' Replies to Remaining Objections. ......125

A.      The Emergence Incentive Plan Should Be Approved as Part of the Plan. ......125

1.      The Emergence Incentive Plan Complies With Section 503(c) of the Bankruptcy Code. ......128

B.      The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections Related to Loans Should Be Overruled. ......132

1.      Plan Treatment of the Institutional Borrowers and Retail Borrowers is Appropriate. ......133

Conclusion ......139

# TABLE OF AUTHORITIES[2]

**Page(s)**

**Cases**

*In re 20 Bayard Views, LLC*,
   445 B.R. 83 (Bankr. E.D.N.Y. 2011) ................................................................114

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
   526 U.S. 434 (1999) ..........................................................................................113

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) .........................................................*passim*

*In re A.H. Robins Co.*,
   88 B.R. 742 (Bankr. E.D. Va. 1988) ..................................................................21

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ............................................39, 43, 90, 95

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] ...........56

*Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
   855 F.3d 459 (2d Cir. 2017) ...............................................................................65

*In re Aegean Marine Petroleum Network, Inc.*,
   No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) ................................124

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996) ..........................................................................27, 136

*In re Aleris Int'l, Inc.*,
   No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) .............21

*In re Almatis, B.V.*,
   No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] ...........55

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) .............................................................................114

---

[2]   ~~This Table of Authorities is not yet complete.  The Debtors are continuing to finalize the Table of Authorities and will file a revised Memorandum on the docket as soon as possible showing a redline reflecting that the Table of Authorities is the only change.~~

**Page**

*In re Ampex Corp.*,
No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] ................................ 56

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013) ................................................................................. 21, 24

*In re Answers Holdings, Inc.*,
No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) ........................................ 50, 56

*In re Avaya Inc.*,
No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) ........................................ 50, 56

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021) ................................................................ 46, 47

*In re Avianca Holdings S.A.*,
No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) ........................................ 49

*In re Avianca,*
632 B.R. 124 (Bankr. S.D.N.Y. 2021) 46, 47

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................ 114

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc.*
*Corp.*),
701 F.2d 1071 (2d Cir. 1983) ................................................................................. 90

*In re Bally Total Fitness of Greater N.Y., Inc.*,
No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) .............. *passim*

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ........................................................................................ 95, 120

*In re Barneys N.Y. Inc.*,
No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) ........................................ 124

*In re Barneys New York Inc.*,
No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020) ........................................ 45, 50

*In re BCBG Max Azria Global Holdings, LLC*,
No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) ........................................ 50, 56

*In re BearingPoint, Inc.*,
453 B.R. 486 (Bankr. S.D.N.Y. 2011) ................................................................ 55

*In re BearingPoint, Inc.*,
No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) ........................................ 43

*In re Best Prods. Co.*,
    177 B.R. 791 (S.D.N.Y. 1995) ........................................................ 24

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) ..................................................... 27, 136

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) ............................................ 113

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ......................................... 115

*In re Cajun Elec. Power Co-op., Inc.*,
    150 F.3d 503 (5th Cir. 1998) ......................................................... 83

*In re Calpine Corp.*,
    No. 05-60200 (BRL) ....................................................................... 44

*In re Capmark Fin. Grp., Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ............................................... 66

*In re Captran Creditors' Trust*,
    128 B.R. 469 (M.D. Fla. 1991) ...................................................... 53

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) ...................................... 21, 90

*In re Cengage Learning, Inc.*,
    No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] ............. 57

*In re Cenveo, Inc.*,
    No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] ............. 55, 56

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................... 39

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015) .............................................. 44

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ........................................... 44

*In re China Fishery Grp. Ltd.*,
    No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022) ................... 49

*Complaint for Declaratory Judgment*
    [Adv. No. 23-01007, Docket No. 2001] .......................................... 77

*In re Crabtree & Evelyn, Ltd.*,
  No. 09-14267 (BRL), 2010 WL 3638369 (Bankr. S.D.N.Y. Jan. 14. 2010) ............ 43

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, *In re DBSD N. Am., Inc.*, No.
  09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part,
  rev'd in part*, 634 F.3d 79 (2d Cir. 2011) .............. 55, 109

*In re Deluxe Media*,
  No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) .............. *passim*

*In re Dewey & LeBoeuf, LLP*,
  478 B.R. 628 (Bankr. S.D.N.Y. 2012) .............. 123

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) .............. *passim*

*In re DJK Residential, LLC*,
  No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] .............. 57

*In re Dow Corning Corp.*,
  237 B.R. 374 (Bankr. E.D. Mich. 1999) .............. 21

*In re Drexel Burnham*,
  960 F.2d 285 (2d Cir. 1992) .............. 52, 60

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991) .............. 61

*In re Drexel Burnham Lambert Grp., Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............. *passim*

*In re Eastman Kodak Co.*,
  No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] .............. 55

*In re Eddington Thread Mfg. Co.*,
  181 B.R. 826 (Bankr. E.D. Pa. 1995) .............. 106

*In re Enron Corp.*,
  326 B.R. 497 (S.D.N.Y. 2005) .............. 52, 55, 56

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) .............. 120

*In re Freymiller Trucking, Inc.*,
  190 B.R. 913 (Bankr. W.D. Okla. 1996) .............. 113

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
 10 F.3d 944 (2d Cir. 1993) ................................................................26, 136

*In re Frontier Communications Corp.*,
 No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) ...........................54

*In re Fullbeauty Brands Holdings Corp.*,
 No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019) .........................50, 56

*In re Garrett Motion*,
 No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021) .....................49, 54

*In re Gaston & Snow*,
 Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4,
 1996) ......................................................................................................89

*In re Genco Shipping & Trading Ltd.*,
 513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................43, 44, 115

*In re Genco Shipping*,
 513 B.R. ............................................................................................115

*In re Glob. Home Prods., LLC*,
 369 B.R. 778 (Bankr. D. Del. 2007) .......................................................128

*In re Global A&T Electronics Ltd.*,
 Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 17, 2017) .................59

*In re Global A&T Electronics Ltd.*,
 No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51] ........56, 59

*In re Granite Broad. Corp.*,
 369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...............................................55, 120

*In re Greate Bay Hotel & Casino, Inc.*,
 251 B.R. 213 (Bankr. D.N.J. 2000) .......................................................114

*In re Hawker Beechcraft, Inc.*,
 479 B.R. 308 (Bankr. S.D.N.Y. 2012) ...................................................128

*In re Health Diagnostic Lab., Inc.*,
 551 B.R. 218 (Bankr. E.D. Va. 2016) ......................................................53

*Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe
 Enters., Ltd. II)*,
 994 F.2d 1160 (5th Cir. 1993) ...........................................................25, 106

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007) ........................................................... 27, 136

*In re Hollander Sleep Products, LLC*,
   No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) ........................... *passim*

*In re Indianapolis Downs, LLC.*,
   486 B.R. 286 (Bankr. D. Del. 2013) ........................................................... 110

*In re Ion Media Networks, Inc.*,
   419 B.R. 585 (Bankr. S.D.N.Y. 2009) ........................................................... 118, 121

~~*In re Ionosphere Clubs,*~~
   ~~98 B.R.~~ ........................................................... ~~136~~

*In re Ionosphere Clubs, Inc.*,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989) ........................................................... 26, 27, 136

*In re Jartran, Inc.*,
   44 B.R. 331 (Bankr. N.D. Ill. 1984) ........................................................... 56

*In re Jason Industries*,
   No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020) ........................... 50

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
   *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988) ........................................................... 114

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
   843 F.2d 636 (2d Cir. 1988) ........................................................... 25, 89, 106, 114

*Kenton Cty. Bondholders Comm. v. Delta Air Lines* (*In re Delta Air Lines*),
   374 B.R. 516 (S.D.N.Y. 2007) ........................................................... 61

*In re Key3Media Grp. Inc.*,
   336 B.R. 87 (Bankr. D. Del. 2005) ........................................................... 66

*In re Lakeland Tours, LLC*,
   No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) ........................... 50

*In re Lapworth*,
   No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ........................... 83

*In re LATAM Airlines Group S.A.*,
   No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)
   ........................................................... 49, 54, 58, 59

*In re Lear Corp.*,
2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009) ........................ 44

*In re Legend Parent Inc.*,
No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014) ........................ 50

*In re Lehman Bros. Holdings. Inc.*,
422 B.R. 407 (Bankr. S.D.N.Y. 2010) ........................ 133

*In re Leslie Fay Companies, Inc.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ........................ 110

*In re Lightsquared Inc.*,
513 B.R. 56 (Bankr. S.D.N.Y. 2014) ........................ 26, 136

*In re LSC Communications, Inc.*,
No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021) ........................ 49, 54

*In re Lumileds*,
No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022) ........................ 49, 54

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005) ........................ 43, 44, 47

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
478 F.3d 452 (2d Cir. 2007) ........................ *passim*

*In re MPM Silicones*,
2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) ........................ 44

*Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*,
169 B.R. 669 (Bankr. D. Ariz. 1994) ........................ 106

*In re Nellson Nutraceutical, Inc.*,
369 B.R. 787 (Bankr. D. Del. 2007) ........................ 128

*In re NII Holdings, Inc.*,
536 B.R. 61 (Bankr. S.D.N.Y. 2015) ........................ 39, 60

*In re Nine West Holdings, Inc.*,
No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) ........................ *passim*

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984) ........................ 90

Page

*O'Connell v. Packles (In re Hilsen)*,
    404 B.R. 58 (Bankr. E.D.N.Y. 2009) ..................................................... 61

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ............................................ 39, 43, 57

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) .............................................................. 133

*In re Philippine Airlines, Inc.*,
    No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) ..................... 49

*In re Pisces Energy, LLC*,
    Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880 (Bankr. S.D.
    Tex. Dec. 21, 2009) ................................................................. 21

*In re Prudential Energy Co.*,
    58 B.R. 857 (Bankr. S.D.N.Y. 1986) .......................................... 107, 110

*In re Purofied Down Prods. Corp.*,
    150 B.R. 519 (S.D.N.Y. 1993) ......................................................... 61

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) ............................................................ 53

*In re Reader's Digest Ass'n, Inc.*,
    No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) .... 26, 114, 115, 136

*In re Repurchase Corp.*,
    332 B.R. 336 (Bankr. N.D. Ill. 2005) ............................................ 107

*In re Res. Cap., LLC*,
    No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] ...... 55

*In re Revlon, Inc.*,
    No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023) ..................... 49, 54

*Rombro v. Dufrayne (In re Med. Diversified, Inc.)*,
    461 F.3d 251 (2d Cir. 2006) ............................................................ 65

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) .............................................. 26

*In re Sabine Oil & Gas Corp.*,
    No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) ................... 45, 50

*In re Sea Trail Corp.*,
    No. 11-07370-8, 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012) ...... 114

**Page**

*In re Seabras 1 USA, LLC,*
No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) .................... 50, 55, 56, 57

*SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network
Limited,* <u>Exh. A</u>, *SEC v. Celsius Network Limited et al.,*
23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6] ......................... *passim*

*In re Sentinel Mgmt. Grp., Inc.,*
398 B.R. 281 (Bankr. N.D. Ill. 2008) .................................... 21, 24

*In re Simplot,*
No. 06-00002 (TLM), 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007) ...... 25

*In re Soup Kitchen Int'l., Inc.,*
506 B.R. 29 (Bankr. E.D.N.Y. 2014) ........................................ 66

*In re Specialty Equip. Cos.,*
3 F.3d 1043 (7th Cir. 1993) ............................................... 43

*In re Spiegel, Inc.,*
No. 03-11540 (BRL), 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006),
*appeal dismissed,* No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28,
2007), *aff'd,* 269 F. App'x 56 (2d Cir. 2008) ............................ 43

*In re SunEdison, Inc.,*
575 B.R. 220 (Bankr. S.D.N.Y. 2017) ..................................... 114

*In re SunEdison, Inc.,*
No. 16-10992 (SMB), 576 B.R. 453 (Bankr. S.D.N.Y. 2017) ................. 44

*In re Sungard Availability Services Capital, Inc.,*
No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019) ............... 50, 56, 58

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S.
Truck Co.),*
800 F.2d 581 (6th Cir. 1986) ............................................ 107

*In re Texaco Inc.,*
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ............................ 60, 89, 107

*In re Toy & Sports Warehouse, Inc.,*
37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...................................... 90

*In re Tricom, S.A.,*
No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009) ..................... 46

*United States v. Mashinsky et al.*,
   23-cr-00347-UA (S.D.N.Y. 2023) .......................................................................... 64

*In re Uno Rest. Holdings Corp.*,
   No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) ........................................... 55

*In re Windstream Holdings, Inc.*,
   No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) .................................. *passim*

*In re Winn-Dixie Stores, Inc.*,
   356 B.R. 239 (Bankr. M.D. Fla. 2006) ................................................................ 52

*In re Worldcom, Inc.*,
   2003 WL 23861928 ...................................................................................... *passim*

*In re Young Broad. Inc.*,
   430 B.R. 99 (Bankr. S.D.N.Y. 2010) ................................................................. 107

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ............................................................ 56, 113

**Statutes**

11 U.S.C. § 502(a) ............................................................................................ 85

11 U.S.C. § 510(b) ..................................................................................... *passim*

11 U.S.C. § 541(a)(1) ....................................................................................... 133

11 U.S.C. § 547(b) ........................................................................................... 76

11 U.S.C. § 726 ............................................................................................. 101

11 U.S.C. § 1122(a) ........................................................................... 26, 135, 136

11 U.S.C. § 1122(b) .......................................................................................... 29

11 U.S.C. § 1123(a)(1) ...................................................................................... 30

11 U.S.C. § 1123(a)(2) ...................................................................................... 30

11 U.S.C. § 1123(a)(3) ...................................................................................... 31

11 U.S.C. § 1123(a)(4) ...................................................................................... 31

11 U.S.C. § 1123(a)(5) ................................................................................. 31, 34

11 U.S.C. § 1123(a)(6) ...................................................................................... 35

11 U.S.C. § 1123(a)(7) ..................................................................... 35

11 U.S.C. § 1123(b)(1)–(3) .............................................................. 36

11 U.S.C. § 1123(b)(6) ..................................................................... 36

11 U.S.C. § 1123(d) ............................................................. 79, 80, 82

11 U.S.C. § 1126 ................................................................. 12, 85, 88

11 U.S.C. § 1126(a) ................................................................. 84, 85

11 U.S.C. § 1126(f) ................................................................. 12, 84

11 U.S.C. § 1126(g) ........................................................ 12, 84, 85

11 U.S.C. § 1127(a) ................................................................. 21 21

11 U.S.C. § 1129(a)(1) ..................................................................... 25

11 U.S.C. § 1129(a)(2) ..................................................................... 82

11 U.S.C. § 1129(a)(3) ....................................................... 53, 89, 92

11 U.S.C. § 1129(a)(4) ..................................................................... 92

11 U.S.C. § 1129(a)(5)(A)(i) ........................................................... 93

11 U.S.C. § 1129(a)(5)(A)(ii) .......................................................... 93

11 U.S.C. § 1129(a)(5)(B) ............................................................... 93

11 U.S.C. § 1129(a)(6) ..................................................................... 94

11 U.S.C. § 1129(a)(7)(A) ............................................................... 95

11 U.S.C. § 1129(a)(8) ................................................................... 102

11 U.S.C. § 1129(a)(9)(A) ............................................................. 103

11 U.S.C. § 1129(a)(9)(B) ............................................................. 104

11 U.S.C. § 1129(a)(9)(C) ............................................................. 104

11 U.S.C. § 1129(a)(10) ................................................................. 105

11 U.S.C. § 1129(a)(11) ........................................................ 106, 107

11 U.S.C. § 1129(a)(12) ................................................................. 111

11 U.S.C. § 1129(a)(14) .......................................................................... 112

11 U.S.C. § 1129(a)(15) .......................................................................... 112

11 U.S.C. § 1129(a)(16) .......................................................................... 112

11 U.S.C. § 1129(b) .......................................................................... 102, 113

11 U.S.C. § 1129(b)(1) .......................................................... 113, 114, 135

11 U.S.C. § 1129(b)(2)(B)(i) .................................................................. 120

11 U.S.C. § 1129(b)(2)(B)(ii) ................................................................ 120

11 U.S.C. § 1129(b)(2)(C)(ii) ................................................................ 120

15 U.S.C. § 77e .......................................................................................... 123

28 U.S.C. § 1930 ...................................................................................... 111

Bankrtupcy Code § 1123 .......................................................... ~~60,~~ 80

Bankrtupcy Code § 1125(a) .................................................................. 84

Bankrtupcy Code § 1126 .......................................................... 12, 85, 88

Bankrtupcy Code § 1129(a) .................................................................. 25

Bankrtupcy Code § 1129(b) .................................................................. 25

Bankrtupcy Code § 1141 ........................................................................ 18

Bankrtupcy Code § 365(a) ...................................................................... 80

Bankrtupcy Code § 501 .......................................................... 85, 88

Bankrtupcy Code § 523 .................................................................. 18, 23

Bankruptcy Code .......................................................... ~~passim~~ 9, 14

Bankruptcy Code § 105(a) .................................................................... 32

Bankruptcy Code § 365 .......................................................................... 79

Bankruptcy Code § 502 .......................................................... 63, 85, 88

Bankruptcy Code § 502(b) .................................................................... 70

Bankruptcy Code § 503(c) .............................................................. passim

Page

Bankruptcy Code § 547(c)(2) .......................................................................... 72

Bankruptcy Code § 1102 ................................................................................. 10

Bankruptcy Code § 1107(a) ........................................................................... 10

Bankruptcy Code § 1108 ................................................................................. 10

Bankruptcy Code § 1109 .......................................................................... 18, 96

Bankruptcy Code § 1111 ........................................................................ 85, 88

Bankruptcy Code § 1122 ........................................... 21, 13625, 26, 136

Bankruptcy Code § 1123 ................................................................ 21, 25, 26

Bankruptcy Code § 1123(b)(3)(A) ...................................................... *passim*

Bankruptcy Code § 1125 .......................................................................... 83, 84

Bankruptcy Code § 1125(eb) .......................................................................... 84

Bankruptcy Code §§ 11265, 502, 501, and 1111 ...................... 85, 88(c) ......... 84

Bankruptcy Code § 1127 .................................................................. 20, 21, 24

Bankruptcy Code § 1127(a) ........................................................................... 21

Bankruptcy Code § 1129 ................................................................................. 25

Bankruptcy Code § 1129(a)(9) ............................................................ 104, 105

Bankruptcy Code § 1146(a) ........................................................................... 34

Bankrutpcy Code § 1125(b) .......................................................................... 84

Bloomberg Law, September 15, 2023,
    https://news.bloomberglaw.com/ip-law/top-celsius-executive-cohen-pavon-pl
    eads-guilty-to-crypto-fraud ....................................................................... 64

**Rules**

Fed. R. Bankr. P. 302 ................................................................................. 124

Bankruptcy RuleFed. R. Bankr. P. 1015(b) ............................................... 10

Bankruptcy Rule 3018(a) ........................................................................ 86, 88

Bankruptcy Rule 3019 ....................................................................... 20, 21, 24

**Page**

Bankruptcy Rule 9019 ............................................................................ 60, 61, 70

Fed. R. Bankr. P. 3018(a) .............................................................. 12486, 88

Fed. R. Bankr. P. 3019 ................................................................. 20, 21, 24

Fed. R. Bankr. P. 6004(h) ................................................................... 124

Fed. R. Bankr. P. 6006(d) ................................................................... 124

Fed. R. Bankr. P. 9019 ............................................................... 60, 61, 70

**Other Authorities**

The New York Times (International Edition) (August 25, 2023) ............... 11

The New York Times (National Edition) (August 25, 2023) .................... 11

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum")[3] in support of confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be further modified, amended, or supplemented from time to time, the "Plan").[4]  In support of this Memorandum and Confirmation of the Plan, the Debtors have also filed contemporaneously herewith the following declarations:  (a) *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3581] (the "Ferraro Declaration"); (b) *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3582] (the "Campagna Declaration"); (c) *Declaration of Ryan Kielty in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3592] (the "Kielty Declaration"); (d) *Declaration of Joel E. Cohen, Managing Director of Stout Risius Ross, LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3588] (the "Cohen Declaration"); (e) *Declaration of Steve Kokinos in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of*

---

[3]    Capitalized terms not immediately defined have the meaning ascribed to them elsewhere in this Memorandum, the Plan, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), or the objection tracker attached as **Exhibit A** hereto (the "Objection Tracker").

[4]    For the avoidance of doubt, citations to Plan provisions shall refer to the location of the Article or Section in the Plan filed contemporaneously herewith at [Docket No. 3577], unless otherwise noted. Further, to the extent any of the provisions of the Plan copied in this Memorandum are inconsistent with the Plan filed at Docket No. 3577, the Plan filed at docket No. 3577 shall control.

*Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3591] (the "Fahrenheit Declaration"); and (f) *Declaration of Allison Hoeinghaus in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3586] (the "Hoeinghaus Declaration").

**Preliminary Statement**

1.      These Chapter 11 Cases were filed in July 2022 in response to dire and unexpected circumstances for Celsius' business.  During an industry-wide "crypto winter," the combination of a "run on the bank" by Celsius' Account Holders and increasing regulatory scrutiny forced Celsius to first pause all withdrawals, and then file for bankruptcy.  The early days of these Chapter 11 Cases were challenging and uncertain.  A dark cloud hung over the Debtors because of their former management team's prepetition actions and statements.  State and federal regulators routinely complained about Celsius' prepetition business practices and lack of engagement.    And the Debtors' Account Holders, many of whom invested in cryptocurrency in large part because it is decentralized and outside of traditional governmental and financial regulations, were surprised to find themselves in the most centralized proceeding possible:  a chapter 11 case.

2.      Amidst this storm, the Debtors, led by their newly-appointed Special Committee, charted a path forward based on the guiding principles of full transparency and engagement with all stakeholders.  Early in these Chapter 11 Cases, the Debtors consented to the appointment of the Examiner to investigate the Debtors' prepetition actions.  The Debtors cooperated with the Examiner and various investigations by state and federal regulators, as well as the Committee.  Mr. Mashinsky resigned after the Special Committee directed that he either resign or be terminated.      In addition to cooperating with the many investigations into the Debtors'

prepetition conduct, the Debtors and their advisors also engaged with the Committee, various ad hoc groups of creditors, and individual Account Holders to resolve key legal issues, drive these Chapter 11 Cases forward, and try to maximize the value of the Debtors' assets for their stakeholders and emerge from bankruptcy as promptly as possible.

3.      The nearly fully consensual Plan is the culmination of over a year of the Debtors' engagement with their creditors, and the Debtors are pleased to report that, after tabulating more than 80,000 votes submitted by creditors holding approximately $3 billion in Claims, over 95% of voting Account Holders by both number and dollar amount voted in support of the Plan, including over 99% of Earn creditors.  This level of creditor participation and support for the Plan is simply unprecedented in large chapter 11 cases, particularly considering how contentious these cases were in their early stages.  The level of support that the Plan has now garnered from the Debtors' creditors demonstrates the broad consensus that has been built over time, particularly as these chapter 11 cases near their conclusion.    The Plan includes agreed settlements with each ad hoc group of Account Holders (Earn, Custody, Retail Borrower, and Withhold) and a resolution of the CEL Token valuation dispute.  If the Plan is confirmed, the Debtors will work to promptly implement this value-maximizing transaction.  There are only a handful of unresolved Objections to confirmation of the Plan, none of which have merit, and which should be overruled.

4.      *First*, several Retail Borrowers have objected to their treatment under the Plan. These borrowers argue that the cryptocurrency that they deposited as "collateral" is their property, and that they should receive 100% of that cryptocurrency under the Plan.  As an initial matter, their fellow borrowers do not agree.  The Plan includes the mediated settlement of the issues relating to retail loans that was negotiated between the Debtors, the Committee, and the

3

Retail Borrower Ad Hoc Group during a three-day mediation before the Honorable Michael E. Wiles. And over 96% of Retail Borrowers who voted on the Plan voted to accept their treatment as unsecured creditors—and Retail Borrowers also have an additional right of setoff or repayment of the principal balance as detailed in the Plan and Disclosure Statement, and priority in making the Liquid Cryptocurrency Weighted Election. That is, because the class of retail borrowers voted to accept the Plan, dissenting borrowers are bound by the class vote. Moreover, the Loan Terms of Use include language that is substantially similar to the Terms of Use governing the Earn Program, and this Court ruled that the Terms of Use provide that the cryptocurrency in Earn Accounts belongs to Celsius, not the Account Holder. Accordingly, the retail loan treatment in the Plan is in line with Retail Borrowers' legal rights and should be approved.

5.    ***Second***, a large institutional unsecured creditor (Pharos) argues that the Plan fails because (a) the Series B Settlement provides a recovery to the Series B Holders who had not previously participated in the Court-approved settlement, when unsecured creditors are not being paid in full, and (b) the "best interests" test is not satisfied because the Debtors' estimates for the Orderly Wind Down are actually the proper estimates for a chapter 7 fire sale, and the NewCo equity has no value. Both arguments are without merit and should be overruled. As to the first point, the Series B Settlement was separately approved by the Court, which resolved a material dispute that the Series B Holders were structurally senior to the creditors of Celsius Network LLC and entitled to be paid ahead of creditors. These equity holders are receiving this distribution as part of this prior authorized settlement of disputed legal issues—not purely on account of their equity position—and Pharos should have objected to the Series B Settlement if it believed that the settlement was inappropriate.

6.     As to the second point, the "best interests test" requires that creditors receive as much under a chapter 11 plan as they would under a chapter 7 liquidation.  The Debtors have demonstrated through the Liquidation Analysis that Holders of Claims in Class 8 receive 19.6% and that Holders of Claims in Class 9 receive 29.5% more under the Plan than a chapter 7 liquidation.  Pharos' objection ignores the significant loss of value that would occur under a chapter 7 liquidation, and the total lack of negotiating power that the chapter 7 trustee would have with counterparties that are aware that the trustee is tasked with liquidating assets quickly.  Additionally, although Pharos argues that the equity of NewCo is worthless, NewCo is being seeded with $450 million of capital, will receive the Debtors' mining assets (valued at a midpoint of $565 million) and other illiquid assets (valued at $283 million), and NewCo will have no debt.  Even under extremely bearish assumptions, the NewCo equity has enormous value that cannot be simply brushed aside, and the evidence at the Confirmation Hearing will demonstrate that the best interests test is satisfied.

7.     **_Third_**, the CEL Token Settlement is reasonable and should be approved.  The Plan was overwhelmingly approved by CEL Token Holders:  of the CEL Token holders who voted, over 98% by number and 95% by dollar amount voted to accept the Plan.  The CEL Token Settlement is a reasonable settlement of the contested issues relating to CEL Token that have been hotly contested throughout these Chapter 11 Cases, and avoids requiring that the Court rule on whether CEL Token is a security, or have a lengthy trial on the proper value of CEL Token given the alleged manipulation of the price of the token that took place prepetition.  The Debtors and the Committee have worked tirelessly to try to consensually resolve this issue and are pleased that the CEL Token Settlement has received nearly unanimous support from those that voted on the Plan.  The Debtors and the Committee entered into settlement agreements with

several large CEL Token holders, and the group of CEL Token holders overwhelmingly voted to accept the Plan, which includes the CEL Token Settlement.

