**WHITE & CASE LLP**
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: david.turetsky@whitecase.com
      sam.hershey@whitecase.com
      jweedman@whitecase.com

– and –

**WHITE & CASE LLP**
Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
Email: kwofford@whitecase.com

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Carolyn P. Gurland
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: mandolina@whitecase.com
      gregory.pesce@whitecase.com
      carolyn.gurland@whitecase.com

– and –

**WHITE & CASE LLP**
Aaron E. Colodny (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
Email: aaron.colodny@whitecase.com

*Counsel to the Official Committee of Unsecured Creditors*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# DECLARATION OF HARRY DEAN TAPPEN

I, HARRY DEAN TAPPEN, am over 18 years of age and understand the obligations of an oath. I have been asked to submit this declaration (hereinafter "**Declaration**") by the Official Committee of Unsecured Creditors (hereinafter "**Committee**") of the above captioned debtors and debtors-in possession (hereinafter "**Debtors**"). The information contained in this Declaration is true and correct to the best of my recollection and belief. I was and am currently an employee of Celsius Network LLC (hereinafter "**Celsius**"). I received my bachelor's degree from Virginia Tech in May 2019. In 2019, I went to work in the Operations Analyst Program at Barclays Bank.

1. When I began my employment at Celsius in August 2020, my title was Trading Desk Analyst and later my title became Coin Deployment Specialist. Over time and into 2022, I transitioned to the position of Treasury Analyst. During my time as a Celsius employee, I either worked remotely, or from Celsius's office in New Jersey.

2. I became involved with the over-the-counter ("**OTC**") trading desk at Celsius, which was a function that was not well established at Celsius before that time.

3. The OTC desk at Celsius facilitated buys and sells of CEL Token by Celsius clients. My roles included helping to facilitate settlement of OTC trades, tracking trades, sending contracts to clients, and fielding client inquiries. This activity generally was done via email.

4. To help set up the OTC desk, I assisted in the creation of settlement functions and a spreadsheet for tracking purchases and sales, and I helped draft policies and templates for communications with clients. I also provided input on the hiring and training of additional Celsius employees, including those working on the OTC desk. I understood that, during the time I was assisting with OTC responsibilities, Johannes Treutler, another Celsius employee, was primarily

2

in charge of quoting prices to OTC customers. However, when he was unavailable from time to time, I would assist and quote prices for the OTC desk.

5. For a period from approximately late 2020 to approximately early 2021, I reported directly to Connor Nolan, who helped to train me on, among other things, OTC settlement procedures. During this period, I also reported to Harumi Urata-Thompson, who was the Chief Financial Officer of Celsius. On OTC desk matters, I reported directly to Ms. Urata-Thompson.

6. I also participated in certain general wallet and treasury management tasks for Celsius subject to oversight and approval, as warranted.

7. There came a time when I became aware of Celsius's practice of instituting resting buy orders to purchase CEL Token if its price fell below a specific level. I was also aware that Celsius appeared to purchase CEL Tokens on Fridays, when AMAs often occurred. The volume of CEL Token trading on exchanges also seemed to be elevated on Fridays.

8. I was aware that Celsius represented that it would purchase 100% of the rewards that Celsius paid out to Celsius customers in CEL Tokens. I understood that this stated buyback policy of the Company had the effect of supporting the price of the CEL Token by helping create demand. It was my working assumption based on Celsius's representations and communications within the Company that Celsius was calculating the amount of CEL Token it would purchase each week based on the amount of CEL Token rewards paid each week -- a practice that I learned had not always been followed. In addition, I had not been aware that amounts of CEL Token sold through the OTC desk were accounted for in determining how much CEL Token Celsius bought from the market each week.

9. It was my understanding that in October 2021, Celsius began burning or destroying CEL Tokens equal to approximately 10% of the rewards Celsius paid weekly to Celsius customers.

In connection with its burning practice, Celsius consequently decided to buy back from the open market the same number of CEL Tokens it had burned. To my understanding, the purpose of this practice of burning CEL Tokens was to support the price of the CEL Token by decreasing supply.

