| | |
|---|---|
| TROUTMAN PEPPER HAMILTON SANDERS LLP<br>Deborah Kovsky-Apap, Esq.<br>4000 Town Center, Suite 1800<br>Southfield, MI 48075<br>Telephone: (248) 359-7331<br>Facsimile: (248) 731-1572<br>Email: deborah.kovsky@troutman.com<br>*Counsel for Ad Hoc Group of*<br>*Withhold Account Holders* | Hearing Date: October 24, 2023 at 10:00 a.m. ET<br>Objection Deadline: October 16, 2023 at 4:00 p.m. ET |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.,*<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10964-MG<br><br>Jointly Administered |

**NOTICE OF APPLICATION OF THE AD HOC GROUP OF WITHHOLD ACCOUNT HOLDERS FOR ALLOWANCE AND PAYMENT OF FEES UNDER BANKRUPTCY CODE SECTIONS 503(B)(3)(D) AND 503(B)(4)**

**PLEASE TAKE NOTICE** that a hearing on the *Application of The Ad Hoc Group of Withhold Account Holders for Allowance and Payment of Fees Under Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4)* (the "Application") filed by the Ad Hoc Group of Withhold Account Holders ("Withhold Ad Hoc Group") will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, on October 24, 2023, at 10:00 a.m., prevailing Eastern Time (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will take place in a hybrid fashion both in person and via Zoom for Government. Those wishing to participate in the Hearing in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No.

163601087v1

523, located at One Bowling Green, New York, New York 10004-1408. Those wishing to appear remotely at the Hearing, whether making a "live" or "listen only" appearance before the Court, need to make an electronic appearance (an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. When making an eCourtAppearance, parties must specify whether they are making a "live" or "listen only" appearance. Electronic appearances (eCourtAppearances) need to be made by **4:00 p.m., prevailing Eastern Time, the business day before the hearing (i.e., on October 23, 2023).**

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m., prevailing Eastern Time on October 24, 2023, **must connect to the Hearing beginning at 9:00 a.m., prevailing Eastern Time on October 24, 2023**. When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing. Parties that type in only their first name, a nickname, or initials will not be admitted into the Hearing. When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect. Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance. Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Application shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all

163601087v1

General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 2560] (the "Case Management Order") by October 16, 2023, at 4:00 p.m., prevailing Eastern Time, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Application.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing. Failure to file a timely objection may result in entry of a final order granting the Application.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius. You may also obtain copies of all pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

| | |
|---|---|
| Dated: October 2, 2023 | Respectfully submitted,<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP<br><br>/s/ *Deborah Kovsky-Apap*<br>Deborah Kovsky-Apap, Esq.<br>4000 Town Center, Suite 1800<br>Southfield, MI 48075<br>Telephone: (248) 359-7331<br>Facsimile: (248) 731-1572<br>Email: deborah.kovsky@troutman.com<br>*Counsel to Ad Hoc Group of Withhold Account Holders* |

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Deborah Kovsky-Apap
875 Third Avenue
New York, NY 10022
Telephone: (212) 704-6000
Facsimile: (212) 704-6288
Email:   deborah.kovsky@troutman.com
*Counsel to the Ad Hoc Group of*
*Withhold Account Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**APPLICATION OF THE AD HOC GROUP OF WITHHOLD ACCOUNT HOLDERS FOR ALLOWANCE AND PAYMENT OF FEES UNDER BANKRUPTCY CODE SECTIONS 503(b)(3)(D) AND 503(b)(4)**

The Ad Hoc Group of Withhold Account Holders and Other Transferees (the "Withhold Ad Hoc Group")[2] hereby submits this application (the "Application"), pursuant to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy Code"), for allowance of legal fees and expenses for professional services rendered by Troutman

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] The members of the Withhold Ad Hoc Group are listed in the *Fourth Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 1860], as amended from time to time.

