**Hearing Date:  October 24, 2023 at 9:00 a.m.**
**Objection Deadline:  October 16, 2023 at 4:00 p.m.**

**ERVIN COHEN & JESSUP LLP**
David Tarlow, Esq.
  dtarlow@ecjlaw.com
William Christopher Manderson, Esq. (admitted *pro hac vice*)
  cmanderson@ecjlaw.com
Chase A. Stone, Esq. (admitted *pro hac vice*)
  cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325
cmanderson@ecjlaw.com

*Attorneys for Simon Dixon and BF To The
Future*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF APPLICATION AND APPLICATION OF BNK TO THE FUTURE (BF)
PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND
PAYMENT OF PROFESSIONAL FEES AND EXPENSES INCURRED
IN MAKING A SUBSTANTIAL CONTRIBUTION**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

1

**PLEASE TAKE NOTICE**, that on October 2, 2023, BNK To The Future ("BF") and its CEO Simon Dixon ("Mr. Dixon") (together, the "Applicants") timely filed this *Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4)) For Allowance Of Payment Of Professional Fees And Expenses Incurred In Making A Substantial Contribution* (the "Application") with the *Declaration Of Simon Dixon In Support Of Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) for Allowance Of Payment Of Professional Fees And Expenses Incurred in Making a Substantial Contribution* filed concurrently therewith (the "Dixon Declaration").  A hearing on the Application is scheduled to be heard before the Honorable Martin Glenn, Chief Judge of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in Room 523, One Bowling Green, New York, New York 10004, on October 24, 2023 at 9:00 a.m. (prevailing Eastern Time) [Docket No. 3498].

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Application (each, an "Objection") shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, all General Orders applicable to Chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York, and pursuant to this Court's *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief* [Docket No. 2560], and that *Notice Of Further Revised Schedule For Substantial Contribution Applications* [Docket No. 3498]; and (c) be filed with the Bankruptcy Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system, and in accordance with General Order M-399; and (d) be served so as to be actually received no later than October 16, 2023 (the "Objection Deadline") on (i) the

entities on the Master Service List available on the case website of the above-captioned debtors

and debtors in possession, including affiliates, (the "Debtors") at https://cases.stretto.com/celsius

and (ii) any person or entity with a particularized interest in the subject matter of the Application.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are

timely filed, served, and received will be considered at the Hearing.  Failure to file a timely

Objection may result in entry of a final order granting the Application.

**PLEASE TAKE FURTHER NOTICE** that if no Objections or other responses are

timely filed and served with respect to the Application, BF may, on or after the Objection

Deadline, submit to the Bankruptcy Court an Order substantially in the form appended to the

Application as **Exhibit A,** which order the Bankruptcy Court may enter without further notice or

opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the hearing may be continued or adjourned

thereafter from time to time without further notice other than an announcement of the adjourned

date or dates in open court at the Hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Application and other

pleadings filed in these Chapter 11 cases may be obtained free of charge by visiting the website

of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Application and

other pleadings filed in these Chapter 11 cases by visiting the Court's website at

http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

DATED:    October 2, 2023

Respectfully submitted,


By:              /s/ William Christopher Manderson
William Christopher Manderson, Esq. (*pro hac vice*)
  cmanderson@ecjlaw.com
David Tarlow, Esq.
  dtarlow@ecjlaw.com
Chase A. Stone, Esq. (*pro hac vice*)
  cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Email: cmanderson@ecjlaw.com

*Attorneys for Simon Dixon and BNK To The Future (BF)*

**ERVIN COHEN & JESSUP LLP**
David Tarlow, Esq.
  dtarlow@ecjlaw.com
William Christopher Manderson, Esq. (admitted *pro hac vice*)
  cmanderson@ecjlaw.com
Chase A. Stone, Esq. (admitted *pro hac vice*)
  cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325
cmanderson@ecjlaw.com

*Attorneys for Simon Dixon and BF To The
Future*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*[2] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**APPLICATION OF BNK TO THE FUTURE (BF) PURSUANT TO 11 U.S.C. §§
503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF PROFESSIONAL
FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION**

---

[2]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................8

JURISDICTION AND VENUE ............................................................................13

BACKGROUND .................................................................................................13

RELIEF REQUESTED.........................................................................................25

BASIS FOR RELIEF ...........................................................................................27

I.      BF and Mr. Dixon have Made a Substantial Contribution to This Chapter 11
        Proceeding Based on a Preponderance of the Evidence .......................................27

        A.      Contributions Made By BF and Mr. Dixon Benefitted The Estate and All
                Interested Parties...................................................................................27

                1.      Phase I—Development And Foundation Of Plan .......................27

                2.      Phase II—Approval of Chapter 11 Plan ...................................33

        B.      Such Contributions Were Actual, Significant and of Demonstrable Benefit
                to The Debtors' Estates...........................................................................35

                1.      Services Were Unique and Not Duplicative of Others .............37

II.     BF's Counsel's Fees and Expenses are Reasonable ..........................................38

III.    DBK's Fees and Expenses Represent Actual, Necessary Expenses.................39

        A.      Time and Labor Required, and Skills Necessary...................................39

                1.      Customary fees and expenses are reasonable ...........................39

NO PRIOR REQUEST .........................................................................................40

RESERVATION OF RIGHTS ..............................................................................41

MOTION PRACTICE/LOCAL RULE 49 ............................................................41

NOTICE................................................................................................................41

CONCLUSION......................................................................................................41

# TABLE OF AUTHORITIES

**Page**

## CASES

*In re Bayou Grp., LLC,*
    431 B.R. 549 (S.D.N.Y. 2010)..................................................................... 26, 28

*In re Best Products Co., Inc.,*
    173 B.R. 862 (Bankr. S.D.N.Y. 1994)....................................................... 27, 32

*In re Dana Corp.,*
    390 B.R. 100 (Bankr. S.D.N.Y. 2008) ............................................................ 26

*In re Granite Partners, L.P.,*
    213 B.R. 440 (Bankr. S.D.N.Y. 1997)........................................... 25, 26, 27, 32

*In re U.S. Lines, Inc.,*
    103 B.R. 427 (Bankr. S.D.N.Y. 1989) ............................................................ 26

*Short Pump Ent't, L.L.C. v. Randall's Island Family Golf Ctrs. (In re Randalls Island
    Golf Ctrs., Inc.),*
    300 B.R. 590 (Bankr. S.D.N.Y. 2003) ............................................................ 27

*Trade Creditor Grp. v. L.J. Hooker Corp., Inc.,*
    188 B.R. 117  (S.D.N.Y. 1995)................................................................ 26, 27

## STATUTES

11 U.S.C. §§ 503(b)(3)(D) ....................................................................... passim

11 U.S.C. §§ 503(b)(4) ............................................................................. passim

28 U.S.C. § 1334 .......................................................................................... 13

28 U.S.C. § 1408 .......................................................................................... 13

28 U.S.C. § 1409 .......................................................................................... 13

28 U.S.C. § 157 ............................................................................................ 13

28 U.S.C. § 157(b) ....................................................................................... 13

## PRELIMINARY STATEMENT

Simon Dixon ("Mr. Dixon"), representing BNK To The Future ("BF"), by and through its

undersigned counsel Ervin Cohen & Jessup LLP ("ECJ"), hereby files this application (the

"Application") pursuant to sections 503(b)(3)(D) and 503(b)(4) of Title 11 of the United States

Code (the "Code") for entry of an order allowing as administrative expenses a fraction of the

reasonable fees and expenses incurred by BF (together, the "Dixon Parties" or "Mr. Dixon") of

Brown Rudnick LLP ("BR"), DBK Financial Services Ltd. ("DBK"), and ECJ from the period of

June 17, 2022 through the Effective Date of the Plan.  In support of this Application, the Dixon

Parties provide as follows:

1.      As set forth in the Dixon Declaration, prepetition, on or around June 12, 2022,

Mr. Dixon became aware that Celsius Network Limited ("Celsius" or in reference to post-

petition activities of debtors, the "Debtor") had 'paused' account holders' ability to withdraw

their assets on or around June 12, 2022.  Since June 17, 2023, and upon the filing of the Chapter

11 petition on July 15, 2022 ("Petition Date"), Mr. Dixon, representing BF, as a creditor, and

himself, in his capacity as both a creditor and a fiduciary of BF (having separate claims), has

sought to aid the Estate and its creditors in developing and securing approval of a successful plan

of reorganization (the "Plan").  In the intervening year and a half since the Petition Date, Mr.

Dixon has held various positions with and related to Celsius in this matter, including as an

unpaid Plan consultant ("Plan Consultant"), an unpaid consultant to the Earn Ad Hoc

Committee, and a key signatory to the Plan Support Agreement ("PSA").

2.      Mr. Dixon has made a substantial contribution to the Estate and to the body of

creditors—over 600,000 accounts in the 'Earn' program (603,000 estimated creditors in total)

with an approximate value of over $4 billion estimated as of the Petition Date—as demonstrated

by an abundance of evidence establishing his contributions.  Mr. Dixon has leveraged his

involvement in the restructuring process; consequently, the fees and expenses BF incurred to

negotiate better outcomes for creditors, as well as to provide specific information (not merely

gathering facts) regarding the events of the case, including details about the development of the

plan of reorganization (the "Plan"), and answering questions about the Plan, together with

consulting with respect to plan features, that significantly enhanced the reorganization process as

a whole.

  3.  Due to Mr. Dixon's detailed knowledge and extensive audience on social media

platforms, which includes unsecured creditors, committee constituents, parties-in-interest.