8.      Only one party filed a formal objection to the CEL Token valuation—Otis Davis—and he fails to challenge the legal theories for why CEL should be valued at zero if the CEL Token Settlement is not approved.  Instead, he admits that Celsius' prepetition actions inflated the CEL Token price between the Pause and the Petition Date from approximately $0.20 to approximately $0.81—which does not support Mr. Davis' argument that CEL Token should be valued at the Petition Date price of approximately $0.81.  To the contrary, the prepetition market manipulation perpetrated by Celsius' former management team (which Mr. Davis readily admits) is a key reason why the Debtors and the Committee proposed the settlement of $0.25 as a fair resolution of this complex dispute.  The Debtors believe that the CEL Token Settlement is appropriate and reasonable, and provides holders of CEL Token with a meaningful recovery instead of $0.00, which it could be if CEL Token is an equity security of Celsius or a now-worthless utility token.  The Debtors believe that the overwhelming support that the CEL Token Settlement has garnered is further evidence that it is fair and reasonable, and Mr. Davis' lone resistance should not prevent the settlement from being approved.

9.      **Fourth**, several objectors argue that the Employee Incentive Plan should not be approved as part of the Plan.  But the Plan, which incorporates the Employee Incentive Plan, was overwhelmingly accepted by creditors entitled to vote, including by each class of account holders who filed objections on this issue.  Accordingly, the Employee Incentive Plan should be approved as accepted by the affected creditor classes; the Plan is a global settlement, and the Court need not examine each component of the Plan when the classes that the objectors are in voted to accept the Plan.  Moreover, these payments (if the metrics are satisfied) would be made

by the Post-Effective Date Debtors, not a chapter 11 debtor, and so the Bankruptcy Code's restrictions on executive payments do not apply. Even if the Court applies a higher standard in evaluating the propriety of the Employee Incentive Plan, it is reasonable and should be approved. The KEIP Motion was filed with these incentive metrics six months ago, and the applicable insiders have worked in good faith to reach the metrics, all of which inures to the benefit of account holders. The tireless work of these executives is why the Debtors are well positioned to promptly make distributions of Liquid Cryptocurrency under the Plan, and the mining executives' efforts to obtain new hosting for machines after the rejection of the hosting contract by Core Scientific has led to material improvements in the value of the mining business. The evidence at the Confirmation Hearing will demonstrate that the Employee Incentive Program is reasonable and should be approved.

10.    **_Lastly_**, the Debtors believe they have resolved all issues with governmental parties. As to the SEC's limited objection regarding Coinbase, the Debtors have filed a revised form of agreement with Coinbase that clarifies that the Post-Effective Date Debtors will not be using the types of services referenced in the SEC's objection. Additionally, the Debtors have received various comments from the U.S. Trustee regarding the Plan, all of which have been included in the modified version of the Plan filed contemporaneously herewith, and the Debtors are not aware of any outstanding request from the U.S. Trustee. And no regulator has objected to the Plan on the basis that any regulatory approval is needed to confirm or consummate the Plan.[5]

---

[5]    For the avoidance of doubt, there are still certain regulatory approvals that need to be obtained the Plan to become effective. Most notably, a Form 10 must become effective with the SEC for the NewCo Stock to be able to trade. The Debtors submitted a letter to the SEC in July 2023 seeking "preclearance" of the NewCo providing audited historical financial statements for only the Mining company in the Form 10 because the Debtors' records for their retail and investing businesses are insufficient to be audited for purposes of the Form 10. For those reasons, the Debtors are seeking approval from the SEC to exclude those historical audited financials from the Form 10, and those discussions with the SEC remain ongoing as of the date hereof. Once the Form 10 is finalized and filed, a 60-day waiting period must conclude before the Form 10 can become effective, which is a condition precedent to the Effective Date of the Plan.

11.     The remaining objections have either been resolved or should be overruled for the reasons set forth further below.

12.     As described in detail herein and in the Disclosure Statement, the Restructuring Transactions set forth in the Plan provide the Debtors and their creditors with the best possible recovery and a smooth conclusion to these Chapter 11 Cases.  As described in the Disclosure Statement, pursuant to the NewCo Transaction, the Fahrenheit-created NewCo will purchase certain assets of the Debtors, including the mining business, and in return convey 100% of the equity in NewCo to creditors.  On the Effective Date, NewCo will become a public company with its stock intended to be listed on NASDAQ.  The NewCo Transaction is, in effect, a full-scale reorganization sponsored by the Fahrenheit Group, as well as the potential to toggle to the Orderly Wind Down if necessary.  The NewCo Transaction is a full-scale reorganization that recognizes and seizes on the long-term promise and potential of cryptocurrency, while the Orderly Wind Down is a "Plan B" alternative to the NewCo Transaction that includes a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets.  If the NewCo Transaction cannot be completed for any reason, the Debtors can elect to pivot to the Orderly Wind Down.  No matter what transaction is ultimately pursued, however, the Debtors' creditors will receive significant value: under either transaction, the Plan provides that the Debtors will distribute at least $2.03 billion of cryptocurrency to their creditors, subject to the fluctuations in cryptocurrency prices.

13.     As contemplated by the NewCo Transactions, U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin"), one of the largest and most successful Bitcoin mining operators, will run NewCo's mining operations.  US Bitcoin will assist NewCo with energizing NewCo's existing fleet of miners and de-risking the build out and operation of NewCo's Bitcoin

mining business.   Proof Group Capital Management LLC will lead NewCo's staking efforts—contributing its staking intellectual property to NewCo and assisting NewCo in developing and growing its staking infrastructure.  Fahrenheit intends to promptly list the equity of NewCo on NASDAQ to provide creditors receiving NewCo stock under the Plan with liquidity for the stock.

14.     The Orderly Wind Down allows the Debtors, in a manner consistent with their fiduciary duties, to quickly pivot from the NewCo Transactions, without the need to restart the plan process and propose and solicit a new chapter 11 plan, in the event the NewCo Transactions cannot be consummated.  The Orderly Wind provides for (a) the establishment of a pure play standalone mining company, (b) a timely monetization of the Debtors' illiquid assets, and (c) an orderly wind down of the Debtors' estates.  Like under the NewCo Transaction, creditors will receive recoveries in the form of an immediate distributions of BTC or ETH and Litigation Proceeds.  Instead of NewCo Common Stock, however, creditors will receive the value of the standalone mining business and proceeds from the liquidation of the Debtors' illiquid assets.

15.     The terms of the Plan are overwhelmingly supported by the Debtors' creditors and provide for a clear pathway to emergence.  The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.  The Debtors are aware, however, that there are risks to implementing the NewCo Transaction, and the Debtors and the Committee believe that it is in the best interests of all stakeholders to also prepare for a scenario where the NewCo Transaction cannot be completed. Regardless of which transaction is ultimately implemented, the Plan provides Holders of Claims

with the maximum recoveries, on the quickest timeline, and with the greatest amount of flexibility.

16.     As set forth below, the Plan satisfies the required elements of the Bankruptcy Code and should be confirmed.

**Background**

## I.     Solicitation and Notification Process.

17.     On July 13, 2022, eight Celsius entities each filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Debtors") with the United States Bankruptcy Court for the Southern District of New York (the "Court"). On December 7, 2022, three additional entities—GK8 Ltd., GK8 UK Limited, and GK8 USA LLC—each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Court (such debtors, "GK8" and, together with the Initial Debtors, the "Debtors"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[6] These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53 and 1648]. On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 241]. On September 29, 2022, the Court entered an order directing the appointment of an examiner [Docket No. 920]. On April 4, 2023, the Court entered an order discharging the examiner [Docket No. 2364].

---

[6]     A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the Debtors' Chapter 11 Cases is set forth in greater detail in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "First Day Declaration").

18.     On August 17, 2023, the Court entered the *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to the Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 3337] (the "Disclosure Statement Order") approving the Disclosure Statement.  The Disclosure Statement Order also approved, among other things, the Solicitation Deadline, Voting Record Date, Voting Deadline, Confirmation Brief Deadline, Plan Objection Deadline, Plan Objection Reply Deadline, 3018 Motion Objection Deadline, Publication Deadline, Plan Supplement Filing Deadline, and the deadline to file the Voting Report, and approving the forms and manner of the Confirmation Hearing Notice, the Non-Voting Status Notices, the Ballots, the Publication Notice, and the Solicitation and Voting Procedures (each as defined in the Disclosure Statement Order).  The Debtors complied with the procedures approved by the Disclosure Statement Order.

19.     On August 17, 2023, the Debtors commenced solicitation on the Plan.  By the Solicitation Deadline of August 25, 2023, the Debtors caused their Solicitation Agent, Stretto,[7] to distribute the Solicitation Package (as defined in the Disclosure Statement Order), which included a cover letter, the Plan, the Disclosure Statement and all exhibits thereto, the Confirmation Hearing Notice, and the applicable Ballot, to Holders of Claims and Interests entitled to vote to accept or reject the Plan as of the Voting Record Date, via electronic mail and/or first-class mail in either paper or electronic format (*i.e.*, USB flash drive format).  The

---

[7]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

Debtors also caused a "push" notification to be delivered to Holders of Claims in the Account
Holder Voting Classes through the Debtors' mobile application linking such Holders to the
Solicitation Agent's online voting portal and the Confirmation Hearing Notice, which informed
the recipients of, among other things:  (a) the date and time set for the hearing to consider
confirmation of the Plan; (b) the manner in which a copy of the Plan and Disclosure Statement
can be obtained without a fee through the Debtors' restructuring website or for a fee at the
Court's PACER website; and (c) the deadline for filing objections to the Plan and the Disclosure
Statement.  Finally, the Debtors caused the Publication Notice to be published in *The New York
Times (National Edition)* and *The New York Times (International Edition)* on August 25, 2023,
and every Wednesday in September starting on September 6, 2023 on *CoinDesk*
(CoinDesk.com).[8]

    20.    The deadline for all Holders of Claims and Interests entitled to vote on the Plan to
cast their ballots was September 22, 2023, at 4:00 p.m. (prevailing Eastern Time) and the
deadline to file objections to confirmation of the Plan was September 22, 2023, at 4:00 p.m.
(prevailing Eastern Time).[9]  On September 27, 2023, the Debtors filed the *Amended Declaration
of Brian Karpuk, Managing Director of Stretto, Inc. on Behalf of Stretto Regarding Solicitation
of Votes and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization of*

---

[8]    *See Affidavits of Publication* [Docket Nos. 3367, 3368, 3507, 3598].

[9]    *See* Disclosure Statement Order, Art. III.A.f, ¶ 23(a).  The Debtors agreed to extend the deadline to object to
confirmation of the Plan for the U.S. Trustee to September 24, 2023, at 12:00 p.m. (prevailing Eastern Time).
*See* [Docket No. 3530].

*Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3574] (the "Voting Report"),[10]

which is summarized below in detail.

21.    In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims in Impaired Classes entitled to receive or retain property on account of such Claims were permitted to vote to accept or reject the Plan.[11]   Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).[12]

22.    Based upon the Voting Report, approximately 95% of Holders of Claims and Interests that voted on the Plan in Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14 (the "Voting Classes") voted to accept the Plan:

| | | Count | % | Dollars | % |
|---|---|---|---|---|---|
| **Class 2 (Retail Borrower Deposit Claims)** | | | | | |
| | Accept: | 4,215 | 98.83% | $220,581,222.65 | 96.33% |
| | Reject: | 50 | 1.17% | $8,410,803.02 | 3.67% |
| **Class 4 (Convenience Claims)** | | | | | |
| | Accept: | 38,248 | 98.25% | $59,269,958.86 | 98.69% |
| | Reject: | 681 | 1.75% | $784,185.09 | 1.31% |
| **Class 5 (General Earn Claims)** | | | | | |
| | Accept: | 38,734 | 99.35% | $2,418,402,994.19 | 99.28% |

---

[10]    On September 25, 2023, the Debtors timely filed the *Declaration of Brian Karpuk, Managing Director of Stretto, Inc. on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560].  On September 27, 2023, the Debtors filed an amended Voting Report with minor corrections.  For the avoidance of doubt, references to the Voting Report in this Memorandum refer to the Voting Report filed at Docket No. [3574].

[11]    *See* 11 U.S.C. § 1126.

[12]    *See* Disclosure Statement Order ¶ 16(a).

| | | Count | % | | % |
|---|---|---|---|---|---|
| | Reject: | 254 | 0.65% | $17,495,733.72 | 0.72% |
| **Class 6A (General Custody Claims)** | | | | | |
| | Accept: | 2,896 | 99.51% | $87,378,989.97 | 98.78% |
| | Deemed to Accept: | 2,973 | | $52,451,991.14 | |
| | Reject: | 29 | 0.49% | $1,722,936.80 | 1.22% |
| **Class 7 (Withhold Claims)** | | | | | |
| | Accept: | 654 | 98.79% | $5,386,520.24 | 82.56% |
| | Reject: | 8 | 1.21% | $1,138,215.57 | 17.44% |
| **Class 8 (Unsecured Loan Claims)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 2 | 100.00% | $82,782,261.00 | 100.00% |
| **Class 9 (General Unsecured Claims - Consolidated Debtors)** | | | | | |
| | Accept: | 20 | 74.07% | $6,375,927.86 | 99.56% |
| | Reject: | 7 | 25.93% | $28,436.05 | 0.44% |
| **Class 9 (General Unsecured Claims - Celsius Mining LLC)** | | | | | |
| | Accept: | 1 | 50.00% | $140,000.00 | 2.58% |
| | Reject: | 1 | 50.00% | $5,284,333.82 | 97.42% |
| **Class 9 (General Unsecured Claims - Celsius Network Inc.)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 1 | 100.00% | $3,325.00 | 100.00% |
| **Class 10 (State Regulatory Claims)** | | | | | |
| | Accept: | 1 | 100.00% | $29,843,334.00 | 100.00% |
| | Reject: | 0 | 0.00% | $0.00 | 0.00% |
| **Class 14 (Series B Preferred Interests)** | | | | | |
| | | **Count** | **%** | **Shares** | **%** |
| | Accept: | 7 | 98.34% | 29,585 | 98.34% |
| | Reject: | 1 | 12.50% | 500 | 1.66% |

23.     The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on October 2, 2023, at 2:00 p.m. (prevailing Eastern Time). Concurrently with this Memorandum, the Debtors have submitted the proposed *Order Confirming the Modified Joint Plan of Celsius Network LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order").

## II.     The Restructuring Transactions.

24.     The terms of the Plan provide a clear pathway to emergence. The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be

owned by customers, file public reports with the SEC to ensure transparency, and importantly,

fully comply with all applicable regulations.

25.     Certain key terms of the Plan include:[13]

- **Retail Borrower Deposit Claims**.[14]  Each Holder of an Allowed Retail Borrower Deposit Claim shall receive:

    Repayment Election:  If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

    *or*

    Set Off Treatment:  If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

    *plus*

    (ii) On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).  Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

    In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of

---

[13]    Each description of the Plan or the Disclosure Statement herein is qualified in its entirety by the terms of the Plan and the Disclosure Statement, as applicable.

[14]    In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 67.0% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment).  Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

(a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **Convenience Claims**.  Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

- **General Earn Claims**.  Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **General Custody Claims**.[15]  For Holders of Allowed General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order:  Each such Holder of an Allowed General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in the Disclosure Statement, one of two treatments:

  Treatment A:  (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim provided that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3. of the Plan.

  Treatment B:  The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim.  The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Court following notice and a hearing.  To the extent no such action is brought and no settlement is reached in the time period set forth in

---

[15]  Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim.  Any such Allowed General Custody Claim will be subject to the ADR Procedures.

For Custody Settlement Participants:  Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; provided that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; provided, further, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan.

- **Withdrawable Custody Claims**.  Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order.  For the avoidance of doubt, any Holder of an Allowed Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

- **Withhold Claims**.[16]  Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:

Treatment A:  If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Liquid Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in the Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

Treatment B:  If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata

---

[16] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement.

- **Unsecured Loan Claims**. Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **General Unsecured Claims**. Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in the Disclosure Statement.

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) the Litigation Proceeds, and (d) the Illiquid Recovery Rights.

- **State Regulatory Claims**. Each Holder of an Allowed State Regulatory Claim shall be entitled to the same recovery as a Holder of a General Unsecured Claim; *provided* that notwithstanding the foregoing, all State Regulatory Claims shall be suspended against the Debtors and will not be Allowed Claims and shall not receive any distributions in these Chapter 11 Cases, in each case, so long as the Debtors' Plan becomes effective and is fully administered as proposed; *provided*, *further*, that the suspension in the foregoing proviso shall be lifted as to the Debtors if the Chapter 11 Cases are closed, dismissed, or otherwise concluded, in each case, without the Estate(s) being fully administered, including any distributions to creditors, in accordance with the Plan and the Bankruptcy Code.

18

For the avoidance of doubt, the State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.

- ***De Minimis* Claims**. All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

- **Series B Preferred Interests**. Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to any order approving the Series B Settlement Order.

- **Section 510(b) Claims**.[17] Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

- **Equitably Subordinated Claims**. Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date (except as otherwise provided herein), and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court following the resolution of the litigation of the subordination of the Equitably Subordinated Claims. For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed by the Equitable Subordination Stay Order. Holders of Equitably Subordinated Claims need not object to the Plan to preserve all of their rights to contest the proposed classification and equitable subordination of their Claims at the appropriate time; a schedule for this litigation will be set by the Bankruptcy Court or agreement of the parties once the stay in the Equitable Subordination Stay Order ends.

## III. The Objections.

26. The Debtors received twelve formal objections to the Plan, twelve letters (largely from *pro se* creditors), and two reservations of rights that the Debtors are treating as objections to the Plan (collectively, the "Objections"), as summarized and defined in the objection chart

---

[17] The Confirmation Order provides that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any. The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims. The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

attached hereto as **Exhibit A** (the "Objection Tracker").  The Debtors also received informal comments from numerous counterparties, including the U.S. Trustee, regulators and other governmental parties, ad hoc groups, and individual creditors, among others.

27.    The Debtors have worked with objecting parties to resolve as many Objections as possible, and as of the date hereof, the Debtors have resolved the majority of Objections.[18]  The Objections have been resolved by stipulating to or including certain language in the Confirmation Order, and/or the amended Plan, as more fully set forth in the Objection Tracker.

28.    Compared to the objections that the Debtors received in the past with respect to other motions filed in these Chapter 11 Cases, including the nearly thirty objections to the Debtors' motion to establish that Earn assets are property of the Debtors' Estates,[19] or the fifteen formal objections and over twenty letter objections to the approval of the Debtors' Disclosure Statement,[20]  the limited number of Objections to the Confirmation of the Plan is a testament to the Debtors' efforts—and success—in building consensus since the outset of these Chapter 11 Cases.

29.    Notwithstanding the Objections, the Plan has overwhelming support from the Holders of Claims and Interests who were entitled to vote.  The transactions contemplated by the Plan represent a significant achievement for the Debtors and are the direct result of a thorough

---

[18]    The unresolved Objections are as follows:  the 168 Trading Objection, the Pharos Objection, the Bronge Objection, the Schoenau Objection, the Davis Objection, the Ubierna de las Heras Objection, the Securities Plaintiffs Objection, the Schneider Objection, the Phillips Objection, the Cassidy Letter, the First Bohon Letter, the Second Bohon Letter, the First Keeney Letter, the Second Keeney Letter, the First Windom Letter, the Johantgen Letter, the Abruzese Letter, the Truss Letter, the 3541 Letter, the Second Windom Letter, and the Lau Letter.

[19]    *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling") at 13.

[20]    *See Debtors' Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225], Exh. A.

marketing process and extensive engagement with many diverse stakeholders. The Debtors strongly believe that the Plan represents the best available alternative for all of their stakeholders. The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests. That the Plan has overwhelming support of the Debtors' creditor base is a significant achievement and sends the important message that the Plan can provide a clear path to emergence.

30. The Debtors continue to work to resolve all outstanding Objections in advance of the Confirmation Hearing. To the extent the Debtors are unable to consensually resolve such Objections prior to the Confirmation Hearing, the Debtors request that the Court overrule such Objections. A detailed response to each of the outstanding Objections is set forth in Section VII of this Memorandum and the Objection Tracker.

<u>**Argument**</u>

31. This Memorandum is divided into three parts. *First*, the Debtors submit that the amended Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and, therefore the Debtors do not need to resolicit the Plan. *Second*, the Debtors present their case in chief that the Plan satisfies all of the applicable requirements of the Bankruptcy Code by a preponderance of the evidence and, accordingly, request that the Court confirm the Plan. *Finally*, throughout this Memorandum and in the third part, the Debtors address the Objections and why they should be overruled.

32. For the reasons set forth herein, and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors request that the Court find that the Debtors have satisfied their burden and confirm the Plan.

**IV.    The Plan, as Modified, Satisfies the Requirements of Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.**

33.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[21]  Further, section 1127(a) provides that when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[22]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[23]  Courts interpreting Bankruptcy Rule 3019 have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated,[24] unless such affected creditors consent to the treatment.[25]

---

[21]  11 U.S.C. § 1127(a).

[22]  *Id.*

[23]  Fed. R. Bankr. P. 3019.

[24]  *See In re AMR Corp.*, 502 B.R. 23, 46 (Bankr. S.D.N.Y. 2013) (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) ("[N]onmaterial modifications . . . do not require resolicitation of the respective impaired classes of creditors and equity security holders.").

[25]  *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *31–32 (Bankr. D. Del. May 13, 2010) (finding that plan modifications that did not adversely affect any creditor other than consenting parties did not require resolicitation); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class' distribution was not sufficiently material to require re-solicitation); *In re Pisces Energy, LLC*, Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880, at *10 (Bankr. S.D. Tex. Dec. 21, 2009) (finding that plan modifications that only modified the rights of expressly consenting parties-in-interest did not require resolicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.").

34.    On September 27, 2023, the Debtors filed an amended Plan [Docket No. 3577], which incorporates and reflects certain revisions.  The modifications to the Plan are not material changes.    Rather, they are either modifications to resolve objections to the Plan or permissible, technical modifications to the Plan, each of which either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.  All Holders of Claims and Interests entitled to vote on the Plan are receiving the same recovery under the Plan as amended and filed at [Docket No. 3319].

35.    The Debtors have made the following non-material modifications to the Plan (ordered as they appear in the Plan):

- ***Deactivation Date Timing and Interaction with CEL Token Settlement***.  The Plan now clarifies the Deactivation Date.  Lastly, the Deactivation Date Cryptocurrency Conversion Table will provide that CEL Token is $0.25.

- ***Distribution Cryptocurrency Conversion Table***.  The Plan now clarifies the application of the Distribution Cryptocurrency Conversion Table, the time period in which such tables must be filed, and how Cryptocurrency prices in such tables will be set following the Effective Date.

- ***Equitably Subordinated Claims***.  The Plan now reflects that litigation regarding the subordination of the Equitably Subordinated Claims is stayed pursuant to the Equitable Subordination Stay Order [Docket No. 3450].

- ***Exculpated Parties***.  The Plan now clarifies that current *and former* financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals are included in the definition of "Exculpated Parties."

- ***Released Parties and Releasing Parties***.  At the request of the SEC, the Plan now clarifies that Holders of *De Minimis* Claims, Section 510(b) Claims, or Other Interests shall not be Released Parties or Releasing Parties unless such parties opt into the Plan's releases.

- ***Withdrawal Preference Exposure***.  In response to an informal request from a stakeholder, the Plan now clarifies that the Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action.  Additionally, the Plan clarifies that the Debtors and the Committee (and after the Effective Date, the Litigation Administrator in consultation with the Plan Administrator) may enter into agreements with Account Holders to settle their Withdrawal Preference Exposure.

- ***State Regulatory Claims***.  As a result of negotiations with Holders of State Regulatory Claims, the Plan now clarifies that State Regulatory Claims shall be suspended and shall not receive any distribution so long as the Debtors' Plan becomes effective and is fully administered.  The State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.  In addition, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan regardless of whether or how such Holders have voted on the Plan.

- ***Account Holder Avoidance Action Settlement***.  The Plan now clarifies that the Account Holder Avoidance Action Settlement releases Avoidance Actions against any Account Holder who is not an Excluded Party and who (i) (a) has Withdrawal Preference Exposure less than *or equal to* $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan and that such Holders will receive a 100% recovery on their Allowed General Custody Claim.

- ***Distribution Mechanics***.  The Plan now clarifies that the Debtors will not be the Distribution Agent for distributions to Withhold Claim Holders.  In addition, the Debtors may elect in their reasonable discretion to make distributions in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.

- ***NewCo Common Stock***.  The Plan now clarifies that the NewCo Common Stock issued on the Effective Date may, with the consent of the Committee and the Plan Sponsor be issued into a trust or similar structure to be held until it is fully and finally distributed to Holders of Allowed Claims as provided in the Plan and in the Transaction Steps Memorandum.  Additionally, pursuant to discussions with the SEC, the Plan now clarifies that only NewCo Common Stock issued in satisfaction, settlement, release, and discharge of Allowed Claims will be issues in reliance upon section 1145.

- ***EIP Awards***.  As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Plan Administrator may distribute the EIP Awards after confirming to Committee counsel that the applicable metrics have been satisfied.  The Plan now also clarifies that the KEIP Motion shall be deemed withdrawn with prejudice upon the Effective Date.

- ***Institutional Loans***.  In response to 168 Trading's Objection, the Plan now clarifies that Institutional Loans will be assumed and assigned to NewCo to the extent such Institutional Loans are not Executory Contracts included on the Schedule of Rejected Contracts.

- ***Undeliverable Distributions and Unclaimed Property***.  The Plan now clarifies that Unclaimed Distributions which remain undeliverable for a period of one year after *the first date on which such distributions are open for a particular Holder*, shall revert to the Post-Effective Date Debtors.

- ***Releases and Exculpations***.

  o As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Debtor Release, Third-Party Release, and Exculpation do not release or exculpate any claim or cause of action against any of the Debtors advisors arising out of any action

or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.).  Further, following negotiations with the U.S. Trustee, the scope of the exculpation provision was narrowed.

o As a result of negotiations with the SEC, the Plan now clarifies that only Releasing Parties are restricted from commencing or pursuing a Claim or Cause of Action against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties without the Bankruptcy Court's approval and that such restriction applies only to (i) core claims arising from or relating to these Chapter 11 Cases or (ii) Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, Third-Party Release, or Exculpation contained in the Plan.  Further, the Plan now clarifies that the Bankruptcy Court retains sole and exclusive jurisdiction to adjudicate whether a colorable Claim or Cause of Action exists.