10. When Celsius liquidated retail loans, the collateral from those liquidations would be tracked by the middle office team. When a certain threshold of liquidations on a coin-by-coin basis was reached, the middle office would generally sell this collateral. This practice was generally followed for all digital assets except for the CEL Token. With respect to the CEL Token, Celsius's management determined that Celsius would not sell CEL Tokens that were used as collateral, the effect of which, as I then understood, was to help prevent a further decrease in the CEL Token's price. In May 2022, there were significant CEL Token liquidations, which I understood resulted primarily from the rapid decline in the price of the CEL Token. In my view, if CEL Token collateral from those liquidated loans had been sold by Celsius as per its practice with other tokens, the price of CEL Token would have likely further decreased.

11. In or about March of 2021, I understood that Celsius discovered a substantial discrepancy between Celsius's assets and its liabilities on its balance sheet, particularly its BTC and ETH holdings. The Company referred to the discrepancy as a "hole" in its balance sheet. Management, including Alex Mashinsky, Daniel Leon, and Harumi Urata-Thompson, directed certain employees to review Celsius's assets and liabilities and attempt to undertake a reconciliation. I and others were involved in this reconciliation effort.

12. Other Celsius employees and I engaged in a manual process of reviewing Company records and data to investigate the hole in the balance sheet. We initially observed that Celsius's Bitcoin ("**BTC**") and Ethereum ("**ETH**") assets were less than the BTC and ETH obligations that Celsius owed to its customers and other counter parties. While attempting to reconcile the shortage,

we discovered that this mismatch was caused, in substantial part, by Celsius's using BTC and ETH to purchase CEL Token on exchanges (predominantly the Liquid exchange), and failing to subsequently repurchase that BTC or ETH (or to hedge against increases in the price of BTC and ETH). Therefore, when the USD prices of BTC and ETH increased significantly, the USD values of BTC and ETH liabilities, compared to assets, also increased significantly.

13. During the period in which I and others investigated the hole in the balance sheet and shortly thereafter, Celsius temporarily reduced the percentage of CEL Token it was buying back from the market. Celsius's actions in reducing its CEL Token purchases appeared to negatively affect the price of the CEL Token at that time. However, it was my understanding at that time that Celsius later resumed its practice of repurchasing 100% of weekly rewards for customers. I am not aware whether Celsius ever told customers or the public it was purchasing any amount other than 100% of the amount of weekly rewards it paid to customers.

14. At some point around the time that Celsius paused all customer withdrawals from the Celsius platform (the "**Pause**"), I reviewed Company data and noticed that Celsius's net position in CEL Tokens had increased over time. To me, that data showed that Celsius had not consistently been purchasing an amount of CEL Token equal to the amount it was paying customers. If it had, absent other factors, the net position of CEL Token should have been fairly constant.

15. As a result of this discovery, I and others, including Jason Perman, Chris Ferraro, Yin Choi, and Kai Tang, looked at the Company's CEL Token holdings and transactions in more depth. We specifically looked at the amount of CEL Token rewards that Celsius had paid its customers, and Celsius's purchases of CEL Tokens, using Celsius exchange data for several previous months. Based on our review, we determined that on numerous occasions Celsius had

been purchasing significantly more CEL Token than it was paying to customers in rewards or selling through its OTC desk. As a result of the questionable quality of Celsius's books and records, including the freeze report, and the unreliability of the data, the discrepancy had not previously been apparent to me before our detailed review.

16.     In my view, Celsius's purchases of CEL Tokens in excess of what was needed to pay customer rewards artificially increased the price of CEL Token prior to the Pause Date.

17.     In April and May 2022, including after the collapse of Terra Luna, many customers withdrew assets from Celsius. Celsius's liquidity therefore became significantly constrained, and Celsius ceased its practice of CEL Token buybacks. The end of this practice, along with several other factors, led to a sharp decline in the CEL token price.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date    October 2, 2023

*Dean Tappen* (DocuSigned by: 91084166AC71430)
Harry Dean Tappen