1

Pepper Hamilton Sanders LLP ("Troutman Pepper") to the Withhold Ad Hoc Group, as an administrative expense incurred in connection with making a substantial contribution in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of the debtors and debtors-in-possession (the "Debtors"). In support of this Application, the Withhold Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtors' Chapter 11 Cases presented a number of novel, complex legal issues unique to the new world of cryptocurrency bankruptcies. From the very outset of the cases, a central question emerged: Who owns the crypto assets on the Debtors' platform – the Debtors, or the customers who had deposited them there?

2. One set of assets was those in so-called "Withhold" accounts, which the Debtors had created in nine states in which they were not permitted to offer Custody accounts. Withhold accounts were neither part of the Earn program nor part of Custody. The Debtors' terms of use made no mention of Withhold accounts, leaving the status and proper treatment of millions of dollars' worth of cryptocurrency unclear.

3. The Withhold Ad Hoc Group was formed to address this "key legal issue[]"[3] and played a pivotal role in its resolution. While the Withhold Ad Hoc Group was sometimes at odds with the Debtors and the Official Committee of Unsecured Creditors (the "Committee"), at all times the Group sought to work efficiently, constructively, and for the benefit of all similarly situated creditors and of these Chapter 11 Cases. The Withhold Ad Hoc Group's efforts yielded a settlement that will provide an enhanced recovery not only to members

---

[3] *See* Fourth Revised Disclosure Statement [Docket No. 3332] (the "Disclosure Statement"), at 208 (the question of whether cryptocurrency in Withhold accounts was property of the Debtors' estates was one of the "key legal issues that would be critical to the outcome of the Chapter 11 Cases").

2

of the Group but to all holders of assets in Withhold accounts, while preserving millions of dollars' worth of cryptocurrency for the Debtors' estates and their general unsecured creditors.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The statutory predicates for the relief requested herein are sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

5. Prior to their bankruptcy filing, the Debtors encouraged retail customers to place eligible cryptocurrency into interesting-bearing accounts in the Debtors' "Earn Rewards" program, which the Debtors then pooled to generate returns to customers. Beginning in 2021, the Debtors began to face actions from a number of state regulators that classified the Earn Rewards program as an offering of unregistered securities. In April 2022, the Debtors stopped accepting new deposits from non-accredited U.S. investors into the Earn Rewards program. Instead, in those states where it was able to do so, the Debtors offered a new "Custody" product. In the nine states where it was unable to offer Custody, the Debtors created an alternative account referred to as a "Withhold" account.

6. From and after April 15, 2022, U.S. customers could not withdraw coins directly from an Earn Rewards account to an external wallet. Coins instead had to first be transferred from Earn Rewards to a Custody or Withhold account, depending on the customer's state of residence, and from there transferred to an external wallet. Coins in Withhold accounts were effectively in no-man's-land: no longer part of the Earn Rewards program, yet not subject to the protections of the Custody program.

7. The Debtors froze all transfers and withdrawals on June 12, 2022. At that time, coins worth about $14.5 million were trapped in Withhold accounts.

8. At the start of the Chapter 11 Cases, "the Debtors identified certain key legal issues that would be critical to the outcome of the Chapter 11 Cases," including "the question of whether the Cryptocurrency transferred to the Debtors' platform constituted property of the Debtors' estate, and whether the answer to this question was different for Cryptocurrency assets in the Earn Program, the Custody Program, or Withhold Accounts." Fourth Revised Disclosure Statement [Docket No. 3332] (the "Disclosure Statement"), at 208.

9. The Withhold Ad Hoc Group organized itself on or about August 10, 2022 and retained Troutman Pepper as its counsel. *See* Declaration of Deborah Kovsky-Apap ("Kovsky Dec."), attached hereto as **Exhibit A**, at ¶ 4. The Withhold Ad Hoc Group promptly engaged with the Debtors with respect to the "key legal issue" of whether assets in Withhold accounts belonged to customers or to the Debtors' estates. *Id.* ¶ 5. At the Debtors' second day hearing on August 16, 2022, the Debtors noted, as one of their four "key workstreams advanced since filing," their engagement with stakeholders, including counsel to the Ad Hoc Group of Withhold Account Holders. *Celsius Second Day Hearing Presentation*, available at https://cases.stretto.com/public/x191/11749/CORRESPONDENCE/1174908162250000000001.pdf.