Accordingly, even prominent legal counsel, the Debtor and the Unsecured Creditors Committee

("UCC") formally sought for Mr. Dixon to provide, among other things: (1) critical outreach and

communication directed specifically to unsecured creditors (designed to enhance their

understanding of the Chapter 11 plan process overall); (2) guidance and support to Plan

proponents during the bid process to investigate, develop, and eventually advocate for key

features of the reorganization, which are now critical parts of the Plan; (3) consulting services to

the Ad Hoc committees, including strategic planning advice, as well as working as a formal Plan

Consultant on behalf of the Debtor; and (4) above all, leverage his influence, unique knowledge,

and qualifications to facilitate the Plan confirmation process with the intention of maximizing

value to the Estate for all unsecured creditors, and, where possible, save significant costs.  Mr.

Dixon has done all that, and, in doing so, has conferred substantial benefit to the Estate and

unsecured creditors, and helped avoid costly conflict and waste of Estate resources.

  4.  Mr. Dixon's contributions are far greater than *mere* participation in these

proceedings.  As demonstrated by numerous first-hand observations appended to the Dixon

Declaration as Exhibit F, Mr. Dixon has acted as a voice of reason in performing outreach to

unsecured creditors. In particular, Mr. Dixon's efforts enhanced the Estate through his

interactions with thousands of U.S. and individual foreign creditors who follow Mr. Dixon online

from abroad, and lack access and/or resources to understand the details of these proceedings that

affect their rights.  In that respect, the impact of Mr. Dixon's activities goes beyond simply

sharing expenses or documenting updates. Rather, these activities are sufficient to support a

contribution claim.  *But-for* Mr. Dixon's efforts, there is ample reason to believe that this case

would be no different from the proceedings of cryptocurrency restructurings that have resulted in

vastly inferior outcomes.[3]

5.      All of the actions undertaken by Mr. Dixon, in his capacity as BF's CEO,

necessitated the retention of professionals, as well as the expenditure of significant time,

resources, and funds, that qualifies for substantial contribution under section 503(b)(3)(D) as it

benefitted the reorganization process and the Estate as a whole.  Mr. Dixon's substantial

contributions from the Petition Date to the present, are actual, demonstrable, and unique, as

ultimately evidenced by the causal connection between BF and Mr. Dixon's efforts and the most

critical event in this case to date: the significant number of votes in favor of confirming the Plan.

6.      Since Petition Date, Mr. Dixon assumed the unique role as educator and guide to

the mass audience of both U.S.-based and international unsecured creditors.  His guidance was

particularly important for international unsecured creditors, many of whom lack knowledge not

only of cryptocurrency, but also of the complexities of the U.S. legal and tax systems,

bankruptcy proceedings, and the Code.  Mr. Dixon's online communication and guidance has

---

[3]      Relevant here, the law firm Kirkland & Ellis ("K&E") serves as bankruptcy counsel for this Debtor, as well as the debtors (and affiliates) in similar cryptocurrency Chapter 11 'mega' proceedings of *BlockFi, Inc.* (Case No. 22-19361 (MBK)) (liquidation plan) and *Voyager Digital Holdings, Inc.* (Case No. 22-10943 (MEW)) (liquidation plan).  Unlike this case, neither of K&E's other cases have achieved similar success as in these proceedings, both without Mr. Dixon's participation.

been hugely influential in garnering support for the reorganization process, and ultimately contributing to the overwhelming vote of unsecured creditors in favor of the Plan. Mr. Dixon's contributions have mitigated the crippling effect of fraud for many creditors, whose entire life savings were at risk through their investments in Celsius. As a result, Mr. Dixon's shared knowledge and guidance has conferred a tangible benefit with a direct positive benefit worth considerable value to the entire Chapter 11 case's administration.

7.      11 U.S.C. § 503(b)(3)(D) does not bar this Application's request for the allowance of administrative fees based upon activities that occurred outside the confines of the courtroom. In that respect, it is noteworthy that Court was rarely privy to the parties' negotiations, settlement discussions, and the critical communications that invariably occur outside the courtroom/formal legal proceedings, or via online forums (to the extent that these events are not depicted in filings). During those times, Mr. Dixon's audience of unsecured creditors, professionals, and others involved in the case received an actual and demonstrable benefit that, by its very existence, was not primarily for BF and/or Mr. Dixon's own self-interest. These activities ultimately facilitated the reorganization process by giving many unsecured creditors a voice and forum for actively participating (and understanding) these proceedings, which is supported by the evidence. Simply put, Mr. Dixon was the communicator and leader that the creditors and the Estate needed, which would typically be expected of an estate-compensated professional.

8.      Mr. Dixon's contributions occurred in two key 'phases' of the case, at which time he incurred fees and expenses for the retention of legal counsel and professional advisors:

    i.      ***Phase 1—Development/Foundation Of Plan***

    ii.     ***Phase 2—Approval Of Chapter 11 Plan***

9.     Mr. Dixon respectfully requests that the Court allow and authorize a fraction of

the fees and expenses of BR and ECJ to be paid as administrative expenses,[4] in the amounts

requested herein.  The fees and expenses sought through this Application are a mere fraction of

the total fees which BF and Mr. Dixon incurred since Petition Date (as discussed *infra*).  In

recognition of the enormous sums creditors have lost, and to avoid any perception of the

'mushrooming' administrative fees, BF and Mr. Dixon are **voluntarily reducing** the amount of

allowed fees and expenses requested herein **by 50 percent** of the actual amounts incurred by BR.

Mr. Dixon has voluntarily taken this extraordinary step to keep the administrative claim to a

minimum, while carefully confining the sums sought to only those amounts which were clearly

beneficial for the reorganization process and the Estate, as a whole.  BF, by and through Mr.

Dixon, simply seeks the allowance of fees expended which made **material differences to the**

**Estate and to the outcome of the reorganization.**

10.     BF respectfully requests that (a) 50 percent of BR's fees and expenses already

incurred and paid in the sum of $222,688.50 be reimbursed; (b) 50 percent of DBK's fees and

expenses already incurred and paid in the sum of $59,034.00; and (c) ECJ's reasonable legal fees

and expenses in the sum of $239,306.00, and the additional amount not to exceed $50,000.00 in

connection with making an appearance and/or responding to anticipated objections, and

additional matters, through the Effective Date of the Plan, for a total amount of $571,028.50.

Mr. Dixon also seeks $20,859.65 in expenses. For the reasons set forth herein, such relief is

---

[4]      "Debtors and the [Unsecured Creditors] Committee *will support any substantial contribution application . . . submitted by the Consenting Dixon Parties* [e.g., BF and Mr. Dixon] for the payment of legal fees and expenses pursuant to section 503(b)(3)(d) of the Bankruptcy Code relating the negotiation and execution" of the PSA (subject to Court approval) [Docket No. 3516], which correspondence to the fees requested in full **as to ECJ's fees and expenses only.**  PSA, Section 13 Expenses, pages 24-25 (emphasis added).

"Nothing in [the PSA] shall prevent the Consenting Dixon Parties from filing an application for substantial contribution for other fees or expenses pursuant to 503(b)(3)(D)."  *Id.*

consistent with section 503(b) of the Bankruptcy Code and applicable case law and this

application should be granted in its entirety.

## JURISDICTION AND VENUE

11.    The United States Bankruptcy Court for the Southern District of New York (the

"Court") has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York, dated entered February 1, 2012.

12.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 .

13.    This is a core proceeding under 28 U.S.C. § 157(b).

14.    The statutory predicates for the relief requested herein are 11 U.S.C. §§

503(b)(3)(D) and 503(b)(4) of the Code.

## BACKGROUND

15.    Mr. Dixon is a British foreign national, ex-investment banker, stockbroker, and

market maker with significant expertise in global financial markets and Bitcoin.  Beginning in

2006, Mr. Dixon moved away from working in corporate finance to establish a public platform,

seeking to educate his audience on banking and monetary reform.  Mr. Dixon has garnered a

significant audience, with over 90,000 subscribers on his YouTube channel and approximately

127,000 followers on his Twitter account.  Mr. Dixon's motivation to pursue monetary reform

stems from his early life experience witnessing the harm caused by the loss of his father's

pension, which has since led to his resolve that people must be empowered to have control over

their money.

16.    For more than a decade, Mr. Dixon has been involved in and developed extensive

experience and knowledge of Bitcoin and cryptocurrencies, which he sought to implement in his

online investment platform in 2011.  *See* Declaration of Simon Dixon ("Dixon Dec.")

concurrently filed herewith, ¶ 2.  Mr. Dixon is the author of the first published book to include

Bitcoin ("BTC"), and was an early investor in Bitcoin (beginning in 2011), and many companies

specializing in technology based on Bitcoin and the wider cryptocurrency sector.  *Id.* Mr. Dixon

is also the co-founder and CEO of BF, an online investment platform which aids individual

investors in growing wealth through investments in technology, including Bitcoin, Ethereum

("ETH") staking, and procuring shares of cryptocurrency companies.  *Id.*  Mr. Dixon has

developed a uniquely vast knowledge of Bitcoin, cryptocurrency, and Bitcoin private equity, as

well as restructuring of Bitcoin companies, which he shares with his audience on his various

social media platforms.  *Id.*

17.    In or around 2020, BF hosted a Series A funding round for Celsius Network Ltd.,

of which Mr. Dixon personally acquired shares in Celsius Network Limited ("Celsius") (which

was acquired through BF).  *Id.* at ¶ 4.  BF gathered approximately 1,000 of Celsius's accredited

customers and BF's investors, who invested just under $10 million into the shares of Celsius

Network Ltd.  *Id.* Unbeknownst to BF and Mr. Dixon, however, the Series A investment round

was a seemingly attractive opportunity cloaked in false representations made by Celsius co-

founder and CEO Alex Mashinsky ("Mashinsky").  As was revealed by the U.S. Federal Trade

Commission, and contrary to what Mashinsky portrayed to BF and Mr. Dixon, at the time of the

investment Celsius was in fact, deeply insolvent.  *See* Dixon Dec. at ¶ 5.  The purpose of the

Series A funding round was to fraudulently obtain equity finance to shore up Celsius's hidden

insolvency.  *Id.*  The infusion of BF's investment funds, among others, made Celsius appear that

it was solvent, when in reality, it was not.