- ***Additional Provisions Regarding Governmental Units***.  As a result of continued negotiations with Governmental Units, the Plan now clarifies (i) the NewCo Assets are transferred free and clear or all Claims and Interests arising before the Effective Date, (ii) Governmental Units may exercise their police and regulatory powers against NewCo regarding any post-Effective Date violations, and (iii) the Debtors and their successors and assigns, other than NewCo, shall not offer or sell securities or provide banking or money services.

- ***Ministerial Edits***.  The Debtors made formatting and grammatical updates where appropriate.

36.    Therefore, the modifications are immaterial or have been consented to after negotiations among consenting parties.  Thus, they comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.[26]  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

---

[26] *See AMR Corp.*, 502 B.R. at 46 (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Best Prods. Co.*, 177 B.R. 791, 802 (S.D.N.Y. 1995) ("The court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment."); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. at 301 ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications.  The rules applicable to such modifications should be read and interpreted consistent to that end.") (citations omitted).

## V.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

37.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[27]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable nonbankruptcy law.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

38.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[28]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[29]  As explained below, the Plan complies

---

[27]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (internal footnote omitted).

[28]    11 U.S.C. § 1129(a)(1).

[29]    S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan." (citations omitted)); *In re Simplot*, No. 06-00002 (TLM), 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (noting that the objective of section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization).

with the requirements of sections 1122 and 1123 of the Bankruptcy Code as well as other applicable provisions.[30]

**B.      The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

39.      The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[31]

40.      The substantial similarity requirement does not mean that claims or interests within a particular class must be identical or that all similarly situated claims receive the same treatment under a plan.[32]   Indeed, as one court in this district has stated, "a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment."[33]   Courts generally will approve placement of similar claims in different classes, provided that a "rational" or "reasonable" basis exists for doing so.[34]   Recognizing this

---

[30]   *See* Campagna Decl. ¶¶ 10–14.

[31]   11 U.S.C. § 1122(a).

[32]   *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *In re Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes." (citations omitted)).

[33]   *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

[34]   *See, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25-123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational

27

flexibility, courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[35]  Courts have identified several grounds justifying the separate classification of claims, including where members of a particular class possess different legal rights[36] and where the debtors have valid business reasons for separate classification.[37]

41.    The Plan's classification of Claims and Interests, as set forth in Article III therein, satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into seventeen (17) separate Classes, with the Claims and Interests in each Class either differing legally and factually from those in other Classes or being grouped separately based on other relevant criteria.   Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

    a.    <u>Class 1</u>:  Other Secured Claims;

    b.    <u>Class 2</u>:  Retail Borrower Deposit Claims;

    c.    <u>Class 3</u>:  Other Priority Claims;

    d.    <u>Class 4</u>:  Convenience Claims;

    e.    <u>Class 5</u>:  General Earn Claims;

    f.    <u>Class 6A</u>:  General Custody Claims;

---

basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[35]    *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[36]    *See In re Drexel*, 138 B.R. at 715.

[37]    *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly-situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, WL 2779438, at *3.

g.    Class 6B:  Withdrawable Custody Claims;

h.    Class 7:  Withhold Claims;

i.    Class 8:  Unsecured Loan Claims;

j.    Class 9:  General Unsecured Claims;

k.    Class 10:  State Regulatory Claims;

l.    Class 11:  De Minimis Claims;

m.    Class 12:  Intercompany Claims;

n.    Class 13:  Intercompany Interests;

o.    Class 14:  Series B Preferred Interests;

p.    Class 15:  Other Interests;

q.    Class 16:  Section 510(b) Claims; and

r.    Class 17:  Equitably Subordinated Claims.

42.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies Claims and Interests because each Holder of such Claims or Interests may hold or have held rights in the Debtors' Estates legally dissimilar to the rights that Holder of Claims or Interests in other classes may hold or have held or because substantial administrative convenience resulted from such classification.  For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business).

43.    Account Holder Claims are classified into separate Classes because Account Holders participated in differing Celsius programs with varying rights and obligations, and

29

invested in different products and services pursuant to different contractual terms. For instance, as has been documented extensively throughout these Chapter 11 Cases, cryptocurrency in Earn Accounts is different than cryptocurrency in Custody Accounts. As the Court found, pursuant to the applicable Terms of Use, cryptocurrency in the Earn Program belongs to the Debtors' Estates, whereas cryptocurrency in the Custody Program belongs to customers.[38] Accordingly, General Earn Claims are classified separately from Custody Claims under the Plan. In addition, Withhold Claims were subject to no Terms of Use at all. Convenience Claims are classified differently from other Account Holder Claims because these Claims are so small in amount and large in number as to make otherwise dealing with them (by classifying them as General Earn Claims, for instance) burdensome.[39] General Unsecured Claims are classified differently from other unsecured Claims because they are structurally different than Administrative Claims, Priority Tax Claims, Other Priority Claims, Intercompany Claims, Convenience Claims, General Earn Claims, Custody Claims, Withhold Claims, Retail Borrower Deposit Claims, Unsecured Loan Claims, Section 510(b) Claims, State Regulatory Claims, or Equitably Subordinated Claims, and are comprised primarily of obligations of the Debtors arising in the ordinary course of business. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1122(a) of the Bankruptcy Code.

44.    *Pro se* creditor Johan Bronge ("Mr. Bronge") objects to the Plan on the basis that, among other things, Retail Borrowers are classified and treated differently from Institutional

---

[38]    *See* Earn Ruling at 30 (holding that assets in Earn Accounts are property of the Debtors' Estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[39]    *See also* 11 U.S.C. § 1122(b).

Borrowers.[40]  This argument is misguided and should be overruled as further set forth in the Debtors' response to the Bronge Objection and the several other letters filed regarding similar issues, *infra* in Section VII of this Memorandum.

### C.    The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.

45.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  As detailed below, the Debtors respectfully submit that the Plan satisfies each of these requirements.[41]

46.    ***Designation of Classes of Claims and Interests (§ 1123(a)(1))***.    Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate, with specified exceptions, classes of claims and interests subject to section 1122 of the Bankruptcy Code.[42]  Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(1) of the Bankruptcy Code, and no party has asserted otherwise.

47.    ***Specification of Unimpaired Classes (§ 1123(a)(2))***.  Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[43]  Article III.A of the Plan identifies Classes 1, 3, and 6B as Unimpaired and preserves optionality for the Debtors to render Classes 12 and 13 Unimpaired.  Accordingly, the

---

[40]    *See generally* Bronge Obj.

[41]    *See* Campagna Decl. ¶¶ 10–33.

[42]    11 U.S.C. § 1123(a)(1).

[43]    11 U.S.C. § 1123(a)(2).

Debtors respectfully submit that the Plan satisfies section 1123(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

48.     ***Treatment of Impaired Classes (§ 1123(a)(3))***.   Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[44]   Article III.A of the Plan identifies Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 as Impaired and preserves optionality for the Debtors to render Classes 12 and 13 Impaired.   Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

49.     ***Equal Treatment Within Classes (§ 1123(a)(4))***.   Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[45]   Article III of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that any such Holder agrees to less favorable treatment.[46]   Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

50.     ***Means for Implementation (§ 1123(a)(5))***.   Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.[47]   The Plan satisfies

---

[44]   11 U.S.C. § 1123(a)(3).

[45]   11 U.S.C. § 1123(a)(4).

[46]   *See* Campagna Decl. ¶ 17.

[47]   11 U.S.C. § 1123(a)(5).

this requirement because Article IV of the Plan provides for, among other provisions, the

following means by which the Plan will be implemented:

    a.      Substantive consolidation of the Initial Consolidated Debtors and Celsius Lending LLC and Celsius Networks Lending LLC;[48]

    b.      the CEL Token Settlement;[49]

    c.      the Account Holder Avoidance Action Settlement;[50]

    d.      the Custody Settlement;[51]

    e.      the Withhold Settlement;[52]

    f.      the Series B Settlement;[53]

    g.      the Retail Borrower Settlement;[54]

    h.      the Class Claim Settlement;[55]

---

[48] The substantive consolidation of Celsius Network Limited and Celsius Network LLC was previously approved by order of the Court. *See* [Docket No. 3074]. The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate the Initial Consolidated Debtors with Celsius Lending LLC and Celsius Networks Lending LLC on the same terms, effective as of the Effective Date.

[49] The Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and resubordination. *See* Plan, Art. IV.B.2.

[50] The Plan shall effectuate the Account Holder Avoidance Action Settlement. *See* Plan, Art. IV.B.3.

[51] The Custody Settlement was previously approved by the Court. *See* [Docket No. 2291].

[52] The Withhold Settlement was previously approved by the Court. *See* [Docket No. 2509].

[53] The Series B Settlement was previously approved by the Court. *See* [Docket No. 3074].

[54] The Plan shall effectuate the Retail Borrower Settlement. *See* Plan, Art. IV.B.7.

[55] The Plan shall effectuate the Class Claim Settlement. *See* Plan, Art. IV.B.8. The Class Claim Settlement has been approved by the Court [Docket No. 3288], and Account Holders (except with respect to Custody Claims) had an opportunity to opt out of the Class Claim Settlement when voting on the Plan. As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes opted out of the Class Claim Settlement. *See* Voting Report ¶ 18.

i.      the consummation of either the NewCo Transaction or the Orderly Wind Down in accordance with the Transaction Steps Memorandum;

j.      the appointment of the Plan Administrator as the sole director and sole officer of the Post-Effective Date Debtors, and who will administer the Post-Effective Date Debtors' estates as further described in the Plan Administrator Agreement;

k.      in the event the NewCo Transaction is consummated, the transfer of assets to NewCo and vesting of assets in the Post-Effective Date Debtors;

l.      in the event the NewCo Transaction is consummated, the issuance and distribution of NewCo Common Stock;

m.      in the event the Orderly Wind Down is consummated, the funding of distributions from the Wind-Down Assets, which are all of the Debtors' assets and which shall vest in the Post-Effective Date Debtors pursuant to the Plan Administrator Agreement;

n.      in the event the Orderly Wind Down is consummated, the appointment of a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet;

o.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the appointment of a Litigation Administrator to prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans;

p.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of a segregated Litigation Recovery Account funded with the Initial Litigation Amount and controlled by the Litigation Administrator(s);

q.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of the Litigation Oversight Committee;

r.      the contribution of Contributed Claims;

s.      the cancellation of all notes, instruments, certificates, and other documents;

t.      the authorization, approval, and ratification of all actions contemplated by the Plan without any further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable;

u.      the creation of the NewCo Board and the appointment of such directors in accordance with the terms of the Plan;

v.      the adoption and implementation of the Emergence Incentive Plan and the grant of awards thereunder by the Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation;

w.      to the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the adoption and implementation of the Emergence Retention Plan and the grant of awards thereunder by the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo, as applicable;

x.      the application of section 1146(a) of the Bankruptcy Code to any transfers of property under the Plan (including the Restructuring Transactions) or pursuant to certain other actions; and

y.      the preservation of Causes of Action by the Post-Effective Date Debtors and the enforcement thereof by the Litigation Administrator(s) (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action).

51.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable Definitive Documents or forms of agreements included in the Plan Supplement.  Accordingly, the Debtors respectfully submit that the Plan, together with the

documents and forms of agreement included in the Plan Supplement,[56] satisfies section 1123(a)(5) of the Bankruptcy Code.

52.    ***Issuance of Non-Voting Securities (§ 1123(a)(6))***.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities and an appropriate division of voting power among the classes of securities in the reorganized debtor's corporate charter.[57]    Here, the New Organizational Documents prohibit the issuance of non-voting securities.[58]    Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code[, and no party has asserted otherwise].

53.    ***Directors and Officers (§ 1123(a)(7))***.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selecting of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[59]    The Plan identifies the manner in which members of NewCo's New Board will be selected, and the identities of such new members have been disclosed.[60]    The identities of the Plan Administrator, Litigation Administrator, and members of the Litigation Oversight Committee have also been disclosed.[61]    The selection of the

---

[56]    The Plan Supplement was filed on July 28, 2023 [Docket No. 3115] (the "First Plan Supplement"), August 13, 2023 [Docket No. 3273], September 8, 2023 [Docket No. 3444] (the "Third Plan Supplement"), September 15, 2023 [Docket No. 3483], September 23, 2023 [Docket No. 3550], and September 27, 2023 [Docket No. 3583].

[57]    11 U.S.C. § 1123(a)(6).

[58]    *See* Third Plan Supp., Exh. A ¶ 5.

[59]    11 U.S.C. § 1123(a)(7).

[60]    *See* Plan, Art. IV.D.7; Third Plan Supp., Exh. B.

[61]    *See* Plan, Art. IV.F., Art. IV.G, Third Plan Supp., Exh. F, Exh. G.

initial directors of NewCo was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

54. The Phillips Objection argues that the Committee has improperly nominated and advocated for certain directors. The Committee is responding to the Phillips Objection and the Debtors incorporate the Committee's arguments made in such response by reference.

**D.    The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

55. Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11 of the Bankruptcy Code.[62]

56. The Plan is consistent with section 1123(b) of the Bankruptcy Code. Pursuant to Article III of the Plan, Classes 1, 3, and 6B are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes. On the other hand, Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests, as applicable, within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[63] Classes 12 and 13 are either

---

[62]    11 U.S.C. § 1123(b)(1)–(3), (6).

[63]    *Id.*

Impaired or Unimpaired, based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.  In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease:  (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

57.     Finally, for the reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code.[64] Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(b) of the Bankruptcy Code.

## 1.     The Debtor Release Is Appropriate and Complies With the Bankruptcy Code.

58.     Article VIII.C of the Plan provides for releases by the Debtors of claims and causes of action against the Released Parties[65] (the "Debtor Release").  The Debtors will release

---

[64]    *See* Ferraro Decl. ¶ 10.

[65]    Pursuant to the Plan, "Released Parties" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the

the Released Parties from any and all claims and Causes of Action arising before the Effective

Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of

these Chapter 11 Cases and related implementation of the Plan and related documents, **with**

**several important exceptions**.  For example, the Debtors are not proposing to release (a) any

Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action

under the Plan against an Excluded Party (including Mr. Mashinsky, Mr. Daniel Leon, and

Mr. Cohen-Pavon, among others), (b) any Avoidance Action not released pursuant to the

Account Holder Avoidance Action Settlement, or (c) any claims or causes of action against any

of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or

failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et

al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW).[66]

---

Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party.  Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided*, *further*, that, notwithstanding anything to the contrary in the Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided*, *further*, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.  For the avoidance of doubt, any Holder of a State Regulatory Claim, *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest shall not be a Released Party in its capacity as such unless such Holder opts into becoming a Releasing Party.  *See* Plan, Art. I.A.206.  The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

[66]    *See* Plan, Art. VIII.C.

59.    For the reasons discussed herein, the Debtor Release is the product of arm's-length negotiations, was critical to obtaining support for the Plan from various constituencies, and is in the best interests of the Estates.    Indeed, the Debtor Release was negotiated in connection with the other terms of the Plan and is an indispensable component to achieving final resolution of potential disputes, in exceedingly complex Chapter 11 Cases, that would otherwise extend and negatively affect these Chapter 11 Cases and the recoveries available to Account Holders and other creditors.

60.    It is well-settled that a debtor is authorized to settle or release its claims in a chapter 11 plan.[67]  Such releases are granted by courts in the Second Circuit where they are in the "best interests of the estate."[68]  In determining whether such a release is within the best interests of the estate, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each] dispute" and "the settlement need not be the best that the debtor could have obtained."[69] Under this standard, the "court should instead 'canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[70]  Courts in the Second Circuit consider the following factors to determine whether a settlement is within the range of reasonableness:  (a) the balance between the claim's possibility of success and the settlement's benefits; (b) the likelihood of complex and protracted litigation, including attendant expense, inconvenience, and delay; (c) the interests of creditors; (d) whether other interested parties

---

[67]    *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) (holding the debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[68]    *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate." (citation omitted)).

[69]    *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[70]    *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

support the settlement; (e) the nature and breadth of releases; (f) the competency and experience

of counsel supporting, and the experience and knowledge of the judge reviewing, the settlement;

and (g) the extent to which the settlement is the product of arm's-length bargaining.[71]

61.    Here, the Debtor Release is a vital component of the Plan, particularly for

Account Holders, and constitutes a sound exercise of the Debtors' business judgment.   The

Released Parties played an integral role in the development of the Plan and have expended

significant time and resources resolving the complex issues in these Chapter 11 Cases to enable

the Debtors to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as

quickly as possible. Over the course of the past year, as the Debtors, the Committee, various ad

hoc groups, the Series B Holders, and *pro se* creditors negotiated multiple settlements and

litigated numerous legal issues, many of which were questions of first impression, it became

apparent that the Debtor Release would be an important part of providing closure to these

challenging Chapter 11 Cases and a necessary condition of the consummation of the

Restructuring Transactions embodied in the Plan.[72]  Without the Debtor Release, the Debtors and

their stakeholders would not have been able to secure the substantial benefits provided by the

Plan, and the Debtor Release provides finality to parties in interest.  Losing the participation of

the Released Parties on the eve of confirmation would threaten the viability of the Plan,

including eliminating the Debtors' ability to make in-kind distributions and hindering the

Debtors' chances of success in consummating the NewCo Transaction.

---

[71]    *Id.* (citing *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d
452, 462 (2d Cir. 2007)).

[72]    *See* Ferraro Decl. ¶ 15.

62.     The Debtor Release was also developed following extensive investigations and is supported by the Committee.  Specifically, during these Chapter 11 Cases, there were numerous investigations into the conduct of the Debtors and their current and former officers, directors, and employees, including internal investigations led by the Special Committee, an investigation by the Committee, an investigation by the Examiner resulting in a lengthy public report, and numerous investigations by state and federal governmental entities.  All of those investigations were considered and taken into account in forming the Debtor Release, and the Schedule of Excluded Parties that includes individuals who the Debtors or the Committee determined should not be released.  That is, the robust process run by the Debtors in close consultation with the Committee further demonstrates that the Debtor Release is appropriate and reasonable.

63.     Significantly, the Debtor Release includes releases granted pursuant to the Account Holder Avoidance Action Settlement.  In other words, the Debtor Release allows the Debtors to release Account Holders from potential preference actions if the Account Holders accept the Account Holder Avoidance Action Settlement, and therefore provides closure and comfort to Account Holders, who have consistently expressed concern over preference actions and for whom these Chapter 11 Cases have been particularly challenging.  In addition, Account Holders who enter into the Account Holder Avoidance Action Settlement will receive expedited distributions because their distributions will not be held back while any preference litigation remains unresolved.  In consideration for releasing Account Holders from potential preference actions, the Debtors will receive mutual releases from potential claims and causes of action against the Debtors and, if applicable, payments from Account Holders to settle their Withdrawal

42

Preference Exposure.[73] Specifically, Account Holders with a Withdrawal Preference Exposure of more than $100,000 are required to make a payment to the Debtors of 27.5% of their total Withdrawal Preference Exposure no later than fourteen days prior to the anticipated Effective Date of the Plan.[74] Such payments will benefit the creditor body as a whole because they will increase the amount available for distribution to creditors from the Debtors' Estates without the need for costly and uncertain litigation.

64.    In consideration for the Debtor Release generally, the Debtors and their Estates will receive mutual releases from potential claims and causes of action of each Releasing Party.[75] Simply put, the Debtors do not believe that the benefits that could be obtained by pursuing causes of action against any of the Released Parties would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. The Debtor Release avoids further delay in consummating the Plan following a challenging year after the Petition Date, and therefore the inclusion of the Debtor Release is worthwhile and inures to the benefit of all the Debtors' stakeholders. For these reasons, the Debtors' agreement to provide the Debtor Release constitutes a sound exercise of the Debtors'

---

[73]    *See generally* Plan, Art. IV.B.3.

[74]    *See id.*

[75]    Pursuant to the Plan, "Releasing Party" means each of the following, solely in its capacity as such: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f). *See* Plan, Art. I.A.202. The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

business judgment.[76]  Accordingly, there is ample justification for providing the Debtor Release, and it should be approved.

65.    The Debtors have modified the Debtor Release in response to the Ubierna Objection and informal comments from the U.S. Trustee.  Specifically, the Debtors have added a paragraph to the Debtor Release (and the Exculpation provision) stating that "[n]otwithstanding anything contained [in the Plan] to the contrary, nothing in the Plan or Confirmation Order shall release or exculpate any claims or causes of action against any of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW)."[77]

### 2.    The Third-Party Release Is Wholly Consensual and Should Be Approved.

66.    Article VIII.D of the Plan includes a consensual third-party release among the Debtors and the Releasing Parties[78] (the "Third-Party Release").  Courts in the Second Circuit have explained that a *consensual* third-party release may be approved with the consent of the affected party.[79]  Consistent with this instruction, courts in this jurisdiction have held that

---

[76]    *See* Ferraro Decl. ¶ 18.

[77]    *See* Plan, Art. VIII.C, VIII.E.

[78]    Pursuant to the Plan, "Releasing Parties" means each of the following, solely in its capacity as such:  (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).  For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest that fails to opt into the Plan's releases shall not be a Releasing Party in its capacity as such.

[79]    *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th

"[r]eleases can be granted by consent and that consent can be established by a vote in favor of the plan, at least where the consequences are plainly and unambiguously expressed to the voting creditor,"[80] and regularly approve third party releases such as those contained in the Plan on the grounds that such releases are consensual.[81]    Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to such release.[82]

67.    Here, the Third-Party Release under the Plan provides, in sum, that the Releasing Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not affirmatively opt out of the Plan's release provisions, will release the Released Parties from any and all Claims and Causes of Action arising before the Effective Date of the Plan related to (a)

---

also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *In re Adelphia*, 368 B.R. at 268 ("The Seventh Circuit held in *Specialty Equipment* that consensual releases are permissible, and the *Metromedia* court did not quarrel with that view." (citation and footnote omitted)); *In re Spiegel, Inc.*, No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (holding that nondebtor releases are tolerated if the creditors consent (citing *Metromedia*, 416 F.3d at 142)), *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008); *In re Oneida*, 351 B.R. at 94 (approving consensual release provisions (citing *Metromedia*, 416 F.3d at 142)).

[80]    *See, e.g., In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) Hr'g Tr. 62:16-19; *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (granting third-party release with respect to affected parties that consented to the releases by voting in favor of the plan); *In re Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan. 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and, therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties); *In re Lear Corp.*, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan are permissible); *In re Calpine Corp.*, No. 05-60200 (BRL), WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (same).

[81]    *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("'Consenting Creditors' should include creditors who voted in favor of the Plan . . . [s]imilarly, creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to the plan were these releases."); *In re MPM Silicones*, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014) (citing *Metromedia*, 416 F.3d at 141*; see also Genco*, 513 B.R. at 271*; In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010).

[82]    *E.g., In re SunEdison, Inc.*, No. 16-10992 (SMB), 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) (collecting cases).

the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, ***with several important exceptions***. For example, the Releasing Parties will not release the Released Parties from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.[83]

68.    Sensitive to the fact that the majority of the Debtors' creditors are Account Holders with limited prior exposure to chapter 11, the Debtors included a robust and clear explanation of releases in the Disclosure Statement.  Ten pages long, the explanation on releases (and exculpations and injunctions) starts with first principles about what a release means in plain English, and includes an exact duplication of this provision, among others, in conspicuous, bold-faced type.  The Confirmation Hearing Notice, Ballots, and other Solicitation Package materials distributed to Holders of Claims and Interests entitled to vote on the Plan also included an exact duplication of the release, and the Ballots clearly informed Holders of Claims and Interests entitled to vote on the Plan of the steps they should take if they decided to opt out of the Third-Party Release.  Holders who abstained from voting or voted to reject the Plan therefore had the opportunity to opt out of the Third-Party Release.  In addition, Holders of Claims presumed to accept the Plan received a Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot, which also reproduced the release in full and provided instructions for opting out of the Third-Party Release.  As a settlement with the SEC, the Debtors also agreed to revise

---

[83]    *See* Plan, Art. VIII.D.

the Plan to have the release be "opt in" for classes deemed to reject the Plan. As a result, Holders of Claims and Interests deemed to reject the Plan received a Non-Voting Notice for Holders Deemed to Reject, which also reproduced the release in full and provided instructions for opting into the Third-Party Release.

69.    As such, affected parties were on notice of the Third-Party Release. By voting to accept the Plan or opting into the Third-Party Release, these parties have unambiguously consented to the releases and such releases are clearly consensual. Courts in this District have approved third-party releases as consensual where a plan provided for a third-party release, but the affected parties were afforded the opportunity to opt out of providing such release.[84]   In *Ditech*, this Court held that "parties that did not return a ballot and failed to opt-out of the Third Party Releases are deemed to consent to the Third Party Releases."[85]   The opt-out mechanism is therefore sufficient to demonstrate consent.[86]   The Notice of Non-Voting Status and Ballots clearly explained the process by which a creditor must opt out or opt in to the Third-Party Release and the implications for failing to abide by these instructions. Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for

---

[84]   *See e.g. In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016), *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 1359] ¶ MM (approving third-party release that contained opt out); *In re Tricom, S.A.*, No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009), Order Confirming First Modified Second Amended Prepackaged Joint Chapter 11 Plan of Reorganization For Tricom S.A. and its Affiliated Debtors (As Modified) [Docket No. 568] ¶ K (approving, as consensual, third-party releases where voting parties were afforded the option to opt out).

[85]   *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019).

[86]   *See In re Avianca*, 632 B.R. 124, 136–37 (Bankr. S.D.N.Y. 2021).

granting third-party releases is sufficient to demonstrate cause.[87]    Finally, the Third-Party

Release contains a carve-out for actual fraud, willful misconduct, and gross negligence.

70.    In addition, as set forth in the Voting Report, 0.13% (504) in number, which is

equivalent to 2.31% ($110,836,665.39), of Holders of Claims or Interests in the Voting Classes

affirmatively opted out of the Third-Party Release.[88]    Furthermore, 1.78% (9) in number, which

is equivalent to 0.09% ($36,871.63) in dollar amount, of Holders of Unimpaired, Unclassified,

and Disputed Claims who received the Non-Voting Packages affirmatively opted out of the

Third-Party Release, while 0.26% (567) in number, which is equivalent to 0.31% ($914.70) in

dollar amount, of Holders of Impaired Claims or Interests who received the Non-Voting

Packages opted into the Third-Party Release.[89]

71.    The U.S. Trustee Objection argues that the releases are "over broad" without

providing further specifics,[90] merely repeating by incorporation its objection to the Disclosure

Statement,[91] where it misinterpreted the releases in the Plan as nonconsensual third-party

releases and argued that the Debtors fail to comply with the (inapplicable) legal standard for

nonconsensual releases set forth in *Metromedia* and *Purdue Pharmaceuticals*.  As the Debtors

emphasized above and in their omnibus reply to objections to the Disclosure Statement,[92] which

---

[87]    *See id.* at 137.