10. On September 1, 2022, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 670] (the "Motion to Return Assets"). In their Motion to Return Assets, the Debtors requested authority to allow withdrawals of coins that were only ever

4

in the Custody Program and Withhold Accounts, as well as cryptocurrency transfers made in the ninety days before the Petition Date from the Earn Rewards program to Custody or Withhold that were, in the aggregate, under the preference statutory floor of $7,575. The Debtors sought to impose the $7,575 limitation because, although they "believe[d], following analysis by their advisors and with input from certain of their key stakeholders, that the cryptocurrency assets in the Custody Program and Withhold Accounts likely do not constitute property of the estates," they also believed that transfers from Earn or Borrow to Custody or Withhold gave rise to colorable preference claims. Motion to Return Assets, ¶ 4.

11. On September 7, 2022, the Withhold Ad Hoc Group filed the *Ad Hoc Group of Withhold Account Holders' Motion for Relief from the Automatic Stay* [Docket No. 737] (the "Stay Relief Motion"), arguing that—as the Debtors indicated in their Motion to Return Assets—cryptocurrency in Withhold Accounts is not property of the Debtors' estates, and requesting that members of the Withhold Ad Hoc Group be permitted to withdraw their assets.

12. Issues raised in the Stay Relief Motion overlapped with those in the Motion to Return Assets, as well as in an adversary proceeding commenced by the Ad Hoc Group of Custodial Account Holders (the "Custody Ad Hoc Group"). The Court ordered the Debtors, the Committee and the two Ad Hoc Groups to meet and confer regarding a path forward to resolve these keys issues. Following intensive negotiation, the parties filed the *Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Orders* [Docket No. 1044] (the "Joint Stipulation"), consisting of two phases ("Phase I" and "Phase II").

13. The threshold legal issues to be addressed in Phase I were whether assets in Custody and Withhold are property of the Debtors' estates, and if not, whether the Debtors

5

should nonetheless be entitled to continue to hold those assets where the Debtors had potentially viable claims against the account holders. Joint Stipulation at 4.

14. In Phase II, the parties would select bellwether hypothetical defendants to obtain indicative rulings as to potential defenses to preference claims. Phase II contemplated extensive fact and expert discovery, stipulations of fact, motion practice and an evidentiary hearing, all on a highly expedited schedule. Joint Stipulation at 6.

15. Following a trial on Phase I issues on December 7, 2022, the Court ruled from the bench that digital assets transferred into Withhold accounts that were not supported on the platform (the "Ineligible Withhold Assets") are not property of the Debtors' estates. *See* Hr'g Tr., Dec. 7, 2022, at 215:4-217:1. Although none of the members of the Withhold Ad Hoc Group held any Ineligible Withhold Assets, the Withhold Ad Hoc Group—realizing that no one else was representing the interests of the holders of those particular Withhold assets—conferred, through counsel, with the Debtors on the terms of a proposed order (the "Withdrawal Order") and regularly followed up to ensure that the Debtors were working on identifying all Ineligible Withhold Assets so that they could be returned to customers. Kovsky Dec. ¶ 6.

16. The Court did not rule, following the Phase I trial, whether Withhold assets other than Ineligible Withhold Assets are property of the Debtors' estates. *See* Hr'g Tr., Dec. 7, 2022, at 187:5-10. Nonetheless, the Court indicated a "strong preference" for the Withhold Ad Hoc Group to "actively proceed with" Phase II. *Id*. The Withhold Ad Hoc Group agreed to do so. *Id.* at 198:23-199:2.

17. Shortly after the December 7 hearing, while simultaneously negotiating the Withdrawal Order and preparing for Phase II, the Debtors, Committee and Withhold Ad Hoc

6

Group also began discussions on a potential settlement regarding the Phase II issues and the disposition of the remaining Withhold assets. Kovsky Dec. ¶ 8.