18.    Without warning, Celsius suspended withdrawals and transfers from and between

accounts on their online platform on June 12, 2022.  *Id.* at ¶ 4.  Prior to the suspension, Mr.

Dixon had personally invested funds from his account and two accounts affiliated with BF, which collectively represented $20 million (with approximately $16 million funded by Mr. Dixon personally).[5] *Id.* at ¶ 10. BF also deposited funds on the Celsius network.[6] Each of these investments, on the part of Mr. Dixon and BF, provide standing as creditors to seek relief through this Application.

19.     On June 17, 2022, Mr. Dixon, as a shareholder of Celsius, met with several Celsius executives and its financial advisors via Zoom, including Mashinsky. *Id.* at ¶7. At this time, Mr. Dixon probed Mashinsky about the extent of Celsius's losses and the percolating regulatory concerns. *Id.* Mashinsky's lack of transparency, combined with serious concerns expressed by Celsius customers, many of whom held the entirety of their life savings with Celsius, began to alarm Mr. Dixon. *Id.* Around that same time, Mr. Dixon's father sadly passed away. In honor of his father, Mr. Dixon felt compelled to devote his time and allocate his resources to assist those who were affected by the massive financial disaster (as many were pensioners), just as his father had been devastated by similar events in the past. *See* Dixon Dec. ¶ 9.

20.     On or around June 17, 2023, Mr. Dixon presented a framework plan for reorganization which, among other things, sought to increase transparency regarding the extent of Celsius's financial distress. *Id.* at ¶ 7. Utilizing his extensive knowledge of Bitcoin cryptocurrency and restructuring efforts of companies within the industry, as well as his sizable social media platform, Mr. Dixon addressed the concerns of investors worried about losing their

---

[5]     Consequently, Mr. Dixon's General Earn Claims are valued at approximately $15 million.
[6]     BF (through its affiliates) has filed proof of claims as to all debtors (Claim Nos. 3183 and 32184) and as to Celsius Network Limited (Claims No. 31846 and 31847) ("BNK To The Future Celsius SP a Segregated Portfolio of BNK To The Future Capital SPC [BNK to the Future US Portfolio] [BNK to the Future Non-US Portfolio" and "BNK To The Future Celsius US SP a Segregate Portfolio of BNK To The Future Capital SPC" respectively].

savings in Celsius though online broadcasts. (*Id.* at ¶12.)

21.     Prepetition, as set forth in the Dixon Declaration, Mashinsky called Mr. Dixon and offered a position to join Celsius's Board of Directors, as a 'special' committee director. (*Id.* at ¶ 8.) On the basis of advice from BR given to Mr. Dixon, acting as a fiduciary to BF, Mr. Dixon declined, as BR appropriately counseled him to avoid such activities.  *Id.* BR's guidance was based on BF's need for Mr. Dixon to put his role as a fiduciary above involvement with another initiative.[7] *Id.* BR advised Mr. Dixon, on behalf of BF, to be cautious about working in any capacity with Mashinsky.  Mr. Dixon and BR prepared a draft email response to Mashinsky, explaining he needed to perform greater 'due diligence' in light of potential conflicts.

22.     Thereafter, on or around July 1, 2022, Mr. Dixon addressed the public via a video posted to his YouTube channel discussing likelihood of Celsius filing for Chapter 11 relief, and to emphasize the need to formulate a reorganization plan to recover lost funds/assets.  *Id.* at ¶ 13. Celsius's imminent insolvency was obvious to Mr. Dixon, in large part because of his experience.  Mashinsky never provided accurate information to BF or Mr. Dixon at any point. *Id.* at ¶ 7.

23.     As Mr. Dixon predicted, on July 13, 2023, Celsius filed for a voluntary Chapter 11 petition.  *See* Dixon Dec., ¶ 17.  Given his personal funds invested in Celsius, Mr. Dixon was a 'top 10' creditor of the Estate. Additionally, as a fiduciary to BF, Mr. Dixon held claims based upon approximately $3.5 million of BF's own balance sheet funds held at Celsius, as well as the approximately $650,000 of segregated funds invested by investors into the Series A funding prepetition via BF.  *Id.* at ¶ 10.

24.     Shortly thereafter, Mr. Dixon applied to join the UCC and retained counsel, BR,

---

[7]     Given Mr. Dixon's role as CEO of BF, and BF's equity interest in the Debtor, Mr. Dixon is a fiduciary to BF.  As such, his fiduciary duties to BF require him to maximize BF's claims.

to support his efforts.  *Id.* at ¶¶ 22-23. While, the UCC chose not to engage Mr. Dixon's services

at that time, it later relied upon Mr. Dixon to assist in the representation of the interests of

unsecured creditors generally.

25.    Also around this time, Mr. Dixon joined and initiated live audio discussions on

Twitter and Twitter Spaces (also known as "X" and/or "X" Spaces) as a means of conducting

informal outreach to the unsecured creditor community generally, at which time he disseminated

information about the initial status of bankruptcy proceedings (e.g., dates/deadlines), as well as

predicted outcomes and offering strategic solutions.  *Id.* at ¶31.  Mr. Dixon's core audience

consists of a wide variety of unsecured creditors, each with varying degrees of knowledge and

understanding about Bitcoin, cryptocurrency, restructuring, and basic principles of the Code.

Mr. Dixon's audience regularly engaged with him and his videos directly by posing questions

and commenting; at the same time, Mr. Dixon became acquainted with prominent professionals

in this case, including counsel for the UCC, the Debtor, and many others, who were familiar with

Mr. Dixon through his videos (some professionals even utilized his content informally for

background on the subject matter).  *Id.* at ¶¶ 33-36. Out of an abundance of caution, Mr. Dixon

makes clear in each video that he is not offering any professional legal advice, or otherwise, and

maintains that assertion in this Application.

26.    In October 2022, Mr. Dixon published a series of seven videos (accompanied by

"AMA" Twitter Space) on his YouTube channel[8] showcasing a comprehensive framework for a

potential Chapter 11 plan of reorganization that developed with the assistance of his legal

---

[8]        The *Making Celsius Creditors Whole* Video Series was viewed over 55,000 times on YouTube.  These
videos were separated thematically into seven different parts: Part 1 of 7: "Equitable Haircut Strategy"; Part 2 of 7:
"Custody and Investment Accounts/Twitter Space AMA Recording"; Part 3 of 7: "Filling The Hole"; Part 4 of 7:
"Profiting From Everything"; Part 5 of 7: "Creating A Compelling Future"/Twitter Space AMA Recording; Part 6 of
7: "Ad-Hoc Clawback & Funding Issues"/Twitter Space AMA Recording; Part 7 of 7: "Celsius Tax Issues (Not Tax
Advice)"/Twitter Space AMA Recording.

counsel BR and professionals including DBK. *Id.* at ¶48. The proposed framework put forth by BF, by and through Mr. Dixon, received overwhelmingly positive support from viewers, including numerous unsecured creditors in the case.[9]  The BF framework was, in fact, the culmination of weeks of diligent financial and legal analysis at the urging of Mr. Dixon.  Mr. Dixon sought to develop a roadmap that unsecured creditors would find promising, as many openly expressed their perception that all hope was lost.  *Id.* The retention of legal professionals was necessary for Mr. Dixon to translate BF's contribution and his ideas into actionable legal objectives, while simultaneously illustrating the possibility (based on Mr. Dixon's past experiences) that Celsius could, in fact, reorganize successfully under a new company, new management, new brand, new licenses and new risk model for the benefit of unsecured creditors.

27.    BF, by and through Mr. Dixon, retained BR as its legal counsel and DBK as its investment banker to help design and advise on the feasibility of such a plan structure. *Id.* at ¶42. BR provided a full regulatory analysis on all aspects of Mr. Dixon's proposed structure, which at the same time, enabled Mr. Dixon to become acquainted with the reorganization process.[10] *Id.*  Mr. Dixon also engaged DBK, who served as BF's head of Investment Banking, as well as external professionals, to provide guidance on the plan structure Mr. Dixon envisaged. In turn, BR's, DBK's, and BF's involvement aided Mr. Dixon in accurately conveying this information to unsecured creditors in a manner that would ethically comport with his role as a non-lawyer.

---

[9]    As one commenter (@timnunn3438) wrote in the comment section of Part 3 on or around October 12, 2022: "Extremely glad we have leadership like Simon and other professionals. Without these people I fear we would be lost and at the mercy of continued greed. Thank you Simon so very much for designing a possible future out of this mess."

[10]    The nature of BR's regulatory analysis was wide-ranging, and included examining the need for government approvals, e.g, Israeli Innovation Authority approval for an offer to the public, Bankruptcy Court approval for distribution of shares to creditors under section 1145 of the Code.