[88]    *See* Voting Report ¶ 19.

[89]    *See id.*

[90]    *See* U.S. Trustee Obj. at 1–2.  The Ubierna de las Heras Objection makes the same general argument.  *See* Ubierna de las Heras Objection at 2.

[91]    *See Objection of the United States Trustee to Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3182] (the "U.S. Trustee DS Objection").

[92]    *See Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225].

48

is incorporated herein by reference, the Third-Party Releases are consensual, providing for a typical "opt out" mechanism (other than with respect to those parties who are "deemed to reject" and must opt in to the third-party releases)[93] for all creditors that are presumed to accept the Plan, voted to reject the Plan, or abstained from voting on the Plan, which is sufficient to demonstrate consent and is consistent with this Court's previous rulings approving third-party releases.[94]   In the Second Circuit, where third-party releases are consensual, such as these are here, after proper notice and absent objection, "courts generally approve them unless they are truly overreaching on their face."[95]

### a.      The Released Parties Have Made Substantial Contributions to the Debtors' Restructuring Efforts.

72.      Further, the Third-Party Release is an important component of the Plan and represents the result of a complicated, yearlong effort among multiple diverse constituencies to bring these Chapter 11 Cases to closure.  As with the Debtor Release, each Released Party has made a substantial contribution to the development of the NewCo Transaction and the Orderly Wind Down justifying their release.

73.      The Released Parties have provided substantial and necessary contributions in exchange for their respective releases under the Third-Party Release, including, among other

---

[93]   The Notice of Non-Voting Status and Ballots sent to such creditors **clearly** explained the process by which a creditor had to opt out or opt in to the third-party releases and the implications for failing to abide by these instructions.  Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for granting third-party releases is sufficient to demonstrate consent.  *See In re Avianca*, 632 B.R. at 137.

[94]   *See In re Avianca Holdings S.A.*, 632 B.R. at 136–37 ("[N]umerous cases in this district and elsewhere have approved the use of an opt-out procedure . . . . the opt-out structure is permissible provided that a clear and prominent explanation of the procedure is given as it has been here.").

[95]   *See id.* at 133.  The Debtors respond to the remaining Objections to the Third-Party Release in the Objection Tracker.

things, the following:    (a) the Special Committee has been instrumental in advancing investigations into the Debtors' prepetition conduct and cooperating with similar third-party investigations; (b) the Committee has avidly represented the interests of the large body of unsecured creditors, namely Account Holders, from the day that it was appointed in July 2022,[96] and has been fully engaged in essentially *all* of the major developments, settlements, and litigations of these Chapter 11 Cases; (c) the Retail Borrower Ad Hoc Group and its members and the Earn Ad Hoc Group and its members participated in a three-day mediation in July 2023 before the Honorable Judge Michael E. Wiles of the United States Bankruptcy Court for the Southern District of New York to resolve outstanding issues regarding the treatment of Earn creditors and Borrow creditors, ultimately leading to the amendment of the Plan and revised treatment of General Earn Claims and Retail Borrower Deposit Claims, as well as the Class Claim Settlement, which inured to the benefit of all Account Holders; (d) the Initial Series B Preferred Holders and their Related Parties are Released Parties because of their participation in the negotiation of the Series B Settlement, one of the last issues resolved in these Chapter 11 Cases before commencing solicitation of the Plan[97]; (e) the majority of the foregoing parties were also instrumental in guiding the negotiation of the Plan, the selection of the Stalking Horse Bidder, and the Auction.  As Bidders, the Plan Sponsor (the Fahrenheit Group) and the BRIC Parties were core participants who made the Auction, as well as the subsequent finalization of the Restructuring Transactions and the Backup Bid, the success that it was; (f) Christopher Ferraro is a Released Party in acknowledgement of the significant responsibility he has taken on—and extraordinary leadership he has provided—in the past year as the Interim Chief

---

[96]    *See* Notice of Appointment of Official Committee of Unsecured Creditors [Docket No. 241].

[97]    *See* Series B Settlement Order [Docket No. 3074].

Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors in a tumultuous environment; (g) finally, significant work will remain once the Plan is Confirmed and the Restructuring Transactions must be implemented. The Distribution Agent, the Plan Administrator, the Litigation Administrator, and (in the event the NewCo Transaction is consummated) NewCo and its directors and officers, will have crucial roles and take on significant responsibility to ensure that everything contemplated by the Plan occurs. Although these Entities will only begin their work after Confirmation, their contributions will be critical to the success of the Plan.

74.     Without the substantial contributions and concessions by the Released Parties, the Debtors' value-maximizing restructuring contemplated by the Plan would not be possible. The Released Parties share the common goal of effectuating a successful reorganization. Courts in this district have approved third-party releases under similar circumstances.[98]

       **b.**       **The Debtors' and Other Released Parties' Respective Officers, Directors, Advisors, and Other Representatives and Agents**

---

[98] *See, e.g., In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re LATAM Airlines Group S.A.*, WL 2541298 at \*48 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re China Fishery Grp. Ltd.*, No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022); *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Jason Industries*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020); *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020); *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019); *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017); *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016); *In re Legend Parent Inc.*, No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014).

**Have Made Substantial Contributions to the Debtors' Restructuring Efforts.**

75.    Finally, the remaining Released Parties include the Released Parties' current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, any Releasing Party, and, pursuant to the Schedule of Released and Exculpated Parties filed as part of the Plan Supplement,[99] each individual who was employed by the Debtors on the date the Disclosure Statement Order was entered[100] to the extent that each such employee is not:  (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties.

76.    Although the majority of the Debtors' operations have been paused since the Petition Date, the Debtors' employees have been instrumental in pushing these Chapter 11 Cases forward——no small feat considering that the Debtors have also experienced significant reductions in force.  As a general matter, the employees have provided the Debtors' advisors their extensive industry knowledge, which was crucial in light of the novel legal and factual issues raised by cryptocurrency.  Further, employees proved instrumental in the resolution and litigation of the core issues of these Chapter 11 Cases, including the briefing and trials related to Earn, Custody, and Withhold assets, and the negotiation of the related settlements, among other issues, by providing the Debtors' advisors their deep understanding of Company operations.

---

[99]    *See* First Plan Supp., Exh. A.

[100]    The Disclosure Statement Order [Docket No. 3337] was entered on August 17, 2023.

Throughout the weeks'-long Auction process, the employees also worked with the Debtors' advisors to evaluate and improve the Bids. Finally, the consummation of the NewCo Transaction or the Orderly Wind Down cannot occur without the efforts of the Debtors' employees, and as such, these employees have made and will continue to make indispensable contributions to the successful reorganization of the Debtors.

77.    Ultimately, the Third-Party Release is reasonable under the circumstances of these Chapter 11 Cases and follows well-established precedent in this district regarding opt-out provisions and scope. Accordingly, the Debtors respectfully submit that the Court should approve the Third-Party Release.[101]

### 3.    The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code.

78.    Article VIII.F of the Plan sets forth an exculpation provision exculpating the Exculpated Parties[102] from enumerated claims (the "Exculpation") between the Petition Date and the Effective Date arising in relation to the Chapter 11 Cases. Furthermore, the Exculpated Parties are not exculpated from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky and Mr. Leon, among others), or (b) any Avoidance Action not released pursuant to the Account

---

[101]    *See* Ferraro Decl. ¶ 25.

[102]    Pursuant to the Plan, "Exculpated Party" means, each of the following, solely in its capacity as such: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder. *See* Plan, Art. I.A.110.

Holder Avoidance Action Settlement.  Notably, following the U.S. Trustee's objection to the Disclosure Statement, and to address the U.S. Trustee's argument that the Exculpation provision should be expressly limited to acts or omissions during these Chapter 11 Cases, the Debtors modified the Exculpation provision to make clearer that it applies solely to actions taken from the Petition Date through the Effective Date.[103]  The Debtors also removed the "release" language from the Exculpation provision to address comments from the U.S. Trustee.

79.    Courts in the Second Circuit evaluate exculpation provisions based upon a number of factors, including whether the provision is integral to the plan and whether protection from liability was necessary for plan negotiations.[104]  Courts evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[105]  A bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[106]  Once the court makes this good-faith finding, it is

---

[103]    *See* Plan, Art. VIII.E.

[104]    *See In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Enron Corp.*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *In re WorldCom, Inc.*, WL 23861928, at *28 (Bankr. S.D.N.Y. Oct 31, 2003) (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *see also In re Drexel Burnham*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 260-61 (Bankr. M.D. Fla. 2006) (approving an exculpation provision where the beneficiaries made significant contributions and expected an exculpation provision would be included in the plan).

[105]    *See, e.g., In re Captran Creditors' Trust*, 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the language of an exculpation provision "include, but are not limited to:  how the exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[106]    11 U.S.C. § 1129(a)(3).

appropriate to provide a standard of care for the parties involved in the negotiation and formulation of that chapter 11 plan.[107]    Exculpation provisions, therefore, prevent future collateral attacks against a court's good-faith finding.

80.    Here, the Exculpation provision is an integral part of the Plan and satisfies the governing standards in the Second Circuit.  The Exculpation provision provides necessary and customary protections to those parties in interest (whether Estate fiduciaries or otherwise) whose efforts were, and continue to be, vital to formulating and implementing the Plan, which has garnered overwhelming support from the Debtors' voting creditors, including Account Holders. As noted throughout this Memorandum, these Chapter 11 Cases have been extraordinarily complex due to their nearly unprecedented nature, involving as they have novel legal and factual cryptocurrency-related issues, challenging settlement negotiations, and a variety of stakeholders, including vocal *pro se* creditors, with different and competing interests.

81.    The Plan and the Restructuring Transactions contemplated therein are the product of a year's-long legal and business process.  First—before they could contemplate the contours of a reimagined, regulatorily compliant cryptocurrency company—the Debtors and their stakeholders had to resolve threshold issues to determine who owned the cryptocurrency assets in the Debtors' possession and what the Debtors would ultimately be able to distribute to their creditors.  In the second phase of the Chapter 11 Cases, the Debtors negotiated the foundational elements of their envisioned reorganization by entering, first, into an agreement with NovaWulf to sponsor the Debtors' reorganization as the Stalking Horse Bidder and, second, conducting a

---

[107]    *See In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) ("Exculpation provisions in chapter 11 plans are not uncommon and 'generally are permissible, so long as they are properly limited and not overly broad.'" (citation omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing

competitive Auction process and secure improved Bids.[108]    Once the core aspects of the

Restructuring Transactions with the Fahrenheit Group as Plan Sponsor were finalized, the

Debtors focused on reaching consensual resolutions of contentious issues with other stakeholders

such as the Series B Holders, the Retail Borrower Ad Hoc Group, and the Earn Ad Hoc Group.

In parallel, the Debtors cooperated with federal criminal and civil investigations into the

Debtors' prepetition conduct, and the Debtors worked closely with government regulators to

ensure that any contemplated cryptocurrency reorganization could be fully compliant.    Finally,

throughout these Chapter 11 Cases, the Debtors also worked hard to gain the trust of their

creditor body; the voting results speak to the Debtors' success on that point.    In light of the

complex nature of these Chapter 11 Cases, it should not be controversial to state that the

protections afforded by the Exculpation provision are necessary here, and that they should apply

for the full life of these Chapter 11 Cases.    Ultimately, the Exculpation provision provides

protection to those parties that worked hand-in-hand with the Debtors and were instrumental in

assuring the success of the Debtors' restructuring.

82.    In the Second Circuit, exculpation provisions that cover non-estate fiduciaries are

approved regularly.[109]    In approving these provisions, courts consider a number of factors,

---

that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within
the scope of their duties.").

[108]    *See* Kielty Decl. ¶¶ 7–8.

[109]    *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No.
22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re Frontier Communications Corp.*, No. 20-22478 (RDD)
(Bankr. S.D.N.Y. Aug. 27, 2020); *In re LATAM Airlines Group S.A.*, WL 2541298 at *49 (JLG) (Bankr.
S.D.N.Y. June 18, 2022); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re
LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Windstream Holdings,
Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No.
19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Cenveo, Inc.*, No. 18-22178 (Bankr.
S.D.N.Y Aug. 21, 2018) [Docket No. 685] (overruling U.S. Trustee objection to exculpation of both estate
fiduciaries and non-fiduciaries from liability for "any cause of action for any claim related to any act or
omission in connection with, relating to, or arising out of, the chapter 11 cases . . . or the filing of the
Restructuring Support Agreement and related prepetition transactions"); *In re Eastman Kodak Co.*, No.

including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[110] Where a court finds that a plan has been proposed in good faith and meets the other requirements of confirmation, approval of an exculpation provision is appropriate.[111]

83.    Here, the Debtors propose to exculpate the Exculpated Parties, which include non-Estate fiduciaries, because the contributions and concessions of the Exculpated Parties have made the Plan possible.   Such exculpation provisions are routinely approved in plans of reorganization in cases similar to these Chapter 11 Cases,[112] which could not have progressed as

---

[110]    12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re Res. Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] (approving exculpation of certain prepetition lenders); *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and post-petition conduct); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010), [Docket No. 559] (approving exculpation of certain prepetition lenders from liability related to acts taken, among other things, "in connection with, or arising out of, the chapter 11 cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan…the Plan, [or] the Disclosure Statement"); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (exculpation of prepetition noteholders and new investors); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation of controlling shareholder as well as estate fiduciaries); *In re Enron Corp.*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the chapter 11 cases").

[110]    *E.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, WL 23861928, at *28 (Bankr. S.D.N.Y. 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[111]    *See In re WorldCom, Inc.*, WL 23861928, at *28.

[112]    *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020)

productively absent the significant contributions of the Exculpated Parties.[113]  Their concerted

efforts were instrumental to the restructuring process and the Plan's overwhelming support from

the vast majority of the Debtors' voting creditors and key stakeholders.

84.    The failure to include exculpation provisions in chapter 11 plans would chill the

critical participation of the management and advisors to debtors in possession as well as essential

creditor groups and equity holders working to formulate and negotiate consensual chapter 11

plans.    In light of the bankruptcy policy in favor of consensual chapter 11 plans and the

negotiations that create them, it stands to reason that exculpation provisions are essential to the

process and should be approved.[114]  Further, in light of the carve out for actions or omissions that

are the result of bad faith, actual fraud, willful misconduct, or gross negligence, the standard of

care established by the Exculpation is entirely consistent with and appropriate under applicable

law and as a matter of public policy.[115]

[Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 39]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685]; *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *In re Enron*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] (approving exculpation for, *inter alia*, "all prepetition activities leading up to the promulgation and confirmation of this Plan," as well as for "any act or omission in connection with, or arising out of the Debtors' restructuring, including, without limitation, the negotiation and execution of this Plan, the Reorganization Cases . . . and . . . all documents ancillary thereto"); *In re Ampex Corp.*, No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] (same).

[113]  *See* Ferraro Decl. ¶ 28.

[114]  *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans"); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization).

[115]  *See, e.g.*, *In re Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d]

85.    The Debtors respectfully submit that the Court has an ample record before it to conclude that the Exculpated Parties are entitled to the Exculpation proposed in the Plan and that the protections afforded therein are reasonable and appropriate.    In short, the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arms'-length negotiations, and significant sacrifice by the non-Debtor Exculpated Parties.    The Exculpated Parties played a critical role in formulating the Plan, and the Exculpation provision played a role in bringing these parties to the table.    Failure to include the Exculpation provision could have deterred the Exculpated Parties from collaborating with the Debtors to develop a fully consensual restructuring.[116]    The scope of the Exculpation provision is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring between the Petition Date and the Effective Date, and ultimately inures to the benefit of only those parties that have made similar contributions to the Debtors' restructuring.    Moreover, the scope of the Exculpation itself and the composition of the Exculpated Parties are entirely consistent with established practice in this and other jurisdictions.[117]

---

negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision extended to estate fiduciaries and non-fiduciaries that excluded gross negligence and willful misconduct); *In re DJK Residential, LLC,* No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct).

[116]    *See, e.g.*, Ferraro Decl., ¶¶ 26–28.

[117]    *See, e.g., In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019).

86.     As noted with respect to the Debtor Release, the Debtors modified the Debtor Release and the Exculpation provision to provide that the Debtors' advisors would not be released or exculpated with respect to any claims or causes of action relating to the filing of the Debtors' claim in the *Voyager* matter.[118]   The U.S. Trustee Objection repeats the arguments made in its objection to the Disclosure Statement, primarily that the Exculpation provision is "over broad and contain[s] prospective parties and activities."[119]  As the Debtors explained in their omnibus reply to objections to the Disclosure Statement, however, other courts in this district have overruled similar U.S. Trustee objections and approved exculpation provisions that included non-estate fiduciaries.[120]

87.     The U.S. Trustee (repeating by incorporation its prior arguments) and Ubierna de las Heras also argue that the Exculpation provision should include an opt-out mechanism.[121] Neither the U.S. Trustee nor Ubierna de las Heras provide precedent or legal authority for this provision.  The entire purpose of an Exculpation provision is to protect parties who acted in good faith during chapter 11 cases under bankruptcy court supervision.  There is no basis for an opt out provision for an exculpation, and the U.S. Trustee and Mr. Ubierna de las Heras offer none.

---

[118]  *See* Plan, Art. VIII.C, VIII.E.

[119]  *See* U.S. Trustee Obj. at 2.  The Ubierna de las Heras Objection makes the same argument.  *See* Ubierna de las Heras Obj. at 2, 6.

[120]  *See In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) ("The Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision.  They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases . . . the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries . . . based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court").

[121]  *See* U.S. Trustee DS Obj. at 23, Ubierna de las Heras Obj. at 6.

88.    Similarly, the U.S. Trustee's prior request that the Plan's Exculpation provision should carve out claims for legal malpractice must also be overruled.[122]  The U.S. Trustee argues that release of claims based on legal malpractice is prohibited by the New York Rules of Professional Conduct.[123]  But, as the *LATAM Airlines* court held, there is "no merit" to this U.S. Trustee request because the New York Rules of Professional Conduct "ha[ve] no bearing on the standard of care established" in an exculpation provision.[124]

89.    Ultimately, exculpation provisions serve an important purpose—they protect deserving parties from other parties who failed to timely assert their rights and who, instead, could attempt to reopen settled litigation through back door methods and thwart the finality and closure provided by the Plan in resolving these Chapter 11 Cases.[125]  In light of the foregoing, the Debtors submit that the Exculpation provision is reasonable and appropriate under the circumstances of these Chapter 11 Cases and respectfully request that the Court approve the Exculpation set forth in Article VIII.F of the Plan.[126]

---

[122]    *See* U.S. Trustee DS Obj. at 26.

[123]    *See id.*

[124]    *LATAM Airlines,* No. 20-11254 (JLG), 2022 WL 2206829, at *50.

[125]    *See In re Global A&T Electronics Ltd.*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 17, 2017) Confirmation Hr'g Tr. 116:8-117:8 ("So, I actually think 1125(e) can well apply to third parties who aren't necessarily fiduciaries as long as they're participating in the exchange.  Now here, the people who really participated all sort of are releasing each other, but I guess I appreciate your point that this probably doesn't add anything but I don't think it adds anything in a bad way, either.  I think it's consistent with the statute and the case law and, again, it's to prevent strike suits.  It's to not give anyone a back door and particularly given the fact that the releases themselves say, "to the extent permitted by applicable law", you know, that's a potential loophole that the exculpation closes. . . It's basically to protect that finding that this was good faith so you can't go back and sue some third party who said, you know, you didn't act in good faith, because it's already been found.").

[126]    The remaining Objection to the Exculpation provision is the Phillips Objection, to which the Committee is responding.  The Debtors incorporate the Committee's response by reference.

### 4.    The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code.

90.    Pursuant to section 524(a), the injunction provision set forth in Article VIII.G of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions.  In part, the Injunction Provision permanently enjoins all Entities from commencing or continuing any action against the Debtors, the Post-Effective Date Debtors, the Released Parties, or the Exculpated Parties on account of, in connection with, or with respect to any such Claims, Interests, Causes of Action, or liabilities discharged, released, settled, compromised, or exculpated under the Plan.  The Injunction Provision is thus a key provision of the Plan because it is necessary to preserve and enforce the discharge provisions in the Plan, the Debtor Release, the Third-Party Release, and the Exculpation that are central to the Plan and is narrowly tailored to achieve that purpose.[127]  As such, to the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Court should approve the Injunction Provision.[128]

### 5.    The CEL Token Settlement, the Account Holder Avoidance Action Settlement, and the Retail Borrower Settlement Comply With the Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors' Good Business Judgment.

91.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[129]  The Plan provides for the general settlement of all Claims, Interests, Causes of

---

[127]    *See In re Drexel*, 960 F.2d at 293 (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

[128]    *See* Ferraro Decl. ¶ 30.

[129]    11 U.S.C. § 1123(b)(3)(A).  *See, e.g., In re Ditech*, 606 B.R. at 622 ("A chapter 11 plan may 'provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate.'") (citations omitted); *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'") (citation omitted); *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (recognizing inapplicability of section 1123(b)(3)(A) as authority to settle creditor's claim in plan but considering settlement under Bankruptcy Rule 9019 standards).

Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the

Plan.  The Plan also provides for approval of the CEL Token Settlement, the Account Holder

Avoidance Action Settlement, and the Retail Borrower Settlement.  A settlement approved

through a plan must be "fair and equitable, and in the best interests of the estate."[130]  It is within

the discretion of the court to determine whether a settlement satisfies those standards.[131]  The

court should "accord proper deference to a debtor's business judgment" when making its

determination.[132]

92.    The Second Circuit weighs the following "*Iridium*" factors in determining

whether a proposed settlement is "fair and equitable":

    a.  the balance between the litigation's possibility of success and the
        settlement's future benefits;

    b.  the likelihood of complex and protracted litigation, with its
        attendant expense, inconvenience, and delay, including the
        difficulty in collecting on the judgment;

    c.  the paramount interests of the creditors, including each affected
        class's relative benefits and the degree to which creditors either do
        not object to or affirmatively support the proposed settlement;

    d.  whether other parties in interest support the settlement;

    e.  the competency and experience of counsel supporting, and the
        experience and knowledge of the bankruptcy court judge
        reviewing, the settlement;

    f.  the nature and breadth of releases to be obtained by officers and
        directors; and

---

[130]  *In re Ditech*, 606 B.R. at 623; *see also In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).

[131]  *See, e.g.*, *In re Ditech*, 606 B.R. at 623 ("The determination of whether a settlement meets those standards is within the discretion of the court."); *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion.'") (citations omitted); *Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement.") (citation omitted); s*ee also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) ("[T]he court must make an informed and independent judgment as to whether a proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'") (citations omitted)).

[132]  *In re Ditech*, 606 B.R. at 623.

g.  the extent to which the settlement is the product of arm's-length bargaining.[133]

93.     Here, the CEL Token Settlement, the Account Holder Avoidance Action Settlement, the Retail Borrower Settlement, and the general settlement of claims and controversies are fair and equitable and an exercise of the Debtors' good business judgment and should therefore be approved.

### a.     The CEL Token Settlement Should Be Approved.

94.     The Debtors and the Committee previously briefed the basis for approving the CEL Token Settlement and the application of the *Iridium* factors thereto in the *Debtors' Brief in Support of CEL Token Settlement* [Docket No. 3431] (the "Debtors' CEL Token Brief") and the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues With Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3432] (the "Committee's CEL Token Brief" and together with the Debtors' CEL Token Brief, the "CEL Token Briefs"), respectively, and such briefs are incorporated herein by reference. This section supplements the arguments contained in the CEL Token Briefs by briefly reiterating how the *Iridium* factors support approval of the CEL Token Settlement addressing the voting results and the two objections filed to the settlement, which reinforce the Debtors' and the Committee's position and further demonstrate that the CEL Token Settlement should be approved.[134]

95.     The CEL Token Settlement proposed by the Plan provides that all Claims and Causes of Action arising out of or related to the CEL Token for, among other things,

---

[133]   *Id*. at 623–24 (*citing Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

[134]   *See generally* Davis Obj.; Lau Letter (arguing that a $0.25 valuation of CEL Token is unfair).

recharacterization and subordination, will be settled pursuant to the following terms: (i) first, except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token, and shall otherwise receive the treatment associated with the program in which they were deployed; and (ii) second, all Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17 of the Plan, as applicable.[135] In addition, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims are classified as Class 15 Section 510(b) Claims (which will not receive any distribution under the Plan).[136] The *Iridium* factors weigh in favor of approving the CEL Token Settlement.

96.    **First**, the *Iridium* factor weighing the balance between a litigation's possibility of success and the settlement's future benefits weighs heavily in favor of approving the CEL Token Settlement. Certain Holders of CEL Token believe that the proper value of CEL Token is its apparent market price of $0.81 per CEL Token on the Petition Date.[137] In comparison, the Debtors and the Committee strongly believe that the value of CEL Token on the Petition Date is not appropriate due to, among other things, market manipulation of the CEL Token price, and believe that CEL Token may be worth as little as $0.00. For example, the price of CEL was extensively manipulated by Celsius' prepetition management.[138] As the Debtors described in the

---

[135]    *See* Plan, Art. IV.B.2.

[136]    *Id.* "Other CEL Token Claim" means any Claim, including any Account Holder Claim, arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token. *Id.*, Art I.A.166.

[137]    *See* CEL Token Brief ¶¶ 8–15 (summarizing the CEL Token valuation disputes, including those in connection with the motions filed by creditors Santos Caceres and Sean StJohn and approval of the Disclosure Statement).

Disclosure Statement,[139] federal prosecutors charged Alexander Mashinsky, the Debtors' founder and former chief executive officer, and Roni Cohen-Pavon, the former chief revenue officer, with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token. [140] Specifically, federal prosecutors assert that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices.[141] On September 15, 2023, Mr. Cohen-Pavon pleaded guilty to four counts, including fraud, manipulation of securities prices, and conspiracy.[142]

97.    In addition, because the CEL Token was marketed as a "utility token" for the Celsius platform, it has no go-forward utility because the Celsius platform will be retired following the Debtors' emergence from chapter 11 and the completion of distributions,[143] and in

---

[138]    *See, e.g.*, *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement* [Docket No. 3435] (the "Ferraro CEL Token Declaration") ¶ 22 (confirming that "Celsius' buyback strategies included placing standing purchase orders to protect the price of CEL Token from decreasing in the event that market prices dropped," that "Celsius also coordinated buybacks to occur contemporaneously with Celsius' 'Ask Mashinsky Anything' online Q&A sessions to increase consumer confidence and demand," and that "[i]n total, Celsius repurchased over 195 million CEL Tokens for over $540 million"); *id.* ¶ 26 (concluding that "[i]t is difficult to determine the true value of CEL Token, if any, at any given time, due to the wide variety of actions taken to regulate the supply of CEL Token and otherwise influence the price of CEL Token").