18.   On March 8, 2023, the Debtors and the Withhold Ad Hoc Group represented to the Court at a hearing that they had reached an agreement in principle with respect to the Withhold assets. Hr'g Tr., Mar. 8, 2023, at 29:11-19 (withdrawing Withhold Ad Hoc Group's objection to extension of Debtors' exclusivity period based on agreement in principle as to treatment of Withhold assets). On March 28, 2023, "after three months of extensive good faith and arm's-length negotiations between the Parties and their respective advisors,"[4] the Debtors, Committee and Withhold Ad Hoc Group finalized the terms of the agreement (the "Withhold Settlement").

19.   Under the Withhold Settlement, Withhold Account holders are entitled to receive 15% of the allowed amount of their Withhold claims as an in-kind distribution, with the remaining 85% treated as an Earn Claim, plus a release of avoidance actions related to the settling account holders' Withhold claims. In exchange, the settling account holders agreed not to pursue any further litigation against the Debtors related to the Withhold claims.

20.   Importantly, the Withhold Settlement that the Withhold Ad Hoc Group negotiated also required the Debtors to offer the same 15% extra in-kind distribution under its plan of reorganization (the "Plan") to *all* Withhold account holders, not just the members of the Ad Hoc Group. As a result of the Withhold Ad Hoc Group's efforts, the Debtors' Plan provides that if Class 7 (Withhold Claims) votes to accept the Plan, "each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Cryptocurrency equal to 15% of such Holder's

---

[4] *Joint Motion for Entry of an Order (I) Approving the Settlement by and among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334] (the Joint Motion to Approve Settlement"), ¶ 18.

7

Withhold Distribution Claim . . ., and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration. . . ." Plan [Docket No. 3319] at 33.

21. The compromise embodied in the Withhold Settlement resolved the status of the Withhold assets and provided certainty to the Debtors' customers who had been stuck in limbo without the need for further protracted and costly litigation over a "key legal issue." The Withhold Settlement—the second of four significant settlements that the Debtors would ultimately reach with their four major customer groups (Custody, Withhold, Earn and Borrow)—also helped pave the way for a largely consensual Plan. As the Debtors and Committee have explained, "given that the Court has not determined whether Transferred Withhold Assets are property of the Debtors' estates, this Settlement provides Settling Withhold Account Holders with a projected recovery in between the projected recoveries that will be offered to Settling Custody Account Holders and holders of Earn Claims under the Plan. This is an appropriate middle ground approach, and by providing this recovery to all holders of Withhold Claims under the Plan, all parties have a reasonable opportunity to review and understand the terms of the Settlement before determining whether to vote to accept the Plan." Joint Motion to Approve Settlement, ¶ 39.

22. The Debtors' *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement") anticipates that holders of Withhold claims—including Withhold account holders who are *not* members of the Withhold Ad Hoc Group—will receive a recovery of 72% under the Plan, as compared with the anticipated 67% to be received by holders of Earn claims. In addition, a greater proportion of the distributions to holders of Withhold claims will be

in the form of cryptocurrency. The settlement negotiated by the Withhold Ad Hoc Group and embodied in the Plan was overwhelmingly approved by Class 7 (Withhold Claims), who voted in favor 98.79% by number and 82.56% by amount. *Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560], at 6.

23.     Equally important, the settlement reached by the Debtors, Committee and Withhold Ad Hoc Group preserves 85% of the Withhold assets—cryptocurrency valued at approximately $12.3 million at the time of the "pause," and likely significantly more today—for the benefit of the estate and its general unsecured creditors.