/ / /

28.     As it later became clear, Mr. Dixon's proposed framework became a critical

feature of the ultimate prevailing bid proposed by NovaWulf, Fahrenheit ("FH"), and BRIC. *Id.*

at ¶ 121.  Initially, BF, by and through Mr. Dixon, switched from being a potential sponsor (after

NovaWulf was selected), to lobbying the Debtor to implement a competitive stalking horse

auction to improve terms for unsecured creditors, following advice given from BR. *Id.*

29.     During the stalking horse auction, Mr. Dixon was engaged by the Debtor (by and

through Chris Ferraro, Celsius's Chief Restructuring Officer, CFO, and Interim CEO) to act as

Plan Consultant in order to, among other things, work with all competing bidders.[11] *Id.* at ¶ 121.

Mr. Dixon's consulting work on behalf of the Estate resulted in a significant increase in value

being returned to creditors due to Mr. Dixon's influence on Plan design.

30.     The following chart summarizes the similarities between the BF reorganization

structure submitted and proposed initially by BF in or around early November 2022, the BF

Orderly WindDown ("OWD") Distribution Plan submitted by BF, also submitted in or around

early November 2022, the FH Plan that won the auction, and the BRIC OWD Plan that won the

backup auction:

| *Summary Table – Comparative Analysis: BF Proposed Structure* | | | | |
|---|---|---|---|---|
| | **BF Structure (Proposed)** | **BF OWD** | **Fahrenheit Plan (Proposed)** | **BRIC OWD** |
| *Crypto Distribution* | Convert all crypto to BTC and ETH and distribute to creditors. | Same as BF initial proposal. | Same as BF initial proposal. | Same as BF initial proposal. |
| *NewCo Assets* | Mining, retail lending, illiquid assets, GK8, and 20 percent contribution of BF equity (20 percent of SALT). | Mining, illiquid assets (and/or liquidated and distributed separately), GK8 (or liquidated and | Mining, illiquid assets. | Mining. |

---

[11]     On February 26, 2023, counsel for the Debtor, Ross M. Kwasteniet, P.C., wrote to Mr. Dixon: "I'm
reaching out because we think it would be constructive to facilitate discussions between you, Celsius, NovaWulf,
and the UCC about the NovaWulf plan structure and the path forward. . .".

| | | distributed separately). | | |
|---|---|---|---|---|
| ***Treatment of Illiquid Assets (not NewCo)*** | Liquidation and distribution of proceeds from illiquid assets not included in NewCo (if any). | Same as BF initial proposal. | Same as BF initial proposal, except distribution from GK8. | Same as BF initial proposal, except distribution from GK8 and other illiquid assets. |
| ***Treatment of Retail Loans*** | Loans to be transferred to NewCo. | Option to (i) set off loan principal or (ii) repay loan principal and distribute net crypto. | Same as BF OWD. | Same as BF OWD. |
| ***Refinancing of Retail Loans*** | Within NewCo. | External third party loan operators. | Same as BF OWD. | Same as BF OWD. |
| ***Distribution of NewCo Equity*** | 100% to creditors. | Same as BF initial proposal. | 90% to Creditors; 10% to Fahrenheit (over 5 years). | Same as BF initial proposal. |

31.    As demonstrated by the chart *supra*, BF and Mr. Dixon's two proposed frameworks became the core of the Fahrenheit and BRIC bids.  This was unsurprising, given that BF and Mr. Dixon's structure resulted from careful planning and analysis, and relied heavily on Mr. Dixon's expertise and guidance from BR.  FH later retained BR as its counsel.  The Plan structure had also been widely disseminated on Mr. Dixon's social media channels prior to the announcement that NovaWulf's bid had prevailed (and prior to the auction) and had been well received by a wide range of creditors participating on social media.  Mr. Dixon expressed his unequivocal support for each of the NovaWulf, BRIC and Fahrenheit bids, which meaningfully shaped the competitive nature of the bidding process itself.  *See* Dixon Dec. at ¶ 166.

32.    It is indisputable that Mr. Dixon's work as a Plan Consultant, as requested by the Debtor, conferred a significant benefit in the context of the auction, the Plan itself, and therefore the reorganization process and Estate as a whole.  Among other benefits conferred, Mr. Dixon's services included: (1) pushing for an auction whereby NovaWulf became a stalking horse bidder in order to foster competition among bidders; (2) assisting the negotiations between different creditor constituencies and Ad Hoc groups; and (3) contributing to the settlement of issues in

order to achieve consensus on the final Plan.  *Id.* at ¶¶ 119; *see also* ¶¶ 170-191.

33.     Further, as a Plan Consultant, Mr. Dixon worked with bidders and maintained

open communication with unsecured creditors to keep them appraised of relevant information, as

was requested of him. (*Id.*, ¶131) Mr. Dixon also explained the relevance of other ongoing

litigation between Celsius and its stakeholders, as well as adversary proceedings, and mediations.

(*Id.*, ¶153).  Moreover, Mr. Dixon continued to support five (5) groups of bidders: BRIC, SALT,

NovaWulf, Figure, and FH, which he discussed at length in his videos and in other online fora.

34.     As the bankruptcy case unfolded, Mr. Dixon's communications with unsecured

creditors became more frequent, and at the same time, Mr. Dixon continued to engage in open

discussions and Q&A sessions on X (Twitter) Spaces, which were valuable opportunities to

obtain unsecured creditor feedback.  *See* Dixon Dec. at ¶¶ 121-127.  Mr. Dixon brought such

feedback to the Debtor, bidders, Ad Hoc groups, and the UCC, which was critically important in

his role as a plan consultant up until that point in the case.  Mr. Dixon heard from many unhappy

unsecured creditors who were concerned with the lack of proposed potential distributions being

discussed if the reorganized entity (hereinafter, "NewCo") emerged.  *Id.* at ¶¶ 121-127.)

35.     As a byproduct of such communications, Mr. Dixon also connected groups of

unsecured creditors with one another to form the 'Earn' Ad Hoc, to negotiate with the so-called

'Loan' Ad Hoc, who were offered 85 percent of their collateral, while the 'Earn' unsecured

creditors were set to receive a distribution as low as 8 percent (which would have likely

weakened support for the proposed plan on an equitable basis).  *Id.* at ¶ 128.  Mr. Dixon

introduced members of both constituencies to one another, culminating in the creation of an ad

hoc committee called the 'Earn Ad Hoc' committee, which Mr. Dixon and BF joined as

consultants.  *Id.* at ¶ 134. However, BF and Mr. Dixon remained independent to avoid

compromising Mr. Dixon's position both as a supporter of all creditor groups and plan

consultant. Throughout this time, Mr. Dixon utilized the knowledge gained from BR and DBK

to build upon the solutions he had been refining, which assisted Earn creditors in the

reorganization process, as well as engaging external financial expertise from BF internally,

ATM, and BF's financial advisors.

36.    Mr. Dixon, through BF, also assisted in the creation of a custom feature, which

would enable unsecured creditors to take a 'selfie' with their passport, complete 'Know Your

Customer' ("KYC") verification, and connect their Celsius bank account, which the KYC team

would, in turn, utilize that information to verify claims. *Id.* at ¶ 82. The information would be

put into a database to match individual unsecured creditors with the correct claim, which was

also useful for calculating tax. *Id.* The feature allowed unsecured creditors to meaningfully

influence the proceedings, as well, including the final Disclosure Statement.

37.    Recognizing Mr. Dixon's considerable influence and knowledge in the subject

matter, Mr. Dixon was invited by the UCC to submit himself to an intensive background

investigation and interview process to fill a potential board position on NewCo, for which he,

among others, was being considered. *Id.* at ¶130. Mr. Dixon was honored to be considered for a

leadership position to assist in governing NewCo.

38.    Nonetheless, negotiating the governance structure of NewCo, in particular, the

number of positions on the board for unsecured creditors, and the skills of individuals who would

fill those positions presented a significant issue for Mr. Dixon. *Id.* at ¶¶ 171-187. These issues

created a serious crisis in confidence from creditors who were being asked to fund the operation,

but who assumed minority board representation. *Id.* at ¶ 177. Mr. Dixon implored the parties

negotiating the Plan Support Agreement (the "PSA") to consider the crisis in confidence that

creditors might have if the PSA called for the appointment of four 'independent' board members, who were not creditors of the Estate,—with only two (2) creditors on the Board, by comparison to those of the Plan sponsor, FH.  *Id.* at ¶¶ 177-180. Mr. Dixon understood the appointment of qualified creditors on the Board made more sense, as those individuals held a clear incentive to ensure NewCo was governed properly, as the Plan was indeed funded by creditors, and yet creditors were only to be given a minority representation on the prospective NewCo board.  This particular issue became a central focus for  Mr. Dixon, as creditors of the Estate would have a vested interest in NewCo.

39.    To facilitate the negotiations to finalize the PSA, which carried enormous stakes, Mr. Dixon retained Ervin Cohen & Jessup LLP ("ECJ") and DBK to provide him with guidance on corporate governance and act as the intermediary between himself, and counsel for the other parties to the PSA.  At this juncture, BF's bankruptcy counsel, BR, had been retained by FH to assist in the implementation of the Plan.  *Id.* at ¶ 140). Thus, BF released BR, which left Mr. Dixon in the perilous position of attempting to negotiate the PSA without the aid of counsel at this critical stage.  *Id.* at ¶ 141). As a byproduct of releasing BR, the significant fees and costs incurred to deliver the substantial contributions conferred by BF, by and through Mr. Dixon, remained outstanding.  *Id.*

40.    Consequently, Mr. Dixon retained ECJ to negotiate concerns that were substantive and practical: if Mr. Dixon was unable to obtain the concessions that creditors were seeking, he was uncertain if he could support the Plan and accept his Board observer position; *ergo*, if the negotiations fell through, the Plan could be imperiled as a result of Mr. Dixon's lack of support, as creditors were likely to reject it in following Mr. Dixon's lead as expressed to him by many of the largest creditors in personal messages and smaller creditors on social media.