[139]    *See, e.g.*, Disclosure Statement, Art. III.LL.1.

[140]    *See Indictment*, *United States v. Mashinsky et al.¸* 23-cr-00347-UA (S.D.N.Y. 2023) [ECF No. 1] ¶¶ 78–89; *see also id*, ¶¶ 48–71 (presenting the "CEL manipulation scheme"). As part of the non-prosecution agreement with the federal prosecutors and for the purposes of the prosecution of Mr. Mashinsky and Mr. Cohen-Pavon, Celsius accepted and acknowledged as true a set of facts, including that "the rise in value of the CEL [T]oken was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL [T]oken by taking steps to artificially support the price of CEL." *SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited*, Exh. A, *SEC v. Celsius Network Limited et al.*, 23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6] ¶ 11.

[141]    *See id.*

[142]    *See* Bob Van Voris, "Celsius Executive Pleads Guilty, Cooperates Against Mashinsky," Bloomberg Law, September                                 15,                                 2023, https://news.bloomberglaw.com/ip-law/top-celsius-executive-cohen-pavon-pleads-guilty-to-crypto-fraud.

[143]    *See* Ferraro CEL Token Decl. ¶ 26.

any case, the Debtors are unable to return CEL Token to Account Holders under applicable law.[144]  Strong arguments also exist that CEL Token is an equity security of the Debtors,[145] which would result in zero recovery on account of CEL Token Deposit Claims pursuant to the absolute priority rule, and zero recovery on account of Other CEL Token Claims.[146]

98.    Despite these arguments, however, the value of CEL Token remains an open and disputed issue.  Absent a settlement, the Debtors would likely need to conduct a valuation trial that would be time-consuming, costly, and there is no certainty that the Debtors would succeed in their arguments, as further explained below.  This valuation trial could delay distributions to creditors and lead to a longer stay in chapter 11, which would further increase costs to the Debtors that would likely far exceed any savings as a result of a judgment valuing CEL Token at $0.00.  The CEL Token Settlement provides a reasonable compromise that avoids this protracted litigation and guarantees that Holders of CEL Tokens will receive some recovery on account of their CEL Token Deposit Claims.[147]  The certainty of the value of CEL Token at this stage in the Chapter 11 Cases far outweighs the potential benefit to the Debtors' estates of succeeding at trial after months of costly litigation.

---

[144]  *See* Aug. 14, 2023 Hr'g Tr. 71: 6–12 (The Court: "without a going concern, the CEL Token, it can't be issued. It can't—you know, Celsius won't exist.").

[145]  *See* Celsius Network, Celsius Network AMA–Ask Mashinsky Anything!, YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at 44:40.  *See also* Committee CEL Token Brief ¶¶ 75–76 (analyzing why CEL represents "an interest in the Debtors").

[146]  *See* 11 U.S.C. § 510(b); the Second Circuit broadly construes section 510(b) of the Bankruptcy Code to subordinate all claims with a causal connection to the purchase of a security.  *See Rombro v. Dufrayne (In re Med. Diversified, Inc.)*, 461 F.3d 251, 255–59 (2d Cir. 2006); *Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 471 (2d Cir. 2017).

[147]  *See* August 14, 2023 Hr'g Tr. at 55:16–19 (The Court: "if somehow the [CEL Token Settlement was not accepted] and the Court conducts the valuation and concludes that the petition date, the value of the CEL token was zero, that would determine what the recovery in the plan would be.").

99.    **Second**, the likelihood of complex and protracted litigation also weighs heavily in favor of the CEL Token Settlement.  The Debtors, the Committee, and various *pro se* creditors are scheduled to hold, as part of the Confirmation Hearing, a hearing on the valuation of CEL Token commencing on October 16, 2023.  Valuation is notoriously time-intensive and expensive to litigate even under straightforward circumstances, and a trial regarding the value of CEL Token would be particularly complex, in part because what is often the most reliable indicator of value—market price—is no longer reliable due to market manipulation.  The CEL Token Settlement provides an elegant solution that would obviate extensive, expense, inconvenience, and delay attendant with litigation.

100.    **Third**, the paramount interests of creditors weigh in favor of the CEL Token Settlement because the settlement provides benefits to the Debtors' Estates and, by extension, unsecured creditors.  Notwithstanding objections by a few vocal holders of CEL Token, courts have repeatedly held that even where large claim holders oppose a settlement, it may still be approved because it is in the "best interests of the estate as a whole."[148]  As discussed above, litigation concerning the value of CEL Token would require the services of specialized experts and would be highly time- and cost-intensive.  While the overwhelming majority (approximately 247,000 out of approximately 259,000, or approximately 95.4%) of accounts that hold CEL Tokens have fewer than 1,000 CEL, only 12 accounts have more than 1,000,000 CEL Tokens.[149]

---

[148]    *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"); *see also In re Soup Kitchen Int'l., Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("the overriding consideration is the [s]ettlement's benefits to the creditor body"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors, weighs in favor of settlement").

[149]    *See Debtors' CEL Token Brief* ¶ 34.

Given the relatively fixed amount of assets available for distribution to creditors, any increase in recovery by one sub-group will necessarily decrease the recoveries by all other creditors. Therefore, as an attempt to avoid the costly CEL Token valuation that would provide meaningful upside only for a small group of creditors, the CEL Token Settlement is in the collective interests of the entire creditor body.

101.    **Fourth**, creditors and other parties in interest, most notably the Committee, support the CEL Token Settlement.  Following the filing of the CEL Token Briefs, the Debtors completed solicitation of the Plan.  Holders of CEL Token Claims were not separately classified under the Plan, but the Debtors tabulated the votes of CEL Token Holders within each Class to evaluate whether Holders of CEL Token accepted the CEL Token Settlement.  Holders of CEL Token that voted on the Plan overwhelmingly accepted the Plan—98.71% of voting CEL Token Holders in the Voting Classes that submitted Ballots voted to approve the Plan.[150]  These results confirm that the fourth *Iridium* factor (regarding the breadth of support for the settlement) weighs heavily in favor of approving the CEL Token Settlement and bolster the Debtors' and Committee's determination that settling all CEL Token issues as proposed is in the best interests of creditor (in satisfaction of the third *Iridium* factor).[151]

102.    **Fifth**, the Debtors' and the Committee's counsel expended significant time and effort over the course of the previous year to investigate issues related to CEL Token and arrive at the CEL Token Settlement, including through discussions with parties in interest represented by sophisticated counsel as well as *pro se* creditors.  The ultimate terms of the CEL Token Settlement, as reflected in the Plan ($0.25/CEL, which represents a $0.05/CEL increase from the

---

[150]    *See* Voting Report ¶ 26.

[151]    *See* Debtors' CEL Token Brief ¶¶ 32–35.

initial terms) were the result of arms'-length negotiation with certain Holders of CEL Token Deposit Claims.

103.    Only two creditors objected to the CEL Token Settlement.  These creditors believe that CEL Token's proper value is its apparent market price of $0.81 per CEL Token on the Petition Date, or even a higher price, and argue that it is inequitable for CEL Token to receive less than the Petition Date price when all other cryptocurrencies are being valued at their Petition Date prices.  The objections do not even attempt to address the legal arguments set forth in the CEL Token Briefs, which emphasize that CEL Token is potentially entirely valueless as an equity security and/or a utility token with no go-forward utility, and instead argue about the true value of CEL Token.  Even further, the objectors' arguments support approval of the CEL Token Settlement by demonstrating the difficulty of ascertaining the true value of CEL Token as of the Petition Date.[152]

104.    The Davis Objection primarily argues that the price of CEL Token was manipulated downwards due to an alleged "naked short" orchestrated by FTX.[153]  While some of Mr. Davis' arguments are plausible on their face (*e.g.*, the Committee has been investigating potential claims against FTX on behalf of the Estates, and the Debtors filed a proof of claim to preserve any such claims), others are completely baseless conspiracies (*e.g.*, the unhinged and unsupported assertion that Christopher Ferraro intentionally facilitated any FTX price manipulation or was orchestrating a coup to unseat Alex Mashinsky as Chief Executive Officer).

---

[152] For the avoidance of doubt, the Debtors dispute the allegations in the Davis Objection and will present argument and evidence at the Confirmation Hearing refuting such allegations as appropriate.  In short, the Davis Objection misconstrues certain documents inadvertently produced to Mr. Davis as relevant and damning based solely on their unintentional production.

[153] *See* Davis Obj. at 2–7.

Although Mr. Davis references certain internal Slack chats that he argues support his arguments, he is completely misrepresenting those documents, which do not actually bear any resemblance to his gross mischaracterization and misreading of those documents.

105.    While the Davis Objection references downward price pressure, he acknowledges that the price was manipulated upwards between the Pause and the Petition Date.[154]    None of this supports adopting the market price as of the Petition Date as the value of CEL Token.   In fact, the Davis Objection illustrates that the value of the CEL Token is highly uncertain and a ripe issue for settlement to avoid value destructive litigation.   Indeed, this price manipulation between the Pause and the Petition Date (from approximately $0.20 to approximately $0.81) is one of the key reasons why the Debtors believe that the CEL Token Settlement at $0.25 is reasonable and should be approved.

106.    Ms. Lau's letter also argues that the initial coin offering price is not fair because most creditors did not get to purchase CEL Token at that price.[155]    Ms. Lau's proposed solution—that the Debtors value CEL Token at the price at which an individual creditor purchased it[156]—is infeasible and inequitable, given that no other cryptocurrency is valued at the price at the time of purchase or deposit; all cryptocurrencies are being valued at their Petition Date price except for CEL Token, due to the various unique issues and facts associated with the token.   In addition to the logistics of tracking what each Holder paid, the Debtors would need to reconcile subsequent CEL Token transactions.

---

[154]    *See id*. at 1–2 ("The vast majority of the **upwards price** action of CEL token between the pause and petition date was due to roughly 15 million illegal naked short positions being closed on FTX"; "doing so pushed the price [of CEL] up from $0.20 to $0.81") (emphasis added; citation omitted)).

[155]    Lau Letter at 1.

[156]    *See id.* at 2.

107.    Further, when a claim is disputed, section 502(b) of the Bankruptcy Code provides that its value should be determined as of the filing of the debtor's petition.  The arguments in the Lau Letter, however, support an even lower valuation of CEL Token than Petition Date prices.  For example, the Lau Letter references purchasing CEL "because [she] believed in Celsius" (suggesting that Ms. Lau viewed CEL Token as reflective of the Debtors' value, like an equity security) and also that "[she] needed [her] CEL [T]okens to maintain [her] platinum status that would allow [her] to maximize [her] earnings through staking," which made purchasing CEL Token "worth it" (ascribing value to the utility aspect of CEL Token, which no longer existed as of the Petition Date).[157]  While these arguments support the position that CEL Token should be worth *nothing*, they also demonstrate why the Debtors and Committee determined to offer some consideration to CEL Token victims under the Plan.

108.    Ultimately, the voting results confirm overwhelming support for avoiding a lengthy trial regarding the value of CEL Token, while the objections to the settlement seek to litigate the substance of the issue, rather than challenging the reasonableness of settling it.  For the reasons set forth herein and in the CEL Token Briefs, the CEL Token Settlement satisfies the *Iridium* factors and should be approved pursuant to Bankruptcy Rule 9019 and section 1123(b)(3)(A) of the Bankruptcy Code.

109.    Accordingly, the CEL Token Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.

---

[157]    *See id.* at 1–2.

b.       **The Account Holder Avoidance Action Settlement Should Be Approved.**

110.    The Account Holder Avoidance Action Settlement proposed by the amended Plan

provides that the Debtor Release contained in Article VIII.C of the Plan shall also release

Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure less than or equal to $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan; and

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure of more than $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of such Account Holder's Withdrawal Preference Exposure no later than 14 days prior to the anticipated Effective Date of the Plan.[158]

The Plan clarifies, however, that (a) Avoidance Actions against ADR-Ineligible Potential

Defendants and Excluded Parties are not included in the Account Holder Avoidance Action

Settlement and are expressly preserved for prosecution by the Litigation Administrator(s) after

the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims

shall be released if such Account Holder with a *De Minimis* Claim otherwise complies with the

requirements set forth above other than voting in favor of the Plan (as such Account Holders are

not entitled to vote), and (c) as a result of the Account Holder Avoidance Action Release, any

Custody Settlement Participant with Withdrawal Preference Exposure at or under $100,000 shall

receive a 100% recovery on their Allowed General Custody Claim.  On September 18, 2023, the

Debtors also filed the *Notice Regarding Calculation of Withdrawal Preference Exposure*

[Docket No. 3488] expressly providing, among other things, that Account Holders with a

---

[158]    *See* Plan, Art. IV.B.3.

Withdrawal Preference Exposure of exactly $100,000 will receive the same treatment under the Account Holder Avoidance Action Settlement as Account Holders with a Withdrawal Preference Exposure under $100,000.[159]  As with the CEL Token Settlement, here, too, the *Iridium* factors weigh in favor of approving both components of the Account Holder Avoidance Action Settlement.

111.    ***First***, the balance between the uncertain probability of success the Debtors could have litigating Avoidance Actions and the settlement's benefits weighs heavily in favor of approving the Account Holder Avoidance Action Settlement.  Given the thousands of Account Holders against whom the Debtors have potential Avoidance Actions, litigation against individual Account Holders would require extensive time, expense, inconvenience, and delay. The Litigation Administrator would need to establish the existence of preferences as to each individual Account Holder and litigate each Account Holder's various defenses, including the safe harbor defense of section 546(e) and the ordinary course of business defense of section 547(c)(2) of the Bankruptcy Code.  Such litigation would undoubtedly be protracted and would deplete the resources available to the Litigation Administrator(s).  Indeed, the Debtors and the Committee reached the Custody Settlement and the Withhold Settlement with the Custody and Withhold Ad Hoc Groups in part because all parties recognized that, without a consensual resolution, the ensuing preference litigation would be too complicated and value destructive.[160]

---

[159] The Notice also offered creditors the opportunity to request a recalculation of their Withdrawal Preference Exposure if they believed that their Withdrawal Preference Exposure was incorrectly calculated because they transferred cryptocurrency between multiple accounts that they controlled, to spouses or partners, and other similar situations, and if they entered into the Account Holder Avoidance Action Settlement.  The Notice instructed creditors to submit requests for recalculation of Withdrawal Preference Exposure by the Voting Deadline, and explained that the Debtors would make commercially reasonable efforts to respond by the date of the Confirmation Hearing.  After the Notice was filed and before the Voting Deadline, the Debtors responded to approximately three dozen such requests.

[160] *See Joint Motion for Entry of an Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief*

112.    **Second**, the Account Holder Avoidance Action Settlement provides substantial benefits to individual Account Holders, as explained above, as well as the entire creditor body. Throughout the course of these Chapter 11 Cases, Account Holders repeatedly raised the issue of Avoidance Actions, and therefore the settlement provides necessary finality to these concerns. Further, the settlement protects and maximizes the value of the Debtors' Estates by providing a clear mechanism whereby property can be recovered and providing the Litigation Administrator clearer direction as to which Avoidance Actions to pursue.  Accordingly, the Account Holder Avoidance Action Settlement strikes the appropriate balance between the aggressive pursuit of Avoidance Actions and the efficient deployment of the Litigation Administrator's resources.

113.    **Fourth**, as the voting results show, 18,080 Holders of Account Claims in the eligible Voting Classes with a total Withdrawal Preference Exposure of $831,188,879.79 elected to participate in the Account Holder Avoidance Action Settlement.[161]  Furthermore, 211 Holders of Account Claims in Class 11 (*De Minimis* Claims) with a total Withdrawal Preference Exposure of $6,117,025.48 opted into the Third-Party Release, which means that such Holders fulfilled the conditions to participate in the Account Holder Avoidance Action Settlement.[162]

114.    **Fifth**, the Debtors and the Committee were each represented by competent counsel in the negotiations of the Account Holder Avoidance Action Settlement, and the concerns of the Account Holders were considered throughout the process.  **Finally**, entry into the

---

*Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2148] ¶¶ 36–42 (analyzing the *Iridium* factors with respect to the Custody Settlement); *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334] ¶¶ 35–41 (same with respect to the Withhold Settlement).

[161]    *See* Voting Report ¶ 24.

[162]    *Id.*

Account Holder Avoidance Action Settlement was optional for Account Holders, thereby providing them the opportunity to evaluate for themselves the risks and benefits of the settlement versus the potential for litigation.

115.    In line with the prominence the issue of Avoidance Actions has in the creditor body, the Debtors received several Objections addressing the Account Holder Avoidance Action Settlement.  The Cassidy Letter and the First Bohon Letter both argued that "a clause should be added to the settlement that allows custody holders to forfeit any value amount they choose to bring their settlement under the $100,000 threshold."[163]  Although the Debtors understand Account Holders' frustration at the threat of preference actions, the Debtors are acting in the best interests of the Estates and in accordance with the Bankruptcy Code, which provides that debtors can avoid potential preference actions in the ninety-day period before the Petition Date.  This Court has itself so noted.[164]  Further, the Debtors are not required to set any threshold under which Avoidance Actions are automatically released and could have decided to retain the option of pursuing all Avoidance Action, no matter the Withdrawal Preference Exposure.  The Debtors, however, chose to expressly include a threshold for the purpose of settling with Account Holders and to alleviate Account Holders' concerns.   The Debtors sympathize with the concerns expressed in the Cassidy Letter and the First Bohon Letter, but believe the $100,000 threshold is appropriate, fair, and reasonable.

116.    The Second Bohon Letter largely repeated the concerns expressed in the First Bohon Letter but also disputed the calculation of Withdrawal Preference Exposure, stating that

---

[163]    *See* Cassidy Letter at 1, First Bohon Letter at 1.

[164]    *See* March 8 Hr'g Tr. 37:6–7, 18–25 ("There's been a lot of concern about the potential for clawback actions…Under the bankruptcy law, you know, to some extent the Debtors and the committee and other professionals, they have to follow the law.").

non-accredited investors were not able to make deposits to Earn Accounts after the creation of Custody Accounts and were thereby prejudiced because deposits to Custody Accounts do not affect Withdrawal Preference Exposure.[165]  The Debtors' calculation of Withdrawal Preference Exposure, however, is wholly in line with this Court's rulings in these Chapter 11 Cases, which provide that Earn Accounts are the Debtors' property and Custody Accounts are customers' property,[166] and accordingly, deposits to Earn Accounts would decrease Withdrawal Preference Exposure by increasing assets that are property of the Estates and deposits to Custody Accounts can have no effect on Withdrawal Preference Exposure because they merely remain the Custody Holder's property despite being deposited onto the Debtors' platform.  The Debtors have, however, modified the Plan in response to comments from counsel to certain potential preference defendants to clarify that the Debtors' calculation of Withdrawal Preference Exposure is not binding on any defendant in an Avoidance Action.[167]  Therefore, the objections in the Cassidy Letter, First Bohon Letter, and Second Bohon Letter should be overruled.

117.    The First Keeney Letter also objected to the calculation of the Withdrawal Preference Exposure, arguing (1) that it was unfair and unreasonable that withdrawal of loan principal increases an Account Holder's Withdrawal Preference Exposure and (2) that it makes no sense that preferential transfers are valued at the time of the transfer while creditors' Claims are valued as of the Petition Date.  Respectfully, there can be no real dispute about the propriety of counting loan principal payments as preferential transfers—a loan is a transfer of property

---

[165]    *See* Second Bohon Letter at 1.

[166]    *See* Earn Ruling at 28 (holding that assets in Earn Accounts are property of the Debtors' estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[167]    *See* Plan, Art. I.B.270.

from the lender, here the Debtors, to a borrower.    Moreover, a preference must be valued at the time of the transfer, in the ninety days before the Petition Date, because such a transfer is only a preference if it occurs before the Petition Date; accordingly, it cannot be valued as of the Petition Date.[168]

118.    Accordingly, the Account Holder Avoidance Action Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[169]

### c.    The Retail Borrower Settlement Should Be Approved.

119.    The Retail Borrower Settlement was the result of months of negotiation between the Debtors, the Committee, and the Retail Borrower Ad Hoc Group concluding in three days of mediation with the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York.  The Retail Borrower Settlement proposed by the Plan provides the following primary terms:  (a) in addition to the Set Off Treatment, Holders of Retail Borrower Deposit Claims have the option to repay their Retail Advance Obligations (the "Retail Advance Obligation Repayment Election") before the Effective Date in exchange for an equivalent amount of cryptocurrency; and (b) priority in electing a preference to exchange the NewCo Equity for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency Weighted Distribution Election) made by such Holders under the Plan.[170]  In addition, under the Retail Borrower Settlement, the Earn Ad Hoc Group and the Borrower Ad Hoc Group would

---

[168]    *See* 11 U.S.C. § 547(b).

[169]    *See* Ferraro Decl. ¶ 13.

[170]    *See* Plan, Art. IV.B.7.

each have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee.

120.    The Settlement is appropriate under the Iridium factors.    ***First***, the balance between the uncertain probability of success of litigation and the settlement's benefits weighs heavily in favor of approving the Retail Borrower Settlement.  In February 2023, the Retail Borrower Ad Hoc Group commenced an adversary proceeding seeking a declaratory judgment that digital assets transferred to the Borrow Program are not property of the Debtors' estates and alleging deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, breach of contract, and unjust enrichment, among other things.[171] Following the mediation with Judge Wiles, the Retail Borrower Ad Hoc Group executed a settlement term sheet that embodied the Retail Borrower Settlement and stayed all deadlines in the adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[172]  The Debtors believe that they would prevail in any such adversary proceeding because the Loan Terms and Conditions provide (as further discussed in the Debtors' detailed response to Objections regarding the Retail Borrower Settlement in Section VII of this Memorandum)—unambiguously in every version and in multiple places—that Retail Borrowers transferred title of their collateral to the Debtors.  Inherent uncertainty, however, exists with respect to litigating the Retail Borrower Ad Hoc Group's adversary proceeding and other claims related to the Borrow Program, and any such litigation would require extensive delay and expense.  The litigation regarding the issue of title and ownership with respect to assets in the

---

[171]  *See generally Complaint for Declaratory Judgment* [Adv. No. 23-01007, Docket No. 2001].

[172]  *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064],

Earn Program[173] and the Custody Program spanned months and required multi-day trials that occurred at great expense to the Debtors' estates.  Furthermore, any litigation with the Retail Borrower Ad Hoc Group at this point in these Chapter 11 Cases would be detrimental to the successful consummation of the Plan because such litigation would inevitably delay distributions to Holders of Retail Borrower Deposit Claims.  On the other hand, approving the Retail Borrower Settlement would ensure that Retail Borrowers receive their distributions and the certainty of finality and would help expedite the consummation of the Plan.  Accordingly, the uncertain probability of success to be expected in litigating the various Claims related to the Borrow Program compared to the benefits provided by the Retail Borrower Settlement weighs in favor of its approval.

121.    *Second*, as discussed earlier, the Retail Borrower Settlement provides improved treatment for all Retail Borrowers regardless of whether they make the Retail Advance Obligation Repayment Election and benefits the entire creditor body by avoiding the costly and time-consuming litigation related to the Borrow Program.  *Third*, the Committee and the Retail Borrower Ad Hoc Group support the Retail Borrower Settlement.  *Fourth*, the Debtors, the Committee, and the Retail Borrower Ad Hoc Group were each represented by competent counsel in the negotiations of the Retail Borrower Settlement, including in the mediation.  *Finally*, the Retail Borrower Settlement is the product of arm's-length, multi-party negotiations and a mediation.

---

*Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064], Exh. B at 4.

[173] *See Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (setting forth the discovery, pleading, and hearing schedule to determine the title of digital assets transferred to the Earn Program).

122.    The Bronge Objection and several other letters filed regarding similar issues argue that the Retail Borrower Settlement should not be approved.  This argument is misguided and should be overruled as further set forth in the Debtors' response, *infra* in Section VII of this Memorandum.

123.    Accordingly, the Retail Borrower Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[174]

**E.    The Plan Complies With Section 1123(d) of the Bankruptcy Code.**

124.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[175]

125.    The Plan provides primarily for the deemed rejection of all Executory Contracts and Unexpired Leases, but also provides for the assumption of certain Executory Contracts and Unexpired Leases.  Specifically, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date, (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another

---

[174]    *See* Ferarro Decl. ¶ 32.

[175]    11 U.S.C. § 1123(d).

third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down, or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.[176]

126.    Article V.A also provides, however, that pursuant to sections 365(a) and 1123 of the Bankruptcy Code, entry of the Confirmation Order shall constitute a Court order approving the rejection, assumption or assumption and assignment, as applicable, of such Executory Contracts or Unexpired as provided for in the Plan, effective as of the Effective Date unless otherwise specified.  The Debtors, or the Post-Effective Date Debtors, as applicable, will satisfy all cure amounts in accordance with section 1123(d) of the Bankruptcy Code.  Article V.C provides that the Debtors, or the Post-Effective Date Debtors, as applicable, shall pay cure amounts on the Effective Date or as soon as reasonably practicable thereafter, unless otherwise provided in the Plan.  Article V.C also provides that any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the cure amount will be deemed to have assented to the cure amount.  Article V.D of the Plan provides that Institutional Loans, to the extent they are Executory Contracts, will be assumed and assigned to NewCo and/or its subsidiaries, and that all such Institutional Loans and obligations thereunder shall remain in full force and effect.

127.    In response to the provisions in Article V.D of the Plan, the Debtors received an Objection from 168 Trading, which is party to the August 20, 2021 Master Loan Agreement with Celsius Network Ltd. as the lender and 168 Trading as the borrower (the "MLA"), pursuant to which 168 Trading delivered to the Debtors USDC 3 million in exchange for 126,582.28 of

---

[176]    *See* Plan, Art. V.A.

cryptocurrency Polkadot (DOT) (the "Collateral").  The MLA was listed on the *Debtors' Notice of (I) Executory Contracts and Unexpired Leases to Be Rejected by the Debtors Pursuant to the Plan and (II) Related Procedures in Connection Therewith* [Docket No. 3454].  168 Trading objects to the rejection of the MLA because it argues that the MLA is an Institutional Loan which cannot be rejected pursuant to Article V.D of the Plan.[177]  The Debtors have revised Article V.D of the Plan to clarify that, to the extent any contracts relating to Institutional Loans are Executory Contracts, the Debtors will be deemed to have assumed them under the Plan unless such Executory Contracts are on the Schedule of Rejected Contracts.[178]  In that case, such Executory Contracts will be rejected.  Accordingly, 168 Trading's arguments fail.

128.    The core of 168 Trading's Objection, however, has to do more with the terms of the MLA than the terms of the Plan:  168 Trading objects to the Plan to the extent the Debtors seek to deprive 168 Trading of its right to redeem the Collateral upon repayment of the loan pursuant to the MLA[179] and "to the extent the Debtors seek to relegate 168 Trading to an unsecured creditor" in implied contravention of the MLA by treating, under Article V.B of the Plan, all claims for rejection damages as unsecured.[180]

---

[177]    *See generally* 168 Trading Obj.