## RELIEF REQUESTED

24.     By this Application, the Withhold Ad Hoc Group requests entry of an order, pursuant to Bankruptcy Code §§ 503(b)(3)(D) and (b)(4), allowing as an administrative expense of the estates $191,697.00 in fees on account of the reasonable and necessary professional services rendered to the Withhold Ad Hoc Group by Troutman Pepper and $3,745.61 in actual and necessary costs and expenses incurred by Troutman Pepper in its representation of the Withhold Ad Hoc Group. Such fees and expenses constitute a substantial contribution in these Chapter 11 Cases that benefited the Debtors, their estates and the Chapter 11 process.

## BASIS FOR RELIEF REQUESTED

25.     Section 503(b)(3)(D) of the Bankruptcy Code grants administrative expense status to claims for the "actual, necessary expenses" incurred by a creditor or unofficial committee "in making a substantial contribution in a case under chapter 9 or 11 of this title." 11 U.S.C. § 503(b)(3)(D). In addition, Bankruptcy Code § 503(b)(4) allows administrative expenses for "reasonable compensation for professional services rendered by an attorney . . . of an entity

9

whose expense is allowable" under § 503(b)(3)(D) and reimbursement of "actual, necessary expenses incurred by such attorney." 11 U.S.C. § 503(b)(4).

26. Although the Bankruptcy Code does not define what constitutes a "substantial contribution," courts consider several factors when determining whether an applicant substantially contributed to the case, such as: (i) whether the services were rendered solely to benefit the applicant or to benefit all parties in the case; (ii) whether the services resulted in an actual and demonstrable benefit; and (iii) whether the services were duplicative of those rendered by estate professionals. *See, e.g., In re Dana Corp.*, 390 B.R. 100, 107-08 (Bankr. S.D.N.Y. 2008); *In re Mirant Corp.*, 354 B.R. 113, 132-34 (Bankr. N.D. Tex. 2006), *subsequently aff'd*, 308 F. App'x 824 (5th Cir. 2009). In addition, the fees sought must be "reasonable ... based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title," and expenses must be "actual and necessary." 11 U.S.C. § 503(b)(4).

27. In these cases, the services were rendered not only to benefit the Withhold Ad Hoc Group, but the case as a whole; the services resulted in an actual and demonstrable benefit well in excess of the amount sought by the Withhold Ad Hoc Group; the services were non-duplicative of those performed by estate professionals; and the fees and expenses sought are reasonable, actual and necessary.

A. **The Withhold Ad Hoc Group's efforts served the general good in these Chapter 11 Cases.**

28. While "[e]fforts undertaken by creditors *solely* to further their own self interest are not compensable under section 503(b)," a creditor's motive is not determinative of the outcome. *In re Bayou Group, LLC*, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010) (quoting *Dana Corp.*, 390 B.R. at 108 (emphasis added)). Courts have recognized that "a measure of self-

10

interest seems likely in nearly every situation, and 'the existence of a self-interest cannot in and of itself preclude reimbursement.'" *In re S & Y Enterprises, LLC*, 480 B.R. 452, 463 (Bankr. E.D.N.Y. 2012) (quoting *In re AmFin Fin. Corp.,* 468 B.R. 827, 833 (Bankr.N.D.Ohio 2012)); *see also In re S & Y Enterprises, LLC*, 480 B.R. 452, 463 (Bankr. E.D.N.Y. 2012) ("An applicant for a substantial contribution administrative expense 'need not possess an altruistic motive in taking over the debtor nor an intention that his or her actions will benefit [the] debtor's estate.'") (citation omitted). A substantial contribution application that "acted to benefit a class of creditors or interest-holders of which class it was a member" has "satisfied the requirement that the party's conduct serve the more general good." *Mirant*, 354 B.R. at 133.

29.   Here, the fifteen members of the Withhold Ad Hoc Group acted not only for their own benefit, but for the benefit of all Withhold account holders. They litigated the ownership of Withhold assets not only for themselves, but for all Withhold account holders. They negotiated a settlement not only for themselves, but one that was incorporated into the Debtors' Plan, made available to all Withhold account holders, and overwhelmingly accepted by them. Moreover, the primary issue raised, litigated and settled by the Withhold Ad Hoc Group— the ownership of the digital assets in the Withhold accounts—was recognized by the Debtors as one of the "key legal issues that would be critical to the outcome of the Chapter 11 Cases." Disclosure Statement at 208.