41.     That said, the parties resolved to continue the negotiations in good faith.  As a testament to the collaborative efforts, Mr. Dixon praised the parties, even as it became clear the PSA would not include additional voting board seats (excluding himself) for unsecured creditors he demanded.  Mr. Dixon, however, as a compromise, made it clear that, if there were additional board observer seats provided for by the PSA, Mr. Dixon, alongside the Earn Ad Hoc committee, would sign on and support the Plan.  Moreover, the PSA includes a provision that supports Mr. Dixon's substantial contribution fees and expenses accrued through his retention of ECJ.

42.     On September 22, 2023, the deadline to vote for the Plan, Mr. Dixon publicly declared his support for the Plan through his social media channels. *See* Dixon Dec. at ¶ 188). Mr. Dixon additionally fielded inquiries from unsecured creditors and demonstrated (via several extensive hours of X Spaces and broadcasting on his YouTube page) how to ensure that their ballots were properly cast.  *Id.*  By many accounts, Mr. Dixon was the sole party in the case with the requisite knowledge and audience to advocate for and support unsecured creditors, which he derived from the analysis, due diligence, and guidance of the professionals he retained, the benefits of which were freely disseminated to his audience for the benefit of the Estate.

43.     It should be noted that the amounts BF, by and through Mr. Dixon, is seeking for substantial contribution, $571,028.50 in fees and $20,859.65 in expenses, is a small fraction of the fees and out of pocket expenses Mr. Dixon and BF have incurred in the case, which total approximately $3.1 million.  The following comparison chart details the key differences between the amounts sought and amounts actually incurred.

| *Substantial Contribution Fees Requested: Actual Amounts Incurred As Compared To Amounts Requested After Voluntary Reduction Through This Application* | | |
| --- | --- | --- |
| **Category** | **Amount ($) (USD)** | **Basis** |
| *Amount incurred, plus additional services (e.g., consultation charge).* | *$3,134,389.10* | Total fees for both (1) actual amounts incurred, and (2) amount of out-of-pocket fees/expenses for beneficial services rendered by Mr. Dixon for the Estate. |
| *Actual amounts incurred.* | *$1,560,455.24.* | Total for actual professional fees, not including out-of-pocket amount for beneficial services rendered provided by Mr. Dixon to the Estate. |
| **Actual amount requested (50 percent reduction).** | **$571,028.50** | **Total is a 50 percent voluntary reduction of all actual fees incurred to retain professionals. No out-of-pocket fees charged for services rendered by Mr. Dixon.  (_Note_: No funds from this Application will be used to pay Mr. Dixon directly).** |

## RELIEF REQUESTED

44.     The Bankruptcy Code provides for the payment of "the actual, necessary expenses" of "a committee ... [of] equity security holders" that have made a "substantial contribution" in a Chapter 11 case. 11 U.S.C. § 503(b)(3)(D).   In addition, section 503(b)(4) of the Bankruptcy Code requires allowance of:

> [R]easonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph ... (D) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(4).

45.     Accordingly, sections 503(b)(3) and (4) permit a debtor to reimburse a party's reasonable professional fees and expenses that were incurred in making a substantial contribution to a bankruptcy case.  *See, e.g., In re Granite Partners, L.P.*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).

/ / /

46.     Whether a substantial contribution occurs is a question of fact.  *See Trade Creditor Grp. v. L.J. Hooker Corp., Inc.*, 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd*, 109 F.3d 349 (2d. Cir. 1996).  Courts have found that a substantial contribution was made when efforts have led to an actual and demonstrable benefit to the debtor's estate, its creditors, and to the extent relevant, the debtor's shareholders.  *See In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008) (quoting *In re U.S. Lines, Inc.*, 103 B.R. 427, 429 (Bankr. S.D.N.Y. 1989)).  In general, "services that confer a significant and demonstrable benefit upon the reorganization process which have not been rendered solely on behalf of a creditor's own interest should be compensated."  *U.S. Lines, Inc.*, 103 B.R. at 430.

47.     Compensable services "foster and enhance - rather than retard and interrupt - the progress of reorganization. Conversely, insubstantial services include those that do not actually increase the size of the estate, or deplete the assets of the estate without providing any corresponding greater benefit."  *Granite Partners*, 213 B.R. at 446 (citations omitted).  "A direct benefit also cannot be established merely by a movant's extensive participation in the case or be based on services that duplicated those of professionals already compensated by the estate, such as counsel for the debtor or an official committee."  *In re Bayou Grp., LLC*, 431 B.R. 549, 561 (S.D.N.Y. 2010) (holding that an applicant cannot recover for services that are duplicative of other professionals in the Chapter 11 case).

48.     Courts view "in hindsight" whether an applicant has made a substantial contribution in the case.  *See Granite Partners*, 213 B.R. at 447.  An "applicant must show a 'causal connection' between the service and the contribution."  *Id*.  The burden of proof is on the applicant to demonstrate by a preponderance of the evidence that it has made a substantial

contribution in the case. *See Short Pump Ent't, L.L.C. v. Randall's Island Family Golf Ctrs. (In re Randalls Island Golf Ctrs., Inc.)*, 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003); *Granite Partners*, 213 B.R. at 445; *In re Best Products Co., Inc.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994).

49.     Courts in the Second Circuit consider various factors when analyzing a request for substantial contribution, including: (i) whether the services benefited a creditor, the estate itself, or all interested parties; (ii) whether the services resulted in an actual, significant and demonstrable benefit to the estate; and (iii) whether the services were duplicated by the efforts of others involved in the case. *See, e.g., Hooker Invs., Inc.*, 188 B.R. at 120; *Best Prods.*, 173 B.R. at 865.

## BASIS FOR RELIEF

50.     The expansive facts and evidence appended to this Motion unequivocally demonstrate that Mr. Dixon has satisfied the standard to establish substantial contribution under section 503(b) by a preponderance of the evidence.  Mr. Dixon's efforts in this case not only maximized potential returns to the Estate and unsecured creditors, but also played a key role in confirming the Plan by garnering overwhelming support in favor of the same.  As a result, and as demonstrated below, each factor in the relevant three-prong test is satisfied.

I.    **BF and Mr. Dixon have Made a Substantial Contribution to This Chapter 11 Proceeding Based on a Preponderance of the Evidence**

A.    **Contributions Made By BF and Mr. Dixon Benefitted The Estate and All Interested Parties**

1.    *Phase I—Development And Foundation Of Plan*

51.     Since the Petition Date, Mr. Dixon has made significant contributions to the Estate through, among other things, the dissemination of digestible information to unsecured

creditors while acting as a repository (informally) and a voice of reason.  As demonstrated in the exhibits attached to this Application, Mr. Dixon's outreach has facilitated the participation and understanding of lay audiences, which enhanced these proceedings and unequivocally furthered the reorganization process as a whole.

52.      Moreover, BF, by and through Mr. Dixon's efforts, conferred substantial contributions upon the Estate, which were not incidental to a service already being provided. Here, there were no other entities or individuals in this case who could confer the value that Mr. Dixon provided to this Estate and its unsecured creditors.  *See In re Bayou Grp., LLC*, 431 B.R. at 565 (discussing benefits conferred by "creative and novel" strategy in approving substantial contribution).  The facts that Mr. Dixon was hired as a Plan Consultant by the Debtor and was later requested to communicate information specific to this case to his audience of unsecured creditors and other parties in interest, *at the behest of the Debtor and UCC*, further establishes the uniqueness of Mr. Dixon's contributions.  The Debtor, various parties in interest, their counsel, and the unsecured creditors all recognize Mr. Dixon's contribution added value, which could not be duplicated.  Mr. Dixon's services conferred significant benefits, and his views had significant influence over not only the substantive aspects of the Plan, but also unsecured creditors' perception of the Plan, which was critical in order to obtain a vote in favor of the Plan.

53.      Mr. Dixon's videos and discussions added value because of his ability to highlight and provide succinct, understandable summaries of the proceedings. He also built trust with unsecured creditors and other parties in interest, while encouraging the parties to resolve disputes and educating creditors about a myriad of issues.  All of these activities amounted to cost-savings to the Estate in light of the financial resources otherwise required to communicate with tens of thousands of unsecured creditors, assuming someone of Mr. Dixon's expertise could be

otherwise identified. These cost-savings also include the considerable effort that Mr. Dixon undertook by strongly advocating for settlement of disputes to avoid protracted litigation.

54. At the beginning of the case, Mr. Dixon was informed by counsel for prominent parties and committees that many of the attorneys retained by those parties relied on Mr. Dixon's videos as an educational tool to understand basic elements of cryptocurrency company restructuring issues. This, in addition to the feedback, financial analysis, and legal implications Mr. Dixon gained from working with retained professionals, was conveyed in a format readily understood by creditors for the benefit of the Estate and the reorganization process as a whole.