[178]    *See* Plan, Art. V.D ("Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtors shall be deemed to have assumed and assigned to NewCo and/or its subsidiaries all such agreements, documents, and instruments under the Plan; *provided* **that if any such agreements, documents, or instruments are (i) Executory Contracts and (ii) on the Schedule of Rejected Contracts, such agreements, documents, or instruments will be rejected as set forth elsewhere in this Plan**"(emphasis added)).

[179]    *See* 168 Trading Obj. ¶ 9.

[180]    *See id.* ¶ 10.

129.    With respect to its argument regarding the classification of any rejection damages,

168 Trading's argument is premature, as the Debtors have not classified the rejection damages

but merely included the MLA on a rejection notice.

130.    Further, to the extent the Debtors reject the MLA, the terms of the MLA do not

provide 168 Trading any foundation for its arguments.  168 Trading is not a secured creditor and

not entitled to the return of any Collateral under the MLA.  Section 4 of the MLA makes clear

that upon 168 Trading's transfer of the Collateral to Celsius, 168 Trading retains no interest in

the Collateral:   "The delivery of Collateral to Lender shall be on a full-title transfer basis,

meaning the *Lender shall be the legal and beneficial owner of the assets posted as Collateral

and the Borrower shall have no right, title or interest in those assets*" (emphasis added).[181]

Moreover, the MLA includes language similar to the language highlighted by the Court's Earn

Ruling when it held that, pursuant to the Terms of Use, the Debtors have title to assets in Earn

Accounts.[182]  Section 4.4.3. of the MLA provides that:

> Collateral is not, and shall not be, held by Lender on behalf of the
> Borrower, *and Lender shall be the sole and exclusive owner of all
> Digital Assets and/or Fiat Currencies posted as Collateral.
> Lender may lend, sell, pledge, hypothecate, assign, invest, use,
> commingle or otherwise dispose of the Collateral to counterparties
> or hold them with counterparties, or otherwise exercise any
> ownership rights in the Collateral.*  Borrower shall have no right or
> title in or to the Collateral throughout the term of this Agreement,
> until such time as the Loan Amount is fully paid up and the
> Collateral is returned to the Borrower.[183]

---

[181]    MLA § 4.3.

[182]    *See generally* Earn Ruling.

[183]    MLA § 4.4.3 (emphasis added).

131.    Consistent with the plain and unambiguous language of the MLA and the Earn Ruling, 168 Trading retains no interest in any assets transferred to Celsius under the MLA.

132.    Accordingly, the 168 Trading Objection should be overruled, and the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code.

**F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2))**.

133.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code regarding solicitation of acceptances of the Plan.[184]    The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[185]    As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.[186]

**1.    The Debtors Complied With Section 1125 of the Bankruptcy Code**.

134.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[187]

---

[184]    11 U.S.C. § 1129(a)(2).

[185]    *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, 2003 WL 23861928 at *49 (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[186]    *See* Campagna Decl. ¶¶ 34–37.

[187]    *Id.*

Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[188]

135.    Section 1125 of the Bankruptcy Code is satisfied here.  Before the Debtors solicited votes on the Plan, the Court entered the Disclosure Statement Order.[189]  The Court also approved the contents of the Solicitation Package provided to Holders of Claims and Interests entitled to vote on the Plan, the notices provided to Holders of Claims and Interests not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[190]  The Debtors, through their Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[191]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.  Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[192]

136.    Based on the foregoing, the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.  No party has asserted otherwise.

---

[188]    *See In re Cajun Elec. Power Co-op., Inc*., 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obligates a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[189]    *See* [Docket No. 3337].

[190]    *See id*.

[191]    *See Affidavit of Service of Solicitation Materials* [Docket No. 3514].

[192]    *See id.*

### 2.      The Debtors Complied With Section 1126 of the Bankruptcy Code.

137.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders

of allowed claims and allowed interests in impaired classes of claims or interests that will

receive or retain property under a plan on account of such claims or interests may vote to accept

or reject such plan.[193]  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)     The holder of a claim or interest allowed under section 502
> of [the Bankruptcy Code] may accept or reject a plan. . . .

> (f)     Notwithstanding any other provision of this section, a class
> that is not impaired under a plan, and each holder of a
> claim or interest of such class, are conclusively presumed
> to have accepted the plan, and solicitation of acceptances
> with respect to such class from the holders of claims or
> interests of such class is not required.

> (g)     Notwithstanding any other provision of this section, a class
> is deemed not to have accepted a plan if such plan provides
> that the claims or interests of such class do not entitle the
> holders of such claims or interests to receive or retain any
> property under the plan on account of such claims or
> interests.[194]

138.    Section 502 of the Bankruptcy Code, which is referenced in section 1126 as noted

above, provides that "(a) a claim or interest, proof of which is filed under section 501 of this title,

is deemed allowed, unless a party in interest…objects."[195]  Section 1111 of the Bankruptcy Code

further provides that:

> (a)     A proof of claim or interest is *deemed filed under section
> 501* of this title for any claim or interest that appears in the
> schedules filed under section 521(a)(1) or 1106(a)(2) of this

---

[193]   *See* 11 U.S.C. §§ 1126(a), (f), (g).

[194]   *Id.*

87

> title, except a claim or interest that is scheduled as
> disputed, contingent, or unliquidated.[196] (emphasis added)

Accordingly, as a result of the interconnections between sections 1126, 502, 501, and 1111 of the Bankruptcy Code, scheduled claims (except those scheduled as disputed, contingent, or unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed" claims.

139.    As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Voting Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14.[197]  The Debtors did not solicit votes from Holders of Claims in Classes 1, 3, and 6B because Holders of such Claims are Unimpaired and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code. The Debtors also did not solicit votes from Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17.  Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17 are deemed to reject the Plan and thus are not entitled to vote on the Plan.  Holders of Claims in Class 12 and Interests in Class 13 are either deemed to reject or presumed to accept the Plan based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.  Thus, pursuant to section 1126 of the Bankruptcy Code, only Holders of Claims in 2, 4, 5, 6A, 7, 8, 9, 10, and 14 were entitled to vote to accept or reject the Plan.

---

[195]   *See* 11 U.S.C. § 502(a).

[196]   *See* 11 U.S.C. § 1126(a).

[197]   Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), Class 6A (General Custody Claims), and Class 7 (Withhold Claims) constitute Account Holder Voting Classes.  Class 8 (Unsecured Loan Claims), Class 9 (General Unsecured Claims), Class 10 (State Regulatory Claims), and Class 14 (Series B Preferred Interests) constitute Voting Classes other than Account Holder Voting Classes.

140.    Pursuant to the Disclosure Statement Order, Holders of Account Holder Claims were entitled to vote in the amount of their Scheduled Claim unless they filed a Proof of Claim that was temporarily allowed by the Court under Bankruptcy Rule 3018(a).[198]    Holders of Account Holder Claims were required to file any motions pursuant to Bankruptcy Rule 3018(a) by the Voting Deadline.[199]    Holders of Claims in Voting Classes other than Account Holder Voting Classes were eligible to vote in the amount of their Scheduled Claims unless such Scheduled Claim was superseded by a timely filed Proof of Claim that is not subject to objection.[200]    The Class Claim Settlement Order similarly provided that each Holder would vote the scheduled amount of such Holder's Claim as authorized by the Court in accordance with the terms of the Disclosure Statement Order.[201]

141.    The Debtors requested authority to have Holders of Account Holder Claims vote in the amount of their Scheduled Claims because the Debtors and their professionals are still undergoing a claims reconciliation process and have concluded that a fair and equitable voting process is one that treats all similarly situated Account Holders equitably.[202]    Moreover, the Class Claim Settlement will obviate the need for the Debtors to reconcile the Claims of any Account Holders that do not opt out of the Class Claim Settlement.[203]    The Debtors' goal was,

---

[198]    *See* Disclosure Statement Order ¶ 22.

[199]    *See id.*, Exh. 1 4(i)(c).

[200]    *See id.*, Exh. 1 4(ii)(1)(b).

[201]    *See* Class Claim Settlement Order, Exh. A ¶ 5.

[202]    *See* Disclosure Statement Mot. ¶ 65.

[203]    As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes elected to opt out of the Class Claim Settlement.  *See* Voting Report ¶ 19.  On September 19, 2023, however, Stretto became aware that certain Holders of Class 4 (Convenience Claims) could not access the election to opt out of the Class Claim Settlement.  *Id.* ¶ 18.  Upon learning of this issue, Stretto immediately opened the ability to opt out of the Class

and remains, ensuring that all Account Holders are allowed to vote the amount of their claim equal to the amount of cryptocurrency the Debtors were obligated to return based on cryptocurrency prices on the Petition Date, rather than duplicate or excessive recoveries simply because certain Account Holders filed multiple claims, overstated the amounts that they were owed, or added claims for "fraud" or "breach of contract" when other Account Holders did not.[204] The vast majority of Account Holders did not file proofs of claim asserting "extra" damages and are relying on the Schedules as an accurate accounting of what they are owed by the Debtors.[205] In addition, no Holders of Account Holder Claims filed any motions pursuant to Bankruptcy Rule 3018(a) to request that they vote in the amount of their Proof of Claim.

142.    As a result of the interconnections between sections 1126, 502, 501, and 1111 of the Bankruptcy Code, as explained above, scheduled claims (except those scheduled as disputed, contingent, or unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed" claims. Accordingly, although Holders of Claims in Voting Classes were largely entitled to vote in the amount of their Scheduled Claim rather than their Allowed Claim, the Debtors satisfy the requirements of section 1126 of the Bankruptcy Code.

143.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least

---

Claim Settlement for Holders in Class 4 (Convenience Claims). *Id.* Moreover, on September 25, 2023, Stretto, on behalf of the Debtors, sent an electronic correspondence to all Holders of Claims in Class 4 informing them that the Debtors extended the deadline for Holders in Class 4 (Convenience Claims) eligible to make the Class Claim Settlement Opt-Out to October 9, 2023. *Id.*

[204]    *See* Disclosure Statement Mot. ¶ 65.

[205]    *Id.*

> two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

144.    As described above, the voting parties in Classes 2, 4, 5, 6A, 7, 8, 9 (at the Consolidated Debtors), 10, and 14 entitled to vote on the Plan voted to accept the Plan in sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.[206]  Specifically, 96.33% of the amount of Claims and 98.83% of the Holders of Claims in Class 2, who voted, voted to accept the Plan; 98.69% of the amount of Claims and 98.25% of the Holders of Claims in Class 4, who voted, voted to accept the Plan; 99.28% of the amount of Claims and 99.35% of the Holders of Claims in Class 5, who voted, voted to accept the Plan; 98.78% of the amount of Claims and 99.51% of the Holders of Claims in Class 6A, who voted, voted to accept the Plan; 82.56% of the amount of Claims and 98.79% of the Holders of Claims in Class 7, who voted, voted to accept the Plan; 99.56% of the amount of Claims and 74.07% of the Holders of Claims in Class 9 (at the Consolidated Debtors), who voted, voted to accept the Plan; 100% of the amount of Claims and 100% of the Holders of Claims in Class 10, who voted, voted to accept the Plan; and 98.34% of the amount of Claims and 98.34% of the Holders of Claims in Class 14, who voted, voted to accept the Plan.[207]  Voting parties in Classes 8 (Institutional Loan Claims) and Class 9 (General Unsecured Claims; at Celsius Mining LLC and Celsius Network LLC), however, voted to reject the Plan.[208]

---

[206]  *See* Voting Report ¶ 13.

[207]  *See id.*

[208]  *See id.*

145.    Based upon the foregoing, the Debtors respectfully submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

### G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (§ 1129(a)(3)).

146.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[209]    The Second Circuit has construed this good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'"[210]    Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[211]    In the context of plans of reorganization, "a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[212] The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.[213]

147.    The fundamental purpose of chapter 11 is to enable a distressed business to obtain reorganize its affairs to prevent or limit job losses and the adverse economic effects associated with disposing of assets at liquidation value.[214]    Here, the Debtors filed for chapter 11 protection

---

[209]    11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

[210]    *E.g.*, *In re Johns-Manville*, 843 F.2d at 649 (citations omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 901-07 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." (citations and quotations omitted)).

[211]    *E.g.*, *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

[212]    *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (citations omitted).

[213]    *In re Adelphia*, 368 B.R. at 247.

[214]    *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start" (citations omitted)).

following the most tumultuous period for the cryptocurrency industry, and chapter 11 protection provided them with the "breathing spell" they needed to address structural and regulatory issues and weather out the "crypto winter." The Plan that has been proposed allows the Debtors the axiomatic "fresh start" by providing a comprehensive restructuring that both (i) returns significant value to creditors on the Effective Date and (ii) seeks to capitalize on the long-term promise of cryptocurrency.

148.    The Plan is the culmination of more than a year of comprehensive efforts to resolve key legal questions—including questions of first impression with respect to cryptocurrency—before the Court and through consensual resolutions with key stakeholders. *First*, in December 2022, the Debtors held two separate trials with respect to Custody and Withhold issues and the Earn Program. With respect to the Custody and Withhold issues, the Court found that the assets in the Custody Accounts were property of the Account Holders. The Court did not determine who owned the assets associated with Withhold Accounts. Finally, the Court found that, regardless of who owns the assets associated with the Custody Accounts and the Withhold Accounts, the Debtors could maintain possession of those assets pending resolution of any Avoidance Actions. After these rulings were issued, the Debtors entered into the Custody Settlement and the Withhold Settlement, which are embodied in the treatment provided to Holders of Custody Claims and Holders of Withhold Claims under the Plan. With respect to the Earn ownership issues, the Court found that the assets transferred onto the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' Estates and granted the Debtors the authority to sell stablecoins.

149.    *Second*, the Plan also reflects numerous consensual settlements with the Debtors' other creditors that were reached after extensive arm's-length negotiations among the Debtors,

the Committee, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, certain individual creditors, and the Series B Holders.  These settlements fully resolve all issues between the non-Debtor parties and the Debtors relating to the Plan.

150.    The numerous settlements embodied in the Plan are compelling evidence of the Debtors' good faith in reaching consensual resolutions throughout these Chapter 11 Cases.  The good faith requirement does not require a debtor "to negotiate with all parties in interest at all times during a bankruptcy case."[215]  Rather, "a debtor need[s] to prioritize how it deals with its constituents."[216]  In light of the settlements the Debtors reached with key stakeholders over the course of the last year, the Plan "has all the hallmarks of good faith in that those who are actually in the money have made substantial concessions from their rights under the bankruptcy code."[217]

151.    ***Third***, all of the Classes of Account Holder Claims have overwhelmingly voted to accept the Plan.[218]  This is a reflection of Account Holders' belief that the Plan has a proper purpose and that they are excited by the potential of the NewCo Transaction to provide upside with respect to cryptocurrency.  The overwhelming support also shows that the Debtors have gained Account Holders' trust, even though these Chapter 11 Cases have sometimes been contentious.

---

[215]    *See In re Windstream Holdings, Inc.*, No. 19-22312 (RDD), 6/25/2020 Hr'g Tr. at 106: 23–25.

[216]    *See id.* at 107: 3–4.

[217]    *See id.* at 108: 7–10.

[218]    *See* Voting Report ¶ 13.

152.    Finally, as set forth herein, the Plan complies with the Bankruptcy Code and applicable nonbankruptcy law.   Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.[219]

**H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

153.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan be subject to approval by the bankruptcy court as reasonable.[220]   Courts have construed this section to require that all payments of claims to professionals, similar to the Professional Fee Claims here, paid out of estate assets be subject to review and approval by the court as to their reasonableness.[221]

154.    Here, all payments made or to be made by the Debtors for services rendered and expenses incurred during the Chapter 11 Cases (*i.e.*, all Professional Fee Claims) are subject to approval by the Court as reasonable.  In addition, Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than forty-five (45) days after the Effective Date.   After notice and a hearing, in accordance with the procedures established by the Bankruptcy Code and prior Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Court.[222]   Accordingly, the Plan fully

---

[219]    *See* Ferraro Decl. ¶ 33.

[220]    11 U.S.C. § 1129(a)(4).

[221]    *See, e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *In re Drexel*, 138 B.R. at 760.

[222]    *See id.*

complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.[223]

I.    **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

155.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.[224]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[225]  Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[226]  Article IV.D.7 of the Plan, the Plan Supplement, and the New Organizational Documents provide information about the NewCo Board and the mechanism for how such members will be chosen.  After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

156.    Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.[227]

---

[223]    *See* Ferraro Decl. ¶ 34.

[224]    11 U.S.C. § 1129(a)(5)(A)(i).

[225]    11 U.S.C. § 1129(a)(5)(B).

[226]    11 U.S.C. § 1129(a)(5)(A)(ii).

[227]    *See* Campagna Decl. ¶¶ 38–39.

**J.     The Plan Does Not Require the Approval of a Governmental Regulatory Commission (§ 1129(a)(6))**.

157.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.[228]    No such regulatory commission exists here.   Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

**K.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7))**.

158.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)     each holder of a claim or interest of such class—
>
>> (i)     has accepted the plan; or
>>
>> (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[229]

159.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's

---

[228]    11 U.S.C. § 1129(a)(6).

[229]    11 U.S.C. § 1129(a)(7)(A).  *See also In re Adelphia*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

estate against the estimated recoveries under that debtor's plan of reorganization.[230] As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.

160.    As set forth in the Disclosure Statement[231] and the Campagna Declaration, the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan (the "Liquidation Analysis").[232]    The projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims and Interests in all Classes are as follows:

| Class No. | Claim or Interest | Status | Voting Rights | Estimated NewCo Transaction Recovery Under Plan | Projected Orderly Wind Down Recovery Under the Plan | Estimated Recovery Under Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| Class 2 | Retail Borrower Deposit | | | | | |

---

[230]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) of the Bankruptcy Code is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[231]    *See generally* Disclosure Statement, Exh. B.

[232]    *See* Campagna Decl. ¶ 56.

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Claims** | Impaired | Entitled to Vote | 85.6% | 83.0% | 47.4% |
| **Class 3** | **Other Priority Claims** | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| **Class 4** | **Convenience Claims** | Impaired | Entitled to Vote | 70% | 70% | N/A |
| **Class 5** | **General Earn Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| **Class 6A** | **General Custody Claims**[233] | Impaired | Entitled to Vote | 72.5% | 72.5% | 72.5% |
| **Class 6B** | **Withdrawable Custody Claims** | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100.0% | 100.0% | 100.0% |
| **Class 7** | **Withhold Claims**[234] | Impaired | Entitled to Vote | 72.0% | 67.1% | 47.4% |
| **Class 8** | **Unsecured Loan Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| **Class 9** | **General Unsecured Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 37.5% |
| **Class 10** | **State Regulatory Claims** | Impaired | Entitled to Vote | [0%] | [0%] | [0%] |
| **Class 11** | ***De Minimis* Claims** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| **Class 12** | **Intercompany Claims** | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | 47.3% |
| **Class 13** | **Intercompany Interests** | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | N/A |
| **Class 14** | **Series B Preferred Interests** | Impaired | Entitled to Vote | 0.1% | 0.1% | 0.1% |
| **Class 15** | **Other Interests** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| **Class 16** | **Section 510(b) Claims**[235] | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | N/A |
| **Class 17** | **Equitably Subordinated Claims** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |

---

[233] Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

[234] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

[235] The Confirmation Order will provide that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any. The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims. The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

161.    The Pharos Objection asserts that the Debtors have not met the burden required by section 1129(a)(7)(A)(ii).  Pharos holds approximately $82 million of Claims, or 94% of the total value of Claims, in Class 8 (Unsecured Loan Claims).[236]  Class 8 voted to reject the Plan.[237] Pharos asserts that the Debtors "have provided no evidence demonstrating that the value of the shares in the 'NewCo' exceed the value of the assets that would be distributed in chapter 7" and that the Liquidation Analysis "appears to assign far greater value to assets in the 'Orderly Wind Down' scenario than in a chapter 7 liquidation, even though there is no principled distinction between the two."[238]  Pharos' arguments in support of this allegation fail for the reasons set forth below.

162.    *First*, Pharos' argument that its projected recoveries under the Plan are not as much as or greater than its projected recoveries under a hypothetical chapter 7 liquidation is plainly incorrect as set forth in the calculation of recoveries included in the Disclosure Statement.[239]  Pharos asserts that "[t]he Debtors have provided no evidence to date supporting the value of the 'NewCo Common Stock Recovery,'" and, therefore, there is no basis to the

---

[236]    *See* Pharos Obj. ¶ 1.

[237]    *See* Voting Report ¶ 13.

[238]    *See* Pharos Obj. ¶ 2.

[239]    It should be noted that Pharos also appears to misunderstand or misread the Debtors' projected recoveries. Pharos asserts that "the Debtors indicate that 6.5%–12.5% more liquid cryptocurrency would be distributed in a chapter 7 liquidation (44%–50%) than under a 'NewCo Transaction' (37.5%)" and that it therefore "follows that the Debtors can only meet their burden under section 1129(a)(7)(A)(ii) if the value of the 'NewCo Common Stock Recovery' exceeds this delta."  *See* Pharos Obj.  ¶ 17. The Debtors have made clear, however, that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.  *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash.").  The 44%–50% figure quoted by Pharos references the total estimated recovery for Unsecured Loan Claims in a chapter 7 liquidation, which would be in cash.  *See* Disclosure Statement, Exh. B at 7.

projected recoveries under the NewCo Transaction as compared to chapter 7 liquidation.[240]  The Debtors' Disclosure Statement illustrates in the preliminary statement that creditor recoveries under the NewCo Transaction—including on account of NewCo Common Stock—are based on the net asset value of NewCo, which is approximated to be $1.248 billion and consists of the following components:  $450 million of cryptocurrency that will "seed" NewCo; Mining;[241] and certain illiquid assets.  Notably, the Debtors and their advisors conducted a valuation of Mining, which was found to have a midpoint valuation of $565 million, as well as their illiquid assets, which were valued at $283 million—and these valuations were explained in detail in the Disclosure Statement.[242]  Similarly, Pharos' underlying sentiment—that NewCo is worthless and therefore cannot provide any real value to creditors—is flatly wrong.  NewCo has material value and the potential to become a formidable industry player right out of the gate:  it is being seeded with $450 million of cryptocurrency while not taking on any debt *and* it will receive the benefit of a business line (Mining) that has generated over $20 million of cash flow during the Debtors' time in bankruptcy and amid a prolonged industry downturn.[243]

163.    ***Second***, Pharos' argument that "there is no principled distinction between" the Orderly Wind Down and chapter 7 liquidation is wholly misguided.  Considering the information and analysis provided about the Orderly Wind Down in the Plan and the Disclosure Statement,

---

[240]    *See* Pharos Obj. ¶ 2.

[241]    "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd.  *See* Plan, Art. I.A.158.

[242]    *See* Disclosure Statement, Art. II.B.2; *see also* Disclosure Statement, Exh. D (the Mining Valuation Analysis); Kielty Decl. ¶¶ 11–12.  The valuation of the illiquid assets factored into the Liquidation Analysis and the Orderly Wind Down as well.  *See* Disclosure Statement, Exh. B–C.

[243]    *See* Ferraro Decl. ¶ 4.

there can be no serious argument that the two scenarios are not distinct—or that the Orderly Wind Down will not provide higher recoveries. As an initial matter, the Orderly Wind Down is expected to generate higher recoveries than a chapter 7 liquidation because the Orderly Wind Down, also known as the Backup Plan Sponsor Transaction, will include the creation of a Backup MiningCo, a pure play, publicly traded mining business that will own the assets of Mining[244] and in which creditors will receive 100% of the equity interests, with a potential management contract with GXD Labs LLC or other manager identified by the Debtors and the Committee.[245] Notably, the Debtors still have the option of selecting a different Backup Plan Sponsor and negotiating a new Backup Plan Sponsor Agreement—as long as those terms provide the same or higher recoveries than the currently contemplated Backup Plan Sponsor Transaction with the BRIC.[246] Accordingly, recoveries under the Orderly Wind Down will include more than just the proceeds to be derived from the liquidation of assets.[247] In contrast, recoveries under a chapter 7 liquidation consist purely of the proceeds to be derived from liquidation of assets.[248]

164. Next, recoveries under the Orderly Wind Down are credibly higher than under a chapter 7 liquidation because the Orderly Wind Down is envisioned to be a methodical liquidation of assets that takes place over a longer period than would a chapter 7 liquidation and

---

[244] "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd. *See* Plan, Art. I.A.158.

[245] *See generally* Disclosure Statement, Exh. C.

[246] *See id.*, Art. II.B.2.

[247] *See id.*, Art. II.B.2.

[248] *See id.*, Exh. B at 2.

which will be conducted by the Plan Administrator, who will likely be Christopher Ferraro,[249] the

Debtors' interim chief executive officer, chief financial officer, and chief restructuring officer,

and the Backup Plan Sponsor, presently the BRIC Parties.[250]    The Orderly Wind Down is

estimated to take approximately five years (or possibly even longer), whereas a chapter 7

liquidation is expected to be complete in approximately six months.[251]    Pharos nonetheless

argues that a chapter 7 trustee could achieve the same results as the Plan Administrator in the

Orderly Wind Down by "request[ing] the authority to operate a business of a debtor for a limited

period of time so that it can realize any additional value from assets that may be sold as a going

concern."[252]    To be clear, the only part of the Debtors' business that would be operational in a

chapter 7 liquidation is Mining, and it is highly unlikely that a chapter 7 trustee would have the

familiarity and technical expertise necessary to keep that business operational, let alone

profitable, while conducting the chapter 7 liquidation process.    Moreover, the chapter 7 trustee

would likely be someone completely unfamiliar with the Debtors, their business, or the

cryptocurrency industry, which are also complex and multifaceted.    In contrast, the Plan

Administrator, Christopher Ferraro (who has shepherded the Debtors through the Chapter 11

Cases), and the Backup Plan Sponsor (the BRIC Parties), have an impressive combination of

industry expertise and knowledge of the Debtors' business which cannot but help ensure that the

monetization of assets in the Orderly Wind Down captures the highest value possible.

---

[249]    *See* Fourth Plan Supp., Exh. I (including the Plan Administrator Agreement).

[250]    The BRIC Parties are the Blockchain Recovery Investment Consortium and the BRIC Support Parties, which are parties designated by the BRIC and agreed by the Debtors and the Committee to work with the BRIC to implement the Backup Plan Sponsor Transaction, presently contemplated to be:  (i) Gemini Trust Company, LLC and (ii) Global X Digital, LLC, or an affiliate thereof.  *See* Plan, Art. I.A.30–31.

[251]    *See* Disclosure Statement, Art. II, Exh. B at 2–3.

[252]    *See* Pharos Obj. ¶ 19.