30.   At the December 7 hearing, the Court highlighted the benefit to the bankruptcy process of the good-faith efforts of the Withhold Ad Hoc Group, along with the Debtors, Committee and Custody Ad Hoc Group:

> [O]ne of the things that I think in good faith, both the Debtors' counsel, the Committee's counsel, and the Ad Hoc Committee's counsel have tried to do is identify things that are sort of what I would refer to as the gating issues. If the Court can resolve them as

11

> to some groups of creditors, it may well be rules that would suggest the outcome as to everybody else. So that's what I'm trying to do. That's what I think the Ad Hoc Committees were trying to do.

Dec. 7 Hr'g Tr. 203:6-15.

31. Accordingly, the Withhold Ad Hoc Group's actions were not solely self-interested, but were aimed at "serv[ing] the more general good."

### B. The services provided resulted in an actual and demonstrable benefit to Withhold account holders, the Debtors' estates, and the Chapter 11 Cases.

32. Some courts require a substantial contribution applicant to show a benefit to the estate. "The statute, however, does not so require—the language chosen by Congress, 'substantial contribution in a case,' makes no reference to the estate, though certainly such language could have been crafted (*see, e.g.,* Code § 503(b)(3)(B) which provides for reimbursement of a creditor that recovers property 'for the benefit of the estate.')." *Mirant*, 354 B.R. at 132; *see also Bayou Group*, 431 B.R. at 561 (explaining that "section 503(b)(3)(D) focuses on process as much as on contribution, on the movant's substantial contribution in *the case*") (emphasis in original).

33. In *Mirant*, the court "consider[ed] compensable under section 503(b) services that substantially contributed to the **proper allocation of the Debtors' value among stakeholders**." *Id.* (emphasis added). Those are precisely the type of services that Troutman Pepper provided on behalf of the Withhold Ad Hoc Group in these Chapter 11 Cases. Significant, gating questions existed at the outset of the case as to whether assets in Withhold accounts were property of the estate, and if they were, whether they were subject to avoidance and recovery. The Withhold Ad Hoc Group's Stay Relief Motion and participation in Phase I and preparation for Phase II led to the Withhold Settlement, which provided a fair and equitable allocation of value to Withhold account holders, while preserving millions of dollars' worth of

12

cryptocurrency for the estate and its general unsecured creditors. This "proper allocation of the Debtors' value" benefited the Withhold account holders, the estates, and the integrity of the bankruptcy process, and it would not have occurred absent the Withhold Ad Hoc Group's efforts.

34. Furthermore, whether viewed from the perspective of the Withhold account holders or the estate and its general unsecured creditors, the Withhold Settlement achieved by the Withhold Ad Hoc has significant value. From the perspective of the Withhold account holders, the Withhold Settlement allocates approximately $2 million in additional cryptocurrency to their class and increases the overall distributions on their claims by 5%. From the perspective of the estate and its unsecured creditors, the settlement allows approximately $12 million of cryptocurrency, which otherwise might have been deemed to be property of the Withhold account holders, to be treated as property of the estate.

35. The Phase I and Phase II process and the subsequent Withhold Settlement also helped pave the way for a largely consensual Plan and avoided significant costs, delays and uncertainty. Thus, the Withhold Ad Hoc Group substantially contributed to the Debtors' reorganization process. *See, e.g.*, *In re M&G USA Corp.*, 599 B.R. 256, 263 (Bankr. D. Del. 2019) (noting that in some circumstances, "creditor activities which result in meaningful settlements and a consensual process may constitute a substantial contribution to reorganization"); *cf. Mirant*, 354 B.R. at 133 ("Absent the Valuation Hearing and consensus on the Plan, the parties would have faced more lengthy litigation and concomitant costs and uncertainty. . . . The court is satisfied that the savings and achieved results warrant the compensation and reimbursement it awards below.").