55. Mr. Dixon made clear to his audience that he intended his outreach to be viewed as deferential to and supportive of this Court, the Office of the United States Trustee, legal counsel employed by the Estate, the parties, and the rule of law generally. In other words, Mr. Dixon upheld his responsibility to act in the best interests of the Estate by refraining from arguments and representations that would benefit him and his interests alone and waste the resources of the Estate. It is evident that prominent voices in this case also viewed Mr. Dixon's contributions as beneficial, as among other notable invitations, Mr. Dixon was requested to attend a mediation held by the Debtor, the UCC, the Earn Ad Hoc and the Loan Ad Hoc.

56. The *raison d'etre* for BF's instant Application is a consequence of the fact that Mr. Dixon was *not* formally employed by the Estate pursuant to a Court order. Rather, in every aspect of his involvement with the case, Mr. Dixon's contributions were, in essence, consistent with the expectations that this Court has for the professional employed by the Estate. It is consistent with the Code that Mr. Dixon receive reimbursement for a fraction of BF's out-of-pocket professional fees for conferred services that were beneficial to the Estate.

57. Mr. Dixon's engagement with his online audience, as well as his background and

qualifications, make him uniquely qualified to articulate complex issues at the intersection of cryptocurrency and bankruptcy reorganization. Through education and knowledge gained through working with BR, ECJ, as well as DBK, and ATM, Mr. Dixon has become a trusted source to convey complicated information to lay audiences, including the development of a comprehensive framework that aided the structure and shape of the initial bidding process.

58.    During Phase I, prior to NovaWulf's, Fahrenheit, and BRIC's prevailing bid, BR advised Mr. Dixon on restructuring and compliance matters to assess the feasibility of creating a structure to return creditors 100 percent of their remaining crypto assets, and 100 percent of their illiquid assets. In that vein, Mr. Dixon worked closely with the UCC and the Debtor and disseminated information through videos published online about various hurdles to the confirmation of a plan with such a provision, including a disaggregated explanation of the specific issues affecting the Earn, Collateral, Stablecoins, Custody, Withold, Suspended, Liquidated Loans, Shareholders, and CEL token. Many, if not all, of Mr. Dixon's videos run for over an hour, and contain slide presentations and tips to demonstrate how to cast one's ballot.

59.    In large part, the structure BF and Mr. Dixon developed with the aid of BR and DBK during Phase I, for which Mr. Dixon advocated in discussions with representatives of various constituencies and discussed at length online, became a central facet of the prevailing bid submitted eventually by NovaWulf, FH, and BRIC. FH later retained BR to aid in advancing the structure proposed by BF and Mr. Dixon. This structure, as it later appeared in the NovaWulf, Fahrenheit and BRIC bids, entailed a crypto distribution of ETH and BTC, without a distribution of Celsius Network Token ("CEL") to avoid regulatory issues and delay the approval of the Plan.

60.    Therefore, Mr. Dixon's contribution was aimed at facilitating and consummating a plan that the U.S. Securities and Exchange Commission would not object to, thus becoming the

first cryptocurrency platform to comply with rigorous securities laws in the United States when it emerges from Chapter 11.  This feature alone appears to differentiate this case from other recent cryptocurrency bankruptcies, which have also been unable to obtain such results.

61.    Additionally, critical elements of Mr. Dixon's proposed structure included: (1) pooling all illiquid assets into NewCo which would be 100 percent owned by creditors and would generate additional returns through diversified businesses operated by NewCo in the cryptocurrency sector (e.g., 'Proof of Work' Mining, 'Proof of Stake' Staking, refinancing loan solutions, securities law compliant business);  and (2) establishing a litigation trust, which would allow for affected unsecured creditors to pursue causes of action and seek damages.  All of these ideas were proposed by Mr. Dixon for to benefit unsecured creditors and the Estate, as well to facilitate the reorganization process, generally.

62.    As discussed *infra*, a comparative analysis between the FH and BRIC bids reveals that much of post-auction structure and the material aspects were identical to Mr. Dixon's published framework and structure, which he discussed extensively in a seven-part series posted online in October 2022.  Given the inclusion of his ideas in the Plan, Mr. Dixon's public support for the final Plan was an obvious choice. Once FH became the Plan sponsor, Mr. Dixon's footprint and structure were cemented into the Plan, which was approved with overwhelming support by unsecured creditors.

63.    BF, by and through Mr. Dixon, expended considerable financial resources to pay professionals for their fees and expenses to research, investigate, analyze, and formulate a structure that became a core feature of the FH bid.  Equally important, BF's counsel assisted Mr. Dixon in successfully articulating the byproduct of this research to an audience of unsecured creditors with varying degrees of familiarity with the subject matter.  As demonstrated by the

overwhelming majority of unsecured creditors who voted in favor of the Plan, and the comments

submitted by unsecured creditors attached to this Application, the regulatory analysis, due

diligence, and comment on creditors' legal strategy was a benefit to the Estate as whole beyond

'extensive participation' alone.  *See In re Granite Partners,* 213 B.R. at 445.

64.     The benefits BF and Mr. Dixon consistently provided to the Estate and its

creditors during 'Phase I' improved creditors' perception of the bankruptcy process through the

communication of feasible solutions developed in conversation with the creditor community.

*See In re Best Products Co.*, 173 B.R. at 866 ("[C]ompensation is limited to those extraordinary

actions . . . that lead an 'actual and demonstrable benefit . . .".)  The product of Mr. Dixon's

retention of BR and DBK deepened his understanding of the bankruptcy process, which he, in

turn, conveyed to his audience with the goal of clarifying issues and removing obstacles in order

to achieve consensus.

65.     During the first phase of his involvement in the case, BF and Mr. Dixon's

contributions included, among others, the following:

| Summary of BF's 'Phase I' Contributions | |
|---|---|
| **Contribution** | **Brief Description** |
| **COMMUNICATION/DISSEMINATION OF INFORMATION TO UNSECURED CREDITORS** | • Regular/consistent outreach to creditors in published videos posted to YouTube;<br>• Engaged unsecured creditor community, provided fundamental information to international creditors, proposed solutions to affected creditors, many of whom had lost their entire investments in Celsius. |
| **DEVELOPMENT OF EQUITABLE SOLUTIONS TO INCORPORATE INTO FUTURE PLAN** | • With aid of counsel, conducted extensive research, regulatory analysis, and due diligence;<br>• Utilized results to form the basis of an equitable plan for unsecured creditors that went beyond liquidation.<br>• Published information online in order to provide comparative analysis to unsecured creditors. |
| **ENDORSEMENT OF PREVAILING BID** | • Publicly supported NovaWulf's prevailing bid;<br>• Comprehensive framework embedded into prevailing bid, which in turn, became incorporated into Plan. |

| LOOKED FOR OPPORTUNITIES TO BUILD CONSENSUS | <ul><li>Introduced Loan Ad Hoc creditors to larger Earn creditors, who in turn formed the Earned Ad Hoc committee;</li><li>Joined Earn Ad Hoc committee as an advisor and provided insights, strategy, and suggestions;</li><li>Publicly endorsed settlement of issues to avoid protracted litigation that would cost the Estate and delay reorganization.</li></ul> |
| SERVICES REQUESTED BY MAJOR CONSTITUENTS | <ul><li>Invited by parties to join mediation session to help resolve issues between Earn Ad Hoc, Loan Ad Hoc, UCC and Celsius;</li><li>Interviewed for position on NewCo board;</li><li>Retained as unpaid plan consultant.</li></ul> |

### 2.    *Phase II—Approval of Chapter 11 Plan*

66.    Mr. Dixon's role as a prominent voice and key stakeholder expanded even further in 'Phase 2,' as the deadline to vote on the proposed Plan approached.  As the pace quickened, Mr. Dixon continued to stringently voice concerns on behalf of unsecured creditors about the complexities and developments that could harm unsecured creditors' interests— in particular, the proposed board composition of NewCo, as proposed by UCC, as well as the implementation of key features that could enhance returns to unsecured creditors.

67.    With respect to the specific features in the Plan, BF and Mr. Dixon submitted analysis and frameworks to the Earn Ad Hoc (based upon the Disclosure Statement's valuation analysis) regarding the impact on estimated recoveries, as well as on important governance issues.   The Debtor's expressed skepticism that the Earn Ad Hoc represented a sufficiently large group of unsecured creditors.  In response, Mr. Dixon demonstrated that $627.8 million in claims had been pledged by 5,998 individual unsecured creditors in support of the Earn Ad Hoc.  BF verified the identities and claim information against the *Statement of Financial Affairs* [Docket No. 974].  An additional 2,320 creditors also pledged support, with verification work ongoing. In total, at least 8,318 submissions from unsecured creditors were received to support the Ad Hoc Earn Group's Reservation of Rights, to the chagrin of the Debtor.

68.    Mr. Dixon's contributions continued to the final weeks of negotiations regarding NewCo's governing board.  Around this time, Mr. Dixon was offered a board observer role by

the UCC, having submitted himself for an interview for a board position, though he was reluctant to accept the position without the UCC's willingness to increase the size of the Board or replace the candidates proposed as potential Board members.  Given the protracted nature of the negotiations, BF and Mr. Dixon retained ECJ as counsel to aid him in addressing the key concerns of unsecured creditors, as BR was retained by FH.  ECJ's counsel to BF and Mr. Dixon directly benefitted the negotiations of the PSA signed by the key stakeholders and constituency groups.

69.    Thereafter, Mr. Dixon advocated for the increase in board member seats from seven (7) to nine (9) members, or in the alternative, proposed to keep seven (7) members, with the caveat that four (4) Board seats be reserved specifically for qualifying creditors.  As ECJ advanced discussions with the UCC on these topics, Mr. Dixon continued to vocalize his view, as discussed by unsecured creditors, that unless the board composition was changed and roles were occupied by unsecured creditors other than himself, there could be a considerable crisis in the confidence of unsecured creditors who would be reluctant to vote to approve the Plan that would result in a governing structure that may not have reflected the views of unsecured creditors, or benefit the Estate, despite the UCC's role as a fiduciary to creditors.