Therefore, it is reasonable that the Plan Administrator and Backup Plan Sponsor would be able to monetize assets at or near market values, whereas a chapter 7 trustee would not. Accordingly, Pharos' objection that the Debtors' projected realization for assets such as the Institutional Loans receivable, various investments, and mining assets in the Orderly Wind Down is too high compared to the projected realization in a chapter 7 liquidation should be overruled.[253]

165.   Finally, the Orderly Wind Down is distinct from a chapter 7 liquidation—and provides higher and better recoveries to creditors than a chapter 7 liquidation—because the Orderly Wind Down contemplates the preservation and distribution of Liquid Cryptocurrency to creditors, which the Debtors recognized as a crucial concern for creditors from the outset of these Chapter 11 Cases,[254] whereas a chapter 7 trustee would be charged with monetizing assets and making distributions in cash.[255]   As noted above, the Debtors have made clear that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.[256]   Accordingly, because it addresses creditors' long-standing wishes to receive distributions in cryptocurrency, the Orderly Wind Down is preferable to a chapter 7 liquidation.

---

[253]   *See* Pharos Obj. ¶¶ 18(a)–(c) for Pharos' complaints respecting the difference between projected realization of those assets under the Orderly Wind Down versus chapter 7 liquidation.

[254]   *See* July 18 Hr'g Tr. 15:18–25, 16:1–2 ("Certainly, undoubtedly, some percentage of [our customers], some number of them, will be interested in getting a recovery in U.S. dollars or other fiat currency…But we definitely expect that the majority are going to be interested in, you know, riding out what you've heard referred to as this crypto winter, remaining long crypto, having the opportunity to realize their recovery through and appreciation in the macro crypto market or environment").

[255]   11 U.S.C. § 726.

[256]   *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash").

166.    Additionally, all Holders of Claims entitled to vote on the Plan have received the

Liquidation Analysis (attached as <u>Exhibit B</u> to the Disclosure Statement) and have been provided

ample time to consider the contents thereof.  Accordingly, the Debtors respectfully submit that

the Plan complies with section 1129(a)(7) of the Bankruptcy Code.[257]

**L.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code.**

167.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests must either accept a plan or be unimpaired under a plan.[258]  If any class of claims or

interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the

claims or interests in that class.[259]

168.    Here, the Plan satisfies either the voting requirements or the cramdown

requirements with respect to nearly all Classes.  The Impaired Voting Classes of Claims and

Interests under the Plan in Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience

Claims), Class 5 (General Earn Claims), and Class 6A (General Custody Claims), Class 7

(Withhold Claims), Class 9 (General Unsecured Claims; at the Consolidated Debtors); Class 10

(State Regulatory Claims), Class 14 (Series B Preferred Interests) voted to accept the Plan.  Class

1 (Other Secured Claims), Class 3 (Other Priority Claims), Class 6B (Withdrawable Custody

Claims) are Unimpaired and are presumed to accept the Plan.  Class 12 (Intercompany Claims)

and Class 13 (Intercompany Interests) are deemed to accept or reject and are proponents of the

Plan.  Such Intercompany Claims shall be Reinstated or set off, settled, addressed, distributed,

---

[257]  *Id*.

[258]  11 U.S.C. § 1129(a)(8).

[259]  11 U.S.C. § 1129(b).

addressed, converted to equity, contributed, cancelled, or released and such Intercompany Interests shall be Reinstated or set off, settled, addressed, distributed, contributed, merged, cancelled, or released consistent with the Transactions Steps Memorandum on or before the Effective Date by the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable.  Class 8 (Unsecured Loan Claims) voted to reject the Plan, and Class 9 (General Unsecured Creditors) voted to reject the Plan at Celsius Mining LLC and Celsius Network Inc. (Class 9 voted to accept at the Consolidated Debtors).  Finally, Class 11 (*De Minimis* Claims), Class 15 (Other Interests), Class 16 (Section 510(b) Claims), and Class 17 (Equitably Subordinated Claims) are deemed to reject the Plan.  Notwithstanding those Classes that rejected the Plan or were deemed to reject the Plan, as discussed below, the Plan satisfies the cramdown requirements of section 1129(b) with respect to these Classes.

169.    Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the "cramdown" requirements of the Bankruptcy Code.[260]

**M.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9))**.

170.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments unless such holders agree to different treatment for such claim. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to

---

[260]    *See* Campagna Decl. ¶ 42.

the allowed amount of such claims.[261]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[262]  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[263]

171.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because Article II.A of the Plan provides that each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably practicable thereafter, or at such other time as provided in Article II.A of the Plan.

172.    ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[264]  ***Finally***, the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because Articles II.C

---

[261]    11 U.S.C. § 1129(a)(9)(A).

[262]    11 U.S.C. § 1129(a)(9)(B).

[263]    11 U.S.C. § 1129(a)(9)(C).

[264]    *See* Plan, Art. III.B.

and III.B of the Plan specifically provide that Holders of Allowed Priority Tax Claims or Allowed Other Priority Claims, respectively, shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee. Thus, the Debtors respectfully submit that the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.[265]

### N. At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

173.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider" as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[266]

174.    As set forth above, Holders of Claims in Classes 2, 4, 5, 6A, 7, 9 (at the Consolidated Debtors), and 10—which are Impaired Classes under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes.[267]    Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.[268]

---

[265]    *See* Campagna Decl. ¶ 43.

[266]    11 U.S.C. § 1129(a)(10).

[267]    *See* Voting Report, Exh. A.

[268]    *See* Campagna Decl. ¶ 44.

**O.      The Plan Is Feasible (§ 1129(a)(11))**.

175.      Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[269]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; rather, a debtor must demonstrate a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization.[270]  Feasibility cannot be defeated by "speculative prospects of failure" or the "mere prospect of financial uncertainty."[271]  As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

176.      In determining standards of feasibility, courts in this jurisdiction and others have identified the following probative factors:

      a.      the adequacy of the capital structure;

      b.      the earning power of the business;

      c.      the economic conditions;

---

[269] 11 U.S.C. § 1129(a)(11).

[270] *See In re Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required." (citation omitted)); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*), 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable." (citation omitted)).

[271] *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

      d.     the ability of management;

      e.     the probability of the continuation of the same management; and

      f.     any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[272]

These factors "are neither exhaustive nor exclusive" as the determination is "fact intensive" and made on a "case by case" basis.[273]

177.    The Restructuring Transactions contemplated by the Plan have been described in detail elsewhere in this Memorandum.  In short, the Plan provides for the NewCo Transaction and, if the NewCo transaction cannot be completed, the option for the Debtors to pivot to the Orderly Wind Down.  The Debtors have structured the Restructuring Transactions to ensure that in either scenario, liquidation or the further reorganization not contemplated by the Plan is highly unlikely.  For the following reasons, the Plan is feasible as required by section 1129(a)(11).

178.    ***First***, as set forth in the Ferraro Declaration, NewCo will be well capitalized and will carry zero debt.[274]  As part of the Plan, the Debtors will seed NewCo with $450 million in Liquid Cryptocurrency free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date.[275]  Thus, NewCo's capital structure will be more than adequate to meet NewCo's Plan obligations.

---

[272]    *See, e.g.*, *In re WorldCom*, 2003 WL 23861928, at *58; *Texaco*, 84 B.R. at 910; *Drexel Burnham*., Inc., 138 B.R. at 762–63; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

[273]    *In re Young Broad. Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010).

[274]    *See* Ferraro Decl. ¶ 37.

[275]    *See id.*

179.    **Second**, with respect to the viability of the Debtors' reorganized mining business, which will be a central feature for both NewCo under the NewCo Transaction and the pure play, publicly traded mining business in the Orderly Wind Down, the Debtors prepared Financial Projections for Mining's financial performance for the fiscal years ending September 30, 2024 through September 30, 2028, which were attached to the Disclosure Statement as <u>Exhibit E</u>.[276] The Debtors and their advisors thoroughly analyzed the Financial Projections and the mining business's ability to meet post-Confirmation Plan obligations and to continue as a go-forward business.    As set forth in the Ferraro Declaration, the Debtors believe that these Financial Projections demonstrate the Debtors' ability to meet their obligations under the Plan and to have a viable reorganized business going forward.[277]

180.    Additionally, as set forth in the Ferraro Declaration, despite numerous challenges facing the Debtors' mining business at the Petition Date, including fluctuating market conditions and the rejection of the Core hosting contract and defaults by counterparties, the Debtors' mining business has had positive cash flow since the Petition Date.[278]    Since the Petition Date, the mining business's adjusted EBITDA on an unaudited basis since the Petition Date is approximately $24.3 million.[279]    Thus, even during an extremely tumultuous period, the Debtors' mining business did not lose money.

181.    In fact, the Debtors' mining business has done more than just avoid losing money—it has led to significant positive cash flows.    The Debtors found new hosting providers

---

[276]    *See id.* ¶ 38.

[277]    *See id.*; *see also* Fahrenheit Decl. ¶ 16.

[278]    *See* Ferraro Decl. ¶ 39.

[279]    *Id.*

and moved towards hosting their own rigs through their own proprietary sites.[280]  Based on these improvements, the Debtors' have generated over $20 million of operating cash flow since the Petition Date, even during a tumultuous period for the Bitcoin mining industry generally.[281] Further, the Debtors have improved the adjusted gross margin of the mining business through a fixed power priced hedge, new hosting agreements with improved economics, and new software on their rigs to improve efficiency.[282]

182.    ***Third***, the Debtors' Auction was highly competitive (and had to be extended repeatedly as a result) and the Debtors were able to attract multiple strategic Bids from sophisticated investors and industry professionals.[283]  Further, all of the proposals the Debtors received during the month-long Auction—those proposed by the current Plan Sponsor (the Fahrenheit Group), the former Plan Sponsor and Stalking Horse Bidder (NovaWulf), and the current Backup Plan Sponsor (the BRIC)—are anchored by the reorganized mining business, indicating a consensus among these sophisticated parties regarding not just the feasibility, but also the long-term profitability, of mining.  As this Court has done previously, the Court here should look positively on the Debtors' ability to attract strategic proposals and attention for their assets.[284]  Notably, NewCo will be directed and managed by sophisticated crypto-natives and

---

[280]    *Id.* ¶ 40; *see also* Fahrenheit Decl. ¶ 16.

[281]    *See* Ferraro Decl. ¶ 43.

[282]    *See id.* ¶ 42.

[283]    *See* Kielty Decl. ¶¶ 8–9.

[284]    *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 194 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010) (finding that a revenue-less debtor's reorganization plan was feasible when their FCC authorization was highly valuable and likely to appeal to a strategic partner to fund capital expenditures); Disclosure Statement, Art. VII.M.3 (describing the whole-company sale process and the Auction).

business professionals who have significant experience with mining, the cryptocurrency market, and corporate governance.[285]

183.    *Fourth*, the Debtors have included extensive disclosure about the risks of NewCo in the Disclosure Statement, including risks that the Debtors may toggle to the Orderly Wind Down, the NewCo may not be able to achieve the projected financial results, certain regulatory approval may not be granted, a liquid trading market for the NewCo Common Stock may not develop and may result in a depressed or volatile trading price, and the mining business is subject to the volatility of Bitcoin prices, utility prices, and rapidly changing technology.   In other words, this is not a case where the debtors are imagining an "overnight reversal of fortune" or otherwise not "consider[ing] the present and future nature of the industry"—which can be fatal to feasibility in this district.[286]   Importantly, despite the risks the Debtors enumerated, the majority of creditors have overwhelmingly voted to accept the Plan, indicating their confidence in the go-forward value of the NewCo.   Thorough disclosure of risks, coupled with support by creditors, are factors calling for the confirmation of a plan.[287]

---

[285]   *See Third Plan Supp.* [Docket No. 3444], Exh. B (introducing the members of the board of directors of NewCo); Disclosure Statement, Exh. F at 20 (introducing the managers of NewCo); *see also* Ferraro Decl. ¶ 40; *see also* Fahrenheit Decl. ¶¶ 11-13.

[286]   *See, e.g.*, *Prudential Energy Co.*, 58 B.R. at 863.   There, court found a debtor did not meet the feasibility standard when the plan imagined "an overnight reversal of fortune" as the debtor had been experiencing decreasing levels of investment in oil and gas projects prior to the bankruptcy and had no confirmed investments exiting bankruptcy.   The court further noted that the debtors could not rely on "past experience" as "a valid barometer of future performance" and should have considered these macro effects in developing their plan.   *Id.*

[287]   *See In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (confirming a plan "when [the] debtors fully and fairly disclosed the risks associated with variances from projections, the lack of a trading market for the shares, the leveraged condition of [NewCo], the competitive conditions in the industry, and certain tax matters associated with the plan" and the debtors enjoyed "[t]he overwhelming support of the creditors, garnered after their professionals reviewed the debtors' projections" which "len[t] credence to the debtors' belief in the feasibility of the plan."); *see also In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (finding that "the best indicator of feasibility is the position of the creditors whose economic interests are at stake").

184.    *Fifth*, with respect to the viability of the Orderly Wind Down, the Debtors prepared the Orderly Wind Down Analysis, attached to the Disclosure statement as <u>Exhibit C</u>, utilizing the Valuation Report, input from the Debtors' management team and advisors, and projected results of operations and cash flows in the period from May 31, 2023 to the assumed Wind Down Date.  The Orderly Wind Down Analysis demonstrates the Debtors' ability to meet their obligations under the Plan even in the event of a toggle to the Orderly Wind Down.

185.    Thus, the Debtors respectfully submit that the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**P.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

186.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 of the United States Code, as determined by the court at the hearing on confirmation of the plan."[288]    Article II.D of the Plan provides that the Debtors and the Post-Effective Date Debtors, as applicable, shall pay all fees and charges due, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or the Post-Effective Date Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  On and after the Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.    Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.[289]

**Q.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)).**

---

[288]    11 U.S.C. § 1129(a)(12); *see also* 28 U.S.C. § 1930.

[289]    *See* Campagna Decl. ¶ 45.

187.    Section 1129(a)(13) of the Bankruptcy Code requires all retiree benefits to continue post-confirmation in accordance with section 1114 of the Bankruptcy Code.  To the best of the Debtors' knowledge and belief, they do not have any retiree benefit obligations.  Out of an abundance of caution, Article IV.P of the Plan provides that, from and after the Effective Date, all retiree benefits as defined in section 1114 of the Bankruptcy Code will continue in the ordinary course in accordance with applicable law.  Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.[290]

**R.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan**.

188.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[291]  Because the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[292]  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply. Finally, each of the Debtors are a commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any

---

[290]    *See id*. ¶ 46.

[291]    *See* 11 U.S.C. § 1129(a)(14).

[292]    11 U.S.C. § 1129(a)(15).

applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.[293]

Accordingly, the Debtors respectfully submit that the Plan is not subject to the requirements of

sections 1129(a)(14)–(16) of the Bankruptcy Code, and no party has asserted otherwise.

**S.      The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the Bankruptcy Code.**

189.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable

requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a

plan may be confirmed so long as the requirements set forth in section 1129(b) of the

Bankruptcy Code are satisfied.[294]   To confirm a plan that has not been accepted by all impaired

classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent

must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect

to the non-accepting impaired classes.[295]

190.    As explained herein, the Debtors respectfully submit that the Plan does not

"discriminate unfairly" and is "fair and equitable."

**1.      The Plan Does Not Unfairly Discriminate with Respect to Rejecting Classes (§ 1129(b)(1)).**

191.    The Plan does not discriminate unfairly with respect to the impaired classes that

have rejected the Plan.   Although the Bankruptcy Code does not provide a standard for

determining when "unfair discrimination" exists, courts typically examine the facts and

circumstances of the particular case to make the determination.[296]   The purpose underlying the

---

[293]   11 U.S.C. § 1129(a)(16).

[294]   *See* 11 U.S.C. § 1129(b).

[295]   *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. at 105 (explaining that "[w]here a class of
creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan
if it 'does not discriminate unfairly and is fair and equitable'").

[296]   *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*,
*Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a

116

unfair discrimination requirement is to "ensure[ ] that a dissenting class will receive value equal to the value given to all other similarly situated classes."[297]  Thus, courts have adopted various tests in order to determine whether discrimination between classes of claimants is "unfair."[298]

192.    Generally, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similarly situated claims receive materially different treatment without a reasonable basis for the disparate treatment.[299]  A plan does not unfairly discriminate where it provides different treatment to two or more classes that are comprised of dissimilar claims or interests.[300]  Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[301]  In this regard, the caselaw recognizes that, by its terms, section

---

*Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[297]    *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988); *accord In re SunEdison, Inc.*, 575 B.R. 220 (Bankr. S.D.N.Y. 2017); *In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011).

[298]    *In re Sea Trail Corp.*, No. 11-07370-8, 2012 WL 5247175, at *7 (Bankr. E.D.N.C. Oct. 23, 2012) ("Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1). . . . These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.").

[299]    *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination . . . .").

[300]    *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom.*, 843 F.2d 636 (2d Cir. 1988).

[301]    *In re Aztec Co.*, 107 B.R. at 590.

1129(b)(1) of the Bankruptcy Code makes clear that not all "discrimination" is impermissible—only unfair discrimination.[302]

193.    Courts in this Circuit consider four factors in determining whether to permit the separate treatment of claims:  (a) whether there is a reasonable basis for discrimination; (b) whether the debtor can consummate the plan without the discrimination; (c) whether the discrimination is proposed in good faith; and (d) whether the degree of discrimination is proportional to its rationale.[303]  In construing the test, leading courts and commentators have concluded that the "test boils down to whether the proposed discrimination has a reasonable basis and is necessary for reorganization."[304]

194.    Here, the Plan's treatment of the Impaired Classes that have rejected the Plan, are deemed to reject the Plan, or may be deemed to reject the Plan is proper because the Plan's overall classification scheme rests on a legally acceptable rationale and all similarly situated Claims and Interests will receive substantially similar treatment.  Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.

195.    No unfair discrimination exists as to Impaired Class 8 (Unsecured Loan Claims) and Class 9 (General Unsecured Claims) that have rejected the Plan.  Holders of Claims in

---

[302]    *See In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 758] Hr'g Tr. 118:4–7 ("Clearly, one of the areas of flexibility that Congress provided in Chapter 11 is the unfair discrimination test of 1129, recognizing implicitly in the plain language that some forms of discrimination are fair.").

[303]    *In re Genco Shipping*, 513 B.R. at 242–43 (collecting cases); *Buttonwood*, 111 B.R. at 63.

[304]    *In re Breitburn Energy Partners LP*, 582 B.R. 321, 351 (Bankr. S.D.N.Y. 2018) (citing 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.03[3][a], at 1129–66); *In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No 758] Hr'g Tr. 112:21-23 (interpreting the *Buttonwood* test as providing a "reminder[] to the fact finder to focus his or her inquiry on the reasonable basis for discriminating").

Classes 8 and 9[305] are receiving the same or a very similar recovery as the other Holders of unsecured Claims, in particular Holders of Claims in Class 5 (General Earn Claims). Under either the NewCo Transaction or the Orderly Wind Down, Holders of Claims in Classes 8 and 9 will receive the exact same recovery as Holders of Claims in Class 5—67% and 61.2%, respectively.

196. Further, Holders of Claims in Classes 8 and 9 will receive almost the same recovery as Holders of Convenience Claims in Class 4, which are receiving 70%. The Claims in the Convenience Class, while consisting of Account Holder Claims, are distinct from the unsecured Claims in Classes 8 and 9 because Class 4 was created for administrative convenience and also provides other Account Holders the ability to opt into the same treatment as Holders of Claims in the Convenience Class if such Account Holders want to reduce the aggregate value of their Claim to $5,000 in exchange for the same 70% recovery.

197. Claims in Classes 8 and 9 are different than General Custody Claims in Class 6A, Withhold Claims in Class 7, and Retail Borrower Deposit Claims in Class 2. General Custody Claims are receiving 72.5% recovery because assets in Custody Accounts are subject to unique Terms of Use and the Court has already ruled that the assets in Custody Accounts belong to Account Holders. Moreover, the Court previously approved the Custody Settlement, which provided that Holders of General Custody Claims would receive the same opportunity to participate in the Custody Settlement under the Plan. In addition, Withhold Claims are receiving 72% in the NewCo Transaction and 67.1% in the Orderly Wind Down because assets in Withhold Account present a unique issue, were not subject to any Terms of Use, and have been

---

[305] Classes 8 and 9 are receiving the exact same recovery—67% under the NewCo Transaction and 61.2% under the Orderly Wind Down.

litigated and negotiated at length throughout these Chapter 11 Cases, culminating in the Withhold Settlement that was approved by the Court, which also provided that non-settling Holders of Withhold Claims would have the opportunity to participate in the Withhold Settlement under the Plan.

198.    Finally, Retail Borrower Deposit Claims in Class 2 are receiving a different recovery than Claims in Classes 8 and 9 because Retail Borrower Deposit Claims, though unsecured, have different legal rights from other unsecured Claims in that they are subject to the Loan Terms and Conditions.  Those Loan Terms and Conditions provide the Debtors the right to set off Retail Borrowers' obligations.  Accordingly, Class 2 is projected to receive a recovery of 85.6% under the NewCo Transaction or 83% under the Orderly Wind Down on account of these setoff rights.  Notably, however, the total percentage of recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.  In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or a 67% recovery on their Retail Borrower Post-Set Off Deposit Claim.  The proposed recovery for Retail Borrower Post-Set Off Deposit Claims is the same as the proposed recovery for Claims in Classes 8 and 9. As with Custody Claims and Withhold Claims, the treatment of Retail Borrower Deposit Claims was heavily negotiated throughout the Chapter 11 Cases, culminating in the Retail Borrower Settlement following a three-day mediation between the Retail Borrower Ad Hoc Group, the Debtors, the Committee, the Earn Ad Hoc Group, and certain individual creditors.

199.    Neither does unfair discrimination exist between the Classes of Account Holder Claims that are Impaired, entitled to vote, and can expect to receive a recovery, and *De Minimis* Claims in Class 11, which are Impaired, deemed to reject, and will receive no recovery. *De Minimis* Claims are Account Holder Claims with an aggregate value equal to or less than $10.00. *De Minimis* Claims are classified separately because of the significant administrative convenience involved in grouping together all such Claims. Further, *De Minimis* Claims are not receiving a recovery because in most cases, the cost associated with making distributions on account of these Claims would be higher than the distributions to which such Claims would be entitled. This is consistent with the Debtors' previous treatment of other "de minimis" claims. For example, the Custody Withdrawal Order, which authorized the Debtors to reopen withdrawals for Custody Settlement participants, also authorized the Debtors to not permit withdrawals where the account balance was not sufficient to satisfy gas fees or transaction costs necessary to make the distribution itself.[306] Moreover, although Holders of *De Minimis* Claims were not entitled to vote, the releases under the Plan only apply to those Holders if they affirmatively opted into them.

200.    Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given that their legal character is distinctly different from all other Claims and Interests. The Debtors separately classified Class 12 (Intercompany Claims) from other unsecured claims and Class 13 (Intercompany Interests) from other interests based on ownership in the Plan and to preserve the option to either Reinstate, compromise, or cancel these Claims and Interests. Such treatment will allow the Debtors greater flexibility when they are

---

[306] *See* Custody Withdrawal Order ¶ 4.

implementing the Restructuring Transactions. Significantly, the optionality with respect to Intercompany Claims and Intercompany Interests does not affect the stakeholders' recovery under the Plan and is intended for only administrative convenience in the restructuring process. Reinstatement is merely a technical preservation of Claims and Interests necessary to preserve the Debtors' corporate structure, does not have any economic substance, and does not enable any junior creditor or interest holder to retain or recover any value under the Plan.[307]

201.    With respect to Class 16 Section 510(b) Claims, the Debtors formed Class 16 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code. The Plan's treatment of Class 16 is proper because no similarly situated class will receive more favorable treatment. Further, section 510(b) of the Bankruptcy Code requires the subordination of any claim that (a) arises from the cancellation of a purchase or sale of a "security" in a debtor or a debtor's affiliate, (b) seeks damages arising from the purchase or sale of such a security, or (c) seeks reimbursement or contribution on account of a claim otherwise allowed under the Bankruptcy Code. Here, the classification of Class 16 comports with section 510(b) because the Section 510(b) Claims include, among others, Claims arising out of or relating to (a) CEL Token (other than CEL Token Deposit Claims), including damages arising from the purchase or sale of CEL Token, certain damages for reimbursement or contribution on account of such a Claim, and Claims arising from the cancellation of a contract for the purchase or sale of CEL Token, and (b) the purchase or sale of preferred shares in Celsius Network Ltd or other equity interests in any Debtor.

---

[307] *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 600–01 (Bankr. S.D.N.Y. 2009) (overruling an objection that reinstatement of an intercompany interest violates the absolute priority rule because "the retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

202.    With respect to Class 17 Equitably Subordinated Claims, the Debtors formed

Class 17 to include Holders of Claims that may be equitably subordinated pursuant to the Plan,

which have been identified on the Schedule of Equitably Subordinated Claims.  The Plan's

treatment of Class 17 is proper because no similarly situated class will receive more favorable

treatment.

203.    Accordingly, the Plan does not discriminate unfairly with respect to the Impaired

Classes that have been deemed to reject the Plan and satisfies the requirements of 1129(b)(1).

### 2.    The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§ 1129(b)(2)).

204.    For a plan to be "fair and equitable" with respect to an impaired class of

unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must

follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2).[308]

Generally, this requires that an impaired rejecting class of claims or interests either be paid in

full or that a class junior to the impaired rejecting class not receive any distribution under a plan

on account of its junior claim or interest.[309]  Additionally, for a plan to be "fair and equitable," no

creditor may be paid more than what it is owed (i.e., no class of creditors may receive more than

100% of its claim).[310]

---

[308]    11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[309]    *See In re 203 N. LaSalle*, 526 U.S. at 459.

[310]    *See* 7 Collier on Bankruptcy ¶1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

205.    The Impaired rejecting Classes here are Class 8 (Unsecured Loan Claims), Class 9 (General Unsecured Loan Claims),[311] and Class 11 (*De Minimis* Claims).    Under the Plan, no Holder of a Claim or Interest junior to these Classes will receive any recovery on account of such Claim or Interest.    Although Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) may be Unimpaired, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.    Rather, Intercompany Claims and Intercompany Interests will be Unimpaired, if at all, for purposes of maintaining the prepetition organizational structure for the administrative benefit of the Post-Effective Date Debtors and such recovery has no economic substance.    Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule.[312]    Moreover, as set forth in the Debtors' Disclosure Statement, no Class of Claims is receiving more than what it is owed.[313]

206.    In its Objection, Pharos asserts that the Debtors' Plan violates the absolute priority rule because, it argues, Series B Preferred Interests in Class 14 (which are junior to Class 8 Unsecured Loan Claims) are receiving a 0.1% recovery "on account of their interests" in either the NewCo Transaction or the Orderly Wind Down.[314]    These arguments have no merit.    The distributions that will be made to Holders of Series B Preferred Interests are not being made "on

---

[311]    Class 9 rejected the Plan at Celsius Mining LLC and Celsius Network LLC, and accepted the Plan at the Consolidated Debtors.