### C. The services provided were not duplicative of those performed by estate professionals.

36. The interests of the Withhold account holders were not represented by any statutory fiduciary, nor did any estate professionals provide services to protect those interests.[5] Indeed, it was through an adversarial process that the Withhold Ad Hoc Group, Debtors and Committee reached the "proper allocation of the Debtors' value among stakeholders." Accordingly, the services provided were not duplicative of those provided by the Debtors' or Committee's professionals, but rather were the necessary counterpoint that enabled the parties to get to the right answer with respect to the status of the Withhold assets.

### D. The amounts requested represent the Withhold Ad Hoc Group's actual and necessary expenses and reasonable compensation for professional fees.

37. The fees and expenses of Troutman Pepper represent reasonable compensation for the professional services rendered to the Withhold Ad Hoc Group in litigating and negotiating a settlement of the key legal issue of the status of the Withhold assets, as well as the actual, necessary expenses incurred in providing such services. In representing the Withhold Ad Hoc Group, Troutman Pepper maintained detailed records of the time expended by professionals and paraprofessionals in rendering services to the group, as well as of expenses incurred. A copy of Troutman Pepper's time records and itemization of expenses is included as **Exhibit B** attached hereto, along with a summary broken out by task codes.

38. For further clarification, Troutman Pepper agreed to provide a courtesy discount to the Withhold Ad Hoc Group through 2022 in the amount of a $300 per hour

---

[5] The Withhold Ad Hoc Group filed a statement in support of the Debtors' motion to redact certain personally identifiable information from the creditor matrix and other publicly-filed documents [Docket No. 633], which was arguably duplicative of the services provided by estate professionals. Accordingly, the Withhold Ad Hoc Group is not seeking reimbursement of the $2,432.00 in professional fees incurred in connection with that statement in support.

reduction of Deborah Kovsky-Apap's standard hourly rate. Kovsky Dec. ¶ 4. This resulted in a total discount to the Withhold Ad Hoc Group of $48,390.00, which Troutman Pepper is not seeking to recover here. In addition, Troutman Pepper has agreed to waive its fees for non-working travel. Troutman Pepper has also agreed to waive its fees and expenses incurred in connection with the preparation and filing of this Application, totaling approximately $12,000. Finally, the Withhold Ad Hoc Group is not seeking reimbursement of Troutman Pepper's fees and expenses incurred in connection with the Group's objection to the Debtors' Disclosure Statement, negotiation of the ADR Procedures set forth in the Plan, or participation in the confirmation hearing.

39.     The Withhold Ad Hoc Group believes that Troutman Pepper's time records and itemization of expenses provide sufficient information for the Court to determine whether the hourly rates and the number of hours worked were reasonable.

## NOTICE

40.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Debtors; (iii) counsel to Committee; and (iv) all other parties registered to receive notice via ECF.  In light of the nature of the relief requested, the Withhold Ad Hoc Group submits that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Withhold Ad Hoc Group respectfully request that the Court enter an order, substantially in the form as **Exhibit C** attached hereto, (i) allowing as an administrative expense claim in the amount of $195,442.61, on account of professional fees and expenses incurred in connection with the Withhold Ad Hoc Group's substantial contribution in these Chapter 11 Cases, (ii) authorizing the Debtors to pay Troutman Pepper the amount of

15

$195,442.61 in fees and expenses and (iii) granting the Withhold Ad Hoc Group such other and further relief as the Court deems just and appropriate.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: October 2, 2023<br>New York, New York | /s/ Deborah Kovsky-Apap<br>**TROUTMAN PEPPER HAMILTON SANDERS LLP**<br>Deborah Kovsky-Apap<br>875 Third Avenue<br>New York, New York 10022<br>Telephone: (212) 704-6000<br>Facsimile: (212) 704-6288<br>Email: deborah.kovsky@troutman.com<br><br>*Counsel to the Ad Hoc Group of Withhold Account Holders* |