70.    On the eve of the deadline to vote on the Plan, Mr. Dixon, ECJ, and the parties, including the UCC and the Earn Ad Hoc committee, negotiated the final version of the PSA, which provided for three (3) board observers, one of whom would be Mr. Dixon.  However, the UCC was unwilling to agree to appointments of unsecured creditors to occupy positions as board members.  Though Mr. Dixon was disappointed by the UCC's recalcitrance to replace their recommended 'independent' board members with unsecured creditors, Mr. Dixon weighed the consequences if he decided to withdraw his support for the Plan, which would have likely caused

significant delay and jeopardized the Plan, and perhaps the entire prospect of reorganization itself. Thus, on the morning of the deadline to vote on the Plan, Mr. Dixon, by and through his counsel at ECJ, ratified the PSA. Thereafter, Mr. Dixon spent in excess of seven (7) hours on YouTube Twitter Spaces to answer questions about supporting the Plan, as well as the mechanics of the voting process. The Plan was approved with overwhelming support of the unsecured creditors.

| Summary of BF's and Mr. Dixon's 'Phase II' Contributions | |
|---|---|
| **Contribution** | **Brief Description** |
| **COMMUNICATION/DISSEMINATION OF INFORMATION TO UNSECURED CREDITORS** | <ul><li>Clear messaging regarding ballot/voting process;</li><li>Invited to attend mediation on July 17, 2023 (including the Debtor, Ad Hoc Earn Group, Ad Hoc Loans Group, and Fahrenheit);</li><li>Provided insight and analysis of negotiations regarding the PSA, and in particular, proposed governance structure of NewCo;</li><li>Built trust/communication with UCC, Earn Ad Hoc, counsel.</li></ul> |
| **PSA/NEWCO GOVERNANCE** | <ul><li>Deployed strategy to negotiate additional board seats;</li><li>Developed arguments for appoint three (3) Board observers;</li><li>Numerous discussions/hours spent in negotiations.</li></ul> |
| **ENDORSEMENT OF PLAN** | <ul><li>Publicly supported and endorsed approval of final bid;</li><li>Reached compromise with UCC;</li><li>Signatory to PSA.</li></ul> |

## B. Such Contributions Were Actual, Significant and of Demonstrable Benefit to The Debtors' Estates

71.     Among the numerous contributions that are actual, significant, and demonstrable, it is difficult to select one (as demonstrated by the volume of comments and responses attached to this Application). That said, perhaps the best example of Mr. Dixon's comprehensive structure and framework became the bedrock of the prevailing bid. To understand the influence of Mr. Dixon's framework, *see supra* "*Summary Table – Comparative Analysis: BF Proposed Structure*" summarizes BF's proposed reorganization structure (proposed in or around November 2022), the FH Plan, and the BRIC OWD Plan.

72.     Since the Petition Date, Mr. Dixon has conducted over 100 live video sessions

and contributed countless hours of content to his YouTube page.  In addition, more recently, Mr.

Dixon received dozens of messages from creditors providing their specific views on Mr. Dixon's

substantial contribution to the Estate, a true and correct copy of those responses is attached as

Exhibit F to the Dixon Dec. filed concurrently herewith.

73.    Through this Application, BF and Mr. Dixon are not seeking reimbursement for

Mr. Dixon's time or the total amount of professional fees and out of pocket expenses. If those

total amounts were quantified, it is likely that such fees would exceed $1.5 million for those out

of pocket expenses alone.  The fees sought through this Application have been **voluntarily**

**reduced** in light of the fact that unsecured creditors of the Estate have already been victimized

through significant loss of their investments.  Mr. Dixon's contributions, to the extent they are

quantified, cannot account for the immeasurable value conferred upon unsecured creditors in

quelling the anxieties of those in his audience, some of whom expressed resolve to take their

own lives prior to engaging with Mr. Dixon's community online.[12]  By comparison, the amount

Mr. Dixon seeks to be reimbursed for investigating, conducting research, analyzing, and

conveying accurate information to unsecured creditors is far less than the *monthly* sums that the

Debtor and the UCC seek on behalf of their counsel's fee applications (which is on the order of

millions of dollars).  Absent the services Mr. Dixon provided to the Estate, especially through his

online social media activities, the Estate would have spent tens of millions of dollars to

communicate the level of detail that unsecured creditors received from Mr. Dixon.

74.    Through this Application, BF, by and through Mr. Dixon, has demonstrated that

the value of his services is far greater than the amount for which he seeks reimbursement.  BF

---

[12]    As unsecured creditor Lubna Imtiaz wrote to Mr. Dixon regarding his contributions, "Without Simon
Dixon I would have committed suicide.  I am an old disabled woman and my entire life savings are on Celsius.  I
had no idea what has been going [on] and although not perfect, Simon has been a reliable guide through the process.
. .".

and Mr. Dixon's contributions to this case yielded the ultimate benefit to the Estate through his public support for the Plan, as there exists a direct causal link to the overwhelming number of 'yes' votes in favor of the Plan and Mr. Dixon's vocal optimism that it was, indeed, beneficial for unsecured creditors and the Estate as a whole. Despite the crisis in confidence regarding the UCC's proposed board governance structure, at a critical moment in the case, Mr. Dixon made it his goal to communicate developments to unsecured creditors, as he was intimately involved in the process—and no other individual in this case had the means to do so—which, in other circumstances, may have resulted in unsecured creditors rejecting the reorganization process due to the information deficit, lack of transparency, and the inability to listen to a trusted communicator to unite the constituencies.

       1.    *Services Were Unique and <u>Not</u> Duplicative of Others*

75.    The efforts and contributions of BF, by and through Mr. Dixon, were not duplicative of the contributions made by others for several reasons, including, among others:

> (a) Core elements of BF's initial proposed structure became core elements of the bid and final Plan proposal, as discussed *supra*;
>
> (b) Invited by counsel for UCC (Mr. Colodny) to participate in mediation, which included the Debtor, UCC, Ad Hoc Earn Group, Ad Hoc Loans Group, FH, and BF/Mr. Dixon.

76.    Ultimately, the final Plan set for confirmation incorporated central facets of the very proposals that BF and Mr. Dixon created. That fact alone speaks volumes about the value of BF, by and through Mr. Dixon, as an active voice and participant in these proceedings, namely, that Mr. Dixon's services/benefits were not duplicative of others—rather, others in this case duplicated his services.

77.    With respect to BF's and Mr. Dixon's services in disseminating information about this case through his online social media presence, there is simply no one else involved in this

matter that has a similar profile to Mr. Dixon, given the uniqueness of his background,

experience, and inherent ability to articulate complicated/technical matters involving

cryptocurrency and key aspects of reorganization under the Code.

78.     For the reasons discussed *supra*, the Court should find that BF and Mr. Dixon

have made a substantial contribution to this Chapter 11 proceeding, including, but not limited to,

that it provided an actual, necessary or demonstrable benefit to the Debtors' estates under

sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.

## II.     BF's Counsel's Fees and Expenses are Reasonable

79.     Having established a substantial contribution, the next issue this Court addresses

is whether the fees of BR and ECJ, both acting as counsel to BF and Mr. Dixon, meet the

remaining criteria of being reasonable based on the time, nature, extent, and value of the services

rendered and whether related expenses are actual and necessary.  *See* 11 U.S.C. § 503(b)(4).

80.     BR's total fees and expenses ($445,376.99) for which reimbursement of only 50

percent is sought, totaling $222,688.50, representing the actual and necessary fees and expenses

to date in light of the time and labor required, skills necessary, and the customary fees and

expenses being charged, as discussed *infra*.

81.     ECJ's total fees and expenses of $239,306.00 represent (1) the actual and

necessary fees and expenses through the effective date of the Plan in light of the time and labor

required, skills necessary, and the customary fees and expenses being charged, as discussed

*infra*, and (2) reasonable future fees and expenses that are anticipated through October 24, 2023

(or the continued date of the hearing on this matter), in an amount not to exceed $50,000.00 in

connection with making an appearance and responding to any anticipated objections to this

Application.

III.    **DBK's Fees and Expenses Represent Actual, Necessary Expenses**

82.     Pursuant to 11 U.S.C. § 503(b)(3)(D), for those "actual, necessary expenses, other than compensation specified in paragraph (4)" of the same subsection, incurred by BF and Mr. Dixon in retaining DBK, who accrued total fees and expenses ($118,068.00), of which reimbursement of only 50 percent is sought as a voluntary reduction, totaling $59,034.00, represent the actual, necessary fees and expenses to date in light of the time and labor required, skills necessary, and the customary fees and expenses being charged, as discussed *infra*.

A.      **Time and Labor Required, and Skills Necessary**

83.     ECJ, BR, and DBK performed significant analysis and diligence regarding a new frontier of issues concerning bankruptcy and crypto currency, much of which was unprecedented.  Counsel assisted him in laying the foundational elements that later became central to the Plan in its current state.  ECJ specifically assisted BF, by and through Mr. Dixon, to successfully negotiate the PSA, which resulted in significant benefits to the Estate and its creditors.  Further, Mr. Dixon has agreed to accept one of three Board Observer positions on NewCo.  The analysis and complex legal issues, which were critical to the community from Petition Date, through the present, resulted in a Plan that other similar Chapter 11 bankruptcies have not yet been able to achieve.