[312]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[313]    *See* Disclosure Statement, Art. III.E.

[314]    See Pharos Obj. ¶ 22.

account" of such interests themselves but pursuant to, and to implement, a settlement previously approved by the Court, *i.e.*, the Series B Settlement.

207.    Prior to the Series B Settlement, the Series B Holders argued that they were entitled to receive recoveries ahead of unsecured Account Holder Claims because Account Holders only had claims against Celsius Network LLC.[315]    Calling it a "gating question" for these Chapter 11 Cases, the Court found that customers could only assert contractual claims against Network LLC and not all Celsius entities.[316]    Importantly, however, the Court noted that there may be non-contractual claims against other Celsius entities.[317]    As a result, to address these potential non-contractual claims, the Debtors and the Committee commenced a series of related litigations, including with respect to the issues of substantive consolidation, the allowance of an intercompany claim between Celsius Network Ltd and Celsius Network LLC, and an alleged constructive transfer.    While this litigation was ongoing, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of Ultimately, however, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of the issues between the parties.    These negotiations were successful and the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders reached a global settlement and filed, on June 27, 2023, a joint motion requesting entry of an order approving the same,[318]

---

[315]    *See generally Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Docket No. 1795].

[316]    *See Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205].

[317]    *See id.* at 4.

[318]    *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899]

which the Court subsequently entered.[319]  The settlement agreement expressly noted that it was

"for settlement purposes only"[320] and the parties explained in their joint motion that the $25

million cash funds (the "Settlement Funds") that would be distributed pursuant to the Series B

Settlement "ends all ongoing litigation between the parties regarding substantive consolidation,

the allowance of an intercompany claim between CNL and LLC, and an alleged constructive

transfer."[321]  Accordingly, payments to Holders of Series B Preferred Interests are being made on

account of the Series B Settlement—and the multiple complex issues it resolves—and not purely

on account of their Interests.

208.    If Pharos believed that the Series B Settlement had any potential to prejudice its

interests as a general unsecured creditor, Pharos should have objected to the Series B Settlement

Motion, but it did not.  More importantly, however, absent the Series B Settlement, if the Initial

Consenting Series B Preferred Holders had been successful in their arguments, they would

potentially be senior to Pharos in receiving distributions from certain Debtors.  A settlement of

these issues does not violate the absolute priority rule.

209.    The Debtors do not believe that the Series B Settlement deviates from the

absolute priority rule, but even if it did, as the Court opined in *Dewey & LeBoeuf*, "a court in its

discretion can approve a settlement that does not comply strictly with the absolute priority rule,

---

and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief [Docket No. 2899]
(the "Series B Settlement Motion").

[319]    *See Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Consenting Series B
Preferred Holders and (II) Granting Related Relief* [Docket No. 3058] (the "Series B Settlement Order"); *see
also Memorandum Opinion Approving the Settlement Among the Debtors, the Committee, and the Initial
Consenting Series B Preferred Holders* [Docket No. 3074].

[320]    *See* Series B Settlement Order, Exh. 1.

[321]    *See* Series B Settlement Mot. ¶ 1.

as long as the settling parties can justify the divergence, and the court can 'clearly articulate the reasons for approving…a settlement that deviates from the absolute priority rule.'"  This Court has already approved the Series B Settlement, and therefore any challenge to it on account of the absolute priority rule is moot.[322]

210.    Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.[323]

### T.    The Debtors Complied With Section 1129(d) of the Bankruptcy Code.

211.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[324]  Article II.C of the Plan contemplates the full payment of all Allowed Priority Tax Claims.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.[325]

## VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.

212.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[326]  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an

---

[322] *In re Dewey & LeBoeuf, LLP*, 478 B.R. 628, 642 (Bankr. S.D.N.Y. 2012) (approving a settlement between a debtor law firm and many of its former partners, which included mutual releases that an ad hoc committee argued constituted a distribution that would violate the absolute priority rule).

[323] *See* Campagna Decl. ¶¶ 48–51.

[324] 15 U.S.C. § 77e.

[325] *See* Campagna Decl. ¶ 53.

[326] Fed. R. Bankr. P. 3020(e).

executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[327]  Each rule

also permits modification of the imposed stay upon court order.[328]

213.    The Debtors submit that good cause exists for waiving and eliminating any stay of

the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

proposed Confirmation Order will be effective immediately upon its entry.[329]  The restructuring

transactions contemplated by the Plan were vigorously negotiated among sophisticated parties,

and the Plan has been accepted by the Voting Class.  Further, each day the Debtors remain in

chapter 11, they incur significant administrative and professional costs—expenses that are

unnecessary in light of the overwhelming support for the Plan among the Voting Class.

Importantly, not a single creditor in a Voting Class voted to reject the Plan.  Accordingly, the

Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed

Confirmation Order may be effective immediately upon its entry.

## VII.    The Debtors' Replies to Remaining Objections.

### A.    The Emergence Incentive Plan Should Be Approved as Part of the Plan.

214.    Victor Ubierna de las Heras ("Mr. Ubierna de las Heras") objects to the

Emergence Incentive Plan because he believes it does not satisfy the requirements of section

503(c) of the Bankruptcy Code.[330]  Mr. Ubierna de las Heras, however, is an outlier in this

---

[327]  Fed. R. Bankr. P. 6004(h), 6006(d).

[328]  *Id.*

[329]  *See, e.g., In re Windstream Holdings, Inc.,* No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Barneys N.Y. Inc.,* No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) (same); *In re Deluxe Ent. Servs. Grp. Inc.,* No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) (same); *In re Hollander Sleep Prods., LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sept. 5, 2019) (same); *In re Aegean Marine Petroleum Network, Inc.,* No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) (same); *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) (same).

[330]  *See generally* Ubierna de las Heras Obj.

regard, as over 95% of the number of Claims that voted, voted to accept the Plan, including the

Emergence Incentive Plan.  Indeed, Mr. Ubierna de las Heras and the one additional creditor who

raised concerns with the Court regarding the Emergence Incentive Plan hold claims in the

Account Holder Voting Classes, which overwhelmingly voted to accept the Plan.  On this basis

alone the objections to the Emergence Incentive Plan should be overruled.  The Debtors worked

with the Committee to develop the Emergence Incentive Plan and select metrics that would

challenge and incentivize the EIP Participants.  The Account Holder Classes have voiced their

clear support of the Plan and terms contained therein, including the Emergence Incentive Plan,

and dissenters in those classes must accept this outcome.  The Committee's support of the

Emergence Incentive Plan, coupled with the voting results, demonstrates that creditors acting in

their own interest as well as their appointed fiduciary believe the Emergence Incentive Plan is

appropriate under the circumstances.

215.    The Ubierna de las Heras Objection to the Emergence Incentive Plan is premised

on the alleged applicability of section 503(c) of the Bankruptcy Code and the appropriateness of

the Emergence Incentive Plan under the facts and circumstances of these Chapter 11 Cases.  In

particular, Mr. Ubierna de las Heras asserts that the Debtors are required to satisfy section 503(c)

of the Bankruptcy Code for the EIP to be in the Plan and have failed to present sufficient

evidence that the Emergence Incentive Plan satisfies such requirements.

216.    The Ubierna de las Heras Objection is misplaced.  As an initial matter, the

payments will be made by the Post-Effective Date Debtors, not any chapter 11 debtor, and so any

restriction on the Debtors under the Bankruptcy Code are inapplicable.  Even if a higher standard

is applied, the Emergence Incentive Plan is justified under the facts and circumstances of these

Chapter 11 Cases, as the Plan allows the Post-Effective Date Debtors to compensate key

members of management who have focused their collective efforts on maximizing value for all stakeholders and providing key services related to the consummation of the Debtors' Plan. Specifically, these executives have worked tirelessly and will continue to work hard distributing Liquid Cryptocurrency to the Debtors' stakeholders, maximizing the value of the Debtors' mining operations, and maintaining security of the Debtors' platform for a period of time after the Effective Date to ensure the security of the Debtors' Liquid Cryptocurrency. The ultimate success of the Debtors' Chapter 11 Cases is heavily reliant on the continued efforts of the EIP Participants, as they possess the specific expertise, knowledge, and familiarity with the Debtors' business and operations, making them indispensable to the Debtors' Plan consummation and the obligations of the Post-Effective Date Debtors.

217.    The demands placed upon the EIP Participants have been, and will continue to be, significant in light of the facts and circumstances of these Chapter 11 Cases, especially at this critical juncture of confirming and consummating the Plan. Contrary to Mr. Ubierna de las Heras' assertion, many of the demands that the EIP Participants face go well beyond the demands of their prepetition day-to-day responsibilities. The EIP Participants' critical roles are even more challenging due to the Debtors' significantly depleted workforce. In fact, many EIP Participants assumed additional roles and responsibilities resulting from the reduction in workforce from over 900 employees in early 2022 to fewer than 150 employees today. Moreover, headcount is expected to continue to fall between now and the anticipated emergence date and the Company is preparing for further attrition due to turnover and reductions in force of approximately 33%. As such, it is vital that the Debtors boost morale among the EIP Participants and incentivize the EIP Participants to continue to meet onerous demands. Ultimately, incentivizing the EIP Participants will inure to the benefit of all stakeholders by

ensuring the EIP Participants are focused on facilitating a value-maximizing resolution to these Chapter 11 Cases, thus maximizing recoveries for the Debtors' stakeholders.

218.    Moreover, Mr. Ubierna de las Heras' contention that "compensation above base salary should be reviewed by the Debtors' post-confirmation Board" misses the mark.[331]    Under the Plan, NewCo will not be responsible for distributing the EIP Awards.[332]    Rather, the Plan Administrator will distribute the EIP Awards subject to his verification of the EIP Participants' satisfaction of the applicable performance metrics under the Emergence Incentive Plan.[333]

### 1.    The Emergence Incentive Plan Complies With Section 503(c) of the Bankruptcy Code.

219.    Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.    Thus, the Ubierna de las Heras Objection should be overruled.

220.    The Debtors maintain that section 503(c) is not the relevant standard given that the Emergence Incentive Plan was incorporated in the Plan that was accepted by Account Holder Classes.    The Emergence Incentive Plan, as its name suggests, is an incentive-based program—not a "pay-to-stay" retention plan prohibited by section 503(c)(3).

---

[331]    *See id.* at 3.

[332]    *See* Plan, Art. IV.J.2.

[333]    *See id.* ("On the Effective Date, the Emergence Incentive Plan shall be effective, the KEIP Motion shall be deemed withdrawn with prejudice, and the Plan Administrator *may* distribute the EIP Awards, ***subject to the Plan Administrator to confirming that the applicable metrics have been satisfied***, without any further action by the Debtors or the Post-Effective Date Debtors.").

221.    In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work."[334]    As evidenced by its terms, the purpose of the Emergence Incentive Plan is to incentivize the EIP Participants to maximize the value of the Post-Effective Date Debtors after emergence from chapter 11 by distributing EIP Awards subject to the satisfaction of certain metrics and subject to the discretion of the Plan Administrator.[335]    Contrary to Mr. Ubierna de las Heras' assertion that the Emergence Incentive Program's "retentive purpose is obvious from the easily achievable benchmarks,"[336] the program does not contain any retention-based components, as the EIP Participants are not merely paid for maintaining their employment for a certain time period.[337]    Rather, the Emergence Incentive Plan incentivizes the EIP Participants to rise to the challenge of consummating the Debtors' Plan.    Importantly, the metrics are not easily achievable, demonstrated by the fact that certain of the metrics have not been achieved—specifically, pursuant to the Mining Rig Metric, target performance required the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, to have, among other things, 95,000 mining rigs hashing (or energized but not hashing due to market conditions, by September 30, 2023).[338]    As of August 31, the Debtors have only approximately 86,000 mining rigs hashing, thus falling well short of

---

[334]    *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the debtor's business" (emphasis in original)); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance.").

[335]    *See* Plan, Art. IV.J.2.

[336]    *See* Ubierna de las Heras Obj. at 3.

[337]    *See* Plan, Art. IV.J.2; *cf. In re Hawker Beechcraft*, 479 B.R. at 315 (denying KEIP approval where lower threshold was attainable so long as debtor did not encounter "any 'whoopsies'").

[338]    *See* Campagna Decl. ¶ 28.

target performance.  Construction and delivery delays, disputes with mining counterparties, and the numerous financial risks associated with developing and maintaining mining sites have together prevented the Debtors from having 95,000 mining rigs hashing at this point.[339] Furthermore, when developing the Mining Metrics, the Debtors and their advisors reached agreement with the Committee to make the Mining Metrics, specifically, more challenging under the facts and circumstances of these Chapter 11 Cases in exchange for the Committee's support of the Emergence Incentive Plan.  Significantly, even despite precarious market conditions facing the cryptocurrency industry and serious challenges facing the Debtors' mining business, including the rejection of the Core hosting contract, the Debtors' mining business has maintained a positive operating cash flow since the Petition Date.[340]

222.    Furthermore, under the Liquid Cryptocurrency Distribution Metric, certain EIP Participants are incentivized to ensure sufficient Liquid Cryptocurrency is available for the initial distribution to all Holders of Allowed Claims within thirty days of the Effective Date, ensuring that the Debtors' Account Holders are able to access their distributions as expeditiously as possible.  This is no small undertaking—the Debtors anticipate that approximately 400,000 customers will be entitled to receive distributions under the Plan.  The Emergence Incentive Plan ensures that those EIP Participants are working toward the goal of maximizing the distributions to account holders who have been waiting for their cryptocurrency for over sixteen months.  As such, Mr. Ubierna de las Heras' objection to the metrics is misguided and without merit.

---

[339]    *See id.*

[340]    *See* Ferraro Decl. ¶ 43.

223.    Despite Mr. Ubierna de las Heras' assertion that "[a] CEO getting his company

out of bankruptcy is just doing his job,"[341] each of the EIP Participants have assumed significant,

additional responsibilities and stresses of the key roles and responsibilities as a result of these

Chapter 11 Cases.  Importantly, the EIP Participants are not required to remain employed with

the Debtors after the Effective Date but have agreed to do so to effectuate the Restructuring

Transactions and maximize value for stakeholders.  To properly incentivize the EIP Participants

to achieve these results, the Emergence Incentive Plan included specific metrics to ensure an

expeditious distribution of liquid cryptocurrency.  The EIP Participants possess the skills,

knowledge, and experience that are critical to the Debtors' ability to consummate the Debtors'

Plan for the benefit of all stakeholders in these Chapter 11 Cases.  To receive the target EIP

Award opportunity, the EIP Participants must achieve multiple performance metrics as reflected

in the Plan, including, among others, confirming and consummating the Plan, achieving

performance targets regarding the distribution of liquid cryptocurrency under the Plan, and, for

some EIP Participants, achieving certain mining rig hashing and profit goals.[342]  As such,

the Emergence Incentive Plan properly incentivizes the EIP Participants to maximize the value

of the Debtors' estates.  The Emergence Incentive Plan is therefore structured to drive

performance from these key parties by providing incentives to achieve targeted goals in a manner

that will benefit all parties—particularly the Debtors' stakeholders—if the performance targets

are achieved.  Furthermore, the overall cost of the Emergence Incentive Plan—$2.6 million—is

reasonable and appropriate under the circumstances.[343]

---

[341]    *See* Ubierna de las Heras Obj. at 4.

[342]    *See* Plan, Art. IV.J.2.

[343]    *See* Hoeinghaus Decl. at ¶ 22.

224.     Moreover, implementing the Emergence Incentive Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates and stakeholders.  The Emergence Incentive Plan is the result of an independent analysis undertaken by the Debtors in conjunction with market guidance from their restructuring advisor Alvarez & Marsal North America, LLC ("A&M") and the Debtors' other advisors to ensure that the Emergence Incentive Plan is market-based, consistent with competitive practices, and compliant with the Bankruptcy Code  The Emergence Incentive Plan was subject to further review and approval from the Special Committee, none of whom are current EIP Participants. Absent the Emergence Incentive Plan, the EIP Participants may be undercompensated, under-incentivized at this critical stage of the Debtors' Chapter 11 Cases, and at risk of leaving the Debtors before certain key milestones are achieved, including the distribution of a significant amount of liquid cryptocurrency.  Such incentives are an important tool for driving performance by key personnel and effectively align the interests of the EIP Participants with those of the Debtors' stakeholders.

225.     Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, has the support of an overwhelming number of creditors who voted to accept the Plan, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.  Thus, Mr. Ubierna de las Heras's objection should be overruled.

**B.     The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections Related to Loans Should Be Overruled.**

226.     Several creditors objected to confirmation of the Plan with respect to the treatment of the loans of the Retail Borrowers.  Specifically, as noted, Mr. Bronge filed the

Bronge Objection and several other Retail Borrowers wrote letters on this issue.[344]  As further set

forth below, the Bronge Objection and the Loan Letters should be overruled.

### 1.    Plan Treatment of the Institutional Borrowers and Retail Borrowers is Appropriate.

227.    The Bronge Objection asserts that the Plan should provide similar treatment to

both the Retail Borrowers and Institutional Borrowers.  Specifically, Mr. Bronge asserts that

Retail Borrowers, like Institutional Borrowers, should be allowed to repay outstanding loan

balances (including interest) in exchange for the full amount of their collateral, with any such

amount to be paid in kind with "full unencumbered property rights."

### a.    Retail Borrowers Do Not Own Their Collateral and are Instead Unsecured Creditors of the Debtors.

228.    The Debtors' Estates consist of "all legal or equitable interests of the debtor in

property as of the commencement of the case."[345]   The Loan Terms and Conditions

provide—unambiguously in every version and in multiple places—that Retail Borrowers

transferred title of their collateral to the Debtors.  For example, the current version of the Loan

---

[344] Prior to the Bronge Objection, Mr. Bronge also filed a *Motion for Repayment of Loans and Return of Collateral* [Docket No. 3270] (the "Bronge Motion"), which was not yet scheduled for a hearing.  There, Mr. Bronge raised similar arguments regarding the treatment of Retail Borrower Deposit Claims and sought a ruling that (a) allows him to redeem the digital assets he transferred to the Borrow Program by repaying the principal and interest of his retail loans, (b) establishes that only the outstanding balance of his retail loans is property of the Debtors' Estates and the digital assets he transferred to the Borrow program are his "encumbered property" until his repayment, and (c) requires the Plan and the Disclosure Statement to use the same definitions and terminologies as the Loan Terms and Conditions.  *See* Bronge Motion at 3–4.  The Bronge Motion and the Bronge Objection were joined by the following letters (collectively, the "Loan Letters"): the First Windom Letter [Docket No. 3533] (joining the Bronge Motion); the Abruzese Letter [Docket No. 3540] (joining the Bronge Objection); the Truss Letter [Docket No. 3541] (joining the Bronge Objection); and the Dame Letter [Docket No. 3543] (joining the Bronge Objection).  In addition, other creditors' letters raise similar arguments. *See, e.g.*, the Second Windom Letter [Docket No. 3546] ¶ 6 (arguing that Retail Borrowers should have the same opportunity as Institutional Borrowers to repay the loan and redeem the digital assets transferred to the Borrow Program); the Johantgen Letter [Docket No. 3538] (arguing that the Plan's treatment of Retail Borrower Deposit Claims is unfair because he would receive fewer digital assets than what he transferred to the Borrow Program).

[345] *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)).

Terms and Conditions provide that "Digital Assets posted as Collateral shall be the exclusive property of [Lending]," that Borrowers "grant [Lending] and any of its Affiliates the right . . . to hold the Digital Assets provided as Collateral in [Lending's] name or in another name . . . with all attendant rights of ownership . . . ," and that Borrowers "acknowledge that, with respect to Digital Assets used by Lending . . . [they] will not be able to exercise any rights of ownership."[346] When the contract is clear and unambiguous, courts will "give effect to the plain meaning of the contract's terms and provisions."[347] As a result, the digital assets Retail Borrowers transferred via the Borrow Program are property of the Debtors' Estates, just as this Court found that assets in Earn Accounts are property of the Debtors' Estates.[348]

229. These arguments were raised in connection with the mediation between the Debtors, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and the Committee, which led to the Retail Borrower Settlement that has been incorporated into the Plan. The Retail Borrower Settlement and the Plan establish a mechanism through which the rights of the Debtors and the Holders of Retail Borrower Deposit Claims are reconciled.[349] This a value-maximizing result that avoids further litigation, which would only drain estate resources to be distributed to the Debtors' stakeholders. The broad agreement of the Holders of Retail Borrower Deposit Claims can be inferred from their overwhelming support for the Plan, as described below.

---

[346] *See* Loan T&C version 9, "Collateral," "Consent to Celsius' Use of Your Digital Assets." *See also* Loan T&C version 8 at 6, 12; Loan T&C version 7 at 14; Loan T&C version 6 at 14; Loan T&C version 5 at 14; Loan T&C version 4 at 14; Loan T&C version 3 at 13; Loan T&C version 2 at 12; Loan T&C version 1 at 11.

[347] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[348] *See, e.g.*, *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] at 30 (holding that "the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors").

[349] *See* Disclosure Statement, Art. II.A.2.

> **b.    The Bronge Objection Misunderstands the Institutional Loan Order.**

230.    Moreover, the Bronge Objection also references the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818], which was approved by the Court,[350] to argue that the Retail Borrowers should be afforded the same treatment as Institutional Borrowers. This order, however, only "authorized, but [did] not direct[]" the Debtors to exercise their rights under the Master Loan Agreements to settle the Institutional Loans.  Nothing in the Institutional Loan Order requires the Debtors to return such collateral.  Instead, it provided the Debtors with the authority to negotiate with Institutional Borrowers to return a portion of their collateral.  Such relief was granted because the Institutional Borrowers are subject to Master Lending Agreements that provided that they retained ownership of the collateral they provided to the Debtors, unlike the Loan Terms and Conditions applicable to Retail Borrowers.

> **c.    Separate Classification of Retail Borrower and Institutional Borrower Claims is Appropriate Under the Bankruptcy Code.**

---

[350] *See Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) The Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1944] (the "Institutional Loan Order").

231.    As an initial matter, Mr. Bronge has no grounds to object to the treatment of the Retail Borrower Deposit Claims on the grounds of unfair discrimination because the Class overwhelmingly voted to accept the Plan.  Section 1129(b)(1) of the Bankruptcy Code only provides an opportunity for a member of a class to object to a plan of reorganization on the grounds that the plan discriminates unfairly against that class if the class "is impaired under, and has not accepted, the plan."[351]  There can be no dispute that the vote of 98.83% of the Holders of Retail Borrower Deposit Claims in favor of the Plan constitutes anything less than an overwhelming show of support.[352]  Because he is a member of a class that has voted to accept the Plan, Mr. Bronge is bound to accept his treatment and the Debtors do not have to demonstrate that the class is not the product of unfair discrimination against similarly situated creditors.

232.    Even if the Debtors were required to demonstrate that the Retail Borrower Deposit Claims class treatment is not the product of unfair discrimination, such differences in treatment between that class and Institutional Borrowers would be justified based on the differences in the legal rights accruing to the Holders of each set of claims.  The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[353]

---

[351]    11 U.S.C. § 1129(b)(1).

[352]    *See* Voting Report ¶ 13.

[353]    11 U.S.C. § 1122(a).

233. Courts generally will approve placement of similar claims in different classes, provided that a "rational" or "reasonable" basis exists for doing so.[354] Recognizing this flexibility, courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[355] Courts have identified several grounds justifying the separate classification of claims, including where members of a particular class possess different legal rights[356] and where the debtors have valid business reasons for separate classification.[357]

234. The Plan's classification of Retail Borrowers in Class 2, as set forth in Article III of the Plan, satisfies the requirements of section 1122 of the Bankruptcy Code because the Retail Borrowers and Institutional Borrowers have different legal rights, and the Debtors have valid business reasons for separate classification.   Specifically, Retail Borrowers initiated loans through their Celsius Accounts and all were subject to the same Loan Terms and Conditions (each as amended).   On the other hand, Celsius originated institutional loans with Institutional

---

[354] *See, e.g., In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25–123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[355] *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[356] *See Drexel*, 138 B.R. at 715.

[357] *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, 2007 WL 2779438, at *3.

Borrowers on an individual basis, entering into separate master lending agreements with each Institutional Borrower.  As such, the rights of Retail Borrowers are distinct from those of Institutional Borrowers, and the fact that all Retail Borrowers are subject to the Loan Terms and Conditions serves as a valid reason for the Debtors to classify Retail Borrower Deposit Claims in their own Class.

> **d.      The Debtors' Valuation of the Collateral Related to the Retail Borrower Claims is Appropriate.**

235.    The Bronge Objection argues that the valuation of the collateral related to the Retail Borrower Deposit Claims using a price reflecting the value of such collateral on the Petition Date for the purposes of distributions and using the current market price to determine the value of the collateral for the purposes of the Set Off Treatment evinces a "lack of fairness" because "[t]his approach may result in an unjustifiable loss of actual BTC or ETH beyond the general 'haircut' that all unsecured claimants are subjected to."[358]   As an initial matter, Mr. Bronge has failed to identify any statutory basis upon which this portion of his objection rests. Further, this treatment is precisely that which was determined to be appropriate under the Retail Borrower Settlement and represents a consensual compromise concerning the various rights and obligations applicable to Retail Borrowers.  Finally, the Debtors' use of different prices to value collateral for the purposes of distributions and for the purposes of setoff is valid.  A distribution under the Plan is on account of a prepetition obligation of the Debtors and is therefore sensibly valued as of the Petition Date.  The Set Off Treatment described in the Plan, however, contemplates a transaction occurring between the Debtors and the relevant Retail Borrowers as

---

[358]    *See* Bronge Obj., "Valuation of Collateral."

of the Effective Date of the Plan and therefore appropriately uses market valuation to account for the value of the collateral at the time of that transaction.[359]

       **e.**        **The Terminology Used by the Debtors in the Plan and Retail Borrower Settlement is Appropriate.**

236.    Last, Mr. Bronge objects to the Debtors' use of terminology describing the Retail Borrower Settlement and related provisions in the Plan.[360]  Mr. Bronge cites no provisions of the Bankruptcy Code, nor any case law, that requires the Plan definitions to conform to a particular contract.  Accordingly, the Bronge Objection and the Loan Letters should be overruled.

237.    The remaining Objections, to the extent not discussed in the body of the Memorandum, are addressed in the Objection Tracker attached hereto as **Exhibit A**.

## Conclusion

238.    For all of the reasons set forth herein and in the Ferraro Declaration, the Campagna Declaration, the Kielty Declaration, the Cohen Declaration, the Fahrenheit Declaration, and the Hoeinghaus Declaration, Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

---

[359]  *See* Disclosure Statement, Art. II.A.2.

[360]  *See* Bronge Obj., "Terminology."

New York, New York
Dated: September 27, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Objection Tracker**