*1.      Customary fees and expenses are reasonable*

84.     In light of the substantial benefit conferred to the Debtors' estates, as discussed *supra*, the fees and expenses of BF's professional advisors are reasonable, and moreover, represent far less than fees and expenses accruing on a monthly basis, as evidenced by interim fee application submitted in this case.  The United States Trustee, in light of the attached invoices, is permitted to review and object to such fees and expenses and assess the

reasonableness of the rates therein.

85.    The hourly rates and expenses of BR and ECJ, as well as DBK, are similar to those fees and hourly rates that are routinely approved for payment, and moreover, the amount of time, spent, and level of staffing, also are consistent with the time and effort expended in this case.  Other courts in the Second Circuit have approved similar fees and expenses.

86.    Accordingly, BF, by and through Mr. Dixon, respectfully submits that its fees and expenses incurred to date are, and fees and expenses likely to be incurred in the future will be reasonable and appropriate, and meet the criteria of section 503(b)(4) of the Bankruptcy Code.

87.    The relevant fees of ECJ and BR are summarized below:

| Fees and Rates of Ervin Cohen & Jessup, LLP | | | | |
|---|---|---|---|---|
| Timekeeper | Timekeeper Category | Hourly Rate | Hours | Amount |
| Chris Manderson | Attorney & Corporate Partner | $975/hr | 124.70 | $121,582.50 |
| Robert Waxman | Attorney & Litigation Partner | $975/hr | 8.00 | $7,800.00 |
| Alex Leitch | Attorney & Corporate Associate | $695/hr | 36.50 | $25,367.50 |
| Isabelle Vidro | Attorney & Litigation Associate | $595/hr | 27.70 | $16,481.50 |
| Chase Stone | Attorney & Bankruptcy Associate | $555/hr | 74.40 | $41,292.00 |
| Sara Gardner | Attorney& Corporate Associate | $525/hr | 1.30 | $682.50 |
| Juliet White | Paralegal | $450/hr | 58.00 | $26,100.00 |
| **Total:** | | | | **$239,306.00** |

| Fees and Rates of Brown Rudnick LLP | | | |
|---|---|---|---|
| Timekeeper | Timekeeper Category | Hourly Rate | |
| Steven B. Levine | Attorney | $1,450/hr | |
| William R. Baldiga | Attorney | $1,570/hr | |
| Clara Krivoy | Attorney | $1,015/hr | |
| **Total:** | | | **$445,377.00** |
| **50% of Total Sought in this Application:** | | | **$222,688.50** |

## NO PRIOR REQUEST

88.    No prior request for the relief sought in this Application has been made to this or any other court.

## RESERVATION OF RIGHTS

89.    This Application is without prejudice to BF and Mr. Dixon's seeking payment of

fees and expenses on any other applicable grounds, and Mr. Dixon specifically reserves all

rights.

## MOTION PRACTICE/LOCAL RULE 49

90.    This Application includes citations to the applicable rules and statutory authorities

upon which the relief requested herein is predicated and a discussion of their application to this

Application.  Accordingly, BF and Mr. Dixon submits that this Application satisfies Local Rule

90131(a).

## NOTICE

91.    Notice of this Application will be provided in accordance with the *Amended Final*

*Order Establishing Certain Notice, Case Management and Administrative Procedures and*

*Granting Related Relief* [Docket No. 1181].  Mr. Dixon and BF respectfully submit that no

further notice is required.

## CONCLUSION

92.    WHEREFORE, BF, by and through its CEO, Mr. Dixon, respectfully requests

that the Court: (i) approve the Application; (ii) enter an order substantially in the form attached

hereto as **Exhibit A** authorizing the Debtor to pay the sum of $571,028.50 for reasonable

professional fees and $20,859.00 in expenses already incurred to date, which includes a sum not

to exceed $50,000.00 for future reasonable fees and expenses of ECJ in connection with the

filing of this Application through and until the Effective Date of the Plan, on account of the

substantial contribution to these cases; and (iii) grant such other and further relief as may be just

and proper.

DATED:    October 2, 2023

Respectfully submitted,

By: _____ /s/ William Christopher Manderson
William Christopher Manderson, Esq. (*pro hac vice*)
    cmanderson@ecjlaw.com
David Tarlow, Esq.
    dtarlow@ecjlaw.com
Chase A. Stone, Esq. (*pro hac vice*)
    cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Email: cmanderson@ecjlaw.com

*Attorneys for Simon Dixon and BNK To The Future (BF)*

# EXHIBIT A

**ERVIN COHEN & JESSUP LLP**
David Tarlow, Esq.
  dtarlow@ecjlaw.com
William Christopher Manderson, Esq. (admitted *pro hac vice*)
  cmanderson@ecjlaw.com
Chase A. Stone, Esq. (admitted *pro hac vice*)
  cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325
cmanderson@ecjlaw.com

*Attorneys for Simon Dixon and BNK To The
Future (BF)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING APPLICATION OF BNK TO THE FUTURE (BF)
PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE
AND PAYMENT OF PROFESSIONAL FEES AND EXPENSES
<u>INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION</u>**

Upon consideration of the *Application Of BNK To The Future Pursuant To 11 U.S.C. §§*

*503(b)(3)(D) And 503(b)(4) For Allowance And Payment Of Professional Fees And Expenses*

*Incurred In Making A Substantial Contribution* (the "<u>Application</u>") [Docket No. __]; and after

due notice pursuant to this Court's *Second Amended Final Order (I) Establishing Certain Notice,*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Case Management, and Administrative Procedures, and (II) Granting Related Relief* [Docket

No. 2560], and that *Notice Of Further Revised Schedule For Substantial Contribution*

*Applications* [Docket No. 3498], and this Court having jurisdiction to consider the Application

and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and

venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

sufficient notice of the Application having been provided; and it appearing that no other or

further notice need be provided; and the Court having reviewed Application, the Dixon

Declaration, and the amounts requested as set forth on Schedule A attached hereto; and after due

consideration and upon all of the proceedings had before the Court, and sufficient cause

appearing therefor, it is hereby

1.      **ORDERED** that the Application is granted in its entirety; and it is further

2.      **ORDERED** that the Debtors are authorized and directed to pay the Fees and

Expenses incurred by incurred by creditor BNK To The Future ("BF"), by and through its CEO,

and individual creditor of the Estate, Simon Dixon ("Mr. Dixon") (together, the "Applicants"),

incurred by the Applicants from the Petition Date through and including October 2, 2023, as

Administrative Expense Claims and in the amounts set forth in Schedule A attached hereto in the

amount of $536,722.50; and it is further

3.      **ORDERED** that as soon as practicable after entry of this Order, counsel for

Applicants, Ervin Cohen & Jessup LLP ("ECJ") shall serve copies of all supporting billing

statements/invoices (including those of ECJ, Brown Rudnick LLP ("BR"), and DBK Financial

Services Ltd. ("DBK") to the Debtors, the Unsecured Creditors Committee, and counsel for the

Office of the United States Trustee (the "U.S. Trustee").  Notice of the filing of an objection to

Applicants' supporting billing statements/invoices must be served upon Applicants, and ECJ, by

no later than fourteen (14) days following the service of such documentation upon the above-referenced parties.  If, after the expiration of the fourteen (14) days following service of the invoices/billing statements, there is no objection to any invoice, then the Debtors are authorized and directed to pay the Fees and Expenses in the amounts set forth in Schedule A attached hereto on the later of three (3) business days after the two (2) week notice period expires, or the Plan's Effective Date; and it is further

4.      **ORDERED** that any dispute arising from Applicants' billing statement/invoice (such as in relation to any entry and/or a portion of such fees and expenses) shall stay the payment of the related amounts to be paid, until the objection is resolved by stipulation and/or by this Court after notice and hearing in accordance with the relevant Rules of Federal Bankruptcy Procedure and Title 11 of the U.S. Code.  Absent an objection, the amounts set forth, as set forth in Schedule A shall be promptly paid to Applicants by the Debtors in accordance with the deadlines specified in this Order; and it is further

5.      **ORDERED** that such payments may be made on the Effective Date of the Plan, or as soon thereafter as practicable; and it is further

6.      **ORDERED** that this Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated: October __, 2023
     New York, New York

_____
          The Honorable Martin Glenn
     CHIEF UNITED STATES BANKRUPTCY JUDGE

# SCHEDULE A

**SCHEDULE A: SUMMARY OF FEES AND EXPENSES IN CONNECTION WITH
APPLICATION OF BNK TO THE FUTURE (BF) PURSUANT TO 11 U.S.C. §§
503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF PROFESSIONAL
FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION**

| Professional | Total Fees | Total Expenses |
|---|---|---|
| Brown Rudnick LLP[1] | $222,688.50 | $491.65 |
| Ervin Cohen & Jessup LLP[2] | $289,306.00 | $20,000.00[3] |
| DBK Financials Services[4] | $59,034.00 | $368.00 |
| **Grand Total Requested:** | $571,028.50 | $20,859.65 |

---

[1]    BF, by and through Simon Dixon, voluntarily reduces the amount of Brown Rudnick LLP's fees by 50 percent.

[2]    Ervin Cohen & Jessup LLP's fees total $289,306.00, with anticipated fees in connection with the future appearance and preparation of responses to objections to the Application, and other matters through the Effective Date of the Plan.

[3]    Estimated based upon fees to serve parties with filings, including anticipated filings.

[4]    BF, by and through Simon Dixon, has agreed to voluntarily reduce the amount of DBK Financials Services fees by 50 percent.